**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS, | Case No. 1:24-cv-05948-JLR-OTW |
| Plaintiffs, | **COMPLAINT IN INTERVENTION** |
| DAVID BREDT and GEOFFREY PITT, | **JURY TRIAL DEMANDED** |
| Intervenor-Plaintiffs, | |
| v. | |
| CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS, | |
| Defendants. | |

Intervenor-Plaintiffs Dr. David Bredt and Dr. Geoffrey Pitt (the "Neuroscientist Plaintiffs"), by way of this Complaint in Intervention against Defendants Cassava Sciences, Inc. ("Cassava"), Remi Barbier, and Dr. Lindsay Burns (collectively, "Defendants"), state and allege as follows:

## NATURE OF THE ACTION

1.      By this Complaint in Intervention, the Neuroscientist Plaintiffs bring this action to recover damages caused by Defendants' prosecution of a baseless defamation lawsuit against them in retaliation for their efforts to raise legitimate concerns regarding anomalies in the data published by Cassava in support of the clinical trials for its drug simufilam.

2.      The Neuroscientist Plaintiffs are accomplished scientists who availed themselves of the Citizen Petition ("CP") mechanism designed to alert the Food and Drug Administration ("FDA") to public concerns about drug-related matters.  They presented their concerns with the research of Cassava's lead scientists—Dr. Hoau-Yan Wang, a professor at the City University of New York ("CUNY"), and Dr. Lindsay Burns, Cassava's former Senior Vice President ("SVP") of Neuroscience—in exacting factual detail, requesting that the FDA further investigate the data that Cassava itself admitted contained "problems" and "errors."

3.      In fact, prior to the Neuroscientist Plaintiffs' submission of the CP to the FDA, Defendants were already aware—and had been counseled by a scientific advisor—that Dr. Wang's Phase 2 results were not to be believed.  One member of Cassava's scientific advisory board stated that he "flat-out did not believe" certain of the Phase 2 results and Dr. Burns herself called the data "frankly unbelievable."[1]

---

[1] *See* Second Supplemented Consolidated Complaint for Violations of the Federal Securities Laws ¶ 319(e), *In Re Cassava Sciences, Inc. Securities Litigation*, No. 21-cv-00751-DAE (W.D. Tex.), ECF No. 259.

4.    But rather than resolving the legitimate concerns raised by the Neuroscientist Plaintiffs, Defendants instead commenced a defamation action captioned *Cassava Sciences, Inc. v. Bredt, et al.*, No. 22-cv-09409-GHW-OTW (S.D.N.Y.) (the "Defamation Action") against the Neuroscientist Plaintiffs and other defendants who raised similar concerns about Defendants' practices.  The Defamation Action was legally deficient and manifestly designed to retaliate against Cassava's critics by imposing crushing litigation costs on them and damaging their professional and personal reputations.

5.    At the time they commenced the Defamation Action, Defendants knew that they lacked the evidence necessary to dispute the Neuroscientist Plaintiffs' claims.  Indeed, Defendants were already aware of the "lack of experiment logbooks/notebooks for all study/research work being performed" by Dr. Wang and had already concluded that his lab was "unacceptable" and "not qualified to provide biomarker analysis."  Yet, Defendants commenced and continued the Defamation Action to suppress criticism and conceal their misconduct without regard for the lack of veracity of their claims.

6.    The Defamation Action's deficiencies as a matter of law were later confirmed by the District Court, which dismissed the claims against the Neuroscientist Plaintiffs with prejudice. And the concerns the Neuroscientist Plaintiffs raised to the FDA have since been corroborated by investigations by the FDA, as well as the Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), and CUNY.  In particular, the government agencies have agreed with the key concerns raised in the CP:  that simufilam's key preclinical data were fabricated; that Cassava's Phase 2b biomarker data were manipulated by Dr. Wang with the help of Dr. Burns; and that Cassava's Phase 2b cognitive data were manipulated by Dr. Burns.

7.     These findings substantiate the long-running concerns from the Neuroscientist Plaintiffs and others about simufilam's underlying science and research, which Cassava so desperately attempted to conceal.  In the wake of these findings and consistent with the concerns raised by the Neuroscientist Plaintiffs in the CP, Cassava finally confirmed on November 25, 2024, that it will stop all trials of simufilam, after a late-stage clinical study revealed that as compared to a placebo, the drug failed to reduce cognitive or functional decline or to improve biomarkers in patients with mild-to-moderate Alzheimer's disease.

