# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
In re:                            :
                                      Docket #1:22-cv-09409-
 CASSAVA SCIENCES, INC.,          : GHW-OTW

                     Plaintiff,   :

   - against -                    :

 BREDT et al,                     : New York, New York
                                    March 8, 2023
                     Defendant.   :
                                    INITIAL CASE
----------------------------------- : MANAGEMENT CONFERENCE
```

PROCEEDINGS BEFORE
THE HONORABLE ONA T. WANG,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          Benesch Friedlander Coplan & Aronoff
                        By:  Erik Connolly, Esq.
                             Timothy M. Frey, Esq.
                        71 S. Wacker Drive, Ste 16th Floor
                        Chicago, IL 60606


For Defendant,
Quintessential Capital
Management LLC:         Kleinberg, Kaplan, Wolff & Cohen, P.C.
                        By:  Joshua Kallman Bromberg, Esq.
                        500 Fifth Avenue
                        New York, NY 10110

                        Kleinberg, Kaplan, Wolff & Cohen, P.C.
                        By:  David M. Levy, Esq.
                        551 Fifth Avenue
                        New York, NY 10176


Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

APPEARANCES - CONTINUED:

For Defendants, David
Bredt & Geoffrey Pitt:        Goodwin Procter LLP
                              By:  Meghan K. Spillane, Esq.
                              The New York Times Building
                              620 Eighth Avenue
                              New York, NY 10018


For Defendants, Jesse
Brodkin, Enea Milioris
and Adrian Heilbut:           Clarick Gueron Reisbaum LLP
                              By:  David R.S. Kumagai, Esq.
                              Isaac Berkman Zaur, Esq.
                              220 5th Avenue, 14th Floor
                              New York, NY 10019

                              Law Office of Daniel F. Wachtell
                              By:  Daniel F. Wachtell, Esq.
                              90 Broad Street, 23rd Floor
                              New York, NY 10004




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

## <u>INDEX</u>

### <u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|
| None | | | | |

### <u>E X H I B I T S</u>

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                        PROCEEDINGS                    4

 2            THE CLERK:  This is 22-civil-9409, Cassava

 3   Sciences, Inc. v. Bredt et al, before the Honorable Ona T.

 4   Wang.

 5            Please state your appearances for the record.

 6            MR. ERIK CONNOLLY:  This is Erik Connolly and Tim

 7   Frey on behalf of Cassava Sciences.

 8            HONORABLE ONA T. WANG (THE COURT):  All right,

 9   good morning.

10            MR. JOSHUA KALLMAN BROMBERG:  Joshua Kallman

11   Bromberg of Kleinberg, Kaplan, Wolff & Cohen, P.C. on

12   behalf of defendant, Quintessential Capital Management LLC.

13   And I'm joined by my colleague, David Levy.

14            MS. MEGHAN K. SPILLANE:  Good morning, your Honor.

15   Meghan Spillane from Goodwin Procter on behalf of Dr. Bredt

16   and Dr. Pitt.

17            MR. DAVID ROBERT SHINE KUMAGAI:  Good morning, your

18   Honor.  David Robert Shine Kumagai on behalf of Jesse Brodkin

19   and Enea Milioris and Adrian Heilbut.  And with me is Isaac

20   Zaur and Dan Wachtell.

21            THE COURT:  Okay.  This is a little more

22   complicated than some of my typical Initial Case Management

23   Conferences.  So I understand, I think, plaintiff's claims.

24   But why don't I just get a brief overview.  And then with

25   defense counsel, everybody will get a chance to speak.  I
```

```
 1                          PROCEEDINGS                    5

 2   just want to understand who the defendants are and how they

 3   fit in with each other.

 4           The other thing I'm going to ask plaintiff's

 5   counsel to do is to talk to me a little bit about what the

 6   status is of any regulatory or criminal investigations, to

 7   the extent you know.

 8           MR. CONNOLLY:  Okay.  Thank you very --

 9           THE COURT:  And can disclose -- I'm sorry.

10           MR. CONNOLLY:  And can disclose.  Thank you very

11   much.  I appreciate that, your Honor.  So I will try to

12   describe the factual background but not in an aggressive or

13   colorful way.  The allegations here center around a company

14   called Cassava Sciences.  It's a biotechnology company, and

15   they are developing a drug they hope is successful in

16   treating Alzheimer's disease.  They have gone through a

17   series of tests already --

18           THE COURT:  And what's the -- I'm sorry -- I

19   should know this, because I've seen it, but I can't recall

20   the name of the drug off the top of my head.

21           MR. CONNOLLY:  Simufilam.

22           MR. TIMOTHY FREY:  Your Honor, it's  S-i-m-u-f-i-

23   l-a-m.

24           MR. CONNOLLY:  So they went through a series of

25   the mandatory testings and have now been approved by the
```

```
 1                        PROCEEDINGS                      6
 2   FDA for what's called the third-phase testing, which is the
 3   last set of tests that you do before you go to market with
 4   the drug.
 5           What Cassava has alleged is that each of these
 6   group of defendants published defamatory information about
 7   them in order to make money from a decline in the company's
 8   equity price.  So each of the defendants are alleged to be
 9   short sellers of Cassava's equity.  And the way that the
10   short sellers can make money is if the equity price goes
11   down.  And so what Cassava has alleged against each group
12   is that at different times and in different publications
13   they each made some fraudulent statements about Cassava.
14           Cassava's perspective on it is that the statements
15   that they made were essentially defamation per se because
16   they were accusing the company of being a fraud and
17   fabricating data.  Fabrication of data is a crime,
18   particularly when it's associated with regulatory issues or
19   securities issues.  And so, from Cassava's perspective,
20   they think the case is a case of defamation per se against
21   each of the defendants for their publications for accusing
22   them of being a fraud and accusing them of committing a
23   crime of fabricating data.  That is the allegation.
24           The defendants have multiple publications that
25   they've done.  There are what we've called the citizens
```

```
 1                        PROCEEDINGS                      7

 2   petition defendants, which are Drs. Bredt and Pitt, who --

 3             THE COURT:  Okay, slow down.

 4             MR. CONNOLLY:  I apologize.  I apologize.

 5             THE COURT:  Drs. Bredt and Pitt.

 6             MR. CONNOLLY:  Correct.  They published what is

 7   alleged to be the defamatory material in what's called

 8   Citizen's Petitions to a regulatory body and then in some

 9   supplements to those, as well.  The other defendant, QCM,

10   Quintessential Capital Management, published the allegedly

11   defamatory materials in a report that they posted on their

12   website and then in some social media postings, as well.

13   There is a dispute over whether or not the company QCM is

14   accountable for the social media posts by their founder.

15   So that is a contested issue, but obviously, Cassava has

16   alleged that they are.

17             THE COURT:  And the founder is whom?

18             MR. CONNOLLY:  Grego, Mr. Grego.

19             THE COURT:  And he is or is not a defendant?

20             MR. CONNOLLY:  He is not a personal defendant.

21             THE COURT:  Okay.

22             MR. CONNOLLY:  And then the last group, which

23   we've called the dot-com defendants, is a collection of,

24   currently before the Court, three defendants that also

25   published a series of reports and a PowerPoint presentation
```

```
 1                          PROCEEDINGS                    8

 2   and social media post making similar accusations regarding

 3   Cassava being a fraud and Cassava fabricating data.

 4          So we have for each set of the defendants what I

 5   would call one main -- one or two main publications and

 6   then for some of the defendants we've got social media

 7   postings, as well, not for each of the defendants.

 8          I hope that wasn't too colored.  I felt like that

 9   was pretty neutral.

10          THE COURT:  Okay.  so then talk to me about the

11   regulatory and criminal investigations, then.

12          MR. CONNOLLY:  So what Cassava can say about that

13   is those investigations from Cassava's perspective were

14   triggered as a result of the defamatory statements made by

15   these defendants and that there is no basis to any of

16   those.  Nothing has been formally brought against them, and

17   so from Cassava's position, that will amount to nothing.

18   But then Cassava came under the scrutiny because of the

19   defamatory publications of these defendants.  I'm certain

20   the defendants disagree with that, but from the Cassava

21   perspective that is the origin story for those, as well.

22   But at this point I can tell you there has been nothing

23   formally announced.

24          THE COURT:  Okay, which or where were the

25   investigations, or is that something you can't disclose?
```

```
 1                          PROCEEDINGS                    9
 2            MR. CONNOLLY:  I cannot disclose any of that
 3    information.
 4            THE COURT:  And you cannot -- can you disclose if
 5    they're closed?
 6            MR. CONNOLLY:  I actually don't think I am allowed
 7    to say that one way or the other.  I believe with most
 8    investigations, until there's a formal announcement by the
 9    agency, I am prohibited from making any statement.  And
10    that would be a violation of Cassava's interactions with
11    any agency.
12            THE COURT:  Well, that seems like it might be an
13    important trigger point as far as proving truth or not, no?
14            MR. CONNOLLY:  No, not at all, actually.
15            THE COURT:  Would it be material to truth?
16            MR. CONNOLLY:  We don't think so at all.  The
17    investments will run the course that they are going to run.
18    Obviously, I have other clients that I deal with that are
19    investigated, and I have civil proceedings that continue.
20    The issue, what this case really comes down to is whether
21    or not Cassava is a fraud, as alleged by the defendants, or
22    did Cassava fabricate its data.  Those are historical
23    events.  Cassava can readily establish that neither of
24    those things are true.  And from Cassava's perspective with
25    that proof, falsity is established, and the focal point of
```

