**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>       Plaintiffs,<br>v.<br>CASSAVA SCIENCES, INC., REMI BARBIER, and DR. LINDSAY BURNS,<br><br>       Defendants. | Civil Action No. 1:24-cv-05948-JLR<br><br>**<u>Oral Argument Requested</u>** |

**DEFENDANT CASSAVA SCIENCES, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY
OF DAVID A. SANDERS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................4

    I.    The Defamation Action and the Claims Now Before the Court ...................................4

    II.   Dr. Sanders and His Report ..........................................................................................4

LEGAL STANDARD .........................................................................................................5

ARGUMENT .......................................................................................................................7

    I.    Dr. Sanders Is Not Qualified to Offer Any of the Opinions in His Report ..................7

    II.   Dr. Sanders Applied No Expertise to Any Question in This Case .............................11

        A.   Dr. Sanders Recites Documents the Jury Can Read for Itself .........................12

        B.   Where Expertise Was Required to Interpret His Comparisons, Dr. Sanders Supplied None ..................................................................................................14

        C.   Dr. Sanders States General Propositions He Applies to Nothing ....................15

        D.   Each of Dr. Sanders's Conclusions Is Baseless ..............................................16

            1.   The Recordkeeping Conclusions ...........................................................16

            2.   The "Legitimate Basis to Question" Conclusions ..................................16

            3.   The ELISA Conclusion ...........................................................................17

            4.   The Immunoblot Conclusion ..................................................................20

    III.  Instead of Helping the Jury, Dr. Sanders Usurps the Jury's Role.............................21

        A.   Dr. Sanders Announces Legal Conclusions in Scientific Vocabulary.............21

        B.   Dr. Sanders Opines on the Motives and Mental States of Others....................22

        C.   Dr. Sanders Aggregates Information Without Regard to Date, Including Information That Did Not Exist When Cassava Acted....................................23

    IV.  The Report Would Substitute a Trial of Dr. Wang's Conduct for the Trial of Plaintiffs' Claims .....................................................................................................24

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ..........................6, 11, 13

*Cassava Sciences, Inc. v. Bredt*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ............................4

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..................................................5, 21

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ..................................................................6, 13, 20

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) .................................................................7, 21, 22

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009)........................7, 21, 23

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................6, 13, 15, 23

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...................................................................21

*Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505 (2d Cir. 1977) .....................................................21

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ......................................6, 7, 11, 15, 23

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736 (2d Cir. 1998) ........................6, 7

*Rutledge v. Walgreen Co.*, 2026 WL 2015284 (2d Cir. July 13, 2026).....................................11, 18

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)........................................................7, 21, 22

*United States v. Frabizio*, 445 F. Supp. 2d 152 (D. Mass. 2006) .................................................21

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ................................................................6, 13

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004)........................................................6, 7

*United States v. Wang*, No. 8:24-cr-00211-TDC (D. Md. Oct. 17, 2025) ..........................11, 15, 21

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015).............................................7

**Statutes and Rules**

Fed. R. Evid. 104(a)..........................................................................................................................6

Fed. R. Evid. 401 .......................................................................................................................1, 25

Fed. R. Evid. 403 .................................................................................................................1, 7, 25

Fed. R. Evid. 702 .................................................................1, 5, 6, 7, 12, 15, 18, 24, 25

Fed. R. Evid. 703 .................................................................................................................1, 19, 25

N.Y. Civ. Rights Law § 70-a .....................................................................................................4, 22

**Other Authorities**

Fed. R. Evid. 702 advisory committee's note to 2023 amendment .................................................6

Defendant Cassava Sciences, Inc. ("Cassava") respectfully submits this memorandum of law in support of its motion to exclude the expert testimony of Dr. David A. Sanders under Federal Rules of Evidence 401, 403, 702, and 703.

## INTRODUCTION

Rule 702 requires an expert to bring specialized knowledge to bear, through a reliable method, on a question the jury will actually be asked to decide. Plaintiffs' retained expert, Dr. David A. Sanders, will do none of those things. He is a virologist who is asked to opine on fields in which he concedes he has no expertise. His "opinions" consist of reading documents and summarizing them; comparing two spreadsheets side by side and observing that figures differ; looking at images in published papers and observing that they resemble one another; and reciting propositions he applies to nothing. And that all culminates in him repeatedly "concluding"—using no disclosed or reliable expert methodology—that Plaintiffs' accusations against Cassava were "virtually impossible" to refute; that there was a "legitimate basis to question" certain published scientific research; and that "[a]nyone reasonably familiar with the biomedical sciences" would have recognized as much. In short, Dr. Sanders offers nothing more than agreement with Plaintiffs' view of the record, with the imprimatur of a supposed "expert." Rule 702 does not permit Plaintiffs to place that before a jury and cloak it as expertise.

Dr. Sanders's proffered testimony suffers four flaws, each of which independently requires exclusion.

*First*, Dr. Sanders is not qualified to offer any of the specialized opinions in his report. He testified that he is not an expert in neurobiology and not an expert in Alzheimer's disease, the field whose research he purports to evaluate. He has no training in digital image forensics, has not performed an immunoblot or an ELISA in decades, has never used the software or the instrument

1

whose output he analyzed, and has no formal training in research ethics or scientific recordkeeping beyond the single course most graduate scientists take. His self-proclaimed title of "Scientific Publication Ethicist" corresponds to no degree, certification, or course of training.

*Second*, Dr. Sanders applied no expertise to any question in this case. He summarizes documents the jury can read and evaluate for itself: regulations and policies governing different actors in different settings; accusations others have made; institutional and journal proceedings; and Cassava's public filings. He compares two sets of spreadsheets and reports that the figures differ. He compares published images by eye and reports that they look alike. And he states general propositions he never applies to any dataset or disputed fact. None of that constitutes legitimate expert testimony. Dr. Sanders fails at every juncture where specialized knowledge may theoretically be helpful to assist the jury: which recordkeeping authority governed which experiment; whether a particular output file actually recorded that which a scientific instrument actually measured; whether an apparent discrepancy admits an innocent explanation; and whether apparent similarities in a low-resolution image mean anything at all.

