# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>       Plaintiffs,<br><br>v.<br><br>CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,<br><br>       Defendants. | Case No. 1:24-cv-05948-JLR-OTW |

# EXPERT REPORT OF DR. DAVID A. SANDERS

January 20, 2026

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................. 1

OPINIONS .................................................................................................................... 3

I.    SCIENTIFIC RECORDKEEPING ...................................................................... 3

    A.  Purpose of Scientific Recordkeeping ....................................................... 3

    B.  General Recordkeeping Standards and Practices ..................................... 4

    C.  Cassava's Recordkeeping Practices ....................................................... 13

    D.  Conclusions ............................................................................................ 18

II.    RESEARCH MISCONDUCT ............................................................................ 19

    A.  Research Integrity Standards .................................................................. 19

    B.  Research Misconduct .............................................................................. 20

    C.  Examples of Research Misconduct ........................................................ 21

    D.  Detecting Possible Research Misconduct .............................................. 23

    E.  Addressing Research Integrity Concerns ............................................... 23

    F.  Conclusions ............................................................................................ 25

III.    SIGNS OF RESEARCH MISCONDUCT IN SIMUFILAM RESEARCH ...... 27

    A.  ELISA Data ............................................................................................ 27

    B.  Phase 2b Biomarker Data ...................................................................... 28

    C.  Quanterix Data ....................................................................................... 30

    D.  Immunoblot Data ................................................................................... 31

IV.    STATISTICAL ANALYSIS OF BIOMEDICAL RESEARCH DATA ............ 36

## BACKGROUND

1.     I have been retained as an expert by counsel at the law firm Clarick Gueron Reisbaum LLP, on behalf of plaintiffs Dr. Jesse Brodkin, Dr. Adrian Heilbut, and Dr. Enea Milioris in the matter of *Heilbut, et al., v. Cassava Sciences, Inc., et al.*, Case 1:24-cv-05948-JLR-OTW, in the United States District Court for the Southern District of New York (the "Action").

2.     In this Action, plaintiffs assert claims against defendants Cassava Sciences, Inc. ("Cassava"), its former CEO, Remi Barbier, and its former senior vice president of neuroscience, Dr. Lindsay Burns, for violation of New York's anti-SLAPP law (New York Civil Rights Law § 70-a), malicious prosecution, and civil conspiracy.  My understanding is that plaintiffs base these claims upon defendants' prosecution of a defamation lawsuit against them in retaliation for their public criticism of the research underlying Cassava's experimental Alzheimer's drug simufilam.

3.     I am a Scientific Publication Ethicist and Associate Professor of Biological Sciences at Purdue University, with approximately 30 years of experience working in the biomedical sciences.  A major focus of my research concerns the ethics of scientific publication, deviations from the standards of scientific publication, and the reform of grant and journal-article peer review of scientific research.  I am also myself a researcher and manage a lab at Purdue University where I have conducted and overseen immunoblot and ELISA experiments.  I have a B.S. in Molecular Biophysics and Biochemistry from Yale College, and I obtained my Ph.D. in Biochemistry from the University of California, Berkeley, in 1989.  My CV is attached to this report as **Appendix C**.

4.     In this Action, I have been asked to address the following topics:

   (1)   Recordkeeping standards and practices in the biomedical sciences, including the recordkeeping practices of Cassava and its scientific collaborator Dr. Hoau-Yan Wang at the City University of New York ("CUNY") (*see* Section I);

   (2)   Research integrity and research misconduct standards and practices in the biomedical sciences, including investigations of research misconduct (*see* Section II);

   (3)   Signs of research misconduct in research underlying simufilam (*see* Section III); and

   (4)   Certain criteria for the proper statistical analysis of biomedical research data (*see* Section IV).

5.     My opinions on these topics are set forth in Sections I to IV, below.

6.      I am being compensated for this engagement at the rate of $500 per hour. My compensation is not contingent on the opinions I express in connection with this Action or its outcome.

7.      In the past four years, I have not testified as an expert at trial or by deposition in any other cases.

8.      The materials that I considered in forming my opinions are identified in footnotes and **Appendix D**.

9.      I reserve the right to amend, supplement, or revise my opinions as this Action proceeds, including if new evidence becomes available and/or in response to any other expert's opinions.

## **OPINIONS**

### **I.    SCIENTIFIC RECORDKEEPING**

#### **A.  Purpose of Scientific Recordkeeping**

10.    Recordkeeping is foundational to all modern science.  The primary purpose of good recordkeeping is that the experimenter and present and future members of the laboratory can review an experiment and potentially reproduce it.  A secondary purpose is that outside entities can confirm that published results, including those presented for regulatory approval submissions, are correct.  Fortunately, both objectives can be achieved through the same best practices.

11.    As the Panel on Scientific Responsibility and the Conduct of Research explained in 1993:

> "Research data, including detailed experimental protocols, primary data from laboratory instruments, and procedures of reduction and analysis of primary data, are the essential components of scientific progress. Scientific integrity is inseparable from meticulous attention to the acquisition and maintenance of these research data.
>
> It is expected that the results of research will be carefully recorded in a form that will allow continuous access for analysis and review. Attention should be given to annotation and indexing of notebooks to facilitate detailed review of data. All data, even from observations and experiments not directly leading to publication, should be treated comparably. . . .
>
> Research data, including the primary experimental results, should be retained for a sufficient period to allow analysis and repetition by others of published material from those data. In some fields, five or seven years are specified as the minimum period of retention but this may vary under different circumstances."[1]

12.    If proper records of an experiment are not maintained, there is no viable way to replicate, confirm, or verify the results of the experiment.  As the National Institutes of Health ("NIH") explains in its most recent Guidelines:

> "Good record keeping is essential to the validity, accountability, reproducibility, and integrity of scientific research. Research records document the entire research process, from formulating a question or hypothesis and applying for funding, to designing

---

[1] Panel on Scientific Responsibility and the Conduct of Research, National Academy of Sciences, National Academy of Engineering, Institute of Medicine, "Responsible Science: Ensuring the Integrity of the Research Process: Volume II", Chapter 7, (1993), https://www.ncbi.nlm.nih.gov/books/NBK236202/.

experiments and studies, developing research protocols, and generating, analyzing, and interpretating [sic] data."[2]

13. In addition, good recordkeeping practices are essential to responding to allegations of data manipulation or research misconduct:

"[G]ood record keeping can help defend you against false allegations of research misconduct. Misconduct allegations commonly arise when other scientists are unable to repeat published research. Often, the underlying reason for this failure is that the original research was not described in sufficient detail in the publication. While good research records cannot prevent you from ever facing allegations of misconduct, they can help you to refute them."[3]

14. Moreover, recordkeeping is also essential to the protection and enforcement of intellectual property rights. For example, in the biomedical sciences, it is generally recommended that patentholders retain all data and records from research underlying patented claims for at least as long as a patent's lifecycle (*e.g.*, 20 years). Without such data and records, it is difficult for patentholders to enforce their patent rights or defend against challenges to the validity of their patents.[4]

## B. **General Recordkeeping Standards and Practices**

15. There are several authorities that set recordkeeping standards for scientific laboratories in the United States, including universities, scientific journals, the NIH, and the FDA.

16. Depending on the work being performed and the context, different requirements may apply to any given laboratory, scientist, or sponsor.

17. Based on my experience, regardless of which set of standards or regulations might govern the specific context at issue, any good scientist is expected to follow certain minimum recordkeeping practices.

18. For example, contemporaneous notebooks or logbooks detailing experiments must be maintained. At a minimum, the notebook should separately document each experiment, including basic details, such as (i) date; (ii) investigators/lab members

---

[2] NIH, "Guidelines and Policies for the Conduct of Research in the Intramural Research Program at NIH" (9th Ed., 2025) at 5, https://oir.nih.gov/system/files/media/file/2025-09/guidelines-conduct_research.pdf

[3] NIH, "Guidelines and Policies for the Conduct of Research in the Intramural Research Program at NIH" (9th Ed., 2025) at 7, https://oir.nih.gov/system/files/media/file/2025-09/guidelines-conduct_research.pdf

[4] *See* Carolyn T. Lye, Minal M. Caron, Lauren Walsh, Barbara E. Bierer & Mark Barnes. *Disparate data retention standards in biomedical research*, Accountability in Research, at 10-11 (2025) ("To support potential questions or challenges regarding the patent, therefore, it is good practice to retain all data supporting a patent application for at least the 20-year life of the patent."), https://doi.org/10.1080/08989621.2025.2543884

---

involved; (iii) purpose of experiment; (iv) methods, protocols, and equipment; (v) results; and (vi) interpretation of results.[5]

19.    Crucially, the primary data or a copy of the primary data should be included in the notebook with the corresponding description of the experiment, whenever possible.

20.    Legibility, recording in the common language of the laboratory, and proper chronological documentation are core principles of recordkeeping.  Redundancy is also advantageous.  One practice that I have encouraged for the members of my laboratory is the transcription of handwritten notes into electronic documents.  This approach allows for a more highly legible form of the notes to be printed and included in the notebook and for a more easily searchable document to be maintained electronically.

21.    In addition, standard laboratory protocols (or Standard Operating Procedures ("SOPs")) should be included in a laboratory notebook and filed electronically for easy reference.  It is also desirable to have them included in the experimenter's notebook the first time they are employed by that individual.  Of course, any deviation from the protocol should be described in the notebook.

22.    Laboratory group leaders need to both set a good example and provide specific training and directives to group members working in the laboratory to ensure good recordkeeping practices are consistently followed by all members of the lab.

23.    Indeed, as the NIH has explained:

"Although record keeping practices vary across scientific disciplines, some principles apply to almost all forms of research.  The overarching principle for scientific record keeping is that another person or research group should be able to reproduce or reconstruct your research from your records.

"Research records should be:

- Legible
- Clear
- Complete
- Thorough
- Consistent
- Properly annotated to make them accessible

---

[5] *See also* Panel on Scientific Responsibility and the Conduct of Research, National Academy of Sciences, National Academy of Engineering, Institute of Medicine, "Responsible Science: Ensuring the Integrity of the Research Process: Volume II", Chapter 13, (1993), https://www.ncbi.nlm.nih.gov/books/NBK236189/

- Well-organized
- Indexed (in some cases)
- In English
- Dated
- Signed or assigned to a particular person
- Recorded so that new entries or corrections can be identified and validated
- Secure
- Backed-up

Records should describe or explain:

- Who conducted it (including the person making the record)
- What you did
- When you did it (clearly stating the date and time of day or whatever form of dating may be appropriate for the experiment)
- Why you did it
- What project the research was part of
- How you did it (including the methodology)
- What materials were used
- The findings
- The interpretation
- The next step(s)."[6]

24. In my experience, these are longstanding and basic recordkeeping principles that are generally expected of any good scientist, regardless of context.

   a. <u>Definition of Original, Raw, or Primary Data</u>

25. Under the FDA's Good Laboratory Practices for Nonclinical Laboratory Studies (21 CFR Part 58), "raw data" is defined as:

> "any laboratory worksheets, records, memoranda, notes, or exact copies thereof, that are the result of original observations and activities of a nonclinical laboratory study and are necessary for the reconstruction and evaluation of the report of that study. In the event that exact transcripts of raw data have been prepared (e.g., tapes which have been transcribed verbatim, dated, and verified accurate by signature), the exact copy or exact transcript may be substituted for the original source as raw data. *Raw data* may include

---

[6] NIH, "Guidelines and Policies for the Conduct of Research in the Intramural Research Program at NIH" (9th Ed., 2025) at 8, https://oir.nih.gov/system/files/media/file/2025-09/guidelines-conduct_research.pdf

> photographs, microfilm or microfiche copies, computer printouts, magnetic media, including dictated observations, and recorded data from automated instruments."

