UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS, <br><br> Plaintiffs, <br><br> v. <br><br> CASSAVA SCIENCES, INC., REMI BARBIER, and DR. LINDSAY BURNS, <br><br> Defendants. | Civil Action No. 1:24-cv-05948-JLR <br><br><br> **Oral Argument Requested** |

**DEFENDANT CASSAVA SCIENCES, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS AND PROCEDURE................................................................. 2

     I.     Cassava's Phase 3 Clinical Trials of Simufilam as an Alzheimer's
Treatment .............................................................................................. 3

     II.    The Citizen Petition and Plaintiffs' Defamatory Statements ................................ 3

     III.   Cassava Files the Defamation Action to Defend the Company and Protect
Phase 3 Enrollment .............................................................................. 5

     IV.   Plaintiffs File this Action................................................................................ 8

     V.    Plaintiffs Refuse to Accept Payment Exceeding Their Attorney's Fees and
Alleged Compensatory Damages, Instead Pursuing a Purported Free Roll
on Punitive Damages ........................................................................... 8

     VI.   Plaintiffs' Alleged Injuries............................................................................ 10

LEGAL STANDARD......................................................................................................... 12

ARGUMENT ...................................................................................................................... 12

     I.     Defendant Is Entitled to Summary Judgment Denying Plaintiffs' Claim for
Attorney Fees for Pursuing Compensatory and Punitive Damages Claims
Under N.Y. Civ. Rights Law § 70-a(1)(b)-(c) ....................................... 12

          A.    New York's Anti-SLAPP Statute Does Not Authorize Attorney's
Fees for Pursuing Compensatory and Punitive Damages ........................ 13

          B.    Plaintiffs' Demand for a Jury Award of Attorney's Fees, Subject to
Multiplication as Punitive Damages, Is Inconsistent with Federal
Procedure for Awarding Attorney's Fees ................................................. 15

          C.    Plaintiffs' Misinterpretation of New York Law Would Open a
Floodgate of Extensive, Unwarranted Litigation..................................... 17

     II.    Defendant Is Entitled to Summary Judgment Denying Plaintiffs' Claim for
Punitive Damages Under N.Y. Civ. Rights Law § 70-a(1)(c) ............................. 19

     III.   Defendant Is Entitled to Summary Judgment on Plaintiffs' Malicious
Prosecution Claim............................................................................... 23

CONCLUSION................................................................................................................... 29

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*315 W. 103 Enters. LLC v. Robbins,*
95 N.Y.S.3d 800 (App. Div. 2019) ........................................................................15

*Matter of A.G. Ship Maint. Corp. v. Lezak,*
69 N.Y.2d 1 (1986) ..............................................................................................15

*Bennett v. Towers,*
982 N.Y.S.2d 843 (Sup. Ct. 2014) ........................................................................20

*Campion Funeral Home, Inc. v. State,*
569 N.Y.S.2d 518 (App. Div. 1991) ......................................................................24

*Drug Rsch. Corp. v. Curtis Publ'g Co.,*
7 N.Y.2d 435 (1960) .............................................................................................25

*Egiazaryan v. Zalmayev,*
2013 WL 6486258 (S.D.N.Y. Dec. 11, 2013), *report and recommendation
adopted as modified*, 2014 WL 1244790 (S.D.N.Y. Mar. 19, 2014)............................20, 22, 23

*Engel v. CBS, Inc.,*
93 N.Y.2d 195 (1999) ....................................................................................23, 24, 27

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,*
314 F.3d 48 (2d Cir. 2002)....................................................................................25

*Gay v. Carlson,*
1992 WL 309819 (S.D.N.Y. Oct. 15, 1992), *aff'd in part*, 60 F.3d 83 (2d Cir.
1995) ...................................................................................................................24

*Gersh v. Kaspar & Esh, Inc.,*
206 N.Y.S.2d 510 (App. Div. 1960)..................................................................25, 26

*Gibson v. SCE Grp., Inc.,*
391 F. Supp. 3d 228 (S.D.N.Y. 2019)...............................................................25, 26

*Gillespie v. Kling,*
192 N.Y.S.3d 78 (App. Div. 2023) ........................................................................20

*Gray v. Grove Mfg. Co., a Div. of Kidde, Inc.,*
971 F. Supp. 78 (S.D.N.Y. 1997) ..........................................................................24

*Guilbert v. Gardner,*
480 F.3d 140 (2d Cir. 2007)..................................................................................12

*Hariri v. Amper,*
854 N.Y.S.2d 126 (App. Div. 2008)......................................................................15

*Isaly v. Garde*,
   2024 WL 1156850 (N.Y. Sup. Ct. Mar. 18, 2024) ...................................................................14

*Isaly v. Garde*,
   213 N.Y.S.3d 852 (Sup. Ct. 2024)...........................................................................................17

*Liberty Synergistics Inc. v. Microflo Ltd.*,
   50 F. Supp. 3d 267 (S.D.N.Y. 2014).........................................................................................24

*Rent Stabilization Ass'n of N.Y.C., Inc. v. McKee*,
   2025 WL 866045 (N.Y. Sup. Ct. Mar. 18, 2025) ............................................................20, 23

*Scott v. Harris*,
   550 U.S. 372 (2007)..................................................................................................................12

*SCR Joint Venture L.P. v. Warshawsky*,
   559 F.3d 133 (2d Cir. 2009)......................................................................................................12

*Skarzynski v. ABM Mgmt. Corp.*,
   192 N.Y.S.3d 221 (App. Div. 2023) ..........................................................................................23

*Stewart v. Fein Such & Crain, LLP*,
   231 N.Y.S.3d 170 (App. Div. 2025) ..........................................................................................24

*Unlimited Cellular, Inc. v. Red Points Sols. SL*,
   677 F. Supp. 3d 186 (S.D.N.Y. 2023).......................................................................................22

**Statutes**

N.Y. Civ. Rights Law § 70-a(1)(a) .........................................................................................9, 16, 17

N.Y. Civ. Rights Law § 70-a(1)(a)-(c) .......................................................................................13, 14

N.Y. Civ. Rights Law § 70-a(1)(c) ................................................................................1, 2, 19, 20, 29

N.Y. Civil Rights Law § 70-a(1)(b)-(c) .......................................................................1, 12, 17, 29

**Rules**

Fed. R. Civ. P. 54(d)(2)(A).............................................................................................................16

Fed. R. Civ. P. 56(a) .......................................................................................................................12

Defendant Cassava Sciences, Inc. ("Defendant") respectfully submits this memorandum of law in support of its motion for summary judgment denying Plaintiffs' claims for (1) attorney's fees for their claims for compensatory or punitive damages under N.Y. Civ. Rights Law section 70-a(1)(b)-(c); (2) punitive damages under N.Y. Civ. Rights Law section 70-a(1)(c); and (3) malicious prosecution. For the reasons below, the Court should grant summary judgment in Defendants' favor on each of these claims.

## INTRODUCTION

Plaintiffs contend that New York's legislature wrote them a blank check to chase a financial windfall in federal court. But the legislature did no such thing, and the evidence in this case forecloses the bonanza Plaintiffs covet. Accordingly, Defendant requests that this Court enter summary judgment denying Plaintiffs' claim for punitive damages under New York's Anti-SLAPP law, Plaintiffs' claim for malicious prosecution, and Plaintiffs' claim that they are entitled to all of their attorney's fees incurred in this case regardless of whether Plaintiffs recover any compensatory or punitive damages.

