**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>      Plaintiffs,<br><br>v.<br><br>CASSAVA SCIENCES, INC., REMI BARBIER, and DR. LINDSAY BURNS,<br><br>      Defendants. | Civil Action No. 1:24-cv-05948-JLR<br><br>**Oral Argument Requested** |

**DEFENDANT CASSAVA SCIENCES, INC.'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendant Cassava Sciences, Inc. ("Cassava") submits the following statement of material facts as to which there is no genuine dispute for purposes of its motion for summary judgment. The prior action captioned *Cassava Sciences, Inc. v. Bredt*, No. 1:22-cv-09409-GHW-OTW (S.D.N.Y.), is referred to as the "Defamation Action."

## I. CASSAVA'S PHASE 3 CLINICAL TRIALS OF SIMUFILAM AS AN ALZHEIMER'S TREATMENT

1. Simufilam was Cassava's investigational drug candidate for the treatment of Alzheimer's Disease. Joint Statement of Undisputed Facts § 1.

2. Cassava conducted Phase 3 clinical trials to determine whether the drug met prespecified endpoints that could support an application for FDA approval. Exhibit 1 (Schoen Dep. Tr.) at 14:3–23, 15:15–24.

3. Cassava requested Special Protocol Assessments ("SPAs") for proposed Phase 3 protocols on May 6, 2021. After FDA responded on June 18, 2021 that the proposals as presented would not support regulatory submission, Cassava submitted revised requests on July 7, 2021, and FDA responded on August 20, 2021 that the revised SPAs would support regulatory submissions. Exhibit 2 (CASSAVA_000543313) at 3313, 3317; Exhibit 3 (CASSAVA_000543318) at 3318, 3322; Exhibit 4 (CASSAVA_000092905) at 2905, 2907; Exhibit 5 (CASSAVA_000379608) at 9608, 9610; Exhibit 6 (Harvey Report) ¶¶ 55–56.

4. The Phase 3 program comprised two double-blind, randomized, placebo-controlled studies in patients with mild-to-moderate Alzheimer's disease: RETHINK-ALZ, designed to enroll approximately 750 patients for 52 weeks, and REFOCUS-ALZ, designed to enroll approximately 1,000 patients for 76 weeks. Exhibit 7 (CASSAVA_000939067) at 9074-9076.

5. The approximately 2,000-patient Phase 3 program was a major undertaking for a biotechnology company of Cassava's size. Exhibit 8 (Barry Dep. Tr.) at 199:14–23; Exhibit 1 (Schoen Dep. Tr.)

at 10:17–25; Exhibit 7 (CASSAVA_000939067) at 9074-9076; Exhibit 9 (CASSAVA_001308025) at 8035.

6. When Cassava decided to commence the Defamation Action, both Phase 3 trials were enrolling patients. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 20:2–12; Exhibit 7 (CASSAVA_000939067) at 9074-9076; Exhibit 11 (CASSAVA_001440911) at 0912.

7. As of September 2022, 538 patients were enrolled in the two Phase 3 trials and 148 clinical sites had been initiated. Sites were recruiting in the United States and Canada, and additional sites were being activated in Australia and South Korea. Exhibit 7 (CASSAVA_000939067) at 9074-9075.

8. Cassava expected second-half 2022 operating expenses of approximately $45 million to $50 million, driven in part by Phase 3 enrollment timing. Exhibit 7 (CASSAVA_000939067) at 9079; CASSAVA_001440911 at 0912.

9. Cassava completed enrollment in both Phase 3 trials in November 2023, with 804 randomized patients in RETHINK-ALZ and 1,125 randomized patients in REFOCUS-ALZ, for 1,929 randomized patients in total. Exhibit 9 (CASSAVA_001308025) at 8035. By that time, Cassava had spent at least $110 million running the Phase 3 trials. Exhibit 47 (CASSAVA_001023794) at 3795.

10. As of June 7, 2024, RETHINK-ALZ had 486 completers, 156 active patients, and 162 early terminations, while REFOCUS-ALZ had 339 completers, 544 active patients, and 242 early terminations. Exhibit 9 (CASSAVA_001308025) at 8035.

11. As of June 2024, FDA had directed Cassava to remain consistent with the previously granted SPAs. Cassava expected Phase 3 efficacy data by December 2024, and planning for a potential new drug application was ongoing. Exhibit 9 (CASSAVA_001308025) at 8035, 8039.

12. RETHINK-ALZ continued through October 2, 2024, and REFOCUS-ALZ continued through December 30, 2024. See RETHINK-ALZ, ClinicalTrials.gov No. NCT04994483,

https://clinicaltrials.gov/study/NCT04994483 (last updated May 25, 2025); REFOCUS-ALZ, ClinicalTrials.gov No. NCT05026177, https://clinicaltrials.gov/study/NCT05026177 (last updated Sept. 22, 2025).

13. FDA was aware of allegations concerning simufilam-related data integrity, possessed authority to hold, terminate, or restrict the trials, and communicated nothing to Cassava indicating that FDA had concluded that the clinical program was based on fabricated data or a fraudulent scientific premise. Exhibit 6 (Harvey Report) ¶ 16; Exhibit 12 (CASSAVA_000696066) at 6068.

## II. THE CITIZEN PETITIONS AND PLAINTIFFS' PUBLIC STATEMENTS

14. On August 18, 2021, two petitioners whose identities were not disclosed in the submission and who transmitted the materials anonymously through counsel submitted a Citizen Petition and accompanying report asking FDA to halt two simufilam trials. Exhibit 13 (SITRICK_01485) at 1485–87; Exhibit 12 (CASSAVA_000696066) at 6066.

15. On September 1, 2021, they submitted an additional petition asking FDA to halt another simufilam trial. Exhibit 12 (CASSAVA_000696066) at 6066.

