# Exhibit 57

Retroactively, here's how this all started. On August 24, 2021, the same day that we announced we had received Special Protocol Agreements for both Phase 3 clinical trials with the FDA, a Citizen's Petition to FDA was publicized, asking FDA to stop our Phase 3 trials based on suspected fraud in Western blot images from preclinical publications of my academic collaborator Dr. Hoau-Yan Wang, most of which were unrelated to simufilam. What? Huh? That's right, never mind that we have CSF biomarker improvements in a placebo-controlled study and improvements in cognition from baseline in a follow-on open-label study of simufilam in a population that always declines. They are fussing about whether there was inappropriate "photoshopping" of Western blot images. Western blot images are notorious for having funny changes in background, particularly along the lanes the proteins migrate down through the SDS-Page gel, and particularly when that gel is hand-poured by the lab, and particularly when developed using X-ray film rather than the more recent digital imaging. Many of the accused Western blot images were over 10 years old, some older than my 16-year-old daughter. For good measure, they complained that the CSF biomarker data had to be re-done using back-up samples after the first lab messed up the analyses (thank you Oskar), either by bad pipetting, or the Simoa machine crashing leaving samples to sit for over a week, or any number of other things. They also complained that the post-mortem human brain samples carefully collected an average of 5-6 h after death and stored at -70 C, had been "dead for a decade." I think that sums it up. It started with an inflammatory, "Cassava Sciences did not get the Theranos memo" and continued with incredible accusations in the petition, in its four supplements, in a second petition and a supplement filed to that.

Notably, this same day, Travis Whitfill of Bios Partners (who did the October 2021 IPO of Cognition Therapeutics), tweeted this to Bik, who obviously knew about the petition prior to its filing. This we know by her connection to another hedge fund (also Dutch) who shorted our stock prior the CP filing. She of course was quick to suggest additional issues (though she probably was the one hired to find the ones in the CP.)





We responded to the 42-page accusatory document overnight on August 25th as best we could, denying and explaining why the accusations are false in a press release.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779298
BURNS_00000650

On September 3, Remi held a press conference to further explain and deny the allegations. The saved transcript was 10 pages, including this paragraph:

> But I think what we're currently seeing is no ordinary short seller betting our data will disappoint. To me, the short attack against Cassava Sciences feels unprecedented in its boldness, its scope, its immediacy and its intensity. It feels highly organized and well-funded. It feels like whoever is behind this effort wants to make a lot of money quickly, at the expense of our science. And, of course, by hiring a law firm to spread allegations on-line, the holders of a short position don't have to do the dirty work. That's done by the law firm. In other words, by distancing the monkey from the organ grinder, those behind this scheme are hard to detect.

By October 1, I submitted this update for my 35th Harvard reunion class report:

In my career, I am, no question, "living the dream." Starting with the shared discovery of a novel protein target for Alzheimer's disease with my academic collaborator fifteen years ago, fast forward to 2017 where our hard work landed a small molecule drug candidate in phase one clinical trials, to now, the initiation of two large phase three clinical trials. I feel fulfilled, also knowing that this drug candidate has great potential to help millions of families affected by Alzheimer's disease. This is the dream of any neuroscientist, to have a chance to make an impact. I feel lucky beyond words, for the constellation of events that led to the almost serendipitous discovery of the target, combined with this molecule being a poster child every step of the way. While much of the innovation credit goes to my collaborator, I take pride in the persistence and focus and just getting here. Simufilam has improved both biomarkers and cognition in phase two trials, and the just started phase three will tell all.

And yet, a nightmare has intruded. Cassava Sciences, its shareholders, my collaborator and I have been hit with continued unprecedented attacks by short-sellers, including filing an anonymous Citizen's Petition with the FDA to stop our phase three trials. Baseless, the petition is a publicity stunt that provided enormous profit via "short and distort." False claims of image manipulation of Western blot images from mostly unrelated work over ten years ago have been used to call us all frauds. The allegations have stalled a publication (now back on track) and a massive NIH grant: guilty until proven innocent while we wait for investigations to conclude. Suddenly aware of cancel culture and more ills of social media, I am confident this blip will pass, but the damage and unfairness to our hard work and to the Alzheimer's disease community in general leaves me questioning humanity. On the flip side, the countering tidal wave of support to expose the hit job, by countless people I don't even know, restores my faith that good will prevail. Phase three data will be the ultimate exoneration for Simufilam.

Meanwhile, I persevere for families affected by Alzheimer's disease. Mindful of what this disease steals from these families, I try to remember to attend to my own family, to myself, and to my relationships. Redacted

# Redacted

# Redacted

Redacted The value of friends and friendships has sharpened, and I look forward to reconnecting with all of you in June. Soon, I will convene with my extended rowing family (and Seth!) when I race at the Head of the Charles for the first time in years. As time zooms by, we are forced to evaluate our path, to learn from, celebrate and share our journey.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779299

BURNS_00000651

What follows is a log of events, starting on October 14.

Oct. 14, 2021

Yesterday was apocalypse averted. The WSJ called Remi for the company's comment on an article about to drop about how Cassava Sciences has committed fraud. This is the threat the FUDsters were alluding to when they claimed that the share price was going to be trashed even further by Oct. 15th. Remi asked how they "knew" it was fraud. "We asked our experts. They said it was fraud." (talking about online images of Western blots). They had not seen the original images. Remi said that this is going to be a huge story whichever way it falls, so they had better get it right. He added that we have 100% confidence that the blots will show no manipulation, and he told them they have to inquire with the journals, who have been sent original images. This was an hour and a half zoom with two WSJ reporters. Eventually they agreed not to run the article and to do some more investigating. Incredible.

Also yesterday, both Barbara Sahakian and Trevor (Robbins) asked, via the University of Cambridge attorney, to be removed from our website because their consulting agreements have expired. Actually that was two days ago, and a day after Barbara, when provoked by the FUDsters, tweeted "I have not consulted for Cassava Sciences in years and I do not own stock in this company." Years? That would be a year or a year and a half, maybe. The next morning, I tried to call Barbara at the university, who said her line no longer existed. I called Addenbrooks Hospital, who also did not have a phone line for her. It was after that call that I received the email with attached expired consulting agreements and the request for removal from the website. I couldn't believe it. My own PhD advisor (forget Barbara). I immediately emailed Trevor asking for a time to talk or zoom. We set up a zoom for today. But then yesterday morning, I received and email stating that he had been advised not to talk to Cassava Sciences "until the recent issues regarding the company have been resolved." But I was allowed to communicate through the lawyer. I forwarded the emails sent to both JNS and JPAD showing that I sent original blots, but the lawyer response was thanks but it doesn't matter, take them off. I responded that if the decision was to resign from the SAB, they would likely be replaced. Response: "that is there [sic] wish." Unbelievable. Never tarnish the reputation of a world-renowned neuroscientist even if it means kicking me when I'm down. OK, forget them both. You find out who your friends are.

So we either have to find two new SAB members over the weekend or take down the page. I reached out to Paul Aisen to meet at CTAD and received a friendly response immediately. He was copied on the emails sending in original blots to JPAD, so he knows. But I don't want to ask him until in person. We also can get Pierre Tariot of Banner, who is lead PI for -06, and Jacobo Mintzer who is lead PI for -07. And Sharon Cohen with whom we already have a consulting agreement with.

Will CUNY hurry up already? I am not allowed to talk to Hoau.

Oct 17, 2021

I still can't get over being canceled by my own PhD advisor. Also on Oct. 14, the Discord group (6 supporters who communicate privately) sent me emails from the dreaded Adrian Heilbut in responding

3

CASS-CLASS-01779300
BURNS_00000652

to Elisabeth Bik. Except it was a fake email for her and not her, which is how they got them. Here they are:



Adrian Heilbut                                      10:14 AM (4 hours ago)
to Elisabeth Bik  Hide details      Inbox      Reply   Actions ∨

From:      Adrian Heilbut <aheilbut@gmail.com>
To:        Elisabeth Bik <ebikpriv@fastmail.com>
Subject:   Re: Cassava claims
Date:      Thursday, October 14, 2021 10:13 AM
Size:      15 KB

Hi Dr. Bik -

Thanks for your email and for all your help! Sorry to hear about the recent craziness again with Didier; it seems like some of those French people are even more insane than the Cassava bulls.

I totally understand your concerns and desire to back off a bit for now. I agree that while there are definitely some issues with images, some aspects might not be as serious as first thought. In terms of drug mechanisms, although very unusual, I'm growing concerned that the thrust of Wang's research might have been drilling into some real biology. In fact there was a researcher from Japan, an expert on lymphocytes and cytoskeletal proteins, who reached out to me last week after reading about it on researchsquare. According to his data (unpublished, but in preparation) there might be evidence for some of the Filamin-A interactions, which is a bit worrying indeed.

It is certainly frustrating that all this is taking so long to play out, and we are still trying to figure out what to do. If you are interested, several of us are having a conference call this Friday at 10am EDT to discuss next steps. It would be great if you could join in, and I think we even have some mutual friends who will be participating. The dial-in number is 214-887-4175 or 240-276-9469

cheers,

**Adrian Heilbut**

Call   Message   Compose   Invite

**Contact details**                           Show all

✉   aheilbut@gmail.com

✎   Add notes

**Mail**

Elisabeth Bik, Adrian Heil... (4)            1:45 PM
Cassava claims
Thank you Adrian. Who else is going to be in the call? Anyone that I know of? Very unl  Inbox  Sent

🔍  Find all conversations with Adrian

**Events**

No matches found

Open contact in new tab ⧉

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779301
BURNS_00000653



Adrian Heilbut          2:16 PM (less than a minute ago)
to Elisabeth Bik   Hide details    Inbox    Reply   Actions ∨

From:    Adrian Heilbut <aheilbut@gmail.com>
To:      Elisabeth Bik <ebikpriv@fastmail.com>
Subject: Re: Cassava claims
Date:    Thursday, October 14, 2021 2:15 PM
Size:     19 KB

I know Jesse is planning to be on the call, and also a couple of researchers that are consulting for the hedge funds that are involved. I think it should be worth the time.

I believe the NIH is just doing their standard reply to any accusations that are made. They probably take forever to do any investigation, so I wouldn't get your hopes up. Probably best to keep quiet for a bit until things settle down, since there have been so many exaggerations made and we all should want to be careful and avoid any further embarrassment. That's why I've been kinda quiet on twitter about SAVA the last few days and talking more about other stocks. Let me know if you have any thoughts or can pass along any of the comments from your sources about the origins of some of the original claims.

cheers,

Adrian

**Contact details**       Show ⊿

✉   aheilbut@gmail.com

✎   Add notes

**Mail**

Elisabeth Bik, Adrian Heil... (5)      2:16 PI
Cassava claims
I know Jesse is planning to be on the call, and also a couple of researchers that are consul | Inbox | Sen

🔍   Find all conversations with Adrian

**Events**

No matches found

Open contact in new tab ☐

---

Adrian Heilbut          2:34 PM (6 minutes ago)
to Elisabeth Bik Show details    Inbox    Reply   Actions ∨

There are actually a few more things I could tell you but I don't want to put it in an email.. I can give you a call to chat more — what is your phone #?

Adrian

**Contact details**       Show all

✉   aheilbut@gmail.com

✎   Add notes

---

Adrian Heilbut          4:17 PM (31 minutes ago)
to Elisabeth Bik Show details    Inbox    Reply   Actions ∨

No, I think it was a grad student, and the data is not yet published. Perhaps they work in the same lab; the last name was Miyagi.

---

Adrian Heilbut          5:26 PM (4 minutes ago)
to Elisabeth Bik Show details    Inbox    Reply   Actions ∨

I don't think it's anybody from Citadel; there's one guy who is consulting for one of the funds, but hasn't said who.. they are pretty cagey.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779302
BURNS_00000654

So we find out that the 240 phone number is FDA department of Enforcement. And I suspect it is this guy who had called the WSJ.

———————————

And yesterday morning, I got an email from Bruno Vellas, editor of JPAD, who previously requested original blot images for two different figures in the 2020 paper. I sent the first, then he requested the second, and I sent that as soon as I received it from Hoau (actually there were several because the request was vague). Now, his email said this:

*It has been brought to our attention by our reviewers that one of the figures (blots from Fig. 3 and Fig. 5a) in the above manuscript may have been manipulated inappropriately. We would be grateful for any explanation you can provide and look forward to hearing from you as soon as possible or by November 13, 2021.*

Are you kidding me? After you saw the original blots and could zoom in to your heart's content? Really? JNS didn't have any problems and are issuing a correction for the erroneous IHC image but were completely happy with the original western blot images. And "one of" but he is not going to say which one? I sent the following response:

Dear Dr. Vellas,

None of the images are manipulated. We'll provide you with more evidence for our position, most likely early next week. Would that work for you?

I have reached out to Prof. Wang to provide you with original X-ray films. As I understand NIH policy, original X-ray films need to be kept for 2 years only after they are produced. So if the original films still exist, we'll mail them to you ASAP. These will prove that nothing was ever manipulated during Prof. Wang's long scientific tenure.

As you may know, Wall St investors (not scientists) are the ones who are making false allegations against us. We are taking these allegations seriously, even if we believe there's no substance to them, because they have potential to affect our scientific reputation. As an example, *The Journal of Neuroscience* reached out to us last month regarding allegations of manipulations in Western blot images in a 2012 publication. We sent the editor original, uncropped images of the blots. I believe they have finished their review. I also believe they agree that the Western blots in question are not manipulated. One human error was identified (an erroneous image was included in the paper), but this has no impact on our data or the paper's conclusions. They are going to issue a correction to provide the correct IHC image in the figure.

It's taking a while but slowly we are clearing our name from the reputational damage caused by the Wall St investors. We look forward to doing the same with JPAD.

Respectfully,
Lindsay
Jacques Touchon replied but thought he was not replying to me:

6

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779303
BURNS_00000655

*"Cette Lindsay Burns semble claire ..."*

Thanks Jacques. We'll send the images of blots for all patients tomorrow. But really, what the hell? I had reached out to Paul Aisen to see if he would meet with us at CTAD and received an affirmative quick response, but he has not further responded as to when. Guess he know this latest email was coming.

I decided mid-last week that every weekend I spend many hours just lying in bed trying to rest my brain, every minute I spend crying, these evil bastards are winning. Taking time away from my family. My work has almost ground to a halt as everything seems on hold until CUNY finishes (will you hurry up?). The UCLA glioblastoma expert just stopped mid-CDA review. The damage done to our Phase 3 start-up we will never be able to quantify. Steve Arnold at MGH backed out after all paperwork was done and the site was SIV ready. He replied to Jim only (taking me off cc) and said:

"I'm disappointed too, but we can't participate  - we have several intensive home-grown clinical trials starting up and have lost a few staff.  The timing throughout 2022 is going to be difficult."

Yet he couldn't have foreseen this before getting that far? Unlikely. Again, it is the reputational risk he is worried about. And he had published with Hoau-Yan and knows he is not a fraud. Just wants to be away. Same with the Brigham in Boston. Nope, sorry. Plenty of other sites declining for unknown reasons, some are busy, but this surely plays into it. We are behind on numbers of sites for both studies. Oh, I forgot to mention, as we were worried about Hans having the plasma P-tau181 assay ready, we reached out to Charlotte Tuenissen's lab to see if they would be ready as a back-up, even though we don't want to be shipping samples to Amsterdam if we can help it. His negative response included the reputation word. Unbelievable. They don't even want to be a service provider for us, as if that would tarnish their reputation. Cancel culture.

-------------------

Let me back up to the beginning, or the sort of beginning. We told the world that our interim analysis of change in cognition for the first 50 subjects to reach 9 months would be revealed in my talk in an 8:00 a.m. session at AAIC. There was intense anticipation, as we had earlier revealed that the first 50 to reach 6 months of open-label treatment improved from baseline by 1.6 points, where they would be expected to decline by about 2.5 points. Yes, it is open-label, everyone knows they are on active treatment. But 6 months is a bit long to be talking about placebo effect in a population that declines. These are mild-to-moderate Alzheimer's disease patients, not super early mild cognitive impairment people. This population all has dementia and they don't stand still for very long if at all. So then at 9 months, they improved an average of 3.0 points. Pretty remarkable. Yes, open-label, but greatly de-risking our Phase 3 program. So what happened? An hour before my talk, $200 million of stock was dumped on the market, causing the price to drop. People looked, knowing the news was going to be out, and saw the stock was down. So they jumped off, and the rest was self-fulfilling. I think the stock closed around $100 that day, after seeing a high of $130 or $140. Hmm. But the NEXT day..... Adam FudSlime published an article in STAT News (who simply hired him to get more clicks, because why else would they hire a known FUDster?). Title: "Alzheimer's Scientists Critique Cassava Sciences' study results – Overblown, inappropriate and uninterpretable." This guy managed to get Lon Schneider, who is upset that he is no longer in our inner circle, and two other people to say the only thing we can say about this data is that the drug is safe. We weren't making claims of efficacy but were stating what happened: the patients

7

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779304

BURNS_00000656

improved 9 months out. According to the hit piece, the data shouldn't have been shown at all. Then, it should have been presented by someone other than me:

"Instead of having an academic researcher present the simulfilam data at the Alzheimer's Association International Conference, which is the norm for scientific conferences, Cassava used an employee — Lindsay Burns, senior vice president for neuroscience. Burns is also married to Cassava CEO Remi Barbier."

As if I have no knowledge of the program and no training but was only there because I am married to the CEO. (A hush spread across the audience). If only I had gone to Harvard or gotten my PhD from Cambridge. Oh yeah, Cambridge. Never mind, Trevor. And every other company was presenting their own data. It is not the "norm," sorry Lon.  Lon is the go-to guy for presenting different companies' negative data and spinning it a little. This is what Lon Schneider sent to AF for the hit piece:

"Open label, uncontrolled studies inherently limit inferences that can be made about biomarkers and clinical benefit. This study only serves to provide tolerability and safety information. It is not clear why they chose to report out 9-month interim data on only 50 of the over 150 patients they planned to follow for 12 months. Without a control the ADAS-cog and NPI data are uninterpretable. Historical controls from the 1990s don't cut it, and besides it appears that even this implausible improvement in the ADAS-cog of 3.1 points is, believe it or not, not inconsistent with the 1.6 point worsening in the historical data that shows typical large variance of change  Moreover, as we know with clinical measures, the numbers they present could easily reverse after the next 50 or 100 patients are added. Ditto with the NPI: atypical reporting and then the analysis they present is non-significant, non-informative and consistent with no change.
The biomarkers are all unvalidated for use as surrogate markers, we know nothing about the methods, and how the repeated measure were done, but the coefficients of variation at baseline range from about 20% to 50%. Again, the small sample, N =25, without contemporaneous controls, the biomarkers are uninterpretable.
I suppose we will have to wait for the phase 3 trials to start and read out to learn more about effectiveness."

Where does he think that the CVs of my biomarker data was 20-50%??? I didn't even show CVs. The SDs were extremely tight for the group % change from baseline. What he told me was, "It doesn't make sense to jump in for the Phase 3 if I was not involved earlier." I had found him at the meeting and was doing my best groveling (ahead of seeing this piece), after I sent an apologetic email for not following up (after he had declined to sign a CDA, opting to wait until the data were public, about a year earlier). And btw, when Jim and Tony reported his pissy conversation from the night before, he in the next breath called some other woman "a stupid bitch." Wow. I left the door open for a consulting agreement as he'd like, saying I know he's busy. Then I see this piece the next day. Upon my return to the office, Becky gave me a voodoo doll. It has since come in handy.

Oct 19, 2021

8

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779305
BURNS_00000657

This morning I sent a 4-page detailed response to JPAD. Apparently Paul Aisen, who agreed to meet with me and Jim at CTAD, "is working with our reviewer expert in the domain." It kind of pissed me off to have to send this detailed explanation, that even after sending original blots we are accused. I have no idea where Paul will come out, but in my last zoom with him, it was clear that he suspected our biomarker data may have been fake (because he loves Oskar). I will give him all the gory details about what went down in Oskar's lab, just as we did for the CSR of the PTI-125-02 study. But I think Bruno Vellas and Jacques Touchon are more friendly. Who knows. I'm so tired of all this. Here's the letter I sent this morning:

Dear Dr. Vellas,                                                                19 October 2021

I am responding to your inquiry regarding the immunoblot images in figures 3 and 5a of ID: JPAD-D-19-00051; HY Wang, Z Pei, KC Lee, et al. PTI-125 reduces biomarkers of Alzheimer's disease in patients. J Prev Alz Dis 2020;7:256-264.

Importantly, the Western blot images in this paper are *representative* images for each assay and each timepoint – that is, data from a single patient. So, the bands in question are two of about 190 bands. We would be delighted to provide Western blots for all 13 subjects from this clinical study for the assay in question. By examining the full dataset (i.e., 13 individual bands for each timepoint) you will see data for the whole group, not just the selected, representative image. Please let us know which of the two images is still in question so we can send all these files. There are 37 anti-tau immunoprecipitates (probed with specific antibodies to different P-tau's and nitrated tau). These were run on 5 different gels of 8, 9, 8 and 3 subjects' anti-tau immunoprecipitates. Figure 5 with $A\beta_{42}$ stimulation has 74 lanes in 8 gels. Again, these are anti-$A\beta_{42}$ and anti-actin immunoprecipitates from each of 3 time points, probed with anti-CD14, anti-$\alpha$7nAChR, anti-$A\beta_{42}$ and anti-actin antibodies. Please let us know which set you'd like us to send.

You have not informed us of any specific allegations with regards to the images in question. However, since we believe transparency is key, below we provide some background on methods. Visual artifacts can derive from gels or blots (nitrocellulose membranes). We also address some of the allegations circulating on the internet regarding Prof. Wang, however ludicrous or misinformed.

**Use of X-ray Film.** Prof. Wang used chemiluminescent Western blot detected on x-ray *film, not digital imaging*. Film provides high sensitivity to detect weak protein bands. High sensitivity, however, means film may show more impurities and artifacts. Film also requires physical storage. Much like traditional photography, x-ray film degrades with time, even under proper dark storage conditions. For these reasons, the original image of the x-ray film is considered a more permanent record than the film itself.

**Physical Storage.** There are no standards in biological research regarding how long physical x-ray film should be kept. For example, *Analytical Biochemistry*, a leading journal on biological research, has no written guidelines regarding how long physical x-ray film should be kept. (And to our knowledge, neither does JPAD). Publication guidelines state, "The authors should be prepared to submit the raw validation data and unprocessed images during review." [1] We believe NIH guidelines suggest keeping original x-ray film for 2 years from the time data is generated. Absent research standards, Prof Wang's

---

[1] Analytical Chemistry, 593 (2020) 113608, *A systematic approach to quantitative western blot analysis*, page 7, Section 4.1.3

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779306

BURNS_00000658

lab followed CUNY's ad hoc policy to store and maintain physical x-ray film through the date of actual publication. However, since discarding old materials is not anyone's top priority, Dr. Wang is hopeful the original x-ray film may still exist somewhere in his lab. He is checking. If found, these will be immediately turned over to you.

**Gel Cassettes.** For laboratories that perform a lot of immunoblotting, the cost of commercial, pre-cast polyacrylamide gels is considerable. To mitigate cost, Prof. Wang's lab typically prepares their own polyacrylamide gels. Using research standards widely available on the internet and elsewhere, for many years Prof Wang's lab has re-used commercial gel cassettes. There is no evidence that repeat use of the same cassette reduces their usability. However, it is conceivable that pouring your own gels might, on occasion, increase the appearance of artifacts in a very small number of blots and not in others.

**Loading Control Bands.** At times, Prof. Wang's loading control bands are said to look "unexpectedly" similar. The original images of these blots prove all bands are unique. Similar looking control bands is a sign of expertise and experience. Prof. Wang's lab has conducted thousands of Western blots. Consistency is a sign of steady hands, precision and accurate workflow. It is well known that in the hands of a novice, Western blotting is frustrating, messy and inaccurate. It is also well known that in the hands of an expert, Western blotting is confident and accurate. And of course, rhetorically asking, why would anyone fabricate loading control bands?

**Lanes Per Gel.** Thirteen (13) lanes do not fit in one gel. Two gels were needed to show all 13 representative conditions. These bands were compiled side-by-side into one image. This is why there is a different background on the left vs. right of published images with 13 bands. This is a practical reality, not evidence of misconduct. We concede that a dark line to demarcate the separate gels required to show all conditions could have been helpful to readers. *Neurobiology of Aging* is unconcerned about this method.

Additional considerations are listed below.

A) Prof. Wang's policy for the physical storage of x-ray film is within the standard of accepted practices in his scientific field now and at the time the experiments were conducted.

B) Western blot results are always subject to interpretation. It is reasonable and expected to ask interpretive questions about one or two blots (out of many). It is unreasonable and unexpected to use subjective interpretive criteria on one or two blots (out of many) as the sole basis for widespread allegations of misconduct.

C) There were no issues, and still are no issues, with joint co-authors on the publications. Co-authors are generally jointly accountable for the integrity of a publication. For this reason, allegations of research misconduct by a first author often leads to finger-pointing and mutual accusations among middle authors. Here, none of the middle authors are engaged in finger-pointing or mutual accusations; nor have the middle authors attempted to distance themselves from accountability.

D) Prof Wang's lab uses careful experimental design and critical validation steps to identify and minimize sources of error and variability throughout immunoblotting and all experimental

10

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779307
BURNS_00000659

processes. It is simply not believable that his lab would bypass these steps for one or two Western blots for the sole purpose of misconduct.

E) Prof Wang has never hesitated to acknowledge an occasional, innocent, non-impactful mistake in publications, which is unavoidable when working with large datasets. Occasional mistakes indicate humans-at-work, not reckless misconduct.

F) Character is important. Dr. Wang's scientific reputation was made over decades of carefully conducted experiments, data sharing and scientific collaboration with his peers. It is simply not possible for someone to engage in decades of honest scientific collaboration, and simultaneously engage in scientific fraud.

G) Finally, we call into question the motivation of the allegations. Wall St is the original source of all the allegations being made against Prof. Wang.[2] The professional Wall St investors who made these allegations are 100% motivated by financial profit. *No journal can be expected to adjudicate allegations that are strictly motivated by a financial profit.*

I would be happy to discuss these topics by Zoom meeting.  My own preference would be to meet with you in person at CTAD. My colleague Dr. Kupiec and I have already proposed to meet with Dr. Aisen. Thank you for your time.

Respectfully,

Lindsay Burns, PhD

_____

And then, I came back to my office from the internal clinops meeting to find a voicemail from Dave Michaels, WSJ reporter (white collar crime and financial enforcement). He followed up with this email:

Greetings Dr. Burns,

I'm a reporter for The Wall Street Journal. I'm writing you because my colleague Joe Walker (cc'd here) and I are working on an article that will discuss the allegations in the FDA Citizen Petition against Cassava and the research underlying Simufilam. The article will likely discuss allegations that Western blot images in research published by you and Dr. Wang appear to have been manipulated, including bands that look too similar to one another and other signs that bands have been copied and pasted.

The Citizen Petition and supplements are posted here:
https://www.regulations.gov/docket/FDA-2021-P-0930/document

We have been in touch with Cassava Sciences about this article, but since we may name you and Dr. Wang directly, I wanted to let you know about the article and ask if you would have any comment about the allegations generally and/or about the following --

_____

[2] Allegations were made via a press release and on the internet rather than in a court of law. This public relations tactic triggered a tidal wave of highly opinionated comments both for and against Prof. Wang.

11

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779308

BURNS_00000660

How do you respond to the allegations of image manipulation?

Are you aware of whether any institutions, such as the FDA, NIH or CUNY are investigating the allegations?

We understand that CUNY has shared the raw data/films from experiments with some of the journals where the papers were published? Is that accurate?

We understand the Journal of Neuroscience is preparing a correction after reviewing the films for the 2012 paper "Reducing Amyloid-Related Alzheimer's Disease Pathogenesis by a Small Molecule Targeting Filamin A." Is this accurate? Are you aware of what the correction will say?

Are you aware of any other forthcoming corrections or retractions related to your work on Simufilam or the science underlying it?

It would be most helpful to speak with you by phone to understand how you view these allegations and your response to them. Barring that, it would be helpful to hear back from you over email. Please let us know if you have time to talk this week.

Thank you for considering our request. You may reach me anytime at the number below.

Sincerely,

Dave Michaels

202-680-9911

---

Remi and Mike Sitrick are going to talk to him to see what he is intending. Then we will prepare a written statement. I'm so sick of this. I'd love to defend myself, but Mike Sitrick says this guy will try to trap me. Meanwhile, our stock has been pounded today and is currently sitting at $47.82. Christ. And I just handed over my entire cell phone contents and LinkedIn messaging, for the SEC and DOJ investigations. And my forever passwords.

Trevor, are you listening? Probably waiting for the sound of his face coming down from our website. Sharon Cohen has signed on, and Jim will ask Pierre Tariot this week.

Apparently, Dave Michaels thought that the correction to be issued by JNS was some kind of evidence of fraud. Remi and Mike had to tell him that it has nothing to do with the Western blots and only the replacement of an incorrect image. Human error, not mal intent. Oh. So thankfully, no statement, at least not now. Hopefully this guy gets a little more research done than just a return email from JNS saying, "We will be issuing a correction."


Oct 20-24

I flew out this day to Boston for the Head of the Charles. I got off the plane to see that Helios Capital had FOIA'ed our SEC investigation letter and posted it online. The next day, appearing online was the first page of Remi's letter of support for Hoau-Yan to CUNY. The FUD people had highlighted and underlined "I believe" and "absent hard evidence" as evidence that we just aren't sure if we are all a scam. And of

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779309
BURNS_00000661

course they omitted the second page, which was much stronger. So what the hell? Remi wrote the following email to Rosemarie Wesson at CUNY:

CONFIDENTIAL COMMUNICATION

Dear Dr. Wesson:

On September 2nd, I emailed you and others CC'ed here a letter on Cassava Sciences letterhead in support of Prof Wang. This letter was clearly labeled "CONFIDENTIAL" in red BOLD heading. Cassava Sciences has not released this letter to the public. However, today it came to my attention this confidential letter is circulating on social media (see snip below).

As you may know, Wall St investors (non-scientists) are behind the unprecedented smear attacks on Prof. Wang et al. This Wall St crowd is vocal, media-savvy, wealthy, and highly, if solely, driven by the profit motive to continue besmirching Prof Wang and Cassava Sciences. I have an immediate concern about whether this Wall St crowd may have accessed the confidential letter by hacking into CUNY's email or Cassava's email systems. To allay this fear, please confirm whether CUNY released this confidential letter to the public. You may reach me at 512-501-2480 if a call is more comfortable.

Respectfully,

Remi Barbier



----------------------------

13

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779310
BURNS_00000662

I kept watching for a response back from Bruno Vellas at JPAD after our offer to provide all blots, and still nothing. And no word back from Nature Communications. Nor, from Rosemarie Wesson.

_____

# Redacted

Oct 29, 2021

While I was away, the AD-science team found a Western blot expert who wrote two posts regarding the Citizen's Petition and allegations. I sent it to Hoau, who said this:

"Thanks for sending this. This person hit the nails straight on!  Also, these people have no idea what IP is and think WB is easy.  Thanks again." I love that Hoau always slightly alters wording of expressions. Once he said he was "running around like a chicken with no head."

Here is the first post from Charles Spruck, PhD, who will eventually write a handful of letters to editors of various journals detailing why various allegations are not credible:

**Notes from a Molecular Biologist**
Oct 21 2021

*The author of this post received a Ph.D. degree in Molecular Biology and has been an academic researcher since 2003. His laboratory studies cancer and other human diseases and routinely run western blots (~1,000/year) for their studies.*

I thought it might be helpful to post an expert's review of the concerns raised in the Labaton Sucharow Citizen Petition (CP) regarding western blot (WB) data for Cassava Science's Alzheimer's drug. Simufilam has demonstrated remarkable improvement in cognition in Alzheimer's patients at 12 months of treatment in an open label study and the drug is entering two pivotal phase III studies.

Western blotting is a research tool that we use to analyze proteins, including their levels, modifications, and association with other proteins. Protein extracts are prepared from cells or tissue, denatured using a detergent and heating, and then loaded onto a gel, which is a matrix of polyacrylamide, and then a current applied. This allows for proteins to be separated based on their size (i.e. molecular weight (MW)). After the gel is "run", the proteins are transferred (i.e. blotted) onto a membrane and then probed with an antibody specific for whatever protein you want to analyze. The blot is then probed again, this time with a

14

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779311

BURNS_00000663

secondary antibody that is enzyme-linked and binds to the first antibody, thus allowing for detection using a chemiluminescent reagent that produces light where the first antibody binds the membrane (thus producing what is known as a "band"). All WBs include analysis of a control protein (e.g. actin, GAPDH) to confirm that equal amounts of protein extract were loaded in each lane.

The first thing to understand about WBs is that they are semi-quantitative. They can basically tell you if there are differences in levels (increases, decreases) or presence of a modification or binding protein. Secondly, the western blotting technique is somewhat of an artform. It takes practice knowing what procedures are best to analyze a specific protein. Thirdly, there are a lot of variables. Researchers use different first and second antibodies, gel conditions, membrane supports, washing and exposing conditions. There is no standardized protocol. For example, many academic labs that are on a budget will pour their own gels as opposed to buying more expensive pre-made gels. With the former, you have more control over your analysis, but the WBs can often look a little dirtier, lanes slightly unevenly spaced, or bands looking not so sharp. Though the results, in terms of levels etc., should be the same no matter what variations are used.

My overall impression of the CP is that it does exactly what it set out to do- confuse the average investor and seed doubt so that they sell their shares. The average investor has no idea what a WB is let alone how to objectively analyze them. The majority of concerns raised are easily explained and a small number of others are obvious errors that likely occurred during generating figures for publication. There is no obvious evidence of systematic data manipulation or scientific misconduct. Someone with knowledge of molecular biology likely helped put together the CP, but many of the concerns raised show a shallow understanding of WB technique and data analysis. Below, I provide responses to general concerns and then a point-by-point analysis of each concern raised in the CP.

