# Exhibit 120

********* CONFIDENTIAL TRANSCRIPT *********

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

ADRIEN HEILBUT; JESSE )
BRODKIN; and ENEA MILIORIS, )
)
               Plaintiff, )
)
DAVID BREDT and GEOFFREY )
PITT, )
)
   Intervenor-Plaintiffs, ) No. 1:24-cv-05948-JLR-OTW
)
         vs. )
)
CASSAVA SCIENCES, INC.; )
REMI BARBIER; and LINDSAY )
BURNS, )
)
          Defendants. )
)

DEPOSITION OF

PAUL AISEN

Wednesday, June 11, 2025

Reported By:

MICHELLE K. BAILEY

RPR, CSR No. 10713

********* CONFIDENTIAL TRANSCRIPT *********

Page 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - -

ADRIEN HEILBUT; JESSE )
BRODKIN; and ENEA MILIORIS, )
)
      Plaintiff, )
)
DAVID BREDT and GEOFFREY )
PITT, )
)
  Intervenor-Plaintiffs, ) No. 1:24-cv-05948-JLR-OTW
)
    vs. )
)
CASSAVA SCIENCES, INC.; )
REMI BARBIER; and LINDSAY )
BURNS, )
)
     Defendants. )
)

Deposition of PAUL AISEN, taken on behalf of the Plaintiffs, beginning at 9:05 a.m., and ending at 3:20 p.m., on Wednesday, June 11, 2025, before MICHELLE K. BAILEY, RPR, CSR No. 10713.

---

Page 3

APPEARANCES:

For the Plaintiffs:

  CLARICK GUERON REISBAUM, LLP
  BY: DAVID KUMAGAI, ESQ.
  41 Madison Avenue
  23rd Floor
  New York, New York 10010
  212.633.4310
  dkumagai@cgr-law.com

For the Intervenor-Plaintiff:

  GOODWIN PROCTER, LLP
  BY: JESSICA VOGELE, ESQ.
  620 Eighth Avenue
  New York, New York 10018
  212.813.8800
  jvogele@goodwinlaw.com

For the Defendants Remi Barbier and Dr. Lindsay Burns:

  LAW OFFICE OF STEVEN J. FINK PLLC
  BY: STEVEN FINK, ESQ.
  81 Main St,
  White Plains, New York 10601
  steven.fink@sjfinkpllc.com

For the Defendant Cassava Sciences:

  GIBSON DUNN & CRUTCHER, LLP
  BY: SCOTT CAMPBELL , ESQ.
    LLOYD MARSHALL, ESQ.
  811 Main Street
  Suite 3000
  Houston, Texas 77002
  scampbell@gibsondunn.com
  lmarshall@gibsondunn.com

ALSO PRESENT:
  Grant Cihlar, videographer

---

Page 4

I N D E X

WITNESS: PAUL AISEN

|  | PAGE |
|---|---|
| EXAMINATION BY MR. KUMAGAI | 10 |
| EXAMINATION BY MR. CAMPBELL | 170 |
| EXAMINATION BY MR. FINK | 195 |
| FURTHER EXAMINATION BY MR. KUMAGAI | 199 |

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | E-mail thread between Dr. Aisen and Dr. Burns, Bates Cassava_000026388 | 172 |
| Exhibit 4 | E-mail thread, with attached original blots, Bates Cassava_000540455 | 181 |
| Exhibit 5 | E-mail thread, Bates Cassava_000540616 | 183 |
| Exhibit 6 | E-mail thread, Bates Cassava_000519954 | 184 |
| Exhibit 7 | E-mail thread, Bates Cassava_000016062 | 187 |
| Exhibit 8 | E-mail thread, Bates Cassava_000541186 | 188 |
| Exhibit 9 | E-mail from Dr. Aisen to Dr. Burns, dated 8/15/22, Bates Cassava_000739110 | 194 |
| Exhibit 20 | Indictment | 26 |
| Exhibit 21 | E-mail from Dr. Burns, dated 5/12/11, Bates Cassava_00517511 | 39 |

---

Page 5

I N D E X
(Continued)

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 22 | Confidentiality Agreement, Bates Aisen_0000862 | 43 |
| Exhibit 23 | E-mail thread between Dr. Burns and Dr. Aisen, Bates Cassava_000375558 | 48 |
| Exhibit 24 | E-mail thread between Dr. Burns and Dr. Aisen, Bates Cassava_000750871 | 56 |
| Exhibit 25 | Article Entitled "Effects of Simufilam of Cerebrospinal Fluid Biomarkers in Alzheimer's Disease: A Randomized Clinical Trial." Bates, Plaintiffs0219624 | 57 |
| Exhibit 26 | Abstract entitled "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients." Bates Aisen_0001761 | 64 |
| Exhibit 27 | E-mail from Dr. Aisen to Dr. Rissman, Bates Aisen_0000661 | 70 |
| Exhibit 28 | E-mail thread between Dr. Rissman and Dr. Aisen, Bates Aisen_0000634 | 77 |
| Exhibit 29 | E-mail thread between Dr. Rissman and Dr. Aisen, Bates Aisen_0000736 | 81 |
| Exhibit 30 | E-mail thread, with attached letter to Dr. Vellas, dated 10/19/21, Bates Aisen_0000652 | 86 |

2 (Pages 2 - 5)

Page 6

I N D E X
(Continued)

E X H I B I T S

EXHIBIT NO.         DESCRIPTION         PAGE
Exhibit 31    E-mail thread between Dr.      91
              Aisen and Dr. Rissman, Bates
              Aisen_0000733
Exhibit 32    E-mail thread, Bates          95
              Aisen_0000650
Exhibit 33    E-mail thread, Bates          98
              Aisen_0000726
Exhibit 34    E-mail thread, Bates         106
              Cassava_000087955
Exhibit 35    E-mail thread, Bates         110
              Aisen_0000686
Exhibit 36    E-mail thread, Bates         112
              Cassava_000461586
Exhibit 37    Letter to Dr. Burns from Dr. 114
              Spruck, dated 11/23/21, Bates
              Cassava_000461614
Exhibit 38    Article posted in Silicon    117
              Investor
Exhibit 39    Letter to Ernst & Young, dated 119
              2/28/22, Bates
              Cassava_001257502
Exhibit 40    E-mail thread, Bates         122
              Aisen_0000793
Exhibit 41    E-mail thread, Bates         126
              Aisen_0000680
Exhibit 42    E-mail thread, Bates         129
              Aisen_0000694

Page 7

I N D E X
(Continued)

E X H I B I T S

EXHIBIT NO.         DESCRIPTION         PAGE
Exhibit 43    Article from JPAD entitled   134
              "PTI-125 Reduces Biomarkers of
              Alzheimer's Disease in
              Patients." Bates
              Aisen_0000787
Exhibit 44    E-mail thread, Bates         135
              Aisen_0000709
Exhibit 45    Letter from Dr. Spruck, dated 136
              6/28/22, Bates Aisen_0001386
Exhibit 46    E-mail thread, Bates         138
              Aisen_0000748
Exhibit 47    Editor's Note with redactions 144
Exhibit 48    E-mail thread, Bates         149
              Aisen_0000706
Exhibit 49    E-mail from Dr. Aisen to Dr. 161
              Burns, dated 11/10/22, with
              attached CTAD abstract, Bates
              Cassava_001041491
Exhibit 50    E-mail thread, Bates         167
              Cassava_00391513
Exhibit 51    Article from Science Magazine 199
              entitled "Blots on a Field?"

Page 8

WEDNESDAY, JUNE 11, 2025

9:05 A.M.

THE VIDEOGRAPHER: Good morning. We're going on the record. The time is 9:05 a.m. Pacific daylight time on Wednesday, June 11th, 2025. Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of the camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record. This is media unit 1 of the video recorded deposition of Dr. Paul Aisen, taken by counsel for plaintiff in the matter of Adrien Heilbut, et al., Cassava Sciences, incorporated, et al. Filed in United States District Court, for the southern district of New York. The case number is 24-c-v-ups-05948. This deposition is being conducted remotely using virtual technology. My name is Grant Cihlar from the firm Veritext, and I have the videographer. I am a notary public you. I am not related to any party in this action nor am I financially interested in the outcome. If there are any objections to proceeding, be please state them at the time of your appearance. Counsel will

Page 9

now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. KUMAGAI: This is David Kumagai, from the law firm Clarick Gueron & Reisbaum, on behalf of the plaintiffs.

MR. CAMPBELL: And this is Scott Campbell, with Gibson Dunn, appearing with my colleague Lloyd Marshall, also from Gibson Dunn, on behalf of Cassava Sciences, Inc.

MR. FINK: Good morning, Dr. Aisen. My name is Steve Fink. I'm with the law offices of Steven J. Fink, PLLC, and I represent Remi Barbier and Dr. Lindsay Burns.

MS. VOGELE: Good morning, everyone. This is Jessica Vogele, on behalf of the intervenor plaintiffs, Dr. Geoffrey Pitt and Dr. David Bredt.

THE VIDEOGRAPHER: Thank you.

Will the court reporter please introduce yourself, administer the oath to the witness, and then counsel may proceed.

THE REPORTER: Good morning. Michelle Bailey. License No. 10713.

PAUL AISEN,
having first been duly sworn

********* CONFIDENTIAL TRANSCRIPT *********

Page 10

by the reporter, was examined and testified as follows:

EXAMINATION

BY MR. KUMAGAI:

Q. Good morning, Mr. Aisen. Thank you very much for being here today. Before we begin, in earnest, can you please just state your full name for the record.

A. My name is Paul Aisen.

Q. And where are you currently located?

A. San Diego, California.

Q. And are you at your offices?

A. Yes.

Q. And offices where?

A. The address of my facility is 9860 Mesa Rim Road, San Diego, California.

Q. And is your office affiliated with any institution or school?

A. Yes. We are an institute, an academic institute of the University of Southern California.

Q. And what is the academic institute that you're a part of?

A. It's called ATRI, the Alzheimer's Therapeutic Research Institute.

Q. And what is your role at that of institution?

Page 11

A. I'm the director.

Q. And that means you're the leader of that. Is that fair?

A. Yes. Yes.

Q. Is there any reason you cannot give honest or accurate testimony today?

A. No.

Q. Can you describe, just at a very high level, the type of work that you currently do and have done throughout your career. I know that's a lot to cover, but sort of a summary, if you can provide one.

A. Yes. So I am a physician by training, formerly in the practice of medicine. But for a number of decades I've been focused on research, and more specifically, the development of therapies for Alzheimer's disease. The institute that I direct is a clinical trials program. We work on methodology and conduct of clinical trials to advance therapeutics of Alzheimer's disease. We conduct trials with funding from NIH and often in partnership with companies. We develop methods. We work on all aspects of clinical trial administration to improve our ability to advance AD therapeutics.

Q. Thank you.

And you have a BA in biochemistry and molecular

Page 12

biology from Harvard; is that right?

A. Correct.

Q. And you have a medical degree from Columbia University; is that right?

A. Yes.

Q. Approximately, when did you first get involved in Alzheimer's research, specifically?

A. The late 1980s.

Q. So you've been involved in Alzheimer's research for approximately 35 or some odd years. Is that fair?

A. Yes.

Q. And aside from your current role as the directed of ACTI -- is that what you said? ACTC?

A. ATRI.

Q. ATRI. Aside from your current role as director of ATRI, do you have any other professional roles that you are actively involved in?

A. As an academic member of the faculty of the university, I have lots of activities. So I'm not sure what your question encompasses. For example, I am an editor in chief of a journal, the Journal For Prevention of Alzheimer's Disease. I am an organizer of an international meeting called Clinical Trials and Alzheimer's Disease. I collaborate with people around the world. So I'm not sure if that answers your

Page 13

question.

Q. It does. Thank you.

All right. Let's shift gears to this case.

Do you know the defendants in this action, Cassava, Dr. Lindsay Burns, or Remi Barbier?

A. Yes.

Q. And how do you know -- let's take them one at a time. How do you know the company Cassava?

A. So I view my role or my mission as advancing AD therapeutics. And I talk to individuals all the time who are -- share an interest in this field. Sometimes they're informal conversations. Sometimes they're more formal but unpaid relationships. Sometimes they're paid consultations. Sometimes they're research collaborations. I have relationships, I think, with most individuals and companies and universities that share an interest in developing therapies for Alzheimer's disease.

In that context, while I can't say I remember the details, I know that I had some contact with Pain, which I think is the precursor to Cassava, years ago. I don't really remember the details, but I believe I was a paid consultant briefly for Pain. And my relationship continued with Cassava. After a period of years, I've had a number of interactions, mainly by e-mail, with

4 (Pages 10 - 13)

******** CONFIDENTIAL TRANSCRIPT ********

Page 14

Lindsay Burns as the leader of Cassava. I believe that those were all informal, unpaid, but I can't be certain of that.

Q. Thank you.

And any communications or meetings with Mr. Barbier, Remi Barbier?

A. I don't think so. I don't recall any.

Q. Aside from your communications with Dr. Burns, have you spoken with or met with anyone else at Cassava?

A. I have met with Rick Barry relatively recently.

Q. And what was the topic of that meeting with Mr. Barry?

A. Talking about the state of affairs with Cassava, trial results. I think he had asked me for help in just interpreting data from the most recent trials.

Q. And do you recall what your feedback or response was to his request?

A. I don't recall the details. But it was a negative study. And we talked about that and what it might mean and what could be inferred from the data.

Q. Do you recall any particulars about what you thought could be inferred from the data?

A. I don't remember the specifics. But I suspect I was suggesting caution in interpreting post-hoc

Page 15

analyses or subgroup analyses. Often that's an important topic of discussion in considering next steps after a negative trial.

Q. So aside from Mr. Barry and Dr. Burns, have you had any contact or meetings with anyone else at Cassava?

A. I don't think so. I would say I do -- as I'm thinking about this, I think Jim Kupiec, I believe, was part of the Cassava team, and I have -- I knew Jim from prior work when he was at another company. And I do remember at one point talking to Lindsay and Jim. I'm not sure I can remember exactly when it was. But that would be the only other person I can recall talking to.

Q. And was that meeting or contact with Mr. Kupiec and Dr. Burns, was that at the CTAD conference in Boston?

A. Could well have been.

Q. Approximately, time range? Do you have a sense as to when that would have been?

A. Last few years. But I don't remember more than that.

Q. Do you know who Doctor professor Hoau-Yan Wang is?

A. I know that he's a basic scientist who was involved in preclinical studies with Cassava.

Q. And have you ever had any communications or

Page 16

meetings with Dr. Wang?

A. No meetings, and I don't believe any communications either.

Q. Are you familiar with Cassava scientific advisory board?

A. You know, I may have been. I seem to recall that I may have been a member of a scientific advisory board. Whether for Pain or for Cassava or both, I don't know and I don't -- again, I don't believe I had any financial arrangement ever with Cassava. But, again, I deal with lots of companies and I don't remember the details. So I'm not sure, again, what exactly you're asking me, but I don't know who's on the scientific advisory board of Cassava. But it could be that I am. So I just don't know.

Q. Do you recall any meetings with Geoffrey Cummings or Steven Arnold in connection with Cassava?

A. I know Jeff Cummings and I know Steve Arnold. And I don't recall any conversations about Cassava, but maybe there were.

Q. So just to be clear, it's not -- you're not quite sure if you have or even currently are serving on Cassava scientific advisory board. Is that fair?

A. Correct. Yes.

Q. Okay.

Page 17

And you mentioned being a paid consultant for Pain Therapeutics, which rebranded as Cassava. Aside from that engagement, have you had any other paid arrangements with Cassava that you can recall?

MR. CAMPBELL: Object to the form of the question.

THE WITNESS: Not that I can recall.

MR. CAMPBELL: I apologize, Dr. Aisen, for cutting you off. Sometimes I will object to Dave's questions. So just give me a beat. I'll put it in, and then you can go ahead and answer.

THE WITNESS: Got it. Thanks.

BY MR. KUMAGAI:

Q. Do you recall, ballpark, how much money you received from Cassava when it was known as Pain Therapeutics?

A. I -- to the best of my recollection, we had only one contact. And I don't. So my guess is it was a day or less of time. And I would -- typically, when I was paid, it would be a few hundred dollars per hour. But that's about as much as I can recall.

Q. Have you ever had any communications with lawyers working for Cassava that you can recall?

A. I'm not sure. I'm not sure. So I have been pulled into this conflict in a number of ways, including

5 (Pages 14 - 17)

********* CONFIDENTIAL TRANSCRIPT *********

Page 18

through the Justice Department and various of litigants. I don't recall having any conversation attorneys for Cassava. Although, I had a brief conversation with Mr. Campbell, I think, yesterday. But that would be it. To my recollection. Again, I'm not certain.

Q. Of course. Okay.

And what did you discuss with Mr. Campbell.

A. Just talked in general about this deposition you and my contacts with you.

Q. And did you review any documents with Mr. Campbell?

A. No. He asked me -- or maybe I brought it up -- the document that I sent to you, Mr. Kumagai, it was a -- you had asked me to search my records for a draft of a note that might have been published but, ultimately, was not published in JPAD. And I found that and sent it to you. And that came up in my conversation with Mr. Campbell.

Q. And anything else that you can recall from your conversation with Mr. Campbell?

A. I don't -- again, I'm not sure. I mean, I -- just as I spoke with you, Mr. Kumagai, about the case in general and my views in general, I had a similar conversation with Mr. Campbell.

Q. Have you had any contact that you can recall

Page 19

with an individual named William Foley, who's a lawyer at the law firm Orrick, Herrington & Sutcliffe?

A. I don't recall. That name sounds maybe slightly familiar, but I don't recall.

Q. And have you had any contact with lawyers representing Dr. Burns or Mr. Barbier?

A. Again, as I said, I don't recall any.

Q. Have you ever been an investor in Cassava, either owning or selling Cassava securities?

A. No.

Q. If you were an investor in Cassava, is that something you would have likely been expected to disclose in some capacity, either as an academic or as an editor of JPAD?

A. Yes.

Q. And why?

A. In my field, we tend to disclose every contact that might be considered a perceived conflict of interest. When we share views about the company, we always talk about our relationships with companies. So stock ownership certainly would have been disclosed in many forum -- in publications. We usually have a disclosure side at the beginning of any presentation of a scientific meeting. And that kind of relationship would have been disclosed.

Page 20

Q. And so being a shareholder in a company is understood in your field as a potential conflict of interest that should be disclosed. Is that fair?

MR. CAMPBELL: Object to form.

THE WITNESS: Yes. As a potential raising of perception of conflict of interest, that should be disclosed. Yes.

BY MR. KUMAGAI:

Q. What is your understanding of Cassava's drug, Simufilam, also known as PTI-125?

A. Are you asking me from a technical perspective or just more generally? I mean, this is -- this is a compound that Cassava was developing as a potential therapeutic for Alzheimer's disease.

Q. Great. Yes. That was more or les what I was asking. Too technical and I won't probably understand. So that's appreciated.

What was your first impression, if you can recall, of Simufilam, or PTI-125?

A. I would say that this was the development of a potential therapeutic based on a novel mechanism of action that might suggest the possibility of a beneficial affect on the pathophysiology of Alzheimer's disease.

Q. And what connections, if any, have you had to

Page 21

Simufilam or its trials or the underlying science?

A. I'm not sure I understand that question. My work involves being open to and interested in all ideas that might be useful in advancing AD therapeutics.

Q. And have you ever reviewed data from trials of Simufilam, for example?

A. Yeah. I can think of two contacts in which I have reviewed data. So in my conversations with Lindsay Burns and Jim Kupiec I suspect we talked about data. I can recall some exchanges with Lindsay Burns in particular about preliminary data from small studies using this drug. And I was drawn into a discussion of a paper published in JPAD, the journal again. I'm one of the editors in chief of JPAD. And I was brought into the discussion of potential issues with figures in the publication of JPAD.

Q. And the data that you just described, including the article in JPAD, that was, I believe, all concerning sort of phase 2 data for Simufilam. Does that sound right?

A. Yes. Yes.

I can -- just as I'm thinking -- and again, I don't remember all the details going back. But I do recall also that we had some discussions about -- let me step back.

6 (Pages 18 - 21)

********* CONFIDENTIAL TRANSCRIPT *********

Page 22

We have a program called -- I know we have a lot of acronyms -- called ACTC, which is Alzheimer's Clinical Trials Consortium. ACTC is an NIH funded program that supports clinical trials of potential therapeutics for Alzheimer's. I am one of the potential investigators, and I direct the coordinating center for ACTC. ACTC accepts suggestions from academic investigators and companies around the world about trials that we would get involved in. And I recall that there were discussions and I believe a submission of a trial, a proposal of a trial from Cassava. This would have been some years ago, maybe five years ago or seven years ago. Again, I don't remember. We did not end up moving forward with a collaboration with Cassava.

Q. And why did you not move forward with a collaboration?

A. I do not remember the details. But we do not move forward in most cases, I will say. So I would guess that the -- the review process is a multistage process with different individuals. Ultimately, decisions are made by a scientific review group. Usually, that group decides that there's not yet enough clinical data to support moving forward. This is how they respond to most. Again, we get many, many submissions, and that's usually the response. But I

Page 23

don't remember the details. Again, it was years ago and I oversee the submission process for all potential collaborators with ACTC.

Q. You mentioned a moment ago that you've had some involvement in government investigations related to Simufilam. Is that fair?

A. Yes.

Q. Can you describe, at a high level, the involvement that your -- that you've had?

A. Yeah. So I was contacted -- and I'm going to get the details wrong. But I think I was contacted by someone from the Justice Department about reviewing activities of Cassava. There had been complaints made and they were investigating. And they asked me to essentially to be deposed. I don't think that's what they called it. It was an interview with someone from the FBI and someone from the Department of Justice, and it was a discussion similar to what I've had with law firms and similar to this one today, again, about my activities with regard to Cassava.

MR. CAMPBELL: Apologies for interrupting for a moment. I'm going to at this point designate the transcript as confidential. I think we can deal with narrowing that.

MR. KUMAGAI: Okay. We'll reserve all rights

Page 24

but understood the designation.

BY MR. KUMAGAI:

Q. Approximately, how many interviews did you have with the DOJ or FBI?

A. I think we had -- again, I don't remember. I suspect we had a phone conversation but, ultimately, had an in-person meeting. One. To my recollection, just one.

Q. And aside from that contact you just described with the FBI and DOJ, have you had any other involvement in government investigations related to Simufilam?

A. I don't recall.

Q. I'm sorry. I cut you off.

A. I don't think so.

Q. I take it you're aware that Dr. Wang was indicted by the Department of Justice in 2024?

A. Generally speaking, yes. I don't know the details.

Q. Do you have a general understanding of the charges against Dr. Wang?

A. Again, I really don't know the specifics. I understand that it's, again, part of this discussion that we're having today about data coming from the company and whether there were any irregularities in publication of that data. That's as much as I know.

Page 25

Q. Do you recall having any sort of reaction when you learned about the indictment?

A. So I want to make sure I understand your question. You're just asking for my emotional response to hearing about this indictment?

Q. Correct.

A. Yeah. Regretful.

Q. And what do you mean by that?

A. I mean that my sense was that, again, never having spoken to Dr. Wang, that he was a scientist doing his job that was being drawn into litigation and that his career was suffering from this. So I had a feeling of regret on his behalf.

Q. Understood.

So in other words, sort of just general sympathy for kind of a colleague in Alzheimer's research who is suffering, so to speak.

MR. CAMPBELL: Object to form.

THE WITNESS: I guess so. I will say that I generally have a bias against the litigation process based on my own experience; that I have regretted that I have been drawn into these discussions. And Dr. Wang's experience, I think, was much, much worse than my own. So, yeah, sympathy.

///

7 (Pages 22 - 25)

******** CONFIDENTIAL TRANSCRIPT ********

Page 26

BY MR. KUMAGAI:

Q. Okay.

I've marked as Plaintiff's Exhibit 20 a document entitled "Indictment," with the caption "United States of America versus Hoau-Yan Wang," or Wang. It should be in Exhibit S share if folks refresh. But I'll share my screen for you, Dr. Aisen. But you're free to look at the document.

(Exhibit 20 marked)

THE WITNESS: Yeah. I see it on Exhibit Share.

BY MR. KUMAGAI:

Q. So have you ever seen this document before, Dr. Aisen?

A. No, I don't think so.

Q. If you'd scroll down to paragraph 14 on page 5. Let me know when you're there.

A. Yep.

Q. Do you see the DOJ describes the charges against Dr. Wang and under the heading "Manner and Means of the Scheme."

Do you see that?

A. Uh-huh. Yes.

Q. And in 14A it describes Dr. Wang -- or alleges that Dr. Wang contributed to, reviewed, approved, and caused to be submitted NIH grant applications and other

Page 27

documents that contained materially false, fraudulent, and misleading statements about his scientific research in order to obtain funding for himself and Company 1."

Do you see that?

A. Yes.

Q. And if you scroll down to paragraph C, it says" "Wang fabricated and falsified the results of his scientific research to NIH, including Western blotting, such that the results were not accurately represented in the research record. He did so by, among other things, manipulating data and images of western blots to artificially add bands, subtract bands, and change the relative thickness and/or darkness, and then drawing conclusions about the presence and absence of the bands and their relative thickness and/or darkness that were not based upon truthful to scientific testing."

Do you see that?

A. Yes.

Q. And then paragraph D and E and F describe false, fraudulent, and misleading statements about Professor Wang or Wang's scientific research that he submitted to various scientific journals.

Do you see that?

A. Yes.

Q. And F describes -- alleges that Wang failed to

Page 28

keep original scientific data and failed to provide all the relevant data he possessed to the government, University 1, scientific journals, and others in order to conceal the scheme."

Do you see that?

A. Yes.

Q. Is it fair to say that these are serious charges?

MR. CAMPBELL: Object to the form.

THE WITNESS: Yes.

BY MR. KUMAGAI:

Q. If you scroll down to page 8, paragraph 19 it states: "In or around November 2020, Wang, along with others, published another article related to the development of drug A, in which Wang presented, among other things, fabricated western blots that purported to support his scientific research."

Do you see that?

A. Yes.

Q. Does that allegation sound familiar to you?

A. Yes.

Q. And how so?

A. As I mentioned, in my role as an editor in chief of JPAD, I became involved in discussions about a publication from Cassava, I think -- I believe including

Page 29

Dr. Wang. Perhaps he was the first author. I don't remember the details, again. But the discussions about that publication were similar in specifics to these charges that -- the question was whether the western blot data in that article was manipulated or fraudulently submitted.

Q. Okay.

And if you look at page 20 -- paragraph 27 on page 10.

A. Yeah.

Q. It states, "Wang published, along with others, scientific journal articles related to the development of drug A and test A."

And then it continues, the next sentence: "After a number of these scientific journals communicated concerns raised about certain western blot images created by Wang that were included in published articles in 2021, journals requested that Wang provide raw, uncropped copies of the western blot images. In response, Company 1, on Wang's behalf, sent the journals additional western blot images fabricated by Wang."

Do you see that?

A. Yes, I do.

Q. And does that allegation sound familiar?

A. The subject of the allegation is familiar, yes.

8 (Pages 26 - 29)

******** CONFIDENTIAL TRANSCRIPT ********

Page 30

Q. When was the JPAD investigation of the Simufilam paper?

A. I think it was 2022, roughly.

Q. We'll get to it. I believe it started around September of 2021, if that sounds familiar.

A. Could be.

Q. Okay.

Now, having reviewed the allegations, does that in any way change your impression or your opinion of Dr. Wang?

A. No.

Q. And why not?

A. Again, these allegations are very similar to those that came up around the paper that was published in JPAD. The review of the issue under my supervision came to a conclusion that there was insufficient evidence to support those allegations. So reading these -- and I would also say that these allegations were the subject of my interview with the Department of Justice. So it's all somewhat familiar to me. And no, reading this again doesn't change my own view.

Q. Is there anything that would change your view of Dr. Wang?

MR. FINK: Objection to the form.

THE WITNESS: Of course.

Page 31

BY MR. KUMAGAI:

Q. And what, specifically, in connection with this issue of allegedly fabricated data and submitting it to --

A. Strong evidence would change my -- strong evidence, in my view, would change my view.

Q. And what would strong evidence look like?

MR. FINK: Objection.

THE WITNESS: I'm not sure how to answer that. There could be any kind of strong evidence. There could have been documentation of conspiracy of fraud or convincing evidence of manipulation of data. I think many types of evidence could be convincing.

BY MR. KUMAGAI:

Q. And in your career, have you personally seen what you would consider convincing evidence of data manipulation?

MR. FINK: Just to be clear, Dave, you're talking about manipulation by anybody? We're not talking specifically about Dr. Wang at this point; right?

MR. KUMAGAI: Correct.

THE WITNESS: I would say yes. In my career, I have become aware of evidence that -- so I have not adjudicated such cases, but I have heard evidence that

Page 32

made me think that fraud had indeed occurred.

BY MR. KUMAGAI:

Q. And what was that evidence?

A. I don't recall the details of any such case. So I don't think I can answer that question.

Q. I'm just trying to understand what the sort of picture in your mind is of convincing evidence of scientific fraud or data manipulation. So let's talk about not specific to Dr. Wang, but in a western blotting experiment. Can you think of an example that you would consider convincing evidence of data manipulation or scientific fraud?

MR. FINK: Objection.

MR. CAMPBELL: Object to form.

THE WITNESS: Well, I guess there are two issues. One would be a technical issue, does it appear that there was questionable artifactual change to an image; and a second question would be was this intentional; was this an intention to misrepresent the data. So was there any evidence of artifactual change and was it intentional. Both of those, I think, are difficult questions to answer. But those would be the questions that I would be looking at.

BY MR. KUMAGAI:

Q. And in your career, you can't, sitting here

Page 33

today at least, recall a specific example where those two elements were met in your mind?

A. Well, again, I said that there have been cases in which I have felt that there was evidence of fraud. So I'm not sure what you're asking me now.

Q. Just that you can't recall the specific instances that you were thinking of.

A. I cannot recall the specific instances.

Q. How common in your experience is it for the Department of Justice to charge or indict a scientist for fabricating or falsifying research?

A. I'm not sure how I would know what's happening with the Department of Justice in this regard. Only one case has brought me into the discussion. That's the one we've talked about.

Q. And can you think of hearing about in your career any other instances, aside from Dr. Wang, of scientists in the Alzheimer's field being indicted by the Department of Justice?

A. I'm not sure. There's been a lot of discussion of this issue in the last few months and the last few years going beyond Cassava. I don't know whether any other instances have gone to the Department of Justice. I don't think I would have heard about this instance if I hadn't been personally brought into the discussion

9 (Pages 30 - 33)

******** CONFIDENTIAL TRANSCRIPT ********

Page 34

with the Department of Justice.  So, again, I don't know, but I don't think I've been specifically aware of any other cases nor would I expect that I would have been aware.

Q.  Okay.

So shifting gears a little bit.  You talked earlier today about some communications that you've had over the years with Dr. Burns; is that right?

A.  Yes.

Q.  What is your general opinion of Dr. Burns?

A.  Could you be more specific?  Are you asking me in terms of her scientific work or company leadership?

Q.  Let's start with just general impressions, and then we can drill down into specifics of scientific work and company leadership.

A.  So currently, I would say that I am sympathetic to -- my feeling is one of sympathy as I have become aware, through the activities we've talked about, about accusations that she has dealt with.  So that's my first response.  Prior to this, I had viewed her as a scientist working to develop effective therapies, just as all of the other people I speak about in this field.  So that would be my response.

Q.  And when you say sympathetic to Dr. Burns, are you sympathetic for the same or similar reasons as you

Page 35

express sympathy for Dr. Wang?

A.  Yes.

Q.  And just to be clear, can you explain the bases for that sympathy?

A.  Yes.  Dr. Burns has been accused of misleading investors in her company and submitting fraudulent scientific data for publication.  And those are serious charges.  And I am sympathetic to her being the target of those charged.

Q.  Are you just generally a very sympathetic man, or is this -- is there something specific about what happened with Dr. Burns or Dr. Wang that kind of inspires particular sympathies?

A.  I would say it's the specifics of the -- my understanding of her experience with regard to these charges.

Q.  And what do you mean by that?

A.  Well, I became aware of this situation, again, primarily, to my recollection, around the publication of a paper in a journal for which I am a voluntary editor in chief.  When this came up, I was inundated with e-mails, phone calls demanding that the journal retract the paper.  And I reviewed the specifics of that paper.  And -- so this was not helpful to me in terms of focusing on my own work.  And then I recognize that

Page 36

Dr. Burns was affected much more extensively than I was.  My own conclusion from the investigation that I supervised was that there was not evidence, not clear evidence of manipulation of data nor did I have any sense, based on my discussions with Dr. Burns and with colleagues, that there was strong evidence.  So, therefore, my feeling was sympathy that she was drawn into this conflict, similar to my being unhappy about being drawn into this conflict but, obviously, many fold more serious her being drawn into it.

Q.  So is it fair to say that your sympathy for Dr. Burns depends or is based on your investigation where you didn't find clear evidence to support the various allegations that she's facing?

A.  Yes.  I don't want to answer a question you haven't asked me.  I'm trying to be as open and transparent as I can.  I have been disturbed by many aspects of this issue, the charges and challenges to Cassava, and so that comes into my feeling of sympathy.  And by many aspects, I mean not only the vigorous interactions that I had with many interested parties, so-called whistleblower scientists, journalists, but seeing the way this story, the story of Cassava, has damaged progress in my field has been very disturbing.  And I would say I suspect that contributes to my feeling

Page 37

of regret about the whole process and my feeling of sympathy towards Dr. Burns, Dr. Wang, and Cassava.

Q.  And just to be clear, if it turns out that evidence that you find convincing emerges showing that Cassava, Dr. Burns, Dr. Wang are, in fact, guilty of what they're being accused of, I take it that would change your sympathy, change your view of each of them.  Is that fair?

A.  Yes.

MR. CAMPBELL:  Object to form.

BY MR. KUMAGAI:

Q.  And are you aware of the specific charges that the SEC made against Dr. Burns in relation to the data from Simufilam's phase 2B study?

A.  No.

Q.  So I can paraphrase and represent to you that according to the SEC, Dr. Burns excluded 40 percent of the phase 2B study's data to create a subset that falsely suggested cognitive improvement, and Dr. Burns unblinded herself to treatment assignments before making those exclusions.  Does that sound familiar?

MR. FINK:  Objection.

MR. CAMPBELL:  Object to form.

THE WITNESS:  No.

///

10 (Pages 34 - 37)

******** CONFIDENTIAL TRANSCRIPT ********

Page 38

BY MR. KUMAGAI:

Q. And if there's convincing evidence that Dr. Burns did, in fact, do that, your sympathies for Dr. Burns, I take it, would diminish or disappear. Is that fair?

MR. FINK: Object to form.

THE WITNESS: I don't think that's fair. I would need to know the specifics. If I were convinced, yes, that would change my view. But these are complicated technical issues. I would need to know all the details to be convinced. If someone fraudulently misrepresents data, yes, that would be a reprehensible thing. And maybe that's the answer you're looking for. But I am not convinced by charges brought by the SEC that this, in fact, is the case.

BY MR. KUMAGAI:

Q. Okay.

So we talked a bit earlier about you attending an advisory meeting, I believe, for Cassava back when it was known as Pain around -- I'm sorry.

A. I believe so, yes.

Q. Do you recall where that meeting took place and approximately the year?

A. I have a vague recollection that could be wrong. Again, I do not remember the details. But I

Page 39

would say I have a vague recollection that it might have been in the San Francisco area and that it would have been 2012, 2015. But I don't remember the details.

Q. I'll introduce as Plaintiff's Exhibit 21 a document Bates stamped Cassava_00517511.

(Exhibit 21 marked)

MR. FINK: Dave, can you please e-mail a copy of that to me?

MR. KUMAGAI: Oh. Yeah. Sure.

THE WITNESS: I am not seeing that in Exhibit Share.

BY MR. KUMAGAI:

Q. If you refresh, do you see Exhibit 21?

A. No. I only see Exhibit 20 after refresh.

MR. KUMAGAI: Scott, can you see it?

MR. CAMPBELL: I can, yeah. I get a little notification when you drop them in that says it's been introduced.

MR. FINK: And I see it as well. So it's showing up on mine.

THE WITNESS: It's still -- I'm only seeing Exhibit 20.

BY MR. KUMAGAI:

Q. Okay. Let me share my screen.

Can you see what has been marked as Exhibit 21,

Page 40

Dr. Aisen?

A. I see your screen. I don't see it marked. But...

Q. This version doesn't have the stamp. But it has the Bates stamp Cassava -- 000517511. Do you see that?

A. Yes. Yes.

Q. And do you recognize the first e-mail address in the to field?

A. Yes.

Q. And what is it?

A. A former e-mail address for me at a former institution.

Q. And do you recognize the e-mail address in the from field?

A. Yes. Lindsay Burns at Cassava it says.

Q. And the subject is "Pain Therapeutics Meeting Agenda." It has the attachments. Refers to a document entitled "AD advisory meeting, 21 May 2011 agenda."

Do you see that?

A. Yes.

Q. You can take a moment to review the e-mail.

Do you recognize this document as an e-mail you received from Dr. Burns on or around May 12th, 2011?

A. That's what it looks like. Again, I have no

Page 41

recollection of the meeting. But this looks like an e-mail, and I recognize that I am on the list of addressees.

Q. And Dr. Burns writes: "We are thrilled to have all of you on board for our advisory meeting on PTI-125, our clinical candidate for AD."

Do you see that?

A. Yes.

Q. And that's a reference to what would later become Simufilam; is that right?

A. I believe so, yes.

Q. Okay.

And she describes some what appear to be logistics for the meeting in that paragraph. Do you see that?

A. Yes.

Q. And then the attachment, which begins with Bates stamp ending in 517512 is titled "BTI-125, a product candidate for the treatment of Alzheimer's disease."

Do you see that?

A. Yes.

Q. And you're listed as one of the attendees under the heading "Advisory Consultants."

Do you see that?

11 (Pages 38 - 41)

********* CONFIDENTIAL TRANSCRIPT *********

Page 42

A. Yes.

Q. Okay.

To the next page is hotel accommodations. And then there is an agenda on the following page. Do you see that?

A. Yes.

Q. And so is this agenda an e-mail -- does it refresh your recollection about any specific discussions or details about this meeting in 2011?

A. Well, I see that this was in Austin. So my recollection is not good. It would be typical documentation for a meeting like this. So, again, I do not recall the details of this meeting, but this all looks like it was the documentation of that meeting.

Q. And is it possible there was a second or a separate meeting in San Francisco?

A. Possible. But, again, I don't remember the specifics. Maybe there was another meeting, and that's why I said San Francisco. It's also likely that that just occurred to me out of nowhere. So I don't know.

Q. And you were paid as a consultant or advisor for attending this meeting; is that right?

A. I would guess so.

Q. After this meeting in 2011, I believe you testified earlier that you continued periodically to

Page 43

communicate or work with Dr. Burns or Cassava in some informal capacity. Is that fair?

A. Yes.

Q. Do you recall sort of the next interaction in time after the 2011 meeting?

A. I don't.

Q. I wouldn't expect you to. That was a long time ago.

I'm kind of switching gears now. So we've been going for about an hour. Why don't we just take a five-minute break, if that's okay with everyone.

THE VIDEOGRAPHER: We are going off the record. The time is 10:02 a.m., and this is the end of media unit 1.

(Recess)

THE VIDEOGRAPHER: We're going back on the record. The time is 10:14 a.m., and this is the beginning of media unit 2.

Please continue.

BY MR. KUMAGAI:

Q. Dr. Aisen, I have marked as Plaintiff's Exhibit 22 a document with the Bates stamp Aisen_0000862.

(Exhibit 22 marked)

///

Page 44

BY MR. KUMAGAI:

Q. Let me know when you can see that.

A. I see it.

Q. And do you recognize Exhibit 22?

A. I don't recognize it, but I see what it appears to be.

Q. And it's titled "Confidentiality Agreement." Do you see that?

A. Yes.

Q. And this was a document that you produced to plaintiffs in this case in response to our subpoena; is that right?

A. It could be. I did an extensive search of my electronic devices and sent everything I could find, which was many things. So I can't say whether this was part of it.

Q. If you scroll down to the bottom, or page 3 of 4, is that your signature?

A. Yes.

Q. And it's also signed or appears to be signed by Remi Barbier. Do you see that?

A. Yes.

Q. Going back up to the top, the agreement is dated June 5th, 2019. Do you see that?

A. Yeah.

Page 45

Q. And in the first paragraph it says: Cassava Sciences and Dr. Aisen wish to explore an opportunity under which it may be necessary for one party to disclose to the other certain confidential information." Do you see that?

A. Yes.

Q. What was the purpose of this agreement?

A. It's routine when I talk to companies that they ask for a confidentiality privilege.

Q. Did Cassava or Mr. Barbier pay you for any work done in connection or under the confidentiality agreement?

A. I don't recall any payments from Cassava to me. Again, I -- we spoke earlier about a meeting that I believe was paid for discussions when the company was known as Pain. I don't recall any financial relationship with Cassava. But, again, I don't recall the details of all the meetings and I can't be certain.

Q. And do you typically enter NDAs or confidentiality agreements with parties or sponsors submitting proposals to ACTC?

A. Often, yes.

Q. And you talked a bit earlier about reviewing some of Cassava's clinical data from its Simufilam trial studies; right?

12 (Pages 42 - 45)

******** CONFIDENTIAL TRANSCRIPT ********

Page 46

A. Yes.

Q. You may recall the first or the earliest clinical data for Simufilam came in around mid of 2019. Does that sound about right?

A. Could be, yes.

Q. The first -- do you recall anything about the phase 2A study of Simufilam?

A. I don't recall much. Again, I review lots and lots of studies.

Q. The phase 2A study was the topic of the article that JPAD published. Does that sound right?

A. My recollection is that the article included both -- included both preclinical information and human study information.

Q. Do you recall that Cassava had two analyses done of its phase 2B data around 2020?

A. I think so. I don't recall details. And in any case, you would need to be more specific.

Q. Do you recall that Cassava had an initial analysis of its phase 2B data performed that showed negative results, and then Cassava performed what it described as a "redo" analysis that showed positive results from the phase 2B data. Does that sound familiar?

MR. CAMPBELL: Object to form.

Page 47

THE WITNESS: I -- so many types of data come from each trial. There's clinical data, cognitive data, there's often imaging data, there's biomarker data. I have a vague recollection of repeating biofluid data results. That could be what you're referring to.

BY MR. KUMAGAI:

Q. And what, if anything, do you recall about that analysis or reanalysis?

A. I believe that two different labs conducted the biofluid analyses and had discordant results. I don't remember the specifics.

Q. And what was your involvement, if any, in reviewing or discussing the discordant results between those two labs' analyses?

A. I have a vague recollection of e-mail exchanges or maybe conversations with Lindsay Burns about this, but I don't remember specifics.

Q. And in your experience, is it a common phenomenon for that type of data to be reanalyzed or analyzed a second time and the two analyses having discordant results?

A. I would say it is not uncommon.

Q. Can you recall other instances, other specific instances where that occurred?

A. Again, I don't recall the details of other

Page 48

instances, but I have a recollection of other instances, yes.

Q. But can you recall any specific company or drug where that occurred?

A. At the moment, I don't recall any specifics, just as I don't recall the specifics of this discussion with Cassava, but it's not unusual.

Q. I'll mark as Plaintiff's Exhibit 23, a document Bates stamped Cassava_000375558.

(Exhibit 23 marked)

BY MR. KUMAGAI:

Q. And that should be up. Let me know when you can see it.

A. Yes, I see it.

Q. If you take a moment to review. Do you recognize the e-mail in the from field at the top?

A. Yes. That's my current e-mail address.

Q. And so Exhibit 23 appears to be an e-mail that you sent Dr. Burns with the date May 20th, 2020; is that right?

A. Yes.

Q. And the subject line is "Biomarker Data." Do you see that?

A. Yes.

Q. And, again, take as long as you'd like to

Page 49

review the exchange. But is this e-mail discussing the same topic we were just discussing a minute ago, the reanalysis of -- excuse me -- the analysis of the phase 2B data?

MR. FINK: Object to the form.

THE WITNESS: This is a discussion about biofluid data from a clinical trial. So yes, that's consistent with -- I believe that's what you're asking. So, again, I don't remember the specifics of this conversation. It certainly looks like my e-mail and it sounds like me. So I have no reason to question it. But I don't remember the specifics.

BY MR. KUMAGAI:

Q. Okay.

And the bottom e-mail on May 15th from Dr. Burns to you, she writes: "I can now share the biomarker data. Please also see our press release today attached."

Do you see that?

A. I see here --

Q. At the bottom of the chain.

A. At the bottom of the chain. Yes, I see that.

Q. And then she continues: "All data came from Oskar's lab, with the exception of," and then she describes some other data.

13 (Pages 46 - 49)

******** CONFIDENTIAL TRANSCRIPT ********

Page 50

Do you see that?

A. Yes.

Q. And do you know what the reference to Oskar's lab is?

A. Yes.

Q. What is it?

A. Oskar Hansson is a leader in biofluid analysis in Alzheimer's disease. He's a Swedish scientist.

Q. Okay.

What do you mean by a leader?

A. Well respected. Has done a great deal of work in the field.

Q. And then you respond and ask for analysis reports on May 16th. Do you see that?

A. Yes.

Q. Dr. Burns replies to you, appearing to attach the analysis reports. And then she writes: "We are struggling with the following question: Are the extreme changes we are seeing in placebo over 28 days possible?"

Do you see that?

A. Yes.

Q. Okay.

And then there's some back and forth on May 19th and May 20th where Dr. Burns appears to send you data from the placebo group.

Page 51

Do you see that?

A. Yes.

Q. And then at the top e-mail, on May 20th, 2020, you respond again to Dr. Burns.

Can you sort of explain to me the gist of what your answer to Dr. Burns' question is about the extreme changes in the placebo group over 28 days?

A. Yes. So, again, I do not question the -- that these are -- represent an exchange between Dr. Burns and myself about data from a clinical trial. I don't recall the details. Are you asking me to interpret or share with you what I think I'm saying here? Is that your question?

Q. Yes.

A. Yes. So it looks to me from this exchange like we are talking about a study that lasted 28 days and that there were biofluid specimens obtained before and after 28 days of exposure to either an investigational product or a placebo. And we're talking about whether the data makes sense. And here I'm saying there's no measurable disease progression over 28 days. And I can explain to you that we would not expect any measurable disease progression over 28 days. This is a disease that progresses over many years. And biofluid markers of disease progression don't change over the short term.

Page 52

I then say: "So any change in the placebo arm must be attributed to issues around acquisition or processing of specimens and assay variability."

I am trying to explain something. I don't see the data here on the exhibit. But, apparently, there was a significant change from beginning to end of a 28-day period in the placebo arm, and that does not sound like biologically plausible change. So I'm saying it must be an issue with the acquisition of specimens or the technical aspects of the assay."

Q. Okay.

And you write in the third paragraph: "Substantial intersubject variability is the rule."

Do you see that?

A. Yes.

Q. And what does that mean?

A. Well, it means that in most biofluid assays, we see significant variability from one person to another. These assays are accurate on a large scale; that is, when many individuals are included in a study group and the results are averaged. But on an individual level, there's a lot of variability. That's what I'm saying here.

Q. Okay.

Just to make sure I understand then, so

Page 53

Dr. Burns is basically asking you what you think of these sort of extreme changes in the placebo group over a 28-day period. And, if I'm understanding it right, you're responding to say, in effect, there's nothing particularly surprising or significant about seeing that kind of variance in the placebo group over 28 days.

MR. FINK: Objection to form.

BY MR. KUMAGAI:

Q. Do I understand that right?

A. I'm saying that, biologically, the disease doesn't change over 28 days. So if we're seeing a change over 28 days, it's because the assay's not perfect. It's too small a sample. There was some issue with the acquisition of the blood specimens or the conduct of the assay. That's what I'm saying. Yes. And as I say here, 20 subjects per arm may be too small for reliable results.

Q. And a 28-day study in your view is too short for reliable results; right?

MR. CAMPBELL: Object to form.

THE WITNESS: It depends on the study.

BY MR. KUMAGAI:

Q. A 28-day study of Alzheimer's treatment is too short a study for reliable results. Is that what you mean?

14 (Pages 50 - 53)

********* CONFIDENTIAL TRANSCRIPT *********

Page 54

MR. FINK:  Object to the form.

THE WITNESS:  No.  It he depends on what you're measuring.  So, for example, if you're measuring levels of drug, that's not too short.  If you're -- it all depends upon what exactly you're measuring.  But if what you're measuring is a marker of the pathophysiology of the disease, then it's too short to expect that before and after measures show disease progression.  So if that's your goal, if you're measuring, let's say, PTI-127, which is mentioned here, that's a marker of disease progression.  We would not expect that in a group large enough to have a meaningful average value there to be data that suggests disease progression over 28 days.

BY MR. KUMAGAI:

Q.  Understood.

And so over a 28-day period, would you expect biomarkers in a placebo group to degrade meaningfully?

A.  Depends upon all of the technical details of acquisition of samples, what the assay was, how it was conducted, what the metric properties of the assay are.  So depends upon many details.

Q.  And so in the case of a 28-day study of a particular potential treatment for Alzheimer's, can the drug's affects get masked by high variability and levels

Page 55

of biomarkers of disease?

MR. CAMPBELL:  Object to form.

THE WITNESS:  I'm not sure I'm understanding your question, but I'll try to answer it anyway.

There, typically, is variability from one person to another and from one time point of an assay to another.  These assays are never perfect.  So a small study over a 28-day period of a measure that is an indicator of disease progression is not expected to show important results.  There are exceptions to that though.  We mentioned here Aß42.  That happens to be a marker of amyloid, which is central to disease progression.  And certain types of candidate therapeutics change Aß42 in the short term, even in hours.  So everything depends upon the specifics of what you're measuring and what the mechanism of action of the drug candidate is.

BY MR. KUMAGAI:

Q.  And was that a biomarker that Simufilam was expected to impact?

A.  Maybe, but not clearly.

Q.  Okay.

And so in reviewing this document, does this bring back any other memories about the -- what we discussed earlier, about the two biomarker analyses that showed discordant results from the phase 2B data?

Page 56

A.  It does not.

Q.  Okay.  You can set that document aside.

I will mark as Exhibit 24 a document Bates stamped Cassava_000750871.

(Exhibit 24 marked)

BY MR. KUMAGAI:

Q.  That should be up.  Let me know when you have Exhibit 24 up on your screen, Dr. Aisen.

A.  Yes.  I have it.

Q.  Take a moment to review.  But the top e-mail in the chain appears to be an e-mail from Dr. Burns to you, dated August 28th, 2020.  Do you see that?

A.  I do.

Q.  And the subject line is "Update"?

A.  Yes.

Q.  What was going on in this back and forth with Dr. Burns?

A.  Again, we are discussing results from a study of the candidate therapeutic from Cassava.  Just scrolling through trying to get a better idea.  Yeah.  That's all I can say.

Q.  And you're discussing here the results of the redo analysis or the reanalysis of the biomarker data; is that right?

A.  I don't know.

Page 57

Q.  You write to Dr. Burns:  "The data looked encouraging.  Congratulations."

Do you see that?

A.  Yes.

Q.  Do you recall what you meant by encouraging?

A.  I do not.  I can -- presumably, I saw something that was consistent with a favorable drug affect, but I do not remember the details.

Q.  Okay.  I'll mark as Exhibit 25 a document with the Bates stamp Plaintiffs 0219624.

(Exhibit 25 marked)

BY MR. KUMAGAI:

Q.  Let me know when you have Exhibit 25 up on the screen, Dr. Aisen.

A.  I have it.

Q.  Okay.  Exhibit 25 is appears to be a PDF version of an article on Research Square.  The title is "Affects of Simufilam on Cerebrospinal Fluid Markers in Alzheimer's Disease; a Randomized Clinical Trial."

Do you see that?

A.  Yes.

Q.  Authored by Dr. Wang and others.

Okay.  And do you recall reviewing this paper or any connection to this research?

A.  I do not.

15 (Pages 54 - 57)

********* CONFIDENTIAL TRANSCRIPT *********

Page 58

Q. Okay. Take as long as you like to review. But I want to direct your attention to the comments section of the article. If you scroll down to the page ending in 626, you'll see that there are comments beginning.

A. Yes.

Q. Okay.

And if you scroll to the page ending in 664, which is way down.

MR. CAMPBELL: Did you say 664, Dave?

MR. KUMAGAI: I'm sorry. Let me get to the document. One second.

Excuse me. 644.

BY MR. KUMAGAI:

Q. There's a comment dated September 11th, 2021, from Joseph Lundquist.

A. Yes.

Q. And he writes: "Hello. I have a question on the sample testing and statistics regarding biomarkers. Were the samples analyzed once or twice and were statistics run once or twice? There was some talk about a reanalysis because wide variability in the placebo group and needing reanalysis. Was this an analytical problem or statistics problem? Thanks for your contributions to the field of AD research."

Do you see that?

Page 59

A. Yes.

Q. And then the next day there's a response from an individual named Lindsay, dated September 12th, 2021.

Do you see that?

A. Yeah. Yes.

Q. Okay.

Take a moment to review Lindsay's comment.

In your view, was this a reasonable justification for discarding or not relying on the initial data done by Mr. Hansson at London University?

MR. CAMPBELL: Object to form.

MR. FINK: Objection to the form.

THE WITNESS: It doesn't explain which data we're talking about. So I'm not sure I understand or think I can answer your question.

BY MR. KUMAGAI:

Q. What do you mean it's not clear what data this is talking about?

A. You said data from Hansson's lab. I don't know which data this is about.

Q. Is the comment consistent with your testimony earlier that there's no measurable disease progression over 28 days?

A. I don't think that's what this is about. The question, I think, was whether samples were analyzed

Page 60

once or twice and were statistics run once or twice, what is meant by once or twice. And then Lindsay is responding, samples were analyzed in triplicate. But that is not your question. We -- she's explaining that we used two different labs. She's not mentioning which labs she's referring to. And she's saying that a first lab was highly variable and they sent different aliquots to a second lab. And she's trying to explain, I guess, the language that she used in an earlier message or in a paper. But I can't tell from this specifically which specimens or which lab, which assay these two individuals, Joseph Lundquist and Lindsay, are referring to.

Q. In your opinion, is a high correlation between biomarkers in a placebo group validation for conducting a second analysis of samples?

MR. FINK: Objection.

MR. CAMPBELL: Object to form.

THE WITNESS: I don't understand your question. I'm reading this and trying to understand. Lindsay says, "In fact, the average" -- is that what you're referring to?

BY MR. KUMAGAI:

Q. I'm referring to -- well, I'll let you answer. I was quoting from the second to last sentence in

Page 61

Lindsay's comment.

A. I believe what she's saying is that the first lab showed discordance in the placebo arm between baseline and 28 days, which is hard to interpret, because in the absence or presence of an intervention, we wouldn't expect to see an affect on a marker of disease progression in such a short period of time, as we just discussed. I think what she's explaining. Therefore, she's saying that she questioned the technical aspects of the assay the first time and proceeded to send different aliquots to another lab. She does not specify the names of the labs.

Q. Do you recall discussing this topic that's being discussed by Mr. Lundquist and Lindsay with Dr. Burns at any point?

MR. FINK: Objection to the form.

THE WITNESS: As I said, I have only a vague recollection, but, periodically, discussed results with Lindsay Burns. And I expect, without being able to recall specifically, that we discussed biomarker results consistent with the e-mails that you've shown me.

BY MR. KUMAGAI:

Q. But sitting here today, you don't have any specific recollection of those conversations?

A. I don't.

16 (Pages 58 - 61)

******** CONFIDENTIAL TRANSCRIPT ********

Page 62

Q. Okay. Let's talk about the JPAD investigation that you referred to earlier today. So first off, very briefly, what is the Journal of Prevention of Alzheimer's Disease, or JPAD, and how long have you served as the co-editor in chief?

A. I would say the journal has been around for about five years, but that's -- may not be accurate. I have been involved, I think, roughly since the journal started. My role is one of several editors in chief. It's a voluntary role. So I don't -- I'm not paid for this work and I don't have a contractual agreement with the publisher. But I serve in the role as one of several editors in chief. The journal focuses on clinical research aiming for effective slowing or prevention of Alzheimer's disease.

Q. Can you describe, generally, the process that JPAD follows for reviewing a submission and deciding whether to publish it or not?

A. Yes.

An author submits a manuscript through the publisher's web mechanism to the journal. Journal staff refer this to one of the editors in chief, typically. Let me pause by saying, at this period in time, it was quite a new journal, and procedures may have changed. A new journal doesn't get very many submissions, and

Page 63

sometimes the process is different. JPAD has become a much more popular journal more recently. And my -- most of my work has, therefore, been in the last couple of years and may not be completely applicable to this time period, even though I think I was involved at this time period. But what happens now is that the journal staff will refer a submission to one of the editors in chief to oversee the review process. That editor in chief will decide whether to send out an article for scientific review or simply to reject it. If it's sent out for scientific review, it's -- voluntary reviewers from anywhere will either agree to review it or not. If they agree, they will send a review and a recommendation back to the journal and the overseeing editor in chief who will decide whether to request revisions, or reject at that point or accept at that point. There may be back and forth over a few cycles. And, ultimately, there's a decision to publish or to reject a manuscript.

Does that answer your question?

Q. It does.

And how long, roughly, does it typically take between when the article is submitted and published, or accepted for publication, I should say?

A. So JPAD has been very efficient in its review process. It's one of the -- so as a new journal, it was

Page 64

one of the selling points of the journal, that the review process was quite quick. And an effort is made to reach a decision within a period of weeks, which is quite short. I think that it's gotten harder to meet that objective as the journal has become more popular.

Q. And so around 2020, JPAD published an article about Cassava's drug Simufilam; is that right?

A. Yes.

Q. Okay. I've mark as Plaintiff's Exhibit 26, document Bates stamped Aisen_0001761.

(Exhibit 26 marked)

BY MR. KUMAGAI:

Q. Let me know when you can see Exhibit 26, Dr. Aisen.

A. Yes. I see it.

Q. Do you recognize Exhibit 26?

A. It's a paper in JPAD on this drug by the Cassava team.

Q. And the title is "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients"; right?

A. Yes.

Q. Among the authors are Dr. Wang, Remi Barbier, and Dr. Burns. Do you see that?

A. Yes.

Q. Do you recognize this as the article about

Page 65

Simufilam that JPAD published?

A. I think it is, yes.

Q. Are you aware of any other articles about Simufilam that JPAD has published or is it just one?

A. I don't know if there are others.

Q. You're not aware of any others; is that right?

A. I'm not aware of any others, but I don't keep track of all the papers.

Q. And at the top left-hand corner, it states "Volume 7, No. 4, 2020."

A. Yes.

Q. Do you see that?

A. Yes.

Q. So what does that mean?

A. The journal is -- has volumes. So any journal has ways of referencing articles. And the way of referencing an article typically includes which volume of the journal and the publication date. And that's what you're seeing here.

Q. And volume 7, does that suggest it was published, you know, around the end of 2020?

A. I have no idea.

Q. Okay.

On the top right it says Serdi and Springer Nature. Do you see that?

17 (Pages 62 - 65)

********* CONFIDENTIAL TRANSCRIPT *********

Page 66

A. Yes.

Q. That's the publisher?

A. Yes.

Q. Okay.

Have you ever read this article?

A. Yes.

Q. And in connection with what?

A. After this article was published, discussions of the integrity of data in publications by Dr. Wang had been called into question. This was brought to public attention in an article, I believe, appearing in Science by a journalist, Charles Piller, who claimed that articles from this company included data that was manipulated. Following that article, which pointed out that these concerns were coming from a group of short sellers, there was a lot of discussion and interaction among individuals about these complaints. There were many contacts between the scientists involved in the complaints and other individuals involved in the complaints with the journal, JPAD, because they had published data from the company authors on this drug.

While I was not involved in reviewing the article when it was submitted nor in the decision to publish it, because the complaints were of a technical nature about western blots, the other editors in chief

Page 67

asked me to oversee the review of the issue in that I had more basic science experience than any other editors in chief. And so at that point I read the paper and focused on the western blot images that were called into question.

Q. And are you an expert in western blots?

A. I am not. I am simply more experienced in basic science techniques than the other editors in chief.

Q. And who are the other editors in chief at the time?

A. I'm not sure I can remember, but I think it's Bruno Vellas, Jacques Touchon. I think there were four. So Bruno, Jacques, myself, and -- right now I can't remember who the fourth was.

Q. Okay.

If you look at the bottom of the first page on the left-hand corner, it says, "Received October 31st, 2019. Accepted for publication November 6th, 2019."

Do you see that?

A. Yes.

Q. And so it was accepted for publication six days after it was received by JPAD; is that right?

A. According to this, yes.

Q. And isn't that an unusually quick time period

Page 68

for an article to be reviewed and accepted for publication?

A. It's very quick. But as I mentioned, the journal was new at this time. It was aiming for very rapid turnaround trying to increase interest amongst scientists in publication. And given that there were relatively few submissions in these early days of the journal, it's not that surprising that this was turned around so quickly.

Q. And since those days, is it fair to say that the editorial standard of the review process has gotten more formal or rigorous?

MR. CAMPBELL: Objection.

THE WITNESS: I would not say that. It's more voluminous. And so processes -- processes have certainly evolved. I was not involved in this review, as I mentioned. So I have no knowledge of what happened in the one week between reception -- the journal receiving the submission and accepting it for publication.

BY MR. KUMAGAI:

Q. And you mentioned earlier that, typically, one of the editors in chief would be responsible, or an article would be referred to one of the co-editors in chief. So is it fair to say that one of the co-editors

Page 69

in chief would have been managing this particular article when it was submitted?

A. Yes. Yes.

Q. And so at the time, it would have been either Dr. Vellas or Dr. Touchon, or, potentially, a fourth editor whose name you can't recall right now, if, in fact, there was a fourth editor?

A. Yes.

Q. And Dr. Burns had sent you some of the data that was described in this article. Is that fair?

A. I don't know. I don't know if the data described in this article is the same as the data referred to in the e-mail exchanges you showed me.

Q. And so -- and to be clear, your e-mail exchanges with Dr. Burns about Simufilam data was -- you were not acting in any capacity related to JPAD; is that right?

A. Correct.

Q. And so what capacity were you serving in during those exchanges or discussions where Dr. Burns was sending you data from Simufilam and you were commenting or reviewing it?

A. As -- I would say as an informal advisor. As I mentioned, I exchanged that type of communication with companies and academic investigators around the world

18 (Pages 66 - 69)

********* CONFIDENTIAL TRANSCRIPT *********

Page 70

because it's consistent with my mission, which is to advance AD therapeutics. So I have that kind of exchange with many individuals frequently.

Q. Okay.

And so you mentioned at some point in time, JPAD began an investigation of certain allegations of data manipulation concerning this paper, Exhibit 26; right?

A. Yes.

Q. And you eventually became the leader of that investigation at JPAD; right?

A. Yes.

Q. Okay. I'll mark another exhibit. I'll mark as Plaintiff's Exhibit 27 a document with the Bates stamp Aisen_0000661.

(Exhibit 27 marked)

BY MR. KUMAGAI:

Q. Okay. That should be available to see. You'll have to zoom in on Exhibit 27 because it was -- the text is quite small. Let me know when you've got it in front of you.

A. I have it.

Q. Okay.

So if you zoom in on the top e-mail, it appears to be an e-mail from you to Robert Rissman, with the

Page 71

subject "Research Integrity Concern," and the date September 28th, 2021. Do you see that?

A. Yes.

Q. And so do you recognize this as an e-mail that you received -- excuse me -- that you sent and produced in this case?

A. Yes.

Q. The bottom e-mail in the chain, from September 27th, 2021, from an individual named Matthew Schrag. Do you see that?

A. Yes.

Q. He sends an e-mail to you and two others, and it appears to be -- well, do you recognize the two other e-mail addresses?

A. Yeah. The other two are Bruno Vellas and Jacques Touchon, the two -- the editors I mentioned.

Q. Okay.

And do you know who Matthew Schrag is?

A. I -- my recollection is that he was one of the scientists engaged by the short sellers to investigate publications from companies. But I don't know him, and that's just my recollection.

Q. Do you have -- do you know what that understanding of Mr. -- Dr. Schrag is based on or where you got that understanding?

Page 72

A. My recollection is it's from the original article raising the issue with Cassava that was published in Science.

Q. So your understanding or your recollection is that the article in Science predates this research integrity concern from Dr. Schrag?

A. I think so, but I can't be certain that that's the case.

Q. Okay.

And Dr. Schrag writes: "I wanted to bring to your attention a research integrity concern associated With a Recent Publication in the Journal of Prevention of Alzheimer's Disease. The concern has to do with the following reference."

And there's a reference to the article that we've just looked at, Exhibit 26; right?

A. Yes.

Q. Okay.

And Dr. Schrag continues: "There's a prominent rectangular change in the background surrounding a band in one of the western blots, which could alter the interpretation of the data. I appreciate the attention of the editorial board to this issue. I have no investments related to any securities associated with this material. I have no current or prior relationship

Page 73

with the investigators associated with these manuscripts."

And then he says: "As I am an active academic scientist in the Alzheimer's disease space, I would appreciate my identity being withheld from any public reference to this issue."

Do you see that?

A. I do.

Q. So what is your understanding of the research integrity concern that Dr. Schrag was raising with the editors of JPAD?

A. Are you asking me about the technical issue, or about his role, or his statement about prior relationships?

Q. Well, let's start with what your understanding is of the substantive integrity concern that he's raising.

A. So he's raising a concern that you can see in the figure that's in the -- I guess this was part of the e-mail -- pointing to one part of one figure in the paper that was published. And when he blows up this -- when he enlarges this figure, it appears as though there's a rectangle around the rightmost blot in the blowup of the figure that he's included.

Q. Okay.

19 (Pages 70 - 73)

******** CONFIDENTIAL TRANSCRIPT ********

Page 74

And what was your initial reaction upon receiving this research integrity concern from Dr. Schrag?

A. I can't remember. If you're asking what my first reaction was, that I can't remember. But my general recollection is that I made a connection of this person with the conflict that we've been talking about, that is, Dr. Schrag. And I looked over the article, looked over the figure. My recollection, based on the start of this e-mail thread, is that when I looked at the figure, I did not see any reason for concern. But I do see the reason for concern in the enlargement of the figure. And my question to Dr. Rissman was is this simply an artifact of over-enlarging a digital image, something I'm quite familiar with. I believe that's what my e-mail was asking Dr. Rissman. Dr. Rissman is a basic scientist.

Q. Understood.

So you were, basically, asking whether the problem was actually in the attempt to identify the problem rather than the actual image depicted in the paper?

A. Yeah. I asked Dr. Rissman what his interpretation would be as someone who does western blots, which I do not do. What does he think about

Page 75

this.

Q. And what is your understanding of why Dr. Schrag wrote that: "I have no investments related to any securities associated with this material"?

MR. CAMPBELL: Objection to form.

THE WITNESS: Are you asking what my view is now or what my view was at the time?

BY MR. KUMAGAI:

Q. Yeah. What was your view at the time?

A. I don't remember.

Q. And what is your view now?

A. My view now is that I believe he was being disingenuous in saying he had no financial interest since I believe he is being paid by a group of short sellers who financially gain; and that he, therefore, gets -- has a financial incentive to find evidence of manipulation of data.

Q. And just to be clear, who or how did you -- strike that.

How did you come to that understanding about Dr. Schrag's connection to short sellers?

A. From the first article that I'm aware of that brought up this issue, which was published in Science and written by Charles Piller. And my recollection is that article starts by saying this information was

Page 76

collected by e-scientists who are paid by the short sellers.

Q. So Dr. Schrag, in your view, should have disclosed that fact if it were true at that time in this e-mail on September 27, 2021, when he raised the integrity concern?

A. Maybe he should have disclosed it. But what he should not have done was to make statements that suggested he had no financial interest. Not that his statements are untrue. I believe that he doesn't have an equity interest. But I believe he does have a financial interest and, therefore, what he writes is misleading.

Q. He was implying or you understood him to be implying that he was sort of independent and independently raising these concerns. Is that fair?

A. Yes.

Q. Okay.

And who is Dr. Robert Rissman?

A. He is a neuroscientist who is part of the institute that I direct.

Q. And sorry. I know there's been a few institutes?

A. ATRI, the Alzheimer's Therapeutic Research Institute, which is part of the University of Southern

Page 77

California.

Q. And you went to him, I believe you said, as someone who regularly conducts western blot experiments and was sort of an expert that you knew in western blotting. Is that fair?

A. Definitely he is a basic scientist who does a lot of western blots. Whether that makes him an expert, I don't know. But he has much more experience than I do, and that's the reason that I consulted him.

Q. And was Dr. Rissman otherwise involved with JPAD in any capacity?

A. I believe that he is currently an associate editor. I could be wrong. But I believe he is. But I would expect that at this time, he was not.

Q. Okay.

And what role did Dr. Rissman end up playing in JPAD's investigation of this particular paper?

A. Just his discussions with me, which I then shared with the other editors in chief.

Q. We'll mark as Exhibit 28 a document with the Bates stamp Aisen_0000634.

(Exhibit 28 marked)

BY MR. KUMAGAI:

Q. Okay. That should be up.

Let me know when you've got it, Dr. Aisen.

20 (Pages 74 - 77)

******** CONFIDENTIAL TRANSCRIPT ********

Page 78

A. Yep. I have it.

Q. All right.

And do you recognize Exhibit 28 as a document you produced, an e-mail dated October 14th, 2021?

A. Yes.

Q. Okay. You can take a moment to review. But I'll start at the bottom e-mail, dated October 9th, 2021. Do you see that?

A. October -- you said October 29th?

Q. Sorry. October 9th, 2021, from Dr. Vellas to Dr. Burns.

A. Yes.

Q. And so it appears Dr. Vellas is notifying Dr. Burns of the research integrity complaint that Dr. Schrag had raised. Do you see that?

A. Yes.

Q. And he Dr. Vellas writes: "We asked one of our experts for advice, and he requested the original blots for review."

Do you see that?

A. Yes.

Q. Who is the expert that is being referred to in that e-mail?

A. I don't remember.

Q. And do you recall why Dr. Vellas instead of

Page 79

yourself was corresponding with Dr. Burns at this point in the investigation?

A. No. Bruno Vellas I would call the founder of the JPAD. While -- you know, he was one -- it looks like there was just three -- three editors in chief. I would say he took a leadership role. So it's not surprising to me that he wrote to Dr. Burns. But I don't know whether he was the editor or who was involved in accepting the paper or not.

Q. Okay.

And then the subsequent e-mail later that day, on October 9th, 2021, Dr. Burns appears to respond and attach original blots from figure 3 of the JPAD paper. Do you see that?

A. Yes.

Q. And then there's some further exchange. And on October 14th, you forward the correspondence to Dr. Rissman.

Do you see that?

A. Yes.

Q. And Dr. Rissman responds: "Yes. I continue to believe that the first two lanes, left side of the right blot, has been cropped and spliced from a different run. That is what the vertical line that runs through the blot top to bottom indicates to me."

Page 80

Do you see that?

A. Yes.

Q. What did you understand Dr. Rissman to be saying there?

A. He was saying that he interpreted the figures as indicating that the data had been cut and pasted so that different runs were being combined into a figure.

Q. So at this point, Dr. Rissman is expressing his view that it appears the data had been manipulated. Is that clear?

A. I don't think he --

MR. CAMPBELL: Object to form.

MR. FINK: Object to the form.

THE WITNESS: I'm sorry.

I don't think he was saying it had been manipulated. But he was raising the question about why was it -- it looks to me, I think he was saying, like a lane from one blot was cut and pasted into this figure. And I think he's saying that because it raised a concern in his mind.

BY MR. KUMAGAI:

Q. Okay. Why don't we take another five-minute break.

A. Okay.

THE VIDEOGRAPHER: We are going off the record.

Page 81

The time is 11:17 a.m., and this is the end of media unit 2.

(Recess)

THE VIDEOGRAPHER: We're going back on the record. The time is 11:25 a.m., and this is the beginning of media unit 3.

Please continue.

MR. KUMAGAI: And I'll just state for the record that plaintiffs and intervener plaintiffs have agreed to allow either Cassava's counsel or the individual defendants' counsels to object, and that objection will be preserved for both of the two sets of defendants.

BY MR. KUMAGAI:

Q. Okay. I have marked as Plaintiff's 29 -- Plaintiff's Exhibit 29, excuse me, a document Bates stamped Aisen_0000736.

(Exhibit 29 marked)

THE WITNESS: I have it.

BY MR. KUMAGAI:

Q. Okay.

And, Dr. Aisen, do you recognize this as an e-mail you sent to Dr. Robert Rissman on October 17th, 2021, and produced in this case?

A. Yes.

21 (Pages 78 - 81)

********* CONFIDENTIAL TRANSCRIPT *********

Page 82

Q. Okay.

And if you look at the bottom e-mail in the chain from Dr. Vellas, on October 16th, 2021, to Dr. Burns. Do you see that?

A. I'm sorry. From Dr. Vellas to Dr. Burns?

Q. Yeah.

A. I see it.

Q. Okay.

And he's -- he makes a reference to the same Simufilam article that we've been discussing in JPAD. And he writes that: "It has been brought to our attention by our reviewers that one of the figures in the above manuscript may have been manipulated inappropriately.

Do you see that?

A. Yes.

Q. And which reviewers is that a reference to?

A. I don't know. I don't know what he's referring to. I don't know if this is someone who reviewed the manuscript at the time of submission, or what seems more likely to me, he's talking about reviewing now in the face of the allegation.

Q. Okay.

And once the investigation of JPAD began, who are you aware of who JPAD had review the article?

Page 83

A. I can think of three reviews. One would have been Dr. Rissman's that's the subject here, one would have been another scientist that I consulted, and the third would be a software review conducted by the publisher.

Q. And who was the second scientist who you consulted?

A. I'm not sure that I can remember the name. I think it was up Sprek [sic] or -- I'm not sure. I don't remember.

Q. Charles Spruck, does that sound familiar?

A. Sounds right, yeah.

Q. And aside from those two individuals and the software analysis, were there any other reviewers involved, as far as you're aware, in JPAD's investigation?

A. Not that I can recall.

Q. Okay.

So Dr. Burns responds to Dr. Vellas on October 16th, 2021. She writes: "None of the images are manipulated."

Then she continues into the second paragraph and writes: "As you may know, "Wall Street investors, not scientists, are the ones who are making false allegations against us. We are taking these allegations

Page 84

seriously even if we believe there's no substance to them because they have potential to affect our scientific reputation."

Do you see that?

A. Yes.

Q. And then the bottom paragraph of Dr. Burns' e-mail, she writes: "It's taking a while, but slowly we are clearing our name from the reputational damage caused by the Wall Street investors."

Do you see that?

A. Yes.

Q. And what did I understand Dr. Burns to be referring to by Wall Street investors?

A. Again, you know, I interpret this as referring to what was in that original science article that brought up Cassava, and that was that the investigations were funded by short sellers.

Q. And how did the fact that the investigations may have been funded by short sellers color or influence or factor into in any way your approach to the JPAD investigation?

A. I think anybody can raise questions, and those questions, if they seem to be rationale, should be investigated. But motives can be important in understanding how issues are raised. And my view is

Page 85

that when there is bias -- and, of course, in some sense there's always bias -- it's good to be upfront about it. And that can be part of one's attempt to understand the basis of the issue.

Q. Okay.

You forwarded Dr. Burns' respond to Dr. Rissman. Do you see that?

A. Yes.

Q. And Dr. Rissman responds: "Geeze, this doesn't sound good. One thing I'm noticing is she's implying that if it's been more than two years since the blots were run, she may not have them. It looks like she's got a history of inquiries like this, which is unfortunate. Let me know how I can help. I can review whatever she sends next."

Do you see that?

A. Yes.

Q. And what did you understand Dr. Rissman to mean by, Geeze, this is -- this doesn't sound good?

A. I think that he's addressing the question of whether there was manipulation of data. And he's saying that his take on this exchange and his review of the blots does not lead him to be confident that there was no manipulation of data. He's saying this doesn't sound good. She's not producing original blots. And -- I'm

22 (Pages 82 - 85)

********* CONFIDENTIAL TRANSCRIPT *********

Page 86

not sure what he means by it looks like she's got a history of inquiries. I'm not sure what that means. But I think he's expressing his concern that there could be manipulation of data.

Q. And did you have any reason at the time to sort of question what might be motivating Dr. Rissman in his review or analysis of what Dr. Burns was providing or the research integrity concerns?

A. You mean did he have motives for his opinion that we should be aware of? No. I think he was trying to be helpful to me in my role of overseeing this review process. I'm not sure there's any other motive here.

Q. Okay. I'll mark another document, Plaintiff's Exhibit 30, which is Bates stamped Aisen_0000652.

(Exhibit 30 marked)

BY MR. KUMAGAI:

Q. Dr. Aisen, let me know when you have Exhibit 30 up on your screen. This appears to be an e-mail from you to Dr. Rissman, on October 19th, 2021.

A. Yes.

Q. And do you recognize this as another document you produced in this case?

A. Well, I accept that that's what it is, yeah. Again, I sent over everything I could find. So when you say do I remember sending this -- but yeah. This is,

Page 87

clearly, a relevant document.

Q. And the documents you found and sent you pulled directly from your inbox or your files on your computer and send them to us; right?

A. All elec- -- everything I could find electronically, yes.

Q. Okay.

In the second e-mail on this chain, Dr. Burns writes to Dr. Vellas: "Dear Dr. Vellas, please see our attached response."

And it's an e-mail she sends on October 19th, 2021. Do you see that?

A. Yes.

Q. Okay.

And if you scroll down to the Bates page with 653 numbers. Do you see that?

A. Yeah.

Q. And this appears to be Dr. Burns' letter; is that right?

A. Yes.

Q. Okay. Dated October 19th, 2021. And Dr. Burns is addressing the research integrity concerns about the 2020 Simufilam paper; right?

A. Yes.

Q. Okay.

Page 88

If you scroll down to the bottom, you'll see in point G, Dr. Burns writes: "Finally, we call into question the motivation of the allegations. Wall Street is the original source of all the allegations being made against Professor Wang. The professional Wall Street investors who made these allegations are a hundred percent motivated by financial profit. No journal can be expected to adjudicate allegations that are strictly motivated by a financial profit."

Do you see that?

A. Yes.

Q. So, once again, Dr. Burns is blaming Wall Street investors for the research integrity concerns about Simufilam; right?

MR. FINK: Objection to form.

I objected. But you can go ahead and respond, Dr. Aisen.

THE WITNESS: I said yes.

BY MR. KUMAGAI:

Q. Do you agree that no journal can be expected to adjudicate allegations that are strictly motivated by a financial profit?

A. I would not say that so strongly. Again, as I mentioned earlier, I believe that any allegation that seems to have a rationale basis merits investigation.

Page 89

But the motivations can be considered.

Q. And so Dr. Burns' claims about Wall Street investors was a factor that you considered as part of JPAD's investigation of the 2020 paper. Is that fair?

A. Yes.

Q. Did Dr. Burns or Cassava ever provide you or JPAD with, you know, convincing evidence to support the claim that Wall Street is the original source of all the allegations being made against Professor Wang?

MR. CAMPBELL: Object to form.

THE WITNESS: Again, as I said earlier, I believe that my source for that information was the original article in Science by Charles Piller.

BY MR. KUMAGAI:

Q. And so you've touched on this a little bit, but I just want to draw it out. So in your experience, what is the best way, in your view, to handle potential biases or conflicts of interest when evaluating scientific claims or allegations of scientific fraud?

MR. FINK: Objection.

THE WITNESS: Yeah. I'm not sure I understand the question, but I'm going to try to answer. I believe that there should be transparency see about motivations.

BY MR. KUMAGAI:

Q. Meaning what exactly?

23 (Pages 86 - 89)

******** CONFIDENTIAL TRANSCRIPT ********

Page 90

A. Meaning that if I am presenting data and I have a financial relationship with a company say that could benefit from a positive interpretation of that data, I should disclose that apparent conflict; that is -- that's what being transparent is. It's explaining any relationships that could be viewed as influential in coming to a conclusion.

Q. Relationships such as being a short seller or being a shareholder in the company; is that right?

A. Yes, or being -- having equity in the company or being a paid consultant in the company.

Q. And so as a general matter, would you consider either a short seller or a shareholder of Cassava stock to be an independent or impartial commentator?

MR. CAMPBELL: Objection.

THE WITNESS: As I've said, in my view, everybody has bias. Biases should be disclosed. So if a paper is being published by someone who has equity interest in interpretation of the data, that should be disclosed.

BY MR. KUMAGAI:

Q. And it should be disclosed because it's a potential conflict of interest.

MR. CAMPBELL: Objection.

THE WITNESS: Because there's an appearance of

Page 91

conflict. Again, my view is that everybody has bias. And the best way to manage the bias is through transparency.

BY MR. KUMAGAI:

Q. Now I'll mark as Plaintiff's Exhibit 31 a document Bate stamped Aisen_0000733.

(Exhibit 31 marked)

BY MR. KUMAGAI:

Q. Let me know when you have it, Dr. Aisen.

A. Yes, I have it.

Q. And this appears to be an e-mail from you to Dr. Robert Rissman, dated October 19th, 2021. Do you see that?

A. Yes.

Q. And if you scroll down the chain, this is a continuation of the document we just looked at, Exhibit 30, where Dr. Burns sent a letter to Dr. Vellas. Do you see that?

A. Yes.

Q. You forwarded it to Dr. Rissman and asked him, "Please let me know what you think."

A. Yes.

Q. Okay.

So on October 19th, Dr. Rissman responds to you with his views on Dr. -- or on the letter that Dr. Burns

Page 92

had sent. Is that fair?

A. Yes.

Q. Okay.

And he writes in the third sentence: "Their counterclaim is that the data is nonetheless valid and they may have the original blots to show this. The problem with that is there's really no way to affirm this. We'd just be looking at a bunch of X-ray films that are labeled with a Sharpie, and we'll have to assume that the lanes are what they say they are."

Do you see that?

A. Yes.

Q. And what did you understand that to mean from Dr. Rissman?

A. I understand -- my understanding was that his view is that the company is not establishing the integrity of the data. And he continues his concern that the gels look like there has been splicing.

Q. And your understanding of Dr. Rissman's concern about splicing is that it could be a sign of data manipulation; right?

A. That it could be, yes.

Q. And just bear with me because I'm not entirely sure I understand the critique or the back and forth on the technical western blotting methods. But my

Page 93

understanding of this exchange is that Dr. Rissman is effectively saying that because of the western blot method that Dr. Wang used for this paper, there was no reliable way to verify one way or the other whether the blots had been manipulated or not because the experiments were run using film images instead of digital images. Is that generally right?

MR. CAMPBELL: Objection to form.

THE WITNESS: Generally right.

BY MR. KUMAGAI:

Q. Anything I'm -- you know, anything critical that I'm misunderstanding or mischaracterizing there?

A. No. I think that's the general summary of this.

Q. And so Dr. Rissman says, you know, even if Dr. Wang or Dr. Burns could provide the so-called, what he puts in quotes, "original blots," their use of firm instead of digital meant that there was no real way to confirm whether or not the original blots were, in fact, original unmanipulated results. Is that fair?

A. I think --

MR. CAMPBELL: Object to form.

THE WITNESS: I think that's the point he's making.

///

24 (Pages 90 - 93)

********* CONFIDENTIAL TRANSCRIPT *********

Page 94

BY MR. KUMAGAI:

Q. In other words, Dr. Wang couldn't prove that the data was manipulated but, also, could not disprove the allegation that it was manipulated.

MR. CAMPBELL: Object to form.

MR. FINK: Objection.

MR. KUMAGAI: Let me strike that.

BY MR. KUMAGAI:

Q. In other words, because of the technique, there was no reliable way to prove one way or the other whether the data had been manipulated in Dr. Rissman's view.

MR. CAMPBELL: Object to form.

THE WITNESS: I believe that's correct.

BY MR. KUMAGAI:

Q. Okay.

And about halfway down Dr. Rissman's e-mail, he writes: "Without commenting on whether the data -- strike that.

He writes: "Without commenting on whether the data has been fabricated, the concept of mishandling western blot data remains."

What did you understand Dr. Rissman to mean by mishandling data?

A. I'm just looking for that. We're still on the

Page 95

same October 19th e-mail?

Q. Yes. It's about halfway down the e-mail. He says: "Without commenting on whether the data" --

A. Yes. I've got it.

Yes. I believe he's interpreting the bands to suggest that there has been cutting and pasting of gels. And he is stating that, in his view, that's not appropriate. And I believe his view is that the investigators can't prove that this was not manipulated.

Q. And then at the bottom of the e-mail, he says that in the last -- he talks about potentially retracting the article. Do you see that?

A. Yes.

Q. And then at the bottom he says he thinks at least an erratum should be generated to explain that the blots were spliced. And an erratum is just a fancy word for a correction; is that right?

MR. CAMPBELL: Objection.

BY MR. KUMAGAI:

Q. You said yes; right, Dr. Aisen?

A. Yes.

Q. I'll mark as Exhibit -- Plaintiff's Exhibit 32 a document Bate stamped Aisen_0000650.

(Exhibit 32 marked)

THE WITNESS: I have it.

Page 96

BY MR. KUMAGAI:

Q. Okay.

This is another e-mail that you appear to have sent to Dr. Rissman, dated October 25th, 2021. Do you see that?

A. Yes.

Q. Okay.

If you scroll down, Dr. Burns sends Dr. Vellas, on October 25th, three links. Do you see that?

A. Yes.

Q. She writes: "Here are two commentaries regarding the allegations that may be helpful in your review."

She continues: "Coincidentally, this is the author who wishes to keep his identity anonymous online."

Do you see that?

A. Yes.

Q. And you can see from the link of the -- the third link that the author she's referring to appears to be Charles Spruck. Do you see that?

A. Yes.

Q. And Dr. Spruck was one of the three sources of review of this article that you referred to earlier as the three reviewers who you consulted during the

Page 97

investigation of this article; right?

A. Yes.

Q. And just from -- do you recall reviewing either of these two articles?

A. I don't recall.

Q. Based on the second title of the second link of shorts and blots -- do you see that?

A. Yes.

Q. It appears to be about short sellers and western blots. Does that ring any bells?

A. I don't remember that. Sorry.

Q. Okay. It's okay.

And was this, if you can recall, the first time you'd heard of Dr. Spruck?

A. I don't know, but it might have been.

Q. And over the course of the investigation, you spoke to Dr. Spruck; is that right?

A. Yes.

Q. And you -- and what was your impression of Dr. Spruck?

A. I believe he is a basic scientist who was an expert in western blotting. And he gave me his honest and informed assessment of this issue.

Q. And did you know Dr. Spruck was an investor in Cassava?

25 (Pages 94 - 97)

******** CONFIDENTIAL TRANSCRIPT ********

Page 98

A. I did not know.

Q. You didn't know that he was a shareholder in the company?

A. I did not know.

Q. Did Dr. Spruck or Dr. Burns or -- ever disclose to you that Dr. Spruck had a financial interest in Cassava?

A. I don't believe so.

Q. Is that a fact that you think should have been disclosed by either Dr. Spruck or Dr. Burns?

MR. CAMPBELL: Object to form; foundation.

THE WITNESS: I do think so, yes.

BY MR. KUMAGAI:

Q. You can set that aside.

I'll mark as Plaintiff's Exhibit 32 a document Bates stamped Aisen_0000726.

(Exhibit 33 marked)

MR. CAMPBELL: Dave, I think you said 32. Did you mean 33?

MR. KUMAGAI: Thank you for fixing that, Steve.

BY MR. KUMAGAI:

Q. Yes. Plaintiff's Exhibit 33 is Bates stamped Aisen_0000726.

A. I have it.

Q. Okay.

Page 99

And this appears to be another e-mail from you to Bruno Vellas, dated October 31st, 2021. Do you see that?

A. Yes.

Q. Okay.

And let's -- take as long as you like to review the whole chain. But this is a continuation of the prior exhibits that we looked at. And I want to focus your attention on the e-mail from Dr. Rissman on October 30th at 12:05 p.m.

Do you see that?

A. Yes.

Q. And Dr. Rissman writes: "I think they fundamentally think it's okay to crop and manipulate to make figures, and it's really not permissible to do this. I don't think they're denying doing what we're accusing them of."

Do you see that?

A. Yes.

Q. And what was your understanding of what Dr. Rissman was saying there?

A. I believe he's saying that there was splicing of gels and that that is not good -- acceptable practice.

Q. Okay.

Page 100

In the last paragraph of his e-mail, he says: "Honestly, I think you're being more than fair by going back and forth with them on this. I think there's clear evidence that the blots have been messed with, which is, in itself, a reason to retract."

Do you see that?

A. Yes.

Q. And what did you make of Dr. Rissman's statement in that e-mail?

A. Yeah. I think his view is clear. As he said at the end, "if there's a chance that the data isn't kosher, just pull the paper."

Q. And did you disagree with that?

A. I did disagree with that. In my view, the standards and the practice of scientific publication would not say that if there's a chance the data isn't kosher, just pull the paper; that is, I think that a paper should -- a retraction should be required when there is clear evidence of manipulation. So that's a different perspective, I think, than the one expressed by Dr. Rissman.

Q. But in that same paragraph, Dr. Rissman does say: "I think there's clear evidence that the blots have been messed with, which, in itself, is a reason to retract."

Page 101

Do you see that?

A. Yes, I see that.

Q. So his standard seems to be clear evidence of manipulation to retract. Isn't that fair?

MR. CAMPBELL: Objection; form.

THE WITNESS: I think that's his perspective, yes.

BY MR. KUMAGAI:

Q. I guess I'm just trying to clarify whether you had a disagreement about the standard for retraction or a disagreement about whether the evidence was clear or not of data manipulation.

A. I would say we had a disagreement on both counts.

Q. And what was your disagreement as to whether or not the evidence was clear?

A. I was unconvinced that -- sorry. There's a plane overhead. My office is near an Air Force base, and sometimes that gets in the way.

In my view, the evidence that there had been cutting and pasting was not clear. There was suggestive evidence that was open to interpretation in my view. Further, in my view, if there's a chance, that would not be on my standard for retracting a paper. I think there would have to be convincing clear evidence that data was

26 (Pages 98 - 101)

********* CONFIDENTIAL TRANSCRIPT *********

Page 102

manipulated. So I would say that I differed from Dr. Rissman on both counts.

Q. And as editor or co-editor in chief of JPAD, how many times have you found clear or convincing evidence of manipulation sufficient to warrant a retraction?

A. This is the only time that such an issue has come up, to my knowledge, with regard to a paper and JPAD.

Q. And you just described how you and Dr. Rissman had a disagreement over whether the evidence of data manipulation was clear or open for interpretation; right?

A. Yes.

Q. And you testified earlier that Dr. Rissman had more experience with western blots than you; right?

A. Yes.

Q. And he had greater expertise than you in assessing whether or not a western blot had been manipulated or not; right?

A. Yes.

MR. CAMPBELL: Object to form.

THE WITNESS: Sorry. I'm answering too quickly. I'll try to slow down.

///

Page 103

BY MR. KUMAGAI:

Q. You said yes; right?

A. I said yes.

Q. And in the next e-mail you respond to Dr. Rissman: "I think we should review the blots with Lindsay in Boston."

Do you see that?

A. This is further down?

Q. I'm sorry. It's further up. It's the e-mail right above. Just one sentence.

A. Thank you. I see.

Q. And why do you think you should review the blots with Lindsay in Boston?

A. To make -- to make sure we understand each other. To make sure we have clarity.

Q. Okay.

And then the next two e-mails between you and Dr. Vellas, you discuss getting another basic scientist to weigh in on the issue. Do you see that?

A. Yes.

Q. And did you end up consulting another basic scientist?

A. My recollection is, as I've said, that we had three sources of information, Dr. Rissman, Dr. Spruck, and the software review of the manuscript.

Page 104

Q. And is it fair to say that two of those sources, Dr. Rissman and the software analysis, believed or provided evidence of -- found evidence -- strike that.

Is it fair to say that two of those sources, Dr. Rissman and the software analysis, found evidence that the data had been manipulated?

MR. CAMPBELL: Object to form.

THE WITNESS: I would say that two sources found evidence to suggest the possibility of cutting and splicing, yes.

BY MR. KUMAGAI:

Q. And the one source who disagreed with those findings was Dr. Spruck, who was a Cassava investor; right?

MR. CAMPBELL: Object to form, foundation.

THE WITNESS: You have told me that he's an investor. If that's correct, then yes.

BY MR. KUMAGAI:

Q. Prior to today, you had no idea whether or not Dr. Spruck was an investor in Cassava. Is that fair?

A. Yes.

Q. And going back to your message about suggesting that you review the blots with Lindsay in Boston, did you have a sense -- strike that.

Page 105

Was part of the reason why you wanted to talk to her in Boston that you believed she was -- you were sympathetic to her and believed she was being treated unfairly by short sellers and Charles Piller and the like?

A. I was just trying to gain clarity on the issue.

Q. Clarity about -- what exactly were you hoping to get from the meeting in Boston?

A. Clarity on the details of the issues surrounding Dr. Wang's work and what the procedures, exchange of specimens, and the preparation of western blots, what the details were from the perspective of Dr. Burns.

Q. But was it your understanding that Dr. Burns was an expert in western blotting?

A. No.

Q. And Dr. Burns, obviously, had a very clear interest in having the investigation sort of exonerate Professor Wang and not find evidence of data manipulation; right?

MR. CAMPBELL: Objection.

THE WITNESS: Yes.

BY MR. KUMAGAI:

Q. So I guess I'm trying to understand why you believe she might be able to shed light or help you

27 (Pages 102 - 105)

********* CONFIDENTIAL TRANSCRIPT *********

Page 106

assess whether or not there have been data manipulation with Dr. Wang's experiments.

A. I viewed her as the senior scientist overseeing the work.

Q. And do you recall meeting Dr. Burns in Boston to discuss this issue?

A. I recall speaking to her about the issue. I can't say that I recall where it was or when it was. But yes, I recall discussing the issue with her.

Q. And what, if anything, do you recall about what she said?

A. I don't remember anything substantive beyond what we've covered already. But, again, I don't recall the details of the discussion.

Q. Do you recall whether the meeting helped persuade you one way or the other whether or not there was data manipulation?

A. No. I don't recall that it was substantive or that it influenced my view.

Q. Okay. I'll mark Plaintiff's Exhibit 34, a document Bates stamped Cassava_000087955.

(Exhibit 34 marked)

BY MR. KUMAGAI:

Q. Do you see the top e-mail is from Dr. Burns to you with the date of December 3rd, 2021, copying

Page 107

Dr. Wang? Do you see that?

A. Yes.

Q. Okay.

Take as long as you like to review. But this appears to be a further continuation of the chain and the exhibits we've been looking at for the past few minutes. Do you see that?

A. Yes.

Q. Okay.

And then on November 2nd, 2021, Dr. Burns sends an e-mail to you. He says: "Hi again, Paul. I received further comments from Dr. Wang."

Do you see that?

A. Yes.

Q. And then she provides some quotes, apparently from Dr. Wang.

And then in the next chain, Dr. Burns -- excuse me.

In the next e-mail, on November 3rd, Dr. Burns says: "Dear Paul and team, I reached out to the thousand blots per year expert, Dr. Charles Spruck, to see what he might have to say about the visual artifact. His e-mail says this."

And then she appears to quote a long paragraph from Dr. Spruck.

Page 108

Do you see that?

A. This is the November 2nd?

Q. Sorry. The November 3rd. The top e-mail in the chain.

A. Oh, sorry.

Q. It's okay.

A. Yes.

Q. Do you see she appears to quote an explanation from Dr. Spruck?

A. Yes.

Q. Is a thousand blots a year significant to you? Is that a lot of blots?

A. Yes.

Q. And Dr. Burns does not disclose in this e-mail whether Dr. Spruck was a Cassava shareholder, does she?

MR. CAMPBELL: Objection.

THE WITNESS: Just looking through, no. I didn't see any disclosure.

BY MR. KUMAGAI:

Q. And at this time, did you understand Dr. Spruck to be an independent western bloat expert?

A. Yes.

Q. Is it typical for a sponsor of a study to introduce you to an expert to vouch for their work, or is this sort of an atypical situation?

Page 109

A. I'm not sure I understand the question.

Q. Was it common, I guess -- strike that?

This is really the only investigation that you've overseen as a JPAD editor in chief; right?

A. Correct.

Q. Okay.

Do you recall -- switching gears back to the meeting with Dr. Burns about this issue. Do you recall whether Dr. Burns asked you to issue any sort of public statement or comment about the findings of the investigation?

A. I don't recall that she asked me. Again, I don't recall the details of too many conversations. So...

Q. Do you recall whether she mentioned short sellers or the financial motives of the people in her view who were behind the allegations of data manipulation?

A. Well, as we've gone through in these e-mails, she certainly has referred to that issue.

Q. And is that an issue or a point that you recall Dr. Burns making repeatedly during the course of this investigation?

A. I don't recall the conversations well enough to say whether it was frequent or not. Again, the e-mails

28 (Pages 106 - 109)

********* CONFIDENTIAL TRANSCRIPT *********

Page 110

document that she made this point.

Q. I'll mark as Plaintiff's Exhibit 35 a document Bate stamped Aisen_0000686?

(Exhibit 35 marked)

THE WITNESS: I have it.

BY MR. KUMAGAI:

Q. This is an e-mail from you to an individual named Valentina Corio, along with Dr. Touchon and Dr. Vellas. Do you see that?

A. Yes.

Q. And it's dated November 15th, 2021; right?

A. Yes.

Q. Who was Ms. Corio?

A. Someone who works for the publisher.

Q. Springer Nature; is that right?

A. Yes.

Q. Okay.

And if you scroll down to the e-mail on November 9th, on the page ending in 687, second page, there's an e-mail from Ms. Corio. And she refers to an entry from the Wall Street Journal. Do you see that?

A. Yes.

Q. And she asks for your opinion on the case. Do you see that?

A. Yes.

Page 111

Q. And on November 11th, 2021, you write: "Hi Valentina. After review of the additional material from the authors, we are satisfied that the published data was not manipulated."

Do you see that?

A. Yes.

Q. What was it that satisfied you that the published data was not manipulated at this point, in November 2021?

A. Well, we received many blots and reviewed those blots. And I did not and the editors did not feel that this was clear evidence of manipulation.

Q. And so at that point, November 11, 2021, were you prepared to sort of conclude the investigation?

A. I can't remember exactly where I was in my thinking. You know, just looking at these e-mails, this e-mail suggests that I was -- had reached a decision. But I do not remember at this point in time.

Q. Okay.

And then in the November 15th e-mail from Ms. Corio, she writes: "I would like to confidentiality inform you that based on the evidence of image manipulation that has been provided for other papers by HY Wang in a larger investigation, the SN research integrity group strongly recommend looking into this

Page 112

further."

Do you see that?

A. Yes.

Q. And then she asks you to request some additional information from the authors; right?

A. Yes.

Q. What was the SN research integrity group?

A. I don't know.

Q. SN stand for Springer Nature?

A. Sounds like that's a reasonable guess.

Q. Okay.

And -- so the publisher, the representative of the publisher is strongly recommending further investigation; right?

A. Yes. That's what that e-mail says.

Q. Okay.

And then you respond again saying: "We are satisfied that no data manipulation occurred."

A. Yes.

Q. Okay. You can set that aside.

I'll mark as Plaintiff's Exhibit 36 a document Bates stamped Cassava_000461586.

(Exhibit 36 marked)

BY MR. KUMAGAI:

Q. That should be up now.

Page 113

A. 586 or 686?

Q. 586.

A. Okay. I don't have it yet.

Q. Plaintiff's Exhibit 36?

A. Okay. I just got it.

Q. Okay.

And this appears to be an e-mail from Dr. Burns, dated November 23rd, 2021, to you, the other editors in chief of JPAD, and Ms. Corio, and another individual.

Do you see that?

A. Yes.

Q. Do you recall reviewing this additional information from Dr. Burns?

A. As I've said, I do not recall the details, no.

Q. Okay.

And in the last paragraph of Dr. Burns' e-mail, she writes: "An immunoblot expert offered to provide his perspective on this matter. Attached please find his letter. He is independent, unaffiliated with, and not compensated by us or anyone we know for this analysis. We look forward to hearing from you when you have finished your evaluation."

Do you see that?

A. Yes.

29 (Pages 110 - 113)

******** CONFIDENTIAL TRANSCRIPT ********

Page 114

Q. And if you scroll down. Hang on.

Do you know the immunoblot expert that Dr. Burns is referring to in this e-mail?

A. Again, I don't remember, but it would seem that would be Dr. Spruck. But I can't say I remember what happened at that time.

Q. And Dr. Burns says that the immunoblot expert is "independent, unaffiliated with, and not compensated by us or anyone we know for this analysis"; right?

A. Yes.

Q. And assuming Dr. Spruck was, in fact, an investor of Cassava at the time, that was a fact that Dr. Burns neglected to mention in this e-mail; right?

MR. CAMPBELL: Objection.

THE WITNESS: If this is correct and if Dr. Burns was aware of it, then she neglected to mention it, yes.

BY MR. KUMAGAI:

Q. Let's look at the letter from Dr. Spruck.

Mark as Plaintiff's Exhibit 37 a document Bates stamped Cassava_000461614.

(Exhibit 37 marked)

THE WITNESS: Yes, I have it.

BY MR. KUMAGAI:

Q. And the letter is dated November 23rd, 2021.

Page 115

Do you see that?

A. Yes.

Q. And it's addressed to Dr. Burns, with the subject, "Review of JPAD Article Western Blotting Data."

Do you see that?

A. Yes.

Q. And on the second page it's signed by Charles Spruck. Do you see that?

A. Yes.

Q. In the first sentence Dr. Spruck writes that he is providing "objective review" of the western blotting in the Simufilam paper.

Do you see that?

A. Yes.

Q. And in your experience, is a review by an investor of a study sponsor generally considered objective?

A. I believe that an investor should disclose that relationship.

Q. And looking at this letter from Dr. Spruck, do you see anywhere a disclosure of any equity interest or shareholdings of Cassava securities?

A. I'm just reviewing it.

Q. Uh-huh.

A. No, I don't see any.

Page 116

Q. Okay.

And in the second sentence of Dr. Spruck's letter to Dr. Burns, he writes: "By way of introduction, I am a molecular biologist and academic researcher at the Sanford Burnham Prebys Medical Discovery Institute in La Jolla, California.

Do you see that?

A. Yes.

Q. And we looked at a few minutes ago an e-mail from Dr. Burns where she copied and pasted an explanation from Dr. Spruck to you and described him as the one thousand blot per year expert; right?

A. Yes.

Q. So isn't it odd here that Dr. Spruck is introducing himself to Dr. Burns when Dr. Burns had already passed along explanations to you in October, the month before this letter?

MR. CAMPBELL: Objection.

THE WITNESS: No. I don't see that as odd.

BY MR. KUMAGAI:

Q. Why not?

A. It's very common in letters from an individual on some academic topic to begin with a statement of who they are. So it's just common language.

Q. I'll mark as Plaintiff's Exhibit 38 a document

Page 117

that I can represent was downloaded from the website Silicon Investor.

A. Yes.

(Exhibit 38 marked)

BY MR. KUMAGAI:

Q. Okay.

And this appears to be an article posted on some forum on Silicon Investor from an individual who went by the student name Dogboy 1, with a date of September 8th, 2021.

Do you see that at the top?

A. Yes.

Q. Okay.

And the post reads: "Hi all. Longtime board watcher and first time public poster. I'd like to thank everyone for the advice offered on this board for the past couple of years. Investing in IMMU was definitely a learning experience for me. By way of introduction, I'm a molecular biologist and principal investigator."

It continues. Second paragraph. "I am also an investor in SAVA and thought you might want an opinion of the lawyer complaint from someone that can actually analyze the data."

Do you see that?

A. Yes.

30 (Pages 114 - 117)

******** CONFIDENTIAL TRANSCRIPT ********

Page 118

Q. Does this sound familiar to you?

A. No.

Q. Does it sound like the letter from Dr. Spruck to Dr. Burns that we just looked at, Exhibit 37?

A. No. I mean, I haven't read this yet, obviously. From what I see so far, no.

Q. Well, in the second sentence -- the third sentence, he also says: "By way of introduction, I'm a molecular biologist and principal investigator," which is the same general language we just saw in Dr. Spruck's letter to Dr. Burns; right?

A. I believe I commented a minute ago that that is standard language that, for example, I use all the time in my letters. So no, this does not suggest anything to me.

May I just ask? I assume SAVA is the -- is Cassava?

Q. That is the stock symbol, I believe, for the company, yes.

Take a moment to review Exhibit 38. You don't see any similarities sitting here today between this post on Silicon Investor and the letter from Dr. Spruck to Dr. Burns?

MR. CAMPBELL: Objection.

THE WITNESS: I'm still reading.

Page 119

I don't really see the similarity, other than that the overall message is similar.

BY MR. KUMAGAI:

Q. Okay.

I'll mark as Plaintiff's Exhibit 39 a document Bates stamped Cassava_001257502.

(Exhibit 39 marked)

BY MR. KUMAGAI:

Q. Let me know when you have that.

A. Yes, I have it.

Q. And you see it's dated February 28th, 2022, and it's addressed to Ernst & Young, LLP?

A. Yes.

Q. And the opening paragraph reads: "In connection with your audits of the consolidating balance sheets of Cassava Sciences, Inc., as of December 31st, 2021 and 2020, the related consolidated statements of operations, stockholders equity, and cash flows for each of the two years in the period ended December 31st, 2021, and your audit of the company's internal controls..."

It goes on and says it's sending this letter. Do you see that?

A. Yes.

Q. Have you ever seen a letter like this before to

Page 120

an auditor of a company?

A. I'm not recalling any such letter.

Q. If you scroll down to the page ending in 507, under the heading Related Party Relationships and Transactions. Do you see that?

A. Yes.

Q. It reads -- the last paragraph reads: "We have informed you of the articles published by Dr. Charles Spruck, PhD, an investor in Cassava Sciences, Inc."

Do you see that?

A. Yes.

Q. Okay. You can set that aside.

So as we mentioned and have discussed, during the JPAD investigation, we've seen documents where Dr. Burns repeatedly emphasized the financial motivations of the people who raised research integrity concerns about Cassava and Simufilam; right?

A. Yes.

Q. But Dr. Burns never once mentioned to you, that you can recall at least, her supposed western blot expert Dr. Spruck was a Cassava shareholder; right?

MR. CAMPBELL: Objection; form.

THE WITNESS: That's correct.

BY MR. KUMAGAI:

Q. And not only did Dr. Burns neglect to mention

Page 121

that Dr. Spruck was an investor, Dr. Burns told you and the other JPAD editors that Dr. Spruck was, quote, "independent"; right?

MR. CAMPBELL: Objection.

THE WITNESS: I think that's correct.

BY MR. KUMAGAI:

Q. Do you want to pull up Plaintiff's Exhibit 36?

A. Yes.

Q. And if you look at the last paragraph in the top e-mail from Dr. Burns, she writes: "An immunoblot expert offered to provide his perspective on this matter. Attached please find his letter. He is independent."

Do you see that?

A. Yes, I do see.

Q. So not only did Dr. Burns neglect to mention to you that Dr. Spruck was a Cassava investor, she held Dr. Spruck out to you as independent; right?

MR. CAMPBELL: Objection.

THE WITNESS: Yeah. I'm just recalling that letter from Ernst & Young used similar language, even owning -- even pointing out that this person is an investor. So I'm just wondering whether that's open to interpretation whether a statement of -- that someone is independent, unaffiliated, and not compensated is

31 (Pages 118 - 121)

******** CONFIDENTIAL TRANSCRIPT ********

Page 122

incompatible with being an investor. Maybe that's a small point. But I'm just struck by the similar language here and the language from Ernst & Young. But I would say that if Dr. Burns was aware that Dr. Spruck was an investor, I think she should have disclosed that.

BY MR. KUMAGAI:

Q. And just to be clear, the letter that we looked at, the audit letter, was a letter from Cassava to Ernst & Young; right?

A. Okay. I didn't get that right. Understood.

Q. And so you --

A. So I guess I would say in that same letter, the author of that letter from Cassava in the same statement said this person is an investor but is independent. So it may be a question of interpretation of the language. But that said, in my view, if the company knew this, and apparently they did, they should have disclosed it to me.

Q. I'll mark as Plaintiff's Exhibit 40 a document Bates stamped Aisen_0000793.

(Exhibit 40 marked)

BY MR. KUMAGAI:

Q. Let me know when you have it.

A. Yep.

Q. This appears to be an e-mail from Dr. Burns to

Page 123

Ms. Corio at Springer Nature, copying you and Dr. Touchon and Dr. Vellas. Do you see that?

A. Yes.

Q. Dated December 30th, 2021?

A. Yes.

Q. And in the top e-mail, Dr. Burns writes: "Please see attached complaint letter sent to the New York State medical licensure regarding Geoffrey Pitt, who, along with David Bredt, filed a petition to the FDA in August to stop our phase 3 trials after taking out short positions in Cassava Sciences stock. As short sellers, they participated in a 100 million windfall from our stock price crashing as a result of this petition. They have also filed not one but four supplements since then."

Do you see that?

A. Yes.

Q. Do you recall Dr. Burns sending you this complaint against Dr. Pitt and Dr. -- excuse me -- against Dr. Pitt?

A. No, I don't.

Q. If you scroll down to the page ending in Bates 795, you'll see the attachment, which is the letter to the New York State Department of Health.

A. Yes.

Page 124

Q. By an individual named Matt Nachtrab. Do you see that?

A. Yes.

Q. Do you know who Mr. Nachtrab is?

A. No.

Q. Ever had any contact with him, as far as you can recall?

A. Not that I recall.

Q. Did you have an understanding as to why Dr. Burns was sending you this complaint about Dr. Pitt and continuing to attack short sellers while you were investigating the JPAD article?

MR. CAMPBELL: Object to form.

THE WITNESS: I'm not sure I understand your question. It was apparent that Dr. Burns was trying to inform me and the other editors of information about the conflict between the people complaining about Cassava's behavior and people trying to stop the phase 3 trial and the company. So that's obvious. I'm not sure, beyond that, what you're asking me.

BY MR. KUMAGAI:

Q. And did you consider the fact that the scientists who filed the citizen petition had shorted Cassava's stock to be relevant to the research integrity concerns that you were investigating at JPAD?

Page 125

A. Relevant? Yes.

Q. How so?

A. Again, I think, as I've said several times, I believe that in discussing an issue, people who are taking a position should be transparent about their relationships that might influence their judgment.

Q. And Dr. Burns was not transparent about Dr. Spruck's relationships that might influence his judgment; right?

MR. CAMPBELL: Object to form.

THE WITNESS: Correct.

MR. FINK: I've lost my audio on this end. I'm not hearing what's being said.

MR. KUMAGAI: Okay. Just one second.

Let's go off the record for five minutes and try to fix.

THE VIDEOGRAPHER: Going off the record. The time is 12:35 p.m., and this is the end of media unit 3.

(Recess)

THE VIDEOGRAPHER: We're going back on the record. The time is 12:46 p.m., and this is the beginning of media unit 4.

Please continue.

BY MR. KUMAGAI:

Q. We'll mark as Plaintiff's Exhibit 41 a document

32 (Pages 122 - 125)

******** CONFIDENTIAL TRANSCRIPT ********

Page 126

Bates stamped Aisen_0000680.

(Exhibit 41 marked)

THE WITNESS:  I have it.

BY MR. KUMAGAI:

Q.  Okay.

And you recognize this as an e-mail from you to Dr. Burns, dated January 25th, 2022?

A.  Yes.

Q.  Okay.

And if you scroll down, you can see that it appears Dr. Burns is forwarding you the findings from a different journal, the Journal of Alzheimer's Research and Therapy, the findings of that journal's investigation into allegations of data manipulation.

Do you see that?

A.  Yes.

Q.  And Dr. Burns writes:  "This is quite incredible.  The independent expert is obviously, Elizabeth Bik, who is highly conflicted by who is paying her."

Do you see that?

A.  Yes.

Q.  And she appears to be referring to the independent expert that the Alzheimer's research and therapy team is relying on.  Is that fair?

Page 127

MR. CAMPBELL:  Objection.

THE WITNESS:  I'm having a little trouble understanding all of this.

Yes.  Okay.  I think I get it.

BY MR. KUMAGAI:

Q.  Do you know who Dr. Elizabeth Bik is?

A.  I know that name, and I received e-mails from her.

Q.  And what e-mails -- what types of e-mails did you receive from Dr. Bik?

A.  E-mails encouraging me to retract a paper from Cassava in JPAD.

Q.  Okay.

And then you respond to Dr. Burns on January 25th.  Do you see that?

A.  Yes.

Q.  You write:  "Hi Lindsay.  Have you provided evidence to the journal that Dr. Bik is paid by the people shorting the stock?  How do you know that Dr. Bik is the expert?"

Do you see that?

A.  Yes.

Q.  As far as you know, did Dr. Burns ever provide evidence that you've seen to suggest or show that Dr. Bik was being paid by the people shorting Cassava

Page 128

stock?

A.  As I've said, I do not recall the details of conversations or even e-mails from several years ago.  I don't remember.

Q.  Okay.

And then in the next paragraph you write:  "At JPAD, we consulted an independent expert without conflict, and the expert concluded that the blots had been manipulated and recommended retraction.  I found your explanation and supporting documents persuasive, but this was not an easy call."

Do you see that?

A.  Yes.

Q.  And who is the independent expert without conflict that you're referring to here?

A.  Dr. Rissman.

Q.  And -- so at this point in time, in January of 2022, you were telling Dr. Burns that JPAD had decided to retract the 2020 Simufilam paper; is that right?

A.  No.

MR. CAMPBELL:  Object to form.

BY MR. KUMAGAI:

Q.  What was your message in this paragraph to Dr. Burns?

A.  My message was that we consulted an expert who

Page 129

recommended retraction but that we found her explanation and supporting documents persuasive.

Q.  Right.  I see.  I apologize.  I misread that sentence.

And what did you mean by "this was not an easy call"?

A.  That we had different experts giving us different opinions.

Q.  Dr. Burns responds:  "I would like to discuss this matter before you take any action."

Do you see that?

A.  Yes.

Q.  And then you write:  "I am not taking any action personally.  I've expressed my views in support of your position to the JPAD publisher and other editors in chief."

Do you see that?

A.  Yes.

Q.  Do you recall discussing the matter further with Dr. Burns by phone?

A.  I don't recall.

Q.  Okay.

I'll mark as Exhibit 42 a document Bates stamped Aisen_0000694.

(Exhibit 42 marked)

33 (Pages 126 - 129)

********* CONFIDENTIAL TRANSCRIPT *********

Page 130

THE WITNESS: That's not showing up for me.

BY MR. KUMAGAI:

Q. It should just be up just now.

A. Yeah. Got it.

Q. Okay.

And the top e-mail is from you to Ms. Corio at Springer Nature and Dr. Vellas. Do you see that?

A. Yeah.

Q. Okay.

I just want to scroll down to the May 27th e-mail on page ending in 696 from Ms. Corio.

A. Yes.

Q. And it appears as though there was sort of a pause or a lull in activity in the investigation between, let's say, around January of 2022 and May of 2022. Do you recall the reason for that or whether that was -- whether there was any sort of pause?

A. I do not recall.

Q. Okay.

Ms. Corio writes in this May 27th, 2022, e-mail: "I would like to follow-up on the investigations which were still ongoing about some images," and she refers to the Simufilam paper in JPAD.

Do you see that?

A. Yes.

Page 131

Q. And in the next paragraph she writes: "Finally, Springer Nature research integrity group received a report from a developer of a new software that analyzed the original images as provided by the authors of the JPAD paper. I'm sending you the results of the analysis. SNRIG can confirm the validity of the of the analysis and that the analyst has no conflict of interest, which provides very strong basis that the raw data and, in turn, the published figures were likely manipulated and calls for a retraction."

Do you see that?

A. Yes.

Q. What was your understanding of what Ms. Corio was telling you about the software analysis of the Simufilam paper?

A. That the software analysis identified the same -- the same aspects of the figures that we've been discussing where a rectangular shape suggests the possibility of splicing.

Q. Well, Ms. Corio describes it differently here; right? She says that the software analysis "provides very strong evidence that the raw data and, in turn, the published figures were likely manipulated and calls for a retraction."

MR. CAMPBELL: If that's a question, I object

Page 132

to form.

BY MR. KUMAGAI:

Q. Do you see that, Dr. Aisen?

A. Yes.

Q. And so in Ms. Corio's view, as expressed to you here, it was more than just the possibility of manipulation. She's presenting it to you as very strong evidence of manipulation; right?

MR. CAMPBELL: Object to form.

THE WITNESS: That's what her statement says in the e-mail, yes.

BY MR. KUMAGAI:

Q. But you in your judgment determined that the evidence was not as strong as Ms. Corio was presenting; is that right?

A. My interpretation is that the software produced the same issue that we have been discussing and did not add to our understanding of the basis of that aspect of the figures. The software is picking up shapes like the rectangle. Interpretation of that change is a matter of the discussion here about whether data has been manipulated. And in my view, the software report did not add to the discussion.

Q. And as far as you know, did Ms. Corio share your view of the software analysis?

Page 133

A. I don't recall anything other than what I'm reading here. That is, I don't recall anything. Here she's saying that the report indicates that, just as you said, very strong evidence that there was manipulation. I don't think that that materially changes our review of the issue. It's another mechanism for demonstrating shapes that appear as though they could be artifactual or an indication of splicing.

Q. And so is it fair to say, did it all just come back to, for you at least, the point Dr. Rissman was making at the beginning, which is due to the nature of these types of experiments using film instead of digital images, there was no real way for you to determine one way or the other whether the images had been manipulated?

MR. CAMPBELL: Object to form.

THE WITNESS: I was persuaded by my detailed review with Dr. Spruck that what appeared to be artifacts can be explained by the normal procedures for gels that are prepared on-site and are photographed on film to be reported; that these artifacts are explained by the approach to the preparation of the gels used in Dr. Wang's lab.

BY MR. KUMAGAI:

Q. And you were convinced by Dr. Spruck's

34 (Pages 130 - 133)

********* CONFIDENTIAL TRANSCRIPT *********

Page 134

explanation, but Dr. Spruck never told you that he was an investor in Cassava; right?

A. Correct.

Q. Okay.

We'll mark as Plaintiff's Exhibit 43 a document Bate stamped Aisen_0000787.

(Exhibit 43 marked)

BY MR. KUMAGAI:

Q. It should be up now.

Do you recognize this as the software analysis that Ms. Corio shared and was described in Exhibit 39 -- or Exhibit 42?

A. I'm sorry. This is? What's the number again?

Q. 43.

A. Let's see. Oh. Yes, I've got it. Okay.

Q. And just to be clear, my question is, do you recognize this as the software analysis that we were discussing a moment ago?

A. Exhibit 43?

Q. Yes.

A. I can't tell. This is just cut and pasted pictures from the journal article. It could be part of that report. I can't tell.

Q. At the time, did you review the software analysis?

Page 135

A. Yes.

Q. But I take it, sitting here today, you can't recall what it looked like exactly.

A. Correct.

Q. If you can just open Exhibit -- hang on. I'll mark as Exhibit 44 a document Bate stamped Aisen_0000709.

(Exhibit 44 marked)

THE WITNESS: Yeah. I don't see it yet. I'm still on Exhibit 43.

BY MR. KUMAGAI:

Q. Yep. Sorry. It just took a minute to load. It should be up now, or momentarily.

A. Yeah. Got it.

Q. Okay.

This is an e-mail from July 3rd, 2022, from you to Dr. Vellas. Do you see that?

A. Yes.

Q. Okay.

And if you scroll down to the e-mail from you to Dr. Burns on June 2nd at the bottom of the chain. You appear to send the software analysis from Springer Nature to Dr. Burns and ask for a response. Do you see that?

A. I do see that.

Page 136

Q. Okay.

And then on June 29th, 2022, Dr. Burns responds to your e-mail and writes: "Attached is a response to the latest query, again, from an independent Western blot expert. Apologize for the delay as I was out of the country."

Do you see that?

A. Yes.

Q. And did you understand that to be another reference to Dr. Spruck, a Cassava investor?

A. Again, I don't remember at the time, but I would -- reading it now, I would guess that's Dr. Spruck.

Q. Okay.

And Dr. Burns doesn't say anything about Dr. Spruck being an investor in Cassava in this e-mail either; right?

MR. CAMPBELL: Objection.

THE WITNESS: That's correct.

BY MR. KUMAGAI:

Q. Okay.

I'll mark as Exhibit 45 a document Bates stamped Aisen_0001386.

(Exhibit 45 marked)

///

Page 137

BY MR. KUMAGAI:

Q. And this appears to be a letter dated June 28th, 2022, from Dr. Charles Spruck to yourself and the other JPAD editors.

Do you see that?

A. Yes.

Q. And Dr. Spruck repeats the argument that Dr. Burns had made multiple occasions previously arguing that the research integrity concern originated from individuals that were shorting stock in Cassava Sciences.

Do you see that?

A. Yes.

Q. And, again, you see Dr. Spruck describe himself as conducting an "objective review" in the first paragraph.

Do you see that?

A. Yes.

Q. And if you could take a moment to look at the letter. Dr. Spruck, once again, does not reveal or disclose anywhere in this letter that he was a Cassava shareholder; right?

A. Just reviewing it.

Yes.

Q. Okay.

35 (Pages 134 - 137)

******** CONFIDENTIAL TRANSCRIPT ********

Page 138

We'll mark as Exhibit 46 a document Bates stamped Aisen_0000748.

(Exhibit 46 marked)

THE WITNESS: Yep.

BY MR. KUMAGAI:

Q. Okay.

And if -- well, first of all, at the top is an e-mail from you to Dr. Vellas. Do you see that, dated August 8, 2022?

A. Yes.

Q. And this is another e-mail that you produced in response to the subpoena; right?

A. I think so, yes.

Q. You can take a moment to review the full thread.

What's going on in this back and forth with the other JPAD editors and the representatives of the publisher?

A. Yes. So we're trying to come to a resolution of the issue at the journal about retraction or no retraction of the paper.

Do you have a specific question?

Q. Sure. Let's start at the bottom e-mail from Dr. Touchon on July 24th.

A. Yes.

Page 139

Q. He writes: "Dear Bruno, Paul, Valentina, and Sandrine. I think that we have to be very cautious because the story is not finished. It's better not to mention the supposed financial aspect of the problem. I agree with Bruno's position."

Do you see that?

A. Yes.

Q. What was -- what did you understand Dr. Touchon to be referencing in that e-mail?

A. So I cannot recall. But I would assume the question was whether any statement from us should mention that the complaints were related to short selling of the stock.

Q. Okay.

And in the second e-mail, you respond to Dr. Touchon, and you write: "Thanks, Jacques. In my opinion, the Cassava controversy is different from the recent discussion with the amyloid oligomer paper. The Cassava issue seems to still be driven by efforts to manipulate the stock price. But I will remove the statement about this from the note. I think we should avoid suggesting that our investigation continues."

Do you see that?

A. Yes.

Q. And so you were in some sense arguing for an

Page 140

inclusion or a statement about the financial motives of the -- or the perceived financial motives of the people bringing research integrity concerns. Is that fair?

A. Yes.

MR. CAMPBELL: Object to form.

BY MR. KUMAGAI:

Q. And Dr. Touchon and Dr. Vellas were arguing against making any sort of statement about the financial motives of the people raising the integrity concerns; right?

A. Yes.

Q. And why was it your view that the Cassava controversy was different and the financial motives should be mentioned?

A. In my view, the Cassava controversy was different and was motivated by stock manipulation. This is considering my knowledge of the sequence of events around -- from the original science paper through the demands that journals retract papers, through the effort to halt the clinical trial. These are unusual actions and, in my opinion, they were driven by a concerted and financially supported effort from interested parties, that is, short sellers. That was the reason that I had suggested including that in the statement. But I, in the end, agreed with Bruno and Jacques that it was best

Page 141

to leave that out of anything we wrote, we published.

Q. And what was your understanding as to why Bruno and Jacques express to you their view that no statement about the financial motives should be mentioned?

A. They viewed, reasonably, that we should stick to the issue at hand, which is do we have convincing evidence of manipulation of data in this paper and not bring in other issues.

Q. So the potential or perceived financial motives of the short sellers who may have been behind some of the allegations was not, in your view, the issue at hand that JPAD was investigating; is that right?

A. What I said was that our written response should stick to the issue of whether there is convincing evidence of data manipulation.

Q. Did you ever see or find evidence proving that short sellers were, in fact, driving the allegations of research misconduct or raising -- strike that.

Did you ever see evidence that proved that research integrity concerns were, in fact, driven by efforts to manipulate the stock price?

MR. CAMPBELL: Object to form.

THE WITNESS: As I've said, I was -- my view was influenced by the first report of this issue, which was in an article in Science by the journalist Charles

36 (Pages 138 - 141)

********** CONFIDENTIAL TRANSCRIPT **********

Page 142

Piller, who starts his article by saying this controversy or this questioning of data from Cassava was driven by short sellers.

BY MR. KUMAGAI:

Q. And aside from that article by Charles Piller, did you see any other evidence or bases for believing that the research integrity concerns were driven by efforts to manipulate the stock price?

MR. CAMPBELL: Object to form.

THE WITNESS: I'm not sure whether there was anything other than that article that brought me to that conclusion.

BY MR. KUMAGAI:

Q. Okay.

If you scroll up to your e-mail on page ending in 7488 from July 28th, 2022.

A. August 8th?

Q. Sorry. July 28th, 2022. It's the -- do you see it?

A. I see July 27th.

Q. It's in French, I think. 28th of juin, 2022. It's at the bottom of the first page.

A. Yes. I'm sorry. I see.

Q. Okay.

You write: "Valentina, Carlotta, Jacques,

Page 143

Sandrine, Bruno. I spoke today with Dr. Spruck, who provided the detailed review that found no evidence of data manipulation. I can confirm that his involvement is totally independent of the authors in Cassava; that he has enormous experience with Western blots and he is very confident in his assessment. I remain convinced that there was no data manipulation or intent to mislead by the authors."

Do you see that?

A. Yes.

Q. And what did you mean by you could confirm that his involvement is totally independent of the authors and Cassava?

A. I meant that he told me that on the phone.

Q. And what did he say to you?

A. I don't remember the conversation.

Q. But he conveyed to you that he was totally independent of the authors in Cassava, even though he was a Cassava shareholder at the time; right?

MR. CAMPBELL: Object to form and foundation.

THE WITNESS: I think you were asking me what I wrote in this e-mail. And I'm explaining that I wrote that he was independent based on what he told me. We earlier discussed whether we shared a common understanding of what that means, to be independent.

Page 144

But he did not tell me that he was a shareholder. And I do think that is something that should be disclosed and that it's routinely disclosed amongst scientists discussing issues.

BY MR. KUMAGAI:

Q. And if Dr. Burns or Dr. Spruck had, in fact, ever mentioned or disclosed to you that Dr. Spruck was a Cassava shareholder, would you have still written to your colleagues here that you can confirm his involvement is totally independent?

MR. CAMPBELL: Objection; form.

THE WITNESS: If I knew that he was a shareholder, I would have said in this e-mail that he was a shareholder.

BY MR. KUMAGAI:

Q. Okay.

I'll mark as Plaintiff's Exhibit 47. This is a document that is not Bates stamped. It's a Word document that, Dr. Aisen, you had produced over e-mail yesterday, June 10th, 2025.

(Exhibit 47 marked)

BY MR. KUMAGAI:

Q. Do you recall sending a document over e-mail yesterday?

A. I do.

Page 145

Q. Just give me a moment to upload.

Okay. And it appears as though the version processed through Exhibit Share converts it to PDF. So the comments are not visible in this version. But do you recognize Exhibit 47 as the draft editor's note that you produced over e-mail yesterday, on June 10th?

A. Yes, I do.

Q. So what is this document?

A. Sorry. I have a plane flying over.

Q. No problem.

A. Okay. You brought this to my attention yesterday or the day before that there had been a draft of a note for consideration for publication in JPAD about this issue. And in searching for it, I did recover this. And so I shared it with you. So this, I believe, was a draft -- I'm not sure who wrote it -- that we were discussing as a possible not to publish in JPAD.

Q. And isn't it the case that this is the draft you had written, and then Dr. Vellas -- the comments here are from Dr. Vellas, who proposed taking out the language about financial interest?

MR. CAMPBELL: Object to form.

THE WITNESS: That sounds right. Again, I can't say that I remember this. I don't. But that's a

37 (Pages 142 - 145)

********* CONFIDENTIAL TRANSCRIPT *********

Page 146

plausible explanation for it.

BY MR. KUMAGAI:

Q. Let me just show you a screen share of the Word version because it's not -- the comments are not showing up in the PDF version. Hang on.

Can you see this, Dr. Aisen?

A. Yes.

Q. I'll zoom in.

And if you scroll to the right, you can see the blue edits are attributed to Bruno Vellas. Do you see that?

A. Yes. I think that's what that means. Oh, yes. I see.

Q. And then in the comments, one of the comments Bruno writes here: "Paul, you should probably ask are these reviewed. Do you have a copy of that? Maybe you can send it to us?"

A. Yes.

Q. Okay.

Is it fair to say that this was, in fact, a draft that you had written and Dr. Vellas proposed some revisions?

A. I believe so.

Q. Okay.

And the second sentence that is crossed out in

Page 147

Dr. Vellas's version reads: "These concerns originally arose from individuals with a financial interest in refuting the findings."

Do you see that?

A. Yes.

Q. And then there is a reference to a thorough review by an independent expert.

Do you see that?

A. Yes.

Q. And who is that a reference to?

A. I would believe that that would be Charles Spruck.

Q. Okay.

And this was, again, at the time when you did not know that Dr. Spruck was a shareholder of Cassava; right?

A. Correct.

Q. And if you had known that he was a shareholder of Cassava, either because Dr. Burns disclosed that to you or Dr. Spruck disclosed it to you, you would not have described him as an independent expert; right?

MR. CAMPBELL: Objection.

MR. FINK: Objection.

THE WITNESS: I would have included the fact that he was an investor in the company.

Page 148

BY MR. KUMAGAI:

Q. Okay.

And Dr. Vellas proposed adding some language here about another reviewer expressing concerns -- some concerns.

Do you see that?

A. Yes.

Q. And is that, as far as you understand, a reference to Dr. Rissman?

A. Yes.

Q. And then Dr. Bruno Vellas -- excuse me -- Dr. Vellas also proposed adding a reference to the software-based review that pointed to background features considered and on the list.

Do you see that?

A. Yes.

Q. And none of these details ever made it into the final statement that JPAD issued about its investigation; right?

A. JPAD did not publish any statement, to my knowledge.

Q. And why not?

A. I think the sense was that an action would be to retract. The absence of an action did not require a statement.

Page 149

Q. I'll mark as Exhibit 48 a document Bates stamped Aisen_0000706.

(Exhibit 48 marked)

BY MR. KUMAGAI:

Q. It should be up in a moment?

A. Yes. I have it.

Q. Okay.

And this is an e-mail that you sent to Remi Barbier copying Lindsay Burns on August 16th, 2022.

Do you see that?

A. Yes.

Q. And if you scroll down to the first e-mail in the chain from you to Dr. Burns, on August 15th, 2022.

Do you see that?

A. Yes.

Q. And you write: Dear Dr. Burns. We have completed our review of your article. We do not find convincing evidence of manipulation of data or intent to mislead and, therefore, take no action regarding the published paper."

Do you see that?

A. Yes.

Q. So why did you decide to make this statement to Dr. Burns in August of 2022?

A. So as we have seen here today, there were a lot

38 (Pages 146 - 149)

********* CONFIDENTIAL TRANSCRIPT *********

Page 150

of exchanges between Dr. Burns and JPAD over this issue. And so the editors felt it was reasonable to indicate to her that from our perspective, this issue was finished.

Q. And do you typically send notes to authors about investigations when there's no editorial action being taken?

MR. CAMPBELL: Objection; foundation.

THE WITNESS: As I've said, I'm not aware of any other investigations.

BY MR. KUMAGAI:

Q. Right.

And so why did you send it to Dr. Burns alone and not the other co-authors, like Dr. Wang?

A. Because my communications had been primarily with Dr. Burns.

Q. And did Dr. Burns ever express to you or request a statement like this so that they could publicize the findings of the investigation?

A. I believe that's higher up on this document. So while, again, I don't recall these exchanges, I believe that this indicates that Remi Barbier was interested in a press release and that I indicated that we would not participate in a press release. And if he quoted us to be -- used the specific language in my brief e-mail to Dr. Burns. I just wanted to avoid any

Page 151

miscommunication around what was happening.

Q. So is your testimony that Dr. Burns never actually asked you to issue this sort of exonerating statement so that they could then publicize it?

A. Oh, I don't remember. I'd have to review all of our e-mails. So, again, I don't remember that specifically about our conversations.

Q. So you're not sure one way or the other whether Dr. Burns had specifically asked for a statement like this that she could use in press releases?

A. I don't recall.

Q. And this August 2022 exchange marked the end of the investigation; is that right?

A. It marked the end of the investigation at JPAD, yes.

Q. Did JPAD ever revisit its finding or conduct further investigations, for example, after reports of investigation by CUNY, or the FDA, or DOJ, or SEC?

A. Not to my knowledge or recollection.

Q. And you wrote to Dr. Burns that JPAD did not find convincing evidence of manipulation of data or intent to mislead; right?

A. Yes.

Q. Is that fair to interpret that you did find, JPAD did find some evidence of data manipulation and an

Page 152

intent to mislead but, in your judgment, it was not sufficiently convincing?

MR. CAMPBELL: Object to form.

THE WITNESS: I don't think it means that we found evidence of intent to mislead because we didn't. We did find conflicting evidence on the issue of splicing of gels. And that's what I meant by the phrase that we did not find convincing evidence. I was referring to the manipulation. We did not have any evidence of an intent to mislead.

BY MR. KUMAGAI:

Q. Okay.

And the evidence of manipulation came from Dr. Rissman and the software analysis. It came from their reviews of the materials; right?

A. Yes.

MR. CAMPBELL: Object to form.

BY MR. KUMAGAI:

Q. And on the other side, the evidence against data manipulation came from Cassava stockholder Dr. Spruck; right?

MR. FINK: Objection --

MR. CAMPBELL: Objection to form.

THE WITNESS: Yes.

///

Page 153

BY MR. KUMAGAI:

Q. Okay.

And Mr. Barbier responds to your e-mail on August 15th, 2022. He said: "Thank you for reviewing and, of course, we appreciate your conclusionary note below."

Do you see that?

A. Yes.

Q. And then Mr. Barbier continues: "It's regrettable you and JPAD were dragged into these financially motivated allegations."

Do you see that?

A. Yes.

Q. Again, Mr. Barbier repeating the same sort of theme that Dr. Burns and Dr. Spruck had repeated throughout the investigation, that the allegations were financially motivated; right?

MR. CAMPBELL: Object to form.

THE WITNESS: This is repeating the notion that the allegations were financially motivated, yes.

BY MR. KUMAGAI:

Q. Based on your experience dealing with Dr. Burns, Dr. Spruck, and Mr. Barbier, is it fair to say that the company line when it came to these research integrity concerns was to blame the allegations on short

39 (Pages 150 - 153)

********* CONFIDENTIAL TRANSCRIPT *********

Page 154

sellers?

MR. CAMPBELL: Objection.

THE WITNESS: I'm not sure I understand what you're asking me. The company, yes, viewed that financially motivated allegations should be considered as such, if that's what you're saying. I -- if you're asking me what the thinking of the company is or what the strategy of the company was, I can't say.

BY MR. KUMAGAI:

Q. You heard from Dr. Burns throughout the JPAD investigation repeatedly that the research integrity concerns were financially motivated by short sellers; right?

A. What I heard repeatedly from Dr. Burns is that the allegations were financially motivated and untrue. That's what I kept hearing from Dr. Burns.

Q. And you understood that to mean -- that to be a reference to short sellers; isn't that right?

A. Yes.

Q. And Dr. Spruck also repeated that argument; right?

A. I think that was in one of the e-mails or letters, but I'd have to go back over it.

Q. And you see here Dr. -- Mr. Barbier also repeating that same line; right?

Page 155

A. Yes.

Q. Over the course of the JPAD investigation, you heard repeatedly from Cassava or its shareholders that these research integrity concerns were financially motivated; right?

A. What I heard repeatedly was that the allegations were financially motivated and that the allegations were false.

Q. So is it fair to say you, based on your experience, were sympathetic to that argument or point by Cassava blaming short sellers for the research integrity concerns, and that was a factor that you were considering throughout the investigation?

MR. CAMPBELL: Object to form.

THE WITNESS: I'm going to be as clear as I can about this complicated issue. In my experience, not just as an editor of JPAD but as a scientist over many decades, I have never seen an attack like this on -- around one figure in one paper in a body of literature supporting the development of a drug. Never seen anything like this. So yes, I attributed the vehemence of the attack as being financially motivated.

BY MR. KUMAGAI:

Q. And that was one factor in our ultimate decision not to take editorial action; right?

Page 156

A. No. Our decision not to take editorial action was based on our conclusion that there was not convincing evidence of manipulation of data.

Q. But you deemed the financial motives of the company's critics significant enough to mention in the initial draft of the editor's note concluding the investigation; right?

A. I -- it appears that that was an initial draft from me that mentioned the financial motivation as an explanation for this exceptionally vehement attack in the lay press and at meetings on a not particularly essential paper and one figure in that paper. I found the whole experience to be surprising, even inexplicable. And the only way to understand the issue in my view was to consider the fact that it was financially -- was driven by financial motivation.

Q. And so it was a factor that you had in your mind and were considering as you reached your decision not to take editorial action; right?

MR. CAMPBELL: Object to form.

THE WITNESS: I'll repeat myself. I'll repeat myself. Our decision was based on our conclusion that there was no convincing evidence of manipulation of data.

///

Page 157

BY MR. KUMAGAI:

Q. And you agreed with Dr. Burns' argument that the research integrity concerns were driven by short sellers; right?

A. I'll repeat myself as many times, I guess, as you ask me. But this was a unique experience for me seeing this public vehement attack on a very limited aspect of a large body of research supporting the development of a drug, totally inexplicable without considering the financial motivation of those that the he inquiry. And that was the reason, I suspect that I had included that in my initial draft of a response. But our conclusion was based on our consideration of all of the evidence that we obtained, and our conclusion was that there was not convincing evidence of data manipulation. And according to the criteria that are shared among publishers, there needs to be convincing evidence in order to ask for retraction of a paper.

Q. And that was your personal determination; right?

A. That was my view with all of the discussions with the publisher and with the other editors.

Q. And who else shared that view?

A. Ultimately, to my knowledge, everyone did.

Q. It was your recommendation, and they agreed to

40 (Pages 154 - 157)

********* CONFIDENTIAL TRANSCRIPT *********

Page 158

adopt your recommendation; is that right?

A. Yes.

Q. And Dr. Rissman did not agree with your ultimate conclusion; right?

MR. CAMPBELL: Object to form.

THE WITNESS: I don't know in the end if he agreed. Certainly, during our discussion, he favored retraction. I don't know if he was persuaded in the end or not.

BY MR. KUMAGAI:

Q. And Ms. Coria, the publisher, and the software analysis, they did not agree that -- with your conclusion; right?

MS. VOGELE: Objection.

THE WITNESS: Software analysis did not address specifically whether a paper should be retracted or not. It suggested that there were findings that could indicate manipulation of data. So I don't think that's consistent with what you just suggested. The publisher was considering retraction of the paper, yes. Ultimately, we all agreed that the paper would not be retracted based on the standards in the publishing industry.

BY MR. KUMAGAI:

Q. Based on your recommendation; right? They

Page 159

deferred to your judgment, the publisher.

MR. CAMPBELL: Object to form.

THE WITNESS: I think, again, you keep asking me the same questions. This was my recommendation, and it was accepted by consensus.

BY MR. KUMAGAI:

Q. It was your recommendation even though Dr. Rissman believed there was clear evidence of manipulation, and even though the publisher, Ms. Corio, believed there was very strong evidence that the raw data was manipulated. Your recommendation was not to take any editorial action; right?

MR. CAMPBELL: Objection to the form.

THE WITNESS: I don't agree with the way you asked that question. Dr. Rissman was concerned that there was no proof of the integrity of the data. That's not the same as saying there is convincing evidence of data manipulation. But the publisher did not take a position on interpretation of the figures themselves. This publisher doesn't have scientific knowledge or expertise. The software, again, is not concluding that the paper should be retracted. It is identifying potentially artifactual issues with the figures. So I think your question is not framed correctly.

///

Page 160

BY MR. KUMAGAI:

Q. In the course of your investigation, did you find convincing evidence that the data had not been manipulated?

A. Convincing evidence that the data had not been manipulated. I'm not sure what that would look like. I did not find convincing evidence that the data was manipulated. And we were aware of what we considered to be a reasonable explanation for the appearance of the figures that we're talking about. That's not proof, I don't think, but it's not convincing evidence of data manipulation.

Q. Well, you refer to Dr. Rissman's concerns being the inability to find convincing evidence of the integrity of the research; right, or something to that effect. So I'm asking if you yourself believed there was convincing evidence demonstrating the integrity of the research.

MR. CAMPBELL: Objection; asked and answered.

THE WITNESS: Again, I don't -- I'm having trouble parsing your question. I -- Dr. Rissman was commenting on certain approaches to Western blotting involving self production of gels and photographic capture of the gel results. And he was indicating that that process is less prone to tracking than modern

Page 161

digital techniques. That was what Dr. Rissman was trying to say. I don't believe anybody has said that you can't do manually poured gels and use photographic capture of the results on the gels. But Dr. Rissman was stating that he believes that tracking the data process is more readily accomplished with modern digital methods.

BY MR. KUMAGAI:

Q. And so did you ever find convincing evidence that the data was not manipulated?

A. Again, I think we've been over this multiple times. I've tried to explain this as clearly as I can. I'm not sure what proof of no data manipulation looks like with this process. I did not find convincing evidence of data manipulation.

Q. Based on all your experience in Alzheimer's research, you can't envision what convincing evidence that the data had not been manipulated would look like?

A. That's correct.

Q. I'll mark as Plaintiff's Exhibit 49 a document Bates stamped Cassava_001041491.

(Exhibit 49 marked)

BY MR. KUMAGAI:

Q. This appears to be an e-mail from you to Dr. Burns, dated November 10th, 2022.

41 (Pages 158 - 161)

********* CONFIDENTIAL TRANSCRIPT *********

Page 162

A. Yes.

Q. Subject: CTAD Abstracts.

Do you see that?

A. Yes.

Q. And you write: "Hi Lindsay. The attached abstract is being presented as a poster at CTAD. I would like to publish a comment from you on the abstract as a letter to the editor."

Do you see that?

A. Yes.

Q. And if you scroll to attachment, which is ending in 492, the next page, there is the abstract titled "Rigor and Replication in Alzheimer's Therapeutic Development, a Case Study." The authors are listed at Adrien Heilbut, Jesse Brodkin, Patrick Marquis, and Enea Milioris.

Do you see that?

A. Yes.

Q. Do you know any of the authors?

A. I've heard the names. But no, I don't know any of the authors.

Q. And you've heard the names, I take it, in connection with this lawsuit as three of them are plaintiffs in this lawsuit; is that right?

A. Correct.

Page 163

Q. And in any other context?

A. And I think maybe in some of the media coverage. But no, not in any other context.

Q. Okay.

And the abstract, if you look at the conclusion, is, to paraphrase, challenging the reliability of the scientific bases or hypotheses underlying Simufilam. Maybe you interpret that differently. But let me know what you think of the conclusion.

A. Well, maybe we better step back a second. Again, I'm trying to be clear and transparent here. So we're talking now about my role in reviewing abstracts for a meeting. I don't think we've covered this topic before. So this is a meeting on clinical trials and Alzheimer's disease. I am one of the organizers of that conference along with Bruno Vellas. Both of us share roles in the journal and in the meeting.

As organizers of the meeting, we review hundreds of submissions that could potentially either be orally presented or presented on posters at the meeting. This was submitted, and so it was reviewed by me and by Bruno and by a bunch of other scientists. And we had discussions about whether this merited inclusion in the meeting. I can't remember all of the discussions. My

Page 164

recollection is that my own view was that it doesn't meet the criteria for inclusion in the meeting. But we were also concerned about favoring one side over another side in a public conflict. And that influenced our decision to include this in the meeting simply as we have knowledge of this through our work at JPAD, for example, and we should simply be objective and, if anything, bend over backwards trying to include different viewpoints.

And so a decision was made to allow this to be presented as a poster at the meeting. But it's not a typical scientific abstract. It's more of an opinion statement. There's really no data here. Again, there were a number of reasons why we had trouble with this decision. But given that this was taking a side in a public debate, our view was that we should inform the other side about this and have an opportunity for both sides to be presented. So it was a unique experience for us dealing with this abstract. That's the background I wanted to share.

Q. Okay.

And so if I understood correctly, you were initially opposed to allowing the abstract?

A. I can't remember whether I specifically was opposed. I was certainly concerned about it and

Page 165

ambivalent.

Q. Okay.

And at the bottom you see the disclosures paragraph. The authors write: "The authors have previously had short positions and/or related hedges in Cassava Sciences stock"; right?

A. Yes.

Q. And so they disclosed, they were aware transparent here about interests; right?

A. Yes. And that was a consideration in including the abstract, yes.

Q. And Dr. Spruck and Dr. Burns never made any similar disclosure about Dr. Spruck's Cassava stock holdings that you're aware of; right?

MR. CAMPBELL: Objection.

THE WITNESS: Dr. Burns was entirely public about her own stock with Cassava. As I've said repeatedly, neither Dr. Spruck nor Dr. Burns shared that Dr. Spruck was an investor in Cassava with me at any time, to my recollection.

BY MR. KUMAGAI:

Q. Okay.

And back to the e-mail to Dr. Burns. As far as you recall, the reason you were reaching out to her for a letter to the editor was that the CTAD leadership had

42 (Pages 162 - 165)

******** CONFIDENTIAL TRANSCRIPT ********

Page 166

decided they would allow -- they would seek a response because of the, in your words, sort of unusual nature of the abstract. Is that fair?

A. Yeah. That the abstract was expressing an opinion in a public conflict. And I thought it made sense to give the other side an opportunity to respond.

Now, maybe it would help for me to explain a little bit further. JPAD is the journal associated with CTAD. As I said, Bruno Vellas and myself are leaders in both. So abstracts -- all the abstracts, including this one from CTAD, are published in JPAD. And that's the reason for saying that -- for suggesting that Dr. Burns add a comment or at least have the opportunity to add a comment in response to this abstract.

Q. And was the fear or risk of potentially -- potential legal action if you didn't allow a response from Cassava any part of decision-making process in reaching out to Dr. Burns and soliciting a comment?

A. No.

MR. CAMPBELL: Object to form.

BY MR. KUMAGAI:

Q. Can you think of any other example where you or anyone at CTAD or JPAD shared an abstract with the company before it was published to solicit a response.

A. Well, I've said a number of times, this is a

Page 167

unique situation. The answer is no.

Q. And doesn't CTAD or JPAD have an embargo policy on research that is presented at the conference?

A. Yes, there is an embargo policy, I believe.

Q. And was sharing this abstract with Dr. Burns in advance of publication consistent with that embargo policy?

A. I believe so. I don't have a specific wording of an embargo policy for the journal in mind. But for one thing, the abstract was not research. It was an opinion. Again, unique. The situation is unique. I'm not sure that this is covered by an embargo. This is what we decided made sense.

Q. And did you talk to Dr. Burns or anyone at Cassava before deciding to publish the abstract and allow or solicit a letter to the editor in response?

A. I don't recall any communication, other than what you're showing me.

Q. Okay. I'll mark one more document.

Introducing as Exhibit -- Plaintiff's Exhibit 50, a document with the Bates stamp Cassava_000391513.

(Exhibit 50 marked)

BY MR. KUMAGAI:

Q. The top e-mail is from Carine Giry to

Page 168

Dr. Burns. And you see you're copied? Dated November 17th, 2022?

A. Yes.

Q. Okay.

And if you scroll down, you can see there is some back and forth between Dr. Burns and Ms. Giry about the content of the draft or the proposed letter to the editor that Cassava had prepared in response to the plaintiff's abstract.

A. Yes. Do you want me to read this in detail?

Q. Just take a look at the e-mail from November 15th, page ending in 515, from Ms. Giry. She says: "After consulting with Springer Nature research integrity group, your response letter, JPAD editor strongly recommended the authors have to remove the non-scientific section of the letter. The statements about unlawful behavior and potential patent infringement and COIs, or conflicts of interest, are outside of the scope of the letter to the editor of a scientific journal."

Do you see that?

A. Yeah.

Q. And do you recall what was going on here?

A. Actually, I do not. I don't think I saw this before. I understand she says the JPAD editors, but I

Page 169

don't recall ever seeing this.

Q. Do you recall the -- do you recall Dr. Burns, either in draft e-mails or the draft letter to the editor, alleging that the authors of the abstract had violated Cassava's patents and had conflicts of interest?

A. You know, I see that I was copied on these e-mails, and I'm starting to remember something about this. But I really don't remember the specifics.

Q. Do you recall that CTAD did, in fact, publish a letter to the editor from Cassava?

A. I believe so. Is that -- is that at the end of this document?

Q. Yes. Take a look.

Does that refresh your memory in any way about this?

A. I -- I don't actually remember reading this, but I suspect that I did.

Q. Do you have any reason to believe that JPAD did not end up, in fact, publishing a letter to the editor from Cassava responding to the plaintiff's abstract?

A. I don't know. Aren't you showing me a letter?

Q. Yeah.

A. Was this not published?

Q. I'm just asking if you recall it.

43 (Pages 166 - 169)

********* CONFIDENTIAL TRANSCRIPT *********

Page 170

A. I don't recall.

Q. All right. I will stop there and just reserve any remaining time that I may have of my allotted time.

Dr. Aisen, I know this was painful, as you've said a few times on the record. So I thank you for your time. And I will pass off questioning.

Should we take a break?

MR. CAMPBELL: Yeah, we should.

MR. KUMAGAI: Let's go off the record.

THE VIDEOGRAPHER: We are going off the record. The time is 1:57 p.m., and this is the end of media unit 4.

* * *

(LUNCHEON RECESS)

* * *

THE VIDEOGRAPHER: We're going back on the record. The time is 2:31 p.m., and this is the beginning of media unit 5.

Please continue.

EXAMINATION

BY MR. CAMPBELL:

Q. Good afternoon, Dr. Aisen. My name is Scott Campbell, and I represent Cassava Sciences in this matter. I appreciate you coming back this afternoon.

Page 171

I want to put on the record that we have a stipulation with the plaintiffs and the intervener plaintiffs that any objections made by Mr. Kumagai on behalf of the plaintiff this afternoon will also be applicable to the intervenor plaintiffs.

And with that, I'd like to kick off my questions this afternoon. So first I just have a sort sideline question that I want to ask. I'm going to mark as Cassava Exhibit 3 a document that is labeled -- let me see if it comes up here.

Did that publish to you?

A. I'm having a little trouble.

MR. FINK: While Dr. Aisen figures out the technical issues on his end, I can tell you it did publish to Exhibit Share.

THE WITNESS: Okay. I see Exhibit 49.

MR. CAMPBELL: This one should be labeled something like Cassava Exhibit 3.

THE WITNESS: Yeah. I'm not seeing that.

MR. FINK: It may not be listed --

THE WITNESS: Is it in a different box or --

MR. CAMPBELL: I apologize if I'm not --

MR. KUMAGAI: I'm not seeing it either, for what that's worth.

MR. CAMPBELL: So I want to introduce this

Page 172

exhibit. I want to stamp it. I want to introduce it.

MR. FINK: It comes up in the -- after Exhibit 39, if you go through the list of the exhibits that have been entered today.

THE WITNESS: Oh, yeah.

MR. KUMAGAI: Okay. I see it.

(Exhibit 3 marked)

BY MR. CAMPBELL:

Q. Yeah. So it's just marked Exhibit 3. So that's going to make it a little difficult. But you can see my name by it now as Exhibit 3. So if we use those numbers, hopefully, they'll work for you. And you should see it stamped as Cassava 3.

A. Yep. I have it.

Q. You have it now?

A. Yeah.

Q. Okay.

And this is an e-mail from you to Lindsay Burns, dated February 18th, 2020. Do you see that?

A. Yep.

Q. And there's an e-mail from Lindsay Burns first to you that you're responding to. And what I'm interested in is about halfway through. She says she's reaching out to you to let you know she still plans on submitting an application to NIH by June 5th.

Page 173

Do you see that?

A. Yes.

Q. And then about halfway, or third line down, she says: "We are grateful for the feedback from the ACTC review, and we respect their need for confirmatory data. We are nonetheless optimistic based on the consistency between clinical and preclinical data in both mice and postmortem tissue."

Do you see that?

A. Yeah.

Q. Did you ever doing any testing with postmortem brain tissue related to Alzheimer's disease?

A. Do you mean me personally or is it done in the field?

Q. Is it done in the field?

A. Absolutely. Extensively.

Q. What if the postmortem tissue has been previously frozen before the testing? Is it still done?

A. Yeah. So there -- certain tests are done best in unfrozen tissue, and many tests are done in frozen tissue.

Q. So in your view, is it implausible that Simufilam would have an affect that was detectable in previously frozen postmortem brain tissue?

A. Yes. Sure, it would be plausible.

44 (Pages 170 - 173)

********* CONFIDENTIAL TRANSCRIPT *********

Page 174

Q. And setting this document aside, are you familiar, in general, from your work with Dr. Burns or your work as an author for JPAD, with Simufilam's proposed mechanism of action?

A. Yes. I haven't read it recently, but yes.

Q. Based on your prior review, do you have any reason to believe that the proposed mechanism of action is scientifically implausible?

A. No.

Q. Is high-affinity binding of maxilum (phonetic) to filamin A implausible?

A. No.

Q. Is high-affinity binding of Simufilam to filamin A implausible?

A. No.

Q. What about the claim that filamin A in Alzheimer's patients may be misfolded? Is that implausible?

MR. KUMAGAI: Objection.

THE WITNESS: No.

BY MR. CAMPBELL:

Q. Is the claim that Simufilam could potentially help fix that misfolding implausible?

MR. KUMAGAI: Objection to form.

THE WITNESS: No.

Page 175

BY MR. CAMPBELL:

Q. Did you review the Citizen's Petition that was filed by the plaintiffs in this case?

A. No.

Q. Are you aware that a Citizen's Petition was filed by certain plaintiffs in this case?

A. I'm aware there was a Citizen's Petition, but I don't know who filed it.

Q. And you don't know one way or the other whether they were plaintiffs in this case?

A. No.

Q. The Citizen's Petition that you are familiar with, do you have an understanding of what its goal was?

A. I thought that there was a Citizen's Petition to stop the phase 3 trial. Is that what you're referring to?

Q. That is the Citizen's Petition I'm referring to.

And do you recall whether the authors of the Citizen's Petition had a financial interest in Cassava one way or another?

A. Again, I don't know who filed the petition.

Q. Did you agree that the clinical trials of Simufilam should be stopped?

A. No.

Page 176

Q. Why not?

A. Clinical trials are the way to get an answer about a potential therapeutic. There is no other way. My overall view is that this is a -- Cassava was proposing a novel, interesting, and plausible mechanism for developing a therapeutic and that it deserved testing and clinical trials.

Q. I want to take a look at the document that was marked Plaintiff's Exhibit 23. Luckily, this one is already in. So we won't have any trouble pulling it up.

A. You said Exhibit 23?

Q. Yeah.

Do you have that?

A. Yeah.

Q. And to be clear, this is the e-mail at the top that starts from you to Lindsay Burns on May 20th, 2020.

Do you see that?

A. Yep.

Q. And this started, as you discussed with Mr. Kumagai earlier, with an e-mail at the bottom from Lindsay Burns to you on May 15th, 2020; is that right?

A. Yeah. May 15th from Lindsay Burns to me. Yeah.

Q. And this was her sharing data with you that came from -- primarily, from Oskar 's Hansson, who we

Page 177

established was Oskar Hansson; is that right?

A. Yes.

Q. Did you have an understanding at the time of why she sent you the data?

A. We had discussed her early small trials, and we had discussed some of the data. And we had talked about how to test the biofluids. And I believe I had suggested that Oskar Hansson would be a good person to involve. But I'm not sure of the details of those conversations. I really don't remember.

Q. Would you be surprised if she also sent this data to other Alzheimer's researchers?

A. Would I be surprised? I mean, companies usually consult with a number of experts. So no.

Q. So she also sent this to, for example, you mentioned Dr. Arnold earlier. Would you be surprised by that?

A. No.

Q. And Dr. Cummings?

A. I would not be surprised.

Q. Would you be surprised if she sent it to Dr. Wang?

A. No.

Q. Do you recall whether you reviewed this data?

A. I don't -- I don't really recall. It sounds

45 (Pages 174 - 177)

******** CONFIDENTIAL TRANSCRIPT ********

Page 178

like she's sharing the data, and I suspect I would have reviewed it, but I can't say that I really remember.

Q. And I probably could guess what your answer to this question is going to be, but I'm going to ask it anyway.

Do you recall whether this data that Dr. Burns sent you on May 15th was blinded or unblinded?

A. I do not recall.

Q. And do you recall whether at the time there was any plan to do further analysis on these biofluids that she was talking about here?

A. Again, I don't recall.

Q. Is analysis of biofluids something that your clinic or lab would be involved in?

A. It could be. So we do have a lab that does biofluid analysis.

Q. Do you recall having any thought after Dr. Burns sent you this data on May 15th that it would somehow preclude you from doing any further bioanalysis or analysis of these biofluids for Cassava?

A. I'm not sure what you mean by the question. I mean, if -- I don't recall any request for us to do any analysis. So I don't understand why we would of be precluded if she did ask us to do it. It is something we do.

Page 179

Q. It was sort of a fancy way of trying to get around the question of whether you can recall whether the data was unblinded. So what I was really trying to get at was, was there any sense, when you received this data, that it conveyed information to you that would preclude you from offering your services to analyze biofluids for Cassava going forward?

A. No.

Q. I think you discussed with Mr. Kumagai --

Am I getting that right, Kumagai?

MR. KUMAGAI: Yeah. That's right.

MR. CAMPBELL: I want to make sure I don't butcher that all afternoon.

BY MR. CAMPBELL:

Q. I think you discussed with Mr. Kumagai Lindsay was struggling and asking for your help with the question about the "extreme changes we were seeing in the placebo over 28 days."

Do you recall that?

A. I recall the discussion this morning. I don't recall the original discussion.

Q. Very fair.

And you also discussed with Mr. Kumagai your response at the very top of this e-mail on May 20th about any change in placebo over 28 days being

Page 180

artifactual.

Do you recall that?

A. Yeah.

Q. Is it uncommon in your experience to get sort of messy data back from these sorts of studies?

A. Data is often confusing, particularly when the group sizes in the study are small, as in this case.

Q. And having received this type of data and these artifactual changes in the placebo, would you have any objection to further analysis of the biofluids by another lab?

A. No. I would probably have recommended it.

Q. Let's take a look at Plaintiff's Exhibit 24.

Do you have that?

A. Yep. I just got it.

Q. And this is the next e-mail, as you might guess from the numbering, 23 to 24, that you discussed with Mr. Kumagai this morning where Dr. Burns sent you additional data that you thought looked encouraging.

Do you recall that?

A. Yes.

Q. And in your experience, is getting different results from different labs on their assessment from biofluids common in these kind of trials?

A. Yes.

Page 181

MR. KUMAGAI: Objection.

BY MR. CAMPBELL:

Q. Do you consider such differing results from different labs to be indicative of anything nefarious?

A. No.

Q. I'm going to try my luck at introducing another exhibit. So hopefully this will go better than the last one.

So I'm going to mark as Cassava Exhibit 4, which I'm assuming will come up as Exhibit 4 for you in just a moment. And this will be a document labeled Cassava_000540455.

MR. KUMAGAI: Scott, it might populate easier to find for Dr. Aisen if for the next one maybe you put zero in front. I think that will sort automatically to the top, if that helps.

MR. CAMPBELL: That's a very good idea. Right now I'm finding it easier to find because it falls at the bottom of the 4s. So right after 49 this time.

THE WITNESS: Yes, I see it. Yeah.

(Exhibit 4 marked)

THE WITNESS: Okay. I have it up.

BY MR. CAMPBELL:

Q. So this is an e-mail responding to another e-mail I think you looked at this morning from

46 (Pages 178 - 181)

******** CONFIDENTIAL TRANSCRIPT ********

Page 182

Dr. Vellas to Lindsay Burns, dated on October 9th. And she responds that same day on October 9th.

Do you see that?

A. Yes.

Q. And this was in response to the integrity alert that you discussed with Dr. Vellas -- or Mr. Kumagai this morning; correct?

A. Yes.

Q. And that same day she responds to the request for original blots by attaching the original blots from figure 3 in the JPAD paper; is that right?

A. Yes.

Q. And do you see attached to there the images that she sent to you?

A. You mean listed under attachments? I see them. Are the attachments actually here? Oh, yes.

Q. They should be part of the document.

A. I see them, yes.

Q. Are those the original blots that Dr. Burns sent in response to the request from Bruno Vellas?

MR. KUMAGAI: Objection.

THE WITNESS: I guess so. You know, again, I don't remember this exchange. But I would guess those -- yeah. So they're listed as the attachments under the e-mail saying the original blots are here. So

Page 183

yes.

BY MR. CAMPBELL:

Q. I'll mark another document as Exhibit 5.

(Exhibit 5 marked)

BY MR. CAMPBELL:

Q. With Mr. Kumagai's helpful suggestion, I'm going to label this 05 and see if that helps.

A. Yep. Right at the top.

Q. And this is an e-mail exchange that ends a couple of days later on October 11th, again, between Dr. Burns, Dr. Vellas, including with you on copy; is that right?

A. Yep.

Q. And this document is marked Cassava_000540616.

Do you see that?

A. Yes. I have it open.

Q. And so this sort of picks up on the day after the original blots you'll see were sent by Dr. Burns on October 9th. There's another request from Mr. Vellas on October 10th saying: "We got it, Lindsay. Can you send the original blot from the alpha 7" -- a lot of letters -- "blot if figure A as well" -- "5A as well."

Do you see that?

A. Yes.

Q. And in response to that, Dr. Burns, in fact,

Page 184

sent of the original blots for figure 5A; is that right?

A. Yes.

MR. KUMAGAI: Objection.

BY MR. CAMPBELL:

Q. Do you see those attached here?

A. Yeah.

MR. KUMAGAI: Objection.

Scott, just for the record, I don't think I see a sticker on this one, at least on my version. So we can just add that after the fact.

MR. CAMPBELL: This is my ability with Veritext. Hopefully this will increase as we go along.

BY MR. CAMPBELL:

Q. Okay. I'd like to take a look at another document.

Actually, let's look at Plaintiff's Exhibit 38.

A. Okay.

Q. I must have mislabeled this one. So I will pull up my version instead. This one may be duplicative of one you looked at this morning. I tried to track them as I went, but I might have missed one. So I will mark this as 6.

(Exhibit 6 marked)

BY MR. CAMPBELL:

Q. Do you have an Exhibit 06 now?

Page 185

A. Yeah. Just got it.

Q. And this is a few days later, a chain that starts on October 16th, 2021, again, between Dr. Vellas and Dr. Burns, with you and others on copy.

Do you see that?

A. Yes.

Q. And the document's labeled Cassava_000519954.

Do you see that?

A. Yep.

Q. And this, it looks like, is another initial reach out from Mr. -- Dr. Vellas to Dr. Burns about allegations that the blots in figures 3 and 5A may have been manipulated; is that right?

A. Yep.

Q. It looks like that was Saturday, October 16th; is that right?

A. Yep.

Q. And Dr. Vellas asked for a response by November 13th, 2021; is that right?

A. Yes.

Q. And Dr. Burns, in fact, responds three days later on October 19th; is that right?

A. Yes.

Q. And if you look below, you can see a copy of the response that she attached. I believe you discussed

47 (Pages 182 - 185)

******** CONFIDENTIAL TRANSCRIPT ********

Page 186

this with Mr. Kumagai this morning.  Do you recall that?

A.  Yes.

Q.  And in the second paragraph she says: "Importantly, the Western blot images in this paper are representative images for each assay and each time point that is data from a single patient.  So the bands in question are two of about 190 bands."

Do you see that?

A.  Yes.

Q.  Do you have an understanding of what she means by that?

A.  Well, typically, in a scientific publication, you select representative images.  So your experiment might include 10 or 20 or a thousand individuals, but for brevity and clarity, you select representative images for display in the publications.  So that's typical.

Is that what you're asking me?

Q.  Well, that's what I was asking you.  And your response makes sense to me.  So I think so.

A.  Okay.

Q.  So if I understand that correctly then, the images she's saying in the article are representative of a whole batch of images that could have been used in the article; is that right?

Page 187

A.  Correct.  Yeah.

Q.  And she offers -- it says in the next line: "We'd be delighted to proved Western blots for all 13 subjects in this clinical study for the assay in question."

Is that right?

A.  Yes.

Q.  So she's offering to provide all of the data that was used in the experiment; is that right?

A.  Yes.

Q.  Mark another exhibit.  We'll mark this as Cassava 07.

(Exhibit 7 marked)

BY MR. CAMPBELL:

Q.  Let me know if you get that.

A.  Yeah.  I just got it.  Okay.

Q.  So Exhibit 07 is an e-mail from Dr. Burns to yourself, Dr. Vellas, Dr. Touchon, and others, dated October 30th, 2021; is that right?

A.  Yes.

Q.  And this is labeled at the bottom Cassava_000016062.  Do you see that?

A.  Yes.

Q.  And she indicates in her cover e-mail that she's forwarding directly from Dr. Wang all of the blot

Page 188

images for the entire cohort on plasma tau $A\beta42$ association with alpha7 and CD14, as well as their corresponding beta-actin controls."

Do you see that?

A.  Yes.

Q.  Do you understand her to be sharing all of the blot images for the entire cohort by this e-mail?

MR. KUMAGAI:  Objection.

THE WITNESS:  Yes.

BY MR. CAMPBELL:

Q.  And if you scroll down past the second page, do you see, approximately, ten pages worth of blots with four to five blots on each page?

A.  Yes.

Q.  And did you review this data as part of JPAD's review of this article?

A.  Yes.

Q.  I'm going to mark another exhibit as Exhibit 08.

(Exhibit 8 marked)

BY MR. CAMPBELL:

Q.  Let me know IF you have Exhibit 08.

A.  Yes.  I have IT.

Q.  And this is an e-mail dated November 23rd, 2021, from Dr. Burns to yourself, Dr. Vellas,

Page 189

Dr. Touchon, and others.

Do you see that?

A.  Yes.

Q.  At the bottom it's marked Cassava_000541186.

Do you see that?

A.  Yes.

Q.  And in the beginning of this, she says she's responding to the latest request for the following, and there's a list of bullets there.

Do you see that?

A.  Yes.

Q.  And I believe that you discussed with Mr. Kumagai this morning that in November of 2021, Springer, the publisher for JPAD, wanted additional information from the authors of the article.

Do you recall that?

A.  I guess so.

Q.  Well, let me ask you this differently.  Do you recall that the publisher wanted additional data from the authors of the article, including the four bulleted items that are listed here?

A.  Yeah.  Again, I don't remember back to that time this level of detail.  But yes.  Seeing this, yes.

Q.  And do you recall speaking with Mr. Kumagai about this this morning?

48 (Pages 186 - 189)

********* CONFIDENTIAL TRANSCRIPT *********

Page 190

A. Yes.

Q. And one of the things that the publisher asked for, bullet 1, was the original blots provided so far to be annotated to indicate which bands represent which samples and groups.

Do you see that?

A. Yes.

Q. Do you understand that to be a reference to the original blots that Dr. Burns had previously sent to you in the e-mails we just looked at?

A. Yes.

MR. KUMAGAI: Objection.

THE WITNESS: Yes.

BY MR. CAMPBELL:

Q. And if you scroll down, starting on the fourth page, you'll see there's a PowerPoint presentation attached to this e-mail. It goes on for about 25 pages.

Do you see that?

A. Yes.

Q. With commentary on the various Western blots, including descriptions of the visible lines of cut films run through processors and the like?

A. Yes.

Q. So in response to the publisher's inquiry, did Dr. Burns, in fact, provide the editors of JPAD and the

Page 191

publisher the annotated versions of all the original blot images?

MR. KUMAGAI: Objection.

THE WITNESS: Yes.

BY MR. CAMPBELL:

Q. And did you review that as part of your review of the article at JPAD?

A. Yes.

Q. I want to take a look very quickly at Plaintiff's Exhibit 47. This is the draft note that you looked at with Mr. Kumagai this morning.

Do you recall that?

A. Yes.

Q. And you spoke with Mr. Kumagai about a sentence that had been included in here -- it's deleted out of this draft note -- that says: "These concerns originally arose from individuals with a financial interest in refuting the findings."

Is that right?

A. Yes.

Q. And you indicated this morning to Mr. Kumagai that the journal's conclusion not to retract the article was based on the evidence. And correct me if I misphrase this here. But you, nonetheless, could only make sense of the vehemence of the critiques based on

Page 192

the financial interest of the critics; is that right?

MR. KUMAGAI: Objection.

THE WITNESS: Yes.

BY MR. CAMPBELL:

Q. And can you explain what you mean by that.

A. Yeah.

There was an extensive public multifaceted attack on the company and on this publication, among other publications. I have not seen anything similar in my four decades of work in the field. And to my thinking, this indicated that the motivation was not pursuit of scientific truth but was motivated by financial interest. That was my assessment.

Q. And in your view as an Alzheimer's researcher with four decades of experience, have these vehement criticisms of Cassava had a positive impact on the research around Alzheimer's disease?

MR. KUMAGAI: Objection.

THE WITNESS: I'm not -- I can't give a brief answer to that question. I guess I will say yes, this has had an important negative impact on all Alzheimer's therapeutic research. Yes, I will say that.

BY MR. CAMPBELL:

Q. And how has it had a negative impact on Alzheimer's research?

Page 193

A. Publicity around the accusations against Cassava has been very extensive, particularly recently, past few months, around the publication of a book written by the author of the original article in Science Magazine, a reporting of the accusations against Cassava from a group of short sellers. The book has been widely covered in the late press, and the author has made multiple appearances. And as a result, charges made in the book, which are, to my thinking and the thinking of almost every one of my colleagues, absurd, suggesting that the entire field of Alzheimer's research has been misdirected as a result of the work of Cassava and a couple of other examples of questions about figures in scientific papers. As a result of this widely publicized attack, including inflammatory headlines in major newspapers, individuals have dropped out of clinical trials in Alzheimer's disease fearing that the trials are motivated by faulty science. And individuals have been rejecting proven effective treatments for the same reason.

Q. Before we leave this document, just to be clear, no version of this editor's note was ever adopted by the editors of JPAD; is that right?

A. Correct, to my knowledge.

Q. And it was never published?

49 (Pages 190 - 193)

********* CONFIDENTIAL TRANSCRIPT *********

Page 194

A.  Correct, to my knowledge.

Q.  Mark one more exhibit.  This, I think, should be 09.

(Exhibit 9 marked)

THE WITNESS:  Okay.

BY MR. CAMPBELL:

Q.  This is an e-mail from you to Dr. Burns on August 15th, 2022; is that right?

A.  Yes.

Q.  And it's marked at the bottom as Cassava_000739110.

Do you see that?

A.  Yes.

Q.  To your knowledge, was this conveyed after the draft note that we just looked at?

A.  Yes, to my knowledge.

Q.  And this is August 2022.  So ten or eleven months after JPAD began its inquiry into the article that Cassava was participating in; is that right?

A.  Yes.

Q.  In your view, did JPAD conduct a thorough investigation of the allegations regarding that article?

A.  Yes.

Q.  And what conclusion did you reach?

A.  We did not find convincing evidence of

Page 195

manipulation of data or intent to mislead, just as I stated in this e-mail.

Q.  And as you further stated in this e-mail, you took no action regarding the paper?

A.  Correct.

Q.  And I believe you testified this morning that that conclusion was the consensus of all the JPAD editors?

A.  Yes.

Q.  To your knowledge, have any of the other editors changed their view?

A.  To my knowledge, they have not changed that view.

Q.  And is it still your view?

A.  It is still my view.

Q.  I have no further questions.  I'll pass to Mr. Fink.

EXAMINATION

BY MR. FINK:

Q.  Thank you.  And Dr. Aisen, I believe I'll be quite brief.

I want to go back to Exhibit 23, if we can do that.

A.  Okay.  I have it.

Page 196

Q.  And focusing on the e-mail at the top of the chain that you wrote to Dr. Burns on May 20th, there has been questioning both by Mr. Kumagai and by Mr. Campbell about the third paragraph:  "Substantial intersubject variability is the rule, but change in placebo over 28 days is artifactual."

Did I read those first two sentences of that paragraph correctly?

A.  Yes.

Q.  What did you mean by the use of your word "artifactual"?

A.  I was referring to biofluid assays that reflect the state of disease progression in Alzheimer's.  If the assays are performed accurately and if they're the right assays and if there is sufficient data, sufficient number of individuals providing specimens that are analyzed, they should not show any significant change over 28 days because the disease does not progress that quickly.  There should be no measurable evidence of progression over a one month period of time.

So if the data suggests that in an arm in which there's no intervention, a placebo arm, that there's extensive change over 28 days, that must indicate a technical problem with the assay, or statistical insignificance, or just an insufficient number of

Page 197

individuals.  It can't be reflecting reality because that's too short of period of time for there to be measurable change in the disease progression.

Q.  If you had a single assay that showed measurable disease progression over 28 days, would you conclude that that must be artifactual?

A.  Well, I'm not sure I know what you mean by -- do you mean a single test but in multiple people?  A single test in a single person?  A valid test?  What do you mean?

Q.  I mean a single test in a single person.

A.  Well, that would usually not be expected to reveal anything given the variability in the assays we use when we're talking about biofluid assays.  So we would never expect to have conclusive evidence of anything in one individual.  It becomes anecdotal instead of a scientifically valid experiment.

Q.  I believe that you testified in response -- and I'm done with that document.

I believe that you testified in response to some of Mr. Kumagai's questions that at the time that the requests or demands were being made for retraction of the JPAD paper, that JPAD was inundated with demands to withdraw the paper.  Is that how you would characterize the situation at that time?

50 (Pages 194 - 197)

********* CONFIDENTIAL TRANSCRIPT *********

Page 198

MR. KUMAGAI: Objection to form.

THE WITNESS: I would.

BY MR. FINK:

Q. Do you recall any of the specific individuals who inundated JPAD with those demands?

A. So I don't know who sent demands to JPAD, and I don't fully recall who sent the demands to me. I received many. But to my recollection, it was names familiar to me from the articles written by Charles Piller. And those names, to my recollection, include Elizabeth Bik. I'm pretty sure she was one. I think Schrag was one. And there were other familiar names. I just can't recall them for sure.

Q. Were any of the plaintiffs in this lawsuit among the people who you recall having communicated about the demand to retract that paper?

A. Not that I recall.

Q. And you mentioned Elizabeth Bik earlier in your testimony. What do you recall about what Ms. Bik had -- or Dr. Bik. I'm not sure -- had to contribute to this conversation?

A. I'm not -- I can't remember who said what. But, basically, all of these e-mails were demanding retraction because of manipulation of data. It was the same message over and over again.

Page 199

Q. And do you recall whether there was a single communication from Elizabeth Bik or whether there were multiple communications with Elizabeth Bik?

A. I can't be sure. I would guess it was multiple, but I can't really recall.

Q. Thank you, Dr. Aisen. That's all I've Got.

FURTHER EXAMINATION

BY MR. KUMAGAI:

Q. I just want to ask a couple questions and show you two more documents, Dr. Aisen. But I think I'll be just a few minutes.

I'm going to mark a document -- one moment -- as Plaintiff's Exhibit 51.

(Exhibit 51 marked)

BY MR. KUMAGAI:

Q. Let me know when you've got that.

A. I've got it.

Q. Okay.

So throughout the course of your testimony today, I believe you've made reference a number of times to an article by Charles Piller published in Science. And I'm paraphrasing, but I believe you've characterized the article as sort of the impetus or the basis for your view that short sellers or people with financial motives

Page 200

were driving the criticism of the research integrity of Simufilam. Is that fair?

A. Yes.

Q. And if you take a look at Exhibit 51, is that -- is this the article that you've been referring to today?

A. I think it may be. I believe there were multiple articles. But, you know, again, I'm having trouble recalling specific details. But this looks like it could be the one that I'm focusing on as when I first heard of all of this and noted that the scientists making complaints were supported by short sellers.

Q. Okay.

And Dr. Schrag is the first person quoted in the lead of the -- or referred to in the lead of the article. Do you see that?

A. Yes.

Q. And then in the second column on the first page, there's discussion of short sellers; right?

A. Yes.

Q. And I can represent that from my review of -- a search for articles from Dr. Piller, Charles Piller, excuse me, in Science on this topic, this was the earliest I could find. And it's dated July 22, 2022. Do you see that? On the bottom of the first page.

Page 201

A. Yeah.

Q. Does that sound right about the time of the -- when you first read in Science that short sellers may be the ones driving the research integrity concerns being raised or allegations against Cassava?

A. Yes.

Q. Okay. You can set that aside.

Look at -- back to Plaintiff's Exhibit 29, which we talked about earlier today.

A. Yes, I have it.

Q. Do you see that? And this was an e-mail. The top e-mail is from you to Dr. Robert Rissman, dated October 17th, 2021.

Do you see that?

A. Yes.

Q. And this is in the early or the first month or so after the research integrity concerns were brought to JPAD's attention. And we looked at Dr. Burns quickly responding to the JPAD editors saying: "As you may know, Wall Street investors, not scientists, are the ones making false allegations against this."

Do you see that?

A. Yes.

Q. And this predates the article in Science by Charles Piller about Dr. Schrag and discussing short

51 (Pages 198 - 201)

********* CONFIDENTIAL TRANSCRIPT *********

Page 202

sellers; right?

A. Yes.

Q. And so is it possible that Dr. Burns was the first source that raised the claim that short sellers or people with financial motives were the ones driving the allegations against the company?

A. Yes. She is stating here that Wall Street investors are driving the allegations. But I think the Science article is the first that connected specific names that it's scientists. Dr. Burns says not scientists. I believe the Science article is the first time I saw that the scientists who are actually questioning the figures were being supported or paid or were themselves short sellers.

Q. Okay.

Dr. Aisen, thank you very, very much for your time today and your patience. That is all my questions. I defer to other counsel, whether they have any other remaining questions.

MR. CAMPBELL: I have nothing further. Thank you very much for appearing today. We appreciate it.

MR. FINK: I also have nothing further. Thank you very much.

MR. KUMAGAI: Okay. We can go off the record.

THE VIDEOGRAPHER: If we're all set to close

Page 203

out, one moment.

Thank you. We are going off the record. The time is 3:18 p.m., and this concludes today's testimony given by Dr. Paul Aisen. The total number of media units used was five and will be retained by Veritext Legal Solutions.

THE REPORTER: Are there copy orders?

MR. FINK: I think you can probably put in a standard order for all of this for these depositions.

MR. KUMAGAI: I think we have a standing order.

MR. CAMPBELL: I'll take one.

MS. VOGELE: I'll take one.

MR. FINK: And I'll take one.

(The deposition concluded at 3:20 p.m.)

* * *

Page 204

CORRECTION LIST

Page/Line          From                To

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____

Page 205

DECLARATION UNDER PENALTY OF PERJURY

I, PAUL AISEN, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken June 11, 2025; that I have made such corrections as appear noted herein, in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this ___ day of _____, 2025. at _____, California.

_____

PAUL AISEN

52 (Pages 202 - 205)

********* CONFIDENTIAL TRANSCRIPT *********

Page 206

REPORTER'S CERTIFICATION

I, Michelle K. Bailey, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 18th day of June, 2025.

_Michelle Bailey_
Michelle K. Bailey
RPR, CSR No. 10713

53 (Page 206)

**[& - 135]**                                                    Page 1

**&**

**&** 3:18 6:18 9:4 19:2 119:12 121:21 122:3,9

**0**

**000016062** 4:18 187:22
**000026388** 4:12
**0000634** 5:19 77:21
**0000650** 6:7 95:23
**0000652** 5:23 86:14
**0000661** 5:17 70:15
**0000680** 6:22 126:1
**0000686** 6:12 110:3
**0000694** 6:23 129:24
**0000706** 7:14 149:2
**0000709** 7:8 135:7
**0000726** 6:9 98:16,23
**0000733** 6:6 91:6
**0000736** 5:21 81:17

**0000748** 7:11 138:2
**0000787** 7:7 134:6
**0000793** 6:20 122:20
**0000862** 5:5 43:23
**000087955** 6:10 106:21
**0001386** 7:10 136:23
**0001761** 5:16 64:10
**000375558** 5:7 48:9
**000391513** 167:22
**000461586** 6:13 112:22
**000461614** 6:15 114:21
**000517511** 40:5
**000519954** 4:17 185:7
**000540455** 4:14 181:12
**000540616** 4:15 183:14
**000541186** 4:20 189:4
**000739110** 4:22 194:11

**000750871** 5:9 56:4
**001041491** 7:16 161:21
**001257502** 6:19 119:6
**00391513** 7:18
**00517511** 4:25 39:5
**0219624** 57:10
**05** 183:7
**05948** 1:8 2:8 8:18
**06** 184:25
**07** 187:12,17
**08** 188:19,22
**09** 194:3

**1**

**1** 8:13 27:3 28:3 29:20 43:14 117:9 190:3
**10** 4:3 29:9 186:14
**10/19/21** 5:23
**100** 123:12
**10010** 3:5
**10018** 3:10
**106** 6:10
**10601** 3:15
**10713** 1:23 2:20 9:22 206:22

**10:02** 43:13
**10:14** 43:17
**10th** 144:20 145:6 161:25 183:20
**11** 1:18 2:19 8:1 111:13 205:5
**11/10/22** 7:15
**11/23/21** 6:15
**110** 6:11
**112** 6:13
**114** 6:14
**117** 6:16
**119** 6:18
**11:17** 81:1
**11:25** 81:5
**11th** 8:6 58:14 111:1 183:10
**122** 6:20
**125** 5:14 7:5 20:10,19 41:5 41:18 64:19
**126** 6:21
**127** 54:10
**129** 6:23
**12:05** 99:10
**12:35** 125:18
**12:46** 125:21
**12th** 40:24 59:3
**13** 187:3
**134** 7:5
**135** 7:8

**[136 - 27th]**                                                          Page 2

**136** 7:9
**138** 7:11
**13th** 185:19
**14** 26:15
**144** 7:12
**149** 7:13
**14a** 26:23
**14th** 78:4 79:17
**15143** 206:21
**15th** 49:15
  110:11 111:20
  149:13 153:4
  168:12 176:21
  176:22 178:7
  178:18 194:8
**161** 7:15
**167** 7:17
**16th** 50:14 82:3
  83:20 149:9
  185:3,15
**170** 4:4
**172** 4:11
**17th** 81:23
  168:2 201:13
**181** 4:13
**183** 4:15
**184** 4:16
**187** 4:18
**188** 4:19
**18th** 172:19
  206:16
**19** 28:12
**190** 186:7

**194** 4:21
**195** 4:5
**1980s** 12:8
**199** 4:6 7:19
**19th** 50:24
  86:19 87:11,21
  91:12,24 95:1
  185:22
**1:24** 1:8 2:8
**1:57** 170:11

**2**

**2** 21:19 43:18
  81:2
**2/28/22** 6:18
**20** 4:23 26:3,9
  29:8 39:14,22
  53:16 186:14
**2011** 40:19,24
  42:9,24 43:5
**2012** 39:3
**2015** 39:3
**2019** 44:24
  46:3 67:19,19
**2020** 28:13
  46:16 48:19
  51:3 56:12
  64:6 65:10,21
  87:23 89:4
  119:17 128:19
  172:19 176:16
  176:21
**2021** 29:18
  30:5 58:14

59:3 71:2,9
76:5 78:4,8,10
79:12 81:24
82:3 83:20
86:19 87:12,21
91:12 96:4
99:2 106:25
107:10 110:11
111:1,9,13
113:8 114:25
117:10 119:17
119:20 123:4
185:3,19
187:19 188:25
189:13 201:13
**2022** 30:3
  119:11 126:7
  128:18 130:15
  130:16,20
  135:16 136:2
  137:3 138:9
  142:16,18,21
  149:9,13,24
  151:12 153:4
  161:25 168:2
  194:8,17
  200:24
**2024** 24:16
**2025** 1:18 2:19
  8:1,6 144:20
  205:5,10
  206:16
**20th** 48:19
  50:24 51:3

176:16 179:24
196:2
**21** 4:24 39:4,6
  39:13,25 40:19
**212.633.4310**
  3:5
**212.813.8800**
  3:10
**22** 5:5 43:22,24
  44:4 200:24
**23** 5:6 48:8,10
  48:18 176:9,11
  180:17 195:23
**23rd** 3:4 113:8
  114:25 188:24
**24** 5:8 8:18
  56:3,5,8
  180:13,17
**24th** 138:24
**25** 5:10 57:9,11
  57:13,16
  190:17
**25th** 96:4,9
  126:7 127:15
**26** 4:23 5:14
  64:9,11,13,16
  70:7 72:16
**27** 5:17 29:8
  70:14,16,19
  76:5
**27th** 71:9
  130:10,20
  142:20

**28** 5:18 50:19 51:7,16,18,21 51:23 52:7 53:3,6,11,12,18 53:23 54:14,17 54:23 55:8 59:23 61:4 77:20,22 78:3 179:18,25 196:6,18,23 197:5
**28th** 56:12 71:2 119:11 137:3 142:16,18,21
**29** 5:20 81:15 81:16,18 201:8
**29th** 78:9 136:2
**2:31** 170:17
**2a** 46:7,10
**2b** 37:14,18 46:16,20,23 49:4 55:25
**2nd** 107:10 108:2 135:21

### 3

**3** 4:11 44:17 79:13 81:6 123:10 124:18 125:18 171:9 171:18 172:7,9 172:11,13 175:15 182:11 185:12

**30** 5:22 86:14 86:15,17 91:17
**3000** 3:20
**30th** 99:10 123:4 187:19
**31** 6:5 91:5,7
**31st** 67:18 99:2 119:16,19
**32** 6:7 95:22,24 98:15,18
**33** 6:8 98:17,19 98:22
**34** 6:10 106:20 106:22
**35** 6:11 12:10 110:2,4
**36** 6:13 112:21 112:23 113:4 121:7
**37** 6:14 114:20 114:22 118:4
**38** 6:16 116:25 117:4 118:20 184:16
**39** 4:24 6:18 119:5,7 134:11 172:3
**3:18** 203:3
**3:20** 2:19 203:14
**3rd** 106:25 107:19 108:3 135:16

### 4

**4** 4:13 44:18 65:10 125:22 170:12 181:9 181:10,21
**40** 6:20 37:17 122:19,21
**41** 3:4 6:21 125:25 126:2
**42** 6:23 129:23 129:25 134:12
**43** 5:5 7:5 134:5,7,14,19 135:10
**44** 7:8 135:6,8
**45** 7:9 136:22 136:24
**46** 7:11 138:1,3
**47** 7:12 144:17 144:21 145:5 191:10
**48** 5:6 7:13 149:1,3
**49** 7:15 161:20 161:22 171:16 181:19
**492** 162:12
**4s** 181:19

### 5

**5** 4:15 26:15 170:18 183:3,4
**5/12/11** 4:24

**50** 7:17 167:21 167:23
**507** 120:3
**51** 7:19 199:14 199:15 200:4
**515** 168:12
**517512** 41:18
**56** 5:8
**57** 5:10
**586** 113:1,2
**5a** 183:22 184:1 185:12
**5th** 44:24 172:25

### 6

**6** 4:16 184:22 184:23
**6/28/22** 7:10
**620** 3:9
**626** 58:4
**64** 5:14
**644** 58:12
**653** 87:16
**664** 58:7,9
**686** 113:1
**687** 110:19
**696** 130:11
**6th** 67:19

### 7

**7** 4:18 65:10,20 183:21 187:13
**70** 5:17

**[7488 - addressees]**                                    Page 4

**7488**  142:16
**77**  5:18
**77002**  3:21
**795**  123:23

**8**

**8**  4:19 28:12
138:9 188:20
**8/15/22**  4:21
**81**  3:15 5:20
**811**  3:20
**86**  5:22
**8th**  117:10
142:17

**9**

**9**  4:21 194:4
**91**  6:5
**95**  6:7
**98**  6:8
**9860**  10:15
**9:05**  2:18 8:2,5
**9th**  78:7,10
79:12 110:19
182:1,2 183:19

**a**

**a.m.**  2:18 8:2,5
43:13,17 81:1
81:5
**ability**  11:22
184:11
**able**  61:19
105:25

**above**  82:13
103:10
**absence**  27:14
61:5 148:24
**absolutely**
173:16
**abstract**  5:14
7:16 162:6,7
162:12 163:5
164:12,19,23
165:11 166:3,4
166:14,23
167:5,10,15
168:9 169:4,21
**abstracts**  162:2
163:13 166:10
166:10
**absurd**  193:10
**academic**  10:19
10:21 12:18
19:13 22:7
69:25 73:3
116:4,23
**accept**  63:16
86:23
**acceptable**
99:23
**accepted**  63:23
67:19,22 68:1
159:5
**accepting**
68:19 79:9
**accepts**  22:7

**accommodati...**
42:3
**accomplished**
161:6
**accurate**  11:6
52:19 62:7
**accurately**  27:9
196:14
**accusations**
34:19 193:1,5
**accused**  35:5
37:6
**accusing**  99:17
**acquisition**
52:2,9 53:14
54:20
**acronyms**  22:2
**actc**  12:13 22:2
22:3,7,7 23:3
45:21 173:4
**acti**  12:13
**actin**  188:3
**acting**  69:16
**action**  8:23
13:4 20:22
55:16 129:10
129:14 148:23
148:24 149:19
150:5 155:25
156:1,19
159:12 166:16
174:4,7 195:4
**actions**  140:20

**active**  73:3
**actively**  12:17
**activities**  12:19
23:13,20 34:18
**activity**  130:14
**actual**  74:21
**actually**  74:20
117:22 151:3
168:24 169:17
182:16 184:16
202:12
**ad**  11:23 13:9
21:4 40:19
41:6 58:24
70:2
**add**  27:12
132:18,23
166:13,13
184:10
**adding**  148:3
148:12
**additional**
29:21 111:2
112:5 113:13
180:19 189:14
189:19
**address**  10:15
40:8,12,14
48:17 158:15
**addressed**
115:3 119:12
**addressees**
41:3

**addresses** 71:14

**addressing** 85:20 87:22

**adjudicate** 88:8 88:21

**adjudicated** 31:25

**administer** 9:19

**administration** 11:22

**adopt** 158:1

**adopted** 193:22

**adrien** 1:4 2:4 8:15 162:15

**advance** 11:18 11:22 70:2 167:6

**advancing** 13:9 21:4

**advice** 78:18 117:16

**advisor** 42:21 69:23

**advisory** 16:5,7 16:14,23 38:19 40:19 41:5,24

**affairs** 14:13

**affect** 20:23 57:7 61:6 84:2 173:23

**affected** 36:1

**affects** 54:25 57:18

**affiliated** 10:17

**affiliations** 9:1

**affinity** 174:10 174:13

**affirm** 92:7

**afternoon** 170:23,25 171:4,7 179:13

**agenda** 40:18 40:19 42:4,7

**ago** 13:21 22:12,12,13 23:1,4 43:8 49:2 116:9 118:12 128:3 134:18

**agree** 8:12 63:12,13 88:20 139:5 158:3,12 159:14 175:23

**agreed** 81:10 140:25 157:2 157:25 158:7 158:21

**agreement** 5:5 44:7,23 45:7 45:12 62:11

**agreements** 45:20

**ahead** 17:11 88:16

**aiming** 62:14 68:4

**air** 101:18

**aisen** 1:17 2:17 4:2,11,21 5:5,7 5:9,16,17,17,19 5:19,21,21,23 6:5,6,7,9,12,20 6:22,23 7:7,8 7:10,11,14,15 8:14 9:10,24 10:6,9 17:8 26:7,13 40:1 43:21,23 45:2 56:8 57:14 64:10,14 70:15 77:21,25 81:17 81:22 86:14,17 88:17 91:6,9 95:20,23 98:16 98:23 110:3 122:20 126:1 129:24 132:3 134:6 135:7 136:23 138:2 144:19 146:6 149:2 170:4,23 171:13 181:14 195:21 199:6 199:11 202:16 203:4 205:3,15

**al** 8:15,16

**alert** 182:5

**aliquots** 60:7 61:11

**allegation** 28:20 29:24,25 82:22 88:24 94:4

**allegations** 30:8,13,17,18 36:14 70:6 83:25,25 88:3 88:4,6,8,21 89:9,19 96:12 109:17 126:14 141:11,17 153:11,16,20 153:25 154:5 154:15 155:7,8 185:12 194:22 201:5,21 202:6 202:8

**allegedly** 31:3

**alleges** 26:23 27:25

**alleging** 169:4

**allotted** 170:3

**allow** 81:10 164:10 166:1 166:16 167:16

**allowing** 164:23

**alpha** 183:21

**alpha7** 188:2

**alter** 72:21

**alzheimer's**
5:12,15 7:6
10:23 11:16,19
12:7,9,22,24
13:18 20:14,23
22:2,5 25:16
33:18 41:19
50:8 53:23
54:24 57:19
62:4,15 64:20
72:13 73:4
76:24 126:12
126:24 161:16
162:13 163:16
173:12 174:17
177:12 192:14
192:17,21,25
193:11,17
196:13
**ambivalent**
165:1
**america** 26:5
**amyloid** 55:12
139:18
**analyses** 15:1,1
46:15 47:10,14
47:20 55:24
**analysis** 46:20
46:22 47:8
49:3 50:7,13
50:17 56:23
60:16 83:14
86:7 104:2,6
113:22 114:9

131:6,7,14,16
131:21 132:25
134:10,17,25
135:22 152:14
158:12,15
178:10,13,16
178:20,23
180:10
**analyst** 131:7
**analytical**
58:22
**analyze** 117:23
179:6
**analyzed** 47:20
58:19 59:25
60:3 131:4
196:17
**anecdotal**
197:16
**annotated**
190:4 191:1
**anonymous**
96:15
**answer** 17:11
31:9 32:5,22
36:15 38:13
51:6 55:4
59:15 60:24
63:19 89:22
167:1 176:2
178:3 192:20
**answered**
160:19

**answering**
102:23
**answers** 12:25
**anybody** 31:19
84:22 161:2
**anyway** 55:4
178:5
**apologies** 23:21
**apologize** 17:8
129:3 136:5
171:22
**apparent** 90:4
124:15
**apparently**
52:5 107:15
122:17
**appear** 32:16
41:13 96:3
133:7 135:22
205:6
**appearance**
8:25 90:25
160:9
**appearances**
3:1 9:1 193:8
**appeared**
133:18
**appearing** 9:7
50:16 66:11
202:21
**appears** 44:5
44:20 48:18
50:24 56:11
57:16 70:24

71:13 73:22
78:13 79:12
80:9 86:18
87:18 91:11
96:20 97:9
99:1 107:5,24
108:8 113:7
117:7 122:25
126:11,23
130:13 137:2
145:2 156:8
161:24
**applicable** 63:4
171:5
**application**
172:25
**applications**
26:25
**appreciate**
72:22 73:5
153:5 170:25
202:21
**appreciated**
20:17
**approach**
84:20 133:22
**approaches**
160:22
**appropriate**
95:8
**approved**
26:24
**approximately**
12:6,10 15:17

24:3 38:23
188:12
**area** 39:2
**arguing** 137:8
139:25 140:7
**argument**
137:7 154:20
155:10 157:2
**arm** 52:1,7
53:16 61:3
196:21,22
**arnold** 16:17
16:18 177:16
**arose** 147:2
191:17
**arrangement**
16:10
**arrangements**
17:4
**article** 5:10
6:16 7:5,19
21:18 28:14
29:5 46:10,12
57:17 58:3
63:9,22 64:6
64:25 65:17
66:5,8,11,14,23
68:1,24 69:2
69:10,12 72:2
72:5,15 74:8
75:22,25 82:10
82:25 84:15
89:13 95:12
96:24 97:1

115:4 117:7
124:12 134:22
141:25 142:1,5
142:11 149:17
186:23,25
188:16 189:15
189:20 191:7
191:22 193:4
194:18,22
199:22,24
200:5,16
201:24 202:9
202:11
**articles** 29:12
29:18 65:3,16
66:13 97:4
120:8 198:9
200:8,22
**artifact** 74:14
107:22
**artifacts**
133:19,21
**artifactual**
32:17,20 133:7
159:23 180:1,9
196:6,11 197:6
**artificially**
27:12
**aside** 12:12,15
14:8 15:4 17:2
24:9 33:17
56:2 83:13
98:14 112:20
120:12 142:5

174:1 201:7
**asked** 14:14
18:12,14 23:14
36:16 67:1
74:23 78:17
91:20 109:9,12
151:3,9 159:15
160:19 185:18
190:2
**asking** 16:13
20:11,16 25:4
33:5 34:11
49:8 51:11
53:1 73:12
74:4,16,19
75:6 124:20
143:21 154:4,7
159:3 160:16
169:25 179:16
186:18,19
**asks** 110:23
112:4
**aspect** 132:18
139:4 157:8
**aspects** 11:21
36:18,20 52:10
61:10 131:17
**assay** 52:3,10
53:15 54:20,21
55:6 60:11
61:10 186:5
187:4 196:24
197:4

**assay's** 53:12
**assays** 52:17,19
55:7 196:12,14
196:15 197:13
197:14
**assess** 106:1
**assessing**
102:19
**assessment**
97:23 143:6
180:23 192:13
**assignments**
37:20
**associate** 77:12
**associated**
72:11,24 73:1
75:4 166:8
**association**
188:2
**assume** 92:10
118:16 139:10
**assuming**
114:11 181:10
**atri** 10:23
12:14,15,16
76:24
**attach** 50:16
79:13
**attached** 4:13
5:22 7:16
49:18 87:10
113:19 121:12
123:7 136:3
162:5 182:13

184:5 185:25 190:17

**attaching** 182:10

**attachment** 41:17 123:23 162:11

**attachments** 40:18 182:15 182:16,24

**attack** 124:11 155:18,22 156:10 157:7 192:8 193:15

**attempt** 74:20 85:3

**attendees** 41:23

**attending** 38:18 42:22

**attention** 58:2 66:11 72:11,22 82:12 99:9 145:11 201:18

**attorney** 9:2

**attorneys** 18:2

**attributed** 52:2 146:10 155:21

**atypical** 108:25

**audio** 8:11 125:12

**audit** 119:20 122:8

**auditor** 120:1

**audits** 119:15

**august** 56:12 123:10 138:9 142:17 149:9 149:13,24 151:12 153:4 194:8,17

**austin** 42:10

**author** 29:1 62:20 96:15,20 122:13 174:3 193:4,7

**authored** 57:22

**authors** 64:22 66:21 111:3 112:5 131:5 143:4,8,12,18 150:4,13 162:14,19,21 165:4,4 168:15 169:4 175:19 189:15,20

**automatically** 181:15

**available** 70:18

**avenue** 3:4,9

**average** 54:12 60:21

**averaged** 52:21

**avoid** 139:22 150:25

**aware** 24:15 31:24 34:2,4 34:18 35:18

37:12 65:3,6,7 75:22 82:25 83:15 86:10 114:16 122:4 150:8 160:8 165:8,14 175:5 175:7

**aß42** 55:11,13 188:1

**b**

**b** 4:9 5:3 6:3 7:3

**ba** 11:25

**back** 21:23,25 38:19 43:16 44:23 50:23 55:23 56:16 63:14,17 81:4 92:24 100:3 104:23 109:7 125:20 133:10 138:16 154:23 163:11 165:23 168:6 170:16 170:25 180:5 189:22 195:23 201:8

**background** 72:20 148:13 164:20

**backwards** 164:8

**bailey** 1:23 2:20 9:21 206:3,21

**balance** 119:15

**ballpark** 17:14

**band** 72:20

**bands** 27:12,12 27:14 95:5 186:6,7 190:4

**barbier** 1:10 2:10 3:13 9:12 13:5 14:6,6 19:6 44:21 45:10 64:22 149:9 150:21 153:3,9,14,23 154:24

**barry** 14:10,12 15:4

**base** 101:18

**based** 20:21 25:21 27:16 36:5,12 71:24 74:9 97:6 111:22 143:23 148:13 153:22 155:9 156:2,22 157:13 158:22 158:25 161:16 173:6 174:6 191:23,25

**baseline** 61:4

**bases** 35:3 142:6 163:7

**basic** 15:23 67:2,8 74:17 77:6 97:21 103:18,21

**basically** 53:1 74:19 198:23

**basis** 85:4 88:25 131:8 132:18 199:24

**batch** 186:24

**bate** 91:6 95:23 110:3 134:6 135:6

**bates** 4:11,13 4:15,16,18,19 4:21,24 5:5,7,9 5:13,15,17,19 5:21,23 6:5,7,8 6:10,11,13,15 6:18,20,21,23 7:6,8,10,11,13 7:16,17 39:5 40:5 41:18 43:22 48:9 56:3 57:10 64:10 70:15 77:21 81:16 86:14 87:15 98:16,22 106:21 112:22 114:20 119:6 122:20 123:22 126:1 129:23 136:22 138:1

144:18 149:1 161:21 167:21

**bear** 92:23

**beat** 17:10

**began** 70:6 82:24 194:18

**beginning** 2:18 9:2 19:23 43:18 52:6 58:4 81:6 125:22 133:11 170:18 189:7

**begins** 41:17

**behalf** 2:17 9:4 9:8,15 25:13 29:20 171:4

**behavior** 124:18 168:17

**believe** 13:22 14:1 15:7 16:2 16:9 21:18 22:10 28:25 30:4 38:19,21 41:11 42:24 45:15 47:9 49:8 61:2 66:11 74:15 75:12,14 76:10 76:11 77:2,12 77:13 79:22 84:1 88:24 89:12,22 94:14 95:5,8 97:21 98:8 99:22

105:25 115:18 118:12,18 125:4 145:16 146:23 147:11 150:19,21 161:2 167:4,8 169:12,19 174:7 177:7 185:25 189:12 195:6,21 197:18,20 199:21,23 200:7 202:11

**believed** 104:2 105:2,3 159:8 159:10 160:16

**believes** 161:5

**believing** 142:6

**bells** 97:10

**bend** 164:8

**beneficial** 20:23

**benefit** 90:3

**best** 17:17 89:17 91:2 140:25 173:19

**beta** 188:3

**better** 56:20 139:3 163:11 181:7

**beyond** 33:22 106:12 124:19

**bias** 25:20 85:1 85:2 90:17

91:1,2

**biases** 89:18 90:17

**bik** 126:19 127:6,10,18,19 127:25 198:11 198:18,19,20 199:2,3

**binding** 174:10 174:13

**bioanalysis** 178:19

**biochemistry** 11:25

**biofluid** 47:4 47:10 49:7 50:7 51:17,24 52:17 178:16 196:12 197:14

**biofluids** 177:7 178:10,13,20 179:7 180:10 180:24

**biologically** 52:8 53:10

**biologist** 116:4 117:19 118:9

**biology** 12:1

**biomarker** 47:3 48:22 49:17 55:18,24 56:23 61:20

**biomarkers** 5:11,14 7:5

54:18 55:1 58:18 60:15 64:19

**bit** 34:6 38:18 45:23 89:15 166:8

**blame** 153:25

**blaming** 88:12 155:11

**blinded** 178:7

**bloat** 108:21

**blood** 53:14

**blot** 29:5,16,19 29:21 67:4 73:23 77:3 79:23,25 80:18 93:2 94:22 102:19 116:12 120:20 136:5 183:21,22 186:4 187:25 188:7 191:2

**blots** 4:13 7:19 27:11 28:16 66:25 67:6 72:21 74:25 77:7 78:18 79:13 85:11,23 85:25 92:6 93:5,17,19 95:16 97:7,10 100:4,23 102:16 103:5 103:13 104:24

105:12 107:21 108:11,12 111:10,11 128:8 143:5 182:10,10,19 182:25 183:18 184:1 185:12 187:3 188:12 188:13 190:3,9 190:20

**blotting** 27:8 32:10 77:5 92:25 97:22 105:15 115:4 115:11 160:22

**blows** 73:21

**blowup** 73:24

**blue** 146:10

**board** 16:5,8 16:14,23 41:5 72:23 117:14 117:16

**body** 155:19 157:8

**book** 193:3,6,9

**boston** 15:15 103:6,13 104:24 105:2,8 106:5

**bottom** 44:17 49:15,21,22 67:17 71:8 78:7 79:25 82:2 84:6 88:1

95:10,14 135:21 138:23 142:22 165:3 176:20 181:19 187:21 189:4 194:10 200:25

**box** 171:21

**brain** 173:12 173:24

**break** 43:11 80:23 170:7

**bredt** 1:6 2:6 9:16 123:9

**brevity** 186:15

**brief** 18:3 150:25 192:19 195:22

**briefly** 13:23 62:3

**bring** 55:23 72:10 141:8

**bringing** 140:3

**brodkin** 1:4 2:4 162:15

**brought** 18:12 21:14 33:14,25 38:14 66:10 75:23 82:11 84:16 142:11 145:11 201:17

**bruno** 67:13,14 71:15 79:3 99:2 139:1 140:25 141:2

143:1 146:10 146:15 148:11 163:17,23 166:9 182:20

**bruno's** 139:5

**bti** 41:18

**bullet** 190:3

**bulleted** 189:20

**bullets** 189:9

**bunch** 92:8 163:23

**burnham** 116:5

**burns** 1:11 2:11 3:13 4:11 4:21,24 5:7,9 6:14 7:15 9:13 13:5 14:1,8 15:4,14 19:6 21:9,10 34:8 34:10,24 35:5 35:12 36:1,5 36:12 37:2,5 37:13,17,19 38:3,4 40:16 40:24 41:4 43:1 47:16 48:19 49:16 50:16,24 51:4 51:6,9 53:1 56:11,17 57:1 61:15,19 64:23 69:9,15,20 78:11,14 79:1 79:7,12 82:4,5

83:19 84:6,12
85:6 86:7 87:8
87:18,21 88:2
88:12 89:2,6
91:17,25 93:16
96:8 98:5,10
105:13,14,17
106:5,24
107:10,17,19
108:14 109:8,9
109:22 113:8
113:14,17
114:3,7,13,16
115:3 116:3,10
116:15,15
118:4,11,23
120:15,19,25
121:1,10,16
122:4,25 123:6
123:18 124:10
124:15 125:7
126:7,11,17
127:14,23
128:18,24
129:9,20
135:21,23
136:2,15 137:8
144:6 147:19
149:9,13,16,24
150:1,12,15,16
150:25 151:2,9
151:20 153:15
153:23 154:10
154:14,16

157:2 161:25
165:12,16,18
165:23 166:12
166:18 167:5
167:14 168:1,6
169:2 172:19
172:21 174:2
176:16,21,22
178:6,18
180:18 182:1
182:19 183:11
183:18,25
185:4,11,21
187:17 188:25
190:9,25 194:7
196:2 201:18
202:3,10
**butcher** 179:13

**c**

**c** 8:18 27:6
**california**
10:11,16,20
77:1 116:6
205:11 206:4
**call** 79:3 88:2
128:11 129:6
**called** 10:23
12:23 22:1,2
23:16 36:22
66:10 67:4
93:16
**calls** 35:22
131:10,23

**camera** 8:8
**campbell** 3:19
4:4 9:6,6 17:5
17:8 18:4,7,11
18:18,20,24
20:4 23:21
25:18 28:9
32:14 37:10,23
39:16 46:25
53:20 55:2
58:9 59:11
60:18 68:13
75:5 80:12
89:10 90:15,24
93:8,22 94:5
94:13 95:18
98:11,18 101:5
102:22 104:8
104:16 105:21
108:16 114:14
116:18 118:24
120:22 121:4
121:19 124:13
125:10 127:1
128:21 131:25
132:9 133:16
136:18 140:5
141:22 142:9
143:20 144:11
145:23 147:22
150:7 152:3,17
152:23 153:18
154:2 155:14
156:20 158:5

159:2,13
160:19 165:15
166:20 170:8
170:22,24
171:17,22,25
172:8 174:21
175:1 179:12
179:14 181:2
181:17,23
183:2,5 184:4
184:11,13,24
187:14 188:10
188:21 190:14
191:5 192:4,23
194:6 196:3
202:20 203:11
**candidate** 41:6
41:19 55:13,16
56:19
**capacity** 19:13
43:2 69:16,19
77:11
**caption** 26:4
**capture** 160:24
161:4
**career** 11:10
25:12 31:15,23
32:25 33:17
**carine** 167:25
**carlotta** 142:25
**case** 8:18 13:3
18:22 32:4
33:14 38:15
44:11 46:18

**[case - charge]** Page 12

54:23 71:6 72:8 81:24 86:22 110:23 145:19 162:14 175:3,6,10 180:7

**cases** 22:18 31:25 33:3 34:3

**cash** 119:18

**cassava** 1:10 2:10 3:17 4:12 4:14,15,17,18 4:20,22,25 5:7 5:9 6:10,13,15 6:19 7:16,18 8:16 9:8 13:5,8 13:21,24 14:1 14:9,14 15:5,8 15:24 16:4,8 16:10,14,17,19 16:23 17:2,4 17:15,23 18:3 19:8,9,11 20:13 22:11,14 23:13,20 28:25 33:22 36:19,23 37:2,5 38:19 39:5 40:5,16 43:1 45:1,10 45:13,17 46:15 46:19,21 48:7 48:9 56:4,19 64:18 72:2

84:16 89:6 90:13 97:25 98:7 104:14,21 106:21 108:15 112:22 114:12 114:21 115:22 118:17 119:6 119:16 120:9 120:17,21 121:17 122:8 122:13 123:11 127:12,25 134:2 136:10 136:16 137:10 137:21 139:17 139:19 140:12 140:15 142:2 143:4,13,18,19 144:8 147:15 147:19 152:20 155:3,11 161:21 165:6 165:13,17,19 166:17 167:15 167:22 168:8 169:11,21 170:24 171:9 171:18 172:13 175:20 176:4 178:20 179:7 181:9,12 183:14 185:7 187:12,22 189:4 192:16

193:2,5,12 194:11,19 201:5

**cassava's** 20:9 45:24 64:7 81:10 124:17 124:24 169:5

**caused** 26:25 84:9

**caution** 14:25

**cautious** 139:2

**cd14** 188:2

**center** 22:6

**central** 55:12

**cerebrospinal** 5:11 57:18

**certain** 14:2 18:5 29:16 45:4,18 55:13 70:6 72:7 160:22 173:19 175:6

**certainly** 19:21 49:10 68:16 109:20 158:7 164:25

**certification** 206:1

**certified** 206:3

**certify** 205:3 206:5

**cgr** 3:6

**chain** 49:21,22 56:11 71:8

82:3 87:8 91:15 99:7 107:5,17 108:4 135:21 149:13 185:2 196:2

**challenges** 36:18

**challenging** 163:6

**chance** 100:11 100:16 101:23

**change** 27:12 30:9,21,22 31:5,6 32:17 32:20 37:7,7 38:9 51:25 52:1,6,8 53:11 53:12 55:13 72:20 132:20 179:25 196:5 196:17,23 197:3

**changed** 62:24 195:11,12

**changes** 50:19 51:7 53:2 133:5 179:17 180:9

**characterize** 197:25

**characterized** 199:23

**charge** 33:10

**[charged - communications]**

| | | | |
|---|---|---|---|
| **charged** 35:9 | **claimed** 66:12 | 187:4 193:17 | **comment** 58:14 |
| **charges** 24:20 | **claims** 89:2,19 | **close** 202:25 | 59:7,21 61:1 |
| 26:18 28:8 | **clarick** 3:3 9:4 | **cognitive** 37:19 | 109:10 162:7 |
| 29:4 35:8,16 | **clarify** 101:9 | 47:2 | 166:13,14,18 |
| 36:18 37:12 | **clarity** 103:15 | **cohort** 188:1,7 | **commentaries** |
| 38:14 193:8 | 105:6,7,9 | **coincidentally** | 96:11 |
| **charles** 66:12 | 186:15 | 96:14 | **commentary** |
| 75:24 83:11 | **clear** 16:21 | **cois** 168:18 | 190:20 |
| 89:13 96:21 | 31:18 35:3 | **collaborate** | **commentator** |
| 105:4 107:21 | 36:3,13 37:3 | 12:24 | 90:14 |
| 115:7 120:8 | 59:17 69:14 | **collaboration** | **commented** |
| 137:3 141:25 | 75:18 80:10 | 22:14,16 | 118:12 |
| 142:5 147:11 | 100:3,10,19,23 | **collaborations** | **commenting** |
| 198:9 199:22 | 101:3,11,16,21 | 13:15 | 69:21 94:18,20 |
| 200:22 201:25 | 101:25 102:4 | **collaborators** | 95:3 160:22 |
| **chief** 12:21 | 102:12 105:17 | 23:3 | **comments** 58:2 |
| 21:14 28:24 | 111:12 122:7 | **colleague** 9:7 | 58:4 107:12 |
| 35:21 62:5,9 | 134:16 155:15 | 25:16 | 145:4,20 146:4 |
| 62:13,22 63:7 | 159:8 163:12 | **colleagues** 36:6 | 146:14,14 |
| 63:8,14 66:25 | 176:15 193:22 | 144:9 193:10 | **common** 33:9 |
| 67:3,9,10 | **clearing** 84:8 | **collected** 76:1 | 47:18 109:2 |
| 68:23,25 69:1 | **clearly** 55:20 | **color** 84:19 | 116:22,24 |
| 77:19 79:5 | 87:1 161:12 | **columbia** 12:3 | 143:24 180:24 |
| 102:3 109:4 | **clinic** 178:14 | **column** 200:18 | **communicate** |
| 113:9 129:16 | **clinical** 5:12 | **combined** 80:7 | 43:1 |
| **cihlar** 3:24 8:20 | 11:17,18,21 | **come** 47:1 | **communicated** |
| **citizen** 124:23 | 12:23 22:3,4 | 75:20 102:8 | 29:16 198:15 |
| **citizen's** 175:2 | 22:23 41:6 | 133:9 138:19 | **communication** |
| 175:5,7,12,14 | 45:24 46:3 | 181:10 | 69:24 167:17 |
| 175:17,20 | 47:2 49:7 | **comes** 36:19 | 199:2 |
| **claim** 89:8 | 51:10 57:19 | 171:10 172:2 | **communicati...** |
| 174:16,22 | 62:14 140:20 | **coming** 24:23 | 14:5,8 15:25 |
| 202:4 | 163:15 173:7 | 66:15 90:7 | 16:3 17:22 |
| | 175:23 176:2,7 | 170:25 | 34:7 150:14 |

**[communications - confusing]**

199:3
**companies**
11:20 13:16
16:11 19:20
22:8 45:8
69:25 71:21
177:13
**company** 13:8
15:9 19:19
20:1 24:24
27:3 29:20
34:12,15 35:6
45:15 48:3
66:13,21 90:2
90:9,10,11
92:16 98:3
118:19 120:1
122:16 124:19
147:25 153:24
154:4,7,8
166:24 192:8
202:6
**company's**
119:20 156:5
**compensated**
113:21 114:8
121:25
**complaining**
124:17
**complaint**
78:14 117:22
123:7,19
124:10

**complaints**
23:13 66:17,19
66:20,24
139:12 200:12
**completed**
149:17
**completely**
63:4
**complicated**
38:10 155:16
**compound**
20:13
**computer** 87:3
**conceal** 28:4
**concept** 94:21
**concern** 71:1
72:6,11,13
73:10,16,18
74:2,11,12
76:6 80:19
86:3 92:17,19
137:9
**concerned**
159:15 164:3
164:25
**concerning**
21:18 70:7
**concerns** 29:16
66:15 76:16
86:8 87:22
88:13 120:17
124:25 140:3,9
141:20 142:7
147:1 148:4,5

153:25 154:12
155:4,12 157:3
160:13 191:16
201:4,17
**concerted**
140:21
**conclude**
111:14 197:6
**concluded**
128:8 203:14
**concludes**
203:3
**concluding**
156:6 159:21
**conclusion**
30:16 36:2
90:7 142:12
156:2,22
157:13,14
158:4,13 163:6
163:10 191:22
194:24 195:7
**conclusionary**
153:5
**conclusions**
27:14
**conclusive**
197:15
**conduct** 11:18
11:19 53:15
151:16 194:21
**conducted** 8:7
8:19 47:9
54:21 83:4

**conducting**
60:15 137:15
**conducts** 77:3
**conference**
15:14 163:17
167:3
**confident** 85:23
143:6
**confidential**
23:23 45:4
**confidentiality**
5:5 44:7 45:9
45:11,20
111:21
**confirm** 93:19
131:6 143:3,11
144:9
**confirmatory**
173:5
**conflict** 17:25
19:18 20:2,6
36:8,9 74:7
90:4,23 91:1
124:17 128:8
128:15 131:7
164:4 166:5
**conflicted**
126:19
**conflicting**
152:6
**conflicts** 89:18
168:18 169:5
**confusing**
180:6

**[congratulations - coordinating]**

congratulations 57:2

connected 202:9

connection 8:9 16:17 31:2 45:11 57:24 66:7 74:6 75:21 119:15 162:23

connections 20:25

consensus 159:5 195:7

consider 31:16 32:11 90:12 124:22 156:15 181:3

consideration 145:13 157:13 165:10

considered 19:18 89:1,3 115:16 148:14 154:5 160:8

considering 15:2 140:17 155:13 156:18 157:10 158:20

consistency 173:6

consistent 49:8 57:7 59:21 61:21 70:1

158:19 167:6

consolidated 119:17

consolidating 119:15

consortium 22:3

conspiracy 31:11

consult 177:14

consultant 13:23 17:1 42:21 90:11

consultants 41:24

consultations 13:14

consulted 77:9 83:3,7 96:25 128:7,25

consulting 103:21 168:13

contact 13:20 15:5,13 17:18 18:25 19:5,17 24:9 124:6

contacted 23:10,11

contacts 18:9 21:7 66:18

contained 27:1 205:7

content 168:7

context 13:19 163:1,3

continuation 91:16 99:7 107:5

continue 8:11 43:19 79:21 81:7 125:23 170:19

continued 5:1 6:1 7:1 13:24 42:25

continues 29:14 49:23 72:19 83:22 92:17 96:14 117:20 139:22 153:9

continuing 124:11

contractual 62:11

contribute 198:20

contributed 26:24

contributes 36:25

contributions 58:24

controls 119:21 188:3

controversy 139:17 140:13

140:15 142:2

conversation 18:2,3,17,20,24 24:6 49:10 143:16 198:21

conversations 13:12 16:19 21:8 47:16 61:24 109:13 109:24 128:3 151:7 177:10

converts 145:3

conveyed 143:17 179:5 194:14

convinced 38:8 38:11,14 133:25 143:6

convincing 31:12,13,16 32:7,11 37:4 38:2 89:7 101:25 102:4 141:6,14 149:18 151:21 152:2,8 156:3 156:23 157:15 157:17 159:17 160:3,5,7,11,14 160:17 161:9 161:14,17 194:25

coordinating 22:6

**[copied - data]** Page 16

| | | | |
|---|---|---|---|
| copied 116:10 168:1 169:7 | correction 95:17 204:1 | coverage 163:3 | current 12:12 12:15 48:17 72:25 |
| copies 29:19 | corrections 205:6 | covered 106:13 163:14 167:12 193:7 | currently 10:10 11:9 16:22 34:16 77:12 |
| copy 39:7 146:16 183:11 185:4,24 203:7 | correctly 159:24 164:22 186:22 196:8 | crashing 123:13 | cut 24:13 80:6 80:18 134:21 190:21 |
| copying 106:25 123:1 149:9 | correlation 60:14 | create 37:18 | cutting 17:9 95:6 101:21 104:10 |
| coria 158:11 | corresponden... 79:17 | created 29:17 | cv 1:8 2:8 |
| corio 110:8,13 110:20 111:21 113:9 123:1 130:6,11,20 131:13,20 132:14,24 134:11 159:9 | corresponding 79:1 188:3 | criteria 157:16 164:2 | cycles 63:17 |
| | counsel 8:14,25 9:20 81:10 202:18 | critical 93:11 | **d** |
| | | criticism 200:1 | d 4:1 5:1 6:1 7:1 27:19 |
| corio's 132:5 | counsels 81:11 | criticisms 192:16 | damage 84:8 |
| corner 65:9 67:18 | counterclaim 92:5 | critics 156:5 192:1 | damaged 36:24 |
| correct 12:2 16:24 25:6 31:22 69:18 94:14 104:18 109:5 114:15 120:23 121:5 125:11 134:3 135:4 136:19 147:17 161:19 162:25 182:7 187:1 191:23 193:24 194:1 195:5 205:8 | country 136:6 | critique 92:24 | darkness 27:13 27:15 |
| | counts 101:14 102:2 | critiques 191:25 | data 14:15,21 14:23 21:5,8,9 21:11,17,19 22:23 24:23,25 27:11 28:1,2 29:5 31:3,12 31:16 32:8,11 32:20 35:7 36:4 37:13,18 38:12 45:24 46:3,16,20,23 47:1,2,2,3,3,4 |
| | couple 63:3 117:17 183:10 193:13 199:10 | crop 99:14 | |
| | course 18:6 30:25 85:1 97:16 109:22 153:5 155:2 160:2 199:20 | cropped 79:23 | |
| | | crossed 146:25 | |
| | | crutcher 3:18 | |
| | court 1:1 2:1 8:17 9:18 | csr 1:23 2:20 206:22 | |
| | | ctad 7:16 15:14 162:2,6 165:25 166:9,11,23 167:2 169:10 | |
| corrected 205:7 | cover 11:10 187:24 | cummings 16:17,18 177:19 | |
| | | cuny 151:18 | |

**[data - delighted]**

47:19 48:22
49:4,7,17,23,25
50:25 51:10,20
52:5 54:13
55:25 56:23
57:1 59:10,13
59:17,19,20
66:9,13,21
69:9,11,12,15
69:21 70:7
72:22 75:17
80:6,9 85:21
85:24 86:4
90:1,3,19 92:5
92:17,20 94:3
94:11,18,21,22
94:24 95:3
100:11,16
101:12,25
102:11 104:7
105:19 106:1
106:17 109:17
111:3,8 112:18
115:4 117:23
126:14 131:9
131:22 132:21
141:7,15 142:2
143:3,7 149:18
151:21,25
152:20 156:3
156:24 157:15
158:18 159:11
159:16,18
160:3,5,7,11

161:5,10,13,15
161:18 164:13
173:5,7 176:24
177:4,6,12,24
178:1,6,18
179:3,5 180:5
180:6,8,19
186:6 187:8
188:15 189:19
195:1 196:15
196:21 198:24
**date** 48:19
65:18 71:1
106:25 117:9
**dated** 4:21,24
5:23 6:15,18
7:9,15 44:24
56:12 58:14
59:3 78:4,7
87:21 91:12
96:4 99:2
110:11 113:8
114:25 119:11
123:4 126:7
137:2 138:8
161:25 168:1
172:19 182:1
187:18 188:24
200:24 201:12
205:10
**dave** 31:18
39:7 58:9
98:18

**dave's** 17:9
**david** 1:6 2:6
3:3 9:3,16
123:9
**day** 17:19 52:7
53:3,18,23
54:17,23 55:8
59:2 79:11
145:12 182:2,9
183:17 205:10
206:16
**daylight** 8:5
**days** 50:19 51:7
51:16,18,21,23
53:6,11,12
54:14 59:23
61:4 67:22
68:7,10 179:18
179:25 183:10
185:2,21 196:6
196:18,23
197:5
**deal** 16:11
23:23 50:11
**dealing** 153:22
164:19
**dealt** 34:19
**dear** 87:9
107:20 139:1
149:16
**debate** 164:16
**decades** 11:14
155:18 192:10
192:15

**december**
106:25 119:16
119:19 123:4
**decide** 63:9,15
149:23
**decided** 128:18
166:1 167:13
**decides** 22:22
**deciding** 62:17
167:15
**decision** 63:18
64:3 66:23
111:17 155:25
156:1,18,22
164:5,10,15
166:17
**decisions** 22:21
**declaration**
205:1
**deemed** 156:4
**defendant** 3:17
**defendants**
1:12 2:12 3:13
13:4 81:11,13
**defer** 202:18
**deferred** 159:1
**definitely** 77:6
117:17
**degrade** 54:18
**degree** 12:3
**delay** 136:5
**deleted** 191:15
**delighted** 187:3

**[demand - disclose]** <span style="float:right">Page 18</span>

| | | | |
|---|---|---|---|
| demand 198:16 | 134:11 147:21 | detectable | differently |
| demanding | describes 26:18 | 173:23 | 131:20 163:9 |
| 35:22 198:23 | 26:23 27:25 | determination | 189:18 |
| demands | 41:13 49:25 | 157:19 | differing 181:3 |
| 140:19 197:22 | 131:20 | determine | difficult 32:22 |
| 197:23 198:5,6 | description | 133:13 | 172:10 |
| 198:7 | 4:10 5:4 6:4 | determined | digital 74:14 |
| demonstrating | 7:4 | 132:13 | 93:7,18 133:12 |
| 133:6 160:17 | descriptions | develop 11:21 | 161:1,6 |
| denying 99:16 | 190:21 | 34:21 | diminish 38:4 |
| department | deserved 176:6 | developer | direct 11:16 |
| 18:1 23:12,17 | designate 23:22 | 131:3 | 22:6 58:2 |
| 24:16 30:19 | designation | developing | 76:21 |
| 33:10,13,19,23 | 24:1 | 13:17 20:13 | directed 12:13 |
| 34:1 123:24 | detail 168:10 | 176:6 | direction |
| depends 8:8 | 189:23 | development | 206:11 |
| 36:12 53:21 | detailed 133:17 | 11:15 20:20 | directly 87:3 |
| 54:2,5,19,22 | 143:2 | 28:15 29:12 | 187:25 |
| 55:14 | details 13:20 | 155:20 157:9 | director 11:1 |
| depicted 74:21 | 13:22 14:19 | 162:14 | 12:15 |
| deposed 23:15 | 16:12 21:23 | devices 44:14 | disagree |
| deposition 1:16 | 22:17 23:1,11 | diego 10:11,16 | 100:13,14 |
| 2:17 8:7,14,19 | 24:18 29:2 | differed 102:1 | disagreed |
| 18:8 203:14 | 32:4 38:11,25 | different 22:20 | 104:13 |
| 205:5 206:8 | 39:3 42:9,13 | 47:9 60:5,7 | disagreement |
| depositions | 45:18 46:17 | 61:11 63:1 | 101:10,11,13 |
| 203:9 | 47:25 51:11 | 79:23 80:7 | 101:15 102:11 |
| describe 11:8 | 54:19,22 57:8 | 100:20 126:12 | disappear 38:4 |
| 23:8 27:19 | 105:9,12 | 129:7,8 139:17 | discarding 59:9 |
| 62:16 137:14 | 106:14 109:13 | 140:13,16 | disclose 19:13 |
| described | 113:15 128:2 | 164:9 171:21 | 19:17 45:4 |
| 21:17 24:9 | 148:17 177:9 | 180:22,23 | 90:4 98:5 |
| 46:22 69:10,12 | 200:9 | 181:4 | 108:14 115:18 |
| 102:10 116:11 | | | 137:21 |

**[disclosed - dr]** Page 19

disclosed 19:21
19:25 20:3,7
76:4,7 90:17
90:20,22 98:10
122:5,17 144:2
144:3,7 147:19
147:20 165:8
disclosure
19:23 108:18
115:21 165:13
disclosures
165:3
discordance
61:3
discordant
47:10,13,21
55:25
discovery
116:6
discuss 18:7
103:18 106:6
129:9
discussed 55:24
61:8,14,18,20
120:13 143:24
176:19 177:5,6
179:9,15,23
180:17 182:6
185:25 189:12
discussing
47:13 49:1,2
56:18,22 61:13
82:10 106:9
125:4 129:19

131:18 132:17
134:18 144:4
145:17 201:25
discussion 15:2
21:12,15 23:18
24:22 33:14,20
33:25 48:6
49:6 66:16
106:14 132:21
132:23 139:18
158:7 179:20
179:21 200:19
discussions
21:24 22:10
25:22 28:24
29:2 36:5 42:8
45:15 66:8
69:20 77:18
157:21 163:24
163:25
disease 5:12,15
7:6 11:16,19
12:22,24 13:18
20:14,24 41:20
50:8 51:21,23
51:23,25 53:10
54:7,8,11,13
55:1,9,12
57:19 59:22
61:7 62:4,15
64:20 72:13
73:4 163:16
173:12 192:17
193:17 196:13

196:18 197:3,5
disingenuous
75:13
display 186:16
disprove 94:3
district 1:1,2
2:1,2 8:17,17
disturbed
36:17
disturbing
36:24
dkumagai 3:6
doctor 15:21
document
18:13 26:4,8
26:12 39:5
40:18,23 43:22
44:10 48:8
55:22 56:2,3
57:9 58:11
64:10 70:14
77:20 78:3
81:16 86:13,21
87:1 91:6,16
95:23 98:15
106:21 110:1,2
112:21 114:20
116:25 119:5
122:19 125:25
129:23 134:5
135:6 136:22
138:1 144:18
144:19,23
145:8 149:1

150:19 161:20
167:19,21
169:13 171:9
174:1 176:8
181:11 182:17
183:3,14
184:15 193:21
197:19 199:13
document's
185:7
documentation
31:11 42:12,14
documents
18:10 27:1
87:2 120:14
128:10 129:2
199:11
dogboy 117:9
doing 25:10
99:16 173:11
178:19
doj 24:4,10
26:18 151:18
dollars 17:20
downloaded
117:1
dr 3:13 4:11,11
4:21,21,24 5:6
5:7,8,9,17,17
5:18,19,20,21
5:23 6:5,5,14
6:14 7:9,15,15
8:14 9:10,12
9:16,16 13:5

**[dr - dr]**

| | | | |
|---|---|---|---|
| 14:8 15:4,14 | 83:19 84:6,12 | 116:14,15,15 | 150:16,25 |
| 16:1 17:8 19:6 | 85:6,7,9,18 | 118:3,4,10,11 | 151:2,9,20 |
| 24:15,20 25:10 | 86:6,7,17,19 | 118:22,23 | 152:14,21 |
| 25:22 26:7,13 | 87:8,9,9,18,21 | 120:8,15,19,21 | 153:15,15,23 |
| 26:19,23,24 | 88:2,12,17 | 120:25 121:1,1 | 153:23 154:10 |
| 29:1 30:10,23 | 89:2,6 91:9,12 | 121:2,10,16,17 | 154:14,16,20 |
| 31:20 32:9 | 91:17,17,20,24 | 121:18 122:4,4 | 154:24 157:2 |
| 33:17 34:8,10 | 91:25,25 92:14 | 122:25 123:2,2 | 158:3 159:8,15 |
| 34:24 35:1,5 | 92:19 93:1,3 | 123:6,18,19,19 | 160:13,21 |
| 35:12,12 36:1 | 93:15,16,16 | 123:20 124:10 | 161:1,4,25 |
| 36:5,12 37:2,2 | 94:2,11,17,23 | 124:10,15 | 165:12,12,13 |
| 37:5,5,13,17,19 | 95:20 96:4,8,8 | 125:7,8 126:7 | 165:16,18,18 |
| 38:3,4 40:1,24 | 96:23 97:14,17 | 126:11,17 | 165:19,23 |
| 41:4 43:1,21 | 97:20,24 98:5 | 127:6,10,14,18 | 166:12,18 |
| 45:2 48:19 | 98:5,6,10,10 | 127:19,23,25 | 167:5,14 168:1 |
| 49:16 50:16,24 | 99:9,13,21 | 128:16,18,24 | 168:6 169:2 |
| 51:4,6,9 53:1 | 100:8,21,22 | 129:9,20 130:7 | 170:4,23 |
| 56:8,11,17 | 102:2,10,15 | 132:3 133:10 | 171:13 174:2 |
| 57:1,14,22 | 103:5,18,24,24 | 133:18,23,25 | 177:16,19,22 |
| 61:15 64:14,22 | 104:2,6,14,21 | 134:1 135:17 | 178:6,18 |
| 64:23 66:9 | 105:10,13,14 | 135:21,23 | 180:18 181:14 |
| 69:5,5,9,15,20 | 105:17 106:2,5 | 136:2,10,13,15 | 182:1,6,19 |
| 71:24 72:6,10 | 106:24 107:1 | 136:16 137:3,7 | 183:11,11,18 |
| 72:19 73:10 | 107:10,12,16 | 137:8,14,20 | 183:25 185:3,4 |
| 74:3,8,13,16,16 | 107:17,19,21 | 138:8,24 139:8 | 185:11,11,18 |
| 74:23 75:3,21 | 107:25 108:9 | 139:16 140:7,7 | 185:21 187:17 |
| 76:3,19 77:10 | 108:14,15,20 | 143:1 144:6,6 | 187:18,18,25 |
| 77:16,25 78:10 | 109:8,9,22 | 144:7,19 | 188:25,25 |
| 78:11,13,14,15 | 110:8,9 113:8 | 145:20,21 | 189:1 190:9,25 |
| 78:17,25 79:1 | 113:14,17 | 146:6,21 147:1 | 194:7 195:21 |
| 79:7,12,18,21 | 114:3,5,7,11,13 | 147:15,19,20 | 196:2 198:20 |
| 80:3,8 81:22 | 114:16,19 | 148:3,9,11,12 | 199:6,11 |
| 81:23 82:3,4,5 | 115:3,10,20 | 149:13,16,24 | 200:14,22 |
| 82:5 83:2,19 | 116:2,3,10,11 | 150:1,12,13,15 | 201:12,18,25 |

202:3,10,16
203:4
**draft** 18:14
145:5,12,16,19
146:21 156:6,8
157:12 168:7
169:3,3 191:10
191:16 194:15
**dragged** 153:10
**draw** 89:16
**drawing** 27:13
**drawn** 21:12
25:11,22 36:7
36:9,10
**drill** 34:14
**driven** 139:19
140:21 141:20
142:3,7 156:16
157:3
**driving** 141:17
200:1 201:4
202:5,8
**drop** 39:17
**dropped**
193:16
**drug** 20:9
21:12 28:15
29:13 48:3
54:4 55:16
57:7 64:7,17
66:21 155:20
157:9
**drug's** 54:25

**due** 133:11
**duly** 9:25 206:7
**dunn** 3:18 9:7,8
**duplicative**
184:19

**e**

**e** 4:1,9,11,13,15
4:16,18,19,21
4:24 5:1,3,6,8
5:17,18,20,22
6:1,3,5,7,8,10
6:11,13,20,21
6:23 7:1,3,8,11
7:13,15,17
13:25 27:19
35:22 39:7
40:8,12,14,22
40:23 41:2
42:7 47:15
48:16,17,18
49:1,10,15
51:3 56:10,11
61:21 69:13,14
70:24,25 71:4
71:8,12,14
73:20 74:10,16
76:1,5 78:4,7
78:23 79:11
81:23 82:2
84:7 86:18
87:8,11 91:11
94:17 95:1,2
95:10 96:3

99:1,9 100:1,9
103:4,9,17
106:24 107:11
107:19,23
108:3,14
109:19,25
110:7,18,20
111:16,17,20
112:15 113:7
113:17 114:3
114:13 116:9
121:10 122:25
123:6 126:6
127:7,9,9,11
128:3 130:6,11
130:21 132:11
135:16,20
136:3,16 138:8
138:11,23
139:9,15
142:15 143:22
144:13,19,23
145:6 149:8,12
150:25 151:6
153:3 154:22
161:24 165:23
167:25 168:11
169:3,8 172:18
172:21 176:15
176:20 179:24
180:16 181:24
181:25 182:25
183:9 187:17
187:24 188:7

188:24 190:10
190:17 194:7
195:2,3 196:1
198:23 201:11
201:12
**earlier** 34:7
38:18 42:25
45:14,23 55:24
59:22 60:9
62:2 68:22
88:24 89:11
96:24 102:15
143:24 176:20
177:16 198:18
201:9
**earliest** 46:2
200:24
**early** 68:7
177:5 201:16
**earnest** 10:7
**easier** 181:13
181:18
**easy** 128:11
129:5
**editor** 12:21
19:14 28:23
35:20 62:5
63:8,14 69:6,7
77:13 79:8
102:3,3 109:4
155:17 162:8
165:25 167:16
168:8,14,19
169:4,11,20

**[editor's - evidence]**

| | | | |
|---|---|---|---|
| **editor's** 7:12 145:5 156:6 193:22 | **eighth** 3:9 | **enea** 1:4 2:4 162:15 | **essential** 156:12 |
| **editorial** 68:11 72:23 150:5 155:25 156:1 156:19 159:12 | **either** 16:3 19:9 19:13 51:18 63:12 69:4 81:10 90:13 97:3 98:10 136:17 147:19 163:20 169:3 171:23 | **engaged** 71:20 | **essentially** 23:15 |
| **editors** 21:14 62:9,13,22 63:7 66:25 67:2,8,10 68:23,24,25 71:16 73:11 77:19 79:5 111:11 113:9 121:2 124:16 129:15 137:4 138:17 150:2 157:22 168:25 190:25 193:23 195:8,11 201:19 | **elec** 87:5 | **engagement** 17:3 | **established** 177:1 |
| | **electronic** 44:14 | **enlargement** 74:12 | **establishing** 92:16 |
| | **electronically** 87:6 | **enlarges** 73:22 | **et** 8:15,16 |
| | **elements** 33:2 | **enlarging** 74:14 | **evaluating** 89:18 |
| | **eleven** 194:17 | **enormous** 143:5 | **evaluation** 113:23 |
| | **elizabeth** 126:19 127:6 198:11,18 199:2,3 | **enter** 45:19 | **events** 140:17 |
| | | **entered** 172:4 | **eventually** 70:10 |
| | | **entire** 188:1,7 193:11 | **everybody** 90:17 91:1 |
| | **embargo** 167:2 167:4,6,9,12 | **entirely** 92:23 165:16 | **evidence** 30:17 31:5,6,7,10,12 31:13,16,24,25 32:3,7,11,20 33:4 36:3,4,6 36:13 37:4 38:2 75:16 89:7 100:4,19 100:23 101:3 101:11,16,20 101:22,25 102:5,11 104:3 104:3,6,10 105:19 111:12 111:22 127:18 127:24 131:22 |
| **edits** 146:10 | **emerges** 37:4 | **entitled** 5:10,14 7:5,19 26:4 40:19 | |
| **effect** 53:4 160:16 | **emotional** 25:4 | **entry** 110:21 | |
| **effective** 34:21 62:14 193:19 | **emphasized** 120:15 | **envision** 161:17 | |
| **effectively** 93:2 | **encompasses** 12:20 | **equity** 76:11 90:10,18 115:21 119:18 | |
| **effects** 5:10 | **encouraging** 57:2,5 127:11 180:19 | **ernst** 6:18 119:12 121:21 122:3,9 | |
| **efficient** 63:24 | | **erratum** 95:15 95:16 | |
| **effort** 64:2 140:19,22 | **ended** 119:19 | **esq** 3:3,9,14,19 3:19 | |
| **efforts** 139:19 141:21 142:8 | **ends** 183:9 | | |

132:8,14 133:4
141:7,15,16,19
142:6 143:2
149:18 151:21
151:25 152:5,6
152:8,10,13,19
156:3,23
157:14,15,18
159:8,10,17
160:3,5,7,11,14
160:17 161:9
161:15,17
191:23 194:25
196:19 197:15
**evolved** 68:16
**exactly** 15:11
16:12 54:5
89:25 105:7
111:15 135:3
**examination**
4:3,4,5,6 10:4
170:21 195:19
199:8
**examined** 10:1
**example** 12:20
21:6 32:10
33:1 54:3
118:13 151:17
164:7 166:22
177:15
**examples**
193:13
**exception**
49:24

**exceptionally**
156:10
**exceptions**
55:10
**exchange** 49:1
51:9,15 70:3
79:16 85:22
93:1 105:11
151:12 182:23
183:9
**exchanged**
69:24
**exchanges**
21:10 47:15
69:13,15,20
150:1,20
**excluded** 37:17
**exclusions**
37:21
**excuse** 49:3
58:12 71:5
81:16 107:17
123:19 148:11
200:23
**exhibit** 4:10,11
4:13,15,16,18
4:19,21,23,24
5:4,5,6,8,10,14
5:17,18,20,22
6:4,5,7,8,10,11
6:13,14,16,18
6:20,21,23 7:4
7:5,8,9,11,12
7:13,15,17,19

26:3,6,9,10
39:4,6,10,13,14
39:22,25 43:22
43:24 44:4
48:8,10,18
52:5 56:3,5,8
57:9,11,13,16
64:9,11,13,16
70:7,13,14,16
70:19 72:16
77:20,22 78:3
81:16,18 86:14
86:15,17 91:5
91:7,17 95:22
95:22,24 98:15
98:17,22
106:20,22
110:2,4 112:21
112:23 113:4
114:20,22
116:25 117:4
118:4,20 119:5
119:7 121:7
122:19,21
125:25 126:2
129:23,25
134:5,7,11,12
134:19 135:5,6
135:8,10
136:22,24
138:1,3 144:17
144:21 145:3,5
149:1,3 161:20
161:22 167:20

167:21,23
171:9,15,16,18
172:1,3,7,9,11
176:9,11
180:13 181:7,9
181:10,21
183:3,4 184:16
184:23,25
187:11,13,17
188:18,19,20
188:22 191:10
194:2,4 195:23
199:14,15
200:4 201:8
**exhibits** 99:8
107:6 172:3
**exonerate**
105:18
**exonerating**
151:3
**expect** 34:3
43:7 51:22
54:7,11,17
61:6,19 77:14
197:15
**expected** 19:12
55:9,19 88:8
88:20 197:12
**experience**
25:21,23 33:9
35:15 47:18
67:2 77:8
89:16 102:16
115:15 117:18

143:5 153:22
155:10,16
156:13 157:6
161:16 164:18
180:4,22
192:15
**experienced**
67:7
**experiment**
32:10 186:13
187:9 197:17
**experiments**
77:3 93:6
106:2 133:12
**expert** 67:6
77:4,7 78:22
97:22 105:15
107:21 108:21
108:24 113:18
114:2,7 116:12
120:21 121:11
126:18,24
127:20 128:7,8
128:14,25
136:5 147:7,21
**expertise**
102:18 159:21
**experts** 78:18
129:7 177:14
**explain** 35:3
51:5,22 52:4
59:13 60:8
95:15 161:12
166:7 192:5

**explained**
133:19,21
**explaining** 60:4
61:8 90:5
143:22
**explanation**
108:8 116:11
128:10 129:1
134:1 146:1
156:10 160:9
**explanations**
116:16
**explore** 45:2
**exposure** 51:18
**express** 35:1
141:3 150:16
**expressed**
100:20 129:14
132:5
**expressing** 80:8
86:3 148:4
166:4
**extensive** 44:13
192:7 193:2
196:23
**extensively**
36:1 173:16
**extreme** 50:18
51:6 53:2
179:17

**f**

**f** 27:19,25

**fabricated** 27:7
28:16 29:21
31:3 94:21
**fabricating**
33:11
**face** 82:22
**facility** 10:15
**facing** 36:14
**fact** 37:5 38:3
38:15 60:21
69:7 76:4
84:18 93:19
98:9 114:11,12
124:22 141:17
141:20 144:6
146:20 147:24
156:15 169:10
169:20 183:25
184:10 185:21
190:25
**factor** 84:20
89:3 155:12,24
156:17
**faculty** 12:18
**failed** 27:25
28:1
**fair** 11:3 12:10
16:23 20:3
23:6 28:7
36:11 37:8
38:5,7 43:2
68:10,25 69:10
76:16 77:5
89:4 92:1

93:20 100:2
101:4 104:1,5
104:21 126:25
133:9 140:3
146:20 151:24
153:23 155:9
166:3 179:22
200:2
**falls** 181:18
**false** 27:1,20
83:24 155:8
201:21
**falsely** 37:19
**falsified** 27:7
**falsifying** 33:11
**familiar** 16:4
19:4 28:20
29:24,25 30:5
30:20 37:21
46:24 74:15
83:11 118:1
174:2 175:12
198:9,12
**fancy** 95:16
179:1
**far** 83:15 118:6
124:6 127:23
132:24 148:8
165:23 190:3
**faulty** 193:18
**favorable** 57:7
**favored** 158:7
**favoring** 164:3

**fbi** 23:17 24:4 24:10
**fda** 123:10 151:18
**fear** 166:15
**fearing** 193:17
**features** 148:14
**february** 119:11 172:19
**feedback** 14:17 173:4
**feel** 111:11
**feeling** 25:12 34:17 36:7,19 36:25 37:1
**felt** 33:4 150:2
**field** 7:19 13:11 19:17 20:2 33:18 34:22 36:24 40:9,15 48:16 50:12 58:24 173:14 173:15 192:10 193:11
**figure** 73:19,20 73:22,24 74:9 74:11,13 79:13 80:7,18 155:19 156:12 182:11 183:22 184:1
**figures** 21:15 80:5 82:12 99:15 131:9,17 131:23 132:19

159:19,23 160:10 171:13 185:12 193:13 202:13
**filamin** 174:11 174:14,16
**filed** 8:16 123:9 123:14 124:23 175:3,6,8,22
**files** 87:3
**film** 93:6 133:12,21
**films** 92:8 190:21
**final** 148:18
**finally** 88:2 131:2
**financial** 16:10 45:16 75:13,16 76:9,12 88:7,9 88:22 90:2 98:6 109:16 120:15 139:4 140:1,2,8,13 141:4,9 145:22 147:2 156:4,9 156:16 157:10 175:20 191:17 192:1,13 199:25 202:5
**financially** 8:23 75:15 140:22 153:11,17,20 154:5,12,15

155:4,7,22 156:16
**find** 36:13 37:4 44:14 75:16 86:24 87:5 105:19 113:19 121:12 141:16 149:17 151:21 151:24,25 152:6,8 160:3 160:7,14 161:9 161:14 181:14 181:18 194:25 200:24
**finding** 151:16 181:18
**findings** 104:14 109:10 126:11 126:13 147:3 150:18 158:17 191:18
**finished** 113:23 139:3 150:3
**fink** 3:14,14 4:5 9:10,11,11 30:24 31:8,18 32:13 37:22 38:6 39:7,19 49:5 53:7 54:1 59:12 60:17 61:16 80:13 88:15 89:20 94:6 125:12 147:23 152:22

171:13,20 172:2 195:17 195:20 198:3 202:22 203:8 203:13
**firm** 8:20 9:4 19:2 93:17
**firms** 23:19
**first** 9:25 12:6 20:18 29:1 34:19 40:8 45:1 46:2,6 60:6 61:2,10 62:2 67:17 74:5 75:22 79:22 97:13 115:10 117:15 137:15 138:7 141:24 142:22 149:12 171:7 172:21 196:7 200:10,14,18 200:25 201:3 201:16 202:4,9 202:11
**five** 22:12 43:11 62:7 80:22 125:15 188:13 203:5
**fix** 125:16 174:23
**fixing** 98:20
**floor** 3:4

**[flows - gels]**                                                Page 26

**flows** 119:18
**fluid** 5:11
  57:18
**flying** 145:9
**focus** 99:8
**focused** 11:14
  67:4
**focuses** 62:13
**focusing** 35:25
  196:1 200:10
**fold** 36:9
**foley** 19:1
**folks** 26:6
**follow** 130:21
**following** 42:4
  50:18 66:14
  72:14 189:8
**follows** 10:2
  62:17
**force** 101:18
**foregoing**
  205:4 206:7,12
**form** 17:5 20:4
  25:18 28:9
  30:24 32:14
  37:10,23 38:6
  46:25 49:5
  53:7,20 54:1
  55:2 59:11,12
  60:18 61:16
  75:5 80:12,13
  88:15 89:10
  93:8,22 94:5
  94:13 98:11

101:5 102:22
104:8,16
120:22 124:13
125:10 128:21
132:1,9 133:16
140:5 141:22
142:9 143:20
144:11 145:23
152:3,17,23
153:18 155:14
156:20 158:5
159:2,13
166:20 174:24
198:1
**formal** 13:13
  68:12
**former** 40:12
  40:12
**formerly** 11:12
**forth** 50:23
  56:16 63:17
  92:24 100:3
  138:16 168:6
  206:9
**forum** 19:22
  117:8
**forward** 22:14
  22:15,18,23
  79:17 113:22
  179:7
**forwarded** 85:6
  91:20
**forwarding**
  126:11 187:25

**found** 18:16
  87:2 102:4
  104:3,6,10
  128:9 129:1
  143:2 152:5
  156:12
**foundation**
  98:11 104:16
  143:20 150:7
**founder** 79:3
**four** 67:13
  123:14 188:13
  189:20 192:10
  192:15
**fourth** 67:15
  69:5,7 190:15
**framed** 159:24
**francisco** 39:2
  42:16,19
**fraud** 31:11
  32:1,8,12 33:4
  89:19
**fraudulent**
  27:1,20 35:6
**fraudulently**
  29:6 38:11
**free** 26:7
**french** 142:21
**frequent**
  109:25
**frequently** 70:3
**front** 70:20
  181:15

**frozen** 173:18
  173:20,24
**full** 10:8 138:14
**fully** 198:7
**fundamentally**
  99:14
**funded** 22:3
  84:17,19
**funding** 11:19
  27:3
**further** 4:6
  79:16 101:23
  103:8,9 107:5
  107:12 112:1
  112:13 129:19
  151:17 166:8
  178:10,19
  180:10 195:3
  195:16 199:8
  202:20,22

**g**

**g** 88:2
**gain** 75:15
  105:6
**gears** 13:3 34:6
  43:9 109:7
**geeze** 85:9,19
**gel** 160:24
**gels** 92:18 95:6
  99:23 133:20
  133:22 152:7
  160:23 161:3,4

**[general - health]**

| | | | h |
|---|---|---|---|
| **general** 18:8,23 18:23 24:19 25:15 34:10,13 74:6 90:12 93:13 118:10 174:2 | 172:3 181:7 184:12 195:23 202:24 | **government** 23:5 24:11 28:2 | **h** 4:9 5:3 6:3 7:3 |

**general** 18:8,23
18:23 24:19
25:15 34:10,13
74:6 90:12
93:13 118:10
174:2
**generally** 20:12
24:17 25:20
35:10 62:16
93:7,9 115:16
**generated**
95:15
**geoffrey** 1:6 2:6
9:16 16:16
123:8
**getting** 103:18
179:10 180:22
**gibson** 3:18 9:7
9:8
**gibsondunn.c...**
3:21,22
**giry** 167:25
168:6,12
**gist** 51:5
**give** 11:5 17:10
145:1 166:6
192:19
**given** 68:6
164:15 197:13
203:4
**giving** 129:7
**go** 8:12 17:11
88:16 125:15
154:23 170:9

172:3 181:7
184:12 195:23
202:24
**goal** 54:9
175:13
**goes** 119:22
190:17
**going** 8:4 21:23
23:10,22 33:22
43:10,12,16
44:23 56:16
80:25 81:4
89:22 100:2
104:23 125:17
125:20 138:16
155:15 168:23
170:10,16
171:8 172:10
178:4,4 179:7
181:6,9 183:7
188:18 199:13
203:2
**good** 8:4 9:10
9:14,21 10:6
42:11 85:2,10
85:19,25 99:23
170:23 177:8
181:17
**goodwin** 3:8
**goodwinlaw....**
3:11
**gotten** 64:4
68:11

**government**
23:5 24:11
28:2
**grant** 3:24 8:20
26:25
**grateful** 173:4
**great** 20:15
50:11
**greater** 102:18
**group** 22:21,22
50:25 51:7
52:20 53:2,6
54:12,18 58:22
60:15 66:15
75:14 111:25
112:7 131:2
168:14 180:7
193:6
**groups** 190:5
**gueron** 3:3 9:4
**guess** 17:18
22:19 25:19
32:15 42:23
60:8 73:19
101:9 105:24
109:2 112:10
122:12 136:12
157:5 178:3
180:16 182:22
182:23 189:17
192:20 199:4
**guilty** 37:5

**h** 4:9 5:3 6:3
7:3
**halfway** 94:17
95:2 172:23
173:3
**halt** 140:20
**hand** 65:9
67:18 141:6,11
**handle** 89:17
**hang** 114:1
135:5 146:5
**hansson** 50:7
59:10 176:25
177:1,8
**hansson's**
59:19
**happened**
35:12 68:17
114:6
**happening**
33:12 151:1
**happens** 55:11
63:6
**hard** 61:4
**harder** 64:4
**harvard** 12:1
**heading** 26:19
41:24 120:4
**headlines**
193:15
**health** 123:24

| | | | |
|---|---|---|---|
| **heard** 8:10 31:25 33:24 97:14 154:10 154:14 155:3,6 162:20,22 200:11 | **highly** 60:7 126:19 | **i** | **impetus** 199:24 |
| **hearing** 25:5 33:16 113:22 125:13 154:16 | **history** 85:13 86:2 | **idea** 56:20 65:22 104:20 181:17 | **implausible** 173:22 174:8 174:11,14,18 174:23 |
| **hedges** 165:5 | **hoau** 15:21 26:5 | **ideas** 21:3 | **implying** 76:14 76:15 85:10 |
| **heilbut** 1:4 2:4 8:15 162:15 | **hoc** 14:25 | **identified** 131:16 | **important** 15:2 55:10 84:24 192:21 |
| **held** 121:17 | **holdings** 165:14 | **identify** 74:20 | **importantly** 186:4 |
| **hello** 58:17 | **honest** 11:5 97:22 | **identifying** 159:22 | **impression** 20:18 30:9 97:19 |
| **help** 14:15 85:14 105:25 166:7 174:23 179:16 | **honestly** 100:2 | **identity** 73:5 96:15 | **impressions** 34:13 |
| **helped** 106:15 | **hopefully** 172:12 181:7 184:12 | **image** 32:18 74:14,21 111:22 | **improve** 11:22 |
| **helpful** 35:24 86:11 96:12 183:6 | **hoping** 105:7 | **images** 27:11 29:17,19,21 67:4 83:20 93:6,7 130:23 131:4 133:13 133:14 182:13 186:4,5,13,16 186:23,24 188:1,7 191:2 | **improvement** 37:19 |
| **helps** 181:16 183:7 | **hotel** 42:3 | | **inability** 160:14 |
| **herrington** 19:2 | **hour** 17:20 43:10 | | **inappropriately** 82:14 |
| **hi** 107:11 111:1 117:14 127:17 162:5 | **hours** 55:14 | | **inbox** 87:3 |
| **high** 11:8 23:8 54:25 60:14 174:10,13 | **houston** 3:21 | **imaging** 47:3 | **incentive** 75:16 |
| **higher** 150:19 | **huh** 26:22 115:24 | **immu** 117:17 | **include** 164:5,8 186:14 198:10 |
| | **human** 46:13 | **immunoblot** 113:18 114:2,7 121:10 | **included** 29:17 46:12,13 52:20 66:13 73:24 147:24 157:12 191:15 |
| | **hundred** 17:20 88:6 | **impact** 55:19 192:16,21,24 | |
| | **hundreds** 163:20 | **impartial** 90:14 | |
| | **hy** 111:24 | | |
| | **hypotheses** 163:7 | | |

includes 65:17
including 17:25
   21:17 27:8
   28:25 140:24
   165:10 166:10
   183:11 189:20
   190:21 193:15
inclusion 140:1
   163:24 164:2
incompatible
   122:1
incorporated
   8:16
increase 68:5
   184:12
incredible
   126:18
independent
   76:15 90:14
   108:21 113:20
   114:8 121:3,13
   121:18,25
   122:14 126:18
   126:24 128:7
   128:14 136:4
   143:4,12,18,23
   143:25 144:10
   147:7,21
independently
   76:16
indicate 150:2
   158:18 190:4
   196:23

indicated
   150:22 191:21
   192:11
indicates 79:25
   133:3 150:21
   187:24
indicating 80:6
   160:24
indication
   133:8
indicative
   181:4
indicator 55:9
indict 33:10
indicted 24:16
   33:18
indictment
   4:23 25:2,5
   26:4
individual 19:1
   52:21 59:3
   71:9 81:11
   110:7 113:10
   116:22 117:8
   124:1 197:16
individuals
   13:10,16 22:20
   52:20 60:12
   66:17,19 70:3
   83:13 137:10
   147:2 186:14
   191:17 193:16
   193:18 196:16
   197:1 198:4

industry
   158:23
inexplicable
   156:14 157:9
inferred 14:21
   14:23
inflammatory
   193:15
influence 84:19
   125:6,8
influenced
   106:19 141:24
   164:4
influential 90:6
inform 111:22
   124:16 164:16
informal 13:12
   14:2 43:2
   69:23
information
   45:4 46:13,14
   75:25 89:12
   103:24 112:5
   113:14 124:16
   179:5 189:15
informed 97:23
   120:8
infringement
   168:18
initial 46:19
   59:10 74:1
   156:6,8 157:12
   185:10

initialed 205:6
initially 164:23
ink 205:6
inquiries 85:13
   86:2
inquiry 157:11
   190:24 194:18
insignificance
   196:25
inspires 35:13
instance 33:24
instances 33:7
   33:8,17,23
   47:23,24 48:1
   48:1
institute 10:19
   10:20,21,24
   11:16 76:21,25
   116:6
institutes 76:23
institution
   10:18,25 40:13
insufficient
   30:16 196:25
integrity 66:9
   71:1 72:6,11
   73:10,16 74:2
   76:6 78:14
   86:8 87:22
   88:13 92:17
   111:25 112:7
   120:16 124:24
   131:2 137:9
   140:3,9 141:20

142:7 153:25 154:11 155:4 155:12 157:3 159:16 160:15 160:17 168:14 182:5 200:1 201:4,17

**intent** 143:7 149:18 151:22 152:1,5,10 195:1

**intention** 32:19

**intentional** 32:19,21

**interaction** 43:4 66:16

**interactions** 13:25 36:21

**interest** 13:11 13:17 19:19 20:3,6 68:5 75:13 76:9,11 76:12 89:18 90:19,23 98:6 105:18 115:21 131:8 145:22 147:2 168:18 169:6 175:20 191:18 192:1 192:13

**interested** 8:23 21:3 36:21 140:22 150:22 172:23

**interesting** 176:5

**interests** 165:9

**internal** 119:20

**international** 12:23

**internet** 8:9

**interpret** 51:11 61:4 84:14 151:24 163:8

**interpretation** 72:22 74:24 90:3,19 101:22 102:12 121:24 122:15 132:16 132:20 159:19

**interpreted** 80:5

**interpreting** 14:15,25 95:5

**interrupting** 23:21

**intersubject** 52:13 196:4

**intervener** 81:9 171:2

**intervenor** 1:8 2:8 3:7 9:15 171:5

**intervention** 61:5 196:22

**interview** 23:16 30:19

**interviews** 24:3

**introduce** 9:18 39:4 108:24 171:25 172:1

**introduced** 39:18

**introducing** 116:15 167:20 181:6

**introduction** 116:4 117:18 118:8

**inundated** 35:21 197:23 198:5

**investigate** 71:20

**investigated** 84:24

**investigating** 23:14 124:12 124:25 141:12

**investigation** 30:1 36:2,12 62:1 70:6,11 77:17 79:2 82:24 83:16 84:21 88:25 89:4 97:1,16 105:18 109:3 109:11,23 111:14,24 112:14 120:14 126:14 130:14

139:22 148:19 150:18 151:13 151:14,18 153:16 154:11 155:2,13 156:7 160:2 194:22

**investigational** 51:18

**investigations** 23:5 24:11 84:16,18 130:22 150:5,9 151:17

**investigator** 117:19 118:9

**investigators** 22:6,8 69:25 73:1 95:9

**investing** 117:17

**investments** 72:24 75:3

**investor** 6:17 19:8,11 97:24 104:14,18,21 114:12 115:16 115:18 117:2,8 117:21 118:22 120:9 121:1,17 121:23 122:1,5 122:14 134:2 136:10,16 147:25 165:19

**investors**  35:6 83:23 84:9,13 88:6,13 89:3 201:20 202:8

**involve**  177:9

**involved**  12:6,9 12:17 15:24 22:9 28:24 62:8 63:5 66:18,19,22 68:16 77:10 79:8 83:15 178:14

**involvement**  23:5,9 24:10 47:12 143:3,12 144:10

**involves**  21:3

**involving**  160:23

**irregularities**  24:24

**issue**  30:15 31:3 32:16 33:21 36:18 52:9 53:13 67:1 72:2,23 73:6,12 75:23 85:4 97:23 102:7 103:19 105:6 106:6,7 106:9 109:8,9 109:20,21 125:4 132:17

133:6 138:20 139:19 141:6 141:11,14,24 145:14 150:1,3 151:3 152:6 155:16 156:14

**issued**  148:18

**issues**  21:15 32:16 38:10 52:2 84:25 105:9 141:8 144:4 159:23 171:14

**items**  189:21

**j**

**j**  3:14 9:11

**jacques**  67:13 67:14 71:16 139:16 140:25 141:3 142:25

**january**  126:7 127:15 128:17 130:15

**jeff**  16:18

**jesse**  1:4 2:4 162:15

**jessica**  3:9 9:15

**jim**  15:7,8,10 21:9

**jlr**  1:8 2:8

**job**  25:11

**jolla**  116:6

**joseph**  58:15 60:12

**journal**  12:21 12:21 21:13 29:12 35:20,22 62:3,6,8,13,21 62:21,24,25 63:2,6,14,25 64:1,5 65:15 65:15,18 66:20 68:4,8,18 72:12 88:7,20 110:21 126:12 126:12 127:18 134:22 138:20 163:18 166:8 167:9 168:20

**journal's**  126:13 191:22

**journalist**  66:12 141:25

**journalists**  36:22

**journals**  27:22 28:3 29:15,18 29:20 140:19

**jpad**  7:5 18:16 19:14 21:13,14 21:16,18 28:24 30:1,15 46:11 62:1,4,17 63:1 63:24 64:6,17 65:1,4 66:20 67:23 69:16

70:6,11 73:11 77:11 79:4,13 82:10,24,25 84:20 89:7 102:3,9 109:4 113:9 115:4 120:14 121:2 124:12,25 127:12 128:7 128:18 129:15 130:23 131:5 137:4 138:17 141:12 145:13 145:18 148:18 148:20 150:1 151:14,16,20 151:25 153:10 154:10 155:2 155:17 164:6 166:8,11,23 167:2 168:14 168:25 169:19 174:3 182:11 189:14 190:25 191:7 193:23 194:18,21 195:7 197:23 197:23 198:5,6 201:19

**jpad's**  77:17 83:15 89:4 188:15 201:18

**judgment**  125:6,9 132:13

**juin** 142:21

**july** 135:16
138:24 142:16
142:18,20
200:24

**june** 1:18 2:19
8:1,6 44:24
135:21 136:2
137:3 144:20
145:6 172:25
205:5 206:16

**justice** 18:1
23:12,17 24:16
30:20 33:10,13
33:19,23 34:1

**justification**
59:9

**jvogele** 3:11

**k**

**k** 1:23 2:20
206:3,21

**keep** 28:1 65:7
96:15 159:3

**kept** 154:16

**kick** 171:6

**kind** 19:24
25:16 31:10
35:12 43:9
53:6 70:2
180:24

**knew** 15:8 77:4
122:16 144:12

152:1 159:1

**know** 11:10
13:4,7,8,20
15:21,23 16:6
16:9,13,15,18
16:18 22:1
24:17,21,25
26:16 33:12,22
34:2 38:8,10
42:20 44:2
48:12 50:3
56:7,25 57:13
59:19 64:13
65:5,21 69:11
69:11 70:20
71:18,21,23
76:22 77:8,25
79:4,8 82:18
82:18,19 83:23
84:14 85:14
86:17 89:7
91:9,21 93:11
93:15 97:15,24
98:1,2,4
111:16 112:8
113:21 114:2,9
119:9 122:23
124:4 127:6,7
127:19,23
132:24 147:15
158:6,8 162:19
162:20 163:9
169:7,22 170:4
172:24 175:8,9
175:22 182:22

187:15 188:22
197:7 198:6
199:17 200:8
201:20

**knowledge**
68:17 102:8
140:17 148:21
151:19 157:24
159:20 164:6
193:24 194:1
194:14,16
195:10,12

**known** 17:15
20:10 38:20
45:16 147:18

**kosher** 100:12
100:17

**kumagai** 3:3
4:3,6 9:3,3
10:5 17:13
18:13,22 20:8
23:25 24:2
26:1,11 28:11
31:1,14,22
32:2,24 37:11
38:1,16 39:9
39:12,15,23
43:20 44:1
47:6 48:11
49:13 53:8,22
54:15 55:17
56:6 57:12
58:10,13 59:16
60:23 61:22

64:12 68:21
70:17 75:8
77:23 80:21
81:8,14,20
86:16 88:19
89:14,24 90:21
91:4,8 93:10
94:1,7,8,15
95:19 96:1
98:13,20,21
101:8 103:1
104:12,19
105:23 106:23
108:19 110:6
112:24 114:18
114:24 116:20
117:5 119:3,8
120:24 121:6
122:6,22
124:21 125:14
125:24 126:4
127:5 128:22
130:2 132:2,12
133:24 134:8
135:11 136:20
137:1 138:5
140:6 142:4,13
144:5,15,22
146:2 148:1
149:4 150:10
152:11,18
153:1,21 154:9
155:23 157:1
158:10,24

**[kumagai - lines]** (cont.)

159:6 160:1 161:8,23 165:21 166:21 167:24 170:9 171:3,23 172:6 174:19,24 176:20 179:9 179:10,11,15 179:23 180:18 181:1,13 182:6 182:21 184:3,7 186:1 188:8 189:13,24 190:12 191:3 191:11,14,21 192:2,18 196:3 198:1 199:9,16 202:24 203:10

**kumagai's** 183:6 197:21

**kupiec** 15:7,13 21:9

**l**

**la** 116:6

**lab** 49:24 50:4 59:19 60:7,8 60:11 61:3,11 133:23 178:14 178:15 180:11

**label** 183:7

**labeled** 92:9 171:9,17 181:11 185:7

187:21

**labs** 47:9,14 60:5,6 61:12 180:23 181:4

**lane** 80:18

**lanes** 79:22 92:10

**language** 60:9 116:24 118:10 118:13 121:21 122:3,3,15 145:22 148:3 150:24

**large** 52:19 54:12 157:8

**larger** 111:24

**lasted** 51:16

**late** 12:8 193:7

**latest** 136:4 189:8

**law** 3:14 9:4,11 19:2 23:18

**law.com** 3:6

**lawsuit** 162:23 162:24 198:14

**lawyer** 19:1 117:22

**lawyers** 17:23 19:5

**lay** 156:11

**lead** 85:23 200:15,15

**leader** 11:2 14:1 50:7,10

70:10

**leaders** 166:9

**leadership** 34:12,15 79:6 165:25

**learned** 25:2

**learning** 117:18

**leave** 141:1 193:21

**left** 65:9 67:18 79:22

**legal** 166:16 203:6

**les** 20:15

**letter** 5:23 6:14 6:18 7:9 87:18 91:17,25 113:20 114:19 114:25 115:20 116:3,17 118:3 118:11,22 119:22,25 120:2 121:12 121:21 122:7,8 122:8,12,13 123:7,23 137:2 137:20,21 162:8 165:25 167:16 168:7 168:14,16,19 169:3,11,20,22

**letters** 116:22 118:14 154:23

183:22

**level** 11:8 23:8 52:21 189:23

**levels** 54:3,25

**license** 9:22

**licensure** 123:8

**light** 105:25

**likely** 19:12 42:19 82:21 131:9,23

**limited** 157:7

**lindsay** 1:10 2:10 3:13 9:12 13:5 14:1 15:10 21:8,10 40:16 47:16 59:3 60:2,12 60:20 61:14,19 103:6,13 104:24 127:17 149:9 162:5 172:18,21 176:16,21,22 179:15 182:1 183:20

**lindsay's** 59:7 61:1

**line** 48:22 56:14 79:24 153:24 154:25 173:3 187:2 204:2

**lines** 190:21

**link**  96:19,20 97:6

**links**  96:9

**list**  41:2 148:14 172:3 189:9 204:1

**listed**  41:23 162:14 171:20 182:15,24 189:21

**literature** 155:19

**litigants**  18:1

**litigation**  25:11 25:20

**little**  34:6 39:16 89:15 127:2 166:8 171:12 172:10

**lloyd**  3:19 9:7

**llp**  3:3,8,18 119:12

**lmarshall**  3:22

**load**  135:12

**located**  10:10

**logistics**  41:14

**london**  59:10

**long**  43:7 48:25 58:1 62:4 63:21 99:6 107:4,24

**longtime** 117:14

**look**  26:8 29:8 31:7 67:17 82:2 92:18 113:22 114:19 121:9 137:19 160:6 161:18 163:5 168:11 169:14 176:8 180:13 184:14 184:16 185:24 191:9 200:4 201:8

**looked**  57:1 72:16 74:8,9 74:10 91:16 99:8 116:9 118:4 122:7 135:3 180:19 181:25 184:20 190:10 191:11 194:15 201:18

**looking**  32:23 38:13 92:8 94:25 107:6 108:17 111:16 111:25 115:20

**looks**  40:25 41:1 42:14 49:10 51:15 79:4 80:17 85:12 86:1 161:13 185:10 185:15 200:9

**lost**  125:12

**lot**  11:10 22:2 33:20 52:22 66:16 77:7 108:12 149:25 183:21

**lots**  12:19 16:11 46:8,9

**luck**  181:6

**luckily**  176:9

**lull**  130:14

**luncheon** 170:14

**lundquist** 58:15 60:12 61:14

**m**

**made**  22:21 23:13 32:1 37:13 64:2 74:6 88:4,6 89:9 110:1 137:8 148:17 164:10 165:12 166:5 167:13 171:3 193:7,8 197:22 199:21 205:5

**madison**  3:4

**magazine**  7:19 193:5

**mail**  4:11,13,15 4:16,18,19,21

4:24 5:6,8,17 5:18,20,22 6:5 6:7,8,10,11,13 6:20,21,23 7:8 7:11,13,15,17 13:25 39:7 40:8,12,14,22 40:23 41:2 42:7 47:15 48:16,17,18 49:1,10,15 51:3 56:10,11 69:13,14 70:24 70:25 71:4,8 71:12,14 73:20 74:10,16 76:5 78:4,7,23 79:11 81:23 82:2 84:7 86:18 87:8,11 91:11 94:17 95:1,2,10 96:3 99:1,9 100:1,9 103:4,9 106:24 107:11,19,23 108:3,14 110:7 110:18,20 111:17,20 112:15 113:7 113:17 114:3 114:13 116:9 121:10 122:25 123:6 126:6 130:6,11,21

132:11 135:16
135:20 136:3
136:16 138:8
138:11,23
139:9,15
142:15 143:22
144:13,19,23
145:6 149:8,12
150:25 153:3
161:24 165:23
167:25 168:11
172:18,21
176:15,20
179:24 180:16
181:24,25
182:25 183:9
187:17,24
188:7,24
190:17 194:7
195:2,3 196:1
201:11,12
**mails** 35:22
61:21 103:17
109:19,25
111:16 127:7,9
127:9,11 128:3
151:6 154:22
169:3,8 190:10
198:23
**main** 3:15,20
**major** 193:16
**make** 25:3
52:25 76:8
99:15 100:8

103:14,14,15
149:23 172:10
179:12 191:25
**makes** 51:20
77:7 82:9
186:20
**making** 37:20
83:24 93:24
109:22 133:11
140:8 166:17
200:12 201:21
**man** 35:10
**manage** 91:2
**managing** 69:1
**manipulate**
99:14 139:20
141:21 142:8
**manipulated**
29:5 66:14
80:9,16 82:13
83:21 93:5
94:3,4,11 95:9
102:1,20 104:7
111:4,8 128:9
131:10,23
132:22 133:15
159:11 160:4,6
160:8 161:10
161:18 185:13
**manipulating**
27:11
**manipulation**
31:12,17,19
32:8,12 36:4

70:7 75:17
85:21,24 86:4
92:21 100:19
101:4,12 102:5
102:12 105:20
106:1,17
109:18 111:12
111:23 112:18
126:14 132:7,8
133:4 140:16
141:7,15 143:3
143:7 149:18
151:21,25
152:9,13,20
156:3,23
157:16 158:18
159:9,18
160:12 161:13
161:15 195:1
198:24
**manner** 26:19
**manually** 161:3
**manuscript**
62:20 63:18
82:13,20
103:25
**manuscripts**
73:2
**mark** 48:8 56:3
57:9 64:9
70:13,14 77:20
86:13 91:5
95:22 98:15
106:20 110:2

112:21 114:20
116:25 119:5
122:19 125:25
129:23 134:5
135:6 136:22
138:1 144:17
149:1 161:20
167:19 171:8
181:9 183:3
184:22 187:11
187:11 188:18
194:2 199:13
**marked** 26:3,9
39:6,25 40:2
43:21,24 48:10
56:5 57:11
64:11 70:16
77:22 81:15,18
86:15 91:7
95:24 98:17
106:22 110:4
112:23 114:22
117:4 119:7
122:21 126:2
129:25 134:7
135:8 136:24
138:3 144:21
149:3 151:12
151:14 161:22
167:23 172:7,9
176:9 181:21
183:4,14
184:23 187:13
188:20 189:4

194:4,10 199:15

**marker** 54:6,10 55:11 61:6

**markers** 51:24 57:18

**marquis** 162:15

**marshall** 3:19 9:7

**masked** 54:25

**material** 72:25 75:4 111:2

**materially** 27:1 133:5

**materials** 152:15

**matt** 124:1

**matter** 8:15 90:12 113:19 121:12 129:10 129:19 132:20 170:25

**matthew** 71:9 71:18

**maxilum** 174:10

**mean** 14:21 18:21 20:12 25:8,9 35:17 36:20 50:10 52:16 53:25 59:17 65:14 85:18 86:9

92:13 94:23 98:19 118:5 129:5 143:11 154:17 173:13 177:13 178:21 178:22 182:15 192:5 196:10 197:7,8,10,11

**meaning** 89:25 90:1

**meaningful** 54:12

**meaningfully** 54:18

**means** 11:2 26:19 52:17 86:1,2 143:25 146:12 152:4 186:10

**meant** 57:5 60:2 93:18 143:14 152:7

**measurable** 51:21,22 59:22 196:19 197:3,5

**measure** 55:8

**measures** 54:8

**measuring** 54:3 54:3,5,6,9 55:15

**mechanism** 20:21 55:16 62:21 133:6 174:4,7 176:5

**media** 8:13 43:13,18 81:1 81:6 125:18,22 163:2 170:11 170:18 203:4

**medical** 12:3 116:5 123:8

**medicine** 11:13

**meet** 64:4 164:2

**meeting** 12:23 14:11 15:13 19:24 24:7 38:19,22 40:17 40:19 41:1,5 41:14 42:9,12 42:13,14,16,18 42:22,24 43:5 45:14 105:8 106:5,15 109:8 163:14,15,18 163:19,21,25 164:2,5,11

**meetings** 14:5 15:5 16:1,2,16 45:18 156:11

**member** 12:18 16:7

**memories** 55:23

**memory** 169:15

**mention** 114:13 114:16 120:25 121:16 139:4

139:12 156:5

**mentioned** 17:1 23:4 28:23 54:10 55:11 68:3,17,22 69:24 70:5 71:16 88:24 109:15 120:13 120:19 140:14 141:4 144:7 156:9 177:16 198:18

**mentioning** 60:5

**merited** 163:24

**merits** 88:25

**mesa** 10:15

**message** 60:9 104:23 119:2 128:23,25 198:25

**messed** 100:4 100:24

**messy** 180:5

**met** 14:9,10 33:2

**method** 93:3

**methodology** 11:17

**methods** 11:21 92:25 161:7

**metric** 54:21

**mice** 173:7

michelle 1:23 2:19 9:21 206:3,21
mid 46:3
milioris 1:4 2:4 162:16
million 123:12
mind 32:7 33:2 80:20 156:18 167:9
mine 39:20
minute 43:11 49:2 80:22 118:12 135:12
minutes 107:7 116:9 125:15 199:12
mischaracteri... 93:12
miscommuni... 151:1
misconduct 141:18
misdirected 193:12
misfolded 174:17
misfolding 174:23
mishandling 94:21,24
mislabeled 184:18

mislead 143:7 149:19 151:22 152:1,5,10 195:1
misleading 27:2,20 35:5 76:13
misphrase 191:24
misread 129:3
misrepresent 32:19
misrepresents 38:12
missed 184:21
mission 13:9 70:1
misunderstan... 93:12
modern 160:25 161:6
molecular 11:25 116:4 117:19 118:9
moment 23:4 23:22 40:22 48:5,15 56:10 59:7 78:6 118:20 134:18 137:19 138:14 145:1 149:5 181:11 199:13 203:1

momentarily 135:13
money 17:14
month 116:17 196:20 201:16
months 33:21 193:3 194:18
morning 8:4 9:10,14,21 10:6 179:20 180:18 181:25 182:7 184:20 186:1 189:13 189:25 191:11 191:21 195:6
motivated 88:7 88:9,21 140:16 153:11,17,20 154:5,12,15 155:5,7,22 192:12 193:18
motivating 86:6
motivation 88:3 156:9,16 157:10 192:11
motivations 89:1,23 120:16
motive 86:12
motives 84:24 86:9 109:16 140:1,2,9,13 141:4,9 156:4 199:25 202:5

move 22:15,18
moving 22:14 22:23
multifaceted 192:7
multiple 137:8 161:11 193:8 197:8 199:3,5 200:8
multistage 22:19

**n**

n 4:1 5:1 6:1 7:1
nachtrab 124:1 124:4
name 8:20 9:10 10:8,9 19:3 69:6 83:8 84:8 117:9 127:7 170:23 172:11 206:15
named 19:1 59:3 71:9 110:8 124:1
names 61:12 162:20,22 198:8,10,12 202:10
narrowing 23:24
nature 65:25 66:25 110:15

112:9 123:1 130:7 131:2 133:11 135:23 166:2 168:13

**ndas** 45:19

**near** 101:18

**necessary** 45:3

**need** 38:8,10 46:18 173:5

**needing** 58:22

**needs** 157:17

**nefarious** 181:4

**negative** 14:20 15:3 46:21 192:21,24

**neglect** 120:25 121:16

**neglected** 114:13,16

**neither** 165:18

**neuroscientist** 76:20

**never** 25:9 55:7 120:19 134:1 151:2 155:18 155:20 165:12 193:25 197:15

**new** 1:2 2:2 3:5 3:5,10,10,15 8:18 62:24,25 63:25 68:4 123:8,24 131:3

**newspapers** 193:16

**nih** 11:20 22:3 26:25 27:8 172:25

**non** 168:16

**normal** 133:19

**notary** 8:21

**note** 7:12 8:6 18:15 139:21 145:5,13 153:5 156:6 191:10 191:16 193:22 194:15

**noted** 200:11 205:6

**notes** 150:4

**noticing** 9:2 85:10

**notification** 39:17

**notifying** 78:13

**notion** 153:19

**novel** 20:21 176:5

**november** 28:13 67:19 107:10,19 108:2,3 110:11 110:19 111:1,9 111:13,20 113:8 114:25 161:25 168:1 168:12 185:19 188:24 189:13

**number** 8:18 11:13 13:25 17:25 29:15 134:13 164:14 166:25 177:14 196:16,25 199:21 203:4

**numbering** 180:17

**numbers** 87:16 172:12

**o**

**oath** 9:19

**object** 17:5,9 20:4 25:18 28:9 32:14 37:10,23 38:6 46:25 49:5 53:20 54:1 55:2 59:11 60:18 80:12,13 81:11 89:10 93:22 94:5,13 98:11 102:22 104:8,16 124:13 125:10 128:21 131:25 132:9 133:16 140:5 141:22 142:9 143:20 145:23 152:3 152:17 153:18 155:14 156:20

158:5 159:2 166:20

**objected** 88:16

**objection** 30:24 31:8 32:13 37:22 53:7 59:12 60:17 61:16 68:13 75:5 81:12 88:15 89:20 90:15,24 93:8 94:6 95:18 101:5 105:21 108:16 114:14 116:18 118:24 120:22 121:4 121:19 127:1 136:18 144:11 147:22,23 150:7 152:22 152:23 154:2 158:14 159:13 160:19 165:15 174:19,24 180:10 181:1 182:21 184:3,7 188:8 190:12 191:3 192:2,18 198:1

**objections** 8:24 171:3

**objective** 64:5 115:11,17 137:15 164:7

**obtain** 27:3

**obtained** 51:17
157:14

**obvious** 124:19

**obviously** 36:9
105:17 118:6
126:18

**occasions** 137:8

**occurred** 32:1
42:20 47:24
48:4 112:18

**october** 67:18
78:4,7,9,9,10
79:12,17 81:23
82:3 83:20
86:19 87:11,21
91:12,24 95:1
96:4,9 99:2,10
116:16 182:1,2
183:10,19,20
185:3,15,22
187:19 201:13

**odd** 12:10
116:14,19

**offered** 113:18
117:16 121:11

**offering** 179:6
187:8

**offers** 187:2

**office** 3:14
10:17 101:18

**offices** 9:11
10:12,14

**oh** 39:9 108:5
134:15 146:12
151:5 172:5
182:16

**okay** 16:25
18:6 23:25
26:2 29:7 30:7
34:5 38:17
39:24 41:12
42:2 43:11
49:14 50:9,22
52:11,24 55:21
56:2 57:9,16
57:23 58:1,6
59:6 62:1 64:9
65:23 66:4
67:16 70:4,13
70:18,23 71:17
72:9,18 73:25
76:18 77:15,24
78:6 79:10
80:22,24 81:15
81:21 82:1,8
82:23 83:18
85:5 86:13
87:7,14,21,25
91:23 92:3
94:16 96:2,7
97:12,12 98:25
99:5,14,25
103:16 106:20
107:3,9 108:6
109:6 110:17
111:19 112:11

112:16,20
113:3,5,6,16
116:1 117:6,13
119:4 120:12
122:10 125:14
126:5,9 127:4
127:13 128:5
129:22 130:5,9
130:19 134:4
134:15 135:15
135:19 136:1
136:14,21
137:25 138:6
139:14 142:14
142:24 144:16
145:2,11
146:19,24
147:13 148:2
149:7 152:12
153:2 163:4
164:21 165:2
165:22 167:19
168:4 171:16
172:6,17
181:22 184:14
184:17 186:21
187:16 194:5
195:25 199:19
200:13 201:7
202:15,24

**oligomer**
139:18

**once** 58:19,20
60:1,1,2 82:24

88:12 120:19
137:20

**one's** 85:3

**ones** 83:24
201:4,21 202:5

**ongoing** 130:22

**online** 96:16

**open** 21:3
36:16 101:22
102:12 121:23
135:5 183:16

**opening** 119:14

**operations**
119:18

**opinion** 30:9
34:10 60:14
86:9 110:23
117:21 139:17
140:21 164:12
166:5 167:11

**opinions** 129:8

**opportunity**
45:2 164:17
166:6,13

**opposed** 164:23
164:25

**optimistic**
173:6

**orally** 163:21

**order** 27:3 28:3
157:18 203:9
203:10

**orders** 203:7

**organizer** 12:22

**organizers** 163:16,19

**original** 4:13 28:1 72:1 78:18 79:13 84:15 85:25 88:4 89:8,13 92:6 93:17,19 93:20 131:4 140:18 179:21 182:10,10,19 182:25 183:18 183:21 184:1 190:3,9 191:1 193:4

**originally** 147:1 191:17

**originated** 137:9

**orrick** 19:2

**oskar** 50:7 176:25 177:1,8

**oskar's** 49:24 50:3

**otw** 1:8 2:8

**outcome** 8:23

**outside** 168:19

**overall** 119:2 176:4

**overhead** 101:18

**oversee** 23:2 63:8 67:1

**overseeing** 63:14 86:11 106:3

**overseen** 109:4

**own** 25:21,23 30:21 35:25 36:2 164:1 165:17

**ownership** 19:21

**owning** 19:9 121:22

**p**

**p.m.** 2:19 99:10 125:18,21 170:11,17 203:3,14

**pacific** 8:5

**page** 4:2,10 5:4 6:4 7:4 26:15 28:12 29:8,9 42:3,4 44:17 58:3,7 67:17 87:15 110:19 110:19 115:7 120:3 123:22 130:11 142:15 142:22 162:12 168:12 188:11 188:13 190:16 200:19,25

204:2

**pages** 188:12 190:17

**paid** 13:13,23 17:1,3,20 42:21 45:15 62:10 75:14 76:1 90:11 127:18,25 202:13

**pain** 13:20,23 16:8 17:2,15 38:20 40:17 45:16

**painful** 170:4

**paper** 21:13 30:2,14 35:20 35:23,23 57:23 60:10 64:17 67:3 70:7 73:21 74:22 77:17 79:9,13 87:23 89:4 90:18 93:3 100:12,17,18 101:24 102:8 115:12 127:11 128:19 130:23 131:5,15 138:21 139:18 140:18 141:7 149:20 155:19 156:12,12 157:18 158:16

158:20,21 159:22 182:11 186:4 195:4 197:23,24 198:16

**papers** 65:8 111:23 140:19 193:14

**paragraph** 26:15 27:6,19 28:12 29:8 41:14 45:1 52:12 83:22 84:6 100:1,22 107:24 113:17 117:20 119:14 120:7 121:9 128:6,23 131:1 137:16 165:4 186:3 196:4,8

**paraphrase** 37:16 163:6

**paraphrasing** 199:23

**parsing** 160:21

**part** 10:22 15:8 24:22 44:16 73:19,20 76:20 76:25 85:3 89:3 105:1 134:22 166:17 182:17 188:15 191:6

**[participants - photographic]**

participants 8:9

participate 150:23

participated 123:12

participating 194:19

particular 21:11 35:13 54:24 69:1 77:17

particularly 53:5 156:11 180:6 193:2

particulars 14:22

parties 8:12 36:21 45:20 140:22

partnership 11:20

party 8:22 45:3 120:4

pass 170:6 195:16

passed 116:16

past 107:6 117:17 188:11 193:3

pasted 80:6,18 116:10 134:21

pasting 95:6 101:21

patent 168:17

patents 169:5

pathophysiol... 20:23 54:6

patience 202:17

patient 186:6

patients 5:15 7:6 64:20 174:17

patrick 162:15

paul 1:17 2:17 4:2 8:14 9:24 10:9 107:11,20 139:1 146:15 203:4 205:3,15

pause 62:23 130:14,17

pay 45:10

paying 126:19

payments 45:13

pdf 57:16 145:3 146:5

penalty 205:1,3

people 12:24 34:22 109:16 120:16 124:17 124:18 125:4 127:19,25 140:2,9 197:8 198:15 199:25 202:5

perceived 19:18 140:2 141:9

percent 37:17 88:7

perception 20:6

perfect 53:13 55:7

performed 46:20,21 196:14

period 13:24 52:7 53:3 54:17 55:8 61:7 62:23 63:5,6 64:3 67:25 119:19 196:20 197:2

periodically 42:25 61:18

perjury 205:1,4

permissible 99:15

person 15:12 24:7 52:18 55:6 74:7 121:22 122:14 177:8 197:9,11 200:14

personal 157:19

personally 31:15 33:25

129:14 173:13

perspective 20:11 100:20 101:6 105:12 113:19 121:11 150:3

persuade 106:16

persuaded 133:17 158:8

persuasive 128:10 129:2

petition 123:9 123:14 124:23 175:2,5,7,12,14 175:17,20,22

phase 21:19 37:14,18 46:7 46:10,16,20,23 49:3 55:25 123:10 124:18 175:15

phd 120:9

phenomenon 47:19

phone 24:6 35:22 129:20 143:14

phonetic 174:10

photographed 133:20

photographic 160:23 161:3

phrase 152:7
physician 11:12
picking 132:19
picks 183:17
picture 32:7
pictures 134:22
piller 66:12 75:24 89:13 105:4 142:1,5 198:10 199:22 200:22,22 201:25
pitt 1:7 2:7 9:16 123:9,19 123:20 124:10
place 8:12 38:22 206:9
placebo 50:19 50:25 51:7,19 52:1,7 53:2,6 54:18 58:21 60:15 61:3 179:18,25 180:9 196:5,22
plains 3:15
plaintiff 1:5 2:5 3:7 8:15 171:4
plaintiff's 26:3 39:4 43:21 48:8 64:9 70:14 81:15,16 86:13 91:5 95:22 98:15,22

106:20 110:2 112:21 113:4 114:20 116:25 119:5 121:7 122:19 125:25 134:5 144:17 161:20 167:20 168:9 169:21 176:9 180:13 184:16 191:10 199:14 201:8
plaintiffs 1:8 2:8,18 3:2 9:5 9:15 44:11 57:10 81:9,9 162:24 171:2,3 171:5 175:3,6 175:10 198:14
plaintiffs021... 5:13
plan 178:10
plane 101:18 145:9
plans 172:24
plasma 188:1
plausible 52:8 146:1 173:25 176:5
playing 77:16
please 8:6,24 9:18 10:8 39:7 43:19 49:17 81:7 87:9 91:21 113:19

121:12 123:7 125:23 170:19
pllc 3:14 9:12
point 15:10 23:22 31:20 55:6 61:15 63:16,16 67:3 70:5 79:1 80:8 88:2 93:23 109:21 110:1 111:8,13,18 122:2 128:17 133:10 155:10 186:5
pointed 66:14 148:13
pointing 73:20 121:22
points 64:1
policy 167:2,4 167:7,9
popular 63:2 64:5
populate 181:13
position 125:5 129:15 139:5 159:19
positions 123:11 165:5
positive 46:22 90:3 192:16
possessed 28:2

possibility 20:22 104:10 131:19 132:6
possible 42:15 42:17 50:19 145:17 202:3
post 14:25 117:14 118:22
posted 6:16 117:7
poster 117:15 162:6 164:11
posters 163:21
postmortem 173:8,11,17,24
potential 20:2 20:5,13,21 21:15 22:4,5 23:2 54:24 84:2 89:17 90:23 141:9 166:16 168:17 176:3
potentially 69:5 95:11 159:23 163:20 166:15 174:22
poured 161:3
powerpoint 190:16
practice 11:13 99:24 100:15
prebys 116:5

**preclinical** 15:24 46:13 173:7

**preclude** 178:19 179:6

**precluded** 178:24

**precursor** 13:21

**predates** 72:5 201:24

**preliminary** 21:11

**preparation** 105:11 133:22

**prepared** 111:14 133:20 168:8

**presence** 27:14 61:5

**present** 3:24

**presentation** 19:23 190:16

**presented** 28:15 162:6 163:21,21 164:11,18 167:3

**presenting** 90:1 132:7,14

**preserved** 81:12

**press** 49:17 150:22,23

151:10 156:11 193:7

**presumably** 57:6

**pretty** 198:11

**prevention** 12:21 62:3,15 72:12

**previously** 137:8 165:5 173:18,24 190:9

**price** 123:13 139:20 141:21 142:8

**primarily** 35:19 150:14 176:25

**principal** 117:19 118:9

**prior** 15:9 34:20 72:25 73:13 99:8 104:20 174:6

**privilege** 45:9

**probably** 20:16 146:15 178:3 180:12 203:8

**problem** 58:23 58:23 74:20,21 92:7 139:4 145:10 196:24

**procedures** 62:24 105:10

133:19

**proceed** 9:20

**proceeded** 61:11

**proceeding** 8:24

**proceedings** 206:10,13

**process** 22:19 22:20 23:2 25:20 37:1 62:16 63:1,8 63:25 64:2 68:11 86:12 160:25 161:5 161:14 166:17

**processed** 145:3

**processes** 68:15 68:15

**processing** 52:2

**processors** 190:22

**procter** 3:8

**produced** 44:10 71:5 78:4 81:24 86:22 132:16 138:11 144:19 145:6

**producing** 85:25

**product** 41:19 51:19

**production** 160:23

**professional** 12:16 88:5

**professor** 15:21 27:21 88:5 89:9 105:19

**profit** 88:7,9,22

**program** 11:17 22:1,4

**progress** 36:24 196:18

**progresses** 51:24

**progression** 51:21,23,25 54:8,11,13 55:9,12 59:22 61:7 196:13,20 197:3,5

**prominent** 72:19

**prone** 160:25

**proof** 159:16 160:10 161:13

**properties** 54:21

**proposal** 22:11

**proposals** 45:21

**proposed** 145:21 146:21 148:3,12 168:7 174:4,7

| | | | q |
|---|---|---|---|
| **proposing** 176:5 | 28:25 29:3 35:7,19 63:23 65:18 67:19,22 68:2,6,20 72:12 100:15 145:13 167:6 186:12 192:8 193:3 | 166:11,24 169:24 193:25 199:22 | **quality** 8:7,8 |

**proposing**
176:5
**prove** 94:2,10
95:9
**proved** 141:19
187:3
**proven** 193:19
**provide** 11:11
28:1 29:18
89:6 93:16
113:18 121:11
127:23 187:8
190:25
**provided** 104:3
111:23 127:17
131:4 143:2
190:3
**provides**
107:15 131:8
131:21
**providing** 86:7
115:11 196:16
**proving** 141:16
**pti** 5:14 7:5
20:10,19 41:5
54:10 64:19
**public** 8:22
66:10 73:5
109:9 117:15
157:7 164:4,16
165:16 166:5
192:7
**publication**
21:16 24:25

28:25 29:3
35:7,19 63:23
65:18 67:19,22
68:2,6,20
72:12 100:15
145:13 167:6
186:12 192:8
193:3
**publications**
19:22 66:9
71:21 186:16
192:9
**publicity** 193:1
**publicize**
150:18 151:4
**publicized**
193:15
**publish** 62:18
63:18 66:24
145:17 148:20
162:7 167:15
169:10 171:11
171:15
**published**
18:15,16 21:13
28:14 29:11,17
30:14 46:11
63:22 64:6
65:1,4,21 66:8
66:21 72:3
73:21 75:23
90:18 111:3,8
120:8 131:9,23
141:1 149:20

166:11,24
169:24 193:25
199:22
**publisher**
62:12 66:2
83:5 110:14
112:12,13
129:15 138:18
157:22 158:11
158:19 159:1,9
159:18,20
189:14,19
190:2 191:1
**publisher's**
62:21 190:24
**publishers**
157:17
**publishing**
158:22 169:20
**pull** 100:12,17
121:7 184:19
**pulled** 17:25
87:2
**pulling** 176:10
**purported**
28:16
**purpose** 45:7
**pursuit** 192:12
**put** 17:10 171:1
181:14 203:8
**puts** 93:17

**q**
**quality** 8:7,8
**query** 136:4
**question** 12:20
13:1 17:6 21:2
25:4 29:4 32:5
32:18 36:15
49:11 50:18
51:6,8,13 55:4
58:17 59:15,25
60:4,19 63:19
66:10 67:5
74:13 80:16
85:20 86:6
88:3 89:22
109:1 122:15
124:15 131:25
134:16 138:22
139:11 159:15
159:24 160:21
171:8 178:4,21
179:2,17 186:7
187:5 192:20
**questionable**
32:17
**questioned**
61:9
**questioning**
142:2 170:6
196:3 202:13
**questions** 17:10
32:22,23 84:22
84:23 159:4

**[questions - recall]**

171:7 193:13 195:16 197:21 199:10 202:17 202:19

**quick** 64:2 67:25 68:3

**quickly** 68:9 102:24 191:9 196:19 201:18

**quite** 16:22 62:24 64:2,4 70:20 74:15 126:17 195:22

**quote** 107:24 108:8 121:2

**quoted** 150:24 200:14

**quotes** 93:17 107:15

**quoting** 60:25

**r**

**raise** 84:22

**raised** 29:16 76:5 78:15 80:19 84:25 120:16 201:5 202:4

**raising** 20:5 72:2 73:10,17 73:18 76:16 80:16 140:9 141:18

**randomized** 5:12 57:19

**range** 15:17

**rapid** 68:5

**rather** 74:21

**rationale** 84:23 88:25

**raw** 29:19 131:8,22 159:10

**ray** 92:8

**reach** 64:3 185:11 194:24

**reached** 107:20 111:17 156:18

**reaching** 165:24 166:18 172:24

**reaction** 25:1 74:1,5

**read** 66:5 67:3 118:5 168:10 174:5 196:7 201:3 205:4

**readily** 161:6

**reading** 30:17 30:21 60:20 118:25 133:2 136:12 169:17

**reads** 117:14 119:14 120:7,7 147:1

**real** 93:18 133:13

**reality** 197:1

**really** 13:22 24:21 92:7 99:15 109:3 119:1 164:13 169:9 177:10 177:25 178:2 179:3 199:5

**reanalysis** 47:8 49:3 56:23 58:21,22

**reanalyzed** 47:19

**reason** 11:5 49:11 74:11,12 77:9 86:5 100:5,24 105:1 130:16 140:23 157:11 165:24 166:12 169:19 174:7 193:20

**reasonable** 59:8 112:10 150:2 160:9

**reasonably** 141:5

**reasons** 34:25 164:14

**rebranded** 17:2

**recall** 14:7,17 14:19,22 15:12 16:6,16,19 17:4,7,14,21,23 18:2,19,25

19:3,4,7 20:19 21:10,24 22:9 24:12 25:1 32:4 33:1,6,8 38:22 42:13 43:4 45:13,16 45:17 46:2,6,8 46:15,17,19 47:7,23,25 48:3,5,6 51:10 57:5,23 61:13 61:20 69:6 78:25 83:17 97:3,5,13 106:5,7,8,9,10 106:13,15,18 109:7,8,12,13 109:15,21,24 113:13,15 120:20 123:18 124:7,8 128:2 129:19,21 130:16,18 133:1,2 135:3 139:10 144:23 150:20 151:11 165:24 167:17 168:23 169:1,2 169:2,10,25 170:1 175:19 177:24,25 178:6,8,9,12,17 178:22 179:2 179:19,20,21

180:2,20 186:1
189:16,19,24
191:12 198:4,7
198:13,15,17
198:19 199:1,5

**recalling** 120:2
121:20 200:9

**receive** 127:10

**received** 17:15
40:24 67:18,23
71:5 107:12
111:10 127:7
131:3 179:4
180:8 198:8

**receiving** 68:19
74:2

**recent** 14:15
72:12 139:18

**recently** 14:10
63:2 174:5
193:2

**reception** 68:18

**recess** 43:15
81:3 125:19
170:14

**recognize**
35:25 40:8,14
40:23 41:2
44:4,5 48:16
64:16,25 71:4
71:13 78:3
81:22 86:21
126:6 134:10
134:17 145:5

**recollection**
17:17 18:5
24:7 35:19
38:24 39:1
41:1 42:8,11
46:12 47:4,15
48:1 61:18,24
71:19,22 72:1
72:4 74:6,9
75:24 103:23
151:19 164:1
165:20 198:8
198:10

**recommend**
111:25

**recommendat...**
63:13 157:25
158:1,25 159:4
159:7,11

**recommended**
128:9 129:1
168:15 180:12

**recommending**
112:13

**record** 8:5,13
9:2 10:8 27:10
43:12,17 80:25
81:5,9 125:15
125:17,21
170:5,9,10,17
171:1 184:8
202:24 203:2
206:12

**recorded** 8:11
8:13

**recording** 8:8
8:11

**records** 18:14

**recover** 145:15

**rectangle** 73:23
132:20

**rectangular**
72:20 131:18

**redactions** 7:12

**redo** 46:22
56:23

**reduces** 5:14
7:5 64:19

**refer** 62:22
63:7 160:13

**reference** 41:9
50:3 72:14,15
73:6 82:9,17
136:10 147:6
147:10 148:9
148:12 154:18
190:8 199:21

**referencing**
65:16,17 139:9

**referred** 62:2
68:24 69:13
78:22 96:24
109:20 200:15

**referring** 47:5
60:6,12,22,24
82:18 84:13,14
96:20 114:3

126:23 128:15
152:9 175:16
175:17 196:12
200:5

**refers** 40:18
110:20 130:23

**reflect** 196:12

**reflecting**
197:1

**refresh** 26:6
39:13,14 42:8
169:15

**refuting** 147:3
191:18

**regard** 23:20
33:13 35:15
102:8

**regarding**
58:18 96:12
123:8 149:19
194:22 195:4

**regret** 25:13
37:1

**regretful** 25:7

**regrettable**
153:10

**regretted** 25:21

**regularly** 77:3

**reisbaum** 3:3
9:4

**reject** 63:10,15
63:18

**rejecting**
193:19

**[related - research]** Page 47

| related 8:22 | remain 143:6 | repeat 156:21 | 190:4 200:21 |
|---|---|---|---|
| 23:5 24:11 | **remaining** | 156:21 157:5 | **representative** |
| 28:14 29:12 | 170:3 202:19 | **repeated** | 112:12 186:5 |
| 69:16 72:24 | **remains** 94:22 | 153:15 154:20 | 186:13,15,23 |
| 75:3 119:17 | **remember** | **repeatedly** | **representatives** |
| 120:4 139:12 | 13:19,22 14:24 | 109:22 120:15 | 138:17 |
| 165:5 173:12 | 15:10,11,19 | 154:11,14 | **represented** |
| **relation** 37:13 | 16:11 21:23 | 155:3,6 165:18 | 27:9 |
| **relationship** | 22:13,17 23:1 | **repeating** 47:4 | **representing** |
| 13:23 19:24 | 24:5 29:2 | 153:14,19 | 19:6 |
| 45:17 72:25 | 38:25 39:3 | 154:25 | **reputation** 84:3 |
| 90:2 115:19 | 42:17 47:11,17 | **repeats** 137:7 | **reputational** |
| **relationships** | 49:9,12 57:8 | **replication** | 84:8 |
| 13:13,15 19:20 | 67:12,15 74:4 | 162:13 | **request** 14:18 |
| 73:14 90:6,8 | 74:5 75:10 | **replies** 50:16 | 63:15 112:4 |
| 120:4 125:6,8 | 78:24 83:8,10 | **report** 131:3 | 150:17 178:22 |
| **relative** 27:13 | 86:25 97:11 | 132:22 133:3 | 182:9,20 |
| 27:15 | 106:12 111:15 | 134:23 141:24 | 183:19 189:8 |
| **relatively** 14:10 | 111:18 114:4,5 | **reported** 1:22 | **requested** |
| 68:7 | 128:4 136:11 | 133:21 206:10 | 29:18 78:18 |
| **release** 49:17 | 143:16 145:25 | **reporter** 9:18 | **requests** |
| 150:22,23 | 151:5,6 163:25 | 9:21 10:1 | 197:22 |
| **releases** 151:10 | 164:24 169:8,9 | 203:7 206:4 | **require** 148:24 |
| **relevant** 28:2 | 169:17 177:10 | **reporter's** | **required** |
| 87:1 124:24 | 178:2 182:23 | 206:1 | 100:18 |
| 125:1 | 189:22 198:22 | **reporting** | **research** 10:24 |
| **reliability** | **remi** 1:10 2:10 | 193:5 | 11:14 12:7,9 |
| 163:7 | 3:13 9:12 13:5 | **reports** 50:14 | 13:14 25:16 |
| **reliable** 53:17 | 14:6 44:21 | 50:17 151:17 | 27:2,8,10,21 |
| 53:19,24 93:4 | 64:22 149:8 | **reprehensible** | 28:17 33:11 |
| 94:10 | 150:21 | 38:12 | 57:17,24 58:24 |
| **relying** 59:9 | **remotely** 8:19 | **represent** 9:12 | 62:14 71:1 |
| 126:25 | **remove** 139:20 | 37:16 51:9 | 72:5,11 73:9 |
| | 168:15 | 117:1 170:24 | 74:2 76:24 |

**[research - reviewing]** Page 48

78:14 86:8 87:22 88:13 111:24 112:7 120:16 124:24 126:12,24 131:2 137:9 140:3 141:18 141:20 142:7 153:24 154:11 155:4,11 157:3 157:8 160:15 160:18 161:17 167:3,10 168:13 192:17 192:22,25 193:11 200:1 201:4,17

**researcher** 116:5 192:14

**researchers** 177:12

**reserve** 23:25 170:2

**resolution** 138:19

**respect** 173:5

**respected** 50:11

**respond** 22:24 50:13 51:4 79:12 85:6 88:16 103:4 112:17 127:14 139:15 166:6

**responding** 53:4 60:3 169:21 172:22 181:24 189:8 201:19

**responds** 79:21 83:19 85:9 91:24 129:9 136:2 153:3 182:2,9 185:21

**response** 14:18 22:25 25:4 29:20 34:20,23 44:11 59:2 87:10 135:23 136:3 138:12 141:13 157:12 166:1,14,16,24 167:16 168:8 168:14 179:24 182:5,20 183:25 185:18 185:25 186:20 190:24 197:18 197:20

**responsible** 68:23

**result** 123:13 193:8,12,14

**results** 14:14 27:7,9 46:21 46:23 47:5,10 47:13,21 52:21 53:17,19,24

55:10,25 56:18 56:22 61:18,20 93:20 131:5 160:24 161:4 180:23 181:3

**retained** 203:5

**retract** 35:22 100:5,25 101:4 127:11 128:19 140:19 148:24 191:22 198:16

**retracted** 158:16,22 159:22

**retracting** 95:12 101:24

**retraction** 100:18 101:10 102:6 128:9 129:1 131:10 131:24 138:20 138:21 157:18 158:8,20 197:22 198:24

**reveal** 137:20 197:13

**review** 18:10 22:19,21 30:15 40:22 46:8 48:15 49:1 56:10 58:1 59:7 63:8,10 63:11,12,13,24 64:2 67:1

68:11,16 78:6 78:19 82:25 83:4 85:14,22 86:7,11 96:13 96:24 99:6 103:5,12,25 104:24 107:4 111:2 115:4,11 115:15 118:20 133:5,18 134:24 137:15 138:14 143:2 147:7 148:13 149:17 151:5 163:19 173:5 174:6 175:2 188:15,16 191:6,6 200:21

**reviewed** 21:5 21:8 26:24 30:8 35:23 68:1 82:19 111:10 146:16 163:22 177:24 178:2

**reviewer** 148:4

**reviewers** 63:11 82:12,17 83:14 96:25

**reviewing** 23:12 45:23 47:13 55:22 57:23 62:17 66:22 69:22

| | | | |
|---|---|---|---|
| 82:21 97:3 113:13 115:23 137:23 153:4 163:13 | 118:11 120:17 120:21 121:3 121:18 122:9 122:10 125:9 128:19 129:3 131:21 132:8 132:15 134:2 136:17 137:22 138:12 140:10 141:12 143:19 145:24 146:9 147:16,21 148:19 150:11 151:13,22 152:15,21 153:17 154:13 154:18,21,25 155:5,25 156:7 156:19 157:4 157:20 158:1,4 158:13,25 159:12 160:15 162:24 165:6,9 165:14 170:2 176:21 177:1 179:10,11 181:17,19 182:11 183:8 183:12 184:1 185:13,16,19 185:22 186:25 187:6,9,19 191:19 192:1 193:23 194:8 | 194:19 196:14 200:19 201:2 202:1 | 100:8 160:13 |
| **reviews** 83:1 152:15 | | **rightmost** 73:23 | **road** 10:16 |
| **revisions** 63:15 146:22 | | **rights** 23:25 | **robert** 70:25 76:19 81:23 91:12 201:12 |
| **revisit** 151:16 | | **rigor** 162:13 | **role** 10:25 12:12,15 13:9 28:23 62:9,10 62:12 73:13 77:16 79:6 86:11 163:13 |
| **rick** 14:10 | | **rigorous** 68:12 | |
| **right** 12:1,4 13:3 21:20 31:21 34:8 41:10 42:22 44:12 45:25 46:4,11 48:20 53:3,9,19 56:24 64:7,20 65:6,24 67:14 67:23 69:6,17 70:8,11 72:16 78:2 79:22 83:12 87:4,19 87:23 88:14 90:9 92:21 93:7,9 95:17 95:20 97:1,17 102:13,16,20 103:2,10 104:15 105:20 109:4 110:11 110:15 112:5 112:14 114:9 114:13 116:12 | | **rim** 10:15 | |
| | | **ring** 97:10 | **roles** 12:16 163:18 |
| | | **risk** 166:15 | **roughly** 30:3 62:8 63:21 |
| | | **rissman** 5:17 5:19,21 6:5 70:25 74:13,16 74:16,23 76:19 77:10,16 79:18 79:21 80:3,8 81:23 85:7,9 85:18 86:6,19 91:12,20,24 92:14 93:1,15 94:23 96:4 99:9,13,21 100:21,22 102:2,10,15 103:5,24 104:2 104:6 128:16 133:10 148:9 152:14 158:3 159:8,15 160:21 161:1,4 201:12 | **routine** 45:8 |
| | | | **routinely** 144:3 |
| | | | **rpr** 1:23 2:20 206:22 |
| | | | **rule** 52:13 196:5 |
| | | | **run** 58:20 60:1 79:23 85:12 93:6 190:22 |
| | | | **runs** 79:24 80:7 |
| | | | **s** |
| | | **rissman's** 83:2 92:19 94:11,17 | **s** 4:9 5:3 6:3 7:3 26:6 176:25 |
| | | | **sample** 53:13 58:18 |
| | | | **samples** 54:20 58:19 59:25 60:3,16 190:5 |

**[san - second]** Page 50

**san** 10:11,16 39:2 42:16,19
**sandrine** 139:2 143:1
**sanford** 116:5
**satisfied** 111:3 111:7 112:18
**saturday** 185:15
**sava** 117:21 118:16
**saw** 57:6 118:10 168:24 202:12
**saying** 51:12,20 52:8,22 53:10 53:15 60:6 61:2,9 62:23 75:13,25 80:4 80:5,15,17,19 85:21,24 93:2 99:21,22 112:17 133:3 142:1 154:6 159:17 166:12 182:25 183:20 186:23 201:19
**says** 27:6 39:17 40:16 45:1 60:21 65:24 67:18 73:3 93:15 95:3,10 95:14 100:1 107:11,20,23

112:15 114:7 118:8 119:22 131:21 132:10 168:13,25 172:23 173:4 186:3 187:2 189:7 191:16 202:10
**scale** 52:19
**scampbell** 3:21
**scheme** 26:20 28:4
**school** 10:18
**schrag** 71:10 71:18,24 72:6 72:10,19 73:10 74:3,8 75:3 76:3 78:15 198:12 200:14 201:25
**schrag's** 75:21
**science** 7:19 21:1 66:11 67:2,8 72:3,5 75:23 84:15 89:13 140:18 141:25 193:4 193:18 199:22 200:23 201:3 201:24 202:9 202:11
**sciences** 1:10 2:10 3:17 8:16 9:8 45:2

119:16 120:9 123:11 137:11 165:6 170:24
**scientific** 16:4,7 16:13,23 19:24 22:21 27:2,8 27:16,21,22 28:1,3,17 29:12,15 32:8 32:12 34:12,14 35:7 63:10,11 84:3 89:19,19 100:15 159:20 163:7 164:12 168:16,20 186:12 192:12 193:14
**scientifically** 174:8 197:17
**scientist** 15:23 25:10 33:10 34:21 50:8 73:4 74:17 77:6 83:3,6 97:21 103:18 103:22 106:3 155:17
**scientists** 33:18 36:22 66:18 68:6 71:20 76:1 83:24 124:23 144:3 163:23 200:11 201:20 202:10

202:11,12
**scope** 168:19
**scott** 3:19 9:6 39:15 170:23 181:13 184:8
**screen** 8:10 26:7 39:24 40:2 56:8 57:14 86:18 146:3
**scroll** 26:15 27:6 28:12 44:17 58:3,7 87:15 88:1 91:15 96:8 110:18 114:1 120:3 123:22 126:10 130:10 135:20 142:15 146:9 149:12 162:11 168:5 188:11 190:15
**scrolling** 56:20
**search** 18:14 44:13 200:22
**searching** 145:14
**sec** 37:13,17 38:14 151:18
**second** 32:18 42:15 47:20 58:11 60:8,16 60:25 83:6,22 87:8 97:6,6

110:19 115:7
116:2 117:20
118:7 125:14
139:15 146:25
163:11 186:3
188:11 200:18
**section** 58:2
168:16
**securities** 19:9
72:24 75:4
115:22
**see** 26:10,18,21
27:4,17,23
28:5,18 29:22
39:13,14,15,19
39:25 40:2,2,5
40:20 41:7,14
41:21,25 42:5
42:10 44:2,3,5
44:8,21,24
45:5 48:13,14
48:23 49:17,19
49:20,22 50:1
50:14,20 51:1
52:4,14,18
56:12 57:3,20
58:4,25 59:4
61:6 64:13,15
64:23 65:12,25
67:20 70:18
71:2,10 73:7
73:18 74:11,12
78:8,15,20
79:14,19 80:1

82:4,7,15 84:4
84:10 85:7,16
87:9,12,16
88:1,10 89:23
91:13,18 92:11
95:12 96:5,9
96:17,19,21
97:7 99:2,11
99:18 100:6
101:1,2 103:7
103:11,19
106:24 107:1,7
107:13,22
108:1,8,18
110:9,21,24
111:5 112:2
113:11,24
115:1,5,8,13,21
115:25 116:7
116:19 117:11
117:24 118:6
118:21 119:1
119:11,23
120:5,10
121:14,15
123:2,7,16,23
124:2 126:10
126:15,21
127:15,21
128:12 129:3
129:11,17
130:7,24
131:11 132:3
134:15 135:9

135:17,23,25
136:7 137:5,12
137:14,17
138:8 139:6,23
141:16,19
142:6,19,20,23
143:9 146:6,9
146:10,13
147:4,8 148:6
148:15 149:10
149:14,21
153:7,12
154:24 162:3,9
162:17 165:3
168:1,5,21
169:7 171:10
171:16 172:6
172:11,13,19
173:1,9 176:17
181:20 182:3
182:13,15,18
183:7,15,18,23
184:5,8 185:5
185:8,24 186:8
187:22 188:4
188:12 189:2,5
189:10 190:6
190:16,18
194:12 200:16
200:25 201:11
201:14,22
**seeing** 36:23
39:10,21 50:19
53:5,11 65:19

157:7 169:1
171:19,23
179:17 189:23
**seek** 166:1
**seem** 16:6
84:23 114:4
**seems** 82:20
88:25 101:3
139:19
**seen** 8:9 26:12
31:15 119:25
120:14 127:24
149:25 155:18
155:20 192:9
**select** 186:13
186:15
**self** 160:23
**seller** 90:8,13
**sellers** 66:16
71:20 75:15,21
76:2 84:17,19
97:9 105:4
109:16 123:12
124:11 140:23
141:10,17
142:3 154:1,12
154:18 155:11
157:4 193:6
199:25 200:12
200:19 201:3
202:1,4,14
**selling** 19:9
64:1 139:13

**[send - show]** Page 52

send 50:24
  61:11 63:9,13
  87:4 135:22
  146:17 150:4
  150:12 183:20
sending 69:21
  86:25 119:22
  123:18 124:10
  131:5 144:23
sends 71:12
  85:15 87:11
  96:8 107:10
senior 106:3
sense 15:17
  25:9 36:5
  51:20 85:1
  104:25 139:25
  148:23 166:6
  167:13 179:4
  186:20 191:25
sent 18:13,17
  29:20 44:14
  48:19 60:7
  63:10 69:9
  71:5 81:23
  86:24 87:2
  91:17 92:1
  96:4 123:7
  149:8 177:4,11
  177:15,21
  178:7,18
  180:18 182:14
  182:20 183:18
  184:1 190:9

198:6,7
sentence 29:14
  60:25 92:4
  103:10 115:10
  116:2 118:7,8
  129:4 146:25
  191:14
sentences 196:7
separate 42:16
september 30:5
  58:14 59:3
  71:2,9 76:5
  117:10
sequence
  140:17
serdi 65:24
serious 28:7
  35:7 36:10
seriously 84:1
serve 62:12
served 62:5
services 179:6
serving 16:22
  69:19
set 56:2 98:14
  112:20 120:12
  201:7 202:25
  206:9
sets 81:12
setting 174:1
seven 22:12
several 62:9,13
  125:3 128:3

shape 131:18
shapes 132:19
  133:7
share 13:11,17
  19:19 26:6,7
  26:10 39:11,24
  49:16 51:11
  132:24 145:3
  146:3 163:17
  164:20 171:15
shared 77:19
  134:11 143:24
  145:15 157:17
  157:23 165:18
  166:23
shareholder
  20:1 90:9,13
  98:2 108:15
  120:21 137:22
  143:19 144:1,8
  144:13,14
  147:15,18
shareholders
  155:3
shareholdings
  115:22
sharing 167:5
  176:24 178:1
  188:6
sharpie 92:9
shed 105:25
sheets 119:16
shift 13:3

shifting 34:6
short 51:25
  53:18,24 54:4
  54:7 55:14
  61:7 64:4
  66:15 71:20
  75:14,21 76:1
  84:17,19 90:8
  90:13 97:9
  105:4 109:15
  123:11,12
  124:11 139:12
  140:23 141:10
  141:17 142:3
  153:25 154:12
  154:18 155:11
  157:3 165:5
  193:6 197:2
  199:25 200:12
  200:19 201:3
  201:25 202:4
  202:14
shorted 124:23
shorthand
  206:3
shorting
  127:19,25
  137:10
shorts 97:7
show 54:8 55:9
  92:6 127:24
  146:3 196:17
  199:10

showed 46:20 46:22 55:25 61:3 69:13 197:4
showing 37:4 39:20 130:1 146:4 167:18 169:22
shown 61:21
sic 83:9
side 19:23 79:22 152:19 164:3,4,15,17 166:6
sideline 171:8
sides 164:18
sign 92:20
signature 44:18 206:21
signed 44:20,20 115:7
significant 52:6 52:18 53:5 108:11 156:5 196:17
silicon 6:16 117:2,8 118:22
similar 18:23 23:18,19 29:3 30:13 34:25 36:8 119:2 121:21 122:2 165:13 192:9

similarities 118:21
similarity 119:1
simply 63:10 67:7 74:14 164:5,7
simufilam 5:11 20:10,19 21:1 21:6,19 23:6 24:11 30:2 41:10 45:24 46:3,7 55:18 57:18 64:7 65:1,4 69:15 69:21 82:10 87:23 88:14 115:12 120:17 128:19 130:23 131:15 163:8 173:23 174:13 174:22 175:24 200:2
simufilam's 37:14 174:3
single 186:6 197:4,8,9,9,11 197:11 199:1
site 133:20
sitting 32:25 61:23 118:21 135:2
situation 35:18 108:25 167:1

167:11 197:25
six 67:22
sizes 180:7
sjfinkpllc.com 3:16
slightly 19:4
slow 102:24
slowing 62:14
slowly 84:7
small 21:11 53:13,16 55:7 70:20 122:2 177:5 180:7
sn 111:24 112:7 112:9
snrig 131:6
software 83:4 83:14 103:25 104:2,6 131:3 131:14,16,21 132:16,19,22 132:25 134:10 134:17,24 135:22 148:13 152:14 158:11 158:15 159:21
solicit 166:24 167:16
soliciting 166:18
solutions 203:6
somewhat 30:20

sorry 24:13 38:20 58:10 76:22 78:10 80:14 82:5 97:11 101:17 102:23 103:9 108:3,5 134:13 135:12 142:18 142:23 145:9
sort 11:11 21:19 25:1,15 32:6 43:4 51:5 53:2 76:15 77:4 86:5 105:18 108:25 109:9 111:14 130:13,17 140:8 151:3 153:14 166:2 171:7 179:1 180:4 181:15 183:17 199:24
sorts 180:5
sound 21:19 28:20 29:24 37:21 46:4,11 46:23 52:8 83:11 85:10,19 85:24 118:1,3 201:2
sounds 19:3 30:5 49:11 83:12 112:10 145:24 177:25

**[source - statement]**                                                                Page 54

| | | | |
|---|---|---|---|
| **source** 88:4 89:8,12 104:13 202:4 | 48:6 49:9,12 55:15 169:9 | 108:15,20 114:5,11,19 | 119:6 122:20 126:1 129:24 |
| **sources** 96:23 103:24 104:2,5 104:9 | **specify** 61:12 | 115:8,10,20 116:11,14 118:3,22 120:9 | 134:6 135:6 136:23 138:2 144:18 149:2 |
| **southern** 1:2 2:2 8:17 10:20 76:25 | **specimens** 51:17 52:3,9 53:14 60:11 105:11 196:16 | 120:21 121:1,2 121:17,18 122:4 133:18 | 161:21 172:13 **stand** 112:9 |
| **space** 73:4 | **spliced** 79:23 95:16 | 134:1 136:10 136:13,16 | **standard** 68:11 101:3,10,24 |
| **speak** 25:17 34:22 | **splicing** 92:18 92:20 99:22 | 137:3,7,14,20 143:1 144:6,7 | 118:13 203:9 **standards** |
| **speaking** 24:17 106:7 189:24 | 104:11 131:19 133:8 152:7 | 147:12,15,20 152:21 153:15 | 100:15 158:22 **standing** |
| **specific** 32:9 33:1,6,8 34:11 | **spoke** 18:22 45:14 97:17 | 153:23 154:20 165:12,18,19 | 203:10 **start** 34:13 |
| 35:11 37:12 42:8 46:18 | 143:1 191:14 | **spruck's** 116:2 118:10 125:8 | 73:15 74:10 78:7 138:23 |
| 47:23 48:3 61:24 138:22 | **spoken** 14:9 25:10 | 133:25 165:13 | **started** 30:4 62:9 176:19 |
| 150:24 167:8 198:4 200:9 | **sponsor** 108:23 115:16 | **square** 57:17 **st** 3:15 | **starting** 169:8 190:15 |
| 202:9 | **sponsors** 45:20 | **staff** 62:21 63:6 | **starts** 75:25 |
| **specifically** 11:15 12:7 | **sprek** 83:9 | **stamp** 40:4,5 41:18 43:22 | 142:1 176:16 185:3 |
| 31:2,20 34:2 60:10 61:20 | **springer** 65:24 110:15 112:9 | 57:10 70:15 77:21 167:21 | **state** 8:25 9:1 10:8 14:13 |
| 151:7,9 158:16 164:24 | 123:1 130:7 131:2 135:22 168:13 189:14 | 172:1 **stamped** 39:5 | 81:8 123:8,24 196:13 206:4 |
| **specifics** 14:24 24:21 29:3 | **spruck** 6:15 7:9 83:11 96:21,23 | 48:9 56:4 64:10 81:17 | **stated** 195:2,3 **statement** |
| 34:14 35:14,23 38:8 42:18 | 97:14,17,20,24 98:5,6,10 | 86:14 91:6 95:23 98:16,22 | 73:13 100:9 109:10 116:23 |
| 47:11,17 48:5 | 103:24 104:14 104:21 107:21 107:25 108:9 | 106:21 110:3 112:22 114:21 | 121:24 122:13 132:10 139:11 |

139:21 140:1,8 140:24 141:3 148:18,20,25 149:23 150:17 151:4,9 164:13

**statements** 27:2,20 76:8 76:10 119:17 168:16

**states** 1:1 2:1 8:17 26:5 28:13 29:11 65:9

**stating** 95:7 161:5 202:7

**statistical** 196:24

**statistics** 58:18 58:20,23 60:1

**stenographic...** 206:10

**step** 21:25 163:11

**steps** 15:2

**steve** 9:11 16:18 98:20

**steven** 3:14,14 9:11 16:17

**steven.fink** 3:16

**stick** 141:5,14

**sticker** 184:9

**stipulation** 171:2

**stock** 19:21 90:13 118:18 123:11,13 124:24 127:19 128:1 137:10 139:13,20 140:16 141:21 142:8 165:6,13 165:17

**stockholder** 152:20

**stockholders** 119:18

**stop** 123:10 124:18 170:2 175:15

**stopped** 175:24

**story** 36:23,23 139:3

**strategy** 154:8

**street** 3:20 83:23 84:9,13 88:3,5,13 89:2 89:8 110:21 201:20 202:7

**strictly** 88:8,21

**strike** 75:19 94:7,19 104:3 104:25 109:2 141:18

**strong** 31:5,5,7 31:10 36:6 131:8,22 132:7 132:14 133:4

159:10

**strongly** 88:23 111:25 112:13 168:15

**struck** 122:2

**struggling** 50:18 179:16

**student** 117:9

**studies** 15:24 21:11 45:25 46:9 180:5

**study** 14:20 37:14 46:7,10 46:14 51:16 52:20 53:18,21 53:23,24 54:23 55:8 56:18 108:23 115:16 162:14 180:7 187:4

**study's** 37:18

**subgroup** 15:1

**subject** 29:25 30:19 40:17 48:22 56:14 71:1 83:2 115:4 162:2

**subjects** 53:16 187:4

**submission** 22:10 23:2 62:17 63:7 68:19 82:20

**submissions** 22:25 62:25 68:7 163:20

**submits** 62:20

**submitted** 26:25 27:22 29:6 63:22 66:23 69:2 163:22

**submitting** 31:3 35:6 45:21 172:25

**subpoena** 44:11 138:12

**subscribed** 206:15

**subsequent** 79:11

**subset** 37:18

**substance** 84:1

**substantial** 52:13 196:4

**substantive** 73:16 106:12 106:18

**subtract** 27:12

**suffering** 25:12 25:17

**sufficient** 102:5 196:15,15

**sufficiently** 152:2

**suggest** 20:22 65:20 95:6

104:10 118:14
127:24
**suggested**
37:19 76:9
140:24 158:17
158:19 177:8
**suggesting**
14:25 104:23
139:22 166:12
193:10
**suggestion**
183:6
**suggestions**
22:7
**suggestive**
101:21
**suggests** 54:13
111:17 131:18
196:21
**suite** 3:20
**summary** 11:11
93:13
**supervised**
36:3
**supervision**
30:15
**supplements**
123:15
**support** 22:23
28:17 30:17
36:13 89:7
129:14
**supported**
140:22 200:12

202:13
**supporting**
128:10 129:2
155:20 157:8
**supports** 22:4
**supposed**
120:20 139:4
**sure** 12:19,25
15:11 16:12,22
17:24,24 18:21
21:2 25:3 31:9
33:5,12,20
39:9 52:25
55:3 59:14
67:12 83:8,9
86:1,2,12
89:21 92:24
103:14,15
109:1 124:14
124:19 138:23
142:10 145:16
151:8 154:3
160:6 161:13
167:12 173:25
177:9 178:21
179:12 197:7
198:11,13,20
199:4
**surprised**
177:11,13,16
177:20,21
**surprising** 53:5
68:8 79:7
156:13

**surrounding**
72:20 105:10
**suspect** 14:24
21:9 24:6
36:25 157:11
169:18 178:1
**sutcliffe** 19:2
**swedish** 50:8
**switching** 43:9
109:7
**sworn** 9:25
206:7
**symbol** 118:18
**sympathetic**
34:16,24,25
35:8,10 105:3
155:10
**sympathies**
35:13 38:3
**sympathy**
25:16,24 34:17
35:1,4 36:7,11
36:19 37:2,7

**t**

**t** 4:9 5:3 6:3 7:3
**take** 8:12 13:7
24:15 37:6
38:4 40:22
43:10 48:15,25
56:10 58:1
59:7 63:21
78:6 80:22
85:22 99:6

107:4 118:20
129:10 135:2
137:19 138:14
149:19 155:25
156:1,19
159:12,18
162:22 168:11
169:14 170:7
176:8 180:13
184:14 191:9
200:4 203:11
203:12,13
**taken** 2:17 8:14
150:6 205:5
206:8,13
**talk** 13:10
19:20 32:8
45:8 58:20
62:1 105:1
167:14
**talked** 14:20
18:8 21:9
33:15 34:6,18
38:18 45:23
177:6 201:9
**talking** 14:13
15:10,12 31:19
31:20 51:16,19
59:14,18 74:7
82:21 160:10
163:13 178:11
197:14
**talks** 95:11

target 35:8
tau 188:1
team 15:8
  64:18 107:20
  126:25
technical 20:11
  20:16 32:16
  38:10 52:10
  54:19 61:10
  66:24 73:12
  92:25 171:14
  196:24
technique 94:9
techniques
  67:8 161:1
technology
  8:20
tell 60:10
  134:21,23
  144:1 171:14
telling 128:18
  131:14
ten 188:12
  194:17
tend 19:17
term 51:25
  55:14
terms 34:12
  35:24
test 29:13
  177:7 197:8,9
  197:9,11
testified 10:2
  42:25 102:15

195:6 197:18
197:20
testimony 11:6
  59:21 151:2
  198:19 199:20
  203:3 205:7
  206:9,12
testing 27:16
  58:18 173:11
  173:18 176:7
tests 173:19,20
texas 3:21
text 70:19
thank 9:17 10:6
  11:24 13:2
  14:4 98:20
  103:11 117:15
  153:4 170:5
  195:21 199:6
  202:16,20,22
  203:2
thanks 17:12
  58:23 139:16
theme 153:15
therapeutic
  10:23 20:14,21
  56:19 76:24
  162:13 176:3,6
  192:22
therapeutics
  11:18,23 13:10
  17:2,16 21:4
  22:5 40:17
  55:13 70:2

therapies 11:15
  13:17 34:21
therapy 126:13
  126:25
thickness 27:13
  27:15
thing 38:13
  85:10 167:10
things 27:10
  28:16 44:15
  190:2
think 13:15,21
  14:7,14 15:6,7
  18:4 21:7
  23:11,15,23
  24:5,14 25:23
  26:14 28:25
  30:3 31:12
  32:1,5,10,21
  33:16,24 34:2
  38:7 46:17
  51:12 53:1
  59:15,24,25
  61:8 62:8 63:5
  64:4 65:2
  67:12,13 72:7
  74:25 80:11,15
  80:17,19 83:1
  83:9 84:22
  85:20 86:3,10
  91:21 93:13,21
  93:23 98:9,12
  98:18 99:13,14
  99:16 100:2,3

100:10,17,20
100:23 101:6
101:24 103:5
103:12 121:5
122:5 125:3
127:4 133:5
138:13 139:2
139:21 142:21
143:21 144:2
146:12 148:23
152:4 154:22
158:18 159:3
159:24 160:11
161:11 163:2,9
163:14 166:22
168:24 179:9
179:15 181:15
181:25 184:8
186:20 194:2
198:11 199:11
200:7 202:8
203:8,10
thinking 15:7
  21:22 33:7
  111:16 154:7
  192:11 193:9,9
thinks 95:14
third 52:12
  83:4 92:4
  96:20 118:7
  173:3 196:4
thorough 147:6
  194:21

**[thought - trials]**  Page 58

thought  14:23 117:21 166:5 175:14 178:17 180:19

thousand 107:21 108:11 116:12 186:14

thread  4:11,13 4:15,16,18,19 5:6,8,18,20,22 6:5,7,8,10,11 6:13,20,21,23 7:8,11,13,17 74:10 138:15

three  79:5,5 83:1 96:9,23 96:25 103:24 162:23 185:21

thrilled  41:4

time  8:5,6,25 13:8,10 15:17 17:19 43:5,7 43:13,17 47:20 55:6 61:7,10 62:23 63:4,5 67:11,25 68:4 69:4 70:5 75:7 75:9 76:4 77:14 81:1,5 82:20 86:5 97:13 102:7 108:20 111:18 114:6,12 117:15 118:13

125:18,21 128:17 134:24 136:11 143:19 147:14 165:20 170:3,3,6,11,17 177:3 178:9 181:19 186:5 189:23 196:20 197:2,21,25 201:2 202:12 202:17 203:3 206:8,13

times  102:4 125:3 157:5 161:12 166:25 170:5 199:21

tissue  173:8,12 173:17,20,21 173:24

title  57:17 64:19 97:6

titled  41:18 44:7 162:13

today  10:7 11:6 23:19 24:23 33:1 34:7 49:17 61:23 62:2 104:20 118:21 135:2 143:1 149:25 172:4 199:21 200:6 201:9 202:17,21

today's  203:3

told  104:17 121:1 134:1 143:14,23

took  38:22 79:6 135:12 195:4

top  44:23 48:16 51:3 56:10 65:9,24 70:24 79:25 106:24 108:3 117:11 121:10 123:6 130:6 138:7 167:25 176:15 179:24 181:16 183:8 196:1 201:12

topic  14:11 15:2 46:10 49:2 61:13 116:23 163:14 200:23

total  203:4

totally  143:4,12 143:17 144:10 157:9

touched  89:15

touchon  67:13 69:5 71:16 110:8 123:2 138:24 139:8 139:16 140:7 187:18 189:1

towards  37:2

track  65:8 184:20

tracking 160:25 161:5

training  11:12

transactions 120:5

transcribed 206:11

transcript 23:23 205:4

transparency 89:23 91:3

transparent 36:17 90:5 125:5,7 163:12 165:9

treated  105:3

treatment 37:20 41:19 53:23 54:24

treatments 193:19

trial  5:12 11:22 14:14 15:3 22:11,11 45:24 47:2 49:7 51:10 57:19 124:18 140:20 175:15

trials  11:17,18 11:19 12:23 14:16 21:1,5

22:3,4,9 123:10 163:15 175:23 176:2,7 177:5 180:24 193:17,18

**tried** 161:12 184:20

**triplicate** 60:3

**trouble** 127:2 160:21 164:14 171:12 176:10 200:9

**true** 76:4 205:8 206:12

**truth** 192:12

**truthful** 27:16

**try** 55:4 89:22 102:24 125:16 181:6

**trying** 32:6 36:16 52:4 56:20 60:8,20 68:5 86:10 101:9 105:6,24 124:15,18 138:19 161:2 163:12 164:8 179:1,3

**turn** 131:9,22

**turnaround** 68:5

**turned** 68:8

**turns** 37:3

**twice** 58:19,20 60:1,1,2

**two** 21:7 32:15 33:2 46:15 47:9,14,20 55:24 60:5,11 71:12,13,15,16 79:22 81:12 83:13 85:11 96:11 97:4 103:17 104:1,5 104:9 119:19 186:7 196:7 199:11

**type** 11:9 47:19 69:24 180:8

**types** 31:13 47:1 55:13 127:9 133:12

**typewriting** 206:11

**typical** 42:11 108:23 164:12 186:17

**typically** 17:19 45:19 55:5 62:22 63:21 65:17 68:22 150:4 186:12

**u**

**uh** 26:22 115:24

**ultimate** 155:24 158:4

**ultimately** 18:16 22:20 24:6 63:17 157:24 158:21

**unaffiliated** 113:20 114:8 121:25

**unblinded** 37:20 178:7 179:3

**uncommon** 47:22 180:4

**unconvinced** 101:17

**uncropped** 29:19

**under** 26:19 30:15 41:23 45:3,11 120:4 182:15,25 205:1,3 206:11

**underlying** 21:1 163:8

**understand** 20:16 21:2 24:22 25:3 32:6 52:25 53:9 59:14 60:19,20 80:3 84:12 85:3,18 89:21 92:13,15 92:24 94:23

103:14 105:24 108:20 109:1 124:14 136:9 139:8 148:8 154:3 156:14 168:25 178:23 186:22 188:6 190:8

**understanding** 20:9 24:19 35:15 53:3 55:3 71:24,25 72:4 73:9,15 75:2,20 84:25 92:15,19 93:1 99:20 105:14 124:9 127:3 131:13 132:18 141:2 143:25 175:13 177:3 186:10

**understood** 20:2 24:1 25:14 54:16 74:18 76:14 122:10 154:17 164:22

**unfairly** 105:4

**unfortunate** 85:14

**unfrozen** 173:20

**unhappy** 36:8

**[unique - view]**

| | | | |
|---|---|---|---|
| **unique** 157:6 164:18 167:1 167:11,11 | 161:3 172:11 196:10 197:14 | **variable** 60:7 | **version** 40:4 57:17 145:2,4 |
| **unit** 8:13 43:14 43:18 81:2,6 125:18,22 170:12,18 | **used** 60:5,9 93:3 121:21 133:22 150:24 186:24 187:9 203:5 | **variance** 53:6 **various** 18:1 27:22 36:14 190:20 | 146:4,5 147:1 184:9,19 193:22 |
| **united** 1:1 2:1 8:16 26:4 | **useful** 21:4 | **vehemence** 155:21 191:25 | **versions** 191:1 **versus** 26:5 |
| **units** 203:5 | **using** 8:19 21:12 93:6 133:12 | **vehement** 156:10 157:7 192:15 | **vertical** 79:24 **video** 8:11,13 |
| **universities** 13:16 | **usually** 19:22 22:22,25 177:14 197:12 | **vellas** 5:23 67:13 69:5 71:15 78:10,13 78:17,25 79:3 82:3,5 83:19 87:9,9 91:17 96:8 99:2 103:18 110:9 123:2 130:7 135:17 138:8 140:7 145:20 145:21 146:10 146:21 148:3 148:11,12 163:17 166:9 182:1,6,20 183:11,19 185:3,11,18 187:18 188:25 | **videographer** 3:24 8:4,21 9:17 43:12,16 80:25 81:4 125:17,20 170:10,16 202:25 |
| **university** 10:20 12:4,19 28:3 59:10 76:25 | | | |
| | **v** | | **view** 13:9 30:21 30:22 31:6,6 37:7 38:9 53:18 59:8 75:6,7,9,11,12 76:3 80:9 84:25 89:17 90:16 91:1 92:16 94:12 95:7,8 100:10 100:14 101:20 101:22,23 106:19 109:17 122:16 132:5 132:22,25 140:12,15 141:3,11,23 156:15 157:21 |
| **unlawful** 168:17 | **v** 8:18 | | |
| **unmanipulated** 93:20 | **vague** 38:24 39:1 47:4,15 61:17 | | |
| **unpaid** 13:13 14:2 | **valentina** 110:8 111:2 139:1 142:25 | | |
| **untrue** 76:10 154:15 | **valid** 92:5 197:9,17 | | |
| **unusual** 48:7 140:20 166:2 | **validation** 60:15 | | |
| **unusually** 67:25 | **validity** 131:6 | | |
| **update** 56:14 | **value** 54:12 | | |
| **upfront** 85:2 | **variability** 52:3 52:13,18,22 54:25 55:5 58:21 196:5 197:13 | **vellas's** 147:1 **verify** 93:4 **veritext** 8:21 184:12 203:5 | |
| **upload** 145:1 | | | |
| **ups** 8:18 | | | |
| **use** 93:17 118:13 151:10 | | | |

157:23 164:1 164:16 173:22 176:4 192:14 194:21 195:11 195:13,14,15 199:25

**viewed** 34:20 90:6 106:3 141:5 154:4

**viewpoints** 164:9

**views** 18:23 19:19 91:25 129:14

**vigorous** 36:20

**violated** 169:5

**virtual** 8:19

**virtually** 8:7

**visible** 145:4 190:21

**visual** 107:22

**vogele** 3:9 9:14 9:15 158:14 203:12

**volume** 65:10 65:17,20

**volumes** 65:15

**voluminous** 68:15

**voluntary** 35:20 62:10 63:11

**vouch** 108:24

**vs** 1:9 2:9

**w**

**wall** 83:23 84:9 84:13 88:3,5 88:12 89:2,8 110:21 201:20 202:7

**wang** 15:21 16:1 24:15,20 25:10 26:5,5 26:19,23,24 27:7,21,25 28:13,15 29:1 29:11,17,18,21 30:10,23 31:20 32:9 33:17 35:1,12 37:2,5 57:22 64:22 66:9 88:5 89:9 93:3,16 94:2 105:19 107:1 107:12,16 111:24 150:13 177:22 187:25

**wang's** 25:22 27:21 29:20 105:10 106:2 133:23

**want** 25:3 36:15 58:2 89:16 99:8 117:21 121:7 130:10 168:10

171:1,8,25 172:1,1 176:8 179:12 191:9 195:23 199:10

**wanted** 72:10 105:1 150:25 164:20 189:14 189:19

**warrant** 102:5

**watcher** 117:15

**way** 30:9 36:23 58:8 65:16 84:20 89:17 91:2 92:7 93:4 93:4,18 94:10 94:10 101:19 106:16 116:3 117:18 118:8 133:13,14 151:8 156:14 159:14 169:15 175:9,21 176:2 176:3 179:1

**ways** 17:25 65:16

**we've** 33:15 34:18 43:9 72:16 74:7 82:10 106:13 107:6 109:19 120:14 131:17 161:11 163:14

**web** 62:21

**website** 117:1

**wednesday** 1:18 2:19 8:1,6

**week** 68:18

**weeks** 64:3

**weigh** 103:19

**went** 77:2 117:9 184:21

**western** 27:8 27:11 28:16 29:4,16,19,21 32:9 66:25 67:4,6 72:21 74:24 77:3,4,7 92:25 93:2 94:22 97:10,22 102:16,19 105:11,15 108:21 115:4 115:11 120:20 136:4 143:5 160:22 186:4 187:3 190:20

**whereof** 206:15

**whistleblower** 36:22

**white** 3:15

**wide** 58:21

**widely** 193:6 193:14

**william** 19:1

**windfall** 123:13

**wish** 45:2

**[wishes - yeah]**

| | | | |
|---|---|---|---|
| **wishes** 96:15 | 142:10 143:21 | 192:10 193:12 | **wrong** 23:11 |
| **withdraw** | 144:12 145:24 | **working** 17:23 | 38:25 77:13 |
| 197:24 | 147:24 150:8 | 34:21 | **wrote** 75:3 79:7 |
| **withheld** 73:5 | 152:4,24 | **works** 110:14 | 141:1 143:22 |
| **witness** 4:2 | 153:19 154:3 | **world** 12:25 | 143:22 145:16 |
| 8:10 9:19 17:7 | 155:15 156:21 | 22:8 69:25 | 151:20 196:2 |
| 17:12 20:5 | 158:6,15 159:3 | **worse** 25:23 | |
| 25:19 26:10 | 159:14 160:20 | **worth** 171:24 | **x** |
| 28:10 30:25 | 165:16 171:16 | 188:12 | **x** 4:1,9 5:1,3 |
| 31:9,23 32:15 | 171:19,21 | **write** 52:12 | 6:1,3 7:1,3 |
| 37:24 38:7 | 172:5 174:20 | 57:1 111:1 | 92:8 |
| 39:10,21 47:1 | 174:25 181:20 | 127:17 128:6 | |
| 49:6 53:21 | 181:22 182:22 | 129:13 139:16 | **y** |
| 54:2 55:3 | 188:9 190:13 | 142:25 149:16 | **yan** 15:21 26:5 |
| 59:13 60:19 | 191:4 192:3,19 | 162:5 165:4 | **yeah** 21:7 |
| 61:17 68:14 | 194:5 198:2 | **writes** 41:4 | 23:10 25:7,24 |
| 75:6 80:14 | 206:7,15 | 49:16 50:17 | 26:10 29:10 |
| 81:19 88:18 | **wondering** | 58:17 72:10 | 39:9,16 44:25 |
| 89:11,21 90:16 | 121:23 | 76:12 78:17 | 56:20 59:5 |
| 90:25 93:9,23 | **word** 95:16 | 82:11 83:20,23 | 71:15 74:23 |
| 94:14 95:25 | 144:18 146:3 | 84:7 87:9 88:2 | 75:9 82:6 |
| 98:12 101:6 | 196:10 | 92:4 94:18,20 | 83:12 86:23,25 |
| 102:23 104:9 | **wording** 167:8 | 96:11 99:13 | 87:17 89:21 |
| 104:17 105:22 | **words** 25:15 | 111:21 113:18 | 100:10 121:20 |
| 108:17 110:5 | 94:2,9 166:2 | 115:10 116:3 | 130:4,8 135:9 |
| 114:15,23 | **work** 11:9,17 | 121:10 123:6 | 135:14 166:4 |
| 116:19 118:25 | 11:21 15:9 | 126:17 130:20 | 168:22 169:23 |
| 120:23 121:5 | 21:3 34:12,14 | 131:1 136:3 | 170:8 171:19 |
| 121:20 124:14 | 35:25 43:1 | 139:1 146:15 | 172:5,9,16 |
| 125:11 126:3 | 45:10 50:11 | **written** 75:24 | 173:10,19 |
| 127:2 130:1 | 62:11 63:3 | 141:13 144:8 | 176:12,14,22 |
| 132:10 133:17 | 105:10 106:4 | 145:20 146:21 | 176:23 179:11 |
| 135:9 136:19 | 108:24 164:6 | 193:4 198:9 | 180:3 181:20 |
| 138:4 141:23 | 172:12 174:2,3 | | 182:24 184:6 |
| | | | 185:1 187:1,16 |

189:22 192:6
201:1
**year** 38:23
107:21 108:11
116:12
**years** 12:10
13:21,24 15:19
22:12,12,13
23:1 33:22
34:8 51:24
62:7 63:4
85:11 117:17
119:19 128:3
**yep** 26:17 78:1
122:24 135:12
138:4 172:14
172:20 176:18
180:15 183:8
183:13 185:9
185:14,17
**yesterday** 18:4
144:20,24
145:6,12
**york** 1:2 2:2
3:5,5,10,10,15
8:18 123:8,24
**young** 6:18
119:12 121:21
122:3,9

**z**

**zero** 181:15
**zoom** 70:19,24
146:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.