# Exhibit 124

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW YORK


Civil Action Number 1:24-cv-05948-JLR-OTW


ADRIAN HEILBUT, JESSE BRODKIN,

and ENEA MILIORIS,

           Plaintiffs,

vs.

DAVID BREDT and GEOFFREY PITT,

           Intervenors-Plaintiffs,

vs.

CASSAVA SCIENCES, INC.,

REMI BARBIER, and LINDSAY BURNS,


           Defendants.

_____

CONFIDENTIAL AND HIGHLY CONFIDENTIAL VIDEO DEPOSITION OF

RICHARD BARRY

August 12, 2025

_____

HIGHLY CONFIDENTIAL

Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
ISAAC ZAUR, ESQ.
DAVE KUMAGAI, ESQ. (Via Videoconference)
Clarick Gueron Reisbaum
41 Madison Avenue, 23rd Floor
New York City, New York  10010
Phone:  212-533-4310
Email:  izaur@cgr-law.com
Email:  dkumagai@cgr-law.com

ON BEHALF OF THE DEFENDANT CASSAVA SCIENCES, INC.:
MONICA LOSEMAN, ESQ.
SCOTT CAMPBELL, ESQ.
Gibson Dunn & Crutcher, LLP
1900 Lawrence Street, Suite 3000
Denver, Colorado  80202
Phone:  303-298-5700
Email:  mloseman@gibsondunn.com
Email:  scampbell@gibsondunn.com

ON BEHALF OF THE DEFENDANTS REMI BARBIER AND LINDSAY BURNS:
ZACHARY R. TAYLOR, ESQ.
BakerHostetler
45 Rockafeller Plaza
New York City, New York  10111
Phone:  212-589-4200
Email:  ztaylor@bakerlaw.com

ALSO PRESENT: Mark Rogers, Videographer
Chris Cook
Adrian Heilbut, Via Videoconference
Jesse Brodkin, Via Videoconference
Enea Milioris, Via Videoconference

Page 3

PURSUANT TO WRITTEN NOTICE and the appropriate rules of civil procedure, the confidential and highly confidential video deposition of RICHARD BARRY, called for examination by the Plaintiffs, was taken at Gibson, Dunn & Crutcher LLP, 1900 Lawrence Street, Suite 3000, Denver, Colorado, commencing at 9:13 a.m. on August 12, 2025, before Laurel S. Tubbs, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public in and for the State of Colorado.

INDEX

EXAMINATION:                          PAGE
By Mr. Zaur                        8, 258
By Ms. Loseman                        247

EXHIBITS:                             PAGE

Exhibit 73  Email                        30

Exhibit 74  First Amended Complaint      53

Exhibit 75  Second Amended Complaint as to      80
        Defendants Heilbut, Brodkin,
        Milioris, and Markey

Exhibit 76  Department of Health and Human      109
        Services Food and Drug Administration

Exhibit 77  Minutes of a Meeting of the ad hoc      125
        Litigation Monitoring Committee of
        the Board of Directors of Cassava
        Sciences, Inc. Dated September 1,
        2021

Page 4

EXHIBITS (Cont'd):                    PAGE
Exhibit 78  Minutes of a Meeting of the ad hoc      125
        Litigation Monitoring Committee of
        the Board of Directors of Cassava
        Sciences, Inc. Dated November 16,
        2021

Exhibit 79  Minutes of a Meeting of the ad hoc      125
        Litigation Monitoring Committee of
        the Board of Directors of Cassava
        Sciences, Inc. Dated December 23,
        2021

Exhibit 80  Minutes of a Meeting of the ad hoc      125
        Litigation Monitoring Committee of
        the Board of Directors of Cassava
        Sciences, Inc. Dated January 21, 2022

Exhibit 81  Minutes of a Meeting of the ad hoc      125
        Litigation Monitoring Committee of
        the Board of Directors of Cassava
        Sciences, Inc. Dated March 14, 2022

Exhibit 82  Minutes of a Meeting of the ad hoc      125
        Litigation Monitoring Committee of
        the Board of Directors of Cassava
        Sciences, Inc. Dated October 29, 2022

Exhibit 83  Minutes of a Meeting of the ad hoc      125
        Litigation Monitoring Committee of
        the Board of Directors of Cassava
        Sciences, Inc. Dated November 1, 2022

Exhibit 84  Public Statement Regarding Recent      129
        Allegations Against Cassava Sciences,
        Inc. Dated September 3, 2021

Exhibit 85  Email with Statement from The City      142
        University of New York

Exhibit 86  New York Times Article Titled      153
        Scientists Question Data Behind an
        Experimental Alzheimer's Drug

Exhibit 87  Email Chain                        153

Exhibit 88  Email Chain                        163

Page 5

EXHIBITS (Cont'd):                    PAGE
Exhibit 89  MOA of Simufilam/FLNA Studies      178
        Proposal

Exhibit 90  Email Chain                        192

Exhibit 91  Email                              196

Exhibit 92  Email Chain                        200

Exhibit 93  Bio of Hans Wigzell, M.D., Ph.D.      202

Exhibit 94  Email Chain                        203

Exhibit 95  Email                              205

Exhibit 96  The Journal of Clinical Investigation      213
        Article Titled Conflicting interest:
        When whistleblowers profit from
        allegations of scientific misconduct

Exhibit 97  Email Chain                        214
Exhibit 98  Email Chain                        219
Exhibit 99  Email Chain                        220
Exhibit 100 Document Entitled Exhibit 6, Letter      234
Exhibit 102 Document Entitled Exhibit 5,      237
        International Journal of Molecular
        Sciences Titled Simufilam Reverses
        Aberrant Receptor Interactions of
        Filamin A in Alzheimer's Disease

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

PREVIOUSLY MARKED EXHIBITS:                    PAGE

Exhibit 56  Audit Report                              94

Exhibit 61  Establishment Inspection Report, The    108
            City College of New York (CCNY)/CUNY

Exhibit 66  Email Chain                             117

Page 7

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:13 a.m. on August 12th, 2025. Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Richard Barry taken by counsel for plaintiff in the matter of Heilbut, et al., versus Cassava Sciences, Incorporated, et al., filed in the United States District Court, Southern District of New York, Case Number 1:24-cv-05948-JLR-OTW.

The location of the deposition today is 1900 Lawrence Street, Suite 3000, Denver, Colorado.  My name is Mark Rogers, representing Veritext, and I'm the videographer.  The court reporter is Laurel Tubbs also from Veritext.

I am not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state

Page 8

their appearances and affiliations for the record, beginning with the noticing attorney.

MR. ZAUR:  Isaac Zaur from the law firm Clarick Gueron Reisbaum for plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris.

MS. LOSEMAN:  Monica Loseman with Gibson Dunn and Crutcher on behalf of the witness and Cassava Sciences.

MR. CAMPBELL:  Scott Campbell also with Gibson Dunn on behalf of Cassava and the witness.

MR. TAYLOR:  And Zach Taylor from Baker Hostetler on behalf of defendants Barbier and Burns.

MS. LOSEMAN:  And we're joined by our client representative, Chris Cook.

THE VIDEOGRAPHER:  Will the court reporter -- sorry.

Will the court reporter please swear in the witness, and then counsel may proceed.

RICHARD BARRY, having been first duly sworn or affirmed, was examined and testified as follows:

EXAMINATION

BY MR. ZAUR:

Q.  Good morning, Mr. Barry.  We met off the record, but I'll just briefly introduce myself on -- for

Page 9

the record.  My name is Isaac Zaur.  Do you understand that I represent the plaintiffs, Jesse Brodkin, Adrian Heilbut, and Enea Milioris in this lawsuit?

A.  Yes.

Q.  Have you ever been deposed before?

A.  Yes.

Q.  Okay.  I'm going to skip, in that case, the preliminaries other than to remind both of us that if I ask any question that is unclear to you, I'm going to ask you to let me know and I'll try to clarify it.  Will you agree to do that?

A.  Yeah.

Q.  And we both should try to give the court reporter the opportunity to record our full -- our full speech by taking a break in between my question and your answer.  Okay?

A.  Sure.

Q.  Is that all right?

The other thing I'll say for you and for everyone is because this is a lawsuit about a lawsuit, there are going to be a number of questions I'm going to ask today that your counsel may take the view that those call for privileged or otherwise immune communications. And so I'll try -- for the most part I'm going to try to telegraph when I'm doing that.  And you'll want to be

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

careful to take a break to allow them to direct you as to what they will and will not permit you to testify about. Does that make sense?

A. Yeah.

Q. Can you give me your educational background beginning after high school?

A. I'm a graduate of Penn State University.

Q. What was your major?

A. Political science.

Q. Are you a CPA?

A. No.

Q. Do you have any formal training in science?

A. No.

Q. Can you give me your high level professional background after graduating from college?

A. I'm pretty old.

Q. I'm getting there myself.

I really do mean kind of what are the -- what are the principal jobs that you've had?

A. My first job out of college, I was basically a speech writer for the Pennsylvania State Senate. I then got into the financial business as a retail broker, first with Merrill Lynch, then with Shearson, then with Legg Mason. And then I switched to the institutional side. And from there --

Page 11

Q. Meaning the -- meaning the buy side?

A. No, it's probably different these days. Back then institutional salesmen covered --

Q. I see.

A. -- you know, insurance companies. There weren't that many hedge funds back then.

And ultimately -- so I moved from Baltimore to New York, worked at Lazard and Freres. And one of my clients offered me a job to go to the buy side. So I went to the buy side in '92, I think. And I worked in Dallas, Texas for -- oh, God, what was it? Two years -- two-plus years. First for the notorious short sellers, the Feshbach Brothers.

Q. Okay.

A. Then I worked for another hedge fund called Regal for maybe a year, also in Dallas. Then I moved to Northern California and worked at a firm called Banyan Securities where I did research for -- basically for hedge funds who paid me. And a lot of that research happened to be on shorts.

I left there to go to Robertson Stephens investment management in 1995, then I took over the management of three different funds. Well, sort of four. And one of the funds was a very small hedge fund called Black Bear which my predecessor had started with one of

Page 12

the founding partner's money.

And it was something like a million dollars left, and it was down a lot, 50 percent or something, so I didn't take the job for that reason. But in the next several years that fund became the biggest fund in the firm. And I ultimately --

Q. Under your leadership?

A. Yeah. I ultimately -- Bank of America acquired Robertson Stephens. It didn't make any sense -- I was perfectly happy to stay there, but investors were convinced that somehow I was going to leave because I wouldn't work for a bank. So I ended up starting my own firm called Eastbourne Capital.

THE REPORTER: I'm sorry. Called East- --

THE DEPONENT: Eastbourne Capital in 1990 -- I think it was 1998 -- I don't remember. And I essentially bought the business out of Robertson Stephens or, at the time, Bank of America, and ran Eastbourne for -- until 2010 where I shut it down. It was a large firm at the time. At one point we were a $3.7 billion firm maybe around 2005.

Q. (By Mr. Zaur) Okay. Why did you shut it down?

A. I'll try to be judicious here. I didn't want to deal with investors any longer.

Page 13

Q. You didn't -- you didn't have to deal with them anymore?

A. I didn't have to deal with them. But that was true for a long time. But it just was -- I'm a believer that -- kind of in the Buffett model where you put your money into your fund, you try to compound your money, and you make investments, you know, the best -- to the best judgment you can. And the whole idea is to try to compound money.

But the hedge fund business became institutionalized. And the investors were really not interested in that. They were interested in their mandate. And ultimately I decided this isn't how I would manage my money any longer. So I just gave it back to them.

Q. So thanks for that -- for that summary. And kind of going back over your time as an investment professional, is it fair to say you primarily invested in long positions?

A. No.

MS. LOSEMAN: Object to form.

Go ahead.

Q. (By Mr. Zaur) Have you -- have you primarily invested in short positions?

MS. LOSEMAN: Object to form.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

You can answer him. I'm just making an objection to the question for the record.

THE DEPONENT: Oh, okay.

When I took over the fund in 1995 it was a short-only fund.

Q. (By Mr. Zaur) I see. And I'm going to stop you there. Did you originate any new short positions during your course of the management of the fund?

A. Oh, yeah, sure. Yeah, we gradually changed --

Q. I see.

A. -- because I was uncomfortable being an short-only fund. I thought the idea was to compound capital. And you do it the best way you can. And so I think in '97 or '98 we told investors that, you know, we were going to be more of a traditional hedge fund.

Q. I see.

A. And we would continue do shorts because we did it very profitably and we were good at it. But I -- that's -- I just did not want to spend my life doing that.

Q. Did there come a time during your management of Eastbourne that you totally stopped taking short positions?

A. Yeah, around the time of the global

Page 15

financial crisis. And we may have still had some index shorts at that point, but we weren't short individual stocks.

Q. And you also previously -- before taking over the management of Eastbourne, you had provided some amount of research support to funds that would take short positions?

A. Yeah.

Q. How did you first come to know the company now called Cassava Sciences?

A. I knew it as Pain Therapeutics.

Q. How did you come to know Pain Therapeutics?

A. When I was managing Eastbourne, we took a pretty large -- I think we were the largest shareholder at one point of Pain. I don't remember the years, but -- so I got to know the management, knew what the products were, what they had in the pipeline.

Q. And who did you come to know in the management?

A. Remi Barbier.

Q. Anyone else?

A. Pete Roddy was the CFO. I think that's it.

Q. Did you come to know anyone on the board of the company at that time other than those individuals?

Page 16

A. Well, I knew Sandy Robertson.

Q. How did you know -- how did you know him?

A. Because he was the named partner of Robertson Stevens. Yeah. I didn't work for Sandy, but I knew him.

Q. I see.

And why did you make the investment in Pain Therapeutics?

A. There was a crying need in the early 2000s. The opioid epidemic was, in hindsight, in its infancy, but it was very clear to me and to anybody that spent time looking at it that this was a huge problem.

And the company had a very clever idea on a way to deal with -- the problem at that time was that OxyContin was a drug that could be broken down, crushed and snorted, which gave addicts, you know, a sensational high.

And Pain Therapeutics devised a way to make the drug -- or make their version of the drug abuse resistant.

Q. And how --

A. It was a great idea.

Q. How did they intend to do that?

A. The one product I remember the most was they created a gummy bear solution. So they basically

Page 17

put the drug inside of a gummy bear. I'm oversimplifying it, but that was the idea.

Q. How did that make it abuse resistant?

A. You can't crush it.

Q. I see.

Did Pain Therapeutics ever get approval to market any of its products?

A. No.

Q. Do you know why?

A. I do know why. There's a lot of different answers, but I do know why.

Q. Could you give me the simplest answer?

MS. LOSEMAN: Object to form.

THE DEPONENT: The simplest answer is that the FDA didn't approve it.

Q. (By Mr. Zaur) Do you know why -- why did the FDA not approve it?

A. They went through several iterations. I think the -- the last iteration was it was a CMC issue. So a formulation issue that they had. That's my understanding. I was long gone by then.

Q. I see.

When you say "long gone," had you exited your investment?

A. I exited the investment when I shut the

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

firm down, yeah.

Q. I see. I see.

But you kept in touch with the development of the business?

A. I didn't, actually.

Q. Okay.

A. No, I learned this later.

Q. I see.

Did you develop any view of Mr. Barbier's approach to dealing with the FDA?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: At the time, no, no. They -- I think -- it's hard to recall the dates, the times, et cetera. But I recall the -- there was an ADCOM for Remoxy. The drug didn't get approved. I think most people were shocked that it didn't get approved. They had two phase 3 trials or one phase 3 trial -- I can't remember -- that was actually successful. But when it didn't get approved, and I made the decision to shut the firm down, I really didn't pay much attention afterwards.

Q. (By Mr. Zaur) You've said publicly that Mr. Barbier reached out to you in late 2020 or perhaps early 2021 about joining the board of Cassava. Is that about right?

A. Yeah.

Page 19

Q. What was the nature of his outreach to you? What did he say to you at that time?

A. He initially left me a voicemail. And he -- I had not talked to him for, at that point, probably 13 years. I don't know. A long time. So I was shocked to hear his voice. And his voicemail said that he was -- the company was on to something exciting and that he needed help with the board of directors, and could I suggest somebody or would I be interested myself.

Q. He said that -- he said all those things in his voicemail?

A. In his voicemail, yeah.

Q. Did you know at that point in time that the company had changed its name?

A. I don't remember.

Q. Did you know that the company was focusing on a treatment for Alzheimer's disease?

A. Don't remember that either.

Q. Okay. So what happened after the voice mails? Did you call him back?

A. Yeah.

Q. And what did you discuss in that conversation?

A. I asked him what he needed. It's, you know...

Page 20

Q. What did -- and what -- did he -- did he explain what he needed?

A. He wanted -- he wanted good board members was how he put it.

Q. Did he say anything more than that about why he needed good board members? Was he concerned about the quality of board members that he had?

MS. LOSEMAN: Object to form.

THE DEPONENT: No, he didn't say. It was a small board. There were, generally, older people on the board. So I took it to mean, well, he's got older people on the board. He needs younger people.

Q. (By Mr. Zaur) And what was your reaction to this -- to the outreach from him -- to the initial outreach from him? Were you enthusiastic about being on the board? What did you -- what did you -- what were your considerations around potentially joining the board at that point?

A. I needed to learn what he was working on. And at the time I knew, you know, painfully little about Alzheimer's. So I was going to need to learn a lot about Alzheimer's and a lot about the mechanism of action of the drug, how it was developed, what the plan was. So I told him I would think of potential candidates and that I would try to get up to speed on the company.

Page 21

Q. I want to ask you a little bit more about that, but for a second I just want to go back.

At the point in time when he called you to approach you about being on the board, you say you hadn't spoken to him in some time. Would you say that you were friends or friendly with him at that point in time?

MS. LOSEMAN: Object.

Q. (By Mr. Zaur) How would you -- or how would you characterize your relationship with him at that point in time?

A. You know, you have -- in business you have lots of relationships that you will maybe -- particularly in this day and age of social media, you would label as friends. I wouldn't label Remi as a friend. He was a CEO for a company that I had a position in that I respected. If I didn't respect him, I wouldn't return the call.

Q. Did you ever become what you would describe as friends with Mr. Barbier?

A. No.

Q. Did you ever become friends with Dr. Burns --

A. No.

Q. -- Lindsay Burns?

A. Never met her.

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

Q. You never met Dr. Burns?

A. At that time I had never met her.

Q. You came to meet her at some point?

A. Once.

Q. Interesting.

When was that?

A. When I was doing my due diligence in -- on whether or not I wanted to join the board. I went down to Austin and I met her literally for less than a minute. I think I said Hello.

Q. I see.

Would you have been interested -- am I right in understanding that she was the head of neuroscience at Cassava at that point in time?

MS. LOSEMAN: Object to form.

THE DEPONENT: I think so.

Q. (By Mr. Zaur) Was that somebody you would have wanted to speak to in conducting diligence about potentially serving on the board?

MS. LOSEMAN: Object to form.

THE DEPONENT: I didn't need to.

Q. (By Mr. Zaur) How come?

A. Because I had other people I could talk to.

Q. Okay. Let me ask you a little bit about

Page 23

that diligence period. Am I right in thinking that you actually joined the board in June of 2021?

A. I think it was June, yeah.

Q. Okay. So my next set of questions will be about this period between Mr. Barbier's outreach to you and your joining the board in June of '21.

What did you do, first, broadly speaking, in terms of diligence around that opportunity?

A. I did what I always do.

Q. Which is?

A. I tried to find -- I've always been lucky at finding people who are very knowledgeable on the subject matter. So I tried to find people that really understood Alzheimer's, you know.

So all I ever knew -- well, I knew more about the disease. But from a drug developer's point of view, all I ever knew was there was a 20-to-30-year history of persistent failures in phase 3 and phase 2 trials by major pharma companies.

And every one of those that I can think of, the mechanism of action was to try to remove amyloid plaque from the brain. So being a curious person, I wondered why did they keep doing this. So the appeal to me at the time was this is a different way about -- of going after the disease.

Page 24

And pretty soon I found a number of, you know, very knowledgeable people who knew a lot about the disease that were actually quite enthusiastic about -- you know, didn't necessarily know Cassava, but they were enthusiastic about the idea of treating it more as an inflammation disease.

Q. Who are those people?

A. Well, one was the chief medical officer at the -- of the company at the time, Jim Kupiec -- Dr. Jim Kupiec. Jim and I had, I would say, two very lengthy conversations.

Q. Had you known him previously?

A. No.

Q. Okay. What were those conversations about?

A. Well, the first thing I wanted to understand was Jim's career was -- he had a lengthy career in drug development for neuroscience drugs. He had ran Pfizer's neuroscience division for something like 20 years prior to moving to Cassava. And I was fascinated that a guy of that stature with his credentials would join this nascent company in Austin, Texas. So I wanted to understand why.

Q. I want to come back to your conversations with Dr. Kupiec. But who were the other people that you spoke with in conducting diligence on Cassava before you

Page 25

joined the board?

A. There were a lot. One of them was Dr. Hans Wigzell.

THE REPORTER: I'm sorry. The name again?

THE DEPONENT: Hans -- well, it's spelled W-i-g-z-e-l-l, but he's Swedish.

Q. (By Mr. Zaur) And how do we pronounce that? Wigzell?

A. Wigzell.

Q. And who is Dr. Wigzell?

A. Dr. Wigzell -- I'm mispronouncing it now -- is a fellow board member at Sarepta Therapeutics who has become a friend, not just a business relationship, a friend. And he's -- he's a very smart guy.

Q. I'll come back to your conversations with him as well.

Is there anything else you can think of who you spoke with in the course of conducting diligence on Cassava before you became a board member?

A. I know I did. I just can't think of who it was. Those two stood out.

Q. Did you discuss with Dr. Kupiec --

A. Kupiec, yeah.

Q. Dr. Kupiec.

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

Did you discuss simufilam's mechanism of action?

A. Yes.

Q. And what did you understand that to be?

A. I'll give you a different answer today than I would have then because I know more today. But it was a -- let me think what I believed at the time. It was a different approach to treating the disease. I'm sorry. I'm blanking on -- I'm blanking on what I thought at the time.

Q. Okay.

A. I can give you an answer of what I know now.

Q. Well, I think I will want to ask you that, and probably about how and when your understanding is of all across time.

A. Mm-hmm.

Q. But let me ask you if you spoke with Dr. Wigzell about simufilam's mechanism of action in the course of doing diligence.

A. I did.

Q. And did you have an understanding from him or from your conversations from him as to what that mechanism of action was?

A. What I remember most about our

Page 27

conversations -- and we had more than one -- was that Hans was a -- believe -- basically he said, Look, science has been trying amyloid plaque removal for years and years and years. It's failed. There's a new approach to treating this disease, and this new approach is to attack inflammation.

And he pointed me to a company in Massachusetts that was using -- it still exists as far as I know -- was using a device to try to deal with inflammation. The company is called Cognito Therapeutics or something like that.

Q. Some kind of medical device?

A. It was -- yeah, it's a device.

Q. Not a pharmaceutical?

A. And I think they're awaiting phase 3 trial results now, I think. I'm not sure. But Hans is very close to them and their founder. So he knew -- and Hans knows a lot about everything. So he knew a lot about the disease. And he's a curious guy. And he looked at all of the information that was available at the time and he encouraged me to join the board.

Q. And did you value his judgment?

A. Yeah.

Q. You continue to think he has good judgment?

A. He has good judgment. We don't always

Page 28

agree.

Q. That would be weird.

A. What's that?

Q. It would be strange to always agree.

Before you joined the board of Cassava, did you have an understanding that simufilam bound to a specific pentapeptide site on the filamin A protein?

A. No.

Q. Did you have any greater understanding of its biological mechanism of action than that it attempted to mitigate inflammation?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: Again, I'm trying to think of what I knew back then. I just don't remember what I knew back then.

Q. (By Mr. Zaur) Did you have any understanding before you joined the board of the relationship between simufilam and Dr. Hoau-Yan Wang?

THE REPORTER: I'm sorry. Doctor?

MR. ZAUR: Hoau-Yan Wang. H-a-o-u [sic] W-a- -- excuse me -- Y-a-n W-a-n-g.

THE DEPONENT: No.

Q. (By Mr. Zaur) Did you know who Dr. Wang was before you joined the board?

A. I don't think so.

Page 29

Q. Did you have any understanding of who had conducted the science that led to the discovery of simufilam before you joined the board?

A. I don't remember. I wasn't concerned about that. I was concerned, Do you own any intellectual property? That's what I was concerned with.

Q. Did you know who the inventors were of the patent for simufilam?

A. I knew that the company owned intellectual property. I didn't -- I don't think I looked at the names of who the inventors were at the time. It might have come up that Lindsay was an inventor. I just don't remember.

Q. Did you know whether or not Cassava had any laboratories of its own?

A. I knew that they did not.

Q. Did you know who any of their outside research collaborators were?

A. At the time, I don't think so.

Q. Did you review any clinical data for simufilam before you joined the board of Cassava?

A. Yes.

Q. Do you remember which clinical data you reviewed?

A. I -- all of the publicly available

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

information at that point, I looked at. And once I signed a CDA with the company, I looked at -- I'm going to call them patient records, but they obviously didn't have names of patients.

But it was -- I can remember looking at the phase 2 of the responders, you know, just looking at it -- I forget -- there was 50 or 100 patients. And looking at, you know, what was the baseline versus the current and how the patients were doing. And that was persuasive to me.

MR. ZAUR: I'll ask the court reporter to mark what will be Plaintiffs' 73.

(Exhibit 73 was marked.)

Q. (By Mr. Zaur) Mr. Barry, do you see that Plaintiffs' 73 is an email exchange between you and a person named Claude Nicaise?

A. Yes.

Q. Am I pronouncing that right?

A. No.

Q. How does --

A. Claude Nicaise.

Q. Claude Nicaise. Who is Claude Nicaise?

A. Claude is a fellow board member of the Sarepta board, and today is the chair of Cassava.

Q. And he was at the time a fellow board

Page 31

member on the Sarepta board --

A. Correct.

Q. -- as was Dr. Wigzell?

A. Mm-hmm. Yes.

Q. Was he -- was he on the Cassava board at this time?

A. No.

Q. Does this email refresh your recollection as to whether Mr. Nicaise was somebody that you spoke with in conducting diligence about Cassava before you joined the board?

A. It's likely that I did because I respect his opinion. I just don't specifically recall doing it.

Q. I see.

And I take it then from your answer that you see this email exchange, but you don't recall it today?

A. I don't. I don't.

Q. I'll ask you to look at the bottom email. So on the bottom third of the page, which appears to be a note from you to Mr. Nicaise.

Do you see that?

A. This is the paragraph that begins The first link?

Q. Yes. And I'll ask you to read that

Page 32

paragraph. And my question is going to be about the sentence at the beginning, They claim that patients always decline. Take a moment and read the paragraph. I'm going to ask you what you understand that sentence to mean.

A. I think it was a pretty good insight.

Q. Can you explain what you meant by that?

A. So I had looked at the data -- now I'm taking this from what you're showing me. I had looked at the data, the analysis of 100 patients. There were patients who actually improved. Again, it was relatively new to Alzheimer's. So a lot of the history of the trials I was -- I only knew because I learned as I was doing due diligence on the company.

I think in every trial you always have to think could this be telling me something different than what I'm -- what the data suggests? You have to think critically in this business. And so I was looking at the data thinking this is remarkably good, but could it be because the patients were too mild? That's the question I was asking him.

Q. Did you ever come to form a view as to whether or not that was the case?

MS. LOSEMAN: Object to form.

THE DEPONENT: I don't think the patients were too mild.

Page 33

Q. (By Mr. Zaur) Directing your attention to the last sentence of that same paragraph, you write to Mr. Nicaise, This seems promising to me, but it also seems to me that Wall Street is way out over its skis with excitement.

What do you mean by that?

A. Well, it's February 3rd and it was ski season. What I meant was this was -- this was a meme stock. This is a word that I never even understood. This is not who I am or how I invest or what I do. So the entire lunacy, for lack of a better word, of the meme stock craze had clearly sprung into Cassava.

And, I mean, I just -- when I was a fund manager -- some of this was starting back then, but it would have been really unusual to see a share price go from, as I say here, 22 to 70. I don't remember that, but that's what I've said. It would have been unusual to see that. So people got very excited about it. I don't determine how the market is going to price companies.

Q. Was it your impression that the market was pricing the company too high?

A. My impression was there was a lot of volatility. And it's really hard to know if it's too high or not because if the drug was ultimately successful, that would have valued the company at a

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

relatively modest valuation. If they were successful in phase 3, it would be worth a whole lot more than $70.

So I'm not -- in this email I'm not saying this is ridiculous. What I'm saying is I just don't understand. This is not how I invest.

Q. Mm-hmm. You can put that to one side.

THE REPORTER: I'm sorry?

MR. ZAUR: You can put that to one side.

Q. (By Mr. Zaur) What were your goals in joining -- well, let me ask you a different question. How did you ultimately decide to join the Cassava board?

A. It was two things. It was -- and I wrote about this after I became executive chair. I have a very close friend whose father died from Alzheimer's, and I witnessed it. And I wrote about this in a shareholder letter. And that experience changed me. It made me understand just how horrific the disease is and the effect it has on the loved ones around people. So the thought of making a difference in that disease category was pretty powerful.

Q. You said there were two reasons. Is that -- was that one of them?

A. That was -- that was probably the biggest reason.

The second thing is I have a history of

Page 35

doing things like this.

Q. What do you mean by that?

A. I am an active investor who gets involved in companies with the aim of making -- helping them grow, and if they have problems, helping them resolve problems. And I've done it individually, and I did it when I was involved in Eastbourne.

Q. Is, for example, the company called MiMedx a company that you got involved in when it had problems and helped it to resolve those problems?

A. Yeah.

Q. And was -- did -- did you see Cassava as an analogous opportunity?

A. No, no.

Q. I'm sorry. I'm trying to ask -- I mean, that was a little bit indirect. I'm trying to ask, did you see -- were you joining the board -- do you have in mind that there were problems that might need your assistance?

A. At the time, no.

Q. Had you -- when -- when you joined the board, were you aware that the phase 2b clinical data, was initially discarded? I'm trying to ask you about the redo. Did you understand that results from the phase 2b trial announced in May of 2020 did not meet the primary

Page 36

endpoint?

MS. LOSEMAN: Object to form. Vague. Misstates the record.

THE DEPONENT: I think you need to be more specific.

Q. (By Mr. Zaur) Did you have any understanding of what happened with the phase 2b data in May of 2020?

A. Are we talking about biomarker data? Are we talking about clinical data?

Q. Well, I'm asking -- I'm asking generally, but it's a fair point because --

A. Yeah.

Q. Did you have any understanding about what had to be done -- about what had gone on?

A. I understood -- I understood what had happened --

MS. LOSEMAN: Let -- hold on. Just for the court reporter.

THE DEPONENT: Yeah. Sorry.

MS. LOSEMAN: Let him finish his question --

THE DEPONENT: Sorry.

MS. LOSEMAN: -- before you answer, and he'll wait for you to complete your answer before he

Page 37

starts the next question.

THE DEPONENT: I got excited.

Q. (By Mr. Zaur) When you joined the board, did you have any understanding as to what had happened with the phase 2b biomarker data announced in May of 2020?

A. I did.

Q. And what was that understanding?

A. My understanding was the samples were analyzed by a university in Sweden. And the company claimed publicly, as well as to me privately, that the analysis was -- what's the right word? Incorrect. They screwed --

Q. You mean that the lab -- that the Lung lab had screwed up the analysis?

A. Yes.

Q. That's what the company told the public?

A. That's what the company -- I don't know if they disclosed the name of the lab at the time, but that is what they told the public.

Q. And they also -- they told you the same thing privately?

A. They did.

Q. Did you believe that at the time?

A. I did.

Q. Do you believe it today?

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

A. Yes.

Q. Do you understand how the Lung lab screwed up the data?

A. I'm not a lab technician, so, no. You know, mechanically how they screwed it up, no. I just know that they did.

Q. Okay. How do you know that they did?

A. Because you see numbers all over the place. You see placebo numbers that move dramatically that just shouldn't move. I remember at the time having somebody who was -- and I can't remember who it was -- explain to me how -- how you could spot that the analysis was done incorrectly. I was satisfied with the answer.

Q. You don't remember what the answer was, but it made sense to you at that time?

A. It made sense to me.

Q. Did you understand that the biomarker data had been rerun by somebody else?

A. Yes.

Q. Did you know who would have done that?

A. I don't know. I knew what the data were, the data generated by the second lab. I knew the data. I don't know that I ever focused on who did it.

Q. Going forward in time, you became executive

Page 39

chairman of Cassava in July of '24; is that right?

A. Yes.

Q. How would you describe your role as a board member before that time, between June of '21 and July of '24?

A. I was active.

Q. What -- what was the nature of that activity?

A. Every board is different. Every company has different needs, things that they, you know, need from a director. I was very active, in persistent conversations with Remi often about capital formation, but -- about investor related -- areas that I know a lot about.

Q. Capital formation, meaning raising -- raising capital, raising money for the company?

A. Raising capital, who are the -- who are the right investors, those thing -- those kinds of things.

Q. Would you say capital formation was your principal focus as a board member in those -- in that intervening period?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: I think if you look at my résumé, nobody would appoint me to a board because of my

Page 40

scientific expertise.

Q. (By Mr. Zaur) Did you interact with anyone at Cassava's management other than Mr. Barbier during that intervening period?

A. Until I became execu- --

Q. Until you became -- until July of '24.

A. Yes.

Q. Who was that?

A. Eric Schoen.

Q. What did you interact with him about?

A. I was the chair of the audit committee. Chris Cook.

Q. Okay. Anyone else?

A. One other person was Antonio Hernandez.

Q. Who's that?

A. He was a -- he was a guy in the clinical operations group. He was the person that I sat with who showed me the data of the phase 2 patients before I joined the board.

Q. I see. And you continued to interact with him after you joined the board?

A. Not much.

Q. Okay.

A. I was very -- I was very taken with Tony Hernandez.

Page 41

Q. In that -- in that meeting or those meetings before you joined the board?

A. Yes.

Q. What do you mean when you say you were taken with him?

A. Tony had joined the company because his family had a long history of Alzheimer's. He was very passionate about Alzheimer's. He had a Ph.D. in neuroscience, I think. I'm not sure about that. But very -- had a long experience in clinical trials, in particular with Alzheimer's trials. So very knowledgeable.

And I was really impressed by his dedication, his -- how -- he was very passionate about the drug and about coming up with something for the disease.

Q. Was he helpful to you in understanding the science underlying simufilam?

A. He was. I can't remember specifically how, but, yeah. Tony was still there when I became executive chair.

Q. Why -- how did you become executive chair in July of 2024? Why did that come about you?

A. Remi Barbier resigned.

Q. And why did he resign?

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

MS. LOSEMAN: I'm going to caution the witness to the extent answering that question requires disclosure of any communications with counsel, I'd advise you not to answer, not to disclose those communications.

THE DEPONENT: I think Remi understood that the -- or came to the view that the -- sorry. I lost my train of thought.

That it was in the best interests of the company and shareholders for him to resign.

Q. (By Mr. Zaur) Did you ask him to resign?

MS. LOSEMAN: And same -- same caution and instruction.

THE DEPONENT: Can I answer that question?

MS. LOSEMAN: Well, not if it requires you to disclose communications you had with counsel at the time.

THE DEPONENT: Counsel would have been in that meeting.

MS. LOSEMAN: Okay. So then I'll instruct you not to answer that question.

MR. ZAUR: Okay. I'm going to try it a couple of different ways and you may give the same instruction.

THE DEPONENT: Okay.

Q. (By Mr. Zaur) Did Cassava's board ask

Page 43

Mr. Barbier to resign?

MS. LOSEMAN: And I instruct you not to answer on the basis of privilege.

Q. (By Mr. Zaur) Did Cassava's board terminate Mr. Barbier's employment as CEO?

MS. LOSEMAN: Same instruction.

Q. (By Mr. Zaur) Did Cassava's board ask Dr. Lindsay Burns to resign from Cassava?

MS. LOSEMAN: I believe the same instruction --

THE DEPONENT: Yeah, the same thing.

MS. LOSEMAN: -- if you had -- yeah, all conversations -- if all conversations were with counsel.

THE DEPONENT: They were.

MS. LOSEMAN: Then I instruct you not to answer.

MR. ZAUR: Okay. I'm going to get the same instruction, but I'm just going to ask it one or two other ways.

Q. (By Mr. Zaur) Did you personally ask Dr. Lindsay Burns to resign from Cassava?

THE DEPONENT: I'm happy to answer that question.

MS. LOSEMAN: Yeah, yeah, that one I don't think -- I mean, if counsel weren't involved in -- in

Page 44

that communication, I think that's fair, if you had a conversation directly with Ms. Burns outside of --

THE DEPONENT: No, the answer is I never talked to Lindsay Burns.

Q. (By Mr. Zaur) Okay. Did Cassava terminate Dr. Lindsay Burns' employment?

MS. LOSEMAN: I'll instruct you not to answer that question on the basis of privilege.

Q. (By Mr. Zaur) Did you personally feel that it was in the best interests of the company for Mr. Barbier to step down?

MS. LOSEMAN: If your personal belief is based on conversations and communications you had with counsel, answering that question would disclose privileged communications. So I would instruct you not to answer.

THE DEPONENT: Then I can't answer it.

Q. (By Mr. Zaur) Same question about Dr. Burns. Did you personally feel that it was in the best interests of Cassava for Dr. Burns to step down?

MS. LOSEMAN: And same instruction.

MR. ZAUR: I think this will be the same instruction.

Q. (By Mr. Zaur) Do you have any understanding -- do you have any understanding as to why

Page 45

Mr. Barbier stepped down from Cassava?

MS. LOSEMAN: And I'll instruct the witness that to the extent you have any understanding not based on anything you learned from counsel or discussed with counsel, you are free to disclose that, but if it is all based on what -- on conversations or what you learned from counsel, then I instruct you not to answer.

THE DEPONENT: It's all based on what I learned from counsel.

Q. (By Mr. Zaur) Have you spoken with Mr. Barbier since he stepped down as --

A. No.

Q. -- CEO?

A. No.

Q. Have you spoken with Dr. Burns since she stepped down in July of 2024?

A. No.

Q. Has Cassava used any consulting services from Mr. Barbier since they [sic] stepped down from Cassava in July of 2024?

A. No.

Q. Has Cassava used any consulting services from Dr. Burns since she stepped down from Cassava in 2024?

A. Yes.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

Q. What are the nature of those services?

A. Very recent. We are aiming to get the -- the Alzheimer's phase 3 program published. We've -- now, she's helped write the study -- the manuscript. As the coinventor of the drug, we needed her help on some things. That's the extent of it.

Q. And the plan is to publish the results of the first phase 3 trial?

A. Both.

Q. Both.

How did you personally decide to become the principal executive of Cassava in July of 2024?

A. I believe in the drug.

Q. Did you consider resigning from the board?

A. No.

Q. Have you ever considered resigning from the board?

A. No.

Q. How did you decide to become CEO of Cassava in September of 2024?

A. It's a long answer.

Q. Is it -- well, let me ask you. I do want to hear it, but let me ask you this way. Is it different than your decision to become principal executive in July of 2024?

Page 47

A. No. So I had not had a full-time job since 2010. And since then I've been kind of a one-man board activist, for lack of a better phrase. I never had any intention of wanting to go back and work again. But I was convinced that this drug needed the chance. I was convinced that patients needed -- needed a drug like this, and there was enough evidence here to see that this drug had a real chance of succeeding in phase 3.

And the company was in a really difficult situation, and if somebody didn't step in and do what I did, we may never have gotten to the end of phase 3. So I wanted to make sure the company got to the end of phase 3.

Q. You spoke a moment ago about believing in the drug, right?

A. Yeah.

Q. Was your belief in the drug based on the clinical data associated with the drug?

MS. LOSEMAN: Object to form.

THE DEPONENT: It was clinical data amongst other things.

Q. (By Mr. Zaur) Well, let me ask you. I want to know kind of all the things, but let me try it this way.

A. Okay.

Page 48

Q. Was your belief in the drug based on a belief in the underlying biochemistry of the drug?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: It's complicated. There are a lot of drugs that are serving patients to this day where the mechanism of action is really unknown. So the way I thought about it -- metformin is a terrific example. It's been on the market for 60 years, I think. Mechanism of action is still unclear. So the way I thought about it was, yes, the -- the explanation we have about the mechanism of action makes sense to me, and I could see how it would disrupt the --

THE REPORTER: I'm sorry. "...the..."

THE DEPONENT: Sorry.

THE REPORTER: Just one more time. Just say it again.

THE DEPONENT: Phosphorylation.

THE REPORTER: "...of..."

THE DEPONENT: Tau, T-a-u.

THE REPORTER: Thank you.

THE DEPONENT: But this is a theory. What's more important is does it have -- does it have an effect on patients? Do you see any improvement in the clinical data? And the answer to me was a very clear yes.

Page 49

And on top of that, you know, once you are a director, and even more so when you're an executive of a company, you tend to start to meet the families and the patients and the physicians who I came to know really well. And there is absolutely no doubt that there were patients who were getting a benefit from this drug. I heard it from physicians. I heard from the patients. I heard it from their loved ones.

So you could accuse me of being a victim of anecdotes. To an extent I was. But I was very convinced to join the board.

Q. (By Mr. Zaur) Has the outcome of the phase 3 trial altered that view?

A. The trial -- both trials failed to meet their primary endpoint. So is this going to be a commercial Alzheimer's drug anytime soon? No. However, when you look at the data from both trials, it's very clear that the drug does something.

In the first trial, which we call trial 7 or study 7 which is refocus, the drug beat placebo at every time point, even at 52 weeks by 10 to 15 percent. The problem is that's not enough to make -- to beat your primary endpoint, but it tells you that the drug does something.

It doesn't tell you that the drug does

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

nothing and that it's a fraud. It tells you the drug is active. It just may not by active enough. So is it -- is it going to be an Alzheimer's drug right now? Probably not. But the drug has activity.

In the second trial, we saw something that was even more powerful. And this hasn't been released yet so I'm assuming everyone is going to be kept to confidentiality. And that is in -- in the mild population in the study 6, which was the larger study. It had three arms.

The mild population as defined by ADAS-Cog or -- I'm sorry -- MMSE and the entry, we showed a statistically significant difference between drug and placebo at 64 weeks, a huge gap. The trouble was the trial ended early because the first one failed. I made the decision to shut the second one down.

And at 76 weeks it wasn't significant probably because of influence. The clinicians at that point knew that the first trial failed and so they just basically took people off the drug.

Q. I see.

A. So past 52 weeks it's kind of hard to rely on the data being accurate. But it's very clear at 52 weeks that there was a signal, even at 64. It just wasn't there at 76.

Page 51

So the answer to your question is, no, this isn't going to be an Alzheimer's drug because we're not Merck. We don't have enough money to do another phase 3 trial. But if somebody did and did it differently than we did, they might get a different outcome.

Q. A little bit of interpreting from that -- from that answer in asking, does -- does that mean that you personally do believe that simufilam mitigates Alzheimer's disease?

A. I think there's evidence that it mitigates it in the mild population. There's never been a drug that's been effective in moderate or severe.

Q. Are you exploring the possibility of selling the drug to someone -- to some pharmaceutical company that does have the resources to do another trial?

A. No.

Q. And why not?

A. Because we have a different opportunity in front of us right now.

Q. Which is related to seizures?

A. Yes.

MS. LOSEMAN: And, Counsel, we've been going a little over an hour.

MR. ZAUR: Yeah. Let's take a break.

Page 52

THE VIDEOGRAPHER: Okay. We're going off record. The time is 10:19 a.m.

(Recess from 10:19 a.m. to 10:33 a.m.)

THE VIDEOGRAPHER: We are now back on the record. This is the beginning of Media Unit 2. The time is 10:33 a.m.

MS. LOSEMAN: Before we go back to questioning, we just want to put on the record we're designating this entire transcript confidential under the terms of the existing protective order.

In addition, the testimony regarding the nonpublic phase 3 results, we're -- we're asking an agreement to treat that testimony as highly confidential. We consider it material, nonpublic information.

And we'd ask everybody in the room and everybody on the Zoom to agree to treat it as highly confidential and not disclose that information beyond those who have participated in this deposition.

MR. ZAUR: We recognize the request. We will certainly treat the information as highly confidential. My only caveat is that not all -- my entire legal team is not necessarily participating in the deposition. So what I would say is we recognize the sensitivity of the information. We'll treat it as highly confidential. I believe the binding terms are the

Page 53

confidentially agreement, but we will work with you to make sure it doesn't go anyplace.

MS. LOSEMAN: I appreciate that.

And to the extent that you're going to go back into the results, we just may need to revisit. We certainly have no objection to the information being shared with attorneys on your team. But -- and if we can reach agreement on that I think you can -- we can just proceed and you can ask any other questions you need to regarding phase 3. But I am concerned that we have agreement on the record to treat nonpublic information as highly confidential.

MR. ZAUR: Okay.

MS. LOSEMAN: Okay.

Q. (By Ms. Zaur) Mr. Barry, you've been handed what's been marked as Plaintiffs' Exhibit 70- --

(Discussion off the record.)

(Exhibit 74 was marked.)

Q. (By Mr. Zaur) Mr. Barry, my apologies. You've now been handed what's been marked as Plaintiffs' Exhibit 73 --

THE DEPONENT: -4.

MR. ZAUR. -4. 74.

(Discussion off the record.)

Q. (By Mr. Zaur) Do you recognize this

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

document?

A. Yes.

Q. What do you recognize it to be?

A. It was a lawsuit filed by Cassava charging the defendants with defamation.

Q. Did you read this document before it was filed?

A. Cover to cover?

Q. Did you read it at all?

A. I'm sure I read some of it. I doubt I read the whole thing.

Q. Did you participate in the decision to file this lawsuit?

A. Yes.

Q. What was the nature of your participation in that decision?

A. We had -- I believe the company formed -- the board formed a special litigation committee. I don't know if that's the proper name or not. I was one of the members on it. But we were exploring ways --

MS. LOSEMAN: And I'm going to just caution the witness. I understand that committee was advised by counsel.

MR. ZAUR: Okay.

MS. LOSEMAN: So as to the formation of

Page 55

the committee, I think that's non-privileged. You can -- you can discuss that.

MR. ZAUR: Okay.

MS. LOSEMAN: But what the committee explored, what it discussed with counsel, to the extent that requires disclosure of anything you learned through communications with counsel, I'll instruct you not to disclose it.

MR. ZAUR: We'll take it -- we'll take it a question at a time. That may --

MS. LOSEMAN: That sounds good.

MR. ZAUR: -- that direction may impact your answers to a number of my questions I'm about to ask.

Q. (By Mr. Zaur) Does it refresh your memory if I suggested the name of the committee was an ad hoc litigation monitoring committee?

A. No.

Q. Okay. Can we call it -- for today's purpose can we call it the litigation committee? Do you understand what I mean?

A. Yes. Yeah.

Q. I think your counsel said that she's okay answering questions about the initial formation of the committee.

Page 56

Why was the committee formed?

MS. LOSEMAN: Well, I think in terms of the -- the fact that a committee was formed, when it was formed, you know, information that would normally be disclosed, for example, on a privilege log, I think that's fine.

MR. ZAUR: Okay.

MS. LOSEMAN: But if answering that question why the committee was formed, if that would require disclosure of communications you and the committee had with counsel, then I would instruct you not to answer.

THE DEPONENT: I think I can answer it.

MS. LOSEMAN: Okay. Go ahead.

THE DEPONENT: Cassava at the time had a very significant problem with people who were interfering with the company's business. It's something I would never have done when I was a short seller. It's not -- it's a line you did not cross.

And the problem was -- and the reason that I thought it needed to be addressed was that we had a lot of sites in our phase 3 trial, and some of those sites were walking away. And they were walking away because of the -- because of the noise and the publicity that was generated by your clients and others. That was changing

Page 57

their view of the company and the drug's prospects.

And in my mind, and I think my fellow committee members' minds, that was unfair to patients. And we felt that we needed to do something to stop them interfering with our trials.

Q. (By Mr. Zaur) So the question -- at least the question I was intending to ask was why was the committee formed. Is that -- is that the explanation for why the litigation committee was formed?

A. That's my memory of it.

Q. And what approaches -- did the board consider any approaches other than litigation for addressing this serious problem you've described?

A. I don't remember.

Q. Did you consider any approaches to statements by my clients other than litigation, meaning you -- you personally?

A. I was only persuaded that litigation was a reasonable solution when I realized the impact it was having on the trials. If not for that, I wouldn't have supported it.

Q. Did you perceive downsides to a litigation approach?

A. Yes.

Q. What were those?

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

A.  It's costly.

Q.  Anything else?

A.  As a -- you know -- as I said earlier, I had a checkered past of shorting stocks in the 1990s and early 2000s.  And companies that responded to short sellers in general, it was just not -- it was not a good practice.

Q.  Can you give an example of what you mean by that?  Do you mean companies that responded to short sellers by suing them?

A.  By suing them or trying to --

THE REPORTER:  I'm sorry.  "...trying to..."

THE DEPONENT:  To respond to their allegations in the media.

Q.  (By Mr. Zaur) I'm sort of really just trying to understand.  So is it -- was it your impression that, from your own experience as a short seller, that it was better to ignore short sellers who made their views public?

MS. LOSEMAN:  Object to form.  Misstates.

MR. ZAUR:  It may misstate the testimony.

Q.  (By Mr. Zaur) I'm trying to understand what you said.

MS. LOSEMAN:  Same objection.

Page 59

THE DEPONENT:  What I'm saying is that the best way to deal with short sellers is to execute your business plan and not -- not get hung up in the noise.  But that is a very stale view based upon my experience from the '90s and early 2000s when the game was played very differently than it's played today.

Q.  (By Mr. Zaur) I'm just trying to follow that thread.  What is the difference in how the game was played?

A.  Well, there was no internet.  There was no Twitter.  There was no social media.  If you found a story that you're absolutely convinced was factual and something was an absolute certain fraud, you could forward your concerns to the Securities and Exchange Commission or to the accountants of the firm, the company you were looking at, or, you know, work with the media to expose the story.

But you absolutely had to have the facts straight.  You didn't do that if you had a difference of opinion with a company and try to disguise it as if it was a fact.  So the game's very different today.

Q.  Okay.  And is it your view that my clients had a difference of opinion with the company that they tried to disguise as a fact?

A.  Yes.

Page 60

Q.  Did you consider writing to my clients directly?

A.  No.

Q.  Did Cassava consider writing to my clients directly before filing suit?

A.  Not that I know of.

Q.  Did the litigation committee consider writing to my clients directly before filing suit?

MS. LOSEMAN:  And again, to the extent that requires disclosure of any communications with counsel, I instruct you not to answer.

THE DEPONENT:  I don't think it was discussed.

Q.  (By Mr. Zaur) Did the board consider writing to my clients directly before filing suit?

MS. LOSEMAN:  Same instruction.

THE DEPONENT:  I don't recall.

Q.  (By Mr. Zaur) Did you discuss the substance of the lawsuit with -- within the litigation committee before the lawsuit was filed?

MS. LOSEMAN:  Again, to the extent that requires disclosure of communications with counsel, which I believe it does, but --

THE DEPONENT:  Yeah, counsel was always there.

Page 61

MS. LOSEMAN:  Okay.  So then I instruct you not to answer.

Q.  (By Mr. Zaur) Okay.  Let me -- let me ask a clarifying question then.  I may still ask a lot of these questions, but they may go faster.

Did the litigation committee ever meet without its counsel present?

A.  Not that I recall.

Q.  Okay.  I think I can ask this yes or no.  Did the litigation committee discuss the substance of this lawsuit before it was filed?

MS. LOSEMAN:  Just yes or no.  I think that's fine.

THE DEPONENT:  Yes.

Q.  (By Mr. Zaur) Okay.  What was the substance of that discussion?

MS. LOSEMAN:  And again, to the extent that requires disclosure of discussions with counsel, I instruct you not to answer.

THE DEPONENT:  Yeah.  I can't answer.

Q.  (By Mr. Zaur) Okay.  Yes or no.  Did the committee discuss the strength or weakness of the claims asserted in the defamation action before it was filed?

MS. LOSEMAN:  I instruct you not to answer that on the basis of privilege.

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

Q. (By Mr. Zaur) Yes or no. Did you -- did the litigation committee discuss the purpose or purposes of the lawsuit before it was filed?

MS. LOSEMAN: I'm not sure what you mean by "purposes." If you could explain that then I can --

MR. ZAUR: Well, it's kind of important for me to use that -- that word. I'll try another way.

MS. LOSEMAN: Mm-hmm.

Q. (By Mr. Zaur) Did the litigation committee discuss the objectives of the lawsuit before it was filed?

MS. LOSEMAN: And again, to the extent that requires disclosure of communications with counsel, I instruct you not to answer.

MR. ZAUR: I don't want to intrude. Do you want to take a break and talk about that? I'm trying to proceed with some care.

THE DEPONENT: We're splitting hairs.

MS. LOSEMAN: Let's take a break.

THE VIDEOGRAPHER: We are going off the record. The time is 10:48 a.m.

(Recess from 10:48 a.m. to 10:52 a.m.)

THE VIDEOGRAPHER: We are now back on the record. This is the beginning of Media Unit 3. The time is 10:52 a.m.

Q. (By Mr. Zaur) Mr. Barry, did any members

Page 63

of the litigation committee discuss the purpose or purposes of the defamation lawsuit outside the presence of counsel before it was filed?

A. I believe so.

Q. Which members had those discussions?

A. I know that I discussed it with Remi Barbier, Sandy Robertson. I don't recall if Michael O'Donnell was there.

THE REPORTER: I'm sorry. The name?

THE DEPONENT: Mike O'Donnell.

Q. (By Mr. Zaur) And what was the substance of those discussions?

A. The substance was that the company was being defamed by your clients, and it was hurting our ability to recruit a phase 3 trial, and severely damaging the reputation of the company unfairly. And we couldn't manage. It was unfair to patients. It was unfair to the company. It was unfair to employees. It's unfair to express your scientific opinion of something as fact when, in fact, it's not fact; it's opinion.

Q. And that's what you believed then that my clients were doing?

A. I believed it then and I believe it now.

Q. And was there -- did those discussions that you've just described between at least some members of the

Page 64

litigation committee, did those discussions take place in committee meetings?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: I can't recall if they were individual discussions or committee meetings. Probably a committee meeting.

Q. (By Mr. Zaur) Did such discussions take place -- well, did -- did members of the board -- setting aside the litigation committee for a moment, did members of the board discuss the purpose or purposes of the defamation action outside the presence of counsel before it was filed?

MS. LOSEMAN: You mean other than what he's --

Q. (By Mr. Zaur) Other -- other than what you've already described.

A. That would have been in a board meeting where an attorney would have been present in all likelihood. So I can't answer that.

MR. ZAUR: Sorry. Just so we have it on the record, that was a direction not to answer?

MS. LOSEMAN: Yes, that was a direction not to answer.

Q. (By Mr. Zaur) Did you discuss -- those questions are about the purpose or purposes of the

Page 65

defamation action. Did you discuss with any other member or members of the board the strength or weakness of the claims asserted in the defamation action outside the presence of counsel before it was filed?

A. It's a hard question to answer because our opinion on the strength or weakness of a case would have been guided by what the lawyers told us.

MR. ZAUR: Okay. Do you want to make a direction on that basis?

MS. LOSEMAN: Yeah, then I'll instruct you not to answer.

Q. (By Mr. Zaur) Okay. So I appreciate that. I'm going to ask another version of -- of that.

Did you discuss the strength or weakness of the claims in the defamation action with anyone outside the presence of counsel before the defamation claim action was filed?

MS. LOSEMAN: I think just a yes or no. I think that question called for just a yes or no. So it's fine.

THE DEPONENT: Yes.

Q. (By Mr. Zaur) What was the substance of those discussions?

MS. LOSEMAN: And to the extent that requires you to disclose any advice you received from

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

counsel, I instruct you not to answer.

THE DEPONENT:  Then I can't answer.

Q.  (By Mr. Zaur) Okay.  Did you discuss the likely effect of filing the defamation action with any other board members outside the presence of counsel before the defamation action was filed?

A.  Again, it would have been in a board meeting where counsel was present.

MS. LOSEMAN:  Okay.  So then I instruct you not to answer.

THE DEPONENT:  Yeah.

Q.  (By Mr. Zaur) Okay.  Did you discuss the strategy associated with the defamation action with anyone outside the presence of counsel before the defamation action was filed?

MS. LOSEMAN:  Just yes or no.  That question is fine.

THE DEPONENT:  Yes.

Q.  (By Mr. Zaur) What was the nature of those discussions?

MS. LOSEMAN:  To the extent that requires you to disclose advice you received from counsel, I instruct you not to answer.

THE DEPONENT:  I think I can answer that.

MS. LOSEMAN:  Okay.  Go ahead.

Page 67

THE DEPONENT:  The company was severely compromised by the defamatory statements brought about by your clients and others, and we ultimately believed we had no choice.

Q.  (By Mr. Zaur) What does it mean that you thought you had -- what did it mean to have no choice?

A.  Well, your clients took out a website on the internet, cassavafraud.com.  It had a number of statements on there that were false and misleading.  They were certainly defamatory.  We couldn't take it down.

We had -- we had people going to clinical trial sites and posing as patients or loved ones of patients to try to gather some form of dirt on the company.  You can't do that and run a clinical trial.

You practically could not, you know, go on the internet.  In fact, I tried.  Every time I Googled Cassava what came up first was cassavafraud.com.  We don't think that we were frauds.  The record will show that we weren't.  We had to do something.  The company was being really damaged by the defamatory statements by your clients.  That's why we filed suit.

Q.  And did you form a view as to what would happen if you did not file suit?

A.  They would continue.

Q.  And would it have been impossible to

Page 68

conduct business?

A.  Impossible is a relative word.  It would -- there was so much damage done in the Alzheimer's community by their statements, I don't know that we ever would have fully recruited the trial.

Q.  What, if anything, did you personally do to investigate the factual bases of the claims in the defamation action before it was filed?

MS. LOSEMAN:  You mean outside any discussions he had with counsel or advice he received from counsel?

MR. ZAUR:  Well, the question as stated is broader.  I certainly will accept that limiting direction.

MS. LOSEMAN:  Okay.  Yeah.  I'll limit you not to disclose anything -- anything you did as a result of discussions or advice you received from counsel on the basis of privilege.

THE DEPONENT:  I -- I read the report from Quintessential Capital Management.  I went online and read the various different things that your clients posted on cassavafraud.com.  I, of course, saw all the stories that were planted in the news media.  I saw various Tweets that were made.  They were forwarded to me because I don't have an X or Twitter or whatever you want

Page 69

to call it account.  I have no social media.  So they were forwarded to me so I knew what was being said.

Q.  (By Mr. Zaur) Which news articles were planted by my clients?

MS. LOSEMAN:  And to the extent that requires disclosure of anything you learned from counsel, I'll instruct you not to answer.

THE DEPONENT:  Yeah.  To be fair, I assumed that they were the source of various news articles.

Q.  (By Mr. Zaur) Which ones?

A.  There was one in the New York Times.

Q.  Any others?

A.  I don't remember.  There were a lot.

Q.  And you assumed that my clients were the source of one or more than one of those articles?

MS. LOSEMAN:  Object to form.

THE DEPONENT:  I think when your clients create a website called cassavafraud.com, it's pretty clear they want to get their story out.  So that is exactly what I assumed.

Q.  (By Mr. Zaur) Okay.  What, if anything -- I asked you a question about you personally a moment ago.  What, if anything, did Cassava do to investigate the factual basis for the claims in the defamation lawsuit

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

before it was filed?

MS. LOSEMAN: I'm going to instruct you --

THE DEPONENT: Yeah.

MS. LOSEMAN: -- not to answer that question to the extent it requires disclosure of communications with counsel.

THE DEPONENT: Yeah, that's counsel.

Q. (By Mr. Zaur) What, if anything, did Cassava do to investigate the strength or weakness of the claims in the lawsuit before it was filed?

MS. LOSEMAN: And to the extent responding to that question requires disclosure of any communications with counsel, I instruct you not to answer.

THE DEPONENT: Yeah, I can't answer.

Q. (By Mr. Zaur) What, if anything, did you personally do to determine the dollar value of damages to be sought in the lawsuit?

MS. LOSEMAN: Same instruction. To the extent that requires disclosure of any communications with counsel, I instruct you not to answer.

THE DEPONENT: I don't ever recall knowing or discussing the dollar value of the lawsuit.

Q. (By Mr. Zaur) Okay. That probably answers my next question, but I'm going to ask it anyway.

Page 71

What, if anything, did Cassava do to determine the dollar value of damages to be sought in the lawsuit?

MS. LOSEMAN: Same instruction.

THE DEPONENT: Yeah, that's probably client -- attorney-client privilege.

Q. (By Mr. Zaur) Was there a vote of the litigation committee to approve filing the lawsuit?

A. I don't recall. It's likely. I -- I don't remember specifically.

Q. Was there a vote of the board to approve filing the lawsuit?

A. I don't recall that either. Again, it's likely, but I don't know.

Q. So I take it you don't -- you also don't know whether or not you voted in favor of filing the lawsuit?

MS. LOSEMAN: Object to form.

THE DEPONENT: Yeah, I don't remember there -- I'm not saying it didn't happen. I just don't remember. But I would have voted in favor. I'll make that clear.

Q. (By Mr. Zaur) When was the decision made to file the lawsuit?

A. It's a hard one to answer without

Page 72

revealing privilege.

MS. LOSEMAN: Okay. Then I -- then I instruct you -- well, I believe --

THE DEPONENT: Actually I think --

MS. LOSEMAN: -- if the question is calling just for the time -- the time period -- the time period for when the decision was made, you can answer that question.

THE DEPONENT: Let me try to answer it this way. We sought advice from lawyers to advise us on what was the best course of action.

MS. LOSEMAN: Well, and I'm going to -- to the extent it goes into what -- what you asked counsel to advise you on, don't disclose that. If -- you can disclose only the date the decision was made, if you recall it.

THE DEPONENT: Yeah, I don't recall.

MS. LOSEMAN: You can disclose the date, but not communications with counsel.

THE DEPONENT: Yeah, I don't recall the date.

Q. (By Mr. Zaur) You've answered the next two questions in part, I think.

What was Cassava's purpose or purposes in filing the lawsuit?

Page 73

MS. LOSEMAN: I'm going to object. I think that that's been asked and answered.

But also instruct you to the extent that requires disclosure of any communications with counsel that you not reveal those.

THE DEPONENT: I think it was simple. To stop the defamatory statements.

Q. (By Mr. Zaur) Do you recall that the defamation case was dismissed by Judge Woods in March of 2024?

A. I heard about that.

Q. During the period between the filing of the lawsuit and the dismissal of the First Amended Complaint, did the litigation committee discuss the progress of the lawsuit?

MS. LOSEMAN: You can answer yes or no.

THE DEPONENT: The answer is I don't -- I don't remember.

Q. (By Mr. Zaur) During that same interval, between the filing of the lawsuit and the dismissal of the First Amended Complaint, did the litigation committee have any further discussions about the strength or weakness of the lawsuit?

MS. LOSEMAN: You can answer yes or no.

THE DEPONENT: Yes, I think.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

Q. (By Mr. Zaur) What was the substance of those discussions?

MS. LOSEMAN: And I'll instruct you not to answer that question to the extent it requires disclosure of communications with counsel.

THE DEPONENT: Yeah, it does.

Q. (By Mr. Zaur) During the same interval from the filing of the lawsuit to the dismissal of the First Amended Complaint, did you discuss the strength or weakness of the claims asserted in the lawsuit with anyone outside the presence of counsel?

A. Probably with Sandy and Remi.

Q. Okay. And what was the substance of those discussions?

A. We felt --

MS. LOSEMAN: And hold on. To the extent those discussions require you to disclose what you learned from counsel regarding the strength or weaknesses of the claims, I'll instruct you not to answer.

THE DEPONENT: Okay. Can't answer.

Q. (By Mr. Zaur) During the same interval, which is to say between the filing of the lawsuit and the dismissal of the First Amended Complaint, did you discuss the purpose or purposes of the lawsuit with anyone outside the presence of counsel?

Page 75

A. Yes.

Q. What was the substance of those discussions?

MS. LOSEMAN: And to the extent disclosing the substance of those communications would reveal communications with counsel, I instruct you not to answer.

THE DEPONENT: Yeah, I can't answer.

Q. (By Mr. Zaur) During the same interval, after the lawsuit was filed and before the First Amended Complaint was dismissed, what, if anything, did you personally do to investigate the factual basis for the claims in the lawsuit?

A. The claims that we made?

Q. Yes.

A. Same answer I gave before. I read the Quintessential report. I read cassavafraud.com. There were social media posts forwarded to me by friends and colleagues.

Q. You did those things again after the lawsuit was filed?

A. Oh, I don't know if it was again, but I was aware of them. But, no. Did I -- did I perform an independent investigation? No.

Q. During that same interval of time, after

Page 76

the lawsuit was filed and before the dismissal of the First Amended Complaint, what, if anything, did Cassava do to further investigate the factual basis for the claims asserted in the lawsuit?

MS. LOSEMAN: And to the extent that requires disclosure of communications with counsel, I instruct you not to answer.

THE DEPONENT: Yeah, it would.

Q. (By Mr. Zaur) Do you understand that Magistrate Judge Ona Wang recommended that the lawsuit be dismissed in a series of decisions in January of 2024?

MS. LOSEMAN: Object to the form to the extent it misstates.

And I'll instruct you not to answer to the extent it requires disclosure of communications with counsel.

THE DEPONENT: I can't answer.

Q. (By Mr. Zaur) Did you discuss the magistrate judge's recommendation with respect to dismissal with anyone outside the presence of counsel at any time?

A. I don't think so.

Q. Did you discuss Judge Woods' dismissal of the lawsuit with anyone outside the presence of counsel at any time?

Page 77

A. I don't think so.

Q. Did you discuss -- yes or no -- Judge Woods' dismissal of the lawsuit in the presence of counsel?

A. I think I'm going to need you to clarify. Who's Judge Wood [sic]?

Q. The magistrate judge was Ona Wang. And she recommended that the case be dismissed. Some period of time after that in March Judge Woods ordered that the case be dismissed.

A. Okay.

Q. This is my characterization. You may disagree.

A. And what was your question about that?

Q. I think she wants to make a record of that.

MS. LOSEMAN: I do want to make an objection. For the record, you continue to mischaracterize the nature of Judge Woods' decision.

You can answer -- I believe it was did you discuss that decision --

MR. ZAUR: Yes.

MS. LOSEMAN: -- with anyone other than counsel?

MR. ZAUR: Can I just fix the -- I want to fix the question.

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

MS. LOSEMAN: Sure.

MR. ZAUR: What's the nature of my mischaracterization?

MS. LOSEMAN: I believe it was dismissed without prejudice.

MR. ZAUR: Okay. My question was whether it was dismissed, but, okay. I'll stand on the question.

Can we have it back?

I'll just -- I can -- I can ask it again.

Q. (By Mr. Zaur) Did you discuss Judge Woods' decision with respect to the dismissal of the lawsuit with anyone ever?

MS. LOSEMAN: Same objection.

You can answer that yes or no.

THE DEPONENT: Yes.

Q. (By Mr. Zaur) What was the substance of those discussions?

MS. LOSEMAN: To the extent those discussions were with counsel, I instruct you not to answer the question.

THE DEPONENT: They were -- they were only with counsel.

Q. (By Mr. Zaur) So just to be clear, you never discussed Judge Woods' dismissal -- or Judge's -- Judge Woods' order with respect to the dismissal of the

Page 79

lawsuit outside the presence of counsel?

A. I don't remember doing that, no.

Q. Did you understand -- did you understand that Judge Woods gave Cassava permission to try again to allege certain defamation claims?

MS. LOSEMAN: Object to form.

And to the extent that requires you to disclose anything you learned from discussions with counsel, I instruct you not to answer.

THE DEPONENT: I can't answer it then.

Q. (By Mr. Zaur) Sitting here today, do you believe that all of Cassava's factual allegations in the First Amended Complaint were true?

MS. LOSEMAN: Do you -- you're referring to Exhibit 74?

MR. ZAUR: Yes.

MS. LOSEMAN: Do you want him to read the document?

THE DEPONENT: It's a big document.

Q. (By Mr. Zaur) I don't want you to sit here and read it. I want to know what, if anything, you know. And if the answer is you don't know, then that's the answer I would get.

A. Yeah. It's -- my answer today is I don't know. It's -- I -- I don't know if I ever read the whole

Page 80

document. I would assume if an attorney filed it that it would be truthful.

Q. Do you -- sitting here today, not having reread the Complaint in the last hour at least, do you have any reason to doubt the accuracy of any of the factual allegations that Cassava made in the First Amended Complaint?

A. No.

(Exhibit 75 was marked.)

(Discussion off the record.)

Q. (By Mr. Zaur) Mr. Barry, you've been handed what's been marked as Exhibit 75. Do you recognize this document?

A. I don't know if I -- I don't recall whether there was one document filed or two. So I can't say I know this one, but I don't know that one, if that makes any sense. Maybe I read this one and I never -- I just don't know.

Q. Let me try this. Can I direct your attention to the line at the top of Exhibit 74 that we were looking at before?

A. Mm-hmm.

Q. Do you see that there's a line -- blue text at the top? I can represent to you that that blue text is stamped -- or is applied to the document by the court's

Page 81

filing -- electronic filing system.

Directing your attention to the date, so towards the right-hand side, do you see that it's notated as having been filed in November of 2022? And directing your attention to -- well, to the same line on Exhibit 75, do you see that the filed date on that line is in April of 2024?

A. I do.

Q. Having looked at those two dates, do you have any understanding as to whether Cassava filed a new, different Complaint after the first Complaint was dismissed?

A. I just don't remember.

Q. Did Cassava, to your knowledge, make a decision to -- to file a new Complaint after the first Complaint was dismissed?

MS. LOSEMAN: Object to form.

And to the extent it requires disclosure of communications with counsel, I instruct you not to answer.

THE DEPONENT: It would.

Q. (By Mr. Zaur) Yes or no. Was there any discussion within the litigation committee as to whether or not to file a Second Amended Complaint after the First Amended Complaint was dismissed?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

MS. LOSEMAN:  You can answer that yes or no.

THE DEPONENT:  I don't remember.

Q.  (By Mr. Zaur)  Not to torture you, but I'm going to ask you that question a couple other -- a couple other ways.

Yes or no.  Was there any discussion within the board more broadly with any other member of the board about whether or not to file a Second Amended Complaint after the First Amended Complaint was dismissed?

MS. LOSEMAN:  And you can answer that yes or no.

THE DEPONENT:  I don't remember.

Q.  (By Mr. Zaur)  Sitting here today, do you have any view as to whether it was a good idea to file a Second Amended Complaint in April of 2024 after the First Amended Complaint was dismissed?

MS. LOSEMAN:  Objection.  Vague.

But I also instruct you not to answer to the extent it requires disclosure of communications with counsel.

THE DEPONENT:  The honest answer is I don't have a view because I don't remember the distinction between the two.  I just knew there was a lawsuit.

Page 83

Q.  (By Mr. Zaur)  Did my client change their behavior in your observation after the lawsuit was filed?

A.  I have trouble sequencing things.  My gut is no, but I don't honestly remember the order of when certain things were said, what date they made certain posts.  But I don't believe they changed their behavior.

Q.  Did you think that they would change their behavior?  Before the lawsuit was filed, did you think that filing a lawsuit would change their behavior?

A.  I can only answer that question in what I -- what I would have thought.  If such a suit were brought against me, my behavior would have changed.  I can't speak for what other people are going to do.

Q.  I think I understand that, but I'm asking, I think, a slightly different question which is did you anticipate that my clients' behavior would change after Cassava filed the defamation lawsuit?

MS. LOSEMAN:  Objection.  Vague.  Asked and answered.

MR. ZAUR:  He didn't answer.

MS. LOSEMAN:  He did answer it.

THE DEPONENT:  I would have -- I would have expected it would.  But I would have expected that because that's what I would have done.  I don't know your clients.

Page 84

Q.  (By Mr. Zaur)  Did you hope that my clients' behavior would change after you -- after Cassava filed the defamation case?

A.  Absolutely.

Q.  Did you think it was likely?

MS. LOSEMAN:  Objection.  Vague.  Asked and answered.

THE DEPONENT:  Again, I would have changed my behavior.

Q.  (By Mr. Zaur)  That's really not what I'm -- what I'm asking.  I'm asking you what was your estimation at the time the lawsuit was filed of the likelihood that it would have an effect on my clients' --

A.  My --

Q.  -- public statements?

MS. LOSEMAN:  Objection.  Vague.  Asked and answered.

You can answer it again.

THE DEPONENT:  Yeah.  My -- my expectation was that their behavior would change -- would change, but that expectation was based upon how I would have reacted.

Q.  (By Mr. Zaur)  Because you expected them to behave as you would behave?

MS. LOSEMAN:  Objection.  Misstates.

THE DEPONENT:  When someone posts things

Page 85

on the internet that are blatantly false such as calling Cassava Theranos 2.0, which if I remember right was not your clients who said, it was somebody else, I would never have -- I would never send a letter to a company, to the SEC, to the press.  I would never -- because -- but that was what was available to me in the 1990s or whatever.  I would never publish something on the internet unless I was absolutely sure it was factual.

So I would have expected if I put out something on the internet and it was untrue and I was sued from it, I would have been remorseful, frankly, but I never saw any sign of remorse from your clients.

Q.  (By Mr. Zaur)  Do you recall that Cassava voluntarily withdrew the lawsuit against my clients in August 2024?

A.  Yes.

Q.  Why did Cassava do that?

MS. LOSEMAN:  And again, I'll instruct you not to disclose communications with counsel or legal advice that you received in response to that question.

THE DEPONENT:  No, it was my decision.  The board probably approved it.  But I think you have to understand that in July of '24 I was less than two months out from major back surgery.  I was living in Michigan which was a half a mile away from my two grandkids.  I

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

hadn't had a job in years and years. I went to Austin because I believed in the drug, and I wanted the drug to have a chance to succeed in the phase 3 trial. I wanted the data out.

When I got there, I realized that the company had no commercial plan. It really hadn't ordered -- hadn't really placed the orders with manufacturing that it should have placed in my view. If you're planning on success, you need to have manufactured product. You have to have stability data, and all these other things.

So there was a question of where do you want to invest your precious capital? Do you want to invest it on the things that will create value for shareholders such as if you're successful in phase 3, or do you want to invest your capital in a lawsuit? And at the time, the company was swimming in lawsuits, and legal expenses were completely out of control.

I wanted to invest the money in things that would generate value for shareholders, and that's why I said I don't want to pursue this. The phase 3 trials at that point were fully enrolled and about to read out.

THE REPORTER: "...about to read out"?

THE DEPONENT: Yeah, read out.

Page 87

THE REPORTER: Thank you.

Q. (By Mr. Zaur) So how -- I'm struggling to understand how the calculus had changed between the decision to file and the decision to withdraw. Was it -- was it -- it's fair to say you knew before Cassava filed the lawsuit that it was going to cost money, right?

MS. LOSEMAN: Object to form. Misstates.

THE DEPONENT: Every lawsuit is going to cost money. Yeah.

Q. (By Mr. Zaur) Okay. And that expense would not go to other business purposes, right?

MS. LOSEMAN: Objection. Vague.

THE DEPONENT: Correct.

Q. (By Mr. Zaur) You're spending money on the lawsuit. You're not spending it on something else, right?

MS. LOSEMAN: Objection. Vague.

THE DEPONENT: Correct.

Q. (By Mr. Zaur) And I think you testified, but I'll just -- I'll just ask you. Is that the reason you decided to withdraw the lawsuit in August of 2024 --

MS. LOSEMAN: Object --

Q. (By Mr. Zaur) -- because you wanted to put the money somewhere else?

MS. LOSEMAN: Apologies.

Objection. Misstates prior testimony.

Page 88

THE DEPONENT: I wanted to invest the company's precious capital in endeavors that would create shareholder value. This was not going to create shareholder value.

Q. (By Mr. Zaur) When you -- when Cassava filed the lawsuit, did you believe it was going to create shareholder value?

A. Indirectly, yes.

Q. Did that view change between filing the lawsuit and the decision to withdraw the lawsuit? Did you come to believe that the lawsuit was not creating shareholder value?

MS. LOSEMAN: Objection. Vague as to time.

THE DEPONENT: Yeah, I did.

Q. (By Mr. Zaur) Why did it change?

A. It changed because the phase 3 trials were fully enrolled at that point. So if we had the data that I had expected, success, then we could have created value from it. When we filed the lawsuit, they were not fully enrolled. We feared that they couldn't get fully enrolled given the noise. We had clinical sites that were dropping out because of the defamatory statements made by your clients. But it was very different in July and August of '24.

Page 89

Q. So the purpose of -- put it a different way.

By August of '24, the purpose of protecting enrollment in the phase 3 trials had been served?

THE DEPONENT: The trials were fully enrolled.

MS. LOSEMAN: Hold on. Were -- were you done with your question? I couldn't -- I couldn't tell --

MR. ZAUR: Well, yes.

MS. LOSEMAN: -- if it was a statement or if there was a question still coming.

MR. ZAUR: The only other word would have been "is that right."

MS. LOSEMAN: Then objection. Misstates. Asked and answered.

Go ahead.

THE DEPONENT: Yeah, the trials were fully enrolled, so, yes.

Q. (By Mr. Zaur) How much did -- how much money did Cassava spend on the defamation lawsuit?

A. I -- I don't recall.

Q. Are you able to give any approximation?

A. No, no. So the initial spend would have been when I was a director, not an operating executive.

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

So I would not have seen the granularity of This expense is for this case and this expense is for that. I wouldn't have seen it.

I know -- I know what we were spending when I became executive chair and CEO. Well, correction. I know what we were spending in the big picture, not necessarily what we were spending on that case. But it's -- legal cases are costly.

Q. But you're not able to put any specific dollar figure on what Cassava spent on the defamation case?

A. Sitting here right now, no.

Q. More than a million dollars?

MS. LOSEMAN: Object to form. Asked and answered.

THE DEPONENT: I would estimate substantially more than a million dollars.

Q. (By Mr. Zaur) More than $5 million?

MS. LOSEMAN: Object to form.

THE DEPONENT: I don't -- I don't know.

Q. (By Mr. Zaur) Could it have been?

MS. LOSEMAN: Object to form. Calls for speculation. Asked and answered.

THE DEPONENT: I don't know.

Q. (By Mr. Zaur) But whatever amount of money

Page 91

that was, that was money you wanted to spend on something else?

A. Yes.

MS. LOSEMAN: Object to form.

THE DEPONENT: Not just something else. Things that would create value for the company.

Q. (By Mr. Zaur) Which the lawsuit would not do?

MS. LOSEMAN: Object to form. Vague. Misstates.

THE DEPONENT: In my view it was not going to create value for us in the summer of '24. The money -- the money was better spent elsewhere.

Q. (By Mr. Zaur) Did you discuss the decision to withdraw the lawsuit with anyone at all?

MS. LOSEMAN: That's a yes or no. You can answer that yes or no.

THE DEPONENT: Yes.

Q. (By Mr. Zaur) What was the substance of those discussions?

A. It was with my lawyers.

MS. LOSEMAN: Then I instruct you not to answer.

Q. (By Mr. Zaur) Did you discuss the decision to withdraw the lawsuit with anyone other than counsel?

Page 92

A. No.

Q. Did you discuss it -- this is included within that answer, but I want to be extra clear. Did you discuss the decision to withdraw the lawsuit with anyone on the board outside the presence of counsel?

A. Not outside the -- not outside the presence of counsel, no.

MS. LOSEMAN: And, Counsel, we've been going a little over an hour.

MR. ZAUR: Okay. Let's take a break.

THE VIDEOGRAPHER: We are going off the record. The time is 11:40 a.m.

(Recess from 11:40 a.m. to 11:56 a.m.)

THE VIDEOGRAPHER: We are now back on the record. This is the beginning of Media Unit 4. The time is 11:56 a.m.

Q. (By Mr. Zaur) A couple of follow-up questions that your counsel may also direct you not to answer.

Did Cassava consider suing anyone else for defamation beyond the defendants in the defamation action?

MS. LOSEMAN: To the extent that requires disclosure of communications with counsel, I instruct you not to answer.

THE DEPONENT: I don't remember.

Page 93

Q. (By Mr. Zaur) Did Cassava consider suing the New York Times?

A. No.

Q. Why not?

MS. LOSEMAN: Again, to the extent that requires disclosure of advice you received from counsel or communications, I instruct you not to answer.

THE DEPONENT: Because despite how I may disagree with the New York Times and their political bias, it is a legitimate news organization. Your clients created lies and falsehoods and put them on the internet. There's a very big difference.

Q. (By Mr. Zaur) Did anyone other than the defendants in the defamation action create lies and falsehoods about Cassava and put them on the internet?

A. Probably in social media, but I'm not on social media. So these things get forwarded to me. What I saw was what your clients put out there.

Q. Whose idea was it to file the defamation lawsuit?

MS. LOSEMAN: To the extent --

THE DEPONENT: It was counsel.

MS. LOSEMAN: Okay. Then I instruct you you not to answer.

THE REPORTER: I'm sorry. One more time.

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

MS. LOSEMAN:  I instruct you not to answer.

Q.  (By Mr. Zaur) I'll hand you a copy of a document that's previously been marked as Plaintiffs' Exhibit 56.  Mr. Barry, do you recognize this document?

A.  I don't actually.

Q.  Before today, did you know that Cassava had conducted an audit of Dr. Wang's lab at CUNY in 2022?

A.  Before today I knew that they conducted an audit.

Q.  When did you learn that?

A.  In June of last year.

Q.  June of 2024?

A.  Correct.

Q.  How did you learn it?

MS. LOSEMAN:  If that -- if you learned it through counsel, then I instruct you not to answer.

THE DEPONENT:  I learned it through counsel, yeah.

Q.  (By Mr. Zaur) Okay.  So other than through discussions with counsel, you never learned that Cassava had conducted an audit of Dr. Wang's lab at CUNY; is that right?

A.  I don't recall ever learning that until I learned last June.

Page 95

Q.  Okay.  If you look in the top line of the second table on the first page of Exhibit 56, do you see where there's a notation Audit Date or Dates?

A.  Yes.

Q.  And do you see right next to that there's a notation that recites On-site audit, September 21st and 22nd of 2022?

A.  I see that.

Q.  Do you remember when the defamation claim action was filed?

A.  I wouldn't have remembered, but it's sitting in front of me.

Q.  So fair to say the audit took place about two months before the action was filed?

A.  Based on what you've handed me, that looks like the sequence, yes.

Q.  When -- at the time Cassava filed the defamation action, what was your understanding of the relationship between Cassava and Dr. Wang's lab at CUNY?

MS. LOSEMAN:  And if that's based solely on communications with counsel, I'll instruct you not to answer.

THE DEPONENT:  No, I think I can answer that.

It -- I knew that Dr. Wang's lab had

Page 96

performed some amount of foundational research that created the drug.  At that time I knew that.

Q.  (By Mr. Zaur)  You knew that Dr. Wang's lab had performed some of the preclinical research that underlay the proposed organism of action of the drug?

A.  I had learned possibly from the Citizen's petition.  It was filed in 2021.  I think that is where I learned to what extent Wang had done work for the company.  I knew that Wang had performed the bio- -- the biomarker data redo from the phase 2b.  But I don't really remember whether I knew the extent of his involvement prior to that.

Q.  Did you know when Cassava -- when Cassava filed the defamation case, did you know at that time that Dr. Wang had performed the biomarker assay redo for the phase 2b?

A.  I believe so.

Q.  Drawing your attention to page 5 of the audit report, which the number is at the bottom right.  You've probably seen this before.  We call those Bates numbers.  So the document says page 5, but the Bates number is a string of digits ending in 6686.

Do you see that?

A.  Yes.

Q.  Do you see that in the last paragraph the

Page 97

audit report concludes that CCNY is considered unacceptable and temporarily not qualified to provide biomarker analysis and research services for any future Cassava studies.

Do you see that?

A.  I see it.

Q.  Would you have wanted to know that before deciding to file the defamation case?

MS. LOSEMAN:  Object to form.  The document speaks for itself.  Lack of foundation.  Calls for speculation.

Go ahead.

THE DEPONENT:  I'm sorry.  I'm trying -- I'm trying to answer your question.

Q.  (By Mr. Zaur)  That's okay.

A.  I don't think I would have cared.

Q.  Can you say why not?

A.  Because your clients posted lies, falsehoods, mischaracterizations, assassinated my character on the internet publicly.  That had nothing to do with Hoau-Yan Wang.  Calling me a serial fraudster.  Really?  So, no, it wouldn't have changed my mind.

Q.  Did my clients say anything about the reliability of the science conducted in Dr. Wang's lab?

A.  They did, but since they lied about

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

everything else, why should I have believed that?

Q.  Did they say anything about the reliability of the CSF biomarker redo in the phase 2b trial that was conducted at Dr. Wang's lab?

A.  They did, but they lied about everything else.  So why should I believe it?  You see, when you lose all credibility by your lies, I'm not going to believe anything you say.  That's their problem.  These were not differences of scientific opinion.  These are outright lies.

Q.  Tell me all --

A.  There's a big difference.

Q.  Tell me all the outright lies.

A.  Theranos 2.0.  Let's see.  I've been going to that office now for, I don't know, 13 months.  Still haven't found the room with all the fake machinery.  It's absolute nonsense and they know it.

Saying there's no foundational research for the drug is absolute nonsense.  There were plenty of studies shown that this drug was a legitimate drug.  Was it going to work on Alzheimer's?  I don't know.  That's why you run a phase 3 trial.  But to say that this was, quote, unquote, all made up, their quote, is an outright lie.

It dismisses the work from the Cochin

Page 99

Institute.  It dismisses the work from Professor Bordey at Yale.  It's absolute nonsense, and it was hyperbole, specifically, so they could get the share price down and they could make money on the short position.  It's outrageous.

So, no, I have -- I give them -- I give them no credibility to anything they say.  And they can hide behind the, oh, it's a different scientific opinion.  They can hide behind that all day long.  It wasn't.  They made things up and it damaged the company.  And we almost failed to do a phase 3 trial as a result of their actions.  That is why we sued them.

Q.  Okay.  Do you think they were right about the reliability of the science conducted at Dr. Wang's lab?

MS. LOSEMAN:  Object to form.  Asked and answered.

THE DEPONENT:  My understanding of the, I don't know, audit report, which I've never seen until five minutes ago, is that Wang's lab was considered unacceptable and temporarily not qualified because of his sloppiness, not because his work wasn't right.  He was sloppy.

Q.  (By Mr. Zaur)  Do you know if he kept lab notebooks?

Page 100

A.  I don't know.  I assume he did.

Q.  If he didn't keep any lab notebooks at all, is that something that you would have wanted to know before you filed the defamation case?

MS. LOSEMAN:  Object to form.  Improper --

THE DEPONENT:  It would not have --

THE REPORTER:  Whoa, whoa, whoa. "...improper..."

MS. LOSEMAN:  Hypothetical.  Calls for speculation.

Thank you.

THE REPORTER:  Your answer?

THE DEPONENT:  It wouldn't have changed my mind.

Q.  (By Mr. Zaur)  If you knew that the research practices in the lab were so sloppy that the science coming out of it couldn't be relied upon, would that have changed your mind about filing the defamation case?

MS. LOSEMAN:  Object to form.  Misstates the record.

THE DEPONENT:  It would not.

Q.  (By Mr. Zaur)  As a member of Cassava's board, would you have expected to learn of an audit report reaching the conclusion reflected on page 5 of this audit

Page 101

report?

MS. LOSEMAN:  Object to form.

Are you asking him about just the paragraph he read into the record or about the entirety of this audit report?

MR. ZAUR:  I'm asking him if he would have expected to learn about the existence of an audit report that contained that language.  I recognize it contains other language.  But I'm asking him if he would have expected to learn about the existence of an audit report that contains that language.

MS. LOSEMAN:  Well, to fairly answer that do you want him to read the document?

MR. ZAUR:  It's certainly fine, but I don't actually think it's necessary.  I'm asking him a very -- a very specific question.  If an audit report contained that language, would that make you, as a board member, want to know about it?

MS. LOSEMAN:  Object to form.  Foundation. Calls for speculation.

THE DEPONENT:  Yes.

MS. LOSEMAN:  Answer if you can.

THE DEPONENT:  Yes.

Q.  (By Mr. Zaur)  Why?

A.  Because of the furor that was -- for lack

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

of a better word, that was raised about research done by Dr. Wang by the critics, and particularly your clients. It would have been helpful as a director to know that this report existed.

Q. Is there anyone at Cassava who would have been responsible for making you aware of that?

A. As a director, your principal contact is the CEO.

Q. Do you think Mr. Barbier should have let you know that that audit report existed?

A. I'd say it differently. I don't recall him telling me about this.

Q. Do you think he might have?

A. It's possible. But when I learned of it in June of last year, I thought that was the first I had ever heard that.

Q. Okay. So I'm going to go back to my earlier question. Whether he did or not, do you think Mr. Barbier should have told you about this audit and report that came out of it?

A. Yes.

Q. Do you know why he didn't?

A. No.

Q. Did you ever discuss it with him?

A. No.

Page 103

Q. Is there anything else that you have come to learn about the company's business that you think Mr. Barbier should have told you about that he did not?

MS. LOSEMAN: Object to form. Vague. Overbroad.

THE DEPONENT: This covers a broad range, so I'm trying to think this through.

Q. (By Mr. Zaur) It is a broad question.

A. Yeah.

Q. But I hope it's specific enough to be understood. Do you understand the question?

A. Repeat it, please.

Q. Apart from the audit we've just been discussing, is there anything else that you've come to learn about Cassava's business that you believe today Mr. Barbier should have told you about that he did not?

MS. LOSEMAN: Same objection.

THE DEPONENT: Yes.

Q. (By Mr. Zaur) What?

A. Two things come to mind. The fact that we had not -- had not submitted a purchase order for the quantity -- the quantity of drug that we would need if we were successful.

Q. That's what you were talking about before. That's something you learned when you visited Texas in

Page 104

July of 2024?

A. Yes. Sorry.

Q. My apologies. You said there were two things, and I interrupted you. Can you clarify the first?

A. Yeah. And I've lost track of the second one. I can't remember the second right now.

These were operational things. They were -- I don't think there was an obfuscation or anything. They were operational things that I would have expected that just were not done.

The other was a commercial plan. I'm sorry. I would have expected that there had been some degree of a rigorous commercial plan that had been prepared.

Q. And is that also something that you discovered in your July '24 visit that didn't exist?

A. There was a commercial plan that existed, but I would not call it rigorous.

Q. Do you know whether Cassava conducted audits of its research partners as a matter of routine before you became the lead executive?

A. I don't think I knew that before I became the executive chair.

Q. Well, do you know now whether or not they did before you became executive chair?

Page 105

A. Now I know they did, yes.

Q. Do you know when that practice began?

A. I don't.

Q. Can you turn to the second page of the audit report? There are dated signatures.

Do you see that?

A. Yes.

Q. And the signatures are both dated October 18 of 2023.

Do you see that too?

A. Yes.

Q. Do you have any understanding of why over a year passed between the on-site audit on September 21st and 22nd of 2022 and October of '23?

A. No.

Q. Does that raise any concern for you?

MS. LOSEMAN: Object to form. Foundation. Calls for speculation.

THE DEPONENT: I -- there's probably a good explanation, but I don't know what it is.

Q. (By Mr. Zaur) You would expect there to be a good explanation for that?

A. Yes.

MS. LOSEMAN: Object to form.

Q. (By Mr. Zaur) Did Cassava consider the

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

results of this audit in deciding to file the defamation case?

MS. LOSEMAN:  Object to form.

And instruct you not to answer to the extent that reveals communications with counsel.

THE DEPONENT:  I think I've already answered it.

Q.  (By Mr. Zaur) Well, to be clear, I've asked a number of questions about whether it would have influenced your decision-making personally.  The broader or slightly different question I'm trying to ask now is whether it affected Cassava's decision organizationally to file the defamation claim.  But I note your counsel has interposed a direction.

MS. LOSEMAN:  Yeah.

To the extent you know the answer to that question and it's as a result of communications with counsel, I instruct you not to answer.

THE DEPONENT:  I can't answer the question.  It's -- I didn't know about the existence of the audit report.

Q.  (By Mr. Zaur) Sitting here today, does the existence of the audit report alter your own assessment of whether or not Cassava could have approved any of the factual allegations in the Complaint?

Page 107

MS. LOSEMAN:  Object to form.

Are you asking -- he hasn't read the audit report.  And you're asking him to opine, sitting here today, without reading the report?  Is that the question?

MR. ZAUR:  That's the question right now.  He read a part of the report.

THE DEPONENT:  Can you repeat the question because I don't think I understand it.

Q.  (By Mr. Zaur) Does the language we looked at in the report -- you've seen that now today, right?

A.  Well, you pointed it out to me.

Q.  Does -- does anything about that language change your view as to whether Cassava would have been able to prove any of the factual claims it asserted in the Complaint?

MS. LOSEMAN:  Objection.  Foundation.  Calls for speculation and calls for a legal conclusion.

THE DEPONENT:  In the Complaint that the company filed against --

Q.  (By Mr. Zaur) Yes.

A.  -- your clients, you're asking whether they -- would we not have been able to prove the claims that we made?

Q.  Any of them, correct.

A.  Any of them.

Page 108

MS. LOSEMAN:  Same objections.

THE DEPONENT:  No.

Q.  (By Mr. Zaur) Okay.  Mr. Barry, I've handed you a document that's previously been marked as Plaintiffs' 61.  Do you recognize this document?

A.  No.

Q.  I'm going to ask you to just read to yourself the first two pages.  Just so you know, I'm going to have a few specific questions.  But my first and most general question is going to be whether reviewing those two pages helps you understand what this document is or not.

MS. LOSEMAN:  And I'm going to object as to foundation and calling for speculation.

THE DEPONENT:  What was the question?

Q.  (By Mr. Zaur) I didn't even ask one yet.

MS. LOSEMAN:  Well, it was unclear to me reading the transcript whether -- you -- you described the general question you're posing.  It was unclear to me whether it was actually posed.

Q.  (By Mr. Zaur) I suggested looking at the first two pages.  But, actually, I invite you to take a look generally through the document and see if there's anything about it.

(Discussion off the record.)

Page 109

(Exhibit 76 was marked.)

Q.  (By Mr. Zaur) Based on that limited review, are you able to recognize what this document is?

A.  It looks like a report probably from the FDA of their findings from the investigation of Dr. Wang's lab.  I've never seen it before so I couldn't say for sure.  That's what it looks like.

Q.  Before today were you aware that the FDA conducted an inspection of Dr. Wang's lab in September of 2022?

A.  I knew they had conducted an inspection of his lab.  I didn't know when.

Q.  Looking at the second page of the document with the Bates number ending 1530, do you see at the conclusion of the third paragraph there's a recitation that says, We issued a form FDA 483 containing the following eight observations.

Do you see that?

A.  I see it.

Q.  Before today, were you aware that the FDA issued a form FDA 483 concerning certain observations at Dr. Wang's lab in September of 2022?

A.  I don't recall whether I knew that or not, but it would not surprise me.

Q.  Would it have made any difference to your

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

judgment concerning the decision to file the defamation action?

A. Absolutely not.

Q. Why not?

A. Because FDA doesn't -- I'm familiar with FDA's inspections of manufacturing facilities. I've seen lots of those. And when FDA goes into a facility, they almost always find observations that they're unhappy with and they issue a 483. So I probably would be surprised if they didn't find anything.

Q. I'm going to hand you what I've marked as Exhibit 76. I'll ask you to take a look at that. Do you recognize this document?

(Exhibit 76 was marked.)

A. No.

Q. Do you recognize it to be FDA form 483?

A. That's what it says on it, yes.

Q. Do you see in the upper right that the dates of inspection and FEI number corresponds to the establishment inspection report that we looked at a moment ago?

A. Yes.

Q. Does this appear to you to be the form 483 issued by the FDA associated with this inspection of Dr. Wang's lab in September of 2022?

Page 111

A. It -- it has every marking that would tell me that it is.

Q. Okay. Directing your attention to the first paragraph within the observations box on the first page of Exhibit 76. Do you see the recitation that these observations pertain to the bioanalytical study to measure certain analytes?

A. I see it.

Q. And you see that it recites that analysis used ELISA methods --

THE REPORTER: I'm sorry.

MR. ZAUR: ELISA, capital E- -- all caps. E-L-I-S-A, and Western blots.

THE DEPONENT: I don't see mention of Western blots. Oh, I see. No, I see it now.

Q. (By Mr. Zaur) Okay. And do you see at the end of that sentence a reference to study PTI-125-02?

A. Yes.

Q. What is PTI -- what is study PTI-125-02?

A. I believe it was a phase 2 study for the Alzheimer's program.

Q. Was it the phase 2b study?

A. It doesn't say.

Q. Okay. Do you know if those are the analytes that were analyzed by Dr. Wang's lab in the

Page 112

phase 2b study, or you don't know?

A. I don't know. I don't remember.

Q. Do you see the first observation recites that the ELISA assays used in the study were not validated/verified?

A. I see it, yeah.

Q. It goes on to say, Specifically, the site used commercially available ELISA kits without in-house validation/verification of assay parameters, such as accuracy, precision, and sensitivity of the method.

A. I see it, yeah.

Q. Is that observation something that you would have wanted to know as a director of Cassava in 2022?

MS. LOSEMAN: Objection. Foundation. Calls for speculation.

THE DEPONENT: Yes.

Q. (By Mr. Zaur) Did you know it?

A. I don't remember. I knew there was an inspection. I knew 483s were issued. The specific language, I couldn't tell you.

Q. You knew -- you knew contemporaneously that there was an inspection?

A. No, I knew at some point. I just don't know when.

Page 113

Q. Did you know it before Cassava filed the defamation action?

A. I don't remember.

Q. Did you know specifically that the FDA had concluded that the ELISA assays used in the study were not validated/verified?

A. I did not know that.

Q. Did you see -- drawing your attention to the second observation in that same box, do you see the recitation that the curve-fitting --

MR. ZAUR: Sorry. I know.

THE REPORTER: Yeah, I lost you at "curve-fitting."

MR. ZAUR: The curve-fitting model used for ELISA assays was not adequately justified.

Q. (By Mr. Zaur) Do you see that language?

A. Yeah. Yes.

Q. Were you aware of that observation at any time before today?

A. I don't think so.

Q. Is that something you would have wanted to know as a director of Cassava?

MS. LOSEMAN: Object to form. Foundation. Calls for speculation.

THE DEPONENT: It would not have mattered

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

to me.

Q. (By Mr. Zaur) Do you know what a curve-fitting model is?

A. I know what a curve-fitting model is. This is an academic lab. It's not a commercial lab. The standards are different. So I would not have had -- I would have not held Dr. Wang's lab to the standards of a large commercial lab that does work for pharma companies.

Q. Would you have expected him to use the correct curve-fitting model for the assay?

MS. LOSEMAN: Object to form. Misstates. Vague.

THE DEPONENT: You're -- you're now getting me past my skis.

Q. (By Mr. Zaur) Meaning you don't -- you don't have the specific --

A. I don't have the scientific background.

THE REPORTER: Whoa, whoa, whoa.

THE DEPONENT: Sorry.

THE REPORTER: The question again.

MR. ZAUR: We can just take the answer.

THE REPORTER: I didn't hear the question. I don't have the answer.

MR. ZAUR: Okay. Did you get over my skis?

Page 115

THE REPORTER: Something like that.

MR. ZAUR: That's fine. We can just leave it. I think we understand what we mean.

Me too, by the way.

Q. (By Mr. Zaur) Drawing your attention to the next page, I'll skip to the last observation. Do you see observation number 8 which admits that the site did not calibrate major equipment during the sample analysis period or could not provide documentation for instrument calibration and maintenance?

A. I see it, yeah.

Q. Were -- were you aware of that observation before Cassava filed the defamation case?

A. No.

Q. Would it have made any difference to you?

A. It would not.

MS. LOSEMAN: Objection.

Q. (By Mr. Zaur) Is it something you would have wanted to know as a director of Cassava?

MS. LOSEMAN: Objection. Foundation. Calls for speculation.

THE DEPONENT: I think I need to make a statement about the structure of the board. So I've sat on three public company boards. And each board member brings a level of expertise from his field that he knows

Page 116

to the board. I am not bringing the scientific expertise to these boards. So would this have been nice to know? Yes. But would I have been enough of a crit- -- could I have done a critical evaluation to really understand it at the time? No, I'm not a scientist. I don't pretend to be.

Q. (By Mr. Zaur) Was there anyone on the Cassava board during your tenure on the board who would have been able to understand and assess the importance, if any, of these observations?

A. Yes.

Q. Who is that?

A. Dr. Pat Scannon, Dr. Bob Gussin.

Are we talking about today or back then?

Q. I'm talking about at the time the FDA inspection occurred and the FDA letter was issued.

A. I don't think I'm forgetting anybody. Those two in particular, yeah.

Q. Do you know whether Dr. Scannon or Dr. Gussin saw the 483 letter?

A. I don't know.

Q. Would you have wanted them -- as a fellow board member, would you have wanted them to review it?

MS. LOSEMAN: Objection. Calls for speculation.

Page 117

THE DEPONENT: If I knew of its existence, I probably would have relied on their interpretation of it. They may have known. I don't know.

Q. (By Mr. Zaur) They didn't mention it to you?

A. No.

Q. What's an investigator's brochure?

A. What is an investigator's brochure?

Q. Yeah.

A. It's a brochure that goes to principle -- or investigators in clinical trials.

Q. What's it for?

A. It provides all of the background -- it provides all the background research that has been done on the drug --

THE REPORTER: I'm sorry. "...on the..."

THE DEPONENT: Drug candidate.

THE REPORTER: Thank you.

Q. (By Mr. Zaur) Do you know whether Cassava was directed to make changes to the investigator's brochure by the FDA in light of the September 2022 inspection that we've just been discussing?

A. I don't know.

Q. I'll hand you what's been previously marked as Exhibit 66. Sorry. I'm sure you're familiar with

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

this, but the earliest email in time is the furthest back in the document. So you'll see on the second to last page of the document, the email thread begins with an email from Emilios Papanastasiou of the FDA to Michael Marsman at Cassava Scientists.

Do you see that?

A. I do, yeah.

Q. Who is Michael Marsman?

A. He is the senior vice president of regulatory at Cassava.

Q. Does that mean he was a contact person with the FDA for the company?

A. He -- he would be.

Q. Do you see at the bottom of that email, the second paragraph to the end recites, The above audit has since been completed.

And do you understand from the email that that's a reference to the FDA audit we just were discussing that gave rise to the 483 letter?

MS. LOSEMAN: Object to form. Foundation. Are you asking him to interpret the email as he's reading it today?

MR. ZAUR: Yes, yes, yes.

MS. LOSEMAN: Okay. Object to form. Foundation. It calls for speculation.

Page 119

THE DEPONENT: It looks like that's the -- that's what they're referring to, but I don't know for sure.

Q. (By Mr. Zaur) Do you see that there is a direction to remove certain data from the current investigator's brochure?

MS. LOSEMAN: Object to form. Foundation. Calls for speculation.

Q. (By Mr. Zaur) I'm just asking if you see that in the email.

A. I see it.

MS. LOSEMAN: Same objections.

Q. (By Mr. Zaur) Was -- if you go up one email in the chain, you see that Mr. Marsman writes back to Mr. Papanastasiou and requests that the data in question be maintained until substitute data can be provided. Do you see that request in the second full paragraph of Mr. Marsman's email?

MS. LOSEMAN: Objection. Foundation. Calls for speculation.

THE DEPONENT: I see a sentence that Cassava proposes to have retained CSF samples analyzed by a different laboratory, if that's what you mean.

Q. (By Mr. Zaur) Yeah. Do you understand what that means?

Page 120

A. I do.

Q. What does it mean?

A. To the extent that the samples still existed from that study, they wanted to send them to a different laboratory to have Wang's results validated.

Q. And was Mr. Marsman proposing in the second sentence of that paragraph, beginning, Accordingly, and going on to the next page?

MS. LOSEMAN: Object to form. Document speaks for itself. Calls for speculation.

THE DEPONENT: He's proposing to keep the data in -- in the IB -- or investigator's brochure until we have results from another lab.

Q. (By Mr. Zaur) And if you go forward in time to November 16th, do you see that at 8:24 a.m. Mr. Papanastasiou writes back to Mr. Marsman? I'm directing your attention to the second paragraph numbered 2. Do you see that he denies -- refuses Mr. Marsman's request to retain the data until substitute data can be created?

MS. LOSEMAN: Object to form. Document speaks for itself. Foundation. Calls for speculation.

THE DEPONENT: I see that they're unable to agree.

Q. (By Mr. Zaur) Who has the last word on

Page 121

whether the data gets included in the IB --

MS. LOSEMAN: Object to form. Foundation. Vague.

Q. (By Mr. Zaur) -- if you know?

A. From a practical point of view, it's the FDA.

Q. And the data that is under discussion in this email thread is the CSF biomarker data analyzed by Dr. Wang in the phase 2b study, right? Do you understand that?

MS. LOSEMAN: Object -- object to form. Foundation. Calls for speculation.

Q. (By Mr. Zaur) You don't know? You can't tell?

A. I don't know because the -- this document isn't specific about phase 2b. So it's phase 2.

Q. Do you know if Cassava, in fact, deleted the data that's being discussed here from the investigator's brochure?

A. I don't know.

MS. LOSEMAN: Object to form.

THE REPORTER: Was your answer "I don't know"?

THE DEPONENT: I don't know.

Q. (By Mr. Zaur) Would you have wanted to

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

know?

MS. LOSEMAN: Object to form. Calls for speculation.

THE DEPONENT: I would have wanted to know any- -- anything that could threaten the Alzheimer's program. And I don't know -- I would have to understand from a regulatory person because regulatory affairs is complicated. I'd have to understand would that threaten the program? And sitting here today, I don't know. But I did not know about any of this correspondence.

Q. (By Mr. Zaur) Looking back to the date of Mr. Papanastasiou's first email to Mr. Marsman, do you see the date of that email is November 1st of 2022?

A. Mm-hmm. Yeah.

Q. Do you know when the defamation action -- well, fair to say that's the same week the defamation action was filed?

A. It's still sitting here.

Q. So, yes?

A. Yes.

Q. A day -- a day or -- a day or two before the defamation action was filed?

A. It would appear that way.

Q. Was the FDA's inspection discussed by the litigation committee before the defamation action was

Page 123

filed?

MS. LOSEMAN: And I'm going to instruct you not to answer on the basis of attorney-client communications.

Q. (By Mr. Zaur) Was the FDA's 483 letter discussed by the litigation committee before the defamation action was filed?

MS. LOSEMAN: Same instruction.

Q. (By Mr. Zaur) Was the correspondence from the FDA directing removal of certain data from the investigator's brochure as a result of the FDA's inspection discussed by the litigation committee before the defamation action was filed?

MS. LOSEMAN: I'm going to object to that question as a mischaracterization of the record, but I'm also going to instruct you not to answer on the basis of privilege.

Q. (By Mr. Zaur) Having looked at those documents related to the FDA's inspection in 2022, is there anything about that inspection that would have altered your view of the merits of the defamation action?

MS. LOSEMAN: I'm going to object. You're asking him to -- having looked at those documents related to the FDA's inspection. You mean the documents he was shown today?

Page 124

MR. ZAUR: Yeah, that he may or may not have seen before.

MS. LOSEMAN: Limiting it to the documents he's seen today, I'm going -- I'm going to object on the basis of foundation. Calls for speculation.

But you can answer if you can.

THE DEPONENT: I don't believe it would have changed my mind. The purpose of the lawsuit was to stop the defamatory and outright lies from your clients towards the company. And there were enough in that document that I know personally were outright lies that I would not have hesitated based upon this information. It would not have changed the fact that it was all made up, or it's Theranos 2.0, or I'm a serial fraudster. Those facts would not have changed based upon what you're showing me. So, no, I don't think it would have changed my mind.

MS. LOSEMAN: Counsel, I don't mean to interrupt. We've been going over an hour.

MR. ZAUR: Oh, really?

MS. LOSEMAN: There is lunch available.

MR. ZAUR: I think my brain reset when we had our short break or something, but that's fine. We can stop.

THE VIDEOGRAPHER: We are going off the

Page 125

record. The time is 12:52 p.m.

(Recess from 12:52 p.m. to 1:41 p.m.)

THE VIDEOGRAPHER: We are now back on the record. This is the beginning of Media Unit 5. The time is 1:41 p.m.

Q. (By Mr. Zaur) Mr. Barry, I'm going to hand you a stack of exhibits which I've marked as a -- as a group. They are Exhibits 77, 78, 79, 80, 81, 82, and 83.

(Exhibits 77 through 83 were marked.)

Q. I'm going to ask you to take a look at them together. And I'm going to circulate to the different groups.

(Discussion off the record.)

Q. (By Mr. Zaur) Just for convenience on the record, 77 ends in 545144, 78 ends in 799544, 79 ends in 395575, 80 ends in 1435249, 81 ends in 1435250, 82 ends in 1434669, and 83 ends in 1440099.

Mr. Barry, do you recognize these meeting minutes of litigation committee meetings?

A. They seem to be.

Q. Is that correct? The minutes were kept of litigation committee meetings?

A. They would have been. I didn't keep them. I don't know if I ever saw them.

Q. Okay. Were they adopted in the ordinary

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

course like minutes of some other meetings might be?

A. I just -- I just don't know. I don't remember.

Q. Okay. And looking at just, for example, 77 at the top of the stack, you see that the minutes recite the attendees and some logistical information, and that the entire substance of the discussion has been redacted for privilege.

Do you see that?

A. Yes.

MR. ZAUR: And, Ms. Loseman, I assume that if I ask Mr. Barry to testify about the substance of the redacted text, you'll instruct him not to do that?

MS. LOSEMAN: Well, to the extent he has any recollection, yes, I would instruct him.

MR. ZAUR: And that would be true for each of these sets of minutes; is that fair?

MS. LOSEMAN: Again, to the extent sitting here today he has any independent recollection of what was discussed with counsel, I would instruct him not to disclose communications with counsel.

MR. ZAUR: Okay. We can put those to the side.

Q. (By Mr. Zaur) Mr. Barry, drawing your attention once again to late November -- late 2022,

Page 127

specifically November of 2022 when Cassava commenced the defamation action, fair to say you were aware at that time that the United States Department of Justice and the Securities and Exchange Commission had initiated investigations into Cassava or Dr. Wang at that time?

A. I believe so.

Q. Did anything about the pendency of those investigations impact your view of the likelihood that Cassava would prevail in the defamation case?

MS. LOSEMAN: And I'll instruct you not to answer to the extent if doing so recalls -- or requires you to divulge communications with counsel.

THE DEPONENT: What was the question again?

Q. (By Mr. Zaur) Did anything about the pendency of those investigations impact your view of Cassava's likelihood of prevailing on the defamation case?

MS. LOSEMAN: Same instruction.

THE DEPONENT: No.

Q. (By Mr. Zaur) Similar but related question. I think it's my last question on this topic.

Did anything about the pendency of those investigations impact your view of Cassava's ability to prove any of the factual allegations in its Complaint?

MS. LOSEMAN: Same instruction.

Page 128

THE DEPONENT: No.

Q. (By Mr. Zaur) As of November 2022, were you aware that the journal PLOS One had retracted an article authored by Dr. Wang, among others, related to research that he had -- that he had done?

A. I don't remember the dates. I know there were publications who retracted and publications who refused to retract. And I couldn't tell you which was which. And I couldn't tell you the dates.

Q. Were you aware of any of those retractions or expressions of concern as of November 2022 when the defamation case was filed?

A. I don't know. I -- that's a sequence I don't remember that well.

Q. Did anything about any journal's retraction of any article or expression of concern about any article impact your assessment of Cassava's likelihood of prevailing in the defamation action?

A. No.

MS. LOSEMAN: Same --

Q. (By Mr. Zaur) Did anything about any retraction or expression of concern impact your assessment of Cassava's ability to prove any of the factual allegations in its Complaint?

A. No.

Page 129

Q. Are you aware today that some of those retractions or expressions of concern relate to alleged improprieties in images related to Western blot testing performed by Dr. Wang?

A. The publications that retracted, their reason for doing it was because of their questions about the Western blot imaging from Dr. Wang's lab. I'm aware that that has happened.

Q. Do you independently -- withdrawn.

Do you personally have a view as to whether Dr. Wang inappropriately manipulated any images of any Western blots?

A. I'm not qualified to have a view.

MR. ZAUR: Let's mark 84.

THE REPORTER: Mm-hmm.

(Exhibit 84 was marked.)

Q. (By Mr. Zaur) Mr. Barry, do you remember Mr. Barbier making a public statement in the days following the publication of the Citizen's petition?

A. Do I remember him making a public statement, or do I remember him making this public statement?

Q. My first question is do you remember him making any public statement?

A. Vaguely.

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

Q.  Do you recognize the content of the document that I put in front of you?

MS. LOSEMAN:  Why don't you take a moment to read the document.

MR. ZAUR:  Yeah, please.

THE DEPONENT:  What was it?  I vaguely remember it.

Q.  (By Mr. Zaur)  Let me -- I think it was the transcript of a statement, but let me --

A.  Okay.

Q.  -- let me ask you a couple of questions.

I take it you don't immediately recognize the text?

A.  I don't.

Q.  Looking at the bottom of page 5 of this document, Bates number ending 310876, Mr. Barbier says, As a reminder, Cassava Sciences does not have its own laboratory facilities.

Do you see that?

A.  Mm-hmm.  Yes.

Q.  And that was -- that was true.  You told me that earlier, right?

A.  Yes.

Q.  We use other people's labs, he writes.

Do you see that?

Page 131

A.  Yes.

Q.  And he says, For this reason, we don't have the original films or images for the Western blots in question.

And from your review of -- just of this document today, do you understand that when Mr. Barbier refers to the Western blots in question he's referring to some Western blots created by Dr. Wang that are the subject of some challenge?  Do you understand that from the context of this document?

MS. LOSEMAN:  Objection.  Foundation. Calls for speculation.

THE DEPONENT:  It seems to be the case.

Q.  (By Mr. Zaur)  Was this -- was this true that Cassava did not possess the original films or images for any of the Western blots that were challenged?

A.  I don't know.

Q.  Does Cassava have them today?

A.  I don't know.

Q.  Have -- as the CEO of Cassava, have you done anything to find out if Cassava possesses any of those original films or images?

A.  No.

Q.  Have you directed anyone at Cassava to find out if Cassava possesses any of those original films or

Page 132

images?

A.  No.

Q.  Did -- at the -- in September of 2021, did Cassava have the right to take possession of those original films or images based on its contractual relationship with CUNY?

MS. LOSEMAN:  Objection.  Calls for a legal conclusion.

And I'll instruct you not to disclose any communications you've had with counsel.

THE DEPONENT:  And I have no idea.

Q.  (By Mr. Zaur)  Today as CEO of Cassava, does -- do you know if Cassava has the right to take possession of any data or images generated by Dr. Wang?

A.  I don't know.

MS. LOSEMAN:  Objection.  Calls for a legal conclusion.

And instruct you not to disclose any communications with counsel.

Q.  (By Mr. Zaur)  Do you see that Mr. Barbier recites here that he has respectfully requested that CUNY inquire thoroughly but expeditiously into the allegations targeting Professor Wang?

Do you see that?

A.  I see it now, yeah.

Page 133

Q.  Recognizing you may not remember this document, did you know in September of '21 that Mr. Barbier had requested CUNY to undertake a thorough and expeditious investigation into the allegations targeting Proffer Wang?

A.  I had heard that CUNY was doing an investigation.  I don't know that I could tell you why they were doing it.  I don't know if that was in response to something where we asked them.  I don't know.

Q.  Did you, as a board member of Cassava, approve Mr. Barbier asking CUNY to undertake an investigation of the allegations against Dr. Wang?

MS. LOSEMAN:  Objection.  Foundation.

THE DEPONENT:  I'm going to try to be polite.  Your question is ridiculous.  Board members do not get to the level of granularity that you're suggesting.

Q.  (By Mr. Zaur)  So the answer to the question is answer no?

MS. LOSEMAN:  Objection.  Asked and answered.  Misstates.

MR. ZAUR:  He didn't answer the question.

MS. LOSEMAN:  He did.

Q.  (By Mr. Zaur)  Did you or did you not approve this request by Mr. Barbier?

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

MS. LOSEMAN: Objection. Foundation. Misstates the testimony. Asked and answered.

MR. ZAUR: You can object to form. You do not need and it is not permissible in the Southern District of New York to provide a litany of reasons for your objection unless I ask for it.

MS. LOSEMAN: It is a short and plain statement of my objection. That's all I'm making.

MR. ZAUR: I'll ask you to keep it short and plain.

MS. LOSEMAN: You're mischaracterizing his testimony.

MR. ZAUR: I'm asking him a question. I haven't mischaracterized anything.

MS. LOSEMAN: You have.

You can respond.

MR. ZAUR: I'm asking you tell me --

MS. LOSEMAN: I'm sorry. Are you asking me what you mischaracterized?

MR. ZAUR: I'm asking you to tell me what I've mischaracterized.

MS. LOSEMAN: He said he didn't know.

MR. ZAUR: He said he didn't know what?

MS. LOSEMAN: He didn't know -- he testified -- and I'm happy to do this without the -- with

Page 135

the witness out of the room if -- if you'd prefer.

MR. ZAUR: I just think you're attacking my question with no basis at all.

MS. LOSEMAN: No. I'm asking you to explain it.

MR. ZAUR: I'm asking you about something very simple.

MS. LOSEMAN: But I don't want to be accused of coaching the witness in explaining my objection.

MR. ZAUR: You can --

MS. LOSEMAN: Okay. I just want to make -- make the record clear.

The reason I objected is because he testified that he recalled that CUNY did an investigation. He couldn't recall why. You're now assuming that there was a direction -- that he knew a direction was given to CUNY.

MR. ZAUR: I'm not making that assumption at all. I understand it.

MS. LOSEMAN: Your question is making that assumption. That's why I'm objecting to it.

MR. ZAUR: The objection is wrong.

Q. (By Mr. Zaur) Yes or no. Did the board direct or approve Mr. Barbier asking CUNY to undertake an

Page 136

investigation?

MS. LOSEMAN: Same objections.

THE DEPONENT: I don't remember it ever becoming a board conversation.

Q. (By Mr. Zaur) Do you think it was a good idea on Mr. Barbier's part?

A. To ask CUNY to do an investigation --

Q. Yeah.

A. -- of -- what was it -- of the allegations?

Q. That's what his language here says. His language here is fairly general.

A. That would be -- yeah, that's a fair request.

Q. On the next page Mr. Barbier says, Based on our long-term scientific relationship with Dr. Wang, we support his scientific integrity and ethics in the strongest possible terms.

Do you see that?

A. In the middle paragraph?

Q. Yes.

A. Yes.

Q. The third sentence in the middle paragraph.

A. Yes.

Q. Does Cassava today, based on its experience

Page 137

and relationship with Professor Wang, still support his scientific integrity and ethics in the strongest possible terms?

A. I've never met Dr. Wang. I've never spoken to him. All I know about Dr. Wang I know from people that know him well. But I know he was an immigrant from Taiwan. Doesn't speak very good English. He's autistic. And he's sloppy. That's what I know about him.

He came up with some pretty brilliant observations in his career. So I can't sit here and malign him if he made a mistake on Western blot images because Western blot images, as I've come to understand, they're sort of in the eye of the beholder.

The company commissioned a study of four independent experts to look at all of the questionable Western blots from Dr. Wang. And you may have seen them. But none of them had a problem with them. However, there were -- as you cite, there were publications that withdrew them. And why? Because they were browbeaten by your clients and they got afraid of constantly being badgered.

I admire the publications that didn't because they would stand up to bullies. So I don't know what to tell you about Dr. Wang since I've never met him.

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

Q. There's a few different things in there. Is it -- is it your belief that the journals that retracted articles authored by Dr. Wang did so because they were browbeaten by my clients into doing so?

A. That is my belief.

Q. And is it your belief that any journal that has published an expression of concern with respect to research authored by Dr. Wang likewise did so because they were browbeaten by my clients?

A. That's my belief.

Q. And is that one of the things you wanted to stop with the defamation action?

MS. LOSEMAN: Object to form. Misstates.

THE DEPONENT: No. Again, it's -- I don't think I understand the question.

Q. (By Mr. Zaur) Can you describe the study that Cassava commissioned by four independent experts to review the challenged Western blots?

A. It was four independent experts who were hired. And actually I think they were hired by the law firm. I think they were hired by Orrick.

Q. Okay.

A. I'm not sure.

Q. Do you know their names?

A. Of the experts? I know one of the names.

Page 139

I knew them all at the time when I saw the results. But I only recognize -- two names I recognize. One I definitely recognize. The others I didn't know.

Q. And when you say saw the results, describe the study to me.

MS. LOSEMAN: And we may need to step out for a moment because the witness said they were -- believes they may have been retained by the law firm, so I just want to make sure we're protecting any work product. Can we break?

THE VIDEOGRAPHER: We are going off the record. The time is 2:07.

(Recess from 2:07 p.m. to 2:13 p.m.)

THE VIDEOGRAPHER: Back on the record. This is the beginning of Media Unit 6. The time is 2:13.

MS. LOSEMAN: And I'm going to instruct the witness not to answer on the basis of attorney-client privilege.

MR. ZAUR: Okay. I'm going to explore the boundaries of that just a little bit.

MS. LOSEMAN: I understand.

Q. (By Mr. Zaur) Yes or no. Was a study commissioned by Cassava to review the propriety of the Western blots that had been challenged?

THE DEPONENT: Commissioned by?

Page 140

MS. LOSEMAN: I'm going to object to form as vague.

MR. ZAUR: It was actually his phrasing from before. So it may be vague, but I'm trying to understand.

THE DEPONENT: Probably a misuse of the word.

MS. LOSEMAN: It -- well, hold on. I'm objecting because it's commissioned by Cassava.

MR. ZAUR: Okay.

MS. LOSEMAN: If you're including within that Cassava's counsel, I'm going to instruct him not to answer on the basis of attorney-client privilege.

Q. (By Mr. Zaur) Okay. So outside of any work that may have been done by Cassava's counsel, did Cassava ever commission an independent study of the Western blots that were challenged?

MS. LOSEMAN: Outside of what Cassava's outside counsel did?

MR. ZAUR: Yeah, I think that's how my question began.

MS. LOSEMAN: I'm sorry. I'm not getting the --

MR. ZAUR: Yeah.

Page 141

MS. LOSEMAN: It's coming in and out. It's me. I'll check.

THE DEPONENT: Not that I'm aware of.

Q. (By Mr. Zaur) Outside of work that may have been done by Cassava's counsel, did Cassava do anything to investigate whether Dr. Wang had improperly manipulated images of Western blots?

MS. LOSEMAN: And to the extent answering that question requires the disclosure of anything you learned from communications with counsel, I'll instruct you not to answer.

THE DEPONENT: Yeah. All of -- all of the knowledge that I have of efforts that were made to investigate were done through counsel. That's -- that's all I know.

Q. (By Mr. Zaur) Okay. Pardon me just a second. Did CUNY conduct an investigation?

A. That's a good question.

Q. Do you know whether they did or not?

A. I know that they -- I only know what has been public information, which was they were -- they were doing an investigation. Someone at CUNY leaked it to the media. And we later found out that that investigation was not complete and it shouldn't have been leaked. I

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

don't know if they ever did a proper investigation.

Q. What's your basis for saying that investigation was not complete?

A. That's what I heard.

Q. From where?

A. I don't remember.

Q. Did you ever read the report that was leaked?

A. No.

Q. Do you know what conclusions it reached?

A. I don't remember. I read the New York Times story.

Q. I'll hand you what I've marked as Plaintiffs' 85.

(Exhibit 85 was marked.)

Q. Do you recognize this statement from the City University of New York?

A. I don't -- I don't remember the statement, but this is clearly where I got what I just told you.

Q. Recognizing the statement or not, do you remember what action City University of New York took in or around October of 2023 with respect to its investigation of Dr. Wang and his lab?

A. You mean after somebody leaked it?

Q. The date is the date. But, yes, it was

Page 143

after the report became public.

A. This is all I know, what they've said in this statement. That's the extent of my knowledge about CUNY.

Q. Okay. Drawing your attention to the email just above Mr. Barbier's email forwarding that statement, there's an email from you to Mr. Barbier copying Mike Sitrick and Sandy Robertson.

Do you see that?

A. Yeah. My email?

Q. Your email, yeah.

A. Yeah.

Q. What did you mean by "Awesome!"?

A. I was referring to something that I don't know that I can discuss.

MS. LOSEMAN: I'll instruct the witness not to disclose communications with counsel.

THE DEPONENT: Yeah.

Q. (By Mr. Zaur) What did you mean by "Well done Chris Cook!"?

MS. LOSEMAN: Same instruction.

To the extent that requires disclosure of communications with counsel, I instruct you not to answer.

THE DEPONENT: It would.

Page 144

Q. (By Mr. Zaur) Who is Mike Sitrick?

A. Mike is a professional PR guy.

Q. And why -- was he doing work for Cassava at this point in time, or I should say was his -- was he or his firm doing work for Cassava at this point in time?

A. Mike was a longtime friend of Sandy Robertson's. Mike -- Sandy held Mike in the highest regard in terms of crisis management communications. Sandy strongly encouraged Remi to utilize Mike's services. I don't know whether Remi ever really did or not.

Q. Okay. Does Mr. Sitrick or his firm work for Cassava today?

A. Today, no.

Q. Do you -- do you know if they were -- slightly different than your previous answer I think.

Do you know if they were ever engaged by Cassava to do work for Cassava?

A. Yes, I engaged them.

Q. Okay. When?

A. July of last year when I became executive chair. Actually maybe a few days before that to be precise, but...

Q. Okay. And do you have an understanding of whether they were working for Cassava before that time?

Page 145

A. I don't know. I know that -- all I know is Sandy encouraged Remi to use Mike.

Q. Okay.

A. I don't know that Remi listened.

Q. Do you know that Chris Cook wrote a letter to CUNY after the report was leaked?

MS. LOSEMAN: I'm going to --

MR. ZAUR: And that fact is -- the fact is public. But I -- I don't know how you want to do it.

MS. LOSEMAN: Yeah. I think yes or no. I think that was a question that called for a yes-or-no answer. That's fine.

THE DEPONENT: Yes.

Q. (By Mr. Zaur) Did you read that letter before it was sent?

A. I read the letter. I don't remember if it was sent or not.

Q. Before or after?

A. That I don't know, but I read the letter.

Q. What was the purpose of the letter?

MS. LOSEMAN: I'll instruct you not to answer to the extent that requires divulging communications with counsel.

Q. (By Mr. Zaur) And is that also the reason you can't answer my question about what you meant by

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

"Awesome!  Well done Chris Cook!"?

A.  You can draw an inference.

MS. LOSEMAN:  Well, I'm going to --

Q.  (By Mr. Zaur)  I'm trying to tread -- I'm trying to tread carefully.

MS. LOSEMAN:  I'm going to instruct you not to respond to the extent any inference can be drawn about what you discussed with counsel.

Q.  (By Mr. Zaur)  Does Cassava have a Scientific Advisory Board today?

A.  No.

Q.  But sometime in the past Cassava had a Scientific Advisory Board; is that correct?

A.  My -- that's my understanding.

Q.  Was it dissolved at some point?

A.  That's my understanding.

Q.  When was it dissolved?

A.  When -- I believe it was after the Citizen's petition was filed and the members of the SAB were getting browbeaten by short sellers.

Q.  And did something happen as a consequence of them getting browbeaten by short sellers?

A.  My understanding is they did not -- they didn't want any more of that.

Q.  Okay.  And so -- and so what happened to

Page 147

the Scientific Advisory Board?  Did they all resign?

A.  I don't know.  It was dissolved is all I know.

Q.  Was it dissolved by any act of Cassava's board of directors?

A.  No.

Q.  Was it dissolved by any act of the Scientific Advisory Board?

A.  Not that I'm aware of.

Q.  So when you say it was dissolved, what do you mean?

A.  This is just my understanding, was that the members -- and I don't even remember who they were and how many of them there were -- were all harassed considerably by the critics and the short sellers.  And I don't know if they said, I don't want to do this anymore, or if the management at that time said, We don't want to put you through this any longer.  I'm not sure which of those cases.  I just know it didn't exist after that.

Q.  You were on the Cassava board of directors when this happened, right?

A.  I think so.

Q.  Okay.  Was -- was a person named Jeffrey Cummings on the Scientific Advisory Board?  Does that ring a bell for you?  Steven Arnold?

Page 148

A.  Don't know.

Q.  Charles Asson [phonetic] or Eisen [phonetic]?

A.  Paul Asson?

Q.  Paul Asson.  Excuse me.

A.  I don't know.

Q.  It's wrong here on my notes.

You don't know if he was or was not?

A.  No, I don't know who was on it.

Q.  Okay.  Did you ever hear that any member of Cassava's Scientific Advisory Board had expressed disbelief at the phase 2a results?

A.  No.

Q.  Did you ever hear that any member of the Scientific Advisory Board had expressed that those results looked too good to be true?

MS. LOSEMAN:  Object to form.  Misstates the record.

But go ahead.

THE DEPONENT:  Yes.

Q.  (By Mr. Zaur)  What was the -- what are you remembering?

A.  This is an attorney-client privileged conversation.

Q.  Well, don't -- I'm sure Ms. Loseman will

Page 149

tell you not to answer that.

MS. LOSEMAN:  I so instruct you.

Q.  (By Mr. Zaur)  Okay.  Outside of any communications you may have had with counsel, did you ever hear that any member of the Scientific Advisory Board suggested getting the phase 2a results replicated by a second lab?

A.  Getting which results?  I'm sorry.

Q.  The phase 2a results.

A.  Phase 2a?

Q.  Yeah.

MS. LOSEMAN:  And same instruction.

THE DEPONENT:  Phase 2a.  So we're not talking about the biomarkers?

Q.  (By Mr. Zaur)  Well, yes, I'm talking about the biomarkers from the phase 2a.

MS. LOSEMAN:  And, again, I'll instruct you not to answer to the extent it divulges attorney-client communications.

THE DEPONENT:  Yeah, I'm not aware of any anyway.

Q.  (By Mr. Zaur)  Would you -- as a member of Cassava's board of directors, would you have wanted to know if a member of the Scientific Advisory Board expressed disbelief at Cassava's reported clinical

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

results?

MS. LOSEMAN: Object to form. Misstates the record. Improper hypothetical. Calls for speculation.

THE DEPONENT: It's a hard one because it would depend on the circumstances. So if somebody in the Scientific Advisory Board felt absolutely certain that there was something amiss in the data, and that was a highly credentialed and highly respected person, would I want to know? Yeah. But people leave boards and advisory boards for lots of different reasons. So I just don't know.

Q. (By Mr. Zaur) Did you consult -- I guess -- I think I know the answer to this question based on some of your -- your previous answers about timing, but I'm just going to -- I'm just going to ask the question anyway, and you can tell me if it makes sense.

Did you consult with any member of the Scientific Advisory Board in deciding whether to commence the defamation action?

A. No.

Q. Is that because the Scientific Advisory Board had been dissolved at that point?

A. Not -- not to my knowledge, no.

Q. You think it was still in place at the time

Page 151

the Cassava filed the defamation action?

A. I don't know if it existed or it didn't exist. But the reason for filing the defamation case was because we were defamed and because it was damaging to the company. We didn't need scientists to tell us that.

Q. So -- so in point of fact, you did not consult with any current or past member of the Scientific Advisory Board in deciding whether or not to commence -- to commence the defamation action?

A. No.

Q. I'm going to ask those questions about you personally. I'm going to ask the same questions about Cassava.

Did Cassava consult with the Scientific Advisory Board in deciding whether to commence the defamation action?

MS. LOSEMAN: And I'm going to instruct you not to disclose any communications with counsel.

THE DEPONENT: I have no idea.

Q. (By Mr. Zaur) After Cassava commenced the defamation action, did you ever consult with any member of the Scientific Advisory Board in order to consider whether or not to continue with the defamation action?

A. No.

Q. Did Cassava do so?

Page 152

MS. LOSEMAN: Same objection and instruction.

THE DEPONENT: Not that I know of.

Q. (By Mr. Zaur) Did you consider the expertise of the Scientific Advisory Board or its members relevant in any way to the defamation action?

MS. LOSEMAN: Objection. Asked and answered.

THE REPORTER: Your answer was?

THE DEPONENT: No.

Q. (By Mr. Zaur) You made reference a little while ago to an article published in the New York Times that was critical of Cassava and the science underlying simufilam. Do you remember that testimony?

A. I remember saying that, but I can't remember which article because there were several.

Q. I see. Do you recall there was an article that quoted nine different scientists who were critical in one way or another of Cassava and the science underlying simufilam?

A. That was in the New York Times?

Q. Yeah.

A. I remember not word for word. I remember the gist of the article, yeah.

Q. Are you aware that Cassava reached out to

Page 153

that reporter and made certain comments about the article before it was -- or the research associated with the article before it was published?

A. No. Who was the reporter?

Q. The name is Apoorva Mandavilli.

THE REPORTER: I'm sorry. One more time for the name.

MR. ZAUR: Apoorva, A-p-o-o-r-v-a. I'm going to dig it out in a second. Mandavilli. This is April of 2022. We'll mark this as 86.

(Exhibit 86 was marked.)

MS. LOSEMAN: I'm sorry. What number are we on?

MR. ZAUR: Shoot. I just said it and I don't know. 86.

THE REPORTER: 86.

MS. LOSEMAN: 86.

Q. (By Mr. Zaur) Does that article look familiar?

A. Vaguely, yeah.

Q. But you don't remember this reporter communicating with Cassava before the article was published?

A. No.

(Exhibit 87 was marked.)

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

Q.  I'm handing you -- handing you another document that I've just marked as 87.  Just -- sorry.

Going back to 86 for a second.  I'll give you a moment to review 87.  But just on 86, is this an article that you believe my clients instigated?

MS. LOSEMAN:  I'm sorry.  When you say this article, which --

MR. ZAUR:  86.

MS. LOSEMAN:  86?  Okay.

THE DEPONENT:  I -- I don't know that it was your clients.  But I do know how journalists work.  And journalists get their stories from somewhere.  I mean, they write negative stories.  They get their stories from short sellers.  And what is outlined in this story is pretty much the short story told by your clients and the other people in this case.  So it's -- it's -- I don't think it's a leap of faith to say they could have, but I don't know.

Q.  (By Mr. Zaur) But you were -- you were concerned about that, and that's one reason that you commenced the defamation action?

A.  I wasn't concerned about what they were planting in the media as -- well, that's not true.  I was concerned about what they were planting in the media, but I was concerned because it was having an effect on the

Page 155

company's business or enrolling in the trial.  And I was concerned because the company's reputation was being unfairly destroyed by statements that were defamatory and untrue.

Q.  And you could say if this is -- if I'm understanding you correctly, but did you have a concern that my clients were both directly damaging the reputation of Cassava by saying false things about it and also indirectly damaging the reputation of Cassava by instigating articles of this kind?

MS. LOSEMAN:  Objection to the extent it calls for a legal conclusion.

THE DEPONENT:  Can you repeat the question?  Sorry.

Q.  (By Mr. Zaur) I'm really -- I'm really trying to understand the nature of your -- of your concern.  I think you've -- I think you've said so far that you had a concern that my clients were damaging Cassava's reputation and clinical trial program by saying false, negative things about it in public; is that right?

MS. LOSEMAN:  Objection to the extent it misstates.

But go ahead.

THE DEPONENT:  That understates it, but I had more than a concern, but, yes.

Page 156

Q.  (By Mr. Zaur) Okay.  Did you also have a concern that my clients were damaging Cassava's reputation and clinical trial program indirectly by instigating articles of this kind?

MS. LOSEMAN:  Objection to the extent it calls for a legal conclusion.

THE DEPONENT:  I would -- knowing the way media works, I would have assumed that the stories were given to the reporters by short sellers.  Whether they were your clients, I don't know.

Q.  (By Mr. Zaur) I see.  Is that one of the things you wanted to stop with the defamation action?

MS. LOSEMAN:  Object to form.  Asked and answered.

THE DEPONENT:  We wanted to stop false, misleading, untruthful information that happened to be defamatory towards the company.  That was it.  I have not read this article in three years, so I don't -- I couldn't tell you what's in here.  In terms of what's false and misleading, I don't know if this article is an example of that or not.  There are plenty others.

Q.  (By Mr. Zaur) Plenty other articles that are an example of that --

A.  Yeah.

Q.  -- that you did want to prevent?

Page 157

A.  Yeah.

Q.  Did Cassava reach out to any of the scientists who are quoted in this article after it was published?  And you may -- I know you took a moment before, but you may want to take a moment again to see the -- the number of individual scientists are named.  Maybe I can -- maybe I can kind of walk us through it.

Do you see in the middle of the second page there's a reference to Dr. Roger Nicoll?

A.  I'm not aware that Cassava reached out to Dr. Nicoll.

Q.  Okay.  Do you see at the top of the next page there's a quote attributed to a Dr. Thomas Südhof?  For the moment I'm just asking if you see that --

A.  I see it.

Q.  -- attribution of that quotation.

Did Cassava -- after this article was published, did Cassava reach out to Dr. Südhof --

A.  I don't know.

Q.  -- to discuss the views expressed in this article?

A.  I don't know.

Q.  In -- two paragraphs down, there's a reference to a Dr. Lawrence Honig.

Do you see that?

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

A. Yeah.

Q. Did Cassava ever reach out to Dr. Honig about the views that he expressed in this quotation -- or in this quotation that's attributed in this article?

A. I don't know.

Q. Again, would that be the same answer for all the other scientists quoted in the article?

A. They're all the --

THE REPORTER: I'm sorry?

MS. LOSEMAN: Object to form.

THE DEPONENT: I was a director, not an operating executive.

Q. (By Mr. Zaur) Would you have expected the operating team to have reached out to any of these scientists?

A. Not necessarily.

MS. LOSEMAN: Objection. Improper hypothetical.

Go ahead.

THE DEPONENT: But not necessarily.

Q. (By Mr. Zaur) Cassava did reach out to the New York Times through its counsel after this article was published, right?

MS. LOSEMAN: Well, I'll instruct the witness not to respond to the extent doing so discloses

Page 159

confidential communications with counsel.

THE DEPONENT: I'm not aware of it.

Q. (By Mr. Zaur) As promised, let's turn back to 87. And I'll just -- I'll draw your attention to the dates because the date on the byline in the Mandavilli article that we were just looking at, Exhibit 86, see the byline is April 18 of 2022?

Sorry. Mr. Barry, I've -- I've confused us both. I'm suggesting you turn back to the -- to Exhibit 86 just to look at the date of that article.

A. Right.

Q. Okay. So with that in mind, I'll ask you to take a moment to review the email exchange that I've marked as Exhibit 87. And you can spend as much time with it as you feel you need to. I'm not going to ask you about any of the substantive discussion. But I ask you take a moment and see if -- if you recognize this.

Mr. Barry, my only real question to you is whether this email exchange refreshes your memory that, in fact, Ms. Mandavilli did communicate with Cassava about that article before it was published?

A. It would appear that way, but I had no knowledge of it.

Q. You say you had no knowledge of it. Do you see that at the top email in the chain you are sending an

Page 160

email to Mr. Barbier copying Guy Singer, Hoau-Yan Wang, Lindsay Burns, Sandy Robertson, on that same thread, right?

A. I see it. I don't remember sending this email. And I don't know what's redacted and whether it has anything to do with the New York Times. It may have been an email that was forwarded and forwarded and I had something entirely different to say. I don't know what it was.

They all have the subject line Time-sensitive: Request for comment from New York Times, blah, blah, blah. So I see that. When I'm doing an email, I don't often look at the subject matter because I'll just respond to things. I could have been responding to something. I don't know what it's --

Q. Well, is anything redacted below?

A. Well, in fact, I know I didn't send this because it -- I never sent anything to Hoau-Yan Wang. I never talked to the guy. I wouldn't even have his email address.

Q. Well, that was going to be my next question. I noticed him on the cc line. How regularly did you email with Dr. Wang?

A. I never emailed with him. So I don't know where this is from.

Page 161

Q. Do you think this email could be like a fabrication?

MS. LOSEMAN: Object to form. Misstates testimony --

Q. (By Mr. Zaur) Well, I'm just asking.

THE REPORTER: I'm sorry. I didn't hear the last.

MS. LOSEMAN: And the document.

THE DEPONENT: I don't know what it is. I think --

Q. (By Mr. Zaur) Well, this is an example of you sending an email to --

A. Yeah, as well as many others.

MS. LOSEMAN: Object. The document speaks for itself. Mischaracterizes.

MR. ZAUR: Well, he --

MS. LOSEMAN: Is there a question?

MR. ZAUR: He just said he never emailed it.

THE DEPONENT: I never emailed it. It's possible that something was sent to me and I inadvertently replied to all. That's possible.

Q. (By Mr. Zaur) I see.

So whatever is redacted here might have been an inadvertent response?

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

A. Yeah, it might have had nothing to do with the New York Times, but I have no idea what it was.

Q. Do you know who Charles Spruck is?

A. I know who he is.

Q. Who is he?

A. He's a Ph.D. scientist who runs a National Cancer Institute lab, I think.

Q. Does he have any relationship with Cassava that you know of?

MS. LOSEMAN: And I'll instruct the witness not to answer if doing so divulges communications with counsel.

THE DEPONENT: I am not -- I'm not aware of -- a formal relationship?

Q. (By Mr. Zaur) Any relationship.

A. I know that he knows people there and they know of him. That's all I know.

Q. Do you know if he's an investor in Cassava stock?

A. I don't know.

Q. Did you ever send articles or blog posts that he wrote to other people?

A. Yes.

Q. Why?

A. Because I thought it was real science. I

Page 163

thought this is a highly credentialed guy that understood Western blotting. And he had a point of view that was very different than the critics.

Q. And did you ever -- would it have made any difference to you whether he was an investor in Cassava stock?

A. No.

MR. ZAUR: I'll mark Exhibit 88.

(Exhibit 88 was marked.)

(Discussion off the record.)

Q. (By Mr. Zaur) Mr. Barry, this is a long email authored by you. You should obviously take a moment to refamiliarize yourself with it. I have just a couple of things that I wanted to ask you about.

Mr. Barry, the first thing I want to ask you about -- you can spend more time with it if any of my questions call for it.

My first question is on the first page, which is Bates number ending 4640. In the paragraph beginning with a reference to a company-wide meeting with all employees, you -- you write that -- while not going into great detail, I explained that no one wanted to remove the founder of a company in this way, let alone the coinventor of such a promising drug. And then you go on to explain a bit more.

Page 164

I asked you some questions about this before that were subject to directions related to privilege. So I'm coming back to that question. And I'm asking you, did Cassava remove Remi Barbier?

A. Remi resigned.

Q. Okay. So is the answer no?

MS. LOSEMAN: Object to form. Asked and answered.

THE DEPONENT: He wrote a letter of resignation and we accepted it, so he resigned.

Q. (By Mr. Zaur) Okay. Would you -- in your email you tell -- well, take a step back.

The people you're sending this mail to are the -- the board of directors as of July 18, 2024; is that correct?

A. Yes.

Q. And you tell the board that you told the employees that no one wanted to remove the founder of a company in this way, right?

A. That's what it says.

Q. And is that what you told employees at Cassava?

A. I don't think I used those exact words. I was -- it was a really difficult situation. These people had been through a lot, you know. They're constantly

Page 165

maligned on the internet and people accusing them of virtually everything under the sun, government investigations. And it was a really delicate time. So when I went to that meeting, their number one concern was is the board going to shut down the Alzheimer's program.

Q. The employees' number one concern?

A. That was what they were concerned about. And then it led to a really lengthy discussion about, you know, what had happened. And I didn't go into great detail. I just said that the government had developed a very dark view of the company and they held a gun to our head.

Q. What did they demand that you do? I'm -- I'm a little bit drawing an inference. You said the government held a gun to our head. Was the government telling you to do something?

A. No. They were -- they were telling us that they were -- am I allowed to say this?

MS. LOSEMAN: Well, you shouldn't disclose anything you've learned through conversations with counsel. So if you are about to disclose that, don't.

MR. ZAUR: I just want to --

MS. LOSEMAN: Yeah. Let's take it a step at a time.

MR. ZAUR: That's fine. Can I also just

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

ask you a question or make a comment about that?

MS. LOSEMAN:  Yes.

MR. ZAUR:  Obviously he'll abide the instruction.  What if he -- what if he learned something from counsel, but any privilege over that was waived because he then disclosed it at a meeting of Cassava's employees?

MS. LOSEMAN:  It's -- I don't think you have established or could you establish that this is a perfect transcript of what was shared with anybody at any point in time.  Even if it were, we disagree that this would constitute any kind of a waiver of a privileged conversation.

If you want to ask him about the resolution with the SEC and the reasons for that resolution which have been publicly disclosed by the company, I think that's fair game.

Q.  (By Mr. Zaur)  Okay.  You may get the same direction, but I'm just going to try this one more way.

Did you tell employees that the board took some action that it had no choice but to take?

A.  I don't remember.

Q.  That -- okay.  Looking at the second to last page of your email, Bates number ending 4643.  Look at the -- there's only -- there's one full paragraph on

Page 167

the page, beginning, Another important decision needed to be made.

A.  Okay.

Q.  Do you see that paragraph?

A.  Mm-hmm.

Q.  What you say is, Another important decision needed to be made about doing an analysis or -- I think it's of plasma biomarkers and CSF left over from our phase 2 trial.

What was the decision that needed to be made there?

A.  Whether we were going to have --

THE REPORTER:  I'm sorry.  One more time.

THE DEPONENT:  Whether we were going to have those samples tested one more time.

Q.  (By Mr. Zaur)  Had those samples been tested before?

A.  They were tested by Dr. Wang, and they were test- -- well, they were tested by Lund, by Dr. Wang, and then by Quanterix, I believe.

Q.  So the samples -- pardon me.  The samples you referred to here are samples of the -- of the same --

A.  The biomarkers in phase 2.

Q.  The biomarkers in the same samples that were taken that were already tested.

Page 168

Looking down two sentences.  After the company reported the revised analysis of our P2b biomarkers by Dr. Wang, we never disclosed any biomarker from the P2 and investors that clearly noticed.

What did you mean by that?

A.  I'm taking this from memory which isn't great.  There were biomarker samples taken from the phase 2 study.  To my knowledge, they were not analyzed.  And there were investors who were close -- following the company closely that were expecting them and asking for them, and we didn't have them.

Q.  Didn't have them?

A.  We had no results.

Q.  You had the samples?

A.  The samples were there, I think.  But we never -- they were not analyzed.  So what I'm -- what I'm saying is they weren't analyzed.  We need to decide, do we want to analyze them?  We're so close to the finish line in the phase 3 -- in the phase 3 study, is it worth analyzing them now?

Q.  And what were the -- were there reasons to do so and reasons to not do so?

A.  The reason to do it was really investor perception.  And I say that in this paragraph.  Because it became an issue created by your clients and others,

Page 169

that the company hadn't disclosed this or disclosed that, we thought -- or there were several of us who thought that, look, let's do the analysis.  Let's see what it shows.  And we'll put it out, good, bad or indifferent, and that was the intention to do.

The only problem was we were unsure of the reliability of the samples at that point because it was two and a half, three years later.  You don't know if they've been properly stored.  You don't know what your readings are going to be.  And we were so close to a phase 3.

So I think we elected to do the analysis, and we sent the samples out.  And that work was about to be performed in November of '24, and then the first study failed and we cut expenditures dramatically.

Q.  So ultimately Cassava did not have those samples analyzed?

A.  I don't think -- I don't believe they were analyzed.

Q.  Okay.  There's -- there -- there's a reference in this same paragraph to our statistical analysis plans submitted to the FDA in advance of the phase 2.  And you write, We essentially promised the agency to produce that data.

What does that mean?

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

A. Where is that?

Q. I'm sorry. It's -- it's in the same paragraph. It is one, two, three, four, five, six, seven lines down. And the sentence begins "Worse."

A. This is still in reference to the samples from the phase 2?

Q. Okay.

A. I -- I don't recall. I mean, I wrote this over a year ago. I think I'm making reference to the same samples, saying that we told FDA we were going to produce that data and --

Q. So in addition to investor perception, was that another reason to analyze the data?

A. Yes.

Q. And to date that data has -- has or has not been created?

A. I don't want to answer this incorrectly. But I don't think it has. I think it was -- the study was underway when the failure of the first trial was announced, and we cut expenditures dramatically.

Q. And did you tell the FDA that you weren't going to do it?

A. I don't know. At that point you probably don't need to tell the FDA. We've got a failed phase 3.

Q. Okay.

Page 171

A. I mean, I have a very conservative attitude when it comes to government agencies, which is if they ask you for something, you give it to them. If you tell them you're going to do something, you do it.

Q. I see. But -- but perhaps not in this particular instance?

A. No, in this instance. That's why we were going to do it because we -- I went back and found that we had told them we were going to. So let's do it. That's essentially what this paragraph says. We didn't get the data because we had a failed phase trial right around Thanksgiving.

Q. So because the phase 3 trial failed, you decided not to analyze the remaining phase 2 samples that you had promised to the FDA?

A. It was -- it was really more we decided not to make the expense.

Q. Okay. Where are those samples now?

A. They're in storage at one of the -- one of the vendors that we used that we pay some outrageous amount of money to every month just to store samples, I believe. I know we have a lot of samples at certain vendors that we're paying a lot for. I assume those samples are with those, but I'm not sure.

Q. The next paragraph refers to -- begins by

Page 172

reciting, The other critical matter -- it says, than needed attention was what work our scientific team could do to validate our basic science.

Specifically you write, What tests can we run to prove our assertion about the method of action?

Do you see that?

A. Yes.

Q. And did you agree that was a critical matter that needed attention in July of 2024?

A. Yes, I'd put it as an overarching thing. My job when I got there, as far as I was concerned -- and I said this to everybody including the board -- my first job is to help change the perception of this company. How are we going to do it? We're going to be honest with people. We're going to -- if we have results of things and the results aren't what we'd like them, we're going to announce them anyway.

We're going to do some of these experiments that haven't been done in the past because they've been used as weapons against us. So, yeah, we identified a number of tests that we could do to help us prove the method of action, and we started them.

Q. Sorry. What had been used as weapons against you?

A. The lack of -- according to your clients,

Page 173

the lack of proof of the binding of filamin A to simu- --

THE REPORTER: I'm sorry. One more time.

THE DEPONENT: Sorry.

THE REPORTER: "...the lack of..." Just one more time.

THE DEPONENT: The lack of binding of the drug to filamin A.

THE REPORTER: Thank you.

Q. (By Mr. Zaur) And you write, In the past we have had one-off tests from three labs that provided some validation to our claims, but we seemed to have an unfortunate habit of running one test and accepting it as gospel.

What did you mean by that?

A. Just what it says. The company would do one experiment. That's -- this is not the full and complete picture. But there were instances where the company would do one experiment. The experiment would show success, what we wanted to see, and the experiment wasn't redone. Good scientists redo their experiments.

Q. I see.

And so your message to the board is we should redo some of those experiments?

MS. LOSEMAN: Object to form. Misstates. Go ahead.

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

THE DEPONENT:  It was -- it was more along the lines of what experiments can we do now that would prove some of the things that we had been claiming?  And we're still doing them.

Q.  (By Mr. Zaur)  You write below, The crazy part of it is that these tests are not expensive -- approximately $300,000 for the whole package.

I sort of understand.  But what did you mean by "the whole package"?

A.  There were, oh, boy, six or seven different tests.  So we put the scientific team together and asked, Okay, what experiment do we need to run to prove X?  What do we need to do Y, et cetera.  And I think we identified six or seven of them.

And I had expected, not being a scientist and being new to the company, that they'd say, Oh, you know, here's our whole list, and it's going to cost $2 million.  And they said --

Q.  Like a clinical trial?

A.  Yeah.  And they said $300,000.  Like, you know, I felt like the old Seinfeld joke about free coffee for life.  I agreed.

Q.  So what were the things -- and I think I have a deck, perhaps even from that meeting, describing some of those tests.  And maybe I'll give that to you.

Page 175

But my first question about it is going to be what were the propositions -- the scientific propositions that you thought Cassava could and should test or test again at that point in time?

MS. LOSEMAN:  Object to form.  Vague.

THE DEPONENT:  It wasn't what I thought. It was what the scientific team thought.

Q.  (By Mr. Zaur)  Okay.

A.  So there were certain cell experiments that were run.  And I can't even remember what they did. The one that stays in my mind because we're still working on it is proving the binding.

Q.  Let me take a step -- that's helpful, but let me take a step back.  Fair to say that whether or not simufilam binds to filamin A, that's a biological proposition that could be tested, right?

A.  It's difficult, but, yeah.

Q.  And that's one of the biological propositions that the scientific team suggested was possible and you thought it was a good idea?

MS. LOSEMAN:  Object to form.  Misstates.

THE DEPONENT:  I'd say it differently. Dr. Wang in his lab claimed to have proven binding, but he was the only one who ever did it.  And so your clients persistently mocked it saying, These things don't bind.

Page 176

He made it up.  Well, we didn't believe that we made it up.  It's just a really difficult experiment.

So we've been working on it.  Now we're talking about 13 months later.  We're still working on it.  Getting close.  But in my mind it's a really important one.  If you want to -- if you want to talk about your mechanism of action, you really need to be able to demonstrate that you can do that.

Q.  (By Mr. Zaur)  You need to be able to demonstrate --

A.  That it binds.

Q.  -- that the drug binds to the protein?

A.  Yeah, it may not bind directly.  It may use a chaperone.  So there's -- there's a lot of different ways that we're looking at it now that weren't looked at in the past.

Again, this is confidential and I -- I don't want to see this anywhere publicly.  We're getting very close.

Q.  So -- and I want to ask -- I'm going to ask you in a minute about the -- the experiments related to the binding proposition.

Are there any other scientific propositions that Cassava is working to replicate or show, or is binding really the one?

Page 177

A.  Today?

Q.  Yeah.  Well, actually, I'm really trying to ask you about the meeting with the scientific team that you talked about in your email to the board July of last year.

A.  Yeah.

Q.  You say there are -- there are a number. And it's a little unclear to me from the language of your email if there's a number of tests that all bear on this proposition or whether there are a number of propositions that are all susceptible of experimentation.

MS. LOSEMAN:  I'm going to object. Compound.

And just a reminder, let him finish his question, and let the witness finish his answer.

Thank you.

THE DEPONENT:  These were -- these were separate experiments.  And if you continue to ask me about them, I will prove to you that I'm not a scientist.

Q.  (By Mr. Zaur)  I may ask you a little bit more of them.

A.  That's fine.

Q.  But I still -- I still don't think I understand the answer to the question which perhaps inartfully I was trying to ask.

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

In your meeting with the scientific team that preceded your email to the board, did the scientific team and you discuss tests for any proposition other than binding?

A.   Yes.

Q.   What were the other propositions that you discussed?

A.   You just handed me a document.

Q.   Okay.

(Exhibit 89 was marked.)

Q.   This is Document 89.  Is there something in Exhibit 89 that would help you answer that question, I take it, Mr. Barry?

A.   Well, the pages aren't numbered.

Q.   No.  You can use the -- the Bates numbers at the bottom right corner.

A.   There's a -- two pages that say List of Proposed Studies.

Q.   Yes.  And just for the record, that's Bates number ending 390 and 391, right?

A.   Yes, yes.  These were -- if not all of them, these were many of the --

THE REPORTER:  "...these were many of the..."

THE DEPONENT:  Studies.  Experiments.

Page 179

Q.   (By Mr. Zaur)  So let's maybe -- would it be helpful to walk it through the table?  Shall we -- shall we see?

A.   I can't stop you.

Q.   Well, let's look at the second one.  It may be easier.  The second line of the table, the company indicated is Yale University.

Do you see that?

A.   Yes.

Q.   And the third column says, Confirmation of simufilam binding to FLNA.  Is that the proposition you were just discussing is whether or not the drug binds to the protein?

A.   Yes, and that's one of the places we were testing.

Q.   Okay.  The next line in the table also lists Confirmation of simufilam binding to FLNA.

Do you see that?

A.   Yes.

Q.   There are one, two, three other studies proposed in this table.

Do you see that?

A.   Yes.

Q.   Can you explain what those studies were designed to find out?

Page 180

A.   So the first study was with the Cochin Institute.  And it was essentially, if I remember right, replicating the work that they had already done showing that the drug binds to the A-7 receptor or disrupts -- I forget the science behind it.

Q.   Okay.  And, look, there's a lot of science I don't understand and there's a lot of science that maybe you won't understand.  I'm not trying to get you to tell me stuff that you don't know.

Would that be the same answer for the fourth study listed on the first page, activity on neuroinflammation, et cetera?

THE REPORTER:  I'm sorry.

MR. ZAUR:  Activity on neuroinflammation.

THE REPORTER:  Thank you.

MR. ZAUR:  Amyloid plaques, Tau phosphorylation, cell death, involvement of TLR4.

Q.   (By Mr. Zaur)  Can you tell me what that means?

A.   Well, from the -- from the -- from the sound of it, it's to see whether the drug has an effect on neuroinflammation, amyloid plaque, Tau phosphorylation.

THE DEPONENT:  There's that word again.  Sorry.

Page 181

Cell death, and the involvement of TLR4.

Q.   (By Mr. Zaur)  Taking us a more general step back, Mr. Barry, did Cassava, in fact, at least commence work on each of these listed proposed studies or some of them or any of them?

A.   The only one that I know we didn't commence with was with the French institute.

Q.   The first listed one?

A.   Yeah.

Q.   Why did you not go forward with that one?

A.   They -- well, my understanding -- I didn't deal with the -- the French institute.  But my understanding was the study that they ran had been two years old or something like that, and they had basically moved on.  They didn't want to drop everything to do another study for us.

Q.   I see.  For whatever reason they declined to participate?

A.   Mm-hmm.

Q.   Okay.  What about the EL study?  Is that the one that you -- you said we're getting close?

A.   It's complicated.  So we were using one lab in Yale that was not getting a satisfactory result.

Q.   Meaning what?

A.   The person who was doing the study was

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

having difficulty proving the binding or finding where they bind to.

Q. Okay.

A. We're now doing that study at a different lab in Yale and making much better progress. This is confidential.

MS. LOSEMAN: I -- before we proceed, can we just have express agreement that discussions about these ongoing studies will be treated as highly confidential and not shared beyond counsel and anyone in your firm -- any counsel in your firm and those in the deposition today?

MR. ZAUR: If you're including my clients, you understand my clients are observing the deposition today? Yeah.

MS. LOSEMAN: Correct.

MR. ZAUR: Yeah.

MS. LOSEMAN: Correct. And it won't be shared --

MR. ZAUR: Yeah.

MS. LOSEMAN: -- beyond the participants we just described. Thank you.

Q. (By Mr. Zaur) Can you describe what you mean by -- I don't remember what phrasing you used. What -- what is the status of the binding experiment being

Page 183

conducted in the second Yale lab?

A. In the second Yale lab, it's going on right now.

Q. And have -- has binding been demonstrated?

A. Not yet. We're getting close.

Q. What does it mean to get close?

A. It's -- you're going to stretch my limits of scientific understanding. But my understanding is that there are a number of different ways it could be binding. And one way that hadn't been examined in the past, but we believe might yield real results is that there is a chaperone that -- that forms the binding. And that's one of the things we're investigating now.

But that's not the only experiment we're doing. We're doing others at different labs or universities. I can't recall. One university, one lab right now, that are looking for the binding, but in a different way.

Q. I see. And are those other studies also listed on this list of proposed studies or those are additional to this list?

A. I think they're additional.

Q. Which labs are working on that?

A. There's one lab that's working on a mass spec project. I've forgotten the name of the lab.

Page 184

Q. Okay.

A. It's a professional lab. There's an academic lab that is working on binding experiments, I believe. There's a crystallography experiment going on right now to prove binding. That is potentially the most interesting and the most promising. I can't remember who's doing it. I get progress reports on these.

Q. Is that -- I was trying to keep count in my head. Is that a total of four labs that are presently trying to demonstrate binding between simufilam and FLNA?

MS. LOSEMAN: I object to form to the extent it misstates.

THE DEPONENT: It's three or four labs. I can't remember.

Q. (By Mr. Zaur) As of today, have any of those labs actually demonstrated binding between simufilam and filamin A?

A. I'd say it differently. I don't believe any of those labs have replicated Dr. Wang's results which showed binding.

MS. LOSEMAN: And, Counsel, just -- we've been going for, I think, well over an hour.

MR. ZAUR: Okay. Let's take a break.

THE VIDEOGRAPHER: We are going off the record. The time is 3:25.

Page 185

(Recess from 3:25 p.m. to 3:50 p.m.)

THE VIDEOGRAPHER: We are now back on the record. This is the beginning of Media Unit 7. The time is 3:50 p.m.

Q. (By Mr. Zaur) Mr. Barry, before our last break you described some ongoing work to replicate the preclinical science conducted by Dr. Wang; is that right?

A. Yes.

Q. Apart from the studies that you talked about before the break, are there any other ongoing studies that Cassava is sponsoring to replicate the preclinical science conducted by Dr. Wang?

MS. LOSEMAN: Object to form.

THE DEPONENT: There are preclinical studies going on for another program, not for Alzheimer's right now.

Q. (By Mr. Zaur) And that's the seizure program?

A. Yes.

Q. And does that program rest on the same proposed mechanism of action?

A. Yes and no. More yes than no.

Q. Can you explain that a little bit?

A. So there was a study published in 2020 by Dr. Angelique Bordey at Yale, who's the vice chair of the

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

Yale Medical School, that showed the drug was active against filamin A, for lack of a better phrase.

So the mice that she did the experiment on -- or what she discovered is that TSC patients with severe epilepsy overexpress filamin A. So she got the idea, If I could find a drug that actually could interact with filamin A, whether binding or have some influence on filamin A, that might be a way to reduce seizures. That was her theory.

So she contacted a company back in 2013, I think. They signed a material transfer agreement. They got the drug to her. She did a brilliant experiment where she used a mouse model where these mice had focal cortical dysplasia type II, which is another disease that gets really severe epilepsy.

And she showed a reduction of seizures. I think 70 percent reduction. And 30 or 40 percent of the mice were seizure free at the end. It was really impressive stuff.

That doesn't prove that it binds, but it proves at least in a preclinical basis that it has an effect on filamin A. And we just replicated that.

Q. You just replicated that 2013 Bordey study?

A. Her study was published in '19 or '20 in Science Translational Research [sic], I think.

Page 187

THE REPORTER: I'm sorry. "...transitional [sic]..." one more time.

THE DEPONENT: Science Translational -- Translational Research.

We just did a mouse model study sponsored by the -- well, from the TSC Alliance which is the advocacy group for patients with TSC. They developed their own mouse model. But that mouse has TSC, not FCDII. So slightly different but -- virtually the same experiment, but much sicker mice than the first ones. And we basically replicated what she did. So it has an effect on filamin A. We can say that.

Q. (By Mr. Zaur) I see.

Is it possible that it has an effect on seizures in some other way?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: It's conjecture, but, no. The way that -- the way these mice were genetically modified, no, it's -- it's the drug causing the lack of seizures. Now, again, these are mice. These are not humans.

Q. (By Mr. Zaur) Is it the drug acting on filamin A is my question?

A. Yeah.

Q. How do we know?

Page 188

A. Because you can see -- in one of the analyses that she did, you can see the reduction in filamin A, if I remember right. I -- I can't recall.

Q. Any others -- any other ongoing studies to replicate the clinical work performed by Dr. Wang?

A. We're still doing --

MS. LOSEMAN: Object to form. Vague and misstates.

THE DEPONENT: We're still doing the binding experiments. We're getting close. But the whole --

Q. (By Mr. Zaur) I'm just -- I'm just trying to get a complete -- we can go back to -- I don't want to interrupt your answer. Go ahead. Give the rest of your answer.

A. Well, just in case I didn't make it clear before, the whole idea was -- when I got there in July, you know, the company had its reputation in tatters, right? Government investigations and cassavafraud.com, a series of allegations which were defamatory by your clients.

And the problem that I -- when I got the team together, I said, Look, we all think we're going to have a successful phase 3 Alzheimer's trial. Our problem right now is there's been so much noise created that

Page 189

people may not believe us. They might think we're making it up. So how are we going to prove that -- that we're for real?

And so we got together and said, Okay, look, let's do -- let's do all these different MOA studies. And our idea was not necessarily to announce them one by one or anything else. It was, Okay, let's get the data from the phase 3 trial. And at that point, we will have a mountain of evidence. We'll have biomarker studies that we've taken a look at. We'll have MOA studies that we can show.

And so if we have the successful phase 3 trial, which we all thought we were going to have, your clients would not be able to continue to say, This is a fraud, it's all made up, et cetera, because we would have had so much evidence it would have been overwhelming. That was the real reason behind it.

We didn't need to do it. All right? The company was already in phase 3. The FDA had no problem with the drug going into phase 3. It's just I felt we needed to do it to establish the fact that we were credible.

Q. Would it have been good practice to do even if my clients had never made any statements about Cassava?

MS. LOSEMAN: Object to form. Vague as to

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

good practice.

THE DEPONENT: You would have to ask my predecessor that question.

Q. (By Mr. Zaur) I don't really understand that answer.

A. I wasn't there. If -- you're asking would I have replicated studies based on what I know? Yeah, I would have.

Q. You would have made that -- you would have undertaken these replication efforts earlier if you had been in charge?

MS. LOSEMAN: Object to form.

THE DEPONENT: I would have done whatever was necessary to make sure the company was considered to be credible. It's just who I am.

Q. (By Mr. Zaur) And you think it was a mistake by Mr. Barbier to not undertake studies of this kind when he was in charge?

MS. LOSEMAN: Object to form. Misstates.

THE DEPONENT: I think if you look at what -- I think they really believed that the drug was going to work and --

Q. (By Mr. Zaur) And "they," you mean Mr. Barbier and his team?

A. In particular, Mr. Barbier and Dr. Burns.

Page 191

I think they really believed the drug was going to work, and they felt they had this amazing discovery, and they wanted to get it into the clinic as quickly as they could because it's a competitive world. So they -- they moved very quickly. Big pharma companies don't move quickly. And that's -- sometimes it's a good thing. But they moved very quickly.

And, you know, they didn't need -- if they showed, you know, phenomenal phase 3 results, I think in their minds they didn't need to show you the binding and all these little micro things that I identified. That I think was their thinking. I'm speculating.

Q. Is it your judgment as a pharmaceutical executive that they moved too quickly?

A. I don't know.

MS. LOSEMAN: Object to form.

THE DEPONENT: I don't know.

Q. (By Mr. Zaur) You don't have a judgment about that one way or the other?

A. No, because you can look at our phase 3 trial and come up with a lot of different explanations for why it failed. And on the one hand you could say, well, you know, they didn't identify the right population, you know. Maybe the patients were too mild. I don't know. We're never going to know.

Page 192

But then there's this huge graveyard of companies that have done Alzheimer's trials. And there's been two successes in history, not counting the symptom relievers. It's the biggest unmet need for a reason.

Q. This is going to be Exhibit 90. This is just to see if this refreshes your memory about legal fees.

(Exhibit 90 was marked.)

Q. It's highly redacted. But do you see the first email in the chain is from Erik Connolly from the law firm Benesch?

A. Yeah.

Q. And you -- do you recognize that as the law firm that filed the defamation action?

A. Mm-hmm. Yes.

Q. And the next email in the chain -- it's not clear who he's writing to -- but Mr. Robinson writes, These numbers same sensible to me. I'm okay going forward.

Do you know what he meant by that?

A. He was in favor of filing the case.

Q. And the numbers he's talking about are fees?

A. Probably. I think we asked -- I think we asked Erik Connolly for an estimate.

Page 193

Q. Like a budget of some kind?

A. Yeah.

Q. And at the top of the chain, you comment a little bit about legal costs. And really my question for you is when we -- when I asked you about this before, I think it was your memory that you hadn't seen any actual spend or budget for the -- for the defamation action. And I'm just wondering if this refreshes your memory as to whether -- as to what the defamation case cost.

MS. LOSEMAN: Object to form, just to the extent it misstates.

THE DEPONENT: I don't remember what the numbers were. I know we asked for an estimated cost. And as I -- half joking here, I've learned to double them. Turns out I probably should quadruple them. But the numbers are -- the numbers are always bigger than you think they're going to be. So I've just learned don't take the numbers at face value. They'll be larger.

Q. (By Mr. Zaur) And when you say you probably should have quadrupled them, is that because you have some memory as to what the spend actually was or are you still --

A. I'm being flippant. Sorry.

Q. Okay.

A. I should probably add there's a -- there's

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

a statement in here which reminds me of something about, I feel very good about Erik. So -- and this has nothing to do with legal argument or anything else. The reason I felt so good about Erik was Erik got it. Erik said --

MS. LOSEMAN: Well, I'm going to instruct you --

THE DEPONENT: I'm sorry.

MS. LOSEMAN: -- not to disclose what Erik told you.

THE DEPONENT: It was not -- it was not --

MR. ZAUR: I didn't make him do that.

MS. LOSEMAN: No, you did not.

THE DEPONENT: It was not -- it was not illegal argument. He was outraged at the fact that people were trying to deprive Alzheimer's patients of the medicine that appeared to have a chance of working. That was -- this is -- I'm not disclosing any attorney-client privilege. Sorry.

MS. LOSEMAN: That does not sound like legal advice to me, so...

THE DEPONENT: No, it was not legal advise, but --

Q. (By Mr. Zaur) He shared your outrage?

A. He did, yeah.

Page 195

Q. Is that one of the reasons you hired that firm?

MS. LOSEMAN: I think that's okay as long as we can have agreement allowing him to answer that question doesn't constitute a waiver.

MR. ZAUR: It doesn't otherwise waiver those discussions. It does not wavier those discussions. I agree.

MS. LOSEMAN: Okay.

THE DEPONENT: It influenced me. I can't speak for Sandy or Remi, but it definitely influenced me.

Q. (By Mr. Zaur) Were you and Sandy and Remi the decision-makers about who would represent Cassava in that case?

A. Well, Remi was always the decision-maker, so we were advising.

Q. Did you advise him to go with Benesch?

A. I felt that he was going to -- he understood the issue and he -- his -- what he had planned could be most helpful to us.

Q. Okay. And you communicated that view to Mr. Barbier?

A. I did.

Q. Did Sandy share the same view? Did Sandy communicate a similar view?

Page 196

A. I don't remember. I think so.

Q. Did Sandy also share your outrage at the defendants in the defamation action?

A. It's a good thing he's not alive today. He was more outraged than I am. He was furious. He was -- he was really upset.

(Exhibit 91 was marked.)

Q. Handing you what I've marked as Exhibit 91, an email to you from a person named Sean Miot?

A. Miot.

Q. Miot.

Who is Sean Miot?

A. Sean is my former broker. He was not my broker at the time. He and I became friends, did bike races together. And --

THE REPORTER: I'm sorry. "...became friends and..."

THE DEPONENT: Did bike --

THE REPORTER: Oh.

THE DEPONENT: -- long bike rides together. And he was working at another -- I can't remember. He wasn't in the finance business anymore. But Sean knew me as an investor and often followed me around.

Q. (By Mr. Zaur) What do you mean by that?

Page 197

A. He found out what I was involved in and made the same investment.

Q. Why were you telling Mr. Miot about -- well, withdrawn.

What did you mean in telling Mr. Miot, It looks like I may have a --

THE REPORTER: I'm sorry. "It looks like..."

MR. ZAUR: I may have a defamation case.

MS. LOSEMAN: And I'll just object and note for the record that the exhibit is incomplete. I don't believe copy of the attachment to the email is included here.

You can answer the question.

THE DEPONENT: So Sean had forwarded me -- like I said, I don't have social media. And Sean had been one of the people forwarding me different Tweets. And I now understand those Tweets were made by your clients. This is long before I knew who they were or what they were about.

And they were -- he had sent me -- I don't know -- 10 of these things. I'm not sure how many. But lots of different things they had to say about Cassava and what a fraud, et cetera, et cetera. So that's why we were exchanging about Cassava to begin with. He was

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

Page 198

interested. And he was forwarding things to me that I otherwise wouldn't have seen.

But on the day the Quintessential report put out their so-called report, they went out of their way to defame me. I had no idea. I got a call from one of my closest friends that morning who was just practically screaming at me on the phone. This is outrageous. You need to sue these people. This is -- and he went through line by line all the things the guy said. Not a single word of it was true.

And I did think for a second, Maybe I should sue them. And then I thought, This isn't how I want to spend my life, you know. What I care about is what -- the people I love and they love me, what they think of me. I don't really care about what some knucklehead on the internet thinks.

So I sent it -- what you're seeing here was just me kind of blowing it off, like maybe I should take on a defamation case. It wasn't a preview of coming attractions.

Q. (By Mr. Zaur) And it wasn't really about maybe Cassava having a defamation action. This was more speaking to you -- you personally?

A. Oh, it was me because I think -- he either told me about the Quintessential report or I sent it to

Page 199

him. I don't remember what the exchange was. But I think before that he may have sent me a text or an email or something saying, you know, This is really outrageous what they're saying about you. It was.

Q. Mm-hmm.

A. I'm still waiting for the apology, by the way.

Q. Why did Cassava wait a year from November of 2021 till November of 2022 before filing the defamation action?

MS. LOSEMAN: And to the extent that requires you to divulge communications with counsel, I instruct you not to answer.

THE DEPONENT: I think there's probably a business explanation more than anything, and that is nobody wanted to do this. You know, this is a small, Austin, Texas-based biotech company with not a lot of money and not a great ability to raise money.

And, you know, didn't have Wellington and Fidelity, and, you know, large institutions as investors. So it was always difficult to raise money, and difficult for a company like this to take on Alzheimer's with a 2,000 patient phase 3 program. It was herculean.

So I don't think -- I mean, my attitude certainly was I have no interest in confronting short

Page 200

sellers. I have no interest in amplifying the ridiculous things that they say. And so I've kind of -- I'm from the school of let's just execute and show the world how stupid they are.

But when it got to the point later where we couldn't recruit our trial or we're having a lot of trouble recruiting our trial and we had doctors running away from us -- and, by the way, I saw this firsthand. When I became CEO, I went to CTAD in October of 2024 --

THE REPORTER: I'm sorry. You went to --

THE DEPONENT: Sorry.

THE REPORTER: What was the --

THE DEPONENT: CTAD, which is the worldwide conference on Alzheimer's in Madrid. You know, I got a wonderful reception by a lot of the investigators who were involved in the trial who were very convinced the drug worked, but there were other people that practically ran the other way when any Cassava person came near them. And that wasn't because they were terrible people or anything else. It was because the reputation of the company had been destroyed. That's what happens when people defame you.

Q. (By Mr. Zaur) This may be an example of that. I want to ask you to look at 92.

(Exhibit 92 was marked.)

Page 201

Q. I'll just note there that the chain does begin on the back of a document --

THE REPORTER: I'm sorry. I can't -- I didn't hear the last phrase -- the last sentence.

MR. ZAUR: With an email from Jim Kupiec.

Q. (By Mr. Zaur) So in the -- the email on the first page from Dr. VandeVrede, is this an example of a trial site dropping out of the study because of adverse news coverage of Cassava?

A. Yeah.

Q. And is this -- in your view is this an example of the knockdown effect of my clients' public statements about Cassava?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: Amongst others, yes.

Q. (By Mr. Zaur) What do you mean "amongst others"?

A. Well, the Citizen's petition, the crescendo of hatred directed towards the company by your clients and other parties that were involved in this suit. You see --

Q. Oh, sorry. You were going to say something?

A. I think it should be pointed out that, you know, I know lots of folks in the media. When these

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

reporters write their story they have their angle written in their head before they've ever written a word, and they know exactly who they're going to call because they're going to get the quote that they want that will support their story. And most of the stories, at least the ones you've shown me, fit that mold perfectly.

There's not even a countervailing viewpoint in that New York Times article. And I could have found 20 different physicians that would have spoken positively about the drug. She chose to either not call them or not include them in her story. And this is the effect of it.

Academic centers, in particular, worry about their reputation. And those are the ones that we lost, and it was because of this.

Q. In Mr. Barbier's email exchange with the New York Times reporter that we looked at earlier, did he suggest to any researchers that you should talk to?

MS. LOSEMAN: Object to form. Foundation.

THE DEPONENT: I only know what you just sent me, and I don't know if he did or not.

(Exhibit 93 was marked.)

Q. (By Mr. Zaur) Tab 93. Do you recognize this as a short bio of Dr. Wigzell from the Sarepta website?

Page 203

A. Yes.

Q. Do you have any reason to doubt the credentials listed here?

MS. LOSEMAN: Object to form. Foundation.

THE DEPONENT: No.

Q. (By Mr. Zaur) Do you know if it's true that he has at some point in time been the chair of the Nobel Prize committee?

A. Nobel Prize of Medicine Committee.

Q. Nobel Prize of Medicine.

A. Yeah. That's correct.

Q. And the chair of the Karolinska Institute?

A. I know he had that as well.

Q. Pretty well credentialed guy?

A. He is.

(Exhibit 94 was marked.)

Q. I hand you an email exchange between you and Dr. Wigzell. 93. Pardon me. It begins with --

A. 94.

Q. Oh, 94. You are right.

Is this an email exchange about the accusations leveled at Cassava?

A. Among -- among other things, yeah.

Q. In Mr. -- excuse me -- Dr. Wigzell's first email to you on the back of the page, do you see where he

Page 204

writes, If you find one strange error to check that this was a singular error and not happening in other articles? It's the -- about three-quarters of the way down. It begins, Never bad.

A. I see it, yeah.

Q. Did you take him to be suggesting that Cassava should check for other errors in Dr. Wang's work?

A. Well, there were -- I think in the Citizen's petition, there were several different images that they questioned. So it was -- I think, your clients and others were badgering the publications to withdraw them. So they were doing their own analysis of whether there was anything that was amiss or not.

Q. I see. So you didn't interpret Dr. Wigzell to say that Cassava should be doing that too since the journals were doing it?

A. No, I didn't.

Q. And you respond to Dr. Wigzell, There's a lot more to this story.

I'm on the -- I'm on the front page now.

You did find out who the author is at the ad-science.org site. And was that Dr. Spruck?

A. It turned out it was, yeah.

Q. And did you think that Dr. Wigzell would be impressed by Dr. Spruck's credentials?

Page 205

A. Yes, because all Hans had seen, as far as I know -- I sent him the Citizen's petition soon after it was filed. In fact, I sent him the petition before I even read the whole thing. And the reason was I was on vacation. I was on a cruise with my family. I didn't have time to read the whole thing.

So he knows me well enough to know that I will dig very deeply into things to get satisfied. And so from the filing of the Citizen's petition -- and it kept going well through this email with Hans -- I was curious whether the people who filed the Citizen's petition really had some merit to their arguments.

(Exhibit 95 was marked.)

Q. Let me ask you to look at Exhibit 95. Directing your attention for a moment to the first email in time on the back page.

A. Mm-hmm.

Q. Is this your email to Dr. Wigzell forwarding the Citizen's petition?

THE REPORTER: I'm sorry. The doctor's name?

MR. ZAUR: Wigzell, W-i-g-z-e-l-l.

THE DEPONENT: This one?

Q. (By Mr. Zaur) Yeah.

A. I can't say for sure. Probably. It looks

52 (Pages 202 - 205)

Page 206

like it.

Q. And you ask him, Did you have any reaction to this? Is -- is that the -- the question that you were just talking about is asking him for his views on the Citizen's petition?

A. Yeah, I was -- like I said, I was on vacation. I was very unpopular with my family because this had been filed and I was missing activities I was supposed to be part of. So I didn't have time to read it initially. But I will go to friends of mine or contacts that I have who I think are very knowledgeable and say, Should I pay attention? So that's -- that's essentially what I'm saying here.

Q. And he could -- he is such a person?

A. Oh, yeah, yeah.

Q. Do you see where he writes, The petition -- this is -- I'm now at the top of the page ending 4732. He writes, The petition is in most places quite professional and claims things that I do support.

Do you see that?

A. I see it.

Q. And do you see where he writes that the enzymes would function okay at 4 degrees Celsius is highly unlikely. Do you understand why he was saying that?

A. Well, above he says, Some claims are

Page 207

wrong. He says in this email, Some claims are wrong, such as the statement that enzymes would not survive at -80 Celsius. In contrast, that is exactly a very good way to preserve things in -80 is, in fact, a most useful way to also allow certain cells to survive.

Q. What does he say in parentheses?

A. He says "not CNS cells though."

Q. What is CNS?

A. Central nervous system cells.

Q. What was the tissue that had been frozen and studied at 4 degrees centigrade?

A. I don't remember. I think it was brain tissue.

Q. That's off the nervous system tissue, right?

A. Yeah.

Q. And he also writes that the petition is showing without any doubts to my mind that there are several published articles where there have been a repeated abuse or outright fakes in the Western blot gels and where are [sic] certain gels have been used in more than one article with different claims as to what they represent.

Do you see that language there?

A. I see it.

Page 208

Q. Did you read it at the time?

A. I did.

Q. Do you see his -- he writes -- his conclusion is, The Board of Cassava has been deceived. And he goes on to say how he thinks the board of Cassava has been deceived.

Did you share those reactions with anyone else on the Cassava board?

A. I spoke to Remi about it.

Q. Anyone else?

A. I don't remember.

Q. Did you share it with any of the scientists on the Cassava board?

A. I don't think I did.

Q. Did you ask any member of the Scientific Advisory Board what their reaction was?

A. No, I didn't know them.

Q. What did you make of Dr. Wigzell's reaction here?

A. Oh, I took it seriously. He's -- he's a highly respected scientist. He's also a delightful person. We have a great relationship. But he's not always right on everything. And we sometimes disagree. So what isn't in this email chain is him advising me to join the board of the company a few months prior to that.

Page 209

Q. Yeah.

A. He was very enthused by the company's approach to treating Alzheimer's.

Q. Yeah. He does express regret about that in this email, right?

A. Yeah.

Q. In the last email -- the last paragraph on that page?

A. He does.

Q. He says, I was also deceived when merely looking through the data presented by the company and recommending the company for you.

Is that a reference to recommending that you join the board?

A. Yes.

Q. Is that a conversation that you had with him in the course of your diligence between late 2020 and June of '21?

A. He was very positive, yeah. He -- well, he -- he encouraged me to do it.

Q. And you see at the end of that first email from him in this chain where he writes, I strongly recommend that you now leave the board?

A. Yeah.

Q. Did you consider that recommendation?

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

A. Did I consider it? Yeah. Not for long, but I considered it.

Q. What led you to disagree with Dr. Wigzell's recommendation in the last sentence of that email?

A. So this was the very beginning of -- I had just been on the board two months, and, suddenly, the Citizen's petition came. Like I said, I was gone. I had no opportunity to talk to any other independent party other than Hans at this point. So I took that as, okay, this is one viewpoint. It's a very strong viewpoint. Somebody I respect. I need to get others. So I got others.

And it's -- you know, it's easy for a scientist to say, you know, Oh, get on this board; oh, get off that board. You know, it's -- if I'm going to do something, I'm going to do it. I'm not -- I'm going to give a company my all as long as I don't think I'm being lied to.

So if I got -- if I came to the conclusion that this company was really a fraud and based on research that I shouldn't believe, I would have resigned.

Q. Do you think Dr. Wigzell was sincere in the views he expresses in this email?

A. Yeah.

Q. Do you know if he's ever changed his mind?

Page 211

A. I don't know if we've talked about it again. He knows me well enough to know that I would not waste my time. So he -- he's that kind of person. He said his piece. You can listen or not listen. This is what I think, but this is what I think today. Four months from now, I might have something very different that I'll think. That's hard to do when you've gone on a board. I can't do that. I can't say, Remi, I'm out today, I'll be back in November.

Q. Is there anything that would have prevented you, in fact, from leaving the board at that time? I mean, by that time I mean August when you had this exchange with Dr. Wigzell.

A. Yeah.

Q. What would have prevented you?

A. At that point, I was pretty con- -- I was pretty concerned about the disease and the effect it was having. And I literally thought, Okay, I've just joined this board. I have a reputation. At the time it was a good reputation. If I leave, it could mean this company never raises capital again.

Do I really know this is a fraud? Do I -- am I absolutely certain beyond a shadow of a doubt that these Western blot images are nonsense and this drug is never going to work and all of these things? No, I don't

Page 212

know that.

So do I want to put a company through what will probably be the repercussions of their newest board member who's a known activist saying, I'm out of here? I would have done it four or five months later if I -- if I really got satisfied that Hans was right. I wasn't satisfied.

Q. I'm going to the first page -- or the front page of the email exchange ending 4730. Dr. Wigzell writes a little bit about Elizabeth Bik. Do you know who that is?

A. I do.

Q. And fair to say he endorses her reputation and professionalism in this paragraph?

MS. LOSEMAN: Object to form. The document speaks for itself.

THE DEPONENT: He says, I fully concur with her conclusions.

Let's just leave it at that. Yeah.

Q. (By Mr. Zaur) And this is the middle of November, so it's about six weeks after your initial August exchange with him?

A. A little later, but, yeah.

Q. And he concludes by saying that Dr. Bik's work just further strengthens my advice to you in our

Page 213

August communications.

Do you see that?

A. Yeah.

Q. Meaning -- did you understand him to mean my advice that you get off this board?

A. I just said that, yeah.

Q. Did you share -- I think I asked you this about the other email. Did you share this email communication with anyone on the Cassava board?

A. I may have talked to Remi about it. I don't know.

Q. Did Dr. Wigzell's reaction affect your view of Cassava's ability to prove any of the claims in the defamation action?

A. No, and the reason is I knew more about Elizabeth Bik than he did. Elizabeth Bik's last job as a working person was at a company that was raided by the FBI. So if she's such a wonderful sleuth at discovering scientific mis- -- lack of scientific integrity, and images that are misleading, why didn't she discover that at the company that she was working for? She has no credibility in my mind. Hans didn't know that. So, no, this is one piece of advice I dismissed.

MR. ZAUR: 96?

(Exhibit 96 was marked.)

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

Q. (By Mr. Zaur) Mr. Barry, I've handed you a document marked Plaintiffs' Exhibit 96. It's an editorial published by The Journal of Clinical Investigation authored by a person named Elizabeth McNally.

Have you ever seen this article before?

A. I don't think I have.

Q. Do you know anything about the drafting or publication of this article?

A. No.

Q. Did anything about -- well --

MR. ZAUR: 90- -- are we at 97?

(Exhibit 97 was marked.)

Q. (By Mr. Zaur) Putting that article -- that specific article to one side, did Cassava make any effort to get positive coverage of its science placed in academic journals?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: Not that I know of.

Q. (By Mr. Zaur) Did Cassava make any effort to get positive coverage of its clinical program published in the popular press?

MS. LOSEMAN: Same objection.

THE DEPONENT: I'm certain that Remi would have tried, but I don't know.

Q. (By Mr. Zaur) Did Cassava make any effort

Page 215

to get critical commentary about short sellers published in the academic press?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: Not that I know of.

Q. (By Mr. Zaur) Did Cassava make any effort to get critical coverage of short sellers published in the legal academic press?

MS. LOSEMAN: Same objection.

THE DEPONENT: I highly doubt it, but, no, I don't know.

Q. (By Mr. Zaur) Did Cassava make any efforts to get critical coverage of short sellers published in the popular general press?

MS. LOSEMAN: Same objection.

THE DEPONENT: I -- I can't think of any, no.

MR. ZAUR: This is 97.

Q. (By Mr. Zaur) Do you see that this an email exchange between Mike Sitrick and a person named Todd Rogenthien?

A. Yeah, it looks like it.

Q. It looks like Mr. Rogenthien emailed Mr. Sitrick on July 18th with a subject line that begins, Welcome Aboard.

Is this the point in time when you or

Page 216

Cassava engaged Sitrick -- Mr. Sitrick and his firm? Does this refresh your memory about that?

A. I -- I engaged Sitrick maybe a week before that.

Q. Okay.

A. Yeah, around that time.

Q. Do you know if that was publicly known?

A. I don't know. I mean, we wouldn't have announced it, so probably not. Oh, by the time this email was sent it would have been publicly known because we issued a press release, and he was the -- he was the media contact.

Q. Disclosed media contact?

A. Yeah. So that's how this guy is saying Welcome Aboard.

Q. Do you remember seeing this -- seeing this email? Does it make sense to you?

A. Vaguely.

Q. Do you see where Mr. Rogenthien tells Mr. Sitrick in the last full paragraph of his July 18, 10:04 a.m. email, he says, We recently discovered one of the PHuDs involved in the defamation suit plagiarized his doctoral thesis.

Did you see that?

A. Yeah.

Page 217

Q. Then he says, We filed a complaint with the school.

Do you know who that refers to?

A. I know now. I didn't know then.

Q. How did you find out?

A. I think attorney-client privilege.

Q. Did you have any reaction to this message from Mr. Rogenthien that he and others had filed a complaint with this person?

A. No, it's -- you know --

Q. Are you happy to see it?

A. It didn't -- it didn't matter to me. It's not what I think. You can only build -- you can only build a successful company by being forthright with people is my view. That's how I ran my money management business. And so I had a very different -- and Mike Sitrick will tell you to this day. I had a very different idea of how we were going to change the perception of the company.

So people could huff and puff all day long about things like this. I didn't care. If somebody wanted to, you know, expose one of the short sellers for being the snake that he is -- I don't know the man. I have no idea. Go for it. But I'm not going to encourage it. I'm not interested.

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

Q. Do you think Mr. Sitrick was interested?

MS. LOSEMAN: Object to form. Foundation.

THE DEPONENT: I think Mike, you know -- he's in a dirty business, and I think he is interested in salacious stories is my guess. But he just passed it on to me.

Q. (By Mr. Zaur) Do you -- in his email to you he writes, This is the one I was talking about.

Do you see that?

A. Yeah.

Q. Do you recall talking to him about this -- about Mr. Rogenthien or anything that Mr. Rogenthien says in his email?

A. Mike got a lot of calls from the meme stock crowd -- or I should back up -- people I thought were the meme stock crowd. I have no idea who these people are. He got a lot of calls from them. Some of them he took seriously. And we would talk probably, God, back then four, five, six times a day.

Q. You and Mr. Sitrick?

A. Yeah, because we were just getting bombarded with calls. You know, commentary on this and commentary on that. There was a lot of news. So, yeah, he called me and talked to me about a lot of these conversations, but I never took them seriously.

Page 219

Q. Did Mr. Sitrick convey to you that he believed activity like this by people presenting themselves as the meme stock crowd could be helpful to protecting or repairing Cassava's reputation?

A. It wasn't our strategy. I don't -- I mean, he and I never spent any time talking to the meme stock people. I mean, maybe he did, but I didn't.

Q. My question is really about -- it's really about him and what he conveyed to you. Did he convey to you a view that activity like that described by Mr. Rogenthien in this email could be useful for Cassava?

A. I don't remember. If he did, I wouldn't have listened to it, so...

(Exhibit 98 was marked.)

Q. I've handed you what's been marked as Plaintiffs' Exhibit 98. It's an email exchange that's mostly redacted. But if you look on the back, you'll see a person named Matthew Nachtrab emailing Mr. Barbier. Do you see Mr. Nachtrab reports on a report that he made to the New York State Department of Health, Office of Professional Medical Conduct.

Do you see that?

A. Yeah.

Q. And did you have an understanding about what that was?

Page 220

A. No. No, I -- I -- I didn't know Matt Nachtrab until 2024.

Q. How did you come to know him?

A. He appeared on the Joe Springer, whatever it was, webcast.

Q. Podcast?

A. Whatever he called it. I don't remember. It was sent to me -- a friend of mine sent it to me and said this guy is pretty thoughtful. Watch this. I thought he was thoughtful.

Q. I don't know if Ms. Loseman will allow you to answer this question. But do you -- why were you emailing on this thread, including to Guy Singer -- or Mr. Barbier, Mr. Foley, to forward the communication from Mr. Nachtrab?

MS. LOSEMAN: To the extent that requires you to disclose privileged conversation, I instruct you not to answer.

THE DEPONENT: Well, the great thing here is it's redacted, so I have absolutely no idea what I was forwarding. So I don't know.

MR. ZAUR: This is 99.

(Exhibit 99 was marked.)

Q. (By Mr. Zaur) Do you recognize this email exchange?

Page 221

A. I do.

Q. And how did this email exchange with Peter Marks come about? Who is Peter Marks?

A. Peter Marks?

Q. Yeah.

A. He's now the former head of the Center for Biological Evaluation and Research [sic], CBER, at the FDA.

Q. I see.

Was he in that role at this time?

A. At the time he was, yeah.

Q. Do you have an understanding of what that role is?

A. Yeah.

Q. What is it?

A. He oversees all of the evaluations of biological products that come before the FDA for evaluation for approval.

Q. I see. And how did this exchange with Mr. Marks [sic] come about?

A. I think it says in the email, but...

Q. There is some discussion of it in the email. There's also some redaction of names which makes it a little confusing --

A. Yeah.

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

Q. -- for me to follow. It appears to me that former Senator Rick Santorum introduced you to him; is that correct?

A. He did.

Q. And did you know Senator Santorum from your earlier career working in the senate?

A. He's my best friend from college.

Q. And what was your purpose in reaching out to Mr. Marks? Is it Mr. Marks or Dr. Marks?

A. Dr. Marks.

Q. Dr. Marks. Excuse me.

A. Well, it's --

Q. And I just -- you probably have looked and you probably know, but just to situate you, this is late July of '24, so not long after you --

A. So, yeah, I had taken the role of the executive chair at that point. It was, again, the -- what I worried about was the reputation of the company. The reputation was so bad because of the defamation and persistent attacks on the company that I was fearful that we'd have brilliant data for a phase 3 trial and FDA might not take it seriously.

I've seen FDA up close -- too close too many times to know FDA is a political organization. So what I wanted to do -- because I had some exposure to

Page 223

Dr. Marks before -- now, Dr. Marks was not going to be -- if simufilam ever got to the FDA for approval, it wasn't CBER that was going to evaluate it. It was CDER.

Q. It's a --

A. It's a small molecule drug. So it goes through Center for Drug Evaluation and Research, not biologics.

Q. Biologics sits above and is a broader --

A. They're -- they're adjacent.

THE REPORTER: I'm sorry. I didn't get the whole question.

Q. (By Mr. Zaur) My question was whether biologics sits above drug evaluation, but it sounds like maybe that was wrong.

A. They're -- they're adjacent.

Q. I see.

A. Yeah. They're evaluating -- biologics is -- they're evaluating things like gene therapy and CAR-T oncology drugs and, you know, things that utilize biological elements to create a drug.

Q. I see. But not like a single -- a single molecule drug treatment?

A. No. Small molecule drugs are CDER, so...

THE REPORTER: CDER?

THE DEPONENT: C-D-E-R.

Page 224

THE REPORTER: Thank you.

THE DEPONENT: Yeah.

So I was -- I had in -- a brief encounter -- which I think I reference in the email -- with Dr. Marks once before.

Q. (By Mr. Zaur) In connection with the MiMedx?

A. Right. And when I went on the board of MiMedx -- this was a very troubled company whose former CEO went to jail. But the company happened to have a great product. It was the best product in its industry. And the company was -- the company could clearly be saved and value could be created for investors which is why I got involved and helped recruit several other board members, and we turned the company around.

But we discovered something very early in that -- and I assume this is all confidential. In the process as we were getting to know the people at the company -- we were interviewing, you know, executives at the company -- we discovered that a previous employee at the company had done something that FDA would have a real problem with. And we were frankly outraged. You just, you know, don't -- you just don't run afoul of the government. And so I called my friend Rick who I knew had a relationship with Dr. Marks. And I was -- what I

Page 225

was thinking at the time was -- this is going to display my age.

But when Warren Buffett had this gigantic position in Salomon Brothers in the early 1990s, they discovered this treasury scheme where Salomon was basically rigging the bond market. And the Department of Justice investigated them. And it started to look really bad.

But Warren Buffett is Warren Buffett. And he went before Congress and testified and said something to the effect of, you know, I can tolerate honest mistakes, but where I find people running afoul of the law, I will be ruthless, was his expression.

And I thought when I heard this from this employee about something that had happened, I'm going to call Dr. Marks and I'm going say the exact same thing. I can tolerate the fact that people will make mistakes, but if somebody deliberately misleads the agency, we will be ruthless.

So Rick put that conversation together because CBER did oversee MiMedx. It's a biologic. And I wasn't calling, asking for any special favor or anything else. I wanted him to know, Hey, there's a new sheriff in town here. The bad guys that, you know, wrecked this company, they're gone. And we're going to behave very

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

differently from now on.

So I thought, you know, I have some credibility. Apparently Marks repeated the story to some other people later on. It got back to me. I thought, I have some credibility with Dr. Marks. I'm not going to ask him to put his credibility on the line. But I'm going to ask him, Look, in the event that we really have great data, how do I get people to take it seriously?

And I know you can't help me because you're CBER. But how -- what's -- how do we do this? What's the right way, you know, for this company to change its reputation at the agency? And so he put me in touch with the director of the office of new drugs at the time.

Q. Looking at the page with the Bates number ending 4799, so a few pages in from the back. So you've summarized for Mr. Marks sort of a reminder about the MiMedx situation. And you write, So here I am again with another company who has, through its own mistakes, managed to come close to destroying something that may prove to make a significant difference in the lives of patients.

Is that a reference to Cassava?

A. Yes.

Q. And so you're drawing -- you were drawing an analogy --

Page 227

A. Yeah.

Q. -- to the MiMedx situation?

MS. LOSEMAN: Object to form. The document speaks for itself.

Q. (By Mr. Zaur) Well, I'm asking you. Did you intend that to be an analogy, the MiMedx situation?

A. Analogy is probably not the right word, but it was -- I'm doing something -- Cassava is in no way, shape or form as severe as MiMdex was. But I'm -- you know, this is a -- this is a troubled company that I'm going to help turn around.

Q. And what did you mean by indicating that the company, through its own mistakes, had managed to come close to destroying something that may prove to make a significant difference in the lives of patients? What mistakes were you referring to?

A. PR mistakes.

Q. Meaning what?

A. Remi and I are very different people. I -- I would have handled the PR fiasco very differently than the way he did.

Q. How would you have handled it differently?

A. I wouldn't have put out a press release that said fact versus fiction, for example. I wouldn't have -- I would not have -- this is just me speaking. I

Page 228

would not have fed the short sellers' fire. I would have said, Have your fun. I'm going to execute. We're going to create data. You're going to be out of business. That's all. He didn't -- he didn't feel like he could do that.

To his defense, he was running a company. And every day people were looking at him like, Are we going to be in business three months from now? People are saying all these bad things. Could we ever raise capital? Could we ever finish this trial? We're getting bashed every day by these defamers.

So it's easy for me to criticize because I wasn't running the company. I just think I would have handled it differently.

Q. Anything other than Remi's PR mistakes that you intended to convey through the word "mistakes" here or is that the sum total of what you were attempting to convey to Dr. Marks in this -- in this paragraph?

A. I think if you look back on the record, you know, relying upon much of your research from Dr. Wang was -- was a mistake in hindsight. I mean, I didn't know that at the time, but in hindsight, yeah. Now -- but that's not all they relied on. Let's make that clear.

Q. So apart from PR mistakes and the mistake

Page 229

of relying perhaps more heavily than one might have done on Dr. Wang, are there any other mistakes that you intended to convey through this paragraph of your email to Dr. Marks?

MS. LOSEMAN: Object to form. Misstates.

THE DEPONENT: No, just -- the company's reputation was terrible.

Q. (By Mr. Zaur) Going down on the same page, you write, We are also performing analyses on CSF -- that's cerebral spinal fluid -- and plasma samples that the previous management decided to ignore -- perhaps because they feared the answer?

Is the decision to ignore those CSF and plasma samples a mistake that Mr. Barbier's leadership made?

A. I think it was a mistake. My comment is overly snarky. I think it was a mistake.

Q. The comment -- which comment as it relates --

A. "Because they feared." Yeah, that's --

Q. Because you don't really know why they ignored the samples?

A. I have no --

THE REPORTER: Whoa, whoa, whoa.

MS. LOSEMAN: Hang on.

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

THE DEPONENT: Sorry.

THE REPORTER: I didn't get it all.

MS. LOSEMAN: And I'm not sure you were done with your answer either.

MR. ZAUR: Where are we in the --

THE REPORTER: "Because you don't really know why..." That's -- I was writing two people. It's not there.

MR. ZAUR: Okay. I think the last thing we've got that I remember is "my comment is overly snarky. I think it was a mistake."

Q. (By Mr. Zaur) So if I can pick up from there, I think my question to you was which comment was overly snarky?

A. Where I said "Perhaps because they feared the answer?"

Q. And why is that overly snarky?

A. Because I had no -- you know, I was in no position to know. He might just not have wanted to spend money. I don't know.

Q. On analyzing the samples?

A. Yeah.

Q. The -- if you look at the last word on that page and then the first few sentences of the following page read, "These," meaning those -- the analysis of those

Page 231

CSF and plasma samples, right?

A. Yeah.

Q. These were promised to FDA as part of the phase 2 SAP. That's statistical analysis protocol?

A. Plan.

Q. Plan. But the analysis was never performed. And that's consistent with the email we saw earlier where you're informing the board you're concerned about that, right?

A. Mm-hmm.

MS. LOSEMAN: Object to form.

I'm sorry. Which exhibit are you comparing it to?

MR. ZAUR: I don't remember the exhibit number. I'll get it for you on a break.

MS. LOSEMAN: Does the witness --

Q. (By Mr. Zaur) And then you write, "Seriously." What is the meaning of the word "seriously" in that context?

A. Seriously? It was a snarky remark because I know Dr. Marks well enough to know that he is frustrated by companies that don't -- that just don't understand the FDA and don't understand the policies and procedures that a company needs to follow in order to get a drug approved. I know that that drives him crazy.

Page 232

That's why I threw in that word.

Q. And then you wrote, We're doing it now. And was that true at that time?

A. What was the date of the --

Q. July -- your email to him is July 28th of 2024.

A. I would -- if I said that, then I had authorized the expenditure.

Q. But you're not doing it anymore?

A. No, but we're also not giving away the samples.

Q. Meaning you're keeping them?

A. Yeah. You know, if -- if we had no interest whatsoever, we could destroy the samples. We're not going to do that.

Q. You described a concern, I believe, with the passage of time the samples might become less stable. Is that the right word?

A. They degrade. Yeah.

Q. Degrade. Does that mean they become less reliable as a source of data?

A. Yes.

Q. So as we sit here today, and no assay is being done on the samples, their reliability as a source of data is deteriorating, right?

Page 233

MS. LOSEMAN: Object to form. Misstates.

THE DEPONENT: It's going to depend on how they're stored and how well they've been stored. At minus 80 centigrade, I don't know if they'll degrade or not. But if we decided to start analyzing them again, we would do several first to see if -- if they were still good.

Q. (By Mr. Zaur) I see. You can do -- you can do that?

A. Yeah.

Q. I see. What do you look for?

A. Now, you're --

Q. You look -- you look for a report from a scientist?

A. Yeah. I look for a scientist to tell me, yeah, they're fine.

MR. ZAUR: I could use a break.

MS. LOSEMAN: Okay.

THE VIDEOGRAPHER: We are going off the record. The time is 5:06 p.m.

(Recess from 5:06 p.m. to 5:40 p.m.)

THE VIDEOGRAPHER: We are now back on the record. This is the beginning of Media Unit 8. The time is 5:40 p.m.

Q. (By Mr. Zaur) Mr. Barry, I'm going to mark

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

Exhibit 100.

(Exhibit 100 was marked.)

Q.   If you'd take a look at that.

A.   What happened to 99?  Oh, there it is.

Q.   Did I genuinely skip 99?  I might have.

A.   No, you didn't.

Q.   Mr. Barry, I don't know whether you will recognize this document.  But if you take a look at the last page and see the signatures, and take a look through it, I think you may.  You let me know when you've had a moment to review it.

A.   I've never seen it before, so, no.

Q.   You don't recognize this as a letter submitted by my clients and one other person to the FDA?

A.   No, I've never seen it.

Q.   Do you know whether Cassava in the defamation action asserted that any part of this document was defamatory?

A.   I don't know.

Q.   So I take it you -- you have no particular view sitting here today as to whether any part of this document is defamatory?

A.   No, I've never seen it before.

MR. ZAUR:  Did I say 100?

MS. LOSEMAN:  Yes.

Page 235

Q.   (By Mr. Zaur)  In your testimony today you've mentioned a couple of times that there is research, other than Dr. Wang's research, that validates the basic science underlying simufilam; is that right?

A.   Yes.

Q.   The one article that I can recall us talking about is Dr. Bordey's study of seizures in mice, right?

A.   Correct.

Q.   I'm handing you what I've marked as Exhibit 101 --

(Exhibit 101 was marked.)

Q.   -- which is an article titled A novel filamin A-binding molecule may significantly enhance SST2 antitumoral -- like tumor with an a-l -- actions in GH-secreting PitNET, P-i-t-N-E-T, cells.

Do you recognize this article?

A.   I don't think I've seen the article before, but I think this is -- yeah, this is from the University of Milan that did this study.

Q.   And what's your understanding of -- is this one of the -- is this one of the studies that, in your view, also corroborates the basic science underlying simufilam?

A.   Yeah.  You know, again, I'm not the

Page 236

scientist here, but I know it had an effect on pituitary tumors.  I remember hearing about that.  I don't think I ever read the study.  But, you know, people inside the company considered it to be validating.

Q.   Do you know what part of the basic science they considered it to be validating of?

A.   I don't know.

Q.   Do you know if they considered it to validate the concept -- the proposition that simufilam bound to filamin A?

A.   I don't know that either.

Q.   With -- with whom in Cassava have you discussed the -- what you've called the Milan study?

A.   I think I discussed it with Dr. Ben Thornton.  I think I may have discussed it with Dr. Melissa Snyder as well.  When it came out, I remember Remi telling me about it.  I was a board member.

Q.   What do you remember Remi saying to you about it?

A.   My -- my memory, which isn't great, is that this was a -- this was a validating study.  These guys contacted Cassava, asked for the drug, wanted to do this experiment and was successful.  That was my understanding.

Q.   And did you consider this to be an

Page 237

independent study?

A.   That was my impression, yeah.

Q.   Drawing your attention to the list of authors on the first page of this study.  Do you see the name Lindsay H. Burns on that list of authors?

A.   Yeah.

Q.   Is Dr. Burns -- is that Dr. Lindsay Burns of Cassava?

A.   I -- your guess is as good as mine, but I don't know another Lindsay Burns.

Q.   If that's -- if that's Dr. Burns, does her coauthorship of that paper affect your view of the independence of that study?

A.   It's hard to know because I don't know the -- I don't know the study.  I don't know what work was performed.  I don't know what her role was in it.  If she just helped write the manuscript, she wasn't part of the experiment, yeah, I would say that's independent.  If she was part of the experiment, then, yeah, maybe not.  I don't know.

(Exhibit 102 was marked.)

Q.   Do you remember anything else about that -- about the science of that study other than what you've -- you've testified to in the last few minutes?

A.   I'm embarrassed to say that that is the

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

study I probably know the least about. Of all the ones that have been done, that's the one I didn't pay that much attention to.

Q. I'm going to hand you Exhibit 102.

MR. ZAUR: I did it again. I gave you one instead of three.

MS. LOSEMAN: Thanks.

Q. (By Mr. Zaur) Exhibit 102 is an article titled Simufilam Reverses Aberrant Receptor Interactions of Filamin A in Alzheimer's Disease.

Do you recognize this article?

A. I don't.

Q. I'm trying to see if I can find a way to remind you. If I suggested to you that this was the Cochin study, would that refresh your memory?

A. I know there was a Cochin study that showed binding, but I don't think I've ever seen this study.

Q. What do you know about -- I'm not going to try to drag us through the document in that case. If you haven't seen it, you haven't seen it.

What else do you know about the Cochin study?

A. If this is the Cochin study, my --

Q. Let's set it aside. I'm just going to ask

Page 239

you about your understanding of the Cochin study and separate that from the article. I believe it to be that, but we don't need to be distracted by it.

A. I think the person I heard the most about -- heard from the most about this study was Jim -- Dr. Kupiec who -- he found it convincing.

Q. What did he find this convincing of?

MS. LOSEMAN: Object to form. Foundation.

MR. ZAUR: He started it.

Q. (By Mr. Zaur) Did he tell you he found it convincing?

A. He did, yeah.

Q. What did he say to you about the article other than that?

A. It is too late in the day, and my understanding of science is not deep enough. I really don't remember. I know Kupiec was impressed by it.

Q. Did you discuss the article with anyone else at Cassava, or discuss the study, I should say, with anyone else at Cassava?

A. Yes.

Q. Who?

A. Chris Cook.

Q. I assume -- I'm not going to ask you -- I'm not going to ask you about that.

Page 240

Anyone else?

A. I may have discussed it with Ben Thornton. Again, I don't remember.

Q. Do you recall the substance of any discussion with Ben Thornton?

A. No.

Q. Did you discuss the study with anyone outside Cassava?

A. I was on a call once -- at least once with an outside advocacy group that was very sceptical of Cassava. Jim Kupiec and I did the call. And Jim went into some detail on the study. I -- I'm not the person to go into detail on a study like this.

Q. What was the advocacy group?

A. I can't remember the name of the group. They -- Cure Alzheimer's or some -- something like that. I don't remember the name of the group.

Q. How did that call come about?

A. As it turned out, I knew -- I knew a guy who was on their board through a friend of mine. And this friend of mine naively thought he could -- you know, if you just put two people together, they can solve whatever differences there are.

And so he connected me to this board member of this organization whose name I've forgotten.

Page 241

And they had said something on their website about Cassava that was patently untrue. And so I -- I don't think I ever had a conversation. I think we emailed.

And I said, I'm politely asking you to take it down. What you're writing -- what you're saying is untrue, and that's not helpful to patients. And he just dodged it. And so ultimately we wound up in a conference call with -- he pushed me off to the person who was running the group. And we had a call with her and her chief scientific officer.

And actually it was not a bad call. But they were really -- they were very negative on the company because, you know, they didn't like Lindsay Burns, didn't like Remi Barbier.

Q. Why did they not like Lindsay Burns and Remi Barbier?

MS. LOSEMAN: Form. Foundation.

Go ahead.

THE DEPONENT: I felt -- I felt at the time that they believed hook, line, and sinker everything they had read in the New York Times and in Science and all of the negative things that had been written. And, look, a lot of the -- and I don't know if it was your clients or who.

But there were -- it was a very active

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

campaign by short sellers and by defamers to basically destroy the reputation of the company. And that -- that not only was with clinicians, it was with advocacy groups and everything else. It was very sad.

So that was part of my effort to change the perception of the company, was to engage with these people. You know, we didn't have anything to hide.

Q. (By Mr. Zaur) Did the representative of this organization on the conference call indicate that they were convinced by Dr. Kupiec's explanation of the Cochin study?

MS. LOSEMAN: Object to form. Vague.

THE DEPONENT: The -- what was her name? Meg Smith? Meg Alexander? I can't remember her name. I remember her saying several times, I'm sorry your previous management dug such a big hole for you. So, you know, I entered that conversation, you know, at a minus 100, and the conversation probably ended at a minus 40. So we made progress.

But she -- so the way I ended it was, look, Meg, if we have data that we think we're going to have and we are successful, we want to have a call with you and we want to go through the data and we want to discuss what we've seen. Are you willing to have that conversation? And she said, Yes, she was. So I

Page 243

considered that progress.

Q. (By Mr. Zaur) I want to go back to the validating -- the validating studies. We talked about Dr. Bordey's study. We talked about the Cochin study. I don't know if I'm pronouncing that right.

A. Cochin.

Q. Cochin study.

We talked about the Milan study. Are there -- are there any other studies that you are aware of that you regard as validating the basic science underlying simufilam that were not conducted by Dr. Wang?

A. I guess the way I think -- I tend to think in mosaics. So I will take various different pieces of things and see how they fit together. And so I found -- I found the early Alzheimer's studies to be persuasive, particularly the cognition --

THE REPORTER: I'm sorry? "...particularly the cognition..."

THE DEPONENT: Cognition maintenance study.

THE REPORTER: Thank you.

THE DEPONENT: I found that to be really interesting.

Q. (By Mr. Zaur) That was -- the cognition maintenance study being a part of the Cassava clinical

Page 244

program, right?

A. Yeah. Yeah.

Q. Setting aside work that was done as part of Cassava's clinical program, are you aware of any other studies that are validating of the basic science underlying simufilam other than the ones we've discussed today?

A. Yeah. The second -- the second study on TSC mice which was just announced a week or two ago. But others I can't think of right now.

Q. Do you believe there are others?

A. I don't know.

Q. If -- the studies that are currently underway -- I think -- am I right in understanding that about three or four studies are currently underway to validate the basic science underlying simufilam?

MS. LOSEMAN: Object to form. Vague and misstates.

THE DEPONENT: I think -- yeah, there are -- there are ongoing studies, yeah.

Q. (By Mr. Zaur) If the currently ongoing studies -- this is a hypothetical question. Your counsel may object, but let's see.

If the currently ongoing studies fail to show that simufilam binds to filamin A, would Cassava

Page 245

abandon the hypothesis that simufilam binds to filamin A?

MS. LOSEMAN: Object to form. Improper hypothetical. Calls for speculation.

THE DEPONENT: I think you'll notice that in our communications now we don't say that it binds. I think we say it interacts. So we wouldn't change that. If we couldn't prove the binding, you know, but we're in the clinic on epilepsy, and we start to show a real reduction in seizures --

You know, I'm not sure I understand the question.

Q. (By Mr. Zaur) Well, I appreciate the clarification.

Does -- is it Cassava's position today that simufilam binds to filamin A, or no?

MS. LOSEMAN: Object to form.

THE DEPONENT: We think so, but we don't say that out loud because, in my view, we haven't proven it.

Q. (By Mr. Zaur) Is it -- is it your view that the -- that an interaction between simufilam and filamin A has been proven?

A. It's -- in my mind, yes.

Q. Proven by what?

A. What we saw in the Alzheimer's trial, 1927

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL

Page 246

patients or whatever the number was.  If you were to believe the critics and your clients, this drug does nothing.  The data will prove otherwise.

I'm not saying it's an Alzheimer's drug and we were successful.  But it did something.  It -- it beat the placebo consistently and showed a big benefit to the mild population in the second trial.  That's not just flipping a coin and getting it -- being lucky.  That tells you there's some activity of the drug.

Now, is our interpretation of the mechanism of action correct?  You know, we could be wrong.  But the drug is doing something.

In the mouse model -- or the two mice models now for TSC-related epilepsy, seizures are definitely getting reduced by the drug.  There's just -- there's no other explanation for it.  Great news for mice, right?  I don't know that that's great for humans.

But the drug is doing something.  At least it's doing something for those mice, and it did something for the Alzheimer's patients.  It didn't do enough.  So in my mind, yeah, the drug is active.  Maybe it's not active enough.  I don't know.

MR. ZAUR:  Excuse me just a moment.

I don't have any further questions for you today.

Page 247

We -- plaintiffs, for the record, take the position that we are holding the deposition open because we disagree with many of the privilege assertions and because of the recent production and still awaited production of certain documents.  But for today I have no further questions.

MS. LOSEMAN:  Let's phrase it to say we disagree and we'll reserve on the issue.  Particularly as to the production of documents, I think you chose to move forward with this deposition knowing the current state of play.  But we'll reserve on that, and hopefully we don't have to revisit it.

I do have a few follow-up questions that I'd like to go through.

EXAMINATION

BY MS. LOSEMAN:

Q.  Sir, if you could pull out Exhibit 56, Exhibit 61, Exhibit 66, and Exhibit 76.

A.  61.  Sorry.  They're not in order.

Q.  Oh, they're not?

A.  76 did you say?

Q.  76.

A.  Yeah.  56?

Q.  56.

A.  Right.

Page 248

Q.  61.

A.  Right.

Q.  And 66.

A.  And 66.  And 66.  Yeah.

Q.  All right.  Let me focus your attention on Exhibits 56 and 61.  Do you have those two documents in front of you?

A.  I do.

Q.  And correct me if I'm wrong, but I believe you testified this morning that you had not previously seen these documents; is that right?

A.  That's right.

Q.  And do you recall earlier this morning plaintiffs' counsel pointed you to certain statements within these exhibits?

A.  Yes.

Q.  And were you allowed to read the entirety of both documents here today?

A.  I was not.

Q.  And, in fact --

THE REPORTER:  I'm sorry.  I didn't hear the objection.

MR. ZAUR:  To form.

THE REPORTER:  Thank you.

Q.  (By Ms. Loseman)  And did you read either

Page 249

of these documents in full today?

A.  No.

Q.  And then you were also shown Exhibit 66 and Exhibit 76.  Do you have those documents in front of you today?

A.  I do.

Q.  And Exhibit 76 is a form 483, and Exhibit 66 is an email communication that you were not on showing communications between people at Cassava and the FDA; is that right?

A.  That's correct.

Q.  You hadn't seen either of those documents before today either; is that right?

A.  That's right.

Q.  Sitting here today, can you recall being made aware of any discussions between Cassava management or any employees at Cassava and the FDA regarding any of these matters reflected in these four exhibits?

MR. ZAUR:  Objection.

THE DEPONENT:  No.

Q.  (By Ms. Loseman)  Are you aware of any management discussions or Cassava employee discussions with anyone at CUNY regarding any of these matters?

MR. ZAUR:  Objection.

THE DEPONENT:  Was I then?

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL

Page 250

Q. (By Ms. Loseman) Were you then?

A. No.

Q. Sitting here today, are you aware of any discussions between management or anyone at Cassava on the one hand and CUNY on the other hand regarding these matters?

MR. ZAUR: Objection.

THE DEPONENT: No, just these documents, whatever they're reporting.

Q. (By Ms. Loseman) Do you know how management resolved the FDA's concern described in Exhibit 66 at the time?

A. I don't. And it -- it speaks to the -- you know, when you're an operating executive you should -- well, I can't know everything. You should know all of the things that are really significant to the company and that could affect, you know -- may even have a small effect on a company's business. As a director, that level of granularity is almost never revealed.

Now, if there was something that was going to threaten the company's ability to be in the clinic or FDA was going to stop a trial or put it on clinical hold, then management absolutely should have told us, but that wasn't the case in this. So it's -- I'm not surprised that I didn't know. It's --

Page 251

Q. So when you were asked earlier today if you would expect to be told about either Exhibit 56, Exhibit 61, or any of these four exhibits, would it depend on the circumstances and whether the FDA -- FDA's concern had, in fact, been resolved?

MR. ZAUR: Objection.

THE DEPONENT: It would depend on the circumstances, yeah.

Q. (By Ms. Loseman) You can set those aside. If you'll pull out Exhibit 88.

A. I didn't have the good sense to put these in order.

Q. My apologies. I should have warned you.

A. That was 88?

Q. Exhibit 88 is an email from you to Mr. Sitrick, at least that's the last email in the chain at the very top.

A. Got it, yeah.

Q. All right. You recall you were asked questions about that -- this exhibit earlier today?

A. Yes.

Q. Can you describe the circumstances in which you wrote this email to the board that begins in the middle of the first page of the exhibit?

A. This -- well, so this was written

Page 252

July 18th. I had to go and speak to the employees on July the 17th because I think that was the day the company announced that Remi and Lindsay were leaving.

That was the culmination of a little more than a month and a half of what felt like 24/7 work. It was -- I had no idea it was -- you know, we were going to be working to that extent and that seriously. So it was, you know -- plus I'm on other boards, so a pretty busy time. And it was also a month and a half after I had major back surgery. So I felt that I was working about 20 hours a day.

There were so many issues that we had to resolve with Cassava. And, you know, the work was kind of just beginning when I had to go and talk to the employees and answer their very good questions.

So -- and the board had really pulled together through this whole process so I really wanted to keep the board very informed, you know. Everybody was concerned about the government investigations, and we really wanted to settle this with the SEC, and they were sort of counting on me, so I really wanted to keep them informed.

So I wrote this email on a flight from Austin to San Diego. And this is after -- I don't know how much sleep I had that week, but it wasn't much. So

Page 253

my choice of words is probably not perfect. What I said, I said. But, you know, I probably did not use the exact perfect word in every -- every sentence. But I was pretty tired.

Q. Was this in any way a transcript or accurate description of information that you shared with employees at that employee town hall session?

MR. ZAUR: Objection.

THE DEPONENT: It was not. It was -- my purpose in visiting the -- or going to see the employees was to help them understand what had happened, that -- to tell them that the board was committed to the program, that they were not going to lose their jobs, certainly until we had the results from the Alzheimer's, and to say that we would do things differently.

Q. (By Ms. Loseman) And is it fair to say you did not share everything that you communicated to the board in this four and-a-half page email? You did not share anywhere close to everything with employees in that town hall?

MR. ZAUR: Objection.

THE DEPONENT: Oh, no, a small subset of what's in this email. Yeah.

Q. (By Ms. Loseman) You can set that aside. And if you would pull out Exhibit 89.

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL

Page 254

A. That's 88. It's not jumping out at me.

Q. All right. It is titled MOA of Simufilam.

MS. LOSEMAN: Is it all right if I hand the witness a copy of Exhibit -- well, here, let me --

MR. COOK: It's not been marked up either.

MS. LOSEMAN: Hmm?

MR. COOK: It's not been marked up. It's just a copy.

MS. LOSEMAN: Let me -- if you don't mind, let me go through this stack and I'll find it.

THE DEPONENT: Sure.

Oh, now I know what I'm looking for. Maybe I can -- here, you go through these.

MS. LOSEMAN: Here it is.

THE DEPONENT: Oh, thank you.

Q. (By Ms. Loseman) Let me -- well, first of all, this document -- is this a final version of the document or was it an iterative report?

A. This was the first generation. These were ideas that were listed by the scientific team when -- it was -- I can't remember if it was before I came there on July 17th or after. But Chris, Eric, and I sat down and said, How can we -- because my question was --

Q. Well, and -- sorry. I heard you say Chris.

A. I did say that.

Page 255

Q. Are you referring to Chris Cook?

A. I was referring to Chris Cook.

Q. Okay. So I want to be clear. I don't mean to elicit any conversation between you and company counsel about this document. So -- so let me try again.

Was this -- did this document evolve --

A. It did.

Q. -- over time?

A. Yeah.

Q. And who are the authors of this document?

A. It was Marian Castro, who was a master's degree -- should have had a Ph.D. Melissa Snyder, also a Ph.D., and Ben Thornton, Ph.D.

Q. And you were --

A. So three scientists.

Q. Thank you.

And apologies for cutting you off.

So you were asked questions about the list of studies that's on the page Bates labeled ending 390. Do you recall being asked questions about this page?

A. Yes.

Q. Are you the best person to describe what these various proposed studies are or are not?

A. It would be an understatement to say no.

Q. Who would be best -- who would be -- strike

Page 256

that.

Who would be most knowledgeable about the studies listed on this page?

A. Ben Thornton.

Q. You can set that aside.

Lastly, if you can locate Exhibit 99. I'll help.

A. I got it.

Q. You recall you were asked questions about this document earlier today?

A. Yes.

Q. Let me direct your attention to the page Bates ending 799.

A. Right.

Q. And let me direct your attention to the text at the bottom of the page. And I'll read the sentence for the record. We are also performing analyses on CSF and plasma samples that the previous management decided to ignore. And it goes on.

Do you see that sentence?

A. Yes.

Q. And you were asked about that sentence earlier today. Do you recall that?

A. Yes.

Q. Are these the analyses that you testified

Page 257

earlier the company was committed to doing and disclosing regardless of -- of the outcome -- good, bad, indifferent, the company was committing to disclose the outcome?

A. Yes.

Q. And when were these analyses halted?

A. Sadly, they were halted the -- the day that we -- I think it was the same day that we announced the failure of study 7, so in November. I convened a meeting of all employees. And, you know, it's a very good team. And people immediately responded.

And I recall Laura Rodriguez who's in one of these documents saying, Oh, we're just about to start the -- the CSF and plasma samples from phase 2. We're just about to start that analysis. Do you want to continue it?

And, you know, I was -- didn't get a lot of sleep that weekend either, and was pretty burdened with a lot of things, and I just said, I -- I don't know. How much does it cost? And the answer was somewhere between 500,000 and $1,000,000.

And we had made the decision over the weekend we were shutting down the Alzheimer's program. So it made absolutely no sense to spend that money on that study, particularly since we -- you know, we had been looking at potentially going to epilepsy anyway as a

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL

Page 258

backup plan. So it was -- it was expense driven.

Q. And there's reference to samples there in -- in that sentence.

Do you see that?

A. On the same page?

Q. CSF and plasma samples.

A. Oh, yeah, yeah, yeah, yeah.

Q. Are those the samples that the company continues to store to this day?

A. Yeah. We have -- from that study, it was the phase 2, we have hundreds, if not thousands of samples from that study that are blood, plasma, CSF, because they were taken frequently. There's a lot.

Q. And is it fair to say the only reason the company has not further analyzed or evaluated those samples is due to the extraordinary cost associated with any such analysis?

MR. ZAUR: Objection. Form.

THE DEPONENT: That is the only reason why that's -- is the cost.

MS. LOSEMAN: I have no further questions. Thank you.

EXAMINATION

BY MR. ZAUR:

Q. Have you informed Dr. Marks at the FDA that

Page 259

Cassava chose not to go forward with that -- the analysis of those samples?

A. I haven't. The main reason is Dr. Marks and Dr. Stein were both victims of the new administration's cleaning house of the FDA, sadly.

Q. Do you know when they left those positions?

A. Marks and Stein left -- I can tell you when it was. It was the day after Marty Makary was confirmed as FDA commissioner. So it was sometime in March.

Q. Of this year?

A. Yeah.

MR. ZAUR: I don't have anything else.

MS. LOSEMAN: Okay.

THE VIDEOGRAPHER: We are -- we are off the record at 6:21 p.m. And this concludes today's testimony given by Richard Barry. The total number of media used was eight and will be retained by Veritext Legal Solutions.

(End of video deposition.)

THE REPORTER: Your order for transcript?

MR. ZAUR: Rough and regular delivery.

THE REPORTER: And exhibits?

MR. ZAUR: Yes.

THE REPORTER: Ms. Loseman.

Page 260

MS. LOSEMAN: Scott?

MR. CAMPBELL: We have a standard order for -- yeah, for the transcript in these proceedings.

MS. LOSEMAN: Let's do the rough, and standard and exhibits.

THE REPORTER: And read and sign?

MS. LOSEMAN: And read and sign, yes, please.

* * * * * * *

WHEREUPON, the foregoing deposition was adjourned at the hour of 6:21 p.m. Total time on the record was 6 hours and 40 minutes.

Page 261

REPORTER'S CERTIFICATE

I, Laurel S. Tubbs, a Registered Professional Reporter and Notary Public within the State of Colorado, do hereby certify that previous to the commencement of the examination, the deponent was duly sworn by me to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

My commission expires October 26, 2027.

LAUREL S. TUBBS
Registered Professional Reporter
Registered Merit Reporter
Certified Realtime Reporter
and Notary Public

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL

Page 262

MONICA LOSEMAN, ESQ.

mloseman@gibsondunn.com

August 28, 2025

RE:  Adrian Heilbut, Et Al v. Cassava Sciences, Inc, Et Al

8/12/2025, Richard Barry (#7527743)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at CS-NY@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 263

Adrian Heilbut, Et Al v. Cassava Sciences, Inc, Et Al

Richard Barry (#7527743)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Richard Barry                    Date

Page 264

Adrian Heilbut, Et Al v. Cassava Sciences, Inc, Et Al

Richard Barry (#7527743)

ACKNOWLEDGEMENT OF DEPONENT

I, Richard Barry, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Richard Barry                    Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

67 (Pages 262 - 264)

HIGHLY CONFIDENTIAL

**[& - 2027]**                                                    Page 1

## &

**&**  2:8 3:5

## 0

**05948**  1:2 7:14

## 1

**1**  3:22 4:17 7:9
**1,000,000**
  257:20
**10**  49:21
  197:22
**100**  5:15 30:7
  32:9 234:1,2
  234:24 242:18
**10010**  2:4
**101**  235:11,12
**10111**  2:14
**102**  5:16
  237:21 238:4,8
**108**  6:3
**109**  3:19
**10:04**  216:21
**10:19**  52:2,3
**10:33**  52:3,6
**10:48**  62:20,21
**10:52**  62:21,24
**117**  6:4
**11:40**  92:12,13
**11:56**  92:13,16
**12**  1:14 3:7
**125**  3:21 4:2,5
  4:8,10,13,15

**125-02**  111:17
  111:19
**129**  4:18
**12:52**  125:1,2
**12th**  7:3
**13**  19:5 98:15
  176:4
**14**  4:12
**142**  4:20
**1434669**  125:17
**1435249**  125:16
**1435250**  125:16
**1440099**  125:17
**15**  49:21
**153**  4:21,23
**1530**  109:14
**16**  4:3
**163**  4:24
**16th**  120:15
**178**  5:2
**17th**  252:2
  254:22
**18**  105:9 159:7
  164:14 216:20
**18th**  215:23
  252:1
**19**  186:24
**1900**  2:9 3:5
  7:16
**192**  5:3
**1927**  245:25
**196**  5:4
**1990**  12:16

**1990s**  58:4 85:6
  225:4
**1995**  11:22
  14:4
**1998**  12:16
**1:24**  1:2 7:14
**1:41**  125:2,5
**1st**  122:13

## 2

**2**  23:18 30:6
  40:18 52:5
  111:20 120:18
  121:16 167:9
  167:23 168:8
  169:23 170:6
  171:14 174:18
  231:4 257:13
  258:11
**2,000**  199:23
**2.0**  85:2 124:14
**2.0.**  98:14
**20**  23:17 24:19
  186:24 202:9
  252:11 264:15
**200**  5:5
**2000s**  16:10
  58:5 59:5
**2005**  12:21
**2010**  12:19
  47:2
**2013**  186:10,23
**202**  5:6

**2020**  18:22
  35:25 36:8
  37:5 185:24
  209:17
**2021**  3:23 4:4,7
  4:19 18:23
  23:2 96:7
  132:3 199:9
**2022**  4:9,12,14
  4:17 81:4 94:8
  95:7 105:14
  109:10,22
  110:25 112:14
  117:21 122:13
  123:19 126:25
  127:1 128:2,11
  153:10 159:7
  199:9
**2023**  105:9
  142:22
**2024**  41:23
  45:16,20,24
  46:12,20,25
  73:10 76:11
  81:7 82:16
  85:15 87:20
  94:13 104:1
  164:14 172:9
  200:9 220:2
  232:6
**2025**  1:14 3:7
  7:3 262:3
**2027**  261:17

HIGHLY CONFIDENTIAL

**[203 - 6:21]**                                                    Page 2

**203** 5:7
**205** 5:8
**21** 4:9 23:6
39:4 133:2
209:18
**212-533-4310**
2:5
**212-589-4200**
2:14
**213** 5:9
**214** 5:12
**219** 5:13
**21st** 95:6
105:13
**22** 33:16
**220** 5:14
**22402** 261:19
**22nd** 95:7
105:14
**23** 4:6 105:14
**234** 5:15
**237** 5:16
**23rd** 2:4
**24** 39:1,5 40:6
85:23 88:25
89:3 91:12
104:16 169:14
222:15
**24/7** 252:5
**247** 3:13
**258** 3:13
**26** 261:17
**28** 262:3

**28th** 232:5
**29** 4:14
**2:07** 139:12,13
**2:13** 139:13,15
**2a** 148:12
149:6,9,10,13
149:16
**2b** 35:22,24
36:7 37:5
96:10,16 98:3
111:22 112:1
121:9,16

**3**

**3** 4:19 18:17,17
23:18 27:15
34:2 46:3,8
47:8,11,13
49:13 51:4
52:12 53:10
56:22 62:23
63:15 86:3,15
86:21 88:17
89:4 98:22
99:11 168:19
168:19 169:11
170:24 171:13
188:24 189:8
189:12,19,20
191:9,20
199:23 222:21
**3.7** 12:20
**30** 3:15 23:17
186:17 262:16

**300,000** 174:7
174:20
**3000** 2:9 3:6
7:16
**303-298-5700**
2:10
**310876** 130:16
**390** 178:20
255:19
**391** 178:20
**395575** 125:16
**3:25** 184:25
185:1
**3:50** 185:1,4
**3rd** 33:7

**4**

**4** 53:22,23
92:15 206:23
207:11
**40** 186:17
242:18 260:12
**41** 2:4
**45** 2:13
**4640** 163:19
**4643** 166:24
**4730** 212:9
**4732** 206:17
**4799** 226:16
**483** 109:16,21
110:9,16,23
116:20 118:19
123:5 249:7

**483s** 112:20

**5**

**5** 5:16 90:18
96:18,21
100:25 125:4
130:15
**50** 12:3 30:7
**500,000** 257:20
**52** 49:21 50:22
50:24
**53** 3:16
**545144** 125:15
**56** 6:2 94:5
95:2 247:17,23
247:24 248:6
251:2
**5:06** 233:20,21
**5:40** 233:21,24

**6**

**6** 5:15 50:9
139:15 260:12
**60** 48:8
**61** 6:3 108:5
247:18,19
248:1,6 251:3
**64** 50:14,24
**66** 6:4 117:25
247:18 248:3,4
248:4 249:3,8
250:12
**6686** 96:22
**6:21** 259:16
260:11

HIGHLY CONFIDENTIAL

**7**

**7**  49:19,20 180:4 185:3 257:8
**70**  33:16 34:2 53:16 186:17
**73**  3:15 30:12 30:13,15 53:21
**74**  3:16 53:18 53:23 79:15 80:20
**75**  3:17 80:9,12 81:5
**7527743**  262:5 263:2 264:2
**76**  3:19 50:17 50:25 109:1 110:12,14 111:5 247:18 247:21,22 249:4,7
**77**  3:21 125:8,9 125:15 126:4
**78**  4:2 125:8,15
**79**  4:5 125:8,15
**799**  256:13
**799544**  125:15

**8**

**8**  3:13 115:7 233:23
**8/12/2025** 262:5

**80**  3:17 4:8 125:8,16 207:3 207:4 233:4
**80202**  2:9
**81**  4:10 125:8 125:16
**82**  4:13 125:8 125:16
**83**  4:15 125:8,9 125:17
**84**  4:18 129:14 129:16
**85**  4:20 142:14 142:15
**86**  4:21 153:10 153:11,15,16 153:17 154:3,4 154:8,9 159:6 159:10
**87**  4:23 153:25 154:2,4 159:4 159:14
**88**  4:24 163:8,9 251:10,14,15 254:1
**89**  5:2 178:10 178:11,12 253:25
**8:24**  120:15

**9**

**90**  5:3 192:5,8 214:11

**90s**  59:5
**91**  5:4 196:7,8
**92**  5:5 11:10 200:24,25
**93**  5:6 202:22 202:23 203:18
**94**  5:7 6:2 203:16,19,20
**95**  5:8 205:13 205:14
**96**  5:9 213:24 213:25 214:2
**97**  5:12 14:15 214:11,12 215:17
**98**  5:13 14:15 219:14,16
**99**  5:14 220:22 220:23 234:4,5 256:6
**9:13**  3:7 7:3

**a**

**a.m.**  3:7 7:3 52:2,3,3,6 62:20,21,21,24 92:12,13,13,16 120:15 216:21
**abandon**  245:1
**aberrant**  5:17 238:9
**abide**  166:3
**ability**  63:15 127:23 128:23

199:18 213:13 250:21
**able**  89:23 90:9 107:14,22 109:3 116:9 176:8,9 189:14
**aboard**  215:24 216:15
**above**  118:15 143:6 206:25 223:8,13 262:6 264:7
**absolute**  59:13 98:17,19 99:2
**absolutely**  49:5 59:12,18 84:4 85:8 110:3 150:7 211:23 220:20 250:23 257:23
**abuse**  16:19 17:3 207:20
**academic**  114:5 184:3 202:13 214:15 215:2,7
**accept**  68:13
**accepted**  164:10
**accepting**  173:12
**account**  69:1
**accountants** 59:15

HIGHLY CONFIDENTIAL

**[accuracy - afoul]**                                       Page 4

| | | | |
|---|---|---|---|
| **accuracy** 80:5 112:10 262:9 | 151:16,21,23 152:6 154:21 156:12 166:21 172:5,22 176:7 185:21 192:14 193:7 196:3 198:22 199:10 213:14 234:17 246:11 261:16 | 55:16 204:22 | **advance** 169:22 |
| **accurate** 50:23 253:6 | | **adas** 50:12 | **adverse** 201:8 |
| **accusations** 203:22 | | **adcom** 18:14 | **advice** 65:25 66:22 68:10,17 72:10 85:20 93:6 194:21 212:25 213:5 213:23 |
| **accuse** 49:9 | | **add** 193:25 | |
| **accused** 135:9 | | **addicts** 16:16 | |
| **accusing** 165:1 | | **addition** 52:11 170:12 | |
| **acknowledge...** 264:3 | | **additional** 183:21,22 | **advise** 42:3 72:10,14 194:23 195:17 |
| **acknowledg...** 262:12 | **actions** 99:12 235:15 | **additions** 264:6 | |
| | | **address** 160:20 | **advised** 54:23 |
| **acquired** 12:9 | **active** 35:3 39:6 39:11 50:2,2 186:1 241:25 246:21,22 | **addressed** 56:21 | **advising** 195:16 208:24 |
| **act** 147:4,7 | | **addressing** 57:13 | **advisory** 146:10,13 147:1,8,24 148:11,15 149:5,24 150:7 150:11,19,22 151:8,15,22 152:5 208:16 |
| **acting** 187:22 | | **adequately** 113:15 | |
| **action** 1:2 7:21 20:22 23:21 26:2,19,24 28:10 48:6,9 48:11 61:23 64:11 65:1,3 65:15,17 66:4 66:6,13,15 68:8 72:11 92:21 93:14 95:10,14,18 96:5 110:2 113:2 122:15 122:17,22,25 123:7,13,21 127:2 128:18 138:12 142:21 150:20 151:1,9 | **activist** 47:3 212:4 | **adjacent** 223:9 223:15 | |
| | **activities** 206:8 | **adjourned** 260:11 | |
| | **activity** 39:8 50:4 180:11,14 219:2,10 246:9 | **administer** 7:20 | **advocacy** 187:7 240:10,14 242:3 |
| | **actual** 193:6 | **administration** 3:20 | |
| | **actually** 18:5 18:18 23:2 24:3 32:10 72:4 94:6 101:15 108:20 108:22 138:20 140:3 144:22 177:2 184:16 186:6 193:21 241:11 | **administratio...** 259:5 | **affairs** 122:7 |
| | | **admire** 137:23 | **affect** 213:12 237:12 250:17 |
| | | **admits** 115:7 | **affected** 106:12 |
| | | **adopted** 125:25 | **affiliations** 8:1 |
| | | **adrian** 1:3 2:17 8:4 9:2 262:4 263:1 264:1 | **affirmed** 8:20 |
| | **ad** 3:21 4:2,5,8 4:10,13,15 | | **afoul** 224:23 225:12 |

HIGHLY CONFIDENTIAL

[afraid - answer]                                                    Page 5

**afraid** 137:21
**age** 21:13 225:2
**agencies** 171:2
**agency** 169:24
  225:18 226:12
**ago** 47:14
  69:23 99:20
  110:21 152:12
  170:9 244:9
**agree** 7:7 9:11
  28:1,4 52:16
  120:24 172:8
  195:8
**agreed** 174:22
**agreement**
  52:13 53:1,8
  53:11 182:8
  186:11 195:4
**ahead** 13:22
  56:14 66:25
  89:17 97:12
  148:19 155:23
  158:19 173:25
  188:14 241:18
**aim** 35:4
**aiming** 46:2
**al** 7:11,12
  262:4,4 263:1
  263:1 264:1,1
**alexander**
  242:14
**alive** 196:4
**allegations**
  4:18 5:11

58:15 79:12
80:6 106:25
127:24 128:24
132:22 133:4
133:12 136:10
188:20
**allege** 79:5
**alleged** 129:2
**alliance** 187:6
**allotted** 262:19
**allow** 10:1
  207:5 220:11
**allowed** 165:18
  248:17
**allowing** 195:4
**alter** 106:23
**altered** 49:13
  123:21
**alzheimer's**
  4:22 5:18
  19:17 20:21,22
  23:14 32:11
  34:14 41:7,8
  41:11 46:3
  49:16 50:3
  51:2,10 68:3
  98:21 111:21
  122:5 165:5
  185:15 188:24
  192:2 194:16
  199:22 200:14
  209:3 238:10
  240:16 243:15
  245:25 246:4

246:20 253:14
257:22
**amazing** 191:2
**amended** 3:16
  3:17 73:13,21
  74:9,23 75:10
  76:2 79:13
  80:6 81:24,25
  82:9,10,16,17
**america** 12:8
  12:18
**amiss** 150:8
  204:13
**amount** 15:6
  90:25 96:1
  171:21
**amplifying**
  200:1
**amyloid** 23:21
  27:3 180:16,22
**analogous**
  35:13
**analogy** 226:25
  227:6,7
**analyses** 188:2
  229:9 256:17
  256:25 257:5
**analysis** 32:9
  37:11,14 38:13
  97:3 111:9
  115:8 167:7
  168:2 169:3,12
  169:22 204:12
  230:25 231:4,6

257:14 258:17
259:1
**analytes** 111:7
111:25
**analyze** 168:18
  170:13 171:14
**analyzed** 37:9
  111:25 119:22
  121:8 168:8,16
  168:17 169:17
  169:19 258:15
**analyzing**
  168:20 230:21
  233:5
**anecdotes**
  49:10
**angelique**
  185:25
**angle** 202:1
**announce**
  172:17 189:6
**announced**
  35:25 37:5
  170:20 216:9
  244:9 252:3
  257:7
**answer** 9:16
  14:1 17:12,14
  26:5,12 31:15
  36:24,25 38:14
  38:15 42:4,13
  42:20 43:3,16
  43:22 44:3,8
  44:16,17 45:7

HIGHLY CONFIDENTIAL

**[answer - argument]**                                      Page 6

| | | | |
|---|---|---|---|
| 46:21 48:24 | 145:22,25 | **anybody** 16:11 | **applicable** |
| 51:1,8 56:12 | 149:1,18 | 116:17 166:10 | 262:8 |
| 56:13 60:11 | 150:14 152:9 | **anymore** 13:2 | **applied** 80:25 |
| 61:2,19,20,24 | 158:6 162:11 | 147:16 196:22 | **appoint** 39:25 |
| 62:13 64:19,21 | 164:6 170:17 | 232:9 | **appreciate** 53:3 |
| 64:23 65:5,11 | 177:15,24 | **anyplace** 53:2 | 65:12 245:12 |
| 66:1,2,10,23,24 | 178:12 180:10 | **anytime** 49:16 | **approach** |
| 69:7 70:4,14 | 188:14,15 | **anyway** 70:25 | 18:10 21:4 |
| 70:15,21 71:25 | 190:5 195:4 | 149:21 150:17 | 26:8 27:4,5 |
| 72:7,9 73:16 | 197:14 199:13 | 172:17 257:25 | 57:23 209:3 |
| 73:17,24 74:4 | 220:12,18 | **apart** 103:13 | **approaches** |
| 74:19,20 75:7 | 229:12 230:4 | 185:9 228:25 | 57:11,12,15 |
| 75:8,16 76:7 | 230:16 252:15 | **apologies** 53:19 | **appropriate** |
| 76:14,17 77:19 | 257:19 | 87:24 104:3 | 3:2 |
| 78:14,20 79:9 | **answered** | 251:13 255:17 | **approval** 17:6 |
| 79:10,22,23,24 | 72:22 73:2 | **apology** 199:6 | 221:18 223:2 |
| 81:20 82:1,11 | 83:19 84:7,17 | **apoorva** 153:5 | **approve** 17:15 |
| 82:19,22 83:10 | 89:16 90:15,23 | 153:8 | 17:17 71:8,11 |
| 83:20,21 84:18 | 99:17 106:7 | **apparently** | 133:11,25 |
| 91:17,23 92:3 | 133:21 134:2 | 226:3 | 135:25 |
| 92:19,24 93:7 | 152:8 156:14 | **appeal** 23:23 | **approved** |
| 93:24 94:2,17 | 164:8 | **appear** 110:23 | 18:15,16,19 |
| 95:22,23 97:14 | **answering** 42:2 | 122:23 159:22 | 85:22 106:24 |
| 100:12 101:12 | 44:14 55:24 | **appearance** | 231:25 |
| 101:22 106:4 | 56:8 141:8 | 7:24 | **approximately** |
| 106:16,18,19 | **answers** 17:11 | **appearances** | 174:7 |
| 114:21,23 | 55:13 70:24 | 2:1 8:1 | **approximation** |
| 121:22 123:3 | 150:15 | **appeared** | 89:23 |
| 123:16 124:6 | **anticipate** | 194:17 220:4 | **april** 81:6 |
| 127:11 133:18 | 83:16 | **appears** 31:20 | 82:16 153:10 |
| 133:19,22 | **antitumoral** | 222:1 | 159:7 |
| 139:17 140:14 | 235:15 | **appended** | **areas** 39:13 |
| 141:11 143:24 | **antonio** 40:14 | 264:7 | **argument** |
| 144:16 145:12 | | | 194:3,15 |

HIGHLY CONFIDENTIAL

**[arguments - audit]**                                    Page 7

**arguments**
  205:12
**arms**  50:10
**arnold**  147:25
**article**  4:21
  5:10 128:4,16
  128:16 152:12
  152:16,17,24
  153:1,3,18,22
  154:5,7 156:18
  156:20 157:3
  157:17,21
  158:4,7,22
  159:6,10,21
  202:8 207:22
  214:5,8,13,14
  235:6,13,17,18
  238:8,11 239:2
  239:13,18
**articles**  69:3,10
  69:16 138:3
  155:10 156:4
  156:22 162:21
  204:2 207:19
**aside**  64:9
  238:25 244:3
  251:9 253:24
  256:5
**asked**  19:24
  69:23 72:13
  73:2 83:18
  84:6,16 89:16
  90:14,23 99:16
  106:9 133:9,20

  134:2 152:7
  156:13 164:1,7
  174:12 192:24
  192:25 193:5
  193:13 213:7
  236:22 251:1
  251:19 255:18
  255:20 256:9
  256:22
**asking**  32:20
  36:11,11 51:8
  52:12 83:14
  84:11,11 101:3
  101:6,9,15
  107:2,3,21
  118:21 119:9
  123:23 133:11
  134:13,17,18
  134:20 135:4,6
  135:25 157:14
  161:5 164:4
  168:10 190:6
  206:4 225:22
  227:5 241:4
**assassinated**
  97:19
**assay**  96:15
  112:9 114:10
  232:23
**assays**  112:4
  113:5,15
**asserted**  61:23
  65:3 74:10
  76:4 107:14

  234:17
**assertion**  172:5
**assertions**
  247:3
**assess**  116:9
**assessment**
  106:23 128:17
  128:22
**assistance**
  35:19
**associated**
  47:18 66:13
  110:24 153:2
  258:16
**asson**  148:2,4,5
**assume**  80:1
  100:1 126:11
  171:23 224:17
  239:24
**assumed**  69:9
  69:15,21 156:8
**assuming**  50:7
  135:17
**assumption**
  135:19,22
**attached**
  262:11
**attachment**
  197:12
**attack**  27:5
**attacking**  135:2
**attacks**  222:20
**attempted**
  28:10

**attempting**
  228:17
**attendees**  126:6
**attention**  18:20
  33:1 80:20
  81:2,5 96:18
  111:3 113:8
  115:5 120:17
  126:25 143:5
  159:4 172:2,9
  205:15 206:12
  237:3 238:3
  248:5 256:12
  256:15
**attitude**  171:2
  199:24
**attorney**  8:2
  64:18 71:6
  80:1 123:3
  139:17 140:14
  148:23 149:19
  194:18 217:6
  262:13
**attorneys**  53:7
  261:15
**attractions**
  198:20
**attributed**
  157:13 158:4
**attribution**
  157:16
**audio**  7:6
**audit**  6:2 40:11
  94:8,10,22

95:3,6,13
96:19 97:1
99:19 100:24
100:25 101:5,7
101:10,16
102:10,19
103:13 105:5
105:13 106:1
106:21,23
107:2 118:15
118:18
**audits** 104:20
**august** 1:14 3:7
7:3 85:15
87:20 88:25
89:3 211:12
212:22 213:1
262:3
**austin** 22:9
24:21 86:1
199:17 252:24
**author** 204:21
**authored** 128:4
138:3,8 163:12
214:4
**authorized**
7:20 232:8
**authors** 237:4
237:5 255:10
**autistic** 137:8
**available** 27:20
29:25 85:6
112:8 124:21
262:6

**avenue** 2:4
**awaited** 247:4
**awaiting** 27:15
**aware** 35:22
75:23 102:6
109:8,20
113:18 115:12
127:2 128:3,10
129:1,7 141:3
147:9 149:20
152:25 157:10
159:2 162:13
243:9 244:4
249:16,21
250:3
**awesome**
143:13 146:1

**b**

**back** 11:3,6
13:14,17 19:20
21:2 24:23
25:16 28:14,15
33:14 47:4
52:4,7 53:5
62:22 78:8
85:24 92:14
102:17 116:14
118:1 119:14
120:16 122:11
125:3 139:14
154:3 159:3,9
164:3,12 171:8
175:14 181:3

185:2 186:10
188:13 201:2
203:25 205:16
211:9 218:15
218:19 219:17
226:4,16
228:19 233:22
243:2 252:10
**background**
10:5,15 114:17
117:13,14
**backup** 258:1
**bad** 169:4
204:4 222:19
225:8,24 228:9
241:11 257:2
**badgered**
137:22
**badgering**
204:11
**baker** 8:11
**bakerhostetler**
2:13
**bakerlaw.com**
2:15
**baltimore** 11:8
**bank** 12:8,12
12:18
**banyan** 11:18
**barbier** 1:10
2:12 8:12
15:20 18:22
21:19 40:3
41:24 43:1

44:11 45:1,11
45:19 63:7
102:9,19 103:3
103:16 129:18
130:16 131:6
132:20 133:3
133:11,25
135:25 136:15
143:7 160:1
164:4 190:17
190:24,25
195:22 219:18
220:14 241:14
241:16
**barbier's** 18:9
23:5 43:5
136:6 143:6
202:16 229:14
**barry** 1:13 3:4
7:10 8:19,24
30:14 53:15,19
62:25 80:11
94:5 108:3
125:6,18
126:12,24
129:17 159:8
159:18 163:11
163:15 178:13
181:3 185:5
214:1 233:25
234:7 259:17
262:5 263:2,24
264:2,4,12

HIGHLY CONFIDENTIAL

**[based - bind]**                                                  Page 9

**based** 44:13
45:4,6,8 47:17
48:1 59:4
84:21 95:15,20
109:2 124:12
124:15 132:5
136:15,25
150:14 190:7
199:17 210:20
**baseline** 30:8
**bases** 68:7
**bashed** 228:11
**basic** 172:3
235:3,23 236:5
243:10 244:5
244:16
**basically** 10:21
11:18 16:25
27:2 50:20
181:14 187:11
225:6 242:1
**basis** 43:3 44:8
61:25 65:9
68:18 69:25
75:12 76:3
123:3,16 124:5
135:3 139:17
140:14 142:2
186:21
**bates** 96:21,22
109:14 130:16
163:19 166:24
178:15,20
226:15 255:19

256:13
**bear** 11:25
16:25 17:1
177:9
**beat** 49:20,22
246:6
**becoming**
136:4
**began** 105:2
140:22
**beginning** 8:2
10:6 32:2 52:5
62:23 92:15
120:7 125:4
139:15 163:20
167:1 185:3
210:5 233:23
252:14
**begins** 31:23
118:3 170:4
171:25 203:18
204:4 215:23
251:23
**behalf** 2:2,7,12
8:7,10,12
**behave** 84:23
84:23 225:25
**behavior** 83:2,6
83:8,9,12,16
84:2,9,20
**beholder**
137:14
**belief** 44:12
47:17 48:1,2

138:2,5,6,10
**believe** 27:2
37:23,25 43:9
46:13 51:9
52:25 54:17
60:23 63:4,23
72:3 77:19
78:4 79:12
83:6 88:6,11
96:17 98:6,8
103:15 111:20
124:7 127:6
146:18 154:5
167:20 169:18
171:22 176:1
183:11 184:4
184:18 189:1
197:12 210:21
232:16 239:2
244:11 246:2
248:9
**believed** 26:7
63:21,23 67:3
86:2 98:1
190:21 191:1
219:2 241:20
**believer** 13:5
**believes** 139:8
**believing** 47:14
**bell** 147:25
**ben** 236:14
240:2,5 255:13
256:4

**benefit** 49:6
246:6
**benesch** 192:11
195:17
**best** 13:7,8
14:14 42:8
44:10,20 59:2
72:11 222:7
224:11 255:22
255:25
**better** 33:11
47:3 58:19
91:13 102:1
182:5 186:2
**beyond** 52:17
92:21 182:10
182:21 211:23
**bias** 93:10
**big** 79:19 90:6
93:12 98:12
191:5 242:16
246:6
**bigger** 193:16
**biggest** 12:5
34:23 192:4
**bik** 212:10
213:16
**bik's** 212:24
213:16
**bike** 196:14,18
196:20
**billion** 12:20
**bind** 175:25
176:13 182:2

HIGHLY CONFIDENTIAL

**[binding - boundaries]**                                          Page 10

**binding** 52:25
173:1,6 175:12
175:23 176:22
176:25 178:4
179:11,17
182:1,25 183:4
183:10,12,17
184:3,5,10,16
184:20 186:7
188:10 191:10
235:14 238:17
245:7
**binds** 175:15
176:11,12
179:12 180:4
186:20 244:25
245:1,5,15
**bio** 5:6 96:9
202:24
**bioanalytical**
111:6
**biochemistry**
48:2
**biologic** 225:21
**biological**
28:10 175:15
175:18 221:7
221:17 223:20
**biologics** 223:7
223:8,13,17
**biomarker** 36:9
37:5 38:18
96:10,15 97:3
98:3 121:8

168:3,7 189:10
**biomarkers**
149:14,16
167:8,23,24
168:3
**biotech** 199:17
**bit** 21:1 22:25
35:16 51:7
139:20 163:25
165:14 177:20
185:23 193:4
212:10
**black** 11:25
**blah** 160:12,12
160:12
**blanking** 26:9,9
**blatantly** 85:1
**blog** 162:21
**blood** 258:12
**blot** 129:3,7
137:12,13
207:20 211:24
**blots** 111:13,15
129:12 131:3,7
131:8,16
137:17 138:18
139:24 140:18
141:7
**blotting** 163:2
**blowing** 198:18
**blue** 80:23,24
**board** 3:22 4:3
4:6,9,11,14,16
15:24 18:23

19:8 20:3,6,7
20:10,11,12,16
20:17 21:4
22:8,19 23:2,6
25:1,12,20
27:21 28:5,17
28:24 29:3,21
30:23,24,25
31:1,5,11
34:11 35:17,22
37:3 39:3,9,21
39:25 40:19,21
41:2 42:25
43:4,7 46:14
46:17 47:3
49:11 54:18
57:11 60:14
64:8,10,17
65:2 66:5,7
71:11 82:8,8
85:22 92:5
100:24 101:17
115:23,24
116:1,8,8,23
133:10,15
135:24 136:4
146:10,13
147:1,5,8,20,24
148:11,15
149:5,23,24
150:7,19,23
151:8,15,22
152:5 164:14
164:17 165:5

166:20 172:12
173:22 177:4
178:2 208:4,5
208:8,13,16,25
209:14,23
210:6,14,15
211:8,11,19
212:3 213:5,9
224:8,14 231:8
236:17 240:20
240:24 251:23
252:16,18
253:12,18
**boards** 115:24
116:2 150:10
150:11 252:8
**bob** 116:13
**bombarded**
218:22
**bond** 225:6
**bordey** 99:1
185:25 186:23
**bordey's** 235:7
243:4
**bottom** 31:19
31:20 96:19
118:14 130:15
178:16 256:16
**bought** 12:17
**bound** 28:6
236:10
**boundaries**
139:20

HIGHLY CONFIDENTIAL

**[box - car]**                                                                    Page 11

**box** 111:4
  113:9
**boy** 174:10
**brain** 23:22
  124:22 207:12
**break** 9:15 10:1
  51:25 62:15,18
  92:10 124:23
  139:10 184:23
  185:6,10
  231:15 233:17
**bredt** 1:7
**brief** 224:3
**briefly** 8:25
**brilliant** 137:10
  186:12 222:21
**bringing** 116:1
**brings** 115:25
**broad** 103:6,8
**broader** 68:13
  106:10 223:8
**broadly** 23:7
  82:8
**brochure** 117:7
  117:8,10,21
  119:6 120:12
  121:19 123:11
**brodkin** 1:3
  2:17 3:18 8:5
  9:2
**broken** 16:15
**broker** 10:23
  196:13,14

**brothers** 11:13
  225:4
**brought** 67:2
  83:12
**browbeaten**
  137:20 138:4,9
  146:20,22
**budget** 193:1,7
**buffett** 13:5
  225:3,9,9
**build** 217:13,14
**bullies** 137:24
**burdened**
  257:17
**burns** 1:10
  2:12 8:12
  21:22,24 22:1
  43:8,21 44:2,4
  44:6,19,20
  45:15,23 160:2
  190:25 237:5,7
  237:7,10,11
  241:14,15
**business** 10:22
  12:17 13:10
  18:4 21:11
  25:13 32:17
  56:17 59:3
  68:1 87:11
  103:2,15 155:1
  196:22 199:15
  217:16 218:4
  228:3,8 250:18

**busy** 252:8
**buy** 11:1,9,10
**byline** 159:5,7

**c**

**c** 7:1 223:25
**calculus** 87:3
**calibrate** 115:8
**calibration**
  115:10
**california**
  11:17
**call** 9:23 19:20
  21:17 30:3
  49:19 55:19,20
  69:1 96:20
  104:18 163:17
  198:5 202:3,10
  225:16 240:9
  240:11,18
  241:8,9,11
  242:9,22
**called** 3:4 11:16
  11:17,24 12:13
  12:14 15:10
  21:3 27:10
  35:8 65:19
  69:19 145:11
  198:4 218:24
  220:7 224:24
  236:13
**calling** 72:6
  85:1 97:21
  108:14 225:22

**calls** 90:22
  97:10 100:9
  101:20 105:18
  107:17,17
  112:16 113:24
  115:21 116:24
  118:25 119:8
  119:20 120:10
  120:22 121:12
  122:2 124:5
  131:12 132:7
  132:16 150:3
  155:12 156:6
  218:14,17,22
  245:3
**campaign**
  242:1
**campbell** 2:8
  8:9,9 260:2
**cancer** 162:7
**candidate**
  117:17
**candidates**
  20:24
**capital** 12:13
  12:15 14:14
  39:12,15,16,17
  39:20 68:20
  86:13,16 88:2
  111:12 211:21
  228:10
**caps** 111:12
**car** 223:19

HIGHLY CONFIDENTIAL

**[care - cder]**                                                          Page 12

| | | | |
|---|---|---|---|
| **care** 62:16 | 35:12 39:1 | 144:13,18,18 | 263:1 264:1 |
| 198:13,15 | 43:8,21 44:5 | 144:25 146:9 | **cassava's** 40:3 |
| 217:21 | 44:20 45:1,18 | 146:12 147:20 | 42:25 43:4,7 |
| **cared** 97:16 | 45:20,22,23 | 151:1,13,14,20 | 72:24 79:12 |
| **career** 24:16,17 | 46:12,19 54:4 | 151:25 152:13 | 100:23 103:15 |
| 137:11 222:6 | 56:15 60:4 | 152:19,25 | 106:12 127:17 |
| **careful** 10:1 | 67:17 69:24 | 153:22 155:8,9 | 127:23 128:17 |
| **carefully** 146:5 | 70:9 71:1 76:2 | 157:2,10,17,18 | 128:23 140:13 |
| **case** 7:14 9:7 | 79:4 80:6 | 158:2,21 | 140:16,19 |
| 32:22 65:6 | 81:10,14 83:17 | 159:20 162:8 | 141:5 147:4 |
| 73:9 77:8,9 | 84:2 85:2,13 | 162:18 163:5 | 148:11 149:23 |
| 84:3 90:2,7,11 | 85:17 87:5 | 164:4,22 | 149:25 155:19 |
| 96:14 97:8 | 88:5 89:21 | 169:16 175:3 | 156:2 166:6 |
| 100:4,19 106:2 | 90:10 92:20 | 176:24 181:3 | 213:13 219:4 |
| 115:13 127:9 | 93:1,15 94:7 | 185:11 189:24 | 244:4 245:14 |
| 127:17 128:12 | 94:21 95:17,19 | 195:13 197:23 | **cassavafraud....** |
| 131:13 151:3 | 96:13,13 97:4 | 197:25 198:22 | 69:19 188:19 |
| 154:16 188:16 | 102:5 104:19 | 199:8 200:19 | **cassavafraud....** |
| 192:21 193:9 | 105:25 106:24 | 201:9,13 | 67:8,17 68:22 |
| 195:14 197:9 | 107:13 112:13 | 203:22 204:7 | 75:17 |
| 198:19 238:20 | 113:1,22 | 204:15 208:4,5 | **castro** 255:11 |
| 250:24 | 115:13,19 | 208:8,13 213:9 | **category** 34:19 |
| **cases** 90:8 | 116:8 117:19 | 214:14,19,25 | **causing** 187:19 |
| 147:19 | 118:5,10 | 215:5,11 216:1 | **caution** 42:1,11 |
| **cassava** 1:10 | 119:22 121:17 | 219:11 226:22 | 54:22 |
| 2:7 3:22 4:3,6 | 127:1,5,9 | 227:8 234:16 | **caveat** 52:21 |
| 4:9,11,14,16,18 | 130:17 131:15 | 236:12,22 | **cber** 221:7 |
| 7:12 8:7,10 | 131:18,20,21 | 237:8 239:19 | 223:3 225:21 |
| 15:10 18:23 | 131:24,25 | 239:20 240:8 | 226:10 |
| 22:14 24:4,19 | 132:4,12,13 | 240:11 241:2 | **cc** 160:22 |
| 24:25 25:20 | 133:10 136:25 | 243:25 244:25 | **ccny** 6:3 97:1 |
| 28:5 29:14,21 | 138:17 139:23 | 249:9,16,17,22 | **cda** 30:2 |
| 30:24 31:5,10 | 140:10,17 | 250:4 252:13 | **cder** 223:3,23 |
| 33:12 34:11 | 141:5 144:3,5 | 259:1 262:4 | 223:24 |

HIGHLY CONFIDENTIAL

**[cell - claims]**                                                          Page 13

**cell** 175:9
  180:17 181:1
**cells** 207:5,7,9
  235:16
**celsius** 206:23
  207:3
**center** 221:6
  223:6
**centers** 202:13
**centigrade**
  207:11 233:4
**central** 207:9
**ceo** 21:15 43:5
  45:13 46:19
  90:5 102:8
  131:20 132:12
  200:9 224:10
**cerebral**
  229:10
**certain** 59:13
  79:5 83:5,5
  109:21 111:7
  119:5 123:10
  150:7 153:1
  171:22 175:9
  207:5,21
  211:23 214:23
  247:5 248:14
**certainly** 52:20
  53:6 67:10
  68:13 101:14
  199:25 253:13
**certificate**
  261:1

**certified** 3:9
  261:21
**certify** 261:6,9
  261:13
**cetera** 18:14
  174:13 180:12
  189:15 197:24
  197:24
**cfo** 15:22
**cgr** 2:5,6
**chain** 4:23,24
  5:3,5,7,12,13
  5:14 6:4
  119:14 159:25
  192:10,16
  193:3 201:1
  208:24 209:22
  251:16
**chair** 30:24
  34:13 40:11
  41:21,22 90:5
  104:23,25
  144:22 185:25
  203:7,12
  222:17
**chairman** 39:1
**challenge** 131:9
**challenged**
  131:16 138:18
  139:24 140:18
**chance** 47:5,8
  86:3 194:17
**change** 83:1,7,9
  83:16 84:2,20

  84:20 88:9,16
  107:13 172:13
  217:18 226:12
  242:5 245:6
  263:4,7,10,13
  263:16,19
**changed** 14:10
  19:14 34:16
  83:6,12 84:8
  87:3 88:17
  97:22 100:13
  100:18 124:8
  124:13,15,16
  210:25
**changes** 117:20
  262:10 264:6
**changing** 56:25
**chaperone**
  176:14 183:12
**character**
  97:20
**characterizati...**
  77:12
**characterize**
  21:9
**charge** 190:11
  190:18
**charging** 54:4
**charles** 148:2
  162:3
**check** 141:2
  204:1,7
**checkered** 58:4

**chief** 24:8
  241:10
**choice** 67:4,6
  166:21 253:1
**chose** 202:10
  247:9 259:1
**chris** 2:16 8:14
  40:12 143:20
  145:5 146:1
  239:23 254:22
  254:24 255:1,2
**circulate**
  125:11
**circumstances**
  150:6 251:4,8
  251:22
**cite** 137:19
**citizen's** 96:6
  129:19 146:19
  201:18 204:9
  205:2,9,11,19
  206:5 210:7
**city** 2:4,14 4:20
  6:3 142:17,21
**civil** 1:2 3:2
**claim** 32:2
  65:16 95:9
  106:13
**claimed** 37:10
  175:23
**claiming** 174:3
**claims** 61:22
  65:3,15 68:7
  69:25 70:10

HIGHLY CONFIDENTIAL

**[claims - commencement]** Page 14

74:10,19 75:13 75:14 76:3 79:5 107:14,22 173:11 206:19 206:25 207:1 207:22 213:13

**clarick** 2:3 8:4

**clarification** 245:13

**clarify** 9:10 77:5 104:4

**clarifying** 61:4

**claude** 30:16,21 30:22,22,23

**cleaning** 259:5

**clear** 16:11 48:24 49:18 50:23 69:20 71:22 78:23 92:3 106:8 135:13 188:16 192:17 228:24 255:3

**clearly** 33:12 142:19 168:4 224:12

**clever** 16:13

**client** 8:14 71:6 71:6 83:1 123:3 139:17 140:14 148:23 149:19 194:18 217:6

**clients** 11:9 56:25 57:16 59:22 60:1,4,8 60:15 63:14,22 67:3,7,21 68:21 69:4,15 69:18 83:16,25 84:2,13 85:3 85:12,14 88:24 93:10,18 97:18 97:23 102:2 107:21 124:9 137:21 138:4,9 154:5,11,15 155:7,18 156:2 156:10 168:25 172:25 175:24 182:13,14 188:21 189:14 189:24 197:19 201:12,20 204:10 234:14 241:24 246:2

**clinic** 191:3 245:8 250:21

**clinical** 5:9 29:20,23 35:22 36:10 40:16 41:10 47:18,20 48:24 67:11,14 88:22 117:11 149:25 155:19 156:3 174:19 188:5 214:3,20

243:25 244:4 250:22

**clinicians** 50:18 242:3

**close** 27:17 34:14 168:9,18 169:10 176:5 176:19 181:21 183:5,6 188:10 222:23,23 226:20 227:14 253:19

**closely** 168:10

**closest** 198:6

**cmc** 17:19

**cns** 207:7,8

**coaching** 135:9

**coauthorship** 237:12

**cochin** 98:25 180:1 238:15 238:16,22,24 239:1 242:11 243:4,6,7

**coffee** 174:21

**cog** 50:12

**cognition** 243:16,18,19 243:24

**cognito** 27:10

**coin** 246:8

**coinventor** 46:5 163:24

**collaborators** 29:18

**colleagues** 75:19

**college** 6:3 10:15,20 222:7

**colorado** 2:9 3:6,10 7:16 261:6

**column** 179:10

**come** 14:22 15:9,12,18,24 22:22 24:23 25:16 29:12 32:21 41:23 88:11 103:1,14 103:20 137:13 191:21 220:3 221:3,17,20 226:20 227:13 240:18

**comes** 171:2

**coming** 41:15 89:12 100:17 141:1 164:3 198:19

**commence** 150:19 151:8,9 151:15 181:4,7

**commenced** 127:1 151:20 154:21

**commencem...** 261:7

HIGHLY CONFIDENTIAL

**[commencing - company's]**                                    Page 15

| | | | |
|---|---|---|---|
| **commencing** 3:6 | 55:25 56:1,3,9 56:11 57:3,8,9 60:7,20 61:6 61:10,22 62:2 | 132:10,19 141:10 143:17 143:23 144:8 145:23 149:4 | 99:10 107:19 115:24 118:12 124:10 137:15 151:5 156:17 |
| **comment** 160:11 166:1 193:3 229:16 229:18,18 230:10,13 | 62:9 63:1 64:1 64:2,5,6,9 71:8 73:14,21 81:23 122:25 123:6 | 149:19 151:18 159:1 162:11 199:12 213:1 245:5 249:9 | 163:20,23 164:19 165:11 166:17 168:2 168:10 169:1 |
| **commentary** 215:1 218:22 218:23 | 123:12 125:19 125:22 203:8,9 | **community** 68:4 | 172:13 173:15 173:18 174:16 |
| **comments** 153:1 | **committing** 257:3 | **companies** 11:5 23:19 33:19 | 179:6 186:10 188:18 189:19 |
| **commercial** 49:16 86:6 104:11,13,17 114:5,8 | **communicate** 159:20 195:25 **communicated** 195:21 253:17 | 35:4 58:5,9 114:8 191:5 192:2 231:22 | 190:14 199:17 199:22 200:21 201:19 208:25 209:11,12 |
| **commercially** 112:8 | **communicating** 153:22 | **company** 15:9 15:25 16:13 19:7,14,16 | 210:17,20 211:20 212:2 213:17,21 |
| **commission** 59:15 127:4 140:17 261:17 | **communication** 44:1 213:9 220:14 249:8 | 20:25 21:15 24:9,21 27:7 27:10 29:9 | 217:14,19 222:18,20 224:9,10,12,12 |
| **commissioned** 137:15 138:17 139:23,25 140:9 | **communicati...** 9:23 42:3,4,15 44:13,15 55:7 56:10 60:10,22 | 30:2 32:13 33:21,25 35:8 35:9 37:9,16 37:17 39:9,16 | 224:15,19,20 224:21 225:25 226:11,19 227:10,13 |
| **commissioner** 259:9 | 62:12 70:6,13 70:20 72:19 73:4 74:5 75:5 | 41:6 42:9 44:10 47:9,12 49:3 51:16 | 228:6,13 231:24 236:4 241:13 242:2,6 |
| **committed** 253:12 257:1 | 75:6 76:6,15 81:19 82:20 85:19 92:23 | 54:17 57:1 59:15,20,23 63:13,16,18 | 250:17 252:3 255:4 257:1,3 258:8,15 |
| **committee** 3:21 4:2,5,8,11,13 4:16 40:11 54:18,22 55:1 55:4,16,17,20 | 93:7 95:21 106:5,17 123:4 126:21 127:12 | 67:1,14,19 85:4 86:6,17 91:6 96:9 | **company's** 56:17 88:2 |

**[company's - consistently]**

103:2 155:1,2 209:2 229:6 250:18,21

**comparing** 231:13

**competitive** 191:4

**complaint** 3:16 3:17 73:13,21 74:9,23 75:11 76:2 79:13 80:4,7 81:11 81:11,15,16,24 81:25 82:9,10 82:16,17 106:25 107:15 107:18 127:24 128:24 217:1,9

**complete** 36:25 141:25 142:3 173:17 188:13 264:8

**completed** 118:16 262:16

**completely** 86:18

**complicated** 48:4 122:8 181:22

**compound** 13:6 13:9 14:13 177:13

**compromised** 67:2

**con** 211:16

**concept** 236:9

**concern** 105:16 128:11,16,22 129:2 138:7 155:6,17,18,25 156:2 165:4,6 232:16 250:11 251:4

**concerned** 20:6 29:4,5,6 53:10 154:20,22,24 154:25 155:2 165:7 172:11 211:17 231:8 252:19

**concerning** 109:21 110:1

**concerns** 59:14

**concluded** 113:5

**concludes** 97:1 212:24 259:16

**conclusion** 100:25 107:17 109:15 132:8 132:17 155:12 156:6 208:4 210:19

**conclusions** 142:10 212:18

**concur** 212:17

**conduct** 68:1 141:18 219:21

**conducted** 29:2 94:8,9,22 97:24 98:4 99:14 104:19 109:9,11 183:1 185:7,12 243:11

**conducting** 22:18 24:25 25:19 31:10

**conference** 200:14 241:8 242:9

**confidential** 1:13,13 3:2,3 52:9,13,17,21 52:25 53:12 159:1 176:17 182:6,10 224:17

**confidentiality** 50:8

**confidentially** 53:1

**confirmation** 179:10,17

**confirmed** 259:9

**conflicting** 5:10

**confronting** 199:25

**confused** 159:8

**confusing** 221:24

**congress** 225:10

**conjecture** 187:17

**connected** 240:24

**connection** 224:6

**connolly** 192:10,25

**consequence** 146:21

**conservative** 171:1

**consider** 46:14 52:14 57:12,15 60:1,4,7,14 92:20 93:1 105:25 151:22 152:4 209:25 210:1 236:25

**considerably** 147:15

**considerations** 20:17

**considered** 46:16 97:1 99:20 190:14 210:2 236:4,6 236:8 243:1

**consistent** 231:7

**consistently** 246:6

HIGHLY CONFIDENTIAL

**constantly** 137:21 164:25
**constitute** 166:12 195:5
**constitutes** 261:12
**consult** 150:13 150:18 151:7 151:14,21
**consulting** 45:18,22
**cont'd** 4:1 5:1
**contact** 102:7 118:11 216:12 216:13
**contacted** 186:10 236:22
**contacts** 206:10
**contained** 101:8,17
**containing** 109:16
**contains** 101:8 101:11
**contemporan...** 112:22
**content** 130:1
**context** 131:10 231:19
**continue** 7:7 14:18 27:24 67:24 77:17 151:23 177:18 189:14 257:15

**continued** 40:20
**continues** 258:9
**contractual** 132:5
**contrast** 207:3
**control** 86:18
**convened** 257:8
**convenience** 125:14
**conversation** 19:23 44:2 136:4 148:24 166:13 209:16 220:17 225:20 241:3 242:17 242:18,25 255:4
**conversations** 7:5 24:11,14 24:23 25:16 26:23 27:1 39:12 43:13,13 44:13 45:6 165:20 218:25
**convey** 219:1,9 228:16,18 229:3
**conveyed** 219:9
**convinced** 12:11 47:5,6 49:11 59:12 200:17 242:10

**convincing** 239:6,7,11
**cook** 2:16 8:14 40:12 143:20 145:5 146:1 239:23 254:5,7 255:1,2
**copies** 262:14
**copy** 94:3 197:12 254:4,8
**copying** 143:7 160:1
**corner** 178:16
**correct** 31:2 87:13,17 94:14 107:24 114:10 125:21 146:13 164:15 182:16 182:18 203:11 222:3 235:9 246:11 248:9 249:11 261:12 264:8
**correction** 90:5
**corrections** 264:6
**correctly** 155:6
**corresponden...** 122:10 123:9
**corresponds** 110:19
**corroborates** 235:23

**cortical** 186:14
**cost** 87:6,9 174:17 193:9 193:13 257:19 258:16,20
**costly** 58:1 90:8
**costs** 193:4
**counsel** 7:10,25 8:18 9:22 42:3 42:15,17 43:13 43:25 44:14 45:4,5,7,9 51:23 54:23 55:5,7,23 56:11 60:11,22 60:24 61:7,18 62:12 63:3 64:11 65:4,16 66:1,5,8,14,22 68:10,11,17 69:6 70:6,7,13 70:21 72:13,19 73:4 74:5,11 74:18,25 75:6 76:6,16,20,24 77:4,23 78:19 78:22 79:1,9 81:19 82:21 85:19 91:25 92:5,7,8,18,23 93:6,22 94:17 94:19,21 95:21 106:5,13,18 124:18 126:20

HIGHLY CONFIDENTIAL

**[counsel - damages]**                                              Page 18

126:21 127:12 132:10,19 140:13,16,20 141:5,10,14 143:17,23 145:23 146:8 149:4 151:18 158:22 159:1 162:12 165:21 166:5 182:10 182:11 184:21 199:12 244:22 248:14 255:4 261:14 262:14

**count** 184:8

**countervailing** 202:7

**counting** 192:3 252:21

**couple** 42:22 82:5,5 92:17 130:11 163:13 235:2

**course** 14:8 25:19 26:20 68:22 72:11 126:1 209:17

**court** 1:1 7:13 7:18 8:15,17 9:13 30:11 36:19

**court's** 80:25

**cover** 54:8,8

**coverage** 201:9 214:15,20 215:6,12

**covered** 11:3

**covers** 103:6

**cpa** 10:10

**craze** 33:12

**crazy** 174:5 231:25

**create** 69:19 86:14 88:2,3,6 91:6,12 93:14 223:20 228:3

**created** 16:25 88:19 93:11 96:2 120:20 131:8 168:25 170:16 188:25 224:13

**creating** 88:11

**credentialed** 150:9 163:1 203:14

**credentials** 24:21 203:3 204:25

**credibility** 98:7 99:7 213:22 226:3,5,6

**credible** 189:22 190:15

**crescendo** 201:19

**crisis** 15:1 144:8

**crit** 116:3

**critical** 116:4 152:13,18 172:1,8 215:1 215:6,12

**critically** 32:17

**criticize** 228:12

**critics** 102:2 147:15 163:3 246:2

**cross** 56:19

**crowd** 218:15 218:16 219:3

**cruise** 205:5

**crush** 17:4

**crushed** 16:15

**crutcher** 2:8 3:5 8:7

**crying** 16:9

**crystallograp...** 184:4

**cs** 262:15

**csf** 98:3 119:22 121:8 167:8 229:9,13 231:1 256:18 257:13 258:6,12

**ctad** 200:9,13

**culmination** 252:4

**cummings** 147:24

**cuny** 6:3 94:8 94:22 95:19 132:6,21 133:3 133:6,11 135:15,18,25 136:7 141:18 141:23 143:4 145:6 249:23 250:5

**cure** 240:16

**curious** 23:22 27:19 205:11

**current** 30:9 119:5 151:7 247:10

**currently** 244:13,15,21 244:24

**curve** 113:10 113:13,14 114:3,4,10

**cut** 169:15 170:20

**cutting** 255:17

**cv** 1:2 7:14

---

**d**

**d** 7:1 223:25

**dallas** 11:11,16

**damage** 68:3

**damaged** 67:20 99:10

**damages** 70:17 71:2

HIGHLY CONFIDENTIAL

**[damaging - defamatory]**                                    Page 19

| | | | |
|---|---|---|---|
| **damaging** | 263:24 264:12 | 168:17 | 63:2 64:11 |
| 63:15 151:4 | **dated** 3:22 4:3 | **decided** 13:13 | 65:1,3,15,16 |
| 155:7,9,18 | 4:6,9,12,14,17 | 87:20 171:14 | 66:4,6,13,14 |
| 156:2 | 4:19 105:5,8 | 171:16 229:11 | 68:8 69:25 |
| **dark** 165:11 | **dates** 18:13 | 233:5 256:19 | 73:9 79:5 |
| **data** 4:22 29:20 | 81:9 95:3 | **deciding** 97:8 | 83:17 84:3 |
| 29:23 32:7,9 | 110:19 128:6,9 | 106:1 150:19 | 89:21 90:10 |
| 32:16,18 35:22 | 159:5 | 151:8,15 | 92:21,21 93:14 |
| 36:7,9,10 37:5 | **dave** 2:3 | **decision** 18:19 | 93:19 95:9,18 |
| 38:3,18,22,23 | **david** 1:7 | 46:24 50:16 | 96:14 97:8 |
| 38:23 40:18 | **day** 21:13 48:5 | 54:12,16 71:23 | 100:4,18 106:1 |
| 47:18,20 48:24 | 99:9 122:21,21 | 72:7,15 77:18 | 106:13 110:1 |
| 49:17 50:23 | 122:21 198:3 | 77:20 78:11 | 113:2 115:13 |
| 86:4,10 88:18 | 217:17,20 | 81:15 85:21 | 122:15,16,22 |
| 96:10 119:5,15 | 218:19 228:7 | 87:4,4 88:10 | 122:25 123:7 |
| 119:16 120:12 | 228:11 239:15 | 91:14,24 92:4 | 123:13,21 |
| 120:19,19 | 252:2,11 257:6 | 106:10,12 | 127:2,9,17 |
| 121:1,7,8,18 | 257:7 258:9 | 110:1 167:1,6 | 128:12,18 |
| 123:10 132:14 | 259:8 264:15 | 167:10 195:13 | 138:12 150:20 |
| 150:8 169:24 | **days** 11:2 | 195:15 229:13 | 151:1,3,9,16,21 |
| 170:11,13,15 | 129:18 144:22 | 257:21 | 151:23 152:6 |
| 171:11 189:8 | 262:16 | **decisions** 76:11 | 154:21 156:12 |
| 209:11 222:21 | **deal** 12:25 13:1 | **deck** 174:24 | 192:14 193:7,9 |
| 226:8 228:3 | 13:3 16:14 | **declare** 264:4 | 196:3 197:9 |
| 232:21,25 | 27:9 59:2 | **decline** 32:3 | 198:19,22 |
| 242:21,23 | 181:12 | **declined** | 199:9 213:14 |
| 246:3 | **dealing** 18:10 | 181:17 | 216:22 222:19 |
| **date** 72:15,18 | **death** 180:17 | **dedication** | 234:17 |
| 72:21 81:2,6 | 181:1 | 41:14 | **defamatory** |
| 83:5 95:3 | **deceived** 208:4 | **deemed** 264:6 | 67:2,10,20 |
| 122:11,13 | 208:6 209:10 | **deep** 239:16 | 73:7 88:23 |
| 142:25,25 | **december** 4:6 | **deeply** 205:8 | 124:9 155:3 |
| 159:5,10 | **decide** 34:11 | **defamation** | 156:17 188:20 |
| 170:15 232:4 | 46:11,19 | 54:5 61:23 | 234:18,22 |

HIGHLY CONFIDENTIAL

**[defame - deponent]**                                    Page 20

| | | | |
|---|---|---|---|
| **defame** 198:5 200:22 | **demonstrated** 183:4 184:16 | 74:20 75:8 76:8,17 78:15 | 143:18,25 145:13 148:20 |
| **defamed** 63:14 151:4 | **denies** 120:18 | 78:21 79:10,19 81:21 82:3,13 | 149:13,20 150:5 151:19 |
| **defamers** 228:11 242:1 | **denver** 2:9 3:6 7:16 | 82:22 83:22 84:8,19,25 | 152:3,10 154:10 155:13 |
| **defendant** 2:7 | **department** 3:19 127:3 | 85:21 86:25 87:8,13,17 | 155:24 156:7 156:15 158:11 |
| **defendants** 1:11 2:12 3:18 8:12 54:5 92:21 93:14 196:3 | 219:20 225:6 **depend** 150:6 233:2 251:3,7 **deponent** 12:15 | 88:1,15 89:5 89:18 90:16,20 90:24 91:5,11 91:18 92:25 | 158:20 159:2 161:9,20 162:13 164:9 167:14 173:3,6 |
| **defense** 228:6 | 14:3 17:14 | 93:8,22 94:18 | 174:1 175:6,22 |
| **defined** 50:11 | 18:12 20:9 | 95:23 97:13 | 177:17 178:25 |
| **definitely** 139:3 195:11 246:15 | 22:16,21 25:5 28:13,22 32:24 | 99:18 100:6,13 100:22 101:21 | 180:24 184:13 185:14 187:3 |
| **degrade** 232:19 232:20 233:4 | 36:4,20,23 37:2 39:24 | 101:23 103:6 103:18 105:19 | 187:17 188:9 190:2,13,20 |
| **degree** 104:13 255:12 | 42:5,13,17,24 43:11,14,22 | 106:6,19 107:7 107:18 108:2 | 191:17 193:12 194:7,10,14,22 |
| **degrees** 206:23 207:11 | 44:3,17 45:8 47:20 48:4,14 | 108:15 111:14 112:17 113:25 | 195:10 196:18 196:20 197:15 |
| **deleted** 121:17 | 48:17,19,21 | 114:13,19 | 199:14 200:11 |
| **deliberately** 225:18 | 53:22 56:13,15 58:14 59:1 | 115:22 117:1 117:17 119:1 | 200:13 201:15 202:20 203:5 |
| **delicate** 165:3 | 60:12,17,24 | 119:21 120:11 | 205:23 212:17 |
| **delightful** 208:21 | 61:14,20 62:17 63:10 64:4 | 120:23 121:24 122:4 124:7 | 214:18,23 215:4,9,15 |
| **delivery** 259:22 | 65:21 66:2,11 | 127:13,19 | 218:3 220:19 |
| **demand** 165:13 | 66:18,24 67:1 | 128:1 130:6 | 223:25 224:2 |
| **demonstrate** 176:8,10 184:10 | 68:19 69:8,18 70:3,7,15,22 71:5,19 72:4,9 72:17,20 73:6 73:17,25 74:6 | 131:13 132:11 133:14 136:3 138:14 139:25 140:6 141:3,12 | 229:6 230:1 233:2 241:19 242:13 243:19 243:22 244:19 |

HIGHLY CONFIDENTIAL

**[deponent - directly]** Page 21

245:4,17
249:20,25
250:8 251:7
253:9,22
254:11,15
258:19 261:7
262:13 264:3
**deposed** 9:5
**deposing**
262:13
**deposition** 1:13
3:3 7:10,15
52:18,23
182:12,14
247:2,10
259:20 260:10
261:9
**deprive** 194:16
**describe** 21:18
39:3 138:16
139:4 182:23
251:22 255:22
**described**
57:13 63:25
64:16 108:18
182:22 185:6
219:10 232:16
250:11
**describing**
174:24
**description**
253:6
**designating**
52:9

**designed**
179:25
**despite** 93:8
**destroy** 232:14
242:2
**destroyed**
155:3 200:21
**destroying**
226:20 227:14
**detail** 163:22
165:10 240:12
240:13
**deteriorating**
232:25
**determine**
33:19 70:17
71:2
**develop** 18:9
**developed**
20:23 165:10
187:7
**developer's**
23:16
**development**
18:3 24:17
**device** 27:9,12
27:13
**devised** 16:18
**died** 34:14
**diego** 252:24
**difference**
34:19 50:13
59:8,19,23
93:12 98:12

109:25 115:15
163:5 226:21
227:15
**differences**
98:9 240:23
**different** 11:2
11:23 17:10
23:24 26:5,8
32:15 34:10
39:9,10 42:22
46:23 51:5,19
59:21 68:21
81:11 83:15
88:24 89:1
99:8 106:11
114:6 119:23
120:5 125:11
138:1 144:16
150:11 152:18
160:8 163:3
174:11 176:15
182:4 183:9,15
183:18 187:9
189:5 191:21
197:17,23
202:9 204:9
207:22 211:6
217:16,18
227:19 243:13
**differently** 51:5
59:6 102:11
175:22 184:18
226:1 227:20
227:22 228:14

253:15
**difficult** 47:9
164:24 175:17
176:2 199:21
199:21
**difficulty** 182:1
**dig** 153:9 205:8
**digits** 96:22
**diligence** 22:7
22:18 23:1,8
24:25 25:19
26:20 31:10
32:13 209:17
**direct** 10:1
80:19 92:18
135:25 256:12
256:15
**directed** 117:20
131:24 201:19
**directing** 33:1
81:2,4 111:3
120:17 123:10
205:15
**direction** 55:12
64:21,22 65:9
68:14 106:14
119:5 135:17
135:18 166:19
**directions**
164:2
**directly** 44:2
60:2,5,8,15
155:7 176:13

HIGHLY CONFIDENTIAL

**[director - disrupt]**                                              Page 22

**director** 39:11
   49:2 89:25
   102:3,7 112:13
   113:22 115:19
   158:11 226:13
   250:18
**directors** 3:22
   4:3,6,9,11,14
   4:16 19:8
   147:5,20
   149:23 164:14
**dirt** 67:13
**dirty** 218:4
**disagree** 77:13
   93:9 166:11
   208:23 210:3
   247:3,8
**disbelief**
   148:12 149:25
**discarded**
   35:23
**disclose** 42:4,15
   44:14 45:5
   52:17 55:8
   65:25 66:22
   68:16 72:14,15
   72:18 74:17
   79:8 85:19
   126:21 132:9
   132:18 143:17
   151:18 165:19
   165:21 194:8
   220:17 257:3

**disclosed** 37:18
   56:5 166:6,16
   168:3 169:1,1
   216:13
**discloses**
   158:25
**disclosing** 75:4
   194:18 257:1
**disclosure** 42:3
   55:6 56:10
   60:10,22 61:18
   62:12 69:6
   70:5,12,20
   73:4 74:4 76:6
   76:15 81:18
   82:20 92:23
   93:6 141:9
   143:22
**discover**
   213:20
**discovered**
   104:16 186:4
   216:21 224:16
   224:20 225:5
**discovering**
   213:18
**discovery** 29:2
   191:2
**discuss** 19:22
   25:23 26:1
   55:2 60:18
   61:10,22 62:2
   62:10 63:1
   64:10,24 65:1

65:14 66:3,12
   73:14 74:9,23
   76:18,23 77:2
   77:20 78:10
   91:14,24 92:2
   92:4 102:24
   143:15 157:20
   178:3 239:18
   239:19 240:7
   242:24
**discussed** 45:4
   55:5 60:13
   63:6 78:24
   121:18 122:24
   123:6,12
   126:20 146:8
   178:7 236:13
   236:14,15
   240:2 244:6
**discussing**
   70:23 103:14
   117:22 118:19
   179:12
**discussion**
   53:17,24 61:16
   80:10 81:23
   82:7 108:25
   121:7 125:13
   126:7 159:16
   163:10 165:8
   221:22 240:5
**discussions**
   61:18 63:5,12
   63:24 64:1,5,7

65:23 66:20
   68:10,17 73:22
   74:2,14,17
   75:3 78:17,19
   79:8 91:20
   94:21 182:8
   195:7,7 249:16
   249:22,22
   250:4
**disease** 5:18
   19:17 23:16,25
   24:3,6 26:8
   27:5,19 34:17
   34:19 41:16
   51:10 186:14
   211:17 238:10
**disguise** 59:20
   59:24
**dismissal** 73:13
   73:20 74:8,23
   76:1,20,23
   77:3 78:11,24
   78:25
**dismissed** 73:9
   75:11 76:11
   77:8,10 78:4,7
   81:12,16,25
   82:10,17
   213:23
**dismisses** 98:25
   99:1
**display** 225:1
**disrupt** 48:12

HIGHLY CONFIDENTIAL

**[disrupts - drag]** Page 23

disrupts 180:4
dissolved
  146:15,17
  147:2,4,7,10
  150:23
distinction
  82:24
distracted
  239:3
district 1:1,1
  7:13,13 134:5
division 24:18
divulge 127:12
  199:12
divulges 149:18
  162:11
divulging
  145:22
dkumagai 2:6
doctor 28:19
doctor's 205:20
doctoral
  216:23
doctors 200:7
document 5:15
  5:16 54:1,6
  79:18,19 80:1
  80:13,15,25
  94:4,5 96:21
  97:10 101:13
  108:4,5,11,23
  109:3,13
  110:13 118:2,3
  120:9,21

121:15 124:11
130:2,4,16
131:6,10 133:2
154:2 161:8,14
178:8,11 201:2
212:16 214:2
227:4 234:8,17
234:22 238:20
254:17,18
255:5,6,10
256:10
documentation
  115:9
documents
  123:19,23,24
  124:3 247:5,9
  248:6,11,18
  249:1,4,12
  250:8 257:12
dodged 241:7
doing 9:25
  14:20 22:7
  23:23 26:20
  30:9 31:13
  32:13 35:1
  63:22 79:2
  127:11 129:6
  133:6,8 138:4
  141:23 144:3,5
  158:25 160:12
  162:11 167:7
  174:4 181:25
  182:4 183:15
  183:15 184:7

188:6,9 204:12
204:15,16
227:8 232:2,9
246:12,18,19
257:1
dollar 70:17,23
  71:2 90:10
dollars 12:3
  90:13,17
double 193:14
doubt 49:5
  54:10 80:5
  203:2 211:23
  215:9
doubts 207:18
downsides
  57:22
dr 21:22 22:1
  24:9,24 25:3
  25:10,11,23,25
  26:19 28:18,23
  31:3 43:8,21
  44:6,19,20
  45:15,23 94:8
  94:22 95:19,25
  96:3,15 97:24
  98:4 99:14
  102:2 109:6,9
  109:22 110:25
  111:25 114:7
  116:13,13,19
  116:20 121:9
  127:5 128:4
  129:4,7,11

131:8 132:14
133:12 136:16
137:4,5,17,25
138:3,8 141:6
142:23 157:9
157:11,13,18
157:24 158:2
160:23 167:18
167:20 168:3
175:23 184:19
185:7,12,25
188:5 190:25
201:7 202:24
203:18,24
204:7,14,18,22
204:24,25
205:18 208:18
210:3,22
211:13 212:9
212:24 213:12
222:9,10,11
223:1,1 224:5
224:25 225:16
226:5 228:18
228:21 229:2,4
231:21 235:3,7
236:14,16
237:7,7,11
239:6 242:10
243:4,11
258:25 259:3,4
drafting 214:7
drag 238:20

HIGHLY CONFIDENTIAL

**[dramatically - email]**                                                    Page 24

**dramatically**
38:9 169:15
170:20
**draw** 146:2
159:4
**drawing** 96:18
113:8 115:5
126:24 143:5
165:14 226:24
226:24 237:3
**drawn** 146:7
**driven** 258:1
**drives** 231:25
**drop** 181:15
**dropping** 88:23
201:8
**drug** 3:20 4:22
16:15,19,19
17:1 18:15
20:23 23:16
24:17 33:24
41:15 46:5,13
47:5,6,8,15,17
47:18 48:1,2
49:6,16,18,20
49:23,25 50:1
50:3,4,13,20
51:2,12,15
86:2,2 96:2,5
98:19,20,20
103:22 117:15
117:17 163:24
173:7 176:12
179:12 180:4

180:21 186:1,6
186:12 187:19
187:22 189:20
190:21 191:1
200:17 202:10
211:24 223:5,6
223:13,20,22
231:25 236:22
246:2,4,9,12,15
246:18,21
**drug's** 57:1
**drugs** 24:17
48:5 223:19,23
226:13
**due** 22:7 32:13
258:16
**dug** 242:16
**duly** 8:20 261:7
**dunn** 2:8 3:5
8:7,10
**dysplasia**
186:14

**e**

**e** 7:1,1 25:6
111:12,13
205:22 223:25
235:16 263:3,3
263:3
**earlier** 58:3
102:18 130:22
190:10 202:17
222:6 231:8
248:13 251:1

251:20 256:10
256:23 257:1
**earliest** 118:1
**early** 16:9
18:23 50:15
58:5 59:5
224:16 225:4
243:15
**easier** 179:6
**east** 12:14
**eastbourne**
12:13,15,18
14:23 15:5,13
35:7
**easy** 210:13
228:12
**editorial** 214:2
**educational**
10:5
**effect** 34:18
48:23 66:4
84:13 154:25
180:21 186:22
187:12,14
201:12 202:12
211:17 225:11
236:1 250:18
**effective** 51:13
**effort** 214:14
214:19,25
215:5 242:5
**efforts** 141:13
190:10 215:11

**eight** 109:17
259:18
**eisen** 148:2
**either** 19:18
71:13 198:24
202:10 230:4
236:11 248:25
249:12,13
251:2 254:5
257:17
**el** 181:20
**elected** 169:12
**electronic** 81:1
**elements**
223:20
**elicit** 255:4
**elisa** 111:10,12
112:4,8 113:5
113:15
**elizabeth**
212:10 213:16
213:16 214:4
**email** 2:5,6,10
2:11,15 3:15
4:20,23,24 5:3
5:4,5,7,8,12,13
5:14 6:4 30:15
31:8,16,19
34:3 118:1,3,3
118:14,17,21
119:10,14,18
121:8 122:12
122:13 143:5,6
143:7,10,11

HIGHLY CONFIDENTIAL

**[email - evaluate]**                                              Page 25

159:13,19,25
160:1,5,7,13,19
160:23 161:1
161:12 163:12
164:12 166:24
177:4,9 178:2
192:10,16
196:9 197:12
199:2 201:5,6
202:16 203:17
203:21,25
205:10,15,18
207:1 208:24
209:5,7,21
210:4,23 212:9
213:8,8 215:19
216:10,17,21
218:7,13
219:11,16
220:24 221:2
221:21,23
224:4 229:3
231:7 232:5
249:8 251:15
251:16,23
252:23 253:18
253:23
**emailed** 160:24
161:18,20
215:22 241:3
**emailing**
219:18 220:13
**embarrassed**
237:25

**emilios** 118:4
**employed**
261:14
**employee**
224:20 225:15
249:22 253:7
**employees**
63:18 163:21
164:18,21
165:6 166:7,20
249:17 252:1
252:15 253:7
253:10,19
257:9
**employment**
43:5 44:6
**encounter**
224:4
**encourage**
217:24
**encouraged**
27:21 144:9
145:2 209:20
**endeavors** 88:2
**ended** 12:12
50:15 242:18
242:20
**endorses**
212:13
**endpoint** 36:1
49:15,23
**ends** 125:15,15
125:15,16,16
125:16,17

**enea** 1:4 2:18
8:5 9:3
**engage** 242:6
**engaged** 144:17
144:19 216:1,3
**english** 137:7
**enhance** 235:14
**enrolled** 86:22
88:18,21,22
89:6,19
**enrolling** 155:1
**enrollment**
89:4
**entered** 242:17
**enthused** 209:2
**enthusiastic**
20:15 24:3,5
**entire** 33:11
52:9,22 126:7
**entirely** 160:8
**entirety** 101:4
248:17
**entitled** 5:15,16
**entry** 50:12
**enzymes**
206:23 207:2
**epidemic** 16:10
**epilepsy** 186:5
186:15 245:8
246:14 257:25
**equipment**
115:8
**eric** 40:9
254:22

**erik** 192:10,25
194:2,4,4,4,8
**errata** 262:11
262:13,16
**error** 204:1,2
**errors** 204:7
**esq** 2:2,3,7,8,12
262:1
**essentially**
12:17 169:23
171:10 180:2
206:12
**establish** 166:9
189:21
**established**
166:9
**establishment**
6:3 110:20
**estimate** 90:16
192:25
**estimated**
193:13
**estimation**
84:12
**et** 7:11,12
18:14 174:13
180:12 189:15
197:24,24
262:4,4 263:1
263:1 264:1,1
**ethics** 136:17
137:2
**evaluate** 223:3

HIGHLY CONFIDENTIAL

**[evaluated - expeditiously]** Page 26

| | | | |
|---|---|---|---|
| **evaluated** 258:15 | 127:4 159:13 159:19 199:1 202:16 203:17 203:21 211:13 212:9,22 215:19 219:16 220:25 221:2 221:19 | 4:18,20,21,23 4:24 5:2,3,4,5,6 5:7,8,9,12,13 5:14,15,15,16 5:16 6:2,3,4 30:13 53:16,18 53:21 79:15 80:9,12,20 81:5 94:5 95:2 109:1 110:12 | **exhibits** 3:14 4:1 5:1 6:1 125:7,8,9 248:6,15 249:18 251:3 259:23 260:5 |
| **evaluating** 223:17,18 | | | **exist** 104:16 147:19 151:3 |
| **evaluation** 116:4 221:7,18 223:6,13 | | | **existed** 102:4 102:10 104:17 120:4 151:2 |
| **evaluations** 221:16 | | | **existence** 101:7 |
| **event** 226:7 | **exchanging** 197:25 | 110:14 111:5 117:25 129:16 142:15 153:11 153:25 159:6 159:10,14 163:8,9 178:10 178:12 192:5,8 196:7,8 197:11 200:25 202:22 203:16 205:13 205:14 213:25 214:2,12 219:14,16 220:23 231:12 231:15 234:1,2 235:11,12 237:21 238:4,8 247:17,18,18 247:18 249:3,4 249:7,8 250:12 251:2,3,10,15 251:20,24 253:25 254:4 256:6 | 101:10 106:20 106:23 117:1 |
| **everybody** 52:15,16 172:12 252:18 | **excited** 33:18 37:2 | | **existing** 52:10 |
| **evidence** 47:7 51:11 189:9,16 | **excitement** 33:5 | | **exists** 27:8 |
| **evolve** 255:6 | **exciting** 19:7 | | **exited** 17:23,25 |
| **exact** 164:23 225:16 253:2 | **excuse** 28:21 148:5 203:24 222:11 246:23 | | **expect** 105:21 251:2 |
| **exactly** 69:21 202:3 207:3 | **execu** 40:5 | | **expectation** 84:19,21 |
| **examination** 3:4,12 8:22 247:15 258:23 261:7 | **execute** 59:2 200:3 228:2 | | **expected** 83:23 83:23 84:22 85:9 88:19 100:24 101:7 101:10 104:10 104:12 114:9 158:13 174:15 |
| | **executive** 34:13 38:25 41:21,22 46:12,24 49:2 89:25 90:5 104:21,23,25 144:21 158:12 191:14 222:17 250:14 | | |
| **examined** 8:20 183:10 | | | |
| **example** 35:8 48:8 56:5 58:8 126:4 156:21 156:23 161:11 200:23 201:7 201:12 227:24 | | | **expecting** 168:10 |
| | **executives** 224:19 | | **expeditious** 133:4 |
| **exchange** 30:15 31:16 59:14 | **exhibit** 3:15,16 3:17,19,21 4:2 4:5,8,10,13,15 | | **expeditiously** 132:22 |

HIGHLY CONFIDENTIAL

**[expenditure - failed]** Page 27

**expenditure**
  232:8
**expenditures**
  169:15 170:20
**expense** 87:10
  90:1,2 171:17
  258:1
**expenses** 86:18
**expensive**
  174:6
**experience**
  34:16 41:10
  58:18 59:4
  136:25
**experiment**
  173:16,18,18
  173:19 174:12
  176:2 182:25
  183:14 184:4
  186:3,12
  187:10 236:23
  237:18,19
**experimental**
  4:22
**experimentat...**
  177:11
**experiments**
  172:19 173:20
  173:23 174:2
  175:9 176:21
  177:18 178:25
  184:3 188:10
**expertise** 40:1
  115:25 116:1

152:5
**experts** 137:16
  138:17,19,25
**expires** 261:17
**explain** 20:2
  32:6 38:12
  62:5 135:5
  163:25 179:24
  185:23
**explained**
  163:22
**explaining**
  135:9
**explanation**
  48:10 57:8
  105:20,22
  199:15 242:10
  246:16
**explanations**
  191:21
**explore** 139:19
**explored** 55:5
**exploring**
  51:14 54:20
**expose** 59:17
  217:22
**exposure**
  222:25
**express** 63:19
  182:8 209:4
**expressed**
  148:11,15
  149:25 157:20
  158:3

**expresses**
  210:23
**expression**
  128:16,22
  138:7 225:13
**expressions**
  128:11 129:2
**extent** 42:2
  45:3 46:6
  49:10 53:4
  55:5 60:9,21
  61:17 62:11
  65:24 66:21
  69:5 70:5,11
  70:20 72:13
  73:3 74:4,16
  75:4 76:5,13
  76:15 78:18
  79:7 81:18
  82:20 92:22
  93:5,21 96:8
  96:11 106:5,16
  120:3 126:14
  126:18 127:11
  141:8 143:3,22
  145:22 146:7
  149:18 155:11
  155:21 156:5
  158:25 184:12
  193:11 199:11
  220:16 252:7
**extra** 92:3
**extraordinary**
  258:16

**eye** 137:14

**f**

**fabrication**
  161:2
**face** 193:18
**facilities** 110:6
  130:18
**facility** 110:7
**fact** 56:3 59:21
  59:24 63:19,20
  63:20 67:16
  103:20 121:17
  124:13 145:8,8
  151:6 159:20
  160:17 181:3
  189:21 194:15
  205:3 207:4
  211:11 225:17
  227:24 248:20
  251:5
**facts** 59:18
  124:15
**factual** 59:12
  68:7 69:25
  75:12 76:3
  79:12 80:6
  85:8 106:25
  107:14 127:24
  128:23
**fail** 244:24
**failed** 27:4
  49:14 50:15,19
  99:11 169:15

HIGHLY CONFIDENTIAL

**[failed - filing]**                                                    Page 28

170:24 171:11 171:13 191:22
**fails** 262:18
**failure** 170:19 257:8
**failures** 23:18
**fair** 13:18 36:12 44:1 69:8 87:5 95:13 122:16 126:17 127:2 136:13 166:17 175:14 212:13 253:16 258:14
**fairly** 101:12 136:12
**faith** 154:17
**fake** 98:16
**fakes** 207:20
**false** 67:9 85:1 155:8,20 156:15,20
**falsehoods** 93:11,15 97:19
**familiar** 110:5 117:25 153:19
**families** 49:3
**family** 41:7 205:5 206:7
**far** 27:8 155:17 172:11 205:1
**fascinated** 24:20

**faster** 61:5
**father** 34:14
**favor** 71:16,21 192:21 225:22
**fbi** 213:18
**fcdii** 187:9
**fda** 17:15,17 18:10 109:5,8 109:16,20,21 110:5,7,16,24 113:4 116:15 116:16 117:21 118:4,12,18 121:6 123:10 169:22 170:10 170:21,24 171:15 189:19 221:8,17 222:21,23,24 223:2 224:21 231:3,23 234:14 249:10 249:17 250:22 251:4 258:25 259:5,9
**fda's** 110:6 122:24 123:5 123:11,19,24 250:11 251:4
**feared** 88:21 229:12,20 230:15
**fearful** 222:20

**february** 33:7
**fed** 228:1
**feel** 44:9,19 159:15 194:2 228:4
**fees** 192:7,23
**fei** 110:19
**fellow** 25:12 30:23,25 57:2 116:22
**felt** 57:4 74:15 150:7 174:21 189:20 191:2 194:4 195:18 241:19,19 252:5,10
**feshbach** 11:13
**fiasco** 227:20
**fiction** 227:24
**fidelity** 199:20
**field** 115:25
**figure** 90:10
**filamin** 5:18 28:7 173:1,7 175:15 184:17 186:2,5,7,8,22 187:12,23 188:3 235:14 236:10 238:10 244:25 245:1 245:15,22
**file** 54:12 67:23 71:24 81:15,24 82:9,15 87:4

93:19 97:8 106:1,13 110:1
**filed** 7:12 54:4 54:7 60:20 61:11,23 62:3 62:10 63:3 64:12 65:4,17 66:6,15 67:21 68:8 70:1,10 75:10,21 76:1 80:1,15 81:4,6 81:10 83:2,8 83:17 84:3,12 87:6 88:6,20 95:10,14,17 96:7,14 100:4 107:19 113:1 115:13 122:17 122:22 123:1,7 123:13 128:12 146:19 151:1 192:14 205:3 205:11 206:8 217:1,8
**filing** 60:5,8,15 66:4 71:8,12 71:16 72:25 73:12,20 74:8 74:22 81:1,1 83:9 88:9 100:18 151:3 192:21 199:9 205:9

HIGHLY CONFIDENTIAL

**[films - form]**                                                                 Page 29

| | | | |
|---|---|---|---|
| **films** 131:3,15 131:22,25 132:5 | 192:11,14 195:2 216:1 | **five** 99:20 170:3 212:5 218:19 | **forgetting** 116:17 |
| **final** 254:17 | **first** 3:16 8:20 10:20,23 11:12 | **fix** 77:24,25 | **forgotten** 183:25 240:25 |
| **finance** 196:22 | 15:9 23:7 | **flight** 252:23 | **form** 13:21,25 |
| **financial** 10:22 15:1 | 24:15 31:24 46:8 49:19 | **flippant** 193:23 | 17:13 18:11 20:8 22:15,20 |
| **financially** 7:22 | 50:15,19 67:17 | **flipping** 246:8 | 28:12 32:21,23 |
| **find** 23:11,13 110:8,10 | 73:13,21 74:9 74:23 75:10 | **flna** 5:2 179:11 179:17 184:10 | 36:2 39:23 47:19 48:3 |
| 131:21,24 179:25 186:6 | 76:2 79:13 | **floor** 2:4 | 58:21 64:3 |
| 204:1,21 217:5 | 80:6 81:11,15 | **fluid** 229:10 | 67:13,22 69:17 |
| 225:12 238:13 239:7 254:10 | 81:24 82:10,16 95:2 102:15 | **focal** 186:13 | 71:18 76:12 79:6 81:17 |
| **finding** 23:12 182:1 | 104:4 108:8,9 108:22 111:4,4 | **focus** 39:21 248:5 | 87:7 90:14,19 90:22 91:4,9 |
| **findings** 109:5 | 112:3 122:12 | **focused** 38:24 | 97:9 99:16 |
| **fine** 56:6 61:13 65:20 66:17 | 129:23 163:15 163:18,18 | **focusing** 19:16 | 100:5,20 101:2 101:19 103:4 |
| 101:14 115:2 | 169:14 170:19 | **foley** 220:14 | 105:17,24 |
| 124:23 145:12 | 172:12 175:1 | **folks** 201:25 | 106:3 107:1 |
| 165:25 177:22 233:16 | 180:1,11 181:8 187:10 192:10 | **follow** 59:7 92:17 222:1 | 109:16,21 110:16,23 |
| **finish** 36:21 | 201:7 203:24 | 231:24 247:13 | 113:23 114:11 |
| 168:18 177:14 | 205:15 209:21 | **followed** 196:23 | 118:20,24 |
| 177:15 228:10 | 212:8 230:24 | **following** 109:17 129:19 | 119:7 120:9,21 |
| **fire** 228:1 | 233:6 237:4 | 168:9 230:24 | 121:2,11,21 |
| **firm** 8:3 11:17 | 251:24 254:16 254:19 | **follows** 8:21 | 122:2 134:3 138:13 140:1 |
| 12:6,13,20,21 | **firsthand** 200:8 | **food** 3:20 | 148:17 150:2 |
| 18:1,20 59:15 | **fit** 202:6 243:14 | **foregoing** 260:10 261:12 | 156:13 158:10 |
| 138:21 139:8 | **fitting** 113:10 | 264:5 | 161:3 164:7 |
| 144:5,12 | 113:13,14 | **forget** 30:7 180:5 | 173:24 175:5 |
| 182:11,11 | 114:3,4,10 | | 175:21 184:11 |

HIGHLY CONFIDENTIAL

**[form - future]**

185:13 187:16 188:7 189:25 190:12,19 191:16 193:10 201:14 202:19 203:4 212:15 214:17 215:3 218:2 227:3,9 229:5 231:11 233:1 239:8 241:17 242:12 244:17 245:2 245:16 248:23 249:7 258:18 261:11

**formal** 10:12 162:14

**formation** 39:12,15,20 54:25 55:24

**formed** 54:17 54:18 56:1,3,4 56:9 57:8,9

**former** 196:13 221:6 222:2 224:9

**forms** 183:12

**formulation** 17:20

**forth** 261:11

**forthright** 217:14

**forward** 38:25 59:14 120:14

181:10 192:19 220:14 247:10 259:1

**forwarded** 68:24 69:2 75:18 93:17 160:7,7 197:15

**forwarding** 143:6 197:17 198:1 205:19 220:21

**found** 24:1 59:11 98:16 141:24 171:8 197:1 202:9 239:6,10 243:15,15,22

**foundation** 97:10 101:19 105:17 107:16 108:14 112:15 113:23 115:20 118:20,25 119:7,19 120:22 121:2 121:12 124:5 131:11 133:13 134:1 202:19 203:4 218:2 239:8 241:17

**foundational** 96:1 98:18

**founder** 27:17 163:23 164:18

**founding** 12:1

**four** 11:23 137:15 138:17 138:19 170:3 184:9,13 211:5 212:5 218:19 244:15 249:18 251:3 253:18

**fourth** 180:11

**frankly** 85:11 224:22

**fraud** 50:1 59:13 189:15 197:24 210:20 211:22

**frauds** 67:18

**fraudster** 97:21 124:14

**free** 45:5 174:21 186:18

**french** 181:7,12

**frequently** 258:13

**freres** 11:8

**friend** 21:14 25:13,14 34:14 144:6 220:8 222:7 224:24 240:20,21

**friendly** 21:6

**friends** 21:6,14 21:19,21 75:18 196:14,17 198:6 206:10

**front** 51:20 95:12 130:2 204:20 212:8 248:7 249:4

**frozen** 207:10

**frustrated** 231:22

**full** 9:14,14 47:1 119:17 166:25 173:16 216:20 249:1

**fully** 68:5 86:22 88:18,20,21 89:5,18 212:17

**fun** 228:2

**function** 206:23

**fund** 11:15,24 12:5,6 13:6,10 14:4,5,8,13,16 33:13

**funds** 11:6,19 11:23,24 15:6

**furious** 196:5

**furor** 101:25

**further** 73:22 76:3 212:25 246:24 247:6 258:15,21 261:9,13

**furthest** 118:1

**future** 97:3

HIGHLY CONFIDENTIAL

**[g - going]** Page 31

**g**

**g** 7:1 25:6
28:21 205:22
**game** 59:5,8
166:17
**game's** 59:21
**gap** 50:14
**gather** 67:13
**gels** 207:20,21
**gene** 223:18
**general** 58:6
108:10,19
136:12 181:2
215:13
**generally** 20:10
36:11 108:23
**generate** 86:20
**generated**
38:23 56:25
132:14
**generation**
254:19
**genetically**
187:18
**genuinely**
234:5
**geoffrey** 1:7
**getting** 10:17
49:6 114:14
140:23 146:20
146:22 149:6,8
176:5,18
181:21,23

183:5 188:10
218:21 224:18
228:10 246:8
246:15
**gh** 235:16
**gibson** 2:8 3:5
8:6,10
**gibsondunn.c...**
2:10,11 262:2
**gigantic** 225:3
**gist** 152:24
**give** 9:13 10:5
10:14 17:12
26:5,12 42:22
58:8 89:23
99:6,6 154:3
171:3 174:25
188:14 210:17
**given** 88:22
135:18 156:9
259:17 264:9
**giving** 232:10
**global** 14:25
**go** 7:8 11:9,21
13:22 21:2
33:15 47:4
52:7 53:2,4
56:14 61:5
66:25 67:15
87:11 89:17
97:12 102:17
119:13 120:14
148:19 155:23
158:19 163:24

165:9 173:25
181:10 188:13
188:14 195:17
206:10 217:24
240:13 241:18
242:23 243:2
247:14 252:1
252:14 254:10
254:13 259:1
**goals** 34:9
**god** 11:11
218:18
**goes** 72:13
110:7 112:7
117:10 208:5
223:5 256:19
**going** 7:3 9:7,9
9:21,21,24
12:11 13:17
14:6,16 20:21
23:25 30:2
32:1,3 33:19
38:25 42:1,21
43:17,18 49:15
50:3,7 51:2,24
52:1 53:4
54:21 62:19
65:13 67:11
70:2,25 72:12
73:1 77:5 82:5
83:13 87:6,8
88:3,6 91:11
92:9,11 98:7
98:14,21

102:17 108:7,8
108:10,13
110:11 120:8
123:2,14,16,22
124:4,4,19,25
125:6,10,11
133:14 139:11
139:16,19
140:1,13 145:7
146:3,6 150:16
150:16 151:11
151:12,17
153:9 154:3
159:15 160:21
163:21 165:5
166:19 167:12
167:14 169:10
170:10,22
171:4,8,9
172:14,14,15
172:16,18
174:17 175:1
176:20 177:12
183:2,7 184:4
184:22,24
185:15 188:23
189:2,13,20
190:22 191:1
191:25 192:5
192:18 193:17
194:5 195:18
201:22 202:3,4
205:10 210:15
210:16,16

HIGHLY CONFIDENTIAL

**[going - harassed]** Page 32

211:25 212:8
217:18,24
223:1,3 225:1
225:15,16,25
226:5,7 227:11
228:2,2,3,8
229:8 232:15
233:2,19,25
238:4,19,25
239:24,25
242:21 250:20
250:22 252:6
253:10,13
257:25
**good** 7:2 8:24
14:19 20:3,6
27:24,25 32:5
32:18 55:11
58:6 82:15
105:20,22
136:5 137:7
141:19 148:16
169:4 173:20
175:20 189:23
190:1 191:6
194:2,4 196:4
207:3 211:20
233:7 237:9
251:11 252:15
257:2,10
**googled** 67:16
**gospel** 173:13
**gotten** 47:11

**government**
165:2,10,15,15
171:2 188:19
224:24 252:19
**gradually** 14:9
**graduate** 10:7
**graduating**
10:15
**grandkids**
85:25
**granularity**
90:1 133:16
250:19
**graveyard**
192:1
**great** 16:22
163:22 165:9
168:7 199:18
208:22 220:19
224:11 226:8
236:20 246:16
246:17
**greater** 28:9
**group** 40:17
125:8 187:7
240:10,14,15
240:17 241:9
**groups** 125:12
242:3
**grow** 35:4
**gueron** 2:3 8:4
**guess** 150:14
218:5 237:9
243:12

**guided** 65:7
**gummy** 16:25
17:1
**gun** 165:11,15
**gussin** 116:13
116:20
**gut** 83:3
**guy** 24:20
25:15 27:19
40:16 144:2
160:1,19 163:1
198:10 203:14
216:14 220:9
220:13 240:19
**guys** 225:24
236:22

**h**

**h** 28:20 237:5
263:3
**habit** 173:12
**hairs** 62:17
**half** 85:25
169:8 193:14
252:5,9 253:18
**hall** 253:7,20
**halted** 257:5,6
**hand** 81:3 94:3
110:11 117:24
125:6 142:13
191:22 203:17
238:4 250:5,5
254:3

**handed** 53:16
53:20 80:12
95:15 108:4
178:8 214:1
219:15
**handing** 154:1
154:1 196:8
235:10
**handled** 227:20
227:22 228:14
**hang** 229:25
**hans** 5:6 25:3,5
27:2,16,17
205:1,10 210:9
212:6 213:22
**happen** 67:23
71:20 146:21
**happened**
11:20 19:19
36:7,17 37:4
129:8 146:25
147:21 156:16
165:9 224:10
225:15 234:4
253:11
**happening**
204:2
**happens**
200:22
**happy** 12:10
43:22 134:25
217:11
**harassed**
147:14

HIGHLY CONFIDENTIAL

**[hard - hypothetical]**                                    Page 33

| | | | |
|---|---|---|---|
| **hard** 18:13 33:23 50:22 65:5 71:25 150:5 211:7 237:14 | **held** 114:7 144:7 165:11 165:15 | 163:1 182:9 192:9 206:23 208:21 215:9 | **hook** 241:20 |
| **hatred** 201:19 | **hello** 22:10 | **hindsight** 16:10 228:21,22 | **hope** 84:1 103:10 |
| **he'll** 36:25 166:3 | **help** 19:8 46:6 172:13,21 178:12 226:9 227:11 253:11 256:7 | **hired** 138:20,20 138:21 195:1 | **hopefully** 247:11 |
| **head** 22:13 165:12,15 184:9 202:2 221:6 | **helped** 35:10 46:4 224:14 237:17 | **history** 23:18 32:11 34:25 41:7 192:3 | **horrific** 34:17 |
| **health** 3:19 219:20 | **helpful** 41:17 102:3 175:13 179:2 195:20 219:3 241:6 | **hmm** 26:17 31:4 34:6 62:8 80:22 122:14 129:15 130:20 167:5 181:19 192:15 199:5 205:17 231:10 254:6 | **hostetler** 8:12 |
| **hear** 19:6 46:23 114:22 148:10 148:14 149:5 161:6 201:4 248:21 | **helping** 35:4,5 | **hoau** 28:18,20 97:21 160:1,18 | **hour** 51:24 80:4 92:9 124:19 184:22 260:11 |
| **heard** 49:7,7,8 73:11 102:16 133:6 142:4 225:14 239:4,5 254:24 | **helps** 108:11 | | **hours** 252:11 260:12 |
| | **herculean** 199:23 | **hoc** 3:21 4:2,5,8 4:10,13,15 55:16 | **house** 112:8 259:5 |
| **hearing** 236:2 | **hereto** 264:7 | **hold** 36:18 74:16 89:7 140:8 250:22 | **huff** 217:20 |
| **heavily** 229:1 | **hernandez** 40:14,25 | **holding** 247:2 | **huge** 16:12 50:14 192:1 |
| **hedge** 11:6,15 11:19,24 13:10 14:16 | **hesitated** 124:12 | **hole** 242:16 | **human** 3:19 |
| **heilbut** 1:3 2:17 3:18 7:11 8:4 9:3 262:4 263:1 264:1 | **hey** 225:23 | **honest** 82:22 172:14 225:11 | **humans** 187:21 246:17 |
| | **hide** 99:8,9 242:7 | **honestly** 83:4 | **hundreds** 258:11 |
| | **high** 10:6,14 16:17 33:21,24 | **honig** 157:24 158:2 | **hung** 59:3 |
| | **highest** 144:7 | | **hurting** 63:14 |
| | **highly** 1:13 3:3 52:13,16,20,24 53:12 150:9,9 | | **hyperbole** 99:2 |
| | | | **hypothesis** 245:1 |
| | | | **hypothetical** 100:9 150:3 158:18 244:22 245:3 |

HIGHLY CONFIDENTIAL

**[ib - information]**                                                  Page 34

| **i** | | | |
|---|---|---|---|
| **ib** 120:12 121:1 | **immediately** 130:12 257:10 | **improvement** 48:23 | **indicate** 242:9 |
| **idea** 13:8 14:13 16:13,22 17:2 24:5 82:15 93:19 132:11 136:6 151:19 162:2 175:20 186:6 188:17 189:6 198:5 217:18,24 218:16 220:20 252:6 | **immigrant** 137:7 | **inadvertent** 161:25 | **indicated** 179:7 |
| | **immune** 9:23 | **inadvertently** 161:22 | **indicating** 227:12 |
| | **impact** 55:12 57:19 127:8,16 127:23 128:17 128:22 | **inappropriately** 129:11 | **indifferent** 169:4 257:2 |
| | **importance** 116:9 | **inartfully** 177:25 | **indirect** 35:16 |
| | **important** 48:22 62:6 167:1,6 176:6 | **include** 202:11 | **indirectly** 88:8 155:9 156:3 |
| **ideas** 254:20 | **impossible** 67:25 68:2 | **included** 92:2 121:1 197:13 | **individual** 15:2 64:5 157:6 |
| **identified** 172:21 174:14 191:11 | **impressed** 41:13 204:25 239:17 | **including** 140:12 172:12 182:13 220:13 | **individually** 35:6 |
| **identify** 191:23 | **impression** 33:20,22 58:17 237:2 | **incomplete** 197:11 | **individuals** 15:25 |
| **ignore** 58:19 229:11,13 256:19 | **impressive** 186:19 | **incorporated** 7:12 | **industry** 224:11 |
| **ignored** 229:22 | **improper** 100:5 100:8 150:3 158:17 245:2 | **incorrect** 37:11 | **infancy** 16:11 |
| **ii** 186:14 | | **incorrectly** 38:13 170:17 | **inference** 146:2 146:7 165:14 |
| **illegal** 194:15 | **improperly** 141:6 | **independence** 237:13 | **inflammation** 24:6 27:6,10 28:11 |
| **images** 129:3 129:11 131:3 131:15,22 132:1,5,14 137:12,13 141:7 204:9 211:24 213:20 | **improprieties** 129:3 | **independent** 75:24 126:19 137:16 138:17 138:19 140:17 210:8 237:1,18 | **influence** 50:18 186:7 |
| | **improved** 32:10 | **independently** 129:9 | **influenced** 106:10 195:10 195:11 |
| **imaging** 129:7 | | **index** 3:11 15:1 | **information** 27:20 30:1 52:14,17,20,24 53:6,11 56:4 124:12 126:6 141:22 156:16 |

HIGHLY CONFIDENTIAL

**[information - interpreting]**                                    Page 35

253:6
**informed**
  252:18,22
  258:25
**informing**
  231:8
**initial**  20:14
  55:24 89:24
  212:21
**initially**  19:3
  35:23 206:10
**initiated**  127:4
**inquire**  132:22
**inside**  17:1
  236:3
**insight**  32:5
**inspection**  6:3
  109:9,11
  110:19,20,24
  112:20,23
  116:16 117:22
  122:24 123:12
  123:19,20,24
**inspections**
  110:6
**instance**  171:6
  171:7
**instances**
  173:17
**instigated**
  154:5
**instigating**
  155:10 156:3

**institute**  99:1
  162:7 180:2
  181:7,12
  203:12
**institutional**
  10:25 11:3
**institutionali...**
  13:11
**institutions**
  199:20
**instruct**  42:19
  43:2,15 44:7
  44:15 45:2,7
  55:7 56:11
  60:11 61:1,19
  61:24 62:13
  65:10 66:1,9
  66:23 69:7
  70:2,13,21
  72:3 73:3 74:3
  74:19 75:6
  76:7,14 78:19
  79:9 81:19
  82:19 85:18
  91:22 92:23
  93:7,23 94:1
  94:17 95:21
  106:4,18 123:2
  123:16 126:13
  126:15,20
  127:10 132:9
  132:18 139:16
  140:13 141:10
  143:16,23

  145:21 146:6
  149:2,17
  151:17 158:24
  162:10 194:5
  199:13 220:17
**instruction**
  42:12,23 43:6
  43:10,18 44:21
  44:23 60:16
  70:19 71:4
  123:8 127:18
  127:25 143:21
  149:12 152:2
  166:4
**instrument**
  115:9
**insurance**  11:5
**integrity**
  136:17 137:2
  213:19
**intellectual**
  29:5,9
**intend**  16:23
  227:6
**intended**
  228:16 229:3
**intending**  57:7
**intention**  47:4
  169:5
**interact**  40:2
  40:10,20 186:6
**interaction**
  245:21

**interactions**
  5:17 238:9
**interacts**  245:6
**interest**  5:10
  199:25 200:1
  232:14
**interested**  7:22
  13:12,12 19:9
  22:12 198:1
  217:25 218:1,5
  261:15
**interesting**
  22:5 184:6
  243:23
**interests**  42:8
  44:10,20
**interfering**
  56:16 57:5
**international**
  5:16
**internet**  59:10
  67:8,16 85:1,8
  85:10 93:11,15
  97:20 165:1
  198:16
**interposed**
  106:14
**interpret**
  118:21 204:14
**interpretation**
  117:2 246:10
**interpreting**
  51:7

HIGHLY CONFIDENTIAL

**interrupt** 124:19 188:14
**interrupted** 104:4
**interval** 73:19 74:7,21 75:9 75:25
**intervening** 39:22 40:4
**intervenors** 1:8
**interviewing** 224:19
**introduce** 8:25
**introduced** 222:2
**intrude** 62:14
**inventor** 29:12
**inventors** 29:7 29:11
**invest** 33:10 34:5 86:13,14 86:16,19 88:1
**invested** 13:18 13:24
**investigate** 68:7 69:24 70:9 75:12 76:3 141:6,14
**investigated** 225:7
**investigating** 183:13
**investigation** 5:9 75:24

109:5 133:4,7 133:12 135:16 136:1,7 141:18 141:23,24 142:1,3,23 214:3
**investigations** 127:5,8,16,23 165:3 188:19 252:19
**investigator's** 117:7,8,20 119:6 120:12 121:19 123:11
**investigators** 117:11 200:16
**investment** 11:22 13:17 16:7 17:24,25 197:2
**investments** 13:7
**investor** 35:3 39:13 162:18 163:5 168:23 170:12 196:23
**investors** 12:11 12:25 13:11 14:15 39:18 168:4,9 199:20 224:13
**invite** 108:22
**involved** 35:3,7 35:9 43:25

197:1 200:16 201:20 216:22 224:14
**involvement** 96:12 180:17 181:1
**isaac** 2:2 8:3 9:1
**issue** 17:19,20 110:9 168:25 195:19 247:8
**issued** 109:16 109:21 110:24 112:20 116:16 216:11
**issues** 252:12
**iteration** 17:19
**iterations** 17:18
**iterative** 254:18
**izaur** 2:5

**j**

**jail** 224:10
**january** 4:9 76:11
**jeffrey** 147:23
**jesse** 1:3 2:17 8:5 9:2
**jim** 24:9,9,10 201:5 239:6 240:11,11

**jim's** 24:16
**jlr** 1:2 7:14
**job** 10:20 11:9 12:4 47:1 86:1 172:11,13 213:16
**jobs** 10:19 253:13
**joe** 220:4
**join** 22:8 24:21 27:21 34:11 49:11 208:25 209:14
**joined** 8:13 23:2 25:1 28:5 28:17,24 29:3 29:21 31:10 35:21 37:3 40:19,21 41:2 41:6 211:18
**joining** 18:23 20:17 23:6 34:10 35:17
**joke** 174:21
**joking** 193:14
**journal** 5:9,16 128:3 138:6 214:3
**journal's** 128:15
**journalists** 154:11,12
**journals** 138:2 204:16 214:16

HIGHLY CONFIDENTIAL

**[judge - know]**                                                    Page 37

**judge** 73:9
  76:10,23 77:2
  77:6,7,9,18
  78:10,24,25
  79:4
**judge's** 76:19
  78:24
**judgment** 13:8
  27:22,24,25
  110:1 191:13
  191:18
**judicious** 12:24
**july** 39:1,4 40:6
  41:23 45:16,20
  46:12,24 85:23
  88:24 104:1,16
  144:21 164:14
  172:9 177:4
  188:17 215:23
  216:20 222:15
  232:5,5 252:1
  252:2 254:22
**jumping** 254:1
**june** 23:2,3,6
  39:4 94:12,13
  94:25 102:15
  209:18
**justice** 127:3
  225:7
**justified** 113:15

**k**

**karolinska**
  203:12

**keep** 23:23
  100:2 120:11
  125:23 134:9
  184:8 252:18
  252:21
**keeping** 232:12
**kept** 18:3 50:7
  99:24 125:21
  205:10
**kind** 10:18 13:5
  13:17 27:12
  47:2,23 50:22
  62:6 155:10
  156:4 157:7
  166:12 190:18
  193:1 198:18
  200:2 211:3
  252:13
**kinds** 39:18
**kits** 112:8
**knew** 15:11,16
  16:1,5 20:20
  23:15,15,17
  24:2 27:17,18
  28:14,15 29:9
  29:16 32:12
  38:22,23 50:19
  69:2 82:24
  87:5 94:9
  95:25 96:2,3,9
  96:11 100:15
  104:22 109:11
  109:23 112:19
  112:20,22,22

  112:24 117:1
  135:17 139:1
  196:23 197:19
  213:15 224:24
  240:19,19
**knockdown**
  201:12
**know** 9:10 11:5
  13:7 14:15
  15:9,12,16,18
  15:24 16:2,2
  16:16 17:9,10
  17:11,16 19:5
  19:13,16,25
  20:20 21:11
  23:14 24:2,4,4
  25:21 26:6,12
  27:9 28:23
  29:7,14,17
  30:6,8 33:23
  37:17 38:5,6,7
  38:21,22,24
  39:10,13 47:23
  49:1,4 54:19
  56:4 58:3
  59:16 60:6
  63:6 67:15
  68:4 71:14,16
  75:22 79:21,21
  79:22,25,25
  80:14,16,16,18
  83:24 90:4,4,6
  90:20,24 94:7
  96:13,14 97:7

  98:15,17,21
  99:19,24 100:1
  100:3 101:18
  102:3,10,22
  104:19,24
  105:1,2,20
  106:16,20
  108:8 109:12
  111:24 112:1,2
  112:13,18,25
  113:1,4,7,11,22
  114:2,4 115:19
  116:2,19,21
  117:3,19,23
  119:2 121:4,13
  121:15,17,20
  121:23,24
  122:1,4,6,9,10
  122:15 124:11
  125:24 126:2
  128:6,13
  131:17,19
  132:13,15
  133:2,7,8,9
  134:22,23,24
  137:5,5,6,6,8
  137:24 138:24
  138:25 139:3
  141:15,20,21
  141:21 142:1
  142:10 143:2
  143:15 144:10
  144:15,17
  145:1,1,1,4,5,9

HIGHLY CONFIDENTIAL

**[know - lack]**

| | | | |
|---|---|---|---|
| 145:19 147:2,3 | 211:22 212:1 | 252:6,8,13,18 | **l** |
| 147:16,19 | 212:10 213:11 | 252:24 253:2 | |
| 148:1,6,8,9 | 213:22 214:7 | 254:12 257:9 | **l**   25:6,6 111:13 |
| 149:24 150:10 | 214:18,24 | 257:16,18,24 | 205:22,22 |
| 150:12,14 | 215:4,10 216:7 | 259:6 | 235:15 |
| 151:2 152:3 | 216:8 217:3,4 | **knowing**   70:22 | **lab**   37:13,13,18 |
| 153:15 154:10 | 217:4,10,22,23 | 156:7 247:10 | 38:2,4,23 94:8 |
| 154:11,18 | 218:4,22 220:1 | **knowledge** | 94:22 95:19,25 |
| 156:10,20 | 220:3,11,21 | 81:14 141:13 | 96:3 97:24 |
| 157:4,19,22 | 222:5,14,24 | 143:3 150:24 | 98:4 99:15,20 |
| 158:5 160:5,8 | 223:19 224:18 | 159:23,24 | 99:24 100:2,16 |
| 160:15,17,24 | 224:19,23 | 168:8 | 109:6,9,12,22 |
| 161:9 162:3,4 | 225:11,23,24 | **knowledgeable** | 110:25 111:25 |
| 162:9,16,17,17 | 226:2,9,11 | 23:12 24:2 | 114:5,5,7,8 |
| 162:18,20 | 227:10 228:20 | 41:12 206:11 | 120:13 129:7 |
| 164:25 165:9 | 228:22 229:21 | 256:2 | 142:23 149:7 |
| 169:8,9 170:23 | 230:7,18,19,20 | **known**   24:12 | 162:7 175:23 |
| 171:22 174:17 | 231:21,21,25 | 117:3 212:4 | 181:23 182:5 |
| 174:21 180:9 | 232:13 233:4 | 216:7,10 | 183:1,2,16,24 |
| 181:6 187:25 | 234:7,10,16,19 | **knows**   27:18 | 183:25 184:2,3 |
| 188:18 190:7 | 235:25 236:1,3 | 115:25 162:16 | **label**   21:13,14 |
| 191:8,9,15,17 | 236:5,7,8,11 | 205:7 211:2 | **labeled**   255:19 |
| 191:23,24,25 | 237:10,14,14 | **knucklehead** | **laboratories** |
| 191:25 192:20 | 237:15,15,16 | 198:16 | 29:15 |
| 193:13 197:22 | 237:20 238:1 | **kumagai**   2:3 | **laboratory** |
| 198:13 199:3 | 238:16,19,22 | **kupiec**   24:9,10 | 119:23 120:5 |
| 199:16,19,20 | 239:17 240:21 | 24:24 25:23,24 | 130:18 |
| 200:15 201:25 | 241:13,23 | 25:25 201:5 | **labs**   130:24 |
| 201:25 202:3 | 242:7,17,17 | 239:6,17 | 173:10 183:15 |
| 202:20,21 | 243:5 244:12 | 240:11 | 183:23 184:9 |
| 203:6,13 205:2 | 245:7,10 | **kupiec's**   242:10 | 184:13,16,19 |
| 205:7 208:17 | 246:11,17,22 | | **lack**   33:11 47:3 |
| 210:13,14,15 | 250:10,14,15 | | 97:10 101:25 |
| 210:25 211:1,2 | 250:15,17,25 | | 172:25 173:1,4 |

HIGHLY CONFIDENTIAL

173:6 186:2
187:19 213:19
**language** 101:8
101:9,11,17
107:9,12
112:21 113:16
136:11,12
177:8 207:24
**large** 12:19
15:14 114:8
199:20
**larger** 50:9
193:18
**largest** 15:14
**lastly** 256:6
**late** 18:22
126:25,25
209:17 222:14
239:15
**laura** 257:11
**laurel** 3:7 7:18
261:4,19
**law** 8:3 138:20
139:8 192:11
192:13 225:13
**law.com** 2:5,6
**lawrence** 2:9
3:5 7:16
157:24
**lawsuit** 9:3,20
9:20 54:4,13
60:19,20 61:11
62:3,10 63:2
69:25 70:10,18

70:23 71:3,8
71:12,17,24
72:25 73:13,15
73:20,23 74:8
74:10,22,24
75:10,13,21
76:1,4,10,24
77:3 78:11
79:1 82:25
83:2,8,9,17
84:12 85:14
86:16 87:6,8
87:15,20 88:6
88:10,10,11,20
89:21 91:7,15
91:25 92:4
93:20 124:8
**lawsuits** 86:17
**lawyers** 65:7
72:10 91:21
**lazard** 11:8
**lead** 104:21
**leadership** 12:7
229:14
**leaked** 141:23
141:25 142:8
142:24 145:6
**leap** 154:17
**learn** 20:19,21
94:11,15
100:24 101:7
101:10 103:2
103:15

**learned** 18:7
32:12 45:4,6,9
55:6 69:6
74:18 79:8
94:16,18,21,25
96:6,8 102:14
103:25 141:10
165:20 166:4
193:14,17
**learning** 94:24
**leave** 12:12
115:2 150:10
209:23 211:20
212:19
**leaving** 211:11
252:3
**led** 29:2 165:8
210:3
**left** 11:21 12:3
19:3 167:8
259:6,7
**legal** 52:22
85:19 86:17
90:8 107:17
132:8,17
155:12 156:6
192:6 193:4
194:3,21,22
215:7 259:19
262:23
**legg** 10:24
**legitimate**
93:10 98:20

**lengthy** 24:10
24:16 165:8
**letter** 5:15
34:16 85:4
116:16,20
118:19 123:5
145:5,14,16,19
145:20 164:9
234:13
**level** 10:14
115:25 133:16
250:19
**leveled** 203:22
**lie** 98:24
**lied** 97:25 98:5
210:18
**lies** 93:11,14
97:18 98:7,10
98:13 124:9,11
**life** 14:20
174:22 198:13
**light** 117:21
**likelihood**
64:19 84:13
127:8,17
128:17
**likely** 31:12
66:4 71:9,14
84:5
**likewise** 138:8
**limit** 68:15
**limited** 109:2
**limiting** 68:13
124:3

HIGHLY CONFIDENTIAL

**[limits - loseman]**

| | | | |
|---|---|---|---|
| **limits** 183:7 | **litany** 134:5 | 41:7,10 46:21 | **looking** 16:12 |
| **lindsay** 1:10 | **literally** 22:9 | 99:9 136:16 | 30:5,6,8 32:17 |
| 2:12 21:24 | 211:18 | 163:11 195:3 | 59:16 80:21 |
| 29:12 43:8,21 | **litigation** 3:21 | 196:20 197:19 | 108:21 109:13 |
| 44:4,6 160:2 | 4:2,5,8,11,13 | 210:1,17 | 122:11 126:4 |
| 237:5,7,10 | 4:16 54:18 | 217:20 222:15 | 130:15 159:6 |
| 241:13,15 | 55:17,20 57:9 | **longer** 12:25 | 166:23 168:1 |
| 252:3 | 57:12,16,18,22 | 13:14 147:18 | 176:15 183:17 |
| **line** 56:19 | 60:7,19 61:6 | **longtime** 144:6 | 209:11 226:15 |
| 80:20,23 81:5 | 61:10 62:2,9 | **look** 27:2 31:19 | 228:7 254:12 |
| 81:6 95:1 | 63:1 64:1,9 | 39:24 49:17 | 257:25 |
| 160:10,22 | 71:8 73:14,21 | 95:1 108:23 | **looks** 95:15 |
| 168:19 179:6 | 81:23 122:25 | 110:12 125:10 | 109:4,7 119:1 |
| 179:16 198:9,9 | 123:6,12 | 137:16 153:18 | 197:6,7 205:25 |
| 215:23 226:6 | 125:19,22 | 159:10 160:13 | 215:21,22 |
| 241:20 263:4,7 | **little** 20:20 21:1 | 166:24 169:3 | **lose** 98:7 |
| 263:10,13,16 | 22:25 35:16 | 179:5 180:6 | 253:13 |
| 263:19 | 51:7,24 92:9 | 188:23 189:5 | **loseman** 2:7 |
| **lines** 170:4 | 139:20 152:11 | 189:10 190:20 | 3:13 8:6,6,13 |
| 174:2 | 165:14 177:8 | 191:20 200:24 | 13:21,25 17:13 |
| **link** 31:24 | 177:20 185:23 | 205:14 219:17 | 18:11 20:8 |
| **list** 174:17 | 191:11 193:4 | 225:7 226:7 | 21:7 22:15,20 |
| 178:17 183:20 | 212:10,23 | 228:19 230:23 | 28:12 32:23 |
| 183:21 237:3,5 | 221:24 252:4 | 233:11,13,13 | 36:2,18,21,24 |
| 255:18 | **lives** 226:21 | 233:15 234:3,8 | 39:23 42:1,11 |
| **listed** 180:11 | 227:15 | 234:9 241:23 | 42:14,19 43:2 |
| 181:4,8 183:20 | **living** 85:24 | 242:21 | 43:6,9,12,15,24 |
| 203:3 254:20 | **llp** 2:8 3:5 | **looked** 27:19 | 44:7,12,21 |
| 256:3 | **locate** 256:6 | 29:10 30:1,2 | 45:2 47:19 |
| **listen** 211:4,4 | **location** 7:15 | 32:7,8 81:9 | 48:3 51:23 |
| **listened** 145:4 | **log** 56:5 | 107:9 110:20 | 52:7 53:3,14 |
| 219:13 | **logistical** 126:6 | 123:18,23 | 54:21,25 55:4 |
| **lists** 179:17 | **long** 13:4,19 | 148:16 176:16 | 55:11 56:2,8 |
| | 17:21,23 19:5 | 202:17 222:13 | 56:14 58:21,25 |

HIGHLY CONFIDENTIAL

**[loseman - lunch]**                                                   Page 41

| | | | |
|---|---|---|---|
| 60:9,16,21 | 107:16 108:1 | 156:5,13 | 254:3,6,9,14,16 |
| 61:1,12,17,24 | 108:13,17 | 158:10,17,24 | 258:21 259:14 |
| 62:4,8,11,18 | 112:15 113:23 | 161:3,8,14,17 | 259:25 260:1,4 |
| 64:3,13,22 | 114:11 115:17 | 162:10 164:7 | 260:7 262:1 |
| 65:10,18,24 | 115:20 116:24 | 165:19,23 | **lost** 42:7 104:5 |
| 66:9,16,21,25 | 118:20,24 | 166:2,8 173:24 | 113:12 202:15 |
| 68:9,15 69:5 | 119:7,12,19 | 175:5,21 | **lot** 11:19 12:3 |
| 69:17 70:2,4 | 120:9,21 121:2 | 177:12 182:7 | 17:10 20:21,22 |
| 70:11,19 71:4 | 121:11,21 | 182:16,18,21 | 24:2 25:2 |
| 71:18 72:2,5 | 122:2 123:2,8 | 184:11,21 | 27:18,18 32:11 |
| 72:12,18 73:1 | 123:14,22 | 185:13 187:16 | 33:22 34:2 |
| 73:16,24 74:3 | 124:3,18,21 | 188:7 189:25 | 39:13 48:5 |
| 74:16 75:4 | 126:11,14,18 | 190:12,19 | 56:21 61:4 |
| 76:5,12 77:16 | 127:10,18,25 | 191:16 193:10 | 69:14 164:25 |
| 77:22 78:1,4 | 128:20 130:3 | 194:5,8,13,20 | 171:22,23 |
| 78:13,18 79:6 | 131:11 132:7 | 195:3,9 197:10 | 176:14 180:6,7 |
| 79:14,17 81:17 | 132:16 133:13 | 199:11 201:14 | 191:21 199:17 |
| 82:1,11,18 | 133:20,23 | 202:19 203:4 | 200:6,15 |
| 83:18,21 84:6 | 134:1,7,11,15 | 212:15 214:17 | 204:19 218:14 |
| 84:16,24 85:18 | 134:18,22,24 | 214:22 215:3,8 | 218:17,23,24 |
| 87:7,12,16,21 | 135:4,8,12,21 | 215:14 218:2 | 241:23 257:16 |
| 87:24 88:13 | 136:2 138:13 | 220:11,16 | 257:18 258:13 |
| 89:7,11,15 | 139:6,16,21 | 227:3 229:5,25 | **lots** 21:12 |
| 90:14,19,22 | 140:1,8,12,19 | 230:3 231:11 | 110:7 150:11 |
| 91:4,9,16,22 | 140:23 141:1,8 | 231:16 233:1 | 197:23 201:25 |
| 92:8,22 93:5 | 143:16,21 | 233:18 234:25 | **loud** 245:18 |
| 93:21,23 94:1 | 145:7,10,21 | 238:7 239:8 | **love** 198:14,14 |
| 94:16 95:20 | 146:3,6 148:17 | 241:17 242:12 | **loved** 34:18 |
| 97:9 99:16 | 148:25 149:2 | 244:17 245:2 | 49:8 67:12 |
| 100:5,9,20 | 149:12,17 | 245:16 247:7 | **lucky** 23:11 |
| 101:2,12,19,22 | 150:2 151:17 | 247:16 248:25 | 246:8 |
| 103:4,17 | 152:1,7 153:12 | 249:21 250:1 | **lunacy** 33:11 |
| 105:17,24 | 153:17 154:6,9 | 250:10 251:9 | **lunch** 124:21 |
| 106:3,15 107:1 | 155:11,21 | 253:16,24 | |

Veritext Legal Solutions

212-267-6868                    www.veritext.com                    516-608-2400

HIGHLY CONFIDENTIAL

[lund - marked]                                                    Page 42

lund   167:19
lung   37:13 38:2
lynch   10:23

**m**

m.d.   5:6
machinery
  98:16
made   18:19
  34:16 38:16,17
  50:15 58:19
  68:24 71:23
  72:7,15 75:14
  80:6 83:5
  88:24 98:23
  99:10 107:23
  109:25 115:15
  124:13 137:12
  141:13 152:11
  153:1 163:4
  167:2,7,11
  176:1,1 189:15
  189:24 190:9
  197:2,18
  219:19 229:15
  242:19 249:16
  257:21,23
  264:5
madison   2:4
madrid   200:14
magistrate
  76:10,19 77:7
mail   164:13

mails   19:20
main   259:3
maintained
  119:16
maintenance
  115:10 243:19
  243:25
major   10:8
  23:19 85:24
  115:8 252:10
makary   259:8
make   10:3 12:9
  13:7 16:7,19
  16:19 17:3
  47:12 49:22
  53:2 65:8
  71:21 77:15,16
  81:14 99:4
  101:17 115:22
  117:20 135:13
  135:13 139:9
  166:1 171:17
  188:16 190:14
  194:12 208:18
  214:14,19,25
  215:5,11
  216:17 225:17
  226:21 227:14
  228:23
maker   195:15
makers   195:13
makes   48:11
  80:17 150:17
  221:23

making   14:1
  34:19 35:4
  102:6 106:10
  129:18,20,21
  129:24 134:8
  135:19,21
  170:9 182:5
  189:1
malign   137:12
maligned   165:1
man   47:2
  217:23
manage   13:14
  63:17
managed
  226:19 227:13
management
  11:22,23 14:8
  14:23 15:5,16
  15:19 40:3
  68:20 144:8
  147:17 217:15
  229:11 242:16
  249:16,22
  250:4,11,23
  256:18
manager   33:14
managing
  15:13
mandate   13:13
mandavilli
  153:5,9 159:5
  159:20

manipulated
  129:11 141:7
manufactured
  86:9
manufacturing
  86:8 110:6
manuscript
  46:5 237:17
march   4:12
  73:9 77:9
  259:10
marian   255:11
mark   2:16 7:17
  30:12 129:14
  153:10 163:8
  233:25
marked   6:1
  30:13 53:16,18
  53:20 80:9,12
  94:4 108:4
  109:1 110:11
  110:14 117:24
  125:7,9 129:16
  142:13,15
  153:11,25
  154:2 159:14
  163:9 178:10
  192:8 196:7,8
  200:25 202:22
  203:16 205:13
  213:25 214:2
  214:12 219:14
  219:15 220:23
  234:2 235:10

HIGHLY CONFIDENTIAL

**[marked - member]**                                          Page 43

| | | | |
|---|---|---|---|
| 235:12 237:21 254:5,7 | 160:13 172:1,9 217:12 | 255:3 | **medical** 24:8 27:12 186:1 219:21 |
| **market** 17:7 33:19,20 48:8 225:6 | **mattered** 113:25 | **meaning** 11:1,1 39:15 57:16 114:15 181:24 213:4 227:18 230:25 231:18 232:12 | **medicine** 194:17 203:9 203:10 |
| **markey** 3:18 | **matters** 249:18 249:23 250:6 | | **meet** 22:3 35:25 49:3,14 61:6 |
| **marking** 111:1 | **matthew** 219:18 | | |
| **marks** 221:3,3 221:4,20 222:9 222:9,9,10,11 223:1,1 224:5 224:25 225:16 226:3,5,17 228:18 229:4 231:21 258:25 259:3,7 | **mcnally** 214:4 | **means** 119:25 180:19 | **meeting** 3:21 4:2,5,8,10,13 4:15 41:1 42:18 64:6,17 66:8 125:18 163:20 165:4 166:6 174:24 177:3 178:1 257:9 |
| | **mean** 10:18 20:11 32:4 33:6,13 35:2 35:15 37:13 41:4 43:25 51:8 55:21 58:8,9 62:4 64:13 67:5,6 68:9 115:3 118:11 119:23 120:2 123:24 124:18 142:24 143:13,19 147:11 154:13 168:5 169:25 170:8 171:1 173:14 174:9 182:24 183:6 190:23 196:25 197:5 199:24 201:16 211:12 211:12,20 213:4 216:8 219:6,7 227:12 228:21 232:20 | **meant** 32:6 33:8 145:25 192:20 | |
| **marsman** 118:4 118:8 119:14 120:6,16 122:12 | | **measure** 111:6 | |
| | | **mechanically** 38:5 | **meetings** 41:2 64:2,5 125:19 125:22 126:1 |
| **marsman's** 119:18 120:18 | | **mechanism** 20:22 23:21 26:1,19,24 28:10 48:6,9 48:11 176:7 185:21 246:11 | **meg** 242:14,14 242:21 |
| **marty** 259:8 | | **media** 7:9 21:13 52:5 58:15 59:11,16 62:23 68:23 69:1 75:18 92:15 93:16,17 125:4 139:15 141:24 154:23 154:24 156:8 185:3 197:16 201:25 216:12 216:13 233:23 259:18 | **melissa** 236:16 255:12 |
| **mason** 10:24 | | | **member** 25:12 25:20 30:23 31:1 39:4,21 65:1 82:8 100:23 101:18 115:24 116:23 133:10 148:10 148:14 149:5 149:22,24 |
| **mass** 183:24 | | | |
| **massachusetts** 27:8 | | | |
| **master's** 255:11 | | | |
| **material** 52:14 186:11 | | | |
| **matt** 220:1 | | | |
| **matter** 7:11 23:13 104:20 | | | |

HIGHLY CONFIDENTIAL

**[member - misstates]**                                                   Page 44

150:18 151:7
151:21 208:15
212:4 236:17
240:25
**members** 20:3
20:6,7 54:20
57:3 62:25
63:5,25 64:8,9
65:2 66:5
133:15 146:19
147:13 152:5
224:15
**meme** 33:8,11
218:14,16
219:3,6
**memory** 55:15
57:10 159:19
168:6 192:6
193:6,8,21
216:2 236:20
238:15
**mention** 111:14
117:4
**mentioned**
235:2
**merck** 51:3
**merely** 209:10
**merit** 3:8
205:12 261:20
**merits** 123:21
**merrill** 10:23
**message** 173:22
217:7

**met** 8:24 21:25
22:1,2,9 137:4
137:25
**metformin** 48:7
**method** 112:10
172:5,22
**methods**
111:10
**mice** 186:3,13
186:18 187:10
187:18,20
235:7 244:9
246:13,17,19
**michael** 63:7
118:4,8
**michigan** 85:24
**micro** 191:11
**microphones**
7:4
**middle** 136:20
136:23 157:8
212:20 251:24
**mike** 63:10
143:7 144:1,2
144:6,7,7
145:2 215:19
217:16 218:3
218:14
**mike's** 144:9
**milan** 235:20
236:13 243:8
**mild** 32:19,25
50:8,11 51:12
191:24 246:7

**mile** 85:25
**milioris** 1:4
2:18 3:18 8:5
9:3
**million** 12:2
90:13,17,18
174:18
**mimdex** 227:9
**mimedx** 35:8
224:7,9 225:21
226:18 227:2,6
**mind** 35:18
57:2 97:22
100:14,18
103:20 124:8
124:17 159:12
175:11 176:5
207:18 210:25
213:22 245:23
246:21 254:9
**minds** 57:3
191:10
**mine** 206:10
220:8 237:9
240:20,21
**minus** 233:4
242:17,18
**minute** 22:9
176:21
**minutes** 3:21
4:2,5,8,10,13
4:15 99:20
125:19,21
126:1,5,17

237:24 260:12
**miot** 196:9,10
196:11,12
197:3,5
**mis** 213:19
**mischaracteri...**
78:3 123:15
**mischaracteri...**
97:19
**mischaracteri...**
77:18
**mischaracteri...**
134:14,19,21
**mischaracteri...**
161:15
**mischaracteri...**
134:11
**misconduct**
5:11
**misleading**
67:9 156:16,20
213:20
**misleads**
225:18
**mispronounc...**
25:11
**missing** 206:8
**misstate** 58:22
**misstates** 36:3
58:21 76:13
84:24 87:7,25
89:15 91:10
100:20 114:11
133:21 134:2

HIGHLY CONFIDENTIAL

138:13 148:17
150:2 155:22
161:3 173:24
175:21 184:12
188:8 190:19
193:11 229:5
233:1 244:18
**mistake** 137:12
190:17 228:21
228:25 229:14
229:16,17
230:11
**mistakes**
225:12,17
226:19 227:13
227:16,17
228:15,16,25
229:2
**misuse** 140:6
**mitigate** 28:11
**mitigates** 51:9
51:11
**mloseman** 2:10
262:2
**mm** 26:17 31:4
34:6 62:8
80:22 122:14
129:15 130:20
167:5 181:19
192:15 199:5
205:17 231:10
**mmse** 50:12
**moa** 5:2 189:5
189:11 254:2

**mocked** 175:25
**model** 13:5
113:14 114:3,4
114:10 186:13
187:5,8 246:13
**models** 246:14
**moderate** 51:13
**modest** 34:1
**modified**
187:19
**mold** 202:6
**molecular** 5:16
**molecule** 223:5
223:22,23
235:14
**moment** 32:3
47:14 64:9
69:23 110:20
130:3 139:7
154:4 157:4,5
157:14 159:13
159:17 163:12
205:15 234:11
246:23
**money** 12:1
13:6,7,9,14
39:16 51:3
86:19 87:6,9
87:14,23 89:21
90:25 91:1,13
91:13 99:4
171:21 199:18
199:18,21
217:15 230:20

257:23
**monica** 2:7 8:6
262:1
**monitoring**
3:21 4:2,5,8,11
4:13,16 55:17
**month** 171:21
252:5,9
**months** 85:23
95:14 98:15
176:4 208:25
210:6 211:6
212:5 228:8
**morning** 7:2
8:24 198:6
248:10,13
**mosaics** 243:13
**mountain**
189:9
**mouse** 186:13
187:5,8,8
246:13
**move** 38:9,10
191:5 247:9
**moved** 11:7,17
181:15 191:4,7
191:14
**moving** 24:19
**mute** 7:6

**n**

**n** 7:1 28:21,21
235:16

**nachtrab**
219:18,19
220:2,15
**naively** 240:21
**name** 7:17 9:1
19:14 25:4
37:18 54:19
55:16 63:9
153:5,7 183:25
205:21 237:5
240:15,17,25
242:13,14
**named** 16:3
30:16 147:23
157:6 196:9
214:4 215:19
219:18
**names** 29:11
30:4 138:24,25
139:2 221:23
**nascent** 24:21
**national** 162:6
**nature** 19:1
39:7 46:1
54:15 66:19
77:18 78:2
155:16
**near** 200:19
**necessarily**
24:4 52:22
90:7 158:16,20
189:6
**necessary**
101:15 190:14

HIGHLY CONFIDENTIAL

**[necessary - numbered]**                                    Page 46

264:6
**need**  16:9 20:21
  22:21 35:18
  36:4 39:10
  53:5,9 77:5
  86:9 103:22
  115:22 134:4
  139:6 151:5
  159:15 168:17
  170:24 174:12
  174:13 176:7,9
  189:18 191:8
  191:10 192:4
  198:8 210:11
  239:3
**needed**  19:8,24
  20:2,6,19 46:5
  47:5,6,6 56:21
  57:4 167:1,7
  167:10 172:2,9
  189:21
**needs**  20:12
  39:10 231:24
**negative**
  154:13 155:20
  241:12,22
**nervous**  207:9
  207:14
**neuroinflam...**
  180:12,14,22
**neuroscience**
  22:14 24:17,18
  41:9

**never**  21:25
  22:1,2 33:9
  44:3 47:3,11
  51:12 56:18
  78:24 80:17
  85:4,4,5,7,12
  94:21 99:19
  109:6 137:4,4
  137:25 160:18
  160:19,24
  161:18,20
  168:3,16
  189:24 191:25
  204:4 211:21
  211:25 218:25
  219:6 231:6
  234:12,15,23
  250:19
**new**  1:1 2:4,4
  2:14,14 4:20
  4:21 6:3 7:13
  11:8 14:7 27:4
  27:5 32:11
  69:12 81:10,15
  93:2,9 134:5
  142:11,17,21
  152:12,21
  158:22 160:6
  160:11 162:2
  174:16 202:8
  202:17 219:20
  225:23 226:13
  241:21 259:4

**newest**  212:3
**news**  68:23
  69:3,9 93:10
  201:9 218:23
  246:16
**nicaise**  30:16
  30:21,22,22
  31:9,21 33:3
**nice**  116:2
**nicoll**  157:9,11
**nine**  152:18
**nobel**  203:8,9
  203:10
**noise**  56:24
  59:3 88:22
  188:25
**non**  55:1
**nonpublic**
  52:12,14 53:11
**nonsense**  98:17
  98:19 99:2
  211:24
**normally**  56:4
**northern**  11:17
**notary**  3:9
  261:5,21
  264:13,19
**notated**  81:3
**notation**  95:3,6
**note**  7:4 31:21
  106:13 197:11
  201:1 262:10
**notebooks**
  99:25 100:2

**noted**  264:7
**notes**  148:7
**notice**  3:1
  245:4
**noticed**  160:22
  168:4
**noticing**  8:2
**notorious**
  11:12
**novel**  235:13
**november**  4:3
  4:17 81:4
  120:15 122:13
  126:25 127:1
  128:2,11
  169:14 199:8,9
  211:9 212:21
  257:8
**number**  1:2
  7:14 9:21 24:1
  55:13 67:8
  96:19,22 106:9
  109:14 110:19
  115:7 130:16
  153:12 157:6
  163:19 165:4,6
  166:24 172:21
  177:7,9,10
  178:20 183:9
  226:15 231:15
  246:1 259:17
**numbered**
  120:17 178:14

HIGHLY CONFIDENTIAL

**[numbers - okay]**                                           Page 47

| | | | |
|---|---|---|---|
| **numbers** 38:8,9 96:21 178:15 192:18,22 193:13,16,16 193:18 **ny** 262:15 | 118:24 119:7 120:9,21 121:2 121:11,11,21 122:2 123:14 123:22 124:4 134:3 138:13 | 84:6,16,24 87:12,16,25 88:13 89:15 103:17 107:16 112:15 115:17 115:20 116:24 | **obviously** 30:3 163:12 166:3 **occurred** 116:16 **october** 4:14 105:9,14 142:22 200:9 |

numbers 38:8,9
96:21 178:15
192:18,22
193:13,16,16
193:18
ny 262:15

**o**

o 7:1 28:20
153:8,8
o'donnell 63:8
63:10
oath 7:20
obfuscation
104:8
object 13:21,25
17:13 18:11
20:8 21:7
22:15,20 28:12
32:23 36:2
39:23 47:19
48:3 58:21
64:3 69:17
71:18 73:1
76:12 79:6
81:17 87:7,21
90:14,19,22
91:4,9 97:9
99:16 100:5,20
101:2,19 103:4
105:17,24
106:3 107:1
108:13 113:23
114:11 118:20

118:24 119:7
120:9,21 121:2
121:11,11,21
122:2 123:14
123:22 124:4
134:3 138:13
140:1 148:17
150:2 156:13
158:10 161:3
161:14 164:7
173:24 175:5
175:21 177:12
184:11 185:13
187:16 188:7
189:25 190:12
190:19 191:16
193:10 197:10
201:14 202:19
203:4 212:15
214:17 215:3
218:2 227:3
229:5 231:11
233:1 239:8
242:12 244:17
244:23 245:2
245:16
objected
135:14
objecting
135:22 140:9
objection 14:2
53:6 58:25
77:17 78:13
82:18 83:18

84:6,16,24
87:12,16,25
88:13 89:15
103:17 107:16
112:15 115:17
115:20 116:24
119:19 131:11
132:7,16
133:13,20
134:1,6,8
135:10,23
152:1,7 155:11
155:21 156:5
158:17 214:22
215:8,14
248:22 249:19
249:24 250:7
251:6 253:8,21
258:18
objections 7:23
108:1 119:12
136:2
objectives
62:10
observation
83:2 112:3,12
113:9,18 115:6
115:7,12
observations
109:17,21
110:8 111:4,6
116:10 137:11
observing
182:14

obviously 30:3
163:12 166:3
occurred
116:16
october 4:14
105:9,14
142:22 200:9
261:17
offered 11:9
office 98:15
219:20 226:13
officer 24:8
241:10
oh 11:11 14:3,9
75:22 99:8
111:15 124:20
174:10,16
196:19 198:24
201:22 203:20
206:15 208:20
210:14,14
216:9 234:4
247:20 253:22
254:12,15
257:12 258:7
okay 9:7,16
11:14 12:22
14:3 18:6
19:19 22:25
23:4 24:14
26:11 38:7
40:13,23 42:19
42:21,24 43:17
44:5 47:25

52:1 53:13,14
54:24 55:3,19
55:23 56:7,14
59:22 61:1,3,9
61:15,21 65:8
65:12 66:3,9
66:12,25 68:15
69:22 70:24
72:2 74:13,20
77:11 78:6,7
87:10 92:10
93:23 94:20
95:1 97:15
99:13 102:17
108:3 111:3,16
111:24 114:24
118:24 125:25
126:4,22
130:10 135:12
138:22 139:19
140:11,15
141:16 143:5
144:12,20,24
145:3 146:25
147:23 148:10
149:3 154:9
156:1 157:12
159:12 164:6
164:11 166:18
166:23 167:3
169:20 170:7
170:25 171:18
174:12 175:8
178:9 179:16

180:6 181:20
182:3 184:1,23
189:4,7 192:18
193:24 195:3,9
195:21 206:23
210:9 211:18
216:5 230:9
233:18 255:3
259:14
**old** 10:16
174:21 181:14
**older** 20:10,11
**ona** 76:10 77:7
**once** 22:4 30:1
49:1 126:25
224:5 240:9,9
**oncology**
223:19
**ones** 34:18 49:8
67:12 69:11
187:10 202:6
202:14 238:1
244:6
**ongoing** 182:9
185:6,10 188:4
244:20,21,24
**online** 68:20
**open** 247:2
**operating**
89:25 158:12
158:14 250:14
**operational**
104:7,9

**operations**
40:17
**opine** 107:3
**opinion** 31:13
59:20,23 63:19
63:20 65:6
98:9 99:8
**opioid** 16:10
**opportunity**
9:14 23:8
35:13 51:19
210:8
**order** 52:10
78:25 83:4
103:21 151:22
231:24 247:19
251:12 259:21
260:2
**ordered** 77:9
86:7
**orders** 86:7
**ordinary**
125:25
**organism** 96:5
**organization**
93:10 222:24
240:25 242:9
**organizationa...**
106:12
**original** 131:3
131:15,22,25
132:5
**originate** 14:7

**orrick** 138:21
**otw** 1:2 7:14
**outcome** 7:22
49:12 51:6
257:2,3
**outlined** 154:14
**outrage** 194:24
196:2
**outraged**
194:15 196:5
224:22
**outrageous**
99:5 171:20
198:8 199:3
**outreach** 19:1
20:14,15 23:5
**outright** 98:10
98:13,23 124:9
124:11 207:20
**outside** 29:17
44:2 63:2
64:11 65:3,15
66:5,14 68:9
74:11,24 76:20
76:24 79:1
92:5,6,6
140:15,19,20
141:4 149:3
240:8,10
**overarching**
172:10
**overbroad**
103:5

HIGHLY CONFIDENTIAL

**[overexpress - past]**

**overexpress**
  186:5
**overly**  229:17
  230:10,14,17
**oversee**  225:21
**oversees**
  221:16
**oversimplifyi...**
  17:1
**overwhelming**
  189:16
**own**  12:13 29:5
  29:15 58:18
  106:23 130:17
  187:8 204:12
  226:19 227:13
**owned**  29:9
**oxycontin**
  16:15

**p**

**p**  7:1 153:8
  235:16
**p.m.**  125:1,2,2
  125:5 139:13
  139:13 185:1,1
  185:4 233:20
  233:21,21,24
  259:16 260:11
**p2**  168:4
**p2b**  168:2
**package**  174:7
  174:9

**page**  3:12,14
  4:1 5:1 6:1
  31:20 95:2
  96:18,21
  100:25 105:4
  109:13 111:5
  115:6 118:2
  120:8 130:15
  136:15 157:8
  157:13 163:18
  166:24 167:1
  180:11 201:7
  203:25 204:20
  205:16 206:17
  209:8 212:8,9
  226:15 229:8
  230:24,25
  234:9 237:4
  251:24 253:18
  255:19,20
  256:3,13,16
  258:5 263:4,7
  263:10,13,16
  263:19
**pages**  108:8,11
  108:22 178:14
  178:17 226:16
**paid**  11:19
**pain**  15:11,12
  15:15 16:7,18
  17:6
**painfully**  20:20
**papanastasiou**
  118:4 119:15

  120:16
**papanastasiou's**
  122:12
**paper**  237:12
**paragraph**
  31:23 32:1,3
  33:2 96:25
  101:4 109:15
  111:4 118:15
  119:18 120:7
  120:17 136:20
  136:23 163:19
  166:25 167:4
  168:24 169:21
  170:3 171:10
  171:25 209:7
  212:14 216:20
  228:18 229:3
**paragraphs**
  157:23
**parameters**
  112:9
**pardon**  141:16
  167:21 203:18
**parentheses**
  207:6
**part**  9:24 72:23
  107:6 136:6
  174:6 206:9
  231:3 234:17
  234:21 236:5
  237:17,19
  242:5 243:25
  244:3

**participants**
  182:21
**participate**
  54:12 181:18
**participated**
  52:18
**participating**
  52:22
**participation**
  54:15
**particular**
  41:11 116:18
  171:6 190:25
  202:13 234:20
**particularly**
  21:12 102:2
  243:16,18
  247:8 257:24
**parties**  7:7
  201:20 261:14
**partner**  16:3
**partner's**  12:1
**partners**
  104:20
**party**  7:21
  210:8
**passage**  232:17
**passed**  105:13
  218:6
**passionate**  41:8
  41:14
**past**  50:22 58:4
  114:14 146:12
  151:7 172:19

HIGHLY CONFIDENTIAL

**[past - phase]**                                                     Page 50

173:9 176:16 183:11
**pat** 116:13
**patent** 29:8
**patently** 241:2
**patient** 30:3 199:23
**patients** 30:4,7 30:9 32:2,9,10 32:19,24 40:18 47:6 48:5,23 49:4,6,7 57:3 63:17 67:12,13 186:4 187:7 191:24 194:16 226:21 227:15 241:6 246:1,20
**paul** 148:4,5
**pay** 18:20 171:20 206:12 238:2
**paying** 171:23
**pendency** 127:7,16,22
**penn** 10:7
**pennsylvania** 10:21
**pentapeptide** 28:7
**people** 18:16 20:10,12,12 22:23 23:12,13 24:2,7,24 33:18 34:18

50:20 56:16 67:11 83:13 137:6 150:10 154:16 162:16 162:22 164:13 164:24 165:1 172:15 189:1 194:16 197:17 198:8,14 200:18,20,22 205:11 217:15 217:20 218:15 218:17 219:2,7 224:18 225:12 225:17 226:4,8 227:19 228:7,8 230:7 236:3 240:22 242:7 249:9 257:10
**people's** 130:24
**perceive** 57:22
**percent** 12:3 49:21 186:17 186:17
**perception** 168:24 170:12 172:13 217:19 242:6
**perfect** 166:10 253:1,3
**perfectly** 12:10 202:6
**perform** 75:23

**performed** 96:1 96:4,9,15 129:4 169:14 188:5 231:7 237:16
**performing** 229:9 256:17
**period** 23:1,5 39:22 40:4 72:6,7 73:12 77:8 115:9
**permissible** 134:4
**permission** 79:4
**permit** 10:2
**persistent** 23:18 39:11 222:20
**persistently** 175:25
**person** 23:22 30:16 40:14,17 118:11 122:7 147:23 150:9 181:25 196:9 200:19 206:14 208:22 211:3 213:17 214:4 215:19 217:9 219:18 234:14 239:4 240:12 241:8 255:22

**personal** 44:12
**personally** 43:20 44:9,19 46:11 51:9 57:17 68:6 69:23 70:17 75:12 106:10 124:11 129:10 151:12 198:23
**persuaded** 57:18
**persuasive** 30:10 243:16
**pertain** 111:6
**pete** 15:22
**peter** 221:2,3,4
**petition** 96:7 129:19 146:19 201:18 204:9 205:2,3,9,12,19 206:5,16,18 207:17 210:7
**pfizer's** 24:18
**ph.d.** 5:6 41:8 162:6 255:12 255:13,13
**pharma** 23:19 114:8 191:5
**pharmaceutical** 27:14 51:15 191:13
**phase** 18:17,17 23:18,18 27:15 30:6 34:2

HIGHLY CONFIDENTIAL

35:22,24 36:7 37:5 40:18 46:3,8 47:8,11 47:13 49:13 51:4 52:12 53:10 56:22 63:15 86:3,15 86:21 88:17 89:4 96:10,16 98:3,22 99:11 111:20,22 112:1 121:9,16 121:16 148:12 149:6,9,10,13 149:16 167:9 167:23 168:8 168:19,19 169:11,23 170:6,24 171:11,13,14 188:24 189:8 189:12,19,20 191:9,20 199:23 222:21 231:4 257:13 258:11

**phenomenal** 191:9

**phone** 2:5,10 2:14 198:7

**phones** 7:6

**phonetic** 148:2 148:3

**phosphorylat...** 48:17 180:17 180:23

**phrase** 47:3 186:2 201:4 247:7

**phrasing** 140:3 182:24

**phuds** 216:22

**physicians** 49:4 49:7 202:9

**pick** 7:5 230:12

**picture** 90:6 173:17

**piece** 211:4 213:23

**pieces** 243:13

**pipeline** 15:17

**pitnet** 235:16

**pitt** 1:7

**pituitary** 236:1

**place** 7:7 38:9 64:1,8 95:13 150:25 261:10

**placebo** 38:9 49:20 50:14 246:6

**placed** 86:7,8 214:15

**places** 179:14 206:18

**plagiarized** 216:22

**plain** 134:7,10

**plaintiff** 7:11

**plaintiffs** 1:5,8 2:2 3:4 8:4 9:2 30:12,15 53:16 53:20 94:4 108:5 142:14 214:2 219:16 247:1 248:14

**plan** 20:23 46:7 59:3 86:6 104:11,13,17 231:5,6 258:1

**planned** 195:19

**planning** 86:9

**plans** 169:22

**planted** 68:23 69:4

**planting** 154:23,24

**plaque** 23:22 27:3 180:22

**plaques** 180:16

**plasma** 167:8 229:10,14 231:1 256:18 257:13 258:6 258:12

**play** 247:11

**played** 59:5,6,9

**plaza** 2:13

**please** 7:4,5,24 8:17 103:12 130:5 260:8

**plenty** 98:19 156:21,22

**plos** 128:3

**plus** 11:12 252:8

**podcast** 220:6

**point** 12:20 15:2,15 19:4 19:13 20:18 21:3,6,10 22:3 22:14 23:16 30:1 36:12 49:21 50:19 86:22 88:18 112:24 121:5 144:4,5 146:15 150:23 151:6 163:2 166:11 169:7 170:23 175:4 189:8 200:5 203:7 210:9 211:16 215:25 222:17

**pointed** 27:7 107:11 201:24 248:14

**policies** 231:23

**polite** 133:15

**politely** 241:4

**political** 10:9 93:9 222:24

**popular** 214:21 215:13

HIGHLY CONFIDENTIAL

**population** 50:9,11 51:12 191:24 246:7

**posed** 108:20

**posing** 67:12 108:19

**position** 21:15 99:4 225:4 230:19 245:14 247:2

**positions** 13:19 13:24 14:7,24 15:7 259:6

**positive** 209:19 214:15,20

**positively** 202:10

**possess** 131:15

**possesses** 131:21,25

**possession** 132:4,14

**possibility** 51:14

**possible** 102:14 136:18 137:2 161:21,22 175:20 187:14

**possibly** 96:6

**posted** 68:22 97:18

**posts** 75:18 83:6 84:25 162:21

**potential** 20:24

**potentially** 20:17 22:19 184:5 257:25

**powerful** 34:20 50:6

**pr** 144:2 227:17,20 228:15,25

**practical** 121:5

**practically** 67:15 198:7 200:18

**practice** 58:7 105:2 189:23 190:1

**practices** 100:16

**preceded** 178:2

**precious** 86:13 88:2

**precise** 144:23

**precision** 112:10

**preclinical** 96:4 185:7,12,14 186:21

**predecessor** 11:25 190:3

**prefer** 135:1

**prejudice** 78:5

**preliminaries** 9:8

**prepared** 104:14

**presence** 63:2 64:11 65:4,16 66:5,14 74:11 74:25 76:20,24 77:3 79:1 92:5 92:7

**present** 2:16 7:25 61:7 64:18 66:8

**presented** 209:11

**presenting** 219:2

**presently** 184:9

**preserve** 207:4

**president** 118:9

**press** 85:5 214:21 215:2,7 215:13 216:11 227:23

**pretend** 116:5

**pretty** 10:16 15:14 24:1 32:5 34:20 69:19 137:10 154:15 203:14 211:16,17 220:9 252:8 253:4 257:17

**prevail** 127:9

**prevailing** 127:17 128:18

**prevent** 156:25

**prevented** 211:10,15

**preview** 198:19

**previous** 144:16 150:15 224:20 229:11 242:16 256:18 261:6

**previously** 6:1 15:4 24:12 94:4 108:4 117:24 248:10

**price** 33:15,19 99:3

**pricing** 33:21

**primarily** 13:18,24

**primary** 35:25 49:15,23

**principal** 10:19 39:21 46:12,24 102:7

**principle** 117:10

**prior** 24:19 87:25 96:12 208:25

**private** 7:5

**privately** 37:10 37:21

**privilege** 43:3 44:8 56:5 61:25 68:18

HIGHLY CONFIDENTIAL

**[privilege - prove]**                                    Page 53

71:6 72:1
123:17 126:8
139:18 140:14
164:3 166:5
194:19 217:6
247:3
**privileged**  9:23
44:15 55:1
148:23 166:12
220:17
**prize**  203:8,9
203:10
**probably**  11:2
19:5 26:15
34:23 50:4,18
64:5 70:24
71:5 74:12
85:22 93:16
96:20 105:19
109:4 110:9
117:2 140:6
170:23 192:24
193:15,20,25
199:14 205:25
212:3 216:9
218:18 222:13
222:14 227:7
238:1 242:18
253:1,2
**problem**  16:12
16:14 49:22
56:16,20 57:13
98:8 137:18
169:6 188:22

188:24 189:19
224:22
**problems**  35:5
35:5,9,10,18
**procedure**  3:2
**procedures**
231:24
**proceed**  8:18
53:9 62:16
182:7
**proceeding**
7:23
**proceedings**
260:3
**process**  224:18
252:17
**produce**  169:24
170:11
**product**  16:24
86:10 139:10
224:11,11
**production**
247:4,5,9
**products**  15:17
17:7 221:17
**professional**
3:8 10:15
13:18 144:2
184:2 206:18
219:21 261:5
261:20
**professionali...**
212:14

**professor**  99:1
132:23 137:1
**proffer**  133:5
**profit**  5:10
**profitably**
14:19
**program**  46:3
111:21 122:6,9
155:19 156:3
165:5 185:15
185:18,20
199:23 214:20
244:1,4 253:12
257:22
**progress**  73:14
182:5 184:7
242:19 243:1
**project**  183:25
**promised**  159:3
169:23 171:15
231:3
**promising**  33:3
163:24 184:6
**pronounce**
25:7
**pronouncing**
30:18 243:5
**proof**  173:1
**proper**  54:19
142:1
**properly**  169:9
**property**  29:6
29:10

**proposal**  5:2
**proposed**  96:5
178:18 179:21
181:4 183:20
185:21 255:23
**proposes**
119:22
**proposing**
120:6,11
**proposition**
175:16 176:22
177:10 178:3
179:11 236:9
**propositions**
175:2,2,19
176:23 177:10
178:6
**propriety**
139:23
**prospects**  57:1
**protecting**  89:3
139:9 219:4
**protective**
52:10
**protein**  28:7
176:12 179:13
**protocol**  231:4
**prove**  107:14
107:22 127:24
128:23 172:5
172:22 174:3
174:13 177:19
184:5 186:20
189:2 213:13

226:20 227:14 245:7 246:3
**proven** 175:23 245:18,22,24
**proves** 186:21
**provide** 97:2 115:9 134:5
**provided** 15:5 119:17 173:10
**provides** 117:13,14
**proving** 175:12 182:1
**pti** 111:17,19 111:19
**public** 3:9 4:18 37:16,19 58:20 84:15 115:24 129:18,20,21 129:24 141:22 143:1 145:9 155:20 201:12 261:5,21 264:19
**publication** 129:19 214:8
**publications** 128:7,7 129:5 137:19,23 204:11
**publicity** 56:24
**publicly** 18:21 29:25 37:10 97:20 166:16

176:18 216:7 216:10
**publish** 46:7 85:7
**published** 46:3 138:7 152:12 153:3,23 157:4 157:18 158:23 159:21 185:24 186:24 207:19 214:3,20 215:1 215:6,12
**puff** 217:20
**pull** 247:17 251:10 253:25
**pulled** 252:16
**purchase** 103:21
**purpose** 55:20 62:2 63:1 64:10,25 72:24 74:24 89:1,3 124:8 145:20 222:8 253:10
**purposes** 62:2 62:5 63:2 64:10,25 72:24 74:24 87:11
**pursuant** 3:1
**pursue** 86:21
**pushed** 241:8
**put** 13:6 17:1 20:4 34:6,8 52:8 85:9

87:22 89:1 90:9 93:11,15 93:18 126:22 130:2 147:18 169:4 172:10 174:11 198:4 212:2 225:20 226:6,12 227:23 240:22 250:22 251:11
**putting** 214:13

**q**

**quadruple** 193:15
**quadrupled** 193:20
**qualified** 97:2 99:21 129:13
**quality** 20:7
**quanterix** 167:20
**quantity** 103:22,22
**quarters** 204:3
**question** 4:22 9:9,15 14:2 32:1,19 34:10 36:22 37:1 42:2,13,20 43:23 44:8,14 44:18 51:1 55:10 56:9 57:6,7 61:4

65:5,19 66:17 68:12 69:23 70:5,12,25 72:5,8 74:4 77:14,25 78:6 78:7,20 82:5 83:10,15 85:20 86:12 89:8,12 97:14 101:16 102:18 103:8 103:11 106:11 106:17,20 107:4,5,7 108:10,15,19 114:20,22 119:16 123:15 127:13,21,21 129:23 131:4,7 133:15,19,22 134:13 135:3 135:21 138:15 140:22 141:9 141:19 145:11 145:25 150:14 150:16 155:14 159:18 160:22 161:17 163:18 164:3 166:1 175:1 177:15 177:24 178:12 187:23 190:3 193:4 195:5 197:14 206:3 219:8 220:12

HIGHLY CONFIDENTIAL

**[question - reason]**                                        Page 55

223:11,12
230:13 244:22
245:11 254:23
**questionable**
137:16
**questioned**
204:10
**questioning**
52:8
**questions** 9:21
23:4 53:9
55:13,24 61:5
64:25 72:23
92:18 106:9
108:9 129:6
130:11 151:11
151:12 163:17
164:1 246:24
247:6,13
251:20 252:15
255:18,20
256:9 258:21
**quickly** 191:3,5
191:5,7,14
**quintessential**
68:20 75:17
198:3,25
**quite** 24:3
206:18
**quotation**
157:16 158:3,4
**quote** 98:23,23
157:13 202:4

**quoted** 152:18
157:3 158:7

**r**

**r** 2:12 7:1 153:8
223:25 263:3,3
**races** 196:15
**raided** 213:17
**raise** 105:16
199:18,21
228:9
**raised** 102:1
**raises** 211:21
**raising** 39:16
39:16,16,17
**ran** 12:18
24:18 181:13
200:18 217:15
**range** 103:6
**reach** 53:8
157:2,18 158:2
158:21
**reached** 18:22
142:10 152:25
157:10 158:14
**reaching**
100:25 222:8
**reacted** 84:21
**reaction** 20:13
206:2 208:16
208:18 213:12
217:7
**reactions** 208:7

**read** 31:25 32:3
54:6,9,10,11
68:19,21 75:16
75:17 79:17,21
79:25 80:17
86:23,24,25
101:4,13 107:2
107:6 108:7
130:4 142:7,11
145:14,16,19
156:18 205:4,6
206:9 208:1
230:25 236:3
241:21 248:17
248:25 256:16
260:6,7 262:9
264:5
**reading** 107:4
108:18 118:22
**readings**
169:10
**real** 47:8
159:18 162:25
183:11 189:3
189:17 224:21
245:8
**realized** 57:19
86:5
**really** 10:18
13:11 18:20
23:13 33:15,23
41:13 47:9
48:6 49:4
58:16 67:20

84:10 86:6,7
96:11 97:22
116:4 124:20
144:10 155:15
155:15 164:24
165:3,8 168:23
171:16 176:2,5
176:7,25 177:2
186:15,18
190:4,21 191:1
193:4 196:6
198:15,21
199:3 205:12
210:20 211:22
212:6 219:8,8
225:7 226:7
229:21 230:6
239:16 241:12
243:22 250:16
252:16,17,20
252:21
**realtime** 3:9
261:21
**reason** 12:4
34:24 56:20
80:5 87:19
129:6 131:2
135:14 145:24
151:3 154:20
168:23 170:13
181:17 189:17
192:4 194:3
203:2 205:4
213:15 258:14

HIGHLY CONFIDENTIAL

**[reason - referring]**                                    Page 56

| | | | |
|---|---|---|---|
| 258:19 259:3 262:11 263:6,9 263:12,15,18 263:21 | **recently** 216:21 **reception** 200:15 | **recommend** 209:23 | **recruited** 68:5 **recruiting** 200:7 |
| **reasonable** 57:19 | **receptor** 5:17 180:4 238:9 | **recommendat...** 76:19 209:25 210:4 | **redacted** 126:7 126:13 160:5 160:16 161:24 192:9 219:17 220:20 |
| **reasons** 34:21 134:5 150:11 166:15 168:21 168:22 195:1 | **recess** 52:3 62:21 92:13 125:2 139:13 185:1 233:21 | **recommended** 76:10 77:8 **recommending** 209:12,13 | **redaction** 221:23 |
| **recall** 18:13,14 31:13,16 60:17 61:8 63:7 64:4 70:22 71:9,13 72:16,17,20 73:8 80:14 85:13 89:22 94:24 102:11 109:23 135:16 152:17 170:8 183:16 188:3 218:11 235:6 240:4 248:13 249:15 251:19 255:20 256:9 256:23 257:11 | **recitation** 109:15 111:5 113:10 **recite** 126:5 **recites** 95:6 111:9 112:3 118:15 132:21 **reciting** 172:1 **recognize** 52:19,23 53:25 54:3 80:12 94:5 101:8 108:5 109:3 110:13,16 125:18 130:1 130:12 139:2,2 139:3 142:16 159:17 192:13 202:23 220:24 234:8,13 235:17 238:11 | **record** 7:3,8 8:1,25 9:1,14 14:2 36:3 52:2 52:5,8 53:11 53:17,24 62:20 62:23 64:21 67:18 77:15,17 80:10 92:12,15 100:21 101:4 108:25 123:15 125:1,4,13,15 135:13 139:12 139:14 148:18 150:3 163:10 178:19 184:25 185:3 197:11 228:19 233:20 233:23 247:1 256:17 259:16 260:12 | **redo** 35:24 96:10,15 98:3 173:20,23 **redone** 173:20 **reduce** 186:8 **reduced** 246:15 261:11 **reduction** 186:16,17 188:2 245:9 **refamiliarize** 163:13 **reference** 111:17 118:18 152:11 157:9 157:24 163:20 169:21 170:5,9 209:13 224:4 226:22 258:2 |
| **recalled** 135:15 **recalls** 127:11 **receipt** 262:17 **received** 65:25 66:22 68:10,17 85:20 93:6 | **recognizing** 133:1 142:20 **recollection** | **recorded** 7:9 **recording** 7:6 **records** 30:3 **recruit** 63:15 | **referenced** 262:6 **referred** 167:22 **referring** 79:14 |
| **recent** 4:18 46:2 247:4 | 31:8 126:15,19 | 200:6 224:14 | 119:2 131:7 |

HIGHLY CONFIDENTIAL

**[referring - remind]**                                                    Page 57

143:14 227:16 255:1,2
**refers** 131:7 171:25 217:3
**reflected** 100:25 249:18
**refocus** 49:20
**refresh** 31:8 55:15 216:2 238:15
**refreshes** 159:19 192:6 193:8
**refused** 128:8
**refuses** 120:18
**regal** 11:16
**regard** 144:8 243:10
**regarding** 4:18 52:11 53:10 74:18 249:17 249:23 250:5
**regardless** 257:2
**registered** 3:8,8 261:4,20,20
**regret** 209:4
**regular** 259:22
**regularly** 160:22
**regulatory** 118:10 122:7,7
**reisbaum** 2:3 8:4

**relate** 129:2
**related** 7:21 39:13 51:21 123:19,23 127:20 128:4 129:3 164:2 176:21 246:14 261:13
**relates** 229:19
**relationship** 21:9 25:14 28:18 95:19 132:6 136:16 137:1 162:8,14 162:15 208:22 224:25
**relationships** 21:12
**relative** 68:2
**relatively** 32:10 34:1
**release** 216:11 227:23
**released** 50:6
**relevant** 152:6
**reliability** 97:24 98:2 99:14 169:7 232:24
**reliable** 232:21
**relied** 100:17 117:2 228:23
**relievers** 192:4

**rely** 50:22
**relying** 228:20 229:1
**remaining** 171:14
**remark** 231:20
**remarkably** 32:18
**remember** 12:16 15:15 16:24 18:18 19:15,18 26:25 28:14 29:4,13 29:23 30:5 33:16 38:10,11 38:15 41:19 57:14 69:14 71:10,19,21 73:18 79:2 81:13 82:3,13 82:23 83:4 85:2 92:25 95:9 96:11 104:6 112:2,19 113:3 126:3 128:6,14 129:17,20,21 129:23 130:7 133:1 136:3 142:6,11,18,21 145:16 147:13 152:14,15,16 152:23,23 153:21 160:4

166:22 175:10 180:2 182:24 184:6,14 188:3 193:12 196:1 196:22 199:1 207:12 208:11 216:16 219:12 220:7 230:10 231:14 236:2 236:16,18 237:22 239:17 240:3,15,17 242:14,15 254:21
**remembered** 95:11
**remembering** 148:22
**remi** 1:10 2:12 15:20 21:14 39:12 41:24 42:5 63:6 74:12 144:9,10 145:2,4 164:4 164:5 195:11 195:12,15 208:9 211:8 213:10 214:23 227:19 236:17 236:18 241:14 241:16 252:3
**remi's** 228:15
**remind** 9:8 238:14

Veritext Legal Solutions

HIGHLY CONFIDENTIAL

**[reminder - research]**                                                                Page 58

**reminder**
  130:17 177:14
  226:17
**reminds**  194:1
**remorse**  85:12
**remorseful**
  85:11
**removal**  27:3
  123:10
**remove**  23:21
  119:5 163:23
  164:4,18
**remoxy**  18:15
**repairing**  219:4
**repeat**  103:12
  107:7 155:13
**repeated**
  207:20 226:3
**repercussions**
  212:3
**replicate**
  176:24 185:6
  185:11 188:5
**replicated**
  149:6 184:19
  186:22,23
  187:11 190:7
**replicating**
  180:3
**replication**
  190:10
**replied**  161:22
**report**  6:2,3
  68:19 75:17

96:19 97:1
99:19 100:24
101:1,5,7,10,16
102:4,10,20
105:5 106:21
106:23 107:3,4
107:6,10 109:4
110:20 142:7
143:1 145:6
198:3,4,25
219:19 233:13
254:18
**reported**
  149:25 168:2
**reporter**  3:8,9
  3:9 7:18 8:16
  8:17 9:14
  12:14 25:4
  28:19 30:11
  34:7 36:19
  48:13,15,18,20
  58:12 63:9
  86:24 87:1
  93:25 100:7,12
  111:11 113:12
  114:18,20,22
  115:1 117:16
  117:18 121:22
  129:15 152:9
  153:1,4,6,16,21
  158:9 161:6
  167:13 173:2,4
  173:8 178:23
  180:13,15

187:1 196:16
196:19 197:7
200:10,12
201:3 202:17
205:20 223:10
223:24 224:1
229:24 230:2,6
243:17,21
248:21,24
259:21,23,25
260:6 261:5,20
261:20,21
**reporter's**
  261:1
**reporters**  156:9
  202:1
**reporting**
  250:9
**reports**  184:7
  219:19
**represent**  9:2
  80:24 195:13
  207:23
**representative**
  8:14 242:8
**representing**
  7:17
**reputation**
  63:16 155:2,7
  155:9,19 156:2
  188:18 200:21
  202:14 211:19
  211:20 212:13
  219:4 222:18

222:19 226:12
229:7 242:2
**request**  52:19
  119:17 120:19
  133:25 136:14
  160:11
**requested**
  132:21 133:3
**requests**
  119:15
**require**  56:10
  74:17
**required**
  264:13
**requires**  42:2
  42:14 55:6
  60:10,22 61:18
  62:12 65:25
  66:21 69:6
  70:5,12,20
  73:4 74:4 76:6
  76:15 79:7
  81:18 82:20
  92:22 93:6
  127:11 141:9
  143:22 145:22
  199:12 220:16
**reread**  80:4
**rerun**  38:19
**research**  11:18
  11:19 15:6
  29:18 96:1,4
  97:3 98:18
  100:16 102:1

HIGHLY CONFIDENTIAL

**[research - right]**                                Page 59

104:20 117:14 128:5 138:8 153:2 186:25 187:4 210:21 221:7 223:6 228:20 235:2,3

**researchers** 202:18

**reserve** 247:8 247:11

**reset** 124:22

**resign** 41:25 42:9,10 43:1,8 43:21 147:1

**resignation** 164:10

**resigned** 41:24 164:5,10 210:21

**resigning** 46:14 46:16

**resistant** 16:20 17:3

**resolution** 166:15,16

**resolve** 35:5,10 252:13

**resolved** 250:11 251:5

**resources** 51:16

**respect** 21:16 31:12 76:19 78:11,25 138:7

142:22 210:11

**respected** 21:16 150:9 208:21

**respectfully** 132:21

**respond** 58:14 134:16 146:7 158:25 160:14 204:18

**responded** 58:5 58:9 257:10

**responders** 30:6

**responding** 70:11 160:15

**response** 85:20 133:8 161:25

**responsible** 102:6

**rest** 185:20 188:14

**result** 68:16 99:11 106:17 123:11 181:23 261:15

**results** 27:16 35:24 46:7 52:12 53:5 106:1 120:5,13 139:1,4 148:12 148:15 149:6,8 149:9 150:1 168:13 172:15

172:16 183:11 184:19 191:9 253:14

**retail** 10:23

**retain** 120:19

**retained** 119:22 139:8 259:18

**retract** 128:8

**retracted** 128:3 128:7 129:5 138:3

**retraction** 128:15,22

**retractions** 128:10 129:2

**return** 21:16 262:13,16

**reveal** 73:5 75:5

**revealed** 250:19

**revealing** 72:1

**reveals** 106:5

**reverses** 5:17 238:9

**review** 29:20 109:3 116:23 131:5 138:18 139:23 154:4 159:13 234:11 262:7

**reviewed** 29:24

**reviewing** 108:10

**revised** 168:2

**revisit** 53:5 247:12

**richard** 1:13 3:3 7:10 8:19 259:17 262:5 263:2,24 264:2 264:4,12

**rick** 222:2 224:24 225:20

**rides** 196:20

**ridiculous** 34:4 133:15 200:1

**rigging** 225:6

**right** 9:18 18:24 22:13 23:1 30:18 37:11 39:1,18 47:15 50:3 51:20 81:3 85:2 87:6,11 87:15 89:14 90:12 94:23 95:5 96:19 99:13,22 104:6 107:5,10 110:18 121:9 130:22 132:4 132:13 147:21 155:20 158:23 159:11 160:3 164:19 171:11

HIGHLY CONFIDENTIAL

**[right - saying]** Page 60

175:16 178:16
178:20 180:2
183:3,17 184:5
185:7,16 188:3
188:19,25
189:18 191:23
203:20 207:15
208:23 209:5
212:6 224:8
226:11 227:7
231:1,9 232:18
232:25 235:4,8
243:5 244:1,10
244:14 246:17
247:25 248:2,5
248:11,12
249:10,13,14
251:19 254:2,3
256:14
**rigorous**
104:13,18
**ring** 147:24
**rise** 118:19
**robertson**
11:21 12:9,17
16:1,4 63:7
143:8 160:2
**robertson's**
144:7
**robinson**
192:17
**rockafeller**
2:13

**roddy** 15:22
**rodriguez**
257:11
**rogenthien**
215:20,22
216:19 217:8
218:12,13
219:11
**roger** 157:9
**rogers** 2:16
7:17
**role** 39:3
221:10,13
222:16 237:16
**room** 52:15
98:16 135:1
**rough** 259:22
260:4
**routine** 104:20
**rules** 3:2
**run** 67:14
98:22 172:5
174:12 175:10
224:23
**running** 173:12
200:7 225:12
228:6,13 241:9
**runs** 162:6
**ruthless** 225:13
225:19
**résumé** 39:25

**s**

**s** 3:7 7:1 111:13
261:4,19 263:3
**sab** 146:19
**sad** 242:4
**sadly** 257:6
259:5
**salacious** 218:5
**salesmen** 11:3
**salomon** 225:4
225:5
**sample** 115:8
**samples** 37:8
119:22 120:3
167:15,16,21
167:21,22,24
168:7,14,15
169:7,13,17
170:5,10
171:14,18,21
171:22,24
229:10,14,22
230:21 231:1
232:11,14,17
232:24 256:18
257:13 258:2,6
258:8,12,16
259:2
**san** 252:24
**sandy** 16:1,4
63:7 74:12
143:8 144:6,7
144:9 145:2

160:2 195:11
195:12,24,24
196:2
**santorum**
222:2,5
**sap** 231:4
**sarepta** 25:12
30:24 31:1
202:24
**sat** 40:17
115:23 254:22
**satisfactory**
181:23
**satisfied** 38:13
205:8 212:6,7
**saved** 224:12
**saw** 50:5 68:22
68:23 85:12
93:18 116:20
125:24 139:1,4
200:8 231:7
245:25
**saying** 34:3,4
59:1 71:20
98:18 142:2
152:15 155:8
155:19 168:17
170:10 175:25
199:3,4 206:13
206:24 212:4
212:24 216:14
228:9 236:18
241:5 242:15
246:4 257:12

HIGHLY CONFIDENTIAL

**[says - see]**                                                    Page 61

| | | | |
|---|---|---|---|
| **says**  96:21 | 244:5,16 | **scientists**  4:22 | **securities**  11:18 |
| 109:16 110:17 | **science.org** | 118:5 151:5 | 59:14 127:4 |
| 130:16 131:2 | 204:22 | 152:18 157:3,6 | **see**  11:4 14:6 |
| 136:11,15 | **sciences**  1:10 | 158:7,15 | 14:11,17 16:6 |
| 164:20 171:10 | 2:7 3:22 4:3,6 | 173:20 208:12 | 17:5,22 18:2,2 |
| 172:1 173:15 | 4:9,12,14,17,18 | 255:15 | 18:8 22:11 |
| 179:10 206:25 | 5:17 7:12 8:8 | **scott**  2:8 8:9 | 30:14 31:14,16 |
| 207:1,7 209:10 | 15:10 130:17 | 260:1 | 31:22 33:15,18 |
| 212:17 216:21 | 262:4 263:1 | **screaming** | 35:12,17 38:8 |
| 217:1 218:13 | 264:1 | 198:7 | 38:9 40:20 |
| 221:21 | **scientific**  5:11 | **screwed**  37:12 | 47:7 48:12,23 |
| **scampbell**  2:11 | 40:1 63:19 | 37:14 38:2,5 | 50:21 80:23 |
| **scannon**  116:13 | 98:9 99:8 | **sean**  196:9,12 | 81:3,6 95:2,5,8 |
| 116:19 | 114:17 116:1 | 196:13,23 | 96:23,25 97:5 |
| **sceptical** | 136:16,17 | 197:15,16 | 97:6 98:6,14 |
| 240:10 | 137:2 146:10 | **season**  33:8 | 105:6,10 |
| **scheme**  225:5 | 146:13 147:1,8 | **sec**  85:5 166:15 | 108:23 109:14 |
| **schoen**  40:9 | 147:24 148:11 | 252:20 | 109:18,19 |
| **school**  10:6 | 148:15 149:5 | **second**  3:17 | 110:18 111:5,8 |
| 186:1 200:3 | 149:24 150:7 | 21:2 34:25 | 111:9,14,15,15 |
| 217:2 | 150:19,22 | 38:23 50:5,16 | 111:16 112:3,6 |
| **science**  10:9,12 | 151:7,14,22 | 81:24 82:9,16 | 112:11 113:8,9 |
| 27:2 29:2 | 152:5 172:2 | 95:2 104:5,6 | 113:16 115:7 |
| 41:18 97:24 | 174:11 175:2,7 | 105:4 109:13 | 115:11 118:2,6 |
| 99:14 100:17 | 175:19 176:23 | 113:9 118:2,15 | 118:14 119:4,9 |
| 152:13,19 | 177:3 178:1,2 | 119:17 120:6 | 119:11,14,17 |
| 162:25 172:3 | 183:8 208:15 | 120:17 141:17 | 119:21 120:15 |
| 180:5,6,7 | 213:19,19 | 149:7 153:9 | 120:18,23 |
| 185:7,12 | 241:10 254:20 | 154:3 157:8 | 122:12 126:5,9 |
| 186:25 187:3 | **scientist**  116:5 | 166:23 179:5,6 | 130:19,25 |
| 214:15 235:4 | 162:6 174:15 | 183:1,2 198:11 | 132:20,24,25 |
| 235:23 236:5 | 177:19 208:21 | 244:8,8 246:7 | 136:19 143:9 |
| 237:23 239:16 | 210:14 233:14 | **secreting** | 152:17 156:11 |
| 241:21 243:10 | 233:15 236:1 | 235:16 | 157:5,8,12,14 |

HIGHLY CONFIDENTIAL

**[see - set]** Page 62

157:15,25
159:6,17,25
160:4,12
161:23 167:4
169:3 171:5
172:6 173:19
173:21 176:18
179:3,8,18,22
180:21 181:17
183:19 187:13
188:1,2 192:6
192:9 201:21
203:25 204:5
204:14 206:16
206:20,21,22
207:24,25
208:3 209:21
213:2 215:18
216:19,24
217:11 218:9
219:17,19,22
221:9,19
223:16,21
233:6,8,11
234:9 237:4
238:13 243:14
244:23 253:10
256:20 258:4
**seeing** 198:17
216:16,16
**seem** 125:20
**seemed** 173:11
**seems** 33:3,3
131:13

**seen** 90:1,3
96:20 99:19
107:10 109:6
110:6 124:2,4
137:17 193:6
198:2 205:1
214:5 222:23
234:12,15,23
235:18 238:17
238:21,21
242:24 248:11
249:12
**seinfeld** 174:21
**seizure** 185:17
186:18
**seizures** 51:21
186:8,16
187:15,20
235:7 245:9
246:14
**seller** 56:18
58:18
**sellers** 11:13
58:6,10,19
59:2 146:20,22
147:15 154:14
156:9 200:1
215:1,6,12
217:22 228:1
242:1
**selling** 51:15
**senate** 10:22
222:6

**senator** 222:2,5
**send** 85:4 120:4
160:17 162:21
**sending** 159:25
160:4 161:12
164:13
**senior** 118:9
**sensational**
16:16
**sense** 10:3
12:10 38:16,17
48:11 80:17
150:17 216:17
251:11 257:23
**sensible** 192:18
**sensitive** 7:4
160:11
**sensitivity**
52:24 112:10
**sent** 145:15,17
160:18 161:21
169:13 197:21
198:17,25
199:2 202:21
205:2,3 216:10
220:8,8 262:14
**sentence** 32:2,4
33:2 111:17
119:21 120:7
136:23 170:4
201:4 210:4
253:3 256:17
256:20,22
258:3

**sentences** 168:1
230:24
**separate**
177:18 239:2
**september** 3:22
4:19 46:20
95:6 105:13
109:9,22
110:25 117:21
132:3 133:2
**sequence** 95:16
128:13
**sequencing**
83:3
**serial** 97:21
124:14
**series** 76:11
188:20
**serious** 57:13
**seriously**
208:20 218:18
218:25 222:22
226:8 231:18
231:18,20
252:7
**served** 89:4
**services** 3:20
45:18,22 46:1
97:3 144:10
**serving** 22:19
48:5
**session** 253:7
**set** 23:4 238:25
251:9 253:24

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 256:5 261:10 | sheet 262:11 | showing 32:8 | significantly |
| sets 126:17 | sheriff 225:23 | 124:16 180:3 | 235:14 |
| setting 64:8 | shocked 18:16 | 207:18 249:9 | similar 127:20 |
| 244:3 | 19:6 | shown 98:20 | 195:25 |
| settle 252:20 | shoot 153:14 | 123:25 202:6 | simple 73:6 |
| seven 170:3 | short 11:12 | 249:3 | 135:7 |
| 174:10,14 | 13:24 14:5,7 | shows 169:4 | simplest 17:12 |
| several 12:5 | 14:13,24 15:2 | shut 12:19,22 | 17:14 |
| 17:18 152:16 | 15:6 56:18 | 17:25 18:19 | simu 173:1 |
| 169:2 204:9 | 58:5,9,18,19 | 50:16 165:5 | simufilam 5:2 |
| 207:19 224:14 | 59:2 99:4 | shutting 257:22 | 5:17 28:6,18 |
| 233:6 242:15 | 124:23 134:7,9 | sic 28:20 45:19 | 29:3,8,21 |
| severe 51:13 | 146:20,22 | 77:6 186:25 | 41:18 51:9 |
| 186:5,15 227:9 | 147:15 154:14 | 187:2 207:21 | 152:14,20 |
| severely 63:15 | 154:15 156:9 | 221:7,20 | 175:15 179:11 |
| 67:1 | 199:25 202:24 | sicker 187:10 | 179:17 184:10 |
| shadow 211:23 | 215:1,6,12 | side 10:25 11:1 | 184:16 223:2 |
| shape 227:9 | 217:22 228:1 | 11:9,10 34:6,8 | 235:4,24 236:9 |
| share 33:15 | 242:1 | 81:3 126:23 | 238:9 243:11 |
| 99:3 195:24 | shorthand | 214:14 | 244:6,16,25 |
| 196:2 208:7,12 | 261:10 | sign 85:12 | 245:1,15,21 |
| 213:7,8 253:17 | shorting 58:4 | 260:6,7 262:12 | 254:2 |
| 253:19 | shorts 11:20 | signal 50:24 | simufilam's |
| shared 53:7 | 14:18 15:2 | signature | 26:1,19 |
| 166:10 182:10 | show 67:18 | 261:19 | sincere 210:22 |
| 182:19 194:24 | 173:19 176:24 | signatures | singer 160:1 |
| 253:6 | 189:11 191:10 | 105:5,8 234:9 | 220:13 |
| shareholder | 200:3 244:25 | signed 30:2 | single 198:10 |
| 15:14 34:15 | 245:8 | 186:11 262:19 | 223:21,21 |
| 88:3,4,7,12 | showed 40:18 | significant | singular 204:2 |
| shareholders | 50:12 184:20 | 50:13,17 56:16 | sinker 241:20 |
| 42:9 86:15,20 | 186:1,16 191:9 | 226:21 227:15 | sir 247:17 |
| shearson 10:24 | 238:17 246:6 | 250:16 | sit 79:20 |
| | | | 137:11 232:23 |

HIGHLY CONFIDENTIAL

**[site - specific]**                                                    Page 64

| | | | |
|---|---|---|---|
| **site** 28:7 95:6 105:13 112:7 115:7 201:8 204:22 | **sleep** 252:25 257:17 | **somebody** 19:9 22:17 31:9 38:11,19 47:10 51:4 85:3 142:24 150:6 210:11 217:21 225:18 | 223:10 230:1 231:12 242:15 243:17 247:19 248:21 254:24 |
| **sites** 56:22,22 67:12 88:22 | **sleuth** 213:18 | | **sort** 11:23 58:16 137:14 174:8 226:17 252:21 |
| **sitrick** 143:8 144:1,12 215:19,23 216:1,1,3,20 217:17 218:1 218:20 219:1 251:16 | **slightly** 83:15 106:11 144:16 187:9 | **soon** 24:1 49:16 205:2 | |
| | **sloppiness** 99:22 | **sorry** 8:16 12:14 25:4 26:9 28:19 34:7 35:15 36:20,23 42:6 48:13,14 50:12 58:12 63:9 64:20 93:25 97:13 104:2,12 111:11 113:11 114:19 117:16 117:25 134:18 140:23 149:8 153:6,12 154:2 154:6 155:14 158:9 159:8 161:6 167:13 170:2 172:23 173:2,3 180:13 180:25 187:1 193:23 194:7 194:19 196:16 197:7 200:10 200:11 201:3 201:22 205:20 | **sought** 70:18 71:2 72:10 |
| **sits** 223:8,13 | **sloppy** 99:23 100:16 137:8 | | **sound** 180:21 194:20 |
| **sitting** 79:11 80:3 82:14 90:12 95:12 106:22 107:3 122:9,18 126:18 234:21 249:15 250:3 | **small** 11:24 20:10 199:16 223:5,23 250:18 253:22 | | **sounds** 55:11 223:13 |
| | **smart** 25:14 | | **source** 69:9,16 232:21,24 |
| | **smith** 242:14 | | **southern** 7:13 134:4 |
| **situate** 222:14 | **snake** 217:23 | | **speak** 22:18 83:13 137:7 195:11 252:1 |
| **situation** 47:10 164:24 226:18 227:2,6 | **snarky** 229:17 230:11,14,17 231:20 | | **speaking** 23:7 198:23 227:25 |
| | **snorted** 16:16 | | **speaks** 97:10 120:10,22 161:14 212:16 227:4 250:13 |
| **six** 170:3 174:10,14 212:21 218:19 | **snyder** 236:16 255:12 | | |
| | **social** 21:13 59:11 69:1 75:18 93:16,17 197:16 | | **spec** 183:25 |
| **ski** 33:7 | | | **special** 54:18 225:22 |
| **skip** 9:7 115:6 234:5 | **solely** 95:20 | | |
| | **solution** 16:25 57:19 | | **specific** 28:7 36:5 90:9 101:16 103:10 108:9 112:20 |
| **skis** 33:4 114:14,25 | **solutions** 259:19 262:23 | | |
| | **solve** 240:22 | | |

114:16 121:16 214:14

**specifically** 31:13 41:19 71:10 99:3 112:7 113:4 127:1 172:4

**speculating** 191:12

**speculation** 90:23 97:11 100:10 101:20 105:18 107:17 108:14 112:16 113:24 115:21 116:25 118:25 119:8,20 120:10,22 121:12 122:3 124:5 131:12 150:4 245:3

**speech** 9:15 10:21

**speed** 20:25

**spelled** 25:5

**spend** 14:20 89:21,24 91:1 159:14 163:16 193:7,21 198:13 230:19 257:23

**spending** 87:14 87:15 90:4,6,7

**spent** 16:12 90:10 91:13 219:6

**spinal** 229:10

**splitting** 62:17

**spoke** 24:25 25:19 26:18 31:9 47:14 208:9

**spoken** 21:5 45:10,15 137:5 202:9

**sponsored** 187:5

**sponsoring** 185:11

**spot** 38:12

**springer** 220:4

**spruck** 162:3 204:22

**spruck's** 204:25

**sprung** 33:12

**sst2** 235:14

**stability** 86:10

**stable** 232:17

**stack** 125:7 126:5 254:10

**stale** 59:4

**stamped** 80:25

**stand** 78:7 137:24

**standard** 260:2 260:5

**standards** 114:6,7

**start** 49:3 233:5 245:8 257:12,14

**started** 11:25 172:22 225:7 239:9

**starting** 12:13 33:14

**starts** 37:1

**state** 3:10 7:24 7:25 10:7,21 219:20 247:10 261:5

**stated** 68:12

**statement** 4:18 4:20 89:11 115:23 129:18 129:21,22,24 130:9 134:8 142:16,18,20 143:3,6 194:1 207:2

**statements** 57:16 67:2,9 67:20 68:4 73:7 84:15 88:23 155:3 189:24 201:13 248:14

**states** 1:1 7:13 127:3

**statistical** 169:21 231:4

**statistically** 50:13

**stature** 24:20

**status** 182:25

**stay** 12:10

**stays** 175:11

**stein** 259:4,7

**step** 44:11,20 47:10 139:6 164:12 165:23 175:13,14 181:3

**stephens** 11:21 12:9,17

**stepped** 45:1,11 45:16,19,23

**steven** 147:25

**stevens** 16:4

**stock** 33:9,12 162:19 163:6 218:15,16 219:3,7

**stocks** 15:3 58:4

**stood** 25:22

**stop** 14:7 57:4 73:7 124:9,24 138:12 156:12 156:15 179:4 250:22

**stopped** 14:23

HIGHLY CONFIDENTIAL

**[storage - suing]**                                              Page 66

| | | | |
|---|---|---|---|
| **storage** 171:19 | **structure** | 201:8 235:7,20 | **substantive** |
| **store** 171:21 | 115:23 | 236:3,13,21 | 159:16 |
| 258:9 | **struggling** 87:2 | 237:1,4,13,15 | **substitute** |
| **stored** 169:9 | **studied** 207:11 | 237:23 238:1 | 119:16 120:19 |
| 233:3,3 | **studies** 5:2 97:4 | 238:15,16,18 | **succeed** 86:3 |
| **stories** 68:23 | 98:20 178:18 | 238:23,24 | **succeeding** |
| 154:12,13,14 | 178:25 179:20 | 239:1,5,19 | 47:8 |
| 156:8 202:5 | 179:24 181:4 | 240:7,12,13 | **success** 86:9 |
| 218:5 | 182:9 183:19 | 242:11 243:4,4 | 88:19 173:19 |
| **story** 59:12,17 | 183:20 185:9 | 243:7,8,20,25 | **successes** 192:3 |
| 69:20 142:12 | 185:11,15 | 244:8 257:8,24 | **successful** |
| 154:15,15 | 188:4 189:6,10 | 258:10,12 | 18:18 33:25 |
| 202:1,5,11 | 189:11 190:7 | **stuff** 180:9 | 34:1 86:15 |
| 204:19 226:3 | 190:17 235:22 | 186:19 | 103:23 188:24 |
| **straight** 59:19 | 243:3,9,15 | **stupid** 200:4 | 189:12 217:14 |
| **strange** 28:4 | 244:5,13,15,20 | **subject** 23:13 | 236:23 242:22 |
| 204:1 | 244:22,24 | 131:9 160:10 | 246:5 |
| **strategy** 66:13 | 255:19,23 | 160:13 164:2 | **suddenly** 210:6 |
| 219:5 | 256:3 | 215:23 | **sue** 198:8,12 |
| **street** 2:9 3:6 | **study** 46:4 | **submitted** | **sued** 85:11 |
| 7:16 33:4 | 49:20 50:9,9 | 103:21 169:22 | 99:12 |
| **strength** 61:22 | 111:6,17,19,20 | 234:14 | **suggest** 19:9 |
| 65:2,6,14 70:9 | 111:22 112:1,4 | **subscribed** | 202:18 |
| 73:22 74:9,18 | 113:5 120:4 | 264:14 | **suggested** |
| **strengthens** | 121:9 137:15 | **subset** 253:22 | 55:16 108:21 |
| 212:25 | 138:16 139:5 | **substance** | 149:6 175:19 |
| **stretch** 183:7 | 139:22 140:17 | 60:19 61:10,16 | 238:14 |
| **strike** 255:25 | 168:8,19 | 63:11,13 65:22 | **suggesting** |
| **string** 96:22 | 169:14 170:18 | 74:1,13 75:2,5 | 133:17 159:9 |
| **strong** 210:10 | 180:1,11 | 78:16 91:19 | 204:6 |
| **strongest** | 181:13,16,20 | 126:7,12 240:4 | **suggests** 32:16 |
| 136:18 137:2 | 181:25 182:4 | **substantially** | **suing** 58:10,11 |
| **strongly** 144:9 | 185:24 186:23 | 90:17 | 92:20 93:1 |
| 209:22 | 186:24 187:5 | | |

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| suit 60:5,8,15 | survive 207:2,5 | 130:3,12 132:4 | 235:7 |
| 67:21,23 83:11 | susceptible | 132:13 157:5 | targeting |
| 201:21 216:22 | 177:11 | 159:13,17 | 132:23 133:4 |
| suite 2:9 3:6 | swear 8:17 | 163:12 164:12 | tatters 188:18 |
| 7:16 | sweden 37:9 | 165:23 166:21 | tau 48:19 |
| sum 228:17 | swedish 25:6 | 175:13,14 | 180:16,22 |
| summarized | swimming | 178:13 184:23 | taylor 2:12 |
| 226:17 | 86:17 | 193:18 198:19 | 8:11,11 |
| summary 13:16 | switched 10:24 | 199:22 204:6 | team 52:22 |
| summer 91:12 | sworn 8:20 | 222:22 226:8 | 53:7 158:14 |
| sun 165:2 | 261:8 264:14 | 234:3,8,9,20 | 172:2 174:11 |
| support 15:6 | symptom 192:3 | 241:5 243:13 | 175:7,19 177:3 |
| 136:17 137:1 | system 81:1 | 247:1 | 178:1,3 188:23 |
| 202:5 206:19 | 207:9,14 | taken 3:5 7:10 | 190:24 254:20 |
| supported | südhof 157:13 | 40:24 41:5 | 257:10 |
| 57:21 | 157:18 | 167:25 168:7 | technician 38:4 |
| supposed 206:9 | **t** | 189:10 222:16 | telegraph 9:25 |
| sure 9:17 14:9 | t 48:19 223:19 | 258:13 261:10 | tell 49:25 89:9 |
| 27:16 41:9 | 235:16,16 | talk 22:23 | 98:11,13 111:1 |
| 47:12 53:2 | 263:3,3 | 62:15 176:6 | 112:21 121:14 |
| 54:10 62:4 | tab 202:23 | 202:18 210:8 | 128:8,9 133:7 |
| 78:1 85:8 | table 95:2 | 218:18 252:14 | 134:17,20 |
| 109:7 117:25 | 179:2,6,16,21 | talked 19:4 | 137:25 149:1 |
| 119:3 138:23 | taiwan 137:7 | 44:4 160:19 | 150:17 151:5 |
| 139:9 147:18 | take 7:7 9:22 | 177:4 185:9 | 156:19 164:12 |
| 148:25 171:24 | 10:1 12:4 15:6 | 211:1 213:10 | 164:17 166:20 |
| 190:14 197:22 | 31:15 32:3 | 218:24 243:3,4 | 170:21,24 |
| 205:25 230:3 | 51:25 55:9,9 | 243:8 | 171:4 180:8,18 |
| 245:10 254:11 | 62:15,18 64:1 | talking 36:9,10 | 217:17 233:15 |
| surgery 85:24 | 64:7 67:10 | 103:24 116:14 | 239:10 253:12 |
| 252:10 | 71:15 92:10 | 116:15 149:14 | 259:7 |
| surprise 109:24 | 108:22 110:12 | 149:15 176:4 | telling 32:15 |
| surprised | 114:21 125:10 | 192:22 206:4 | 102:12 165:16 |
| 110:9 250:24 | | 218:8,11 219:6 | 165:17 197:3,5 |

HIGHLY CONFIDENTIAL

**[telling - think]**                                             Page 68

| | | | |
|---|---|---|---|
| 236:17 | 235:1 259:17 | **therapy** 223:18 | 257:18 |
| **tells** 49:23 50:1 | 262:9,17 264:8 | **thesis** 216:23 | **think** 11:10 |
| 216:19 246:9 | **testing** 129:3 | **thing** 9:19 | 12:16 14:15 |
| **temporarily** | 179:15 | 24:15 34:25 | 15:14,22 17:19 |
| 97:2 99:21 | **tests** 172:4,21 | 37:21 39:18 | 18:13,15 20:24 |
| **tend** 49:3 | 173:10 174:6 | 43:11 54:11 | 22:10,16 23:3 |
| 243:12 | 174:11,25 | 163:15 172:10 | 23:20 25:18,21 |
| **tenure** 116:8 | 177:9 178:3 | 191:6 196:4 | 26:7,14 27:15 |
| **term** 136:16 | **texas** 11:11 | 205:4,6 220:19 | 27:16,24 28:13 |
| **terminate** 43:5 | 24:22 103:25 | 225:16 230:9 | 28:25 29:10,19 |
| 44:5 | 199:17 | **things** 19:10 | 32:5,14,15,16 |
| **terms** 23:8 | **text** 80:23,24 | 34:12 35:1 | 32:24 36:4 |
| 52:10,25 56:2 | 126:13 130:13 | 39:10,19 46:6 | 39:24 41:9 |
| 136:18 137:3 | 199:2 256:16 | 47:21,23 68:21 | 42:5 43:25 |
| 144:8 156:19 | **thank** 48:20 | 75:20 83:3,5 | 44:1,22 48:8 |
| **terrible** 200:20 | 87:1 100:11 | 84:25 86:11,14 | 51:11 53:8 |
| 229:7 | 117:18 173:8 | 86:19 91:6 | 55:1,23 56:2,5 |
| **terrific** 48:7 | 177:16 180:15 | 93:17 99:10 | 56:13 57:2 |
| **test** 167:19 | 182:22 224:1 | 103:20 104:4,7 | 60:12 61:9,12 |
| 173:12 175:3,3 | 243:21 248:24 | 104:9 138:1,11 | 65:18,19 66:24 |
| **tested** 167:15 | 254:15 255:16 | 155:8,20 | 67:18 69:18 |
| 167:17,18,19 | 258:22 | 156:12 160:14 | 72:4,23 73:2,6 |
| 167:25 175:16 | **thanks** 13:16 | 163:14 172:15 | 73:25 76:22 |
| **testified** 8:21 | 238:7 | 174:3,23 | 77:1,5,15 83:7 |
| 87:18 134:25 | **thanksgiving** | 175:25 183:13 | 83:8,14,15 |
| 135:15 225:10 | 171:12 | 191:11 197:22 | 84:5 85:22 |
| 237:24 248:10 | **theory** 48:21 | 197:23 198:1,9 | 87:18 95:23 |
| 256:25 | 186:9 | 200:2 203:23 | 96:7 97:16 |
| **testify** 10:2 | **theranos** 85:2 | 205:8 206:19 | 99:13 101:15 |
| 126:12 261:8 | 98:14 124:14 | 207:4 211:25 | 102:9,13,18 |
| **testimony** | **therapeutics** | 217:21 223:18 | 103:2,7 104:8 |
| 52:11,13 58:22 | 15:11,12 16:8 | 223:19 228:9 | 104:22 106:6 |
| 87:25 134:2,12 | 16:18 17:6 | 241:22 243:14 | 107:8 113:20 |
| 152:14 161:4 | 25:12 27:10 | 250:16 253:15 | 115:3,22 |

HIGHLY CONFIDENTIAL

**[think - time]**                                                                 Page 69

116:17 124:16
124:22 127:21
130:8 135:2
136:5 138:15
138:20,21
140:21 144:16
145:10,11
147:22 150:14
150:25 154:17
155:17,17
161:1,10 162:7
164:23 166:8
166:17 167:7
168:15 169:12
169:18 170:9
170:18,18
174:14,23
177:23 183:22
184:22 186:11
186:17,25
188:23 189:1
190:16,20,21
191:1,9,12
192:24,24
193:6,17 195:3
196:1 198:11
198:15,24
199:2,14,24
201:24 204:8
204:10,24
206:11 207:12
208:14 210:17
210:22 211:5,5
211:7 213:7

214:6 215:15
217:6,13 218:1
218:3,4 221:21
224:4 228:13
228:19 229:16
229:17 230:9
230:11,13
234:10 235:18
235:19 236:2
236:14,15
238:17 239:4
241:3,3 242:21
243:12,12
244:10,14,19
245:4,6,17
247:9 252:2
257:7
**thinking** 23:1
  32:18 191:12
  225:1
**thinks** 198:16
  208:5
**third** 31:20
  109:15 136:23
  179:10
**thomas** 157:13
**thornton**
  236:15 240:2,5
  255:13 256:4
**thorough** 133:3
**thoroughly**
  132:22
**thought** 14:13
  26:9 34:19

42:7 48:7,10
56:21 67:6
83:11 102:15
162:25 163:1
169:2,2 175:3
175:6,7,20
189:13 198:12
211:18 218:15
220:10 225:14
226:2,4 240:21
**thoughtful**
  220:9,10
**thousands**
  258:11
**thread** 59:8
  118:3 121:8
  160:2 220:13
**threaten** 122:5
  122:8 250:21
**three** 11:23
  50:10 115:24
  156:18 169:8
  170:3 173:10
  179:20 184:13
  204:3 228:8
  238:6 244:15
  255:15
**threw** 232:1
**till** 199:9
**time** 7:6,24
  12:18,20 13:4
  13:17 14:22,25
  15:25 16:12,14
  18:12 19:2,5

19:13 20:20
21:3,5,6,10
22:2,14 23:24
24:9 26:7,10
26:16 27:20
29:11,19 30:25
31:6 35:20
37:18,23 38:10
38:16,25 39:4
42:16 47:1
48:15 49:21
52:2,5 55:10
56:15 62:20,23
67:16 72:6,6,6
75:25 76:21,25
77:9 84:12
86:17 88:14
92:12,15 93:25
95:17 96:2,14
113:19 116:5
116:15 118:1
120:15 125:1,4
127:2,5 139:1
139:12,15
144:4,5,25
147:17 150:25
153:6 159:14
160:11 163:16
165:3,24
166:11 167:13
167:15 173:2,5
175:4 184:25
185:3 187:2
196:14 203:7

HIGHLY CONFIDENTIAL

**[time - treatment]**

205:6,16 206:9 208:1 211:3,11 211:12,19 215:25 216:6,9 219:6 221:10 221:11 225:1 226:14 228:22 232:3,17 233:20,23 241:20 250:12 252:9 255:8 260:11 261:10 262:18

**timeframe** 262:8

**times** 4:21 18:14 69:12 93:2,9 142:12 152:12,21 158:22 160:6 160:11 162:2 202:8,17 218:19 222:24 235:2 241:21 242:15

**timing** 150:15

**tired** 253:4

**tissue** 207:10 207:13,14

**titled** 4:21 5:10 5:17 235:13 238:9 254:2

**tlr4** 180:17 181:1

**today** 7:15 9:22 26:5,6 30:24 31:17 37:25 59:6,21 79:11 79:24 80:3 82:14 94:7,9 103:15 106:22 107:4,10 109:8 109:20 113:19 116:14 118:22 122:9 123:25 124:4 126:19 129:1 131:6,18 132:12 136:25 144:13,14 146:10 177:1 182:12,15 184:15 196:4 211:5,9 232:23 234:21 235:1 244:7 245:14 246:25 247:5 248:18 249:1,5 249:13,15 250:3 251:1,20 256:10,23

**today's** 55:19 259:16

**todd** 215:20

**together** 125:11 174:11 188:23 189:4 196:15,21 225:20 240:22

243:14 252:17

**told** 14:15 20:24 37:16,19 37:20 65:7 102:19 103:3 103:16 130:21 142:19 154:15 164:17,21 170:10 171:9 194:9 198:25 250:23 251:2

**tolerate** 225:11 225:17

**tony** 40:24 41:6 41:20

**took** 11:22 14:4 15:13 20:11 50:20 67:7 95:13 142:21 157:4 166:20 208:20 210:9 218:18,25

**top** 49:1 80:20 80:24 95:1 126:5 157:12 159:25 193:3 206:17 251:17

**topic** 127:21

**torture** 82:4

**total** 184:9 228:17 259:17 260:11

**totally** 14:23

**touch** 18:3 226:13

**towards** 81:3 124:10 156:17 201:19

**town** 225:24 253:7,20

**track** 104:5

**traditional** 14:16

**train** 42:7

**training** 10:12

**transcript** 52:9 108:18 130:9 166:10 253:5 259:21 260:3 261:12 262:6 262:19 264:5,8

**transfer** 186:11

**transitional** 187:2

**translational** 186:25 187:3,4

**tread** 146:4,5

**treasury** 225:5

**treat** 52:13,16 52:20,24 53:11

**treated** 182:9

**treating** 24:5 26:8 27:5 209:3

**treatment** 19:17 223:22

HIGHLY CONFIDENTIAL

**[trial - understand]**                                          Page 71

| | | | |
|---|---|---|---|
| **trial** 18:17 27:15 32:14 35:25 46:8 49:13,14,19,19 50:5,15,19 51:4,16 56:22 63:15 67:12,14 68:5 86:3 98:3 98:22 99:11 155:1,19 156:3 167:9 170:19 171:11,13 174:19 188:24 189:8,13 191:21 200:6,7 200:16 201:8 222:21 228:10 245:25 246:7 250:22 | **true** 13:4 79:13 126:16 130:21 131:14 148:16 154:23 198:10 203:6 232:3 261:12 264:8 | **tubbs** 3:7 7:18 261:4,19 | **u** |
| | **truth** 261:8 | **tumor** 235:15 | **u** 28:20 48:19 |
| | **truthful** 80:2 | **tumors** 236:2 | **ultimately** 11:7 12:6,8 13:13 33:24 34:11 67:3 169:16 241:7 |
| | **try** 9:10,13,24 9:24 12:24 13:6,8 20:25 23:21 27:9 42:21 47:23 59:20 62:7 67:13 72:9 79:4 80:19 133:14 166:19 238:20 255:5 | **turn** 105:4 159:3,9 227:11 | |
| | | **turned** 204:23 224:15 240:19 | **unable** 120:23 |
| | | **turns** 193:15 | **unacceptable** 97:2 99:21 |
| | | **tweets** 68:24 197:18,18 | **unclear** 9:9 48:9 108:17,19 177:8 |
| | | **twitter** 59:11 68:25 | |
| **trials** 18:17 23:19 32:12 41:10,11 49:14 49:17 57:5,20 86:22 88:17 89:4,5,18 117:11 192:2 | **trying** 27:3 28:13 35:15,16 35:23 58:11,12 58:17,23 59:7 62:15 97:14,14 103:7 106:11 140:4 146:4,5 155:16 177:2 177:25 180:8 184:8,10 188:12 194:16 238:13 | **two** 11:11,12 18:17 24:10 25:22 34:12,21 43:18 72:22 80:15 81:9 82:24 85:23,25 95:14 103:20 104:3 108:8,11 108:22 116:18 122:21 139:2 157:23 168:1 169:8 170:3 178:17 179:20 181:13 192:3 210:6 230:7 240:22 244:9 246:13 248:6 | **uncomfortable** 14:12 |
| | | | **under** 12:7 52:9 121:7 165:2 |
| | | | **underlay** 96:5 |
| | | | **underlying** 41:18 48:2 152:13,19 235:4,23 243:10 244:6 244:16 |
| **tried** 23:11,13 59:24 67:16 214:24 | | | |
| **trouble** 50:14 83:3 200:7 | **tsc** 186:4 187:6 187:7,8 244:9 246:14 | **type** 186:14 | **understand** 9:1 24:16,22 26:4 32:4 34:5,17 35:24 38:2,18 54:22 55:21 58:17,23 76:9 79:3,3 83:14 85:23 87:3 |
| **troubled** 224:9 227:10 | | **typewritten** 261:11 | |

HIGHLY CONFIDENTIAL

**[understand - validation]**                                    Page 72

| | | | v |
|---|---|---|---|
| 103:11 107:8 108:11 115:3 116:4,9 118:17 119:24 121:9 122:6,8 131:6 131:9 135:20 137:13 138:15 139:21 140:5 155:16 174:8 177:24 180:7,8 182:14 190:4 197:18 206:24 213:4 231:23 231:23 245:10 253:11 **understanding** 17:21 22:13 26:15,22 28:6 28:9,17 29:1 36:7,14 37:4,7 37:8 41:17 44:25,25 45:3 81:10 95:18 99:18 105:12 144:24 146:14 146:16,23 147:12 155:6 181:11,13 183:8,8 219:24 221:12 235:21 236:24 239:1 239:16 244:14 **understatement** 255:24 | **understates** 155:24 **understood** 23:14 33:9 36:16,16 42:5 103:11 163:1 195:19 **undertake** 133:3,11 135:25 190:17 **undertaken** 190:10 **underway** 170:19 244:14 244:15 **unfair** 57:3 63:17,17,18,18 **unfairly** 63:16 155:3 **unfortunate** 173:12 **unhappy** 110:8 **unit** 7:9 52:5 62:23 92:15 125:4 139:15 185:3 233:23 **united** 1:1 7:13 127:3 **universities** 183:16 **university** 4:20 10:7 37:9 142:17,21 179:7 183:16 | 235:20 **unknown** 48:6 **unmet** 192:4 **unpopular** 206:7 **unquote** 98:23 **unsure** 169:6 **untrue** 85:10 155:4 241:2,6 **untruthful** 156:16 **unusual** 33:15 33:17 **upper** 110:18 **upset** 196:6 **use** 62:7 114:9 130:24 145:2 176:14 178:15 233:17 253:2 **used** 45:18,22 111:10 112:4,8 113:5,14 164:23 171:20 172:20,23 182:24 186:13 207:21 259:18 262:19 **useful** 207:4 219:11 **using** 27:8,9 181:22 **utilize** 144:9 223:19 | **v** 153:8 262:4 263:1 264:1 **vacation** 205:5 206:7 **vague** 18:11 28:12 36:2 39:23 48:3 64:3 82:18 83:18 84:6,16 87:12,16 88:13 91:9 103:4 114:12 121:3 140:2,4 175:5 187:16 188:7 189:25 201:14 214:17 215:3 242:12 244:17 **vaguely** 129:25 130:6 153:20 216:18 **validate** 172:3 236:9 244:16 **validated** 112:5 113:6 120:5 **validates** 235:3 **validating** 236:4,6,21 243:3,3,10 244:5 **validation** 112:9 173:11 |

HIGHLY CONFIDENTIAL

**[valuation - want]**                                                       Page 73

| | | | |
|---|---|---|---|
| **valuation** 34:1 | **video** 1:13 3:3 | **views** 58:19 | 77:7 96:8,9,15 |
| **value** 27:22 | 7:6,9 259:20 | 157:20 158:3 | 97:21 102:2 |
| 70:17,23 71:2 | **videoconfere...** | 206:4 210:23 | 121:9 127:5 |
| 86:14,20 88:3 | 2:3,17,17,18 | **virtually** 165:2 | 128:4 129:4,11 |
| 88:4,7,12,19 | **videographer** | 187:9 | 131:8 132:14 |
| 91:6,12 193:18 | 2:16 7:2,18 | **visit** 104:16 | 132:23 133:5 |
| 224:13 | 8:15 52:1,4 | **visited** 103:25 | 133:12 136:16 |
| **valued** 33:25 | 62:19,22 92:11 | **visiting** 253:10 | 137:1,4,5,17,25 |
| **vandevrede** | 92:14 124:25 | **voice** 19:6,19 | 138:3,8 141:6 |
| 201:7 | 125:3 139:11 | **voicemail** 19:3 | 142:23 160:1 |
| **various** 68:21 | 139:14 184:24 | 19:6,11,12 | 160:18,23 |
| 68:24 69:9 | 185:2 233:19 | **volatility** 33:23 | 167:18,20 |
| 243:13 255:23 | 233:22 259:15 | **voluntarily** | 168:3 175:23 |
| **vendors** 171:20 | **view** 9:22 18:9 | 85:14 | 185:7,12 188:5 |
| 171:23 | 23:17 32:21 | **vote** 71:7,11 | 228:21 229:2 |
| **verification** | 42:6 49:13 | **voted** 71:16,21 | 243:11 |
| 112:9 | 57:1 59:4,22 | **vs** 1:6,9 | **wang's** 94:8,22 |
| **verified** 112:5 | 67:22 82:15,23 | | 95:19,25 96:3 |
| 113:6 | 86:8 88:9 | **w** | 97:24 98:4 |
| **verify** 262:9 | 91:11 107:13 | **w** 25:6 28:21,21 | 99:14,20 109:6 |
| **veritext** 7:17,19 | 121:5 123:21 | 205:22 | 109:9,22 |
| 259:18 262:14 | 127:8,16,23 | **wait** 36:25 | 110:25 111:25 |
| 262:23 | 129:10,13 | 199:8 | 114:7 120:5 |
| **veritext.com** | 163:2 165:11 | **waiting** 199:6 | 129:7 184:19 |
| 262:15 | 195:21,24,25 | **waived** 166:5 | 204:7 235:3 |
| **version** 16:19 | 201:11 213:12 | **waiver** 166:12 | **want** 9:25 |
| 65:13 254:17 | 217:15 219:10 | 195:5,6 | 12:25 14:20 |
| **versus** 7:11 | 234:21 235:23 | **walk** 157:7 | 21:1,2 24:23 |
| 30:8 227:24 | 237:12 245:18 | 179:2 | 26:14 46:22 |
| **vice** 118:9 | 245:20 | **walking** 56:23 | 47:23 52:8 |
| 185:25 | **viewpoint** | 56:23 | 62:14,15 65:8 |
| **victim** 49:9 | 202:8 210:10 | **wall** 33:4 | 68:25 69:20 |
| **victims** 259:4 | 210:10 | **wang** 28:18,20 | 77:16,24 79:17 |
| | | 28:23 76:10 | 79:20,21 86:13 |

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 86:13,16,21 | 252:17,20,21 | we've 46:4 | 68:20 86:1 |
| 92:3 101:13,18 | wanting 47:4 | 51:23 92:8 | 165:4 171:8 |
| 135:8,12 139:9 | wants 77:15 | 103:13 117:22 | 198:4,9 200:9 |
| 145:9 146:24 | warned 251:13 | 124:19 170:24 | 200:10 224:8 |
| 147:16,17 | warren 225:3,9 | 176:3 184:21 | 224:10 225:10 |
| 150:10 156:25 | 225:9 | 189:10 211:1 | 240:11 |
| 157:5 163:15 | waste 211:3 | 230:10 242:24 | western 111:13 |
| 165:22 166:14 | watch 220:9 | 244:6 | 111:15 129:3,7 |
| 168:18 170:17 | wavier 195:7 | weakness 61:22 | 129:12 131:3,7 |
| 176:6,6,18,20 | way 14:14 | 65:2,6,14 70:9 | 131:8,16 |
| 181:15 188:13 | 16:14,18 23:24 | 73:22 74:10 | 137:12,13,17 |
| 198:13 200:24 | 33:4 46:23 | weaknesses | 138:18 139:24 |
| 202:4 212:2 | 47:24 48:7,9 | 74:18 | 140:18 141:7 |
| 242:22,23,23 | 59:2 62:7 | weapons | 163:2 207:20 |
| 243:2 255:3 | 72:10 89:2 | 172:20,23 | 211:24 |
| 257:14 | 115:4 122:23 | webcast 220:5 | whatsoever |
| wanted 20:3,3 | 152:6,19 156:7 | website 67:7 | 232:14 |
| 22:8,18 24:15 | 159:22 163:23 | 69:19 202:25 | whispering 7:5 |
| 24:22 47:12 | 164:19 166:19 | 241:1 | whistleblowers |
| 86:2,3,19 | 183:10,18 | week 122:16 | 5:10 |
| 87:22 88:1 | 186:8 187:15 | 216:3 244:9 | whoa 100:7,7,7 |
| 91:1 97:7 | 187:18,18 | 252:25 | 114:18,18,18 |
| 100:3 112:13 | 191:19 198:5 | weekend | 229:24,24,24 |
| 113:21 115:19 | 199:7 200:8,18 | 257:17,22 | wide 163:20 |
| 116:22,23 | 204:3 207:4,5 | weeks 49:21 | wigzell 5:6 25:3 |
| 120:4 121:25 | 226:11 227:9 | 50:14,17,22,24 | 25:8,9,10,11 |
| 122:4 138:11 | 227:21 238:13 | 212:21 | 26:19 31:3 |
| 149:23 156:12 | 242:20 243:12 | weird 28:2 | 202:24 203:18 |
| 156:15 163:14 | 253:5 | welcome | 204:14,18,24 |
| 163:22 164:18 | ways 42:22 | 215:24 216:15 | 205:18,22 |
| 173:19 191:3 | 43:19 54:20 | wellington | 210:22 211:13 |
| 199:16 217:22 | 82:6 176:15 | 199:19 | 212:9 |
| 222:25 225:23 | 183:9 | went 11:10 | wigzell's |
| 230:19 236:22 | | 17:18 22:8 | 203:24 208:18 |

HIGHLY CONFIDENTIAL

**[wigzell's - yeah]**                                      Page 75

| | | | |
|---|---|---|---|
| 210:3 213:12 | 102:1 120:25 | 213:21 222:6 | **written** 3:1 |
| **willing** 242:24 | 140:7 152:23 | 252:7,10 | 202:1,2 241:22 |
| **withdraw** 87:4 | 152:23 180:24 | **works** 156:8 | 251:25 |
| 87:20 88:10 | 198:10 202:2 | **world** 191:4 | **wrong** 135:23 |
| 91:15,25 92:4 | 227:7 228:16 | 200:3 | 148:7 207:1,1 |
| 204:11 | 230:23 231:18 | **worldwide** | 223:14 246:12 |
| **withdrawn** | 232:1,18 253:3 | 200:14 | 248:9 |
| 129:9 197:4 | **words** 164:23 | **worried** 222:18 | **wrote** 34:12,15 |
| **withdrew** | 253:1 | **worry** 202:13 | 145:5 162:22 |
| 85:14 137:20 | **work** 12:12 | **worse** 170:4 | 164:9 170:8 |
| **witness** 8:7,10 | 16:4 47:4 53:1 | **worth** 34:2 | 232:2 251:23 |
| 8:18 42:2 45:3 | 59:16 96:8 | 168:19 | 252:23 |
| 54:22 135:1,9 | 98:21,25 99:1 | **wound** 241:7 | **x** |
| 139:7,17 | 99:22 114:8 | **wrecked** | **x** 68:25 174:13 |
| 143:16 158:25 | 139:9 140:16 | 225:24 | **y** |
| 162:11 177:15 | 141:4 144:3,5 | **write** 33:2 46:4 | **y** 28:21 174:13 |
| 231:16 254:4 | 144:12,18 | 154:13 163:21 | **yale** 99:2 179:7 |
| 262:8,10,12,18 | 154:11 169:13 | 169:23 172:4 | 181:23 182:5 |
| **witnessed** | 172:2 180:3 | 173:9 174:5 | 183:1,2 185:25 |
| 34:15 | 181:4 185:6 | 202:1 226:18 | 186:1 |
| **wondered** | 188:5 190:22 | 229:9 231:17 | **yan** 28:18,20 |
| 23:23 | 191:1 204:7 | 237:17 | 97:21 160:1,18 |
| **wonderful** | 211:25 212:25 | **writer** 10:21 | **yeah** 9:12 10:4 |
| 200:15 213:18 | 237:15 244:3 | **writes** 119:14 | 12:8 14:9,9,25 |
| **wondering** | 252:5,13 | 120:16 130:24 | 15:8 16:4 18:1 |
| 193:8 | **worked** 11:8,10 | 192:17 204:1 | 18:25 19:12,21 |
| **wood** 77:6 | 11:15,17 | 206:16,18,22 | 23:3 25:24 |
| **woods** 73:9 | 200:17 | 207:17 208:3 | 27:13,23 35:11 |
| 76:23 77:3,9 | **working** 20:19 | 209:22 212:10 | 36:13,20 41:20 |
| 77:18 78:10,24 | 144:25 175:11 | 218:8 | 43:11,12,24,24 |
| 78:25 79:4 | 176:3,4,24 | **writing** 60:1,4 | 47:16 51:25 |
| **word** 33:9,11 | 183:23,24 | 60:8,15 192:17 | 55:22 60:24 |
| 37:11 62:7 | 184:3 194:17 | 230:7 241:5 | 61:20 65:10 |
| 68:2 89:13 | 196:21 213:17 | | |

HIGHLY CONFIDENTIAL

**[yeah - zaur]**                                                    Page 76

| | | | |
|---|---|---|---|
| 66:11 68:15 | 203:11,23 | 259:11 | 36:6 37:3 40:2 |
| 69:8 70:3,7,15 | 204:5,23 | **years** 11:12,12 | 42:10,21,25 |
| 71:5,19 72:17 | 205:24 206:6 | 12:5 15:15 | 43:4,7,17,20 |
| 72:20 74:6 | 206:15,15 | 19:5 24:19 | 44:5,9,18,22,24 |
| 75:8 76:8 | 207:16 209:1,4 | 27:3,4,4 48:8 | 45:10 47:22 |
| 79:24 84:19 | 209:6,19,24 | 86:1,1 156:18 | 49:12 51:25 |
| 86:25 87:9 | 210:1,24 | 169:8 181:14 | 52:19 53:13,15 |
| 88:15 89:18 | 211:14 212:19 | **yield** 183:11 | 53:19,23,25 |
| 94:19 103:9 | 212:23 213:3,6 | **york** 1:1 2:4,4 | 54:24 55:3,9 |
| 104:5 106:15 | 215:21 216:6 | 2:14,14 4:20 | 55:12,15 56:7 |
| 112:6,11 | 216:14,25 | 4:21 6:3 7:14 | 57:6 58:16,22 |
| 113:12,17 | 218:10,21,23 | 11:8 69:12 | 58:23 59:7 |
| 115:11 116:18 | 219:23 221:5 | 93:2,9 134:5 | 60:14,18 61:3 |
| 117:9 118:7 | 221:11,14,25 | 142:11,17,21 | 61:15,21 62:1 |
| 119:24 122:14 | 222:16 223:17 | 152:12,21 | 62:6,9,14,25 |
| 124:1 130:5 | 224:2 227:1 | 158:22 160:6 | 63:11 64:7,15 |
| 132:25 136:8 | 228:22 229:20 | 160:11 162:2 | 64:20,24 65:8 |
| 136:13 140:21 | 230:22 231:2 | 202:8,17 | 65:12,22 66:3 |
| 140:25 141:12 | 232:13,19 | 219:20 241:21 | 66:12,19 67:5 |
| 143:10,11,12 | 233:10,15,16 | **younger** 20:12 | 68:12 69:3,11 |
| 143:18 145:10 | 235:19,25 | **z** | 69:22 70:8,16 |
| 149:11,20 | 237:2,6,18,19 | | 70:24 71:7,23 |
| 150:10 152:22 | 239:12 244:2,2 | **z** 25:6 205:22 | 72:22 73:8,19 |
| 152:24 153:20 | 244:8,19,20 | **zach** 8:11 | 74:1,7,21 75:9 |
| 156:24 157:1 | 246:21 247:23 | **zachary** 2:12 | 76:9,18 77:21 |
| 158:1 161:13 | 248:4 251:8,18 | **zaur** 2:2 3:13 | 77:24 78:2,6 |
| 162:1 165:23 | 253:23 255:9 | 8:3,3,23 9:1 | 78:10,16,23 |
| 172:20 174:20 | 258:7,7,7,7,10 | 12:22 13:23 | 79:11,16,20 |
| 175:17 176:13 | 259:12 260:3 | 14:6 17:16 | 80:11 81:22 |
| 177:2,6 181:9 | **year** 11:16 | 18:21 20:13 | 82:4,14 83:1 |
| 182:15,17,20 | 23:17 94:12 | 21:8 22:17,22 | 83:20 84:1,10 |
| 187:24 190:7 | 102:15 105:13 | 25:7 28:16,20 | 84:22 85:13 |
| 192:12 193:2 | 144:21 170:9 | 28:23 30:11,14 | 87:2,10,14,18 |
| 194:25 201:10 | 177:5 199:8 | 33:1 34:8,9 | 87:22 88:5,16 |

HIGHLY CONFIDENTIAL

**[zaur - ztaylor]**                                                    Page 77

| | | | |
|---|---|---|---|
| 89:10,13,20 | 132:20 133:18 | 182:17,20,23 | 258:18,24 |
| 90:18,21,25 | 133:22,24 | 184:15,23 | 259:13,22,24 |
| 91:7,14,19,24 | 134:3,9,13,17 | 185:5,17 | **zoom** 52:16 |
| 92:10,17 93:1 | 134:20,23 | 187:13,22 | **ztaylor** 2:15 |
| 93:13 94:3,20 | 135:2,6,11,19 | 188:12 190:4 | |
| 96:3 97:15 | 135:23,24 | 190:16,23 | |
| 99:24 100:15 | 136:5 138:16 | 191:18 193:19 | |
| 100:23 101:6 | 139:19,22 | 194:12,24 | |
| 101:14,24 | 140:3,11,15,21 | 195:6,12 | |
| 103:8,19 | 140:25 141:4 | 196:25 197:9 | |
| 105:21,25 | 141:16 143:19 | 198:21 200:23 | |
| 106:8,22 107:5 | 144:1 145:8,14 | 201:5,6,16 | |
| 107:9,20 108:3 | 145:24 146:4,9 | 202:23 203:6 | |
| 108:16,21 | 148:21 149:3 | 205:22,24 | |
| 109:2 111:12 | 149:15,22 | 212:20 213:24 | |
| 111:16 112:18 | 150:13 151:20 | 214:1,11,13,19 | |
| 113:11,14,16 | 152:4,11 153:8 | 214:25 215:5 | |
| 114:2,15,21,24 | 153:14,18 | 215:11,17,18 | |
| 115:2,5,18 | 154:8,19 | 218:7 220:22 | |
| 116:7 117:4,19 | 155:15 156:1 | 220:24 223:12 | |
| 118:23 119:4,9 | 156:11,22 | 224:6 227:5 | |
| 119:13,24 | 158:13,21 | 229:8 230:5,9 | |
| 120:14,25 | 159:3 161:5,11 | 230:12 231:14 | |
| 121:4,13,25 | 161:16,18,23 | 231:17 233:8 | |
| 122:11 123:5,9 | 162:15 163:8 | 233:17,25 | |
| 123:18 124:1 | 163:11 164:11 | 234:24 235:1 | |
| 124:20,22 | 165:22,25 | 238:5,8 239:9 | |
| 125:6,14 | 166:3,18 | 239:10 242:8 | |
| 126:11,16,22 | 167:16 173:9 | 243:2,24 | |
| 126:24 127:15 | 174:5 175:8 | 244:21 245:12 | |
| 127:20 128:2 | 176:9 177:20 | 245:20 246:23 | |
| 128:21 129:14 | 179:1 180:14 | 248:23 249:19 | |
| 129:17 130:5,8 | 180:16,18 | 249:24 250:7 | |
| 131:14 132:12 | 181:2 182:13 | 251:6 253:8,21 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.