# Exhibit 125

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:24-cv-05948-JLR-OTW

ADRIAN HEILBUT, JESSE BRODKIN and ENEA MILIORIS,

Plaintiffs,

DAVID BREDT and GEOFFREY PITT,

Intervenor-Plaintiffs,

vs.

CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,

Defendants.

_____

VIDEORECORDED 30(b)(6) DEPOSITION OF

CASSAVA SCIENCES, INC.

(through ERIC SCHOEN)

September 30, 2025

_____

Page 2

APPEARANCES:

ON BEHALF OF THE DEFENDANT, CASSAVA SCIENCES, INC.:
SCOTT CAMPBELL, ESQ.
JOHN TURQUET BRAVARD, ESQ.
Gibson Dunn & Crutcher, LLP
1900 Lawrence Street, Suite 3000
Denver, Colorado  80202
Phone: 303-298-5700
Email: scampbell@gibsondunn.com
jturquetbravard@gibsondunn.com

ON BEHALF OF THE PLAINTIFFS:
DAVID KUMAGAI, ESQ.
ISAAC ZAUR, ESQ. (via videoconference)
AMANDA WONG, ESQ. (via videoconference)
Clarick Gueron Reisbaum, LLP
41 Madison Avenue, 23rd Floor
New York, New York  10010
Phone: 646-453-4026
Email: dkumagai@cgr-law.com

FOR THE DEFENDANTS, REMI BARBIER and LINDSAY BURNS:
ARIC WU, ESQ.
BakerHostetler, LLP
45 Rockefeller Plaza
New York, New York  10111
Phone: 212-589-4200
Email: awu@bakerlaw.com

Also Present:  Davis Baumunk, videographer
Adrian Heilbut (via videoconference)
Enea Milioris (via videoconference)
Jesse Brodkin (via videoconference)

Page 3

PURSUANT TO WRITTEN NOTICE and the appropriate Rules of Civil Procedure, the video-recorded 30(b)(6) deposition of CASSAVA SCIENCES, INC., through ERIC SCHOEN, called for examination by the Plaintiffs, was taken at the offices of Gibson Dunn & Crutcher, LLP, 1900 Lawrence Street, Suite 3000, Denver, Colorado, commencing at 9:03 a.m. on September 30, 2025, before Bonnie Carpenter Johnshoy, CSR, RPR, CRR.

I N D E X

EXAMINATION:                      PAGE
By Mr. Kumagai                 8
By Mr. Campbell                285
By Mr. Kumagai                 295

EXHIBITS:                         PAGE
Exhibit 130   Notice of Rule 30(b)(6) Deposition   14
of Cassava Sciences, Inc.

Exhibit 131   "Response of Cassava Sciences,   40
Inc., to Public Allegations of
Fraud and Research Misconduct"
CASSAVA_000797948 through 797995

Exhibit 132   Letter to FDA with Enea Milioris,   54
Adrian Heilbut, Jesse Brodkin, and
Patrick Markey

Exhibit 133   11/3/21 PowerPoint presentation,   56
Cassava Sciences:  a Shambolic
Charade

Exhibit 134   PowerPoint presentation, "SavaDX   62
Exposed"

Exhibit 135   PowerPoint presentation, "Cassava   64
and the Wang Lab: Seeing Through
the Blind

Page 4

EXHIBITS (Continued)                PAGE
Exhibit 136   10/20/21 and 11/2/21 Twitter   65
thread

Exhibit 137   Quick Reference Sheet for Rule   91
30(b)(6) Deposition

Exhibit 138   5/24/19 email from Remi Barbier to   93
board of directors
CASSAVA_000004863

Exhibit 139   7/3 to 7/5/19 email thread between   97
Lindsay Burns, T.W. Robbins, and
Barbara Sahakian
CASSAVA_00055933 through 55937

Exhibit 140   5/15 and 5/16/20 email thread   104
between Lindsay Burns and Steven
Arnold
CASSAVA_000018239 and 18230

Exhibit 141   11/9 and 11/14/20 email thread   108
between Lindsay Burns and Jeffrey
Cummings
CASSAVA_000020942

Exhibit 142   Letter from US FDA to Cassava   117
Sciences, denial of breakthrough
therapy designation
CASSAVA_000100022 through 100025

Exhibit 143   8/24/21 email from Remi Barbier to   121
distribution list
CASSAVA_000771233 and 771234

Exhibit 144   2/8 through 2/11/22 email thread   128
between Gary Lauder, Sandy
Robertson, and Remi Barbier
CASSAVA_000709518 through 709522

Exhibit 145   1/18/22, Expression of Concern,   144
Wang, et al., The Journal of
Neuroscience

Exhibit 146   PLoS One Retraction   147

Exhibit 147   Neurobiology of Aging Expression   156
of Concern

Page 5

EXHIBITS (Continued)                PAGE
Exhibit 148   City University of New York Final   188
Investigation Report of Hoau-Yan
Wang
RFCUNY000743 through 792

Exhibit 149   3/8/23 letter from Orrick to City   214
University of New York
CASSAVA_001309142 through 1309144

Exhibit 150   11/14/23 email thread between Jim   229
Kupiec, Michael Marsman, and Tammy
Bean with attachments
CASSAVA_001192666 through 1192681

Exhibit 151   4/2022 JPAD excerpt   247
CASSAVA_000740322 through 740325
and 000740556, 000740570 and
740571740571

Exhibit 152   11/3/22 email from Eric Schoen to   254
distribution list with attachment
CASSAVA_001278817 through 1278820

Exhibit 153   5/2/22 Letter from Benesch to the   267
New York Times
CASSAVA_000986192 through 986202

Exhibit 154   7/26/22 letter from Benesch to   270
Science Magazine
CASSAVA_000986398 through 986405

Exhibit 155   7/26/22 email thread between   274
Marisa Taylor and Kate Watson Moss
CASSAVA_001495215 through 1495218

Exhibit 156   8/2/22 email thread between Kate   276
Watson Moss, J. Mogenson, Remi
Barbier, and Eric Schoen
CASSAVA_001415124 through 1415127

Exhibit 157   11/14/20 email thread between   288
Lindsay Burns and Jeffrey Cummings
CASSAVA_000041919 through 41922

Exhibit 158   12/1 through 12/11/20 email thread   292
between Lindsay Burns and Jeffrey
Cummings

2 (Pages 2 - 5)

Page 6

EXHIBITS PREVIOUSLY MARKED:

Exhibit 56    Cassava Audit Number A 27 Audit    180
              Report
              CASSAVA_000796682 through 796704

Exhibit 66    11/1 through 11/16/22 email thread    173
              between Laura Rodriguez, Michael
              Marsman, and Andrew Papanastasiou
              CASSAVA_001213617 through 1213621

Exhibit 74    First Amended Complaint    277

Exhibit 76    Department of Health and Human    169
              Services, Food and Drug
              Administration Form 483
              CASSAVA_000898032 through 898034

Exhibit 84    Public Statement Regarding Recent    201
              Allegations Against Cassava
              Sciences, Inc, 9/3/21
              CASSAVA000310872

Exhibit 85    Statement from City University of    221
              New York

Exhibit 86    New York Times article,    160
              "Scientists Question Data Behind
              an Experimental Alzheimer's Drug"

Exhibit 96    The Journal of Clinical    249
              Investigation, "Conflicting
              interests: when whistleblowers
              profit from allegations of
              scientific misconduct"
              CASSAVA_001315724 through 1215726

Page 7

PROCEEDINGS

VIDEOGRAPHER: Good morning. We are going on the record at 9:03 on September 30th, 2025.

This is Media Unit 1 of the video-recorded 30(b)(6) deposition of Cassava Sciences, Inc., represented by Eric Schoen, taken by counsel for plaintiff in the matter of Adrian Heilbut, et al., versus Cassava Sciences, Inc., et al., filed in the United States District Court for the Southern District of New York, Case Number 1:24-CV-05948-JLR-0TW.

The location of this deposition is 1900 Lawrence Street, Denver, Colorado.

My name is Davis Baumunk representing Veritext and I am the videographer. The court reporter is Bonnie Carpenter from Veritext.

Will counsel please state their appearances, starting with the noticing attorney.

MR. KUMAGAI: This is David Kumagai from the law firm Clarick Gueron Reisbaum on behalf of the plaintiffs, Adrian Heilbut, Jesse Brodkin and Enea Milioris, and I believe also participating remotely and appearing remotely for this deposition is my colleague Isaac Zaur, also from Clarick Gueron Reisbaum, and the plaintiffs, Adrian Heilbut, Jesse Brodkin, and Enea Milioris.

Page 8

MR. CAMPBELL: I'm Scott Campbell from Gibson Dunn & Crutcher along with my colleague John Bravard, appearing on behalf of Cassava Sciences, and the witness, who is appearing on behalf of Cassava Sciences.

MR. WU: Aric Wu from Baker Hostetler on behalf of defendants, Remi Barbier and Lindsay Burns.

ERIC SCHOEN,
having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. KUMAGAI:

Q. Okay. Good morning, Mr. Schoen.

A. Good morning.

Q. You understand that I represent the plaintiffs in this case, Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris?

A. Yes, I do.

Q. So if I refer to my clients or our clients throughout the day, I'm referring to those three people. Do you understand?

A. Understood.

Q. Okay. And you understand you are providing testimony today on behalf of the company Cassava Sciences, Inc.?

A. I do.

Page 9

Q. Mr. Schoen, does any of the research about simufilam or SavaDX contain manipulated or fabricated data?

A. Not to my knowledge or the company's knowledge.

Q. Does Cassava know whether or not whether any of the simufilam research published by Dr. Wang, Dr. Burns, or anyone else contains manipulated or fabricated data?

A. Not to the company's knowledge.

Q. What evidence does Cassava have in its possession to refute the allegations by our clients that the research underlying simufilam was manipulated or fabricated?

A. Sure. Let me go to some of the reference materials because there's -- it's voluminous.

Q. Okay. And can you just state the tab that you're looking at?

A. Sure. CASSAVA_0000797960.

Q. Sorry. What tab in the binder?

A. Tab 10.

Q. Okay.

A. So I may refer to the materials, but I'll put some of it in my own words. So -- sorry. Can you repeat the question, just so I get it precisely?

3 (Pages 6 - 9)

Page 10

Q. Sure. What evidence does Cassava have in its possession to refute the allegations by our clients that the research underlying simufilam was manipulated or fabricated?

A. So evidence would be third-party independent, you know, researchers doing their own work that either corroborates or -- or conforms to the same Cassava conclusions.

We have a Phase 2b open label study that was done at -- I believe it was 16 independent sites, give or take, that also showed not efficacy for the drug, but promising evidence of its -- you know, of its potential.

That we've got research that's been published in peer-reviewed journals.

We've got, you know, pre -- preclinical research. We've got Phase 2a, you know, trial results. There's a whole -- there's a whole body of -- of research that refutes or -- or demonstrates that the research is not fabricated, not manipulated, and not a fraud.

Q. Okay. Starting with the first category that you referenced, third-party materials, I believe, to paraphrase. What specifically are you talking about there?

A. Let me look to some reference materials. In the same tab 10, I'm moving to page 30 to 35. Do you

Page 11

want -- the specific reference is CASSAVA_000797977.

Q. Okay.

A. And you have to remember I'm the chief financial officer for the company, so some of the scientific stuff, I just need to go to reference stuff.

But the first one would be a 2020 study from Yale University, which shows a confirmatory study relating to simufilam by a laboratory unaffiliated with Cassava was published in February 2020, more than a year before the citizens petition was filed. The study established the bioactivity of the drug as well as its effect on diseases associated with dysfunctional filamin A. The study was performed using actual simufilam provided to the researchers by Cassava.

Q. Okay. And Cassava's position is that was an independent study, even though Dr. Bordey was a Cassava investor?

MR. CAMPBELL: Object to form.

A. Do I --

MR. CAMPBELL: You can still answer the question.

A. Our position is she was an independent researcher and if she was an investor, that was -- at the time was unknown to the company. Or sorry. I should say unknown to me. I don't know if the company was aware.

Page 12

Q. (By Mr. Kumagai) And it's independent, even though Dr. Burns was a co-author? Is that the company's view?

A. That's the company's view.

Q. Okay. The next study?

A. 2022, Nagoya University study. In May 2022, researchers at Nagoya University graduate school of medicine, Japan, published another study that further supports Cassava's scientific hypothesis. Researchers studied progressive supranuclear palsy, one of a class of diseases referred to as tuapthies that includes Alzheimer's disease. The Nagoya researchers determined that filamin A is instrumental in the tau pathologies observed in progressive supranuclear palsy, PSP. Specifically, they developed in vivo biochemical evidence that increased filamin A levels, enhanced the phosphorylation and insolubility of tau through interacting acton filaments. They further demonstrated that reduction of filamin A corrected aberrant tau levels in cells cultured from the PSP patients. Their conclusion: Filamin A promotes tau aggregation, providing a potential mechanism by which filamin A contributes to PSP pathology.

Q. Okay. And so if I were to ask you to continue to describe the other studies that the company

Page 13

believes to be third-party or independent support for its science, I take it you would continue to read the paragraphs in this Orrick report submitted to the DOJ in May 2023?

MR. CAMPBELL: Object to form of the question.

A. Yeah. That's -- that's correct. You know, in general, with some of these studies, simufilam was provided to the universities as well as maybe a small stipend for them to run their own studies, but they were independently done. And to us, that's evidence showing that the results were real and not fabricated or manipulated.

Q. (By Mr. Kumagai) And just sticking with this document which is tab 10 in your binder, beginning with the Bates 797948, does Cassava, to this day, stand by this presentation and believe it was an accurate -- or is accurate?

MR. CAMPBELL: Object to form.

A. It was certainly -- it was acc -- we believe it was accurate as of May 15th, 2023.

Q. (By Mr. Kumagai) And in the time since, has the company discovered anything that was inaccurate or should be revised?

A. I'd have to read the entire piece and tell

4 (Pages 10 - 13)

Page 14

you because we've published, we've -- you know, it's an evolving body of knowledge and evidence.

Q. Okay. I'll mark as Plaintiffs' Exhibit 130 a document titled Notice of Rule 30(b)(6) Deposition of Cassava Sciences, Inc.

(Exhibit 130 was marked.)

Q. Mr. Schoen, do you recognize Exhibit 130?

A. I do.

Q. You've seen this before?

A. I believe so, yes.

Q. Can you turn to page 3 with the topics? You see there are 17 topics listed on pages 3 to 4?

A. Yes.

Q. Have you seen each of these topics before?

A. Yes, I have.

Q. And you are prepared to testify on behalf of Cassava as to topics 1 through 17; is that right?

A. I am.

Q. So what, if anything, did you do to prepare for this deposition?

A. I met with attorneys from Gibson Dunn, I reviewed materials.

Q. And when did you meet and for approximately how long?

A. When did I meet?

Page 15

Q. Meet with the attorneys at Gibson Dunn.

A. Yesterday, the full day. A full business day.

Q. So around seven to eight hours?

A. Approximately, yes.

Q. And who else was present? I take it Mr. Campbell. Who else?

A. Mr. Bravard.

Q. Okay. Anyone else?

A. No.

Q. And did you review documents?

A. Yes.

Q. Approximately how many?

A. There's a whole plethora in front of me, so, you know, I didn't read page by page all of these, but I've reviewed a lot of documents.

Q. And did you talk to anyone at Cassava about the deposition or to help you prepare for the deposition?

A. No.

Q. Chris Cook?

A. I -- he knew that I was going to a deposition, but we didn't sit and prepare for it.

Q. So have you had any discussions or meetings outside the presence of counsel about the deposition today?

Page 16

A. No.

Q. Are there any --

A. Other -- no. Other than it's occurring.

Q. No substantive discussions?

A. Correct.

Q. Are there any topics that you lack personal knowledge on?

A. Yes.

Q. And which ones are those?

A. In particular, the ones that are deeply scientific. Again, I'm a -- I'm a financial person; not a scientist.

Q. And so what did you do specifically about the scientific topics to educate yourself to testify on behalf of the company about those topics?

MR. CAMPBELL: Object to the form of the question. You can answer in terms of documents you reviewed that are there, but any communications with counsel and our discussions of the materials are privileged.

A. Okay. Yeah. To prepare, I reviewed documents and then, also, I've been with the company for a number of years, so a lot of these events and materials are things that I've -- I've seen before.

Q. (By Mr. Kumagai) Okay. And so you have a

Page 17

number of binders and documents in front of you today, which I understand from counsel are intended to help you provide accurate testimony on behalf of the company today. Is that fair?

A. That's fair.

Q. You also have a quick reference sheet which is -- appears akin to sort of an index of the documents in the binders; is that right?

A. Correct.

Q. Okay. So as we go today, I would just ask, to the extent you're referring to documents in any of the binders while answering a question, that you state that on the record so that, you know, we can follow along and it's part of the record. Is that okay?

A. Yes.

Q. When did Cassava first consider bringing the defamation action?

A. I don't know that answer. It would have been sometime before the suit was filed.

Q. Did you try to prepare to answer that question on behalf of the company?

A. Not specifically.

Q. When did Cassava make the decision to commence the defamation action?

A. That would have been a board decision, but

5 (Pages 14 - 17)

Page 18

I don't know the exact date.

Q.   And who was involved in the decision to commence the defamation action?

A.   That would have been the board of directors of Cassava and outside counsel.  Sorry.  As informed by outside counsel.

Q.   Aside from the board of directors and outside counsel, was anyone else involved in the decision to commence the defamation action?

A.   The decision was made by the board.  That's who -- that's who can authorize a -- a legal action.

Q.   What was Remi Barbier's role in the decision to commence the defamation action?

A.   Well, he's the chief executive officer, so, clearly, he's going to give his opinions to the board.

Q.   What was Dr. Lindsay Burns' role in the decision to commence the defamation action?

A.   I'm not aware of her role in it.

Q.   Aside from outside counsel, who else, if anyone, did the board or the company consult prior to commencing the defamation action?

MR. CAMPBELL:  Object to form.

A.   I'm not aware of anyone.  I can't know every communication any board member has with anybody else.  I can only know what I've seen or am aware of.

Page 19

Q.   (By Mr. Kumagai)  In preparing today to talk about the purposes and the reasons for the defamation action, did you try to determine who was involved in the decision to commence the defamation action?

A.   Well, I -- I know who was involved in the decision to commence the defamation, so I didn't spend any extra time on it.

Q.   And that's knowledge you have personally as -- you know, in your role as CFO?

A.   In my role as CFO, I attended every board meeting, so I would be present at those.

Q.   What was the decision to commence the defamation action based on?

A.   Well, you had the defendants, who, basically, were claiming the company was a fraud, claiming that our drug was unsafe.

You know, we're an Alzheimer's company.  We're trying to help people with Alzheimer's disease.  And we had people who were, essentially, trying to either destroy the company or shut down the trials and, in a sense, hurt the company and hurt patients.

Q.   Anything else?

A.   Can you repeat the question then?

Q.   What was the decision to commence the defamation action based on?

Page 20

A.   Those -- those are the reasons.

Q.   What were the business considerations, if any, that went into the decision to commence the defamation action?

A.   Well, the big decision was -- well, I guess it would be two-fold.  One, to commence an action costs money.  I'm the CFO.  That's what we think about.  But the important piece of this is we were enrolling two large Phase 3 clinical trials, and the defamatory, false statements of the defendants were, either directly or indirectly -- impossible to tell -- inhibiting our ability to recruit.

We had clinical sites that, you know, were -- agreed to be a site to us and then walked away.  We had, you know, physicians telling us that they had patients who would be in the trial but for, you know, the things they read online about the company being a fraud.

So it was -- it was impacting our business.  That's the -- that's -- I think that's the answer to your question you asked.

Q.   What do you mean when you say indirectly or directly, it's impossible to tell?

A.   Well, there are -- there were people -- individuals calling clinical sites, saying, How could you be involved with this?  The company is a fraud.  Directly,

Page 21

it would be if one of the defendants did that.  I don't know that.

Indirectly, it would be if they read online this company is a fraud and then decided to take that into their own hands.

Q.   Did you speak to or contact any of the individuals who were purportedly making those phone calls?

A.   You can't -- no.

Q.   Why not?

A.   Inability to -- to find out who they were.

Q.   Did you try to find out who they were?

A.   Yes.  We did.  But --

Q.   How?

A.   It was not like an investigation.  But if a site said, Oh, this person called and said that, we were, like can we get -- you know, who was it?  Can we get any information on it?  Just basic -- basically, trying to figure out, you know, who was making the -- you know, who was impacting our ability to recruit patients into the Phase 3 trial.

Q.   And what did you hear back from the sites after making those inquiries?

A.   I don't know specifically, but it wasn't, you know, name, address -- it was not name and address and phone number of whoever made the call.

6 (Pages 18 - 21)

Page 22

Q. Did they say this person called and referenced the plaintiffs' -- or the defendants' statements online about Cassava?

MR. CAMPBELL: Object to form.

A. No. Or not to my knowledge. I -- I wasn't personally there for the phone call. It was more somebody called and said, How could you be involved with a company that's a fraud, which --

Q. (By Mr. Kumagai) How many of those phone calls do you recall hearing about?

A. I don't know. I can't --

Q. And so what is the assumption that those phone calls were being caused by statements by our clients based on?

A. Well, the -- if -- in here, there's a tab -- and I'll take it to -- there's so many, I don't pretend to be able to state them all, but I'm on tab 4. It's the -- it's the memorandum and order from --

Q. Judge Woods' opinion?

A. -- Judge Woods.

Q. Okay.

A. And I'm in the -- Exhibit A.

Q. Yeah.

A. I don't see a reference number on it. But there's pages and pages and pages of, I think, online

Page 23

statements attributed to the defendants saying, you know -- paraphrasing, the company's a fraud, it's all made up. And those were the same things, you know, the people -- whoever was contacting the sites were saying the same thing. The company is a fraud.

For -- and so the belief is that, somehow, they had to be -- whoever was calling the sites, whoever was interfering with our ability to recruit patients had to get that information somewhere, and this was a likely source.

Q. But you don't have any evidence connecting whoever was calling the sites to the statements by our clients?

A. No. We don't know --

MR. CAMPBELL: Hold on. Okay. Mischaracterization of testimony. Go ahead.

A. No. We -- we don't have -- we don't know who was -- we don't know if it was one individual. We don't know who -- who was doing that.

Q. (By Mr. Kumagai) And so what was Cassava's ultimate purpose for commencing the defamation action?

A. Well, we had a group of defendants who was maliciously defaming the company. You know, everybody has got the right -- you know, as a public company, we have so many people who are polarized either for the company or

Page 24

against the company. And that's fine.

But you -- when you cross a line is when you go and you maliciously defame the company with statements that are known to be untrue by the company, that the company is a fraud, that the company's drug is unsafe when we have volumes of evidence showing -- you know, you can't ever prove safety, but we sure have a lot of evidence showing it's a safe drug.

So that was the -- the reason is -- is those statements impacting the company's ability to recruit and run a Phase 3 trial -- and the whole reason you do that is to find out if a drug works, is it efficacious -- was not acceptable.

Q. What do you mean, you can't ever prove safety?

A. It's -- it's -- you know, you can demonstrate it. You can have a thousand patient administrations, but, you know -- peanuts, I think everybody in the world thinks they're safe, but if you've got a peanut allergy, they're not. So peanuts are generally a safe thing, but can you prove that they're safe to everybody in the world? It's probably not true.

We've got an experimental drug. We have run thousands and thousands and thousands of administrations on patients. We've never had any

Page 25

drug-related serious adverse events. That's all a good thing.

We've had a data safety monitoring board of experts look at our blinded -- you know, even in the Phase 3, they looked at blinded data and unblinded data and came to the conclusion that the trial should continue. But they're the experts and they never would come out and say, you know, the drug has been proven to be safe because it's not proveable.

Q. Is it possible that the reason you've never seen any adverse safety events is because the drug doesn't actually do anything at all?

MR. CAMPBELL: Object to form.

A. Well, that -- we talked about a few minutes ago, there's a whole body of evidence that shows the drug is active and the drug has an effect. So the -- if the drug did nothing, we wouldn't have that second body of evidence.

If we were giving a sugar pill, you wouldn't have all those independent researchers saying we've tested your drug, we've -- you know, we've done research and found there to be activity or confirming studies to Cass -- to Cassava's research.

Q. (By Mr. Kumagai) And you're referring to the supposedly independent studies that we looked at in

7 (Pages 22 - 25)

Page 26

tab 10 in the Orrick presentation to the DOJ?

A. Correct.

MR. CAMPBELL: Object to the characterization.

Q. (By Mr. Kumagai) And in your answer to a few questions ago -- well, strike that.

What do you mean by our clients were maliciously defaming Cassava?

A. Well, to me, if you are claiming something, the company is a fraud, the company's drug is unsafe, and you're doing it for financial benefit because the defendants are known short sellers of the company's stock, and you're -- so you're doing it for financial benefit, when you've got patients out there, Alzheimer's patients who are desperately in need of a -- of some kind of treatment -- we didn't know if the drug was going to be successful or not, but who were trying to stop Phase 3 trials for that? That's malicious in my -- in my definition.

Q. It's malicious because they were trying -- in your view, because they were trying to stop the Phase 3 trials?

MR. CAMPBELL: Object to form.

A. In my view, they were trying to profit by spreading lies about the company that potentially is

Page 27

harming and -- Alzheimer's patients. That's -- to me, that is malicious.

Q. (By Mr. Kumagai) What were the factual bases for Cassava's decision to commence the defamation action?

A. I'm going to go to a reference material.

I'm going to move to tab 3. Paragraph 10 on page 3.

Q. Okay. You're looking at the First Amended Complaint in the defamation action?

A. Correct.

Q. And what page? Sorry.

A. Page 3.

Q. Okay.

A. This says it as succinctly or probably more succinctly than I could, but -- the company's position is that with this action, Cassava seeks to hold accountable defendants who decided that making a quick buck, profit, was more important than treating people with Alzheimer's disease. Defendants are a new breed of profiteers. Instead of selling illegal goods on the black market, they sell lies to artificially drive down the stock price and enrich themselves. Cassava will not be the last victim of these defendants unless they're held to account for their action. Disinformation under the guise of science is

Page 28

still disinformation, and calling the company a fraud is defamation per se, even if the company is pursuing a new drug treatment for a complex disease.

Q. But what specific facts supported the company's claim that defendants are a new breed of profiteers?

MR. CAMPBELL: Object to form.

A. Well, you've got -- so you've got the company. You know, we know that we're not a fraud. We know that our drug -- the safety record of our drug is very, very good. We've got somebody going online saying the company is a fraud. It's all made up. The drug isn't safe. They're putting patients at risk, you know. And doing that for profit, that's -- a new breed of profiteer -- you know, maybe those aren't the exact words, but that is a -- a strategy to make money, you know, at the expense of patients.

Q. (By Mr. Kumagai) What facts was -- well, strike that. We'll come back to it.

You understand Cassava filed the defamation action in November 2022; right?

A. Correct.

Q. And you understand Cassava voluntarily dismissed the action in August of 2024?

A. Approximately that date. I don't know that

Page 29

by heart.

Q. Over the course of the litigation, did Cassava's factual bases or purpose for the defamation action change?

A. Purpose for the defamation action, no. Factual bases, I mean, there's a growing -- in -- to my knowledge, the defendants didn't stop defaming the company. They didn't stop with the Cassava.fraud website, so that body of evidence would grow over time.

Q. Were there any changes of circumstances or new facts that came to light over the course of the litigation that negatively affected Cassava's factual bases for the defamation action?

MR. CAMPBELL: Object to form.

A. No.

Q. (By Mr. Kumagai) Did anything happen over the course of the litigation that caused Cassava to reconsider its purpose?

A. When you say "caused Cassava to reconsider its purpose," when we dismissed the suit, we had a change in leadership that preceded it. And part of the -- the origination of the suit was, Hey, we've got people defaming us and calling us liars and calling us frauds that are impacting our trial sites and our ability to recruit for the -- for this study. By the 2024 date that

8 (Pages 26 - 29)

Page 30

we dismissed the suit, the trials were fully enrolled.

So there was absolutely a change in facts and circumstances there where the ability to impact the trials had diminished over time.

Now, certainly, they did enroll people slower. You know, there was a negative impact. But by the time the suit was dropped, that impact had been greatly diminished. Sites that had been with us for years and enrolled a lot of patients now had enough knowledge to know, Ah, I shouldn't be paying attention to people who are defaming and lying about the company online.

Q. So the decision to drop or voluntarily dismiss the defamation action didn't have anything to do with Dr. Wang's criminal indictment or the company settlement with the SEC for fraud charges?

MR. CAMPBELL: Object to form.

A. The company had a -- a change in leadership. Our previous CEO, Remi Barbier, resigned. Rick Barry came in as the new CEO. So new CEOs take a 360 look at an organization. And Rick said, you know -- you know, the company's position is -- is we drop the suit because we were spending a lot of money on it and the -- you know, the negative impact to the company on recruitment and ability to complete the trials had been greatly diminished.

Page 31

Q. (By Mr. Kumagai) Did Dr. Wang's criminal indictment have any impact or bearing on the decision by the company to voluntarily dismiss the case?

A. Not --

MR. CAMPBELL: Object to form.

A. Not from the company's perspective. I've just gone through why the company dropped the suit.

Q. (By Mr. Kumagai) Did the company's settlement with the SEC have anything to do with its decision to voluntarily dismiss the defamation action?

MR. CAMPBELL: Object to form.

A. No. The company dismissed the defamation action because of new leadership, you know, the -- the desire to spend less -- you know, to use resources in -- in a more productive manner and that the negative impact of the defaming actions of the defendants -- you know, that impact had diminished with the full enrollment and near completion of the Phase 3 trials.

Q. (By Mr. Kumagai) What do you mean by "more productive purposes"?

A. It's cash. You know, cash could be used to build more drug substance, run more clinical studies, you know, the -- no offense to those in the room, but legal spend is not -- is not necessarily the most productive use of corporate funds for a biotech.

Page 32

Q. Looking back at the legal spend on the defamation action, was it a productive use of funds for the company?

MR. CAMPBELL: Object to form.

A. That's going to be impossible to tell. I think, you know, if it -- the trials got enrolled. You know, it would simply be speculation to say would they have enrolled 5 percent slower if the defamation action hadn't been filed if we had, you know, than they would have. That's impossible to tell. But the trials enrolled, the studies were completed, so in that -- in that view, the action was a -- it accomplished its purpose.

Q. (By Mr. Kumagai) At any time, has Cassava ever tried to measure the purported impact of our clients' statements on trial enrollment?

A. I don't think you can make a direct measurement of that.

Q. So the answer is no?

A. The answer is no.

Q. Did Cassava ever do any type of cost-benefit or risk analysis of the defamation action?

A. Not to my knowledge.

Q. What were the possible downsides or risks to Cassava in bringing the defamation action?

Page 33

A. Anytime you bring litigation, you know, the downside impacts are use of corporate funds. There's always going to be time and distraction for management. Those are the main downsides.

Q. And when Cassava brought the defamation action, did it believe the lawsuit would create shareholder value?

A. So that's the -- you've got to look at that in context. To create shareholder value, spending money brings down a cash balance. That doesn't create shareholder value. Bringing a Phase 3 trial to completion and if it's -- if it's a positive trial and it reads out well, that creates shareholder value.

So indirectly, yes, if bringing the lawsuit helps the, you know, trials have their own fair chance to enroll and succeed, then yes, that is enhancing shareholder value.

Q. And looking back, did the defamation action create shareholder value?

A. Looking back, the Phase 3 trials were not successful, so it did not create shareholder value in hindsight. But at the time, certainly, a necessary action.

Q. Necessary in the company's view in order to ensure full enrollment of the Phase 3 trials; is that

9 (Pages 30 - 33)

Page 34

right?

A. To stop the people inhibit -- stop inhibiting the fair and full enrollment of the trials, yes.

Q. And aside from that purpose for the defamation action, any other purposes the company had in bringing the defamation action?

A. No.

Q. When Cassava decided to bring the defamation action case in November 2022, did the company believe it would win the case?

A. When I think of that, the company did believe it was -- it was -- had merit to bringing the case, so yes, the company did think it would win.

Now, did the -- you know, you have -- could you define "win" for me? Is that a --

Q. Well, I think that's the question for you. What was a victory in the views of Cassava?

A. In the views of Cassava, a victory would be, you know, being on record that the company believes that the -- the lies and the false information being spread online, you know, aren't true. Allowing the trials to enroll, that's a win for the company. Holding the defendants to account would also be a win for the company.

Now, how do you measure -- you know, a win

Page 35

generally, people think in monetary terms. I won this lawsuit. I'm going to get a $100 million verdict or settlement. I don't think that I -- at least the company never expected that someone was going to write them a check for $100 million. That -- the damage was so severe that I don't think any of the defendants have the financial means to -- to -- to give a true win to the company.

Q. So was the goal to get money from the defendants or not?

MR. CAMPBELL: Object to form.

A. Well, certainly, there's -- if there's a monetary settlement to be had for somebody, you know, defaming the company, yes. That's -- that's part of it. But, again, the -- the primary goal of this lawsuit was to allow the trials to enroll in a fair and normal manner.

Q. (By Mr. Kumagai) And I'll go slowly here because Scott may want to say something. But the company's view that the lawsuit had merit, what was that based on?

MR. CAMPBELL: So I am going to object here to form and I'm going to give you an instruction, which is if the merit to the company -- and I know the answer to this question, so I'm going to partially instruct you. To the extent the merits of the lawsuit -- the legal merits

Page 36

and likelihood of success that the company had an understanding of was based on advice of lawyers from at Benesch -- in particular, Eric Connolly -- you can't testify into what the company was told by its counsel.

If you have an independent basis -- which I can't think of one, but if there is one for the merits -- legal merits of the case, you can testify to that.

A. Okay. I can't testify. It's -- it's between counsel and the company.

Q. (By Mr. Kumagai) And so when you said the company believed the case had merit, you meant legal merit or any other kind of merit?

A. Legal merit.

Q. And your -- that conclusion or view was based solely on advice from Benesch?

A. Yes.

Q. Did the company consult any other law firms or lawyers to get a second opinion as to whether or not the defamation action had merit?

A. Let me phrase it a little differently because I -- the answer is no. We didn't consult with other lawyers to find out if that -- we did consult with other lawyers, you know, with the same fact set to say, you know, what do you think, what would be an appropriate course of action going forward.

Page 37

Q. And can you tell me which lawyers or law firms those were?

A. I don't know the answer to that.

Q. I guess I'm a little confused as to what you mean by that. Is this before the defamation action was brought, you --

A. Before -- before the defamation action was brought, the company consulted, I believe, with three different firms, saying, Here's what's happening, you know, what do you -- what course of action do you recommend? And --

Q. And what were those other two firms?

A. I don't know the names of them.

Q. And did the company ultimately proceed on the course of actions recommended by the other two law firms?

MR. CAMPBELL: Object to form. So the advice that was given by the law firms is privileged, so to the extent your answer would reflect what the advice was, you can't answer the question.

A. I can't answer the question.

Q. (By Mr. Kumagai) Did you ultimately retain those other two law firms?

A. I don't know. I mean, we did retain them -- so yeah, I guess we did.

10 (Pages 34 - 37)

Page 38

Q.   Did the retention of those other two law firms result in the filing of any litigation?

A.   I have to think and make sure I've got this right.  It's hard for me to answer that one.  I can't recall -- it didn't result in the filing of any litigation in any way related to this defamation case.

Q.   Okay.  Was one of the goals of the defamation action to prove that the science underlying simufilam was legitimate?

MR. CAMPBELL:  Object to form.

A.   No.  That's not the goal of a -- of a defamation case.

Q.   (By Mr. Kumagai)  What do you mean by that?

A.   Well, as we -- as I stated, the goal of the defamation case was to allow the clinical trials to move forward in an orderly manner so that we could get a Phase 3 readout on the efficacy of simufilam.  But a defamation case is not -- at least the company did not file it to prove our drug was efficacious or not efficacious or add to the body of evidence for it.

Q.   What were Cassava's reasons for suing the seven defendants that it did as opposed to other critics of the company?

A.   I think that would be -- that would be --

MR. CAMPBELL:  If it's advice of counsel,

Page 39

then you can't answer the question --

A.   Yeah.  I can't answer the question.

MR. CAMPBELL:  -- unless you have an independent factual basis, you can.

A.   I can't answer it because it's advice of counsel.

Q.   (By Mr. Kumagai)  Why did the company not include Dr. Elizabeth Bik among the defendants?

MR. CAMPBELL:  Same instruction.

A.   It's advice of counsel.

Q.   (By Mr. Kumagai)  What specifically did our clients say about Cassava that was defamatory?

A.   Well, here, we're going to -- I'm going to move to one of my reference materials.  I'm on tab 4.

Q.   Uh-huh.  You're looking back to Exhibit --

A.   Exhibit A.

Q.   -- A of Judge Woods' decision?

A.   Correct.  In this exhibit, there's 23 pages of statements that were false or defamatory.  I'll read statement 11.  "I will never cover Cassava.  Simufilam is a fraud."

Q.   Okay.  And you appreciate that this exhibit to Judge Woods' decision is a subset of the approximately 1,000 statements that Cassava alleged were defamatory in its initial complaint in the defamation action; right?

Page 40

A.   Yes.

Q.   And so have you -- are you familiar with the initial longer set of statements that Cassava claimed were defamatory in the --

A.   Yes.

Q.   -- initial complaint?  Can you describe generally the messages or the statements that were defamatory in those --

A.   The themes are the same.  You know, Cassava is a fraud.  Their science is made up.  Their drug is not safe.  They're putting patients at risk.  Those are generally -- that's the general themes.

Q.   Okay.  I'll mark as Exhibit 131 a document Bates-stamped CASSAVA_000797948.  This is actually in your binder, as well.  So you can look at the one in your binder or this copy.  Sorry.

MR. CAMPBELL:  This is tab 10, Dave?

MR. KUMAGAI:  I don't know what the tab number is, but I think so.

(Exhibit 131 was marked.)

A.   Okay.

MR. CAMPBELL:  So I will say, you're free to look at that one and you're not -- you don't need to make any markings on exhibits.  I'm not suggesting that you do, but to the extent you're referencing anything

Page 41

specifically, it's helpful to use the exhibit because that's what's going to go in the record with the court reporter.

Q.   (By Mr. Kumagai)  Okay.  Mr. Schoen, do you recognize Exhibit 130?

A.   Mine says 131.

Q.   Oh, I'm sorry.  131.

A.   Yes, I do.

Q.   And this is a document that Orrick, the law firm, sent on Cassava's behalf to the Department of Justice on May 15th, 2023; right?

A.   Correct.

Q.   If you turn to page 4, there's -- about halfway down the page, there's a paragraph that begins, "The short sellers have made."

Do you see that?

A.   Yes.

Q.   It says, "The short sellers have made three broad categories of allegations:  One, that Western blot images contained in journal articles published by Dr. Wang have been improperly manipulated; 2, that the science underlying Cassava is impossible, improbable, and/or scientifically undoable; and 3, that Cassava and Dr. Wang manipulated certain biomarker test results in one of the company's clinical trials."

11 (Pages 38 - 41)

Page 42

Do you see that?

A. Yes, I do.

Q. Do you agree with that general summary of the various allegations?

A. Yes, I do.

MR. CAMPBELL: Object to form. Sorry. Put that in there.

Q. (By Mr. Kumagai) And so what were Cassava's factual bases for claiming that the first category of statements were false?

A. I'll talk generally about it and then I can go to some specifics.

But when -- if Dr. Wang -- generally, when he would do an experiment, when -- researchers want to get their information published and so they go out to what's called a peer-reviewed journal where someone else looks at their materials, looks at their conclusions and, you know, asks them to make changes or publishes it if they agree with it.

So that's some external validation that Dr. Wang's Western blot work passed the scrutiny of another expert in the field. A peer, if you will.

Q. Okay. So the fact that some of the research had been peer reviewed and published?

A. Yes.

Page 43

Q. Anything else?

A. Let me look at the materials because I'm -- well, yes. There are other -- you know, you're asking -- if you're asking me on May 13th, 2023, but over the course of time, you know, with these allegations, Cassava has done a -- you know, a full investigation of all the allegations and, you know, lies and falsehoods made by short sellers.

So part of that was hiring our own experts to look at Western blot images and look at the ones that were considered to be manipulated and --

MR. CAMPBELL: I don't -- I don't mean to cut you off. I just want to instruct, the materials here that have been disclosed are fine for you to discuss. The internal investigation and any experts that were hired by counsel for the firm as part of its internal investigation, that specific work is privileged.

I don't know if you're going there, but if you are, that particular information is privileged.

Anything that's been disclosed as a result of investigations to the Department of Justice, the SEC, that's all fine.

A. Okay. I will -- I will amend my answer to say yes, there are other things other than peer-reviewed journals, but it's privileged, so I can't go into the

Page 44

specifics.

Q. (By Mr. Kumagai) Okay. So sticking with the first category of statements, when Cassava brought the defamation action, aside from the fact that these journal articles had been published in peer-reviewed journals, what facts did Cassava possess that showed these statements were false?

A. Well, Cassava had worked with Dr. Wang for over a decade. I'm not sure how many years. And there was never any -- he has never been called into question. We had looked -- our own people had looked at his work. I don't know if their -- what their expert blot -- Western blot expertise, it's a very obscure field, if you will.

But we had no reason to think that Dr. Wang -- when you work with someone for 10 or 15 years, you get a feel for the person's character, so, you know, I would say that another piece of evidence for us is knowing who he was.

Q. Okay. And aside from the character evidence based on working with Dr. Wang and the fact of his papers being published in peer-reviewed journals, what other evidence did Cassava possess when it brought the defamation action that demonstrated to the company that this first category of statements was false?

A. Well, again, I don't know every Western

Page 45

blot paper that he's done, but to the extent his work was showing the -- the mechanism of action or the -- the drug effect of simufilam and we have third-party outside researchers also showing or confirming or -- showing that same kind of activity, that's also evidence that -- it's not evidence that the Western blots weren't manipulated, but it shows that his work was -- had integrity to it.

Q. And anything else?

A. Not that I can think of right now.

Q. Okay. Let's look at the second category of statements: The allegations that the science underlying Cassava is impossible, improbable, and/or scientifically undoable.

Do you see that?

A. I do.

Q. So what were Cassava's factual bases when it brought the defamation action for claiming that those statements were false?

A. Let me look at my materials for a minute before I -- I'm going to read from page 5, simply because it's a -- it's a science piece, it's not a -- it's not something that rolls off my tongue. But specific allegations of impossible science at Cassava leveled by short sellers do not withstand scrutiny. Claims that simufilam does not bind filamin A were disproven by

12 (Pages 42 - 45)

Page 46

researchers at Yale and the University of Milan in 2020 and 2023. Assertions that altered filamin A may not exist were disproven by research in Quebec in 2022. Claims that the antibodies used by Dr. Wang are not suitable for Western blotting are contradicted by numerous experiments in which they are, in fact, used for that purpose, including papers cited by the short sellers.

And I think there's another one that -- where someone said that the use of brain tissue was inappropriate or impossible when, you know, there's a scientific body of evidence that shows that that is a perfectly normal scientific activity.

Q. Okay. And anything else? Any other facts that you're aware of the company had in its possession when it brought the defamation action to refute that second category of statements?

A. I'm going to read from the bottom of page 5. Short sellers characterized as improbable and scientifically unclear Cassava's claims regarding SavaDX. Here, again, they mischaracterized Cassava's claims and ignore independent evidence and attempt to portray the company as a sham. Cassava's attempt to identify protein biomarkers in blood samples follows a similar scientific strategy to other plasma-based Alzheimer's biomarker assays that are both commercially available and emerging

Page 47

in the research community. The fact that blinded tests of SavaDX correlated closely to brain imaging and cerebrospinal fluid diagnoses is evidence that Cassava's SavaDX -- Cassava's SavaDX technology is legitimate.

So, again, you know, you're asking me specifics, but there's a body of evidence that supports that our science is real and credible and --

Q. Okay. And looking at the third category of statements, the allegations that Cassava and Dr. Wang manipulated certain biomarker test results in one of the company's clinical trials --

A. Okay.

Q. -- what were Cassava's factual bases when it brought the defamation action for claiming that those statements were false?

A. Well, when the defamation action was brought -- I believe you're referring to the Phase 2b study and the biomarker testing?

Q. I'm reading from the Orrick paper. I believe that's right, but it doesn't say it explicitly in that sentence.

A. So at the -- at the time of the defamation action, the samples that were given to Dr. Wang were blinded. So in order for him to do something improper -- let me read exactly what the third category is.

Page 48

"Manipulated certain biomarker test results in one of the company's clinical trials." If a -- if a -- if samples are blinded, it's impossible or virtually impossible to manipulate the results.

Q. It later turned out that Dr. Wang was not blinded for those analyses; right?

MR. CAMPBELL: Object to form and characterization.

A. We -- that's not the company's position. The company's position is that it's possible that he was unblinded to a certain subset of the subjects, but that information wasn't known at the time the defamation action was filed.

Q. (By Mr. Kumagai) Why didn't Cassava know that by the time it filed the defamation action?

A. That was -- that fact and circumstances was unknown to the company.

Q. Why didn't Cassava figure that out before bringing the defamation action?

MR. CAMPBELL: Object to form.

A. Yeah. Again, Cassava had, you know, 15 years of -- of collaboration and work with Dr. Wang. If a study is blinded, the study is blinded. So if the company -- you know, eventually, it came out that he could have been unblinded to a subset of the samples, but it

Page 49

wasn't done, you know -- it was -- it was done, you know, negligently. When you do something negligently, you don't necessarily know that you did it. You know, that's -- that's the -- that's, to me, the definition of negligence.

So Cassava couldn't reasonably have been -- have been expected to know that at the time the defamation action was filed.

Q. (By Mr. Kumagai) The study and the analysis was done before the defamation action was filed; right?

MR. CAMPBELL: Object to form.

A. Correct. And it wasn't -- sorry. I wasn't quite finished with the full answer there, too. So, first of all, the samples were blinded, but, also, there was another lab involved that wasn't Dr. Wang that's -- that did a portion of the sample results. And the results were consistent with Dr. Wang's findings, which gave us additional belief or -- that there was no manipulation of those clinical trial results.

Q. (By Mr. Kumagai) Which lab was that?

A. Quanterix.

Q. And prior to that, another lab -- the initial lab that did the analysis had also analyzed the samples; right?

A. Yes.

13 (Pages 46 - 49)

Page 50

Q. And were those results consistent with Dr. Wang's results?

A. They were not consistent with Dr. Wang's results.

Q. So what prevented the company from discovering, as you put it, this negligent potential unblinding prior to bringing the defamation action?

MR. CAMPBELL: Object to form.

A. What prevented the company? There's no, you know, reasonable -- there's no reason the company would go looking for something prior to filing the defamation action. You know, we had clinical results from an initial lab -- that's Lund University -- that made no sense both to the company and to outside experts. Multiple outside experts that were consulted on it.

So the samples were reanalyzed on what the company thought was a blinded basis and may have been a blinded basis, except for what we just talked about, and came up with results that were consistent with, you know, the Quanterix results.

You know, a reasonable company action wouldn't be let's go look and see if there's some kind of problem with this. You know, everything that we -- all the knowledge that we had at that point pointed to these are and still may be credible results.

Page 51

Q. (By Mr. Kumagai) And so I think you've touched on this, but what evidence did Cassava have in November 2022 when it brought the defamation action that could refute this third category of allegations?

A. I'll repeat. So we had independent third-party evidence showing activity of simufilam. We had a third-party independent laboratory that did some of the biomarker analysis that was similar to Dr. Wang's results. And we know -- the company at the time and -- believed that Dr. Wang was fully blinded to the results. So, therefore, we had a reasonable basis to believe that results were not manipulated.

Q. But before bringing the defamation action, the company didn't bother going back to check to see whether or not Dr. Wang was blinded or whether or not Dr. Wang did anything improper to manipulate those results?

MR. CAMPBELL: Object to form and characterization.

A. That wouldn't be a -- you know, something the company would do when they have no -- you know, everything available to the company at the time stated that those results were, you know, valid and credible.

Q. (By Mr. Kumagai) What new facts led the company to later conclude that Dr. Wang might have been

Page 52

unblinded as to a subset of the data?

A. That specific fact came to us from the Securities & Exchange Commission.

Q. And what was that fact?

A. It was an email from Dr. Burns to Dr. Wang which didn't directly unblind Dr. Wang to a subset of the -- of the -- of the patients, but Dr. Wang could have used it, you know, to calculate -- to infer who a certain number of those patients were and, therefore, could have unblinded himself.

Q. And that was an email from around 2020; is that right?

A. Yes.

Q. So it wasn't an email that was created after the defamation action began? It was an email that existed two years before the defamation action started?

A. Correct. It was done before the sam -- the backup samples were analyzed in 2020. And it's worth putting -- you know, saying where you're saying, you know, where did that information come from, you know, my knowledge is that email was also sent from Dr. Burns to, you know, a professor at Lund, to outside people, her -- she was trying to -- to understand why the Lund data was so unintelligible, to put it -- you know, studies fail all the time, but the data from the Lund piece didn't make any

Page 53

sense. Even for -- you know, certainly, not for success, but not even for failure. It was a -- a flawed piece of data.

Q. And that was an email that, if Cassava had gone back to look for, it could have found on its own; right?

MR. CAMPBELL: Object to form.

A. Yeah. Cassava, you know -- if she sent the email, Cassava at the time could have -- could have seen it if it was there.

Q. (By Mr. Kumagai) And she did send the email; right? Dr. Burns?

A. To my -- to the company's knowledge, Dr. Burns sent the email.

MR. KUMAGAI: Let's take a ten-minute break.

MR. CAMPBELL: Sure.

VIDEOGRAPHER: Going off the record at 10:10. This marks the end of Media 1.

(Recess taken, 10:10 a.m. to 10:22 a.m.)

VIDEOGRAPHER: This marks the start of Media 2 of the 30(b)(6) deposition of Cassava Sciences, Inc., represented by Eric Schoen. We're back on the record. The time is 10:22.

Q. (By Mr. Kumagai) Mr. Schoen, are you

14 (Pages 50 - 53)

Page 54

familiar with a letter to the FDA that our clients submitted and was at issue in the defamation action?

A. A -- aware of it, yes. Familiar with it, no.

Q. I'll mark as Exhibit 132 the FDA letter.

(Exhibit 132 was marked.)

MR. CAMPBELL: You got the narrower table this time.

MR. KUMAGAI: Yeah. A little easier.

Q. (By Mr. Kumagai) Take a moment to flip through, Mr. Schoen. I just mostly want to begin by asking whether you recognize this or have seen it before.

A. I recognize it, yes.

Q. And you see at the last page, it says sincerely, Enea Milioris, Ph.D., Adrian Heilbut, Ph.D., Jesse Brodkin, Ph.D., and Patrick Markey, Ph.D.?

A. Yes.

Q. Okay. And this is one of the documents that Cassava alleged was -- contained defamatory statements in the defamation action; right?

A. I'd have to read it, but -- I don't know that specifically, but it sounds --

Q. I can make that representation to you.

A. Yes. Now that I'm looking at some of the -- the pieces in here, yes.

Page 55

Q. Well, having looked at some of the pieces, is there a particular statement that you see that you recall now is a statement the company claimed was defamatory in the action?

A. It's a -- it's a big document, so I'm going to have to take a peek at it.

Q. Okay. Well, why don't I direct you to -- on the first page that begins, "Dear Sir/Madam."

A. Uh-huh.

Q. If you look at the third paragraph, beginning, "Considering the questionable" --

Do you see that?

A. Yes.

Q. Further down in that paragraph, the last sentence in that paragraph -- the last two sentences say, quote, On the other hand, we demonstrate that the CSF biomarker data generated by Cassava scientific advisory board member Dr. Wang, through an opaque process, yielded improbable values. This leads to the strong suspicion that the data have been entirely fabricated.

Do you see that?

A. I do.

Q. So what were Cassava's factual bases for claiming that statement was false when it brought the defamation action in -- in November 2022?

Page 56

MR. CAMPBELL: Object to form.

A. Well, again -- and to go back to the Phase 2b biomarker data, we had run it in the Lund lab and the results were scattered enough that we knew that they were not accurate. We had backup samples that we gave to Dr. Wang. At the time we believed him -- and he still may be -- may have been blinded in the process, so he could not have known how to fabricate results even if he wanted to. And we also had Quanterix's data, which was independently done, which was directionally the same as Dr. Wang's results.

So for someone to say the results were positive, they are entirely fabricated, you know, we -- we had a very good -- a good -- reasonable basis to believe that simply to be an untrue and knowingly untrue statement.

Q. (By Mr. Kumagai) Based on the facts that you just described?

A. Yes.

Q. Anything else?

A. There might be more, but that's the -- the top ones that come to my mind.

Q. Okay. You can set that aside. Mark Plaintiffs' Exhibit 133.

(Exhibit 133 was marked.)

Page 57

Q. Mr. Schoen, do you recognize Exhibit 133?

A. I do.

Q. And what is it?

A. This is a -- it looks like a PowerPoint presentation. The authors are -- at least three of the authors are defendants in the case, and it's --

Q. Have you seen this before?

A. Yes, I have.

Q. And when was the first time, as far as you know, the company became aware of this document?

A. I do not know the first time. It's dated November 3, 2021. So if that date is accurate, it would be probably shortly -- shortly after it was published.

Q. And what makes you say that?

A. If something like this was published, the company would -- would become aware of it pretty quickly.

Q. How?

A. You know -- so part of my role is investor relations, and so whenever there was something good, bad, or indifferent about the company, it was brought to my attention.

If -- yeah. Again, I don't know exactly how the company became aware of this, but it would have come to me, and if we aren't -- weren't already aware of it through some other means, I would have brought it up.

15 (Pages 54 - 57)

Page 58

Q. To who?

A. I would have -- to the CEO.

Q. Mr. Barbier?

A. Yes.

Q. Anyone else?

A. No.

Q. Okay. Let's look at slide 32. See at the bottom, the title of this slide is "SavaDX: A miraculous diagnostic"?

Do you see that?

A. Yes, I do.

Q. And at the bottom, it says, "Yet another phenomenal, unprecedented breakthrough by Cassava with zero external validation."

Do you see that?

A. Yes.

Q. And this is another statement that Cassava claimed was defamatory in the defamation action; right?

A. Okay.

Q. What facts did Cassava have in its possession when it brought the case to prove that that was false?

A. I'm going to have to go to some of my reference materials for specifics.

I'm going to go to tab 10. Give me a

Page 59

minute to make sure I'm at the place that I want to be.

Okay. I'm on tab 10. Page 24. The reference is CASSAVA_00797971.

Q. Okay.

MR. CAMPBELL: And Dave, the Bates numbers on Exhibit 131 match our tab 10?

MR. KUMAGAI: Yeah.

MR. CAMPBELL: Okay.

Q. (By Mr. Kumagai) 171, you said was the last -- or sorry. You said 971?

A. 971.

MR. KUMAGAI: Yeah. It's the same.

A. So the statement was with zero -- you know, another phenomenal, unprecedented breakthrough with zero external validation. That would lead a reader to believe that Dr. Wang did this in his lab and said, Here are my results. And I'm going to read from page 24.

"To validate his hypothesis, Cassava provided Dr. Wang with a blinded blood examples from Alzheimer's patients and healthy controls. In 2015, Steven Arnold at Harvard sent blinded samples to Dr. Wang without providing the key to Dr. Wang or Cassava. In 2016, researchers from Institute Servier in France likewise sent blinded samples to Dr. Wang without providing the key to Dr. Wang or Cassava. In both

Page 60

instances, Dr. Wang identified the samples from the patients diagnosed with Alzheimer's disease with 98 to 100 percent accuracy. Dr. Arnold characterized the results as extraordinary."

So by having blinded samples that is -- in a sense, it's external validation that it's not just Dr. Wang saying, I did this and here's the result.

Q. Okay. And so you're referring to tab 10, which was marked as Exhibit 131 earlier today; right? And this is the Orrick paper that was submitted to the DOJ on May 15th, 2023?

A. Yes.

Q. Does this paper, Exhibit 131, contain all of the facts that Cassava relied on to allege in the defamation action that the defamatory statements were false?

MR. CAMPBELL: Object to form.

A. Probably the most significant one. Whether they were all of them, I can't speak to that.

Q. (By Mr. Kumagai) And it postdates the defamation action's filing in November 2022, so it probably -- or possibly contained some facts that became available after the case was filed; right?

A. Possibly, yes.

Q. Okay. Is there any other document or

Page 61

source that you view or the company considers as a master source or collection of facts that would be relevant to demonstrating that the allegedly defamatory statements were false?

A. Other than this document, this is the -- this is a good primary source. This document is a good primary source. There's additional material later in -- in this document.

Q. Okay. And when the defamation action was brought in November 2022, was there anything similar to this document that existed that the company relied on, as far as you know?

MR. CAMPBELL: Object to form, with the caution on privileged materials that may have been produced to the company.

A. Yeah. I -- I can't speak to anything that would have been shared with counsel.

Q. (By Mr. Kumagai) So setting aside anything prepared for counsel or by counsel, is there any document similar to this Exhibit 131 that existed at the time the defamation action was filed that compiled Cassava's factual bases?

A. Not that I'm aware.

MR. CAMPBELL: I'm going to object to form. Not -- that's a hard question to ask. This was prepared

16 (Pages 58 - 61)

Page 62

by counsel also, but -- so I understand what you're driving at.

MR. KUMAGAI: I think he understood, too.

Q. (By Mr. Kumagai) Right? Okay. And so Exhibit 132, which is the FDA letter and Exhibit 133, which is the slide deck titled "Cassava Sciences: A shambolic Charade," do you recall discussions within the company about these documents when they first -- when the company first became aware of them?

A. I don't recall discussions.

Q. Do you recall any discussions at all internally at the company about either Exhibit 132 or 133?

A. No. I don't recall any specific discussions.

Q. I'll mark as Exhibit 134 a document with the title "SavaDX Exposed."

(Exhibit 134 was marked.)

Q. Do you recognize Exhibit 134?

A. I do not.

Q. Do you recall the company having any discussions about this particular document?

A. I do not.

Q. Have you ever seen it before?

A. Not to my knowledge. But it's possible.

Q. Okay. If you look at page 18 --

Page 63

A. Sorry. Are there page numbers?

Q. They're kind of in the blue text --

A. Got it. Thank you.

Q. -- at the top. The slide with the title, "How does this revelation relate to Simufilam MOA?"

Do you see that?

A. I see that.

Q. At the bottom, it says, quote, We find the implied MOA and scientific rationale laughably unsubstantiated, inconsistent with Cassava claims so far, contrary to FLNA functions in literature.

Do you see that?

A. I do.

Q. And this is another statement that Cassava claimed to be defamatory in the defamation action; right?

A. Okay.

Q. And if I were to ask you what the -- Cassava's factual bases for alleging that that statement was false, I take it you would turn to tab 10, which is Exhibit 131, and refer to the contents of the Orrick report. Is that right?

A. Yes. And I would also refer you to the third-party independent literature talking about Cassava's method of action and also, to scientific peer-reviewed journals that -- you know, that Dr. Wang's research was

Page 64

published in, as well.

Q. Okay. You can set that aside.

I'll mark as Exhibit 135 --

(Exhibit 135 was marked.)

Q. -- a document titled "Cassava and the Wang Lab: Seeing Through the Blind."

A. Sorry.

Q. Do you recognize Exhibit 135?

A. Yes, I do.

Q. You've seen this before?

A. I have seen it before.

Q. And what is it?

A. I haven't reviewed it in some time, but it -- I'd have to take a peek to tell you what it is.

Q. Do you recall any discussions within the company about this particular slide deck?

A. No, I don't.

Q. Okay. If you look at slide 5 -- it's actually page 5. So it's "Emails show both Cassava and Wang were not blinded during the open-label study."

Do you see that?

A. Yes.

Q. And this is another statement that Cassava claimed to be false and defamatory in the defamation action; right?

Page 65

A. Okay.

Q. What were Cassava's factual bases for claiming this statement was false?

A. Let me look at my reference materials, please.

Let me read the slide.

Yeah. I'm going to have to -- I've seen this in the materials, but I'm just unsure where to find it. So if I could come back to it or I could spend time searching.

Q. No, that's okay. So just -- you would need to find the answer in -- in the materials in front of you. It's not easily at your fingertips, as far as you can tell, right now and so we'll just move on.

A. Okay.

Q. I'll mark Exhibit 136.

(Exhibit 136 was marked.)

A. Thank you.

Q. Do you recognize Exhibit 136?

A. No, I don't.

Q. Have you ever seen the Tweets on page 3 before? I think I'm referring to the page numbers at the top. Sorry.

A. Okay. Not to my knowledge.

Q. Have you previously looked at Tweets by the

17 (Pages 62 - 65)

Page 66

individual Adrian H?

A. Yeah. There's a -- there's a whole appendix of them in the judge's decision.

Q. Okay.

A. Yes, I looked at many of them.

Q. And this is one of the Tweets that Cassava claimed was defamatory both in the initial action and in the Second Amended Complaint. I can represent that. And so --

MR. CAMPBELL: Just for clarity, do you want to specify which statement? Is it both or the bottom one?

Q. (By Mr. Kumagai) The specific statement, I believe, is the statement by Dr. Heilbut on November 22nd, 2021, quote, Not as crazy as photoshopping all of your studies for 20 years and putting a molecule into humans based on nonsense.

And so what was Cassava's factual bases for claiming that the statement "photoshopping all of your studies for 20 years" was false?

A. Well, again, that's -- that's accusing -- it's accusing Dr. Wang -- he isn't the company -- but accusing Dr. Wang of fabricating all of his work for 20 years, which the company had a very good basis to believe was untrue and simply false.

Page 67

And Dr. Heilbut wouldn't have -- I can't speak to what Dr. Heilbut should have known or could have known, but, you know, the company knew this statement to be untrue.

Q. And why can't you speak to what Dr. Heilbut could have known or should have known?

A. I -- I don't know what he knows or doesn't know, but it would be highly improbable for him to know that Dr. Wang allegedly had photoshopped all of his work for 20 years.

Q. What is the company's belief that he did not photoshop his studies based on?

A. Well, the fact that his results would -- you know, so, one, Dr. Wang didn't just do research for the company. He did research for many companies. The companies themselves, the scientists would review his research. He published, you know, many of his articles and they would be peer reviewed by experts. And you know, until the citizens petition in 2020, to my knowledge, there was never any question of the validity of his work.

Q. And when the citizens petition came out in 2021, I believe, what did Cassava do to check whether or not the claims were true or not?

A. So when the citizens petition came out in 2021, in addition to the body of evidence, you've got to

Page 68

be a responsible corporate citizen. So Cassava hired a law firm, Orrick, to do an internal investigation. They formed a special --

MR. CAMPBELL: Hold -- I think what you're saying is okay, but if you're going to get into what the law firm did as part of its investigation, that's --

A. Privileged.

MR. CAMPBELL: -- privileged.

A. Fair enough. The board also formed a special -- I'm going to call it investigation committee -- I'm not sure exactly what the formal title was -- comprised of independent directors to get information from the law firm about the results of their investigation, you know, independent of anybody at the company.

That's the -- that's the responsible thing to do when there's allegations of fraud.

Q. (By Mr. Kumagai) And did the company rely on the investigation by Orrick when it brought the defamation action?

MR. CAMPBELL: Object to form.

A. Certainly, that investigation was part of -- of the information. We also had Benesch, you know, the law firm that actually -- our law firm for the defamation case would have been involved, as well.

Q. (By Mr. Kumagai) What do you mean by that?

Page 69

A. Well, can you -- can you restate your question?

Q. Was the company relying on Orrick's investigation and the finding from that investigation when it brought the defamation action?

MR. CAMPBELL: Object to form.

A. Yeah. That would have been a piece of it, but, certainly, not exclusively. So yes, they were relying on it, in part.

Q. (By Mr. Kumagai) And what particular findings from the Orrick investigation was the company relying on as a basis for the defamation action?

MR. CAMPBELL: Object to form.

A. That's going to be privileged, so I can't answer that.

Q. (By Mr. Kumagai) And what findings, if any, from Benesch's investigation did the company rely on as a basis for bringing the defamation action?

MR. CAMPBELL: To the extent that's set forth in public documents that are disclosed, like the complaint, it's fine. But any communications with counsel, obviously, are privileged.

A. Right. Yeah, I'm going to point to the -- I think there's close to a thousand statements identified by Benesch believed to be -- at the time of the filing to

18 (Pages 66 - 69)

Page 70

be false or defamatory.

Q. (By Mr. Kumagai) And what were the findings of the independent director committee that you referred to a moment ago?

A. What do you mean by -- you have to define the findings. The -- the committee, you know, met on a regular basis. They reported to the board. And there was no findings of any wrongdoing or fraud or -- no findings of any wrongdoing by any employee of the company.

Q. And when was that conclusion reported to the board?

A. It would have been not one time. The investigation was ongoing for -- for several years. It's -- this is a -- you know, there's -- the allegations are so broad, the science is really complex, so it's not like let's go spend a month and, you know, we're finished. It's, you know -- again, I should not -- cannot go into the specifics of the investigation, but it took several years to -- to conclude.

And so, along the way, there were regular reports to the board of here's what we've done and we didn't find any, you know, evidence of wrongdoing.

You know, three months later, six months later, you know, here's -- here's the continuing investigation and the summary is we haven't found any

Page 71

evidence of -- of wrongdoing.

Q. And who is -- what investigation are you talking about just now?

A. The internal investigation that we were speaking of.

Q. That was overseen -- overseen by a special committee or a committee of the board?

A. Correct.

Q. The board of directors?

A. That's who I'm referring to, that the outside counsel was reporting to the independent committee and at certain times -- so I wasn't privy to every meeting when the independent committee met with counsel, but they also met with the board to report generally their findings.

Q. And so just so I have it straight, Orrick was the law firm conducting the investigation, they were reporting to the committee of independent directors, and that committee was reporting to the board?

A. That committee reporting to the board and also bringing in Orrick to -- to report directly to the board.

Q. And was there a point in time when Gibson replaced Orrick in that investigation?

A. Gibson replaced Orrick -- I'm not going to

Page 72

be able to say the date. Gibson Dunn replaced Orrick to -- to represent the company. The status of the investigation, I'm just not sure at that -- at that exact point.

Q. Approximately when did the investigation begin and when did it conclude?

A. So the investigation began shortly after the citizens petition, which you correctly pointed out was late 2021, and concluded sometime -- I don't -- I don't like to speak when I can't be exact, but, you know, the 2024 time period.

Q. Before or after the settlement with the SEC?

A. Before.

Q. And is --

A. Sorry. I want to -- so when you say the investigation concluded, I think there was a point in time where we actually -- you know, the -- the activities by the outside counsel, you know, would have -- would have naturally come to a conclusion, you know.

The committee of the board, I -- I don't know if they were -- if it was disbanded or not because there was -- there's ongoing lawsuits, there's ongoing activity, so there's still a desire to know if there's any new -- new information coming to light.

Page 73

Q. But the investigatory work by outside counsel was concluded prior to the SEC settlement that was announced in 2024?

MR. CAMPBELL: Object to form.

A. The -- I want to make sure I parse this out correctly because there was, you know, an initial investigation that -- that did conclude prior to the SEC, you know, settlement. But in mid-2024, the SEC did a reverse proffer to the company and gave us new information that led us to continue investigating. It was things that we had not seen or didn't have any privy to.

So to say it was concluded, you know, I -- it was still -- it was still open and the company was actively working on it because of new information.

Q. (By Mr. Kumagai) And so when that new information came in, what did the company do in terms of internally investigating it?

MR. CAMPBELL: Object to form. And to the extent that that's information that you get from counsel, that's privileged.

A. Yeah. It's all -- it's all going to be something I can't respond to.

Q. (By Mr. Kumagai) So is it the company's position today that Dr. Wang did not manipulate, fabricate, or doctor any research whatsoever related to

19 (Pages 70 - 73)

Page 74

simufilam?

MR. CAMPBELL: Object to form.

A. The company has no knowledge that Dr. Wang did any of the things you just mentioned.

Q. (By Mr. Kumagai) That's not exactly the question, though. Is it the company's position that Dr. Wang did not do -- strike that.

Is it the company's position that Dr. Wang did not engage in manipulating, doctoring, or fabricating any research related to simufilam?

MR. CAMPBELL: Object to form.

A. Yeah. The company's position is that Dr. Wang did not manipulate or doctor findings of his. However, there is, of course -- you know, he's been indicted and if he's found to have done something improper, the company would consider itself a victim because it was, you know, not done at the company's -- with the company's -- if there was any wrongdoing, it was not done with the company's knowledge or behest.

Q. (By Mr. Kumagai) How can you say that now without knowing what the particular wrongdoing is?

A. Because -- well, I'm going to go back to the company did a full investigation internally of our actions and activities and found no wrongdoing. And so that's the company's position is until -- until and if,

Page 75

which we -- you know, something came to light, that's our position. You can't know what you don't know.

Q. Did Cassava ever seek to meet with Dr. Heilbut, Dr. Brodkin, or Dr. Milioris at any point in time?

A. I don't know the answer to that question.

Q. Did Cassava ever communicate directly with any of our clients?

A. I don't know the answer to that question.

Sorry. Can I rephrase that? I am aware that I -- I communicated with Dr. Brodkin in some investor relation emails having nothing to do with citizens petition or allegations. They were general.

Part of my role, I answered lots of investor relations emails, so he would have asked questions and I would have responded in the normal course of my -- my duties.

Q. You're aware that many of the statements by our clients were addressed directly to the company or Mr. Barbier or Dr. Burns; right?

MR. CAMPBELL: Object to form.

A. I'm aware that some were.

Q. (By Mr. Kumagai) And so why didn't the company respond directly to any of our clients?

A. I don't know. I -- I said that I don't

Page 76

know if they did or didn't. I can't know that.

Q. Would Cassava have agreed to meet with Dr. Heilbut, Dr. Brodkin, or Dr. Milioris if they had asked for a meeting to discuss their allegations of data manipulation?

A. I can't --

MR. CAMPBELL: Object to form. Hypothetical.

A. Yeah. I can't speculate what the company would or wouldn't have done.

Q. (By Mr. Kumagai) To your knowledge, has the company ever sat down or held a meeting with any critics accusing it of manipulating or fabricating data?

A. I don't know the answer to that.

Q. So you're not aware of any instance in which the company met with critics who were accusing the company of manipulating or fabricating data?

A. I'm not aware of that.

Q. Before commencing the defamation action, did the company consider whether or not our clients themselves genuinely believed in the truth of their statements?

MR. CAMPBELL: Object to form.

A. I've kind of gone through that. But yeah -- yes. Cassava has, you know, internal knowledge,

Page 77

internal people, you know, 15 years of history with Dr. Wang, you know, contractual relationships with outside people who have done work, so if someone says, you know, categorically, they've made up all their data, we knew to be false.

So we considered the -- you may want to repeat your question exactly, but yes, we did consider those statements and knew them, you know, on the surface to be lies.

Q. (By Mr. Kumagai) I guess I'm trying to get at a slightly different question. What you just described, I think, is the company's view of the facts that it considered to show that the statements were not true; right?

A. Okay.

Q. And I'm asking whether the company considered whether our clients themselves believed that what they were saying was true.

A. If you considered -- if -- if I'm -- if I'm the subject -- if someone is claiming you're a fraud, you made everything up, and I'm on the other side of that equation and I know that I'm not a fraud and I did not make anything up, I have to do it -- intuit it, yes, I can consider did you have a base -- a reasonable or factual basis to believe that.

20 (Pages 74 - 77)

Page 78

Sure, I can consider that and I can conclude that no, you didn't because you can't know something or believe something so you should not know something or believe something that's untrue if you don't have any basis for it.  And to our knowledge, there was no basis for it.

Q.  Well -- but if you look at the FDA letter, which is one of the exhibits you've got in front of you -- I think it's 133.

A.  I think we're going back to 132.

MR. CAMPBELL:  It says Exhibit 6 on the cover.  Yeah.

A.  132.  Okay.

Q.  (By Mr. Kumagai)  You can see that our clients describe over the course of 23 pages the bases for their opinion that Cassava was engaged in some sort of improper conduct; right?

MR. CAMPBELL:  Object to the characterization.

A.  Well, I -- I haven't read all 23 pages, but the crux of it is that defendants were saying the company is a fraud.  All their data is made up.

You know, you can say, you know, there's -- there's a thousand -- there's thousands of Tweets.  There's, you know, many, many things, so you can -- you

Page 79

can have this, but at the crux of it, the defendants were, you know, selling the stock short, then spreading things we knew to be lies, you know, false and untrue.

So, you know, did we consider that -- that the defendants had a reasonable belief, you know, we knew the -- the important things, the core things that were being said were untrue.  So that's -- so yes, we did consider it.

Now, if you're parsing it out to did you look at every single line in here, because you can say ten -- you know, even a clock -- a broken clock is right twice a day.  But the -- the important things, the things that were damaging Cassava's business, we knew to be lies.

Q.  (By Mr. Kumagai)  What specifically?

A.  The fact that our data was all made up, fabricated, that we were frauds, and that our drug was unsafe and shouldn't be put into -- to patients.

Q.  Aside from those three categories, anything else?

A.  I'm sure there's lots of other ones, but those are the key ones, unless you want me to search my documents.

Q.  And so what specific facts did the company possess that demonstrated to the company that our clients were not sincere in making the statements they did about

Page 80

the company?

A.  Again -- I think you're just asking the same question in a different way, but, you know, we knew the facts to be untrue.  You know, we had tangible evidence to the contrary.  So we had a good faith, you know, reasonable basis to believe that the defendants were lying.  The defendants were making things up.

We had a -- the motivation for it, that they were hoping to make money on it or did make money on it.  That's -- you know, it's a reasonable basis.

Q.  Aside from the fact that they were short sellers, what other facts did the company possess that led the company to conclude that their motives were improper?

MR. CAMPBELL:  Object to form.

A.  Yeah.  I don't know what other facts we had, but, you know, money -- money drives a lot of behavior in the world and so if you've got, you know, the reason Number 1, you know, loud and clear, proven, you know, reason Number 27, you know, we may know, we may not know it, but it doesn't -- doesn't matter.

Q.  (By Mr. Kumagai)  And by reason Number 1, you're referring to their financial motives as short sellers?

A.  Correct.

Q.  What were reasons 2, 3, 4, if any?

Page 81

A.  I don't know those.

Q.  So aside from their financial motives, the company did not have any other facts to question the bases of their motives?

MR. CAMPBELL:  Object to form.

A.  Oh, I -- I'm -- I don't know if we did or didn't.  I would assume we did.  But, you know, once you -- if you have a compelling, you know, huge reason, I don't -- I don't personally know, need -- know or need to know the other -- the others.

Q.  (By Mr. Kumagai)  Do you believe that our clients ever doubted anything they said about Cassava?

A.  I don't know what your clients believed or didn't believe.

Q.  Has the company ever known or had reason to know or believe what our clients believed or didn't believe?

MR. CAMPBELL:  Object to form.

A.  Can you repeat that, please?  Sorry.

Q.  (By Mr. Kumagai)  Yeah.  Strike that.

Has -- the company ever formed a view as to the sincerity of our clients' statements?

MR. CAMPBELL:  Object to form.

A.  The company, you know, made a conclusion that the defendants were, you know, falsely lying,

21 (Pages 78 - 81)

Page 82

claiming that the company was a fraud, claiming that our drug was unsafe, despite all the evidence we had to that.

So we did not have a -- you can't ever know what someone else is thinking, but we certainly had a reasonable basis to believe that the -- that the defendants were not sincere in their belief.

Q. (By Mr. Kumagai) And what were the bases for believing that the defendants were not sincere in their belief?

A. Because of all the evidence we had to the contrary. We knew that experiments had been done. We knew that data was not made up. We knew that we weren't a fraud. We knew that we've got, you know -- here's where I could go to a reference material, our safety information.

You know, there's been hundreds of thousands of administrations of simufilam. There's never been a drug-related serious adverse event. That is a -- I've said before, you can't prove safety, but that is a really, really strong safety record.

We've had outside experts, a data safety monitoring board. It's a formal board of highly -- of experts in the field that look at your data specifically for safety, because when you're going through the FDA process, you're trying to prove efficacy, which only comes out in a Phase 3 trial -- or generally only comes out in

Page 83

the Phase 3 trial, but you also have to show your drug is -- is generally safe and we have -- we've done that.

So back to your question, yeah, we had a really good reason to believe that your clients were not sincere because we knew otherwise.

Q. What statements are you referring to when you claim that our clients said the drug was unsafe?

A. Here, I'm going to have to spend some time -- probably a lot of time in my reference materials. There is -- I want to go to the citizens -- let me find my citizens petition.

Q. Off the top of your head, are you aware of any particular specific statements that our clients, Dr. Heilbut, Dr. Brodkin, or Dr. Milioris, made --

A. Off the top of --

Q. -- that the drug was unsafe?

A. Off the top of my head, I don't know. But I know that the defendants in the defamation case absolutely did make statements that the drug is unsafe, it should not be put into humans, there was a -- you know, there was all the calls to the FDA to halt the trials.

Q. And if you were going to look for the statements you're thinking of, where would you go look in your reference materials?

A. The -- I'd go to the thousand defamatory

Page 84

statements in the original --

Q. Complaint?

A. -- complaint. Thank you.

Q. Okay. But you can't think of any specific statement?

A. I can't.

Q. What were Cassava's factual bases for claiming that our clients' statements caused an over $2 billion decline in the company's market cap?

A. Well, in August of 2021, we had a -- you know, a -- a public company's market cap is -- is a tangible thing. You can look at a closing stock price, you can look at a historical trend.

After the citizens petition was filed, our stock price declined dramatically. I don't have specifics in front of me. And so that was the basis is stock price was A, citizens petition was filed, stock price is B, and throughout the course of history after that was never up to -- to A.

Q. And you're aware that our clients, Dr. Heilbut, Dr. Brodkin, and Dr. Milioris, were not the authors of the citizens petition; right?

A. I'm aware of that.

Q. What are the company's bases for claiming that our clients' statements in particular caused a harm

Page 85

to the company?

A. Again, you know, we're trying to recruit a Phase 3 trial. When you've got a website called CassavaFraud.com, even if you don't go into the website, that -- that says something to somebody.

When you've got people on Twitter or X or whatever the platforms were that the defendants used saying this company is a fraud, you know, this company's science is all made up, which we've gone through examples of that today, and you are having difficulty recruiting at the speed that you thought you would, you have clinical sites who are withdrawing from their trials -- there's a period where we had to actually take some sites out of our trial and add ones late in the recruiting process because we had sites that joined, went through all the -- all through the activities to get activated and never recruited a patient.

Now, you'd have to go to the physician to say why didn't you, but you can make a tangible leap when you've got patients leaving your study, recruitment rates are slow, sites leaving your study, that there was a tangible detrimental impact on our business.

Q. And before Cassava commenced the defamation action, did it ever go to those sites or clinicians and say why are these people leaving or why aren't you

22 (Pages 82 - 85)

Page 86

enrolling patients?

A. I wouldn't know that.

Q. You're aware that Magistrate Judge Ona Wang issued an order recommending the dismissal of the lawsuit around January of 2024?

A. I am.

Q. After that decision, did Cassava do anything to reassess the factual bases or purposes for its lawsuit?

A. Well, yes. But that would be between us and -- and counsel, so I can't speak to it.

Q. And same question: After District Court Judge Gregory Woods issued his order dismissing the claims in March of 2024, did Cassava do anything to reassess the factual bases or purposes for its lawsuit?

A. Absolutely, but, again, that would have been done in conjunction with counsel, so it would be privileged.

Q. After those court orders, did the company conduct additional factual investigations --

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) -- specific to the defamation action?

A. Yeah. If we did, it would be in conjunction with counsel, so it would be privileged.

Page 87

Q. Well, did you? Did the company?

A. Conduct -- I wouldn't know if we conducted specific actions.

Q. So you don't know whether or not the company conducted any additional fact-finding related to the defamation after the decision from Judge Woods in March 2024?

MR. CAMPBELL: Object to form.

A. Yeah. I don't know that specifically. But, again, this is an ongoing process, so we're, you know -- so we are -- the law firms -- well, sorry. I can't speak to what they were doing, but -- yeah, there were additional actions to collect information and investigate.

Q. (By Mr. Kumagai) And that was all done by counsel?

A. In conjunction with counsel, yes.

Q. Did the company consider dropping the lawsuit after the decisions from Judge Wang and Judge Woods?

A. The company certainly would have debated it with counsel, but I can't go into what those debates were.

Q. Prior to filing the Second Amended Complaint, did the company conduct any cost-benefit analysis to help it decide whether or not to continue the

Page 88

case?

A. Not that I'm aware.

Q. Prior to filing the Second Amended Complaint, did the company assess whether the lawsuit had achieved the goals the company had set out to achieve?

MR. CAMPBELL: Object to form.

A. Yeah. I'm not aware of that.

Q. (By Mr. Kumagai) What were the company's factual bases for its decision to file the Second Amended Complaint?

A. Well, as I understand it, the -- the complaint was dismissed with prejudice, saying -- and it's a -- there's a tab here I can refer to that there's -- hey, these 22 pages of statements are defamatory per se, but you need to augment your complaint, you know, to show that.

And that was what -- that was the purpose of the Second Amended Complaint being filed was to -- I'm going to -- going to parse this badly because I'm not an attorney, but to correct whatever deficiencies were -- were noted by the judge in the first complaint.

Q. Was Cassava's purpose for the Second Amended Complaint the same as its purposes that you articulated earlier when it commenced the defamation action?

Page 89

MR. CAMPBELL: Object to form.

A. Yeah. To -- to my knowledge.

Q. (By Mr. Kumagai) Okay. I'll go slow here for these next few questions. What were Cassava's legal bases for commencing the defamation action?

MR. CAMPBELL: If you can answer independent of advice of counsel, go ahead.

A. I can't answer independent of counsel's advice.

Q. (By Mr. Kumagai) What were Cassava's legal bases for continuing the defamation action over the course of November 2022 through August 2024?

MR. CAMPBELL: Same instruction.

A. I can't answer because of privilege.

Q. (By Mr. Kumagai) Were Cassava's legal bases the same from the beginning to the end of the defamation action?

A. That would be discussed with counsel, so I can't talk to it.

Q. And what were Cassava's legal bases for voluntarily dismissing the defamation action?

MR. CAMPBELL: So you're asking what -- like what's the legal mechanism or --

Q. (By Mr. Kumagai) What were -- what was the legal rationale for deciding to voluntarily dismiss the

23 (Pages 86 - 89)

Page 90

case when -- in August of 2024?

A.   The legal rationale would be something that would have been talked about with counsel and I can't talk to.  But from the company's perspective, in July of 2024, Remi Barbier resigned from the company.  Rick Barry joined the company.  He did, you know, a 360 review of operations.

He also looked at where we were as far as, you know, recruitment and status in the Phase 3 trials and -- you know, he's the CEO of the company.  His conclusion was, you know, we've -- we've achieved our goal.  We have -- the trials will be completed.  We'll get a readout on simufilam in our Phase 3 trials.  And therefore, his recommendation to the board was to dismiss the suit.  Counsel would have put in their thoughts, as well, and the board decided to drop the lawsuit.

Q.   Did anyone disagree with the recommendation to drop the lawsuit?

A.   Not to my knowledge.

Q.   You were at that board meeting; right?

A.   Yes.

Q.   And did anyone express --

A.   Not to my recollection.

MR. KUMAGAI:  Let's break for 5 minutes.

VIDEOGRAPHER:  Going off the record at

Page 91

11:20.  This marks the end of Media 2.

(Recess taken, 11:20 a.m. to 11:36 a.m.)

VIDEOGRAPHER:  This marks the start of Media 3 of the 30(b)(6) deposition of Cassava Sciences, Inc., represented by Eric Schoen.  We're back on the record.  The time is 11:36.

(Exhibit 137 was marked.)

Q.   (By Mr. Kumagai)  All right, Mr. Schoen. I've marked as Exhibit 137 the document titled "Cassava Quick Reference Sheet for Rule 30(b)(6) Deposition."

Do you see that?

A.   I do.

Q.   And this is a document that was prepared by counsel; is that correct?

A.   Correct.

Q.   And it is, effectively, an index of the documents in binders in front of you today; right? Correct?

MR. CAMPBELL:  Object to form.

Q.   (By Mr. Kumagai)  And you -- you've had this index from the beginning of today's deposition; right?

A.   Correct.

Q.   And so what are the subbullets under each of the -- well, first -- strike that.

Page 92

What are the bolded bullets representing?

A.   Well, my understanding is the bolded bullets match to the questions proposed by the defendants that I should have knowledge of.  And so this document is meant to organize it so that I can spend the time answering in an efficient manner rather than searching documents for -- for various things.

Q.   The bullet -- the bolded bullets correspond to the topics?

A.   Topics, yeah.

Q.   And then the subbullets are references to the documents in your binder; correct?

A.   Correct.

Q.   When Cassava decided to commence the defamation action, did it rely on any consultations with experts other than lawyers?

MR. CAMPBELL:  Object to form.  And again, to the extent experts were retained by -- and used by counsel and not disclosed in these materials, that's privileged.

A.   Yeah.  That's going to be privileged.

Q.   (By Mr. Kumagai)  Did Cassava consult any members of its scientific advisory board about the defamation action?

A.   Not to my knowledge.

Page 93

Q.   When Cassava decided to commence the defamation action, did it consider or rely on any feedback that it had received from members of its scientific advisory board?

A.   Not to my knowledge.

Q.   I'll mark as Exhibit 138 a document Bates-stamped CASSAVA_000004863.

(Exhibit 138 was marked.)

Q.   Okay.  This appears to be an email from Remi Barbier to a number of individuals who appear to be members of Cassava's board of directors and the email is dated May 24th, 2019.

Do you see that?

A.   I do.

Q.   And if you look at the paragraph beginning with, "Without getting ahead of ourselves" -- do you see that?

A.   Yes.

Q.   Mr. Barbier writes to the board, "One of the key themes we're hearing is that no one will believe us."

Do you see that?

A.   I do.

Q.   Do you understand what that is referring to?

24 (Pages 90 - 93)

Page 94

A. Well, this email is referring to the Phase 2a study, which was done prior to the Phase 2b study. It was an open label study, so companies have access to all the results. There's no blinding. And the results were -- were quite good.

So that's -- I can't know exactly what was in Mr. Barbier's head when he wrote this, but that's what I would -- how I would interpret it is because the results were so good and because it was open label, it might be met with skepticism.

Q. And when Cassava decided to commence the defamation action, did the company consider the fact that a key theme it had heard about the Phase 2a study was that no one would believe us?

MR. CAMPBELL: Object to form.

A. Well, you say "a key theme." This is one person, you know, stating in an email. But in commencing the defamation action, you know, the -- the Phase 2b -- 2b study was an issue. Not the Phase 2a. And the Phase 2b study was a blinded controlled study rather than an open label study.

In an open label study, every subject is given the drug. The doctor knows it's a drug, the patient knows it's a drug, the company knows it's a drug, the company has access to all the data. It's -- in the

Page 95

scientific community, it's considered much less rigorous because you can have placebo effect, you could have bias. So if you get good results, they're generally not looked at as -- as being as definitive as a blinded study.

Q. (By Mr. Kumagai) And it seems that Mr. Barbier, the CEO of the company, was describing that the company had been receiving some skeptical feedback from the -- from others outside the company. Is that right?

A. It says "One of the key themes we're hearing," which means somebody said that, but I -- you know, how many, who, I -- I don't know.

Q. And when Cassava decided to commence the defamation action, did it consider the fact that other individuals had expressed skepticism or disbelief in the company's data?

MR. CAMPBELL: Object to form.

A. Consider it? I mean, skepticism is a part of -- of science. I mean, that's what -- what it is. You're investigating something. There's going to be people who believe it. There's going to be people who don't believe it. And that's -- that's a fine, normal part of scientific discourse.

So, you know, the fact that some people may have looked with skepticism on the Phase 2a study is

Page 96

normal and is -- is partially why we engaged in the Phase 2b study.

The Phase 2b study was very similar, except it was larger and had a blinded arm so that you could -- scientifically, it had more rigor and more credibility.

Q. (By Mr. Kumagai) Is that still the company's view today?

A. Well, on -- on Phase -- on scientific studies in general or on the Phase 2b study?

Q. On the Phase 2b.

A. On the Phase 2b study, we did an 8-K in July of 2021, disclosing that our SVP of neuroscience, Lindsay Burns, had sent an email to Dr. Wang that could have partially unblinded him to a number of patients. And in that same 8-K, we're saying you should -- I'm going to paraphrase -- but you should not place undue reliance on this study because of that fact.

So today, looking at it, no. The Phase -- the Phase 2b study clearly is called into question, but at the time of this email, the Phase 2b study hadn't even been run.

Q. And I believe you said July 2021, but you're referring to an 8-K in July of 2024; right?

A. The July 2024. Thank you.

Q. I'll mark as Exhibit 139 a document

Page 97

Bates-stamped CASSAVA_55933.

(Exhibit 139 was marked.)

Q. Okay. The top email in Exhibit 139 appears to be an email from Professor Barbara J. Sahakian to Lindsay Burns, copying T.W. Robbins dated July 5th, 2019.

Do you see that?

A. I do.

Q. And who is Barbara -- Barbara Sahakian and what was her connection to the company, if any?

A. Barbara -- I know her name. I know she's -- I would consider her a scientific advisor, but I don't have her biography or her credentials in front of me.

Q. She was a member of the company's scientific advisory board; right?

A. That sounds correct.

Q. Okay.

A. We haven't had a scientific advisory board in years, so ...

Q. When did the scientific advisory board end or disband?

A. There's not a clear date for that, but it would have been after the citizens petition. I believe that there was the board -- the scientific advisory board was getting harassment from outside individuals.

25 (Pages 94 - 97)

Page 98

Q.  So sometime -- the citizens petition was August 2021, so sometime shortly after that, the scientific advisory board disbanded?

A.  I can't say that because the -- it was never -- there was never a board action.  There was never -- scientific advisory boards aren't -- aren't formal bodies with minutes, but around that time would have been -- after that time, I don't believe the scientific advisory ever convened.

Q.  And what was the company's view of the scientific advisory board's role?

A.  Well, Cassava, you know, was and is a small company and so you -- if you are trying to develop a drug, you know, convening a scientific advisory board of outside experts in the field is a way to -- to force multiply, where you can get five or six opinions on what you're doing and how you're doing it, expert opinions to inform the company to its course of action.  That's -- that's fairly normal for a biotech.

Q.  And that was how the company viewed the scientific advisory board?

A.  Yes.  They're advisory in nature.  They're not an -- an authoritative body for the company.

Q.  Okay.  In this email chain -- and you can take a moment to look at it -- appears to be a discussion

Page 99

of the data from the Phase 2a study involving Dr. Burns, Dr. Sahakian, and Dr. Robbins.

A.  Do you want me to read the whole document?

Q.  I'll -- I'll point you to a particular -- I mean, you can, if you'd like, but I'm going to direct your attention to Dr. Sahakian's email on the first page from July 5th, 2019, where she says, "Thank you for your email, Lindsay."

A.  Uh-huh.

Q.  Do you see that?

A.  Yes.

Q.  So she refers to an individual named Helena Kraemer.  And then in the last paragraph of her email, she writes, "I do think someone independent from Dr. Wang run the same analyses is so important.  Showing that two independent scientists have high reliability in the results obtained is very solid methodology and cannot be criticized."

Do you see that?

A.  I do.

Q.  And who conducted the Phase 2a study analysis?

A.  The biomarkers were Dr. Wang.

Q.  And did the company ever have a second independent -- or an inde -- strike that.

Page 100

Did the company ever have someone independent from Dr. Wang run the Phase 2a analyses?

A.  No.

Q.  And why not?

A.  That wouldn't necessarily be a normal process to have something done in duplicate.  I mean, these are -- this is cerebrospinal fluid, so an elderly patient has to go get not one, but two spinal taps, so -- the volume of what you get is -- is small.  You're also going to look at cost considerations of doing an analysis twice.

Q.  Did the company consider having an independent expert use the same samples to rerun the analyses that Dr. Wang ran for the Phase 2a study?

A.  I don't know.

Q.  Okay.  And if you look further down, there's an email from July 5th, 2019, from Dr. Burns.  She writes, "It is mostly a marketing exercise, but much needed.  When we showed the data to Paul Aisen, he thought they were encouraging and exciting, but he flat out did not believe the p-values were possible with 12 patients.  We were all at first incredulous.  I too don't imagine the statistics will change, but we need to say that a third party analyzed them."

Do you see that from Dr. Burns?

Page 101

A.  I listened to it, but I can't find out where you're reading from.

Q.  It's the bottom of the first page, where it says, "Dear Trevor and Barbara."

A.  Yeah.

Q.  Do you see that?

A.  Yes, I do.

Q.  And do you know who Dr. Paul Aisen is?

A.  He was on our scientific board.  He's a very respected scientist and -- in the Alzheimer's community.

Q.  Okay.  And he told Dr. Burns based on this email that he flat out did not believe the p-values were possible with 12 patients in reference to the Phase 2a data.

Do you see that?

MR. CAMPBELL:  Object to form.

A.  Yeah.  I see that.

Q.  (By Mr. Kumagai)  So when Cassava decided to commence the defamation action, did the company consider any feedback from Dr. Aisen about simufilam's Phase 2a data?

A.  Well, these are -- you're talking about two totally separate things.  The Phase 2a was an open label study with 12 participants that, you know, the results

26 (Pages 98 - 101)

Page 102

were met with skepticism. And so the company's actions were, essentially, to repeat that study, but with a larger population and a blinded arm such that the evidence couldn't be met with the same amount of skepticism.

Again, you're taking away the open label aspect, so you're also taking away the placebo effect. And also, when you have a blinded study, it greatly reduces the ability of bias or, you know, manipulation.

Q. You're aware that some of the allegedly defamatory statements in the defamation action were also targeted at the Phase 2a study?

MR. CAMPBELL: Object to form.

A. Yeah. Not specifically.

Q. (By Mr. Kumagai) And so did Cassava -- strike that.

When Cassava decided to commence the defamation action, did the company consider the feedback it had received from Dr. Sahakian on getting a second lab to analyze the Phase 2a study?

A. I'd like to look at that. Because I -- I don't know that I -- I would like to know when we released the results of the Phase 2a study. It would be helpful because I'm trying to figure out in context whether Dr. Sahakian was talking about -- she says, "It might be useful, especially for your larger scale study."

Page 103

So can you point me to where she recommended that we -- I think you said rean -- like run the sample --

Q. Well, so if -- the email before Dr. Sahakian's email is Dr. Burns' email where she refers to Paul Aisen; right?

A. Uh-huh.

Q. And she refers to 12 patients and a third party -- getting a third party to analyze those, right? Does that sound like the Phase 2a study?

A. It could be, but it's not clear to me because, in this email, they're also talking about the -- you know, a -- there's reference to a larger study, so it's unclear to me of the context.

Q. Okay. And just to be clear, when Cassava decided to commence the defamation action, did it rely on any -- strike that.

When Cassava decided to commence the defamation action, did it consider any feedback that it had received from Dr. Sahakian or Dr. Aisen on the Phase 2a study?

A. I don't know that that feedback would have been considered important enough to con -- so there's a body of -- of emails and knowledge that you have, so it would be considered in that, but it's not a -- a primary

Page 104

point to me.

Q. As far as you're aware, it wasn't something the company considered when it brought the defamation action?

A. As far as I'm aware.

Q. I'll mark as Exhibit 140 a document Bates-stamped CASSAVA_00018239.

(Exhibit 140 was marked.)

Q. Okay. And Exhibit 140 appears to be an email from Dr. Steven Arnold to Dr. Lindsay Burns on May 16th, 2020.

Do you see that?

A. I see that.

Q. And who is Dr. Steven Arnold?

A. Dr. Steven Arnold, I believe, was a scientific advisor at one point for the company. He's also a very respected expert in Alzheimer's -- in the field.

Q. Okay. And the subject of the email is "Biomarker data."

Do you see that?

A. I do.

Q. And it appears -- if you start at the bottom of the chain, Dr. Burns appears to ask Dr. Arnold to weigh in on some biomarker data.

Page 105

Do you see that?

A. I do. But can I read it?

Q. Yeah. Of course.

A. Okay.

Q. So Dr. Arnold and Dr. Burns appear to be discussing the Phase 2b biomarker data; right?

A. Yes.

Q. And after Lindsay or Dr. Burns asks Dr. Arnold to look at the data, Dr. Arnold responds, which -- in the top email on May 16th, 2020, on the first page.

Do you see that?

A. I do.

Q. And in the paragraph under "Questions and Thoughts," Dr. Arnold writes, "Hoau's data are always surprising."

Do you see that?

A. I do.

Q. And continues, "I don't know how he does it."

Do you see that?

A. I do.

Q. And then in the next paragraph, he writes, "It's easy to Monday morning quarterback and I should have thought of this before, but study-wise, 28 days is too

27 (Pages 102 - 105)

Page 106

short to detect any change in a number of these anolytes because of the protein half-lives."

Do you see that?

A. I do.

Q. And so when Cassava decided to commence the defamation action, did the company consider the feedback that Dr. Arnold provided on the Phase 2b data?

MR. CAMPBELL: Object to form and characterization.

A. You know, this is an email. It goes into a body of knowledge. So, you know, everything is considered when commencing the defamation action, but I'd have no reason to think we'd focus specifically on this email for any reason.

Q. (By Mr. Kumagai) Why not?

A. I don't know -- it's -- well, why -- you know, why would someone focus on this email and not the, you know, 50,000 others or however many are generated over the course -- over the course of time. It doesn't -- you know, it is relevant to it and it would be considered, but not with a laser focus.

Q. You testified earlier that Dr. Arnold was an expert, well-respected in the field; right?

A. Yes.

Q. And he provided feedback to the company's

Page 107

head of SVP of neuroscience that Dr. Wang's data are always surprising, he doesn't know how he does it, and study-wise, 28 days is too short. Right?

A. Yeah. I see that.

Q. And the company did not consider this email when it brought the defamation action?

A. Well --

MR. CAMPBELL: Object to form.

A. Let's -- you know, so, first of all, when you're reading an email, I can't know what Dr. Arnold was -- was thinking, but as a -- as a company representative, I'm looking at this. It looks to me in some respects that -- I don't see anything saying I think Dr. -- you know, Dr. Wang is a fraud. I think this -- it's saying he seems to do a really good job in difficult biomarker examinations. And that's -- that's a company's perspective.

I can't know what Dr. Arnold was thinking. You'd have to ask him. You know, when it comes to 28 days is too short, you know, that's a scientific question I cannot answer.

But, again, these are biomarkers that were blinded, so there's no reason to have any -- any suspicion that the results are anything other than what they are.

Q. (By Mr. Kumagai) Except that there was;

Page 108

the company just didn't discover the fact until years later?

MR. CAMPBELL: Object to form.

A. You said there was. There's the potential that he could have been unblinded to a subset of patients. Not that there was.

Q. (By Mr. Kumagai) I'll mark as Exhibit 141 a document Bates-stamped CASSAVA_000020942.

(Exhibit 141 was marked.)

A. Thank you.

Q. Okay. Exhibit 141 appears to be an email from Dr. Jeffrey Cummings to Dr. Burns dated November 14th, 2020, with the subject "Phase 2b manuscript."

Do you see that?

A. I do.

Q. And who is Dr. Cummings?

A. Dr. Cummings may have been a member of our scientific advisory board at some time, but he is also a very respected expert in the Alzheimer's disease field.

Q. Okay. And it appears as though Dr. Burns asked Dr. Cummings to take a look at the draft Phase 2b manuscript; is that fair?

A. I'm going to have to read the email if you want me to make that conclusion.

Page 109

Q. Yeah.

A. Okay.

Q. Okay. So Dr. Burns sends the draft of her Phase 2b manuscript to Dr. Cummings and asks if he would like to add himself as an author.

Do you see that?

A. I do.

Q. And then Dr. Cummings responds, "I've reviewed the paper. Unfortunately, it comes off as heavily manipulated to show positive results."

And then it continues, "I am afraid I could not put my name on this without marked revisions."

Do you see that?

A. I do.

Q. And so when Cassava decided to commence the defamation action, did the company consider the feedback that Dr. Cummings provided to Dr. Burns about the Phase 2b manuscript?

MR. CAMPBELL: Object to form.

A. Yeah. I'm sure it would be considered in the same way that the other emails you showed me have. As part of a body of -- of emails and knowledge regarding the studies.

Q. (By Mr. Kumagai) Well, what makes you say that?

28 (Pages 106 - 109)

Page 110

A. Well, if -- because I don't see particular relevance from this document to the defamation suit.

Q. Why not?

A. I'd ask the question in reverse of why. I think -- I'll let you ask -- ask the questions rather than me guessing at what they are.

Q. Well, the question is why do you not think this would be relevant to the defamation action?

A. It would be relevant in the context of everything else, but I don't see anything in here that will sway a company's, you know, decision on a whole body of things in a defamation case by a single email.

It's just not -- you know, if the all -- if the allegation in the defamation case was one single point and this was relevant to it, then this would be considered. And it would be considered, but it's not a -- not a primary document.

Q. You're aware that some of the statements that Cassava claimed were defamatory in the defamation action alleged that the Phase 2b data appeared to be heavily manipulated; right?

MR. CAMPBELL: Object to form.

A. Okay. Yes.

Q. (By Mr. Kumagai) And here, you have Dr. Cummings, who you described as a highly respected

Page 111

Alzheimer's expert, telling Dr. Burns in November of 2020 that he believed the Phase 2b data comes off as heavily manipulated to show positive results --

MR. CAMPBELL: Object to form and characterization.

Q. (By Mr. Kumagai) -- right?

A. I see where you're going there. You're talking -- you're focusing on heavily manipulated, and again, my -- I can't see this in the context of an email chain, but these, I believe, are talking about cognition results. Is that a -- fair -- fair piece?

You know, Dr. Cummings, when he says -- using the word "manipulated" may have been -- I can't know what was in his head, but that's a poor choice of words. Later -- you know, if -- if he was talking about manipulated in a fraudulent sense, I wouldn't expect him to write later in the email I can't put my name on the paper without marked revisions.

What I believe he was saying -- and I probably shouldn't speculate, but when I read this, I conclude that, Hey, the analysis you did seems to be skewed and somehow -- that I would prefer a different way.

And, you know, when you do a scientific analysis, there is not -- unless you have a protocol that says I'm going to evaluate A, B, C, and D and do it

Page 112

exactly like this with no deviations, you know, there's scientific license of someone -- you know, you've got -- you can have people who didn't take drugs, you throw out people.

I am aware of the cognition results from the Phase 2b. That was also part of our July 1, 2024 disclosure that we should have, you know, made a better disclosure on the study population and who was excluded. And, you know, in my mind, that was part of our corporate disclosures that, yeah, there was probably some negligence that we could have done a better job of disclosing, but in no way, shape, or form do I see this as saying you did something improper with the actual analysis of the Phase 2b.

Q. What is the difference between Dr. Cummings saying -- saying here that the Phase 2b manuscript comes off as heavily manipulated to show positive results and what you described as claims of manipulation in the fraudulent sense?

MR. CAMPBELL: Object to form.

A. Well, sorry. If you're making up data or committing fraud, you would take a blank sheet of paper and say, Here's the results that I want. You know, what I think this is talking about is a scientific process. And again, I'm a -- the CFO, I'm not a scientist, but when you

Page 113

look at scientific data, there's not one way of saying the answer is A. It's not like finance where the answer is $27. You have to make judgments.

And, you know, what I think -- what I take this to mean is Dr. Cummings was saying, Hey, the judgments you made maybe make the results look more favorable -- or sorry -- positive where another way you could do the analysis, it wouldn't look as positive. Not that it has no scientific validity, it can't be done, you're wrong.

You know, he's saying I could put my name on this paper, but we'd have to look at it in a different way. That's not -- and he's a respected expert, but he's not, you know, the Supreme Court judge who says this is the right way and this is the wrong way.

It's just -- that's not how -- that's not how my understand -- I'm not a scientist, but that's not my understanding of how scientific analysis is done.

In Phase 3, it's much more specific because you do have a protocol. You do say, Here's how I'm going to handle outliers. You know, that's -- that's a different -- it's a whole different animal.

Q. (By Mr. Kumagai) What is your understanding of scientific fraud, other than, you know, writing down results on a blank sheet of paper?

29 (Pages 110 - 113)

Page 114

MR. CAMPBELL: Object to form.

A. My understanding of scientific fraud? If you portray results that aren't supported by the underlying data.

Q. (By Mr. Kumagai) And you don't interpret Dr. Cummings' sentence here, "Unfortunately, it comes off as heavily manipulated to show positive results" as fitting within that definition you just gave?

A. I'm going to say again, I -- I don't know -- you know, I'm reading an email four years later. I'm not a scientist. I don't know what Dr. Cummings was thinking. But if he was saying there is, you know, fraud or manipulation, he wouldn't be offering to put his name on a paper. He would be saying -- he should have been saying if that was his intent that you need to do this or you have a problem.

And there's nothing in here that says that. He's saying you'd have -- he was saying you would have to do it differently for me to be on the paper.

Q. Right. You would have to not heavily manipulate the data to show positive results?

MR. CAMPBELL: Object to form and characterization.

A. Yeah. Again, you're -- you're focusing on the word "manipulating," which I -- I don't interpret

Page 115

that -- the company doesn't interpret that in the same way, but, again, you could talk to Dr. Cummings and ask him what he -- what he meant.

Q. (By Mr. Kumagai) Why does the company interpret Dr. Cummings' assertion that the data is heavily manipulated to show positive results differently from our clients' assertions that the Phase 2b data was manipulated?

MR. CAMPBELL: Object to form.

A. Yeah. That -- that would be context. You know, this is -- this is not an open letter to the public. This is a letter, you know, to Dr. Burns giving his suggestions as a scientific advisor.

If I go out on -- pick your favorite social media platform -- and go Cassava's data is heavily manipulated, you know, whatever I say, that is a wholly different animal. There's no context to it.

You know, I don't know that the defendants ever offered to be, you know, co-authors on the paper if it was done a different way.

Q. (By Mr. Kumagai) You don't think defendants -- our clients gave context in the 23-page letter to the FDA?

MR. CAMPBELL: Object to form.

A. We can go back and look at it, but, again,

Page 116

there's a thousand defamatory statements. You know, if you want to pick and parse and choose and say these three, you know -- I -- I'm not the attorney. I haven't spent hours and hours and hours on each of them, but I know that there's many of them that were sole -- you know, out-of-context Tweets saying the company is a fraud. Their data are made up. You know, their drug is not safe. Those are my three favorites I go back to.

And so to say that, you know, in this document, we, you know, did this or that, there's -- you know, without reading it, I can't -- I can't give you any more information.

Q. (By Mr. Kumagai) Is there anyone at the company who read all of the plaintiffs' statements?

A. I don't know the answer to that.

Q. Is there anyone at the company who read the entirety of the FDA letter that our clients sent prior to the defamation action?

A. It's very likely that someone at the company read everything, but I just -- I don't have knowledge of who didn't do what on a -- on a granular basis like that.

Q. And who would you expect, if anyone, to have done that?

A. Well, it would be -- you know, at the

Page 117

company, it would be Remi Barbier and then after Chris Cook arrived, he would have looked, as well. Anything in a legal manner.

Q. But sitting here today, you don't know one way or the other whether anyone at the company read the entirety of our clients' letter to the FDA?

A. Definitively, no, I don't know that.

Q. What about the four slide decks that we looked at earlier?

A. Well, I know I looked at some of those slide decks in their entirety, but I can't know -- I can't possibly know what other people do and don't -- don't look at.

Q. I'll mark as Plaintiffs' Exhibit 142 a document Bates-stamped CASSAVA_100022.

(Exhibit 142 was marked.)

Q. Do you recognize Exhibit 142?

A. I do.

Q. And what is it?

A. It's a response from the Food and Drug Administration on a request for a breakthrough therapy designation from the company.

Q. Okay. And if you look at the last page, it appears to be signed by Eric P. Bastings at the FDA dated October 27th, 2020.

30 (Pages 114 - 117)

Page 118

Do you see that?

A. I don't see the date, but I see the signature.

Q. The very back page, it's a digital signature, and it looks like there's a date stamp underneath it.

A. Yes. Okay.

Q. And so this was the FDA denying Cassava's application for a breakthrough therapy designation for simufilam; is that right?

A. Yes.

Q. Okay. If you look at the page -- the second page ending 23, there's a paragraph followed by three numbers.

Do you see that?

A. Yes.

Q. And the paragraph says, "The assertions that you made in support of this breakthrough therapy designation request based on the results of studies PTI-125-03 and PTI-125-02 described in that request are untenable for the following reasons."

Do you see that?

A. I do.

Q. And then it lists four reasons?

A. I see it.

Page 119

Q. And PTI-125-03 and PTI-125-02 are the Phase 2a and 2b simufilam studies; right?

A. That sounds right to me. I don't recall.

Q. Okay. And then Number 2 says, "The inference that you have drawn that the effect of simufilam on several cerebrospinal fluid biomarkers in both studies is indicative of a potential effect on the pathology and pathophysiology of Alzheimer's disease is highly speculative."

Do you see that?

A. I do.

Q. And then if you look at Number 4, the FDA refers to the simufilam CANTAB test component, which is the -- the analysis that Dr. Burns did; right?

A. Yes.

Q. And it says that the maneuver done by Dr. Burns limits the interpretability of the data.

Do you see that?

A. Yes.

Q. And so when Cassava decided to commence the defamation action, did the company consider any of the feedback that the FDA provided in this letter denying Cassava's application for a breakthrough therapy designation?

MR. CAMPBELL: Object to form.

Page 120

A. I'm sure it would be, again, part of the body of things that the company considered.

Q. (By Mr. Kumagai) Cassava considered the fact that the FDA had described some of the company's assertions about simufilam as untenable and highly speculative?

MR. CAMPBELL: Object to form and characterization.

A. Well, again, you -- you've got to -- and I haven't read this -- maybe I'll take time and read it, but I scanned these. You're looking at an FDA rejection letter for a specific purpose. You know, if you apply to college and you get a rejection letter, you get a rejection.

So this is not -- in my view, this is not -- in the company's view -- this is not the FDA opining on here's -- we're looking at your scientific program and here's what we think about it. They're giving comments of why we didn't get, you know, a breakthrough designation approved. And I think in here, it says, You may submit your application again, you know, if you -- if you have new evidence.

So it's saying the evidence that you supplied is not sufficient for this purpose, not that -- that's how I read this.

Page 121

Q. I'll mark as Exhibit 143 a document Bates-stamped Cassava_000771233.

(Exhibit 143 was marked.)

Q. Okay. Exhibit 143 appears to be an email from Mr. Barbier to a number of Cassava employees dated August 24th, 2021, with the subject "Allegations."

Do you see that?

A. I do.

Q. And what is -- what is this email about?

A. It looks like -- let me read it before I answer.

Q. Yeah.

A. It's Mr. -- it's -- so on this particular date, August 24th, 2021, the citizens petition became public, and this is our CEO informing the -- the company of what had occurred, and -- it's information and also saying, Hey, make sure you don't, in particular, talk to anybody outside of the company with it -- about it.

Q. And why was the company telling employees not to talk to anyone outside the company about the citizens petition?

A. Well, the company policy is you don't speak with people outside the company -- well, how do I say this? This is a -- this is a matter that he's saying has impacted our stock price. It's, on its surface, clearly

31 (Pages 118 - 121)

Page 122

potentially litigious, so it is important and it's -- you know, potentially has material nonpublic information.

So an employee going out and speculating on what they -- what they think or don't think on it, that wouldn't be just with this. I mean, I've sent a version of this email or -- or the CEO has, you know, many, many times, saying, Hey, here's information that's important to the company, but please don't pass it on. It's company confidential.

Q. Okay. And if you look at the last paragraph, it says, "Please do not communicate your thoughts on this matter to anyone inside or outside the company."

Do you see that?

A. Yes.

Q. And so was it the company's policy that nobody should talk about the citizens petition to anyone inside or outside the company?

MR. CAMPBELL: Object to form.

A. Yeah. Inside the company, you know, you'd have to ask Mr. Barbier what he meant by that because there was no prohibition on people discussing things internally.

Q. (By Mr. Kumagai) But the CEO did advise the company, within minutes of receiving the citizens

Page 123

petition, not to communicate about it internally or externally; right?

A. Yeah. And externally, that's -- that's the appropriate move, absolutely. And again, I don't know what he meant by "internally."

Q. That is what he says, though; right?

A. That's the words.

Q. Okay. So just starting at the top of the email, Mr. Barbier says, "A few minutes ago, I was alerted to an alarming document that has just been made public," and then on the next page, he writes, "Needless to say, these allegations are complete nonsense."

Do you see that?

A. Yes.

Q. And what were the company's factual bases for concluding, within a few minutes of being alerted to the citizens petition, that its allegations were complete nonsense?

MR. CAMPBELL: Object to form and scope.

THE DEPONENT: Do I respond? Sorry.

MR. CAMPBELL: Yeah. You can respond. I'm objecting to the --

A. Sure. So, you know, this -- this is a time-sensitive communication to the company. The citizens petition, as I remember, is -- is fairly voluminous, so

Page 124

Mr. Barbier, you know, and myself -- you know, I was -- I was there that day. We didn't have time to read the whole thing, but when you read it, you can tell within, you know, the first couple paragraphs that they're saying, Ah, the company is fraudulent, doing something wrong. You know, I -- we can go to the -- to that document if you want.

And so on the surface, if you're at the company and you know that our science is real and you know that we have a real basis for, you know, the -- whatever this date is -- a real basis for our science and all the things we've talked about: The outside evidence, peer-reviewed papers. Someone saying they made it all up, you know that it's complete nonsense.

Now, that's without having read every word because I bet there were some words in the citizens petition that are probably true and accurate and we can parse out that. It would take us, you know, days and weeks.

But this is the appropriate communication to the company saying, Hey, guys, there's huge allegations that just came out. We don't believe they're true.

This is an internal communication. This is not a press release saying, you know -- you wouldn't put a press release saying, you know, these all -- all

Page 125

allegations are complete nonsense until you've had a chance to review them. But this, to me, is the appropriate -- it's the appropriate response.

Q. (By Mr. Kumagai) And so that was the company's view within minutes of receiving this citizens petition? That the allegations were complete nonsense?

A. That was the CEO's view within minutes of receiving the citizens petition.

Q. And did the company's view change at any time since then?

MR. CAMPBELL: Object to form.

A. Well, change at any time. So this has been a process over time. Of course, the company has received new information. You know, at the time of this, there was -- the company didn't have knowledge that Dr. Burns had sent an email that may have unblinded Dr. Wang to a subset of patients.

So the belief that any allegations in there of Phase 2b being potentially manipulated would have been incredulous. So yes, the -- the company's thinking has changed over time, but on August 24th, 2021, you know, in a quick gut check, this would have been the appropriate thought process.

You've got to remember, we're not -- if -- I'm going to add to this. If you're -- you know, J&J and

32 (Pages 122 - 125)

Page 126

you've got 100,000 employees and someone says there's fraud at your company, you know, you -- you've got to -- you've got to do an investigation. You've got to do the right corporate things. And you actually don't necessarily know. You're not aware of any, but you've got a thousand people at different sites who may be doing different things.

Cassava is a -- you know, is a 20-person organization, if that. I can't remember exactly our head count. So the CEO had intimate knowledge of every program, of everything that went on, so you could not -- he was in a position to make a gut check reaction to, Hey, it's all fraud and made up and no -- no, it's not true. This is all -- you know, he used the words "complete nonsense," which I'm sure he didn't have counsel look at this email. He wouldn't have had time to -- to put it in the best terms, but, again, in the company's opinion, this was the appropriate thing to send out to the employee base to say, you know, Hey, you're going to see this online, but here's -- here's what we think about it based upon our few minutes of review.

Rumors are things you don't want to let run rampant, especially in the internet age.

Q. (By Mr. Kumagai) Why is that?

A. Because social media allows things to

Page 127

expand and -- and take on a life of their own much faster than the old days of print, paper and fax. Something is disseminated much more quickly and widely.

Q. And so what does that mean in terms of operating a pharmaceutical company like Cassava?

MR. CAMPBELL: Object to form.

A. What does it mean? Well, it means like -- like Cassava, you know, we're -- we have to be aware of the internet footprint, that any words you write, you know, publicly are just that. It's not necessarily who you write them to. It could be to anybody. So you have to be much more cautious about how information is disseminated.

MR. CAMPBELL: I don't think we're quite at an hour, but if you're totally switching gears, I'm guessing lunch is here.

MR. KUMAGAI: Yeah. Sure. Let's take a break.

VIDEOGRAPHER: Going off the record at 12:30. This marks the end of Media 3.

(Recess taken, 12:30 p.m. to 1:10 p.m.)

VIDEOGRAPHER: This marks the start of Media 4 of the 30(b)(6) deposition of Cassava Sciences, Inc., represented by Eric Schoen. We're back on the record. The time is 1:10.

Page 128

Q. (By Mr. Kumagai) Mr. Schoen, do you know an individual by the name of Gary Lauder?

A. I do not.

Q. Or Lauder Partners? Have you heard of them?

A. Not to my knowledge.

(Exhibit 144 was marked.)

Q. I'll mark as Exhibit 144 a document Bates-stamped CASSAVA_000709518. Exhibit 144 appears to be an email exchange between Gary Lauder, Sandy Robertson, Remi Barbier, with the subject line "Disparaging ADDF emails to a supporter" and dated February 11th, 2022.

Do you see that?

A. I do.

Q. Are you familiar with the ADDF?

A. I don't know what that stands for.

Q. Have you heard of an organization with that name in the Alzheimer's space?

A. It's possible, but I -- like I said, right now, I don't -- I don't recall what ADDF stands for at this moment.

Q. Okay. There's an exchange among Gary, Sandy in this thread here. And if you look at the email on the bottom of the first page from Gary to Sandy, copying Remi, it begins, "I have not heard from the ADDF

Page 129

yet."

Do you see that?

A. Okay.

Q. And Mr. Lauder writes to Sandy and Remi, "Did you actually read the article? I had a similar conversation with Elizabeth Holmes just after the Wall Street Journal reported on the accusations. I believed her at the time. The existence of a profit motive among short sellers does often lead to lies and distortions that are meant to lower the stock price, but sometimes, it provides a rationalization to dismiss all criticism. Gary."

Do you see that?

A. I do.

Q. When Cassava decided to commence the defamation action, did the company consider this comment from Mr. Lauder?

A. Well, again, in the context of a full body of knowledge, it would have been considered, but not anything specific that I'm aware of.

Q. Did the company consider the risk that it was relying on the existence of a profit motive among short sellers as a rationalization to dismiss all criticism?

MR. CAMPBELL: Object to form.

33 (Pages 126 - 129)

Page 130

A. Yeah. A rationalization to dismiss all criticism, I don't -- I don't agree with that. You know, we're -- we're a public company. We're a biotech. We're embarking on an Alzheimer's disease program that's really difficult. It's complex.

And we had a novel mechanism of action, so we're not just trying to do what everybody else did. So we are going to have criticism from lots of different areas.

So, you know, I think you characterized it as we dismiss all criticism saying short sellers, short sellers. There's tons of criticism that we -- you know, we take and we think it's great because it's part of scientific debate.

You know, the particular criticism from the defendants, the criticism that everything is made up, you know, the science is false, the drug is not safe, I think somewhere in there -- I don't know if it's your defendants, but calling us a Theranos 2.0, you know, that's not scientific criticism. And so, you know, why would somebody try to destroy a company that's trying to help Alzheimer's patients?

Short selling is -- is a profit motive and that's a very legitimate motive, but to say that we dismiss all criticism of that, that's not the case.

Page 131

Q. Can you give some examples of criticism that the company received and thought was great? Part of scientific discourse?

A. Well, thought it was great, but, you know, we've gone through several examples of it just -- just recently of one of the scientific advisors saying, Hey, I thought your -- you know, you analyzed it this way, but, you know, I would have analyzed it that way. That's a good example of it, you know. You know, the --

Q. Are you referring to the email from Dr. Cummings when he said the data was heavily manipulated to show positive results?

A. Correct.

MR. CAMPBELL: Object to the characterization of the document.

A. And that he couldn't be -- wouldn't be an author on the paper without revisions. You know, that, to me, is -- you know, that's scientific criticism and there's nothing wrong with it. Juxtapose that to somebody saying you're an outright fraud, you make up your data, your drug is not safe. You know, those are malicious and defamatory lies.

Now, if the people who say those lies happen to be short sellers, now you've got a motivation for why they're doing that. You know, that doesn't strike

Page 132

me as scientific criticism. That strikes me as I'm saying whatever I want to say to make a profit.

Q. (By Mr. Kumagai) Can you think of any examples of criticism the company received from short sellers that the company accepted or viewed as legitimate criticism?

A. Actually, I can. If you look -- if you look at -- I think it was September 3rd, 2021, you know, we did a -- Remi Barbier did a statement where he, you know, talked about the short sellers' attack. And then he said, Oh, by the way, we're humans. We've looked at stuff and we actually made a couple errors and we're correcting those. And for years in our 10-K, we had erratum or corrigendum or whatever they are, correcting some errors that we found, you know. That was scientific criticism. We looked at it. We found, you know, Hey, we made a mistake.

Now, it's important to note the mistake wasn't our conclusions are wrong. We had some figures that had 19 lines instead of 18, but the data conclusions were still proper. But we stood up, took responsibility, and corrected it. So yes. There are examples.

Q. Aside from that example, anything else?

A. That's the one that comes to mind.

Q. If you look further down in this thread

Page 133

with -- between Mr. Lauder and Mr. Robertson, there's an email from Mr. Lauder on February 11th, 2022, on the page ending 519 where Mr. Lauder appears to compare Cassava to Theranos.

Do you see that?

A. Let me -- yes, I see it. Let me read it, please.

Okay. I've read it.

Q. And then further up in the email we looked at a moment ago, he also refers to his conversations with Elizabeth Holmes, who was the founder of Theranos; right?

A. Yes.

Q. And so our clients weren't the only ones making an analogy between Cassava and Theranos; right?

MR. CAMPBELL: Object to form.

A. Yeah. I -- I don't find that characterization. He's saying be careful because this happened to me; it could happen to you. He is not in any way saying that Cassava, you know, is a Theranos. He's -- I think -- I don't read that -- I don't read it contextually like you're reading it, and I certainly -- you know, I'm not Gary Lauder, so I don't even know what, you know, exactly he was referring to.

Q. (By Mr. Kumagai) Are you aware of an individual named Dr. Roger Nicoll?

34 (Pages 130 - 133)

Page 134

A.   I've heard his name.

Q.   And is it true that he also compared Cassava to Theranos in talking to the New York Times?

MR. CAMPBELL:  Object to form.

A.   Yeah.  I do believe that was his quote.

Q.   (By Mr. Kumagai)  And the company was aware of that quote; right?

A.   Yes.

Q.   When Cassava decided to commence the defamation action, did it consider the financial motives of anyone other than our plaintiffs and other short sellers who were criticizing the company?

A.   I don't know the answer to that, and any work then would have been done in conjunction with counsel, so I wouldn't be able to answer it.

Q.   When Cassava decided to commence the defamation action, did it consider Dr. Wang's financial motives?

A.   I'm sure that -- that had to be part of the -- of the calculus, particularly if you're -- you've got an internal investigation going on.  Because Dr. Wang was a paid consultant of the company.  He was not an employee of the company.  He was an employee of City University of New York.  He also held some stock options.  So if you're looking at allegations, that's definitely

Page 135

something you'd -- you'd look at.

But I think -- I know personally, because I'm the CFO of the company, that Dr. Wang never exercised any options, so he never made any money off company stock, and he probably was in a position that he had the opportunity to.

Q.   Dr. Wang was a participant in the company's bonus plan; right?

A.   You're referring to the 2020 cash incentive plan.  So yes, he was a participant in it, but that's -- the -- the context there is you're saying he -- sorry.  Dr. Wang was never paid a cash bonus out of that plan.

Q.   But Dr. Wang was eligible for bonus payments under that plan if the company's stock price hit a certain milestone; right?

MR. CAMPBELL:  Object to form.

A.   Yeah.  That's -- that's not actually true, either.  He was a member of the plan or a participant in the plan.  If the company -- this one, actually, I know very, very well.  If the company's stock price hit certain levels for a certain amount of time, it would unlock a potential payment, not an actual payment.

And that was the compensation committee of the board -- independent board members would determine who would and who would not, you know, receive a bonus.  There

Page 136

were some milestones that were hit.  There was a compensation committee meeting where some individuals were awarded a hypothetical bonus amount that was never paid.  And Dr. Wang was not awarded a bonus.

Q.   (By Mr. Kumagai)  But Dr. Wang was eligible under the bonus plan to receive bonus payments if the company stock price hit certain milestones --

MR. CAMPBELL:  Object to form.

Q.   (By Mr. Kumagai)  -- right?

A.   He had the potential to, yes.

Q.   And did -- when Cassava decided to commence the defamation action, did it consider Dr. Wang's financial motives in potentially receiving payments from that bonus plan when it commenced the defamation?

A.   Absolutely, in the same way that you would look at his stock option or his compensation, but that one, you can -- you can almost dismiss out of hand because, you know, the bonus plan was at the direction of the compensation committee of the board of directors.

So they could do what they want if we hit those milestones, but I know, you know, from board meetings and my involvement in it that the intent was this is a success-based plan.  It wasn't, Hey, if you are able to get your stock price to a certain level, people are going to get paid out.

Page 137

It was meant to be if you get a drug approval or if you get a buyout, so any, you know, to -- so yes, it was considered, but it's not a factor, in my view -- in the company's view.

Q.   You're saying that was the thinking behind the plan, but the actual language in the plan was not based on the drug getting approved.  It was based on the stock's price maintaining a certain level for a certain amount of time; right?

MR. CAMPBELL:  Object to form.

A.   Correct.  But, again, it had to be awarded by the compensation committee of the board of directors and had to hit actual triggers for payouts.  And the triggers were not just stock price of a certain amount.  It was, you know, a buyout or some liquidity event that gave the -- the company enough cash to pay those bonuses, so --

Q.   (By Mr. Kumagai)  Isn't it the case that the company had to have at least two years of cash to operate for two years and -- after paying out the bonuses?

A.   Generally, yes.

Q.   When Cassava decided to commence the defamation action, did it consider Dr. Burns' financial motives?

A.   Dr. Burns was an employee of the company,

35 (Pages 134 - 137)

Page 138

so yeah, I mean, again, if you're the company and you're investigating allegations of fraud, you're going to look at everything and everyone, including Dr. Burns, so yes.

Q. And so how exactly did the company consider or rely on the financial motives of individuals like Dr. Burns or Dr. Wang when it decided to commence the defamation action?

MR. CAMPBELL: Object to form. And to the extent that that involves communications with counsel, don't include that in your answer.

A. Okay. You know, counsel did most of this, but Dr. Burns, you know, was a 20-year employee of the company, so when you're considering her finan -- you know, any -- every employee of the company, you know, has a vested interest in the company being successful. A financial interest, potentially. So it would be considered.

Now, what specifically was done to say, you know, this person or that person, you know, that would have been done by counsel and so I can't speak to it.

Q. (By Mr. Kumagai) So you can't speak to any sort of safeguards or controls that the company put in place prior to commencing the defamation action to ensure that the decision to bring the defamation action itself wasn't tainted by improper financial motives?

Page 139

MR. CAMPBELL: Object to form.

A. You used the word "putting in place safeguards" and I'd be -- I wouldn't know what those would be, you know. You -- you always have to think of financial -- you know, it's part of -- of the board and the oversight role is to make sure that the corporate financial incentives are aligned with corporate goals, not individual goals.

So a -- so yes, it would be considered, but I don't have any special actions that the company would or should take that come to mind.

Q. (By Mr. Kumagai) When Cassava decided to commence the defamation action, did the company consider the fact that multiple scientific journals had issued retractions, corrections, and expressions of concern related to Dr. Wang's research?

A. Oh, absolutely.

Q. And how did that factor into the decision to bring the defamation action?

A. I seem to have lost my -- it got organized for me. Excuse me.

Q. Are you looking for the index, which is, I think, Exhibit 137?

A. Yeah. That's what I'm looking for.

So when the citizen -- you know, the --

Page 140

this is a great example. When the citizens petition and the various other allegations were made against the company, some of the journals that had been published, you know, asked the company or Dr. Wang for original uncropped images to investigate the allegations. That's what a scientific journal does.

And if you give me a minute, I'm going to -- I can get to some relevant pieces of it.

I'm going to go to tab 10, which is the exhibit --

Q. Sorry.

A. Yeah. I've got it.

Q. Exhibit 131?

A. Exhibit 131. Page 27 and 28. And on page 27, I'll start with, you know, here's a -- a list of five of -- of five of them.

Again, allegations were made of image manipulation. You know, bad things. The journals decided to do their own investigation. They asked for original materials from either the company or Dr. Wang. Those materials were supplied. And there's a -- a number of -- of -- I'll call it exonerations that came from them.

You know, from Neuroscience, after reviewing the 2005 article authored by Dr. Burns and Wang, the journal released an editorial note stating after

Page 141

careful examination of these original materials, Neuroscience found no evidence of manipulation of Western blot data or other figures of this publication.

Then on March 19th, 2022, Neuroscience published a corrigendum to a 2021 Neuroscience article authored by Dr. Wang stating that two errors pertaining to the visual display of the representative Western blot images ... have no material impact on the findings of the research. The data analyses were correct. To me, that's an exoneration.

Journal of Neuroscience. After review of a 2012 article authored by Dr. Wang and Dr. Burns, the journal determined that no evidence of data manipulation was found for Western blot data.

Molecular Neurodegeneration. In connection with the 2021 paper authored by Dr. Wang and others, which had nothing to do with Cassava or simufilam, the journal disclosed that the authors have retracted this article because concerns have been raised regarding the data. There were no findings of image manipulation or research misconduct in connection with this article.

A different author repeated Dr. Wang's experiment that had been questioned and obtained essentially the same result. The paper was republished June 15, 2022, with the identical title, abstract, and

36 (Pages 138 - 141)

Page 142

conclusion.

Neurobiology of Aging. Examining a 2017 paper authored by Dr. Burns and Wang, the journal disclosed that its editor did not find compelling evidence of data manipulation intended to misrepresent the results, but noted that errors in the published report were identified and the authors have requested a corrigendum -- I'm going to have to learn to say that word -- to correct those issues.

So those four, in my -- in my mind, were exonerations of allegations. And to my understanding, almost everything Dr. Burns -- Dr. Wang had ever done, you know, said, Hey, it was all fake and so it's a -- you know, it's very helpful that he got these exonerations.

Q. What about the PLoS One --

A. PLoS One. On March 30th, 2022, the journal retracted five papers authored by Dr. Wang, two of which were co-authored by Dr. Burns, stating the data in the comments provided to PLoS One did not resolve the concerns about the integrity and the reliability of the reported data. In light of these issues, the PLoS One editors retract this article.

Then I'll continue. There were no findings of data manipulation or research misconduct in connection with these articles, which had nothing to do with

Page 143

simufilam.

Q. That's -- that's Orrick saying the last sentence; right?

A. That is Orrick saying the last sentence.

Q. And do you view that as a -- as a, quote, exoneration, too?

A. That's not an exoneration. And so in that instance, you know, it is very helpful if there's no findings of manipulation of research, but, clearly, PLoS One still had concerns. And I believe there's a -- a COPE and -- the way that authors are supposed to deal with allegations, whether they can or not, and if they can't determine something definitively, they're supposed to go back to the actual creator of the work; in this case, it would be CUNY would be the body that oversees Dr. Wang.

So, you know, we -- PLoS One, we think the retraction was unfortunate, but we don't think they followed the proper procedures. And again, there were no findings of image manipulation or research misconduct in -- in connection with these articles.

Q. According to Orrick?

A. I'd have to read who wrote that, but I --

Q. It's not in quotes; right? In the paper --

A. It's not in quotes; correct.

Q. Okay. I'll mark as Exhibit 145 ...

Page 144

(Exhibit 145 was marked.)

Q. Have you seen Exhibit 145 before?

A. I may have, but I don't recall it.

Q. Okay. And the top right, it says the Journal of Neuroscience, January 19, 2022.

Do you see that?

A. I do.

Q. And the title is Erratum. And then it continues, "Expression of Concern, Wang, et al, reducing amyloid-related Alzheimer's disease pathogenesis via small molecule targeting filamin A."

Do you see that?

A. Yes.

Q. And so this is an expression of concern that the Journal of Neuroscience issued on the same 2012 paper by Dr. Wang and Dr. Burns that you referred to on page 27 of Exhibit 131?

Do you see that?

A. I do.

Q. And it doesn't say here that the journal found no evidence of data manipulation; right?

MR. CAMPBELL: Object to form.

A. I haven't read it, but I -- it doesn't -- I don't see that here. And again, this is -- sorry. No, I don't see that.

Page 145

Q. (By Mr. Kumagai) Okay. And so this is an expression of concern that was issued after that initial supplement that was issued by the Journal of Neuroscience that is quoted in the Orrick white paper. And here, the Journal of Neuroscience editors write, "The editors have been made aware of concerns about Western blots in this study, including those published with the article's erratum. These and other concerns are currently under investigation by the academic authorities at the City University of New York. JNeurosci will await the outcome of that investigation before taking further action."

Do you see that?

A. I do.

MR. CAMPBELL: I'm going to object to form. I'd just note that there are two references in the Neuroscience description in 10. One is dated March 29, 2022. The other doesn't appear to be dated.

MR. KUMAGAI: I'm talking about the second bullet, the Journal of Neuroscience. Not the first bullet.

MR. CAMPBELL: So that's -- I'll note that there is no date in that one at all.

Q. (By Mr. Kumagai) Okay. Do you view this expression of concern as an exoneration?

A. No. Not as an exoneration. This is -- so

37 (Pages 142 - 145)

Page 146

this is a continuation of the process that a journal is supposed to appropriately go through. You know, the journal looked at, you know, the original images and found no issues. Stated that.

But then, if there's -- you know, if something is being called into question, it's very normal for a journal to put up an expression of concern, particularly if there's an investigation by the body that governs the person that did the work, in this case City University of New York.

So I -- in my understanding, the normal context is you put up an expression of concern and you wait for City University of New York to issue a report. And to my knowledge, City University of New York has never issued a report on these -- these or any other allegations.

Q. Okay. We'll come back to that. When Cassava decided to commence the defamation action, did it consider this particular expression of concern from the Journal of Neuroscience in January of 2022?

A. It would have been part of the -- the package, yes.

Q. And was it the company's view when it brought the defamation action that the Journal of Neuroscience had exonerated Dr. Burns and Dr. Wang of the

Page 147

allegations of data manipulation?

A. Well, I'm going to go back to page 27 of Exhibit 10 because these are -- these are points in time. But an expression of concern, in the company's view, doesn't reverse an exoneration. They didn't ever say what we said before is false. This is simply, again, part of the process.

Q. It's a subsequent expression of concern; right?

A. Yes. Dated -- dated -- I believe it's dated later.

Q. I might have lost the other set of stickers. Oh, no, I've got them. Now marked Plaintiffs' Exhibit 146.

(Exhibit 146 was marked.)

Q. Sorry. Do you recognize Exhibit 146?

A. I don't recognize it, but I can tell what it is.

Q. And what is it?

A. It says it's a retraction of a paper.

Q. A paper by Dr. Wang; right?

A. I'm going to have to read it to answer that.

Q. It's actually a paper by Dr. Wang and Dr. Burns, if you look at the last sentence on -- the last

Page 148

paragraph on the first page.

A. Yes. It is a retraction of a page written by -- authored by Dr. Wang and Dr. Burns.

Q. And this is from the journal of -- the journal PLoS One and it was published -- this retraction notice was published on March 30th, 2022, if you look on the bottom left corner.

Do you see that?

A. I do.

Q. So when Cassava decided to commence the defamation action, did it consider that PLoS One had retracted this paper and several others by Dr. Burns or Dr. Wang?

A. Certainly, that would have been part of the package.

Q. And how did Cassava factor this -- these retractions into its decision to bring the defamation action?

A. Well, again, in the -- I'm going back to the -- tab 10, but there were no findings of image manipulation or research misconduct in connection with the PLoS One articles.

So in the company's view, PLoS One didn't follow the process that they're supposed to follow, which would be to put an expression of concern and wait for City

Page 149

University, who is the ultimate authority, to, you know, issue its findings. I think that's unfortunate, but it's -- you know, PLoS One's their own organization.

Q. So in the company's view, PLoS One should have taken the same position as the Journal of Neuroscience and just issued an expression of concern and waited to take further editorial action until CUNY had completed its investigation?

MR. CAMPBELL: Object to form.

A. Yeah. Yeah. Essentially.

Q. (By Mr. Kumagai) And then how -- how should the journals have responded to whatever CUNY found?

MR. CAMPBELL: Object to form.

A. CUNY hasn't -- hasn't issued anything.

Q. (By Mr. Kumagai) Right. But I'm saying in your -- in the company's view on what the proper process is, you said the journals should have waited for CUNY to finish its investigation?

A. Yeah. So --

Q. So then if CUNY found that, you know, images were manipulated or couldn't be verified, then what should the journals have done?

MR. CAMPBELL: Object to form. Improper hypothetical.

A. Yeah. I can't answer what a journal should

38 (Pages 146 - 149)

Page 150

or shouldn't do, but, put simply, a journal would read the report and then determine what the proper -- their proper course of action is.

Q. (By Mr. Kumagai) You can't opine on what a journal should or shouldn't do. I thought a few moments ago, you testified that PLoS One should not have done -- should not have issued this retraction.

MR. CAMPBELL: Object to form.

A. Yeah. I'm saying that according to our reading of the COPE -- C-O-P-E -- guidance for how a journal is supposed to handle these types of situations, that -- the guidance wasn't appropriately followed. PLoS One is its own organization. It had the right to retract the article and it did so.

Q. (By Mr. Kumagai) Okay. And if you look at the retraction notice for this article, it refers to -- at the beginning, it says, "Following the publication of this article, concerns were raised regarding results presented in Figures 1 and 7, specifically" and then it describes issues with those figures in the bullets.

Do you see that?

A. Yes.

Q. Including, you know, horizontal and vertical irregularities suggestive of splice lines in certain panels, the lack of a positive control sample, and

Page 151

panels that appeared to be similar.

Do you see those?

A. Yes.

Q. And then there's a description of what the corresponding authors said in response to the allegations.

Do you see that in the next paragraph?

A. Yes.

Q. The next paragraph says, "The corresponding author provided image data to support the contested Western blot results in this and other PLoS One articles. Per PLoS's assessment of the data files, the pixel patterns in background areas of blot images provided for multiple panels in the five papers appear more similar than would be expected for data obtained in independent experiments. Furthermore, the supporting data files did not contain positive controls as needed to verify the reliability of the results. In response to these concerns, the corresponding author stated that the repetitive features in the background noise of the image data are likely the result of scanner artifacts. The explanation given for the background image similarities does not resolve the journal's concerns in light of PLoS's assessment of the data files." The data files -- "The data and comments provided did not resolve the concerns about the integrity and reliability of data presented in

Page 152

this article. In light of these issues, the PLoS One editors retract this article."

Do you see that?

A. I do.

Q. Did the company consider any of those findings when it decided to commence the defamation action?

A. Clearly, this would be part of the package that was considered and probably one of the more important pieces. As part of the internal investigation, I know that the company hired experts.

MR. CAMPBELL: Hold on.

THE DEPONENT: Yeah.

MR. CAMPBELL: If -- if you're talking about experts that are hired by counsel as part of the internal investigation, that's privileged.

A. Yeah. So yes, it was considered. And I can't -- can't go into more specifics.

Q. (By Mr. Kumagai) So you can't testify as to the specific weight that this PLoS One retraction or the other four PLoS One retractions were given by the company when deciding to bring the defamation action?

A. I can't -- I can't testify as to what weight it was given.

Q. And do you think it's an accurate

Page 153

characterization of this retraction notice, having now read it, for Orrick to have written there are no findings of image manipulation or research misconduct in connection with these articles?

A. I didn't write what -- what Orrick wrote, but when I read this, they're saying there's concerns. There's things we can't answer. And that's -- to me -- to me, that's different than we found manipulation or we found X or Y.

Q. If any of the scientific journals had definitively stated that Dr. Wang had engaged in research misconduct, what impact, if any, would that have had on the defamation action?

MR. CAMPBELL: Object to form. Improper hypothetical.

A. Yeah. Well, I know the investigation looked into all of the journal articles, but if -- if someone is -- if someone is saying we found that it was manipulated -- you know, you're asking me a hypothetical, because I don't know that anyone did, you know, so I don't want to speculate what counsel and counsel's experts would have done, but it would have been part of the internal investigation.

Q. (By Mr. Kumagai) And you can't say anything more about that and how it relates to the

39 (Pages 150 - 153)

Page 154

defamation action because it was done under the purview of counsel; is that right?

A. I can't say it because it's -- it's a hypothetical, so I don't know -- I can't know what -- you know, I can't know what would have been done for something that didn't happen.

Q. Well, what specifically was done by the company to get comfortable with the PLoS One editors' finding that their concerns about the integrity and reliability of the data was not resolved by the author's comments?

A. That would have been done by experts hired by counsel.

Q. And so you can't speak to that because it's privileged because of Scott's privilege instruction?

A. Correct.

MR. CAMPBELL: Again, beyond what you've already spoken to, which is in the documents.

MR. KUMAGAI: So just to be clear, what is the -- the line that you're drawing here? So is it your position that, you know, at trial, he can say we brought in -- we had an independent investigation, we had experts involved looking at these allegations, and that was one of the bases for bringing the defamation action?

MR. CAMPBELL: No. My position is this

Page 155

document that's right here that he read from that addresses, obviously, the PLoS One piece and how it fits into the responses to allegations that have been brought against the company is not privileged. It was disclosed to the Department of Justice. It's been disclosed in this case. So, obviously, he can and has testified to it.

I'm drawing a -- a parse on the statement that you were suggesting that he couldn't talk to it at all because it was entirely privileged. He's talked to it here. What he's saying is there was an internal investigation that was done separate and apart from this report by Orrick issued to the Department of Justice and he can't speak to the privileged investigation that was conducted by counsel.

I mean, the reality is he's trying to answer the questions honestly and I'm just trying to stop him on the line when he's incorporating on privilege. So it is a fact that experts were engaged. That is a nonprivileged fact. But the work that was done by them is work product that was conducted at Orrick's direction, so --

MR. KUMAGAI: Right. But if that's offered as a basis --

MR. CAMPBELL: We haven't offered it. You're just asking questions and he's answering them.

Page 156

MR. KUMAGAI: Okay. To the extent it is offered, just to be clear, we would be entitled to probe everything that the experts did. And so I just want to make sure it's clear you're instructing the witness not to describe any particular findings by any of those experts or what those experts relayed to the company.

MR. CAMPBELL: Yeah. Again, that's why we're tying into the documents that are disclosed and nonprivileged.

Q. (By Mr. Kumagai) Okay. I'll mark as Exhibit 147 ...

(Exhibit 147 was marked.)

Q. Here you go. Exhibit 147 appears to be from the Journal of Neurobiology of Aging with the title "Expression of Concern, Wang, et al. 2017 PTI-125 binds and reverses and altered confirmation of filamin A to reduce Alzheimer's disease pathogenesis."

A. Yes.

Q. Do you see that?

A. I do.

Q. Have you seen this document before?

A. Not to my knowledge.

Q. Okay. And it says -- begins, "A reader has made the editors aware of concerns regarding the above-referenced report published at Neurobiology of Aging." It

Page 157

refers to materials provided by the authors. It says, "The material was evaluated by an independent expert with relevant methodological expertise. The manuscript was scanned by AI-based figure proofing software and all available input was considered by the handling editor and editor-in-chief. Overall, the editors did not find compelling evidence of data manipulation intended to misrepresent the results. However, the following errors in the published report were identified during the course of the evaluation." And then it lists one, two, three, four, five, six, seven -- eight errors.

Do you see that?

A. I do.

Q. And it continues, "The authors have requested a corrigendum to correct these issues. However, Neurobiology of Aging is aware of an ongoing inquiry of these and other concerns by the sponsoring institution, the City University of New York, and will make a final decision as to appropriate corrective action once that inquiry has been concluded."

Do you see that?

A. I do.

Q. So is it the company's view that this expression of concern was an exoneration?

A. No. The -- what I read to is -- the

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 158

expression of concern is not an exoneration, but when you talk about this part in here when the editors did not find compelling evidence of data manipulation intended to misrepresent the results, you know, exoneration -- you can use whatever word you want, but they're saying we didn't find any manipulation.

Q. Well, they're saying they didn't find compelling evidence of data manipulation intended to misrepresent the results. So it's possible that they found some evidence of data manipulation, just not enough to reach the conclusion that it was compelling or intended to misrepresent the results; right?

MR. CAMPBELL: Object to form.

A. You'd have to talk to the -- the people that did that examination.

Q. (By Mr. Kumagai) And did the company talk to the people that did that examination?

A. I don't know the answer to that.

Q. And the editors, in the final paragraph, make clear that they're awaiting CUNY's investigation before making a final decision as to appropriate corrective action; right?

A. Yeah. And according to my understanding, that's the appropriate course of action.

Q. And so when Cassava decided to commence the

Page 159

defamation action, did it consider this expression of concern and the eight errors that the authors admitted to in this paper?

A. Yeah. That would be -- certainly be part of the package.

Q. And to what extent did the company rely on, if any, this expression of concern when it decided to bring the defamation action?

MR. CAMPBELL: Object to form.

A. Yeah. It would have been part of the package and, in particular, the company would have looked at these eight errors. And again, that's part of the scientific debate that we talked about of, Hey, here's some things that weren't right and the company said, We agree and we'd like to correct them.

But to my understanding, these weren't critical elements of the -- of the paper or the conclusions.

Q. (By Mr. Kumagai) And what does that -- what are you basing that statement on?

A. My -- my understanding.

Q. From whom?

A. That's going to be hard for me to do. It's over years of -- over years of discussions, but I think the easiest one would be to say that there's a -- let me

Page 160

keep reading.

Yeah. I know that the authors requested a corrigendum and I know from my knowledge over the years that it was -- that these were not considered to be conclusion issues. It was descriptor issues.

Q. What do you mean by the difference between conclusion issues and descriptor issues?

A. Okay. If you have -- here's the paper, here's the primary conclusion. If the errors made that primary conclusion incorrect or misleading, that's different than, Hey, the figure that we showed should have had -- you know, been cockeyed this way or -- sorry. I shouldn't do that that with -- the figure that we showed had an extra line or was mislabeled, that's a minor issue versus a conclusion issue, in my view.

Q. And that's your understanding of these eight admitted errors in this 2017 paper?

A. That's my understanding.

Q. Okay. I'll introduce a document previously marked as Exhibit 86.

Do you recognize this Exhibit 86?

A. Yes, I do.

Q. And what is it?

A. It appears to be a copy of a New York Times article regarding the company and its Alzheimer's program.

Page 161

Q. Okay. The title of the New York Times article is "Scientists Question Data Behind an Experimental Alzheimer's Drug." Subtitle, "Studies linked to Cassava Sciences, once a stock market favorite, have been retracted or challenged by medical journals."

The reporter is Apoorva Mandavilli. And it's dated April 18th, 2022.

Do you see that?

A. Yes, I do.

Q. What was the company's reaction when this article was published?

A. I'm going to have to read -- at least read some of it quickly.

Q. Yep.

A. I can read it word for word, but I remember when we -- the company's reaction was, Hey, it's the New York Times. They can publish what they want, but it appears to be very one-sided.

You know, no one knows -- we don't know where a reporter goes to get a story, but, generally, in journalism, both sides of a coin are looked at, and this article seemed to be one-sided.

Q. And what makes you say that? Who else should the company have -- or should the New York Times have spoken to to make it not one-sided?

41 (Pages 158 - 161)

Page 162

MR. CAMPBELL:  Object to form.

A.  I don't know who they should have spoken to, but it appears that she spoke to what I'll call known -- known critics of the company, which is okay, too, but it's one voice rather than --

Q.  (By Mr. Kumagai)  Dr. Spruck is also quoted in the article; right?

A.  I believe so.

Q.  If you look on page 5.  Do you see that?  "Charles Spruck, a cancer researcher at the Sanford Burnham Prebys Medical Center and Discovery Institute."

A.  Yes.

Q.  And he said he believed the anomalies in those images could be the result of simple mistakes or vagaries of the technique.

Do you see that?

A.  Yes.

Q.  Mr. Barbier was also quoted; right?

A.  Yes.

Q.  So what other sort of supporters or defenders of the company should the reporter have spoken to, in your view, or quoted?

MR. CAMPBELL:  Object to form.

A.  Sorry.  Your question was what did the company think of this article and, you know, it -- the

Page 163

company didn't think it was fair and balanced, but it's the New York Times.  They can -- you know, they're -- a -- people have a right to their -- to their opinions and to present them how they want.  But this one was not -- we didn't think it was fair.

Q.  (By Mr. Kumagai)  What do you mean by "people have the right to present their opinions"?

A.  Well, we're a biotech.  We're working on a novel drug.  So we have many people who are proponents of us and many detractors.  That's scientific discourse.  You know, they're going to be able to present what they -- you know, it's a news article.  The person can report their view of the news.

Q.  Okay.  If you look at page 2, about one, two, three, four -- five paragraphs down, there's a paragraph that says, "The New York Times contacted nine prominent experts for comment about the scientific underpinnings of Cassava's trials.  All said they did not trust the company's methods, results, or even the premise underlying the drug's supposed effectiveness."

Do you see that?

A.  I do.

Q.  And so when Cassava decided to commence the defamation action, did it consider the fact that the New York Times had reported in April of 2022 that it had

Page 164

contacted nine prominent experts about the scientific underpinnings of Cassava's simufilam trials, and all nine said they did not trust the company's methods, results, or even the premise underlying the drug's supposed effectiveness?

MR. CAMPBELL:  Object to form.

A.  Sure.  It would have been part of the package.

Q.  (By Mr. Kumagai)  And what did the company do to address this fact that nine prominent experts spoke to the New York Times and told the New York Times they didn't trust the company's methods, results, or even the premise of simufilam's supposed effectiveness?

MR. CAMPBELL:  Object to form.

A.  Yeah.  I -- I -- I don't know whether it was considered.  I don't know if we had a list of the nine.  To me, it seems, you know, you'd have to look at, you know, who -- who are the nine, how are they chosen.  If you -- you know, if you looked up -- yeah.  I don't know.

Q.  (By Mr. Kumagai)  Okay.  And the next paragraph, it says Dr. -- it quotes Dr. Roger Nicoll, who we spoke about a moment ago.

A.  Uh-huh.

Q.  Do you see that?  And he's quoted as

Page 165

saying, "This drug should not be put into patients.  It should never have been.  Never.  The longer this goes on, the more outraged I am."

Do you see that?

A.  Yes.

Q.  And did the company consider these opinions from Dr. Nicoll when it decided to commence the defamation action?

A.  It would have been all part of the package, yes.

Q.  And how did the company get comfortable with bringing the defamation action in spite of comments like these from Dr. Nicoll?

MR. CAMPBELL:  Object to form.

A.  Yeah.  I -- to me, that would also be discussions with, you know -- defamation is a very -- from my understanding is a very clear, you know, it's got to be defamatory, it has to be something that someone, you know, knows -- knows or reasonably expected to know is defamatory, so, you know, that would be a discussion with counsel that I don't know the details of.

Q.  (By Mr. Kumagai)  Did the company, after this article came out, take seriously these criticisms and consider whether it should stop its clinical trials?

MR. CAMPBELL:  Object to form.

42 (Pages 162 - 165)

Page 166

A.   These criticisms, we would absolutely take seriously.  This is the New York Times.  But you asked me if we would consider stopping our clinical trials.  The whole idea of running clinical trials is to find out if a drug works.  There's nothing in here, to me, that's -- that would warrant saying stop the trial.

Q.   (By Mr. Kumagai)  Well, Dr. Nicoll is saying it should never have been put into patients; right?

A.   You'd have to ask Dr. Nicoll why he thought that.

Q.   Well, aren't there also downsides to running clinical trials that don't work?  Downsides like giving patients false hope in a drug that is based on fraudulent science?

MR. CAMPBELL:  Object to form.

A.   Sure.  There can also be side effects, which is why safety is one of the primary observations or -- observations of a clinical trial.  And simufilam, you know, has had hundreds of thousands of administrations and has a very clean safety profile.

Q.   (By Mr. Kumagai)  But what about the concern about giving patients false hope?

A.   False hope presumes that a drug isn't going to work.  We had really good reason to believe that simufilam could work.  So giving a patient false hope, I

Page 167

think that comes with entering a clinical trial.

You know, if you give me a bottle of medicine and say, This is going to fix you, that's expected hope.  If you said, Hey, here's an experimental drug, here's an informed consent brochure which, essentially, says here's the evidence, you know, both good and bad or -- if there is bad, saying this is -- you know, this is an experimental drug, people are taking that, you know, with full knowledge.

Q.   They didn't know about the Phase 2b data being potentially tainted by Dr. Burns' unblinding Dr. Wang; right?

MR. CAMPBELL:  Object to form.

A.   In April 8th, 2022, no.

Q.   (By Mr. Kumagai)  No.  I mean, the people who participated in the clinical trials, they didn't know about that when they enrolled in the trials; right?

A.   That's correct.  Nor did the company know.

Q.   Right.  Has the company apologized to patients for any of those subsequent discoveries?

A.   No.  I don't think that would be -- that wouldn't be appropriate because -- no.

Q.   Why not?

A.   Well, there's the potential that Dr. Wang was unblinded as to a portion of the Phase 2b subjects, a

Page 168

subset of them.  To apologize to that when we ran in good faith a large, well-controlled Phase 3 trial and the company was surprised by the result that the trial failed, you know, that's -- that's part of the scientific -- you know, scientific trials.  That's clinical trials.

You know, if a trial fails, I don't think is a regular -- it would not be a regular thing for a company to go back and say, we -- we are unhappy for patients.  That's the whole crux of this is to help patients, but, you know, if you look at Alzheimer's trials, they're very difficult.  There's very, very few successes.  There are lots and lots of failures.

Q.   The informed consents that patients signed and the brochures they were given, did those brochures describe the results from the Phase 2b clinical trial?

A.   I'm not familiar with the contents of the informed consent.

Q.   You have no idea one way or the other whether the Phase 2b results were --

A.   I don't know --

Q.   -- part of the brochures delivered to patients?

A.   I just don't know that.

Q.   And the company's position today is that those results should not be relied on; right?

Page 169

A.   That's the company's position today.

Q.   And the company hasn't issued any sort of apology or note to the people who participated in the trials and signed up at a time when the company was claiming that the Phase 2b results were reliable and showed improvements?

MR. CAMPBELL:  Object to form.

A.   The company has not issued any kind of apology, no.  The company believes, you know, the Phase 3 trials were run appropriately.

MR. CAMPBELL:  I don't know if you're at a breaking spot, but we're about at an hour.

MR. KUMAGAI:  Sure.

VIDEOGRAPHER:  Going off the record at 2:11.  This marks the end of Media 4.

(Recess taken, 2:11 p.m. to 2:26 p.m.)

VIDEOGRAPHER:  This marks the start of Media 5 of the video 30(b)(6) deposition of Cassava Sciences, Inc., represented by Eric Schoen.  We're back on the record.  The time is 2:26.

Q.   (By Mr. Kumagai)  Okay.  Mr. Schoen, I'm going to show you a document previously marked as Exhibit 76.  You can take a moment to review, but my first question is whether you recognize Exhibit 76.

A.   I don't.

43 (Pages 166 - 169)

Page 170

Q.   Okay.  It's -- the top line says Department of Health and Human Services, Food and Drug Administration.

Do you see that?

A.   I do.

Q.   Then it says dates of inspection, September 4th to September 16th, 2022.

Do you see that?

A.   I do.

Q.   And the site that was inspected appears to be the City College of New York/CUNY.

Do you see that?

A.   I do.

Q.   And so are you aware that an FDA inspection of Dr. Wang's lab occurred in September of 2022?

A.   Yes, I am.

Q.   And what was the company's understanding of what the FDA found during that inspection?

A.   The FDA inspected -- they found deficiencies in the lab and issued what I believe is a 483, noting those deficiencies.

Q.   And I believe this is, in fact, the Form 483.  If you look on the last page, there's a little -- small text on the bottom left.

A.   Form 483.  Okay.

Page 171

Q.   And so does that refresh your recollection of ever seeing this before or seeing the Form 483?

A.   I don't recall seeing the Form 483 before.

Q.   And what did the company do when it learned that the FDA had conducted an inspection of Dr. Wang's lab and found some deficiencies, as you said?

A.   I believe -- I believe the company did work with Dr. Wang to try to correct his deficiencies.

Q.   And anything else?

A.   I'm just not sure.

Q.   And so when Cassava decided to commence the defamation action, did it consider the fact that the FDA had inspected Dr. Wang's lab and issued this Form 483?

A.   Yeah.  It would have been part of the package.

Q.   The company was aware of it when it brought the defamation action; right?

A.   If it predates the defamation action, yes.

Q.   If you look at the -- page 2, date issued on the bottom right, it says September 16th, 2022.

Do you see that?

A.   Yes.  Then yes.

Q.   Okay.  And if you look at Number 3, the FDA reports that it observed, quote, there were inadequate source records to reconstruct the study.  Specifically,

Page 172

the site did not maintain documentation of sample storage and tracking, documentation of experimental procedures, source records for Western blot analysis, audit trails for the plate reader used in ELISA assays.

Do you see that?

A.   Yes.

Q.   And the reference to the study appears to be a reference to the study PTI 125-02.

Do you see that in the first paragraph?

A.   Yes.

Q.   And that was the Phase 2b study; right?

A.   Yes.

Q.   And so did the -- strike that.

When Cassava commenced the defamation action, it was aware that the FDA had found Dr. Wang's lab had inad -- inadequate source records to reconstruct the Phase 2b study; right?

A.   That's the FDA's finding.

Q.   Let me just ask you again.  When Cassava commenced the defamation action, it was aware that the FDA had found that Dr. Wang's lab had inadequate source records to reconstruct the Phase 2b study; right?

A.   Yes.  That the FDA found that.

Q.   When Cassava commenced the defamation action, it was aware that the FDA had found that

Page 173

Dr. Wang's lab lacked source records for Western blot analyses; right?

A.   Yes.

Q.   And when Cassava commenced the defamation action, it was aware of the fact that the FDA had found Dr. Wang's lab lacked documentation of experimental procedures; right?

A.   Yes.

Q.   I'll mark -- or I'll show you a document previously marked as Exhibit 66 with the Bates stamp CASSAVA_ 001213617.

You can take a moment to review, but this appears to be an email exchange between an individual at the FDA and Michael Marsman beginning in November of 2022 and then it's forwarded to Nadav Friedmann and Laura Rodriguez at Cassava.

Do you see that?

A.   Yes.

Q.   Have you ever seen this correspondence with the FDA before?

A.   Not to my knowledge.

Q.   Do you recall any discussions about this exchange between Mr. Papanastasiou and Mr. -- Dr. Marsman at Cassava?

A.   I'm going to have to read it to see how ...

44 (Pages 170 - 173)

Page 174

Okay. I've read it, and I'm broadly aware -- broadly aware of this topic.

Q. And what are you broadly aware of about this topic?

A. Well, FDA went and made an inspection, issued a 483, which is Exhibit 76. You know, thereafter, Cassava went and did an inspection. And some of the findings of FDA -- for example, FDA was unable to locate information. I believe one had to do with freezer temperatures and the other had to do with ELISA readings. And Cassava's inspection was able to locate the data that FDA's inspection was not.

So it called into question how thorough the FDA inspection was in our minds.

Q. Even though the Cassava inspection that you're referring to -- the audit -- reached the conclusion that Dr. Wang's lab was not qualified to provide biomarker analyses?

MR. CAMPBELL: Object to form.

A. Yes.

Q. (By Mr. Kumagai) Okay. We'll get to that audit report. Looking at this email, so the first email is on November 1st, 2022, from Mr. Papanastasiou at the FDA.

Do you see that?

Page 175

A. Yes.

Q. And it's dated November 1st, 2022, which is about one or two days before Cassava commenced the defamation action; right?

A. Okay. Yes.

Q. The second paragraph says, "As you are aware from emails that you exchanged with the agency on September 13th, 2022, the agency was then about to conduct an audit of data at City" University -- "City College of New York, City University of New York laboratory in New York. That inspection was to be directed at analyses of cerebrospinal fluid samples obtained during the Phase 2b study. Data from those analyses are described in the current investigator's brochure for simufilam dated September 17th, 2021, and the objective of that inspection was to confirm the reliability of those data."

Do you see that?

A. I do.

Q. And it refers to the investigator at the laboratory as Dr. Wang.

Do you see that?

A. Yes.

Q. Okay. And the next paragraph says, "The above audit has since been completed. The agency staff who conducted that audit concluded that the reliability of

Page 176

cerebrospinal fluid sample data in Figure 2 on page 10 of 32 of the current investigator's brochure for IND 126487 could not be verified. This conclusion applied to all the anolytes listed in that figure."

Do you see that?

A. Yes.

Q. It continues, "Based on the conclusions of the above audit, you must now delete all the data from the cerebrospinal fluids anolytes described in Figure 2 from the investigator's brochure for this IND. The items to be deleted are Figure 2 itself and all text related to the analyses described in that figure."

Do you see that?

A. Yes.

Q. Okay. What is your understanding of what the FDA was instructing Cassava to do there?

A. Just what it says, to update the investigator brochure.

Q. By deleting the cerebrospinal fluid data from the Phase 2b study; right?

A. Right. Figure 2 and all the text related to the analysis described in that figure.

Q. And the reason was because the reliability of the data could not be verified; right?

MR. CAMPBELL: Object to form.

Page 177

A. Yes, it could not be verified.

Q. (By Mr. Kumagai) Okay. Looking at the next email, Dr. Marsman responds on November 7th, "Hello Andrew." And then he continues and proposes to have retained CSF samples from the study analyzed by a different laboratory to provide independent confirmation of the CUNY data.

Do you see that?

A. I do.

Q. Did that ever happen?

A. Not to my knowledge.

Q. Okay. Dr. Marsman follows up again on November 14th.

Do you see that?

A. I do.

Q. And then Mr. -- well, Andrew from the FDA provides his response on November 16th.

Do you see that? It's on the first page.

A. Yes.

Q. It runs to the next page. And he writes -- on page ending 618, the FDA writes, quote, We are unable to share any additional information with you regarding the FDA's inspection of the CCNY/CUNY laboratory that was conducted in September 2022. We recommend that you contact that laboratory directly to obtain that

Page 178

information.

Two, we are also unable to agree to your request that the data in Figure 2 and all related text be retained in the current investigator's brochure for simufilam dated December 17th, 2021, pending the conduct of additional analyses of those data. As already stated in our email to you dated November 1st, 2022, those data could not be verified during the recent FDA audit of the aforementioned CCNY/CUNY laboratory. Their retention in the investigator's brochure would thus be potentially misleading.

Do you see that?

A. Yes, I do.

Q. And so when Cassava decided to commence the defamation action, you know, a day or two after receiving the initial email from the FDA here, did the company consider the fact that the FDA had instructed the company to remove the Phase 2b biomarker data from the investigator's brochure because the data could not be verified?

A. I wouldn't be able to know that because the timing is so close.

Q. So you're not sure?

A. Correct. I'm not sure.

Q. When Cassava revised the investigator's --

Page 179

strike that.

Did Cassava revise the investigator's brochure in accordance with this instruction from the FDA?

A. I'm not the regulatory authority. I know Cassava did revise the investigator brochure. Whether it's specifically in this time frame, I just don't know.

Q. Did the company disclose to trial participants or the site investigators that the FDA had -- had instructed it to remove the Phase 2b data because it could not be verified?

MR. CAMPBELL: Object to form.

A. Yeah. Again, not being a clinical regulatory person, you know, I know that when there's a revised investigator brochure, it's given to all participants. But I haven't read it, so I don't know -- I don't know if it contains why this was revised or what's been removed or what the difference is. I just don't know that.

Q. (By Mr. Kumagai) Did the company ever issue a disclosure to its investors, stating that the FDA had attempted to verify these data and could not verify these data?

A. I don't believe so.

Q. Why not?

A. I don't know that you would -- I don't know

Page 180

what you would -- what you would disclose. Is that --

Q. What do you mean by that?

A. I -- you're asking me regulatory -- so, you know, investigator brochures is confidential. It's between the investigators and the patients. You know, 483's are issued all the time and I just don't know that it's -- this type of finding is necessarily a -- you know, I don't think it -- I don't believe it's a required public -- public disclosure. I don't know why you -- it's an FDA finding. It's not a company finding.

Q. The fact that the FDA had attempted to verify the reliability of the Phase 2b data and concluded that it was unable to verify the Phase 2b data was not, in your view, material or significant enough to warrant a disclosure to anyone?

MR. CAMPBELL: Object to form.

A. Yeah. I -- again, I -- not being the regulatory person in the company, but in my -- you know, no, I don't think it's -- it doesn't rise, in my view, to the significance that you would issue a press release.

Q. (By Mr. Kumagai) Okay. I'll show you a document previously marked as Plaintiffs' Exhibit 56.

Do you recognize Exhibit 56?

A. I do.

Q. And what is it?

Page 181

A. It's an audit report prepared by Cassava of an audit -- a qualification audit performed on Dr. Wang's lab.

Q. Okay. And it was conducted by Laura Rodriguez; right?

A. Yes.

Q. And Michael Marsman? Do you see that?

A. Yes.

Q. And it was -- the on-site audit was conducted on September 21st and September 22nd, 2022?

A. Yes.

Q. And so were the findings of this audit by Ms. Rodriguez and Dr. Marsman things that the company considered when it decided to commence the defamation action?

MR. CAMPBELL: Object to form.

A. It -- I don't know the answer to that.

Q. (By Mr. Kumagai) Do you recall any discussions about the findings of Cassava's audit of Dr. Wang's lab in September of 2022?

A. I don't recall any discussions.

Q. Do you recall whether it was ever brought to the board's attention?

A. I don't recall, but I don't -- I just don't recall.

46 (Pages 178 - 181)

Page 182

Q.  Did you -- what did you do -- this is one of the 30(b)(6) topics; right?  The -- the internal audit?

A.  Yes.

Q.  And so what did you do to prepare to provide testimony on behalf of the company today with respect to the audit?

A.  Let me look at the materials that I reviewed.  I did look at this audit report.  I also looked at some of the testimony of Dr. -- or Laura Rodriguez.

Q.  Anything else?

A.  No.

Q.  Okay.  If you look at page 7 of the audit, under "Study Records" -- do you see that?

A.  I do.

Q.  The audit report states, "In reviewing the sample inventory tracking and chain of custody for PTI-125-02, the auditor noted there was no formal process and all samples for every Cassava study were grouped into one spreadsheet."

Do you see that?

A.  Yes.

Q.  In the next paragraph, the report states, "Also noted was there was no formal logbook entry of the experiments performed to include the pipet's IDS, user calibration due dates, lot numbers, and expiration dates

Page 183

for reagents used, when samples were received and returned, lot numbers for the ELISA and Western blot kits used, and preparation of calibration curves and/or QC's."

Do you see that?

A.  Yes.

Q.  And then, in the audit summary, the report states, "CCNY School of Medicine Laboratory."

Do you see that?

A.  Yes.

Q.  And that's Dr. Wang's lab; right?

A.  Yes.

Q.  Okay.  So the report states that, "Dr. Wang's lab was found to not have all the required processes in place at this time to support the biomarker analysis and research services.  They lack standard operating procedures, proper good documentation practices and laboratory practices, i.e. equipment calibration and sample management that are deemed critical for conducting any type of analysis to support a clinical trial.  They are considered unacceptable and temporarily not qualified to provide biomarker analysis and research services for any future Cassava studies."

Do you see that?

A.  I do.

Q.  And so when Cassava decided to commence the

Page 184

defamation action, did it consider the fact that its own audit of Dr. Wang's lab found the lab to be unacceptable and unqualified to provide biomarker analysis or research services?

MR. CAMPBELL:  Object to form.

A.  Yeah.  I can't say if it was considered or not, but it certainly would have been a relevant piece of information.

Q.  (By Mr. Kumagai)  And why would it have been a relevant piece of information?

A.  Well, it pertains to Dr. Wang and the conduct in his lab.

Q.  As far as you're aware, was there ever a point in time when Cassava considered the impact that the findings from its own audit of Dr. Wang's lab could have on the defamation action?

MR. CAMPBELL:  Object to form.

A.  I -- when I think of the audit of Dr. Wang's lab and his -- this was done at a point in time.  And it was done, I believe, for the purpose of qualifying Dr. -- we do qualification audits of vendors on a regular basis.

So when we went to Dr. Wang's lab, it was thinking really more ahead to the Phase 3 program.  Could he be a vendor in that program.  And so the finding was

Page 185

today, on the day -- you know, September 22nd, this lab is not -- what is it -- considered unacceptable and temporarily not qualified.

Eventually, you know, for many reasons, we decided not to move forward with Dr. Wang as a vendor on Phase 3.

So the relevance of it became moot, but to try to -- you know, to -- your question was did we consider the relevance of this audit report on the defamation case.  The study -- the study samples for Phase 2b were analyzed in Dr. Wang's lab at a very different point in time.  So there's no conclusion that I'm aware of of was the lab qualified at that point in time or not qualified at that point in time.

Q.  (By Mr. Kumagai)  And does Cassava have any evidence one way or the other to know what the state of the lab was when it conducted the Phase 2b analysis?

A.  We don't have any.  I don't have any knowledge of that.

Q.  Do you have a reason to believe it was in a much better or different state than it was in September 2022 when Dr. Wang visited it -- or -- excuse me -- when Laura Rodriguez visited it?

A.  I can't speculate.

Q.  And it was never requalified to provide

47 (Pages 182 - 185)

Page 186

biomarker analyses and research services for any future Cassava studies?

A. Right. Correct. Again, we decided not to use Dr. Wang as a vendor, so there was no reason to.

Q. And you mentioned a moment ago there were a variety of reasons why the company decided not to use Dr. Wang's lab as a vendor for any future studies. Can you explain?

A. Broadly, yes. So a Phase 3 study is very large. There's a big volume of samples, so you have to consider could the lab handle those samples. That's one.

Two, clearly, an audit report that said the lab is not acceptable is not a favorable item for considering to use them again.

And then, three, you've got, you know, online -- your defendants saying Dr. Wang has made up data, Dr. Wang has manipulated images. And that doesn't help in the court of public opinion. And that's absolutely got to be a factor for the company and who they choose as a vendor.

You know, Cassava -- it was more important than ever for Cassava to make sure that Phase 3 is done in a proper and -- and with -- with a proper chain of custody, if you will, or a chain of custody that is unimpugned by previous allegations would be the way I'd

Page 187

say it.

Q. And Dr. Wang's lab didn't meet that criteria?

A. Correct. All of those criteria.

Q. Any of those criteria?

A. That's a decision for the clinical team, but in my view, no.

Q. Did Cassava ever consider whether the lack of records or limited records available at Dr. Wang's lab might affect or undermine the company's ability to prove its defamation claims?

MR. CAMPBELL: Object to form.

A. I don't know if that was considered.

Q. (By Mr. Kumagai) You don't recall any discussions where that was considered?

A. No.

Q. Are you aware of an article published by the outlet called Science in October 2023 that included a copy of a CUNY investigation report?

A. I'm very aware of that.

Q. What do you recall about that?

A. It was an article in Science magazine that included a leaked draft of a report purported to be a CUNY investigative report. And I do know that, subsequent to that, CUNY said this is not -- well, I'm paraphrasing

Page 188

here -- but CUNY stated that they were investigating their own processes and that report was not final.

Q. And what do you recall about what the report found?

A. Let me go to my -- my materials.

Q. I'm going to mark -- you can go to your materials, but I'm also going to mark an exhibit. I'll mark as Plaintiffs' Exhibit 148 --

(Exhibit 148 was marked.)

Q. -- a document bearing Bates stamp RFCUNY000743.

A. Is this the -- okay.

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. Well, it appears to be a version of a -- of a report from City University of New York regarding Dr. Wang, but I -- from this document, I can't tell if this is the leaked report or -- I haven't read it word for word, so I don't know what it is.

Q. And what -- when you referred earlier to the leaked version of the report being a draft, what was that based on?

A. In my -- in my view, it -- probably a poor choice of words, but any report that's not final is, in a

Page 189

sense, a draft. It's not final. It's -- you know, people bring me words all the time and until it's finalized, they're just words on a piece of paper.

Q. And what does it mean to be finalized?

A. I don't know CUNY's processes, but it would be, you know, someone in authority at CUNY has said yes, this is the final report and signed it, stamped it, do whatever -- whatever CUNY's processes is, but issued it with the -- with the weight of City University of New York behind it.

Q. Do you know what City's processes are for formalizing or finalizing a report?

A. I do not.

Q. Okay. So Exhibit 148 is titled "City University of New York, Final Investigation Report of Associate Professor Hoau-Yan Wang, Ph.D."

Do you see that?

A. Yes.

Q. And the beginning -- the first paragraph, it says, "This report summarizes the investigation conducted by a committee of research active faculty at the City University of New York that was tasked with an examination of 31 allegations" -- it continues -- "of research misconduct made against Dr. Wang."

Do you see that?

48 (Pages 186 - 189)

Page 190

A. Yes.

Q. Okay. And this is a -- this investigation referenced in this report is the same CUNY investigation that the expressions of concern that we looked at earlier from the journals had referenced that they were waiting on before taking further actions? Is that your understanding?

MR. CAMPBELL: Object to form.

A. Yes. That's my understanding.

Q. (By Mr. Kumagai) What was Cassava's role in the investigation by CUNY?

A. Cassava, we requested CUNY to do an investigation, but as far as I know, we had virtually no role in it.

Q. You're not aware of any assistance in drafting responses or any sort of support provided by Cassava to Dr. Wang in responding to these -- to the investigation?

MR. CAMPBELL: Object to form.

A. The -- the company would have -- if Dr. Wang asked for our assistance with something, we would have assisted him, I believe. I'm not aware of what specifically. What I thought you were referring to was did we assist City University of New York in the investigation, and that answer is -- is no, we never -- we

Page 191

were an interested party, but we -- as far as I know, we never really heard from them.

Q. (By Mr. Kumagai) What do you mean by you were an interested party?

A. Well, some of the allegations are regarding work that we paid Dr. Wang -- we paid City University of New York to do and they used Dr. Wang to do it. So we are -- if some of these allegations are true, Cassava -- Cassava could potentially be a victim of fraud.

Q. So what role, if any, did Cassava have in assisting Dr. Wang in the investigation by CUNY?

MR. CAMPBELL: Object to form. And instruct you that if the -- to the extent that any assistance of Dr. Wang was through counsel, not to answer that portion of the question.

A. Yeah. Assistance to Dr. Wang from the company in responding to allegations or in the investigation would have been driven through counsel, so I can't answer you.

Q. (By Mr. Kumagai) Can you answer yes or no whether the company provided Dr. Wang with assistance in responding to --

A. Yes. I believe so.

Q. And just -- just to finish my question, can you answer yes or no whether the company provided

Page 192

assistance to Dr. Wang in connection with the CUNY investigation?

A. Yes.

Q. And I take it anything beyond that -- or strike that.

All of the assistance was done through counsel; is that right?

A. To my knowledge, yes.

Q. And I take it Cassava is continuing to assert a common interest privilege over those communications with Dr. Wang in connection with the CUNY investigation?

MR. CAMPBELL: I'll take that one. Yes, we are continuing to assert a common interest privilege.

A. Thank you.

Q. (By Mr. Kumagai) Okay. So what was the company's reaction when a version of this report from CUNY was published by the Science publication in October of 2023?

A. Well, as a company, we -- as a company, we weren't happy with it. Anytime there's a leaked report and it impacts company stock or company perception, it's clearly a concern.

You know, it's unfortunate because it's a draft report. You know, it could -- the conclusions could

Page 193

change. It might not even be a real report. We've never even been able to verify that, you know, this is a true copy of a draft report.

You know, we did express to, you know, CUNY that, Hey, if this is a draft report, you know, you haven't followed any kind of process or procedure that would -- I think it's their own procedures that we could see, so we certainly notified CUNY. And I think CUNY, subsequent to that, issued -- did issue a press release or some kind of external communication saying, Hey, we're still working on it, we're investigating our own processes, and we'll get back to you is my paraphrase of it. And that's -- that's the last that I know of that we've heard from CUNY.

Q. And did the company have any reaction to the specific findings on the 31 allegations that were described in the version of the CUNY report that was published by Science?

A. There's no reaction to the draft report. It doesn't -- it doesn't have validity and it -- as a purported leaked draft report, that's -- it's too many qualifiers for us to put any -- any kind of weight to it.

Q. So was it the company's position that none of the specific purported findings in the version of the report that was published could be given any credit or

49 (Pages 190 - 193)

Page 194

weight because it was a leaked copy?

MR. CAMPBELL: Object to form.

A. It was -- you know, clearly, the company would read it. But any of the conclusions -- you know, it's listed as a final report, but it's clearly not. It was, for lack of a better word, disavowed by CUNY itself, so you -- the amount of weight you put to it is nothing. If I write, you know, ten words, fifteen words -- you know, a whole piece of paper, but I don't sign my name on the bottom, it's words on a piece of paper.

Q. (By Mr. Kumagai) So just to be clear, the company gave no weight to the contents of the CUNY report that was published by Science in October 2023?

MR. CAMPBELL: Object to form.

A. Yeah. Clearly, we looked at it. When you say, you know, gave no weight, gave no credibility to it -- but, of course, we're going to read it and if there's things -- if there were things in it -- and I can't say specifically that there were or weren't, you know, we've got a -- a counsel doing an independent investigation. This would be something they would look at and if there were actionable items, they would have --

MR. CAMPBELL: Hold on. Don't speculate as to what counsel would look at or what counsel would do and don't talk about counsel's investigation.

Page 195

A. Okay. The company put, you know, little or no weight to this report -- to this purported draft leaked report.

Q. (By Mr. Kumagai) And were there any facts that the company was aware of that led it to believe that the version published by Science was fake or inauthentic in any way?

A. Not fake or inauthentic. The one item that the company was aware of is that, you know, to draw conclusions like this, we had knowledge that their investigation couldn't have been complete because you -- they had never reached out to the company for information. I don't even know that they had spent very much time with Dr. Wang.

So it -- it was -- it seemed to us to be not reliable more than just the fact that it's a draft -- purported draft leaked report because we know as a company that some actions that would -- we would expect to be taken in an investigation, some maybe by CUNY's own procedures haven't been done.

Q. And why would you expect that CUNY -- the investigation committee would reach out to or rely on Cassava in any way in conducting the investigation of Dr. Wang?

A. We were a party to some of the

Page 196

allegations -- you know, findings in here. So you'd expect -- be careful not to speak for myself versus the company. It would seem a normal course of the process.

Q. The company has said publicly a number of times that Cassava does not have the data, you know, it doesn't have its own labs, it doesn't store the data at the company. Dr. Wang and others have the data; right?

A. Correct.

Q. And so why would the CUNY investigation committee need to go to Cassava or talk to Cassava when it's investigating allegations of data manipulation because -- against Dr. Wang?

A. Again, you know, it's CUNY's investigation. It's not my investigation. But if I -- so I'm going to -- the company would have expected it because we were a party to some of the contracts. So, if nothing else, a thorough investigation would -- as an example, I would say, Hey, are you aware of Dr. Wang doing anything wrong? That would have been a basic question that I don't believe was ever asked.

Q. Did Cassava have facts or evidence in its possession that demonstrated that, you know, any of the allegations against Dr. Wang was not true or unfounded?

MR. CAMPBELL: Object to form.

A. Evidence that things are not true or not

Page 197

founded? I wouldn't know what evidence we have of that.

Q. (By Mr. Kumagai) Sitting here today, you're not aware of any evidence that the company possesses that would exonerate Dr. Wang with respect to any of the particular allegations of data manipulation?

MR. CAMPBELL: Object to form.

A. Yeah. I -- I'm just not aware. I'd have to read all of the items and then -- yeah. So the answer is no, I don't know.

Q. (By Mr. Kumagai) Okay. If you go to the page ending 746, there's a heading that says, "Details of investigation and research records and evidence reviewed." Do you see that?

A. Yes.

Q. In the first paragraph, about halfway down, there's a sentence that reads, "In no instance did Dr. Wang provide any material that could be reasonably recognized as original uncropped blots, images that included clear film blot edges and molecular weight markers. In his response to our investigation, Dr. Wang has protested that our definition of original blot data is unreasonably strict. However, our definition is shared by ORI, for whom this report is written." Do you see that?

A. I think I got lost. I'm sorry. Page 745?

50 (Pages 194 - 197)

Page 198

Q. No. Sorry. It's 746.

A. That's why I was lost.

Q. Under the heading "Details of Investigation and Research Records."

A. Yes. Now I see everything that you just read. Yes.

Q. Okay. And then in that same paragraph near the bottom, it says the lab did not -- sorry. Sorry. Let me start from the last sentence. It says, "It also became clear from our interviews with Dr. Wang and Dr. Zhe Pei, a post-doctoral research associate in the Wang lab, that the lab did not employ notebooks to record the details of the preparation or of the execution of Western blot experiments performed in the lab."

Do you see that?

A. I see that.

Q. And so when Cassava filed the Second Amended Complaint in April of 2024 after a version of this report was published by Science, did the company consider the findings that were described in the report published by Science?

MR. CAMPBELL: Object to form.

A. Yeah. I -- I can't call them findings. Again, it's a draft -- purported draft leaked report that was, essentially, disavowed by CUNY, saying we're going to

Page 199

do our own investigation.

So -- I don't know what counsel did or didn't do, nor should I speculate. But the company doesn't put weight to -- to this report.

Q. (By Mr. Kumagai) Aren't those findings that I just read consistent with the findings of the FDA and Cassava's own audit conducted in September of 2022?

A. At that point in time, yeah. That would sound consistent.

Q. Okay. If you look at the page ending in 792, there's an addendum -- final report addendum dated May 26th, 2023.

Do you see that?

Did I give you the wrong page again? It's the page ending in 792.

A. Okay.

Q. And at the top, it says CUNY 2021.

A. Yes, I see that.

Q. Okay. Okay. The last paragraph reads, "Already frustrated by the respondent's inability to provide even a single datum or notebook in response to any allegation, the committee decided that it would be most conservative to conclude that the respondent's failure to provide data or records prevented us from making an objective assessment in any case. But to be clear, the

Page 200

committee concludes that Dr. Wang's inability or unwillingness to provide primary research materials to this investigation represents egregious misconduct."

It continues, "This failure, the troubling research practices described in our report, and the clear indications of misconduct in his response to PLoS' editorial concerns is highly suggestive of longstanding and deliberate scientific misconduct by Dr. Wang. However, absent access to primary research materials, it is not possible to make definitive assessments for the 31 specific allegations. This is a" deep source -- "this is a source of deep frustration to the committee which spent the better part of a year actively attempting to provide an objective investigation into these serious charges against Dr. Wang."

Do you see that?

A. I do.

Q. And so is that another paragraph that the company simply did not give credit to because the version of the CUNY report was leaked and not final, in the company's view?

MR. CAMPBELL: Object to form.

A. Give me a second if I can find any of this in my background materials.

Yeah. No, I don't have anything to add.

Page 201

The company -- the company's position, as I've said before, is this is a draft -- purported draft leaked report and, therefore, isn't final. So anything in it is subject to revision, subject to -- I don't know what it's subject to. It's a -- it's a draft leaked report.

Q. (By Mr. Kumagai) And so the company gave the purported findings or descriptions in the draft leaked report no credit --

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) -- is that right?

A. Yeah. I wouldn't know that, other than -- you know, I would be speculating as to what counsel did with it, but the company gave it no weight.

MR. KUMAGAI: Could we take a 5-minute break?

VIDEOGRAPHER: Going off the record at 3:16. This marks the end of Media 5.

(Recess taken, 3:16 p.m. to 3:30 p.m.)

VIDEOGRAPHER: This marks the start of Media 6 of the 30(b)(6) deposition of Cassava Sciences, Inc., represented by Eric Schoen. We're back on the record. The time is 3:30.

Q. (By Mr. Kumagai) Okay. I'll show you a document that was previously marked as Exhibit 84.

A. I don't know when, but -- to wrap up the

51 (Pages 198 - 201)

Page 202

previous topic --

MR. CAMPBELL:  He found the document he was looking for.

A.  I was looking for a document regarding the purported draft leaked report from CUNY.

Q.  (By Mr. Kumagai)  Okay.

A.  And in Section 7, there's a press release from Cassava.

Q.  You're referring to tab 7 in your binder?

A.  Tab 7 in the binder, there's a Cassava press release dated September 22, 2021, that, essentially, also states the company's position on the purported draft leaked CUNY report.

Q.  Okay.  I mean, I don't think that's the right one, but I understand that there was a press release that the company issued in response to the publication of the leaked CUNY report; right?

A.  Yeah.

Q.  And you're --

MR. CAMPBELL:  I don't think it was tab 29 in his binder -- or 28.  That might explain why it was missing.  We thought it was 28 in his binder.  But in any case, you can read into the record the document you're referencing.  We can get you a copy of it, Dave.

A.  It is a press release dated October 13th,

Page 203

2023.

Q.  (By Mr. Kumagai)  What tab is it?  Sorry.

A.  Tab 28.

Q.  Okay.  And so that's the -- you mean to clarify that that is where the company responded to the CUNY report that was leaked and published by Science?

A.  Correct.

Q.  Okay.  If you look at Exhibit 84, do you recognize it?

A.  I do.

Q.  And what is it?

A.  This is a public statement made by the company's CEO on September 3rd, 2021, responding to the -- the allegations against the company.

Q.  Okay.  And this is a -- where Mr. Barbier acknowledged some of the errors that you had alluded to earlier today, I believe; is that right?

A.  That's correct.

Q.  If you turn to page 5, the second paragraph reads, "One way to settle the discourse around Western blots might be to go back to the original films and images.  As a reminder, Cassava Sciences does not have its own laboratory facilities.  We use other people's labs.  For this reason, we don't have the original films or images for the Western blots in question.  Those were

Page 204

generated by our science collaborator at CUNY, who is Professor Wang.  For this reason, I have respectfully requested that CUNY inquire thoroughly but expeditiously into the allegations targeting Professor Wang.  I have also asked CUNY that its conclusionary findings be made available to the public."

Do you see that?

A.  I do.

Q.  And was that the company's position at the time in September of 2021?

A.  That was.

Q.  At that time, did Cassava believe that Dr. Wang had the original films or images for the Western blots in question?

MR. CAMPBELL:  Object to form.

A.  We would -- Cassava wouldn't know if he did or didn't.  Some of these exper -- experiments were done in 2005, so I don't know CUNY's recordkeeping policy.  I don't know how long Dr. Wang keeps originals.  It's -- it depends when the experiment was performed.

Q.  (By Mr. Kumagai)  And so today, does Cassava know whether or not Dr. Wang has the original films or images for any of the Western blots in question?

MR. CAMPBELL:  Object to form.

A.  Cassava wouldn't know which -- at this

Page 205

time, we would probably know on most of it which ones he had and which ones he hadn't.

Q.  (By Mr. Kumagai)  And where would that information reside?

A.  I don't know.

MR. KUMAGAI:  To the extent it's not privileged, we would request and -- that you ensure that you produced any documents demonstrating Cassava's knowledge as to which Western blots Dr. Wang maintained and which ones he did not.

Q.  (By Mr. Kumagai)  Since making this statement in September of 2021, does Cassava -- strike that.

Since Cassava made this statement in September of 2021, has Cassava come into possession of any of the original films or images for the Western blots in question?

MR. CAMPBELL:  Object to form.

A.  Yeah.  I've got the same response, that I just -- when you say "Cassava," we had an internal investigation run by outside counsel, and any results there would be privileged.

Q.  (By Mr. Kumagai)  When Cassava commenced the defamation action, did the company have possession of the original films or images from Dr. Wang's Western blot

52 (Pages 202 - 205)

Page 206

experiments?

MR. CAMPBELL: Object to form.

A. Yeah. I wouldn't -- I wouldn't know the timing.

Q. (By Mr. Kumagai) Just to clarify, does Cassava currently have possession of the original films or images from Dr. Wang's Western blot experiments?

MR. CAMPBELL: Object to form.

A. Yeah. There's multiple, multiple experiments. I know that an internal investigation was run at the behest of outside counsel. And beyond that, I actually don't know which of them we have, which of them we don't. I don't know that.

MR. CAMPBELL: And just to clarify your answer for privilege purpose, you don't know, outside of conversations with counsel, what Cassava possesses?

THE DEPONENT: Correct.

Q. (By Mr. Kumagai) But you do know that Cassava does not -- strike that.

You do know that for some of the Western blots in question, there were no longer any original films or images available at Dr. Wang's lab; right?

MR. CAMPBELL: Object to form.

A. Yeah. I -- I believe so, but I'm not certain.

Page 207

Q. (By Mr. Kumagai) Aside from the original films or images from Dr. Wang's Western blot experiments, when Cassava commenced the defamation action, did the company have possession of any other original or raw data from Dr. Wang's experiments with simufilam?

MR. CAMPBELL: Object to form.

A. I don't know the answer to that.

Q. (By Mr. Kumagai) In preparing for today's deposition, did you try to find the answer to that question?

A. That specific question, no.

Q. How would you go about finding the answer to that specific question?

A. You -- because I -- to parse it, I think you're asking does Cassava have it as opposed to counsel. How would I go about finding that out? I would inquire of our scientific team, but I'm -- you're asking absolutes. I'm fairly certain the answer is no. I don't know why we will have the originals, but I can't say we don't with --

Q. Do you know whether or not anyone at the company examined whether or not Dr. Wang had original films or images from his Western blot experiments prior to filing the defamation action?

A. Anyone at the company? I don't know the answer to that. As I've said before, I know that as part

Page 208

of the internal investigation, experts were hired, but, beyond that, I can't go into any of the details.

Q. You can't go into any of the details because of the privilege instruction from counsel --

A. Because of privilege from Gibs -- yes.

Q. -- right?

A. Yes.

Q. Okay. So in the September 2021 statement by Mr. Barbier, he calls on CUNY to conduct a thorough and expeditious investigation and release CUNY -- the conclusionary findings of that investigation to the public; right?

A. Correct.

Q. Cassava brought the defamation action before any conclusionary findings were released by CUNY; right?

A. Correct.

Q. Why?

A. CUNY has still not released any conclusionary findings, nor is there a timetable for when they would.

Q. Was there ever a time when the company was planning to wait until CUNY released the findings from its investigation before bringing the defamation action?

A. Well, there's a -- there's a time

Page 209

sensitivity to this. Because we're talking about site recruitment, patient recruitment. So if CUNY had put out a timetable and said on June 30th, we will issue our report, certainly, that would have taken into account. CUNY has not made any sort of timetable, any disclosures.

So you wouldn't have an expectation to wait for that report when we're having damage to our business on a daily basis. You know, the -- the answer is, you know, we have the evidence that we have. We wish we had more. We know we've been, you know -- there's been false accusations of fraud, of making up data, of, you know, giving an unsafe drug to patients that we knew to be untrue.

So a CUNY finding, while it would have been relevant, certainly wouldn't have been something you would -- you would wait for at the harm of patients.

Q. Did CUNY provide any findings at all to Cassava prior to Cassava commencing the defamation action?

A. Not to my knowledge.

Q. If CUNY had released a report finding that Dr. Wang had engaged in research misconduct, would the company still have brought the defamation action?

MR. CAMPBELL: Objection to form.

A. That's a hypothetical I just can't answer.

Q. (By Mr. Kumagai) Why not?

53 (Pages 206 - 209)

Page 210

A. Because you're asking me to answer a question that on -- based on something I haven't seen.

Q. Well, I'm giving you the facts to assume. Okay? So on September 1st of 2022, CUNY issues a report where the conclusion is Dr. Wang has engaged in research misconduct and -- period. With that fact, would Cassava have still brought the defamation action?

MR. CAMPBELL: Objection to form. Improper hypothetical. And he can't testify to that on behalf of the company.

A. Yeah. I -- the same answer. I -- you know, I haven't seen that -- you're saying a finding of this, is it -- is it -- I just can't answer that question because I don't -- I don't know -- I can't answer that hypothetical.

Q. (By Mr. Kumagai) Because you don't know what?

A. Because I haven't seen -- I don't have a way of knowing at that time, you know, what the weight of all -- what the weight of all the evidence that -- would one other piece of information -- would that have been critical? I just can't speculate as to it. It wouldn't be -- it wouldn't be proper.

Q. So you said a moment ago that CUNY's findings would be relevant to the defamation action;

Page 211

right?

A. Absolutely.

Q. How?

A. So -- so it would still be relevant. CUNY is doing an investigation now. There's findings. You're giving me one piece of information.

They find that Dr. Wang did this. But you're giving me that in a -- in a -- in a box. You know, that's a piece of information that is out of context from -- is there -- you know, is this irrefutable, is this -- you can't -- you can't know, unless you see that -- that final report, what it is.

So I -- I'm not going to answer a question that I -- you know, that I don't -- that I can't answer.

Q. Because the hypothetical report that I'm giving you is not complete enough or what's missing in the hypothetical that you need to answer the question?

MR. CAMPBELL: Objection to form.

A. I'd have -- I'd have to see what the report -- you're saying hypothetically if you had this one other piece of information, would it change the totality of everything that you know and everything that you say. I don't know that. You know, I -- I just -- I just don't know.

Q. (By Mr. Kumagai) So if we looked at the --

Page 212

Exhibit 148, right? Do you still have that?

A. Yes.

Q. If CUNY had issued that on September 1st, 2022, in the formal way that you testified to earlier, signed, stamped, would Cassava have still brought the defamation action?

MR. CAMPBELL: Objection to form. Improper hypothetical.

A. Yeah. I -- I can't answer that because I -- you know, I'm answering on behalf of the company, but I can't answer a hype -- you know, I'm answering what I know; not what do I speculate based upon one other piece.

You know, it's -- it wasn't -- it wouldn't be Eric Schoen that would be bringing the defamation suit or not. It would be counsel talking to the board, counsel maybe bringing this. You know, you're asking me -- there's way too much for me to speculate on to answer that.

Q. (By Mr. Kumagai) So you simply can't say anything about how that CUNY report would have affected Cassava's calculus in bringing the defamation action?

MR. CAMPBELL: Objection to form.

A. No, I can't.

Q. (By Mr. Kumagai) Sitting here today, does the company still want CUNY to release its conclusionary

Page 213

findings to the public?

A. Yes.

Q. Has Cassava ever tried to influence in any way the process or outcome of the CUNY investigation?

A. Not to my --

MR. CAMPBELL: Object to form.

A. Not to my knowledge. CUNY, if -- if the CUNY report comes out that Dr. Wang did something improper, Cassava paid CUNY to perform research. If that research was not performed properly, Cassava would be a victim of that. So the answer is yes, we -- we do want to see a report.

Q. (By Mr. Kumagai) So why are you comfortable speculating about that scenario with the CUNY report coming out with those findings, but refusing to testify as to how that report that you just posited would affect the decision to bring the defamation action?

MR. CAMPBELL: Object to the characterization of the testimony. You can answer if you can.

A. Okay. Yeah. They're -- they're totally different things. You're saying does the company want this future event to happen. Yes, we do. We are interested in the CUNY report.

That's way different than going, say, back

54 (Pages 210 - 213)

Page 214

in time, if this thing had happened, would you have done A or B. I don't know because I -- I can't speculate to it.

Q. (By Mr. Kumagai) Has Cassava ever done anything in any way to try to suppress the findings of the CUNY investigation?

A. Not to my knowledge.

Q. I'll mark as Plaintiffs' Exhibit 149 a document Bates-stamped Cassava_001309142.

(Exhibit 149 was marked.)

Q. This appears to be a letter from Orrick dated March 8th, 2023, to Derek Davis, Matthew Drost, and Rosemary Wesson and Tamera Schneider at CUNY.

Do you see that?

A. Yes.

Q. And it appears to be signed by Guy Singer at Orrick.

Do you see that?

A. Yes.

Q. Have you ever seen this letter before?

A. I have not, to my knowledge.

Q. And Orrick was representing Cassava at the time; right?

A. Yes.

Q. And the subject line is "Confidential: Research Misconduct Inquiry Concerning Professor Wang."

Page 215

It appears to be in relation to the CUNY investigation of Dr. Wang; right?

A. Yes. Based upon the few sentences I've read.

Q. If you look at the last paragraph on the second page -- do you see that?

A. I do.

Q. It says, "Separately, while Cassava currently has no reason to question Dr. Wang's integrity or the quality of his work, we note that a finding by CUNY that Dr. Wang engaged in research misconduct in connection with the work he was performing for the company would have significant legal implications. For example, to the extent Dr. Wang is found to have manipulated or fabricated data, that would plainly be a breach of the research foundation's contracts with Cassava, which require, among other things, that CUNY and Dr. Wang will perform all the services described herein or incidental to those described herein in accordance with the highest standards of research practice and all applicable laws and regulations."

Do you see that?

A. Yes.

Q. And it continues, "Additionally, as you know, over the past 18 months, Cassava has been sued on

Page 216

numerous occasions in connection with allegations related to Dr. Wang's research. For example, Cassava is a defendant in a Federal securities fraud class action alleging that the company and its officers failed to disclose that Dr. Wang had manipulated and falsified data in a string of academic journals and presentations providing the basis for the underlying science supporting the continued commercial development of simufilam."

Do you see that?

A. Yes.

Q. And then it continues, "To the extent that CUNY finds that misconduct actually occurred in this instance, that decision would, under the relevant contracts, require CUNY to indemnify and hold Cassava harmless from any and all liability, loss, or damage it might suffer as a result of claims, demands, costs, or judgments in the securities class action suit and all other matters related to Dr. Wang's research."

Do you see that?

A. Yes.

Q. And so it appears Cassava is threatening CUNY with an indemnification claim in the event that CUNY finds that Dr. Wang engaged in any research misconduct; right?

MR. CAMPBELL: Object to the

Page 217

characterization of the document.

A. Yeah. No, I -- I don't see that -- I do not see that as a threat.

Q. (By Mr. Kumagai) How would you characterize the sentence, "To the extent that CUNY finds that misconduct actually occurred in this instance, that decision would, under the relevant contracts, require CUNY to indemnify and hold harmless Cassava from any and all liability loss or damage"?

A. Yeah. That goes back to what I said previously of Cassava has no knowledge that Dr. Wang did anything improper. However, if he did, Cassava would be a victim. And as a victim, this is the -- I guess the legal -- potential legal ramifications of Dr. Wang.

Q. Cassava, through its counsel, Orrick, is telling CUNY that if it makes a finding of research misconduct against Dr. Wang, then CUNY will be required to indemnify Cassava for any liability, loss, or damage arising in the securities class action or other related suits; right?

MR. CAMPBELL: Object to the characterization of the document. That's not what it says.

A. Yeah. I don't view it as a -- as a threat. I think if you go on -- you're reading one specific

55 (Pages 214 - 217)

Page 218

paragraph, but if you go on to the next paragraph, you know, in light of the importance of this investigation to Dr. Wang, Cassava, and CUNY, it's imperative the investigation be conducted meticulously, transparently, fairly, and in accordance with due process rights of Dr. Wang and Cassava.

It's saying do this properly. It's not a threat in any way that I see of saying find this thing. It's just -- that's --

Q. (By Mr. Kumagai) Why was it relevant to the message of do this properly for Cassava to tell CUNY that if it makes a particular finding, it will be on the hook for the liability and damages the company incurs in a securities class action?

MR. CAMPBELL: Object to form and the characterization of the document.

A. You'd have to ask the author, Orrick, of this. Of why they -- why they wrote that particular paragraph. But I think the totality of the letter speaks for itself is that we want a full, fair, and impartial investigation. I don't see a veiled threat there as you -- threat being your word, not mine.

Q. (By Mr. Kumagai) Why did the company convey to CUNY that if CUNY makes a finding of research misconduct, the indemnification clauses of its contract

Page 219

with Cassava would be triggered?

MR. CAMPBELL: Object to the form of the question. And object to the characterization and misstatement of the document.

MR. KUMAGAI: How is it a misstatement?

MR. CAMPBELL: It doesn't say if they make a finding that it will have that conclusion. It says to the extent that misconduct actually occurred.

MR. KUMAGAI: No. It says to the extent that CUNY finds that misconduct actually occurred.

MR. CAMPBELL: But you're suggesting that it's based on whether they find yes or no based on some standard other than on whether it actually happened. All they're saying is if we're actually a victim of the --

MR. KUMAGAI: Are you testifying now?

MR. CAMPBELL: No. You asked me to clarify my objection.

Q. (By Mr. Kumagai) Mr. Schoen, let me ask it again. Why did Cassava tell CUNY, quote, To the extent that CUNY finds that misconduct actually occurred in this instance, that decision would, under the relevant contracts, require CUNY to indemnify and hold Cassava harmless from any and all liability, loss, or damage it might suffer as a result of claims, demands, costs, or judgments in the securities class action suit and all

Page 220

other matters related to Dr. Wang's research?

MR. CAMPBELL: Object to form.

A. Yeah. I'd say you'd have to ask Guy Singer from Orrick why he -- why he included that.

Q. (By Mr. Kumagai) Orrick represents the company; right?

A. Correct.

Q. And you are here sitting today, as the company's representative, saying you can't speak to this document?

A. I'm the company's representative, but I don't know -- I didn't author this document. I don't know what was in the author's head. I -- you know, I read to you what I look at as the important part of this document is that next paragraph where we say we want a full, fair, and open investigation.

Q. You acknowledge that Cassava, through its counsel, told CUNY that, to the extent that CUNY finds that misconduct actually occurred, the decision would require CUNY to indemnify Cassava; right?

A. Correct. That was communicated through Cassava's counsel.

Q. On March 18th -- on March 8th, 2023; right?

A. Correct.

Q. And your testimony on behalf of the company

Page 221

is that conveying that information was in no way a threat or effort by Cassava to pressure CUNY to reach any particular findings in its -- in its investigation of Dr. Wang?

A. Correct. That was no intent.

Q. But you don't know what the actual intent was, according to your prior testimony, because you didn't write that letter; is that right?

MR. CAMPBELL: Object to form.

A. I'm parsing between Cassava's intent. I can't know why the author of this included that, but you said as the company's representative. No, it was no intent to threaten in any -- CUNY in any way.

Q. (By Mr. Kumagai) But you can't explain the reason Cassava's counsel included the reference to the indemnification provision of their contract in the letter to CUNY?

MR. CAMPBELL: Object to form.

A. Yeah. No, I can't.

Q. (By Mr. Kumagai) Okay. I'll show you a document previously marked as Exhibit 85.

Do you recognize this document?

A. I do.

Q. And what is it?

A. It's a statement from City University of

56 (Pages 218 - 221)

Page 222

New York regarding the leaked purported draft report.

Q. Okay. And if you look at that statement from CUNY, it says, "On October 12, 2023, Science Magazine published an article that later appeared in other publications regarding the City University of New York's investigation into allegations of misconduct related to certain research conducted by Dr. Wang."

Do you see that?

A. Yes.

Q. And so that's referring to the leaked version of the CUNY report that Science published that we had talked about earlier today; right?

A. Yes.

Q. And CUNY's statement continues, "Consistent with its policy, CUNY will not comment on the accuracy of the investigation referenced in the articles because no final action as to this investigation has been taken."

Do you see that?

A. Yes.

Q. And so CUNY is not saying one way or the other whether the report that was published by Science magazine is authentic or not; right?

A. I think there's more than that. They're not saying it's authentic or not and they're also saying no final action has been taken. So even if it was

Page 223

authentic, it wasn't final.

Q. They don't say it wasn't the final report. They just say no final action has been taken; right?

A. That's accurate.

Q. Okay. And then it continues. "CUNY is committed to ensuring that its investigative processes are held to the highest procedural and ethical standards and that the fairness of the proceedings is preserved for all parties. To that end, any finding regarding allegations of research misconduct must be reliable and credible. Because questions regarding the confidentiality and integrity of this investigation have been raised, CUNY will stay the underlying inquiry into the allegations regarding Dr. Wang's research until such time as the University completes a comprehensive investigation of the process."

Do you see that?

A. Yes.

Q. And it was Cassava that raised questions regarding the confidentiality and integrity of the investigation; right?

MR. CAMPBELL: Object to form.

A. Well, let me read the -- the previous letter. One second.

Q. (By Mr. Kumagai) I think -- not to confuse

Page 224

you, I don't think we're -- the timing is quite right. I think that the March letter is before the article was published. There was a -- another letter that I think you had referred to as tab 28 or something like that where Cassava issued a press release and responded directly and sent a letter directly to CUNY about the leaked report in October 2023.

A. Your question was, you know, was it Cassava that -- this says, "Because questions regarding confidentiality and integrity of the investigation have been raised." The point I wanted to make is yes, we did raise questions, but I don't know that we were the only one that raised questions, so your characterization was that it was Cassava that prompted this. I don't know that, nor could I know that.

Q. Cassava was -- strike that.

Cassava itself raised questions about the confidentiality and integrity of the CUNY investigation after Science magazine published the copy of the report; right?

A. Yes. I believe so.

Q. And then if you look up the -- into this chain, Rick Barry writes on October 27th, 2023, to Remi Barbier and Mike Sitrick and Sandy Robertson, "Awesome. Well done, Chris Cook."

Page 225

Do you see that?

A. Yes.

Q. And so why was Mr. Barry celebrating CUNY's decision to stay the investigation of Dr. Wang and saying, "Well done, Chris Cook"?

MR. CAMPBELL: Object to form.

A. Yeah. You'd have to ask -- ask Rick what he meant by that. You know, I believe it was Chris Cook who raised the questions to CUNY of their investigation, so he's -- that's likely, but -- anything beyond that, I can't -- I can't speculate what Rick was thinking.

Q. (By Mr. Kumagai) Well, I'm asking you as the company's representative was it the company's goal to stay the CUNY investigation?

MR. CAMPBELL: Object to form.

A. The company's -- no. My understanding is the -- there was a leaked report that was published in the magazine and again, you know, did damage to the company's reputation. And it wasn't a final report.

So it was appropriate for Cassava to raise questions to CUNY on the confidentiality, clearly, and integrity of the investigation.

You know, what CUNY did with that -- you know, our goal wasn't to have them stay the investigation. Our goal was and always is to have them do a thorough and

57 (Pages 222 - 225)

Page 226

we'd prefer an expeditious -- meaning quick -- investigation, but thorough.

So this statement is, I think, a good -- the statement from CUNY is good in -- in the perspective that they -- using the -- disavowed, but they said, Hey, this report should not be taken at its face value, should not be relied upon.

They said, "CUNY will not comment on the accuracy of the investigation referenced in the articles because no final action has been taken."

Q. (By Mr. Kumagai) Right. And then in the next paragraph --

A. To that end, it must be credible. So it's CUNY saying -- my words, how I interpret this or the company interprets it is don't rely on that report. Just the same as I've been saying, that the company gave very little to a purported draft leaked report.

Q. And then the company -- and then CUNY said in the statement, "CUNY will stay the underlying inquiry into the allegations regarding Dr. Wang's research."

Do you see that?

A. Yes.

Q. And in response to the statement from City University, that includes both the statement you referenced and the statement I just read. Rick Barry

Page 227

writes to Remi Barbier, Mike Sitrick, and Sandy Robertson, "Awesome. Well done, Chris Cook"; right?

A. Yes.

Q. And you don't believe that that was the company in any way celebrating news that the CUNY investigation had been stayed?

MR. CAMPBELL: Object to form.

A. Yeah. No, that wouldn't be something that -- that, from the company's perspective, would be celebrated. The former portion that the draft leaked report was disavowed, that was awesome.

Q. (By Mr. Kumagai) Well, a moment ago, you said you'd have to ask Rick Barry or Chris Cook what he meant. Now you're testifying that that's -- that's what he meant when he said awesome?

A. No. You asked me what the company's position is, and from the company's position, we want CUNY to do a thorough and expeditious investigation. What Rick meant by that, you'd have to ask him.

To parse that even more, you're insinuating that Rick was happy that the investigation had been stayed. I don't know what Rick's thought was, but from the company's perspective, we want the investigation today to continue and be completed.

Q. Is the company aware of the current status

Page 228

of the CUNY investigation?

A. Not to my knowledge.

Q. Has the company done anything to inquire or ask CUNY to proceed expeditiously as it had initially requested in September of 2021?

MR. CAMPBELL: Object to form.

A. I don't know the answer to that.

Q. (By Mr. Kumagai) So your testimony is that it remains the company's position that it wants CUNY to finish its investigation into Dr. Wang and release those findings to the public and yet, the company has not done anything to follow up or check on the status of the CUNY investigation?

MR. CAMPBELL: Object to form.

A. I don't know whether the company has or hasn't.

Q. (By Mr. Kumagai) By this point in time, in October of 2023, Cassava knew that multiple scientific journals had said that they would await the results of the CUNY investigation before taking any editorial action; right?

A. Correct.

Q. And did that play a role in any way in Cassava's views toward the CUNY investigation or correspondence with CUNY about that investigation?

Page 229

A. Not to my knowledge.

Q. Cassava was aware that so long as the CUNY investigation was stayed or refrained from issuing final conclusions, the scientific journals were effectively frozen and not going to take any further editorial action on Dr. Wang's papers; right?

MR. CAMPBELL: Object to form.

A. Yeah. That was our belief.

Q. (By Mr. Kumagai) I'll mark as Exhibit 150 a document Bates-stamped CASSAVA_001192666.

(Exhibit 150 was marked.)

Q. Okay. This appears to be an email from Jim Kupiec to Michael Marsman, copying Marian Castro on November 14th, 2023.

A. Yes.

Q. And there's a few emails in the chain and there appears to be an attachment. And the subject is "Request for WCG Reconsideration."

Do you see that?

A. Yes.

Q. What was WCG and what was their connection to the simufilam trials?

A. WCG is an investigational review board body, an IRB, that approves study protocols, approves IRBs and has authority over that. I can't give you a better

58 (Pages 226 - 229)

Page 230

definition than that because I'm a finance person, not a clinical person.

Q. And so are you aware that, around this time, when the CUNY report was leaked and published by Science, there was a New York Times article about it, and WCG made a decision to disseminate the contents of the New York -- the New York Times article to study participants?

A. Yes.

Q. And in response to that decision by WCG, the company sought to convince WCG not to do that -- not to disclose the article to study participants; right?

A. Correct.

Q. Why?

A. Well, as we've gone through, the Science article reported on a purported draft leaked report, to which I've stated the company put no weight because of that status.

Then, subsequently, and before these emails, City University of New York came out and said, you know, we won't comment on the actually -- all the things that we talked about. Basically, saying don't rely on this report. Yet, an IRB body wants to take something that -- take that report and send it to every patient is what I think the intent of this is. It's hard for me to see without reviewing the whole thing.

Page 231

But yeah. The company would -- would object to that. That's -- takes something that the body that owns that report, CUNY, is saying don't rely on this and send it out. You know, that's -- that would be irresponsible, in -- in our view.

Q. And so the company's view was that study participants should not be told about the CUNY report that was leaked in published -- and published by Science; right?

MR. CAMPBELL: Object to form.

A. Let me read the -- the letter. You're asking me specific questions about something I am only generally aware of.

Q. (By Mr. Kumagai) The letter attached to this email thread, I believe, is the letter that --

A. November 13th?

Q. Are you looking at the October 18th or which letter are you looking at?

A. Which one -- which would you like me to review? I can review both of them.

Q. Yeah. I think you should look at the November 13th letter.

A. Okay. I've read it.

Q. And so my question --

MR. KUMAGAI: Can you read the question

Page 232

back?

(The requested portion of the record was read.)

A. To answer that specifically, you say should not be told. Our position is that the IRB, you know, an authoritative body, shouldn't be disseminating to public -- because they're an authority and these study participants look at them as an authority -- shouldn't be disseminating an article that was leaked and, essentially, disavowed by the body that would own that report. That would be spreading rumors, for lack of a better word.

So the company -- when you say the company -- the participants should not be told, they can -- people can tell them whatever they want, but somebody -- you know, a governing body of this study should not be sending a -- a rumor. I mean, that -- the answer is it would be improper for the IRB to be sending that to study participants.

Q. (By Mr. Kumagai) Well, but that wasn't the proposal; right? The IRB had made a decision instructing Cassava to provide information to all active participants regarding the subject matter of an October 14th, 2023 New York Times article titled "Scientists investigating Alzheimer's drug faulted in leaked report." That's the first paragraph of the November 13th letter; right?

Page 233

A. Okay. Same -- I -- I don't know who was asked to send it, but if it's the IRB, it's an authoritative piece. If it comes from Cassava, the sponsor of the study, that's, arguably, the same thing. It's -- it would -- it would not make intuitive sense to me to send it, particularly after the CUNY -- you know, disavowing it.

Q. And Cassava's position that -- was that none of that information should be shared, right?

MR. CAMPBELL: Object to form.

A. I wouldn't say none of it should be shared. It should not be a -- the IRB should not be requiring the company to send it.

Q. (By Mr. Kumagai) Why wouldn't Cassava agree to send it and also include the additional information, including the CUNY press release as context, so that the study participants have all of that same information?

MR. CAMPBELL: Object to the form of the question.

A. Because the report that -- as I've said before, the company doesn't believe any weight should be given to the report because it's a draft and it's leaked and it's been disavowed, essentially, by City University of New York. It is words on a piece of paper that, if

59 (Pages 230 - 233)

Page 234

read by a patient -- it -- it would not be appropriate for the company to send that to them, especially from in a position of authority.

Q. (By Mr. Kumagai) Okay. Your interpretation of CUNY's statement saying they cannot comment on the accuracy of the report that was published by Science is CUNY disavowing the report?

A. Yeah. I use the word "disavow," but they were very specific in here that it's not -- it -- I'll read it again because I'm using the word "disavow," but when they say we won't comment on the accuracy of the investigation because no final action has been taken, any findings -- to that end, any findings of research -- allegations of research misconduct must be reliable and credible. Because questions regarding the confidentiality and integrity of this investigation were raised, CUNY will stay the underlying inquiry. It means -- it's just that. It means it's not finished.

So to send an uncomplete and unfinished draft report to study patients, it would be irresponsible, in my view. In the company's view.

Q. Does Cassava own all of the scientific data from studies of simufilam?

A. I'm going to parse that answer because we own most of them. Yale University did keep some of the

Page 235

intellectual property rights with regards to a specific use for simufilam, but other than that, yes.

Q. So with the exception of a specific instance where Yale retained certain rights, Cassava owns all of the scientific data from studies of simufilam?

A. To my knowledge, yes.

Q. So Cassava owns the data that Dr. Wang and his lab at CUNY generated from their experiments and studies on simufilam; right?

MR. CAMPBELL: Object to form.

A. I'd have to go to my re -- I've got the CUNY contracts here. Because I know we do own -- let me find it and just make sure I'm answering absolutely accurately.

Q. (By Mr. Kumagai) Why don't we come back to this topic after the next break and just leave that there and come back to it.

How did the company reach the conclusion that it was the purported victim of a short-and-distort campaign?

A. Well, so short and distort is a term you can look up on the internet. It's when someone shorts a stock, you know, for profit and then spreads distorting information about the company.

So when the citizens petition -- to start

Page 236

with that -- initially came out, we didn't know that it was a short-and-distort campaign because it didn't disclose that the clients of the New York law firm that filed the citizens petition were short sellers. That disclosure didn't come till days later, which is a -- a different issue. So there, you've got the short.

And then we knew in all of this -- all of the defamatory comments that they were damaging to the company, damaging to the stock. So to us, we considered it a short-and-distort campaign because we know there's short sellers of the stock who are spreading false information about the company. Because they're short sellers, we know their motive is profit. And when the stock went down, that's sort of the definition of a short-and-distort campaign.

So that's how the company came to that conclusion, which I think was your original question.

Q. And it's -- it's illegal to engage in a short-and-distort campaign; right?

MR. CAMPBELL: Object to --

A. I can't make a legal -- a legal -- I can't make a legal qualification on that.

Q. (By Mr. Kumagai) Did the company have a basic understanding when it accused the short sellers of perpetuating a short-and-distort campaign that they were

Page 237

accusing the short sellers of engaging in unlawful conduct?

MR. CAMPBELL: Object to form.

A. Yeah. I -- to me, the focus here is def -- the focus for the company in the defamation suit was there's maliciously false and defamatory statements that have been made, and that conduct, I do know to be illegal.

You know, you're asking me to make a legal determination whether shorting and distorting is illegal. There's probably a fine line there. You know, where it is, I don't know. I'm not -- I'm not a -- a prosecutor.

Q. (By Mr. Kumagai) And who was in -- who came up with the term "short and distort" to describe the conduct of our clients and other short sellers?

A. Who came -- who first -- short and -- we're not the first company to have a short-and-distort attack. So who came up with it, I don't know.

The first time I saw it in our context was in a -- in the present -- in the statement from the CEO, but who it actually originated from, I wouldn't know that.

Q. The first time you saw someone from the company use that term to describe what our clients and the other short sellers were engaged in as a short and distort was Barbier's September 2021 statement? Is that what you're talking about?

60 (Pages 234 - 237)

Page 238

A. I -- I'd like to check. We did a press release prior to that and I don't know if we -- if we used that term as to what was done.

Q. It was around that time?

A. It was around --

Q. Around August, September, 2021?

A. Yes.

Q. And is it fair to say that, in Cassava's public statements, in their communications with the media, in communications with scientific journals, the company blamed the allegations of data manipulation against Dr. Wang and the company on this so-called short-and-distort campaign?

MR. CAMPBELL: Object to form.

A. Well, the company believed that the same people making these baseless allegations and telling false statements about the company being short sellers showed the motivation of why they would do that.

So -- repeat the question. I think I'm going to say yes, but I'd like you to repeat it.

Q. (By Mr. Kumagai) In Cassava's public statements, its communications with the media, its communications with scientific journals, Cassava blamed the allegations of data manipulation against Dr. Wang and the company on perpetrators of a short-and-distort

Page 239

campaign?

MR. CAMPBELL: Object to form.

A. Yeah. "Blamed" is -- is a strange word because the -- it was the same people who were short-selling the stock who were making the allegations. So if you want to use the word "blame," then, you know, that's your word. It's -- they were the same -- same entities or individuals.

Q. (By Mr. Kumagai) Okay. Blamed or attributed.

A. Attributed. Yes.

Q. And how did Cassava know that the reason the scientific journals were conducting investigations was because of statements by our clients or the other defendants in the defamation action?

A. I don't know who exactly, you know, sent things in to the scientific journals, whether it was your clients or short-and-distort sellers or people who read that. But there's a -- you know, a domino effect, when you put out false and defamatory words like the company is a fraud, all their science is made up, anyone can pick that up and say, Hey, journal, these people are frauds, you should look into it.

So I don't know -- I don't know if it's public of who actually reached out to the journals.

Page 240

Q. I'm trying -- just trying to understand how the company -- what facts the company based its belief on that all of these criticisms and scrutiny originated with our clients and the other defendants in the defamation action.

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) How did the company come to that view?

A. Well, it originated, you know -- first of all, the filing of the citizens petition was sort of the origin, if you will. Then you have a report by Quintessential -- QCM that got incorporated in that. And you had the individual defendants.

So I don't know quite -- state your question again, please, and I'll try and answer it.

Q. How did the company come to the view that the scrutiny it was under from scientific journals, from the media, from the Government had all originated with the statements made by our clients and the other short sellers?

MR. CAMPBELL: Object to form.

A. Okay. Well, we came to the conclusion because of the statements that were made that were defamatory. They were put out on social media and social media platforms. Could there have been other people

Page 241

making -- there are always -- there are plenty of people who criticize the company. It's important, though, the context and the manner that it's done in.

So we -- we knew that from -- there's anecdotal evidence, so the citizens petition, I believe, was filed on August 17th, 2021. It became public August 24th, 2021. And on August 25th, 2021, you know, the FBA -- FBI showed up at Cassava's door and served a subpoena. And that's indicative of the FBI had -- again, anecdotal, but the FBI would have been -- would have received a copy of that report before it was made public, so it would have come from the defendants in the defamation case.

Q. (By Mr. Kumagai) And the fact that the FBI decided to follow up on the citizens petition rather than just kind of dismiss it as another one of thousands of tips it surely gets every day, that didn't cause the company any concern about whether there might be some merit to the allegations?

MR. CAMPBELL: Object to form.

A. Yeah. Again, no, it didn't, simply because of what I've talked about before. That the company has generated other third-party evidence from independent researchers showing the effects of the drug.

You've got all the allegations against

61 (Pages 238 - 241)

Page 242

Dr. Wang. We've got an open label study where the primary endpoints were cognition that's totally independent of Dr. Wang. We've got 15 years of scientific research inside the company that tell us -- that led to our belief that the allegations were false, untrue, and unfounded.

Q. (By Mr. Kumagai) How would you describe the company's feelings toward our clients and the other short sellers that were engaged in this so-called short-and-distort campaign?

MR. CAMPBELL: Object to form.

A. The company doesn't have any feelings.

Q. (By Mr. Kumagai) How would you describe the feelings among the company's employees towards our clients and the other short sellers criticizing the company?

MR. CAMPBELL: Object to form.

A. Yeah. You know, the -- again, I'll -- I'll answer your question, but I'll do it this way: So the company has many, many critics. The company has many proponents. And that's fine. People can criticize.

But the defamation case was filed against your clients because of the outright -- things that we knew to be untrue: That the company is a fraud. That the company is making up its data.

So I would -- I would say they're not very

Page 243

well liked, but this is business. Not -- it's not personal.

This is -- you know, the impact of -- of the defendants was damaging our ability to recruit subjects and complete our clinical studies timely and objectively. So someone who's doing that is an opponent to the company, but feelings beyond that, you know, we're a business.

I've -- I'm in IR. I get, you know, unkind emails all the time and I don't -- I don't have feelings toward those people. It's just -- it's just part of business. But it goes past the line, if you will, if you're impacting somebody's business with false statements. It's just -- it's a different category.

Q. (By Mr. Kumagai) Okay. I mean, I get that -- what you're saying. But Mr. Barry, for example, testified that he was outraged by what our clients were saying about the company. He said Sandy Robertson was furious. So my question really is whether or not that was a common sentiment shared among the company.

MR. CAMPBELL: Object to form.

A. Yeah. I don't know that. I don't -- you know, I -- quite frankly, for me, I spent very little time, if ever, you know, discussing the defendants. It's not a useful piece of energy. So I -- I can't really

Page 244

speculate as to how others felt, but I know -- I'm dispassionate about it. I clearly think -- I don't think they're very good people.

But, you know, outraged, that's -- that's not my style and I -- I can't speak to how others felt, other than, you know, we didn't sit around in conference rooms and talk disparagingly. It's just -- we've got work to do. We're trying to run a public company and run Phase 3 trials. You know, let the lawyers handle the legal dispute and let us focus on our business.

Q. (By Mr. Kumagai) Have you ever had any conversations with Dr. Burns about the perpetrators of this short-and-distort campaign -- the alleged perpetrators?

A. Over the years, but not -- you know, when you say conversations, no more than a -- you know, a sentence or two, a word or two. And Dr. Burns probably was in the outraged group, but I haven't had conversations with her. That's --

Q. And who else was in the outraged group?

A. I said I would characterize her as that. I don't know anybody else who would be outraged. I think -- yeah. I shouldn't speculate on what other people thought. I -- but --

MR. KUMAGAI: Shall we take a break?

Page 245

MR. CAMPBELL: Shall we take a break? Sure.

VIDEOGRAPHER: Going off the record at 4:36. This marks the end of Media 6.

(Recess taken 4:36 p.m. to 4:55 p.m.)

VIDEOGRAPHER: This marks the start of Media 7 of the 30(b)(6) deposition of Cassava Sciences, Inc., represented by Eric Schoen. We're back on the record. The time is 4:55.

Q. (By Mr. Kumagai) Mr. Schoen, are you familiar with the PR firm called Sitrick & Company?

A. I am.

Q. What was Sitrick's role with respect to Cassava?

A. We hired them as a -- as a consultant. He was a -- a public relations and media consultant for us.

Q. Mike Sitrick --

A. Mike Sitrick.

Q. -- and his company?

A. Yeah. Sitrick & Company. Mike Sitrick specifically was probably not the only interface, but the main interface.

Q. And when did Cassava first engage Sitrick?

A. I don't know exactly. It would have been shortly after the citizens petition was filed in August of

62 (Pages 242 - 245)

Page 246

2021.

Q. And what role did Sitrick play in the company's responses to allegations of data manipulation?

A. Well, he's a media consultant, so he would have either drafted or reviewed press releases. You know, similar to, you know -- sorry -- drafted or reviewed press release or external communications in general.

Q. And was part of his role to sort of advise on the media strategy of the company?

A. Yeah. Yes.

Q. What role did Mr. Sitrick play in connection with the defamation action?

MR. CAMPBELL: So I'm going to -- I don't think that question is objectionable. I do want to note for the record, as you know, that Mr. Sitrick was retained by the company and, at times, by legal counsel. I don't think it relates to the defamation action specifically, so I don't think this is privileged, but I want to caution you to the extent any of the work that you're discussing about Mr. Sitrick and his company's role is related to the work that they did in advising legal counsel, that is privileged. To the extent he's advising the company on press matters, that's not privileged, and you can answer.

A. Okay.

Q. (By Mr. Kumagai) What role, if any, did

Page 247

Sitrick play with respect to the defamation action or the media strategy related to the defamation action?

A. Yeah. I'm not aware of -- of his role in the defamation action. If we issued a press release, he would have, you know, reviewed it, advised on it.

Q. I'll mark as Exhibit 151 a document Bates-stamped CASSAVA_000740322.

(Exhibit 151 was marked.)

MR. CAMPBELL: Thank you.

Q. (By Mr. Kumagai) And Exhibit 151, I can represent has been excerpted by my team, so there's some pages missing, just to state that for the record. And it has a cover page that says JPAD, the Journal of Prevention of Alzheimer's Disease.

Do you see that?

A. I do.

MR. CAMPBELL: This is just like the cover of the table and then like the relevant page you want to ask questions about?

MR. KUMAGAI: Exactly. It's a very, very long document.

Q. (By Mr. Kumagai) If you look at the page ending 570, there's a -- on the right-hand column, there's a bolded text that says "Letter to the editor: Cassava Sciences' response to CTAD abstract."

Page 248

Do you see that?

A. I do.

Q. Have you ever seen this letter to the editor of JPAD before?

A. I may have. Not to my recollection.

Q. Okay. Are you familiar with a letter that Mr. Barbier wrote on behalf of the company in response to an abstract or a poster that our clients presented at the CTAD conference?

A. I can read it now.

Q. But aside from looking at this document right now, are you otherwise familiar --

A. No.

Q. -- with that having happened?

A. No. No.

Q. Do you know why the company decided to submit a letter responding to our clients' abstract or poster at the CTAD conference?

A. I'd have to read both of them, but -- can I read at least a section of the letter?

Q. Sure. I'll just -- I really just want to ask you about the conclusion here on the next page, 571.

A. Yes.

Q. It says -- the second sentence says, "The authors used adulterated simufilam to conduct their

Page 249

experiment. Their" experiment -- "their experiment lacks an appropriate positive control. They engaged in patent infringement and they failed to disclose all conflicts of interest."

Do you see that?

A. I do.

Q. And so, as far as you can tell, that was Mr. Barbier, on behalf of the company, making those assertions about our clients' poster presentation; right?

A. Correct.

Q. And sitting here today, do you know what the company's allegation of patent infringement against our clients was based on?

MR. CAMPBELL: Object to form.

A. Patent infringement, no, I don't know the specifics there.

Q. (By Mr. Kumagai) Okay. You can set that aside.

I'll show you a document previously marked as Exhibit 96 with the Bates stamp CASSAVA_1315724.

Okay. And this appears to be an editorial that was published in the Journal of Clinical Investigation or JCI with the title "Conflicting interests: When whistle-blowers profit from allegations of scientific misconduct," by Elizabeth M. McNally.

63 (Pages 246 - 249)

Page 250

Do you see that?

A.  Yes.

Q.  Does Cassava have any relationship with the Journal of Clinical Investigation or its publisher, American Society for Clinical Investigation?

A.  Not to my knowledge.

Q.  Does the company have any relationships with individuals affiliated with the Journal of Clinical Investigation?

MR. CAMPBELL:  Object to form.

A.  Not to my knowledge.

Q.  (By Mr. Kumagai)  Does the company have any relationship with Elizabeth McNally?

A.  Not to my knowledge.

Q.  To your knowledge, has the company ever communicated with Dr. McNally or any of the other editors or publishers of JCI?

A.  Let me read the -- just the footnotes real quick to make sure we're not listed in there, but to my knowledge, no.  Sorry.  Can you say that again?  J -- no.  No.

Q.  Do you want me to say anything again or you're clear?

A.  Yeah.  Can you repeat it, just to make sure I caught it all?

Page 251

Q.  To your knowledge, has the company ever communicated with Dr. McNally or any editors or publishers of JCI?

A.  Not to my knowledge.

Q.  To your knowledge, did the company have any role whatsoever in this editorial, Exhibit 96?

A.  Not to my knowledge.

Q.  When did the company first become aware of this editorial?

A.  I don't -- I don't know.  I -- I don't know.  Shortly after its publication would be a reasonable expectation, but I don't know the exact time.  I've read it before.

Q.  Are you familiar with the fact that Mr. Barbier appears to have been in possession of a copy of this editorial that had metadata indicating it was -- the copy he had was from five days prior to the editorial's publication?

MR. CAMPBELL:  Object to the characterization.

A.  I'm not aware of that.

Q.  (By Mr. Kumagai)  Okay.  So to the best of your knowledge, sitting here today, you have no knowledge or awareness of any role by the company in the drafting or publishing of this editorial?

Page 252

A.  Not to my knowledge.

Q.  And in preparing for today's deposition, did you do anything to prepare to provide testimony about this particular editorial?

A.  No.

Q.  Okay.  Cassava publicized the defamation action; is that right?

A.  Yeah.  We did a press release.

Q.  Why?

A.  Well, again, the -- the actions of the defendants were causing issues with our ability to attract clinical trial subjects and attract sites.  So publicizing the defamation action is -- is coming on board and saying, Look, the company -- the allegations against the company aren't true, which the hope is people read that and say, Ah, there's another side to this -- to these -- to the lies, to these items, and so patients will enroll in the studies, sites will enroll or become sites.

Q.  Okay.  But Cassava had already issued a number of press releases and Mr. Barbier's transcript, denying or attempting to address the allegations; right?

A.  Oh, absolutely.

Q.  And so why publicize the lawsuit when it was filed?

MR. CAMPBELL:  Object to form.

Page 253

A.  Again, it's to -- it's a -- it's a continuum of -- of correct information or corrections -- correct information coming out of the company.  You know, one press release doesn't do it.

So this was another piece of information put out by the company, you know, saying definitively, you know, not only do we think these things aren't -- to be not true, but we have been, you know, legally defamed and we're pursuing an action against the people that spread the lies about us.

Q.  (By Mr. Kumagai)  And what was the significance, if any, to the company of sending that particular message that we are taking action against the alleged defamers?

A.  I think I just answered that.  It's trying to get the word out to patients and sites that these -- the things being said by the defamers are not true.  Saying it one more time.  In fact, you know, we're filing a lawsuit because what they did was illegal.

Q.  And was any part of the goal of issuing the press release to send a message to other critics that we're serious about taking legal action against potential defamation?

A.  No.  You know, again, scientific debate, criticism of the company is absolutely fine.  Defamation,

64 (Pages 250 - 253)

Page 254

calling the company frauds, calling us -- that we make up data, saying our drug is unsafe, saying things that you know or should know to be untrue, that's a totally different -- different thing.

So no, it wasn't meant to quiet critics. We -- we welcome critics.

Q. Really? Okay. I'll mark as Exhibit 152 a document Bates-stamped CASSAVA_001278817.

(Exhibit 152 was marked.)

Q. This is an email from Eric Schoen dated November 3rd, 2022, the subject, "Cassava press release" and attaching the press release.

Do you see that?

A. Yes.

Q. And this is the press release you were talking about a moment ago that the company issued after filing the defamation action; right?

A. Yes.

Q. Okay. And the press release begins on page 818. It's dated November 3rd, 2022, titled "Cassava Sciences files lawsuit against perpetrators of short-and-distort campaign."

Do you see that?

A. Yes.

Q. And so who drafted this press release?

Page 255

A. I can't tell you who -- exactly who drafted it.

Q. On the last page, there's a section that says, "For more information, contact Eric Schoen, Chief Financial Officer."

Do you see that?

A. Yes.

Q. And so were you involved in preparing this press release?

A. At this time, the -- this -- you're asking me who prepared it. I don't know because we may have had Mike Sitrick at the time. Remi Barbier generally drafted press releases. I'm on every single release as the information contact for the company.

I do also read every release before it goes out, but depending upon the subject matter, you know, I have -- may have heavy involvement. I may have light involvement. And this is not a finance topic, so I would have had little involvement before it was near final.

Q. Okay. So your best guess, based on general practice, is that Remi Barbier was the drafter of this, potentially in combination with Mike Sitrick and/or with your involvement?

A. Correct. You know, if we're talking about Benesch, they may have reviewed it. Orrick was our legal

Page 256

counsel. There's going to be a series of reviewers. If you're asking me the most likely person to draft it, it would be Remi Barbier.

Q. Okay. The second sentence says, "The 150-plus-page complaint alleges that the defendants' disinformation campaign caused a precipitous decline in Cassava Science's stock price, a multi-billion-dollar decline in its market capitalization, and delayed the company's work in developing a treatment for Alzheimer's disease."

Do you see that?

A. Yes.

Q. What was the goal of empha -- emphasizing the 150-plus-page length of the complaint?

A. You'd have to ask the author.

Q. Well, you're sitting here today as the company's representative. This was one of the documents we disclosed previously to have you prepared to provide testimony on, so I'm going to ask it again: Do you know why the press release emphasizes the length of the complaint?

A. I don't know the answer to that.

Q. Okay. On page 2, it describes Eric Connolly at Benesch.

Do you see that?

Page 257

A. Yes.

Q. And it says, "Mr. Connolly has litigated some of the largest defamation claims in the country, including a $6 billion claim against ABC and multi-billion-dollar claims brought on behalf of a voting technology company against Fox News."

Do you see that?

A. Yes.

Q. And then there's a quote from Mr. Connolly.

Do you see that?

A. Yes.

Q. And the next paragraph, there's another quote from Mr. Connolly that says, "We are still investigating whether additional individuals or entities should be brought into this case or have separate claims brought against them, according to Mr. Connolly."

Do you see that?

A. Yes.

Q. What was the purpose of including that sentence in the press release announcing or publicizing the defamation action?

A. Well, I think -- sorry. I don't know specifically, but I do know, you know, when -- when the defamation case is brought, it's brought against individuals and people can be added. There was a -- it's

65 (Pages 254 - 257)

Page 258

going to be covered by privilege, but there was a process that --

MR. CAMPBELL: Hold on. If it's covered by privilege, you can't answer the question.

A. Okay. It would be covered by privilege because --

MR. CAMPBELL: If there's a way you can answer it outside of your legal understanding of the significance of adding individuals, you can, but if it's just conversations with Mr. Connolly --

A. It's conversations with counsel.

Q. (By Mr. Kumagai) Okay. And so that was true at the time Cassava was investigating whether to add additional individuals or entities into the defamation case or potentially bring separate claims against them in another case?

A. Yes.

Q. And what was the point of including that fact in the press release announcing the defamation claim against our clients and the other defendants in that case?

A. I'm not sure.

Q. Is it possible that Cassava was trying to send a message to the other critics of the company that they might be next to face a lawsuit from the company?

A. To say -- the answer to that is no. You

Page 259

know, again, Cassava has lots of critics. Critics are okay. But if you defame the company and make claims that are knowingly untrue, false, and defamatory, no, it's -- it's not a warning to critics.

Q. You just said a moment ago you didn't know why that sentence was included; right?

A. Correct.

Q. And so how can you turn around then and say what it wasn't?

A. I'm doing a poor job of saying what I think and what the company thinks.

Q. So sitting here today, you can't say the company's purpose for including that quote from Mr. Connolly?

A. I don't know the purpose of including that quote.

Q. Okay. And the next sentence says, "The filing of this lawsuit marks another step in Cassava Science's vigorous defense of itself and its stakeholders."

Do you see that?

A. Yes.

Q. And then it refers to a number of press releases.

Do you see that?

Page 260

A. Yes.

Q. So aside from the lawsuit and the press releases stated here, what other steps, if any, did Cassava take as part of this vigorous campaign against its critics?

A. Well, Cassava embarked on a thorough internal investigation into all the allegations. Cassava also, you know, continued to work with outside entities to generate additional scientific information to corroborate or show, you know, the mechanism of action of simufilam.

MR. CAMPBELL: Before your next question, I'm going to go back and interpose an objection to that question on form.

Q. (By Mr. Kumagai) Okay. And Cassava also disseminated the press release over email to various third parties; right?

A. Well, yes, I -- in this example, I sent it to the entire company and we would have probably sent it to the board of directors.

Q. And are you aware that employees sent it to media companies, as well?

A. I'm not aware of that.

Q. Would it surprise you if they did that?

A. It probably would surprise me. When you say "employees," you know, if --

Page 261

Q. Mr. Barbier.

A. Mr. Barbier -- sorry. Mr. Barbier, then it would not surprise me.

Q. And are you aware that Dr. Burns sent it to the NIH?

A. Not aware, but it doesn't surprise me.

Q. Do you have an understanding as to why Mr. Barbier or Dr. Burns would send the press release announcing the defamation action to media companies or Government entities?

MR. CAMPBELL: Object to form.

A. Well, for Dr. -- Dr. Burns, no, I wouldn't have any idea. For Remi Barbier, he's the CEO of the company. He may regularly disseminate any press release that we -- that we issue.

Q. (By Mr. Kumagai) What was the immediate effect, if any, of the filing of the defamation action and the publicization of the filing?

A. I'm not aware of any immediate effect.

Q. Did the company receive any immediate feedback from anyone after filing the defamation action?

MR. CAMPBELL: Objection to form.

A. In -- in general, I'm sure we did. You know, as the reader of investor relations emails, I'm -- yeah, I would imagine I get a lot of, hey, you know, from

66 (Pages 258 - 261)

Page 262

proponents of the company, good job or, you know, way to go, but other than that, I'm not aware of any specific important feedback.

Q. (By Mr. Kumagai) Nothing major or material stands out in your mind?

A. No.

Q. Okay. You've talked about this a little bit over the course of today, about supporters being in contact with the company and particularly, you as the investor relations contact. Is that right?

A. Yes.

Q. And so is it fair to say that Cassava was in regular contact with a group of supporters that called itself, you know, the Cassava Army or the Sava Army?

MR. CAMPBELL: Object to form.

A. Yeah. To say in regular contact would imply back and forth, where there was no, you know -- I got inbound inquiries from people that may have said they were affiliated with that group, but I would answer them the same I would answer anybody that would come into investor relations.

Contact implies, to me, regular cadence of back and forth, and that -- that's -- that didn't -- that's not part of investor relations.

Q. (By Mr. Kumagai) But the company was aware

Page 263

of this group that called themselves the Sava Army?

A. Yes.

Q. Sometimes called themselves the Sava Savages?

A. Yes.

Q. And what role did the Sava Army or the Savages play in responding to allegations of data manipulation against Cassava and Dr. Wang?

MR. CAMPBELL: Object to form.

A. I don't have any direct knowledge. You know, they -- so the Savages didn't have any formal role or communication or -- or anything with the company. You know, they were proponents. They would sometimes ask questions. They liked to tell me what they were doing, but I -- I don't know who they did or didn't communicate or what they did or didn't do.

They were an independent group that I took special care, you know, because they called themselves, you know, close to our ticker symbol, to make sure that I was clear that they were not representatives or affiliated with the company in any way because I have -- didn't know exactly who they were, didn't know exactly what they were doing, nor was it in my purview to know that.

So I took special care not to be involved in their activities, for lack of a better way to phrase

Page 264

it.

Q. (By Mr. Kumagai) But, as you said, members of that group were keeping you informed as to what they were doing; is that fair?

A. Yeah. Not on a -- you know, not on a weekly report basis, but they would write in and say, you know, we did this or we support you or --

Q. And the company was aware that members of that group, the Sava Army, had filed a complaint with the New York Department of Health against Dr. Pitt; is that fair?

A. Yeah. I -- I'm aware of that. I don't know if I was aware at the time, but I am aware now.

Q. And the company was aware that members of the Sava Army had filed a petition to the Department of Justice to investigate our clients and other alleged participants in the short-and-distort campaign?

MR. CAMPBELL: Object to form.

A. Yeah. That -- that sounds correct, but I don't remember specifically what they did or didn't do. It was a -- it was a, you know, read and forget. It wasn't -- it wasn't important to the company.

Q. (By Mr. Kumagai) Did you or anyone else at the company, as far as you know, ever tell the Sava Army to stop filing complaints or taking affirmative steps to

Page 265

take action against critics?

A. Not to my knowledge.

Q. So the company never told them to cut it out?

A. Not to my knowledge.

Q. Was the company happy with what the, quote, Sava Army was doing?

MR. CAMPBELL: Object to form.

A. Yeah. You know, it's nice to have proponents, but, again, I -- I, from an IR -- investor relations standpoint kept a very fine line because I did not want to be in any way, shape, or form associated with what they were doing.

So were we happy with it? Some things they did, I didn't object to, but I, you know -- they weren't representatives of the company. They were unique, independent individuals. Cassava is not happy. We're an entity.

Q. (By Mr. Kumagai) Were employees of the company encouraged or -- strike that.

Were employees of the company encouraging the Sava Army to continue doing what they were doing?

A. Not to my knowledge.

Q. Was Dr. Burns encouraging the Sava Army to continue doing what they were doing?

67 (Pages 262 - 265)

Page 266

MR. CAMPBELL: Object to form.

A. I don't have any knowledge of if Dr. Burns was -- had communications with the -- the Savages. I -- I don't know and don't recall.

Q. (By Mr. Kumagai) Aside from our clients and the other defendants in the defamation action, who else has Cassava accused of defamation in the time since the citizens petition was disclosed in August of 2021?

MR. CAMPBELL: Object to form.

A. I'm not sure of anyone that we've accused of defamation. We haven't filed a case against anybody else.

Q. (By Mr. Kumagai) But short of filing a case, are you aware that the company, through its counsel, has sent letters to entities like the New York Times, Science, Reuters, Mother Jones, Tortoise Media, Nature News, Stat News, an individual named Richard Law, the publishers of Charles Piller's book? Are you aware that the company has sent legal correspondence either threatening a defamation claim or accusing them of making defamatory statements?

MR. CAMPBELL: Object to form.

A. I'm aware of letters to some of those -- some, I don't recognize, but some, I do recognize. So yes, I'm aware that we sent letters. I don't recall the

Page 267

exact substance and the exact words of those letters, so I'd like to look at one before I said yes or no.

Q. (By Mr. Kumagai) I'll mark as Exhibit 153 a document Bates-stamped CASSAVA_000986192.

(Exhibit 153 was marked.)

Q. This appears to be a letter dated May 5th, 2022, to the New York Times with the subject, "The New York Times report scientists question data behind an experimental Alzheimer's drug."

A. Yes.

Q. From Eric Connolly at Benesch on behalf of Cassava; right?

A. Yes.

Q. And this is in reference to the article that we looked at earlier today that was published in April of 2022; right?

A. Yes.

Q. Okay. In the first -- on the first page in the second paragraph, the company writes -- or Benesch writes, "As a science organization, Cassava expressly supports the exercise of free speech and dissenting opinion."

Do you see that?

A. Yes.

Q. Is that true?

Page 268

A. Yes.

Q. The next sentence says, "However, even the importance of New York Times does not justify the knowing publication of false and defamatory information that a reasonable reporter would know or suspect constitutes a reckless representation of Cassava prior to publication."

Do you see that?

A. Yes.

Q. And so is it fair to say that, in this letter, Cassava was accusing the New York Times of defamation?

MR. CAMPBELL: Object to form.

A. I'd like to read the whole letter before I conclude on that.

Q. (By Mr. Kumagai) Okay. I don't think we have time for you to read the whole thing sitting here today, but you do see the sentence I just read, suggesting that the New York Times had published false and defamatory information about Cassava; right?

MR. CAMPBELL: Object to the characterization.

A. Sorry. As I read this one sentence in here, it says, "justify the knowing publication of false and defamatory information," meaning if -- well, sorry. I can't -- I can't testify to that without reading this

Page 269

because I don't know if it's referring to the New York Times or pieces of information in the New York Times authored by others.

Q. (By Mr. Kumagai) Published by the New York Times.

A. Right. But the New York Times included other information that may have come from, you know -- may have been what they're referring to.

Q. Okay. If you turn to the page ending in 201, the second-to-last page, there's a paragraph that says, "It cannot be overstated."

Do you see that?

A. Yes.

Q. And it continues, "It is not only Cassava's reputation and stock price at risk. In this case, the collateral damages caused by irresponsible reporting are borne by the patients with always disease who may be deprived of a promising treatment candidate. Already, as a result of the Times reporting, one clinical testing site has withdrawn from simufilam's Phase 3 study program, making it more challenging to locate participants for the study."

Do you see that?

A. Yes.

Q. So Cassava was accusing the New York Times

68 (Pages 266 - 269)

Page 270

of causing Phase 3 trial sites to decide not to participate in the Phase 3 program; right?

MR. CAMPBELL: Object to the characterization.

A. Yes. As a result of -- that's what that sentence says.

Q. (By Mr. Kumagai) Okay. You can set that aside. I'll mark as Exhibit 154 a document Bates-stamped CASSAVA_000986398.

(Exhibit 154 was marked.)

Q. Okay. This appears to be a letter dated July 26th, 2022, from Benesch -- Eric Connolly at Benesch on behalf of Cassava to Holden Thorp, the editor-in-chief of Science.

Do you see that?

A. Yes.

Q. Okay. If you look at the last page, the second paragraph says, "Science's falsehoods in the aggregate give the false impression that simufilam is conclusively ineffective and unsafe and that Cassava Sciences has engaged in research misconduct, including data manipulation."

Do you see that?

A. Yes.

Q. It says -- continues, "Science's false

Page 271

statements also harm patients with Alzheimer's disease who may be deprived of a promising treatment candidate. There have been no factual reports to date that simufilam is unsafe and the goal of the ongoing Phase 3 studies is to determine simufilam's longterm safety and efficacy. The false and disparaging report published by Science serves only to halt the progress of the Phase 3 studies and deprive families of one more option to help their loved ones."

Do you see that?

A. Yes.

Q. And then in the next paragraph, Cassava asks for a retraction and correction to avoid further harm to Cassava's reputation and to mitigate Cassava's damages. And then Cassava reserves all rights to bring an action to recover all the damages it has suffered and will suffer as a result of the report, including an action for defamation.

Do you see that?

A. Yes.

Q. And so would you characterize this letter as a threat to Science to bring a defamation action?

MR. CAMPBELL: Object to form.

A. I would characterize this -- I wouldn't characterize it. This is what it says. It is asking for

Page 272

a retraction and saying Cassava Sciences is reserving its rights under the law, you know, if -- if that doesn't happen.

Q. (By Mr. Kumagai) To bring a defamation action?

A. That's one of the -- the -- one potential remedy, yes.

Q. That Cassava states in this letter; right?

A. Yes.

Q. Okay. You can set that aside.

A. That Benesch states in the letter, but on behalf of the company.

Q. Well, actually, sorry, one more line in that paragraph. If you go to page 403, there's a discussion of Dr. Bik in this letter.

Do you see that?

A. Yes.

Q. And the paragraph ending -- or beginning, "It is self-evident."

Do you see that paragraph?

A. Yes.

Q. And it continues -- there's a sentence that says, "In an article regarding scientific ethics, a reader would reasonably expect to see disclosures regarding Bik's financial conflicts and criminal conduct at her prior

Page 273

place of work or, at the very least, an expression of concern regarding her refusal to furnish such information to Science."

Do you see that?

A. I do.

Q. What were Cassava's bases for accusing Dr. Bik of engaging in criminal conduct?

MR. CAMPBELL: Object to the characterization.

A. I don't know the answer to that.

MR. KUMAGAI: You object to that characterization?

MR. CAMPBELL: Yeah.

MR. KUMAGAI: Why?

MR. CAMPBELL: Because if you read the article, first of all, it doesn't say they're accusing Bik of criminal conduct and the actual allegations are two paragraphs above it, "a better company."

MR. KUMAGAI: It says "reasonably expect to see disclosures regarding Bik's financial conflicts and criminal conduct."

MR. CAMPBELL: Yeah. Two separate things.

MR. KUMAGAI: Okay.

MR. CAMPBELL: And it's clearly described what's meant by that in two paragraphs above it.

69 (Pages 270 - 273)

Page 274

Q. (By Mr. Kumagai) And Mr. Schoen, can you provide the bases for the accusation against Dr. Bik?

MR. CAMPBELL: Object to the characterization.

A. I don't know that.

Q. (By Mr. Kumagai) Okay. You can set that aside.

Mark a document Bates-stamped 1 -- or sorry -- marked Exhibit 155, which is a document Bates-stamped CASSAVA_001495215.

(Exhibit 155 was marked.)

Q. This appears -- the top email appears to be an email from Marisa Taylor at Reuters to Kate Watson Moss at Benesch, copying Eric Connolly at Benesch, and two other individuals, and it's dated July 26th, 2022.

Do you see that?

A. I do.

Q. Okay. And the second email from the top, there's an email from Kate Watson Moss, who is another attorney at Benesch; right?

A. Yes.

Q. And she's responding to questions from Reuters, it looks like.

Do you see that?

A. Yes.

Page 275

Q. Okay. And if you go to the last paragraph of Ms. Watson Moss' email, it says, "We hope this information clears up any misconceptions you may have about Cassava Sciences and prevents the publication of false and defamatory statements or implications about my client. It should go without saying that Cassava Sciences will have no choice but to pursue legal action should Reuters publish anything false about it."

Do you see that?

A. Yes.

Q. And this is a statement that Cassava's lawyers sent to Reuters on Cassava's behalf; right?

A. Yes.

Q. Okay. You can set that aside.

So did the company have a kind of concerted -- or strike that.

Did the company have a strategy of sending out letters to news organizations in an effort to prevent them from publishing or republishing criticisms that our clients and other short sellers had made about the company?

MR. CAMPBELL: Object to form.

A. Yeah. There was no strategy, but, clearly, from the examples you've just had me read, if news outlets did repeat false or defamatory information, the company

Page 276

sent a letter, you know, generally asking for retractions or corrections and reserving their rights under the law if that didn't happen.

Q. (By Mr. Kumagai) Okay. Is the company continuing to do that today?

A. Not to my knowledge.

(Exhibit 156 was marked.)

Q. I'll mark as Exhibit 156 a document Bates-stamped CASSAVA_001415124. This appears to be another exchange involving Benesch and journalists or members of the press, if you look at the email that begins on the bottom of the first page dated August 12, 2022, from Kate Watson Moss to a Ms. Mogenson at Mother Jones.

Do you see that?

A. Yes.

Q. And Kate Watson Moss provides a similar message that was provided to Reuters, and in the last paragraph, writes, "I hope this information clears up any misconceptions you may have about Cassava Sciences and prevents the publication of false and defamatory statements or implications about my client. It should go without saying that Cassava Sciences will have no choice but to pursue legal action should Mother Jones publish anything false about it."

Do you see that?

Page 277

A. I do.

Q. That's another statement that Benesch sent to Mother Jones on behalf of the company; right?

A. Yes.

MR. KUMAGAI: Okay. You can set that aside.

Let's take a 5-minute break.

VIDEOGRAPHER: Going off the record at 5:41.

(Recess taken, 5:41 p.m. to 5:51 p.m.)

VIDEOGRAPHER: Back on the record at 5:51.

Q. (By Mr. Kumagai) Okay. Mr. Schoen, I'm going to show you a document previously marked as Exhibit 74, which I believe is also in your binder. It's the First Amended Complaint in the defamation action.

MR. CAMPBELL: For the record, I think this is tab 3 in the binder.

MR. KUMAGAI: Okay.

Q. (By Mr. Kumagai) You recognize this as the First Amended Complaint in the defamation action?

A. Yes, I do.

Q. And it's dated November 4th, 2022. Do you see that up at the top? The filed date?

A. Yes.

Q. Okay. I just want to direct your attention

70 (Pages 274 - 277)

Page 278

to paragraph 430.

MR. KUMAGAI: Sorry. I don't think -- I held back one of these. Did you get it? Okay.

MR. CAMPBELL: We've all read it.

MR. KUMAGAI: Have you? The whole thing?

Q. (By Mr. Kumagai) Okay. Paragraph 430 on page 167.

A. Yes.

Q. Are you there?

A. I am.

Q. There's a heading that says "Cassava's Clinical Research Efforts."

Do you see that?

A. Yes.

Q. And it says, "Defendants' statements were a substantial cause of multiple clinical research sites withdrawing from Cassava's clinical research programs. Nine clinical research sites have withdrawn from or avoided participation in the company's clinical research studies because of Defendants' disinformation campaign."

Do you see that?

A. Yes.

Q. What can you tell me, if anything, about those nine clinical research sites?

A. I can't give you specifics. I can't -- I

Page 279

can't name them, but I do know that, you know, various sites signed up to be a site, you know, went through the process, and then declined.

I knew some personally that I had negotiated with that later came back and I didn't hear firsthand, but it's like there's too much noise around the company. There's too many -- too many allegations, too much. Those were particularly with academic research sites.

Q. And who specifically conveyed that message that you just described?

A. I don't -- I'm talking in generalities. I don't know somebody specifically telling me -- I don't know specifically telling me that. That was -- I just don't know.

Q. Do you know anything at all about the source of that message you just described hearing?

A. I don't know the source of it. It would be Cassava, the company.

Q. Do you know how many of these nine clinical research sites withdrew from the company's clinical research studies as opposed to avoided participation in?

A. I don't know the breakdown of which is which.

Q. Prior to beginning enrollment for the

Page 280

simufilam Phase 3 trials, how long did the company forecast it would take to complete enrollment?

A. I don't know the answer to that.

Q. Who would know?

A. Probably no one. Someone at the clinical team, but -- you know, Jim Kupiec, probably.

Q. Mr. Kupiec -- or Dr. Kupiec is retired; right?

A. Correct.

Q. Aside from Dr. Kupiec, would anyone at the company know the length of time the company forecast it would take to complete enrollment for the Phase 3 clinical trials?

MR. CAMPBELL: And just to clarify, you're asking anyone currently at the company?

Q. (By Mr. Kumagai) Aside from Dr. Kupiec, anyone currently at the company or formerly at the company?

A. Yeah. I don't believe there's anybody currently at the company. Formerly at the company, you know, Dr. Nadav Friedmann, who is now deceased, you know, would have known that. I'm sure, at some point in time, you know, there was -- when you're -- you're doing that, you project a number of sites and a recruitment rate per month, how many subjects you want to get in and then you

Page 281

extrapolate that and you come up with a date.

I don't know that any empirical piece was ever done, other than we did know -- no empirical piece saying, Ah, we expected X, we got Y, but when you do have sites that say I'm not participating because of the allegations against your company, you know, participants who drop out, I know the Wall Street -- participants who drop out because, you know -- and tell their doctor, you know, I've heard these, you know, rumors that, you know, your science is false, you know, that's empirical data, but how you measure it versus a -- you know, it was supposed to be this and it -- it was supposed to be X and now it's Y, I don't think you can do that.

Q. Can you name any individual patient or potential trial site that ever said explicitly that they would not participate in the Phase 3 trials because of statements by our clients or the other defendants in the defamation action?

MR. CAMPBELL: Object to form.

A. I don't know that. I don't know of any specific patients or sites.

Q. (By Mr. Kumagai) And is there documentary evidence or record anywhere that would support the claim Cassava made that nine clinical research sites withdrew or avoided participating in the company's clinical research

71 (Pages 278 - 281)

Page 282

studies because of defendants' disinformation campaign?

MR. CAMPBELL: Object to form.

A. There may be, but I wouldn't know where it is.

Q. (By Mr. Kumagai) And where would you go to look for that sort of documentary evidence?

A. Well, if it's in this complaint, it would be -- the first place I'd go is to -- to Benesch.

Q. Anywhere else?

A. No place within the company presently.

Q. Okay. Let's just go back quickly, if we can, to the questions I had earlier about Cassava's ownership of data. I believe you testified that Cassava owns all of the simufilam data, with the exception of data that Yale --

A. Yes.

Q. -- owns; right?

A. Yes. Yale retained some intellectual property on right of use for a certain use, but other than that, Cassava owns the data and the intellectual property around simufilam.

Q. And so, for example, when Remi Barbier said in September 2021 that, you know, we don't have our own laboratories at Cassava, Dr. Wang is one of the laboratories we use -- Dr. Wang's lab at CUNY, and he

Page 283

referred to the original films or records that -- from Dr. Wang's experiments with simufilam, Cassava owns those records; right?

MR. CAMPBELL: Object to form.

A. Yes.

Q. (By Mr. Kumagai) Cassava owns all of the data that Dr. Wang generated from his experiments or studies using simufilam; right?

A. Contractually, Yes.

Q. And Cassava, as the owner of that data, had a right to access, review that data that was residing at, presumably, Dr. Wang's lab in CUNY; right?

MR. CAMPBELL: Object to form.

A. Contractually, yes.

Q. (By Mr. Kumagai) Is it the company's position that Dr. Bordey's 2020 paper, also referred to as the Yale study, confirmed simufilam's mechanism of action in Alzheimer's disease?

MR. CAMPBELL: Object to form.

A. That's not the contention. I have to read the paper, but you have to be very careful when you say confirms mechanism of action. But the results of her study were positive vis-a-vis the impact of simufilam on her test -- the test mice in her study.

Q. (By Mr. Kumagai) And Cassava has presented

Page 284

findings to the Department of Justice and the SEC from its forensic investigation of Dr. Burns' emails; right? Are you familiar with that?

A. Not specifically, but --

Q. Is it true that Dr. Burns deleted all of her sent email from before June 2020?

A. Yeah. Let me go to one of my reference sheets because there is -- there is reference to that.

Q. While you're doing that, can I ask, are you aware of any other instances of employees deleting emails or otherwise destroying records in violation of any company policy?

MR. CAMPBELL: Object to the characterization and the form.

A. Yeah. So company policy was not to not delete emails until there were lawsuits filed, and then we've been on a litigation hold since 2021. But prior to that -- I think you said deleted in violation of company policy and that's not the case.

Q. (By Mr. Kumagai) Okay. So are you aware of any instances in which any employee at the company failed to comply with the preservation hold that was in place beginning sometime in 2021?

A. No, I'm not.

Q. Do you have the tab open to address the

Page 285

Dr. Burns question?

A. I don't. But let me -- let me -- if you ask me, I'll see if I can answer.

Q. Is it true that the company's -- through counsel's -- strike that.

Counsel for the company conducted a forensic analysis that found Dr. Burns had deleted all of her sent email from before early June of 2020.

A. I don't know the answer to that. I can't say the specific dates without looking at my -- my reference materials.

Q. Are you aware generally that a forensic investigation took place of Dr. Burns' email account?

A. Yes.

Q. And are you aware generally that the forensic investigation found that Dr. Burns had deleted a wide period of emails?

A. Yes.

MR. KUMAGAI: Okay. All right. That's all the questions I have for you today, Mr. Schoen, subject to any questions from opposing counsel.

MR. CAMPBELL: I have just a few.

EXAMINATION

BY MR. CAMPBELL:

Q. Mr. Schoen, first, can you pull out Exhibit

72 (Pages 282 - 285)

Page 286

148.  It should be in your pile, potentially in order. This is the draft leaked CUNY report.

A.  Yes.

Q.  And if you look on the page marked 746 at the bottom --

A.  Yes.

Q.  -- Mr. Kumagai read to you a section of this text in the middle of the page including that, "In no instance did Dr. Wang provide any material that could be reasonably recognized as original uncropped blots, images that included clear film/blot images and molecular weight markers."

Do you recall that?

MR. KUMAGAI:  Objection to form.

A.  Yes.

Q.  (By Mr. Campbell)  And he read down to the end of that paragraph.

Do you recall?

A.  I want to make sure I'm on the right paragraph, but yes, I recall.

Q.  Okay.  It's the paragraph that ends "experiments performed in the lab."  Do you see that?  The last sentence says, "Dr. Wang and Dr. Zhe Pei, a post-doctoral research associate in the Wang lab, did not employ notebooks to record the details of the preparation

Page 287

or execution of the Western Blot experiments performed in the lab."

A.  Yes.

Q.  Do you recall Mr. Kumagai reading that to you?

A.  Yes.

Q.  And then he asked you if these findings were consistent with the company's audit.

Do you recall that?

A.  Yes.

Q.  And you testified that it was consistent with the company's audit?

A.  I did.

Q.  Okay.  What did you mean by that?

A.  I was referring to the last piece that the lab did not employ notebooks to record the details of the preparation or execution of the Western blot experiments. Essentially, Dr. Wang was a poor recordkeeper rather than the entire list -- bullet list that -- that counsel read to me.

Q.  Okay.  And did Cassava's audit include any findings about Dr. Wang's use of materials that could be reasonably characterized as original uncropped blots?

MR. KUMAGAI:  Objection to form.

A.  Not to my knowledge.

Page 288

Q.  (By Mr. Campbell)  Mr. Kumagai also asked you if you had specific evidence that rebutted information in CUNY's leaked report and its conclusions that Dr. Wang engaged in research misconduct.

Do you recall that?

A.  Yes.

Q.  And I think you said you did not -- that Cassava did not possess such data?

A.  Correct.

Q.  To be clear, does the company have evidence that Dr. Wang's work is not fabricated?

A.  Yes, we do.  We talked about it multiple times in this testimony.  The evidence from other researchers, the evidence that wasn't produced by Dr. Wang that is -- that conforms to Dr. Wang's research.

Q.  So what were you referring to when you said the company did not possess such data?

A.  I was referring to the original uncropped Western blots.

Q.  I'd like to mark as Exhibit --

MR. CAMPBELL:  I'm sorry.  I wasn't marking.  What number are we on?

MR. KUMAGAI:  157, I think.

(Exhibit 157 was marked.)

MR. CAMPBELL:  Thank you.

Page 289

Q.  (By Mr. Campbell)  I'm going to mark this as Exhibit 157.  Do you recall -- let me direct your attention to the end of this document, the second-to-last page.  There's an email exchange between Dr. Burns and Jeffrey Cummings.

Do you see that?

A.  Yes, I do.

Q.  And I believe counsel showed you the first couple of emails in this chain.

Do you recall that?

A.  Yes, I do.

Q.  And he asked you questions about Mr. Cummings' statement that the paper that was sent by Dr. Burns came off as heavily manipulated to show positive results.

Do you recall that?

A.  Yes, I do.

Q.  And I believe you testified that you showed -- that you believed this was part of a scientific exchange of ideas between Dr. Burns and Dr. Cummings that the company welcomed.

Do you recall that?

A.  Yes, I did.

MR. KUMAGAI:  Objection to form.

Q.  (By Mr. Campbell)  And then there are

73 (Pages 286 - 289)

Page 290

additional emails in this chain that weren't part of the exhibit that counsel showed you; correct?

A. Yes.

Q. Okay. And if you look at the next email up in the chain from Dr. Burns, responding to Dr. Cummings, she responds and says, "Thanks so much for your review and feedback"; is that right?

A. Yes.

Q. Okay. And then in the next paragraph, she describes certain issues with the paper -- two issues here: One dealing with three noncompliers and the presentation of a percent change?

Do you see that?

A. Yes.

Q. And then she describes that she -- that it seemed more appropriate to her and easier to depict in a single figure percent change from baseline.

Do you see that?

A. Yes.

Q. And then she asks Dr. Cummings questions about the best way to present, for example, appropriate p-value adjustments for multiplicity.

Do you see that?

A. Yes.

Q. Okay. And then skimming down through

Page 291

several substantive paragraphs to the last paragraph of her email, she says, "I will address all of your comments and revision. Happy to send back, if you'd like."

Do you see that?

A. Yes.

Q. Is this description and response from Dr. Burns what you were describing as part of the back-and-forth regarding this transcript?

A. Yes, it is.

MR. KUMAGAI: Objection to foundation.

Q. (By Mr. Campbell) And then the response from Dr. Cummings that same day, on Saturday, November 14th, says, "Lindsay, this sounds better than it comes across in the manuscript."

Do you see that?

A. Yes, I do.

Q. And then he goes on to list several other issues that he'd like to address in the paper.

Do you see that?

A. Yes, I do.

Q. And then there's several more exchanges. We don't need to get into all of them, but at the top of the email on November 14th, that same day, Dr. Burns says, "Thanks. All sounds appropriate to me and yes, I am learning," exclamation point.

Page 292

MR. KUMAGAI: Objection.

A. Yes, I see that.

Q. (By Mr. Campbell) Okay. Is this, again, part of the exchange you were describing where the company would solicit advice on its science from its advisors?

MR. KUMAGAI: Objection.

A. Yes.

Q. (By Mr. Campbell) I'd like to mark another exhibit as 158. This is why I shouldn't mark my own exhibits. I covered a portion of it.

(Exhibit 158 was marked.)

Q. This is an email exchange a couple of weeks later -- it starts on December 1st, 2020 -- between Dr. Burns and Dr. Cummings. The subject is "Revised Paper."

Do you see that?

A. Yes.

Q. She says, "Hi Jeff. I know it's taken a while, but here is a revised draft of the paper per your suggestions. Overall, leaving in the noncompliers did not change much."

Do you see that?

A. Yes.

Q. And then there's discussion of the ANCOVA and ANOVA statistics below that.

Page 293

Do you see that?

A. Yes.

Q. And then if you look above, there is a back-and-forth between Dr. Cummings and Dr. Burns again, and in the next chain up on December 7th, Dr. Cummings sends an email to Dr. Burns. Are you with me? It's the page ending 780130.

A. Yes.

Q. Okay. And he gives some thoughts on the revised paper. He says, "It is much improved" and then lists some additional points to consider.

Do you see that?

A. Yes, I do.

Q. And then below those bulleted points to consider, he says, "Assuming that we can come to a shared view of most of these things, I would be happy to be included in the authorship."

Do you see that?

A. I do.

Q. Is this more examples of the scientific back-and-forth between the company and its advisors?

MR. KUMAGAI: Objection.

A. It's a representative example, yes.

Q. (By Mr. Campbell) And if you look in the next email above on the following page, Dr. Burns sends an

74 (Pages 290 - 293)

Page 294

email to Mr. Cummings -- or Dr. Cummings on December 10th at 8:21 a.m.

Q. Do you see that?

A. Yes.

Q. And in the bottom line of that, after she describes some more significant symbols in Figure 2 and the ANOVA and ANCOVA calculations, she says, "I've not included in author contributions your help in writing/ presenting data and guidance of the program. Will update when we have settled on the final manuscript."

Q. Do you see that?

A. I do.

Q. And then if you look on the first page of this document, there's a response, again, after some additional back-and-forth on statistics between Dr. Burns and Dr. Cummings, from Dr. Cummings on November -- December 11th, 2020.

Q. Do you see that?

A. I do.

Q. And he says to start off, "Hi Lindsay. I think these are all justifiable decisions."

Q. Do you see that?

A. I do.

Q. And then she, in response to him that same day, December 11th, says, "Thanks, Jeff. I appreciate

Page 295

your operations comment. I am learning, but we need help. We have a pending hire of an ex-Pfizer person in the AD space who is a long-time CTAD regulator. We also have two clin ops candidates to consider, so I will include your contribution to the paper and program and submit. Thanks for the backup recommendation."

Q. Do you see that?

A. I do.

Q. Do you know if Dr. Cummings was ultimately included as an author on that paper?

A. Yes. He was.

MR. CAMPBELL: Nothing further.

MR. KUMAGAI: Just a couple more.

RE-EXAMINATION

BY MR. KUMAGAI:

Q. Do you know if the paper was ever accepted for publication?

A. I don't know that.

Q. Do you know if it was rejected by journals?

A. I don't know that.

Q. Do you know if Dr. Cummings ever sought to sever or separate himself from his affiliation with the company?

A. I don't know that.

MR. KUMAGAI: Okay. No further questions.

Page 296

MR. CAMPBELL: Nothing further.

VIDEOGRAPHER: Going off the record at 6:14. This marks the end of Media 7 of 7.

* * * * * * * * * *

(WHEREUPON, the foregoing deposition was concluded at the hour of 6:14 p.m. Total time on the record was 7 hours, 5 minutes.)

Page 297

CERTIFICATE OF DEPOSITION OFFICER

STATE OF COLORADO          )
CITY AND COUNTY OF DENVER    )

I, Bonnie Carpenter Johnshoy, a Registered Professional Reporter, commissioned to administer oaths, do hereby certify that previous to the commencement of the examination, the witness was duly sworn by me to testify to the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof.

That I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

_____
Bonnie Carpenter Johnshoy
Registered Professional Reporter
Certified Shorthand Reporter
Certified Realtime Reporter

75 (Pages 294 - 297)

Page 298

SCOTT CAMPBELL, ESQ.

scampbell@gibsondunn.com

October 14, 2025

RE: ADRIAN HEILBUT, et al. v. CASSAVA SCIENCES, INC., et al.

9/30/2025, Eric Schoen, 30(b)(6) (#7624582)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 299

ADRIAN HEILBUT, et al. v. CASSAVA SCIENCES, INC., et al.

9/30/2025, Eric Schoen - 30(b)(6) (#7624582)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Eric Schoen              Date

Page 300

ADRIAN HEILBUT, et al. v. CASSAVA SCIENCES, INC., et al.

9/30/2025, Eric Schoen - 30(b)(6) (#7624582)

ACKNOWLEDGEMENT OF DEPONENT

I, Eric Schoen, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Eric Schoen              Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

76 (Pages 298 - 300)

[& - 134]                                                                                                  Page 1

**&**

**&** 2:3 3:5 8:2
52:3 245:11,20

**0**

**000004863** 4:6
93:7
**000018239** 4:11
**000020942** 4:13
108:8
**000041919** 5:23
**0000797960**
9:19
**000100022** 4:16
**00018239** 104:7
**00055933** 4:8
**000709518** 4:20
128:9
**000740322** 5:9
247:7
**000740556** 5:10
**000740570** 5:10
**000771233** 4:18
121:2
**000796682** 6:3
**000797948** 3:18
40:14
**000797977** 11:1
**000898032** 6:9
**000986192** 5:14
267:4
**000986398** 5:16
270:9

**001192666** 5:8
229:10
**001213617** 6:5
173:11
**001278817** 5:12
254:8
**001309142** 5:5
214:8
**001315724** 6:18
**001415124** 5:21
276:9
**001495215** 5:18
274:10
**00797971** 59:3
**05948** 1:3 7:10
**0tw** 7:10

**1**

**1** 7:4 14:17
53:19 80:18,21
112:6 150:19
274:8
**1,000** 39:24
**1/18/22** 4:21
**10** 9:21 10:25
13:15 26:1
27:7 40:17
44:15 58:25
59:2,6 60:8
63:19 132:13
140:9 145:16
147:3 148:20
176:1

**10/20/21** 4:2
**100** 35:2,5 60:3
**100,000** 126:1
**100022** 117:15
**100025** 4:16
**10010** 2:10
**10111** 2:14
**104** 4:9
**108** 4:12
**10:10** 53:19,20
**10:22** 53:20,24
**10th** 294:1
**11** 39:20
**11/1** 6:4
**11/14/20** 4:12
5:22
**11/14/23** 5:6
**11/16/22** 6:4
**11/2/21** 4:2
**11/3/21** 3:21
**11/3/22** 5:11
**11/9** 4:12
**117** 4:14
**1192681** 5:8
**11:20** 91:1,2
**11:36** 91:2,6
**11th** 128:12
133:2 294:17
294:25
**12** 100:21
101:14,25
103:8 222:3
276:12

**12/1** 5:24
**12/11/20** 5:24
**121** 4:17
**1213621** 6:5
**1215726** 6:18
**125** 156:15
**125-02** 118:20
119:1 172:8
182:17
**125-03** 118:20
119:1
**126487** 176:2
**1278820** 5:12
**128** 4:19
**12:30** 127:20
127:21
**130** 3:15 14:3,6
14:7 41:5
**1309144** 5:5
**131** 3:16 40:13
40:20 41:6,7
59:6 60:9,13
61:20 63:20
140:13,14
144:17
**1315724** 249:20
**132** 3:19 54:5,6
62:5,12 78:10
78:13
**133** 3:21 56:24
56:25 57:1
62:5,12 78:9
**134** 3:23 62:15
62:17,18

**[135 - 2021]**

**135** 3:24 64:3,4 64:8
**136** 4:2 65:16 65:17,19
**137** 4:3 91:7,9 139:23
**138** 4:5 93:6,8
**139** 4:7 96:25 97:2,3
**13th** 43:4 175:8 202:25 231:16 231:22 232:25
**14** 3:15 298:3
**140** 4:9 104:6,8 104:9
**141** 4:12 108:7 108:9,11
**1415127** 5:21
**142** 4:14 117:14,16,17
**143** 4:17 121:1 121:3,4
**144** 4:19,21 128:7,8,9
**145** 4:21 143:25 144:1,2
**146** 4:23 147:14,15,16
**147** 4:23,24 156:11,12,13
**148** 5:2 188:8,9 189:14 212:1 286:1

**149** 5:4 214:7,9
**1495218** 5:18
**14th** 108:13 177:13 229:14 232:22 291:13 291:23
**15** 44:15 48:21 77:1 141:25 242:3
**150** 5:6 229:9 229:11 256:4 256:14
**151** 5:9 247:6,8 247:10
**152** 5:11 254:7 254:9
**153** 5:13 267:3 267:5
**154** 5:15 270:8 270:10
**155** 5:17 274:9 274:11
**156** 4:24 5:19 276:7,8
**157** 5:22 288:23,24 289:2
**158** 5:24 292:9 292:11
**15th** 13:21 41:11 60:11
**16** 10:10
**160** 6:14

**167** 278:7
**169** 6:7
**16th** 104:11 105:10 170:7 171:20 177:17
**17** 14:12,17
**171** 59:9
**173** 6:4
**17th** 175:15 178:5 241:6
**18** 62:25 132:20 215:25
**180** 6:2
**18230** 4:11
**188** 5:2
**18th** 161:7 220:23 231:17
**19** 132:20 144:5
**1900** 2:4 3:5 7:11
**19th** 141:4
**1:10** 127:21,25
**1:24** 1:3 7:10
**1st** 174:23 175:2 178:7 210:4 212:3 292:13

|  2  |
| --- |

**2** 41:21 53:22 80:25 84:9 91:1 119:4 163:14 171:19

176:1,9,11,21 178:3 256:23 294:6
**2.0** 130:19
**2/11/22** 4:19
**2/8** 4:19
**20** 66:16,20,23 67:10 126:8 138:12 300:15
**2005** 140:24 204:18
**201** 6:10 269:10
**2012** 141:12 144:15
**2015** 59:20
**2016** 59:23
**2017** 142:2 156:15 160:17
**2019** 93:12 97:5 99:7 100:17
**2020** 11:6,9 46:1 52:11,18 67:19 104:11 105:10 108:13 111:1 117:25 135:9 283:16 284:6 285:8 292:13 294:17
**2021** 57:12 66:15 67:22,25 72:9 84:10 96:12,22 98:2

**[2021 - 3]**                                                                                   Page 3

121:6,14
125:21 132:8
141:5,16
175:15 178:5
199:17 202:11
203:13 204:10
205:12,15
208:8 228:5
237:24 238:6
241:6,7,7
246:1 266:8
282:23 284:17
284:23
**2022**   12:6,7
28:21 34:10
46:3 51:3
55:25 60:21
61:10 89:12
128:12 133:2
141:4,25
142:16 144:5
145:17 146:20
148:6 161:7
163:25 167:14
170:7,15
171:20 173:14
174:23 175:2,8
177:24 178:7
181:10,20
185:22 199:7
210:4 212:4
254:11,20
267:7,16
270:12 274:15

276:12 277:22
**2023**   13:4,21
41:11 43:4
46:2 60:11
187:18 192:19
194:13 199:12
203:1 214:11
220:23 222:3
224:7,23
228:18 229:14
232:22
**2024**   28:24
29:25 72:11
73:3,8 86:5,14
87:7 89:12
90:1,4 96:23
96:24 112:6
198:18
**2025**   1:13 3:7
7:3 298:3
**212-589-4200**
2:14
**214**   5:4
**21st**   181:10
**22**   88:14
202:11
**221**   6:12
**22393**   297:19
**229**   5:6
**22nd**   66:14
181:10 185:1
**23**   39:18 78:15
78:20 115:22
118:13

**23rd**   2:9
**24**   59:2,17
**247**   5:9
**249**   6:16
**24th**   93:12
121:6,14
125:21 241:7
**254**   5:11
**25th**   241:7
**267**   5:13
**26th**   199:12
270:12 274:15
**27**   6:2 80:19
113:3 140:14
140:15 144:17
147:2
**270**   5:15
**274**   5:17
**276**   5:19
**277**   6:6
**27th**   117:25
224:23
**28**   105:25
107:3,19
140:14 202:21
202:22 203:3
224:4
**285**   3:12
**288**   5:22
**29**   145:16
202:20
**292**   5:24
**295**   3:13

**2:11**   169:15,16
**2:26**   169:16,20
**2a**   10:16 94:2
94:13,19 95:25
99:1,21 100:2
100:14 101:14
101:22,24
102:11,19,22
103:10,21
119:2
**2b**   10:9 47:17
56:3 94:2,18
94:18,19 96:2
96:3,9,10,11,19
96:20 105:6
106:7 108:13
108:22 109:4
109:17 110:20
111:2 112:6,14
112:16 115:7
119:2 125:19
167:10,25
168:15,19
169:5 172:11
172:17,22
175:12 176:20
178:18 179:9
180:12,13
185:11,17

**3**

**3**   14:11,12 20:9
21:20 24:11
25:5 26:17,21

[3 - 797995]                                                            Page 4

27:7,8,13
31:18 33:11,20
33:25 38:17
41:23 57:12
65:21 80:25
82:25 83:1
85:3 90:9,13
91:4 113:19
127:20 168:2
169:9 171:23
184:24 185:6
186:9,22 244:9
269:20 270:1,2
271:4,7 277:17
280:1,12
281:16
**3/8/23**  5:4
**30**  1:11,13 3:2
  3:7,15 4:4 7:5
  10:25 14:4
  53:22 91:4,10
  127:23 169:18
  182:2 201:20
  245:7 298:5,16
  299:2 300:2
**3000**  2:4 3:6
**303-298-5700**
  2:5
**30th**  7:3 142:16
  148:6 209:3
**31**  189:23
  193:16 200:10
**32**  58:7 176:2

**35**  10:25
**360**  30:19 90:6
**3:16**  201:17,18
**3:30**  201:18,22
**3rd**  132:8
  203:13 254:11
  254:20

**4**

**4**  14:12 22:17
  39:14 41:13
  80:25 119:12
  127:23 169:15
**4/2022**  5:9
**40**  3:16
**403**  272:14
**41**  2:9
**41922**  5:23
**430**  278:1,6
**45**  2:13
**483**  6:8 170:21
  170:23,25
  171:2,3,13
  174:6
**483's**  180:6
**4:36**  245:4,5
**4:55**  245:5,9
**4th**  170:7
  277:22

**5**

**5**  32:8 45:20
  46:18 64:18,19
  90:24 162:9
  169:18 201:14

201:17 203:19
  277:7 296:7
**5/15**  4:9
**5/16/20**  4:9
**5/24/19**  4:5
**5/5/22**  5:13
**50,000**  106:18
**519**  133:3
**54**  3:19
**55933**  97:1
**55937**  4:8
**56**  3:21 6:2
  180:22,23
**570**  247:23
**571**  248:22
**5:41**  277:9,10
**5:51**  277:10,11
**5th**  97:5 99:7
  100:17 267:6

**6**

**6**  1:11 3:2,15
  4:4 7:5 14:4
  53:22 78:11
  91:4,10 127:23
  169:18 182:2
  201:20,20
  245:4,7 257:4
  298:5 299:2
  300:2
**618**  177:21
**62**  3:23
**64**  3:24

**646-453-4026**
  2:10
**65**  4:2
**66**  6:4 173:10
**6:14**  296:3,6

**7**

**7**  150:19
  182:12 202:7,9
  202:10 245:7
  296:3,3,7
**7/26/22**  5:15,17
**7/3**  4:7
**7/5/19**  4:7
**709522**  4:20
**74**  6:6 277:14
**740325**  5:9
**740571740571**
  5:10
**745**  197:25
**746**  197:11
  198:1 286:4
**76**  6:7 169:23
  169:24 174:6
**7624582**  298:5
  299:2 300:2
**771234**  4:18
**780130**  293:7
**792**  5:3 199:11
  199:15
**796704**  6:3
**797948**  13:16
**797995**  3:18

**[7th - action]**

**7th** 177:3 293:5

**8**

**8** 3:11 96:11,15
  96:23
**8/2/22** 5:19
**8/24/21** 4:17
**80202** 2:4
**818** 254:20
**84** 6:10 201:24
  203:8
**85** 6:12 221:21
**86** 6:14 160:20
  160:21
**898034** 6:9
**8:21** 294:2
**8th** 167:14
  214:11 220:23

**9**

**9/3/21** 6:11
**9/30/2025**
  298:5 299:2
  300:2
**91** 4:3
**93** 4:5
**96** 6:16 249:20
  251:6
**97** 4:7
**971** 59:10,11
**98** 60:2
**986202** 5:14
**986405** 5:16

**a**

**a.m.** 3:7 53:20
  53:20 91:2,2
  294:2
**abc** 257:4
**aberrant** 12:19
**ability** 20:11
  21:19 23:8
  24:10 29:24
  30:3,24 102:8
  187:10 243:4
  252:11
**able** 22:17 72:1
  134:15 136:23
  163:11 174:11
  178:21 193:2
**above** 156:24
  175:24 176:8
  273:18,25
  293:3,25 298:6
  300:7
**absent** 200:9
**absolutely** 30:2
  83:19 86:16
  123:4 136:15
  139:17 166:1
  186:19 211:2
  235:13 252:22
  253:25
**absolutes**
  207:17
**abstract** 141:25
  247:25 248:8

  248:17
**academic** 145:9
  216:6 279:8
**acc** 13:20
**acceptable**
  24:13 186:13
**accepted** 132:5
  295:16
**access** 94:3,25
  200:9 283:11
**accomplished**
  32:12
**accordance**
  179:3 215:19
  218:5
**account** 27:24
  34:24 209:4
  285:13
**accountable**
  27:17
**accuracy** 60:3
  222:15 226:9
  234:6,11 298:9
**accurate** 13:17
  13:18,21 17:3
  56:5 57:12
  124:17 152:25
  223:4
**accurately**
  235:14
**accusation**
  274:2
**accusations**
  129:7 209:11

**accused** 236:24
  266:7,10
**accusing** 66:21
  66:22,23 76:13
  76:16 237:1
  266:20 268:10
  269:25 273:6
  273:16
**achieve** 88:5
**achieved** 88:5
  90:11
**acknowledge**
  220:17
**acknowledged**
  203:16
**acknowledge...**
  300:3
**acknowledg...**
  298:12
**action** 17:17,24
  18:3,9,11,13,17
  18:21 19:3,4
  19:13,25 20:4
  20:6 23:21
  27:5,10,17,25
  28:21,24 29:4
  29:5,13 30:13
  31:10,13 32:2
  32:8,12,22,25
  33:6,18,23
  34:6,7,10
  36:19,25 37:5
  37:7,10 38:8
  39:25 44:4,23

**[action - addressed]**                                                          Page 6

| | | | |
|---|---|---|---|
| 45:2,17 46:15 | 154:24 157:19 | 283:17,22 | 216:12 217:6 |
| 47:14,16,23 | 158:22,24 | 297:16,17 | 219:8,10,13,14 |
| 48:12,15,19 | 159:1,8 163:24 | **action's** 60:21 | 219:20 220:19 |
| 49:7,9 50:7,12 | 165:8,12 | **actionable** | 230:20 237:20 |
| 50:21 51:3,13 | 171:12,17,18 | 194:22 | 239:25 272:13 |
| 52:15,16 54:2 | 172:15,20,25 | **actions** 31:16 | **ad** 295:2 |
| 54:20 55:4,25 | 173:5 175:4 | 37:15 74:24 | **add** 38:19 |
| 58:18 60:15 | 178:15 181:15 | 87:3,13 102:1 | 85:14 109:5 |
| 61:9,21 63:15 | 184:1,16 | 139:10 190:6 | 125:25 200:25 |
| 63:24 64:25 | 205:24 207:3 | 195:18 252:10 | 258:13 |
| 66:7 68:19 | 207:23 208:14 | **activated** 85:16 | **added** 257:25 |
| 69:5,12,18 | 208:24 209:18 | **active** 25:16 | **addendum** |
| 76:19 85:24 | 209:22 210:7 | 189:21 232:21 | 199:11,11 |
| 86:23 88:25 | 210:25 212:6 | **actively** 73:14 | **addf** 128:11,15 |
| 89:5,11,17,21 | 212:21 213:17 | 200:13 | 128:20,25 |
| 92:15,24 93:2 | 216:3,17 | **activities** 72:18 | **adding** 258:9 |
| 94:12,18 95:14 | 217:19 218:14 | 74:24 85:16 | **addition** 67:25 |
| 98:5,18 101:20 | 219:25 222:17 | 263:25 | **additional** |
| 102:10,17 | 222:25 223:3 | **activity** 25:22 | 49:18 61:7 |
| 103:16,19 | 226:10 228:20 | 45:5 46:12 | 86:20 87:5,13 |
| 104:4 106:6,12 | 229:5 234:12 | 51:6 72:24 | 177:22 178:6 |
| 107:6 109:16 | 239:15 240:5 | **acton** 12:18 | 233:15 257:14 |
| 110:8,20 | 246:12,17 | **actual** 11:13 | 258:14 260:9 |
| 116:18 119:21 | 247:1,2,4 | 112:13 135:22 | 290:1 293:11 |
| 129:16 130:6 | 252:7,13 253:9 | 137:6,13 | 294:15 |
| 134:10,17 | 253:13,22 | 143:14 221:6 | **additionally** |
| 136:12 137:23 | 254:17 257:21 | 273:17 | 215:24 |
| 138:7,23,24 | 260:10 261:9 | **actually** 25:12 | **additions** 300:6 |
| 139:13,19 | 261:17,21 | 40:14 64:19 | **address** 21:24 |
| 145:11 146:18 | 265:1 266:6 | 68:23 72:18 | 21:24 164:10 |
| 146:24 148:11 | 271:15,17,22 | 85:13 126:4 | 252:21 284:25 |
| 148:18 149:7 | 272:5 275:7 | 129:5 132:7,12 | 291:2,18 |
| 150:3 152:7,22 | 276:23 277:15 | 135:17,19 | **addressed** |
| 153:13 154:1 | 277:20 281:18 | 147:24 206:12 | 75:19 |

**addresses**
155:2
**adjustments**
290:22
**administer**
297:5
**administration**
6:8 117:21
170:3
**administrations**
24:18,25 82:16
166:19
**admitted** 159:2
160:17
**adrian** 1:4 2:17
3:19 7:7,20,24
8:15 54:15
66:1 298:4
299:1 300:1
**adulterated**
248:25
**adverse** 25:1,11
82:17
**advice** 36:2,15
37:18,19 38:25
39:5,10 89:7,9
292:5
**advise** 122:24
246:8
**advised** 247:5
**advising**
246:21,22
**advisor** 97:11
104:16 115:13

**advisors** 131:6
292:5 293:21
**advisory** 55:17
92:23 93:4
97:15,18,20,24
98:3,6,9,11,14
98:21,22
108:19
**affect** 187:10
213:17
**affected** 29:12
212:20
**affiliated** 250:8
262:19 263:20
**affiliation**
295:22
**affirmative**
264:25
**aforemention...**
178:9
**aforesaid**
297:11
**afraid** 109:11
**age** 126:23
**agency** 175:7,8
175:24
**aggregate**
270:19
**aggregation**
12:21
**aging** 4:24
142:2 156:14
156:25 157:16

**ago** 25:15 26:6
70:4 123:9
133:10 150:6
164:23 186:5
210:24 227:12
254:16 259:5
**agree** 42:3,18
130:2 159:15
178:2 233:15
**agreed** 20:14
76:2
**ah** 30:10 124:4
252:16 281:4
**ahead** 23:16
89:7 93:16
184:24
**ai** 157:4
**aisen** 100:19
101:8,21 103:6
103:20
**akin** 17:7
**al** 4:22 7:7,8
144:9 156:15
298:4,4 299:1
299:1 300:1,1
**alarming**
123:10
**alerted** 123:9
123:16
**aligned** 139:7
**allegation**
110:14 199:22
249:12

**allegations**
3:17 6:10,17
9:12 10:2
41:19 42:4
43:5,7 45:11
45:23 47:9
51:4 68:16
70:14 75:13
76:4 121:6
123:12,17
124:21 125:1,6
125:18 134:25
138:2 140:2,5
140:17 142:11
143:12 146:16
147:1 151:5
154:23 155:3
186:25 189:23
191:5,8,17
193:16 196:1
196:11,23
197:5 200:11
203:14 204:4
216:1 222:6
223:9,13
226:20 234:14
238:11,16,24
239:5 241:19
241:25 242:5
246:3 249:24
252:14,21
260:7 263:7
273:17 279:7
281:6

**[allege - anybody]** Page 8

**allege** 60:14
**alleged** 39:24
54:19 110:20
244:13 253:14
264:16
**allegedly** 61:3
67:9 102:9
**alleges** 256:5
**alleging** 63:18
216:4
**allergy** 24:20
**allotted** 298:19
**allow** 35:16
38:15
**allowing** 34:22
**allows** 126:25
**alluded** 203:16
**altered** 46:2
156:16
**alzheimer's**
6:15 12:12
19:17,18 26:14
27:1,19 46:24
59:20 60:2
101:10 104:17
108:20 111:1
119:8 128:18
130:4,22
144:10 156:17
160:25 161:3
168:10 232:24
247:14 256:9
267:9 271:1
283:18

**amanda** 2:8
**amend** 43:23
**amended** 6:6
27:9 66:8
87:23 88:3,9
88:18,23
198:18 277:15
277:20
**american** 250:5
**amount** 102:4
135:21 136:3
137:9,14 194:7
**amyloid** 144:10
**analogy** 133:14
**analyses** 48:6
99:15 100:2,14
141:9 173:2
174:18 175:11
175:13 176:12
178:6 186:1
**analysis** 32:22
49:9,23 51:8
87:25 99:22
100:10 111:21
111:24 112:13
113:8,18
119:14 172:3
176:22 183:15
183:19,21
184:3 185:17
285:7
**analyze** 102:19
103:9

**analyzed** 49:23
52:18 100:24
131:7,8 177:5
185:11
**ancova** 292:24
294:7
**andrew** 6:5
177:4,16
**anecdotal**
241:5,10
**animal** 113:22
115:17
**announced**
73:3
**announcing**
257:20 258:19
261:9
**anolytes** 106:1
176:4,9
**anomalies**
162:13
**anova** 292:25
294:7
**answer** 11:20
16:17 17:18,20
20:19 26:5
32:19,20 35:23
36:21 37:3,19
37:20,21 38:4
39:1,2,5 43:23
49:13 65:12
69:15 75:6,9
76:14 89:6,8
89:14 107:21

113:2,2 116:15
121:11 134:13
134:15 138:10
147:22 149:25
153:7 155:16
158:18 181:17
190:25 191:14
191:19,20,25
197:8 206:15
207:7,9,12,18
207:25 209:8
209:24 210:1
210:11,13,14
211:13,14,17
212:9,11,17
213:11,19
228:7 232:4,17
234:24 240:15
242:18 246:23
256:22 258:4,8
258:25 262:19
262:20 273:10
280:3 285:3,9
**answered**
75:14 253:15
**answering**
17:12 92:6
155:25 212:10
212:11 235:13
**antibodies** 46:4
**anybody** 18:24
68:14 121:18
127:11 244:22
262:20 266:11

280:19
**anytime** 33:1
  192:21
**apart** 155:11
**apologize** 168:1
**apologized**
  167:19
**apology** 169:3
  169:9
**apoorva** 161:6
**appear** 93:10
  105:5 145:17
  151:13
**appearances**
  2:1 7:17
**appeared**
  110:20 151:1
  222:4
**appearing** 7:22
  8:3,4
**appears** 17:7
  93:9 97:3
  98:25 104:9,23
  104:24 108:11
  108:21 117:24
  121:4 128:9
  133:3 156:13
  160:24 161:18
  162:3 170:10
  172:7 173:13
  188:16 214:10
  214:15 215:1
  216:21 229:12
  229:17 249:21

251:15 267:6
  270:11 274:12
  274:12 276:9
**appended**
  300:7
**appendix** 66:3
**applicable**
  215:20 298:8
**application**
  118:9 119:23
  120:21
**applied** 176:3
**apply** 120:12
**appreciate**
  39:22 294:25
**appropriate**
  3:1 36:24
  123:4 124:20
  125:3,3,22
  126:18 157:19
  158:21,24
  167:22 225:20
  234:1 249:2
  290:16,21
  291:24
**appropriately**
  146:2 150:12
  169:10
**approval** 137:2
**approved**
  120:20 137:7
**approves**
  229:24,24

**approximately**
  14:23 15:5,13
  28:25 39:23
  72:5
**april** 161:7
  163:25 167:14
  198:18 267:16
**areas** 130:9
  151:12
**arguably** 233:4
**aric** 2:12 8:5
**arising** 217:19
**arm** 96:4 102:3
**army** 262:14,14
  263:1,6 264:9
  264:15,24
  265:7,22,24
**arnold** 4:10
  59:21 60:3
  104:10,14,15
  104:24 105:5,9
  105:9,15 106:7
  106:22 107:10
  107:18
**arrived** 117:2
**article** 6:14
  129:5 140:24
  141:5,12,18,21
  142:22 150:14
  150:16,18
  152:1,2 160:25
  161:2,11,22
  162:7,25
  163:12 165:23

187:17,22
  222:4 224:2
  230:5,7,11,15
  232:9,23
  267:14 272:23
  273:16
**article's** 145:7
**articles** 41:20
  44:5 67:17
  142:25 143:20
  148:22 151:10
  153:4,17
  222:16 226:9
**articulated**
  88:24
**artifacts**
  151:20
**artificially**
  27:22
**aside** 18:7,19
  34:5 44:4,19
  56:23 61:18
  64:2 79:18
  80:11 81:2
  132:23 207:1
  248:11 249:18
  260:2 266:5
  270:8 272:10
  274:7 275:14
  277:6 280:10
  280:16
**asked** 20:20
  75:15 76:4
  108:22 140:4

140:19 166:2 190:21 196:20 204:5 219:16 227:16 233:2 287:7 288:1 289:12

**asking** 43:3,4 47:5 54:12 77:16 80:2 89:22 153:19 155:25 180:3 207:15,17 210:1 212:16 225:12 231:12 237:8 255:10 256:2 271:25 276:1 280:15

**asks** 42:18 105:8 109:4 271:13 290:20

**aspect** 102:6

**assays** 46:25 172:4

**assert** 192:10 192:14

**assertion** 115:5

**assertions** 46:2 115:7 118:17 120:5 249:9

**assess** 88:4

**assessment** 151:11,23 199:25

**assessments** 200:10

**assist** 190:24

**assistance** 190:15,21 191:14,16,21 192:1,6

**assisted** 190:22

**assisting** 191:11

**associate** 189:16 198:11 286:24

**associated** 11:12 265:12

**assume** 81:7 210:3

**assuming** 293:15

**assumption** 22:12

**attached** 231:14 298:11

**attaching** 254:12

**attachment** 5:12 229:17

**attachments** 5:7

**attack** 132:10 237:16

**attempt** 46:21 46:22

**attempted** 179:21 180:11

**attempting** 200:13 252:21

**attended** 19:10

**attention** 30:10 57:21 99:6 181:23 277:25 289:3

**attorney** 7:17 88:20 116:3 274:20 297:14 297:15 298:13

**attorneys** 14:21 15:1

**attract** 252:11 252:12

**attributed** 23:1 239:10,11

**audit** 6:2,2 172:3 174:16 174:22 175:9 175:24,25 176:8 178:8 181:1,2,2,9,12 181:19 182:2,6 182:8,12,15 183:6 184:2,15 184:18 185:9 186:12 199:7 287:8,12,21

**auditor** 182:17

**audits** 184:21

**augment** 88:15

**august** 28:24 84:10 89:12 90:1 98:2 121:6,14 125:21 238:6 241:6,7,7 245:25 266:8 276:12

**authentic** 222:22,24 223:1

**author** 12:2 109:5 131:17 141:22 151:9 151:18 218:17 220:12 221:11 256:15 294:8 295:10

**author's** 154:10 220:13

**authored** 140:24 141:6 141:12,16 142:3,17,18 148:3 269:3

**authoritative** 98:23 232:6 233:3

**authorities** 145:9

**authority** 149:1 179:4 189:6 229:25 232:7,8

**[authority - barbier]**

234:3
**authorize**
  18:11
**authors** 57:5,6
  84:22 115:19
  141:18 142:7
  143:11 151:5
  157:1,14 159:2
  160:2 248:25
**authorship**
  293:17
**available** 46:25
  51:22 60:23
  157:5 187:9
  204:6 206:22
  298:6
**avenue** 2:9
**avoid** 271:13
**avoided** 278:19
  279:22 281:25
**await** 145:10
  228:19
**awaiting**
  158:20
**awarded** 136:3
  136:4 137:11
**aware** 11:25
  18:18,23,25
  46:14 54:3
  57:10,16,23,24
  61:23 62:9
  75:10,18,22
  76:15,18 83:12
  84:20,23 86:3

88:2,7 102:9
104:2,5 110:18
112:5 126:5
127:8 129:20
133:24 134:6
145:6 156:24
157:16 170:14
171:16 172:15
172:20,25
173:5 174:2,2
174:3 175:7
184:13 185:12
187:17,20
190:15,22
195:5,9 196:18
197:3,7 227:25
229:2 230:3
231:13 247:3
251:8,21
260:20,22
261:4,6,19
262:2,25 264:8
264:12,13,13
264:14 266:14
266:18,23,25
284:10,20
285:12,15
**awareness**
  251:24
**awesome**
  224:24 227:2
  227:11,15
**awu** 2:15

**b**

**b** 1:11 3:2,15
  4:4 7:5 14:4
  53:22 84:17
  91:4,10 111:25
  127:23 169:18
  182:2 201:20
  214:2 245:7
  298:5 299:2
  300:2
**back** 21:21
  28:19 32:1
  33:18,20 39:15
  51:14 53:5,23
  56:2 65:9
  74:22 78:10
  83:3 91:5
  115:25 116:8
  118:4 127:24
  143:14 146:17
  147:2 148:19
  168:8 169:19
  193:12 201:21
  203:21 213:25
  217:10 232:1
  235:15,17
  245:8 260:12
  262:17,23
  277:11 278:3
  279:5 282:11
  291:3,7 293:4
  293:21 294:15

**background**
  151:12,19,21
  200:24
**backup** 52:18
  56:5 295:6
**bad** 57:19
  140:18 167:7,7
**badly** 88:19
**baker** 8:5
**bakerhostetler**
  2:13
**bakerlaw.com**
  2:15
**balance** 33:10
**balanced** 163:1
**barbara** 4:8
  97:4,8,8,10
  101:4
**barbier** 1:9
  2:12 4:5,17,20
  5:20 8:6 30:18
  58:3 75:20
  90:5 93:10,19
  95:6 117:1
  121:5 122:21
  123:9 124:1
  128:11 132:9
  162:18 203:15
  208:9 224:24
  227:1 248:7
  249:8 251:15
  255:12,21
  256:3 261:1,2
  261:2,8,13

282:22
**barbier's** 18:12 94:7 237:24 252:20
**barry** 30:19 90:5 224:23 225:3 226:25 227:13 243:16
**base** 77:24 126:18
**based** 19:13,25 22:14 35:20 36:2,15 44:20 46:24 56:17 66:17 67:12 101:12 118:19 126:20 136:23 137:7,7 157:4 166:13 176:7 188:23 210:2 212:12 215:3 219:12,12 240:2 249:13 255:20
**baseless** 238:16
**baseline** 290:17
**bases** 27:4 29:3 29:6,13 42:9 45:16 47:13 55:23 61:22 63:18 65:2 66:18 78:15 81:3 82:7 84:7 84:24 86:8,15

88:9 89:5,11 89:16,20 123:15 154:24 273:6 274:2
**basic** 21:17 196:19 236:24
**basically** 19:15 21:17 230:21
**basing** 159:20
**basis** 36:5 39:4 50:17,18 51:11 56:14 66:24 69:12,18 70:7 77:25 78:5,6 80:6,10 82:5 84:16 116:22 124:10,11 155:23 184:22 209:8 216:7 264:6
**bastings** 117:24
**bates** 13:16 40:14 59:5 93:7 97:1 104:7 108:8 117:15 121:2 128:9 173:10 188:10 214:8 229:10 247:7 249:20 254:8 267:4 270:8 274:8,9 276:8
**baumunk** 2:17 7:13

**bean** 5:7
**bearing** 31:2 188:10
**began** 52:15 72:7
**beginning** 13:15 55:11 89:16 91:21 93:15 150:17 173:14 189:19 272:18 279:25 284:23
**begins** 41:14 55:8 128:25 156:23 254:19 276:11
**behalf** 2:2,7 7:19 8:3,4,6,23 14:16 16:15 17:3,21 41:10 182:5 210:9 212:10 220:25 248:7 249:8 257:5 267:11 270:13 272:12 275:12 277:3
**behavior** 80:17
**behest** 74:19 206:11
**belief** 23:6 49:18 67:11 79:5 82:6,9 125:18 229:8 240:2 242:4

**believe** 7:21 10:10,21 13:17 13:21 14:10 33:6 34:11,13 37:8 47:17,20 51:11 56:14 59:15 66:14,24 67:22 77:25 78:3,4 80:6 81:11,14,16,17 82:5 83:4 93:20 94:14 95:21,22 96:22 97:23 98:8 100:21 101:13 104:15 111:10 111:19 124:22 134:5 143:10 147:10 162:8 166:24 170:20 170:22 171:7,7 174:9 179:23 180:8 184:20 185:20 190:22 191:23 195:5 196:19 203:17 204:12 206:24 224:21 225:8 227:4 231:15 233:22 241:5 277:14 280:19 282:13 289:8 289:18

**[believed - board]** Page 13

**believed** 36:11 51:9 56:6 69:25 76:21 77:17 81:13,16 111:2 129:7 162:13 238:15 289:19

**believes** 13:1 34:20 169:9

**believing** 82:8

**benefit** 26:11 26:13 32:22 87:24

**benesch** 5:13 5:15 36:3,15 68:22 69:25 255:25 256:24 267:11,19 270:12,12 272:11 274:14 274:14,20 276:10 277:2 282:8

**benesch's** 69:17

**best** 126:17 251:22 255:20 290:21

**bet** 124:16

**better** 112:7,11 185:21 194:6 200:13 229:25 232:11 263:25 273:18 291:13

**beyond** 154:17 192:4 206:11 208:2 225:10 243:7

**bias** 95:2 102:8

**big** 20:5 55:5 186:10

**bik** 39:8 272:15 273:7,16 274:2

**bik's** 272:24 273:20

**billion** 84:9 256:7 257:4,5

**bind** 45:25

**binder** 9:20 13:15 40:15,16 92:12 202:9,10 202:21,22 277:14,17

**binders** 17:1,8 17:12 91:17

**binds** 156:15

**bioactivity** 11:11

**biochemical** 12:15

**biography** 97:12

**biomarker** 41:24 46:24 47:10,18 48:1 51:8 55:17 56:3 104:20,25 105:6 107:16

174:17 178:18 183:14,21 184:3 186:1

**biomarkers** 46:23 99:23 107:22 119:6

**biotech** 31:25 98:19 130:3 163:8

**bit** 262:8

**black** 27:21

**blame** 239:6

**blamed** 238:11 238:23 239:3,9

**blank** 112:22 113:25

**blind** 3:25 64:6

**blinded** 25:4,5 47:1,24 48:3,6 48:23,23 49:14 50:17,18 51:10 51:15 56:7 59:19,21,24 60:5 64:20 94:20 95:4 96:4 102:3,7 107:23

**blinding** 94:4

**blood** 46:23 59:19

**blot** 41:19 42:21 43:10 44:12,13 45:1 141:3,7,14

151:10,12 172:3 173:1 183:2 197:19 197:21 198:13 205:25 206:7 207:2,22 286:11 287:1 287:17

**blots** 45:6 145:6 197:18 203:21,25 204:14,23 205:9,16 206:21 286:10 287:23 288:19

**blotting** 46:5

**blowers** 249:24

**blue** 63:2

**board** 4:5 17:25 18:4,7 18:10,15,20,24 19:10 25:3 55:18 68:9 70:7,11,21 71:7,9,14,19,20 71:22 72:21 82:21,21 90:14 90:16,20 92:23 93:4,11,19 97:15,18,20,24 97:24 98:3,5 98:14,21 101:9 108:19 135:24 135:24 136:19

**[board - burns]** Page 14

136:21 137:12 139:5 212:15 229:23 252:13 260:19

**board's** 98:11 181:23

**boards** 98:6

**bodies** 98:7

**body** 10:17 14:2 25:15,17 29:9 38:20 46:11 47:6 67:25 98:23 103:24 106:11 109:22 110:11 120:2 129:18 143:15 146:8 229:24 230:22 231:2 232:6,10 232:15

**bolded** 92:1,2,8 247:24

**bonnie** 3:7 7:15 297:4,20

**bonus** 135:8,12 135:13,25 136:3,4,6,6,14 136:18

**bonuses** 137:16 137:20

**book** 266:18

**bordey** 11:16

**bordey's** 283:16

**borne** 269:17

**bother** 51:14

**bottle** 167:2

**bottom** 46:17 58:8,12 63:8 66:11 101:3 104:24 128:24 148:7 170:24 171:20 194:10 198:8 276:12 286:5 294:5

**box** 211:8

**brain** 46:9 47:2

**bravard** 2:3 8:3 15:8

**breach** 215:15

**break** 53:16 90:24 127:18 201:15 235:16 244:25 245:1 277:7

**breakdown** 279:23

**breaking** 169:12

**breakthrough** 4:15 58:13 59:14 117:21 118:9,18 119:23 120:19

**bredt** 1:6

**breed** 27:20 28:5,14

**bring** 33:1 34:9 138:24 139:19 148:17 152:22 159:8 189:2 213:17 258:15 271:15,22 272:4

**bringing** 17:16 32:25 33:11,14 34:7,13 48:19 50:7 51:13 69:18 71:21 154:24 165:12 208:24 212:14 212:16,21

**brings** 33:10

**broad** 41:19 70:15

**broadly** 174:1 174:2,3 186:9

**brochure** 167:5 175:14 176:2 176:10,18 178:4,10,19 179:3,5,14

**brochures** 168:14,14,21 180:4

**brodkin** 1:4 2:18 3:19 7:20 7:24 8:16 54:16 75:4,11 76:3 83:14 84:21

**broken** 79:11

**brought** 33:5 37:6,8 44:3,22 45:17 46:15 47:14,17 51:3 55:24 57:20,25 58:21 61:10 68:18 69:5 104:3 107:6 146:24 154:21 155:3 171:16 181:22 208:14 209:22 210:7 212:5 257:5,15 257:16,24,24

**buck** 27:18

**build** 31:22

**bullet** 92:8 145:19,20 287:19

**bulleted** 293:14

**bullets** 92:1,3,8 150:20

**burnham** 162:11

**burns** 1:9 2:12 4:7,10,12 5:22 5:24 8:6 9:8 12:2 18:16 52:5,21 53:12 53:14 75:20 96:13 97:5 99:1 100:17,25 101:12 103:5

**[burns - campbell]**                                    Page 15

104:10,24
105:5,8 108:12
108:21 109:3
109:17 111:1
115:12 119:14
119:17 125:15
137:23,25
138:3,6,12
140:24 141:12
142:3,12,18
144:16 146:25
147:25 148:3
148:12 167:11
244:12,17
261:4,8,12
265:24 266:2
284:2,5 285:1
285:7,13,16
289:4,14,20
290:5 291:7,23
292:14 293:4,6
293:25 294:15
**business**  15:2
20:2,18 79:13
85:22 209:7
243:1,8,12,13
244:10
**buyout**  137:2
137:15

**c**

**c**  7:1 111:25
150:10

**cadence**  262:22
**calculate**  52:8
**calculations**
294:7
**calculus**  134:20
212:21
**calibration**
182:25 183:3
183:17
**call**  21:25 22:6
68:10 140:22
162:3 198:23
**called**  3:4 21:15
22:1,7 42:16
44:10 85:3
96:19 146:6
174:13 187:18
238:12 242:8
245:11 262:13
263:1,3,18
**calling**  20:24
23:7,12 28:1
29:23,23
130:19 254:1,1
**calls**  21:7 22:10
22:13 83:21
208:9
**campaign**
235:20 236:2
236:10,15,19
236:25 238:13
239:1 242:9
244:13 254:22
256:6 260:4

264:17 278:20
282:1
**campbell**  2:2
3:12 8:1,1
11:18,20 13:5
13:19 15:7
16:16 18:22
22:4 23:15
25:13 26:3,23
28:7 29:14
30:16 31:5,11
32:4 35:11,21
37:17 38:10,25
39:3,9 40:17
40:22 42:6
43:12 48:7,20
49:11 50:8
51:18 53:7,17
54:7 56:1 59:5
59:8 60:17
61:13,24 66:10
68:4,8,20 69:6
69:13,19 73:4
73:18 74:2,11
75:21 76:7,23
78:11,18 80:14
81:5,18,23
86:21 87:8
88:6 89:1,6,13
89:22 91:19
92:17 94:15
95:17 101:17
102:12 106:8
107:8 108:3

109:19 110:22
111:4 112:20
114:1,22 115:9
115:24 119:25
120:7 122:19
123:19,21
125:11 127:6
127:14 129:25
131:14 133:15
134:4 135:16
136:8 137:10
138:8 139:1
144:22 145:14
145:21 149:9
149:13,23
150:8 152:12
152:14 153:14
154:17,25
155:24 156:7
158:13 159:9
162:1,23 164:6
164:14 165:14
165:25 166:15
167:13 169:7
169:11 174:19
176:25 179:11
180:16 181:16
184:5,17
187:12 190:8
190:19 191:12
192:13 194:2
194:14,23
196:24 197:6
198:22 200:22

201:9 202:2,20
204:15,24
205:18 206:2,8
206:14,23
207:6 209:23
210:8 211:18
212:7,22 213:6
213:18 216:25
217:21 218:15
219:2,6,11,16
220:2 221:9,18
223:22 225:6
225:15 227:7
228:6,14 229:7
231:10 233:10
233:19 235:10
236:20 237:3
238:14 239:2
240:6,21
241:20 242:10
242:16 243:21
245:1 246:13
247:9,17
249:14 250:10
251:19 252:25
258:3,7 260:11
261:11,22
262:15 263:9
264:18 265:8
266:1,9,22
268:12,20
270:3 271:23
273:8,13,15,22
273:24 274:3

275:22 277:16
278:4 280:14
281:19 282:2
283:4,13,19
284:13 285:22
285:24 286:16
288:1,21,25
289:1,25
291:11 292:3,8
293:24 295:12
296:1 298:1
**cancer** 162:10
**candidate**
  269:18 271:2
**candidates**
  295:4
**cantab** 119:13
**cap** 84:9,11
**capitalization**
  256:8
**care** 263:18,24
**careful** 133:17
  141:1 196:2
  283:21
**carpenter** 3:7
  7:15 297:4,20
**case** 1:3 7:9
  8:15 31:3
  34:10,11,14
  36:7,11 38:6
  38:12,15,18
  57:6 58:21
  60:23 68:24
  83:18 88:1

90:1 110:12,14
130:25 137:18
143:14 146:9
155:6 185:10
199:25 202:23
241:13 242:21
257:15,24
258:15,16,20
266:11,14
269:15 284:19
**cash** 31:21,21
  33:10 135:9,12
  137:16,19
**cass** 25:23
**cassava** 1:9,12
  2:2 3:3,15,16
  3:18,21,24 4:6
  4:8,11,13,14,16
  4:18,20 5:5,8,9
  5:12,14,16,18
  5:21,23 6:2,3,5
  6:9,10,18 7:5,7
  8:3,4,23 9:6,11
  9:19 10:1,8
  11:1,9,14,16
  13:16 14:5,17
  15:17 17:16,23
  18:5 22:3 26:8
  27:17,23 28:20
  28:23 29:17,19
  32:14,21,25
  33:5 34:9,18
  34:19 39:12,20
  39:24 40:3,9

40:14 41:22,23
43:5 44:3,6,8
44:22 45:12,23
47:9 48:14,18
48:21 49:5
51:2 53:4,8,9
53:22 54:19
55:17 58:13,17
58:20 59:3,18
59:22,25 60:14
62:6 63:10,14
64:5,19,23
66:6 67:22
68:1 75:3,7
76:2,25 78:16
81:12 85:23
86:7,14 91:4,9
92:14,22 93:1
93:7 94:11
95:13 97:1
98:12 101:19
102:14,16
103:15,18
104:7 106:5
108:8 109:15
110:19 117:15
119:20 120:3
121:2,5 126:8
127:5,8,23
128:9 129:15
133:3,14,19
134:3,9,16
136:11 137:22
139:12 141:17

146:18 148:10
148:16 158:25
161:4 163:23
169:18 171:11
172:14,19,24
173:4,11,16,24
174:7,15 175:3
176:16 178:14
178:25 179:2,5
181:1 182:18
183:22,25
184:14 185:15
186:2,21,22
187:8 190:12
190:17 191:8,9
191:10 192:9
195:23 196:5
196:10,10,21
198:17 201:20
202:8,10
203:22 204:12
204:16,22,25
205:12,14,15
205:20,23
206:6,16,19
207:3,15
208:14 209:18
209:18 210:6
212:5 213:3,9
213:10 214:3,8
214:21 215:8
215:16,25
216:2,14,21
217:8,11,12,15

217:18 218:3,6
218:11 219:1
219:19,22
220:17,20
221:2 223:19
224:5,8,14,16
224:17 225:20
228:18 229:2
229:10 232:21
233:3,14
234:22 235:4,7
238:23 239:12
245:7,14,23
247:7,24
249:20 250:3
252:6,19 254:8
254:11,20
256:7 258:13
258:22 259:1
259:18 260:4,6
260:7,14
262:12,14
263:8 265:17
266:7 267:4,12
267:20 268:6
268:10,19
269:25 270:9
270:13,20
271:12,15
272:1,8 274:10
275:4,6 276:9
276:19,22
279:19 281:24
282:13,20,24

283:2,6,10,25
288:8 298:4
299:1 300:1
**cassava's** 11:15
12:9 23:20
25:23 27:4
29:3,12 38:21
41:10 42:9
45:16 46:19,20
46:22 47:3,4
47:13 55:23
61:21 63:18,23
65:2 66:18
79:13 84:7
88:22 89:4,10
89:15,20 93:11
115:15 118:8
119:23 163:18
164:2 174:11
181:19 190:10
199:7 205:8
212:21 220:22
221:10,15
228:24 233:8
238:8,21 241:8
269:14 271:14
271:14 273:6
275:11,12
278:11,17
282:12 287:21
**cassava.fraud**
29:8
**cassava0003...**
6:11

**cassavafraud....**
85:4
**castro** 229:13
**categorically**
77:4
**categories**
41:19 79:18
**category** 10:20
42:10 44:3,24
45:10 46:16
47:8,25 51:4
243:14
**caught** 250:25
**cause** 241:17
278:16
**caused** 22:13
29:17,19 84:8
84:25 256:6
269:16
**causing** 252:11
270:1
**caution** 61:14
246:18
**cautious**
127:12
**ccny** 177:23
178:9 183:7
**celebrated**
227:10
**celebrating**
225:3 227:5
**cells** 12:20
**center** 162:11

**[ceo - city]** Page 18

ceo 30:18,19
  58:2 90:10
  95:6 121:15
  122:6,24
  126:10 203:13
  237:19 261:13
ceo's 125:7
ceos 30:19
cerebrospinal
  47:3 100:7
  119:6 175:12
  176:1,9,19
certain 41:24
  47:10 48:1,11
  52:8 71:12
  135:15,20,21
  136:7,24 137:8
  137:8,14
  150:25 206:25
  207:18 222:7
  235:4 282:19
  290:10
certainly 13:20
  30:5 33:22
  35:12 53:1
  68:21 69:8
  82:4 87:21
  133:21 148:14
  159:4 184:7
  193:8 209:4,15
certificate
  297:1
certified
  297:21,21

certify 297:6
cfo 19:9,10
  20:7 112:25
  135:3
cgr 2:11
chain 98:24
  104:24 111:10
  182:16 186:23
  186:24 224:23
  229:16 289:9
  290:1,5 293:5
challenged
  161:5
challenging
  269:21
chance 33:15
  125:2
change 29:4,20
  30:2,17 100:23
  106:1 125:9,12
  193:1 211:21
  290:12,17
  292:21 299:4,7
  299:10,13,16
  299:19
changed
  125:21
changes 29:10
  42:18 298:10
  300:6
character
  44:16,19
characterizati...
  26:4 48:8

51:19 78:19
  106:9 111:5
  114:23 120:8
  131:15 133:17
  153:1 213:19
  217:1,22
  218:16 219:3
  224:13 251:20
  268:21 270:4
  273:9,12 274:4
  284:14
characterize
  217:5 244:21
  271:21,24,25
characterized
  46:18 60:3
  130:10 287:23
charade 3:22
  62:7
charges 30:15
  200:14
charles 162:10
  266:18
check 35:5
  51:14 67:22
  125:22 126:12
  228:12 238:1
chief 11:3
  18:14 157:6
  255:4 270:13
choice 111:14
  188:25 275:7
  276:22

choose 116:2
  186:20
chosen 164:18
chris 15:20
  117:1 224:25
  225:5,8 227:2
  227:13
circumstances
  29:10 30:3
  48:16
cited 46:7
citizen 68:1
  139:25
citizens 11:10
  67:19,21,24
  72:8 75:12
  83:10,11 84:14
  84:17,22 97:23
  98:1 121:14,21
  122:17,25
  123:17,24
  124:16 125:5,8
  140:1 235:25
  236:4 240:10
  241:5,15
  245:25 266:8
city 5:2,4 6:12
  134:23 145:9
  146:9,13,14
  148:25 157:18
  170:11 175:9,9
  175:10 188:17
  189:9,14,22
  190:24 191:6

221:25 222:5
226:23 230:19
233:24 297:3
**city's** 189:11
**civil** 3:2
**claim** 28:5 83:7
216:22 257:4
258:19 266:20
281:23
**claimed** 40:3
55:3 58:18
63:15 64:24
66:7 110:19
**claiming** 19:15
19:15 26:9
42:9 45:17
47:14 55:24
65:3 66:19
77:20 82:1,1
84:8,24 169:5
**claims** 45:24
46:3,19,20
63:10 67:23
86:13 112:18
187:11 216:16
219:24 257:3,5
257:15 258:15
259:2
**clarick** 2:9 7:19
7:23
**clarify** 203:5
206:5,14
219:16 280:14

**clarity** 66:10
**class** 12:10
216:3,17
217:19 218:14
219:25
**clauses** 218:25
**clean** 166:20
**clear** 80:18
97:22 103:11
103:15 154:19
156:2,4 158:20
165:17 194:11
197:19 198:10
199:25 200:5
250:23 263:20
286:11 288:10
**clearly** 18:15
96:19 121:25
143:9 152:8
186:12 192:23
194:3,5,15
225:21 244:2
273:24 275:23
**clears** 275:3
276:18
**client** 275:6
276:21
**clients** 8:18,18
9:12 10:2
22:13 23:13
26:7 32:15
39:12 54:1
75:8,19,24
76:20 77:17

78:15 79:24
81:12,13,16,22
83:4,7,13 84:8
84:20,25 115:7
115:22 116:17
117:6 133:13
236:3 237:14
237:22 239:14
239:18 240:4
240:19 242:7
242:14,22
243:17 248:8
248:17 249:9
249:13 258:20
264:16 266:5
275:20 281:17
**clin** 295:4
**clinical** 6:16
20:9,13,24
31:22 38:15
41:25 47:11
48:2 49:19
50:12 85:11
165:24 166:3,4
166:12,18
167:1,16 168:5
168:15 179:12
183:19 187:6
230:2 243:5
249:22 250:4,5
250:8 252:12
269:19 278:12
278:16,17,18
278:19,24

279:20,21
280:5,12
281:24,25
**clinicians** 85:24
**clock** 79:11,11
**close** 69:24
178:22 263:19
**closely** 47:2
**closing** 84:12
**cockeyed**
160:12
**cognition**
111:10 112:5
242:2
**coin** 161:21
**collaboration**
48:22
**collaborator**
204:1
**collateral**
269:16
**colleague** 7:22
8:2
**collect** 87:13
**collection** 61:2
**college** 120:13
170:11 175:9
**colorado** 2:4
3:6 7:12 297:2
**column** 247:23
**combination**
255:22
**come** 25:7
28:19 52:20

| | | | |
|---|---|---|---|
| 56:22 57:24 | 138:6 139:13 | **commission** | 246:7 266:3 |
| 65:9 72:20 | 146:18 148:10 | 52:3 | **community** |
| 139:11 146:17 | 152:6 158:25 | **commissioned** | 47:1 95:1 |
| 205:15 235:15 | 163:23 165:7 | 297:5 | 101:11 |
| 235:17 236:5 | 171:11 178:14 | **committed** | **companies** |
| 240:7,16 | 181:14 183:25 | 223:6 | 67:15,16 94:3 |
| 241:12 262:20 | **commenced** | **committee** | 260:21 261:9 |
| 269:7 281:1 | 85:23 88:24 | 68:10 70:3,6 | **company**  8:23 |
| 293:15 | 136:14 172:14 | 71:7,7,11,13,18 | 11:4,24,25 |
| **comes**  82:24,25 | 172:20,24 | 71:19,20 72:21 | 12:25 13:23 |
| 107:19 109:9 | 173:4 175:3 | 135:23 136:2 | 16:15,22 17:3 |
| 111:2 112:16 | 205:23 207:3 | 136:19 137:12 | 17:21 18:20 |
| 114:6 132:24 | **commencem...** | 189:21 195:22 | 19:15,17,20,21 |
| 167:1 213:8 | 297:6 | 196:10 199:22 | 20:17,25 21:4 |
| 233:3 291:14 | **commencing** | 200:1,12 | 22:7 23:5,23 |
| **comfortable** | 3:6 18:21 | **committing** | 23:24,25 24:1 |
| 154:8 165:11 | 23:21 76:19 | 112:22 | 24:3,4,5 26:10 |
| 213:14 | 89:5 94:17 | **common** | 26:25 28:1,2,9 |
| **coming**  72:25 | 106:12 138:23 | 192:10,14 | 28:12 29:8 |
| 213:15 252:13 | 209:18 | 243:20 | 30:11,14,17,23 |
| 253:3 | **comment** | **communicate** | 31:3,7,12 32:3 |
| **commence** | 129:16 163:17 | 75:7 122:11 | 34:6,10,12,14 |
| 17:24 18:3,9 | 222:15 226:8 | 123:1 263:15 | 34:20,23,24 |
| 18:13,17 19:4 | 230:20 234:6 | **communicated** | 35:3,8,14,23 |
| 19:6,12,24 | 234:11 295:1 | 75:11 220:21 | 36:1,4,9,11,17 |
| 20:3,6 27:4 | **comments** | 250:16 251:2 | 37:8,14 38:18 |
| 92:14 93:1 | 120:19 142:19 | **communication** | 38:23 39:7 |
| 94:11 95:13 | 151:24 154:11 | 18:24 123:24 | 44:23 46:14,22 |
| 101:20 102:16 | 165:12 236:8 | 124:20,23 | 48:17,24 50:5 |
| 103:16,18 | 291:2 | 193:10 263:12 | 50:9,10,14,17 |
| 106:5 109:15 | **commercial** | **communicati...** | 50:21 51:9,14 |
| 119:20 129:15 | 216:8 | 16:18 69:21 | 51:21,22,25 |
| 134:9,16 | **commercially** | 138:9 192:11 | 55:3 57:10,16 |
| 136:11 137:22 | 46:25 | 238:9,10,22,23 | 57:20,23 61:1 |

**[company - company]**                                                    Page 21

| | | | |
|---|---|---|---|
| 61:11,15 62:8 | 123:24 124:5,9 | 192:20,20,22 | 243:7,18,20 |
| 62:9,12,20 | 124:21 125:13 | 192:22 193:15 | 244:8 245:11 |
| 64:16 66:22,24 | 125:15 126:2 | 194:3,12 195:1 | 245:19,20 |
| 67:3,15 68:14 | 127:5 129:16 | 195:5,9,12,17 | 246:9,16,22 |
| 68:17 69:3,11 | 129:21 130:3 | 196:3,4,7,15 | 248:7,16 249:8 |
| 69:17 70:9 | 130:21 131:2 | 197:3 198:19 | 250:7,12,15 |
| 72:2 73:9,13 | 132:4,5 134:6 | 199:3 200:19 | 251:1,5,8,24 |
| 73:16 74:3,16 | 134:12,22,23 | 201:1,6,13 | 252:14,14 |
| 74:23 75:19,24 | 135:3,4,19 | 202:16 203:5 | 253:3,6,12,25 |
| 76:9,12,16,17 | 136:7 137:16 | 203:14 205:24 | 254:1,16 |
| 76:20 77:16 | 137:19,25 | 207:4,21,24 | 255:14 257:6 |
| 78:21 79:23,24 | 138:1,4,13,14 | 208:22 209:22 | 258:23,24 |
| 80:1,12,13 | 138:15,22 | 210:10 212:10 | 259:2,11 |
| 81:3,15,21,24 | 139:10,13 | 212:25 213:22 | 260:18 261:14 |
| 82:1 85:1,8 | 140:3,4,20 | 215:12 216:4 | 261:20 262:1,9 |
| 86:19 87:1,5 | 152:5,11,22 | 218:13,23 | 262:25 263:12 |
| 87:18,21,24 | 154:8 155:4 | 220:6,25 | 263:21 264:8 |
| 88:4,5 90:5,6 | 156:6 158:16 | 226:15,16,18 | 264:14,22,24 |
| 90:10 94:12,24 | 159:6,11,14 | 227:5,25 228:3 | 265:3,6,16,20 |
| 94:25 95:6,7,8 | 160:25 161:24 | 228:11,15 | 265:21 266:14 |
| 97:9 98:13,18 | 162:4,21,25 | 230:10,16 | 266:19 267:19 |
| 98:20,23 99:24 | 163:1 164:9 | 231:1 232:12 | 272:12 273:18 |
| 100:1,12 | 165:6,11,22 | 232:13 233:13 | 275:15,17,21 |
| 101:20 102:17 | 167:18,19 | 233:22 234:2 | 275:25 276:4 |
| 104:3,16 106:6 | 168:3,8 169:2 | 235:18,24 | 277:3 279:7,19 |
| 107:5,11 108:1 | 169:4,8,9 | 236:9,12,16,23 | 280:1,11,11,15 |
| 109:16 115:1,4 | 171:4,7,16 | 237:5,16,22 | 280:17,18,20 |
| 116:6,14,16,20 | 178:16,17 | 238:10,12,15 | 280:20 281:6 |
| 117:1,5,22 | 179:7,19 | 238:17,25 | 282:10 284:12 |
| 119:21 120:2 | 180:10,18 | 239:20 240:2,2 | 284:15,18,21 |
| 121:15,18,19 | 181:13 182:5 | 240:7,16 241:2 | 285:6 288:10 |
| 121:20,22,23 | 186:6,19 | 241:18,22 | 288:17 289:21 |
| 122:8,8,13,18 | 190:20 191:17 | 242:4,11,15,19 | 292:4 293:21 |
| 122:20,25 | 191:21,25 | 242:19,23,24 | 295:23 |

**company's** 9:4 9:10 12:3,4 23:2 24:5,10 26:10,12 27:16 28:5 30:21 31:6,8 33:24 35:19 41:25 47:11 48:2,9 48:10 53:13 67:11 73:23 74:6,8,12,17,18 74:19,25 77:12 84:9,11,24 85:8 88:8 90:4 95:16 96:7 97:14 98:10 102:1 106:25 107:16 110:11 120:4,16 122:16 123:15 125:5,9,20 126:17 135:7 135:14,20 137:4 146:23 147:4 148:23 149:4,16 157:23 161:10 161:16 163:19 164:3,12 168:24 169:1 170:17 187:10 192:17 193:23 200:21 201:1 202:12 203:13 204:9 220:9,11 221:12 225:13 225:13,16,18 227:9,16,17,23 228:9 231:6 234:21 242:7 242:13 246:3 246:20 249:12 256:9,17 259:13 278:19 279:21 281:25 283:15 285:4 287:8,12

**compare** 133:3

**compared** 134:2

**compelling** 81:8 142:4 157:7 158:3,8 158:11

**compensation** 135:23 136:2 136:16,19 137:12

**compiled** 61:21

**complaint** 6:6 27:10 39:25 40:6 66:8 69:21 84:2,3 87:24 88:4,10 88:12,15,18,21 88:23 198:18 256:5,14,21 264:9 277:15

277:20 282:7

**complaints** 264:25

**complete** 30:24 123:12,17 124:14 125:1,6 126:14 195:11 211:16 243:5 280:2,12 300:8

**completed** 32:11 90:12 149:8 175:24 227:24 298:16

**completes** 223:15

**completion** 31:18 33:11

**complex** 28:3 70:15 130:5

**comply** 284:22

**component** 119:13

**comprehensive** 223:15

**comprised** 68:12

**con** 103:23

**concern** 4:21 4:25 139:15 144:9,14 145:2 145:24 146:7 146:12,19 147:4,8 148:25 149:6 156:15

157:24 158:1 159:2,7 166:22 190:4 192:23 241:18 273:2

**concerning** 214:25

**concerns** 141:19 142:19 143:10 145:6,8 150:18 151:18 151:22,24 153:6 154:9 156:24 157:17 200:7

**concerted** 275:16

**conclude** 51:25 70:19 72:6 73:7 78:2 80:13 111:21 199:23 268:14

**concluded** 72:9 72:17 73:2,12 157:20 175:25 180:12 296:6

**concludes** 200:1

**concluding** 123:16

**conclusion** 12:21 25:6 36:14 70:10 72:20 81:24 90:11 108:25

**[conclusion - considered]**

142:1 158:11 160:5,7,9,10,15 174:16 176:3 185:12 210:5 219:7 235:18 236:17 240:22 248:22

**conclusionary** 204:5 208:11 208:15,20 212:25

**conclusions** 10:8 42:17 132:19,20 159:18 176:7 192:25 194:4 195:10 229:4 288:3

**conclusively** 270:20

**conduct** 78:17 86:20 87:2,24 175:8 178:5 184:12 208:9 237:2,7,14 248:25 272:25 273:7,17,21

**conducted** 87:2 87:5 99:21 155:14,20 171:5 175:25 177:24 181:4 181:10 185:17 189:21 199:7

218:4 222:7 285:6

**conducting** 71:17 183:18 195:23 239:13

**conference** 244:6 248:9,18

**confidential** 122:9 180:4 214:24

**confidentiality** 223:11,20 224:10,18 225:21 234:15

**confirm** 175:16

**confirmation** 156:16 177:6

**confirmatory** 11:7

**confirmed** 283:17

**confirming** 25:22 45:4

**confirms** 283:22

**conflicting** 6:16 249:23

**conflicts** 249:3 272:25 273:20

**conforms** 10:7 288:15

**confuse** 223:25

**confused** 37:4

**conjunction** 86:17,25 87:17 134:14

**connected** 297:15

**connecting** 23:11

**connection** 97:9 141:15,21 142:24 143:20 148:21 153:3 192:1,11 215:11 216:1 229:21 246:12

**connolly** 36:3 256:24 257:2,9 257:13,16 258:10 259:14 267:11 270:12 274:14

**consent** 167:5 168:17

**consents** 168:13

**conservative** 199:23

**consider** 17:16 74:16 76:20 77:7,24 78:1 79:4,8 87:18 93:2 94:12 95:14,18 97:11 100:12 101:21 102:17 103:19

106:6 107:5 109:16 119:21 129:16,21 134:10,17 136:12 137:23 138:4 139:13 146:19 148:11 152:5 159:1 163:24 165:6 165:24 166:3 171:12 178:17 184:1 185:9 186:11 187:8 198:19 293:11 293:15 295:4

**considerations** 20:2 100:10

**considered** 43:11 77:6,13 77:17,19 95:1 103:23,25 104:3 106:11 106:20 109:20 110:16,16 120:2,3 129:19 137:3 138:17 139:9 152:9,17 157:5 160:4 164:16 181:14 183:20 184:6 184:14 185:2 187:13,15 236:9

**[considering - copying]**

**considering** 55:11 138:13 186:14

**considers** 61:1

**consistent** 49:17 50:1,3 50:19 199:6,9 222:14 287:8 287:11

**constitutes** 268:5

**consult** 18:20 36:17,21,22 92:22

**consultant** 134:22 245:15 245:16 246:4

**consultations** 92:15

**consulted** 37:8 50:15

**contact** 21:6 177:25 255:4 255:14 262:9 262:10,13,16 262:22

**contacted** 163:16 164:1

**contacting** 23:4

**contain** 9:2 60:13 151:16

**contained** 41:20 54:19 60:22

**contains** 9:8 179:16

**contention** 283:20

**contents** 63:20 168:16 194:12 230:6

**contested** 151:9

**context** 33:9 102:23 103:14 110:9 111:9 115:10,17,22 116:6 129:18 135:11 146:12 211:9 233:16 237:18 241:3

**contextually** 133:21

**continuation** 146:1

**continue** 12:25 13:2 25:6 73:10 87:25 142:23 227:24 265:22,25

**continued** 4:1 5:1 216:8 260:8

**continues** 105:19 109:11 144:9 157:14 176:7 177:4 189:23 200:4 215:24 216:11

222:14 223:5 269:14 270:25 272:22

**continuing** 70:24 89:11 192:9,14 276:5

**continuum** 253:2

**contract** 218:25 221:16

**contracts** 196:16 215:16 216:14 217:7 219:22 235:12

**contractual** 77:2

**contractually** 283:9,14

**contradicted** 46:5

**contrary** 63:11 80:5 82:11

**contributes** 12:22

**contribution** 295:5

**contributions** 294:8

**control** 150:25 249:2

**controlled** 94:20 168:2

**controls** 59:20 138:22 151:16

**controversy** 297:9

**convened** 98:9

**convening** 98:14

**conversation** 129:6

**conversations** 133:10 206:16 244:12,16,18 258:10,11

**convey** 218:24

**conveyed** 279:10

**conveying** 221:1

**convince** 230:10

**cook** 15:20 117:2 224:25 225:5,8 227:2 227:13

**cope** 143:10 150:10

**copies** 298:14

**copy** 40:16 160:24 187:19 193:3 194:1 202:24 224:19 241:11 251:15 251:17

**copying** 97:5 128:25 229:13 274:14

**[core - create]** Page 25

| | | | |
|---|---|---|---|
| **core** 79:6 | **corrected** 12:19 | **counsel** 7:6,16 | 297:15 298:14 |
| **corner** 148:7 | 132:22 | 15:24 16:19 | **counsel's** 89:8 |
| **corporate** | **correcting** | 17:2 18:5,6,8 | 153:21 194:25 |
| 31:25 33:2 | 132:12,14 | 18:19 36:4,9 | 285:5 |
| 68:1 112:9 | **correction** | 38:25 39:6,10 | **count** 126:10 |
| 126:4 139:6,7 | 271:13 | 43:16 61:17,19 | **country** 257:3 |
| **correct** 13:7 | **corrections** | 61:19 62:1 | **county** 297:3 |
| 16:5 17:9 26:2 | 139:15 253:2 | 69:22 71:11,13 | **couple** 124:4 |
| 27:11 28:22 | 276:2 300:6 | 72:19 73:2,19 | 132:12 289:9 |
| 39:18 41:12 | **corrective** | 86:11,17,25 | 292:12 295:13 |
| 49:12 52:17 | 157:19 158:22 | 87:16,17,22 | **course** 29:2,11 |
| 71:8 80:24 | **correctly** 72:8 | 89:7,18 90:3 | 29:17 36:25 |
| 88:20 91:14,15 | 73:6 | 90:15 91:14 | 37:10,15 43:4 |
| 91:18,23 92:12 | **correlated** 47:2 | 92:19 126:15 | 74:14 75:16 |
| 92:13 97:16 | **correspond** | 134:15 138:9 | 78:15 84:18 |
| 131:13 137:11 | 92:8 | 138:11,20 | 89:11 98:18 |
| 141:9 142:8 | **corresponden...** | 152:15 153:21 | 105:3 106:19 |
| 143:24 154:16 | 173:19 228:25 | 154:2,13 | 106:19 125:13 |
| 157:15 159:15 | 266:19 | 155:14 165:21 | 150:3 157:9 |
| 167:18 171:8 | **corresponding** | 191:14,18 | 158:24 194:17 |
| 178:24 186:3 | 151:5,8,18 | 192:7 194:20 | 196:3 262:8 |
| 187:4 196:8 | **corrigendum** | 194:24,24 | **court** 1:1 7:8 |
| 203:7,18 | 132:14 141:5 | 199:2 201:12 | 7:14 41:2 |
| 206:17 208:13 | 142:7 157:15 | 205:21 206:11 | 86:12,19 |
| 208:17 220:7 | 160:3 | 206:16 207:15 | 113:14 186:18 |
| 220:21,24 | **corroborate** | 208:4 212:15 | **cover** 39:20 |
| 221:5 228:22 | 260:9 | 212:15 217:15 | 78:12 247:13 |
| 230:12 249:10 | **corroborates** | 220:18,22 | 247:17 |
| 253:2,3 255:24 | 10:7 | 221:15 246:16 | **covered** 258:1 |
| 259:7 264:19 | **cost** 32:21 | 246:21 256:1 | 258:3,5 292:10 |
| 280:9 288:9 | 87:24 100:10 | 258:11 266:14 | **crazy** 66:15 |
| 290:2 297:12 | **costs** 20:6 | 285:6,21 | **create** 33:6,9 |
| 300:8 | 216:16 219:24 | 287:19 289:8 | 33:10,19,21 |
| | | 290:2 297:14 | |

**[created - cv]** Page 26

| | | | |
|---|---|---|---|
| **created** 52:14 | **criticized** 99:18 | 295:9,21 | 222:3,11,15,20 |
| **creates** 33:13 | **criticizing** | **cuny** 143:15 | 223:5,12 224:6 |
| **creator** 143:14 | 134:12 242:14 | 149:7,12,14,17 | 224:18 225:9 |
| **credentials** | **critics** 38:22 | 149:20 170:11 | 225:14,21,23 |
| 97:12 | 76:13,16 162:4 | 177:7,23 178:9 | 226:4,8,14,18 |
| **credibility** 96:5 | 242:19 253:21 | 187:19,23,25 | 226:19 227:5 |
| 194:16 | 254:5,6 258:23 | 188:1 189:6 | 227:17 228:1,4 |
| **credible** 47:7 | 259:1,1,4 | 190:3,11,12 | 228:9,12,20,24 |
| 50:25 51:23 | 260:5 265:1 | 191:11 192:1 | 228:25 229:2 |
| 223:10 226:13 | **cross** 24:2 | 192:11,17 | 230:4 231:3,7 |
| 234:15 | **crr** 3:8 | 193:4,8,8,14,17 | 233:6,16 234:7 |
| **credit** 193:25 | **crutcher** 2:3 | 194:6,12 | 234:16 235:8 |
| 200:19 201:8 | 3:5 8:2 | 195:21 196:9 | 235:12 282:25 |
| **criminal** 30:14 | **crux** 78:21 79:1 | 198:25 199:17 | 283:12 286:2 |
| 31:1 272:25 | 168:9 | 200:20 202:5 | **cuny's** 158:20 |
| 273:7,17,21 | **cs** 298:15 | 202:13,17 | 189:5,8 195:19 |
| **criteria** 187:3,4 | **csf** 55:16 177:5 | 203:6 204:1,3 | 196:13 204:18 |
| 187:5 | **csr** 3:8 | 204:5 208:9,10 | 210:24 222:14 |
| **critical** 159:17 | **ctad** 247:25 | 208:15,19,23 | 225:3 234:5 |
| 183:18 210:22 | 248:9,18 295:3 | 209:2,5,14,17 | 288:3 |
| **criticism** | **cultured** 12:20 | 209:20 210:4 | **current** 175:14 |
| 129:11,24 | **cummings** 4:13 | 211:4 212:3,20 | 176:2 178:4 |
| 130:2,8,11,12 | 5:22,25 108:12 | 212:25 213:4,7 | 227:25 |
| 130:15,16,20 | 108:17,18,22 | 213:8,9,14,24 | **currently** 145:8 |
| 130:25 131:1 | 109:4,8,17 | 214:5,12 215:1 | 206:6 215:9 |
| 131:18 132:1,4 | 110:25 111:12 | 215:10,17 | 280:15,17,20 |
| 132:6,15 | 112:15 113:5 | 216:12,14,22 | **curves** 183:3 |
| 253:25 | 114:6,11 115:2 | 216:22 217:5,7 | **custody** 182:16 |
| **criticisms** | 115:5 131:11 | 217:16,17 | 186:24,24 |
| 165:23 166:1 | 289:5,13,20 | 218:3,11,24,24 | **cut** 43:13 265:3 |
| 240:3 275:19 | 290:5,20 | 219:10,19,20 | **cv** 1:3 7:10 |
| **criticize** 241:2 | 291:12 292:14 | 219:22 220:18 | |
| 242:20 | 293:4,5 294:1 | 220:18,20 | |
| | 294:1,16,16 | 221:2,13,17 | |

**[d - decided]**

| d | | | |
|---|---|---|---|
| **d** 3:9 7:1 111:25 | 131:20 132:20 141:3,9,13,14 141:19 142:5 | 72:1 97:22 118:2,5 121:14 124:11 145:22 | 294:25 300:15 **days** 105:25 107:3,19 |
| **daily** 209:8 | 142:18,21,24 | 171:19 271:3 | 124:18 127:2 |
| **damage** 35:5 209:7 216:15 217:9,18 219:23 225:18 | 144:21 147:1 151:9,11,14,15 151:20,23,23 151:24,25 | 277:23 281:1 299:24 300:12 **dated** 57:11 93:12 97:5 | 175:3 236:5 251:17 298:16 **deal** 143:11 **dealing** 290:11 |
| **damages** 218:13 269:16 271:14,16 | 154:10 157:7 158:3,8,10 161:2 167:10 | 108:12 117:24 121:5 128:12 145:16,17 | **dear** 55:8 101:4 **debate** 130:14 159:13 253:24 |
| **damaging** 79:13 236:8,9 243:4 | 174:11 175:9 175:13,16 176:1,8,19,24 | 147:10,10,11 161:7 175:2,14 178:5,7 199:11 | **debated** 87:21 **debates** 87:22 **decade** 44:9 |
| **data** 6:14 9:3,9 25:3,5,5 52:1 52:23,25 53:3 | 177:7 178:3,6 178:7,18,19 179:9,21,22 180:12,13 | 202:11,25 214:11 254:10 254:20 267:6 270:11 274:15 | **deceased** 280:21 **december** 178:5 292:13 293:5 294:1,17 |
| 55:17,20 56:3 56:9 76:4,13 76:17 77:4 | 186:17 196:5,6 196:7,11 197:5 197:21 199:24 | 276:12 277:22 **dates** 170:6 182:25,25 | 294:25 **decide** 87:25 270:1 |
| 78:22 79:15 82:12,20,22 94:25 95:16 | 207:4 209:11 215:15 216:5 234:22 235:5,7 | 285:10 **datum** 199:21 **dave** 40:17 | **decided** 21:4 27:18 34:9 90:16 92:14 |
| 99:1 100:19 101:15,22 104:20,25 | 238:11,24 242:24 246:3 254:2 263:7 | 59:5 202:24 **david** 1:6 2:7 7:18 | 93:1 94:11 95:13 101:19 102:16 103:16 |
| 105:6,9,15 106:7 107:1 110:20 111:2 | 267:8 270:22 281:10 282:13 282:14,14,20 | **davis** 2:17 7:13 214:11 **day** 8:19 13:16 | 103:18 106:5 109:15 119:20 129:15 134:9 |
| 112:21 113:1 114:4,21 115:5 115:7,15 116:7 | 283:7,10,11 288:8,17 294:9 **date** 18:1 28:25 | 15:2,3 79:12 124:2 178:15 185:1 241:17 | 134:16 136:11 137:22 138:6 |
| 119:17 131:11 | 29:25 57:12 | 291:12,23 | 139:12 140:18 |

**[decided - defamatory]**

146:18 148:10
152:6 158:25
159:7 163:23
165:7 171:11
178:14 181:14
183:25 185:5
186:3,6 199:22
241:15 248:16
**deciding** 89:25
152:22
**decision** 17:23
17:25 18:2,8
18:10,13,17
19:4,6,12,24
20:3,5 27:4
30:12 31:2,10
39:17,23 66:3
86:7 87:6 88:9
110:11 138:24
139:18 148:17
157:19 158:21
187:6 213:17
216:13 217:7
219:21 220:19
225:4 230:6,9
232:20
**decisions** 87:19
294:21
**deck** 62:6 64:16
**decks** 117:8,11
**declare** 300:4
**decline** 84:9
256:6,8

**declined** 84:15
279:3
**deemed** 183:18
300:6
**deep** 200:11,12
**deeply** 16:10
**def** 237:4
**defamation**
17:17,24 18:3
18:9,13,17,21
19:2,4,6,13,25
20:4 23:21
27:4,10 28:2
28:20 29:3,5
29:13 30:13
31:10,12 32:2
32:8,22,25
33:5,18 34:6,7
34:10 36:19
37:5,7 38:6,8
38:12,15,17
39:25 44:4,23
45:17 46:15
47:14,16,22
48:12,15,19
49:6,9 50:7,12
51:3,13 52:15
52:16 54:2,20
55:25 58:18
60:15,21 61:9
61:21 63:15
64:24 68:19,24
69:5,12,18
76:19 83:18

85:23 86:23
87:6 88:24
89:5,11,17,21
92:15,24 93:2
94:12,18 95:14
101:20 102:10
102:17 103:16
103:19 104:3
106:6,12 107:6
109:16 110:2,8
110:12,14,19
116:18 119:21
129:16 134:10
134:17 136:12
136:14 137:23
138:7,23,24
139:13,19
146:18,24
148:11,17
152:6,22
153:13 154:1
154:24 159:1,8
163:24 165:7
165:12,16
171:12,17,18
172:14,20,24
173:4 175:4
178:15 181:14
184:1,16
185:10 187:11
205:24 207:3
207:23 208:14
208:24 209:18
209:22 210:7

210:25 212:6
212:14,21
213:17 237:5
239:15 240:4
241:13 242:21
246:12,17
247:1,2,4
252:6,13
253:23,25
254:17 257:3
257:21,24
258:14,19
261:9,17,21
266:6,7,11,20
268:11 271:18
271:22 272:4
277:15,20
281:18
**defamatory**
20:9 39:12,19
39:24 40:4,8
54:19 55:4
58:18 60:15
61:3 63:15
64:24 66:7
70:1 83:25
88:14 102:10
110:19 116:1
131:22 165:18
165:20 236:8
237:6 239:20
240:24 259:3
266:21 268:4
268:18,24

275:5,25 276:20

**defame** 24:3 259:2

**defamed** 253:8

**defamers** 253:14,17

**defaming** 23:23 26:8 29:7,23 30:11 31:16 35:14

**defendant** 2:2 216:3

**defendants** 1:10 2:12 8:6 19:14 20:10 21:1 22:2 23:1 23:22 26:12 27:18,20,24 28:5 29:7 31:16 34:24 35:6,10 38:22 39:8 57:6 78:21 79:1,5 80:6,7 81:25 82:6,8 83:18 85:7 92:3 115:18,22 130:16,19 186:16 239:15 240:4,13 241:12 243:4 243:24 252:11 256:5 258:20

266:6 278:15 278:20 281:17 282:1

**defenders** 162:21

**defense** 259:19

**deficiencies** 88:20 170:20 170:21 171:6,8

**define** 34:16 70:5

**definitely** 134:25

**definition** 26:19 49:4 114:8 197:21 197:22 230:1 236:14

**definitive** 95:4 200:10

**definitively** 117:7 143:13 153:11 253:6

**delayed** 256:8

**delete** 176:8 284:16

**deleted** 176:11 284:5,18 285:7 285:16

**deleting** 176:19 284:10

**deliberate** 200:8

**delivered** 168:21

**demands** 216:16 219:24

**demonstrate** 24:17 55:16

**demonstrated** 12:18 44:23 79:24 196:22

**demonstrates** 10:18

**demonstrating** 61:3 205:8

**denial** 4:15

**denver** 2:4 3:6 7:12 297:3

**denying** 118:8 119:22 252:21

**department** 6:7 41:10 43:21 155:5,12 170:1 264:10,15 284:1

**depending** 255:16

**depends** 204:20

**depict** 290:16

**deponent** 123:20 152:13 206:17 298:13 300:3

**deposing** 298:13

**deposition** 1:11 3:3,15 4:4 7:5 7:11,22 14:4 14:20 15:18,18 15:22,24 53:22 91:4,10,21 127:23 169:18 201:20 207:9 245:7 252:2 296:5 297:1,10

**deprive** 271:8

**deprived** 269:18 271:2

**derek** 214:11

**describe** 12:25 40:6 78:15 156:5 168:15 237:13,22 242:6,12

**described** 56:18 77:12 110:25 112:18 118:20 120:4 175:13 176:9 176:12,22 193:17 198:20 200:5 215:18 215:18 273:24 279:11,17

**describes** 150:19 256:23 290:10,15 294:6

**describing** 95:6 291:7 292:4
**description** 145:16 151:4 291:6
**descriptions** 201:7
**descriptor** 160:5,7
**designation** 4:15 117:22 118:9,19 119:24 120:20
**desire** 31:14 72:24
**desperately** 26:15
**despite** 82:2
**destroy** 19:20 130:21
**destroying** 284:11
**details** 165:21 197:11 198:3 198:12 208:2,3 286:25 287:16
**detect** 106:1
**determination** 237:9
**determine** 19:3 135:24 143:13 150:2 271:5
**determined** 12:12 141:13

**detractors** 163:10
**detrimental** 85:22
**develop** 98:13
**developed** 12:15
**developing** 256:9
**development** 216:8
**deviations** 112:1
**diagnosed** 60:2
**diagnoses** 47:3
**diagnostic** 58:9
**difference** 112:15 160:6 179:17
**different** 37:9 77:11 80:3 111:22 113:12 113:22,22 115:17,20 126:6,7 130:8 141:22 153:8 160:11 177:6 185:11,21 213:22,25 236:6 243:14 254:4,4
**differently** 36:20 114:19 115:6

**difficult** 107:15 130:5 168:11
**difficulty** 85:10
**digital** 118:4
**diminished** 30:4,8,25 31:17
**direct** 32:17 55:7 99:5 263:10 277:25 289:2
**directed** 175:11
**direction** 136:18 155:20
**directionally** 56:10
**directly** 20:10 20:22,25 52:6 71:21 75:7,19 75:24 177:25 224:5,6
**director** 70:3
**directors** 4:5 18:4,7 68:12 71:9,18 93:11 136:19 137:12 260:19
**disagree** 90:17
**disavow** 234:8 234:10
**disavowed** 194:6 198:25 226:5 227:11 232:10 233:24

**disavowing** 233:7 234:7
**disband** 97:21
**disbanded** 72:22 98:3
**disbelief** 95:15
**disclose** 179:7 180:1 216:5 230:11 236:3 249:3
**disclosed** 43:14 43:20 69:20 92:19 141:18 142:4 155:4,5 156:8 256:18 266:8
**disclosing** 96:12 112:11
**disclosure** 112:7,8 179:20 180:9,15 236:5
**disclosures** 112:10 209:5 272:24 273:20
**discourse** 95:23 131:3 163:10 203:20
**discover** 108:1
**discovered** 13:23
**discoveries** 167:20
**discovering** 50:6

**discovery** 162:11

**discuss** 43:14 76:4

**discussed** 89:18

**discussing** 105:6 122:22 243:24 246:19

**discussion** 98:25 165:20 272:15 292:24

**discussions** 15:23 16:4,19 62:7,10,11,14 62:21 64:15 159:24 165:16 173:22 181:19 181:21 187:15

**disease** 12:12 19:18 27:20 28:3 60:2 108:20 119:8 130:4 144:10 156:17 247:14 256:10 269:17 271:1 283:18

**diseases** 11:12 12:11

**disinformation** 27:25 28:1 256:6 278:20 282:1

**dismiss** 30:13 31:3,10 89:25

90:14 129:11 129:23 130:1 130:11,25 136:17 241:16

**dismissal** 86:4

**dismissed** 28:24 29:20 30:1 31:12 88:12

**dismissing** 86:13 89:21

**disparaging** 128:11 271:6

**disparagingly** 244:7

**dispassionate** 244:2

**display** 141:7

**disproven** 45:25 46:3

**dispute** 244:10

**disseminate** 230:6 261:14

**disseminated** 127:3,13 260:15

**disseminating** 232:6,9

**dissenting** 267:21

**distort** 235:19 235:21 236:2 236:10,15,19 236:25 237:13

237:16,23 238:13,25 239:18 242:9 244:13 254:22 264:17

**distorting** 235:23 237:9

**distortions** 129:9

**distraction** 33:3

**distribution** 4:17 5:12

**district** 1:1,2 7:8,9 86:12

**dkumagai** 2:11

**doctor** 73:25 74:13 94:23 281:8

**doctoral** 198:11 286:24

**doctoring** 74:9

**document** 13:15 14:4 40:13 41:9 55:5 57:10 60:25 61:5,6,8 61:11,19 62:15 62:21 64:5 91:9,13 92:4 93:6 96:25 99:3 104:6 108:8 110:2,17 116:10 117:15

121:1 123:10 124:6 128:8 131:15 155:1 156:21 160:19 169:22 173:9 180:22 188:10 188:13,18 201:24 202:2,4 202:23 214:8 217:1,22 218:16 219:4 220:10,12,14 221:21,22 229:10 247:6 247:21 248:11 249:19 254:8 267:4 270:8 274:8,9 276:8 277:13 289:3 294:14

**documentary** 281:22 282:6

**documentation** 172:1,2 173:6 183:16

**documents** 15:11,16 16:17 16:22 17:1,7 17:11 54:18 62:8 69:20 79:22 91:17 92:7,12 154:18 156:8 205:8 256:17

**[doing - dr]** Page 32

| | | | |
|---|---|---|---|
| **doing** 10:6 | 51:15,16,25 | 119:14,17 | 185:5,11,22 |
| 23:19 26:11,13 | 52:5,5,6,7,21 | 125:15,16 | 186:4,7,16,17 |
| 28:14 87:12 | 53:12,14 55:18 | 131:11 133:25 | 187:2,9 188:18 |
| 98:17,17 | 56:6,11 59:16 | 134:17,21 | 189:24 190:17 |
| 100:10 124:5 | 59:19,21,22,24 | 135:3,7,12,13 | 190:21 191:6,7 |
| 126:6 131:25 | 59:25 60:1,3,7 | 136:4,5,12 | 191:11,14,16 |
| 194:20 196:18 | 63:25 66:14,22 | 137:23,25 | 191:21 192:1 |
| 211:5 243:6 | 66:23 67:1,2,5 | 138:3,6,6,12 | 192:11 195:14 |
| 259:10 263:14 | 67:9,14 73:24 | 139:16 140:4 | 195:24 196:7 |
| 263:23 264:4 | 74:3,7,8,13 | 140:20,24 | 196:12,18,23 |
| 265:7,13,22,22 | 75:4,4,4,11,20 | 141:6,12,12,16 | 197:4,17,20 |
| 265:25,25 | 76:3,3,3 77:2 | 141:22 142:3 | 198:10,10 |
| 280:23 284:9 | 83:14,14,14 | 142:12,12,17 | 200:1,8,15 |
| **doj** 13:3 26:1 | 84:21,21,21 | 142:18 143:15 | 204:13,19,22 |
| 60:10 | 96:13 99:1,2,2 | 144:16,16 | 205:9,25 206:7 |
| **dollar** 256:7 | 99:6,14,23 | 146:25,25 | 206:22 207:2,5 |
| 257:5 | 100:2,14,17,25 | 147:21,24,25 | 207:21 209:21 |
| **domino** 239:19 | 101:8,12,21 | 148:3,3,12,13 | 210:5 211:7 |
| **door** 241:8 | 102:18,24 | 153:11 162:6 | 213:8 215:2,9 |
| **doubted** 81:12 | 103:5,5,20,20 | 164:22,22 | 215:11,14,17 |
| **downside** 33:2 | 104:10,10,14 | 165:7,13 166:7 | 216:2,5,18,23 |
| **downsides** | 104:15,24,24 | 166:9 167:11 | 217:11,14,17 |
| 32:24 33:4 | 105:5,5,8,9,9 | 167:12,24 | 218:3,6 220:1 |
| 166:11,12 | 105:15 106:7 | 170:15 171:5,8 | 221:4 222:7 |
| **dr** 8:15,15,16 | 106:22 107:1 | 171:13 172:15 | 223:14 225:4 |
| 9:7,7 11:16 | 107:10,14,14 | 172:21 173:1,6 | 226:20 228:10 |
| 12:2 18:16 | 107:18 108:12 | 173:23 174:17 | 229:6 235:7 |
| 30:14 31:1 | 108:12,17,18 | 175:20 177:3 | 238:12,24 |
| 39:8 41:20,23 | 108:21,22 | 177:12 181:2 | 242:1,3 244:12 |
| 42:13,21 44:8 | 109:3,4,8,17,17 | 181:13,20 | 244:17 250:16 |
| 44:15,20 46:4 | 110:25 111:1 | 182:9 183:10 | 251:2 261:4,8 |
| 47:9,23 48:5 | 111:12 112:15 | 183:13 184:2 | 261:12,12 |
| 48:22 49:15,17 | 113:5 114:6,11 | 184:11,15,19 | 263:8 264:10 |
| 50:2,3 51:8,10 | 115:2,5,12 | 184:21,23 | 265:24 266:2 |

272:15 273:7
274:2 280:7,10
280:16,21
282:24,25
283:2,7,12,16
284:2,5 285:1
285:7,13,16
286:9,23,23
287:18,22
288:3,11,14,15
289:4,14,20,20
290:5,5,20
291:7,12,23
292:14,14
293:4,4,5,6,25
294:1,15,16,16
295:9,21
**draft** 108:22
109:3 187:23
188:22 189:1
192:25 193:3,5
193:19,21
195:2,16,17
198:24,24
201:2,2,5,7
202:5,12 222:1
226:17 227:10
230:15 233:23
234:20 256:2
286:2 292:19
**drafted** 246:5,6
254:25 255:1
255:12

**drafter** 255:21
**drafting** 190:16
251:24
**dramatically**
84:15
**draw** 195:9
**drawing**
154:20 155:7
**drawn** 119:5
**drive** 27:22
**driven** 191:18
**drives** 80:16
**driving** 62:2
**drop** 30:12,21
90:16,18 281:7
281:8
**dropped** 30:7
31:7
**dropping** 87:18
**drost** 214:11
**drug** 6:8,15
10:11 11:11
19:16 24:5,8
24:12,23 25:1
25:8,11,15,16
25:17,21 26:10
26:16 28:3,10
28:10,12 31:22
38:19 40:10
45:2 79:16
82:2,17 83:1,7
83:16,19 94:23
94:23,24,24
98:13 116:7

117:20 130:17
131:21 137:1,7
161:3 163:9
165:1 166:5,13
166:23 167:5,8
170:2 209:12
232:24 241:24
254:2 267:9
**drug's** 163:20
164:4
**drugs** 112:3
**due** 182:25
218:5
**duly** 8:8 297:7
**dunn** 2:3 3:5
8:2 14:21 15:1
72:1
**duplicate** 100:6
**duties** 75:17
**dysfunctional**
11:12

---

**e**

**e** 3:9 7:1,1
150:10 299:3,3
299:3
**earlier** 60:9
88:24 106:22
117:9 188:21
190:4 203:17
212:4 222:12
267:15 282:12
**early** 285:8

**easier** 54:9
290:16
**easiest** 159:25
**easily** 65:13
**easy** 105:24
**edges** 197:19
**editor** 142:4
157:5,6 247:24
248:4 270:13
**editorial**
140:25 149:7
200:7 228:20
229:5 249:21
251:6,9,16,25
252:4
**editorial's**
251:18
**editors** 142:21
145:5,5 152:2
154:8 156:24
157:6 158:2,19
250:16 251:2
**educate** 16:14
**effect** 11:12
25:16 45:3
95:2 102:6
119:5,7 239:19
261:17,19
**effectively**
91:16 229:4
**effectiveness**
163:20 164:5
164:13

**effects** 166:16 241:24

**efficacious** 24:13 38:19,19

**efficacy** 10:11 38:17 82:24 271:5

**efficient** 92:6

**effort** 221:2 275:18

**efforts** 278:12

**egregious** 200:3

**eight** 15:4 157:11 159:2 159:12 160:17

**either** 10:7 19:19 20:10 23:25 62:12 135:18 140:20 246:5 266:19

**elderly** 100:7

**elements** 159:17

**eligible** 135:13 136:5

**elisa** 172:4 174:10 183:2

**elizabeth** 39:8 129:6 133:11 249:25 250:13

**email** 2:5,11,15 4:5,7,9,12,17 4:19 5:6,11,17

5:19,22,24 6:4 52:5,11,14,15 52:21 53:4,9 53:12,14 93:9 93:11 94:1,17 96:13,20 97:3 97:4 98:24 99:6,7,13 100:17 101:13 103:4,5,5,12 104:10,19 105:10 106:10 106:13,17 107:5,10 108:11,24 110:12 111:9 111:17 114:10 121:4,9 122:6 123:9 125:16 126:16 128:10 128:23 131:10 133:2,9 173:13 174:22,22 177:3 178:7,16 229:12 231:15 254:10 260:15 274:12,13,18 274:19 275:2 276:11 284:6 285:8,13 289:4 290:4 291:2,23 292:12 293:6 293:25 294:1

**emails** 64:19 75:12,15 103:24 109:21 109:22 128:12 175:7 229:16 230:19 243:10 261:24 284:2 284:10,16 285:17 289:9 290:1

**embarked** 260:6

**embarking** 130:4

**emerging** 46:25

**empha** 256:13

**emphasizes** 256:20

**emphasizing** 256:13

**empirical** 281:2 281:3,10

**employ** 198:12 286:25 287:16

**employee** 70:9 122:3 126:18 134:23,23 137:25 138:12 138:14 284:21

**employees** 121:5,19 126:1 242:13 260:20 260:25 265:19 265:21 284:10

**encouraged** 265:20

**encouraging** 100:20 265:21 265:24

**endpoints** 242:2

**ends** 286:21

**enea** 1:4 2:18 3:19 7:20,24 8:16 54:15

**energy** 243:25

**engage** 74:9 236:18 245:23

**engaged** 78:16 96:1 153:11 155:18 209:21 210:5 215:11 216:23 237:23 242:8 249:2 270:21 288:4

**engaging** 237:1 273:7

**enhanced** 12:16

**enhancing** 33:16

**enrich** 27:23

**enroll** 30:5 33:16 34:23 35:16 252:17 252:18

**enrolled** 30:1,9 32:6,8,11

**[enrolled - examining]**                                                          Page 35

167:17
**enrolling** 20:8
  86:1
**enrollment**
  31:17 32:16
  33:25 34:3
  279:25 280:2
  280:12
**ensure** 33:25
  138:23 205:7
**ensuring** 223:6
**entering** 167:1
**entire** 13:25
  260:18 287:19
**entirely** 55:20
  56:13 155:9
**entirety** 116:17
  117:6,11
**entities** 239:7
  257:14 258:14
  260:8 261:10
  266:15
**entitled** 156:2
**entity** 265:18
**entry** 182:23
**equation** 77:22
**equipment**
  183:17
**eric** 1:12 3:3
  5:11,20 7:6 8:7
  36:3 53:23
  91:5 117:24
  127:24 169:19
  201:21 212:14

245:8 254:10
255:4 256:23
267:11 270:12
274:14 298:5
299:2,24 300:2
300:4,12
**errata** 298:11
  298:13,16
**erratum** 132:13
  144:8 145:8
**errors** 132:12
  132:14 141:6
  142:6 157:8,11
  159:2,12 160:9
  160:17 203:16
**especially**
  102:25 126:23
  234:2
**esq** 2:2,3,7,8,8
  2:12 298:1
**essentially**
  19:19 102:2
  141:24 149:10
  167:6 198:25
  202:11 232:9
  233:24 287:18
**established**
  11:11
**et** 4:22 7:7,8
  144:9 156:15
  298:4,4 299:1
  299:1 300:1,1
**ethical** 223:7

**ethics** 272:23
**evaluate**
  111:25
**evaluated**
  157:2
**evaluation**
  157:10
**event** 82:17
  137:15 213:23
  216:22
**events** 16:23
  25:1,11
**eventually**
  48:24 185:4
**everybody**
  23:23 24:19,22
  130:7
**evidence** 9:11
  10:1,5,12
  12:15 13:11
  14:2 23:11
  24:6,8 25:15
  25:18 29:9
  38:20 44:17,20
  44:22 45:5,6
  46:11,21 47:3
  47:6 51:2,6
  67:25 70:22
  71:1 80:5 82:2
  82:10 102:3
  120:22,23
  124:12 141:2
  141:13 142:4
  144:21 157:7

158:3,8,10
167:6 185:16
196:21,25
197:1,3,12
209:9 210:20
241:5,23
281:23 282:6
288:2,10,13,14
**evident** 272:19
**evolving** 14:2
**ex** 295:2
**exact** 18:1
  28:15 72:3,10
  251:12 267:1,1
**exactly** 47:25
  57:22 68:11
  74:5 77:7 94:6
  112:1 126:9
  133:23 138:4
  239:16 245:24
  247:20 255:1
  263:22,22
**examination**
  3:4,10 8:10
  141:1 158:15
  158:17 189:23
  285:23 295:14
  297:7
**examinations**
  107:16
**examined** 8:8
  207:21
**examining**
  142:2

**[example - experiment]**

example  131:9 132:23 140:1 174:8 196:17 215:13 216:2 243:16 260:17 282:22 290:21 293:23

examples  59:19 85:9 131:1,5 132:4,22 275:24 293:20

except  50:18 96:3 107:25

exception 235:3 282:14

excerpt  5:9

excerpted 247:11

exchange  52:3 128:10,22 173:13,23 276:10 289:4 289:20 292:4 292:12

exchanged 175:7

exchanges 291:21

exciting  100:20

exclamation 291:25

excluded  112:8

exclusively 69:8

excuse  139:21 185:22

execution 198:13 287:1 287:17

executive  18:14

exercise  100:18 267:21

exercised  135:3

exhibit  3:15,16 3:19,21,23,24 4:2,3,5,7,9,12 4:14,17,19,21 4:23,24 5:2,4,6 5:9,11,13,15,17 5:19,22,24 6:2 6:4,6,7,10,12 6:14,16 14:3,6 14:7 22:22 39:15,16,18,22 40:13,20 41:1 41:5 54:5,6 56:24,25 57:1 59:6 60:9,13 61:20 62:5,5 62:12,15,17,18 63:20 64:3,4,8 65:16,17,19 78:11 91:7,9 93:6,8 96:25 97:2,3 104:6,8 104:9 108:7,9 108:11 117:14 117:16,17

121:1,3,4 128:7,8,9 139:23 140:10 140:13,14 143:25 144:1,2 144:17 147:3 147:14,15,16 156:11,12,13 160:20,21 169:22,24 173:10 174:6 180:22,23 188:7,8,9 189:14 201:24 203:8 212:1 214:7,9 221:21 229:9,11 247:6 247:8,10 249:20 251:6 254:7,9 267:3 267:5 270:8,10 274:9,11 276:7 276:8 277:13 285:25 288:20 288:24 289:2 290:2 292:9,11

exhibits  3:14 4:1 5:1 6:1 40:24 78:8 292:10

exist  46:2

existed  52:16 61:11,20

existence  129:8 129:22

exonerate 197:4

exonerated 146:25

exoneration 141:10 143:6,7 145:24,25 147:5 157:24 158:1,4

exonerations 140:22 142:11 142:14

expand  127:1

expect  111:16 116:23 195:18 195:21 196:2 272:24 273:19

expectation 209:6 251:12

expected  35:4 49:6 151:14 165:19 167:4 196:15 281:4

expeditious 208:10 226:1 227:18

expeditiously 204:3 228:4

expense  28:17

exper  204:17

experiment 42:14 141:23

204:20 249:1,1 249:1

**experimental** 6:15 24:23 161:3 167:4,8 172:2 173:6 267:9

**experiments** 46:5 82:11 151:15 182:24 198:14 204:17 206:1,7,10 207:2,5,22 235:8 283:2,7 286:22 287:1 287:17

**expert** 42:22 44:12 98:17 100:13 104:17 106:23 108:20 111:1 113:13 157:2

**expertise** 44:13 157:3

**experts** 25:4,7 43:9,15 50:14 50:15 67:18 82:20,22 92:16 92:18 98:15 152:11,15 153:21 154:12 154:22 155:18 156:3,5,6 163:17 164:1

164:10 208:1

**expiration** 182:25

**explain** 186:8 202:21 221:14

**explanation** 151:21

**explicitly** 47:20 281:15

**exposed** 3:23 62:16

**express** 90:22 193:4

**expressed** 95:15

**expression** 4:21 4:24 144:9,14 145:2,24 146:7 146:12,19 147:4,8 148:25 149:6 156:15 157:24 158:1 159:1,7 273:1

**expressions** 139:15 190:4

**expressly** 267:20

**extent** 17:11 35:25 37:19 40:25 45:1 69:19 73:19 92:18 138:9 156:1 159:6 191:13 205:6

215:14 216:11 217:5 219:8,9 219:19 220:18 246:19,22

**external** 42:20 58:14 59:15 60:6 193:10 246:7

**externally** 123:2,3

**extra** 19:7 160:14

**extraordinary** 60:4

**extrapolate** 281:1

**f**

**fabricate** 56:8 73:25

**fabricated** 9:2 9:8,14 10:4,19 13:12 55:20 56:13 79:16 215:14 288:11

**fabricating** 66:23 74:9 76:13,17

**face** 226:6 258:24

**facilities** 203:23

**fact** 36:23 42:23 44:4,20

46:6 47:1 48:16 52:2,4 67:13 79:15 80:11 87:5 94:12 95:14,24 96:17 108:1 120:4 139:14 155:18,19 163:24 164:10 170:22 171:12 173:5 178:17 180:11 184:1 195:16 210:6 241:14 251:14 253:18 258:19

**factor** 137:3 139:18 148:16 186:19

**facts** 28:4,18 29:11 30:2 44:6 46:13 51:24 56:17 58:20 60:14,22 61:2 77:12 79:23 80:4,12 80:15 81:3 195:4 196:21 210:3 240:2

**factual** 27:3 29:3,6,12 39:4 42:9 45:16 47:13 55:23 61:22 63:18 65:2 66:18

**[factual - filamin]** Page 38

77:24 84:7 86:8,15,20 88:9 123:15 271:3
**faculty** 189:21
**fail** 52:24
**failed** 168:3 216:4 249:3 284:22
**fails** 168:6 298:18
**failure** 53:2 199:23 200:4
**failures** 168:12
**fair** 17:4,5 33:15 34:3 35:16 68:9 108:23 111:11 111:11 163:1,5 218:20 220:15 238:8 262:12 264:4,11 268:9
**fairly** 98:19 123:25 207:18 218:5
**fairness** 223:8
**faith** 80:5 168:2
**fake** 142:13 195:6,8
**false** 20:9 34:21 39:19 42:10 44:7,24 45:18 47:15 55:24

58:22 60:16 61:4 63:19 64:24 65:3 66:20,25 70:1 77:5 79:3 130:17 147:6 166:13,22,23 166:25 209:10 236:11 237:6 238:16 239:20 242:5 243:13 259:3 268:4,18 268:23 270:19 270:25 271:6 275:5,8,25 276:20,24 281:10
**falsehoods** 43:7 270:18
**falsely** 81:25
**falsified** 216:5
**familiar** 40:2 54:1,3 128:15 168:16 245:11 248:6,12 251:14 284:3
**families** 271:8
**far** 57:9 61:12 63:10 65:13 90:8 104:2,5 184:13 190:13 191:1 249:7 264:24

**faster** 127:1
**faulted** 232:24
**favorable** 113:7 186:13
**favorite** 115:14 161:4
**favorites** 116:8
**fax** 127:2
**fba** 241:8
**fbi** 241:8,9,10 241:14
**fda** 3:19 4:14 54:1,5 62:5 78:7 82:23 83:21 115:23 116:17 117:6 117:24 118:8 119:12,22 120:4,11,16 170:14,18,19 171:5,12,23 172:15,20,23 172:25 173:5 173:14,20 174:5,8,8,14,24 176:16 177:16 177:21 178:8 178:16,17 179:3,8,20 180:10,11 199:6
**fda's** 172:18 174:12 177:23

**features** 151:19
**february** 11:9 128:12 133:2
**federal** 216:3
**feedback** 93:2 95:7 101:21 102:17 103:19 103:22 106:6 106:25 109:16 119:22 261:21 262:3 290:7
**feel** 44:16
**feelings** 242:7 242:11,13 243:7,10
**felt** 244:1,5
**field** 42:22 44:13 82:22 98:15 104:18 106:23 108:20
**fifteen** 194:8
**figure** 21:18 48:18 102:23 157:4 160:11 160:13 176:1,4 176:9,11,12,21 176:22 178:3 290:17 294:6
**figures** 132:19 141:3 150:19 150:20
**filaments** 12:18
**filamin** 11:12 12:13,16,19,21

**[filamin - first]** Page 39

12:22 45:25
46:2 144:11
156:16
**file** 38:18 88:9
**filed** 7:8 11:10
17:19 28:20
32:9 48:13,15
49:7,9 60:23
61:21 84:14,17
88:18 198:17
236:4 241:6
242:21 245:25
252:24 264:9
264:15 266:11
277:23 284:16
**files** 151:11,15
151:23,23
254:21
**filing** 38:2,5
50:11 60:21
69:25 87:23
88:3 207:23
240:10 253:18
254:17 259:18
261:17,18,21
264:25 266:13
**film** 197:19
286:11
**films** 203:21,24
204:13,23
205:16,25
206:6,21 207:2
207:22 283:1

**final** 5:2 157:18
158:19,21
188:2,25 189:1
189:7,15 194:5
199:11 200:20
201:3 211:12
222:17,25
223:1,2,3
225:19 226:10
229:3 234:12
255:19 294:10
**finalized** 189:2
189:4
**finalizing**
189:12
**finan** 138:13
**finance** 113:2
230:1 255:18
**financial** 11:4
16:11 26:11,13
35:7 80:22
81:2 134:10,17
136:13 137:23
138:5,16,25
139:5,7 255:5
272:25 273:20
**find** 21:10,11
24:12 36:22
63:8 65:8,12
70:22 83:10
101:1 133:16
142:4 157:6
158:2,6,7
166:4 200:23

207:9 211:7
218:8 219:12
235:13
**finding** 69:4
87:5 154:9
172:18 180:7
180:10,10
184:25 207:12
207:16 209:14
209:20 210:12
215:10 217:16
218:12,24
219:7 223:9
**findings** 49:17
69:11,16 70:3
70:6,8,8 71:15
74:13 141:8,20
142:23 143:9
143:19 148:20
149:2 152:6
153:2 156:5
174:8 181:12
181:19 184:15
193:16,24
196:1 198:20
198:23 199:5,6
201:7 204:5
208:11,15,20
208:23 209:17
210:25 211:5
213:1,15 214:4
221:3 228:11
234:13,13
284:1 287:7,22

**finds** 216:12,23
217:5 219:10
219:20 220:18
**fine** 24:1 43:14
43:22 69:21
95:22 237:10
242:20 253:25
265:11
**fingertips**
65:13
**finish** 149:18
191:24 228:10
**finished** 49:13
70:16 234:18
**firm** 7:19 41:10
43:16 68:2,6
68:13,23,23
71:17 236:3
245:11
**firms** 36:17
37:2,9,12,16,18
37:23 38:2
87:11
**first** 6:6 8:8
10:20 11:6
17:16 27:9
42:9 44:3,24
49:13 55:8
57:9,11 62:8,9
88:21 91:25
99:6 100:22
101:3 105:10
107:9 124:4
128:24 145:19

148:1 169:23 172:9 174:22 177:18 189:19 197:15 232:25 237:15,16,18 237:21 240:9 245:23 251:8 267:18,18 273:16 276:12 277:15,20 282:8 285:25 289:8 294:13

**firsthand** 279:6

**fits** 155:2

**fitting** 114:8

**five** 98:16 140:15,16 142:17 151:13 157:11 163:15 251:17

**fix** 167:3

**flat** 100:20 101:13

**flawed** 53:2

**flip** 54:10

**flna** 63:11

**floor** 2:9

**fluid** 47:3 100:7 119:6 175:12 176:1 176:19

**fluids** 176:9

**focus** 106:13,17 106:21 237:4,5

244:10

**focusing** 111:8 114:24

**fold** 20:6

**follow** 17:13 148:24,24 228:12 241:15

**followed** 118:13 143:18 150:12 193:6

**following** 118:21 150:17 157:8 293:25

**follows** 8:9 46:23 177:12

**food** 6:8 117:20 170:2

**footnotes** 250:18

**footprint** 127:9

**force** 98:15

**forecast** 280:2 280:11

**foregoing** 296:5 297:12 300:5

**forensic** 284:2 285:7,12,16

**forget** 264:21

**form** 6:8 11:18 13:5,19 16:16 18:22 22:4 25:13 26:23 28:7 29:14

30:16 31:5,11 32:4 35:11,22 37:17 38:10 42:6 48:7,20 49:11 50:8 51:18 53:7 56:1 60:17 61:13,24 68:20 69:6,13 73:4 73:18 74:2,11 75:21 76:7,23 80:14 81:5,18 81:23 86:21 87:8 88:6 89:1 91:19 92:17 94:15 95:17 101:17 102:12 106:8 107:8 108:3 109:19 110:22 111:4 112:12,20 114:1,22 115:9 115:24 119:25 120:7 122:19 123:19 125:11 127:6 129:25 133:15 134:4 135:16 136:8 137:10 138:8 139:1 144:22 145:14 149:9 149:13,23 150:8 153:14 158:13 159:9

162:1,23 164:6 164:14 165:14 165:25 166:15 167:13 169:7 170:22,25 171:2,3,13 174:19 176:25 179:11 180:16 181:16 184:5 184:17 187:12 190:8,19 191:12 194:2 194:14 196:24 197:6 198:22 200:22 201:9 204:15,24 205:18 206:2,8 206:23 207:6 209:23 210:8 211:18 212:7 212:22 213:6 218:15 219:2 220:2 221:9,18 223:22 225:6 225:15 227:7 228:6,14 229:7 231:10 233:10 233:19 235:10 237:3 238:14 239:2 240:6,21 241:20 242:10 242:16 243:21 249:14 250:10 252:25 260:13

**[form - generalities]**

261:11,22
262:15 263:9
264:18 265:8
265:12 266:1,9
266:22 268:12
271:23 275:22
281:19 282:2
283:4,13,19
284:14 286:14
287:24 289:24
297:12
**formal** 68:11
82:21 98:7
182:17,23
212:4 263:11
**formalizing**
189:12
**formed** 68:3,9
81:21
**former** 227:10
**formerly**
280:17,20
**forth** 69:20
262:17,23
291:8 293:4,21
294:15
**forward** 36:25
38:16 185:5
**forwarded**
173:15
**found** 25:22
53:5 70:25
74:15,24
132:15,16

141:2,14
144:21 146:3
149:12,20
153:8,9,18
158:10 170:18
170:19 171:6
172:15,21,23
172:25 173:5
183:13 184:2
188:4 202:2
215:14 285:7
285:16
**foundation**
291:10
**foundation's**
215:16
**founded** 197:1
**founder** 133:11
**four** 114:10
117:8 118:24
142:10 152:21
157:11 163:15
**fox** 257:6
**frame** 179:6
**france** 59:23
**frankly** 243:23
**fraud** 3:17
10:19 19:15
20:17,25 21:4
22:8 23:2,5
24:5 26:10
28:1,9,12
30:15 39:21
40:10 68:16

70:8 77:20,22
78:22 82:1,13
85:8 107:14
112:22 113:24
114:2,12 116:6
126:2,13
131:20 138:2
191:9 209:11
216:3 239:21
242:23
**frauds** 29:23
79:16 239:22
254:1
**fraudulent**
111:16 112:19
124:5 166:14
**free** 40:22
267:21
**freezer** 174:9
**friedmann**
173:15 280:21
**front** 15:14
17:1 65:12
78:8 84:16
91:17 97:12
**frozen** 229:5
**frustrated**
199:20
**frustration**
200:12
**full** 15:2,2
31:17 33:25
34:3 43:6
49:13 74:23

129:18 167:9
218:20 220:15
**fully** 30:1 51:10
**functions** 63:11
**funds** 31:25
32:2 33:2
**furious** 243:19
**furnish** 273:2
**further** 12:8,18
55:14 100:16
132:25 133:9
145:11 149:7
190:6 229:5
271:13 295:12
295:25 296:1
**furthermore**
151:15
**future** 183:22
186:1,7 213:23

**g**

**g** 7:1
**gary** 4:19 128:2
128:10,22,24
129:12 133:22
**gears** 127:15
**general** 13:8
40:12 42:3
75:13 96:9
246:7 255:20
261:23
**generalities**
279:12

**generally** 24:21 35:1 40:7,12 42:11,13 71:14 82:25 83:2 95:3 137:21 161:20 231:13 255:12 276:1 285:12,15

**generate** 260:9

**generated** 55:17 106:18 204:1 235:8 241:23 283:7

**genuinely** 76:21

**geoffrey** 1:6

**getting** 93:16 97:25 102:18 103:9 137:7

**gibs** 208:5

**gibson** 2:3 3:5 8:2 14:21 15:1 71:23,25 72:1

**gibsondunn.c...** 2:5,6 298:2

**give** 10:10 18:15 35:7,22 58:25 116:11 131:1 140:7 167:2 199:14 200:19,23 229:25 270:19 278:25

**given** 37:18 47:23 94:23 151:21 152:21 152:24 168:14 179:14 193:25 233:23 300:9

**gives** 293:9

**giving** 25:19 115:12 120:18 166:13,22,25 209:12 210:3 211:6,8,16

**go** 9:15 11:5 17:10 23:16 24:3 27:6 35:17 41:2 42:12,15 43:25 50:11,22 56:2 58:23,25 70:16 70:17 74:22 82:14 83:10,23 83:25 85:4,18 85:24 87:22 89:3,7 100:8 115:14,15,25 116:8 124:6 140:9 143:13 146:2 147:2 152:18 156:13 168:8 188:5,6 196:10 197:10 203:21 207:12 207:16 208:2,3 217:25 218:1

235:11 260:12 262:2 272:14 275:1,6 276:21 282:5,8,11 284:7

**goal** 35:9,15 38:11,14 90:12 225:13,24,25 253:20 256:13 271:4

**goals** 38:7 88:5 139:7,8

**goes** 106:10 161:20 165:2 217:10 243:12 255:15 291:17

**going** 7:2 15:21 18:15 26:16 27:6,7 28:11 32:5 33:3 35:2 35:4,21,22,24 36:25 39:13,13 41:2 43:18 45:20 46:17 51:14 53:18 55:5 58:23,25 59:17 61:24 65:7 68:5,10 69:14,23 71:25 73:21 74:22 78:10 82:23 83:8,22 88:19 88:19 90:25 92:21 95:20,21

96:15 99:5 100:10 108:24 111:7,25 113:20 114:9 122:3 125:25 126:19 127:19 130:8 134:21 136:25 138:2 140:7,9 142:8 145:14 147:2 147:22 148:19 159:23 161:12 163:11 166:23 167:3 169:14 169:22 173:25 188:6,7 194:17 196:14 198:25 201:16 211:13 213:25 229:5 234:24 238:20 245:3 246:13 256:1,19 258:1 260:12 277:8 277:13 289:1 296:2

**good** 7:2 8:12 8:13 25:1 28:11 56:14,14 57:19 61:6,6 66:24 80:5 83:4 94:5,9 95:3 107:15 131:9 166:24 167:6 168:1

183:16 226:3,4 244:3 262:1
**goods** 27:21
**governing** 232:15
**government** 240:18 261:10
**governs** 146:9
**graduate** 12:7
**granular** 116:21
**great** 130:13 131:2,4 140:1
**greatly** 30:8,25 102:7
**gregory** 86:13
**group** 23:22 244:18,20 262:13,19 263:1,17 264:3 264:9
**grouped** 182:18
**grow** 29:9
**growing** 29:6
**gueron** 2:9 7:19 7:23
**guess** 20:5 37:4 37:25 77:10 217:13 255:20
**guessing** 110:6 127:16
**guidance** 150:10,12

294:9
**guise** 27:25
**gut** 125:22 126:12
**guy** 214:15 220:3
**guys** 124:21

**h**

**h** 66:1 299:3
**half** 106:2
**halfway** 41:14 197:15
**halt** 83:21 271:7
**hand** 55:16 136:17 247:23
**handle** 113:21 150:11 186:11 244:9
**handling** 157:5
**hands** 21:5
**happen** 29:16 131:24 133:18 154:6 177:10 213:23 272:3 276:3
**happened** 133:18 214:1 219:13 248:14
**happening** 37:9
**happy** 192:21 227:21 265:6 265:14,17

291:3 293:16
**harassment** 97:25
**hard** 38:4 61:25 159:23 230:24
**harm** 84:25 209:16 271:1 271:13
**harming** 27:1
**harmless** 216:15 217:8 219:23
**harvard** 59:21
**head** 83:12,17 94:7 107:1 111:14 126:9 220:13
**heading** 197:11 198:3 278:11
**health** 6:7 170:2 264:10
**healthy** 59:20
**hear** 21:21 279:5
**heard** 94:13 128:4,17,25 134:1 191:2 193:14 281:9
**hearing** 22:10 93:20 95:11 279:17
**heart** 29:1

**heavily** 109:10 110:21 111:2,8 112:17 114:7 114:20 115:5 115:15 131:11 289:14
**heavy** 255:17
**heilbut** 1:4 2:17 3:19 7:7 7:20,24 8:15 54:15 66:14 67:1,2,5 75:4 76:3 83:14 84:21 298:4 299:1 300:1
**held** 27:24 76:12 134:24 223:7 278:3
**helena** 99:12
**hello** 177:3
**help** 15:18 17:2 19:18 87:25 130:22 168:9 186:18 271:8 294:8 295:1
**helpful** 41:1 102:22 142:14 143:8
**helps** 33:15
**hereto** 300:7
**hey** 29:22 88:14 111:21 113:5 121:17 122:7 124:21

126:12,19
131:6 132:16
136:23 142:13
159:13 160:11
161:16 167:4
193:5,10
196:17 226:5
239:22 261:25
**hi** 292:18
294:20
**high** 99:16
**highest** 215:19
223:7
**highly** 67:8
82:21 110:25
119:8 120:5
200:7
**hindsight** 33:22
**hire** 295:2
**hired** 43:15
68:1 152:11,15
154:12 208:1
245:15
**hiring** 43:9
**historical** 84:13
**history** 77:1
84:18
**hit** 135:14,20
136:1,7,20
137:13
**hoau** 5:2
189:16
**hoau's** 105:15

**hold** 23:15
27:17 68:4
152:12 194:23
216:14 217:8
219:22 258:3
284:17,22
**holden** 270:13
**holding** 34:23
**holmes** 129:6
133:11
**honestly**
155:16
**hook** 218:13
**hope** 166:13,22
166:23,25
167:4 252:15
275:2 276:18
**hoping** 80:9
**horizontal**
150:23
**hostetler** 8:5
**hour** 127:15
169:12 296:6
**hours** 15:4
116:4,4,4
296:7
**huge** 81:8
124:21
**huh** 39:15 55:9
99:9 103:7
164:24
**human** 6:7
170:2

**humans** 66:16
83:20 132:11
**hundreds**
82:15 166:19
**hurt** 19:21,21
**hype** 212:11
**hypothesis** 12:9
59:18
**hypothetical**
76:8 136:3
149:24 153:15
153:19 154:4
209:24 210:9
210:15 211:15
211:17 212:8
**hypothetically**
211:20

**i**

**i.e.** 183:17
**idea** 166:4
168:18 261:13
**ideas** 289:20
**identical**
141:25
**identified** 60:1
69:24 142:7
157:9
**identify** 46:22
**ids** 182:24
**ignore** 46:21
**illegal** 27:21
236:18 237:7,9
253:19

**image** 140:17
141:20 143:19
148:20 151:9
151:19,21
153:3
**images** 41:20
43:10 140:5
141:8 146:3
149:21 151:12
162:14 186:17
197:18 203:22
203:25 204:13
204:23 205:16
205:25 206:7
206:22 207:2
207:22 286:10
286:11
**imagine** 100:22
261:25
**imaging** 47:2
**immediate**
261:16,19,20
**impact** 30:3,6,7
30:23 31:2,15
31:17 32:15
85:22 141:8
153:12 184:14
243:3 283:23
**impacted**
121:25
**impacting**
20:18 21:19
24:10 29:24
243:13

**[impacts - indicted]** Page 45

impacts  33:2
  192:22
impartial
  218:20
imperative
  218:3
implications
  215:13 275:5
  276:21
implied  63:9
implies  262:22
imply  262:17
importance
  218:2 268:3
important  20:8
  27:19 79:6,12
  99:15 103:23
  122:1,7 132:18
  152:9 186:21
  220:14 241:2
  262:3 264:22
impossible
  20:11,22 32:5
  32:10 41:22
  45:12,23 46:10
  48:3,3
impression
  270:19
improbable
  41:22 45:12
  46:18 55:19
  67:8
improper  47:24
  51:16 74:16

78:17 80:13
  112:13 138:25
  149:23 153:14
  210:8 212:7
  213:9 217:12
  232:17
improperly
  41:21
improved
  293:10
improvements
  169:6
inability  21:10
  199:20 200:1
inaccurate
  13:23
inad  172:16
inadequate
  171:24 172:16
  172:21
inappropriate
  46:10
inauthentic
  195:6,8
inbound
  262:18
incentive  135:9
incentives
  139:7
incidental
  215:18
include  39:8
  138:10 182:24
  233:15 287:21

295:4
included
  187:18,23
  197:19 220:4
  221:11,15
  259:6 269:6
  286:11 293:17
  294:8 295:10
includes  12:11
  226:24
including  46:7
  138:3 145:7
  150:23 233:16
  257:4,19
  258:18 259:13
  259:15 270:21
  271:17 286:8
inconsistent
  63:10
incorporated
  240:12
incorporating
  155:17
incorrect
  160:10
increased
  12:16
incredulous
  100:22 125:20
incurs  218:13
ind  176:2,10
inde  99:25
indemnificati...
  216:22 218:25

221:16
indemnify
  216:14 217:8
  217:18 219:22
  220:20
independent
  10:6,10 11:16
  11:22 12:1
  13:1 25:20,25
  36:5 39:4
  46:21 51:5,7
  63:23 68:12,14
  70:3 71:11,13
  71:18 89:7,8
  99:14,16,25
  100:2,13
  135:24 151:14
  154:22 157:2
  177:6 194:20
  241:23 242:2
  263:17 265:17
independently
  13:11 56:10
index  17:7
  91:16,21
  139:22
indicating
  251:16
indications
  200:6
indicative
  119:7 241:9
indicted  74:15

**[indictment - intent]**

**indictment**
30:14 31:2
**indifferent**
57:20
**indirectly**
20:11,21 21:3
33:14
**individual**
23:18 66:1
99:12 128:2
133:25 139:8
173:13 240:13
266:17 281:14
**individuals**
20:24 21:7
93:10 95:15
97:25 136:2
138:5 239:8
250:8 257:14
257:25 258:9
258:14 265:17
274:15
**ineffective**
270:20
**infer** 52:8
**inference** 119:5
**influence** 213:3
**inform** 98:17
**information**
21:17 23:9
34:21 42:15
43:19 48:12
52:20 68:12,22
72:25 73:9,14

73:16,19 82:14
87:13 116:12
121:16 122:2,7
125:14 127:12
174:9 177:22
178:1 184:8,10
195:12 205:4
210:21 211:6,9
211:21 221:1
232:21 233:9
233:16,18
235:24 236:12
253:2,3,5
255:4,14 260:9
268:4,19,24
269:2,7 273:2
275:3,25
276:18 288:2
**informed** 18:5
167:5 168:13
168:17 264:3
**informing**
121:15
**infringement**
249:3,12,15
**inhibit** 34:2
**inhibiting**
20:11 34:3
**initial** 39:25
40:3,6 49:23
50:13 66:7
73:6 145:2
178:16

**initially** 228:4
236:1
**input** 157:5
**inquire** 204:3
207:16 228:3
**inquiries** 21:22
262:18
**inquiry** 157:16
157:20 214:25
223:13 226:19
234:17
**inside** 122:12
122:18,20
242:4
**insinuating**
227:20
**insolubility**
12:17
**inspected**
170:10,19
171:13
**inspection**
170:6,14,18
171:5 174:5,7
174:11,12,14
174:15 175:11
175:15 177:23
**instance** 76:15
143:8 197:16
216:13 217:6
219:21 235:4
286:9
**instances** 60:1
284:10,21

**institute** 59:23
162:11
**institution**
157:17
**instruct** 35:24
43:13 191:13
**instructed**
178:17 179:9
**instructing**
156:4 176:16
232:20
**instruction**
35:22 39:9
89:13 154:15
179:3 208:4
**instrumental**
12:13
**integrity** 45:7
142:20 151:25
154:9 215:9
223:12,20
224:10,18
225:22 234:16
**intellectual**
235:1 282:18
282:20
**intended** 17:2
142:5 157:7
158:3,8,11
**intent** 114:15
136:22 221:5,6
221:10,13
230:24

**interacting**
12:18
**interest** 138:15
138:16 192:10
192:14 249:4
**interested**
191:1,4 213:24
297:16
**interests** 6:17
249:24
**interface**
245:21,22
**interfering**
23:8
**internal** 43:15
43:16 68:2
71:4 76:25
77:1 124:23
134:21 152:10
152:16 153:22
155:10 182:2
205:20 206:10
208:1 260:7
**internally**
62:12 73:17
74:23 122:23
123:1,5
**internet** 126:23
127:9 235:22
**interpose**
260:12
**interpret** 94:8
114:5,25 115:1
115:5 226:14

**interpretability**
119:17
**interpretation**
234:5
**interprets**
226:15
**intervenor** 1:7
**interviews**
198:10
**intimate**
126:10
**introduce**
160:19
**intuit** 77:23
**intuitive** 233:5
**inventory**
182:16
**investigate**
87:14 140:5
264:16
**investigating**
73:10,17 95:20
138:2 188:1
193:11 196:11
232:23 257:14
258:13
**investigation**
5:2 6:16 21:14
43:6,15,17
68:2,6,10,13,18
68:21 69:4,4
69:11,17 70:13
70:18,25 71:2
71:4,17,24

72:3,5,7,17
73:7 74:23
126:3 134:21
140:19 145:9
145:11 146:8
149:8,18
152:10,16
153:16,23
154:22 155:11
155:13 158:20
187:19 189:15
189:20 190:2,3
190:11,13,18
190:25 191:11
191:18 192:2
192:12 194:21
194:25 195:11
195:19,22,23
196:9,13,14,17
197:12,20
198:3 199:1
200:3,14
205:21 206:10
208:1,10,11,24
211:5 213:4
214:5 215:1
218:2,4,21
220:16 221:3
222:6,16,17
223:12,15,21
224:10,18
225:4,9,14,22
225:24 226:2,9
227:6,18,21,23

228:1,10,13,20
228:24,25
229:3 234:12
234:16 249:23
250:4,5,9
260:7 284:2
285:13,16
**investigational**
229:23
**investigations**
43:21 86:20
239:13
**investigative**
187:24 223:6
**investigator**
175:19 176:18
179:5,14 180:4
**investigator's**
175:14 176:2
176:10 178:4
178:10,19,25
179:2
**investigators**
179:8 180:5
**investigatory**
73:1
**investor** 11:17
11:23 57:18
75:11,15
261:24 262:10
262:21,24
265:10
**investors**
179:20

**involved** 18:2,8
19:3,5 20:25
22:7 49:15
68:24 154:23
255:8 263:24
**involvement**
136:22 255:17
255:18,19,23
**involves** 138:9
**involving** 99:1
276:10
**ir** 243:9 265:10
**irb** 229:24
230:22 232:5
232:17,20
233:2,12
**irbs** 229:24
**irrefutable**
211:10
**irregularities**
150:24
**irresponsible**
231:5 234:20
269:16
**isaac** 2:8 7:23
**issue** 54:2
94:19 146:13
149:2 160:14
160:15 179:20
180:20 193:9
209:3 236:6
261:15
**issued** 86:4,13
139:14 144:15

145:2,3 146:15
149:6,14 150:7
155:12 169:2,8
170:20 171:13
171:19 174:6
180:6 189:8
193:9 202:16
212:3 224:5
247:4 252:19
254:16
**issues** 142:9,21
146:4 150:20
152:1 157:15
160:5,5,7,7
210:4 252:11
290:10,10
291:18
**issuing** 229:3
253:20
**item** 186:13
195:8
**items** 176:10
194:22 197:8
252:17

**j**

**j** 5:20 97:4
250:20
**j&j** 125:25
**january** 86:5
144:5 146:20
**japan** 12:8
**jci** 249:23
250:17 251:3

**jeff** 292:18
294:25
**jeffrey** 4:12
5:22,24 108:12
289:5
**jesse** 1:4 2:18
3:19 7:20,24
8:15 54:16
**jim** 5:6 229:12
280:6
**jlr** 1:3 7:10
**jneurosci**
145:10
**job** 107:15
112:11 259:10
262:1
**john** 2:3 8:2
**johnshoy** 3:8
297:4,20
**joined** 85:15
90:5
**jones** 266:16
276:13,23
277:3
**journal** 4:22
6:16 41:20
42:16 44:4
129:7 140:6,25
141:11,13,17
142:3,16 144:5
144:15,20
145:3,5,19
146:1,3,7,20,24
148:4,5 149:5

149:25 150:1,5
150:11 153:17
156:14 239:22
247:13 249:22
250:4,8
**journal's**
151:22
**journalism**
161:21
**journalists**
276:10
**journals** 10:14
43:25 44:5,21
63:25 139:14
140:3,18
149:12,17,22
153:10 161:5
190:5 216:6
228:19 229:4
238:10,23
239:13,17,25
240:17 295:19
**jpad** 5:9 247:13
248:4
**jturquetbravard**
2:6
**judge** 22:19,20
39:17,23 86:3
86:13 87:6,19
87:19 88:21
113:14
**judge's** 66:3
**judgments**
113:3,6 216:17

219:25
**july** 90:4 96:12
96:22,23,24
97:5 99:7
100:17 112:6
270:12 274:15
**june** 141:25
209:3 284:6
285:8
**justice** 41:11
43:21 155:5,12
264:16 284:1
**justifiable**
294:21
**justify** 268:3,23
**juxtapose**
131:19

**k**

**k** 96:11,15,23
132:13
**kate** 5:18,19
274:13,19
276:12,16
**keep** 160:1
234:25
**keeping** 264:3
**keeps** 204:19
**kept** 265:11
**key** 59:22,25
79:21 93:20
94:13,16 95:10
**kind** 26:15
36:12 45:5

50:22 63:2
76:24 169:8
193:6,10,22
241:16 275:15
**kits** 183:2
**knew** 15:21
56:4 67:3 77:4
77:8 79:3,5,13
80:3 82:11,12
82:12,13 83:5
209:12 228:18
236:7 241:4
242:23 279:4
**know** 9:6 10:6
10:12,15,16
11:25 13:7
14:1 15:15
17:13,18 18:1
18:23,25 19:5
19:9,17 20:13
20:15,16 21:2
21:16,18,18,23
21:24 22:11
23:2,3,14,17,18
23:19,23,24
24:7,16,18
25:4,8,21
26:16 28:9,9
28:10,13,15,16
28:25 30:6,10
30:20,21,23
31:13,14,16,21
31:23 32:6,7,9
33:1,15 34:15

34:20,22,25
35:13,23 36:23
36:24 37:3,10
37:13,24 40:9
40:18 42:17
43:3,5,6,7,18
44:12,16,25
46:10 47:5
48:14,21,24
49:1,1,3,3,6
50:10,12,19,21
50:23 51:9,20
51:21,23 52:8
52:19,19,20,22
52:24 53:1,8
54:21 56:13
57:10,11,18,22
59:13 61:12
63:25 67:3,7,8
67:8,14,17,18
68:14,22 70:6
70:14,16,17,22
70:23,24 72:10
72:18,19,20,22
72:24 73:6,8
73:12 74:14,17
75:1,2,2,6,9,25
76:1,1,14,25
77:1,2,3,8,22
78:2,3,23,23,25
79:2,3,4,5,11
80:3,4,6,10,15
80:16,17,18,19
80:19,19,20

81:1,6,7,8,9,9
81:10,13,16,24
81:25 82:3,13
82:15 83:17,18
83:20 84:11
85:2,8 86:2
87:2,4,9,11
88:15 90:6,9
90:10,11 94:6
94:17,18 95:12
95:12,24 97:10
97:10 98:12,14
100:15 101:8
101:25 102:8
102:21,21
103:13,22
105:19 106:10
106:11,16,17
106:18,20
107:2,9,10,14
107:18,19,20
110:11,13
111:12,13,15
111:23 112:1,2
112:7,9,23
113:4,11,14,21
113:24 114:10
114:10,11,12
115:11,12,16
115:18,18,19
116:1,3,4,5,7,9
116:10,11,15
116:25 117:4,7
117:10,11,12

| | | | |
|---|---|---|---|
| 120:12,19,21 | 160:3,12 | 204:22,25 | 244:16,22 |
| 122:2,6,20 | 161:19,19 | 205:1,5 206:3 | 245:24 246:5,6 |
| 123:4,23 124:1 | 162:2,25 163:2 | 206:10,12,13 | 246:15 247:5 |
| 124:1,4,6,9,9 | 163:11,12 | 206:15,18,20 | 248:16 249:11 |
| 124:10,14,18 | 164:15,16,17 | 207:7,18,20,24 | 249:15 251:10 |
| 124:24,25 | 164:18,19,20 | 207:25 209:8,9 | 251:11,12 |
| 125:14,21,25 | 165:16,17,18 | 209:10,10,11 | 253:3,6,7,8,18 |
| 126:2,5,8,14,19 | 165:19,20,21 | 210:12,14,16 | 253:24 254:3,3 |
| 127:8,10 128:1 | 166:19 167:2,6 | 210:19 211:8 | 255:11,16,24 |
| 128:16 130:2 | 167:7,9,10,16 | 211:10,11,14 | 256:19,22 |
| 130:10,12,15 | 167:18 168:4,5 | 211:22,23,23 | 257:22,23,23 |
| 130:17,18,19 | 168:6,10,20,23 | 211:24 212:10 | 259:1,5,15 |
| 130:20 131:4,7 | 169:9,11 174:6 | 212:11,12,13 | 260:8,10,25 |
| 131:8,9,9,17,18 | 178:15,21 | 212:16 214:2 | 261:24,25 |
| 131:21,25 | 179:4,6,13,13 | 215:25 218:2 | 262:1,14,17 |
| 132:8,10,15,16 | 179:15,16,17 | 220:12,12,13 | 263:11,13,15 |
| 133:19,22,22 | 179:25,25 | 221:6,11 224:8 | 263:18,19,21 |
| 133:23 134:13 | 180:4,5,6,7,9 | 224:12,14,15 | 263:22,23 |
| 135:2,19,25 | 180:18 181:17 | 225:8,18,23,24 | 264:5,7,13,21 |
| 136:18,21,21 | 185:1,4,8,16 | 227:22 228:7 | 264:24 265:9 |
| 137:2,15 | 186:15,21 | 228:15 230:20 | 265:15 266:4 |
| 138:11,12,13 | 187:13,24 | 231:4 232:5,15 | 268:5 269:1,7 |
| 138:14,19,19 | 188:20 189:1,5 | 233:1,6 235:12 | 272:2 273:10 |
| 139:3,4,5,25 | 189:6,11 | 235:23 236:1 | 274:5 276:1 |
| 140:4,15,18,23 | 190:13 191:1 | 236:10,13 | 279:1,1,2,13,14 |
| 142:13,14 | 192:24,25 | 237:7,8,10,11 | 279:15,16,18 |
| 143:8,16 146:2 | 193:2,4,4,5,13 | 237:17,20 | 279:20,23 |
| 146:3,5 149:1 | 194:3,4,8,9,16 | 238:2 239:6,12 | 280:3,4,6,11,21 |
| 149:3,20 | 194:20 195:1,9 | 239:16,16,19 | 280:21,23 |
| 150:23 152:10 | 195:13,17 | 239:24,24 | 281:2,3,6,7,8,9 |
| 153:16,19,20 | 196:1,5,13,22 | 240:9,14 241:7 | 281:9,9,10,11 |
| 153:20 154:4,4 | 197:1,9 199:2 | 242:17 243:3,7 | 281:20,20 |
| 154:5,5,21 | 201:4,11,12,25 | 243:9,22,23,24 | 282:3,23 285:9 |
| 158:4,18 160:2 | 204:16,18,19 | 244:1,4,6,9,15 | 292:18 295:9 |

**[know - kumagai]**

295:16,18,19
295:20,21,24
**knowing** 44:17
74:21 210:19
268:3,23
**knowingly**
56:15 259:3
**knowledge** 9:4
9:5,10 14:2
16:7 19:8 22:5
29:7 30:9
32:23 50:24
52:21 53:13
62:24 65:24
67:19 74:3,19
76:11,25 78:5
89:2 90:19
92:4,25 93:5
103:24 106:11
109:22 116:21
125:15 126:10
128:6 129:19
146:14 156:22
160:3 167:9
173:21 177:11
185:19 192:8
195:10 205:9
209:19 213:7
214:6,20
217:11 228:2
229:1 235:6
250:6,11,14,15
250:20 251:1,4
251:5,7,23,23

252:1 263:10
265:2,5,23
266:2 276:6
287:25
**known** 24:4
26:12 48:12
56:8 67:2,3,6,6
81:15 162:4,4
280:22
**knows** 67:7
94:23,24,24
161:19 165:19
165:19
**kraemer** 99:13
**kumagai** 2:7
3:11,13 7:18
7:18 8:11 12:1
13:14,22 16:25
19:1 22:9
23:20 25:24
26:5 27:3
28:18 29:16
31:1,8,19
32:14 35:17
36:10 37:22
38:13 39:7,11
40:18 41:4
42:8 44:2
48:14 49:8,20
51:1,24 53:11
53:15,25 54:9
54:10 56:17
59:7,9,12
60:20 61:18

62:3,4 66:13
68:17,25 69:10
69:16 70:2
73:15,23 74:5
74:20 75:23
76:11 77:10
78:14 79:14
80:21 81:11,20
82:7 86:22
87:15 88:8
89:3,10,15,24
90:24 91:8,20
92:22 95:5
96:6 101:19
102:14 106:15
107:25 108:7
109:24 110:24
111:6 113:23
114:5 115:4,21
116:13 120:3
122:24 125:4
126:24 127:17
128:1 132:3
133:24 134:6
136:5,9 137:18
138:21 139:12
145:1,18,23
149:11,15
150:4,15
152:19 153:24
154:19 155:22
156:1,10
158:16 159:19
162:6 163:6

164:9,21
165:22 166:7
166:21 167:15
169:13,21
174:21 177:2
179:19 180:21
181:18 184:9
185:15 187:14
190:10 191:3
191:20 192:16
194:11 195:4
197:2,10 199:5
201:6,10,14,23
202:6 203:2
204:21 205:3,6
205:11,23
206:5,18 207:1
207:8 209:25
210:16 211:25
212:19,24
213:13 214:3
217:4 218:10
218:23 219:5,9
219:15,18
220:5 221:14
221:20 223:25
225:12 226:11
227:12 228:8
228:17 229:9
231:14,25
232:19 233:14
234:4 235:15
236:23 237:12
238:21 239:9

240:7 241:14 242:6,12 243:15 244:11 244:25 245:10 246:25 247:10 247:20,22 249:17 250:12 251:22 253:11 258:12 260:14 261:16 262:4 262:25 264:2 264:23 265:19 266:5,13 267:3 268:15 269:4 270:7 272:4 273:11,14,19 273:23 274:1,6 276:4 277:5,12 277:18,19 278:2,5,6 280:16 281:22 282:5 283:6,15 283:25 284:20 285:19 286:7 286:14 287:4 287:24 288:1 288:23 289:24 291:10 292:1,6 293:22 295:13 295:15,25

**kupiec** 5:7 229:13 280:6,7 280:7,10,16

**l**

**lab** 3:24 49:15 49:20,22,23 50:13 56:3 59:16 64:6 102:18 170:15 170:20 171:5 171:13 172:15 172:21 173:1,6 174:17 181:3 181:20 183:10 183:13 184:2,2 184:12,15,19 184:23 185:1 185:11,13,17 186:7,11,13 187:2,9 198:8 198:11,12,14 206:22 235:8 282:25 283:12 286:22,24 287:2,16

**label** 10:9 64:20 94:3,9 94:21,22 101:24 102:5 242:1

**laboratories** 282:24,25

**laboratory** 11:8 51:7 175:10,20 177:6,23,25

178:9 183:7,17 203:23

**labs** 196:6 203:23

**lack** 16:6 150:25 183:15 187:8 194:6 232:11 263:25

**lacked** 173:1,6

**lacks** 249:1

**language** 137:6

**large** 20:8 168:2 186:10

**larger** 96:4 102:2,25 103:13

**largest** 257:3

**laser** 106:21

**late** 72:9 85:14

**lauder** 4:19 128:2,4,10 129:4,17 133:1 133:2,3,22

**laughably** 63:9

**laura** 6:4 173:15 181:4 182:9 185:23

**law** 7:19 36:17 37:1,15,18,23 38:1 41:9 68:2 68:6,13,23,23 71:17 87:11 236:3 266:17 272:2 276:2

**law.com** 2:11

**lawrence** 2:4 3:5 7:12

**laws** 215:20

**lawsuit** 33:6,14 35:2,15,19,25 86:4,9,15 87:19 88:4 90:16,18 252:23 253:19 254:21 258:24 259:18 260:2

**lawsuits** 72:23 284:16

**lawyers** 36:2 36:18,22,23 37:1 92:16 244:9 275:12

**lead** 59:15 129:9

**leadership** 29:21 30:18 31:13

**leads** 55:19

**leaked** 187:23 188:19,22 192:21 193:21 194:1 195:2,17 198:24 200:20 201:2,5,7 202:5,13,17 203:6 222:1,10 224:6 225:17 226:17 227:10

**[leaked - little]** Page 53

230:4,15 231:8 232:9,24 233:23 286:2 288:3

**leap** 85:19

**learn** 142:8

**learned** 171:4

**learning** 291:25 295:1

**leave** 235:16

**leaving** 85:20 85:21,25 292:20

**led** 51:24 73:10 80:12 195:5 242:4

**left** 148:7 170:24

**legal** 18:11 31:23 32:1 35:25 36:7,11 36:13 89:4,10 89:15,20,23,25 90:2 117:3 215:13 217:14 217:14 236:21 236:21,22 237:8 244:9 246:16,21 253:22 255:25 258:8 266:19 275:7 276:23 298:23

**legally** 253:8

**legitimate** 38:9 47:4 130:24 132:5

**length** 256:14 256:20 280:11

**letter** 3:19 4:14 5:4,13,15 54:1 54:5 62:5 78:7 115:11,12,23 116:17 117:6 119:22 120:12 120:13 214:10 214:19 218:19 221:8,16 223:24 224:2,3 224:6 231:11 231:14,15,18 231:22 232:25 247:24 248:3,6 248:17,20 267:6 268:10 268:13 270:11 271:21 272:8 272:11,15 276:1

**letters** 266:15 266:23,25 267:1 275:18

**level** 136:24 137:8

**leveled** 45:23

**levels** 12:16,19 135:21

**liability** 216:15 217:9,18 218:13 219:23

**liars** 29:23

**license** 112:2

**lies** 26:25 27:22 34:21 43:7 77:9 79:3,13 129:9 131:22 131:23 252:17 253:10

**life** 127:1

**light** 29:11 72:25 75:1 142:21 151:22 152:1 218:2 255:17

**liked** 243:1 263:14

**likelihood** 36:1

**likely** 23:9 116:19 151:20 225:10 256:2

**likewise** 59:24

**limited** 187:9

**limits** 119:17

**lindsay** 1:9 2:12 4:7,10,12 5:22,24 8:6 18:16 96:13 97:5 99:8 104:10 105:8 291:13 294:20

**line** 24:2 79:10 128:11 154:20 155:17 160:14 170:1 214:24 237:10 243:12 265:11 272:13 294:5 299:4,7 299:10,13,16 299:19

**lines** 132:20 150:24

**linked** 161:3

**liquidity** 137:15

**list** 4:17 5:12 140:15 164:16 287:19,19 291:17

**listed** 14:12 176:4 194:5 250:19

**listened** 101:1

**lists** 118:24 157:10 293:11

**literature** 63:11,23

**litigated** 257:2

**litigation** 29:2 29:12,17 33:1 38:2,5 284:17

**litigious** 122:1

**little** 36:20 37:4 54:9 170:23 195:1 226:17

**[little - made]** Page 54

243:23 255:19 262:7
**lives** 106:2
**llp** 2:3,9,13 3:5
**locate** 174:8,11 269:21
**location** 7:11
**logbook** 182:23
**long** 14:24 204:19 229:2 247:21 280:1 295:3
**longer** 40:3 165:2 206:21
**longstanding** 200:7
**longterm** 271:5
**look** 10:24 25:4 30:20 33:8 40:15,23 43:2 43:10,10 45:10 45:19 50:22 53:5 55:10 58:7 62:25 64:18 65:4 78:7 79:10 82:22 83:22,23 84:12,13 93:15 98:25 100:10 100:16 102:20 105:9 108:22 113:1,6,8,12 115:25 117:12 117:23 118:12

119:12 122:10 126:15 128:23 132:7,8,25 135:1 136:16 138:2 147:25 148:6 150:15 162:9 163:14 164:17 168:10 170:23 171:19 171:23 182:7,8 182:12 194:21 194:24 199:10 203:8 215:5 220:14 222:2 224:22 231:21 232:8 235:22 239:23 247:22 252:14 267:2 270:17 276:11 282:6 286:4 290:4 293:3,24 294:13
**looked** 25:5,25 44:11,11 55:1 65:25 66:5 90:8 95:3,25 117:2,9,10 132:11,16 133:9 146:3 153:17 159:11 161:21 164:19 182:8 190:4 194:15 211:25 267:15

**looking** 9:18 27:9 32:1 33:18,20 39:15 47:8 50:11 54:24 96:18 107:12 120:11 120:17 134:25 139:22,24 154:23 174:22 177:2 202:3,4 231:17,18 248:11 285:10
**looks** 42:16,17 57:4 107:12 118:5 121:10 274:23
**loss** 216:15 217:9,18 219:23
**lost** 139:20 147:12 197:25 198:2
**lot** 15:16 16:23 24:7 30:9,22 80:16 83:9 182:25 183:2 261:25
**lots** 75:14 79:20 130:8 168:12,12 259:1
**loud** 80:18
**loved** 271:8

**lower** 129:10
**lunch** 127:16
**lund** 50:13 52:22,23,25 56:3
**lying** 30:11 80:7 81:25

**m**

**m** 249:25
**madam** 55:8
**made** 18:10 21:25 23:2 28:12 40:10 41:15,18 43:7 50:13 77:4,21 78:22 79:15 81:24 82:12 83:14 85:9 112:7 113:6 116:7 118:18 123:10 124:13 126:13 130:16 132:12,16 135:4 140:2,17 145:6 156:24 160:9 174:5 186:16 189:24 203:12 204:5 205:14 209:5 230:6 232:20 237:7 239:21 240:19,23 241:11 275:20

**[made - marked]**

281:24 300:5
**madison** 2:9
**magazine** 5:16
187:22 222:3
222:22 224:19
225:18
**magistrate**
86:3
**main** 33:4
245:22
**maintain** 172:1
**maintained**
205:9
**maintaining**
137:8
**major** 262:4
**make** 17:23
28:16 32:17
38:3 40:24
42:18 52:25
54:23 59:1
73:5 77:23
80:9,9 83:19
85:19 108:25
113:3,6 121:17
126:12 131:20
132:2 139:6
156:4 157:18
158:20 161:25
186:22 200:10
219:6 224:11
233:5 235:13
236:21,22
237:8 250:19

250:24 254:1
259:2 263:19
286:19
**makes** 57:14
109:24 161:23
217:16 218:12
218:24
**making** 21:7,18
21:22 27:18
79:25 80:7
112:21 133:14
158:21 199:24
205:11 209:11
238:16 239:5
241:1 242:24
249:8 266:20
269:21
**malicious**
26:18,20 27:2
131:21
**maliciously**
23:23 24:3
26:8 237:6
**management**
33:3 183:18
**mandavilli**
161:6
**maneuver**
119:16
**manipulate**
48:4 51:16
73:24 74:13
114:21

**manipulated**
9:2,8,13 10:3
10:19 13:13
41:21,24 43:11
45:6 47:10
48:1 51:12
109:10 110:21
111:3,8,13,16
112:17 114:7
115:6,8,16
125:19 131:11
149:21 153:19
186:17 215:14
216:5 289:14
**manipulating**
74:9 76:13,17
114:25
**manipulation**
49:18 76:5
102:8 112:18
114:13 140:18
141:2,13,20
142:5,24 143:9
143:19 144:21
147:1 148:21
153:3,8 157:7
158:3,6,8,10
196:11 197:5
238:11,24
246:3 263:8
270:22
**manner** 31:15
35:16 38:16
92:6 117:3

241:3
**manuscript**
108:14,23
109:4,18
112:16 157:3
291:14 294:10
**march** 86:14
87:7 141:4
142:16 145:16
148:6 214:11
220:23,23
224:2
**marian** 229:13
**marisa** 5:18
274:13
**mark** 14:3
40:13 54:5
56:23 62:15
64:3 65:16
93:6 96:25
104:6 108:7
117:14 121:1
128:8 143:25
156:10 173:9
188:6,7,8
214:7 229:9
247:6 254:7
267:3 270:8
274:8 276:8
288:20 289:1
292:8,9
**marked** 6:1
14:6 40:20
54:6 56:25

**[marked - meeting]**

60:9 62:17 64:4 65:17 91:7,9 93:8 97:2 104:8 108:9 109:12 111:18 117:16 121:3 128:7 144:1 147:13 147:15 156:12 160:20 169:22 173:10 180:22 188:9 201:24 214:9 221:21 229:11 247:8 249:19 254:9 267:5 270:10 274:9,11 276:7 277:13 286:4 288:24 292:11

**markers** 197:20 286:12

**market** 27:21 84:9,11 161:4 256:8

**marketing** 100:18

**markey** 3:20 54:16

**marking** 288:22

**markings** 40:24

**marks** 53:19,21 91:1,3 127:20 127:22 169:15

169:17 201:17 201:19 245:4,6 259:18 296:3

**marsman** 5:7 6:5 173:14,23 177:3,12 181:7 181:13 229:13

**master** 61:1

**match** 59:6 92:3

**material** 27:6 61:7 82:14 122:2 141:8 157:2 180:14 197:17 262:4 286:9

**materials** 9:16 9:23 10:21,24 14:22 16:19,23 39:14 42:17 43:2,13 45:19 58:24 61:14 65:4,8,12 83:9 83:24 92:19 140:20,21 141:1 157:1 182:7 188:5,7 200:2,9,24 285:11 287:22

**matter** 7:7 80:20 121:24 122:12 232:22 255:16

**matters** 216:18 220:1 246:23 297:8

**matthew** 214:11

**mcnally** 249:25 250:13,16 251:2

**mean** 20:21 24:14 26:7 29:6 31:19 37:5,24 38:13 43:12 68:25 70:5 95:18,19 99:5 100:6 113:5 122:5 127:4,7 138:1 155:15 160:6 163:6 167:15 180:2 189:4 191:3 202:14 203:4 232:16 243:15 287:14

**meaning** 226:1 268:24

**means** 35:7 57:25 95:11 127:7 234:17 234:18

**meant** 36:11 92:5 115:3 122:21 123:5 129:10 137:1 225:8 227:14

227:15,19 254:5 273:25

**measure** 32:15 34:25 281:11

**measurement** 32:18

**mechanism** 12:22 45:2 89:23 130:6 260:10 283:17 283:22

**media** 7:4 53:19,22 91:1 91:4 115:15 126:25 127:20 127:23 169:15 169:18 201:17 201:20 238:9 238:22 240:18 240:24,25 245:4,7,16 246:4,9 247:2 260:21 261:9 266:16 296:3

**medical** 161:5 162:11

**medicine** 12:8 167:3 183:7

**meet** 14:23,25 15:1 75:3 76:2 187:2

**meeting** 19:11 71:12 76:4,12 90:20 136:2

**meetings** 15:23 136:22
**member** 18:24 55:18 97:14 108:18 135:18
**members** 92:23 93:3,11 135:24 264:2,8,14 276:10
**memorandum** 22:18
**mentioned** 74:4 186:5
**merit** 34:13 35:19,23 36:11 36:11,12,13,19 241:19
**merits** 35:25,25 36:6,7
**message** 218:11 253:13,21 258:23 276:17 279:10,17
**messages** 40:7
**met** 14:21 70:6 71:13,14 76:16 94:10 102:1,4
**metadata** 251:16
**method** 63:24
**methodologi...** 157:3
**methodology** 99:17

**methods** 163:19 164:3 164:12
**meticulously** 218:4
**mice** 283:24
**michael** 5:7 6:4 173:14 181:7 229:13
**mid** 73:8
**middle** 286:8
**mike** 224:24 227:1 245:17 245:18,20 255:12,22
**milan** 46:1
**milestone** 135:15
**milestones** 136:1,7,21
**milioris** 1:4 2:18 3:19 7:21 7:25 8:16 54:15 75:4 76:3 83:14 84:21
**million** 35:2,5
**mind** 56:22 112:9 132:24 139:11 142:10 262:5
**minds** 174:14
**mine** 41:6 218:22

**minor** 160:14
**minute** 45:19 53:15 59:1 140:7 201:14 277:7
**minutes** 25:14 90:24 98:7 122:25 123:9 123:16 125:5,7 126:21 296:7
**miraculous** 58:8
**mischaracteri...** 23:16
**mischaracteri...** 46:20
**misconceptio...** 275:3 276:19
**misconduct** 3:17 6:18 141:21 142:24 143:19 148:21 153:3,12 189:24 200:3,6 200:8 209:21 210:6 214:25 215:11 216:12 216:23 217:6 217:17 218:25 219:8,10,20 220:19 222:6 223:10 234:14 249:25 270:21 288:4

**mislabeled** 160:14
**misleading** 160:10 178:11
**misrepresent** 142:5 157:8 158:4,9,12
**missing** 202:22 211:16 247:12
**misstatement** 219:4,5
**mistake** 132:17 132:18
**mistakes** 162:14
**mitigate** 271:14
**moa** 63:5,9
**mogenson** 5:20 276:13
**molecular** 141:15 197:19 286:11
**molecule** 66:16 144:11
**moment** 54:10 70:4 98:25 128:21 133:10 164:23 169:23 173:12 186:5 210:24 227:12 254:16 259:5
**moments** 150:5
**monday** 105:24

**monetary** 35:1 35:13
**money** 20:7 28:16 30:22 33:9 35:9 80:9 80:9,16,16 135:4
**monitoring** 25:3 82:21
**month** 70:16 280:25
**months** 70:23 70:23 215:25
**moot** 185:7
**morning** 7:2 8:12,13 105:24
**moss** 5:18,20 274:13,19 275:2 276:13 276:16
**mother** 266:16 276:13,23 277:3
**motivation** 80:8 131:24 238:18
**motive** 129:8 129:22 130:23 130:24 236:13
**motives** 80:13 80:22 81:2,4 134:10,18 136:13 137:24 138:5,25

**move** 27:7 38:15 39:14 65:14 123:4 185:5
**moving** 10:25
**multi** 256:7 257:4
**multiple** 50:15 139:14 151:13 206:9,9 228:18 278:16 288:12
**multiplicity** 290:22
**multiply** 98:15

**n**

**n** 3:9 7:1
**nadav** 173:15 280:21
**nagoya** 12:6,7 12:12
**name** 7:13 21:24,24 97:10 109:12 111:17 113:11 114:13 128:2,18 134:1 194:9 279:1 281:14
**named** 99:12 133:25 266:17
**names** 37:13
**narrower** 54:7
**naturally** 72:20

**nature** 98:22 266:16
**near** 31:18 198:7 255:19
**necessarily** 31:24 49:3 100:5 126:5 127:10 180:7
**necessary** 33:22,24 300:6
**need** 11:5 26:15 40:23 65:11 81:9,9 88:15 100:23 114:15 196:10 211:17 291:22 295:1
**needed** 100:19 151:16
**needless** 123:11
**negative** 30:6 30:23 31:15
**negatively** 29:12
**negligence** 49:4 112:10
**negligent** 50:6
**negligently** 49:2,2
**negotiated** 279:5
**neurobiology** 4:24 142:2 156:14,25 157:16

**neurodegener...** 141:15
**neuroscience** 4:22 96:12 107:1 140:23 141:2,4,5,11 144:5,15 145:3 145:5,16,19 146:20,25 149:6
**never** 24:25 25:7,10 35:4 39:20 44:10,10 67:20 82:16 84:18 85:16 98:5,5,6 135:3 135:4,12 136:3 146:14 165:2,2 166:8 185:25 190:25 191:2 193:1 195:12 265:3
**new** 1:2 2:10,10 2:14,14 5:2,5 5:14 6:13,14 7:9 27:20 28:2 28:5,14 29:11 30:19,19 31:13 51:24 72:25,25 73:9,14,15 120:22 125:14 134:3,24 145:10 146:10 146:13,14

157:18 160:24 161:1,16,24 163:2,16,24 164:11,11 166:2 170:11 175:10,10,10 188:17 189:9 189:15,22 190:24 191:7 222:1,5 230:5 230:6,7,19 232:22 233:25 236:3 264:10 266:15 267:7,7 268:3,10,18 269:1,2,4,6,25

**news** 163:12,13 227:5 257:6 266:17,17 275:18,24

**nice** 265:9

**nicoll** 133:25 164:22 165:7 165:13 166:7,9

**nih** 261:5

**nine** 163:16 164:1,2,10,17 164:18 278:18 278:24 279:20 281:24

**noise** 151:19 279:6

**noncompliers** 290:11 292:20

**nonprivileged** 155:19 156:9

**nonpublic** 122:2

**nonsense** 66:17 123:12,18 124:14 125:1,6 126:15

**normal** 35:16 46:12 75:16 95:22 96:1 98:19 100:5 146:6,11 196:3

**notary** 300:13 300:19

**note** 132:18 140:25 145:15 145:21 169:3 215:10 246:14 298:10

**notebook** 199:21

**notebooks** 198:12 286:25 287:16

**noted** 88:21 142:6 182:17 182:23 300:7

**notes** 297:13

**notice** 3:1,15 14:4 148:6 150:16 153:1

**noticing** 7:17

**notified** 193:8

**noting** 170:21

**novel** 130:6 163:9

**november** 28:21 34:10 51:3 55:25 57:12 60:21 61:10 66:14 89:12 108:13 111:1 173:14 174:23 175:2 177:3,13,17 178:7 229:14 231:16,22 232:25 254:11 254:20 277:22 291:13,23 294:16

**number** 6:2 7:9 16:23 17:1 21:25 22:24 40:19 52:9 80:18,19,21 93:10 96:14 106:1 119:4,12 121:5 140:21 171:23 196:4 252:20 259:23 280:24 288:22

**numbers** 59:5 63:1 65:22 118:14 182:25 183:2

**numerous** 46:5 216:1

**ny** 298:15

**o**

**o** 7:1 150:10

**oaths** 297:5

**object** 11:18 13:5,19 16:16 18:22 22:4 25:13 26:3,23 28:7 29:14 30:16 31:5,11 32:4 35:11,21 37:17 38:10 42:6 48:7,20 49:11 50:8 51:18 53:7 56:1 60:17 61:13,24 68:20 69:6,13 73:4 73:18 74:2,11 75:21 76:7,23 78:18 80:14 81:5,18,23 86:21 87:8 88:6 89:1 91:19 92:17 94:15 95:17 101:17 102:12 106:8 107:8 108:3 109:19 110:22 111:4 112:20 114:1

**[object - okay]** Page 60

| | | objective | offering 114:13 |
|---|---|---|---|
| 114:22 115:9 | 225:15 227:7 | 175:15 199:25 | officer 11:4 |
| 115:24 119:25 | 228:6,14 229:7 | 200:14 | 18:14 255:5 |
| 120:7 122:19 | 231:2,10 | objectively | 297:1 |
| 123:19 125:11 | 233:10,19 | 243:6 | officers 216:4 |
| 127:6 129:25 | 235:10 236:20 | obscure 44:13 | offices 3:5 |
| 131:14 133:15 | 237:3 238:14 | observations | oh 21:15 41:7 |
| 134:4 135:16 | 239:2 240:6,21 | 166:17,18 | 81:6 132:11 |
| 136:8 137:10 | 241:20 242:10 | observed 12:14 | 139:17 147:13 |
| 138:8 139:1 | 242:16 243:21 | 171:24 | 252:22 |
| 144:22 145:14 | 249:14 250:10 | obtain 177:25 | okay 8:12,22 |
| 149:9,13,23 | 251:19 252:25 | obtained 99:17 | 9:17,22 10:20 |
| 150:8 153:14 | 261:11 262:15 | 141:23 151:14 | 11:2,15 12:5 |
| 158:13 159:9 | 263:9 264:18 | 175:12 | 12:24 14:3 |
| 162:1,23 164:6 | 265:8,15 266:1 | obviously | 15:9 16:21,25 |
| 164:14 165:14 | 266:9,22 | 69:22 155:2,6 | 17:10,14 22:21 |
| 165:25 166:15 | 268:12,20 | occasions 216:1 | 23:15 27:9,14 |
| 167:13 169:7 | 270:3 271:23 | occurred | 36:8 38:7 |
| 174:19 176:25 | 273:8,11 274:3 | 121:16 170:15 | 39:22 40:13,21 |
| 179:11 180:16 | 275:22 281:19 | 216:12 217:6 | 41:4 42:23 |
| 181:16 184:5 | 282:2 283:4,13 | 219:8,10,20 | 43:23 44:2,19 |
| 184:17 187:12 | 283:19 284:13 | 220:19 | 45:10 46:13 |
| 190:8,19 | objecting | occurring 16:3 | 47:8,12 54:18 |
| 191:12 194:2 | 123:22 | october 117:25 | 55:7 56:23 |
| 194:14 196:24 | objection | 187:18 192:18 | 58:7,19 59:2,4 |
| 197:6 198:22 | 209:23 210:8 | 194:13 202:25 | 59:8 60:8,25 |
| 200:22 201:9 | 211:18 212:7 | 222:3 224:7,23 | 61:9 62:4,25 |
| 204:15,24 | 212:22 219:17 | 228:18 231:17 | 63:16 64:2,18 |
| 205:18 206:2,8 | 260:12 261:22 | 232:22 298:3 | 65:1,11,15,24 |
| 206:23 207:6 | 286:14 287:24 | offense 31:23 | 66:4 68:5 |
| 213:6,18 | 289:24 291:10 | offered 115:19 | 77:15 78:13 |
| 216:25 217:21 | 292:1,6 293:22 | 155:22,24 | 84:4 89:3 93:9 |
| 218:15 219:2,3 | objectionable | 156:2 | 97:3,17 98:24 |
| 220:2 221:9,18 | 246:14 | | 100:16 101:12 |
| 223:22 225:6 | | | |

**[okay - original]**

103:15 104:9
104:19 105:4
108:11,21
109:2,3 110:23
117:23 118:7
118:12 119:4
121:4 122:10
123:8 128:22
129:3 133:8
138:11 143:25
144:4 145:1,23
146:17 150:15
156:1,10,23
160:8,19 161:1
162:4 163:14
164:21 169:21
170:1,25
171:23 174:1
174:21 175:5
175:23 176:15
177:2,12
180:21 181:4
182:12 183:12
188:12 189:14
190:2 192:16
195:1 197:10
198:7 199:10
199:16,19,19
201:23 202:6
202:14 203:4,8
203:15 208:8
210:4 213:21
221:20 222:2
223:5 229:12

231:23 233:1
234:4 239:9
240:22 243:15
246:24 248:6
249:17,21
251:22 252:6
252:19 254:7
254:19 255:20
256:4,23 258:5
258:12 259:2
259:17 260:14
262:7 267:18
268:15 269:9
270:7,11,17
272:10 273:23
274:6,18 275:1
275:14 276:4
277:5,12,18,25
278:3,6 282:11
284:20 285:19
286:21 287:14
287:21 290:4,9
290:25 292:3
293:9 295:25
**old** 127:2
**ona** 86:3
**once** 81:7
157:19 161:4
**one's** 149:3
**ones** 16:9,10
43:10 56:22
79:20,21 85:14
133:13 205:1,2
205:10 271:9

**ongoing** 70:13
72:23,23 87:10
157:16 271:4
**online** 20:17
21:3 22:3,25
28:11 30:11
34:22 126:19
186:16
**opaque** 55:18
**open** 10:9
64:20 73:13
94:3,9,20,22
101:24 102:5
115:11 220:16
242:1 284:25
**operate** 137:20
**operating**
127:5 183:16
**operations** 90:7
295:1
**opine** 150:4
**opining** 120:17
**opinion** 22:19
36:18 78:16
126:17 186:18
267:22
**opinions** 18:15
98:16,17 163:3
163:7 165:6
**opponent** 243:6
**opportunity**
135:6
**opposed** 38:22
207:15 279:22

**opposing**
285:21
**ops** 295:4
**option** 136:16
271:8
**options** 134:24
135:4
**order** 22:18
33:24 47:24
86:4,13 286:1
**orderly** 38:16
**orders** 86:19
**organization**
30:20 126:9
128:17 149:3
150:13 267:20
**organizations**
275:18
**organize** 92:5
**organized**
139:20
**ori** 197:23
**origin** 240:11
**original** 84:1
140:4,19 141:1
146:3 197:18
197:21 203:21
203:24 204:13
204:22 205:16
205:25 206:6
206:21 207:1,4
207:21 236:17
283:1 286:10
287:23 288:18

**originals** 204:19 207:19

**originated** 237:20 240:3,9 240:18

**origination** 29:22

**orrick** 5:4 13:3 26:1 41:9 47:19 60:10 63:20 68:2,18 69:11 71:16,21 71:24,25 72:1 143:2,4,21 145:4 153:2,5 155:12 214:10 214:16,21 217:15 218:17 220:4,5 255:25

**orrick's** 69:3 155:20

**otw** 1:3

**outcome** 145:10 213:4 297:17

**outlet** 187:18

**outlets** 275:24

**outliers** 113:21

**outraged** 165:3 243:17 244:4 244:18,20,22

**outright** 131:20 242:22

**outside** 15:24 18:5,6,8,19 45:3 50:14,15 52:22 71:11 72:19 73:1 77:2 82:20 95:8 97:25 98:14 121:18 121:20,23 122:12,18 124:12 205:21 206:11,15 258:8 260:8

**overall** 157:6 292:20

**overseen** 71:6,6

**oversees** 143:15

**oversight** 139:6

**overstated** 269:11

**own** 9:24 10:6 13:10 21:5 33:15 43:9 44:11 53:5 127:1 140:19 149:3 150:13 184:1,15 188:2 193:7,11 195:19 196:6 199:1,7 203:23 232:10 234:22 234:25 235:12 282:23 292:9

**owner** 283:10

**ownership** 282:13

**owns** 231:3 235:4,7 282:14 282:17,20 283:2,6

**p**

**p** 7:1 100:21 101:13 117:24 150:10 290:22

**p.m.** 127:21,21 169:16,16 201:18,18 245:5,5 277:10 277:10 296:6

**package** 146:22 148:15 152:8 159:5,11 164:8 165:9 171:15

**page** 3:10,14 4:1 5:1 10:25 14:11 15:15,15 27:8,12,13 41:13,14 45:20 46:17 54:14 55:8 59:2,17 62:25 63:1 64:19 65:21,22 99:6 101:3 105:11 115:22 117:23 118:4 118:12,13

123:11 128:24 133:2 140:14 140:14 144:17 147:2 148:1,2 162:9 163:14 170:23 171:19 176:1 177:18 177:20,21 182:12 197:11 197:25 199:10 199:14,15 203:19 215:6 247:13,18,22 248:22 254:19 255:3 256:5,14 256:23 267:18 269:9,10 270:17 272:14 276:12 278:7 286:4,8 289:4 293:7,25 294:13 299:4,7 299:10,13,16 299:19

**pages** 14:12 22:25,25,25 39:18 78:15,20 88:14 247:12

**paid** 134:22 135:12 136:3 136:25 191:6,6 213:9

**palsy** 12:10,14

**panels** 150:25 151:1,13
**papanastasiou** 6:5 173:23 174:23
**paper** 45:1 47:19 60:10,13 109:9 111:18 112:22 113:12 113:25 114:14 114:19 115:19 127:2 131:17 141:16,24 142:3 143:23 144:16 145:4 147:20,21,24 148:12 159:3 159:17 160:8 160:17 189:3 194:9,10 233:25 283:16 283:21 289:13 290:10 291:18 292:15,19 293:10 295:5 295:10,16
**papers** 44:21 46:7 124:13 142:17 151:13 229:6
**paragraph** 27:7 41:14 55:10,14,15 93:15 99:13

105:14,23 118:13,17 122:11 148:1 151:6,8 158:19 163:16 164:22 172:9 175:6,23 182:22 189:19 197:15 198:7 199:19 200:18 203:19 215:5 218:1,1,19 220:15 226:12 232:25 257:12 267:19 269:10 270:18 271:12 272:14,18,20 275:1 276:18 278:1,6 286:17 286:20,21 290:9 291:1
**paragraphs** 13:3 124:4 163:15 273:18 273:25 291:1
**paraphrase** 10:22 96:16 193:12
**paraphrasing** 23:2 187:25
**parse** 73:5 88:19 116:2 124:18 155:7 207:14 227:20 234:24

**parsing** 79:9 221:10
**part** 17:14 29:21 35:14 43:9,16 57:18 68:6,21 69:9 75:14 95:18,23 109:22 112:6,9 120:1 130:13 131:2 134:19 139:5 146:21 147:6 148:14 152:8,10,15 153:22 158:2 159:4,10,12 164:7 165:9 168:4,21 171:14 200:13 207:25 220:14 243:11 246:8 253:20 260:4 262:24 289:19 290:1 291:7 292:4
**partially** 35:24 96:1,14
**participant** 135:7,10,18
**participants** 101:25 179:8 179:15 230:7 230:11 231:7 232:8,13,18,21 233:17 264:17

269:21 281:6,7
**participate** 270:2 281:16
**participated** 167:16 169:3
**participating** 7:21 281:5,25
**participation** 278:19 279:22
**particular** 16:10 36:3 43:19 55:2 62:21 64:16 69:10 74:21 83:13 84:25 99:4 110:1 121:13,17 130:15 146:19 156:5 159:11 197:5 218:12 218:18 221:3 252:4 253:13
**particularly** 134:20 146:8 233:6 262:9 279:8
**parties** 223:9 260:16 297:9 297:16
**partners** 128:4
**party** 10:5,21 13:1 45:3 51:6 51:7 63:23 100:24 103:9,9

**[party - pertaining]**                                               Page 64

191:1,4 195:25 196:15 241:23

**pass** 122:8

**passed** 42:21

**past** 215:25 243:12

**patent** 249:2,12 249:15

**pathogenesis** 144:10 156:17

**pathologies** 12:13

**pathology** 12:23 119:7

**pathophysiol...** 119:8

**patient** 24:17 85:17 94:23 100:8 166:25 209:2 230:23 234:1 281:14

**patients** 12:20 19:21 20:16 21:19 23:8 24:25 26:14,14 27:1 28:13,17 30:9 40:11 52:7,9 59:20 60:2 79:17 85:20 86:1 96:14 100:21 101:14 103:8 108:5 125:17 130:22 165:1

166:8,13,22 167:20 168:9 168:10,13,22 180:5 209:12 209:16 234:20 252:17 253:16 269:17 271:1 281:21

**patrick** 3:20 54:16

**patterns** 151:12

**paul** 100:19 101:8 103:6

**pay** 137:16

**paying** 30:10 137:20

**payment** 135:22,22

**payments** 135:14 136:6 136:13

**payouts** 137:13

**peanut** 24:20

**peanuts** 24:18 24:20

**peek** 55:6 64:14

**peer** 10:14 42:16,22,24 43:24 44:5,21 63:24 67:18 124:13

**pei** 198:10 286:23

**pending** 178:5 295:2

**people** 8:19 19:18,19 20:23 23:4,25 27:19 29:22 30:5,10 34:2 35:1 44:11 52:22 77:1,3 85:6,25 95:21,21,24 112:3,4 117:12 121:23 122:22 126:6 131:23 136:24 158:14 158:17 163:3,7 163:9 167:8,15 169:3 189:1 232:14 238:16 239:4,18,22 240:25 241:1 242:20 243:11 244:3,23 252:15 253:9 257:25 262:18

**people's** 203:23

**percent** 32:8 60:3 290:12,17

**perception** 192:22

**perfectly** 46:12

**perform** 213:9 215:17

**performed** 11:13 181:2

182:24 198:14 204:20 213:10 286:22 287:1

**performing** 215:12

**period** 72:11 85:13 210:6 285:17

**perpetrators** 238:25 244:12 244:14 254:21

**perpetuating** 236:25

**person** 16:11 21:15 22:1 94:17 126:8 138:19,19 146:9 163:12 179:13 180:18 230:1,2 256:2 295:2

**person's** 44:16

**personal** 16:6 243:2

**personally** 19:8 22:6 81:9 135:2 279:4

**perspective** 31:6 90:4 107:17 226:4 227:9,23

**pertaining** 141:6

**pertains** 184:11
**petition** 11:10
  67:19,21,24
  72:8 75:13
  83:11 84:14,17
  84:22 97:23
  98:1 121:14,21
  122:17 123:1
  123:17,25
  124:17 125:6,8
  140:1 235:25
  236:4 240:10
  241:5,15
  245:25 264:15
  266:8
**pfizer** 295:2
**ph.d.** 54:15,15
  54:16,16
  189:16
**pharmaceutical**
  127:5
**phase** 10:9,16
  20:9 21:20
  24:11 25:4
  26:17,21 31:18
  33:11,20,25
  38:16 47:17
  56:2 82:25
  83:1 85:3 90:9
  90:13 94:1,2
  94:13,18,19,19
  95:25 96:1,3,8
  96:9,10,11,18
  96:19,20 99:1

99:21 100:2,14
101:14,22,24
102:11,19,22
103:10,20
105:6 106:7
108:13,22
109:4,17
110:20 111:2
112:6,13,16
113:19 115:7
119:1 125:19
167:10,25
168:2,15,19
169:5,9 172:11
172:17,22
175:12 176:20
178:18 179:9
180:12,13
184:24 185:6
185:10,17
186:9,22 244:8
269:20 270:1,2
271:4,7 280:1
280:12 281:16
**phenomenal**
  58:13 59:14
**phone** 2:5,10
  2:14 21:7,25
  22:6,9,13
**phosphorylat...**
  12:17
**photoshop**
  67:12

**photoshopped**
  67:9
**photoshopping**
  66:15,19
**phrase** 36:20
  263:25
**physician**
  85:18
**physicians**
  20:15
**pick** 115:14
  116:2 239:21
**piece** 13:25
  20:8 44:17
  45:21 52:25
  53:2 69:7
  111:11 155:2
  184:7,10 189:3
  194:9,10
  210:21 211:6,9
  211:21 212:12
  233:3,25
  243:25 253:5
  281:2,3 287:15
**pieces** 54:25
  55:1 140:8
  152:10 269:2
**pile** 286:1
**pill** 25:19
**piller's** 266:18
**pipet's** 182:24
**pitt** 1:6 264:10
**pixel** 151:11

**place** 59:1
  96:16 138:23
  139:2 183:14
  273:1 282:8,10
  284:23 285:13
  297:11
**placebo** 95:2
  102:6
**plainly** 215:15
**plaintiff** 7:6
**plaintiffs** 1:5,7
  2:7 3:4 7:20,24
  8:15 14:3 22:2
  56:24 116:14
  117:14 134:11
  147:13 180:22
  188:8 214:7
**plan** 135:8,10
  135:12,14,18
  135:19 136:6
  136:14,18,23
  137:6,6
**planning**
  208:23
**plasma** 46:24
**plate** 172:4
**platform**
  115:15
**platforms** 85:7
  240:25
**play** 228:23
  246:2,11 247:1
  263:7

**plaza** 2:13
**please** 7:16
  65:5 81:19
  122:8,11 133:7
  240:15
**plenty** 241:1
**plethora** 15:14
**plos** 4:23
  142:15,16,19
  142:21 143:9
  143:16 148:5
  148:11,22,23
  149:3,4 150:6
  150:12 151:10
  152:1,20,21
  154:8 155:2
  200:6
**plos's** 151:11
  151:22
**plus** 256:5,14
**point** 50:24
  69:23 71:23
  72:4,17 75:4
  99:4 103:1
  104:1,16
  110:14 184:14
  184:19 185:12
  185:13,14
  199:8 224:11
  228:17 258:18
  280:22 291:25
**pointed** 50:24
  72:8

**points** 147:3
  293:11,14
**polarized** 23:25
**policy** 121:22
  122:16 204:18
  222:15 284:12
  284:15,19
**poor** 111:14
  188:24 259:10
  287:18
**population**
  102:3 112:8
**portion** 49:16
  167:25 191:15
  227:10 232:2
  292:10
**portray** 46:21
  114:3
**posited** 213:16
**position** 11:15
  11:22 27:16
  30:21 48:9,10
  73:24 74:6,8
  74:12,25 75:2
  126:12 135:5
  149:5 154:21
  154:25 168:24
  169:1 193:23
  201:1 202:12
  204:9 227:17
  227:17 228:9
  232:5 233:8
  234:3 283:16

**positive** 33:12
  56:13 109:10
  111:3 112:17
  113:7,8 114:7
  114:21 115:6
  131:12 150:25
  151:16 249:2
  283:23 289:14
**possess** 44:6,22
  79:24 80:12
  288:8,17
**possesses** 197:4
  206:16
**possession** 9:12
  10:2 46:14
  58:21 196:22
  205:15,24
  206:6 207:4
  251:15
**possible** 25:10
  32:24 48:10
  62:24 100:21
  101:14 128:19
  158:9 200:10
  258:22
**possibly** 60:22
  60:24 117:12
**post** 198:11
  286:24
**postdates** 60:20
**poster** 248:8,18
  249:9
**potential** 10:12
  12:22 50:6

  108:4 119:7
  135:22 136:10
  167:24 217:14
  253:22 272:6
  281:15
**potentially**
  26:25 122:1,2
  125:19 136:13
  138:16 167:11
  178:10 191:9
  255:22 258:15
  286:1
**powerpoint**
  3:21,23,24
  57:4
**pr** 245:11
**practice** 215:20
  255:21
**practices**
  183:16,17
  200:5
**pre** 10:15
**prebys** 162:11
**preceded** 29:21
**precipitous**
  256:6
**precisely** 9:25
**preclinical**
  10:15
**predates**
  171:18
**prefer** 111:22
  226:1

**prejudice** 88:12

**premise** 163:19 164:4,13

**preparation** 183:3 198:13 286:25 287:17

**prepare** 14:19 15:18,22 16:21 17:20 182:4 252:3

**prepared** 14:16 61:19,25 91:13 181:1 255:11 256:18

**preparing** 19:1 207:8 252:2 255:8

**presence** 15:24

**present** 2:17 15:6 19:11 163:4,7,11 237:19 290:21

**presentation** 3:21,23,24 13:17 26:1 57:5 249:9 290:12

**presentations** 216:6

**presented** 150:18 151:25 248:8 283:25

**presenting** 294:9

**presently** 282:10

**preservation** 284:22

**preserved** 223:8

**press** 124:24,25 180:20 193:9 202:7,11,15,25 224:5 233:16 238:1 246:5,6 246:23 247:4 252:8,20 253:4 253:21 254:11 254:12,15,19 254:25 255:9 255:13 256:20 257:20 258:19 259:23 260:2 260:15 261:8 261:14 276:11

**pressure** 221:2

**presumably** 283:12

**presumes** 166:23

**pretend** 22:17

**pretty** 57:16

**prevent** 275:18

**prevented** 50:5 50:9 199:24

**prevention** 247:13

**prevents** 275:4 276:20

**previous** 30:18 186:25 202:1 223:23 297:6

**previously** 6:1 65:25 160:19 169:22 173:10 180:22 201:24 217:11 221:21 249:19 256:18 277:13

**price** 27:22 84:12,15,16,17 121:25 129:10 135:14,20 136:7,24 137:8 137:14 256:7 269:15

**primary** 35:15 61:6,7 103:25 110:17 160:9 160:10 166:17 200:2,9 242:1

**print** 127:2

**prior** 18:20 49:22 50:7,11 73:2,7 87:23 88:3 94:2 116:17 138:23 207:22 209:18 221:7 238:2

251:17 268:6 272:25 279:25 284:17

**privilege** 89:14 154:15 155:17 192:10,14 206:15 208:4,5 258:1,4,5

**privileged** 16:20 37:18 43:17,19,25 61:14 68:7,8 69:14,22 73:20 86:18,25 92:20 92:21 152:16 154:15 155:4,9 155:13 205:7 205:22 246:18 246:22,23

**privy** 71:12 73:11

**probably** 24:22 27:15 57:13 60:18,22 83:9 111:20 112:10 124:17 135:5 152:9 188:24 205:1 237:10 244:17 245:21 260:18,24 280:5,6

**probe** 156:2

**problem** 50:23 114:16

**[procedural - providing]** Page 68

| | | | |
|---|---|---|---|
| **procedural** 223:7 | **professional** 297:5,20 | **promising** 10:12 269:18 271:2 | **protocols** 229:24 |
| **procedure** 3:2 193:6 | **professor** 52:22 97:4 189:16 204:2,4 214:25 | **promotes** 12:21 | **prove** 24:7,14 24:21 38:8,19 58:21 82:18,24 187:10 |
| **procedures** 143:18 172:2 173:7 183:16 193:7 195:20 | **proffer** 73:9 | **prompted** 224:14 | **proveable** 25:9 |
| | **profile** 166:20 | **proofing** 157:4 | **proven** 25:8 80:18 |
| **proceed** 37:14 228:4 | **profit** 6:17 26:24 27:18 28:14 129:8,22 130:23 132:2 235:23 236:13 249:24 | **proper** 132:21 143:18 149:16 150:2,2 183:16 186:23,23 210:23 | **provide** 17:3 174:17 177:6 182:5 183:21 184:3 185:25 197:17 199:21 199:24 200:2 200:13 209:17 232:21 252:3 256:18 274:2 286:9 |
| **proceedings** 223:8 | | | |
| **process** 55:18 56:7 82:24 85:14 87:10 100:6 112:24 125:13,23 146:1 147:7 148:24 149:16 182:17 193:6 196:3 213:4 218:5 223:16 258:1 279:3 | | **properly** 213:10 218:7 218:11 | |
| | | **property** 235:1 282:19,20 | |
| | **profiteer** 28:15 | | |
| | **profiteers** 27:20 28:6 | **proponents** 163:9 242:20 262:1 263:13 265:10 | |
| | **program** 120:18 126:11 130:4 160:25 184:24,25 269:20 270:2 294:9 295:5 | | **provided** 11:14 13:9 59:19 106:7,25 109:17 119:22 142:19 151:9 151:12,24 157:1 190:16 191:21,25 276:17 |
| | | **proposal** 232:20 | |
| | | **proposed** 92:3 | |
| **processes** 183:14 188:2 189:5,8,11 193:12 223:6 | **programs** 278:17 | **proposes** 177:4 | |
| | **progress** 271:7 | **prosecutor** 237:11 | |
| | **progressive** 12:10,14 | **protein** 46:22 106:2 | |
| **produced** 61:15 205:8 288:14 | **prohibition** 122:22 | **protested** 197:21 | **provides** 129:11 177:17 276:16 |
| **product** 155:20 | **project** 280:24 | **protocol** 111:24 113:20 | **providing** 8:22 12:21 59:22,25 216:7 |
| **productive** 31:15,20,24 32:2 | **prominent** 163:17 164:1 164:10 | | |

**provision** 221:16

**psp** 12:14,20,23

**pti** 118:20,20 119:1,1 156:15 172:8 182:17

**public** 3:17 6:10 23:24 69:20 84:11 115:11 121:15 123:10 130:3 180:9,9 186:18 203:12 204:6 208:12 213:1 228:11 232:7 238:9,21 239:25 241:6 241:11 244:8 245:16 300:19

**publication** 141:3 150:17 192:18 202:16 251:11,18 268:4,6,23 275:4 276:20 295:17

**publications** 222:5

**publicization** 261:18

**publicize** 252:23

**publicized** 252:6

**publicizing** 252:12 257:20

**publicly** 127:10 196:4

**publish** 161:17 275:8 276:23

**published** 9:7 10:14 11:9 12:8 14:1 41:20 42:15,24 44:5,21 57:13 57:15 64:1 67:17 140:3 141:5 142:6 145:7 148:5,6 156:25 157:9 161:11 187:17 192:18 193:18 193:25 194:13 195:6 198:19 198:20 203:6 222:4,11,21 224:3,19 225:17 230:4 231:8,8 234:6 249:22 267:15 268:18 269:4 271:6

**publisher** 250:4

**publishers** 250:17 251:2 266:18

**publishes** 42:18

**publishing** 251:25 275:19

**pull** 285:25

**purported** 32:15 187:23 193:21,24 195:2,17 198:24 201:2,7 202:5,12 222:1 226:17 230:15 235:19

**purportedly** 21:7

**purpose** 23:21 29:3,5,18,20 32:13 34:5 46:6 88:17,22 120:12,24 184:20 206:15 257:19 259:13 259:15

**purposes** 19:2 31:20 34:6 86:8,15 88:23

**pursuant** 3:1

**pursue** 275:7 276:23

**pursuing** 28:2 253:9

**purview** 154:1 263:23

**put** 9:24 42:6 50:6 52:24

79:17 83:20 90:15 109:12 111:17 113:11 114:13 124:24 126:16 138:22 146:7,12 148:25 150:1 165:1 166:8 193:22 194:7 195:1 199:4 209:2 230:16 239:20 240:24 253:6

**putting** 28:13 40:11 52:19 66:16 139:2

**q**

**qc's** 183:3

**qcm** 240:12

**qualification** 181:2 184:21 236:22

**qualified** 174:17 183:20 185:3,13,14

**qualifiers** 193:22

**qualifying** 184:21

**quality** 215:10

**quanterix** 49:21 50:20

**[quanterix's - read]**

**quanterix's** 56:9

**quarterback** 105:24

**quebec** 46:3

**question** 6:14 9:25 11:21 13:6 16:17 17:12,21 19:23 20:20 34:17 35:24 37:20,21 39:1,2 44:10 61:25 67:20 69:2 74:6 75:6 75:9 77:7,11 80:3 81:3 83:3 86:12 96:19 107:20 110:4,7 146:6 161:2 162:24 169:24 174:13 185:8 191:15,24 196:19 203:25 204:14,23 205:17 206:21 207:10,11,13 210:2,13 211:13,17 215:9 219:3 224:8 231:24 231:25 233:20 236:17 238:19 240:15 242:18 243:19 246:14

258:4 260:11 260:13 267:8 285:1

**questionable** 55:11

**questioned** 141:23

**questions** 26:6 75:16 89:4 92:3 105:14 110:5 155:16 155:25 223:11 223:19 224:9 224:12,13,17 225:9,21 231:12 234:15 247:19 263:14 274:22 282:12 285:20,21 289:12 290:20 295:25

**quick** 4:3 17:6 27:18 91:10 125:22 226:1 250:19

**quickly** 57:16 127:3 161:13 282:11

**quiet** 254:5

**quintessential** 240:12

**quite** 49:13 94:5 127:14 224:1 240:14

243:23

**quote** 55:16 63:8 66:15 134:5,7 143:5 171:24 177:21 219:19 257:9 257:13 259:13 259:16 265:6

**quoted** 145:4 162:6,18,22 164:25

**quotes** 143:23 143:24 164:22

**r**

**r** 7:1 299:3,3

**raise** 224:12 225:20

**raised** 141:19 150:18 223:12 223:19 224:11 224:13,17 225:9 234:16

**ramifications** 217:14

**rampant** 126:23

**ran** 100:14 168:1

**rate** 280:24

**rates** 85:20

**rather** 92:6 94:20 110:5 162:5 241:15

287:18

**rationale** 63:9 89:25 90:2

**rationalization** 129:11,23 130:1

**raw** 207:4

**reach** 158:11 195:22 221:2 235:18

**reached** 174:16 195:12 239:25

**reaction** 126:12 161:10,16 192:17 193:15 193:19

**read** 13:2,25 15:15 20:17 21:3 39:19 45:20 46:17 47:25 54:21 59:17 65:6 78:20 99:3 105:2 108:24 111:20 116:14 116:16,20 117:5 120:10 120:10,25 121:10 124:2,3 124:15 129:5 133:6,8,20,20 143:22 144:23 147:22 150:1 153:2,6 155:1

157:25 161:12 161:12,15 173:25 174:1 179:15 188:19 194:4,17 197:8 198:6 199:6 202:23 215:4 220:13 223:23 226:25 231:11 231:23,25 232:3 234:1,10 239:18 248:10 248:19,20 250:18 251:12 252:15 255:15 264:21 268:13 268:16,17,22 273:15 275:24 278:4 283:20 286:7,16 287:19 298:9 300:5

**reader** 59:15 156:23 172:4 261:24 272:23

**reading** 47:19 101:2 107:10 114:10 116:11 133:21 150:10 160:1 217:25 268:25 287:4

**readings** 174:10

**readout** 38:17 90:13

**reads** 33:12 197:16 199:19 203:20

**reagents** 183:1

**real** 13:12 47:7 124:9,10,11 193:1 250:18

**reality** 155:15

**really** 70:15 82:19,19 83:4 107:15 130:4 166:24 184:24 191:2 243:19 243:25 248:21 254:7

**realtime** 297:21

**rean** 103:2

**reanalyzed** 50:16

**reason** 24:9,11 25:10 44:14 50:10 80:18,19 80:21 81:8,15 83:4 106:13,14 107:23 166:24 176:23 185:20 186:4 203:24 204:2 215:9 221:15 239:12 298:11 299:6,9 299:12,15,18 299:21

**reasonable** 50:10,21 51:11 56:14 77:24 79:5 80:6,10 82:5 251:11 268:5

**reasonably** 49:5 165:19 197:17 272:24 273:19 286:10 287:23

**reasons** 19:2 20:1 38:21 80:25 118:21 118:24 185:4 186:6

**reassess** 86:8 86:14

**rebutted** 288:2

**recall** 22:10 38:5 55:3 62:7 62:10,11,13,20 64:15 119:3 128:20 144:3 171:3 173:22 181:18,21,22 181:24,25 187:14,21 188:3 266:4,25 286:13,18,20 287:4,9 288:5 289:2,10,16,22

**receipt** 298:17

**receive** 135:25 136:6 261:20

**received** 93:3 102:18 103:20 125:13 131:2 132:4 183:1 241:11

**receiving** 95:7 122:25 125:5,8 136:13 178:15

**recent** 6:10 178:8

**recently** 131:6

**recess** 53:20 91:2 127:21 169:16 201:18 245:5 277:10

**reckless** 268:6

**recognize** 14:7 41:5 54:12,13 57:1 62:18 64:8 65:19 117:17 147:16 147:17 160:21 169:24 180:23 188:13 203:9 221:22 266:24 266:24 277:19

**recognized** 197:18 286:10

**recollection** 90:23 171:1 248:5

**[recommend - regulator]**

recommend
   37:11 177:24
recommendat...
   90:14,17 295:6
recommended
   37:15 103:2
recommending
   86:4
reconsider
   29:18,19
reconsideration
   229:18
reconstruct
   171:25 172:16
   172:22
record  7:3
   17:13,14 28:10
   34:20 41:2
   53:18,24 82:19
   90:25 91:6
   127:19,25
   169:14,20
   198:12 201:16
   201:22 202:23
   232:2 245:3,9
   246:15 247:12
   277:8,11,16
   281:23 286:25
   287:16 296:2,7
recorded  3:2
   7:4
recordkeeper
   287:18

recordkeeping
   204:18
records  171:25
   172:3,16,22
   173:1 182:13
   187:9,9 197:12
   198:4 199:24
   283:1,3 284:11
recover  271:16
recruit  20:12
   21:19 23:8
   24:11 29:25
   85:2 243:4
recruited  85:17
recruiting
   85:10,14
recruitment
   30:24 85:20
   90:9 209:2,2
   280:24
reduce  156:17
reduced  297:11
reduces  102:8
reducing  144:9
reduction
   12:19
refer  8:18 9:23
   63:20,22 88:13
reference  4:3
   9:15 10:24
   11:1,5 17:6
   22:24 27:6
   39:14 58:24
   59:3 65:4

82:14 83:9,24
   91:10 101:14
   103:13 172:7,8
   221:15 267:14
   284:7,8 285:11
referenced
   10:21 22:2
   156:25 190:3,5
   222:16 226:9
   226:25 298:6
references
   92:11 145:15
referencing
   40:25 202:24
referred  12:11
   70:4 144:16
   188:21 224:4
   283:1,16
referring  8:19
   17:11 25:24
   47:17 60:8
   65:22 71:10
   80:22 83:6
   93:24 94:1
   96:23 131:10
   133:23 135:9
   174:16 190:23
   202:9 222:10
   269:1,8 287:15
   288:16,18
refers  99:12
   103:5,8 119:13
   133:10 150:16
   157:1 175:19

259:23
reflect  37:19
refrained  229:3
refresh  171:1
refusal  273:2
refusing  213:15
refute  9:12
   10:2 46:15
   51:4
refutes  10:18
regarding  6:10
   46:19 109:22
   141:19 150:18
   156:24 160:25
   177:22 188:17
   191:5 202:4
   222:1,5 223:9
   223:11,14,20
   224:9 226:20
   232:22 234:15
   272:23,24
   273:2,20 291:8
regards  235:1
registered
   297:4,20
regular  70:7,20
   168:7,7 184:22
   262:13,16,22
regularly
   261:14
regulations
   215:21
regulator  295:3

**regulatory** 179:4,13 180:3 180:18

**reisbaum** 2:9 7:19,23

**rejected** 295:19

**rejection** 120:11,13,14

**relate** 63:5

**related** 25:1 38:6 73:25 74:10 82:17 87:5 139:16 144:10 176:11 176:21 178:3 216:1,18 217:19 220:1 222:6 246:20 247:2

**relates** 153:25 246:17

**relating** 11:8

**relation** 75:12 215:1 297:8

**relations** 57:19 75:15 245:16 261:24 262:10 262:21,24 265:11

**relationship** 250:3,13

**relationships** 77:2 250:7

**relayed** 156:6

**release** 124:24 124:25 180:20 193:9 202:7,11 202:15,25 208:10 212:25 224:5 228:10 233:16 238:2 246:7 247:4 252:8 253:4,21 254:11,12,15 254:19,25 255:9,13,15 256:20 257:20 258:19 260:15 261:8,14

**released** 102:21 140:25 208:15 208:19,23 209:20

**releases** 246:5 252:20 255:13 259:24 260:3

**relevance** 110:2 185:7,9

**relevant** 61:2 106:20 110:8,9 110:15 140:8 157:3 184:7,10 209:15 210:25 211:4 216:13 217:7 218:10 219:21 247:18

**reliability** 99:16 142:20 151:17,25 154:10 175:16 175:25 176:23 180:12

**reliable** 169:5 195:16 223:10 234:14

**reliance** 96:16

**relied** 60:14 61:11 168:25 226:7

**rely** 68:17 69:17 92:15 93:2 103:16 138:5 159:6 195:22 226:15 230:21 231:3

**relying** 69:3,9 69:12 129:22

**remains** 228:9

**remedy** 272:7

**remember** 11:3 123:25 125:24 126:9 161:15 264:20

**remi** 1:9 2:12 4:5,17,20 5:20 8:6 18:12 30:18 90:5 93:10 117:1 128:11,25 129:4 132:9

224:23 227:1 255:12,21 256:3 261:13 282:22

**reminder** 203:22

**remotely** 7:21 7:22

**remove** 178:18 179:9

**removed** 179:17

**repeat** 9:25 19:23 51:5 77:7 81:19 102:2 238:19 238:20 250:24 275:25

**repeated** 141:22

**repetitive** 151:19

**rephrase** 75:10

**replaced** 71:24 71:25 72:1

**report** 5:2 6:2 13:3 63:21 71:14,21 142:6 146:13,15 150:2 155:12 156:25 157:9 163:12 174:22 181:1 182:8,15 182:22 183:6

| | | | |
|---|---|---|---|
| 183:12 185:9 186:12 187:19 187:23,24 188:2,4,17,19 188:22,25 189:7,12,15,20 190:3 192:17 192:21,25 193:1,3,5,17,19 193:21,25 194:5,12 195:2 195:3,17 197:23 198:19 198:20,24 199:4,11 200:5 200:20 201:3,5 201:8 202:5,13 202:17 203:6 209:4,7,20 210:4 211:12 211:15,20 212:20 213:8 213:12,15,16 213:24 222:1 222:11,21 223:2 224:6,19 225:17,19 226:6,15,17 227:11 230:4 230:15,22,23 231:3,7 232:10 232:24 233:21 233:23 234:6,7 234:20 240:11 | 241:11 264:6 267:8 271:6,17 286:2 288:3 **reported** 70:7 70:10 129:7 142:20 163:25 230:15 **reporter** 7:14 41:3 161:6,20 162:21 268:5 297:5,20,21,21 **reporting** 71:11,18,19,20 269:16,19 **reports** 70:21 171:24 271:3 **represent** 8:14 66:8 72:2 247:11 **representation** 54:23 268:6 **representative** 107:12 141:7 220:9,11 221:12 225:13 256:17 293:23 **representatives** 263:20 265:16 **represented** 7:5 53:23 91:5 127:24 169:19 201:21 245:8 **representing** 7:13 92:1 | 214:21 **represents** 200:3 220:5 **republished** 141:24 **republishing** 275:19 **reputation** 225:19 269:15 271:14 **requalified** 185:25 **request** 117:21 118:19,20 178:3 205:7 229:18 **requested** 142:7 157:15 160:2 190:12 204:3 228:5 232:2 **require** 215:16 216:14 217:7 219:22 220:20 **required** 180:8 183:13 217:17 300:13 **requiring** 233:12 **rerun** 100:13 **research** 3:17 9:1,7,13 10:3 10:13,16,17,18 25:22,23 42:24 | 46:3 47:1 63:25 67:14,15 67:17 73:25 74:10 139:16 141:9,20 142:24 143:9 143:19 148:21 153:3,11 183:15,21 184:3 186:1 189:21,24 197:12 198:4 198:11 200:2,5 200:9 209:21 210:5 213:9,10 214:25 215:11 215:15,20 216:2,18,23 217:16 218:24 220:1 222:7 223:10,14 226:20 234:13 234:14 242:3 270:21 278:12 278:16,17,18 278:19,24 279:8,21,22 281:24,25 286:24 288:4 288:15 **researcher** 11:23 162:10 **researchers** 10:6 11:14 |

12:7,9,12 25:20 42:14 45:4 46:1 59:23 241:24 288:14

**reserves** 271:15

**reserving** 272:1 276:2

**reside** 205:4

**residing** 283:11

**resigned** 30:18 90:5

**resolve** 142:19 151:22,24

**resolved** 154:10

**resources** 31:14

**respect** 182:6 197:4 245:13 247:1

**respected** 101:10 104:17 106:23 108:20 110:25 113:13

**respectfully** 204:2

**respects** 107:13

**respond** 73:22 75:24 123:20 123:21

**responded** 75:16 149:12 203:5 224:5

**respondent's** 199:20,23

**responding** 190:17 191:17 191:22 203:13 248:17 263:7 274:22 290:5

**responds** 105:9 109:8 177:3 290:6

**response** 3:16 117:20 125:3 151:5,17 177:17 197:20 199:21 200:6 202:16 205:19 226:23 230:9 247:25 248:7 291:6,11 294:14,24

**responses** 155:3 190:16 246:3

**responsibility** 132:21

**responsible** 68:1,15

**restate** 69:1

**result** 38:2,5 43:20 60:7 141:24 151:20 162:14 168:3 216:16 219:24 269:19 270:5

271:17

**results** 10:16 13:12 41:24 47:10 48:1,4 49:16,16,19 50:1,2,4,12,19 50:20,25 51:8 51:10,12,17,23 56:4,8,11,12 59:17 60:4 67:13 68:13 94:4,4,8 95:3 99:17 101:25 102:22 107:24 109:10 111:3 111:11 112:5 112:17,23 113:6,25 114:3 114:7,21 115:6 118:19 131:12 142:5 150:18 151:10,17 157:8 158:4,9 158:12 163:19 164:3,12 168:15,19,25 169:5 205:21 228:19 283:22 289:15

**retain** 37:22,24

**retained** 92:18 177:5 178:4 235:4 246:15 282:18

**retention** 38:1 178:9

**retired** 280:7

**retract** 142:22 150:13 152:2

**retracted** 141:18 142:17 148:12 161:5

**retraction** 4:23 143:17 147:20 148:2,5 150:7 150:16 152:20 153:1 271:13 272:1

**retractions** 139:15 148:17 152:21 276:1

**return** 298:13 298:16

**returned** 183:2

**reuters** 266:16 274:13,23 275:8,12 276:17

**revelation** 63:5

**reverse** 73:9 110:4 147:5

**reverses** 156:16

**review** 15:11 67:16 90:6 125:2 126:21 141:11 169:23 173:12 229:23 231:20,20

283:11 290:6 298:7

**reviewed** 10:14 14:22 15:16 16:18,21 42:16 42:24 43:24 44:5,21 63:24 64:13 67:18 109:9 124:13 182:8 197:12 246:5,6 247:5 255:25

**reviewers** 256:1

**reviewing** 140:24 182:15 230:25

**revise** 179:2,5

**revised** 13:24 178:25 179:14 179:16 292:14 292:19 293:10

**revision** 201:4 291:3

**revisions** 109:12 111:18 131:17

**rfcuny000743** 5:3 188:11

**richard** 266:17

**rick** 30:19,20 90:5 224:23 225:7,11 226:25 227:13

227:18,21

**rick's** 227:22

**right** 14:17 17:8 23:24 28:21 34:1 38:4 39:25 41:11 45:9 47:20 48:6 49:10,24 52:12 53:6,12 54:20 58:18 60:9,23 62:4 63:15,21 64:25 65:14 69:23 75:20 77:14 78:17 79:11 84:22 90:20 91:8,17 91:22 95:9 96:23 97:15 103:6,9 105:6 106:23 107:3 110:21 111:6 113:15 114:20 118:10 119:2,3 119:14 123:2,6 126:4 128:19 133:11,14 134:7 135:8,15 136:9 137:9 143:3,23 144:4 144:21 147:9 147:21 149:15 150:13 154:2 155:1,22

158:12,22 159:14 162:7 162:18 163:3,7 166:8 167:12 167:17,19 168:25 171:17 171:20 172:11 172:17,22 173:2,7 175:4 176:20,21,24 181:5 182:2 183:10 186:3 192:7 196:7 201:10 202:15 202:17 203:17 206:22 208:6 208:12,16 211:1 212:1 214:22 215:2 216:24 217:20 220:6,20,23 221:8 222:12 222:22 223:3 223:21 224:1 224:20 226:11 227:2 228:21 229:6 230:11 231:9 232:20 232:25 233:9 235:9 236:19 247:23 248:12 249:9 252:7,21 254:17 259:6 260:16 262:10

267:12,16 268:19 269:6 270:2 272:8 274:20 275:12 277:3 280:8 282:17,19 283:3,8,11,12 284:2 285:19 286:19 290:7

**rights** 218:5 235:1,4 271:15 272:2 276:2

**rigor** 96:5

**rigorous** 95:1

**rise** 180:19

**risk** 28:13 32:22 40:11 129:21 269:15

**risks** 32:24

**robbins** 4:7 97:5 99:2

**robertson** 4:20 128:10 133:1 224:24 227:1 243:18

**rockefeller** 2:13

**rodriguez** 6:4 173:16 181:5 181:13 182:9 185:23

**roger** 133:25 164:22

**role** 18:12,16 18:18 19:9,10 57:18 75:14 98:11 139:6 190:10,14 191:10 228:23 245:13 246:2,8 246:11,20,25 247:3 251:6,24 263:6,11
**rolls** 45:22
**room** 31:23
**rooms** 244:7
**rosemary** 214:12
**rpr** 3:8
**rule** 3:15 4:3 14:4 91:10
**rules** 3:2
**rumor** 232:16
**rumors** 126:22 232:11 281:9
**run** 13:10 24:11,24 31:22 56:3 96:21 99:14 100:2 103:2 126:22 169:10 205:21 206:11 244:8,8
**running** 166:4 166:12
**runs** 177:20

**s**

**s** 7:1 299:3
**safe** 24:8,19,21 24:22 25:8 28:13 40:11 83:2 116:7 130:17 131:21
**safeguards** 138:22 139:3
**safety** 24:7,15 25:3,11 28:10 82:14,18,19,20 82:23 166:17 166:20 271:5
**sahakian** 4:8 97:4,8 99:2 102:18,24 103:20
**sahakian's** 99:6 103:5
**sam** 52:17
**sample** 49:16 103:3 150:25 172:1 176:1 182:16 183:18
**samples** 46:23 47:23 48:2,25 49:14,24 50:16 52:18 56:5 59:21,24 60:1 60:5 100:13 175:12 177:5 182:18 183:1

185:10 186:10 186:11
**sandy** 4:19 128:10,23,24 129:4 224:24 227:1 243:18
**sanford** 162:10
**sat** 76:12
**saturday** 291:12
**sava** 262:14 263:1,3,6 264:9,15,24 265:7,22,24
**savadx** 3:23 9:2 46:19 47:2,4,4 58:8 62:16
**savages** 263:4,7 263:11 266:3
**saw** 237:18,21
**saying** 20:24 23:1,4 25:20 28:11 37:9 52:19,19 60:7 68:5 77:18 78:21 85:8 88:12 96:15 107:13,15 111:19 112:12 112:16,16 113:1,5,11 114:12,14,15 114:18,18 116:6 120:23

121:17,24
122:7 124:4,13
124:21,24,25
130:11 131:6
131:20 132:1
133:17,19
135:11 137:5
143:2,4 149:15
150:9 153:6,18
155:10 158:5,7
165:1 166:6,8
167:7 186:16
193:10 198:25
210:12 211:20
213:22 218:7,8
219:14 220:9
222:20,24,24
225:4 226:14
226:16 230:21
231:3 234:5
243:16,18
252:13 253:6
253:18 254:2,2
259:10 272:1
275:6 276:22
281:4
**says** 27:15 41:6 41:18 54:14 58:12 63:8 77:3 78:11 85:5 95:10 99:7 101:4 102:24 111:12 111:25 113:14

114:17 118:17 119:4,16 120:20 122:11 123:6,9 126:1 144:4 147:20 150:17 151:8 156:23 157:1 163:16 164:22 167:6 170:1,6 171:20 175:6 175:23 176:17 189:20 197:11 198:8,9 199:17 215:8 217:23 219:7,9 222:3 224:9 247:13 247:24 248:24 248:24 255:4 256:4 257:2,13 259:17 268:2 268:23 269:11 270:6,18,25 271:25 272:23 273:19 275:2 278:11,15 286:23 290:6 291:2,13,23 292:18 293:10 293:15 294:7 294:20,25

**scale** 102:25

**scampbell** 2:5 298:2

**scanned** 120:11 157:4

**scanner** 151:20

**scattered** 56:4

**scenario** 213:14

**schneider** 214:12

**schoen** 1:12 3:3 5:11,20 7:6 8:7 8:12 9:1 14:7 41:4 53:23,25 54:11 57:1 91:5,8 127:24 128:1 169:19 169:21 201:21 212:14 219:18 245:8,10 254:10 255:4 274:1 277:12 285:20,25 298:5 299:2,24 300:2,4,12

**school** 12:7 183:7

**science** 5:16 13:2 27:25 38:8 40:10 41:21 45:11,21 45:23 47:7 70:15 85:9 95:19 124:9,11 130:17 166:14 187:18,22

192:18 193:18 194:13 195:6 198:19,21 203:6 204:1 216:7 222:3,11 222:21 224:19 230:5,14 231:8 234:7 239:21 266:16 267:20 270:14 271:6 271:22 273:3 281:10 292:5

**science's** 256:7 259:19 270:18 270:25

**sciences** 1:9,12 2:2 3:3,15,16 3:21 4:15 6:11 7:5,7 8:3,4,23 14:5 53:22 62:6 91:4 127:23 161:4 169:19 201:20 203:22 245:7 247:25 254:21 270:21 272:1 275:4,6 276:19 276:22 298:4 299:1 300:1

**scientific** 6:18 11:5 12:9 16:11,14 46:11 46:12,23 55:17 63:9,24 92:23

93:3 95:1,23 96:8 97:11,15 97:18,20,24 98:3,6,9,11,14 98:21 101:9 104:16 107:20 108:19 111:23 112:2,24 113:1 113:9,18,24 114:2 115:13 120:17 130:14 130:20 131:3,6 131:18 132:1 132:15 139:14 140:6 153:10 159:13 163:10 163:17 164:1 168:4,5 200:8 207:17 228:18 229:4 234:22 235:5 238:10 238:23 239:13 239:17 240:17 242:3 249:25 253:24 260:9 272:23 289:19 293:20

**scientifically** 41:23 45:12 46:19 96:5

**scientist** 16:12 101:10 112:25 113:17 114:11

| scientists 6:14 | securities 52:3 | 156:19 157:12 | 257:10,17 |
| 67:16 99:16 | 216:3,17 | 157:21 161:8 | 259:21,25 |
| 161:2 232:23 | 217:19 218:14 | 162:9,16 | 267:23 268:7 |
| 267:8 | 219:25 | 163:21 164:25 | 268:17 269:12 |
| scope 123:19 | see 14:12 22:24 | 165:4 170:4,8 | 269:23 270:15 |
| scott 2:2 8:1 | 41:16 42:1 | 170:12 171:21 | 270:23 271:10 |
| 35:18 298:1 | 45:14 50:22 | 172:5,9 173:17 | 271:19 272:16 |
| scott's 154:15 | 51:14 54:14 | 173:25 174:25 | 272:20,24 |
| scrutiny 42:21 | 55:2,12,21 | 175:17,21 | 273:4,20 |
| 45:24 240:3,17 | 58:7,10,15 | 176:5,13 177:8 | 274:16,24 |
| se 28:2 88:14 | 63:6,7,12 | 177:14,18 | 275:9 276:14 |
| search 79:21 | 64:21 78:14 | 178:12 181:7 | 276:25 277:23 |
| searching | 91:11 93:13,16 | 182:13,20 | 278:13,21 |
| 65:10 92:6 | 93:22 97:6 | 183:4,8,23 | 285:3 286:22 |
| sec 30:15 31:9 | 99:10,19 | 189:17,25 | 289:6 290:13 |
| 43:21 72:13 | 100:25 101:6 | 193:8 197:13 | 290:18,23 |
| 73:2,7,8 284:1 | 101:16,18 | 197:24 198:5 | 291:4,15,19 |
| second 25:17 | 104:12,13,21 | 198:15,16 | 292:2,16,22 |
| 36:18 45:10 | 105:1,12,17,21 | 199:13,18 | 293:1,12,18 |
| 46:16 66:8 | 106:3 107:4,13 | 200:16 204:7 | 294:3,11,18,22 |
| 87:23 88:3,9 | 108:15 109:6 | 211:11,19 | 295:7 |
| 88:18,22 99:24 | 109:13 110:1 | 213:12 214:13 | seeing 3:24 |
| 102:18 118:13 | 110:10 111:7,9 | 214:17 215:6 | 64:6 171:2,2,3 |
| 145:18 175:6 | 112:12 118:1,2 | 215:22 216:9 | seek 75:3 |
| 198:17 200:23 | 118:2,15,22,25 | 216:19 217:2,3 | seeks 27:17 |
| 203:19 215:6 | 119:10,18 | 218:8,21 222:8 | seem 139:20 |
| 223:24 248:24 | 121:7 122:14 | 222:18 223:17 | 196:3 |
| 256:4 267:19 | 123:13 126:19 | 225:1 226:21 | seemed 161:22 |
| 269:10 270:18 | 128:13 129:2 | 229:19 230:25 | 195:15 290:16 |
| 274:18 289:3 | 129:13 133:5,6 | 247:15 248:1 | seems 95:5 |
| section 202:7 | 144:6,12,18,24 | 249:5 250:1 | 107:15 111:21 |
| 248:20 255:3 | 144:25 145:12 | 254:13,23 | 164:17 |
| 286:7 | 148:8 150:21 | 255:6 256:11 | seen 14:9,14 |
| | 151:2,6 152:3 | 256:25 257:7 | 16:24 18:25 |

25:11 53:9 54:12 57:7 62:23 64:10,11 65:7,21 73:11 144:2 156:21 173:19 210:2 210:12,18 214:19 248:3

**self** 272:19

**sell** 27:22

**sellers** 26:12 41:15,18 43:8 45:24 46:7,18 80:12,23 129:9 129:23 130:11 130:12 131:24 132:5,10 134:12 236:4 236:11,13,24 237:1,14,23 238:17 239:18 240:20 242:8 242:14 275:20

**selling** 27:21 79:2 130:23 239:5

**send** 53:11 126:18 230:23 231:4 233:2,6 233:13,15 234:2,19 253:21 258:23 261:8 291:3

**sending** 232:16 232:17 253:12 275:17

**sends** 109:3 293:6,25

**sense** 19:21 50:14 53:1 60:6 111:16 112:19 189:1 233:5

**sensitive** 123:24

**sensitivity** 209:1

**sent** 41:10 52:21 53:8,14 59:21,24 96:13 116:17 122:5 125:16 224:6 239:16 260:17 260:18,20 261:4 266:15 266:19,25 275:12 276:1 277:2 284:6 285:8 289:13 298:14

**sentence** 47:21 55:15 114:6 143:3,4 147:25 197:16 198:9 217:5 244:17 248:24 256:4 257:20 259:6

259:17 268:2 268:17,22 270:6 272:22 286:23

**sentences** 55:15 215:3

**sentiment** 243:20

**separate** 101:24 155:11 257:15 258:15 273:22 295:22

**separately** 215:8

**september** 1:13 3:7 7:3 132:8 170:6,7,15 171:20 175:8 175:15 177:24 181:10,10,20 185:1,22 199:7 202:11 203:13 204:10 205:12 205:15 208:8 210:4 212:3 228:5 237:24 238:6 282:23

**series** 256:1

**serious** 25:1 82:17 200:14 253:22

**seriously** 165:23 166:2

**served** 241:8

**serves** 271:6

**services** 6:8 170:2 183:15 183:21 184:4 186:1 215:18

**servier** 59:23

**set** 36:23 40:3 56:23 64:2 69:19 88:5 147:12 249:17 270:7 272:10 274:6 275:14 277:5

**setting** 61:18

**settle** 203:20

**settled** 294:10

**settlement** 30:15 31:9 35:3,13 72:12 73:2,8

**seven** 15:4 38:22 157:11

**sever** 295:22

**several** 70:13 70:18 119:6 131:5 148:12 291:1,17,21

**severe** 35:5

**sham** 46:22

**shambolic** 3:21 62:7

**shape** 112:12 265:12

**share** 177:22
**shared** 61:17
  197:22 233:9
  233:11 243:20
  293:15
**shareholder**
  33:7,9,11,13,17
  33:19,21
**sheet** 4:3 17:6
  91:10 112:22
  113:25 298:11
**sheets** 284:8
**short** 26:12
  41:15,18 43:8
  45:24 46:7,18
  79:2 80:11,22
  106:1 107:3,20
  129:9,23
  130:11,11,23
  131:24 132:4
  132:10 134:11
  235:19,21
  236:2,4,6,10,11
  236:12,15,19
  236:24,25
  237:1,13,14,15
  237:16,23,23
  238:12,17,25
  239:4,18
  240:19 242:8,9
  242:14 244:13
  254:21 264:17
  266:13 275:20

**shorthand**
  297:21
**shorting** 237:9
**shortly** 57:13
  57:13 72:7
  98:2 245:25
  251:11
**shorts** 235:22
**show** 64:19
  77:13 83:1
  88:15 109:10
  111:3 112:17
  114:7,21 115:6
  131:12 169:22
  173:9 180:21
  201:23 221:20
  249:19 260:10
  277:13 289:14
**showed** 10:11
  44:6 100:19
  109:21 160:11
  160:13 169:6
  238:17 241:8
  289:8,19 290:2
**showing** 13:11
  24:6,8 45:2,4,4
  51:6 99:15
  241:24
**shows** 11:7
  25:15 45:7
  46:11
**shut** 19:20
**side** 77:21
  166:16 252:16

**sided** 161:18,22
  161:25
**sides** 161:21
**sign** 194:9
  298:12
**signature** 118:3
  118:5 297:19
**signed** 117:24
  168:13 169:4
  189:7 212:5
  214:15 279:2
  298:19
**significance**
  180:20 253:12
  258:9
**significant**
  60:18 180:14
  215:13 294:6
**similar** 46:23
  51:8 61:10,20
  96:3 129:5
  151:1,13 246:6
  276:16
**similarities**
  151:21
**simple** 162:14
**simply** 32:7
  45:20 56:15
  66:25 147:6
  150:1 200:19
  212:19 241:21
**simufilam** 9:2,7
  9:13 10:3 11:8
  11:13 13:8

  38:9,17 39:20
  45:3,25 51:6
  63:5 74:1,10
  82:16 90:13
  118:10 119:2,5
  119:13 120:5
  141:17 143:1
  164:2 166:18
  166:25 175:14
  178:5 207:5
  216:8 229:22
  234:23 235:2,5
  235:9 248:25
  260:10 270:19
  271:3 280:1
  282:14,21
  283:2,8,23
**simufilam's**
  101:21 164:13
  269:20 271:5
  283:17
**sincere** 79:25
  82:6,8 83:5
**sincerely** 54:15
**sincerity** 81:22
**singer** 214:15
  220:3
**single** 79:10
  110:12,14
  199:21 255:13
  290:17
**sir** 55:8
**sit** 15:22 244:6

| | | | |
|---|---|---|---|
| **site** 20:14 21:15 170:10 172:1 179:8 181:9 209:1 269:19 279:2 281:15 | **skeptical** 95:7 **skepticism** 94:10 95:15,18 95:25 102:1,4 **skewed** 111:22 | 232:15 279:13 **somebody's** 243:13 **sorry** 9:20,24 11:24 18:5 | **sounds** 54:22 97:16 119:3 264:19 291:13 291:24 **source** 23:10 |
| **sites** 10:10 20:13,24 21:21 23:4,7,12 29:24 30:8 85:12,13,15,21 85:24 126:6 252:12,18,18 253:16 270:1 278:16,18,24 279:2,9,21 280:24 281:5 281:21,24 | **skimming** 290:25 **slide** 58:7,8 62:6 63:4 64:16,18 65:6 117:8,11 **slightly** 77:11 **slow** 85:21 89:3 **slower** 30:6 32:8 **slowly** 35:17 | 27:12 40:16 41:7 42:6 49:12 59:10 63:1 64:7 65:23 72:16 75:10 81:19 87:11 112:21 113:7 123:20 135:11 140:11 144:24 147:16 160:12 162:24 | 61:1,2,6,7 171:25 172:3 172:16,21 173:1 200:11 200:12 279:17 279:18 **southern** 1:2 7:9 **space** 128:18 295:3 |
| **sitrick** 224:24 227:1 245:11 245:17,18,20 245:20,23 246:2,11,15,20 247:1 255:12 255:22 | **small** 13:9 98:12 100:9 144:10 170:24 **social** 115:14 126:25 240:24 240:24 | 197:25 198:1,8 198:8 203:2 246:6 250:20 257:22 261:2 268:22,24 272:13 274:9 278:2 288:21 | **speak** 21:6 60:19 61:16 67:2,5 72:10 86:11 87:12 121:22 138:20 138:21 154:14 155:13 196:2 220:9 244:5 |
| **sitrick's** 245:13 **sitting** 117:4 197:2 212:24 220:8 249:11 251:23 256:16 259:12 268:16 | **society** 250:5 **software** 157:4 **sole** 116:5 **solely** 36:15 **solicit** 292:5 **solid** 99:17 **solutions** 298:23 | **sort** 17:7 78:16 138:22 162:20 169:2 190:16 209:5 236:14 240:10 246:8 282:6 **sought** 230:10 295:21 | **speaking** 71:5 **speaks** 218:19 **special** 68:3,10 71:6 139:10 263:18,24 **specific** 11:1 28:4 43:17 45:22 52:2 |
| **situations** 150:11 **six** 70:23 98:16 157:11 | **somebody** 22:6 28:11 35:13 85:5 95:11 130:21 131:19 | **sound** 103:10 199:9 | 62:13 66:13 79:23 83:13 84:4 86:22 |

**[specific - statement]** Page 83

87:3 113:19
120:12 129:20
152:20 193:16
193:24 200:11
207:11,13
217:25 231:12
234:9 235:1,3
262:2 281:21
285:10 288:2
**specifically**
10:22 12:15
16:13 17:22
21:23 39:11
41:1 54:22
79:14 82:22
87:9 102:13
106:13 138:18
150:19 154:7
171:25 179:6
190:23 194:19
232:4 245:21
246:17 257:23
264:20 279:10
279:13,14
284:4
**specifics** 42:12
44:1 47:6
58:24 70:18
84:15 152:18
249:16 278:25
**specify** 66:11
**speculate** 76:9
111:20 153:21
185:24 194:23

199:3 210:22
212:12,17
214:2 225:11
244:1,23
**speculating**
122:3 201:12
213:14
**speculation**
32:7
**speculative**
119:9 120:6
**speech** 267:21
**speed** 85:11
**spend** 19:6
31:14,24 32:1
65:9 70:16
83:8 92:5
**spending** 30:22
33:9
**spent** 116:3
195:13 200:12
243:23
**spinal** 100:8
**spite** 165:12
**splice** 150:24
**spoke** 162:3
164:10,23
**spoken** 154:18
161:25 162:2
162:21
**sponsor** 233:4
**sponsoring**
157:17

**spot** 169:12
**spread** 34:22
253:9
**spreading**
26:25 79:2
232:11 236:11
**spreads** 235:23
**spreadsheet**
182:19
**spruck** 162:6
162:10
**staff** 175:24
**stakeholders**
259:20
**stamp** 118:5
173:10 188:10
249:20
**stamped** 40:14
93:7 97:1
104:7 108:8
117:15 121:2
128:9 189:7
212:5 214:8
229:10 247:7
254:8 267:4
270:8 274:8,10
276:9
**stand** 13:16
**standard**
183:15 219:13
**standards**
215:19 223:7
**standpoint**
265:11

**stands** 128:16
128:20 262:5
**start** 53:21
91:3 104:23
127:22 140:15
169:17 198:9
201:19 235:25
245:6 294:20
**started** 52:16
**starting** 7:17
10:20 123:8
**starts** 292:13
**stat** 266:17
**state** 7:16 9:17
17:12 22:17
185:16,21
240:14 247:12
297:2
**stated** 38:14
51:22 146:4
151:18 153:11
178:6 188:1
230:16 260:3
**statement** 6:10
6:12 39:20
55:2,3,24
56:16 58:17
59:13 63:14,18
64:23 65:3
66:11,13,14,19
67:3 84:5
132:9 155:7
159:20 203:12
205:12,14

**[statement - study]** Page 84

208:8 221:25
222:2,14 226:3
226:4,19,23,24
226:25 234:5
237:19,24
275:11 277:2
289:13
**statements**
20:10 22:3,13
23:1,12 24:4
24:10 32:16
39:19,24 40:3
40:7 42:10
44:3,7,24
45:11,18 46:16
47:9,15 54:20
60:15 61:3
69:24 75:18
76:22 77:8,13
79:25 81:22
83:6,13,19,23
84:1,8,25
88:14 102:10
110:18 116:1
116:14 237:6
238:9,17,22
239:14 240:19
240:23 243:14
266:21 271:1
275:5 276:21
278:15 281:17
**states** 1:1 7:8
182:15,22
183:7,12

202:12 272:8
272:11
**stating** 94:17
140:25 141:6
142:18 179:20
**statistics**
100:23 292:25
294:15
**status** 72:2
90:9 227:25
228:12 230:17
**stay** 223:13
225:4,14,24
226:19 234:17
**stayed** 227:6,22
229:3
**stenotype**
297:10,13
**step** 259:18
**steps** 260:3
264:25
**steven** 4:10
59:21 104:10
104:14,15
**stickers** 147:13
**sticking** 13:14
44:2
**stipend** 13:10
**stock** 26:12
27:22 79:2
84:12,15,16,17
121:25 129:10
134:24 135:4
135:14,20

136:7,16,24
137:14 161:4
192:22 235:23
236:9,11,14
239:5 256:7
269:15
**stock's** 137:8
**stood** 132:21
**stop** 26:17,21
29:7,8 34:2,2
155:16 165:24
166:6 264:25
**stopping** 166:3
**storage** 172:1
**store** 196:6
**story** 161:20
**straight** 71:16
**strange** 239:3
**strategy** 28:16
46:24 246:9
247:2 275:17
275:23
**street** 2:4 3:6
7:12 129:7
281:7
**strict** 197:22
**strike** 26:6
28:19 74:7
81:20 91:25
99:25 102:15
103:17 131:25
172:13 179:1
192:5 205:12
206:19 224:16

265:20 275:16
285:5
**strikes** 132:1
**string** 216:6
**strong** 55:19
82:19
**studied** 12:10
**studies** 12:25
13:8,10 25:23
25:25 31:22
32:11 52:24
66:16,20 67:12
96:9 109:23
118:19 119:2,6
161:3 183:22
186:2,7 234:23
235:5,9 243:5
252:18 271:4,7
278:20 279:22
282:1 283:8
**study** 10:9 11:6
11:7,10,13,16
12:5,6,8 29:25
47:18 48:23,23
49:8 64:20
85:20,21 94:2
94:2,3,13,19,20
94:20,21,22
95:4,25 96:2,3
96:9,11,17,19
96:20 99:1,21
100:14 101:25
102:2,7,11,19
102:22,25

103:10,13,21
105:25 107:3
112:8 145:7
171:25 172:7,8
172:11,17,22
175:13 176:20
177:5 182:13
182:18 185:10
185:10 186:9
229:24 230:7
230:11 231:6
232:7,15,18
233:4,17
234:20 242:1
269:20,22
283:17,23,24
**stuff** 11:5,5
132:11
**style** 244:5
**subbullets**
91:24 92:11
**subject** 77:20
94:22 104:19
108:13 121:6
128:11 201:4,4
201:5 214:24
229:17 232:22
254:11 255:16
267:7 285:20
292:14
**subjects** 48:11
167:25 243:5
252:12 280:25

**submit** 120:21
248:17 295:5
**submitted** 13:3
54:2 60:10
**subpoena**
241:9
**subscribed**
300:14
**subsequent**
147:8 167:20
187:24 193:9
**subsequently**
230:18
**subset** 39:23
48:11,25 52:1
52:6 108:5
125:17 168:1
**substance**
31:22 267:1
**substantial**
278:16
**substantive**
16:4 291:1
**subtitle** 161:3
**succeed** 33:16
**success** 36:1
53:1 136:23
**successes**
168:12
**successful**
26:17 33:21
138:15
**succinctly**
27:15,16

**sued** 215:25
**suffer** 216:16
219:24 271:16
**suffered** 271:16
**sufficient**
120:24
**sugar** 25:19
**suggesting**
40:24 155:8
219:11 268:17
**suggestions**
115:13 292:20
**suggestive**
150:24 200:7
**suing** 38:21
**suit** 17:19
29:20,22 30:1
30:7,21 31:7
90:15 110:2
212:14 216:17
219:25 237:5
**suitable** 46:4
**suite** 2:4 3:6
**suits** 217:20
**summarizes**
189:20
**summary** 42:3
70:25 183:6
**supplement**
145:3
**supplied**
120:24 140:21
**support** 13:1
118:18 151:9

183:14,19
190:16 264:7
281:23
**supported** 28:4
114:3
**supporter**
128:12
**supporters**
162:20 262:8
262:13
**supporting**
151:15 216:7
**supports** 12:9
47:6 267:21
**supposed**
143:11,13
146:2 148:24
150:11 163:20
164:4,13
281:12,12
**supposedly**
25:25
**suppress** 214:4
**supranuclear**
12:10,14
**supreme**
113:14
**sure** 9:15,19
10:1 24:7 38:3
44:9 53:17
59:1 68:11
72:3 73:5 78:1
79:20 109:20
120:1 121:17

123:23 126:15
127:17 134:19
139:6 156:4
164:7 166:16
169:13 171:10
178:23,24
186:22 235:13
245:2 248:21
250:19,24
258:21 261:23
263:19 266:10
280:22 286:19
**surely** 241:17
**surface** 77:8
121:25 124:8
**surprise** 260:23
260:24 261:3,6
**surprised**
168:3
**surprising**
105:16 107:2
**suspect** 268:5
**suspicion** 55:19
107:23
**svp** 96:12 107:1
**sway** 110:11
**switching**
127:15
**sworn** 8:8
297:7 300:14
**symbol** 263:19
**symbols** 294:6

**t**

**t** 299:3,3
**t.w.** 4:7 97:5
**tab** 9:17,20,21
10:25 13:15
22:16,17 26:1
27:7 39:14
40:17,18 58:25
59:2,6 60:8
63:19 88:13
140:9 148:20
202:9,10,20
203:2,3 224:4
277:17 284:25
**table** 54:7
247:18
**tainted** 138:25
167:11
**take** 10:11 13:2
15:6 21:4
22:16 30:19
53:15 54:10
55:6 63:19
64:14 85:13
98:25 108:22
112:3,22 113:4
120:10 124:18
127:1,17
130:13 139:11
149:7 165:23
166:1 169:23
173:12 192:4,9
192:13 201:14

229:5 230:22
230:23 244:25
245:1 260:4
265:1 277:7
280:2,12
**taken** 3:4 7:6
53:20 91:2
127:21 149:5
169:16 195:19
201:18 209:4
222:17,25
223:3 226:6,10
234:12 245:5
277:10 292:18
297:10
**takes** 231:2
**talk** 15:17 19:2
42:11 89:19
90:3 115:2
121:17,20
122:17 155:8
158:2,14,16
194:25 196:10
244:7
**talked** 25:14
50:18 90:3
124:12 132:10
155:9 159:13
222:12 230:21
241:22 262:7
288:12
**talking** 10:22
63:23 71:3
101:23 102:24

103:12 111:8
111:10,15
112:24 134:3
145:18 152:14
209:1 212:15
237:25 254:16
255:24 279:12
**tamera** 214:12
**tammy** 5:7
**tangible** 80:4
84:12 85:19,22
**taps** 100:8
**targeted**
102:11
**targeting**
144:11 204:4
**tasked** 189:22
**tau** 12:13,17,19
12:21
**taylor** 5:18
274:13
**team** 187:6
207:17 247:11
280:6
**technique**
162:15
**technology**
47:4 257:6
**tell** 13:25 20:11
20:22 32:5,10
37:1 64:14
65:14 124:3
147:17 188:18
218:11 219:19

232:14 242:4
249:7 255:1
263:14 264:24
278:23 281:8
**telling** 20:15
111:1 121:19
217:16 238:16
279:13,14
**temperatures**
174:10
**temporarily**
183:20 185:3
**ten** 53:15 79:11
194:8
**term** 235:21
237:13,22
238:3
**terms** 16:17
35:1 73:16
126:17 127:4
**test** 41:24
47:10 48:1
119:13 283:24
283:24
**tested** 25:21
**testified** 8:8
106:22 150:6
155:6 212:4
243:17 282:13
287:11 289:18
**testify** 14:16
16:14 36:4,7,8
152:19,23
210:9 213:16

268:25 297:8
**testifying**
219:15 227:14
**testimony** 8:23
17:3 23:16
182:5,9 213:19
220:25 221:7
228:8 252:3
256:19 288:13
298:9,17 300:8
**testing** 47:18
269:19
**tests** 47:1
**text** 63:2
170:24 176:11
176:21 178:3
247:24 286:8
**thank** 63:3
65:18 84:3
96:24 99:7
108:10 192:15
247:9 288:25
**thanks** 290:6
291:24 294:25
295:5
**theme** 94:13,16
**themes** 40:9,12
93:20 95:10
**theranos**
130:19 133:4
133:11,14,19
134:3
**therapy** 4:15
117:21 118:9

118:18 119:23
**thereof** 297:13
**thing** 23:5
24:21 25:2
68:15 84:12
124:3 126:18
168:7 214:1
218:8 230:25
233:4 254:4
268:16 278:5
**things** 16:24
20:17 23:3
43:24 73:10
74:4 78:25
79:2,6,6,12,12
80:7 92:7
101:24 110:12
120:2 122:22
124:12 126:4,7
126:22,25
140:18 153:7
159:14 181:13
194:18,18
196:25 213:22
215:17 230:20
239:17 242:22
253:7,17 254:2
265:14 273:22
293:16
**think** 20:7,19
22:25 24:18
32:6,17 34:12
34:14,17 35:1
35:3,6 36:6,24

38:3,24 40:19
44:14 45:9
46:8 51:1 62:3
65:22 68:4
69:24 72:17
77:12 78:9,10
80:2 84:4
99:14 103:2
106:13 107:13
107:14 110:5,7
112:24 113:4
115:21 120:18
120:20 122:4,4
126:20 127:14
130:10,13,17
132:3,8 133:20
135:2 139:4,23
143:16,17
149:2 152:25
159:24 162:25
163:1,5 167:1
167:21 168:6
180:8,19
184:18 193:7,8
197:25 202:14
202:20 207:14
217:25 218:19
222:23 223:25
224:1,2,3
226:3 230:24
231:21 236:17
238:19 244:2,2
244:22 246:14
246:17,18

253:7,15
257:22 259:10
268:15 277:16
278:2 281:13
284:18 288:7
288:23 294:21
**thinking** 82:4
83:23 107:11
107:18 114:12
125:20 137:5
184:24 225:11
**thinks** 24:19
259:11
**third** 10:5,21
13:1 45:3 47:8
47:25 51:4,5,7
55:10 63:23
100:23 103:8,9
241:23 260:15
**thorough**
174:13 196:16
208:9 225:25
226:2 227:18
260:6
**thoroughly**
204:3
**thorp** 270:13
**thought** 50:17
85:11 100:19
105:25 125:23
131:2,4,7
150:5 166:9
190:23 202:22
227:22 244:23

**thoughts** 90:15
105:15 122:12
293:9
**thousand** 24:17
69:24 78:24
83:25 116:1
126:6
**thousands**
24:24,24,24
78:24 82:16
166:19 241:16
**thread** 4:2,7,9
4:12,19 5:6,17
5:19,22,24 6:4
128:23 132:25
231:15
**threat** 217:3,24
218:8,21,22
221:1 271:22
**threaten**
221:13
**threatening**
216:21 266:20
**three** 8:19 37:8
41:18 57:5
70:23 79:18
116:2,8 118:14
157:10 163:15
186:15 290:11
**throw** 112:3
**ticker** 263:19
**till** 236:5
**time** 11:24
13:22 19:7

29:9 30:4,7
32:14 33:3,22
43:5 47:22
48:12,15 49:6
51:9,22 52:25
53:9,24 54:8
56:6 57:9,11
61:20 64:13
65:9 69:25
70:12 71:23
72:11,17 75:5
83:9,9 91:6
92:5 96:20
98:7,8 106:19
108:19 120:10
123:24 124:2
125:10,12,13
125:14,21
126:16 127:25
129:8 135:21
137:9 147:3
169:4,20 179:6
180:6 183:14
184:14,20
185:12,13,14
189:2 195:13
199:8 201:22
204:10,12
205:1 208:22
208:25 210:19
214:1,22
223:14 228:17
230:4 237:18
237:21 238:4

243:10,24
245:9 251:12
253:18 255:10
255:12 258:13
264:13 266:7
268:16 280:11
280:22 295:3
296:6 297:10
298:18
**timeframe**
298:8
**timely** 243:5
**times** 5:14 6:14
71:12 122:7
134:3 160:24
161:1,17,24
163:2,16,25
164:11,11
166:2 196:5
230:5,7 232:23
246:16 266:15
267:7,8 268:3
268:10,18
269:2,2,5,6,19
269:25 288:13
**timetable**
208:20 209:3,5
**timing** 178:22
206:4 224:1
**tips** 241:17
**tissue** 46:9
**title** 58:8 62:16
63:4 68:11
141:25 144:8

**[title - trying]**                                                        Page 89

156:14 161:1
249:23

**titled** 14:4 62:6
64:5 91:9
189:14 232:23
254:20

**today** 8:23
15:25 17:1,3
17:10 19:1
60:9 73:24
85:10 91:17
96:7,18 117:4
168:24 169:1
182:5 185:1
197:2 203:17
204:21 212:24
220:8 222:12
227:23 249:11
251:23 256:16
259:12 262:8
267:15 268:17
276:5 285:20

**today's** 91:21
207:8 252:2

**told** 36:4
101:12 164:11
220:18 231:7
232:5,13 265:3

**tongue** 45:22

**tons** 130:12

**took** 70:18
132:21 263:17
263:24 285:13

**top** 56:22 63:4
65:23 83:12,15
83:17 97:3
105:10 123:8
144:4 170:1
199:17 274:12
274:18 277:23
291:22

**topic** 174:2,4
202:1 235:16
255:18

**topics** 14:11,12
14:14,17 16:6
16:14,15 92:9
92:10 182:2

**tortoise** 266:16

**total** 296:6

**totality** 211:21
218:19

**totally** 101:24
127:15 213:21
242:2 254:3

**touched** 51:2

**toward** 228:24
242:7 243:11

**towards** 242:13

**tracking** 172:2
182:16

**trails** 172:3

**transcript**
252:20 291:8
297:13 298:6
298:19 300:5,8

**transparently**
218:4

**treating** 27:19

**treatment**
26:16 28:3
256:9 269:18
271:2

**trend** 84:13

**trevor** 101:4

**trial** 10:16
20:16 21:20
24:11 25:6
29:24 32:16
33:11,12 49:19
82:25 83:1
85:3,14 154:21
166:6,18 167:1
168:2,3,6,15
179:7 183:19
252:12 270:1
281:15

**trials** 19:20
20:9 26:18,22
30:1,4,24
31:18 32:6,10
33:15,20,25
34:3,22 35:16
38:15 41:25
47:11 48:2
83:21 85:12
90:9,12,13
163:18 164:2
165:24 166:3,4
166:12 167:16

167:17 168:5,5
168:11 169:4
169:10 229:22
244:9 280:1,13
281:16

**tried** 32:15
213:3

**triggered** 219:1

**triggers** 137:13
137:14

**troubling** 200:4

**true** 24:22
34:22 35:7
67:23 77:14,18
124:17,22
126:13 134:2
135:17 191:8
193:2 196:23
196:25 252:15
253:8,17
258:13 267:25
284:5 285:4
297:12 300:8

**trust** 163:19
164:3,12

**truth** 76:21
297:8

**try** 17:20 19:3
21:11 130:21
171:8 185:8
207:9 214:4
240:15

**trying** 19:18,19
21:17 26:17,20

**[trying - unique]**                                                          Page 90

26:21,24 52:23 77:10 82:24 85:2 98:13 102:23 130:7 130:21 155:15 155:16 240:1,1 244:8 253:15 258:22

**tuapthies** 12:11

**turn** 14:11 41:13 63:19 203:19 259:8 269:9

**turned** 48:5

**turquet** 2:3

**tweets** 65:21,25 66:6 78:24 116:6

**twice** 79:12 100:11

**twitter** 4:2 85:6

**two** 20:6,8 37:12,15,23 38:1 52:16 55:15 99:15 100:8 101:23 137:19,20 141:6 142:17 145:15 157:10 163:15 175:3 178:2,15 186:12 244:17 244:17 273:17 273:22,25

274:14 290:10 295:3

**tying** 156:8

**type** 32:21 180:7 183:19

**types** 150:11

**typewritten** 297:11

**u**

**uh** 39:15 55:9 99:9 103:7 164:24

**ultimate** 23:21 149:1

**ultimately** 37:14,22 295:9

**unable** 174:8 177:21 178:2 180:13

**unacceptable** 183:20 184:2 185:2

**unaffiliated** 11:8

**unblind** 52:6

**unblinded** 25:5 48:11,25 52:1 52:10 96:14 108:5 125:16 167:25

**unblinding** 50:7 167:11

**unclear** 46:19 103:14

**uncomplete** 234:19

**uncropped** 140:4 197:18 286:10 287:23 288:18

**under** 27:25 91:24 105:14 135:14 136:6 145:8 154:1 182:13 198:3 216:13 217:7 219:21 240:17 272:2 276:2

**underlying** 9:13 10:3 38:8 41:22 45:11 114:4 163:20 164:4 216:7 223:13 226:19 234:17

**undermine** 187:10

**underneath** 118:6

**underpinnings** 163:18 164:2

**understand** 8:14,20,22 17:2 28:20,23 52:23 62:1 88:11 93:24

113:17 202:15 240:1

**understanding** 36:2 92:2 113:18,24 114:2 142:11 146:11 158:23 159:16,21 160:16,18 165:17 170:17 176:15 190:7,9 225:16 236:24 258:8 261:7

**understood** 8:21 62:3

**undoable** 41:23 45:13

**undue** 96:16

**unfinished** 234:19

**unfortunate** 143:17 149:2 192:24

**unfortunately** 109:9 114:6

**unfounded** 196:23 242:5

**unhappy** 168:8

**unimpugned** 186:25

**unintelligible** 52:24

**unique** 265:16

unit 7:4
united 1:1 7:8
universities 13:9
university 5:2,5 6:12 11:7 12:6 12:7 46:1 50:13 134:24 145:10 146:10 146:13,14 149:1 157:18 175:9,10 188:17 189:9 189:15,22 190:24 191:6 221:25 222:5 223:15 226:24 230:19 233:24 234:25
unkind 243:9
unknown 11:24 11:25 48:17
unlawful 237:1
unlock 135:21
unprecedented 58:13 59:14
unqualified 184:3
unreasonably 197:22
unsafe 19:16 24:6 26:10 79:17 82:2 83:7,16,19

209:12 254:2 270:20 271:4
unsubstantiat... 63:10
unsure 65:8
untenable 118:21 120:5
untrue 24:4 56:15,15 66:25 67:4 78:4 79:3 79:7 80:4 209:13 242:5 242:23 254:3 259:3
unwillingness 200:2
update 176:17 294:9
use 31:14,24 32:2 33:2 41:1 46:9 100:13 158:5 186:4,6 186:14 203:23 234:8 235:2 237:22 239:6 282:19,19,25 287:22
used 31:21 46:4 46:6 52:8 85:7 92:18 126:14 139:2 172:4 183:1,3 191:7 238:2 248:25 298:19

useful 102:25 243:25
user 182:24
using 11:13 111:13 226:5 234:10 283:8

v

v 298:4 299:1 300:1
vagaries 162:15
valid 51:23
validate 59:18
validation 42:20 58:14 59:15 60:6
validity 67:20 113:9 193:20
value 33:7,9,11 33:13,17,19,21 226:6 290:22
values 55:19 100:21 101:13
variety 186:6
various 42:4 92:7 140:2 260:15 279:1
veiled 218:21
vendor 184:25 185:5 186:4,7 186:20
vendors 184:21

verdict 35:2
verified 149:21 176:3,24 177:1 178:8,20 179:10
verify 151:16 179:21,21 180:12,13 193:2 298:9
veritext 7:14,15 298:14,23
veritext.com. 298:15
version 122:5 188:16,22 192:17 193:17 193:24 195:6 198:18 200:19 222:11
versus 7:7 160:15 196:2 281:11
vertical 150:24
vested 138:15
victim 27:23 74:16 191:9 213:11 217:13 217:13 219:14 235:19
victory 34:18 34:19
video 3:2 7:4 169:18

| | | | |
|---|---|---|---|
| **videoconfere...** 2:8,8,17,18,18 | **views** 34:18,19 228:24 | **walked** 20:14 | 184:11 185:5 |
| **videographer** 2:17 7:2,14 53:18,21 90:25 91:3 127:19,22 169:14,17 201:16,19 245:3,6 277:8 277:11 296:2 | **vigorous** 259:19 260:4 | **wall** 129:6 281:7 | 185:22 186:4 186:16,17 |
| **videorecorded** 1:11 | **violation** 284:11,18 | **wang** 3:24 4:22 5:3 9:7 41:20 41:23 42:13 44:8,15,20 46:4 47:9,23 48:5,22 49:15 51:10,15,16,25 52:5,6,7 55:18 56:6 59:16,19 59:21,22,24,25 60:1,7 64:5,20 66:22,23 67:9 67:14 73:24 74:3,7,8,13 77:2 86:3 87:19 96:13 99:14,23 100:2 100:14 107:14 125:16 134:21 135:3,7,12,13 136:4,5 138:6 140:4,20,24 141:6,12,16 142:3,12,17 143:15 144:9 144:16 146:25 147:21,24 148:3,13 153:11 156:15 167:12,24 171:8 175:20 | 188:18 189:16 189:24 190:17 190:21 191:6,7 191:11,14,16 191:21 192:1 192:11 195:14 195:24 196:7 196:12,18,23 197:4,17,20 198:10,11 200:8,15 204:2 204:4,13,19,22 205:9 207:21 209:21 210:5 211:7 213:8 214:25 215:2 215:11,14,17 216:5,23 217:11,14,17 218:3,6 221:4 222:7 225:4 228:10 235:7 238:12,24 242:1,3 263:8 282:24 283:7 286:9,23,24 287:18 288:3 288:14 |

| **virtually** 48:3 190:13 | | |
| **vis** 283:23,23 | | |
| **visited** 185:22 185:23 | | |

**view** 12:3,4 26:21,24 32:12 33:24 35:19 36:14 61:1 77:12 81:21 96:7 98:10 120:15,16 125:5,7,9 137:4,4 143:5 145:23 146:23 147:4 148:23 149:4,16 157:23 160:15 162:22 163:13 180:14,19 187:7 188:24 200:21 217:24 231:5,6 234:21 234:21 240:8 240:16 293:16

**visual** 141:7
**vivo** 12:15
**voice** 162:5
**volume** 100:9 186:10
**volumes** 24:6
**voluminous** 9:16 123:25
**voluntarily** 28:23 30:12 31:3,10 89:21 89:25
**voting** 257:5
**vs** 1:8

**w**

**wait** 146:13 148:25 208:23 209:6,16
**waited** 149:7 149:17
**waiting** 190:5

**viewed** 98:20 132:5

**wang's** 30:14 31:1 42:21 49:17 50:2,3

51:8 56:11
63:25 107:1
134:17 136:12
139:16 141:22
170:15 171:5
171:13 172:15
172:21 173:1,6
174:17 181:2
181:20 183:10
183:13 184:2
184:15,19,23
185:11 186:7
187:2,9 200:1
205:25 206:7
206:22 207:2,5
215:9 216:2,18
220:1 223:14
226:20 229:6
282:25 283:2
283:12 287:22
288:11,15

**want** 11:1
35:18 42:14
43:13 54:11
59:1 66:11
72:16 73:5
77:6 79:21
83:10 99:3
108:25 112:23
116:2 124:7
126:22 132:2
136:20 153:21
156:3 158:5
161:17 163:4

212:25 213:11
213:22 218:20
220:15 227:17
227:23 232:14
239:6 246:14
246:18 247:18
248:21 250:22
265:12 277:25
280:25 286:19

**wanted** 56:8
224:11

**wants** 228:9
230:22

**warning** 259:4

**warrant** 166:6
180:14

**watson** 5:18,20
274:13,19
275:2 276:13
276:16

**way** 38:6 70:20
80:3 98:15
109:21 111:22
112:12 113:1,7
113:13,15,15
115:2,20 117:5
131:7,8 132:11
133:19 136:15
143:11 160:12
168:18 185:16
186:25 195:7
195:23 203:20
210:19 212:4
212:17 213:4

213:25 214:4
218:8 221:1,13
222:20 227:5
228:23 242:18
258:7 262:1
263:21,25
265:12 290:21
297:15

**wcg** 229:18,21
229:23 230:6,9
230:10

**we've** 10:13,15
10:16 14:1,1
24:23,25 25:3
25:21,21,21
28:11 29:22
70:21 82:13,20
83:2 85:9
90:11,11
124:12 131:5
132:11 193:1
193:14 194:20
209:10 230:14
242:1,3 244:7
266:10 278:4
284:17

**website** 29:8
85:3,4

**weekly** 264:6

**weeks** 124:19
292:12

**weigh** 104:25

**weight** 152:20
152:24 189:9

193:22 194:1,7
194:12,16
195:2 197:19
199:4 201:13
210:19,20
230:16 233:22
286:11

**welcome** 254:6

**welcomed**
289:21

**went** 20:3
85:15 126:11
174:5,7 184:23
236:14 279:2

**wesson** 214:12

**western** 41:19
42:21 43:10
44:12,25 45:6
46:5 141:2,7
141:14 145:6
151:10 172:3
173:1 183:2
198:13 203:20
203:25 204:13
204:23 205:9
205:16,25
206:7,20 207:2
207:22 287:1
287:17 288:19

**whatsoever**
73:25 251:6

**whistle** 249:24

**whistleblowers**
6:17

white 145:4
wholly 115:16
wide 285:17
widely 127:3
win 34:11,14
  34:16,23,24,25
  35:7
wise 105:25
  107:3
wish 209:9
withdrawing
  85:12 278:17
withdrawn
  269:20 278:18
withdrew
  279:21 281:24
withstand
  45:24
witness 8:4
  156:4 297:7
  298:8,10,12,18
won 35:1
wong 2:8
woods 22:19,20
  39:17,23 86:13
  87:6,20
word 111:13
  114:25 124:15
  139:2 142:8
  158:5 161:15
  161:15 188:19
  188:20 194:6
  218:22 232:11
  234:8,10 239:3

239:6,7 244:17
253:16
words 9:24
  28:15 111:14
  123:7 124:16
  126:14 127:9
  188:25 189:2,3
  194:8,8,10
  226:14 233:25
  239:20 267:1
work 10:6
  42:21 43:17
  44:11,15 45:1
  45:7 48:22
  66:23 67:9,20
  73:1 77:3
  134:14 143:14
  146:9 155:19
  155:20 166:12
  166:24,25
  171:7 191:6
  215:10,12
  244:7 246:19
  246:21 256:9
  260:8 273:1
  288:11
worked 44:8
working 44:20
  73:14 163:8
  193:11
works 24:12
  166:5
world 24:19,22
  80:17

worth 52:18
wrap 201:25
write 35:4
  111:17 127:9
  127:11 145:5
  153:5 194:8
  221:8 264:6
writes 93:19
  99:14 100:18
  105:15,23
  123:11 129:4
  177:20,21
  224:23 227:1
  267:19,20
  276:18
writing 113:25
  294:8
written 3:1
  148:2 153:2
  197:23
wrong 113:10
  113:15 124:5
  131:19 132:19
  196:18 199:14
wrongdoing
  70:8,9,22 71:1
  74:18,21,24
wrote 94:7
  143:22 153:5
  218:18 248:7
wu 2:12 8:5,5

| x |
|---|
| x 3:9 85:6 153:9 281:4,12 |
| y |
| y 153:9 281:4 281:13 |

yale 11:7 46:1
  234:25 235:4
  282:15,18
  283:17
yan 5:2 189:16
yeah 13:7
  16:21 22:23
  37:25 39:2
  48:21 53:8
  54:9 57:22
  59:7,12 61:16
  65:7 66:2 69:7
  69:23 73:21
  74:12 76:9,25
  78:12 80:15
  81:20 83:3
  86:24 87:9,12
  88:7 89:2
  92:10,21 101:5
  101:18 102:13
  105:3 107:4
  109:1,20
  112:10 114:24
  115:10 121:12
  122:20 123:3
  123:21 127:17
  130:1 133:16

**[yeah - zhe]**                                                                 Page 95

| | | |
|---|---|---|
| 134:5 135:17 | 284:15 | 232:23 233:25 |
| 138:1 139:24 | **year** 11:9 | 236:3 264:10 |
| 140:12 149:10 | 138:12 200:13 | 266:15 267:7,8 |
| 149:10,19,25 | **years** 16:23 | 268:3,10,18 |
| 150:9 152:13 | 30:8 44:9,15 | 269:1,2,4,6,25 |
| 152:17 153:16 | 48:22 52:16 | **york's** 222:5 |
| 156:7 158:23 | 66:16,20,24 | |
| 159:4,10 160:2 | 67:10 70:13,19 | **z** |
| 164:15,19 | 77:1 97:19 | **zaur** 2:8 7:23 |
| 165:15 171:14 | 108:1 114:10 | **zero** 58:14 |
| 179:12 180:17 | 132:13 137:19 | 59:13,14 |
| 184:6 191:16 | 137:20 159:24 | **zhe** 198:10 |
| 194:15 197:7,8 | 159:24 160:3 | 286:23 |
| 198:23 199:8 | 242:3 244:15 | |
| 200:25 201:11 | **yep** 161:14 | |
| 202:18 205:19 | **yesterday** 15:2 | |
| 206:3,9,24 | **yielded** 55:18 | |
| 210:11 212:9 | **york** 1:2 2:10 | |
| 213:21 217:2 | 2:10,14,14 5:2 | |
| 217:10,24 | 5:5,14 6:13,14 | |
| 220:3 221:19 | 7:9 134:3,24 | |
| 225:7 227:8 | 145:10 146:10 | |
| 229:8 231:1,21 | 146:13,14 | |
| 234:8 237:4 | 157:18 160:24 | |
| 239:3 241:21 | 161:1,17,24 | |
| 242:17 243:22 | 163:2,16,25 | |
| 244:23 245:20 | 164:11,11 | |
| 246:10 247:3 | 166:2 170:11 | |
| 250:24 252:8 | 175:10,10,11 | |
| 261:25 262:16 | 188:17 189:9 | |
| 264:5,12,19 | 189:15,22 | |
| 265:9 273:13 | 190:24 191:7 | |
| 273:22 275:23 | 222:1 230:5,7 | |
| 280:19 284:7 | 230:7,19 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.