# Exhibit 126

HIGHLY CONFIDENTIAL

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:24-cv-05948-JLR-OTW

ADRIAN HEILBUT, JESSE BRODKIN and ENEA MILIORIS,

    Plaintiffs,

DAVID BREDT and GEOFFREY PITT,

    Intervenor-Plaintiffs,

vs.

CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,

    Defendants.

---

VIDEORECORDED DEPOSITION OF ERIC SCHOEN

October 1, 2025

---

\* HIGHLY CONFIDENTIAL \*

HIGHLY CONFIDENTIAL

Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
DAVID KUMAGAI, ESQ.
ISAAC ZAUR, ESQ. (via videoconference)
AMANDA WONG, ESQ. (via videoconference)
Clarick Gueron Reisbaum, LLP
41 Madison Avenue, 23rd Floor
New York, New York 10010
Phone: 646-453-4026
Email: dkumagai@cgr-law.com

ON BEHALF OF THE DEFENDANT, CASSAVA SCIENCES, INC.:
SCOTT CAMPBELL, ESQ.
Gibson Dunn & Crutcher, LLP
1900 Lawrence Street, Suite 3000
Denver, Colorado 80202
Phone: 303-298-5700
Email: scampbell@gibsondunn.com

FOR THE DEFENDANTS, REMI BARBIER and LINDSAY BURNS:
ARIC WU, ESQ.
BakerHostetler, LLP
45 Rockefeller Plaza
New York, New York 10111
Phone: 212-589-4200
Email: awu@bakerlaw.com

Also Present: Davis Baumunk, videographer
Adrian Heilbut (via videoconference)
Enea Milioris (via videoconference)
Jesse Brodkin (via videoconference)

Page 3

PURSUANT TO WRITTEN NOTICE and the appropriate Rules of Civil Procedure, the video-recorded deposition of ERIC SCHOEN, called for examination by the Plaintiffs, was taken at the offices of Gibson Dunn & Crutcher, LLP, 1900 Lawrence Street, Suite 3000, Denver, Colorado, commencing at 9:00 a.m. on October 1, 2025, before Bonnie Carpenter Johnshoy, CSR, RPR, CRR.

INDEX

EXAMINATION: PAGE
By Mr. Kumagai 6
By Mr. Campbell 229
By Mr. Kumagai 234
By Mr. Campbell 235
By Mr. Kumagai 235

EXHIBITS: PAGE
Exhibit 159  11/15/23 Eric Schoen deposition   7
transcript
CASSAVA_000938526 through 938650
Exhibit 160  6/14/24 telephonic board of   73
directors meeting with attached
minutes of board of directors
meeting
CASSAVA_001308025 through
1308025_032
Exhibit 161  5/6 through 5/12/21 email thread   107
between Eric Schoen and Anthony
Daher
CASSAVA_000910448 through 914052
Exhibit 162  8/16 through 9/22/21 email thread   113
between Eric Schoen and Remi
Barbier
CASSAVA_000318907 through 318911

Page 4

EXHIBITS (Continued)   PAGE
Exhibit 163  11/5 and 11/10/21 email thread   119
between Eric Schoen, James Kramer,
Candi Schad, and Lindsay Burns
CASSAVA_001434684
Exhibit 164  12/20 and 12/21/21 email thread   123
between Timothy Koehler Brennan
and Eric Schoen
CASSAVA_001247246
Exhibit 165  4/21/22 email thread between Eric   125
Schoen and Timothy Brennan
CASSAVA_001245411
Exhibit 166  "Defamatory statements on social   128
media"
Exhibit 167  2/18/22 email from Anthony Daher   132
to Lindsay Burns with attachment
CASSAVA_001001300 and 1001342
Exhibit 168  6/16/22 email from Todd Rogenthien   136
to Eric Schoen
CASSAVA_001253022
Exhibit 169  4/8, 4/9, and 4/18/22 email thread   136
between Roger Nicoll and Apoorva
Mandevilli
CASSAVA_001253024 through 1253028
Exhibit 170  Cassava Sciences, Inc., 2020 Cash   144
Incentive Bonus Plan
Exhibit 171  Cassava Sciences, Inc., 2024 Form   149
10-K
Exhibit 172  Cassava Sciences, Inc., 10-Q, June   150
30, 2025
Exhibit 173  Cassava Sciences, Inc., November   189
18, 2022 Form 8-K
Exhibit 174  Clinical Research Protocol   205
PTI-125-09
CASSAVA_001225354 through 1225408

Page 5

PROCEEDINGS

VIDEOGRAPHER:  Good morning.  We are going on the record at 9:00 on October 1st, 2025.

This is Media Unit 1 of the video-recorded deposition of Eric Schoen, taken by counsel for plaintiffs in the matter of Adrian Heilbut, et al., versus Cassava, Inc., et al., filed in the United States District Court for the Southern District of New York, Case Number 1:24-CV-05948-JLR-OTW.

The location of this deposition is 1900 Lawrence Street, Denver, Colorado.

My name is Davis Baumunk, representing Veritext and I am the videographer.  The court reporter is Bonnie Carpenter from Veritext.

Will counsel please state their appearances, starting with the noticing attorney.

MR. KUMAGAI:  This is David Kumagai from Clarick Gueron Reisbaum on behalf of plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris.  Also appearing remotely on Zoom is my colleague Isaac Zaur from Clarick Gueron Reisbaum --

VIDEOGRAPHER:  It's just Amanda Wong.

MR. KUMAGAI:  Oh, okay.  Amanda Wong from Clarick Gueron Reisbaum, potentially Isaac Zaur later in the day, and I believe some or all of the plaintiffs may

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

join throughout the day: Adrian Heilbut, Enea Milioris, and Jesse Brodkin.

MR. CAMPBELL: Scott Campbell with Gibson Dunn on behalf of Cassava, Inc., and the witness.

MR. WU: Aric Wu from BakerHostetler for defendants Remi Barbier and Lindsay Burns.

ERIC SCHOEN, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. KUMAGAI:

Q. All right. Good morning again, Mr. Schoen.

A. Good morning.

Q. Aside from the deposition yesterday, have you ever been deposed before?

A. Yes.

Q. Can you describe those depositions?

A. A deposition with the SEC in the -- or some securities litigation for Cassava, and back in about 1993. I was also deposed by the SEC when I was an auditor for Pricewaterhouse -- now PricewaterhouseCoopers -- in a case against one of our clients.

Q. So three depositions plus yesterday and today?

A. Yes.

Page 7

Q. Okay. And so you were deposed by the SEC in their investigation of the company that ultimately led to the settlement in July, approximately, 2024; is that right?

A. Yes.

Q. And were you also deposed in the consolidated securities litigation in Texas?

A. No.

Q. Okay. So what securities litigation were you referring to?

A. That's incorrect. It's the SEC investigation, which, in my mind, I tied into the securities litigation, but you're -- you're correct. I was not deposed in connection with the securities litigation.

Q. So it was just one deposition before the SEC and then one deposition back in the early nineties and then the deposition yesterday and the deposition today?

A. That is correct.

Q. Okay. I'll mark as Exhibit 159 --

(Exhibit 159 was marked.)

Q. -- a document Bates-stamped CASSAVA_ 000938526.

A. I apologize, I've got to -- oh, I have got them. Without my glasses, this was going to be a very

Page 8

frustrating day.

Q. Go ahead and take a moment to flip through Exhibit 159, but my first question is just whether you recognize Exhibit 159 as the deposition transcript from the deposition you just referenced a moment ago before the Securities & Exchange Commission.

A. Yes. It certainly appears to be, yes.

Q. Okay. And so the deposition occurred on November 15th, 2023, at the SEC's offices in Washington, D.C.; right?

A. Yes. Although there is a -- there's two dates in it -- one says November 9th and one says November 15th -- and I don't recall which one is correct. On -- on the cover page, 8526, it says November 15th, 2023, and on 8531, it says November 9th, 2023.

Q. Right. Okay. So --

A. Yes. In November 2023.

Q. -- in November 2023, you were deposed and this is the transcript, as far as you can tell, of that deposition; right?

A. Yes.

Q. Have you reviewed this deposition transcript previously?

A. No.

Page 9

Q. As far as you know, sitting here today, was the testimony that you provided in that deposition honest, accurate, complete?

A. Yes.

Q. Do you have any reason to believe this transcript is not an accurate recording of that deposition?

A. No.

Q. Okay. You can set that aside. Can you describe how you came to join Cassava?

A. I joined Cassava in late 2018. A former member of Cassava's -- no. Cassava -- Cassava was called Pain Therapeutics, Inc., prior to being called Cassava. They had a chief financial officer named Peter Roddy. He was also a board member of Vermillion, Inc., where I was the principal financial officer at the time. So -- he was also the chair of the audit committee, so I interacted with him. At some point, he had decided to leave Cassava. He was moving back to California. And he basically said, you know, they were going to be doing a search, and so that's how I got introduced to Mr. Barbier.

Q. And then what happened?

A. Well, there was a period of time where Pain

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

Therapeutics, Inc., went without a CFO, but I kept in touch with Mr. Barbier. I believe I interviewed, you know, a year before I had joined the company. Kept in touch with him.

And eventually, he called me and said, Hey, you know, we're moving from our -- our program in, you know, abuse-resistant opioids into a program with Alzheimer's disease. It's time we had a CFO. We'd like to bring you in again and meet the team.

And eventually, I got an offer from Cassava and accepted it in October of 2018.

Q. And you have been the CFO of the company ever since then; right?

A. Correct.

Q. Can you describe your CFO role and how it has evolved, if at all, since you joined in 2018?

A. Well, it's -- you know, Cassava is a small company, 20 people. So the CFO role is -- the CFO role is expansive. It covers not only accounting and finance and SEC reporting, but investor relations. I don't claim to be very good at IT, but IT reports to me. You know, I'm -- I'm quasi-HR. I'm the compliance officer for insider trading.

I wear a lot of administrative hats. I'm sort of a jack-of-all-trades and I'm adept at knowing when

Page 11

it's out of my depth and to bring in -- bring in experts. So that role has been pretty consistent.

You know, Remi Barbier, our former CEO, had been with the company since its inception for 20 years, so with Rick Barry joining a year ago, you know, I -- part of my role was to make sure Rick was up to speed on things since he had not been there for the amount of time, but the roles remained largely the same.

Q. And so you reported directly to Mr. Barbier until he left the company and Mr. Barry took over, and since then, you've been reporting directly to Mr. Barry?

A. That's correct.

Q. And who has reported to you over the years?

A. Over the years, Ruth Araya has been my controller for the whole time I've been there. Steve Pomeroy is our director of IT. He was a consultant when I was there, so he didn't report to me as a consultant, but when he joined as an employee in the early 2020's, he's reported to me since then.

I think those would be my only two direct reports.

Q. To what extent have you been involved in the company's scientific research and clinical program?

A. I would call it -- so I'm an executive officer of the company, so I do pay attention to

Page 12

everything, but when it comes to the science, I'm on the periphery, so I'm not in every scientific meeting, but I do pay very close attention to what we're doing, particularly as it intersects with my SEC reporting responsibilities because if there's clinic -- if there's an event that requires a Form 8-K, I'm the one that, you know -- not initiates that process, but makes sure it gets done and gets done timely. So I'm broadly aware of all of our programs.

I also have responsibility for writing a large portion of our Form 10-K's and Form 10-Qs in conjunction with the -- the scientific team, of course, so I -- I know the top line and top level, but when you go down into the detail, I do not know it, nor do I expect myself to know it.

Q. And coming to Cassava in 2018, did you have any prior experience in biotech?

A. Yes. My role with Vermillion, Inc., which is now called Aspire Women's Health. I joined as controller in 2010. They're a medical -- a diagnostics company publicly traded, so biotech, but not drug development. It's diagnostics.

Q. And so was your kind of role in the scientific work at that company similar to your role at Cassava?

Page 13

A. Very similar. I was the principal financial officer from 2011 to 2018, so the primary drafter of Form 10-K, 10-Q, 8-K in conjunction with the team and counsel, of course. So, again, stayed aware of all of our progress with diagnostics and our program -- our scientific programs, but never at a detailed level. I don't have that in my background.

Q. Have you read any of the scientific research papers about simufilam?

A. I've read them, but I've never studied them. I find them to be -- I find scientific papers to be tough, dry reading.

Q. Yes. And have you looked at the data that was generated from the Phase 2 and Phase 3 clinical trials with simufilam?

A. The only data I would have looked at are those that are published publicly. I would never -- I have not looked at the raw data of any of those studies.

Q. And have you looked at the raw data of any simufilam research at all?

A. No.

Q. So all of the simufilam research that you're familiar with has been mediated by Dr. Wang, Dr. Burns, or someone else at the company in a scientific role?

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

MR. CAMPBELL:  Object to form.

A.  Yeah.  Yeah.  That's correct.

Q.  (By Mr. Kumagai)  So, to your knowledge, what is simufilam?

A.  Simufilam is a proprietary drug for -- investigational drug from Cassava.  It modulates filamin -- an altered form of filaman-A in our belief and can have beneficial therapeutic effects on patients.  And that's what we're -- we're investigating.

Q.  What was the company's belief about simufilam's ability to treat Alzheimer's disease?

MR. CAMPBELL:  Object to form.  And again, you're answering in your personal capacity today, just to remind you.

A.  Sure.  Well, with regards to Alzheimer's disease, you know, it's -- what I said is it's an investigational drug.  So we believed there was preclinical data sufficient to go into the clinic, and then the clinical data that we generated was sufficient to move us into a Phase 3 program in conjunction with FDA.

And Phase 3 is where you find out if a drug is efficacious.  Not if it's efficacious, but if it meets its endpoints and is approved by FDA.

Q.  (By Mr. Kumagai)  What is your understanding, if any, of simufilam's purported mechanism

Page 15

of action in Alzheimer's disease patients?

A.  You know, I've read our -- you know, our published decks, but I don't have a -- I don't have a scientific understanding of it.

Q.  But what is your understanding?

A.  Just what I said.  That our drug, you know, passes the blood-brain barrier, interacts somehow with filamin A is our belief.  And that has beneficial effects, you know, we believed in Alzheimer's patients.  Our Phase 3 trials failed.

Now we're moving to an indication in tuberous sclerosis complex-related epilepsy.

Q.  And what is your understanding of the failure of the Phase 3 trials?  What does that mean?

A.  Well, when you have Phase 3 trials, you set out primary endpoints and secondary endpoints, and if you meet your primary endpoints in two well-controlled pivotal studies, you put an NDA into the -- new drug application, an NDA, into the Food and Drug Administration, FDA, looking for approval.

Our -- both of our Phase 3 studies -- one read out in November 2024, the other read out in March 2025 -- didn't meet those primary endpoints.  And in that respect, the -- the clinical trials failed.  Therefore, we did not submit a new drug application to

Page 16

FDA.

And for all intents and purposes, we've shut down that program.  We don't see -- we've shut down that program.

Q.  And when you testified a moment ago that it was the belief that simufilam interacts somehow with filamin A, what do you mean by that?

A.  Well, again, you're getting into science, but I'll tell you what I -- you know, my belief.  As a company, it's an investigational drug.  We're talking about, you know, the human brain.  You can't take a microscope, you can't, you know, biopsy it, or you shouldn't.

So when you talk about those -- those interactions, you're talking about things that are very small level, so it's very hard to -- it's hard to prove that.

Q.  And the company, in your view, has not yet proven that?

MR. CAMPBELL:  Object to form.

A.  Yeah.  I think it would be difficult to prove.  We've generated certain evidence that there's, you know, activity, but proven, yeah, we've never made a claim that we do this.  It's like it's our -- it's -- it's our thesis.  I think there's lots of drugs that are even on

Page 17

the market and they still don't know quite how they work.

And so simufilam, you know, if it was efficacious in Alzheimer's patients, we wouldn't necessarily need to prove it, but we do have -- I do -- I am aware that we have ongoing experiments and studies to show the -- to continue to show evidence of the mechanism of action.

Q.  (By Mr. Kumagai)  Okay.  And you testified earlier that you are primarily responsible for all the SEC filings at the company; right?

A.  Correct.  I'm sorry.  I'm primarily responsible for -- for preparing the SEC filings.

Q.  And you sign and certify them; right?

A.  Correct.  Along with other officers and in the case of the 10-K, the directors of the company, but yes.

Q.  In the company's previous SEC filings, it would typically say simufilam binds filamin A; right?

A.  I'd have to look at -- at the exact language.

Q.  And in more recent filings, they say something closer to what you testified earlier, that simufilam interacts with filamin A; right?

A.  Okay.

Q.  Are you familiar with the general change in

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

language from "binding" to "interacting"?

A.   Generally, yes.

Q.   Why was that change made?

A.   That's at the hands of the scientific team. I don't know specifically.

Q.   Sitting here today as the CFO, you have no idea why the company changed the language from "binding" to "interacting"?

MR. CAMPBELL:  Object to form.

A.   Sitting here as a CFO, you know, I -- I know that it came from the scientific team.  I know that, you know, we -- so no, I actually don't know why the specific change was made, but I do know it's very difficult -- since it's very difficult to prove, we've just taken a position that's -- as a company, that's lighter than a -- than saying it binds.  Because I don't know that we've -- not being one of our scientists, I don't know that we've proven it, but I don't believe that we have.

Q.   (By Mr. Kumagai)  And that was true -- that's always been the case; right?

MR. CAMPBELL:  Object to form.

A.   Yeah.  I don't know that since I'm not the science team.  You know, that language specifically would come out of the science team and be reviewed by Nadav

Page 19

Friedmann, our former chief medical officer, who is now deceased, by our CEO, by the -- you know, by the clinical team.  It's -- it's -- you know, that kind of language, I wouldn't ever try to parse in my role as CFO.

Q.   (By Mr. Kumagai)  And is it your testimony that you didn't notice that change?

A.   Oh, I definitely noticed it.

Q.   Did you ask any questions about why that change was being made?

A.   I think -- yes, I did talk about it with Chris Cook.  But, again, he's -- he's the legal person and I think it was --

MR. CAMPBELL:  I'm going to just caution you.  Your conversations with in-house counsel are privileged.  I don't know if you're going to get into the substance of those, but please don't discuss your conversations with counsel.

A.   Thank you for that.  Yeah.  I can't go into the -- the substance of it.  But yeah, it's a -- it would be a normal thing for me to inquire when we, you know, change language that's been there over time.

Q.   (By Mr. Kumagai)  And so, aside from discussing those changes with Mr. Cook, did you discuss them with anyone else?

A.   Not to my knowledge.

Page 20

Q.   Who was responsible for the science -- can you describe who has been historically responsible for the scientific portions of the SEC filings?

A.   The SEC filings, the scientific portion, I would -- I'll describe the process.  So the process when we're going to file a 10-K is I would take the -- the raw document and update it to my understanding.  You know, I would look at our press releases, you know, my knowledge of where our clinical programs are, presentations, and I would draft in the material from that, taking great care that I'm not using my writing license with it because scientific data, you know, information should be tight.  That's draft one.

I would send that to our former CEO, Remi Barbier, and from there, I -- you know, he was the -- the quarterback, to use a football expression, of that.  So I assumed he would confer with Lindsay Burns or Nadav Friedmann and the scientific team and then I would get back a revised draft.  So I was not -- we didn't sit in drafting sessions and talk about language.  But that would be the -- the normal process.

Since Rick Barry has joined, I'm a little bit more of what I would say that quarterback position where I do that same initial draft of the 10-K, to use that example, but then I send it to Rick and Chris and

Page 21

then I would send it to -- Rick Barry and Chris Cook. Then I would also send -- when I got their edits, I would send it to Jim Kupiec when he was there.  Now, I would send it to Angelique Bordey.

You know, it -- it -- it really depends on what information is there because we're always going to have a -- a scientist that is leading that program and I would make sure that that language is clear, fair, and accurate.

But mostly, it falls -- you know, my job, my responsibility would be -- would be to make sure, Hey, we issued this press release.  Is the language in the 10-K or 10-Q the same?  And if it's not, why not.  Because those things should be generally consistent.

Q.   Okay.  And in terms of the change in language from filaman -- strike that.

In terms of the change in language in the SEC filings from simufilam binds filaman A to simufilam interacts with filamin A, you recall having a discussion or discussions with Chris Cook and those conversations are privileged.

Do you have any other understanding as to why those changes were made?

A.   I'll simply repeat that my understanding today is that we haven't proven, you know, that there is a

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

binding and we've got ongoing experiments for that, but, other than that, no, I'm not aware of why that language would have been changed.

Q. And that was true that you hadn't proven simufilam bonding filaman A back when the SEC filings used that language; right?

MR. CAMPBELL: Object to form.

A. If we haven't proven it today, then we wouldn't have proven it back then. That's correct.

Q. (By Mr. Kumagai) What is your understanding of what SavaDX is?

A. Sava -- Sava -- SavaDX, as we call it, is a -- call it an early-stage program -- it's never been a big focus for the company -- of -- it's a potential diagnostic to diagnose, you know -- diagnose Alzheimer's disease or stages of disease or potential for the disease through a drop -- you know, through blood -- a blood sample rather than a, you know, PET scan or a cerebrospinal fluid tap.

So the idea was if we can figure out who either has Alzheimer's disease or potential Alzheimer's disease, you could have a mainstream diagnostic for that.

You know, my knowledge of the program, you know, in -- since 2022, probably, we've been working -- we've disclosed and put it very, very much as like a back-

Page 23

burner program in our SEC filings. We've always said that we spend less than -- I'd have to look at it -- it's 1 percent -- a very small percentage of our R&D budget on that program. I -- you know, my -- what else would you like to know?

Q. Is it still in development?

A. There may still be ongoing work, but we don't -- the company doesn't plan to develop it as a -- a product, so we have -- in the -- in our SEC filings, I believe we've said that we're -- that we're not moving forward with that program.

Q. And so what do you mean by "there may still be ongoing work"?

A. There may be a company, you know, doing -- we may be spending 10- or 15,000 to continue an experiment on it. I just -- I'm not aware of that. We've got lots of -- lots of programs, even though we're small, so it would be unfair for me to say there is zero work ongoing right now when I don't know that. There may be some mass spectrometry work that's being done on it.

Q. But if the company has said publicly that it has no plans to develop it further, why would there still be ongoing tests related to it?

MR. CAMPBELL: Object to form.

A. You know, that's normal. We're a science

Page 24

company. We don't just do things that are -- you know, there may be some type of -- you'd have to ask the person with the program, but I'm, you know -- we don't only do exactly what we're working on.

You know, back in 2012, we gave simufilam to a professor at Yale University, even though we had no idea we would be -- you know, we might have an indication in tuberous sclerosis complex-related epilepsy.

You know, I would call it -- if there was ongoing work -- and I'm not aware there is -- it'd be the tail end of that program because there is no plans to move forward with it.

Q. (By Mr. Kumagai) And who at the company would be most knowledgeable about SavaDX?

A. Ben -- Ben Thornton.

Q. Anyone else?

A. I think Ben Thornton is the -- the primary person.

Q. And he's still at the company. And can you remind me of his role again?

A. He is still with the company. He is an SVP of technology. I'd have to look at our --

Q. I think I've heard that before. What does that mean exactly, that title?

A. I can't tell you that. I can tell you what

Page 25

I think it means.

Q. Yeah.

A. But he's working -- he's a science person, so he's -- he's our experimenter. He's not a clinical person. So he's separate from that. He doesn't work with clinical programs.

Q. Do you personally have any experience at all with Western blot experiments or ELISA experiments?

A. No.

Q. Have you ever seen an original Western blot?

A. No.

Q. Who at the company, if anyone, would be the resident expert on Western blots?

MR. CAMPBELL: Object to form. Just to clarify, you're asking today at the company?

Q. (By Mr. Kumagai) Well, let's start -- let's go across time. So since you began in 2018 through today, who at the company would you turn to if you had scientific questions about Western blots?

A. I don't know that we have anybody that I would think was an expert. If somebody came to me and said I've got Western blot questions, I would go -- I would have gone to Lindsay Burns and/or Ben Thornton, simply because they are the science people in the company,

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

not because I have any knowledge that they know anything more than I do about Western blots.

Q. And so Lindsay has left. Mr. Thornton is still at the company. So today, if that question arose, you would go to him, I take it?

A. If the question arose today, that's who I would ask.

Q. Do you recall having any discussions with Dr. Burns about Western blots?

A. Not that I recall.

Q. What about Mr. -- Dr. Thornton?

A. Not that I recall.

Q. Do you recall having discussions with anyone at the company about Western blots?

A. Other than in the context of ongoing litigation, no.

Q. So does that mean that those conversations were with counsel?

A. The only conversations I recall would have been with -- with counsel on those. It was in the context of litigation.

Q. And is there anything you can tell me about those conversations without disclosing requests for legal advice or the delivery of legal advice?

A. Not that I can recall.

Page 27

Q. You talked a little bit about this yesterday, but just to make sure the record is clear, can you talk about your role with respect to the company's public relations?

A. Sure. You know, we're a small company. So right now, we have an investor relation firm, LifeSci Advisors. At one point during my years with Cassava for a course of one year, we had another IR firm called The Ruth Group, but, largely, investor relations -- call it front line has been me.

So at Cassava, if you go to our website, you know, there's a "contact us." If you put an email into that, it goes to my email. My -- my Cassava email.

If -- and any press release that you look at, you would find, at the bottom of it, you know, my name, my email address, and my phone number.

So investors sometimes, you know, if we've got a big release, lots of times, but if -- any investor who has a question, be it a good one, a bad one, indifferent, if they come in through one of those lines, either a phone call or an email, it comes to me.

I look at myself a little bit -- when I say the front line, if it's something that I can answer or, you know, choose to answer, it's not material, nonpublic information, I do so.

Page 28

If it's science questions that I, you know, can't -- you know, can't understand or don't have the wherewithal, I sometimes make a judgment that these aren't, you know, worth our company's time. Again, I adjudicate that or if I think, hey, these are -- these look to me, on the surface, like legitimate questions, prior to Mr. Barry coming on board as CEO, I would send the -- those questions to Remi Barbier to further adjudicate are these valid, should we -- again, we have limited resources, so you don't necessarily want to spend time answering every single question an investor puts to you.

So I've -- you know, to summarize that, yes, I have a very heavy role in investor relations. I go to our investor conferences, usually with the CEO. I, you know -- when we've had earnings calls, I've had a -- you know, a speaking role there. So I'm part of the -- the public outreach, if you will, for Cassava.

Q. And you're describing it as investor relations. I guess my question is a little broader about public relations or media relations. So if a media inquiry comes into the company, who would typically be responsible for fielding that in the first instance?

MR. CAMPBELL: Object to form.

A. So, again, I've got to -- I have to talk to

Page 29

prior to Mr. Barry joining in July of 2024, my -- that if a media inquiry came in, I would send that to Mr. Barbier. To Remi Barbier.

It's -- it gets a little -- I don't want to call it murky, but Chris Cook joined the company at some point. And I don't believe I would send media inquiries to him prior to Mr. Barry joining the company, but I'm not sure.

Once Mr. Barry joined in July of 2024, if a media inquiry comes in, I would send it generally both to Rick Barry and to Chris Cook.

Q. (By Mr. Kumagai) And was that due to some directive from Mr. Barry?

A. Not that I can recall. That's just my normal -- you know, again, a media inquiry is -- a -- it's a -- more a public outreach than an individual saying, Hey, I'm curious about this. Especially a media inquiry could be, you know, a newspaper or a magazine or an article, so it requires more attention. So I put it in the hands of the CEO and now Chris Cook, who's our chief operating and legal officer.

Q. How has Mr. Cook's role changed over time since joining in approximately October or November of 2022?

A. Sure. In my -- again, this is -- is me

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

speaking. So in -- when he joined the company, he was our general counsel. He was, I'll call it, laser-focused on our legal matters and in handling those.

He is, you know, a very smart person, so he, as part of his role as general counsel, very studiously went into the science and so he -- when I say on the -- the peripheral level, he's better at it than I am. I can't speak to how -- how deep he goes, but it's -- it's better than my knowledge.

As Rick Barry joined the company, you know, having not the 20 years of background, you know, Chris took on a -- a much bigger role in -- in, I want to say, educating Rick, but in -- in talking to people when they wanted to know about the science. You know, we would, you know, even have Chris talk with investors.

And at some point, it became apparent that the role of general counsel didn't fit what Chris was doing with the company, so sometime after that, the board appointed him as chief operating and legal officer.

Q. Okay. And in your view, who at the company has the greatest institutional knowledge?

MR. CAMPBELL: Object to form.

A. Institutional knowledge about what specifically?

Q. (By Mr. Kumagai) Well, what is your

Page 31

under -- how would you define "institutional knowledge" for Cassava?

A. Sure. If you asked me institutional knowledge about the company's history, about, you know, what's transpired between 2018 and 2025, that would be me.

If you're talking about who has the most scientific institutional knowledge, that would be -- when it comes to our science programs, that would be Ben Thornton. You know, he's been with the company for a long, long time, either as an employee or as a consultant. And I think there were times when he wasn't even associated with the company, but a long time. He would be the institutional knowledge scientifically.

Q. And what's Dr. Thornton's role on the current TSC program?

A. I don't know specifically, but I do know that when you have these experiments on method of action, he's very involved in them.

Let me phrase, too, when I say involved in them, Cassava doesn't have our own labs, we don't actually do the experiments, but when we outsource those to companies, you know, we're heavily involved in what's happening, what are the results. And so that's where -- when I say he's involved in them, that's what I'm referring to.

Page 32

Q. And would he provide feedback on study design, those sorts of features?

A. I would imagine so, but I wouldn't be in those -- in those meetings, I -- I hope.

Q. And you talked a bit about this yesterday, too, but just to be clear, you, as CFO, have attended most, if not all, of the company's board meetings since joining the company; is that right?

A. Correct.

Q. And so is it accurate to say you've attended every single board meeting that the company has held since you joined in 2018?

A. That's -- no. That's not the case. I've been -- I've attended every regular board meeting. But I do know that there were board -- our board meetings that I did not attend in particular around -- if the board had a special meeting in particular around the time of July 2024, I was not involved in those.

Q. Okay. Aside from the special meetings around July of 2024, can you think of any other meetings of the board of directors that you did not attend since you've joined the company in 2018?

A. Not that I can recall, but -- there may be one or two that I wasn't at, but I -- not that I recall.

Q. And how often does the board of directors

Page 33

meet?

A. Regular scheduled meetings would be four per year.

Q. And has that been the actual schedule?

A. There's -- there's generally more than that. The regularly scheduled meetings are the regularly scheduled meetings, but if we -- you know, for example, our CMO, Dr. Friedmann, passed away so we had a special meeting called to discuss that. If we do a financing sometimes and we don't -- and we haven't discussed it with the board in advance, you'd have a special meeting.

You know, there's topics that come up, so we generally have more than four board meetings per year, but that's the regular scheduled, you know, a year in advance cadence.

Q. Were there any special meetings specifically devoted to the citizens petition or statements by our clients?

A. It's certainly possible, but I don't recall.

Q. Can you recall any meetings of the board of directors where our clients, the citizens petition, or the defamation action were discussed?

A. I would have been -- it would have been discussed, but I can't recall specifically. You're

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

talking years ago.

Q. Can you recall any specific discussion at the board of directors meeting -- strike that.

Can you recall any discussion of the board involving our clients or the defamation action?

MR. CAMPBELL: So I'm just going to pause. I don't know what your answer will include, but don't include in your answer any discussions at the board level that were provided or went back and forth with legal counsel. Otherwise, you can answer the question.

A. Not -- not that I can recall, other than with -- with legal counsel.

Q. (By Mr. Kumagai) And so, just to be clear, can you specifically recall the substance of those discussions with legal counsel? Yes or no?

A. No, I can't.

Q. So you can't, sitting here today, recall any of the substantive discussions of the board of directors where our clients, the defamation action were discussed?

A. Well, I can recall that it was discussed, but just generally in the -- the board moved forward with the -- with the action, but any of the specifics, I don't recall.

Q. Do you recall anything out of the ordinary

Page 35

about any board of directors meeting where the defamation action or our clients were discussed?

MR. CAMPBELL: Object to form.

A. Yeah. Nothing out of the ordinary and certainly nothing without counsel.

Q. (By Mr. Kumagai) What other -- strike that.

Are you on any of the board committees?

A. Yes, I am.

Q. And what committees are those?

A. Sorry. The -- let me rephrase that. No. I'm not on any board committees. I'm not a board member.

Q. Do you attend the meetings of any board committees?

A. Yes, I do.

Q. And which committees are those?

A. I'm at every -- generally at every audit committee meeting. I believe at every audit committee meeting. Since July 2024, with Rick Barry joining, I'm also at the compensation committee meetings. I may have been at a nominating -- I may have been -- in fact, I believe I was at a nominating and governance committee once, but not -- they don't have -- that's an irregular committee. Let me think what else we have. Those are the ones I can think of.

Page 36

Q. Have you ever attended any of the meetings of the special litigation committee or litigation monitoring committee?

A. Not to my recollection.

Q. Have you ever attended any of the meetings of the committee responsible for the independent investigation that was conducted by Orrick or Gibson?

A. Not that I can recall. And I will add, though, we also do have ad hoc fundraising committees at some -- when we're doing -- raising money, raising capital and I'd also be at those meetings. I knew I was missing a committee.

Q. Have you ever attended any meetings or calls involving the scientific advisory board?

A. Not that I can recall.

Q. Can you describe your compensation from Cassava?

A. Sure. The chief financial officer of the company. My compensation is set by the compensation committee. I have an annual base salary. I have a bonus target, but the company doesn't have a bonus plan, so that's -- isn't -- isn't similar to most publicly traded companies. So the company's paid ad hoc bonuses infrequently over the years. I'm compensated by stock options. I was a participant in the 2020 cash incentive

Page 37

plan.

I was a recipient of the very -- there was only one milestone that was met that was adjudicated by the compensation committee and amounts were set and I received a $50,000 -- I'm going to say award that has never been paid and there's no belief that it will ever be paid, but in the terms of the plan then, it became a contractual obligation of the company that we could not rescind.

I get medical and health benefits commensurate with every other employee. Nothing -- nothing different from that.

And that's the -- that's the -- the basics of my compensation.

Q. And what do you mean when you refer to the $50,000 award as something the company could not rescind?

A. So the 2020 -- so the 2020 cash incentive plan has -- since then, there were -- there was one milestone met and adjudicated by the compensation committee and according to the terms of the plan at that time, once an award was made, it was the -- the property of the recipient.

So the company can't cancel something that's been given. It would be giving someone a bonus and saying, Just kidding, we're going to take it back. But

10 (Pages 34 - 37)

Case 1:24-cv-05948-JLR-OTW    Document 241-26    Filed 08/03/26    Page 12 of 136

HIGHLY CONFIDENTIAL

Page 38

when I say -- the reason I've used the words can't be rescinded is the company has since -- the compensation committee has adjudicated all of the other milestones that were met and awarded zero dollars to any participant and any future milestones that are met.

The plan, put simply, has been effectively canceled to the extent the company could legally do it, but there are still some elements of it that are active and alive, and those are described in detail in our Form K SEC filing.

Q. But you could personally disclaim that and release the company from that $50,000 obligation; right?

A. I could.

Q. Have you done that?

A. I have not.

Q. Why not?

A. Honestly, because I didn't think of it.

Q. Sitting here today is the first time you've thought of it?

A. Yes.

Q. Okay. Can you describe your -- what was your salary in 2018 and each of the years since then?

A. I'm not going to be able to give that verbatim. I know that my salary was 250,000 when I joined the company. It moved to -- you're asking me for -- can I

Page 39

give you general -- general numbers? Because I don't want to --

Q. Sure. You can say --

A. In roughly 2022, it moved to -- I did get raises that were called cost of living infrequently from 2018 to 2021. In 2022, I got a raise to 425,000. And since then, it's been -- call it cost-of-living adjustments that were -- again, all of these are -- are decided by the compensation committee of the board of directors.

Q. And these are all disclosed in the public filings?

A. Yeah. The proxy has --

Q. And have you received a bonus -- well, strike that.

Can you describe the bonus you received each year starting in 2018, if any?

A. There's two I can think of and I don't believe I've had more than two. In 2022 -- I'm not sure if it's reported in 2021 or 2022 -- I received a $500,000 bonus. And in 2024, I received a $250,000 bonus.

Q. And what was the reason for the $500,000 bonus?

A. You'd have to go back to the -- the compensation committee minutes, but it's, you know,

Page 40

contributions to the company.

Q. Was it based on any specific achievement or milestone that the company had hit?

A. Yeah. I don't -- I don't recall what the compensation committee's deliberations were. And at that time, all I would have been -- all I would have done is read the minutes of those meetings, so I can't tell you that.

Again, I was not involved in compensation committee meetings prior to 2024.

Q. What about the $200,000 bonus?

A. Yeah. That would --

Q. 250,000.

A. 250,000 was May 2024. And again, I was not -- that was prior to Mr. Barry joining the company, so I would not have been -- I do not believe I was in those meetings, so I can't say what the specific, you know, deliberations were of the compensation committee.

Q. And what -- so you have no idea what rationale the company had for awarding a $250,000 bonus to you in May of 2024?

MR. CAMPBELL: Object to form.

A. Yeah. I -- I could guess, but I don't -- I don't want to guess.

Q. (By Mr. Kumagai) Well, please guess.

Page 41

A. Is that appropriate?

MR. CAMPBELL: Object to form.

A. Yeah. I --

Q. (By Mr. Kumagai) What would you guess?

A. Yeah. I -- I don't prefer -- I don't think that's relevant to me to guess why somebody -- you know, compensation committee deliberations.

Q. Well, you just said that you could on the record, so I'd like to hear.

MR. CAMPBELL: Object to form.

A. Well, it's contributions to the company. So if you look at any given year, you know, the company -- particularly in 2024, you know, we were about to complete two large well-controlled Phase 3 studies. We were -- you know, we believed we would be successful.

If you look at every other -- so I -- I'm not in compensation committee meetings, but I do -- you know, we -- the compensation committee did infrequently use a compensation consultant. And so if you look at my compensation relative to our peer group, it's very, very low, so it's not surprising that a bonus was awarded.

We also raised capital in 2024, and that was successful. We -- you know, it's a compendium of the company was going places and so that's why I would think the compensation committee would meet and award a bonus.

11 (Pages 38 - 41)

212-267-6868          www.veritext.com          516-608-2400

HIGHLY CONFIDENTIAL

Page 42

Q. (By Mr. Kumagai) And isn't it the case that the company also laid off a third of its staff in 2024?

A. That was in -- that would be December. That was after the failure. So bonus was awarded May 2024 when, from the company's perspective, everything was going fantastic. In Dec -- you know, in November 2024, we failed our first Alzheimer's Phase 3 trial. Had a failure. Failing result. We decided to shut down the second trial early. So the company was in a much different position.

It's -- it's -- again, corporate governance is -- if we're not running an Alzheimer's program, do we need all these people, and the answer was no.

Q. Do you recall when Dr. Wang was indicted by the Department of Justice?

A. Roughly June 28th, 2024.

Q. Okay. And so the company awarded the bonuses before news of Dr. Wang's indictment?

A. Yes.

Q. And were those bonuses paid? Did you receive the $250,000 bonus?

A. Yes, I did.

Q. When did you receive that?

A. I don't know exactly.

Page 43

Q. Was it in May of 2024, or was it later in the year?

A. I don't recall.

Q. Approximately when?

MR. CAMPBELL: Object to form.

A. Yeah, it would have been -- if it was awarded in May, it would have been in June or July of 2024, but I don't know exactly when.

Q. (By Mr. Kumagai) Okay. And you previously mentioned you received stock options from the company, as well?

A. Yes.

Q. Can you describe the stock options you've received each year from -- starting in 2018?

A. Well, I don't know all those verbatim, but I can tell you in good -- good generality. So my initial grant with the company was 50,000 stock options when I joined the company. That was 2018. In 2019, I did not receive a grant. Post then, I received -- I've received several grants, such that I had -- I just don't know those off the top of my head.

In conjunction with the 2024 bonus, I believe I was also awarded 25,000 stock options.

Q. And after Dr. Wang was indicted and the SEC settlement was reached, did you ever consider not

Page 44

accepting or returning the 250,000 bonus that you received?

MR. CAMPBELL: Object to form.

A. No, I didn't.

Q. (By Mr. Kumagai) Why not?

A. I don't think that would be something that -- that any officer of any company would do. You know, the bonus wasn't dependent on any results -- you know, specific result of the company. It was for the work that we -- that myself and any other officer of the company has put in.

Q. And after the Phase 3 trials failed and before the company laid off a third of its staff, did you consider -- consider returning the 250,000 bonus that you had received that year?

A. No, I didn't.

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) Why not?

A. Again, if you look at -- two things. One, I just don't think that would be something that any officer of a company would do, you know. And then, two, if you look at the compensation surveys -- sorry. Not surveys -- the compensation reviews done by our independent compensation consultant, you know, our compen -- the compensation of the officers of the --

Page 45

officers today is below -- you know, well below the median.

So in terms of peer groups, the company's under -- you know, has under-compensated its officers rather than over-compensated.

Q. And so in your view, you deserved the bonus?

A. Yes. In my view, I did.

MR. KUMAGAI: Okay. Let's take a break.

VIDEOGRAPHER: Going off the record at 9:57. This marks the end of Media 1.

(Recess taken, 9:57 a.m. to 10:07 a.m.)

VIDEOGRAPHER: This marks the start of Media 2 of the video deposition of Eric Schoen. We're back on the record. The time is 10:07.

Q. (By Mr. Kumagai) Okay. Mr. Schoen, before the break, we were talking about your compensation. Aside from the salary, bonus, and stock option sources from Cassava, do you have any other sources of income?

A. Yes, I do.

Q. Can you describe?

A. Rental properties. Investment -- you know, stocks and bonds. Treasury bonds. So interest income. Those would be the -- the three primary other sources.

Q. And where do you have rental properties?

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

A.  Bellevue, Washington, and Austin, Texas.

Q.  Just those two properties?

A.  At the present time, yes.

Q.  And are those apartment buildings or --

A.  Condos.  So owned condominiums in a condominium complex that I rent to other people.

Q.  And how many condominiums do you own in each --

A.  One in -- one condo in each location.

Q.  Prior to joining Cassava, did you have stock in Cassava?

A.  Not that I recall.

Q.  And since joining the company, through stock options, you have --

A.  Through stock options and open market purchases, but those aren't income from the company, so I didn't mention them.

Q.  And approximately how much Cassava stock do you currently hold?

A.  Outright, approximately 11,000 shares.

Q.  And since you joined in 2018, can you describe the share ownership that you've had over time?

A.  Sure.  In -- so I do -- so some of this, I'll be specific and some, I'll be general just because I don't memorize everything, but in early 2019, before the

Page 47

Phase 2a results were out, I bought 10,000 shares of Cassava.

After that time, I've done open market purchases at various times.  I participated in the warrant program that we ran in 2024 and exercised 1,000 warrants for 1,500 shares.

You know, all of the times I've made purchases, it's been during open windows for the company.  We're really tight in that manner, so because I'm the compliance officer, I get my clearance from the CEO.

Q.  And are all those trades that you've done disclosed publicly?

A.  Correct.

Q.  Aside from Cassava, do you have -- are you a shareholder of any other biotech or pharmaceutical companies?

A.  Well, I own like -- I'm in mutual funds, so absolutely.  Any other shares outright -- at the present time, yes, I own some of Sarepta Therapeutics.

Q.  That's the company that Rick Barry is on the board of, as well; right?

A.  Correct.

Q.  He's still on the board of that company?

A.  To my knowledge, yes.

Q.  And is that how you were introduced to that

Page 48

investment opportunity?  Through Mr. Barry?

A.  Yes.

Q.  Approximately how much have you invested in Sarepta?

A.  Approximately 30 -- roughly $35,000.

Q.  Are you familiar with the practice of short selling stock?

A.  Yes, I am.

Q.  And what are your views on short selling?

MR. CAMPBELL:  Object to form.

A.  Well, short selling is part of the ecosystem.  I think they take care of imbalances.  I think when short selling is done, you know, honestly, it's, you know -- I've never shorted a stock, but I think it's a -- it's a perfectly acceptable practice.

Q.  (By Mr. Kumagai)  What makes you say that?

A.  Again, it's -- it's -- well, it's legal if it's done correctly.  It's part of the -- especially in biotech, people are going to make -- you know, some people are going to believe in the stock, some people are going to think that the company is not going to be successful.  So people who believe the company might be successful are betting for it; people who believe a company might be unsuccessful are betting against it.

That's kind of the financial system that we

Page 49

have.  So I don't see anything wrong with it, again, if done correctly.

Q.  What do you mean by "done correctly"?

A.  Well, the defendants in this case shorted the stock and then spread, you know, malicious lies, falsehoods, and defamed the company, you know, in our belief, for the purpose of driving down the stock to make a financial profit.  You know, that, to me, is an improper use.

Q.  In your view, is it proper to take a short position and then make public statements critical of the company?

MR. CAMPBELL:  Object to form.

A.  Yeah.  I don't see any issue with that.  Again, the people who are betting against the company, in my view, are not going to be, you know -- are going to be -- have criticisms.  They're not going to believe in the company.  And that's -- I see no issue with that.

Q.  (By Mr. Kumagai)  Okay.  I'm going to turn to the defamation action.  And I think we've covered this extensively yesterday on the record, but I want to make sure I've covered it from your personal capacity and personal capacity -- perspective.

So some of these will be somewhat repetitive as -- of yesterday, but I just want to make

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

sure that we've covered this with you in your individual capacity.

So can you describe your -- the extent, if any, of your personal involvement in the defamation action?

A. I'm the CFO of the company, so I -- I pay legal bills. I'm broadly aware of -- of the concepts, but I've not been involved, you know, in very many meetings and those meetings would have been with -- with counsel, so they would be privileged. So my answer would be not a lot.

Q. And so you have been involved in some meetings where the defamation action was discussed; right?

A. Yes.

Q. Those include meetings of the board of directors, although you can't recall any specific substantive discussions; right?

A. Yes.

Q. You also attended separate meetings or discussions with counsel; is that right?

A. Well, it would be likely that I would have. I don't recall any specific ones. I was not -- I'm not -- I was not a primary regular attendee of those -- of any meetings with -- with counsel.

Q. And by "counsel," are you referring to

Page 51

Benesch?

A. Either -- Benesch, yes.

Q. To your knowledge, did Benesch ever come to Cassava's offices in Austin?

A. I don't recall.

Q. Do you know if anyone at the company held any in-person meetings with the team at Benesch that brought the defamation action?

A. I don't know.

Q. Okay. So aside from the meetings at the board of directors, the meetings or discussions with Benesch that you may or may not have participated in, can you recall any other discussions or meetings that you were involved in where the defamation action or our clients were discussed?

A. Absolutely, I would have discussed it with Chris Cook, as well.

Q. Do you recall the substance of any of those discussions with Chris Cook?

MR. CAMPBELL: Just a yes or no.

A. Yes.

Q. (By Mr. Kumagai) And can you describe those conversations with Mr. Cook without revealing requests for legal advice or the delivery of legal advice from Mr. Cook?

Page 52

A. No, I can't.

Q. Okay. So aside from the meetings of the board of directors, meetings or discussions involving Benesch, and meetings or discussions involving Mr. Cook, do you recall participating in any other conversations or meetings where either the defamation action or our clients were discussed?

A. Not that I recall.

Q. Do you recall when you personally first became aware that the company was contemplating a defamation lawsuit?

A. Not that I recall.

Q. Did you have any involvement at all in the fact gathering or drafting of -- strike that.

Did you have any involvement at all in the fact gathering, if any, that was done in preparation for the filing of the defamation action?

MR. CAMPBELL: Object to form. And anything that you were directed to -- any information you were directed to gather by counsel is privileged, so don't include that in your answer.

MR. KUMAGAI: I think it's just a yes-or-no question.

A. Yes.

Q. (By Mr. Kumagai) So you did have some

Page 53

involvement in gathering facts for Benesch as they prepared to file the complaint in the defamation action; is that right?

A. I don't -- I don't know quite how to answer that because I don't know where -- anything that I -- information I would have passed on, I don't know where it went. If it went to Benesch -- you know, in the testimony yesterday, we talked about as -- as a person in investor relations, people would send, you know, I found this on the internet, and I would forward that to Chris Cook or whoever. And so where it ultimately went, I don't know, but other than forwarding information that came to me or something specifically asked by counsel, the answer is no.

Q. So just to unpack that -- and I think I've seen some emails where this was happening -- in your capacity as the sort of investor relations liaison, people would occasionally send you, for example, Tweets by our clients that you would pass on to counsel; is that right?

MR. CAMPBELL: So -- hold on just a second. So if, in the ordinary course of your business, you would take information that was gathered and you would forward it along to counsel or to Mr. Barbier or to anybody, testifying to whether or not that occurred, that is fine.

If there were specific requests from counsel that you gather information of that sort or of any

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

other sort, that is privileged and don't include that in your answer.

A. It's the former, so my answer is appropriate.

MR. CAMPBELL: Okay.

Q. (By Mr. Kumagai) It was the ordinary course collection that you were doing and forwarding?

A. Correct. Correct.

Q. So can you answer yes or no whether or not you participated in gathering any facts specifically for the purpose of filing the defamation action?

MR. CAMPBELL: You can answer yes or no.

A. It's not that I -- not that I recall. So probably a no, but not that I recall.

Q. (By Mr. Kumagai) Did you have any personal involvement in drafting or reviewing the complaint that was filed in the defamation action?

A. I've read it, but not -- not -- no in drafting or reviewing.

Q. And did you review the complaint after it was filed or before it was filed?

A. I don't know.

Q. And because there's been mult -- multiple complaints, I just want to clarify my question. Have you had any involvement in drafting or reviewing any of the

Page 55

complaints that were filed in the defamation action prior to the filing of those complaints?

A. I can't recall for the original complaint. The answer, I believe, is no for the subsequent amended complaints.

Q. Do you have personal knowledge of the individuals at the company who were involved in preparing or reviewing any of the complaints that were filed in the defamation action?

A. Personal knowledge, other than by people's job responsibilities, no.

Q. And who would -- who do you believe, based on people's job responsibilities, to have been involved in preparing or reviewing any of the complaints that were filed in the defamation action?

A. CEO Remi Barbier and then Chris Cook and -- for the time he was there as general counsel.

Q. Mr. Cook -- strike that.

Mr. Cook joined the company right around the same time that the defamation action began in November of 2022. Does that sound right?

A. Yes.

Q. Do you know whether or not Mr. Cook was involved in the decision making or drafting or review of the initial filings in the defamation action?

Page 56

A. I don't know.

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) Do you recall being involved in any discussions about the decision to file the Second Amended Complaint?

A. Not that I recall.

Q. Do you recall being involved in any discussions about the decision to voluntarily dismiss the defamation action?

A. Not that I recall, other than the board meeting.

Q. And do you recall the substance of the discussions at the board meeting where the decision was made to voluntarily dismiss the defamation action?

MR. CAMPBELL: Just a yes or no.

A. No.

Q. (By Mr. Kumagai) Do you recall anything at all about that meeting where the decision was made to voluntarily dismiss the defamation action?

A. Can you repeat that, please?

Q. Sure. Do you recall anything at all about the meeting where the decision was made to voluntarily dismiss the defamation action?

A. No.

Q. So all that you know sitting here today is

Page 57

that there was a meeting of the board of directors where the decision was made to voluntarily dismiss the defamation action?

A. Yes.

Q. Do you recall whether or not Benesch attended that meeting?

A. I don't recall.

Q. Do you recall whether that was a regular meeting of the board of directors or a special meeting?

A. I don't recall.

Q. Do you recall whether the full board attended that meeting or not?

A. I don't recall.

Q. Do you recall whether Mr. Barry attended that meeting?

A. I don't recall. It would be normal. I mean, he would have been there, but I don't -- I don't have a specific -- I just don't remember that meeting specifically.

Q. How sure are you, sitting here today, that the decision to voluntarily dismiss the defamation action was actually made at a board of directors meeting?

MR. CAMPBELL: Object to form.

A. I mean, I -- I believe it was. I don't know how you -- that would be ord -- again, I don't recall

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

that specific meeting, but that's -- you know, any type of corporate action there would be a board action, so ...

Q. (By Mr. Kumagai) I'm just trying to understand because it doesn't -- it sounds like you don't recall any of the details. I just want to understand what the basis is for you saying that the decision was made at a board of directors meeting. And so it sounds like your belief that it was made at a board of directors meeting is based on the fact that historically and the way the company operates is that a decision of that kind would typically be made at a board of directors meeting?

A. Yes.

Q. Aside from past practice and the typical operations of the company, do you have any other reason to believe that the decision to voluntarily dismiss the defamation action was, in fact, made at a board of directors meeting?

A. No.

Q. Okay. Have you had -- strike that.

I believe you testified that you've been involved in discussions regarding the company's litigation expenses. Is that right?

A. Yes.

Q. And that's part of your role as CFO?

A. Yes.

Page 59

Q. And have you been involved in discussions specifically about the company's litigation expenses on the defamation action?

A. Yes.

Q. What do you recall, if anything, about those discussions?

A. The discussions, I -- as part of the role of CFO, for not every board meeting, but I would keep a -- you know, a tally of, you know, how much are we spending on this. You know, in my view, I would separate the defamation action from other litigation.

My role as CFO is to keep the board informed of what's the spend on this matter.

Q. And that included informing the board on a regular basis of the specific spend on the defamation action; is that right?

A. Yes. I would -- I wouldn't say I did it every quarter, but almost every quarter.

Q. And what, if anything, do you recall about those discussions where you presented to the board on the spend that the company was making on the defamation action?

A. I don't recall discussions, but in my presentation, I would note like the defamation action was much less than the money we were spending on other, you

Page 60

know, legal actions.

Q. Do you recall any questions or commentary that anyone attending those meetings provided?

A. I don't recall.

Q. When Cassava commenced the defamation action in November 2022, did you have any personal view on whether the litigation was a good or bad idea?

A. I didn't have a personal view.

Q. So you had no personal views in November 2022 about the defamation action?

MR. CAMPBELL: Object to form.

A. I didn't -- I didn't have a personal view on the litigation. You know, I am part of the team and the team decided that it was an appropriate action, so, from that perspective, I was aligned with it. But I didn't have a personal view. It's out of my scope of -- of knowledge to know is this a good idea or a bad idea.

Q. (By Mr. Kumagai) When you say you were part of the team, do you mean you were part of the team that made the decision to commence the defamation action?

A. No. Part of the management team, so I'm broadly aware of all significant actions that the company takes.

Q. Do you recall ever providing anyone with your opinion or views on the defamation action?

Page 61

A. Not that I recall.

Q. And so I started my question there by asking about the decision to begin the defamation action back in November of 2022. Have you ever had an opinion on the litigation at any time?

A. On the defamation action? Sure. I have opinions. Particularly as I sit here in an anti-SLAPP suit.

Q. What are those opinions?

A. Well, if I could go back in time, I just wish it never would have happened. I think it's -- my opinion is that it's a -- not a good use of time or money for the company.

Q. The defamation action?

MR. CAMPBELL: Object to form.

A. As I sit here today, yes.

Q. (By Mr. Kumagai) And why do you say that?

A. Well, the company has spent a large amount of money on this process, both the defamation action and the defense of this anti-SLAPP action, which I would rather have be spent on operations of the company to further -- to further the company's drug development.

Q. And so if you could go back in time, you would not have wanted the company to file the defamation action?

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

MR. CAMPBELL: Object to form.

A. As I sit here today, yes.

Q. (By Mr. Kumagai) Do you recall ever discussing the defamation action with Remi Barbier?

A. Not that I recall.

Q. Do you recall ever discussing the defamation action with Lindsay Burns?

A. Not that I recall.

Q. Do you recall ever discussing the defamation action with Rick Barry?

A. Yes, I would have discussed it with Rick, but in the presence of Chris Cook, so anything there would be privileged. And I do want to amend, you know, I've never discussed the defamation action with Lindsay Burns, but I know she's commented to me. So never a conversation. But as I said yesterday, I know she was unhappy with it.

Q. Unhappy with the statements that were being made about the company and about Dr. Wang and --

A. Correct.

Q. What comments did -- did Dr. Burns make to you?

A. I don't recall specifically.

Q. What makes you say that you know Dr. Burns was unhappy with the statements being made by our clients

Page 63

and the other defendants in the defamation action?

A. Again, these weren't conversations. These were anecdotes, and she was generally displeased with the comments being made online.

Q. What gave you the impression that she was generally displeased?

A. Her tone, her demeanor.

Q. What about her tone and demeanor?

A. Her tone and demeanor was that of a displeased person.

Q. Can you --

A. She was -- she was being -- you know, the comments -- she was being attacked online. Sometimes personally. I don't know if it was by defendants, but, in general, so her -- you know, when she -- she wasn't happy about it. I can't give you -- there's no more specifics that I have.

You know, you asked me if I had discussed it with Lindsay Burns and the answer is not discussed, but, you know, we -- that's the extent of the interaction on that subject with her.

Q. Was Dr. Burns animated or using any particular words to convey to you that she was unhappy and displeased with those statements?

A. Not that I recall.

Page 64

Q. Did anyone else give comments or convey opinions to you about statements that were being made about the company or Dr. Wang or Dr. Burns?

MR. CAMPBELL: Object to form.

A. Yeah. Not that I recall or not that's covered by privilege -- or except as covered by privilege.

Q. (By Mr. Kumagai) And again, I just want to make it clear, you don't recall the substance of the conversations you had with Benesch or Chris Cook or with Mr. Barry where Mr. Cook was present? You just recall that they happened; is that right?

A. Correct.

Q. Okay. So just to make sure we're fully clear, can you provide the names of each person that you can specifically recall having any sort of discussion or interaction or exchange with about our clients' statements or the defamation action?

A. So Lindsay Burns, Rick Barry, and Chris Cook, and it's possible Remi Barbier, but I don't have any -- I just don't recall.

Q. And members of Orrick or Benesch, as well?

A. Where I was present? Let's expand that then. Board meetings. And then if I was attending a -- it would have been Orrick or Benesch or counsel. Again, I don't have -- I don't have a specific recollection, so --

Page 65

but you're asking me a broad question. That's who -- at some point, I would have been in a meeting where the topic was discussed.

Q. Okay. Anyone else?

A. Not that I can think of.

Q. Have you personally ever interacted with Dr. Wang?

A. Other than by email, no.

Q. Can you describe your interactions with Dr. Wang over email?

A. Sure. Over the course of years, the specific ones are, you know, he was a consultant for the company, so when we renew contracts, it would be me sending him an email, Here's, you know, an updated contract or an amendment to it, and he would send it back.

If he got a -- this, I don't know specifically, but he did get awarded stock options at some point, and as the CFO, I have sent that to him and got his signature and received back.

But only -- the only interactions that I recall having with him were ordinary course of business in the -- in my role as CFO.

Q. Have you ever had any discussions with or attended any meetings or calls with Dr. Wang's counsel, for example, a woman named Jennifer Beidel?

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

A.  I know her name, but not that I recall.

Q.  And how do you know her name?

A.  Invoices.

Q.  Okay.  And is the company -- strike that.

Has the company paid Dr. Wang's legal expenses?

A.  Yes.

Q.  Since when?

A.  I don't recall exactly.

Q.  And the company has paid Dr. Wang's legal expenses for what exactly?

MR. CAMPBELL:  Object to form.

A.  For his defense.

Q.  (By Mr. Kumagai) So the company is paying Dr. Wang's legal expenses for the defense of the criminal indictment that is going to trial in the next few weeks?

A.  Yes.

MR. CAMPBELL:  Object to form.

Q.  (By Mr. Kumagai) Approximately how much has the company paid in legal expenses for Dr. Wang?

A.  I don't know off the top of my head.

Q.  As the CFO, can you give some general approximation?

A.  More than 500,000, less than 3 million.

Q.  You can't get any more specific than that?

Page 67

A.  Not without making an educated guess, and I don't want to do that.

Q.  So it's possible that the company has paid as much as $2.99 million to cover Dr. Wang's legal expenses?

MR. CAMPBELL:  Object to form.

A.  I don't believe the company has paid $2.99 million.

Q.  (By Mr. Kumagai) What do you believe that the company has paid in Dr. Wang's legal expenses?

A.  I would have to make an educated guess, and I don't want to do that.  I don't know.

Q.  So the best you can do, sitting here today, is estimate that it's somewhere between 500,000 and 3 million?

MR. CAMPBELL:  Object to form.

A.  Yeah.  The best I can do without running even some -- with a zero potential of being inaccurate, that's my range.

Q.  (By Mr. Kumagai) Why is the company paying Dr. Wang's legal expenses?

MR. CAMPBELL:  Object to form.  And also, if your understanding is based on communications with legal counsel, don't include that in your answer.

A.  It's based upon communications with legal

Page 68

counsel, so I can't answer.

Q.  (By Mr. Kumagai) Is the company paying for the legal expenses of either Dr. Burns or Mr. Barbier?

A.  Yes.

Q.  Can you explain that?

MR. CAMPBELL:  Object to form.

A.  The company is paying for attorneys for both Dr. Burns and Remi Barbier.

Q.  (By Mr. Kumagai) In all of the ongoing legal proceedings that they're involved with?

MR. CAMPBELL:  Object to form.

A.  Yes.  They're -- they're indemnified by the company, so yes.

Q.  (By Mr. Kumagai) So the company is paying for the legal expenses of Dr. Burns and Mr. Barbier in this case?

A.  Yes.

Q.  The company is also paying for the legal expenses of Dr. Burns and Mr. Barbier in connection with the securities action?

A.  Yes.

Q.  Approximately how much has the company spent on legal expenses for Mr. Barbier and Dr. Burns?

MR. CAMPBELL:  Object to form.

A.  I don't know specifically for them.

Page 69

Q.  (By Mr. Kumagai) Approximately how much?

A.  More than $500,000.

Q.  Each?

A.  Yes.

Q.  And why is the company paying for their legal expenses?

MR. CAMPBELL:  Object to form.  And to the extent your understanding is based on communications with legal counsel, exclude that from your answer.

A.  There -- they're indemnified parties of the company.  They're former -- they're indemnified parties of the company.

Q.  (By Mr. Kumagai) Does the company have any -- strike that.

Has the company had any sort of legal disputes with either Dr. Burns or Mr. Barbier that you're aware of?

MR. CAMPBELL:  Object to form.

A.  Any answer there would be privileged.

Q.  (By Mr. Kumagai) Well, it's just a yes-or-no question.  Are you aware of any legal disputes between the company or Dr. Burns and Mr. Barbier?

A.  You'd have to define "legal disputes."

Q.  What's your understanding?

A.  Well, are we in a -- legal litigation with

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

them?  No.

Q.  Are you in some other sort of dispute resolution proceeding?

A.  No.

Q.  Has the company ever been in some other form of dispute resolution proceeding with either Dr. Burns or Mr. Barbier?

A.  Not to my knowledge.

Q.  Have there been any arbitrations or mediations between the company on one side and Dr. Burns or Mr. Barbier on the other side that you're aware of?

A.  Not to my knowledge.

Q.  Does the company have any sort of insurance coverage for the legal expenses or any liability award in this case?

MR. CAMPBELL:  Object to form.

A.  In this case -- let me think on that for a second.  The answer is no.

Q.  (By Mr. Kumagai)  What makes you say that?

A.  Well, any case that's brought against the company, we would give a notice of claim to our carrier and get -- in the ordinary course, we would get a letter from them saying preliminary covered, not covered.  I know right now there's no coverage in this case.

Q.  And is that because the company submitted a

Page 71

claim to its carrier or carriers and was denied coverage?

A.  I don't recall that.  It's either going to be denied coverage or we had a policy that was attached to the securities litigation that's been fully expended, so in any case, I do know there's no current coverage for this case.

Q.  And what do you mean by "there's no current coverage"?

A.  There's no coverage under a policy here.  In --

Q.  And is the company in the process of trying to get some sort of coverage?

A.  Well, again, in insurance terms -- not for this case.  But in insurance terms, there's no coverage, but each year, when you renew a policy, you've got a new policy year, so if new litigation arises on a new matter, you have coverage.

Q.  But as far as you know, there is no current policy covering the defense costs or a liability award in this case and there is no plans for any future policy that would potentially cover the defense costs or liability award in this case?

A.  That is correct.

Q.  Did you or anyone else at Cassava ever have a budget as to how much the company was prepared to spend

Page 72

on the defamation action?

MR. CAMPBELL:  Object to form.

A.  Can you repeat that, please?

Q.  (By Mr. Kumagai)  Was there ever a budget for the defamation action?

A.  No.

Q.  Why not?

A.  That's a very difficult thing -- I don't know how you would budget it.

Q.  As the CFO, you don't know how the case would be budgeted?  What do you mean by that?

A.  You could ask an attorney, but no, there was no budget ever for that.

Q.  Have you ever seen other law firms -- strike that.

Have you ever seen a litigation budget for a particular litigation from counsel or in-house?

A.  Yes, I have.

Q.  And there was never any sort of budget like that for this case or -- excuse me -- for the defamation action?

A.  No.  There wasn't, to my knowledge.

Q.  And why not?

MR. CAMPBELL:  Object to form.

A.  Most likely, I didn't -- I didn't ask for

Page 73

it or require it.

Q.  (By Mr. Kumagai)  And do you know why you didn't ask for it or require it?

A.  I didn't ask for it or require it, I guess because I didn't think of it and I also would -- call it my failing because when I think of, you know, I'm defending a case, there's a finite cadence and ending and I just didn't -- in the defamation case, it wasn't something that I asked for or thought of asking for.

Q.  Is there a budget for this present anti-SLAPP case?

A.  There's not.

Q.  So is there any limit that you're aware of as to what Cassava was willing to spend on the defamation action?

MR. CAMPBELL:  Object to form.

A.  Not to my knowledge.

Q.  (By Mr. Kumagai)  Did you ever have a personal view, as the CFO, on the maximum amount of money that the company should spend on the defamation action?

A.  No, I didn't.

Q.  So how much money did Cassava spend on the defamation action?

A.  I don't know.

(Exhibit 160 was marked.)

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

Q.  Exhibit 160 is a document Bates-stamped CASSAVA_001308025.  Do you recognize Exhibit 160?

A.  I do.

Q.  And what is it?

A.  It appears to be the minutes of a board of directors meeting from June 14th, 2024.

Q.  Well, can I -- can I correct you or try to correct you?  I think -- and I had trouble reading these, as well, but I think this is the agenda for the June 14th, 2024 meeting and it includes a copy of the minutes of the board meeting from March 8th, 2024.  Is that --

A.  Yes, looking at it now, you are correct.

Q.  Okay.  Do you recall attending the June 14th, 2024 meeting?

A.  I don't recall -- recall it, but I know I was there, yes.

Q.  Okay. If you -- well, let's start with the minutes from the March 8th, 2024 meeting, so page ending 003.

A.  003.  Okay.

Q.  So this was a telephone meeting of the board of directors that happened on March 8th, 2024, according to these minutes.

Do you see that?

A.  Yes, I do.

Page 75

Q.  And was that typically the company's practice that the board meetings were by phone?

A.  Typically, yes.

Q.  And was it like old-school phone or was it like a Zoom video meeting?

A.  This would have -- so at this time, old-school audio conference only.

Q.  Okay.  And has there -- in the time since, have the meetings switched to video meetings?

A.  Yeah.  About the time that Rick Barry joined, we've been having Zoom meetings since then.

Q.  Okay.  If you look at the preliminary matters in the bottom of this page, it says, "Mr. Barbier opened the discussion regarding the general progress of the company since the board meeting of December 6th, 2023. Questions were asked and responses were provided.  At approximately 10:25, the board invited Eric Schoen, chief financial officer; Chris Cook; Jim Kupiec; and Michael Marsman to join the meeting and the board appointed Mr. Cook as secretary of the meeting."

Do you see that?

A.  I do.

Q.  And then there's an update from Dr. Kupiec on the Phase 3 clinical program.

Do you see that?

Page 76

A.  Yes.

Q.  Dr. Marsman provided an overview of the plan for the NDA for simufilam.

Do you see that?

A.  Yes.

Q.  Mr. Barbier then addressed an ongoing radio-labeled mass balance study.

Do you see that?

A.  Yes.

Q.  Mr. Barbier then updated the board on SavaDX.

Do you see that?

A.  Yes.

Q.  Dr. Marsman left.  There was an interruption due to echoing and noisy feedback.

Do you see that?

A.  Yes, I do.

Q.  And then you reported to the company -- you reported on the company's cash position and use of cash.

Do you see that?

A.  Yes.

Q.  And then, the next page, there's a list of resolutions.

Do you see that?

A.  Yes.

Page 77

Q.  The following page is redacted for privilege.

And then you provided an update on legal finance?

Do you see that?

A.  Yes.

Q.  Okay.  And then you report -- there's a discussion of the annual meeting, and then you reported on a new-hire since the December meeting, and the board discussed a proposal to issue a stock option grant.

Do you see that?

A.  Yes.

Q.  Okay.  And looking -- so just looking at these minutes, does this refresh your recollection -- bring back any specific memories as to what happened at this board of directors meeting beyond what's just written on the page?

A.  No.  Nothing specific.

Q.  Okay.  And was it typically your job at each board meeting to provide an update on what's called legal finance?

A.  Yes.

Q.  And what exactly does that entail?

A.  It -- really, it's -- it's a section that I prepare in the board materials for things that I think

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

are -- are board-appropriate or governance-appropriate. Cash balances, you know -- the types of items that are in here. Twice a year, I go through a budget for the board. Board-level finance or administration matters.

Q. And in those twice-a-year budgets, do you include estimates on the legal spend?

A. Yes.

Q. So when I asked you earlier about the lack of a budget for the defamation action or the anti-SLAPP action, were those budgets that you just referenced -- how is that not a budget for those cases?

A. Sure. You --

MR. CAMPBELL: Object to form.

A. Sorry. You asked me was there a budget for the defamation case. No, the budgets -- the budgets were not by individual case. The budget was, you know -- really, it was -- so, as a public company, I've got to give forward-looking guidance, so I'm looking at, Hey, here's what we're spending on legal matters, you know, on average. Chris, is there anything coming up that's going to like cause that -- is there a trial, is there something that's going to cause that to greatly go up or down? If the answer is no, it's really a run rate, a budget of general legal matters, but it's significant enough to be broken out for the board.

Page 79

Q. (By Mr. Kumagai) Okay. So it's not necessarily like a preset budget for how much the company is willing to or going to spend on a case, but you do provide projections twice a year for how much you expect the company to spend on XYZ litigations?

A. Correct. In conjunction with the budget for the entire company of what are we going to spend? We're a company that doesn't have revenue, so our spending is -- is even of greater focus.

Q. Okay. And looking at this document, does it -- you know, the legal finance section, does it refresh your recollection as to any specific discussions involving the legal spend on the defamation action?

A. No, it doesn't.

Q. Okay. If you look at page 11 which is -- 11 of 32 and the Bates ending in 11 --

A. Okay.

Q. -- it looks like this is now the minutes from -- the prior meeting are concluded and this is the beginning of the actual agenda of discussion points for the June 14th, 2024 meeting. Is that fair?

A. That's what it looks like.

Q. Okay. And so there's a discussion of the R&D science programs. Is that, typically, how these board meetings would begin? You know, you'd go over the minutes

Page 80

and then turn to an overview of the -- the science programs?

A. Yes. That's typically how they go.

Q. Okay. If you turn to page 17, the second agenda topic is finance and administration.

Do you see that?

A. Yes.

Q. And is this where you would come in and present these items?

A. Yes.

Q. Okay. Looking at this discussion on page 17, does it refresh your recollection or jog your memory as to any specific discussions beyond what's on the page that occurred at this board meeting?

A. No.

Q. Okay. Can you describe the capital raise that the company did in May of 2024?

A. Sure. I should add when you say specific discussions, I remember that the board was -- was pleased that we had raised that money, but that's nothing out of the ordinary. Now, please repeat your question.

Q. Sure. Can you just describe generally what the capital raise was that happened in May of 2024?

A. Sure. In January of 2024, the company issued -- did a warrant distribution similar to a

Page 81

dividend. So all current Cassava stockholders as of a specific record date would get a specified number of warrants.

Those warrants were publicly traded. So a person who received the warrants could do one of three things. They could exercise the warrants, which was -- would be a sale of stock from the company to that warrant holder at a specified price. Or if the person -- if the holder didn't want to do that, they could actually sell the warrants. You know, if you went to your E*TRADE account, you would see your warrants in there and you could click a sell order and keep the cash. Again, it was akin to a dividend distribution, even though it wasn't a dividend distribution. Or someone could do nothing.

The warrants were a finite instrument and they had an origin date and they had a finite expiration date that was set in the program.

So this capital raise was the total amount of money between the origin date and the close of the warrant program. The warrants are gone. They don't exist anymore. It was 126.3 million.

Q. And so that's cash that the company raised to use going forward?

A. Correct. That's a gross number, I believe. There would be some offering expenses.

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

Q. Okay. The next page, it looks like the net proceeds to the company were around 123 million?

A. That's correct.

Q. Okay. And is that the most recent capital raise or fund raise that the company has done?

A. Yes, it is.

Q. Is the company currently planning or pursuing additional fundraising?

A. I think to tell you that would be material nonpublic information, to answer yes or no. We typically don't answer that.

MR. CAMPBELL: We can designate the transcript as highly confidential and it won't go beyond the people in this room.

A. No. We're not currently looking at raising money.

Q. (By Mr. Kumagai) And why not?

A. The company is adequately funded at present.

Q. Adequately funded. What do you mean by that?

A. Well, to complete the answer, so the company has sufficient cash now to operate for, you know -- into 2027, so we're not at a place where we have to raise capital.

Page 83

In my view, as well, it wouldn't be a good time to raise capital because we've got existing litigation that's an overhang if you go out and talk to investors.

Q. And so is your forecast that the company has sufficient cash to operate into 2027 -- does that factor in the estimates or potential payouts that the company will make as a result of those ongoing litigations, including this case?

MR. CAMPBELL: Object to form.

A. Yes, it does.

Q. (By Mr. Kumagai) Have you or the company budgeted or forecast how much it will cost to resolve this case?

MR. CAMPBELL: Object to form.

A. I'm uncertain because we have -- we've made -- so the only -- a portion -- I don't understand what the "this case" is. With the three defendants that are here? The answer is no. We've not set an estimate. There's a portion of the -- of this that has been settled.

Q. (By Mr. Kumagai) And how much did that settle for?

MR. CAMPBELL: Objec -- that's subject to a confidentiality provision in the agreement and he can't disclose that.

Page 84

A. I can't disclose that.

MR. CAMPBELL: It's in the agreement. We can talk about it, but it's not for him to disclose.

MR. KUMAGAI: That's fine.

Q. (By Mr. Kumagai) The company did disclose publicly that it had reserved $4 million to resolve the claims by Dr. Pitt and Dr. Bredt; right?

MR. CAMPBELL: Object to form.

A. The company disclosed they had reserved $4 million as are required by GAAP, an estimate of settlement amounts. We'd never disclosed who or what they were for.

Q. (By Mr. Kumagai) And is the company going to disclose the amount that it paid Dr. Bredt or Dr. Pitt for settling this case?

MR. CAMPBELL: Object to form.

A. Other than as required by SEC regs, and I don't -- I'm not aware of any that would, no, that would be -- that wouldn't be a required disclosure.

Q. (By Mr. Kumagai) And how much has the company set aside for the settlement -- potential settlement of the securities action?

A. The amount that we've disclosed in our Q2 10-Q is 31.25 million.

Q. And is that still accurate, sitting here

Page 85

today?

MR. CAMPBELL: Object to form.

A. Yes.

Q. (By Mr. Kumagai) Accurate as of today?

MR. CAMPBELL: Object to form.

A. Accurate as of today as the company's best estimate.

Q. (By Mr. Kumagai) Are there any other ongoing --

A. And I'm sorry. This is all confidential.

MR. CAMPBELL: If we want to designate this transcript as highly confidential, it's not to go beyond anyone -- and I'm assuming you'll agree to this and you can say at the end when I'm done, it's not to go beyond anyone who is on this call currently.

MR. KUMAGAI: Who's attending the deposition?

MR. CAMPBELL: Who is attending the deposition presently.

A. What I'm giving you is information that's -- that is my -- that has not been disclosed publicly because I haven't disclosed my Q3 financials yet because it's October 1st.

Q. (By Mr. Kumagai) Understood.

MR. CAMPBELL: First, can we agree to that

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

on the record?

MR. KUMAGAI: I don't think we have an objection to it. I mean, obviously, we have like paralegals and staff who see these transcripts, so you're including the legal --

MR. CAMPBELL: Legal team. Your clients that are currently on the phone, it doesn't go to anyone else.

MR. KUMAGAI: Yes.

MR. CAMPBELL: Okay.

MR. KUMAGAI: You know, for the time being. Obviously, we will need to revisit down the road. But yes.

Q. (By Mr. Kumagai) So aside from this litigation, the securities action, which I'm referring to is the one in the Western District of Texas, are there other cases that the company is currently defending or litigating?

A. Yes.

Q. And what are those cases?

A. There's derivative cases for the securities action. There's also an additional securities action that was filed in December 2024 that's separate from the 2021 action. And then there may be some other very minor cases that I don't know if they qualify as derivative actions,

Page 87

but they're all in the same, you know, we lost money on Cassava stock, we're unhappy about it. But very, very minor cases, in my view. I just --

Q. Okay. And so your testimony earlier about the company having -- I'm paraphrasing -- sufficient cash to continue operating into at least 2027 accounts for the costs and potential liability facing the company in all of the ongoing litigation?

MR. CAMPBELL: Object to form.

A. Yeah. As CFO of the company, given everything I know about the company's liabilities, we have sufficient cash to operate into 2027.

Q. (By Mr. Kumagai) Okay. If you turn to the page 24, do you see there's a heading "Legal Expenses"?

A. Yes.

Q. And so this is the item from the June 2024 board meeting where you presented to the board the legal expenses of the company; is that right?

A. Yes.

Q. Okay. Just take a moment to look at this section. Does this refresh your recollection as to how much money Cassava spent on the defamation action?

A. As of that point in time, yes.

Q. And how much?

A. It looks like 1.645 on the defamation

Page 88

action. So 1.645 million.

Q. As of April 2024; right?

A. Correct.

Q. And the case was voluntarily dismissed in August 2024; right?

A. Yes, I believe so.

Q. Do you have an understanding of approximately how much additional legal expenses the company incurred on the defamation action between the end of April 2024 and -- or strike that -- from April 2024 to the end of the case in August of 2024?

MR. CAMPBELL: Object to form.

A. I don't know that.

Q. (By Mr. Kumagai) Cassava spent at least $1.645 million in legal expenses on the defamation action; right?

MR. CAMPBELL: Object to form.

A. Yes.

MR. KUMAGAI: What's wrong with that question?

MR. CAMPBELL: It's just not clear to me the offensive legal fees is limited entirely to the defamation action. It's a confusion on my part. It might not be on his, but that's the basis for my objection. It's also -- it says primarily for both of them, so it

Page 89

suggests to me an estimate of certain buckets.

Q. (By Mr. Kumagai) Mr. Schoen, did the company have any other offensive litigations from August to April of 2024 that you're aware of?

A. Not to my knowledge.

MR. KUMAGAI: Let's take a break.

VIDEOGRAPHER: Going off the record at 1:12 (sic). This marks the end of Media 2.

(Recess taken, 11:12 a.m. to 11:23 a.m.)

VIDEOGRAPHER: This marks the start of Media 3 of the video deposition of Eric Schoen. We're back on the record. The time is 11:23.

Q. (By Mr. Kumagai) All right, Mr. Schoen. Before the break, we were talking about Exhibit 160, the agenda for the June 2024 board of directors meeting. Do you recall that?

A. Yes.

Q. Okay. And do you still have Exhibit 160 in front of you?

A. Yes.

Q. Could you turn to the page ending 25.

A. Yes.

Q. And there's a description of the director compensation. Do you see that?

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

A.  Yes.

Q.  And so the directors were awarded a number of options at this meeting.  Is that -- is that right?  Or excuse me.  They were issued at the May 9, 2024 date?

A.  Yeah.  That's correct.

Q.  And then at the bottom of the page, there's a heading called "Officer Compensation, Equity and Cash Bonus."

Do you see that?

A.  Yes.

Q.  And it says, "On May 20th, 2024, the compensation committee of the board reviewed, discussed, and unanimously approved new stock option grants and cash bonuses for executive officers in recognition of their contributions to the company.  Stock options have a ten-year life, vest over 48 equal months, and were priced at $22.10, the closing market price on the date granted.  Please see the appendix for final minutes of meetings of the compensation committee held on May 8th and May 20th, 2024."

Do you see that?

A.  I do.

Q.  Then on the next page, it describes the stock options and cash bonuses awarded to Mr. Barbier, Mr. Cook, Dr. Kupiec, and yourself.

Page 91

Do you see that?

A.  I do.

Q.  And this is the $250,000 bonus and 25,000 stock option grant that we talked about earlier; right?

A.  It is.

Q.  And Mr. Barbier received a stock -- 50,000 -- 50,000 in stock options and a $500,000 cash bonus; right?

A.  Yes.

Q.  Mr. Cook received 10,000 stock options and a $50,000 cash bonus; right?

A.  Yes.

Q.  And Dr. Kupiec received 10,000 stock options and a $50,000 cash bonus; right?

A.  Yes.

Q.  And you described in your testimony earlier today that at this point in time, the company was doing, I think in your words, fantastic.

Do you recall saying that?

A.  The company was doing -- I don't recall fantastic, but yes, the company was -- was doing very well in -- correct.

Q.  What do you mean by that?

A.  Well, the company has -- was -- had raised 126 million in cash, which is great for the balance sheet

Page 92

and for particular -- you know, our thoughts were moving that in, you know, the fall of 2024 and earlier 2025, we'd have readouts from the Phase 3 trials.  Recruitment was well in the science section.  We had a really strong belief internally that we were going to be successful.

So we were -- you know, for -- as a small biotech, believing you're going to have a successful Alzheimer's program and having the funding to at least start thinking about, you know, how do we commercialize that or, you know, what do we do at that point is -- I don't know how you'd be doing any better at that point.

Q.  What was the status of the SEC investigation at this point in time?

MR. CAMPBELL:  Object to form.

A.  Well, answering from my -- I want to look at the date of the meeting.  The status of the SEC investigation.

MR. CAMPBELL:  So I'll object to the form of the question.  If you can answer it without communications with counsel, go ahead and do so.

A.  Yeah.  I can't answer that without -- without -- with -- only privileged communications.

Q.  (By Mr. Kumagai)  So the meeting -- this meeting was June 14th, 2024.  Within a month, the company was announcing a $40 million settlement with the SEC;

Page 93

right?

A.  I don't remember the exact date of the settlement.

Q.  It was around July of 2024?  Does that sound right?

A.  Yeah.  July or early August sounds right.

Q.  And it was -- it's your view that in June 2024, the company was doing as well as it could be doing, even though it was about to pay a $40 million fine to the SEC?

MR. CAMPBELL:  Object to form.

A.  In my view, yes.

Q.  (By Mr. Kumagai)  Well, how do you maintain that position in light of the fact that the company, weeks later, paid a $40 million fine to the SEC?

MR. CAMPBELL:  Object to the form.

A.  At this point in time, I do know that the -- the thought of paying a $40 million fine to the SEC was not a part of my calculus in any way, shape, or form.

Q.  (By Mr. Kumagai)  What do you mean by that?

A.  I -- if -- it would be an unexpected result.

Q.  In June of 2024, you did not expect that the company was going to have to pay a fine to the SEC?

MR. CAMPBELL:  Object to form.

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

A.  No, I did not.

Q.  (By Mr. Kumagai)  What changed between June and July of 2024?

MR. CAMPBELL:  Object to form.

A.  On --

MR. CAMPBELL:  And again, please limit your answer to exclude communications with counsel.

A.  Let me think if there's anything that was not.  Give me one second, please.  Anything would have been -- that would have been discussed with either counsel or Mr. Cook.

Q.  (By Mr. Kumagai)  And just so I have the facts right, the month before announcing the $40 million settlement with the SEC, the company approved a $500,000 cash bonus for Mr. Barbier, a $50,000 cash bonus for Mr. Cook, a $50,000 bonus for Dr. Kupiec, and a $250,000 bonus for you; is that right?

MR. CAMPBELL:  Object to form.

A.  I'm only -- so I'm only hesitating in my answer because they were approved by the compensation committee in May 2024, so months before.  I -- I'm looking, but they weren't approved -- it was approved by the compensation committee in May.  Not at this meeting.

Q.  (By Mr. Kumagai)  So why was it discussed at the board meeting?  Did the board have to sign off on

Page 95

the decisions of the compensation committee?

A.  The compensation committee can -- can -- has the authority to award bonuses, award stock options at certain times, you know.  For good prac -- as part of good practice, the board would generally be informed.

It's also possible the board would ratify things, but if -- if the -- if the compensation committee deemed it, but the compensation committee approved it at their -- ostensibly, their May 20th meeting.  So this was information for the board.  It's prudent to keep the board informed of executive compensation.

Q.  Okay.  So on May 20, 2024, the compensation committee of the board approved a 500 million -- or strike that.

On May 20th, 2024, the compensation committee of the board approved a $500,000 bonus to Mr. Barbier, a $50,000 bonus to Mr. Cook, a $50,000 bonus to Dr. Kupiec, and a $250,000 bonus for yourself; right?

A.  Yes.

Q.  And that was approximately six weeks or two months before the SEC fine of $40 million was announced; right?

MR. CAMPBELL:  Object to form.

A.  Yes.  And I should mention -- sorry -- your question earlier was at this meeting on June 14th, were

Page 96

those bonuses appropriate and I answered it yes.  And when I think about it, I don't recall exactly what was transpiring on June 14th, but as of May 20th, you know, absolutely, the company was doing fantastic, to use the word I used earlier.

Q.  (By Mr. Kumagai)  Based on the same summary that you provided earlier?

A.  Correct.

Q.  Can you just repeat what -- what you said earlier?

A.  Sure.  We had two Phase 3 studies that we believed would be successful.  We had just raised -- as of May 20th, we had raised 126.3 gross in proceeds.  We were, you know, hitting on all marks for a company of our size, and we -- we believed we were going to be successful in an Alzheimer's program.

Q.  And what was the belief based on?  Had you received preliminary Phase 3 data, any sort of empirical indication that the Phase 3 studies were going to succeed?

MR. CAMPBELL:  Object to form.

A.  Sure.  So the Phase 3 studies were blinded, so empirical data -- you know, all the data is blinded, but the company does have access, as all biotechs do, to blinded data.  And based upon that blinded data, it looked very promising, although it's -- so blinded means you see

Page 97

the cognition results, but it's blended between the placebo group and the drug group.  But based upon historic rates of decline that we thought would be -- we expected to be the same in our studies, the blinded data looked very, very good.

Q.  (By Mr. Kumagai)  And who was primarily responsible for interpreting that blinding data and reporting to the board about it --

MR. CAMPBELL:  Object to form.

Q.  (By Mr. Kumagai)  -- during the period when the Phase 3 trials were still ongoing?

MR. CAMPBELL:  Same objection.

A.  I -- I would expect that to be Dr. Kupiec.

Q.  (By Mr. Kumagai)  And he was conveying a positive message to the board that things were looking good?

MR. CAMPBELL:  Object to form.

A.  Yes, as I recall.

Q.  (By Mr. Kumagai)  Who was on the compensation committee in this period of time, May of 2024?

A.  It would be Bob Gussin and I'd -- I'd have to look because it was -- Sanford Robertson, one of our board of directors, passed away and I'm not exactly sure when he passed.  So he was replaced on the compensation

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

committee with Claude Naciase, so -- I believe it would have been Sandy Robertson and Bob Gussin. And I believe Sandy passed away in August of 2024, so --

Q. And how did the compensation committee go about making its decisions? Did someone from management present proposals that they approved or did they do the work themselves?

MR. CAMPBELL: Object to form.

A. Yeah. As I mentioned, before Rick Barry joined the company, I wasn't involved in compensation committees. But in general, yeah. Management -- you know, a CEO can always give his recommendations. The compensation committee is always going to deliberate on the CEO's compensation without him present. That's a normal process.

I can speak specifically to since Rick Barry joined the company, I've been in those meetings.

You know, we -- the management comes in with a point of view and makes -- can make suggestions. Management -- or the compensation committee appoints an independent compensation consultant to run data on whatever the subjects of that meeting are, i.e., executive compensation. And then the committee discusses compensation for other than the CEO without, for example, me present.

Page 99

You're never present when your own compensation is discussed and they would discuss it without Rick Barry present or me present when they discussed his compensation.

Q. (By Mr. Kumagai) And so do you know who, if anyone, from management was present at the May 2024 compensation committee meeting?

A. I've seen those minutes, so I would -- I can't tell you. It would be very normal that Remi Barbier would be there with -- in those meetings. That would be normal.

Q. So based on past practice, you expect that Mr. Barbier would have attended the May 2024 compensation committee meetings?

A. Yes.

Q. Do you know an individual named Anthony Daher or Daher?

A. I know who he is, yes.

Q. And who is he?

A. He is -- well, who I believe is an in -- was an investor in the company. He was very supportive of the company. He's actually a very nice guy. He's visited the company offices a couple times and I've exchanged emails with him over the years. I believe he was probably also a member of the -- the Discord group. At least he

Page 100

claimed he was.

Q. The Sava Army Discord group?

A. Yeah. The Sava Army Discord group. I do not know that for certain, but he told me he was. So that's who -- that's -- that's him from what I know.

Q. And what do you recall about your conversations or discussions or meetings with him?

A. Well, in general, we'd just talk about the -- the progress of the company in -- in investor relation terms. I can't tell you specifically what we talked about, but it was nothing that would be -- have any material nonpublic information or anything that I wouldn't talk to any other investor about.

Q. And you mentioned that he visited Cassava's offices in person a couple of times?

A. Correct.

Q. Approximately when was -- were those visits?

A. There would be nothing past maybe the start of 2024. He emailed me and said, Hey, I'm coming into town, can I stop by. If any -- any investor said that that I didn't believe to be dangerous, and I had time, I would meet with someone for ten minutes or something.

Q. Okay. And so what did -- what happened at those meetings when Mr. Daher came to visit the offices?

Page 101

A. I'd take him into the conference room, we would talk about the company for ten minutes, and then I'd escort him out of the offices.

Q. Do you recall discussing the Discord group or the activities of the so-called Sava Army with Mr. Daher during those meetings?

A. No.

Q. Do you recall anything about the substance of the discussions of those during those meetings?

A. The substance -- no, not the substance.

Q. Are you familiar with an individual named Matthew Nachtrab?

A. Yes, I am.

Q. And who is he?

A. So Matthew Nachtrab was an investor in the company that I know definitively. At one point, he filed a 13F, I believe. It could be a 13G -- I'm not sure which filing -- that he had purchased 5 percent of the company. He was a very vocal proponent of the company. You know, I've had phone conversations with him. He's emailed me. Again, nothing beyond what you would tell any investor, but as a 5 percent investor, you know, you take -- you take his call.

Q. And as far as you know, was Mr. Nachtrab the largest individual shareholder of the company?

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

A.   As far as I know, yes.

Q.   And as far as you know, he is no longer an investor in the company today?

A.   I don't know that.  I know he's -- he reported that he's no longer a 5 percent shareholder.

Q.   Approximately when did he do that?

A.   It would have been after the failure of the first -- the first trial.  So after November 25th, 2024.

Q.   And what do you recall, if anything, about your interactions with Mr. Nachtrab?

A.   You know, he's a really, you know, interesting gentleman.  The specific I recall is he was always very honest.  You know, I'm very careful not to disclose anything I shouldn't, but Matt would always tell me, Hey, just to let you know, I do buy and sell the stock.  I don't -- I'm not just a long holder, so be careful what you tell me.  I'd say, Matt, that's part of my job is not to disclose anything I shouldn't.  That, I remember specifically.

Matt also did an online video that I don't know if he told me about it or somebody told me about it.  And I very rarely look at social media, but I did -- I did look at -- or take time and look at that -- that video of his.

Q.   And what do you recall about the video?

Page 103

A.   He's -- he's a proponent of the company, so it was all -- you know, he was taking anecdotes and different, you know, individual patients that may have believed that they were getting a drug effect from simufilam, you know.

And again, that's a reason why the company needs to stay so separate from anybody who -- you know, we love fans, but they've got to stay -- there's got to be a clear line because the company could never -- would never and could never promote a video like that where you've got an individual patient saying I'm -- you know, simufilam is working for me, because the only way you can show efficacy is through the results of the Phase 3 trial.  And you can get yourself, as a company, in hot water if you do anything different prior to Phase 3 results.

Q.   And Mr. Nachtrab, was he also a member of the so-called Sava Army?

A.   I don't know that.  I don't think he ever told me that specifically.  It would make sense that he would be a -- a leader of it if there was such a thing, but I just don't know.

Q.   And do you recall hearing about, either directly or indirectly, Mr. Nachtrab filing complaints with the DOJ against our clients and other short sellers and a complaint against Dr. Pitt with the Department of

Page 104

Health in New York?

MR. CAMPBELL:  Objection to form.

A.   All of that sounds familiar, but I don't have -- I don't recall having specific discussions with him about that.

Q.   (By Mr. Kumagai)  And where do you think you heard it from?

A.   Again, I -- the in -- the inputs I get are from investor relations, so it could have been from -- it could have been from him, it could have been from anybody.  You know, people like to say, Hey, we did this thing and -- you know, to try and help the company.

You know, I didn't have an opinion on it, so I don't -- you know, there's no -- it doesn't stick in my brain that -- whether it was him that told me or somebody else.

Q.   And in all of the instances you can recall where an investor said something to the effect of, you know, Hey, we did this thing for the company, was there ever a time when you or someone else at the company told the person not to do that or to stop doing that?

A.   I can't speak for someone else at the company, but no, I wouldn't have said that.  And I don't -- so I wouldn't have said that.  And most of the things that I remember were we did this; not we're

Page 105

planning to do this.

So even -- that wouldn't have been something I do.  I stay clearly separate from their affairs and, you know, that's -- no active action, no passive action.  So no.

Q.   So to the best of your knowledge, neither you nor anyone else at the company ever told any members of the Sava Army to stop taking actions of any kind?

A.   To the best of my knowledge, that is correct.

Q.   Are you familiar with an individual named Gabe Ohlander -- or Oleander?

A.   I know his name, yes.

Q.   And who is he?

A.   I -- well, he's a purported, you know, investor.  And when I say "purported," people say, Hey, I'm an investor.  I don't have -- you know, we don't have records of who owns stock and who doesn't.  But my belief is he was a strong supporter of the company.  He's a very intelligent guy.  I believe he's done a lot of research because he's -- he asks a lot of -- of good questions.  I've spoken with him in the past.  I've probably exchanged emails with him in the past.

Q.   And what do you recall about the substance of your interactions with Gabe?

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

A. I don't have any -- I don't have any substance things, other than my recollection is he was -- he was -- he asked science questions sometimes. And they were good enough that I would -- I would forward them, as I would anything else, to see if they were actionable. But I -- you know, that's -- that's my impression. But I don't remember anything substantively of our discussions.

Q. Are you familiar with an individual named Todd Rogenthien?

A. That name doesn't sound familiar to me.

Q. So aside from Mr. Nachtrab, Mr. -- is it Ohlander or Oleander, do you recall?

A. I would say Ohlander, but I don't recall.

Q. Okay. Strike that. So aside from Mr. Daher, Mr. Nachtrab, and Mr. Ohlander, were there any other investors or purported investors who you can recall, sitting here today, having interactions with about the company or the allegations of data manipulation against the company?

A. Let me think on that. I mean, should -- are you asking me -- as investor relations, I spoke with lots of people and I sort of remember some of the names, I think. But no, if you asked me of -- you have to paraphrase your question, please.

Q. I'm just really asking for the names that

Page 107

sort of stand out in your mind, sitting here today. So aside from the individuals we've already discussed, are there any others who stand out in your mind --

A. No.

Q. -- today?

A. No.

Q. When you said a moment ago you sort of remember some, you mean you sort of remember having interactions with particular individuals, but, sitting here today, you can't remember their names? Is that --

A. Correct. I had interactions with lots and lots of people and if you -- if you showed me a list of 100 names, I could probably tell you, yes, I've talked with him, him, him, him, him, her, her, her, her, her, but I, you know, don't know the specific names.

Again, investor relations, I've talked with lots and lots of -- interacted with lots and lots of people over the years.

Q. I'll mark as Exhibit 161 a document Bates-stamped CASSAVA_000910448.

(Exhibit 161 was marked.)

Q. Exhibit 161 appears to be an email from Eric Schoen to Anthony Daher dated May 12th, 2021, with the subject "Cassava Daher meeting."

Do you see that?

Page 108

A. I do.

Q. You can take a moment to look -- look it over. I just want to start by asking you what's -- what's going on in this exchange with Mr. Daher or Daher?

A. Let me look at it real quick.

What it appears is going on here is, you know, Anthony Daher emailed me with a list of questions and I offered to discuss them with him over a telephone call. Or a Zoom -- sorry -- a Zoom meeting. Not a telephone call.

Q. And is this one of the conversations you had talked about earlier that you had with Mr. Daher?

A. Yeah. It would have been one of them.

Q. Do you recall anything -- looking at this email now today, does it bring back any specific memories about what you talked to Mr. Daher about at this particular Zoom meeting or during this particular Zoom meeting?

A. Nothing specific. If I looked at the questions, I could probably tell you how I answered them. Or some of them.

Q. Sure. Do you want to look at the questions on the page 450 and --

A. Sure. So -- on page 450, what this appears to be talking about is we have a stock option plan and

Page 109

when you want to -- the stock option -- the number of stock options in that plan and the actual plan is approved by shareholders.

Judging by this, it looks like in 2021, we went back and asked shareholders for more options, so Anthony was asking questions. What are -- the 4 million requested shares would have been used for. Scarring shareholders and diluting their positions since they had a recent offering on the table. Closed at 49. I'm not sure what "scarring" is.

You know, the answer to that would be, you know, we've got employees. We haven't had, you know, the -- to use myself as an example, you know, my original option grant -- and remember, we talked about comp -- you know, compensation, and I was open that if you looked at peer companies, Cassava's cash compensation was way below the median, you know, over the years or at least until 2022.

So if you're working at a company and you're spending the number of hours that officers and employees do, the way you're looking to get compensated is by being -- having your -- your future attached to the success of the company. Stock options is one way of doing that.

So getting -- what I would have explained

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

to him is, look, you know, the company is -- I believe at the time didn't have very many options available in the plan, so we're asking for more to compensate employees, directors, the people who are going to make the company successful.

The second one --

Q. I'm sorry. Just -- let me just pause you there.

A. Sure.

Q. Are these specific recollections of what you told Mr. Daher during this Zoom meeting, or is it just you looking at these questions and, sitting here today, thinking back how you most likely would have answered them?

A. These are not specific recollections, but that's how I would have answered to anybody who asked me that question --

Q. Okay.

A. -- at that point in time.

Q. I don't think we need to go through the -- the rest of them, but I want to make sure I didn't -- you know, I kind of did cut you off, so if there's something else you wanted to say about the questions, you can say it.

A. No. I don't have any specific

Page 111

recollections of this meeting other than looking at the questions.

Q. And you mentioned a few times Cassava's peer companies. Who are those companies?

A. If you looked at the -- they would be -- so peer companies are done by -- like today, it would be let's find companies that have employee bases, you know, less than 50 and market caps between 50 million and 500 million and they're biotechs.

Your compensation consultant would come up with a list of them, you know, throw out some that aren't -- that's what they're experts at is finding comparable companies. So it's not necessarily competitors, but peer biotech companies.

Biotech company compensation is available. It's open to the public in proxies. A compensation consultant looks at it and comes up with peer companies.

Q. And do you have a personal view as to who Cassava's peer companies are today?

MR. CAMPBELL: Object to form.

A. I don't. There's a list of them, but we -- there's nothing specific that I'd tell you about it.

Q. (By Mr. Kumagai) Okay. In the email that -- that we were looking at, at the beginning of the email, so on page 449, Mr. Daher writes to you, "Hi Eric.

Page 112

So here are the questions investors and myself would have liked to ask. You can also, if you would like, join the Discord channel anonymously and see and read the thoughts and reactions of this group. We are around a 450-plus investor Sava group with approximately over 700,000-plus shares (personally holding 35,000 plus.) I really think it could help Cassava Science in a way by seeing people and market sentiment. Group link." And then it's a link to the Discord.

Do you see that?

A. I do.

Q. Did you ever click that link, as far as you know?

A. To my recollection, I never clicked that link.

Q. Have you ever visited Discord or been a member of any group or channel on Discord?

MR. CAMPBELL: Object to form.

A. I've never been a member of a group or channel on Discord and to my recollection, I've never visited the Discord site.

Q. (By Mr. Kumagai) Have you ever seen screenshots or snippets or content from any Discord group?

A. It's possible I have, but because I don't believe I visited, I wouldn't know -- I wouldn't have

Page 113

known -- I don't know. I don't realize -- when people send me snippets, I don't know the source.

Q. Okay. It's possible, but you wouldn't have known how to recognize whether a particular screenshot was from Discord or some other platform?

A. That is correct.

Q. Do you know if any other employee or director at the company was a member of any Discord group related to Cassava?

A. Not to my knowledge.

Q. You can set that aside.

(Exhibit 162 was marked.)

Q. I'll mark as Exhibit 162 a document Bate stamped CASSAVA_000318907. Okay. Exhibit 162 appears to be an email from Eric Schoen to an individual named Marcus dated September 21st, 2021 -- or September 22nd, 2021 -- excuse me -- with the subject line "thread with Jordan Thomas."

A. Yes.

Q. Do you see that? Okay. Take a moment to look over this exchange. It appears to begin on August 17th, 2021, with an email from Marcus to you and Mr. Barbier.

Do you see that?

A. Yes.

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

Q. Who is this Marcus individual, as far as you know?

A. I don't know.

Q. Do you have any recollection of this exchange with Mr. -- with Marcus?

A. Not with this exchange in particular, no.

Q. Okay. And so there's a discussion -- sorry. Go ahead.

A. We -- yeah. I was just looking to see if there was a last name to help my memory. No. But please go ahead.

Q. The chain begins with a discussion of shorting activity.

Do you see that?

A. Yes.

Q. And does Cassava have records or keep track of short positions taken against the company?

A. No. Or sorry. Not to my knowledge would be more accurate. Sorry. Let me -- can I -- you can look up on Google short interests, so I've looked at the -- you know, what the short interest is in the company over the years, you know, regularly, but when you say short positions, I thought you were referring to individual short positions, and no, there's no record -- I don't have any records of that.

Page 115

Q. I appreciate that clarification. So you have, over time, generally monitored the short interest in the company?

A. Yes. You can see that on a quarterly basis, so I used to look at it on a quarterly basis.

Q. You don't look at it anymore on a quarterly basis?

A. I don't.

Q. Why not?

A. We are not a prime-time short target anymore and our short interest is way down. Back around this time frame, the short interest was really, really high relative to our number of shares outstanding, so, you know, I pay atten -- I've always got a million topics I can look at. I pay attention to the ones that are most important.

Q. And what did you make of the high short interest in the company?

A. What did I make of it? It means we've got, you know, a significant amount of short sellers. My interpretation was what a dangerous -- so this is back in 2021, but what a dangerous endeavor for somebody to be shorting the stock when the upside is so potential -- the upside is -- has great potential.

Q. What do you mean by that?

Page 116

A. An Alzheimer's target -- so, for most companies, if -- if a company is successful, you've got a certain target market. You've got a certain amount of revenue that you might get someday.

If a company -- and it's quantified. And as a CFO, you know, people have asked me over the years, what's your total addressable market? In Alzheimer's, over those years, I don't think I ever had that question one time because if you had a safe, efficacious Alzheimer's drug, you know, huge, you know, amazing.

So the potential market cap of the company, would we have been successful, would be great. So it surprised me that a small company would have such a large short interest.

Q. Because, in your view, the short sellers were taking a significant risk due to the potential market cap or --

A. Take --

MR. CAMPBELL: Object to form.

A. Well, look at when this is. August 24th. Well, I'd be interested in -- taking a great risk, but if you look at the later part of this thread, it's after the filing of the citizens petition. So clearly, I would be very interested in short interests relative to, you know, false and defamatory allegations being made against the

Page 117

company.

Q. (By Mr. Kumagai) Right. But my question was not -- sorry -- not specific to this document. So when you testified earlier that you would monitor generally the short interest in the company, did that begin before the defamation -- or excuse me -- before the citizens petition was filed?

A. I don't recall. It's a normal thing for a CFO to look at, so I would have looked at it. But, clearly, once the short interest was high -- in the 10 million -- I monitored it on a regular basis because it's -- it was important.

Q. And was it your view that the short sellers were taking a considerable risk due to the potential for the stock to rise?

A. Over the course of time, yes, absolutely.

Q. Okay. And I want to direct your attention to the page in this exchange ending 908. There's an email from you dated September 16th, 2021. It says, "Hi Marcus. If you are willing to share your thread with Jordan Thomas, it would be useful and appreciated."

Do you see that?

A. I do.

Q. And then it looks like Marcus had already shared some of the thread and offered to continue to push

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

him. And it appears to be a reference to Mr. Thomas.

Do you see that?

A. Yes.

Q. So this investor sent you exchanges that he had had with Mr. Thomas, who is the lawyer that filed the citizens petition; right?

MR. CAMPBELL: Object to form.

A. Yes.

Q. (By Mr. Kumagai) And why were you asking this individual, Marcus, to send you those threads?

A. Well, this is what I alluded to in my testimony yesterday, that once the citizens petition was filed, and then days later -- not at the time the petition was filed, the -- the clients of Mr. Thomas admitted to be short sellers of the company.

So, you know, I was very interested in any correspondence with Mr. Thomas that people would -- would share with me. This is something, you know, that -- something that I would either -- that I would share with -- with the CEO of the company.

At least that's what I -- I don't recall that specifically, but that's what I would do if I found things that I thought might be relevant.

Q. And so if investors came to you with information that you thought was relevant, you would

Page 119

accept it and then pass it along to Mr. Barbier or others at the company?

A. Yes.

Q. Okay. And then further up the chain, the top email, it appears you send -- you send Marcus a press release from the morning of September 22nd, 2021.

Do you see that?

A. Yes.

Q. And is that a common practice of yours, too, to send out press releases that might be relevant to particular investors?

A. At this point in time, yes. Because I've got -- would get lots and lots of people asking questions, saying you've got, you know, short sellers, you've got all this and I -- at that point in time, I was getting more email than I could possibly handle. So if I'd get a press release, my common practice at the time, I would go back through my emails, find people who had made inquiries, and send it out to them.

Q. I'll mark as Exhibit 163 a document Bates stamped CASSAVA_001434684.

(Exhibit 163 was marked.)

Q. Do you recognize Exhibit 163?

A. Recognize it. I know what it is now that I've looked at it.

Page 120

Q. It appears to be an email from you dated November 10, 2021, to James Kramer, copying William Foley and Guy Singer with the subject line "Bad FUD statement on Twitter."

Do you see that?

A. Yes.

Q. And the content of the email -- of your email is redacted.

Do you see that?

A. Yes.

Q. And Mr. Kramer, Mr. Foley, and Mr. Singer were company counsel at Orrick; is that right?

A. Yes.

Q. Okay. And the email that you forwarded to counsel is a November 5th, 2021 email from an individual named Candi Schad.

Do you see that?

A. Yes.

Q. Who is Candi Schad?

A. I don't know who Candi Schad is, other than a purported investor who would email me in investor relations. I may have responded to her at some -- at some point, but, beyond that, I don't know her.

Q. Do you recall her telling you that she was a member of the so-called Sava Army?

Page 121

A. I don't recall that.

Q. Do you know -- what does FUD stand for?

A. In this context, it would be -- it's not my words, but fear, uncertainty, and doubt.

Q. And what is that FUD nickname used for in these contexts, as far as you know?

A. In, as far as I know, these contexts, it's to refer to the "distort" part of short and distort.

Q. And is that a term that you have ever used yourself?

A. I mean, I may have said it, but it doesn't -- it doesn't fit well into my vernacular. So if I have, it's been rarely. I don't use that term.

Q. What term would you use instead?

A. Short attack. Short and distort, I may have used. I honestly didn't -- don't think I wrote that very much, so I don't think I had some common -- I don't have any common words that I would have used.

Q. Have you heard others at the company, like Dr. Burns, for example, use the term FUD in reference to our clients and the other short sellers?

A. In reference to short sellers, I have heard Dr. Burns use the word "FUD" in passing.

Q. Have you ever heard Dr. Burns use any nicknames or -- or epithets for the short sellers?

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

A.  Not that I can recall.

Q.  Do you recall Dr. Burns ever referring to Dr. Heilbut as Hellbutt?

A.  Not that I can recall.

Q.  Do you recall Dr. Burns ever referring to Dr. Brodkin as Buttskin?

A.  No.  I don't.

Q.  Do you recall Dr. Burns ever referring to Dr. Bik as Elizabeth Bitch?

A.  No, I don't.

Q.  Okay.  What's going on in this exchange with Ms. Schad, as far as you can tell?

A.  An exchange -- I'm not even sure if I responded, but maybe I did.  This is her -- as I alluded to in testimony yesterday, this is her trying to give information to the company on potentially malicious or -- she's giving me information on people who are detractors of the company, and I'm looking at it and saying is this potentially worth -- you know, I'm not an attorney, so it's something that I think is serious enough that I'm forwarding to counsel for them to evaluate.

MR. CAMPBELL:  So that answer is fine.  But I would just caution you, don't give any statements about what counsel asked you to gather or any direction you got from counsel as part of any litigation.

Page 123

THE DEPONENT:  Okay.

Q.  (By Mr. Kumagai)  And do you know who Anthony is that Ms. Schad is referring to?

A.  I don't specifically.  It -- it may be Anthony Daher, but I don't -- I wouldn't -- wouldn't know that.

Q.  And is it fair to say this isn't the only instance in which investors or members of the Sava Army shared statements that our clients or others had made online about the company with you?

MR. CAMPBELL:  Object to form.

A.  Yeah.  No.  It wouldn't be the only instance.

Q.  (By Mr. Kumagai)  And I think just a yes-or-no answer.  At this point in time, November 2021, was the company already planning to file a defamation action?

A.  I don't recall.

Q.  Set that aside.  I'll mark as Exhibit 164 a document Bates-stamped CASSAVA_001247246.

(Exhibit 164 was marked.)

Q.  Exhibit 164 appears to be an email from you, Mr. Schoen, to an individual named Timothy Koehler Brennan dated December 21st, 2022 -- 2021, with the subject "Jesse Brodkin allegations re C-14."

Page 124

Do you see that?

A.  Yes.

Q.  And in the initial email from Mr. Brennan, he writes, "Short sellers like Dr. Brodkin are alleging that Dr. Wand-Burns' experiments are physically impossible due to the radioactive waste that would be generated." And it continues.

Do you see that?

A.  I do.

Q.  And I believe he meant to say Dr. Wang, but spelled it "Wand."  And then you respond, "Hi Timothy. Sorry, I've not seen that particular allegation.  If you are able to screen print me a copy, I would appreciate it. Thanks, Eric."

Do you see that?

A.  I do.

Q.  And so you asked this investor to send you a screenshot of statements by short sellers like Dr. Brodkin; is that right?

MR. CAMPBELL:  Object to form.

A.  Yes.

Q.  (By Mr. Kumagai)  And was -- is it fair to say this isn't the only instance where you received information about short sellers like our clients from investors?

Page 125

A.  Yes.  This would not be the only instance.

(Exhibit 165 was marked.)

Q.  Okay.  I'll mark as Exhibit 165 a document Bates-stamped CASSAVA_001245411.  And Exhibit 165 appears to be an email from you to Timothy Brennan dated April 21st, 2022, with a subject "Adrian Heilbut threatening to release simufilam experiments."

Do you see that?

A.  Yes.

Q.  What's going on in this email exchange?

A.  Reading it, Timothy Brennan is telling me about some Tweets that he's saying Dr. Heilbut made, threatening to release experiments that had been performed on simufilam that he apparently purchased online.  And I'm responding, "I'd love to see that."

Q.  And do you recall whether Mr. Brennan then sent you what you had requested?

A.  I don't recall.

Q.  And why did you want to see that?

A.  Well, in particular -- so I welcomed any information on -- on posts, but, in particular, there's a reference here to simufilam purchased online.  Simufilam is a proprietary investigational drug, so it should not be available online.

We had found instances in the past where

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

people sent me a screenshot of a company offering it and we had legal counsel send -- do whatever they do to try to prevent that. So in this case, it's -- that's why I would have had particular interest in that.

Q. And do you recall whether this went anywhere beyond an email exchange with Mr. Brennan?

A. From the company's perspective, no, I don't recall that.

MR. CAMPBELL: I'll just remind you, it's your personal perspective today.

Q. (By Mr. Kumagai) Do you personally recall whether there was any further follow-up or --

A. Sorry. The answer is no. You said anything further. I -- I'm not -- I'm excluding Mr. Brennan because I don't know what he did.

MR. KUMAGAI: I see. I don't think we need to go through all of them. Why don't we break?

MR. CAMPBELL: Okay.

VIDEOGRAPHER: Going off the record at 12:22. This marks the end of Media 3.

(Recess taken, 12:22 p.m. to 1:02 p.m.)

VIDEOGRAPHER: This marks the start of Media 4 of the video deposition of Eric Schoen. We're back on the record. The time is 1:02.

Q. (By Mr. Kumagai) Mr. Schoen, are you aware

Page 127

of any efforts by the NIH to claw back any of the grant funding or money that the NIH had awarded to the company in the past?

A. No, I'm not.

Q. Are you aware of any pending or threatened claims against the company under the false act -- False Claims Act?

MR. CAMPBELL: Object to form. If you can answer without communications with counsel, go ahead. But otherwise --

A. I can't answer that without counsel. Without -- any discussions I've had about that would be with counsel.

MR. KUMAGAI: So even the yes-or-no answer to that question would be covered by privilege?

MR. CAMPBELL: Even the question whether he's had discussions about it with counsel.

Q. (By Mr. Kumagai) When you testified earlier that the company has enough cash on hand to continue operations into 2027, does that factor in potential claims by the NIH to claw back funds or potential liabilities under the False Claims Act?

MR. CAMPBELL: Object to form.

A. It encompasses everything that I know today.

Page 128

Q. (By Mr. Kumagai) I'll mark as Exhibit 166 Appendix A to the First Amended Complaint filed in the defamation action on November 4th, 2022.

(Exhibit 166 was marked.)

MR. KUMAGAI: I actually only have --

MR. CAMPBELL: I've probably got an e-copy.

MR. KUMAGAI: That's good reading.

Q. (By Mr. Kumagai) Have you ever seen this before, Mr. Schoen?

A. Yes, I have.

Q. And in what context have you seen this before?

A. I'm sorry. Rephrase. I've seen these -- I've seen sets of these examples of false and defamatory statements made. I don't know if I've seen this exact list before. I definitely have seen the one in the amended -- Second Amended Complaint.

Q. Okay. And I can represent to you that this is the Appendix A that was filed as an attachment to the First Amended Complaint in November 2022 with the list of all the allegedly defamatory social media posts, I believe.

Can you turn to page 9. There's a Tweet that -- or a statement dated November 7th, 2021, from Dr. Jesse Brodkin that says, quote, We show they

Page 129

fabricated data. Therefore, their claims of safety based on data are suspect.

Do you see that?

A. Yes.

Q. And in your view, does that statement assert that simufilam is unsafe?

MR. CAMPBELL: Object to form.

MR. KUMAGAI: What's wrong with that question?

MR. CAMPBELL: Well, it's a characterization of it. And I want to be -- I want to be clear that he's answered these questions in two different capacities; right? So I don't know if he can interpret what Dr. Brodkin means or if that's what you're asking him to do, but he can answer -- he can answer the question, but this is just your view reading this statement today, as I understand the question, of whether or not you think this statement by itself relates to the safety of simufilam.

MR. KUMAGAI: That's not exactly the question.

MR. CAMPBELL: I'm trying to understand the question.

Q. (By Mr. Kumagai) Let me rephrase -- let me repeat the question.

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

In your view, test -- testifying today in your personal capacity, does this statement assert that simufilam is unsafe?

A. No.

Q. Okay. Can you turn to page 11? There's a statement dated November 8th, 2021, from Dr. Jesse Brodkin. It begins, "The dose is way, way, way."

Do you see that?

A. Yes.

Q. And the statement -- you can take a moment to read the full statement. My question is the same. In your view, does this statement assert that simufilam is unsafe?

A. In that narrow context of reading this statement, no.

Q. Okay. Turn to page 16. There's a statement dated November 14th, 2021, from Adrian Heilbut. It's about two paragraphs, and it begins, "The privilege to conduct trials under an IND."

Do you see that?

A. Yes.

Q. Take a moment to read the full statement. In your view, does this statement assert that simufilam is unsafe?

A. Let me read the whole statement. No.

Page 131

Q. If you turn to page 28, there's a statement from November 26th, 2021, from Dr. Jesse Brodkin. And it begins, "Yes, I agree that my main concern is not safety."

Do you see that?

A. Yes.

Q. In your view, does this statement assert that simufilam is unsafe?

A. No.

Q. If you turn to page 44, there's a statement dated December 21st, 2021, from Dr. Jesse Brodkin. It begins, "I said we don't know because Sava lies about everything."

Do you see that?

A. Yes.

Q. In your view, does this statement assert that simufilam is unsafe?

A. No.

Q. Okay. If you'd turn to page 74, please, there's a statement dated March 22nd, 2022, from Dr. Adrian Heilbut. It begins, "Problem is if you cannot trust the pharmacology or efficacy data."

Do you see that?

A. Yes.

Q. In your view, does this statement assert that simufilam is unsafe?

Page 132

A. No.

Q. Okay. You can set that aside. We were talking before about your responsibilities as the primary point of contact for investor relations; right? Do you recall that?

A. Yes.

Q. Was investor relations also part of Dr. Burns' role?

A. No.

Q. I'll mark as Exhibit 167 a document Bates-stamped CASSAVA_0001001300.

(Exhibit 167 was marked.)

A. Let me -- let me add to that response if that's okay. It was not her role, but at certain times, we would have her at investor meetings, she would do presentations, so yes, it was, but wasn't her primary role.

Q. Okay. And Exhibit 167 is an email from Anthony Daher, who we were discussing earlier, to Lindsay Burns at her Yahoo email address dated February 18th, 2022.

Do you see that?

A. Yes.

Q. And Mr. Daher or Daher writes, "Hi Dr. Burns. Attached list of volunteers wanting to help.

Page 133

Have a great day and weekend. Anthony."

Do you see that?

A. I see.

Q. And then there's an attachment with a list. The title is "List Savages Discord group volunteers." Hashtag, in Sava we trust.

Do you see that?

A. Yes.

Q. Have you ever seen this list before?

A. Not to my knowledge.

Q. And was it part of Dr. Burns' role as the SVP of neuroscience at the company to be communicating with Mr. Daher about this subject?

MR. CAMPBELL: Object to form.

A. I don't know what the subject is. Printed -- from this, I can't tell.

Q. (By Mr. Kumagai) Was it part of Dr. Burns' role as the SVP of neuroscience to liaise with the so-called Sava Army?

A. Not to my knowledge.

Q. But do you have some knowledge that Dr. Burns was, in fact, communicating with members of the Sava Army?

MR. CAMPBELL: Object to form.

A. No direct knowledge.

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

Q. (By Mr. Kumagai) You don't recall being copied on emails and exchanges with Dr. Burns and members of the Sava Army where Dr. Burns was involved?

A. Yeah. It is possible. I don't recall, though, any of this.

Q. Okay. If you look at the attachment which is page 1342, you mentioned earlier that, you know, if you saw a list of names, you might recall having communicated with -- with particular individuals. So I just want you to kind of walk through the list and let me know if you recall any interactions or communications with these people listed here.

We've already talked about Mr. Daher, obviously, so perhaps start with Dale Wayne Mershon.

A. Can I just go and tell the ones that are affirmative or do you want me to go through each one?

Q. Yeah. Just tell me who you recall having interactions with.

A. Jake Atchley looks familiar. Jacob Braun, I know I had interaction with.

Q. Let's just pause at each of them, if you don't mind. So Jake Atchley, what -- what do you recall, if anything, about your interactions with Mr. Atchley?

A. I believe he would have -- we would have traded emails at some point.

Page 135

Q. About what?

A. Investor -- nothing that I can remember specifically. It would have been general investor relations.

Q. Okay. Next, you said Mr. Braun?

A. Jacob Braun. Again, he was a proponent of Cassava. I believe he also wrote some kind of analyst report on the company. I didn't put much stock in it, because people can write what they want. And that's about as much -- but he would have emailed with me, you know, several times over -- over the course of time.

We talked about Matt Nachtrab.

Q. Uh-huh.

A. That's all that I recognize.

Q. Marie-Andree Roy. Do you recall any interactions with her?

A. Marie-Andree Roy?

Q. Sorry. Roy. Yeah.

A. I don't recall.

Q. And so sitting here today, do you recall any specific conversations that you had with anyone at Cassava about the Sava Army or the Savages group?

A. None -- none -- no. Other than we've -- that we've talked about. With anybody at Cassava?

Q. Yeah.

Page 136

A. No. Not that I recall.

Q. I'll mark as Exhibit 168 a document Bates-stamped CASSAVA_001253022.

(Exhibit 168 was marked.)

Q. And while you're reading that, I'll mark as Exhibit 169 a document Bates-stamped CASSAVA_001253024, which I can represent was produced as an attachment to Exhibit 168.

(Exhibit 169 was marked.)

MR. CAMPBELL: So this is one of the attachments to the email?

MR. KUMAGAI: Yeah.

Q. (By Mr. Kumagai) Okay. Exhibit 168 is an email from Todd Rogenthien to you, Eric Schoen, dated June 16th, 2022, with the subject "Dr. Roger Nicoll is not who you think he is."

Do you see that?

A. Yes.

Q. Do you recall this exchange with Mr. Rogenthien?

A. I -- it looks familiar now that I see it, but I don't recall it.

Q. What's going on here?

A. It looks like he's saying that Dr. Nicoll is -- has been -- you know, is not a proponent of the

Page 137

company. And I do recall when he says, "Do you really think he's brilliant now," I believe Dr. Barbier referred to Dr. Nicoll as a brilliant somebody in some kind of presentation or public statement. And so that's what he's referring to is do you really think he's brilliant now. He's saying "you," but it's not referring to me specifically.

Q. I see. And if you look at Exhibit 169, it appears that Mr. Rogenthien had obtained the email exchange between Dr. Nicoll and the reporter at the New York Times, Ms. Mandevilli, through a FOIA request and he's sending it to you.

A. I'm sorry. This is the attachment to the email I received?

Q. Yes.

A. Okay.

MR. CAMPBELL: Is the other attachment --

MR. KUMAGAI: There was two attachments. The one was a FOIA letter like a form letter, which I can represent --

MR. CAMPBELL: It's just a FOIA request to the New York Times?

MR. KUMAGAI: Yeah. Well, it was a FOIA request, I think, to UCSF because it's a public institution.

35 (Pages 134 - 137)

Page 138

MR. CAMPBELL: Got it.

Q. (By Mr. Kumagai) And if you look at the page ending 026, you see Dr. Nicoll tells the reporter at the New York Times on April 9th, 2022, "for me, this saga is" worse -- "is more egregious than Theranos." Strike that. Sorry.

The quote is, "For me, the saga is more egregious than Theranos."

Do you see that?

A. I do.

Q. And so Mr. Rogenthien was making you aware of this exchange that Dr. Nicoll, whom Mr. Barbier had described as brilliant, had with the reporter at the New York Times; right?

A. Yes.

Q. And what, if anything, did you do with this information that Mr. Rogenthien provided to you?

A. I don't recall.

Q. Do you recall sharing it with others at the company?

A. I don't recall that.

Q. Do you recall Sandy Robertson trying to take this and convince his contacts at UCSF to get Dr. Nicoll to retract his statement?

A. I don't recall that.

Page 139

Q. But as of this date, June 2022, you were aware that Dr. Nicoll had described the company as more egregious than Theranos; correct?

A. Well, I would have read this email, yes.

Q. Okay. You can set that aside. I want to go back to the 2020 cash incentive bonus plan that we were talking about a little bit earlier today.

Can you generally describe the initial 2020 plan and how it was set up to provide bonuses?

A. Sure. The 2020 plan was voted by the board of directors. It was set up -- again, in my opinion -- my words, as a success plan, whereby if the company achieved certain market capitalization -- and it's a rough a -- rough termination because there's some certain adjustments to it -- for 20 business days, it would, essentially, unlock a potential bonus pool that, in the original plan, would be shared by -- not shared by. There was a guaranteed award to the CEO of the company, there were guaranteed amounts much smaller to the board of directors.

And then the compensation committee of the board could meet and allocate or not allocate the remainder of that specific award that had been unlocked to the participants in the plan, subject to sort of guardrails for the scientific group, the administrative group, and a -- I think there was one other -- one other

Page 140

group that I'm not thinking of.

When I called it a success-based plan, simply meeting those milestones doesn't result in a cash payment. It can unlock an amount of money, the compensation committee could award that amount of money, but that amount of money was only paid in the event some triggers were hit.

One is, I believe, sale of the company. Or two -- and the original -- it's hard for me because the plan has been amended several times, but the second one was the company having more than two years of cash, you know, after payment of -- of said bonuses as determined by the board of directors -- either the board of directors or the compensation committee. I can't remember. You're asking me -- that's pretty good for a years' old plan. But that's -- that's essentially it.

Q. Is it safe to say that you are the most knowledgeable person about the company -- at the company about this plan?

A. I would think so.

Q. Who wrote the plan? Came up with the plan? Who was primarily responsible for conceiving of the plan?

A. That would be Mr. Barbier, but in conjunction with counsel at our law firm at the time.

Q. What firm was that?

Page 141

A. I don't know. It may have preceded Orrick.

Q. Morgan Lewis?

A. No. It wouldn't have been Morgan Lewis. It would have been wherever -- Mike O'Donnell, one of the board members, wherever he was.

Q. That's what I was trying to name, but I'm not sure if it was the right firm.

A. It's not Morgan Lewis.

Q. Okay. And are you aware of any other peer companies or biotech companies with a cash incentive bonus plan that conditioned bonus payments on stock price milestones rather than drug development milestones?

MR. CAMPBELL: Object to form.

A. I'm not aware of any. I believe there may have been a Tesla company model. That's the only one that I ever recall talking -- talking about, but I had very little involvement in the -- in the drafting of the plan.

Q. (By Mr. Kumagai) And -- and aside from Tesla, are you aware of any other companies or biotech companies?

A. I'm not.

Q. And the 2020 cash incentive bonus plan also included as a participant -- as a participant Dr. Wang as an outside consultant; right?

A. Correct.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

Q. Were any other outside consultants or nonemployees, aside from the directors, participants in the plan?

A. Not that I recall.

Q. Are you aware of any other biotech companies or peer companies with a cash incentive bonus plan that included outside consultants as participants?

A. No, I'm not.

Q. And under the 2020 plan, Mr. Barbier's bonuses were mandatory, not discretionary; is that right?

A. They were fixed. If a milestone was achieved.

Q. Meaning unlike for the other category -- strike that.

Meaning that it wasn't up to the compensation committee to decide whether or not to provide Mr. Barbier with a bonus if a milestone had been met; right?

MR. CAMPBELL: Object to form.

A. Correct.

Q. (By Mr. Kumagai) And the bonus payments for the directors, was that also fixed?

A. Correct. We're talking about the plan as originated, yes.

Q. What about Dr. Wang's bonus payments under

Page 143

the 2020 plan? Were they fixed or left to the discretion of the compensation committee?

MR. CAMPBELL: Object to form.

A. Left -- left to the discretion of the compensation committee.

Q. (By Mr. Kumagai) So under the 2020 plan, what was the maximum payout that Mr. Barbier was eligible to receive under the plan?

A. I don't recall, but it -- in the maximum plan, it would have been many, many, many millions. Greater than 50.

Q. I believe in the SEC deposition, you described it as around 90 million. Does that sound about right?

A. That sounds about right.

Q. And what category, if any, was Dr. Burns a member of under the 2020 plan?

A. She would have been in the scientific bucket.

Q. Meaning her cash bonuses were discretionary? Up to the discretion of the compensation committee?

A. Correct.

Q. Aside from Mr. Barbier and the board members, were there any -- was there anyone else who was

Page 144

entitled to a fixed bonus payment if the milestones were met?

A. No.

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) And under the 2020 plan, which category did you fall under?

A. I was in the administrative group. Again, discretionary at the -- at the compensation committee's behest.

(Exhibit 170 was marked.)

Q. I'll mark Exhibit 170. It's kind of stapled in a bit of a weird spot, but --

MR. CAMPBELL: I'll manage.

Q. (By Mr. Kumagai) -- hopefully, you can manage.

Do you recognize Exhibit 170?

A. Yes.

Q. What is it?

A. It looks to be a copy of the 2020 cash incentive plan. The original 2020 cash incentive plan.

Q. Okay. And it says this plan was effective as of August 26, 2020.

Do you see that?

A. Yes.

Q. And that was approximately two weeks or so

Page 145

before the company announced the positive purported results of the Phase 2b redo analysis; right?

MR. CAMPBELL: Object to form.

A. That sounds right.

Q. (By Mr. Kumagai) Okay. Can you describe the changes or amendments that have been made to this 2020 plan in the time since it was adopted?

A. Generally, yes. I believe there's been two amendments. The first amendment removed the board of directors from the plan so that they -- all of -- they were -- all of their past bonuses were rescinded and there was no potential for any future bonuses. So, essentially, they were zeroed out.

Q. And why was -- sorry. Approximately when was that change made and why was it made?

A. Approximately -- I don't know exactly -- roughly -- I don't know exactly. There's a factual date on it.

Q. Yeah. I believe it was March 16th, 2023. Does that sound right?

A. That sounds right.

Q. Okay. And was that the only change -- the only major or material change, as far as you can recall, that was made in that March 2023 amendment?

A. Yes. That's my recollection. And there

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

was a second amendment after that that you may get to.

Q. Yeah. I may have just missed your answer on this, but why was that change made?

A. There was litigation related to the plan, and that was part of a settlement.

Q. A derivative case; is that right?

A. I don't know the legal vernacular, but there was a -- a -- there was a lawsuit related to that, and the change to remove the directors was part of the settlement, along with governance changes.

Q. What governance changes?

A. There was -- I don't recall exactly. There's minor changes to governance to -- I just don't recall.

Q. That's fine. And after the plan was amended in March of 2023 or around that time, was Dr. Wang still a participant in the plan?

A. I believe so, yes.

Q. Okay. Can you describe the second amendment or change to the plan?

A. Sure. The second amendment would have been in 2024 and the second amendment, the easiest way to say it was the plan was eliminated to the extent possible by the board to the extent legally possible. It's still -- you know, there was one award that was made in 2020 that

Page 147

can't be rescinded by the company. All of the milestones met after that have been adjudicated by the compensation committee with a zero dollar award. All future milestones have a zero dollar award. The only person who is left in the plan, effectively, is the president, CEO, and chairperson should he or she hold all three roles.

Q. And is there a person who meets that criteria today?

A. Not today.

Q. Okay. So there was one milestone -- how many milestones were met under the plan?

A. Either 11 or 12. I think 12.

Q. And so that means the company accrued a fixed obligation under the plan to Mr. Barbier; is that right?

MR. CAMPBELL: Object to form.

A. Well, when you use the word "accrued," that's an accounting term. That would be a liability, so no, no amount was ever put on the books because it was not deemed probable of being paid out and some other accounting things. But yes, there was a notational liability -- notational liability to Dr. -- Mr. Barbier.

Q. (By Mr. Kumagai) And approximately how much is that liability?

A. I could have told you two years ago. Well,

Page 148

I -- I just don't know today.

Q. Approximately $75 million? Does that sound right?

A. Well, I can't answer that because I think that liability is to the president, CEO, and chairman should he or she hold all three offices. So I don't know today if Mr. Barbier would still be -- at one point in time, I did have a -- you know, there was a notational liability to Mr. Barbier. Whether that continues, I just don't know.

Q. So sitting here today, you're not sure whether or not the company has any notational liability to Mr. Barbier under the cash incentive bonus plan?

A. I'm not sure.

Q. Has any money ever been paid to anyone under the cash incentive bonus plan?

A. No. Zero.

Q. Sitting here today, what is -- do you know what the approximately -- approximate liability of the company under the plan to the extent the other conditions are satisfied in the future?

MR. CAMPBELL: Object to form.

A. That's stated clearly in the 2024 Form 10-K. I don't -- I can't recall it at this moment, if it's anything.

Page 149

Q. (By Mr. Kumagai) Okay. Let's look at that.

(Exhibit 171 was marked.)

Q. I'll mark Plaintiffs' Exhibit 171. There you go.

MR. CAMPBELL: Thanks.

A. Page 110 would be useful.

Q. (By Mr. Kumagai) And you recognize Exhibit 171 as the Form 10-K of Cassava from -- for the year of 2024?

A. Yes, I do.

Q. Okay. And that's your signature on the certifications at the back dated March 3rd, 2025?

A. Yes. That's my conformed signature.

Q. Sorry. That's your what?

A. Conformed signature. It's not a manual signature.

Q. I see. Okay.

A. I'm being -- I'm being precise.

Q. And sorry. So you're at note 11 on page 110?

A. Yes. So looking at this, it looks like the -- the last amendment to the plan was possibly made after this date, so the relevant information would be in the Form 10-Q from Q1 or Q2 2025.

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

Q. The relevant information for -- for what question?

A. You had asked me if there was any -- yeah. You had asked me if there was any -- if -- if there was any liability to Mr. Barbier -- any notational liability at present.

Q. Okay. And so the most up-to-date information as to what the current status of the plan is in the more recent 10-Q?

A. Correct.

Q. See if I have that. Do you want to set 171 aside for now, but we'll come back to it, so just keep it handy, if you don't mind.

A. Yep.

(Exhibit 172 was marked.)

Q. I'll mark Exhibit 172. Do you recognize Exhibit 172?

A. I do.

Q. And what is it?

A. It's the Cassava Form 10-Q for the quarter ended June 30th, 2025.

Q. This is the most recent 10-Q that the company has filed; is that correct?

A. Yes.

Q. Okay. I think page 27 has a description,

Page 151

but there may be more. Here we go. Looking at note 9 or --

A. Yeah. I'm looking at note 9 on page 13 and 14.

Q. Okay. So just to clarify, the first question -- as a first question, it appears the plan was amended in March of 2023, then again in -- well, when was the next amendment after the March 2023 amendment?

A. It looks like March 6th, 2025.

Q. Okay.

A. It's the last full paragraph in the --

Q. Was it just those two amendments that you're aware of?

A. To my knowledge, yes.

Q. And so back to the original, I think, question, which is: Does the company have any outstanding liability under the plan?

A. From an accounting perspective, the company has no outstanding liability under the plan.

Q. Setting aside the accounting perspective, does the company have any liabilities under the plan?

A. If the milestones are met, yes, the company does.

Q. Okay. So let's start with the paragraph at the top of page 14. It says, "In October 2020, the

Page 152

company achieved the first valuation milestone based on market capitalization. Subsequently, in 2020, the compensation committee approved a potential cash bonus award of 6-1/2 million dollars in total for all CIB plan participants after taking into account a March 2023 CIB plan amendment subject to future satisfaction of a performance condition."

Do you see that?

A. I do.

Q. So does that mean that there's a fixed amount that is owed to Mr. Barbier, the directors disclaimed their entitlement to any of those funds, and then there are set amounts that were designated to the other participants in the plan, including yourself, Dr. Wang, Dr. Burns?

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) Is that right?

A. No. Dr. Wang has never been awarded a bonus under the plan. The 6.5 million is the total award remaining after removing the directors, a portion of which would be Remi Barbier, a small portion of which is mine. That's the total award -- the total notational award at this point.

Q. Right. But -- and isn't Dr. Wang among the group that received a part of that total notational award?

Page 153

A. No. He was a participant in the plan, but he was not awarded any -- any bonus.

Q. Not even a notational bonus?

A. No. Zero.

Q. So the compensation committee, when it met, decided to provide you with some amount of that -- those funds, but decided not to provide Dr. Wang with any funds?

MR. CAMPBELL: Object to form.

A. Correct.

Q. (By Mr. Kumagai) And what about Dr. Burns?

A. Dr. Burns did get an award.

Q. Okay. The next paragraph describes 11 additional milestones that were achieved based on market capitalization in 2021.

Do you see that?

A. Yes.

Q. And that triggered a -- a potential obligation to the company's chairman, president, and CEO?

A. Yes.

Q. Do you see that? Of 74.3 million?

A. Yes.

Q. And so that -- those funds are potentially available to be awarded to some individual who ultimately assumes those three titles of chairman, president, and CEO?

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

A. Yeah. Those are the words in the plan, so that's why the disclosure is here. But, as I mentioned, currently, no one holds those three roles.

Q. So is there any chance that Mr. Barbier would be entitled to the fund -- those funds, 74.3 million?

MR. CAMPBELL: Object to form.

A. Any chance? My position and the company's position would be no, that he's not entitled to them. Your question is is there any chance? Yes.

Q. (By Mr. Kumagai) What is -- what do you mean by that?

A. Mr. Barbier may have a different opinion if he's entitled to that. It would most likely be a litigated matter.

Q. And what makes you say that?

MR. CAMPBELL: Object to form. And don't include any advice from counsel in your answer.

A. Sorry. The answer would be discussion with counsel.

Q. (By Mr. Kumagai) Okay. So there is a notational liability under the plan to an individual who eventually assumes the role of chairman, president, and CEO; right?

A. I don't even think I would say that. A

Page 155

potential -- how about a potential notational liability?

Q. Okay. And then there's a notational liability of some amount to you; right?

A. Yeah. There's a list of names that ascribe to the 6.5 million that includes me.

Q. And where is that list of names?

A. Sorry. In the company records.

Q. I see.

A. That -- when I say "notational liability," that's -- there is a specific list of names that in a -- and amounts that equal 6.5 million. That's the only -- that's the only notational liability, if there is such a term, that the company has. But there's -- there's nothing on Cassava's -- in accounting's records or in the financials of the company.

Q. And sitting here today, who else do you know to be on that list?

A. It would have been employees at the time, so Lindsay Burns, Mike Zamlutz, Ruth Araya. Those are the ones that come to mind.

Q. Okay. And if you look at page 16 of this disclosure -- this document, there's the heading "Anti-SLAPP Lawsuit."

Do you see that?

A. Yes.

Page 156

Q. And that's referring to the present case; right?

A. Yes, it is.

Q. Okay. And it says, "The company has reserved a loss contingency of $4 million on its condensed consolidated balance sheet as of June 30th, 2025, relating to potential settlement with the intervenor plaintiffs and other claimants."

Do you see that?

A. Yes.

Q. And who are the other claimants that refers to?

A. So you guys are going to have to help me with who the intervenor plaintiffs are.

Q. The intervenor plaintiffs are Dr. Pitt and Dr. Bredt. Our clients are the original plaintiffs: Dr. Brodkin, Dr. Milioris, and Dr. Heilbut.

A. Give me a second to see if I can -- can I answer that -- the question of --

MR. CAMPBELL: If you know from -- based on your own facts, not based on conversations with counsel, then you can answer.

A. Based on -- the -- the 4 million comprises Bredt and Pitt as a group, QCM as a group, and also, the -- the defendants.

Page 157

Q. (By Mr. Kumagai) You mean our clients?

A. Yes, your clients.

Q. Why is QCM included in that?

A. I don't know.

MR. CAMPBELL: So -- if you can answer that question without disclosing -- we might need to take a moment so he understands the confidentiality obligations aside from the privilege obligations.

MR. KUMAGAI: Why don't we -- why don't we come back to this topic maybe after the next break. You can talk about it.

Q. (By Mr. Kumagai) Okay. If you look at page 3, there's the consolidated balance sheet. And the -- it says the company's current assets as of June 30th, 2025, approximately 112 million in cash and cash equivalents.

Do you see that?

A. Yes.

Q. And that's down from approximately 128.5 million at the end of 2024.

Do you see that?

A. Yes.

Q. And so what has that money been spent on in the first half of 2025?

A. Operations.

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

Q. Primarily operations on the TSC program; is that fair?

A. Well, top -- operations in the TSC program, the close-down of the Phase 3 trials, and also, corporate expenses, including legal expenses.

Q. And are the -- is the simufilam program closed down as of today? Excuse me. Is the Alzheimer's program in -- the Phase 3 clinical trial program for the Alzheimer's program closed down as of today?

A. Yes, it is.

Q. So does the company expect to incur significant expenses going forward in connection with the Alzheimer's program?

A. No.

Q. When you -- you said earlier today that you forecast that the company has enough cash to continue to operate through or into the beginning of 2027.

Do you recall that?

A. Yes.

Q. What happens then?

MR. CAMPBELL: Object to form.

A. What happens then? Well, in a -- at some point, the company will either need to -- you know, raise money in some way, shape, or form.

Q. (By Mr. Kumagai) And does the company

Page 159

currently have a plan as to how it would do that and when it would do that?

A. The company doesn't have a plan today of how it would do -- that. Or sorry -- of when it would do that. You know, you can borrow money, you can raise it in the capital markets, we own a building we could sell. There's a myriad of options, but we haven't picked any single one.

The most likely is to raise capital in the public markets.

Q. And as far as -- as far as you know, is the company attempting to sell itself or merge with any other company?

MR. CAMPBELL: Object to form.

A. The way I'll answer it is there's -- confidentially, there's no attempts to it, but as a public company, you're always for sale.

Q. (By Mr. Kumagai) Sitting here today, you're not aware of any active discussions about a potential merger or acquisition?

A. No. I would rephrase that. When I say active -- when you say "active discussions," no substantive discussions. Cassava is always going to be looking at acquiring another asset, but there's nothing that's fulminated or substantive.

Page 160

Q. And what -- what is Cassava currently looking at acquiring, even if it's passive?

A. You know, when a company fails a Phase 3 program and has cash, you know, through the investors' -- investor relations portal and other ways, we've had a myriad of companies say, Hey, we've got great assets, and we've got a process to evaluate all of those, but there's nothing that's moved beyond the initial stage of that.

But -- there's 15 or 20 different things that have come through, none of which warrant attention, but I just -- when you say "active," I'm trying to be precise.

Q. Okay. If you look back at the 10-K from 2024, so Exhibit 171 --

A. Yes.

Q. Do you have that? Turn to page 31. At the top of the page, you see there's a bold heading saying, "Lawsuit against the perpetrators of short-and-distort campaign."

Do you see that?

A. Yes.

Q. And what is that referring to?

A. That would be the defamation lawsuit.

Q. And why is the company continuing to include this paragraph in its SEC filings?

Page 161

MR. CAMPBELL: Object to form.

A. So this is the 10-K for 2024. The suit was active in 2024 and was dismissed in August 2nd, 2024. So a 10-K is a compendium of activity that happened in that fiscal year and, in certain instances, in previous years, as well.

Q. (By Mr. Kumagai) And so you're not including that same disclosure in the 10-Qs?

A. I'd have to look if we deemed it droppable.

Q. Sorry. You can set that aside. We don't need to get to the bottom of that right now.

Okay. If you'd turn to page 31 of the 10-K --

A. Okay.

Q. -- there's a -- the next heading after the Short-and-Distort heading refers to "2024 Nonproduct Development Business Developments."

Do you see that?

A. Yes.

Q. And there's the update on the Government investigations.

Do you see that?

A. I do.

Q. And it refers to a -- the subpoenas that the company received beginning in August of 2021.

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

Do you see that?

A.  Yes.

Q.  And is it right that the company received a subpoena from the DOJ and the SEC in August of 2021 or what -- what came first?

A.  I don't -- I don't recall the order of receipt.

Q.  And then the next paragraph describes the company's announcement on September 26th, 2024, of its settlement with the SEC.

Do you see that?

A.  Yes, I do.

Q.  And it says, "The company has neither admitted nor denied the allegations of the complaint."

Do you see that?

A.  I do.

Q.  And so what is the company's position today as to the allegations in the SEC complaint?

A.  We neither admit nor deny the allegations.

Q.  And so is that the company's position with respect to the facts alleged in that case in other contexts, too?  So if we have the same allegation in our case, it's -- is it also the company's position that they neither admit nor deny the allegation?

MR. CAMPBELL:  Object to form.

Page 163

A.  I thought -- today, I'm testifying on my personal behalf.  So -- we settled under neither ad -- can you repeat that question?

Q.  (By Mr. Kumagai)  Do you know whether the company is taking that same position with respect to any overlapping allegations in our case?

A.  Overlapping allegations.  I don't know -- I don't --

Q.  That's okay.  We'll come back to it.  It's a hard question.

Okay.  The next paragraph describes the DOJ.  Do you see that?  Or references the DOJ?

A.  I do.

Q.  It says, "The company continues to cooperate with the DOJ related to requests for documents and information, including those related to conduct alleged in the indictment of Dr. Wang discussed below."

Do you see that?

A.  Yes.

Q.  Is that still true today?  Is the company continuing to cooperate with the DOJ on requests for documents and information?

A.  To my knowledge, yes.

Q.  What is your understanding of the company's role, if any, in the upcoming criminal trial of Dr. Wang?

Page 164

MR. CAMPBELL:  Object to form.

A.  Any -- anything -- any information I would have, that would be from discussion with counsel.

Q.  (By Mr. Kumagai)  Are you personally planning to attend the trial?

A.  I'm not planning to.

Q.  Without disclosing any legal advice, do you know whether anyone from the company is attending the trial of Dr. Wang?

A.  I don't know if anyone is attending.

Q.  Okay.  The next -- the next page, there's a heading that says "Indictment of Dr. Wang."

Do you see that?

A.  I do.

Q.  Okay.  In this top paragraph, the -- there's a sentence that begins, "Among other things."

Do you see that?

A.  Yes.

Q.  It says, "Among other things, the indictment alleges that Dr. Wang made materially false, fraudulent, and misleading statements to NIH regarding the mechanism by which the company's therapeutic product candidate simufilam was designed to treat Alzheimer's disease and the improvement of certain Alzheimer's disease indicators in patients treated with simufilam and that

Page 165

Dr. Wang manipulated or otherwise fabricated research results, including Western blot images that he prepared."

Do you see that?

A.  I do.

Q.  How is that allegation by the DOJ any different from the statements that our clients made that it's all made up?

MR. CAMPBELL:  Object to form.

A.  I'd have to read the -- I have not read the DOJ's complaint or -- I don't know what you call it.  So I'd have to read that to know how I would feel it's different.

Q.  (By Mr. Kumagai)  Looking at this summary, sitting here today, can you describe how this summary of the DOJ's allegations is any different from our clients' claims that it's all made up?

MR. CAMPBELL:  Object to form.

A.  Yeah.  In -- so this is a summary of something that I haven't read where there's specific statements from your clients.  So I can't compare -- to me, those are apples and oranges, so I can't -- I can't make a comparison.  That would be pure speculation.

Q.  (By Mr. Kumagai)  So sitting here today, as the CFO of the company, you have no idea how the DOJ's charges against Dr. Wang are different from the statements

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

that our clients made about the company that it's all made up?

MR. CAMPBELL: Object to form.

A. Well, I don't know that the DOJ has said it's all made up. I haven't read the DOJ complaint.

Q. (By Mr. Kumagai) You have read this disclosure about the DOJ complaint; right?

A. Yes.

Q. And you've read the disclosure that says, "The indictment alleges that Dr. Wang made materially false, fraudulent, and misleading statements to NIH regarding the mechanism by which the company's therapeutic product candidate simufilam was designed to treat Alzheimer's disease and the improvement of certain Alzheimer's disease indicators in patients treated with simufilam and that Dr. Wang manipulated or otherwise fabricated research results, including Western blot images that he prepared."

Do you see that?

A. I do.

Q. And so how -- sitting here today, reading that summary of the allegations, my question is: How that is any different from the statements that our clients made to the effect of it's all made up?

MR. CAMPBELL: Object to form.

Page 167

A. Yeah. I -- my answer won't change because I don't know -- these are not the DOJ's words. This is a summary written by counsel of the DOJ complaint. Without reading the DOJ complaint, I can't -- I can't objectively answer your question.

Q. (By Mr. Kumagai) My question is not about -- so set aside the DOJ complaint. Okay?

My question is about Cassava's disclosure that describes the allegations of the DOJ against Dr. Wang in these two sentences that we just read -- or one sentence that I just read. Looking at that summary that Cassava has disclosed, my question is: How is that summary different from the allegations that our clients made about simufilam and the science underlying simufilam being all made up?

MR. CAMPBELL: Object to form.

A. How is it different? The -- I don't have a different answer for you. This is a summary of something versus a direct statement by the defendants.

Q. (By Mr. Kumagai) My question is not about what the indictment specifically says. It's how is the summary that Cassava prepared different from the allegations that our clients made that it's all made up.

MR. CAMPBELL: Object to form.

A. How is the summary different? Again, I

Page 168

don't think your question is answerable because these are the -- these are the company's words interpreting -- interpreting a DOJ document. They're just not the same as, you know, somebody Tweeting Cassava Science's science is all made up.

Q. (By Mr. Kumagai) My question is: How are the allegations from the DOJ as described by Cassava in this sentence different from the statements that our clients made to the effect it's all made up?

MR. CAMPBELL: Object to form.

A. Yeah. I just don't have a different answer for you. These are not the DOJ's words. These are -- these are a summary.

Q. (By Mr. Kumagai) That's not my question. I'm asking you to compare Cassava's summary of the allegations with your understanding of our client's statements, it's all made up --

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) -- and tell me how they're different, in your view.

A. Well, your clients, for one, were talking about Cassava's research. Your question isn't answerable. They're -- you're asking me to compare two things that aren't comparable and so I -- I can't answer your question.

Page 169

Q. Why are they not comparable?

A. These are not the DOJ's words.

Q. That's -- that's not my question, though. My question is to compare Cassava's summary of the allegations -- okay --

A. Uh-huh.

Q. -- with our clients' statements, it's all made up, and tell me your understanding of the difference.

MR. CAMPBELL: Object to form.

A. They're -- well, these words are different than your clients' words. But -- your clients have a thousand -- I don't know a thousand -- you know, many, many different items, individually different in some ways. This is a summary of a DOJ document. I -- I don't know how to answer your question.

Q. (By Mr. Kumagai) What is your understanding of what our clients were saying when they said in various forms it's all made up?

A. My understanding as an individual is that your clients were saying Cassava Sciences is a fraud, Cassava Sciences' research has been fabricated, in other words, blank piece of paper, making up graphs and numbers, and that the drug is unsafe. That's the fundamental cusp of your -- what your clients have said, in my understanding.

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

Q. And the company's summary of the DOJ's allegations is that -- includes Dr. Wang manipulated or otherwise fabricated research results, including Western blot images that he prepared.

Do you see that?

A. Yes.

Q. How is that different from your understanding of our clients' statements that Cassava's research has been fabricated, as you just said?

MR. CAMPBELL: Object to form.

A. Yeah. It could be very different. These are -- these words are not as -- they're not specific. So I -- I can't answer that. I can't compare -- you know, if you give me an apple and give me an orange and say how are these things different, it just simply can't be done.

The DOJ didn't say it's all made up. I don't know what the DOJ said. I haven't read the DOJ complaint. I don't even know that it's, you know, relevant because this is Dr. Wang and your clients defamed Cassava Sciences.

Q. (By Mr. Kumagai) By making allegations?

A. That's one way it's different, if that's helpful.

Q. That's different?

A. Different --

Page 171

Q. What is your understanding of what it means to fabricate research results?

A. That's an interpretation. "Fabricate" probably goes further than "manipulate." "Fabricate," to me, Eric Schoen, means create rather than "manipulate" means I didn't like the 7. I'm going to change it to a 6. But that's me, as a -- as a laymen, trying to interpret science.

Q. So in your view, as a layman, "fabricate" means make up --

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) -- right?

A. Yes.

MR. KUMAGAI: Okay. Let's take a break.

VIDEOGRAPHER: Going off the record at 2:16. This marks the end of Media 4.

(Recess taken, 2:16 p.m. to 2:24 p.m.)

VIDEOGRAPHER: This marks the start of Media 5 of the video deposition of Eric Schoen. We're back on the record. The time is 2:24.

Q. (By Mr. Kumagai) Okay, Mr. Schoen. I just want to ask a few more questions about the 10-K, which is Exhibit 171. Excuse me. If you go to page 32, to the section about Dr. Wang, the third paragraph describes Dr. Wang's compensation from the company.

Page 172

Do you see that?

A. Yes.

Q. So for over a decade, until Cassava terminated its consulting relationship with Dr. Wang, he was paid a cash stipend of $2,000 per month. Is that right?

A. Yes.

Q. When did Cassava terminate the consulting relationship?

A. The -- I don't know the exact date. Around the time of his indictment, but I don't -- I don't know the exact date.

Q. Okay. So approximately around June of 2024?

A. That would be correct, to my knowledge.

Q. Do you know if it was before or after the indictment?

A. I don't recall exactly.

Q. And what was the reason, to the extent you know, for the termination of the consulting relationship?

MR. CAMPBELL: Object to form.

A. I'm not aware of the reason for it.

Q. (By Mr. Kumagai) Okay. So in addition to the 2,000-per-month stipend, he was also awarded stock options under the company's equity incentive plans, none

Page 173

of which were exercised, it says.

Do you see that?

A. Yes.

Q. Dr. Wang held 18,571 stock options that were granted between 2015 and 2019.

A. Yes.

Q. Dr. Wang's stock options expired unexercised in August 2024.

Do you see that?

A. I do.

Q. And so what does that mean in terms of the value, if any, that Dr. Wang received from those stock options?

A. Sure. And first, because they expired in August 2024, his consulting agreement would have been terminated in July of 2024.

Q. Okay.

A. What it means is he never received any financial benefit from those stock options. Stock options vest, they sit, you have to exercise them to realize any value. He let them expire unexercised, so he never received any financial gain or compensation of any kind from his stock options, to my knowledge.

Q. To your knowledge, was Dr. Wang a Cassava shareholder at any point in time?

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

A.  Not to my knowledge.

Q.  And then it says, "Dr. Wang was previously a participant in the company's 2020 cash incentive bonus plan."

Do you see that?

A.  Yes.

Q.  And that was from the time the plan was adopted in August of 2020 up until the March 2025 amendment; is that right?

A.  I don't know that that's right because he may have been removed as a participant prior.  I just don't recall.

Q.  What makes you say that he may have been removed prior?

A.  If his consulting agreement was terminated, there would be no reason to have him still be a participant in the plan.

Q.  I see.  So you're not -- you're not aware one way or the other, but it's possible, in your view, that he was removed from the plan in conjunction with the termination of his consulting agreement?

A.  Correct.

Q.  And that happened in, you said, July of 2024?

A.  That's a good inference from this, yes.

Page 175

Q.  Okay.  Okay.  And the next section is the "Leadership Update" section.  It describes the appointment --

A.  I apologize.  The last sentence in that paragraph says, "The company terminated its consulting relations with him and the board removed him as a participant in the CIB plan."  So yes, he would have been removed in -- at the same time his cons -- around the time his consulting agreement was terminated.

Q.  Okay.  And just to be clear, does that mean Dr. Wang has no rights or potential rights to any payment under the CIB plan?

A.  That is correct.

Q.  Okay.  The "Leadership Update" section.  The second subsection says, "Resignation of former executive officer and director."

Do you see that?

A.  Yes.

Q.  And it says, "On July 15th, 2024, Mr. Remi Barbier resigned as president and CEO of the company, effective as of September 13th, 2024."

Do you see that?

A.  Yes.

Q.  And why -- what was the reason for Mr. Barbier's resignation from the company, if you know?

Page 176

A.  Mr. Barbier resigned.  I don't know his -- his reasons.

Q.  Do you know whether Mr. Barbier resigned voluntarily?

MR. CAMPBELL:  Object to form.

A.  Mr. Barbier did give a -- sorry.  Can you repeat that question?

Q.  (By Mr. Kumagai)  Do you know whether or not Mr. Barbier's resignation was voluntary?

MR. CAMPBELL:  Object to form.

A.  In my view, a resignation is, by the word, voluntary, but I'm not familiar with the circumstances, other than I have read his resignation letter.

Q.  (By Mr. Kumagai)  Do you know whether or not the board of directors asked for Mr. Barbier's resignation?

A.  I don't know.

Q.  Sitting here today, your testimony is that you don't know whether or not the board of directors asked Mr. Barbier to tender his resignation?

MR. CAMPBELL:  Object to form.

A.  I'd have to look at his resignation letter, but I -- I don't know the -- I don't -- I don't know.  Or if I -- sorry.  I can't recall.  I don't know meaning the same thing.  So I'm not aware sitting here today.

Page 177

Q.  (By Mr. Kumagai)  You can't remember whether or not, a year ago, the CEO of the company that you've been working at for eight years was asked to tender his resignation?

MR. CAMPBELL:  Object to form.

Q.  (By Mr. Kumagai)  Is that your testimony?

A.  My testimony is that whatever -- if anything -- if there were any conversations, I certainly wasn't privy to them, so no, I do not know.

Q.  Were you privy to any conversations after the fact about the nature of Mr. Barbier's resignation?

A.  I'm trying to think if I had any, but not that I can recall.

Q.  Okay.  And so between July 15th and September 13th, 2024, Mr. Barbier was employed as an -- in a nonexecutive capacity without duties or responsibilities; is that right?

A.  That is correct.

Q.  And so what does mean?  He was technically an employee, but wasn't doing anything?

A.  Yeah.  He was employed.  He was receiving a paycheck, but he wasn't at the office.  I assume he'd be available if we had questions of him.  But, essentially, what that says.  He didn't have duties or responsibilities.

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

Q. Okay. And then it says, "Mr. Barbier is receiving severance compensation equal to 1.23 million over 12 months following the effective date."

Do you see that?

A. Yes.

Q. And so does that mean, as of today, which is October 1, 2025, all of the 1.23 million in severance has been paid by the company to Mr. Barbier?

A. Yes. That is correct.

Q. And does the company owe any other compensation to Mr. Barbier sitting here today, as far as you know?

A. As far as I know, no. Sorry. I'm going to correct that. There is a notational amount from the 2020 cash incentive plan that the company potentially could owe, but other than that, no.

Q. And you may have said this already, but approximately how much is that notational amount?

A. Roughly -- it's -- I just don't know. I haven't looked at it in so long. It's -- it's in the millions. You know, approximately 2, give or take a million.

Q. Okay. Somewhere between 1 and 3 million?

A. Yes.

Q. Okay. And the next paragraph on the next

Page 179

page, it refers to the consulting agreement that the company entered with Mr. Barbier.

Do you see that?

A. I do.

Q. And that was a one-year term for that agreement; is that right?

A. Yes.

Q. And Mr. Barbier was billing at a rate of $100 per hour.

Do you see that?

A. Yes.

Q. Did the company engage Mr. Barbier under that agreement and pay him any money under that contract?

A. Yes. He submitted consulting invoices, but very, very little. And the amount is small enough that we called it de minimis. So call that something less than $5,000 or something of that nature. So very few -- very few consulting hours.

Q. Okay. And that agreement has now expired; is that right?

A. It was terminated effective January 23, 2025.

Q. There it is. Okay. And why was it terminated early?

A. I -- I'm not aware of why.

Page 180

Q. So today, are you aware of any formal --

A. Say I've -- I'm not aware of why, except there may have been discussions with counsel that I can't -- that I can't talk about.

Q. So just yes or no, are you aware of the reason it was terminated, but you can't disclose the reason because you learned it from counsel?

A. No. I'm not aware of the reason why.

Q. Okay. As of today, does the company have any ongoing formal relationship with Mr. Barbier, as far as you know?

MR. CAMPBELL: Object to form.

A. Other than there's an indemnification of his legal fees, no.

Q. (By Mr. Kumagai) Okay. The next paragraph is "Other Management Changes" and it describes the stepping down of Dr. Burns on July 16th, 2024.

Do you see that?

A. Yes.

Q. And to the best of your knowledge, was Dr. Burns asked by anyone at the company or on the board to step down?

A. Let me think about that -- that question if I know. Do I under -- not -- not to my knowledge.

Q. What do you know, if anything, about the

Page 181

reasons for Dr. Burns stepping down from the company?

A. Yeah. I don't know the specific reasons.

Q. Do you know the general reasons?

A. Well, in general, the company made a disclosure on July 1, 2024, that Dr. Burns inadvertently sent an email to Dr. Wang that we discussed, and she was also at the center of an SEC investigation that she eventually settled with. So that might be generally why she resigned.

But that's probably more speculation than I should make because I didn't discuss it with her and don't know. I'm aware of events that occurred around her resignation.

Q. And those same events occurred around the time of Mr. Barbier's resignation, too; right?

A. No. Not those same events. Mr. Barbier was never -- the email that I referenced was sent by Dr. Burns, so no, not the same events.

Q. Mr. Barbier's resignation occurred close in proximity to the time the SEC settled with the company, Mr. Barbier, and Dr. Burns; right?

A. Yes.

Q. Okay. In the next paragraph -- the second paragraph, under "Other Management Changes," it describes the consulting agreement with Dr. Burns.

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

Do you see that?

A.  Yes.

Q.  And that was also a one-year agreement; right?

A.  Yes.

Q.  And to what extent did the company pay Dr. Burns for any consulting services under that agreement?

A.  We did pay her.

Q.  And how much?

A.  Can I go to -- it would be disclosed in the 10 -- in the 10-Q.

Q.  That's okay.  You don't have to search for it.  If it's in there, we can look.

A.  Yeah.

Q.  Okay.  And then it refers to a 2008 equity incentive plan and a 2018 omnibus incentive plan.

Do you see that?

A.  Yes.

Q.  And what are those?

A.  That's the company stock option plans.

Q.  Okay.  Is the 2018 omnibus incentive plan the most recent --

A.  Yes.

Q.  -- plan?  That's the governing plan today?

Page 183

A.  Correct.

Q.  Did the consulting agreement with Dr. Burns expire, or has it been extended?

A.  The consulting agreement is expired.

Q.  And it was not extended?

A.  The consulting agreement was not extended.  However, Dr. Burns is still doing -- is still potentially doing some work for the company.  I want to be fulsome here.  And it is disclosed in the 10-Q, but we -- she's doing up to $20,000 or -- a fixed fee of $20,000 of additional work for the company.

Q.  And what is your understanding of what that work relates to?

A.  Solely to assisting with a manuscript related to the Alzheimer's disease program.

Q.  I believe Mr. Barry testified to this or someone did.  Is it -- is it the case that the -- Dr. Burns and the company is trying to have a manuscript about the Phase 3 trials published in a scientific journal?

A.  Correct.

Q.  And where does that stand, as far as you know?

A.  In process.

Q.  Okay.  And Dr. Burns received a severance

Page 184

package of $500,000 made in quarterly payments -- quarterly installments over 12 months; is that right?

A.  Correct.

Q.  So a total of $500,000 that has now been fully paid out; is that right?

A.  Correct.

Q.  And then the Burns agreement also provided for a general release of claims against the company subject to certain extension -- exceptions; is that right?

A.  Correct.

Q.  And Dr. Burns is subject to a one-year noncompete and a two-year nonsolicit and indefinite nondisparagement and confidentiality covenants; is that right?

A.  Sorry.  Let me -- yes.

Q.  What is your personal understanding, if any, of the meaning of the nondisparagement clause?

A.  Nondisparagement is a conventional term where my -- to me, that means -- I'm sorry.  Is it mutual?  Let me read.  It means that Dr. Burns would not say disparaging remarks against the company.

Q.  And as far as you know, does Dr. -- Mr. Barbier have a similar covenant or -- or clause in his separation agreement?

A.  I don't know that he has a separation

Page 185

agreement.  He resigned from the company.

Q.  Was there any agreement under which the severance compensation was paid out under?

A.  Yeah.  It was under his employment contract.

Q.  Okay.  And as far as you know, there's not a subsequent agreement that the company entered with Mr. Barbier that is currently in effect?

A.  Correct.

Q.  And as far as you know, does the company have any nondisparagement obligations towards either Dr. Burns or Mr. Barbier?

A.  Obligations?  Not that I'm aware of.  I'd have to read her -- her agreement, but not that I'm aware of.

Q.  Okay.  Can you turn to page 63?  And there's a bold heading on page 63 that reads, quote, The validity of aspects of the company's Phase 2b study has been called into question.

Do you see that?

A.  Yes.

Q.  And I believe you referenced this yesterday.  This is the disclosure related to the issues that the company discovered about the conduct of the Phase 2b study; is that fair?

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

A. That is -- that is correct. The potential conduct, but yes, the conduct of the Phase 2b study.

Q. Well, the company does know today that Dr. Burns sent an email to Dr. Wang that potentially unblinded him; right?

A. Yes.

Q. Okay. And the reference to the ad hoc investigation committee and that capitalized internal investigation, do you see that?

A. Yes.

Q. Those are referencing the independent committee of the board and the investigation that they oversaw with the assistance of counsel, Orrick and/or Gibson, that we've been talking about occasionally over the past two days. Is that right?

A. Yes. And -- except to clarify again, I'm -- I'm not sure if it was one committee through the whole process or one committee and then a reconvened committee. I just don't know the answer.

Q. Okay. Okay. And it says -- sorry. At the end, "Accordingly, in light of the foregoing uncertainties and allegations, you should not rely on the CUNY bioanalysis of CSF biomarkers reported by the company in connection with the Phase 2b study or the cognitive disclosures from the Phase 2b study."

Page 187

Do you see that?

A. Yes.

Q. And that is the company's position today; right?

A. Correct.

Q. Do you recall when the company first made that disclosure about not relying on those two aspects of the Phase 2b study?

A. My belief is that would be the July 1st, 2024 8-K disclosure.

Q. And it's been the company's position since that disclosure was made to the present?

A. Correct.

Q. Shortly after the company filed the defamation action in November of 2022, the company closed an approximately 50-million-dollar capital raise. Is that right?

A. Yes.

Q. Were you involved in that?

A. Yes.

Q. What can you tell me -- or strike that.

Can you describe that capital raise?

A. In -- sorry. Describe it. Sure. You know, raising capital is a -- is a complex subject for public companies. It's something that Mr. Barbier and --

Page 188

Mr. Barbier and I would discuss on a regular basis.

Sometimes the company might need capital, sometimes there might be an opportunistic time where bankers reach out and say, Hey, you know, we've got some investors. The process would go -- you know, you cannot do a capital raise. It's a board of directors decision, so you'd have to either have a board of directors meeting or a unanimous written consent.

Once you do that, you engage bankers. You do -- there's lots of different ways to raise money. I believe that was a registered direct offering where you -- it's confidential. It's not a publicly marketed offering where they go to a select group of investors. You bring them over the wall, so to speak, wherein they're under confidentiality for a set period of time, so that they are saying they will not tell the company's raising money. You go through the process.

You know, with -- it's generally the bankers leading it and at the end, when the board authorizes a capital raise, they generally -- they did put an ad hoc committee of the board to approve the raise. Once that happens, the company sells shares, receives proceeds, and we raised $50 million.

Q. And what do you recall specifically about the process of that capital raise and the investors or

Page 189

potential investors who participated? I can mark a document. I'll mark as Exhibit 173 ...

(Exhibit 173 was marked.)

Q. Here you go. Do you recognize this -- do you recognize Exhibit 173?

A. I do.

Q. And what is it?

A. It's the 8-K and exhibits to the 8-K filing from the -- November 18th, 2022, where the company raised $50 million.

Q. And so the company entered this agreement raising $50 million approximately on November 18th, 2022, which was approximately two weeks after filing the defamation action; right?

A. Yes.

Q. And H.C. Wainwright served as the placement agent; is that right?

A. That's right.

Q. And these were institutional investors; is that right?

A. Yes.

Q. And you described earlier, there's a period where the select investors are confidentially informed about the offering and given a chance, I take it, to do some diligence, and decide whether or not to participate

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

and by how much?  Is that fair?

A.  Yes.

Q.  And so approximately when, if you know, did the process for raising these funds begin?

A.  Approximately -- these deals are generally done very quickly, so it would have been within, you know, a week at the outside.  They're usually done in two or three days.

So if there's an engagement letter, there's other materials I could refer to figure out when it started, but it would have been within a few days -- a few days prior to November 18th.  Sorry.  Yeah.  So the 18th is a culmination of the offering, so within a week prior to that.

Q.  That's the -- within a week prior to that, it would have been opened up to the institutional investors -- potential investors; right?

A.  That would be the normal time frame for it.

Q.  And prior to that, what would the company's process have been with respect to engaging H.C. Wainwright to explore and market this potential offering?

A.  A typical -- I don't specifically remember this process, but, typically, it would be, you know, negotiating a fee arrangement with them.  Having them, you know, present why -- you know, why they think market

Page 191

conditions are favorable.

There's a lot of diligence that's done.  You'd look at other deals done around that time to find out what discount -- what prevalent discounts are.  You're -- essentially, as a company, you're trying to figure out is -- is it a favorable market window in general, and then what specifics, you know, does the company have to bring to play.

Q.  And so for this November 2022 capital raise, assuming it followed the ordinary sequence or cadence for this type of raise, approximately when would it have started with the company?

A.  When would -- when would it have started with the company?  When would discussions with Wainwright have started?

Q.  Yeah.

A.  Not much before a week before, if any.  I'm saying, you know, there would be an engagement letter, but these things happen very, very quickly.  This doesn't happen over a period of months.

Q.  Do you recall any discussions with anyone about the defamation action potentially helping the company raise capital?

A.  No.

Q.  Did the defamation action help the company

Page 192

raise funds?

A.  In my opinion, it would be a nonevent as far as this raise went.

Q.  Do you know whether or not any of the institutional investors or the potential investors who participated in this raise asked any questions about the citizens petition or the allegations of data manipulation that had been made starting in around August of 2021?

A.  I don't recall.

Q.  Is that something that you have heard from potential investors as part of their due diligence, questions about these allegations?

A.  Yeah.

MR. CAMPBELL:  Object to form.

A.  Did you -- so questions about the citizens petition, yes.  Questions about the defamation action, I don't recall those.  That -- again, that was a -- a minor, minor thing.  The citizens petition was a major item that investors were interested in.

Q.  (By Mr. Kumagai)  So you do recall hearing from investors or potential investors questions about the citizens petition and allegations of data manipulation against the company?

A.  I don't recall that in the context of the raise specifically, but you're -- I think you said in

Page 193

general, was that a topic of discussion.  And absolutely, it was a topic of discussion.

Q.  Do you know one way or another whether it was a topic of discussion with any of the investors or potential investors who participated in this November 2022 raise?

A.  I don't recall.

Q.  Based on your experience, would these sorts of raises -- do you expect that it would have been a topic of conversation?

A.  Yes.

MR. CAMPBELL:  Object to form.

MR. KUMAGAI:  Okay.  We should take a break.

VIDEOGRAPHER:  Going off the record at 2:57.  This marks the end of Media 5.

(Recess taken, 2:57 p.m. to 3:06 p.m.)

VIDEOGRAPHER:  This marks the start of Media 6 of the video deposition of Eric Schoen.  We're back on the record.  The time is 3:06.

Q.  (By Mr. Kumagai)  Mr. Schoen, were you personally involved in any of the scientific journal investigations into Dr. Wang's or Dr. Burns' research papers?

A.  No.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

Q.  Were you involved in any discussions or meetings at the company where there was a discussion of the scientific journal investigations into Dr. Wang or Dr. Burns?

A.  Not that I recall.

Q.  Were you personally involved in any discussions about the FDA's inspection of Dr. Wang's lab?

A.  Other than being aware of it, no.

Q.  And how did you personally become aware of it?

A.  Somebody -- I don't remember who, you know, came to my office to say the FDA is at -- at CUNY and Dr. Wang's lab and security won't let them in is why it sticks out in my head, which is not the proper reaction from City University of New York.  But I don't remember specifically who that person was.

Q.  Do you recall what you then did in response to that?

A.  I didn't do anything.

Q.  Do you recall what happened after -- do you have personal knowledge of what happened after that person came into your office and told you about that?

A.  Personal knowledge, no, I don't.

Q.  Were you personally involved in any discussions about the FDA's instruction in November of

Page 195

2022 to remove the Phase 2b biomarker data from the investigator's brochure that we discussed yesterday?

A.  Can you say the first six words of that?

Q.  Sure.  Did you have any personal involvement in any discussions about the FDA's instruction in November of 2022 to remove the Phase 2b biomarker data from the investigator's brochure?

A.  Not that I recall.

Q.  Did you have any personal involvement in the audit of Dr. Wang's lab that Cassava conducted in September of 2022?

A.  No.

Q.  Do you recall any discussions that you had with anyone about that audit?

A.  Not that I recall.

Q.  Were you personally involved in any discussions about the CUNY report that was published by Science magazine around October of 2023?

A.  I'm sorry.  Can you repeat that question?  I didn't hear the start of it.

Q.  Were you personally involved in any discussions about the CUNY report that was published by Science magazine around October of 2023?

A.  None that wouldn't involve counsel.

Q.  And do you, sitting here today,

Page 196

specifically remember the substance of discussions that you had with counsel about that CUNY report?

A.  I don't remember the substance, but I do believe I --

MR. CAMPBELL:  Hold on.  Just yes or no.

A.  Repeat.  I'm sorry.

Q.  (By Mr. Kumagai)  So no, you don't remember the substance of any discussions you had with counsel about the CUNY report --

A.  Correct.

Q.  -- right?  Do you recall any discussions about the DOJ's indictment of Dr. Wang in or around June 2024?

A.  I'm sorry.  Do I recall discussions?  I -- I remember vividly being informed of -- of that.

Q.  And what do you remember about that?

A.  Chris Cook called me and let me know.

MR. CAMPBELL:  If it's a conversation with Chris Cook, it's -- if it's related to -- if he gave you something that is giving you information related to legal advice or asking you for information related to legal advice, that is privileged.  So just be cautious about conversations with Mr. Cook.

A.  Thank you.  No.  Mr. Cook called me to advise me that Dr. Wang had been indicted.

Page 197

Q.  (By Mr. Kumagai)  And what was your reaction to that?

A.  I was surprised and I was really unhappy because I was on vacation on the other side of the world and I had to get back to Austin.

Q.  And where were you at the time?

A.  Santorini, Greece.

Q.  And then Mr. Cook called you and then you flew back to Austin; is that right?

A.  Yes.  I think the -- that was a Friday.  I flew back on a Sunday.

Q.  And then what happened?

A.  I'd have to look at my calendar, but I think the Monday was July 1st?  Would that be --

Q.  Sounds about right.

A.  So then what happened?  We issued -- subsequent to my return, we issued a Form 8-K.

Q.  July 1st, 2024, was a Monday.  And so you issued the 8-K on that Monday after flying home from --

A.  Correct.

Q.  -- from Greece.  Do you -- can you describe the substance of any of those conversations that you were involved in between the time Mr. Cook notified you and the time the 8-K was filed on the Monday without revealing advice from counsel or requests for advice?

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

Page 198

A. To my knowledge, I wasn't involved in any conversations. I was in transit.

Q. Who drafted the 8-K disclosure that was made on July 1st?

A. I -- I don't know who drafted it.

Q. Okay. And were you personally involved in any discussions about the SEC complaint and settlement that was announced on or around July of 2024?

A. I was aware. I wasn't personally involved in any of the negotiations or discussions, but in -- anything I was aware of would have been through discussions with counsel.

Q. And so aside from discussions with counsel, do you recall discussing the SEC charges or settlement with anyone else?

A. Not that I recall.

Q. Do you personally believe that the simufilam research that Dr. Burns and Dr. Wang conducted is reliable?

MR. CAMPBELL: Object to form.

A. Personally, yes, I do.

Q. (By Mr. Kumagai) And what makes you say that?

A. I've been at the company for seven years. I've seen a body of evidence that all points towards the

Page 199

same thing, that the drug has validity to it. I'm trying to pick my words carefully because it failed two Phase 3 trials, which is a big thing.

But prior to those failing, I had great faith and belief in the drug. And to this day, I still think the drug has potential in other indications, again, based upon not one thing but a body of research.

So Dr. Wang's research clearly has more questions in it because of the allegations of potential unblind -- potential unblinding. But I have no reason to doubt the -- the research of Dr. Burns.

Q. Well, wasn't part of the same disclosure that you made and the same findings about the unblinding of Dr. Wang -- there was a discussion of the exclusions of data that Dr. Wang -- or Dr. Burns -- excuse me -- had conducted and -- and the SEC alleged, at least, was materially misleading?

MR. CAMPBELL: Object to form.

A. Yeah. You're asking me in my personal capacity, but my understanding and knowledge of that is it was a disclosure issue rather than a -- it was a disclosure issue. Dr. Burns settled on that for a negligence charge. Or negligence -- did not admit, did not deny. I don't have any reason -- you know, you're asking me personally. I don't have any reason to doubt --

Page 200

I think your question was the integrity of Dr. Burns' research. I don't.

Q. (By Mr. Kumagai) And when you say that you still believe the simufilam research is reliable -- strike that.

What impact, if any, have the findings from the internal investigation of the company, the indictment of Dr. Wang and charges by the DOJ, the SEC charges -- what impact have those events had, if any, on your personal view on the reliability or integrity of the simufilam research?

MR. CAMPBELL: Object to form.

A. So, in my opinion, you know, there are open questions on the Phase 2b biomarker research because of the potential unblinding. That's without question. I place no reliance on that.

But all of the other inquiries and investigations that you're referencing don't impact negatively my view of the credibility of simufilam's research. I'm -- me personally, I'm a believer. I probably wouldn't still be CFO of the company if I didn't believe that the drug has a potential value for patients.

Q. (By Mr. Kumagai) And what impact, if any, did the failure of the Phase 3 trials have on your view on the -- about the reliability or integrity of the simufilam

Page 201

research?

A. I knew going in -- me personally -- that Phase 3 programs in Alzheimer's are really, really hard, even with all of our positive -- I'll call it data. My belief got even larger in the drug, you know, with the blinded data that we had access to.

So the failure of the Phase 3 trials has led me to question, you know, elements of the program. You know, the -- the Number 1 question I get as investor relations is tell me why the drug failed when all of the things leading up to it looked so positive.

But that's not a question that I -- a CFO -- I don't know if the company will ever know, but it leads me to wonder did we get the right patients, did we get the right dose, is simufilam not right for Alzheimer's.

I, you know -- it -- I've lost your original question, even though I probably have answered it.

Q. Does the fact that the drug failed in the Phase 3 trials in conjunction with the discoveries from the internal investigation, the charges by the DOJ, the SEC charges -- make you have any doubt whatsoever in whether or not the science underlying simufilam was made up?

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

MR. CAMPBELL:  Object to form.

A.   No.  I look -- I've -- I believe the sci -- the science and the work done -- the scientific work done has always been credible, with the one exception of the Phase 2b study that's in -- in question.  And the allegations and investigations don't cause me any pause because I'm -- I'm an insider.  I worked with people.  I know the years of work that's been put in.  So I look at those as completely separate things.

So the drug failed in Alzheimer's, but the investigations by the Government or the citizens petition, to me, that was noise.  You know, the drug was either going to work or not and had a legitimate chance to work.  It failed Phase 3.

Q.   (By Mr. Kumagai)  So is it really your testimony, sitting here today, that the Department of Justice's charges against Dr. Wang that he falsified and fabricated his research data -- does not give you pause as to the reliability or integrity of the simufilam research?

MR. CAMPBELL:  Object to form.

A.   Again, I have now completely discounted Dr. Wang's work in the Phase 2b study, but it doesn't give me pause as far as the whole simufilam program, if you will, because of all the work that was done independent of Dr. Wang.

Page 203

To me, you know, you're asking me my faith and credibility.  The open label study that was done with the cognition endpoints, you know, that's the big thing.  That was why I became a -- you know, prior to that, you know, we were a company with some good preclinical work and some good biomarkers, you know, in small studies.  But the open label study is what cemented my belief in the drug.

Q.   (By Mr. Kumagai)  And that was a nonblinded study; right?

A.   Open label.  Correct.  Nonblinded.

Q.   Yesterday, you testified about how important blinded studies are to the reliability of results; right?

MR. CAMPBELL:  Object to form.

A.   Correct.  To show efficacy.  Any kind of open label study rightfully should have criticisms, so, you know, is there study bias, is there a placebo effect, which is very real.  So you always, you know -- you could put an asterisk next to it, but the open label study I'm referring to was not a -- well, it was small, but not -- you know, it had over 200 patients in it.  It was run over a period of years.  It did have a component to it -- a six-month period that we referred to as the cognition maintenance study that was blinded.  It was a withdrawal

Page 204

study, which is different, meaning some people stayed on the drug who were on the drug and some went to placebo and even those results were favorable.

So yes.  Even though it was open label, me personally, a nonscientist, have -- have always believed the program to be credible, with the exception of Dr. Wang's work, potentially, in the Phase 2b.

Q.   (By Mr. Kumagai)  And so it was the open label study results that really cemented your view of the reliability and integrity of the simufilam research?

A.   Yes.  To add to that, though, you know, I was privy to blinded data from the Phase 3, which turned out to be -- I want to say not correct.  The blinded data was correct, but our interpretation of the blinded data was incorrect.  But it was the open label study that -- that cemented my belief in it.

Q.   And when did the results of that study come out?

A.   The -- the results were rolled out over time.  It was 50 -- the first 50 patients who went through -- I believe it was six months, nine months, and twelve months of open label treatment.  Then we had cognition maintenance study results.  And then, finally, patients over a two-year period.  And I believe the final results were February of 2024.

Page 205

Q.   I'll mark as Exhibit 174 a document Bates-stamped CASSAVA_001225354.

(Exhibit 174 was marked.)

MR. KUMAGAI:  Do you mind sharing?

MR. CAMPBELL:  Thanks.

MR. KUMAGAI:  Sorry.

Q.   (By Mr. Kumagai)  Do you recognize Exhibit 174?

A.   I don't recognize it, but I can tell you what it is.

Q.   What is it?

A.   It looks like a draft clinical research protocol for PTI-125-09.

Q.   And what was that study?

A.   The 09 study -- I remember -- make sure I get this --

Q.   I think the heading underneath there --

A.   It's an -- it's an open label extension of PTI-125-04.  The 09 study -- what I can't remember is what encompassed the cognition maintenance study piece, but we allowed people who participated in our open label study to continue on the drug, both so we could study the safety of the drug and we may have -- I don't know if we continued to follow cognition.

Q.   And this was a -- appears to be an

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

amendment to the protocol for this study that was made on September 18th, 2024.

Do you see that at the top?

A. Well, so -- I don't -- I don't deal in protocols much, so I can't tell if this is a final version because it's all red-lined. Is it --

Q. So are you familiar with the clinical trial gov website?

A. Yes.

Q. And that's where Cassava publishes or provides these protocols and anytime an amendment is made, provides a red-line of changes to the protocol?

A. Okay. So this is a final -- this is the final amendment from clinicaltrials.gov. Okay.

MR. CAMPBELL: Is that what you're representing, Dave?

MR. KUMAGAI: Yes.

MR. CAMPBELL: Okay.

Q. (By Mr. Kumagai) Okay. And so if you turn to the page ending with the Bates 356 --

A. Okay.

Q. -- do you see under -- there's a Section 2.1, "Mechanism of Action"?

A. Yes.

Q. And you see there's a lot of crossed-out

Page 207

language?

Do you see that?

A. Yes.

Q. Do you know why these changes were made to the protocol for this study?

A. No, I don't.

Q. Do you know why Cassava deleted the sentence that begins, Simufilam binds with phentomolar affinity to an altered confirmation of filaman A"?

A. I'm sorry. Where am I --

Q. It's the second sentence of "Mechanism of Action." It's the first crossed-out sentence.

A. No, I don't.

Q. Do you know why the company deleted the sentence, "Simufilam binding reverses the altered filaman A confirmation and restores filaman A's native shape"?

A. No, I don't.

Q. Do you believe, sitting here today, that simufilam binds to an altered confirmation of filaman A?

MR. CAMPBELL: Object to form.

A. My personal belief is that simufilam interacts with the altered form of filaman A. Binds is a specific scientific term that I -- I don't know. So I -- do I believe it binds? It could, but I don't believe it does. And so I don't -- I don't know if it does. That's

Page 208

a better way to say it.

Q. (By Mr. Kumagai) And if you look at the bottom of the paragraph or where the crossed-out text ends, there's a sentence that says, "Simufilam, through actions involving filaman A, prevents amyloid beta" and then continues.

Do you see that?

A. Yes, I do.

Q. Is that more consistent with your current view of what simufilam does?

A. Yes.

Q. And what does it mean -- what does "through actions involving filaman A" mean to you?

A. It means to me -- it means interacts.

Q. What actions specifically, if you know?

A. Well, my scientific -- scientific -- scientific depth is not good, but I've always -- I've been in enough of the presentations that, you know, something binding with something is a direct interaction. You could have an indirect interaction where the simufilam -- simufilam impacts something next to or associated with this altered filaman A, so the end result might be the same, but the how could be different.

So that's what I -- that's how I, as a layman, would interpret "through actions involving filaman

Page 209

A."

Q. Okay. If you turn to page -- the page ending in 357, there's a section titled 2.3, "Clinical Studies."

Do you see that?

A. Yes.

Q. And you'll see -- you see the text deleted is a description of biomarkers. Do you see that? Let me -- let me -- strike that. Let me rephrase the question.

The first paragraph under 2.3 refers to the Phase 2a study.

Do you see that?

A. Yes. Can I just ask you: What's the date of this?

Q. January -- or excuse me. September 18th, 2024, is the date.

A. Okay.

Q. Why do you ask?

A. It -- it's relevant to -- for me to know, you know, when this -- when this document was filed or when this document came from.

Q. Okay. So you see, looking back at the page ending 357, the first paragraph under "Clinical Studies," there's a description of the Phase 2a study.

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

Do you see that?

A. Yes.

Q. And it appears the revisions here deleted the prior descriptions of the biomarker results so that the paragraph refers only to the safety results; is that --

A. Yes.

Q. -- fair? Do you know why those changes were made?

A. Well, if this is a document in September 2024, and we said on July 1st, 2024, that you shouldn't rely on the -- this is Phase 2a or Phase 2b?

Q. It's Phase 2a.

A. Phase 2a. Then I don't know why it would be removed. If it was Phase 2b, I --

Q. Okay. If you look at the next paragraph, it describes the Phase 2b study.

Do you see that?

A. Yes.

Q. And again, it appears as though the company deleted the efficacy findings such that the paragraph is limited to the safety findings. Is that fair?

A. Yes.

Q. Do you know why they did that?

A. I do not know why specifically.

Page 211

Q. Do you have a sense as to why these changes were made?

MR. CAMPBELL: Object to form.

A. Well, I -- you know, I -- the -- part of the disclosure was for the SEC with the -- on July 1st was issues with the cognition data, so it would be -- it would make sense to me to remove it from our clinical pro -- research protocol.

Q. (By Mr. Kumagai) And the disclosure was that the company was saying you should not rely on the cognition data or the biomarker data from the Phase 2b study; right?

A. Right. So that -- that that would be a reason for me to say to take it out.

Q. Okay. And if you look -- if you'd turn to the page ending 367 under "References."

Do you see that?

A. Yes.

Q. You see the company has deleted as a reference Dr. Wang's 2020 article in the Journal of Prevention of Alzheimer's Disease?

A. Yes, I do.

Q. You see the company has also deleted Dr. Burns' and Dr. Wang's 2017 article in the Journal of Neuroimmunology and Neuroinflammation?

Page 212

A. Yes, I do.

Q. Do you see the company has also deleted Dr. Wang and Dr. Burns' 2017 paper in the journal Neurobiology of Aging?

A. Yes, I do.

Q. And do you see the company has also deleted Dr. Wang's article published in the Journal of Neuroscience?

A. Yes, I do.

Q. Do you know why the company deleted reference in its clinical protocol to those four research papers?

MR. CAMPBELL: Object to form.

A. I don't know specifically.

Q. (By Mr. Kumagai) Do you have a sense as to why those deletions were made?

MR. CAMPBELL: Object to form.

A. Well, Dr. Wang was indicted by the Department of Justice, so if -- if -- I don't have any specific knowledge, but if -- I think it would be prudent to remove references to his research if he's under indictment from the Department of Justice and has not yet been to trial.

Q. (By Mr. Kumagai) Why?

MR. CAMPBELL: Object to form.

Page 213

A. Because he's under indictment and accused of wrongdoing. So as a responsible company, you certainly wouldn't want to reference, in a clinical protocol, his -- his work until he's had his -- his day in court.

Q. (By Mr. Kumagai) Well, if you look at footnote 1 that is still remaining, there's a paper by Dr. Wang, Dr. Jockers, and Dr. Burns. Just a 2023 paper.

Do you see that?

A. Yes, I do.

Q. How do you explain that?

MR. CAMPBELL: Object to form.

A. Well, I'm not -- if you ask six of those questions, I won't know the answer. And this one, I think I do. But I know that Dr. Jockers was a scientist in France who ran an experiment that was done totally independent of Dr. Wang. You wouldn't -- I shouldn't -- stop speculating. But I wouldn't have -- he hasn't been deleted from history. He's been accused of something. So if -- if you had Eric Schoen, which you shouldn't have, doing a clinical protocol, if he didn't have anything to do with an experiment, but is an author on a paper, that's no reason -- that's especially no reason to take that out of a clinical protocol.

If it's his Phase 2b experiment that he ran and it's in question, you would absolutely take it out.

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

Q.   Are you aware of the exclusion criteria that Dr. Jockers applied to the studies he conducted and reported in that 2023 paper?

A.   I am not.

Q.   Are you familiar with -- strike that.

Are you aware that he excluded between 30 percent and 40 percent of the data from the findings he reported in that paper?

A.   I am not.

Q.   Do you know whether the company is continuing to cite and rely on this paper by Dr. Jockers in submissions to the FDA or other Government authorities?

A.   I don't know the answer to that.

Q.   Do you know whether the company has done anything at all to assess whether that paper by Dr. Jockers is reliable?

MR. CAMPBELL:  Object to form.

A.   I don't know.

Q.   (By Mr. Kumagai)  Do you think the company should confirm the reliability of that paper by Dr. Jockers if it continues to cite the paper in submissions to the FDA and other authorities?

MR. CAMPBELL:  Object to form.

A.   Me answering in my personal capacity, I would see no reason.  There's been no question that I know

Page 215

of of Dr. Jockers' work.

Q.   (By Mr. Kumagai)  Well, I'm raising a question right now.

A.   Other than from you.

Q.   Okay.

A.   By that analogy, you would go back and redo and re-examine everything in the history of -- of the company, which just isn't -- isn't feasible or practical.

Q.   Well, if you're aware of the possibility that this paper by Dr. Jockers applied a potentially improper 30 percent or 40 percent exclusion rate to the studies in the findings it reported, wouldn't you personally want to go back and check whether or not that was true?

MR. CAMPBELL:  Object to form.

A.   You just injected the words "potentially improper."  That's the first time I've heard that.  If a -- if a reputable scientist brought that to the company's attention and our scientific people thought that the questions were valid, then yes, I think it would be prudent to re-examine the work.

Q.   (By Mr. Kumagai)  Have you had any conversations with Dr. Bordey or anyone about the reliability of that paper by Dr. Jockers?

A.   I have not.

Page 216

Q.   Do you personally have any regrets about the way that Cassava has conducted its simufilam clinical program?

A.   Regrets?  Generally, yes.  I -- you know, our two Phase 3 trials failed.  Well, as I've said before, I'm a believer in the drug, so -- the trials failed.  That's full stop.  I regret that we didn't have a different clinical program that may have been successful.

Q.   Do you personally feel like the company let anyone who participated in that program down?

A.   No.  It's -- it's an experimental program.  There's no guarantees of success, so you're not letting them down.  You're giving them -- you're giving patients hope, which is a good thing, but they're told in advance, you know, this is an experimental drug, so you're not letting a patient down.

I mean, we -- I'm disappointed.  I feel bad for all Alzheimer's patients, but specifically to the patients in the Phase 3 trial no different than I do for anybody else.

Q.   You personally don't have any concerns whatsoever that the company has given these Alzheimer's patients false hope based on a drug that was potentially, as the DOJ alleges, based on fabricated and falsified science?

Page 217

MR. CAMPBELL:  Object to form.

A.   Yeah.  No.  I don't.

Q.   (By Mr. Kumagai)  Why not?

A.   You use the word "false hope."  I think that's unfair.  You know, when you go into a clinical trial, you're doing it for two reasons.  You are going to be hopeful, but the company never said -- to give someone false hope, in my view, the company would have had to come out and say this drug works, this -- you know, that's when you're setting an unreasonable expectation.

What the company said is, Here's a body of research, here's our safety database, your physician is prescribing this for you.  That's not a -- a company action.  You know, false hope -- if you use different words, I would say yes, but false hope, no.

Q.   What words would you use?

A.   I mean, I am disappointed for the Phase 3 trial patients and for all Alzheimer's patients that we did not prove an efficacious drug to help people and mankind.  That is very disappointing.

But do I feel -- I forget the words you used -- bad about giving false hope, I -- I don't believe that the company gave people false hope.

Q.   Well, the company did tell the world and patients that simufilam binds filaman A; right?

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

A. Okay.

Q. They did do that; right?

A. Yes.

Q. Now, after the thousands of people participated in the trials, the company is saying simufilam potentially interacts with filaman A; right?

A. Okay.

Q. Isn't that right?

A. Yes.

Q. And so your testimony here today is that you don't personally feel any guilt or regret about that change in position after the clinical trials ended?

A. Guilt, no. Regret, I regret that the drug failed. But what you're making an analogy is just -- it's not -- it doesn't -- it doesn't follow through. If simufilam binds filaman A, that's not an efficacious therapeutic drug for Alzheimer's disease.

Those aren't the same thing. That's a scientific observation; one that -- you know, the company still believes that simufilam interacts with filaman A. But if you came to me and said I've got a drug that binds filaman A, I would not conclude you've got an efficacious drug for Alzheimer's disease.

Clinical trials, when you're a participant, you are warned up, down, and sideways that this is an

Page 219

experimental drug, you may get a placebo. You have no chance of it working.

So false hope, you know, you -- you're on -- on -- it's -- it's -- Alzheimer's disease, it's -- it's irreversible. These people are going to die from Alzheimer's disease, a slow and horrible death.

So false hope, first, you've got to pass the barrier of did I get the drug and then does the drug work, you know -- no. I don't -- I don't see it. You're asking me personally, and I don't see it that way.

Q. The people who participated in your Phase 3 trials could have participated in other drug trials if they were not participating in the simufilam trials; right?

A. Yes.

MR. CAMPBELL: Object to form.

Q. (By Mr. Kumagai) And the people who enrolled in the Phase 3 trials did so at a time when the company was telling them and the world that simufilam's mechanism of action in Alzheimer's disease is that it binds filaman A; right?

A. Up to a point in time, yes, and there are public statements.

Q. And now today, the company's position is that simufilam potentially interacts with filaman A;

Page 220

right?

A. Yes.

Q. And your testimony is that you don't feel any regret whatsoever about signing people up to these trials who could have participated in other trials based on a statement about the drug's mechanism of action that the company no longer stands behind?

MR. CAMPBELL: Object to form.

A. No. I don't regret that because binding filaman A is not the reason -- that is not an efficacious drug for Alzheimer's disease. That's not the reason that I -- again, you're asking me personally. I'm not a scientist. That's not the reason I thought simufilam was effective.

Simufilam, I believe, had a -- could be therapeutic is because of the -- the cognitive -- cognition evidence generated by the open label study specifically.

You know, to me, I wouldn't care if it -- you know, what it -- what it binds to. Does it work or does it not work? So not important to me.

Q. (By Mr. Kumagai) And the answer is that it doesn't work based on the Phase 3 trials; right?

MR. CAMPBELL: Object to form.

A. No. The answer is the Phase 3 trials

Page 221

failed. That is different.

Q. (By Mr. Kumagai) What is your personal view about whether simufilam works as a treatment for Alzheimer's disease?

A. My personal view is it could be a potentially -- a potential treatment for Alzheimer's disease.

Q. And that's based on the open label study?

A. It's based upon the open label study and all of the evidence that was discussed over the last couple days.

So the Phase 3 trials failed, but that's very different than saying simufilam doesn't work in Alzheimer's disease. Those are not the same thing.

Q. Do you think Cassava has negatively affected the public's perception of Alzheimer's disease -- or research? Excuse me.

MR. CAMPBELL: Object to form.

A. That Cassava has negatively -- no.

Q. (By Mr. Kumagai) What makes you say that?

A. If you Google Cassava or asked about Cassava to people in the context of Alzheimer's disease, there would absolutely be a negative connotation. We did have an SVP of neuroscience that negligently sent an email that could have been used to unblind. That's not good,

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

either.

But in the context of Alzheimer's disease, we're a drug development company. We had a drug that we had a very good reason to think could be efficacious. We put it out to the market. If the citizens petition had never been filed and your clients hadn't spread false and defamatory information about the company, the trial would have continued and it would have failed, and the world would have said, God bless you, good try. You know, you were trying to help people. You gave it your effort.

So no, I don't think Cassava has paled but for the defamation of your clients and the citizens petition and all the noise that that's created. I think Cassava has -- we were not successful in our mission, but we certainly gave it, you know -- gave it our all.

Q. When you say that if you ask people in the context of Alzheimer's disease, Cassava would absolutely have a negative connotation, what do you mean by that?

A. If you Google Cassava, you would get allegations of fraud, you would get -- if you looked it up on social media, you'd probably still see CassavaFraud.com. That's a negative connotation, you know, in and of itself, rather than a company that, you know -- almost every company that's tried an Alzheimer's trial has failed. They -- you know, they don't have the

Page 223

same negative connotation as I believe -- again, my personal -- my personal feeling, Cassava Sciences has given all of -- of where we are.

Q. And is it your view that Cassava's negative connotation or reputation is entirely attributable to our clients and the other short sellers?

MR. CAMPBELL: Object to form.

A. No.

Q. (By Mr. Kumagai) What else is it attributable to?

A. Well, your clients -- we had failed trials. If the trials had been successful, which we believed they would be, no one would care about any other -- again, I'm talking if you do a Google search. If we had an approved drug, anything else would be -- would be irrelevant.

Q. Do you think the indictment and charges against Dr. Wang has had a negative effect on Cassava's reputation?

A. Do I think so? Yes.

Q. And do you blame the indictment of Dr. Wang on our clients and other short sellers?

A. Do I blame? No, I don't blame your clients.

Q. And do you think the $40 million fine or settlement with the SEC and the charges the SEC made in

Page 224

its complaint have had a negative effect on Cassava's reputation?

MR. CAMPBELL: Object to form.

A. I think that you -- if you asked 20 knowledgeable people, you might get ten, it's had a negative effect and ten saying it's had a positive effect. The settlement -- so it depends what time you're talking about, too, because part of that was settlement with the SEC, change in leadership. You know, we settled the SEC on a negligence basis. Did not admit or deny. Settling with the SEC, in meetings with investors, many of them said that's great. You know, you're past that. You've got a new CEO. You know, it's looked at as a positive.

Q. (By Mr. Kumagai) Positive because they were expecting something worse?

MR. CAMPBELL: Object to form.

A. I don't know. I'm telling you -- you asked me a hypothetical question. I'm giving you my -- my best answer to it. What do I think.

Q. (By Mr. Kumagai) Well, how could a $40 million fine -- or settlement with the SEC and the SEC's charges against the company, its former CEO, and its senior vice president of neuroscience be viewed as positively impacting the company's reputation unless people were expecting something worse?

Page 225

MR. CAMPBELL: Object to form.

A. Well, expecting something worse, yeah, meaning -- sure. Sure. That's fair.

Q. (By Mr. Kumagai) And in your view, did the disclosures that Dr. Wang was potentially unblinded during his analysis of the Phase 2b data negatively affect the company's reputation?

A. Yes.

Q. And in your view, did the company's disclosure that Dr. Burns had excluded 40 percent of data from the cognitive results from the Phase 2b data negatively affect the company's reputation?

MR. CAMPBELL: Object to form.

A. Sorry. Is this -- do I think -- can you just repeat the question? I'd like to get it answered correctly.

Q. (By Mr. Kumagai) Do you think the disclosures about the cognitive results from the Phase 2b study that the company made in July of 2024 negatively affected the company's reputation?

A. Yes.

Q. Do you think that Cassava has had a negative impact on investors' willingness to support Alzheimer's research?

MR. CAMPBELL: Object to form.

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

A.   Do I think that -- I don't -- I don't have an opinion.  Probably more yes than no.

Q.   (By Mr. Kumagai)  What do you mean by that?

A.   Well, you're saying like investors' opinions.  Again, you're going to have people who think one way and who think another, and I think you'd have more who would think it would negatively impact their perception.

Q.   Do you think Cassava's conduct in filing the defamation action, sending legal letters to publications has negatively affected free speech when it comes to Alzheimer's research?

MR. CAMPBELL:  Object to form.

A.   No, I don't.

Q.   (By Mr. Kumagai)  Why not?

A.   Again, the company believes that free speech and scientific discourse is a normal part of things.  The defamation case was filed because we had short sellers who were saying false and defamatory lies that we knew to be not true, so we had a good faith basis to do it.  And the -- at the time, those things were impacting our ability to recruit sites and recruit patients for our Phase 3 trial.

So you're saying did that negatively impact people's view on -- no.

Page 227

Q.   Did you have any personal involvement in efforts to enroll the Phase 3 trials?

A.   No.

MR. KUMAGAI:  Could we just take a short, short break?

THE DEPONENT:  Sure.

VIDEOGRAPHER:  Going off the record at 4:00.  This marks the end of Media 6.

(Recess taken, 4:00 p.m. to 4:05 p.m.)

VIDEOGRAPHER:  This marks the start of Media 7 of the video deposition of Eric Schoen.  We're back on the record.  The time is 4:05.

Q.   (By Mr. Kumagai)  Mr. Schoen, we were talking earlier about the Phase 2b results; right?

A.   Yes.

Q.   And as of July 2024, the company issued a disclosure that said people should not rely on the cognition or biomarker results from the Phase 2b study; right?

A.   Yes.

Q.   So do you have any regrets that patients may have signed up for the Phase 3 studies based on those Phase 2b study results that the company no longer stands behind?

MR. CAMPBELL:  Object to form.

Page 228

A.   Yeah.  No, I don't have any regrets.

Q.   (By Mr. Kumagai)  And why not?

A.   Again, if -- in my view, if the Phase 2b -- which we still don't know, you know, what happened in it -- was the only thing, was the only study that was in the investigator's brochure and the only thing people were relying on to go into the Phase 2b, I would have regrets.

But again, Phase 2b was part of an entire body of -- of evidence supporting the potential, you know, efficacy of -- it was possible that simufilam could be efficacious, so, you know, removing one piece from that body of evidence, unless you had a line of patients who told me the only reason I joined was the Phase 2b results, then I would regret it, but, again, I believe the open label study, to me, is, by and large, the best piece of scientific evidence for people.

So no, I don't have regrets.

Q.   Isn't it true that the Phase 2b results were the only results that Cassava claimed to have statistical significance?

A.   I don't know --

MR. CAMPBELL:  Object to form.

A.   I don't know the answer to that.

Q.   (By Mr. Kumagai)  And so you don't know one way or the other whether or not patients signed up for the

Page 229

Phase 3 trials based on the Phase 2b results?

A.   I do not know that answer.

Q.   And yet, your testimony is still that you have no regrets that patients may have signed up for the Phase 3 studies based on the Phase 2b results that the company no longer stands behind?

MR. CAMPBELL:  Object to form.

A.   Yeah.  I don't have regrets, no.

Q.   (By Mr. Kumagai)  Do you feel bad at all for the patients who may have signed up for the Phase 3 studies based on Phase 2b data that the company no longer stands behind?

MR. CAMPBELL:  Object to form.

A.   Yeah.  If -- again, if a patient came and said to me, I signed up solely because of the Phase 2b results, sure, I would feel bad.

Q.   (By Mr. Kumagai)  But otherwise, no?

A.   Otherwise, no.

MR. KUMAGAI:  Okay.  Subject to any questions opposing counsel may have, that's all my questions.

MR. CAMPBELL:  I just have a few.

EXAMINATION

BY MR. CAMPBELL:

Q.   The FDA authorized the Phase 3 study to go

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

forward based on the available evidence; is that right?

A. Yes, they did.

Q. I want to take a look at Exhibit 173, I think. It was the clinical research protocol. Maybe it's 174.

MR. KUMAGAI: I just want to interpose the objection to form to the first question.

Q. (By Mr. Campbell) So this is a document Mr. Kumagai asked you about that I believe you had not seen before; is that right?

A. That's correct.

Q. And he asked you about why a number of changes to this document were made. Do you recall that?

A. Yes, he did.

Q. And he asked you questions about why things were deleted?

A. Yes. Why I -- I thought they were deleted.

Q. Okay. Taking a look at, for example, page 6 of 55, marked at the bottom --

MR. KUMAGAI: Objection to form.

Q. (By Mr. Campbell) -- 359 -- do you see that?

A. Yes, I do.

Q. Okay. There's a section on "Food Effect and Bioequivalent Study" that's deleted.

Page 231

Do you see that?

MR. KUMAGAI: Object to form.

A. Yes, I do.

Q. (By Mr. Campbell) And it addresses -- or it addressed, before it was deleted, the significant difference between fasting, low fat, or high fat meals on AUC last.

Do you see that?

MR. KUMAGAI: Objection to form.

A. Yes, I do.

MR. CAMPBELL: Objection to whether he sees that?

MR. KUMAGAI: I'm lost as where you are and I can't tell if you're --

MR. CAMPBELL: Page 6 of 55. And it's 359.

Q. (By Mr. Campbell) There was previously a Section 2.35 labeled "Food Effect and Bioequivalent Study."

MR. KUMAGAI: What page number?

MR. CAMPBELL: 359. 6 of 55.

MR. KUMAGAI: Okay.

MR. CAMPBELL: Okay. Are you with me now?

MR. KUMAGAI: Yeah.

Q. (By Mr. Campbell) Okay. And he says -- and it says here -- it was deleted -- there was no

Page 232

significant difference between fasting, low fat, or high fat meals on ACU last."

Do you see that?

A. Yes, I do.

Q. "Indicating no effect of food."

Do you see that?

A. Yes, I do.

Q. Do you know why those were deleted?

MR. KUMAGAI: Objection.

A. I do not.

Q. (By Mr. Campbell) Do you have any personal knowledge of why anything was deleted in this document?

A. No, I don't.

Q. Or why the amendments to this document were made?

A. No, I don't.

Q. Okay. During your examination, Mr. Kumagai asked you several questions comparing Cassava's summary of the DOJ's indictment in its 10-K to plaintiffs' statement in this case.

Do you recall that?

A. Yes, I do.

Q. And you said you couldn't compare them because they were apples and oranges.

Do you recall that?

Page 233

A. Yes, I do.

Q. To be clear, to your knowledge, has the Department of Justice ever charged Cassava with fraud?

A. No.

Q. Has the Department of Justice ever said that Cassava's science is all made up?

A. No.

MR. KUMAGAI: Objection to form.

Q. (By Mr. Campbell) Has the Department of Justice ever said -- ever said that Cassava put a molecule in humans based on nonsense?

A. No, it hasn't, to my knowledge.

Q. Has the DOJ, to your knowledge, ever said that Cassava Sciences is a Shambolic scientific charade?

A. Not to my knowledge.

Q. To your knowledge, has the DOJ ever compared every aspect of Cassava's programs as deliberate coordinated misconduct?

A. No. Not to my knowledge.

Q. Has the DOJ, to your knowledge, ever said that Dr. Burns was a fraud?

A. Not to my knowledge.

Q. To your knowledge, has the DOJ ever said that Mr. Barbier is a liar?

A. Not to my knowledge.

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

Q. To your knowledge, has the DOJ ever said that Mr. Barbier concocted his own secret, fake new biomarker?

A. No.

Q. To your knowledge, has the DOJ ever said that Cassava is all complete made-up garbage?

A. No.

Q. To your knowledge, has the DOJ ever said the lies from Cassava never end?

A. No.

Q. To your knowledge, has the DOJ ever said fraud, crook, misconduct, scam, snake oil, con, scheme, hashtag Sava?

A. No.

Q. To your knowledge, has the DOJ ever said that the company was a scam at all?

A. No.

MR. CAMPBELL: I have no further questions.

RE-EXAMINATION

BY MR. KUMAGAI:

Q. All right. Mr. Schoen, have you read the indictment against Mr. Wang?

A. No, I haven't.

Q. Have you read any of the filings in the Department of Justice's case against Dr. Wang?

Page 235

A. No, I haven't.

Q. Do you have any personal knowledge at all about the Department of Justice's case against Dr. Wang?

A. No personal knowledge.

MR. KUMAGAI: Okay. No further questions.

RE-EXAMINATION

BY MR. CAMPBELL:

Q. So just to summarize what Mr. Kumagai's -- the result of Mr. Kumagai's question, you don't have a basis, sitting here today, to compare all the DOJ allegations in its complaint to the allegations the plaintiffs made in this case?

A. No, I don't.

MR. CAMPBELL: No further questions.

RE-EXAMINATION

BY MR. KUMAGAI:

Q. But you did, Mr. Schoen -- you were responsible for the SEC filing that included a summary of the DOJ charges against Dr. Wang; right?

A. Yes.

VIDEOGRAPHER: Going off the record at 4:13. This marks the end of Media 7 of 7.

THE COURT REPORTER: Mr. Campbell, do you want a copy of the depositions?

MR. CAMPBELL: Yes, please.

Page 236

THE COURT REPORTER: Do you want copies of the exhibits?

MR. CAMPBELL: Yes, please.

THE COURT REPORTER: And you'll handle signature?

MR. CAMPBELL: Yes, please.

* * * * * * * * * *

(WHEREUPON, the foregoing deposition was concluded at the hour of 4:13 p.m. Total time on the record was 5 hours, 50 minutes.)

Page 237

CERTIFICATE OF DEPOSITION OFFICER

STATE OF COLORADO        )
CITY AND COUNTY OF DENVER    )

I, Bonnie Carpenter Johnshoy, a Registered Professional Reporter, commissioned to administer oaths, do hereby certify that previous to the commencement of the examination, the witness was duly sworn by me to testify to the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof.

That I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

_____
Bonnie Carpenter Johnshoy
Registered Professional Reporter
Certified Shorthand Reporter
Certified Realtime Reporter

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

SCOTT CAMPBELL, ESQ.

scampbell@gibsondunn.com

October 16, 2025

RE: ADRIAN HEILBUT, et al. v. CASSAVA SCIENCES, INC., et al.

10/1/2025, Eric Schoen (#7625500)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 239

ADRIAN HEILBUT, et al. v. CASSAVA SCIENCES, INC., et al.

10/1/2025 - Eric Schoen (#7625500)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Eric Schoen                Date

Page 240

ADRIAN HEILBUT, et al. v. CASSAVA SCIENCES, INC., et al.

10/1/2025 - Eric Schoen (#7625500)

ACKNOWLEDGEMENT OF DEPONENT

I, Eric Schoen, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Eric Schoen                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

61 (Pages 238 - 240)

HIGHLY CONFIDENTIAL

### &

**&**   2:8 3:4 8:6

### 0

**0001001300** 132:11
**000318907**   3:25 113:14
**000910448**   3:23 107:20
**000938526**   3:17 7:23
**001001300**   4:11
**001225354**   4:24 205:2
**001245411**   4:8 125:4
**001247246**   4:6 123:20
**001253022**   4:13 136:3
**001253024**   4:16 136:6
**001308025**   3:20 74:2
**001434684**   4:3 119:21
**003**   74:19,20
**026**   138:3
**032**   3:20
**05948**   1:3 5:9
**09**   205:15,19

### 1

**1**   1:12 3:6 5:4 23:3 45:11 178:7,23 181:5 201:9 213:6
**1,000**   47:5
**1,500**   47:6
**1.23**   178:2,7
**1.645**   87:25 88:1,15
**10**   4:19,20 12:11,11 13:3 13:3 17:15 20:6,24 21:12 21:13 23:15 84:24 117:10 120:2 148:24 149:9,25 150:9 150:20,22 160:13 161:2,4 161:8,13 171:22 182:12 182:12 183:9 232:19
**10,000**   47:1 91:10,13
**10/1/2025** 238:5 239:2 240:2
**100**   107:13 179:9
**10010**   2:5

**1001342**   4:11
**10111**   2:13
**107**   3:21
**10:07**   45:12,15
**10:25**   75:17
**11**   79:15,16,16 130:5 147:12 149:20 153:12
**11,000**   46:20
**11/10/21**   4:2
**11/15/23**   3:16
**11/5**   4:2
**110**   149:7,21
**112**   157:15
**113**   3:23
**119**   4:2
**11:12**   89:9
**11:23**   89:9,12
**12**   147:12,12 178:3 184:2
**12/20**   4:4
**12/21/21**   4:4
**1225408**   4:24
**123**   4:4 82:2
**125**   4:7
**125-04**   205:19
**125-09**   4:23 205:13
**1253028**   4:16
**126**   91:25
**126.3**   81:21 96:13
**128**   4:9

**128.5**   157:20
**12:22**   126:20 126:21
**12th**   107:23
**13**   151:3
**1308025**   3:20
**132**   4:10
**1342**   134:7
**136**   4:12,14
**13f**   101:17
**13g**   101:17
**13th**   175:21 177:15
**14**   123:25 151:4,25
**144**   4:17
**149**   4:18
**14th**   74:6,9,14 79:21 92:24 95:25 96:3 130:17
**15**   160:9
**15,000**   23:15
**150**   4:20
**159**   3:16 7:20 7:21 8:3,4
**15th**   8:9,13,15 175:19 177:14
**16**   130:16 155:21 238:3
**160**   3:18 73:25 74:1,2 89:14 89:18

HIGHLY CONFIDENTIAL

**[161 - 2024]**                                                    Page 2

**161** 3:21 107:19,21,22
**162** 3:23 113:12,13,14
**163** 4:2 119:20 119:22,23
**164** 4:4 123:19 123:21,22
**165** 4:7 125:2,3 125:4
**166** 4:9 128:1,4
**167** 4:10 132:10,12,18
**168** 4:12 136:2 136:4,8,13
**169** 4:14 136:6 136:9 137:8
**16th** 117:19 136:15 145:19 180:17
**17** 80:4,12
**170** 4:17 144:10,11,16
**171** 4:18 149:3 149:4,9 150:11 160:14 171:23
**172** 4:20 150:15,16,17
**173** 4:21 189:2 189:3,5 230:3
**174** 4:23 205:1 205:3,8 230:5
**17th** 113:22

**18** 4:22
**18,571** 173:4
**189** 4:21
**18th** 132:20 189:9,12 190:12,12 206:2 209:16
**1900** 2:8 3:4 5:10
**1993** 6:19
**1:02** 126:21,24
**1:24** 1:3 5:9
**1st** 5:3 85:23 187:9 197:14 197:18 198:4 210:11 211:5

**2**

**2** 13:14 45:14 89:8 178:21
**2,000** 172:5,24
**2.1** 206:23
**2.3** 209:3,11
**2.35** 231:17
**2.99** 67:4,8
**2/18/22** 4:10
**20** 10:18 11:4 30:11 95:12 139:15 160:9 224:4 240:15
**20,000** 183:10 183:10
**200** 203:22

**200,000** 40:11
**2008** 182:16
**2010** 12:20
**2011** 13:2
**2012** 24:5
**2015** 173:5
**2017** 211:24 212:3
**2018** 9:12 10:11,16 12:16 13:2 25:18 31:5 32:12,22 38:22 39:6,17 43:14,18 46:21 182:17,22
**2019** 43:18 46:25 173:5
**2020** 4:17 36:25 37:17,17 139:6,8,10 141:22 142:9 143:1,6,17 144:5,19,20,22 145:6 146:25 151:25 152:2 174:3,8 178:14 211:20
**2020's** 11:18
**2021** 39:6,20 86:23 107:23 109:4 113:16 113:16,22 115:22 117:19 119:6 120:2,15

123:15,24
128:24 130:6
130:17 131:2
131:10 153:14
161:25 162:4
192:8
**2022** 4:22 22:24 29:24 39:4,6,19,20 55:21 60:6,10 61:4 109:18 123:24 125:6 128:3,20 131:19 132:21 136:15 138:4 139:1 187:15 189:9,12 191:9 193:5 195:1,6 195:11
**2023** 8:9,15,16 8:18,19 75:15 145:19,24 146:16 151:7,8 152:5 195:18 195:23 213:7 214:3
**2024** 4:18 7:3 15:22 29:1,9 32:18,20 35:19 39:21 40:10,14 40:21 41:13,22 42:3,5,7,17 43:1,8,22 47:5 74:6,10,11,14

HIGHLY CONFIDENTIAL

**[2024 - 357]**                                    Page 3

74:18,22 79:21
80:17,23,24
86:23 87:16
88:2,5,10,10,11
89:4,15 90:4
90:11,20 92:2
92:24 93:4,8
93:23 94:3,21
95:12,15 97:21
98:3 99:6,13
100:20 102:8
146:22 148:23
149:10 157:20
160:14 161:2,3
161:3,16 162:9
172:14 173:8
173:15,16
174:24 175:19
175:21 177:15
180:17 181:5
187:10 196:13
197:18 198:8
204:25 206:2
209:17 210:11
210:11 225:19
227:16
**2025** 1:12 3:6
4:20 5:3 15:23
31:5 92:2
149:13,25
150:21 151:9
156:6 157:15
157:24 174:8
178:7 179:22

238:3
**2027** 82:24
83:6 87:6,12
127:20 158:17
**205** 4:23
**20th** 90:11,19
95:9,15 96:3
96:13
**212-589-4200**
2:13
**21st** 113:16
123:24 125:6
131:10
**22.10** 90:17
**22393** 237:19
**229** 3:11
**22nd** 113:16
119:6 131:19
**23** 179:21
**234** 3:12
**235** 3:13,14
**23rd** 2:4
**24** 87:14
**24th** 116:20
**25** 89:21
**25,000** 43:23
91:3
**250,000** 38:24
39:21 40:13,14
40:20 42:22
44:1,14 91:3
94:16 95:18
**25th** 102:8

**26** 144:22
**26th** 131:2
162:9
**27** 150:25
**28** 131:1
**28th** 42:17
**2:16** 171:16,17
**2:24** 171:17,20
**2:57** 193:16,17
**2a** 47:1 209:12
209:25 210:12
210:13,14
**2b** 145:2
185:18,25
186:2,24,25
187:8 195:1,6
200:14 202:5
202:22 204:7
210:12,15,17
211:11 213:24
225:6,11,18
227:14,18,23
228:3,7,8,13,18
229:1,5,11,15
**2nd** 161:3

**3**

**3** 13:14 14:20
14:21 15:10,14
15:15,21 41:14
42:8 44:12
66:24 67:14
75:24 89:11
92:3 96:11,18

96:19,21 97:11
103:13,15
126:20 157:13
158:4,8 160:3
178:23 183:19
199:2 200:24
201:3,7,21
202:14 204:12
216:5,19
217:17 219:11
219:18 220:23
220:25 221:12
226:23 227:2
227:22 229:1,5
229:10,25
**30** 4:20 48:5
214:7 215:11
238:16
**3000** 2:8 3:5
**303-298-5700**
2:9
**30th** 150:21
156:6 157:15
**31** 160:16
161:12
**31.25** 84:24
**318911** 3:25
**32** 79:16
171:23
**35,000** 48:5
112:6
**356** 206:20
**357** 209:3,24

HIGHLY CONFIDENTIAL

**[359 - acceptable]**                                                          Page 4

**359** 230:21 231:15,20
**367** 211:16
**3:06** 193:17,20
**3rd** 149:13

**4**

**4** 84:6,10 109:6 126:23 156:5 156:23 171:16
**4/18/22** 4:14
**4/21/22** 4:7
**4/8** 4:14
**4/9** 4:14
**40** 92:25 93:9 93:15,18 94:13 95:21 214:7 215:11 223:24 224:21 225:10
**41** 2:4
**425,000** 39:6
**44** 131:9
**449** 111:25
**45** 2:12
**450** 108:23,24 112:4
**48** 90:16
**49** 109:9
**4:00** 227:8,9
**4:05** 227:9,12
**4:13** 235:22 236:9
**4th** 128:3

**5**

**5** 101:18,22 102:5 171:19 193:16 236:10
**5,000** 179:17
**5/12/21** 3:21
**5/6** 3:21
**50** 111:8,8 143:11 187:16 188:23 189:10 189:12 204:20 204:20 236:10
**50,000** 37:5,16 38:12 43:17 91:7,7,11,14 94:15,16 95:17 95:17
**500** 95:13 111:8
**500,000** 39:20 39:22 66:24 67:14 69:2 91:7 94:14 95:16 184:1,4
**55** 230:19 231:15,20
**5th** 120:15

**6**

**6** 3:10 171:6 193:19 227:8 230:19 231:15 231:20

**6-1/2** 152:4
**6.5** 152:19 155:5,11
**6/14/24** 3:18
**6/16/22** 4:12
**63** 185:16,17
**646-453-4026** 2:5
**6th** 75:15 151:9

**7**

**7** 3:16 171:6 227:11 235:22 235:22
**700,000** 112:5
**73** 3:18
**74** 131:18
**74.3** 153:20 154:6
**75** 148:2
**7625500** 238:5 239:2 240:2
**7th** 128:24

**8**

**8** 4:22 12:6 13:3 187:10 189:8,8 197:17 197:19,24 198:3
**8/16** 3:23
**80202** 2:9
**8526** 8:14
**8531** 8:15

**8th** 74:11,18,22 90:19 130:6

**9**

**9** 90:4 128:23 151:1,3
**9/22/21** 3:23
**90** 143:13
**908** 117:18
**914052** 3:23
**938650** 3:17
**9:00** 3:6 5:3
**9:57** 45:11,12
**9th** 8:12,15 138:4

**a**

**a.m.** 3:6 45:12 45:12 89:9,9
**ability** 14:11 226:22
**able** 38:23 124:13
**above** 238:6 240:7
**absolutely** 47:18 51:16 96:4 117:16 193:1 213:25 221:23 222:17
**abuse** 10:7
**accept** 119:1
**acceptable** 48:15

accepted 10:11
accepting 44:1
access 96:23
  201:6
account 81:11
  152:5
accounting
  10:19 147:18
  147:21 151:18
  151:20
accounting's
  155:14
accounts 87:6
accrued 147:13
  147:17
accuracy 238:9
accurate 9:3,6
  21:9 32:10
  84:25 85:4,6
  114:19
accused 213:1
  213:18
achieved
  139:12 142:12
  152:1 153:13
achievement
  40:2
acknowledge...
  240:3
acknowledg...
  238:12
acquiring
  159:24 160:2

acquisition
  159:20
act 127:6,7,22
action 15:1
  17:7 31:17
  33:23 34:5,19
  34:23 35:2
  49:20 50:5,13
  51:8,14 52:6
  52:17 53:2
  54:11,17 55:1
  55:9,15,20,25
  56:9,14,19,23
  57:3,21 58:2,2
  58:16 59:3,11
  59:16,22,24
  60:6,10,14,20
  60:25 61:3,6
  61:14,19,20,25
  62:4,7,10,14
  63:1 64:17
  68:20 72:1,5
  72:21 73:15,20
  73:23 78:9,10
  79:13 84:22
  86:15,22,22,24
  87:22 88:1,9
  88:15,23 105:4
  105:5 123:17
  128:3 187:15
  189:14 191:22
  191:25 192:16
  206:23 207:12
  217:14 219:20

220:6 226:10
  237:16,17
actionable
  106:5
actions 60:1,22
  86:25 105:8
  208:5,13,15,25
active 38:8
  105:4 159:19
  159:22,22
  160:11 161:3
activities 101:5
activity 16:23
  114:13 161:4
actual 33:4
  79:20 109:2
actually 18:12
  31:20 57:22
  81:9 99:22
  128:5
acu 232:2
ad 36:9,23
  163:2 186:7
  188:21
add 36:8 80:18
  132:13 204:11
addition
  172:23
additional 82:8
  86:22 88:8
  153:13 183:11
additions 240:6
address 27:16
  132:20

addressable
  116:7
addressed 76:6
  231:5
addresses
  231:4
adept 10:25
adequately
  82:18,20
adjudicate 28:5
  28:9
adjudicated
  37:3,19 38:3
  147:2
adjustments
  39:8 139:14
administer
  237:5
administration
  15:19 78:4
  80:5
administrative
  10:24 139:24
  144:7
admit 162:19
  162:24 199:23
  224:10
admitted
  118:14 162:14
adopted 145:7
  174:8
adrian 1:4 2:16
  5:6,18 6:1
  125:6 130:17

HIGHLY CONFIDENTIAL

**[adrian - amounts]** Page 6

| | | | |
|---|---|---|---|
| 131:20 238:4 239:1 240:1 | 173:15 174:15 174:21 175:9 179:1,6,13,19 181:25 182:3,8 183:2,4,6 184:7,24 185:1 185:2,7,14 189:11 | **alleged** 162:21 163:17 199:16 | 222:17,24 225:24 226:12 |
| **advance** 33:11 33:15 216:14 | | **allegedly** 128:21 | **amanda** 2:3 5:22,23 |
| **advice** 26:24,24 51:24,24 154:18 164:7 196:21,22 197:25,25 | | **alleges** 164:20 166:10 216:24 | **amazing** 116:10 |
| | | **alleging** 124:4 | **amend** 62:13 |
| | | **allocate** 139:21 139:21 | **amended** 55:4 56:5 128:2,17 128:17,20 140:10 146:16 151:7 |
| **advise** 196:25 | **ahead** 8:2 92:20 114:8,11 127:9 | **allotted** 238:19 | |
| **advisors** 27:7 | | **allowed** 205:21 | |
| **advisory** 36:14 | **akin** 81:13 | **alluded** 118:11 122:14 | |
| **affairs** 105:4 | **al** 5:6,7 238:4,4 239:1,1 240:1 240:1 | **altered** 14:7 207:9,15,19,22 208:22 | **amendment** 65:15 145:9,24 146:1,20,21,22 149:23 151:8,8 152:6 174:9 206:1,11,14 |
| **affect** 225:6,12 | | | |
| **affected** 221:16 225:20 226:11 | **aligned** 60:15 | **alzheimer's** 10:8 14:11,15 15:1,9 17:3 22:15,21,21 42:8,13 92:8 96:16 116:1,7 116:10 158:7,9 158:13 164:23 164:24 166:14 166:15 183:15 201:3,16 202:10 211:21 216:18,22 217:18 218:17 218:23 219:4,6 219:20 220:11 221:4,6,14,16 221:22 222:2 | |
| **affinity** 207:9 | **alive** 38:9 | | **amendments** 145:6,9 151:12 232:14 |
| **affirmative** 134:16 | **allegation** 124:12 162:22 162:24 165:5 | | |
| **aforesaid** 237:11 | | | |
| **agenda** 74:9 79:20 80:5 89:15 | **allegations** 106:18 116:25 123:25 162:14 162:18,19 163:6,7 165:15 166:22 167:9 167:13,23 168:7,16 169:5 170:2,21 186:22 192:7 192:12,22 199:9 202:6 222:20 235:11 235:11 | | **amount** 11:7 61:18 73:19 81:18 84:14,23 115:20 116:3 140:4,5,6 147:19 152:11 153:6 155:3 178:14,18 179:15 |
| **agent** 189:17 | | | |
| **aging** 212:4 | | | |
| **ago** 8:5 11:5 16:5 34:1 107:7 147:25 177:2 | | | |
| **agree** 85:13,25 131:3 | | | **amounts** 37:4 84:11 139:19 152:13 155:11 |
| **agreement** 83:24 84:2 | | | |

HIGHLY CONFIDENTIAL

**[amyloid - approximately]** Page 7

| | | | |
|---|---|---|---|
| **amyloid** 208:5 | 94:7,20 109:11 | **anybody** 25:21 | **applicable** |
| **analogy** 215:6 | 122:22 123:15 | 53:22 103:7 | 238:8 |
| 218:14 | 126:13 127:9 | 104:10 110:16 | **application** |
| **analysis** 145:2 | 127:11,14 | 135:24 216:20 | 15:18,25 |
| 225:6 | 129:15,15 | **anymore** 81:21 | **applied** 214:2 |
| **analyst** 135:7 | 146:2 148:4 | 115:6,11 | 215:10 |
| **andree** 135:15 | 154:18,19 | **anytime** 206:11 | **appointed** |
| 135:17 | 156:19,22 | **apartment** 46:4 | 30:19 75:19 |
| **anecdotes** 63:3 | 157:5 159:15 | **apologize** 7:24 | **appointment** |
| 103:2 | 167:1,5,18 | 175:4 | 175:3 |
| **angelique** 21:4 | 168:11,24 | **apoorva** 4:15 | **appoints** 98:20 |
| **animated** 63:22 | 169:15 170:13 | **apparent** 30:16 | **appreciate** |
| **announced** | 186:19 213:13 | **apparently** | 115:1 124:13 |
| 95:21 145:1 | 214:13 220:22 | 125:14 | **appreciated** |
| 198:8 | 220:25 224:19 | **appearances** | 117:21 |
| **announcement** | 228:23 229:2 | 2:1 5:16 | **appropriate** |
| 162:9 | **answerable** | **appearing** 5:19 | 3:1 41:1 54:4 |
| **announcing** | 168:1,22 | **appears** 8:7 | 60:14 78:1,1 |
| 92:25 94:13 | **answered** 96:1 | 74:5 107:22 | 96:1 |
| **annual** 36:20 | 108:20 110:13 | 108:6,24 | **approval** 15:20 |
| 77:8 | 110:16 129:12 | 113:14,21 | **approve** 188:21 |
| **anonymously** | 201:18 225:15 | 118:1 119:5 | **approved** |
| 112:3 | **answering** | 120:1 123:22 | 14:23 90:13 |
| **answer** 27:23 | 14:13 28:11 | 125:4 137:9 | 94:14,20,22,22 |
| 27:24 34:7,8 | 92:15 214:24 | 151:6 205:25 | 95:8,13,16 |
| 34:10 42:14 | **anthony** 3:22 | 210:3,20 | 98:6 109:2 |
| 50:10 52:21 | 4:10 99:16 | **appended** | 152:3 223:14 |
| 53:4,13 54:2,3 | 107:23 108:7 | 240:7 | **approximate** |
| 54:9,12 55:4 | 109:6 123:3,5 | **appendix** 90:18 | 148:19 |
| 63:19 67:24 | 132:19 133:1 | 128:2,19 | **approximately** |
| 68:1 69:9,19 | **anti** 61:7,20 | **apple** 170:14 | 7:3 29:23 43:4 |
| 70:18 78:23 | 73:11 78:9 | **apples** 165:21 | 46:18,20 48:3 |
| 82:10,11,22 | 155:23 | 232:24 | 48:5 66:19 |
| 83:19 92:19,21 | | | 68:22 69:1 |

HIGHLY CONFIDENTIAL

**[approximately - attention]**  Page 8

75:17 88:8
95:20 100:17
102:6 112:5
144:25 145:14
145:16 147:23
148:2,19
157:15,19
172:13 178:18
178:21 187:16
189:12,13
190:3,5 191:11
**approximation**
66:23
**april** 88:2,10
88:10 89:4
125:6 138:4
**araya** 11:14
155:19
**arbitrations**
70:9
**aric** 2:11 6:5
**arises** 71:16
**army** 100:2,3
101:5 103:17
105:8 120:25
123:8 133:19
133:23 134:3
135:22
**arose** 26:4,6
**arrangement**
190:24
**article** 29:19
211:20,24
212:7

**ascribe** 155:4
**aside** 6:14 9:9
19:22 32:19
45:17 47:14
51:10 52:2
58:13 84:21
86:14 106:11
106:14 107:2
113:11 123:19
132:2 139:5
141:18 142:2
143:24 150:12
151:20 157:8
161:10 167:7
198:13
**asked** 31:3
53:13 63:18
73:9 75:16
78:8,14 106:3
106:23 109:5
110:16 116:6
122:24 124:17
150:3,4 176:15
176:19 177:3
180:21 192:6
221:21 224:4
224:17 230:9
230:12,15
232:18
**asking** 25:16
38:25 61:3
65:1 73:9
106:21,25
108:3 109:6

110:3 118:9
119:13 129:14
140:15 168:15
168:23 196:21
199:19,25
203:1 219:10
220:12
**asks** 105:21
**aspect** 233:17
**aspects** 185:18
187:7
**aspire** 12:19
**assert** 129:6
130:2,12,23
131:6,15,24
**assess** 214:15
**asset** 159:24
**assets** 157:14
160:6
**assistance**
186:13
**assisting**
183:14
**associated**
31:12 208:21
**assume** 177:22
**assumed** 20:17
**assumes** 153:24
154:23
**assuming** 85:13
191:10
**asterisk** 203:20
**atchley** 134:19
134:22,23

**attached** 3:18
71:3 109:22
132:25 238:11
**attachment**
4:11 128:19
133:4 134:6
136:7 137:13
137:17
**attachments**
136:11 137:18
**attack** 121:15
**attacked** 63:13
**attempting**
159:12
**attempts**
159:16
**atten** 115:14
**attend** 32:16,21
35:13 164:5
**attended** 32:6
32:11,14 36:1
36:5,13 50:19
57:6,12,14
65:24 99:13
**attendee** 50:23
**attending** 60:3
64:23 74:13
85:16,18 164:8
164:10
**attention** 11:25
12:3 29:19
115:15 117:17
160:10 215:19

HIGHLY CONFIDENTIAL

**[attorney - barbier]**                                                    Page 9

**attorney** 5:16 72:12 122:19 237:14,15 238:13

**attorneys** 68:7

**attributable** 223:5,10

**auc** 231:7

**audio** 75:7

**audit** 9:18 35:17,18 195:10,14

**auditor** 6:20

**august** 88:5,11 89:3 93:6 98:3 113:22 116:20 144:22 161:3 161:25 162:4 173:8,15 174:8 192:8

**austin** 46:1 51:4 197:5,9

**author** 213:21

**authorities** 214:12,22

**authority** 95:3

**authorized** 229:25

**authorizes** 188:20

**available** 110:2 111:15 125:24 153:23 177:23 230:1 238:6

**avenue** 2:4

**average** 78:20

**award** 37:5,16 37:21 41:25 70:14 71:19,22 95:3,3 139:18 139:22 140:5 146:25 147:3,4 152:4,19,22,22 152:25 153:11

**awarded** 38:4 41:21 42:5,18 43:7,23 65:17 90:2,24 127:2 152:18 153:2 153:23 172:24

**awarding** 40:20

**aware** 12:8 13:4 17:5 22:2 23:16 24:10 50:7 52:10 60:22 69:17,21 70:11 73:13 84:18 89:4 126:25 127:5 138:11 139:2 141:9,14,19 142:5 151:13 159:19 172:22 174:18 176:25 179:25 180:1,2 180:5,8 181:12 185:13,14

194:8,9 198:9 198:11 214:1,6 215:9

**awu** 2:14

**b**

**back** 6:19 7:17 9:21 20:19 22:5,9,25 24:5 34:9 37:25 39:24 45:15 61:4,10,23 65:15,19 77:15 89:12 108:15 109:5 110:13 115:11,21 119:17 126:24 127:1,21 139:6 149:13 150:12 151:15 157:10 160:13 163:9 171:20 193:20 197:5,9,11 209:23 215:6 215:13 227:12

**background** 13:7 30:11

**bad** 27:19 60:7 60:17 120:3 216:17 217:22 229:9,16

**bakerhostetler** 2:12 6:5

**bakerlaw.com** 2:14

**balance** 76:7 91:25 156:6 157:13

**balances** 78:2

**bankers** 188:4 188:9,19

**barbier** 1:9 2:11 3:24 6:6 9:23 10:2 11:3 11:9 20:15 28:8 29:2,3 53:22 55:16 62:4 64:19 68:3,8,15,19,23 69:16,22 70:7 70:11 75:13 76:6,10 90:24 91:6 94:15 95:17 99:9,13 113:23 119:1 137:2 138:12 140:23 142:17 143:7,24 147:14,22 148:7,9,13 150:5 152:11 152:21 154:4 154:13 175:20 176:1,3,6,20 177:15 178:1,8 178:11 179:2,8 179:12 180:10

HIGHLY CONFIDENTIAL

**[barbier - beyond]**                                                    Page 10

181:16,21
184:23 185:8
185:12 187:25
188:1 233:24
234:2
**barbier's** 142:9
175:25 176:9
176:15 177:11
181:15,19
**barrier** 15:7
219:8
**barry** 11:5,10
11:11 20:22
21:1 28:7 29:1
29:7,9,11,13
30:10 35:19
40:15 47:20
48:1 57:14
62:10 64:10,18
75:10 98:9,17
99:3 183:16
**base** 36:20
**based** 40:2
55:12 58:9
67:23,25 69:8
96:6,17,24
97:2 99:12
129:1 140:2
152:1 153:13
156:20,21,23
193:8 199:7
216:23,24
220:5,23 221:8
221:9 227:22

229:1,5,11
230:1 233:11
**bases** 111:7
**basically** 9:22
**basics** 37:13
**basis** 58:6
59:15 88:24
115:5,5,7
117:11 188:1
224:10 226:20
235:10
**bate** 113:13
**bates** 7:22 74:1
79:16 107:20
119:20 123:20
125:4 132:11
136:3,6 205:2
206:20
**baumunk** 2:15
5:12
**began** 25:18
55:20
**beginning**
79:20 111:24
158:17 161:25
**begins** 114:12
130:7,18 131:3
131:11,20
164:16 207:8
**behalf** 2:2,7
5:18 6:4 163:2
**behest** 144:9
**beidel** 65:25

**belief** 14:7,10
15:8 16:6,9
37:6 49:7 58:8
92:5 96:17
105:18 187:9
199:5 201:5
203:7 204:16
207:21
**believe** 5:25 9:5
10:2 18:18
23:10 29:6
35:18,22 39:19
40:16 43:23
48:20,22,23
49:17 55:4,12
57:24 58:15,20
67:7,9 81:24
88:6 98:1,2
99:20,24
100:22 101:17
105:20 110:1
112:25 124:10
128:22 134:24
135:7 137:2
140:8 141:14
143:12 145:8
145:19 146:18
183:16 185:22
188:11 196:4
198:17 200:4
200:22 202:2
204:21,24
207:18,24,24
217:22 220:15

223:1 228:14
230:9
**believed** 14:17
15:9 41:15
96:12,15 103:4
204:5 223:12
**believer** 200:20
216:6
**believes** 218:20
226:16
**believing** 92:7
**bellevue** 46:1
**ben** 24:15,15
24:17 25:24
31:8
**beneficial** 14:8
15:8
**benefit** 173:19
**benefits** 37:10
**benesch** 51:1,2
51:3,7,12 52:4
53:1,7 57:5
64:9,21,24
**best** 67:13,17
85:6 105:6,9
180:20 224:18
228:15
**beta** 208:5
**better** 30:7,9
92:11 208:1
**betting** 48:23
48:24 49:15
**beyond** 77:16
80:13 82:13

HIGHLY CONFIDENTIAL

**[beyond - borrow]** Page 11

85:12,14
101:21 120:23
126:6 160:8
**bias** 203:18
**big** 22:14 27:18
199:3 203:3
**bigger** 30:12
**bik** 122:9
**billing** 179:8
**bills** 50:7
**binding** 18:1,7
22:1 207:15
208:19 220:9
**binds** 17:18
18:16 21:18
207:8,19,22,24
217:25 218:16
218:21 219:21
220:20
**bioanalysis**
186:23
**bioequivalent**
230:25 231:17
**biomarker**
195:1,6 200:14
210:4 211:11
227:18 234:3
**biomarkers**
186:23 203:6
209:8
**biopsy** 16:12
**biotech** 12:17
12:21 47:15
48:19 92:7

111:14,15
141:10,19
142:5
**biotechs** 96:23
111:9
**bit** 20:23 27:1
27:22 32:5
139:7 144:12
**bitch** 122:9
**blame** 223:20
223:22,22
**blank** 169:22
**blended** 97:1
**bless** 222:9
**blinded** 96:21
96:22,24,24,25
97:4 201:6
203:13,25
204:12,13,14
**blinding** 97:7
**blood** 15:7
22:17,17
**blot** 25:8,11,23
165:2 166:17
170:4
**blots** 25:14,20
26:2,9,14
**board** 3:18,19
9:16 28:7
30:18 32:7,11
32:14,15,15,16
32:21,25 33:11
33:13,21 34:3
34:4,8,18,22

35:1,8,12,12,13
36:14 39:9
47:21,23 50:15
51:11 52:3
56:10,13 57:1
57:9,11,22
58:2,7,8,11,16
59:8,12,14,20
64:23 74:5,11
74:22 75:2,15
75:17,19 76:10
77:9,16,20,25
78:1,3,4,25
79:24 80:14,19
87:17,17 89:15
90:12 94:25,25
95:5,6,10,10,13
95:16 97:8,15
97:24 139:10
139:19,21
140:13,13
141:5 143:24
145:9 146:24
175:6 176:15
176:19 180:21
186:12 188:6,7
188:19,21
**bob** 97:22 98:2
**body** 198:25
199:7 217:11
228:9,12
**bold** 160:17
185:17

**bonding** 22:5
**bonds** 45:23,23
**bonnie** 3:6 5:14
237:4,20
**bonus** 4:17
36:20,21 37:24
39:14,16,21,21
39:23 40:11,20
41:21,25 42:5
42:22 43:22
44:1,8,14 45:7
45:18 90:8
91:3,8,11,14
94:15,15,16,17
95:16,17,17,18
139:6,16
141:10,11,22
142:6,17,21,25
144:1 148:13
148:16 152:3
152:19 153:2,3
174:3
**bonuses** 36:23
42:19,21 90:14
90:24 95:3
96:1 139:9
140:12 142:10
143:20 145:11
145:12
**books** 147:19
**bordey** 21:4
215:23
**borrow** 159:5

HIGHLY CONFIDENTIAL

**[bottom - campbell]**                                    Page 12

**bottom**  27:15 75:13 90:6 161:11 208:3 230:19
**bought**  47:1
**brain**  15:7 16:11 104:15
**braun**  134:19 135:5,6
**break**  45:9,17 89:6,14 126:17 157:10 171:14 193:14 227:5
**bredt**  1:6 84:7 84:14 156:16 156:24
**brennan**  4:5,7 123:24 124:3 125:5,11,16 126:6,15
**brilliant**  137:2 137:3,5 138:13
**bring**  10:9 11:1 11:1 77:15 108:15 188:13 191:8
**broad**  65:1
**broader**  28:20
**broadly**  12:8 50:7 60:22
**brochure**  195:2 195:7 228:6
**brodkin**  1:4 2:17 5:19 6:2

122:6 123:25 124:4,19 128:25 129:14 130:7 131:2,10 156:17
**broken**  78:25
**brought**  51:8 70:20 215:18
**bucket**  143:19
**buckets**  89:1
**budget**  23:3 71:25 72:4,9 72:13,16,19 73:10 78:3,9 78:11,14,16,23 79:2,6
**budgeted**  72:11 83:13
**budgets**  78:5 78:10,15,15
**building**  159:6
**buildings**  46:4
**burner**  23:1
**burns**  1:9 2:11 4:3,11 6:6 13:24 20:17 25:24 26:9 62:7,14,21,24 63:19,22 64:3 64:18 68:3,8 68:15,19,23 69:16,22 70:7 70:10 121:20 121:23,24

122:2,5,8 124:5 132:8,20 132:25 133:11 133:17,22 134:2,3 143:16 152:15 153:10 153:11 155:19 180:17,21 181:1,5,18,21 181:25 182:7 183:2,7,18,25 184:7,11,20 185:12 186:4 193:23 194:4 198:18 199:11 199:15,22 200:1 211:24 212:3 213:7 225:10 233:21
**business**  53:20 65:21 139:15 161:17
**buttskin**  122:6
**buy**  102:15

**c**

**c**  5:1 123:25
**cadence**  33:15 73:7 191:11
**calculus**  93:19
**calendar**  197:13
**california**  9:21

**call**  11:24 22:12,13 24:9 27:9,21 29:5 30:2 39:7 73:5 85:15 101:23 108:9,10 165:10 179:16 201:4
**called**  3:3 9:13 9:14 10:5 12:19 27:8 33:9 39:5 77:20 90:7 101:5 103:17 120:25 133:19 140:2 179:16 185:19 196:17 196:24 197:8
**calls**  28:16 36:14 65:24
**campaign**  160:19
**campbell**  2:7 3:11,13 6:3,3 14:1,12 16:20 18:9,22 19:13 22:7 23:24 25:15 28:24 30:22 34:6 35:3 40:22 41:2,10 43:5 44:3,17 48:10 49:13 51:20 52:18 53:19

HIGHLY CONFIDENTIAL

**[campbell - cash]**

| | | | |
|---|---|---|---|
| 54:5,12 56:2 | 149:6 152:16 | 231:20,22,24 | 223:13 |
| 56:15 57:23 | 153:8 154:7,17 | 232:11 233:9 | **careful** 102:13 |
| 60:11 61:15 | 156:20 157:5 | 234:18 235:7 | 102:17 |
| 62:1 64:4 | 158:21 159:14 | 235:14,23,25 | **carefully** 199:2 |
| 66:12,18 67:6 | 161:1 162:25 | 236:3,6 238:1 | **carpenter** 3:6 |
| 67:16,22 68:6 | 164:1 165:8,17 | **cancel** 37:23 | 5:14 237:4,20 |
| 68:11,24 69:7 | 166:3,25 | **canceled** 38:7 | **carrier** 70:21 |
| 69:18 70:16 | 167:16,24 | **candi** 4:3 | 71:1 |
| 72:2,24 73:16 | 168:10,18 | 120:16,19,20 | **carriers** 71:1 |
| 78:13 82:12 | 169:9 170:10 | **candidate** | **case** 1:3 5:8 |
| 83:10,15,23 | 171:11 172:21 | 164:23 166:13 | 6:21 17:15 |
| 84:2,8,16 85:2 | 176:5,10,21 | **cap** 116:11,17 | 18:21 32:13 |
| 85:5,11,18,25 | 177:5 180:12 | **capacities** | 42:1 49:4 |
| 86:6,10 87:9 | 192:14 193:12 | 129:13 | 68:16 70:15,17 |
| 88:12,17,21 | 196:5,18 | **capacity** 14:13 | 70:20,24 71:5 |
| 92:14,18 93:11 | 198:20 199:18 | 49:22,23 50:2 | 71:6,14,20,22 |
| 93:16,25 94:4 | 200:12 202:1 | 53:16 130:2 | 72:10,20 73:7 |
| 94:6,18 95:23 | 202:20 203:15 | 177:16 199:20 | 73:8,11 78:15 |
| 96:20 97:9,12 | 205:5 206:15 | 214:24 | 78:16 79:3 |
| 97:17 98:8 | 206:18 207:20 | **capital** 36:10 | 83:9,14,18 |
| 104:2 111:20 | 211:3 212:13 | 41:22 80:16,23 | 84:15 88:4,11 |
| 112:18 116:19 | 212:17,25 | 81:18 82:4,25 | 126:3 146:6 |
| 118:7 122:22 | 213:11 214:17 | 83:2 159:6,9 | 156:1 162:21 |
| 123:11 124:20 | 214:23 215:15 | 187:16,22,24 | 162:23 163:6 |
| 126:9,18 127:8 | 217:1 219:16 | 188:2,6,20,25 | 183:17 226:18 |
| 127:16,23 | 220:8,24 | 191:9,23 | 232:20 234:25 |
| 128:6 129:7,10 | 221:18 223:7 | **capitalization** | 235:3,12 |
| 129:22 133:14 | 224:3,16 225:1 | 139:13 152:2 | **cases** 78:11 |
| 133:24 136:10 | 225:13,25 | 153:14 | 86:17,20,21,24 |
| 137:17,21 | 226:13 227:25 | **capitalized** | 87:3 |
| 138:1 141:13 | 228:22 229:7 | 186:8 | **cash** 4:17 36:25 |
| 142:19 143:3 | 229:13,22,24 | **caps** 111:8 | 37:17 76:19,19 |
| 144:4,13 145:3 | 230:8,21 231:4 | **care** 20:10 | 78:2 81:12,22 |
| 147:16 148:22 | 231:11,15,16 | 48:12 220:19 | 82:23 83:6 |

HIGHLY CONFIDENTIAL

**[cash - change]**                                                              Page 14

87:5,12 90:7
90:13,24 91:7
91:11,14,25
94:15,15
109:16 127:19
139:6 140:3,11
141:10,22
142:6 143:20
144:19,20
148:13,16
152:3 157:15
157:16 158:16
160:4 172:5
174:3 178:15
**cassava**   1:9 2:7
3:17,20,23,25
4:3,6,8,11,13
4:16,17,18,20
4:21,24 5:6 6:4
6:19 7:22 9:11
9:12,13,13,14
9:21 10:10,17
12:16,25 14:6
27:7,11,13
28:18 31:2,20
36:17 45:19
46:10,11,18
47:2,14 60:5
71:24 73:14,22
74:2 81:1 87:2
87:22 88:14
107:20,24
112:7 113:9,14
114:16 119:21

123:20 125:4
132:11 135:7
135:22,24
136:3,6 149:9
150:20 159:23
160:1 167:12
167:22 168:4,7
169:20,21
170:20 172:3,8
173:24 195:10
205:2 206:10
207:7 216:2
221:15,19,21
221:22 222:11
222:14,17,19
223:2 225:22
228:19 233:3
233:10,14
234:6,9 238:4
239:1 240:1
**cassava's**   9:13
51:4 100:14
109:16 111:3
111:19 155:14
167:8 168:15
168:22 169:4
170:8 223:4,17
224:1 226:9
232:18 233:6
233:17
**cassavafraud....**
222:22
**category**
142:13 143:16

144:6
**cause**   78:21,22
202:6
**caution**   19:13
122:23
**cautious**
196:22
**cemented**   203:7
204:9,16
**center**   181:7
**ceo**   11:3 19:2
20:14 28:7,15
29:20 47:10
55:16 98:12,24
118:20 139:18
147:5 148:5
153:18,25
154:24 175:20
177:2 224:13
224:22
**ceo's**   98:14
**cerebrospinal**
22:19
**certain**   16:22
89:1 95:4
100:4 116:3,3
132:14 139:13
139:14 161:5
164:24 166:14
184:9
**certainly**   8:7
33:19 35:5
177:8 213:2
222:15

**certificate**
237:1
**certifications**
149:13
**certified**
237:21,21
**certify**   17:13
237:6
**cfo**   10:1,8,12,15
10:18,18 18:6
18:10 19:4
32:6 50:6
58:24 59:8,12
65:18,22 66:22
72:10 73:19
87:10 116:6
117:9 165:24
200:21 201:13
**cgr**   2:6
**chain**   114:12
119:4
**chair**   9:18
**chairman**
148:5 153:18
153:24 154:23
**chairperson**
147:6
**chance**   154:4,8
154:10 189:24
202:13 219:2
**change**   17:25
18:3,13 19:6,9
19:21 21:15,17
145:15,22,23

HIGHLY CONFIDENTIAL

**[change - closer]**                                                      Page 15

146:3,9,20
167:1 171:6
218:12 224:9
239:4,7,10,13
239:16,19
**changed** 18:7
22:3 29:22
94:2
**changes** 19:23
21:23 145:6
146:10,11,13
180:16 181:24
206:12 207:4
210:8 211:1
230:13 238:10
240:6
**channel** 112:3
112:17,20
**characterizati...**
129:11
**charade** 233:14
**charge** 199:23
**charged** 233:3
**charges** 165:25
198:14 200:8,8
201:22,23
202:17 223:16
223:25 224:22
235:19
**check** 215:13
**chief** 9:15 19:1
29:20 30:19
36:18 75:17

**choose** 27:24
**chris** 19:11
20:25 21:1,20
29:5,11,20
30:11,15,17
51:17,19 53:10
55:16 62:12
64:9,18 75:18
78:20 196:17
196:19
**cib** 152:4,5
175:7,12
**circumstances**
176:12
**cite** 214:11,21
**citizens** 33:17
33:22 116:23
117:7 118:6,12
192:7,15,18,22
202:11 222:5
222:12
**city** 194:15
237:3
**civil** 3:2
**claim** 10:20
16:23 70:21
71:1
**claimants**
156:8,11
**claimed** 100:1
228:19
**claims** 84:7
127:6,7,21,22
129:1 165:16

184:8
**clarick** 2:4 5:18
5:20,24
**clarification**
115:1
**clarify** 25:16
54:24 151:5
186:16
**claude** 98:1
**clause** 184:17
184:23
**claw** 127:1,21
**clear** 21:8 27:2
32:6 34:13
64:8,14 88:21
103:9 129:12
175:10 233:2
**clearance**
47:10
**clearly** 105:3
116:23 117:10
148:23 199:8
**click** 81:12
112:12
**clicked** 112:14
**client's** 168:16
**clients** 6:22
33:18,22 34:5
34:19 35:2
51:14 52:6
53:18 62:25
64:16 86:6
103:24 118:14
121:21 123:9

124:24 156:16
157:1,2 165:6
165:15,20
166:1,23
167:13,23
168:9,21 169:7
169:11,11,17
169:20,24
170:8,19 222:6
222:12 223:6
223:11,21,23
**clinic** 12:5
14:18
**clinical** 4:23
11:23 13:14
14:19 15:24
19:2 20:9 25:4
25:6 75:24
158:8 205:12
206:7 209:3,24
211:7 212:11
213:3,20,23
216:2,8 217:5
218:12,24
230:4
**clinicaltrials....**
206:14
**close** 12:3
81:19 158:4
181:19
**closed** 109:9
158:7,9 187:15
**closer** 17:22

HIGHLY CONFIDENTIAL

**[closing - company]**                                                      Page 16

| | | | |
|---|---|---|---|
| closing 90:17 | commencem... | 152:3 153:5 | 16:10,18 17:10 |
| cmo 33:8 | 237:6 | 186:8,12,17,18 | 17:15 18:7,15 |
| cognition 97:1 | commencing | 186:19 188:21 | 22:14 23:8,14 |
| 203:3,24 | 3:5 | committee's | 23:21 24:1,13 |
| 204:23 205:20 | commensurate | 40:5 144:8 | 24:19,21 25:13 |
| 205:24 211:6 | 37:11 | committees | 25:16,19,25 |
| 211:11 220:17 | commentary | 35:8,10,12,14 | 26:4,14 27:5 |
| 227:18 | 60:2 | 35:16 36:9 | 28:22 29:5,7 |
| cognitive | commented | 98:11 | 30:1,10,18,20 |
| 186:24 220:16 | 62:15 | common 119:9 | 31:9,12 32:8 |
| 225:11,18 | comments | 119:17 121:17 | 32:11,22 36:19 |
| colleague 5:20 | 62:21 63:4,13 | 121:18 | 36:21 37:8,16 |
| collection 54:7 | 64:1 | communicated | 37:23 38:2,7 |
| colorado 2:9 | commercialize | 134:8 | 38:12,25 40:1 |
| 3:5 5:11 237:2 | 92:9 | communicating | 40:3,15,20 |
| come 18:25 | commission 8:6 | 133:12,22 | 41:11,12,24 |
| 27:20 33:12 | commissioned | communicati... | 42:2,10,18 |
| 51:3 80:8 | 237:5 | 67:23,25 69:8 | 43:10,17,18 |
| 111:10 150:12 | committee 9:18 | 92:20,22 94:7 | 44:7,9,11,13,21 |
| 155:20 157:10 | 35:18,18,20,22 | 127:9 134:11 | 46:13,16 47:8 |
| 160:10 163:9 | 35:24 36:2,3,6 | comp 109:14 | 47:20,23 48:21 |
| 204:17 217:8 | 36:12,20 37:4 | companies | 48:22,23 49:6 |
| comes 12:1 | 37:20 38:3 | 31:22 36:23 | 49:12,15,18 |
| 27:21 28:22 | 39:9,25 40:10 | 47:16 109:16 | 50:6 51:6 |
| 29:10 31:8 | 40:18 41:7,17 | 111:4,4,6,7,13 | 52:10 55:7,19 |
| 98:18 111:17 | 41:18,25 90:12 | 111:14,17,19 | 58:10,14 59:21 |
| 226:12 | 90:19 94:21,23 | 116:2 141:10 | 60:22 61:13,18 |
| coming 12:16 | 95:1,2,7,8,13 | 141:10,19,20 | 61:21,24 62:19 |
| 28:7 78:20 | 95:16 97:20 | 142:6,6 160:6 | 64:3 65:13 |
| 100:20 | 98:1,4,13,20,23 | 187:25 | 66:4,5,10,14,20 |
| commence | 99:7,14 139:20 | company 7:2 | 67:3,7,10,20 |
| 60:20 | 140:5,14 | 10:3,12,18 | 68:2,7,13,14,18 |
| commenced | 142:16 143:2,5 | 11:4,10,25 | 68:22 69:5,11 |
| 60:5 | 143:22 147:3 | 12:21,24 13:24 | 69:12,13,15,22 |

**[company - compensated]**

| | | | |
|---|---|---|---|
| 70:5,10,13,21 | 122:16,18 | 186:3,23 187:6 | 154:8 157:14 |
| 70:25 71:11,25 | 123:10,16 | 187:14,15 | 162:9,17,20,23 |
| 73:20 75:15 | 126:1 127:2,6 | 188:2,22 189:9 | 163:24 164:22 |
| 76:18 78:17 | 127:19 133:12 | 189:11 191:5,8 | 166:12 168:2 |
| 79:2,5,7,8 | 135:8 137:1 | 191:12,14,23 | 170:1 172:25 |
| 80:17,24 81:7 | 138:20 139:2 | 191:25 192:23 | 174:3 185:18 |
| 81:22 82:2,5,7 | 139:12,18 | 194:2 198:24 | 187:3,11 |
| 82:18,23 83:5 | 140:8,11,18,18 | 200:7,21 | 188:16 190:19 |
| 83:8,12 84:5,9 | 141:15 145:1 | 201:13 203:5 | 215:19 219:24 |
| 84:13,21 86:17 | 147:1,13 | 207:14 210:20 | 224:24 225:7,9 |
| 87:5,7,10,18 | 148:12,20 | 211:10,19,23 | 225:12,20 |
| 88:9 89:3 | 150:23 151:16 | 212:2,6,10 | **comparable** |
| 90:15 91:17,20 | 151:18,21,22 | 213:2 214:10 | 111:13 168:24 |
| 91:21,24 92:24 | 152:1 155:7,13 | 214:14,19 | 169:1 |
| 93:8,14,24 | 155:15 156:4 | 215:8 216:9,22 | **compare** |
| 94:14 96:4,14 | 158:11,16,23 | 217:7,8,11,13 | 165:20 168:15 |
| 96:23 98:10,17 | 158:25 159:3 | 217:23,24 | 168:23 169:4 |
| 99:21,22,23 | 159:12,13,17 | 218:5,19 | 170:13 232:23 |
| 100:9 101:2,16 | 160:3,24 | 219:19 220:7 | 235:10 |
| 101:18,19,25 | 161:25 162:3 | 222:3,7,23,24 | **compared** |
| 102:3 103:1,6 | 162:13 163:5 | 224:22 225:19 | 233:17 |
| 103:9,14 | 163:14,20 | 226:16 227:16 | **comparing** |
| 104:12,19,20 | 164:8 165:24 | 227:23 229:6 | 232:18 |
| 104:23 105:7 | 166:1 171:25 | 229:11 234:16 | **comparison** |
| 105:19 106:18 | 175:5,20,25 | **company's** | 165:22 |
| 106:19 109:19 | 177:2 178:8,10 | 11:23 14:10 | **compen**   44:25 |
| 109:23 110:1,4 | 178:15 179:2 | 17:17 27:3 | **compendium** |
| 111:15 113:8 | 179:12 180:9 | 28:4 31:4 32:7 | 41:23 161:4 |
| 114:17,21 | 180:21 181:1,4 | 36:23 42:6 | **compensate** |
| 115:3,18 116:2 | 181:20 182:6 | 45:3 58:21 | 110:3 |
| 116:5,11,13 | 182:21 183:8 | 59:2 61:22 | **compensated** |
| 117:1,5 118:15 | 183:11,18 | 75:1 76:19 | 36:24 45:4,5 |
| 118:20 119:2 | 184:8,21 185:1 | 85:6 87:11 | 109:21 |
| 120:12 121:19 | 185:7,10,24 | 126:7 153:18 | |

HIGHLY CONFIDENTIAL

**[compensation - consultant]** Page 18

| | | | |
|---|---|---|---|
| **compensation** 35:20 36:16,19 36:19 37:4,14 37:19 38:2 39:9,25 40:5,9 40:18 41:7,17 41:18,19,20,25 44:22,23,24,25 45:17 89:24 90:7,12,19 94:20,23 95:1 95:2,7,8,11,12 95:15 97:20,25 98:4,10,13,14 98:20,21,23,24 99:2,4,7,13 109:15,16 111:10,15,16 139:20 140:5 140:14 142:16 143:2,5,21 144:8 147:2 152:3 153:5 171:25 173:22 178:2,11 185:3 **competitors** 111:14 **complaint** 53:2 54:16,20 55:3 56:5 103:25 128:2,17,20 162:14,18 165:10 166:5,7 167:3,4,7 | 170:18 198:7 224:1 235:11 **complaints** 54:24 55:1,2,5 55:8,14 103:23 **complete** 9:3 41:13 82:22 234:6 240:8 **completed** 238:16 **completely** 202:9,21 **complex** 15:12 24:8 46:6 187:24 **compliance** 10:22 47:10 **component** 203:23 **comprises** 156:23 **con** 234:12 **conceiving** 140:22 **concepts** 50:7 **concern** 131:3 **concerns** 216:21 **conclude** 218:22 **concluded** 79:19 236:9 **concocted** 234:2 | **condensed** 156:5 **condition** 152:7 **conditioned** 141:11 **conditions** 148:20 191:1 **condo** 46:9 **condominium** 46:6 **condominiums** 46:5,7 **condos** 46:5 **conduct** 130:19 163:16 185:24 186:2,2 226:9 **conducted** 36:7 195:10 198:18 199:16 214:2 216:2 **confer** 20:17 **conference** 75:7 101:1 **conferences** 28:15 **confidential** 1:16 82:13 85:10,12 188:12 **confidentiality** 83:24 157:7 184:13 188:15 **confidentially** 159:16 189:23 | **confirm** 214:20 **confirmation** 207:9,16,19 **conformed** 149:14,16 **confusion** 88:23 **conjunction** 12:12 13:3 14:20 43:22 79:6 140:24 174:20 201:21 **connected** 237:15 **connection** 7:14 68:19 158:12 186:24 **connotation** 221:23 222:18 222:22 223:1,5 **cons** 175:8 **consent** 188:8 **consider** 43:25 44:14,14 **considerable** 117:14 **consistent** 11:2 21:14 208:9 **consolidated** 7:7 156:6 157:13 **consultant** 11:16,17 31:10 41:19 44:24 |

HIGHLY CONFIDENTIAL

**[consultant - corrections]**                                    Page 19

| | | | |
|---|---|---|---|
| 65:12 98:21 111:10,17 141:24 | **continues** 124:7 148:9 163:14 208:6 214:21 | 177:10 196:23 197:22 198:2 215:23 | **copying** 120:2 |
| **consultants** 142:1,7 | **continuing** 160:24 163:21 214:11 | **convey** 63:23 64:1 | **corporate** 42:12 58:2 158:4 |
| **consulting** 172:4,8,20 173:15 174:15 174:21 175:5,9 179:1,14,18 181:25 182:7 183:2,4,6 | **contract** 65:15 179:13 185:5 | **conveying** 97:14 | **correct** 7:13,19 8:13 10:14 11:12 14:2 17:11,14 22:9 32:9 47:13,22 54:8,8 62:20 64:12 71:23 74:7,8,12 79:6 81:24 82:3 88:3 90:5 91:22 96:8 100:16 105:10 107:11 113:6 139:3 141:25 142:20,23 143:23 150:10 150:23 153:9 172:15 174:22 175:13 177:18 178:9,14 183:1 183:21 184:3,6 184:10 185:9 186:1 187:5,13 196:10 197:20 203:11,16 204:13,14 230:11 237:12 240:8 |
| | **contracts** 65:13 | **convince** 138:23 | |
| | **contractual** 37:8 | **cook** 19:11,23 21:1,20 29:5 29:11,20 51:17 51:19,23,25 52:4 53:10 55:16,18,19,23 62:12 64:9,10 64:19 75:18,20 90:25 91:10 94:11,16 95:17 196:17,19,23 196:24 197:8 197:23 | |
| **contact** 27:12 132:4 | **contributions** 40:1 41:11 90:15 | | |
| **contacts** 138:23 | **controlled** 15:17 41:14 | | |
| **contemplating** 52:10 | **controller** 11:15 12:20 | | |
| **content** 112:23 120:7 | **controversy** 237:9 | | |
| **context** 26:15 26:20 121:3 128:11 130:14 192:24 221:22 222:2,17 | **conventional** 184:18 | **cook's** 29:22 | |
| | **conversation** 62:16 193:10 196:18 | **cooperate** 163:15,21 | |
| **contexts** 121:6 121:7 162:22 | **conversations** 19:14,17 21:20 26:17,19,23 51:23 52:5 63:2 64:9 100:7 101:20 108:11 135:21 156:21 177:8 | **coordinated** 233:18 | |
| **contingency** 156:5 | | **copied** 134:2 | |
| **continue** 17:6 23:15 87:6 117:25 127:20 158:16 205:22 | | **copies** 236:1 238:14 | |
| | | **copy** 74:10 124:13 128:6 144:19 235:24 | |
| **continued** 4:1 205:23 222:8 | | | **corrections** 240:6 |

HIGHLY CONFIDENTIAL

**[correctly - database]**                                      Page 20

**correctly** 48:18
49:2,3 225:16
**corresponden...**
118:17
**cost** 39:5,7
83:13
**costs** 71:19,21
87:7
**counsel** 5:5,15
13:4 19:14,17
26:18,20 30:2
30:5,17 34:10
34:12,15 35:5
50:9,20,24,25
52:20 53:13,18
53:22,25 55:17
64:24 65:24
67:24 68:1
69:9 72:17
92:20 94:7,10
120:12,15
122:21,24,25
126:2 127:9,11
127:13,17
140:24 154:18
154:20 156:21
164:3 167:3
180:3,7 186:13
195:24 196:2,8
197:25 198:12
198:13 229:20
237:14,15
238:14

**county** 237:3
**couple** 99:23
100:15 221:11
**course** 12:12
13:4 27:8
53:20 54:7
65:11,21 70:22
117:16 135:11
**court** 1:1 5:7
5:13 213:4
235:23 236:1,4
**covenant**
184:23
**covenants**
184:13
**cover** 8:14 67:4
71:21
**coverage** 70:14
70:24 71:1,3,5
71:8,9,12,14,17
**covered** 49:20
49:22 50:1
64:6,6 70:23
70:23 127:15
**covering** 71:19
**covers** 10:19
**create** 171:5
**created** 222:13
**credibility**
200:19 203:2
**credible** 202:4
204:6
**criminal** 66:15
163:25

**criteria** 147:8
214:1
**critical** 49:11
**criticisms**
49:17 203:17
**crook** 234:12
**crossed** 206:25
207:12 208:3
**crr** 3:7
**crutcher** 2:8
3:4
**cs** 238:15
**csf** 186:23
**csr** 3:7
**culmination**
190:13
**cuny** 186:22
194:12 195:17
195:22 196:2,9
**curious** 29:17
**current** 31:15
71:5,7,18 81:1
150:8 157:14
208:9
**currently** 46:19
82:7,15 85:15
86:7,17 154:3
159:1 160:1
185:8
**cusp** 169:23
**cut** 110:22
**cv** 1:3 5:9

**d**

**d** 3:8 5:1
**d.c.** 8:10
**daher** 3:22 4:10
99:17,17
100:25 101:6
106:15 107:23
107:24 108:4,4
108:7,12,16
110:11 111:25
123:5 132:19
132:24,24
133:13 134:13
**dale** 134:14
**dangerous**
100:22 115:21
115:22
**data** 13:13,16
13:18,19 14:18
14:19 20:12
96:18,22,22,24
96:24 97:4,7
98:21 106:18
129:1,2 131:21
192:7,22 195:1
195:6 199:15
201:4,6 202:18
204:12,13,14
211:6,11,11
214:7 225:6,10
225:11 229:11
**database**
217:12

HIGHLY CONFIDENTIAL

**[date - deny]** Page 21

| | | | |
|---|---|---|---|
| **date** 81:2,16,17 81:19 90:4,17 92:16 93:2 139:1 145:17 149:24 150:7 172:10,12 178:3 209:14 209:17 239:24 240:12 | **death** 219:6 | 55:9,15,20,25 | **defense** 61:20 |
| **dated** 107:23 113:16 117:19 120:1 123:24 125:5 128:24 130:6,17 131:10,19 132:20 136:14 149:13 | **dec** 42:7 | 56:9,14,19,23 | 66:13,15 71:19 |
| | **decade** 172:3 | 57:3,21 58:16 | 71:21 |
| | **deceased** 19:2 | 59:3,11,15,21 | **define** 31:1 |
| | **december** 42:4 | 59:24 60:5,10 | 69:23 |
| | 75:15 77:9 | 60:20,25 61:3 | **definitely** 19:7 |
| | 86:23 123:24 | 61:6,14,19,24 | 128:16 |
| | 131:10 | 62:4,7,10,14 | **definitively** |
| | **decide** 142:16 | 63:1 64:17 | 101:16 |
| | 189:25 | 72:1,5,20 73:8 | **deleted** 207:7 |
| | **decided** 9:20 | 73:14,20,23 | 207:14 209:7 |
| | 39:9 42:9 | 78:9,15 79:13 | 210:3,21 |
| | 60:14 153:6,7 | 87:22,25 88:9 | 211:19,23 |
| | **decision** 55:24 | 88:15,23 117:6 | 212:2,6,10 |
| | 56:4,8,13,18,22 | 123:16 128:3 | 213:18 230:16 |
| **dates** 8:12 | 57:2,21 58:6 | 160:23 187:15 | 230:17,25 |
| **dave** 206:16 | 58:10,15 60:20 | 189:14 191:22 | 231:5,25 232:8 |
| **david** 1:6 2:2 | 61:3 188:6 | 191:25 192:16 | 232:12 |
| 5:17 | **decisions** 95:1 | 222:12 226:10 | **deletions** |
| **davis** 2:15 5:12 | 98:5 | 226:18 | 212:16 |
| **day** 5:25 6:1 | **decks** 15:3 | **defamatory** 4:9 | **deliberate** |
| 8:1 133:1 | **declare** 240:4 | 116:25 128:14 | 98:13 233:17 |
| 199:5 213:4 | **decline** 97:3 | 128:21 222:7 | **deliberations** |
| 240:15 | **deemed** 95:8 | 226:19 | 40:5,18 41:7 |
| **days** 118:13 | 147:20 161:9 | **defamed** 49:6 | **delivery** 26:24 |
| 139:15 186:15 | 240:6 | 170:19 | 51:24 |
| 190:8,11,12 | **deep** 30:8 | **defendant** 2:7 | **demeanor** 63:7 |
| 221:11 238:16 | **defamation** | **defendants** | 63:8,9 |
| **de** 179:16 | 33:23 34:5,19 | 1:10 2:11 6:6 | **denied** 71:1,3 |
| **deal** 206:4 | 35:1 49:20 | 49:4 63:1,14 | 162:14 |
| **deals** 190:5 | 50:4,13 51:8 | 83:18 156:25 | **denver** 2:9 3:5 |
| 191:3 | 51:14 52:6,11 | 167:19 | 5:11 237:3 |
| | 52:17 53:2 | **defending** 73:7 | **deny** 162:19,24 |
| | 54:11,17 55:1 | 86:17 | 199:24 224:10 |

HIGHLY CONFIDENTIAL

**department**
42:16 103:25
202:16 212:19
212:22 233:3,5
233:9 234:25
235:3
**dependent** 44:8
**depends** 21:5
224:7
**deponent** 123:1
227:6 238:13
240:3
**deposed** 6:15
6:20 7:1,6,14
8:19
**deposing**
238:13
**deposition** 1:11
3:2,16 5:5,10
6:14,18 7:16
7:17,18,18 8:4
8:5,8,21,23 9:2
9:7 45:14
85:17,19 89:11
126:23 143:12
171:19 193:19
227:11 236:8
237:1,10
**depositions**
6:17,23 235:24
**depth** 11:1
208:17
**derivative**
86:21,25 146:6

**describe** 6:17
9:10 10:15
20:2,5 36:16
38:21 39:16
43:13 45:21
46:22 50:3
51:22 65:9
80:16,22 139:8
145:5 146:19
165:14 187:22
187:23 197:21
**described** 38:9
91:16 138:13
139:2 143:13
168:7 189:22
**describes** 90:23
153:12 162:8
163:11 167:9
171:24 175:2
180:16 181:24
210:17
**describing**
28:19
**description**
89:23 150:25
209:8,25
**descriptions**
210:4
**deserved** 45:6
**design** 32:2
**designate** 82:12
85:11
**designated**
152:13

**designed**
164:23 166:13
**detail** 12:14
38:9
**detailed** 13:6
**details** 58:5
**determined**
140:12
**detractors**
122:17
**develop** 23:8,22
**development**
12:22 23:6
61:22 141:12
161:17 222:3
**developments**
161:17
**devoted** 33:17
**diagnose** 22:15
22:15
**diagnostic**
22:15,22
**diagnostics**
12:20,22 13:5
**die** 219:5
**difference**
169:8 231:6
232:1
**different** 37:12
42:11 103:3,15
129:12 154:13
160:9 165:6,12
165:15,25
166:23 167:13

167:17,18,22
167:25 168:8
168:11,20
169:10,13,13
170:7,11,15,22
170:24,25
188:10 204:1
208:23 216:8
216:19 217:14
221:1,13
**difficult** 16:21
18:14,14 72:8
**diligence**
189:25 191:2
192:11
**diluting** 109:8
**direct** 11:20
117:17 133:25
167:19 188:11
208:19
**directed** 52:19
52:20
**direction**
122:24
**directive** 29:13
**directly** 11:9,11
103:23
**director** 11:16
89:23 113:8
175:16
**directors** 3:18
3:19 17:15
32:21,25 33:22
34:3,19 35:1

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 39:10 50:16 | disclosure | discuss 19:16 | 58:21 59:1,6,7 |
| 51:11 52:3 | 84:19 154:2 | 19:23 33:9 | 59:20,23 65:23 |
| 57:1,9,22 58:7 | 155:22 161:8 | 99:2 108:8 | 79:12 80:13,19 |
| 58:8,11,17 | 166:7,9 167:8 | 181:11 188:1 | 100:7 101:9 |
| 74:6,22 77:16 | 181:5 185:23 | discussed 33:10 | 104:4 106:7 |
| 89:15 90:2 | 187:7,10,12 | 33:23,25 34:20 | 127:12,17 |
| 97:24 110:4 | 198:3 199:12 | 34:21 35:2 | 159:19,22,23 |
| 139:11,19 | 199:21,22 | 50:13 51:15,16 | 180:3 191:14 |
| 140:13,13 | 211:5,9 225:10 | 52:7 62:11,14 | 191:21 194:1,7 |
| 142:2,22 | 227:17 | 63:18,19 65:3 | 194:25 195:5 |
| 145:10 146:9 | disclosures | 77:10 90:12 | 195:13,17,22 |
| 152:11,20 | 186:25 225:5 | 94:10,24 99:2 | 196:1,8,11,14 |
| 176:15,19 | 225:18 | 99:4 107:2 | 198:7,10,12,13 |
| 188:6,7 | discord 99:25 | 163:17 181:6 | disease 10:8 |
| **disappointed** | 100:2,3 101:4 | 195:2 221:10 | 14:11,16 15:1 |
| 216:17 217:17 | 112:3,9,16,17 | discusses 98:23 | 22:16,16,16,21 |
| **disappointing** | 112:20,21,23 | discussing | 22:22 164:24 |
| 217:20 | 113:5,8 133:5 | 19:23 62:4,6,9 | 164:24 166:14 |
| **disclaim** 38:11 | discount 191:4 | 101:4 132:19 | 166:15 183:15 |
| **disclaimed** | discounted | 198:14 | 211:21 218:17 |
| 152:12 | 202:21 | discussion | 218:23 219:4,6 |
| **disclose** 83:25 | discounts 191:4 | 21:19 34:2,4 | 219:20 220:11 |
| 84:1,3,5,14 | discourse | 64:15 75:14 | 221:4,7,14,16 |
| 102:14,18 | 226:17 | 77:8 79:20,23 | 221:22 222:2 |
| 180:6 | discovered | 80:11 114:7,12 | 222:17 |
| **disclosed** 22:25 | 185:24 | 154:19 164:3 | dismiss 56:8,14 |
| 39:11 47:12 | discoveries | 193:1,2,4 | 56:19,23 57:2 |
| 84:9,11,23 | 201:21 | 194:2 199:14 | 57:21 58:15 |
| 85:21,22 | discretion | discussions | dismissed 88:4 |
| 167:12 182:11 | 143:1,4,21 | 21:20 26:8,13 | 161:3 |
| 183:9 | discretionary | 34:8,15,18 | disparaging |
| **disclosing** | 142:10 143:21 | 50:17,20 51:11 | 184:21 |
| 26:23 157:6 | 144:8 | 51:13,19 52:3 | displeased 63:3 |
| 164:7 | | 52:4 56:4,8,13 | 63:6,10,24 |

HIGHLY CONFIDENTIAL

**[dispute - dr]** Page 24

| | | | |
|---|---|---|---|
| **dispute** 70:2,6 | 109:23 177:20 | 62:24 63:22 | 164:9,12,20 |
| **disputes** 69:16 | 183:7,8,10 | 64:3,3 65:7,10 | 165:1,25 |
| 69:21,23 | 213:20 217:6 | 65:24 66:5,10 | 166:10,16 |
| **distort** 121:8,8 | **doj** 103:24 | 66:15,20 67:4 | 167:9 170:2,19 |
| 121:15 160:18 | 162:4 163:12 | 67:10,21 68:3 | 171:24,25 |
| 161:16 | 163:12,15,21 | 68:8,15,19,23 | 172:4 173:4,7 |
| **distribution** | 165:5 166:4,5 | 69:16,22 70:7 | 173:12,24 |
| 80:25 81:13,14 | 166:7 167:3,4 | 70:10 75:23 | 174:2 175:11 |
| **district** 1:1,2 | 167:7,9 168:3 | 76:2,14 84:7,7 | 180:17,21 |
| 5:7,8 86:16 | 168:7 169:14 | 84:14,14 90:25 | 181:1,5,6,18,21 |
| **dividend** 81:1 | 170:16,17,17 | 91:13 94:16 | 181:25 182:7 |
| 81:13,14 | 200:8 201:22 | 95:18 97:13 | 183:2,7,18,25 |
| **dkumagai** 2:6 | 216:24 233:13 | 103:25 121:20 | 184:11,20,22 |
| **document** 7:22 | 233:16,20,23 | 121:23,24 | 185:12 186:4,4 |
| 20:7 74:1 | 234:1,5,8,11,15 | 122:2,3,5,6,8,9 | 193:23,23 |
| 79:10 107:19 | 235:10,19 | 124:4,5,10,19 | 194:3,4,7,13 |
| 113:13 117:3 | **doj's** 165:10,15 | 125:12 128:25 | 195:10 196:12 |
| 119:20 123:20 | 165:24 167:2 | 129:14 130:6 | 196:25 198:18 |
| 125:3 132:10 | 168:12 169:2 | 131:2,10,20 | 198:18 199:8 |
| 136:2,6 155:22 | 170:1 196:12 | 132:8,25 | 199:11,14,15 |
| 168:3 169:14 | 232:19 | 133:11,17,22 | 199:15,22 |
| 189:2 205:1 | **dollar** 147:3,4 | 134:2,3 136:15 | 200:1,8 202:17 |
| 209:21,22 | 187:16 | 136:24 137:2,3 | 202:22,25 |
| 210:10 230:8 | **dollars** 38:4 | 137:10 138:3 | 204:7 211:20 |
| 230:13 232:12 | 152:4 | 138:12,24 | 211:24,24 |
| 232:14 | **dose** 130:7 | 139:2 141:23 | 212:3,3,7,18 |
| **documents** | 201:15 | 142:25 143:16 | 213:7,7,7,14,16 |
| 163:15,22 | **doubt** 121:4 | 146:16 147:22 | 214:2,11,16,21 |
| **doing** 9:22 12:3 | 199:11,25 | 152:15,15,18 | 215:1,10,23,24 |
| 23:14 30:18 | 201:23 | 152:24 153:7 | 223:17,20 |
| 36:10 54:7 | **dr** 13:23,24 | 153:10,11 | 225:5,10 |
| 91:17,20,21 | 26:9,11 31:14 | 156:15,16,17 | 233:21 234:25 |
| 92:11 93:8,9 | 33:8 42:15,19 | 156:17,17 | 235:3,19 |
| 96:4 104:21 | 43:24 62:19,21 | 163:17,25 | |

HIGHLY CONFIDENTIAL

**[draft - email]**                                    Page 25

| | | | |
|---|---|---|---|
| **draft** 20:10,13 20:19,24 205:12 | **drug's** 220:6 | **ecosystem** 48:12 | **egregious** 138:5,8 139:3 |
| **drafted** 198:3,5 | **drugs** 16:25 | **edits** 21:2 | **eight** 177:3 |
| **drafter** 13:3 | **dry** 13:12 | **educated** 67:1 67:11 | **either** 22:21 27:21 31:10 |
| **drafting** 20:20 52:14 54:16,19 54:25 55:24 141:17 | **due** 29:12 76:15 116:16 117:14 124:6 192:11 | **educating** 30:13 | 51:2 52:6 68:3 69:16 70:6 71:2 94:10 |
| **driving** 49:7 | **duly** 6:8 237:7 | **effect** 103:4 104:18 166:24 168:9 185:8 203:18 223:17 224:1,6,6 230:24 231:17 232:5 | 103:22 118:19 140:13 147:12 158:23 185:11 188:7 202:12 222:1 |
| **drop** 22:17 | **dunn** 2:8 3:4 6:4 | | **elements** 38:8 201:8 |
| **droppable** 161:9 | **duties** 177:16 177:24 | | **eligible** 143:7 |

**drug** 12:21
14:5,6,17,21
15:6,18,19,25
16:10 61:22
97:2 103:4
116:10 125:23
141:12 169:23
199:1,5,6
200:22 201:5
201:10,20
202:10,12
203:8 204:2,2
205:22,23
216:6,15,23
217:9,19
218:13,17,21
218:23 219:1,8
219:8,12
220:11 222:3,3
223:15

**e**

**e** 3:8 5:1,1
81:10 128:6
239:3,3,3
**earlier** 17:9,22
78:8 87:4 91:4
91:16 92:2
95:25 96:5,7
96:10 108:12
117:4 127:19
132:19 134:7
139:7 158:15
189:22 227:14
**early** 7:17
11:18 22:13
42:10 46:25
93:6 179:24
**earnings** 28:16
**easiest** 146:22
**echoing** 76:15

**effective**
144:21 175:21
178:3 179:21
220:14
**effectively** 38:6
147:5
**effects** 14:8
15:8
**efficacious**
14:22,22 17:3
116:9 217:19
218:16,22
220:10 222:4
228:11
**efficacy** 103:12
131:21 203:16
210:21 228:10
**effort** 222:10
**efforts** 127:1
227:2

**eliminated**
146:23
**elisa** 25:8
**elizabeth** 122:9
**email** 2:6,10,14
3:21,23 4:2,4,7
4:10,12,14
27:12,13,13,16
27:21 65:8,10
65:14 107:22
108:15 111:23
111:25 113:15
113:22 117:18
119:5,16 120:1
120:7,8,14,15
120:21 123:22
124:3 125:5,10
126:6 132:18

HIGHLY CONFIDENTIAL

**[email - example]**                                    Page 26

132:20 136:11
136:14 137:9
137:14 139:4
181:6,17 186:4
221:24
**emailed**  100:20
101:20 108:7
135:10
**emails**  53:15
99:24 105:23
119:18 134:2
134:25
**empirical**  96:18
96:22
**employed**
177:15,21
**employee**  11:18
31:10 37:11
111:7 113:7
177:20
**employees**
109:12,21
110:3 155:18
**employment**
185:4
**encompassed**
205:20
**encompasses**
127:24
**endeavor**
115:22
**ended**  150:21
218:12

**endpoints**
14:23 15:16,16
15:17,23 203:3
**ends**  208:4
**enea**  1:4 2:16
5:19 6:1
**engage**  179:12
188:9
**engagement**
190:9 191:18
**engaging**
190:20
**enroll**  227:2
**enrolled**  219:18
**entail**  77:23
**entered**  179:2
185:7 189:11
**entire**  79:7
228:8
**entirely**  88:22
223:5
**entitled**  144:1
154:5,9,14
**entitlement**
152:12
**epilepsy**  15:12
24:8
**epithets**  121:25
**equal**  90:16
155:11 178:2
**equity**  90:7
172:25 182:16
**equivalents**
157:16

**eric**  1:11 3:3,16
3:22,24 4:2,5,7
4:13 5:5 6:7
45:14 75:17
89:11 107:23
111:25 113:15
124:14 126:23
136:14 171:5
171:19 193:19
213:19 227:11
238:5 239:2,24
240:2,4,12
**errata**  238:11
238:13,16
**escort**  101:3
**especially**
29:17 48:18
213:22
**esq**  2:2,3,3,7,11
238:1
**essentially**
139:15 140:16
145:12 177:23
191:5
**estimate**  67:14
83:19 84:10
85:7 89:1
**estimates**  78:6
83:7
**et**  5:6,7 238:4,4
239:1,1 240:1
240:1
**evaluate**
122:21 160:7

**event**  12:6
140:6
**events**  181:12
181:14,16,18
200:9
**eventually**  10:5
10:10 154:23
181:8
**evidence**  16:22
17:6 198:25
220:17 221:10
228:9,12,16
230:1
**evolved**  10:16
**exact**  17:19
93:2 128:15
172:10,12
**exactly**  24:4,24
42:25 43:8
66:9,11 77:23
96:2 97:24
129:20 145:16
145:17 146:12
172:18
**examination**
3:3,9 6:10
229:23 232:17
234:19 235:6
235:15 237:7
**examine**  215:7
215:21
**examined**  6:8
**example**  20:25
33:7 53:17

HIGHLY CONFIDENTIAL

**[example - extent]**                                    Page 27

65:25 98:24
109:13 121:20
230:18
**examples**
128:14
**except** 64:6
180:2 186:16
**exception**
202:4 204:6
**exceptions**
184:9
**exchange** 8:6
64:16 108:4
113:21 114:5,6
117:18 122:11
122:13 125:10
126:6 136:19
137:10 138:12
**exchanged**
99:23 105:22
**exchanges**
118:4 134:2
**exclude** 69:9
94:7
**excluded** 214:6
225:10
**excluding**
126:14
**exclusion** 214:1
215:11
**exclusions**
199:14
**excuse** 72:20
90:4 113:17

117:6 158:7
171:23 199:15
209:16 221:17
**executive** 11:24
90:14 95:11
98:22 175:16
**exercise** 81:6
173:20
**exercised** 47:5
173:1
**exhibit** 3:16,18
3:21,23 4:2,4,7
4:9,10,12,14,17
4:18,20,21,23
7:20,21 8:3,4
73:25 74:1,2
89:14,18
107:19,21,22
113:12,13,14
119:20,22,23
123:19,21,22
125:2,3,4
128:1,4 132:10
132:12,18
136:2,4,6,8,9
136:13 137:8
144:10,11,16
149:3,4,8
150:15,16,17
160:14 171:23
189:2,3,5
205:1,3,7
230:3

**exhibits** 3:15
4:1 189:8
236:2
**exist** 81:20
**existing** 83:2
**expand** 64:22
**expansive**
10:19
**expect** 12:14
79:4 93:23
97:13 99:12
158:11 193:9
**expectation**
217:10
**expected** 97:3
**expecting**
224:15,25
225:2
**expended** 71:4
**expenses** 58:22
59:2 66:6,11
66:15,20 67:5
67:10,21 68:3
68:15,19,23
69:6 70:14
81:25 87:14,18
88:8,15 158:5
158:5,12
**experience**
12:17 25:7
193:8
**experiment**
23:15 213:15
213:21,24

**experimental**
216:11,15
219:1
**experimenter**
25:4
**experiments**
17:5 22:1 25:8
25:8 31:17,21
124:5 125:7,13
**expert** 25:14,22
**experts** 11:1
111:12
**expiration**
81:16
**expire** 173:21
183:3
**expired** 173:7
173:14 179:19
183:4
**explain** 68:5
213:10
**explained**
109:25
**explore** 190:21
**expression**
20:16
**extended** 183:3
183:5,6
**extension** 184:9
205:18
**extensively**
49:21
**extent** 11:22
38:7 50:3

HIGHLY CONFIDENTIAL

63:20 69:8
146:23,24
148:20 172:19
182:6

**f**

**fabricate** 171:2
171:3,4,9
**fabricated**
129:1 165:1
166:17 169:21
170:3,9 202:18
216:24
**facing** 87:7
**fact** 35:21
52:14,16 58:9
58:16 93:14
133:22 177:11
201:20
**factor** 83:7
127:20
**facts** 53:1
54:10 94:13
156:21 162:21
**factual** 145:17
**failed** 15:10,24
42:8 44:12
199:2 201:10
201:20 202:10
202:14 216:5,6
218:14 221:1
221:12 222:8
222:25 223:11

**failing** 42:9
73:6 199:4
**fails** 160:3
238:18
**failure** 15:14
42:5,9 102:7
200:24 201:7
**fair** 21:8 79:21
123:7 124:22
158:2 185:25
190:1 210:8,22
225:3
**faith** 199:5
203:1 226:20
**fake** 234:2
**fall** 92:2 144:6
**falls** 21:10
**false** 116:25
127:6,6,22
128:14 164:20
166:11 216:23
217:4,8,14,15
217:22,23
219:3,7 222:6
226:19
**falsehoods** 49:6
**falsified** 202:17
216:24
**familiar** 13:23
17:25 48:6
101:11 104:3
105:11 106:8
106:10 134:19
136:21 176:12

206:7 214:5
**fans** 103:8
**fantastic** 42:7
91:18,21 96:4
**far** 8:20 9:1
71:18 101:24
102:1,2 112:12
114:1 121:6,7
122:12 145:23
159:11,11
178:11,13
180:10 183:22
184:22 185:6
185:10 192:3
202:23
**fasting** 231:6
232:1
**fat** 231:6,6
232:1,2
**favorable**
191:1,6 204:3
**fda** 14:20,23
15:19 16:1
194:12 214:12
214:22 229:25
**fda's** 194:7,25
195:5
**fear** 121:4
**feasible** 215:8
**features** 32:2
**february**
132:20 204:25
**fee** 183:10
190:24

**feedback** 32:1
76:15
**feel** 165:11
216:9,17
217:21 218:11
220:3 229:9,16
**feeling** 223:2
**fees** 88:22
180:14
**fielding** 28:23
**figure** 22:20
190:10 191:6
**filaman** 14:7
21:16,18 22:5
207:9,15,16,19
207:22 208:5
208:13,22,25
217:25 218:6
218:16,20,22
219:21,25
220:10
**filamin** 14:7
15:8 16:7
17:18,23 21:19
**file** 20:6 53:2
56:4 61:24
123:16
**filed** 5:7 54:17
54:21,21 55:1
55:8,15 86:23
101:16 117:7
118:5,13,14
128:2,19
150:23 187:14

HIGHLY CONFIDENTIAL

**[filed - form]**                                                    Page 29

| | | | |
|---|---|---|---|
| 197:24 209:21 | **finding** 111:12 | **flew** 197:9,11 | 25:15 28:24 |
| 222:6 226:18 | **findings** 199:13 | **flip** 8:2 | 30:22 35:3 |
| **filing** 38:10 | 200:6 210:21 | **floor** 2:4 | 38:9 40:22 |
| 52:17 54:11 | 210:22 214:7 | **fluid** 22:19 | 41:2,10 43:5 |
| 55:2 101:18 | 215:12 | **flying** 197:19 | 44:3,17 48:10 |
| 103:23 116:23 | **fine** 53:23 84:4 | **focus** 22:14 | 49:13 52:18 |
| 189:8,13 226:9 | 93:9,15,18,24 | 79:9 | 56:2 57:23 |
| 235:18 | 95:21 122:22 | **focused** 30:2 | 60:11 61:15 |
| **filings** 17:10,12 | 146:15 223:24 | **foia** 137:11,19 | 62:1 64:4 |
| 17:17,21 20:3 | 224:21 | 137:21,23 | 66:12,18 67:6 |
| 20:4 21:18 | **finite** 73:7 | **foley** 120:2,11 | 67:16,22 68:6 |
| 22:5 23:1,9 | 81:15,16 | **follow** 126:12 | 68:11,24 69:7 |
| 39:12 55:25 | **firm** 27:6,8 | 205:24 218:15 | 69:18 70:6,16 |
| 160:25 234:24 | 140:24,25 | **followed** | 72:2,24 73:16 |
| **final** 90:18 | 141:7 | 191:10 | 78:13 83:10,15 |
| 204:24 206:5 | **firms** 72:14 | **following** 77:1 | 84:8,16 85:2,5 |
| 206:13,14 | **first** 6:8 8:3 | 178:3 | 87:9 88:12,17 |
| **finally** 204:23 | 28:23 38:18 | **follows** 6:9 | 92:14,18 93:11 |
| **finance** 10:19 | 42:8 52:9 | **food** 15:19 | 93:16,19,25 |
| 77:4,21 78:4 | 85:25 102:8,8 | 230:24 231:17 | 94:4,18 95:23 |
| 79:11 80:5 | 128:2,20 145:9 | 232:5 | 96:20 97:9,17 |
| **financial** 9:15 | 151:5,6 152:1 | **football** 20:16 | 98:8 104:2 |
| 9:17 13:2 | 157:24 162:5 | **footnote** 213:6 | 111:20 112:18 |
| 36:18 48:25 | 173:14 187:6 | **forecast** 83:5 | 116:19 118:7 |
| 49:8 75:18 | 195:3 204:20 | 83:13 158:16 | 123:11 124:20 |
| 173:19,22 | 207:12 209:11 | **foregoing** | 127:8,23 129:7 |
| **financials** | 209:24 215:17 | 186:21 236:8 | 133:14,24 |
| 85:22 155:15 | 219:7 230:7 | 237:12 240:5 | 137:19 141:13 |
| **financing** 33:9 | **fiscal** 161:5 | **forget** 217:21 | 142:19 143:3 |
| **find** 13:11,11 | **fit** 30:17 121:12 | **form** 4:18,22 | 144:4 145:3 |
| 14:21 27:15 | **fixed** 142:11,22 | 12:6,11,11 | 147:16 148:22 |
| 111:7 119:18 | 143:1 144:1 | 13:3 14:1,7,12 | 148:23 149:9 |
| 191:3 | 147:14 152:10 | 16:20 18:9,22 | 149:25 150:20 |
| | 183:10 | 22:7 23:24 | 152:16 153:8 |

HIGHLY CONFIDENTIAL

**[form - generally]** Page 30

| | | | |
|---|---|---|---|
| 154:7,17 158:21,24 159:14 161:1 162:25 164:1 165:8,17 166:3 166:25 167:16 167:24 168:10 168:18 169:9 170:10 171:11 172:21 176:5 176:10,21 177:5 180:12 192:14 193:12 197:17 198:20 199:18 200:12 202:1,20 203:15 207:20 207:22 211:3 212:13,17,25 213:11 214:17 214:23 215:15 217:1 219:16 220:8,24 221:18 223:7 224:3,16 225:1 225:13,25 226:13 227:25 228:22 229:7 229:13 230:7 230:20 231:2,9 233:8 237:12 **formal** 180:1 180:10 | **former** 9:12 11:3 19:1 20:14 54:3 69:11 175:15 224:22 **forms** 169:18 **forth** 34:9 **forward** 23:11 24:12 34:22 53:10,21 78:18 81:23 106:4 158:12 230:1 **forwarded** 120:14 **forwarding** 53:12 54:7 122:21 **found** 53:9 118:22 125:25 **four** 33:2,13 212:11 **frame** 115:12 190:18 **france** 213:15 **fraud** 169:20 222:20 233:3 233:21 234:12 **fraudulent** 164:21 166:11 **free** 226:11,16 **friday** 197:10 **friedmann** 19:1 20:18 33:8 | **front** 27:9,23 89:19 **frustrating** 8:1 **fud** 120:3 121:2 121:5,20,23 **full** 57:11 130:11,22 151:11 216:7 **fully** 64:13 71:4 184:5 **fulminated** 159:25 **fulsome** 183:8 **fund** 82:5 154:5 **fundamental** 169:23 **funded** 82:18 82:20 **funding** 92:8 127:2 **fundraising** 36:9 82:8 **funds** 47:17 127:21 152:12 153:7,7,22 154:5 190:4 192:1 **further** 23:22 28:8 61:22,22 119:4 126:12 126:14 171:4 234:18 235:5 235:14 | **future** 38:5 71:20 109:22 145:12 147:3 148:21 152:6 |
| | | | **g** |
| | | | **g** 5:1 **gaap** 84:10 **gabe** 105:12,25 **gain** 173:22 **garbage** 234:6 **gather** 52:20 53:25 122:24 **gathered** 53:21 **gathering** 52:14,16 53:1 54:10 **general** 17:25 30:2,5,17 39:1 39:1 46:24 55:17 63:15 66:22 75:14 78:24 98:11 100:8 135:3 181:3,4 184:8 191:7 193:1 **generality** 43:16 **generally** 18:2 21:14 29:10 33:5,13 34:22 35:17 63:3,6 80:22 95:5 115:2 117:5 |

HIGHLY CONFIDENTIAL

**[generally - group]**                                                    Page 31

| | | | |
|---|---|---|---|
| 139:8 145:8 181:8 188:18 188:20 190:5 216:4 | **giving** 37:24 85:20 122:17 196:20 216:13 216:13 217:22 224:18 | 45:10 48:19,20 48:20,21 49:16 49:16,17,19 66:16 71:2 78:20,22 79:3 | **gov** 206:8 **governance** 35:22 42:12 78:1 146:10,11 146:13 |
| **generated** 13:14 14:19 16:22 124:6 220:17 | **glasses** 7:25 **go** 8:2 12:13 14:18 19:18 25:18,23 26:5 | 79:7 81:23 84:13 89:7 92:5,7 93:24 96:15,19 98:13 | **governing** 182:25 **government** 161:20 202:11 214:12 |
| **gentleman** 102:12 | 27:11 28:14 39:24 61:10,23 | 108:4,6 110:4 122:11 125:10 | **grant** 43:17,19 77:10 91:4 |
| **geoffrey** 1:6 | 78:3,22 79:25 | 126:19 136:23 | 109:14 127:1 |
| **getting** 16:8 103:4 109:25 119:15 | 80:3 82:13 83:3 85:12,14 86:7 92:20 | 156:13 158:12 159:23 171:6 171:15 178:13 | **granted** 90:17 173:5 **grants** 43:20 |
| **gibson** 2:8 3:4 6:3 36:7 186:14 | 98:4 110:20 114:8,11 119:17 126:17 | 193:15 201:2 202:13 217:6 219:5 226:5 | 90:13 **graphs** 169:22 |
| **gibsondunn.c...** 2:10 238:2 | 127:9 134:15 134:16 139:6 149:5 151:1 | 227:7 235:21 **good** 5:2 6:12 6:13 10:21 | **great** 20:10 91:25 115:24 116:12,21 |
| **give** 38:23 39:1 63:16 64:1 66:22 70:21 78:18 94:9 98:12 122:15 122:23 156:18 170:14,14 176:6 178:21 202:18,22 217:7 | 171:23 182:11 188:5,13,17 189:4 215:6,13 217:5 228:7 229:25 **god** 222:9 **goes** 27:13 30:8 171:4 | 27:19 43:16,16 60:7,17 61:12 83:1 95:4,4 97:5,16 105:21 106:4 128:7 140:15 174:25 203:5,6 208:17 216:14 221:25 | 133:1 160:6 199:4 224:12 **greater** 79:9 143:11 **greatest** 30:21 **greatly** 78:22 **greece** 197:7,21 **gross** 81:24 |
| **given** 37:24 41:12 87:10 189:24 216:22 223:3 240:9 | **going** 5:2 7:25 9:22 19:13,15 20:6 21:6 34:6 37:5,25 38:23 41:24 42:6 | 222:4,9 226:20 **google** 114:20 221:21 222:19 223:14 | 96:13 **group** 27:9 41:20 97:2,2 99:25 100:2,3 101:4 112:4,5 |

HIGHLY CONFIDENTIAL

**[group - honest]**                                                    Page 32

112:8,17,19,23
113:8 133:5
135:22 139:24
139:25 140:1
144:7 152:25
156:24,24
188:13
**groups** 45:3
**guaranteed**
139:18,19
**guarantees**
216:12
**guardrails**
139:24
**gueron** 2:4 5:18
5:21,24
**guess** 28:20
40:23,24,25
41:4,6 67:1,11
73:4
**guidance** 78:18
**guilt** 218:11,13
**gussin** 97:22
98:2
**guy** 99:22
105:20 120:3
**guys** 156:13

**h**

**h** 239:3
**h.c.** 189:16
190:20
**half** 157:24

**hand** 127:19
**handle** 119:16
236:4
**handling** 30:3
**hands** 18:4
29:20
**handy** 150:13
**happen** 191:19
191:20
**happened** 9:24
61:11 64:11
74:22 77:15
80:23 100:24
161:4 174:23
194:20,21
197:12,16
228:4
**happening**
31:23 53:15
**happens**
158:20,22
188:22
**happy** 63:15
**hard** 16:16,16
140:9 163:10
201:3
**hashtag** 133:6
234:13
**hats** 10:24
**head** 43:21
66:21 194:14
**heading** 87:14
90:7 155:22
160:17 161:15

161:16 164:12
185:17 205:17
**health** 12:19
37:10 104:1
**hear** 41:9
195:20
**heard** 24:23
104:7 121:19
121:22,24
192:10 215:17
**hearing** 103:22
192:20
**heavily** 31:22
**heavy** 28:14
**heilbut** 1:4
2:16 5:6,19 6:1
122:3 125:6,12
130:17 131:20
156:17 238:4
239:1 240:1
**held** 32:12 51:6
90:19 173:4
**hellbutt** 122:3
**help** 104:12
112:7 114:10
132:25 156:13
191:25 217:19
222:10
**helpful** 170:23
**helping** 191:22
**hereto** 240:7
**hesitating**
94:19

**hey** 10:5 21:11
28:5 29:17
78:18 100:20
102:15 104:11
104:19 105:16
160:6 188:4
**hi** 111:25
117:19 124:11
132:24
**high** 115:13,17
117:10 231:6
232:1
**highly** 1:16
82:13 85:12
**hire** 77:9
**historic** 97:2
**historically**
20:2 58:9
**history** 31:4
213:18 215:7
**hit** 40:3 140:7
**hitting** 96:14
**hoc** 36:9,23
186:7 188:21
**hold** 46:19
53:19 147:6
148:6 196:5
**holder** 81:8,9
102:16
**holding** 112:6
**holds** 154:3
**home** 197:19
**honest** 9:2
102:13

HIGHLY CONFIDENTIAL

**[honestly - individual]**                                      Page 33

| | | | |
|---|---|---|---|
| **honestly** 38:17 48:13 121:16 | **images** 165:2 166:17 170:4 | 178:15 182:17 182:17,22 | 202:24 213:16 |
| **hope** 32:4 216:14,23 217:4,8,14,15 217:22,23 219:3,7 | **imagine** 32:3 | **inception** 11:4 | **indicating** 232:5 |
| | **imbalances** 48:12 | **include** 34:7,8 50:15 52:21 54:1 67:24 78:6 154:18 160:25 | **indication** 15:11 24:7 96:19 |
| **hopeful** 217:7 | **impact** 200:6,9 200:18,23 225:23 226:7 226:24 | | **indications** 199:6 |
| **hopefully** 144:14 | | **included** 59:14 141:23 142:7 157:3 235:18 | **indicators** 164:25 166:15 |
| **horrible** 219:6 | **impacting** 224:24 226:22 | **includes** 74:10 155:5 170:2 | **indicted** 42:15 43:24 196:25 212:18 |
| **hot** 103:14 | **impacts** 208:21 | | |
| **hour** 179:9 236:9 | **important** 115:16 117:12 203:13 220:21 | **including** 83:9 86:5 152:14 158:5 161:8 163:16 165:2 166:17 170:3 | **indictment** 42:19 66:16 163:17 164:12 164:20 166:10 167:21 172:11 172:17 196:12 200:7 212:22 213:1 223:16 223:20 232:19 234:22 |
| **hours** 109:20 179:18 236:10 | **impossible** 124:5 | | |
| **house** 19:14 72:17 | **impression** 63:5 106:6 | **income** 45:19 45:23 46:16 | |
| **hr** 10:22 | **improper** 49:8 215:11,17 | **incorrect** 7:11 204:15 | |
| **huge** 116:10 | | **incur** 158:11 | |
| **huh** 135:13 169:6 | **improvement** 164:24 166:14 | **incurred** 88:9 | **indifferent** 27:20 |
| **human** 16:11 | **inaccurate** 67:18 | **ind** 130:19 | **indirect** 208:20 |
| **humans** 233:11 | | **indefinite** 184:12 | **indirectly** 103:23 |
| **hypothetical** 224:18 | **inadvertently** 181:5 | **indemnificati...** 180:13 | **individual** 29:16 50:1 78:16 99:16 101:11,25 103:3,11 105:11 106:8 |
| **i** | **incentive** 4:17 36:25 37:17 139:6 141:10 141:22 142:6 144:20,20 148:13,16 172:25 174:3 | **indemnified** 68:12 69:10,11 | |
| **i.e.** 98:22 | | **independent** 36:6 44:24 98:21 186:11 | |
| **idea** 18:7 22:20 24:7 40:19 60:7,17,17 165:24 | | | |

HIGHLY CONFIDENTIAL

**[individual - investigating]**                    Page 34

113:15 114:1 114:23 118:10 120:15 123:23 153:23 154:22 169:19

**individually** 169:13

**individuals** 55:7 107:2,9 134:9

**inference** 174:25

**information** 20:12 21:6 27:25 52:19 53:6,12,21,25 82:10 85:20 95:10 100:12 118:25 122:16 122:17 124:24 125:21 138:17 149:24 150:1,8 163:16,22 164:2 196:20 196:21 222:7

**informed** 59:13 95:5,11 189:23 196:15

**informing** 59:14

**infrequently** 36:24 39:5 41:18

**initial** 20:24 43:16 55:25 124:3 139:8 160:8

**initiates** 12:7

**injected** 215:16

**inputs** 104:8

**inquire** 19:20

**inquiries** 29:6 119:18 200:17

**inquiry** 28:22 29:2,10,15,17

**insider** 10:23 202:7

**inspection** 194:7

**installments** 184:2

**instance** 28:23 123:8,13 124:23 125:1

**instances** 104:17 125:25 161:5

**institution** 137:25

**institutional** 30:21,23 31:1 31:3,7,13 189:19 190:16 192:5

**instruction** 194:25 195:5

**instrument** 81:15

**insurance** 70:13 71:13,14

**integrity** 200:1 200:10,25 202:19 204:10

**intelligent** 105:20

**intents** 16:2

**interacted** 9:18 65:6 107:17

**interacting** 18:1,8

**interaction** 63:20 64:16 134:20 208:19 208:20

**interactions** 16:15 65:9,20 102:10 105:25 106:17 107:9 107:11 134:11 134:18,23 135:16

**interacts** 15:7 16:6 17:23 21:19 207:22 208:14 218:6 218:20 219:25

**interest** 45:23 114:21 115:2 115:11,12,18 116:14 117:5

117:10 126:4

**interested** 116:21,24 118:16 192:19 237:16

**interesting** 102:12

**interests** 114:20 116:24

**internal** 186:8 200:7 201:22

**internally** 92:5

**internet** 53:10

**interpose** 230:6

**interpret** 129:13 171:7 208:25

**interpretation** 115:21 171:3 204:14

**interpreting** 97:7 168:2,3

**interruption** 76:15

**intersects** 12:4

**intervenor** 1:7 156:7,14,15

**interviewed** 10:2

**introduced** 9:23 47:25

**invested** 48:3

**investigating** 14:9

HIGHLY CONFIDENTIAL

**investigation**
7:2,12 36:7
92:13,17 181:7
186:8,9,12
200:7 201:22
**investigational**
14:6,17 16:10
125:23
**investigations**
161:21 193:23
194:3 200:18
202:6,11
**investigator's**
195:2,7 228:6
**investment**
45:22 48:1
**investor** 10:20
27:6,9,18
28:11,14,15,19
53:8,16 99:21
100:9,13,21
101:15,21,22
102:3 104:9,18
105:16,17
106:21 107:16
112:5 118:4
120:21,21
124:17 132:4,7
132:15 135:2,3
160:5 201:9
**investors** 27:17
30:15 83:4
106:16,16
112:1 118:24

119:11 123:8
124:25 160:4
188:5,13,25
189:1,19,23
190:17,17
192:5,5,11,19
192:21,21
193:4,5 224:11
225:23 226:4
**invited** 75:17
**invoices** 66:3
179:14
**involve** 195:24
**involved** 11:22
31:18,19,22,24
32:18 40:9
50:8,12 51:14
55:7,13,24
56:4,7 58:21
59:1 68:10
98:10 134:3
187:19 193:22
194:1,6,24
195:16,21
197:23 198:1,6
198:9
**involvement**
50:4 52:13,15
53:1 54:16,25
141:17 195:5,9
227:1
**involving** 34:5
36:14 52:3,4
79:12 208:5,13

208:25
**ir** 27:8
**irregular** 35:23
**irrelevant**
223:15
**irreversible**
219:5
**isaac** 2:3 5:20
5:24
**issue** 49:14,18
77:10 199:21
199:22
**issued** 21:12
80:25 90:4
197:16,17,19
227:16
**issues** 185:23
211:6
**it'd** 24:10
**item** 87:16
192:18
**items** 78:2 80:9
169:13

**j**

**jack** 10:25
**jacob** 134:19
135:6
**jake** 134:19,22
**james** 4:2 120:2
**january** 80:24
179:21 209:16
**jennifer** 65:25

**jesse** 1:4 2:17
5:19 6:2
123:25 128:25
130:6 131:2,10
**jim** 21:3 75:18
**jlr** 1:3 5:9
**job** 21:10 55:11
55:13 77:19
102:18
**jockers** 213:7
213:14 214:2
214:11,16,21
215:1,10,24
**jog** 80:12
**johnshoy** 3:7
237:4,20
**join** 6:1 9:10
75:19 112:2
**joined** 9:12
10:3,16 11:18
12:19 20:22
29:5,9 30:1,10
32:12,22 38:24
43:18 46:21
55:19 75:11
98:10,17
228:13
**joining** 11:5
29:1,7,23 32:8
35:19 40:15
46:10,13
**jordan** 113:17
117:20

HIGHLY CONFIDENTIAL

**journal** 183:20
193:22 194:3
211:20,24
212:3,7
**judging** 109:4
**judgment** 28:3
**july** 7:3 29:1,9
32:18,20 35:19
43:7 93:4,6
94:3 173:16
174:23 175:19
177:14 180:17
181:5 187:9
197:14,18
198:4,8 210:11
211:5 225:19
227:16
**june** 4:20 42:17
43:7 74:6,9,14
79:21 87:16
89:15 92:24
93:8,23 94:2
95:25 96:3
136:15 139:1
150:21 156:6
157:15 172:13
196:12
**justice** 42:16
212:19,22
233:3,5,10
**justice's** 202:17
234:25 235:3

**k**

**k** 4:19,22 12:6
13:3,3 17:15
20:6,24 21:12
38:9 148:24
149:9 160:13
161:2,4,13
171:22 187:10
189:8,8 197:17
197:19,24
198:3 232:19
**k's** 12:11
**keep** 59:8,12
81:12 95:10
114:16 150:12
**kept** 10:1,3
**kidding** 37:25
**kind** 12:23 19:3
48:25 58:10
105:8 110:22
134:10 135:7
137:3 144:11
173:22 203:16
**knew** 36:11
201:2 226:20
**know** 9:1,22
10:3,6,7,17,21
11:3,5 12:7,13
12:14,15 14:16
15:2,2,6,9 16:9
16:11,12,23
17:1,2 18:5,10
18:11,11,12,12

18:13,17,18,23
18:24 19:2,3
19:15,20 20:7
20:8,12,15
21:5,10,25
22:15,17,18,23
22:24 23:4,5
23:14,19,25
24:1,3,5,7,9
25:21 26:1
27:5,12,15,17
27:24 28:1,2,4
28:13,16,17
29:15,18 30:4
30:10,11,14,14
30:15 31:4,9
31:16,16,22
32:15 33:7,12
33:14 34:7
38:24 39:25
40:17 41:6,12
41:13,15,18,23
42:7,25 43:8
43:15,20 44:8
44:9,21,24
45:1,4,22 47:7
48:13,14,19
49:5,6,8,16
50:8 51:6,9
53:4,5,6,7,9,11
54:22 55:23
56:1,25 57:25
58:1 59:9,9,10
60:1,13,17

62:13,15,16,24
63:12,14,15,18
63:20 65:12,14
65:16 66:1,2
66:21 67:12
68:25 70:23
71:5,18 72:9
72:10 73:2,6
73:24 74:15
78:2,16,19
79:11,25 81:10
82:24 86:11,25
87:1,11 88:13
92:1,2,6,9,10
92:11 93:17
95:4 96:3,14
96:22 98:12,18
99:5,16,18
100:4,5 101:16
101:19,22,24
102:1,2,4,4,11
102:11,13,15
102:21 103:2,3
103:5,7,11,18
103:21 104:11
104:12,13,14
104:19 105:4
105:13,15,17
106:6 107:15
107:15 108:7
109:11,12,12
109:13,15,17
110:1,22 111:7
111:11 112:13

HIGHLY CONFIDENTIAL

**[know - kumagai]**                                    Page 37

| | | | |
|---|---|---|---|
| 112:25 113:1,2 | 176:24 177:9 | 220:20 222:9 | **knowledgeable** |
| 113:7 114:2,3 | 178:12,13,19 | 222:15,23,24 | 24:14 140:18 |
| 114:21,22 | 178:21 180:11 | 222:25 224:9 | 224:5 |
| 115:14,20 | 180:24,25 | 224:12,13,17 | **known** 113:1,4 |
| 116:6,10,10,24 | 181:2,3,12 | 228:4,4,9,11,21 | **koehler** 4:5 |
| 118:16,18 | 183:23 184:22 | 228:23,24 | 123:23 |
| 119:14,24 | 184:25 185:6 | 229:2 232:8 | **kramer** 4:2 |
| 120:20,23 | 185:10 186:3 | **knowing** 10:25 | 120:2,11 |
| 121:2,6,7 | 186:19 187:24 | **knowledge** | **kumagai** 2:2 |
| 122:19 123:2,5 | 188:4,5,18 | 14:3 19:25 | 3:10,12,14 |
| 126:15 127:24 | 190:3,6,23,25 | 20:8 22:23 | 5:17,17,23 |
| 128:15 129:13 | 190:25 191:7 | 26:1 30:9,21 | 6:11 14:3,24 |
| 131:11 133:15 | 191:18 192:4 | 30:23 31:1,4,7 | 17:8 18:20 |
| 134:7,10,20 | 193:3 194:11 | 31:13 47:24 | 19:5,22 22:10 |
| 135:10 136:25 | 196:17 198:5 | 51:3 55:6,10 | 24:13 25:17 |
| 140:12 141:1 | 199:24 200:13 | 60:17 70:8,12 | 29:12 30:25 |
| 145:16,17 | 201:5,8,9,13,13 | 72:22 73:17 | 34:13 35:6 |
| 146:7,25 148:1 | 201:17 202:8 | 89:5 105:6,9 | 40:25 41:4 |
| 148:6,8,10,18 | 202:12 203:1,3 | 113:10 114:18 | 42:1 43:9 44:5 |
| 155:17 156:20 | 203:4,5,6,18,19 | 133:10,20,21 | 44:18 45:9,16 |
| 157:4 158:23 | 203:22 204:11 | 133:25 151:14 | 48:16 49:19 |
| 159:5,11 160:3 | 205:23 207:4,7 | 163:23 172:15 | 51:22 52:22,25 |
| 160:4 163:4,7 | 207:14,23,25 | 173:23,24 | 54:6,15 56:3 |
| 164:8,10 | 208:15,18 | 174:1 180:20 | 56:17 58:3 |
| 165:10,11 | 209:20,21 | 180:24 194:21 | 60:18 61:17 |
| 166:4 167:2 | 210:8,14,24,25 | 194:23 198:1 | 62:3 64:7 |
| 168:4 169:12 | 211:4 212:10 | 199:20 212:20 | 66:14,19 67:9 |
| 169:12,14 | 212:14 213:13 | 232:12 233:2 | 67:20 68:2,9 |
| 170:13,17,18 | 213:14 214:10 | 233:12,13,15 | 68:14 69:1,13 |
| 170:18 172:10 | 214:13,14,18 | 233:16,19,20 | 69:20 70:19 |
| 172:11,16,20 | 214:25 216:4 | 233:22,23,25 | 72:4 73:2,18 |
| 174:10 175:25 | 216:15 217:5,9 | 234:1,5,8,11,15 | 79:1 82:17 |
| 176:1,3,8,14,17 | 217:14 218:19 | 235:2,4 | 83:12,21 84:4 |
| 176:19,23,23 | 219:3,9 220:19 | | 84:5,13,20 |

HIGHLY CONFIDENTIAL

85:4,8,16,24
86:2,9,11,14
87:13 88:14,19
89:2,6,13
92:23 93:13,20
94:2,12,24
96:6 97:6,10
97:14,19 99:5
104:6 111:23
112:22 117:2
118:9 123:2,14
124:22 126:11
126:16,25
127:14,18
128:1,5,7,8
129:8,20,24
133:17 134:1
136:12,13
137:18,23
138:2 141:18
142:21 143:6
144:5,14 145:5
147:23 149:1,8
152:17 153:10
154:11,21
157:1,9,12
158:25 159:18
161:7 163:4
164:4 165:13
165:23 166:6
167:6,20 168:6
168:14,19
169:16 170:21
171:12,14,21

172:23 176:8
176:14 177:1,6
180:15 192:20
193:13,21
196:7 197:1
198:22 200:3
200:23 202:15
203:9 204:8
205:4,6,7
206:17,19
208:2 211:9
212:15,24
213:5 214:19
215:2,22 217:3
219:17 220:22
221:2,20 223:9
224:14,20
225:4,17 226:3
226:15 227:4
227:13 228:2
228:24 229:9
229:17,19
230:6,9,20
231:2,9,13,19
231:21,23
232:9,17 233:8
234:20 235:5
235:16
**kumagai's**
235:8,9
**kupiec** 21:3
75:18,23 90:25
91:13 94:16
95:18 97:13

**l**

**lab** 194:7,13
195:10
**label** 203:2,7
203:11,17,20
204:4,9,15,22
205:18,21
220:17 221:8,9
228:15
**labeled** 76:7
231:17
**labs** 31:20
**lack** 78:8
**laid** 42:2 44:13
**language** 17:20
18:1,7,24 19:3
19:21 20:20
21:8,12,16,17
22:2,6 207:1
**large** 12:11
41:14 61:18
116:13 228:15
**largely** 11:8
27:9
**larger** 201:5
**largest** 101:25
**laser** 30:2
**late** 9:12
**law** 72:14
140:24
**law.com** 2:6
**lawrence** 2:8
3:5 5:11

**lawsuit** 52:11
146:8 155:23
160:18,23
**lawyer** 118:5
**layman** 171:9
208:25
**laymen** 171:7
**leader** 103:20
**leadership**
175:2,14 224:9
**leading** 21:7
188:19 201:11
**leads** 201:14
**learned** 180:7
**leave** 9:20
**led** 7:2 201:8
**left** 11:10 26:3
76:14 143:1,4
143:4 147:4
**legal** 19:11
26:23,24 29:21
30:3,19 34:9
34:12,15 48:17
50:7 51:24,24
60:1 66:5,10
66:15,20 67:4
67:10,21,24,25
68:3,10,15,18
68:23 69:6,9
69:15,21,23,25
70:14 77:3,21
78:6,19,24
79:11,13 86:5
86:6 87:14,17

HIGHLY CONFIDENTIAL

**[legal - looking]** Page 39

88:8,15,22 126:2 146:7 158:5 164:7 180:14 196:20 196:21 226:10 238:23

**legally** 38:7 146:24

**legitimate** 28:6 202:13

**letter** 70:22 137:19,19 176:13,22 190:9 191:18

**letters** 226:10

**letting** 216:12 216:16

**level** 12:13 13:6 16:16 30:7 34:8 78:4

**lewis** 141:2,3,8

**liabilities** 87:11 127:22 151:21

**liability** 70:14 71:19,21 87:7 147:18,22,22 147:24 148:5,9 148:12,19 150:5,5 151:17 151:19 154:22 155:1,3,9,12

**liaise** 133:18

**liaison** 53:16

**liar** 233:24

**license** 20:11

**lies** 49:5 131:11 226:19 234:9

**life** 90:16

**lifesci** 27:6

**light** 93:14 186:21

**lighter** 18:16

**liked** 112:2

**likely** 50:21 72:25 110:13 154:14 159:9

**limit** 73:13 94:6

**limited** 28:10 88:22 210:22

**lindsay** 1:9 2:11 4:3,11 6:6 20:17 25:24 26:3 62:7,14 63:19 64:18 132:19 155:19

**line** 12:13 27:10,23 103:9 113:17 120:3 206:12 228:12 239:4,7,10,13 239:16,19

**lined** 206:6

**lines** 27:20

**link** 112:8,8,12 112:15

**list** 76:22 107:12 108:7

111:11,21 128:16,20 132:25 133:4,5 133:9 134:8,10 155:4,6,10,17

**listed** 134:12

**litigated** 154:15

**litigating** 86:18

**litigation** 6:19 7:7,9,13,15 26:16,21 36:2 36:2 58:21 59:2,11 60:7 60:13 61:5 69:25 71:4,16 72:16,17 83:3 86:15 87:8 122:25 146:4

**litigations** 79:5 83:9 89:3

**little** 20:22 27:1 27:22 28:20 29:4 139:7 141:17 179:15

**living** 39:5,7

**llp** 2:4,8,12 3:4

**location** 5:10 46:9

**long** 31:10,10 31:12 102:16 178:20

**longer** 102:2,5 220:7 227:23 229:6,11

**look** 17:19 20:8 23:2 24:22 27:14,22 28:6 41:12,16,19 44:19,22 75:12 79:15 87:20 92:15 97:23 102:22,23,23 108:2,2,5,22 110:1 113:21 114:19 115:5,6 115:15 116:20 116:22 117:9 134:6 137:8 138:2 149:1 155:21 157:12 160:13 161:9 176:22 182:14 191:3 197:13 202:2,8 208:2 210:16 211:15 213:5 230:3,18

**looked** 13:13 13:16,18,19 96:24 97:4 108:19 109:15 111:5 114:20 117:9 119:25 178:20 201:11 222:20 224:13

**looking** 15:20 74:12 77:13,13 78:18,18 79:10 80:11 82:15

HIGHLY CONFIDENTIAL

**[looking - march]**                                    Page 40

94:22 97:15
108:14 109:21
110:12 111:1
111:24 114:9
122:18 149:22
151:1,3 159:24
160:2 165:13
167:11 209:23
**looks** 79:18,22
82:1 87:25
109:4 111:17
117:24 134:19
136:21,24
144:19 149:22
151:9 205:12
**loss** 156:5
**lost** 87:1
201:17 231:13
**lot** 10:24 50:11
105:20,21
191:2 206:25
**lots** 16:25
23:16,17 27:18
106:22 107:11
107:12,17,17
107:17,17
119:13,13
188:10
**love** 103:8
125:15
**low** 41:21
231:6 232:1

**m**

**made** 16:23
18:3,13 19:9
21:23 37:21
47:7 56:14,18
56:22 57:2,22
58:6,8,11,16
60:20 62:19,25
63:4 64:2
83:17 116:25
119:18 123:9
125:12 128:15
145:6,15,15,24
146:3,25
149:23 164:20
165:6,7,16
166:1,1,5,10,23
166:24 167:14
167:15,23,23
168:5,9,9,17
169:8,18
170:16 181:4
184:1 187:6,12
192:8 198:4
199:13 201:24
206:1,11 207:4
210:9 211:2
212:16 223:25
225:19 230:13
232:15 233:6
234:6 235:12
240:5

**madison** 2:4
**magazine**
29:18 195:18
195:23
**main** 131:3
**mainstream**
22:22
**maintain** 93:13
**maintenance**
203:25 204:23
205:20
**major** 145:23
192:18
**make** 11:6 21:8
21:11 27:2
28:3 48:19
49:7,11,21,25
62:21 64:8,13
67:11 83:8
98:19 103:19
110:4,21
115:17,19
165:22 171:10
181:11 201:23
205:15 211:7
**makes** 12:7
48:16 62:24
70:19 98:19
154:16 174:13
198:22 221:20
**making** 55:24
59:21 67:1
98:5 138:11
169:22 170:21

218:14
**malicious** 49:5
122:16
**manage** 144:13
144:15
**management**
60:21 98:5,11
98:18,20 99:6
180:16 181:24
**mandatory**
142:10
**mandevilli** 4:15
137:11
**manipulate**
171:4,5
**manipulated**
165:1 166:16
170:2
**manipulation**
106:18 192:7
192:22
**mankind**
217:20
**manner** 47:9
**manual** 149:16
**manuscript**
183:14,18
**march** 15:23
74:11,18,22
131:19 145:19
145:24 146:16
149:13 151:7,8
151:9 152:5
174:8

HIGHLY CONFIDENTIAL

**[marcus - meeting]**                                    Page 41

**marcus** 113:15 113:22 114:1,5 117:19,24 118:10 119:5

**marie** 135:15 135:17

**mark** 7:20 107:19 113:13 119:20 123:19 125:3 128:1 132:10 136:2,5 144:11 149:4 150:16 189:1,2 205:1

**marked** 7:21 73:25 107:21 113:12 119:22 123:21 125:2 128:4 132:12 136:4,9 144:10 149:3 150:15 189:3 205:3 230:19

**market** 17:1 46:15 47:3 90:17 111:8 112:8 116:3,7 116:11,16 139:13 152:2 153:13 190:21 190:25 191:6 222:5

**marketed** 188:12

**markets** 159:6 159:10

**marks** 45:11,13 89:8,10 96:14 126:20,22 171:16,18 193:16,18 227:8,10 235:22

**marsman** 75:19 76:2,14

**mass** 23:19 76:7

**material** 20:10 27:24 82:9 100:12 145:23

**materially** 164:20 166:10 199:17

**materials** 77:25 190:10

**matt** 102:14,17 102:20 135:12

**matter** 5:6 59:13 71:16 154:15

**matters** 30:3 75:13 78:4,19 78:24 237:8

**matthew** 101:12,15

**maximum** 73:19 143:7,9

**meals** 231:6 232:2

**mean** 15:14 16:7 23:12 24:24 26:17 37:15 49:3 57:17,24 60:19 71:7 72:11 82:20 86:3 91:23 93:20 106:20 107:8 115:25 121:11 152:10 154:12 157:1 173:11 175:10 177:19 178:6 208:12 208:13 216:17 217:17 222:18 226:3

**meaning** 142:13,15 143:20 176:24 184:17 204:1 225:3

**means** 25:1 96:25 115:19 129:14 147:13 171:1,5,6,10 173:18 184:19 184:20 208:14 208:14

**meant** 124:10

**mechanism** 14:25 17:6

164:22 166:12 206:23 207:11 219:20 220:6

**media** 4:9 5:4 28:21,21 29:2 29:6,10,15,17 45:11,14 89:8 89:11 102:22 126:20,23 128:21 171:16 171:19 193:16 193:19 222:21 227:8,11 235:22

**median** 45:2 109:17

**mediated** 13:23

**mediations** 70:10

**medical** 12:20 19:1 37:10

**meet** 10:9 15:17,23 33:1 41:25 100:23 139:21

**meeting** 3:18 3:19 12:2 32:11,14,17 33:9,11 34:3 35:1,18,19 56:11,13,18,22 57:1,6,9,9,12 57:15,18,22 58:1,7,8,11,17

HIGHLY CONFIDENTIAL

59:8 65:2 74:6 74:10,11,14,18 74:21 75:5,15 75:19,20 77:8 77:9,16,20 79:19,21 80:14 87:17 89:15 90:3 92:16,23 92:24 94:23,25 95:9,25 98:22 99:7 107:24 108:9,17,18 110:11 111:1 140:3 188:7

**meetings** 32:4,7 32:15,19,20 33:2,6,7,13,16 33:21 35:13,20 36:1,5,11,13 40:7,10,17 41:17 50:8,9 50:13,15,19,24 51:7,10,11,13 52:2,3,4,6 60:3 64:23 65:24 75:2,9,9,11 79:25 90:18 98:17 99:10,14 100:7,25 101:6 101:9 132:15 194:2 224:11

**meets** 14:22 147:7

**member** 9:13 9:16 35:12 99:25 103:16 112:17,19 113:8 120:25 143:17

**members** 64:21 105:7 123:8 133:22 134:2 141:5 143:25

**memories** 77:15 108:15

**memorize** 46:25

**memory** 80:13 114:10

**mention** 46:17 95:24

**mentioned** 43:10 98:9 100:14 111:3 134:7 154:2

**merge** 159:12

**merger** 159:20

**mershon** 134:14

**message** 97:15

**met** 37:3,19 38:4,5 142:17 144:2 147:2,11 151:22 153:5

**method** 31:17

**michael** 75:18

**microscope** 16:12

**mike** 141:4 155:19

**milestone** 37:3 37:19 40:3 142:11,17 147:10 152:1

**milestones** 38:3 38:5 140:3 141:12,12 144:1 147:1,3 147:11 151:22 153:13

**milioris** 1:4 2:16 5:19 6:1 156:17

**million** 66:24 67:4,8,15 81:21 82:2 84:6,10,24 88:1,15 91:25 92:25 93:9,15 93:18 94:13 95:13,21 109:6 111:8,9 115:14 117:11 143:13 148:2 152:4,19 153:20 154:6 155:5,11 156:5 156:23 157:15 157:20 178:2,7 178:22,23 187:16 188:23

189:10,12 223:24 224:21

**millions** 143:10 178:21

**mind** 7:12 107:1,3 134:22 150:13 155:20 205:4

**mine** 152:21

**minimis** 179:16

**minor** 86:24 87:3 146:13 192:17,18

**minutes** 3:19 39:25 40:7 74:5,10,18,23 77:14 79:18,25 90:18 99:8 100:23 101:2 236:10

**misconduct** 233:18 234:12

**misleading** 164:21 166:11 199:17

**missed** 146:2

**missing** 36:11

**mission** 222:14

**model** 141:15

**modulates** 14:6

**molecule** 233:10

**moment** 8:2,5 16:5 87:20

HIGHLY CONFIDENTIAL

**[moment - never]**                                        Page 43

107:7 108:2
113:20 130:10
130:22 148:24
157:7
**monday** 197:14
197:18,19,24
**money** 36:10
59:25 61:12,19
73:19,22 80:20
81:19 82:16
87:1,22 127:2
140:4,5,6
148:15 157:23
158:24 159:5
179:13 188:10
188:16
**monitor** 117:4
**monitored**
115:2 117:11
**monitoring**
36:3
**month** 92:24
94:13 172:5,24
203:24
**months** 90:16
94:21 95:21
178:3 184:2
191:20 204:21
204:21,22
**morgan** 141:2
141:3,8
**morning** 5:2
6:12,13 119:6

**move** 14:20
24:11
**moved** 34:22
38:25 39:4
160:8
**moving** 9:21
10:6 15:11
23:10 92:1
**mult** 54:23
**multiple** 54:23
**murky** 29:5
**mutual** 47:17
184:19
**myriad** 159:7
160:6

**n**

**n** 3:8 5:1
**nachtrab**
101:12,15,24
102:10 103:16
103:23 106:11
106:15 135:12
**naciase** 98:1
**nadav** 18:25
20:17
**name** 5:12
27:16 66:1,2
105:13 106:10
114:10 141:6
**named** 9:15
65:25 99:16
101:11 105:11
106:8 113:15

120:16 123:23
**names** 64:14
106:22,25
107:10,13,15
134:8 155:4,6
155:10
**narrow** 130:14
**native** 207:16
**nature** 177:11
179:17
**nda** 15:18,19
76:3
**necessarily**
17:4 28:10
79:2 111:13
**necessary**
240:6
**need** 17:4 42:14
86:12 110:20
126:16 157:6
158:23 161:11
188:2
**needs** 103:7
**negative**
221:23 222:18
222:22 223:1,4
223:17 224:1,6
225:23
**negatively**
200:19 221:15
221:19 225:6
225:12,19
226:7,11,24

**negligence**
199:23,23
224:10
**negligently**
221:24
**negotiating**
190:24
**negotiations**
198:10
**neither** 105:6
162:13,19,24
163:2
**net** 82:1
**neurobiology**
212:4
**neuroimmun...**
211:25
**neuroinflam...**
211:25
**neuroscience**
133:12,18
212:8 221:24
224:23
**never** 13:6,10
13:17 16:23
22:13 37:6
48:14 61:11
62:14,15 72:19
84:11 99:1
103:9,9,10
112:14,19,20
152:18 173:18
173:21 181:17
217:7 222:6

HIGHLY CONFIDENTIAL

**[never - object]**                                                      Page 44

| | | | |
|---|---|---|---|
| 234:9 | noncompete | 155:1,2,9,12 | **ny** 238:15 |
| **new** 1:2 2:5,5 | 184:12 | 178:14,18 | **o** |
| 2:13,13 5:8 | **nondisparage...** | **note** 59:24 | |
| 15:18,25 71:15 | 184:13,17,18 | 149:20 151:1,3 | **o** 5:1 |
| 71:16,16 77:9 | 185:11 | 238:10 | **o'donnell** 141:4 |
| 90:13 104:1 | **nonemployees** | **noted** 240:7 | **oaths** 237:5 |
| 137:10,22 | 142:2 | **notes** 237:13 | **objec** 83:23 |
| 138:4,13 | **nonevent** 192:2 | **notice** 3:1 19:6 | **object** 14:1,12 |
| 194:15 224:13 | **nonexecutive** | 70:21 | 16:20 18:9,22 |
| 234:2 | 177:16 | **noticed** 19:7 | 22:7 23:24 |
| **news** 42:19 | **nonproduct** | **noticing** 5:16 | 25:15 28:24 |
| **newspaper** | 161:16 | **notified** 197:23 | 30:22 35:3 |
| 29:18 | **nonpublic** | **november** 4:21 | 40:22 41:2,10 |
| **nice** 99:22 | 27:24 82:10 | 8:9,12,13,15,15 | 43:5 44:3,17 |
| **nickname** | 100:12 | 8:18,19 15:22 | 48:10 49:13 |
| 121:5 | **nonscientist** | 29:23 42:7 | 52:18 56:2 |
| **nicknames** | 204:5 | 55:20 60:6,10 | 57:23 60:11 |
| 121:25 | **nonsense** | 61:4 102:8 | 61:15 62:1 |
| **nicoll** 4:15 | 233:11 | 120:2,15 | 64:4 66:12,18 |
| 136:15,24 | **nonsolicit** | 123:15 128:3 | 67:6,16,22 |
| 137:3,10 138:3 | 184:12 | 128:20,24 | 68:6,11,24 |
| 138:12,24 | **normal** 19:20 | 130:6,17 131:2 | 69:7,18 70:16 |
| 139:2 | 20:21 23:25 | 187:15 189:9 | 72:2,24 73:16 |
| **nih** 127:1,2,21 | 29:15 57:16 | 189:12 190:12 | 78:13 83:10,15 |
| 164:21 166:11 | 98:15 99:9,11 | 191:9 193:5 | 84:8,16 85:2,5 |
| **nine** 204:21 | 117:8 190:18 | 194:25 195:6 | 87:9 88:12,17 |
| **nineties** 7:17 | 226:17 | **number** 5:8 | 92:14,18 93:11 |
| **noise** 202:12 | **notary** 240:13 | 27:16 81:2,24 | 93:16,25 94:4 |
| 222:13 | 240:19 | 90:2 109:1,20 | 94:18 95:23 |
| **noisy** 76:15 | **notational** | 115:13 201:9 | 96:20 97:9,17 |
| **nominating** | 147:21,22 | 230:12 231:19 | 98:8 111:20 |
| 35:21,22 | 148:8,12 150:5 | **numbers** 39:1 | 112:18 116:19 |
| **nonblinded** | 152:22,25 | 169:22 | 118:7 123:11 |
| 203:9,11 | 153:3 154:22 | | 124:20 127:8 |

HIGHLY CONFIDENTIAL

**[object - okay]** Page 45

127:23 129:7
133:14,24
141:13 142:19
143:3 144:4
145:3 147:16
148:22 152:16
153:8 154:7,17
158:21 159:14
161:1 162:25
164:1 165:8,17
166:3,25
167:16,24
168:10,18
169:9 170:10
171:11 172:21
176:5,10,21
177:5 180:12
192:14 193:12
198:20 199:18
200:12 202:1
202:20 203:15
207:20 211:3
212:13,17,25
213:11 214:17
214:23 215:15
217:1 219:16
220:8,24
221:18 223:7
224:3,16 225:1
225:13,25
226:13 227:25
228:22 229:7
229:13 231:2

**objection** 86:3
88:24 97:12
104:2 230:7,20
231:9,11 232:9
233:8
**objectively**
167:4
**obligation** 37:8
38:12 147:14
153:18
**obligations**
157:7,8 185:11
185:13
**observation**
218:19
**obtained** 137:9
**obviously** 86:3
86:12 134:14
**occasionally**
53:17 186:14
**occurred** 8:8
53:23 80:14
181:12,14,19
**october** 1:12
3:6 5:3 10:11
29:23 85:23
151:25 178:7
195:18,23
238:3
**offensive** 88:22
89:3
**offer** 10:10
**offered** 108:8
117:25

**offering** 81:25
109:9 126:1
188:11,12
189:24 190:13
190:21
**office** 177:22
194:12,22
**officer** 9:15,17
10:22 11:25
13:2 19:1
29:21 30:19
36:18 44:7,10
44:21 47:10
75:18 90:7
175:16 237:1
**officers** 17:14
44:25 45:1,4
90:14 109:20
**offices** 3:4 8:9
51:4 99:23
100:15,25
101:3 148:6
**oh** 5:23 7:24
19:7
**ohlander**
105:12 106:12
106:13,15
**oil** 234:12
**okay** 5:23 7:1,9
7:20 8:8,17 9:9
17:8,24 21:15
30:20 32:19
38:21 42:18
43:9 45:9,16

49:19 51:10
52:2 54:5
58:19 64:13
65:4 66:4
74:13,17,20
75:8,12 77:7
77:13,19 79:1
79:10,15,17,23
80:4,11,16
82:1,4 86:10
87:4,13,20
89:18 95:12
100:24 106:14
110:18 111:23
113:3,14,20
114:7 117:17
119:4 120:14
122:11 123:1
125:3 126:18
128:18 130:5
130:16 131:18
132:2,14,18
134:6 135:5
136:13 137:16
139:5 141:9
144:21 145:5
145:22 146:19
147:10 149:1
149:12,18
150:7,25 151:5
151:10,24
153:12 154:21
155:2,21 156:4
157:12 160:13

HIGHLY CONFIDENTIAL

**[okay - outright]**                                                      Page 46

161:12,14
163:9,11
164:11,15
167:7 169:5
171:14,21
172:13,23
173:17 175:1,1
175:10,14
177:14 178:1
178:23,25
179:19,23
180:9,15
181:23 182:13
182:16,22
183:25 185:6
185:16 186:7
186:20,20
193:13 198:6
206:13,14,18
206:19,21
209:2,18,23
210:16 211:15
215:5 218:1,7
229:19 230:18
230:24 231:21
231:22,24
232:17 235:5
**old** 75:4,6
  140:15
**oleander**
  105:12 106:12
**omnibus**
  182:17,22

**once** 29:9 35:23
  37:21 117:10
  118:12 188:9
  188:22
**ones** 35:25
  50:22 65:12
  115:15 134:15
  155:20
**ongoing** 17:5
  22:1 23:7,13
  23:18,23 24:10
  26:15 68:9
  76:6 83:8 85:9
  87:8 97:11
  180:10
**online** 63:4,13
  102:20 123:10
  125:14,22,24
**open** 46:15
  47:3,8 109:15
  111:16 200:13
  203:2,7,11,17
  203:20 204:4,8
  204:15,22
  205:18,21
  220:17 221:8,9
  228:14
**opened** 75:14
  190:16
**operate** 82:23
  83:6 87:12
  158:17
**operates** 58:10

**operating**
  29:21 30:19
  87:6
**operations**
  58:14 61:21
  127:20 157:25
  158:1,3
**opinion** 60:25
  61:4,12 104:13
  139:11 154:13
  192:2 200:13
  226:2
**opinions** 61:7,9
  64:2 226:5
**opioids** 10:7
**opportunistic**
  188:3
**opportunity**
  48:1
**opposing**
  229:20
**option** 45:18
  77:10 90:13
  91:4 108:25
  109:1,14
  182:21
**options** 36:25
  43:10,13,17,23
  46:14,15 65:17
  90:3,15,24
  91:7,10,14
  95:3 109:2,5
  109:23 110:2
  159:7 172:25

173:4,7,13,19
  173:19,23
**orange** 170:14
**oranges** 165:21
  232:24
**ord** 57:25
**order** 81:12
  162:6
**ordinary** 34:25
  35:4 53:20
  54:6 65:21
  70:22 80:21
  191:10
**origin** 81:16,19
**original** 25:10
  55:3 109:13
  139:16 140:9
  144:20 151:15
  156:16 201:18
**originated**
  142:24
**orrick** 36:7
  64:21,24
  120:12 141:1
  186:13
**ostensibly** 95:9
**otw** 1:3 5:9
**outcome**
  237:17
**outreach** 28:18
  29:16
**outright** 46:20
  47:18

HIGHLY CONFIDENTIAL

**[outside - particular]**                                    Page 47

| | | | |
|---|---|---|---|
| **outside** 141:24 142:1,7 190:7 | 77:1,17 79:15 80:4,12,14 82:1 87:14 | **paper** 169:22 212:3 213:6,7 | 133:11,17 146:5,9 152:25 |
| **outsource** 31:21 | 89:21 90:6,23 108:23,24 | 213:21 214:3,8 214:11,15,20 | 192:11 199:12 211:4 224:8 |
| **outstanding** 115:13 151:16 151:19 | 111:25 117:18 128:23 130:5 | 214:21 215:10 215:24 | 226:17 228:8 |
| **overhang** 83:3 | 130:16 131:1,9 131:18 134:7 | **papers** 13:9,11 193:24 212:12 | **participant** 36:25 38:4 141:23,23 |
| **overlapping** 163:6,7 | 138:3 149:7,21 150:25 151:3 | **paragraph** 151:11,24 | 146:17 153:1 174:3,11,17 |
| **oversaw** 186:13 | 151:25 155:21 157:13 160:16 | 153:12 160:25 162:8 163:11 | 175:7 218:24 |
| **overview** 76:2 80:1 | 160:17 161:12 164:11 171:23 | 164:15 171:24 175:5 178:25 | **participants** 139:23 142:2,7 152:5,14 |
| **owe** 178:10,16 | 179:1 185:16 185:17 206:20 | 180:15 181:23 181:24 208:3 | **participate** 189:25 |
| **owed** 152:11 | 209:2,2,23 211:16 230:18 | 209:11,24 210:5,16,21 | **participated** 47:4 51:12 |
| **own** 31:20 46:7 47:17,19 99:1 156:21 159:6 234:2 | 231:15,19 239:4,7,10,13 239:16,19 | **paragraphs** 130:18 | 54:10 189:1 192:6 193:5 205:21 216:10 |
| **owned** 46:5 | **paid** 36:23 37:6 37:7 42:21 | **paralegals** 86:4 | 218:5 219:11 219:12 220:5 |
| **ownership** 46:22 | 66:5,10,20 67:3,7,10 | **paraphrase** 106:24 | **participating** 52:5 219:13 |
| **owns** 105:18 | 84:14 93:15 140:6 147:20 | **paraphrasing** 87:5 | **particular** 32:16,17 63:23 |
| **p** | 148:15 172:5 178:8 184:5 | **parse** 19:4 | 72:17 92:1 107:9 108:17 |
| **p** 5:1 | 185:3 | **part** 11:5 28:17 30:5 48:11,18 | 108:17 113:4 114:6 119:11 |
| **p.m.** 126:21,21 171:17,17 193:17,17 227:9,9 236:9 | **pain** 9:14,25 **paled** 222:11 | 58:24 59:7 60:13,19,19,21 88:23 93:19 95:4 102:17 116:22 121:8 122:25 132:7 | 124:12 125:20 125:21 126:4 134:9 |
| **package** 184:1 | | | |
| **page** 3:9,15 4:1 8:14 74:18 75:13 76:22 | | | |

HIGHLY CONFIDENTIAL

**[particularly - personally]**                                    Page 48

**particularly**
  12:4 41:13
  61:7
**parties**  69:10
  69:11 237:9,16
**pass**  53:18
  119:1 219:7
**passed**  33:8
  53:6 97:24,25
  98:3
**passes**  15:7
**passing**  121:23
**passive**  105:5
  160:2
**past**  58:13
  99:12 100:19
  105:22,23
  125:25 127:3
  145:11 186:15
  224:12
**patient**  103:11
  216:16 229:14
**patients**  14:8
  15:1,9 17:3
  103:3 164:25
  166:15 200:22
  201:14 203:22
  204:20,24
  216:13,18,19
  216:23 217:18
  217:18,25
  226:23 227:21
  228:12,25
  229:4,10

**pause**  34:6
  110:7 134:21
  202:6,18,23
**pay**  11:25 12:3
  50:6 93:9,24
  115:14,15
  179:13 182:6,9
**paycheck**
  177:22
**paying**  66:14
  67:20 68:2,7
  68:14,18 69:5
  93:18
**payment**  140:4
  140:12 144:1
  175:11
**payments**
  141:11 142:21
  142:25 184:1
**payout**  143:7
**payouts**  83:7
**peer**  41:20 45:3
  109:16 111:4,6
  111:14,17,19
  141:9 142:6
**pending**  127:5
**people**  10:18
  25:25 30:13
  42:14 46:6
  48:19,19,20,22
  48:23 49:15
  53:9,16 82:14
  104:11 105:16
  106:22 107:12

  107:18 110:4
  112:7 113:1
  116:6 118:17
  119:13,18
  122:17 126:1
  134:12 135:9
  202:7 204:1
  205:21 215:19
  217:19,23
  218:4 219:5,11
  219:17 220:4
  221:22 222:10
  222:16 224:5
  224:25 226:5
  227:17 228:6
  228:16
**people's**  55:10
  55:13 226:25
**percent**  23:3
  101:18,22
  102:5 214:7,7
  215:11,11
  225:10
**percentage**
  23:3
**perception**
  221:16 226:8
**perfectly**  48:15
**performance**
  152:7
**performed**
  125:13
**period**  9:25
  97:10,20

  188:15 189:22
  191:20 203:23
  203:24 204:24
**peripheral**  30:7
**periphery**  12:2
**perpetrators**
  160:18
**person**  19:11
  24:2,18 25:3,5
  30:4 51:7 53:8
  63:10 64:14
  81:5,8 100:15
  104:21 140:18
  147:4,7 194:16
  194:21
**personal**  14:13
  49:22,23 50:4
  54:15 55:6,10
  60:6,8,9,12,16
  73:19 111:18
  126:10 130:2
  163:2 184:16
  194:21,23
  195:4,9 199:19
  200:10 207:21
  214:24 221:2,5
  223:2,2 227:1
  232:11 235:2,4
**personally**  25:7
  38:11 52:9
  63:14 65:6
  112:6 126:11
  164:4 193:22
  194:6,9,24

HIGHLY CONFIDENTIAL

**[personally - please]**                                    Page 49

| | | | |
|---|---|---|---|
| 195:16,21 | 183:19 185:18 | **physician** | 142:3,7,9,23 |
| 198:6,9,17,21 | 185:24 186:2 | 217:12 | 143:1,6,8,10,17 |
| 199:25 200:20 | 186:24,25 | **pick** 199:2 | 144:5,20,20,21 |
| 201:2 204:5 | 187:8 195:1,6 | **picked** 159:7 | 145:7,10 146:4 |
| 215:13 216:1,9 | 199:2 200:14 | **piece** 169:22 | 146:15,17,20 |
| 216:21 218:11 | 200:24 201:3,7 | 205:20 228:11 | 146:23 147:5 |
| 219:10 220:12 | 201:21 202:5 | 228:15 | 147:11,14 |
| **perspective** | 202:14,22 | **pitt** 1:6 84:7,14 | 148:13,16,20 |
| 42:6 49:23 | 204:7,12 | 103:25 156:15 | 149:23 150:8 |
| 60:15 126:7,10 | 209:12,25 | 156:24 | 151:6,17,19,21 |
| 151:18,20 | 210:12,12,13 | **pivotal** 15:17 | 152:4,6,14,19 |
| **pet** 22:18 | 210:14,15,17 | **place** 82:24 | 153:1 154:1,22 |
| **peter** 9:15 | 211:11 213:24 | 200:16 237:11 | 159:1,3 174:4 |
| **petition** 33:17 | 216:5,19 | **placebo** 97:2 | 174:7,17,20 |
| 33:22 116:23 | 217:17 219:11 | 203:18 204:2 | 175:7,12 |
| 117:7 118:6,12 | 219:18 220:23 | 219:1 | 178:15 182:17 |
| 118:13 192:7 | 220:25 221:12 | **placement** | 182:17,22,25 |
| 192:16,18,22 | 225:6,11,18 | 189:16 | 182:25 |
| 202:11 222:5 | 226:23 227:2 | **places** 41:24 | **planning** 82:7 |
| 222:13 | 227:14,18,22 | **plaintiffs** 1:5,7 | 105:1 123:16 |
| **pharmaceutical** | 227:23 228:3,7 | 2:2 3:3 5:5,18 | 164:5,6 |
| 47:15 | 228:8,13,18 | 5:25 149:4 | **plans** 23:22 |
| **pharmacology** | 229:1,1,5,5,10 | 156:7,14,15,16 | 24:11 71:20 |
| 131:21 | 229:11,15,25 | 232:19 235:12 | 172:25 182:21 |
| **phase** 13:14,14 | **phentomolar** | **plan** 4:17 23:8 | **platform** 113:5 |
| 14:20,21 15:9 | 207:8 | 36:21 37:1,7 | **play** 191:8 |
| 15:14,15,21 | **phone** 2:5,9,13 | 37:18,20 38:6 | **plaza** 2:12 |
| 41:14 42:8 | 27:16,21 75:2 | 76:3 108:25 | **please** 5:15 |
| 44:12 47:1 | 75:4 86:7 | 109:2,2 110:3 | 19:16 40:25 |
| 75:24 92:3 | 101:20 | 139:6,9,10,12 | 56:20 72:3 |
| 96:11,18,19,21 | **phrase** 31:19 | 139:16,23 | 80:21 90:18 |
| 97:11 103:13 | **physically** | 140:2,10,15,19 | 94:6,9 106:24 |
| 103:15 145:2 | 124:5 | 140:21,21,22 | 114:10 131:18 |
| 158:4,8 160:3 | | 141:11,17,22 | 235:25 236:3,6 |

HIGHLY CONFIDENTIAL

**[pleased - pretty]**                                                Page 50

| | | | |
|---|---|---|---|
| **pleased** 80:19 | **positions** 109:8 | 193:5 199:6,9 | 166:18 167:22 |
| **plus** 6:23 112:4 | 114:17,23,24 | 199:10 200:15 | 170:4 |
| 112:5,6 | **positive** 97:15 | 200:22 221:6 | **preparing** |
| **point** 9:20 27:7 | 145:1 201:4,11 | 228:9 | 17:12 55:7,14 |
| 29:6 30:16 | 224:6,13,14 | **potentially** | **prescribing** |
| 65:2,18 87:23 | **positively** | 5:24 71:21 | 217:13 |
| 91:17 92:10,11 | 224:24 | 122:16,19 | **presence** 62:12 |
| 92:13 93:17 | **possibility** | 153:22 178:15 | **present** 2:15 |
| 98:19 101:16 | 215:9 | 183:7 186:4 | 46:3 47:18 |
| 110:19 119:12 | **possible** 33:19 | 191:22 204:7 | 64:10,22 73:10 |
| 119:15 120:23 | 64:19 67:3 | 215:10,16 | 80:9 82:19 |
| 123:15 132:4 | 95:6 112:24 | 216:23 218:6 | 98:6,14,25 |
| 134:25 148:7 | 113:3 134:4 | 219:25 221:6 | 99:1,3,3,6 |
| 152:23 158:23 | 146:23,24 | 225:5 | 150:6 156:1 |
| 173:25 219:22 | 174:19 228:10 | **prac** 95:4 | 187:12 190:25 |
| **points** 79:20 | **possibly** 119:16 | **practical** 215:8 | **presentation** |
| 198:25 | 149:23 | **practice** 48:6 | 59:24 137:4 |
| **policy** 71:3,9 | **post** 43:19 | 48:15 58:13 | **presentations** |
| 71:15,16,19,20 | **posts** 125:21 | 75:2 95:5 | 20:9 132:16 |
| **pomeroy** 11:16 | 128:21 | 99:12 119:9,17 | 208:18 |
| **pool** 139:16 | **potential** 22:14 | **preceded** 141:1 | **presented** |
| **portal** 160:5 | 22:16,21 67:18 | **precise** 149:19 | 59:20 87:17 |
| **portion** 12:11 | 83:7 84:21 | 160:12 | **presently** 85:19 |
| 20:4 83:17,20 | 87:7 115:23,24 | **preclinical** | **preset** 79:2 |
| 152:20,21 | 116:11,16 | 14:18 203:5 | **president** 147:5 |
| **portions** 20:3 | 117:14 127:21 | **prefer** 41:5 | 148:5 153:18 |
| **position** 18:15 | 127:22 139:16 | **preliminary** | 153:24 154:23 |
| 20:23 42:11 | 145:12 152:3 | 70:23 75:12 | 175:20 224:23 |
| 49:11 76:19 | 153:17 155:1,1 | 96:18 | **press** 20:8 |
| 93:14 154:8,9 | 156:7 159:20 | **preparation** | 21:12 27:14 |
| 162:17,20,23 | 175:11 186:1 | 52:16 | 119:5,10,16 |
| 163:5 187:3,11 | 189:1 190:17 | **prepare** 77:25 | **pretty** 11:2 |
| 218:12 219:24 | 190:21 192:5 | **prepared** 53:2 | 140:15 |
| | 192:11,21 | 71:25 165:2 | |

HIGHLY CONFIDENTIAL

**[prevalent - protocols]**

| | | | |
|---|---|---|---|
| **prevalent** 191:4 | 40:15 46:10 55:1 79:19 103:15 174:11 174:14 190:12 190:13,15,19 199:4 203:4 210:4 | **proceedings** 68:10 | **programs** 12:9 13:6 20:9 23:17 25:6 31:8 79:24 80:2 201:3 233:17 |
| **prevent** 126:3 | | **proceeds** 82:2 96:13 188:23 | |
| **prevention** 211:21 | | **process** 12:7 20:5,5,21 61:19 71:11 98:15 160:7 183:24 186:18 188:5,17,25 190:4,20,23 | |
| **prevents** 208:5 | | | **progress** 13:5 75:14 100:9 |
| **previous** 17:17 161:5 237:6 | | | **projections** 79:4 |
| **previously** 8:24 43:9 174:2 231:16 | **privilege** 64:6,6 77:2 127:15 130:18 157:8 | | **promising** 96:25 |
| **price** 81:8 90:17 141:11 | **privileged** 19:15 21:21 50:10 52:20 54:1 62:13 69:19 92:22 196:22 | **produced** 136:7 | **promote** 103:10 |
| **priced** 90:16 | | **product** 23:9 164:22 166:13 | **proper** 49:10 194:14 |
| **pricewaterho...** 6:21 | | **professional** 237:5,20 | **properties** 45:22,25 46:2 |
| **pricewaterho...** 6:21 | **privy** 177:9,10 204:12 | **professor** 24:6 | **property** 37:21 |
| **primarily** 17:9 17:11 88:25 97:6 140:22 158:1 | **pro** 211:7 | **profit** 49:8 | **proponent** 101:19 103:1 135:6 136:25 |
| | **probable** 147:20 | **program** 10:6,7 11:23 13:5 14:20 16:3,4 21:7 22:13,23 23:1,4,11 24:3 24:11 31:15 42:13 47:5 75:24 81:17,20 92:8 96:16 158:1,3,6,8,8,9 158:13 160:4 183:15 201:8 202:23 204:6 216:3,8,10,11 | |
| **primary** 13:2 15:16,17,23 24:17 45:24 50:23 132:3,16 | **probably** 22:24 54:14 99:24 105:22 107:13 108:20 128:6 171:4 181:10 200:21 201:18 222:21 226:2 | | **proposal** 77:10 |
| | | | **proposals** 98:6 |
| | | | **proprietary** 14:5 125:23 |
| **prime** 115:10 | | | |
| **principal** 9:17 13:1 | **problem** 131:20 | | **protocol** 4:23 205:13 206:1 206:12 207:5 211:8 212:11 213:3,20,23 230:4 |
| **print** 124:13 | **procedure** 3:2 | | |
| **printed** 133:16 | **proceeding** 70:3,6 | | |
| **prior** 9:14 12:17 28:7 29:1,7 40:10 | | | **protocols** 206:5 206:11 |

HIGHLY CONFIDENTIAL

**[prove - questions]**                                              Page 52

prove  16:16,22 17:4 18:14 217:19
proven  16:19 16:23 18:18 21:25 22:4,8,9
provide  32:1 64:14 77:20 79:4 139:9 142:16 153:6,7
provided  9:2 34:9 60:3 75:16 76:2 77:3 96:7 138:17 184:7
provides  206:11,12
providing  60:24
provision  83:24
proxies  111:16
proximity  181:20
proxy  39:13
prudent  95:10 212:20 215:21
pti  4:23 205:13 205:19
public  27:4 28:18,21 29:16 39:11 49:11 78:17 111:16 137:4,24 159:10,16

187:25 219:23 240:19
public's  221:16
publications  226:11
publicly  12:21 13:17 23:21 36:22 47:12 81:4 84:6 85:22 188:12
published  13:17 15:3 183:19 195:17 195:22 212:7
publishes  206:10
purchased  101:18 125:14 125:22
purchases  46:16 47:4,8
pure  165:22
purported  14:25 105:15 105:16 106:16 120:21 145:1
purpose  49:7 54:11
purposes  16:2
pursuant  3:1
pursuing  82:8
push  117:25
put  15:18 22:25 27:12 29:19

38:6 44:11 135:8 147:19 188:20 202:8 203:20 222:5 233:10
puts  28:11

**q**

q1  149:25
q2  84:23 149:25
q3  85:22
qcm  156:24 157:3
qs  12:11 161:8
qualify  86:25
quantified  116:5
quarter  59:18 59:18 150:20
quarterback  20:16,23
quarterly  115:4,5,6 184:1,2
quasi  10:22
question  8:3 26:4,6 27:19 28:11,20 34:10 52:23 54:24 61:2 65:1 69:21 80:21 88:20 92:19 95:25 106:24

110:17 116:8 117:2 127:15 127:16 129:9 129:15,17,21 129:23,25 130:11 150:2 151:6,6,16 154:10 156:19 157:6 163:3,10 166:22 167:5,6 167:8,12,20 168:1,6,14,22 168:25 169:3,4 169:15 176:7 180:23 185:19 195:19 200:1 200:15 201:8,9 201:12,18 202:5 209:10 213:25 214:25 215:3 224:18 225:15 230:7 235:9
questions  19:8 25:20,23 28:1 28:6,8 60:2 75:16 105:21 106:3 108:7,20 108:22 109:6 110:12,23 111:2 112:1 119:13 129:12 171:22 177:23 192:6,12,15,16

HIGHLY CONFIDENTIAL

192:21 199:9
200:14 213:13
215:20 229:20
229:21 230:15
232:18 234:18
235:5,14
**quick** 108:5
**quickly** 190:6
191:19
**quite** 17:1 53:4
**quote** 128:25
138:7 185:17

**r**

**r** 5:1 239:3,3
**r&d** 23:3 79:24
**radio** 76:7
**radioactive**
124:6
**raise** 39:6
80:16,23 81:18
82:5,5,25 83:2
158:23 159:5,9
187:16,22
188:6,10,20,21
188:25 191:10
191:11,23
192:1,3,6,25
193:6
**raised** 41:22
80:20 81:22
91:24 96:12,13
188:23 189:9

**raises** 39:5
193:9
**raising** 36:10
36:10 82:15
187:24 188:16
189:12 190:4
215:2
**ran** 47:5
213:15,24
**range** 67:19
**rarely** 102:22
121:13
**rate** 78:23
179:8 215:11
**rates** 97:3
**rather** 22:18
45:5 61:21
141:12 171:5
199:21 222:23
**ratify** 95:6
**rationale** 40:20
**raw** 13:18,19
20:6
**reach** 188:4
**reached** 43:25
**reaction** 194:14
197:2
**reactions** 112:4
**read** 13:8,10
15:2,22,22
40:7 54:18
112:3 130:11
130:22,25
139:4 165:9,9

165:11,19
166:5,6,9
167:10,11
170:17 176:13
184:20 185:14
234:21,24
238:9 240:5
**reading** 13:12
74:8 125:11
128:7 129:16
130:14 136:5
166:21 167:4
**readouts** 92:3
**reads** 185:17
**real** 108:5
203:19
**realize** 113:1
173:20
**really** 21:5 47:9
77:24 78:17,23
92:4 102:11
106:25 112:6
115:12,12
137:1,5 197:3
201:3,3 202:15
204:9
**realtime** 237:21
**reason** 9:5 38:1
39:22 58:14
103:6 172:19
172:22 174:16
175:24 180:6,7
180:8 199:10
199:24,25

211:14 213:22
213:22 214:25
220:10,11,13
222:4 228:13
238:11 239:6,9
239:12,15,18
239:21
**reasons** 176:2
181:1,2,3
217:6
**recall** 8:13
21:19 26:8,10
26:12,13,19,25
29:14 32:23,24
33:20,21,25
34:2,4,11,14,17
34:21,24,25
36:8,15 40:4
42:15 43:3
46:12 50:16,22
51:5,13,18
52:5,8,9,12
54:13,14 55:3
56:3,6,7,10,12
56:17,21 57:5
57:7,8,10,11,13
57:14,16,25
58:5 59:5,19
59:23 60:2,4
60:24 61:1
62:3,5,6,8,9,23
63:25 64:5,8
64:10,15,20
65:21 66:1,9

HIGHLY CONFIDENTIAL

**[recall - referred]**                                    Page 54

71:2 74:13,15
74:15 89:16
91:19,20 96:2
97:18 100:6
101:4,8 102:9
102:12,25
103:22 104:4
104:17 105:24
106:12,13,16
108:14 117:8
118:21 120:24
121:1 122:1,2
122:4,5,8
123:18 125:16
125:18 126:5,8
126:11 132:5
134:1,4,8,11,17
134:22 135:15
135:19,20
136:1,19,22
137:1 138:18
138:19,21,22
138:25 141:16
142:4 143:9
145:23 146:12
146:14 148:24
158:18 162:6
172:18 174:12
176:24 177:13
187:6 188:24
191:21 192:9
192:17,20,24
193:7 194:5,17
194:20 195:8

195:13,15
196:11,14
198:14,16
230:13 232:21
232:25
**receipt** 162:7
238:17
**receive** 42:22
42:24 43:19
143:8
**received** 37:5
39:14,16,20,21
43:10,14,19,19
44:2,15 65:19
81:5 91:6,10
91:13 96:18
124:23 137:14
152:25 161:25
162:3 173:12
173:18,22
183:25
**receives** 188:22
**receiving**
177:21 178:2
**recent** 17:21
82:4 109:9
150:9,22
182:23
**recess** 45:12
89:9 126:21
171:17 193:17
227:9
**recipient** 37:2
37:22

**recognition**
90:14
**recognize** 8:4
74:2 113:4
119:23,24
135:14 144:16
149:8 150:16
189:4,5 205:7
205:9
**recollection**
36:4 64:25
77:14 79:12
80:12 87:21
106:2 112:14
112:20 114:4
145:25
**recollections**
110:10,15
111:1
**recommendat...**
98:12
**reconvened**
186:18
**record** 5:3 27:2
41:9 45:10,15
49:21 81:2
86:1 89:7,12
114:24 126:19
126:24 171:15
171:20 193:15
193:20 227:7
227:12 235:21
236:10

**recorded** 3:2
5:4
**recording** 9:6
**records** 105:18
114:16,25
155:7,14
**recruit** 226:22
226:22
**recruitment**
92:3
**red** 206:6,12
**redacted** 77:1
120:8
**redo** 145:2
215:6
**reduced** 237:11
**refer** 37:15
121:8 190:10
**reference** 118:1
121:20,22
125:22 186:7
211:20 212:11
213:3
**referenced** 8:5
78:10 181:17
185:22 238:6
**references**
163:12 211:16
212:21
**referencing**
186:11 200:18
**referred** 137:2
203:24

HIGHLY CONFIDENTIAL

**[referring - rephrase]**                                              Page 55

**referring** 7:10 31:25 50:25 86:15 114:23 122:2,5,8 123:3 137:5,6 156:1 160:22 203:21
**refers** 156:11 161:16,24 179:1 182:16 209:11 210:5
**refresh** 77:14 79:11 80:12 87:21
**regarding** 58:21 75:14 164:21 166:12
**regards** 14:15
**registered** 188:11 237:4 237:20
**regret** 216:7 218:11,13,13 220:4,9 228:14
**regrets** 216:1,4 227:21 228:1,7 228:17 229:4,8
**regs** 84:17
**regular** 32:14 33:2,14 50:23 57:8 59:15 117:11 188:1
**regularly** 33:6 33:6 114:22

**reisbaum** 2:4 5:18,21,24
**related** 15:12 23:23 24:8 113:9 146:4,8 163:15,16 183:15 185:23 196:19,20,21
**relates** 129:18 183:13
**relating** 156:6
**relation** 27:6 100:10 237:8
**relations** 10:20 27:4,9 28:14 28:20,21,21 53:9,16 104:9 106:21 107:16 120:22 132:4,7 135:4 160:5 175:6 201:10
**relationship** 172:4,9,20 180:10
**relative** 41:20 115:13 116:24
**release** 21:12 27:14,18 38:12 119:6,17 125:7 125:13 184:8
**releases** 20:8 119:10
**relevant** 41:6 118:23,25

119:10 149:24 150:1 170:19 209:20
**reliability** 200:10,25 202:19 203:13 204:10 214:20 215:24
**reliable** 198:19 200:4 214:16
**reliance** 200:16
**rely** 186:22 210:12 211:10 214:11 227:17
**relying** 187:7 228:7
**remainder** 139:22
**remained** 11:8
**remaining** 152:20 213:6
**remarks** 184:21
**remember** 57:18 80:19 93:2 102:19 104:25 106:7 106:22 107:8,8 107:10 109:14 135:2 140:14 177:1 190:22 194:11,15 196:1,3,7,15,16 205:15,19

**remi** 1:9 2:11 3:24 6:6 11:3 20:14 28:8 29:3 55:16 62:4 64:19 68:8 99:9 152:21 175:19
**remind** 14:14 24:20 126:9
**remotely** 5:20
**remove** 146:9 195:1,6 211:7 212:21
**removed** 145:9 174:11,14,20 175:6,8 210:15
**removing** 152:20 228:11
**renew** 65:13 71:15
**rent** 46:6
**rental** 45:22,25
**repeat** 21:24 56:20 72:3 80:21 96:9 129:25 163:3 176:7 195:19 196:6 225:15
**repetitive** 49:25
**rephrase** 35:11 128:13 129:24 159:21 209:9

HIGHLY CONFIDENTIAL

**[replaced - revealing]**                                    Page 56

| | | | |
|---|---|---|---|
| **replaced** 97:25 | **requested** | **resident** 25:14 | 177:25 |
| **report** 11:17 | 109:7 125:17 | **resignation** | **responsibility** |
| 77:7 135:8 | **requests** 26:23 | 175:15,25 | 12:10 21:11 |
| 195:17,22 | 51:24 53:24 | 176:9,11,13,16 | **responsible** |
| 196:2,9 | 163:15,21 | 176:20,22 | 17:9,12 20:1,2 |
| **reported** 11:9 | 197:25 | 177:4,11 | 28:23 36:6 |
| 11:13,19 39:20 | **require** 73:1,3 | 181:13,15,19 | 97:7 140:22 |
| 76:18,19 77:8 | 73:4 | **resigned** | 213:2 235:18 |
| 102:5 186:23 | **required** 84:10 | 175:20 176:1,3 | **rest** 110:21 |
| 214:3,8 215:12 | 84:17,19 | 181:9 185:1 | **restores** 207:16 |
| **reporter** 5:13 | 240:13 | **resistant** 10:7 | **result** 42:9 44:9 |
| 137:10 138:3 | **requires** 12:6 | **resolution** 70:3 | 83:8 93:22 |
| 138:13 235:23 | 29:19 | 70:6 | 140:3 208:22 |
| 236:1,4 237:5 | **rescind** 37:9,16 | **resolutions** | 235:9 |
| 237:20,21,21 | **rescinded** 38:2 | 76:23 | **results** 31:23 |
| **reporting** | 145:11 147:1 | **resolve** 83:13 | 44:8 47:1 97:1 |
| 10:20 11:11 | **research** 4:23 | 84:6 | 103:13,15 |
| 12:4 97:8 | 11:23 13:9,20 | **resources** | 145:2 165:2 |
| **reports** 10:21 | 13:22 105:20 | 28:10 | 166:17 170:3 |
| 11:21 | 165:1 166:17 | **respect** 15:24 | 171:2 203:14 |
| **represent** | 168:22 169:21 | 27:3 162:21 | 204:3,9,17,19 |
| 128:18 136:7 | 170:3,9 171:2 | 163:5 190:20 | 204:23,25 |
| 137:20 | 193:23 198:18 | **respond** 124:11 | 210:4,5 225:11 |
| **representing** | 199:7,8,11 | **responded** | 225:18 227:14 |
| 5:12 206:16 | 200:2,4,11,14 | 120:22 122:14 | 227:18,23 |
| **reputable** | 200:20 201:1 | **responding** | 228:13,18,19 |
| 215:18 | 202:18,19 | 125:15 | 229:1,5,16 |
| **reputation** | 204:10 205:12 | **response** | **retract** 138:24 |
| 223:5,18 224:2 | 211:8 212:11 | 132:13 194:17 | **return** 197:17 |
| 224:24 225:7 | 212:21 217:12 | **responses** | 238:13,16 |
| 225:12,20 | 221:17 225:24 | 75:16 | **returning** 44:1 |
| **request** 137:11 | 226:12 230:4 | **responsibilities** | 44:14 |
| 137:21,24 | **reserved** 84:6,9 | 12:5 55:11,13 | **revealing** 51:23 |
| | 156:5 | 132:3 177:17 | 197:24 |

HIGHLY CONFIDENTIAL

**revenue** 79:8 116:4
**reverses** 207:15
**review** 54:20 55:24 238:7
**reviewed** 8:23 18:25 90:12
**reviewing** 54:16,19,25 55:8,14
**reviews** 44:23
**revised** 20:19
**revisions** 210:3
**revisit** 86:12
**rick** 11:5,6 20:22,25 21:1 29:11 30:10,13 35:19 47:20 62:10,11 64:18 75:10 98:9,16 99:3
**right** 6:12 7:4 8:10,17,21 10:13 17:10,13 17:18,23 18:21 22:6 23:19 27:6 32:8 38:12 47:21 50:13,17,20 53:3,18 55:19 55:21 58:22 59:16 64:11 70:24 84:7 87:18 88:2,5

88:16 89:13 90:3 91:4,8,11 91:14 93:1,5,6 94:13,17 95:18 95:22 117:2 118:6 120:12 124:19 129:13 132:4 138:14 141:7,24 142:10,18 143:14,15 145:2,4,20,21 146:6 147:15 148:3 152:17 152:24 154:24 155:3 156:2 161:11 162:3 166:7 171:12 172:6 174:9,10 177:17 179:6 179:20 181:15 181:21 182:4 184:2,5,9,14 186:5,15 187:4 187:17 189:14 189:17,18,20 190:17 196:11 197:9,15 201:14,15,15 203:10,14 211:12,13 215:3 217:25 218:2,6,8 219:14,21

220:1,23 227:14,19 230:1,10 234:21 235:19
**rightfully** 203:17
**rights** 175:11 175:11
**rise** 117:15
**risk** 116:16,21 117:14
**road** 86:12
**robertson** 97:23 98:2 138:22
**rockefeller** 2:12
**roddy** 9:15
**rogenthien** 4:12 106:9 136:14,20 137:9 138:11 138:17
**roger** 4:15 136:15
**role** 10:15,18 10:18 11:2,6 12:18,23,24 13:25 19:4 24:20 27:3 28:14,17 29:22 30:5,12,17 31:14 58:24 59:7,12 65:22

132:8,14,17 133:11,18 154:23 163:25
**roles** 11:8 147:6 154:3
**rolled** 204:19
**room** 82:14 101:1
**rough** 139:13 139:14
**roughly** 39:4 42:17 48:5 145:17 178:19
**roy** 135:15,17 135:18
**rpr** 3:7
**rules** 3:2
**run** 78:23 98:21 203:22
**running** 42:13 67:17
**ruth** 11:14 27:8 155:19

**s**

**s** 5:1 239:3
**safe** 116:9 140:17
**safety** 129:1,18 131:3 205:22 210:5,22 217:12
**saga** 138:4,7

HIGHLY CONFIDENTIAL

**[salary - screenshot]**                                      Page 58

**salary**  36:20
  38:22,24 45:18
**sale**  81:7 140:8
  159:17
**sample**  22:18
**sandy**  98:2,3
  138:22
**sanford**  97:23
**santorini**  197:7
**sarepta**  47:19
  48:4
**satisfaction**
  152:6
**satisfied**  148:21
**sava**  22:12,12
  100:2,3 101:5
  103:17 105:8
  112:5 120:25
  123:8 131:11
  133:6,19,23
  134:3 135:22
  234:13
**savadx**  22:11
  22:12 24:14
  76:11
**savages**  133:5
  135:22
**saw**  134:8
**saying**  18:16
  29:16 37:25
  58:6 70:23
  91:19 103:11
  119:14 122:18
  125:12 136:24

137:6 160:17
  169:17,20
  188:16 191:18
  211:10 218:5
  221:13 224:6
  226:4,19,24
**says**  8:12,12,14
  8:15 75:13
  88:25 90:11
  117:19 128:25
  137:1 144:21
  151:25 156:4
  157:14 162:13
  163:14 164:12
  164:19 166:9
  167:21 173:1
  174:2 175:5,15
  175:19 177:24
  178:1 186:20
  208:4 231:24
  231:25
**scam**  234:12,16
**scampbell**  2:10
  238:2
**scan**  22:18
**scarring**  109:7
  109:10
**schad**  4:3
  120:16,19,20
  122:12 123:3
**schedule**  33:4
**scheduled**  33:2
  33:6,7,14

**scheme**  234:12
**schoen**  1:11 3:3
  3:16,22,24 4:2
  4:5,7,13 5:5
  6:7,12 45:14
  45:16 75:17
  89:2,11,13
  107:23 113:15
  123:23 126:23
  126:25 128:9
  136:14 171:5
  171:19,21
  193:19,21
  213:19 227:11
  227:13 234:21
  235:17 238:5
  239:2,24 240:2
  240:4,12
**school**  75:4,7
**sci**  202:2
**science**  12:1
  16:8 18:24,25
  20:1 23:25
  25:3,25 28:1
  30:6,14 31:8
  79:24 80:1
  92:4 106:3
  112:7 167:14
  168:4 171:8
  195:18,23
  201:24 202:3
  216:25 233:6
**science's**  168:4

**sciences**  1:9 2:7
  4:17,18,20,21
  169:20,21
  170:20 223:2
  233:14 238:4
  239:1 240:1
**scientific**  11:23
  12:2,12,24
  13:6,8,11,24
  15:4 18:4,11
  20:3,4,12,18
  25:20 31:7
  36:14 139:24
  143:18 183:19
  193:22 194:3
  202:3 207:23
  208:16,16,17
  215:19 218:19
  226:17 228:16
  233:14
**scientifically**
  31:13
**scientist**  21:7
  213:14 215:18
  220:13
**scientists**  18:17
**sclerosis**  15:12
  24:8
**scope**  60:16
**scott**  2:7 6:3
  238:1
**screen**  124:13
**screenshot**
  113:4 124:18

HIGHLY CONFIDENTIAL

**[screenshot - send]**                                                                 Page 59

126:1
**screenshots**
  112:23
**search**  9:23
  182:13 223:14
**sec**  6:18,20 7:1
  7:11,17 10:20
  12:4 17:9,12
  17:17 20:3,4
  21:18 22:5
  23:1,9 38:10
  43:24 84:17
  92:12,16,25
  93:10,15,18,24
  94:14 95:21
  143:12 160:25
  162:4,10,18
  181:7,20 198:7
  198:14 199:16
  200:8 201:23
  211:5 223:25
  223:25 224:9,9
  224:11,21
  235:18
**sec's**  8:9 224:22
**second**  42:10
  53:19 56:5
  70:18 80:4
  94:9 110:6
  128:17 140:10
  146:1,19,21,22
  156:18 175:15
  181:23 207:11

**secondary**
  15:16
**secret**  234:2
**secretary**  75:20
**section**  77:24
  79:11 87:21
  92:4 171:24
  175:1,2,14
  206:22 209:3
  230:24 231:17
**securities**  6:19
  7:7,9,13,14 8:6
  68:20 71:4
  84:22 86:15,21
  86:22
**security**  194:13
**see**  16:3 49:1
  49:14,18 74:24
  75:21,25 76:4
  76:8,12,16,20
  76:24 77:5,11
  80:6 81:11
  86:4 87:14
  89:25 90:9,18
  90:21 91:1
  96:25 106:5
  107:25 112:3
  112:10 113:20
  113:24 114:9
  114:14 115:4
  117:22 118:2
  119:7 120:5,9
  120:17 124:1,8
  124:15 125:8

125:15,19
126:16 129:3
130:8,20 131:4
131:13,22
132:22 133:2,3
133:7 136:17
136:21 137:8
138:3,9 144:23
149:18 150:11
152:8 153:15
153:20 155:8
155:24 156:9
156:18 157:17
157:21 160:17
160:20 161:18
161:22 162:1
162:11,15
163:12,18
164:13,17
165:3 166:19
170:5 172:1
173:2,9 174:5
174:18 175:17
175:22 178:4
179:3,10
180:18 182:1
182:18 185:20
186:9 187:1
206:3,22,25
207:2 208:7
209:5,7,7,8,13
209:23 210:1
210:18 211:17
211:19,23

212:2,6 213:8
214:25 219:9
219:10 222:21
230:21 231:1,8
232:3,6
**seeing**  112:7
**seen**  25:10
  53:15 72:14,16
  99:8 112:22
  124:12 128:8
  128:11,13,14
  128:15,16
  133:9 198:25
  230:10
**sees**  231:11
**select**  188:13
  189:23
**sell**  81:9,12
  102:15 159:6
  159:12
**sellers**  103:24
  115:20 116:15
  117:13 118:15
  119:14 121:21
  121:22,25
  124:4,18,24
  223:6,21
  226:19
**selling**  48:7,9
  48:11,13
**sells**  188:22
**send**  20:14,25
  21:1,2,3,4 28:7
  29:2,6,10 53:9

HIGHLY CONFIDENTIAL

**[send - sign]**                                                           Page 60

53:17 65:15
113:2 118:10
119:5,5,10,19
124:17 126:2
**sending** 65:14
137:12 226:10
**senior** 224:23
**sense** 103:19
211:1,7 212:15
**sent** 65:18
118:4 125:17
126:1 181:6,17
186:4 221:24
238:14
**sentence**
164:16 167:11
168:8 175:4
207:8,11,12,15
208:4
**sentences**
167:10
**sentiment**
112:8
**separate** 25:5
50:19 59:10
86:23 103:7
105:3 202:9
**separation**
184:24,25
**september**
113:16,16
117:19 119:6
162:9 175:21
177:15 195:11

206:2 209:16
210:10
**sequence**
191:10
**serious** 122:20
**served** 189:16
**services** 182:7
**sessions** 20:20
**set** 9:9 15:15
36:19 37:4
81:17 83:19
84:21 113:11
123:19 132:2
139:5,9,11
150:11 152:13
161:10 167:7
188:15
**sets** 128:14
**setting** 151:20
217:10
**settle** 83:22
**settled** 83:20
163:2 181:8,20
199:22 224:9
**settlement** 7:3
43:25 84:11,21
84:22 92:25
93:3 94:14
146:5,10 156:7
162:10 198:7
198:14 223:25
224:7,8,21
**settling** 84:15
224:10

**seven** 198:24
**several** 43:20
135:11 140:10
232:18
**severance**
178:2,7 183:25
185:3
**shambolic**
233:14
**shape** 93:19
158:24 207:16
**share** 46:22
117:20 118:18
118:19
**shared** 117:25
123:9 139:17
139:17
**shareholder**
47:15 101:25
102:5 173:25
**shareholders**
109:3,5,8
**shares** 46:20
47:1,6,18
109:7 112:6
115:13 188:22
**sharing** 138:19
205:4
**sheet** 91:25
156:6 157:13
238:11
**short** 48:6,9,11
48:13 49:10
103:24 114:17

114:20,21,22
114:24 115:2
115:10,11,12
115:17,20
116:14,15,24
117:5,10,13
118:15 119:14
121:8,15,15,21
121:22,25
124:4,18,24
160:18 161:16
223:6,21
226:19 227:4,5
**shorted** 48:14
49:4
**shorthand**
237:21
**shorting**
114:13 115:23
**shortly** 187:14
**show** 17:6,6
103:12 128:25
203:16
**showed** 107:12
**shut** 16:3,3
42:9
**sic** 89:8
**side** 70:10,11
197:4
**sideways**
218:25
**sign** 17:13
94:25 238:12

HIGHLY CONFIDENTIAL

**[signature - sorts]**                                                  Page 61

| | | | |
|---|---|---|---|
| **signature** 65:19 | 164:25 166:13 | 159:18 165:14 | 102:21 104:16 |
| 149:12,14,16 | 166:16 167:14 | 165:23 166:21 | 115:22 137:3 |
| 149:17 236:5 | 167:14 198:18 | 176:18,25 | 168:4 194:11 |
| 237:19 | 200:4,11,25 | 178:11 195:25 | **someday** 116:4 |
| **signed** 227:22 | 201:15,24 | 202:16 207:18 | **somewhat** |
| 228:25 229:4 | 202:19,23 | 235:10 | 49:24 |
| 229:10,15 | 204:10 207:8 | **six** 95:20 195:3 | **sorry** 17:11 |
| 238:19 | 207:15,19,21 | 203:24 204:21 | 35:11 44:22 |
| **significance** | 208:4,10,20,21 | 213:12 | 78:14 85:10 |
| 228:20 | 216:2 217:25 | **size** 96:14 | 95:24 108:9 |
| **significant** | 218:6,16,20 | **slapp** 61:7,20 | 110:7 114:8,18 |
| 60:22 78:24 | 219:13,25 | 73:11 78:9 | 114:19 117:3 |
| 115:20 116:16 | 220:13,15 | 155:23 | 124:12 126:13 |
| 158:12 231:5 | 221:3,13 | **slow** 219:6 | 128:13 135:18 |
| 232:1 | 228:10 | **small** 10:17 | 137:13 138:6 |
| **signing** 220:4 | **simufilam's** | 16:16 23:3,17 | 145:14 149:15 |
| **similar** 12:24 | 14:11,25 | 27:5 92:6 | 149:20 154:19 |
| 13:1 36:22 | 200:19 219:19 | 116:13 152:21 | 155:7 159:4 |
| 80:25 184:23 | **singer** 120:3,11 | 179:15 203:6 | 161:10 176:6 |
| **simply** 21:24 | **single** 28:11 | 203:21 | 176:24 178:13 |
| 25:25 38:6 | 32:11 159:8 | **smaller** 139:19 | 184:15,19 |
| 140:3 170:15 | **sit** 20:19 61:7 | **smart** 30:4 | 186:20 187:23 |
| **simufilam** 13:9 | 61:16 62:2 | **snake** 234:12 | 190:12 195:19 |
| 13:15,20,22 | 173:20 | **snippets** 112:23 | 196:6,14 205:6 |
| 14:4,5 16:6 | **site** 112:21 | 113:2 | 207:10 225:14 |
| 17:2,18,23 | **sites** 226:22 | **social** 4:9 | **sort** 10:25 |
| 21:18,18 22:5 | **sitting** 9:1 18:6 | 102:22 128:21 | 53:16,25 54:1 |
| 24:5 76:3 | 18:10 34:17 | 222:21 | 64:15 69:15 |
| 103:5,11 125:7 | 38:18 56:25 | **solely** 183:14 | 70:2,13 71:12 |
| 125:14,22,22 | 57:20 67:13 | 229:15 | 72:19 96:18 |
| 129:6,19 130:3 | 84:25 106:17 | **solutions** | 106:22 107:1,7 |
| 130:12,23 | 107:1,9 110:12 | 238:23 | 107:8 139:23 |
| 131:7,16,25 | 135:20 148:11 | **somebody** | **sorts** 32:2 |
| 158:6 164:23 | 148:18 155:16 | 25:22 41:6 | 193:8 |

HIGHLY CONFIDENTIAL

**[sound - statements]**                                    Page 62

| | | | |
|---|---|---|---|
| **sound** 55:21 93:5 106:10 143:13 145:20 148:2 | 110:15,25 111:22 117:3 135:21 139:22 155:10 165:19 170:12 181:2 207:23 212:20 | **speed** 11:6 | 229:12 |
| **sounds** 58:4,7 93:6 104:3 143:15 145:4 145:21 197:15 | | **spelled** 124:11 | **stapled** 144:12 |
| | | **spend** 23:2 28:10 59:13,15 59:21 71:25 73:14,20,22 78:6 79:3,5,7 79:13 | **start** 25:17 45:13 74:17 89:10 92:9 100:19 108:3 126:22 134:14 151:24 171:18 193:18 195:20 227:10 |
| **source** 113:2 | **specifically** 18:5,24 30:24 31:16 33:17,25 34:14 53:13 54:10 57:19 59:2 62:23 64:15 65:17 68:25 98:16 100:10 102:19 103:19 118:22 123:4 135:3 137:7 167:21 188:24 190:22 192:25 194:16 196:1 208:15 210:25 212:14 216:18 220:18 | | |
| **sources** 45:18 45:19,24 | | **spending** 23:15 59:9,25 78:19 79:8 109:20 | |
| **southern** 1:2 5:8 | | **spent** 61:18,21 68:23 87:22 88:14 157:23 | **started** 61:2 190:11 191:12 191:13,15 |
| **speak** 30:8 98:16 104:22 188:14 | | **spoke** 106:21 | **starting** 5:16 39:17 43:14 192:8 |
| | | **spoken** 105:22 | |
| **speaking** 28:17 30:1 | | **spot** 144:12 | **state** 5:15 237:2 |
| **special** 32:17 32:19 33:8,11 33:16 36:2 57:9 | | **spread** 49:5 222:6 | **stated** 148:23 |
| | | **staff** 42:2 44:13 86:4 | **statement** 120:3 128:24 129:5,16,18 130:2,6,10,11 130:12,15,17 130:22,23,25 131:1,6,9,15,19 131:24 137:4 138:24 167:19 220:6 232:19 |
| **specific** 18:13 34:2 40:2,17 44:9 46:24 50:16,22 53:24 57:18 58:1 59:15 64:25 65:12 66:25 77:15,18 79:12 80:13,18 81:2 102:12 104:4 107:15 108:15 108:19 110:10 | **specifics** 34:23 63:16 191:7 | **stage** 22:13 160:8 | |
| | **specified** 81:2,8 | **stages** 22:16 | |
| | **spectrometry** 23:20 | **stamped** 7:22 74:1 107:20 113:14 119:21 123:20 125:4 132:11 136:3,6 205:2 | |
| | **speculating** 213:17 | | |
| | **speculation** 165:22 181:10 | **stand** 107:1,3 121:2 183:22 | **statements** 4:9 33:18 49:11 62:18,25 63:24 64:2,16 122:23 123:9 124:18 |
| | **speech** 226:11 226:17 | **stands** 220:7 227:23 229:6 | |

HIGHLY CONFIDENTIAL

**[statements - successful]**                                    Page 63

| | | | |
|---|---|---|---|
| 128:15 164:21 | 102:16 105:18 | 209:24 214:2 | **submit**  15:25 |
| 165:6,20,25 | 108:25 109:1,2 | 215:12 227:22 | **submitted** |
| 166:11,23 | 109:23 115:23 | 229:5,11 | 70:25 179:14 |
| 168:8,17 169:7 | 117:15 135:8 | **studiously**  30:6 | **subpoena** |
| 170:8 219:23 | 141:11 172:24 | **study**  32:1 76:7 | 162:4 |
| **states**  1:1 5:7 | 173:4,7,12,19 | 185:18,25 | **subpoenas** |
| **statistical** | 173:19,23 | 186:2,24,25 | 161:24 |
| 228:20 | 182:21 | 187:8 202:5,22 | **subscribed** |
| **status**  92:12,16 | **stockholders** | 203:2,7,10,17 | 240:14 |
| 150:8 | 81:1 | 203:18,20,25 | **subsection** |
| **stay**  103:7,8 | **stocks**  45:23 | 204:1,9,15,17 | 175:15 |
| 105:3 | **stop**  100:21 | 204:23 205:14 | **subsequent** |
| **stayed**  13:4 | 104:21 105:8 | 205:15,19,20 | 55:4 185:7 |
| 204:1 | 213:17 216:7 | 205:21,22 | 197:17 |
| **stenotype** | **street**  2:8 3:5 | 206:1 207:5 | **subsequently** |
| 237:10,13 | 5:11 | 209:12,25 | 152:2 |
| **step**  180:22 | **strike**  21:16 | 210:17 211:12 | **substance** |
| **stepping** | 34:3 35:6 | 220:17 221:8,9 | 19:16,19 34:14 |
| 180:17 181:1 | 39:15 52:14 | 225:19 227:18 | 51:18 56:12 |
| **steve**  11:15 | 55:18 58:19 | 227:23 228:5 | 64:8 101:8,10 |
| **stick**  104:14 | 66:4 69:14 | 228:15 229:25 | 101:10 105:24 |
| **sticks**  194:14 | 72:15 88:10 | 230:25 231:18 | 106:2 196:1,3 |
| **stipend**  172:5 | 95:13 106:14 | **subject**  63:21 | 196:8 197:22 |
| 172:24 | 138:5 142:14 | 83:23 107:24 | **substantive** |
| **stock**  36:24 | 187:21 200:4 | 113:17 120:3 | 34:18 50:17 |
| 43:10,13,17,23 | 209:9 214:5 | 123:25 125:6 | 159:23,25 |
| 45:18 46:11,14 | **strong**  92:4 | 133:13,15 | **substantively** |
| 46:15,18 48:7 | 105:19 | 136:15 139:23 | 106:7 |
| 48:14,20 49:5 | **studied**  13:10 | 152:6 184:9,11 | **succeed**  96:19 |
| 49:7 65:17 | **studies**  13:18 | 187:24 229:19 | **success**  109:23 |
| 77:10 81:7 | 15:18,21 17:5 | **subjects**  98:22 | 139:12 140:2 |
| 87:2 90:13,15 | 41:14 96:11,19 | **submissions** | 216:12 |
| 90:24 91:4,6,7 | 96:21 97:4 | 214:12,22 | **successful** |
| 91:10,13 95:3 | 203:6,13 209:4 | | 41:15,23 48:21 |

HIGHLY CONFIDENTIAL

**[successful - telephone]**                    Page 64

48:22 92:5,7
96:12,15 110:5
116:2,12 216:8
222:14 223:12
**sufficient** 14:18
14:19 82:23
83:6 87:5,12
**suggestions**
98:19
**suggests** 89:1
**suit** 61:8 161:2
**suite** 2:8 3:5
**summarize**
28:13 235:8
**summary** 96:6
165:13,14,18
166:22 167:3
167:11,13,18
167:22,25
168:13,15
169:4,14 170:1
232:18 235:18
**sunday** 197:11
**support** 225:23
**supporter**
105:19
**supporting**
228:9
**supportive**
99:21
**sure** 11:6 12:7
14:15 21:8,11
27:2,5 29:8,25
31:3 36:18

39:3,19 46:23
49:22 50:1
56:21 57:20
61:6 64:13
65:11 78:12
80:18,22,24
96:11,21 97:24
101:17 108:22
108:24 109:9
110:9,21
122:13 139:10
141:7 146:21
148:11,14
173:14 186:17
187:23 195:4
205:15 225:3,3
227:6 229:16
**surface** 28:6
**surprised**
116:13 197:3
**surprising**
41:21
**surveys** 44:22
44:23
**suspect** 129:2
**svp** 24:21
133:12,18
221:24
**switched** 75:9
**sworn** 6:8
237:7 240:14
**system** 48:25

**t**

**t** 239:3,3
**table** 109:9
**tail** 24:11
**take** 8:2 16:11
20:6 26:5
37:25 45:9
48:12 49:10
53:21 87:20
89:6 101:1,22
101:23 102:23
108:2 113:20
116:18 130:10
130:22 138:23
157:6 171:14
178:21 189:24
193:13 211:14
213:22,25
227:4 230:3
**taken** 3:4 5:5
18:15 45:12
89:9 114:17
126:21 171:17
193:17 227:9
237:10
**takes** 60:23
**talk** 16:14
19:10 20:20
27:3 28:25
30:15 83:3
84:3 100:8,13
101:2 157:11
180:4

**talked** 27:1
32:5 53:8 91:4
100:11 107:13
107:16 108:12
108:16 109:14
134:13 135:12
135:24
**talking** 16:10
16:15 30:13
31:6 34:1
45:17 89:14
108:25 132:3
139:7 141:16
141:16 142:23
168:21 186:14
223:14 224:7
227:14
**tally** 59:9
**tap** 22:19
**target** 36:21
115:10 116:1,3
**team** 10:9
12:12 13:4
18:4,11,24,25
19:3 20:18
51:7 60:13,14
60:19,19,21
86:6
**technically**
177:19
**technology**
24:22
**telephone**
74:21 108:8,10

HIGHLY CONFIDENTIAL

**[telephonic - think]**                                          Page 65

| | | | |
|---|---|---|---|
| **telephonic** 3:18 | 179:21,24 | **thanks** 124:14 | **think** 11:20 |
| **tell** 8:20 16:9 | 180:6 | 149:6 205:5 | 16:21,25 19:10 |
| 24:25,25 26:22 | **termination** | **theranos** 138:5 | 19:12 24:17,23 |
| 40:7 43:16 | 139:14 172:20 | 138:8 139:3 | 25:1,22 28:5 |
| 82:9 99:9 | 174:21 | **therapeutic** | 31:11 32:20 |
| 100:10 101:21 | **terms** 21:15,17 | 14:8 164:22 | 35:24,25 38:17 |
| 102:14,17 | 37:7,20 45:3 | 166:12 218:17 | 39:18 41:5,24 |
| 107:13 108:20 | 71:13,14 | 220:16 | 44:6,20 48:12 |
| 111:22 122:12 | 100:10 173:11 | **therapeutics** | 48:12,14,21 |
| 133:16 134:15 | **tesla** 141:15,19 | 9:14 10:1 | 49:20 52:22 |
| 134:17 168:19 | **test** 130:1 | 47:19 | 53:14 61:11 |
| 169:8 187:21 | **testified** 6:8 | **thereof** 237:13 | 65:5 70:17 |
| 188:16 201:10 | 16:5 17:8,22 | **thesis** 16:25 | 73:5,6 74:8,9 |
| 205:9 206:5 | 58:20 117:4 | **thing** 19:20 | 77:25 82:9 |
| 217:24 231:14 | 127:18 183:16 | 72:8 103:20 | 86:2 91:18 |
| **telling** 120:24 | 203:12 | 104:11,19 | 94:8 96:2 |
| 125:11 219:19 | **testify** 237:8 | 117:8 176:25 | 103:18 104:6 |
| 224:17 | **testifying** 53:23 | 192:18 199:1,3 | 106:20,23 |
| **tells** 138:3 | 130:1 163:1 | 199:7 203:3 | 110:20 112:6 |
| **ten** 90:15 | **testimony** 9:2 | 216:14 218:18 | 116:8 121:16 |
| 100:23 101:2 | 19:5 53:7 87:4 | 221:14 228:5,6 | 121:17 122:20 |
| 224:5,6 | 91:16 118:12 | **things** 11:6 | 123:14 126:16 |
| **tender** 176:20 | 122:15 176:18 | 16:15 21:14 | 129:17 136:16 |
| 177:3 | 177:6,7 202:16 | 24:1 44:19 | 137:2,5,24 |
| **term** 121:9,13 | 218:10 220:3 | 77:25 81:6 | 139:25 140:20 |
| 121:14,20 | 229:3 238:9,17 | 95:7 97:15 | 147:12 148:4 |
| 147:18 155:13 | 240:8 | 104:25 106:2 | 150:25 151:15 |
| 179:5 184:18 | **tests** 23:23 | 118:23 147:21 | 154:25 168:1 |
| 207:23 | **texas** 7:7 46:1 | 160:9 164:16 | 177:12 180:23 |
| **terminate** | 86:16 | 164:19 168:23 | 190:25 192:25 |
| 172:8 | **text** 208:3 | 170:15 191:19 | 197:10,14 |
| **terminated** | 209:7 | 201:11 202:9 | 199:6 200:1 |
| 172:4 173:16 | **thank** 19:18 | 226:18,21 | 205:17 212:20 |
| 174:15 175:5,9 | 196:24 | 230:15 | 213:13 214:19 |

HIGHLY CONFIDENTIAL

**[think - today]**                                              Page 66

215:20 217:4
221:15 222:4
222:11,13
223:16,19,24
224:4,19
225:14,17,22
226:1,5,6,6,7,9
230:4
**thinking**  92:9
110:13 140:1
**third**  42:2
44:13 171:24
**thomas**  113:18
117:21 118:1,5
118:14,17
**thornton**  24:15
24:17 25:24
26:3,11 31:9
**thornton's**
31:14
**thought**  38:19
73:9 93:18
97:3 114:23
118:23,25
163:1 215:19
220:13 230:17
**thoughts**  92:1
112:3
**thousand**
169:12,12
**thousands**
218:4
**thread**  3:21,23
4:2,4,7,14

113:17 116:22
117:20,25
**threads**  118:10
**threatened**
127:5
**threatening**
125:7,13
**three**  6:23
45:24 81:5
83:18 147:6
148:6 153:24
154:3 190:8
**throw**  111:11
**tied**  7:12
**tight**  20:12
47:9
**time**  9:17,25
10:8 11:7,15
19:21 25:18
28:4,11 29:22
31:10,12 32:17
37:21 38:18
40:6 45:15
46:3,22 47:3
47:19 55:17,20
61:5,10,12,23
75:6,8,10 83:2
86:11 87:23
89:12 91:17
92:13 93:17
97:20 100:22
102:23 104:20
110:2,19 115:2
115:10,12

116:9 117:16
118:13 119:12
119:15,17
123:15 126:24
135:11 140:24
145:7 146:16
148:8 155:18
171:20 172:11
173:25 174:7
175:8,8 181:15
181:20 188:3
188:15 190:18
191:3 193:20
197:6,23,24
204:20 215:17
219:18,22
224:7 226:21
227:12 236:9
237:10 238:18
**timeframe**
238:8
**timely**  12:8
**times**  27:18
31:11 47:4,7
95:4 99:23
100:15 111:3
132:14 135:11
137:11,22
138:4,14
140:10
**timothy**  4:5,7
123:23 124:11
125:5,11

**title**  24:24
133:5
**titled**  209:3
**titles**  153:24
**today**  6:24 7:18
9:1 14:13 18:6
21:25 22:8
25:16,19 26:4
26:6 34:17
38:18 45:1
56:25 57:20
61:16 62:2
67:13 85:1,4,6
91:17 102:3
106:17 107:1,5
107:10 108:15
110:12 111:6
111:19 126:10
127:25 129:16
130:1 135:20
139:7 147:8,9
148:1,7,11,18
155:16 158:7,9
158:15 159:3
159:18 162:17
163:1,20
165:14,23
166:21 176:18
176:25 178:6
178:11 180:1,9
182:25 186:3
187:3 195:25
202:16 207:18
218:10 219:24

HIGHLY CONFIDENTIAL

235:10

**todd** 4:12 106:9 136:14

**told** 100:4 102:21,21 103:19 104:15 104:20 105:7 110:11 147:25 194:22 216:14 228:13

**tone** 63:7,8,9

**took** 11:10 30:12

**top** 12:13,13 43:21 66:21 119:5 151:25 158:3 160:17 164:15 206:3

**topic** 65:2 80:5 157:10 193:1,2 193:4,9

**topics** 33:12 115:14

**total** 81:18 116:7 152:4,19 152:22,22,25 184:4 236:9

**totally** 213:15

**touch** 10:2,4

**tough** 13:12

**towards** 185:11 198:25

**town** 100:21

**track** 114:16

**trade** 81:10

**traded** 12:21 36:22 81:4 134:25

**trades** 10:25 47:11

**trading** 10:23

**transcript** 3:16 8:4,20,24 9:6 82:13 85:12 237:13 238:6 238:19 240:5,8

**transcripts** 86:4

**transit** 198:2

**transpired** 31:5

**transpiring** 96:3

**treasury** 45:23

**treat** 14:11 164:23 166:13

**treated** 164:25 166:15

**treatment** 204:22 221:3,6

**trial** 42:8,10 66:16 78:21 102:8 103:13 158:8 163:25 164:5,9 206:7 212:23 216:19 217:6,18 222:7 222:25 226:23

**trials** 13:14 15:10,14,15,24 44:12 92:3 97:11 130:19 158:4 183:19 199:3 200:24 201:7,21 216:5 216:6 218:5,12 218:24 219:12 219:12,13,18 220:5,5,23,25 221:12 223:11 223:12 227:2 229:1

**tried** 222:24

**triggered** 153:17

**triggers** 140:7

**trouble** 74:8

**true** 18:20 22:4 163:20 215:14 226:20 228:18 237:12 240:8

**trust** 131:21 133:6

**truth** 237:8

**try** 19:4 74:7 104:12 126:2 222:9

**trying** 58:3 71:11 122:15 129:22 138:22 141:6 160:11 171:7 177:12

183:18 191:5 199:1 222:10

**tsc** 31:15 158:1 158:3

**tuberous** 15:12 24:8

**turn** 25:19 49:19 80:1,4 87:13 89:21 128:23 130:5 130:16 131:1,9 131:18 160:16 161:12 185:16 206:19 209:2 211:15

**turned** 204:12

**tweet** 128:23

**tweeting** 168:4

**tweets** 53:17 125:12

**twelve** 204:22

**twice** 78:3,5 79:4

**twitter** 120:4

**two** 8:11 11:20 15:17 32:24 39:18,19 41:14 44:19,21 46:2 95:20 96:11 129:12 130:18 137:18 140:9 140:11 144:25 145:8 147:25 151:12 167:10

HIGHLY CONFIDENTIAL

**[two - used]**                                                                Page 68

168:23 184:12 186:15 187:7 189:13 190:7 199:2 204:24 216:5 217:6

**type** 24:2 58:1 191:11

**types** 78:2

**typewritten** 237:11

**typical** 58:13 190:22

**typically** 17:18 28:22 58:11 75:1,3 77:19 79:24 80:3 82:10 190:23

**u**

**ucsf** 137:24 138:23

**uh** 135:13 169:6

**ultimately** 7:2 53:11 153:23

**unanimous** 188:8

**unanimously** 90:13

**unblind** 199:10 221:25

**unblinded** 186:5 225:5

**unblinding** 199:10,13 200:15

**uncertain** 83:16

**uncertainties** 186:21

**uncertainty** 121:4

**under** 31:1 45:4,4 71:9 127:6,22 130:19 142:9 142:25 143:6,8 143:17 144:5,6 147:11,14 148:13,16,20 151:17,19,21 152:19 154:22 163:2 172:25 175:12 179:12 179:13 180:24 181:24 182:7 185:2,3,4 188:14 206:22 209:11,24 211:16 212:21 213:1

**underlying** 167:14 201:24

**underneath** 205:17

**understand** 28:2 58:4,5

83:17 129:17 129:22

**understanding** 14:25 15:4,5 15:13 20:7 21:22,24 22:11 67:23 69:8,24 88:7 163:24 168:16 169:8 169:17,19,25 170:8 171:1 183:12 184:16 199:20

**understands** 157:7

**understood** 85:24

**unexercised** 173:8,21

**unexpected** 93:21

**unfair** 23:18 217:5

**unhappy** 62:17 62:18,25 63:23 87:2 197:3

**unit** 5:4

**united** 1:1 5:7

**university** 24:6 194:15

**unlock** 139:16 140:4

**unlocked** 139:22

**unpack** 53:14

**unreasonable** 217:10

**unsafe** 129:6 130:3,13,24 131:7,16,25 169:23

**unsuccessful** 48:24

**upcoming** 163:25

**update** 20:7 75:23 77:3,20 161:20 175:2 175:14

**updated** 65:14 76:10

**upside** 115:23 115:24

**use** 20:16,24 41:19 49:9 61:12 76:19 81:23 96:4 109:13 121:13 121:14,20,23 121:24 147:17 217:4,14,16

**used** 22:5 38:1 96:5 109:7 115:5 121:5,9 121:16,18 217:22 221:25 238:19

HIGHLY CONFIDENTIAL

**[useful - wang's]**                                                    Page 69

| | | | |
|---|---|---|---|
| **useful** 117:21 149:7 | **vest** 90:16 173:20 | 174:19 176:11 200:10,19,24 | **wand** 124:5,11 |
| **using** 20:11 63:22 | **vice** 224:23 | 204:9 208:10 217:8 221:3,5 | **wang** 13:23 42:15 43:24 |
| **usually** 28:15 190:7 | **video** 3:2 5:4 45:14 75:5,9 | 223:4 225:4,9 226:25 228:3 | 62:19 64:3 65:7,10 66:20 |

**v**

**v** 238:4 239:1 240:1

**vacation** 197:4
**valid** 28:9 215:20
**validity** 185:18 199:1
**valuation** 152:1
**value** 173:12 173:21 200:22
**various** 47:4 169:18
**verbatim** 38:24 43:15
**verify** 238:9
**veritext** 5:13,14 238:14,23
**veritext.com.** 238:15
**vermillion** 9:16 12:18
**vernacular** 121:12 146:7
**version** 206:5
**versus** 5:6 167:19

89:11 102:20
102:23,25
103:10 126:23
171:19 193:19
227:11
**videoconfere...** 2:3,3,16,16,17
**videographer** 2:15 5:2,13,22
45:10,13 89:7
89:10 126:19
126:22 171:15
171:18 193:15
193:18 227:7
227:10 235:21
**videorecorded** 1:11
**view** 16:18
30:20 45:6,8
49:10,16 59:10
60:6,8,12,16
73:19 83:1
87:3 93:7,12
98:19 111:18
116:15 117:13
129:5,16 130:1
130:12,23
131:6,15,24
168:20 171:9

**viewed** 224:23
**views** 48:9 60:9 60:25
**visit** 100:25
**visited** 99:22 100:14 112:16 112:21,25
**visits** 100:18
**vividly** 196:15
**vocal** 101:19
**voluntarily** 56:8,14,19,22 57:2,21 58:15 88:4 176:4
**voluntary** 176:9,12
**volunteers** 132:25 133:5
**voted** 139:10
**vs** 1:8

**w**

**wainwright** 189:16 190:20 191:14
**walk** 134:10
**wall** 188:14

124:10 141:23
146:16 152:15
152:18,24
153:7 163:17
163:25 164:9
164:12,20
165:1,25
166:10,16
167:9 170:2,19
171:24 172:4
173:4,12,24
174:2 175:11
181:6 186:4
194:3 196:12
196:25 198:18
199:14,15
200:8 202:17
202:25 212:3
212:18 213:7
213:16 223:17
223:20 225:5
234:22,25
235:3,19
**wang's** 42:19
65:24 66:5,10
66:15 67:4,10
67:21 142:25
171:25 173:7
193:23 194:7

HIGHLY CONFIDENTIAL

**[wang's - worked]**                                                        Page 70

194:13 195:10 199:8 202:22 204:7 211:20 211:24 212:7
**want** 28:10 29:4 30:12 39:1 40:24 49:21,25 54:24 58:5 62:13 64:7 67:2,12 81:9 85:11 92:15 108:3,22 109:1 110:21 117:17 125:19 129:11,11 134:9,16 135:9 139:5 150:11 171:22 183:8 204:13 213:3 215:13 230:3,6 235:24 236:1
**wanted** 30:14 61:24 110:23
**wanting** 132:25
**warned** 218:25
**warrant** 47:4 80:25 81:7,20 160:10
**warrants** 47:5 81:3,4,5,6,10 81:11,15,20
**washington** 8:9 46:1

**waste** 124:6
**water** 103:14
**way** 58:9 93:19 103:12 109:16 109:21,23 112:7 115:11 130:7,7,7 146:22 158:24 159:15 170:22 174:19 193:3 208:1 216:2 219:10 226:6 228:25 237:15
**wayne** 134:14
**ways** 160:5 169:13 188:10
**we've** 16:2,3,22 16:23 18:14,17 18:18 22:1,24 22:25 23:1,10 23:16 27:17 28:16 49:20 50:1 75:11 83:2,16,19 84:23 107:2 109:12 115:19 134:13 135:23 135:24 160:5,6 160:7 186:14 188:4
**wear** 10:24
**website** 27:11 206:8

**week** 190:7,13 190:15 191:17
**weekend** 133:1
**weeks** 66:16 93:14 95:20 144:25 189:13
**weird** 144:12
**welcomed** 125:20
**went** 10:1 30:6 34:9 53:7,7,11 81:10 109:5 126:5 192:3 204:2,20
**western** 25:8 25:10,14,20,23 26:2,9,14 86:16 165:2 166:17 170:3
**whatsoever** 201:23 216:22 220:4
**wherewithal** 28:3
**william** 120:2
**willing** 73:14 79:3 117:20
**willingness** 225:23
**window** 191:6
**windows** 47:8
**wish** 61:11
**withdrawal** 203:25

**witness** 6:4 237:7 238:8,10 238:12,18
**woman** 65:25
**women's** 12:19
**wonder** 201:14
**wong** 2:3 5:22 5:23
**word** 96:5 121:23 147:17 176:11 217:4
**words** 38:1 63:23 91:18 121:4,18 139:12 154:1 167:2 168:2,12 169:2,10,11,22 170:12 195:3 199:2 215:16 217:15,16,21
**work** 12:24 17:1 23:7,13 23:18,20 24:10 25:5 44:9 98:7 183:8,11,13 202:3,3,8,13,13 202:22,24 203:5 204:7 213:4 215:1,21 219:9 220:20 220:21,23 221:13
**worked** 202:7

HIGHLY CONFIDENTIAL

**[working - zoom]** Page 71

**working** 22:24
24:4 25:3
103:12 109:19
177:3 219:2
**works** 217:9
221:3
**world** 197:4
217:24 219:19
222:8
**worse** 138:5
224:15,25
225:2
**worth** 28:4
122:19
**write** 135:9
**writes** 111:25
124:4 132:24
**writing** 12:10
20:11
**written** 3:1
77:16 167:3
188:8
**wrong** 49:1
88:19 129:8
**wrongdoing**
213:2
**wrote** 121:16
135:7 140:21
**wu** 2:11 6:5,5

**x**

**x** 3:8
**xyz** 79:5

**y**

**yahoo** 132:20
**yale** 24:6
**yeah** 14:2,2
16:21,23 18:23
19:18,19 25:2
35:4 39:13
40:4,12,23
41:3,5 43:6
49:14 64:5
67:17 75:10
87:10 90:5
92:21 93:6
98:9,11 100:3
108:13 114:9
123:12 134:4
134:17 135:18
135:25 136:12
137:23 145:19
146:2 150:3
151:3 154:1
155:4 165:18
167:1 168:11
170:11 177:21
181:2 182:15
185:4 190:12
191:16 192:13
199:19 217:2
225:2 228:1
229:8,14
231:23
**year** 10:3 11:5
27:8 33:3,13

33:14 39:17
41:12 43:2,14
44:15 71:15,16
78:3,5 79:4
90:16 149:9
161:5 177:2
179:5 182:3
184:11,12
204:24
**years** 11:4,13
11:14 27:7
30:11 34:1
36:24 38:22
65:11 99:24
107:18 109:17
114:22 116:6,8
140:11,15
147:25 161:5
177:3 198:24
202:8 203:23
**yep** 150:14
**yesterday** 6:14
6:23 7:18 27:2
32:5 49:21,25
53:8 62:16
118:12 122:15
185:23 195:2
203:12
**york** 1:2 2:5,5
2:13,13 5:8
104:1 137:11
137:22 138:4
138:14 194:15

**z**

**zamlutz** 155:19
**zaur** 2:3 5:20
5:24
**zero** 23:18 38:4
67:18 147:3,4
148:17 153:4
**zeroed** 145:13
**zoom** 5:20 75:5
75:11 108:9,9
108:17,17
110:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.