# Exhibit 132

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

ADRIAN HEILBUT, JESSE      )
BRODKIN, and ENEA          )
MILIORIS,                  )
    Plaintiffs             )
                           )  CASE NO.
VS.                        )  1:24-cv-059498-JLR-OTW
                           )
CASSAVA SCIENCES, INC.,    )
REMI BARBIER, and          )
LINDSAY BURNS,             )
    Defendants             )

ORAL AND VIDEOTAPED DEPOSITION OF REMI BARBIER

NOVEMBER 11, 2025

ORAL AND VIDEOTAPED DEPOSITION OF REMI BARBIER, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above styled and numbered cause on Tuesday, November 11, 2025, from 9:00 a.m. to 6:24 p.m., before Janalyn Elkins, CSR, in and for the State of Texas, reported by computerized stenotype machine, at the offices of Baker & Hostetler, LLP, 111 Congress Avenue, Suite 810, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Page 2

APPEARANCES

FOR THE PLAINTIFFS:
DAVID KUMAGAI
CLARICK GUERON REISBAUM, LLP
41 Madison Avenue, 23rd Floor
New York, New York 10010
Tel: (212) 633-4310
dkumagai@cgr-law.com

FOR THE DEFENDANTS REMI BARBIER AND LINDSAY BURNS:
ARIC H. WU
ZACHARY R. TAYLOR
BAKER HOSTETLER
45 Rockefeller Plaza
New York, New York 10111
Tel: (212) 220-9175
awu@bakerlaw.com
Ztaylor@bakerlaw.com

FOR THE WITNESS:
BILLY JACOBSON
JACOBSON LOPEZ
1015 15th Street NW, Suite 1030
Washington, DC 20005
Tel: (202) 810-0965
bjacobson@jacobsonlopez.com

FOR THE DEFENDANT CASSAVA SCIENCES:
SCOTT CAMPBELL
GIBSON DUNN & CRUTCHER LLP
1900 Lawrence Street, Suite 3000
Denver, Colorado 80202
Tel: (303) 298-5723
scampbell@gibsondunn.com

Also Present:
PETER ZIERLEIN

Page 3

I N D E X

PAGE

Appearances .................................. 2

Stipulations ................................. 6

REMI BARBIER
Examination by Mr. Kumagai ................... 7
Signature and Changes........................ 273
Reporter's Certificate....................... 275

Page 4

E X H I B I T S
NO.        DESCRIPTION              PAGE
Exhibit 175  Letter of Resignation          38
Exhibit 176  Adam's Take Article            66
Exhibit 177  Cash Incentive Bonus Plan      81
Exhibit 178  Email                          95
Exhibit 179  Email                          96
Exhibit 180  Spreadsheet                    97
Exhibit 181  Email                          101
Exhibit 182  Email                          104
Exhibit 183  Minutes of the Meeting of
             the Board of Directors of
             Cassava from March 4th,
             2022                           203
Exhibit 184  Meeting of the Board of
             Directors on
             September 16th, 2022           204
Exhibit 185  Minutes From the Board
             Meeting
             September 16th, 2022           205
Exhibit 186  Email                          219
Exhibit 187  Email                          229
Exhibit 188  Email                          237
       PREVIOUSLY MARKED EXHIBITS
Exhibit 88   Email                          45
Exhibit 131  Response of Cassava Sciences,
             Inc. to Public Allegations of
             Fraud and Research             161
Exhibit 132  Letter                         171
Exhibit 133  A Shambolic Charade            171
Exhibit 134  SavaDX Exposed                 172

Exhibit 135  Cassava and the Wang Lab:
             Seeing Through the Blind       172
Exhibit 166  Defamatory Statements on Social
             Media                          176

Page 5

Exhibit 77   Minutes of a Meeting of the
             Ad hoc Litigation Monitoring
             Committee of the Board of
             Directors of Cassava Sciences,
             Inc.                           195
Exhibit 78   Minutes From the Ad Hoc
             Litigation Monitoring Committee
             November 16th, 2021            196
Exhibit 79   Minutes From a Meeting of the
             Litigation Monitoring Committee
             December 23rd, 2021            197
Exhibit 80   Minutes From a Meeting of the
             Litigation Monitoring Committee
             January 21st, 2022             198
Exhibit 81   Minutes of a Meeting of the
             Litigation Monitoring Committee
             March 14th, 2024               199
Exhibit 82   Minutes From the Litigation
             Monitoring Committee
             October 29th, 2022             199
Exhibit 83   Minutes of a Meeting From the
             Litigation Committee
             November 1st, 2022             202
Exhibit 138  Email                          222
Exhibit 143  Email                          225
Exhibit 86   Scientists Question Data Behind
             An Experimental Alzheimer's Drug  233

Exhibit 149  Letter                         262

2 (Pages 2 - 5)

Page 6

THE REPORTER: Mr. Kumagai, do you want a rough draft?

MR. KUMAGAI: Yes, please.

THE REPORTER: And do you need expedite?

MR. KUMAGAI: I think we have a standing order so we do have some kind of expedited order but I don't know exactly what it is to be honest.

THE REPORTER: Mr. Wu, do you want a copy?

MR. WU: Yeah, sure.

THE REPORTER: Do you need a rough draft or expedite?

MR. WU: Just the rough drafted.

THE REPORTER: Mr. Campbell.

MR. CAMPBELL: I'll take a copy. I don't need anything rough or expedited.

MR. JACOBSON: I don't think I need anything.

VIDEOGRAPHER: Here begins the deposition of Remi Barbier. Today's date is November 11th, 2025, and the time is 9:29 a.m. Will counsel please identify themselves for the record, after which the court reporter will swear in the witness.

MR. KUMAGAI: This is David Kumagai from the firm Clarick Gueron Reisbaum on behalf of the Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and

Page 7

Dr. Enea Milioris. Also on the Zoom are Isaac Zaur from the law firm Clarick Gueron Reisbaum, Amanda Wong from the same firm, and the individual Plaintiffs may be joining throughout the day.

MR. WU: Aric Wu from BakerHostetler from the individual Defendants, and with me is my colleague Zach Taylor.

MR. CAMPBELL: Scott Campbell from Gibson Dunn on behalf of Cassava Sciences, Inc.

MR. JACOBSON: Billy Jacobson, Jacobson Lopez on behalf of Mr. Barbier.

REMI BARBIER, having been duly sworn, testified as follows:

EXAMINATION

Q. (BY MR. KUMAGAI) All right. Good morning, Mr. Barbier.

A. Morning.

Q. Mr. Barbier, what is your understanding, if any, of the science underlying simufilam?

A. That's a loaded question for a first question. The -- let me be clear. I'm not a scientist. I don't have training as a scientist. I don't have experience as a scientist. However, as a CEO, I understand it at a -- I understand the science at a high level. So any questions you ask around the science, I can answer at my

Page 8

level, which is a high level. If you need details, it's probably not me.

Q. Can you describe what you understand to be the science underlying simufilam?

A. So simufilam is a -- a novel drug candidate with a proposed mechanism of action having to do with somehow binding to a -- another molecule in -- that is present in the brain of Alzheimer's patients.

Q. Anything else?

A. I -- I think at a high level, that's -- that's my understanding.

Q. And what is that understanding based on?

A. Working at the company for many years, decades.

Q. Have you read the underlying research papers or reviewed any primary data?

A. How do you mean by primary data?

Q. Let's take it one at a time. So let's start with have you reviewed any of the research papers underlying simufilam?

A. Somewhere along the line, I'm sure I've read many, if not most. But I don't remember exactly which or when.

Q. And sitting here today, can you name any of the papers that you've read over the years underlying simufilam?

Page 9

A. I cannot.

Q. Have you ever reviewed any primary data underlying simufilam?

A. How do you mean by "primary data"?

Q. What is your understanding of primary data?

A. I -- I don't know. You -- you used the term. You -- you need to define it.

Q. Do you have any understanding of what the term primary data means?

A. In your context, I do not.

Q. Have you ever reviewed any original data underlying simufilam?

A. I've not seen original data. What I've seen is copies of data.

Q. Have you reviewed any raw data underlying simufilam?

A. Same answer.

Q. You have not seen any raw data. You have seen copies of raw data?

A. If I've seen raw data, I don't remember this.

Q. Do you know whether any science underlying simufilam was made up?

A. How do you mean "made up"? Like, fabricated you mean?

Q. What do you understand the term made up to be?

3 (Pages 6 - 9)

Page 10

A. I -- I don't understand in your context. Makeup could be women's makeup. Makeup could be fabricated. I -- what -- what's your understanding -- how are you using the term?

Q. Are you interpreting my question to mean women's makeup?

A. Should I?

Q. What do you understand the term "made up" to mean in the context of scientific research?

MR. WU: Objection.

THE WITNESS: It's not a term I've come across in my career, so I -- I'm not sure what -- can you use a better -- more precise adjective?

Q. (BY MR. KUMAGAI) You're not familiar with ever coming across the term "made up" in the course of your time as CEO of simufilam -- of Cassava, excuse me.

A. With regard to the science, never.

Q. Have you -- strike that.

Do you know whether any science underlying simufilam was fabricated?

A. In my opinion, none of it was fabricated.

Q. Do you know for a fact whether any of the science underlying simufilam was fabricated?

A. In my opinion, none of it. None of the science is fabricated.

Page 11

Q. My question is whether you know for a fact whether any of the science underlying simufilam was fabricated?

A. In my opinion, none of the science is fabricated.

Q. What do you mean "in your opinion"?

A. That's all I have to go by.

Q. So do you or do you not know for a fact whether or not any of the science underlying simufilam was fabricated?

A. In my opinion, none of it is fabricated.

Q. Does that mean you do not know for a fact that any of the science underlying simufilam was fabricated?

A. Same answer. In my opinion, none of it was fabricated.

Q. You don't know sitting here today whether any science underlying simufilam was fabricated, right?

A. None of the science was fabricated in my opinion.

Q. What is that opinion based on?

A. Based on outside investigations conducted by third parties.

Q. Which investigations?

A. For example, there was a study conducted by -- paid for by Cassava Sciences where -- whereby they hired

Page 12

an outside law firm and the law firm hired out -- outside experts.

MR. CAMPBELL: Hold on. Anything that was directed by outside counsel for the firm is privileged and I would instruct you not to answer.

MR. WU: All right. So -- so beyond the fact of the investigation, if he asks you questions about the substance of, you know, discussions with the law firm that conducted the investigation, you can't answer that because it's privileged. But let's see what questions he asks.

Q. (BY MR. KUMAGAI) Okay. Aside from the investigation by an outside law firm that you just referenced, what is your opinion that none -- none of the science underlying simufilam was fabricated based on?

A. Correct, that's my opinion.

Q. What is that opinion based on aside from the investigation by outside counsel?

A. That's a pretty big aside. I mean, an investigation by a third party is -- it's -- it's real. There also have been -- there was an investigation by CUNY of Dr. Wang. CUNY, C-U-N-Y.

Q. Aside from the CUNY investigation and the investigation by outside counsel, what is your opinion

Page 13

based on?

A. Partially based on what I heard from scientists who would know these things.

Q. Which scientist?

A. Some of our managers are -- were scientists, are scientists. Some -- strike that.

Some of Cassava Sciences' scientists.

Q. Who?

A. There's a long list of scientists. I don't remember. But the primary person I relied on was Dr. Nadav Friedmann.

Q. So aside from communications with Dr. Friedmann, the CUNY investigation, and the investigation by outside counsel, what is your opinion that none of the science underlying simufilam was fabricated based on?

A. It's based on all the things we just mentioned. Outside investigations, the opinions of experts in the field.

Q. I'm just trying to make sure the answer is clear, so let me take a step back.

I asked you whether you know for a fact whether any science underlying simufilam was fabricated, right? And your response was that it is your opinion that the -- none of the science was fabricated, right?

4 (Pages 10 - 13)

Page 14

You have to answer verbally.

A. Correct.

Q. And that opinion is based on, one, the outside investigation by outside counsel; two, the CUNY investigation; and three, communications with Dr. Nadav Friedmann. Anything else?

MR. WU: Object -- objection, slightly mischaracterizes what he said.

Q. (BY MR. KUMAGAI) You can answer.

A. There may be other things, but that's a pretty good start.

Q. What other things can you think of sitting here today?

A. There was an SEC investigation. There was a DOJ investigation.

Q. Anything else?

A. There may be other things. I -- I can't remember the -- the long list of things. But the dots connect is -- in my opinion.

Q. Dots connect to what?

A. To there is and was no fabrication of data, research data at Cassava Sciences.

Q. To what extent did the SEC investigation support that opinion?

A. I was not privy to what the SEC investigated.

Page 15

What I know is they investigate -- they investigated a lot of data, emails and such. And to my knowledge, they did not come up with support for the allegations in the -- by the short sellers.

THE REPORTER: By the what?

THE WITNESS: Short sellers. Two words or one word.

Q. (BY MR. KUMAGAI) And to what extent did the DOJ investigation support your opinion that none of the science underlying simufilam was fabricated?

A. Again, as CEO, I'm not privy to the details of what DOJ did or did not do. What I am privy to is the end result, which in the case of Dr. Wang, there is no guilty verdict as to the allegations of research, misconduct, and fabrication.

Q. What would it take to convince you that any science underlying simufilam was fabricated?

MR. WU: Objection, calls for speculation.

THE WITNESS: Yeah, that's a highly speculative question, and I'm not going there.

Q. (BY MR. KUMAGAI) Have you ever seriously considered the possibility that any science underlying simufilam was fabricated?

A. There were investigations into the allegations because we did take the allegations and the citizens'

Page 16

petitions very seriously as we should have. And the -- the conclusion is there is -- there was no fabrication.

Q. And so after the citizens' petition came out, did you personally consider the possibility that any of the science underlying simufilam was fabricated?

A. Well, first off, it wasn't a personal thing. This is a -- a corporate action. So we took a number of corporate actions to -- to test the hypothesis that the short sellers put out.

Q. But my question is whether you personally ever considered the possibility that any science underlying simufilam was fabricated?

A. I came into the short sellers' allegations with an open mind, and I rest my conclusions as to the short sellers' allegations based on data and investigations by independent third parties.

Q. So did you or did you not ever personally consider the possibility that any science underlying simufilam was fabricated?

MR. WU: Objection, asked and answered.

THE WITNESS: Yeah, I believe I've already answered.

Q. (BY MR. KUMAGAI) I think it's a yes or no question. Did you or did you not ever consider the possibility -- strike that.

Page 17

It's a yes or no question. Did you consider the possibility that any science underlying simufilam was fabricated?

MR. WU: Objection, same.

THE WITNESS: Again -- again, given the seriousness of the allegations in the citizens' petition, we went in with an open mind and we based our conclusions based on data and investigations.

Q. (BY MR. KUMAGAI) Is that a yes? Did you personally consider all the possibility that any science underlying simufilam was fabricated?

MR. WU: Same objection.

THE WITNESS: At what point in time?

Q. (BY MR. KUMAGAI) After the citizen petition came out?

A. How long after?

Q. At any point.

A. Like, microseconds after or a month?

Q. Throughout the period after the citizens' petition?

A. It -- it's a vague -- it's a very long time period. You need to narrow it down.

Q. Well, my question is at any point since the citizens' petition came out, did you personally consider the possibility that any science underlying simufilam

5 (Pages 14 - 17)

Page 18

was fabricated?

A. At what point in time?

Q. Any point in time after the citizens' petition?

A. So ten seconds after I read it?

Q. Let's start there.

A. Could be.

Q. Can you recall any point in time when you considered the possibility that any science underlying simufilam was fabricated?

A. Again, let me be clear. As CEO, I'm not the scientist in the room. So I rested my -- my opinions around the CP and -- and the short sellers' allegations based on people who -- with real world experience in science training and experience.

Q. Okay. But you haven't answered the question. It's a very simple question.

At any point in time, have you personally considered the possibility that any science underlying simufilam was fabricated?

A. Again, I kept an open mind until those with the sufficient training and experience could draw conclusions.

Q. Is that a yes or no?

MR. WU: Respectfully, he's -- he's answered your question.

Page 19

THE WITNESS: Yeah, I -- I really have.

Q. (BY MR. KUMAGAI) Well, I honestly can't tell if have actually considered the possibility or not.

A. I kept an open mind until those with training and experience in science and laboratory techniques could make their own conclusions.

Q. So you never personally considered the possibility that any science underlying simufilam was fabricated?

MR. WU: Objection, same one.

THE WITNESS: As CEO of the company, I relied on other people's opinions to draw conclusions.

Q. (BY MR. KUMAGAI) Meaning you never considered the possibility?

A. Meaning any conclusions I drew were based on the training and experience of people who would know these things.

Q. What would it take to convince you that the science underlying simufilam was fabricated?

MR. WU: Objection, already asked.

THE WITNESS: Speculative question. I -- I don't have an answer for speculative question.

Q. (BY MR. KUMAGAI) It's not a speculative question. You testified earlier that you had an open mind after the citizens' petition. Were you open to the

Page 20

possibility that the science underlying simufilam was fabricated?

A. Again, I drew conclusions based on the opinions and the experience of those who would know these things.

Q. But after the citizens' petition came out when you testified that you kept an open mind, were you open to the possibility that any science underlying simufilam was fabricated?

A. I think what's important -- what's important to the company, and certain -- certainly to the company's shareholder, was whether or not there was any truth to the allegations in the citizens' petition. Again, as a non-scientist, I came in with an open mind and took my conclusions -- drew my conclusions from people who would know these things.

Q. Did you consider the possibility that any of the allegations in the citizens' petition were true?

A. How -- how many times can you ask the same question?

Q. Can you answer this question?

A. I'll answer it in the same way I have.

Q. Which is what?

A. Which is being the non-scientist in the room, I relied on the opinions of those who -- who would know these things to draw a conclusion.

Page 21

Q. Do you believe Alzheimer's patients have a altered conformation of filamin-A in their brain?

A. I have no basis for believing or not believing. I haven't examined every Alzheimer's patients on the planet, or any of them for that matter.

Q. Do you believe simufilam restores altered conformations of filamin-A back to its native shape?

A. I've never done the primary work to confirm that proposed mechanism of action.

Q. So do you believe it or not?

A. It's been published. There appears to be solid data. I believe the data.

Q. So do you or do you not believe that simufilam restores altered conformations of filamin-A back to its native shape?

A. I believe there are certain data that support that hypothesis or that thesis.

Q. You are married to Dr. Lindsay Burns, right?

A. Correct.

Q. And how did you meet Dr. Burns?

A. Oh, a long time ago in San Francisco.

Q. In what context?

A. I think we -- we met biking.

Q. Approximately when was that?

A. Over 20 years ago.

6 (Pages 18 - 21)

Page 22

Q. And when did you get married?
A. June 2005.
Q. You're still married today, correct?
A. Correct.
Q. Do you think Dr. Burns is a good scientist?
A. Do I think Dr. Burns is a good scientist? I think she's got a track record. She's got training and experience that, yes, suggests she's a very good scientist.
Q. And can you unpack that? What makes -- what's the basis for you saying she's a very good scientist?
A. Well, she went to very good schools. She trained with the best and the brightest.
Q. And after the training, what basis do you have for believing that Dr. Burns is a very good scientist?
A. I think that's enough for someone's training, experience, who they trained with, that's enough to form an opinion.
Q. Do you think Dr. Burns has been treated unfairly?
A. In what regard and by whom and when?
Q. Do you think Dr. Burns has been treated unfairly during her time at Cassava?
A. By whom?
Q. Anyone.

Page 23

A. She has, I'm not aware of it.
Q. Do you care about Dr. Burns' reputation as a scientist?
A. As a scientist and as a person, yes.
Q. Have you ever questioned Dr. Burns' integrity?
A. Never.
Q. Have you ever had any concerns about Dr. Burns' scientific work?
A. Never.
Q. Have you ever considered the possibility that Dr. Burns has engaged in any research misconduct?
A. Not -- never.
Q. Have you ever asked Dr. Burns whether she manipulated or fabricated any research?
A. I don't specifically remember asking that question, no.
Q. Do you believe Dr. Burns has ever done anything wrong in connection with any scientific research?
A. I have no evidence to suggest that she has done anything wrong.
Q. How did you first meet Dr. Wang?
A. I only met him once at a -- some sort of scientific conference. I don't remember the context.
Q. Approximately when was that?
A. Over ten years ago, but I don't remember where

Page 24

or when.
Q. So you've only met Dr. Wang once in person; is that right?
A. Correct.
Q. Approximately how many times have communicated with Dr. Wang?
A. I -- I've never counted. I -- I can't say.
Q. But you have been in communication with Dr. Wang over the course of your time at Cassava?
A. There may have been a -- a few emails from time to time. But I -- I've never counted.
Q. Have you ever spoken to Dr. Wang on the phone?
A. I have.
Q. Approximately how many times?
A. I don't know.
Q. More than ten?
A. I don't know.
Q. Have you ever had any video conferences with Dr. Wang?
A. If I have, I do not remember them.
Q. Have you ever communicated with Dr. Wang over text?
A. If I have, I don't remember.
Q. Do you have his phone number on your cell phone?

Page 25

A. I don't know.
Q. Have you communicated with Dr. Wang on any other platform or messaging service?
A. Not that I remember.
Q. Do you believe Dr. Wang is a good scientist?
A. Yes.
Q. And what is that based on?
A. Based on his training, experience, and his institution, his employer, and the fact that he's worked with some of the best and the brightest neurobiologists on the planet.
Q. Who are those?
A. I don't have a list in front of me.
Q. Do you trust Dr. Wang?
A. I do.
Q. Why?
A. Again, based on the fact that he's -- he's worked with the best and the brightest, has gotten some of the best training, that's a pretty good start.
Q. Has your opinion of Dr. Wang changed at all over the course of the past 20 years?
A. Opinion regarding what?
Q. In any respect?
A. Yeah. I mean, I've seen the man in action. He's -- he's very good at what he does.

7 (Pages 22 - 25)

Page 26

Q. What do you mean "seen the man in action"?

A. I've seen the data that he's generated.

Q. And what makes you say that the data that Dr. Wang has generated indicates to you that he's very good at what he does?

A. Again, he has an -- he's collaborated with some of the best and the brightest neurobiologists on the planet. That's a pretty strong reference in my business.

Q. Do you know whether or not the data that you just referenced was original or raw data?

A. I don't believe I've seen original or what you're calling raw data. Everything I've seen from Dr. Wang, I believe, has been publications or perhaps emails at best.

Q. Have you ever at any point in time questioned Dr. Wang's integrity?

A. As CEO, it's not my role, it's not my place to question what -- the integrity of an outside investigator. But I've seen no evidence at all for any allegations of ethical issues.

Q. Have you personally ever questioned Dr. Wang's integrity?

A. I've never questioned -- I've never gone to him and questioned him, no.

Page 27

Q. In your mind, have you ever questioned Dr. Wang's integrity?

A. I've had no reason to question his integrity.

Q. So no?

A. There's no evidence. There's not -- unless I come out of the blue and say, hey, how's your integrity, there's no basis for me to question his integrity.

Q. You have never believed that you had a basis to question Dr. Wang's integrity; is that right?

A. I have -- you've asked me if I have ever questioned his integrity. I have never gone up to him and -- and said, hey, how's your integrity.

Q. Okay. In your mind, have you ever questioned Dr. Wang's integrity?

A. I've never had basis to question his integrity.

Q. So no?

A. No.

Q. Okay. You founded Cassava around May of 1998; is that right?

A. Sounds right.

Q. And just -- when I refer to Cassava or the company today in any of my questions, I'm intending to capture Pain Therapeutics as well. Is that okay?

A. Understood.

Q. If there's any reason in any of your responses

Page 28

to distinguish between the two, just -- I just ask that you say so explicitly so that we're not confused.

A. And likewise.

Q. Okay. And so you've been -- you were the president, CEO, and chairman of the board of Cassava from its founding in 1998 until the summer of 2024; is that right?

A. The dates sound correct.

Q. And the roles are correct?

A. The -- sorry?

Q. The roles?

A. The roles?

Q. Yeah.

A. What was it? President, CEO, and chairman of the board --

Q. You were president, CEO, and chairman of the board --

A. Correct.

Q. The whole time?

A. Maybe in the early years. I don't quite remember when we were a -- a private company. But during the public years, yes.

Q. Do you recall approximately when the company went public?

A. Approximately July 2000. June, July time

Page 29

frame.

Q. Can you describe your compensation from Cassava starting at the beginning?

A. When I first started the company? This is 25 year stretch, so no, I -- I'm not going to summarize 25 years of compensation. It -- it would take -- I -- I don't have the raw data with me. What I can say is early on, I received no cash compensation.

Q. Approximately how much money have you received from Cassava or Pain as salary over the years?

A. I -- I've never tallied up my salary over 25 years.

Q. Does it sound right that you received around 15 or $16 million in salary?

A. I have never tallied up my salary.

Q. What was your salary when you left Cassava?

A. I don't specifically remember. But this is a matter of public record. You can look it up if you really -- if you were really interested.

Q. And sitting here today, your testimony is you just have no idea what your annual salary was?

A. At what point?

Q. When you left the company?

A. I mean, it was over, you know, when you're -- when you're running a public company, a biotech company,

8 (Pages 26 - 29)

Page 30

there are scales that -- and comparables. So it was within the range. Whatever the comp committee deemed it to be.

Q. And how much -- what was your severance package when you left the company?

A. There were several items to it. But the -- and I don't recall all the different items. But the -- if you're asking about -- are you asking about compensation?

Q. Compensation?

A. I believe it was one year salary.

Q. Okay. And I believe in the disclosures from the company, they say that they've paid you approximately 1.24 million in severance compensation. Does that sound right?

A. Could be, yeah.

Q. Aside from your salary, what other sources of income, if any, did you have during your time at Pain and Cassava?

A. At all or just from Cassava?

Q. Let's start with Cassava.

A. Can you repeat the question? What -- what was my compensation at Cassava?

Q. Aside from your compensation, your salary, what other sources of compensation did you have during your

Page 31

time at Cassava?

A. Are you referring to outside of Cassava or Pain Therapeutic?

Q. Let's start with within. So aside from your salary, do you receive an annual bonus?

A. Oh, I see your question. Certain years, the company managers received a bonus. When they did, I was a part of the managers' pool.

Q. And did you receive any stock options?

A. Yes. As a small emerging company, stock options was a -- an important part of compensation.

Q. And did you exercise those options?

A. At various points during my tenure, yes.

Q. So aside from your salary, bonus, stock options, did you have any other compensation from Cassava during your time there?

A. If I did, I don't remember.

Q. Okay. Now, separate from compensation you received from the company during your time at Cassava, did you have any other sources of income?

A. Cassava was my primary and only source of -- it was my primary income.

Q. What were your secondary sources of income?

A. I held stock from the companies that I previously started, that type of thing. And I earned

Page 32

interest on cash in the bank, that type of thing.

Q. Okay. So investments, you had investment income; is that fair?

Aside from that, did you have any other sources of income during your time at Cassava?

A. Can you be more specific? What -- what are you thinking of?

Q. Items that you would have to report on a tax return, any sources of income from real estate, from other consulting opportunities, anything like that?

A. I believe I was on a couple of boards on and off during my tenure. I may have received compensation in the form of stock, possibly cash, but I -- I don't remember exactly.

Q. Okay. So aside from compensation from Cassava, compensation from investments and savings accounts, potential compensation from your role on other companies' boards, during your time at Cassava, did you have any other sources of income?

A. I would say all of the above were probably 99 percent of my -- my income. There may have been a little bit of income here and there from various sources. I don't remember.

Q. Can you remember any of those other sources?

A. Not really.

Page 33

Q. What does "not really" mean?

A. No.

Q. Okay. Do you currently own stock in Cassava?

A. I don't know if I own stock or stock options. I -- I know I own stock options.

Q. Have you made any trades in Cassava securities on the open market or that would not have been disclosed in SEC filings?

A. During my tenure, no. Any -- no.

Q. All of your trades in Cassava securities have been disclosed publicly; is that right?

A. During my tenure at Cassava, yes.

Q. Have you bought or sold any Cassava stock since you left the company?

A. I believe I sold some amount of stock. I don't remember how much. But it was a fairly de minimis amount.

Q. Approximately when?

A. I -- I don't remember. But it was after the attorneys gave me the clearance that I was no longer an insider.

Q. Was that before or after the Phase III trials failed?

A. I believe that was after.

Q. Was it before or after the Phase III trial

9 (Pages 30 - 33)

Page 34

results were disclosed publicly?

A. I believe it was after.

Q. And approximately what was the value of that sale?

A. I -- I don't remember.

Q. Over $100,000?

A. Certainly less than a million dollars, but I -- I don't remember exactly.

Q. More than $500,000?

A. I -- I just don't remember.

Q. So anywhere between 100,000 and a million?

A. I -- I don't remember. It was less than a million for sure, but I don't remember the amount.

Q. Are you familiar with short selling?

A. I've never engaged in short selling, but I understand if you're referring to the Wall Street definition of short selling, I understand the concept.

Q. What is your understanding of the concept?

A. It's a form of speculation whereby an investor makes money if -- if the stock price falls.

Q. Have you ever formed an opinion as to whether short selling is good or bad?

A. There are various types of short selling. So yeah, I have my opinions.

Q. And what are those?

Page 35

A. Depends on the type of short selling.

Q. Can you break it down?

A. You can have short selling -- for example, if you -- if you have a position in your portfolio and you want to keep it but somehow, you have the need to raise cash and you don't want to sell the stock, you can short it.

Q. And what is your opinion of that kind of short selling?

A. It's perfectly appropriate.

Q. Okay. And what about the other forms of short selling?

A. Look, I want to be clear, I'm not a Wall Street expert, so I -- I -- I just can't categorize all the different forms. I do know that there's also an abusive form of short selling.

Q. And what do you mean by that?

A. Abusive in the sense that a party would short a stock and then do everything in its power to badmouth the company in the form of whispers and innuendos, anything that can cause an investor -- another investor to go, oh my gosh, maybe I should sell this stock.

Q. Do you think there's anything wrong with taking a short position in a company and then publicly criticizing the company -- yeah.

Page 36

A. Depends on the context.

Q. So do you believe short selling is inherently bad?

A. Again, depends on which form of short selling you're talking about. Abusive short selling, very bad.

Q. You're familiar with the term "short and distort"?

A. I've heard it, yes.

Q. And what is your understanding of what that means?

A. It's an abusive form of short selling.

Q. How so?

A. Again, a short seller makes money when the price of the stock price falls. And sometimes, it doesn't fall. Short sellers can be wrong, and sometimes they can -- they can rely on what's called short and distort, which is lying about a company's position or its operations or its financial status.

Q. Why did you leave Cassava?

A. I was asked to leave.

Q. By who?

A. The board.

Q. And what is your understanding of why the board asked you to leave?

A. Well, it all happened very quickly, a very

Page 37

short telephonic board meeting on relatively short notice. And they never quite stated the explicit reason during that board meeting. It was never explicit.

Q. At any point in time, has it become explicit?

A. The board never gave me an explicit answer.

Q. So what is your understanding, if any, of why the board asked you to leave?

A. Well, it happened in very close proximity to the SEC fine, which was very substantial for the company.

Q. Meaning what?

A. What -- what what?

Q. What is your -- strike that.

What connection, if any, are you drawing between the SEC fine and the board asking you to leave?

A. Oh, the two happened in close proximity.

Q. And so do you believe that you were asked to leave because of the SEC fine?

A. I believe I was asked to leave not because of the SEC fine but because of the magnitude of the SEC fine.

Q. Approximately $40 million?

A. That's my recollection. It could be plus or minus a -- a few million. I -- I don't remember exactly.

10 (Pages 34 - 37)

Page 38

MR. KUMAGAI: I'll mark as Exhibit 175 the document Bates stamped CASSAVA_001402478.

(Exhibit No. 175 was marked.)

Q. (BY MR. KUMAGAI) Okay, Mr. Barbier. Take a moment to review Exhibit 175. My first question is whether you recognize this document.

Do you recognize Exhibit 175?

A. I'm still reading it. But generally, yeah. It's a -- yes.

Q. And what is it?

A. It is my resignation letter to the board of directors.

Q. Okay. And I didn't mean to cut you off. So let me know when you're finished. Okay?

A. Give me a minute.

Q. Mr. Barbier, are you done?

A. Okay. I'm done reading it.

Q. Okay. And that's your signature on the second page?

A. Looks like my electronic signature, yes.

Q. And it's dated July 15th, 2024, right?

A. Correct.

Q. Okay. On the first page the third paragraph from the bottom you write, (Reading:) On several occasions I've also had to take on the challenge of

Page 39

bringing the Company back from the brink of extinction.

Do you see that?

A. I do.

Q. And when was the company on the brink of extinction?

A. I don't remember dates or years. But essentially when the company's cash got to very low levels.

Q. All right. And was that during the period that simufilam was being proposed as an Alzheimer's treatment or was that before then?

A. There were several occasions. And again, I don't remember exactly. This is all public record. You can look it up.

Q. Okay. On the back page, the second paragraph from the top, you write, (Reading:) Needless to say, but worth repeating, I remain a true believer in simufilam.

Do you see that?

A. I do.

Q. And what does that mean?

A. I think it's plain English.

Q. Can you explain what you meant by that?

A. I remain a true believer in simufilam.

Q. What does it mean to be a true believer?

Page 40

A. To believe.

Q. Believe in --

A. Plain -- plain English.

Q. Believe in what?

A. Believe in the drug.

Q. To do what, if anything?

A. It's undefined.

Q. And so what were you trying to express when you said to the company, (Reading:) I remain a true believer in simufilam?

A. My opinion is that is a plain English sentence that any person on the street would understand.

Q. To mean what?

A. That I believe.

Q. Believe in the drug as a treatment for Alzheimer's disease?

A. I believe in -- in the drug.

Q. To treat Alzheimer's disease?

A. It only says I -- (Reading:) I remain a true believer in simufilam, our oral drug candidate for people with Alzheimer's disease.

Q. Did you mean to convey that you remained a true believer in simufilam as a treatment for Alzheimer's?

A. I just believe in the drug.

Q. Do you still, sitting here today, believe in

Page 41

the drug?

A. I believe it has potential, yes, potential to treat human disease.

Q. Which disease?

A. I don't know.

Q. Sitting here today, are you a true believer in simufilam as a treatment for Alzheimer's disease?

A. It's a hypothetical question. The company has made it clear that they're no longer pursuing that indication.

Q. My question is for you sitting here today. Are you a true believer in simufilam as a treatment for Alzheimer's disease?

A. I'm a true believer in the drug for the treatment of human disease.

Q. But not Alzheimer's specifically?

A. The company has made it clear that they are not developing that indication.

Q. I'm asking you personally whether you're a true believer in Alzheimer -- in simufilam as a treatment for Alzheimer's?

A. My opinion is irrelevant. I no longer run --

Q. It's relevant to this deposition. So I'm asking you --

A. I --

11 (Pages 38 - 41)

Page 42

Q. -- sitting here today whether you're a true believer in simufilam as a treatment for Alzheimer's disease?

A. I'm a true believer in this drug candidate for the treatment of human disease. Which human disease, I don't know yet.

Q. Have you ever considered the possibility that simufilam cannot treat any human disease?

A. Of course.

Q. When did you consider that possibility?

A. At all times.

Q. And what does that mean, to consider the possibility?

A. When you're a drug developer, when you develop a novel drug, it could fail at any point in time for any reason. Sometimes for no reason or for reasons that are not clear.

Q. And is it your understanding -- strike that.

Do you believe simufilam failed as a treatment for Alzheimer's disease?

A. The -- say that again. It sounded tricky. What -- what -- what was your question?

Q. Do you believe simufilam has failed as a treatment for Alzheimer's disease?

A. What I believe is irrelevant. What is factual

Page 43

is that it did fail in two large well-designed -- seemingly well-designed Phase III trials.

Q. Okay. And you refer to the recent board constraints, do you see that in the fourth paragraph on the second page?

A. I do.

Q. So you write, (Reading:) The recent Board constraints placed upon me, without my consent, including removal of my duties and responsibilities, precluding me from reporting to the office or communicating with colleagues, investors, analysts, and stakeholders, have resulted in a significant diminution in my position and responsibilities as President and CEO over the past ten days, and continue indefinitely.

Do you see that?

A. I do.

Q. When were those constraints placed upon you?

A. They were placed as of the date of the board meeting, and I don't remember the -- the date. I never got minutes of that board meeting, so I don't know. But approximately -- well, it says here ten days beforehand. So approximately early July.

Q. Okay. And was that the same board meeting where the board asked you to resign?

A. Yes.

Page 44

Q. And what was your response to that request?

A. I could take -- I could take it or leave it.

Q. What did you say during that board meeting in response to the board asking you to step down?

A. I don't remember.

Q. Do you remember anything about the substance of what you conveyed to the board in response to their request that you step down?

A. I -- I don't think I had a chance to talk much. It was more -- Rick Barry did the talking, and he's more -- I think what he said was this is -- this is what's going to happen.

Q. What, if anything, can you recall about what you did say at that meeting?

A. I do remember asking -- getting a question, one of the few questions I was able to get in there saying, you know, what -- what's the thinking behind here, what -- what -- what are the reasons? You don't just fire a public company CEO without underlying reasons. And I never got a clear answer -- never got a -- a straight answer.

Q. What answer --

A. Or any answer.

Q. Sorry. I didn't mean to cut you off.

Did they -- there was no response to that

Page 45

question?

A. Not that I recall.

Q. Okay.

MR. KUMAGAI: Let's take a five minute break.

VIDEOGRAPHER: Going off the record. The time is 10:25.

(Brief recess.)

VIDEOGRAPHER: Back on the record. The time is 10:40.

(BY MR. KUMAGAI) All right. I'll mark or introduce a document previously marked as Exhibit 88, the Bates stamp CASSAVA_001444640.

(Exhibit No. 88 was previously marked.)

Q. (BY MR. KUMAGAI) So I just want to draw your attention to the email from Mr. Barry dated July 18th, 2024. It's the second email in the chain. And it appears to be addressed to members of the board of directors.

Do you see that?

A. I do.

Q. I just want to start by asking you about the second paragraph in Mr. Barry's email. He writes, (Reading:) While not going into great detail, I explained that no one wanted to remove the founder of a

12 (Pages 42 - 45)

Page 46

company in this way, let alone the co-inventor of such a promising drug -- but the circumstances that came to light over the last month and the information that our investigative committee learned really gave the board no choice but to take action.

Do you see that?

A. I -- I do not. Where are you?

Q. It's the second paragraph in Mr. Barry's email, begins, "Yesterday".

A. Yes.

Q. Do you see that?

A. Okay. Yes, I do.

Q. Starts with "Yesterday"?

A. Yes, I do.

Q. And then the second sentence, do you see that?

Do you agree that the board had no choice but to remove you from your role as CEO of the company?

A. I'm still reading this. I've not seen this before.

Q. Okay. I'm just asking you about this second sentence of that paragraph. Okay, Mr. Barbier, I just want to ask you about that paragraph yesterday -- beginning "Yesterday".

So do you agree with Mr. Barry's statement that, (Reading:) The circumstances that came to light

Page 47

over the last month and the information that our investigative committee learned really gave the board no choice but to take action?

MR. WU: Objection.

THE WITNESS: I don't know what the circumstances. I -- I don't know what Rick Barry is talking about here. So I -- I can't agree or disagree not knowing what -- what he's referring to.

Q. (BY MR. KUMAGAI) Okay. In the next sentence, he writes, (Reading:) I shared that the government had developed a remarkably dark view of the company -- primarily from various disclosures over the last several years and that dark view caused the SEC in particular to look at everything they uncovered about the company through a highly suspicious lens -- and we didn't have the time or the evidence to disprove their allegations.

Do you see that sentence?

A. I do.

Q. Do you agree with that sentence?

MR. WU: Objection.

THE WITNESS: That is a -- sorry.

MR. WU: Objection.

You can answer.

THE WITNESS: I can answer?

MR. WU: If you understand the question,

Page 48

you can answer.

THE WITNESS: I -- ask again, please?

Q. (BY MR. KUMAGAI) Do you agree with that sentence?

A. That is a long, almost run-on sentence with many different parts. Can you be more specific --

Q. Sure.

A. -- break it down?

Q. Do you agree that the government had developed a remarkably dark view of the company?

A. I -- I agree that the government had a dark view of the company, yes.

Q. And what do you mean by a "dark view of the company"?

A. That they expected to find Theranos 2.0.

THE REPORTER: Find what?

MR. WU: Theranos --

THE WITNESS: Theranos, T-H-E-R-N-O-S 2.0.

MR. KUMAGAI: Okay, yeah. We can get it at the break.

Q. (BY MR. KUMAGAI) And then he writes, (Reading:) We didn't have the time or the evidence to disprove their allegations.

Do you see that?

A. I do.

Page 49

Q. Do you agree with that?

A. I -- I don't know what he means by we didn't have the time or the evidence, nor what he's referring to in the allegations.

Q. You're familiar with the allegations that the SEC made against you, Dr. Burns, and the company?

A. To be clear, are you referring to the short sellers' allegations? Or --

Q. No. I'm referring to the SEC's allegations against you, Dr. Burns, and the company that resulted in the settlement of approximately $40 million?

A. No. I've never seen that settlement between the company and the SEC.

Q. You were also an individual charged by the SEC in their complaint, right?

A. That was a separate settlement agreement as I understand it.

Q. Okay. But are you generally familiar with what the SEC alleged against the company?

A. Against the company, I've never seen the -- I've not seen it.

Q. You generally -- okay.

Are you generally familiar with what the SEC alleged against you?

A. Yes.

13 (Pages 46 - 49)

Page 50

Q. And what is your understanding of what they alleged?

A. They alleged negligence with regard to a small number of public disclosures which had been made by the company in the previous whatever, two, three years.

Q. And are you familiar with the allegations by the SEC against Dr. Burns?

A. Same -- I believe same set of allegations.

Q. And so do you believe that the company had evidence to disprove those allegations?

A. Which allegations?

Q. Against you and Dr. Burns?

A. It's a speculative question. The fact is it says right here, they didn't have the willpower or the ability, the time or the evidence to disprove the allegations. So we'll never know.

Q. Do you believe you have the evidence to disprove the allegations by the SEC against you?

MR. WU: Objection.

THE WITNESS: Can you be more specific? You're throwing around the word "allegations", and I -- you're shifting back and forth between Cassava and it sounds like --

Q. (BY MR. KUMAGAI) I'm talking -- okay. I'm talking about what we just talked about, your

Page 51

familiarity with the allegations by the SEC against you personally?

A. Okay. So nothing do with this email then?

Q. I'm asking you whether you believe you had evidence to disprove the allegations that the SEC made against you?

MR. WU: Objection.

THE WITNESS: The allegations of negligence made by the SEC were a matter of -- almost a matter of opinion. And so it's hard to prove or disprove an opinion.

Q. (BY MR. KUMAGAI) And what about the allegations against Dr. Burns, same question?

A. Same question, same answer.

Q. You believe generally that the allegations against Dr. Burns were effectively matters of opinion, and it's difficult to prove or disprove matters of opinion; is that right?

A. Well, it's a little bit different with -- with Lindsay insofar as she had no responsibilities for corporate disclosures. So how she got roped into that by the SEC is still -- to me is a head scratcher.

Q. You don't think Dr. Burns did anything wrong, right?

A. Again, you're -- you're skipping around. Do

Page 52

you want to focus on this document or the SEC?

Q. No, it's -- not talking about this document.

A. This document, meaning the email from Rick Barry?

Q. Yeah. Setting that aside, my question is just -- strike that. We've already -- we've already talked about it.

Okay. I want to turn to the page ending in 43. Halfway down the page, there's a paragraph that begins "Another important decision".

Do you see that?

A. No. Can you show? I want to make sure.

Q. Sure. The page ending 643 at the bottom, "Another important decision"?

A. I'm there, yes.

Q. Okay. Thank you.

Take a moment to read that paragraph up until "Remi was worried about the optics of such a result".

My first question is just whether you have an understanding of what Mr. Barry is referencing with respect to samples that have been taken but not tested from the Phase II study?

A. I'm not sure Rick knows what -- I'm not understanding what he's talking about here. So what is

Page 53

your question?

Q. Are you aware of any samples that were taken from patients during the Phase II studies that were never analyzed in accordance with the statistical analysis plan that was submitted to the FDA?

A. I -- I believe you're -- I -- I wouldn't phrase it that way. The -- there is no statistical analysis plan around the Phase II trial. The SA -- statistical analysis plan or SAP is with regard to a Phase III clinical program.

Q. Okay. So you -- reading this, you're not aware of what Mr. Barry is talking about?

A. I -- just reading it for the first time, I think he's confusing some things with other things.

Q. Were you worried about the optics of any results like he describes?

A. No. I -- I have no idea what that -- what he's referring to.

Q. Okay. I want to draw your attention to the next paragraph that begins "The other critical matter".

Do you see that at the bottom of the page?

A. No. Yes, yes, yes.

Q. Okay. Mr. Barry writes, (Reading:) The other critical matter that needed attention was what our -- what work our scientific team could do to validate our

14 (Pages 50 - 53)

Page 54

basic science -- specifically, what tests we can run to prove our assertion about the method of action. In the past we have had one-off tests from three labs that provided some validation to our claims, but we seemed to have an unfortunate habit of running one test and accepting it as gospel.

Do you see that?

A. I do.

Q. Do you agree that -- with Mr. Barry that under your leadership, Cassava had an unfortunate habit of running one test and accepting it as gospel?

A. No. That -- no, I don't agree.

Q. What makes you say that?

A. You never agree -- you never accept -- in drug development, anyone with drug development experience never accepts as gospel the results of just one trial.

Q. Do you have any idea what Mr. Barry is talking about when he says that the company had an unfortunate habit of "running one test and accepting it as gospel"?

A. I -- I do not.

Q. What tests, if any, are you aware of that -- that the company performed under your -- under your leadership to validate the claim that simufilam binds to filamin-A?

A. I don't remember specifically. But what I

Page 55

remember generally is repeating a series of tests to validate and revalidate the hypothesis.

Q. Who performed those tests?

A. Which tests?

Q. The tests you just referred to?

A. I referred to a series of tests.

Q. Who performed those?

A. Depends which one you're talking about.

Q. Okay. Tell me -- break them down and tell me the tests that you performed on --

A. Again, I'm not the scientist in the room. I -- I don't have the ability to break it down and to say who did what to whom and when.

Q. Sitting here today, can you tell me anything at all about the supposed series of tests that you just referenced?

A. Just reading Rick Barry's note here, it says, (Reading:) In the past we have had tests from three labs.

I don't know which labs or which tests he's referring to. But that lends credence to the idea that it was tested across a -- a series of labs.

Q. Sitting here today, do you know anything about who performed any such tests and when?

A. Again, not being a scientist or having

Page 56

responsibility for technical operations, I -- I don't remember who did what and -- and when. But I know that a series of tests were done that resulted in a series of publications.

Q. Was Dr. Wang and his lab at CUNY responsible for any of those tests that you're thinking of?

A. He had to be.

Q. Anyone else?

A. I remember Dr. Wang doing some studies. There's a lady at Yale. I don't remember her name. Later on, there was also a -- lab in Italy. I don't remember the lady's name.

Q. Okay. Aside from studies by Dr. Wang, the woman at Yale, and a -- a lab in Italy, can you think of any other labs who may have performed tests to potentially validate basic science underlying simufilam?

A. There may have been others. I -- I just don't remember.

Q. Okay. You can set that document aside.

What is your opinion of your successor, Mr. Barry?

A. You know, this is a -- drug development is a long-term commitment. So it's too early to say what -- what he can and can't do.

Q. Do you have any opinion at all about whether

Page 57

Mr. Barry was the right person for the job?

A. I can't say. I'm no longer on the board.

Q. But I'm not asking you in your capacity as a director. I'm simply asking your personal opinion whether you think Mr. Barry is suitable for CEO of the company?

A. Are you asking me as an investor in the company or a former -- how -- how are you -- what -- what's the context for your question?

Q. I'm asking you as the former CEO whether you think your successor is an appropriate choice for CEO?

A. Yeah. Being the former CEO or the former, you know, dishwasher is irrelevant to the board's decision that from this day forward, this person is the right leader for this company at this time.

Q. Do you think Mr. Barry is honest?

A. While he was a board member, I have no reason to doubt his honesty.

Q. Do you think Mr. Barry has integrity?

A. During his -- as I know -- know him, during his tenure as a board member, I have no reason to doubt his integrity.

Q. Do you like Mr. Barry?

MR. WU: Objection.

THE WITNESS: Yeah. That's -- that is a --

15 (Pages 54 - 57)

Page 58

a non-relevant question and it's -- I'm not going to answer that.

Q. (BY MR. KUMAGAI) Do you personally think he's a good choice to run Cassava, the company that you founded?

A. Again, whether you're the former CEO or the former dishwasher of the company, it doesn't matter what your opinion is. The fact is, the board, they made the decision, I'm sure they reached a consensus that at this stage of the company's life, this is the best person to run the company. And I -- I -- I'm not here to -- to doubt their choice.

Q. Okay. Respectfully, a few times you've said my questions are irrelevant or it doesn't matter; the judge or the Court will decide what's relevant, what matters. Here today, you just have to answer the question to the best of your ability, whether or not you think it's relevant or whether it is, in fact, relevant. So let me just ask again.

As the founder of Cassava, do you think Mr. Barry is a good choice to be CEO?

A. Again, my opinion is that my opinion doesn't matter. Okay. The fact is he is the CEO. Whether I like him, dislike him, I don't know and probably no one on the planet cares what I think right now.

Page 59

Q. I do personally. So I'm asking you, do you have an opinion on Mr. Barrys as the choice for CEO?

A. My opinion is that my opinion doesn't count.

Q. What is your opinion?

A. I don't have one. I don't spend time thinking about Rick Barry.

Q. Since you left the company that you founded and worked at for 25 years, you've never thought about whether your successor was a good fit to replace you?

A. I trust in the board. That's all you can do as an investor.

Q. What have you been doing since you left Cassava?

A. Can you be a little more specific?

Q. Sure. Have you had any employment or professional role since stepping down from your roles at Cassava?

A. No.

Q. Do you have any sources of income today aside from investment income or other passive investments?

A. I have no employment.

Q. Looking back at your time as CEO of Cassava, do you think you did a good job?

A. I started the company. It had a market cap of 10 million. I left the company, it had a market cap of

Page 60

over a billion in 20 years. I built it from scratch. So -- and I left the company in, you know, with a -- a novel drug. So yes, I do think I did a great job.

Q. And what does the company's market cap tell you about the job that you did as CEO?

A. I can't speak for the entire market. As you know, the marketplace is a consensus of a thousand or million different opinions. So I can't speak for everyone's opinion. On the other hand, market cap is one of several metrics that shows how -- how investors value the company's operations. And by that metric, I would say, yes, Cassava Sciences going from 10 million to over a billion was a success during my tenure.

Q. Aside from market cap, what other metrics, if any, do you measure your performance as CEO by?

A. The impact -- personally, I'm -- I'm less concerned about market cap. But my personal motivation is more what impact can we make on clinical medicine. In other words, you spend 25 years working. What's in it for the patient?

Q. And during your time as CEO of Cassava, what impact, if any, did you or the company have on clinical medicine?

A. It's too soon to tell.

Q. What does that mean?

Page 61

A. Give it more time. Drug development is not an overnight success type of business. It takes -- sometimes, it takes many decades to learn if your efforts are -- were worth it or not.

Q. Can you identify any particular benefits to clinical medicine that you believe Cassava has contributed during your time as CEO?

A. During my time as CEO, we had several drug candidates under development. And by that metric, yeah, I think that it was a success.

Q. Did any of those drugs succeed in getting approval for any indications?

A. They did not.

Q. So how do you measure -- strike that.

What would you consider to be a positive impact on clinical medicine?

A. Eventually, a drug for -- a drug approved by FDA or some other regulatory agency for a human indication.

Q. Anything else?

A. That would be pretty big.

Q. You also mentioned a metric to measure the company's success as looking to what's in it for the patients, right?

A. Correct.

16 (Pages 58 - 61)

Page 62

Q. And what do you mean by that?

A. Can you ask again?

Q. You mentioned as a metric that you use to measure the company's success as, quote, looking to what's in it for the patients.

What do you mean by that?

A. Cassava Sciences is a drug development company. Ultimately, or I should say the long-term success of the company hinges on whether or not there is a drug approval. That drug approval, if and when it happens, and it's never a sure thing, would be a measure of clinical success.

Q. During your time as CEO, did the company provide any benefit to patients?

A. You need to rephrase that question.

Q. Why?

A. Which patients? Which indication? You need to be more specific.

Q. I'm asking whether during your time as CEO, the company, in your opinion, provided any benefit whatsoever to any patients?

A. Do you mean safety benefit, efficacy benefit? How -- how do you mean benefit?

Q. Any benefits?

A. Financial benefit? What -- you need to be more

Page 63

specific around your -- your question.

Q. Do you believe that the company during your time as CEO provided any form of benefit to any patients whether, it be financial, clinical, safety, anything?

A. So I'm not understanding your question. It's not specific enough. But what I can do is say -- say the obvious which is there is no drug approval coming out of Cassava Sciences, not yet at least. There may be in the future. If there is, that would be a huge clinical benefit for whatever indication the company gets approval for. Until then, we can only talk about potential safety, potential benefit, potential this, potential that.

Q. So did the company during your time as CEO deliver any actual benefits to any patients?

A. No drug was approved by the FDA or any other regulatory agency during my time with the company.

Q. Sitting here today, can you think of any actual benefit the company provided to any patient?

A. I think the company must have tested thousands of patients during my tenure in various indications. So again, you need to be a little more specific regarding either timing, indication, trial, type of benefit. But the obvious answer is during my tenure, Cassava Sciences did not get a regulatory, an FDA approval, for any of --

Page 64

any drug candidate in any indication.

Q. Can you think of a single individual patient who you believe you helped during your time as CEO of the company?

A. Again, you're -- you're the master of asking these, you know, broad, broad questions that lack specificity. So just to be clear, during my tenure, the company did many clinical studies across various indications. I forget how many. I can't speak for all patients over 20 plus years of clinical trials. What I can say based on evidence is the -- the company has not had a drug approval during my tenure.

Q. Do you believe you acted with integrity during your time as CEO?

A. I do.

Q. And what makes you say that?

A. I know my behavior.

Q. What does integrity mean to you?

A. Ethics.

Q. What does that mean to you?

A. Integrity.

Q. What does it mean to act as the CEO with integrity in your view?

A. To act with good ethics.

Q. Such as? Can you be more specific of what you

Page 65

mean by good ethics?

A. The absence of bad ethics.

Q. And what are bad ethics, in your view?

A. I think you're the attorney. You probably have seen your share.

Q. Sitting here today, can you think of any example of what a bad ethic means?

A. In what context?

Q. Context of running a company, public company?

A. Sure. I can give you a couple examples. There's a company called Theranos that lacked integrity. There's another company, I believe they call Microbiome, a small company on the west coast, that lacked integrity.

Q. Are you familiar with a writer named Adam Feuerstein?

A. I've never -- I don't believe I've met him. He -- I believe he -- he writes or he used to write for -- for some trade journal.

Q. And have you ever reviewed any of his articles or writings?

A. I don't specifically remember reading. But generally speaking, yes, I'm -- I'm sure it crossed my desk or someone emailed it to me at some point.

Q. And do you recall ever forming an opinion or a

17 (Pages 62 - 65)

Page 66

view as to Mr. Feuerstein or his opinions?

A. Yeah. He's known in the industry. He's been in the industry a long time. And he has -- to my knowledge, he's always been a naysayer.

Q. What do you mean by that?

A. Let me give you a specific example. Right after Google went public, the Google we all know and love or hate, he interviewed the two Google guys, the cofounders, and essentially he had the -- let's just say that he told the Google guys that Google -- Google was going nowhere and that it was going to get overtaken by Yahoo and the whole thing was essentially no good. That's -- gives you some insight into how his mind works.

MR. KUMAGAI: Okay. I'll mark as Exhibit 176.

(Exhibit No. 176 was marked.)

Q. (BY MR. KUMAGAI) Okay. Exhibit 176 is a document titled, (Reading:) Adam's Take: Worst Biopharma CEO of 2024? It's no contest. Subheading is Remi Barbier, the former CEO of Cassava Sciences, had a very bad year.

And it appears to be -- have been published on December 18th, 2024 to statnews.com. Have you ever seen this article by Mr. Feuerstein?

Page 67

A. I don't remember seeing this article.

Q. Okay. In the first sentence it says, (Reading:) Remi Barbier, the former -- and currently disgraced -- CEO of Cassava Sciences, is the Worst Biopharma CEO of 2024.

Do you see that?

A. I do.

Q. Would you agree with the characterization that you're currently disgraced?

A. This is -- you need to understand this is his opinion. So if you want an interpretation of his words, you would have to ask him. I can't speak for the man. I've never met him. I don't think I've met him.

Q. I'm asking you whether you believe you're currently disgraced?

A. No.

Q. Why not?

A. Why would I be?

Q. Okay. Well, in the first paragraph of the second page, it says, (Reading:) Barbier had a bad year. Cassava's Alzheimer's drug candidate simufilam proved to be nothing more than a placebo in a large clinical trial. The company blew up. He lost his job. He was penalized by the Securities and Exchange Comission. And he remains a defendant in ongoing

Page 68

shareholder and class-action lawsuits.

Do you see that paragraph?

A. I do.

Q. Are any of those sentences false in your opinion?

A. The second sentence, I don't have the data to agree or disagree with it. The third sentence, "the company blew up.", I'm not sure what that means. The fourth sentence "he lost his job.", correct. The sentence penalized by the SEC, correct. And remains a defendant in ongoing and shareholder -- several lawsuits, correct.

Q. Okay. In the next paragraph, the second sentence, he writes, (Reading:) Any CEO with an ounce of integrity would have shelved a drug like simufilam given the overwhelming evidence of its futility. Not Barbier. He spent more than four years making excuses, spinning bad data, misleading investors, and exploiting the desperation of Alzheimer's patients. At his direction, Cassava tried suing critics into silence.

(Reading:) Why? Greed. Barbier got rich.

Do you see that?

A. I do.

Q. And it continues, (Reading:) As satisfying as the end of Cassava has been, it still disgusts me that

Page 69

he -- and his wife/accomplice Lindsay Burns, Cassava's former head of neuroscience -- actually profited from all of this. They walked away with millions of dollars, while people struggling to live with Alzheimer's -- duped into simufilam studies -- lost months, if not years, that they will never get back.

Do you see that?

A. I do.

Q. What do you make of Mr. Feuerstein's claim that you -- that "Any CEO with an ounce of integrity would have shelved a drug like simufilam"?

A. What's the question?

Q. How do you respond to Mr. Feuerstein's claim here that "Any CEO with an ounce of integrity would have shelved a drug like simufilam given the overwhelming evidence of its futility"?

A. Look, I -- I am not a spokesman for this writer. If you need a -- an interpretation of that sentence, you need to consult the writer. I -- I just can't -- I don't know what -- what he had in his head when he wrote that.

Q. Do you agree that any CEO with an ounce of integrity would have shelved a drug like simufilam?

A. No.

Q. Is it true that you and Dr. Burns walked away

18 (Pages 66 - 69)

Page 70

with millions of dollars from your time at Cassava?

A. I don't know what that means, walk away with. Can you define that?

Q. Did you and Dr. Burns together earn millions of dollars in compensation from Cassava?

A. If you're asking were we compensated by Cassava sciences during my employment with Cassava Sciences, the obvious answer is, yes, we were compensated as any CEO, any managers would be.

Q. And compensated to the tune of well over $10 million collectively, right?

A. You asked me earlier and I responded, and I still respond; I've never tallied up.

Q. Does more than 10 million sound correct?

A. I've never tallied up.

Q. Do you believe Mr. Feuerstein and Stat News were unfair to you, Dr. Burns, and Cassava over the years?

A. I've never given this writer much thought. I don't know how much credibility he has. What I do know is he's a financial type with no drug development experience, to my knowledge.

Q. Do you think he's been unfair in his coverage of the company?

A. I -- I can't say what -- what goes on in his

Page 71

head.

Q. I'm not asking what goes on in his head. I'm asking you whether you believe that Mr. Feuerstein's coverage of the company has been unfair?

A. Yeah. And what I'm saying is, if you want to get into the writer's head, you need to ask the writer, not the reader.

Q. And so you can't make any assessment about the fairness or intent of Mr. Feuerstein; is that right?

MR. WU: Objection. You're asking about this specific article? Can you clarify? Are you asking about this specific article.

Q. (BY MR. KUMAGAI) I'm asking you whether you believe you can make an assessment about Mr. Feuerstein's intent?

A. Again, here you're asking about psychology. I -- I'm not this writer. I -- I can't speak for his psychology. What I can say is that I've been working with Wall Street long enough that most investors have an angle. I would want to know what his angle is. There's no disclosure here. Is he a short seller? Does he work for short sellers? I don't know. Maybe. Maybe not. This is why I can't get into his head any more than you can.

Q. Would you say that's true of all of Cassava's

Page 72

critics over the years?

A. What is true?

Q. That you can't get into their head any more than anyone else can?

MR. WU: Objection.

THE WITNESS: Yeah. Can -- again, this is a very broad question. We -- over 25 years, I -- I've never counted how many investors we've had, but my guess is thousands. And I -- I can't speak for thousands of people.

Q. (BY MR. KUMAGAI) Are you proud of your time at Cassava?

A. I'm proud of my time at Cassava.

Q. Why?

A. As stated earlier, I took the company from an idea into a billion dollar company with multiple drugs under development, that is never an easy thing to do. Many try. Most fail.

Q. Do you have any regrets from your time as CEO of Cassava?

A. I didn't like that I was fired, asked to leave, yeah.

Q. Anything other than that?

A. That would be the big one.

Q. Do you regret any decisions that you made as

Page 73

CEO?

A. Look, I'm human. I make mistakes. We all make mistakes, and you learn. Hopefully, you learn from experience and from mistakes. So I'm humble enough to say, yeah, you know, there are things that I did in the early years that I -- I would do differently. I can't think of what those would be. But generally speaking, people who like to learn try to learn from experience and their mistakes and other people's mistakes as well.

Q. And you would consider yourself someone who likes to learn and learn from experience, learn from your mistakes, and other people's mistakes?

A. Generally, yes.

Q. So can you think of any particular mistake that you believe you made during your time as CEO of the company?

A. I can't think about that right now. But over a span of 25 years, again, everyone makes mistakes, and I'm sure I made my share.

Q. You just testified a moment ago that you are someone who likes to learn, learn from your own mistakes. But sitting here today, you can't think of a single mistake that you made over the course of 25 years as CEO of the -- of the company?

A. I'd -- I'd have to -- it's a very, very broad

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 74

question that spans 25 years. I'd have to sit down and think carefully about what happened and when and why.

Q. You can't name one sitting here today?

A. One what?

Q. Mistake.

A. Human error? How -- what do you mean by mistake?

Q. Well, you just testified earlier, I'm humble, I learn from my mistakes, I like to learn. I'm asking you to name one mistake that you made and have learned from?

A. I would want to think. If I only had one, I would want to think. It's like saying you only have one wish. You want to think carefully.

Q. Well, you can name multiple.

A. I cannot.

Q. Sitting here today, you can't think of any mistakes that you did during your time as CEO?

A. Sitting here today, I'd want the benefit of time and effort and -- and thoughtfulness to give you a correct answer. But what I'm saying is, generally speaking, we're all humans. We all -- we all make mistakes from time to time.

Q. What mistakes, if any, did you make as CEO of the company?

A. I can't remember specifically any mistakes, but

Page 75

I'm sure I made them.

Q. Do you feel like you let anyone down during the course of your time as CEO?

A. How do you mean "let down"? That's a --

Q. What is your understanding of what that means?

A. You used it first. You need to define it.

Q. My question is first do you have an understanding of what it means to let someone else down?

A. In what context?

Q. So let me try to define it for you. Disappointed them, broke a promise, did anything that did not meet the expectations that you had set for yourself?

A. Yes.

Q. And who do you think you let down during your time as CEO?

A. What comes to mind is after one of our main drug candidates failed to get regulatory approval, we had to let go of a number of people. I forget how many. But they were good people, good workers. It was heart-wrenching to let them go.

Q. So aside from employees that you terminated as CEO, can you think of any other people who you believe you let down during your time as CEO?

A. That's the big one that comes to mind.

Page 76

Q. What about any small ones?

A. I -- you -- again, you're -- these are very -- you're asking these super broad questions that span 25 years. So unless you give me a specific period of time, I have to give you the general answer of I don't specifically remember.

Q. Do you think you let any Alzheimer's patients down?

A. Again, I can't speak for the entire population. But I think the -- in general, you always want a positive result over a negative result, yeah.

Q. So under your leadership, do you think Cassava helped Alzheimer's patients in any way?

A. Well, I left or was asked to leave before the Phase III trial was unblinded. So up until that point, there was a lot of promise, and that's when I left.

Q. Looking back, do you think any of that promise has been fulfilled?

A. During my tenure, I think we fulfilled the promise to investors. I think we fulfilled our promise to stakeholders and to the Alzheimer's community.

Q. What promise to investors do you mean?

A. To develop a -- a late stage novel drug.

Q. Did you develop a novel drug?

A. Cassava Sciences did.

Page 77

Q. Simufilam, correct?

A. Correct.

Q. And the drug ultimately failed in its Phase III trials, right?

A. After I left, things happened. I can't -- I don't have any data. I don't have any special insight on what happened after -- after I left.

Q. You don't take any responsibility for the failure of the Phase III trials?

A. It's not a good thing. But I can tell you that at the time I left, it was still a lot of promise in the trial.

Q. Do you think the Phase III trials would have succeeded if you were still CEO?

A. Highly speculative question. I can't answer that.

Q. Isn't it an easy question? You know, the data is the data. So how would your role as CEO have any effect on the success or failure of the Phase III trials?

A. The data is the data. Data interpretation is altogether different. And how the statistical analysis plan was finalized, I don't know, or modified perhaps, I don't know.

Q. So you think that if you were still CEO, the

20 (Pages 74 - 77)

Page 78

plan may have been different and the interpretation of the data may have been different such that the Phase III trials could have been presented as a success. Is that what you mean?

A. So you're getting into very speculative territory. I can't speculate. What I can say is at the time I left, the company looked like this and a few months later or whatever a year later, it looked like that. What happened during this and that, someone else is -- was responsible for it.

Q. When you left the company around July of 2024, did you have an opinion as to whether the Phase III trials were likely to fail or succeed?

A. Yes, of course.

Q. What was that opinion?

A. My opinion is that it had a -- a chance to succeed.

Q. And what was that opinion based on?

A. Everything I had learned about the drug and the -- the company during my tenure at Cassava Sciences.

Q. Do you think Rick Barry taking over as CEO is the reason the Phase III trials failed?

A. A highly speculative question. I can't provide a speculative answer. I'm not going to speculate.

Q. You can't say anything about whether you think

Page 79

Rick Barry's leadership is the reason for the failure of the Phase III trials?

A. I can't speculate.

Q. You think it's a possibility that Rick Barry's leadership is the cause of the Phase III trials failing?

A. I cannot speculate.

MR. WU: Okay. When you can, can we take a break?

MR. KUMAGAI: Sure. Let's take a five-minute break.

VIDEOGRAPHER: Going off the record. The time is 11:33.

(Brief recess.)

VIDEOGRAPHER: Back on the record. The time is 11:43.

Q. (BY MR. KUMAGAI) Mr. Barbier, are you familiar with Cassava's 2020 cash incentive bonus plan?

A. Generally speaking, yes. I know it exists. I've -- I've seen it before.

Q. What is your understanding of that plan?

A. It's a very complex plan. But at a high level, my understanding is that if the company performs and that performance is reflected in the stock price, then there are -- there's some sort of compensation for -- for a number of people, managers and others.

Page 80

Q. And who came up with the cash incentive bonus plan?

A. The cash incentive bonus plan was crafted by, I believe, a series of attorneys, and I forget which ones.

Q. And what role, if any, did you have in the creation of the cash incentive bonus plan?

MR. CAMPBELL: Objection. And just exclude from your answer any communications with counsel.

THE WITNESS: Okay. That makes it harder. Ask -- ask again, please.

Q. (BY MR. KUMAGAI) What role, if any, did you have in the creation of the cash incentive bonus plan?

A. How -- how do you mean "creation"? Do you mean the crafting of the -- the document?

Q. Let's break it up. Whose idea was it to create the cash incentive bonus plan, to the best of your knowledge?

A. Best of my knowledge, it was a -- it was a compensation committee. I believe it was some informal discussions around the comp -- with the members of the comp committee.

Q. And you were a member of the comp committee, correct?

A. I was not.

Q. Were the discussions with the comp committee

Page 81

between you and the comp committee?

A. Between me as CEO and members of the comp committee, yes.

Q. Okay. So just to be clear, the idea to create what would become the cash incentive bonus plan began through discussions between you and the compensation committee; is that right?

A. Correct.

Q. Approximately when?

A. I don't remember dates.

Q. The plan was adopted in August 2020. Does that sound right?

A. I -- I don't -- it's a matter of record. I -- I don't remember the date.

MR. KUMAGAI: We'll mark as Exhibit 177 a document Bates stamped CASSAVA_000700979.

(Exhibit No. 177 was marked.)

Q. (BY MR. KUMAGAI) All right. Just take a moment to generally flip through Exhibit 177. My question is whether you recognize the exhibit?

A. Yes, I generally recognize this to be the cash incentive bonus plan.

Q. This is the same plan we were discussing a few moments ago, right?

A. This is the plan I was referring to. I -- I'm

21 (Pages 78 - 81)

Page 82

not sure what you're...

Q. And you see it was effective as of August 26, 2020. Do you see that on the first page?

A. I do.

Q. Looking at this document and seeing the August 26, 2020 date, does that refresh your recollection as to any discussions or events surrounding the creation of or adoption of the cash incentive bonus plan?

A. You -- what I remember generally is there was a lot of discussion, a lot of debate, a lot of back and forth. It was a slow, methodical process. The attorneys --

MR. WU: Just -- just careful not to divulge the substance of your discussions with attorneys.

THE WITNESS: Oops. Okay.

A lot of input from outsiders, put it that way.

Q. (BY MR. KUMAGAI) Aside from lawyers, were any other outsiders involved in the creation of the 2020 cash incentive bonus plan?

A. There may have been. I -- I don't remember. I -- again, what I remember, it was kind of a long drawn-out process and I -- I don't remember all the

Page 83

different parties and stakeholders who had a voice in it.

Q. And so the general structure of the bonus plan was to award potential payments based on certain market cap milestones; is that right?

A. So let me be a little more specific, because again, you're asking a pretty broad question. But the company had a certain market capitalization at the time this was established, and if the market capitalization at sometime in the future, in the defined future, reached or exceeded X, Y, and Z, then yes, that could result. It didn't automatically, but it could result in some form of compensation for the -- the plan members.

Q. And so when the market cap thresholds were met, you as CEO were to be awarded mandatory amounts equivalent to a third of the bonus allotted for that threshold. Is that your understanding?

A. I -- I don't remember the amounts. I -- I'd have to read the document carefully.

Q. Okay. And the triggers for the actual payment of the awards were a merger or sale of the company or a determination by the compensation committee that the company had enough cash to operate for two years. Does that sound right?

A. Again, this is a long, complex legal document.

Page 84

I -- I don't remember all the ins and outs. But let's assume that's correct.

Q. Does that sound correct to you or does that not sound correct to you?

A. I -- I just don't remember the -- all the -- the precise terms.

Q. Okay. And if you look on the last page at the back, there's a Schedule 2 listing the participants.

Do you see that?

A. I do.

Q. Your name is first.

Do you see that?

A. I do.

Q. Dr. Burns is a participant.

Do you see that?

A. I do.

Q. And Dr. Wang is also a participant.

Do you see that?

A. I do.

Q. So just starting at the beginning, can you describe what you remember, if anything, about how the discussions began to create this bonus plan?

MR. WU: Just the same caution about not disclosing the substance of communications with attorneys.

Page 85

THE WITNESS: Okay. It's a little difficult to be thorough, to answer thoroughly, because this is a legal document and this is a legal process. But from a big picture point of view, the concept was that if the company hit a grand slam or even a home run, then there would be compensation to those who made the home run happen or helped to make the grand -- the home run happen. That was the basic premise. And then it got very complicated from there.

Q. (BY MR. KUMAGAI) And what do you mean by "home run" or "grand slam"?

A. Each -- again, I -- I don't remember. I'm -- I have to look at the schedule. But each -- what's called target valuation milestone, and that -- that's a defined term. I forget how it was defined. But when the company's capitalization reached a -- a big multiple of its then capitalization, then that would be considered for shareholders a financial gain, a windfall for shareholders. So it was -- it was -- the intent was to make something that was shareholder friendly and that compensated the managers as well.

Q. What do you mean by "shareholder friendly"?

A. No one under this plan does well unless shareholders do well first.

Q. So why were the milestones based on market cap

22 (Pages 82 - 85)

Page 86

as opposed to drug development milestones?

A. The board had a -- certainly the comp committee had thorough discussions about whether it's this or that. And everyone felt that if you're going to make it shareholder friendly, base it on what's important to most shareholders, which is stock price. The issue -- one possible issue with making it based on drug development milestones is that Wall Street investors may not agree that a milestone is actually important to the development of the program. So it was a very thorough discussion.

Like I said, it took a long time, had input from many different parties and to the structure and the amounts and this and that. And eventually, the -- the thinking was to make it fair as -- as much as possible to shareholders.

Q. And approximately how long was the process to create this plan?

A. I -- I -- I don't remember, but multiple board meetings is what I recall.

Q. And the board meetings are every quarter; is that right?

A. Correct. Scheduled board meetings, when I was, there were every quarter.

Q. So do you have any sense of approximately how

Page 87

long it took between initial discussions to the adoption of the plan?

A. I don't remember. But certainly at least two board meetings and multiple compensation committee meetings and discussions.

Q. So a few months?

A. Not years, if that's what you're asking. Not multiple years, but months, multiple months.

Q. And so if it was adopted in August 2020, fair to say that discussions began at some point in 2020?

A. They may have happened the year before. I just don't remember. Like I said, it was a long, drawn-out thorough process.

Q. Are you aware of any other biotech company with a bonus plan that conditions bonus payments on stock price milestones as opposed to drug development milestones?

A. So there is something like 200 publicly traded biotech companies today. I -- I can't speak for all 200. I haven't done the homework. Nor can I recall any companies that have a similar program but based on clinical milestones as opposed to market cap.

Q. So can you think of any biotech company that has a similar bonus plan?

A. Again, there -- I believe there are over 200

Page 88

publicly traded biotech companies. I have not done the homework to say -- to answer that question accurately.

Q. So you are not aware of any other biotech company that has a similar bonus plan to the 2020 cash incentive bonus plan; is that right?

A. We never -- I never did the homework. Maybe attorneys did. I -- I just don't know. But I never did the homework to see if anyone else has a similar plan in place.

Q. Did you ever consider whether this bonus plan might incentivize any form of misconduct?

A. Never.

Q. Did you ever consider whether conditioning bonus payments on stock price might incentivize participants to say or do things to boost the stock price?

A. You're asking -- ask again. And can you be a little more specific, because on one -- ask again, please.

Q. Did you ever consider whether conditioning bonus payments on stock price might incentivize participants in the bonus plan to say or do things to boost the stock price?

A. You're making a wrong assumption. You're assuming that participants have the ability to put their

Page 89

thumb on the -- the scale and boost the stock price. I don't see that.

Q. You don't think you as CEO had any capacity to boost the stock price?

A. With good clinical data, sure, that would be a boost.

Q. What about your interpretations of clinical data?

A. Same thing. Good clinical available data, that's generally a boost.

Q. You understood that statements by you about clinical data could affect Cassava's stock price, right?

A. Yes.

Q. Have you ever discussed the cash incentive bonus plan with Dr. Burns?

A. If I did, I don't remember.

Q. Have you ever discussed the cash incentive bonus plan with Dr. Wang?

A. Same answer. If I did, I don't remember.

Q. Whose idea was it to include Dr. Wang in the bonus plan?

A. I believe the comp committee -- correction. It -- I -- I don't know if it was the comp committee or the entire board that had to vote in participants.

Q. Like, whose idea was it to propose Dr. Wang's

23 (Pages 86 - 89)

Page 90

inclusion in the bonus plan?

A. What I remember is -- and I can't remember if it's the comp committee, members of the comp committee, or the board to actually include people in -- in the -- as participants in the plan.

Q. So your testimony is that it was either the members of the comp committee or the full board who initially came up with the idea to include Dr. Wang in the bonus plan?

A. No. My testimony is that it is either the board or the comp committee, I can't remember which, maybe both, to -- I'm thinking. Now that I'm thinking, I actually think it was -- it's the comp committee who is to -- actually, I don't know. I -- I don't know. But either the comp committee or the board were the only ones empowered to include participants in this. Where they got their ideas from, I -- I don't remember.

Q. Did you propose to the comp committee or the board that Dr. Wang should be included in the bonus plan?

A. I -- I don't remember.

Q. Possible that you did?

A. It's possible I did. It's possible I didn't.

Q. And who were the members of the comp committee around this time in August 2020?

Page 91

A. Again, it's a matter of public record. I -- I know Sandy Robertson was a member. I can't remember the other members.

Q. Michael O'Donnell? Was he a member?

A. I can't remember.

Q. Are you aware of any other biotech companies with a cash incentive bonus plan that included outside consultants as participants?

A. My answer is the same. There are many public biotech companies. I -- I never did the homework to see who -- who's got what.

Q. So at the time, you were not aware of whether there was any other biotech company with a bonus plan that included an outside consultant as a participant, right?

A. At the time, I did not do -- I did not go through the effort of looking at 200 plus public biotech companies to figure out who's got what type of compensation in place.

Q. Did you ever consider whether including Dr. Wang in the bonus plan might incentivize him to engage in any form of research misconduct?

A. Ask again?

Q. Did you ever consider whether including Dr. Wang in the bonus plan might incentivize him to

Page 92

engage in any form of research misconduct?

A. Never crossed my mind.

Q. You testified earlier that good data could move the stock price, right?

A. Correct.

Q. And --

A. I said -- to be precise, I said good clinical data, I believe.

Q. And Dr. Wang was responsible for some of the clinical data on simufilam, right?

A. I believe he was responsible for preclinical data.

Q. Wasn't he responsible for some of the data from the Phase IIA and Phase IIB clinical studies?

A. I believe he did the CSF bioanalysis.

Q. And so you understood that good data had the potential to boost the company's stock price. You also understood that Dr. Wang was responsible for some of that data and a participant in the bonus plan, right?

MR. WU: Objection.

THE WITNESS: What is the question?

Q. (BY MR. KUMAGAI) Dr. Wang was responsible for some of the data, the clinical data on simufilam, right?

A. As I recall, he was responsible for some of the CSF bioanalyses for one or two studies.

Page 93

Q. And that was clinical data, right?

A. I'll go with that. That's clinical data.

Q. And clinical data had the potential to boost the company's stock price, right?

A. Efficacy. Clinical efficacy data is what -- is what companies live and die for. And he had -- he did not participate in clinical efficacy data, to my knowledge.

Q. Would you describe any of the data generated from the Phase II studies as clinical efficacy data?

A. So Dr. Wang did CSF bioanalysis to my knowledge. And again, I'm not the scientist, so I'm not going to stand here and defend what he did or didn't do. And I can't. But to my knowledge, the FDA has never accepted a CSF -- CSF data as clinical efficacy endpoint.

Q. Do you believe that any of the Phase II data constitutes clinical efficacy data?

A. Any? You need to be more specific. There was a lot of data in there.

Q. Do you believe -- strike that. Sitting here today, can you think of any data from the Phase II studies of simufilam that you would consider to be clinical efficacy data?

A. There was a lot of data. I -- again, not being

24 (Pages 90 - 93)

Page 94

a scientist, I don't have it all in my head.  I would have to go back and see what -- what was what and who did what and when and -- and how we -- how it was published.

Q.  What was your maximum potential payout under the cash incentive bonus plan?

A.  I -- I -- I would have to read the whole cash compensation plan.  But it -- it's a well defined amount.  And I -- I -- I just have not read this in quite a while.

Q.  It was a third of each of the aggregate bonus payments on Schedule 1, right?

A.  I -- I don't know.  If -- I mean, we can go with it if that's accurate.  But I -- I can't testify that it's right or wrong.

Q.  Were you generally aware at the time the bonus plan was adopted that you were a participant of the plan and eligible for payments under the plan?

A.  Is the question was I a participant in the plan?

Q.  You were aware when the plan was adopted that you were a participant in the plan, right?

A.  At the time of the adoption, it's -- my name is right there.

Q.  So yes?

Page 95

A.  So yes, yeah.

Q.  All right.

MR. KUMAGAI:  I'll mark as Exhibit 178 a document with the Bates stamp CASSAVA_000699398.

(Exhibit No. 178 was marked.)

MR. KUMAGAI:  Can we go off the record for a minute, actually?

VIDEOGRAPHER:  Going off the record.  The time is 12:07.

(Discussion off the record.)

VIDEOGRAPHER:  Back on the record.  The time is 12:10.

Q.  (BY MR. KUMAGAI)  Okay, Mr. Barbier.  Exhibit 178 is an email.  The top email is from you to Nadav Friedmann dated June 16th, 2020.  The subject is "phantom stock plan", and it appears you are forwarding an exchange that you had with Mr. O'Donnell who was a, I believe, a director on board at the time.

Do you see that?

A.  I do.

Q.  I just want to ask you whether -- on the timing this refreshes your recollection in any way as to when the discussions about the cash incentive bonus plan began?

A.  I'm sorry.  Is there a question?

Page 96

Q.  Yeah.  Yeah.  So does this -- this June 2020, is that, you know, approximately when formal discussions around the cash incentive bonus plan began?

A.  I don't remember when -- it depends what you mean by "formal".  Could -- can you define that a little?

Q.  Well, strike that.

Is this approximately around the time when you began discussing with members of the comp committee about adopting a cash incentive bonus plan?

A.  This is part of the process, but I don't remember when that process started.

Q.  And what was Mr. O'Donnell's role?

A.  I believe he had two roles.  One is as counsel, which we won't talk about.  And second is as a board member.

Q.  And he was -- was he also a member of the comp committee?

A.  I believe not, but I would want to check that.

Q.  Okay.  You can set that aside.

MR. KUMAGAI:  I'll mark as Exhibit 179 a document Bates stamped CASSAVA_000988572.

(Exhibit No. 179 was marked.)

MR. KUMAGAI:  And I'll mark as Exhibit 180 a document Bates stamped CASSAVA_000988573, which is the

Page 97

attachment to Exhibit 171 and the Excel has been converted to a -- a PDF and printed.

(Exhibit No. 180 was marked.)

Q.  (BY MR. KUMAGAI)  All right.  Mr. Barbier, Exhibit 179 appears to be an email from you dated July 15th, 2020.

Do you see that?

A.  I do.

Q.  And it's addressed to Bob Gussin, Sandy Robertson.

Do you see that?

A.  I do.

Q.  And it BCC'd Nadav Friedmann.

Do you see that?

A.  I do.

Q.  And the subject is "Comp Committee".

Do you see that?

A.  I do.

Q.  The attachment refers to a document titled Comp2020(1).xlsx.

Do you see that?

A.  I --

Q.  It's under the line, under the subject.  I'm just referring to the --

A.  Is this it?  Oh, yes, yes.

25 (Pages 94 - 97)

Page 98

Q. Okay. And you write, (Reading:) Bob and Sandy -- please see attached spreadsheet as a discussion among yourselves. Thanks, Remi.

Do you see that?

A. I do.

Q. Why were you BCCing Mr. Friedmann on this email?

A. Because Dr. Friedmann had a -- a lot of experience with compensating drug developers back when he was president and CEO of Daiichi Pharmaceuticals, one of the world's leading pharmaceutical companies, and before that when he was the head of biotechnology for Johnson & Johnson.

Q. But why BCC him instead of openly copy him?

A. No special reason. I can't remember why or why not.

Q. Was that something you did regularly?

A. I -- it's a broad question. I -- I can't remember why he was BCC'd or -- or CC'd or...

Q. Was he -- was Mr. Friedmann a member of the comp committee?

A. He was not.

Q. Okay. If you look at Exhibit 180, it said -- the top says "Confidential Draft".

Do you see that?

Page 99

A. I do.

Q. And "Proposed Cash Award Program" with the draft dated July 14th, 2020.

Do you see that?

A. I do.

Q. And did you create this document?

A. I don't specifically remember, but it's possible.

Q. Looking at this, does this refresh your recollection in any way about any role that you played in creating the cash incentive bonus plan?

A. Yes. This is part of the long process I was referring to. There were a number of discussions, telephonic discussions before anything was put on paper. Eventually, there was agreement that it could make sense, but people want to see things on paper at some point.

Q. And so is this draft your proposal to members of the comp committee for what a bonus plan could look like for the company?

A. This is -- this is a July 14th, 2020 draft of -- I can't remember if this is what we discussed or -- verbally or what others wanted to see. But it's -- it's a draft document, clearly.

Q. Okay. And if you look at the "Notes (random

Page 100

order)".

Do you see that?

A. I do.

Q. About halfway down you -- it says, (Reading:) Cash awards are payable upon SAVA market cap closing at or above each award level.

A. Uh-huh.

Q. Do you see that? And then the second last item says, (Reading:) SAVA may temporarily defer, but not eliminate, payment of cash awards if the total dollar amount owed is likely to cause a reasonable hardship to the Company.

Do you see that?

A. I do.

Q. And so under this July 2020 proposal, cash awards would be payable immediately upon the market cap hitting certain milestones unless the company determined that payment would cause a reasonable hardship. Is that fair?

A. I believe that's what the words say.

Q. And so unlike the final plan that was adopted, payments under your proposal would be made immediately, not deferred until a merger or the cap -- the company having enough cash on hand for two years?

MR. WU: Objection --

Page 101

Q. (BY MR. KUMAGAI) Does that sound right?

MR. WU: Objection. Mischaracterizes his prior testimony.

THE WITNESS: Yeah, I agree here. You're trying to mischaracterize. You are mischaracterizing what was a very long process into a -- a single email. And I would refer you to the final cash incentive bonus plan. This is the definitive document. Everything else was just basis for discussion.

Q. (BY MR. KUMAGAI) And you were proposing this plan as a basis for discussion in Exhibit 180; is that right?

A. Correct.

MR. KUMAGAI: I'll mark as Exhibit 181 a document Bates stamped CASSAVA_000706864.

(Exhibit No. 181 was marked.)

Q. (BY MR. KUMAGAI) Okay. Do you recognize Exhibit 181 as an email that Mr. Robertson sent you on August 1st, 2020?

A. That's what I read, yeah.

Q. And Mr. Robertson writes, (Reading:) Remi, did you ever talk to Mike Sitrick? Did you ever connect with Eddie Chang? Is that money rewarding compensation plan in place ( or new stock options for directors)? We should do that sooner rather than later.

26 (Pages 98 - 101)

Page 102

Do you see that?

A. I do.

Q. What was your understanding as to why Mr. Robertson wrote that the bonus plan -- or strike that.

Did you understand this to be a reference to the bonus plan that was under discussion at this time?

A. Again, Sandy is not with us, so I -- I -- I can't speak with him. But it's reasonable to assume that he -- he's probably referring to the bonus plan. But I -- I don't know for sure.

Q. Okay. And he writes, (Reading:) We should do that sooner rather than later.

Do you see that?

A. I do.

Q. Do you have any understanding as to what Mr. Robertson meant by that?

A. I think the -- the sentence, (Reading:) We should do this -- that sooner rather than later seeks to evidence of how long the process took and he probably lost track of where are we in the process.

Q. Do you recall what else, if anything, was going on at the company around August 2020?

A. Not specifically. But I can tell you there was

Page 103

always something going on at the company.

Q. Wasn't that the same time the company was undergoing what you described as the redo analysis of the Phase IIB biomarker data?

A. I -- I don't remember.

Q. And was there any connection between the redo analysis and the timing of the adoption of the cash incentive bonus plan?

A. Not in my mind.

Q. Was there any discussion about adopting the bonus plan before releasing the results from the Phase IIB redo analysis?

A. There was -- again, this is a long-winded, you know, slow methodical process. I don't remember all the twists and turns and what happened in the interim.

Q. So there may have been some discussion about adopting the bonus plan before releasing the reuse results of the redo analysis from the Phase IIB study?

A. I -- I just don't remember.

Q. After the plan was adopted in August 2020, do you recall whether any valuation milestones were met?

A. When you say "after," do you mean from August 2020 to today?

Q. Yeah.

A. The company's market cap did rise substantially

Page 104

during COVID, and I believe some of these milestones were met. But I -- again, complex plan, I don't have all the numbers in my head. I don't know which ones were met and which ones were not met. What I do remember is none of us getting paid on the cash incentive bonus plan.

Q. And was -- were there disputes about that?

A. If there were, I don't remember them.

MR. KUMAGAI: I'll mark as Exhibit 182 a document Bates stamped CASSAVA_000702208.

(Exhibit No. 182 was marked.)

Q. (BY MR. KUMAGAI) Okay. Exhibit 128 appears to be an email from you, Mr. Barbier, dated October 16th, 2020 to Mr. Robertson and Mr. Gussin copying Dr. Friedmann.

Do you see that?

A. I do.

Q. And it refers to an attachment with the title CashBonusOct2020.pdf.

Do you see that?

A. I do.

Q. Okay. And you write, (Reading:) Bob and Sandy -- Attached is a spreadsheet with proposals regarding cash bonus. Of course, I only opine; both of you decide. Also, FYI, the proposed cash bonus for

Page 105

Lindsay is 100 percent based on Nadav's opinion. Would you like to discuss this weekend, or early next.

Do you see that?

A. I do.

Q. Okay. So does this refresh your recollection this Mr. Robertson and Mr. Gussin were the compensation committee members at the time?

A. Dr. Gussin.

Q. Sorry. Dr. Gussin?

A. Correct.

Q. Okay. And why were you proposing bonuses to Mr. Robertson and Dr. Gussin?

A. I'd -- I'd have to go back to the comp. Bear with me.

Q. The bonus plan?

A. I -- I'd have to go -- again, the cash compensation plan is a -- a very complex detailed document that spells out -- it -- it's not sufficient to meet the condition. There have to be other things that trigger it. And I -- I believe -- I -- I'd have to read this full thing -- thing in full. But I believe one of the conditions is that the CFO had to put the board on notice that a condition was met.

Q. The CFO or the CEO?

A. The -- the CFO put me on notice.

27 (Pages 102 - 105)

Page 106

Q. And then you proposed --

A. And then -- and then I put -- there has to be a record. In other words, this is the official record that apparently, a milestone was met. So then the question becomes, the milestone being met, what happens. And there, it's as I say in the email, both of you decide. It's up to the -- the discretion of Dr. Gussin and Sandy Robertson. So to me, this is a mechanical email.

Q. Okay. If you look at the attachment, the title is "2020 Cash Incentive Bonus Plan -- First Milestone Valuation, October 2020".
Do you see that?

A. I do.

Q. Okay. And next to your name under the column "Non-discretionary Cash Bonus amount", there's a number approximately 3.3 million.
Do you see that?

A. I do.

Q. And it says your base salary was $920,000 at the time.
Do you see that?

A. I do.

Q. What is your understanding of nondiscretionary cash bonus amount?

Page 107

A. Again, I believe that's a defined term in the cash -- 2020 cash incentive bonus plan.

Q. Okay. And so you were to be awarded 3.3 million of a potential payment under the bonus plan after the first milestone was met. Is that your understanding of what this means?

A. I think you said that wrong.

Q. Correct me.

A. I'm not sure what you're asking.

Q. After the first milestone was hit in October 2020, you were eligible to receive a bonus payment of $3.3 million, right?

A. A nondiscretionary cash bonus amount, correct.

Q. Okay. And you proposed here that Dr. Burns be awarded a potential payment of $900,000.
Do you see that?

A. What I say is the proposed cash bonus for Lindsay is 100 percent based on Dr. Friedmann's opinion.

Q. Okay. And the proposal was to award Dr. Burns an -- an award of $900,000; is that right?

A. That was Friedmann's opinion, correct.

Q. And you accepted that opinion and proposed it to the comp committee, right?

A. Yeah. Again, they -- when it -- with regard to Lindsay, the proposed cash bonus amount, if any, is

Page 108

100 percent based on Dr. Friedmann's opinion, not -- not Remi's.

Q. Okay. Do you have any other -- strike that.
Do you have any recollection of any discussions about this October 2020 milestone?

A. Discussion with whom?

Q. With anyone?

A. Anyone, with shareholders? With -- I -- generally speaking, I probably did have discussions. But you -- you need to be more specific in terms of timing and with whom.

Q. Do you recall having any discussions with Dr. Burns about this October 2020 milestone?

A. I do not have -- I don't recall that.

Q. Do you recall any discussions with anyone else about this October 2020 milestone?

A. Which?

Q. The October 2020 milestone that is --

A. The -- the entire --

Q. -- described in Exhibit 182?

A. Yeah. I -- I would have had to have discuss -- excuse me. Discussions with Dr. Friedmann with regard to the discretionary -- the proposed discretionary cash amounts.

Q. It's not a trick question. I'm just trying to

Page 109

see if sitting here today, you can actually remember having any particular conversations about this milestone?

A. I -- I don't remember specific discussions with Friedmann. But I do remember in general having a series of discussions saying, you know, just to pick an example, Mike Zamloot. Good job, bad job. If so, what do you think. All of these people are technical people, I believe, except for Ruth Araya and Eric Schoen. So they would fall -- they would all report to Dr. Friedmann somehow.

Q. All right. And Dr. Friedmann reported to you?

A. Correct.

Q. Do you recall any specific discussions about any subsequent milestones that were met under the cash incentive bonus plan?

A. Again, the stock during COVID, I know the stock price went up. There may have been. I don't specifically remember whether we reached any or not.

Q. Sitting here today, do you believe Cassava has any actual or potential obligation to pay you any amounts of money under the bonus plan?

A. I'd have to read -- again, this is a very complex document. So I -- I don't know. Frankly, I haven't thought about it.

28 (Pages 106 - 109)

Page 110

Q. So if the company is sold, do you intend to seek payment under the bonus plan?

MR. WU: Objection.

THE WITNESS: If they owe it, I have confidence they'll pay it. If they don't owe it, I have confidence they will not pay me.

Q. (BY MR. KUMAGAI) Okay. You can set that aside.

MR. WU: Do you -- do you want to break or --

MR. KUMAGAI: Do you want to break. Let's take a break.

VIDEOGRAPHER: Going off the record. The time is 12:33.

(Brief recess.)

VIDEOGRAPHER: Back on the record. The time is 1:15.

Q. (BY MR. KUMAGAI) Mr. Barbier, are you familiar with the defamation lawsuit that Cassava filed on or around November 2022?

A. Generally, yes. It was filed not by Cassava, I believe but by Cassava's law firm.

Q. And what law firm was that?

A. Erik Connolly is the partner. Benesch something, something, something.

Page 111

Q. And you understand that I represent the Plaintiffs in this case, Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris?

A. Understood.

Q. And you understand that my clients, the Plaintiffs in this case, were among the defendants in the defamation action, right?

A. Understood.

Q. Can you describe the extent, if any, of your personal involvement in the defamation action?

MR. WU: And just -- just to caution, when -- when you get to or if you get to discussions with counsel to leave out the substance of your discussions with counsel.

THE WITNESS: Excuse me, it would be helpful to me, certainly, if you could be a little more specific in your question, because it was a very long-winded process.

Q. (BY MR. KUMAGAI) Let's start at the very beginning. When was the first time that you are aware of the company considering filing defamation claims?

A. I -- I don't specifically remember a date. I do remember Sandy Robertson on the board suggesting that we look into it. But, I -- again, I -- I don't know what the dates were.

Page 112

Q. Do you recall whether that was before or after the citizens' petition had been released?

A. After.

Q. All right. And do you recall that the citizens' petition came out sometime around August of 2021?

A. Sounds right.

Q. Okay. So at some point after August of 2021, Mr. Robertson suggested that the company look into potential defamation claims; is that right?

A. I don't know if he suggested that the company looks -- look into it, but he certainly raised the topic.

Q. In what context?

A. I -- I can't remember the -- the discussions. But he was certainly of the opinion that the CP was a short attack, was a Wall Street tactic to make money.

Q. Did you share that opinion?

A. I did. And still do.

Q. So after Mr. Robertson made the suggestion or comments that you just described, what happened next in connection with any discussions about potentially filing defamation claims?

A. Yeah. Again, I don't remember the timing of who said what to whom. But Sandy was well respected on

Page 113

matters of finance and Wall Street, so he may have had his own discussions with individual board members. I don't know. He didn't tell me.

Q. And was Mr. Robertson's comment the first time that you considered or contemplated having the company file defamation claims?

A. When you say you, do you mean the Cassava Sciences or Remi Barbier?

Q. I mean you as the CEO of the company?

A. Yeah, pretty much -- again, I don't remember exactly who said what and when. But pretty much, I -- I know Sandy Robertson was a strong proponent that we consider and look into filing a -- some sort of a -- action against the -- the short sellers.

Q. And then what happened after that initial suggestion by Mr. Robertson?

A. When you say after, you know, there was a long time between the time -- the first time I remember hearing it which is sometime after the CP and the actual filing. So I -- can you be a little more --

Q. What -- what -- what is the next discussion, if any, that you can recall after Mr. Robertson's suggestion where the idea of filing a defamation action was discussed?

A. Yeah. So, again, are you asking me what --

29 (Pages 110 - 113)

Page 114

from my point of view, or from Sandy Robertson's point of view? It's not clear.

Q. Throughout today, I'm really asking about what you know about discussions that you had or things that you've done.

A. Uh-huh.

Q. So I'm asking you after that initial discussion where Mr. Robertson raised the idea, what is the next chronologically -- chronological discussion in which the defamation action was discussed?

A. Again, I don't remember precise dates or even who said what to whom. I know it was floated among board members, perhaps individually, perhaps at a board meeting. I -- I just don't remember.

Q. Aside from the initial discussion you referenced with Mr. Robertson, do you recall the substance of any other discussions where the idea of filing a defamation action was discussed?

A. Yeah. So then you fast forward to the litigation committee and the board. And, again, don't -- if you ask me about dates, I don't remember the dates and who said what to whom. But there were a series of discussions with the -- among the legal committee members.

THE WITNESS: And I don't know how much I

Page 115

can say here.

MR. CAMPBELL: If it's just discussion with legal committee members, it's not -- doesn't involve any communication with counsel, it's possible that you could testify to that. But if it reflects communications seeking legal advice or receiving legal advice from counsel by you or the committee, please exclude those from your answer.

THE WITNESS: I need to exclude a large part of what I was about to say there.

Q. (BY MR. KUMAGAI) And just to be clear, I'm, right now, not asking you about the particular details or substance of what was discussed. I'm trying to understand the timeline and sequence of discussions that occurred. And I don't think Scott is saying you can't testify about whether a discussion about the claim happened on X date or around X time with X committee, right?

MR. CAMPBELL: No. The question is when is the next time you recall a discussion occurring, and that's the whole substantive question. I have no objection.

THE WITNESS: If the question is chronology, when do you remember, the -- the answer is my -- the same thing which is I -- I don't remember.

Page 116

There were a lot of things going on. Even without the short attack, there's always a lot of -- there are many moving parts inside a drug development company, a small drug development company preparing for Phase III trial. So I -- I just don't remember who said what to whom. But it was percolating -- percolating and eventually reached the level of the groups that I can't talk about.

Q. (BY MR. KUMAGAI) I think you can say which groups it reached and approximately when that occurred?

A. Oh. Okay. So, again, I cannot say when. I -- I just don't remember. And what I do remember it was a long, arduous, thought out, rational process. But I don't remember the chunks of that -- the -- the when with regards to the chunk of that process. The groups that discussed it were the board and the litigation committee.

Q. Any other committees or groups?

A. The company may have had a -- a committee or two outstanding of the board. I -- I don't remember. There may have been a finance committee. I -- I just don't remember.

Q. Okay. So, again, at this point, I'm just asking you about the various discussions that you can recall. After the citizens' petition came out around August of 2021, there was a discussion where Sandy

Page 117

Robertson floated the possibility of filing defamation claims, right?

A. Correct, that's my recollection.

Q. Following that discussion, there were discussions among the litigation monitoring committee about potentially filing defamation claims; is that right?

A. Again, I don't remember the sequence. What I do remember is there were the -- a series of discussions within the litigation committee meetings that I attended because I did not attend all of them. And then obviously at the board.

Q. Without describing the substance yet of any of those discussions with the litigation monitoring committee, sitting here today, do you recall the substance of any of those discussions?

A. I -- I don't. I can -- I can characterize what I remember, but I can't -- with any specificity, I can't remember who said what to whom and why.

Q. Can you characterize what you remember from those meetings?

MR. CAMPBELL: Don't characterize anything that reflects communications with counsel seeking or receiving legal advice.

THE WITNESS: Let me try.

30 (Pages 114 - 117)

Page 118

MR. CAMPBELL:  Well, hold on, before you try.  So if you can -- if you can speak to the substance or characterization of the meeting without any reference to legal advice that was sought or received, go ahead.  But make sure to keep those things out.

THE WITNESS:  Understood.  Okay.  So what I would like to do is describe the process as best I remember it and as best I know without naming individual outside counsel or -- or anyone.

MR. KUMAGAI:  And to just --

MR. CAMPBELL:  And just to be clear.  It's not just don't name them.  It's if there were any communications --

THE WITNESS:  Or -- or don't talk about it.  Okay.

MR. CAMPBELL:  -- that were made by them, you can't reference them even if you're not naming those --

THE WITNESS:  Okay.  Understood.

MR. KUMAGAI:  And to be clear, I think he can name who was there and who participated in the discussions.

MR. WU:  Just don't say what they said.

THE WITNESS:  Okay.  I think I understand.

MR. WU:  We'll -- we'll try.

Page 119

MR. CAMPBELL:  It's the substance of the legal communications that are -- that are off the table.

THE WITNESS:  Okay.  Let me give it a shot and answer your question.

So -- and I'll answer from Remi's perspective as chairman of the board, and keep in mind that there were obviously several board members, each of whom had different opinions and it all came together resulting in a decision.

But when I approach board matters, topics such as do we or don't we spend time and money and resources on something like a -- an action -- a legal action, I always approach it -- as with all these big board decisions with an open mind.  What do we have, what's out there.  Then I encourage both myself and the board members to -- to apply reason and, you know, to let rationale drive the decision.  Okay.

Which means on the -- the good news is, it's -- it's typically rationally driven decision.  The bad news is it takes a long time because, you know, people want -- have input and different opinions and so forth.  So here with regard to the defamation action, I would say -- I would characterize it as having taken a long time.  There were a lot of different opinions.  And I would say without -- again, getting into details of

Page 120

who said what to whom, the conclusion -- the early conclusion was this is a very technical area of the law.

If we move forward, we need to get outside experts involved to see what they see.  And that's what the board ended up doing.

Q. (BY MR. KUMAGAI)  By "outside experts," who do you mean?

A. Law firms.

Q. Aside from law firms, were any other consultants or third parties involved in the process that you just described?

A. By "process," do you mean decision-making process or just general think -- generally thinking about it?

Q. I'm trying to be true to your testimony earlier and what you said was the -- that's the process.  So I'm trying to ask whether anyone else was consulted in connection with the process that you were referring to?

A. So the decision-making process rested entirely with the members of the board, the board decision, driven by the litigation committee.  Now, did others have an opinion, maybe, maybe not.  I can't speak for all of our stakeholders.

Q. I'm just trying to be clear on the process and who was involved.  So you mentioned consulting legal

Page 121

experts, lawyers.  Did you consult anyone else?

A. When you say we, again, Remi Barbier or the board?  I can't speak for all board members so I don't know what they did or didn't do.  I can speak for myself the decision-making process, which is really what's important to me as CEO, was driven by -- by attorneys, by the -- the board of directors and by litigation committee.

Q. And aside from the lawyers, did the board or the litigation committee, to the best of your knowledge, consult any other outside advisors or consultants in connection with the decision to bring the defamation action?

A. They may have.  I -- I just don't remember, or perhaps I don't know.  But what I distinctly remember is the board and the litigation committee insisting that the whole thing be driven by -- by expertise, by someone who really knows what they're doing in this area.  That's when we went out and consulted with several different outside law firms and asked them to conduct due diligence, legal due diligence.

Q. And what were the results of the legal due diligence that was conducted?

MR. WU:  Wait a second.  Let's just think about is there any way to answer that without divulging

31 (Pages 118 - 121)

Page 122

the substance.

MR. CAMPBELL:  No, assuming that it was a request for advice related to the filing of an action, that was the purpose of the diligence, we would object to you answering that question.

THE WITNESS:  He said it best.  The -- the whole point was to come to a fork in the road, do we, don't we.

Q.  (BY MR. KUMAGAI)  Can you just name the law firms or lawyers that you recall consulting as part of that process?

MR. CAMPBELL:  If you can name them.

MR. WU:  Just name the names, whatever you can remember.

THE WITNESS:  Well, actually, it's easy.  I remember Erik Connolly at Benesch.  I believe there were two other firms, I don't -- oh, Orrick, they threw their name in the hat.  I -- I don't remember their expert's name.  And I think that there was one other heavyweight in defamation actions.  I -- I don't remember his name.

Q.  (BY MR. KUMAGAI)  Was it a lawyer from the law firm Quinn Emanuel?

A.  The name rings a bell.  I talked to them sometime at some point, but I don't remember in regards to whether it was defamation or -- or non-defamation.

Page 123

Q.  You ultimately -- strike that.

The company ultimately retained the law firm Benesch to bring the defamation action, right?

A.  Correct.

Q.  Why?

A.  It was a corporate decision.  It was a -- a board decision.  And driven by the advice and expertise of someone who actually knows what they're talking about in the field.  They conducted due diligence.  It took them a while to do their diligence.

MR. WU:  All right.  Just -- just careful not to say, then, what -- what they considered or told you after the due diligence.

THE WITNESS:  Okay.  And the result was an action.

Q.  (BY MR. KUMAGAI)  Okay.  I'll go slowly again here.  Did either of the other two law firms that the company consulted recommend filing a defamation action?

MR. CAMPBELL:  Objection.

You can't answer the question as to what they recommended or didn't recommend.  That's legal advice.

Q.  (BY MR. KUMAGAI)  What were the base --

THE WITNESS:  Sorry.  Am I allowed to have 30 seconds in private with him?

Page 124

MR. CAMPBELL:  Of course.

MR. KUMAGAI:  Should we go off the record?

VIDEOGRAPHER:  Going off the record.  The time is 1:35.

(Discussion off the record.)

VIDEOGRAPHER:  Back on the record.  The time is 1:37.

Q.  (BY MR. KUMAGAI)  Okay, Mr. Barbier.  Before the break, you testified that during the course of deciding whether to bring the defamation action, the company consulted three different law firms, right?

A.  At least three.  There may have been more.  But three is the number I remember.

Q.  And the company ultimately decided to retain the law firm Benesch to file the defamation action, right?

A.  Correct.

Q.  Was the decision to retain Benesch as opposed to the other law firms based on financial considerations?

A.  How do you mean financial?  Like, payment to me, compensation or what -- can you be more specific on -- on --

Q.  Was the decision to retain Benesch as opposed to the other two firms based on Benesch offering lower

Page 125

rates?

A.  So I -- I don't remember what their rates are.  All rates are too high if you're asking the CEO of a public company.  But the decision was really driven more by legal technical due diligence, again, because it's a area of precision and expertise that the board and certainly I never -- I -- I just didn't -- didn't have.

Q.  Prior to consulting with the three law firms, had the decision to file a defamation action already been made?

A.  No, of course not.

Q.  Who made the ultimate decision to file the defamation action?

A.  The board, following thorough discussion and reasoning and debate.

Q.  Did you as the CEO recommend to the board that the company file the defamation action?

A.  It wasn't for me the recommend.  It was for the attorneys who specialize in this area of law to say thumbs up or thumbs down.

Q.  Is it your testimony that Benesch made the decision to file the defamation action?

MR. WU:  Wait a second -- wait a --

MR. CAMPBELL:  Object.

MR. KUMAGAI:  Yeah, it's --

32 (Pages 122 - 125)

Page 126

MR. WU: Okay. The question is just did Benesch make -- Benesch make the decision? If -- if you can answer that yes or -- you can answer that yes or no, if you can.

THE WITNESS: The company, the board made the decision, the corporate decision was made by the board of directors of Cassava Sciences based on -- I -- I can't use the word I'm -- I -- I want to use. But following due diligence conducted by Benesch and others.

Q. (BY MR. KUMAGAI) To be clear, I think -- and Scott will correct me if I'm wrong. But I think you can if that's what you wanted to say is the decision was made based on the advice of Benesch?

MR. CAMPBELL: Well, I think the -- the answer that was -- the question that was asked is just did Benesch make the decision. I think you've answered that question while we wait for another question before we --

THE WITNESS: I believe I have.

Q. (BY MR. KUMAGAI) Did the company make the decision to file the defamation action based on the advice of Benesch?

A. Based on legal advice -- ask again. I'm not --

Q. Did the company make the decision to file the defamation action based on the advice of Benesch?

Page 127

A. So it's -- your question to me is upside down. It's the -- the company -- the board of directors of the company made the decision to file taking in -- into consideration the -- the due diligence and advice of outside counsel of Benesch and others.

Q. And aside from the due diligence and advice of counsel, what else did the board of directors base the decision to file the defamation action on?

A. Again, it was a -- a very long process. I don't think it was quite a year. It may have been a year. I -- I don't quite remember. But certainly multiple board meetings and multiple litigation -- meetings of the litigation committee taking into consideration the legal advice they were receiving from experts in the field.

Q. What facts did the company base its decision on?

A. The fact that we got -- we felt we got very good legal advice from people with -- from legal experts in this specific, narrow field of the law.

Q. By that, you mean defamation law?

A. Correct.

Q. Aside from the fact of consulting counsel, what other facts did the board of directors base its decision to commence the defamation action on?

Page 128

A. So I'm going to take that as a general question, and I'm going to give you a general answer, because you're -- you're not being specific enough. So generally, a -- a board would, and -- and we did, would -- would -- would have a debate and discussion around resources and time and effort and staffing, and that type of thing. And take that into consideration.

For example, if a law firm says do it but the company has no resources, of course it's not going to happen. But if the company has resources to do what a -- a law firm is recommending, then it becomes a decision, do we or don't we.

Q. Aside from what you just described as resource considerations, what other facts, if any, did the board of directors base its decision to commence the defamation action on?

MR. WU: Objection.

THE WITNESS: So, you know, there are board minutes that spell these things out. I -- I just don't remember the -- all the discussions that went into it. But what I do remember is a series of discussions and a lot of telephone calls, probably some emails about the topic of a defamation lawsuit.

Q. (BY MR. KUMAGAI) Did anyone on the board express concerns or opposition to the filing of the

Page 129

defamation action?

A. As I recall, the final decision was made unanimously in favor -- in favor of filing. So I don't recall anyone -- I remember there being plenty of discussion, rational discussion. But I don't remember anyone voting negatively or against filing the defamation action.

Q. Do you recall any specific concern or objection during the course of the deliberations around proceeding with the defamation action?

A. Yes.

Q. And what do you recall?

A. What I recall specifically is we as a board, myself primarily and including as chairman of the board is since none of us know what defamation really means in the eyes of the law, do we have what it takes to file a defamation action and to win a defamation action. And to answer that question, we went out and talked to experts in the field.

Q. Legal experts?

A. Correct.

Q. Did anyone ever tell you -- strike that.

Did anyone ever express the view that the company did not have what it took to win a defamation action?

33 (Pages 126 - 129)

Page 130

MR. CAMPBELL: Objection.

And to the extent it would reflect any communications with counsel, that's to be excluded from your answer.

THE WITNESS: I -- I cannot answer that question thoroughly without stepping into legal advice. Clear -- you're asking me about legal advice, and I -- I -- I'm not going there. I can't go there.

Q. (BY MR. KUMAGAI) So setting aside legal advice, you can't answer -- strike that.

You can't answer that question without disclosing legal advice. Is that fair?

A. What I'm saying is the decision, the go/no-go decision was driven by legal advice that I can't -- I'm told I -- I can't talk about, I can't get into.

Q. To your knowledge, did Benesch or any of the other law firms conduct any fact finding as part of their due diligence process?

MR. CAMPBELL: Object to -- we're not getting into what Benesch did as part of its due diligence to evaluate the legal claims.

THE WITNESS: Yeah. Yeah. Other than to say they did -- the firms we went out to really scrubbed us really hard, in my opinion, and -- and charged us for it. That I'm allowed to say. And I think that's all I

Page 131

can say.

MR. KUMAGAI: So just to be clear, Scott, are you instructing him not to answer whether or not he knows whether any of the law firms conducted any sort of fact finding as part of their due diligence?

MR. CAMPBELL: He's already testified that they did diligence. If your -- if your question is a yes or no did that diligence include facts, I think you can ask that question. If you start to ask what factual due diligence did they do in giving their advice, then I think that's privileged.

Q. (BY MR. KUMAGAI) As far as you know, Mr. Barbier, did the so-called due diligence conducted by any of the law firms include factual investigations?

A. As far as I know, they did.

THE REPORTER: Did or didn't?

THE WITNESS: Did, yes.

Q. (BY MR. KUMAGAI) Can you describe what you know about those factual investigations?

A. I cannot.

MR. CAMPBELL: Objection.

You can't answer that question.

MR. KUMAGAI: Scott, so you're instructing him not to answer because of the company's privilege?

MR. CAMPBELL: I'm assuming you know what

Page 132

Benesch did because Benesch told you, correct?

THE WITNESS: They did not tell me any -- everything and --

MR. CAMPBELL: That -- that's not my question. I'm just saying your knowledge of what Benesch did would be based on communications with counsel.

THE WITNESS: With -- correct.

MR. CAMPBELL: Then you can't answer that question.

Q. (BY MR. KUMAGAI) To your knowledge, did Benesch or any of the other law firms conduct interviews with any members of Cassava Scientific team as part of their due diligence?

MR. CAMPBELL: Objection.

Same instruction. To the extent your knowledge of what investigation they did was based on communications with counsel, you can't answer that question.

THE WITNESS: Yeah. What I think I can answer is in my opinion, I think they did thorough due diligence.

Q. (BY MR. KUMAGAI) What is that opinion based on?

A. Thorough due diligence.

Page 133

Q. What makes you say that in your opinion Benesch did thorough due diligence?

A. They certainly charged us for it.

Q. And aside from Benesch charging you some amount of money, what basis for you -- do you have for saying you believe Benesch did thorough due diligence?

MR. WU: Again --

THE WITNESS: I'm not an attorney, okay.

MR. WU: So just -- just caution. Let -- let Scott say his part again.

MR. CAMPBELL: If you -- if you can't answer that question without divulging communications with counsel, then I instruct you not to answer.

Q. (BY MR. KUMAGAI) You can't answer?

A. I -- I cannot answer based on legal constraints.

Q. You can't answer based on the instruction from Mr. Campbell?

A. Correct.

Q. Okay. Aside from Mr. Robertson and the other members of the board of directors and the various lawyers at the three law firms, who else, if anyone, can you recall discussing whether or not to file a defamation action?

A. Well, we -- I -- I can't remember any specific

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 134

discussions. But Nadav and myself had a number of discussions. I believe the CFO and myself had discussions. There may have been others: I -- I don't know.

Q. What was Mr. Fried -- Dr. Friedmann's role at the time?

A. He was -- essentially, he was the second in command. He was -- I forget his title. I believe it was chief medical officer and chief operating officer or some such thing.

Q. Can you describe the substance of the discussions you had with Dr. Friedmann?

MR. CAMPBELL: And, again, this -- I don't know if this is going to be privileged information. But to the extent you're discussing legal advice received from counsel or request for legal advice from counsel with Dr. Friedmann within the scope of Cassava, that would also be privileged.

THE WITNESS: Yeah. So Dr. Friedmann was a member of the board of directors, so he had a voice in the matter. What I do remember, and I -- I can say this, is he was in favor of filing a defamation action. And I want to be clear. This was not about retribution or punishment. This was about winning. Do we have a case against a bunch of short sellers who essentially

Page 135

said everything's a -- everything we've ever touched scientifically is a fraud.

Q. (BY MR. KUMAGAI) My question is whether you can describe the substance of any conversations you had with Dr. Friedmann?

A. I cannot.

Q. And can you describe the substance of any conversations you had with the CFO, who I understand to be Mr. Schoen, about the defamation action?

A. I cannot.

Q. Is that because you cannot remember or because the substance is privileged?

A. I don't believe it's privileged. Eric Schoen is not -- he's certainly not an attorney, he's not on the board of directors. But he is the CFO. And he was a -- you know, he had a voice in the company. He was number three high, three or four depending on how you count, part of the management team. So my style, my management style would be to ask the officers their opinion on any big topic.

Q. So just to be clear, you can't recall any specific conversations with Dr. Friedmann or Mr. Schoen about the defamation action, but you expect that you would have talked to them about it?

A. That's fair.

Page 136

Q. And just to be clear, the decision to retain Benesch, was that also a decision made by a full vote of the board?

A. I believe it was. You'd have to check the records. What I don't know and I don't remember is if the board instructed the litigation committee to press the button or -- or vice versa. I -- I don't remember the specific mechanics. What I do remember, again, are -- are board discussions based on outside recommendations to move forward.

Q. So did the board of directors delegate authority to retain a law firm and potentially file the defamation action to the litigation committee?

A. Again, I don't remember the mechanics.

Q. It's possible but you can't recall?

A. What I remember is the decision-making more than the -- once the decision was made, I -- the mechanics, I -- I don't remember specifically.

Q. Well, was the decision to file a defamation action made before or after the decision to retain Benesch?

A. When you say "retain," you mean to -- for due diligence purposes or retained for the defamation action to be filed?

Q. Was the decision to file the defamation action

Page 137

made before Benesch was retained to file the defamation action?

A. It's -- I find it to be a confusing question. Like -- can I help out?

Q. Uh-huh.

A. The board made the decision to instruct Benesch to go ahead and do -- file or not because they -- they had done their due diligence, they hadn't done their -- you know, the -- what's it called, all the -- the preparation for the -- the action. Anyway, it -- it was the board who instructed Benesch to go ahead and with the -- with the action. I'm not sure I'm answering your question, because I -- I don't understand your question. It's -- it would be helpful if you were more specific in time.

Q. We -- we can come back to that.

Who did Benesch report to at the company after Benesch was retained?

A. I believe they reported to -- it would -- it would be the litigation committee.

Q. And you were a member of the litigation committee?

A. Again, I -- I don't remember the exact -- I -- I remember the decision-making process. But I -- I don't remember the exact mechanics. But I do believe

35 (Pages 134 - 137)

Page 138

that it was the litigation committee that Benesch was -- was instructed to report to the litigation committee. But then obviously, the litigation committee doesn't take care of things, like, you know, the documentation, the paperwork, the exchange of emails, that type of thing. That would flow through to the company.

Q. Who at the company?

A. The officers, Eric Schoen, Nadav, and myself.

Q. Did Chris Cook have any role in the decision to commence the defamation action?

MR. CAMPBELL: Objection. So you can answer that, I think, yes or no. But if we go any further than -- than that, don't include any communications with Chris Cook, who's also an attorney, that are substantive.

THE WITNESS: Repeat the question, please?

Q. (BY MR. KUMAGAI) So just yes or no. Did Chris Cook have any role in the decision to commence the defamation action?

A. At what point in time?

Q. I'm asking about the decision to file the defamation action. So prior to its filing, and it was filed around November of 2022. My question is, did Chris Cook have any role in the decision to file the defamation action?

Page 139

A. So Chris Cook, as I recall, came on board --

MR. CAMPBELL: Hold on, just a yes or no if you can.

MR. KUMAGAI: I think he's just going to describe --

MR. WU: I think he's going to set a timing that might obviate the back and forth on this. Let's just try --

THE WITNESS: He came as -- I -- as an employee, I believe, November, December.

Q. (BY MR. KUMAGAI) Okay.

A. That's public record. He went on the litigation committee. And I think that's about all I -- I want to say for that.

Q. So it seems clear that if he started at the company after the defamation action was filed, Mr. Cook was not involved in the decision to file the defamation action; is that right?

A. Well, Chris Cook was never on the board of directors during my tenure. So he would not have a vote as to do we or don't we file. Did he have input? Presumably so. He was on the litigation committee.

Q. But I'm asking --

A. I can't speak for him.

Q. It's a -- it's a timing confusion. I'm asking

Page 140

about before the -- the lawsuit was filed, which appears to be prior to Mr. Cook joining the company, was he in any way involved or consulted on the decision to commence the defamation action?

A. Can you refresh my memory, when was the defamation suit filed?

Q. I believe it was filed on November 2nd, 2022?

A. I -- I would have to go back. I -- I just don't remember if there was an overlap between his employment at Cassava Sciences and the filing. I -- I just don't.

Q. Can you describe how Chris Cook came to join the company?

MR. CAMPBELL: Yeah.

THE WITNESS: Sure. We -- I was spending more and more time on litigation matters, and I'm not an expert, I'm not trained as an attorney, I -- I don't think like an attorney. I'm a growth company CEO. And so it was a -- really just ended up being a, in my opinion, pretty -- pretty big misuse of my time and -- and the company's resources to have me doing a lot of sitting in on a lot of litigation-type meetings. So it just reached a point where I went to -- I forget if I went to the comp committee or -- or the board.

But I went to the board or some subset of

Page 141

the board and said, look, this is -- on legal matters, I'm in over my head. We need a full-time in-house general counsel. So we hired a -- an outside -- a -- a -- a head hunter firm, I forget which one, interviewed a few candidates and he appeared to be the best candidate at the time. We made him an offer, he accepted the offer, he came on board.

Q. (BY MR. KUMAGAI) And was his hiring in any way related to the commencement of the defamation action around the same time?

A. I don't remember the timing, so I don't know.

Q. When Mr. Cook joined the company, he reported to you; is that right?

A. Correct.

Q. And you mentioned after the litigation was filed, Mr. -- or strike that.

You mentioned after Mr. Cook joined the company he joined the litigation monitoring committee; is that right?

A. He joined the -- the what, the litigation committee, did you say? Yes, that is correct.

Q. Is there a distinction in your mind between the litigation committee and the litigation monitoring committee?

A. It -- it's one and the same.

36 (Pages 138 - 141)

Page 142

Q. Okay.

A. I think we're saying the same thing.

Q. Okay. And so after Mr. Cook was filed, was he the person primarily responsible at the company for interacting with Benesch about the defamation action?

A. There was a transition period. Obviously, you never want to flood -- especially an officer, you want -- you never want to flood them on day one. But he did get flooded in some sense. He hit the ground running. And I forget exactly what the transition was. But, yes, at some point, he took over and he was paid to take over for all litigation matters.

Q. Took over those responsibilities from you?

A. From -- yes. Any -- well, any litigation things, not just responsibilities, but meetings and so forth, he took over from me.

Q. To your knowledge, why did Cassava commence the defamation action?

A. To my actual knowledge, the defamation action was commenced by the board of directors of the company based on legal advice that we had a case and we could win the case.

Q. Can you describe the substance of that legal advice?

MR. CAMPBELL: Objection.

Page 143

THE WITNESS: Cannot.

MR. CAMPBELL: You can't describe the legal advice.

THE REPORTER: I can't hear you.

MR. KUMAGAI: So just to be clear, Mr. Campbell, you're instructing him not to answer; is that right?

MR. CAMPBELL: To the extent the question is asking for legal advice that you received from counsel, I'm instructing you not to disclose that.

Q. (BY MR. KUMAGAI) Aside from the legal advice, why did Cassava commence the defamation action?

A. Again, the -- the board of directors voted to vote in favor, unanimously voted in favor of having Benesch file the action based on technical due diligence, which I can't describe. And even if I wanted to, I wouldn't be able to. And on that basis, the company moved forward. Again, I want to emphasize that I -- I'm not -- I'm not an attorney, so I don't understand the legal definitions of defamation and so forth. And I can't speak for the attorneys, and I will not.

What I do understand is that at a high level, there were a lot of -- there were a lot of allegations made against the company and this was one

Page 144

way -- filing a lawsuit was one way to fight back. Again, not in the sense of punishment or retribution. We don't have time -- a CEO never has time for that. It was really in the spirit of letting some sunshine into the allegations, letting the truth out, even if that meant spending money, big money on attorneys.

Q. What truth was that?

A. That the allegations were false.

Q. And when you testified that the board voted in favor of having Benesch file the action based on technical due diligence which you can't describe, is your inability to describe that because you were never told about the specific due diligence?

A. It's twofold. Number one, even if I wanted to, I can't and will not for -- because of legal constraints. And No. 2, a lot of the stuff was over my head. Some very nuanced legal issues that I -- I just -- I had never run into.

Q. But just to be clear, did Benesch present to the board that so-called technical due diligence that you're describing? Yes or no?

A. Ask again, please.

Q. Did Benesch present its technical due diligence to the board?

A. Again, I -- I forget the -- the mechanics.

Page 145

I -- I don't know if Benesch presented to the litigation committee which then presented to the board or -- or the other way around.

Q. And sitting here today, do you recall the substance of any of the due diligence that Benesch presented? Just a yes or no.

A. Yes.

Q. And to be clear, you cannot describe the substance of what you recall because you cannot do so without revealing legal advice; is that right?

A. Again, for two reasons. Number one is there are legal constraints around what I can or should talk about. And number 2, there's some nuances that were very technical and legalistic that is not my area of expertise. But I -- what I can say and what I believe I've said is it was a very rational driven process. There was nothing, you know, fast-trigger about it. It was very methodical. It was -- let's bring in the experts. Let's see if we have a case. Let's see what the experts say. Let's check out our resources. Let's talk about, you know, is it the right thing to do for shareholders and for stakeholders as well. So it was a very rational driven process.

Q. And in a few of your answers, you've said you can't answer because of legal constraints. By that, you

37 (Pages 142 - 145)

Page 146

mean the instruction from Mr. Campbell not to answer questions that would reveal potentially privileged information; is that right?

A. That -- that's what I understand to be my constraint.

MR. WU: When -- when you get to a good point, can we take a break?

Q. (BY MR. KUMAGAI) What was Cassava's purpose for commencing the defamation action?

A. I would not phrase it that way. The way I would phrase it is what was the board's reason -- what -- what was your -- your word you said, purpose? What was the board's purpose for filing the defamation action? And I believe we just spent 40 minutes going over that, but if you'd like, I'll -- I'll repeat it once -- once again.

Q. Yes, please?

A. So the board made a very methodical, rational process that took quite a long time as to whether we file -- whether we had a legal basis for filing, number one; and whether -- number two, whether we had a legal basis or reasonable legal basis for winning a -- a filing.

Q. And that's how you would describe Cassava's purpose for commencing the defamation action?

Page 147

A. The -- the board made the decision to file.

Q. In your view, does the company and the board have a different purpose or rationale for the defamation action, or is it one and the same?

A. I don't understand the question.

Q. You keep clarifying that when I ask what the company's purpose was, you're saying it's the board's purpose. I'm just trying to understand what's the difference?

A. The difference is the board of directors makes the big decisions, the strategic decisions for the company. The company carries out the strategic decisions through the CEO, sometimes the board -- the chairman of the board. So you've got company here, operates. Board of director here, oversight. And then linking the two is the CEO and other managers, senior managers, officers of the company.

Q. And so as far as you're concerned, the company's purpose for the defamation action are the same as the board of directors' purpose for the defamation action?

MR. WU: Objection.

THE WITNESS: Yeah, your -- your question, sorry to say, is -- is pretty goofy. You need to separate -- or put it this way. As a manager, as

Page 148

someone who spent a lot of years in the trenches, you always separate operations from decision making, okay. So the board of directors, again, this is public company 101 -- actually, corporations 101. Board of directors is responsible for making the -- leading the company in essence, the strategic direction of the company, okay.

So they don't get involved in all the minutiae. But they do get involved in big issues. A defamation action, at that point in time for Cassava, would be considered and was considered a big issue, so resided within the board of directors. Once the board says go, then someone has to carry out the go.

So the execution is where the company comes in and then we have, you know, documentation and exchange of emails and -- and this and that.

Q. (BY MR. KUMAGAI) Did Benesch tell the board of directors that Cassava was likely to win the defamation action?

MR. CAMPBELL: Hold on. Objection, that's privileged what Benesch told the board of directors. Instruct you not to answer.

Q. (BY MR. KUMAGAI) Did Benesch tell the board of directors that Cassava had a good basis to file defamation claims?

MR. CAMPBELL: Same objection. Same

Page 149

instruction.

Q. (BY MR. KUMAGAI) Did Benesch tell the board of director that Cassava had a factual basis to file the defamation action?

MR. CAMPBELL: Same objection. Same instruction.

Q. (BY MR. KUMAGAI) Did Benesch tell the board of directors that Cassava had a legal basis to file the defamation action?

MR. CAMPBELL: Same objection. Same instruction.

MR. KUMAGAI: Okay. Let's take a break.

VIDEOGRAPHER: Going off the record. The time is 2:16.

(Brief recess.)

VIDEOGRAPHER: Back on the record. The time is 2:28.

Q. (BY MR. KUMAGAI) Mr. Barbier, to your knowledge, what was the board's goal in commencing the defamation action?

A. At -- at what point in time? Can you be a little more specific? Like before it was filed, at the time it was filed, after?

Q. So I'm talking about the decision to commence the defamation action. So at that time, when the

38 (Pages 146 - 149)

Page 150

decision was made to commence the defamation action, to your knowledge, what was the board's goal?

A. Okay. So can I -- when you say commence, can I take that to mean the actual filing in the court, the pressing the button, making it official action?

Q. Yes. So --

A. Not the preparation leading up to it?

Q. Yes. Let me just pause there and just ask the question cleanly so that it's cleanly on the record.

To your knowledge, what was the board's goal in filing the defamation action?

A. Okay. So to my knowledge, the board of Cassava Sciences filed the defamation action to let some sun into the process. The company had been hit by a series of allegations that were false and, again, based on legal diligence and expertise, we believe we had basis to -- the board believed it had a basis to both file and win a case.

Q. So aside from what you describe as letting some sun into the process, to your knowledge, did the board have any other goals in filing the defamation action?

A. It may have. But I would say those are the -- those were the primary goals.

Q. And so to your knowledge, what did the board hope to achieve by letting some sun into the process?

Page 151

A. So, again, I -- I can't speak for all the board members. But I believe that overall that at a high level the -- we hope the process would -- would really bring some truth to all the allegations that were being charged against the company and that we could win -- that the company could win its defamation case against the Plaintiffs -- against the Defendant, sorry.

Q. And so just to be clear, when you say those goals, you mean the goal of letting some sun into the process and the goal of winning the defamation case; is that right?

A. Those would be two, correct.

Q. As far as you know, did the board have any other goals in filing the defamation action?

A. So, again, you'd have to talk to individual board members. But I think at a high level, those are -- those were two achievable goals.

Q. Did you personally, as one of the board members, have any other goals in voting to file the defamation action?

A. No. You asked me why did the board file, and I said, you know, I can't speak for the board, but I can speak for myself as a -- the board -- as a board member. And as chairman of the board -- board, it was really twofold; let the sun in and -- and win the case.

Page 152

Q. What did winning the case look like to you?

A. Looked like not losing the case.

Q. When the decision was made to file the defamation action, did you have an idea as to what it would look like to win the case?

A. No. You're asking me -- I believe you're -- it's a -- you're asking me for some legal stuff they that I -- I just don't know what -- I'm not expert in -- in the law.

Q. Well, I think you're interpreting it as a legal question, but I'm really asking as -- as a -- from the business perspective, did you have an idea of what it would look like to win the case?

A. Well, let me respond by saying, again, going back to what did I think a win would look like. Is -- is that fair?

Q. Uh-huh.

A. So to me, a win would be letting the truth be told and regarding a -- truth regarding the allegations and our science and -- and winning the case. Winning in a court of law.

Q. Why was the filing of a defamation lawsuit a good way to let the sun in?

A. Again, based on legal advice, it was the right thing to do at the right time.

Page 153

Q. Did you consider alternative options to achieving the goal of letting the sun in?

A. I'm not sure what you mean, did we consider. Can you be a little more specific both as to what you have in mind -- what you might have in mind and also as to timing. Because remember, a lot of time went -- went by.

Q. During the process in which the board was deciding whether or not to file the defamation action, did you consider other ways of achieving the goal of letting the sun in?

A. Well, I think we implemented a -- a number of things to try to let the sun in. But it's really hard to fight against, you know, clicks on the internet. Telling the truth doesn't always win clicks. Stories of, you know, horrible scientific misconduct, that wins a lot of clicks. So in some regards, the -- you know, it was a -- a battle of truth versus non-truths.

Q. What do you mean when you say I think we implemented "a number of things to try the let the sun in"?

A. Well, I think we put out a number of press releases that attempt to correct the record. I think we reached out to some of our larger shareholders in an attempt to give them our side of the allegations. We

39 (Pages 150 - 153)

Page 154

probably did other measures that I can't remember right now. I think we -- we may have been invited to a conference or two at that time.

Q. And so is it fair to say the defamation action was part of these efforts to let the sun in, so to speak?

A. No, these are distinct efforts.

Q. I understand that. And the defamation action was another effort to let the sun in?

A. Was a legal effort to let the sun in.

Q. Aside from issuing press releases, reaching out to some of the larger shareholders, and attending conferences, what other steps, if any, did the company take to let the sun in?

A. The company may have reached out to some of our stakeholders, some of our vendors and such. I -- I don't remember specifically what -- what was done. But it was a concerted effort to try to be, you know, cool-headed and rational and say, look, here's their side, and it looks awful, and it's full of allegations. And here's our side.

Q. And the defamation action was part of that concerted effort?

A. The defamation action, again, was a legal -- a legal effort to let the sun in.

Page 155

Q. Did you view the filing of the defamation action as a way to attract attention to Cassava's side of the story?

A. I -- I mean, you're -- you're characterizing it in a funny way. The way I would -- I -- I do characterize it is to really let the sun in. There are just so many allegations that were just so obviously false that we needed to tell our side of the story. And we did as best we could. And part of that arsenal was engaging with attorneys to tell our side of the story.

Q. Why weren't press releases enough?

A. You can ask our stakeholders why they -- why they weren't enough. I -- I don't know.

Q. In your view, did the defamation action succeed in letting the sun in?

A. Well, the defamation action was dropped, as I understand it, after I left. So the ending was kind of a dead end. So I don't know that -- if we ever achieved the -- the full victories that we -- that the board, you know, hoped for.

Q. But you would describe the goal as being twofold; one, letting the sun in; two, winning the case, right?

A. Right.

Q. Right?

Page 156

A. Correct.

Q. So obviously, the second goal was not achieved. But is it your view that the first goal was achieved?

A. I think it was a step in the right direction. I -- I can't say -- I don't know. I can't say if it was fully achieved. Or rather, I can say that it was not fully achieved, but I think it was a -- a step in the right direction.

Q. And what makes you say it was a step in the right direction?

A. Because it gave -- it gave the company's side of the allegations to those who would take their time to actually read our materials.

Q. The defamation action generated attention for Cassava's side of the story. Is that fair?

A. I -- I did not say that.

Q. I guess I'm just trying to unpack what you meant by the prior answer. Can you explain?

A. Yeah, it's pretty plain English. It let some sun into our side -- into Cassava's side of the story.

Q. To be fair, "sun in" is not the most clear term, at least to me. So just -- can you unpack a little bit what you mean by that?

A. That's fair. But yet you've been using it continuously for the past five minutes, so I believe you

Page 157

know what letting the sunshine -- sun in means.

Q. What does it mean to you?

A. It means letting the truth be told, giving people a chance to decide for themselves.

Q. Anything else?

A. That's what comes to mind immediately.

Q. Okay. After the defamation action was filed, did Cassava's purpose for the lawsuit change or evolve?

A. When you say "purpose," how do you mean and when do you mean it?

Q. Okay. Let's use goal instead, because that's what we were talking about before.

Over the course of the litigation after it was filed, did Cassava's goals for the defamation action change?

A. And by goals, what are you referring to? That's a broad term.

Q. You had just testified earlier that you believe the goal in filing the defamation action was twofold, right?

A. Right.

Q. One, to let the sun in?

A. Yeah.

Q. Right?

A. Correct.

40 (Pages 154 - 157)

Page 158

Q. Two, to win the case?

A. Correct.

Q. After the defamation action was filed, did the goals of the lawsuit for Cassava change?

A. Well, Cassava did not win the case, so that changed. Did it let the sun in? I hope so. I think anyone who took time to read our side of the story hopefully came away feeling a little bit more enlightened.

Q. As far as you know, were those two goals always the company's goals for as long as it pursued the defamation action?

A. I believe they were. Those were two continuous goals.

Q. As far as you know, after the defamation action was filed, did Cassava have any other goals?

A. With regard to -- to what?

Q. To the action?

A. From my point of view as CEO, those remained the two goals. Now, whether they were, you know, other legal goals, I can't speak to those.

Q. To your knowledge, why did Cassava decide to sue the seven parties named in the defamation action as opposed to other critics of the company?

A. That was based strictly in my opinion, based on

Page 159

legal advice, which I can't get into.

MR. KUMAGAI: So just to be clear, Scott, are you instructing Mr. Barbier not to answer that question?

MR. CAMPBELL: If his knowledge of which Defendants were selected is based on communications from counsel, yes.

Q. (BY MR. KUMAGAI) Is that the case?

A. That is the case.

Q. Why didn't the board of directors decide to sue Dr. Elisabeth Bik?

MR. CAMPBELL: And to preempt, I'll give you the same instruction.

THE WITNESS: Same answer.

Q. (BY MR. KUMAGAI) When did you first become aware of our clients, Drs. Heilbut, Brodkin, and Milioris?

A. I don't specifically remember.

Q. Do you recall how you first became aware of any of our clients, Dr. Heilbut, Dr. Brodkin, or Dr. Milioris?

A. I don't think I've ever met them. I don't think I've ever talked to them. If I did, I can't remember.

Q. Do you recall anything about the circumstances

Page 160

in which you first became aware of our clients?

A. I -- I can't remember when I became aware.

Q. Not just the time, but do you recall anything at all about how you became aware of them?

A. I don't remember how I became aware of them.

Q. Are you aware of any statements that Drs. Heilbut, Brodkin or Milioris made about Cassava or simufilam?

A. I'm aware they made some very juicy statements, things like -- what comes to mind is it's all a fraud, quote, unquote. And I forget which one of the -- which one of them made that. But that was a -- that was a juicy statement to make.

Q. And why were you laughing in recalling their statements?

A. Because no scientist in their right mind would state that publicly and actually believe it.

Q. Aside from the statement you just described, do you recall any other statements by Drs. Heilbut, Brodkin or Milioris about Cassava or simufilam?

A. No.

Q. To your knowledge, did Dr. Heilbut, Dr. Brodkin or Dr. Milioris ever assert that simufilam was unsafe?

A. I -- I don't -- I don't remember what they said. If I ever knew it, I -- I don't know that I ever

Page 161

read all of their materials.

Q. What is your opinion, if any, of Dr. Heilbut?

A. I have not spent much time thinking about him.

Q. Do you have any opinion of him?

A. I -- I don't know him. I've never met him.

Q. What about Dr. Brodkin?

A. Same answer.

Q. What about Dr. Milioris?

A. Same answer.

Q. Okay.

MR. KUMAGAI: I'll show you a document previously marked as Exhibit 131.

(Exhibit No. 131 was previously marked.)

Q. (BY MR. KUMAGAI) And -- and Exhibit 131 is titled "Response of Cassava Sciences, Inc. to Public Allegations of Fraud and Research Misconduct".

Do you see that?

A. I do.

Q. And it says it was submitted to the U.S. Department of Justice on May 15th, 2023.

Do you see that?

A. I do.

Q. Have you ever seen this document before?

A. I don't know if I've seen this version of this document before.

41 (Pages 158 - 161)

Page 162

Q. Were you involved in the company's or Orrick's preparation of this response?

A. Depends on what you mean by "involved".

Q. Did you have any role in reviewing or contributing to this document before it was submitted to the DOJ?

A. I know that Orrick interviewed me. We went through a formal interview. That's all I can say about that.

Q. And what was the topic of that interview?

MR. WU: Hold on. Hold on.

MR. CAMPBELL: Hold on just a second. So that's a communication between you and counsel, so I just want to caution you that if -- if the topic related to you providing information for Orrick to provide legal advice to the company, that's a privileged communication and you can't testify to it.

THE WITNESS: Understood.

Repeat your question, please.

Q. (BY MR. KUMAGAI) What were the topics of Orrick's interview of you?

A. That would fall under the category of privileged communication, based on my understanding.

Q. Okay. Can you turn to page 4? It's the Bates ending in 951.

Page 163

A. Yeah.

Q. The fourth paragraph from the top begins "The short sellers".

Do you see that?

A. I do.

Q. Okay. And it states, (Reading:) The short sellers have made three broad categories of allegations: (1) that Western blot images contained in journal articles published by Dr. Wang have been improperly manipulated; (2) that the science underlying Cassava is "impossible", "improbably" and/or "scientifically undoable"; and (3) that Cassava and Dr. Wang manipulated certain biomarker test results in one of the Company's clinical trials.

Do you see that?

A. I do.

Q. In your opinion, is that a accurate summary of the broad categories of allegations made by our clients and other short sellers?

MR. CAMPBELL: Object to form.

Q. (BY MR. KUMAGAI) You can answer.

THE WITNESS: Sorry. With -- who said what?

MR. CAMPBELL: I was just objecting to the form of the question. I -- it's not a privilege

Page 164

instruction. You can answer.

THE WITNESS: Okay.

Go back to your question now.

MR. WU: Re-ask the question.

Q. (BY MR. KUMAGAI) These three categories?

A. Yes.

Q. In your view, does that capture the allegations that our clients and other short sellers made about the company?

MR. CAMPBELL: Object to form.

THE WITNESS: Yeah. I mean, look, at my level, CEO level, I -- I forgot who said what about whom, you know, except for a few juicy remarks such as it's all a fraud. I -- I -- I just don't remember who said what to whom. So it's possible that your people said this or maybe others said it. I -- I just don't -- I -- I can't associate who said what with whom and when.

Q. (BY MR. KUMAGAI) And what do you mean by "juicy remarks"?

A. Plain English, sensational comments.

Q. Have you, as CEO of the company, ever seen any evidence to refute the allegation that western blot images contained in journal articles published by Dr. Wang have been improperly manipulated?

A. I've never seen evidence of improper

Page 165

manipulation.

Q. What is your understanding of what evidence of improper manipulation looks like?

A. It would be an independent third party who provides full disclosure of all their conflict potential or actual conflicts of interest would actually look at the data, preferably the raw data, and render a -- an opinion, a professional opinion about whether or not something was -- what word did you use, manipulated, or...

Q. Manipulated?

A. Yeah. Basically having an outside, independent, you know, fully disclosed third party and -- come out and examine and investigate and provide an opinion.

Q. Did Cassava ever have an expert provide an opinion that satisfies the criteria you just described?

A. The board hired Orrick, and to be precise, I forget if -- if it's the board or the litigation committee. But there was a decision made at the highest level of Cassava Sciences to hire Orrick to investigate the allegations of scientific misconduct. And the reason for this is we, you know, we -- we took the allegations pretty seriously. We thought -- we thought they were full of beans. I certainly thought they --

42 (Pages 162 - 165)

Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

Page 166

they were full of beans. But having said that, they were pretty serious allegations. They gathered a lot of headlines and media attention, so we took it seriously.

Q. And the board had Orrick conduct the investigation?

A. Again, I forget the mechanics. I -- I forget if it's the -- if Orrick reported to the -- the full board or to the litigation committee.

Q. And approximately when did Orrick complete that investigation?

A. Well, the document you just handed me is dated...

Q. Says it was submitted on May 15th, 2023, right?

A. But I -- I don't know when it was completed. It doesn't quite say when it was completed. Or does it?

Q. I'm not aware. Do you know when Orrick completed its investigation?

A. I don't remember.

Q. Was it before or after the defamation action was filed?

MR. CAMPBELL: Object to form.

THE WITNESS: I don't remember. If I don't know when it was completed, I'm not going to know when -- before or after.

Q. (BY MR. KUMAGAI) Did the company wait to file

Page 167

the defamation action until Orrick had completed its investigation?

A. Again, if I don't know when the investigation was completed, I can't say if it was before or after.

Q. Were the results of -- strike that.

Were any results of any investigation by Orrick part of the board's bases for deciding to commence the defamation action?

A. Again, you -- you would have to give me a date on when this was completed and shared with the board. I just don't remember.

Q. So you don't remember whether or not any results of any investigation by Orrick were part of the board's bases for deciding to commence the defamation action?

A. What I don't remember is the date of -- of the completion of this document -- the investigation. Nor do I remember the specific dates around when Orrick hired outside attorney -- sorry, outside experts.

MR. CAMPBELL: Hold on. So when it comes to what Orrick actually did as part of the investigation, that's privileged.

THE WITNESS: That's -- got it.

MR. CAMPBELL: So please exclude that from your answer.

Page 168

Q. (BY MR. KUMAGAI) Have you seen any evidence to refute the second allegation -- strike that.

So back to page 4, the three categories of allegations, Mr. Barbier?

A. Yes.

Q. Have you seen any evidence that refutes the allegations that "the science underlying Cassava is 'impossible', 'improbable', and/or 'scientifically undoable'"?

A. I've never seen any evidence that the science underlying Cassava is impossible, improbable, or undoable, and I -- nor I do know what scientifically undoable really means. And improbable is a probabilistic concept, and impossible is so absolute as to be ridiculous. So that whole sentence strikes me as being ridiculous.

Q. Do you have any idea what it would look like to see evidence to refute that category?

A. I -- I don't know what scientifically undoable means. If you conduct the science and you get results, you do it. So strike that one off the list. Improbable, again, has a statistical meaning. And I don't know what they -- what statistics they're -- they mean when they say improbable. And impossible is such an absolute concept that you can strike that off the --

Page 169

out of the sentence as well. So all together, that sentence is maybe sensational, but it doesn't have any -- to me, it doesn't -- it's not grounded in novel drug development.

Q. Do you view that sentence as something that can be proved or disproved?

A. Again, it depends on -- on context. What do you mean by impossible? Impossible in 500 years from now, impossible today, impossible to do, impossible to get results. I don't know what that means. It's such an absolute concept.

Improbable, again, it invokes probability theory. What -- how do you mean? What -- what probabilities are we talking about here? What's the method of counting. And scientifically undoable is -- is a ridiculous statement. If you can do the science, it's doable. Doesn't mean you'll get good results or bad results. But to say that something is scientifically undoable, maybe that -- you can say that about exceeding the speed of light. But outside of certain physics parameter, I don't know what scientifically undoable means.

Q. Okay. Have you seen any evidence to suggest that Cassava and/or Dr. Wang manipulated certain biomarker test results in one of the company's clinical

43 (Pages 166 - 169)

Page 170

trials?

A. I have no evidence that he manipulated results or data.

Q. Have you seen any evidence proving that Dr. Wang did not manipulate any -- any data?

A. I have no evidence that he manipulated data. I can't prove a negative.

Q. Have you seen any evidence that anyone at Cassava manipulated any data?

A. During my entire tenure at Cassava, I've never seen any suggestion of manipulated data.

Q. What would a suggestion of manipulated data look like to you?

A. It's all a fraud, that would be highly suggestive of the whole thing is manipulated.

Q. But what facts would you consider to be indicative of potentially manipulated data?

A. Okay. So you just asked me about suggesting -- suggestions. Now you're asking me about facts. I don't have any facts to say that anything at Cassava has ever -- was ever manipulated.

Q. Have you ever considered what facts would demonstrate that data had been manipulated?

A. Yeah. Let the data speak for itself. If an independent investigation found evidence of

Page 171

manipulation, a credible independent source, then that would be a fact. I'm not against facts. I'm not against independent investigations. I'm all for them. I like them. I just haven't seen any evidence of manipulation.

Q. Have you ever reviewed any of the publications or slide decks that Drs. Brodkin, Heilbut or Milioris posted online about Cassava?

A. I may have seen one or two somewhere along the line. I -- I don't remember. But again, I just don't -- I've never spent a lot of time thinking about them or -- or their statements.

Q. Do you recall, sitting here today, any particular discussions about any of the publications by our clients about Cassava?

A. I -- I don't specifically recall any discussions.

Q. Okay.

MR. KUMAGAI: I'll show you a document previously marked as Exhibit 132. You can ignore the exhibit sticks on the cover page.

(Exhibit No. 132 was previously marked.)

Q. (BY MR. KUMAGAI) I'll also show you a document previously marked as Exhibit 133.

(Exhibit No. 133 was previously marked.)

Page 172

Q. (BY MR. KUMAGAI) I'll show you a document previously marked as Exhibit 134 and a document previously marked as Exhibit 135.

(Exhibit Nos. 134-135 were previously marked.)

MR. KUMAGAI: One of these has the cover page ripped off.

MR. WU: Oh, okay.

Q. (BY MR. KUMAGAI) Okay. Let's start with Exhibit 132. And I -- I don't want to have you sit here and read the whole thing on the record, Mr. Barbier. But I would just ask you to kind of flip through it and let me know if looking at this document now refreshes your recollection as to ever having seen it before or discussed it with anyone.

If you look at page 23, it's signed sincerely, Enea Milioris, Adrian Heilbut, Jesse Brodkin and Patrick Markey. So, Mr. Barbier, with the document Exhibit 132 in front of you, does this jog your memory as to ever having seen it before or discussed it with anyone?

A. If I read it, I just don't remember.

Q. And do you recall discussing it with anyone?

A. I -- I don't recall discussing this with anyone.

Page 173

Q. Okay, you can set --

A. I may have, I just don't recall.

Q. You can set it aside. And really, I have the same questions for the next few documents, so just take a moment to look at Exhibit 133. If you can --

MR. WU: Wait a second. Wait a second. 133, is that the blue one?

MR. KUMAGAI: Yeah.

MR. WU: Okay.

Q. (BY MR. KUMAGAI) This cover page says "Cassava Sciences: A Shambolic Charade" dated the 3rd of November 2021 and then it shows Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey on the first page.

Do you see that?

A. Yes. Wait. Sorry. Am I in the right place?

Q. This one, yeah.

A. Yes.

Q. Can you see on page 2, Mr. Barbier, the disclosure the authors of the presentation and the associated letter to FDA hold stock and options positions that may benefit from a decline in Cassava Sciences stock price.

Do you see that?

A. Yes.

44 (Pages 170 - 173)

Page 174

Q. And would you understand that to be a disclosure that they are short sellers?

A. I can't say short sellers, but I can say that they would -- that they -- they say they benefit from a decline in -- in the stock price. What form that takes is not specifically expressed here.

Q. And is that consistent with your understanding of short sellers, the fact that they would benefit from a decline in the stock price?

A. Correct.

Q. Looking at this document, Exhibit 133, does it refresh your recollection as to ever reviewing it previously or discussing it with anyone?

A. If I read it, I -- I don't remember it. I certainly don't remember discussing it with anyone.

Q. Okay. You can set that aside.

If you look at Exhibit 134, the cover page of the -- of the slide deck says "SavaDx Exposed"?

A. Got it.

Q. And the subtitle is "A revolutionary diagnostic for Alzheimer's Disease or a scam of scientifically illiterate investors?"

Do you see that?

A. I see.

Q. And just -- if you turn to the -- well, you

Page 175

can't really see it, but there's a page that says, (Reading:) Contributors: Jesse Brodkin, Enea Milioris, Adrian Heilbut, and Patrick Markey.

Do you see that?

A. I see this.

Q. Looking at Exhibit 134 does it refresh your recollection as to any time in which you previously reviewed this document or discussed it with anyone?

A. If I read it or discussed it with anyone, I don't remember.

Q. Okay. You can set that aside.

Exhibit 135, slide deck with the title "Cassava and the Wang Lab: Seeing Through the Blind". Yeah, this is the cover page. Yeah.

A. Yes.

Q. Okay. Just take a moment to flip through it. You'll see that the contributors are, again, Jesse Brodkin, Enea Milioris, Adrian Heilbut, and Patrick Markey?

A. Yes.

Q. Looking at Exhibit 135 today, does it refresh your recollection as to ever reviewing this document before or discussing it with anyone?

A. If I read it, I -- I just don't remember when or how or any discussions.

Page 176

Q. Okay. You can set that aside.

To the best of your recollection, have you ever reviewed any tweets or social media posts by any of our clients, Dr. Heilbut, Dr. Brodkin or Dr. Milioris?

A. I don't generally do social media. I don't have social media accounts. So with that said, people used to send me stuff all the time and I don't specifically remember who sent me what or -- or -- or how.

Q. Do you recall people sending you statements by apparent short sellers on Twitter?

A. I don't have a Twitter account. But I -- I -- I don't -- no, I don't specifically remember. But it may have happened. People sent me a lot of stuff.

Q. Okay.

MR. KUMAGAI: I'll show you a document previously marked as Exhibit 166.

(Exhibit No. 166 was previously marked.)

Q. (BY MR. KUMAGAI) Okay. I can represent to you that Exhibit 166 is an appendix that was filed on the docket in the defamation action on November 4th, 2022.

A. Yes.

Q. Have you ever seen this document before?

A. If I did, I don't -- I don't remember.

Q. Okay. Take a look at the second page, which is

Page 177

the first page with statements on it.

Do you see that?

MR. WU: He means -- he means this page?

MR. KUMAGAI: Yeah.

THE WITNESS: Yes.

Q. (BY MR. KUMAGAI) Just take a moment to look at those statements and --

A. Do you want me to read the whole thing?

Q. Do you recall ever seeing any tweets by someone with the Twitter handle Adrian_H?

A. No. I -- I may have. I just don't remember if I did.

Q. Do you recall ever seeing any tweets by an account with the handle DRnotaDR?

A. If I did, I -- see them, I -- I don't remember.

Q. Okay. And do you recall ever seeing any tweets by an account with the handle jesse_brodkin?

A. Same answer. If I did, I don't remember.

Q. Okay. Just glancing at some of these tweets in this document, does that refresh your recollection as to ever seeing any tweets or discussing any tweets by Adrian Heilbut, Jesse Brodkin or Enea Milioris?

A. Do you want me to read the whole thing? I'll --

Q. No. No. I'm just saying looking at --

45 (Pages 174 - 177)

Page 178

A. So my -- my general answer to your question of do -- do I remember seeing these statements. If I saw them, I -- I just don't remember.

Q. And same for any discussions?

A. Be more precise. Discuss --

Q. Fair. Do you have any recollection of discussing any tweets by Dr. Heilbut, Dr. Brodkin or Dr. Milioris?

A. If I did, I -- I just don't remember.

Q. Okay. You can set that aside.

I believe you testified earlier that you believed that the statements our clients made about the company that were challenged in the defamation action, you believe those to be false. Is that fair?

A. No, that's not fair.

Q. Okay.

A. What I believe is that the attorneys who filed the defamation action believed there was legal grounds for -- to claim defamation as defined in the law.

Q. Did you personally ever form a view as to whether our clients' statements were false?

A. Well, your clients made a hell of a lot of statements here. So unless you want to go through each one, the general answer is I -- this is why we hired expensive attorneys to figure it out. There was some

Page 179

statements that were laughable, such as it's all a fraud or I just read one something about Photoshopping all the data for 20 years. I mean, that -- that's just laughable.

Q. What do you mean by laughable?

A. You read it and you laugh. It's a joke.

Q. You testified a moment ago that what you believe is the attorneys who filed the defamation action believed there was legal grounds to claim defamation as defined in the law, right?

A. Correct.

Q. What was that belief based on?

MR. CAMPBELL: Objection.

And to the extent your understanding of what that belief would be is based on communications with counsel, I instruct you not to answer.

THE WITNESS: Can we --

MR. WU: Can we take a break?

MR. KUMAGAI: You want to take a break?

MR. WU: Yeah.

MR. KUMAGAI: Sure.

VIDEOGRAPHER: Going off the record. The time is 3:19.

(Brief recess.)

VIDEOGRAPHER: Back on the record. The

Page 180

time is 3:30.

Q. (BY MR. KUMAGAI) Mr. Barbier, have you ever reviewed any of the complaints that were filed in the defamation action?

A. I've read the defamation action at the time it came out. By complaints, you mean the substance of the defamation action or is there a -- a meaning -- specific meaning to it?

Q. By complaint, I'm referring to the legal document that contains the allegations of the company against the defendants in the defamation action?

A. So yes, after it came out and became public document, I -- I -- I can't say I read every single sentence. It was a long document. But I -- I -- I looked at it.

Q. Did you have any role in preparing the complaint?

MR. CAMPBELL: To the extent you can answer without revealing communications with counsel.

Q. (BY MR. KUMAGAI) Let's just start with a yes and no, and then I can see if I can --

A. Yes.

Q. Did you review a draft of the complaint before it was filed?

A. Yes.

Page 181

Q. Did you provide any comments or markup of the draft?

MR. CAMPBELL: Yes or no.

THE WITNESS: I can't remember.

Q. (BY MR. KUMAGAI) Just a yes or no. Can you recall any feedback that you provided to anyone in connection with your review of a draft of the complaint?

A. And by anyone, do you mean anyone at Benesch or the world in general?

Q. The world in general?

A. So this was a Benesch document. So, yes, I provided feedback to Benesch.

Q. And can you describe the substance of any feedback you provided to Benesch on the draft of the complaint?

MR. CAMPBELL: Objection. That's a communication with counsel. I would instruct you not to answer.

Q. (BY MR. KUMAGAI) Do you recall the substance of any feedback that you provided to Benesch on the draft complaint?

A. Not off the top of my head, no.

Q. Who else, to your knowledge, if anyone, reviewed a draft of the complaint aside from Benesch?

A. Anyone within what -- Cassava or the board

Page 182

members.

Q. Anyone that you're aware of having reviewed a draft of the complaint aside from Benesch?

A. I -- I don't remember.

Q. Do you recall whether Dr. Burns reviewed any draft of the complaint prior to filing the defamation action?

A. If she did -- if she did, I don't know about it.

Q. Did you have any discussions with Dr. Burns about whether or not to commence the defamation action?

A. To commence? So...

MR. WU: To file it.

THE WITNESS: The decision, the actual decision-making process, I did not.

Q. (BY MR. KUMAGAI) Did you have any discussions with Dr. Burns about any aspect of the defamation action?

A. At what point in time?

Q. Any point in time.

A. So after it was filed and made public, probably had a brief discussion about it, but not much time.

Q. And what makes you say that you didn't have any discussions with Dr. Burns prior to the filing of the defamation action about the defamation action?

Page 183

A. Well, she wasn't an -- an officer of the company and she wasn't a -- a director of the company. So she would have no input on -- on the whole decision-making on the go/no-go, decision-making path.

Q. Setting aside discussions about whether to go or no go, did you have any discussions at home, casually with Dr. Burns about possibly filing a defamation action?

A. Before it was made public, I don't remember having of the -- any such discussion.

Q. Is it possible that you did, you just don't remember?

A. It's not impossible. But it's not possible. I -- I just don't remember.

Q. Okay. That was a bit confusing. I think your testimony is that you simply do not remember whether or not you discussed the defamation action with Dr. Burns before it was filed?

A. Correct.

Q. Did you ever form a view as to whether our clients genuinely believed any of the statements they made about Cassava or simufilam?

A. Well, again, I did not go through, you know, all 1,000 or however many allegations there are. But the -- the highlights that I saw were -- were -- were

Page 184

just, you know, borderline amusing. Things like it's all a fraud or it's all Photoshopped. That's just not credible.

Q. And so did you form a view as to whether or not our clients believed those statements?

A. Do I believe that your -- your clients believe that they made the statements, is that the question?

Q. Did you ever form a view as to whether our clients believed what they were saying about Cassava was true or not?

A. Again, I didn't spend much time thinking about your clients. Not then, not now.

Q. So have you ever considered whether our clients were sincere in what they said about Cassava?

A. Again, when you read things like it's all a fraud, it's hard to, you know -- words like sincerity don't come to mind.

Q. Why not?

A. Because it's sensational, it's a sensational statement. It's not a scientific statement, it's not a business statement, it's not a financial -- it's not a statement that can be adequately or productively placed in the context of healthy criticism. Healthy criticism is very different than it's all a fraud. That -- that's just attention, headline stuff.

Page 185

Q. What did you understand that statement to mean?

A. I thought it was a joke.

Q. Did you ever form a view as to whether our clients had done due diligence on the company?

A. If they did, I'm not familiar with it.

Q. Did you ever form a view as to whether any statement by Dr. Heilbut, Dr. Brodkin, or Dr. Milioris had caused harm to Cassava?

A. So now you're getting into -- I would place that in a legal category. I don't know what harm really means in a legal context. This is why we hired outside experts who can look at these things with an independent rational, you know, third party -- from the perspective of a third party and say harm, no harm.

Q. Setting aside legal concepts of harm, because I'm not asking about that, did you have -- strike that.

Did you ever form a view as to whether any statements by our clients were harming or hurting the company?

A. I -- I never reached out to them and asked them are you trying to hurt the company. I -- I don't know what their intent was, other than clearly to make money by their own admission.

Q. Setting aside their intentions for a moment and any legal concepts of harm, did you ever form a view as

47 (Pages 182 - 185)

Page 186

to whether any statements by our company -- by our clients were hurting the company?

A. So, by hurting, I -- I don't quite -- if you don't mean a legal hurt or an operational hurt, what -- how -- how do you mean hurting? Like, emotionally, like, oh, you broke my heart or what -- how do you mean hurt.

Q. In any way?

A. It -- it's too broad. You -- you need to be a little more specific by...

Q. Can you, sitting here today, think of any way in which any statement by our clients hurt the company?

MR. CAMPBELL: Again, setting aside the legal definition of harm and any advice from counsel.

THE WITNESS: Yeah. I think for --

THE REPORTER: Please speak up.

MR. WU: Sorry.

THE WITNESS: I think from a clinical perspective, there were some individuals, some people calling our clinical sites and saying hurtful things, probably a lot, you know, some of which may be reflected in this -- this document. I would be curious to know if your clients engaged in any of those phone calls to clinical sites and badmouthed the company. If they did, I would say, yeah, that would be very harmful to the

Page 187

clinical program.

Q. (BY MR. KUMAGAI) Aside from that example, can you think of any way in which any statement by our clients hurt Cassava?

A. So if you ignore the financial, ignore the legal, ignore the operating, ignore the clinical, and ignore the emotional, you need to tell me what else you have in mind, because that's a lot of elimination.

Q. I only said ignore the legal. So I want to hear from you what your idea is on all those other categories. Okay. So let me just ask the question again. The only thing you should exclude is advice of counsel on any legal concept of harm. Okay. Do you understand?

A. I do.

Q. Can you describe any ways in which any statement by our clients caused harm to Cassava?

A. Again, there was some individuals who called some of our clinical sites. If they participated in those phone calls, shame on them, because that would hurt the clinical program.

Q. Aside from that example?

A. There may be others, but that's the one that comes to mind.

Q. In your view, did any statement by any of our

Page 188

clients cause financial harm to Cassava?

A. I can't answer that question. There were -- again, what, hundreds, thousands of statements. I'm not qualified to say what -- what caused harm and hurt the company.

Q. Sitting here today, you can't think of any financial harms to the company caused by any statement by our clients?

A. So I understand this case to be about the legal definition of harm. So, again, the harm concept I leave to the attorneys. I understand clinical hurt, calling our clinical sites and saying it's all a fraud, if that's what they said, yeah, that would constitute harm.

Q. Did anything our clients said about the company cause any financial or operational harm to Cassava?

A. If they were -- if they participated in phone calls, in making phone calls to clinical sites and spoke badly about the company, that would be a definite hurt.

Q. Aside from any participation in phone calls to clinical sites, did any of our clients' statements about the company cause any financial or operational harm to Cassava?

A. So if there were -- if your clients made any attempt to reach out to CUNY while CUNY was investigating Dr. Wang, that could reasonably be called

Page 189

interference and cause harm to Dr. Wang and subsequent -- subsequently to Cassava Sciences.

Q. Have you ever known whether Dr. Heilbut, Dr. Brodkin, or Dr. Milioris made any phone calls to clinical sites and spoke badly about the company?

A. You would have to answer that for me. I -- I don't know your clients. I have never talked to them.

Q. My question is whether you had ever become aware of any phone calls by Dr. Milioris, Dr. Brodkin, or Dr. Heilbut to clinical sites where they spoke badly about Cassava?

A. I'm aware that some people, some short sellers did call some of our clinical sites. I'm also aware that there was at least one -- one person who attempted to enroll in our clinical sites, which by the way, is -- it's not a good thing to do.

Q. Do you know whether Dr. Heilbut, Dr. Brodkin, or Dr. Milioris did any of that?

A. I've never talked to them. I don't know what they did or didn't do other than they clearly spent a lot of time on PowerPoint.

Q. Do you know whether or not Dr. Heilbut, Dr. Milioris, or Dr. Brodkin communicated with CUNY about any investigation related to Cassava?

A. I don't know specifically who did, but I

48 (Pages 186 - 189)

Page 190

believe there is evidence out there that somebody did.

Q. Have you ever known who did that?

A. I -- I can't remember. I can't remember. I know it happened. I -- I can't remember the circumstances.

Q. Have you ever read any of the decisions issued by any of the judges in the defamation action?

A. I believe I've skimmed -- I started to read some, and -- and frankly did not understand what it -- what it meant in plain English.

Q. So have you reviewed the opinion issued by magistrate Judge Ona Wang around January of 2024?

A. I may have. I don't remember. What I do remember is pretty much everything I was reading was -- I had to call Benesch for plain English translation to make sure I properly understood.

Q. And did you receive translation, so to speak from --

A. I received advice.

MR. CAMPBELL: Object -- hold on. Objection to the extent he's asking for legal advice you received from Benesch, including and interpreting court orders. That's privileged, and I could instruct you not to answer.

Q. (BY MR. KUMAGAI) Okay. Did you ever review

Page 191

any opinion issued by Judge Gregory Woods on or around March 2024?

A. Same answer.

Q. To your knowledge, did the company conduct any additional due diligence or fact finding related to the defamation action after any opinions were issued by Judge Wang or Judge Woods?

A. Did you say any diligence? So to -- to be clear, again, this is a very sophisticated legal matter and no one within the company had the legal sophistication to conduct the type of due diligence that I believe you're referring -- the legal due diligence you're referring to. Whether or not our counsel did, I can't speak for that.

Q. To your knowledge, did anyone at the company conduct any non-legal due diligence related to the defamation action after any opinions issued by the Court?

A. So I don't know what non-legal due diligence means in the context of a legal investigation. You -- you'd have to be more precise in the question.

Q. Did the company undertake any actions independent of Benesch after those decisions came out related to the defamation action?

A. I'm not quite understanding the question. This

Page 192

was a legal matter and any initiatives and certainly any legal due diligence would be spearheaded by people with the right knowledge and experience.

Q. Okay. Are you aware that the company filed another complaint around April of 2024 after the decisions came out from -- from Judge Wang and Judge Woods?

A. Again, at a high level, I'm aware that it continued after the initial judgment or whatever it's called. What and how and who, I -- I don't remember.

Q. Did you review any drafts of the Second Amended Complaint that was filed around April of 2024?

A. If I did, I don't remember.

Q. Okay. Did the board discuss whether or not to file the Second Amended Complaint in April of 2024?

MR. CAMPBELL: And you can answer that question unless it's a discussion with counsel.

THE WITNESS: It was -- at the board level, it was always a discussion with -- with counsel.

Q. (BY MR. KUMAGAI) Who made the decision to file the Second Amended Complaint?

A. I don't recall.

Q. Do you recall whether that was -- strike that.

And so are you aware that Cassava voluntarily dismissed the defamation action around

Page 193

August 2024 after you had left the company?

A. Yes, I learned that through -- I'm not sure how, press release probably.

Q. Did you have any involvement at all in that decision?

A. Zero.

Q. Do you think that was the right decision?

A. It's a hypothetical question. I don't have a hypothetical answer.

Q. I don't think it is a hypothetical question, but either way, can you try to answer whether or not you think it was a good decision to voluntarily dismiss the defamation action around August of 2024?

A. Again, at that point, I was out of the company. My opinion didn't -- didn't matter anymore. I was just one of thousands of investors in Cassava Sciences.

Q. Do you have an opinion?

A. Don't have an opinion one way or another.

Q. Did you ever try to communicate directly with Dr. Heilbut, Dr. Brodkin, or Dr. Milioris?

A. If I did, I don't remember.

Q. Did you ever form a view as to our client's motives?

A. Yes.

Q. And what was that view?

49 (Pages 190 - 193)

Page 194

A. One motive was clearly financial. If they had other motives, which is possible, I don't know what those were.

Q. And what was your basis for believing their motives were financial?

A. Well, partially their disclosures that they're short the -- you know, they're trying to make money from a -- a drop in the -- in the price of the -- of Cassava stock.

Q. And what, if anything, did their motives tell you about whether any statements they made about Cassava were true or false?

A. So you're trying to connect intent with motivation. That's -- I -- I don't know that I can do that. What I do know is, you know, look, having run a public company for many years, I know that investors -- some investors will do just about anything to make money on a stock price, especially a small company, small emerging company. And they did their best to drop the stock price.

Q. Did the fact that our clients had a financial motive say anything at all about whether their statements were true or false?

MR. WU: Objection.

THE WITNESS: Okay. When you say "their

Page 195

statements," again, we're talking about hundreds if not thousands, so I don't know. Again, to pick my favorite example, the whole thing is a fraud, okay. That -- it's hard to take that seriously.

Q. (BY MR. KUMAGAI) Okay. We've talked a bit about the litigation committee today. Can you tell me how and why the committee was formed?

A. So I believe the committee was formed sometime after the citizens' petition was made public. And I believe it was formed at the suggestion of -- of counsel. I forget the full name, but I think it's, like, ad hoc litigation monitoring committee or some such thing.

Q. Okay. I'll show you a document previously marked as Exhibit 77.

(Exhibit No. 77 was previously marked.)

Q. (BY MR. KUMAGAI) Okay. This is a document Bates stamped CASSAVA_00054144. The title is "Minutes of a Meeting of the ad hoc Litigation Monitoring Committee of the Board of Directors of Cassava Sciences, Inc." Dated September 1st, 2021.

Do you see that?

A. I do.

Q. Okay. It is mostly redacted. But looking at this copy of the minutes, does it refresh your

Page 196

recollection as to any discussions that occurred at this meeting?

A. You're asking for specific discussions?

Q. Yeah.

A. Yes, I believe I remember what this meeting is about.

Q. Did you -- did -- strike that.

Did the committee discuss potential defamation claims at this meeting?

A. I can't remember.

Q. Okay. You can set that aside.

MR. KUMAGAI: I'll mark -- I'll show you a document previously marked as Exhibit 78.

(Exhibit No. 78 was previously marked.)

Q. (BY MR. KUMAGAI) This appears to be a copy of the minutes from the ad hoc litigation monitoring committee from a meeting on November 16th, 2021.

Do you see that?

A. I do.

Q. Did you discuss potential defamation claims during this meeting?

A. I don't remember if we did or did not.

Q. Okay. You can set that aside.

MR. KUMAGAI: I'll show you a document previously marked as Exhibit 79.

Page 197

(Exhibit No. 79 was previously marked.)

Q. (BY MR. KUMAGAI) Exhibit 79 appears to be minutes from a meeting of the litigation monitoring committee from a meeting on December 23rd, 2021. Do you see that?

A. I do.

Q. Was there any discussion of potential defamation claims at this meeting?

A. I believe there were.

Q. What was the substance of those discussions?

MR. CAMPBELL: Objection. So to the extent that your answer would reflect communications with Jim Kramer, Claudia Frost or Guy Singer, or any other attorney regarding the substance of the actions, please omit that from your answer.

Q. (BY MR. KUMAGAI) In light of Mr. Campbell's instruction, can you describe the substance of those discussions?

A. I believe I was instructed not to.

Q. Okay. You can set that aside.

What makes you say that you believe the defamation action was discussed -- or potential defamation claims were discussed at the December 23rd, 2021 meeting?

A. It's based on the list of invitees, people that

50 (Pages 194 - 197)

Page 198

were invited to the -- to the committee.

Q. Who?

A. Says also invited -- also present by invitation of the committee were one, two, three -- three names of Orrick.

Q. And so is this around the time the board began considering filing a defamation action?

A. I don't believe that's accurate.

Q. The board began considering a defamation action before that meeting?

A. Depends on what you mean by the board. Do you mean formal board meeting or individual board members?

Q. When, to the best of your knowledge, did any individual board members begin considering a potential defamation action?

A. So, again, Sandy Robertson I'm pretty sure he -- my recollection is he seeded the idea. But I don't remember exactly when. It was after the citizens' petition, but clearly way before the -- the board made a decision to hire a -- a law firm.

Q. Okay.

MR. KUMAGAI: I'll mark or I'll show you a document previously marked as Exhibit 80.

(Exhibit No. 80 was previously marked.)

Q. (BY MR. KUMAGAI) Appears to be minutes from a

Page 199

meeting of the litigation monitoring committee from a meeting on January 21st, 2022.

Do you see that?

A. I do.

Q. Was there any discussion of a potential defamation action at this meeting?

A. I -- I don't remember.

Q. Okay. You can set that aside. I'll show you a document previously marked Exhibit 81.

(Exhibit No. 81 was previously marked.)

Q. (BY MR. KUMAGAI) Exhibit 81 appears to be the minutes of a meeting of the litigation monitoring committee that occurred on March 14th, 2024.

Do you see that?

A. I do.

Q. Was there any discussion at this meeting of potential defamation claims?

A. I don't specifically remember.

Q. Do you have a general recollection?

A. Again, at a high level, what I recall is it was a series of discussions, long discussions over many months, but I -- I don't remember exactly who said what and when and dates and meetings.

(Exhibit No. 82 was previously marked.)

Q. (BY MR. KUMAGAI) Okay. I'll show you a

Page 200

document previously marked Exhibit 82. And Exhibit 82 appears to be a copy of minutes from the litigation monitoring committee on October 29th, 2022.

Do you see that?

A. I do.

Q. Was there any discussion of potential defamation claims at this meeting?

A. I don't remember but based on the presence of Erik Connolly, there may have been.

Q. And looking at this document now, does it refresh your recollection as to any specific discussions that took place at this meeting?

A. The same answer.

MR. CAMPBELL: Just a yes or -- just a yes or no.

THE WITNESS: Okay. Can you repeat?

Q. (BY MR. KUMAGAI) Looking at this document, does it refresh your recollection as to any specific discussions that took place at this meeting?

A. No.

Q. Can you describe the substance of any discussions related to potential defamation claims that may have occurred at this meeting?

MR. CAMPBELL: Objection. I think the answer is no, since you don't recall. But if you have

Page 201

any, please exclude from your answer any communications with counsel, including Erik Connolly, at the meeting.

THE WITNESS: Okay. So what I can say is what I have been saying, which is it was a long methodical process with input from various legal counsel, experts in the field.

Q. (BY MR. KUMAGAI) Okay. If you look at Exhibit 82 and Exhibit 81, Exhibit 81 refers to a meeting on March 14th, 2022. Exhibit 82 is a meeting on October 29th, 2022.

Do you see that?

A. I do.

Q. Were there any meetings of the litigation monitoring committee between the March 14th meeting and the October 29th meeting?

A. You'd have to ask the company for its corporate records. I -- I don't keep -- I don't have copies of these records.

Q. How did the committee decide when to meet?

A. When to what? When to meet? Again, these are legal decisions driven by general counsel and outside -- by lawyers basically. And I believe the -- the standard may have been something like whenever there was a material update or a decision to make -- to be made, that was not made at the board. But I -- I don't

51 (Pages 198 - 201)

Page 202

remember specifically what the criteria was for holding a meeting. And keep in mind, these were not Remi meetings. These are legal meetings. So Mike O'Donnell would be able to provide a more accurate answer.

Q. You attended the meetings, though, right?

A. Some. Some. I'm not sure I attended all of them.

Q. According to the minutes, you attended the October 29th, 2022 meeting, right?

A. That's accurate.

Q. Okay.

MR. KUMAGAI: I'll show you a document previously marked as Exhibit 83.

(Exhibit No. 83 was previously marked.)

Q. (BY MR. KUMAGAI) Appears to be minutes of a meeting from the litigation committee on November 1st, 2022.

Do you see that?

A. Uh-huh.

Q. Was there any discussion during this meeting of potential defamation claims or the defamation action?

A. I don't specifically remember.

Q. Do you know why the litigation monitoring committee met on October 29th, 2022 and again three days later on November 1st, 2022?

Page 203

A. No, I do not.

Q. You see in the November 1st, 2022 meeting, there's a paragraph that says, (Reading:) Remi Barbier noted that Chris Cook had joined the Corporation as its new General Counsel and would be joining future Litigation Committee meetings.

Do you see that?

A. I do.

Q. Does this refresh your recollection as to when Mr. Cook joined the company and whether he had any role in the decision to file the defamation action?

A. Just reading the words, Chris Cook joined the company. Doesn't say exactly when. But it joined the company presumably recently.

Q. Okay. And then it says, (Reading:) Remi Barbier then left the meeting and the Committee met separately without management present.

Do you see that?

A. I do.

Q. Do you recall why you left that meeting?

A. I do not.

Q. Okay. Set that aside. Okay. I'll mark a document as Exhibit 183 the Bates stamp CASSAVA_00143035.

(Exhibit No. 183 was marked.)

Page 204

Q. (BY MR. KUMAGAI) Exhibit 183 appears to be copy of the minutes of the meeting of the board of directors of Cassava from March 4th, 2022.

Do you see that?

A. I do.

Q. Do you recall whether there was any discussion of potential defamation claims at this meeting on March 4th, 2022?

A. I don't remember.

Q. Okay. You can set that aside. I'll mark a document previous -- sorry. I'll introduce Exhibit 184 with the Bates stamp CASSAVA_000939067.

(Exhibit No. 184 was marked.)

Q. (BY MR. KUMAGAI) Exhibit 184 appears to be an agenda for a meeting of the board of directors on September 16th, 2022.

Do you see that?

A. I do.

Q. Okay. And on the third page, there appear to be a copy of minutes from the -- the board of directors meeting on June 10th, 2022.

Do you see that?

A. Yes.

Q. Was there any discussion about potential defamation claims during the June 10th, 2022 board

Page 205

meeting?

A. There may have been. I just don't remember.

Q. Okay. You can set that aside.

MR. KUMAGAI: And I'll mark as Exhibit 185 a document Bate stamped CASSAVA_001440911.

(Exhibit No. 185 was marked.)

Q. (BY MR. KUMAGAI) Exhibit 185 appears to be a copy of minutes from the board meeting that took place on September 16th, 2022.

Do you see that?

A. I do.

Q. Was there any discussion during this meeting about potential defamation claims or whether or not to file the defamation action?

A. There may have been. I don't remember. But give me a minute to read this. See if I remember anything. Is there a question?

Q. Yeah. One second. Reviewing Exhibit 185, does this refresh your recollection as to whether there were any discussions during this meeting about potential defamation claims?

A. There may have been. I don't remember.

Q. Was the defamation action discussed during this meeting?

A. It may have been. I don't remember.

52 (Pages 202 - 205)

Page 206

Q. All right. Is this the meeting of the board where the decision to file the defamation action was made?

A. Same answer. It may have been the case. I don't remember.

Q. Do you remember anything at all about this meeting in September of 2022?

A. Not specifically.

Q. Do you have any general recollection about this meeting in September of 2022?

A. No. I mean, look, over the years, I probably had 40 or 50 board meetings. I -- I can't keep them straight.

Q. Do you remember how long this meeting was?

A. No.

Q. Do you remember anything notable that occurred during this meeting?

A. Again, generally speaking, I don't remember. I know the meeting existed. I know we met as a board. There were a number of discussions according to the board minutes. But I don't specifically remember who said what to whom or any final resolutions.

Q. Okay. You can set that aside.

MR. KUMAGAI: I've lost track of how long we're going, but -- so if you guys want to take a break,

Page 207

let me know. But I'm about to change topics.

MR. WU: Do you want to take a break?

THE WITNESS: Just a short one, just a biology break.

MR. WU: Yeah. Okay. Good.

VIDEOGRAPHER: Going off the record. The time is 4:15.

(Brief recess.)

VIDEOGRAPHER: Back on the record. The time is 4:45.

Q. (BY MR. KUMAGAI) Mr. Barbier, are you familiar with the Phase IIB study of simufilam?

A. Yes, I am.

Q. What, if anything, did the Phase IIB study results tell you about whether simufilam had any effect on Alzheimer's disease?

A. Are you asking if -- if it was an efficacy study?

Q. I'm asking whether the results told you anything about whether simufilam had an effect on Alzheimer's disease?

A. So as I recall, the Phase IIB study was designed to study the safety of the drug in a certain number of patients, I forget how many, with using biomarkers, CSF and plasma biomarkers as an indication

Page 208

of biological activity.

Q. Okay. And the first round of biomarker analyses were done by Lund University, right?

A. To be more precise, the first round of CSF bioanalysis was done by Lund. With the exception, I believe there was an exception of one or two or possibly three, a small number of biomarkers that they were unable or unwilling to do.

Q. And Dr. Wang did the analysis for those biomarkers, is that right?

A. I -- I don't remember who did them.

Q. Who made the decision to have Dr. Wang measure a certain number of biomarkers during the first round of the CSF biomarker analysis?

A. So for these type of drug development decisions, this would be clearly Dr. Friedmann's decision.

Q. Do you recall the results of the biomarker analyses done by Lund University?

A. By Lund?

Q. Yeah.

A. There were a lot of results. So by your question, do you mean do I remember the -- kind of the headline which is really what I -- all I remember? Yes, I remember the --

Page 209

Q. And what was the headline?

A. The headlines is the data was untrustworthy. You couldn't make heads or tails of it, according to Dr. Friedmann. It wasn't good. It wasn't bad. It was indeterminate I think is the word he used.

Q. What was your reaction when you first learned about the results provided by Lund?

A. Well, when you get an indeterminate result, what -- obviously what you want to know first and foremost is why. How did it happen?

Q. And did you ever receive an answer to that question?

A. So I as CEO never got a great answer as to what Lund did or didn't do to cause the results to be indeterminate.

Q. To your knowledge, did Lund agree with the conclusion that the results were indeterminate?

A. I -- I can't speak for Lund.

Q. Did they ever convey to you agreement with Cassava's description of the Lund results as indeterminate or invalid?

A. Again, I cannot speak for Lund. I don't believe I had any communications with anyone at Lund. Other than perhaps for contracts and -- and such, house -- housekeeping items.

53 (Pages 206 - 209)

Page 210

Q. Were you involved in the decision to conduct a reanalysis or a redo analysis of the CSF biomarker analysis that Lund conducted?

A. So that decision, as I recall, was made at the board level led by a -- Dr. Friedmann led the discussion around do we or don't we.

Q. And who made the decision to have Dr. Wang and his lab at CUNY conduct the redo?

A. I believe it was the board. But I -- I -- I -- I can't remember exactly if the board said go ahead, redo and pick a lab or -- or if the board specified Dr. Wang.

Q. Do you recall any discussion about having a completely independent lab conduct the redo analysis?

A. Well, that was supposed to be Lund. They screwed it up.

Q. After that, was there any discussion about having an independent lab reanalyze the Lund data?

A. I believe that was part of the discussion that Dr. Friedmann brought to the board.

Q. And so why did the company ultimately have Dr. Wang perform the redo analysis?

A. Well, again, it was Dr. Friedmann's decision. This is clearly a -- a heavy-duty, you know, technical decision. What I can say, what I remember specifically

Page 211

is that there just are not many labs out there that can do the type of technical bioanalysis we were looking for. And of those that could do it, they probably would not be willing to do it fee for service. And of those that could do it for fee for service were probably not going to do it on a timely basis. So there were a lot of reasons to go with the tried and trued.

Q. Did you have any concerns about potential conflicts of interest or the appearance of a conflict of interest in having Dr. Wang conduct the redo considering his financial ties to the company?

A. By "financial ties," how do you mean?

Q. That he was a participant in the cash incentive bonus plan and a paid consultant for the company?

A. Yeah. So this is a curious point. I've been in the industry for decades, and I've yet to find an outside advisor who is willing to advise for free. Unfortunately, all the good advisors demand some form of payment. So yes, how Yan did get paid as an outside consultant -- it was a modest amount. I can't remember how much. But I've also known Hoau-Yan and certainly CUNY to be an ethical player, hard-working ethical scientists, so I never had concerns about potential financial conflicts of interest.

Q. All right. During your entire time at Cassava,

Page 212

you never had any concerns about potential financial conflicts of interest with respect to Dr. Wang?

A. Never.

Q. Once Dr. Wang began to conduct the redo analysis for the Phase IIIB data were you kept appraised of the results as they came in?

A. I don't remember how Dr. Friedmann shared the -- the results with me.

Q. Do you know why the biomarkers that Dr. Wang tested during the initial round of analyses was not included in the disclosure by the company with the final results for the Phase IIB study?

A. I believe you're confusing some topics with other topics, can you repeat, perhaps narrow the question down a little bit?

Q. Dr. Wang conducted the CSF biomarker analysis for a couple biomarkers that Lund either declined or was unable to analyze --

A. Correct.

Q. -- during the first round, right?

A. Correct.

Q. Why weren't the results of those biomarkers included in Cassava's disclosure around September of 2020 when it announced the rest of the round two results?

Page 213

A. So why weren't the results of the first bioanalysis announced in the second bioanalysis, is that the question?

Q. The ones that Dr. Wang had done initially?

A. Yeah, I -- I -- I don't -- again, at a high level, you know, as CEO I'm sitting here looking at the headlines, not the -- not the details. I don't remember which he did and which he didn't do. I do remember that he did a small number. I believe it was two or three. I don't remember which were disclosed as part of which package or which release.

Q. To your knowledge, was Dr. Wang blind when he conducted the redo analysis?

A. No, he was not blind.

Q. Blinded?

A. Oh, blinded.

THE WITNESS: Correct that, please.

To my knowledge, yes, the -- the study called -- the protocol, the study protocol called for a blinded bioanalysis of the -- the CSF samples.

Q. (BY MR. KUMAGAI) Do you have any reason to question whether Dr. Wang was, in fact, blinded as to all samples during his analysis of the Phase IIB data?

A. Yeah. During his analysis, I had no reason to -- to believe that he was not following the protocol.

54 (Pages 210 - 213)

Page 214

Q. Sitting here today, do you have any reason to question whether Dr. Wang was, in fact, blinded as to all samples during his analysis of the Phase IIB data?

A. Does Remi believe that he was blinded during the Phase IIB? Yes, I do believe he was blinded.

Q. Do you have any doubts about that?

A. I have no doubts about Dr. Wang's ethics.

Q. Have you ever even questioned Dr. Wang's ethics?

A. He's never given me or anyone else I know reason to question his ethics.

Q. And what is the basis for your belief that Dr. Wang was blinded during the Phase IIB study?

A. The study protocol called for a blinded bioanalysis. And one way that Dr. Hoau-Yan Wang was always characterized to me as being extremely detail-oriented.

Q. When Cassava announced the results of the Phase IIB redo analysis around September of 2020, the company did not identify Dr. Wang's lab as the lab that conducted the redo analysis, right?

A. I would want to check the press release, but I believe we said in an -- an academic lab.

Q. And why did the company describe Dr. Wang's lab as an academic lab without disclosing Dr. Wang?

Page 215

A. So there are two parts to your question, I think. Why did we call Dr. Wang's academic lab an academic lab, is that part of your question?

Q. Why didn't you disclose that it was Dr. Wang's lab at CUNY that conducted the analysis?

A. So in a press release, an initial press release, we never -- perhaps, I should say rarely, if ever, announce the -- the vendors' names. In a technical press release, absolutely we would always disclose the vendor's name.

Q. Did you have any discussions with anyone about whether or not to disclose Dr. Wang's name in that press release in September of 2020?

A. I don't believe we -- we have. We were following the norm for the industry and certainly the -- their record for Cassava Sciences.

Q. Are you aware that today, Cassava's position in its SEC filings is that, quote, (Reading:) You should not rely on the CUNY bioanalysis of CSF biomarkers reported by the company in connection with the Phase IIB study or the cognition disclosures from the Phase IIB study.

Are you aware of that disclosure?

A. As of when? I -- I don't know what that disclosure is.

Page 216

Q. That is a disclosure that's included in the March 3rd, 2025 Cassava 10K for the year ending 2024?

A. Wait, 2025. So that's outside --

Q. 2024. Yeah. Sorry, it's --

A. -- within my tenure?

Q. It's -- it was after your tenure?

A. Oh, so I -- I can't speak for anything that happened after my tenure.

Q. Do you agree with the position that, quote, (Reading:) You should not rely on the CUNY bioanalysis of CSF biomarkers reported by the company in connection with the Phase IIB study or the cognition disclosures from the Phase IIB study?

A. At the time I left, which was, when was it, July 2024, I had every reason to believe that Dr. Wang's acted ethically and there was no research misconduct.

Q. You testified to the SEC during one of your depositions that Cassava conducted a forensic analysis of Lund's Phase IIB data; is that right?

A. I -- I don't remember specifically, but I'll -- I'm willing to go with it for sake of discussion.

Q. Do you recall whether Cassava conducted a forensic analysis of the Lund data of the Phase IIB study?

A. I do recall that Dr. Friedmann and his team,

Page 217

and -- and I think maybe even some outsiders took a series of steps to check the -- on how the samples were shipped to Lund, what happened during Lund, what happened after Lund to make sure that nothing obvious had -- could account for the results.

Q. Do you recall whether Dr. Friedmann's son, I believe his name is Arnand, was involved in any analysis of the Lund data?

A. He may have been involved in -- informally and unpaid in -- he's a brilliant mathematician. He may have helped out with some of the statistics. But that was not -- that was between Dr. Friedmann and -- and his family.

Q. Do you know why he was involved?

A. Probably cheap labor, cheap, highly qualified, experienced labor.

Q. To your knowledge, has Cassava ever conducted a forensic analysis of any data from Dr. Wang?

A. Depends upon what you mean by "forensic analysis".

Q. What is your understanding of that term?

A. I -- I don't know. You used it.

Q. Do you have any understanding of what it means to conduct a forensic analysis?

A. In the context of Dr. Wang's lab, no.

55 (Pages 214 - 217)

Page 218

Q. You're familiar with a form of forensic analysis that was conducted of the Lund data from Phase IIB, right?

A. Correct.

Q. To your knowledge, did Cassava ever conduct a forensic analysis of the same or similar sort of Dr. Wang's data?

A. So the Lund data was indeterminate. So when data is indeterminate, you don't know what to make of it. Is it good, I don't know. Is it bad, nobody knows. That's when you do -- you go through a number of steps and investigations to -- to at least eliminate some possible, if not, probable causes for the indeterminate data. To the extent that Dr. Wang, to my knowledge, did not provide us, did not provide the company with indeterminate data, there was no need for -- for, quote, forensic investigation, unquote.

Q. And to the best of your knowledge, there was no forensic investigation of Dr. Wang's data, right?

A. For -- there was no indeterminate data. Data was either good or bad. But there was no indeterminate data from -- from Hoau-Yan at CUNY.

Q. Can you think of any instance in which Dr. Wang's lab at CUNY provided Cassava with bad data?

A. I'm not familiar with that. He may have. I --

Page 219

I just don't...

MR. KUMAGAI: Okay. I'll mark as Exhibit 186 a document Bates stamped CASSAVA_000005833.

(Exhibit No. 186 was marked.)

Q. (BY MR. KUMAGAI) Okay. This appears to be an email from Carl Kesten to you, Mr. Barbier, dated May 1st, 2021 with the subject "SAVA Questions?".

Do you see that?

A. Yes.

Q. Okay. And I just want to direct your attention to the email that you sent to Mr. Kestens on April 30th, 2021.

Do you see that?

A. I do.

Q. And you wrote, (Reading:) IMHO, if a drug candidate showed efficacy signals in a long-term, open-label safety study, then I believe you've won a box with a Schrödinger's cat in it. Only a RCT can then tell whether Schrödinger's cat in the box is alive or dead, with, strictly speaking, 50/50 odds.

Do you see that?

A. I do.

Q. What do you mean by that?

A. By what? You -- you just read a whole bunch of sentences.

Page 220

Q. What do you mean -- what did you mean by only an RCT can tell from Schrödinger's cat in the box is alive or dead?

A. RCT refers to a randomized clinical trial, also known as a Phase III trial.

Q. And so is it your view that only a Phase III trial can tell you whether or not a drug is effective?

A. It's a little more complicated than what you just said. Only the FDA can -- can pronounce a drug safe and effective. All the company -- all a company can do is show data that suggests safety or efficacy. But ultimately, the FDA is the sole arbiter of safety and efficacy.

Q. In your view, can -- strike that.

In your view, did any of the Phase II studies of simufilam demonstrate that simufilam had an effect on Alzheimer's disease?

A. You need to define the terms. Effects on Alzheimer's disease is -- is very, very broad, especially in the context of a -- a novel drug development program.

Q. So in your view, did any of the Phase II studies of simufilam demonstrate that simufilam had any positive effect on any biomarker of Alzheimer's disease?

A. In my view, again, at a high level, and I'm not

Page 221

a scientist, I'm not going to pretend to be a scientist. But in my view, the data that I saw was certainly suggestive of a promising future and certainly gave us the basis, the rational basis to move forward into the next step of drug development.

Q. What was the purpose of Cassava's scientific advisory board?

A. It's a very broad question, so I'll answer broadly. So the -- the role of an SAB is to provide outside advice and counsel from time to time regarding any specific scientific or technical issues that may come up. Or sometimes if data is difficult to interpret or -- or has different meanings, it can be helpful to go outside the four walls of the company and get an outsider's opinion.

Q. When you voted in favor of filing the defamation action, did you consider any advice or feedback that you had received from members of the scientific advisory board?

A. Regarding what?

Q. Any topic?

A. Regarding the defamation action?

Q. Regarding any of the claims in the defamation action, yes?

A. To my knowledge, the SAB had no role in the --

56 (Pages 218 - 221)

Page 222

or they may have had a role in them. If they did, I'm not familiar, in the -- any role that -- that the SAB had in the defamation action, I'm not familiar with that.

Q. Okay.

MR. KUMAGAI: I'll show you a document previously marked Exhibit 138.

(Exhibit No. 138 was previously marked.)

Q. (BY MR. KUMAGAI) This appears to be an email from you, Mr. Barbier, on May 24th, 2019 to Dr. Gussin and a number of other people who appear to be the members of Cassava's board.

Do you see that?

A. I do.

Q. First question there, Sara Ramastrami listed there.

Do you see that?

A. I do.

Q. Why did Ms. Ramastrami resign from the board in 2020?

A. So her name is Saira Ramasastry.

Q. Okay.

A. I'll spell that later.

I don't exactly recall the reasons why, but basically she said she was busy and that type of thing.

Page 223

And she was on the west coast. We were no longer on the west coast, and I think she didn't -- maybe she didn't want to fly to Austin. I -- I don't know.

Q. Okay. In the paragraph in this email saying "Without getting ahead of ourselves", do you see that?

A. Yes.

Q. You write, (Reading:) One of the key themes we're hearing is that 'no one will believe us'.

Do you see that?

A. Yes.

Q. What did you mean by that?

A. Well, any time you're an innovator, you always have a camp of nonbelievers.

Q. Okay. When you voted to commence the defamation action, did you consider the fact that a key theme you had been hearing from people outside the company was that no one will believe us?

A. I don't recall that that theme or that discussion, that line of discussion came up. The line of discussion that came up was more around damage to the company, reputational damage, that type of thing, stock price damage.

Q. When you decided to commence or when you -- strike that.

When you voted to commence the defamation

Page 224

action, did you consider any feedback from Dr. Paul Asin, Dr. Barbara Sahakian, or Dr. Stephen Arnold?

A. To my knowledge, none of the people you just named have any expertise or would claim to have any expertise in defamation action. So I don't know why we would have.

Q. Do you recall ever hearing any feedback from anyone on the scientific advisory board concerning the length of the Phase IIA or B studies?

A. No. I -- I was not on the SAB. I may have popped my head in once or twice during an SAB meeting or said hello to SAB members. But typically, I did not attend full meetings of the -- the scientific advisory board.

Q. Do you recall ever hearing feedback from anyone that 28 days was too short of a time period for the Phase II studies?

A. What I remember is Dr. Friedmann saying, you know, look we can make it 15 days, we can make it 20, we can make it anything we want to, but it's a balance. It's a balance between losing patients and getting data. And also safety. Remember, this is an early stage drug, so you don't want to expose patients to a drug too soon in the absence of a safety data.

Q. And as far as you know, did the SAB ever

Page 225

actually meet together?

A. Over the course of the Pain Therapeutics and/Cassava Sciences, yes, there -- there were meetings. I -- I don't remember when or who was there.

Q. Okay.

MR. KUMAGAI: I'll show you a document previously marked as Exhibit 143.

(Exhibit No. 143 was previously marked.)

Q. (BY MR. KUMAGAI) Exhibit 143 appears to be an email from you dated August 24th, 2021 to employes of the company.

Do you see that?

A. I do.

Q. And the subject is "Allegations".

Do you see that?

A. Yes.

Q. Okay. And you write, (Reading:) Dear All, A few minutes ago I was alerted to an alarming document that has just been made public. This document, released by a New York law firm, alleges scientific conduct by our scientist and our scientific advisors.

(Reading:) Needless to say, these allegations are complete non-sense. The "evidence" cited in their document is laughable. However, it appears investors are selling first, asking questions

57 (Pages 222 - 225)

Page 226

later.
Do you see that?
A. I do.
Q. And so within a few minutes of being made aware of the citizens' petition, you wrote an email to the company's employees saying "Needless to say, these allegations are complete non-sense".
Do you see that?
A. I do.
Q. And so is that what you would consider keeping an open mind to claims about the company?
MR. CAMPBELL: Object to form.
THE WITNESS: What?
MR. WU: You -- you -- you can answer. It's just an objection to form.
THE WITNESS: Oh. Sorry, can you repeat?
Q. (BY MR. KUMAGAI) Earlier today, you testified about your general process of keeping an open mind, right. And in this email, within a few minutes of being alerted to the citizens' petition you tell the company these allegations are complete nonsense?
A. Correct.
Q. So how is that consistent with what you said about keeping an open mind?
A. So between the time I read -- I saw the

Page 227

allegation, this CP, and I guess the time I wrote this, I'm not sure how much time went by, Nadav Friedmann and I had some -- some discussions and he read it. I believe I may have had a discussion with Ben Thornton as well. Anyway, we -- we had a series of internal discussions. And people who are in the position to know with, you know, real deep science experience and expertise said this is -- this is bull crap. This is not believable.
Q. And you -- had you read the citizens' petition before sending this email?
A. I did.
Q. So within a few minutes of being alerted to the citizens' petition, you read it, had discussions with Dr. Friedmann, and concluded that the allegations are complete nonsense; is that right?
MR. WU: Objection -- objection. You can answer.
Q. (BY MR. KUMAGAI) You can answer.
A. That's what the -- this is an internal document. And that's the -- the impression I conveyed. Basically, I was conveying Nadav Friedmann's initial impressions of the document to the entire company or who -- whoever was on this mailing list. I think it was the entire company.

Page 228

Q. And so within a few minutes of becoming aware of the citizens' petition, you had concluded that the allegations were complete nonsense; is that right?
A. Dr. Friedmann concluded that the allegations, that the document, the citizens' petition was nonsense.
Q. And you agreed with that conclusion?
A. Yes, I did.
Q. In this email, you write in the last paragraph, the second sentence, (Reading:) Due to the legal aspects of this event, please do not communicate your thoughts on this matter to anyone inside or outside the Company.
Do you see that?
A. I do.
Q. Why did you instruct employees not to communicate thoughts on the citizens' petition within the company?
MR. CAMPBELL: You can answer that question but given the preamble, please exclude any legal advice you received from your answer.
THE WITNESS: Yeah, that was based on legal advice.
Q. (BY MR. KUMAGAI) So it's your testimony that lawyers told you to tell the company not to communicate internally about the citizens' petition?

Page 229

MR. CAMPBELL: Objection. Don't testify to anything lawyers told you.
Q. (BY MR. KUMAGAI) Okay. Did you also ask Dr. Burns to tell Dr. Wang not to send emails about the citizens' petition?
A. If I did, I don't remember.
Q. At what point did you involve Mike Sitrick and his firm in connection with the company's efforts to respond to the citizens' petition and other allegations by short sellers?
A. I believe he was involved in our first press release regarding the citizens' petition.
MR. KUMAGAI: Okay. I'm going to mark a document as Exhibit 187 document Bates stamped CASSAVA_000704285.
(Exhibit No. 187 was marked.)
Q. (BY MR. KUMAGAI) Okay. This appears to be an email from Mr. Robertson to you, dated August 24th, 2021.
Do you see that?
A. I do.
Q. And he writes, (Reading:) We should get Mike Sitrick involved.
Do you see that?
A. I do.

58 (Pages 226 - 229)

Page 230

Q. And so did you proceed to get Mr. Sitrick involved?

A. Again, I remember him being involved in our first press release after the CP came out.

Q. And why did you get Mr. Sitrick involved?

A. His profession is to handle these types of kind of corporate urgencies. So in my job as CEO, again, let's take a step back. My job as CEO is to get the best people involved in every decision, every area of operations whether it's finance, PR, IR, legal. And Mike Sitrick is -- he knows -- he knows what he's doing.

Q. And what was your goal in having Mr. Sitrick involved in the company's efforts to respond to allegations by short sellers?

A. Again, this was a -- kind of a corporate emergency in the sense that there was a -- a very sensational citizens' petition that came out after the market closed, stock price was dropping. I needed advice on how to handle it. That is part of the spirit of keeping an open mind is getting the best people with the best minds involved.

Q. Okay. Do you recall giving a presentation or -- or speaking during a call around September 2021 to provide the company's response to the allegations in the citizens' petition and other short sellers?

Page 231

A. That's a very vague question. What -- what phone call are you referring to?

Q. Okay.

MR. KUMAGAI: Let's take a break.

VIDEOGRAPHER: Going off the record. The time is 5:02.

(Brief recess.)

VIDEOGRAPHER: Back on the record. The time is 5:12.

Q. (BY MR. KUMAGAI) Mr. Barbier, when you voted to file the defamation action, did you consider any corrections, retractions, or expressions of concern issued by any scientific journals related to simufilam?

A. The defamation action, as I said earlier, was really based on some heavy duty legal analysis done by people who know what they're doing in that area of law. And I can't -- I can't say. And I probably don't know what went into their diligence.

Q. You're aware that the scientific journal PLOS ONE issued retractions for five research papers authored by Dr. Wang?

A. I am aware.

Q. When you voted to file the defamation action, did you consider those retractions in any way?

A. Same answer. The -- the consideration to file

Page 232

or not a defamation action was based on legal advice and legal due diligence. It was very comprehensive diligence period.

Q. Do you recall any discussions with any clinical sites about any of the retractions issued by PLOS ONE?

A. I remember having discussions and hearing about discussions from clinical sites about the harm that the short sell -- certain short sellers were doing to the company by calling them, persistently pestering them and -- and even calling them at home on some -- some -- on some occasions. That was pretty harmful behavior.

Q. Which clinical sites do you recall having any of those sorts of discussions?

A. We had many clinical sites. I want to say over a hundred. I can't remember. I can't keep them all straight.

Q. Sitting here today, can you name any of the clinical sites that you recall having any discussion like the ones you just described with?

A. I remember some clinical sites just automatically dropped out after the citizens' petition came out. So.

Q. Can you recall any discussion with any clinical site where they mentioned Dr. Heilbut, Dr. Brodkin, or Dr. Milioris?

Page 233

A. Again, we had many, many clinical sites, I want to say over a hundred, possibly more. I was not the primary talk. I was not the primary avenue into the clinical sites. We hired a CRO to do that and some of our technical people were talking to clinical sites. But I know for a fact that some of our people were very upset that the short sellers were reaching out to our clinical sites and trying to persuade them to drop from the program or to drop patients from the -- the trial.

Q. And in hearing or communicating with people like Cassava about communications with clinical sites, did anyone ever mention that a clinical site had referred to Dr. Heilbut, Dr. Brodkin, or Dr. Milioris?

A. They may have. I was not part of those discussions.

MR. KUMAGAI: Okay. I'll show you a document previously marked as Exhibit 86.

(Exhibit No. 86 was previously marked.)

Q. (BY MR. KUMAGAI) And this is an article published by the New York Times with the headline "Scientists Question Data Behind an Experimental Alzheimer's Drug" dated April 18th, 2022.

Do you see that?

A. I do.

Q. And you've seen this before?

59 (Pages 230 - 233)

Page 234

A. I remember seeing it. I don't specifically remember reading it.

Q. When you voted to file the defamation action, did you consider anything that was reported in this New York Times article?

A. In this article specifically?

Q. Yes.

A. I don't remember whether or not it was part of the legal diligence to -- to move forward or not.

Q. Okay. On page 2, do you see the paragraph referring to "The New York Times contacted nine prominent experts", it's -- one, two, three, four, five paragraphs down?

A. What page?

Q. Page 2?

A. Yes.

Q. When you -- strike that.

When you voted to commence the defamation action, did you consider the fact that the New York Times reportedly, (Reading:) Contacted nine prominent experts for comment about the scientific underpinnings of Cassava's trials. All said they did not trust the company's methods, results or even the premise underlying the drug's supposed effectiveness.

A. Again, I can't speak for the -- what this

Page 235

reporter wrote. You -- you would have to consult her. But those are pretty broad statements.

Q. Did it concern you at the time to see that the New York Times reportedly contacted nine experts, all of whom said, (Reading:) They did not trust the company's methods, results or even the premise concerning the drug's supposed effectiveness?

A. What concerned me was whether or not the so-called nine prominent experts had, in fact, read any of our work or looked at our results or the premise. Because to do so would have taken many, many hours.

Q. And so this report didn't cause you any concern at all?

A. Of course it did. It caused a lot of reputational damage.

Q. And what do you -- what, if anything, do you recall about how you reacted to this article?

A. I don't recall specifically.

Q. And the next paragraph refers to Dr. Roger Nicoll.

Do you see that?

A. I do.

Q. And he's quoted as saying, (Reading:) "This drug should not be put into patients. It never -- it should never have been. Never. The longer this goes

Page 236

on, the more outraged I am."

Do you see that?

A. I do.

Q. And do you recall that in your response to this New York Times article, you describe Dr. Nicoll as brilliant?

A. He's a well-known neuroscientist. I -- I don't know what -- what words I -- I used or didn't use.

Q. And do you recall uncovering through FOIA requests emails where Dr. Nicoll told this New York Times reporter that Cassava was more egregious than Theranos?

A. I remember someone saying that. I -- I don't know if it was him or someone else.

Q. To our clients, we're not the only people who compared the company to Theranos, right?

MR. CAMPBELL: Object to form.

MR. WU: You can answer. Yeah.

THE WITNESS: I can answer?

Yeah, again, I remember someone saying we're -- we are worse -- Cassava Sciences is worse than Theranos. But I don't remember who said that. But that's the type of reputational harm that the short sellers did towards the -- the company.

Q. (BY MR. KUMAGAI) Was Dr. Roger Nicolls a short

Page 237

seller, as far as you know?

A. I -- I don't know what his conflicts may have been.

Q. Do you recall any discussions about suing Dr. Nicolls?

A. Any discussions would have been initiate -- of that sort would have been initiated and conducted by attorneys.

(Exhibit No. 188 was marked.)

Q. (BY MR. KUMAGAI) Okay. I'm going to show you a document marked Exhibit 188, Bates stamped Francisco_0000322. Okay. The second email in this is from you dated April 18th, 2022.

Do you see that?

A. I do.

Q. And the subject is "New York Times Hit Piece".

Do you see that?

A. I do.

Q. And was this in reference to the New York Times article we just looked at a moment ago?

A. Let me connect the dates. It appears, yes. Yes, the subject is "New York Times Hit Piece".

Q. And so is it your view that the New York Times was unfair to Cassava?

A. Yes.

60 (Pages 234 - 237)

Page 238

Q. And why do you think the New York Times was unfair?

A. They caused a lot of reputational harm by repeating many of the same allegations that the short sellers were spreading.

Q. And did you consider suing the New York Times?

A. If that was a consideration, it would have been at the initiation of -- and the recommendation of attorneys.

Q. Okay. You write, (Reading:) The reporter consulted the exact same naysayers who dissed us some time ago in the Wall Street Journal, while down-playing Charles Spruck and others who have come to our defense.

Do you see that?

A. I do.

Q. And so do you also think the Wall Street Journal was unfair to Cassava?

A. I thought the Wall Street Journal article was very one-sided against Cassava Sciences.

Q. And what did you mean by "while down-playing Charles Spruck"?

A. Oh. There are -- there are some people out there in the field with real expertise in -- in western blot and some of the other areas of science where the -- the short sellers claim fraud. And they had an opinion

Page 239

that there was no fraud and there was no basis for misconduct, research misconduct.

Q. And is it your view that Dr. Charles Spruck was an independent expert?

A. I never asked him. You would have to ask him. But we -- the -- Cassava Sciences certainly never paid him, to my knowledge. He was never on our payroll. He was never -- never received any type of compensation, nor did he ever ask us for compensation to my knowledge.

Q. Did you ever become aware that Charles Spruck was an investor in Cassava?

A. He may have been. I -- I just don't know.

Q. And do you think that is something that should have been disclosed by either Dr. Spruck or anyone at the company relying on Dr. Spruck to defend the company against allegations of research misconduct?

MR. CAMPBELL: Object to form.

THE WITNESS: Maybe he disclosed, maybe he didn't. I -- I -- I never talk -- I don't think I ever talked to him. I may have emailed him once or twice.

Q. (BY MR. KUMAGAI) Do you think the fact that Dr. Spruck was an investor in Cassava is something that should have been disclosed to anyone who Dr. Spruck provided opinions about the allegations of research misconduct?

Page 240

MR. CAMPBELL: Object to form.

THE WITNESS: Again, I can't speak for Dr. Spruck's investments. He may have been an investor. He -- he may not have been. Do you know?

Q. (BY MR. KUMAGAI) I believe he was an investor, yes.

A. Was --

Q. Anyway. Let's -- let's go to the next paragraph where it says "This is maddening".

Do you see that?

A. I do.

Q. What about this was maddening?

A. Well, we're just doing our thing, trying to run an experimental Phase III program, and we just keep taking hit -- hits by -- you know, by pretty influential media, Wall Street Journal, New York Times.

Q. And did the allegations by short sellers like our clients also make you mad?

A. Did I -- again, I never spent a lot of time thinking about your -- your four clients. I know that overall, their behavior and the behavior of short sellers did hurt the reputation of the company and did cause the stock price to, in fact, go down.

Q. Did you consider their statements to be maddening?

Page 241

A. I don't believe I said that.

Q. The next sentence, you write, (Reading:) I get there are legal complexities around launching an offensive strategy, but a few of us have had it with being told to sit still while being punched in the face. These cowardly attacks on innovation won't stop until they put us out of business until we hit back, hit hard.

Do you see that?

A. I do.

Q. And you wrote that to the board of directors, right?

A. Correct.

Q. What did you mean by "a few of us have had it with being told to sit still while being punched in the face"?

A. Well, I think there was a sense of frustration with how long the diligence was going on for the -- to -- whether or not to file a -- a defamation action. And, again, I don't remember the -- the exact timing. But it did seem like we were sitting ducks taking a lot of punches while short sellers were having a field day with -- with all sorts of allegations that was very difficult for us to refute in a way that would capture headlines.

Q. And you wanted to punch back, right?

61 (Pages 238 - 241)

Page 242

MR. CAMPBELL: Object to form.

Q. (BY MR. KUMAGAI) You wanted to punch back, right?

A. Well, I wanted -- I wanted the company to defend itself on a sound and reasonable basis, yeah.

Q. Who did you mean when you said "a few of us have had it"?

A. Dr. Friedmann and myself mostly.

Q. Dr. Burns as well?

A. I didn't ask her specifically. But I think none of us at the company were happy with the media coverage we were getting.

Q. And when you wrote "we hit back, hit hard". What did you mean by that?

A. Get defensive. Enough just -- with just taking punches. Hit back.

Q. And by -- you described it as an offensive move, right?

A. Correct.

Q. Are you aware that the FDA conducted an inspection of Dr. Wang's lab at CUNY around September of 2022?

A. I don't remember the date, but yes, I'm aware -- aware that it happened.

Q. And were you aware around the time that it

Page 243

happened?

A. I -- I don't remember when I became aware.

Q. Do you recall whether you became aware around the same time that the inspection actually happened or later?

A. I -- I don't remember.

Q. And do you -- are you aware that the FDA issued what's called a Form 483 as a result of its inspection of Dr. Wang's lab?

A. I am.

Q. And are you aware of what the Form 483 -- the contents of the Form 483?

A. Not specifically. But generally speaking, a Form 483 is a list of deficiencies that, in their opinion, need to be remedied.

Q. And do you recall what your reaction was upon learning about the inspection and Form 483?

A. I do.

Q. And what was your reaction?

A. My reaction is twofold. One is in all my years of experience and all the years of Dr. Friedmann's experience and everyone I consulted, including our regulatory guy, no one had ever heard of the FDA inspecting an academic lab according to GLP standards. That's unheard of. That was my first reaction.

Page 244

Second thing is I was trying to figure out what exactly is the news, which is to say we -- we specifically asked CUNY and Dr. Wang to conduct his studies under non-GLP conditions. So for his lab to fail a GLP inspection is meaningless.

Q. And so did you think the FDA was treating Cassava unfairly insofar it was inspecting Dr. Wang's lab to a standard that you didn't believe was appropriate?

A. It's not my belief. It's -- we -- we know. It's -- it's fundamentally -- it's factual that to inspect an academic -- excuse me -- non-GLP academic lab according to GLP standards makes no sense. It just doesn't. That's a fact.

Q. When you decided -- strike that.

When you voted to file the defamation action, did you consider anything about the FDA's inspection of Dr. Wang's lab or the reported findings in the Form 483?

A. Other -- I can't speak for the entire board, but I as CEO, based on what I knew of this -- of the non -- of the GLP inspection of a non-GLP lab, no, that didn't cross my mind.

Q. Did you consider the FDA's claim that there were inadequate source records to reconstruct the study?

Page 245

A. I'd have to go back, but I believe that's one of the deficiencies that they noted in their Form 483. I can't remember exactly.

Q. Are you aware that in November 2022, the FDA instructed Cassava to remove the Phase IIB CSF data from its investigator's brochure because the data could not be verified?

A. Yes, I remember Friedmann or somebody telling me this. I think it was actually Mike Marsman telling me this.

Q. And do you recall approximately when he told you that?

A. I do not.

Q. What was your reaction to that?

A. Do it.

Q. When you -- did you ever consider that instruction from the FDA in connection with the defamation action in any way?

A. I did not. Other board members may have. I can't speak for all of them.

Q. Did you consider how the FDA's finding that it could not verify Dr. Wang's CSF data might affect the strength of Cassava's defamation claims?

A. Again, to the extent this was a GLP finding of a non-GLP lab, no, it had no standing in my mind.

62 (Pages 242 - 245)

Page 246

Q. Are you aware that in September -- strike that.

Are you aware that in 2022, Cassava conducted its own audit of Dr. Wang's lab at CUNY?

A. Yes, I am aware that the -- one of the internal people conducted a vendor lab -- I'm sorry. I'm aware that one of Cassava's scientist personnel conducted a -- an inspection of Dr. Wang's lab at CUNY. I -- I don't remember the -- the timing.

Q. And were you aware of that inspection when it was happening?

A. No, I -- I believe I became aware after the fact.

Q. And were you made aware of the findings of that inspection?

A. I was made aware of the headlines.

Q. What was the headline?

A. The headline was non-GLP lab fails GLP inspection.

Q. You're referring to Cassava's audit now?

A. Correct.

Q. What is your understanding of why that would be the case, that Cassava's own audit applied the GLP standard?

A. So why would a non-GLP lab fail GLP lab, is that the question?

Page 247

Q. Strike that.

When you decided to file the defamation action, did you consider Cassava's inspection of Dr. Wang's lab in any way?

A. Remi did not. Other board members and the lawyers may have.

Q. To your knowledge, did they?

A. I never asked them.

Q. Did you ever consider how the findings from Cassava's audit of Dr. Wang's lab might impact the defamation action?

A. Again, Remi did not. Other board members or attorneys -- and/or attorneys may have.

Q. What role, if any, did you have in CUNY's investigation of Dr. Wang?

A. I remember after the CP came out, I remember sending a -- a formal letter to CUNY asking for a -- a formal investigation, internal investigation, of Dr. Wang's lab.

Q. And did you ever consider what it would mean for Cassava if CUNY's investigation determined that Dr. Wang had, in fact, engaged in research misconduct?

MR. CAMPBELL: Object to form.

THE WITNESS: You're asking a hypothetical question. The fact is he -- is he did not engage in

Page 248

research misconduct as determined by CUNY's investigation.

Q. (BY MR. KUMAGAI) Are you aware that in October 2023, the media outlet Science published what appeared to be a report from CUNY's investigation of Dr. Wang?

A. My understanding of the -- when -- what was the date, October --

Q. 2023?

A. Yeah. '23, did you say?

Q. Yes.

A. My understanding is that was a draft that was leaked to the press and that that draft did not represent CUNY's final views or final conclusions regarding potential research misconduct by -- by Dr. Wang.

Q. And what was your reaction to that report when it came out?

A. Well, I wasn't happy that somehow, someone at CUNY was able to leak it to the press.

Q. Did you review it when it came out?

A. Did I look at it? I may have. I don't remember specifically.

Q. Were you concerned at all about what the version of the report that was published by Science

Page 249

reported?

A. I -- I was more concerned -- I was concerned that the fact that the -- an early draft was leaked to the press, that's highly suggestive of someone at CUNY not being fair and certainly not being independent. So I was more concerned for the fairness, the integrity, the overall rationale underlying the CUNY investigation.

Q. And did the contents of the report concern you in any way?

A. Again, this was a -- a leaked draft report as I understood it and still understand it. So I don't get excited by draft reports. I get more excited by final reports and recommendations.

Q. Did you -- strike that.

Did you consider the CUNY report published by Science in October 2023 in connection with the defamation action in any way?

A. Did Remi? I did not, again, because it was a -- a draft leak -- leaked report that indicated to me perhaps some level of non-independence and non-fairness at CUNY. But I can't speak for other board members or the lawyers.

Q. Did any of the findings reported in the FDA's Form 483, Cassava's internal audit, or the leaked version of the CUNY report, did any of the findings

63 (Pages 246 - 249)

Page 250

related to Dr. Wang's recordkeeping practices in those investigations concern you at all?

MR. WU: Object to form.

THE WITNESS: So, again, the Cassava Sciences inspection of CUNY's -- of Dr. Wang's lab and FDA's inspection of Dr. Wang's lab were conducted against GLP standards. And he failed GLP standards as any academic lab would.

Q. (BY MR. KUMAGAI) Have you ever, at any point in time, been concerned about the adequacy of Dr. Wang's recordkeeping practices?

A. I have not. I did not.

Q. When did you first learn that the FBI or the DOJ were investigating Dr. Wang?

A. I don't remember specifically.

Q. To your knowledge, were you personally ever under investigation by the FBI or DOJ?

A. Personally, not to my knowledge.

Q. To your knowledge, was Dr. Burns ever under investigation by the FBI or DOJ?

A. Not to my knowledge, she wasn't.

Q. After learning about the FBI or DOJ investigation of Dr. Wang, were you ever concerned that you might become a target of an investigation by the FBI or DOJ?

Page 251

MR. JACOBSON: Don't answer if that calls for privilege.

Objection.

THE WITNESS: I'm not going to answer based on legal constraints.

Q. (BY MR. KUMAGAI) I'm asking whether you were ever concerned about potentially becoming a target of -- of FBI or DOJ investigation?

MR. JACOBSON: Same instruction.

THE WITNESS: Same answer.

Q. (BY MR. KUMAGAI) When did you first learn that the SEC had commenced an investigation related to Cassava?

A. I don't remember the timing, but...

Q. And what was your reaction?

A. Well, I was hoping the SEC would clear our name against the allegations of research misconduct, knowing that there was no research misconduct at Cassava Sciences.

Q. And did there come a point in time that you learned the SEC was investigating conduct by you personally?

A. I -- I don't know at what point in the SEC's investigation -- remember, it lasted -- I -- I forget how long, but two years, maybe more, three years. A

Page 252

long time. Many, many months and -- what -- what was the question? When -- when -- when --

Q. Did there come a point in time when you learned that you were being investigated by the SEC?

A. Oh. I -- I don't specifically remember at what point the SEC investigated any individuals versus the entire company. But it was a very long, drawn-out process.

Q. But you did, at some point, become aware that you were the target of an SEC investigation; is that right?

A. The -- at some point. Yes. Yes.

Q. And at some point, did you also learn that Dr. Burns was a target of an SEC investigation?

A. Yes, at some point.

Q. Can you -- do you have any sense of approximately when that was?

A. I -- I -- I don't. It was such a long, drawn-out process that I forget when it began. And I can tell you when it ended.

Q. Okay.

MR. KUMAGAI: Let's take a break.

VIDEOGRAPHER: Going off the record. The time is 5:54. Sorry. 5:44.

(Brief recess.)

Page 253

VIDEOGRAPHER: Back on the record. The time is 5:53.

Q. (BY MR. KUMAGAI) Mr. Barbier, to your knowledge, has Cassava ever possessed any original or raw data from any preclinical or clinical research on simufilam or SavaDx?

A. I can't answer that question. I -- it's above what -- above my responsibilities.

Q. To the best of your knowledge, did Cassava ever possess any original or raw data from any preclinical or clinical research on simufilam?

A. I have no way to answer that question accurately or thoroughly. What I can say is that generally speaking, original data stays with the lab that generated the lab -- the -- the data in question. And to the extent that Cassava Sciences never had, and its predecessors Pain Therapeutics never had its own labs, I'm not sure why we would have original data on our -- on the company's premise.

Q. Who, if anyone, at Cassava would know whether or not Cassava has ever possessed original or raw data?

A. So, again, Cassava has a 25 year plus lifespan. So let's narrow your question down to let's say around -- in proximity to the citizens' petition. So someone like Nadav Friedmann would have had direct

64 (Pages 250 - 253)

Page 254

knowledge, I believe, of whether or not someone, anyone at Cassava Sciences had original data or raw data that originated from a -- a -- a lab.

Q. And around the same time, you as CEO did not know whether or not the company possessed any of that raw or original data?

A. Again, at -- at the level of the CEO, that's not something that I'm -- you know, the company didn't pay me to sit around and ask do we or don't we have raw data. The company paid me to do high-level strategic operations and -- and strategy.

Q. You didn't know whether or not the company possessed any original or raw data concerning simufilam, right?

A. So again, you're asking me, you know, is it possible that there's a metal rod on the factory floor somewhere, and I'm saying I didn't work on the factory floor. So -- and I never inspected the factory floor for metal rods or raw data. So I don't really have a basis to answer your question accurately or thoroughly.

Q. I'm asking you personally, not about your responsibilities or whether you should have known, I'm simply asking you whether you knew or not. So let me just ask the question again.

Did you know during your time as CEO

Page 255

whether or not the company possessed any original or raw data from any simufilam research?

A. Okay. So sounds like it's the same question. So I'm going to answer it in the same way. I -- I don't have a rational basis to answer your question. I -- I didn't look around people's offices and ask do you have raw data or don't you have raw data.

Q. Meaning you didn't know whether or not the company had possession of raw or original data, right?

A. Meaning I don't have a basis to answer that one way or another.

Q. It's not about basis. I'm just asking whether you knew personally whether or not the company possessed raw or original data from any simufilam research? It sounds like the answer is, no, you didn't know.

A. No, I understand. But I'm also trying to be thorough in my responses, and thoroughness includes anchoring a response in -- in facts and reality. And I'm saying in reality, I never went around and asked people. I had no reason to. I had no reason to believe there was original data because we don't have a lab in-house.

Q. You never asked anyone at the company whether or not the company possesses any raw or original data from any simufilam research; is that right?

Page 256

A. Correct.

Q. To your knowledge, when Cassava filed the defamation action, what facts or evidence did the company have in its possession, if any, to refute the claim that Dr. Wang manipulated or fabricated data?

MR. CAMPBELL: Object to form.

MR. WU: Objection.

THE WITNESS: So the way you're asking the question, you're making an assumption that he did engage in research misconduct. And the way I'm going to answer it is by saying to the best of my knowledge, he did not conduct research misconduct. Dr. Wang was an employee of a very credible employer, CUNY. He's a career scientist. The guy worked in the lab for, whatever, 30, 40 years. He's in his 60s or maybe late 50s.

I do believe that people work in patterns. You don't work your butt off in the lab for decades and suddenly wake up at age, you know, late 50s or early 60s and go, oh, I think I'll, you know, engage in research misconduct. That just doesn't fit the pattern. I've always known Dr. Wang to be a very ethical person. I've never had any reasons to doubt his ethics.

Q. (BY MR. KUMAGAI) How do you know that Dr. Wang wasn't fabricating data from the very beginning of his career?

Page 257

A. So this is a business based on reputation. Dr. Wang has worked with some of the best and the brightest neurobiologist, which is a pretty hard field. It's a very narrow field. You don't get to enter that club, if you will, without hard work, lots of insights, and lots of data. He was part of that world. You don't get to collaborate with all these world-class scientists unless they're very confident of your work.

And, in fact, he did collaborate with world-class scientists. Furthermore, the thing to understand about scientific misconduct or really just science in general, the way it's conducted, is it's very complex. Lots of moving parts. Very difficult for one individual to engage in research misconduct without the collaboration of a bunch of people.

So for Wang to have engaged in research misconduct is to say that it wasn't just Wang, because he can't do it alone. It was everyone associated with Wang, and I don't buy into that thesis.

Q. So is it fair to say that in your view, the allegations of misconduct against Dr. Wang were implausible from the start because of his collaboration with world-class scientists and the lengths he would have had to go to to hide any misconduct?

A. I would say that would be a contributing reason

65 (Pages 254 - 257)

to believe that his work is solid.

Q. Aside from Dr. Wang's history of collaboration with other scientists and what you described as the implausibility of allegations of research misconduct against him, what else, if anything, is your opinion that he did not engage in research misconduct based on?

A. At what point in time?

Q. Around the time the citizens' petition came out?

A. Okay. So, again, Dr. Wang was an elderly professor. He went through an entire career working in the lab. For him to have engaged in anything, anything unethical, someone along the way would have or should have raised a hand saying, hey, this guy is doing this. That never happened. That never happened with him. And again, if you go back, if I go back and think of the -- the frauds in biotech, it's been -- I -- I can't think of one person.

What I can think of is a group of people collectively engaging in fraud. Very difficult. It's a collaborative sport. It's -- it's not a -- the idea of a lone scientist, you know, that -- that went away many, many years ago. At this point, it's all about collaboration.

Q. To your knowledge, did you or anyone else at

the company communicate with any of the scientists whom Dr. Wang had collaborated with in the past?

A. To my knowledge, some of them were, possibly are, I don't know, still members of the Scientific Advisory Board and help the company with informal or formal advice.

Q. After the citizens' petition came out, did you or anyone else at the company, to your knowledge, ask any of Dr. Wang's prior collaborators whether they had ever had any concerns about research misconduct by Dr. Wang?

A. So I did not, if you're asking. Remi did not.

Q. To your knowledge, did anyone else at the company?

A. It may have happened. I don't know. Dr. Friedmann may have had the -- he was the gatekeeper for the SAB.

Q. You don't know whether or not Dr. Friedmann reached out to any of Dr. Wang's prior collaborators to ask about prior concerns related to research misconduct?

A. I -- I can't speak for Dr. Friedmann.

Q. And you don't know whether he did that or not?

A. I -- I have no basis to speak for -- for him.

Q. So meaning you don't know what he did or didn't do?

A. The man is dead. He's not talking.

Q. To the best of your knowledge, have you or has anyone else at Cassava asked Dr. Wang to share his lab notebooks or records from any experiments related to simufilam?

A. Again, with all due respect, I was the CEO. I was not the scientist at the company. You're asking me a lot of nitty-gritty scientific details that were outside my sphere of responsibilities.

Q. So just answer the question. Did you ever ask Dr. Wang to share with you any of his lab notebooks or records from any experiments that he conducted?

A. So I believe I told you earlier today that I had -- I believe I had one meeting with him, informal meeting. It was, like, a lunch or a coffee or something. And no, I did not, at that time or at any time, ask him about his notes.

Q. To your knowledge, did anyone else at Cassava ask Dr. Wang?

A. I -- I don't know.

Q. You don't know whether anyone else at Cassava asked Dr. Wang for his lab notebooks or other records --

A. It may have been -- the question may have been asked. I -- I just don't know.

Q. And you don't think that was an important thing

to do prior to filing the defamation action?

MR. CAMPBELL: Object to form.

THE WITNESS: So I can't speak to the -- whatever legal due diligence was conducted by Benesch and -- and others. So I can't answer your question.

Q. (BY MR. KUMAGAI) Would you have expected Benesch, as part of any due diligence that they'd conducted prior to filing the defamation action, to have inspected anything from Dr. Wang's laboratory?

A. I'm not an attorney. I don't know what went into the recipe, what went into the diligence for -- for any legal conclusions that may have been reached.

Q. To the best of your knowledge, have you or anyone else at Cassava or its lawyers ever tried to influence the CUNY investigation in any way?

A. So can you rephrase that and remove the word attorneys, because I cannot speak for -- I don't believe I can speak for the attorneys?

Q. Well, let me just -- fine.

To the best of your knowledge, have you or has anyone else at Cassava ever tried to influence the CUNY investigation in any way?

A. I have not.

Q. And are you aware of anyone else at Cassava trying to do that?

Page 262

A. If it happened, I'm not aware of it.

Q. Are you aware of whether Cassava's lawyers did anything to influence or try to influence the CUNY investigation?

A. I can't speak for everything they did, but I can't imagine a scenario where it's a plausible yes.

Q. Do you recall whether Cassava or its lawyers ever threatened CUNY with an indemnification claim if CUNY found that Dr. Wang had engaged in research misconduct?

MR. CAMPBELL: Object to form.

THE WITNESS: Yeah, again, you're asking me -- you went from asking me, you know, nitty-gritty scientific questions to asking me hardcore legal questions, and I -- I don't have the background or expertise to answer those types of questions.

MR. KUMAGAI: I'll show you a document previously marked as Exhibit 149.

(Exhibit No. 149 was previously marked.)

Q. (BY MR. KUMAGAI) And Exhibit 149 appears to be a letter dated March 8th, 2023 to CUNY from Guy D. Singer at the law firm Orrick.

Do you see that?

A. I do.

Q. And the first -- excuse me. The subject of the

Page 263

letter is "Research Misconduct Inquiry Concerning Professor Hoau-yan Wang".

Do you see that?

A. I do.

Q. Have you ever seen this letter before?

A. Can you give me a minute or so to read it?

Q. Sure. I don't want you to read the whole thing right now, but take a moment to look at the three pages. Okay. I want to draw your attention to the -- page 3.

A. I'm still reading it. This -- this is -- there's a lot here. Unless you just want to focus on one sentence.

Q. Well, first question, don't read the whole thing because we don't have time. But --

A. Okay.

Q. -- sitting here from what you have read, do you recall ever having seen this letter before?

A. I -- I would need to read it to give you a thorough answer. But, you know, my -- my quick and dirty read of it is I don't remember seeing this.

Q. Okay. In your capacity as CEO, is this correspondence the type of correspondence that you would typically have involvement in?

A. Again, I -- I want to read it before you ask me to comment on it.

Page 264

Q. Okay. Let me just direct your attention to the paragraph at the top of page 3, which is what I want to ask you about.

Do you see that, page 3?

A. Where it says "Wang"?

Q. Yeah.

A. Yes.

Q. About halfway down, there's a sentence that begins "To the extent that CUNY finds".

Do you see that?

A. Yes.

Q. And it says, (Reading:) To the extent that CUNY finds that misconduct actually occurred in this instance, that decision would, under the relevant contracts, require CUNY to indemnify and hold [Cassava] harmless from any and all liability, loss, or damage it might suffer as a result of claims, demands, costs, or judgment[s]" in the securities class action suit and all other matters related to Dr. Wang's research.

Do you see that?

A. I do.

Q. Are you aware of Cassava taking this position with respect to CUNY?

MR. CAMPBELL: Object to form.

THE WITNESS: So you just made me aware of

Page 265

this statement.

Q. (BY MR. KUMAGAI) Do you recall any discussions with anyone about seeking indemnification from CUNY in the event that CUNY found Dr. Wang had engaged in research misconduct?

MR. CAMPBELL: Object to form.

And given that this is a letter from legal counsel, please exclude any discussions with legal counsel in your answer.

Q. (BY MR. KUMAGAI) During your time as CEO, was it -- strike that.

During your time as CEO, to your knowledge, did the company do anything to suppress or prevent CUNY from finding that Dr. Wang had engaged in research misconduct?

MR. CAMPBELL: Object to form.

THE WITNESS: Yeah. The way you're asking the question is you're drawing a conclusion and then you're asking me if the company influenced that conclusion. So can you rephrase that question maybe a bit more neutral?

Q. (BY MR. KUMAGAI) To your knowledge, during your time as CEO, did the company or its counsel do anything to pressure CUNY in reaching an outcome in its investigation of Dr. Wang?

67 (Pages 262 - 265)

212-267-6868          www.veritext.com          516-608-2400

Page 266

MR. CAMPBELL: Object to form.

THE WITNESS: Again, I've not -- you have not given me time to read this letter. So I can't say if this letter meets the definition of -- fits the -- is an appropriate answer to your question. But out -- outside of potentially this letter, I'm not familiar with any such efforts.

Q. (BY MR. KUMAGAI) During your time as CEO, did you want -- want CUNY to expeditiously complete its investigation and release the findings to the public?

A. Yes.

Q. And that was always your wish during your time as CEO of the company?

A. Yes.

Q. And you didn't do anything to prevent CUNY from expeditiously investigating Dr. Wang and releasing its findings to the public?

A. I don't believe -- wait, what's the -- the question? Did I influence CUNY?

Q. Did you -- did you do anything to prevent or attempt to prevent CUNY from investigating Dr. Wang and releasing its findings to the public?

A. No, not to my knowledge.

Q. Are you familiar with a group of investors or supporters that call themselves the SAVA Army or

Page 267

SAVAges?

A. Someone told me about them. Some -- I may have been sent a -- a couple of tweets or whatever, media, social media things. I don't believe I've ever -- ever -- in fact, I know I've never been on whatever it's called, savages.com or whatever they call themselves.

Q. Do you recall having any -- any communications with Matthew Nachtrab or Paul Efron or Colin McDermott about allegations of research misconduct?

A. So the first and the third name ring a bell. The second one, I can't quite place. They were very vocal in -- with regard to Cassava Sciences. And I want to say there -- you know, there came a point where someone was sending me emails perhaps on a weekly -- certainly on a monthly basis sharing with me their opinions about what to do or what not to do and how to deal with short sellers. That type of thing.

Q. And Mr. Nachtrab sent to you a letter that he had sent to the Department of Justice petitioning the department to investigate short sellers of Cassava, right?

A. It's possible. I don't specifically remember. Sounds like something he would do, though.

Q. Do you recall ever telling any of the members of the SAVA Army or any of the supporters of the company

Page 268

to stop tweeting or taking other steps to attack the short sellers?

MR. CAMPBELL: Object to form.

THE WITNESS: That -- that -- that's a pretty broad question. Can you perhaps tailor it to a specific audience?

Q. (BY MR. KUMAGAI) Did you ever try to discourage any of the SAVA Army members from taking any actions against the short sellers?

A. Okay. So first off, I don't know what you mean by Cassava Army. Sounds ominous, but I -- I don't know what that really means. Second, if -- if someone -- as -- as the CEO, it would be inappropriate for me to send an email to an investor to say, hey, stop -- you know, I'm tired of you. Don't email me anymore. That -- that's not what public company CEOs do. You could ignore. So time -- from time to time, you may respond, you may share a thought or two. But it would not be my habit to respond by saying, hey, I'm not interested in your thoughts anymore.

Q. Did you ever do anything to encourage any member of the SAVA Army or the SAVAges group --

A. Encourage them to do what?

Q. -- to take -- to take any actions against the short sellers or Dr. Bik or other critics of the

Page 269

company?

MR. CAMPBELL: Object to form.

THE WITNESS: So, again, I -- I think you just said SAVA Army again or Cassava Army. That -- who does that represent?

Q. (BY MR. KUMAGAI) Have you never heard the term SAVA Army before?

A. I've heard of the SAVAges. I don't know what the relationship is between the -- the Army and the SAVAges if there is one.

Q. Okay. So have you ever done anything to encourage any member of the SAVA -- SAVAges to take action against any short sellers?

A. I'm trying to remember. I received a lot of emails from investors during the -- the time of the citizens' petition and pretty much until I left. By encourage, I'm not sure what you mean. But assuming, you know, plain English, again, my -- let's step back a little bit.

Q. Let me just -- I think you're -- you've answered the question.

Aside from advice of counsel, what, if anything, was the board's decision to file the defamation action based on?

A. It was based on advice of counsel clearly. But

68 (Pages 266 - 269)

Page 270

also the -- the harm to the company that the short sellers were doing and continued to do for a long time, both with the citizens' petition, calling our clinical sites, doing their best to suppress the -- to make the stock price decline, calling principal investigators, you know, trying to enroll in our -- our patients. I mean, the -- collectively, all these things really damaged the -- the company's reputation and hurt the stock price. And this is one reason why I can never take these short sellers too seriously. In my opinion, it was clear -- they were clearly out to destroy the stock price, make money, go home, and perhaps do it again somewhere else.

Q. And that's why you never took the short sellers too seriously?

MR. CAMPBELL: Object to form.

THE WITNESS: So to be clear, we took the allegations seriously and that justified the resources, the intense resources we put into investigating, through a third-party, investigating the allegations. So the allegations, we took seriously. The -- many of the people behind the allegations were clearly there to make money, and it's hard to take them seriously.

Q. (BY MR. KUMAGAI) Aside from the investigation by outside counsel, Cassava didn't conduct any other

Page 271

investigation of the allegations, right?

A. So the board of directors of Cassava directed an outside law firm to conduct a thorough investigation of the allegations. There was one investigation by -- or I should say an investigation by one outside law firm. Are you proposing there should have been two or three or what?

Q. I'm just asking you whether there was any other investigation. The answer is no, right?

A. By Cassava?

Q. Yes.

A. There was one formal investigation. Again, excluding whatever SEC or DOJ or others may have done.

Q. And that was the investigation by Benesch?

MR. CAMPBELL: Object to form.

THE WITNESS: No. You're confusing topics now. You asked me about investigation into the allegations. But now you switched tracks and you're asking me about the due diligence into whether or not the company should pursue a defamation claim against the short sellers.

Q. (BY MR. KUMAGAI) Aside from --

A. Very -- very different.

Q. Okay. Aside from the due diligence investigation by Benesch, did the company do any other

Page 272

investigation as part of preparing to file the defamation action?

A. So, again, there was the investigation by Orrick and due diligence by several law firms.

Q. Okay.

MR. KUMAGAI: That's all my questions for today, subject to any questions from other counsel.

MR. CAMPBELL: I don't have any questions.

MR. WU: I have no questions.

MR. JACOBSON: No questions.

VIDEOGRAPHER: This concludes the deposition of Remi Barbier. Going off the record. The time is 6:24.

(Deposition concluded.)

Page 273

REPORTER'S CERTIFICATION
DEPOSITION OF REMI BARBIER
TAKEN NOVEMBER 11, 2025

I, Janalyn Elkins, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, REMI BARBIER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to DAVID KUMAGAI;

That a copy of this certificate was served on all parties and/or the witness shown herein on

_____.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and

69 (Pages 270 - 273)

Page 274

further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 21st day of November 2025.

JANALYN ELKINS
Texas CSR 3631
Expiration Date 1/31/2027
Veritext Legal Solutions
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
Firm Registration No. 571
PH: (817) 336-3042

Page 275

ARIC H. WU, Esq.
awu@bakerlaw.com

November 21, 2025

RE: Heilbut, Et. Al. v. Cassava Sciences, Inc., Et Al.
11/11/2025, Remi Barbier (#7684285)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Page 276

Heilbut, Et. Al. v. Cassava Sciences, Inc., Et Al.

Remi Barbier (#7684285)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

_____  _____
Remi Barbier                    Date

Page 277

Heilbut, Et. Al. v. Cassava Sciences, Inc., Et Al.

Remi Barbier (#7684285)

ACKNOWLEDGEMENT OF DEPONENT

I, Remi Barbier, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____
Remi Barbier                    Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

**[& - 186]**                                                           Page 1

| & | 1 | | |
| --- | --- | --- | --- |

**&**

**&** 1:18 2:18 98:13

**0**

**000005833** 219:3
**0000322** 237:12
**00054144** 195:18
**000699398** 95:4
**000700979** 81:16
**000702208** 104:10
**000704285** 229:15
**000706864** 101:15
**000939067** 204:12
**000988572** 96:22
**000988573** 96:25
**001402478** 38:2
**00143035** 203:24
**001440911** 205:5
**001444640** 45:13
**059498** 1:6

**1**

**1** 94:12 97:20 163:8
**1,000** 183:24
**1.24** 30:14
**1/31/2027** 274:7
**10** 59:25 60:12 70:11,14
**100** 105:1 107:18 108:1
**100,000** 34:6,11
**10010** 2:4
**101** 4:5 148:4,4
**10111** 2:9
**1015** 2:14
**1030** 2:14
**104** 4:5
**10:25** 45:7
**10:40** 45:10
**10k** 216:2
**10th** 204:21,25
**11** 1:10,15 273:2
**11/11/2025** 275:5
**111** 1:18
**11:33** 79:12
**11:43** 79:15
**11th** 6:19
**12798** 274:5
**128** 104:12

**12:07** 95:9
**12:10** 95:12
**12:33** 110:14
**131** 4:15 161:12,13,14
**132** 4:17 171:20,22 172:10,19
**133** 4:18 171:24,25 173:5,7 174:11
**134** 4:19 172:2 174:17 175:6
**134-135** 172:4
**135** 4:20 172:3 175:12,21
**138** 5:16 222:7 222:8
**143** 5:17 225:7 225:8,9
**149** 5:19 262:18,19,20
**14th** 5:11 99:3 99:21 199:13 201:9,14
**15** 29:13 224:19
**15th** 2:14 38:21 97:6 161:20 166:13
**16** 29:14
**1600** 274:8
**161** 4:16

**166** 4:22 176:17,18,20
**16th** 4:9,10 5:5 95:15 104:13 196:17 204:16 205:9
**171** 4:17,18 97:1
**172** 4:19,21
**175** 4:2 38:1,3 38:5,7
**176** 4:2,22 66:16,17,18
**177** 4:3 81:15 81:17,19
**178** 4:3 95:3,5 95:14
**179** 4:4 96:21 96:23 97:5
**180** 4:4 96:24 97:3 98:23 101:11
**181** 4:5 101:14 101:16,18
**182** 4:5 104:9 104:11 108:20
**183** 4:6 203:23 203:25 204:1
**184** 4:8 204:11 204:13,14
**185** 4:9 205:4,6 205:7,18
**186** 4:11 219:3 219:4

**[187 - 30]**                                                                                    Page 2

**187**  4:11
  229:14,16
**188**  4:12 237:9
  237:11
**18th**  45:16
  66:24 233:22
  237:13
**1900**  2:18
**195**  5:3
**196**  5:5
**197**  5:7
**198**  5:9
**199**  5:11,13
**1998**  27:18
  28:6
**1:15**  110:17
**1:24**  1:6
**1:35**  124:4
**1:37**  124:7
**1st**  5:15 101:19
  195:21 202:16
  202:25 203:2
  219:7

**2**

**2**  3:3 84:8
  144:16 145:13
  163:10 173:19
  234:10,15
**2.0.**  48:15,18
**20**  21:25 25:21
  60:1 64:10
  179:3 224:19
  277:15

**200**  87:18,20,25
  91:17
**2000**  28:25
**20005**  2:14
**2005**  22:2
**2019**  222:10
**202**  2:15 5:15
**2020**  79:17
  81:11 82:3,6
  82:21 87:9,10
  88:4 90:25
  95:15 96:1
  97:6 99:3,21
  100:15 101:19
  102:24 103:20
  103:23 104:14
  106:11,12
  107:2,11 108:5
  108:13,16,18
  212:24 214:19
  215:13 222:20
**2021**  5:5,7
  112:6,8 116:25
  173:12 195:21
  196:17 197:4
  197:24 219:7
  219:12 225:10
  229:19 230:23
**2022**  4:7,9,10
  5:9,13,15
  110:20 138:23
  140:7 176:21
  199:2 200:3
  201:9,10 202:9

202:17,24,25
  203:2 204:3,8
  204:16,21,25
  205:9 206:7,10
  233:22 237:13
  242:22 245:4
  246:2
**2023**  161:20
  166:13 248:4,9
  249:16 262:21
**2024**  5:11 28:6
  38:21 45:17
  66:20,24 67:5
  78:11 190:12
  191:2 192:5,12
  192:15 193:1
  193:13 199:13
  216:2,4,15
**2025**  1:10,15
  6:19 216:2,3
  273:2 274:4
  275:3
**203**  4:7
**204**  4:9
**205**  4:10
**21**  275:3
**212**  2:5,10
**219**  4:11
**21st**  5:9 199:2
  274:3
**220-9175**  2:10
**222**  5:16
**225**  5:17

**229**  4:11
**23**  172:16
  248:10
**233**  5:18
**237**  4:12
**23rd**  2:4 5:7
  197:4,23
**24th**  222:10
  225:10 229:18
**25**  29:4,5,11
  59:8 60:19
  72:7 73:18,23
  74:1 76:3
  253:22
**26**  82:2,6
**262**  5:19
**273**  3:7
**275**  3:8
**28**  224:16
**298-5723**  2:19
**29th**  5:13 200:3
  201:10,15
  202:9,24
**2:16**  149:14
**2:28**  149:17
**2nd**  140:7

**3**

**3**  163:12 263:9
  264:2,4
**3.3**  106:17
  107:4,12
**30**  123:25
  256:14 273:16

**[30 - account]**                                                                 Page 3

| | | | |
|---|---|---|---|
| 273:19 275:16 | **500** 169:8 | **80202** 2:19 | **able** 44:16 |
| **300** 274:8 | **500,000** 34:9 | **81** 4:3 5:10 | 143:17 202:4 |
| **3000** 2:18 | **50s** 256:15,18 | 199:9,10,11 | 248:20 |
| **303** 2:19 | **571** 274:9 | 201:8,8 | **above** 1:14 |
| **30th** 219:11 | **5:02** 231:6 | **810** 1:19 | 32:20 100:6 |
| **336-3042** | **5:12** 231:9 | **810-0965** 2:15 | 253:7,8 275:6 |
| 274:10 | **5:44** 252:24 | **817** 274:10 | 277:7 |
| **3631** 274:7 | **5:53** 253:2 | **82** 5:12 199:24 | **absence** 65:2 |
| **38** 4:2 | **5:54** 252:24 | 200:1,1 201:8 | 224:24 |
| **3:19** 179:23 | **6** | 201:9 | **absolute** |
| **3:30** 180:1 | **6** 2:25 3:4 | **83** 5:14 202:13 | 168:14,25 |
| **3rd** 173:11 | **60s** 256:15,18 | 202:14 | 169:11 |
| 216:2 | **633-4310** 2:5 | **86** 5:18 233:17 | **absolutely** |
| **4** | **643** 52:13 | 233:18 | 215:9 |
| **4** 162:24 168:3 | **66** 4:2 | **88** 4:14 45:12 | **abusive** 35:15 |
| **40** 37:22 49:11 | **6:24** 1:16 | 45:14 | 35:18 36:5,11 |
| 146:14 206:12 | 272:13 | **8th** 262:21 | **academic** |
| 256:15 | **7** | **9** | 214:23,25 |
| **41** 2:4 | **7** 3:6 | **900,000** 107:15 | 215:2,3 243:24 |
| **43** 52:9 | **76102** 274:9 | 107:20 | 244:12,12 |
| **45** 2:9 4:14 | **7684285** 275:5 | **920,000** 106:20 | 250:8 |
| **483** 243:8,11,12 | 276:2 277:2 | **95** 4:3 | **accept** 54:14 |
| 243:14,17 | **77** 5:1 195:15 | **951** 162:25 | **accepted** 93:15 |
| 244:19 245:2 | 195:16 | **96** 4:4 | 107:22 141:7 |
| 249:24 | **78** 5:4 196:13 | **97** 4:4 | **accepting** 54:6 |
| **4:15** 207:7 | 196:14 | **99** 32:21 | 54:11,19 |
| **4:45** 207:10 | **79** 5:6 196:25 | **9:00** 1:15 | **accepts** 54:16 |
| **4th** 4:7 176:21 | 197:1,2 | **9:29** 6:20 | **accomplice** |
| 204:3,8 | **8** | **a** | 69:1 |
| **5** | **80** 5:8 198:23 | **a.m.** 1:15 6:20 | **accordance** |
| **50** 206:12 | 198:24 | **ability** 50:15 | 53:4 |
| **50/50** 219:20 | | 55:12 58:17 | **account** 176:12 |
| | | 88:25 | 177:14,17 |
| | | | 217:5 |

**[accounts - adrian]**                                          Page 4

| | | | |
|---|---|---|---|
| **accounts** 32:16 176:6 | 125:9,13,17,22 | 182:7,11,18,25 | 90:13,14 95:7 |
| **accuracy** 275:9 | 126:21,25 | 182:25 183:8 | 109:1 122:15 |
| **accurate** 94:14 | 127:8,25 | 183:17 190:7 | 123:8 148:4 |
| 163:17 198:8 | 128:16 129:1,7 | 191:6,17,24 | 156:13 160:17 |
| 202:4,10 | 129:10,17,17 | 192:25 193:13 | 165:6 167:21 |
| **accurately** 88:2 | 129:25 133:24 | 197:22 198:7,9 | 225:1 243:4 |
| 253:13 254:20 | 134:22 135:9 | 198:15 199:6 | 245:9 264:13 |
| **achievable** | 135:23 136:13 | 202:21 203:11 | **ad** 5:1,4 195:12 |
| 151:17 | 136:20,23,25 | 205:14,23 | 195:19 196:16 |
| **achieve** 150:25 | 137:2,10,12 | 206:2 221:17 | **adam** 65:15 |
| **achieved** | 138:10,19,22 | 221:22,24 | **adam's** 4:2 |
| 155:18 156:2,3 | 138:25 139:16 | 222:3 223:15 | 66:19 |
| 156:6,7 | 139:18 140:4 | 224:1,5 231:11 | **additional** |
| **achieving** | 141:9 142:5,18 | 231:14,23 | 191:5 |
| 153:2,10 | 142:19 143:12 | 232:1 234:3,19 | **additions** 277:6 |
| **acknowledge...** | 143:15 144:10 | 241:18 244:17 | **addressed** |
| 277:3 | 146:9,14,25 | 245:18 247:3 | 45:18 97:9 |
| **acknowledg...** | 147:4,19,21 | 247:11 249:17 | **adequacy** |
| 275:12 | 148:9,18 149:4 | 256:3 261:1,8 | 250:10 |
| **act** 64:22,24 | 149:9,20,25 | 264:18 269:13 | **adequately** |
| **acted** 64:13 | 150:1,5,11,13 | 269:24 272:2 | 184:22 |
| 216:16 | 150:21 151:14 | 273:25 274:2 | **adjective** 10:13 |
| **action** 8:6 16:7 | 151:20 152:4 | **actions** 16:8 | **admission** |
| 21:9 25:24 | 153:9 154:4,8 | 122:20 191:22 | 185:23 |
| 26:1 46:5 47:3 | 154:22,24 | 197:14 268:9 | **adopted** 81:11 |
| 54:2 68:1 | 155:2,14,16 | 268:24 | 87:9 94:17,21 |
| 111:7,10 | 156:14 157:7 | **activity** 208:1 | 100:21 103:20 |
| 113:14,23 | 157:14,19 | **actual** 63:15,18 | **adopting** 96:10 |
| 114:10,18 | 158:3,12,15,18 | 83:20 109:21 | 103:10,17 |
| 119:12,13,22 | 158:23 166:19 | 113:19 142:19 | **adoption** 82:8 |
| 121:13 122:3 | 167:1,8,15 | 150:4 165:6 | 87:1 94:23 |
| 123:3,15,18 | 176:21 178:13 | 182:14 | 103:7 |
| 124:10,15 | 178:18 179:8 | **actually** 19:3 | **adrian** 1:3 6:25 |
| | 180:4,5,7,11 | 69:2 86:9 90:4 | 111:2 172:17 |

**[adrian - amount]**

173:12 175:3 175:18 177:10 177:22

**advice** 115:6,6 117:24 118:4 122:3 123:7,22 126:13,22,23 126:25 127:4,6 127:14,19 130:6,7,10,12 130:14 131:10 134:15,16 142:21,24 143:3,9,11 145:10 152:24 159:1 162:16 186:14 187:12 190:19,21 221:10,17 228:19,22 230:19 232:1 259:6 269:22 269:25

**advise** 211:17

**advisor** 211:17

**advisors** 121:11 211:18 225:21

**advisory** 221:7 221:19 224:8 224:13 259:5

**affect** 89:12 245:22

**age** 256:18

**agency** 61:18 63:17

**agenda** 204:15

**aggregate** 94:11

**ago** 21:21,25 23:25 73:20 81:24 179:7 225:18 237:20 238:12 258:23

**agree** 46:16,24 47:7,19 48:3,9 48:11 49:1 54:9,12,14 67:8 68:7 69:22 86:9 101:4 209:16 216:9

**agreed** 228:6

**agreement** 49:16 99:15 209:19

**ahead** 118:4 137:7,11 210:10 223:5

**al** 275:4,4 276:1,1 277:1 277:1

**alarming** 225:18

**alerted** 225:18 226:20 227:13

**alive** 219:19 220:3

**allegation** 164:22 168:2 227:1

**allegations** 4:15 15:3,14 15:24,25 16:13 16:15 17:6 18:12 20:12,17 26:21 47:16 48:23 49:4,5,8 49:9 50:6,8,10 50:11,16,18,21 51:1,5,8,13,15 143:25 144:5,8 150:15 151:4 152:19 153:25 154:20 155:7 156:12 161:16 163:7,18 164:7 165:22,24 166:2 168:4,7 180:10 183:24 225:14,23 226:7,21 227:15 228:3,4 229:9 230:14 230:24 238:4 239:16,24 240:17 241:22 251:17 257:21 258:4 267:9 270:18,20,21

270:22 271:1,4 271:18

**alleged** 49:19 49:24 50:2,3

**alleges** 225:20

**allotted** 83:16 275:19

**allowed** 123:24 130:25

**altered** 21:2,6 21:14

**alternative** 153:1

**altogether** 77:22

**alzheimer** 41:20

**alzheimer's** 5:18 8:8 21:1,4 39:10 40:16,18 40:21,23 41:7 41:13,16,21 42:2,20,24 67:21 68:19 69:4 76:7,13 76:21 174:21 207:16,21 220:17,19,24 233:22

**amanda** 7:2

**amended** 192:11,15,21

**amount** 33:15 33:17 34:13

**[amount - approach]**

94:9 100:11
106:16,25
107:13,25
133:4 211:20
**amounts** 83:15
83:18 86:14
108:24 109:22
**amusing** 184:1
**analyses** 208:3
208:19 212:10
**analysis** 53:5,7
53:9 77:22
103:3,7,12,18
208:9,14 210:2
210:3,14,22
212:5,16
213:13,23,24
214:3,19,21
215:5 216:18
216:23 217:7
217:18,20,24
218:2,6 231:15
**analysts** 43:11
**analyze** 212:18
**analyzed** 53:4
**anchoring**
255:18
**angle** 71:20,20
**announce**
215:8
**announced**
212:24 213:2
214:18

**annual** 29:21
31:5
**answer** 7:25
9:17 11:14
12:5,10 13:20
14:1,9 19:22
20:20,21 37:5
44:20,21,22,23
47:23,24 48:1
51:14 58:2,16
63:24 70:8
74:20 76:5
77:15 78:24
80:8 85:2 88:2
89:19 91:9
115:8,24 119:4
119:5 121:25
123:20 126:3,3
126:15 128:2
129:18 130:4,5
130:10,11
131:3,22,24
132:9,18,21
133:12,13,14
133:15,17
138:12 143:6
145:25 146:1
148:21 156:18
159:3,14 161:7
161:9 163:21
164:1 167:25
177:18 178:1
178:24 179:16
180:18 181:18

188:2 189:6
190:24 191:3
192:16 193:9
193:11 197:12
197:15 200:13
200:25 201:1
202:4 206:4
209:11,13
221:8 226:14
227:18,19
228:18,20
231:25 236:18
236:19 251:1,4
251:10 253:7
253:12 254:20
255:4,5,10,15
256:10 260:10
261:5 262:16
263:19 265:9
266:5 271:9
**answered**
16:20,22 18:15
18:25 126:16
269:21
**answering**
122:5 137:12
**answers** 145:24
**anymore**
193:15 268:15
268:20
**anyway** 137:10
227:5 240:8
**apparent**
176:11

**apparently**
106:4
**appear** 204:19
222:11
**appearance**
211:9
**appearances**
3:3
**appeared** 141:5
248:5
**appears** 21:11
45:18 66:23
95:16 97:5
104:12 140:1
196:15 197:2
198:25 199:11
200:2 202:15
204:1,14 205:7
219:5 222:9
225:9,25
229:17 237:21
262:20
**appended**
277:7
**appendix**
176:20
**applicable**
275:8
**applied** 246:22
**apply** 119:16
**appraised**
212:5
**approach**
119:10,13

**appropriate** 35:10 57:11 244:9 266:5
**approval** 61:12 62:10,10 63:7 63:11,25 64:12 75:18
**approved** 61:17 63:16
**approximately** 21:24 23:24 24:5,14 28:23 28:25 29:9 30:14 33:18 34:3 37:22 43:21,22 49:11 81:9 86:17,25 96:2,8 106:17 116:9 166:9 245:11 252:17
**april** 192:5,12 192:15 219:11 233:22 237:13
**araya** 109:9
**arbiter** 220:12
**arduous** 116:12
**area** 120:2 121:18 125:6 125:19 145:14 230:9 231:16
**areas** 238:24
**aric** 2:7 7:5 275:1

**army** 266:25 267:25 268:8 268:11,22 269:4,4,7,9
**arnand** 217:7
**arnold** 224:2
**arsenal** 155:9
**article** 4:2 66:25 67:1 71:11,12 233:19 234:5,6 235:17 236:5 237:20 238:18
**articles** 65:20 163:9 164:23
**aside** 12:12,18 12:20,24 13:12 30:17,24 31:4 31:14 32:4,15 52:5 56:13,19 59:19 60:14 75:22 82:20 96:20 110:8 114:15 120:9 121:9 127:6,23 128:13 130:9 133:4,20 143:11 150:19 154:11 160:18 173:3 174:16 175:11 176:1 178:10 181:24 182:3 183:5 185:15,24

186:13 187:2 187:22 188:19 196:11,23 197:20 199:8 203:22 204:10 205:3 206:23 258:2 269:22 270:24 271:22 271:24
**asin** 224:2
**asked** 13:22 16:20 19:20 23:13 27:10 36:20,24 37:7 37:17,19 43:24 70:12 72:21 76:14 121:20 126:15 151:21 170:18 185:20 239:5 244:3 247:8 255:19 255:23 260:3 260:22,24 271:17
**asking** 23:15 30:8,8 37:15 41:19,24 44:4 44:15 45:22 46:20 51:4 57:3,4,7,10 59:1 62:19 64:5 67:14 70:6 71:2,3,10 71:11,13,16

74:9 76:3 83:7 87:7 88:17 107:9 113:25 114:3,7 115:12 116:23 125:3 130:7 138:21 139:23,25 143:9 152:6,7 152:11 170:19 185:16 190:21 196:3 207:17 207:19 225:25 247:17,24 251:6 254:15 254:21,23 255:12 256:8 259:12 260:7 262:12,13,14 265:17,19 271:8,19
**asks** 12:7,11
**aspect** 182:17
**aspects** 228:10
**assert** 160:23
**assertion** 54:2
**assessment** 71:8,14
**associate** 164:17
**associated** 173:21 257:18
**assume** 84:2 102:10

**assuming** 88:25 122:2 131:25 269:17

**assumption** 88:24 256:9

**attached** 98:2 104:23 273:20 275:11

**attachment** 97:1,19 104:18 106:10

**attack** 112:17 116:2 268:1

**attacks** 241:6

**attempt** 153:23 153:25 188:24 266:21

**attempted** 189:14

**attend** 117:11 224:13

**attended** 117:10 202:5,6 202:8

**attending** 154:12

**attention** 45:16 53:19,24 155:2 156:14 166:3 184:25 219:10 263:9 264:1

**attorney** 65:4 133:8 135:14 138:14 140:17

140:18 143:19 167:19 197:14 261:10 275:13

**attorneys** 33:20 80:4 82:13,16 84:25 88:7 121:6 125:19 143:21 144:6 155:10 178:17 178:25 179:8 188:11 237:8 238:9 247:13 247:13 261:17 261:18

**attract** 155:2

**audience** 268:6

**audit** 246:3,19 246:22 247:10 249:24

**august** 81:11 82:2,6 87:9 90:25 101:19 102:24 103:20 103:23 112:5,8 116:25 193:1 193:13 225:10 229:18

**austin** 1:19 223:3

**authored** 231:20

**authority** 136:12

**authors** 173:20

**automatically** 83:12 232:21

**available** 89:9 275:6

**avenue** 1:19 2:4 233:3

**award** 83:4 99:2 100:6 107:19,20

**awarded** 83:15 107:3,15

**awards** 83:21 100:5,10,16

**aware** 23:1 53:2,11 54:21 87:14 88:3 91:6,12 94:16 94:21 111:20 159:16,19 160:1,2,4,5,6,9 166:16 182:2 189:9,12,13 192:4,8,24 215:17,23 226:4 228:1 231:19,22 239:10 242:20 242:24,24,25 243:2,3,7,11 245:4 246:1,2 246:4,5,9,11,13 246:15 248:3 252:9 261:24

262:1,2 264:22 264:25

**awful** 154:20

**awu** 2:10 275:2

**b**

**b** 4:1 224:9

**back** 13:21 21:7,14 39:1 39:15 45:9 50:22 59:22 69:6 76:17 79:14 82:11 84:8 94:2 95:11 98:9 105:13 110:16 124:6 137:16 139:7 140:8 144:1 149:16 152:15 164:3 168:3 179:25 207:9 230:8 231:8 241:7,25 242:2,13,16 245:1 253:1 258:16,16 269:18

**background** 262:15

**bad** 34:22 36:3 36:5 65:2,3,7 66:22 67:20 68:18 109:7 119:20 169:18

209:4 218:10 218:21,24 **badly** 188:18 189:5,10 **badmouth** 35:19 **badmouthed** 186:24 **baker** 1:18 2:8 **bakerhostetler** 7:5 **bakerlaw.com** 2:10,11 275:2 **balance** 224:20 224:21 **bank** 32:1 **barbara** 224:2 **barbier** 1:7,10 1:12 2:7 3:5 6:19 7:11,12 7:16,18 38:4 38:16 46:21 66:21 67:3,20 68:17,21 79:16 95:13 97:4 104:13 110:18 113:8 121:2 124:8 131:13 149:18 159:3 168:4 172:11 172:18 173:19 180:2 203:3,16 207:11 219:6 222:10 231:10

253:3 272:12 273:1,6 275:5 276:2,24 277:2 277:4,12 **barry** 44:10 45:16 47:6 52:4,21 53:12 53:23 54:9,17 56:21 57:1,5 57:16,19,23 58:21 59:6 78:21 **barry's** 45:23 46:8,24 55:17 79:1,4 **barrys** 59:2 **base** 86:5 106:20 123:23 127:7,16,24 128:15 **based** 8:12 11:20,21 12:15 12:18 13:1,2 13:16,17 14:3 16:15 17:7,8 18:13 19:15 20:3 25:7,8,17 64:11 78:18 83:4 85:25 86:7 87:21 105:1 107:18 108:1 124:19 124:25 126:7 126:13,21,23

126:25 132:6 132:17,23 133:15,17 136:9 142:21 143:15 144:10 150:15 152:24 158:25,25 159:6 162:23 179:12,15 197:25 200:8 228:21 231:15 232:1 244:21 251:4 257:1 258:6 269:24 269:25 **bases** 167:7,14 **basic** 54:1 56:16 85:8 **basically** 165:12 201:22 222:25 227:22 **basis** 21:3 22:11,14 27:7 27:8,15 101:9 101:11 133:5 143:17 146:20 146:22,22 148:23 149:3,8 150:16,17 194:4 211:6 214:12 221:4,4 239:1 242:5 254:20 255:5 255:10,12

259:23 267:15 **bate** 205:5 **bates** 38:2 45:13 81:16 95:4 96:22,25 101:15 104:10 162:24 195:18 203:23 204:12 219:3 229:14 237:11 **battle** 153:18 **bcc** 98:14 **bcc'd** 97:13 98:19 **bccing** 98:6 **beans** 165:25 166:1 **bear** 105:13 **becoming** 228:1 251:7 **began** 81:5 84:22 87:10 95:24 96:3,9 198:6,9 212:4 252:19 **beginning** 29:3 46:23 84:20 111:20 256:24 **begins** 6:18 46:9 52:10 53:20 163:2 264:9 **behalf** 6:24 7:9 7:11

**[behavior - bik]**

**behavior** 64:17 232:11 240:21 240:21

**belief** 179:12 179:15 214:12 244:10

**believable** 227:9

**believe** 16:21 21:1,6,10,12,13 21:16 23:17 25:5 26:12,14 30:11,12 32:11 33:15,24 34:2 36:2 37:17,19 40:1,2,4,5,14 40:15,17,24,25 41:2 42:19,23 42:25 50:8,9 50:17 51:4,15 53:6 61:6 63:2 64:3,13 65:12 65:17,18 67:14 70:16 71:3,14 73:15 75:23 80:4,19 87:25 89:22 92:8,11 92:15 93:17,21 95:18 96:14,19 100:20 104:1 105:20,21 107:1 109:9,20 110:22 122:16 126:19 133:6

134:2,8 135:13 136:4 137:19 137:25 139:10 140:7 145:15 146:14 150:16 151:2 152:6 156:25 157:18 158:13 160:17 178:11,14,17 179:8 184:6,6 190:1,8 191:12 195:8,10 196:5 197:9,19,21 198:8 201:22 208:6 209:23 210:9,19 212:13 213:9 213:25 214:4,5 214:23 215:14 216:15 217:7 219:17 223:8 223:17 227:4 229:11 240:5 241:1 244:8 245:1 246:11 254:1 255:20 256:16 258:1 260:13,14 261:17 266:18 267:4

**believed** 27:8 150:17 178:12 178:18 179:9 183:21 184:5,9

**believer** 39:17 39:24,25 40:10 40:20,23 41:6 41:12,14,20 42:2,4

**believing** 21:3 21:3 22:15 194:4

**bell** 122:23 267:10

**ben** 227:4

**benefit** 62:14 62:20,22,22,23 62:25 63:3,10 63:12,19,23 74:18 173:22 174:4,8

**benefits** 61:5 62:24 63:15

**benesch** 110:24 122:16 123:3 124:15,18,24 124:25 125:21 126:2,2,9,13,16 126:22,25 127:5 130:16 130:20 132:1,1 132:6,12 133:1 133:4,6 136:2 136:21 137:1,6 137:11,17,18 138:1 142:5 143:15 144:10 144:19,23

145:1,5 148:16 148:20,22 149:2,7 181:8 181:11,12,14 181:20,24 182:3 190:15 190:22 191:23 261:4,7 271:14 271:25

**best** 22:13 25:10,18,19 26:7,15 58:10 58:17 80:16,18 118:7,8 121:10 122:6 141:5 155:9 176:2 194:19 198:13 218:18 230:9 230:20,21 253:9 256:11 257:2 260:2 261:13,20 270:4

**better** 10:13

**beyond** 12:6

**big** 12:20 61:21 72:24 75:25 85:4,16 119:13 135:20 140:20 144:6 147:11 148:8,10

**bik** 159:11 268:25

**biking**  21:23
**billion**  60:1,13
   72:16
**billy**  2:13 7:10
**binding**  8:7
**binds**  54:23
**bioanalyses**
   92:25
**bioanalysis**
   92:15 93:11
   208:5 211:2
   213:2,2,20
   214:15 215:19
   216:10
**biological**
   208:1
**biology**  207:4
**biomarker**
   103:4 163:13
   169:25 208:2
   208:14,18
   210:2 212:16
   220:24
**biomarkers**
   207:25,25
   208:7,10,13
   212:9,17,22
   215:19 216:11
**biopharma**
   66:20 67:5
**biotech**  29:25
   87:14,19,23
   88:1,3 91:6,10
   91:13,17

258:17
**biotechnology**
   98:12
**bit**  32:22 51:19
   156:23 158:8
   183:15 195:5
   212:15 265:21
   269:19
**bjacobson**  2:15
**blew**  67:23
   68:8
**blind**  4:21
   175:13 213:12
   213:14
**blinded**  213:15
   213:16,20,22
   214:2,4,5,13,14
**blot**  163:8
   164:22 238:24
**blue**  27:6 173:7
**board**  4:6,8,9
   5:2 28:5,15,17
   36:22,23 37:1
   37:3,5,7,15
   38:11 43:3,7
   43:18,20,23,24
   44:3,4,7 45:18
   46:4,16 47:2
   57:2,17,21
   58:8 59:10
   86:2,19,21,23
   87:4 89:24
   90:4,7,11,15,19
   95:18 96:15

105:22 111:23
113:2 114:13
114:13,20
116:15,19
117:12 119:6,7
119:10,14,16
120:5,20,20
121:3,3,7,9,16
123:7 125:6,14
125:16 126:5,7
127:2,7,12,24
128:4,14,18,24
129:13,14
133:21 134:20
135:15 136:3,6
136:9,11 137:6
137:11 139:1
139:19 140:24
140:25 141:1,7
142:20 143:13
144:9,20,24
145:2 146:18
147:1,2,10,13
147:14,15,20
148:3,4,11,11
148:16,20,22
149:2,7 150:12
150:17,20,24
151:1,13,16,18
151:21,22,23
151:23,24,24
153:8 155:19
159:10 165:18
165:19 166:4,8

167:10 181:25
192:14,18
195:20 198:6,9
198:11,12,12
198:14,19
201:25 204:2
204:15,20,25
205:8 206:1,12
206:19,21
210:5,9,10,11
210:20 221:7
221:19 222:12
222:19 224:8
224:14 241:10
244:20 245:19
247:5,12
249:21 259:5
271:2
**board's**  57:13
   146:11,13
   147:7 149:19
   150:2,10 167:7
   167:14 269:23
**boards**  32:11
   32:18
**bob**  97:9 98:1
   104:22
**bonus**  4:3 31:5
   31:7,14 79:17
   80:1,3,6,12,16
   81:5,22 82:8
   82:22 83:3,16
   84:22 87:15,15
   87:24 88:4,5

88:10,14,21,22 89:15,18,21 90:1,9,19 91:7 91:13,21,25 92:19 94:6,11 94:16 95:23 96:3,10 99:11 99:19 101:7 102:4,7,11 103:8,11,17 104:6,24,25 105:15 106:11 106:16,25 107:2,4,11,13 107:17,25 109:16,22 110:2 211:14

**bonuses** 105:11

**boost** 88:15,23 89:1,4,6,10 92:17 93:3

**borderline** 184:1

**bottom** 38:24 52:13 53:21

**bought** 33:13

**box** 219:17,19 220:2

**brain** 8:8 21:2

**break** 35:2 45:5 48:8,20 55:9 55:12 79:8,10 80:15 110:9,11 110:12 124:9

146:7 149:12 179:18,19 206:25 207:2,4 231:4 252:22

**brief** 45:8 79:13 110:15 149:15 179:24 182:22 207:8 231:7 252:25

**brightest** 22:13 25:10,18 26:7 257:3

**brilliant** 217:10 236:6

**bring** 121:12 123:3 124:10 145:18 151:4

**bringing** 39:1

**brink** 39:1,4

**broad** 64:6,6 72:7 73:25 76:3 83:7 98:18 157:17 163:7,18 186:9 220:19 221:8 235:2 268:5

**broadly** 221:9

**brochure** 245:6

**brodkin** 1:4 6:25 111:3 159:16,20 160:7,19,22 161:6 171:7 172:17 173:13

175:2,18 176:4 177:17,22 178:7 185:7 189:4,9,17,23 193:20 232:24 233:13

**broke** 75:11 186:6

**brought** 210:20

**built** 60:1

**bull** 227:8

**bunch** 134:25 219:24 257:15

**burns** 1:8 2:7 21:18,20 22:5 22:6,15,19,22 23:2,5,7,11,13 23:17 49:6,10 50:7,12 51:13 51:16,23 69:1 69:25 70:4,17 84:14 89:15 107:14,19 108:13 182:5 182:10,17,24 183:7,17 229:4 242:9 250:19 252:14

**business** 26:9 61:2 152:12 184:21 241:7 257:1

**busy** 222:25

**butt** 256:17

**button** 136:7 150:5

**buy** 257:19

**c**

**c** 2:1 12:23

**call** 65:12 189:13 190:15 215:2 230:23 231:2 266:25 267:6

**called** 36:16 65:11 85:13 131:13 137:9 144:20 187:18 188:25 192:10 213:19,19 214:14 235:9 243:8 267:6

**calling** 26:13 186:20 188:11 232:9,10 270:3 270:5

**calls** 15:18 128:22 186:23 187:20 188:17 188:17,19 189:4,9 251:1

**camp** 223:13

**campbell** 2:17 6:13,14 7:8,8 12:3 80:7 115:2,19

**[campbell - cassava]**

117:22 118:1 118:11,16 119:1 122:2,12 123:19 124:1 125:24 126:14 130:1,19 131:6 131:21,25 132:4,9,15 133:11,18 134:13 138:11 139:2 140:14 142:25 143:2,6 143:8 146:1 148:19,25 149:5,10 159:5 159:12 162:12 163:20,24 164:10 166:21 167:20,24 179:13 180:18 181:3,16 186:13 190:20 192:16 197:11 200:14,24 226:12 228:18 229:1 236:17 239:17 240:1 242:1 247:23 256:6 261:2 262:11 264:24 265:6,16 266:1 268:3 269:2 270:16 271:15 272:8

**campbell's** 197:16
**candidate** 8:5 40:20 42:4 64:1 67:21 141:6 219:16
**candidates** 61:9 75:18 141:5
**cap** 59:24,25 60:4,9,14,17 83:5,14 85:25 87:22 100:5,16 100:23 103:25
**capacity** 57:3 89:3 263:21
**capitalization** 83:8,9 85:16 85:17
**capture** 27:23 164:7 241:23
**care** 23:2 138:4
**career** 10:12 256:13,25 258:11
**careful** 82:14 123:11
**carefully** 74:2 74:13 83:19
**cares** 58:25
**carl** 219:6
**carries** 147:12
**carry** 148:12

**case** 1:5 15:13 111:2,6 134:25 142:21,22 145:19 150:18 151:6,10,25 152:1,2,5,13,20 155:22 158:1,5 159:8,9 188:9 206:4 246:22
**cash** 4:3 29:8 32:1,13 35:6 39:7 79:17 80:1,3,6,12,16 81:5,21 82:8 82:22 83:23 88:4 89:14,17 91:7 94:6,7 95:23 96:3,10 99:2,11 100:5 100:10,15,24 101:7 103:7 104:5,24,25 105:16 106:11 106:16,25 107:2,2,13,17 107:25 108:23 109:15 211:13
**cashbonusoct...** 104:19
**cassava** 1:7 2:17 4:7,15,20 5:2 7:9 10:16 11:25 13:7 14:22 22:23

24:9 27:18,21 28:5 29:2,10 29:16 30:19,20 30:21,23 31:1 31:2,16,19,21 32:5,15,18 33:3,6,10,12,13 36:19 38:2 45:13 50:22 54:10 58:4,20 59:13,17,22 60:12,21 61:6 62:7 63:8,24 66:21 67:4 68:20,25 70:1 70:5,6,7,17 72:12,13,20 76:12,25 78:20 81:16 95:4 96:22,25 101:15 104:10 109:20 110:19 110:21 113:7 126:7 132:13 134:17 140:10 142:17 143:12 148:9,17,23 149:3,8 150:12 158:4,5,16,22 160:7,20 161:15 163:10 163:12 165:16 165:21 168:7 168:11 169:24

170:9,10,20
171:8,15
173:10,22
175:13 181:25
183:22 184:9
184:14 185:8
187:4,17 188:1
188:15,22
189:2,11,24
192:24 193:16
194:8,11
195:18,20
203:24 204:3
204:12 205:5
211:25 214:18
215:16 216:2
216:18,22
217:17 218:5
218:24 219:3
225:3 229:15
233:11 236:11
236:21 237:24
238:17,19
239:6,11,22
244:7 245:5
246:2 247:21
250:4 251:13
251:18 253:4,9
253:16,20,21
253:22 254:2
256:2 260:3,18
260:21 261:14
261:21,24
262:7 264:15

264:22 267:12
267:20 268:11
269:4 270:25
271:2,10 275:4
276:1 277:1
**cassava's** 67:21
69:1 71:25
79:17 89:12
110:22 146:8
146:24 155:2
156:15,20
157:8,14
209:20 212:23
215:17 221:6
222:12 234:22
245:23 246:6
246:19,22
247:3,10
249:24 262:2
**casually** 183:6
**cat** 219:18,19
220:2
**categories**
163:7,18 164:5
168:3 187:11
**categorize**
35:14
**category**
162:22 168:18
185:10
**cause** 1:15
35:21 79:5
100:11,18
188:1,15,21

189:1 209:14
235:12 240:23
**caused** 47:13
185:8 187:17
188:4,7 235:14
238:3
**causes** 218:13
**caution** 84:23
111:11 133:9
162:14
**cc'd** 98:19
**cell** 24:24
**ceo** 7:23 10:16
15:11 18:10
19:11 26:18
28:5,14,16
43:13 44:19
46:17 57:5,10
57:11,12 58:6
58:21,23 59:2
59:22 60:5,15
60:21 61:7,8
62:13,19 63:3
63:14 64:3,14
64:22 66:20,21
67:4,5 68:14
69:10,14,22
70:8 72:19
73:1,15,24
74:17,23 75:3
75:16,23,24
77:14,18,25
78:21 81:2
83:15 89:3

98:10 105:24
113:9 121:6
125:3,16
140:18 144:3
147:13,16
158:19 164:12
164:21 209:13
213:6 230:7,8
244:21 254:4,7
254:25 260:6
263:21 265:10
265:12,23
266:8,13
268:13
**ceos** 268:16
**certain** 20:10
21:16 31:6
83:4,8 100:17
163:13 169:21
169:24 207:23
208:13 232:8
**certainly** 20:10
34:7 86:2 87:3
111:16 112:12
112:16 125:7
127:11 133:3
135:14 165:25
174:15 192:1
211:21 215:15
221:2,3 239:6
249:5 267:15
**certificate** 3:8
273:12

**certification** 273:1
**certified** 273:3 274:3
**certify** 273:4,15 273:23
**cfo** 105:22,24 105:25 134:2 135:8,15
**cgr** 2:5
**chain** 45:17
**chairman** 28:5 28:14,16 119:6 129:14 147:14 151:24
**challenge** 38:25
**challenged** 178:13
**chance** 44:9 78:16 157:4
**chang** 101:23
**change** 157:8 157:15 158:4 207:1 276:4,7 276:10,13,16 276:19
**changed** 25:20 158:6
**changes** 3:7 273:20,21 275:10 277:6
**characterizati...** 67:8 118:3

**characterize** 117:17,20,22 119:23 155:6
**characterized** 214:16
**characterizing** 155:4
**charade** 4:18 173:11
**charged** 49:14 130:24 133:3 151:5
**charging** 133:4
**charles** 238:13 238:21 239:3 239:10
**cheap** 217:15 217:15
**check** 96:19 136:4 145:20 214:22 217:2
**chief** 134:9,9
**choice** 46:5,16 47:3 57:11 58:4,12,21 59:2
**chris** 138:9,14 138:17,24 139:1,19 140:12 203:4 203:12
**chronological** 114:9

**chronologica...** 114:9
**chronology** 115:24
**chunk** 116:14
**chunks** 116:13
**circumstances** 46:2,25 47:6 159:25 190:5
**cited** 225:24
**citizen** 17:14
**citizens** 15:25 16:3 17:6,19 17:24 18:3 19:25 20:5,12 20:17 112:2,5 116:24 195:9 198:18 226:5 226:20 227:10 227:14 228:2,5 228:16,25 229:5,9,12 230:17,25 232:21 253:24 258:8 259:7 269:16 270:3
**civil** 1:20
**claim** 54:23 69:9,13 115:16 178:19 179:9 224:4 238:25 244:24 256:5 262:8 271:20

**claims** 54:4 111:21 112:10 112:23 113:6 117:2,6 130:21 148:24 196:9 196:20 197:8 197:23 199:17 200:7,22 202:21 204:7 204:25 205:13 205:21 221:23 226:11 245:23 264:17
**clarick** 2:3 6:24 7:2
**clarify** 71:11
**clarifying** 147:6
**class** 68:1 257:7,10,23 264:18
**claudia** 197:13
**cleanly** 150:9,9
**clear** 7:21 13:21 18:10 35:13 41:9,17 42:17 44:20 49:7 64:7 81:4 114:2 115:11 118:11,20 120:24 126:10 130:7 131:2 134:23 135:21 136:1 139:15

**[clear - committee]**

143:5 144:19 145:8 151:8 156:21 159:2 191:9 251:16 270:11,17

**clearance** 33:20

**clearly** 99:24 185:22 189:20 194:1 198:19 208:16 210:24 269:25 270:11 270:22

**clicks** 153:14 153:15,17

**client's** 193:22

**clients** 111:5 159:16,20 160:1 163:18 164:8 171:15 176:4 178:12 178:21,22 183:21 184:5,6 184:9,12,13 185:4,18 186:2 186:12,23 187:4,17 188:1 188:8,14,20,23 189:7 194:21 236:15 240:18 240:20

**clinical** 53:10 60:18,22 61:6 61:16 62:12

63:4,10 64:8 64:10 67:23 87:22 89:5,7,9 89:12 92:7,10 92:14,23 93:1 93:2,3,5,7,10 93:15,18,24 163:14 169:25 186:18,20,24 187:1,6,19,21 188:11,12,17 188:20 189:5 189:10,13,15 220:4 232:4,7 232:12,14,18 232:20,23 233:1,4,5,8,11 233:12 253:5 253:11 270:3

**close** 37:8,16

**closed** 230:18

**closing** 100:5

**club** 257:5

**coast** 65:13 223:1,2

**coffee** 260:15

**cofounders** 66:9

**cognition** 215:21 216:12

**colin** 267:8

**collaborate** 257:7,9

**collaborated** 26:6 259:2

**collaboration** 257:15,22 258:2,24

**collaborative** 258:21

**collaborators** 259:9,19

**colleague** 7:6

**colleagues** 43:11

**collectively** 70:11 258:20 270:7

**colorado** 2:19

**column** 106:15

**come** 10:11 15:3 27:6 122:7 137:16 165:14 184:17 221:12 238:13 251:20 252:3

**comes** 75:17,25 148:13 157:6 160:10 167:20 187:24

**coming** 10:15 63:7

**comission** 67:25

**command** 134:8

**commence** 127:25 128:15 138:10,18 140:4 142:17 143:12 149:24 150:1,3 167:8 167:14 182:11 182:12 223:14 223:23,25 234:18

**commenced** 142:20 251:12

**commencem...** 141:9

**commencing** 146:9,25 149:19

**comment** 113:4 234:21 263:25

**comments** 112:21 164:20 181:1

**commitment** 56:23

**committee** 5:2 5:4,6,8,10,12 5:14 30:2 46:4 47:2 80:19,21 80:22,25 81:1 81:3,7 83:22 86:2 87:4 89:22,23 90:3 90:3,7,11,13,15 90:18,24 96:9

96:18 97:16
98:21 99:19
105:7 107:23
114:20,24
115:3,7,17
116:16,18,20
117:5,10,15
120:21 121:8
121:10,16
127:13 136:6
136:13 137:20
137:22 138:1,2
138:3 139:13
139:22 140:24
141:18,21,23
141:24 145:2
165:20 166:8
195:6,7,8,12,20
196:8,17 197:4
198:1,4 199:1
199:13 200:3
201:14,19
202:16,24
203:6,16

**committees**
116:17

**communicate**
193:19 228:10
228:16,24
259:1

**communicated**
24:5,21 25:2
189:23

**communicating**
43:11 233:10

**communication**
24:8 115:4
162:13,16,23
181:17

**communicati...**
13:12 14:5
80:8 84:24
115:5 117:23
118:13 119:2
130:3 132:6,18
133:12 138:14
159:6 179:15
180:19 197:12
201:1 209:23
233:11 267:7

**community**
76:21

**comp**  30:2
80:20,21,22,25
81:1,2 86:2
89:22,23 90:3
90:3,7,11,13,15
90:18,24 96:9
96:17 97:16
98:21 99:19
105:13 107:23
140:24

**comp2020**
97:20

**companies**
31:24 32:18
87:19,21 88:1

91:6,10,18
93:6 98:11

**company**  8:13
19:11 20:10
27:22 28:21,23
29:4,23,25,25
30:5,13 31:7
31:10,19 33:14
35:20,24,25
37:10 39:1,4
40:9 41:8,17
44:19 46:1,17
47:11,14 48:10
48:12,14 49:6
49:10,13,19,20
50:5,9 54:18
54:22 57:6,7
57:15 58:4,7
58:11 59:7,24
59:25 60:2,22
62:7,9,13,20
63:2,10,14,17
63:19,20 64:4
64:8,11 65:9,9
65:11,12,13
67:23 68:8
70:24 71:4
72:15,16 73:16
73:24 74:24
78:7,11,20
79:22 83:8,21
83:23 85:5
87:14,23 88:4
91:13 99:20

100:12,17,23
102:24 103:1,2
110:1 111:21
112:9,11 113:5
113:9 116:3,4
116:18 123:2
123:18 124:11
124:14 125:4
125:17 126:5
126:20,24
127:2,3,16
128:9,10
129:24 135:16
137:17 138:6,7
139:16 140:2
140:13,18
141:12,18
142:4,20
143:18,25
147:2,12,12,14
147:17 148:3,5
148:6,13
150:14 151:5,6
154:13,15
158:24 162:16
164:9,21
166:25 178:13
180:10 183:2,2
185:4,19,21
186:1,2,12,24
188:5,7,14,18
188:21 189:5
191:4,10,15,22
192:4 193:1,14

194:16,18,19
201:16 203:10
203:13,14
210:21 211:11
211:14 212:11
214:20,24
215:20 216:11
218:15 220:10
220:10 221:14
223:17,21
225:11 226:11
226:20 227:23
227:25 228:12
228:17,24
232:9 236:16
236:24 239:15
239:15 240:22
242:4,11 252:7
254:5,8,10,12
255:1,9,13,23
255:24 256:4
259:1,5,8,14
260:7 265:13
265:19,23
266:13 267:25
268:16 269:1
270:1 271:20
271:25

**company's**
20:10 36:17
39:7 58:10
60:4,11 61:23
62:4 85:16
92:17 93:4

103:25 131:24
140:21 147:7
147:19 156:11
158:11 162:1
163:13 169:25
226:6 229:8
230:13,24
234:23 235:5
253:19 270:8

**comparables**
30:1

**compared**
236:16

**compensated**
70:6,8,10
85:21

**compensating**
98:9

**compensation**
29:2,6,8 30:9
30:10,14,23,24
30:25 31:11,15
31:18 32:12,15
32:16,17 70:5
79:24 80:19
81:6 83:13,22
85:6 87:4
91:19 94:8
101:23 105:6
105:17 124:22
239:8,9

**complaint**
49:15 180:9,17
180:23 181:7

181:15,21,24
182:3,6 192:5
192:12,15,21

**complaints**
180:3,6

**complete**  166:9
225:23 226:7
226:21 227:16
228:3 266:9
277:8

**completed**
166:14,15,17
166:23 167:1,4
167:10 275:16

**completely**
210:14

**completion**
167:17 273:18

**complex**  79:21
83:25 104:2
105:17 109:24
257:13

**complexities**
241:3

**complicated**
85:9 220:8

**comprehensive**
232:2

**computerized**
1:17

**concept**  34:17
34:18 85:4
168:14,25
169:11 187:13

188:10

**concepts**
185:15,25

**concern**  129:8
231:12 235:3
235:12 249:8
250:2

**concerned**
60:17 147:18
235:8 248:24
249:2,2,6
250:10,23
251:7

**concerning**
224:8 235:6
254:13 263:1

**concerns**  23:7
128:25 211:8
211:23 212:1
259:10,20

**concerted**
154:18,23

**concluded**
227:15 228:2,4
272:14

**concludes**
272:11

**conclusion**  16:2
20:25 120:1,2
209:17 228:6
265:18,20

**conclusions**
16:14 17:8
18:22 19:6,12

19:15 20:3,14
20:14 248:14
261:12
**condition**
105:19,23
**conditioning**
88:13,20
**conditions**
87:15 105:22
244:4
**conduct** 121:20
130:17 132:12
166:4 168:20
191:4,11,16
210:1,8,14
211:10 212:4
217:24 218:5
225:20 244:3
251:21 256:12
270:25 271:3
**conducted**
11:21,24 12:9
121:23 123:9
126:9 131:4,13
210:3 212:16
213:13 214:21
215:5 216:18
216:22 217:17
218:2 237:7
242:20 246:3,5
246:6 250:6
257:12 260:12
261:4,8

**conference**
23:23 154:3
**conferences**
24:18 154:13
**confidence**
110:5,6
**confident** 257:8
**confidential**
98:24
**confirm** 21:8
**conflict** 165:5
211:9
**conflicts** 165:6
211:9,24 212:2
237:2
**conformation**
21:2
**conformations**
21:7,14
**confused** 28:2
**confusing**
53:14 137:3
183:15 212:13
271:16
**confusion**
139:25
**congress** 1:19
**connect** 14:19
14:20 101:22
194:13 237:21
**connection**
23:18 37:14
103:6 112:22
120:18 121:12

181:7 215:20
216:11 229:8
245:17 249:16
**connolly**
110:24 122:16
200:9 201:2
**consensus** 58:9
60:7
**consent** 43:8
**consider** 16:4
16:18,24 17:2
17:10,24 20:16
42:10,12 61:15
73:10 88:10,13
88:20 91:20,24
93:24 113:13
153:1,3,10
170:16 221:17
223:15 224:1
226:10 231:11
231:24 234:4
234:19 238:6
240:24 244:17
244:24 245:16
245:21 247:3,9
247:20 249:15
**consideration**
127:4,14 128:7
231:25 238:7
**considerations**
124:20 128:14
**considered**
15:22 16:11
18:8,18 19:3,7

19:13 23:10
42:7 85:17
113:5 123:12
148:10,10
170:22 184:13
**considering**
111:21 198:7,9
198:14 211:10
**consistent**
174:7 226:23
**constitute**
188:13
**constitutes**
93:18
**constraint**
146:5
**constraints**
43:4,8,17
133:16 144:16
145:12,25
251:5
**consult** 69:19
121:1,11 235:1
**consultant**
91:14 211:14
211:20
**consultants**
91:8 120:10
121:11
**consulted**
120:17 121:19
123:18 124:11
140:3 238:11
243:22

**[consulting - counsel]** Page 20

**consulting**
  32:10 120:25
  122:10 125:8
  127:23
**contacted**
  234:11,20
  235:4
**contained**
  163:8 164:23
**contains**
  180:10 273:21
**contemplated**
  113:5
**contents**
  243:12 249:8
**contest** 66:20
**context** 9:10
  10:1,9 21:22
  23:23 36:1
  57:9 65:8,9
  75:9 112:14
  169:7 184:23
  185:11 191:20
  217:25 220:20
**continue** 43:14
**continued**
  192:9 270:2
**continues**
  68:24
**continuous**
  158:13
**continuously**
  156:25

**contracts**
  209:24 264:15
**contributed**
  61:7
**contributing**
  162:5 257:25
**contributors**
  175:2,17
**conversations**
  109:2 135:4,8
  135:22
**converted** 97:2
**convey** 40:22
  209:19
**conveyed** 44:7
  227:21
**conveying**
  227:22
**convince** 15:16
  19:18
**cook** 138:9,14
  138:18,24
  139:1,16,19
  140:2,12
  141:12,17
  142:3 203:4,10
  203:12
**cool** 154:19
**copies** 9:14,19
  201:17 275:14
**copy** 6:8,14
  98:14 195:25
  196:15 200:2
  204:2,20 205:8

273:12
**copying** 104:14
**corporate** 16:7
  16:8 51:21
  123:6 126:6
  201:16 230:7
  230:15
**corporation**
  203:4
**corporations**
  148:4
**correct** 12:17
  14:2 21:19
  22:3,4 24:4
  28:8,9,18
  38:22 61:25
  68:9,10,12
  70:14 74:20
  77:1,2 80:23
  81:8 84:2,3,4
  86:23 92:5
  101:13 105:10
  107:8,13,21
  109:13 117:3
  123:4 124:17
  126:11 127:22
  129:21 132:1,8
  133:19 141:14
  141:21 151:12
  153:23 156:1
  157:25 158:2
  174:10 179:11
  183:19 212:19
  212:21 213:17

218:4 226:22
  241:12 242:19
  246:20 256:1
  277:8
**correction**
  89:22
**corrections**
  231:12 277:6
**corresponden...**
  263:22,22
**costs** 264:17
**counsel** 6:20
  12:4,19,25
  13:14 14:4
  80:8 96:14
  111:13,14
  115:4,7 117:23
  118:9 127:5,7
  127:23 130:3
  132:7,18
  133:13 134:16
  134:16 141:3
  143:10 159:7
  162:13 179:16
  180:19 181:17
  186:14 187:13
  191:13 192:17
  192:19 195:11
  201:2,6,21
  203:5 221:10
  265:8,9,23
  269:22,25
  270:25 272:7
  273:23 275:14

**[count - data]** Page 21

| count | crafted | 207:25 208:4 | **d** |
|---|---|---|---|

**count** 59:3
135:18
**counted** 24:7
24:11 72:8
**counting**
169:15
**couple** 32:11
65:10 212:17
267:3
**course** 10:15
24:9 25:21
42:9 73:23
75:3 78:14
104:24 124:1,9
125:11 128:9
129:9 157:13
225:2 235:14
**court** 1:1 6:21
58:15 150:4
152:21 190:22
191:18
**cover** 171:21
172:6 173:10
174:17 175:14
**coverage** 70:23
71:4 242:12
**covid** 104:1
109:17
**cowardly** 241:6
**cp** 18:12
112:16 113:19
227:1 230:4
247:16

**crafted** 80:3
**crafting** 80:14
**crap** 227:8
**create** 80:15
81:4 84:22
86:18 99:6
**creating** 99:11
**creation** 80:6
80:12,13 82:8
82:21
**credence** 55:21
**credibility**
70:20
**credible** 171:1
184:3 256:13
**criteria** 165:17
202:1
**critical** 53:20
53:24
**criticism**
184:23,23
**criticizing**
35:25
**critics** 68:20
72:1 158:24
268:25
**cro** 233:4
**cross** 244:23
**crossed** 65:23
92:2
**crutcher** 2:18
**cs** 275:15
**csf** 92:15,25
93:11,15,15

207:25 208:4
208:14 210:2
212:16 213:20
215:19 216:11
245:5,22
**csr** 1:16 274:7
**cuny** 12:23,23
12:24 13:13
14:4 56:5
188:24,24
189:23 210:8
211:22 215:5
215:19 216:10
218:22,24
242:21 244:3
246:3,7 247:17
248:20 249:4,7
249:15,21,25
256:13 261:15
261:22 262:3,8
262:9,21 264:9
264:13,15,23
265:3,4,13,24
266:9,15,19,21
**cuny's** 247:14
247:21 248:1,5
248:14 250:5
**curious** 186:22
211:15
**currently** 33:3
67:3,9,15
**cut** 38:13 44:24
**cv** 1:6

**d** 3:1 262:21
**daiichi** 98:10
**damage** 223:20
223:21,22
235:15 264:16
**damaged** 270:8
**dark** 47:11,13
48:10,11,13
**data** 5:18 8:15
8:16 9:2,4,5,9
9:11,13,14,15
9:18,19,20
14:21,22 15:2
16:15 17:8
21:12,12,16
26:2,3,10,11,13
29:7 68:6,18
77:6,17,18,21
77:21,21 78:2
89:5,8,9,12
92:3,8,10,12,13
92:16,19,23,23
93:1,2,3,5,7,9
93:10,15,17,18
93:20,23,24,25
103:4 165:7,7
170:3,5,6,9,11
170:12,17,23
170:24 179:3
209:2 210:18
212:5 213:23
214:3 216:19

**[data - defamation]** Page 22

216:23 217:8
217:18 218:2,7
218:8,9,14,16
218:19,20,20
218:22,24
220:11 221:2
221:12 224:21
224:24 233:21
245:5,6,22
253:5,10,14,15
253:18,21
254:2,2,6,10,13
254:19 255:2,7
255:7,9,14,21
255:24 256:5
256:24 257:6
**date** 6:19 43:18
43:19 81:14
82:6 111:22
115:17 167:9
167:16 242:23
248:8 273:19
274:7 276:24
277:12
**dated** 38:21
45:16 95:15
97:5 99:3
104:13 166:12
173:11 195:21
219:6 225:10
229:18 233:22
237:13 262:21
**dates** 28:8 39:6
81:10 111:25

114:11,21,22
167:18 199:23
237:21
**david** 2:3 6:23
273:11
**day** 7:4 57:14
142:8 241:21
274:3 277:15
**days** 43:14,21
202:24 224:16
224:19 273:19
275:16
**dc** 2:14
**de** 33:16
**dead** 155:18
219:20 220:3
260:1
**deal** 267:17
**dear** 225:17
**debate** 82:11
125:15 128:5
**decades** 8:13
61:3 211:16
256:17
**december** 5:7
66:24 139:10
197:4,23
**decide** 58:15
104:25 106:7
157:4 158:22
159:10 201:19
**decided** 124:14
223:23 244:15
247:2

**deciding**
124:10 153:9
167:7,14
**decision** 52:10
52:14 57:13
58:9 119:9,17
119:19 120:12
120:19,20
121:5,12 123:6
123:7 124:18
124:24 125:4,9
125:12,22
126:2,6,6,12,16
126:21,24
127:3,8,16,24
128:12,15
129:2 130:13
130:14 136:1,2
136:16,17,19
136:20,25
137:6,24 138:9
138:18,21,24
139:17 140:3
147:1 148:2
149:24 150:1
152:3 165:20
182:14,15
183:4,4 192:20
193:5,7,12
198:20 201:24
203:11 206:2
208:12,17
210:1,4,7,23,25
230:9 264:14

269:23
**decisions** 72:25
119:14 147:11
147:11,13
190:6 191:23
192:6 201:21
208:16
**deck** 174:18
175:12
**decks** 171:7
**declare** 277:4
**decline** 173:22
174:5,9 270:5
**declined**
212:17
**deemed** 30:2
277:6
**deep** 227:7
**defamation**
110:19 111:7
111:10,21
112:10,23
113:6,23
114:10,18
117:1,6 119:22
121:12 122:20
122:25,25
123:3,18
124:10,15
125:9,13,17,22
126:21,25
127:8,21,25
128:16,23
129:1,7,10,15

**[defamation - describe]**                                    Page 23

| | | | |
|---|---|---|---|
| 129:17,17,24 | 197:22,23 | **deferred** | **depending** |
| 133:24 134:22 | 198:7,9,15 | 100:23 | 135:17 |
| 135:9,23 | 199:6,17 200:7 | **deficiencies** | **depends**  35:1 |
| 136:13,19,23 | 200:22 202:21 | 243:14 245:2 | 36:1,4 55:8 |
| 136:25 137:1 | 202:21 203:11 | **define**  9:7 70:3 | 96:4 162:3 |
| 138:10,19,22 | 204:7,25 | 75:6,10 96:5 | 169:7 198:11 |
| 138:25 139:16 | 205:13,14,21 | 220:18 | 217:19 |
| 139:17 140:4,6 | 205:23 206:2 | **defined**  83:10 | **deponent** |
| 141:9 142:5,18 | 221:17,22,23 | 85:14,15 94:8 | 273:16,17 |
| 142:19 143:12 | 222:3 223:15 | 107:1 178:19 | 275:13 277:3 |
| 143:20 146:9 | 223:25 224:5 | 179:10 | **deposing** |
| 146:13,25 | 231:11,14,23 | **definite**  188:18 | 275:13 |
| 147:3,19,20 | 232:1 234:3,18 | **definition** | **deposition**  1:10 |
| 148:9,17,24 | 241:18 244:16 | 34:17 186:14 | 1:12 6:18 |
| 149:4,9,20,25 | 245:18,23 | 188:10 266:4 | 41:23 272:12 |
| 150:1,11,13,21 | 247:2,11 | **definitions** | 272:14 273:1,8 |
| 151:6,10,14,20 | 249:17 256:3 | 143:20 | 273:10,18 |
| 152:4,22 153:9 | 261:1,8 269:24 | **definitive**  101:8 | **depositions** |
| 154:4,8,22,24 | 271:20 272:2 | **delegate**  136:11 | 216:18 |
| 155:1,14,16 | **defamatory** | **deliberations** | **describe**  8:3 |
| 156:14 157:7 | 4:22 | 129:9 | 29:2 84:21 |
| 157:14,19 | **defend**  93:13 | **deliver**  63:15 | 93:9 111:9 |
| 158:3,12,15,23 | 239:15 242:5 | **delivered** | 118:7 131:18 |
| 166:19 167:1,8 | **defendant**  2:17 | 273:10 | 134:11 135:4,7 |
| 167:14 176:21 | 67:25 68:11 | **demand**  211:18 | 139:5 140:12 |
| 178:13,18,19 | 151:7 | **demands** | 142:23 143:2 |
| 179:8,9 180:4 | **defendants**  1:8 | 264:17 | 143:16 144:11 |
| 180:5,7,11 | 2:7 7:6 111:6 | **demonstrate** | 144:12 145:8 |
| 182:6,11,17,25 | 159:6 180:11 | 170:23 220:16 | 146:24 150:19 |
| 182:25 183:7 | **defense**  238:13 | 220:23 | 155:21 181:13 |
| 183:17 190:7 | **defensive** | **denver**  2:19 | 187:16 197:17 |
| 191:6,17,24 | 242:15 | **department** | 200:21 214:24 |
| 192:25 193:13 | **defer**  100:9 | 161:20 267:19 | 236:5 |
| 196:9,20 197:8 | | 267:20 | |

**[described - disclosure]**

**described**
103:3 108:20
112:21 120:11
128:13 160:18
165:17 232:19
242:17 258:3
**describes** 53:16
**describing**
117:13 144:21
**description** 4:1
209:20
**designed** 43:1,2
207:23
**desk** 65:24
**desperation**
68:19
**destroy** 270:11
**detail** 45:24
214:17
**detailed** 105:17
**details** 8:1
15:11 115:12
119:25 213:7
260:8
**determination**
83:22
**determined**
100:17 247:21
248:1
**develop** 42:14
76:23,24
**developed**
47:11 48:9

**developer**
42:14
**developers**
98:9
**developing**
41:18
**development**
54:15,15 56:22
61:1,9 62:7
70:21 72:17
86:1,8,10
87:16 116:3,4
169:4 208:15
220:21 221:5
**diagnostic**
174:20
**die** 93:6
**difference**
147:9,10
**different** 30:7
35:15 48:6
51:19 60:8
77:22 78:1,2
83:1 86:13
119:8,21,24
121:20 124:11
147:3 184:24
221:13 271:23
**differently** 73:6
**difficult** 51:17
85:2 221:12
241:23 257:13
258:20

**diligence**
121:21,21,23
122:4 123:9,10
123:13 125:5
126:9 127:4,6
130:18,21
131:5,7,8,10,13
132:14,22,25
133:2,6 136:23
137:8 143:16
144:11,13,20
144:23 145:5
150:16 185:4
191:5,8,11,12
191:16,19
192:2 231:18
232:2,3 234:9
241:17 261:4,7
261:11 271:19
271:24 272:4
**diminution**
43:12
**direct** 219:10
253:25 264:1
**directed** 12:4
271:2
**direction** 68:20
148:6 156:4,8
156:10
**directly** 193:19
**director** 57:4
95:18 147:15
149:3 183:2

**directors** 4:6,8
5:2 38:12
45:19 101:24
121:7 126:7
127:2,7,24
128:15 133:21
134:20 135:15
136:11 139:20
142:20 143:13
147:10,20
148:3,4,11,17
148:20,23
149:8 159:10
195:20 204:3
204:15,20
241:10 271:2
**dirty** 263:20
**disagree** 47:7
68:7
**disappointed**
75:11
**disclose** 143:10
215:4,10,12
**disclosed** 33:7
33:11 34:1
165:13 213:10
239:14,18,23
**disclosing**
84:24 130:12
214:25
**disclosure**
71:21 165:5
173:20 174:2
212:11,23

**[disclosure - document]**

| | | | |
|---|---|---|---|
| 215:23,25 216:1 | **discussion** 82:11 86:11 95:10 98:2 101:9,11 102:7 103:10,16 108:6 113:21 114:7,9,15 115:2,16,20 116:25 117:4 124:5 125:14 128:5 129:5,5 182:22 183:10 192:17,19 197:7 199:5,16 200:6 202:20 204:6,24 205:12 210:5 210:13,17,19 216:21 223:19 223:19,20 227:4 232:18 232:23 | 114:23 115:14 116:23 117:5,9 117:14,16 118:22 128:20 128:21 134:1,2 134:3,12 136:9 171:14,17 175:25 178:4 182:10,16,24 183:5,6 196:1 196:3 197:10 197:18 199:21 199:21 200:11 200:19,22 205:20 206:20 215:11 227:3,6 227:14 232:4,6 232:7,13 233:15 237:4,6 265:2,8 | **dismiss** 193:12 **dismissed** 192:25 **disprove** 47:16 48:23 50:10,15 50:18 51:5,10 51:17 **disproved** 169:6 **disputes** 104:7 **dissed** 238:11 **distinct** 154:7 **distinction** 141:22 **distinctly** 121:15 **distinguish** 28:1 |
| **disclosures** 30:12 47:12 50:4 51:21 194:6 215:21 216:12 | | | |
| **discourage** 268:8 | | | |
| **discretion** 106:7 | | | |
| **discretionary** 106:16 108:23 108:23 | | | |
| **discuss** 105:2 108:21 178:5 192:14 196:8 196:20 | | | |
| **discussed** 89:14 89:17 99:22 113:24 114:10 114:18 115:13 116:15 172:15 172:20 175:8,9 183:17 197:22 197:23 205:23 | | **disease** 40:16 40:18,21 41:3 41:4,7,13,15 42:3,5,5,8,20 42:24 174:21 207:16,21 220:17,19,24 | **distort** 36:7,17 **district** 1:1,1 **divulge** 82:15 **divulging** 121:25 133:12 **dkumagai** 2:5 **doable** 169:17 **docket** 176:21 **document** 38:2 38:6 45:12 52:1,2,3 56:19 66:19 80:14 81:16 82:5 83:19,25 85:3 95:4 96:22,25 97:19 99:6,24 |
| **discussing** 81:23 96:9 133:23 134:15 172:23,24 174:13,15 175:23 177:21 178:7 | **discussions** 12:8 80:20,25 81:6 82:7,15 84:22 86:3 87:1,5,10 95:23 96:2 99:13,14 108:5 108:9,12,15,22 109:4,6,14 111:12,14 112:15,22 113:2 114:4,17 | **disgraced** 67:4 67:9,15 **disgusts** 68:25 **dishwasher** 57:13 58:7 **dislike** 58:24 | |

| | | | |
|---|---|---|---|
| 101:8,15 | 258:14 270:2,4 | 98:8 104:15 | 215:2,4,12 |
| 104:10 105:18 | **doj** 14:15 15:9 | 105:8,9,12 | 216:15,25 |
| 109:24 161:11 | 15:12 162:6 | 106:7 107:14 | 217:6,12,18,25 |
| 161:23,25 | 250:14,17,20 | 107:18,19 | 218:7,14,19,24 |
| 162:5 166:11 | 250:22,25 | 108:1,13,22 | 222:10 224:1,2 |
| 167:17 171:19 | 251:8 271:13 | 109:11,12 | 224:2,18 |
| 171:23 172:1,2 | **dollar** 72:16 | 111:2,2,3 | 227:15 228:4 |
| 172:13,18 | 100:10 | 134:5,12,17,19 | 229:4,4 231:21 |
| 174:11 175:8 | **dollars** 34:7 | 135:5,22 | 232:24,24,25 |
| 175:22 176:16 | 69:3 70:1,5 | 159:11,20,20 | 233:13,13,13 |
| 176:23 177:20 | **dots** 14:18,20 | 159:21 160:22 | 235:19 236:5 |
| 180:10,13,14 | **doubt** 57:18,21 | 160:22,23 | 236:10,25 |
| 181:11 186:22 | 58:12 256:22 | 161:2,6,8 | 237:5 239:3,14 |
| 195:14,17 | **doubts** 214:6,7 | 163:9,12 | 239:15,22,23 |
| 196:13,24 | **dr** 6:25,25 7:1 | 164:24 169:24 | 240:3 242:8,9 |
| 198:23 199:9 | 12:23 13:11,13 | 170:5 176:4,4 | 242:21 243:9 |
| 200:1,10,17 | 14:5 15:13 | 176:4 178:7,7 | 243:21 244:3,7 |
| 202:12 203:23 | 21:18,20 22:5 | 178:8 182:5,10 | 244:18 245:22 |
| 204:11 205:5 | 22:6,15,19,22 | 182:17,24 | 246:3,7 247:4 |
| 219:3 222:6 | 23:2,5,7,11,13 | 183:7,17 185:7 | 247:10,15,19 |
| 225:6,18,19,24 | 23:17,21 24:2 | 185:7,7 188:25 | 247:22 248:6 |
| 227:21,23 | 24:6,9,12,19,21 | 189:1,3,4,4,9,9 | 248:16 250:1,5 |
| 228:5 229:14 | 25:2,5,14,20 | 189:10,17,17 | 250:6,10,14,19 |
| 229:14 233:17 | 26:4,14,17,22 | 189:18,22,23 | 250:23 252:14 |
| 237:11 262:17 | 27:2,9,14 49:6 | 189:23 193:20 | 256:5,12,21,23 |
| **documentation** | 49:10 50:7,12 | 193:20,20 | 257:2,21 258:2 |
| 138:4 148:14 | 51:13,16,23 | 208:9,12,16 | 258:10 259:2,9 |
| **documents** | 56:5,9,13 | 209:4 210:5,7 | 259:11,16,18 |
| 173:4 | 69:25 70:4,17 | 210:12,20,22 | 259:19,21 |
| **doing** 56:9 | 84:14,17 89:15 | 210:23 211:10 | 260:3,11,19,22 |
| 59:12 120:5 | 89:18,20,25 | 212:2,4,7,9,16 | 261:9 262:9 |
| 121:18 140:21 | 90:8,19 91:21 | 213:4,12,22 | 264:19 265:4 |
| 230:11 231:16 | 91:25 92:9,18 | 214:2,7,8,13,15 | 265:14,25 |
| 232:8 240:13 | 92:22 93:11 | 214:20,24,25 | 266:16,21 |

**[dr - egregious]**

268:25
**draft** 6:2,10
98:24 99:3,18
99:21,24
180:23 181:2,7
181:14,21,24
182:3,6 248:12
248:13 249:3
249:10,12,19
**drafted** 6:12
**drafts** 192:11
**draw** 18:21
19:12 20:25
45:15 53:19
263:9
**drawing** 37:14
265:18
**drawn** 82:25
87:12 252:7,19
**drew** 19:15
20:3,14
**drive** 119:17
**driven** 119:19
120:21 121:6
121:17 123:7
125:4 130:14
145:16,23
201:21
**drnotadr**
177:14
**drop** 194:8,19
233:8,9
**dropped**
155:16 232:21

**dropping**
230:18
**drs** 159:16
160:7,19 171:7
**drug** 5:18 8:5
40:5,15,17,20
40:24 41:1,14
42:4,14,15
46:2 54:14,15
56:22 60:3
61:1,8,17,17
62:7,9,10 63:7
63:16 64:1,12
67:21 68:15
69:11,15,23
70:21 75:18
76:23,24 77:3
78:19 86:1,7
87:16 98:9
116:3,4 169:4
207:23 208:15
219:15 220:7,9
220:20 221:5
224:22,23
233:22 235:24
**drug's** 234:24
235:7
**drugs** 61:11
72:16
**ducks** 241:20
**due** 121:21,21
121:22 123:9
123:13 125:5
126:9 127:4,6

130:18,20
131:5,10,13
132:14,21,25
133:2,6 136:22
137:8 143:15
144:11,13,20
144:23 145:5
185:4 191:5,11
191:12,16,19
192:2 228:9
232:2 260:6
261:4,7 271:19
271:24 272:4
**duly** 1:14 7:13
273:6
**dunn** 2:18 7:9
**duped** 69:5
**duties** 43:9
**duty** 210:24
231:15

**e**

**e** 2:1,1 3:1 4:1
48:18 276:3,3
276:3
**earlier** 19:24
70:12 72:15
74:8 92:3
120:15 157:18
178:11 226:17
231:14 260:13
**early** 28:20
29:8 43:22
56:23 73:6

105:2 120:1
224:22 249:3
256:18
**earn** 70:4
**earned** 31:25
**easy** 72:17
77:17 122:15
**eddie** 101:23
**effect** 77:19
207:15,20
220:17,24
**effective** 82:2
220:7,10
**effectively**
51:16
**effectiveness**
234:24 235:7
**effects** 220:18
**efficacy** 62:22
93:5,5,7,10,15
93:18,24
207:17 219:16
220:11,13
**effort** 74:19
91:17 128:6
154:9,10,18,23
154:25
**efforts** 61:4
154:5,7 229:8
230:13 266:7
**efron** 267:8
**egregious**
236:11

| | | | |
|---|---|---|---|
| **either** 63:23 90:6,10,15 123:17 193:11 212:17 218:21 239:14 | **emails** 15:2 24:10 26:15 128:22 138:5 148:15 229:4 236:10 267:14 269:15 | **encourage** 119:15 268:21 268:23 269:12 269:17 | 227:23,25 244:20 252:7 258:11 |
| **elderly** 258:10 | **emanuel** 122:22 | **ended** 120:5 140:19 252:20 | **entirely** 120:19 |
| **electronic** 38:20 | **emergency** 230:16 | **endpoint** 93:16 | **equivalent** 83:16 |
| **eligible** 94:18 107:11 | **emerging** 31:10 194:19 | **enea** 1:4 7:1 111:3 172:17 173:12 175:2 175:18 177:22 | **eric** 109:9 135:13 138:8 |
| **eliminate** 100:10 218:12 | **emotional** 187:7 | **engage** 91:22 92:1 247:25 256:9,19 257:14 258:6 | **erik** 110:24 122:16 200:9 201:2 |
| **elimination** 187:8 | **emotionally** 186:5 | **engaged** 23:11 34:15 186:23 247:22 257:16 258:12 262:9 265:4,14 | **errata** 275:11 275:13,16 |
| **elisabeth** 159:11 | **emphasize** 143:18 | | **error** 74:6 |
| **elkins** 1:16 273:3 274:6 | **employed** 273:24 | | **especially** 142:7 194:18 220:20 |
| **email** 4:3,4,5,5 4:11,11,12,14 5:16,17 45:16 45:17,23 46:8 51:3 52:3 95:14,14 97:5 98:7 101:6,18 104:13 106:6,9 219:6,11 222:9 223:4 225:10 226:5,19 227:11 228:8 229:18 237:12 268:14,15 | **employee** 139:10 256:12 | **engaging** 155:10 258:20 | **esq** 275:1 |
| | **employees** 75:22 226:6 228:15 | **english** 39:22 40:3,11 156:19 164:20 190:10 190:15 269:18 | **essence** 148:6 |
| | **employer** 25:9 256:13 | **enlightened** 158:9 | **essentially** 39:7 66:9,12 134:7 134:25 |
| | **employes** 225:10 | **enroll** 189:15 270:6 | **established** 83:9 |
| | **employment** 59:15,21 70:7 140:10 | **enter** 257:4 | **estate** 32:9 |
| | **empowered** 90:16 | **entire** 60:6 76:9 89:24 108:19 170:10 211:25 | **et** 275:4,4 276:1,1 277:1 277:1 |
| **emailed** 65:24 239:20 | | | **ethic** 65:7 |
| | | | **ethical** 26:21 211:22,22 256:21 |
| | | | **ethically** 216:16 |

**ethics** 64:19,24
65:1,2,3 214:7
214:9,11
256:22
**evaluate**
130:21
**event** 228:10
265:4
**events** 82:7
**eventually**
61:17 86:14
99:15 116:6
**everyone's** 60:9
**everything's**
135:1
**evidence** 23:19
26:20 27:5
47:16 48:22
49:3 50:10,15
50:17 51:5
64:11 68:16
69:16 102:21
164:22,25
165:2 168:1,6
168:10,18
169:23 170:2,4
170:6,8,25
171:4 190:1
225:23 256:3
**evolve** 157:8
**exact** 137:23,25
238:11 241:19
**exactly** 6:7 8:21
32:14 34:8

37:25 39:13
113:11 142:10
198:18 199:22
203:13 210:10
222:24 244:2
245:3
**examination**
3:6 7:14
**examine**
165:14
**examined** 21:4
**example** 11:24
35:3 65:7 66:6
109:7 128:8
187:2,22 195:3
**examples** 65:10
**exceeded** 83:11
**exceeding**
169:20
**excel** 97:1
**except** 109:9
164:13
**exception**
208:5,6
**exchange** 67:24
95:17 138:5
148:15
**excited** 249:12
249:12
**exclude** 80:7
115:7,9 167:24
187:12 201:1
228:19 265:8

**excluded** 130:3
**excluding**
271:13
**excuse** 10:16
108:22 111:15
244:12 262:25
**excuses** 68:17
**execution**
148:13
**exercise** 31:12
**exhibit** 4:2,2,3
4:3,4,4,5,5,6,8
4:9,11,11,12,14
4:15,17,18,19
4:20,22 5:1,4,6
5:8,10,12,14,16
5:17,18,19
38:1,3,5,7
45:12,14 66:16
66:17,18 81:15
81:17,19,20
95:3,5,14
96:21,23,24
97:1,3,5 98:23
101:11,14,16
101:18 104:9
104:11,12
108:20 161:12
161:13,14
171:20,21,22
171:24,25
172:2,3,4,10,19
173:5 174:11
174:17 175:6

175:12,21
176:17,18,20
195:15,16
196:13,14,25
197:1,2 198:23
198:24 199:9
199:10,11,24
200:1,1 201:8
201:8,8,9
202:13,14
203:23,25
204:1,11,13,14
205:4,6,7,18
219:3,4 222:7
222:8 225:7,8
225:9 229:14
229:16 233:17
233:18 237:9
237:11 262:18
262:19,20
**exhibits** 4:13
**existed** 206:19
**exists** 79:18
**expect** 135:23
**expectations**
75:12
**expected** 48:15
261:6
**expedite** 6:4,11
**expedited** 6:6
6:15
**expeditiously**
266:9,16

**expensive** 178:25
**experience** 7:22 18:13,14,21 19:5,16 20:4 22:8,17 25:8 54:15 70:22 73:4,8,11 98:9 192:3 227:7 243:21,22
**experienced** 217:16
**experimental** 5:18 233:21 240:14
**experiments** 260:4,12
**expert** 35:14 140:17 152:8 165:16 239:4
**expert's** 122:18
**expertise** 121:17 123:7 125:6 145:15 150:16 224:4,5 227:8 238:23 262:16
**experts** 12:2 13:18 120:4,6 121:1 127:15 127:19 129:19 129:20 145:19 145:20 167:19 185:12 201:6

234:12,21 235:4,9
**expiration** 274:7
**explain** 39:23 156:18
**explained** 45:25
**explicit** 37:2,3 37:4,5
**explicitly** 28:2
**exploiting** 68:18
**expose** 224:23
**exposed** 4:19 174:18
**express** 40:8 128:25 129:23
**expressed** 174:6
**expressions** 231:12
**extent** 14:23 15:8 111:9 130:2 132:16 134:15 143:8 179:14 180:18 190:21 197:11 218:14 245:24 253:16 264:9 264:12
**extinction** 39:1 39:5

**extremely** 214:16
**eyes** 129:16

**f**

**f** 273:16
**fabricated** 9:23 10:3,20,21,23 10:25 11:3,5 11:10,11,13,15 11:17,18 12:15 13:16,23,25 15:10,17,23 16:5,12,19 17:3,11 18:1,9 18:19 19:9,19 20:2,8 23:14 256:5
**fabricating** 256:24
**fabrication** 14:21 15:15 16:2
**face** 241:5,15
**fact** 10:22 11:1 11:8,12 12:7 13:22 25:9,17 50:13 58:8,18 58:23 127:18 127:23 130:17 131:5 171:2 174:8 191:5 194:21 213:22 214:2 223:15

233:6 234:19 235:9 239:21 240:23 244:14 246:12 247:22 247:25 249:3 257:9 267:5
**factory** 254:16 254:17,18
**facts** 127:16,24 128:14 131:8 170:16,19,20 170:22 171:2 255:18 256:3
**factual** 42:25 131:9,14,19 149:3 244:11
**fail** 42:15 43:1 72:18 78:13 244:5 246:24
**failed** 33:23 42:19,23 75:18 77:3 78:22 250:7
**failing** 79:5
**fails** 246:17 275:18
**failure** 77:9,19 79:1
**fair** 32:3 86:15 87:9 100:19 130:12 135:25 152:16 154:4 156:15,21,24 178:6,14,15

**[fair - financial]**                                                        Page 31

249:5 257:20
**fairly** 33:16
**fairness** 71:9
249:6,20
**fall** 36:15
109:10 162:22
**falls** 34:20
36:14
**false** 68:4 144:8
150:15 155:8
178:14,21
194:12,23
**familiar** 10:14
34:14 36:6
49:5,18,23
50:6 65:15
79:16 110:18
185:5 207:11
218:1,25 222:2
222:3 266:6,24
**familiarity**
51:1
**family** 217:13
**far** 131:12,15
147:18 151:13
158:10,15
224:25 237:1
**fast** 114:19
145:17
**favor** 129:3,3
134:22 143:14
143:14 144:10
221:16

**favorite** 195:2
**fbi** 250:13,17
250:20,22,24
251:8
**fda** 53:5 61:18
63:16,25 93:14
173:21 220:9
220:12 242:20
243:7,23 244:6
245:4,17
**fda's** 244:17,24
245:21 249:23
250:6
**federal** 1:20
**fee** 211:4,5
**feedback** 181:6
181:12,14,20
221:18 224:1,7
224:15
**feel** 75:2
**feeling** 158:8
**felt** 86:4 127:18
**feuerstein**
65:16 66:1,25
70:16 71:9
**feuerstein's**
69:9,13 71:3
71:15
**field** 13:19
123:9 127:15
127:20 129:19
201:6 238:23
241:21 257:3,4

**fight** 144:1
153:14
**figure** 91:18
178:25 244:1
**filamin** 21:2,7
21:14 54:24
**file** 113:6
124:15 125:9
125:12,17,22
126:21,24
127:3,8 129:16
133:23 136:12
136:19,25
137:1,7 138:21
138:24 139:17
139:21 143:15
144:10 146:20
147:1 148:23
149:3,8 150:17
151:19,21
152:3 153:9
166:25 182:13
192:15,20
203:11 205:14
206:2 231:11
231:23,25
234:3 241:18
244:16 247:2
269:23 272:1
**filed** 110:19,21
136:24 138:23
139:16 140:1,6
140:7 141:16
142:3 149:22

149:23 150:13
157:7,14 158:3
158:16 166:20
176:20 178:17
179:8 180:3,24
182:21 183:18
192:4,12 256:2
**filing** 111:21
112:22 113:13
113:20,23
114:18 117:1,6
122:3 123:18
128:25 129:3,6
134:22 138:22
140:10 144:1
146:13,20,23
150:4,11,21
151:14 152:22
155:1 157:19
182:6,24 183:7
198:7 221:16
261:1,8
**filings** 33:8
215:18
**final** 100:21
101:7 129:2
206:22 212:11
248:14,14
249:12
**finalized** 77:23
**finance** 113:1
116:20 230:10
**financial** 36:18
62:25 63:4

70:21 85:18 124:19,21 184:21 187:5 188:1,7,15,21 194:1,5,21 211:11,12,24 212:1

**financially** 274:1

**find** 48:15,16 137:3 211:16

**finding** 130:17 131:5 191:5 245:21,24 265:14

**findings** 244:18 246:13 247:9 249:23,25 266:10,17,22

**finds** 264:9,13

**fine** 37:9,15,18 37:20,21 261:19

**finished** 38:14

**fire** 44:19

**fired** 72:21

**firm** 6:24 7:2,3 12:1,1,4,9,13 110:22,23 122:22 123:3 124:15 128:8 128:11 136:12 141:4 198:20 225:20 229:8

262:22 271:3,6 274:9

**firms** 120:8,9 121:20 122:10 122:17 123:17 124:11,19,25 125:8 130:17 130:23 131:4 131:14 132:12 133:22 272:4

**first** 7:20 16:6 23:21 29:4 38:5,23 52:20 53:13 67:2,19 75:6,7 82:3 84:11 85:24 106:11 107:5 107:10 111:20 113:4,18 156:3 159:15,19 160:1 173:13 177:1 208:2,4 208:13 209:6,9 212:20 213:1 222:15 225:25 229:11 230:4 243:25 250:13 251:11 262:25 263:13 267:10 268:10

**fit** 59:9 256:20

**fits** 266:4

**five** 45:4 79:10 156:25 231:20

234:12

**flip** 81:19 172:12 175:16

**floated** 114:12 117:1

**flood** 142:7,8

**flooded** 142:9

**floor** 2:4 254:16,18,18

**flow** 138:6

**fly** 223:3

**focus** 52:1 263:11

**foia** 236:9

**following** 117:4 125:14 126:9 213:25 215:15 273:5

**follows** 7:13

**foregoing** 277:5

**foremost** 209:10

**forensic** 216:18 216:23 217:18 217:19,24 218:1,6,17,19

**forget** 64:9 75:19 80:4 85:15 134:8 140:23 141:4 142:10 144:25 160:11 165:19 166:6,6 195:11

207:24 251:24 252:19

**forgot** 164:12

**fork** 122:7

**form** 22:17 32:13 34:19 35:16,20 36:4 36:11 63:3 83:13 88:11 91:22 92:1 163:20,25 164:10 166:21 174:5 178:20 183:20 184:4,8 185:3,6,17,25 193:22 211:18 218:1 226:12 226:15 236:17 239:17 240:1 242:1 243:8,11 243:12,14,17 244:19 245:2 247:23 249:24 250:3 256:6 261:2 262:11 264:24 265:6 265:16 266:1 268:3 269:2 270:16 271:15

**formal** 96:2,5 162:8 198:12 247:17,18 259:6 271:12

| | | | |
|---|---|---|---|
| **formed** 34:21 195:7,8,10 | **frankly** 109:24 190:9 | 243:21 | **g** |
| **former** 57:8,10 57:12,12 58:6 58:7 66:21 67:3 69:2 | **fraud** 4:16 135:2 160:10 161:16 164:14 170:14 179:1 184:2,16,24 188:12 195:3 238:25 239:1 258:20 | **friendly** 85:20 85:22 86:5 | **gain** 85:18 |
| **forming** 65:25 | | **front** 25:13 172:19 | **gatekeeper** 259:16 |
| **forms** 35:11,15 | | **frost** 197:13 | **gathered** 166:2 |
| **fort** 274:9 | | **frustration** 241:16 | **general** 76:5,10 83:3 109:5 120:13 128:1,2 141:3 178:1,24 181:9,10 199:19 201:21 203:5 206:9 226:18 257:12 |
| **forth** 50:22 82:12 119:22 139:7 142:16 143:21 | **frauds** 258:17 | **fulfilled** 76:18 76:19,20 | |
| | **frcp** 273:15 | **full** 90:7 105:21 105:21 136:2 141:2 154:20 155:19 165:5 165:25 166:1,7 195:11 224:13 | |
| | **free** 211:17 | | |
| | **fried** 134:5 | | |
| **forward** 57:14 114:19 120:3 136:10 143:18 221:4 234:9 | **friedmann** 13:11,13 14:6 95:15 97:13 98:6,8,20 104:15 108:22 109:5,11,12 134:12,17,19 135:5,22 209:4 210:5,20 212:7 216:25 217:12 224:18 227:2 227:15 228:4 242:8 245:8 253:25 259:16 259:18,21 | | **generally** 38:8 49:18,22,23 51:15 55:1 65:23 73:7,13 74:20 79:18 81:19,21 82:10 89:10 94:16 108:9 110:21 120:13 128:4 176:5 206:18 243:13 253:14 |
| | | **fully** 156:6,7 165:13 | |
| **forwarding** 95:16 | | **fundamentally** 244:11 | |
| **found** 170:25 262:9 265:4 | | **funny** 155:5 | |
| **founded** 27:18 58:5 59:7 | | **further** 138:13 273:15,23 274:1 | |
| **founder** 45:25 58:20 | | **furthermore** 257:10 | **generated** 26:2 26:4 93:9 156:14 253:15 |
| **founding** 28:6 | | **futility** 68:16 69:16 | |
| **four** 68:17 135:17 221:14 234:12 240:20 | | **future** 63:9 83:10,10 203:5 221:3 | **genuinely** 183:21 |
| **fourth** 43:4 68:9 163:2 | **friedmann's** 107:18,21 108:1 134:5 208:16 210:23 217:6 227:22 | | **getting** 44:15 61:11 78:5 104:5 119:25 130:20 185:9 |
| **frame** 29:1 | | | |
| **francisco** 21:21 237:12 | | **fyi** 104:25 | |

223:5 224:21 230:20 242:12

**gibson** 2:18 7:8

**gibsondunn.c...** 2:20

**give** 38:15 61:1 65:10 66:6 74:19 76:4,5 119:3 128:2 153:25 159:12 167:9 205:16 263:6,18

**given** 17:5 68:16 69:15 70:19 214:10 228:19 265:7 266:3 273:8 277:9

**gives** 66:13

**giving** 131:10 157:3 230:22

**glancing** 177:19

**glp** 243:24 244:4,5,12,13 244:22,22 245:24,25 246:17,17,22 246:24,24 250:7,7

**go** 11:7 35:22 75:19,21 91:16 93:2 94:2,13 95:6 105:13,16

118:4 123:16 124:2 130:8,13 130:13 137:7 137:11 138:12 140:8 148:12 148:12 164:3 178:23 183:4,4 183:5,6,23 210:10 211:7 216:21 218:11 221:13 240:8 240:23 245:1 256:19 257:24 258:16,16 270:12

**goal** 149:19 150:2,11 151:9 151:10 153:2 153:10 155:21 156:2,3 157:11 157:19 230:12

**goals** 150:21,23 151:9,14,17,19 157:14,16 158:4,10,11,14 158:16,20,21

**goes** 70:25 71:2 235:25

**going** 15:20 29:5 44:12 45:6,24 58:1 60:12 66:11,11 78:24 79:11 86:4 93:13

95:8 102:23 103:1 110:13 116:1 124:3 128:1,2,9 130:8 134:14 139:4,6 146:14 149:13 152:14 166:23 179:22 206:25 207:6 211:6 221:1 229:13 231:5 237:10 241:17 251:4 252:23 255:4 256:10 272:12

**good** 7:15 14:11 22:5,6,8 22:11,12,15 25:5,19,25 26:5 34:22 58:4,21 59:9 59:23 64:24 65:1 66:12 75:20,20 77:10 89:5,9 92:3,7 92:16 109:7 119:18 127:19 146:6 148:23 152:23 169:17 189:16 193:12 207:5 209:4 211:18 218:10 218:21

**goofy** 147:24

**google** 66:7,7,8 66:10,10,10

**gosh** 35:22

**gospel** 54:6,11 54:16,19

**gotten** 25:18

**government** 47:10 48:9,11

**grand** 85:5,7 85:11

**great** 45:24 60:3 209:13

**greed** 68:21

**gregory** 191:1

**gritty** 260:8 262:13

**ground** 142:9

**grounded** 169:3

**grounds** 178:18 179:9

**group** 258:19 266:24 268:22

**groups** 116:7,9 116:14,17

**growth** 140:18

**gueron** 2:3 6:24 7:2

**guess** 72:8 156:17 227:1

**guilty** 15:14

**gussin** 97:9 104:14 105:6,8

105:9,12 106:7 222:10

**guy** 197:13 243:23 256:14 258:14 262:21

**guys** 66:8,10 206:25

**h**

**h** 2:7 4:1 48:18 177:10 275:1 276:3

**habit** 54:5,10 54:19 268:19

**halfway** 52:9 100:4 264:8

**hand** 60:9 100:24 258:14

**handed** 166:11

**handle** 177:10 177:14,17 230:6,19

**happen** 44:12 85:7,8 128:10 209:10

**happened** 36:25 37:8,16 74:2 77:5,7 78:9 87:11 103:15 112:21 113:15 115:17 176:14 190:4 216:8 217:3,4 242:24 243:1,4

258:15,15 259:15 262:1

**happening** 246:10

**happens** 62:10 106:5

**happy** 242:11 248:19

**hard** 51:10 130:24 153:13 184:16 195:4 211:22 241:7 242:13 257:3,5 270:23

**hardcore** 262:14

**harder** 80:9

**hardship** 100:11,18

**harm** 185:8,10 185:14,14,15 185:25 186:14 187:13,17 188:1,4,10,10 188:13,15,21 189:1 232:7 236:23 238:3 270:1

**harmful** 186:25 232:11

**harming** 185:18

**harmless** 264:16

**harms** 188:7

**hat** 122:18

**hate** 66:8

**head** 51:22 69:2,20 71:1,2 71:6,23 72:3 94:1 98:12 104:3 141:2,4 144:17 181:22 224:11

**headed** 154:19

**headline** 184:25 208:24 209:1 233:20 246:16,17

**headlines** 166:3 209:2 213:7 241:24 246:15

**heads** 209:3

**healthy** 184:23 184:23

**hear** 143:4 187:10

**heard** 13:2 36:8 243:23 269:6,8

**hearing** 113:19 223:8,16 224:7 224:15 232:6 233:10

**heart** 75:21 186:6

**heavy** 210:24 231:15

**heavyweight** 122:19

**heilbut** 1:3 6:25 111:2 159:16,20 160:7,19,22 161:2 171:7 172:17 173:13 175:3,18 176:4 177:22 178:7 185:7 189:3,10 189:17,22 193:20 232:24 233:13 275:4 276:1 277:1

**held** 31:24

**hell** 178:22

**hello** 224:12

**help** 137:4 259:5

**helped** 64:3 76:13 85:7 217:11

**helpful** 111:16 137:14 221:13

**hereto** 277:7

**hey** 27:6,12 258:14 268:14 268:19

**hide** 257:24

**high** 7:24 8:1 8:10 79:21 125:3 135:17 143:23 151:2

151:16 192:8 199:20 213:5 220:25 254:10

**highest** 165:20

**highlights** 183:25

**highly** 15:19 47:15 77:15 78:23 170:14 217:15 249:4

**hinges** 62:9

**hire** 165:21 198:20

**hired** 11:25 12:1 141:3 165:18 167:19 178:24 185:11 233:4

**hiring** 141:8

**history** 258:2

**hit** 85:5 107:10 142:9 150:14 237:16,22 240:15 241:7,7 242:13,13,16

**hits** 240:15

**hitting** 100:17

**hoau** 211:21 214:15 218:22 263:2

**hoc** 5:1,4 195:12,19 196:16

**hold** 12:3 118:1 139:2 148:19 162:11,11,12 167:20 173:21 190:20 264:15

**holding** 202:1

**home** 85:5,7,7 85:10 183:6 232:10 270:12

**homework** 87:20 88:2,6,8 91:10

**honest** 6:7 57:16

**honestly** 19:2

**honesty** 57:18

**hope** 150:25 151:3 158:6

**hoped** 155:20

**hopefully** 73:3 158:8

**hoping** 251:16

**horrible** 153:16

**hostetler** 1:18 2:8

**hours** 235:11

**house** 141:2 209:25 255:22

**housekeeping** 209:25

**how's** 27:6,12

**huge** 63:9

**huh** 100:7 114:6 137:5

152:17 202:19

**human** 41:3,15 42:5,5,8 61:18 73:2 74:6

**humans** 74:21

**humble** 73:4 74:8

**hundred** 232:15 233:2

**hundreds** 188:3 195:1

**hunter** 141:4

**hurt** 185:21 186:4,4,7,12 187:4,21 188:4 188:11,18 240:22 270:8

**hurtful** 186:20

**hurting** 185:18 186:2,3,5

**hypothesis** 16:8 21:17 55:2

**hypothetical** 41:8 193:8,9 193:10 247:24

### i

**idea** 29:21 53:17 54:17 55:21 72:16 80:15 81:4 89:20,25 90:8 113:23 114:8 114:17 152:4

152:12 168:17 187:10 198:17 258:21

**ideas** 90:17

**identify** 6:20 61:5 214:20

**ignore** 171:20 187:5,5,6,6,7,9 268:17

**ii** 52:23 53:3,8 93:10,17,23 220:15,22 224:17

**iia** 92:14 224:9

**iib** 92:14 103:4 103:12,18 207:12,14,22 212:12 213:23 214:3,5,13,19 215:20,21 216:12,13,19 216:23 218:3 245:5

**iii** 33:22,25 43:2 53:9 76:15 77:3,9 77:13,19 78:2 78:12,22 79:2 79:5 116:4 220:5,6 240:14

**iiib** 212:5

**illiterate** 174:22

images 163:8 164:23
imagine 262:6
imho 219:15
immediately 100:16,22 157:6
impact 60:16 60:18,22 61:16 247:10
implausibility 258:4
implausible 257:22
implemented 153:12,20
important 20:9 20:9 31:11 52:10,14 86:5 86:9 121:6 260:25
impossible 163:11 168:8 168:11,14,24 169:8,8,9,9,9 183:13
impression 227:21
impressions 227:23
improbable 168:8,11,13,22 168:24 169:12

improbably 163:11
improper 164:25 165:3
improperly 163:9 164:24
inability 144:12
inadequate 244:25
inappropriate 268:13
incentive 4:3 79:17 80:1,3,6 80:12,16 81:5 81:22 82:8,22 88:5 89:14,17 91:7 94:6 95:23 96:3,10 99:11 101:7 103:8 104:6 106:11 107:2 109:16 211:13
incentivize 88:11,14,21 91:21,25
include 89:20 90:4,8,16 131:8,14 138:13
included 90:19 91:7,14 212:11 212:23 216:1

includes 255:17
including 43:9 91:20,24 129:14 190:22 201:2 243:22
inclusion 90:1
income 30:18 31:20,22,23 32:3,5,9,19,21 32:22 59:19,20
indefinitely 43:14
indemnificati... 262:8 265:3
indemnify 264:15
independence 249:20
independent 16:16 165:4,13 170:25 171:1,3 185:12 191:23 210:14,18 239:4 249:5
indeterminate 209:5,8,15,17 209:21 218:8,9 218:13,16,20 218:21
indicated 249:19
indicates 26:4
indication 41:10,18 61:19

62:17 63:10,23 64:1 207:25
indications 61:12 63:21 64:9
indicative 170:17
individual 7:3 7:6 49:14 64:2 113:2 118:8 151:15 198:12 198:14 257:14
individually 114:13
individuals 186:19 187:18 252:6
industry 66:2,3 211:16 215:15
influence 261:15,21 262:3,3 266:19
influenced 265:19
influential 240:15
informal 80:19 259:5 260:14
informally 217:9
information 46:3 47:1 134:14 146:3 162:15

**[inherently - investigating]** Page 38

| | | | |
|---|---|---|---|
| **inherently** 36:2 | **insofar** 51:20 | **integrity** 23:5 | **internet** 153:14 |
| **initial** 87:1 | 244:7 | 26:17,19,23 | **interpret** |
| 113:15 114:7 | **inspect** 244:12 | 27:2,3,6,7,9,11 | 221:12 |
| 114:15 192:9 | **inspected** | 27:12,14,15 | **interpretation** |
| 212:10 215:6 | 254:18 261:9 | 57:19,22 64:13 | 67:11 69:18 |
| 227:22 | **inspecting** | 64:18,21,23 | 77:21 78:1 |
| **initially** 90:8 | 243:24 244:7 | 65:11,14 68:15 | **interpretations** |
| 213:4 | **inspection** | 69:10,14,23 | 89:7 |
| **initiate** 237:6 | 242:21 243:4,8 | 249:6 | **interpreting** |
| **initiated** 237:7 | 243:17 244:5 | **intend** 110:1 | 10:5 152:10 |
| **initiation** 238:8 | 244:18,22 | **intending** | 190:22 |
| **initiatives** | 246:7,9,14,18 | 27:22 | **interview** 162:8 |
| 192:1 | 247:3 250:5,6 | **intense** 270:19 | 162:10,21 |
| **innovation** | **instance** 1:13 | **intent** 71:9,15 | **interviewed** |
| 241:6 | 218:23 264:14 | 85:19 185:22 | 66:8 141:4 |
| **innovator** | **institution** 25:9 | 194:13 | 162:7 |
| 223:12 | **instruct** 12:5 | **intentions** | **interviews** |
| **innuendos** | 133:13 137:6 | 185:24 | 132:12 |
| 35:20 | 148:21 179:16 | **interacting** | **introduce** |
| **input** 82:18 | 181:17 190:23 | 142:5 | 45:12 204:11 |
| 86:12 119:21 | 228:15 | **interest** 32:1 | **invalid** 209:21 |
| 139:21 183:3 | **instructed** | 165:6 211:9,10 | **inventor** 46:1 |
| 201:5 | 136:6 137:11 | 211:24 212:2 | **investigate** |
| **inquiry** 263:1 | 138:2 197:19 | **interested** | 15:1 165:14,21 |
| **ins** 84:1 | 245:5 | 29:19 268:20 | 267:20 |
| **inside** 116:3 | **instructing** | 274:2 | **investigated** |
| 228:11 | 131:3,23 143:6 | **interference** | 14:25 15:1 |
| **insider** 33:21 | 143:10 159:3 | 189:1 | 252:4,6 |
| **insight** 66:13 | **instruction** | **interim** 103:15 | **investigating** |
| 77:6 | 132:16 133:17 | **internal** 227:5 | 188:25 250:14 |
| **insights** 257:5 | 146:1 149:1,6 | 227:20 246:4 | 251:21 266:16 |
| **insisting** | 149:11 159:13 | 247:18 249:24 | 266:21 270:19 |
| 121:16 | 164:1 197:17 | **internally** | 270:20 |
| | 245:17 251:9 | 228:25 | |

**investigation** 12:7,9,13,19,21 12:22,24,25 13:13,14 14:4 14:5,14,15,23 15:9 132:17 166:5,10,17 167:2,3,6,13,17 167:22 170:25 189:24 191:20 218:17,19 247:15,18,18 247:21 248:2,5 249:7 250:17 250:20,23,24 251:8,12,24 252:10,14 261:15,22 262:4 265:25 266:10 270:24 271:1,3,4,5,9 271:12,14,17 271:25 272:1,3

**investigations** 11:21,23 13:18 15:24 16:15 17:8 131:14,19 171:3 218:12 250:2

**investigative** 46:4 47:2

**investigator** 26:20

**investigator's** 245:6

**investigators** 270:5

**investment** 32:2 59:20

**investments** 32:2,16 59:20 240:3

**investor** 34:19 35:21,21 57:7 59:11 239:11 239:22 240:3,5 268:14

**investors** 43:11 60:10 68:18 71:19 72:8 76:20,22 86:8 174:22 193:16 194:16,17 225:25 266:24 269:15

**invitation** 198:3

**invited** 154:2 198:1,3

**invitees** 197:25

**invokes** 169:12

**involve** 115:3 229:7

**involved** 82:21 120:4,10,25 139:17 140:3 148:7,8 162:1

162:3 210:1 217:7,9,14 229:11,23 230:2,3,5,9,13 230:21

**involvement** 111:10 193:4 263:23

**ir** 230:10

**irrelevant** 41:22 42:25 57:13 58:14

**isaac** 7:1

**issue** 86:6,7 148:10

**issued** 190:6,11 191:1,6,17 231:13,20 232:5 243:7

**issues** 26:21 144:17 148:8 221:11

**issuing** 154:11

**italy** 56:11,14

**item** 100:8

**items** 30:6,7 32:8 209:25

**j**

**jacobson** 2:13 2:13 6:16 7:10 7:10,10 251:1 251:9 272:10

**jacobsonlope...** 2:15

**janalyn** 1:16 273:3 274:6

**january** 5:9 190:12 199:2

**jesse** 1:3 6:25 111:2 172:17 173:13 175:2 175:17 177:17 177:22

**jim** 197:12

**jlr** 1:6

**job** 57:1 59:23 60:3,5 67:23 68:9 109:7,7 230:7,8

**jog** 172:19

**johnson** 98:13 98:13

**join** 140:12

**joined** 141:12 141:17,18,20 203:4,10,12,13

**joining** 7:4 140:2 203:5

**joke** 179:6 185:2

**journal** 65:19 163:8 164:23 231:19 238:12 238:17,18 240:16

**journals** 231:13

**judge** 58:14 190:12 191:1,7 191:7 192:6,6

**judges** 190:7

**judgment** 192:9 264:18

**juicy** 160:9,13 164:13,19

**july** 28:25,25 38:21 43:22 45:16 78:11 97:6 99:3,21 100:15 216:15

**june** 22:2 28:25 95:15 96:1 204:21,25

**justice** 161:20 267:19

**justified** 270:18

**k**

**keep** 35:5 118:5 119:6 147:6 201:17 202:2 206:12 232:15 240:14

**keeping** 226:10 226:18,24 230:20

**kept** 18:20 19:4 20:6 212:5

**kesten** 219:6

**kestens** 219:11

**key** 223:7,15

**kind** 6:6 35:8 82:24 155:17 172:12 208:23 230:6,15

**knew** 160:25 244:21 254:23 255:13

**know** 6:7 9:6 9:21 10:19,22 11:1,8,12,16 12:8 13:3,22 15:1 19:16 20:4,15,24 24:15,17 25:1 26:10 29:24 33:4,5 35:15 38:14 41:5 42:6 43:20 44:17 47:5,6 49:2 50:16 55:20,23 56:2 56:22 57:13,20 57:20 58:24 60:2,7 64:6,17 66:7 69:20 70:2,20,20 71:20,22 73:5 77:17,23,24 79:18 88:7 89:23 90:14,14 91:2 94:13

96:2 102:12 103:14 104:3 109:6,17,24 111:24 112:11 113:3,12,17 114:4,12,25 118:8 119:16 119:20 121:4 121:15 128:18 129:15 131:12 131:15,19,25 134:4,14 135:16 136:5 137:9 138:4 141:11 145:1 145:17,21 148:14 151:13 151:22 152:8 153:14,16,17 154:18 155:13 155:18,20 156:5 157:1 158:10,15,20 160:25 161:5 161:24 162:7 164:13 165:13 165:23 166:14 166:16,23,23 167:3 168:12 168:19,23 169:10,21 172:13 182:8 183:23 184:1 184:16 185:10

185:13,21 186:21,22 189:7,17,19,22 189:25 190:4 191:19 194:2,7 194:14,15,15 194:16 195:2 202:23 206:19 206:19 207:1 209:9 210:24 212:9 213:6 214:10 215:24 217:14,22 218:9,10 223:3 224:5,19,25 227:6,7 231:16 231:17 233:6 236:8,14 237:1 237:2 239:12 240:4,15,20 244:10 251:23 253:20 254:5,8 254:12,15,25 255:8,15 256:18,19,23 258:22 259:4 259:15,18,22 259:24 260:20 260:21,24 261:10 262:13 263:19 267:5 267:13 268:10 268:11,15 269:8,18 270:6

**[knowing - lab]**

**knowing**  47:8 251:17
**knowledge**
15:2 66:4
70:22 80:17,18
93:8,12,14
121:10 130:16
132:5,11,17
142:17,19
149:19 150:2
150:10,12,20
150:24 158:22
159:5 160:22
181:23 191:4
191:15 192:3
198:13 209:16
213:12,18
217:17 218:5
218:14,18
221:25 224:3
239:7,9 247:7
250:16,18,19
250:21 253:4,9
254:1 256:2,11
258:25 259:3,8
259:13 260:2
260:18 261:13
261:20 265:12
265:22 266:23
**known**  66:2
189:3 190:2
211:21 220:5
236:7 254:22
256:21

**knows**  52:24
121:18 123:8
131:4 218:10
230:11,11
**kramer**  197:13
**kumagai**  2:3
3:6 6:1,3,5,23
6:23 7:15
10:14 12:12
14:9 15:8,21
16:23 17:9,14
19:2,13,23
38:1,4 45:4,11
45:15 47:9
48:3,19,21
50:24 51:12
58:3 66:15,18
71:13 72:11
79:9,16 80:11
81:15,18 82:20
85:10 92:22
95:3,6,13
96:21,24 97:4
101:1,10,14,17
104:9,12 110:7
110:11,18
111:19 115:11
116:8 118:10
118:20 120:6
122:9,21
123:16,23
124:2,8 125:25
126:10,20
128:24 130:9

131:2,12,18,23
132:11,23
133:14 135:3
138:17 139:4
139:11 141:8
143:5,11 146:8
148:16,22
149:2,7,12,18
159:2,8,15
161:11,14
162:20 163:21
164:5,18
166:25 168:1
171:19,23
172:1,6,9
173:8,10
176:16,19
177:4,6 179:19
179:21 180:2
180:20 181:5
181:19 182:16
187:2 190:25
192:20 195:5
195:17 196:12
196:15,24
197:2,16
198:22,25
199:11,25
200:17 201:7
202:12,15
204:1,14 205:4
205:7 206:24
207:11 213:21
219:2,5 222:6

222:9 225:6,9
226:17 227:19
228:23 229:3
229:13,17
231:4,10
233:16,19
236:25 237:10
239:21 240:5
242:2 248:3
250:9 251:6,11
252:22 253:3
256:23 261:6
262:17,20
265:2,10,22
266:8 268:7
269:6 270:24
271:22 272:6
273:11

**l**

**lab**  4:20 56:5
56:11,14
175:13 210:8
210:11,14,18
214:20,20,23
214:24,25
215:2,3,5
217:25 218:24
242:21 243:9
243:24 244:4,8
244:12,18,22
245:25 246:3,5
246:7,17,24,24
247:4,10,19

**[lab - legal]**                                                    Page 42

250:5,6,8
253:14,15
254:3 255:21
256:14,17
258:12 260:3
260:11,22
**label** 219:17
**labor** 217:15
217:16
**laboratory**
19:5 261:9
**labs** 54:3 55:19
55:20,22 56:15
211:1 253:18
**lack** 64:6
**lacked** 65:11,13
**lady** 56:10
**lady's** 56:12
**large** 43:1
67:22 115:9
**larger** 153:24
154:12
**lasted** 251:24
**late** 76:23
256:15,18
**laugh** 179:6
**laughable**
179:1,4,5
225:24
**laughing**
160:14
**launching**
241:3

**law** 7:2 12:1,1
12:9,13 110:22
110:23 120:2,8
120:9 121:20
122:9,21 123:2
123:17 124:11
124:15,19
125:8,19
127:20,21
128:8,11
129:16 130:17
131:4,14
132:12 133:22
136:12 152:9
152:21 178:19
179:10 198:20
225:20 231:16
262:22 271:3,5
272:4
**law.com** 2:5
**lawrence** 2:18
**lawsuit** 110:19
128:23 140:1
144:1 152:22
157:8 158:4
**lawsuits** 68:1
68:12
**lawyer** 122:21
**lawyers** 82:20
121:1,9 122:10
133:22 201:22
228:24 229:2
247:6 249:22
261:14 262:2,7

**leader** 57:15
**leadership**
54:10,23 76:12
79:1,5
**leading** 98:11
148:5 150:7
**leak** 248:20
249:19
**leaked** 248:13
249:3,10,19,24
**learn** 61:3 73:3
73:3,8,8,11,11
73:11,21,21
74:9,9 250:13
251:11 252:13
**learned** 46:4
47:2 74:10
78:19 193:2
209:6 251:21
252:3
**learning**
243:17 250:22
**leave** 36:19,20
36:24 37:7,15
37:18,19 44:2
72:21 76:14
111:13 188:10
**led** 210:5,5
**left** 29:16,23
30:5 33:14
59:7,12,25
60:2 76:14,16
77:5,7,11 78:7
78:11 155:17

193:1 203:16
203:20 216:14
269:16
**legal** 83:25
85:3,3 114:23
115:3,6,6
117:24 118:4
119:2,12
120:25 121:21
121:22 123:21
125:5 126:23
127:14,19,19
129:20 130:6,7
130:9,12,14,21
133:15 134:15
134:16 141:1
142:21,23
143:2,9,11,20
144:15,17
145:10,12,25
146:20,21,22
149:8 150:16
152:7,10,24
154:10,24,25
158:21 159:1
162:15 178:18
179:9 180:9
185:10,11,15
185:25 186:4
186:14 187:6,9
187:13 188:9
190:21 191:9
191:10,12,16
191:19,20

**[legal - look]** Page 43

192:1,2 201:5
201:21 202:3
228:9,19,21
230:10 231:15
232:1,2 234:9
241:3 251:5
261:4,12
262:14 265:7,8
274:8 275:23
**legalistic**
145:14
**lends** 55:21
**length** 224:9
**lengths** 257:23
**lens** 47:15
**letter** 4:2,17
5:19 38:11
173:21 247:17
262:21 263:1,5
263:17 265:7
266:3,4,6
267:18
**letting** 144:4,5
150:19,25
151:9 152:18
153:2,11
155:15,22
157:1,3
**level** 7:24 8:1,1
8:10 79:21
100:6 116:7
143:24 151:3
151:16 164:12
164:12 165:21

192:8,18
199:20 210:5
213:6 220:25
249:20 254:7
254:10
**levels** 39:8
**liability** 264:16
**life** 58:10
**lifespan** 253:22
**light** 46:3,25
169:20 197:16
**likely** 78:13
100:11 148:17
**likes** 73:11,21
**likewise** 28:3
**lindsay** 1:8 2:7
21:18 51:20
69:1 105:1
107:18,25
**line** 8:20 97:23
171:10 223:19
223:19 276:4,7
276:10,13,16
276:19
**linking** 147:16
**list** 13:9 14:18
25:13 168:21
197:25 227:24
243:14
**listed** 222:15
**listing** 84:8
**litigation** 5:1,4
5:6,8,10,12,14
114:20 116:15

117:5,10,14
120:21 121:7
121:10,16
127:12,13
136:6,13
137:20,21
138:1,2,3
139:13,22
140:16,22
141:15,18,20
141:23,23
142:12,14
145:1 157:13
165:19 166:8
195:6,12,19
196:16 197:3
199:1,12 200:2
201:13 202:16
202:23 203:6
**little** 32:22
51:19 59:14
63:22 83:6
85:1 88:18
96:6 111:16
113:20 149:22
153:4 156:23
158:8 186:10
212:15 220:8
269:19
**live** 69:4 93:6
**llp** 1:18 2:3,18
**loaded** 7:20
**lone** 258:22

**long** 13:9 14:18
17:16,21 21:21
48:5 56:23
62:8 66:3
71:19 82:24
83:25 86:12,17
87:1,12 99:12
101:6 102:21
103:13 111:18
113:17 116:12
119:20,24
127:9 146:19
158:11 180:14
199:21 201:4
206:14,24
219:16 241:17
251:25 252:1,7
252:18 270:2
**longer** 33:20
41:9,22 57:2
223:1 235:25
**look** 29:18
35:13 39:14
47:14 69:17
73:2 84:7
85:13 98:23
99:19,25
106:10 111:24
112:9,12
113:13 141:1
152:1,5,13,15
154:19 164:11
165:6 168:17
170:13 172:16

**[look - making]**

173:5 174:17 176:25 177:6 185:12 194:15 201:7 206:11 224:19 248:22 255:6 263:8

**looked** 78:7,8 152:2 180:15 235:10 237:20

**looking** 59:22 61:23 62:4 76:17 82:5 91:17 99:9 172:13 174:11 175:6,21 177:25 195:24 200:10,17 211:2 213:6

**looks** 38:20 112:12 154:20 165:3

**lopez** 2:13 7:11

**losing** 152:2 224:21

**loss** 264:16

**lost** 67:23 68:9 69:5 102:22 206:24

**lot** 15:2 76:16 77:11 82:11,11 82:11,18 93:20 93:25 98:8 116:1,2 119:24 128:22 140:21

140:22 143:24 143:24 144:16 148:1 153:6,17 166:2 171:11 176:14 178:22 186:21 187:8 189:21 208:22 211:6 235:14 238:3 240:19 241:20 260:8 263:11 269:14

**lots** 257:5,6,13

**love** 66:8

**low** 39:7

**lower** 124:25

**lunch** 260:15

**lund** 208:3,5,19 208:20 209:7 209:14,16,18 209:20,22,23 210:3,15,18 212:17 216:23 217:3,3,4,8 218:2,8

**lund's** 216:19

**lying** 36:17

**m**

**machine** 1:18

**mad** 240:18

**maddening** 240:9,12,25

**made** 9:22,23 9:25 10:8,15

33:6 41:9,17 49:6 50:4 51:5 51:9 58:8 72:25 73:15,19 73:23 74:10 75:1 85:6 100:22 112:20 118:16 125:10 125:12,21 126:5,6,13 127:3 129:2 136:2,17,20 137:1,6 141:6 143:25 146:18 147:1 150:1 152:3 160:7,9 160:12 163:7 163:18 164:8 165:20 178:12 178:22 182:21 183:9,22 184:7 188:23 189:4 192:20 194:11 195:9 198:19 201:24,25 206:3 208:12 210:4,7 225:19 226:4 246:13 246:15 264:25 277:5

**madison** 2:4

**magistrate** 190:12

**magnitude** 37:20

**mailing** 227:24

**main** 75:17

**make** 13:20 19:6 52:12 60:18 69:9 71:8,14 73:2,2 74:21,23 85:7 85:20 86:4,15 99:15 112:17 118:5 126:2,2 126:16,20,24 160:13 185:22 190:16 194:7 194:17 201:24 209:3 217:4 218:9 224:19 224:19,20 240:18 270:4 270:12,22

**makes** 22:10 26:3 34:20 36:13 54:13 64:16 73:18 80:9 133:1 147:10 156:9 182:23 197:21 244:13

**makeup** 10:2,2 10:2,6

**making** 68:17 86:7 88:24 120:12,19

**[making - mean]** Page 45

121:5 136:16
137:24 148:2,5
150:5 182:15
183:4,4 188:17
256:9
**man** 25:24 26:1
67:12 260:1
**management**
135:18,19
203:17
**manager**
147:25
**managers** 13:5
31:7,8 70:9
79:25 85:21
147:16,17
**mandatory**
83:15
**manipulate**
170:5
**manipulated**
23:14 163:10
163:12 164:24
165:9,11
169:24 170:2,6
170:9,11,12,15
170:17,21,23
256:5
**manipulation**
165:1,3 171:1
171:5
**march** 4:7 5:11
191:2 199:13
201:9,14 204:3

204:8 216:2
262:21
**mark** 38:1
45:11 66:15
81:15 95:3
96:21,24
101:14 104:9
196:12 198:22
203:22 204:10
205:4 219:2
229:13
**marked** 4:13
38:3 45:12,14
66:17 81:17
95:5 96:23
97:3 101:16
104:11 161:12
161:13 171:20
171:22,24,25
172:2,3,5
176:17,18
195:15,16
196:13,14,25
197:1 198:23
198:24 199:9
199:10,24
200:1 202:13
202:14 203:25
204:13 205:6
219:4 222:7,8
225:7,8 229:16
233:17,18
237:9,11
262:18,19

**market** 33:7
59:24,25 60:4
60:6,9,14,17
83:4,8,9,14
85:25 87:22
100:5,16
103:25 230:18
**marketplace**
60:7
**markey** 172:18
173:13 175:3
175:19
**markup** 181:1
**married** 21:18
22:1,3
**marsman** 245:9
**master** 64:5
**material**
201:24
**materials**
156:13 161:1
**mathematician**
217:10
**matter** 21:5
29:18 51:9,9
53:20,24 58:7
58:14,23 81:13
91:1 134:21
191:9 192:1
193:15 228:11
**matters** 51:16
51:17 58:15
113:1 119:10
140:16 141:1

142:12 264:19
**matthew** 267:8
**maximum** 94:5
**mcdermott**
267:8
**mean** 8:16 9:4
9:23,24 10:5,9
11:6,12 12:20
25:24 26:1
29:24 33:1
35:17 38:13
39:21,25 40:13
40:22 42:12
44:24 48:13
60:25 62:1,6
62:22,23 64:18
64:20,22 65:1
66:5 74:6 75:4
76:22 78:4
80:13,13 85:10
85:22 94:13
96:5 103:22
113:7,9 120:7
120:12 124:21
127:21 136:22
146:1 150:4
151:9 153:3,19
155:4 156:23
157:2,9,10
162:3 164:11
164:18 168:24
169:8,13,17
179:3,5 180:6
181:8 185:1

186:4,5,6 198:11,12 206:11 208:23 211:12 217:19 219:23 220:1,1 223:11 238:20 241:13 242:6 242:14 247:20 268:10 269:17 270:7

**meaning** 19:13 19:15 37:11 52:3 168:22 180:7,8 255:8 255:10 259:24

**meaningless** 244:5

**meanings** 221:13

**means** 9:9 36:10 49:2 65:7 68:8 70:2 75:5,8 107:6 119:18 129:15 157:1,3 168:13 168:20 169:10 169:22 177:3,3 185:11 191:20 217:23 268:12

**meant** 39:23 102:18 144:6 156:18 190:10

**measure** 60:15 61:14,22 62:4

62:11 208:12

**measures** 154:1

**mechanical** 106:8

**mechanics** 136:8,14,18 137:25 144:25 166:6

**mechanism** 8:6 21:9

**media** 4:22 166:3 176:3,5 176:6 240:16 242:11 248:4 267:3,4

**medical** 134:9

**medicine** 60:18 60:23 61:6,16

**meet** 21:20 23:21 75:12 105:19 201:19 201:20 225:1

**meeting** 4:6,8 4:10 5:1,6,8,10 5:14 37:1,3 43:19,20,23 44:3,14 114:14 118:3 195:19 196:2,5,9,17,21 197:3,4,8,24 198:10,12 199:1,2,6,12,16 200:7,12,19,23 201:2,9,9,14,15

202:2,9,16,20 203:2,16,20 204:2,7,15,21 205:1,8,12,20 205:24 206:1,7 206:10,14,17 206:19 224:11 260:14,15

**meetings** 86:20 86:21,23 87:4 87:5 117:10,21 127:12,13 140:22 142:15 199:23 201:13 202:3,3,5 203:6 206:12 224:13 225:3

**meets** 266:4

**member** 57:17 57:21 80:22 91:2,4 96:16 96:17 98:20 134:20 137:21 151:23 268:22 269:12

**members** 45:18 80:20 81:2 83:13 90:3,7 90:24 91:3 96:9 99:18 105:7 113:2 114:13,24 115:3 119:7,16 120:20 121:3

132:13 133:21 151:2,16,19 182:1 198:12 198:14 221:18 222:12 224:12 245:19 247:5 247:12 249:21 259:4 267:24 268:8

**memory** 140:5 172:19

**mention** 233:12

**mentioned** 13:17 61:22 62:3 120:25 141:15,17 232:24

**merger** 83:21 100:23

**messaging** 25:3

**met** 21:23 23:22 24:2 65:17 67:13,13 83:14 103:21 104:2,4,4 105:23 106:4,5 107:5 109:15 159:22 161:5 202:24 203:16 206:19

**metal** 254:16 254:19

**method** 54:2 169:15

**methodical** 82:12 103:14 145:18 146:18 201:5

**methods** 234:23 235:6

**metric** 60:11 61:9,22 62:3

**metrics** 60:10 60:14

**michael** 91:4

**microbiome** 65:12

**microseconds** 17:18

**mike** 101:22 109:7 202:3 229:7,22 230:11 245:9

**milestone** 85:14 86:9 106:4,5,11 107:5,10 108:5 108:13,16,18 109:3

**milestones** 83:5 85:25 86:1,8 87:16,17,22 100:17 103:21 104:1 109:15

**milioris** 1:4 7:1 111:3 159:17 159:21 160:7 160:20,23

161:8 171:7 172:17 173:12 175:2,18 176:4 177:22 178:8 185:7 189:4,9 189:18,23 193:20 232:25 233:13

**million** 29:14 30:14 34:7,11 34:13 37:22,24 49:11 59:25 60:8,12 70:11 70:14 106:17 107:4,12

**millions** 69:3 70:1,4

**mind** 16:14 17:7 18:20 19:4,25 20:6 20:13 27:1,13 66:13 75:17,25 92:2 103:9 119:6,14 141:22 153:5,5 157:6 160:10 160:16 184:17 187:8,24 202:2 226:11,18,24 230:20 244:23 245:25

**minds** 230:21

**minimis** 33:16

**minus** 37:24

**minute** 38:15 45:4 79:10 95:7 205:16 263:6

**minutes** 4:6,9 5:1,4,6,8,10,12 5:14 43:20 128:19 146:14 156:25 195:18 195:25 196:16 197:3 198:25 199:12 200:2 202:8,15 204:2 204:20 205:8 206:21 225:18 226:4,19 227:13 228:1

**minutiae** 148:8

**mischaracteri...** 101:5

**mischaracteri...** 14:8 101:2

**mischaracteri...** 101:5

**misconduct** 15:15 23:11 88:11 91:22 92:1 153:16 161:16 165:22 216:16 239:2,2 239:16,25 247:22 248:1 248:15 251:17

251:18 256:10 256:12,20 257:11,14,17 257:21,24 258:4,6 259:10 259:20 262:10 263:1 264:13 265:5,15 267:9

**misleading** 68:18

**mistake** 73:14 73:23 74:5,7 74:10

**mistakes** 73:2,3 73:4,9,9,12,12 73:18,22 74:9 74:17,22,23,25

**misuse** 140:20

**modest** 211:20

**modified** 77:23

**molecule** 8:7

**moment** 38:5 52:17 73:20 81:19 173:5 175:16 177:6 179:7 185:24 237:20 263:8

**moments** 81:24

**money** 29:9 34:20 36:13 101:23 109:22 112:17 119:11 133:5 144:6,6 185:22 194:7

194:17 270:12 270:23

**monitoring** 5:1 5:4,6,8,10,12 117:5,14 141:18,23 195:12,19 196:16 197:3 199:1,12 200:3 201:14 202:23

**month** 17:18 46:3 47:1

**monthly** 267:15

**months** 69:5 78:8 87:6,8,8 199:22 252:1

**morning** 7:15 7:17

**motivation** 60:17 194:14

**motive** 194:1 194:22

**motives** 193:23 194:2,5,10

**move** 92:3 120:3 136:10 221:4 234:9 242:18

**moved** 143:18

**moving** 116:3 257:13

**multiple** 72:16 74:14 85:16

86:19 87:4,8,8 127:12,12

**n**

**n** 2:1 3:1 12:23 48:18

**nachtrab** 267:8 267:18

**nadav** 13:11 14:5 95:15 97:13 134:1 138:8 227:2,22 253:25

**nadav's** 105:1

**name** 8:23 56:10,12 74:3 74:10,14 84:11 94:23 106:15 118:12,21 122:9,12,13,18 122:19,20,23 195:11 215:10 215:12 217:7 222:21 232:17 251:16 267:10

**named** 65:15 158:23 224:4

**names** 122:13 198:4 215:8

**naming** 118:8 118:17

**narrow** 17:22 127:20 212:14 253:23 257:4

**native** 21:7,15

**naysayer** 66:4

**naysayers** 238:11

**necessary** 277:6

**need** 6:4,10,15 6:16 8:1 9:7 17:22 35:5 62:15,17,25 63:22 67:10 69:18,19 71:6 75:6 93:19 108:10 115:9 120:3 141:2 147:24 186:9 187:7 218:16 220:18 243:15 263:18

**needed** 53:24 155:8 230:18

**needless** 39:16 225:22 226:6

**negative** 76:11 170:7

**negatively** 129:6

**negligence** 50:3 51:8

**neither** 273:23

**neurobiologist** 257:3

**neurobiologists** 25:10 26:7

**neuroscience** 69:2

**neuroscientist** 236:7

**neutral** 265:21

**never** 10:17 19:7,13 21:8 23:6,9,12 24:7 24:11 26:24,24 27:8,11,15 29:11,15 34:15 37:2,3,5 43:19 44:20,20 49:12 49:20 50:16 53:4 54:14,14 54:16 59:8 62:11 65:17 67:13 69:6 70:13,15,19 72:8,17 88:6,6 88:7,12 91:10 92:2 93:14 125:7 139:19 142:7,8 144:3 144:12,18 161:5 164:25 168:10 170:10 171:11 185:20 189:7,19 209:13 211:23 212:1,3 214:10 215:7 235:24 235:25,25 239:5,6,7,8,8

239:19 240:19 247:8 253:16 253:17 254:18 255:19,23 256:22 258:15 258:15 267:5 269:6 270:9,14

**new** 1:1 2:4,4,9 2:9 101:24 203:5 225:20 233:20 234:4 234:11,19 235:4 236:5,10 237:16,19,22 237:23 238:1,6 240:16

**news** 70:16 119:18,20 244:2

**nicoll** 235:20 236:5,10

**nicolls** 236:25 237:5

**nine** 234:11,20 235:4,9

**nitty** 260:8 262:13

**non** 20:13,23 58:1 106:16 122:25 153:18 191:16,19 225:23 226:7 244:4,12,22,22 245:25 246:17

246:24 249:20 249:20

**nonbelievers** 223:13

**nondiscretion...** 106:24 107:13

**nonsense** 226:21 227:16 228:3,5

**norm** 215:15

**nos** 172:4

**notable** 206:16

**notary** 277:13 277:19

**note** 55:17 275:10

**notebooks** 260:4,11,22

**noted** 203:4 245:2 277:7

**notes** 99:25 260:17

**notice** 37:2 105:23,25

**novel** 8:5 42:15 60:3 76:23,24 169:3 220:20

**november** 1:10 1:15 5:5,15 6:19 110:20 138:23 139:10 140:7 173:12 176:21 196:17 202:16,25

203:2 245:4 273:2 274:3 275:3

**nuanced** 144:17

**nuances** 145:13

**number** 16:7 24:24 50:4 75:19 79:25 99:13 106:16 124:13 134:1 135:17 144:14 145:11,13 146:20,21 153:12,20,22 206:20 207:24 208:7,13 213:9 218:11 222:11

**numbered** 1:14

**numbers** 104:3

**nw** 2:14

**ny** 275:15

**o**

**o** 48:18

**o'donnell** 91:4 95:17 202:3

**o'donnell's** 96:13

**object** 14:7 122:4 125:24 130:19 163:20 164:10 166:21 190:20 226:12

236:17 239:17 240:1 242:1 247:23 250:3 256:6 261:2 262:11 264:24 265:6,16 266:1 268:3 269:2 270:16 271:15

**objecting** 163:24

**objection** 10:10 14:7 15:18 16:20 17:4,12 19:10,20 47:4 47:20,22 50:19 51:7 57:24 71:10 72:5 80:7 92:20 100:25 101:2 110:3 115:22 123:19 128:17 129:8 130:1 131:21 132:15 138:11 142:25 147:22 148:19 148:25 149:5 149:10 179:13 181:16 190:21 194:24 197:11 200:24 226:15 227:17,17 229:1 251:3 256:7

**obligation** 109:21

**obviate** 139:7

**obvious** 63:7 63:24 70:8 217:4

**obviously** 117:12 119:7 138:3 142:6 155:7 156:2 209:9

**occasions** 38:25 39:12 232:11

**occurred** 115:15 116:9 196:1 199:13 200:23 206:16 264:13

**occurring** 115:20

**october** 5:13 104:13 106:12 107:11 108:5 108:13,16,18 200:3 201:10 201:15 202:9 202:24 248:4,8 249:16

**odds** 219:20

**offensive** 241:4 242:17

**offer** 141:6,7

**offering** 124:25

**office** 43:10

**officer** 134:9,9 142:7 183:1 273:7

**officers** 135:19 138:8 147:17

**offices** 1:18 255:6

**official** 106:3 150:5

**oh** 21:21 31:6 35:22 37:16 97:25 116:10 122:17 172:8 186:6 213:16 216:7 226:16 238:22 252:5 256:19

**okay** 12:12 18:15 27:13,18 27:23 28:4 30:12 31:18 32:2,15 33:3 35:11 38:4,13 38:14,17,18,23 39:15 43:3,23 45:3 46:12,20 46:21 47:9 48:19 49:18,22 50:24 51:3 52:8,16 53:11 53:19,23 55:9 56:13,19 58:13 58:23 66:15,18

67:2,19 68:13 79:7 80:9 81:4 82:17 83:20 84:7 85:1 95:13 96:20 98:1,23 99:25 101:17 102:13 104:12,22 105:5,11 106:10,15 107:3,14,19 108:3 110:7 112:8 116:10 116:22 118:6 118:15,19,24 119:3,17 123:14,16 124:8 126:1 133:8,20 139:11 142:1,3 148:2,6 149:12 150:3,12 157:7 157:11 161:10 162:24 163:6 164:2 169:23 170:18 171:18 172:8,9 173:1 173:9 174:16 175:11,16 176:1,15,19,25 177:16,19 178:10,16 183:15 187:11 187:13 190:25

192:4,14 194:25 195:3,5 195:14,17,24 196:11,23 197:20 198:21 199:8,25 200:16 201:3,7 202:11 203:15 203:22,22 204:10,19 205:3 206:23 207:5 208:2 219:2,5,10 222:5,22 223:4 223:14 225:5 225:17 229:3 229:13,17 230:22 231:3 233:16 234:10 237:10,12 238:10 252:21 255:3 258:10 263:9,15,21 264:1 268:10 269:11 271:24 272:5

**ominous** 268:11

**omit** 197:15

**ona** 190:12

**once** 23:22 24:2 136:17 146:16 146:16 148:11 212:4 224:11

239:20
**ones** 76:1 80:4
  90:16 104:3,4
  213:4 232:19
**ongoing** 67:25
  68:11
**online** 171:8
**oops** 82:17
**open** 16:14
  17:7 18:20
  19:4,24,25
  20:6,6,13 33:7
  119:14 219:17
  226:11,18,24
  230:20
**openly** 98:14
**operate** 83:23
**operates**
  147:15
**operating**
  134:9 187:6
**operational**
  186:4 188:15
  188:21
**operations**
  36:18 56:1
  60:11 148:2
  230:10 254:11
**opine** 104:24
**opinion** 10:21
  10:24 11:4,6
  11:11,14,19,20
  12:14,17,18,25
  13:14,24 14:3

14:19,24 15:9
22:18 25:20,22
34:21 35:8
40:11 41:22
51:10,11,16,18
56:20,25 57:4
58:8,22,22
59:2,3,3,4 60:9
62:20 65:25
67:11 68:5
78:12,15,16,18
105:1 107:18
107:21,22
108:1 112:16
112:18 120:22
130:24 132:21
132:23 133:1
135:20 140:20
158:25 161:2,4
163:17 165:8,8
165:15,17
190:11 191:1
193:15,17,18
221:15 238:25
243:15 258:5
270:10
**opinions** 13:18
  18:11 19:12
  20:3,24 34:24
  60:8 66:1
  119:8,21,24
  191:6,17
  239:24 267:16

**opportunities**
  32:10
**opposed** 86:1
  87:16,22
  124:18,24
  158:24
**opposition**
  128:25
**optics** 52:18
  53:15
**options** 31:9,11
  31:12,15 33:4
  33:5 101:24
  153:1 173:21
**oral** 1:10,12
  40:20 273:7
**order** 6:6,6
  100:1
**orders** 190:23
**oriented**
  214:17
**original** 9:11
  9:13 26:11,12
  253:4,10,14,18
  253:21 254:2,6
  254:13 255:1,9
  255:14,21,24
  273:10
**originated**
  254:3
**orrick** 122:17
  162:7,15
  165:18,21
  166:4,7,9,16

167:1,7,13,18
167:21 198:5
262:22 272:4
**orrick's** 162:1
  162:21
**otw** 1:6
**ounce** 68:14
  69:10,14,22
**outcome**
  265:24 274:2
**outlet** 248:4
**outraged** 236:1
**outs** 84:1
**outside** 11:21
  12:1,2,4,13,19
  12:25 13:14,18
  14:3,4 26:19
  31:2 91:7,14
  118:9 120:3,6
  121:11,20
  127:5 136:9
  141:3 165:12
  167:19,19
  169:20 185:11
  201:21 211:17
  211:19 216:3
  221:10,14
  223:16 228:11
  260:9 266:6
  270:25 271:3,5
**outsider's**
  221:15
**outsiders** 82:18
  82:21 217:1

**[outstanding - patients]**

**outstanding** 116:19

**overall** 151:2 240:21 249:7

**overlap** 140:9

**overnight** 61:2

**oversight** 147:15

**overtaken** 66:11

**overwhelming** 68:16 69:15

**owe** 110:4,5

**owed** 100:11

**own** 19:6 33:3 33:4,5 73:21 113:2 185:23 246:3,22 253:17

**p**

**p** 2:1,1

**p.m.** 1:16

**package** 30:4 213:11

**page** 3:2 4:1 38:19,23 39:15 43:5 52:8,9,13 53:21 67:20 82:3 84:7 162:24 168:3 171:21 172:7 172:16 173:10 173:14,19

174:17 175:1 175:14 176:25 177:1,3 204:19 234:10,14,15 263:9 264:2,4 273:21 276:4,7 276:10,13,16 276:19

**pages** 263:8

**paid** 11:25 30:13 104:5 142:11 211:14 211:19 239:6 254:10

**pain** 27:23 29:10 30:18 31:2 225:2 253:17

**paper** 99:14,16

**papers** 8:14,18 8:24 231:20

**paperwork** 138:5

**paragraph** 38:23 39:15 43:4 45:23 46:8,21,22 52:9,17 53:20 67:19 68:2,13 163:2 203:3 223:4 228:8 234:10 235:19 240:9 264:2

**paragraphs** 234:13

**parameter** 169:21

**part** 31:8,11 96:11 99:12 115:10 122:10 130:17,20 131:5 132:13 133:10 135:18 154:5,22 155:9 167:7,13,21 210:19 213:10 215:3 230:19 233:14 234:8 257:6 261:7 272:1

**partially** 13:2 194:6

**participant** 84:14,17 91:14 92:19 94:17,19 94:22 211:13

**participants** 84:8 88:15,22 88:25 89:24 90:5,16 91:8

**participate** 93:7

**participated** 118:21 187:19 188:16

**participation** 188:19

**particular** 47:13 61:5 73:14 109:2 115:12 171:14

**parties** 11:22 16:16 83:1 86:13 120:10 158:23 273:13 273:24

**partner** 110:24

**parts** 48:6 116:3 215:1 257:13

**party** 12:21 35:18 165:4,13 185:13,14 270:20 273:17

**passive** 59:20

**past** 25:21 43:14 54:3 55:18 156:25 259:2

**path** 183:4

**patient** 60:20 63:19 64:2

**patients** 8:8 21:1,4 53:3 61:24 62:5,14 62:17,21 63:3 63:15,21 64:10 68:19 76:7,13 207:24 224:21 224:23 233:9 235:24 270:6

**patrick** 172:18 173:13 175:3 175:18
**pattern** 256:20
**patterns** 256:16
**paul** 224:1 267:8
**pause** 150:8
**pay** 109:21 110:5,6 254:9
**payable** 100:5 100:16
**payment** 83:20 100:10,18 107:4,12,15 110:2 124:21 211:19
**payments** 83:4 87:15 88:14,21 94:12,18 100:22
**payout** 94:5
**payroll** 239:7
**pdf** 97:2
**penalized** 67:24 68:10
**people** 18:13 19:16 20:14 40:21 69:4 72:10 73:8 75:19,20,23 79:25 90:4 99:16 109:8,8

119:21 127:19 157:4 164:15 176:6,10,14 186:19 189:12 192:2 197:25 222:11 223:16 224:3 227:6 230:9,20 231:16 233:5,6 233:10 236:15 238:22 246:5 255:20 256:16 257:15 258:19 270:22
**people's** 19:12 73:9,12 255:6
**percent** 32:21 105:1 107:18 108:1
**percolating** 116:6,6
**perfectly** 35:10
**perform** 210:22
**performance** 60:15 79:23
**performed** 54:22 55:3,7 55:10,24 56:15
**performs** 79:22
**period** 17:19,22 39:9 76:4 142:6 224:16 232:3

**persistently** 232:9
**person** 13:10 23:4 24:2 40:12 57:1,14 58:10 142:4 189:14 256:21 258:18
**personal** 16:6 57:4 60:17 111:10
**personally** 16:4 16:10,17 17:10 17:24 18:17 19:7 26:22 41:19 51:2 58:3 59:1 60:16 151:18 178:20 250:16 250:18 251:22 254:21 255:13
**personnel** 246:6
**perspective** 119:6 152:12 185:13 186:19
**persuade** 233:8
**pestering** 232:9
**peter** 2:22
**petition** 16:3 17:7,14,20,24 18:3 19:25 20:5,12,17 112:2,5 116:24

195:9 198:19 226:5,20 227:10,14 228:2,5,16,25 229:5,9,12 230:17,25 232:21 253:24 258:8 259:7 269:16 270:3
**petitioning** 267:19
**petitions** 16:1
**ph** 274:10
**phantom** 95:16
**pharmaceutical** 98:11
**pharmaceutic...** 98:10
**phase** 33:22,25 43:2 52:23 53:3,8,9 76:15 77:3,9,13,19 78:2,12,22 79:2,5 92:14 92:14 93:10,17 93:23 103:4,12 103:18 116:4 207:12,14,22 212:5,12 213:23 214:3,5 214:13,19 215:20,21 216:12,13,19 216:23 218:3

220:5,6,15,22
224:9,17
240:14 245:5
**phone** 24:12,24
24:25 186:23
187:20 188:16
188:17,19
189:4,9 231:2
**photoshopped**
184:2
**photoshopping**
179:2
**phrase** 53:6
146:10,11
**physics** 169:21
**pick** 109:6
195:2 210:11
**picture** 85:4
**piece** 237:16,22
**place** 26:18
88:9 91:19
101:24 173:16
185:9 200:12
200:19 205:8
267:11
**placebo** 67:22
**placed** 43:8,17
43:18 184:22
**plain** 39:22
40:3,3,11
156:19 164:20
190:10,15
269:18

**plaintiff** 1:13
**plaintiffs** 1:5
2:2 6:25 7:3
111:2,6 151:7
**plan** 4:3 53:5,8
53:9 77:23
78:1 79:17,20
79:21 80:2,3,6
80:12,16 81:5
81:11,22,23,25
82:9,22 83:3
83:13 84:22
85:23 86:18
87:2,15,24
88:4,5,8,10,22
89:15,18,21
90:1,5,9,20
91:7,13,21,25
92:19 94:6,8
94:17,17,18,20
94:21,22 95:16
95:23 96:3,10
99:11,19
100:21 101:8
101:11,24
102:4,7,11
103:8,11,17,20
104:2,6 105:15
105:17 106:11
107:2,4 109:16
109:22 110:2
211:14
**planet** 21:5
25:11 26:8

58:25
**plasma** 207:25
**platform** 25:3
**plausible** 262:6
**played** 99:10
**player** 211:22
**playing** 238:12
238:20
**plaza** 2:9
**please** 6:3,20
48:2 80:10
88:19 98:2
115:7 138:16
144:22 146:17
162:19 167:24
186:16 197:14
201:1 213:17
228:10,19
265:8
**plenty** 129:4
**plos** 231:19
232:5
**plus** 37:23
64:10 91:17
253:22
**point** 17:13,17
17:23 18:2,3,7
18:17 26:16
29:22 37:4
42:15 65:24
76:15 85:4
87:10 99:17
112:8 114:1,1
116:22 122:7

122:24 138:20
140:23 142:11
146:7 148:9
149:21 158:19
182:19,20
193:14 211:15
229:7 250:9
251:20,23
252:3,6,9,12,13
252:15 258:7
258:23 267:13
**points** 31:13
**pool** 31:8
**popped** 224:11
**population**
76:9
**portfolio** 35:4
**position** 35:4
35:24 36:17
43:13 215:17
216:9 227:6
264:22
**positions**
173:22
**positive** 61:15
76:11 220:24
**possess** 253:10
**possessed**
253:4,21 254:5
254:13 255:1
255:13
**possesses**
255:24

**[possession - previously]** Page 55

| | | | |
|---|---|---|---|
| **possession** 255:9 256:4 | 199:17 200:6 200:22 202:21 204:7,24 205:13,20 211:8,23 212:1 248:15 | **preferably** 165:7 | **presumably** 139:22 203:14 |
| **possibility** 15:22 16:4,11 16:18,25 17:2 17:10,25 18:8 18:18 19:3,8 19:14 20:1,7 20:16 23:10 42:7,10,13 79:4 117:1 | | **premise** 85:8 234:23 235:6 235:10 253:19 | **pretend** 221:1 |
| | **potentially** 56:16 112:22 117:6 136:12 146:2 170:17 251:7 266:6 | **preparation** 137:10 150:7 162:2 | **pretty** 12:20 14:10 25:19 26:8 61:21 83:7 113:10,11 140:20,20 147:24 156:19 165:24 166:2 190:14 198:16 232:11 235:2 240:15 257:3 268:5 269:16 |
| **possible** 86:7 86:15 90:22,23 90:23 99:8 115:4 136:15 164:15 183:11 183:13 194:2 218:13 254:16 267:22 | | **preparing** 116:4 180:16 272:1 | |
| | **power** 35:19 | **presence** 200:8 | |
| | **powerpoint** 189:21 | **present** 2:21 8:8 144:19,23 198:3 203:17 | |
| | **pr** 230:10 | **presentation** 173:20 230:22 | **prevent** 265:13 266:15,20,21 |
| **possibly** 32:13 183:7 208:6 233:2 259:3 | **practices** 250:1 250:11 | **presented** 78:3 145:1,2,6 | **previous** 50:5 204:11 |
| | **preamble** 228:19 | | |
| **posted** 171:8 | **precise** 10:13 84:6 92:7 114:11 165:18 178:5 191:21 208:4 | **president** 28:5 28:14,16 43:13 98:10 | **previously** 4:13 31:25 45:12,14 161:12,13 171:20,22,24 171:25 172:2,3 172:4 174:13 175:7 176:17 176:18 195:14 195:16 196:13 196:14,25 197:1 198:23 198:24 199:9 199:10,24 200:1 202:13 202:14 222:7,8 225:7,8 233:17 |
| **posts** 176:3 | | | |
| **potential** 32:17 41:2,2 63:12 63:12,12,13 83:4 92:17 93:3 94:5 107:4,15 109:21 112:10 165:5 196:8,20 197:7,22 198:14 199:5 | | **press** 136:6 153:22 154:11 155:11 193:3 214:22 215:6,6 215:9,12 229:11 230:4 248:13,20 249:4 | |
| | **precision** 125:6 | | |
| | **preclinical** 92:11 253:5,10 | | |
| | **precluding** 43:10 | | |
| | **predecessors** 253:17 | **pressing** 150:5 | |
| | **preempt** 159:12 | **pressure** 265:24 | |

233:18 262:18 262:19

**price** 34:20 36:14,14 79:23 86:6 87:16 88:14,16,21,23 89:1,4,12 92:4 92:17 93:4 109:18 173:23 174:5,9 194:8 194:18,20 223:22 230:18 240:23 270:5,9 270:12

**primarily** 47:12 129:14 142:4

**primary** 8:15 8:16 9:2,4,5,9 13:10 21:8 31:21,22 150:23 233:3,3

**principal** 270:5

**printed** 97:2

**prior** 101:3 125:8 138:22 140:2 156:18 182:6,24 259:9 259:19,20 261:1,8

**private** 28:21 123:25

**privilege** 131:24 163:25

251:2

**privileged** 12:4 12:10 131:11 134:14,18 135:12,13 146:2 148:20 162:16,23 167:22 190:23

**privy** 14:25 15:11,12

**probabilistic** 168:14

**probabilities** 169:14

**probability** 169:12

**probable** 218:13

**probably** 8:2 32:20 58:24 65:4 102:11,21 108:9 128:22 154:1 182:21 186:21 193:3 206:11 211:3,5 217:15 231:17

**procedure** 1:20

**proceed** 230:1

**proceeding** 129:9 273:25

**process** 82:12 82:25 85:3 86:17 87:13 96:11,12 99:12

101:6 102:21 102:22 103:14 111:18 116:12 116:14 118:7 120:10,12,13 120:16,18,19 120:24 121:5 122:11 127:9 130:18 137:24 145:16,23 146:19 150:14 150:20,25 151:3,10 153:8 182:15 201:5 226:18 252:8 252:19

**produced** 1:13

**productively** 184:22

**profession** 230:6

**professional** 59:16 165:8

**professor** 258:11 263:2

**profited** 69:2

**program** 53:10 86:10 87:21 99:2 187:1,21 220:21 233:9 240:14

**prominent** 234:12,20 235:9

**promise** 75:11 76:16,17,20,20 76:22 77:11

**promising** 46:2 221:3

**pronounce** 220:9

**properly** 190:16

**proponent** 113:12

**proposal** 99:18 100:15,22 107:19

**proposals** 104:23

**propose** 89:25 90:18

**proposed** 8:6 21:9 39:10 99:2 104:25 106:1 107:14 107:17,22,25 108:23

**proposing** 101:10 105:11 271:6

**protocol** 213:19,19,25 214:14

**proud** 72:11,13

**prove** 51:10,17 54:2 170:7

**[proved - question]**                                    Page 57

**proved** 67:22 169:6

**provide** 62:14 78:23 162:15 165:14,16 181:1 202:4 218:15,15 221:9 230:24

**provided** 54:4 62:20 63:3,19 181:6,12,14,20 209:7 218:24 239:24

**provides** 165:5

**providing** 162:15

**proving** 170:4

**provisions** 1:20

**proximity** 37:8 37:16 253:24

**psychology** 71:16,18

**public** 4:15 28:22,24 29:18 29:25 39:13 44:19 50:4 65:9 66:7 91:1 91:9,17 125:4 139:12 148:3 161:15 180:12 182:21 183:9 194:16 195:9 225:19 266:10 266:17,22

268:16 277:19

**publications** 26:14 56:4 171:6,14

**publicly** 33:11 34:1 35:24 87:18 88:1 160:17

**published** 21:11 66:23 94:4 163:9 164:23 233:20 248:4,25 249:15

**punch** 241:25 242:2

**punched** 241:5 241:14

**punches** 241:21 242:16

**punishment** 134:24 144:2

**purpose** 122:4 146:8,12,13,25 147:3,7,8,19,20 157:8,9 221:6

**purposes** 136:23

**pursuant** 1:19 273:15

**pursue** 271:20

**pursued** 158:11

**pursuing** 41:9

**put** 16:9 82:18 88:25 99:14 105:22,25 106:2 147:25 153:22 235:24 241:7 270:19

**q**

**qualified** 188:4 217:15

**quarter** 86:21 86:24

**question** 5:18 7:20,20 10:5 11:1 15:20 16:10,24 17:1 17:23 18:15,16 18:25 19:21,22 19:24 20:19,20 23:16 26:19 27:3,7,9,15 30:22 31:6 38:5 41:8,11 42:22 44:15 45:1 47:25 50:13 51:13,14 52:5,20 53:1 57:9 58:1,16 62:15 63:1,5 69:12 72:7 74:1 75:7 77:15,17 78:23 81:20 83:7 88:2 92:21

94:19 95:25 98:18 106:5 108:25 111:17 115:19,21,23 119:4 122:5 123:20 126:1 126:15,17,17 127:1 128:2 129:18 130:6 130:11 131:7,9 131:22 132:5 132:10,19 133:12 135:3 137:3,13,13 138:16,23 143:8 147:5,23 150:9 152:11 159:4 162:19 163:25 164:3,4 178:1 184:7 187:11 188:2 189:8 191:21 191:25 192:17 193:8,10 205:17 208:23 209:12 212:15 213:3,22 214:2 214:11 215:1,3 221:8 222:15 228:18 231:1 233:21 246:25 247:25 252:2 253:7,12,15,23 254:20,24

255:3,5 256:9 260:10,23 261:5 263:13 265:18,20 266:5,19 268:5 269:21

**questioned** 23:5 26:16,22 26:24,25 27:1 27:11,13 214:8

**questions** 7:25 12:7,11 27:22 44:16 58:14 64:6 76:3 146:2 173:4 219:7 225:25 262:14,15,16 272:6,7,8,9,10

**quick** 263:19

**quickly** 36:25

**quinn** 122:22

**quite** 28:20 37:2 94:10 127:10,11 146:19 166:15 186:3 191:25 267:11

**quote** 62:4 160:11 215:18 216:9 218:16

**quoted** 235:23

**r**

**r** 2:1,8 48:18 276:3,3

**raise** 35:5

**raised** 112:12 114:8 258:14

**ramasastry** 222:21

**ramastrami** 222:15,19

**random** 99:25

**randomized** 220:4

**range** 30:2

**rarely** 215:7

**rates** 125:1,2,3

**rather** 101:25 102:14,20 156:6

**rational** 116:12 129:5 145:16 145:23 146:18 154:19 185:13 221:4 255:5

**rationale** 119:17 147:3 249:7

**rationally** 119:19

**raw** 9:15,18,19 9:20 26:11,13 29:7 165:7 253:5,10,21

254:2,6,9,13,19 255:1,7,7,9,14 255:24

**rct** 219:18 220:2,4

**reach** 188:24

**reached** 58:9 83:11 85:16 109:19 116:7,9 140:23 153:24 154:15 185:20 259:19 261:12

**reaching** 154:11 233:7 265:24

**reacted** 235:17

**reaction** 209:6 243:16,19,20 243:25 245:14 248:17 251:15

**read** 8:14,20,24 18:4 52:17 83:19 94:7,9 101:20 105:20 109:23 156:13 158:7 161:1 172:11,22 174:14 175:9 175:24 177:8 177:23 179:2,6 180:5,13 184:15 190:6,8 205:16 219:24 226:25 227:3

227:10,14 235:9 263:6,7 263:13,16,18 263:20,24 266:3 275:9 277:5

**reader** 71:7

**reading** 38:8,17 38:24 39:16 40:9,19 43:7 45:24 46:18,25 47:10 48:22 53:11,13,23 55:17,18 65:22 66:19 67:3,20 68:14,21,24 98:1 100:4,9 101:21 102:13 102:19 104:22 163:6 175:2 190:14 203:3 203:12,15 215:18 216:10 219:15 223:7 225:17,22 228:9 229:22 234:2,20 235:5 235:23 238:10 241:2 263:10 264:12

**real** 12:21 18:13 32:9 227:7 238:23

**reality** 255:18 255:19
**really** 19:1 29:19,19 32:25 33:1 46:4 47:2 114:3 121:5,18 125:4 129:15 130:23,24 140:19 144:4 151:3,24 152:11 153:13 155:6 168:13 173:3 175:1 185:10 208:24 231:15 254:19 257:11 268:12 270:7
**reanalysis** 210:2
**reanalyze** 210:18
**reason** 27:3,25 37:2 42:16,16 57:17,21 78:22 79:1 98:15 119:16 146:11 165:23 213:21 213:24 214:1 214:11 216:15 255:20,20 257:25 270:9 275:11 276:6,9 276:12,15,18 276:21

**reasonable** 100:11,18 102:10 146:22 242:5
**reasonably** 188:25
**reasoning** 125:15
**reasons** 42:16 44:18,19 145:11 211:7 222:24 256:22 273:21
**recall** 18:7 28:23 30:7 44:13 45:2 65:25 86:20 87:20 92:24 102:23 103:21 108:12,14,15 109:14 112:1,4 113:22 114:16 115:20 116:24 117:15 122:10 129:2,4,8,12,13 133:23 135:21 136:15 139:1 145:4,9 159:19 159:25 160:3 160:19 171:13 171:16 172:23 172:24 173:2 176:10 177:9 177:13,16

181:6,19 182:5 192:22,23 199:20 200:25 203:20 204:6 207:22 208:18 210:4,13 216:22,25 217:6 222:24 223:18 224:7 224:15 230:22 232:4,12,18,23 235:17,18 236:4,9 237:4 243:3,16 245:11 262:7 263:17 265:2 267:7,24
**recalling** 160:14
**receipt** 273:19 275:17
**receive** 31:5,9 107:11 190:17 209:11
**received** 29:8,9 29:13 31:7,19 32:12 118:4 134:15 143:9 190:19,22 221:18 228:20 239:8 269:14
**receiving** 115:6 117:24 127:14

**recent** 43:3,7
**recently** 203:14
**recess** 45:8 79:13 110:15 149:15 179:24 207:8 231:7 252:25
**recipe** 261:11
**recognize** 38:6 38:7 81:20,21 101:17
**recollection** 37:23 82:7 95:22 99:10 105:5 108:4 117:3 172:14 174:12 175:7 175:22 176:2 177:20 178:6 196:1 198:17 199:19 200:11 200:18 203:9 205:19 206:9
**recommend** 123:18,21 125:16,18
**recommendat...** 238:8
**recommendat...** 136:10 249:13
**recommended** 123:21
**recommending** 128:11

reconstruct 244:25

record 1:21 6:21 22:7 29:18 39:13 45:6,9 79:11 79:14 81:13 91:1 95:6,8,10 95:11 106:3,3 110:13,16 124:2,3,5,6 139:12 149:13 149:16 150:9 153:23 172:11 179:22,25 207:6,9 215:16 231:5,8 252:23 253:1 272:12 273:8

recordkeeping 250:1,11

records 136:5 201:17,18 244:25 260:4 260:12,22

redacted 195:24

redo 103:3,6,12 103:18 210:2,8 210:11,14,22 211:10 212:4 213:13 214:19 214:21

refer 27:21 43:3 101:7

reference 26:8 102:6 118:3,17 237:19

referenced 12:14 26:11 55:16 114:16 275:6

referencing 52:21

referred 55:5,6 233:13

referring 31:2 34:16 47:8 49:3,7,9 53:18 55:21 81:25 97:24 99:13 102:11 120:18 157:16 180:9 191:12,13 231:2 234:11 246:19

refers 97:19 104:18 201:8 220:4 235:19

reflect 130:2 197:12

reflected 79:23 186:21

reflects 115:5 117:23

refresh 82:6 99:9 105:5

140:5 174:12 175:6,21 177:20 195:25 200:11,18 203:9 205:19

refreshes 95:22 172:13

refute 164:22 168:2,18 241:23 256:4

refutes 168:6

regard 10:17 22:21 50:3 53:9 107:24 108:22 119:22 158:17 267:12

regarding 25:22 63:22 104:24 152:19 152:19 197:14 221:10,20,22 221:23 229:12 248:15

regards 116:14 122:24 153:17

registration 274:9

regret 72:25

regrets 72:19

regularly 98:17

regulatory 61:18 63:17,25 75:18 243:23

reisbaum 2:3 6:24 7:2

related 122:3 141:9 162:14 189:24 191:5 191:16,24 200:22 231:13 250:1 251:12 259:20 260:4 264:19 273:24

relationship 269:9

relatively 37:1

release 193:3 213:11 214:22 215:6,7,9,13 229:12 230:4 266:10

released 112:2 225:19

releases 153:23 154:11 155:11

releasing 103:11,17 266:16,22

relevant 41:23 58:1,15,18,18 264:14

relied 13:10 19:12 20:24

rely 36:16 215:19 216:10

relying 239:15

**[remain - report]**

**remain** 39:17
39:24 40:9,19
**remained** 40:22
158:19
**remains** 67:25
68:10
**remarkably**
47:11 48:10
**remarks**
164:13,19
**remedied**
243:15
**remember** 8:21
9:20 13:10
14:18 23:15,23
23:25 24:20,23
25:4 28:21
29:17 31:17
32:14,23,24
33:16,19 34:5
34:8,10,12,13
37:24 39:6,13
43:19 44:5,6
44:15 54:25
55:1 56:2,9,10
56:12,18 65:22
67:1 74:25
76:6 81:10,14
82:10,23,24,25
83:18 84:1,5
84:21 85:12
86:19 87:3,12
89:16,19 90:2
90:2,11,17,21

91:2,5 96:4,12
98:15,19 99:7
99:22 103:5,14
103:19 104:5,8
109:1,4,5,19
111:22,23
112:15,24
113:10,18
114:11,14,21
115:24,25
116:5,11,11,13
116:19,21
117:8,9,18,19
117:20 118:8
121:14,15
122:14,16,18
122:20,24
124:13 125:2
127:11 128:20
128:21 129:4,5
133:25 134:21
135:11 136:5,7
136:8,14,16,18
137:23,24,25
140:9 141:11
153:6 154:1,17
159:18,24
160:2,5,24
164:14 166:18
166:22 167:11
167:12,16,18
171:10 172:22
174:14,15
175:10,24

176:8,13,24
177:11,15,18
178:2,3,9
181:4 182:4
183:9,12,14,16
190:3,3,4,13,14
192:10,13
193:21 196:5
196:10,22
198:18 199:7
199:18,22
200:8 202:1,22
204:9 205:2,15
205:16,22,25
206:5,6,14,16
206:18,21
208:11,23,24
208:25 210:10
210:25 211:20
212:7 213:7,8
213:10 216:20
224:18,22
225:4 229:6
230:3 232:6,15
232:20 234:1,2
234:8 236:13
236:20,22
241:19 242:23
243:2,6 245:3
245:8 246:8
247:16,16
248:23 250:15
251:14,24
252:5 263:20

267:22 269:14
**remi** 1:7,10,12
2:7 3:5 6:19
7:12 52:18
66:21 67:3
98:3 101:21
113:8 121:2
202:2 203:3,15
214:4 247:5,12
249:18 259:12
272:12 273:1,6
275:5 276:2,24
277:2,4,12
**remi's** 108:2
119:5
**removal** 43:9
**remove** 45:25
46:17 245:5
261:16
**render** 165:7
**repeat** 30:22
138:16 146:15
162:19 200:16
212:14 226:16
**repeating**
39:17 55:1
238:4
**rephrase** 62:15
261:16 265:20
**replace** 59:9
**report** 32:8
109:10 137:17
138:2 235:12
248:5,17,25

**[report - results]** Page 62

249:8,10,15,19
249:25
**reported** 1:17
109:12 137:19
141:12 166:7
215:20 216:11
234:4 244:18
249:1,23
**reportedly**
234:20 235:4
**reporter** 6:1,4
6:8,10,13,22
15:5 48:16
131:16 143:4
186:16 235:1
236:11 238:10
273:4
**reporter's** 3:8
273:1
**reporting**
43:10
**reports** 249:12
249:13
**represent**
111:1 176:19
248:14 269:5
**reputation** 23:2
240:22 257:1
270:8
**reputational**
223:21 235:15
236:23 238:3
**request** 44:1,8
122:3 134:16

**requested**
273:17
**requests**
236:10
**require** 264:15
**required**
277:13
**research** 4:16
8:14,18 10:9
14:22 15:14
23:11,14,18
91:22 92:1
161:16 216:16
231:20 239:2
239:16,24
247:22 248:1
248:15 251:17
251:18 253:5
253:11 255:2
255:14,25
256:10,12,19
257:14,16
258:4,6 259:10
259:20 262:9
263:1 264:19
265:5,14 267:9
**resided** 148:11
**resign** 43:24
222:19
**resignation** 4:2
38:11
**resolutions**
206:22

**resource**
128:13
**resources**
119:12 128:6,9
128:10 140:21
145:20 270:18
270:19
**respect** 25:23
52:22 212:2
260:6 264:23
**respected**
112:25
**respectfully**
18:24 58:13
**respond** 69:13
70:13 152:14
229:9 230:13
268:18,19
**responded**
70:12
**response** 4:15
13:24 44:1,4,7
44:25 161:15
162:2 230:24
236:4 255:18
**responses**
27:25 255:17
**responsibilities**
43:9,13 51:20
142:13,15
253:8 254:22
260:9
**responsibility**
56:1 77:8

**responsible**
56:5 78:10
92:9,11,13,18
92:22,24 142:4
148:5
**rest** 16:14
212:24
**rested** 18:11
120:19
**restores** 21:6
21:14
**result** 15:13
52:19 76:11,11
83:12,12
123:14 209:8
243:8 264:17
**resulted** 43:12
49:10 56:3
**resulting** 119:9
**results** 34:1
53:16 54:16
103:11,18
121:22 163:13
167:5,6,13
168:20 169:10
169:17,18,25
170:2 207:15
207:19 208:18
208:22 209:7
209:14,17,20
212:6,8,12,22
212:25 213:1
214:18 217:5
234:23 235:6

**[results - roles]** Page 63

235:10
**retain** 124:14
  124:18,24
  136:1,12,20,22
**retained** 123:2
  136:23 137:1
  137:18
**retractions**
  231:12,20,24
  232:5
**retribution**
  134:23 144:2
**return** 32:9
  275:13,16
**returned**
  273:19,20
**reuse** 103:17
**revalidate** 55:2
**reveal** 146:2
**revealing**
  145:10 180:19
**review** 38:5
  180:23 181:7
  190:25 192:11
  248:21 275:7
**reviewed** 8:15
  8:18 9:2,11,15
  65:20 171:6
  175:8 176:3
  180:3 181:24
  182:2,5 190:11
**reviewing**
  162:4 174:12
  175:22 205:18

**revolutionary**
  174:20
**rewarding**
  101:23
**rich** 68:21
**rick** 44:10 47:6
  52:3,24 55:17
  59:6 78:21
  79:1,4
**ridiculous**
  168:15,16
  169:16
**right** 7:15
  11:17 12:6
  13:24,25 21:18
  24:3 27:9,19
  27:20 28:7
  29:13 30:15
  33:11 38:21
  39:9 45:11
  49:15 50:14
  51:18,24 57:1
  57:14 58:25
  61:24 66:6
  70:11 71:9
  73:17 77:4
  81:7,12,18,24
  83:5,24 86:22
  88:5 89:12
  91:15 92:4,10
  92:19,23 93:1
  93:4 94:12,15
  94:22,24 95:2
  97:4 101:1,12

107:12,20,23
109:12 111:7
112:4,7,10
115:12,18
117:2,7 123:3
123:11 124:11
124:16 139:18
141:13,19
143:7 145:10
145:21 146:3
151:11 152:24
152:25 154:1
155:23,24,25
156:4,8,10
157:20,21,24
160:16 166:13
173:16 179:10
192:3 193:7
202:5,9 206:1
208:3,10
211:25 212:20
214:21 216:19
218:3,19
226:19 227:16
228:3 236:16
241:11,25
242:3,18
252:11 254:14
255:9,25 263:8
267:21 271:1,9
**ring** 267:10
**rings** 122:23
**ripped** 172:7

**rise** 103:25
**road** 122:7
**robertson** 91:2
  97:10 101:18
  101:21 102:4
  102:18 104:14
  105:6,12 106:8
  111:23 112:9
  112:20 113:12
  113:16 114:8
  114:16 117:1
  133:20 198:16
  229:18
**robertson's**
  113:4,22 114:1
**rockefeller** 2:9
**rod** 254:16
**rods** 254:19
**roger** 235:19
  236:25
**role** 26:18
  32:17 46:17
  59:16 77:18
  80:5,11 96:13
  99:10 134:5
  138:9,18,24
  162:4 180:16
  203:10 221:9
  221:25 222:1,2
  247:14
**roles** 28:9,11
  28:12 59:16
  96:14

**room** 18:11 20:23 55:11
**roped** 51:21
**rough** 6:2,10 6:12,15
**round** 208:2,4 208:13 212:10 212:20,24
**rules** 1:20
**run** 41:22 48:5 54:1 58:4,11 85:5,7,8,11 144:18 194:15 240:13
**running** 29:25 54:5,11,19 65:9 142:10
**ruth** 109:9

**s**

**s** 2:1 4:1 48:18 264:18 276:3
**sa** 53:8
**sab** 221:9,25 222:2 224:10 224:11,12,25 259:17
**safe** 220:10
**safety** 62:22 63:4,12 207:23 219:17 220:11 220:12 224:22 224:24

**sahakian** 224:2
**saira** 222:21
**sake** 216:21
**salary** 29:10,11 29:14,15,16,21 30:11,17,24 31:5,14 106:20
**sale** 34:4 83:21
**samples** 52:22 53:2 213:20,23 214:3 217:2
**san** 21:21
**sandy** 91:2 97:9 98:2 102:9 104:23 106:8 111:23 112:25 113:12 114:1 116:25 198:16
**sap** 53:9
**sara** 222:15
**satisfies** 165:17
**satisfying** 68:24
**sava** 100:5,9 219:7 266:25 267:25 268:8 268:22 269:4,7 269:12
**savadx** 4:19 174:18 253:6
**savages** 267:1 268:22 269:8 269:10,12

**savages.com** 267:6
**savings** 32:16
**saw** 178:2 183:25 221:2 226:25
**saying** 22:11 44:16 71:5 74:12,20 109:6 115:15 130:13 132:5 133:5 142:2 147:7 152:14 177:25 184:9 186:20 188:12 201:4 223:4 224:18 226:6 235:23 236:13,20 254:17 255:19 256:11 258:14 268:19
**says** 40:19 43:21 50:14 54:18 55:17 67:2,20 98:24 100:4,9 106:20 128:8 148:12 161:19 166:13 173:10 174:18 175:1 198:3 203:3,15 240:9 264:5,12
**scale** 89:1

**scales** 30:1
**scam** 174:21
**scampbell** 2:20
**scenario** 262:6
**schedule** 84:8 85:13 94:12
**scheduled** 86:23
**schoen** 109:9 135:9,13,22 138:8
**schools** 22:12
**schrödinger's** 219:18,19 220:2
**science** 7:19,24 7:25 8:4 9:21 10:17,19,23,24 11:2,4,9,13,17 11:18 12:15 13:15,23,25 15:10,17,22 16:5,11,18 17:2,10,25 18:8,14,18 19:5,8,19 20:1 20:7 54:1 56:16 152:20 163:10 168:7 168:10,20 169:16 227:7 238:24 248:4 248:25 249:16 257:12

**[sciences - see]**                                      Page 65

**sciences** 1:7
 2:17 4:15 5:2
 7:9 11:25 13:7
 14:22 60:12
 62:7 63:8,24
 66:21 67:4
 70:7,7 76:25
 78:20 113:8
 126:7 140:10
 150:13 161:15
 165:21 173:11
 173:23 189:2
 193:16 195:20
 215:16 225:3
 236:21 238:19
 239:6 250:5
 251:19 253:16
 254:2 267:12
 275:4 276:1
 277:1
**scientific** 10:9
 23:8,18,23
 53:25 132:13
 153:16 165:22
 184:20 221:6
 221:11,19
 224:8,13
 225:20,21
 231:13,19
 234:21 257:11
 259:4 260:8
 262:14
**scientifically**
 135:2 163:11

168:8,12,19
169:15,19,22
174:21
**scientist** 7:21
 7:22,23 13:4
 18:11 20:13,23
 22:5,6,9,11,15
 23:3,4 25:5
 55:11,25 93:12
 94:1 160:16
 221:1,1 225:21
 246:6 256:14
 258:22 260:7
**scientists** 5:18
 13:2,5,6,7,9
 211:23 233:21
 257:7,10,23
 258:3 259:1
**scope** 134:17
**scott** 2:17 7:8
 115:15 126:11
 131:2,23
 133:10 159:2
**scratch** 60:1
**scratcher** 51:22
**screwed** 210:16
**scrubbed**
 130:23
**sec** 14:14,23,25
 33:8 37:9,15
 37:18,20,20
 47:13 49:6,13
 49:14,19,24
 50:7,18 51:1,5

51:9,22 52:1
68:10 215:18
216:17 251:12
251:16,21
252:4,6,10,14
271:13
**sec's** 49:9
 251:23
**second** 38:18
 39:15 43:5
 45:17,23 46:8
 46:15,20 67:20
 68:6,13 96:15
 100:8 121:24
 125:23 134:7
 156:2 162:12
 168:2 173:6,6
 176:25 192:11
 192:15,21
 205:18 213:2
 228:9 237:12
 244:1 267:11
 268:12
**secondary**
 31:23
**seconds** 18:4
 123:25
**securities** 33:6
 33:10 67:24
 264:18
**see** 12:10 31:6
 39:2,19 43:4
 43:15 45:20
 46:6,11,15

47:17 48:24
52:11 53:21
54:7 67:6 68:2
68:22 69:7
82:2,3 84:9,12
84:15,18 88:8
89:2 91:10
94:2 95:19
97:7,11,14,17
97:21 98:2,4
98:25 99:4,16
99:23 100:2,8
100:13 102:1
102:15 104:16
104:20 105:3
106:13,18,22
107:16 109:1
120:4,4 145:19
145:19 161:17
161:21 163:4
163:15 168:18
173:15,19,24
174:23,24
175:1,4,5,17
177:2,15
180:21 195:22
196:18 197:5
199:3,14 200:4
201:11 202:18
203:2,7,18
204:4,17,22
205:10,16
219:8,13,21
222:13,17

223:5,9 225:12 225:15 226:2,8 228:13 229:20 229:24 233:23 234:10 235:3 235:21 236:2 237:14,17 238:14 240:10 241:8 262:23 263:3 264:4,10 264:20

**seeded** 198:17

**seeing** 4:21 67:1 82:5 175:13 177:9 177:13,16,21 178:2 234:1 263:20

**seek** 110:2

**seeking** 115:6 117:23 265:3

**seeks** 102:20

**seem** 241:20

**seemed** 54:4

**seemingly** 43:2

**seems** 139:15

**seen** 9:13,13,18 9:18,20 25:24 26:1,2,12,13,20 46:18 49:12,20 49:21 65:5 66:25 79:19 161:23,24 164:21,25

168:1,6,10 169:23 170:4,8 170:11 171:4,9 172:14,20 176:23 233:25 263:5,17

**selected** 159:6

**sell** 35:6,22 232:8

**seller** 36:13 71:21 237:1

**sellers** 15:4,6 16:9,13,15 18:12 36:15 49:8 71:22 113:14 134:25 163:3,7,19 164:8 174:2,3 174:8 176:11 189:12 229:10 230:14,25 232:8 233:7 236:24 238:5 238:25 240:17 240:22 241:21 267:17,20 268:2,9,25 269:13 270:2 270:10,14 271:21

**selling** 34:14,15 34:17,22,23 35:1,3,9,12,16 36:2,4,5,11

225:25

**send** 176:7 229:4 268:14

**sending** 176:10 227:11 247:17 267:14

**senior** 147:16

**sensational** 164:20 169:2 184:19,19 230:17

**sense** 35:18 86:25 99:16 142:9 144:2 225:23 226:7 230:16 241:16 244:13 252:16

**sent** 101:18 176:8,14 219:11 267:3 267:18,19 275:14

**sentence** 40:11 46:15,21 47:9 47:17,19 48:4 48:5 67:2 68:6 68:7,9,10,14 69:19 102:19 168:15 169:1,2 169:5 180:14 228:9 241:2 263:12 264:8

**sentences** 68:4 219:25

**separate** 31:18 49:16 147:25 148:2

**separately** 203:17

**september** 4:9 4:10 195:21 204:16 205:9 206:7,10 212:23 214:19 215:13 230:23 242:21 246:1

**sequence** 115:14 117:8

**series** 55:1,6,15 55:22 56:3,3 80:4 109:5 114:23 117:9 128:21 150:14 199:21 217:2 227:5

**serious** 166:2

**seriously** 15:21 16:1 165:24 166:3 195:4 270:10,15,18 270:21,23

**seriousness** 17:6

**served** 273:12

**service** 25:3 211:4,5

**set** 50:8 56:19 75:12 96:20

110:7 139:6 173:1,3 174:16 175:11 176:1 178:10 196:11 196:23 197:20 199:8 203:22 204:10 205:3 206:23

**setting** 52:5 130:9 183:5 185:15,24 186:13

**settlement** 49:11,12,16

**seven** 158:23

**several** 30:6 38:24 39:12 47:12 60:10 61:8 68:11 119:7 121:19 272:4

**severance** 30:4 30:14

**shambolic** 4:18 173:11

**shame** 187:20

**shape** 21:7,15

**share** 65:5 73:19 112:18 260:3,11 268:18

**shared** 47:10 167:10 212:7

**shareholder** 20:11 68:1,11 85:20,22 86:5

**shareholders** 85:18,19,24 86:6,16 108:8 145:22 153:24 154:12

**sharing** 267:15

**sheet** 275:11

**shelved** 68:15 69:11,15,23

**shifting** 50:22

**shipped** 217:3

**short** 15:4,6 16:9,13,14 18:12 34:14,15 34:17,22,23 35:1,3,6,8,11 35:16,18,24 36:2,4,5,6,11 36:13,15,16 37:1,1 49:7 71:21,22 112:17 113:14 116:2 134:25 163:3,6,19 164:8 174:2,3 174:8 176:11 189:12 194:7 207:3 224:16 229:10 230:14 230:25 232:8,8 233:7 236:23

236:25 238:4 238:25 240:17 240:21 241:21 267:17,20 268:2,9,25 269:13 270:1 270:10,14 271:21

**shorthand** 273:3

**shot** 119:3

**show** 52:12 161:11 171:19 171:23 172:1 176:16 195:14 196:12,24 198:22 199:8 199:25 202:12 220:11 222:6 225:6 233:16 237:10 262:17

**showed** 219:16

**shown** 273:13

**shows** 60:10 173:12

**side** 153:25 154:20,21 155:2,8,10 156:11,15,20 156:20 158:7

**sided** 238:19

**sign** 275:12

**signals** 219:16

**signature** 3:7 38:18,20 273:16,18,21 274:5

**signed** 172:16 275:19

**significant** 43:12

**silence** 68:20

**similar** 87:21 87:24 88:4,8 218:6

**simple** 18:16

**simply** 57:4 183:16 254:23

**simufilam** 7:19 8:4,5,19,25 9:3 9:12,16,22 10:16,20,23 11:2,9,13,17 12:15 13:15,23 15:10,17,23 16:5,12,19 17:3,11,25 18:9,19 19:8 19:19 20:1,7 21:6,13 39:10 39:18,24 40:10 40:20,23 41:7 41:12,20 42:2 42:8,19,23 54:23 56:16 67:21 68:15 69:5,11,15,23

**[simufilam - speak]** Page 68

77:1 92:10,23
93:23 160:8,20
160:23 183:22
207:12,15,20
220:16,16,23
220:23 231:13
253:6,11
254:13 255:2
255:14,25
260:5
**sincere** 184:14
**sincerely**
172:17
**sincerity**
184:16
**singer** 197:13
262:22
**single** 64:2
73:23 101:6
180:13
**sit** 74:1 172:10
241:5,14 254:9
**site** 232:24
233:12
**sites** 186:20,24
187:19 188:12
188:17,20
189:5,10,13,15
232:5,7,12,14
232:18,20
233:1,4,5,8,11
270:4
**sitrick** 101:22
229:7,23 230:1

230:5,11,12
**sitting** 8:23
11:16 14:12
29:20 40:25
41:6,11 42:1
55:14,23 63:18
65:6 73:22
74:3,16,18
93:22 109:1,20
117:15 140:22
145:4 171:13
186:11 188:6
213:6 214:1
232:17 241:20
263:16
**skimmed** 190:8
**skipping** 51:25
**slam** 85:5,11
**slide** 171:7
174:18 175:12
**slightly** 14:7
**slow** 82:12
103:14
**slowly** 123:16
**small** 31:10
50:3 65:13
76:1 116:3
194:18,18
208:7 213:9
**social** 4:22
176:3,5,6
267:4
**sold** 33:13,15
110:1

**sole** 220:12
**solid** 21:11
258:1
**solutions** 274:8
275:23
**somebody**
190:1 245:8
**someone's**
22:16
**son** 217:6
**soon** 60:24
224:23
**sooner** 101:25
102:14,20
**sophisticated**
191:9
**sophistication**
191:11
**sorry** 28:10
44:24 47:21
95:25 105:9
123:24 147:24
151:7 163:22
167:19 173:16
186:17 204:11
216:4 226:16
246:5 252:24
**sort** 23:22
79:24 113:13
131:4 218:6
237:7
**sorts** 232:13
241:22

**sought** 118:4
**sound** 28:8
29:13 30:15
70:14 81:12
83:24 84:3,4
101:1 242:5
**sounded** 42:21
**sounds** 27:20
50:23 112:7
255:3,15
267:23 268:11
**source** 31:21
171:1 244:25
**sources** 30:17
30:25 31:20,23
32:5,9,19,23,24
59:19
**southern** 1:1
**span** 73:18
76:3
**spans** 74:1
**speak** 60:6,8
64:9 67:12
71:17 72:9
76:9 87:19
102:10 118:2
120:22 121:3,4
139:24 143:21
151:1,22,23
154:6 158:21
170:24 186:16
190:17 191:14
209:18,22
216:7 234:25

240:2 244:20
245:20 249:21
259:21,23
261:3,17,18
262:5

**speaking** 65:23
73:7 74:21
79:18 108:9
206:18 219:20
230:23 243:13
253:14

**spearheaded**
192:2

**special** 77:6
98:15

**specialize**
125:19

**specific** 32:6
48:6 50:20
59:14 62:18
63:1,6,22
64:25 66:6
71:11,12 76:4
83:6 88:18
93:19 108:10
109:4,14
111:17 124:22
127:20 128:3
129:8 133:25
135:22 136:8
137:14 144:13
149:22 153:4
167:18 180:7
186:10 196:3

200:11,18
221:11 268:6

**specifically**
23:15 29:17
41:16 54:1,25
65:22 74:25
76:6 99:7
102:25 109:19
111:22 129:13
136:18 154:17
159:18 171:16
174:6 176:8,13
189:25 199:18
202:1,22 206:8
206:21 210:25
216:20 234:1,6
235:18 242:10
243:13 244:3
248:23 250:15
252:5 267:22

**specificity** 64:7
117:18

**specified**
210:11

**speculate** 78:6
78:24 79:3,6

**speculation**
15:18 34:19

**speculative**
15:20 19:21,22
19:23 50:13
77:15 78:5,23
78:24

**speed** 169:20

**spell** 128:19
222:23

**spells** 105:18

**spend** 59:5
60:19 119:11
184:11

**spending**
140:15 144:6

**spent** 68:17
146:14 148:1
161:3 171:11
189:20 240:19

**sphere** 260:9

**spinning** 68:18

**spirit** 144:4
230:19

**spoke** 188:17
189:5,10

**spoken** 24:12

**spokesman**
69:17

**sport** 258:21

**spreading**
238:5

**spreadsheet**
4:4 98:2
104:23

**spruck** 238:13
238:21 239:3
239:10,14,15
239:22,23

**spruck's** 240:3

**staffing** 128:6

**stage** 58:10
76:23 224:22

**stakeholders**
43:12 76:21
83:1 120:23
145:22 154:16
155:12

**stamp** 45:13
95:4 203:23
204:12

**stamped** 38:2
81:16 96:22,25
101:15 104:10
195:18 205:5
219:3 229:14
237:11

**stand** 93:13

**standard**
201:22 244:8
246:23

**standards**
243:24 244:13
250:7,7

**standing** 6:5
245:25

**start** 8:17
14:11 18:5
25:19 30:21
31:4 45:22
111:19 131:9
172:9 180:20
257:22

started 29:4
31:25 59:24
96:12 139:15
190:8
starting 29:3
84:20
starts 46:13
stat 70:16
state 1:17
160:17 273:4
stated 1:20
37:2 72:15
statement
46:24 160:13
160:18 169:16
184:20,20,21
184:22 185:1,7
186:12 187:3
187:17,25
188:7 265:1
statements
4:22 89:11
160:6,9,15,19
171:12 176:10
177:1,7 178:2
178:12,21,23
179:1 183:21
184:5,7 185:18
186:1 188:3,20
194:11,23
195:1 235:2
240:24
states 1:1 163:6

statistical 53:4
53:7,8 77:22
168:22
statistics
168:23 217:11
statnews.com.
66:24
status 36:18
stays 253:14
stenotype 1:17
step 13:21 44:4
44:8 156:4,7,9
221:5 230:8
269:18
stephen 224:2
stepping 59:16
130:6
steps 154:13
217:2 218:11
268:1
sticks 171:21
stipulations 3:4
stock 31:9,10
31:14,24 32:13
33:3,4,4,5,13
33:15 34:20
35:6,19,22
36:14 79:23
86:6 87:15
88:14,15,21,23
89:1,4,12 92:4
92:17 93:4
95:16 101:24
109:17,17

173:21,23
174:5,9 194:9
194:18,20
223:21 230:18
240:23 270:5,9
270:12
stop 241:6
268:1,14
stories 153:15
story 155:3,8
155:10 156:15
156:20 158:7
straight 44:21
206:13 232:16
strategic
147:11,12
148:6 254:10
strategy 241:4
254:11
street 2:14,18
34:16 35:13
40:12 71:19
86:8 112:17
113:1 238:12
238:16,18
240:16 274:8
strength
245:23
stretch 29:5
strictly 158:25
219:20
strike 10:18
13:6 16:25
37:13 42:18

52:6 61:14
93:21 96:7
102:4 108:3
123:1 129:22
130:10 141:16
167:5 168:2,21
168:25 185:16
192:23 196:7
220:14 223:24
234:17 244:15
246:1 247:1
249:14 265:11
strikes 168:15
strong 26:8
113:12
structure 83:3
86:13
struggling 69:4
studies 53:3
56:9,13 64:8
69:5 92:14,25
93:10,23
220:16,23
224:9,17 244:4
study 11:24
52:23 103:18
207:12,14,18
207:22,23
212:12 213:18
213:19 214:13
214:14 215:21
215:22 216:12
216:13,24
219:17 244:25

stuff 144:16 152:7 176:7,14 184:25

style 135:18,19

styled 1:14

subheading 66:20

subject 95:15 97:16,23 219:7 225:14 237:16 237:22 262:25 272:7

submitted 53:5 161:19 162:5 166:13

subscribed 277:14

subsequent 109:15 189:2

subsequently 189:2

subset 140:25

substance 12:8 44:6 82:15 84:24 111:13 114:17 115:13 117:13,16 118:2 119:1 122:1 134:11 135:4,7,12 142:23 145:5,9 180:6 181:13 181:19 197:10 197:14,17

200:21

substantial 37:9

substantially 103:25

substantive 115:21 138:15

subtitle 174:20

succeed 61:11 78:13,17 155:14

succeeded 77:14

success 60:13 61:2,10,23 62:4,8,12 77:19 78:3

successor 56:20 57:11 59:9

suddenly 256:18

sue 158:23 159:10

suffer 264:17

sufficient 18:21 105:18

suggest 23:19 169:23

suggested 112:9,11

suggesting 111:23 170:18

suggestion 112:20 113:16

113:23 170:11 170:12 195:10

suggestions 170:19

suggestive 170:15 221:3 249:4

suggests 22:8 220:11

suing 68:20 237:4 238:6

suit 140:6 264:18

suitable 57:5

suite 1:19 2:14 2:18 274:8

summarize 29:5

summary 163:17

summer 28:6

sun 150:13,20 150:25 151:9 151:25 152:23 153:2,11,13,20 154:5,9,10,14 154:25 155:6 155:15,22 156:20,21 157:1,22 158:6

sunshine 144:4 157:1

super 76:3

support 14:24 15:3,9 21:16

supporters 266:25 267:25

supposed 55:15 210:15 234:24 235:7

suppress 265:13 270:4

sure 6:9 8:20 10:12 13:20 34:13 48:7 52:12,13,24 58:9 59:15 62:11 65:10,23 68:8 73:19 75:1 79:9 82:1 89:5 102:12 107:9 118:5 137:12 140:15 153:3 179:21 190:16 193:2 198:16 202:6 217:4 227:2 253:18 263:7 269:17

surrounding 82:7

suspicious 47:15

swear 6:22

switched 271:18

**[sworn - testified]**                                              Page 72

| | | | |
|---|---|---|---|
| **sworn**  1:14 7:13 273:6 277:14 | **taken**  1:14 52:22 53:2 119:23 235:11 273:2,25 | **tax**  32:8 | **temporarily** 100:9 |

**t**

**t**  4:1 48:18 276:3,3
**table**  119:2
**tactic**  112:17
**tailor**  268:5
**tails**  209:3
**take**  4:2 6:14 8:17 13:21 15:16,25 19:18 29:6 38:4,25 44:2,2 45:4 46:5 47:3 52:17 66:19 77:8 79:7,9 81:18 110:12 128:1,7 138:4 142:12 146:7 149:12 150:4 154:14 156:12 173:4 175:16 176:25 177:6 179:18,19 195:4 206:25 207:2 230:8 231:4 252:22 263:8 268:24 268:24 269:12 270:10,23

**takes**  61:2,3 119:20 129:16 174:5
**talk**  44:9 63:11 96:15 101:22 116:7 118:14 130:15 145:12 145:21 151:15 233:3 239:19
**talked**  50:25 52:7 122:23 129:18 135:24 159:23 189:7 189:19 195:5 239:20
**talking**  36:5 44:10 47:7 50:24,25 52:2 52:25 53:12 54:17 55:8 123:8 149:24 157:12 169:14 195:1 233:5 260:1
**tallied**  29:11,15 70:13,15
**target**  85:14 250:24 251:7 252:10,14

**tax**  32:8
**taylor**  2:8 7:7
**team**  53:25 132:13 135:18 216:25
**technical**  56:1 109:8 120:2 125:5 143:15 144:11,20,23 145:14 210:24 211:2 215:9 221:11 233:5
**techniques** 19:5
**tel**  2:5,10,15,19
**telephone** 128:22
**telephonic**  37:1 99:14
**tell**  19:2 55:9,9 55:14 60:4,24 77:10 102:25 113:3 129:22 132:2 148:16 148:22 149:2,7 155:8,10 187:7 194:10 195:6 207:15 219:19 220:2,7 226:20 228:24 229:4 252:20
**telling**  153:15 245:8,9 267:24

**temporarily** 100:9
**ten**  18:4 23:25 24:16 43:14,21
**tenure**  31:13 32:12 33:9,12 57:21 60:13 63:21,24 64:7 64:12 76:19 78:20 139:20 170:10 216:5,6 216:8
**term**  9:6,8,25 10:4,8,11,15 36:6 56:23 62:8 85:15 107:1 156:22 157:17 217:21 219:16 269:6
**terminated** 75:22
**terms**  84:6 108:10 220:18
**territory**  78:6
**test**  16:8 54:5 54:11,19 163:13 169:25
**tested**  52:22 55:22 63:20 212:10
**testified**  7:13 19:24 20:6 73:20 74:8 92:3 124:9

131:6 144:9
157:18 178:11
179:7 216:17
226:17
**testify** 94:14
115:5,16
162:17 229:2
**testimony**
29:20 90:6,10
101:3 120:15
125:21 183:16
228:23 273:8
275:9,17 277:8
**tests** 54:1,3,21
55:1,3,4,5,6,10
55:15,18,20,24
56:3,6,15
**texas** 1:17,19
273:4 274:7,9
**text** 24:22
**thank** 52:16
**thanks** 98:3
**theme** 223:16
223:18
**themes** 223:7
**theory** 169:13
**theranos** 48:15
48:17,18 65:11
236:12,16,22
**therapeutic**
31:3
**therapeutics**
27:23 225:2
253:17

**therefor** 273:22
**thesis** 21:17
257:19
**thing** 16:6
31:25 32:1
62:11 66:12
72:17 77:10
89:9 105:21,21
115:25 121:17
128:7 134:10
138:6 142:2
145:21 152:25
170:15 172:11
177:8,23
187:12 189:16
195:3,13
222:25 223:21
240:13 244:1
257:10 260:25
263:7,14
267:17
**things** 13:3,17
14:10,12,17,18
19:17 20:4,15
20:25 53:14,14
73:5 77:5
88:15,22 99:16
105:19 114:4
116:1 118:5
128:19 138:4
142:15 153:13
153:20 160:10
184:1,15
185:12 186:20

267:4 270:7
**think** 6:5,16
8:10 14:12
16:23 20:9
21:23 22:5,6,7
22:16,19,22
35:23 39:22
44:9,11 51:23
53:14 56:14
57:5,11,16,19
58:3,17,20,25
59:23 60:3
61:10 63:18,20
64:2 65:4,6
67:13 70:23
73:7,14,17,22
74:2,11,12,13
74:16 75:15,23
76:7,10,12,17
76:19,20 77:13
77:25 78:21,25
79:4 87:23
89:3 90:13
93:22 102:19
107:7 109:8
115:15 116:8
118:20,24
120:13 121:24
122:19 126:10
126:11,14,16
127:10 130:25
131:8,11
132:20,21
138:12 139:4,6

139:13 140:18
142:2 151:16
152:10,15
153:12,19,22
153:23 154:2
156:4,7 158:6
159:22,23
183:15 186:11
186:15,18
187:3 188:6
193:7,10,12
195:11 200:24
209:5 215:2
217:1 218:23
223:2 227:24
238:1,16
239:13,19,21
241:16 242:10
244:6 245:9
256:19 258:16
258:17,19
260:25 269:3
269:20
**thinking** 32:7
44:17 56:6
59:5 86:15
90:12,12
120:13 161:3
171:11 184:11
240:20
**third** 11:22
12:21 16:16
38:23 68:7
83:16 94:11

120:10 165:4
165:13 185:13
185:14 204:19
267:10 270:20
**thornton** 227:4
**thorough** 85:2
86:3,10 87:13
125:14 132:21
132:25 133:2,6
255:17 263:19
271:3
**thoroughly**
85:2 130:6
253:13 254:20
**thoroughness**
255:17
**thought** 59:8
70:19 109:25
116:12 165:24
165:24,25
185:2 238:18
268:18
**thoughtfulness**
74:19
**thoughts**
228:11,16
268:20
**thousand** 60:7
**thousands**
63:20 72:9,9
188:3 193:16
195:2
**threatened**
262:8

**three** 14:5 50:5
54:3 55:18
124:11,12,13
125:8 133:22
135:17,17
163:7 164:5
168:3 198:4,4
202:24 208:7
213:9 234:12
251:25 263:8
271:7
**threshold**
83:17
**thresholds**
83:14
**threw** 122:17
**throckmorton**
274:8
**throwing** 50:21
**thumb** 89:1
**thumbs** 125:20
125:20
**ties** 211:11,12
**time** 6:20 8:17
10:16 17:13,21
18:2,3,7,17
21:21 22:23
24:9,10,11
26:16 28:19,25
30:18 31:1,16
31:19 32:5,18
37:4 42:15
45:7,10 47:16
48:22 49:3

50:15 53:13
57:15 59:5,22
60:21 61:1,7,8
62:13,19 63:3
63:14,17 64:3
64:14 66:3
70:1 72:11,13
72:19 73:15
74:17,19,22,22
75:3,16,24
76:4 77:11
78:7 79:12,15
83:8 86:12
90:25 91:12,16
94:16,23 95:9
95:12,18 96:8
102:8 103:2
105:7 106:21
110:14,17
111:20 113:4
113:18,18,18
115:17,20
119:11,20,24
124:4,7 128:6
134:6 137:15
138:20 140:16
140:20 141:2,6
141:10 144:3,3
146:19 148:9
149:14,17,21
149:23,25
152:25 153:6
154:3 156:12
158:7 160:3

161:3 171:11
175:7 176:7
179:23 180:1,5
182:19,20,22
184:11 189:21
198:6 207:7,10
211:25 216:14
221:10,10
223:12 224:16
226:25 227:1,2
231:6,9 235:3
238:12 240:19
242:25 243:4
250:10 251:20
252:1,3,24
253:2 254:4,25
258:7,8 260:16
260:17 263:14
265:10,12,23
266:3,8,12
268:17,17,17
269:15 270:2
272:13 275:18
**timeframe**
275:8
**timeline** 115:14
**timely** 211:6
**times** 20:18
24:5,14 42:11
58:13 233:20
234:5,11,20
235:4 236:5,11
237:16,19,22
237:23 238:1,6

240:16
**timing** 63:23
  95:21 103:7
  108:11 112:24
  139:6,25
  141:11 153:6
  241:19 246:8
  251:14
**tired** 268:15
**title** 104:18
  106:10 134:8
  175:12 195:18
**titled** 66:19
  97:19 161:15
**today** 8:23
  11:16 14:13
  22:3 27:22
  29:20 40:25
  41:6,11 42:1
  55:14,23 58:16
  59:19 63:18
  65:6 73:22
  74:3,16,18
  87:19 93:22
  103:23 109:1
  109:20 114:3
  117:15 145:4
  169:9 171:13
  175:21 186:11
  188:6 195:6
  214:1 215:17
  226:17 232:17
  260:13 272:7

**today's** 6:19
**together** 70:4
  119:8 169:1
  225:1
**told** 66:10
  123:12 130:15
  132:1 144:13
  148:20 152:19
  157:3 207:19
  228:24 229:2
  236:10 241:5
  241:14 245:11
  260:13 267:2
**took** 16:7 20:13
  72:15 86:12
  87:1 102:21
  123:9 129:24
  142:11,13,16
  146:19 158:7
  165:23 166:3
  200:12,19
  205:8 217:1
  270:14,17,21
**top** 39:16 95:14
  98:24 163:2
  181:22 264:2
**topic** 112:13
  128:23 135:20
  162:10,14
  221:21
**topics** 119:10
  162:20 207:1
  212:13,14
  271:16

**total** 100:10
**touched** 135:1
**towards** 236:24
**track** 22:7
  102:22 206:24
**tracks** 271:18
**trade** 65:19
**traded** 87:18
  88:1
**trades** 33:6,10
**trained** 22:13
  22:17 140:17
**training** 7:22
  18:14,21 19:4
  19:16 22:7,14
  22:16 25:8,19
**transcript**
  273:7,20 275:6
  275:19 277:5,8
**transition**
  142:6,10
**translation**
  190:15,17
**treat** 40:18
  41:3 42:8
**treated** 22:19
  22:22
**treating** 244:6
**treatment**
  39:10 40:15,23
  41:7,12,15,20
  42:2,5,20,24
**trenches** 148:1

**trial** 33:25 53:8
  54:16 63:23
  67:23 76:15
  77:12 116:4
  220:4,5,7
  233:9
**trials** 33:22
  43:2 64:10
  77:4,9,13,20
  78:3,13,22
  79:2,5 163:14
  170:1 234:22
**trick** 108:25
**tricky** 42:21
**tried** 68:20
  211:7 261:14
  261:21
**trigger** 105:20
  145:17
**triggers** 83:20
**true** 20:17
  39:17,24,25
  40:9,19,22
  41:6,12,14,19
  42:1,4 69:25
  71:25 72:2
  120:15 184:10
  194:12,23
  273:8 277:8
**trued** 211:7
**trust** 25:14
  59:10 234:22
  235:5

**truth** 20:11
144:5,7 151:4
152:18,19
153:15,18
157:3
**truths** 153:18
**try** 72:18 73:8
75:10 117:25
118:2,25 139:8
153:13,20
154:18 193:11
193:19 262:3
268:7
**trying** 13:20
40:8 101:5
108:25 115:13
120:15,17,24
147:8 156:17
185:21 194:7
194:13 233:8
240:13 244:1
255:16 261:25
269:14 270:6
**tuesday** 1:15
**tune** 70:10
**turn** 52:8
162:24 174:25
**turns** 103:15
**tweeting** 268:1
**tweets** 176:3
177:9,13,16,19
177:21,21
178:7 267:3

**twice** 224:11
239:20
**twists** 103:15
**twitter** 176:11
176:12 177:10
**two** 14:4 15:6
28:1 37:16
43:1 50:5 66:8
83:23 87:3
92:25 96:14
100:24 116:19
122:17 123:17
124:25 145:11
146:21 147:16
151:12,17
154:3 155:22
158:1,10,13,20
171:9 198:4
208:6 212:24
213:9 215:1
234:12 251:25
268:18 271:6
**twofold** 144:14
151:25 155:22
157:19 243:20
**type** 31:25 32:1
35:1 61:2
63:23 70:21
91:18 128:7
138:5 140:22
191:11 208:15
211:2 222:25
223:21 236:23
239:8 263:22

267:17
**types** 34:23
230:6 262:16
**typically**
119:19 224:12
263:23

**u**

**u** 12:23
**u.s.** 161:19
**uh** 100:7 114:6
137:5 152:17
202:19
**ultimate**
125:12
**ultimately** 62:8
77:3 123:1,2
124:14 210:21
220:12
**unable** 208:8
212:18
**unanimously**
129:3 143:14
**unblinded**
76:15
**uncovered**
47:14
**uncovering**
236:9
**undefined** 40:7
**under** 54:9,22
54:22 61:9
72:17 76:12
85:23 94:5,18

97:23,23
100:15,22
102:7 106:15
107:4 109:15
109:22 110:2
162:22 244:4
250:17,19
264:14
**undergoing**
103:3
**underlying**
7:19 8:4,14,19
8:24 9:3,12,15
9:21 10:19,23
11:2,9,13,17
12:15 13:15,23
15:10,17,22
16:5,11,18
17:2,11,25
18:8,18 19:8
19:19 20:1,7
44:19 56:16
163:10 168:7
168:11 234:24
249:7
**underpinnings**
234:21
**understand**
7:23,24 8:3
9:25 10:1,8
34:16,17 40:12
47:25 49:17
67:10 102:6
111:1,5 115:14

118:24 135:8
137:13 143:20
143:23 146:4
147:5,8 154:8
155:17 174:1
185:1 187:14
188:9,11 190:9
249:11 255:16
257:11
**understanding**
7:18 8:11,12
9:5,8 10:3
34:18 36:9,23
37:6 42:18
50:1 52:21,25
63:5 75:5,8
79:20,22 83:17
102:3,17
106:24 107:6
162:23 165:2
174:7 179:14
191:25 217:21
217:23 246:21
248:7,12
**understood**
27:24 89:11
92:16,18 111:4
111:8 118:6,19
162:18 190:16
249:11
**undertake**
191:22
**undoable**
163:12 168:9

168:12,13,19
169:15,19,22
**unethical**
258:13
**unfair**  70:17,23
71:4 237:24
238:2,17
**unfairly**  22:20
22:23 244:7
**unfortunate**
54:5,10,18
**unfortunately**
211:18
**unheard**
243:25
**united**  1:1
**university**
208:3,19
**unpack**  22:10
156:17,22
**unpaid**  217:10
**unquote**  160:11
218:17
**unsafe**  160:23
**untrustworthy**
209:2
**unwilling**  208:8
**update**  201:24
**upset**  233:7
**upside**  127:1
**urgencies**
230:7
**use**  10:13 62:3
126:8,8 157:11

165:9 236:8
**used**  9:6 65:18
75:6 176:7
209:5 217:22
236:8 275:19
**using**  10:4
156:24 207:24

**v**

**v**  275:4 276:1
277:1
**vague**  17:21
231:1
**validate**  53:25
54:23 55:2
56:16
**validation**  54:4
**valuation**  85:14
103:21 106:12
**value**  34:3
60:11
**various**  31:13
32:22 34:23
47:12 63:21
64:8 116:23
133:21 201:5
**vendor**  246:5
**vendor's**
215:10
**vendors**  154:16
215:8
**verbally**  14:1
99:23

**verdict**  15:14
**verified**  245:7
**verify**  245:22
275:9
**veritext**  274:8
275:14,23
**veritext.com**
275:15
**versa**  136:7
**version**  161:24
248:25 249:25
**versus**  153:18
252:6
**vice**  136:7
**victories**
155:19
**video**  24:18
**videographer**
6:18 45:6,9
79:11,14 95:8
95:11 110:13
110:16 124:3,6
149:13,16
179:22,25
207:6,9 231:5
231:8 252:23
253:1 272:11
**videotaped**
1:10,12
**view**  47:11,13
48:10,12,13
64:23 65:3
66:1 85:4
114:1,2 129:23

147:2 155:1,14
156:3 158:19
164:7 169:5
178:20 183:20
184:4,8 185:3
185:6,17,25
187:25 193:22
193:25 220:6
220:14,15,22
220:25 221:2
237:23 239:3
257:20
**views** 248:14
**vocal** 267:12
**voice** 83:1
134:20 135:16
**voluntarily**
192:25 193:12
**vote** 89:24
136:2 139:20
143:14
**voted** 143:13
143:14 144:9
221:16 223:14
223:25 231:10
231:23 234:3
234:18 244:16
**voting** 129:6
151:19
**vs** 1:6

**w**

**wait** 121:24
125:23,23

126:17 166:25
173:6,6,16
216:3 266:18
**wake** 256:18
**walk** 70:2
**walked** 69:3,25
**wall** 34:16
35:13 71:19
86:8 112:17
113:1 238:12
238:16,18
240:16
**walls** 221:14
**wang** 4:20
12:23 15:13
23:21 24:2,6,9
24:12,19,21
25:2,5,14,20
26:4,14 56:5,9
56:13 84:17
89:18,20 90:8
90:19 91:21,25
92:9,18,22
93:11 163:9,12
164:24 169:24
170:5 175:13
188:25 189:1
190:12 191:7
192:6 208:9,12
210:7,12,22
211:10 212:2,4
212:9,16 213:4
213:12,22
214:2,13,15,25

217:18 218:14
229:4 231:21
244:3 247:15
247:22 248:6
248:16 250:14
250:23 256:5
256:12,21,23
257:2,16,17,19
257:21 258:10
259:2,11 260:3
260:11,19,22
262:9 263:2
264:5 265:4,14
265:25 266:16
266:21
**wang's** 26:17
26:22 27:2,9
27:14 89:25
214:7,8,20,24
215:2,4,12
216:15 217:25
218:7,19,24
242:21 243:9
244:7,18
245:22 246:3,7
247:4,10,19
250:1,5,6,10
258:2 259:9,19
261:9 264:19
**want** 6:1,8 35:5
35:6,13 45:15
45:22 46:22
52:1,8,12
53:19 67:11

71:5,20 74:11
74:12,13,18
76:10 95:21
96:19 99:16
110:9,11
119:21 126:8
134:23 139:14
142:7,8,8
143:18 162:14
172:10 177:8
177:23 178:23
179:19 187:9
206:25 207:2
209:9 214:22
219:10 223:3
224:20,23
232:14 233:1
263:7,9,11,24
264:2 266:9,9
267:12
**wanted** 45:25
99:23 126:12
143:16 144:14
241:25 242:2,4
242:4
**washington**
2:14
**way** 20:21 46:1
53:7 76:13
82:19 95:22
99:10 121:25
140:3 141:8
144:1,1 145:3
146:10,10

147:25 152:23
155:2,5,5
186:8,11 187:3
189:15 193:11
193:18 198:19
214:15 231:24
241:23 245:18
247:4 249:9,17
253:12 255:4
255:11 256:8
256:10 257:12
258:13 261:15
261:22 265:17
**ways** 153:10
187:16
**we've** 52:6,6
72:8 135:1
195:5
**weekend** 105:2
**weekly** 267:14
**went** 17:7
22:12 28:24
66:7 109:18
121:19 128:20
129:18 130:23
139:12 140:23
140:24,25
153:6,6 162:7
227:2 231:18
255:19 258:11
258:22 261:10
261:11 262:13
**west** 65:13
223:1,2

**western** 163:8
164:22 238:23
**whatsoever**
62:21
**whispers** 35:20
**wife** 69:1
**willing** 211:4
211:17 216:21
**willpower**
50:14
**win** 129:17,24
142:22 148:17
150:18 151:5,6
151:25 152:5
152:13,15,18
153:15 158:1,5
**winded** 103:13
111:18
**windfall** 85:18
**winning** 134:24
146:22 151:10
152:1,20,20
155:22
**wins** 153:16
**wish** 74:13
266:12
**witness** 1:13
2:12 6:22
10:11 15:6,19
16:21 17:5,13
19:1,11,21
47:5,21,24
48:2,18 50:20
51:8 57:25

72:6 80:9
82:17 85:1
92:21 101:4
110:4 111:15
114:25 115:9
115:23 117:25
118:6,14,19,24
119:3 122:6,15
123:14,24
126:5,19
128:18 130:5
130:22 131:17
132:2,8,20
133:8 134:19
138:16 139:9
140:15 143:1
147:23 159:14
162:18 163:22
164:2,11
166:22 167:23
177:5 179:17
181:4 182:14
186:15,18
192:18 194:25
200:16 201:3
207:3 213:17
226:13,16
228:21 236:19
239:18 240:2
247:24 250:4
251:4,10 256:8
261:3 262:12
264:25 265:17
266:2 268:4

269:3 270:17
271:16 273:6,9
273:13 275:8
275:10,12,18
**woman** 56:14
**women's** 10:2,6
**won** 219:17
**wong** 7:2
**woods** 191:1,7
192:7
**word** 15:7
50:21 126:8
146:12 165:9
209:5 261:16
**words** 15:6
60:19 67:11
100:20 106:3
184:16 203:12
236:8
**work** 21:8 23:8
53:25 71:21
235:10 254:17
256:16,17
257:5,8 258:1
**worked** 25:9,18
59:8 256:14
257:2
**workers** 75:20
**working** 8:13
60:19 71:18
211:22 258:11
**works** 66:14
**world** 18:13
181:9,10 257:6

**[world - years]** Page 80

257:7,10,23
**world's** 98:11
**worried** 52:18
53:15
**worse** 236:21
236:21
**worst** 66:19
67:4
**worth** 39:17
61:4 274:9
**wrenching**
75:21
**write** 38:24
39:16 43:7
65:18 98:1
104:22 223:7
225:17 228:8
238:10 241:2
**writer** 65:15
69:18,19 70:19
71:6,17
**writer's** 71:6
**writes** 45:23
47:10 48:21
53:23 65:18
68:14 101:21
102:13 229:22
**writings** 65:21
**wrong** 23:18,20
35:23 36:15
51:23 88:24
94:15 107:7
126:11

**wrote** 69:21
102:4 219:15
226:5 227:1
235:1 241:10
242:13
**wu** 2:7 6:8,9,12
7:5,5 10:10
12:6 14:7
15:18 16:20
17:4,12 18:24
19:10,20 47:4
47:20,22,25
48:17 50:19
51:7 57:24
71:10 72:5
79:7 82:14
84:23 92:20
100:25 101:2
110:3,9 111:11
118:23,25
121:24 122:13
123:11 125:23
126:1 128:17
133:7,9 139:6
146:6 147:22
162:11 164:4
172:8 173:6,9
177:3 179:18
179:20 182:13
186:17 194:24
207:2,5 226:14
227:17 236:18
250:3 256:7
272:9 275:1

**x**

**x** 3:1 4:1 83:11
115:17,17,17
**xlsx** 97:20

**y**

**y** 12:23 83:11
**yahoo** 66:12
**yale** 56:10,14
**yan** 211:19,21
214:15 218:22
263:2
**yeah** 6:9 15:19
16:21 19:1
25:24 28:13
30:16 34:24
35:25 38:8
48:19 52:5
57:12,25 61:9
66:2 71:5 72:6
72:22 73:5
76:11 95:1
96:1,1 101:4
101:20 103:24
107:24 108:21
112:24 113:10
113:25 114:19
125:25 130:22
130:22 132:20
134:19 140:14
147:23 156:19
157:23 163:1
164:11 165:12
170:24 173:8

173:17 175:14
175:14 177:4
179:20 186:15
186:25 188:13
196:4 205:18
207:5 208:21
211:15 213:5
213:24 216:4
228:21 236:18
236:20 242:5
248:10 262:12
264:6 265:17
**year** 29:5 30:11
66:22 67:21
78:8 87:11
127:10,11
216:2 253:22
**years** 8:13,24
21:25 23:25
25:21 28:20,22
29:6,10,12
31:6 39:6
47:13 50:5
59:8 60:1,19
64:10 68:17
69:6 70:18
72:1,7 73:6,18
73:23 74:1
76:4 83:23
87:7,8 100:24
148:1 169:8
179:3 194:16
206:11 243:20
243:21 251:25

251:25 256:15
258:23
**yesterday** 46:9
46:13,22,23
**york** 1:1 2:4,4,9
2:9 225:20
233:20 234:5
234:11,19
235:4 236:5,10
237:16,19,22
237:23 238:1,6
240:16

**z**

**z** 83:11
**zach** 7:7
**zachary** 2:8
**zamloot** 109:7
**zaur** 7:1
**zero** 193:6
**zierlein** 2:22
**zoom** 7:1
**ztaylor** 2:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

CHANGES AND SIGNATURE PAGE

WITNESS NAME:          REMI BARBIER

DATE OF DEPOSITION:    NOVEMBER 11, 2025

Changes to spelling of certain names throughout the transcript:

- Change "Sara Ramastrami" to "Saira Ramasastry"
- Change "Paul Asin" to "Paul Aisen"
- Change "Stephen Arnold" to "Steven Arnold"
- Change "Nicolls" to "Nicoll"
- Change "Colin McDermott" to "Colum McDermott"

Specific Changes:

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 9 | 20 | Change "I don't remember this" to "I don't remember it." | Correction for clarity |
| 20 | 11 | Change "shareholder" to "shareholders" | Correction for clarity |
| 23 | 1 | Change "She has" to "If she has" | Correction for clarity |
| 27 | 10 | Change "I have -- you've asked me if I have ever" to "I have not -- you've asked me if I have ever" | Correction for clarity |
| 36 | 5 | Change "Abusive short selling, very bad" to "Abusive short selling is very bad" | Correction for clarity |
| 53 | 7-10 | Change "The -- there is no statistical analysis plan around the Phase II trial. The SA – statistical analysis plan or SAP is with regard to a Phase III clinical program" to "There is a known statistical analysis plan around the Phase II trial. The SAP is with regard to a Phase III trial clinical program" | Correction for clarity |
| 68 | 9-12 | Change "The sentence penalized by the SEC, correct. And remains a defendant in ongoing and shareholder -- several shareholder lawsuits, correct." to "The sentence which reads he was penalized by the SEC is correct. And the sentence which reads he remains a defendant in | Correction for clarity |

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
|  |  | ongoing shareholder and class-action lawsuits is correct." |  |
| 86 | 23-24 | Change "Scheduled board meetings, when I was, there were every quarter" to "Scheduled board meetings—when I was there—were every quarter." | Correction for clarity |
| 101 | 8 | Change "This is the definitive document" to "That is the definitive document" | Correction for clarity |
| 102 | 10 | Change "I can't speak with him" to "I can't speak for him" | Correction for clarity |
| 102 | 20-21 | Change "seeks to evidence of how long the process took" to "speaks to how long the process took" | Correction for clarity |
| 104 | 2 | Change "But I -- again, complex plan" to "But I -- again, this was a complex plan" | Correction for clarity |
| 130 | 7 | Change "Clear" to "Clearly" | Correction for clarity |
| 143 | 1 | Change "Cannot" to "I cannot" | Correction for clarity |
| 151 | 3 | Change "we hope the process would" to "we hoped the process would" | Correction for clarity |
| 151 | 7 | Change "against the Defendant" to "against the Defendants" | Correction for accuracy |
| 182 | 22 | Change "but not much time" to "but did not spend much time on it" | Correction for clarity |
| 183 | 13 | Change "It's not impossible. But it's not possible." to "It's not impossible. But it's not probable." | Correction for clarity |
| 188 | 18 | Change "that would be a definite hurt" to "that would be a definite harm" | Correction for clarity |
| 193 | 18 | Change "Don't have an opinion" to "I don't have an opinion" | Correction for clarity |
| 198 | 3 | Change "Says also invited" to "It says also invited" | Correction for clarity |
| 211 | 19 | Change "how Yan" to "Hoau-Yan" | Correction for spelling |
| 212 | 5 | Change "analysis for the Phase IIIB data" to "analysis for the Phase IIB data" | Correction for accuracy |
| 212 | 8 | Change "the results with me" to "the Phase IIB results with me" | Correction for clarity |
| 213 | 24 | Change "Yeah. During his analysis" to "No. During his analysis" | Correction for clarity |
| 230 | 18 | Change "stock price was dropping" to "the stock price was dropping" | Correction for clarity |

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 237 | 6-7 | Change "-- of that sort" to "-- any discussions of that sort" | Correction for clarity |
| 240 | 20 | Change "your four clients" to "your three clients" | Correction for accuracy |
| 249 | 19 | Change "a draft leak -- leaked report" to "a leaked draft report" | Correction for clarity |

Heilbut, Et. Al. v. Cassava Sciences, Inc., Et Al.

Remi Barbier (#7684285)

ACKNOWLEDGEMENT OF DEPONENT

I, Remi Barbier, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_Remi Barbier_

_____     12/24/2025
                                     _____

Remi Barbier                              Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.


_____

NOTARY PUBLIC