# Exhibit 136

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>Plaintiffs,<br><br>v.<br><br>CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,<br><br>Defendants. | Case No. 1:24-cv-05948-JLR-OTW |

## EXPERT REPORT OF BRIAN E HARVEY, MD PHD

**February 27, 2026**



Confidential
Subject to Protective Order

# Table of contents

I. Qualifications ............................................................................................................................1

II. Procedural history ......................................................................................................................5

III. Assignment ...............................................................................................................................6

IV. Summary of opinions.................................................................................................................7

V. Background ................................................................................................................................8

    V.A. Overview of FDA drug approval process..............................................................................8

    V.B. Sponsors' interactions with FDA during the clinical trial process .......................................10

    V.C. FDA pre-market review teams ...........................................................................................13

    V.D. Bioresearch Monitoring inspections and other cross-functional offices................................14

    V.E. Alzheimer's Disease...........................................................................................................15

    V.F. Simufilam .........................................................................................................................18

    V.G. Timeline of events............................................................................................................18

VI. Opinions .................................................................................................................................21

    VI.A. FDA engaged with the pre-clinical and clinical research behind simufilam candidacy prior to the allegations concerning simufilam data integrity, was aware of the allegations and took the appropriate regulatory actions consistent with evaluating/investigating those allegations and maintained regulatory oversight and authority over the Phase 3 trials until their completion..................21

        VI.A.1. Phase 1 trial and FDA interactions..............................................................................22

        VI.A.2. Phase 2 trials and FDA interactions .............................................................................24

        VI.A.3. Phase 3 trials and FDA interactions .............................................................................26

        VI.A.4. FDA's awareness of allegations against Cassava ........................................................28

        VI.A.5. Several public news and media platforms published information relating to the allegations .......29

        VI.A.6. FDA took the allegations seriously and investigated accordingly...............................................31

        VI.A.7. FDA maintained regulatory oversight of the Phase 3 trials until their completion........................33

    VI.B. FDA had the authority to terminate, hold, or otherwise restrict the conduct of all of Cassava's trials—Phase 1, 2, or 3—and if the agency had concluded that the simufilam clinical program was based upon fabricated data or a fraudulent scientific premise as alleged, FDA would have exercised that regulatory authority .....................................................................................................34

        VI.B.1. FDA has many regulatory tools to monitor and enforce data integrity, including halting and restricting clinical trials...........................................................................................................34

        VI.B.2. If FDA had concluded that simufilam's clinical program was based upon fabricated data or a fraudulent scientific premise as alleged, FDA would have taken some regulatory action ...............37

    VI.C. Nothing that FDA communicated to Cassava indicated that the agency believed that the simufilam clinical trial data was fabricated or based upon fraudulent science .......................................................39

Appendix A. Curriculum Vitae of Brian E. Harvey, MD, PhD............................................................. A-1

Appendix B. Materials Considered.................................................................................................. B-1

Expert Report of Brian E. Harvey, MD PhD

# List of figures

Figure 1: FDA clinical trial phases...........................................................................................................8
Figure 2: FDA pre-market review team members ....................................................................................14
Figure 3: Timeline of relevant events .....................................................................................................19
Figure 4: FDA classification levels ..........................................................................................................37

Confidential
Subject to Protective Order

Expert Report of Brian E. Harvey, MD PhD

# I. Qualifications

(1)     I received my B.A. degree with Honors in Biology/Chemistry (joint major) from Middlebury College (Vermont) in 1980. My graduate studies began with a Ph.D. in Biochemistry from the University of Connecticut (Storrs) in 1985. Later, I received my M.D. from the UCONN School of Medicine (Farmington) in 1989. I was an intern and resident for three years in Internal Medicine at The Beth Israel Hospital in Boston, Massachusetts, with a position of a Clinical Fellow in Medicine at Harvard Medical School, completing the program in 1992. I completed a three-year Gastroenterology/Hepatology Fellowship at Johns Hopkins Hospital in Baltimore, Maryland in 1995.

(2)     I have eleven years of experience at FDA, where I participated in or led the regulatory review for New Drug Application (NDA) and Biologic License Application (BLA) submissions, as well as supplements of major innovative drugs and biologic products, including oversight of their progress and completion of clinical trials. Specifically, I held the position of Medical Officer/Supervisory Medical Officer (GS-602-14/15) at FDA in the Centers for Drugs, Centers for Biologics and Centers for Medical Devices. Starting as a Medical Reviewer in September 1995 at the Center for Devices and Radiological Health (CDRH), I worked in the Gastroenterology and Renal Devices Branch, as well as the Cardiovascular Devices Division and the In Vitro Diagnostic Devices Division/Office.

(3)     After a detail on Capitol Hill focusing on Health Policy as an American Political Science Association (APSA) Fellow in 2000–2001, I became the Associate Director for Policy, in the Office of Therapeutic Review and Research in the Center for Biologics Evaluation and Research (CBER), until FDA review authority for Therapeutic Biologic Products transferred from CBER to the Center for Drug Evaluation and Research (CDER) in 2003. When these biological products transferred to CDER, I became the Deputy Director of the Office of Drug Evaluation Five (ODE5) in the Office of New Drugs (OND), which had oversight for the Divisions of Dermatologic and Dental Drug Products; Over the Counter (OTC) Drugs; and Anti-Inflammatory, Analgesic, and Ophthalmologic Drug Products. During this time, from 2003 to 2005, I also served in the additional role of Acting Director of the Division of Anti-Inflammatory, Analgesic, and Ophthalmologic Drug Products. In this position, I led or provided senior oversight of regulatory review teams for NDAs. In my role as Division Director, I was involved with drug development and application-related interactions between my division and the company sponsors in this therapeutic area, including oversight of the initiation, conduct, and completion of clinical trials. When drug applications were submitted by company sponsors, I led the interdisciplinary team responsible for the review of submitted NDAs, which included chemists, toxicologist, statisticians, clinical pharmacologists, and medical officers.

(4)     In 2005, with the reorganization of the OND, I became Director of the Division of Gastroenterology Products, which included rare disease treatments for the Inborn Errors of Metabolism. In this position,

---

Expert Report of Brian E. Harvey, MD PhD

I led regulatory review teams for both NDA and BLA submissions. My duties also included review of Investigational New Drug Applications (IND) for both drug and biological products in the therapeutic areas of Gastroenterology, Hepatology, and Inborn Errors of Metabolism indications. In my role as Division Director, I was involved with all submissions, including label negotiations between my division and the drug sponsors in these therapeutic areas. Major approvals under my leadership included Humira (adalimumab) sBLA for adult Crohn's Disease, Remicade (infliximab) sBLA for Pediatric Crohn's and sBLA for Maintenance of Adult UC, Lialda (mesalamine) NDA for UC, Amitiza (lubiprostone) NDA for the treatment of chronic idiopathic constipation in adults, Elaprase (idursulfase) BLA for Hunter Syndrome (MPS II), and Myozyme (alglucosidase alfa) BLA for Pompe's Disease.

(5)     I left FDA in 2007 for a senior position in the biopharmaceutical industry to create the FDA liaison function for Sanofi-Aventis. As Vice President of U.S. Regulatory Policy, I worked with the various drug and biologic product development teams across the range of therapeutic areas to provide guidance on their interactions with FDA, including regulatory strategy, clinical trial development, and product labeling. Examples of FDA approvals include LANTUS (insulin glargine injection) supplemental approval (sNDA), Lovenox (enoxaparin sodium) sNDA, Amaryl (glimepiride) sNDA, Aralen® (chloroquine phosphate, USP) sNDA, Priftin (rifapentine) sNDA, Plavix (clopidogrel bisulfate) sNDA, Taxotere (docetaxel) sNDA, ELITEK (rasburicase) sNDA, Aubagio (teriflunomide) sNDA, and Multaq (dronedarone) NDA.

(6)     In January 2012, I was recruited to become Pfizer's Vice President of U.S. Regulatory Strategy, where I interacted with FDA for all Pfizer business units across all therapeutic areas and product types. In this role, I was the final signatory authority responsible for regulatory submissions to the agency, including approving all new products labels and all label changes for FDA-approved Pfizer products. As the lead Pfizer U.S. regulatory liaison to FDA, I played major roles in the approvals of Xeljanz (tofacitinib) NDA NME, the first JAK inhibitor approved for RA and several subsequent sNDA approvals, as well as helping design its Phase 3 clinical trial that led to the sNDA for Ulcerative Colitis (UC). In addition, I was directly involved in FDA approvals for Duavee (conjugated estrogens/bazedoxifene) NDA, a novel estrogen combination product for postmenopausal women and Ibrance (palbociclib), which prior to NDA approval received Breakthrough Therapy designation status for the treatment of a type of advanced Triple Negative Breast Cancer. I also provided regulatory and clinical trial design input on VYNDAMAX (tafamidis), leading to the NDA approval of this orphan drug used to treat adults with the cardiomyopathy of wild-type or hereditary transthyretin-mediated amyloidosis (ATTR-CM). In addition, I worked with the Pfizer Vaccine group on receiving FDA Breakthrough Therapy designation and Priority Review, ultimately leading to Accelerated Approval of TRUMENBA® (Meningococcal Group B Vaccine) BLA. Finally, I provided strategic advice and was involved with the teams seeking FDA approval of ELIQUIS (apixaban)

Expert Report of Brian E. Harvey, MD PhD

NDA, a blood thinner used to prevent stroke in adults with atrial fibrillation not caused by a heart valve problem, as part of the Pfizer/BMS Partnership.

(7)     I held this VP position until the Pfizer reorganization during the Hospira merger in 2015, when I left to start my own individual consulting LLC, where I continue to work as Principal Consultant. In this role, I work with biopharmaceutical companies, consulting groups, non-profits, academic institutions, trade associations, professional societies, venture groups, and law firms to provide FDA regulatory insights and expertise. I have also served as an expert witness in litigation relating to the FDA regulatory approval process and related clinical trial design for drugs, biological products, and medical devices.

(8)     Outside of my consulting work, I have donated my services on a volunteer basis to non-profit 501(c)(3) Global Liver Institute, of which I was a founding Board Member. The Global Liver Institute promotes awareness of liver diseases, the importance for additional research funding, and the continuing unmet medical needs of most patients with chronic liver diseases. I hold the position as an Entrepreneur-in-Residence (EIR) at Yale Ventures where I advise Yale students, fellows and staff as to whether studies and related information are adequate to submit an IND application to FDA to begin clinical trials for their drugs and biological products.

(9)     During my professional career, I have obtained significant experience and expertise in FDA regulatory procedures and the steps needed for successful data development to support labeling and approval of a pharmaceutical and biological product. In my FDA division director roles in the context of NDA/BLA submissions, I routinely analyzed the written opinions of agency review team members, including medical officers, statisticians, toxicologists, clinical pharmacologists, and chemists (NDA) or biological chemists (BLA). Now, as an independent regulatory consultant, I work with the bio-pharmaceutical industry, consulting companies, venture groups, and law firms to provide FDA-focused regulatory insights and expertise, including as an expert witness.

(10)    A current copy of my Curriculum Vitae (CV) is attached to this report as Appendix A.

(11)    In forming my opinions presented in this report, I utilized standard and well accepted regulatory standards utilized both by industry and by FDA in conducting and concluding clinical trials for the purpose of supporting marketing applications for drugs and biologics in the U.S. Specifically, I reviewed the provided documents, including regulatory correspondence between the sponsor and agency; information on public government websites, including FDA regulations set forth in the Code of Federal Regulations, guidance, policy, and procedures; as well as publications in peer-reviewed journals. The methodology I employed and level of detail applied to the totality of the evidence in this matter and in the preparation of this report are no different than that used by me over the course of my career, including at FDA and as an expert in regulatory strategy. My opinions are informed by my experience at FDA and in the industry and based upon what a reasonable pharmaceutical company

Expert Report of Brian E. Harvey, MD PhD

would do under the regulatory standards and guidance. My methods are generally accepted in my field of expertise and are in accord with those utilized by pharmaceutical companies. My opinions expressed in this witness statement are all within a reasonable professional, medical, and scientific probability. These opinions are based upon my education, training and experience, which support my qualifications to render these opinions in this report.

(12)    A list of the information reviewed and relied upon for this report is in Appendix B. I reserve the right to update my report should new information become available. I am being compensated at my standard hourly rate of $800, plus customary fees and expenses. My compensation is unaffected by the outcome in this matter. I do not have any financial interest in any of the parties in this litigation.

Expert Report of Brian E. Harvey, MD PhD

## II. Procedural history

(13)   I understand that the present case stems from a series of public statements made by Plaintiffs that Cassava Sciences, Inc.'s ("Cassava") clinical trial data for its investigational Alzheimer's Disease (AD) drug simufilam was fabricated, manipulated, and/or undocumented. Plaintiffs made these accusations in a variety of public forums, including on websites they created for this purpose and on X (formerly known as Twitter). I understand that Cassava filed a defamation lawsuit against Plaintiffs in November 2022. I further understand that in March 2024, the court dismissed Cassava's original Complaint, but gave Cassava "leave to replead" as to certain statements made by Plaintiffs, including the following:[1]

1.   "$SAVA remains a complete scientific fraud that is going to have its rug pulled any day, and Mr. Market knows it." – Adrian Heilbut

2.   "The privilege to conduct trials under an IND is based on a balance of safety and potential for efficacy. If $SAVA pre-clinical and clinical data are fabricated or manipulated, or trials not properly run, there is no ethical or regulatory justification for further clinical trials. We know IT WILL fail because we see and understand that the biology was MADE UP. It is not a matter of hope, or optimism, or liking what one sees – it is all fabricated nonsense..." – Adrian Heilbut

3.   "How is it legal for $SAVA to spinal tap folks and then just make up their biomarker values?" – Eneas Milioris

4.   "Allowing an obvious fraud like $sava to continue to take advantage of patients, investors and families makes a mockery of our regulatory framework and markets. 50:50 Remi ends up behind bars." – Jesse Brodkin

5.   "Everyone in the biotech industry knows $sava is a scam..." – Jesse Brodkin

(14)   I understand that Plaintiffs filed the present case in August 2024 claiming that their Tweets and other public statements were truthful and thus that Cassava's defamation lawsuit was unfounded.[2]

---

[1]   Memorandum Opinion & Order, *Cassava Sciences v. David Bredt, et al.*: 1:22-cv-9409-GHW (SDNY Mar. 28, 2024) at 41, 55, 58–9, 61, 67.

[2]   Defendants filed the defamation lawsuit against the Plaintiffs in the current matter, as well as Quintessential Capital Management (QCM), David Bredt, Geoffrey Pitt, and Patrick Markey. I understand that Cassava has reached settlement agreements with QCM, Bredt, and Pitt.

First Amended Complaint, *Adrian Heilbut, et al. v. Cassava Sciences, et al.*: 1:24-cv-5948-JLR (SDNY Oct. 24, 2024) at ¶ 1.

Complaint, *Cassava Sciences v. David Bredt, et al.*: 1:22-cv-9409-GHW (SDNY Nov. 2, 2022).

Expert Report of Brian E. Harvey, MD PhD

# III. Assignment

(15)   Based upon my scientific and medical training, clinical expertise, and experience with the drug
approval process at both FDA and pharmaceutical companies, I have been asked by counsel for
Cassava to address the following topics:

1.   **FDA awareness of allegations**. Whether—and to what extent—FDA would likely have been
aware of public allegations that simufilam-related results were falsified or manipulated, including
allegations raised in public reporting, a Citizen Petition and related submissions, and publicly
disclosed investigations or proceedings by other governmental entities.

2.   **Regulatory implications for Phase 3 continuation**. In light of Cassava's direct interactions with
FDA and FDA's available regulatory oversight and enforcement tools, whether FDA would likely
have allowed simufilam Phase 3 trials to proceed if FDA believed that the Phase 2 clinical data
and/or relevant nonclinical (preclinical) results were unreliable due to manipulation, fabrication,
or other material integrity deficiencies.

3.   **What FDA conveyed to Cassava**. What FDA's communications and actions in its interactions
with Cassava (including information requests, meeting feedback, inspection-related
communications, and directions concerning sponsor-facing materials such as the Investigator's
Brochure) would have conveyed to a reasonable sponsor about FDA's contemporaneous
assessment of the integrity and regulatory acceptability of the evidentiary basis for continued
clinical development of simufilam, including whether FDA had determined that key results were
fabricated or falsified.

Expert Report of Brian E. Harvey, MD PhD

# IV. Summary of opinions

(16)   Based upon my experience and my review of the materials listed in Appendix B to this report, I reached the following opinions:

- FDA was aware of allegations and questions regarding simufilam-related data integrity through multiple channels, and FDA's actions in response, such as information requests, review of sponsor materials, and inspection-related activity were consistent with FDA evaluating those allegations within the agency's established regulatory framework.

- FDA had the authority to terminate, hold, or otherwise restrict the conduct of all of Cassava's trials—Phase 1, 2, or 3—where participant safety is at risk or where deficiencies materially undermine the scientific basis for exposing subjects or patients. If the agency had concluded that the simufilam clinical program was based upon fabricated data or a fraudulent scientific premise as alleged, FDA would have exercised their regulatory authority. Most importantly, FDA would not have permitted Phase 3 trials to proceed if the agency believed that the simufilam clinical trials and related study results were unreliable, nor would it have approved the Special Protocol Assessment (SPA) for both Phase 3 clinical trial protocols.

- Nothing in the agency communications with Cassava, or in FDA regulatory actions reflected in the records I reviewed, indicated that FDA concluded that the simufilam clinical program was based upon fabricated clinical data or a fraudulent scientific premise.

Expert Report of Brian E. Harvey, MD PhD

# V. Background

(17)    In this section, I provide background information regarding the FDA review process, Alzheimer's Disease and simufilam that is relevant to my analysis of the Plaintiffs' allegations and my opinions in this Report.

## V.A. Overview of FDA drug approval process

(18)    The clinical trials necessary to support approval of both new drugs and biological products are conducted in the U.S. under the IND regulations. As described in 21 CFR 312.21 and as shown in Figure 1 below, clinical development programs for such new products occur in steps: Phase 1, 2, and 3.[3] At every phase of this regulatory process, FDA monitors, provides guidance, assists, and when appropriate, puts a hold on drug development.

**Figure 1: FDA clinical trial phases**

| Phase | Objectives | Typical number of participants | Typical time |
|---|---|---|---|
| Phase 1 | • Initial evaluation of safety and dosage | 20–100 healthy volunteers | Several months |
| Phase 2 | • Assess efficacy and side effects over a range of doses<br>• Provide safety data and refine trial design to prepare for Phase 3 protocol(s) | Several hundred patients who have the disease | Several months to 2 years |
| Phase 3 | • Analyze whether drug confers a treatment benefit<br>• Provide additional safety data, including rarer and longer-term side effects | 300–3,000 patients with the disease | 1–4 years |

Source: U.S. Food & Drug Administration, "Step 3: Clinical Research," updated Jan. 4, 2018, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

(19)    The first formal step in the FDA drug review process is to submit an IND Application so that the drug can be tested on humans in the U.S.[4] In the IND, the drug's sponsor, typically the manufacturer, describes the animal pharmacology and toxicology studies that it has performed in order to establish that the drug is reasonably safe for initial testing in humans.[5] The IND also includes information

---

[3]    U.S. Food and Drug Administration, "Step 3: Clinical Research," updated Jan. 4, 2018, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

U.S. Department of Health and Human Services et al., "Good Review Management Principles and Practices for New Drug Applications and Biologics License Applications Guidance for Industry and Review Staff," Sep. 2018, *available at* https://www.fda.gov/media/72259/download.

[4]    U.S. Food and Drug Administration, "Investigational New Drug (IND) Application," updated Sep. 16, 2025, https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

[5]    U.S. Food and Drug Administration, "Investigational New Drug (IND) Application," updated Sep. 16, 2025, https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

Expert Report of Brian E. Harvey, MD PhD

about how the drug will be manufactured and details of proposed clinical protocols, including the qualifications of the clinical investigators who will administer the drug during human trials.[6]

(20)    Phase 1 often is the first time the drug is tested in humans and typically involves administering the drug to healthy subjects with single doses at increasing amounts called Single Ascending Dose (SAD), followed by multiple doses at increasing amounts called Multiple Ascending Dose (MAD). During these studies, blood samples are typically obtained to measure the amount of drug or biologic product in their blood, called Pharmacokinetics (PK).[7] The data generated from Phase 1 guides drug dose selection, dosing intervals and overall design of the Phase 2 clinical trials.[8]

(21)    The goals of Phase 2 are to optimize the appropriate dose (e.g., dose ranging) from the safety perspective, as well as efficacy by measuring the desired positive effects on patients with the disease using Primary and Secondary Endpoints. The data generated from Phase 2 helps design the larger and longer Phase 3 trials to support NDA approvals for drugs and BLA for biological products.[9]

(22)    Traditionally, the agency requires "two adequate and well-controlled clinical trials" in order to establish safety and "substantial evidence" of effectiveness.[10] FDA may also consider and has recently encouraged in public statements by agency senior management results from a single large adequate and well-controlled multi-center trial as the basis for approval, especially if the single trial demonstrates a clinically and statistically strong effect on mortality or serious morbidity, the drug addresses an unmet medical need, or a second trial would be impractical or unethical.[11]

---

[6]    U.S. Food and Drug Administration, "Investigational New Drug (IND) Application," updated Sep. 16, 2025, https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

[7]    Lona Sheeran, "Protocol Optimization, Strategies & Decisions: Making the Most of Your SAD/MAD Studies," Worldwide Clinical Trials, May 20, 2024, https://www.worldwide.com/blog/2024/05/making-the-most-of-your-sad-mad-studies/.

