# Exhibit 139

Q6MRHEIc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADRIAN HEILBUT, et al.,

               Plaintiffs,

           v.                  24 Civ. 5948 (JLR)(OTW)

CASSAVA SCIENCES, INC., ET
AL.,
                               Conference

             Defendants.

------------------------------x
                             New York, N.Y.
                             June 22, 2026
                             10:00 a.m.

Before:

               HON. JENNIFER L. ROCHON,

                          District Judge

                   APPEARANCES

CLARICK GUERON REISBAUM LLP
    Attorneys for Plaintiffs
BY:  ISAAC ZAUR
    DAVID KUMAGAI

GIBSON DUNN
    Attorneys for Defendants
BY:  MONICA K. LOSEMAN
    MYLAN L. DENERSTEIN
    SCOTT CAMPBELL

BAKERHOSTETLER
    Attorneys for Defendants Remi Barbier and Lindsay Burns
BY:  ARIC WU
    DOUGLAS GREENE

THE COURT:  Please be seated.  Good morning.

(Case called)

Good morning, counsel.  Can I have appearances, please?

MR. ZAUR:  Good morning, your Honor.  Isaac Zaur, from Clarick Gueron Reisbaum, for the plaintiffs.

MR. KUMAGAI:  Good morning, your Honor.  David Kumagai from Clarick Gueron Reisbaum, for the plaintiffs.

THE COURT:  Good morning.

MS. LOSEMAN:  Good morning, your Honor.  Monica Loseman, with Gibson Dunn, on behalf of Cassava Sciences.  I'll let my colleagues introduce themselves, but our client representative, Chris Cook, the chief legal officer, is in court.

THE COURT:  Thank you.  Welcome.

MR. CAMPBELL:  And Scott Campbell, with Gibson Dunn, on behalf of Cassava Sciences.

MS. DENERSTEIN:  Mylan Denerstein, with Gibson Dunn, on behalf of Cassava Sciences.

MR. WU:  Good morning, your Honor.  Aric Wu, from BakerHostetler, for defendants Remi Barbier and Lindsay Burns.

MR. GREENE:  Good morning, your Honor.  Douglas Greene, from BakerHostetler, for Remi Barbier and Lindsay Burns.

THE COURT:  Thank you for being here.

All right.  I have the premotion letters submitted by the parties.  Let me just put it on the record.  I have a letter, dated June 2, 2026, at Docket No. 212, that is filed by defendant Cassava Sciences requesting leave to file motion to exclude the expert testimony of David Sanders and for summary judgment of plaintiff's malicious prosecution claim, damage for punitive damages, and an attorneys' fees demand.  I also have a letter at Docket 213, dated June 2, 2026, from defendants Barbier and Burns requesting leave to move for summary judgment as well, the malicious prosecution claim, the conspiracy claim, and the demand for punitive damages.

I have a response from plaintiff.  That's dated June 9, 2026, at Docket 217, that responds to the defendants' request for summary judgment and *Daubert* motions.  I know that there was a sealing of Docket 217.  I understand the magistrate judge is handling the sealing and unsealing of that particular letter, so I'm not going to address that here.  We'll just talk more then about the anticipated motions.  I have your letters. I looked through them.

I'll just give an opportunity to add whatever you'd like or highlight whatever you'd like regarding the anticipated motions, and so I will hear, first, from defendants.  I don't know if each group wishes to speak, someone from Baker, someone from Gibson or not.  I'll leave it to you how you would like to present, and then I'll hear from plaintiffs in response.  And

Q6MRHEIc

then, obviously because it's defendants' motions, if there's any brief reply you have, that is fine.  Again, you don't have to get into arguing the motions in full.  It's just to highlight some of the issues and why it's appropriate for summary judgment in this case or *Daubert*.  Go ahead.

MS. LOSEMAN:  Thank you, your Honor.  Would you prefer we argue from the podium?

THE COURT:  It's up to you.  It's probably easier from the podium because the microphone is a bit closer to you.

MS. LOSEMAN:  Happy to do that, your Honor.

Thank you, your Honor.  I'll be very brief.  I don't want to go into the substance of the motions that we intend to file with your Honor -- looking to leave to file with your Honor.  Suffice it to start with the purpose of the motions is to narrow this case significantly for the jury.  We do understand and anticipate that certain claims will move forward to a trial before a jury, but there is a lot of work I think the parties can do with the benefit of the Court to narrow this case for trial.  And so that is the goal behind the letter that we have submitted with your Honor.