8.     As a result of the lawsuit, the Neuroscientist Plaintiffs have been forced to incur substantial legal expenses, lost meaningful business opportunities, and suffered significant additional economic and non-economic harm.  Cassava's lawsuit and intimidation campaign have also seriously harmed the public by stifling legitimate scientific and popular discourse related to simufilam and Alzheimer's research.

9.     Accordingly, the Neuroscientist Plaintiffs seek to recover their costs and attorney's fees, other compensatory damages, and punitive damages against Cassava, its former CEO Remi Barbier, and its former SVP of Neuroscience Dr. Lindsay Burns.

## **PARTIES AND JURISDICTION**

10.     Intervenor-Plaintiff Dr. David Bredt is a citizen of California.

11.     Intervenor-Plaintiff Dr. Geoffrey Pitt is a citizen of New York.

12.     Defendant Cassava is a publicly traded corporation incorporated in Delaware with its principal place of business in Austin, Texas, and thus a citizen of Delaware and Texas.

13.     Defendant Remi Barbier is a citizen of Texas.

14.     Defendant Dr. Lindsay Burns is a citizen of Texas.

15.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 exclusive of interest and costs, and complete diversity of citizenship exists between the Neuroscientist Plaintiffs and Defendants.

16.     This Court has personal jurisdiction over Cassava because this action arises out of Cassava's filing and prosecution of the Defamation Action in New York.

17.     This Court has personal jurisdiction over Barbier and Dr. Burns (together, the "Individual Defendants") because this action arises out of the Defamation Action initiated and prosecuted in New York at their direction and under their supervision.

18.     The Individual Defendants have each purposefully and personally engaged in conduct in New York related to the transactions underlying this action, including through their control over the prosecution of the Defamation Action, their roles as Cassava's primary actors and spokespersons concerning the Defamation Action, their identification by Cassava as its principal witnesses in the Defamation Action, and their contacts with CUNY and Dr. Wang in New York.

19.     The Defamation Action was initiated and continued with the Individual Defendants' knowledge and consent, and for their personal benefit, as it was an integral part of Defendants' bad-faith intimidation campaign designed to distract attention away from their own misconduct, stifle legitimate public criticism, defend themselves against scrutiny from scientific, regulatory, and law enforcement bodies, and inflate the value of their Cassava stockholdings, which, in turn, increased their compensation from the company.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims—namely the filing and prosecution of the Defamation Action—occurred in this District.

21.     The Neuroscientist Plaintiffs have standing to bring this Complaint in Intervention because they have been, and continue to be, adversely affected by the Defamation Action filed by Cassava and the actions taken by the Individual Defendants.

22.     The claims presented by the Complaint in Intervention are ripe for adjudication because the Neuroscientist Plaintiffs are presently and gravely adversely affected by the Defamation Action filed by Cassava and the actions taken by the Individual Defendants.

## RIGHT TO INTERVENE

23.     The Neuroscientist Plaintiffs repeat and reallege the allegations of all of the preceding paragraphs as though fully set forth herein.

24.     The Neuroscientist Plaintiffs seek intervention as of right in this Action pursuant to Federal Rule of Civil Procedure 24(a)(2), on the grounds that the Neuroscientist Plaintiffs "claim[] an interest relating to the property or transaction that is the subject of the action, and [are] so situated that disposing of the action may as a practical matter impair or impede [their] ability to protect [their] interest[s]," namely, a claim that they were wrongfully prosecuted for defamation by Cassava for their critiques of the research and data underlying simufilam.

25.     The Neuroscientist Plaintiffs further assert that "existing parties" cannot "adequately represent [their] interest[s]," on the grounds that their claims concern the CP and the supplemental submissions to the FDA; and Neuroscientist Plaintiffs and their counsel bring knowledge and experience to this matter which may usefully supplement that of existing Plaintiffs and counsel.

26.     In the alternative, the Neuroscientist Plaintiffs seek "permissive intervention" pursuant to FRCP 24(b)(1) on the grounds that they have a "claim . . .  that shares with the main

action a common question of law or fact," again, that they were wrongfully prosecuted for defamation by Cassava for their critiques of the research and data underlying simufilam.