PROCEEDINGS                    10

1

2   the case becomes, as it does in most defamation cases,

3   actual malice, if I have to satisfy that standard, which I

4   don't concede I do.

5          THE COURT:  Okay.  I mean, I guess in reading

6   between the lines, and maybe anticipating what some of

7   defense counsel might say is well, there's been no formal

8   charges yet -- with "yet" being the operative word.  But,

9   be that as it may, I guess if the process hasn't run its

10  course, the process hasn't run its course, and we don't

11  know one way or the other, right?

12         MR. CONNOLLY:  You don't know one way or the

13  other, which --

14         THE COURT:  Okay.

15         MR. CONNOLLY:  -- is why Court's typically don't

16  look at the potential of I'll call "sister" investigations

17  as a factor of whether or not you can initiate your civil

18  litigation.  I get to start my civil litigation, I get --

19         THE COURT:  Oh, yes.

20         MR. CONNOLLY:  -- to start my discovery.  If that

21  happens, certainly -- and, certainly if something like that

22  happens, we could all be back here in a very different

23  posture.  But, at the same token, I with some certainty --

24  I'm not a defense attorney here -- but if those don't

25  result in any indictments or any filings, I doubt the

```
 1                            PROCEEDINGS                    11
 2   defendants are going to say, "But we'll stipulate to
 3   falsity, then, because it didn't run its course."  So --
 4            THE COURT:  Well, I wasn't sort of talking about
 5   merits in the end or of the, you know, of anything being
 6   necessarily dispositive of an element yet, with "yet" being
 7   the obvious word, with "yet" being actually a very
 8   important word.  I mean, when I was in private practice and
 9   often on the defense side but sometimes on the plaintiff's
10   side, if there were parallel proceedings -- I won't gender
11   them -- but if there were parallel proceedings, either
12   regulatory or criminal, we would sometimes be asked to put
13   the brakes on in the civil proceeding, so -- which, of
14   course, brings us to the motion to stay but which I will
15   put that to the side because I do want to hear from the
16   defendants, the defendant groups and, you know, to the
17   extent you can, talk to me about how this even came up,
18   meaning, you know, how were these statements made.  I'm
19   assuming or I would hope that, you know, what would come
20   out in discovery, if discovery were to proceed, would be
21   that, you know, the defendant had some reason other than or
22   had some indication or suggestion other than just making it
23   up in their heads to say what they said.  Like I said, I'm
24   not asking for major disclosures; but, again, to the extent
25   that some of this might be helpful, it might also be
```

1                          PROCEEDINGS                    12

2    helpful for me to understand the motion to stay and where

3    it falls and, you know, where the various factors fall.