*Third*, in lieu of analysis, Dr. Sanders purports to answer questions that the jury itself must decide, using information that a jury cannot use. He opines that accusations against Cassava were "virtually impossible" to refute and that there was a "legitimate basis to question" Cassava's research. He divines the unstated reasoning of journal editors and investigators. And he tells the jury what "[a]nyone reasonably familiar with the biomedical sciences" would have recognized, without ever specifying who that person is or what that person knows. Dr. Sanders never identifies what Cassava knew on the date it filed or continued its defamation action against Plaintiffs and never separates what was knowable then from what emerged in the years afterward. He instead commingles decades of material—publications, journal actions, CUNY proceedings, criminal

allegations, guidance issued in 2025, and spreadsheets created in December 2025—into one retrospective verdict. He then offers that verdict as a measure of what Cassava should have believed in 2022. That is not an expert opinion. It is an attempt to answer the ultimate question the jury must decide, restated in scientific vocabulary.

*Fourth*, admitting the report would substitute a trial of Dr. Wang's scientific conduct for the trial of Plaintiffs' claims. The report is focused almost entirely on the conduct of Dr. Wang, not Cassava or any other party. Dr. Sanders's inferential gambit is that Dr. Wang committed misconduct, that Cassava collaborated with Dr. Wang, and that Cassava therefore lacked a good faith basis to bring the Defamation Action. Litigating that chain would require days of testimony about plate readers, optical densities, gel splicing, journal practice, and records retention, met by a rebuttal case on each subject, directed to an issue the jury will not be asked to decide. Further, Dr. Sanders would invite the jury to reason in precisely the ways the law forbids: to treat his 2026 conclusions as evidence of what Cassava knew in 2022; to hold Cassava answerable for the laboratory practices of a non-party; and to conclude that because Dr. Sanders now endorses Plaintiffs' accusations, Cassava must have sued to silence critics it knew were right. Terms like "fraud," "fabrication," and "falsification" carry that reasoning still further when an "expert" witness supplies them, because a jury will hear contested accusations presented as settled scientific fact.

No narrowing can cure these overlapping defects. There is no subset of Dr. Sanders's opinions that a virologist is qualified to give, that reflects legitimate expert work, or that bears on what Cassava knew or intended when it sued. The Court should exclude his report and testimony in their entirety.

**BACKGROUND**

## I.   The Defamation Action and the Claims Now Before the Court

On November 2, 2022, Cassava filed a defamation action against Plaintiffs and others (the "Defamation Action") after they accused Cassava of fraud in connection with the development of simufilam, its investigational candidate for the treatment of Alzheimer's disease. ECF 9, FAC ¶¶ 41, 46. In March 2024, Judge Woods dismissed Cassava's amended complaint in the Defamation Action for failure adequately to plead actual malice, while granting leave to replead claims concerning statements he found defamatory *per se. Cassava Sciences, Inc. v. Bredt*, 2024 WL 1347362, at *17–18, *20–29 (S.D.N.Y. Mar. 28, 2024). Cassava filed a Second Amended Complaint on April 29, 2024, and voluntarily dismissed the action on August 2, 2024. FAC ¶¶ 69, 80.

Plaintiffs now assert anti-SLAPP, malicious prosecution, and conspiracy claims against Cassava and two individual defendants. Those claims require Plaintiffs to prove, among other things, that Cassava commenced or continued the Defamation Action "without a substantial basis in fact and law," with an "entire lack of probable cause," with actual malice, and for an improper purpose. N.Y. Civ. Rights Law § 70-a; ECF No. 82 at 26–29. The inquiry at trial must, therefore, be directed to *Cassava's* information, beliefs, and purpose at the time of each challenged litigation decision.

## II.   Dr. Sanders and His Report

Dr. Sanders is an associate professor of biological sciences at Purdue University. Exhibit 1 (Sanders Rpt.) ¶ 3. His academic training and peer reviewed research principally concern molecular biophysics, biochemistry, virology, membrane fusion, and viral glycoproteins. Exhibit 2 (Sanders C.V.) at 1–3. Plaintiffs nevertheless asked him to address scientific recordkeeping; research integrity and research misconduct standards; supposed "signs of research misconduct" in

the research underlying simufilam; and criteria for statistical analysis of biomedical data. Sanders Rpt. ¶ 4. Dr. Sanders's report addresses those subjects in four corresponding sections.

Section I surveys recordkeeping authorities drawn from federal regulations, funding agency policies, institutional retention schedules, and Dr. Sanders's own laboratory practices, applying the resulting composite standard to Dr. Wang and Cassava. *Id.* ¶¶ 10–77. Section II recites definitions and elements of research misconduct, then recounts the history of accusations, journal notices, and institutional proceedings concerning Dr. Wang's work. *Id.* ¶¶ 78–110. Section III, titled "Signs of Research Misconduct in Simufilam Research," offers four discrete critiques: of ELISA data Dr. Wang reported to Cassava, *id.* ¶¶ 111–119;[1] of biomarker data from a Phase 2b clinical trial, *id.* ¶¶ 120–127; of biomarker testing performed by Quanterix (an external laboratory), *id.* ¶¶ 128–131; and of immunoblot figures published by Dr. Wang, *id.* ¶¶ 132–153.[2] Section IV states three general propositions about biomedical statistics. *Id.* ¶¶ 154–157.

**LEGAL STANDARD**

Rule 702 requires Plaintiffs to "demonstrate[] to the court that it is more likely than not" that each opinion will help the jury, rests on sufficient facts or data, results from reliable principles and methods, and reflects a reliable application of those methods to the facts. Fed. R. Evid. 702. The first requirement is one of fit: expert testimony must be "relevant to the task at hand" and must

---

[1] An ELISA (Enzyme-Linked Immunosorbent Assay) is a laboratory technique that measures the concentration of a specific biological molecule, often a protein biomarker, in a sample such as blood plasma or cerebrospinal fluid. Exhibit 5 (Scofield Rpt.) ¶ 17. The assay is run on a plate of (typically) 96 wells; a series of chemical reactions causes each well to produce an optical signal, and a "plate reader" measures that signal and converts it into a numeric value, commonly an optical density reading. *Id.* ¶¶ 18–20. That instrument output is the "raw signal" for each well. *Id.* ¶ 21.