26. In my experience, consistent with the FDA's definition, the terms "original data," "raw data," and "primary data" are often used interchangeably in the biomedical sciences to refer generally to the unaltered and immediately recorded results or outputs of an experiment.

27. For immunoblot experiments recorded upon film, the original data are the uncropped images of blots/gels that include film edges and molecular weight markers.[7]

28. For ELISA experiments, the original data are the original numerical data files generated by the platereader—*i.e.*, the original software files or database records—containing the unaltered absorbance readings for each well of an ELISA plate.[8]

   b. Retention of Records

29. There are different standards, expectations, and regulatory requirements for the retention of original records and data, depending on the context, including the laboratory where the experiments are performed, the nature of the studies, and purposes for which the data are used.

30. In the context of studies funded by the NIH, such as Cassava's phase 2 studies of simufilam,[9] the principal investigator (*e.g.*, Dr. Burns) and sponsoring organization (*e.g.*, Cassava) assume responsibilities to ensure the "the proper conduct of the project or program."[10]  Likewise, the funding recipient "is responsible for the actions of its employees and other research collaborators, including third parties, involved in the project."[11]

---

[7] *See* CUNY 002570 ("ORI considers that uncropped blots/gels that includes film edges and molecular weight markers to be the original raw data, and we apply that standard when assessing image integrity in the oversight of our cases.").

[8] *See, e.g.,* CASSAVA_000569709 (Dr. Burns requesting "all the software files" from ELISA experiments conducted by Lund University "to start our QC"); CASSAVA_000569713 (example of what appears to be PDF version of original software file from ELISA experiment by Lund University); CASSAVA_001237925 (Dr. Burns receiving software files from ELISA experiments by Abilene Christian University).

[9] *See, e.g.,* NIH Grant No. 4R44AG060878-02 ("Increasing size of Phase 2b clinical trial to 60 patients"), https://www.sbir.gov/awards/176337

[10] *See, e.g.,* NIH Grants Policy Statement, Section 9.1, (October 2018), https://grants.nih.gov/grants/policy/nihgps/nih_gps_2018.pdf

[11] *See, e.g.,* NIH Grants Policy Statement, Section 4.1.27, (October 2018), https://grants.nih.gov/grants/policy/nihgps/nih_gps_2018.pdf

---

31.     In the context of NIH-funded research, the NIH has generally required that all records that "may reasonably be considered pertinent to a grant" must be retained "for a period of 3 years from the date the annual [report] is submitted."[12]

32.     In the context of clinical studies associated with an Investigational New Drug ("IND") application submitted to the FDA, as in the case of Cassava's simufilam clinical studies, the FDA's regulations state:

> "Sponsors are responsible for selecting qualified investigators, providing them with the information they need to conduct an investigation properly, ensuring proper monitoring of the investigation(s), ensuring that the investigation(s) is conducted in accordance with the general investigational plan and protocols contained in the IND, maintaining an effective IND with respect to the investigations, and ensuring that FDA and all participating investigators are promptly informed of significant new adverse effects or risks with respect to the drug."[13]

33.     The FDA also requires clinical investigators "to prepare and maintain adequate and accurate case histories that record all observations and other data pertinent to the investigation on each individual administered the investigational drug or employed as a control in the investigation" for "a period of 2 years following the date a marketing application is approved [or] until 2 years after the investigation is discontinued and FDA is notified."[14]

34.     Moreover, the FDA provides guidance specific to research involving bioanalytical methods and biomarkers, such as Cassava's simufilam research.[15]

35.     With respect to recordkeeping, these FDA guidelines state:

> "General and specific SOPs and good record keeping are essential to a properly validated analytical method. The data generated for bioanalytical method validation should be documented and available for data audit and inspection. . . . This documentation should be stored at the analytical site or at another secure location.

---

[12] *See, e.g.,* NIH Grants Policy Statement, Section 8.4.2, (October 2018) https://grants.nih.gov/grants/policy/nihgps/nih_gps_2018.pdf

[13] 21 CFR Part 312 § 312.50.

[14] 21 C.F.R. Part 312 § 312.62; *see also* 21 C.F.R. Part 312 § 312.57 (describing additional "Recordkeeping and record retention" requirements for sponsors).

[15] *See* FDA, "M10 Bioanalytical Method Validation and Study Sample Analysis" (November 2022), https://www.fda.gov/media/162903/download; *see also* FDA, "Bioanalytical Method Validation for Biomarkers Guidance for Industry" (January 2025), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/FDA/biomarkers-guidance-level-2.pdf

---

In this case, the documentation should be readily available when requested.

All relevant documentation necessary for reconstructing the study as it was conducted and reported should be maintained in a secure environment. Relevant documentation includes, but is not limited to, source data, protocols and reports, records supporting procedural, operational, and environmental concerns, and correspondence records between all involved parties.

Regardless of the documentation format (i.e., paper or electronic), records should be contemporaneous with the event and subsequent alterations should not obscure the original data. The basis for changing or reprocessing data should be documented with sufficient detail, and the original record should be maintained."[16]

36. The FDA's guidelines also state that "when biomarker data will be used to support regulatory decision-making, such as the pivotal determination of safety and/or effectiveness to support approval or to support dosage instructions in product labeling, the assay should be fully validated."[17]

37. In addition, the FDA's Good Laboratory Practices for Nonclinical Laboratory Studies requires raw data to be retained "for whichever of the following periods is shortest:

A period of at least 2 years following the date on which an application for a research or marketing permit, in support of which the results of the nonclinical laboratory study were submitted, is approved by the Food and Drug Administration;

at least 5 years following the date on which the results of the nonclinical laboratory study are submitted to the Food and Drug Administration in support of an application for a research or marketing permit;

In other situations (e.g., where the nonclinical laboratory study does not result in the submission of the study in support of an application for a research or marketing permit), a period of at least 2 years

---

[16] FDA, "M10 Bioanalytical Method Validation and Study Sample Analysis" at p. 36, (November 2022), https://www.fda.gov/media/162903/download

[17] FDA, "Bioanalytical Method Validation for Biomarkers Guidance for Industry" at p. 2, (January 2025), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/FDA/biomarkers-guidance-level-2.pdf

following the date on which the study is completed, terminated, or discontinued."[18]

38.    Universities and research institutions also typically have policies or guidelines on scientific recordkeeping.  For example, CUNY's policies state that records should generally be retained for a period of "3 years after research concluded or otherwise terminated," while further stating:

> "Depending on the nature of the research, some of these files may be valuable for other researchers, as well as in documenting research conducted at a college or the University, and should be appraised for potential permanent retention. Appraisals of research files should involve consultation with both members of the faculty and acknowledged professionals in the respective field."[19]

39.    For comparison, the University of Cambridge's policies state that research funding bodies generally "consider a minimum of ten years after the completion of a project to be an appropriate period" to retain research records, "[h]owever, research based on clinical samples or relating to public health may require longer storage to allow for long-term follow-up to occur."[20]

40.    The various regulatory requirements, guidelines, and policies, described in this section, generally set *minimum* requirements for anyone subject to the regulations, guidelines, or policies; and regardless of which specific set of requirements may apply to a particular context, these various requirements, guidelines, and policies help to inform the standards and practices that are generally expected of laboratories in the biomedical sciences following sound scientific principles.

41.    In my experience, laboratories generally retain original data and records for much longer than the minimum periods required by government regulations or institutional policies, especially if the data or research may be subject to questions from regulators, other scientists, sponsors, scientific journals, or other third parties.

42.    In my view, all original data and records should be retained and carefully and accurately labeled for as long as the results of the experiments may be subject to questions or scrutiny, which may be a period of many years or even decades.

---

[18] 21 C.F.R. Part 58 § 58.195.

[19] CUNY Records Retention Schedule, Academic Affairs, Section 7[881] "Faculty and faculty-student research records", https://policy.cuny.edu/schedule/academic-affairs/#7%5B881%5D

[20]  University of Cambridge, " Good Research Practice Guidelines", Section 7.2 https://www.cam.ac.uk/research/research-integrity/resources/good-research-practice#primary-data

43.    According to the Harvard University Faculty of Medicine's *Guidelines for Investigators in Scientific Research*:

> "Primary data should remain in the laboratory at all times and should be preserved as long as there is any reasonable need to refer to them. The chief of each research unit must decide whether to preserve such primary data for a given number of years or for the life of the unit. In no instance, however, should primary data be destroyed while investigators, colleagues, or readers of published results may raise questions answerable only by reference to such data."[21]

44.    For some data (*e.g.*, fluorescent micrographs), the original images are strictly electronic and keeping a photographic copy of the image would not constitute retaining the original form, although including such a labeled photograph in a physical notebook is advisable.  For numeric data that is produced in an electronic format, however, retention of both the original output file and a printed copy placed in the notebook would be consistent with sound scientific principles.  In addition, all manipulations of the data, both their nature and the results, should be recorded in both electronic and printed forms.

    c.    Recordkeeping Standards and Practices for Immunoblot Experiments

45.    With regard to immunoblots ("Western blots"), the original data should always be maintained in notebooks.  Each experiment should be recorded in the notebook and clearly separated from other experiments.  It would make no sense to have a notebook, which described the experiments and the samples and yet did not include the primary output data.  (In **Appendix A**, I explain the purpose of immunoblot experiments and provide an overview of the standards and practices in the biomedical sciences for conducting immunoblot experiments.)

    1)    If a colorimetric detection system is used, then it is the original membrane that is retained, labeled and included in the notebook.

    2)    If a radioactivity-based or chemiluminescence-based detection system is employed, then a film must be retained, labeled and included in the notebook.

46.    Documentation of how an immunoblot experiment was conducted is critical for permitting the correct interpretation of results.  Clearly, the details of how samples were prepared and loaded onto the gels must be provided.  Of course, it is best if

---

[21] Panel on Scientific Responsibility and the Conduct of Research, National Academy of Sciences, National Academy of Engineering, Institute of Medicine, "Responsible Science: Ensuring the Integrity of the Research Process: Volume II", Chapter 8, (1993), https://www.ncbi.nlm.nih.gov/books/NBK236202/

written standard protocols are employed.  If so, only deviations from those protocols need to be recorded for any given experiment.

1)  For simplicity, the steps required in a common immunoblot experiment that relies on chemiluminescence will be our example.  The percentage of acrylamide in the gel and the nature of the membrane to which the proteins are transferred must be noted.  The composition of the blocking solution should be described.  The identity of the primary antibody and the conditions of its incubation with membrane (dilution and diluent, temperature and duration) must be documented.  Similarly, the identity of the secondary antibody and the conditions of its incubation with the membrane must be recorded.  The length of time of incubation with the chemiluminescent substrate should be noted.  Finally, when film is used as the means of signal detection then the length of time of exposure of the film to the membrane should be documented.

2)  If stripping and reprobing is performed, then the order of antibody incubation must be described.

3)  It is worthy of consideration that for most, but not all, of the steps described it is inadequate to rely upon a statement that a manufacturer's protocol was followed as a description of experimental method, because those protocols may not be included in the published scientific literature and can change with time.

47.  Data processed by Adobe Photoshop or presented in a Powerpoint slide are never the primary data. A digital photograph of a membrane or film may be considered as primary data for storage in a digital format, but the photo must include the entire membrane or film. Subsequent image processing should be performed on a copy of the original image, not the original image itself.  It appears that these protocols were not consistently followed by Dr. Wang (*see* Section I.C.a, below). In more modern systems, a fluorescence detection system might be used and direct digital images produced.