First, New York law does not guarantee anti-SLAPP plaintiffs recovery of any and all attorney's fees they incur chasing punitive damages through multi-year litigation as "damages" every time a defamation case is dismissed. To the contrary, New York's Anti-SLAPP statute provides only that anti-SLAPP plaintiffs may recover their costs and attorney's fees incurred in defending a defamation case when plaintiffs demonstrate that that underlying case did not have a substantial basis in fact and law. To recover any additional compensatory or punitive damages, Plaintiffs must meet a much higher bar: showing that Cassava brought the defamation case with intent to harass, intimidate, punish, or otherwise maliciously inhibit Plaintiffs' free speech. If Plaintiffs cannot meet that bar, they are not entitled to anything further—and they certainly are

1

not entitled to recover their attorney's fees and costs incurred pursuing those elective (and here, losing) claims.

Second, the evidence in this case makes plain that Plaintiffs cannot recover punitive damages under New York's Anti-SLAPP statute. New York law only permits Plaintiffs to recover punitive damages in the rare case where they can demonstrate that Cassava sued Plaintiffs for the "*sole* purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting" their free speech. N.Y. Civ. Rights Law § 70-a(1)(c) (emphasis added). But the undisputed facts in this case demonstrate that this was not Cassava's purpose, and certainly not its "sole purpose." Rather, Cassava sought to defend itself against false accusations that it was a "fraud" and that its executives were criminals—statements the court determined were *per se* defamatory. And Cassava sought legal redress for those false accusations to preserve patient enrollment in its critical, FDA-authorized Phase 3 clinical trials of its drug candidate for treating Alzheimer's disease.

Third, and finally, the undisputed facts bar Plaintiffs' claim for malicious prosecution. In New York, malicious prosecution requires plaintiffs to show that they suffered a "special injury" as a result of Cassava filing the defamation lawsuit. But discovery, including Plaintiffs' own discovery responses and expert reports, makes plain that Plaintiffs cannot claim anything more than the "ordinary physical, psychological, or financial demands of defending" a defamation lawsuit. This is not a "special injury" as a matter of law. Accordingly, Plaintiffs' malicious prosecution claim must be denied.

## STATEMENT OF FACTS AND PROCEDURE

The following facts are not in genuine dispute:

Cassava Sciences, Inc. was a company focused on developing simufilam, a drug

candidate for the treatment of Alzheimer's disease.  SOF¶¶1-2.[1]

## I.    Cassava's Phase 3 Clinical Trials of Simufilam as an Alzheimer's Treatment

After years of development, including Phase 1 and Phase 2 clinical trials, in 2021 Cassava entered into Special Protocol Assessments ("SPAs") with the FDA to conduct a Phase 3 clinical trial of simufilam.  SOF¶3.  The Phase 3 program approved by the FDA comprised two double-blind, randomized, placebo-controlled studies in patients with mild-to-moderate Alzheimer's disease: RETHINK-ALZ, designed to enroll approximately 750 patients for 52 weeks, and REFOCUS-ALZ, designed to enroll approximately 1,000 patients for 76 weeks. SOF¶4.  Cassava's expenses associated with these Phase 3 trials exceeded $100 million.  SOF¶9. Given that significant investment of time and expense, the outcome of those trials was critical to the success or failure of simufilam as an Alzheimer's treatment candidate.

By November 2023, Cassava had enrolled more than 1,900 patients in its Phase 3 trials at more than 100 clinical sites, comprising 804 in RETHINK-ALZ and 1,125 in REFOCUS-ALZ. SOF¶9.  As of June 7, 2024, RETHINK-ALZ had 486 completers, 156 active patients, and 162 early terminations, while REFOCUS-ALZ had 339 completers, 544 active patients, and 242 early terminations.  SOF¶10.  RETHINK-ALZ continued through October 2, 2024, and REFOCUS-ALZ continued through December 30, 2024.  SOF¶12.

## II.    The Citizen Petition and Plaintiffs' Defamatory Statements

On August 18, 2021, two anonymous individuals filed a Citizen Petition with the FDA challenging the integrity of the science supporting simufilam and the company's clinical trials, and asking the FDA to put the trials on hold.  SOF¶14.  The Citizen Petition's authors were later

---

[1] Pursuant to Local Rule 56.1 and this Court's Individual Rules of Civil Practice, Cassava submits simultaneously with this Memorandum both a Statement of Material Facts Pursuant to Local Rule 56.1 and a Joint Statement of Material Facts Pursuant to Local Rule 56.1.  Citations to each are labeled herein as SOF¶ and JSOF¶, respectively.

disclosed to be David Bredt and Geoffrey Pitt, both of whom took short positions in Cassava's stock before submitting the Citizen Petition. SOF¶16. In early 2022, the FDA rejected the Citizen Petition. SOF¶17. Despite the agency's awareness of allegations concerning simufilam-related data integrity, and its authority to hold, terminate, or restrict Cassava's trials, the FDA never communicated anything to Cassava indicating that the FDA had concluded that the clinical program was based on fabricated data or a fraudulent scientific premise. SOF¶13. Rather, the FDA permitted Cassava's clinical trials to proceed. SOF¶11.

After reviewing the Citizen Petition, Plaintiffs in this case—Adrian Heilbut, Jesse Brodkin, and Enea Milioris—began making *per se* defamatory statements online about Cassava, primarily on Twitter/X. For example, Heilbut publicly called Cassava a "fraud" and a "complete fraud," by which he meant that Cassava's scientific basis was "substantially made-up and fraudulent" and that no scientific basis for studying simufilam in humans was "true or justified." SOF¶18. Heilbut also stated that there was "no ethical or regulatory justification for further clinical trials," that "the biology was MADE UP," that "it is all fabricated nonsense," and that "Wang and $SAVA . . . are LIARS, and it is ALL MADE UP." SOF¶19.

Jesse Brodkin publicly stated, "Simufilam is a frauuuud!," accused Remi Barbier of criminal acts, and stated that allowing "an obvious fraud like $SAVA to continue taking advantage of patients, investors, and families makes a mockery of our regulatory framework and markets." SOF¶¶20-21. He followed up with this: "50:50 Remi ends up behind bars," and later confirmed that he was accusing Barbier of criminal conduct. SOF¶21.

Enea Milioris publicly compared Cassava to "Flintstones Theranos," stated that "SAVA data are made up," and asked, "[h]ow is it legal for $SAVA to spinal tap folks and then just make up their biomarker values?" SOF¶¶22-23. When Milioris published the statement about

4

made-up biomarker values, he did not believe he had evidence that anyone at Cassava had fabricated those values and, when asked under oath, could not identify any evidence to support his accusation.  SOF¶24.

Like the Citizen Petition authors, Plaintiffs took short positions in Cassava stock before making their public statements.  SOF¶25.

Around the time Plaintiffs were making these public, defamatory statements, Cassava learned that some clinical sites that had initially agreed to participate in its Phase 3 trial—including academic research centers, which are particularly sensitive as to their reputation—had withdrawn, that some physicians reported patients declining to enroll in the trials because they had read online statements describing Cassava as a fraud, and that unidentified individuals had contacted clinical sites to ask how the sites could work with a company described as a fraud. SOF¶28.