16. The petitioners were later identified as David Bredt and Geoffrey Pitt, each of whom had taken a short position in Cassava securities before submitting the petitions.  Exhibit 14 (Milioris Dep. Tr.) at 326:19–327:9; Exhibit 15 (Heilbut Dep. Tr.) at 83:25–84:3; 84:20–24; Exhibit 16 (Bredt RFA Resp.) No. 1 at 8, No. 2 at 9; Exhibit 17 (Pitt RFA Resp.) No. 1 at 8, No. 2 at 9.

17. On February 10, 2022, FDA denied both Citizen Petitions. Exhibit 12 (CASSAVA_000696066) at 6066.

18. Dr. Adrian Heilbut publicly called Cassava a "fraud" and a "complete fraud" and stated that "$SAVA is 100 percent BS." Exhibit 49 (*Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, Ex. A (S.D.N.Y. Mar. 28, 2024)) at 6, 7, 9, 10, 12-14.





He testified that what he meant by this was that Cassava's scientific basis was "substantially made-up and fraudulent" and that no scientific basis for studying simufilam in humans was "true or justified." Exhibit 15 (Heilbut Dep. Tr.) at 8:10–17, 9:11–17, 10:14–24, 11:3–20.

19. Dr. Heilbut stated that there was "no ethical or regulatory justification for further clinical trials," that "the biology was MADE UP," that "it is all fabricated nonsense," and that "Wang and $SAVA . . . are LIARS, and it is ALL MADE UP." Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A)

at 2, 3, 10.



20. Dr. Jesse Brodkin publicly stated, "I will NEVER cover Sava. Simufilam is a frauuud!"; stated that Cassava either "has been lying to us for months about having the blots" or "submitted fake evidence to the Journal of Neuroscience"; and later stated that Cassava was "committing securities fraud by lying about [its] 'science.'" Exhibit 18 (Brodkin Dep. Tr.) at 139:2–140:7, 140:18–142:12, 212:6–24; Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 1, 8.



21. Dr. Brodkin also stated that allowing "an obvious fraud like $SAVA" to continue taking advantage of patients, investors, and families made a mockery of the regulatory framework, followed by "50:50 Remi ends up behind bars." Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 4.



Dr. Brodkin confirmed that this statement accused Cassava of intentional fraud and accused Barbier of criminal acts. Exhibit 18 (Brodkin Dep. Tr.) at 190:12–191:23, 237:3–238:9.

22. Dr. Enea Milioris publicly compared Cassava to "Flintstones Theranos" and asked, "How is it legal for $SAVA to spinal tap folks and then just make up their biomarker values?" Exhibit 14 Milioris Dep. Tr.) at 218:1–22, 223:9–224:18; Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 4, 5.



**Enea Milioris**
@DRnotaDR

A Western Blot-based blood diagnostic with unprecedented accuracy is the Flintstones' Theranos $SAVA

**Jesse Brodkin** @jesse_brodkin · Nov 29, 2021

🩹🟦 Breaking $sava Fraud News 🟦 🩹:
We FOIA'd some emails from Cassava's collaborator Dr. Xu to SAB member and Western Blot magic-man Dr. Wang. By a stroke of luck we happened to catch the behind-the-scenes exchange of the raw data behind the $sava AD diagnostic SavaDx...1/3

From: Qiang Xu <qcxf07a@acu.edu>
Sent time: 01/24/2021 10:48:30 PM
To: Ben Thornton <gthornton@cassavasciences.com>; Ben Thornton <gbt20a@acu.edu>; Hoau-Yan wang <_____@gmail.com>; Hoau-yan Wang
Subject: [EXTERNAL] 20210124 results
Attachments: 20210124 Western blot results.xlsx

Hi Ben and Hoau,

Hope you are well! Attached is today's results and analysis.

Blessings,

John

--
Qiang (John) Xu, Ph.D.
Professor
Department of Biology
Abilene Christian University
ACU Box 27868
Abilene, Texas 79699-7868

3:07 PM · Nov 29, 2021

---

**Enea Milioris**
@DRnotaDR

How is it legal for $SAVA to spinal tap folks and then just make up their biomarker values?

**Swapnil Agarwal** @swapnilagarwal · Nov 17, 2021
Replying to @BruinStocks @LuoshengPeng and 8 others
Insane how this is legal!

6:51 AM · Nov 19, 2021

23. In another exchange, beneath "Sue me for libel," Dr. Milioris wrote, "SAVA data are made up," followed by a trademark notation. He testified that the notation was a joking reference to the accusation being "almost our trademark" and that "our" included himself and Dr. Heilbut. Exhibit 14 (Milioris Dep. Tr.) 236:23–237:21; Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 18.

24. When Dr. Milioris published the statement about made-up biomarker values, he did not believe he had evidence that anyone at Cassava had fabricated those values and later could not identify any such evidence. Exhibit 14 (Milioris Dep. Tr.) at 219:18–223:1.

25. Dr. Heilbut took a short position in Cassava securities the same month he began tweeting about Cassava; Dr. Brodkin bought put options before the group's first publication about Cassava; and Dr. Milioris took a short position before contacting any regulatory authority. Exhibit 15 (Heilbut Dep. Tr.) at 301:2–21, 303:4–20, 306:3–10; Exhibit 18 (Brodkin Dep. Tr.) at 292:14–23; Exhibit 14 (Milioris Dep. Tr.) at 337:2–20, 338:6–13, 338:20-339:8.

26. In a November 8, 2021 communication, Dr. Heilbut wrote that he was "no doubt guilty" of calling Cassava a fraud, advised Dr. Brodkin to distinguish "scientific fraud" from accusing someone of a crime, and advised against calling Cassava a fraud. Dr. Brodkin responded that "corrective action" had been taken and testified that he likely deleted a tweet. Exhibit 18 (Brodkin Dep. Tr.) at 150:5–18, 151:5–24; Exhibit 50 (PLAINTIFFS0207417) at 2.

27. After the Defamation Action was filed, Dr. Heilbut urged the group to focus on "the data, science, [and] papers" and avoid opinions about people, the company, or their motives or character; at that time, he was not certain of any particular individual's motive or intent. Exhibit 15 (Heilbut Dep. Tr.) at 323:8–25, 324:13–25, 325:10–18; Exhibit 51 (PLAINTIFFS0229623) at 3.