General concerns raised in the petition:

1.   It is stated that "the western blot data presented by Wang/Burns are almost always overexposed and highly processed, which has been repeatedly seen in previously reported examples of image manipulation." Several of the studies scrutinized in the CP were published between 2005-2012. It is important to realize that during this time WBs were visualized by exposing the membrane to film. Control proteins generally give very strong signals due to their high level of expression in cells and use of validated antibodies that give the best (i.e. strongest) signal. Also, analysis of low-expressed proteins requires more extract to be run per lane to see the signal. These factors can often lead to control bands that are strong (i.e. overexposed). Today, most researchers use digital imaging systems to expose WBs, which avoids issues with overexposure. As far as the claim of "highly processed" images, know that most research papers published pre-2010 used images of 300-600 dpi or lower. Images retrieved from online papers, as was done for the CP, are likely even lower resolution. In my opinion, it is dangerous to take a low-resolution WB and adjust the contrast and brightness levels to attempt to uncover evidence of data manipulation. For example, the CP repeatedly shows changes in background pixels as evidence of data manipulation, but there are many factors that could give this effect. Over the years, I've seen things as simple as streaks on a film caused by the processor or how the membrane is wrapped with layers of plastic wrap to prevent drying from influencing the background of the figure.

2.   It is repeatedly said in the CP that the authors should produce the original WB data in order to satisfy their concerns. I'm pretty sure the scientists behind the CP know that this request is unreasonable. Most researchers will store data after publication in case questions do arise. In a perfect world, films and electronic WB data would be stored forever, but students leave the lab, labs downsize or move to new institutes, and thumb drives get lost. In addition, journals generally don't require researchers to keep data for longer than a year or so. The fact that Drs. Wang/Burns have not "answered" the WB concerns of the CP is likely not due to them hiding something but rather that it is impossible to retrieve data used in a publication 10-15 years ago. Journals rely on a thorough analysis of the data by the reviewers, which are generally 3 experts in the field. If a reviewer had a problem with any of the WBs in question, they could have asked for them to be repeated. If they thought the data were manipulated in any way, the reviewers would have instantly rejected the paper and likely notified the journal.

15

CONFIDENTIAL
CONFIDENTIAL

3.   The CP repeatedly says that their analysis indicates fraud or scientific misconduct. Scientific misconduct is a very serious claim. As scientists, we welcome critiques of our data presented in research papers or presentations. That is part of being a scientist. But know that scientists are trained from early in their careers and throughout about what constitutes misconduct. We take refresher courses and sign statements when we submit research papers regarding the validity of our work. Every researcher knows that being accused of misconduct can instantly ruin a career. In my years as an academic researcher, I have never known of anyone who was even accused of scientific misconduct. I'm not saying that it doesn't happen, but there is a big difference between a paper mill in China that is duplicating figures in different publications and an established researcher whose lab has consistently published quality papers and is supported by NIH funding. It is improbable to think that Drs. Wang/Burns have systematically produced fraudulent research and manipulated data for research publications and grant applications without a colleague, collaborator, or reviewer detecting it for 15+ years.

In the next article, I will follow up on specific allegations made in the petition.

Here is the second post:

**Of shorts and blots**
Oct 21 2021

This article looks at specific accusations in the citizens petition supplement attachment 1

Example #1: "Manipulated WB". The CP claims that different WBs were "spliced together" to make a figure in a 2005 paper. They point out a "bowtie" effect of several bands as supporting evidence. However, anyone with WB experience has seen this bowtie effect. In theory, it can be caused by proteins sticking to the sides of the wells or a small amount of extract entering the space between the wells and the plates that support the gel on each side. This effect is often seen when the top of the gel is exposed to air too long prior to loading.



*Neuroscience* 2005;135:247–261, Figure 5a.

Example #2: "Falsified WB". This claim states that the same beta-actin control WB was used in 2 different papers published 5 years apart. The CP takes a beta-actin WB, which is low resolution, stretches it vertically, then blows it up and compares it to a WB published 5 years earlier. Although they claim the blots are identical, to me they look completely different. For example: 1) the left side of the band in lane 1 of the 2005 publication has a notch that is not in the 2010 WB; 2) band images between lanes 2 and 3 are clearly different; 3) the right sides of the bands in lane 4 are also different. I also have difficulty taking this claim seriously. The labs likely ran many beta-actin WBs between the 5-year timeframe the 2 papers were published, but it is claimed they somehow elected to risk their scientific careers to include 4 control lanes from a previous publication? A new beta-actin WB could be run in half a day. This accusation suggests that the scientists who contributed to the CP are not very experienced in molecular biology.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779313

BURNS_00000665



Example #3: "Reused WB". This claim takes 2 WB panels of a figure and compares them side-by-side, suggesting they are identical. This claim could have some credibility, though it is more likely a mistake in constructing the figure for publication than scientific misconduct. Although I can't say for sure that the 2 WBs in question are indeed the same, they do look very similar, though one is a slightly darker exposure. When WBs are exposed to film, we generally get several exposures from light to dark. If the films aren't labelled properly, things can get mixed up when the graduate student/post-doc generates the figure for publication, especially if two of the WBs look similar. If the 2 blots are indeed the same, the PI, other authors, or reviewers probably should have asked if this was indeed an error. I'm inclined to think this was an error in making the figure and not intentional since there is nothing covert going on here- the 2 WBs are basically side-by-side in the same figure.



Example #4: "Band insertion into WBs". The concerns raised here include: 1) irregular spacing between lanes; 2) FLNA bands not looking correct since it is a large (290 kDa) protein; 3) bands looking identical

17

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779314
BURNS_00000666

between lanes; and 4) white halos around bands. In my opinion, this claim is completely baseless and shows a lack of experience of the scientists that generated the CP. Irregular spacing between bands is routinely seen with self-poured gels. It is explained by the teeth of the comb used to cast the gel not being completely straight when the gel is polymerized. The claim that FLNA shouldn't run very far in a gel because of its large size is inaccurate because proteins will run as far through a gel as a current is applied. Longer gels could have been used. Also, the researchers could have used gradient gels that allow for larger proteins to be better resolved in the gel. As far as the control beta-actin bands looking identical, they are basing this assumption on a common "tadpole-like" appearance of the bands. However, this tadpole effect is commonly seen if the gel is polymerized next to an air current (e.g. in a fume hood). The air current can cause the sides of the wells to lose moisture during polymerization resulting in a tadpole-like effect on the same sides of the wells of each lane, which is seen here. As far as halos around bands, most films used to expose WBs have a threshold level of exposure that is designed to limit background. You often see this halo effect directly on the exposed film, especially with stronger bands. The white halo could also be a compression effect, caused when the figure levels were adjusted for publication.



Concern 3.2 "Evidence of data manipulation from human tissue". It is claimed that Figure 12 of a 2017 paper shows a WB with 12 lanes for the control protein NR1 and 13 lanes for PCLgamma1. It is also suggested that WBs from different experiments were spliced together to make the figure. The 12/13 lane issue is an obvious error that likely occurred when making the figure for publication, but in no way rises to the level of scientific misconduct. As far as splicing together 2 different WBs, please refer to Response to General Concern #1 above about manipulating low-resolution figures and spliced WBs. I honestly don't see much evidence of splicing for the top WB. Also, on the bottom WB, the change in pixels

18

CASS-CLASS-01779315
BURNS_00000667

appears to wrap around the top of the band on the left side of the proposed splice site. It would be difficult to crop the figure this way. Another thing to point out is that the 3 lanes on the right of both WBs are running lower in the gel than the band directly to the left, which is slightly higher than the other bands to its left. However, the proposed splice sites are 4 lanes from the right on the top WB and 3 lanes from the right on the bottom WB. These factors support that the figure was not generated by splicing 2 WBs spliced together.



*Neurobiol Aging* 2017;55:99-114
Figure 12.

*Appendix items/Additional areas of concern:*

Claim #4: It is claimed that the top WBs cannot be FLNA based on the banding pattern. Please see Response to Example #4 above. Also, note that Albumin was used as the control protein here, which is a comparatively large (66 kDa) for a control protein and suitable for analysis of large proteins, such as FLNA.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779316
BURNS_00000668



Claim #6: It is claimed that several papers between 2010-2017 don't show control WBs for co-immunoprecipitation experiments that evaluate the interaction of beta-amyloid with alpha7-nicotinic acetylcholine receptors. This claim is true, but there is a very good reason for it. Beta-amyloid are small (10 kDa) peptides of 40-43 amino acids in length. Their small size makes them very difficult to analyze by WB, other than running specialized gels that would likely preclude the analysis of larger interacting proteins, such as alpha7nAChR (60+ kDa). Most companies pre-validate their antibodies for use in certain applications, such as immunoprecipitation experiments.



20

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779317
BURNS_00000669

*E.2 Additional suspicious WBs (1) and probable band duplication (2):*

1) Suspicious WBs. The CP shows several examples (pages 30-31) of control bands looking the same between WBs suggesting that the researchers must have duplicated these images. To me, this is a ridiculous claim. I see clear differences between the bands in question and I think most others do as well.

2A) Probable band duplication. Regarding the white halo around bands on WBs, see Response to Example #4 above.

2B) FLNA bands look identical (page 33). The CP highlights 3 FLNA bands that they claim are duplicated, but I see clear differences. For example, differences are seen with the bottom of the right and middle bands and top of the right bands.

2C) Five IRbeta bands look identical (page 34). There are clear differences in the sizes of the notch at the bottom left of each band, as well as the slopes of the bands on the top right.

2D) Clipping multiple blots together (page 35). The clip effect that is seen when the proteins run through an air bubble in the gel, which is common with self-poured gels.

2E) Tampering of WBs (pages 37-39). It is claimed that bands are inserted into various WBs in a 2006 Nature Medicine publication. This claim is borderline ridiculous and is likely why it appears at the end of the CP. Dr. Wang is first author on this publication, so the implication being made is that he started manipulating data early in his career and continues to do so today as head of an academic laboratory. Firstly, Nature Medicine is an outstanding journal, so the data was thoroughly vetted by experts in the field prior to publication. See Response to General Concern #1 regarding manipulation of low-resolution WB images and drawing conclusions. Also, several of the examples shown as evidence of data manipulation support the opposite. For example, on page 38 the background pixels around the bands are irregularly shaped. It is hard to believe that Dr. Wang would have cropped each of the bands for insertion as irregular shapes (which would be difficult in 2006) instead of just using a box shape. Also, if differences in background pixels are evidence of data manipulation, why are there also irregular shaped pixels around the text in the figures? Were they copied from other figures as well? It is obvious that the differences in background pixels observed are the direct result of the scientists who constructed the CP altering the contrast and brightness of already low-resolution figures.

Oh yeah, and Bik had a couple of "new findings," one a couple of weeks ago that was a purported overlap of literally one neuron in on hippocampal image with another (in a different group). She is clearly being told, "Find something new, anything!" Then, I think it was Friday, another "new finding" in a 2020 paper of Hoau's (unrelated, again), claiming duplication of one blot to another (probably in another paper, as usual). One they claimed was reversed. They are getting so desperate.

So I emailed the JNS editorial people to ask if they were able to tell me a timeframe of when the correction would run. The reply was, "The correction has been sent to production and is being prepared for publication. It should be scheduled for publication within the next month."

21

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779318
BURNS_00000670

So then I replied, "For clarity, can you confirm that with this correction, the journal's review of this matter is complete, with no further comment?"

Which received this response:

Dear Dr. Burns,

Thank you for working toward this Corrigendum. As Mr. Dourafei noted, it is in preparation for publication and should be out soon.

Unfortunately, I cannot guarantee that this is the end of the process for this paper. As you probably know, there are additional concerns about Figure 1 noted on PubPeer (https://pubpeer.com/publications/F91E0D22B887598445BB1F908393EE), along with other questions raised in a Citizen's Petition (https://www.regulations.gov/document/FDA-2021-P-0930-0004). If these are brought to us directly, we will investigate them as well.

If you would like to be proactive about addressing the concerns raised in Pubpeer or the Citizen's Petition, I would welcome raw data for all Western blots from the paper and responses to concerns that panels are duplicated in 1A, 6A/B, 9A, and 12A.

Yours,

Marina R. Picciotto, PhD
Editor in Chief
The Journal of Neuroscience

When Hoau found and sent me the new requested blot images for the above email, he said this:

"These blots took me 6 hours …. Keep up with this, I will start to eliminate projects. I guess this is what they want."

Nov. 2

As Hoau noted, dealing with these journals has become almost a full-time job. Before sending on the additional blots to JNS, I received at 5:18 on Monday this more urgent email:

Dear Dr. Burns,

I am writing to ask if you might be able to provide the raw data to address the additional concerns raised in the PubPeer comments and Citizen's Petition outlined below, and in particular the four concerns raised about duplication that have not yet been addressed that are in Figures 1A, 6A/B, 9A, and 12A.

I would like to publish a single Correction that is published very soon, if at all possible.

If it will take a while to gather these raw data, we will move ahead with the current Correction and add a note that additional concerns are currently being investigated.

22

CONFIDENTIAL
CONFIDENTIAL

Yours,

Marina R. Picciotto, PhD
Editor in Chief
The Journal of Neuroscience


My response:

Dear Dr. Picciotto,

We previously sent original blots to address the PubPeer postings for Figures 6A/B and 9A (in addition to Figure 11). All these were in your original request and were supplied to you.

We are now attaching the original FLNA blots images for Figure 1A and B (one image for hippocampus and one for prefrontal cortex, because these are the same for Figure 1A and 1B). For clarity, Figure 1A and 1B - TOP are from hippocampus IP'ed with anti-FLNA but probed with alpha7 and TLR4, respectively, so that the FLNA controls should be the same. Similarly, Figure 1A and 1B - BOTTOM are from PFCX IP'ed with anti-FLNA but probed with alpha7 and TLR4, respectively, so that the FLNA control should be the same. To reiterate, the FLNA blot images for Figures 1A and 1B (for respective brain regions) are the same because this is the same blot that was stripped and reprobed for alpha7nAChR and TLR4 (they have the same loading control FLNA).

We are also attaching the original FLNA blot image from Figure 12A.

There is no manipulation in these images. I'm confident any reasonable person with knowledge, experience & expertise in Western blots will reach this same conclusion.

Additionally, here are two commentaries from an independent, immunoblot expert that may be helpful in your review:
https://ad-science.org/2021/10/21/notes-from-a-molecular-biologist/
https://ad-science.org/2021/10/21/of-shorts-and-blots/
Confidentially, this is the author, who wishes to keep his identity anonymous from online trolls:
https://www.sbpdiscovery.org/our-scientists/charles-spruck-phd

As you may know, certain Wall St investors (and paid or unpaid science vigilantes) have succeeded in making false allegations against our science. Of course, we take all allegations seriously, even those we believe have no substance, because of their potential to affect our scientific reputation. As an example, two recent Citizen Petitions were submitted to FDA. The first Citizen Petition urges FDA to immediately halt the clinical progress of our drug candidate for Alzheimer's disease (August 2021). The second Citizen Petition urges FDA to immediately approve our drug candidate for Alzheimer's disease (October 2021). Notably, both petitions were submitted by lawyers or investors, i.e., non-scientists. The strongly opposing views of each petition makes it doubtful either one promotes responsible scientific objectivity, or are free from bias or financial conflict of interest. While integrity is always a collective responsibility, FDA's sole purview is drug

23

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779320
BURNS_00000672

safety & efficacy. The two Citizen Petitions do not express concerns over the safety or human efficacy of our drug candidate since these will need to be proven in an on-going large, Phase 3 clinical program. Unsurprisingly, FDA has not contacted on this matter. In time, we expect both Citizen Petitions will be denied or dismissed.

You will not find evidence of image manipulation because there is none.  As with any large, complex body of knowledge, at most an occasional honest error may be detected that does not invalidate data conclusions.

If additional questions remain, I am happy to get on a zoom call with you.

Respectfully,
Lindsay Burns

She responded that evening:

Dear Dr. Burns,

Thank you very much for sending these data and for your prompt response to all my requests.

We will review the data you have provided and proceed as soon as possible with getting this matter resolved.

As you know, the Journal of Neuroscience follows the COPE guidelines and takes any allegation of error or data manipulation very seriously. As a result, we must follow up on these allegations and examine the raw data to refute or corroborate them, even though basic science studies have little bearing on the evidence for or against drug approval that are in front of the FDA. I certainly understand the financial issues that have given rise to this level of accusation and oversight, and yet, we have a responsibility to investigate the allegations carefully.

I hope to get information back to you by the end of the day tomorrow.

Yours,

Marina Picciotto
Editor in Chief
The Journal of Neuroscience

And the next morning:

Dear Dr. Burns,

Thank you for sending the full, uncropped blots for Figures 1A and B and Figure 12 from your 2012 manuscript.

I am satisfied that these blots have not been manipulated.

I appreciate your prompt cooperation with these requests.

24

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779321

BURNS_00000673

Yours,

Marina R. Picciotto, PhD
Editor in Chief
The Journal of Neuroscience

Then, her official statement, able to be shared with the media:

The Journal of Neuroscience follows COPE guidelines and takes any claims of misconduct very seriously. In response to allegations of data manipulation in JNeurosci 2012;32:9773-9784 the Journal requested raw data, including images of original, uncropped Western blots. The Journal determined that there was one duplicated panel in Figure 8 and a Corrigendum was requested and will be printed. No evidence of data manipulation was found for Western blot data.

Yours,

Marina R. Picciotto, PhD
Editor in Chief
The Journal of Neuroscience

I went to the gym. The gym, because the pool is out of service. The stair machine for 20 minutes and then some weights. I haven't done any weights in years. Coming out of the gym I am texted a screenshot of our stock, which bottomed out below 45 today but spiked to 67 (while I was lifting). I should lift weights more often, I texted back. Then, the evil FUDsters started tweeting fraud again:



Neither do you, asshat.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779322

BURNS_00000674

And more about the hedge fund that is "coming after" us:



Quintessential Capital
1,003 followers
3mo

We are a hedge fund specialized in uncovering criminal corporations: we will pay a financial reward (terms apply) to WHISTLEBLOWERS who help us lawfully expose the next fraud: reach out to us and share your suspicions.

We seek companies listed on US or European stock exchanges with a market cap exceeding $250m. We are particularly interested in extreme instances of accounting fraud (e.g. fake invoicing; undisclosed liabilities; fake m&a transactions) or undisclosed related party transactions.

If you are aware of a similar situation reach out to info@qcmfunds.com in full confidentiality. #frauddetection #fraud #duediligence #whistleblowers #shortselling

So later today, at 3:30, I receive the following email from Paul Aisen (in response to my email saying "Please do let us know when you have finished your review of these immunoblots. We are happy to answer any questions that arise."):

Hi Lindsay,

The journal is still evaluating this issue.  We have received concerns from two scientists, and from an additional reviewer that we contacted.

At this point we understand that the gel images were selected to be representative, and lanes from different gels were combined.  Reviewers remain concerned, for example, about one lane in Figure 3a, cropped below left and also shown in blot 2 from your recent email, below right:



I think it would be helpful for us to discuss in person next week in Boston.  Bruno is able to join us.

Thanks,
Paul


So I responded:

26

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779323

BURNS_00000675

Dear Paul,

Thanks for your question. To reiterate, these images you have pasted below were not from two different gels. The NBA paper, with 13 different conditions, did combine lanes from two different gels for the simple reason that 13 lanes do not fit in one gel. That was not necessary for any of the blots in the JPAD paper. This "box" in the image below is visible in the original blot image that we sent -- it is not a result of any sort of cropping and pasting but rather simply a visual abnormality of the gel, the membrane or the film. Please let us know if you have further questions, and I am happy to discuss in person in Boston.

Thanks,
Lindsay


And then followed up with this:


Hi again Paul,

I have received further comments from Dr. Wang. He says, "If you enlarge the blot you can see there is continuity of the background stretch from left to right. What causes the pale region on the last lane to become boxy is the darker regions above and on the right. This is NOT the result of manipulation. You may want to talk to the person who wrote the blog for his suggestion."

At one point, we thought this might be a visual artifact of the scotch tape used to tape the film to the blot. I asked him again if he thought this was a possibility (we are not ruling it out) and he said this:

"Not really. The shape of the paler region is not square and stretches from left to right. The darker regions on top and underneath the far right band, together with two vertical lines on the right create the illusion of a pale region. I can't say I have seen this before but this is not man-made. You can enlarge the image from which you can see there is no break in the background. Whoever says this is the result of cut and paste is dead wrong."


Thank you.
Lindsay


J'en ai marre, Bruno.

Nov 3

So yesterday, on November 2, the evil Tweeters including Quintessential Capital Management (QCM) hedge fund were tweeting away about their planned attack for 9:00 a.m. the next morning. True to their

27

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779324

BURNS_00000676

words, on November 3 at 9:00 a.m. ET, Adrian Heilbut and QCM separately but coordinatedly released inflammatory crap. Heilbut dropped powerpoint slides on two websites: cassavafraud and simuflimflam (or something like that) claiming falsified data, and I can't give details because I only scanned them briefly and promptly forgot. The title though, was "Cassava Sciences: a Shambolic Charade." Shambolic of course taken from a quote from Remi about the analgesics division of FDA when they for the fourth time rejected Remoxy but could offer no more specific reason than "the benefits don't outweigh the risks." Meanwhile, over 60,000 people are still dying every year from opioid overdoses, with an estimated >85% of these addictions starting on OxyContin. Remi had said we can't work with "shambolic regulations." So they think they are being clever and sticking it back to us.

The second piece of damaging sludge released at 9:00 a.m. on Nov 2, from QCM, was a long rambling rant of "criminal charges" and accusations, a "final report" of Quintessential Capital Management called "Cassava Sciences: Game Over!" It started with a criminal record of a CRA who I'm not sure even did any work for us, but has listed on her LinkedIn profile that she was a CRA for us for 4 months in 2018. They continue to rip into IMIC and the FDA citation that this site had, and, the prior history of Aimee Cabo, the wife of Boris Nikolov and co-owner of the site. Apparently, she is a recovered cocaine addict and has written a book and has a blog – clearly where they found this information. This rant also had selfie photos of one QCM member Gabriel Grego, who showed up at IMIC and was "shocked" that they pay patients a stipend that they found coercive among other "findings" that clearly show a lack of understanding of clinical trials. The guy at QCM, Gabriel Grego, actually came to our building and hung out outside; I saw him when I was leaving and he asked where the lobby was. I thought it was weird – why wouldn't the lobby be behind the front door? So they claim there is "minimal activity" here, and by name mentioned that they "ran into" me and that I "kindly directed" him to the lobby. The guy also has a photo of himself in front of our office door, as well as in front of IMIC and Optimus U, two of our sites. They accuse us of "cherry picking" data and all sorts of other garbage that is patently false. The ranting and rambling is false, incoherent and monstrous. was milling about his vehicle when I left to pick up [Redacted] one day and asked me from a distance, "Where's the lobby?" Thinking this a stupid question and in a rush, I responded "Right in there." So the claim was that there was little activity going on in the building, as he selfied himself in the lobby lounging and in front of our door. Pretty desperate for material on us.

Here are some today tweets from Adrian:

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779325
BURNS_00000677



**Adrian H** @Adrian_H · 1h                                    ···
Looks like I also got a little present from the NIH FOIA office today!  750 pages of potentially fraudulent grant applications..

$SAVA

◯ 5          ⟲ 2          ♡ 17          ⬆



**Adrian H** @Adrian_H · 1h                                    ···
Cassava claims that Simufilam is safe.  But can their poorly designed, unreliable trials run by questionable actors be trusted to assess and report safety accurately?  Neither we nor the FDA can really know.

$SAVA
cassavafraud.com

## Is Simufilam really safe?  Probably? Maybe?

* Cassava claims Simufilam is safe, but data suggests a cavalier attitude towards safety, a calculated avoidance of critical studies, and dependence on unreliable investigators.
* Simufilam doses administered are **millions** of times higher than should be required based on the purported mechanism and pharmacokinetics.  **Simufilam might be safe... but only because it is inert and does not bind its supposed target.**
* Cassava's Phase 1 study tested only a **single administration** of the drug
* If the Ph2 biomarker studies were manipulated or fabricated, as the data suggests, how can safety results from the same trials be relied upon?
* A key clinical site for the Ph2a study, upon which the presumption of Simufilam safety is based, was the subject of FDA concerns about integrity and reliability, documented in a rare **Warning Letter** to the clinical investigator, Dr. Lopez



**Adrian H** @Adrian_H · 2h                          ···
But Wang can't make up ALL the clinical data.. so $SAVA had to find UNRELIABLE clinical investigators to run their trials..  $SAVA picked a doctor with the rare distinction of having received an FDA Warning Letter.

cassavafraud.com

### Key Cassava Phase 2 Clinical Site Under FDA Scrutiny

Dr. Evelyn Lopez-Brigaud, a clinical investigator for the Simufilam Ph2a & Ph2b studies, received a Warning Letter (related to a different study) documenting unaddressed FDA inspection concerns about the validity and integrity of data collected at the site.

* Subjects may have taken placebo only instead of the required study drug, or took both the fat extracted dose of the study drug
* The investigator failed to ensure that subject is adhered to the dosing regimen
* The investigator failed to conduct the clinical studies in accordance with the investigational plan

Neither safety nor efficacy data from studies supervised Lopez-Brigaud can be trusted

Why does Cassava rely on such questionable investigators to run its trials?





**Adrian H** @Adrian_H · 2h                          ···
There is no real debate that Dr. Wang has been fabricating his research. The CP was spot on, and since then, DOZENS more examples have been identified on PubPeer, including his work with other groups.  Wang is a serial fabulist.  @MimotionDigest

cassavafraud.com
$SAVA

### ...has now been flagged publicly by experts

* Publications dating back over 2 decades have been flagged and reported publicly
* Amongst those reporting concerns and would expect on scientific fraud Dr Elisabeth Bik.
* The pattern of systematic data manipulation and fabrication is consistent with the findings of our report

There is now no serious question that the majority of Dr. Wang's work - including that with Cassava - contains fabrications

Nothing he has touched can be trusted or presumed to be valid



CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779326
BURNS_00000678



Literally he has tweeted crap like this 14 times in the last 5 hours! He must be exhausting himself. And shitting himself that he has not really impacted the stock price.

Now Bik says this, but this total BS "report" this morning says they paid her, although I see that was carefully worded as well:

> A number of forensic experts including, Dr. Elizabeth Bik and consultants hired by QCM, have systematically **reviewed the documents and confirmed the allegations**, pointing out that Cassava and Dr. Wang could have easily disputed the claims simply releasing the originals of the images in question (for the record: they haven't)[30][31].

I guess they weren't talking enough, and she is parsing words.... Maybe she wasn't paid to statistically analyze blots (how could you?) but she was sure as hell paid to find fault with them. Just like initially she said she was not paid "by any pharmaceutical company or any person" which she then updated to "any pharmaceutical company or any *specific* person." Parsing words to mislead your reader does not fit into morality and ethics.



CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779327

BURNS_00000679

All this FUD was released in reaction to the stock spiking to 67 the prior day, when presumably someone leaked that the Journal of Neuroscience found no issues with the multiple immunoblots we sent them (and which were cited to have been fraudulent by Elisabeth Bik; let's call her the bitch monkey). The FUDsters slammed the price back down to 58 with all these threats about the upcoming reveal. But once people saw the desperation and idiocy of these FUD pieces the next day, they realized for the most part, that they are making shit up, as opposed to their claim that Hoau-Yan's 20 years of work is "completely made up" and "total fraud" among other libelous labels.

November 4

Traveling to the Investigators Meeting in Atlanta. Today, Thursday, also the Diwali holiday of triumph of lightness over dark, we released our press release simultaneous with market open, that the Journal of Neuorscience found no evidence of manipulation of Western blot images. They provided a statement that we used in our press release:

*"The Journal of Neuroscience follows COPE [Committee on Publication Ethics] guidelines and takes any claims of misconduct very seriously. In response to allegations of data manipulation in JNeurosci 2012;32:9773-9784 the Journal requested raw data, including images of original, uncropped Western blots. The Journal determined that there was one duplicated panel in Figure 8 and a Corrigendum was requested and will be printed. No evidence of data manipulation was found for Western blot data."*

The stock price shot up, as shorts covered (most notably QCM, but I'll get to that) to over 90. Trading was halted for a time. Our supporters were jubilant, relieved. They have been fighting a tough battle against this well-funded FUD. Not surprisingly though, the PubPeer (let's call them PubSmear) comments increased, even from the Bitch Monkey herself. Because I was traveling to the Investigator Meeting for our first Phase 3 clinical trial (PTI-125-07), this message landed in my inbox while at the airport. With airport wifi, I could not access the platform itself, so I forwarded it to Hoau to ask him to check if it was anything new about the JNS article (as we had addressed everything mentioned either on PubSmear or in the Citizen's Petition, but maybe there was one more blot left out?). He responded that it was the same old request and added "I get a visceral response to these PubPeer messages." No shit. For me though, it is more intense with the Research Square comments. An earlier version of my manuscript that I am trying to get published was put onto Research Square when I accidentally checked a box to say I was willing to have the paper online ahead of publication. Never did I imagine that meant during review. This is something I had never heard of or thought possible. But a week or so later, here come the first few comments, all very encouraging and interested. Now though, it is a platform for attack, disguised as scientific query. I have responded to many, but am hyper vigilant. And yes, each time I get a Research Square new comment email in my inbox, I have a mild panic response.

The Investigators Meeting was fantastic. First in-person meeting for investigators in two years. (AAIC was also in person, but for most, this was the first large gathering.) Such enthusiasm, engaging questions. Excellent raters, investigators and site coordinators all showing up. And great finally to meet our Premier Research colleagues who we have spent hours zooming with since May when we selected this CRO. When I arrived at the hotel, I had an email from Hoau with another immunoblot uncropped

31

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779328

BURNS_00000680

image – Figure 5a, the NR1 immunoblot. Apparently this was in the original diatribe, but we had missed it, providing only blots for Figures 1A, 1B, 6A, 6B, 9, 11 and 12, in addition to the immunohistochemistry image correction for Figure 8B. So I rush it off to Maria Picciotto "proactively" explaining that it was in a new PubSmear request. The Tweeters FUDers were hounding her, me, Hoau to provide the images on PubSmear. Are you joking? For real? Are you delusional? **Redacted - Privileged** **Redacted - Privileged** Now, hors de question! Back home Saturday evening, and out for a much-needed row Sunday morning. Post-row, I'm walking the dogs on the fossil trail and check my email on my phone. Even greater delusion: the Bitch Monkey has emailed me directly, along with Hoau and all co-authors on this 2012 JNS paper. She introduces herself, name-drops her Stanford training and politely requests that we send her all these original images. Are you for real??!! I truly can't believe this wench. Signs her email "Kind regards." Oh yeah? Kind regards would have been contacting us with questions before you provided a 42-page death blow as "supporting material" to the Citizen's Petition.



Now on the way to CTAD in Boston, which may be at times of den of thieves trying to ask me questions so they can plan further attacks. I will not talk to anyone without first asking who they are and from where. Last night an email hit my inbox from a Marta from Point72 capital, saying she wanted to catch up with me at CTAD. I quickly searched and found this to be a hedge fund, and asked Remi. He said they are a prime suspect. I may accidentally trip her on my rush away. I will have my cell phone ready for fake calls interrupting anyone I don't want to talk to. Security, maybe I need security. Glad I am staying at Gita's and not in the conference hotel. Happy though to see any of the Cassava discord group who may be there, who have put in untold hours fighting all this FUD.

I did see this Marta at my poster; she marched up with a firm handshake and introduced herself, rolling the r of Marta in a Spanish accent. I said I had to meet someone then and ducked out. She said she

32

CASS-CLASS-01779329

BURNS_00000681

would come back and wanted to know all about how I found the filamin A target. Doesn't sound as if she wants to know what the drug does, but how to scoop us.

Wednesday, Nov 10, JNS published the correction of the erroneous image (the new one looks better for us, so clearly the mistake wasn't done to mislead), along with (interestingly) three of the immunoblots we sent: Figures 6A/B and 9A. But the FUDfussers were not satisfied. They claimed that these original blots were indeed manipulated. They just won't stop no matter what we do. Paid noisemakers they are. Harrassing Dr. Marina Picciotto, Editor in Chief of JNS.

Thursday, Nov 11, Jim and I met with Paul Aisen over the lunch break. No lunch was eaten. "Speaking for the Journal," he whipped out his laptop and pulled up the WB image. He explained that they used an independent consultant who has experience in WB, albeit using different (digital) imaging methods. He said he thought the last email exchange, where I sent comments from the WB expert Charles Spruck, seemed to put the issue to rest, except that their independent reviewer "remains concerned." I took his laptop and showed him that if you zoom in, there is no evidence of a sharp line of cut and paste. He kind of bounced his head side to side as if to say, well, that doesn't necessarily prove it wasn't manipulated. WTF? He then also went on to say that maybe the paper could have been more clear that the images were representative of a whole group (when I reminded him that we sent that whole group, which concurred). Really? As if that needs emphasizing? We did say representative. We went over again the practice of taping a cut film onto an already exposed film wide enough to fit through the scanner, and I explained again how tape left on the larger film could remain from previous taping. He did accept this explanation but said that he thought the journal was just going to be done with this and "not comment." We looked at him and Jim said, "So.... Silence?" We stated that silence was not going to put an end to this, as they will keep coming back, and he then agreed that they could provide a statement something like this: "The journal accepts the explanations of the authors." I hope it is a little more formal. We spoke about the Phase 3 program, the MMSE range, the trial designs, including the use of plasma P-tau181 with the ADX antibody.

When Paul mentioned, "We have spoken about the importance of going to a lab that people know" for biomarker analyses, I was able to segway into the Oskar Hansson debacle. I said that my current theory, "because it has haunted me for a year and a half," was that it was possibly simply uncalibrated pipette instruments. I noted that "up, down 25% doesn't matter for diagnosis, but when you are trying to detect a change and you have this going on at both ends," it could make a dramatic difference. I also noted that this work in Oskar's lab happened at the beginning of the pandemic, with the usual person out sick. I told him that the Simoa crashed, leaving samples to sit for a week and a half while they talked to tech support. I told him that a patient number was entered incorrectly, resulting in no Day 28 value for that patient. I did not go down the list of other issues (like a strip of the total tau assay not working, leaving only singlicate values, or the repeat run in which standards ran high so we were advised to use the prior run with high CVs of those samples, even though standards were matching the very first run but not the run immediately prior.) I did not mention that the IL-6 assay had several CVs over 20% and 5 over 30%, and because there was no additional plate, I was forced to accept the >20% and remove only those >30%. OK, I wasn't forced; I could have demanded that they buy another plate, but it would have been a different lot and no reason to think it would have been better. Without mentioning all this detail, I pulled out the page from the FDA request for information that showed the percent change from baseline in p-tau181 in placebo in Oskar Hansson's lab (red), versus in Hoau's lab (blue). Jim hadn't seen this either and they both wanted to know what the document was. "An addendum to the CSR for the FDA.