[8]    U.S. Food and Drug Administration, "Step 3: Clinical Research," updated Jan. 4, 2018, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

    University of Cincinnati College of Medicine, "Clinical Trials Phases Defined," University of Cincinnati, https://med.uc.edu/depart/psychiatry/research/clinical-research/crm/trial-phases-1-2-3-defined.

[9]    U.S. Food and Drug Administration, "Step 3: Clinical Research," updated Jan. 4, 2018, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

[10]    Lizzy Lawrence, "FDA to lower number of trials required for approval of drugs, other medical products," STAT, Dec. 4, 2025, https://www.statnews.com/2025/12/04/fda-considers-single-clinical-trial-for-new-product-approvals.

    In section 505(d) of the FD&C Act, "substantial evidence" is defined as "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof."

    Federal Food, Drug, and Cosmetic Act, 21 USC 355(d).

[11]    Lizzy Lawrence, "FDA to lower number of trials required for approval of drugs, other medical products," STAT, Dec. 4, 2025, https://www.statnews.com/2025/12/04/fda-considers-single-clinical-trial-for-new-product-approvals.

    *See also* Joanne S. Eglovitch, "This Week at FDA: Makary teases plan for single-trial drug approvals, Høeg named acting CDER chief, and more," Regulatory Focus, Dec. 5, 2025, https://www.raps.org/news-and-articles/news-

---

Expert Report of Brian E. Harvey, MD PhD

# V.B. Sponsors' interactions with FDA during the clinical trial process

(23)    Drug company developers and other sponsors often seek specific guidance and feedback from the agency before and during the clinical trial process. As discussed in further detail below, these interactions may include a Pre-IND meeting before an IND application is submitted and Phase 1 trials are enrolled, an End of Phase 2 (EOP2) meeting after Phase 2 trials are conducted in preparation for Phase 3 trials, a SPA after the EOP2 meeting to ensure the company and FDA are in alignment regarding the proposed Phase 3 trial design/protocols, and a Pre-NDA (drugs) or a pre-BLA (biologicals) meeting after Phase 3 trials to discuss application filing and submission format issues.[12]

(24)    Before the first participant is enrolled in the proposed IND study, FDA encourages the drug company to request a Pre-IND Meeting with the agency's pre-market review division with authority over the proposed product.[13] Questions regarding the specific elements of drug development are submitted by the company to FDA, along with the required briefing document containing background and supporting information detailing the various aspects of the program.

---

articles/2025/12/this-week-at-fda-makary-teases-plan-for-single-tri.

U.S. Food and Drug Administration, "Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products Guidance for Industry," Dec. 2019, at 8–9, *available at* https://www.fda.gov/media/133660/download.

[12]    21 CFR 312.82.

21 CFR 312.47.

U.S. Food and Drug Administration, "Rare Diseases: Early Drug Development and the Role of Pre-IND Meetings Guidance for Industry," Oct. 2018, at 2, *available at* https://www.fda.gov/media/117322/download.

U.S. Food and Drug Administration, "Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff Good Review Practice," Dec. 2017, at 13–4, *available at* https://www.fda.gov/media/94850/download.

U.S. Food and Drug Administration, "Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products: Guidance for Industry," Dec. 2017, at 4, *available at* https://www.fda.gov/media/109951/download.

U.S. Food and Drug Administration, "SOPP 8101.1: Regulatory Meetings with Sponsors and Applicants for Drugs and Biological Products," Dec. 2025, at 4, *available at* https://www.fda.gov/media/84040/download.

U.S. Food and Drug Administration, "Small Business and Industry Assistance: Frequently Asked Questions on the Pre-Investigational New Drug (IND) Meeting," updated Feb. 22, 2022, https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-and-industry-assistance-frequently-asked-questions-pre-investigational-new-drug-ind.

U.S. Food and Drug Administration, "Special Protocol Assessment Guidance for Industry," Apr. 2018, at 3, 7, *available at* https://www.fda.gov/media/97618/download.

[13]    21 CFR 312.82.

U.S. Food and Drug Administration, "Rare Diseases: Early Drug Development and the Role of Pre-IND Meetings Guidance for Industry," Oct. 2018, at 2, *available at* https://www.fda.gov/media/117322/download.

U.S. Food and Drug Administration, "Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff Good Review Practice," Dec. 2017, at 13, *available at* https://www.fda.gov/media/94850/download.

---

Expert Report of Brian E. Harvey, MD PhD

(25)    This pre-submission information is provided to FDA as a briefing package to request a meeting prior to the IND submission, where the agency provides answers to the company's questions.[14] Based upon this written feedback, the IND is submitted to FDA. The primary chemistry, nonclinical, and clinical FDA reviewers will determine whether any substantial safety issues are presented by the specific drug or biological product. The agency reviewers routinely provide written feedback regarding concerns and recommendations to the company sponsor, as well as request additional information. The primary goal of IND review is to assure that research subjects will not be exposed to unreasonable risk.[15] This determination is based upon having sufficient data and information from the three major review areas—nonclinical, CMC (chemistry, manufacturing, and controls) and clinical—aimed first at assessing safety and second at achieving the proposed clinical objectives. Therefore, company drug sponsors need to document and certify the manufacturing process in order to avoid introducing risks, such as impurities. Acceptability of these CMC plans should be agreed upon with FDA. If adequate information is provided to support study initiation per FDA review, the agency will issue a "Study May Proceed" Letter; thus the IND is allowed to enroll participants and conduct the various clinical activities in Phase 1. The alternative outcome is that FDA may also place the IND on hold before the end of the 30-day review or at any time for the duration of the IND.[16] For example, if there are significant deficiencies in the submission, FDA can place the IND trial on full or partial clinical hold or, in extreme cases, even terminate the IND. In contrast to a full clinical hold, a partial clinical hold is intended to allow a protocol to proceed, but with some restrictions on the study design and execution. In some cases, one study for one therapeutic indication may be allowed to proceed while another is placed on clinical hold, based upon FDA benefit/risk analysis for each specific patient population.

(26)    After the appropriate nonclinical testing, CMC and clinical Phase 1 & Phase 2 data have been obtained and submitted to FDA, the drug sponsor is also encouraged to have an EOP2 meeting with the division to review the available information and discuss the sponsor's proposed Phase 3 (pivotal)

---

[14]    U.S. Food and Drug Administration, "Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff Good Review Practice," Dec. 2017, at 16–7, *available at* https://www.fda.gov/media/94850/download.

U.S. Food and Drug Administration, "Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products Guidance for Industry," Dec. 2017, at 4–6, 7–9, *available at* https://www.fda.gov/media/109951/download.

U.S. Food and Drug Administration, "SOPP 8101.1: Regulatory Meetings with Sponsors and Applicants for Drugs and Biological Products," Dec. 2025, at 36, *available at* https://www.fda.gov/media/84040/download.

U.S. Food and Drug Administration, "Small Business and Industry Assistance: Frequently Asked Questions on the Pre-Investigational New Drug (IND) Meeting," updated Feb. 22, 2022, https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-and-industry-assistance-frequently-asked-questions-pre-investigational-new-drug-ind.

[15]    U.S. Food and Drug Administration, "Investigational New Drug (IND) Application," updated Sep. 16, 2025, https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

[16]    U.S. Food and Drug Administration, "IND Application Procedures: Clinical Hold," updated Oct. 9, 2015, https://www.fda.gov/drugs/investigational-new-drug-ind-application/ind-application-procedures-clinical-hold.

National Institutes of Health, "Responding to a Clinical Hold," *available at* https://seed.nih.gov/sites/default/files/2024-09/Responding-to-a-Clinical-Hold.pdf.

Expert Report of Brian E. Harvey, MD PhD

clinical trial program.[17] In a procedure similar to the Pre-IND, with background and questions submitted by the company and feedback from FDA, the Official EOP2 Meeting Minutes are a guide for all aspects of Phase 3 drug development, including clinical, CMC, nonclinical and any additional data for special populations (e.g., hepatic, renal, cardiac QT, pediatric, geriatric).[18] If FDA does not agree with the adequacy of the drug company data provided from earlier in development or for any other safety reasons, the agency can encourage additional nonclinical and/or clinical study at the Phase 1/Phase 2 levels and clinical holds can be imposed for non-compliance or data concerns. FDA has often been called the "Gate Keeper to Phase 3." Therefore, under FDA regulations, the agency has the authority to place any IND study in Phase 1, Phase 2, and Phase 3 on clinical hold at any time.

(27)   Drug sponsors may also pursue a SPA after the EOP2 meeting. According to FDA Guidance:

> "SPA is a process in which sponsors may ask to meet with FDA to reach agreement on the design and size of certain clinical trials, clinical studies, or animal studies… to determine if they adequately address scientific and regulatory requirements for a study that could support marketing approval. An SPA agreement indicates concurrence by FDA with the adequacy and acceptability of specific critical elements of overall protocol design (e.g., entry criteria, dose selection, endpoints, and planned analyses) for a study intended to support a future marketing application. These elements are critical to ensuring that the trial conducted under the protocol can be considered an adequate and well-controlled study that can support marketing approval."[19]

(28)   A Pre-NDA for drugs and a Pre-BLA for biological products is an additional meeting between a company sponsor and FDA.[20] The purpose of the Pre-NDA or Pre-BLA meeting is to discuss

---

[17]   21 CFR 312.47.

   U.S. Food and Drug Administration, "Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff Good Review Practice," Dec. 2017, at 14, *available at* https://www.fda.gov/media/94850/download.

[18]   U.S. Food and Drug Administration, "Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff Good Review Practice," Dec. 2017, at 16, 18, *available at* https://www.fda.gov/media/94850/download.

   U.S. Food and Drug Administration, "Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products: Guidance for Industry," Sep. 2023, at 3–4, 16–17, *available at* https://www.fda.gov/media/172311/download.

   U.S. Food and Drug Administration, "E14 Clinical Evaluation of QT/QTc Interval Prolongation and Proarrhythmic Potential for Non-Antiarrhythmic Drugs," at 7, *available at* https://www.fda.gov/media/71372/download.

[19]   U.S. Food and Drug Administration, "Special Protocol Assessment Guidance for Industry," Apr. 2018, at 1, *available at* https://www.fda.gov/media/97618/download.

[20]   21 CFR 312.47.

   U.S. Food and Drug Administration, "Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff Good Review Practice," Dec. 2017, at 14, *available at* https://www.fda.gov/media/94850/download.

Expert Report of Brian E. Harvey, MD PhD

application filing and submission format issues.[21] Each topic of discussion in the Pre-NDA/Pre-BLA meeting is a critical interaction between the agency review team and the company sponsor to ensure the submission of a well-organized and complete NDA or BLA.

## V.C. FDA pre-market review teams

(29)    Drug review at FDA is a 'team sport.' No single discipline or individual decides whether a medicine is safe, effective, and ready for patients. Instead, a coordinated group of scientific, clinical and regulatory experts evaluates every aspect of a product—how it is made, how it works in the body, how it is studied in clinical trials and how patients will use it in the real world. At the core are agency reviewers who assess clinical trial results, safety data, product quality and statistical integrity. In addition, other specialists focus upon the integrity of data based upon clinical trial conduct, inspect manufacturing facilities, evaluate risk mitigation plans and ensure the nonclinical data foundation underlying the development program is scientifically sound. Together, these groups form a comprehensive, end-to end-review ecosystem designed to protect patients and support innovation. Their collective goal is simple: ensure that any medicine reaching the market is high quality, well understood, appropriately labeled and supported by reliable data-driven evidence.

(30)    The scientific evaluation of the application is carried out by a team of Primary Reviewers, each responsible for a specific technical or clinical discipline that feeds into the overall benefit-risk evaluation and final regulatory decision.[22] Core scientific and regulatory disciplines typically include those listed in Figure 2 below.

---

[21]    21 CFR 312.47.

    U.S. Food and Drug Administration, "Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff Good Review Practice," Dec. 2017, at 14, *available at* https://www.fda.gov/media/94850/download.

[22]    U.S. Food and Drug Administration, "CDER 21st Century Review Process Desk Reference Guide," at 3, *available at* https://www.fda.gov/media/78941/download.

Expert Report of Brian E. Harvey, MD PhD

**Figure 2: FDA pre-market review team members**

| Discipline | Role |
|---|---|
| Clinical (Medical) | Evaluates clinical trial data, safety, efficacy, and benefit risk profile. |
| Pharmacology/Toxicology | Assesses preclinical data, toxicology findings, and safety margins. |
| Product Quality (CMC) | Reviews manufacturing processes, controls, stability, and product characterization. |
| Biometrics (Statistics) | Analyzes statistical design, data integrity, and robustness of clinical results. |
| Clinical Pharmacology | Examines PK/PD, dosing rationale, drug interactions, and special populations. |
| Clinical Microbiology | Reviews antimicrobial susceptibility and microbiological data (for relevant products). |
| SEALD | Ensures endpoints and labeling claims are scientifically justified. |
| Pediatric & Maternal Health (PeRC) | Evaluates pediatric study plans and maternal health considerations. |
| QT-IRT | Assesses cardiac safety and QT prolongation risk. |
| Medication Error Review | Evaluates proprietary names and labeling for error prone elements. |
| Risk Management Analyst | Reviews REMS submissions and risk mitigation strategies. |
| Office of Scientific Investigations (OSI) | Conducts Bioresearch Monitoring (BIMO) inspections to verify data integrity. |
| Office of Manufacturing Product Quality (OMPQ) | Assesses manufacturing site compliance and product quality systems. |
| Office of Prescription Drug Promotion (OPDP) | Reviews labeling and promotional implications. |
| Controlled Substances Staff | Evaluates abuse potential and scheduling considerations. |
| Patient Labeling (DMPP) | Reviews patient facing materials for clarity and accuracy. |
| Other specialized reviewers | Engaged as needed depending on the product's characteristics. |

Source: U.S. Food & Drug Administration, "CDER 21st Century Review Process Desk Reference Guide," at 3–4, *available at* https://www.fda.gov/media/78941/download.

(31) These reviewers conduct in depth analyses of their assigned sections, document their findings, and recommend regulatory decisions based upon the evidence. Each discipline contributes a distinct perspective—clinical evidence, statistical rigor, product quality, data integrity, safety, labeling, nonclinical and post market risk—ensuring that FDA decisions are grounded in a comprehensive evaluation of a product's benefit-risk profile based upon reliable data.

## V.D. Bioresearch Monitoring inspections and other cross-functional offices

(32) Regulatory oversight provided by these agency pre-market review teams is reinforced by cross-cutting FDA offices. For example, the Office of Manufacturing Quality evaluates manufacturing site quality systems and the Office of Prescription Drug Promotion assesses promotional implications of labeling. Risk management analysts review REMS proposals, while Controlled Substances Staff evaluate abuse potential and drug scheduling. Patient labeling experts ensure clarity and usability of patient facing materials.

Expert Report of Brian E. Harvey, MD PhD

(33)   The OSI conducts BIMO inspections to verify data integrity and GCP compliance.[23] In particular, OSI safeguards the integrity of clinical research supporting FDA regulated drugs and biologics to ensure that evidence submitted to FDA is scientifically reliable, ethically obtained, and compliant with federal regulations.[24] BIMO conducts over one thousand "on-site inspections, data audits, and remote regulatory assessments" each year in order to ensure the quality and integrity of data submitted in support of new product approvals and marketing applications, as well as the safety of study participants.[25] There are reported examples where FDA has required drug sponsors to repeat studies performed at facilities where it identified data integrity issues, such as poor report keeping, falsifying data, and manipulating study participant samples.[26]

(34)   Together, these agency-based disciplines form an integrated review ecosystem that identifies issues early, promotes consistent regulatory decision making and ensures that approved products meet FDA standards for quality, safety and effectiveness. This multidisciplinary structure is central to the current FDA 21st Century Review model, enabling efficient, transparent and scientifically robust evaluations that support public health.[27]

## V.E. Alzheimer's Disease

(35)   Alzheimer's Disease is a progressively debilitating form of dementia that impacts various cognitive functions and is associated with irreversible damage to the brain.[28] Structural changes related to Alzheimer's Disease symptoms can occur years before the first outward signs of dementia are

---

[23]   Office of Scientific Investigations, "Fiscal Year 2023 Annual Report," Feb. 2024, at 3, *available at* https://www.fda.gov/media/176281/download?attachment.

[24]   U.S. Food and Drug Administration, "Office of Scientific Investigations," updated Feb. 13, 2024, https://www.fda.gov/about-fda/cder-offices-and-divisions/office-scientific-investigations.

[25]   U.S. Food and Drug Administration, "Bioresearch Monitoring Program Information," updated Dec. 2, 2025, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/fda-bioresearch-monitoring-information/bioresearch-monitoring-program-information.

[26]   U.S. Food and Drug Administration, "Notification to Pharmaceutical Companies: Clinical and Bioanalytical Studies Conducted by Semler Research Are Unacceptable," updated Apr. 20, 2016, https://www.fda.gov/drugs/drug-safety-and-availability/notification-pharmaceutical-companies-clinical-and-bioanalytical-studies-conducted-semler-research.

U.S. Food and Drug Administration, "FDA to pharmaceutical companies: Certain studies conducted by Raptim Research Pvt. Ltd. are unacceptable," updated Mar. 28, 2025, https://www.fda.gov/drugs/drug-safety-and-availability/fda-pharmaceutical-companies-certain-studies-conducted-raptim-research-pvt-ltd-are-unacceptable.

[27]   "The 21st Century Review Initiative is a set of performance standards the Center for Drug Evaluation and Research (CDER) follows when doing drug reviews that involve multiple offices. The standards address meetings and timelines to identify problems early in the review process. The goal is to make the drug review process more organized and integrated, and ensure all decision makers are heard. Review team members are mutually accountable for raising and addressing differing points in a timely manner over the course of the drug review."

U.S. Food and Drug Administration, "CDER Initiatives: Streamlining the Drug Development Process to Ensure Drugs are Safe and Effective," updated Jul. 3, 2024, https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-initiatives.

[28]   Alzheimer's Association, "What is Alzheimer's Disease?" https://www.alz.org/alzheimers-dementia/what-is-alzheimers#brain.

---

Expert Report of Brian E. Harvey, MD PhD

diagnosed.[29] There are two main features of Alzheimer's Disease: the abnormal protein build-ups of beta-amyloid plaques in spaces between nerve cells and tau tangles inside cells.[30] This disease worsens over time, often beginning with difficulty recalling newly learned information, progressing until individuals can no longer speak, recognize family members and caregivers, carry a conversation and interact with their environment by the late stages of the disease.[31]

(36)    There are currently only two available treatments that have demonstrated in clinical trials that they can reduce symptoms by targeting amyloid plaques: donanemab (Kisunla™) and lecanemab (Leqembi®).[32] However, both of these biological products have the potentially fatal side effect of bleeding in the brain, as well as other reported adverse events and labeled limitations.[33] Furthermore, both products are only labeled for individuals in the earliest stage of Alzheimer's Disease, limiting treatment to those patients diagnosed with mild cognitive impairment (MCI) or mild dementia and confirmed to have elevated levels of beta-amyloid in their brain through a PET scan.[34] Neither treatment has yet undergone large-scale controlled clinical trials in patients with moderate or severe stages of Alzheimer's Disease and finding individuals prior to any clinical symptoms (e.g., preclinical stage) continues to be a challenge for trial enrollment.[35] Donanemab and lecanemab treatment

---

[29]    Lori L. Beason-Held et al., "Changes in brain function occur years before the onset of cognitive impairment." *The Journal of Neuroscience* 33, no. 46 (2013): 18001l–2.

[30]    Alzheimer's Association, "What is Alzheimer's Disease?" https://www.alz.org/alzheimers-dementia/what-is-alzheimers#brain.

[31]    Alzheimer's Association, "What is Alzheimer's Disease?" https://www.alz.org/alzheimers-dementia/what-is-alzheimers#brain.

[32]    Alzheimer's Association, "What is Alzheimer's Disease?" https://www.alz.org/alzheimers-dementia/what-is-alzheimers#brain.

[33]    Eisai Inc. and Biogen, "Leqembi," https://www.leqembi.com.

        Lilly USA, "Hope is here with Kisunla," https://kisunla.lilly.com/what-is-kisunla#slow-the-progression.

[34]    The three main stages of Alzheimer's Disease progress from mild (early-stage), to moderate (middle-stage), and finally severe (late-stage). There is also a preclinical stage that encompasses the period (years up to decades) when changes occur in the brain of an individual without any symptoms.

        Johns Hopkins Medicine, "Stages of Alzheimer's Disease," https://www.hopkinsmedicine.org/health/conditions-and-diseases/alzheimers-disease/stages-of-alzheimer-disease.