Again, I won't get into the substance of the arguments, but we do seek leave to file a motion to exclude the expert opinion of Dr. Sanders.  We've outlined at a very high level the reasons we believe his opinions are not admissible in this matter.  And then as to the motion for summary judgment,

Q6MRHEIc

the malicious prosecution claim, we believe that discovery has revealed there is no --

THE COURT:  Let me go back to the *Daubert* motion for a moment.

MS. LOSEMAN:  Yes, your Honor.

THE COURT:  You are seeking to exclude the expert testimony of a Dr. Sanders.  Is that a gentleman?

MS. LOSEMAN:  Yes, it is, your Honor.

THE COURT:  OK.  Is his expert testimony counter by an expert on your side as well.

MS. LOSEMAN:  Yes, it is.

THE COURT:  Can you talk to me about the difference between your expert's analysis and why that is relevant and theirs is not?

MS. LOSEMAN:  Frankly, your Honor, I think if their expert's analysis is excluded, so too would our expert's opinion.  His opinion would no longer be necessary.  It's been introduced simply to counter his opinions.

THE COURT:  I see, OK.  All right.  Are you relying on your expert's opinion in critiquing his for *Daubert* purposes?

MS. LOSEMAN:  Your Honor, that is an excellent question.  I believe that we have not ruled that out just yet. Certainly the substance of his opinion goes to the validity of the methods that he used and the information he considered in arriving at his expert opinion.  So we will be -- I anticipate

Q6MRHEIc

at least at this point we would be relying on it in part.

THE COURT:  OK.  Once you involve your expert or otherwise, in looking at it, certainly if there are a battle of experts, I'm not going to exclude one of them, so you should think about that as you are going through.  Certainly if there are grounds to exclude, I'll consider those, and you know what the grounds are.  But if it's just which expert to believe, and I'm not sure what it is, just think about that as you're deciding whether to make the motion.

MS. LOSEMAN:  We appreciate that thank you.

THE COURT:  Talk to me more about summary judgment.

MS. LOSEMAN:  On summary judgment, we intend to move for summary judgment on the malicious prosecution claim for two primary reasons, the first being that there is no special injury.  We have now concluded all discovery.  There is no evidence that any of these three remaining plaintiffs suffered any special injury.

The second reason is that there is no malice.  We believe the evidence will show that Cassava filed the original defamation claim to protect its science in the ongoing phase 3 clinic call trials to prevent dis-enrollment of participants in those trials.  We believe the evidence has proven that that fact is not in dispute.  There's an entire absence of malice.

THE COURT:  So not going to hear if there's a fact issue on malice and that's the true reason or not?

Q6MRHEIc

MS. LOSEMAN:  I'm sure they'll argue, your Honor, that there is a fact issue.  But we believe when the Court has reviewed the testimony, the email communications, the documents, the Court will see there's not a triable issue on that claim.

THE COURT:  OK.

MS. LOSEMAN:  On punitive damages, your Honor, under the anti-SLAPP statute here in New York, plaintiffs have to prove that the sole purpose of filing the defamation claim was to harass or intimidate the plaintiffs.  Once again, we believe once the Court sees all the evidence, the testimony, and the documents, the Court will conclude there's not a triable issue on that claim for damages.

Then finally, your Honor, we understand that plaintiffs are taking the position that they are entitled to two components of attorneys' fees.  One is the attorneys' fees incurred in defending the defamation claim.  We do not——and I want to be very clear——intend to move for summary judgment on that claim.  However, your Honor, plaintiffs are taking the position that they are entitled to their attorneys' fees for pursuing compensatory punitive damages and punitive damages in this case whether they win or lose.  That is their read of the statute.

Even if they lose their claims for compensatory and punitive damages claims on the anti-SLAPP case, their view is

Q6MRHEIc

they get a free roll of the dice in this court.  We believe that is a misread of the statute and that they are not entitled to move on those fees.  So we intend to move on that element for relief as well.

THE COURT:  And the attorneys' fees question is not going to go to the jury, is it?

MS. LOSEMAN:  Your Honor, I wouldn't think so.  That might introduce a conflict of laws issue.  But as we understand the way plaintiffs have pled their claim in the complaint, they are seeking fees for defending this claim.  If they were to seek fees under Rule 54, I suppose obviously that would not go to the jury and that might be the appropriate procedure.  But we believe that claim -- we need clarity on that issue now and it's ripe for resolution by the Court.