27.    The Neuroscientist Plaintiffs incorporate by reference the allegations and legal bases for intervention set forth in their Motion for Intervention herein in their entirety in support of their right to file and serve this Complaint in Intervention upon Defendants.

## FACTS

28.    Pursuant to Fed. R. Civ. P. 10, this Complaint in Intervention incorporates the First Amended Complaint of Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris, filed on October 24, 2024 at ECF No. 9 (the "FAC"), herein in its entirety to the extent any of the allegations there are relevant to the Neuroscientist Plaintiffs, and adopts such allegations as its own.[2]

29.    The Neuroscientist Plaintiffs also repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

### The Neuroscientist Plaintiffs Raise Concerns with Cassava's Anomalous Data

30.    Shortly after Cassava announced its approval for Phase 3 clinical trials, the Neuroscientist Plaintiffs, through their attorney, filed a CP with the FDA on August 18, 2021, raising three groups of major concerns (and several additional ones) about the data on which Cassava had relied in its FDA filings:

a.    *First*, the CP described how underlying papers by Drs. Wang and Burns employed "Western blot" analyses containing "anomalies that are suggestive of systematic data manipulation";

---

[2] In particular, the Neuroscientist Plaintiffs incorporate by reference paragraphs 3 through 12; 29 through 38; 43 through 52; 53 through 58; 60 through 68; 71 through 73; 76 through 107; and 110 through 171 of the FAC.

b. *Second*, the CP noted that claims about the effect of simufilam based on its purported effect in long dead and frozen brain tissue "defies logic" and contains "hallmarks of manipulation"; and

c. *Third*, the CP raised questions about the validity of Cassava's biomarker data, presented in both the September 2020 retest of the unsuccessful May 2020 analysis and a poster describing blood tests presented in July 2021 at the Alzheimer's Association International Conference.

31.     After Cassava responded to the CP on August 25, 2021, by summarily denying the allegations, counsel for the Neuroscientist Plaintiffs issued an August 26, 2021, press release disclosing, among other things, that the CP was submitted on behalf of individuals with expertise in "neuroscience, drug discovery, biochemistry, and finance" and that they held short positions in Cassava stock.

32.     The Neuroscientist Plaintiffs followed up the CP with four supplemental submissions (on August 30, September 9, November 17, and December 8, 2021).  These submissions reiterated the concerns raised in the CP and noted that other scientists also "expressed major concerns with the integrity of these phase 2a data and advised the inspection of the original images is needed to assess the authenticity of the clinical study results."

**Cassava Files the Defamation Action to Punish the Neuroscientist Plaintiffs for their Critiques of Cassava's Anomalous Data**

33.     In an effort to punish and suppress the Neuroscientist Plaintiffs' participation in the public and scientific discourse concerning Cassava and simufilam, Cassava commenced the Defamation Action on November 2, 2022.

34.     In the Defamation Action, Cassava alleged that the Neuroscientist Plaintiffs had made false and defamatory statements.  However, the CP itself confirmed that "[a]ll the

information detailed herein was obtained from public, non-proprietary sources," as it cited the papers and presentations at issue, quoted or reproduced the authors' own reported results, and laid out detailed factual bases—admitted by Cassava and confirmed by others—for why the data raised concerns.

35.    Cassava sought compensatory, consequential, and punitive damages against the Neuroscientist Plaintiffs and claimed that their supposedly defamatory statements caused Cassava to lose "more than $2 billion in market capitalization."

36.    Two days later, Cassava filed a First Amended Complaint, making substantially similar allegations and adding only a handful of jurisdictional allegations.

37.    The allegations in the initial Complaint and First Amended Complaint were without basis in fact or law, for numerous reasons.  Among many other defects in the Defamation Action, evident from the face of Cassava's pleadings:

a.    The factual assertions in the CP were true, and the Neuroscientist Plaintiffs' qualified inferences of possible data manipulation were nonactionable opinion;

b.    Cassava did not allege facts to show actual malice; and

c.    The challenged statements were incapable of defamatory meaning, and Cassava failed to plead facts to suggest that the Neuroscientist Plaintiffs caused any injuries or special damages.