4          So anybody can start.

5          MR. BROMBERG:  Good morning, your Honor.  Joshua

6    Bromberg again on behalf of Quintessential Capital

7    Management.  Without going too deeply into the merits,

8    which are I think set forth in our motion to dismiss, we

9    think this is a garden-variety SLAPP suit, and it's been

10   filed by Cassava as retaliation against the multitude of

11   different defendants for public statements made on the

12   subject of a topic of very important public interest,

13   namely the testing and the science behind this new

14   Alzheimer's drug.

15         Our position has been, again as stated in our

16   motion to dismiss, that these statements not only were

17   substantially true but they were opinions or otherwise not

18   defamatory.  They were not made with actual malice, as

19   Cassava is required to prove here, either under

20   longstanding First Amendment case law or under the New York

21   anti-SLAPP statute.  And, finally, none of the statements

22   made by the defendants can be shown to have caused any

23   damages to Cassava as a matter of law.  Those are the

24   defenses that are common, as I understand it, to all of the

25   defendants.  And there are various individualized defenses

1                           PROCEEDINGS                    13

2  that have also been asserted.

3          I will hold off on explaining to your Honor why we

4  think the discovery stay is appropriate unless --

5          THE COURT:  Yes, why don't you hold off for now.

6  So QCM on its own published -- let's see, published

7  materials in a QCM-issued report on its website, and the

8  founder also said some things in a social media post?

9          MR. BROMBERG:  Correct, your Honor.  There was a

10 report published on QCM's website, and subsequently there

11 were a number of Twitter posts made by Gabriel Grego, who

12 is the principal of QCM.  The reason for these, of course,

13 we concede that our client is a short seller, but what was

14 not mentioned in the Complaint -- obviously, this is

15 outside the record and will eventually be -- will be

16 uncovered in discovery, if we get that far.  We don't think

17 that's appropriate, but Quintessential Capital Management

18 has a very long track record of uncovering corporate fraud

19 and has as virtually unblemished record in that regard.

20         THE COURT:  All right, next?

21         MS. SPILLANE:  Your Honor, as I stated previously,

22 I represent Dr. Bredt and Dr. Pitt, who are two

23 neuroscientists who submitted a series of publications

24 before the FDA.  Significantly, the first of their

25 Citizen's Petitions before the FDA, which included a 39-

PROCEEDINGS                    14

1
2    page Statement of Concern, was submitted on August 18th of
3    2021.  They then submitted four subsequent times, on
4    August 30th, on September 9th, on November 17th, and
5    finally on December 8th.  They had enlisted a law firm to
6    submit these Citizen's Petitions on their behalf.  In them,
7    consistent with what you heard from my colleague, they
8    evidenced anomalies in the data and apparent errors in the
9    data that gave them serious concerns that it was possible
10   that the data had been manipulated.
11       As you will see from our motion, which is fully
12   submitted, everything they said in the reports is backed up
13   with publicly available data that they attached, much of
14   which was actually annexed to the Complaint itself.
15       And, significantly, your Honor, while the first
16   publication was on August 18th -- of course, the Complaint
17   was not filed until November 2nd of 2022, which was over a
18   year later, and the identities of Dr. Bredt and Dr. Pitt
19   were known as of November 17, 2021.  So not only was the
20   first publication of the Citizen's Petitions long before
21   the one-year statute of limitations, but the identity of
22   both doctors were known well before the filing.
23       So our motion to dismiss papers have been fully
24   submitted, and we echo many of the defenses that have
25   already been raised.  But one that is particular to my

1                          PROCEEDINGS                    15

2    clients is, of course, a statute of limitations defense

3    based on the first-publication rule.

4            THE COURT:  Okay.

5            MR. KUMAGAI:  Your Honor, David Kumagai on behalf

6    of the dot-com defendants, Brodkin, Milioris and Heilbut.

7    So our motion to dismiss is going to be filed tomorrow and

8    then fully briefed by May 5th.  And, broadly, there are

9    many of the same arguments you heard from the other

10   defendants; but there are two general aspects of our

11   motion.  The first is that we're moving under Rule 12(b)(2)

12   for lack of personal jurisdiction over defendants Brodkin

13   and Milioris.  Both defendants are out of state; there's no

14   allegation either of them ever set foot in New York in

15   connection with these challenged statements.  And plaintiff

16   Cassava is also out of state; they're a Delaware company

17   based in Texas.  So that will be as to two of the dot-com

18   defendants, Brodkin and Milioris.

19           And then, second, we're moving under 12(b)(6) to

20   dismiss claims against all three of our clients, Brodkin,

21   Milioris and Heilbut.  And the arguments are broadly

22   consistent with the arguments from the other defendants.