[2] A Western blot (or immunoblot) is a laboratory technique used to detect and compare specific proteins in a sample; the result is an image of dark bands on a lighter background, each band reflecting the presence and amount of a target protein. Sanders Rpt. App. A ¶¶ 3, 19; Scofield Rpt. ¶ 2. Dr. Wang co-authored numerous published papers containing immunoblot figures relating to his research concerning simufilam.

bear a valid connection to the pertinent inquiry. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591, 597 (1993). An opinion may rest on valid science and still be inadmissible if it does not help the jury decide a consequential fact. Fed. R. Evid. 702(a); *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

The Court must also conduct a "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). The analysis must be reliable at every step, and a court may exclude an opinion connected to the record only by the expert's *ipse dixit* or by an unexplained analytical leap. *Id.*; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). These are threshold questions for the Court, not the jury: the "sufficiency of an expert's basis, and the application of the expert's methodology," are matters of admissibility, *see* Fed. R. Evid. 702 advisory committee's note to 2023 amendment, and Rule 104(a) commits them to the Court in advance of trial.

Rule 702 is not a credential check. Qualifications must match the specific opinion offered, and expertise in one field does not confer expertise in another. *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998); *Nimely*, 414 F.3d at 399 n.13. Nor does an advanced degree transform lay observation into expert testimony: Rule 702 does not reach opinions "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004), and an expert may not simply narrate documents the jury can read without assistance, *id.* at 540–41, 551; *United States v. Mejia*, 545 F.3d 179, 197–98 (2d Cir. 2008).

Finally, an expert may not state ultimate legal conclusions, communicate a legal standard, tell the jury what result to reach, or opine on a party's "knowledge, motivations, intent, state of mind, or purposes." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir. 1992); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009). Testimony that clears Rule 702 must still be excluded where its probative value is substantially outweighed by unfair prejudice, confusion of the issues, or the danger of a collateral trial. Fed. R. Evid. 403.

## ARGUMENT

Four independent defects require exclusion of Dr. Sanders's report and any associated testimony: (I) he is not qualified to offer any of his opinions; (II) he applied no expertise to any question in this case; (III) in place of analysis, he answers the questions the jury must decide; and (IV) the report would replace the trial of Plaintiffs' claims with a trial of a non-party's scientific conduct.

## I.     Dr. Sanders Is Not Qualified to Offer Any of the Opinions in His Report

Qualification is a threshold requirement, assessed opinion by opinion. A witness may be eminently qualified in his own discipline and wholly unqualified to offer the opinion actually proffered; what matters is whether his knowledge, skill, experience, training, or education fits the specific question on which he proposes to testify. *Tin Yat Chin*, 371 F.3d at 40; *Nora Beverages*, 164 F.3d at 746. The Second Circuit has accordingly upheld exclusion where a physician's general medical training did not extend to the specialized subject of his opinion. *Nimely*, 414 F.3d at 399 n.13; *see also Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015).

Dr. Sanders is a virologist and biochemist. His training and peer reviewed research concern molecular biophysics, biochemistry, virology, membrane fusion, and viral glycoproteins. Sanders C.V. at 1–3. He offers no opinions in this case on any of these topics.

By contrast, Dr. Sanders has no practical expertise in Alzheimer's disease, clinical trial design, biomarker analysis, bioanalytical validation, biostatistics, FDA regulation, electronic assay data provenance, or forensic image analysis. Yet each opinion in his report requires expertise in one or more of those disciplines.  Specifically, Dr. Sanders purports to:

- tell a jury that Dr. Wang fabricated data in a field he concedes is not his, using an instrument he has never operated and software he has never used;

- identify image manipulation through the discipline of forensic image analysis in which he has no training;

- define the recordkeeping obligations binding "any good scientist" solely on the strength of an introductory "responsible conduct of research" course that is "a standard part of a graduate career," and without a single peer reviewed publication on the subject;

- speculate about how research misconduct investigations are conducted and about why investigative bodies decline to make formal findings, on the strength of an unspecified "experience with similar investigations" that he never identifies by institution, committee, or role, and where the only integrity work his CV discloses is opinion columns and press interviews;

- tell the jury what the FDA and NIH require, having never worked for the FDA, never conducted an FDA-supervised clinical trial, never taken a drug through approval, and never audited a laboratory under the FDA's Good Laboratory Practices, and having never once applied the NIH recordkeeping standards he cites—to a grantee, an organization, or a laboratory, on NIH's behalf or otherwise;

- assess the integrity of a Phase 2b Alzheimer's trial and its biomarker data when he is not an expert in neurobiology or Alzheimer's disease; and

- instruct the jury on the criteria governing statistical analysis of biomedical data, with no training, practical experience, or published work in biostatistics.

The mismatch between testimony and qualifications is apparent in Dr. Sanders's own deposition testimony, *see* Exhibit 3 (Sanders Dep. Tr.), and resume:

| Opinion Offered | Expertise Required | Dr. Sanders's Testimony / Resume |
|---|---|---|
| Published immunoblot images show signs of falsification or fabrication. Sanders Rpt. ¶¶ 132, 152. | Performing immunoblots; forensic analysis of digital images. | Last performed an immunoblot "decades" ago. Dep. Tr. 343:18–21. No training or certification in digital image forensics, and no methodological or validation work on duplication detection or on compression and resolution artifacts. Sanders C.V. at 1–3. |
| Dr. Wang fabricated ELISA data. Sanders Rpt. ¶ 119. | ELISA methodology; plate reader instrumentation and analysis software. | Has not performed an ELISA in "decades." Dep. Tr. 262:8–12. Not "intimately familiar" with the Multi-Mode Analysis Software and has never used it. *Id.* at 244:2–22. Does not use the DTX 880 plate reader, *id.* at 244:23, and "did not examine one of the machines"; first read the manual only after being retained. *Id.* at 244:8–14. |