48.  Supplying a processed image, rather than a direct photograph of an entire membrane or film, as an "original uncropped blot" is a violation of scientific norms and a form of falsification of the literature.  Furthermore, providing multiple images of immunoblot bands superimposed on a particular background as "original uncropped blots" is, in my opinion, a form of fabrication.

49.  There is an important distinction between original images and processed images, and the originals need to be preserved unaltered.  It should be noted that whereas membranes can prove to be fragile over time, the images on films can be reasonably stable for at least a decade.

50.  If the original unaltered and unprocessed images are not retained, along with contemporaneous records of the experiment in a laboratory notebook, there is no

viable way to verify an immunoblot image or to refute claims that an immunoblot image has been manipulated or fabricated.

d.  Recordkeeping Standards and Practices for ELISA Experiments

51.  With regard to ELISA experiments, the experiments should always be contemporaneously recorded in a laboratory notebook.  (In **Appendix B**, I explain the purpose of ELISA experiments and provide an overview of the standards and practices in the biomedical sciences for conducting ELISA experiments.)

52.  In addition, the raw data—*i.e.*, the original software files or database records containing the original numerical data generated by the platereader containing the unaltered absorbance readings for each well of an ELISA plate—should also be retained.

53.  If the raw data are not retained and contemporaneous records of the experiment are not found in a laboratory notebook, there is no viable way to verify the results of an ELISA test or to refute claims that the results have been manipulated or fabricated.

## C.  **Cassava's Recordkeeping Practices**

54.  I have reviewed certain statements by Cassava to the effect that Cassava does not maintain possession of original data from the research underlying simufilam or SavaDX.

55.  For example, on September 3, 2021, in response to allegations of data manipulation in the Citizen's Petition and by the plaintiffs, Cassava's then-CEO, Remi Barbier stated:

> "Cassava Sciences does not have its own laboratory facilities. We use other people's labs. For this reason, we don't have the original films or images for the Western blots in question. Those were generated by our science collaborator at CUNY, who is Prof. Wang. For this reason, I have respectfully requested that CUNY inquire thoroughly but expeditiously into the allegations targeting Prof. Wang. I have also asked CUNY that its conclusionary findings be made available to the public."[22]

56.  Likewise, in March 2022, in response to requests from the Securities and Exchange Commission, Cassava stated: "Cassava Sciences does not have a laboratory of its own.

---

[22] CASSAVA_000310872 (Plaintiffs' Exhibit 84) at -877.

Cassava outsources research and development to third parties and service providers, and therefore has no original data in its possession."[23]

### a.  Recordkeeping Practices of Dr. Wang's Laboratory at CUNY

57.  I understand that Dr. Wang's laboratory at CUNY conducted all of the preclinical research underlying simufilam, as well as biomarker analyses of cerebrospinal sample fluid ("CSF") samples for Cassava's phase 2a study, phase 2b study, and phase 2 open label study of simufilam.  I also understand that Dr. Wang's lab at CUNY was tasked by Cassava with conducting analyses of CSF samples for purposes of screening patients for enrollment in the phase 2b and phase 2 open-label studies.

58.  I further understand that Cassava owned and had a right to access all data concerning simufilam that was generated at Dr. Wang's laboratory at CUNY.[24]

59.  Based on my review of the factual record, the recordkeeping practices in Dr. Wang's laboratory at CUNY failed to follow basic recordkeeping principles that are generally expected of any good scientist, regardless of context.

60.  For example, in September 2022, the FDA conducted an inspection of Dr. Wang's laboratory at CUNY and issued a Form 483 and Inspection Report describing certain observations of Dr. Wang's laboratory.[25]

61.  The FDA reported several findings, including:

1)  The ELISA experiments used in the study were not validated/verified. Specifically, the site used commercially available ELISA kits without in-house validation/verification of assay parameters, such as accuracy, precision, and sensitivity of the method.

2)  There were inadequate source records to reconstruct the study. Specifically, the site did not maintain;

   a.  Documentation of sample storage and tracking;

   b.  Documentation of experimental procedures (e.g., records of sample removal/return, preparation of calibration standards,

---

[23] CASSAVA_000800400 at -415-416 (Cassava Response to Interrogatory No. 7); *see also* R. Barbier Dep. Tr. at 253:3-256:1; Cassava 30(b)(6) Dep Tr. at 207:1-19; BARBIER_00000183 at -354-55 (R. Barbier March 4, 2024 SEC Dep. Tr.).

[24] *See* CASSAVA_000797897 (Clinical Trial Agreement § 4.1); *see also* Cassava 30(b)(6) Dep. Tr. at 282:11-283:4; L. Rodriguez Dep. Tr. at 131:16-23; H. Wang Dep. Tr. at 29:15-30:10.

[25] CUNY 001529 (Plaintiffs' Exhibit 61) ("FDA Inspection Report"); CASSAVA_ 000898032 (Plaintiffs' Exhibit 76) ("Form 483").

        sample aliquoting, and processes associated with the conduct of ELISA and Western blot);

    c.   Source records for Western-blot analysis; and

    d.   Audit trails for the plate reader (Multimode Detector software) used in ELISA experiments.

   3)  There were inadequate data security and integrity protocols in place as there was no access control (no user log-in requirement) to the computers connected with the ELISA plate reader and image scanner used in the study.[26]

62. In addition, Cassava conducted its own audit of Dr. Wang's laboratory at CUNY between April and September 2022, including a two-day site visit on September 21-22, 2022.[27]

63. The Audit Report concluded that Dr. Wang's laboratory at CUNY:

> "lack[ed] standard operating procedures, proper good documentation practices, and laboratory practices (i.e., equipment calibration and sample management) that are deemed critical for conducting any type of analysis to support a clinical trial. They are considered unacceptable and temporarily not qualified to provide biomarker analysis and research services for any future Cassava studies."[28]

64. Notably, Cassava's auditor, Laura Rodriguez, stated in the Report: "The biggest concern for this auditor was also the lack of proper documentation practices."[29]

65. The Audit Report further explained:

> "In reviewing the sample inventory, tracking, and chain of custody for PTl-125-02, the auditor noted there was no formal process and all samples for every Cassava study were grouped into one spreadsheet. Sample manifest forms were also bound together in one binder. The auditor recommended the separation of the samples within the inventory log and place each study manifest into separate binders.

---

[26] FDA Inspection Report; Form 483.

[27] CASSAVA_000796682 (Plaintiffs' Exhibit 56) ("Cassava Audit Report").

[28] Cassava Audit Report at -688.

[29] Cassava Audit Report at -686.

Also noted was there was no formal log book entry of the experiments performed to include the pipets IDs used with calibration due dates, lot numbers and expiry dates for reagents used, when samples were received and returned, lot numbers for the ELISA and Western blot kits used, and preparation of calibration curves and/or QCs (noted later there were no QCs utilized).When discussed with the CCNY representatives, The auditor was provided with some information on what reagent and kits were used including lot numbers but there was no organization of this information. A recommendation was made to create study folders within their server with subfolders for each element to store the CoAs, calibration and maintenance certificates, and create an excel log to document the information they have with regards to lot numbers and expiry dates. Also suggested was to institute paper or electronic logbooks for all experiments going forward to include keeping a separate logbook for each study or project."[30]

66.    In particular, the Cassava Audit Report observed the following deficiencies, among others:

1)    The laboratory did not have any formal SOPs in place. The four SOPs provided were not well written, did not contain an approval signature, and were not in a formal template.

2)    Lack of experiment logbooks/notebooks for all study/research work being performed.

3)    Lack of study record organization which makes it difficult to recreate what was used during sample analysis (i.e., reagents, ELISA and Western Blot kit lots, pipets, BOC freezer, and balances). All documents provided were either on network drive, in a binder, or loose in a folder.

4)    The ELISA computer being utilized was not the original computer as the previous one had been stolen.  Due to this, there was no password protection to the system and/or the FilterMax F5 software.

5)    There was no formal process for sample inventory, tracking. and chain of custody for PTl-125-02 samples. All three studies had their

---

[30] Cassava Audit Report at -688.

samples grouped into one inventory spreadsheet. Sample manifest forms were also bound together in one binder.

6) The laboratory was very congested and not very organized. There were many reagents that were expired within the laboratory. Some pipets were sitting on the bench. The weighing room where the balances were located was clean but also very congested.

67. Cassava's Laura Rodriguez, who audited Dr. Wang's lab in September 2022, testified that "[t]here were no logbooks to indicate what was being performed, how [Dr. Wang] did … the experiments that he worked on" and "it was true for everything Dr. Wang did at that lab [] not just Cassava studies. All research. He didn't have a logbook."[31]

68. Ms. Rodriguez further testified that Dr. Wang had discarded the original x-ray films from all immunoblot experiments.[32]

69. Likewise, according to the "Final Report" of CUNY's investigation committee, published by *Science* magazine in October 2023, Dr. Wang's laboratory engaged in "long-standing and egregious misconduct in data management and record keeping…. It appears likely that no primary data and no research notebooks pertaining to the 31 allegations [investigated by the committee] exist."[33]

70. Based on its interviews of Dr. Wang and his post-doctoral research associate, Dr. Zhe Pei, the CUNY investigation committee further reported that:

"the lab did not employ notebooks to record the details of the preparation or execution of the western blot experiments performed in the lab.

. . . details of blot preparation and sample loading were written on loose sheets of paper and were typically discarded after the blots were run and data had been quantified from the blots. No other primary records were maintained."[34]

---

[31] L. Rodriguez Dep. Tr. 214:16-215:03.

[32] L. Rodriguez Dep. Tr. 176:09-20 ("All Western blot experiments, whether it was ours or anybody else's, all were gone.").

[33] RFCUNY000743 (Plaintiffs' Exhibit 148) at -743; *see also* RFCUNY000743 (Plaintiffs' Exhibit 148) at -746-747 (reporting that Dr. Wang "stated that a significant number of boxes containing research records were thrown away in response to a request from [CUNY] to clean the lab during the COVID-19 pandemic. Officials at [CUNY] were not able to confirm this. Furthermore, as CUNY faculty, none of the committee members were directed to throw away research material during the pandemic and are not aware of other colleagues who were asked to do so. In our experience, labs were asked to decontaminate but not discard belongings.").

[34] RFCUNY000743 (Plaintiffs' Exhibit 148) at -744.

---

71.    And, CUNY's subsequent investigation of the committee's investigation confirmed Dr. Wang's lack of recordkeeping:

> "While the Committee speculated that they did not have access to all image files that were present in Dr. Wang's lab, the investigation found no evidence to support this. To the contrary, Dr. Wang consistently reported that he did not maintain original research data in hard copy files, electronic images, or lab notebooks."[35]

## D.    Conclusions

72.    Each of the FDA inspection report, the Cassava audit report, and the CUNY investigation report recite facts that, if true, reflect the critical failure of proper recordkeeping practices at Dr. Wang's laboratory.  These delinquencies, including the destruction of records, seriously undermine the integrity and reliability of the research conducted at the lab.

73.    In my view, the most significant recordkeeping deficiencies described by the FDA, Cassava, and CUNY are the failures to maintain laboratory notebooks and original data from experiments involving simufilam.

74.    Anyone reasonably familiar with the biomedical sciences would recognize that a laboratory's failure to retain original data or maintain laboratory notebooks provide legitimate bases to question the integrity of the laboratory's scientific data.