## III. Cassava Files the Defamation Action to Defend the Company and Protect Phase 3 Enrollment

On November 2, 2022, Cassava sued Plaintiffs for defamation.  SOF¶60.  The decision to commence the action was made by Cassava's Board of Directors after receiving advice from counsel. SOF¶30.

The decision to pursue the Defamation Action was not hasty or made lightly.  SOF¶¶37-42.  The Board acted in response to Plaintiffs' statements asserting that Cassava was a fraud and that simufilam was unsafe.  SOF¶¶33-40, 44-48.  Cassava understood that the Plaintiffs and others were seeking to shut down its clinical trials.  SOF¶33.  Cassava believed Plaintiffs' statements were false or misleading and were damaging the company.  SOF¶¶34-36.  The business considerations included litigation expense and concern that public accusations of fraud were impeding enrollment in the Phase 3 trials.  SOF¶33.  The lawsuit's purposes were to defend

5

the company against defamatory statements and to protect enrollment in the Phase 3 trials. SOF¶34.

The record contains no evidence that anyone involved in deciding to file the Defamation Action—not one member of the Board of Directors, not counsel at Orrick, and not counsel at Benesch—did so "for the purpose of harassing, intimidating, [or] punishing" Plaintiffs, or "otherwise maliciously inhibiting" Plaintiffs' rights. SOF¶¶44-48. The evidence instead confirms that their focus was rightly on protecting the Phase 3 trials by preserving enrollment, preserving the Company's reputation and credibility with clinical sites, physicians, patients, and other key constituencies, and obtaining judicial redress for statements Cassava believed were false. SOF¶¶44-48. The Board considered the resources, time, and effort the litigation would require and whether Cassava had sufficient legal basis and ability to prevail, ultimately unanimously deciding to file. SOF¶42. The Board's Litigation Monitoring Committee met seven times between September 1, 2021 and November 1, 2022, with attorneys from Orrick or Benesch attending by invitation. SOF¶37. During Board executive sessions on March 4 and September 16, 2022, the independent directors discussed investigations and allegations concerning Cassava and recorded that they had received no facts indicating wrongdoing by, or causing them to doubt the integrity or actions of, Cassava's management or employees. SOF¶40.

To the contrary, when Cassava filed the Defamation Action, it possessed preclinical research, Phase 2 clinical results, a multi-site open-label study, and peer-reviewed publications that all belied Plaintiffs' claims that Cassava was a fraud and its science was "all made up." SOF¶49. For example, in addition to more than a decade of peer-reviewed publications by Dr. Wang, Cassava also relied on biomarker results from Quanterix, an independent biomarker analysis company, that were consistent with Dr. Wang's findings. SOF¶¶50, 54. Similarly, a

6

2020 Yale study reported increased FLNA expression in identified human tissue and mouse models and reported that simufilam treatment reduced seizure frequency in mice—confirming simufilam's bioactivity in the brain.  SOF¶52.  That Yale research was conducted entirely independently of the work at CUNY.

On March 28, 2024, Judge Woods found that more than 300 of Plaintiffs' statements were defamatory *per se*, including all of Plaintiffs' tweets noted above.  SOF¶62.  However, Judge Woods found that the amended complaint did not sufficiently allege malice and dismissed the case without prejudice, allowing Cassava the opportunity to amend.  SOF¶63.

On April 29, 2024, Cassava filed a second amended complaint intended to cure the pleading deficiencies in the prior complaint.  SOF¶64.  On June 28, 2024, Plaintiffs again moved to dismiss.  SOF¶66.

Following the resignation of Cassava's CEO, on July 17, 2024, Richard Barry took over as Cassava's principal executive officer and Executive Chairman of the Board of Directors. SOF¶¶68-69.  Mr. Barry assessed the state of Cassava's operations and the status of the Phase 3 program at that time, concluded that the trials would be completed, and recommended dismissal of the Defamation Action.  SOF¶70.  By that time, both Phase 3 trials had been fully enrolled since November 2023, and the online accusations' effect on recruitment and Cassava's ability to complete the trials had "substantially diminished."  SOF¶¶67, 71.  The Board decided to dismiss based in part on those changed circumstances, the change in leadership, and the desire to allocate corporate resources to drug development and clinical studies rather than litigation.  SOF¶71.

On August 2, 2024, based on the Board's decision, Cassava voluntarily dismissed the case.  SOF¶72.  The Phase 3 RETHINK-ALZ and REFOCUS-ALZ trials continued through October 2 and December 30, 2024, respectively.  SOF¶73.

**IV.    Plaintiffs File this Action**

On October 24, 2024, Plaintiffs filed this lawsuit.  On December 2, 2024, Bredt and Pitt intervened as additional Plaintiffs.  SOF¶74.

**V.    Plaintiffs Refuse to Accept Payment Exceeding Their Attorney's Fees and Alleged Compensatory Damages, Instead Pursuing a Purported Free Roll at Punitive Damages**

Even before Cassava filed the Defamation Action, Plaintiffs' internal communications reflected a desire for Cassava to sue them based on their statements.  SOF¶¶81-84.  In March 2022, Brodkin wrote, "I need Sava to sue me so I can get into discovery," believing a lawsuit would give him access to Cassava's internal communications and data.  SOF¶81.  Indeed, on the day Brodkin learned that Cassava had filed a defamation lawsuit, he publicly expressed his desire to be named, enthusiastically tweeting: "Please name me, please name me, please name me!" SOF¶82.

When he found out he was a named defendant, Brodkin confirmed in private communications that he wanted the case to proceed so he could obtain discovery from Cassava. SOF¶82.  Indeed, Brodkin immediately began evaluating the defamation case as an opportunity to recoup his investment losses and obtain personal wealth, asking his co-defendants about the "Chances we get rich off counterclaim anti-SLAPP mega class action suit?" SOF¶83.  He described the Defamation Action as "our big break" and wrote that Plaintiffs should explore opportunities to "recoup [their short trading] investment and time."  SOF¶83.

Brodkin was not alone in his immediate enthusiasm for a lengthy discovery process and the chances to obtain millions from Cassava through a countersuit.  SOF¶84.  Immediately after the Defamation Action was filed, Milioris privately wrote to his co-defendants, "If I can countersue for 10M then I'm in."  He later added, "I want discovery all the way!" SOF¶84.

Facing the prospect of multi-year litigation costing millions in legal fees, in 2025,

Cassava made offers of judgment to resolve this case in its entirety, including an offer of $1.5 million to Plaintiffs Brodkin, Heilbut, and Milioris. SOF¶85. Cassava estimated that this amount would comfortably cover all damages available under section 70-a(1)(a) for fees incurred in defending the Defamation Action. SOF¶85. Bredt and Pitt promptly agreed to settle, and dismissed their claims on October 2, 2025. SOF¶86. Plaintiffs, however, refused Cassava's offer of judgment. SOF¶87.