**III. CASSAVA FILES THE DEFAMATION ACTION TO DEFEND THE COMPANY AND PROTECT PHASE 3 ENROLLMENT**

*A. Cassava Received Reports That Public Allegations Were Affecting Clinical Sites and Recruitment*

28. Cassava received reports that some clinical sites had agreed to participate and then withdrew, that some physicians had patients who would have enrolled but for online statements describing Cassava as a fraud, and that unidentified individuals had contacted clinical sites and questioned how the sites could work with a company described as a fraud. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 20:13–21:20. Barry testified that "[a]cademic centers, in particular, worry about their reputation. And those are the ones that we lost, and it was because of this." Exhibit 8 (Barry Dep. Tr.) at 202:13-15.

29. On April 4, 2022, the Executive Director of the Lehigh Center for Clinical Research informed Premier Research and Cassava that, after internal discussions concerning public developments the site regarded as increasingly troubling, the site had decided to withdraw from protocol PTI-125-07. Exhibit 19 (CASSAVA_001133797) at 6263; Exhibit 20 (Burns Dep. Tr.) at 262:10–264:16.

*B. Cassava's Board Deliberated with Counsel and Identified Corporate Purposes for the Action*

30. Cassava's Board of Directors made the decision to commence the Defamation Action after receiving advice from outside counsel at Benesch and Orrick, and Cassava's Chief Legal Officer. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 17:23–18:11; Exhibit 21 (Cassava July 24 Interrog. Resp.) No. 1 at 4–5.

31. The Board, then-Chief Executive Officer, Chief Legal Officer, and outside counsel were also the primary participants or advisers in decisions to continue the Defamation Action. Exhibit 21 (Cassava July 24 Interrog. Resp.) Nos. 1–2 at 4–5.

32. Cassava's Chief Financial Officer attended every Board meeting and was present for the Board's deliberations. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 19:1–11.

33. The Board acted in response to statements asserting that Cassava was a fraud and that simufilam was unsafe, and to efforts Cassava understood as seeking to shut down its trials. The business considerations included litigation expense and concern that public accusations of fraud were impeding recruitment. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 19:12–20:20; Exhibit 7 (CASSAVA_000939067) at 9079; Exhibit 11 (CASSAVA_001440911) at 0912.

34. Cassava's identified purposes for filing the Defamation Action were to respond to accusations it regarded as false and to protect its ability to recruit for and conduct the Phase 3 trials. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 23:20–24:13.

35. Schoen testified on behalf of Cassava that the company welcomes "scientific debate [and] criticism of the company" but could not abide "defam[ing] the company with statements that are known to be untrue," accusations of "fraud," and suggestions that its drug was "unsafe." Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 253:24-254:6; *id.* at 24:2-8. Schoen further testified that Plaintiffs' statements were "impacting the company's ability to recruit and run a Phase 3 trial -- and the whole reason you do that is to find out if a drug works." *Id.* at 24:10-12.

36. Cassava believed statements on cassavafraud.com were false or misleading and damaging the company. Exhibit 8 (Barry Dep. Tr.) at 67:1–24.

37. Cassava's ad hoc Litigation Monitoring Committee met seven times between September 1, 2021 and November 1, 2022, with attorneys from Orrick or Benesch attending by invitation. At meetings on October 29 and November 1, 2022, counsel made reports and the Committee reached a consensus to proceed as discussed. Exhibit 22 (CASSAVA_000545144); Exhibit 23 (CASSAVA_000799544); Exhibit 24 (CASSAVA_000395575); Exhibit 25 (CASSAVA_001435249); Exhibit 26 (CASSAVA_001435250); Exhibit 27 (CASSAVA_001434669); Exhibit 28 (CASSAVA_001440099); Exhibit 8 (Barry Dep. Tr.) at 125:6–126:23.

38. Before filing, the Litigation Monitoring Committee of Cassava's Board of Directors discussed its belief that Plaintiffs were defaming Cassava, harming Phase 3 recruitment, and unfairly damaging the company's reputation. Exhibit 8 (Barry Dep. Tr.) at 62:25–63:23.

39. Richard Barry shared that belief, but initially preferred to avoid confronting short sellers and focus on executing Cassava's business plan; he supported litigation only after concluding that the conduct was affecting Phase 3 recruitment. Exhibit 8 (Barry Dep. Tr.) at 57:15–21, 62:25-63:23, 199:14–200:8.

40. During executive sessions on March 4 and September 16, 2022, the independent directors discussed investigations and allegations concerning Cassava and recorded that they had received no facts indicating wrongdoing by, or causing them to doubt the integrity or actions of, Cassava's management or employees. Exhibit 29 (CASSAVA_001435035) at 5038; Exhibit 11 (CASSAVA_001440911) at 0913.

41. Before the filing decision, Cassava consulted at least three law firms, no decision to sue had been made before those consultations, and the Board made the ultimate decision after discussion, reasoning, and debate. Exhibit 30 (Barbier Dep. Tr.) at 124:8–17, 125:8–15.

42. The Board considered the resources, time, effort, and staffing the litigation would require, whether Cassava had a sufficient legal basis and ability to prevail, and ultimately reached a unanimous filing decision. Exhibit 30 (Barbier Dep. Tr.) at 128:1–12, 129:2–21.

43. Dr. Burns did not participate in the Board's filing-decision process, understood the filing to be a Board action, and identified no role for herself in that decision; Cassava's corporate designee, who attended all relevant Board meetings, likewise was unaware of any such role. Exhibit 20 (Burns Dep. Tr.) at 151:7–22, 152:8–12; Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 18:12–18.