33

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779330

BURNS_00000682

Because they asked." I said that I saw in Oskar's presentation the repeated lumbar punctures in a few short weeks and analysis on P-tau181, total tau, Abeta42 and NfL. In his talk, he emphasized that P-tau181 was quite stable, in contrast to the other three. "And this is the one that is supposed to be stable," I said, showing Paul this:



He looked at it closely. I think he got it. I said, "He did this experiment because of my data, but then I never heard from him." I added that after Hoau had completed the first 5 biomarkers on the remaining or backup CSF samples, I reached out to tell Oskar, adding, "The data are very different." I told Paul this was early July, yet Oskar's response was this: "Here in Sweden we have quite a long summer vacation. Can it wait until Shorena is back?" I told Paul I had said 'Sure.' "But then I never heard from him." Hopefully…. Paul gets it now. I finished with telling Paul that nothing good will come of disclosing that it was Oskar's lab who did our first analysis of this Phase 2b study. "It hurts him, and it hurts us," I said.

Oskar was there. Featured in at least two talks, one of them a lunchtime panel discussion, which we missed, because this was happening right when we were talking to Paul, one room away. Jim and I caught the last 10-15 minutes of it, and afterwards, we went up to say hello to Henrick Zetterberg, who has been working closely with Hans Frykman, who has just finished validating a plasma P-tau181 assay using the ADX antibody (superior to the Quanterix antibody). He was very pleased that this plasma assay is ready for prime time, that we are using it for the main inclusion criterion in our clinical trials (to confirm Alzheimer's) in lieu of the more expensive and invasive PET scan of amyloid deposits in the brain. As far as we know, this is a first. Other trials are using it to cut down on screen fails from PET scans, but we are the first to be using it alone. Henrick was positively giddy about this, and we thanked him for helping Hans. So then, I waited for someone to finish up talking to Oskar, just to the left of Henrick, and moved in: "Nothing has changed. There is a long line to talk to you." He acted like there was never anything unusual between us. "I saw your slide with the repeat lumbar punctures close together." Oskar droned on about biological fluctuation, and even differences in levels morning to night, which he claimed to have looked at but didn't show. That's the variation in your lab's conduct of the ELISA assays, dork. But this is his out. High fluctuation day to day, morning to night. Yeah, right.

But it just shows you how much reputation matters. Oskar can do no wrong because he has dozens of high-profile publications and has been groomed as the younger golden boy of the Swedish mafia. Hoau-

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779331

BURNS_00000683

Yan, a Taiwanese immigrant at a less than top-tier university (City University of New York School of Medicine), just doesn't get the same pass. Hoau is used to all his papers being scrutinized and questioned, when the same data with an MGH label would be whisked through unquestioned. Never mind that Hoau was the scientist who identified alpha7 as an ultra-high-affinity binding site (the only so far) of soluble Abeta42. He said it took years to publish, because no one believed him. He followed this seminal 2000 paper with a 2003 JBC paper that demonstrated that this tight binding interaction of soluble amyloid results in hyperphosphorylation (i.e., adorning with too many phosphate groups) of tau protein via activation of kinases ERK1 and JNK. These two papers were absolutely ground-breaking. Subsequently, every pharma company had an alpha7 program, until they gave up on it years later for being a difficult drug target. It is not a receptor that can just be shut down with an antagonist, because you need it for acetylcholine neurotransmission, i.e. for thinking and memory. So companies tried to develop "partial agonists" – compounds that bind kind of loosely but manage to displace something else, in this case Abeta42, while still slightly activating the receptor (that's the agonist part). But that was problematic because any weak interaction is never going to interfere with a femtomolar interaction. Almost nothing in biology is femtomolar. Picomolar ($10^{-12}$), nanomolar ($10^{-9}$), yes, but when does $10^{-15}$ ever happen? This femtomolar, aka ultra-high-affinity interaction -- picture an intensely strong magnet on steel -- is the big reason it is so difficult to remove soluble Abeta42 from the brain with an antibody, which will almost never bind its target as tightly. Companies also tried what's called an allosteric modulator. This is a drug that binds the receptor at a different site from the ligand (Abeta42) to induce a change in the receptor such that it no longer binds said ligand yet would still be available to bind the desirable acetylcholine neurotransmitter. Also difficult, and, as it turns out, usually toxic.

Nov 15, 2021

Tears at this ongoing war. Why? Why so much hatred and personal targeting? Is it truly just to make a buck? Remi tells me the WSJ guy is spinning his story, finding an angle for views. Don't we get any say? We get a limited say. How did it go from balanced to not? Welcome to the internet. Can't the SEC hurry up? I can't take it anymore. Fuck it, really.

I forgot to mention here, that after waiting week after week to hear the outcome of CUNY's investigation, I hear on Nov 12, the final day of CTAD, that CUNY spent 3 months deciding WHETHER to investigate and that they had come to the conclusion that an investigation is warranted. WTF?! Really? So pissed. And this after two burly security guys ceremoniously took his computer in early September. They, like the journals, are waiting for others to speak first. Nadav said that Hoau should sue CUNY for this inaction, allowing his reputation to be continued to be harmed.

This morning I got the following email:

35

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779332

BURNS_00000684

**Suspicious figures in your Neuroscience 2005 paper**

To: Lindsay Burns; Hoau-yan Wang <hywang@med.cuny.edu>
Cc: Weerd-Wilson, Donna (ELS-AMS) <D.Weerd-Wilson@elsevier.com>

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Drs. Wang and Burns,

Thanks very much for your responses. Please be advised that we have requested information from Professor Watson on the research that CUNY appears to be conducting. In the mean time, we decided to publish an expression of concern until a conclusion arises from this investigation. This is the text of the note:

**Expression of concern**
**Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor–G protein coupling and Gβγ signaling**
H.-Y.Wang, E.Friedman, M.C. Olmstead, L.H.Burns
Neuroscience Volume 135, Issue 1, 2005, Pages 247-261. https://doi.org/10.1016/j.neuroscience.2005.06.003

The Editor in Chief would like to note an expression of concern related to the above-mentioned publication, arising from the apparent duplication and insertion of spurious bands in Western blots that raise concerns about the data in the article. Upon request to the authors, no evidence has so far been submitted to the journal to confirm that these bands are authentic, instead the author informed us that this and other issues are currently under investigation by the academic authorities at the City University of New York (CUNY). The Editor in Chief and Publisher await the outcome of that investigation before taking further action.

I hope you understand that we must keep our readers informed of any vicissitudes that may arise from the data published in the Journal.

Best regards,

Juan

Prof. Juan Lerma
Editor-in-Chief of Neuroscience, the IBRO Journal
EMBO Member

Note that "fraudulent" had been changed to "suspicious." I called him. I told him that the duplicated image (the full image) was an error and no one found it. "I wasn't editor back then." I told him that we don't think we have files for this 16-year-old paper. We also discussed that it was common practice to put bands from different gels together in one image 15 years ago. He said, "Yes, but when you do that, you are supposed to say that you are doing that." He agreed to wait until we can respond before publishing anything. I later spoke to Hoau by zoom (yeah, I know, we're not really supposed to be talking). There were no rules back then. Rules about stating merging of separate gels were much more recent. I asked Hoau to find examples of such rules and when they were implemented so we can include these in our response. Even better if he can find the correct image, but I don't know if he can. I asked how he is doing. I think he was happy just to talk to me and hear general other updates, but he said (once again), "I feel alone." Me too. You find out who your friends are. Some stay away. Just like the sites who have stayed away or dragged their feet, and the UCLA glioblastoma clinician who was ready to sign the CDA in September and then went silent, until last week after JNS cleared us. But these assholes don't stop, as long as they continue to be paid by the hedge funds.

Nov. 16

In Hoau's search for the 2005 paper images, he realized that the full duplicate image error was not in that paper. It was in the 2008 PLoS One paper. So I immediately called Juan back, editor in chief of Neuroscience and told him I thought it was that error we were talking about and that in fact there are NO duplicate images or bands in the 2005 paper. We did talk again about the merging of lanes from different gels, which was common practice back then. I said that with these low-resolution images, it is impossible to tell truly whether they are the same, but even I can see differences in these low-res images. We both concurred that without the original images, you can't prove anything. He did say that another, later paper of Hoau's was directed to him with allegations, and when he saw the original image, he said he could see they were different. "Elizabeth Bik was wrong," he said flatly. So he gets it, but we

36

need to provide what we can. There will be no "statement of concern" or at least as originally proposed (and now tweeted the world over by malicious FUDers).

While talking to Juan, flashed into my inbox an email from Sophie Morgan, editor at Nature Communications. And, Remi tried to call me to tell me that the DOJ wanted all emails with the JNS editor, which I promptly sent. So back to Nature Communications, and..... the paper "has now been seen by 5 referees..... Considering their advice, I regret to inform you that we cannot publish your manuscript in Nature Communications."


Nov 17

I drafted yesterday a reply, not yet sent. When I woke up wide awake at 4:00 a.m., I worked on it some more, reading again and again the reviewer comments. FIVE reviewers. That is a record. Here it is in current draft form:

Dear Dr. Morgan,

This decision was clearly swayed by the 100% false allegations posed against Dr. Wang and Cassava Sciences by short-selling hedge funds and their paid Twitter "scientists," whose libelous tweets continue, despite clearance of any data manipulation by the Journal of Neuroscience two weeks ago and a verbal clearance by JPAD last week. It saddens me to see 2 or 3 of the 5 reviewers and Nature Communications influenced by this damaging vortex. I am copying my coauthors so they can understand this decision and the reviewer comments. As you know, unlike the revision sent to you on August 4th, which was not sent back to reviewers, this revision sent on October 5th complied with every single request of the original 4 reviewers, per your advice. I am now being told that the requested control experiment that proved that simufilam in CSF of treated subjects did not interfere with the biotin readout of the ELISAs (when not all even use biotin) should have been conducted by a new author -- because Dr. Wang has a conflict of interest? I believe that Reviewer 4 is fundamentally biased, and that Reviewer 5 missed that we actually did report exactly as the SAP said we would in the primary outcome on the FAS.

Each reason for rejection in your summary does not fully make sense:

1. the poor clinical trial reporting i.e. the incomplete reporting, -- we have reported everything. What is incomplete? The failed CSF analysis of the first lab? Happy to include it.
2. the disconnect between the pre-specified outcomes and the outcomes reported – we reported the pre-specified outcomes, i.e. change from baseline of the FAS (as well as percent change, a descriptive statistic)
3. and the concerns made in the confidential comments to the editor regarding the study not being powered for efficacy -- the study was powered for efficacy of biomarkers only as evidenced by the very strong statistical significance
4. and that there is no multiplicity testing; -- there is, of the primary 6 biomarkers; see additional comment below
5. the undisclosed conflict in that the external validation experiments were performed in the lab of a co-inventor; -- there is no undisclosed conflict; being listed on patents is not a financial disclosure. We have disclosed the full extent of this conflict.
6. and the lack of adjustment for education when assessing cognition, -- this is not required of a small study like this and does not invalidate this preliminary cognitive result

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779334

BURNS_00000686

Additional details/comments:

1. Dr. Wang is paid by research agreements with us and receives a very modest consultant fee. He has no royalty. We disclosed the full extent of this COI. There is no undisclosed conflict. All IP of patents was assigned to Cassava Sciences, who is developing this drug.

2. We would be happy to provide the triplicate values of all biomarker data (not just the experiment to show no interference of biotin) – but no one asked for these until now. Everyone else measures in duplicate only; triplicate is more rigorous.

3. This "biotin" control experiment cost us the $1500 for the ELISA plate, two days of Dr. Wang's time, and remaining CSF samples of half of the placebo patients. To say that we should have purchased more control CSF and repeated this experiment for all the biomarkers is absurd, especially when one biomarker increases (so this theory does not hold) and a couple of other do not even use biotin.

4. These assays are not available at CROs. The ELISA plates are commercially available, but they cannot be done GLP (and the correct term is CLIA), and no CRO offers them. Obviously, we tried going to another academic lab, and look what that got us -- a failed analysis.

5. We are happy to report the failed CSF Biomarker analysis data if that is desired.

6. We did discuss the expected increase in Abeta42.

7. We have previously demonstrated the restoration of native shape of FLNA in mice and lymphocytes of patients.

8. Did anyone care that a commercial lab – Quanterix Corporation – validated the CSF analysis by showing a treatment effect in PLASMA? Apparently not, as they are still fussing about Dr. Wang doing this work. Why shouldn't he have authorship? And once again, he is STILL blind to treatment. Yet there is a concern about a conflict.

9. This was not a Phase 3 trial. We simply did not collect education data. To claim that education would have influenced the drug effect on biomarkers is nonsense.

10. This small study was in no way powered for cognition. Whether the cognition assessments are deemed exploratory or secondary is irrelevant, but we wanted a preliminary assessment, and these early results using CANTAB concur with the unprecedented results now shown on ADAS-Cog in our open-label extension. To criticize that this Phase 2 proof-of-concept study wasn't powered for efficacy in cognition is inappropriate. If I removed the cognition data, they would ask to see it.

11. Patients were not "arbitrarily removed" from the CANTAB data; low and high cutoffs for baseline scores were applied across groups for the PAL test only, as explained for this sensitivity analysis. Beyond that, noncompliers (by lack of drug in plasma OR >25% noncompliance by pill counts -- a total of 5 subjects) were removed from both tests. Numbers in each group in each analysis were previously reported in the figure legend, but since this figure was requested to be removed, they should have been noted in the text.

12. This study was more than sufficiently powered for the primary efficacy endpoints (6 most important biomarkers), which WERE fully adjusted for multiplicity. Why did they say they were not? Further, a well-respected statistician stated last week at CTAD that groups of biomarkers could be adjusted for multiplicity if they were measuring essentially the same thing. This person would agree that our adjustment across all six primary biomarkers is conservative. We could additionally adjust secondary biomarkers by appropriate groups.

13. We would be happy to remove from the table the post hoc analyses that excluded the 3 subjects with no detectable drug in plasma from the table, which did not make much difference. Biomarker results were analyzed and reported exactly how we said we would in the SAP – using absolute change from baseline on the FAS. The percent change from baseline was DESCRIPTIVE

38

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779335

BURNS_00000687

statistics for easier viewing and comprehension of the treatment effects across the full panel of eleven biomarkers. Why should it be removed? With different scales across the eleven biomarkers, it is impossible to show these effects in one figure otherwise. We could instead show a figure of 11 panels if that is preferred.

14. We disagree that "adjustments have been made" regarding the primary endpoint. Change from baseline analyzed by ANCOVA is an absolutely standard statistical analysis for biomarkers.

15. I believe we addressed that there is no significant dose response in the text. We could provide the NS p values for dose comparisons for each biomarker, if desired.

I ask that you circulate this email to your team, as I truly do not understand this decision.

Best wishes,
Lindsay

Of course not sent. I arrived at work this morning to an inflammatory WSJ article, titled "SEC Investigating Cassava Sciences, Developer of Experimental Alzheimer's Drug." Subtitle: "Cassava, one of best-performing U.S. stocks this year, denies claims that it manipulated research results." Full photos of "the doctors" behind the citizen's petition and "the expert" Biktch. So self-important. Mentioned that they could even get a reward for "whistleblowing." Un-effing real. Yesterday I actually called a Harvard classmate, Amy Dockser Marcus, who I swear I might not have spoken to since Freshman year. She is a reporter for the WSJ, and I called to ask her advice and just to let her know my side of the story, given that it seemed that an inflammatory article was imminent. She spoke highly of Joe Walker but did not know Dave Michaels, the one who was earlier convinced that Cassava=Fraud. I just gave her the high-level background, and her advice was to reach out to Joe just to give him more background even if he was not allowed to quote me. She was certainly sympathetic. Remi said he had talked to them to urge them to middle ground as much as possible. Clearly the piece was the doings of Dave Michaels.

Interestingly but not surprisingly, AF is boasting about knowing who the "whistleblowers", previously anonymous, were. This shows that they were also behind the inflammatory StatNews piece that dropped the day after my talk at AAIC. See FudSlime's tweet:



CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779336

BURNS_00000688

This morning I received another email from the U Cambridge legal person demanding that Trevor and Barbara be taken off our website immediately and threatening legal action. They had already been taken down, but the link he had was still active but not accessible from our website. In a rage, I replied that they were planned to be removed within days (I did not know exact timing and that it already had happened), and I followed that I would like to retract my letter of support for the use of CANTAB in clinical trials of M2M AD. Tit for tat. And then followed with informing him that they had already been removed, once I learned that.

The amazing news today is that Hoau found – found! – the original blot images from the 2005 paper on opioid receptors. Older than Redacted Post hard drive melt. How he found these is beyond me. I immediately forwarded to Dr. Lerma of Neuroscience, whom I had spoken to the previous two mornings. He confirmed receipt and will "study them" when he is able. Phew! But in reaching out again to Maria P. of JNS regarding a 2010 paper, Hoau was told that she "would provide no more public statements." She is being attacked and harassed, even mentioned in the new supplement to the CP that was timed to coordinate with the WSJ article.

My favorite quote in the WSJ article from the Biktch: "The drug might work great!" WTF??! How can she say this if she is so sure the whole house is built on cards?! She must be nervous, and she should be.

Nov 18

Awake early morning, I checked email at 5:00 or so and saw the email from Trevor stating, "We have had a barrage of queries relating to Cassava in the last period and it has been difficult to know what to do- hence we have had to operate via Cambridge Enterprise." They were just trying to hide and not thinking about the effects their removal from the SAB would have on us. Still, feeling abandoned by Trevor, who is somewhere between an old friend and a parent has been hurtful. I just couldn't stop crying. Their emails of today clarified that they had not received my email of Aug 2 (which I forwarded), so thought they hadn't heard from me in a long time. I wrote a very long email to them both, explaining everything. "...in all of this the only thing that has brought me to tears is being abandoned by two of my most ardent supporters, especially with no opportunity to explain the situation (thank you Ciaran)."

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779337
BURNS_00000689





Lindsay Burns
Thu 11/18/2021 10:02 AM
To: Barbara Sahakian
Cc: twr2@hermes.cam.ac.uk

Hi again,

I'm sorry you both were dragged into the vicious attacks on us by people motivated for financial gain. The repugnant and libelous things that are being spread hourly on Twitter are hard to stomach and I'm sorry you were tempted to respond. Jeff Cummings and others chose silence as they know anything they say will be twisted. I have to say that in all of this the only thing that has brought me to tears is being abandoned by two of my most ardent supporters, especially with no opportunity to explain the situation (thank you Ciaran). It is actually too upsetting to me to talk very soon. For Hoau-Yan, it is far worse to have his scientific integrity attacked and left hanging by seemingly never-ending investigations. At its peak, his wife dragged him into the hospital for a week because he was in such bad shape. We thought that CUNY would have finished a couple of weeks ago, but only last week they told us that the had reached a decision that an investigation was warranted (despite being told by Hoau-Yan early on that he needed it done to clear his name).

The background is that a "citizen's petition" normally reserved for already approved drugs or ones up for approval (like adanumab) was filed with the FDA by short-sellers (disclosed as short-sellers two days after the major damage was done). It claimed that our Phase 2 studies should be halted due to "fraudulent" Western blot images. I thought this would have been clear to you as we attached our immediate (overnight) response asserting that we believe the allegations are false. (The "we believe" part, demanded by lawyers, was of course attacked on Twitter). We also forwarded to you blog posts by another person who runs 1000 blots per year explaining the visual artifacts and anomalies of western blots that were being viewed as photoshopped or duplicated. Now we are getting clearance by each journal who has reached out to us and received original uncropped images, including the latest, a 2005 paper on opioid receptor signaling (not even related). Finding these files among backup discs (post hard drive melt), was beyond challenging, and not what Hoau should be spending time on. For the record, short sellers made over $100 million in August alone, and $50 million in a single week recently. They are "naked shorting," meaning borrowing shares that don't exist, closing and borrowing again, to drive down the price – all day long. You'll see this especially on the 15th of each month when options expire (I barely understand any of this).

I'm sorry for my enraged email yesterday, which came the day of a not at all balanced Wall St. Journal article. Believe it or not, they initially had prepared an article saying we were completely fraud. How did they know it is fraud, we asked them? Oh, we asked our "expert." End of story. We told them they needed to reach out to the journals who have the actual evidence of no fraud, and that we are 100% confident they will not find any. Still, the headline was that Cassava is being investigated by the SEC. With full photos of "the doctors" who filed the petition. One of them is involved with Protega, another company in AD. The day earlier, I had received a rejection from Nature Communications, after sending back the manuscript doing absolutely everything that was asked of me, including an unwarranted control experiment to show that the drug in CSF of treated patients does not interfere with the biotin readout of ELISAs (never mind that biotin is not used in all the ELISAs, and Abeta42 goes up). They even got a 5th reviewer, and the reasons for the rejection based on numbers 4 and 5 were frankly head-scratching, clearly colored by the cloud of these false allegations. The revision to Nat Comm took from August 4 to now. In between them and the initial submission to Nat Comm, I had sent it to another journal who sat on it for two months before even sending it for review, which is why I went back to Nat Comm with the revision and control experiment done. I also drafted a response to them yesterday, and I will copy you if I ever send it. Before I send it back again to journal (is it #9?), I will let things clear.

As for PAL, I already discussed this a bit with Jenny some time ago, and more recently with Kenton and Deanna. Many subjects on both ends of the scale, across groups, would make dramatic changes to the middle from baseline to end of study (the only two assessments after the practice test), as if they suddenly figured it out, or simply forgot what they had been doing before. There were a couple of course who didn't really understand and stayed on the nearly all errors end. The fact that I had to do this sensitivity analysis to take them out has been problematic. SWM was totally straightforward. It was especially difficult with small numbers, as we knew we had going in.

Sorry for the long email. Will try to keep you both posted.

Best wishes,
Lindsay

## Nov 20

I pieced together a conspiracy theory that I find credible, even though it would only be part of the story. I'll start at the beginning. In January 2020, Remi and I presented to Lilly at JPM. I remember that meeting especially because when I walked in, I saw Hugh Marsten, who was also a PhD student of Trevor's at the time I was there. I remember him for aristocratically rolling his r's while presenting an article during a lunchtime journal club "…. In the rrrrrodent rrrrat." And for voraciously licking the bottom of his yoghurt cup, resembling the aforementioned animal. Jokes aside, Hugh was always a nice guy and I hadn't seen him since Cambridge. So that was great, and it started the meeting out well. (Incidentally, it was just after this meeting that I received an email from Barbara asking for a letter of support for CANTAB in clinical trials, so I was able to tell her of this small worldness.) I presented to the Lilly team the Phase 2a biomarker data and told them that we would soon be finishing the placebo-controlled Phase 2b study to repeat this biomarker data and, as secondary endpoints, assess cognition. I told them that we would be sending CSF samples to Oskar Hansson. "We know Oskar well," they had said. Oskar has been working with Lilly on the P-tau217 assay; see Lilly press release that summer, coinciding with AAIC:

41

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779338

BURNS_00000690

## Lilly's P-tau217 Blood Test Shows High Accuracy in Diagnosis of Alzheimer's Disease in Data Published in JAMA

July 28, 2020



**New Alzheimer's disease blood test could enable early diagnosis and advance understanding of how disease impacts those living with it**



INDIANAPOLIS, July 28, 2020 /PRNewswire/ — A new study on Lilly's blood test for Alzheimer's disease (AD), P-tau217 (phosphorylated tau at threonine-217), was published today in JAMA. The results showed that P-tau217 distinguished AD from other neurodegenerative diseases significantly better than other blood-based biomarkers or magnetic resonance imaging (MRI). These data will also be presented at the upcoming 2020 Alzheimer's Association International Conference® (AAIC) ®. Eli Lilly and Company (NYSE: LLY) and Avid Radiopharmaceuticals Inc., a wholly owned subsidiary of Lilly, are studying P-tau217 as a biomarker of AD pathology.

The cross-sectional three-cohort study included patients from an Arizona-based neuropathology cohort, the Swedish BioFINDER-2 cohort and a cohort of Colombian autosomal-dominant AD relatives. The study findings showed that P-tau217 accurately identified AD from other neurodegenerative diseases in both an Arizona-based neuropathology cohort and in the Swedish BioFINDER-2 study. In the third Colombian cohort, P-tau217 in mutation carriers' blood was elevated about 20 years before anticipated symptom onset and was associated with memory performance. The collaborative study was led by Oskar Hansson, M.D., Professor of Neurology at Lund University and Consultant Neurologist at Skåne University Hospital, with support from Eric Reiman, M.D., CEO of Banner Research and Executive Director of Banner Alzheimer's Institute, and was co-authored by Shorena Janelidze, Ph.D. and Sebastian Palmqvist, M.D., of Lund University.

This press release and the JAMA paper was released during AAIC. And it was splashed around in the New York Times by Gina Kolata. My Ah-ha moment was both that I remembered that I had TOLD the Lilly people that we were sending samples to Oskar, and that there was no way Oskar would have had access to the NYT without Lilly's help. This is his currency, scientific prestige. We help you, but remember you are working for us. A wink and a nod. How else did we end up with zero correlation in change from baseline between biomarkers in his analysis? This also explains why he was a million miles away from the actual work, never responded once during the analysis, but remained only copied on all emails. When the results came back upside down, I emailed to ask when they could Skype. He was very busy revising a paper and he had a deadline. (What journals give you a deadline? Probably so he could make the issue that would come out during AAIC.) So he deferred. They barely answered questions, leaving the answer that they only used Simoa for NfL for two weeks! That one was easy. He had said they would do a study to see what the natural fluctuations might be by comparing samples taken 3 weeks apart. He apparently did that study, but he never got back to me. When I emailed early July to say that we had completed the first five biomarkers and "the results are very different," when could he talk? And this is when I got the, "Here in Sweden we have quite a long summer vacation. Can it wait until Shorena is back?" response, never hearing back. When I saw Oskar at CTAD, that was the confirmation. He had looked at me as I approached him as if he had no clue who I was. No smile, no eye contact, no questions. No greeting, no nothing. Droned on as if I was just some random post-doc asking a question.

So I think Lilly is behind this, at least partly. It makes sense in that they are the only ones truly threatened by us, who are competing for patients, who refused to write a letter of support for an NIH grant application (having done so in the past), who want to get to market with their expensive antibody before we get there with a cheap pill. They want our trials halted. They want a cloud of controversy to affect its pace, if they can't stop them outright.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779339
BURNS_00000691

But then -- The WSJ article revealed the two "doctors" behind the CP. David Bredt is ex-Lilly, but also, more recently, ex-J&J. Here's his bio from an April 2021 press release when he joined MPM Capital, where he is now:

**David S. Bredt, M.D., Ph.D.**

Before joining MPM, David was Site Head for Johnson & Johnson's R&D Campus in La Jolla, which focuses on Neuroscience, Immunology and Biotechnology and is the original JLABS incubator for emerging healthcare companies. He was Global Head of Neuroscience Discovery at Johnson & Johnson where he had line management responsibility for neuroscience biology, biomarkers, and external innovation activities. His discovery group delivered numerous small and large molecule clinical candidates for Alzheimer's disease, major depression, schizophrenia and epilepsy.

David joined Eli Lilly and Company as Vice President of Integrative Biology in August 2004 and became Vice President of Neuroscience Discovery and Early Development a few years later. As head of neuroscience research at Eli Lilly, David's group was responsible for Discovery through Phase 2 programs in Neurology, Psychiatry, Migraine, and Pain indications. His group prosecuted numerous small and large molecules that entered preclinical and clinical development including galcanezumab / Emgality, which is now approved for preventative treatment of migraine

David graduated *summa cum laude* in Chemistry at Princeton University. He received his M.D. and Ph.D. at Johns Hopkins University School of Medicine, where he trained with Dr. Solomon H. Snyder. After graduation, David was Professor of Physiology at the University of California, San Francisco for ten years. His research on nitric oxide, glutamate receptor signaling, and synaptic plasticity has yielded ~225 papers, which have been cited ~75,000 times in the scientific literature. He served on the Medical Advisory Committee for the Muscular Dystrophy Association, he was an Established Investigator for the American Heart Association, and he was a National Young Investigator for the National Science Foundation

So, a promising career, but nothing emerged from his research on NO. No drugs approved except a CGRP antibody for migraine. And, he was behind the Lilly gamma secretase inhibitor (for AD) that made patients worse. And, "Global Head of Neuroscience Discovery" at J&J….. means he worked closely with Guy Seabrook. Another fuck-head, who dismissed us earlier saying we lacked "differentiation" between other approaches and had not shown "central target engagement," also not true.

Tonight I was looking for Remi, didn't see him at either end of the house. Then I found him outside, sitting in a chair by the table, staring out into space. "There you are," I said. "I couldn't find you."

"I'm just feeling catatonic after the events of the week," he said, truly catatonic. "It's starting to sink in." I think I responded about how incredible and pathetic for someone who has been in drug development to play such a vile game, but here were his next words: "That doesn't bother me. What bothers me a lot is being branded as a criminal in the countries most preeminent journal, the Wall St. Journal. I busted my hump for 30 years. Started four companies and employed thousands of people. Here I am at the end and I get called a criminal in the country's, no the world's, most prominent newspaper. It stings," he said with visible tears in his eyes. For the record, I have never seen Remi cry. He can handle so much. I've seen him shell-shocked for sure. Four times at each of Sharon Hertz's nonsensical rejections of Remoxy. I remember where I was upon learning of each, the first in our home in Palo Alto, [Redacted] But never tears. This is a first. "I know criminals," he continued. "I grew up with criminals. I know what they do. I'm not one. I made a conscious decision not to be one. And here I am near the end [of my career], and this." I recall my own bawling two days earlier, when I checked email and saw Trevor's first response, however reconciliative it was. "I don't care about the Wall St. Journal," I had said. "I don't know why it hurts so much to have these people abandon me." These evil people are trying their hardest

43

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779340
BURNS_00000692

to hit us all in our most sensitive spots. Well we are strong, you MFs. It has been painful, but you do not know with whom they are dealing, you little army of pathetic immoral bastard fuckheads.

I'm so pissed that so many journals are being silent. Time to call Alzheimer's Research and Therapy and demand a response. They all expect us to find and provide 15-year-old files, send them to them, and then they just sit there saying nothing. You can be sure that if they had found anything, they would be busy with retractions. But silence? Back to Paul Aisen's initial verbal response while we were sitting at that corner table in the lunch area in the Park Plaza at CTAD. "I think as the journal, we are going to be done and not comment." "Silence?" we had said incredulous. "You can't just say nothing or they will keep coming back," I had said. "You have to provide some sort of statement." OK, he had said. We will say something like "the journal is satisfied with the explanations of the authors." Even Neuroscience. I spoke to Juan Lerma twice and received email confirmation that he would get back to us after he was in the office and had time "to study them." But it has been a couple of days. Guess he was out.

And the newest request for J Pain. I feel like responding that we will look for and provide files, but I won't turn them over until they promise to provide a statement after their review. These editors are cowards. Bravo for Maria Picciotto for providing a solid public statement. But now she is being harassed.

The J&J and Lilly folks also must realize that we no longer need them. $270 million in the bank gets us more than through these Phase 3 trials. We are like a big pharma competitor now. Once approved, we don't even need them to sell it. Remi's plan, his hope plan, is to sell it for a dollar a day. No big pharma intermediary to collect millions on this. Just get it to the people. And a newer thought: maybe we go to Canada first. Get it approved there, and every American can mail order their prescription from Canada. And Europe. FDA last. Let them come to us.

Nov. 21

I just did a PubMed search on David S. Bredt. The guy wants to be right in Hoau's area. Receptor associated proteins... AND alpha7 nicotinic acetylcholine receptor. He must just be so pissed that Hoau figured it out, *and* we actually have a drug, *and* it is in Phase 3. Hoau, who already is credited with the discovery that soluble Abeta42 binds ultra-tightly to alpha7 and signals through it to hyperphosphorylated tau. This seminal discovery is why anyone in AD pays attention to alpha7. But mostly they don't, because it is difficult to target directly. Bredt can't stand that his Princeton-educated ass didn't get there first. Here's what David S. Butthead has been doing:

Nicotinic acetylcholine receptor redux: Discovery of accessories opens therapeutic vistas.
Matta JA, Gu S, Davini WB, **Bredt DS**.
Science. 2021 Aug 13;373(6556):eabg6539. doi: 10.1126/science.abg6539.
PMID: 34385370    Review.

44

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779341

BURNS_00000693

Targeting receptor complexes: a new dimension in drug discovery.
Rosenbaum MI, Clemmensen LS, **Bredt DS**, Bettler B, Strømgaard K.
Nat Rev Drug Discov. 2020 Dec;19(12):884-901. doi: 10.1038/s41573-020-0086-4. Epub 2020 Nov 11.
PMID: 33177699    Review.


Getting a Handle on Neuropharmacology by Targeting Receptor-Associated Proteins.
Maher MP, Matta JA, Gu S, Seierstad M, **Bredt DS**.
Neuron. 2017 Dec 6;96(5):989-1001. doi: 10.1016/j.neuron.2017.10.001.
PMID: 29216460    Free article.    Review.


NACHO Engages N-Glycosylation ER Chaperone Pathways for α7 Nicotinic Receptor Assembly.
Kweon HJ, Gu S, Witham E, Dhara M, Yu H, Mandon ED, Jawhari A, **Bredt DS**.
Cell Rep. 2020 Aug 11;32(6):108025. doi: 10.1016/j.celrep.2020.108025.
PMID: 32783947    Free article.

Polyamine regulation of ion channel assembly and implications for nicotinic acetylcholine receptor pharmacology.
Dhara M, Matta JA, Lei M, Knowland D, Yu H, Gu S, **Bredt DS**.
Nat Commun. 2020 Jun 3;11(1):2799. doi: 10.1038/s41467-020-16629-3
PMID: 32493979    Free PMC article.