        Alzheimer's Association, "Donanemab Approved for Treatment of Early Alzheimer's Disease," https://www.alz.org/alzheimers-dementia/treatments/donanemab.

        Alzheimer's Association, "Lecanemab Approved for Treatment of Early Alzheimer's Disease," https://www.alz.org/alzheimers-dementia/treatments/lecanemab-leqembi.

        Rosebud Roberts and David S. Knopman, "Classification and Epidemiology of MCI," *Clinical Geriatric Medicine* 29, no. 4 (2013): 753–72.

        Alzheimer's Association, "What is an Amyloid PET Scan?" *available at* https://www.alz.org/getmedia/5eaf0f47-9c27-444a-b729-9774f78826d7/new-ideas-amyloid-pet-scan-info-sheet-english.pdf.

        Alzheimer's Association, "New Guidance for Gold-Standard Imaging Tests Assists Clinicians in Diagnosis and Management of Alzheimer's and Other Dementia," Jan. 8, 2025, https://www.alz.org/news/2025/updated-appropriate-use-criteria-amyloid-tau-pet.

[35]    Alzheimer's Association, "Donanemab Approved for Treatment of Early Alzheimer's Disease," https://www.alz.org/alzheimers-dementia/treatments/donanemab.

        Alzheimer's Association, "Lecanemab Approved for Treatment of Early Alzheimer's Disease," https://www.alz.org/alzheimers-dementia/treatments/lecanemab-leqembi.

---

Expert Report of Brian E. Harvey, MD PhD

regimens require intravenous (IV) administration at a hospital or infusion therapy center on a regular basis for up to 18 months.[36] This is in addition to procedures such as "amyloid biomarker assessments (e.g., amyloid-PET), genetic testing and serial brain MRIs to monitor [patient] safety."[37]

(37)    An estimated 7.2 million Americans have Alzheimer's Disease, and it ranks as the sixth cause of death among Americans aged 65 and older.[38] Since 2012, the National Institutes of Health (NIH) has released yearly national plans to address the lack of a cure for Alzheimer's Disease coupled with "a substantial increase in federal dementia research efforts."[39] However, much of the pathophysiology regarding the cause of Alzheimer's Disease is still poorly understood.[40] Researchers developing potential therapies have had difficulty finding "the right target, right drug, right biomarker, right participant, and right trial" due to having a "lack [of] understanding of some critical aspects of disease biology and drug action."[41]

(38)    Thus, despite decades of research and hundreds of potential Alzheimer's Disease treatments in the pipeline, product approval is rare and failure is the common outcome in clinical development.[42] Specifically, clinical trials testing Alzheimer's Disease therapies are reported to have an extremely

---

[36]    The initial regimen of lecanemab takes 18 months. Patients treated with donanemab have the option to end treatment after 9 months if they reach a "threshold clearance of amyloid."

Alzheimer's Association, "Donanemab Approved for Treatment of Early Alzheimer's Disease," https://www.alz.org/alzheimers-dementia/treatments/donanemab.

Alzheimer's Association, "Lecanemab Approved for Treatment of Early Alzheimer's Disease," https://www.alz.org/alzheimers-dementia/treatments/lecanemab-leqembi.

The Mary S. Easton Center for Alzheimer's Research and Care, "Donanemab," UCLA, https://eastonad.ucla.edu/patient-care/alzheimers-disease-treatments/donanemab.

The Mary S. Easton Center for Alzheimer's Research and Care, "Lecanemab," UCLA, https://eastonad.ucla.edu/patient-care/alzheimers-disease-treatments/lecanemab.

[37]    The Mary S. Easton Center for Alzheimer's Research and Care, "Donanemab," UCLA, https://eastonad.ucla.edu/patient-care/alzheimers-disease-treatments/donanemab.

The Mary S. Easton Center for Alzheimer's Research and Care, "Lecanemab," UCLA, https://eastonad.ucla.edu/patient-care/alzheimers-disease-treatments/lecanemab.

[38]    Alzheimer's Association, "2025 Alzheimer's Disease Facts and Figures Report: Executive Summary," 2025, *available at* https://www.alz.org/getmedia/c05f7ba4-9aea-4cb0-8898-5e8bff3f0930/executive-summary-2025-alzheimers-disease-facts-and-figures.pdf.

Kumar B. Rajan et al., "Population Estimate of People with Clinical AD and Mild Cognitive Impairment in the United States (2020–2060)," *Alzheimer's & Dementia* 17, no. 12 (Dec. 2021): 1966–75, *available at* https://doi.org/10.1002/alz.12362.

[39]    National Institute on Aging, "2025 NIH Alzheimer's Disease and Related Dementias Research Progress Report: Advances and Achievements," Sep. 2025, *available at* https://www.nia.nih.gov/about/2025-nih-dementia-research-progress-report.

[40]    Do Seo and David M. Holtzman, "Current understanding of the Alzheimer's disease-associated microbiome and therapeutic strategies," *Experimental & Molecular Medicine* 56 (2024): 86, *available at* https://doi.org/10.1038/s12276-023-01146-2.

[41]    Jeffrey Cummings et al., "The "rights" of precision drug development for Alzheimer's disease," *Alzheimer's Research & Therapy* 11, no. 76 (Aug. 2019): 1, *available at* https://doi.org/10.1186/s13195-019-0529-5.

[42]    Jeffrey Cummings et al., "Alzheimer's disease drug development pipeline: 2024," *Alzheimer's & Dementia* 10, no. 2 (Apr. 2024), *available at* https://doi.org/10.1002/trc2.12465.

---

Expert Report of Brian E. Harvey, MD PhD

high failure rate of 99.6%.[43] Neurological diseases, which include Alzheimer's Disease, were shown to have one of the lowest (5.9%) overall likelihood of approvals (LOA) in a study of trials between 2011 to 2020 conducted by the Biotechnology Innovation Organization (BIO).[44] In comparison, the overall likelihood across all disease areas was calculated to be 7.9%.[45]

## V.F. Simufilam

(39)     As described to FDA, simufilam is a drug that is proposed to reduce neurodegeneration and neuroinflammation associated with Alzheimer's Disease by binding to Filamin A, a protein described as altered in the brain of Alzheimer's patients.[46] Specifically, it is hypothesized that Filamin A undergoes a critical conformational change that transforms it from a benign structural scaffold into a central driver of neurodegeneration. Typically responsible for organizing the actin cytoskeleton and regulating receptor trafficking, misfolded Filamin A under the influence of amyloid beta adopts an "altered" shape that enables two major pathological cascades.[47] Simufilam is designed to correct this alteration and restore Filamin A back to normal shape (e.g., conformation).[48]

## V.G. Timeline of events

---

[43]   Jeffrey Cummings et al., "Alzheimer's disease drug-development pipeline: few candidates, frequent failures," *Alzheimer's Research & Therapy* 6, no. 3 (Jul. 2014): 5, *available at* https://doi.org/10.1186/alzrt269.

[44]   BIO, "Clinical Development Success Rates and Contributing Factors 2011–2020," Feb. 2021, at 10, *available at* https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf.

[45]   BIO, "Clinical Development Success Rates and Contributing Factors 2011–2020," Feb. 2021, at 10, *available at* https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf,

[46]   H.Y. Wang et al., "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients," *The Journal of Prevention of Alzheimer's Disease* 7, no. 4 (2020): 256–64.

[47]   Lindsay H. Burns and Hoau-Yan Wang, "Altered filamin A enables amyloid beta-induced tau hyperphosphorylation and neuroinflammation in Alzheimer's disease," *Neurology Neuroimmunology & Neuroinflammation* 4, no. 12 (2017): 263–71.

[48]   H.Y. Wang et al., "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients," *The Journal of Prevention of Alzheimer's Disease* 7, no. 4 (2020): 256–64.

Expert Report of Brian E. Harvey, MD PhD

### Figure 3: Timeline of relevant events

| Date | Event |
|---|---|
| 2007–2017 | Cassava performed preclinical testing and established simufilam human testing safety |
| Jan. 27, 2017 | Cassava requested Pre-IND meeting |
| Mar. 27, 2017 | FDA provided Pre-IND meeting written response |
| Jun. 30, 2017 | Cassava submitted IND |
| Aug. 18, 2017–Mar. 27, 2018 | Cassava conducted Phase 1 trial |
| Aug. 31, 2017 | FDA provided Cassava a "Study May Proceed" letter |
| Mar. 7, 2019–May 8, 2019 | Cassava conducted Phase 2a trial |
| Sep. 9, 2019–Mar. 31, 2020 | Cassava conducted Phase 2b trial |
| Jan. 31, 2020 | Cassava requested Type C meeting |
| Feb. 7, 2020 | Phase 2a study results published in a peer-reviewed medical journal |
| Mar. 24, 2020–Nov. 9, 2023 | Cassava conducted Phase 2 one-year open-label safety study |
| Apr. 15, 2020 | FDA provided Type C meeting written response |
| Aug. 28, 2020 | Cassava submitted Breakthrough Therapy application |
| Sep. 11, 2020 | Cassava requested EOP2 meeting |
| Oct. 27, 2020 | FDA denied Cassava's Breakthrough Therapy application |
| Jan. 8, 2021 | FDA provided EOP2 meeting written response |
| Mar. 25, 2021–Mar. 26, 2021 | FDA conducted an on-site audit of simufilam Phase 2 trial (PTI-125-04) |
| May 4, 2021–May 11, 2021 | Cassava conducted pharmacokinetics and bioequivalence study |
| May 6, 2021 | Cassava requested Phase 3 SPAs |
| Jun. 18, 2021 | FDA replied that Cassava's Phase 3 SPAs would not support regulatory submissions |
| Jul. 7, 2021 | Cassava re-requested Phase 3 SPAs |
| Aug. 18, 2021 | First Citizen Petition and accompanying report submitted to FDA by David Bredt and Geoffrey Pitt requesting FDA halt two simufilam trials (NCT04388254 and NCT04994483) |
| Aug. 20, 2021 | FDA replied that Cassava's updated Phase 3 SPAs would support regulatory submissions |
| Sep. 1, 2021 | Second Citizen Petition submitted to FDA by David Bredt and Geoffrey Pitt requesting FDA halt an additional simufilam trial (NCT05026177) |
| Oct. 31, 2021 | Plaintiffs (Adrian Heilbut, Jesse Brodkin, and Enea Milioris) began making disparaging comments about Cassava on various public platforms and created two websites, "cassavafraud.com" and "simuflimflam.com." |
| Nov. 3, 2021–Nov. 28, 2022 | Plaintiffs published three decks and a poster presented at a scientific conference on their website of Cassava's alleged misconduct |
| Nov. 3, 2021–Oct. 2, 2024 | Cassava conducted RETHINK-ALZ Phase 3 trial |
| Nov. 4, 2021 | FDA independently requested information about Cassava's Phase 2b trial |
| Nov. 8, 2021 | Cassava submitted responses to FDA information request |
| Nov. 17, 2021 | *The Wall Street Journal* published an article about SEC investigating Cassava |
| Nov. 18, 2021–Dec. 30, 2024 | Cassava conducted REFOCUS-ALZ Phase 3 trial |
| Nov. 22, 2021 | FDA requested additional information based on Cassava's responses |
| Nov. 30, 2021 | Cassava submitted additional information to FDA |
| Feb. 10, 2022 | FDA denied both Citizen Petitions citing the requests were inappropriate subject matters |
| Apr. 18, 2022 | *The New York Times* published an article about scientists questioning simufilam trial data |
| May 12, 2022–Dec. 31, 2024 | Cassava conducted Phase 2 96-week cognition maintenance extension study |
| Sep. 16, 2022 | FDA issued FDA Form 483 and an Establishment Inspection Report (EIR) after an investigation of Dr. Wang's CUNY lab |
| Nov. 1, 2022 | FDA affirmatively directed Cassava to remove mentions of cerebrospinal fluid (CSF) biomarker data in their Investigator's Brochure |
| Nov. 7, 2022 | Cassava requested an explanation of the FDA request and offered an alternative solution |

Confidential
Subject to Protective Order

Expert Report of Brian E. Harvey, MD PhD

**Figure 3: Timeline of relevant events**

| Date | Event |
|---|---|
| Nov. 16, 2022 | FDA declined Cassava's requests for an explanation and their proposed alternative solution |
| Oct. 14, 2023 | *The New York Times* published an article about the leaked CUNY investigative report |
| Jun. 28, 2024 | DOJ indicted Dr. Wang for defrauding the NIH of roughly $16 million in federal grant funding |
| Sep. 26, 2024 | Cassava reached a settlement with the SEC over allegations about negligent disclosures related to the Phase 2b study of simufilam |
| Nov. 25, 2024 | Cassava announced RETHINK-ALZ trial results and discontinued REFOCUS-ALZ trial |
| May 30, 2025 | CUNY concluded that Dr. Wang had not engaged in scientific misconduct |
| Oct. 23, 2025 | DOJ dropped the fraud case against Dr. Wang |
| Dec. 23, 2025 | Cassava reached a settlement of $31.25 million on a class action covering investors from 2020–2023 |

Note: FDA conducted at least three routine investigations of clinical trial sites during Phase 3 simufilam trials.
Sources: CASSAVA_000042888; CASSAVA_000016414; CASSAVA_000239329 at -9334; Clinicaltrials.gov, "A Safety Study of PTI-125 in Healthy Volunteers," updated May 10, 2021, https://clinicaltrials.gov/study/NCT03784300; Clinicaltrials.gov, "PTI-125 for Mild-to-moderate Alzheimer's Disease Patients," updated Jul. 7, 2021, https://clinicaltrials.gov/study/NCT03748706; Clinicaltrials.gov, "PTI-125 for Mild-to-moderate Alzheimer's Disease Patients," updated Sep. 29, 2021, https://clinicaltrials.gov/study/NCT04079803; CASSAVA_000189877; H.Y. Wang et al., "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients," *The Journal of Prevention of Alzheimer's Disease* 7, no. 4 (2020): 256–64; ClinicalTrials.gov, "Simufilam (PTI-125), 100 mg, for Mild-to-moderate Alzheimer's Disease Patients (PTI-125)," updated Apr. 22, 2025, https://clinicaltrials.gov/study/NCT04388254; CASSAVA_000784543; Jun. 20, 2025 Deposition of Laura Rodriguez (hereinafter Rodriguez Dep. Tr.) at 38:3–39:17; CASSAVA_000898032; CUNY 001529; CASSAVA_001213617; CASSAVA_000010607; Clinicaltrials.gov, "Food Effect and Bioequivalence Study of Simufilam Tablets in Healthy Volunteers," updated Aug. 22, 2023, https://www.clinicaltrials.gov/study/NCT04932655; CASSAVA_000543313; CASSAVA_000543318; CASSAVA_000092905; CASSAVA_000379608; SITRICK_01485; CASSAVA_000945294; Letter from Jordan A. Thomas, Partner, Labaton Sucharow, to Division of Dockets Management, Food and Drug Administration (Sep. 1, 2021), *available at* https://fdapetitions.com/wp-content/uploads/2021/08/2021P-0967.01.pdf; Dupli Checker, "Domain Age Checker," https://www.duplichecker.com/domain-age-checker.php; Clinicaltrials.gov, "Simufilam 100 mg for Mild-to-Moderate Alzheimer's Disease (RETHINK-ALZ)," updated May 25, 2025, https://clinicaltrials.gov/study/NCT04994483; CASSAVA_000791501; Dave Michaels and Joseph Walker, "SEC Investigating Cassava Sciences, Developer of Experimental Alzheimer's Drug," *Wall Street Journal*, Health, Nov. 17, 2021, https://www.wsj.com/health/healthcare/cassava-sciences-alzheimers-sec-investigation-11637154199; Clinicaltrials.gov, "Simufilam 50 mg or 100 mg for Mild-to-Moderate Alzheimer's Disease (REFOCUS-ALZ)," updated Sep. 22, 2025, https://clinicaltrials.gov/study/NCT05026177; CASSAVA_000696066; Apoorva Mandavilli, "Scientists Question Data Behind an Experimental Alzheimer's Drug," *New York Times*, Health, Apr. 18, 2022, https://www.nytimes.com/2022/04/18/health/alzheimers-cassava-simufilam.html; ClinicalTrials.gov, "Open-Label Extension of the PTI-125-04 Study in Mild-to-Moderate Alzheimer's Disease," updated Aug. 15, 2025, https://www.clinicaltrials.gov/study/NCT05352763; Apoorva Mandavilli, "Scientists Investigating Alzheimer's Drug Faulted in Leaked Report," *New York Times*, Health, Oct. 14, 2023, https://www.nytimes.com/2023/10/14/health/alzheimers-drug-research-simufilam.html; U.S. Department of Justice, "Professor Charged for Operating Multimillion-Dollar Grant Fraud Scheme," press release no. 25-80, Jun. 28, 2024, https://www.justice.gov/archives/opa/pr/professor-charged-operating-multimillion-dollar-grant-fraud-scheme; Cassava Sciences, "Cassava Sciences Resolves SEC Investigation," press release, Sep. 26, 2024, https://www.cassavasciences.com/news-releases/news-release-details/cassava-sciences-resolves-sec-investigation; Cassava Sciences, "Cassava Sciences Topline Phase 3 Data Did Not Meet Co-Primary Endpoints," press release, Nov. 25, 2024, https://www.cassavasciences.com/news-releases/news-release-details/cassava-sciences-topline-phase-3-data-did-not-meet-co-primary; Science.org, "Justice Department unexpectedly drops fraud case against Alzheimer's scientist," Oct. 24, 2025, https://www.science.org/content/article/justice-department-unexpectedly-drops-fraud-case-against-alzheimer-s-scientist; Cassava Sciences, "Cassava Announces Agreement to Settle Securities Class Action Litigation," press release, Dec. 23, 2025, https://www.cassavasciences.com/news-releases/news-release-details/cassava-announces-agreement-settle-securities-class-action; *See* Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "Cassava Sciences (SAVA): A Shambolic Charade," cassavafraud.com; CASSAVA_000797948 at -7949–7951.

Expert Report of Brian E. Harvey, MD PhD

# VI. Opinions

## VI.A. FDA engaged with the pre-clinical and clinical research behind simufilam candidacy prior to the allegations concerning simufilam data integrity, was aware of the allegations and took the appropriate regulatory actions consistent with evaluating/investigating those allegations and maintained regulatory oversight and authority over the Phase 3 trials until their completion

(40)    As shown in Figure 3 above, FDA and Cassava frequently communicated regarding the simufilam development program. At each stage of this process, Cassava submitted detailed trial data reports and proposals for the next phase of clinical studies, met with FDA to obtain feedback and communicated with the agency to address FDA feedback and provide any additional data or other information requested by the agency. As described further in the remainder of this section, this FDA detailed feedback and repeated communications with Cassava—including proactive outreach on at least one occasion—is strong evidence that FDA scrutinized the Cassava drug development data and related information.

(41)    FDA routinely conducts inspections of both clinical trial sites and laboratories that perform work in support of an investigational drug application to assess compliance with applicable regulatory standards. During Cassava's development program, FDA conducted multiple inspections of clinical trial sites and laboratories participating in Cassava's studies—one during Phase 2 trials and three during Phase 3 trials—all of which were described as routine and not for cause.[49] During these inspections, the trial sites contacted Laura Rodriguez, a director of clinical quality systems at Cassava, who conducted both an entry and exit call with FDA and provided them with any information they requested.[50]

(42)    Further, FDA could have learned about the allegations regarding the data integrity behind simufilam through several channels including direct letters to individuals that worked at FDA and established media platforms such as *The New York Times*, *The Wall Street Journal*, and X.[51] Plaintiffs also

---

[49]    Rodriguez Dep. Tr. at 30:23–25.

[50]    Rodriguez Dep. Tr. at 30:11–19.

[51]    SITRICK_01485; CASSAVA_000696066; CASSAVA_000945294; CASSAVA_000304503.

Dave Michaels and Joseph Walker, "SEC Investigating Cassava Sciences, Developer of Experimental Alzheimer's Drug," *Wall Street Journal*, Health, Nov. 17, 2021, https://www.wsj.com/health/healthcare/cassava-sciences-alzheimers-sec-investigation-11637154199.

Apoorva Mandavilli, "Scientists Question Data Behind an Experimental Alzheimer's Drug," *New York Times*, Health, Apr. 18, 2022, https://www.nytimes.com/2022/04/18/health/alzheimers-cassava-simufilam.html.

Apoorva Mandavilli, "Scientists Investigating Alzheimer's Drug Faulted in Leaked Report," *New York Times*, Health,

---

Expert Report of Brian E. Harvey, MD PhD

created two websites attacking Cassava and simufilam with several slide decks and a poster presented at a scientific conference about their allegations.[52] FDA took steps to investigate Cassava's Phase 2b simufilam trials that were consistent with its awareness of the allegations. At a minimum, FDA received and reviewed two Citizen Petitions and their supplemental materials from Plaintiffs and received at least one letter directly addressed to the Director of the agency's Neuroscience Office along with a letter represented to have been sent to FDA that was published on Plaintiff's websites.[53] These documents addressed to FDA accused Cassava of data manipulation in the simufilam trials.[54]

## VI.A.1. Phase 1 trial and FDA interactions

(43)    After ten years of preclinical testing, Cassava held a pre-IND meeting with FDA in March 2017 (written response only).[55] FDA suggested several revisions to Cassava's proposed initial clinical study, including redefining how dose-escalating patient cohorts were grouped and providing additional patient safety monitoring, but it stated that the "proposed drug substance test parameters appear reasonable."[56] FDA also suggested that Cassava further investigate certain aspects of simufilam clinical pharmacology by (1) conducting in vitro studies in order to characterize the simufilam related metabolic pathways, identify any potentially active metabolites, and determine whether they interact with drug transporter proteins in patients taking concomitant medications; (2) performing a mass-balance study in order to analyze simufilam metabolism and elimination

---

Oct. 14, 2023, https://www.nytimes.com/2023/10/14/health/alzheimers-drug-research-simufilam.html.