THE COURT:  OK.  I'm just not used to seeing attorneys' fees being litigated prior to the action being concluded before the jury.  Generally speaking, I then decide it.  If there's a fact issue that goes to entitlement to attorneys' fees, then I suppose the jury can decide that, but this sounds more like a legal issue.

MS. LOSEMAN:  I think it is a legal issue, your Honor. But, again, it is not clear to us how plaintiffs intend to prosecute the claims.  So, for example, they have—as I understood it and I may have misunderstood them—included fees in their claim for punitive damages, that there might be some

Q6MRHEIc

argument that attorneys' fees would figure into the punitive damages element as well or that claim as well.

So that is why we're seeking some clarity now, your Honor. Because, one, we don't think they are entitled to fees for seeking compensatory and punitive damages. The statute certainly does not authorize that claim. But, two, we need clarity into how it figures to the punitive damages claim that plaintiffs are bringing.

THE COURT: Because punitive damages would go to the jury, if they are still here?

MS. LOSEMAN: Yes.

THE COURT: All right. Anything further on your motion?

MS. LOSEMAN: No. I believe that's it, your Honor. I appreciate it.

THE COURT: Of course. Thank you.

Anything from the other set of defendants?

MR. WU: Yes. From here?

THE COURT: Yes, please.

MR. WU: So, your Honor, I'll be brief as well. We share many of the same common arguments on summary judgment. One of the differences is if we prevail on summary judgment on the malicious prosecution and conspiracy claim, our defendants are out of the claim. They're only named in those two counts, and the additional arguments we have on malicious prosecution

Q6MRHEIc

of Dr. Burns, who was a scientist at the company.  She was not in management.  She was not the C-suite.  She's not on the Board of Directors, had no decision making role with respect to the defamation action.

That actually feeds into the malice argument because they rely on her personal animus.  They cite her personal journal entries where she is really upset at the plaintiffs and say, well, that's malice, but she had nothing to do with the decision making in the first place.  And then on the conspiracy claim, we've got the Intracorporate Conspiracy Doctrine, and at the motion to dismiss stage, they relied on the personal interest exception.  But I think the evidence will show, and we intend to show to you, that it just is not borne out, their argument that they were trying to conceal research misconduct.

Thank you, your Honor.

THE COURT:  Thank you very much.  Mr. Zaur?  Is it Zaur?

MR. ZAUR:  Yes, your Honor.  Thank you.

THE COURT:  Or Mr. Kumagai?  I'm not sure.

MR. ZAUR:  I will address most issues, but Mr. Kumagai will address the attorneys' fees issues.

THE COURT:  Sure.  Thank you.

MR. ZAUR:  So we'll take turns, if that's all right, your Honor?

With respect to the *Daubert* motion, it actually wasn't

Q6MRHEIc

clear to us until today whether defendants are seeking to exclude all of Dr. Sanders' opinions. He has a number of different sets of opinions. We don't think there's any basis for that. Most of what they say in their letter is that he relies on evidence that he himself didn't go and get, which is, of course, very typical for a scientific expert to be given data and asked to assume that it is what it says it is and to perform his analysis. To the extent that that is their objection, we think it's totally ill-taken, and we think his opinions will stand entirely on their own.

Also, to be clear, they suggest that he shouldn't be heard from because he is not an expert in, for example, Alzheimer's disease, but he is not offered as an expert in the disease. He is offered as an expert in research and record-keeping practices and publication ethics because that is really at the heart of the misconduct that underlies both of these actions. So that is what it is. We have not sought to exclude and don't expect to seek to exclude their rebuttal experts. We think it will be a battle of the experts at trial.

THE COURT: One moment then. Ms. Loseman, you are seeking to exclude the entirety of Dr. Sanders' report?

MR. KUMAGAI: Yes, your Honor, we are.

THE COURT: Thank you. Just to be clear.

Go ahead, Mr. Zaur.

MR. ZAUR: With respect to the special injury prong of

Q6MRHEIc

malicious prosecution -- moving on to summary judgment and malicious prosecution.

THE COURT:  Yes.

MR. ZAUR:  The evidence in discovery absolutely maps on to the allegations in the complaint that were upheld; specifically, Dr. Heilbut pled that he lost certain consulting engagements and that was born out by his testimony and by testimonies that we produced on his behalf showing records of consulting calls that he did and that they fell off after the defamation action was filed.

With respect to Dr. Milioris.  We pled in the complaint that he lost an annual contract to work for a pharmaceutical company in Greece, and we produced that document.  And he testified about it and about the circumstances of its cancellation.