38.    In addition to these facial pleading defects, the Defamation Action could never have been supported by evidence that would have shown any statement by the Neuroscientist Plaintiffs to be false. This is because the biochemical and clinical research underlying Cassava's claims about simufilam were tainted by egregious research misconduct and Cassava lacked the original

data from that research necessary to refute the Neuroscientist Plaintiffs' supposedly defamatory statements.

39.    The Neuroscientist Plaintiffs filed a motion to dismiss the First Amended Complaint on January 6, 2023.

**Cassava's Attempts to Circumvent the Stay of Discovery**

40.    On March 8, 2023, Magistrate Judge Wang held an Initial Pretrial Conference in the Defamation Action and ordered that all discovery be stayed.

41.    On July 27, 2023, Cassava served document subpoenas on the Neuroscientist Plaintiffs, ostensibly in connection with a separate consolidated securities class action that Cassava is defending in the Western District of Texas, denominated *In Re Cassava Sciences, Inc. Securities Litigation*, No. 21-cv-00751-DAE (W.D. Tex.) (the "Securities Action"). Each of these subpoenas sought more than 50 broad categories of irrelevant documents, including extensive and disproportionate third-party discovery concerning the Neuroscientist Plaintiffs' personal, professional, and financial circumstances. The subpoenas were a manifest effort to circumvent the stay of discovery entered in the Defamation Action, in a further effort to harass, punish, and intimidate the Neuroscientist Plaintiffs.

42.    The Neuroscientist Plaintiffs each served timely objections to the subpoenas and, through counsel, have held multiple meet-and-confers with Cassava, which has refused to drop or narrow the subpoenas.

**Cassava's Claims in the Defamation Action are Dismissed**

43.     On January 3, 2024, Magistrate Judge Wang issued a Report and Recommendation recommending that Cassava's claims against the Neuroscientist Plaintiffs be dismissed.  *Cassava Scis., Inc., v. Bredt, et al.*, No. 22-cv-9409, 2024 WL 555484 (S.D.N.Y. Jan. 3, 2024).[3]

44.     Among other things, Magistrate Judge Wang held that the Neuroscientist Plaintiffs' statements were "non-actionable opinion," reasoning that such statements were "accompanied by a recitation of the facts on which [they were] based," in that they "arise[d] from – and refer[red] to – Cassava's own published research, and call[ed] for further investigation after drawing inferences about Dr. Wang's and Dr. Burns's research and reported results."  *Id.* at *10.

45.     Moreover, Magistrate Judge Wang held that Cassava's pleadings violated Rule 8(a) of the Federal Rules of Civil Procedure because Cassava's conclusory allegation that "nearly everything [the Neuroscientist Plaintiffs] said in their petitions and everything that they republished was factually inaccurate," coupled with a pleading that "attaches and incorporates more than 100 exhibits (many of which contain multiple links) and spans nearly 1600 pages, is tantamount to dropping all of the scientific discourse – spanning years of research – in the lap of a randomly selected federal judge."  *Id.* at *11.

46.     Cassava filed a meritless objection to Magistrate Judge Wang's Report and Recommendation, to which the Neuroscientist Plaintiffs responded on January 31, 2024.

47.     On March 28, 2024, District Judge Gregory H. Woods granted all Defendants' motions to dismiss the First Amended Complaint, agreeing with the Magistrate Judge's conclusion

---

[3]  Magistrate Judge Wang issued two other Reports and Recommendations recommending that Cassava's claims against the other two sets of defendants be dismissed as well.  *Cassava Scis., Inc. v. Heilbut*, No. 22-cv-9409, 2024 WL 553806 (S.D.N.Y. Jan. 5, 2024); *Cassava Scis., Inc. v. Quintessential Cap. Mgmt. LLC*, No. 22-cv-9409, 2024 WL 554042 (S.D.N.Y. Jan. 23, 2024).

that the Neuroscientist Plaintiffs' statements were non-actionable opinion and that Cassava's pleadings violated Rule 8(a) of the Federal Rules of Civil Procedure. *Cassava Scis., Inc. v. Bredt, et al.*, No. 22-cv-9409, 2024 WL 1347362, at *8 and *27, n.48 (S.D.N.Y. Mar. 28, 2024).

48.    Cassava did not appeal the dismissal of its claims against the Neuroscientist Plaintiffs in the Defamation Action.