23   And as you'll see in our motion, your Honor, we are

24   especially focused on the context of this case, which

25   really is under the case law important, critically

```
 1                           PROCEEDINGS                    16
 2   important to keep in mind when evaluating these allegedly
 3   defamatory statements.  So all of the challenged statements
 4   were made within this context of a very public, very
 5   intense scientific debate over Alzheimer's research
 6   generally and Cassava's drug Simufilam, in particular.  And
 7   it really is a novel area of scientific debate.  And the
 8   Second Circuit in the Ony case from 2013 has very strongly
 9   cautioned Courts against trying to referee these types of
10   debates involving novel scientific claims.
11           So we'll argue that the defamation claims fail for
12   three reasons.  First, Cassava cannot plead falsity.  And
13   really, to answer your earlier question, your Honor, about
14   what the impetus for these statements was, it's all based
15   on publicly available data, including -- from Cassava,
16   including the CEO admitting errors in the research, both
17   their clinical studies and underlying research papers.  And
18   those are the errors that defendants have all been calling
19   out in their statements and, you know, drawing the
20   conclusion and expressing the opinion that they are signs
21   of possible data manipulation.  There's also been seven
22   scientific journals retracting or correcting articles
23   published by Cassava's lead researcher for its drug, and
24   these are --
25           THE COURT:  Did you say several or seven?
```

1                          PROCEEDINGS                    17

2              MR. KUMAGAI:  Seven.

3              THE COURT:  Seven.  Okay, what journals were they?

4              MR. KUMAGAI:  So the first one is *Plus One*.  The

5    second is *Alzheimer's Research in Therapy*.  The third is

6    *Molecular Nerve Degeneration*.  The fourth is *Neuroscience*.

7    The fifth is *The Journal of Neuroscience*.  The sixth is

8    *Neurobiology of Aging*.  And the seventh is *Physiology and

9    Behavior*.  And we'll cite those in our motion to dismiss

10   tomorrow.

11             THE COURT:  Are they all peer-reviewed journals?

12             MR. KUMAGAI:  Your Honor, I believe so, but I

13   can't confirm.

14             THE COURT:  Okay.  Are there -- and this might be

15   a question for Cassava counsel, for plaintiff's counsel --

16   are there continuing to be statements or reports or

17   coverage of this drug and these issues along the lines

18   of -- I saw a mention in the 26(f) report that Cassava may

19   need to amend its Complaint?

20             MR. CONNOLLY:  This group of defendants, some of

21   these defendants, have continued to publish defendant

22   statements about Cassava since the filing of the Complaint.

23   So there is some ongoing defamation that has taken place

24   since the filing of the Complaint.  The Court will have to

25   evaluate the amendment of the Complaint to encompass those

```
 1                        PROCEEDINGS                    18
 2   at a future date and time.  Typically the way that works
 3   for the defamation cases is if the new defamatory
 4   statements are of the same ilk, same nature as the existing
 5   ones.  You can amend it, and you can bring it back in at a
 6   subsequent date due to a lack of bias to the defendant.
 7   But that's the typical evaluation that we do.
 8             THE COURT:  Okay.  All right, and I see that there
 9   is at least one defendant who needs to be served in
10   Germany, still.
11             MR. CONNOLLY:  Yes.  So --
12             THE COURT:  Who's that defendant?
13             MR. CONNOLLY:  Mr. Markey.  Mr. Markey would be
14   part of the dot.com defendant group, or at least that's the
15   naming that we have used for convenience's sake.  His
16   counsel in good faith was, I believe, working to determine
17   whether or not they would accept service.  Once they
18   indicated to us that Mr. Markey would not be accepting
19   service through counsel, we initiated the proceedings to
20   serve it in the Hague.  The documentation is with Germany
21   now, and that will play out however that typically will
22   play out.  And I'm sure your Honor knows that that can take
23   anywhere from a few months to a long time.  And if I
24   ultimately have to amend my roster to address that, I'll
25   amend my roster to address that.  We'll see what happens
```

```
 1                        PROCEEDINGS                    19
 2  there.
 3           THE COURT:  Okay, so what you're calling the
 4  Citizen's Petition groups are scientists, are Ph.D.'s who
 5  can and did apparently review the data, review the peer
 6  review journals.  Are there any other scientist defendants
 7  in the other two defendants groups, or are they investors?
 8           MR. CONNOLLY:  Yes, your Honor.  The dot.com
 9  defendants all have Ph.D.'s and are scientists, as well.
10           THE COURT:  And so Mr. Markey should actually be
11  Dr. Markey?
12           MR. CONNOLLY:  I apologize, yes.  I believe
13  Mr. Markey is a Dr. Markey.  I apologize.  Then, that
14  means --
15           THE COURT:  Yes, because, I mean, this case -- I
16  mean, one should say that in all circumstances, that
17  matters; but in this case, it definitely matters.
18           MR. CONNOLLY:  I absolutely respect that.
19  Cassava's allegations in that regard is their status as
20  doctors actually demonstrates the actual malice that we
21  would not necessarily have in other circumstances.  And so
22  I certainly apologize.  I did not mean --
23           THE COURT:  Wait, so I'm trying to understand why
24  if their status as Ph.D.'s would actually demonstrate
25  actual malice; I'm just trying to understand that.
```

1                          PROCEEDINGS                      20

2              MR. CONNOLLY:  There is a section in our Complaint

3     that discusses common knowledge in the scientific

4     community.  It is at page 135.  It begins at paragraph 316

5     and continues through to paragraph 330.  And this is one of

6     the -- I believe we have 50 or 60 paragraphs discussing the

7     actual malice of these defendants.  One of the primary

8     reasons why their status as doctors bolsters the claim for

9     actual malice is because they had knowledge that what they

10    were calling anomalies or what they were calling

11    irregularities were not indicia of fraud and were not

12    indicia of fabrication.  There is a potential that if I

13    look at something with no scientific training whatsoever, I

14    could says that seems like maybe that's fraud.  But if

15    you're a doctor and you actually study it, you know it's

16    not.