| Opinion Offered | Expertise Required | Dr. Sanders's Testimony / Resume |
|---|---|---|
| Recordkeeping standards and the elements of research misconduct. Sanders Rpt. ¶¶ 15–50, 81–83. | Research ethics; research misconduct investigations. | Only training is the "responsible conduct of research" course that is "a standard part of a graduate career." Dep. Tr. 43:2–44:21. No specialized courses in scientific ethics and no other formal training. *Id.* at 44:2–3, 44:12–18, 44:19–45:4. No peer reviewed publications on the conduct of research misconduct investigations.<br><br>Bases opinions about how investigations proceed on unspecified "experience with similar investigations," Sanders Rpt. ¶ 100, without identifying any institution, committee, or proceeding in which he participated. Discloses no service as a research integrity officer or on any institutional inquiry or investigation committee. Disclosed research integrity work consists of opinion columns and press interviews. Sanders C.V. at 4–6. |
| The integrity of Cassava's Phase 2b study and its biomarker data. Sanders Rpt. ¶¶ 120–131. | Alzheimer's disease; neurobiology; clinical-trial design; biomarker analysis. | "I am not" an expert in neurobiology; "I am not" an expert in Alzheimer's disease. Dep. Tr. 21:21–22:2. |

| Opinion Offered | Expertise Required | Dr. Sanders's Testimony / Resume |
|---|---|---|
| FDA and NIH requirements. Sanders Rpt. ¶¶ 15–50. | FDA regulation and practice. | Never worked for the FDA. Dep. Tr. 151:2–4. Never conducted an FDA-supervised clinical trial. *Id.* at 151:5–8. Never involved in taking a drug through FDA approval. Id. at 152:9–12. Familiarity derives from teaching about FDA policies. *Id.* at 151:9–13, 152:1–8.<br><br>Never audited a GLP laboratory. *Id.* at 161:18–21. Never employed by NIH; has received NIH funds and served on review panels, but has never applied the NIH recordkeeping standards he cites on NIH's behalf, *id.* at 162:24–163:3, 163:18–21, 164:23–165:3; never reviewed any organization for compliance with NIH rules, *id.* at 164:17–22; never evaluated a laboratory's recordkeeping for NIH, *id.* at 167:25–168:4. |
| Criteria for statistical analysis of biomedical research data. Sanders Rpt. ¶¶ 154–157. | Biostatistics. | No training, practical experience, or peer reviewed work in biostatistics. Sanders C.V. at 1–3. |

The title Dr. Sanders has given himself, "Scientific Publication Ethicist," does not supply the missing expertise. That designation of his own creation, Sanders Rpt. ¶ 3, corresponds to no degree, no certification, and no course of training he was able to identify, Sanders Dep. Tr. 43:2–45:4; *id.* at 57:11–58:5 (belongs to no formed scientific-integrity organization). His experience commenting publicly on scientific controversies is advocacy, not a qualification to authenticate electronic assay data or published images.

No permissible remainder survives. The Court need not consider whether some narrowed version of this testimony might be admissible, because there is no subset of the report that Dr. Sanders is qualified to offer that also bears on what Cassava knew, believed, or intended. Where a

witness lacks the expertise his opinions require, the inquiry ends and the opinions are excluded. *Nimely*, 414 F.3d at 396 n.11, 399 n.13.[3]

## II.    Dr. Sanders Applied No Expertise to Any Question in This Case

Independent of his qualifications, Dr. Sanders performed no expert work. A reliable expert opinion applies a discernible standard in a discernible way and explains how the method links the evidence to the conclusion. *Amorgianos*, 303 F.3d at 267; *Rutledge v. Walgreen Co.*, 2026 WL 2015284, at *21–23 (2d Cir. July 13, 2026). No part of Dr. Sanders's report meets that description. Across 157 paragraphs, Dr. Sanders did four things. He summarized documents. He compared two sets of spreadsheets. He looked at published images. And he recited general propositions that he applied to nothing. A juror can readily do each of these things without assistance. And yet, Dr. Sanders is absent at every juncture where specialized knowledge might actually assist the jury— he does not explain how the documents do and do not apply to these circumstances; he fails to describe what the spreadsheets record and how; he stops short of interpreting or evaluating even a single immunoblot image. Each of these defects independently requires exclusion of the associated opinion.

### A.    Dr. Sanders Recites Documents the Jury Can Read for Itself

Section I of the report assembles a 1993 National Academies publication, NIH grant policies and later intramural guidance, FDA regulations and guidance governing different

---

[3] In the criminal prosecution arising from Dr. Wang's simufilam-related research, the court largely excluded the Government's proffered immunoblot image witness—a research scientist who had published on scientific image analysis and spent years examining published figures for signs of manipulation—and permitted him to offer opinions about the images only to the extent they were "shown to be grounded in his experience as a research scientist using Western blot images rather than any purported expertise in forensic image analysis." Order at 2, *United States v. Wang*, No. 8:24-cr-00211-TDC (D. Md. Oct. 17, 2025), ECF No. 132. Dr. Sanders cannot invoke even that much: he last performed an immunoblot decades ago, and public commentary on research controversies is not laboratory experience.

categories of studies, the retention policies of three institutions, and Dr. Sanders's own preferred laboratory practices. Sanders Rpt. ¶¶ 10–50. Dr. Sanders acknowledges at the threshold that "[d]epending on the work being performed and the context, different requirements may apply to any given laboratory, scientist, or sponsor," *id.* ¶ 16, but he then treats those disparate sources as a universal minimum binding every "good scientist," *id.* ¶¶ 17, 24, 40–42, irrespective of the work being performed and the context. He never explains *which* authority governed a particular experiment, *which* duty belonged to CUNY or to Dr. Wang, *which* obligation belonged to Cassava, or *which* standard even existed at any given point in time. Assembling published authorities and quoting them is not expertise; it is compilation. The report discloses no method for converting this compilation into a governing standard or for applying that standard to particular experiments, actors, and dates. Fed. R. Evid. 702(c)–(d).

Section II of the report is a narrative of other people's accusations. It recites regulatory definitions of fabrication, falsification, and plagiarism, catalogs examples, and then summarizes what Plaintiffs, journals, CUNY, regulators, and litigants said or did concerning Dr. Wang's work. Sanders Rpt. ¶¶ 78–110. Dr. Sanders discloses no method for assessing the significance of these allegations. The jury can read a retraction notice, an expression of concern, and a committee report. Expertise in virology will not assist the jury in that task.