75.    Anyone reasonably familiar with the biomedical sciences would recognize that a laboratory's failure to follow basic recordkeeping practices would seriously undermine the laboratory's ability to refute claims of data manipulation, fabrication, or research misconduct.

76.    Assuming the accuracy of the descriptions by FDA, Cassava, and CUNY set forth above, Cassava's and Dr. Wang's failure to retain original data from their immunoblot experiments, along with contemporaneous records of such experiments in a laboratory notebook, make it virtually impossible for them to refute claims that their immunoblot images were manipulated or fabricated.  Anyone reasonably familiar with the biomedical sciences would recognize this to be the case.

77.    Cassava's apparent failure to obtain or review original data from Dr. Wang's ELISA experiments, along with contemporaneous records of such experiments in a laboratory notebook, make it virtually impossible for them to refute claims that their ELISA data were manipulated or fabricated.  Anyone reasonably familiar with the biomedical sciences would recognize this to be the case.

---

[35] CUNY 001573 at -575.

## II.    RESEARCH MISCONDUCT

### A.    Research Integrity Standards

78.    According to *On Being a Scientist: A Guide to Responsible Conduct in Research*, a widely read scientific-research guide published by National Academies Press: "Research is based on the same ethical values that apply in everyday life, including honesty, fairness, objectivity, openness, trustworthiness, and respect for others." [36]

79.    The Guide describes three widely accepted sets of obligations for scientific researchers seeking to adhere to basic professional standards:

> First, "researchers have an obligation to honor the trust that their colleagues place in them. Science is a cumulative enterprise in which new research builds on previous results. If research results are inaccurate, other researchers will waste time and resources trying to replicate or extend those results. Irresponsible actions can impede an entire field of research or send it in a wrong direction, and progress in that field may slow."

> Second, "researchers have an obligation to themselves [. . .] Adhering to professional standards builds personal integrity in a research career."

> Third, "because scientific results greatly influence society, researchers have an obligation to act in ways that serve the public."[37]

80.    Moreover, the Guide affirms the importance of "honesty in reporting research results" as a fundamental "scientific standard," and further explains:

> "Researchers who manipulate their data in ways that deceive others, even if the manipulation seems insignificant at the time, are violating both the basic values and widely accepted professional standards of science. If data are altered to present a case that is stronger than the data warrant, researchers fail to fulfill all three of the obligations."

---

[36] National Academy of Sciences, National Academy of Engineering (US) and Institute of Medicine (US) Committee on Science, Engineering, and Public Policy. On Being a Scientist: A Guide to Responsible Conduct in Research: Third Edition. Washington (DC): National Academies Press (US); "Introduction to the Responsible Conduct of Research" *On Being a Scientist: A Guide to Responsible Conduct in Research: Third Edition*, The National Academies Press, (2009), https://www.ncbi.nlm.nih.gov/books/NBK214569/

[37] *Id.*

---

**B.    Research Misconduct**

81.    The United States Office of Research Integrity ("ORI") and other federal agencies have defined "research misconduct" as follows:

> "Research misconduct is defined as fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.
>
> Fabrication is making up data or results and recording or reporting them.
>
> Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
>
> The research record is the record of data or results that embody the facts resulting from scientific inquiry, and includes, but is not limited to, research proposals, laboratory records, both physical and electronic, progress reports, abstracts, theses, oral  presentations, internal reports, and journal articles.
>
> [. . .]
>
> Research misconduct does not include honest error or differences of opinion."[38]

82.    According to ORI, "a finding of research misconduct requires that:

> "There be a significant departure from accepted practices of the relevant research community; and
>
> The misconduct be committed intentionally, or knowingly, or recklessly; and
>
> The allegation be proven by a preponderance of evidence."[39]

---

[38] *See* 65 F.R. 76260-76264; *see also* 42 C.F.R. Part 93 § 93.103 (effective May 17, 2005); 42 C.F.R. Part 93 § 93.234 (effective January 1, 2026).

[39] *Id.*

---

83.   These definitions are generally used by all research-funding agencies of the United States government, including the NIH.  These are generally the minimum standards used by universities during research misconduct investigations.

84.   In addition, according to the NIH, in the context of any study receiving NIH-funding, the recipient of the funding "is responsible for the actions of its employees and other research collaborators, including third parties, involved in the project."[40]

## C.    Examples of Research Misconduct

85.   Fabrication:  Fabricating data or results can take many forms.  For example, it can be as simple as making up datasets for experiments that were never conducted, or adding fake data to actual data in order to strengthen a conclusion.

86.   Falsification:  Falsifying (or manipulating) results can also take many forms, including:

1)  Altering data, error, or variance measures, in order to support a particular conclusion;

2)  Selectively removing data from a table or other reporting mechanism without statistical or scientific justification;

3)  Misrepresenting results of statistical analysis through practices such as HARKing (Hypothesizing After the Results are Known), $p$-hacking (selectively reporting results that are "statistically significant," especially correlations, without properly performing the necessary appropriate study design), and "Optional Stopping" (ending an experiment earlier than in the stated design when a "statistically significant" result has been obtained);

4)  Repeating without a valid scientific justification an experiment that did not report a statistically significant result until one experiment did report such a statistically significant result;

5)  Falsely describing details of the study, research procedures, or materials, such as misrepresenting the time or conditions under which studies or experiments were performed;

6)  Image manipulation, such as selectively adding data to or removing data from images, copying part of an image and inserting it somewhere else within the same image, combining images without proper annotation, or selectively enhancing or diminishing features within an image, altering image intensities and resolution,

---

[40] *See, e.g.,* NIH Grants Policy Statement, Section 4.1.27, (October 2018), https://grants.nih.gov/grants/policy/nihgps/nih_gps_2018.pdf

altering backgrounds of images, or using images that originated from experiments other than the experiment being presented.

87. Failure to follow study protocols: Failing to follow study protocols is another form of possible research misconduct.

88. For example, if a study protocol requires that a study be conducted under blinded conditions, a failure to follow such conditions could also constitute research misconduct. In addition, if the individuals conducting a study deviate from any of the study protocols, a failure to disclose such deviations at the same time the study's results are presented could constitute research misconduct.

89. Recordkeeping failures / destruction of records: The failure to make and retain records of experiments, such as experimental notebooks and raw data, is another form of potential research misconduct. In addition, deliberately destroying research records after research integrity concerns are raised is a clear sign of research misconduct.

90. According to the most recent version of the Public Health Service Policies on Research Misconduct, which became effective as of January 1, 2026:

> "A respondent's destruction of research records documenting the questioned research is evidence of research misconduct where the institution or HHS establishes by a preponderance of the evidence that the respondent intentionally or knowingly destroyed records after being informed of the research misconduct allegations."[41]

91. The prior version, in effect since 2005, stated:

> "The destruction, absence of, or respondent's failure to provide research records adequately documenting the questioned research is evidence of research misconduct where the institution or HHS establishes by a preponderance of the evidence that the respondent intentionally, knowingly, or recklessly had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner and that the respondent's conduct constitutes a significant departure from accepted practices of the relevant research community."[42]

92. Under both versions, the destruction of records underlying questioned research may be used to support a finding of research misconduct.

---

[41] 42 C.F.R. Part 93 § 93.105 (effective January 1, 2026).

[42] 42 C.F.R. Part 93 § 93.106 (effective May 17, 2005).

## D.    Detecting Possible Research Misconduct

93.    Methods for detecting falsified or fabricated data may differ depending upon the nature of the research at issue.

94.    Focusing first on numerical data, one sometimes uncovers inconsistencies between the primary data and how results are portrayed.  A requirement for this type of analysis is that the primary data are accessible.  Sometimes there is inconsistency between one and more reports of what purport to be the same data within a publication or between publications.  There are numerous statistical methods for detecting fabricated data.  For example, examining whether the value given for the mean average of data that are collected as integers is consistent with the sample size.  Highly improbable low or nearly identical standard deviation figures are indications of problems.  When tables of data report identical numbers for completely distinct experiments or when the data differ in the tables by a consistent value there is strong evidence of fabrication.

95.    Image manipulation detection strategies depend upon the identities of the experimental technique and the suspected infraction.[43]  Again, the most direct way for answering questions about whether an image has been inappropriately manipulated is to compare the final published image with the original data.

96.    The highest resolution images available should always be the objects of investigation.  Visual inspection is a powerful means for uncovering feature duplications, background irregularities, and discontinuities that are indicative of falsification or fabrication.  Electronic tools can be valuable aids to finding and confirming these violations.  Magnification and overlay techniques can be applied to examine potential duplications with comparison of images at the pixel level being a common method.  Brightness and contrast adjustments are potent approaches for the detection of many types of image manipulation.  Recoloring black and white images including using a gradient map can aid in the visualization of image irregularities.

## E.    Addressing Research Integrity Concerns

97.    Generally, after research integrity concerns are raised, the most obvious starting point for any subject or investigator is to compare the challenged data (*e.g.*, as presented in a grant proposal, publication, patent, or poster) with the primary data and contemporaneous records of the experiments in the laboratory notebook.

98.    Discrepancies between the original data and the presented data are hallmarks of research misconduct.  If the discrepancies are the result of honest mistakes, then they should be promptly disclosed; any conclusions based on the data should be reanalyzed; and any publications should be retracted or corrected to account for the errors.

---

[43] *See* Stebbing, J., Sanders, D. *"The importance of being earnest in post-publication review: scientific fraud and the scourges of anonymity and excuses." Oncogene* 37, 695–696 (2018), https://doi.org/10.1038/onc.2017.390

Discrepancies between the original data/records and presented data that cannot be reasonably explained are strong indicators of research misconduct.

99.    The absence of primary data and contemporaneous records from a challenged study or experiment present major obstacles to any investigation into research misconduct.[44]

100.    In such cases, the lack of readily available evidence to prove or refute research integrity concerns often leads investigatory bodies to avoid making formal findings of research misconduct.  In my view, this appears to have been the case with several of the scientific journals that addressed research integrity concerns in papers authored by Dr. Wang and Dr. Burns.  This opinion is based on my experience with similar investigations and my review of the language used by the journal editors.

101.    For example, the *Journal for the Prevention of Alzheimer's Disease* ("JPAD") investigated research integrity concerns regarding a paper by Dr. Wang and Dr. Burns (concerning simufilam's phase 2a study).  According to materials provided to me by counsel, Dr. Paul Aisen, the co-editor-in-chief who led the investigation, concluded: "We do not find convincing evidence of manipulation of data or intent to mislead, and therefore take no action regarding the published paper."[45]  However, materials provided to me by counsel also show that, during the JPAD investigation, Dr. Aisen consulted a colleague with expertise in Western blots, Dr. Robert Rissman, who stated that there was "clear evidence" of manipulation and sufficient grounds to retract the article.[46]  Based on my own professional training and experience, the language used by JPAD in its conclusion indicates that there was some evidence but not sufficiently "convincing evidence" of misconduct in the journal's view.  The language used by JPAD in its conclusion indicates that the investigation was constrained in its fact-finding abilities, and it does not amount to a finding that *no* research misconduct occurred.

102.    Similarly, the journal *Neurobiology of Aging* investigated a 2017 paper by Dr. Wang and Dr. Burns, and although the investigation found 8 errors that the authors agreed to correct, the journal's Expression of Concern stated:  "Overall, the editors did not find compelling evidence of data manipulation intended to misrepresent the results."[47]  Again, the qualifying language—"compelling"—indicates that the investigation was

---

[44] *See, e.g.,* RFCUNY000743 (Plaintiffs' Exhibit 148) at -792 ("From the onset of our investigation, the committee has asserted that the only objective way to make an objective assessment of each allegation of research misconduct was to examine the scans of the original blots used to create the figures in question. . . a central challenge and frustration of this investigation was the failure of the respondent to provide any verifiable original data or research records."), https://www.science.org/do/10.1126/science.adl3444/full/cuny_wang_final_report.pdf

[45] Aisen_0000706 (Plaintiffs' Exhibit 48).