Discovery has confirmed that, as Cassava intended, its early offer of judgment far exceeded the attorney's fees Plaintiffs incurred in the Defamation Action, as well as their alleged economic damages. Plaintiffs claim $440,000 in Defamation Action attorney's fees. SOF¶77. Plus, their expert reports purport to support approximately $571,000 in compensatory economic damages, consisting of $166,598 for Adrian Heilbut and $404,679 for Enea Milioris. SOF¶91.[2]

Plaintiffs have made clear why they refused this early opportunity to resolve their claims for 150% of their actual alleged damages: they believe that they are playing with house money. Plaintiffs assert that they are entitled to collect not just the costs and attorney's fees incurred in defending the Defamation Action, but also all of their attorney's fees for electing to pursue this multi-year case. SOF¶¶76-77. Indeed, they believe they are entitled to have Cassava pay their attorney's fees for this case, even if they are awarded no compensatory damages and no punitive damages at trial. SOF¶¶76-77. Worse, Plaintiffs assert that their fees and costs in this case constitute compensatory damages that would be subject to a four- to ten-fold punitive damages multiplier. SOF¶78. Thus, Plaintiffs believe the law allows them to turn a $1 million case into a $50 million boondoggle, based primarily on recovery of fees they voluntarily incurred, with no

---

[2] Plaintiffs submitted no expert report claiming, supporting, or calculating emotional, non-economic, or other damages.

9

risk of loss.  SOF¶¶76-79.

## VI.    Plaintiffs' Alleged Injuries

Plaintiffs' damages expert, Michael Soudry, served only two economic loss reports in this case: one for Heilbut and one for Milioris.  SOF¶88.  Soudry did not submit a report for Brodkin.  SOF¶89.

Brodkin's claimed damages include tens of thousands of dollars in lost behavior-spectrometer sales, hundreds of thousands or millions of dollars in lost future earnings, at least $1 million in emotional distress, and unspecified additional compensatory and reputational injury.  SOF¶93.  But his verified interrogatory response identified no particular lost customer, sale, analyst position, application, offer, or contract.  SOF¶93.  Indeed, Brodkin could not identify any specific lost sales or earnings that resulted from the Defamation Action, stating in his deposition: "Yeah, I don't know.  That's kind of hard for me to answer.  It's . . . I can't answer what might have happened."  SOF¶95.  Nor did any customers ever tell Brodkin that they decided not to purchase his products because of the Defamation Action.  SOF¶95.

Heilbut's claimed damages include $8,500 in lost consulting calls, tens of thousands of dollars in future consulting calls, hundreds of thousands or millions of dollars from an equity research and consulting business and future biotechnology investment employment, at least $1 million in emotional distress damages, and unspecified additional compensatory and reputational injury.  SOF¶99.  Again, however, Heilbut's verified interrogatory response identified no particular canceled call, written refusal, future engagement, application, offer, or employment contract.  SOF¶99.  The claimed $8,500 in lost consulting calls is simply an extrapolation of what Heilbut believes he would have been paid if he had been asked to have ongoing calls with a company called Guidepoint.  SOF¶103.

10

Plaintiffs' own damages expert acknowledged that he was unable to reliably project Heilbut's hypothetical "lost income" from a consulting business after the Defamation Action was filed. SOF¶109. This is unsurprising, as Heilbut has never been employed as an investment manager or equity analyst at any point in his career. SOF¶111. Instead, the expert used Heilbut's average income from his prior position as a data analyst at Kallyope to estimate supposed lost income from January 2023 to April 2024, when Heilbut was again hired as a data analyst. SOF¶109.

But Heilbut did not lose his job because of the Defamation Action. SOF¶105. Heilbut was fired from his data analyst job in February 2021, nearly two years before the Defamation Action was filed. SOF¶105. According to his own testimony, Heilbut's employer was dissatisfied with his work, and Heilbut did not get along with his supervisor. SOF¶105. When Heilbut again sought employment as a data analyst in 2024, he was hired at a salary higher than he previously earned (though Heilbut soon voluntarily quit that job). SOF¶¶106-07. Importantly, no prospective employer ever told Heilbut that they would not hire him as a data analyst because of the Defamation Action. SOF¶108.

Milioris was likewise unemployed when the Defamation Action was filed. SOF¶115. The supposed basis for his damages is a three-year employment contract he allegedly executed with a Greek company called ElmiPharm Mon Ike on October 11, 2022. SOF¶116. Milioris testified that he did not start the position with ElmiPharm because he initiated a meeting with the company in November 2022 to disclose the Defamation Action, where ElmiPharm purportedly proposed "postponing" the engagement until the Defamation Action concluded. SOF¶117. Milioris did not view the contract with ElmiPharm as guaranteed, believed it was up to ElmiPharm to decide whether and when he would begin work, and did not believe he was

11

guaranteed a bonus under the contract.  SOF¶124.  Nor did Milioris ever seek to enforce the employment contract.  SOF¶121.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation and alteration omitted).  "A fact is material if it might affect the outcome of the suit under the governing law."  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (citation omitted).  "A 'genuine issue' exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor."  *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.

## ARGUMENT

I.     **Defendants Are Entitled to Summary Judgment Denying Plaintiffs' Claim for Attorney Fees for Pursuing Compensatory and Punitive Damages Claims Under N.Y. Civ. Rights Law § 70-a(1)(b)-(c)**

Plaintiffs' claim to recover attorney's fees incurred in pursuing compensatory and punitive damages through a multi-year litigation and trial, even if they are unsuccessful in recovering such damages, is (A) inconsistent with the letter, structure, and intent of New York's Anti-SLAPP statute; (B) inconsistent with federal procedure for awarding attorney fees; and (C)

12

bad policy, as it would open the door to extensive, unwarranted litigation by allowing plaintiffs to manufacture "damages" based on litigation costs and fees, while eliminating those plaintiffs' anti-SLAPP litigation risk.  The Court should deny Plaintiffs' claim.

### A.    New York's Anti-SLAPP Statute Does Not Authorize Attorney's Fees for Pursuing Compensatory and Punitive Damages

New York's Anti-SLAPP Statute, N.Y. Civil Rights Law section 70-a, does not grant plaintiffs a right to recover attorney's fees for pursuing an independent action to recover compensatory damages or punitive damages.  And because awarding attorney's fees is in derogation of the common law, this Court cannot infer such a right.  Accordingly, the attorney's fees plaintiffs demand for pursuing damages under section 70-a are unavailable as a matter of law.

### 1.    Section 70-a Does Not Expressly Authorize Any Award of Attorney's Fees Incurred in Pursuing Compensatory or Punitive Damages

Section 70-a provides "a defendant in an action involving public petition and participation" (a SLAPP action) the right to bring an anti-SLAPP claim to "recover damages, including costs and attorney's fees, from any person who commenced or continued such action." That is, section 70-a provides for recovery of a defendant's damages from defending against a wrongful SLAPP action, including costs and attorney's fees spent defending that defamation action.

Subsections 70-a(1)(a)-(c) further clarify that recovery of (a) costs and attorney's fees, (b) other compensatory damages, and (c) punitive damages are each subject to increasing standards of evidentiary proof:

> (a) **costs and attorney's fees** shall be recovered upon a demonstration, including an adjudication pursuant to subdivision (g) of rule thirty-two hundred eleven or subdivision (h) of rule thirty-two hundred twelve of the civil practice law and rules, that the action involving public petition and participation was **commenced or continued without a**

**substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law**;

(b) other **compensatory damages** may only be recovered upon an additional demonstration that the action involving public petition and participation was **commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights**; and

(c) **punitive damages** may only be recovered upon an additional demonstration that the action involving public petition and participation was **commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights**.