44. The witnesses in this case who addressed Cassava's filing decision identified the action's purposes as obtaining redress for statements Cassava believed were false, protecting Cassava's clinical operations and Phase 3 enrollment, and prevailing in the action; none identified

13

harassment, intimidation, punishment, or suppression of protected speech as a purpose. Cassava's corporate designee expressly denied that the Defamation Action or its public announcement was intended to silence critics. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 23:20–24:13, 253:15–254:6, 258:18–259:16; Exhibit 8 (Barry Dep. Tr.) at 62:25–63:23, 67:1–24, 199:14–200:8; Exhibit 30 (Barbier Dep. Tr.) at 155:1–158:21.

45. In a non-privileged discussion before the Defamation Action was filed, at least three members of the Litigation Monitoring Committee confirmed that the action was a means of addressing harm to Cassava's reputation and its ability to recruit participants for its Phase 3 trial. Barry testified:

> Q: [D]id any members of the litigation committee discuss the purpose or purposes of the defamation lawsuit outside the presence of counsel before it was filed?

> A: [T]he company was being defamed by your clients, and it was hurting our ability to recruit a phase 3 trial, and severely damaging the reputation of the company unfairly . . . . It's unfair to express your scientific opinion of something as fact when, in fact, it's not fact; it's opinion. Exhibit 8 (Barry Dep. Tr.) at 62:25-63:20.

46. Barry further testified that the purpose of the Defamation Action was to defend Cassava's reputation and the clinical safety of its drug candidate, stating:

> [Plaintiffs] took out a website on the internet, cassavafraud.com [that] had a number of statements on there that were false and misleading. They were certainly defamatory. We couldn't take it down. . . . Every time I Googled Cassava what came up first was cassavafraud.com. We don't think that we were frauds. The record will show that we weren't. We had to do something. The company was being really damaged by the defamatory statements by your clients. That's why we filed the suit.

Exhibit 8 (Barry Dep. Tr.) at 67:7-21. Barry believed Plaintiffs' statements would continue if Cassava did not file the Defamation Action. *Id.* at 67:22-24.

47. Barbier similarly testified that the purpose of filing the Defamation Action was to "let the sun in" or "let the truth be told" about Cassava. Exhibit 30 (Barbier Dep. Tr.) at 157:3-4; 157:18-158:2.

48. Cassava's corporate representative rejected the idea that its purpose in filing the Defamation Action or issuing concurrent press releases about the case was to send a message to critics. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 253:20-24.

***C. Cassava Possessed Contemporaneous Scientific, Clinical, Safety, and Regulatory Information Supporting Its Beliefs***

49. When the Defamation Action was filed, Cassava possessed preclinical research, Phase 2 clinical results, a multi-site open-label study, and peer-reviewed publications that it regarded as evidence against accusations of fabrication or manipulation. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 9:11–10:19.

50. Cassava had worked with Dr. Wang for more than a decade, and Cassava personnel had reviewed his work. Cassava regarded that experience as part of its basis for not accepting accusations that his work was fraudulent. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 44:8–18.

51. Cassava regarded research by outside researchers reporting similar biological activity as support for the integrity of Dr. Wang's work. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 44:25-45:7.

52. A 2020 Yale study reported increased FLNA expression in identified human tissue and mouse models and reported that PTI-125 treatment reduced seizure frequency in those mouse models. Yale-affiliated researchers performed and analyzed most experiments, and the seizure analyses were blinded. Exhibit 31 (Bordey Ex. 116) at 1, 3, 7, 11–12; Exhibit 32 (Bordey Ex. 117) at 1; Exhibit 33 (Bordey Dep. Tr.) at 185:16–187:19.

53. A May 2022 Nagoya University study also provided evidence supporting a role for FLNA in tau pathology. Cassava understood the study to report that increased FLNA enhanced tau phosphorylation and insolubility and that reducing FLNA corrected aberrant tau levels in cells cultured from patients with progressive supranuclear palsy. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 12:6–23.

54. Cassava also relied on biomarker results from Quanterix that it understood to be consistent with Dr. Wang's findings. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 47:13–49:21.

55. Cassava's corporate designee described the multi-site open-label study as having been conducted at approximately sixteen sites and as producing promising evidence of simufilam's potential. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 10:5–19.

56. Simufilam had been administered thousands of times without a drug-related serious adverse event, and an independent data-safety monitoring board had recommended that the Phase 3 trials continue. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 24:23–25:9.

57. At the time the Defamation Action was filed, Cassava considered the supporting evidence "real and credible." Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 45:16-47:7.

58. On August 15, 2022, less than three months before filing, Dr. Paul Aisen informed Dr. Burns on behalf of the Journal of Prevention of Alzheimer's Disease's Editors-in-Chief that the journal had completed its review of the identified article, did not find convincing evidence of data manipulation or intent to mislead, and would take no action regarding the paper. The inquiry had lasted approximately ten or eleven months; Dr. Aisen described it as thorough; and the editors accepted that recommendation by consensus. Exhibit 34 (CASSAVA_000739110); Exhibit 35 (Aisen Dep. Tr.) at 156:1–3, 157:13–24, 158:21–159:5, 194:7–195:15.

59. Dr. Aisen further testified that he did not find convincing evidence that the data in the identified paper had been manipulated and that the editors were aware of what they regarded as a reasonable explanation for the appearance of the figures at issue. Exhibit 35 (Aisen Dep. Tr.) at 160:2–12.

***D. The Defamation Action's Procedural Course and Cassava's Voluntary Dismissal***

60. Cassava commenced the Defamation Action on November 2, 2022. ECF 9 ¶ 46.

61. On March 28, 2024, Judge Gregory H. Woods dismissed the claims against all defendants without prejudice. The Court held that a subset of challenged tweets had been adequately alleged to be defamatory *per se*. *Bredt*, 2024 WL 1347362, at *1, *21–*22, *29.

62. Exhibit A to the March 28 Order contains 328 numbered tweet entries—the "Defamatory Tweets"—that were defamatory per se because they accused Cassava of lying, scientific fraud, or criminal conduct, or asserted that Cassava's technology lacked scientific support. *Bredt*, 2024 WL 1347362, at *21–*22, n.42; Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A).