Functional α6β4 acetylcholine receptor expression enables pharmacological testing of nicotinic agonists with analgesic properties.
Knowland D, Gu S, Eckert WA 3rd, Dawe GB, Matta JA, Limberis J, Wickenden AD, Bhattacharya A, **Bredt DS**.
J Clin Invest. 2020 Nov 2;130(11):6158-6170. doi: 10.1172/JCI40311.
PMID: 33074244    Free PMC article.

α7 nicotinic acetylcholine receptor upregulation by anti-apoptotic Bcl-2 proteins.
Dawe GB, Yu H, Gu S, Blackler AN, Matta JA, Siuda ER, Rex EB, **Bredt DS**.
Nat Commun. 2019 Jun 21;10(1):2746. doi: 10.1038/s41467-019-10723-x.
PMID: 31227711    Free PMC article.


Brain α7 Nicotinic Acetylcholine Receptor Assembly Requires NACHO.
Gu S, Matta JA, Lord B, Harrington AW, Sutton SW, Davini WB, **Bredt DS**.
Neuron. 2016 Mar 2;89(5):948-55. doi: 10.1016/j.neuron.2016.01.018. Epub 2016 Feb 11.
PMID: 26875622    Free article.

I just emailed Hoau: "This guy is just pissed that you found the gem in what he thinks is his sandbox. Never mind that you discovered this sandbox in 2000. And he's having a tantrum." And he has quite the ego. In 2005, he writes in the third person in the Johns Hopkins alumni notes:

David Bredt, Med '93, vice president of Integrative Biology for Eli Lilly and Company, has been elected to the Johns Hopkins University Society of Scholars. Bredt is recognized as one of a handful of top molecular neuroscientists in the world. He was a professor at the University of California at San Francisco Medical School before accepting the position at Lilly.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779342
BURNS_00000694

Nov 24

Monday this week I got an email from Paul Aisen's admin:

I am following up to provide Dr. Aisen's statement below. Please let me know if you have any questions.

"The journal publisher has advised the editors that this inquiry should not yet be closed."

I followed up with this: "Dr. Aisen told us differently in person. May I ask what more is the journal publisher waiting for? Are there specific issues that we can further clarify? We have provided everything asked of us, including a statement by an independent true Western blot expert who runs 1000 blots per year. He has told us he is happy to provide a letter of explanation."

Her response:

"Yes, Springer is now requesting the following:
- The original blots provided so far to be annotated to indicate which bands represent which samples/groups;
- Original blots for Figs. 4a and 5c;
- Explanation why the same beta-actin control bands are presented in Fig. 5a and 5c;
- High quality versions of all figures published in the article.

Any additional explanatory material would be helpful."

So, I pulled all 11 attachments from the last email sent to them, the original 3 or 4, and got Hoau to find and send those for the new figures requested. This made for a 25-page powerpoint presentation with blue annotation and arrows and asterixes noting lines where the smaller films were taped to the larger. This took me two days and I sent it late Tuesday night. Hours and hours. Along with the formal letter from Charles Spruck that I requested only that morning. After introducing himself, his letter says this:

"I have been following the Citizen Petition (CP) filed against Cassava Sciences and their Alzheimer's drug Simufilam with great interest. After objectively reviewing the CP, I have concluded that the vast majority of concerns raised regarding the WB data are baseless and demonstrate a general lack of understanding of the technique and data interpretation. Evidence provided as potentially "altered" or "manipulated" data are effects we see routinely in our WB analyses. Below, I provide an explanation of several concens raised in the CP and potentially by JPAD editors regarding WB data in the above mentioned article.

> 1. *Bands have a similar shape or strange ends*: From my analysis, it is obvious that Wang et al. used self-made gels for their WB analysis, which is routine for most academic labs. Self-made gels can lead to bands on the WB displaying "characteristics" that are generally not seen with pre-made gels and might be misconstrued as data manipulation by the untrained eye. For example, self-poured gels can often exhibit irregular spacing between lanes on the WB that is simply a result of the teeth of the comb used to cast the gel not being completely strait when the gel is polymerized. In addition, bands on the WB can often look identicle or have common "characteristics", often at the same ends of the bands, giving the appearance of bands being

46

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779343

BURNS_00000695

reproduced. However, these effects are easily explained if the gel is polymerized next to an air current, such as a fume hood (commonly used since TEMED is an inhalant irritant). The air current can cause the same sides of wells to unevenly lose moisture during polymerization resulting in bands with similar characteristics. Another concern raised in the CP and observed in the JPAD article is a "halo" effect around bands on the WB. You often see this halo effect with stronger bands, such as control proteins. This is a common effect when a WB is exposed to film, since the films used for analysis have a threshold level of exposure that is designed to limit background. Also, stronger signals on the blot can "pull" chemoluminescent reagent into the band resulting in reduced background around the bands. These are very common effects we see in the lab and are in no way evidence of data manipulation.

2*. Potenially altered pT231Tau band in WB in Figure 3A*. This concern pertains to what appears to be a white box around the far right band of the pT231Tau WB in the second panel from top of Figure 3A (see Figure at right). To an untrained eye, this may look like clear evidence of data manipulation. However, we have seen this effect many times before transitioning to digital imaging for our WBs. Most film developers can't process smaller sized films because they frequently get caught up in the rollers of the machine. For exposure of smaller WBs, researchers don't need to use a full size 5 x 7" or 8 x 11" film, so most will cut the larger films into smaller pieces and then tape the smaller unexposed film to a larger already exposed film to run through the processor. This is common practice and is why you see bits of film all over most academic dark rooms. What happens is that most researchers will reuse the same larger exposed film for many smaller WBs and bits of tape can get stuck to the exposed film's surface over time. When an unexposed film is taped on top of an exposed film with bits of tape on it, you often see this boxed underexposed effect in the background likely due to lack of access of the developing fluids. This is likely what happened here. As supporting evidence, in the original WB the white halo is not centered on the band and there is no evidence of a band to its immediate right, as might be expected if the band was copied from another WB.

I hope this clears up some potential issues with the JPAD article WB data. If the editors have any additional questions or would like to discuss these findings in more detail, my contact information is below."

I sent it over and then, because I needed to, I got on the erg at 9:30 at night. Pulling hard (my body needed it), but listening to an Enya playlist (my brain needed Enya).

Of course, after I send all this in, no one responds to say thank you, received. Just crickets. I did forward it all to Ken Santora at NIA, who promptly emailed to say he had received it. I also sent this letter to the editor of Neuroscience, who has been at a conference and then in a 3-day meeting but promises to get to it asap. On Wednesday, I emailed the editor of J Pain and sent the letter also (along with Charles' blog posts) to let them know we would be responding when we could and requesting that they let us know the outcome of their evaluation, preferably in a public statement (rather than silence as in the editor of Alz Res Therapy, who btw, rejected my Phase 2b paper).

Meanwhile, our supporters that I call "the LinkedIn people" keep sending me screenshots of the disgusting FUD tweeted by the hideous 5 or so: Adrian Hellbutt, Jesse Buttskin, Elisabeth Biktch, Hobbes (tweeting as Helios Captial), and of course Adam Fudstain. They also noted that Point72 Capital, Steve Cohen, may have come to CTAD and my poster. I said someone named Marta did, but that because she emailed ahead and I checked, Remi told me they were a prime suspect, so I did not talk to her. When she

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779344

BURNS_00000696

marched up with her firm handshake and introduced herself as Marta... an immunologist and microbiologist, I told her I had to meet someone right then. She said she would come back and wanted to know how we found the FLNA target. F U bitch. Why don't you read the papers of the company you have shorted? Anthony Daher (LinkedIn person #1) noted "Well, well well. Guess who are Marta's best friends on Twitter?" He lists the above 5 and sends screenshots of the 5 above. I responded, "Of course. She does payroll." Apparently prime suspect Point72 Capital was confirmed today.

Nov 26

I keep thinking about the irony that Elisabeth Biktch had a real opportunity to be a whistleblower with uBiome, but instead said, "Internally, we're all like, "What is precision sequencing? We don't even know it and we work in a lab, we're the scientists," and it was sort of an inside joke that even we didn't know what it was. Only Jessica and Zach knew what it was." (This is from Amy Dockser Marcus' interview.)

So she knew something funny was going on, but she just said nothing. And now, she is an outside person, pointing fingers at Western blots, which she clearly doesn't understand, and saying she sees fraud. Really, WTF? And when the real Western blot expert Charles Spruck calls out her accusations as baseless and ignorant, she ignores? And when the editor of JNS says she found "no evidence of data manipulation," the Biktch demands to see the blots herself, first via PubSmear and then by an email to Hoau, me and all the other authors? And when Maria Picciotto does publish three of said Western blots, she says on Twitter, "I'm not sure this is even X-ray film…. Where are the size markers?" WTF again. Its as if she missed her opportunity so she is creating a new one. And worse, at least for her, her whispering to the (a?) hedge funds that uBiome wasn't what it was cracked out to be….. so they could short and profit isn't insider trading? This is why she is so cozy with them. Why they are paying her now to find "concerns" and "new findings," each time with renewed glee. The two immunohistochemistry images of hippocampus that supposedly overlap by a single neuron in the corner. Pure imagination. Finally Neurobiology of Aging also reached out to Hoau, so he is dealing with that too, and they can say publicly that these are not the same single neuron. (Some neurons look alike. Would that even be a joke?)

Dec 1

So much in the last few days it's hard to recall it all. The biggest is that Hellbutt and Buttskin accessed CUNY emails between John Xu and Hoau, including a spreadsheet of data with the Origene antibody. The Twitter Creeps say it was FOIA'ed but FOIA gives the opportunity to redact confidential information. This is a continued leak from CUNY, as with a few prior emails where Hoau's CUNY email is copied, as well as the letter of support Remi wrote for Hoau in the beginning. They hadn't responded to Remi's email asking why this confidential letter had been released, and then come these couple of emails. I believe we filed an injunction against CUNY to make them stop. But the emails that included trade secrets of what SavaDx actually measures were already leaked. Of course we are now onto MS, hoping that will be the penultimate platform, but it's out there. No more secrets. Ben is beyond distraught, saying things like, "I'm 72. I don't know how much longer I will live." (I don't know if I want to spend the rest of my life on this.) It is really so infuriating that we sit here and keep taking punches. I just don't understand why we have to wait for the investigations to conclude before filing a defamation suit.

48

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779345

BURNS_00000697

## Redacted - Privileged

Difficult to file

against CUNY when they hold the cards of clearing Hoau and could easily just drag it out for 2 years if they felt like it. Obviously they don't care about him. Hoau has held up that department for 20 years.

This morning I sent more original blots to Journal of Pain. Here was the PubSmear complaint that spurred the inquiry:



Tally M. Largent-Milnes, Wenhong Guo, Hoau-Yan Wang, Lindsay H. Burns, and Todd W. Vanderah. Oxycodone Plus Ultra-Low-Dose Naltrexone Attenuates Neuropathic Pain and Associated μ-Opioid Receptor--Gs Coupling. J Pain. 2008 Aug; 9(8): 700–713.

Figure 1.

Increasing the contrast on this western blot shows the detail in the background. The blots have linear cuts and appear to be assembled from multiple source blots. The intensity of background signal under some bands is different from those they are being directly compared to which could alter the interpretation of the bands. Key artifacts are indicated by red arrows.

The original images clearly show no cut and paste, and that this visual effect happens only when contrast enhancement is extreme, i.e. -40% for the pale areas that then disappear. Unbelievable that Hoau actually has all these files still, this one 13 years old, so really 14 when the work was done.

When I spoke to Hoau yesterday, I started listing off the history of David Bredt. **Hoau said, "I know him well."** Remi had guessed that it was something personal, but Hoau was at J&J so much earlier that Bredt. I asked, "Wait. You *know* him? *Personally*?" "Well, not personally, but yes I know him well." Bredt was one of the two most outspoken critics of Hoau's initial finding that Abeta42 binds the alpha7 receptor with femtomolar affinity (along with Ron Lucas). Surprising, yes. But Bredt *vocally* insisted that Hoau's data were impossible. Couldn't be true. Hoau said, "I was not holding a gun to anyone's head saying you must believe my data. I was just showing my data." Apparently, there was an exchange in person at the SFN conference ahead of Hoau's publication, so probably 1999. Amazing that Hoau even remembered this guy, but I think there were continued exchanges over those years at subsequent conferences. It took 8 years for someone else to bother to test this and replicate Hoau's findings (Hoau says an Italian guy at Columbia, and by then, in 2003, Hoau had also published that this high-affinity interaction activates ERK and JNK1 to hyperphosphorylated tau. Now to 2012. Hoau said, "Do you remember when we presented to Janssen in 2012?" It took me a while, and it was this that jogged my memory: "They had a code word for us – Project Longhorn." It all came flooding back, and interestingly, the Project Longhorn label and the visuals of the Janssen building had been floating around, unmoored, in my brain recently. Like when

49

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779346

BURNS_00000698

images are there but kind of not processed or interrogated. And why these images so frequently recently? My God, yes! Hoau continued: "Bredt was in the meeting, but he was the only person who dialed in by phone." Wow, I remember that too now. We all thought it a bit strange, as he didn't have a real reason for not showing up in person, i.e. he was not traveling. And I vaguely remember Hoau saying that he knew this guy, but he hadn't told us he was an outspoken critic. Bredt had two opportunities to partner with us, but clearly he never was going to, just by his animosity and skepticism. He would instead quietly hope for us to fail. And by now, loudly hope for us to fail.

I opened an email from Lewis Robinson, the retired MT neurologist who was friends with my mother. He emails this: "I looked Bredt up. Naturally a slimeball like that went to Princeton. Worse, he worked for Solomon Snyder, who screwed Candace Pert out of proper credit for her discovery of the opiate receptor — https://en.wikipedia.org/wiki/Candace_Pert . Snyder will never get a Nobel because of this, according to a classmate who is a retired hematology prof at JH."

Candace Pert was my hero in college. I loved her mind-body writing. The thought that neurotransmitters and neuropeptides were working not just in the brain but also in the body to influence body mood or body mind. And finding that endogenous opioid receptor. I almost had forgotten about her – how could I?

When Remi arrived home, he said, "Did you see the disaster du jour?" "What now?" I said. "One of the journal editors has prepared a Statement of Concern." It's all over Twitter, he tells me. "Oh that? That's old." (Is that all you got for me?) I tell him it was a draft statement and then he didn't print it and replied that he has since received the images from the authors and that the authors have "the right to have their allegations heard." But old and inaccurate news regurgitated to cause new harm. The stock dropped below 50 today, down 8% or something. I emailed Juan (the editor) to ask "Have you had a chance to review the images we sent on Nov. 17?"

Dec 2

Today I brought the dogs to the office again. First tried to call Neuroscience Editor in Chief Juan Lerma (again) and was told he was traveling, in Madrid today. I think he truly is busy, but I do wonder about feet dragging. Then I got on a zoom with Jim and a PI who wanted to hear from Cassava about the allegations. I had sent over an email with links to Charles Spruck's two blog posts and his bio and attached his letter he wrote for JPAD (or really, for the Springer personnel who supposedly requested the additional information, i.e. the annotated blots). I also reiterated that although many editors were still reviewing original images (or may be dragging their feet), no evidence of data manipulation had been found. A couple of instances of human error, and that's it. I then briefly summarized what we know about David Bredt (excluding the 1999-2012 part discovered later). All as background. Dr. Nash immediately replied that he was looking forward to doing the study, but it was clear that it was his CEO's call. Hence the zoom this morning. I think it was fine and Jim was well spoken as always, but they did not commit on the call (though Dr. Nash might as well have, from his reaction). They need time to review the materials (Charles' blog posts and letter). So then, I don't know what possessed me, but I checked out Twitter (I think I was looking for something in particular), and saw this:

50

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779347

BURNS_00000699



So now I am wondering if Springer did in fact ask to "keep the inquiry open" and that maybe it wasn't Paul Aisen simply being political. If their queen found problems, they must be real. Hopefully that are closely reading Charles' blog posts (but those were sent to them on Oct. 25) and his letter of Nov. 23. Hopefully they see her inexperience in interpreting Western blot appearances. Hopefully they are saying, "Oh shit. We made a mistake. She is not perfect." But somehow, I doubt it. When I was talking to Juan Lerma, he said he had seen some other images (not sure for what), and "Elizabeth Bik was wrong!" Said almost incredulously. All these journals dragging their feet, finding additional things to request, dragging things out – it is a case of The Emperor's New Clothes. No one wants to say Elizabeth Bik was wrong. I'd love to go onto Twitter and ask her, "What happens when you make a mistake? Do you apologize? How about dozens of mistakes, what then?" She has not commented on the blog posts of Charles Spruck that clearly call out her "findings" as inexperience with Western blotting. Silence from the Biktch. And after Maria published three of our original blots, Biktch commented, "I'm not sure that is even X-ray film." What the hell else do you think it is? Just because it is cut to fit the gel it's not film? And it's not a Western blot if he doesn't run lane markers? Whom are you kidding?

Seeing this SpringerNature award for "Sense in Science" to Bik may have been the tipping point for me. I was in the office with the dogs (more and more these days I am bringing in the dogs) and so I took them out to the trail behind the building. I was so freaking angry, with tears. Fuming, ready to explode. Up ahead on the trail, a mountain biker, whom I let safely bike up and over the hill. And safely far from earshot, I had to scream. A loud angry bloody murder scream. I won't say it felt good because I was so angry. Had to reassure the dogs. Then of course some more mountain bikers emerged from a trail below a few minutes later. Long enough I hope. Stayed back from them too. Came back in and found Ben, who had shown up. Talked to him for a while, said I was done. Done being out of the loop, done not being able to speak up or fight back. Done not being able to talk to any media or social media. Done being pummeled and having my reputation dragged through the mud. For how much longer? Nadav walked in and so I exploded at him with all these things, before rushing off with dogs to Quarry Lake and then swim. Of course I soon after wondered what my brain looked like on fMRI during this uncontrolled outburst and rapid recounting. Brain on fire.

So I hear tonight, that the confidential data and emails were just handed over by CUNY in a New York state FOIA request. No consulting or opportunity for redaction. Just handing it out like candy. And quickly. Usually these requests take time **Redacted - Privileged**

51

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779348

BURNS_00000700

# Redacted - Privileged

Dec 4

I'm sort of infrequent on Facebook, but I went on tonight and saw this "memory," uncannily popping up. Did Facebook scan my computer and find "Global Head of Neuroscience" here in this log or perhaps in my email to Dr. Nash? Some things are too weird.



**10 years ago**

**Lindsay Burns Barbier**
November 30, 2011 ·

On file with two big patents moments ago not coincidentally the day before we meet with bigwigs of a Big Pharma. 3 of us and 12 of them with titles that include things like "Global Head of..." and "Global Strategic..." Exciting, finally.

Gita Manaktala, Alison Townley and 5 others          6 Comments

This was in reference to the meeting with Janssen at their facility close to Princeton. It was me, Ben, Nadav and Hoau, who drove down from Philly. Hoau had remembered this meeting as 2012. Evidently it was December 1, 2011. Yes, a year after we moved to Austin. And "Global Head of..." refers to none other than Bredt. Seared into my memory was this title and the odd spelling/sound of his name. Everyone else was there in person with business cards, but I wrote down Bredt's name. I'm pretty sure he was involved in some of the meetings in 2017 too (Hoau was not; he would remember if he had been).

Dec 7

Juan Lerma, thank you!! But still, you are killing me. He is ready to publish an editorial note that says the following:

"In response to allegations of data manipulation in an article published in Neuroscience Vol 135, Issue 1, 2005, Pages 247-261, and following COPE (Committee on Publication Ethics) guidelines, the journal asked the authors for images of the original, uncropped Western blots from this study. After careful examination of these original material, Neuroscience found no evidence of manipulation of the Western blot data or other figures of this publication. For transparency, the illustrations containing the uncropped Western blot images used for the assembly of these figures that were subjected to scrutiny can be found below. Any subsequent information arising from the institutional investigation will be considered once available."

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779349
BURNS_00000701

Yet, when told we would have to do a press release and would he like to review it first, he replied that he doesn't want us to release this news before he publishes it, but that he would consult with his legal guy. Are you kidding? This is absolutely material. How long until you publish? Of course we don't want to ruffle feathers, so once again, we sit tight and take the punches.

And just now, I received this email from Hoau:

"I finally heard from ART and the publisher said what I provided was insufficient so that they want to retract the paper. Sorry for the bad news."

WTF? Here is their email to Hoau:

Dear Prof Wang,

I am following up about our investigation into your article entitled Increased Aβ42-α7-like nicotinic acetylcholine receptor complex level in lymphocytes is associated with apolipoprotein E4-driven Alzheimer's disease pathogenesis in *Alzheimer's Research and Therapy*. Thank you for your responses to the concerns raised.

After careful consideration, the journal has taken the decision to retract the article in line with COPE guidelines. Our investigation has concluded that **explanation provided for the inconsistencies in the Western blots were insufficient** and therefore confidence in the integrity of the data presented in article is compromised.

In line with our protocols for retracting articles, we will be publishing a Retraction Notice which will be bi-directionally linked to your article. The proposed wording can be found below:

**Retraction for:** 10.1186/s13195-017-0280-8

The Editors-in-Chief have retracted this article. Following publication, concerns have been raised regarding the western blot images presented in Figs. 1, 5 and 6. The authors have provided the raw data, which have been assessed by independent experts and deemed insufficient to address the concerns. The Editors-in-Chief therefore no longer have confidence in the integrity of the data in this article.

--------

We would appreciate it if each author could individually respond in writing with whether they agree or disagree with the retraction and the retraction wording. Individual agreement will be logged in the retraction notice, but please note that while we give dissenting authors space to explain why they dissent, those reasons would not be included in the notice. Given that all the emails from Servier were returned as undeliverable, please confirm current contact information for all your co-authors on this paper so we may contact each of them for a response.

Hoau responded with this:

53

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779350

BURNS_00000702

My co-authors and I do not agree to retract this paper because there is no data manipulation in this paper as evidence by the files we sent you.

Per COPE guidelines, retraction would require " clear evidence that the findings are unreliable, either as a result of major error e.g., miscalculation or experimental error), or as a result of fabrication (eg, of data) or falsification (eg, image maipulation)".

_____

I got a call from Ben and finally called him back. Apparently Endpoints News has selected Bik as one of 20 scientists who have impacted Biotech. From the article:

"As of the middle of last year, Bik said that her research has led to 172 retractions and more than 300 errata and corrections, according to a Nature profile. Those successes have made Bik avowed enemies along the way, most recently a slew of Twitter trolls backing Austin-based Alzheimer's biotech Cassava Sciences.

In August, on the heels of an FDA petition letter from two scientists accusing the company of manipulating Western blot images from early-stage clinical trials of lead drug simufilam, Bik published a blog post largely confirming the writers' findings based on her analysis of Cassava's published science. Bik, an active presence on Twitter, soon become the target of increasingly virulent and misogynistic attacks on the platform for her findings, with detractors calling her a paid shill for investors shorting the company's stock. Bik has maintained she has no monetary interest in Cassava.

The episode has highlighted a particular challenge for female scientists active on social media, Bik said. Where a bold, male truth-teller in the life sciences might be treated with accolades for directly calling out fraudulent research, women are instead treated with less respect and more questions. Instead of applause, Bik's skills are relegated to little more than guesswork. That response, she said, has a dampening effect not only on her own work but the work of other female researchers too concerned about their livelihood — and perhaps wellbeing — to speak out publicly about wrongdoing.

"It does keep me up at night," she said. "Those threats are disturbing and threatening to me, but I'm not going to change what I do. I'm going to stand behind the things I say and the things I find."

_____

I can't believe it. Bredt is hard at work. This is so the pot calling the kettle black. Twitter trolls? She is one of them and has two abominable people working for her. Buttkin and Hellbutt. Misogynist investors? Really? What about the misogynist writing of AF in the Statnews article to crash out stock? Calling me out as "married to the CEO." As if I have no other qualifications. And this is why Springer is having such a hard time with our original images. It is full-on The Emperor's New Clothes. And she may have no monetary interest in Cassava, but someone is paying her to "find" things.

Dec 8

The Twitter creeps sent a letter to our division head at FDA:

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779351

BURNS_00000703

**Full Letter & Report to FDA (23 page PDF)**

To:

Eric Bastings, M.D.
Director
Division of Neurology I (DN I)
Food and Drug Administration
Center for Drug Evaluation and Research
6901-B Ammendale Road
Beltsville, MD 20705-1266

Dear Dr Bastings:

We are writing to express grave concerns regarding Cassava Sciences as a sponsor of clinical studies using Simufilam to treat Alzheimer's disease (AD). These concerns arise from an assessment of virtually every aspect of their program that has been made available for public scrutiny. We find serious deficiencies in the scientific integrity of the sponsor, Cassava Sciences, who exhibits

[ 24 pages of crap in between]

Ultimately, only the conduct of a full, thorough investigation of the data, investigators, sponsor, and collaborators can provide reassurance. We, therefore, request that an immediate clinical hold be placed on the entire clinical program of Cassava Sciences. Furthermore, we strongly believe that the conduct of the company and its program application be reviewed by the FDA's Application Integrity Policy Committee (AIP-C) and proper action taken.

Cassava Sciences, through persistent obfuscation and exaggeration of the effects of Simufilam, have exposed study participants to incalculable risk with unknown consequences for their health and misled investigators and patients into choices that affect their wellbeing. This presents a clear and ongoing harm to the public and considering that an investigation process may be lengthy, and patients are currently being administered with Simufilam, immediate action is warranted.

Sincerely,

Enea Milioris, PhD

Adrian Heilbut, PhD

Jesse Brodkin, PhD

Patrick Markey, PhD

Dec 10

Two days ago, also on Dec. 8, Bredt and his grad school buddy filed their FOURTH supplement to the CP. This one was mostly based on a typo in our NBA paper stating that [C14]-PTI-125 had a specific activity of 57.7 Ci/mmol, when it should have been mCi/mmol. So pages droned on about how this was impossible, and hence, the binding affinity curve that the labeled drug generated was untrue, and hence, Simufilam does not bind FLNA. Of course they know this is a typo, but it was done so that unknowing readers would panic. Or so that the short sellers would have more time to cover. There was more drivel, related to the emails between John Xu and Hoau or Zhe.

_____

55

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779352

BURNS_00000704

After two days of careful drafting, Hoau sent a formal response first to Behavioral Pharmacology showing that a blot image from the 2005 Neuroscience paper was not copied and pasted into this 2007 paper with Cella Olmstead. These bands were so different that "any third grader could tell," said Hoau. It was pretty ridiculous. That one was not hard.

Second, he sent a response to Alzheimer's Research & Therapy, to the Rebecca Pearce who asked for a retraction but who obviously didn't even bother to examine the 10 high-resolution TIFF files of original blot images. She simply didn't like his explanation (it was "insufficient," as mentioned above). He sent the following:

December 9, 2021

Douglas Galasko, PhD, and Philip Scheltens, PhD

Editors-in-Chief

Alzheimer's Research & Therapy

RE: Concerns on Wang et al. (2017) Increased $A\beta_{42}$-$\alpha$7-like nicotinic acetylcholine receptor complex level in lymphocytes is associated with apolipoprotein E4-driven Alzheimer's disease pathogenesis *Alzheimer's Research & Therapy* 9:54.

Dear Drs. Glasko and Scheltens,

This letter is in response to publisher Rebecca Pearce asking for a retraction due to allegations around my publication in Alzheimer's Research and Therapy (MS ID AZRT-D-17-00036/ DOI 10.1186/s13195-017-0280-8). With this letter response I explain why the allegations are false.

I previously emailed 10 attachments of original uncropped blots; none show evidence of image manipulation. Ms. Pearce stated in her email that the reasons for retraction are "in line with COPE guidelines." I respectfully disagree. The stated reason for retraction is: "*Our investigation has concluded that explanation provided for the inconsistencies in the Western blots were insufficient and therefore confidence in the integrity of the data presented in article is compromised.*" It appears that yes, the explanations in my letter were examined, but the original blots provided in the other 10 attachments were not examined during the investigation. Critically, COPE guidelines for retraction require "**clear evidence** [*emphasis added*] that the findings are unreliable, either as a result of major error (eg, miscalculation or experimental error), or as a result of fabrication (eg, of data) or falsification (eg, image manipulation)." These basic elements of retraction are lacking in the proposed retraction. And in fact, the high-resolution TIFF image files of the original uncropped blots sent in 10 separate attachments provide clear evidence of an **absence** of manipulation.

I provide below more detailed explanations to show the allegations are flawed.

**First,** it is alleged that by creating the right mix of contrast and/or darkness to the entire image, one protein band, or set of bands, has a very slightly different background. This artificial creation may *invent* image manipulation, but it does not provide evidence of existing image manipulation. As is apparent in the original whole blots, background inconsistencies are not created unless and until extreme high contrast (+ 100%) and darkness (- 48%) settings are applied. Applying such extreme settings do not inform that the allegations are true. Further, the continuity of the surrounding background of the protein bands in each original blot image show evidence that these protein band are not, and cannot be, transplanted from a different source. A fair and reasonable investigation cannot i) invent evidence and then use the invention as evidence of the very allegation under investigation and ii) ignore evidence showing that the allegation is flawed. There is no manipulation of the protein band or blot.

56

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779353
BURNS_00000705

**Second**, a practiced Western blot researcher knows that image background can vary slightly for many reasons, including use of hand-poured gels; condition of x-ray film; streaks produced by the film processor; wrinkles and folds of the plastic wrap that cover the membrane to prevent drying from influencing the background (and uneven drying of the membrane); air bubbles; trace amounts of chemiluminescent reagents; patches intrinsic to the nitrocellulose membranes; scotch tape or other markings remaining on the underlying, previously exposed film to which the smaller film, cut to fit the size of the gel, is taped so that it more easily fits through the processor, and so on. The latter is a practice of many academic labs conducting high volumes of Western blots and using x-ray film rather than digital imaging. (Digital imaging does avoid many of these visual artifacts, which is one reason, along with cost of film, that labs have been transitioning to digital imaging for immunoblotting.) Any one or a combination of these things can influence an image background on x-ray film and result in a minor visual imprint. None of these things are evidence of data manipulation. There is both an absence of evidence for the allegations and evidence that the allegations are flawed.

**Third**, I urge you to consider the profit motive. Starting in August 2021, my entire academic research career was suddenly subjected to intense public scrutiny when Wall St investors and their collaborators started to relentlessly attack my reputation and scientific integrity, often with outlandish claims of data manipulation that are published on social media for maximum effect.

The back story is that for over a decade, I have led research collaborations with a small innovation company called Cassava Sciences (www.CassavaSciences.com). Cassava is in Phase 3 clinical development with a novel drug candidate to treat Alzheimer's disease. My lab conducted much of the basic research underlying the Company's drug candidate (no royalties or milestones are owed me or CUNY, my institution). By smearing my scientific integrity, Wall St investors and their collaborators intentionally cause a decline in Cassava's stock price, at great financial profit to themselves. My vocal critics on PubPeer have either admitted a profit motive or have not come clean on this topic. The profit motive may explain the intense barrage of allegations, false rumors, ethnic slurs, social media slams and other unethical behavior I have endured since August 2021. I would suggest a common profit motive – rather than legitimate scientific inquiry – ties together the various allegations.

**Finally**, I should also mention that the editors of *Journal of Neuroscience* (Marina Picciotto, PhD) and *Neuroscience* (Prof. Juan Lerma, PhD) both recently cleared me of allegations of data manipulation following a thorough examination of raw data in three papers. For all three papers, the editors-in-chief found "*no evidence of data manipulation.*" I believe those false allegations were instigated by the same sources that triggered the current allegations in *Neurobiology of Aging*.

An independent expert on Western blots, Dr. Charles Spruck, has examined and refuted the allegations of manipulation of our Western blot images across many papers. (He is not paid by Cassava Sciences, CUNY or any author). Dr. Spruck is a molecular biologist whose academic lab runs ~1,000 Western blots each year. Dr. Spruck has agreed to speak with journal editors, but he wants to remain anonymous on social media sites. Here are his blog posts:

https://ad-science.org/2021/10/21/notes-from-a-molecular-biologist/
https://ad-science.org/2021/10/21/of-shorts-and-blots/

Here is Dr. Spruck's bio:
https://www.sbpdiscovery.org/our-scientists/charles-spruck-phd

I believe this letter response shows by a preponderance of evidence that the allegations concerning *Alzheimer's Research & Therapy* 9: 54 are meritless and have serious flaws. There is no evidence of data manipulation. The original uncropped blots provide clear evidence of an **absence** of manipulation. For these reasons, I believe there is no basis for a retraction.

Thank you for your time and the opportunity to respond.

57

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779354

BURNS_00000706

Sincerely yours,

Hoau-Yan Wang

That was the most advanced draft. We earlier worked on a letter to Neurobiology of Aging, our 2017 paper. It is final now but going out Monday morning. Hopefully we are now done with the BS. Oh, but did I mention that I have a zoom call with Jim on Monday with a PI and CEO of a trial site – they want to hear about the allegations and are not sure they want to participate. (Sounds like a repeat of Dr. Nash; hopefully they get it as quickly as he did.) Her response to Chris from Premier was this:

"Thank you for your email and I appreciate you sending me the information pertaining to the data manipulation. I am available on Monday at 1:00 to discuss further. Please know we are very excited about this trial, however only want to ensure appropriate provisions are in place to avoid this situation from occurring again." – What?! The data manipulation? After we just sent links to Charles' blog posts and said that three papers have been cleared by editors-in-chief? Do you read or just stick to your beliefs? I had to respond with this:

Dear Jessica,

I look forward to talking with you. To be clear, these are allegations only. There is no data manipulation, and editors who have examined high-resolutions images have found no evidence of any data manipulation.

Kind regards,
Lindsay

I guess Mike Sitrick is right. Unless you say what your conclusions are clearly, people don't read it. I looked back at Chris's email and although it does say the editors found "no evidence of data manipulation," when he mentioned the blog posts of the independent Western blot expert, we should have said he "refuted these allegations." Upfront. She's not going to read it. Period.

Dec 14

Over the weekend, the Twitter Creeps claimed that mentioning one set of initials on a sample tube to confirm the patient ID number was a HIPAA violation and that everything will shut down because of it. Further, they claimed to know the full patient name (impossible, as this does not leave the site) and to have called them. Total BS. I cannot even keep up with the crap they are spewing daily, and promising "a fresh batch of emails" from CUNY. Presumably, CUNY will have heeded our strongly worded letter and have stopped.