Memorandum Opinion & Order, *Cassava Sciences v. David Bredt, et al.*: 1:22-cv-9409-GHW (SDNY Mar. 28, 2024), Exhibit A.

[52]    Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "Cassava Sciences (SAVA): A Shambolic Charade," cassavafraud.com.

Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "Cassava Sciences (SAVA): A Shambolic Charade," https://www.simuflimflam.com.

[53]    SITRICK_01485; CASSAVA_000696066; CASSAVA_000945294; CASSAVA_000304503.

Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (Nov. 2, 2021), *available at* https://www.cassavafraud.com/docs/SAVAReport_Nov2_Final_links.pdf.

Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (Nov. 2, 2021), *available at* https://www.simuflimflam.com/docs/SAVAReport_Nov2_Final_links.pdf.

[54]    SITRICK_01485 at 1486–1487; CASSAVA_000696066 at -6066–6067; CASSAVA_000945294 at 5296–5298; CASSAVA_000304503.

Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (Nov. 2, 2021), *available at* https://www.cassavafraud.com/docs/SAVAReport_Nov2_Final_links.pdf.

Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (Nov. 2, 2021), *available at* https://www.simuflimflam.com/docs/SAVAReport_Nov2_Final_links.pdf.

[55]    CASSAVA_000042888 at -2897; CASSAVA_000797948 at -7949–7950.

[56]    CASSAVA_000042888 at -2889–2891, -2893.

Expert Report of Brian E. Harvey, MD PhD

particularly for patients with hepatic and renal conditions; and (3) evaluating the effect of food on simufilam pharmacokinetics.[57]

(44)    Following the pre-IND meeting, Cassava submitted an IND to FDA in June 2017.[58] FDA reviewed Simufilam's IND application and determined that Cassava could proceed with its proposed clinical studies.[59] In the August 2017 "Study May Proceed" Letter, FDA recommended the following modifications to Cassava's proposed development plan:[60]

- Chemistry Manufacturing and Controls (CMC):
  - Include the beyond-use date and/or time in the product label
  - Include the composition of the placebo
- Clinical
  - Provide details regarding the initial clinical protocol (number of doses, total enrollment, and enrollment criteria) in the informed consent form
  - Exclude patients with a history of seizures based upon concerns raised by convulsions observed in canine studies
  - Clarify that the "postmenopausal" inclusion criteria means no menstrual cycles for at least one year
  - Specify that stopping criteria for the proposed study include clinical judgment of the investigator and the independent Data Safety Monitoring Board/Data Monitoring Committee (DSMB/DMC)
- Clinical pharmacology
  - Consider exploring additional dosage amounts, including doses greater than 200 mg, as long as such amounts are supported by safety and pharmacokinetic data for lower doses
  - Adjust pharmacokinetic sampling times based on parameters estimated from the first patient cohort
  - Analyze pharmacokinetic samples from all timepoints for patients in the placebo group
  - Amend the language describing the exclusion criteria for patients taking or planning to take other medications

---

[57]    CASSAVA_000042888 at -2892.
[58]    CASSAVA_000016414.
        *See also* CASSAVA_000784543.
[59]    CASSAVA_000239329.
[60]    CASSAVA_000239329 at -9329–9330

Expert Report of Brian E. Harvey, MD PhD

(45)   Cassava conducted the Phase 1 dose-escalating safety study between August 2017 and March 2018.[61]

## VI.A.2. Phase 2 trials and FDA interactions

(46)   Cassava then conducted a Phase 2a, multi-center, open label study between March 2019 and May 2019.[62] The study results were published in a peer-reviewed medical journal article in February 2020.[63]

(47)   Cassava next conducted a double-blind, randomized, placebo-controlled Phase 2b trial between September 2019 and March 2020.[64] While the Phase 2b trial was ongoing, Cassava requested feedback using the traditional regulatory mechanism of the FDA Type C Meeting (written response only) in early 2020 in order to obtain agency guidance regarding further development of simufilam.[65] FDA provided the following written feedback in April 2020:[66]

- Biomarkers are only considered to have regulatory utility for Alzheimer's Disease stage 1 and are not sufficient evidence of clinical benefit for Alzheimer's Disease stages 2–4.

- The data provided, which included Phase 1 and Phase 2a clinical trials, did not appear adequate to support Fast Track or Breakthrough Therapy Designation (BTD).

- Cassava should address the clinical pharmacology aspects described in its Pre-IND Written Response Only (WRO) Letter (e.g., characterizing drug-drug and drug-transporter interactions, conducting a mass-balance study, analyzing the effects of food) and analyze the effect of simufilam on the corrected QT interval, a measure of electrical properties of the heart that serves as a predictor for various adverse cardiac outcomes.

(48)   Cassava applied for FDA's BTD in August 2020 based upon the results of the Phase 2b trial, in addition to data from the Phase 1 and Phase 2 trials, all described above.[67] Following a detailed agency review of the trial data, FDA denied Cassava's BTD request in October 2020 for the following reasons:[68]

---

[61]   Clinicaltrials.gov, "A Safety Study of PTI-125 in Healthy Volunteers," updated May 10, 2021, https://clinicaltrials.gov/study/NCT03784300.

[62]   Clinicaltrials.gov, "PTI-125 for Mild-to-moderate Alzheimer's Disease Patients," updated Jul. 7, 2021, https://clinicaltrials.gov/study/NCT03748706.

[63]   H.Y. Wang et al., "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients," *The Journal of Prevention of Alzheimer's Disease* 7, no. 4 (2020): 256–64.

[64]   Clinicaltrials.gov, "PTI-125 for Mild-to-moderate Alzheimer's Disease Patients," updated Sep. 29, 2021, https://clinicaltrials.gov/study/NCT04079803.

[65]   CASSAVA_000137028; CASSAVA_000189877.

[66]   CASSAVA_000137028; CASSAVA_000189877 at -9880–9883.

[67]   CASSAVA_000104349. *See also* CASSAVA_000784543.

[68]   CASSAVA_000784543 at -4543–4545.

Expert Report of Brian E. Harvey, MD PhD

- Cassava failed to provide comparisons between simufilam and other approved drugs in order to demonstrate that it was superior, which is a major criteria for Breakthrough Therapy Designation.

- Cassava failed to establish that changes in Alzheimer's Disease biomarkers correlated with improvement in disease pathophysiology.

- The open label study failed by its design to establish that observed effects were due to simufilam given that the study lacked a placebo control arm.

- Cassava failed to provide detailed results for all tests included in the episodic and spatial memory measures and failed to adequately explain why the episodic and spatial memory measures were lacking p-values.

- Cassava also failed to provide a detailed description of the criteria that it applied to identify the subset of patients for which it reported episodic memory results.

(49)   In March 2020, Cassava initiated an interventional Phase 2 trial, which was completed in November 2023.[69]

(50)   FDA performed a routine on-site inspection of the Phase 2 trial site in March 2021 "on behalf of Cassava Sciences to ensure protocol, ICH-GCP, and other applicable regulatory compliance at [the] clinical site with respect to protocol PTI-125-04."[70]

(51)   Cassava also conducted a Phase 2 cognition maintenance study between May 2022 and December 2024.[71]

(52)   In November 2021, FDA independently requested additional information from Cassava regarding its Phase 2b trial.[72] FDA asked which laboratories conducted the initial and secondary bioanalysis and which laboratories analyzed the actual and raw CSF samples used to create a specific figure in Cassava's EOP2 meeting materials that showed changes in CSF data.[73] After responding to the agency's specific questions, Cassava further explained how Cassava had the data re-analyzed at CUNY after the initial data analysis performed by the Swedish laboratory exhibited high variability in both subject and placebo patient groups and implausible correlations between biomarkers expected to move in the same direction.[74]

---

[69]   ClinicalTrials.gov, "Simufilam (PTI-125), 100 mg, for Mild-to-moderate Alzheimer's Disease Patients (PTI-125)," updated Apr. 22, 2025, https://clinicaltrials.gov/study/NCT04388254.

[70]   Rodriguez Dep. Tr. at 38:3–39:17.

[71]   ClinicalTrials.gov, "Open-Label Extension of the PTI-125-04 Study in Mild-to-Moderate Alzheimer's Disease," updated Aug. 15, 2025, https://www.clinicaltrials.gov/study/NCT05352763.

[72]   CASSAVA_000016365.

[73]   CASSAVA_000016365 at -6365–6366.

[74]   CASSAVA_000016365 at -6367–6369.

Confidential
Subject to Protective Order

Expert Report of Brian E. Harvey, MD PhD

(53)    After reviewing Cassava's response, FDA subsequently asked Cassava to submit the raw CSF data, any associated method validation or analytical reports and identifiers for the clinical trials from which the CSF samples were obtained.[75] Cassava subsequently collected and provided this information to the agency.[76]

## VI.A.3. Phase 3 trials and FDA interactions

(54)    After completing Phase 2 trials, Cassava held an EOP2 meeting with FDA in January 2021 (Written Response Only) in preparation for Phase 3 trials.[77] FDA responded as follows:[78]

- FDA agreed with Cassava's proposed co-primary endpoints to measure efficacy (improvement in ADAS-Cog14 and ADCS-iADL scores and improvement in ADAS-Cog14 and ADCS-CGIC scores).

- FDA agreed that the completed and planned nonclinical safety studies appeared to be sufficient to support NDA submission, but with the agency recommendation to complete carcinogenicity studies prior to submission instead of as a post-approval commitment/requirement.

- Based upon the information provided regarding the design of the two planned Phase 3 trials, the results generated from these trials may be sufficient to provide substantial evidence of simufilam efficacy.

- The sample size justification that was provided for one of the two planned Phase 3 trials appeared appropriate, and FDA requested a sample size justification for the other planned Phase 3 trial.

- Cassava should investigate the efficacy and safety of several dosage amounts.

- Cassava should evaluate the effects of food, other medications, hepatic impairment and renal insufficiency on simufilam pharmacokinetics, as well as explain how it plans to address these issues in Phase 3 trials.

- The data provided thus far did not appear to support Fast Track or Breakthrough Therapy Designation, and more clinical data was needed to determine if simufilam would qualify for Priority Review or Accelerated Approval.

- Cassava should also address the clinical pharmacology aspects described in its Pre-IND Written Response letter and the Type C Meeting responses (e.g., characterizing drug-drug and drug-transporter interactions, conducting a mass-balance study).

---

[75]   CASSAVA_000788613.

[76]   CASSAVA_000791501.

[77]   CASSAVA_000010607 at -0629.

[78]   CASSAVA_000749734.

Expert Report of Brian E. Harvey, MD PhD

- FDA agreed that Cassava's proposed impurity testing and acceptance limits appeared adequate but indicated that any results above the qualification threshold would need to be explained and justified in the NDA.

- FDA agreed that the proposed drug product specifications were adequate, and it agreed with how Cassava planned to demonstrate that the updated Phase 3 formulation of simufilam had a comparable and acceptable stability and dissolution profile as the Phase 2 formulation.

- FDA provided guidance for the development, optimization and validation of dissolution methods; it outlined factors to consider when setting dissolution acceptance criteria, as well as requirements for presenting the underlying data.

- FDA agreed with Cassava's plans to forego testing in pediatric and pregnant patients, as well as to pool U.S. and Canadian trial data.

(55) In May 2021, Cassava requested SPAs outlining the key elements of the two proposed Phase 3 trials including entry criteria, dose selection and endpoints.[79] FDA responded in June indicating that Cassava's proposed studies would not support a regulatory submission.[80] FDA recommended that Cassava incorporate the following revisions for both trials:[81]

- Designate both the ADAS-Cog12 and ADCS-ADL scales as co-primary endpoints and the iARDS scale as a secondary endpoint

- Collect measurements of plasma biomarkers, CSF biomarkers, serial amyloid and tau positron emission tomography, as well as the Clinical Dementia Rating scale at regular intervals

- Collect plasma samples for pharmacokinetic analysis at regular intervals

(56) Cassava incorporated this FDA feedback as revisions to the study protocols, and the company again submitted SPAs in July 2021.[82] FDA responded in August indicating that Cassava's proposed studies would support a regulatory submission.[83]

(57) Also in response to FDA feedback and prior to starting Phase 3, in May 2021 Cassava conducted a randomized, four-way crossover trial to assess how food intake affected the absorption of simufilam, to confirm bioequivalence between the different tablet formulations and to inform dosing instructions for subsequent trials.[84]

---

[79] CASSAVA_000543318; CASSAVA_000543313.

[80] CASSAVA_000543318 at -3322; CASSAVA_000543313 at -3317.

[81] CASSAVA_000543318 at 3318–3319; CASSAVA_000543313 at 3313–3314.

[82] CASSAVA_000092905; CASSAVA_000379608.

[83] CASSAVA_000092905; CASSAVA_000379608.

[84] Clinicaltrials.gov, "Food Effect and Bioequivalence Study of Simufilam Tablets in Healthy Volunteers," updated Aug. 22, 2023, https://www.clinicaltrials.gov/study/NCT04932655.

Expert Report of Brian E. Harvey, MD PhD

(58)     Cassava initiated the proposed 52-week Phase 3 trial called RETHINK-ALZ in October 2021.[85]
Cassava then initiated the proposed 76-week Phase 3 trial called REFOCUS-ALZ in November
2021.[86]

## VI.A.4. FDA's awareness of allegations against Cassava

(59)     In August 2021, a neuroscientist, David Bredt and a cardiologist, Geoffrey Pitt, were involved in the
submission of a Citizen Petition and accompanying report to FDA.[87] In the filing, they stated that they
had "grave concerns about the quality and integrity of the laboratory-based studies" supporting
simufilam.[88] Bredt and Pitt pointed to purported irregularities in Cassava's published research,
including results from its clinical trials, as well as in studies by Dr. Lindsay Burns and Dr. Hoau-Yan
Wang.[89] They argued that the purported irregularities they identified could indicate potential data
manipulation and questioned both the soundness of the experimental methodology and the validity of
the conclusions drawn from the data.[90] They further recommended that FDA pause Cassava's clinical
trials and undertake a thorough audit of Cassava's research with supplements calling for the agency to
"immediately halt" trials.[91] Bredt and Pitt were involved in the submission of an additional Citizen
Petition in September 2021 citing similar concerns as the first petition.[92]

(60)     Also in August 2021, FDA received a letter addressed to Neuroscience  Office Director Dr. Billy
Dunn from the law firm Labaton Sucharow.[93] A partner at Labaton Sucharow begins the letter by
stating, "Cassava Sciences apparently didn't get the Theranos memo," referencing a fraudulent
biotechnology company whose founder was sentenced to 135 months in federal prison for defrauding
its investors.[94] An additional 23-page letter and report written by Plaintiffs expressing their concerns

[85]   Clinicaltrials.gov, "Simufilam 100 mg for Mild-to-Moderate Alzheimer's Disease (RETHINK-ALZ)," updated May 25,
2025, https://clinicaltrials.gov/study/NCT04994483.

[86]   Clinicaltrials.gov, "Simufilam 50 mg or 100 mg for Mild-to-Moderate Alzheimer's Disease (REFOCUS-ALZ),"
updated Sep. 22, 2025, https://clinicaltrials.gov/study/NCT05026177.

[87]   SITRICK_01485; CASSAVA_000945294; CASSAVA_000797948 at -7951.

"A citizen petition is a way for individuals, regulated industry representatives, or consumer groups to petition FDA to
issue, amend, revoke a regulation, or to take other administrative action. The requirements for a citizen petition are set
out in 21 CFR 10.30." U.S. Food and Drug Administration, "Tobacco Products-Related Citizen Petitions," updated Jan.
28, 2026, https://www.fda.gov/tobacco-products/products-guidance-regulations/tobacco-products-related-citizen-
petitions.

[88]   SITRICK_01485 at -1485; CASSAVA_000797948 at -7951.

[89]   SITRICK_01485 at -1486; CASSAVA_000797948 at -7951.

[90]   SITRICK_01485 at -1486–1487; CASSAVA_000797948 at -7951.

[91]   SITRICK_01485 at -1487; CASSAVA_000696066 at -6067; CASSAVA_000797948 at -7951.

[92]   Letter from Jordan A. Thomas, Partner, Labaton Sucharow, to Division of Dockets Management, Food and Drug
Administration (Sep. 1, 2021), *available at* https://fdapetitions.com/wp-content/uploads/2021/08/2021P-0967.01.pdf.
CASSAVA_000696066 at -6067; CASSAVA_000797948 at -7951.

[93]   CASSAVA_000304503.

[94]   CASSAVA_000304503 at -4503.
U.S. Department of Justice, "Elizabeth Holmes Sentenced To More Than 11 Years For Defrauding Theranos Investors

Expert Report of Brian E. Harvey, MD PhD

about simufilam clinical trials and Cassava—which Plaintiffs posted on their websites—was addressed to Dr. Eric Bastings in FDA Neurology Office.[95]

(61)  In February 2022, FDA denied both Citizen Petitions filed by Dr. Bredt and Dr. Pitt along with their various supplements, citing that the actions requested fell outside what the citizen petition process allows.[96] According to the letter, citizen petitions can request FDA to take or refrain from specific administrative actions but cannot be used to compel agency investigations, fact-finding, or enforcement actions.[97]

## VI.A.5. Several public news and media platforms published information relating to the allegations

(62)  FDA also would have been aware of the allegations through investigations by other government agencies and posts by Plaintiffs on X, with one Tweet going as far as to call Cassava "a complete scientific fraud," as described in Section II above.[98] In addition to federal investigations into Cassava and public Tweets on X, multiple sites also published articles about the controversy surrounding Cassava and their simufilam trials.[99]

(63)  Starting in October 2021, Adrian Heilbut, Jesse Brodkin, Enea Milioris and Patrick Markey, made disparaging comments in a variety of public forums. First, they created two websites—

---

Of Hundreds Of Millions," press release, Nov. 18, 2022, https://www.justice.gov/usao-ndca/pr/elizabeth-holmes-sentenced-more-11-years-defrauding-theranos-investors-hundreds.

[95]  Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (Nov. 2, 2021), *available at* https://www.cassavafraud.com/docs/SAVAReport_Nov2_Final_links.pdf.
Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (Nov. 2, 2021), *available at* https://www.simuflimflam.com/docs/SAVAReport_Nov2_Final_links.pdf.

[96]  CASSAVA_000696066 at -6067–6068.

[97]  CASSAVA_000696066 at -6067–6068.

[98]  U.S. Department of Justice, "Professor Charged for Operating Multimillion-Dollar Grant Fraud Scheme," press release no. 24-830, Jun. 28, 2024, https://www.justice.gov/archives/opa/pr/professor-charged-operating-multimillion-dollar-grant-fraud-scheme.
Memorandum Opinion & Order, *Cassava Sciences v. David Bredt, et al.*: 1:22-cv-9409-GHW (SDNY Mar. 28, 2024), at 40.

[98]  Science.org, "Justice Department unexpectedly drops fraud case against Alzheimer's scientist," Oct. 24, 2025, https://www.science.org/content/article/justice-department-unexpectedly-drops-fraud-case-against-alzheimer-s-scientist.
Memorandum Opinion & Order, *Cassava Sciences v. David Bredt, et al.*: 1:22-cv-9409-GHW (SDNY Mar. 28, 2024), at 67.

[99]  Dave Michaels and Joseph Walker, "SEC Investigating Cassava Sciences, Developer of Experimental Alzheimer's Drug," *Wall Street Journal*, Health, Nov. 17, 2021, https://www.wsj.com/health/healthcare/cassava-sciences-alzheimers-sec-investigation-11637154199.
Apoorva Mandavilli, "Scientists Question Data Behind an Experimental Alzheimer's Drug," *New York Times*, Health, Apr. 18, 2022, https://www.nytimes.com/2022/04/18/health/alzheimers-cassava-simufilam.html.
Apoorva Mandavilli, "Scientists Investigating Alzheimer's Drug Faulted in Leaked Report," *New York Times*, Health, Oct. 14, 2023, https://www.nytimes.com/2023/10/14/health/alzheimers-drug-research-simufilam.html.