And with respect to Dr. Brodkin, he doesn't work on a regular basis outside the home, as we indicated in our letter. But the case law around special injury has become -- and once upon a time, it was a very high standard.  It has certainly evolved to being a very fact-specific situation, and Dr. Brodkin and his wife Dr. Lisa Brodkin testified about the quite unusual is and outsized impact of the defamation case on their family and on their family finances, so we think there's plenty of evidence to go to the jury on special injury.

With respect to malice, the defamation complaint, what

it says in essence is that you, plaintiffs, our clients, have said a bunch of things about the drug that you know are wrong, and not only that, we, Cassava, can prove it because we, Cassava, have the data.  They say that very specifically.

The truth is that they did not have the data.  The company didn't have the data, and Dr. Wang's lab did not have the data, and they knew that.  So this is perhaps an unusual case, your Honor.  There can be no valid reason to bring a case that turns around an entirely false claim that they had the data.  They just didn't, and so whatever they proclaimed in their depositions, or perhaps what they will claim at trial, that nevertheless we were believers in the drug.  That is not a valid basis to bring a claim where you claim you have the data and you know you don't have the data.

THE COURT:  So your theory is that that is malice?

MR. ZAUR:  Absolutely, your Honor.  And there is other evidence, as counsel alluded to, with respect to the subjective malice, not only of Dr. Burns, who is not some junior scientist at the company.  She was the coinventor of the drug.  She was the coauthor with Dr. Wang of all the principal research related to the drug.  She was a long-standing -- the lead scientist there, and she was the spouse of the CEO of the company.  She's also, as we indicated in our letter, clearly involved in many privileged communications with litigation counsel before and during the prosecution of the lawsuit.  So

her commentary is particularly notable, but the comment about her own subjective mental state with respect to the filing and the prosecution of the case, but there is evidence about the subjective mental state of others at the company.

There will be plenty of evidence certainly to go to a jury and we think to show the malice, in the sense that they brought a case they knew they could not win, and therefore could not have had a proper purpose for, and indeed also that they were subjectively motivated with bad intent.  So we think -- I'll stop there.

With respect to the conspiracy claim, it's correct that the individual defendants are defendants only with respect to the malicious prosecution and the conspiracy claim.  We think that the personal interest exception to the Intracorporate Conspiracy Doctrine, the facts are exactly as we allege them in the complaint.  Mr. Barbier's personal conversations and his relationship with Dr. Burns.  Dr. Burns' urgency to protect her own personal scientific representation and her kind of powerful personal malice plainly shows there are personal interests that take them outside the scope of the Intracorporate Conspiracy Doctrine, so we don't really think there's a viable motion there at all.

Have I missed anything?  I think those are the summary judgment items.

THE COURT:  Punitive damages.

Q6MRHEIc

MR. ZAUR:  Yes.  Mr. Kumagai will address damages.

THE COURT:  OK.  Thank you very much.

Mr. Kumagai?

MR. KUMAGAI:  Thank you, your Honor.  So just addressing the proposed motion, Cassava's proposed motion for an order stating that plaintiffs cannot recover fees incurred prosecuting their claims for compensatory damages and punitive damages, our position is that Section 78 clearly entitled plaintiffs to recover fees, both incurred in the underlying defamation action and the anti-SLAPP proceeding if we establish that the lawsuit lacked a substantial basis in fact and law.  So contrary to what defendants' counsel suggests, it's not a free roll of the dice.  Defendants have always and continue to this day to contest the motion that the lawsuit was filed without a substantial basis in fact and law.  So we still need to go to trial to prove that.

If we do that, we are entitled under the statute to recover the fees incurred in this anti-SLAPP proceeding.  Every court to consider the recoverability of fees in an anti-SLAPP proceeding has determined that the fees incurred in that proceeding are recoverable.  Granted, there's not a lot of case law in similar situations where there's a separate plenary action, but that is the appropriate method or mechanism in federal court, and that is the situation we're in here.

THE COURT:  Would that be through an application for

Q6MRHEIc

attorneys' fees after a trial or is there a suggestion that the jury would return some sort of attorneys' fees assessment?

MR. KUMAGAI:  It would be -- no, in our view, this is part of the main trial, so we need to -- the first component of our anti-SLAPP claim is to make this showing that the defamation action lacked a substantial basis in fact and law.

THE COURT:  Understood.  But you would be asking a jury to assess attorneys' fees, and so attorneys' fees and the amount spent on attorneys' fees would be introduced into evidence during the trial.

MR. KUMAGAI:  It would be part of our evidence during the trial, yes, your Honor.