**The Defamation Action Caused the Neuroscientist Plaintiffs Substantial Damages**

49.    The Neuroscientist Plaintiffs were forced to incur hundreds of thousands of dollars in attorney's fees and costs in defending the Defamation Action, including but not limited to moving to dismiss the First Amended Complaint.

50.    The Neuroscientist Plaintiffs also incurred substantial costs in responding to the subpoenas issued by Cassava in the Securities Action, manifestly intended as an end-run around the stay of discovery in the Defamation Action.

51.    And critically, both Neuroscientist Plaintiffs also experienced substantial harm to their professional reputations, and have likewise experienced emotional and psychological harm, from Cassava's prosecution of the Defamation Action.

52.    By way of example, Dr. Bredt has been doxed by thousands of posts on X and other websites that reveal his home address and characterize him as a "thief" or a "devil." This continues to create fear and anxiety for Dr. Bredt and his family. Upon information and belief, the majority of these posts have come from Cassava investors and supporters. Among other posts, Defendant Dr. Burns herself threatened Dr. Bredt and other critics in a Facebook post that stated, in part: "Your days are numbered."

53.    Similarly, Cassava supporters posted hundreds of harassing messages on X concerning Dr. Pitt, including doxing him by revealing his personal identifying information,

calling for Dr. Pitt to be investigated by the state medical board, demanding that his New York medical license be revoked, and accusing Dr. Pitt of misconduct antithetical to the medical profession.

54.     As one example, a Cassava supporter generated over a dozen posts on X where the user separately tagged various cardiovascular and professional associations believed to be associated with Dr. Pitt in an attempt to tarnish his reputation by accusing Dr. Pitt of misconduct in connection with the submission of the CP.  Another user tagged New York Presbyterian Hospital—where Dr. Pitt serves as an attending physician—in response to the post string calling Dr. Pitt "deplorable" with "low moral character" and "despicable ethics" and encouraging the hospital to "boot him" before he is a "drain on donor relations."  Another user threatened to "notify all of [the hospital's] donors" of Dr. Pitt's alleged misconduct.  All of this interference with Dr. Pitt's professional relationships stemmed directly from Defendants' baseless accusations against Dr. Pitt following the submission of the CP.

55.     Cassava supporters also lodged several complaints against Dr. Pitt directly with Weill Cornell Medical College concerning his Cassava-related activities—even though Dr. Pitt made clear at all times that he was submitting the CP in his personal capacity—which impacted Dr. Pitt's advancement opportunities at the institution.

56.     The Defamation Action has also had negative impacts on Dr. Bredt's current employer, Rapport Therapeutics ("Rapport"), who has been forced to respond to extensive inquiries concerning the "Cassava Sciences situation," and whose investors have been subject to expansive and burdensome discovery demands from Cassava in connection with the Securities Action.

57.     Among other things, Defendant Barbier himself called investment bankers during Rapport's IPO process in the spring of 2024, alleging that Dr. Bredt (Rapport's CSO) had behaved without integrity.  Cassava supporters have also inundated Rapport's message board on Yahoo Finance, accusing Dr. Bredt of lacking professional integrity.  This conduct by Defendants and their supporters continues to engender negative public sentiment for Rapport, as well as personal and professional challenges for Dr. Bredt.

58.     Finally, an anonymous group of Cassava investors, at the encouragement of Defendants, also sent a letter to the Major Fraud Division of the DOJ petitioning it to open a criminal investigation into the Neuroscientist Plaintiffs based on the baseless allegations in the above-referenced Defamation Action.

## COUNT ONE
### (New York Civil Rights Law § 70-a)
### Against Defendant Cassava

59.     The Neuroscientist Plaintiffs repeat and re-allege all other Paragraphs as if set forth fully within.

60.     Cassava commenced and continued the Defamation Action, which is an action involving public petition and participation, as defined in New York Civil Rights Law § 76-a.

61.     All of the Neuroscientist Plaintiffs' challenged statements in the Defamation Action were made between August 18, 2021, and December 8, 2021, and the Defamation Action was commenced and continued from November 2022 to August 2024, after the November 10, 2020, effective date of the amendments to the New York's statutory Anti-SLAPP regime (N.Y. Senate Bill No. 52-A/Assembly Bill No. 5991A).