17             And so one of the issues here is that that, in

18    conjunction with all the other evidence, indicates that,

19    well, you can say that something might be an anomaly; what

20    the Court's don't let you do and what is an entirely

21    different nature of defamation is claiming that something

22    is a fraud or fabricated.  There's a clear demarcation in

23    the law on those two things.  And from Cassava's

24    perspective, the reason they brought the case, is that it

25    crossed that line.

```
 1                      PROCEEDINGS                    21
 2            THE COURT:  So, I mean, the law may have a clear
 3    demarcation, but my concern would be whether -- and, you
 4    know, I'm just speaking -- you know, I have not done a deep
 5    dive into this, I've not done a deep dive into the law, for
 6    sure; but is it possible that there's something in between
 7    fabrication and fraud and perfectly fine data that just has
 8    anomalies that could be what, when I was a scientist, would
 9    have called sloppy science, right, that there is -- you
10    know, the controls that are in place -- and I don't mean
11    just your control group -- but controls and guardrails
12    around the research and the procedures that are in place
13    are not -- that they could be indicative that those actual
14    procedures weren't always followed.  And that could be --
15    to use a discovery and spoliation analogy, it could be one
16    of those things where it's like somebody didn't destroy the
17    documents intentionally, I mean, the act was intentional
18    that they were destroyed but it was just inattention,
19    negligence, failure -- lack of care around a certain set of
20    procedures.  I'm not saying that that happened with
21    Cassava; I'm just saying that this -- you know, I'm -- I
22    question -- and I guess it might come down to what the
23    actual anomalies are -- whether certain defendants having a
24    deeper background and a scientific background actually cuts
25    one way or the other.
```

```
 1                        PROCEEDINGS                    22

 2              MR. CONNOLLY:  Sure.  And I would give three

 3    responses to that, if you allow me --

 4              THE COURT:  Yes, go ahead.

 5              MR. CONNOLLY:  -- and I'll keep it brief,

 6    obviously.  The first is what is alleged in the Complaint

 7    does not fall into the category of the gray area, as you

 8    have described it.  Cassava alleges in the Complaint, in

 9    pretty excruciating detail, that that is not the case here,

10    and it's all factual allegations.  The second thing I would

11    say is the gray area that you were discussing, that concept

12    absolutely would end up, I expect, to be one of the hotly

13    contested disputed issues of fact between the parties that,

14    until we complete discovery -- and ultimately, the trier of

15    fact would have to make a call on that -- but I do think

16    you are correct in identifying something that once we get

17    into the facts and we're not looking at the allegations,

18    that's going to be hotly contested by the parties.

19              THE COURT:  All right.

20              MR. CONNOLLY:  And, briefly, your Honor, I'll just

21    make one other reference.  I know some journal articles

22    were cited by the dot.com defendants.  I would direct the

23    Court's attention to paragraph 30 of the Complaint, which

24    are the journal articles that at one point may have

25    partially retracted and then flipped and said no, we see no
```

PROCEEDINGS                    23

1
2  evidence of fraud here.  And those are listed out in
3  paragraph 30 of the Complaint for you -- I'm sorry-- 300,
4  paragraph 300 -- too many zeros.

5          THE COURT:  What a difference a zero makes.

6          MR. CONNOLLY:  I know, I know.  I don't know the
7  last time I had a Complaint that wasn't over 100 pages.  So
8  this is --

9          THE COURT:  I'll tell you that when we first --
10 when I was in private practice, I spent a lot of time
11 working with the Madoff trustee in asset recovery.  And
12 when we were trying to figure out what various customers'
13 purported losses were, I would read them and by like, "Oh,
14 wow, they claim they lost $5 million -- oh, no, wait, I
15 missed three zeros, I miscounted the commas and zeros."

16         So, let's look at the motion to stay.  I don't
17 really want to have full-blown argument -- oh, actually,
18 before I do this -- I might have missed this in the Case
19 Management Plan -- have you exchanged your initial
20 disclosures yet?  Yes.

21         MR. CONNOLLY:  We did, we did.

22         THE COURT:  All right.  In light of all the other
23 things going on in this case, my leaning had been and has
24 been, continues to be to stay discovery for a period of
25 time.  But I am willing to hear you out on why you think

```
 1                              PROCEEDINGS                    24
 2   that's not a good idea.
 3              MR. CONNOLLY:  Thank you, your Honor.  I think I
 4   would focus here on burden, and I'd focus on prejudice,
 5   because I think the initial disclosures, which I'm happy to
 6   give your Honor copies of the --
 7              THE COURT:  No, I don't want to see them.
 8              MR. CONNOLLY:  But the -- I know you want more
 9   paperwork.
10              THE COURT:  No, I don't.
11              MR. CONNOLLY:  The initial disclosures demonstrate
12   that there's actually no burden here and that the prejudice
13   would be significant.  So on burden, which is obviously the
14   defendant's need to establish that the discovery is going
15   to be oppressive and burdensome to them, we have not
16   exchanged any interrogatories or requests for production,
17   so none of that is out the door yet.  And so no one can
18   actually say it's going to be burdensome.  And the one data
19   point we do have on burden has to do with the
20   identification that the parties have made of individuals
21   with knowledge because those will be the custodians from
22   whom this group of defendants would have to gather
23   documents.  Drs. Bredt and Pitt have only identified two
24   people with relevant knowledge, themselves, in terms of
25   things that they would have to collect documents from.  QCM
```

1                              PROCEEDINGS                    25

2  has identified one person, their principal, as the only

3  person with relevant knowledge; and so, therefore, you're

4  talking about collecting documents from one person.  The

5  dot.com defendants didn't identify themselves at all as

6  having release knowledge, but I'm going to assume that they

7  do.  And so that's three people.

8             THE COURT:  Okay.  Let me stop you right there.

9             MR. CONNOLLY:  Yes.

10            THE COURT:  I was actually thinking more about

11  Cassava's witnesses.  If there are parallel proceedings

12  which cannot be disclosed, why are we not -- why would we

13  end up in -- why would we put defendants through having to

14  either seek documents or depositions or other disclosures?