Sections III.B and III.C of the report describe a review of Cassava's own documents and announce Dr. Sanders's conclusions from his reading. The Phase 2b section recounts Cassava's public disclosures concerning the clinical study, the initial biomarker results, and the later reanalysis of those samples, and then declares that there was a "legitimate basis to question the integrity of the phase 2b biomarker data." *Id.* ¶¶ 120–127. Dr. Sanders confirmed at deposition that the facts supporting that conclusion are the disclosures "listed in Paragraphs 120 to 125" of

13

his report and nothing else. Sanders Dep. Tr. 328:2–20. The Quanterix section quotes deposition testimony and Cassava's description of plasma samples tested in two batches, and from the bare fact of batched testing announces a "legitimate basis" for doubt. Sanders Rpt. ¶¶ 128–131. He did not examine the raw results generated by Quanterix, the assay protocol used by the lab, the chain of custody for the samples tested, the performance characteristics of the assay, or the FDA's treatment of two-batch testing generally. In all respects, these sections merely summarize documents already in the record, which the jury can read for itself, and then announce a conclusion resting on Dr. Sanders's say-so alone.

Section III.D of the report similarly lacks any legitimate expert analysis. Here, Dr. Sanders recites allegations made by Plaintiffs and by the authors of the 2021 Citizen Petition, the final report of a 2023 CUNY investigation committee, and a 2022 *PLoS One* retraction notice. He then pronounces that "these documents describe credible and troubling signs of data falsification or fabrication." *Id.* ¶¶ 132–134. Vouching for accusations that others have made is not a methodology; it is editorial comment masquerading as expertise.

An expert may not serve as a mere conduit for documents that the jury can read for itself. Repeating and endorsing the conclusions of others adds nothing that a jury cannot accomplish on its own. *Rezulin*, 309 F. Supp. 2d at 540–41, 551; *Mejia*, 545 F.3d at 197–98. Where the expert's own assurance is the only connection between an expert's conclusion and the underlying record, that testimony is barred by the *ipse dixit* rule. *Joiner*, 522 U.S. at 146; *Amorgianos*, 303 F.3d at 267. Sections I, II, III.B, III.C, and III.D of the report are paradigmatic examples of *ipse dixit* and should be excluded on that basis alone.

14

## B. Where Expertise Was Required to Interpret His Comparisons, Dr. Sanders Supplied None

Both experts and lay people make comparisons. What separates expert analysis from lay observation is what the witness brings to the comparison: an account of what the compared materials *comprise*, of what a difference between them *signifies*, of what *else* might *explain* that difference, and of *why* the difference supports the conclusion drawn. Dr. Sanders supplies none of that. He describes two things (datasets, images), observes that these two things differ or that they resemble each other, and treats the observation itself as an expert opinion. But saying "these are different, and that is suspicious" is not expert testimony, because it is not analysis.

Stripped of its jargon, Dr. Sanders's ELISA work consists of placing two spreadsheets side by side and observing that numbers in one differ from numbers in the other. He calls the workbooks Dr. Wang sent to Cassava the "presented data," calls a second set of files the "raw data," and reports "discrepancies between the datasets from these two sources." Sanders Rpt. ¶¶ 112–116. He described the assignment in precisely those terms: he "was asked to compare the data, here, with the data, here." Sanders Dep. Tr. 309:25–310:5. Appendix E presents the exercise in that form, as paired columns of figures. Reading two columns of numbers and noticing that they do not match is barely even arithmetic. A jury handed both files can perform it, and nothing in the performance draws on virology, biochemistry, or any other specialized field.

The immunoblot work is the visual counterpart. Dr. Sanders examined figures reproduced in Dr. Wang's published papers "with the naked eye," Sanders Rpt. ¶ 135, and reported that bands appear "remarkably similar," share small "dots" or "jutting" features, or look "horizontally

15

stretched," *id.* ¶¶ 135–151. Comparing two pictures and judging whether they resemble each other is likewise an ordinary human capability. *Id.* ¶¶ 132–134.[4]

Rule 702 does not admit testimony "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *Rezulin*, 309 F. Supp. 2d at 540. The objection is not that these tasks were easy. It is that Dr. Sanders brought no specialized knowledge to bear on them, while the form of his presentation lends his lay observations the "aura of special reliability" that attaches to expert testimony. *Nimely*, 414 F.3d at 397. A jury told that a professor of biological sciences has compared spreadsheets and detected fabrication will not readily distinguish the comparison, which requires nothing, from the conclusion, which requires a great deal. Whether these observed differences *mean* anything is a separate question, and the one question in the report that genuinely called for expertise. Dr. Sanders offers no such expert insight.

### C. Dr. Sanders States General Propositions He Applies to Nothing

Section IV of the report states generic propositions about prespecification of statistical analyses, exclusion criteria, and the uniform application of those criteria across a dataset. Sanders Rpt. ¶¶ 154–157. Dr. Sanders then stops. He performs no statistical analysis, identifies no challenged calculation, applies the propositions to no dataset in this case, and draws no case-specific conclusion. The same defect runs through the definitional portions of Sections I and II, which recite recordkeeping norms and misconduct definitions that are never connected to a fact. Abstract principles untethered to the evidence do not "help the trier of fact," and this is doubly true for unremarkable principles that a jury can appreciate without expert assistance. Fed. R. Evid. 702(a); *Rezulin*, 309 F. Supp. 2d at 540–41.

---

[4] The District of Maryland drew precisely that line when excluding the Government's expert witness in connection with the criminal prosecution of Dr. Wang, barring the witness from opining "on whether one image was fabricated, whether two images are the same or not, and whether one image derives from another or does not derive from another." *Wang* Order at 2.

### D. Each of Dr. Sanders's Conclusions Is Baseless

Reading, comparing, and reciting are not the opinions. Dr. Sanders's report advances four conclusions: that recordkeeping failures undermined Dr. Wang's research; that there was a legitimate basis to question Cassava's data; that Dr. Wang fabricated ELISA results; and that published immunoblot images were manipulated. Legitimately reaching such conclusions requires the exercise of judgment based on specialized knowledge. Dr. Sanders's methodology applied neither. Each conclusion is addressed in turn below, and each is baseless.