[46] Aisen_0000726 (Plaintiffs' Exhibit 33); *see also* Aisen_0000733 (Plaintiffs' Exhibit 31).

[47] Expression of Concern (2022): Wang et al., (2017) "PTI-125 binds and reverses an altered conformation of filamin A to reduce Alzheimer's disease pathogenesis," *Neurobiol. Aging*, 55:99-114, https://doi.org/10.1016/j.neurobiolaging.2022.03.012

constrained in its fact-finding abilities, and it does not amount to a finding that *no* research misconduct occurred.

103.  In addition to a lack of records and other fact-finding constraints, there are several other obstacles that can impede or discourage investigations of research misconduct, and prevent investigators from finding the truth.

104.  Institutional or personal conflicts of interest can impede investigations. For example, journal editors or publishers may be reluctant to issue corrections and retractions because they can diminish the reputation and profitability of the journal. Also, authors may seek to publish in journals where their colleagues, consultants, or friends are editors, which further reduces the likelihood that the journals will take appropriate action against potential or actual research misconduct. For example, discovery materials provided to me by counsel show that Dr. Aisen, the editor of JPAD, who led the investigation into the JPAD paper by Dr. Wang and Dr. Burns (regarding simufilam's phase 2a study), had previously served as a consultant for Cassava.[48]

105.  Investigations of research misconduct have also frequently resulted in lawsuits and other legal issues for individuals and institutions involved in research misconduct investigations. Legal costs and risks can provide strong incentives for institutions to avoid finding that research misconduct occurred.

106.  The many factors that impede and discourage findings of research misconduct lead to the proliferation of bad science and unreliable research.

## F.  **Conclusions**

107.  Any individual reasonably familiar with the biomedical sciences would recognize that the most obvious and reliable method to investigate or address research integrity concerns is to compare the primary records of an experiment with the reported results of the experiment.

108.  Comparing the original data from an immunoblot experiment (*i.e.*, the original unaltered and unprocessed images) with the reported results of the experiment is one of the first steps anyone reasonably familiar with the biomedical sciences would take to investigate research integrity concerns involving immunoblot experiments.

109.  Comparing the original data from an ELISA experiment (*i.e.*, the software files or database records) with the reported results of the experiment is one of the first steps anyone reasonably familiar with the biomedical sciences would take to investigate research integrity concerns involving ELISA experiments.

---

[48] Aisen Dep. Tr. 13:07-14:03 (testifying that he previously consulted for Cassava); *id.* at 70:05-12 (testifying that he led JPAD investigation into article on phase 2a study).

110.  Any individual reasonably familiar with the biomedical sciences would recognize that the lack of primary records (*i.e.*, original data and a contemporaneous notebook) is both a major obstacle to any investigation into research misconduct and a potential indicator of research misconduct.

### III.  SIGNS OF RESEARCH MISCONDUCT IN SIMUFILAM RESEARCH

#### A.  ELISA Data

111.  I understand that at all relevant times Dr. Wang used a platereader machine with the instrument name DTX 880, which was originally manufactured by Beckman Coulter and subsequently serviced by Molecular Devices.

112.  I also understand that the Multimode Analysis Software program used to operate Dr. Wang's platereader machine autosaves the original results of each plate in the program's database folder, which was stored on the computer connected to the platereader machine in Dr. Wang's laboratory at CUNY.

113.  I further understand that, in response to a subpoena served by plaintiffs, CUNY produced the contents of the database folder stored on the computer connected to the platereader machine in Dr. Wang's laboratory at CUNY.

114.  Based on my review of the record, including Dr. Wang's deposition testimony, I understand that Dr. Wang generally presented the results of his ELISA tests by:

   1)  Exporting results from the Multimode Analysis Software to Microsoft Excel;

   2)  Organizing the results in Microsoft Excel by copying the values from each well into a plate map, as reflected in the second Tab of his Excel files;

   3)  Running certain calculations (*e.g.*, averaging values of triplicate samples), as reflected in the in the second Tab of his Excel files; and

   4)  Sharing the Excel files with Dr. Burns at Cassava.

115.  I have compared (i) the ELISA test results reported by Dr. Wang from simufilam research, including the phase 2a, phase 2b, and phase 2 open label studies of simufilam; with (ii) the corresponding ELISA test results autosaved to the database folder on the computer connected to Dr. Wang's platereader machine.  (*See* **Appendix E**.)

116.  There are apparent discrepancies between the datasets from these two sources that raise serious concerns about the integrity of the presented data.

117.  For example:

1) In many cases, the differences are round numbers;

2) In many cases, the most significant digit after the decimal point is different, whereas the least significant digits are identical;

3) In many cases, the values of triplicate groups moved in the same direction relative to their corresponding groups.

118. I cannot think of any legitimate explanation for these discrepancies; the most plausible explanation is that the raw values were manipulated.

### a. Conclusions

119. Based on the facts I have been shown (and asked to assume), it appears Dr. Wang repeatedly fabricated data from ELISA experiments conducted for Cassava.

## B. Phase 2b Biomarker Data

120. According to Cassava:

> "The Company's Phase 2b Study was designed as a 28-day, approximately 60-patient randomized, double-blind, placebo-controlled, multiple dose study. A primary objective of the Phase 2b Study was to measure changes in levels of cerebral spinal fluid (CSF) biomarkers in study participants from baseline value to Day 28. CSF biomarker assays and related bioanalysis for the Phase 2b Study (the CUNY Bioanalysis) were conducted by the laboratory at CUNY of Dr. Hoau-Yan Wang, formerly a paid scientific collaborator, consultant and advisor to Cassava. Based on the CUNY Bioanalysis, Cassava reported statistically significant improvements in CSF biomarkers in treatment groups as compared to the placebo group for the Phase 2b Study."[49]

121. In May 2020, Cassava announced that the top-line results from its phase 2b study of simufilam did not meet its primary endpoint; at the same time, the company stated it would "re-analyze CSF biomarkers from all study participants."[50]

122. In September 2020, Cassava disclosed positive results from the "re-analysis" of the phase 2b data; at the same time, it reported that the re-analysis was conducted by an "outside lab," described only as an "academic lab" in the company's press release,

---

[49] Cassava Sciences, Inc., Form 10-K, dated March 3, 2025, at p. 63, https://www.cassavasciences.com/static-files/204c86e1-bcff-46b8-a2fc-8059211b27f0

[50] Cassava Sciences, Inc., Press Release (May 15, 2020), https://www.cassavasciences.com/news-releases/news-release-details/top-line-results-phase-2b-study-pti-125-alzheimers-disease-does

without identifying that it was Dr. Wang's lab at CUNY that conducted the re-analysis.[51]

123.  I understand that, in February 2021, Dr. Burns included Dr. Wang as the first author on a draft manuscript of the phase 2b study submitted to Research Square. [52]

124.  More recently, Cassava has disclosed the following findings from an internal investigation:

> "The Internal Investigation determined that certain statistical information contained in an attachment to an email sent by a former senior employee of Cassava [Dr. Burns] to Dr. Wang before the CUNY Bioanalysis of CSF biomarkers was conducted could have been used to unblind him as to some number of Phase 2b Study participants. Unblinded information, if accessed in connection with bioanalysis, could be improperly utilized to manipulate underlying samples or data to skew reported results.
>
> The Internal Investigation did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants. Nevertheless, the fact that Dr. Wang possessed information that could have been used to so unblind himself together with the allegations in the DOJ indictment, undermine the blinded study design and create substantial uncertainty about the validity of the CUNY Bioanalysis of CSF biomarkers." [53]

125.  As a result, Cassava has subsequently stated in its SEC filings that: "you should not rely on the CUNY Bioanalysis of CSF biomarkers reported by the Company in connection with the Phase 2b Study."[54]

---

[51] Cassava Sciences, Inc., Press Release (Sept. 14, 2020), https://www.cassavasciences.com/news-releases/news-release-details/cassava-sciences-announces-final-results-phase-2b-clinical-study

[52] *See* Hoau-Yan Wang, Zhe Pei, Kuo-Chieh Lee, Yaneicy Gonzalez Rojas, Tamara Doehner, John Puente, Patrick Sciara, Brian Beck, Evelyn Lopez-Brignoni, Boris Nikolov, Carrie Crowley, George Ben Thornton, Remi Barbier, Nadav Friedmann, Jeffrey L. Cummings, Lindsay Burns. *Effects of simufilam on cerebrospinal fluid biomarkers in Alzheimer's disease: A randomized clinical trial*, [Preprint], Research Square (February 24, 2021), https://www.researchsquare.com/article/rs-249858/v1.

[53] Cassava Sciences, Inc., Form 10-K, dated March 3, 2025, at p. 63, https://www.cassavasciences.com/static-files/204c86e1-bcff-46b8-a2fc-8059211b27f0

[54] *Id.*

### a. **Conclusions**

126.    Based on the facts disclosed by Cassava (summarized above), in my view, the company, Dr. Burns, and Dr. Wang failed to follow sound scientific standards and practices in analyzing and presenting the phase 2b biomarker data.

127.    After the disclosure of results from the "reanalysis" in September 2020, and subsequent disclosure in February 2021 that Dr. Wang's lab at CUNY was the "academic lab" that was involved in the "reanalysis"—anyone reasonably familiar with the biomedical sciences would have recognized that there was a legitimate basis to question the integrity of the phase 2b biomarker data and simufilam clinical program.

## C. **Quanterix Data**

128.    I understand that Cassava, through Dr. Burns, asked another lab, Quanterix Corporation, to test plasma samples from phase 2b study participants. I further understand that Cassava and Dr. Burns have claimed that Quanterix's test results showed that simufilam had a significant treatment effect versus placebo.[55]

129.    Based on a submission by Cassava to the FDA, I understand that the company undertook the following steps in having Quanterix test the plasma samples:

> "Initially, Cassava Sciences sent plasma samples from approximately half of the study subjects in its Phase 2b study (PTI-125-02) to Quanterix. Quanterix conducted the analysis using their plasma P-tau181 Simoa assay. This proprietary assay is described on Quanterix' web site (https://www.quanterix.com/simoa-assay-kits/p-tau18l-v2-new/).
>
> Clinical samples were sent to Quanterix blind to treatment group. Samples that returned a 'fatal error' or high coefficient of variation (CV) (>20%, as is their standard cutoff for diagnosis purposes) were re-run by Quanterix in the next plate. Throughout testing and repeating, each patient's Day 0 and Day 28 samples were run together in the same plate, i.e., if one of these two samples needed to be repeated, both were repeated together.
>
> Data received from Quanterix for the first half of samples were encouraging enough that Cassava Sciences sent Quanterix the second half of the samples for this plasma p-tau181 analysis. Quanterix's Simoa assay includes a standard step to dilute subject samples 4-fold. For the second half of samples, Quanterix diluted

---

[55] L. Burns Dep. Tr. at 242:19-22.

many subject samples 8-fold instead of the standard 4-fold without informing Cassava Sciences. (8x dilution increased the likelihood of high CVs and outlier results). As a result, Quanterix agreed to run (at no extra charge) one extra plate of subject samples with high CVs (anything >11%), 8x dilutions, and a few anomalous results that needed to be repeated. Additional plasma samples were sent for this purpose.