N.Y. Civ. Rights Law § 70-a(1)(a)-(c) (emphasis added).

In short, a SLAPP defendant may recover costs and attorney's fees incurred in defending the defamation action based on a summary determination (such as under New York's motion to dismiss or motion for summary judgment provisions specifically addressing anti-SLAPP motions) that the Defamation Action lacked a substantial basis in fact and law. But to recover *other* compensatory damages, a Plaintiff must meet a much higher burden, showing that the case was brought with intent to harass, intimidate, punish, or otherwise maliciously inhibit free speech. And to recover punitive damages, that must be the *sole* purpose of the defamation action.

New York courts have confirmed that the legislature intentionally drew this important distinction between (a) a defendant's ability to promptly recover its reasonable defense costs through motion practice in the defamation case and (b) the potential recovery of *other* damages through more extensive litigation should the defendant elect to pursue it. *See Isaly v. Garde*, 2024 WL 1156850, at *7-8 (N.Y. Sup. Ct. Mar. 18, 2024) ("That is a marked, and presumably purposeful distinction crafted by the Legislature. While a demand for costs and fees is non-discretionary and may be premised solely upon a decision granting a CPLR 3211(g) motion to dismiss, the other discretionary compensatory and punitive damages claims available to deter

14

SLAPPs require progressively higher levels of intent and motive that are more conducive to pleadings and litigation independent of the underlying CPLR 3211(g) motion to dismiss.").

> **2.    This Court Cannot Infer a Right to Recover Attorney's Fees for Pursuing an Independent Action for Compensatory or Punitive Damages**

Nothing in the statute suggests that the "damages" incurred in defending a SLAPP action extend to include the attorney's fees and costs a defendant-turned-plaintiff might incur in bringing a separate anti-SLAPP action seeking compensatory and punitive damages. Nor can a court infer such a statutory right where it is not explicit. *See 315 W. 103 Enters. LLC v. Robbins*, 95 N.Y.S.3d 800, 800 (App. Div. 2019); *Hariri v. Amper*, 854 N.Y.S.2d 126, 130 (App. Div. 2008).

New York adheres to the American Rule: "attorneys' fees and disbursements are incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court rule." *Matter of A.G. Ship Maint. Corp. v. Lezak*, 69 N.Y.2d 1, 5 (1986). Fee-shifting provisions are "in derogation of the common law" and therefore must be strictly construed; courts will not infer a statutory right to fees unless it is clear and explicit. *315 W. 103 Enters. LLC*, 95 N.Y.S.3d at 800; *see also Hariri*, 854 N.Y.S.2d at 130. New York law creates no such clear and explicit right here, and for this reason alone summary judgment must be granted as a matter of law.

> **B.    Plaintiffs' Demand for a Jury Award of Attorney's Fees, Subject to Multiplication as Punitive Damages, Is Inconsistent with Federal Procedure for Awarding Attorney's Fees**

In addition to being inconsistent with the statute, Plaintiffs' request that the jury calculate and award attorney's fees as damages in the present action, subject to a punitive damages multiplier, is inconsistent with Federal Rules of Civil Procedure governing attorney's fee awards.

15

In federal court, attorney's fees requests are governed by Rule 54(d)(2), which provides that "a claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A). Here, the substantive law does not require fees to be proved at trial as an element of damages. To the contrary, the applicable substantive law authorizing an award of attorney's fees, section 70-a(1)(a), expressly anticipates that the determination of whether attorney's fees are even *available* is amenable to summary determination by the relevant court (such as under New York's Motion to Dismiss or Motion for Summary Judgment provisions specifically addressing anti-SLAPP motions). The statute is silent as to how fees are calculated, deferring to the relevant court's procedural rules. Because Plaintiffs filed in federal court, Plaintiffs' request for fees is subject to Rule 54 and, therefore, "must be made by motion" to this Court.

Proceedings on that motion are in turn governed by Rule 54(d)(2)(C), which states that "the court must, on a party's request, give an opportunity for adversary submissions on the motion . . . [and] the court may decide issues of liability for fees before receiving submissions on the value of services. The court must find facts and state its conclusions of law as provided in Rule 52(a)."

In short, because Plaintiffs elected to file this action in federal court, their case is subject to federal procedure, including Rule 54. And pursuant to Rule 54, whether and what fees Plaintiffs should recover under section 70-a(1)(a) is a question for this Court, not a jury.

Notably, this result is consistent with the express language of New York's Anti-SLAPP statute, which envisions summary adjudication by a court of an award of fees incurred in defending the underlying defamation action. But it is entirely inconsistent with Plaintiffs'

16

misreading of the statute and the procedure Plaintiffs request here: namely, that a jury determine not only whether Plaintiffs are entitled to fees (including in the present action), but also what fees they are entitled to recover, and whether those fees should then be subject to a punitive damages multiplier.  That procedure is unsupported by state law and barred by Rule 54.

### C.    Plaintiffs' Misinterpretation of New York Law Would Open a Floodgate of Extensive, Unwarranted Litigation

In addition to being inconsistent with the express language of the applicable statute and rules, Plaintiffs' misinterpretation of section 70-a(1)(a) is inconsistent with the anti-SLAPP law's purpose, as it would incentivize extended litigation driven by nothing more than attorney's fees.

"[T]he legislature's clear intent in crafting [the anti-SLAPP statute] [was to be] a vehicle through which defendants could expeditiously halt SLAPP claims and recover attorney's fees and costs without the burden of the same protracted litigation that [the anti-SLAPP statute] was designed to combat." *Isaly v. Garde*, 213 N.Y.S.3d 852, 860-61 (Sup. Ct. 2024).  Plaintiffs seek to turn this statute on its head and use it as a vehicle to subsidize protracted litigation, regardless of a claim's merit.

Under section 70-a(1)(a), every SLAPP defendant who prevails on a motion to dismiss or motion for summary judgment establishing that the defamation claim lacked a substantial basis in fact or law under New York Law "shall" recover their reasonable attorney's fees incurred up through that motion.  That recovery is non-discretionary.  But Plaintiffs seek to extend that mandatory recovery to *also* include all costs and fees those defendants incur in subsequently filing a new, separate, and future action for compensatory and punitive damages under subsections 70-a(1)(b) and (c)—*even if that separate action is not supported and they lose each and every claim*.  And, alternatively, if they prevail on their claim for punitive damages, Plaintiffs would have the jury subject that extended award of attorney's fees through the current

17

action to a punitive damages multiplier.  Again, nothing in the statute supports this expansive and reckless interpretation.  Nor has a single New York court allowed a case to proceed in this manner.