63. The March 28 Order also held that two statements concerning blinding in the Open Label Study were actionable, but that Cassava had not adequately pleaded actual malice, and permitted Cassava to amend its claims concerning the challenged tweets and those two statements. *Bredt*, 2024 WL 1347362, at \*17–\*18, \*28–\*29.

64. On April 29, 2024, Cassava filed a Second Amended Complaint against Drs. Heilbut, Brodkin, Milioris, and Patrick Markey, asserting four individual defamation counts and a conspiracy count based on seventy-five separately numbered statements. *Cassava Scis., Inc. v. Bredt*, No. 1:22-cv-9409-GHW, ECF 120 ¶¶ 137–519, 667–732 (S.D.N.Y. Apr. 29, 2024).

65. Cassava's identified purpose did not change during the litigation, and Cassava understood the Second Amended Complaint to be an effort to address pleading deficiencies identified by the Court. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 29:2–9, 88:17–89:2; Exhibit 21 (Cassava July 24 Interrog. Resp.) No. 2 at 5; *Bredt*, 2024 WL 1347362, at \*29.

66. On June 28, 2024, Plaintiffs moved to dismiss the Second Amended Complaint. ECF 9 ¶ 76.

67. By the time Cassava dismissed the Defamation Action, Cassava regarded the risk that public statements would impede continued enrollment in the Phase 3 trials as substantially diminished. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 29:19–30:8; Exhibit 9 (CASSAVA_001308025) at 8035.

68. Remi Barbier resigned as Cassava's Chief Executive Officer in July 2024. Exhibit 8 (Barry Dep. Tr.) at 41:20–42:9.

69. Barry became Cassava's Executive Chairman and principal executive officer in July 2024. He became Chief Executive Officer in September 2024, after Cassava had dismissed the Defamation Action. Exhibit 8 (Barry Dep. Tr.) at 41:20–24, 46:11–20; ECF 9 ¶ 80.

70. After becoming Executive Chairman and principal executive officer, Barry reviewed Cassava's operations and the status of the Phase 3 program, concluded that the trials would be completed

and produce readouts concerning simufilam, and recommended dismissal. Exhibit 8 (Barry Dep. Tr.) at 85:17–86:23, 88:16–25.

71. The Board decided to dismiss, based in part on the change in corporate leadership, the completed Phase 3 enrollment, the reduced perceived threat to recruitment, and the desire to allocate corporate resources to drug development and clinical studies. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 29:19–31:24, 90:4–23; Exhibit 21 (Cassava July 24 Interrog. Resp.) No. 3 at 5–6.

72. On August 2, 2024, rather than file an opposition to the pending motion to dismiss, Cassava voluntarily dismissed the Defamation Action. *Cassava Scis., Inc. v. Bredt*, No. 1:22-cv-9409-GHW, ECF 141 (S.D.N.Y. Aug, 2 2024).

73. RETHINK-ALZ and REFOCUS-ALZ continued after dismissal through October 2 and December 30, 2024, respectively. *See* RETHINK-ALZ, ClinicalTrials.gov No. NCT04994483, https://clinicaltrials.gov/study/NCT04994483 (last updated May 25, 2025); REFOCUS-ALZ, ClinicalTrials.gov No. NCT05026177, https://clinicaltrials.gov/study/NCT05026177 (last updated Sept. 22, 2025).

## IV. PLAINTIFFS FILE THIS ACTION

74. The First Amended Complaint in this action was filed on October 24, 2024, after Cassava's August 2, 2024 voluntary dismissal of the Defamation Action. ECF 9 ¶ 1; *id.* ¶ 80.

75. On December 2, 2024, David Bredt and Geoffrey Pitt moved to intervene as plaintiffs; the Court granted their unopposed motion on December 9, 2024; and they filed a Complaint in Intervention on December 12, 2024. ECF 30, 39–40.

## V. PLAINTIFFS PURSUE CURRENT ACTION FOR ATTORNEY'S FEES AND PUNITIVE DAMAGES

### *A. Plaintiffs Treat Fees Incurred Prosecuting This Action as a Separate Category of Damages*

76. In separate paragraphs of their prayer for relief, Plaintiffs request attorney's fees and costs incurred in the Defamation Action and attorney's fees and costs incurred in prosecuting this

action; they separately request additional compensatory, actual, special, and punitive damages. ECF 9, Prayer for Relief ¶¶ A–E.

77. Each Plaintiff verified a damages response that separately itemized as damages his one-third share of approximately $440,000 in attorney's fees and costs incurred in the Defamation Action and his one-third share of approximately $330,000 in attorney's fees and costs incurred to date in prosecuting this action. Exhibit 36 (Brodkin May 12 Interrog. Resp.) No. 9 at 8–10; Exhibit 37 (Heilbut May 12 Interrog. Resp.) No. 9 at 8–10; Exhibit 38 (Milioris May 12 Interrog. Resp.) No. 9 at 8–10.

78. Each Plaintiff's verified response stated that legal fees, costs, and other compensatory damages were likely to exceed $2 million and proposed punitive damages of four to ten times compensatory damages—$8 million to $20 million—for claimed total damages of at least $10 million to $22 million. Exhibit 36 (Brodkin May 12 Interrog. Resp.) No. 9 at 8–10; Exhibit 37 (Heilbut May 12 Interrog. Resp.) No. 9 at 8–10; Exhibit 38 (Milioris May 12 Interrog. Resp.) No. 9 at 8–10.

79. None of the three damages responses provided an hour total or a breakdown between attorney's fees and costs for the Defamation Action. Exhibit 36 (Brodkin May 12 Interrog. Resp.) Nos. 7–9 at 8–10; Exhibit 37 (Heilbut May 12 Interrog. Resp.) Nos. 7–9 at 8–10; Exhibit 38 (Milioris May 12 Interrog. Resp.) Nos. 7–9 at 8–10.