Yesterday I did have a zoom call with this Jessica Branning, site coordinator from the Maitland, FL site. They apparently were a site for Athira and understandably are gun-shy or wanting to know what to say to their staff and patients who read the allegations about us. She listened carefully to the David Bredt history and how we responded to the false allegations immediately (unlike Athira, because theirs weren't false) and that we were cleared by the JNS editor. She understood and said about Bred, "I don't like that guy."

58

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779355

BURNS_00000707

Last night I received this from the discord group, a message from Seeking Alpha reporter Joe Springer:



Very accurate. I have not mentioned this history to too many people, so I believe he got it independently (and hopefully has confirmed that Bredt was fired, as we suspected). The only detail left out is that not only has Hoau-Yan beat Bredt to the finish line (well the almost finish line) in solving the a7nAChR pathway, he discovered it. And Bredt argued loudly against this data, but then jumped on board, sucked us for information along the way, most notably in 2017, then continued to publish and patent in this area, thinking he could get there without us. And now he's pissed. As I emailed to Hoau on Nov 21, along with a pubmed link to Bredt's recent publications, "This guy is just pissed that you found the gem in what he thinks is his sandbox. Never mind that you discovered this sandbox in 2000. And he's having a tantrum."

Good news yesterday is that Dr. Imran Khan of Moorehouse School of Medicine filed a Citizen's Petition with FDA asking for immediate approval (this is the second) and laying out the case. Incidentally, Imran Khan is the person who reported that the site coordinator answering phones at the Tom's River site had bad-mouthed us, saying "I wouldn't put my mother in that trial..... Cassava is shady..... Who does an open-label trial anyway?" This of course was denied when we inquired.

---

Forgot to add that the investor discord group also sent yesterday, Dec. 13, a letter to Weill Medical School, John's Hopkins and the NY medical licensure complaining about the unethical behavior of Bret and Pitt. Here's the first part of the letter, which is followed by a summary of Simufilam data:

"I am conveying my concerns regarding Dr. Geoffrey Pitt and Dr. David S. Bredt. They are attempting to endanger the lives of Alzheimer's patients for financial gain. As a physician sworn to the Hippocratic Oath, I do not bring these allegations lightly, and I will provide ample evidence to validate my claims. In addition, the above actions reflect poorly on your institution/board and directly contradict what the public reasonably expects from physicians. Most egregious of all, if Dr. Bredt and Dr. Pitt are successful, their efforts will cause material patient harm.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779356

BURNS_00000708

In August, Dr. Bredt and Dr. Pitt anonymously submitted a Citizen's Petition via Jordan Thomas, JD. The said Citizen's Petition's stated intention was to halt further clinical trials by Cassava Sciences to protect patients.

Cassava sciences, a publicly-traded company in the stock market, is currently testing Simufilam in phase three trials.  Thus far, results from human trials are spectacular.  To be clear, there has never been a trial in the US with better phase two data for Alzheimer's disease. However, Dr. Pitt and Dr. Bredt insist that further research must be halted for "patient safety."  In over a hundred pages of complaints, both physicians failed to point to a single significant adverse event. Cassava Sciences has administered over 149,000 doses over 18 months with no safety issues, yet the authors of the Citizen's Petition have filed four separate supplements to the FDA to halt trials for "patient safety." Thus far, the FDA has allowed two new trials on Simufilam to initiate, so it is unmistakable that the FDA has correctly dismissed Dr. Bredt's and Dr. Pitt's complaints.

As it is certain Dr. Bredt and Dr. Pitt are not interested in protecting patients, what is their motive?  Jordan Thomas disclosed that both physicians would financially benefit if Cassava Sciences stock drops. As expected, after the citizen petition was leaked to the public, the stock dropped by 50%. One article calculated over a hundred million in profits because of the stock price decreases.  Since then, a Wall Street Journal article revealed the authors of the citizen's petition to be Dr. Bredt and Dr. Pitt.

Below, I elaborate on the problem Cassava Sciences is attempting to solve further strengthening my claims that Simufilam is safe and it must continue further testing.
1. There is an overwhelming and urgent need ("An Unmet Medical Need")
2. Simufilam has consistently reported an excellent safety and tolerability profile.
3. The cognitive data, by my judgment, is a treatment effect, not a placebo.

I cannot restate the importance of Cassava Sciences continuing research. Allowing credentialed individuals to represent the physician community/ NY Medical Licensure/ Cornell University/ American Board of Internal Medicine/ Johns Hopkins School of Medicine poorly reflects your prestigious institutions." [Letter goes on to elaborate points 1, 2 and 3 above.]


Dec 15

Today is the expirations of options day, so the shorts were at it with 70% volume going through dark pools (visualize some sort of Golum creature). Meaning naked shorting. The unnaked shorting is 30%. They drove the price down to $42 before some covered to push the price back up at the end of the day. And to help drive down the price, this guy Leonid Schneider (not to be confused with Lon, but that's probably why the shorts like him), blogged this piece "Cassava Fraud and Alzheimer's Capitalism:"

"The travesty around **Cassava Sciences** and their alleged miracle drug for Alzheimer's, Simufilam, waits to be dramatised for screen or stage, a real-life parody on US stock-market capitalism.
It's better than **Theranos** even. Apparently even more criminal.
What obviously happened here is that a gang of crooks was that bold to shamelessly fabricate the preclinical lab data and the clinical trial results, engaging some unbelievably crooked academic and trial site partners-in-crime, that the stock-market and the most respected authorities, NIH,
FDA and a learned society, swallowed it hook, like and sinker. And they are reluctant to let go.
For investors, Cassava became a religion of financial deliverance: a miracle Alzheimer's drug, out of nowhere. The more outrageous Cassava lies of clinical success became, the higher its stock rose. And rose, and rose, the company was last valued at $5 Billion. Nobody wondered, huh, all these results are way to good to be true and make scientifically zero sense. Until some inquisitive scientists decided to play the stock market as well.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779357

BURNS_00000709

Rotten Cassava (image source: IITA)

This is probably the world premiere of data integrity sleuths seeking to earn money with manipulating the stock market by exposing research fraud. At least two sets of them are now short-trading Cassava stocks, betting on the stock value to drop as they reveal lies and fabrications this company submitted in scientific journals and FDA. Others are piling on.

Maybe it is a way forward to deal with research fraud in biotech. Or maybe not. Cassava is indeed too fake, their owner **Remi Barbier**, his wife **Lindsay Burns**, and their partners like Professor **Hoau-Yan Wang**, are all just too cartoonishly crooked and scientifically illiterate to be anywhere near credible as characters in a screenplay about the abysses of biotech entrepreneurship. And yet there are still hordes of investors fanatically defending Cassava, also they and their nasty online harassment of critics would really stretch credibility in a movie dramatisation. Real life however is much stranger and more riveting than any fiction. It all started in August 2021 with a "Citizen's Petition" by the law firm **Labaton Sucharow** to the FDA, which FDA published on its website, and which I covered extensively in my earlier article."

It then drones on with links to crap.


Then, a hilarious Reddit post from a supporter, for comic relief. I just have to not look at any of this stuff, but "the LinkedIn people," i.e. Anthony Daher, who is the only one with my cell number, texts me what he thinks is important. Or important S@$%t.

Dec 16

Juan Lerma, where are you? Did they pay you to be slow? Doubt it, but your 10 days are up. Just wish you'd publish this Editorial Note.  A few days ago I called Valentina Corio of Springer to ask how the investigation was going (that started on Oct. 9!). She emailed back with this:

Dear Dr Burns,

My apologies for not taking your call yesterday, but I was in a meeting.

Anyway, I'd like to inform you that our investigations are still ongoing and I can't share any details with the authors and with any third parties, as long as the investigations have not been completed.

We thank you again for all the information and supplementary material that you have provided during this time. We do not have additional questions or request. We also thank you for your promptness in responding to our requests.

However, the provided material is still under analysis. It will be my care to contact you with the outcome of our investigations, as soon as it's possible.

Best regards,

Valentina


Still waiting on J Pain, Alzheimer's Research and Therapy, NBA (at least they're responsive), Behavioral Pharmacology (the Cella Olmstead paper).

Just heard this "quick note" from J Pain editor Mark Jensen:

61

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779358
BURNS_00000710

"Just a quick note to let you know that the chair of the committee that is reviewing this issue regarding your article confirmed that they are not able to meet until after the holidays. So it might be closer to the end of January 2022 before we are able to make a determination. I know it would be ideal to have this resolved as soon as possible, so I apologize for the delay. I'll keep you informed of our progress."

Jesus Christ. Everyone is waiting for everyone else to speak first.

Here now more defamation by Adrian Hell-butt, commenting on the fact that I commented on an interview with a neurologist by Joe Springer, mostly praising Simufilam. All I said was "Great discussion with Dr. Boyer! Thanks to both of you!" Last time on LinkedIn posting anything was…. September?



**Adrian H** @Adrian_H · 8 m
Imagine what it must be like to be
@lindsaybbar, the CSO of a scientific fraud
like $SAVA, knowing the charade is about
to come crashing down & the last 15 years of
your work is fake, & going on LinkedIn every
day to comment on stock promotion videos
put out by "Tendies Club"



December 17, 2021

What the hell? After intense harassment and pressure, Marina Picciotto walks back her statement that she found "no evidence of image manipulation" with this NEW expression of concern:

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779359
BURNS_00000711

The Journal of Neuroscience, 6, 2021 • 00(00):000 • 1

# Expression of Concern

**Expression of Concern: Wang et al., "Dissociating β-Amyloid from α7 Nicotinic Acetylcholine Receptor by a Novel Therapeutic Agent, S 24795, Normalizes α7 Nicotinic Acetylcholine and NMDA Receptor Function in Alzheimer's Disease Brain"**

*JNeurosci is publishing an Expression of Concern for the article, "Dissociating β-Amyloid from α7 Nicotinic Acetylcholine Receptor by a Novel Therapeutic Agent, S 24795, Normalizes α7 Nicotinic Acetylcholine and NMDA Receptor Function in Alzheimer's Disease Brain," by Hoau-Yan Wang, Andres Stucky, Jingling Liu, Changming Shen, Caryn Trocme-Thibierge, and Philippe Morain, which appeared on pages 10961–10973 of the September 2, 2009 issue. The editors have been made aware of concerns about Western blots in this study. These and other concerns are currently under investigation by the academic authorities at the City University of New York (CUNY). JNeurosci will await the outcome of that investigation before taking further action.*

DOI: 10.1523/JNEUROSCI.2387-21.2021

What changed? What new evidence does she have? Who has put her up to this? Is it just because she is being harassed? What the hell – I cannot stand it.

I took ☐ **Redacted** ☐ then to Red Bud with the dogs. I'm tired of being crushed, kicked, and not being able to speak up for myself. No emails, don't respond. Everyone is waiting for CUNY. I want to get this thing in on Monday. Then, to distract myself, I thought, maybe there will be news of the p-tau sample run today at Neurocode. They are two hours earlier. So I check my email. What greets me instead? Two new PubSmear requests. It is Bik and one other posting the "Expression of Concern." WTF. I scrolled back to the earlier smears on this paper, and they are 1) complaints about listing the alpha7 antibody catalog number along with an alpha1 antibody number (in error). So we should correct this, well, this typo. 2) Bik again saying where are the "edges" of the blot and where are the MW markers? If you run alpha7 enough times, you don't need a MW marker to identify it. And yes, the edges are right at the edge of the gel because the film was cut to fit the gel. Any more questions? Oh yes, the line at the very edge (reflecting the edge of the cut film on top of the full-size, previously exposed film), and a hint of a shadow that is also some remnant marking on the underlying previously exposed film. No evidence of cut and paste, but they will fuss about anything they can see. So why didn't Dr. Picciotto reach out to us with these questions instead of or at least before publishing this "Expression of concern"? It feels again like being abandoned by a supporter, or someone I thought gets it that these accusations are total BS.

Dec 18

The shitsters are taking a victory lap, high-fiving each other on Twitter about what a multi-level fraud we are and how it is all going to fall like dominoes. They are absolutely gleeful. Yesterday I cycled through the rage (preparing then deleting an email to Marina Picciotto complete with Charles Spruck's letter and blog posts and Juan Lerma's Editorial note... and finally settled on calling her Yale office and rattling through a quick summary of Bredt's professional jealousy/criticism dating to 1999, to his publishing in our area since 2017 after passing on a partnership opportunity, to leaving J&J for a VC firm which then may have fired him the month the petition was filed, to the funding of this spinoff by said VC firm on the day of the third supplement to the petition and the WSJ article. Oh, and please call me, here's my cell phone). After the rage and high-anxiety stress came the abyss, the tears. How many times can I be kicked, trampled on, smeared? ┆ **Redacted - Privileged**

**Redacted - Privileged**

63

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779360

BURNS_00000712

# Redacted - Privileged

And in addition to the usual Twitter Creeps, we now hear again from this shithead who joined Lon Schneider and George Perry in the July Statnews hit piece. Hey Rob. You can apologize now, or when the drug is approved. Your choice.



Here's the original email from Marina Picciotto regarding Hoau's 2010 paper (that she cleared but did not want to provide a public statement for). Now she has issued an Expression of Concern for that one too.



Dec 21

The good news is that last night at 6:50 we received an email from Juan Lerma that the editorial note had published. Amazingly or not, by the time I received this word, I already had two PubSmear requests from Bik with more accusations, each time more desperate. The first was that she believes the blot that

64

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779361
BURNS_00000713

is "very similar, not identical" is very similar. Well yeah, but not identical. We can argue forever and it comes down to opinion. Second, she claims once again:

> "None of these blots look like the expected uncropped X-ray films; there are no marker lanes or labels, or edges of the blot visible. Yet, the article state the blots were exposed to X-ray films. How could the authors then provide scans of blots?
>
> Even more concerning, the blots provided in this Editorial Note appear to show very similar background patterns, albeit shown at different resolutions. How can the authors explain that?"

She thinks that all blots should be developed on a full sheet of X-ray film instead of being cut to fit the gels. She further believes that the MW lane should show up on the film. Even if the film overlaps, it won't show unless the antibodies are binding non-specifically. They are titrated to minimize background. And her second "more concerning" is just so pathetic. So what if there are extremely subtle, marginally perceptible patterns in the background (when the bands themselves are clearly different)? That just shows that the nitrocellulose membrane, which is sold on a roll, has repeating irregularities. Charles Spruck said: "We have seen similar spotting patterns in the background of blots, sometimes very pronounced. Don't know the exact reason but my guess would be a problem with the nitrocellulose membrane and not being able to block all charges. We usually just order another roll when it occurs." Charles also updated his letter to be generic to editors and to address these common problems, including making background breaks pop out by using extreme contrast and darkness settings. He noted that there is also a gray halo around the lettering when these settings are applied, and none of the accusers address that.

This morning we released a press release noting that Dr. Lerma found "no evidence of data manipulation in Western blots or any of the figures for this publication." Trading halted for half an hour, then instantly shot up to 50 before the naked shorting and dark pools forced it down to close at $43. So much hatred, so much energy. And the pelting with more PubSmear emails began anew. Yet another suspected overlapping IHC image in the ICH figure of the NBA paper. And why are there subtle candy wrapper ends in the publication for the 2005 Neuroscience paper that are contrasted away when manipulated. Well, because of image manipulation, that's why.

Dec 30

When Juan published his editorial note and we issued a press release, I posted on FB, venting a bit. Due to one discord member having friended me, this post got out to Twitter. Not my intent. Joe Springer picked up on it and amplified it. Bik had a hissy fit and accused me of making a "veiled death threat."

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779362
BURNS_00000714



I think it is **deeply disturbing** that for someone who prides herself on science integrity, she will not disclose her financial conflicts of interest, i.e. who is paying her to try to find fault with all Cassava and Wang papers, however unrelated. She doesn't work for free, yet she won't disclose who is donating into her Patreon account.

And the person who wrote the comment to the CP tweets this:



We now have an official complaint filed with the NY state medical licensure board about Geoffrey Pitt. Calling him "morally unfit" to practice medicine. Written by Matt Nachtraub and very well written. Below is the conclusion of this letter:

> The totality of Dr. Pitt's actions show a pattern of moral unfitness and dishonesty. It is inconceivable that Dr. Pitt is unaware of the great potential harm by delaying or halting

66

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779363
BURNS_00000715

Simufilam's trial given the otherwise hopeless state of current therapies for AD. Dr. Pitt's willingness to not only enable such harm but to actively seek it through deception and use of repugnant personal attacks on largely irrelevant victims to profit from an undisclosed short bet is an immoral act that betrays a fundamental lack of concern for public health. This behavior would be grounds for professional misconduct regardless of the target of attack. However, for a doctor to do this with the target being such a desperately needed and promising therapeutic makes the act particularly appalling to one so likely to need the treatment when I succumb to the disease.

Paragraph 20 of Article 131-A § 6530 defines professional misconduct as "Conduct in the practice of medicine which evidences moral unfitness to practice medicine." If 16 https://www.regulations.gov/document/FDA-2021-P-0930-0161 17 https://www.globenewswire.com/news-release/2021/11/17/2336493/0/en/Protego-Biopharma-Raises-51- Million-Series-A-Financing-to-Advance-the-Treatment-of-Protein-Misfolding-Diseases.html. 18 https://patents.google.com/patent/US20200362013A1/en?oq=US20200362013A1 seeking to trade the unnecessary continued suffering from an untreatable fatal wasting disease through dishonesty and repugnant personal attacks for pecuniary gain is not evidence of "moral unfitness" to practice medicine, it hard to imagine what is.

Paragraph 21 of Article 131-A § 6530 defines professional misconduct as "Willfully making or filing a false report, or failing to file a report … or inducing another person to do so." Dr. Pitt's CP falsely and misleadingly identified him as a whistleblower rather than a third party with a short position. Moreover, the certification for his filing (signed by the lawyer) misrepresented that it included all known information and failed to include required aspects of financial disclosure. This constitutes each of a filing a false report, failing to file a report (in its failure to include required aspects of the certification), and inducement of another person to do so (as the lawyer both filed the report with false information and signed the certification on behalf of Dr. Pitt's filing). Accordingly, Dr. Pitt's actions constitute multiple forms of Professional Conduct and the laws and rule governing the practice of medicine in the state of New York.

Also a document sent off to the DOJ detailing the short and distort details. Here is the conclusion of that document:

In conclusion, we believe that unethical, illegal, and damaging short and distort tactics have been clearly, and undeniably planned and executed by several bad actors, including but not limited to: Dr. Bredt, Dr. Pitt, and Jordan Thomas of Labaton Sucharow law firm in New York, NY who have individually and collectively clearly misrepresented, defrauded, and slandered SAVA for financial gain. The short and distort tactics, and false claims propagated voraciously on several social media platforms have had an undeniable damaging effect on SAVA and small retail investors. It is irrefutable that the short and distort tactics were used purely for financial gain and to destroy a company that is on the verge of finding a cure for Alzheimer's Disease. There was never any goodwill or humanitarian intent in the short attack. In fact, the bad actors behind the short attack are committing a crime against humanity by attempting to halt a promising cure for Alzheimer's Disease, the sixth leading cause of death in the United States, through false and misleading information simply for financial gain. Mr. Remi Barbier, CEO of SAVA had this to say about the continued short attacks: "Another science journal has cleared us of allegations," said Remi Barbier, President & CEO. "This clearance is from an independent third

67

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779364

BURNS_00000716

party who is neutral and expert in the field. This reinforces my conviction that false and misleading allegations of scientific misconduct being made against us are simply designed to enrich those making them. People who seek to profit from false allegations may not comprehend the harm they are causing the Alzheimer's community, or perhaps they simply don't care. Leaving a trail of destruction in their wake in the quest for profit, with little concern for patients or their caregivers, is a twisted form of money-making and the opposite of what people with dementia deserve."

The false claims and attacks propagated by the CP and other bad actors have been clearly refuted by two separate prestigious academic journals, and yet the bad actors continue their onslaught against SAVA with no fear of any consequences. We encourage, hope, and pray that the U.S. Department of Justice will expediently and judiciously investigate and prosecute to the full extent of the law all bad actors that have participated in short and distort tactics against SAVA and their shareholders.

Jan 1, 2022

Now Adam F is getting upset, saying this:



Adam Feuerstein 🖋 ⬤ @adamfeuerstein · 4h          •••
$SAVA It's sad to watch @JoeSpringer have breakdown in real time. I wish someone close to him would step in and get him the help he clearly needs. For days now, he's posting disturbing YouTube videos filled with deranged nonsense, lies and libelous accusations. Very concerning.

♡ 28          ⊏⊐ 2          ♡ 42          ⬆

Projecting much Adam? Didn't you just publish (publish, not just Tweet!) the following in Statnews, in an article titled "Worst biopharma CEO of 2021? There are too many to choose just one"?

"You have to be completely ignorant about the development of drugs to treat Alzheimer's disease to lend any scientific credence to simufilam, the experimental treatment being developed by Cassava Sciences. But Worst biopharma CEO of 2021? There are too many to choose just one https://www.statnews.com/2021/12/21/worst-biopharma-ceo-2021/ 6 of 8 12/27/2021, 6:11 PM Cassava is the one of this year's top-performing biotech stocks because **CEO Remi Barbier has deliberately — and cynically — chosen to promote simulfilam to Reddit meme traders who are too naive to realize they're being played.**"

Totally made up. Remi has never had a social media account of any sort.

Jan 2

I can still hear my grandfather saying "January second, nineteen five," the day he was born. He would be 116 today.

Redacted

# Redacted

68

CONFIDENTIAL
CONFIDENTIAL

# Redacted

Redacted          It's hard to say

what he might think of all these personal attacks to take down Cassava Sciences for financial gain, but one thing he always said rises in my mind:

> "You're either crooked or honest. There's no such thing as a little bit crooked."

Robert H. Burns always strove for pure honesty and anonymously helped those in need. The total disregard to those in need of an effective Alzheimer's disease treatment and the active impeding of a promising AD drug candidate are high up on the list of moral depravity.

Jan 4

Last night the jury reached a verdict on several of the charges against Elizabeth Holmes. Found guilty on 4 counts of wire fraud, not guilty on 4 and hung jury on the other 3.

And immediately the Twitter creeps tweet this:



And more of the criminal calling us criminals.

Jan 8

I spent yesterday and most of the week reading more about mTOR, assembling what should be figures for a new paper. It was good to dive into something to escape the Twitter crap. The mTOR story is confusing, but quite interesting, and we have some great data showing a drug effect. It was fun to string together the data and figure out the story, and what it might mean. The story is another wide-reaching aspect of mechanism of action of Simufilam. Here's my draft title: Simufilam attenuates heightened mTOR activity and restores its sensitivity to insulin in Alzheimer's disease patient lymphocytes. I would love to send it to Neurobiology of Aging. This editor was pretty reasonable and responsive about the inquiry. But we still haven't heard from him…. Or the others.

My favorite was this email from Springer/JPAD, received Dec. 22 (and still no response):

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779366
BURNS_00000718

Valentina Corio <valentina.corio@springer.com>
Wed 12/22/2021 4:26 AM
To: Lindsay Burns
Cc: Bruno Vellas <vellas.bruno@gmail.com>; Jacques touchon <jtconseil34@gmail.com>; Paul Aisen <paisen@usc.edu>

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and kno

Dear Dr Burns,

Thank you for sharing the updated letter by Dr Spruck and the new press release. We'll be in touch again as soon as our investigations have been completed.

Best wishes,
Valentina Corio

Still waiting and waiting. Remi said, "The journal editors do not exist. Forget about them." Correct. They do not want to stick their necks out. It is a case of The Emperor's New Clothes. No one sees any fraud, but they are afraid to say so. Maybe someone else will speak first. Maybe we can't see it but it's there, or somewhere else. They are so afraid of their own asses being wrong that they would rather contribute to the slow start of Phase 3 clinical trials of a promising AD drug candidate by their silence. Can they not see that? Do they actually care about Alzheimer's disease? Correct – they do not exist.

Jan 10

Hoau tells me today that Rebecca Pearce publisher of Alz Res Ther publisher sent him this email (again):

**From:** Rebecca Pearce <rebecca.pearce@biomedcentral.com>
**Sent:** Tuesday, January 4, 2022 10:16 AM
**To:** PUEYO Maria IRIS; caryn.trocme.thibierge@gmail.com; Isabelle.guignot@servier.com; ebouguen@yahoo.fr; karine.deschet@orange.fr; elisabeth.mocaer@gmail.com; vera_kiyasova@yahoo.fr; ousset.pj@chu-toulouse.fr; vellas.b@chu-toulouse.fr; Hoau-yan Wang
**Subject:** [EXTERNAL] Concerns with publication in Alzheimer's Research & Therapy (MS ID AZRT-D-17-00036/ DOI 10.1186/s13195-017-0280-8)

Wang, HY., Trocmé-Thibierge, C., Stucky, A. *et al.* Increased Aβ42-α7-like nicotinic acetylcholine receptor complex level in lymphocytes is associated with apolipoprotein E4-driven Alzheimer's disease pathogenesis. *Alz Res Therapy* **9**, 54 (2017). https://doi.org/10.1186/s13195-017-0280-8

Dear Prof Wang et al,
After further careful consideration, the journal has taken the decision to retract the article in line with COPE guidelines. Our investigation has concluded that explanation provided for the inconsistencies in the Western blots were insufficient and therefore confidence in the integrity of the data presented in article is compromised.
In line with our protocols for retracting articles, we will be publishing a Retraction Notice which will be bi-directionally linked to your article. The proposed wording can be found below:
**Retraction for:** 10.1186/s13195-017-0280-8
The Editors-in-Chief have retracted this article. Following publication, concerns have been raised regarding the western blot images presented in Figs. 1, 5 and 6. The authors have provided the raw data, which have been assessed by independent experts and deemed insufficient to address the concerns. The Editors-in-Chief therefore no longer have confidence in the integrity of the data in this article.
-------

We would appreciate it if each author could **individually respond** in writing with whether they agree or disagree with the retraction and the retraction wording. Individual agreement will be logged in the

70

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779367

BURNS_00000719

retraction notice, but please note that while we give dissenting authors space to explain why they dissent, those reasons would not be included in the notice. We will include in the notification that Prof Morain has passed.

We look forward to hearing from you by January 14, 2022.
With best wishes,
Rebecca

**Rebecca Pearce**
Publisher

**Springer Nature**
One New York Plaza, Suite 4600, NY, NY 10004-1562
T  + 1 (212) 451-8733

What the hell? He has explained that he is blind and just sent the data to Servier. He cannot reach these Servier people because one of them is dead and the others no longer work there. He sent 10 original blot images, which they claim do not help them. I told him he has to reach out to Bruno Vellas, who is a co-author and explain 1) that he is blind, 2) here are the original blots, 3) he disagrees with the retraction and 4) Bruno will have to say he either agrees or disagrees. Gawd.

Sometimes I think Hoau just lets himself get run over. Here's what he said before he forwarded me the email: "I got a message from Rebecca Pearce who just sent the same email (just change the date she wants to have my agreement) that she intended to retract the Alzheimer's Research & Therapy 2017 paper even though we had sent the letter to the editors (copied her as well). I think it is not fruitful to communicate with her (and the editors) at all. I would just submit the paper somewhere else when I have time. It is what it is unfortunately."

Jan 17

Today was a beautiful row, cold, but glassy mirror water, sun low to the horizon that made it feel, in some of those first moments, as if I were rowing in the sky. A bit like the paddle board on the lake at the ranch when the clouds are reflected in the water. Happy also to have my 5K erg behind me and to have pulled a respectable 20:22, hoping for good luck this 2022. (Just as last year's 20:21 and the year before that 20:20, but you know the story). Frost on the dock, but sun out warming things up.

I get home and Remi hands me his cell phone and says, "This is depressing." I see it is the New Yorker article, which we thought was going to reflect poorly on Jordan Thomas. That thought was just a trap. It was the FUD climax, a full-on hit job on Cassava dressed up as an article about Jordan Thomas. I kept reading and scrolling and saying, "Oh my God.  Oh. My God...." Etc. etc. Redacted to stop. So unreal. Once again, we are frauds, just like Theranos..... the holier than though "whistleblowers" ratted us out. And, as Remi said tonight through his dejection, "It's worse than that. I'm the Bernie Maddoff of science. Genial, with wire-rimmed glasses, just like Maddoff." Fucking incredible. Bredt claims that he only heard about Cassava Sciences in Feb 2021. OK, so maybe this was the first he had heard our new name. Actually, that's impossible too, if he calls himself a neuroscientist.

71

CASS-CLASS-01779368

BURNS_00000720

But if you pretend that's even correct, he would have immediately known who we were, having spent a couple of in-depth meetings with us in 2016 and 2017, and he certainly knows Hoau-Yan from 1999 and the 2011 meeting AT Janssen in Titusville. So he lied right there. Remi left this morning after I handed him his phone back and didn't come back until 5:00. I thought he was in the office, but no. He turned his phone off and wandered. Bik all excited about herself Tweeting away about how she is right. I'd love to run to the media and tell all, but Remi says that's dropping our ammunition. For what and when, I have no idea, nor do I want to know. All I know is the damage, to our trial, to ourselves, our kids. "Working 60 hours a week for 30 years," said Remi. You start to think, forget it, I'm done. Someone else solve Alzheimer's disease. But that's what these assholes want. We have incredible supporters. Hillary Metz gave an awesome interview for Joe Springer on Friday – such a powerful story. Immediately AF is tweeting that it's just an anecdote and the people who are NOT getting better "deserve to be heard too." OK fine. Did aducanumab ever have any similar stories? And hers was the third, since Doug Baker spoke about the two subjects in our open-label trial he knows personally, several days earlier.

Two things got me about the New Yorker article. First, the reporter is the author of Empire of Pain, the story of OxyContin and the Sackler family. Yet— in his article, he says that the failure of Remoxy was another fraud scheme by us and was "too good to be true." Did he not for one second think that the Sackler family might have had something to do with this repeated rejection while OxyContin stays on the market killing 60K people per year (and netting 2-3 billion for Purdue)? The other one that was shocking is that Bredt said that if the drug really does what we say it does it would be worth "five Nobel prizes." Yeah, you shithead. No shit. But you're trying to stop it.

And AF cheering loudly immediately (he must have known):



I thoroughly enjoyed reading this profile of whistleblower attorney Jordan Thomas, especially the sections about $SAVA and CEO Remi Barbier.

Great work by @praddenkeefe



Followed by an acknowledgement of this being a "paid hit job" and more to come:

72

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779369

BURNS_00000721



FlameofUdun @DurinsBane · 3m
Replying to @sing3r @praddenkeefe and @NewYorker
You'll see

FlameofUdun liked your reply

More paid hit jobs on the way and you guys are trading on that information... SMH

Finally, as if "the Great Wang" wasn't racist enough, we have this from Asshole #1:



Adrian H @Adrian_H · Jan 15
Replying to @lawrenceshaw82 @jesse_brodkin and 29 others
I want to see you chopping frozen chicken into 200um slices, chop suey style, like Wang did.

Jan 20

# Redacted - Privileged

73

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779370
BURNS_00000722

# Redacted - Privileged

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779371
BURNS_00000723

# Redacted - Privileged

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779372
BURNS_00000724

I forwarded Hoau's email response to her bogus explanation to the same visual artifact in a blot from one of her papers to Colum McDermott. Here's his reply:

Lindsay,

Thanks for the communication with Dr. Wang. I was able to lodge my 37th complaint with the SEC from this. I pointed out that Bik's after hours attack coincided with a short attack to take the share price down. Then the Alexander Tweet which was used to out right slander Dr. Wang with a claim that he had confirmation of attempted manipulation. Also included a video link of Bik admitting who pays her.

Also showed the ties between July 29th AF still involved in the most recent attack supporting Bik's and Alexander's fraudulent manipulation.

Hopefully this is already in the hands of the DOJ, but if it isn't this should bring the SEC back into it if they have dropped the ball. They were buying thousands of Put options the last week knowing they were going to pull another hit job to take out the calls in the same way they wiped out the August call options in one fail swoop.

Have a good weekend.

Colum

Wow – 37 complaints to the SEC by Colum alone, and what are they doing? Just watching, apparently.


Jan 26

Yesterday, just before heading out the door **Redacted** I see a response from Paul Aisen. "Oh my God, oh my God. I'm going to faint," I said. **Redacted** I just could not breath. Here's what happened.

The back and forth with Alz Res Ther has been incredible, and in the end they said they were going to retract and did the authors agree. I was sure they would change their mind after we sent a solid response late December, but no. Hoau reminded them that they needed evidence to retract and that there was no evidence. He also reminded them that he was BLIND to condition (AD, MCI and control) and APOE status. So next they emailed the blots with the Bik signature pink and yellow arrows, pointing at nothing (miniscule specks in the background, far from the bands, which she claims indicates that Hoau copied and pasted bands into a similar background. These are just specks on the nitrocellulose membrane that comes in a roll. Additionally, some of the loading control bands were pasted in backwards from the original blot, a human error that occurred in the dark room and that does not change the data. These arrows as evidence were supplied with no explanation whatsoever. After stating that they now had evidence and were going to retract, asking all authors to agree or disagree, I finally got Chuck Spruck to look at the accusations, which he refuted in a clear and detailed 3-page letter. Just a few days later, they responded:

" We have consulted our independent expert again who has reviewed your rebuttal. The conclusion remains that a retraction is necessary and we will now be taking this forward. I will indicate on the retraction note that you disagree with the retraction. I have thus far **heard from Profs Kiyasova, Pueyo, Deschet, and Bouguen.**"

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779373

BURNS_00000725

So I sent this to Paul Aisen, stating "This is quite incredible. The independent expert is obviously Elisabeth Bik, who is highly conflicted (by who is paying her)." Here's his response:

Hi Lindsay,

Have you provided evidence to the journal that Dr. Bik is paid by the people shorting the stock? How do you know that Dr. Bik is the expert?

At JPAD we consulted an independent expert without conflict, and the expert concluded that the blots had been manipulated and recommended retraction. I found your explanation and supporting documents persuasive, but this was not an easy call.

I know this is a terrible ordeal for you and your colleagues.