---

Expert Report of Brian E. Harvey, MD PhD

"cassavafraud.com" and "simuflimflam.com"—where they published a letter that was represented to have also been sent to FDA accusing Cassava of data manipulation in its Alzheimer's research.[100]

(64)    Plaintiffs went on to publish three slide decks on their websites, each accusing Cassava of scientific misconduct or unreliable methods. These decks largely rely on publicly available sources and Freedom of Information Act (FOIA) obtained documents.[101]

(65)    During this same time period, hedge fund Quality Capital Management (QCM), also a short-seller, released a report on Cassava.[102] The report disclosed QCM's financial interest and described its investigation, including consulting experts, reviewing public data, speaking to former employees and conducting surveillance.[103] It alleged misconduct by individuals connected to Cassava, questioned research integrity and criticized clinical trial protocols.[104]

(66)    In November 2021, *The Wall Street Journal* published an article about the SEC investigation into Cassava.[105] The article also mentions that some scientists and at least one image manipulation consultant called into question the images in Dr. Wang's scientific papers on simufilam.[106]

(67)    In April 2022, *The New York Times* reported that medical journals had either retracted or challenged several studies associated with Cassava and simufilam.[107] In October 2023, *The New York Times*

---

[100]  *See* Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "Cassava Sciences (SAVA): A Shambolic Charade," cassavafraud.com.
Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (Nov. 2, 2021), *available at* https://www.cassavafraud.com/docs/SAVAReport_Nov2_Final_links.pdf.
Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (Nov. 2, 2021), *available at* https://www.simuflimflam.com/docs/SAVAReport_Nov2_Final_links.pdf.

[101]  Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "Cassava Sciences: A Shambolic Charade," presentation, Nov. 3, 2021, *available at* https://www.cassavafraud.com/docs/SAVAReport_Deck_2021_11_03.pdf.
Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "SavaDx Exposed," presentation, Nov. 29, 2021, *available at* https://www.cassavafraud.com/docs/SAVADx_Theranos2.0.pdf.
Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "Cassava and the Wang Lab: Seeing Through The Blind," presentation, Dec. 10, 2021, *available at* https://www.cassavafraud.com/docs/SAVA_UNBLINDED.pdf.

[102]  Quintessential Capital Management, "Cassava Sciences (SAVA): Game over!" Nov. 3, 2021, *available at* https://www.qcmfunds.com/cassava-sciences-sava-game-over/.

[103]  Quintessential Capital Management, "Cassava Sciences (SAVA): Game over!" Nov. 3, 2021, *available at* https://www.qcmfunds.com/cassava-sciences-sava-game-over/.

[104]  Quintessential Capital Management, "Cassava Sciences (SAVA): Game over!" Nov. 3, 2021, *available at* https://www.qcmfunds.com/cassava-sciences-sava-game-over/.

[105]  Dave Michaels and Joseph Walker, "SEC Investigating Cassava Sciences, Developer of Experimental Alzheimer's Drug," *Wall Street Journal*, Health, Nov. 17, 2021, https://www.wsj.com/health/healthcare/cassava-sciences-alzheimers-sec-investigation-11637154199.

[106]  Dave Michaels and Joseph Walker, "SEC Investigating Cassava Sciences, Developer of Experimental Alzheimer's Drug," *Wall Street Journal*, Health, Nov. 17, 2021, https://www.wsj.com/health/healthcare/cassava-sciences-alzheimers-sec-investigation-11637154199.

[107]  Apoorva Mandavilli, "Scientists Question Data Behind an Experimental Alzheimer's Drug," *New York Times*, Health, Apr. 18, 2022, https://www.nytimes.com/2022/04/18/health/alzheimers-cassava-simufilam.html.

---

Expert Report of Brian E. Harvey, MD PhD

published a subsequent article about the leaked CUNY investigative report into Dr. Wang and his research on simufilam.[108]

### VI.A.6. FDA took the allegations seriously and investigated accordingly

(68)    FDA demonstrated that it was aware of the allegations by taking steps to independently investigate Cassava by requesting clinical information, issuing an FDA Inspection Report (Form 483) and Establishment Inspection Report (EIR), as well as requesting that certain data be removed from Cassava's Investigator Brochure.

(69)    On November 4, 2021, FDA independently submitted a clinical information request to Cassava about their Phase 2 simufilam trials.[109] Cassava submitted responses to the request on November 8, 2021.[110] FDA then requested additional information about the data used in the simufilam trials in response to Cassava's answers, to which Cassava promptly responded to on November 30, 2021.[111]

(70)    In September 2022, FDA issued an FDA Form 483 and an EIR outlining issues with the lab's documentation, analyses and equipment following their on-site inspection of Dr. Wang's laboratory at CUNY.[112] The inspection focused on the work performed by Dr. Wang in Cassava's Phase 2b study for simufilam.[113] The form listed inspectional observations related to this study, which used ELISA and Western blot methods to measure various analytes in CSF samples.[114] Key observations include:[115]

- ELISA Assay Validation: The ELISA assays were not validated or verified for accuracy, precision and sensitivity, despite using commercially available kits.

- Curve Fitting Model: The calibration standards data were fitted using a linear regression model, which FDA stated was not appropriate for the nonlinear log-transformed concentration-response relationship, leading to inaccurate sample concentration determinations.

- Inadequate Source Records: The site lacked proper documentation for sample storage, tracking, experimental procedures and audit trails for ELISA plate readers.

---

[108] Apoorva Mandavilli, "Scientists Investigating Alzheimer's Drug Faulted in Leaked Report," *New York Times*, Health, Oct. 14, 2023, https://www.nytimes.com/2023/10/14/health/alzheimers-drug-research-simufilam.html.

[109] CASSAVA_000016414.

[110] CASSAVA_000016414; CASSAVA_000016365.

[111] CASSAVA_000788613; CASSAVA_000791501.

[112] CASSAVA_000898032; Rodriguez Dep. Tr. at 172:15–175:1; CUNY 001529.

[113] CASSAVA_000898032 at -8032.

[114] CASSAVA_000898032 at -8032.

[115] CASSAVA_000898032 at -8032–8033.

Expert Report of Brian E. Harvey, MD PhD

- Exclusion of Data: One of three concentration data points was excluded from triplicate analysis without justification for certain analytes and samples.

- Quality Control: No quality control samples were included during ELISA sample analysis to ensure run acceptance.

- Stability Assessment: The site did not conduct stability assessments to confirm the accuracy of analyte measurements.

- Access Control: Computers connected to ELISA plate readers and image scanners lacked user log-in requirements.

- Equipment Calibration: Major equipment, including the ELISA plate reader and freezer, was not calibrated during the sample analysis period, nor was documentation provided for calibration and maintenance.

(71)    The Form 483 noted that these observations were not final agency determinations of compliance but rather highlighted areas requiring corrective action.[116]

(72)    FDA also communicated with Cassava regarding portions of the Investigator's Brochure related to CSF data.[117] In November 2022, FDA notified Cassava that the September investigation could not verify the reliability of Cassava's CSF data and that Cassava must remove any figures and text related to analyses using that data in the Investigator's Brochure.[118] Cassava responded to FDA requesting an explanation of FDA's findings and proposed to have an independent laboratory conduct analyses using the CSF data as an alternative solution to deleting those portions of the brochure.[119] FDA declined both of Cassava's requests, insisting that Cassava remove the data that FDA could not verify during its investigation and because including the data could be "potentially misleading."[120]

(73)    These communications between FDA and Cassava demonstrate FDA's awareness of the allegations concerning data integrity, that FDA took the allegations seriously and that nothing discovered in the agency investigations gave rise to any concerns of fraud or research misconduct warranting a halt of the ongoing trials for simufilam.

---

[116]  CASSAVA_000898032 at -8032.

[117]  Rodriguez Dep. Tr. at 255:1–258:11; CASSAVA_001213617 at -3620.

[118]  CASSAVA_001213617 at -3620.

[119]  Rodriguez Dep. Tr. at 256:23–257:7; CASSAVA_001213617 at -3619–3620.

[120]  Rodriguez Dep. Tr. at 257:13–258:11; CASSAVA_001213617 at -3618.

Expert Report of Brian E. Harvey, MD PhD

## VI.A.7. FDA maintained regulatory oversight of the Phase 3 trials until their completion

(74) Following the September 2022 inspection of the CUNY laboratory and FDA's November 2022 directive concerning removal of certain CSF-related material from the Investigator's Brochure, FDA did not place Cassava's Phase 3 trials on clinical hold, suspend subject enrollment, or otherwise terminate the ongoing investigations.

(75) Instead, FDA continued to exercise regulatory oversight of the development program through the ordinary mechanisms available to the agency for monitoring investigational drugs.

(76) FDA requires sponsors to submit annual reports summarizing the status of each ongoing study, including enrollment progress, safety information, protocol changes and any significant manufacturing or quality developments. Drug sponsors may also submit additional data packages, analyses, or briefing materials to FDA in connection with scheduled meetings (e.g., Type B/Type C interactions) or in response to specific FDA questions.

(77) Sponsors conducting Phase 3 trials must submit periodic safety reports and promptly report certain serious and unexpected adverse events, as well as provide FDA with updates regarding the progress of the investigation. In practice, these reporting obligations provide FDA with a continuing view into the emerging safety profile of the drug candidate, including whether new information suggests the need for protocol changes, enhanced monitoring, or other risk-mitigation steps.

(78) FDA has authority to inspect clinical investigators, institutional review boards (IRBs), sponsors and contract research organizations (CROs) involved in Phase 3 trials. These inspections can address compliance with human subject protection requirements and applicable quality standards, including whether the study is being conducted in accordance with the protocol and whether records and data are adequately documented and reliable. FDA also may inspect laboratories and other vendors that generate study-critical data.

(79) During Phase 3, FDA may communicate with sponsors through formal correspondence or meeting processes to address emerging questions about trial conduct, safety findings, data quality issues, manufacturing changes, or other matters that bear on the conduct of the investigation.

(80) In my experience, these oversight mechanisms operate together throughout Phase 3 trial conduct. They are designed to allow FDA to monitor subject safety, ensure that studies are conducted in a scientifically sound manner and identify and address compliance or data-quality concerns during the life of the trials.

Expert Report of Brian E. Harvey, MD PhD

(81) Based upon the record presented above, it is clear to me that FDA conducted such oversight during the Phase 3 trials of simufilam, and I have no evidence to support the belief that agency oversight did not continue until the completion or sponsor termination of the Phase 3 trials.

## VI.B. FDA had the authority to terminate, hold, or otherwise restrict the conduct of all of Cassava's trials—Phase 1, 2, or 3—and if the agency had concluded that the simufilam clinical program was based upon fabricated data or a fraudulent scientific premise as alleged, FDA would have exercised that regulatory authority

(82) As discussed above, FDA was aware of the accusations made by Plaintiffs and thoroughly evaluated Cassava's clinical program data in light of these allegations. If FDA believed that simufilam clinical program was based upon fabricated data or fraudulent science as alleged, then FDA would have taken action to—at a minimum—put a clinical hold on the simufilam clinical development, if not exercise more severe penalties allowed by their regulations (discussed further below). In contrast, FDA engaged in a rigorous SPA process with Cassava in order to refine their proposed Phase 3 trial protocols and encouraged these Phase 3 trials to proceed. The agency would not have put Phase 3 trial participants' safety at risk if the simufilam clinical program was based upon fabricated fraudulent data as Plaintiffs alleged in their public statements and Tweets.

### VI.B.1. FDA has many regulatory tools to monitor and enforce data integrity, including halting and restricting clinical trials

(83) FDA uses many regulatory tools, policies and procedures in order to ensure clinical trial standards, including patient safety and data integrity. I discuss several below.

- FDA pre-market review teams: As discussed in Section V above, a coordinated group of scientific, clinical and regulatory experts from multiple disciplines assess clinical trial results, safety data, product quality and statistical integrity in order to ensure that the nonclinical data foundation underlying a product's development program is scientifically sound.[121]

- Clinical holds: As mentioned above, FDA monitors clinical trial data on an ongoing basis and FDA IND regulations (21 CFR 312.42) allow the agency to place a clinical trial on hold if nonclinical lab data quality is in question, either because the data are of poor quality or is insufficient to determine whether human subjects would be exposed to unreasonable risk.[122]

---

[121] *See* Section V.C

[122] 21 CFR 312.42.

*See also* U.S. Food and Drug Administration, "Drug Development and Review Definitions," https://www.fda.gov/drugs/investigational-new-drug-ind-application/drug-development-and-review-definitions.

---

Expert Report of Brian E. Harvey, MD PhD

Under 21 CFR 312.42, FDA may place a trial on clinical hold if: 1) The IND lacks sufficient information to assess risk; 2) The investigator brochure is misleading, erroneous, or materially incomplete; 3) There are unresolved questions about nonclinical safety; or 4) Human subjects may be exposed to unreasonable and significant risk.[123]

- Bioresearch Monitoring Inspections: The Office of Scientific Investigations (OSI) conducts over one thousand "on-site inspections, data audits and remote regulatory assessments" each year in order to ensure that evidence submitted to FDA is scientifically reliable, ethically obtained, and compliant with federal regulations and has required drug sponsors to repeat studies performed at facilities where it identified data integrity issues, such as poor report keeping, falsifying data and manipulating study participant samples.[124]

- Clinicaltrials.gov reporting: If a responsible party (e.g., drug company sponsor) fails to comply with the requirements of registering and submitting clinical trial data results to ClinicalTrials.gov, FDA has the legal authority to issue a publicly available Notice of Noncompliance, assess civil money penalties and, in the event of continued noncompliance, pursue an injunction or criminal prosecution.[125]

(84)    FDA enforces compliance with a progressive hierarchy of additional legal and statutory actions, starting with an FDA Form 483 issued after an inspection to document "objectionable conditions" that may violate regulations.[126] The firm is given a chance to voluntarily correct the issues; failure to provide an adequate response often leads to a more serious, publicly issued Warning Letter, which notifies the company of significant violations and the need for prompt action.[127] If significant issues persist, FDA can pursue further legal actions, including assessing Civil Monetary Penalties for

---

[123]  21 CFR 312.42.

[124]  U.S. Food and Drug Administration, "Office of Scientific Investigations," updated Feb. 13, 2024, https://www.fda.gov/about-fda/cder-offices-and-divisions/office-scientific-investigations.

Office of Scientific Investigations, "Fiscal Year 2023 Annual Report," Feb. 2024, at 3, *available at* https://www.fda.gov/media/176281/download?attachment.

U.S. Food and Drug Administration, "Bioresearch Monitoring Program Information," updated Dec. 2, 2025, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/fda-bioresearch-monitoring-information/bioresearch-monitoring-program-information.

U.S. Food and Drug Administration, "Notification to Pharmaceutical Companies: Clinical and Bioanalytical Studies Conducted by Semler Research Are Unacceptable," updated Apr. 20, 2016, https://www.fda.gov/drugs/drug-safety-and-availability/notification-pharmaceutical-companies-clinical-and-bioanalytical-studies-conducted-semler-research.

U.S. Food and Drug Administration, "FDA to pharmaceutical companies: Certain studies conducted by Raptim Research Pvt. Ltd. are unacceptable," updated Mar. 28, 2025, https://www.fda.gov/drugs/drug-safety-and-availability/fda-pharmaceutical-companies-certain-studies-conducted-raptim-research-pvt-ltd-are-unacceptable.

[125]  U.S. Food and Drug Administration, "ClinicalTrials.gov - Notices of Noncompliance and Civil Money Penalty Actions," updated Feb. 5, 2026, https://www.fda.gov/science-research/fdas-role-clinicaltrialsgov-information/clinicaltrialsgov-notices-noncompliance-and-civil-money-penalty-actions.

[126]  Asha Kattige, "FDA 483 - Navigating Compliance Challenges," Scendea, Aug. 2021, https://www.scendea.com/articles/fda-483-navigating-compliance-challenges.

[127]  Asha Kattige, "FDA 483 - Navigating Compliance Challenges," Scendea, Aug. 2021, https://www.scendea.com/articles/fda-483-navigating-compliance-challenges.

---

Expert Report of Brian E. Harvey, MD PhD

specific violations like failing to report clinical trial data, with potential fines per violation.[128] One of FDA's most severe enforcement tool is a Consent Decree, a legally binding, court-supervised agreement typically implemented for firms with repeated, systemic violations, requiring extensive, long-term remediation, third-party oversight and potential substantial financial penalties for non-compliance.[129]

(85)    In FY 2024, FDA issued 190 warning letters to drug and biologics manufacturers.[130] As an example of Form 483 being escalated to a Warning Letter, in December 2025, FDA issued a significant Warning Letter to Unipack LLC (Warning Letter #716621) centered on severe data integrity and laboratory control failures.[131] Investigators found that analysts were granted administrative rights to chromatographic systems, allowing them to delete or modify raw data and assay calculation folders without oversight.[132] The audit trails revealed numerous "deleted system" errors that the company failed to investigate, indicating a systemic breakdown in the Quality Unit's ability to ensure record reliability.[133] This case reflects a trend where FDA scrutinizes computer system controls, as seen in other recent actions against firms like Eugia Pharma (Aurobindo) and Applied Therapeutics for non-contemporaneous documentation and clinical trial data discrepancies.[134]

(86)    After a company submits an FDA Form 483 response, the agency conducts a formal review to assign a compliance classification based on the severity of findings and the adequacy of the proposed remediation.[135] If the response is deemed satisfactory, the facility may be classified as Voluntary

---

[128] U.S. Food and Drug Administration, "ClinicalTrials.gov - Notices of Noncompliance and Civil Money Penalty Actions," updated Feb. 5, 2026, https://www.fda.gov/science-research/fdas-role-clinicaltrialsgov-information/clinicaltrialsgov-notices-noncompliance-and-civil-money-penalty-actions.

[129] Beth Weinman, Josh Oyster, and Jessica Band, "Deconstructing the Consent Decree: A Primer and Recent Trends for FDCA Injunctions," Food & Drug Law Institute, 2020, https://www.fdli.org/2020/11/deconstructing-the-consent-decree-a-primer-and-recent-trends-for-fdca-injunctions/.

[130] Liz Oestreich, Kalah Auchincloss, and Erin Hartmann, "Trends In FDA FY 2024 Inspection-Based Warning Letters," Outsourced Pharma, Mar. 7, 2025, https://www.outsourcedpharma.com/doc/trends-in-fda-fy-2024-inspection-based-warning-letters-0001.

[131] U.S. Food and Drug Administration, "Warning Letter: Unipack LLC," Reference no. 320-26-32, Dec. 19, 2025, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/unipack-llc-716621-12192025.

[132] U.S. Food and Drug Administration, "Warning Letter: Unipack LLC," Reference no. 320-26-32, Dec. 19, 2025, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/unipack-llc-716621-12192025.

[133] U.S. Food and Drug Administration, "Warning Letter: Unipack LLC," Reference no. 320-26-32, Dec. 19, 2025, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/unipack-llc-716621-12192025.

[134] U.S. Food and Drug Administration, "Warning Letter: Eugia Pharma Specialities Limited," Reference no. 320-24-55, Aug. 15, 2024, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/eugia-pharma-specialities-limited-681905-08152024.

U.S. Food and Drug Administration, "Warning Letter: Applied Therapeutics, Inc," Reference no. 24-HFD-45-11-01, Dec. 3, 2024, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/applied-therapeutics-inc-696833-12032024.

[135] Miah Jung et al., "An FDA Analysis of Inspected Entities After Receiving Official Action Indicated Letters for Good

---

Expert Report of Brian E. Harvey, MD PhD

Action Indicated (VAI), requiring no further immediate legal action but necessitating a verification of CAPA effectiveness during the next inspection.[136] However, if the response is insufficient, lacking a robust Root Cause Analysis, or failing to address systemic issues, FDA may escalate the matter to OAI, which often results in a public Warning Letter or the withholding of product approvals.[137] Firms are expected to maintain an "inspection-ready" state by providing periodic progress updates every 4– 8 weeks until all Establishment Inspection Report (EIR) concerns are formally resolved and documented. OAI is the most serious FDA inspection classification, assigned when an investigator identifies significant objectionable conditions that require formal regulatory or administrative intervention. Unlike a VAI status, where the agency trusts the firm to correct minor issues voluntarily, an OAI status signals that FDA has lost confidence in the facility's ability to maintain compliance without legal pressure.[138]

**Figure 4: FDA classification levels**

| Classification | Meaning | Action level |
|---|---|---|
| NAI | No Action Indicated | No violations found; facility is in full compliance |
| VAI | Voluntary Action Indicated | Minor violations; firm is expected to correct them voluntarily |
| OAI | Official Action Indicated | Serious violations; FDA recommends formal enforcement |

Source: U.S. Food & Drug Administration, "Inspections Database Frequently Asked Questions," updated Sep. 13, 2024, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspections-database-frequently-asked-questions.

## VI.B.2. If FDA had concluded that simufilam's clinical program was based upon fabricated data or a fraudulent scientific premise as alleged, FDA would have taken some regulatory action

(87)    As demonstrated by its thorough responses during frequent interactions with Cassava during the 2017–2023 period described in Section VI.A above, FDA reviewed Cassava's clinical trial data in detail and would have taken note of data, methods, or protocols that appeared to be fraudulent or

---

Clinical Practice Violations," *Therapeutic Innovation & Regulatory Science* 55, no. 5, (2021): 907–17, *available at* https://doi.org/10.1007/s43441-021-00267-y.

[136] Miah Jung et al., "An FDA Analysis of Inspected Entities After Receiving Official Action Indicated Letters for Good Clinical Practice Violations," *Therapeutic Innovation & Regulatory Science* 55, no. 5, (2021): 907–17, *available at* https://doi.org/10.1007/s43441-021-00267-y.