THE COURT:  OK.  Go ahead.

MR. KUMAGAI:  The position Cassava is taking right now is truly novel.  None of the three cases they cite in their letter are really on point, and don't address the recoverability of fees incurred pursuing compensatory or punitive damages.  They're trying to draw what we respectfully believe to be a completely arbitrary distinction between the discretionary component of damages under the anti-SLAPP statute and the nondiscretionary component.

Under the prior anti-SLAPP law, prior to the amendment in 2020, all three prongs were discretionary, and courts still awarded the fees incurred in the anti-SLAPP proceeding in those cases, so there's no principal reason sort of to create some

distinction between discretionary versus non-discretionary.

Thank you, your Honor.

THE COURT:  Let me pause you one moment.  So your argument that a punitive damages request should not be stricken at the request of the defendants is because the malice essentially that you're pointing to for purposes of the malicious prosecution claim justify punitive damages?

MR. KUMAGAI:  So there's two basically avenues to punitive damages for our claims.  So the malicious prosecution claim allows for punitive damages under sort of the traditional punitive damages standard where there's egregious, unconscionable conduct.  We believe there's evidence of that here, and we presented it in the summary judgment motion.

On the anti-SLAPP claim, that's the third prong of the statute, where we have to show the sole purpose was to inhibit free speech, suppress, intimidate our clients.  All of the evidence is very similar to what we're showing with malice on the malicious prosecution claim.  We would also present evidence showing that their stated purposes are not credible are not -- don't make sense in the context of what was actually happening at the time with the trials primarily because the evidence that the witnesses offered was that it was to protect -- to allow the trials to be fully enrolled.

They continued the lawsuit, filed the second amended complaint, long after the trials were fully enrolled.  So their

Q6MRHEIc

stated purposes that they've offered are just not credible.

THE COURT:  OK.  All right.  Thank you.

Ms. Loseman, is there anything you would like to add?

MS. LOSEMAN:  Your Honor, if I may, just briefly?

THE COURT:  Sure.

MS. LOSEMAN:  I'd like to respond on two points.  On the issue regarding the motion for summary judgment on malice, on that element, I do want to say that the plaintiffs have, I think, set up a bit of a fault construct in the sense that they say Cassava said, when the company filed the defamation action, that it could prove these plaintiffs wrong with particular data.  That's not what Cassava said.  As to the data, I'll suffice it to say we disagree with their point, and we think there's a lot for the Court to get into on a fully breathed motion for summary judgment.  But there are many other ways Cassava believed it could prove these plaintiffs wrong, including by the fact that the FDA received the Citizen Petition and rejected it and permitted the phase 3 trials to continue.

So there is much more context, there are a lot more facts that we believe the Court needs to consider.  And even considering all of those facts together and the full context, we believe the Court will see there's no issue for a jury to try here on the element of malice.

On the attorneys' fees point, I do want to say, I

Q6MRHEIc

agree with plaintiffs that the case law is unfortunately fairly limited on how attorneys' fees are treated here.  We see much more typically in the case law that fees incurred in defending the defamation action are awarded to plaintiffs in the underlying defamation action.  We're not aware of a case where a court has awarded fees for prosecuting a completely separate litigation matter for compensatory damages or punitive damages, let alone a jury being charged with deciding that.  So that's why, we submit, a motion for summary judgment will be helpful in guiding this case for the jury trial.

With that, your Honor, I don't want to get ahead of myself, but we do have thoughts on the overall schedule and how things might proceed, but I'll rest with that for now.

THE COURT:  Thank you.

Mr. Wu, anything further?

MR. WU:  Unless your Honor has any questions?

THE COURT:  No.  Thank you very much.

Ms. Loseman, you can stay there or stand there if you would like, but what are your thoughts?  I will allow you to make the motions insofar as it will, at the very least, assist the parties in getting some clarity as to how we're going to proceed to trial.  It's a 2024 case, so I'd like to move rather efficiently through summary judgment because we all agree that there's at least something that is going to go to the jury, so let's get ourselves ready for trial.

Q6MRHEIc

Ms. Loseman, what is your thought on timing?

MS. LOSEMAN:  Your Honor, we very much agree.  The company would like to get this matter behind it.  So I've not had a chance to check with any of my colleagues in the courtroom, but I do believe something like a 45, 45, 30 schedule for opening motions, oppositions, and replies would get us fully briefed by mid to late October, I believe, something like that.

THE COURT:  And do you plan to file a consolidated brief with Mr. Wu, or are you both filing separate briefs?