62.     The Defamation Action involved claims based upon communications by the Neuroscientist Plaintiffs in places open to the public and in public fora (*e.g.,* the CP and its various

13

supplemental submissions) in connection with an issue of public interest (e.g., Alzheimer's research).

63.     The Defamation Action involved claims based upon lawful conduct by the Neuroscientist Plaintiffs in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

64.     The Defamation Action was commenced and continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification, or reversal of existing law.

65.     From November 2022 through August 2024, during the entire period that Cassava pursued the Defamation Action, Cassava lacked relevant proof that a reasonable mind could accept as adequate to support the conclusion that the Neuroscientist Plaintiffs defamed Cassava or conspired to defame Cassava.

66.     The Defamation Action was commenced and continued for the sole purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting the free exercise of speech, petition, or association rights.

67.     Cassava commenced and continued the Defamation Action in retaliation against the Neuroscientist Plaintiffs for their public criticism of Cassava and simufilam.

68.     From November 2022 through August 2024, during the entire period that Cassava pursued the Defamation Action, Cassava knew that its claims in the Defamation Action were facially deficient as a matter of law and impossible to prove.

69.     The Neuroscientist Plaintiffs have suffered significant economic and non-economic damage as a result of the Defamation Action.

70. The Defamation Action and Cassava's campaign of intimidation have stifled legitimate debate over Alzheimer's research, while causing significant harm to the public at large, including Alzheimer's patients and their families, the scientific community, and public trust in legal, regulatory, and scientific institutions.

### COUNT TWO
### (Malicious Prosecution)
### Against All Defendants

71. The Neuroscientist Plaintiffs repeat and re-allege all other Paragraphs as if set forth fully within.

72. The Defamation Action was initiated and continued by Cassava, at the direction of Barbier and Dr. Burns, who were Cassava's CEO and SVP of Neuroscience, respectively, and are married.

73. Barbier and Dr. Burns each individually participated in the malicious prosecution of the Defamation Action, including by issuing threats or attacks against the Neuroscientist Plaintiffs on investor calls, and other forums, by participating in decisions to commence and continue the lawsuit, by publicly and privately spreading the baseless allegations in the lawsuit, by orchestrating and implementing the company's PR campaign that falsely blamed all criticism of simufilam on a "short and distort" campaign, and by overseeing the company's overall litigation strategy, which included the Defamation Action and the recruitment and hiring of a new general counsel, reporting directly to Barbier, six days before the lawsuit was filed.

74. The Defamation Action was terminated in favor the Neuroscientist Plaintiffs, as evidenced by the dismissal of the claims against them in the First Amended Complaint.

75.    Cassava did not appeal the dismissal of its claims against the Neuroscientist Plaintiffs in the Defamation Action and otherwise abandoned the Defamation Action as asserted against Plaintiffs without any settlement, compromise, inducement, or consideration of any kind.

76.    The Defamation Action was entirely and patently without probable cause from beginning to end.

77.    Defendants knew they lacked probable cause and could never prove that the Neuroscientist Plaintiffs' supposedly defamatory statements were false or defamatory because Defendants knew that the foundational scientific claims supporting simufilam were widely contested among the scientific community and had never been independently corroborated; they also knew that they lacked original records or data capable of refuting the Neuroscientist Plaintiffs' statements that the data presented by Defendants appeared to be fabricated or manipulated; they knew from their internal audit in September 2022 that Dr. Wang's laboratory was "unacceptable" and failed to retain any original records or data; and they knew that the clinical studies supporting simufilam were tainted by egregious research misconduct, including by Dr. Burns individually.

78.    Defendants pursued the Defamation Action to retaliate against and punish the Neuroscientist Plaintiffs for raising legitimate and well-founded concerns about simufilam and Cassava with the FDA.

79.    The Defamation Action was a sham intended to silence, intimidate, and discredit the Neuroscientist Plaintiffs and other critics, and it was consistent with a long pattern of intimidation and coercion by Defendants, whose sole aim has been to inflate Cassava's stock price and enrich themselves, to the detriment of the Neuroscientist Plaintiffs, their investors, the scientific community, and Alzheimer's patients.

80.     The Defamation Action caused special injuries to Dr. Bredt, including highly substantial and identifiable interference to his person, property, or business, representing concrete harms that are considerably more cumbersome than the ordinary demands of defending a lawsuit.