15  What do you do with a document request that says produce

16  everything that has been provided to a regulatory or

17  investigative agency; identify every single meeting you

18  have had with any regulatory or investigative or criminal

19  agency; let's depose somebody and have them take the Fifth

20  multiple times until something is closed; why do we want to

21  do that?

22            MR. CONNOLLY:  First, you're presupposing

23  something that is not accurate.  I have not asserted the

24  Fifth Amendment.  And so you're claiming that my clients

25  are --

```
 1                        PROCEEDINGS                   26
 2            THE COURT:  I know.  But what I am saying -- I am
 3   telling you this from my experience, both managing cases
 4   that have parallel proceedings for the last several years,
 5   as well as in my experience as a private practitioner
 6   working at the intersection of bankruptcy, criminal, SEC
 7   and civil proceedings.  So I am asking you how do you
 8   respond to that, if your client gets document responses,
 9   requests for deposition, interrogatories that seek that
10   information, the same information that you just said
11   earlier you are not at liberty to disclose?
12            MR. CONNOLLY:  So there is a fine distinction
13   there, your Honor.  So if you're asking me for the
14   documents that have been provided to regulatory
15   authorities, I absolutely can provide that information.
16   That's going to be part of my document production already.
17   If you're asking me for things that went to a DOJ, I'm
18   absolutely giving you that already because I'm providing
19   it, anyways, as part of my regular production.  So the
20   only -- I'm trying to think if there's any category of
21   document request that I'm going to get hit with that I
22   would have to assert anything that would prevent it from
23   being disclosed.  And I can't think of in this context
24   anything.
25            And if there's concern about the regulatory
```

1

2   proceedings and the status of it are so gave, then I am

3   happy to go back to my client and I'm happy to go back to

4   the attorneys who are handling that directly to find out if

5   I can give you a better update with respect to it.  But

6   right now, sitting here, I see no reason why I'm holding

7   back anything from my production based upon those parallel

8   proceedings.  I just don't see it.  And so it's speculative

9   that I might have it.  And if we have to wrestle with it

10  and there is of 25 RFPs one that I have to go back and

11  discuss with the Court, well, that's the exact same thing

12  we do whenever we have an RFP that might have some

13  disagreement over an attorney-client privilege assertion of

14  it.

15          So I am not going to be holding back on

16  proceeding with the discovery.  My client needs to get

17  discovery going, and they need to get it going fast because

18  the one thing that we learned from the 26(a) disclosures is

19  that the majority of the information or a very significant

20  portion of the information that is critical to this case is

21  in the hands of third parties.  QCM identified nine third

22  parties they said had relevant information.  The dot.com

23  defendants identified 40 third parties that they said had

24  relevant information.  I need to start issuing subpoenas to

25  those third parties.  I need to get discovery requests out

PROCEEDINGS                    28

to them because they're under no preservation obligations

at all.  Indeed, I need interrogatories because I don't

even know all the third parties that are at play right now.

QCM in their report said that they relied upon a group of

unnamed scientists.  But when I read their 26(a)(1)

disclosure, they're not there.  So now there are some

unnamed scientists that I still need to figure out who they

are.  So delay from my end risks losing discovery from the

third parties that all the parties in their 26(a)(1)s said

were highly relevant.  And there's no reason to do that

because I can't satisfy their burden element.  They've got

six custodians.  I have far more that I have to deal with.

I am taking on a bigger burden.  They have six custodians.

That's it.  That's not burdensome under any measure.

            MR. BROMBERG:  Can I be heard on that, your Honor?

            THE COURT:  Yes.  I would love for you to be heard

on that.

            MR. BROMBERG:  So I'm not sure how Mr. Connolly

can say that discovery will not be burdensome here because

discovery will need to be taken not only from the six

defendants who are before your Honor today but from the

plaintiff, as to whom we expect there will be at least six,

probably twice as many employees who need to be deposed,

putting aside all of the document productions.  And then,

```
 1                          PROCEEDINGS                    29
 2   as Mr. Connolly mentioned, there are literally dozens of
 3   third parties as to whom just documents will need to be
 4   taken and discovery -- depositions will need to be taken.
 5   And, in addition to all that, your Honor, there's
 6   Dr. Markey, who still hasn't been served.  And then not
 7   only will there be the usual burdensome discovery of
 8   electronically stored information, but all of this
 9   information pertains to the subject matter of very complex
10   scientific studies and academic papers, which can only
11   vastly elevate the costs and burden of discovery, which
12   include, of course, expert discovery, should that become
13   necessary.
14           So that's what I have to say as to burden.  Now,
15   as to the regulatory proceedings, first of all, as your
16   Honor noted, those regulatory proceedings are still
17   ongoing.  As my able co-counsel has informed me, only on
18   the 28th of February Cassava filed its report stating that
19   those proceedings are ongoing.  I've also been informed by
20   my co-counsel that the plaintiffs in the securities class
21   action ongoing in the Western District of Texas requested
22   documents from Cassava pertaining to the ongoing regulatory
23   and criminal proceedings, and Cassava opposed that request.
24   We would, of course, fully expect to make similar requests
25   to Cassava.  To the extent that those regulatory and
```

```
 1                      PROCEEDINGS                 30
 2   criminal proceedings are still ongoing, it's not clear that
 3   we'd be able to obtain the information that we're seeking
 4   at this juncture, which --
 5              THE COURT:  Let me just stop you right there.  You
 6   said there's plaintiffs in a securities class action in the
 7   Eastern District of Texas who sought documents, and Cassava
 8   opposed those requests.  They opposed them on the basis
 9   that there were ongoing parallel proceedings or for some
10   other reason?
11              MR. BROMBERG:  It's a Private Securities
12   Litigation Reform Act, PSLRA automatically stays discovery
13   in securities fraud cases until an MTD is decided, the
14   motion to dismiss is decided.
15              MR. CONNOLLY:  Can I speak to that, your Honor?
16              THE COURT:  Yes.
17              MR. CONNOLLY:  So --
18              THE COURT:  Are you -- do you represent Cassava in
19   the securities litigation?
20              MR. CONNOLLY:  No, I do not, your Honor.
21              THE COURT:  Okay, let's hear from Mr. Bromberg,
22   then.
23              MR. BROMBERG:  The Court can take judicial notice
24   of Cassava's conduct in that securities class action.  It's
25   in the Western District of Texas.  And contrary to the
```