#### 1. The Recordkeeping Conclusions

Dr. Sanders asserts that recordkeeping "delinquencies" at Dr. Wang's laboratory "seriously undermine" his research and supply a "legitimate basis" to question its integrity. Sanders Rpt. ¶¶ 72–77. He never identifies which recordkeeping authority governed which experiment, or which recordkeeping duty belonged to CUNY, to Dr. Wang, and/or to Cassava—and, as importantly, which did *not*. *Supra* Part II.A. The only exception to this gap is Dr. Sanders's admission that one of the authorities he referenced explicitly does not apply to the work he assessed: he cites the FDA's Good Laboratory Practices for nonclinical laboratory studies, *id.* ¶ 37, then agreed that Dr. Wang's laboratory was not a GLP laboratory and that, if it was not, it "would not" be subject to those regulations. Sanders Dep. Tr. 161:10–162:14.

This failure to match standards to underlying conduct is fatal to the proffered opinion. A conclusion that recordkeeping is "inadequate" is meaningful only if that inadequacy is measured against a legitimately applicable standard. Dr. Sanders makes no attempt to meet this threshold.

#### 2. The "Legitimate Basis to Question" Conclusions

Dr. Sanders concludes that there was a "legitimate basis to question" both the Phase 2b biomarker data and the Quanterix testing. Sanders Rpt. ¶¶ 127, 131. As to the Phase 2b data, Dr. Sanders confirmed at deposition that the only facts underlying this conclusion are Cassava's public

disclosures, listed in his report. Sanders Dep. Tr. 328:2–20. As to Quanterix, the sole basis for his opinion is the fact that plasma samples were tested in two batches. Dr. Sanders never explains *why* batched testing is scientifically improper rather than unremarkable, and he admits that he did not examine the underlying results, protocol, chain of custody, or assay performance characteristics. Sanders Rpt. ¶¶ 128–131.

Here again, Dr. Sanders identifies no basis for his opinion. Identifying a fact and pronouncing it to be troubling, without explaining *why* that fact is questionable, is a conclusion and is not legitimate expert analysis.

### 3. The ELISA Conclusion

Dr. Sanders concludes that "it appears Dr. Wang repeatedly fabricated data from ELISA experiments conducted for Cassava" based on his review of two spreadsheets: the "presented data" and the "raw data." Sanders Rpt. ¶ 119. To make that serious accusation of deliberate fabrication requires that two critical judgments be made, neither of which Dr. Sanders even acknowledges, much less explains.

First, one must determine that one of the two datasets represents the data actually recorded by the ELISA instrument. Here, Dr. Sanders's accusation of fabrication is premised on the assumption that the "raw data" are faithful, unaltered captures of the original ELISA measurements. If that premise is false, any difference between the "raw data" and the "presented data" is meaningless. Yet, Dr. Sanders did *nothing* to establish or confirm this premise. He did not review the source database. He did not create the exported "raw data" himself. He did not determine how or when the "raw data" were created. He did not even know who created the "raw data." He did not inspect the metadata for clues about when or how those files were created. He did not determine whether results stored on the ELISA machine could be reevaluated or

overwritten between the time the samples were run and the "raw data" were downloaded. Sanders Dep. Tr. 259:4–260:25, 263:11–267:6. When asked what steps he took to verify that the "raw data" were properly generated and accurate, Dr. Sanders testified that he "took no steps." *Id.* at 266:9–17. Instead, he "was told to assume that it was the raw data," and he had "no independent information" to confirm that. *Id.* at 288:4–7.

This is a complete abdication of Dr. Sanders's role as a purported expert. Rule 702(b) does not permit Dr. Sanders to leave the dispositive technical premise of a fabrication charge to counsel's instruction. *See Rutledge*, 2026 WL 2015284, at *22–23 (affirming exclusion where the expert failed to substantiate the assumptions on which his conclusion rested).

Worse, Dr. Sanders's premise (really, counsel's instruction) was factually wrong, and the metadata Dr. Sanders never examined shows why. The "raw data" spreadsheets were created by Plaintiffs themselves, from a database CUNY did not produce until more than a year after the Defamation Action was dismissed in 2024. In December 2025, Dr. Heilbut loaded database contents that CUNY produced in October 2025 into Multi-Mode Analysis Software residing on his own computer and generated new Excel exports. Scofield Rpt. ¶¶ 44–45. The metadata from those files shows that they were exported from that software in December 2025, under software versions and labware configurations different from those recorded in Dr. Wang's contemporaneous exports—exports reflecting plate measurements taken years earlier, in June 2020 for the Phase 2b pTau-181 analysis and October 2019 for the Aβ42 analysis. *Id.* ¶¶ 39–60, 77, 83, 85; *see* Sanders Dep. Tr. 266:18–23 (Dr. Sanders agreeing that the experiments underlying Appendix E ranged from 2013 to 2021). Confronted with those facts at his deposition, Dr. Sanders could not interpret them: he did not know what a lot number is on an ELISA machine, what causes lot number and optimization dates to change, what the August 2021 optimization dates on his files

signified, or whether they had any effect on the data. Sanders Dep. Tr. 284:12–285:10, 286:9–287:5. He had never considered these questions. Dr. Sanders nonetheless agreed that a change in a file's metadata "is indicative that it's no longer the raw data," *id.* at 287:14–20, and he acknowledged that he had "reason to ask whether any of these represent the raw data," *id.* at 310:23–311:3. Rule 703 supplies an independent bar: a spreadsheet generated by an adverse party in the midst of litigation, from a database produced years after the events at issue, and never validated by anyone, is not the kind of material upon which an expert in the field would reasonably rely.