The final dataset includes all data points with the repeats swapped for the earlier high CV or 8 dilution results. Four subjects' data with Day O or Day 28 samples with CVs >15% (i.e., one in placebo, two in 50 mg and one in 100 mg) were excluded from the final data set, as were two outliers. The rule for removing outliers that was applied was > 150% change and > 2.5 pg/ml. This rule allowed removal of one in placebo and one in 100 mg (both large increases)."[56]

### a. <u>Conclusions</u>

130. Assuming that Cassava's statements to the FDA reproduced above are correct, Cassava and Dr. Burns failed to follow sound scientific standards and practices in analyzing and presenting the Quanterix data, including insofar as Dr. Burns waited to send the second half of samples until reviewing the results of the first half.

131. Anyone reasonably familiar with the biomedical sciences would have recognized that there was a legitimate basis to question the integrity of the Quanterix data presented by Cassava, especially in light of Dr. Burn's sending of samples in two halves.

## D. <u>Immunoblot Data</u>

132. Numerous articles co-authored by Dr. Wang have problematic immunoblot data with signs of inappropriately repeated images.

133. I have reviewed allegations against Dr. Wang and Cassava made by plaintiffs and by the authors of the Citizen's Petition in 2021.[57]  I have also reviewed the reported findings of CUNY's investigation committee, as described in the committee's "final report" published by *Science* magazine in October 2023,[58] as well as the retraction

---

[56] CASSAVA_000835817 (Plaintiffs' Exhibit 206)

[57] *See, e.g.,* CASSAVA 000490972 (August 18, 2021 Citizen's Petition); Plaintiffs' Exhibit 133 (Nov. 3, 2021 slide deck, titled "Cassava Sciences:  A Shambolic Charade"), https://www.cassavafraud.com/docs/SAVAReport_Deck_2021_11_03.pdf

[58] RFCUNY000743 (Plaintiffs' Exhibit 148).

notice issued in March 2022 by the scientific journal *Plos One*, which retracted five articles by Dr. Wang, including two co-authored by Dr. Burns.[59]

134. In my opinion, these documents describe credible and troubling signs of data falsification or fabrication in Dr. Wang's (and Dr. Burns's) immunoblot data, including, among other issues: duplicated images; a lack of positive controls as needed to verify the reliability of the results; background image similarities; distinct aberrations in band shapes and backgrounds; incongruities in the backgrounds of blot panels; unexpected vertical discontinuities in several western blot panels, suggesting the undisclosed splicing of blots from different gels; discontinuities in the background intensities of blot panels; and discontinuities in background signals consistent with the cutting and pasting of specific bands.

135. Indeed, there are instances of apparent image duplication that can be identified simply by inspecting Dr. Wang's published immunoblot images with the naked eye.

136. For example, an article co-authored by Dr. Wang, published in the *Journal of Neuroscience* in 2009[60] ("JNeuro 2009") contains many easily identifiable signs of inappropriately repeated images.

137. In Figure 3e, there are data (the two panels labeled "IP: GluR2 and GluR3") presented in the form of an immunoblot and described as follows:

> "The expression levels of …GluR2, GluR3,… in postmitochondrial synaptosome-enriched fraction prepared from frontal cortices of P21 rats exposed to saline or cocaine in utero … after immunoprecipitation with anti-GluR2 or anti-GluR3 (e). The blots were stripped and sequentially reprobed with… anti-GluR2 and anti-GluR3" [antibodies].

138. The two lanes in the GluR2 panel (hereafter referred to as GluR2-1 and GluR2-2) are remarkably similar to two lanes from an earlier article co-authored by Dr. Wang and Dr. Burns, published in *Neuroscience* in 2005[61] ("Neuro 2005")—specifically, the Striatum/Actin panel of Figure 12A (hereafter referred to as SA1 and SA2).

---

[59] *Retraction: High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor–Gs Coupling Underlying Opioid Tolerance and Dependence*, PLoS ONE 17(3): e0266627 (March 30, 2022) https://doi.org/10.1371/journal.pone.0266627 (Plaintiffs' Exhibit 146).

[60] Kalindi Bakshi, Serena Gennaro, Christopher Y. Chan, Mary Kosciuk, JingJing Liu, Andres Stucky, Ekkehart Trenkner, Eitan Friedman, Robert G. Nagele, Hoau-Yan Wang, *Prenatal Cocaine Reduces AMPA Receptor Synaptic Expression through Hyperphosphorylation of the Synaptic Anchoring Protein GRIP*, The Journal of Neuroscience, 29 (19) 6308-6319 (May 13, 2009), https://doi.org/10.1523/JNEUROSCI.5485-08.2009

[61] Hoau-Yan Wang, *et al.*, "*Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor–G protein coupling and Gβγ signaling,*" *Neuroscience*, Volume 135, Issue 1, 247-261, (2005) https://doi.org/10.1016/j.neuroscience.2005.06.003 (HEILBUT_00000344).

---

139. GluR2-1 and GluR2-2 appear to have been horizontally stretched relative to SA1 and SA2. In the comparison between the images, please note first the dots at the upper righthand corner of each of the noted bands in each panel. In each case the leftmost dot is sitting near the center of the gap between the bands, whereas the righthand dot is positioned just above the end of the right band. Furthermore, GluR2-1 and SA1 each have an element jutting to the left from the bottom of the band. Finally, among the many common features of the bands, GluR2-2 and SA2 share two lighter elements on top of the left three-fifths of the bands that closely correspond to one another.

140. Similarly, the two lanes in the GluR3 panel (hereafter referred to as GluR3-1 and GluR3-2) are remarkably similar to the first two lanes of the Spinal Cord/Actin panel of Figure 12A of Neuro 2005 (hereafter referred to as SCA1 and SCA2).

141. GluR3-1 and GluR3-2 appear to have been horizontally stretched relative to SCA1 and SCA2. In the comparison between the images, please note first the dots at the upper righthand corner of GluR3-1 and SCA1. In each case the leftmost dot is sitting near the center of the gap between the bands, whereas the righthand dot is positioned just above the end of the right band. Furthermore, GluR3-2 and SCA2 each have an element jutting to the left from the bottom of the band. Finally, among the many common features of the bands, GluR3-1 and SCA1 share two lighter elements on top of the left three-fifths of the bands that closely correspond to one another.

142. It is especially noteworthy that SA1 and SCA2 also appear to have a common origin (note the dots and the bottom jutting element) with SCA2 stretched vertically with respect to SA1, and therefore, GluR2-1 and GluR3-2 also appear to have a common origin. This would mean that one particular, original image is used to represent four different immunoblot bands (SA1, SCA2, GluR2-1 and GluR3-2) that purport to display reactions with three different antibodies across two articles. Even without access to the original films, it is nearly impossible to escape the conclusion that images have been unacceptably reused multiple times to represent supposedly different experimental data.

143. The images in question recur in yet another paper co-authored by Dr. Wang, published in *Biological Psychiatry* in 2010[62] ("JBP 2010").

144. In the upper (supposed "10-min preexposure") beta-actin panel of Figure 1A, the first two lanes (hereafter referred to as 10mBA1 and 10mBA2) are remarkably similar to SCA1 and SCA2 and, therefore, to GluR3-1 and GluR3-2 respectively by the criteria previously discussed.

---

[62] Hoau-Yan Wang, Kalindi Bakshib, Changpeng Shenb, Maya Frankfurtb, Caryn Trocmé-Thibiergea, Philippe Morain, *S 24795 Limits β-Amyloid–α7 Nicotinic Receptor Interaction and Reduces Alzheimer's Disease-Like Pathologies*, Biological Psychiatry, Volume 67, Issue 6, 2010, 522-530, (March 15, 2010), https://doi.org/10.1016/j.biopsych.2009.09.031

145. Furthermore, the second through fifth bands of the upper beta-actin panel of Figure 1A of JBP2010 (10mBA2-10mBA5) are remarkably similar to the bands in the Striatum/Actin panel of Figure 12A of Neuro2005 (SA1-4). 10mBA2-10mBA5 appear to have been stretched horizontally when compared to SA1-4.

146. Finally, the sixth band of the upper beta-actin panel of Figure 1A of JBP2010 (10mBA6) is highly similar to the third band in the Spinal Cord/Actin panel of Figure 12A of Neuro 2005 (SCA3). 10mBA6 appears to have been stretched horizontally when compared to SCA3.

147. It is not plausible that all of these duplications occurred through honest error. This analysis was performed using visual inspection and did not require employment of image-analysis software.

148. In sum, we have one image of a band used five times (SA1, SCA2, GluR2-1, GluR3-2, and 10mBA2) others two or three times (SA2/GluR2-2/10mBA3 and SCA1/GluR3-1/10mBA1).

149. There are other problems with JNeuro2009.

    1) The beta-tubulin bands in Figure 3a are remarkably similar to the bands in the lefthand GRIP1 panel in Figure 9c.

    2) It would also appear that the first and third bands in the PKCdelta panel of Figure 9a when inverted around a horizontal access have a common origin with the first and third bands in the PKCepsilon panel.

150. There are also other problems with Neuro2005.

    1) The top Galphao (Galphao/Galphao) panel in Figure 2 appears strongly to have a common origin with the top left ACII (ACII/ACII) panel. Note the three dots that form triangles in the upper left quarter of the images, the smudge between the upper two dots, and the blurred dash and dot to the right of the lower dot. "The standard should be how likely is it that two images could be so similar and yet have distinct origins."

    2) Also, in the 2022 Editorial Note to Neuro2005, the images submitted representing the "Original uncropped Blots" for the Figure 5 Galpha panels have, at varying intensities, extensive shared background features that indicate that they are not the original uncropped blots but rather images of bands superimposed on a common background.

151. As yet another example, in Figure 1c of Dr. Wang's 2011 article published in *Translational Neuroscience*, the bands in the pS-Akt and pY-ERK2 panels are remarkably similar. Note the shape and intensities of the bands, and how the band shapes in the pS-Akt panel do not resemble those in the Akt panel and how the band

shapes in the pY-ERK2 panels do not resemble those in the ERK2 panel, despite the fact that they should. The sites of greater intensity in the third bands in each panel correspond closely as do the shapes of the fourth bands and the small upward protrusions in their left halves.[63]

### a. Conclusions

152. In my view, there are many credible and serious signs of research misconduct in the immunoblot images presented by Cassava and Dr. Wang's research.

153. Anyone reasonably familiar with the biomedical sciences would have recognized that there was a legitimate basis to question the integrity of Cassava and Dr. Wang's immunoblot data, especially in light of their failure to follow basic recordkeeping standards and practices, including the lack of notebooks and original data.

---

[63] Hoau-Yan Wang, Andres Stucky, Chang-Gyu Hahn, Robert Wilson, David Bennett, Steven Arnold, *BDNF-trkB signaling in late life cognitive decline and Alzheimer's disease*, Translational Neuroscience, Vol. 2, Issue 2, 91-100, (June 26, 2011), https://doi.org/10.2478/s13380-011-0015-4

## IV.  STATISTICAL ANALYSIS OF BIOMEDICAL RESEARCH DATA

154.  I have been asked to opine on the propriety of certain approaches to the statistical analysis of biomedical research data.

155.  First, any statistical analysis of biomedical research data should be prespecified, meaning that the statistical methodology to be used in analyzing the data should be established prior to conducting the experiments—and certainly prior to any review of the data, with certain very limited exceptions.  Those exceptions include if there is an expansion of the scope of the experiments, and it is scientifically valid to include the earlier conducted experiments in the overall analysis.