The current case is instructive.  In May 2025, facing what it knew would be enormous litigation costs, including document discovery, depositions, travel, and expert discovery, Defendant made settlement offers to all plaintiffs and potential plaintiffs in this case that covered their attorney's fees and costs incurred in the Defamation Action.  SOF¶85.  In the case of the current Plaintiffs, Defendant made a $1.5 million offer of judgment that was structured to far exceed all attorney's fees (and alleged compensatory damages) Plaintiffs had incurred at that time.  SOF¶85.  The point was to eliminate any rational basis to proceed with the litigation, as the cost of that litigation would predictably exceed any actual damages plaintiffs might reasonably recover.  SOF¶85.  Everyone except these three Plaintiffs settled.  SOF¶86.  Instead, these Plaintiffs demanded tens of millions of dollars, even as they acknowledged that their claimed compensatory damages totaled only thousands.  SOF¶¶76-79, 91-92.  Both sides have since incurred millions in fees and costs prosecuting and defending a case that is not worth anything near that.[3]

Section 70-a does not authorize recovery of fees and costs spent prosecuting an anti-SLAPP action for compensatory and punitive damages because the legislature did not permit it (for good reason).  From the outset, Plaintiffs have viewed this case as a potential lottery ticket

---

[3] Plaintiffs' misreading of section 70-a has apparently caused them to believe any Rule 68 offer is wholly ineffective in these cases.  Even though Defendant tailored its offer of judgment to exceed all attorney's fees and alleged compensatory damages Plaintiffs had incurred at that time, Plaintiffs believe they will not be exposed to cost recovery at the end of this case, even if they recover only the underlying fees from the Defamation Action.  Instead, Plaintiffs believe that they can outdistance Rule 68 by running up their fees in this case.  This (mis)reading would render Rule 68 toothless in its intended purpose of encouraging settlement and avoiding expensive litigation.

that could make them rich.  SOF¶¶83-84.  This misguided interpretation of section 70-a has led

Plaintiffs to pursue that lottery ticket based on a mistaken belief that counsel will be paid even if

they lose, and that Plaintiffs face no accountability for rejecting a generous Rule 68 offer, no

matter how weak their case.

Worse, Plaintiffs are using their own litigation costs as the basis for seeking to enrich

themselves.  Plaintiffs' alleged compensatory damages (which are themselves ill-founded) total

only $571,000.  SOF¶91.  Their attorney's fees for bringing this multi-year action, however, run

into the millions.  The windfall Plaintiffs are pursuing here, and their stated reason for refusing a

$1.5 million offer of judgment, is based on a belief that they can recover a multiple of their

attorney's fees as punitive damages in this case.  SOF¶78.

If the Court sanctions Plaintiffs' view, every defamation action that is dismissed in New

York will be followed by protracted anti-SLAPP litigation in federal court.  Enterprising

attorneys, confident in the near-certainty of recovering their fees, will seek a multiple of those

fees as punitive damages, however remote the possibility of success.  That is exactly what has

happened here.

For all of these reasons, the Court should enforce New York's anti-SLAPP statute and its

own rules as written, and deny Plaintiffs' claim for attorney's fees in this action pursuing

compensatory and punitive damages.

## II.     Defendants Are Entitled to Summary Judgment Denying Plaintiffs' Claim for Punitive Damages Under N.Y. Civ. Rights Law § 70-a(1)(c)

Based upon the undisputed evidence, no reasonable jury could find that Cassava pursued

the Defamation Action with the "sole purpose of harassing, intimidating, punishing or otherwise

maliciously inhibiting the free exercise of speech."  N.Y. Civ. Rights Law § 70-a(1)(c).  This

standard is intentionally designed to be a high bar and requires clear and convincing evidence of

19

malicious intent.  *See Rent Stabilization Ass'n of N.Y.C., Inc. v. McKee*, 2025 WL 866045, at \*2 (N.Y. Sup. Ct. Mar. 18, 2025) (citing *Gillespie v. Kling*, 192 N.Y.S.3d 78, 80 (App. Div. 2023)) (requiring anti-SLAPP claimant to proffer clear and convincing evidence that the underlying action was commenced with actual malice); *Bennett v. Towers*, 982 N.Y.S.2d 843, 850 (Sup. Ct. 2014) (noting that section 70-a(1)(c) must be "strictly construed" and that "because economic gain is almost always involved in cases such as these, most [claimants] will be hard pressed to recover punitive damages").  The evidence in this case does not approach that bar.  To the contrary, the evidence shows that Cassava had "many logical and highly plausible reasons" to pursue the Defamation Action—"including, most obviously, obtaining a judicial ruling regarding the falseness of the challenged statements." *Egiazaryan v. Zalmayev*, 2013 WL 6486258, at \*12 (S.D.N.Y. Dec. 11, 2013), *report and recommendation adopted as modified*, 2014 WL 1244790 (S.D.N.Y. Mar. 19, 2014) (granting summary judgment).

First and foremost, Cassava vehemently disputes Plaintiffs' statements about simufilam, including, most significantly, Plaintiffs' allegations that Cassava is a Theranos-like fraud. SOF¶22.  Cassava's officers repeatedly testified under oath that the Defamation Action was intended to discredit defamatory statements that were impeding enrollment in its Phase 3 clinical trials.  SOF¶¶33-48.  As Cassava's Chief Financial Officer, Eric Schoen, explained on behalf of the company, Plaintiffs' actions were "impacting the company's ability to recruit and run a Phase 3 trial," which is a major step in the pharmaceutical testing process that proves whether a drug is effective.  SOF¶35.  Richard Barry, a member of the Litigation Monitoring Committee, similarly testified:  "Q: [D]id any members of the litigation committee discuss the purpose or purposes of the defamation lawsuit outside the presence of counsel before it was filed? [. . .] A: [T]he company was being defamed by your clients, and it was hurting our ability to recruit a phase 3

20

trial, and severely damaging the reputation of the company unfairly . . . . It's unfair to express your scientific opinion of something as fact when, in fact, it's not fact; it's opinion." SOF¶45. Thus, while Cassava welcomes "scientific debate [and] criticism of the company," it drew the line at "defam[ing] the company with statements that are known to be untrue," calling the company a "fraud," and suggesting that its drug is "unsafe" despite substantial evidence to the contrary. SOF¶35. Mr. Schoen categorically rejected any idea that Cassava's purpose in filing the suit or issuing concurrent press releases about the case was to send a message to critics. SOF¶48.

Cassava's current CEO and Executive Chairman, Richard Barry, agreed that the Board felt compelled to act to defend its clinical operations and reputation.

> [Plaintiffs] took out a website on the internet, cassavafraud.com [that] had a number of statements on there that were false and misleading. They were certainly defamatory. We couldn't take it down. . . . Every time I Googled Cassava what came up first was cassavafraud.com. We don't think that we were frauds. The record will show that we weren't. We had to do something. The company was being really damaged by the defamatory statements by your clients. That's why we filed the suit.

SOF¶46. Cassava's former Chief Executive Officer, who was also on the Board at the time the Defamation Action was initially filed, Remi Barbier, similarly testified that Cassava's goals when filing the Defamation Action were to "let the sun in"—i.e., "let[] the truth be told" about Cassava—and to win the Defamation Action. SOF¶47.

Cassava's Board also had at its disposal a plethora of information contradicting Plaintiffs' sweeping accusations of fraud, including peer-reviewed scientific publications, years of preclinical research, promising Phase 2 clinical results, a multi-site open-label study, and research performed by third-party laboratories. SOF¶49. As Cassava's corporate representative testified, Cassava had worked with Dr. Wang for over a decade and there had never been any previous incidents that called into question his credibility. SOF¶50. Dr. Wang's studies had

been published in peer-reviewed journals, providing external validation for Dr. Wang's work. SOF¶¶49-51. Cassava also had biomarker data generated independently by Quanterix that corroborated Dr. Wang's findings. SOF¶54. In addition, a 2020 Yale study supported simufilam's bioactivity and effects on diseases associated with dysfunctional filamin A. SOF¶52. And a 2022 study at Nagoya University in Japan supported a role for filamin A in tau pathology. SOF¶53. In short, there was a broad body of evidence indicating that Cassava's science was "real and credible." SOF¶57.