### B. Plaintiffs Contemporaneously Discussed Discovery and Financial Recovery

80. In a May 28, 2025 court-ordered submission, Plaintiffs reported net trading losses on Cassava securities through November 2, 2022 of $72,079.02 for Dr. Heilbut, $278,985.00 for Dr. Brodkin, and $899,443.70 for Dr. Milioris, together with the periods during which each held net-short positions. Exhibit 39 (Milioris Ex. 1) at 1.

81. In March 2022, before the Defamation Action was filed, Dr. Brodkin wrote, "I need Sava to sue me so I can get into discovery," and believed a lawsuit would give him access to Cassava's

internal communications and data at no cost to him. Exhibit 18 (Brodkin Dep. Tr.) at 240:2–24; Exhibit 40 (PLAINTIFFS0151099) at 1099.

82. Immediately after the Defamation Action was filed, Dr. Brodkin publicly repeated "Please name me" six times and stated that he would be disappointed if he were not served. Exhibit 52 (Brodkin Ex. 33) at 1.



He testified that he wanted to be named so that he could obtain discovery, believed at the time that there was no financial downside and that the litigation would be resolved rapidly, and did not want dismissal because he wanted discovery. Exhibit 18 (Brodkin Dep. Tr.) at 249:14–251:23.

83. Dr. Brodkin also asked his co-defendants privately at the time about the "Chances we get rich off counterclaim anti-SLAPP mega class action suit?," described the litigation as "our big break," and wrote that Plaintiffs should explore opportunities to "recoup [their] investment and time." Exhibit 18 (Brodkin Dep. Tr.) at 252:14–256:7; Exhibit 53 (PLAINTIFFS0175058) at 6, 7; Exhibit 54 (PLAINTIFFS0230146) at 18.

84. Immediately after filing, Dr. Milioris wrote, "If I can countersue for 10M then I'm in," later wrote, "I want discovery all the way!," and stated that the group had "very good chances which ever [sic] way this goes." Exhibit 41 (PLAINTIFFS0193748) at 3759, 3764; Exhibit 42 (PLAINTIFFS0233202) at 3203; Exhibit 14 (Milioris Dep. Tr.) at 239:1–248:22.

### C. Cassava Served Offers of Judgment Before Completion of Discovery

85. Cassava served offers of judgment on Bredt, Pitt, Heilbut, Brodkin, and Milioris before completion of discovery in this case, which included an offer of $1.5 million to Brodkin, Heilbut, and Milioris. Cassava estimated that this amount would comfortably cover all damages available under N.Y. Civil Rights Law § 70-a(1)(a) for fees incurred in defending the Defamation Action. Campbell Decl. ¶ 3; Exhibit 48 (Offer of Judgment).

86. Bredt and Pitt later resolved their claims against Cassava, Barbier, and Burns, and on October 2, 2025, the Court entered a stipulated dismissal of their claims with prejudice; final judgment was entered on October 6, 2025, with each party bearing its own costs. ECF 172–73.

87. Heilbut, Brodkin, and Milioris did not accept Cassava's offers and continued litigating. Campbell Decl. ¶ 4.

## VI. PLAINTIFFS CANNOT ESTABLISH THE SPECIAL INJURY REQUIRED FOR MALICIOUS PROSECUTION

### A. Plaintiffs' Economic-Damages Evidence Assumes Causation and Omits Material Variables

88. Plaintiffs' economist Michael Soudry prepared one economic-loss report for Dr. Heilbut and one for Dr. Milioris. Exhibit 43 (Soudry Dep. Tr.) at 9:9-11:13; Exhibit 44 (Soudry Heilbut Report) at 1; Exhibit 45 (Soudry Milioris Report) at 1.

89. Mr. Soudry did not prepare an economic-loss report for Dr. Brodkin. Exhibit 43 (Soudry Dep. Tr.) at 9:9-11:13.

90. The factual information underlying both Soudry analyses was assumed to be true, and Soudry did not independently verify the facts supplied through pleadings, records, depositions, Plaintiff interviews, and counsel. Exhibit 44 (Soudry Heilbut Report) at 1; Exhibit 45 (Soudry Milioris Report) at 1; Exhibit 43 (Soudry Dep. Tr.) at 24:10–25:16, 36:5–38:7.

91. Soudry calculated $166,598 in alleged lost earnings for Dr. Heilbut and $404,679 in alleged lost earnings for Dr. Milioris. Exhibit 44 (Soudry Heilbut Report) at 3; Exhibit 45 (Soudry Milioris Report) at 2.

92. Plaintiffs served no expert report quantifying or offering an expert damages opinion concerning any Plaintiff's alleged emotional-distress, reputational, or other non-economic damages. Exhibit 43 (Soudry Dep. Tr.) at 9:9–11:17; Campbell Decl. ¶ 5.

### B. Dr. Brodkin Cannot Identify a Particular Lost Sale, Customer, Job, or Opportunity

93. Dr. Brodkin claimed tens of thousands of dollars in lost behavior-spectrometer sales, hundreds of thousands or millions of dollars in lost future earnings, at least $1 million in emotional-distress damages, and unspecified additional compensatory and reputational damages, but his verified response identified no particular lost customer, sale, analyst position, application, offer, or contract. Exhibit 36 (Brodkin May 12 Interrog. Resp.) No. 9 at 8–10.

94. Dr. Brodkin testified that he received approximately $30,000 from behavior-spectrometer sales in 2021, approximately $13,000 recognized in 2022 that was mostly attributable to a prior-year sale, no box-sale income in 2023, and no box sales in 2024; in 2025, he received an order for four boxes. Exhibit 18 (Brodkin Dep. Tr.) at 25:15–30:17.

95. Dr. Brodkin could not identify what behavior-spectrometer sales would have occurred absent the Defamation Action, stating "Yeah, I don't know. That's kind of hard for me to answer. It's . . . I can't answer what might have happened." In fact, Dr. Brodkin admitted that no customer ever told him that the action caused a decision not to purchase. Exhibit 18 (Brodkin Dep. Tr.) at 264:17–265:23.