Regards,
Paul

So this is what elicited my near syncope. I drove **Redacted**
**Redacted**

Here is Chuck Spruck's response to the Alz Res Ther:

"It is unbelievable that editors would trust Bik over the actual authors and not question her methods and motivations. I suspect that she is proactively contacting the editors of Dr. Wang's publications and then they feel that any rebuttal must go through her."

I emailed Paul back, asking for time to discuss the JPAD "decision" before he takes any action:

"I would like to discuss this matter before you take any action. As you know, COPE guidelines require hard evidence of data manipulation, not something that is a tough call. Further, this needs to be by someone with substantial experience in the old style Western blotting, not someone who has only used digital imaging. Please let me know when you are available. Happy also to discuss what we know about Bik."

His reply:

"I am not taking any action personally. I have expressed my views (in support of your position) to the JPAD publisher and other editors-in-chief."

I emailed him back thanking him, but later emailed this:

Dear Paul,

77

CONFIDENTIAL
CONFIDENTIAL

As you know, any retraction would be more than just a terrible ordeal. It would be career ruining to Dr. Wang, and the brakes to our clinical trials that David Bredt and his gang have been wanting by this ridiculous petition. If someone's career is going to be ended, the journal at least owes him an explanation of their methods of determining that manipulation, the validation of those methods, and a detailed explanation of how they were applied to determine manipulation. They have said nothing but provided yellow and pink arrows applied by Bik. If these editors/publishers truly cared about Alzheimer's disease and a promising potential therapy, they would not go against COPE guidelines to retract, as Alz Res Ther is flagrantly doing. If it's the publisher Rebecca Pearce who is simply relying on Bik and ignoring another expert and the actual authors, I blame the editors for their silence. I am attaching a flowchart of the inquiry process following COPE guidelines, which require **clear** evidence of image manipulation. There is none.

I hope to have some plasma p-tau data from the new assay on some of our open-label trial samples soon, but obviously JPAD and the publisher were not swayed by the totality of blots nor by the replication of simufilam's reduction of plasma p-tau by Quanterix using their kits (nor by the explanation provided). In any case, I will wait for any communication from JPAD before requesting further discussion.

Lindsay

I think he is not being straight with me. I have an email accidentally sent to me by Jacques Touchon early on saying, "Cette Lindsay Burns semble claire." So Bruno? According to Anthony Oliva, Bruno alluded to the allegations against us over lunch and said something to the effect that it takes up everyone's time and turns out to be nothing. Furthermore, I just can't believe that Paul's opinion would be overridden by two other editors. For a retraction, wouldn't they all have to agree? Is Paul playing me trying to get a confession? WTF? He doesn't trust me because he thinks so highly of Oskar. Oskar who is in bed with Lilly, who got him the NYT article saying that plasma p-tau217 is the one and only plasma biomarker that is going to save the day. Lilly, who said chipperly "Oh we know Oskar well." when I told them at a JPM meeting Jan 2020 that we were sending CSF samples to Oskar this time (for our Phase 2b). They knew, and 6 months later Oskar's laudatory NYT article. Oskar, who wouldn't look me in the eye at CTAD last November, looking right through me as if I were a random post doc asking a question when I spoke to him. Paul is a political animal. That's it. He might not trust me, but I sure as hell don't trust him now. I'm not sure I'd even call him a frenemy. Paul, who took my ACTC application out of the pile when I submitted it in August 2019, saying "Oh we thought you were waiting for your Phase 2b data." Paul, who instead signed on with Smoke and Mirrors.

I decided this morning to include the placebo changes from baseline in Oskar's lab vs. Hoau's that is so damning -- the graph I showed Paul at CTAD -- as a supplementary figure in the Phase 2b paper. This is the CUNY vs. Sweden placebo CSF p-tau181 percent change from baseline figure for individual subjects, one jagged red line from Sweden overlayed with a nearly straight blue line from CUNY. Waiting for either CUNY or FDA clearance before I push submit for this paper. No fair review until then.

Jan 27

I am now at the Investigator meeting for the -06 study, Refocus-ALZ. We need to stop saying -06 and -07 and start staying Refocus and Rethink. Rater training this morning and CRA training this afternoon, where I essentially had a practice run of my slides for tomorrow with the PIs. We will also have a Q&A session with some canned true or false questions for the audience, but we will also try to take questions

78

CASS-CLASS-01779375

BURNS_00000727

from the 110 people attending virtually and the 70 in the room. Because I anticipate that someone will ask for comment on the allegations, I came to write a quick precise response:

The allegations are false. We're on record as saying they are false. They are financially motivated by short sellers of our stock who took out a short position and then filed a petition that they knew would tank our stock price. They have funded a targeted media campaign against us. They have never presented any evidence to support the allegations. There are no whistleblowers or witnesses who have stepped up to corroborate these false allegations. The two quotes that I love from the hit pieces against us are someone accusing us of fraud and saying in the next breath, "The drug might work great." How can you say that if you firmly believe the science is all made up? The second is, "If true, it is worth five Nobel Prizes."

Feb 3

Happy to report that the IM went very well, and no one asked for a comment on the allegations. There was palpable excitement and the talks went well. Dr. Nash found me and said hello. I didn't recognize him from our zoom call, and when he showed me his nametag I thanked him for coming. He said, "I'm excited," indicating that it was not his decision to be on hold. Happily, the site emailed Tuesday with their decision to continue activation activities.

"Blot, blot Western baby, got no bands this shit is crazy." Every time I get more emails from more journals I think of this line from the Lady Gaga spook Bad Science. Except I change the words to "Blot, blot Western baby, want more bands, this shit is crazy." While out, Hoau sent all five responses (once again) to PLoS. I spoke to him and he said, "I get to a point..." Ben zoomed with him yesterday to talk about the SavaDx antibodies – looks as if we have a great rabbit monoclonal that sees the 90-Kd in patient plasma.... And it does NOT recognize the recombinant fragment. Go figure. And the antibody does not work in Western blot, but it works by IP, so should work in an ELISA. All good news. But, Ben said Hoau "looked terrible." Apparently he has lost 25 pounds. From where, I thought. He does not have this to lose.

Back to the blots. J Pain said that their reviewers decided that my email response "did not mitigate their concerns." I had apologized that we simply do not have high resolution images still; although we did send whole blot images, these were saved in single files of four or two blots pasted into one TIFF file, losing resolution. So I had to loop in once again Dr. Spruck, who wrote a detailed analysis refuting or explaining the complaints, once again 3 pages. Wow, he has spent some time for us. So I asked that Dr. Jenson, the editor, send this back to the reviewers, as well as to the institutions (CUNY and U Arizona) who are now investigating (because the reviewers were still not satisfied).

Tuesday, Feb 1, we (not sure to whom exactly) heard from CUNY that they seem to be in agreement that there was no misconduct and they accept all explanations of the image anomalies, BUT, they would be "more comfortable" if we could get additional outside experts to weigh in since we now only have had the opinion and expertise of Dr. Spruck. So we have asked Chuck if he has ideas of others who are highly experienced in WB. Overall good news, but whimpy by stalling for time.

Looking forward to hearing the final Editorial Note from Neurobiology of Aging. Their only complaint was a typo in a figure (+ should have been -) and an error in methods that instead of stripping and reprobing blots with an NR1 antibody, levels were measured in a separate blot. We corrected the Ci to mCi typo on specific activity of C14-labelled PTI-125, and there was a 0.1 ug typo that was 0.1 mg of

79

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779376

BURNS_00000728

synaptic membranes. Last I commented on the scale for C14 that was unexpectedly high for this radioisotope (prompting an insane "contest" on Twitter to prove us wrong and countless other slanderous remarks). The machine may not have been correctly calibrated, but importantly, the binding affinity for AD and control tissue was nearly identical whether measured by displacement binding of tritiated naloxone (that binds the same site) or direct binding of [C14]-PTI-125.

The only journal who has cleared us (Hoau) that we haven't yet announced is Molecular Psychiatry. The comment was "The journal has decided not to take editorial action at this time." Afraid to say no evidence of data manipulation? Definitely a case of "The Emperor's New Clothes." Everyone is afraid to say they see nothing. JPAD started their investigation October 9.

Feb 7

Redacted

| Redacted | Redacted - Privileged |
|---|---|

Redacted - Privileged

| Redacted - Privileged | Redacted |
|---|---|

Redacted

80

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779377
BURNS_00000729



CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779378
BURNS_00000730

# Redacted

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779379
BURNS_00000731



CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779380
BURNS_00000732

Redacted

----------------------

So back to the Cassava drama. I have barely kept up and make it a point to avoid the Twitter assholery against us and me personally. Here's one recent one:

84

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779381
BURNS_00000733

**Finding Nemo**
@Nemo_Is_NoOne

Replying to @SusannaSoto and @PatrickMarcas

$SAVA management

1. had the authority to exclude a patient that a site
enrolled .
2. has the ability to key in desired BM/Cog value as
they wished.

Data entry wasn't done at trial sites, Burns keyed data
into the biostatistics system.

What's your next question?

6:39 PM · Feb 16, 2022 · Twitter for iPhone

1 Retweet    2 Likes

And yesterday, a certain Wei Liu, Associate Professor at UT San Antonio, convinced the cleaner to let him into our offices saying that he worked there. Thankfully, the cleaner was suspicious and followed him around. More thankfully, Remi had gone in (on President's Day, when the office was actually closed) and saw. Got his ID and made a police report. So sick of this crap. Oh, and Friday, I learned that our enemies have gone so far as to try to enroll fake patients in our trials to screw things up. (Not sure how that works, but the open label study did not confirm pathology prior to enrollment because CUNY was shut down when we started the study. No way to check first. Given the low fail rate, we decided to check later. But this study closed enrollment end of October.

Yesterday I heard from an old study section friend Ralph Garripa at Memorial Sloan Kettering. I had reached out to him earlier to see if he knew someone at MSK who might be interested in a Phase 1 cancer trial with Simufilam, and he replied late. Here's what I said to him:

Hi Ralph,

Good to hear from you. I was reaching out then because I thought you might have a colleague there who might be interested, though I know your work is far from the clinic. I do have interest at UCLA, a well-known GBM Phase 1 trialist, as well as Wake Forest. But of course new projects are on ice until we get all these attacks and false allegations against us put to bed. It's been insane and both time and emotionally consuming. Responding to dozens of journals asking for original Western blot images for papers often 15 years old and on other topics, co-authored by me or not, has demanded so much time from me and my collaborator Hoau-Yan Wang (at CUNY) that there is little time for other things. I am only now writing up a paper that should have been done last fall on simufilam's effects on mTOR in AD patient lymphocytes. These bad actors even have gone so far as to try to enroll fake patients in our trials to screw things up. Meanwhile, the journals are sitting on their hands until CUNY speaks first.

Here's a brief run-down, without divulging anything non-public. The citizen's petition to stop our Phase 3 trials was filed by David Bredt, who left J&J last April, and his med school buddy, a cardiologist Geoffrey Pitt. The petition and its four supplements (all spouting vile statements about Cassava being a total fraud) were denied a couple of weeks ago by FDA. Bredt and Pitt, and their hedge fund friends, took out massive short positions in Cassava stock prior to filing their petition by "anonymous whistleblowers," then reaping $100 million in the stock price crash in August. They also seem to be supporting a dozen or so Twitter trolls who continue to spew nonsense and slander, if not outright false statements about us,

85

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779382

BURNS_00000734

including me personally. What to know about Bredt: he has been an outspoken critic of Hoau-Yan since 1999 when Hoau first presented his data showing soluble Abeta42 binds the alpha7 nicotinic receptor with ultra-high affinity (and later that this causes hyperphosphorylation of tau). Said it was not possible. Fast forward to 2011. We met with J&J in their offices, including Hoau. Although Bredt was the Head of Global Neuroscience, he was the only one who attended by phone (and was not traveling). We later met with them in 2016 and 2017, answering detailed questions in writing, by phone, and in person at JPM -- before they brushed us off by saying our approach was not "differentiated enough." A quick pubmed search shows that Bredt has published in this same alpha7 area since 2017. He holds a competitive patent with J&J on alpha 9 and 10 nicotinic receptors (close cousins) and funded a J&J spinoff Protega (also addressing protein misfolding in AD) via his most recent employer, a VC firm, coincidentally on the same day as a hit piece on us in the WSJ published and the third supplement to their petition was filed. He apparently was fired from this VC firm in August when he filed the petition.

The good news is that we have an army of supporters who have filed 1) counter petitions to the FDA to ask them to accelerate approval of our drug, 2) a complaint to the medical licensure of NY about Dr. Pitt, 3) a petition to the DOJ, 4) at least 37 petitions to the SEC, and most recently, 5) an open letter to the New Yorker about a recent hit piece. And our Phase 3 clinical trials are ongoing. There has certainly been damage to the speed of start-up by scaring both investigators and patients, but it's hard to quantify. More data soon will also help, from our ongoing open-label study, which also now has a randomized withdrawal after the 12 months of open-label. We are still waiting on CUNY to wrap up their investigation, and then hopefully other things will fall into place including a couple of NIA grants that would have funded in August. I have said no to numerous study sections amidst the chaos. I did serve on ETTN-13 a couple of times, which I find harder than evaluating therapeutics. Sooner or later, I'll be back though.

Best wishes and do stay in touch!
Lindsay


-----------


Feb 23

Bik is now paving the way for dismissing the upcoming conclusion of the CUNY investigation, which they know full well will find nothing. DesBIKable bitch. Just like the FDA petition was not REALLY meant to stop our trials but "to raise awareness." I can't wait to expose all these people.

86

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779383
BURNS_00000735



**FlameofUdun** @DurinssBane · 12h
SSAVA hear it on the discord first,
Westerns mean nothing apparently and
Wang did nothing wrong. Both totally
true statements 😂 forget the fact that
literally all of Simus preclinical work is
western based



♡ 3        ⟳        ♡ 6        ⤴



**Elisabeth Bik** ⬤ @Microbiom... · 11h
Replying to @DurinssBane
Unfortunately, it is very rare that an
institution investigates one of their own
grant-getting professors and concludes
that they did misconduct.
Rather, the institution will conclude
some small mistakes were made, but no
misconduct, and the grants can continue
to roll in
😊

 



**Elisabeth Bik** ⬤ @Microbiom... · 11h
Replying to @DurinssBane and
@PaulKingsley7
Academic misconduct investigations
unfortunately do not follow logic. In
general, fraudsters are good liars, and
will mislead the investigators claiming
blots have been lost in some disaster,
here is the 'original' (but photoshopped)
blot, or all bands look similar.

♡ 2        ⟳ 6        ♡ 37        ⤴



**Elisabeth Bik** ⬤ @Microbiom... · 10h
Many stories about research misconduct
will show it took several tries and years
of perseverance by the whistleblowers to
get a serious investigation started and
for consequences to happen.
See cases of D Stapel, JH Schön, A
Wakefield etc.

♡ 4        ⟳ 2        ♡ 18        ⤴

Show replies



**Paul Kingsley** @PaulKingsley7 · 9h
Replying to @DurinssBane and
@MicrobiomDigest
Of course.

**March 3**

President's Day, Remi went into the office late afternoon. He encountered a Wei Liu, associate professor at UT San Antonio, who got the cleaning person to let him in by telling him he works here. Our cleaning guy was suspicious and followed him, a Chinese – Spanish conversation ensued, which Remi heard. Remi took a photo of his ID and kicked him out. We later had a private detective find him and question him. Claimed he didn't know anything about Cassava Sciences. So why were you in their offices on President's Day? Oh THAT Cassava Sciences. Claimed he was trying to collaborate with us.

Next, on March 1, I receive two nearly identical emails (and Hoau received those and three more) for the PLoS One papers, saying they are retracting. Once again, no clear details of how they think there is data manipulation. Such total BS. Here's the email:

Dear Dr. Wang and colleagues,

I am writing from the PLOS Publication Ethics team in regard to your 2008 PLOS ONE article, "High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor–Gs Coupling Underlying Opioid Tolerance and Dependence" (https://doi.org/10.1371/journal.pone.0001554). Thank you for engaging with us in the discussion of concerns raised about this article.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779384
BURNS_00000736

We have now completed our editorial assessment of this case and decided to retract the above article. This decision was reached in discussion with the PLOS Publication ethics team and senior members of the journal's Editorial team. Together, we carefully considered the concerns raised, comments and data you provided, and the implications of the concerns for the reliability of results reported in the article. PLOS ONE abides by guidance of the Committee on Publication Ethics (COPE) in following up on concerns raised to the journal and addressing issues in the published literature. In this case we consider that retraction is warranted due to concerns about results presented in Figures 1 and 7, as well as concerns about the underlying data provided for this article and four other articles mentioned in the retraction notice copied below.

We plan to notify your institution of this issue and editorial decision, per the journal's standard procedure.

The specific issues that underlie this decision are explained in the retraction notice, which is included below my signature and will be posted on your article at the time of retraction. If you have any comments on the issues raised in the notice, or if you see any inaccuracies in the notice, **please reply with your comments no later than 08 March 2022**.

As discussed in COPE's Retraction Guidelines, the purpose of the public retraction notice is to correct the literature and relay the reasons for the editorial decision. Per PLOS' standards we also include standardized statements in retraction notices to indicate authors' positions with regard to the editorial decision. To inform these statements, we ask that each of you **reply individually by 08 March 2022** with your responses to both of the following questions:

1. Please add your initials next to the phrase that indicates your position with regard to the retraction decision:
• agree with retraction
• disagree with retraction

2. Add your initials next to the relevant phrase(s) if either of the following applies in your case and you would like a corresponding statement added to the public retraction notice:
• stand by the article's findings
• apologize for the issues with the published article

Please note that we will not consider requests for custom text in author position statements. We do not consider retraction notices to be an appropriate forum for discussion of items that go beyond the information readers should be provided around the circumstances and basis for the retraction. If you wish to comment publicly on information relayed in the retraction notice you may do so by posting a public Comment on the article or retraction webpage. Please note that any Comment posted on a PLOS webpage must abide by the Good Practice guidelines outlined at https://journals.plos.org/plosone/s/comments, and must include a Competing Interests statement which in this case should include your authorship of the retracted article.

After the specified reply deadline the notice text will be finalized and we will not consider further responses or queries regarding the retraction. If we do not receive your **reply by 08 March 2022**, or if you do not provide a reply to question 1 by this deadline, we will include a statement in the notice to indicate that you 'did not reply directly or could not be reached'.

If you have questions about this information you may reach me directly by replying to this email. Please reference Case 7282710 in any messages related to this matter.

I realize this will likely be a disappointing outcome and I am sorry I do not have more positive news to relay on this occasion.

88

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779385

BURNS_00000737

Best regards,
Maria

Maria Zalm, Ph.D
Senior Editor Publication Ethics | she, her

PLOS | pub-ethics@plos.org
Empowering researchers to transform science
Carlyle House, Carlyle Road, Cambridge CB4 3DN | United Kingdom
California (U.S.) corporation #C2354500, based in San Francisco

**Retraction: High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor–Gs Coupling Underlying Opioid Tolerance and Dependence**
The *PLOS ONE* Editors
Following the publication of this article [1], concerns were raised regarding results presented in Figures 1 and 7. Specifically,

- There appear to be horizontal and vertical irregularities suggestive of splice lines in the following panels:
    - Between lanes between lanes 4-5 of the Figure 1A left and right FLNA panels, right MOR panel, and left and right Gα panels.
    - Between the 92.3kDa and the 50.4kDa marker of the Figure 1A left MOR panel.
    - Between lanes 2-3 of the Figure 7A Morphine + NLX +FLNA$_{2550\text{-}2560}$ panel.
    - Around multiple bands presented in the Figure 7A MOR and Gα panels
- In Figure 1C, neither the published panels nor the underlying data provided in follow-up discussions include a positive control sample. The absence of a positive control calls into question the reliability of the results presented in Figure 1C.
- The Figure 7A NLX and FLNA$_{2550\text{-}2560}$ panels appear similar.

The corresponding author noted that the Figure 7A NLX and FLNA$_{2550\text{-}2560}$ panels were inadvertently duplicated and provided a replacement panel for the FLNA$_{2550\text{-}2560}$ panel. However, the corresponding author disagreed with the Figures 1A concerns, stating that the observations are likely the result of image compression artefacts.
The corresponding author provided image data to support the contested western blot results in this [1] and other PLOS ONE articles [2-5]. Per PLOS' assessment of the data files, the pixel patterns in background areas of blot images provided for multiple panels in [1-5] appear more similar than would be expected for data obtained in independent experiments. Furthermore, the supporting data files did not contain molecular weight markers or positive controls as needed to verify the reliability of the results. In response to these concerns, the corresponding author stated that the repetitive features in the background noise of the image data are likely the result of scanner artifacts and noted that the protein sizes on the blot were verified against pre-stained molecular weight markers. The explanation given for the background image similarities does not resolve the journal's concerns in light of PLOS' assessment of the data files.
The data and comments provided did not resolve the concerns about the integrity and reliability of data presented in this article. In light of these issues, the *PLOS ONE* Editors retract this article.
[Author initials] agreed with the retraction. [author initials] either did not respond directly or could not be reached. [author initials] did not agree with the retraction.
**References**

1. Wang H-Y, Frankfurt M, Burns LH (2008) High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor–Gs Coupling Underlying Opioid Tolerance and Dependence. PLoS ONE 3(2): e1554. https://doi.org/10.1371/journal.pone.0001554

89

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779386
BURNS_00000738

2. Wang H-Y, Burns LH (2009) Naloxone's Pentapeptide Binding Site on Filamin A Blocks Mu Opioid Receptor–Gs Coupling and CREB Activation of Acute Morphine. PLoS ONE 4(1): e4282. https://doi.org/10.1371/journal.pone.0004282

3. Bakshi K, Kosciuk M, Nagele RG, Friedman E, Wang H-Y (2011) Prenatal Cocaine Exposure Increases Synaptic Localization of a Neuronal RasGEF, GRASP-1 via Hyperphosphorylation of AMPAR Anchoring Protein, GRIP. PLoS ONE 6(9): e25019. https://doi.org/10.1371/journal.pone.0025019

4. Bakshi K, Parihar R, Goswami SK, Walsh M, Friedman E, Wang H-Y (2014) Prenatal Cocaine Exposure Uncouples mGluR1 from Homer1 and Gq Proteins. PLoS ONE 9(3): e91671. https://doi.org/10.1371/journal.pone.0091671

5. Stucky A, Bakshi KP, Friedman E, Wang H-Y (2016) Prenatal Cocaine Exposure Upregulates BDNF-TrkB Signaling. PLoS ONE 11(8): e0160585. https://doi.org/10.1371/journal.pone.0160585

And there's more. Yesterday some Seeking Alpha idiot published this Seeking Alpha article:

## Cassava Sciences warns of potential clinical hold on simufilam in recent 10-K filing

Mar. 02, 2022 3:45 PM ET**Cassava Sciences, Inc. (SAVA)**DNLI, CRTXBy: Jonathan Block, SA News Editor160 Comments

Cassava Sciences (SAVA +2.4%) has warned that it may face a clinical hold on its trials for simufilam after the U.S. FDA imposed them this year on two competitors that are also working on Alzheimer's candidates.

The notification was tucked away in Cassava's (SAVA +2.7%) 10-K annual report filing on Feb. 28.

The company noted the holds on Cortexyme (CRTX +5.4%) and Denali Therapeutics (DNLI +0.4%) in regards to their Alzheimer's candidates, both done in January.

Cortexyme (CRTX +5.4%) said it would provide updates after further engagement with the agency and Denali (DNLI +0.4%) did not provide details behind its hold.

"A clinical hold may require us to spend significant resources over many months to address the root causes of FDA's concerns," Cassava (SAVA +2.7%) said in the filing. "We may not find and successfully address such root causes, which could adversely affect our business. "

"If we are on clinical hold for 1 year or longer, the FDA may consider our IND for simufilam to fall into Inactive Status, which may result in termination of the clinical program for simufilam," the company added. "To the extent we are not successful in lifting an FDA clinical hold, our results of operations and business will be materially adversely affected."

The FDA in February denied a citizen petition alleging improprieties in some simufilam studies.

--------------------

And this:

## Cassava Sciences And Alzheimer's Disease: Unravelling Some Of The Puzzle

Mar. 03, 2022 9:27 PM ET**Cassava Sciences, Inc. (SAVA)**AVXL43 Comments11 Likes

90

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779387
BURNS_00000739

Summary

- Cassava Sciences may have removed an outlier in the drug group turning a negative result into a positive one, leading to a windfall for its CEO and chief scientific investigator.

- Cassava Sciences stated mechanisms of action do not explain its results.

- Simufilam may be a sigma-1 receptor agonist like Aricept and Anavex 2-73 and may be a peroxynitrite decomposition catalyst which may explain its benefits in regards to cognition.

- Peroxynitrite scavengers such as Anavex 2-73 appear to produce better results over longer periods of time.

[Continues with drivel....]

And this, picking up more of our Risk Factors from the 10-K:

# Cassava 10K Filing Warns of Anticipated Hold, Paints Dire Picture of Alzheimer's Space

Published: Mar 03, 2022 By Vanessa Doctor, RN

**Cassava Sciences** has **warned** that the U.S. **Food and Drug Administration** might order a clinical hold on its studies for Alzheimer's drug simufilam in 2022 after learning that two of its competitors had received hold orders for similar research efforts.

In its **10-K annual report filing** dated February 28, the biotechnology firm warned investors that its operations and business could suffer down the line if it is unsuccessful in lifting the anticipated FDA hold in time. The regulator has not yet issued any such letter to Cassava, but the company expects that its time is coming after rivals **Denali Therapeutics** and **Cortexyme** received theirs.

The FDA typically issues a clinical hold order to suspend an active trial if it needs more information about the drug candidate's mode of action, safety, efficacy and other deficiencies. If a company gets this letter, it will be unable to enroll new participants, and those who are already in the trial might be taken off the investigational drug.

Cassava said that if it does receive such a directive, it will cooperate with the regulator fully and expeditiously in order to get simufilam's research and development schedule back on track. However, it cautioned that if it fails to satisfy the FDA's requirements or is unable to address the concerns immediately, its business could suffer, and its investigational new drug (IND) application might be marked as "inactive", leading to further losses.

"The grounds for imposition of a clinical hold are complex, variable and somewhat arbitrary. If we are issued a clinical hold, FDA will expect us to address the cited deficiencies and submit a detailed, written response. A clinical hold may require us to spend significant resources over many months to address the root causes of FDA's concerns. Our response may not be adequate to lift such clinical hold, or we may disagree with FDA's assessments of deficiencies. To the extent we are not successful in lifting an FDA clinical hold, our results of operations and business will be materially adversely affected," Cassava said in its filing.

In January, the FDA issued a **full clinical hold on Cortexyme's IND for atuzaginstat**, which it is evaluating for the treatment of Alzheimer's and other neurodegenerative diseases. Cortexyme immediately launched a cost-cutting strategy to rationalize operations while awaiting results to ensure enough cash flow to sustain its pipeline up to 2024.

In the same month, the regulator sent a formal clinical hold letter to another company that focuses on Alzheimer's treatment, Denali Therapeutics. The hold order involved the **investigational drug DNL919**, for which the FDA sought additional data, specifically information relating to preclinical toxicology

91

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779388

BURNS_00000740

assessments. The FDA also suggested that changes be implemented on its informed consent form, investigator brochure and trial protocol.

Cassava's latest warning covers other issues that might later affect its operations and revenues. The company said that physicians and patients themselves might not accept and use its drugs, even with FDA approval. It also said that it might not succeed in developing its neurodegeneration product candidates, adding that it does not have the capabilities to manufacture or commercialize its product candidates. Much of its lack of confidence might be pointed to the fact that nearly every attempt at drug approval for Alzheimer's disease has failed.