[137] Miah Jung et al., "An FDA Analysis of Inspected Entities After Receiving Official Action Indicated Letters for Good Clinical Practice Violations," *Therapeutic Innovation & Regulatory Science* 55, no. 5, (2021): 907–17, *available at* https://doi.org/10.1007/s43441-021-00267-y.

Asha Kattige, "FDA 483 - Navigating Compliance Challenges," Scendea, Aug. 2021, https://www.scendea.com/articles/fda-483-navigating-compliance-challenges.

[138] Miah Jung et al., "An FDA Analysis of Inspected Entities After Receiving Official Action Indicated Letters for Good Clinical Practice Violations," *Therapeutic Innovation & Regulatory Science* 55, no. 5, (2021): 907–17, *available at* https://doi.org/10.1007/s43441-021-00267-y.

Expert Report of Brian E. Harvey, MD PhD

manipulated. For example, in response to Cassava's question "Does FDA have any comments or questions regarding the underlying sciences of PTI-125?" posed during the Type C meeting in early 2020 during Cassava's Phase 2 trials, FDA stated "We have carefully reviewed the summary of pertinent data that you have presented in this submission. At the present time, we have no questions or comments about those data."[139] FDA would also have had access to Cassava's clinical trial protocols and results data posted on clinicaltrials.gov throughout the development process. FDA could have utilized its enforcement powers if it had evidence that company misconduct resulted in the posting of false or inaccurate information.

(88)   The independent DSMB/DMC, as well as FDA had the role of clinical trial oversight during the entire Cassava development program. It is clear that these regulatory mechanisms are the appropriate methods for patient safety monitoring, since both groups are enabled to examine all data from every step in drug development and are bound by strict rules of conduct.

(89)   Moreover, as discussed in Section VI.A above, FDA was made aware of the allegations concerning simufilam data integrity through multiple avenues and then investigated these allegations. In particular, FDA views Citizen Petitions very seriously and would have taken action had it believed it was necessary in order to ensure clinical trial integrity and protect patient safety.

(90)   As discussed above, FDA has many tools and enforcement actions at its disposal to identify and take action against data manipulation, including clinical holds and Warning Letters. If nonclinical data are unreliable, incomplete, or potentially fabricated, FDA would—and often does—halt a trial, under either a partial or complete clinical hold. In particular, this is not a rare event since FDA placed clinical holds on trials for experimental drugs a reported 664 times each year on average between 2017 to 2021.[140] For example, in 2019, FDA suspended several clinical trials studying Venclexta in combination with other drugs to treat patients with multiple myeloma because of an increased risk of death among study participants compared to the control group.[141] FDA placed the trial of Vertex Pharmaceuticals Type 1 diabetes cell therapy product on clinical hold in 2022 because it felt that the company had insufficient information to support a higher dose after testing a lower dose in two patients.[142]

(91)   However, FDA did not place a clinical hold on Cassava's program nor issue a Warning Letter in this instance. The agency instead allowed Phase 3 trials to proceed after a rigorous SPA process. If FDA

---

[139] CASSAVA_000189877 at -9881.

[140] Liz Essley Whyte, "FDA Increasingly Halting Human Trials as Companies Pursue Risky, Cutting-Edge Drugs; Agency places more holds on trials to protect patients, ensure studies are designed properly, Wall Street Journal review finds," *Wall Street Journal*, Jan. 10, 2023.

[141] U.S. Food and Drug Administration, "FDA In Brief: FDA warns about safety concerns related to investigational use of Venclexta (venetoclax) for multiple myeloma," Mar. 21, 2019, https://www.fda.gov/news-events/fda-brief/fda-brief-fda-warns-about-safety-concerns-related-investigational-use-venclexta-venetoclax-multiple.

[142] Vertex, "Vertex Provides Updates on Phase 1/2 Clinical Trial of VX-880 for the Treatment of Type 1 Diabetes," press release, May 2, 2022, *available at* https://news.vrtx.com/node/29856/pdf.

Expert Report of Brian E. Harvey, MD PhD

believed that Cassava's development program was akin to Theranos V2 founded on fraudulent science, it would not have placed Alzheimer's Disease patients' safety at risk by allowing Phase 3 trials to proceed.

## VI.C. Nothing that FDA communicated to Cassava indicated that the agency believed that the simufilam clinical trial data was fabricated or based upon fraudulent science

(92)    As the events described in Section V.A above demonstrate, FDA maintained consistent and substantive oversight of simufilam development from the pre-IND stage through the close of Phase 3 trials. At each stage in the process, FDA reviewed Cassava's clinical data, requested additional studies, provided detailed written feedback, and required protocol modifications before allowing studies to proceed. In response, Cassava answered FDA questions, implemented the recommended changes, and supplied additional data as requested. At no point in these extensive interactions did FDA suggest that Cassava's clinical data were fabricated, fraudulent, or otherwise unreliable. On the contrary, FDA's consistent endorsement of the continuation of Cassava's clinical program and ultimate agreement that the Phase 3 trials could support a regulatory submission are inconsistent with the public accusations and Tweets made by Plaintiffs.

(93)    FDA communications during an IND-stage development program must be interpreted in context. As a former FDA medical officer and regulatory professional, I am familiar with how FDA communicates (i) routine scientific feedback, (ii) evidentiary and design expectations, (iii) ordinary requests for supporting information, and (iv) inspectional observations that require corrective action. Importantly, FDA generally does not "announce" fraud conclusions to sponsors through routine meeting minutes, written responses, protocol comments, or inspection correspondence. When FDA believes a sponsor's development program rests on fabricated evidence, the agency's posture typically shifts from scientific dialogue to enforcement-oriented action, such as restrictive clinical holds, disqualification proceedings, formal integrity findings, or other steps aimed at preventing reliance on untrustworthy evidence

(94)    The record of FDA's communications with Cassava—spanning Pre-IND, IND "study may proceed," Type C feedback, EOP2 feedback, SPA process, clinical information requests, and inspection-related correspondence—reflects a familiar pattern: FDA engaged on scientific and regulatory questions, evaluated allegations and related concerns through ordinary regulatory tools and required risk-mitigation steps where it could not independently verify discrete analyses. None of these communications, individually or collectively, are indicative of FDA concluding that Cassava's program was premised on fraud.

Expert Report of Brian E. Harvey, MD PhD

(95)    FDA's early-stage interactions with sponsors, including Pre-IND comments and IND review correspondence, are principally aimed at: (i) patient safety, (ii) adequacy of monitoring, (iii) chemistry/manufacturing controls, and (iv) whether proposed studies are sufficiently designed to generate interpretable results. FDA routinely recommends modifications to dose escalation, inclusion/exclusion criteria, stopping rules, pharmacokinetic sampling and informed consent. Those types of comments are not how FDA traditionally communicates a conclusion that clinical or nonclinical evidence is fabricated. Rather, they represent what FDA does when it is treating a sponsor as a legitimate applicant operating within the agency's IND framework.

(96)    Accordingly, FDA Pre-IND and IND-stage communications, including the "Study May Proceed" letter with recommended modifications, are best understood as standard regulatory oversight and study optimization, not as any form of fraud determination.

(97)    FDA's expedited-development programs (e.g., Breakthrough Therapy Designation) apply heightened evidentiary criteria. FDA may, and frequently does, deny such designations for many reasons wholly unrelated to data integrity—such as inadequate comparative context, insufficient demonstration of clinical benefit, limitations of open-label designs, incomplete statistical presentation, lack of validated linkage between biomarkers and clinical outcomes, or the need for more robust efficacy data.

(98)    For those reasons, FDA denial of expedited-program status should not be reframed as a marker of fraud. A denial means FDA is not persuaded that the submission satisfies the specific designation criteria at that point in time. It does not mean FDA believes the sponsor fabricated its results. If FDA had concluded that the underlying evidence was fraudulent, one would expect FDA to focus on reliability and integrity and to take protective action regarding ongoing or planned studies—not merely to deny an expedited designation while continuing ordinary scientific engagement.

(99)    The EOP2 process and SPA review require FDA to engage on matters that would be unproductive if FDA believed the development program were founded on fabricated science. During these interactions, FDA addresses endpoints, estimands, statistical powering, dosing arms, monitoring and other design elements aimed at producing interpretable Phase 3 efficacy and safety evidence.

(100)    The SPA sequence described in the record—initial SPA feedback requiring changes, followed by Cassava's incorporation of FDA requested revisions and the agency's subsequent SPA agreement— fits the standard pattern of regulatory alignment on Phase 3 design. This is not how FDA behaves when it believes the sponsor's foundational evidence is fabricated. In my experience, FDA does not invest in refining Phase 3 protocols through a structured SPA process if it has already concluded that the program rests on fraud; instead, FDA's posture typically becomes restrictive, with the agency seeking to prevent patient exposure and prevent reliance on unreliable evidence. In my experience, FDA approval of any SPA is rare.

Expert Report of Brian E. Harvey, MD PhD

(101)    FDA frequently issues targeted information requests during IND development. Such requests commonly seek clarification about data sources, analytical methods, identities of laboratories, validation reports and underlying datasets. This is particularly true when a sponsor's public disclosures, prior submissions, or evolving scientific questions raise issues FDA wants to understand more fully.

(102)    FDA's November 2021 requests—asking which laboratories performed certain bioanalyses, which laboratories handled raw samples and requesting raw datasets and associated validation reports—are consistent with FDA doing what it is supposed to do: probe data provenance, assess interpretability and test reliability through documentation following the public allegations against Cassava.[143] Those steps are not, standing alone, a "fraud conclusion." They are more accurately described as standard operating procedures, regulatory due diligence and fact development.

(103)    If FDA had concluded fraud following those exchanges, the agency's next steps would typically be framed as protective or enforcement-driven, with involvement of other agency offices beyond the premarket review division, which I have not seen any indication of in the record I have reviewed.

(104)    FDA Form 483 inspectional observations and Establishment Inspection Reports (EIRs) are mechanisms FDA utilizes to document inspectional observations and compliance concerns. They are frequently directed at recordkeeping, documentation completeness, method validation practices, audit trails, equipment calibration, access controls and other quality-system fundamentals.

(105)    Critically, Form 483 observations are not final agency determinations and they are not an FDA finding that fraud occurred. FDA makes integrity findings through explicit final determinations, or by initiating a specific enforcement action grounded. The types of issues described (e.g., validation practices, documentation gaps, audit trail controls, calibration documentation) are serious and require remediation, but they exist on a spectrum of compliance concerns. They do not equate to "fabrication," and they do not establish that FDA concluded any falsification occurred.

(106)    Thus, FDA's issuance of inspection-related observations here is properly interpreted as FDA identifying deficiencies and requiring corrective action, not as FDA concluding that Cassava's program was fraudulent.

(107)    FDA's directive to remove certain CSF figures and text from the Investigator's Brochure (IB), on the stated basis that FDA could not verify the reliability of that specific dataset during its inspection/investigation and that inclusion could be "potentially misleading," is best understood as a bounded regulatory risk-mitigation step.

---

[143]  CASSAVA_000016365.

Expert Report of Brian E. Harvey, MD PhD

(108)    In practice, FDA can require sponsors to revise investigator-facing materials when FDA believes certain content could mislead investigators or subjects, is not sufficiently substantiated for the purpose presented, or cannot be independently verified at the time. That decision:

        A.  does not require FDA to conclude the data were fabricated;

        B.  is consistent with FDA taking a conservative approach where verification is incomplete; and

        C.  is also consistent with FDA continuing to permit ongoing development while narrowing how particular analyses are characterized in investigator communications.

(109)    If FDA had concluded that fraud had occurred in a way that undermined the premise of the clinical program, FDA would have moved beyond Investigator's Brochure (IB) document edits and toward actions aimed at preventing continued reliance on the program as a whole. The IB-related step described here is consistent with compartmentalization—addressing a discrete evidentiary component—not with a global conclusion that the clinical program was based on fabricated science.

(110)    Taking the agency communications as a whole, the record reflects: (i) ongoing scientific engagement, (ii) iterative protocol refinement, (iii) targeted information requests to understand data provenance and reliability, (iv) inspectional observations requiring corrective action, and (v) bounded modifications to investigator-facing materials where FDA could not verify specific analyses at the time. That pattern is materially different from the pattern expected when FDA has concluded a sponsor's program is premised on fabricated evidence.

(111)    Furthermore, contrary to Plaintiff's claims that simufilam was ineffective and only advanced to Phase 3 because its Phase 2 data was fabricated, the Phase 3 (REFOCUS-ALZ) NCT05026177 was NOT a "failed trial"—it was a "terminated trial" with only ~50% of enrolled patients completing endpoints at 76 weeks.[144] Had there not been legally induced economic pressures to halt the simufilam Alzheimer's Disease development program, the company could have continued the 76-week Phase 3 until all patients generated clinical endpoint data, as agreed to in the SPA by both Cassava and FDA. These clinical endpoints of longer duration bring a more realistic opportunity for this drug or any drug to impact a chronic disease lasting decades, including Alzheimer's Disease.

(112)    For these reasons, based upon my training and experience, I conclude that FDA communications to Cassava were not indicative of the agency concluding that fraud had occurred and a reasonable sponsor in Cassava's position could interpret FDA posture as consistent with continued regulatory

---

[144] Clinicaltrials.gov, "Simufilam 50 mg or 100 mg for Mild-to-Moderate Alzheimer's Disease (REFOCUS-ALZ)," updated Sep. 22, 2025, https://clinicaltrials.gov/study/NCT05026177.

Expert Report of Brian E. Harvey, MD PhD

engagement and oversight rather than an agency determination that the program was founded on fraudulent science.

Expert Report of Brian E. Harvey, MD PhD

Brian E. Harvey, MD PhD

February 27, 2026

Date

Confidential
Subject to Protective Order

Expert Report of Brian E. Harvey, MD PhD

# Appendix A. Curriculum Vitae of Brian E. Harvey, MD, PhD

**Brian E. Harvey, MD, PhD**
beharvey@comcast.net

## SUMMARY

Experience in biopharmaceutical industry, biomedical research, clinical medicine, drug, biologics, medical device and combination product development, including over 11 years of FDA regulatory experience in the Centers for Drugs, Biologics and Devices in medical officer review and management positions.

## EXPERIENCE

**Brian E Harvey LLC**                                          **2015 – Present**
**Principal Consultant**

- Regulatory Strategy
- Drug & Biologics Meetings: Pre-IND, End of Phase 2, Pre-NDA/BLA
- Drug NDA 505(b)(1) & NDA 505(b)(2)
- Authorized Generics (sNDA)
- Biologicals BLA & supplements
- Biosimilars 351(k) BLA
- Combination Products
- Medical Devices, including IVDs
- Rare Disease/Orphan Product Development
- Expert Biopharmaceutical Development Regulatory Consultant
- Regulatory Strategy, Clinical Trial Design, Health Authority Interactions
- U.S. FDA Regulatory Policy, Process & Procedure Expert Witness
- Due Diligence & Portfolio Analysis
- Global Liver Institute (Non-Profit) Founding Board Member & Regulatory Advisor
- Entrepreneur In Residence (EIR) at Yale University, Yale Ventures

Expert Report of Brian E. Harvey, MD PhD

**Pfizer, Inc.**                                                    **2012 – 2015**
**Vice President U.S. Regulatory Strategy**

- Signatory Authority for all Regulatory NDA & BLA Submissions to FDA
- Regulatory Strategy impact across all Pfizer business units
- Member of CEO's Senior Leadership Council (SLC)
- Liaison for Medical Device Regulatory including Software Medical Devices
- PhRMA Regulatory Affairs Coordination Committee (RACC) member
- Oversight of U.S. Regulatory Policy & Intelligence functions
- Responsible for U.S. Advertising & Promotion regulatory activities
- PDUFA VI Preparation, PhRMA Steering Committee & 21st Century Cures

**Sanofi Aventis**                                                 **2007 – 2012**
**Vice President U.S. Regulatory Policy**

- Liaison with U.S. Food and Drug Administration (FDA)
- PhRMA Committees: Regulatory Affairs Coordinating Committee (RACC), Asian Pacific Technical Committee, International Biologics, Biotechnology Taskforce and Biologics Key Issues Team & Biosimilars
- Biotechnology Industry Organization (BIO) Regulatory Affairs Committee
- Member of the internal Drug Induced Liver Disease (Dili) Committee
- Signatory authority for Sanofi written comments to FDA docket
- Member of Sanofi Policy Development Committee
- PDUFA V Preparation, Passage & Implementation regulatory activities

**Food & Drug Administration**                                     **2005 – 2007**
**Center for Drug Evaluation and Research (CDER)**
**Director, Division of Gastroenterology Products (GS-602-15)**

- Leader of regulatory team for submissions to FDA: IND, NDA, BLA, SPA
- Front line manager for division consisting of 35-40 professionals representing medical officers, project management, pharmacology, toxicology and secretarial support; responsible for personnel issues, budget, travel, training, employee development and awards/recognition
- Created review team dedicated to inborn errors of metabolism products
- Ongoing interactions with senior FDA leadership
- CDER PDUFA IV Working Groups
- Led regulatory review teams that approved first ever treatments for pediatric Crohn's disease, Pompe's disease and Hunter's syndrome
- Experience with risk management programs for approved drugs and biologic products, including RiskMAPs and Medication guides
- Visiting Professor, Mass General Hospital, Division of Gastroenterology

Expert Report of Brian E. Harvey, MD PhD

**Food & Drug Administration**                                    **2003 – 2005**
**Center for Drug Evaluation and Research (CDER)**
**Deputy Director, Office of Drug Evaluation 5 (120 people)**
**Director (Acting), Division of Anti-Inflammatory, Analgesic and Ophthalmologic**
**Drug Products (GS-602-15)**

- Broad range of regulatory experience involving drug development and approvals in the therapeutic areas of rheumatology, analgesia, ophthalmology, dental and dermatology, as well as over-the-counter (OTC) products
- Management experience at office and division levels
- First hand experience with senior FDA leadership
- Extensive experience in writing, editing and clearing FDA talk papers, press releases, question/answer (Qs/As) documents, briefing memos, background research for congressional testimony, responses to congressional inquiries and chairman letters
- FDA lead in planning and coordinating public joint advisory committee meeting on COX-2 drug products (February 2005)
- Member of Senior Leadership Team (SLT 1) that led planning and execution of the Office of New Drugs (OND) wide reorganization
- Led multidisciplinary regulatory team for NDA review with large complex datasets and multiple proposed indications for use

**Food & Drug Administration**                                    **2002 – 2003**
**Center for Biologics Evaluation and Research (CBER)**
**Associate Director Regulatory Policy (GS-602-15)**

- Advised Office Director on policy related to therapeutic biologics
- Provided consulting opinions on jurisdictional decisions regarding biologics, drugs and medical devices
- Worked with multidisciplinary team to develop CBER guidelines on therapeutic biologic comparability prior to the current formalized ICH guidance
- CBER member PDUFA III working group
- Team Member Prescription Drug Labeling Initiative
- Led team charged with updating signatory authority procedures and regulations as part of the CBER to CDER transfer of the therapeutic biologic products (2003)

**American Political Science Association (APSA)**          **2000 – 2001**
**Congressional Fellow (On detail from U.S. Food & Drug Administration)**

Expert Report of Brian E. Harvey, MD PhD

- Legislative staff experience in Senate Judiciary & Finance committees
- Worked with staff on Health (HELP) committee on legislative initiatives
- Contributed background research to Senate personal staff and communications director on health and science issues
- Wrote daily briefing memos for the Senator
- Wrote talking points and drafts for selected portions of speeches for Senator, including floor statements in support of legislation
- Wrote responses to constituent letters
- Represented the Senator in meetings with constituent and advocacy groups; staffed meetings when the Senator was in attendance
- Completed introductory and advanced Congressional Research Service (CRS) courses on the legislative procedures in the House and Senate
- Attended legislative policy seminars at the American University, Brookings Institution, The Institute of Medicine (IOM) at the National Academy of Sciences, the Johns Hopkins School of Government,

**Food & Drug Administration**                                    **1995 – 2002**
**Center for Devices and Radiological Health (CDRH)**
**Medical Officer (GS-602-14/15)**

- Broad range of regulatory review and supervisory experience involving medical device development, clearance and approvals in gastroenterology, hepatology, renal, gynecology, cardiology, surgery and *in vitro* diagnostics
- Medical Reviewer for IDE, PMA, 510(k), HDE, De Novo & Combination Products
- Presented FDA device policy at academic and professional meetings
- Represented FDA and presented medical device regulatory information at public HCFA (CMS) Medicare Coverage Advisory Committee meeting
- CDC working group that led to published MMWR Guidelines for Laboratory Testing and Results Reporting of Antibody to Hepatitis C
- Worked with CBER review team as gastroenterology medical officer for first FDA approval for the treatment of Crohn's disease
- Presented and participated in FDA public advisory committee meetings
- Visiting Professor, University of Virginia School of Medicine
- Presentation of FDA activities to visiting congressional delegations
- Member of CDRH CMS-FDA collaboration for developing data analysis criteria for medical device reimbursement
- NIH Digestive Diseases Interagency Coordinating Committee member
- PDUFA II Activities

## CLINICAL & RELATED EXPERIENCE

**Outside Activities**                                              **1995 – 2010**

Confidential
Subject to Protective Order

Expert Report of Brian E. Harvey, MD PhD

- Medical Hospitalist, Anne Arundel Medical Center, Annapolis, MD,
- Physician, Shipley's Care After Hours, Millersville, MD,
- Physician, Anne Arundel Medical Center ER, Annapolis, MD,

**Other Experience**

- Harvard Hospital Quality Assessment Study, Harvard School of Public Health, Boston, MA, 1991
- Global Liver Institute (GLI), Washington, DC (current)
- Yale University, EIR, New Haven, CT (current)

## EDUCATION

| | |
|---|---|
| Johns Hopkins Hospital, Baltimore, MD | |
| Gastroenterology & Hepatology Fellowship | **1992 – 1995** |
| | |
| Beth Israel Hospital, Boston, MA | |
| Internal Medicine Internship & Residency | |
| Clinical Fellow in Medicine Harvard | **1989 – 1992** |
| | |
| New England Deaconess Hospital, Boston, MA | |
| Postdoctoral Research | **1988 – 1989** |
| | |
| University of Connecticut School of Medicine, Farmington, CT | |
| Medical Degree | **1985 – 1989** |
| | |
| University of Connecticut, Storrs, CT | |
| Ph.D., Biochemistry | **1980 – 1985** |
| | |
| Middlebury College, Middlebury, VT | |
| B.A., Biology/Chemistry (Minor-Economic Theory) | **1976 – 1980** |

## PROFESSIONAL HONORS

- Commissioner's Special Citation for TOPOFF 3 (2006), FDA
- Outstanding Service Award (2005), FDA
- CDER Leadership Award (2004), FDA
- Group Special Recognition Award (2004), FDA
- Hammer Award (2000), National Partnership for Reinventing Government
- Group Special Recognition Award (2000), FDA
- Excellence in Review Science (2000), Infliximab Licensing Group, FDA
- Individual Special Recognition Award (1998), FDA

Expert Report of Brian E. Harvey, MD PhD

- Reclassification Group Recognition Award (1998), FDA
- PMA Transformation Team Achievement Award (1997), FDA
- Office of Women's Health Recognition Award (1997), FDA
- Individual Special Recognition Award (1996), FDA
- Group Special Recognition Award (1996), FDA
- Scholar in Medicine, University of Connecticut School of Medicine
- Merck Internal Medicine Prize, University of Connecticut School of Medicine
- Dean's List and Honors graduate, Middlebury College
- United Technologies Corporation Scholar, Middlebury College
- Bausch & Lomb Science Award

## SELECTED PUBLICATIONS & BOOK CHAPTERS

The Complex Pathophysiology of Metabolic dysfunction-Associated SteatoHepatitis (MASH) May Complicate FDA Accelerated Approval Regulatory Paradigm.
**Harvey, BE.** *Endocrinol Diabetes Metab J* Volume 10(1): 1–3 (2025).
DOI: 10.31038/EDMJ.20261012
https://researchopenworld.com/wp-content/uploads/2025/12/EDMJ-10-1012.pdf

How improvements in US FDA regulatory process and procedures led to the drug approval for first ever treatment of a common liver disease.