Mr. Wu?

MR. WU:  So I think there's some common issues where we could join in their arguments, but there are some distinct issues that we would brief separately.

THE COURT:  That's fine.  Just make sure you do it efficiently.  So you're saying 45 days.  Let me see what that looks like, and I'll check with plaintiff to see what your thoughts are.  So I was looking at August 3, September 14, and October 5.

Mr. Zaur, what is your thought generally on a briefing schedule?

MR. ZAUR:  Judge, we think that's OK on a briefing schedule.  I have a couple of observations about it.  I think it would probably be helpful——we understand that two sets of defendants may wish to brief some issue separately——if they

Q6MRHEIc

could submit a single Rule 56.1 statement, I think that might simplify the total volume of filings so we're not responding to two of those.

THE COURT:  I can ask them about that.

MR. ZAUR:  That would be our suggestion.  And my only other thought is a bigger picture, which is we would really like to try this case this year, and my proposal was going to be that we try to shoot for a trial date at the end of October.

THE COURT:  Well, I don't think I'll be able to decide the summary judgment motion if I receive the last brief on October 5.

MR. ZAUR:  We recognize that, and our view is the summary judgment motions are sort of a distraction.

THE COURT:  I'm going to hear them.  Would you like a shorter schedule?

MR. ZAUR:  No.  I think the schedule is probably workable, but what I would suggest is that we at least talk about trying to set a trial date sometime after that in the foreseeable future, so we know what we're working towards.

THE COURT:  OK.  Let me turn to the 56.1.  So August 3, September 14, October 5; Ms. Loseman, does that work for you?

MS. LOSEMAN:  Yes, it does, your Honor.  Thank you.

THE COURT:  Mr. Wu, does that work for you?

MR. WU:  Yes, your Honor.

Q6MRHEIc

THE COURT:  OK.  What is your thought, Mr. Wu, about combining a 56.1 statement?

MR. WU:  I don't think we want to get locked into that.  We'll do the same thing.  We'll coordinate with Cassava's counsel on the common issues, but the distinct issues, I don't think it will create any extra burden for the plaintiffs if we do our own 56.1.

THE COURT:  That's fine.  You are entitled to make your own motions, so I'll let you file your own 56.1 statement, and try not to duplicate efforts, if you would.  I do have a requirement that if there are issues that all parties agree upon, that there is a joint 56.1 sort of a stipulation, if you will, of some facts.  There are usually some things that the parties can agree upon, a contract presented—I don't know—you had a meeting on some certain date.  There are a few things that can be agreed upon, maybe not much in a case like this since there's a lot of disagreement.  But insofar as there's any agreement on facts, please put them in a joint statement.

It makes it easier for both of you as well as the Court, but both of you primarily because then you don't have to find record evidence in support of your facts.  You can both agree that this fact is a fact that is undisputed, and then I can use some of that when I'm assessing the background for the case as well.

In terms of a trial date, I'm not comfortable setting

Q6MRHEIc

a trial date yet until I know what the summary judgment motions look like and can get through them.  But I'm generally pretty prompt at getting trial set down.  So if I get the motions, once I get it decided, I'll try to put down a trial as soon as possible, so start thinking about trial, just in terms of how you would preplan, but I will try to get it scheduled fairly soon after a decision on summary judgment.  And if the parties get together and want to brief it faster, then you can brief it more quickly.

All right.  Mr. Zaur, is there anything else that we should talk about today?  Oh, in terms of oral argument on a motion, it just depends what it looks like.  Sometimes I ask for oral argument, sometimes I don't.  It depends if it would be helpful for me or not.  And I will do the *Daubert* and summary judgment at the same time if I do argument.

Mr. Zaur, anything further to discuss?

MR. ZAUR:  Nothing else.  Thank you, your Honor.

THE COURT:  Ms. Loseman, anything further today?

MS. LOSEMAN:  No.  Thank you, your Honor.

THE COURT:  Mr. Wu, anything further?

MR. WU:  No, your Honor.

THE COURT:  Good.  We'll get those motions in.  I presume the parties will work through if any redactions need to be made in any of the motion papers.  It seems like you're working well in that regard.  But know that there's a pretty

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q6MRHEIc

strict standard under *Lugosch* for sealing things, so if it doesn't meet that standard, it won't be sealed.  There's an even higher standard once we get to trial, just so that everyone is aware most things come out at trial.  Full disclosure.

All right.  Pleasure seeing all of you, and court is adjourned.

(Adjourned)

o0o