81.     The Defamation Action caused special injuries to Dr. Pitt, including highly substantial and identifiable interference to his person, property, or business, representing concrete harms that are considerably more cumbersome than the ordinary demands of defending a lawsuit.

82.     For example, as a direct result of the Defamation Action, the Neuroscientist Plaintiffs experienced harassment from Cassava's supporters online, including doxing of their personal information with malicious intent; public challenges to their professional integrity, including by leading medical publications, influenced by Cassava's self-serving PR campaign; employment challenges stemming from unfounded complaints brought by Cassava and its supporters; and unfounded threats of criminal investigation or loss of their professional licenses.

### COUNT THREE
### (Conspiracy)
### Against All Defendants

83.     The Neuroscientist Plaintiffs' repeat and re-allege all other Paragraphs as if set forth fully within.

84.     Defendants knowingly, willfully, and actively conspired and agreed to commence and continue the Defamation Action and to commit Counts One and Two.

85.     The Defamation Action was a central component of Defendants' concerted and coordinated PR campaign, led by Barbier and Dr. Burns, designed to silence, intimidate, and discredit the Neuroscientist Plaintiffs and other critics, distract from problems with simufilam's foundational scientific and clinical research, evade further public and government scrutiny, conceal and cover-up their misconduct, and inflate Cassava's stock price.

86.    Dr. Burns and Barbier each had personal stakes in achieving Cassava's objectives that went beyond merely carrying out the corporation's managerial policies.

87.    Dr. Burns had additional, independent, and personal conspiratorial purposes, including the protection of her reputation as a scientist and as the co-author or collaborator with Dr. Wang on much of the scientific and clinical research that the Neuroscientist Plaintiffs had criticized, the concealment and cover-up of her own personal research misconduct and misrepresentations, limiting her personal exposure to civil and criminal liability, keeping her job, and inflating her compensation.

88.    Barbier had additional, independent, and personal conspiratorial purposes, including, as Dr. Burns's husband, the protection of her professional and scientific reputation, the concealment and cover-up of his own misconduct and misrepresentations, limiting his personal exposure to civil and criminal liability, keeping his job, and maximizing his compensation.

89.    The additional, independent interests of Barbier and Dr. Burns are further illustrated by their eventual resignations from Cassava, announced on July 17, 2024, in connection with long-running internal and government investigations—and the abandonment of the Defamation Action shortly thereafter.

90.    Defendants engaged in various wrongful and overt acts in furtherance of their conspiracy, including their threats against the Neuroscientist Plaintiffs; their malicious prosecution of the Defamation Action; their public and private dissemination of the baseless allegations in the Defamation Action; their concealment, cover-up, and suppression of facts that substantiated the Neuroscientist Plaintiffs' supposedly defamatory critiques, such as the findings of Cassava's internal audit in September 2022; their unlawful acts identified by the SEC; and their other unlawful or wrongful acts described herein.

91.     As a direct and proximate result of the operation and execution of Defendants'
conspiracy, the Neuroscientist Plaintiffs have suffered substantial damages.

## PRAYER FOR RELIEF

WHEREFORE, the Neuroscientist Plaintiffs demand judgment as follows:

A)     Awarding the Neuroscientist Plaintiffs' costs and attorney's fees incurred in
connection with the Defamation Action;

B)     Awarding the Neuroscientist Plaintiffs' costs and attorney's fees incurred in
prosecuting this action;

C)     Awarding the Neuroscientist Plaintiffs' compensatory damages in an amount to be
proven at trial;

D)     Awarding the Neuroscientist Plaintiffs' punitive damages in an amount to be
established at trial; and

E)     Any such other and further relief as the Court deems just and proper.


Dated:  December 12, 2024
         New York, New York

                                                 */s/ Jeffrey A. Simes*
                                                 Jeffrey A. Simes
                                                 Meghan K. Spillane
                                                 GOODWIN PROCTER LLP
                                                 620 Eighth Avenue
                                                 New York, NY 10018
                                                 Tel.:    (212) 813-8800
                                                 Fax:     (212) 355-3333
                                                 jsimes@goodwinlaw.com
                                                 mspillane@goodwinlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2024, a true and correct copy of the foregoing was electronically filed and served on all parties of record via the Court's CM/ECF system.

*/s/ Jeffrey A. Simes*