1                          PROCEEDINGS                    31

2    position they're taking here, Cassava opposed the

3    plaintiffs' motion for partial relief from the PSLRA

4    discovery stay.  And I'll quote from their brief.  They

5    say, "Here, plaintiffs have failed to show they will be

6    unduly prejudiced by having to wait just a few more months

7    to obtain the discovery at issue.  After all, it is not as

8    though they will be obstructed from obtaining the discovery

9    forever, because the stay is temporary and lasts only

10   unless and until plaintiffs' Complaint survives the motion

11   to dismiss stage, when they will have access to all of the

12   discovery material they seek."  That's 21-cv-751-DAA,

13   Western District of Texas, October 25th.

14              THE COURT:  21-cv-751?

15              MR. BROMBERG:  751-DAA, correct, your Honor.  And

16   that's Docket 82.  And based on that argument, the Court in

17   the Western District of Texas maintained the PSLRA

18   discovery stay, and we believe the same result should

19   obtain here.  The Court should exercise its discretion to

20   impose a stay until such time as the motions to dismiss

21   have been adjudicated.

22              THE COURT:  All right, let me hear again,

23   Mr. Connolly, about -- or Mr. Frey about the third parties

24   because if there is anything that I would be concerned

25   about if there's a stay entered, I would be concerned about

```
 1                        PROCEEDINGS                32

 2   preservation by potential third parties, preservation

 3   issues.

 4             MR. CONNOLLY:  I think there's two ways to

 5   approach that, your Honor.  I completely understand my

 6   friend's argument regarding the concern about depositions

 7   and the costs associated with the depositions  If the Court

 8   wants to stay depositions, I would be amenable to that so

 9   that we could focus on the documents --

10             THE COURT:  Mr. Connolly, you're not answering my

11   question.  My question was --

12             MR. CONNOLLY:  And this is where I was going --

13             THE COURT:  -- preservation issues with third

14   parties who may not be on notice of this lawsuit and a duty

15   to preserve.

16             MR. CONNOLLY:  So I need to be able to serve

17   subpoenas to those third parties because that does start to

18   trigger the obligation to preserve.

19             THE COURT:  I know.

20             MR. CONNOLLY:  And I do need at least some

21   discovery --

22             THE COURT:  Who are these third parties, and --

23   you don't have to identify them, but you have to explain to

24   me why these third parties matter and why these third

25   parties might not yet be on notice.  I understand, I fully
```

```
 1                        PROCEEDINGS                    33
 2  get it, that a subpoena is for damn sure the start date,
 3  but that doesn't mean that they are not already on notice
 4  and could be, could have a duty to preserve already.  So
 5  I'm trying to parse that out, okay?
 6            MR. CONNOLLY:  Sure.  The third parties are the
 7  third parties that these defendants identified in their
 8  Rule 26(a)(1) disclosure statements.  These defendants --
 9  I'll use the dot.com defendants as my example -- identified
10  40 third parties that they claimed had relevant knowledge.
11  They range from scientific journals to scientists to
12  individuals who have done some testing on our drug to other
13  individuals that they may or may not have been relying on
14  for their statements.  And so when I think through the
15  third parties, there is a significant segment of them that
16  are being identified by these defendants in their Rule
17  26(a)(1) disclosures as individuals that they are telling
18  us have relevant knowledge.
19            THE COURT:  Isn't that on them, then?
20            MR. CONNOLLY:  No.  I need that discovery because
21  they might be using that to support their actual malice.
22            THE COURT:  Right.  But if they're going to use
23  it to support their actual malice, then the documents exist
24  and are preserved.
25            MR. CONNOLLY:  Not -- no.  If these third parties
```

PROCEEDINGS                     34

had oral communications with any of these witnesses and

these third parties have their own documents discussing

what they did or did not know, I have to have that

information.  If you are relying on a third party as a

source --

        THE COURT:  Doesn't it only matter what the third

party told or provided to the defendants, which the

defendants presumably would have?

        MR. CONNOLLY:  No.  Because the credibility of the

third party is the quintessential analysis of actual

malice.  If the third party is not a reliable source which

I can establish with information in the possession of the

third party, then you cannot rely on them for actual malice

purposes.  And in fact, what the case law says is your

reliance upon them undermines your credibility.

        THE COURT:  Let me hear from the defendants who

listed these third parties in their disclosures.