The verification Dr. Sanders failed to perform was in fact performed by someone with the necessary expertise. Between April and September 2022, Cassava's Director of Clinical Quality Systems audited Dr. Wang's laboratory at CUNY, including a two-day on-site audit on September 21–22, 2022. Exhibit 4 (Rodriguez Aff.) ¶¶ 2–4.[5] She obtained the ELISA source data for the Phase 2b biomarker work, together with the DTX 880 ELISA plate reader's own electronic audit trail and run-history records. She then compared the plate identifiers, measurement timestamps, and run metadata in those records—"including Lot numbers"—against the Excel source-data files Dr. Wang had maintained for those plate runs. *Id.* ¶¶ 5–15. The metadata corresponded, and she therefore confirmed that Dr. Wang's ELISA records for the Phase 2b analysis reflected source exports generated by the plate reader "at or immediately following the time the plates were measured." *Id.* ¶¶ 15–16. And the well values in those contemporaneous exports are identical to the "presented data" Dr. Sanders now calls fabricated. Scofield Rpt. ¶¶ 77, 93–98. The lot numbers

---

[5] The results of this 2022 audit were produced to Plaintiffs and were available for Dr. Sanders to review in preparing his report. Rodriguez Aff. ¶ 19; *see* Sanders Rpt. ¶¶ 62–66 (quoting the 2022 audit report).

that Dr. Sanders could not interpret are the same records that a quality auditor used to check against the instrument's audit trail in 2022.

The second judgment one must make before reaching a conclusion that the "presented data" are fabricated is whether an observed discrepancy admits an innocent explanation. Dr. Sanders's entire treatment of this question is his statement that he "cannot think of any legitimate explanation" for the differences. Sanders Rpt. ¶ 118. Once again, this is *ipse dixit*, not analysis. *Joiner*, 522 U.S. at 146.

In fact, legitimate explanations exist, as demonstrated by the plate-reader software's own documentation: saved measurement results may be reevaluated using parameters different from those in the original protocol and then written back to the database, overwriting the prior results. Scofield Rpt. ¶¶ 47–50 (quoting *Multi-Mode Analysis Software User Guide* at 214–17, 228–34). As described above, the so-called "raw data" were exported in December 2025 from a database folder taken off a laboratory computer that Cassava's own auditor found was "not the original computer" and had "no password protection to the system and/or the FilterMax F5 software," Sanders Rpt. ¶ 66—and the resulting files carry labware configurations postdating the experiments, suggesting that someone in the intervening years had overwritten the original values. An expert who cannot say what a metadata field means is in no position to exclude the non-fraudulent explanations that field supplies. He certainly should not be permitted to testify that the underlying data are "fabricated."

### 4. The Immunoblot Conclusion

Dr. Sanders's conclusion that published images were manipulated applies neither expert judgment nor specialized knowledge. He never establishes that apparent similarity in a low-resolution journal image is probative of anything. To the contrary, reliance on low-resolution, post-

publication images can "artificially amplify perceived similarities and unusual features," and apparent similarity in a housekeeping control does not reliably establish duplication. Scofield Rpt. ¶¶ 112–113. Dr. Sanders offers no way to distinguish manipulation from accepted manuscript preparation, under which published blots are routinely cropped, contrast-adjusted, resized, reordered, and assembled from more than one gel. *Id.* ¶¶ 113–114. Dr. Sanders's review technique discloses no protocol, no objective matching criteria, no threshold for when two bands "match," no controls, no blinding, no validation set, no error rate, and no image-analysis software. Sanders Rpt. ¶ 147. It cannot be tested or replicated, and he does not show that it is used or accepted by forensic image analysts. The absence of those basic indicia is dispositive. *Daubert*, 509 U.S. at 593–94; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see United States v. Frabizio*, 445 F. Supp. 2d 152, 165–70, 176–77 (D. Mass. 2006) (excluding visual image-authentication opinions that lacked testing, an error rate, and objective standards).[6]

## III.   Instead of Helping the Jury, Dr. Sanders Usurps the Jury's Role

Where the report reaches conclusions, they are not scientific findings but answers to the questions reserved to the Court and the jury. An expert may not state ultimate legal conclusions, communicate a legal standard, or substitute his own formulation for the instructions the Court will give. *Bilzerian*, 926 F.2d at 1294; *Hygh*, 961 F.2d at 363–64; *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509–12 (2d Cir. 1977). Nor may an expert opine on the "knowledge, motivations, intent, state of mind, or purposes" of a party or anyone else. *Fosamax*, 645 F. Supp. 2d at 192. Dr. Sanders does all of this.

---

[6] *See also Wang* Order at 2 (excluding opinions on whether a Western blot image was fabricated, whether two images are the same, and whether one image derives from another).

### A.  Dr. Sanders Announces Legal Conclusions in Scientific Vocabulary

The conclusions of Section I of the report appear at the end of its narrative without any disclosed derivation. Dr. Sanders declares that recordkeeping "delinquencies" at Dr. Wang's laboratory "seriously undermine" his research, that missing notebooks and original data create a "legitimate basis" to question its integrity, and that the absence of records made accusations against Cassava "virtually impossible" to refute. Sanders Rpt. ¶¶ 72–77. The last of these is not a scientific proposition at all. Whether Cassava could refute Plaintiffs' statements is the substantial basis and probable cause question, and "virtually impossible to refute" is argument about the burden and strength of proof in the Defamation Action. The "legitimate basis to question" formulation, which recurs in Sections I, III.B, III.C, and III.D, is the same inquiry inverted: it tells the jury that doubt about the research was warranted, which is the conclusion Plaintiffs must establish to show that Cassava's suit lacked a substantial basis. *Id.* ¶¶ 73–77, 127, 131, 153.

An expert may not deliver those conclusions, regardless of how they are labeled. Testimony that "undertakes to tell the jury what result to reach" or that communicates the governing legal standard is inadmissible regardless of the witness's credentials. *Bilzerian*, 926 F.2d at 1294; *Hygh*, 961 F.2d at 363–64. That Dr. Sanders reaches his conclusions in the vocabulary of scientific practice rather than the vocabulary of § 70-a does not change what they are.

### B.  Dr. Sanders Opines on the Motives and Mental States of Others

Section II purports to tell the jury what third parties privately thought. Dr. Sanders opines that several journals declined to make formal misconduct findings not because they found none, but because they lacked evidence, and he attributes that choice to the journals' unstated institutional concerns. Sanders Rpt. ¶¶ 100–102, 104–105. He reads the editors' words "convincing" and "compelling" as coded concessions that misconduct occurred. *Id.* He concedes that this opinion rests on nothing but "my experience with similar investigations and my review of

the language used by the journal editors," Sanders Rpt. ¶ 100; Sanders Dep. Tr. 212:20–25—that is, on his surmise about "what they're saying" and why, Sanders Dep. Tr. 210:12–212:19. Section I performs the same exercise on Cassava, opining on the company's "apparent failure" to obtain or review records and on what its personnel should have understood. Sanders Rpt. ¶¶ 72–77.