156.  Second, it is sometimes appropriate to exclude some data points from a dataset for purposes of performing a statistical analysis. However, the criteria for excluding such data points should always be pre-specified, except in very limited circumstances. Those are limited to occasions where the control experiments have unexpected results or limitations, or new information about detection limits or instrument saturation emerges, or problems with the linearity of the data are encountered.

157.  Third, any exclusion criteria should be uniformly applied to all data in a dataset. It is never appropriate to apply one set of exclusion criteria to a subset of data and a different set of exclusion criteria to other data.

Respectfully submitted,

*David A. Sanders*

**Dr. David A. Sanders**

West Lafayette, Indiana

**APPENDIX A**
**(Immunoblots)**

1.      Over the course of my career, I have conducted dozens of immunoblot experiments (also referred to as Western blot experiments) and presented the results of the same. I have also taught students how to conduct and present immunoblot experiments and overseen such experiments conducted by graduate and undergraduate students in my laboratory.

2.      In this section, I will explain the purpose of immunoblot experiments and provide an overview of the standards and practices in the biomedical sciences for conducting and presenting immunoblot experiments.

**A.  Purpose of Immunoblot Experiments**

3.      Immunoblotting is an experimental procedure that seeks to determine the amount and molecular size (referred to as the molecular weight or "MW") of a protein in a sample based on the ability of an antibody to adhere (bind) to the specific protein of interest.

4.      For example, immunoblotting is commonly used in experiments where one wants to diagnose disease through detection of the presence or absence or changes in the amount of a particular protein.  Immunoblots allow an experimenter to investigate chemical modifications of proteins.  The specificity of antibodies for particular proteins can be determined through immunoblotting.  The production of recombinant proteins is frequently measured by immunoblotting.  Alterations in protein levels that occur in response to pharmaceutical treatments are commonly assayed through immunoblots.  The presence of a protein in a complex can be measured by combining an immunoprecipitation experiment with an immunoblot experiment. Immunoblots are commonly employed in viral, cancer, and cell-biological research including neurobiological experiments.

**B.  Steps for Conducting Immunoblot Experiments**

5.      Step 1 (sample treatment):  First, a sample, which frequently consists of a mixture of proteins from a cell, is treated with a strong detergent and a reducing agent and then heated to near boiling. The detergent is most often sodium dodecyl sulfate ("SDS"), which is also found commonly in shampoos. This treatment accomplishes primarily two goals. It puts all of the proteins in a form (referred to as "denatured") where they are no longer compact and no longer function and also puts a negative charge on the proteins.

6.      Step 2 (gel electrophoresis):  Next, the proteins are separated by a process called gel electrophoresis. In essence, one creates a matrix made of polyacrylamide through which the proteins migrate towards a positively charged electrode. In a sieving process, smaller proteins are able to get through the matrix faster than larger ones, so there is a separation by size. A mixture of proteins of known sizes, commonly known as molecular-weight markers, is used as a standard for comparison of migration speed to the proteins in the sample. The proteins are often tagged with colored dyes so that

1

the migration in the gel of the proteins of interest can be easily compared to that of the standard (marker) proteins.

7.    In the construction of the gel through which the proteins will migrate, there is a layer of gel at the top into which a plastic comb is inserted in order to create slots into which the protein samples will be deposited. The spaces created by the teeth of the comb are called "wells." A gel may have between 8 and 15 wells, thereby making it possible to analyze 7 to 14 samples, with one additional well typically reserved for the molecular weight markers.

8.    After a suitable time, the electrophoresis is terminated, and the proteins are present in the gel with the largest proteins towards the top.

9.    Step 3 (transfer of proteins to membrane):  The proteins are then transferred to a membrane to which proteins can adhere (normally made of either nitrocellulose or polyvinylidene fluoride "PVDF") also by a process of electrophoresis. The still negatively charged proteins migrate out of the gel onto the membrane behind which is a positively charged electrode. The proteins are retained on the membrane; one can think of their locations on the membrane as an image of their places in the gel.

10.   Typically, membranes are consistently marked on a particular corner so that information on the orientation of the gel relative to the membrane can be preserved. The membrane is commonly stained with a dye such as Ponceau S to determine whether the transfer of proteins has occurred evenly.

11.   The membrane is designed to adhere to proteins, so before it is exposed to the antibody (or antibodies) that recognize(s) the specific proteins of interest, there is a "blocking' step, wherein the membrane is exposed to a protein mixture, such as nonfat milk. All of the places where the antibody might adhere, simply by virtue of its being a protein, are now covered, so the only places where the antibody can adhere are those where the protein it binds to is present.

12.   Step 4 (application of antibody solution(s) and visualization):  A solution containing an antibody (referred to as the "primary antibody") that is capable of binding to a particular protein in its denatured form is placed on the membrane. If the protein is present, the antibody will bind precisely where the protein is on the membrane. And the amount of antibody that binds is proportional to the amount of protein that is present at any particular position.

13.   The next step is to visualize where the antibody is now bound to the membrane. In the most common protocol, there is a secondary antibody that can bind to antibodies of the species of animal (or animal cell) by which the primary antibody was produced. This secondary antibody is modified chemically (see below) to allow for visualization of where it is bound to the membrane. A solution containing the modified secondary antibody is placed on the membrane.

14.   If the primary antibody is present (because the protein that the primary antibody binds to is present), the secondary antibody will bind precisely where the primary protein is

2

on the membrane. And the amount of secondary antibody that binds is proportional to the amount of the protein to which the primary antibody binds that is present at any particular position.

15.    The chemical modification of the antibody is typically done by adding a radioactive element, an enzyme, or a fluorescent molecule.

16.    If the modification of the antibody is done by adding a radioactive element, then the membrane is exposed in the dark to X-ray film. The places where the protein/primary antibody/secondary antibody are present appear as "bands" on the film.

17.    If the modification of the antibody is done by adding an enzyme, then there is (1) the production of a color by the enzyme (through a chemical reaction) on the membrane where the protein/primary antibody/secondary antibody are present or (2) the production of light by the enzyme (through a chemical reaction) by a process called chemiluminescence on the membrane where the protein/primary antibody/secondary antibody are present. The chemiluminescence is detected by exposure in the dark to X-ray film or through the use of a charge-coupled device ("CCD").

18.    If the modification of the antibody is done by adding a fluorescent dye, then the detection is through a fluorescence detection device.

19.    If chemiluminescence is the detection technique employed, then the product film will have dark bands on a lighter background at the places where the enzyme-linked antibody bound (directly or indirectly) to the protein of interest.  The more protein detected the darker will be the band.  The greater the length of time of exposure of the membrane to film, the darker the bands will be.  Frequently in the experiments a standard time of exposure (e.g., two minutes) of the membrane to the film will be employed.  A deviation from that standard, including when there are multiple exposures of the same membrane to pieces of film, is normally noted either on the film itself or in the notebook containing the film.  In addition, the corners of the membrane that was placed on the film are indicated as are the sites of the molecular weight markers on the membrane. To be fair, if a relatively simple experiment (e.g., recombinant-protein expression) that is oft-repeated with no likelihood of a change in the apparent molecular-weight of the detected protein is conducted, it might be acceptable to omit the indication of the molecular-weight markers. Labeling of the experimental lanes is performed either with a marker or an inscribed piece of tape. The date is also added to the film.  If the film is swiftly affixed to a notebook page, then the lane labels and dates are sometimes written in the notebook.

20.    Step 5 (quantification):  The films or the digital records can be used for quantification of the protein in the samples and are always labeled, catalogued, and preserved in physical or digital notebooks.

21.    "Densitometry" is frequently used to quantify a protein and gel documentation ("gel-doc") systems involving quantification software are often employed. Care must be exerted to avoid artifacts that can distort the results.

3

22.    In order to quantify the amount of a detected protein in a particular sample, one has to compare the signal ("band intensity") of the protein of interest in a lane with that of a protein that should be at a constant level (termed a "housekeeping protein) in the different samples.

23.    Ideally, the comparison should be between the signal from the protein of interest and the housekeeping protein originating from the same sample analyzed on the same polyacrylamide gel and in the same lane. The term "loading control" can actually only apply when this criterion is fulfilled.

24.    To quantify a protein of interest, it is required to normalize the signal to the amount of sample protein originally loaded on the gel. Some proteins in cells are present at relatively constant levels and are termed *housekeeping* proteins. Common examples are the enzyme glyceraldehyde-3-phosphate dehydrogenase (GAPDH) or the structural proteins $\beta$-actin or tubulin. Probing the membrane with an antibody against a housekeeping protein gives a proxy for the total amount of protein loaded in each well.

25.    An alternative normalization method is to use the Ponceau red stained membrane image (see step 2, above) to show the total protein in each lane. In best practices, a *loading control* image should be obtained from the same membrane as the one for the protein of interest. Typically, one chooses a housekeeping protein of a different molecular weight than the protein of interest.

26.    Stripping and reprobing immunoblots is a method in which the primary antibody that recognizes a particular protein (protein #1) is removed from an immunoblot membrane.  The associated secondary antibody is also removed.  This protocol allows the incubation of the membrane with a different primary antibody (and its associated secondary antibody) that recognizes a different protein (protein #2).  This allows for a direct comparison between the amounts of the proteins #1 and #2 in a given sample or samples. In fact, the stripping and reprobing can be performed more than two times with a membrane.

27.    Stripping is necessary, because otherwise there would be a signal detected on the film from the first secondary antibody as well as the second secondary antibody, which, if the molecular weights of the proteins are similar, could obscure the results of the detection of protein #2.  Stripping and reprobing also can facilitate simpler presentation of the results.  Commonly, one of the proteins that is detected is the loading control described above.

28.    It is preferable to compare the amounts of proteins in a sample that has been loaded in a single gel well, because of potential variations in the precision in loading samples into multiple wells.  There should be little variation in the amount of the loading control protein, and therefore it is measured by immunoblot to detect anomalous loading events.  A common protocol is that densitometric measurements of the bands of the protein of interest and the loading control are made, and a ratio of the values between those of the protein of interest and those of the loading control are calculated.

29. Variations in the electric field across the gel result in anomalous migration of proteins that are visualized as "smiles," i.e., slighting retarded migration of the proteins towards the edges of the gel that result is bands that curve upwards, or peculiar band shapes. The importance of this feature of the experiment is that there should be common but not identical features for bands seen on films that originate from a sample that was loaded on a particular lane. If the anomalies are not seen in all bands that are purported to have originated from such a sample, or if different anomalies are displayed, then it is unlikely that all the bands represent one electrophoresis sample. Other features that should be similar are the horizontal spacing between bands and the slope of the set of bands. It is, in particular, essential that the features are common between the bands representing proteins of interest and those of the loading controls, because otherwise, they are not actually experimental controls that assess loading precision.

30. These comments apply equally to stripped-and-reprobed membranes with the additional caveat that the protocol needs to be tested to ensure that all primary (and associated secondary) antibodies are removed by the stripping conditions and that the proteins of interest on the membrane are not removed under the stripping conditions. It should be noted that special care needs to be taken when one is probing for the total concentration of a protein and then subsequently for a modified (i.e., phosphorylated) form of the same protein. Any remaining primary (and associated secondary antibody) may affect (either increasing or decreasing) the signal observed from the binding of the modified protein by the modification-specific antibody. Also, the band shape, spacing, and slope should be highly similar in the case of the images originating from detection of the total or modified proteins. If this is not the case, then it is probable that there is a misrepresentation of the origin of the images.