Cassava also possessed substantial evidence contradicting Plaintiffs' suggestions that simufilam was unsafe. Simufilam had been administered thousands of times to clinical trial participants without a drug-related serious adverse event, all under the supervision of an outside data safety monitoring board composed of experts. SOF¶56. Cassava therefore knew it had a strong safety record and a concrete basis to reject Plaintiffs' attempts to undermine the public's perception of simufilam's safety. SOF¶57.

Moreover, as found by the court in the Defamation Action, more than 300 of Plaintiffs' statements constituted defamation *per se.* Under New York law, therefore, injury to Cassava's reputation is presumed as a matter of law. *Unlimited Cellular, Inc. v. Red Points Sols. SL*, 677 F. Supp. 3d 186, 198 (S.D.N.Y. 2023).

On this record, no reasonable jury could find that Cassava commenced the Defamation Action for the "sole purpose" of harassment, intimidation, or punishment. It is undisputed that the company's officers and Board of Directors were concerned about its reputation and ability to run a successful Phase 3 trial given Plaintiffs' repeated allegations that Cassava was a fraud and that its drug may be unsafe. Indeed, the law presumed that such injury had occurred. *Id.* This is precisely the type of motive, brought to light through deposition testimony, that the *Egiazaryan*

22

Court determined barred punitive damages on summary judgment.  2013 WL 6486258, at *13 (granting summary judgment for anti-SLAPP defendant on punitive damages because of uncontradicted testimony that he brought the action to "defend his honor and dignity and to vindicate his reputation").

Plaintiffs cannot contradict Cassava's sworn testimony concerning the purpose of the Defamation Action.  There is no evidence that Cassava brought the lawsuit solely to harass or intimidate Plaintiffs; Plaintiffs' allegations are supported by mere speculation and unsupported inference.  Neither is sufficient to support a claim for punitive damages.  *See Rent Stabilization Ass'n of N.Y.C.*, 2025 WL 866045, at *2 (finding a "combination of a conclusory statement and an attempt to draw an inference" insufficient to create a triable issue on punitive damages); *Egiazaryan*, 2013 WL 6486258, at *13 (holding that a claimant "is entitled to counter [a defendant's] testimony as to motive, but he must do so by offering concrete evidence, and not speculation").  Accordingly, the Court should grant summary judgment denying Plaintiffs' punitive damages claim.

## III.    Defendants Are Entitled to Summary Judgment on Plaintiffs' Malicious Prosecution Claim

This Court should also grant summary judgment denying Plaintiffs' malicious prosecution claim.  To prove malicious prosecution, Plaintiffs must show (1) the prosecution of a civil action against them; (2) by or at Cassava's insistence; (3) without probable cause; (4) with malice; (5) that terminated in Plaintiffs' favor; and (6) that caused Plaintiffs a special injury.  *Skarzynski v. ABM Mgmt. Corp.*, 192 N.Y.S.3d 221, 223 (App. Div. 2023); *Engel v. CBS, Inc.*, 93 N.Y.2d 195, 204 (1999).  The undisputed evidence revealed in discovery, however, establishes that the Defamation Action did not cause any Plaintiff any special injury.

23

The special injury element requires "some concrete harm that is considerably more cumbersome than the physical, psychological or financial demands of defending a lawsuit." *Engel*, 93 N.Y.2d at 205. The plaintiff must show "a highly substantial and identifiable interference with person, property, or business." *Stewart v. Fein Such & Crain, LLP*, 231 N.Y.S.3d 170, 175 (App. Div. 2025). Injury to reputation does not qualify, *Engel*, 93 N.Y.2d at 205-07; *Campion Funeral Home, Inc. v. State*, 569 N.Y.S.2d 518, 521 (App. Div. 1991), nor do vague assertions of lost business, *Engel*, 93 N.Y.2d at 206-07. Rather, to meet the threshold for special injury, a plaintiff must show that the lost business is "specific and verifiable" and causally tied to the prior action. *Liberty Synergistics Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 295 (S.D.N.Y. 2014). "Round figures with no itemization do not satisfy the requirement of pleading special damages." *Gray v. Grove Mfg. Co., a Div. of Kidde, Inc.*, 971 F. Supp. 78, 81 (S.D.N.Y. 1997) (citing *Gay v. Carlson*, 1992 WL 309819, at *10 (S.D.N.Y. Oct. 15, 1992), *aff'd in part*, 60 F.3d 83 (2d Cir. 1995)).

Because each Plaintiff asserts a distinct factual basis for their alleged special damages, the Court must evaluate the evidence supporting each Plaintiff's claim individually. But the answer is the same as to each: there is no evidence of special injury to any Plaintiff.

**Brodkin**. Brodkin asserts special damages in the form of "tens of thousands of dollars in lost earnings from lost sales of behavior spectrometers [boxes used to track mice activity] through his business Behavioral Instruments." SOF¶93. But Plaintiffs submitted no expert report substantiating Brodkin's alleged damages. SOF¶89. When asked during his deposition what box sales he would have made were it not for the Defamation Action, Brodkin replied, "Yeah, I don't know. That's kind of hard for me to answer. It's . . . I can't answer what might

24

have happened." SOF¶95. Nor could Brodkin say anyone had ever told him they did not buy a box from him because of the Defamation Action. SOF¶95.

Brodkin's allegations are the opposite of the "specific and verifiable" losses required to plead special damages. It is well-established under New York law that a plaintiff's speculation about lost earnings cannot survive summary judgment. "Where loss of customers constitutes the alleged special damages, the individuals 'who ceased to be customers, or who refused to purchase, must be named' and the exact damages itemized." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (quoting *Drug Rsch. Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 441-42 (1960)). A general allegation that future prospective clients did not hire a claimant because of the prior proceeding is inadequate as a matter of law to survive summary judgment. *See Gibson v. SCE Grp., Inc.*, 391 F. Supp. 3d 228, 253 (S.D.N.Y. 2019) (rejecting conclusory allegation of special damages where the plaintiffs "have not identified any engagements or assignments they did not get, or did not get offered, due to Defendants'" conduct); *cf. Gersh v. Kaspar & Esh, Inc.*, 206 N.Y.S.2d 510, 511 (App. Div. 1960) ("The general allegation that numerous prospective employers refused to employ plaintiff . . . is inadequate.").

There is no evidence in the record that Cassava caused Brodkin special injury. His malicious prosecution claim must be denied.