96. Dr. Brodkin did not know who posted the negative online reviews he associated with his claimed lost sales and had no reason to believe the reviewers were employed by or directed by Cassava. Exhibit 18 (Brodkin Dep. Tr.) at 266:13–268:6.

97. No fund contacted Dr. Brodkin about a biotech-analyst position, he never applied for one, and no one offered him hundreds of thousands or millions of dollars to work as a biotech analyst. Exhibit 18 (Brodkin Dep. Tr.) at 268:15–271:5.

98. Dr. Brodkin's claimed emotional distress principally concerned conflict with his wife over perceived financial and legal risks, and he could not separately identify his additional compensatory and reputational damages. Exhibit 18 (Brodkin Dep. Tr.) at 271:6–272:23, 276:8–277:15.

***C. Dr. Heilbut Cannot Identify a Particular Lost Engagement, and His Future-Earnings Theory Is Speculative***

99. Dr. Heilbut claimed $8,500 in lost consulting calls, tens of thousands of dollars in future consulting calls, hundreds of thousands or millions of dollars from an equity-research and consulting business and future biotechnology-investment employment, at least $1 million in emotional-distress damages, and unspecified additional compensatory and reputational damages, but his verified response identified no particular canceled call, written refusal, future engagement, application, offer, or employment contract. Exhibit 37 (Heilbut May 12 Interrog. Resp.) No. 9 at 8–10.

100. Dr. Heilbut claims $8,500 in lost earnings from paid consulting calls that he contends would have occurred between November 2022 and October 2024. Exhibit 15 (Heilbut Dep. Tr.) at 138:11–22.

101. Dr. Heilbut's paid consulting calls were arranged through Guidepoint. He identified Perceptive and Eminence as the relevant clients, estimated that he participated in approximately twelve to fifteen Perceptive calls beginning in fall 2021 and continuing through 2022, followed by one or two calls in early 2023, and participated in two Eminence calls in fall 2021. Exhibit 15 (Heilbut Dep. Tr.) at 138:18–141:15.

102. Nearly every Perceptive or Eminence call discussed Cassava as a primary or secondary topic. Dr. Heilbut charged $350 per hour and estimated that he earned approximately $15,000 to $20,000 from equity-research calls and reports from late 2021 through early 2023. Exhibit 15 (Heilbut Dep. Tr.) at 142:10–143:8, 145:5–146:18.

103. The claimed $8,500 in lost Guidepoint consulting calls is an extrapolation of what Dr. Heilbut believes he would have earned if calls had continued at the same rate. Exhibit 15 (Heilbut Dep. Tr.) at 138:11–22, 139:7–25, 142:10–143:8, 148:3–18.

104. Dr. Heilbut testified that his causation theory concerning Perceptive was based on a statement from one contact expressing concern about official Guidepoint calls because of the Defamation Action; no one at Eminence told him that calls stopped because of the action. Exhibit 15 (Heilbut Dep. Tr.) at 148:19–149:23.

105. Dr. Heilbut's employer, Kallyope, terminated Dr. Heilbut in February 2021, approximately twenty months before the Defamation Action, because the company was dissatisfied with the amount or nature of his work and he was not getting along with his immediate supervisor. Exhibit 15 (Heilbut Dep. Tr.) at 194:16–196:19.

106. Dr. Heilbut's annual Kallyope salary was approximately $130,000, and his income was roughly $50,000 to $70,000 in each of 2021, 2022, and 2023. In 2024, while the Defamation Action remained pending, he sought a "steady job" to increase his income in light of his legal expenses, and Alivia Analytics hired him full time at an annual salary of approximately $160,000 to $165,000. Exhibit 15 (Heilbut Dep. Tr.) at 193:7-194:25, 198:3–199:9, 200:11–203:17.

107. Dr. Heilbut voluntarily resigned from Alivia in April 2025 after approximately one year because he was not enjoying the job, did not believe he was learning enough, considered it a poor fit, and wanted to seek a different and better position. He was unemployed again at the time of his deposition. Exhibit 15 (Heilbut Dep. Tr.) at 201:15–202:6.

108. Dr. Heilbut identified no employer that declined to hire him because of the Defamation Action, no particular job application he submitted, and no specific employment rejection attributable to the action. Exhibit 37 (Heilbut May 12 Interrog. Resp.) No. 9 at 8–10.

109. Soudry used Dr. Heilbut's average 2018–2020 Kallyope earnings of $133,279 per year as the benchmark for alleged losses from January 2023 through April 2024. According to Soudry, too

many variables prevented a conventional projection of the consulting business, so Soudry measured an assumed lost opportunity by reference to those prior wage earnings. Exhibit 44 (Soudry Heilbut Report) at 2–3; Exhibit 43 (Soudry Dep. Tr.) at 55:17–57:12, 81:3–21.

110.    Soudry was not specifically aware of any job-search efforts by Dr. Heilbut between November 2022 and April 2024 and did not analyze business planning, market conditions, investment, competition, relevant experience, entrepreneurial risk, or labor-market supply and demand in projecting consulting or alternative wage earnings. Exhibit 43 (Soudry Dep. Tr.) at 83:25–86:16; Exhibit 46 (Bubna Report) ¶ 13(4)–(5), ¶¶ 39–44.

111.    Dr. Heilbut's claim for hundreds of thousands or millions of dollars in future earnings rests on typical investment-management compensation and hypothetical profit-sharing or "balance sheet" arrangements, although he has never been employed as an investment manager or equity analyst and has never earned that level of compensation in either role. Exhibit 15 (Heilbut Dep. Tr.) at 180:2–183:3.

112.    The only balance-sheet arrangement Dr. Heilbut entered was a 2024 arrangement concerning Cassava with Hindenburg; the position was not profitable and he received no payment. He entered no other balance-sheet arrangement, and his equity-research venture generated only several thousand dollars in 2021, which includes earnings from consulting calls through Guidepoint. Exhibit 15 (Heilbut Dep. Tr.) at 183:4–188:11, 191:13–192:24, 195:7–10.