"Despite billions of dollars invested by NIH and the biopharmaceutical industry in research programs to develop novel therapeutics for Alzheimer's disease, the FDA has not approved any new drugs for Alzheimer's disease. Since 2003, many new types and classes of drugs have been developed and tested in Alzheimer's disease, and virtually all of these scientific programs have failed in clinical testing," noted Cassava in the same filing. Cassava did note the exception of Biogen's aducanumab (Aduhelm), which was approved by the FDA in 2021.

~~~~~~~~~~~~~~~~~~~~~~~

And Twitter Creeps claiming that it's official that our SAB is defunct:



Amidst all this, we presented (mostly me) to Merck yesterday. Nice enough people, and not on the hate list of Big Pharma with Lilly and J&J (Biogen is nowhere), but still. I don't like any of them and we don't need a partner. I loved their question, "What are you looking for in a partner?" To which Remi replied, "Can we take this question off-line?" I would have answered, "Well, we're not. But we are being polite because you asked to talk to us."

Here's their (second) follow-up email from the meeting yesterday. OK, you too are gone now.

Hi all,

 The team noticed after our call that there is a potential clinical hold via your 10K.  Can you provide any information regarding the cause of the clinical hold? I know, Jim, you mentioned that the sites and up and running, so has the FDA not progressed with the hold?

Thanks so much for any information.

Best,

Paige

92

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779389
BURNS_00000741

And now Bik is complaining that what she thinks is a duplication is not agreed to by the journal. Clearly she is communicating with them and asking for retraction status. Sorry Biktch.



Forgot to mention that Bik, Bredt and Pitt TOGETHER approached an analyst to request that he hear their "case" against Cassava. The analyst instead told Remi. They stop at nothing.

Here's a recent email from long supporter Column McDermott explains how they keep driving the price down:

Remi,

When I sent you the options data for Thursday I made a mistake by claiming 5000 puts bought equaled 5M shares. 5000 x 100 share is 500,000 shares. I was pissed off seeing them continue to print more shares. The point still is the same though. They are printing shares like last month when they printed 1M shares by buying 10000 contracts at 60 and 61 on the Friday 5 hours before they expired when the SP was 54.50. They drove it down to 51 close. Then at the end of the day they returned 1.2M shares to the shorts available pool even though the price went down, the OBV fell by 200K shares which shows nobody was selling. Here is your proof on the 5000 puts printing shares.

93

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779390
BURNS_00000742

We had 100% usage for the last 10 days. Meaning no share available to lend or short. The available shares were less than 30K yesterday. Look at the short interest daily trading above 50% every day meaning more shorting than buying every day. Now look what showed up at the end of the day yesterday. Another 500K shares available to short. Out of thin air. Plus another Discord member told me that the 5000 puts are no longer even open interest meaning they disappeared. This is exactly what Wes Christian said they do. They do an option purchase with their buddies then at the end of the day they tear up the contract and the shares created flow into the market, yet the contract is torn up. That is what happened here in my opinion. It seems very obvious because nobody had 500K to loan to anyone. The shorts are and will continue to print shares because there is nothing stopping them. Thought you may want to show this to the BOD. I already sent all this to the SEC, but I'm sure if you reached out to them or you need to contact the FBI to get action. The DOJ office told me I needed to contact the FBI because DOJ just prosecutes, FBI investigates.

Wanted you to see exactly how they are flooding SAVA with fake share to destroy the stock price. Hope you are still pushing for the blockchain like Overstock. Might want to speed it up before they take SAVA down to the low 20's like those other options I sent you seem to imply.

Thanks,
Colum

March 13, 2022

It's been a Twitter storm of pathetic accusations that the antibody we used against FLNA only recognizes linear, i.e. denatured protein, despite the Santa Cruz spec sheet saying otherwise. Then, the next accusation is that the antibody epitope (a 300-amino acid region) would be blocked by the drug binding, because the 5-amino acid region is contained in this stretch of 300. The next is that we are missing controls (go figure) and that we didn't do an FLNA knockout (it's lethal). All kind of vile crap from a new account "Logorithmic Disorder." Who says they have the whole industry behind them. Yeah, right. And has piled on the same into PubSmear. Got 5 emails for this last night.

Meanwhile, trying to navigate another FOIA for our Investigator Brochure, via U. Washington who is one of our clinical trial sites. But it's ours, not theirs, so this shouldn't apply. How many attacks can we take?

Tomorrow is the day I am hoping to send back responses on the FIVE Plos papers poised for retraction. I asked for a 5-working day extension, and the response was ok but not a day more. Editor Maria Zalm is best buds with Bik, and she clearly is involved here to, with retraction salivation based on nothing but a lack of confidence. No actual evidence. And all five at once. We have one letter from Spruck already, but that is addressing only the 2008 and 2009 papers. The 2016 paper was in the 8 queries of CUNY, so I asked Paul to address that, then had to hand him also the 2011 Plos paper. The last 2014, Hoau got Venkat to add to his pile. Pretty insane, and down to the wire. Tuesday is the drop dead day.

The LinkedIn folks have noticed that Tim Van Treuen of Bios Partners was the one who reported to the AAIC organizers "possible data manipulation" in the SavaDx poster. His buddy Travis Whitfall was the one who immediately after the CP dropped, Tweeted to Bik, "looping in the expert" as if that were the first time she had seen it. Both Van Treuen are with Bios Partners, who have Cognition Therapeutics in their "portfolio." Susan Catalano of CogRx was on the study section for my Phase 3 clinical trial grant (despite a massive perceived conflict), and I highly suspect her of being the reviewer that tried to sink the ship. It didn't work.

94

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779391

BURNS_00000743

Today Bik and Hellbutt are Tweeting that CUNY is unlikely to say they see any fraud:



March 17, 2022

Bik will be exposed. She has no idea what's coming for her (nor do I, but I hope it's good). And you know why my publication has been languishing? Because no one will give me a fair review with you jackasses spouting off slanderous lies.

Venkat V. sent a great letter on Monday saying he found no evidence of misconduct after reviewing allegations and the original WB images he was provided. He reviewed the 2014 PLOS paper and the CUNY list of 8 queries. If we hadn't found him, we would still be waiting for a second expert. The last expert, Dr. Hal Scofield, who was first sick, is still not done, but literally wrote the book on WB (or edited it in 2015): **Western Blotting: Methods and Protocols.** Email going out to CUNY tonight with 8 attachments that are letters mostly from Charles Spruck and two from Venkat V.

I actually had to call Charles (Chuck) Spruck yesterday to ask that he address his generic letter to CUNY Administrators (instead of journal editors). I actually caught him on the phone. Told him the Bredt backstory. It seems that what fuels Chuck is an anger to Bik. "She's a scientist," he told me, incredulous. Actually the first question he asked was "How is Dr. Wang doing?" When I texted this to Hoau he replied: "Wow. Thank him for me. I am very grateful for his firm support (unlike many good weather

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779392
BURNS_00000744

friends who run away as soon and far as they can)." I love that Hoau often uses English expressions with substitute phrasing or words. Once he said, "I am running around like a chicken with no head." This thing makes my blood boil for him. He has lost 25 pounds off an already small frame, and his right kidney is doing worse and worse.

Last Friday, Hoau received another SEC subpoena with questions like, Are you a CLIA lab? When was your freezer/platereader/you name it last serviced? What is the backup power source for the freezer? What is the expiration date on the ELISA kits you used for biomarkers? Etc. etc. **Redacted - Privileged**

**Redacted - Privileged**

**Redacted - Privileged** Pretty incredible that they started out assuming we were a scam, and easy Theranos. They bought Bredt's garbage hook line and sinker. Soon he will sink in jail.

Oh, we lost trying to get a court order to prevent our IB from being FOIA'd by a hedge fund. The claim was that because U Washington is a state university, and because they are under CDA and in possession of our IB as a clinical trial site, that they should hand it over to the NY law firm. It's weird because I had already seen a snip of it on Twitter, but I guess this makes it legal for them? Not sure how or why OUR confidential information, which doesn't belong to U Washington, was subject to FOIA. Because we emailed it? So soon will come the twisting.

March 18

After Brodkin bragging and posting the front page of the IB, here's the first twisting:



And we received another wallop of FOIA requests, for 700 pages of review and redacting. More of Remi's time.

96

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779393

BURNS_00000745

The Discord Detectives came up with some interesting details... We now know that Brodkin is working for Summit Point Capital, because they are the ones who FOIA'd the IB, and Brodkin is the one posting and smearing it on Twitter. Here's what the Discord Detectives found out about Summit:

> This company LLC was created, in February 2021 (when SAVA revealed 6 months data and stock price skyrocketed)
> Boulanger's email is curtis@summitpointcapital.com. A few quick Google searches connected Boulanger to this website for Summit Point.
> His LinkedIn shows Summit Point is a sole-proprietor. His personal LinkedIn has no photo but says he graduated from the University of Alberta in 2014. A Facebook page matching the name and location in Alberta shows a person still living in Canada working for JP Morgan since 2017 and appearing to be very young. The company website is extremely bare and shows Summit Point's contact point as Union Square. Some more searching shows that Summit Point's website was created in 2021.
> It was incorporated in New York State on February 9th, 2021.
> The address for the business on the website Company Detail shows the address for Summit Point as 90 State Street in Albany, NY which also happens to be the address for a company called Registered Agents, which will register your company as an LLC for $49. The company was created one week after the $SAVA stock price surged due to Cassava's news release of their promising Phase 2 study results. The stock surged 488%, going from a $20.50 open to a high of $117.54 and a close of $44.80 on 203 million shares. In comparison, SAVA's recent volume is about 1.5 million on average.
> A second address found for Summit Point comes back to an apartment building in NY.
> Very suspect this generic-looking firm was created one week after SAVA's first major SP pop...by some random 20-something Canadian and is run out of an apartment in NYC.

Actually it looks like this Logo Distorter is also in possession of the IB, so also working for Summit; we just don't know who this new account is. I'm suspecting it's another Bredt account, like "@LetsHaveaBall."


March 19

That's not all for a Friday (yesterday). We received 5 emails in rapid succession with copy paste content from Maria Zalm. Three days to say Yup, we are retracting, bitches. Just check out this language. Her claim is that because appeals require NEW information and because we didn't supply any NEW information, she gets to retract. She claims she does not need actual evidence of data manipulation, just her concerns, which she claims still stand even after reading Chuck's and Venkat's letters.

Dear Dr. Wang and co-authors,

Thank you for your response against the editorial decision to retract your 2008 PLOS ONE article, "High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor–Gs Coupling Underlying Opioid Tolerance and Dependence" (https://doi.org/10.1371/journal.pone.0001554).

We understand that you disagree with the journal's editorial decision to retract this article, and you have

97

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779394
BURNS_00000746

provided a detailed response. As indicated in the PLOS Appeals of Post-Publication Decisions policy, PLOS will only consider appeals of Retraction decisions if new information and/or data are provided that directly addresses the issues underlying the decision. Such information has not been provided with your appeal, and the concerns listed in the notice remain unresolved. As such, **we are upholding our editorial decision to retract this article. This decision is final, we will not consider any further appeals.**

Below, we provide clarifications regarding some of the points raised in your appeal.

1. **You raised the potential motivations behind those who raised the concerns.** PLOS follows up with all publication ethics concerns raised to the journal, irrespective of the identity or the competing interests of the individuals who raise the concerns. Although we take note of any potential competing interests, we assess the concerns based on their merit alone and follow up as per COPE guidance if our internal assessment determines that there is merit to the concerns that have been raised.

2. **You asked about the identities of those who raised the allegations.** This request goes against PLOS policy and COPE guidance. The COPE retraction guidelines state that "claimants may be named only when they have given permission". In addition, the journal's Ethical Publishing Practice policy states that "we also protect the confidentiality of those who raise publication ethics or research integrity concerns, where possible".

3. You commented, "**PLOS One has failed to present "clear evidence" that my publications are unreliable or that I falsified data.**" As indicated in the retraction notice, image concerns have been raised with multiple figures presented in this article. The underlying data and explanations you have provided did not resolve these concerns, and instead raised additional concerns. Consequently, PLOS considers that the article contains unreliable content. The issues noted in this case raise concerns about the integrity of data reported, but please note that per CLUE (Cooperation & Liaison between Universities & Editors) guidance journals do not have the jurisdiction to adjudicate on misconduct concerns, as such conclusions about misconduct or falsification can only be drawn by an institutional investigation.

4. You noted, "**PLOS One has no basis to communicate with my employer under COPE guidelines.**" Our discussion of this case with the institution is in line with COPE guidance, PLOS policy, and the CLUE recommendations pertaining to cooperation between journals and research institutes. As indicated in our Ethical Publishing Practice policy "we reserve the right to share relevant information with others involved in the case ... and/or contact authors' institutions, funders or regulatory bodies, in accordance with COPE guidelines." The COPE retraction guidelines state that "When editors or journals have credible grounds to suspect misconduct, this should be brought to the attention of the authors' institutions as early as possible, but the decision to correct or retract an article should be made by the journal and does not necessarily depend on an institutional finding of misconduct." In addition, the CLUE recommendations on best practice and the COPE guidelines on cooperation between research institutes and journals state that journals should pass on research integrity concerns to institutions. In this case we consider that the concerns that have been raised with your article and with the supporting data provided to PLOS warrant notification of the institute.

5. **Regarding the absence of molecular weight markers on blot image data**: The Publication Ethics team is aware that molecular weight markers do not generally interact with antibodies used in western blot experiments. However, in the raw, uncropped, underlying data provided to the journal, we would expect to see the markers penned on the original film or image. The absence of the markers and the cut blots are a relatively minor editorial concern in this case, and

98

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779395

BURNS_00000747

so although this has not been resolved we have removed this concern from the retraction notice.

The retraction is moving forward and we will notify the full author group when the retraction is complete.

Best regards,
Maria

Maria Zalm, Ph.D
Senior Editor Publication Ethics | she, her

March 20, 2022

**Redacted**

March 22, 2022

Yesterday I sent this email to PLOS via their general inquiry email with heading "Looking for phone/email of Emily Chennette:

**Dear PLOS One personnel,**

99

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779396
BURNS_00000748

I would like to bring to the attention of the Editor-in-Chief of PLOS One five simultaneous pending retractions for papers of my collaborator Dr. Hoau-Yan Wang. These pending retractions are unfounded. The pending retractions are based on "concerns" only (no evidence of manipulation) about the integrity of data images that were collected using old-style Western blotting, meaning X-ray film, hand-poured gels and scanning of the images. Most labs have now transitioned to digital imaging, which avoids much of the visual artifacts of these original techniques. I strongly believe these retractions are baseless, as there was no research misconduct, no intent to deceive and no image manipulation. Instead, these pending retractions are part of a negative campaign against Cassava Sciences and our long-time collaborator, in an attempt to stop or slow two large Phase 3 clinical trials of our promising drug candidate for Alzheimer's disease. Short-seller hedge funds (who profit from causing a decline in the stock price) have been manipulating the stock price to great gain. Twitter "scientists" have been promoting a false and damaging narrative that the program is "all made up" and even that some experiments "didn't happen." We know certain of these negative voices on Twitter have ties to the hedge funds. I will attach a recent article in Compliance Week that details the manipulation of Cassava Sciences stock by short sellers. They are also connected to the highly conflicted individuals (also short sellers) who filed a petition with the FDA to stop the Phase 3 trials, which the FDA denied on February 10 (https://www.cassavasciences.com/news-releases/news-release-details/fda-denies-citizen-petitions-filed-behalf-short-selling-clients).

I am also attaching three letters from two independent Western blot experts who have reviewed and refuted the allegations in all five papers poised to be retracted. I am also attaching the letter written by Dr. Wang himself addressing them. I do not believe your ethics editor has the necessary Western blot expertise to evaluate the allegations, and she appears to be relying on accuser(s) who are highly conflicted, stating that such conflicts are irrelevant. Additionally, she claims that any appeal must provide new information. I believe the assessments by these outside, independent reviewers meets that requirement.

I would be grateful for any time to discuss this matter, but I do urge you to evaluate the situation before it proceeds. It will be a great embarrassment to PLOS One if this Alzheimer's disease drug candidate definitively demonstrates the success that we expect it will, if PLOS One has mass retracted all PLOS papers of one of the drug's inventors.

Respectfully,

Lindsay Burns

# Redacted - Privileged

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779397

BURNS_00000749

# Redacted - Privileged

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779398
BURNS_00000750

# Redacted - Privileged

Today, we get NBA publishing an EOC, and Bik Tweeting and PubSmearing it, misleading people into thinking it is a "decision." Of course this would not have published if we had already had word from CUNY.



March 24, 2022

Today the AD-Science team released some details from Hoau's emails (that he was and is blind to treatment group for Phase 2b subjects), that he has a very small amount of cash from his stock and options as of June 2021. This from his responses to a FINRA investigation (one of several). They then went on to point out the Cognition Therapeutics VC firm's involvement:

Bios Partners is the lead venture capital firm behind Cognition Therapeutics (CGTX – more on them a bit later). In the email excerpt below, Tim Van Treuren, a senior analyst with Bios Partners, emails AAIC directly (instead of Dr. Wang) with questions on the SavaDx poster.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779399
BURNS_00000751

From: **Tim Van Treuren** <tvantreuren@biosres.com>
Date: Mon, Aug 30, 2021 at 12:58 PM
Subject: Concerns regarding AAIC 2021 poster presentation "SavaDx, a novel plasma biomarker to detect Alzheimer's disease, confirms mechanism of action of simuflam"
To: <abstracts@alz.org>

To whom it may concern,
I am writing to express concern regarding potential manipulation of data that is presented in the poster entitled "SavaDx, a novel plasma biomarker to detect Alzheimer's disease, confirms mechanism of action of simuflam" presented during the 2021 Alzheimer's Association International Conference in July. The abstract can be found at the following link. The poster can be found at the following link.

We previously saw Travis Whitfill, another senior partner with Bios Partners, take the lead to tag team Elizabeth Bik on Dr. Wang's papers right after the CP (Citizen Petition) came out.



Replying to @MSollander

Yikes. Cc'ing @MicrobiomDigest, expert on identifying manipulated scientific images.




3:28 PM · Aug 24, 2021 · Twitter for iPhone

And then they expose Fartstain:

### Part 3 – Night king of shorting

Adam Feuerstein is infamous for handing out public (and private) invitations to short biotechs. We saw this recently when he attacked Anavex Life Sciences over a delayed regulatory update, while waiting weeks to time his FuD right when the AVATAR study results dropped.

Adam has also been on record attacking Cassava Sciences with misogynistic statements and insinuations of fraud while maintaining ties with the authors of the Citizen Petition. Below is an excerpt of an email from him to Dr. Wang.

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779400
BURNS_00000752

I've attached a copy of a research paper describing the results of the phase 2b study that was submitted to a preprint server in February 2021. You are the lead author on the paper. Inside the Oversight and Settings section of the paper, it says, "CSF samples were analyzed at CUNY School of Medicine."

Can you confirm that your lab performed the CSF biomarker analysis?

For a self proclaimed biotech expert, Adam pretends to not know what a blinded trial is. He also pretends to not know about other blinded trials where analysis is done in-house. For instance, the trailblazer-alz-2 trial which he's mentioned a few times (without much criticism) had all its biomarker analysis done unblinded as seen below.

This blog elicited the following from Fartstain himself:



Adam Feuerstein ✦
@adamfeuerstein

$SAVA — It's come to my attention, a day late, that a group of anonymous retail investors and social media trolls — all with financial incentives to pump this stock — have accused me of being part of conspiracy to destroy the company. This is a lie.

10:18 AM · Mar 24, 2022 · Twitter Web App

Yup, sure it is. That's why you bragged about knowing who the petitioners were before they were named, why you slammed me personally in your July 29, 2021 StatNews FUD-piece, why you named Remi one of the top 10 worst CEOs for "cynically" hyping the stock on Reddit when he has zero social media accounts, why you claim you've never seen a risk factor of possible clinical hold in a 10-K before, etc., etc.

March 26, 2022

Some in my Harvard class have received copies of the Red Book already, as noted in our FB group. Which prompted a few to note differences about how they are now than when they wrote their entries starting with "I'll just put it out there that…" Which prompted me to note the following:

I'll just put it out there that what I thought was going to be a somewhat minor "blip" turned into a year-long battle that isn't over and has been emotionally exhausting, time-consuming, uber-stressful and eating away at my core affect. But I see the other side…. somewhere coming up…. and I can't wait to see you all in June!

March 28, 2022

Remi met with FBI agents today about the guy from San Antonio who snuck into the office on President's Day, telling our cleaning guy that he worked there, only to be busted by Remi 5 minutes later. This FBI agent said he had 10 people working for him in the Austin area on corporate espionage and each are working on 5-6 cases. So yes, at least 50 cases in the Austin area alone. He said that most of the spies working for the Chinese government are unwilling participants. They have family back in China and one

104

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779401

BURNS_00000753

day they get a visit and are told, "Remember your grandmother who lives at XXX address and your sister who lives YYY?" Basically they are told if you want them to stay safe, you need to help us. So this guy didn't quite break in, but got in, then when visited later (he's an Associate Professor at UT San Antonio), he said, "Never heard of Cassava...... Oh that Cassava Sciences.... I was trying to collaborate with them." We'll see where that goes. A totally different scandal than the Bredt-led one, but who knows really?

# Redacted - Privileged

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779402
BURNS_00000754

# Redacted - Privileged

106

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779403
BURNS_00000755

# Redacted - Privileged

Got this from Art Singer, LinkedIn Discord member on March 29:



TUESDAY

Arthur Singer · 1:26 PM

If you noticed, the 5000 17.5 Aug Puts created/sold yesterday were used to return .5M shares to the short pool. Providing ammunition for the shorts to help control the SP in the event of any good news. Dirty pool.

March 30, 2022

Finally a response from PLOS last night, but not a good one:

Dear Dr. Burns,

I lead the PLOS Publication Ethics team, and am writing in response to the following message in which you discussed the pending editorial actions for articles by Dr. Hoau-Yan Wang and colleagues. While you directed your comments to Dr. Chenette, please note that this type of issue is addressed by the Publication Ethics team, and that our team discusses editorial decisions involving retractions with the relevant editorial leads for PLOS ONE. Nevertheless, in light of your comments, I have cc'd Dr. Chenette on this message.

Below, I will comment only on the two articles for which you are a listed co-author, pone.0001554 and pone.0004282. As is explained in the PLOS Ethical Publishing Practice policy, and in accordance with COPE guidance, we consider case details and materials received in ethics case follow-up discussions as confidential information, and as such we will not discuss with you details of the three related cases involving articles for which you are not a listed author.

That said, all concerns raised to PLOS are addressed according to COPE guidance and PLOS policies, and I assure you that as noted in our Ethical Publishing Practice Policy, PLOS conducts thorough, objective editorial examinations of concerns raised, regardless of who they are raised by or whether those raising concerns have potential competing interests. Our editorial assessments and discussions about case resolutions (i.e. our decisions) focus on the PLOS content and the materials and data provided in follow-up discussions.

Dr. Zalm, as other members of the PLOS Publication Ethics team, has scientific expertise (including in western blotting), as well as specialized editorial expertise in publication ethics, including in image forensics, image data analysis, and the PLOS policies and industry-wide standards relevant to addressing publication ethics concerns. She is a senior member of our team and is fully qualified to evaluate the concerns and the materials provided for your articles.

Dr. Zalm has already discussed the issues in this case with Dr. Wang, and the summary of the editorial assessments and reasons underlying PLOS' decisions are summarized in the retraction notices which have been

107

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779404
BURNS_00000756

shared with you and the other listed authors. I will not revisit all aspects of those prior discussions, but I will provide some comments about the concern discussed in paragraph 3 of the pone.0004282 and pone.0001554 retraction notices, involving similarities between background patterns observed in the blot data provided to PLOS. This is a major concern that contributed to the editorial decision for both of your articles, and the comments we received did not resolve this concern.

As is stated in the retraction notices, we noted similarities in pixel patterns within the background areas of image data provided for multiple experiments spanning multiple articles. In response to this issue, Dr. Wang commented, "*The inside of the lid of the scanner is a white sheet that becomes the background of any transparent image that is being scanned, like the blots. Consequently, the same background image is visible on all radiographic images scanned with that same scanner.*"

Our team has evaluated blot data received from hundreds of laboratories worldwide, and we are familiar with western blot and blot imaging techniques, as well as common imaging and image compression artefacts. Even considering that irregularities (scratches, marks, etc.) on the scanner may appear on multiple blot images generated with the same equipment, we are highly concerned about the degree of pixel x pixel similarity that we observed across blot images provided for pone.0004282, pone.0001554, and other articles published over an 8-year period. Comparing the blot images there was also very little variation as to the orientation or relative positioning of similar background pixel groupings across different blot images. Overall, we concluded that the degree of similarity observed across image data for different experiments and different articles is highly concerning, and exceeds what would reasonably be expected for independent data, even considering possible scanner artefacts. In light of our assessment, the integrity of the primary data is in question and therefore we cannot stand by the published results.

We understand that you, Dr. Wang, and some external reviewers whose reports you provided may not agree with the concerns or with the outcome of our assessment. Nevertheless, Dr. Chenette (cc'd here) and I both stand by Dr. Zalm's assessment and the editorial decisions for these articles. Note that key aspects of the editorial assessment - including the evaluation of image background pixel patterns - were independently verified by two senior members of the PLOS Publication Ethics team.

I understand that this is a disappointing outcome but the decisions for your articles are final. The retractions are proceeding and we will provide another update when they have been completed, at which time the retraction notices will be available on the articles' PLOS ONE webpages.

We wish you all the best and appreciate your and your co-authors' cooperation in discussing the concerns about these articles.

Kind regards,
Renee Hoch, Ph.D.
Senior Editor, Team Manager Publication Ethics

My response, 10 minutes later:

Dear Dr. Hoch,

Thank you for your detailed response. I am frankly incredulous that tiny instances of similar background pixels, in areas far away from the area of the blot that is published, would cause such concern. If someone were to manipulate an image to change results, dropping in a different background that is to be cropped out anyway makes no sense whatsoever. Furthermore, this "common background" that

108

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779405

BURNS_00000757

contains tiny spots of similarities also contains many clear differences in each case. They are not the same backgrounds, and instances of similarity in those backgrounds in no way constitutes image manipulation, particularly over an 8-year period. There are any number of things that could cause such small similarities as detailed in a letter from an independent Western blot expert that we previously provided (attached again).

Further, COPE guidelines detail a certain flow of steps prior to retraction in the absence of clear evidence of image manipulation. I don't think anyone can say that these tiny spots of similar pixels are clear evidence of image manipulation. I am attaching a COPE guidelines flowchart, which would require escalating to the institution first before proceeding with a retraction. I am also copying the independent expert who provided a number of plausible reasons why such similarities might happen.

I am happy to discuss this matter by phone, as is the independent expert who has already offered.

Best wishes,

Lindsay Burns

To which I received this:

Dear Dr. Burns,

Thank you for your message. I understand your position, but as noted in my previous message we stand by PLOS' assessment and decision in these cases. Based on the outcome of our editorial assessment, due process was taken in accordance with COPE guidance.

Kind regards,
Renee
--------------------------------

And replied this:

Dear Dr. Hoch,

The belief that background to be cropped out was somehow manipulated, when this "manipulation" or "duplication" is limited to only one spot amidst clearly distinct backgrounds, makes no sense at all. This is not clear evidence of data manipulation, which is the only route per COPE guidelines that you would skip the next step of an institutional investigation (which is ongoing anyway). Please help me to understand how these five retractions are following COPE guidelines. I strongly believe they are not. In fact, the journal's belief that this is data manipulation only shows that the reviewers do not have the relevant expertise in immunoblotting.

I welcome a continued dialogue.

Best wishes,

Lindsay

And here come all five retractions, March 30, before any time to engage in any dialogue. Unbelievable PLOS One. Maria Zalm is an adoring fan of Bik and has no WB experience herself. Showing up on

109

CASS-CLASS-01779406

BURNS_00000758

PubPeer. They are off celebrating their bonuses, especially Bik who is probably getting $1MM for each retraction. Oh, she has worked hard.

Because I had copied Chuck Spruck on this email, here is his reply, about 2 hours post-retraction:

Dr. Hoch,

By deciding to retract these PLOS publications, your editorial office is establishing a very dangerous precedent.

You are setting an extremely low bar for data manipulation, a very serious charge, based on patterns of background pixels in western blot figures. These background regions have nothing to do with the actual data and are generally cropped out of figures. They do not change the scientific conclusions of the publications. These regions are only relevant to individuals attempting to find something "unexplainable" to build a case for potential data manipulation. Are we as scientists now required to go through all our published articles and significantly alter the contrast/brightness of figures to identify suspect areas in background pixels? Should we proactively retract publications where this is the case?

As scientists, we are obligated to not only prove our hypotheses but do everything possible to disprove it. Dr. Wang and I have provided several plausible explanations for the common pixel patterns observed between figures. It is unclear why these explanations were not accepted as potential evidence of disproving the hypothesis of data manipulation. Has your Editorial staff conducted an analysis of western blot data from other PLOS publications from labs that used scanned films (i.e. prior to 2010) to determine if the issue of common background pixels is unique to Dr. Wang's data? If not, do you intend to hold these other publications to the same standard you are setting for Dr. Wang and issue retractions for these publications?

By coming to this conclusion, your Editorial staff is accepting a hypothesis of potential data manipulation from sources that have either stated a financial interest in discrediting Dr. Wang's work or have not disclosed their financial backing. You are opening the door to scientific competitors and big pharma to file statements of concern to discredit past publications. If simufilam/PTI-125 is ultimately proven to be an effective treatment for Alzheimer's disease, your editorial decision could be held as an example of how outside forces can impede the development of potentially life-saving drugs. I hope that this is not the case.

Charles Spruck, Ph.D.
NCI-designated Cancer Center
Sanford Burnham Prebys Medical Discovery Institute

But look at the joy they are having on Twitter! They are using our logo in the Retraction Watch article, with "hat tip" to Adrian_H, who is also tweeting it:

110

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779407
BURNS_00000759



Elisabeth 'The Shrew Of Frisco' Bik Retweeted

**Retraction Watch** @RetractionWatch · 3h    ...
Five studies linked to Cassava Sciences retracted
retractionwatch.com/2022/03/30/fiv...





**Adrian H** @Adrian_H · 7h    ...
There are actually FIVE @PLOSONE retractions of papers from Dr. HY Wang today $SAVA

journals.plos.org/plosone/search...

Here's the actual text from Adrian's "hat tip" article:

As we've reported, Wang, of the City University of New York, helped conduct the studies that formed the backbone of the regulatory filing for the drug simufilam, which Cassava Sciences — formerly Pain Therapeutics — has been trying to bring to market. Cassava, according to a citizen's petition to the FDA, has funded Wang's lab for more than 15 years, and two of the now-retracted papers feature Lindsay Burns, a Cassava employee, as a co-author. (The citizen's petition, which called on the FDA to halt Cassava's trials, was filed by a law firm representing Cassava short sellers but eventually denied by the FDA because it was not an appropriate venue.)
According to the *Wall Street Journal*, the company has been under investigation by the Securities and Exchange Commission for questions about whether it provided manipulated data to the U.S. Food and Drug Administration for the medication.

111

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779408
BURNS_00000760

Wang's work has come under scrutiny on PubPeer, as well as by Elisabeth Bik, who has been unimpressed with the way journals have handled the case.
Three of Wang's papers have received expressions of concern but have not been retracted.

Here's part of the retraction notice for one of the articles, "Prenatal Cocaine Exposure Upregulates BDNF-TrkB Signaling," which appeared in August 2016:

> *The corresponding author provided image data to support their western blot results in this [1] and other PLOS ONE articles [2–5]. Per PLOS' assessment of the data files, the pixel patterns in background areas of blot images provided for multiple panels in [1–5] appear more similar than would be expected for data obtained in independent experiments. The corresponding author stated that the repetitive features in the background noise of the underlying data are likely the result of scanner artifacts.*
> *With the exception of point 1, the data and comments provided to PLOS did not resolve the concerns about the integrity and reliability of the reported data. Therefore, the PLOS ONE Editors retract this article.*
>
> *HYW did not agree with the retraction and stands by the article's findings. AS, KPB, and EF either did not respond directly or could not be reached.*

The four other papers are:

- Prenatal Cocaine Exposure Increases Synaptic Localization of a Neuronal RasGEF, GRASP-1 via Hyperphosphorylation of AMPAR Anchoring Protein, GRIP
- Naloxone's Pentapeptide Binding Site on Filamin A Blocks Mu Opioid Receptor–Gs Coupling and CREB Activation of Acute Morphine
- Prenatal Cocaine Exposure Uncouples mGluR1 from Homer1 and Gq Proteins
- High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor–Gs Coupling Underlying Opioid Tolerance and Dependence

The last paper was one of those criticized in the citizen's petition.

These are not Wang's first retractions. In February, he lost a paper in *Molecular Degeneration* on which he was second to last author for what the last author said was "an irregularity in one of the figures." Of note, that retraction is also the 23rd for Stanley Rapoport, who as of 2017 remained at the NIH but was no longer running a lab.
*Hat tip: @Adrian_H*

And more joy for the Twitterati:



**Paul** @lipa0902 · 1h
Replying to @Adrian_H and @PLOSONE
I start to think Wang's whole professional career is built on one fake experiments upon another. SSAVA house is built on Wang's quick sands.

 



**Adrian H** @Adrian_H · 1h
you are just starting to think that?  Dude, he has been making up everything since 2000

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779409
BURNS_00000761



**Adrian H** @Adrian_H · 7h

Replying to @Adrian_H and @PLOSONE

This is the beginning of the end for $SAVA. It is going to be much easier for @CUNYResearch @GC_CUNY @CUNY as well as the other more cowardly journals to take appropriate action now, and all will be revealed.

♡ 2         ♺         ♡ 21         ⬆



**Adrian H** @Adrian_H · 1h

Bravo @PLOSONE @emilychenette @GeorgeVousden @mtdohm

@MarinaP63 @JuanLerma1 @TheBaleLab @ELSneuroscience @hassinki @jclinicalinvest @emmcnally @jbiolchem @ChiefEditorJBC you still have some work to do to fix your Wang / $SAVA messes

Matt Nachtrab also emailed and called the CEO of PLOS and got this response:

From: **Alison Mudditt** <amudditt@plos.org>
Date: Thu, Mar 31, 2022 at 4:52 PM
Subject: Re: Ethic Team at PLOS / Internal Review Request / Urgent
To: Matthew Nachtrab <mnachtrab@gmail.com>, alastair.adam@flatworldknowledge.com
<alastair.adam@flatworldknowledge.com>
CC: natalie@publicationethics.org <natalie@publicationethics.org>

Dear Matt,

Thank you for reaching out to share your concerns. You're right – we do (not unsurprisingly!) receive a number of complaints about retractions – we were aware that these particular ones would likely draw attention. That said, we have a dedicated and highly experienced Publications Ethics Team that strives to make the best scientific and ethical decisions in every case.

The resolutions for these articles are based on our internal assessment of the articles and the materials received, and how the issues align with Committee of Publication Ethics (COPE) guidance and PLOS policies. However, given the concerns you have raised I have asked our Editorial Director to review the process here at her earliest convenience. I will respond with more information as soon as I hear from her – but I am not an expert and it would not be appropriate for me as CEO to interfere with a decision of our ethics team.

Best regards.

Alison

**Alison Mudditt**

Chief Executive Officer

PLOS

113

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779410

BURNS_00000762

And he emailed COPE to complain that their guidelines were not followed and got this:

From: **Iratxe Puebla** <cope_assistant@publicationethics.org>
Date: Sat, Apr 2, 2022 at 4:01 AM
Subject: Concerns raised to the attention of COPE
To: <mnachtrab@gmail.com>

Dear Dr Nachtrab,

I am writing in relation to the concerns you raised to COPE regarding the retraction of five
publications in *PLOS ONE* by Hoau-Yan Wang.
I acknowledge receipt of your submission. I have raised this to the attention of a member of
the Facilitation and Integrity subcommittee for their input and I will be in touch in due
course.

With best wishes,
Iratxe
Iratxe Puebla
Facilitation and Integrity Officer
Committee on Publication Ethics (COPE)
www.publicationethics.org

And to start of the storm that would meet us tomorrow this from the biggest dickwad on Twitter, which I
strongly suspect HE manipulated to look manipulated. This was re-blasted everywhere the next day.



April 5, 2022

Redacted I come home early, even if I don't have to pick up Redacted and
sometimes try to nap for 10 minutes. Eventually I manage to get on the erg for 10 minutes of 4/3/2/1
increasing intensity. But it's been hard. Harder for Hoau of course. Ben reports he is doing "not well," as

114

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779411
BURNS_00000763

he is there this week. A couple of days ago a colleague mentioned he had been awake at 4:00 a.m. and couldn't get back to sleep. My first thought was that it was remarkable that he thought this was remarkable. I've mostly been sleeping better recently, but not the last couple of nights. But if I let it get to me, the assholery wins.

I've decided **Redacted** to Thailand for our Investigator Meeting of South Korea and Australian sites. Started planning a bit. I want nothing more than to hug some baby elephants. Flying with an emotional support elephant would be even trickier than flying with Syra and Pike, who are here in the office with me now, doing their job. No, they are not official, but they really help these days. I think I will have to start meditating. It's just not in my nature. Rowing passes though with a bonus of fitness and endorphins.

Today was the "fireside chat" so that Remi could update on our progress. Had to give out our current enrollment, which is quite abysmal, thanks to a slow start of holidays, the omicron variant, and yeah shitheads, all your FUD. Just this morning one of our sites reached out to say:

Good evening,