**Harvey, BE.** *Acta Pharmacologica Sinica 46*, 515–524 (2025).

https://doi.org/10.1038/s41401-024-01396-4

NASH: regulatory considerations for clinical drug development and U.S. FDA approval. **Harvey, BE.** *Acta Pharmacol Sin* **43**, 1210–1214 (2022).

https://doi.org/10.1038/s41401-021-00832-z
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9061714/pdf/41401_2021_Article_83 2.pdf

Regulatory Considerations for Early Clinical Development of Drugs for Diabetes, Obesity, Nonalcoholic Steatohepatitis (NASH) and Other Cardiometabolic Disorders. In: Krentz A., Weyer C., Hompesch M. (eds) Translational Research Methods in Diabetes, Obesity, and Nonalcoholic Fatty Liver Disease. Fleming

Expert Report of Brian E. Harvey, MD PhD

G.A., **Harvey B.E.** (2019)  Springer, Cham. https://doi.org/10.1007/978-3-030-11748-1_19

Targeting neurons in the gastrointestinal tract to treat Parkinson's disease. Robert A Hauser, Dean Sutherland, Juan A Madrid, Maria Angeles Rol, Steven Frucht, Stuart Isaacson, Fernando Pagan, Brian N Maddux, George Li, Winona Tse, Benjamin L Walter, Rajeev Kumar, Daniel Kremens, Mark F Lew, Aaron Ellenbogen, Odinachi Oguh, Alberto Vasquez, William Kinney, Matt Lowery, Maria Resnick, Nicole Huff, Jerry Posner, Karla V Ballman, **Brian E Harvey**, Michael Camilleri, Michael Zasloff, Denise Barbut.  Clin Park Relat Disord. 2019 Jul 2:1:2–7.  doi: 10.1016/j.prdoa.2019.06.001

Assessment and reporting of clinical pharmacology information in drug labeling. Spyker DA, Harvey ED, **Harvey BE**, Harvey AM, Rumack BH, Peck CC, Atkinson AJ Jr, Woosley RL, Abernethy DR, Cantilena LR.
Clin Pharmacol Ther. 2000 Mar;67(3):196–200.

Regulatory policy and computer assisted imaging technologies: Is "virtual colonoscopy" an implied claim?
**Harvey, BE**, Alpert S.   Gastrointestinal Endoscopy.  1997; 45(4)
DOI:10.1016/S0016-5107(97)80027-2

Patient safety and efficacy as measured by clinical trials and regulatory policy.
**Harvey BE**, Alpert S.
Stud Health Technol Inform. 1997;39:75–9.

Inhibition of CMP-sialic acid transport in human liver and colorectal cancer cell lines by a sialic acid nucleoside conjugate (KI-8110).
**Harvey BE**, Thomas P.
Biochem Biophys Res Commun. 1993 Jan 29;190(2):571–5.

Sialyltransferase activity and hepatic tumor growth in a nude mouse model of colorectal cancer metastases.
**Harvey BE**, Toth CA, Wagner HE, Steele GD Jr, Thomas P.
Cancer Res. 1992 Apr 1;52(7):1775–9.

Confidential
Subject to Protective Order

Expert Report of Brian E. Harvey, MD PhD

<u>Biosynthesis of glycerolipids by hepatoma and liver microsomes. I. Fatty acyl-CoA ligase and acyl-CoA:sn-glycerol-3-phosphate acyltransferase.</u>
**Harvey BE**, Crain RC.
Biochim Biophys Acta. 1987 Feb 14;917(2):247–57.

<u>Role of lipid transfer proteins in the abnormal lipid content of Morris hepatoma mitochondria and microsomes.</u>
Crain RC, Clark RW, **Harvey BE**.
Cancer Res. 1983 Jul;43(7):3197–202.

## EXPERT TESTIMONY

*Sunovion Pharmaceuticals, Inc., v. BIAL-Portela & CA, S.A.,*
Case No. 21698/TO (Int'l Chamber of Commerce, Int'l Ct. of Arbitration,
(Three Judge Arbitration Panel, London, UK, October 2016)

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE PATENT TRIAL AND APPEAL BOARD
COHERUS BIOSCIENCES INC.,
Petitioner, v. ABBVIE BIOTECHNOLOGY LTD.,
Patent Owner.  Case IPR2016-00188 (2016)
Patent No. 9,017,680
(Washington DC, Deposition November 2016)

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE PATENT TRIAL AND APPEAL BOARD
BOEHRINGER INGELHEIM INTERNATIONAL GMBH and
BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.,
Petitioner, v. ABBVIE BIOTECHNOLOGY LTD.,
Patent Owner.  Case IPR2016-00409 (2016)
Patent No. 8,889,135 B2
(Washington DC, Deposition January 2017)

*Paul Radzik v. Connecticut Children's Medical Center,*
HHDCV095027092S, CT Super. Ct. filed February 9, 2009.
(Deposition September 2016 and Jury Trial, Harford CT, January 2017)

Expert Report of Brian E. Harvey, MD PhD

*Estate of Richard Bigler, Plaintiffs, v. OLYMPUS AMERICA INC., and VIRGINIA MASON* MEDICAL CENTER, Case No. 15-2-05472-4-SEA, (Deposition March 2017 and Jury Trial, Seattle, WA, June 2017)

*Geralynn Boone, et al. v. Boehringer Ingelheim Pharmaceuticals, Inc., et al.,* Case No. X03-HHD-CV16-6067796-S, Conn. Super., Hartford Co. (Washington DC, Deposition November 2017 and February 2018)

Zofran (Ondansetron) Prods. Liab. Litig., 541 F. Supp. 3d 164, 178 (D. Mass. 2021) I submitted an Expert report in this case September 26, 2018, but did not subsequently testify since the  motion for summary judgment based on federal preemption was GRANTED. "This memorandum and order shall apply to all cases presently pending in this multi-district litigation proceeding." In re Zofran (Ondansetron) Prods. Liab. Litig., 541 F. Supp. 3d 164, 206 (D. Mass. 2021) https://casetext.com/case/in-re-zofran-ondansetron-prods-liab-litig-8

AMERICAN ARBITRATION ASSOCATION INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION CASE NO. 01-17-0003-0930 SELEX GALILEO, INC., Claimant NOMIR MEDICAL TECHNOLOGIES, INC., Respondent (New York, NY January 2020)

INTERNATIONAL CHAMBER OF COMMERCE INTERNATIONAL COURT OF ARBITRATION ICC CASE NO. 23681/MK LOCL PHARMA, INC. (d/b/a Charleston Laboratories Delaware), Claimant DAIICHI SANKYO COMPANY, LIMITED, Respondent (NJ & Virtual, July 2020)

ICC Case No. 25658/pdp Ambio Inc. Claimant v. Sandoz Inc. Respondent International Court of Arbitration of the International Chamber of Commerce I submitted two Expert Reports and the case was resolved at mediation prior to my testimony in 2022

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE C.A. No. 2018-0075-SG JEFF HIMAWAN, JOSH TARGOFF and STEPHEN TULLMAN, as the duly-appointed Representatives of the former stockholders of CEPTION THERAPEUTICS, INC., Plaintiffs, v. CEPHALON, INC., Defendant (Delaware, September 2022)

Expert Report of Brian E. Harvey, MD PhD

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE
C.A. No. 2020-1069-MTZ
SHAREHOLDER REPRESENTATIVE SERVICES, LLC,
Plaintiff, Counterclaim Defendant, v.
ALEXION PHARMACEUTICALS, INC., Defendant, Counterclaim Plaintiff.
(Delaware, July 2023)


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
ALLERGAN HOLDINGS UNLIMITED
COMPANY, ABBVIE INC., ABBVIE US
LLC, AND EDEN BIODESIGN, LLC,
Plaintiffs,
v. MSN LABORATORIES PRIVATE LIMITED,
ET AL., Defendants.
C.A. No. 23-794 (RGA) (CONSOLIDATED)  (Washington DC, Deposition June 2025)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 16-CV-12182-FDS
THE UNITD STATES OF AMERICA et al. ex rel. JULIE LONG, Plaintiffs, v.
JANSSEN BIOTECH, INC., Defendant (Washington DC, Deposition December 2025)

Confidential
Subject to Protective Order

Expert Report of Brian E. Harvey, MD PhD

# Appendix B. Materials Considered

## B.1. Depositions

- Deposition of Laura Rodriguez, June 20, 2025.

## B.2. Discovery

- CASSAVA_000010607
- CASSAVA_000016365
- CASSAVA_000016414
- CASSAVA_000042888
- CASSAVA_000092905
- CASSAVA_000104349
- CASSAVA_000137028
- CASSAVA_000189877
- CASSAVA_000239329
- CASSAVA_000304503
- CASSAVA_000379608
- CASSAVA_000543313
- CASSAVA_000543318
- CASSAVA_000696066
- CASSAVA_000749734
- CASSAVA_000784543
- CASSAVA_000788613
- CASSAVA_000791501
- CASSAVA_000797948
- CASSAVA_000898032

Confidential
Subject to Protective Order

Expert Report of Brian E. Harvey, MD PhD

- CASSAVA_000945294
- CASSAVA_001213617
- CASSAVA_001213621
- CUNY 001529
- SITRICK_01485

# B.3. Publicly available documents

## B.3.a. Filings, case law, legislation and regulations

- 21 CFR 11.
- 21 CFR 211.
- 21 CFR 312.42.
- 21 CFR 312.47.
- 21 CFR 312.82.
- Federal Food, Drug, and Cosmetic Act, 21 USC 355 (2026).
- First Amended Complaint. Adrian Heilbut, et al. v. Cassava Sciences, et al. No. 1:24-cv-5948-JLR (SDNY Oct. 24, 2024).
- Complaint. Cassava Sciences v. David Bredt, et al. No. 1:22-cv-9409-GHW (SDNY Nov. 2, 2022).
- First Amended Complaint. Cassava Sciences v. David Bredt, et al. No. 1:22-cv-9409 (SDNY Nov. 4, 2022).
- Memorandum Opinion & Order. Cassava Sciences v. David Bredt, et al. No. 1:22-cv-9409-GHW (SDNY Mar. 28, 2024).
- Second Amended Complaint. Cassava Sciences v. David Bredt, et al. No. 1:22-cv-9409 (SDNY Apr. 29, 2024).

## B.3.b. Academic literature

- Alzheimer's Association. "2024 Alzheimer's disease facts and figures." *Alzheimer's & Dementia* 20, no. 5 (May 2024): 3708–21.

Expert Report of Brian E. Harvey, MD PhD

- Anderson, Roy M., Christoforos Hadjichrysanthou, Stephanie Evans, and Mei Mei Wong. "Why do so many clinical trials of therapies for Alzheimer's disease fail?" *The Lancet* 390, no. 10110 (November 2017): 2327–29.

- Beason-Held, Lori L., Joshua O. Goh, Yang An, Michael A. Kraut, Richard J. O'Brien, Luigi Ferrucci, and Susan M. Resnick. "Changes in Brain Function Occur Years before the Onset of Cognitive Impairment." *The Journal of Neuroscience* 33, no. 46 (January 2013): 18008–14.

- Behl, Christian. "In 2024, the amyloid-cascade-hypothesis still remains a working hypothesis, no less but certainly no more." *Frontiers in Aging Neuroscience* 4, no. 16 (September 2024): 1459224.

- Burns, Lindsay H. and Hoau-Yan Wang. "Altered filamin A enables amyloid beta-induced tau hyperphosphorylation and neuroinflammation in Alzheimer's disease." *Neuroimmunology and Neuroinflammation* 4, no. 12 (2017): 263–71.

- Chen, Zhi-Ru, Jia-Bao Huang, Shu-Long Yang, and Fen-Fang Hong. "Role of Cholinergic Signaling in Alzheimer's Disease." *Molecules* 27, no. 6 (2022): 1816.

- Cummings, Jeffrey, Yadi Zhou, Garam Lee, Kate Zhong, Jorge Fonseca, and Feixiong Cheng. "Alzheimer's disease drug development pipeline: 2024." *Alzheimer's & Dementia* 10, no. 2 (April 2024): e12465.

- Cummings, Jeffrey, Howard H. Feldman, and Philip Scheltens. "The "rights" of precision drug development for Alzheimer's disease." *Alzheimer's Research & Therapy* 11, no. 76 (August 2019): 1–14.

- Cummings, Jeffrey, Travis Morstorf, and Kate Zhong. "Alzheimer's disease drug-development pipeline: few candidates, frequent failures." *Alzheimer's Research & Therapy* 6, no. 37 (Jul. 2014): 1–7.

- Decourt, Boris, Gary X. D'Souza, Jiong Shi, Aaron Ritter, Jasmin Suazo, and Marwan N. Sabbagh. "The Cause of Alzheimer's Disease: The Theory of Multipathology Convergence to Chronic Neuronal Stress." *Aging and Disease* 13, no. 1 (February 2022): 37–60.

- Giau, Vo Van, Eva Bagyinszky, Young Chul Youn, Seong Soo A. An, and SangYun Kim. "APP, PSEN1, and PSEN2 Mutations in Asian Patients with Early-Onset Alzheimer Disease." *International Journal of Molecular Sciences* 20, no. 19 (2019): 4757.

- Jung, Miah, Rachelle M. Swann, Michelle S. Anantha, and Faranak Jamali. "An FDA Analysis of Inspected Entities After Receiving Official Action Indicated Letters for Good Clinical Practice Violations." *Therapeutic Innovation & Regulatory Science* 55, no. 5 (June 2021): 907–17.

- Kaskie, Brian, Julie Bobitt, Yogesh Shah, and Sarah Khasawinah. "Placing public health onto the Alzheimer's disease and related dementias public policy platform." *The Gerontologist* 65, no. S1 (2025): S75–84.

Expert Report of Brian E. Harvey, MD PhD

- Kim, C. Kwon, Yin Rui Lee, Lynnett Ong, Michael Gold, Amir Kalali, and Joydeep Sarkar. "Alzheimer's Disease: Key Insights from Two Decades of Clinical Trial Failures." *Journal of Alzheimer's Disease* 87, no. 1 (2022): 83–100.

- Kinney, Jefferson W., Shane M. Bemiller, Andrew S. Murtishaw, Amanda M. Leisgang, Arnold M. Salazar, and Bruce T. Lamb. "Inflammation as a central mechanism in Alzheimer's disease." *Alzheimer's & Dementia* 4, no. 1 (September 2018): 575–90.

- Krishnamurthy, Nithya, Alyssa A. Grimshaw, Sydney A. Axson, Sung Hee Choe, and Jennifer E. Miller. "Why promising drugs are shelved and barriers and facilitators to re-purposing them: A systematic literature review." *BMC Health Services Research* 22 (2022): 970.

- Kumah, Augustine, Chinwe N. Nwogu, Abdul-Razak Issah, Emmanuel Obot, Deborah T. Kanamitie, Jerry S. Sifa, and Lawrencia A. Aidoo. "Cause-and-Effect (Fishbone) Diagram: A Tool for Generating and Organizing Quality Improvement Ideas." *Global Journal on Quality and Safety in Healthcare* 2, no. 7 (May 2024): 85–7.

- Mitra, Saikat, Maniza Muni, Nusrat Jahan Shawon, Rajib Das, Talha Bin Emran, Rohit Sharma, and Deepak Chandran et al. "Tacrine Derivatives in Neurological Disorders: Focus on Molecular Mechanisms and Neurotherapeutic Potential." *Oxidative Medicine and Cellular Longevity* 2022, no. 7252882 (August 2022): 1–22.

- Rajan, Kumar B., Jennifer Weuve, Lisa L. Barnes, Elizabeth A. McAninch, Robert S. Wilson, and Denis A. Evans. "Population Estimate of People with Clinical AD and Mild Cognitive Impairment in the United States (2020–2060)." *Alzheimer's & Dementia* 17, no. 12 (December 2021): 1966–75.

- Reitz, Christiane. "Alzheimer's Disease and the Amyloid Cascade Hypothesis: A Critical Review.' *International Journal of Alzheimer's Disease* 2012, no. 1 (2012): 1–11.

- Roberts, Rosebud and David S. Knopman. "Classification and Epidemiology of MCI." *Clinical Geriatric Medicine* 29, no. 4 (2013): 753–72.

- Seo, Do., David M. Holtzman. "Current understanding of the Alzheimer's disease-associated microbiome and therapeutic strategies." *Experimental & Molecular Medicine* 56 (January 2024): 86–94.

- Wang, Hoau-Yan, Kuo-Chieh Lee, Zhe Pei, Amber Khan, Kalindi Bakshi, and Lindsay H. Burns. "PTI-125 binds and reverses an altered conformation of filamin A to reduce Alzheimer 's disease pathogenesis." *Neurobiology of Aging* 55 (July 2017): 99–114.

- Wang, Hoau-Yan, Zhe Pei, Kuo-Chieh Lee, E. Lopez-Brignoni, B. Nikolov, C.A. Crowley, M.R. Marsman, Remi Barbier, N. Friedman, and Lindsay H. Burns. "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients." *The Journal of Prevention of Alzheimer's Disease* 7, no. 4 (2020): 256–64.

Expert Report of Brian E. Harvey, MD PhD

- Yiannopoulou, Konstantina G., Aikaterini I. Anastasiou, Venetia Zachariou, and Sygkliti-Henrietta Pelidou. "Reasons for Failed Trials of Disease-Modifying Treatments for Alzheimer Disease and Their Contribution in Recent Research." *Biomedicines* 7, no. 4 (2019): 97.

## B.3.c. Websites, news articles, and other sources

- ADUHELM™ (aducanumab-avwa). Package Insert. Biogen. Revised June 2021. *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/761178s000lbl.pdf

- Alzheimer's Association. "Donanemab Approved for Treatment of Early Alzheimer's Disease." https://www.alz.org/alzheimers-dementia/treatments/donanemab.

- Alzheimer's Association. "Lecanemab Approved for Treatment of Early Alzheimer's Disease." https://www.alz.org/alzheimers-dementia/treatments/lecanemab-leqembi.

- Alzheimer's Association. "Milestones." https://www.alz.org/alzheimers-dementia/research-and-progress/milestones.