        MR. KUMAGAI:  Your Honor, Dave Kumagai for the

dot.com defendants.  So we don't understand Cassava's

concern here.  We actually understand that they've already

served preservation notices on third parties that they

believe to have relevant information, and so these are

people that we think may have relevant information in

support of our defenses.  As Cassava's counsel noted,

```
 1                          PROCEEDINGS                    35
 2   they're scientists and --
 3             THE COURT:  Wait, wait, wait.  Preservation
 4   notices have already been served by you?
 5             MR. CONNOLLY:  No, your Honor.  We sent to the 19
 6   third parties that we listed, we told them we have a
 7   lawsuit pending --
 8             THE COURT:  Okay.  What about the third parties
 9   disclosed by defendants?
10             MR. CONNOLLY:  I have not sent anything to them
11   yet.  Again, my letter doesn't have any binding authority,
12   of course, but I have not sent it to them yet.
13             THE COURT:  Let me decide whether that has any
14   binding authority.
15             Let me hear from Mr. Kumagai.  I mean, are the
16   third parties on your initial disclosures, are they
17   preserving documents?  I mean, I don't understand.  You're
18   saying that third parties on your initial disclosures have
19   already gotten preservation notices?
20             MR. KUMAGAI:  Not from us, your Honor.  We
21   understand from our clients that some third-party notices
22   have gone out.  But we haven't sent notices yet to these
23   individuals.
24             THE COURT:  Okay.  You know what, first ruling of
25   the day.  You're going to meet and confer and you're going
```

1                          PROCEEDINGS                    36

2  to figure out which third parties should get preservation

3  notices and who's going to send them, and you're going to

4  send them.  Okay?  This is for everybody.  This is not just

5  for plaintiffs, this is just for defendants.  Okay, you're

6  going to figure this out.  But I don't see this as a reason

7  to have everybody engaging in wholesale discovery.  All

8  right?

9            Was there anything, Mr. Connolly, or Mr. Frey,

10 that you didn't get to say about the discovery stay

11 otherwise that you would like to say?  I'm not -- I told

12 you where I'm leaning.  I'm not going to rule except to

13 temporarily stay any other discovery other than the meet

14 and confer on the preservation notices until I actually

15 issue a written order.  Okay?  I'm going to need to take

16 some time to think about this.  I'm going to need to see

17 the transcript.

18           MR. CONNOLLY:  Nothing further, your Honor.

19           THE COURT:  Okay.  Anything further that the

20 defendants would like to add that's not in their papers or

21 that's come up today that you would like to respond to?

22           MR. BROMBERG:  Not from Quintessential, your

23 Honor.

24           MS. SPILLANE:  No, your Honor.

25           MR. KUMAGAI:  No, your Honor.

PROCEEDINGS


1                          PROCEEDINGS                      37

2             THE COURT:  All right, then, I am -- let me see if

3 the dates -- I'll enter a discovery end date for now, just

4 so that the docket system and all our internal systems

5 don't have a big headache about the discovery end date.

6 But because discovery is currently stayed for a short time

7 until I formally rule on the discovery stay -- and I've

8 already told you where I'm leaning -- that will probably

9 get pushed and will get extended, depending on when the

10 motion to dismiss is decided and how it's decided.  Okay?

11 So I understand it's December of 2023, so let's not worry

12 about it right now.

13             Right now you are directed to meet and confer on

14 preservation notices that need to go out to third parties,

15 figure out all the third parties who need to get

16 preservation notices, make sure they go out.  Okay?  Work

17 together on that.

18             And then I think, because the motion to dismiss is

19 pending, the burden is on me -- usually I don't let you go

20 without another deadline that you have to follow -- but

21 since I have all the homework now, I think I just have to

22 go and do my homework.  So can you resolve the third-party

23 preservation notices in the next two weeks and then just

24 file a joint status letter saying that you've resolved it?

25 Or, if you need more time, explain to me why you need more

PROCEEDINGS                38

1

2   time.

3          And then if there is a final resolution that can

4   be disclosed of any of the regulatory or criminal

5   proceedings, don't assume I'm going to see it.  Okay?  I'll

6   put that on plaintiff's counsel to file a letter letting me

7   know if something has changed there.  Okay?  Otherwise,

8   silence will mean you can't say anything one way or the

9   other until you can.  Okay?  Because I think that might

10  also be helpful in understanding the motion to stay.  I

11  mean, I don't think it will take that long; but in the

12  event something happens next week, for example, that would

13  be helpful.

14          MR. CONNOLLY:  Sure.

15          THE COURT:  Okay.  Yes?

16          MR. KUMAGAI:  Your Honor, sorry.  Just to correct

17  one minor point, I believe plaintiff's counsel mentioned

18  that we had been retained to represent the defendant

19  Markey, who has not been served yet.  We did have

20  discussions with him early on, but we have not been

21  formally retained.  So I just wanted to correct that point.

22          THE COURT:  All right, so Dr. Markey is currently

23  (indiscernible).

24          Okay, All right, anything else we need to do at

25  this time?

```
 1                          PROCEEDINGS                    39

 2              MR. CONNOLLY:  Not from the plaintiffs, your

 3    Honor.

 4              THE COURT:  Okay.  Defendants?  Any

 5              MR. BROMBERG:  No, your Honor.

 6              THE COURT:  All right -- oh, you know, one last

 7    thing, Case Management Plan, you had said you will discuss

 8    the possibility of settlement at the Rule 26(f) meet-and-

 9    confer.  Is there anything you would like to talk about

10    settlement-wise, either on the record, meaning you've

11    decided and you want to do mediation or you might want to

12    do something private or you're not ready; or is there

13    anything you would like to discuss off the record, which I

14    can also do?

15              MR. CONNOLLY:  Not from the plaintiff's side?

16              MS. SPILLANE:  No, your Honor.

17              THE COURT:  Okay, anything off the record?  Okay,

18    we're going to close the record.  I'm going to request the

19    parties order a copy of the transcript.  I understand there

20    to be three groups of defendants, so I'm going to ask you

21    to split the costs four ways.  Okay?

22              All right.  Thank you very much.

23              (Whereupon, the matter is recessed.)

24

25
```

40

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the case of Cassava Sciences,
Inc. v. Bredt et al, Docket #22-cv-09409-GHW-OTW, was
prepared using digital transcription software and is a true
and accurate record of the proceedings.

        Signature /s/Carole Ludwig

            Carole Ludwig

        Date:    March 13, 2023