Divining the knowledge, motives, and purposes of journals, editors, investigators, or a party is "not a proper subject for expert or even lay testimony." *Fosamax*, 645 F. Supp. 2d at 192; *accord Rezulin*, 309 F. Supp. 2d at 546–47. And reading a journal notice to mean the opposite of what it says is a credibility judgment reserved to the jury. *Nimely*, 414 F.3d at 398. No scientific methodology permits either.

### C. Dr. Sanders Aggregates Information Without Regard to Date, Including Information That Did Not Exist When Cassava Acted

Plaintiffs' claims are measured as of the time Cassava acted, and information Cassava did not possess "could not have played a role" in its decisions. ECF 206 at 3–4. Yet, Dr. Sanders's report performs no time-indexed analysis of any kind. He never parses what Cassava knew on November 2, 2022, when it filed the Defamation Action, or in April 2024, when it filed the Second Amended Complaint. He never separates information available before suit from information that emerged while the action was pending or after it was dismissed. And he never opines that Cassava was aware of any of the specific defects he claims to have found. What he offers instead is a single aggregate—decades of publications, later journal retractions and expressions of concern, the 2023 CUNY investigation, the 2024 indictment of Dr. Wang, guidance issued in 2025, and spreadsheets created in December 2025—combined into one retrospective verdict, presented without regard to when any of it arose.

Some of what Dr. Sanders found could not have been known to anyone in 2022, let alone to Cassava. His conclusion that Dr. Wang "repeatedly fabricated data from ELISA experiments

conducted for Cassava" rests entirely on files Plaintiff Dr. Heilbut created in December 2025, exported from a database CUNY did not produce until October 2025, more than a year after Cassava dismissed the Defamation Action. *Supra* Part II.D. Whatever those files show, no one could have seen it when Cassava sued. The same is true of Dr. Sanders's image comparisons, performed for this litigation in 2026, and of the recordkeeping standard he assembles in part from NIH guidance published in 2025. The report's recurring formulation—that "[a]nyone reasonably familiar with the biomedical sciences" would have recognized a legitimate basis to question the data, Sanders Rpt. ¶¶ 127, 153—does not solve that problem. On this record, Dr. Sanders's hypothetical observer can only be Dr. Sanders in 2026, evaluating materials Cassava never had.

Cassava does not contend that scientific information is categorically irrelevant; information actually available to Cassava may well bear on its decisions. But that information consists of historical facts about what Cassava had and what it was told. Documents and the testimony of the people involved provide evidence of what Cassava knew. Dr. Sanders does not help the jury determine those facts. He simply tells the jury what to conclude, based on evidence Cassava never possessed. That is not permitted. Fed. R. Evid. 702(a).

## IV. The Report Would Substitute a Trial of Dr. Wang's Conduct for the Trial of Plaintiffs' Claims

The report's intended inferential chain is apparent: Dr. Wang committed misconduct; Cassava collaborated with Dr. Wang; therefore Cassava lacked a good faith basis to sue Plaintiffs. Rule 702 does not permit an expert to supply that inference. Plaintiffs must prove Cassava's knowledge and purpose with evidence tied to Cassava and to the relevant decision dates, not by asking a research critic to place an expert imprimatur on alleged wrongdoing by a non-party.

Evaluating the report and cross-examining Dr. Sanders would result in a collateral trial on subjects remote from the elements the jury must decide: decades of publications, numerous

immunoblot figures, multiple ELISA experiments and their electronic files, competing record-retention standards, journal notices, CUNY proceedings, regulatory materials, criminal allegations, and conflicting expert interpretations of each. Cassava would be required to rebut every element of Dr. Sanders's faulty report to prevent the jury from imputing Dr. Wang's alleged misconduct to Cassava. The resulting proceeding would have little bearing on the question of whether Cassava had a substantial basis and a proper purpose when it filed and maintained the Defamation Action.

That diversion carries acute risk of prejudice. Terms such as "fraud," "fabrication," "falsification," and "research misconduct," delivered by a witness the jury has been told is an expert, invite a verdict resting on moral condemnation of Dr. Wang rather than on Cassava's own basis and purpose for suing. Cross-examination cannot restore the proper focus once the trial has become a research misconduct proceeding. The mismatch between Dr. Sanders's inquiry and the issues to be tried warrants exclusion under Rule 702(a), and the resulting confusion and unfair prejudice independently warrant exclusion under Rule 403.

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Sanders's report and testimony in their entirety under Rules 401, 403, 702, and 703.

Dated: August 3, 2026

Respectfully submitted,

/s/ *Monica K. Loseman*
Monica K. Loseman (NY Bar No. 6100671)
Mylan L. Denerstein (NY Bar No. 2620730)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
MLoseman@gibsondunn.com
MDenerstein@gibsondunn.com

M. Scott Campbell (admitted *pro hac vice*)
John Turquet Bravard (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
Telephone: 303.298.5700
SCampbell@gibsondunn.com
JTurquetBravard@gibsondunn.com

*Attorneys for Defendant Cassava Sciences, Inc.*

**CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATION**

Pursuant to Rule 3.C of the Individual Rules of Practice in Civil Cases of the Honorable Jennifer L. Rochon, I hereby certify that the foregoing memorandum of law complies with the applicable word-count limitation. Exclusive of the caption, the table of contents, the table of authorities, the signature block, and this certificate, and inclusive of footnotes, the memorandum contains 7,954 words, as counted by the word-processing system used to prepare it, and therefore does not exceed the 8,750-word limit. The memorandum is double-spaced and set in 12-point Times New Roman type, including footnotes.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2026, I caused a copy of the foregoing to be served on all counsel of record through the Court's CM/ECF system.

/s/ *Monica K. Loseman*
Monica K. Loseman