## C. **Presenting Results of Immunoblot Experiments**

31. Immunoblot (Western blot) data must be collected and presented at the highest resolution possible, labeled appropriately and presented with minimal image manipulation.

32. The generally accepted standards for presenting the results immunoblot experiments are described in Mike Rossner, Kenneth M. Yamada, "What's in a picture? The temptation of image manipulation." *J Cell Biol* 5 July 2004; 166 (1): 11–15, available at https://doi.org/10.1083/jcb.200406019.

33. Submission by the authors of an image as a Powerpoint slide is regarded as unacceptable, although the journal may supply a Powerpoint slide of a published image as a courtesy to a reader.

34. A lane containing molecular-weight markers must be included on all gels, and the migration position of those proteins must be indicated in the image of the immunoblot.

35. Clear descriptions and identifications of the antibodies employed and the protocol for each step in the immunoblot must be provided. If lanes that were not adjacent in the

original immunoblot and/or lanes from different immunoblots are presented next to one another, there must be a clear boundary (white space or black line) between them.

36. "Loading controls" of "housekeeping proteins" must be analyzed on the same gel and transferred to the same blotting membrane as the proteins of interest whose levels are being measured in the experiment.

**D. Manipulations of Immunoblots**

37. The examples of unacceptable image manipulation in immunoblots include insertion or deletion of a band, duplication of bands within an image or in multiple images, brightness and color adjustments, background falsification, and lane splicing without annotation that this procedure has been employed.

38. In general, manipulations that are designed to highlight or diminish specific features are violations of scientific norms. Pasting of representations of immunoblot bands on a background that does not correspond with that of the original immunoblot image is unacceptable and is especially blameworthy when bands from different immunoblots are repeatedly affixed to the same background.

39. Lane splicing occurs when bands from lanes that were not adjacent in the original immunoblot and/or lanes from different immunoblots are presented next to one another. Although at one time, this practice was considered venial, lane splicing without annotation has been forbidden for about two decades.

6

**APPENDIX B**

**(ELISA Experiments)**

1. Over the course of my career, I have conducted Enzyme-Linked ImmunoSorbent Assay ("ELISA") experiments. I have also taught students how to conduct ELISA tests and present their results, and have overseen such tests conducted by graduate students in my laboratory.

2. In this Appendix D, I will explain the purpose of ELISA tests and provide an overview of the standards and practices in the biomedical sciences for conducting and presenting ELISA tests.

## A. Purpose of ELISA Tests

3. An ELISA test is a technique that allows for the quantitative measure of the amount of a protein antigen or antibody (also a protein) present in a sample.

4. An antigen, although originally defined as a substance that induces an immune response, is, for the purpose of this description, a substance to which an antibody specifically binds. In the ELISA, a protein antigen or an antibody is first bound to a solid surface, normally a polystyrene multiwell plate. The proteins bind nonspecifically through hydrophobic interactions. There are several variations (described below) on the ELISA technique, but the feature they have in common is that detection of the substance of interest in the sample depends upon a chemical reaction produced by an enzyme linked to an antibody that generates a change in the color of the sample-containing solution that can be detected by an absorbance microplate reader/spectrophotometer (also referred to as a platereader machine). The extent of the color change provides a quantitative measure of the concentration of the substance of interest in the sample.

## A. Steps for Conducting ELISA Tests

5. Step 1: In the first step of the ELISA a protein-containing sample is adsorbed onto the surface of the polystyrene well. The protein could be a mixture from an experimental sample or just one protein or antibody type. After the adherence of the protein to the walls of the well, the liquid is removed, and the well is washed to remove any remaining unbound chemicals.

6. Step 2: Next, proteins that are not being measured in the ELISA and which do not interact with the other proteins that will subsequently be added are bound to the well. This step prevents the proteins (antigens or antibodies) present in the solutions that will be placed in the well subsequently from binding nonspecifically to the polystyrene in the well. The only way that they will be retained in the well is through specific antigen-antibody interactions. The liquid is then removed, and the well is washed to remove any remaining unbound chemicals.

7. Step 3: The next step involves the adding of a solution that contains an enzyme-linked antibody that recognizes a specific antigen (see below on the various ELISA types). Again, the liquid is removed, and the well is washed to remove any unbound chemicals.

8. Step 4: In the final step, a substrate (the chemical whose color will change after the reaction) for the enzyme is added in a solution to the well. Common enzymes linked to the antibodies are horseradish peroxidase or alkaline phosphatase. The absorbance is then measured. An important experiment to conduct is the "blank" control in which the absorbance of a well in which the protein antigen or antibody that is being detected is absent, but all other steps have been executed. The absorbance of the solution in that well is measured and its value is subtracted from the absorbance measurements from the other wells.

9. There is a variation on the ELISA where the enzyme that catalyzes the reaction that produces the color change is not linked directly to an antibody. Instead, the primary antibody that binds the protein antigen (or a secondary antibody that binds to the primary antibody) is bound to biotin (a small molecule that is a vitamin and enzyme cofactor). After the antibody or antibodies are added to the well (appropriate blocking and washing steps are also included as above), a protein called streptavidin that is linked to an enzyme such as horseradish peroxidase is then added to the well. Streptavidin binds tightly to biotin, so when the protein antigen is present, the antibody with the biotin attached binds (directly or indirectly as above) to it, and the streptavidin binds to the biotin-linked antibody. The color-change reaction is then allowed to proceed.

## B. Four Main ELISA Techniques

10. There are four main ELISA techniques for protein antigen detection. We will focus solely on those elements by which they differ—not repeating, for example, a description of the washing and blocking steps.

1) "Direct": The first and conceptually simplest is referred to as "Direct." The sample containing the protein antigen of interest is placed in the well, to the walls of which the proteins adhere. An enzyme-linked antibody that binds to the protein of interest is added and the color-change chemical reaction is measured. One disadvantage of this method is that there needs to be a different enzyme-linked antibody for each protein that is to be detected, so it is not widely utilized nowadays.

2) "Indirect": In the "Indirect" method, the sample containing the protein antigen of interest is placed in the well, to the walls of which the proteins adhere as in the Direct technique. However, the antibody (referred to as the "primary" antibody) that is added to the well, which binds to the protein of interest, is not linked to an enzyme. Instead, a "secondary" antibody that is enzyme-linked and specific for the type and species (e.g., originating in rabbit, mouse, or goat) of the primary

2

antibody is added to the well, and the color-change chemical reaction is measured. This method is both more economical and flexible than the Direct method.

3) "Sandwich":  In the "Sandwich" ELISA technique, an antibody that specifically binds the protein of interest is adsorbed onto the well.  The sample potentially the protein of interest is then added to the well.  The protein of interest will bind to the antibody and will therefore be retained in the well during the washing steps.  Next, a second antibody that binds to the protein of interest on a different epitope (in our instance, a surface region) is added to the well.  The two antibodies, each bound to the protein of interest, form a "sandwich" with the protein of interest between them.

If the second antibody is enzyme-linked, then one can proceed to measure the color-change chemical reaction in a "direct sandwich" ELISA.  Otherwise, a third antibody, which is enzyme-linked, that specifically recognizes the second antibody is added to the well, and the color-change chemical reaction is measured in an "indirect sandwich" ELISA.  The sandwich ELISA has enhanced specificity and sensitivity and is often used in assays of cytokines.  There is the limitation, however, that there must exist two antibodies that can bind simultaneously to different epitopes of the protein of interest.

4) "Competition":  In the "Competition" ELISA, the sample potentially with the protein antigen of interest is mixed with a primary antibody that specifically binds it.  Separately, the protein antigen of interest is adsorbed onto the well surface.  The sample/primary-antibody mix is then added to the well.   An enzyme-linked secondary antibody that specifically recognizes the primary antibody is then added to the well.  The color change chemical reaction is then measured.  In this assay, the more protein of interest in the sample, the less primary antibody is available to bind to the protein antigen adsorbed on the well surface and to be detected by the secondary antibody.  Contrariwise, if there is little protein of interest in the sample, the abundant available primary antibody will bind to the protein antigen adsorbed on the well and there will be a greater color change. Therefore, in the competition assay, a decrease in absorbance indicates an increase in the protein of interest in the sample.

Another variation on the Competition ELISA is where an antibody that recognizes the protein antigen of interest is absorbed to the well surface and then the sample potentially containing the protein antigen is added to the well.  Next, purified protein antigen bound to biotin is added to the well.  Finally, enzyme-linked streptavidin is added to the well, and the color-change chemical reaction is measured.  In this assay, the more protein of interest in the sample, the less purified protein antigen bound to biotin will bind to the antibody in the well and thereafter there will be less enzyme-linked streptavidin retained.  Contrariwise, if there is little protein of interest in the sample, the abundant available antibody in the well will bind to the purified protein antigen bound to biotin and there will be a greater color change.  Therefore, in this competition assay as well, a decrease in absorbance indicates an increase in the protein of interest in the sample.

3

11.    It should be noted that the ELISA can be used for detection of antibodies that bind to a particular protein antigen in a sample, in order, for example, to determine whether an individual had been infected by a virus, such as the human immunodeficiency virus (HIV).  One illustration of this method is when a protein antigen for which an experimenter wishes to determine whether there has been an immune response is added to a multiplate well.  Then the sample that is being studied to determine the amount of antibody that binds to that antigen is added followed by an enzyme-linked antibody that recognizes the type (e.g., species) of antibody expected to be in the sample.  The color-change chemical reaction is measured, and an increase over the blank control described above can be utilized to determine the amount of the antibody present that binds to the protein antigen.

## C.  <u>Other Factors to Consider</u>

12.    There are a number of factors that need to be taken into consideration when conducting and analyzing ELISA experiments.

13.    <u>Optimization</u>:  Each step in the assay needs to be optimized, for example, for the time when an added antibody or color-development chemical is present in the well.  The timing of the last step is particularly critical, because color-development, if unimpeded, will proceed with time.  Normally a "stop" solution (often consisting of sulfuric acid) is added to the well at a defined time, so the color-generating reaction is terminated.

1)  When one relies on kits, some of those tasks are already achieved.  Nevertheless, the details of the experiment depend upon the nature of the sample and the detection system.  First, the kits have been optimized for particular types of samples and are only recommended for them.  Second, the kits can differ in how long they may be stored or other characteristics, so careful records of lot numbers and kit-expiration and experiment dates need to be kept.

14.    <u>Standard curves</u>:  In addition, there needs to be a standard curve created for each multiwell plate.  In kits, standard protein antigens are normally provided for this purpose.  The goal of creating the standard curve is to be able to associate values of the absorbance of sample-containing ELISA wells with actual protein concentrations.  Various dilutions of the standard protein antigens are placed in the wells, and the assay is conducted.  The values obtained are plotted on a graph.  The multiplate readers normally have software that allows for production of the graph.  A 4-parameter algorithm is strongly recommended to provide the best standard-curve fit.  Linear plots of the data produce less precise fits.  Kits come with recommended antigen-concentration ranges, and it is essential that samples are properly diluted or have sufficient protein, so that the assay can function properly.  Values in wells containing experimental samples are placed on the graph and thereby the concentration of the protein antigen can be calculated.

4

5

**D.  Presenting Results of ELISA Tests**

15.    The concentration data derived from ELISA measurements are the normal results presented in articles or reports.

16.    It is therefore essential that the original experimental data, the standard curves, and the calculations that produced the published data be retained.  (*See* Report, Section I.)

5

**APPENDIX C**

[C.V.]

**APPENDIX D**

[Materials Considered]

1

**APPENDIX E**

[Materials Underlying Opinions in Section III.A (ELISA datasets)]

1