**Heilbut**. Heilbut alleged that because of the Defamation Action he lost $8,500 in consulting calls, tens of thousands of dollars from larger prospective engagements, and hundreds of thousands or millions because of an abandoned consulting business. SOF¶99. Like Brodkin, Heilbut apparently could not find an expert willing to support his speculation that he would have made millions as an equity consultant. SOF¶¶109-10. This is unsurprising, given that Heilbut

was unemployed well before the Defamation Action was filed and had no meaningful experience in equity consulting.  Heilbut has never been employed as an investment manager or equity analyst; he did not have any experience in equity research at the time he began his venture in 2021; nor had he ever earned any income from equity research activity.  SOF¶111.  In fact, Heilbut testified that the only balance sheet agreement he ever entered ended up losing money.  SOF¶112.  There is thus no basis to support the allegation that Heilbut tried in any meaningful way to work as an equity analyst or that he would have earned any significant income doing so.

Accordingly, instead of supporting Heilbut's allegations that he lost millions as an equity consultant, Plaintiffs' expert offers a cursory opinion claiming that Heilbut's economic losses are equivalent to his lost wages during his period of unemployment after the filing of the Defamation Action, calculated based on his salary at his previous jobs as a data analyst.  SOF¶109.  But Heilbut did not lose his job because of the Defamation Action.  He testified that he was fired in 2021 due to performance and a poor relationship with his manager nearly two years before the Defamation Action was filed.  SOF¶105.  Heilbut further offers zero evidence that he actually sought a job and was unable to obtain one, let alone that Cassava's Defamation Action prevented him from obtaining a job.  SOF¶¶108, 110.  When he sought another salaried job in 2024, he was hired, though he promptly quit that job.  SOF¶¶106-07.

The general allegation that Heilbut lost earnings because of the Defamation Action cannot support a claim for special damages.  *Gersh*, 206 N.Y.S.2d at 511 ("The general allegation that numerous prospective employers refused to employ plaintiff . . . is inadequate."); *see also Gibson*, 391 F. Supp. 3d at 253 (rejecting a conclusory allegation of special damages where the plaintiffs "have not identified any engagements or assignments they did not get, or did not get offered, due to Defendants'" conduct).

26

Moreover, Heilbut admitted that the income he supposedly lost in future consulting opportunities was "because of the enormous distraction in time and like just anxiety caused by this whole thing and because . . . it sort of affected my reputation, I think." SOF¶113.  He further testified that he was "distracted" and "more risk averse" because of the Defamation Action, SOF¶113, but he provides no evidence that any identified client, engagement, or contract was lost for either reason.  The New York Court of Appeals has expressly severed the psychological and financial demands of defending a lawsuit from special damages, *Engel*, 93 N.Y.2d at 205. The burdens Heilbut complains of are exactly the "physical, psychological or financial demands of defending a lawsuit" and "vague allegations of reputational loss" that cannot support a claim of special injury.  *Id.* at 205, 207.  By attributing his losses to those very burdens, Heilbut openly admits that he has suffered no special injury.

His malicious prosecution claim must be denied.

**Enea Milioris**.  Discovery also has not substantiated Milioris' allegation that he suffered special injury in the form of a rescinded employment contract.

Notably, like Heilbut, Milioris was unemployed well before the Defamation Action was filed.  His only affirmative job search efforts over the same period occurred in summer 2022, before the Defamation Action was filed, when he spoke with three former colleagues in London. Cassava did not cause Milioris to lose any existing job.

Instead of actual lost employment income, Milioris alleged that a Greek company called ElmiPharm terminated a signed three-year employment agreement because of the "attention and bad publicity" associated with the Defamation Action.  SOF¶116.  But Milioris has produced no admissible evidence that ElmiPharm repudiated its obligations under the contract or would have

27

actually refused to employ him on the agreed start date, let alone that they did so as a result of the Defamation Action.  SOF¶¶117-18.

Rather, Milioris offers only his own testimony that he initiated a meeting to ask whether the litigation presented an issue, that ElmiPharm suggested postponing the engagement until the litigation concluded, and that he accepted that outcome without objection.  SOF¶¶118-21.  He admittedly did not seek legal advice, demand performance, or attempt to report for work.  SOF¶121.  Milioris offers no evidence that ElmiPharm believed the allegations in the Defamation Action (or why), or that ElmiPharm otherwise thought the Defamation Action disqualified him from doing the job.  Instead, Milioris testified that "employment laws in Greece generally favor the employee," making it "rather rare and difficult to . . . get fired without . . . good cause."  SOF¶121.  Indeed, it is on this basis that he asserts his employment income was a "near certainty" for the purpose of calculating his alleged damages.  SOF¶121.  But Milioris cannot have it both ways.  If ElmiPharm had no basis to terminate his agreement without cause, that termination, and his simple acceptance of it, is not attributable to Cassava.

Nor is there any evidence that Milioris attempted to pursue any other type of employment in the years that followed.  Instead, he moved to Paros, a remote Greek island, in 2023, where he remained until November 2024, voluntarily hobbling his own career opportunities, as he otherwise "likely would [have been] in a position to either look for employment in Athens or potentially back in London where the opportunities would have been even better."  SOF¶119.  As of the time of his deposition, Milioris described himself as a stay-at-home dad and was still not employed or seeking employment.

In sum, Milioris claims he lost employment income from a "near certain" employment contract but did not bother to investigate whether the agreement was properly rescinded.  No

28

admissible evidence indicates the contract was actually terminated, and Milioris' own testimony suggests termination would be improper.

Put simply, Milioris' allegation that he lost a contract as a result of Cassava filing the Defamation Action, and therefore suffered a special injury, is not supported by admissible evidence. The Court should accordingly grant summary judgment denying his claim for malicious prosecution.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in Defendants' favor on Plaintiffs' claims for (1) attorney's fees for their claims for compensatory or punitive damages under N.Y. Civil Rights Law section 70-a(1)(b)-(c); (2) punitive damages under N.Y. Civil Rights Law section 70-a(1)(c); and (3) malicious prosecution.


Dated: August 3, 2026                    Respectfully submitted,

                                         /s/ *Monica K. Loseman*
                                         Monica K. Loseman (NY Bar No. 6100671)
                                         Mylan L. Denerstein (NY Bar No. 2620730)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         200 Park Avenue
                                         New York, NY 10166-0193
                                         Telephone: 212.351.4000
                                         MLoseman@gibsondunn.com
                                         MDenerstein@gibsondunn.com

                                         M. Scott Campbell (admitted *pro hac vice*)
                                         John Turquet Bravard (admitted *pro hac vice*)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         1900 Lawrence Street, Suite 3000
                                         Denver, CO 80202-2211
                                         Telephone: 303.298.5700
                                         SCampbell@gibsondunn.com
                                         JTurquetBravard@gibsondunn.com

                                         *Attorneys for Defendant Cassava Sciences, Inc.*

29

## CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATION

Pursuant to Rule 3.C of the Individual Rules of Practice in Civil Cases of the Honorable Jennifer L. Rochon, I hereby certify that the foregoing memorandum of law complies with the applicable word-count limitation. Exclusive of the caption, the table of contents, the table of authorities, the signature block, and this certificate, and inclusive of footnotes, the memorandum contains 8,665 words, as counted by the word-processing system used to prepare it, and therefore does not exceed the 8,750-word limit. The memorandum is double-spaced and set in 12-point Times New Roman type, including footnotes.

*/s/ Monica K. Loseman*
Monica K. Loseman.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on August 3, 2026, a true and correct copy of the foregoing document was served electronically on counsel through the ECF filing system.

*/s/ Monica K. Loseman*
Monica K. Loseman

30