113.    Dr. Heilbut claims he was unable to grow his career as a consultant and equity research analyst "because of the enormous distraction in time and like just anxiety caused by this whole thing and because . . . it sort of affected my reputation, I think." Exhibit 15 (Heilbut Dep. Tr.) at 164:18-24. He further claimed that he was "distracted" and "more risk averse." *Id.* at 182:5-9.

114.    Dr. Heilbut had seen the same psychiatrist intermittently since approximately 2018; the frequency of visits did not increase after the Defamation Action was filed, and he received no

new diagnosis or depression prescription after filing. Exhibit 15 (Heilbut Dep. Tr.) at 217:4–218:15.

### D. Dr. Milioris Lacks Competent Evidence That Elmipharm Withdrew Employment Because of the Defamation Action

115. Dr. Milioris's last full-time work engagement ended in early 2020, more than two years before the Defamation Action. Afterward, he traded for his own account and attempted to establish Alphavia Advisors, which never advised a client. When Cassava filed the Defamation Action, he was not employed in a full-time salaried position and had begun a discrete consulting project for Pharmathen that continued until spring 2023. Exhibit 14 (Milioris Dep. Tr.) at 17:18–24:7, 29:2–30:12, 33:1–15.

116. Dr. Milioris signed a fixed-term employment contract dated October 11, 2022 with Elmipharm Mon Ike—referred to at his deposition as "InnoPharm"—for a full-time sales-director position with a stated three-year term and a January 2023 start date. Exhibit 14 (Milioris Dep. Tr.) at 37:19–38:19, 262:8–14; Exhibit 45 (Soudry Milioris Report) at 1–2.

117. Dr. Milioris never began working for Elmipharm. He testified that he initiated a November 2022 meeting to disclose the Defamation Action and ask whether it presented an issue, and Elmipharm representatives proposed postponing the engagement indefinitely until the action resolved. Exhibit 14 (Milioris Dep. Tr.) at 41:11–43:19, 262:5–14, 265:18–22.

118. The causal account that Elmipharm withdrew the position because of the Defamation Action rests on Dr. Milioris's description of that in-person meeting. Soudry conducted no independent verification and reviewed no corroborating communication from Elmipharm. Exhibit 14 (Milioris Dep. Tr.) at 38:20–43:19; Exhibit 43 (Soudry Dep. Tr.) at 128:3–129:16.

119. In September 2023, Dr. Milioris moved to Paros, a Greek island where he frequently spent his summer vacations. Exhibit 14 (Milioris Dep. Tr.) at 60:17-61:21. If Dr. Milioris had not been in Paros, he "most likely would [have been] in a position to either look for employment in Athens or

potentially back in London where the opportunities would have been even better." *Id.* at 272:13-17.

120. When Dr. Milioris contacted Elmipharm after the Defamation Action was dismissed and learned that no role was available, he did not ask what had happened to the original role or why no position was available. Exhibit 14 (Milioris Dep. Tr.) at 43:20–44:14.

121. Dr. Milioris described his employment with Elmipharm as a "near certainty" because "employment laws in Greece generally favor the employee," making it "rather rare and difficult to . . . get fired without . . . good cause." Nevertheless, Dr. Milioris did not seek legal advice concerning the contract and, at the time, did not feel that its rescission was wrongful because he believed Elmipharm was entitled to take a cautious position. Exhibit 14 (Milioris Dep. Tr.) at 88:23–90:9, 261:21-262:4, 265:11–13.

122. Soudry assumed that Dr. Milioris would receive €134,400 for each of three years, including the full 40 percent annual bonus, and calculated a cumulative net loss of €351,124, converted to $404,679. Exhibit 45 (Soudry Milioris Report) at 2; Exhibit 43 (Soudry Dep. Tr.) at 131:4–132:6, 133:22–135:7.

123. Soudry treated €12,000 in 2023 earnings and €20,038 in 2024 earnings as mitigation, assumed the same €20,038 amount for 2025, and did not analyze the asserted cancellation, alternative employment, job-search efforts, labor-market conditions, termination risk, or voluntary reductions in work. Exhibit 45 (Soudry Milioris Report) at 2; Exhibit 46 (Bubna Report) ¶ 13(6)–(8), ¶¶ 53–59.

124. According to Dr. Milioris, the three years of employment was not guaranteed, it was up to Elmipharm to decide whether he would begin working despite the signed contract, and the contemplated bonus was up to 40 percent rather than guaranteed. Exhibit 14 (Milioris Dep. Tr.) at 260:13–262:21.

125. At the time of his deposition, Dr. Milioris was not seeking employment because he was caring for his wife and child and participating in this litigation, and his claimed future opportunities included positions he could not identify that might have existed in Athens or London. Exhibit 14 (Milioris Dep. Tr.) at 266:21–267:5, 270:9–24, 271:15272:7.

126. By late 2022, Dr. Milioris was experiencing stress in multiple aspects of his life, including stock trading, and his later improvement followed multiple interventions, including moving, exercise, medication, and stepping back from social media. Exhibit 14 (Milioris Dep. Tr.) at 55:1–19, 59:15–60:13, 62:6–11, 63:4–17, 88:5–20.

Dated: August 3, 2026

Respectfully submitted,

/s/ *Monica K. Loseman*
Monica K. Loseman (NY Bar No. 6100671)
Mylan L. Denerstein (NY Bar No. 2620730)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
MLoseman@gibsondunn.com
MDenerstein@gibsondunn.com

M. Scott Campbell (admitted *pro hac vice*)
John Turquet Bravard
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
Telephone: 303.298.5700
SCampbell@gibsondunn.com
JturquetBravard@gibsondunn.com

*Attorneys for Defendant Cassava Sciences, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on August 3, 2026, a true and correct copy of the foregoing document was served electronically on counsel through the ECF filing system.


/s/ Monica K. Loseman
Monica K. Loseman