I am sorry to be writing to you again with a similar, now more pressing concern. I was under the impression after our last call that Cassava's decision to not alert the sites of certain public information concerns was until if and when, a site brought those concerns to you, which we did. I apologize if I misunderstood when I assumed that because we did reach out we would be kept abreast going forward of any developments. That obviously was my mistake. That said, the news over the past month has been even more troubling to our site, as was the news about five days ago. I appreciate that you are having a fireside chat tomorrow, although we were hoping that you might have reached out several times since our discussions when major developments were made public. It seems as though these updates to us as a site were not in the plans. That is of course all in the past, however it is with regret that I inform you that after several internal discussions, we have come to the decision that it is in our sites best interest to withdraw as site for this protocol. We sincerely want to thank you for the opportunity, as while we regret it did not work out, please know that we wish you all the best in the future. Please advise as to what next steps need to be taken to initiate the closeout process.

Sincerely,

Vince Gillen
Executive Director
Lehigh Center for Clinical Research

Jee-sus. So we are supposed to proactively reach out to all 100 sites to allay potential concerns as they might arise? Just called and spoke to him – he was in a meeting but we'll talk later. Will try to talk him off the ledge. Meanwhile Jim is dealing with two other sites. Yeah, FUDDLEs, it's working. Congratulations.

And the CEO of PLOS got back to Matt and said:

Many thanks for your patience. Our Editorial Director, Suzanne Farley, has reviewed the investigation and she is satisfied that the outcomes are appropriate (I will note here that Suzanne was led the development of what

115

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779412

BURNS_00000764

became COPE's image manipulation guidelines when she was at Springer Nature, so has extensive experience in this area). Some relevant detail from Suzanne:

- We will not rescind or remove the retractions on the basis of the complaint. To do so would not align with industry standard practice or with PLOS policies on removal of PLOS content or appeals of post-publication decisions.
- We cannot reveal confidential aspects of an investigation to someone who is not an author/peer-reviewer/editor/formally-engaged external investigator. The confidential aspects include information about whether/when we discuss cases with institutional officials. However, we confirm that PLOS followed up in accordance with the relevant COPE guidance.
- You appear to have interpreted the COPE image manipulation (and retraction) guidelines differently: while you believe that there was only unclear evidence of manipulation (in which case, PLOS should have referred to the institution before retracting), PLOS believes that there was clear evidence of manipulation (which does not require pre-retraction referral to the institution)

We'd be happy to cooperate with a COPE review of PLOS' investigation; please use pub-ethics@plos.org for any communication.

Wow.

I did speak to Vince Gillen of the Allentown, PA site (Dr. Gross). He is a mile a minute. Not concerned about any possibility of fraud, but from a business perspective, he knows that we are going to suck up more of his site's time than another study, and he's trying to balance that with wanting to offer the drug to his patients. He was mostly upset that it was his imaging center who called him to ask him about it, and not only did he not know about the PLOS retractions, he didn't have an answer. He said he felt like an idiot. But I let him rant and he was totally honest with me. He felt that he should have been warned of this because he previously had zoomed with us about the allegations.

Today was the "fireside chat" that Remi used to give a general update and answer questions. Last night he had said, "I'm worried about getting mugged."

More true that we could have imagined. Apparently 200K phantom shares were dumped at market open, just like the $200MM dump right before my talk at AAIC. Followed quickly by AF speed writing a hit-piece and with help from a down market today, they drove our stock down a whopping 19% -- to 31. Unbelievable. We are enrolling and dosing (they said we were not). Here's AF's shit-headline in StatNews:

"Troubles mount for Cassava Sciences, as patient enrollment lags for Alzheimer's drug studies"

April 6, 2022

And today, to really try to kick us hard again, this fake screenshot claiming that Remi and Eric sold shares. Actually, I first thought it was a screenshot, but now find out that it was actually fake news told to the brokerage. I guess someone just called them up and told them? So it was actually on this company's website for anyone with an account to see, and anyone on Twitter to see:

116

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779413

BURNS_00000765



The brokerage was called. But the fear was out, and the stock dropped another 6.5% to 29.2. And we have Buttskin trying to claim our patents are invalid because of the PLOS retractions. Speaking of, I myself filed a complaint with COPE.



**Jesse brodkin**
@jesse_brodkin

A case (among several) for $sava share price target $0 in three slides:



7:41 AM · Apr 6, 2022 · Twitter for iPad

117

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779414
BURNS_00000766

I spent much of the day emailing other sites who had reached out to Premier about the PLOS retractions. Jim emailed a couple last night, much too long and at times a bit off-point. So I took the reigns this morning and first emailed Paul Solomon in Boston (he had also inquired). Then I sent a similar email to Dr. Nash in GA, and the UCSF team. Jim will email Toronto and Pierre Tarriot. Here's what I sent being proactive:

I am reaching out proactively about the recent the PLOS One retractions. We strongly believe these are unwarranted and are certainly not evidence of data manipulation. Hence, complaints have been filed with COPE because PLOS did not follow COPE guidelines for retraction, which require escalation to the institution in the absence of clear evidence of data manipulation. The basis for retractions of all five papers is a miniscule spec of common pixels in the backgrounds of original blot images from these publications, which we believe were caused by an imperfection in the scanner glass or backing of the scanner used to scan all these X-ray films. There are other differences between these backgrounds, and the spec of concern is far away from the cropped area of data in the publications. I will attach an email communication from a Western blot expert who strongly disagrees with these retractions. None of these five papers have anything to do with AD or simufilam, but they are nonetheless being used in a negative campaign against Cassava.

Please note that 4 other journals have reported that they found no evidence of data manipulation, and any others are simply waiting for CUNY to complete their investigation before responding. The papers under scrutiny are a small handful of Dr. Wang's >120 publications, all of which I'm sure have been examined closely by those making claims.

If you'd like to discuss further, please let me know and we can set up a call or zoom.

I think this is the night I said to Remi, "I feel like the guy in the Batman movie getting beat up in the back alley."


April 7, 2022

More proactive emails went out today to academic sites. Yesterday an angry LinkedIn message from someone who had previously sent a congratulations message after FDA denied the petition. "Sava destroyed my retirement money.... Better you hire a strong PR team because each time the CEO opens his mouth the stock tanks...." Eric gets tons of hate email.

Today, as expected, they made hay out of Gonzalez's site being deleted from clinicaltrials.gov. Change history shows every change you make. I had previously argued that she is not lining up random people by the busload but that it is more likely her site is likely mishandling the blood sample collected for plasma p-tau. Sooo many screenfails and so few qualifying. My guess is that she gets so many in at once that the bloods sit on the counter, possibly not even on ice, until they are all collected before spinning them. No way to confirm because they all say they handled them correctly. Even the "within 30 minutes" is a guess, but hopefully they would have at least been on ice during that time? "Pure speculation" said my colleague who wanted to cut her site. Maybe, but until we check it out we won't know. In the meantime, we suffered this additional blow today:

118

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779415
BURNS_00000767



**Jesse brodkin**
@jesse_brodkin

Head $sava MD pumper is OUT 😵 Author on P2b, OL and hand picked for Cassava's September conference call to investors has seen enough and is fleeing this sinking ship.



6:22 AM · Apr 7, 2022 · Twitter for iPad

We knew this would happen, but he proceeded anyway. They seemed to be like oil and water as they reacted badly to the questioning. We will pick this up next week with her and I hope to get her back screening, but carefully. But when I saw this I blew up because I saw it coming. As Eric said, this is a self-inflicted gunshot. Except that I am the target.

I realize this is a dooms-log. Who is going to want to read it? Why am I keeping track? Therapy? Anti-therapy?

**Redacted - Privileged**

# Redacted - Privileged

April 8, 2022

So if Bik, Bredt and Pitt approached an analyst after the New Yorker piece came out, stating that they had closed their short positions, their motivation is simply to bring down the company. (News flash!)

I had emailed Steve Arnold early yesterday. He sent this response:

_____

119

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779416

BURNS_00000768

It is heartwrenching to see this happening.  The allegations are serious, and spreading to other works that I and others have with Hoau's contributions, large or small.  I'm being contacted by journalists to comment which I politely decline. I've not yet been contacted by a journal, but NIH is aware, and Hoau's role in a current grant is suspended. The allegations and investigations put me in a difficult spot. Until they run their course and determinations are made, I'll be halting my contacts with Hoau and activities and listings as an SAB member for Cassava.

With regrets,

Steven

Fine. Don't think we will come running back to you either, especially not Hoau. Find someone else next time. What is most disturbing is that Steve is in a position to start an open support letter for Hoau to be signed by all his collaborators. But instead, they all treat him as if he is radioactive. Rush also. When Rush asked Hoau to send back their clinical samples, Remi had said, "I hope he microwaves them first."

This reminds me of a parenting story I read once where a mother convinced her very bouncy popular daughter that she had enough social currency to "spend" on associating with and getting to know the awkward misfit. And of course they became best friends. But this is not the storyline here.

As much as I would have liked to say other things, here is how I responded:

Thanks Steven. I can tell you more by phone if you'd like, but this should all be over soon with plenty of backing in Hoau's favor. I too have two grants on hold that should have issued in August. One is for $46MM in support of one of our Phase 3 studies. Unfortunately the person who has been hit hardest by all this is Hoau. He has been abandoned by colleagues and friends (despite understanding why), has lost substantial bodyweight and will never be the same. Heartwrenching for sure. This is cancel culture at its most vicious. And this is exactly why we will not publicize any advisors, even after we are cleared.

Stay well.
Lindsay

Translation: Piss off.

We had a breakthrough tonight. Remi was going through his next batch of 900+ pages of FOIA'd documents and came across the Bik email to me, Hoau and the other authors of the JNS 2012 paper. He noticed a recipient with a Russo Partners email.  This is a high-end NY PR/IR firm, that Remi has actually used before. He fired them because they are very expensive and weren't doing anything. (Of course Russo was angry with him.) The person was Marissa Goberdham who had the Russo email. Remi saw this as "plain evidence of a direct link between Bik and a media campaign against us and our CUNY prof."

When I saw the email, I texted Remi: "Jaw on floor." Then I called Hoau. As I was reading Remi's email to Hoau, we both went, wait a minute. Marissa Goberdham was a student of Hoau. She was an author on that paper that Bitck was emailing about. I remember noticing that Bik had found a current email for an old student of Hoau and thinking what is her method for finding a current email of someone no longer in the academic world? How did she look her up? What does she have access to? And then I let it go. But upon this realization when talking to Hoau, my first thought was, I guess that doesn't establish a link between the Bik and a PR firm for a negative campaign against us. Or does it? It does, because Bik has no

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779417
BURNS_00000769

magic access to find people's emails. She must have been working with this PR firm (on behalf of someone who pays her) and then noted that Marissa was a co-author. Otherwise, how would she have found the email? Marissa isn't high up enough to have her email posted online or be listed. Search her and nothing comes up. Not even employment there. Hoau said that she left after 7+ years trying to get her PhD. She was getting married and wanted Hoau to sign off that she had completed her PhD. She "was already on probation" said Hoau, she hadn't worked hard and had not completed anything close to a PhD. CUNY has a limit of 8 years. He told her if she went in front of the committee, she would embarrass herself and him. He thought if she postponed getting married and worked her butt off, maybe. But she thought she was deserving and left on poor terms.

April 9, 2022

I woke up in the night last night even more angry at Steve Arnold. I wanted to follow with another email, but given that any emails not copying a lawyer can be produced (we have eleven lawsuits against us), I thought maybe I'll write it and mail it. Or maybe I'll just write it here:

Steven,

Thanks again for your recent email. I am mailing this letter because I don't want it to be discoverable in email. Did it ever occur to you that instead of politely declining, you could simply say to these journalists who call you something like this: "I have collaborated with Dr. Wang for over 15 years on many projects. I do not believe any of the data he produced in those projects is fraudulent. Furthermore, I have no reason to believe he would ever falsify data. That's all I'm going to say on this topic." But instead, you treat him as if he is radioactive, wanting to "halt contacts" as if any association could damage you. Have you ever considered what it would be like if the tables were turned? I'm sure you think that could never happen. You have a pristine reputation at a prestigious institution and you are infallible. Yet it can easily happen to the Taiwanese immigrant at a lesser institution, and we should just hold our breath, far away, until the ugliness passes. If it could never happen to you, isn't that all the more reason you could take this "risk" to stand up for him? Maybe not though. What if you were accused, let's say, not of falsifying Western blot images, but of some sort of malpractice. It has happened as I'm sure you know. Wouldn't you want all your colleagues and collaborators to stand up for you and vouch for your character? I know someone whose physician father was falsely convicted of malpractice, and it took the help of Alan Dershowitz to overturn the conviction. In the meantime, he suffered a heart attack. I know another physician (a national team rower) who had to stop practicing because he was falsely accused of some sort of child molestation by the spouse of a friend as leverage in an ugly custody battle. There are many such stories. In every case, wouldn't you want anyone and everyone who knows the person accused to stand up and defend their colleague or friend? I know none of these analogies are perfect and they can go on and on, but we should nevertheless consider them. Which type of bystander would you have been, had you walked past the execution of George Floyd? What happened to the Jewish mantra "Never again"? Are you just going to let honest, hard-working Hoau suffer whatever comes his way while you watch in horror? When you actually had the ability to speak out? Even to gather a few of his collaborators for a stronger assembly of voices? Yesterday, I was contacted on LinkedIn by someone at Biogen. It was honestly eye-opening for me. He feels that "the same thing that happened to Biogen" that is happening to us. I was confused -- they have a crappy drug that doesn't work and is dangerous. What could he possibly mean? But look at it from the other side. It was sometimes helpful with some very careful management, when there is nothing else. Yet they were vociferously dumped on. He believes they were also subject to cancel culture, while the company sat on their hands – his words. All this to

121

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779418

BURNS_00000770

say, just look at things from the other side please. It is too late to add your help for Hoau. He has been damaged. He will be cleared soon, but not by any help from his colleagues. The only person who has steadfastly stood up for him (and us) is a complete stranger who knows Western blotting inside and out. I spoke to him on the phone briefly only once. His nearly first words were, "How is Dr. Wang doing?" We should all be more like him.

April 12, 2022

Two supporters and I filed complaints to the COPE organization about PLOS One retracting Hoau's five papers. In response, the COPE person sent this email to the senior ethics editor:

---

Iratxe Puebla <cope_assistant@publicationethics.org>

Mon 4/11/2022 12:59 AM

To: Renee Hoch <rhoch@plos.org>

Cc:

- Lindsay Burns;
- golander@gmail.com;
- mnachtrab@gmail.com

Dear Dr Hoch,

I am writing to you as Lindsay Burns as well as two readers - all cc-d in this email- have contacted the Committee on Publication Ethics (COPE) to raise concerns in relation to the retractions of five publications in *PLOS ONE* by Dr Hoau-Yan Wang. The retracted articles are listed below:

Wang H-Y, Frankfurt M, Burns LH (2008) High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor-Gs Coupling Underlying Opioid Tolerance and Dependence. PLoS ONE 3(2): e1554. https://doi.org/10.1371/journal.pone.0001554

Wang H-Y, Burns LH (2009) Naloxone's Pentapeptide Binding Site on Filamin A Blocks Mu Opioid Receptor-Gs Coupling and CREB Activation of Acute Morphine. PLoS ONE 4(1): e4282. https://doi.org/10.1371/journal.pone.0004282

Bakshi K, Kosciuk M, Nagele RG, Friedman E, Wang H-Y (2011) Prenatal Cocaine Exposure Increases Synaptic Localization of a Neuronal RasGEF, GRASP-1 via Hyperphosphorylation of AMPAR Anchoring Protein, GRIP. PLoS ONE 6(9): e25019. https://doi.org/10.1371/journal.pone.0025019

Bakshi K, Parihar R, Goswami SK, Walsh M, Friedman E, Wang H-Y (2014) Prenatal Cocaine Exposure Uncouples mGluR1 from Homer1 and Gq Proteins. PLoS ONE 9(3): e91671. https://doi.org/10.1371/journal.pone.0091671

Stucky A, Bakshi KP, Friedman E, Wang H-Y (2016) Prenatal Cocaine Exposure Upregulates BDNF-TrkB Signaling. PLoS ONE 11(8): e0160585. https://doi.org/10.1371/journal.pone.0160585

As you know, COPE's role is primarily to provide advice for member editors and journals and to promote a better understanding of publication ethics. If concerns are raised to COPE's attention, we aim to provide guidance on whether there are any actions that are not aligned with the COPE Core Practices or COPE guidelines and provide advice in relation to disagreements between the reader/author and the editor. We do not seek to interfere with specific editorial decisions.

With this in mind, we are writing to you in the hope that we can facilitate a dialogue in relation to the concerns raised. In order to make the process as transparent and constructive as possible, we have copied the individuals who raised concerns into this email and request that you do the same in your reply.

The concerns submitted to COPE relate to the handling of the retractions for the publications. The presenters feel that the issues raised about background similarities in the images are not justified and

122

CASS-CLASS-01779419

BURNS_00000771

that *PLOS ONE* proceeded with retraction even though clear evidence of image manipulation had not been established. The presenters view this as inconsistent with the COPE Retraction guidelines. In addition, the presenters feel that *PLOS ONE* did not follow the journal's process for image manipulation issues as it did not raise the concerns about the images to the attention of the author's institution, even though there was an ongoing investigation at the City University of New York. The presenters feel that the journal should have solicited input from the institution and await its recommendation. The presenters have also noted concerns about potential competing interests on the part of the individual who raised the concerns about the images.

We would very much appreciate hearing your comments in relation to the presenters' concerns, so that we can ascertain what advice we are able to provide.

We would be grateful if you could please comment on the process the journal followed to evaluate the image concerns in the five publications and to handle the retractions. Could you please provide the following:

- A summary of the process followed to review the concerns about the five articles and to handle the retractions of the publications.

- Comments on whether the journal considered other approaches to correct the record (e.g. Corrections or Expressions of Concern), and if so, on the circumstances that informed the decision to pursue retractions for all articles.

- Clarification on whether the journal raised the concerns about the articles to the attention of the institution, and if this step was not taken, the context for not escalating the matter to the City University of New York.

- Clarification on whether the journal reviewed the concerns about potential competing interests by the individual who noted the similarities in the images, and if so, how this was considered as part of the follow-up process.

- Information on the policies and processes in place at the journal to handle post-publication concerns about published articles.

Many thanks for helping us address these concerns. We look forward to hearing from you.

With best wishes,

Iratxe Puebla
Facilitation and Integrity Officer
Committee on Publication Ethics (COPE)

---

Dr. Hoch responded that she would respond within the week. She will have a very hard time responding to any of this.

Next up: An incriminating interrogative email sent to both Hoau and Remi by a NYT editor. Of course. First WSJ, then The New Yorker, and now NYT. Hoau did not respond. Here are questions and answers from Remi:

---

I'm a reporter for The New York Times. I am writing about your company, and specifically about some of the questions raised about your work. Please respond to the following questions. I would appreciate a response by **Tuesday 10 am ET.**

123

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779420
BURNS_00000772

1. How many employees does the company now have? **Approx. 25 fulltime**.

2. Is your lab work done only at Dr. Wang's lab at CUNY, as you have previously stated? Or do you also rely on other labs now? **We work with and rely on multiple labs.**

3. Is Dr. Wang still a member of your scientific advisory board? **Yes.**

4. Please comment on the recent retractions of papers in PLoS One from Dr. Wang's lab, including those related to Cassava's work. **The specific allegation involves approx. 6 pixels out of thousands or possibly millions that appear to be visual artifacts in the <u>background</u> only, and that are visible only under extremely manipulated conditions. These background pixels have <u>no</u> impact on the data or its interpretation.**

5. One expert on biomarkers noted that your reported biomarker values are out of range for the ELISA you used and better match those expected from Luminex. Please respond. **Other experts may disagree.**

6. Some experts noted that the drug restoring the shape of 100% of filamin A did not seem believable given filamin A's distribution in the body. Please respond. **We don't make this claim.**

7. Some experts said the improvement in cognition did not seem believable because the patients' scores after treatment took them out of Alzheimer's disease range entirely. Please respond. **The data is the data.**

8. Some experts said that the results from the clinical trial were difficult to interpret because there was no placebo arm, and the patients were not followed long enough to confirm that the results were real. Please respond. **An open-label study has no placebo arm by definition. Cognition measurements in randomized trials can be difficult to interpret (see Biogen data) and cognition measurement in open-label studies are even harder to interpret. However, safety data is safety data.**

9. You initially said the re-analysis of results from your phase 2b trial were done by an independent lab, but later revealed it was done by Dr. Wang. Please explain how Dr. Wang can be considered to be independent when he receives money from the company and leads all of your lab work.

**(1) Prof. Wang does not conduct all of our lab work.**

**(2) We are not aware of any medical professor who consults for free on an ongoing basis. We pay him $2,000/month.**

**(3) We have many external advisors, consultants, directors and auditors who are both compensated and independent.**

**(4) The alternative would be to conduct the bioanalysis in house, which some might argue is non-independent.**

10. Your phase 3 trial has only 60 participants per the fireside chat last week. How do you plan to step up the recruitment? **Biotech companies do not generally disclose details of their patient recruitment plans to the public. We are confident we will achieve our goals.**

> Happy to clarify any questions that are unclear.
> Thanks,
> Apoorva

She responds with more questions, clearly dictating from Bredt on the other end of the phone. Remi responds with this (in red):

---

Thank you. A couple of follow ups based on your responses:

4. Re: the retractions, I am not asking about one specific allegation in one specific paper. I am asking for comment on the number of retractions and expressions of concern by now. Dr. Wang now has 6 retractions and 2 expressions of concern, even if not all of them are related to Cassava. Does that not concern you? **Five of the six retractions are from PLOS. The sixth retraction was voluntary by all**

124

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779421

BURNS_00000773

authors due to a faint visual artifact in a single blot. The authors are repeating the experiment and are expected to resubmit results to the journal. "Expressions of concerns" are placeholders to recognize CUNY's pending investigation into allegations. If CUNY clears, the expressions of concerns are expected to clear.

6. I'm referring to Fig 2A in this paper, where all of the misshapen protein seems to have shifted by PTI-125 binding : https://www.sciencedirect.com/science/article/pii/S0197458017300878
One prominent Alzheimer's researcher said there was "no rational way this could happen." **(1) This paper refers to measurement of an altered conformation of filamin A in the brain that normalizes with drug treatment, and <u>not</u> with all filamin A in the body which would clearly and obviously not be rational. This is a distinction with a difference.  (2) This paper went through peer-review prior to publication, indicating there are neutral experts in the field who believe the methods and the data. (3) More recently, this paper went through another examination by neutral, expert parties as a result of allegations. In response to these allegations, the journal editor requested raw data for the article, including images of original, uncropped Western blots. Having received that data and completed its review, the editors found <u>no evidence for the allegations</u>. In fact, below is a reprint of the email from Peter Rapp, PhD, Editor-in-Chief, Neurobiology of Aging:**

*"We have now completed our evaluation of concerns regarding your 2017 report in Neurobiology of Aging (Wang et al. (2017) Neurobiol Aging, 55:99-114), including issues identified in your own review of the manuscript. To recap the evaluation, we considered input from several independent sources: 1) all of the available material was evaluated by a senior, highly-cited NIH scientist who has no conflicts or competing interests, but who has extensive relevant methodological expertise, 2) the paper was scanned using AI-based, automated image proofing software available through NBA's publisher (i.e., Proofig), and 3) the Editor who handled your original and revised submissions and I both reviewed the concerns, your responses, and the other available input. Our joint conclusion is that the number and nature of errors identified in the published report are legitimate concerns that might cause reasonable readers to question the reliability of the results. That said, we did not find compelling evidence of deliberate data manipulation intended to misrepresent the findings.  In the interest of NBA readers, our consensus decision is to publish an 'Expression of Concern' in connection with the report, with final action pending the outcome of the ongoing inquiry at the sponsoring institution (i.e., similar to the recent notice published at J Neurosci). If the outcome of that inquiry does not recommend otherwise, we would anticipate lifting the Expression of Concern and publishing a corrigendum.*

8. I'm not following your response to this question. The experts were not saying that an open-label trial should have a placebo arm. What they were saying is that an open-label placebo arm cannot be interpreted as showing positive results *because* there is no placebo, and you cannot rule out a placeo effect, especially in the 9-month range of the results reported. **To be clear, FDA does not accept cognition data from an open-label study as statutory evidence of efficacy. No one will argue this point. That said, mild-to-moderate Alzheimer's disease is an irreversible, chronic disease. It's a one-way street in that patients inevitably decline over time. We are not aware of a placebo effect going out 9 months in an open-label study in patients with mild-to-moderate Alzheimer's disease.**

125

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779422

BURNS_00000774

9. Please respond to the question asked -- Dr. Wang is not independent if he is on your scientific advisory board, so why was he described as such? As to your response, the alternative would be to hire a truly independent lab, one that is not linked to Cassava as Dr. Wang is. Why did you choose not to go that route?

**(1) Either way, we pay.**

**(2) I don't see Dr Wang – or any medical doctor – selling out his/her reputation for $2,000 per month.**

**(3) In biotech, SAB members are independent if they are (i) non-employees (ii) whose compensation is not based on results and (ii) who perform their work independently in their own facilities at their discretion. Prof. Wang clearly meets this definition.**

Thanks,
Apoorva

She continues a vicious tone, and Remi responds, again in red:

---

Thank you.

So no comment on the 5 PLoS retractions? **We did comment. See prior email regarding PLOS:**

> 4. Please comment on the recent retractions of papers in PLoS One from Dr. Wang's lab, including those related to Cassava's work. **The specific allegation involves approx. 6 pixels out of thousands or possibly millions that appear to be visual artifacts in the <u>background</u> only, and that are visible only under extremely manipulated conditions. These background pixels have <u>no</u> impact on the data or its interpretation.**

6. The comment was not that your blot showed 100% of filamin A in the body but that the idea of it shifting all filamin A in the brain *given the protein's distribution in the body* does not seem rational. Thanks for sharing the email from the editor. However, it does not say no evidence, it says they do not find compelling evidence, and also says they are adding an expression of concern, so it is not resolved yet. **Lack of evidence is lack of evidence, however worded. As a reminder, this is spoken by a neutral, expert in the field.**

**As I said below:** *"Expressions of concerns" are placeholders to recognize CUNY's pending investigation into allegations. If CUNY clears, the expressions of concerns are expected to clear.*

8. Where you say: **"That said, mild-to-moderate Alzheimer's disease is an irreversible, chronic disease. It's a one-way street in that patients inevitably decline over time"** In your press releases, you have said the drug improved cognition and decreased neuropsychiatric behaviors -- doesn't that mean you're saying your drug does reverse aspects of the disease and that decline is not inevitable?
**We have no further comment beyond what is in the press release.**

*Then she responds with this:*

Sorry, I think there is some miscommunication here. Per my previous email, I am asking how you feel about ALL of the retractions from Dr. Wang's lab and whether you are concerned about the quality of the lab's work. Those retractions are not all because of approx 6 pixels.

---

126

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779423

BURNS_00000775

*And Remi responds:*

**Yes they are.** That should be its own story. By this low-bar from PLOS, many, if not most, Western blots with hand poured gels and traditional x-ray film may qualify for retraction. Science editors are supposed to follow COPE guidelines for retraction (COPE is an independent org that assists science journal editors, see https://publicationethics.org/guidance/Guidelines). There are open questions about whether PLOS editor followed COPE guidelines in retracting Prof. Wang's five paper.

We stand by Prof. Wang 100%.


*Later, Remi added this:*

Apoorva –

I would appreciate if you would include the following statement in your article, attributed to me: **"Short sellers and their proxies have been disseminating false and misleading information about Cassava Sciences for months.  We are confident the facts will prevail.  We have the utmost confidence in our people, Prof. Wang, our drug candidate and our data and remain committed to our work."**

Thank you

**Remi Barbier
President & CEO**

In the middle of all this, Remi commented, "I'm tired of all the hate. You'd think we were killing baby seals."


April 13, 2022

Looks like we held her off, for now. Possibly this statement. Possibly a phone call from someone else to this reporter. It's not over, but I'm claiming it as a battle victory. Meanwhile, the clock is ticking on Renee Hoch responding to COPE's questions.


April 14, 2022

Two twilight zone things happened to me today. Here's the first: I was supposed to zoom with the UCSF team at 4:00. I click the link a couple minutes early. There's a name I don't recognize. Then I see "Pankaj." I think, oh how funny... they also have a Pankaj. Then I see Hans. What? This is my 5:00 zoom group in Vancouver. So I leave, click the link again. Same Vancouver team. I try logging into zoom and entering the meeting number and password. Pankaj and Hans and team. Now they are showing slides and it's getting embarrassing. I try logging in from a different zoom account, linked to my personal email, which notes that I haven't used that account in ages and sends me a code to unlock it before I can get in. No luck. I tried again and again, emailed them. I then emailed them all a Teams link after carefully copying and pasting each email address. They aren't looking. I even tried dialing into the Zoom dial-in number, put in the meeting number and passcode. It's Vancouver, who are probably getting more and more curious, as I am getting more and more frustrated. How does the dial-in still mess me up? They are all on, using the correct Zoom meeting ID and passcode, the same that I am trying that get me zoomed

127

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779424

BURNS_00000776

into the Vancouver team. I try using Firefox, which STILL brings me, about the 20th time, to Hans and team. Eventually, one by one they accept my Teams invite and log on. With 20 minutes to go; I go over another 12 before eventually clicking into the Zoom with Vancouver an hour later (incidentally, by this time, the UCSF link doesn't bring me there).

# Redacted

Right before twilight thing number 1, literally 5 minutes before 4:00, Renee Hoch emails her "response" to the COPE questions. I scan them. So vague, they say nearly nothing, but make up for lack of detail regarding the "concerns" by providing dates that they asked for things and dates that we provided them. Nice diversion screen.

For COPE's first request: "**A summary of the process followed to review the concerns about the five articles and to handle the retractions of the publications**," she responds with:

"In evaluating the materials provided, the PLOS Publication Ethics editors noted that some of the underlying data did not match the published panels. The editors also identified additional concerns pertaining to the underlying data files, including about similarities in background noise patterns for data files provided for different experiments and different articles."

So this is the first time that we hear that the original blots we provided "did not match," and she is trying to downplay the "similarities in background noise patterns" as "additional concerns."

She claims that "PLOS followed up with the authors on February 2-4, 2021 [she means 2022] regarding these additional concerns and asked the authors to clarify issues that were not fully resolved following the first round of queries." Meaning what? Which additional concerns and which issues?

Then "On February 9-12, the authors responded to the additional queries and provided additional data, but these did not resolve the outstanding concerns with the published figures or those with the underlying data provided." Why? This is so vague no one knows what she is talking about.

Then "After completing our assessment of the comments and data provided by the authors, we discussed the case and its resolution…" Um, but how did you arrive at that "resolution"?

Then "On March 15, the authors appealed the decisions and provided a rebuttal letter, three letters from a third party who was not on the author lists and who was not engaged by the journal in the case follow-up commenting on some of the concerns raised on public platforms and concerns raised by the journal…" She incorrectly noted that the letters were from just one person, not two.

Then "We reviewed the appeal documents and concluded that the issues underlying the retraction decision had not been resolved based on the materials provided." So basically she just didn't believe Chuck or Venkat's assessments.

COPE's second request: "**Comments on whether the journal considered other approaches to correct the record (e.g. Corrections or Expressions of Concern), and if so, on the circumstances that informed the decision to pursue retractions for all articles.**"

128

CONFIDENTIAL
CONFIDENTIAL

She responds this: In this case, we considered that the unresolved issues warranted retraction, and that Corrections or Expressions of Concern were not suitable, for the following reasons:
• The image and data concerns were not resolved in follow-up discussions, as is discussed in the public retraction notices, and so Corrections were not appropriate.
• In light of the unresolved data and figure concerns, we concluded that the results reported in the five articles could not be considered reliable or well-supported by primary data, and that consequently the first criterion of the COPE Retraction Guidelines applied.
• We concluded that for each of the five articles there was a sufficient burden of evidence to support retraction as the final resolution as per COPE guidance for Image Manipulation in a Published Article, and that institutional input was not needed to inform this decision.
• The PLOS Retraction policy states that PLOS may retract an article, "if there are image or data concerns for which the original raw data are not provided, not available, or not sufficient (per our editorial assessment) to address the issues." (The "not sufficient" clause of this policy applies in this case, for all five retracted articles.) Per PLOS' internal standards, the unresolved issues warranted retraction rather than an Expression of Concern.

COPE's third request: "**Clarification on whether the journal raised the concerns about the articles to the attention of the institution, and if this step was not taken, the context for not escalating the matter to the City University of New York.**"

She says: "The PLOS Publication Ethics team notified the City University of New York of the concerns and retractions on 30 March 2022/01 April 2022." Right. After you retracted all five.

COPE's fourth request: "**Clarification on whether the journal reviewed the concerns about potential competing interests by the individual who noted the similarities in the images, and if so, how this was considered as part of the follow-up process.**"

She says: "As noted in the PLOS Ethical Publishing Practice policy, we follow up on concerns raised to PLOS regardless of who raised the issues. We recognize that readers raising concerns may in some cases have potential competing interests. However, we complete an objective editorial assessment of the issues raised about the PLOS content and follow up accordingly on verified issues, regardless of the reader's potential interests. For example, in this case, we conducted an objective and rigorous assessment of the articles & supporting materials and followed up with the authors on concerns that we verified or identified internally." BS.

April 15, 2022

It was a dragon slaying day. Got up at 5:00 a.m. to address this BS from Hoch at PLOS. I sent this email before 6:00 a.m:

---

Dear Iratxe,

Thank you for raising this matter to the Facilitation and Integrity subcommittee. I would like to add the following:

129

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779426

BURNS_00000778

1. Dr. Hoch's response is the first that I have heard that the retractions were due to the original images "not matching" the published images. If a wrong image was erroneously supplied (which I don't believe was the case), this does not constitute image manipulation. Further, per the attached email communication from Dr. Hoch to me (with a response by one of the independent Western blot experts at the top of the thread), Dr. Hoch had provided a different reason as most noteworthy: "...similarities between background patterns observed in the blot data provided to PLOS. This is a major concern that contributed to the editorial decision..."

2. Dr. Hoch may not have read the letters provided by independent Western blot experts, as she incorrectly stated that the three letters were from "an" independent third-party. The third letter was from a second independent Western blot expert. I will attach all three letters here, which were disregarded in the decision to retract, along with the author explanations.

3. Dr. Hoch states in her response that PLOS One followed COPE guidelines and retracted because the data images provided were "insufficient to resolve the concerns." This is in direct contradiction to an email from the PLOS One CEO provided to one of the people filing a complaint to COPE. In this email, Alison Mudditt stated: "You appear to have interpreted the COPE image manipulation (and retraction) guidelines differently: while you believe that there was only unclear evidence of manipulation (in which case, PLOS should have referred to the institution before retracting), PLOS believes that there was clear evidence of manipulation (which does not require pre-retraction referral to the institution)."

Thank you again for helping us to resolve this matter.

Best regards,
Lindsay

And a few hours later she tosses this back across the fence, basically saying that, well, Dr. Burns is an author only on two of the five (so for those TWO, the background pixels carried the retraction?), and, that she is concerned now about keeping the case confidential, now that Iratxe has insisted on keeping the complainants copied:

---

Dear Iratxe,

Please let me know if the COPE Facilitation and Integrity Committee would like PLOS to provide point by point responses to the issues raised by Dr. Burns.

For now, I would like to note to the Facilitation and Integrity Committee that the issue raised in point 1 of Dr. Burns' email was addressed directly in correspondence from PLOS to the corresponding author(s)* in February, 2022. Dr. Burns is an author only on two of the affected articles (pone.0001554 and pone.0004282), and is corresponding author for only one (pone.0004282). Mr. Nachtrab is not an author on any of the five articles and so was not involved in any of the case correspondence; to my knowledge the same is true of the other reader cc'd in this discussion.

130

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779427

BURNS_00000779

\* For pone.0004282, PLOS also included Dr. Wang and a third individual on the follow-up queries due to the email header on the message through which PLOS received comments and data in the first round of discussion.

Per <u>PLOS' Ethical Publishing Practice Policy</u>, "*We consider information and materials received in ethics case follow-up discussions as confidential, but we reserve the right to share relevant information with others involved in the case (e.g. editors, reviewers, other journals, affected data repositories), discuss the case at a COPE forum, and/or contact authors' institutions, funders or regulatory bodies, in accordance with COPE guidelines.*" According to this policy we would not ordinarily share case details with readers; we do not consider readers contesting a case outcomes as those "involved in the case" and with whom we would share confidential case information. (In this case, Dr. Burns is in this category for pone.0025019, pone.0091671, and pone.0160585.)

I have concerns about the conflict in this case between honoring COPE's request for transparency in these review discussions and PLOS' ability to uphold this aspect of our policy. While I did not raise this in my first response to COPE, I would be grateful for your/COPE's input on how COPE would like PLOS to proceed in these discussions in light of this conflict, particularly if follow-up comments or queries involve details of our case correspondence and/or editorial assessments.

Best regards,
Renee

I followed with an email attaching 4 of the 5 responses to additional queries (couldn't immediately find the fifth) and again with an email with one last relevant document: Dr. Wang's official response to all the retractions in which he details his honesty and record of integrity.

I just feel like kickboxing this woman in the face.

# Redacted - Privileged

131

CONFIDENTIAL
CONFIDENTIAL

CASS-CLASS-01779428

BURNS_00000780