- Alzheimer's Association. "2025 Alzheimer's Disease Facts and Figures Report: Executive Summary." 2025. *Available at* https://www.alz.org/getmedia/c05f7ba4-9aea-4cb0-8898-5e8bff3f0930/executive-summary-2025-alzheimers-disease-facts-and-figures.pdf.

- Alzheimer's Association. "New Guidance for Gold-Standard Imaging Tests Assists Clinicians in Diagnosis and Management of Alzheimer's and Other Dementia." January 8, 2025. https://www.alz.org/news/2025/updated-appropriate-use-criteria-amyloid-tau-pet.

- Alzheimer's Association. "Public Health Approach to Alzheimer's." https://www.alz.org/professionals/public-health/public-health-approach.

- Alzheimer's Association. "What is Alzheimer's Disease?" https://www.alz.org/alzheimers-dementia/what-is-alzheimers.

- Alzheimer's Association. "What is an Amyloid PET Scan?" *Available at* https://www.alz.org/getmedia/5eaf0f47-9c27-444a-b729-9774f78826d7/new-ideas-amyloid-pet-scan-info-sheet-english.pdf.

- Biotechnology Innovation Organization. "Clinical Development Success Rates and Contributing Factors 2011–2020." February 2021. *Available at* https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf.

- Cassava Sciences. "Cassava Announces Agreement to Settle Securities Class Action Litigation." Press release. December 23, 2025. https://www.cassavasciences.com/news-releases/news-release-details/cassava-announces-agreement-settle-securities-class-action.

Expert Report of Brian E. Harvey, MD PhD

- Cassava Sciences. "Cassava Sciences Resolves SEC Investigation." Press release. September 26, 2024. https://www.cassavasciences.com/news-releases/news-release-details/cassava-sciences-resolves-sec-investigation.

- Cassava Sciences. "Cassava Sciences Topline Phase 3 Data Did Not Meet Co-Primary Endpoints." Press release. November 25, 2024. *Available at* https://www.cassavasciences.com/node/17296/pdf.

- Center for Biologics Evaluation and Research. "SOPP 8101.1: Regulatory Meetings with Sponsors and Applicants for Drugs and Biological Products." December 2025. *Available at* https://www.fda.gov/media/84040/download.

- Center for Drug Evaluation and Research. "Cognex Approval Package." October 10, 1997. *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/97/020070ap.pdf.

- Dupli Checker. "Domain Age Checker." https://www.duplichecker.com/domain-age-checker.php.

- Durivage, Mark. "Data Integrity for the FDA Regulated Industry." Quality Systems Compliance. January 12, 2019. *Available at* https://qscompliance.com/wp-content/uploads/2019/01/ALCOA-Principles.pdf.

- Eglovitch, Joanne S. "This Week at FDA: Makary teases plan for single-trial drug approvals, Høeg named acting CDER chief, and more." Regulatory Focus. December 5, 2025. https://www.raps.org/news-and-articles/news-articles/2025/12/this-week-at-fda-makary-teases-plan-for-single-tri.

- Eisai Inc. and Biogen. "Leqembi." https://www.leqembi.com/.

- Friends of Cancer Research. "Breakthrough Therapies." Updated September 30, 2025. https://friendsofcancerresearch.org/breakthrough-therapies/.

- Johns Hopkins Medicine. "Stages of Alzheimer's Disease." https://www.hopkinsmedicine.org/health/conditions-and-diseases/alzheimers-disease/stages-of-alzheimer-disease.

- Kattige, Asha. "FDA 483 - Navigating Compliance Challenges." Scendea. August 2021, https://www.scendea.com/articles/fda-483-navigating-compliance-challenges.

- Lawrence, Lizzy. "FDA to lower number of trials required for approval of drugs, other medical products." STAT. December 4, 2025. https://www.statnews.com/2025/12/04/fda-considers-single-clinical-trial-for-new-product-approvals/.

- Letter from Billy Dunn, Director of the Office of Neuroscience, CDER, to Priya Singhal, Vice President of Global Safety and Regulatory Sciences, Biogen Inc. (June 7, 2021). *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/761178Orig1s000ltr.pdf.

Expert Report of Brian E. Harvey, MD PhD

- Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (November 2, 2021). *Available at* https://www.cassavafraud.com/docs/SAVAReport_Nov2_Final_links.pdf.

- Letter from Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey to Eric Bastings, Director of Division of Neurology I, U.S. Food and Drug Administration (November 2, 2021). *Available at* https://www.simuflimflam.com/docs/SAVAReport_Nov2_Final_links.pdf.

- Letter from Jordan A. Thomas, Partner, Labaton Sucharow, to Division of Dockets Management, Food and Drug Administration (September 1, 2021). *Available at* https://fdapetitions.com/wp-content/uploads/2021/08/2021P-0967.01.pdf.

- Lilly USA. "Hope is here with Kisunla." https://kisunla.lilly.com/what-is-kisunla#slow-the-progression.

- Mandavilli, Apoorva. "Scientists Investigating Alzheimer's Drug Faulted in Leaked Report." *New York Times*, Health. October 14, 2023. https://www.nytimes.com/2023/10/14/health/alzheimers-drug-research-simufilam.html.

- Mandavilli, Apoorva. "Scientists Question Data Behind an Experimental Alzheimer's Drug." *New York Times*, Health. April 18, 2022. https://www.nytimes.com/2022/04/18/health/alzheimers-cassava-simufilam.html.

- MedPath. "FDA Breakthrough Therapy Designation Shows 72% Approval Success Rate in Decade-Long Analysis." Updated November 2025. https://trial.medpath.com/news/44bed2cc87ddc99e/fda-breakthrough-therapy-designation-shows-72-approval-success-rate-in-decade-long-analysis.

- Michaels, Dave and Joseph Walker. "SEC Investigating Cassava Sciences, Developer of Experimental Alzheimer's Drug." *Wall Street Journal*, Health. November 17, 2021. https://www.wsj.com/health/healthcare/cassava-sciences-alzheimers-sec-investigation-11637154199.

- Milioris, Enea, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "Cassava Sciences (SAVA): A Shambolic Charade." https://www.cassavafraud.com.

- Milioris, Enea, Adrian Heilbut, Jesse Brodkin, and Patrick Markey, "Cassava Sciences (SAVA): A Shambolic Charade." https://www.simuflimflam.com.

- Milioris, Enea, Adrian Heilbut, Jesse Brodkin, and Patrick Markey. "Cassava and the Wang Lab: Seeing Through the Blind." Presentation. December 10, 2021. *Available at* https://www.cassavafraud.com/docs/SAVA_UNBLINDED.pdf.

- Milioris, Enea, Adrian Heilbut, Jesse Brodkin, and Patrick Markey. "Cassava Sciences: A Shambolic Charade." Presentation. November 3, 2021. *Available at* https://www.cassavafraud.com/docs/SAVAReport_Deck_2021_11_03.pdf.

Expert Report of Brian E. Harvey, MD PhD

- Milioris, Enea, Adrian Heilbut, Jesse Brodkin, and Patrick Markey. "SavaDx Exposed." Presentation. November 29, 2021. *Available at* https://www.cassavafraud.com/docs/SAVADx_Theranos2.0.pdf.

- National Institute of Aging. "2025 NIH Alzheimer's Disease and Related Dementias Research Progress Report: Advances and Achievements." September 8, 2025. https://www.nia.nih.gov/about/2025-nih-dementia-research-progress-report.

- National Institutes of Health. "Responding to a Clinical Hold." *Available at* https://seed.nih.gov/sites/default/files/2024-09/Responding-to-a-Clinical-Hold.pdf.

- National Library of Medicine. "A Safety Study of PTI-125 in Healthy Volunteers." Updated May 10, 2021. https://clinicaltrials.gov/study/NCT03784300.

- National Library of Medicine. "Abbreviated Statistical Analysis Plan." Updated February 10, 2025. *Available at* https://cdn.clinicaltrials.gov/large-docs/63/NCT05352763/SAP_001.pdf.

- National Library of Medicine. "Food Effect and Bioequivalence Study of Simufilam Tablets in Healthy Volunteers." Updated August 22, 2023. https://clinicaltrials.gov/study/NCT04932655.

- National Library of Medicine. "Open-Label Extension of the PTI-125-04 Study in Mild-to-Moderate Alzheimer's Disease." Updated August 15, 2025. https://clinicaltrials.gov/study/NCT05352763.

- National Library of Medicine. "PTI-125 for Mild-to-moderate Alzheimer's Disease Patients." Updated September 29, 2021. https://clinicaltrials.gov/study/NCT04079803.

- National Library of Medicine. "PTI-125 for Mild-to-moderate Alzheimer's Disease Patients." Updated July 7, 2021. https://clinicaltrials.gov/study/NCT03748706.

- National Library of Medicine. "Simufilam (PTI-125), 100 mg, for Mild-to-moderate Alzheimer's Disease Patients (PTI-125)." Updated April 22, 2025. https://clinicaltrials.gov/study/NCT04388254.

- National Library of Medicine. "Simufilam 100 mg for Mild-to-Moderate Alzheimer's Disease (RETHINK-ALZ)." Updated May 25, 2025. https://clinicaltrials.gov/study/NCT04994483.

- National Library of Medicine. "Simufilam 50 mg or 100 mg for Mild-to-Moderate Alzheimer's Disease (REFOCUS-ALZ)." Updated September 22, 2025. https://clinicaltrials.gov/study/NCT05026177.

- Novo Nordisk. "Evoke phase 3 trials did not demonstrate a statistically significant reduction in Alzheimer's disease progression." Press release no. 37. November 24, 2025. https://www.novonordisk.com/content/nncorp/global/en/news-and-media/news-and-ir-materials/news-details.html?id=916462.

Expert Report of Brian E. Harvey, MD PhD

- Novo Nordisk. "Novo Nordisk A/S: Evoke phase 3 trials did not demonstrate a statistically significant reduction in Alzheimer's disease progression." Press release. November 24, 2025. https://www.globenewswire.com/news-release/2025/11/24/3193328/0/en/Novo-Nordisk-A-S-Evoke-phase-3-trials-did-not-demonstrate-a-statistically-significant-reduction-in-Alzheimer-s-disease-progression.html.

- Oestreich, Liz, Kalah Auchincloss, and Erin Hartmann. "Trends In FDA FY 2024 Inspection-Based Warning Letters." Outsourced Pharma. March 7, 2025. https://www.outsourcedpharma.com/doc/trends-in-fda-fy-2024-inspection-based-warning-letters-0001.

- Office of Scientific Investigations. "Fiscal Year 2023 Annual Report." February 2024. https://www.fda.gov/media/176281/download?attachment.

- Propharma. "How Mature Are Your Data Integrity Practices? New FDA and EU Regulatory Focus Areas." October 23, 2025. https://www.propharmagroup.com/thought-leadership/how-mature-is-your-data-integrity-new-fda-and-eu-regulatory-focus-areas.

- Quintessential Capital Management. "Cassava Sciences (SAVA): Game over!" November 3, 2021. https://www.qcmfunds.com/cassava-sciences-sava-game-over/.

- Rosen, David L. "Keeping Track of Your Data — What You Need to Know about FDA's Draft Guidance on Data Integrity for In Vivo Bioavailability and Bioequivalence Studies." Foley & Lardner LLP. May 15, 2024. https://www.foley.com/insights/publications/2024/05/track-data-fda-draft-guidance-data-integrity/.

- Science.org. "Justice Department unexpectedly drops fraud case against Alzheimer's scientist." October 24, 2025. https://www.science.org/content/article/justice-department-unexpectedly-drops-fraud-case-against-alzheimer-s-scientist.

- Sheeran, Lona. "Protocol Optimization, Strategies & Decisions: Making the Most of Your SAD/MAD Studies." Worldwide Clinical Trials. May 20, 2024. https://www.worldwide.com/blog/2024/05/making-the-most-of-your-sad-mad-studies/.

- *The Arc of Alzheimer's: From Preventing Cognitive Decline in Americans to Assuring Quality Care for those Living with the Disease.* 115th Cong. (March 29, 2017).

- The Mary S. Easton Center for Alzheimer's Research and Care. "Donanemab." UCLA. https://eastonad.ucla.edu/patient-care/alzheimers-disease-treatments/donanemab.

- The Mary S. Easton Center for Alzheimer's Research and Care. "Lecanemab." UCLA. https://eastonad.ucla.edu/patient-care/alzheimers-disease-treatments/lecanemab.

- U.S. Department of Justice. "Elizabeth Holmes Sentenced To More Than 11 Years For Defrauding Theranos Investors Of Hundreds Of Millions." Press Release. November 18, 2022.

Expert Report of Brian E. Harvey, MD PhD

https://www.justice.gov/usao-ndca/pr/elizabeth-holmes-sentenced-more-11-years-defrauding-theranos-investors-hundreds.

■ U.S. Department of Justice. "Professor Charged for Operating Multimillion-Dollar Grant Fraud Scheme." Press release no. 24-830. June 28, 2024. https://www.justice.gov/archives/opa/pr/professor-charged-operating-multimillion-dollar-grant-fraud-scheme.

■ U.S. Food and Drug Administration. "Best Practices for Communication Between IND Sponsors and FDA During Drug Development Guidance for Industry and Review Staff Good Review Practice." December 2017. *Available at* https://www.fda.gov/media/94850/download.

■ U.S. Food and Drug Administration. "Bioresearch Monitoring Program Information." Updated December 2, 2025. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/fda-bioresearch-monitoring-information/bioresearch-monitoring-program-information.

■ U.S. Food and Drug Administration. "CDER 21st Century Review Process Desk Reference Guide." Presentation. February 1, 2016. *Available at* https://www.fda.gov/media/78941/download.

■ U.S. Food and Drug Administration. "CDER Initiatives: Streamlining the Drug Development Process to Ensure Drugs are Safe and Effective." Updated July 3, 2024. https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-initiatives.

■ U.S. Food and Drug Administration. "Clinical Trials and Human Subject Protection." Updated December 9, 2025. https://www.fda.gov/science-research/science-and-research-special-topics/clinical-trials-and-human-subject-protection.

■ U.S. Food and Drug Administration. "ClinicalTrials.gov - Notices of Noncompliance and Civil Money Penalty Actions." Updated February 5, 2026. https://www.fda.gov/science-research/fdas-role-clinicaltrialsgov-information/clinicaltrialsgov-notices-noncompliance-and-civil-money-penalty-actions.

■ U.S. Food and Drug Administration. "Data Integrity and Compliance With CGMP Guidance for Industry." April 2016. *Available at* https://www.fda.gov/files/drugs/published/Data-Integrity-and-Compliance-With-Current-Good-Manufacturing-Practice-Guidance-for-Industry.pdf.

■ U.S. Food and Drug Administration. "Data Integrity and Compliance With Drug CGMP Questions and Answers Guidance for Industry." December 2018. *Available at* https://www.fda.gov/media/119267/download.

■ U.S. Food and Drug Administration. "Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products Guidance for Industry." December 2019. *Available at* https://www.fda.gov/media/133660/download.

Expert Report of Brian E. Harvey, MD PhD

- U.S. Food and Drug Administration. "Drug Approval Package: Aduhelm (aducanumab-avwa)." Updated June 28, 2021. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/761178Orig1s000TOC.cfm.

- U.S. Food and Drug Administration. "Drug Approval Package: KISUNLA." July 29, 2025. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761248Orig1s000TOC.cfm.

- U.S. Food and Drug Administration. "Drug Approval Package: LEQEMBI." February 6, 2023. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2023/761269Orig1s000TOC.cfm.

- U.S. Food and Drug Administration. "Drug Development and Review Definitions." Updated August 2015. https://www.fda.gov/drugs/investigational-new-drug-ind-application/drug-development-and-review-definitions.

- U.S. Food and Drug Administration. "FDA In Brief: FDA warns about safety concerns related to investigational use of Venclexta (venetoclax) for multiple myeloma." March 21, 2019. https://www.fda.gov/news-events/fda-brief/fda-brief-fda-warns-about-safety-concerns-related-investigational-use-venclexta-venetoclax-multiple.

- U.S. Food and Drug Administration. "FDA to pharmaceutical companies: Certain studies conducted by Raptim Research Pvt. Ltd. are unacceptable." Updated March 28, 2025. https://www.fda.gov/drugs/drug-safety-and-availability/fda-pharmaceutical-companies-certain-studies-conducted-raptim-research-pvt-ltd-are-unacceptable.

- U.S. Food and Drug Administration. "Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products: Guidance for Industry." December 2017. *Available at* https://www.fda.gov/media/109951/download.

- U.S. Food and Drug Administration. "Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products: Guidance for Industry." September 2023. *Available at* https://www.fda.gov/media/172311/download.

- U.S. Food and Drug Administration. "Good Review Management Principles and Practices for New Drug Applications and Biologics License Applications Guidance for Industry and Review Staff." September 2018. *Available at* https://www.fda.gov/media/72259/download.

- U.S. Food and Drug Administration. "Guidance for Industry E14 Clinical Evaluation of QT/QTc Interval Prolongation and Proarrhythmic Potential for Non-Antiarrhythmic Drugs." October 2005. *Available at* https://www.fda.gov/media/71372/download.

- U.S. Food and Drug Administration. "Guidance for Industry Expedited Programs for Serious Conditions – Drugs and Biologics." May 2014. *Available at* https://www.fda.gov/media/86377/download.

Expert Report of Brian E. Harvey, MD PhD

- U.S. Food and Drug Administration. "IND Application Procedures: Clinical Hold." Updated October 9, 2015. https://www.fda.gov/drugs/investigational-new-drug-ind-application/ind-application-procedures-clinical-hold.

- U.S. Food and Drug Administration. "Inspections Database Frequently Asked Questions." Updated September 13, 2024. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspections-database-frequently-asked-questions.

- U.S. Food and Drug Administration. "Investigational New Drug (IND) Application." Updated September 16, 2025. https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

- U.S. Food and Drug Administration. "Notification to Pharmaceutical Companies: Clinical and Bioanalytical Studies Conducted by Semler Research Are Unacceptable." Updated April 20, 2016. https://www.fda.gov/drugs/drug-safety-and-availability/notification-pharmaceutical-companies-clinical-and-bioanalytical-studies-conducted-semler-research.

- U.S. Food and Drug Administration. "Office of Scientific Investigations." Updated February 13, 2024. https://www.fda.gov/about-fda/cder-offices-and-divisions/office-scientific-investigations.

- U.S. Food and Drug Administration. "Rare Diseases: Early Drug Development and the Role of Pre-IND Meetings Guidance for Industry." October 2018. *Available at* https://www.fda.gov/media/117322/download.

- U.S. Food and Drug Administration. "Small Business and Industry Assistance: Frequently Asked Questions on the Pre-Investigational New Drug (IND) Meeting." Updated February 22, 2022. https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-and-industry-assistance-frequently-asked-questions-pre-investigational-new-drug-ind.

- U.S. Food and Drug Administration. "Special Protocol Assessment Guidance for Industry." April 2018. *Available at* https://www.fda.gov/media/97618/download.

- U.S. Food and Drug Administration. "Step 3: Clinical Research." Updated January 4, 2018. https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

- U.S. Food and Drug Administration. "Tobacco Products-Related Citizen Petitions." Updated January 28, 2026. https://www.fda.gov/tobacco-products/products-guidance-regulations/tobacco-products-related-citizen-petitions.

- U.S. Food and Drug Administration. "Warning Letter: Applied Therapeutics, Inc." Reference no. 24-HFD-45-11-01. December 3, 2024. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/applied-therapeutics-inc-696833-12032024.

- U.S. Food and Drug Administration. "Warning Letter: Eugia Pharma Specialities Limited." Reference no. 320-24-55. August 15, 2024. https://www.fda.gov/inspections-compliance-

Expert Report of Brian E. Harvey, MD PhD

enforcement-and-criminal-investigations/warning-letters/eugia-pharma-specialities-limited-681905-08152024.

■    U.S. Food and Drug Administration. "Warning Letter: Unipack LLC." Reference no. 320-26-32. December 19, 2025. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/unipack-llc-716621-12192025.

■    University of Cincinnati College of Medicine. "Clinical Trials Phases Defined." University of Cincinnati. https://med.uc.edu/depart/psychiatry/research/clinical-research/crm/trial-phases-1-2-3-defined.

■    Vertex. "Vertex Provides Updates on Phase 1/2 Clinical Trial of VX-880 for the Treatment of Type 1 Diabetes." Press release. May 2, 2022. *Available at* https://news.vrtx.com/node/29856/pdf.

■    Weinman, Beth, Josh Oyster, and Jessica Band. "Deconstructing the Consent Decree: A Primer and Recent Trends for FDCA Injunctions." Food & Drug Law Institute. 2020. https://www.fdli.org/2020/11/deconstructing-the-consent-decree-a-primer-and-recent-trends-for-fdca-injunctions/.

■    Whyte, Liz Essley. "FDA Increasingly Halting Human Trials as Companies Pursue Risky, Cutting-Edge Drugs." *Wall Street Journal*, Health. January 10, 2023. https://www.wsj.com/articles/fda-increasingly-halting-human-trials-as-companies-pursue-risky-cutting-edge-drugs-11673322324.

Confidential
Subject to Protective Order