**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>Plaintiffs,<br><br>v.<br><br>CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,<br><br>Defendants. | Case No.: 1:24-cv-05948-JLR-OTW<br><br>**ORAL ARGUMENT REQUESTED** |

**THE INDIVIDUAL DEFENDANTS' RULE 56.1 STATEMENT**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants Remi Barbier and Lindsay Burns*

**TABLE OF CONTENTS**

Page

I. Cassava Sciences, Inc. ........................................................................................... 1

    A. Board of Directors ................................................................................ 1

    B. Executive Officers ................................................................................ 6

    C. Science Team ........................................................................................ 7

II. Encouraging Results From Simufilam Clinical Trials ........................................... 8

    A. Phase 1 Study ....................................................................................... 9

    B. Phase 2a Clinical Study ...................................................................... 10

    C. Phase 2b Clinical Study ...................................................................... 10

    D. Phase 2 Open-Label Study .................................................................. 14

    E. Phase 3 Clinical Trials ........................................................................ 14

III. FDA Denies Anonymous Citizen Petitions Seeking To Halt Clinical Trials ................... 15

IV. Plaintiffs Adopt the Citizen Petition Allegations and Accuse Cassava of Fraud ............. 19

V. Impact of Public Allegations Against Cassava on Clinical Sites and Recruitment ......... 20

VI. GLP Reviews of Dr. Wang's Non-GLP Laboratory ............................................. 21

VII. Government Investigations of Cassava ................................................................ 23

    A. DOJ Investigation Does Not Result in Any Charges ......................... 24

    B. Settlement of SEC Complaint Alleging Negligent Disclosures .......... 24

VIII. Orrick, Herrington & Sutcliffe LLP Investigation Finds No Evidence That Cassava Engaged in or Was Aware of Research Misconduct ........................................... 25

IX. CUNY Investigation Finds No Research Misconduct By Dr. Wang .................... 26

X. Dismissal of Criminal Indictment Against Dr. Wang .......................................... 27

XI. Cassava's Defamation Action ............................................................................. 28

XII. Plaintiffs File This Lawsuit ................................................................................ 37

Pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Civil Rules for the United States District Court for the Southern District of New York, and Rule 3(I)(iii) of the Court's Individual Practices in Civil Cases, Defendants Remi Barbier and Lindsay Burns (the "Individual Defendants"), respectfully submit this statement of material facts as to which there is no genuine dispute for purposes of their Motion for Summary Judgment on all claims asserted against them in the Amended Complaint ("AC"), filed on October 24, 2024 (ECF No. 9), by Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris.

## I. Cassava Sciences, Inc.

1. Cassava Sciences, Inc. ("Cassava" or "the Company"), now named Filana Therapeutics, is a clinical-stage biotechnology company. *See* Ex. 67,[1] Cassava 2021 Form 10-K, filed on March 1, 2022 ("2021 Form 10-K") at 4; AC ¶¶ 19, 28.

### A. Board of Directors

2. Between 2020 and 2024, eleven individuals served as Cassava directors. Ex. 13, Cassava Proxy Statement, filed on March 26, 2020 ("2020 Proxy") at 15; Ex. 29, Cassava Proxy Statement, filed on March 31, 2021 ("2021 Proxy") at 15, 17; Ex. 72, Cassava Proxy Statement, filed on March 24, 2022 ("2022 Proxy") at 18; Ex. 94, Cassava Proxy Statement, filed on March 27, 2023 ("2023 Proxy") at 23; Ex. 103, Cassava Proxy Statement, filed on March 26, 2024 ("2024 Proxy") at 9.

3. Between January 1, 2020 and July 16, 2024, nine of the eleven individuals who served as Cassava directors were independent directors (Robert Z. Gussin, Ph.D., Patrick J. Scannon, M.D., Ph.D., Michael J. O'Donnell, Esq., Saira Ramasastry, Sanford R. Robertson, Richard J. Barry, Pierre Gravier, Robert Anderson, Jr., and Claude Nicaise, M.D.) and two were

---

[1] Freestanding cites to "Ex. __" refer to the exhibits attached to the Declaration of Zachary R. Taylor, filed concurrently herewith.

management directors (Remi Barbier and Nadav Friedmann, M.D., Ph.D.). Ex. 13, 2020 Proxy at 28; Ex. 29, 2021 Proxy at 29; Ex. 72, 2022 Proxy at 19-20; Ex. 94, 2023 Proxy at 24-25; Ex. 103, 2024 Proxy at 11.

4. On July 17, 2024, Richard J. Barry was appointed the Company's principal executive officer and Executive Chairman of the Board. Ex. 109, Cassava Form 8-K and attached press release, filed on Sept. 9, 2024 ("Sept. 9, 2024 Form 8-K") at 4.

5. In September 2024, Mr. Barry was appointed Cassava's Chief Executive Officer. *Id*.

6. Robert Z. Gussin, Ph.D. has been a Cassava director since March 2003. Ex. 29, 2021 Proxy at 15; *see also* Ex. 72, 2022 Proxy at 18-19; Ex. 94, 2023 Proxy at 23-24; Ex. 103, 2024 Proxy at 10.

7. Dr. Gussin worked at Johnson & Johnson for 26 years, including as Chief Scientific Officer and Corporate Vice President, Science and Technology from 1986 through 2000. Ex. 29, 2021 Proxy at 15; *see also* Ex. 72, 2022 Proxy at 18-19; Ex. 94, 2023 Proxy at 23-24; Ex. 103, 2024 Proxy at 10.

8. Patrick J. Scannon, M.D., Ph.D. has been a Cassava director since December 2007. Ex. 29, 2021 Proxy at 16; *see also* Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24; Ex. 103, 2024 Proxy at 10.

9. Dr. Scannon co-founded XOMA Corporation and served as XOMA's Chief Scientific and Medical Officer from 1993 to 2006, and as XOMA's Chief Biotechnology Officer from 2006 to 2016. Ex. 29, 2021 Proxy at 16; *see also* Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24; Ex. 103, 2024 Proxy at 10.

10.     Michael J. O'Donnell, Esq. has been a Cassava director since June 1998. Ex. 29, 2021 Proxy at 15; Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24; Ex. 103, 2024 Proxy at 10.

11.     Mr. O'Donnell is a member of the law firm of Orrick Herrington & Sutcliffe, the Company's corporate counsel. Ex. 29, 2021 Proxy at 15; Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24; Ex. 103, 2024 Proxy at 10.

12.     Mr. O'Donnell serves as corporate counsel to numerous biopharmaceutical and life sciences companies. *Id.*

13.     Saira Ramasastry was a Cassava director from February 2013 to June 2020.  Ex. 13, 2020 Proxy at 15; Ex. 24, Cassava Form 8-K, filed on June 19, 2020.

14.     Ms. Ramasastry is Managing Partner of Life Sciences Advisory, LLC, a life science company advisory business, and was previously an investment banker with Merrill Lynch & Company, Inc.  Ex. 13, 2020 Proxy at 15; Ex. 24, Cassava Form 8-K, filed on June 19, 2020.

15.     Ms. Ramasastry has also been a director of other public companies, including Sangamo Therapeutics, Inc., VIR Biotechnology, Inc., Innovate Biopharmaceuticals, Inc. and Glenmark Pharmaceuticals Ltd.  Ex. 13, 2020 Proxy at 15.

16.     Sanford R. Robertson was a Cassava director from September 1998 until his passing in August 2024. Ex. 103, 2024 Proxy at 10; Ex. 116, Cassava Proxy Statement, filed on April 14, 2025 ("2025 Proxy") at 33.

17.     Mr. Robertson was previously the lead director of Salesforce.com. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 33.

18.     Mr. Robertson founded Francisco Partners, a technology buyout fund, and Robertson, Stephens & Company, a technology investment bank. Ex. 103, 2024 Proxy at 10; *see also* Ex. 29, 2021 Proxy at 16; Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24.

19. Richard J. Barry has been a Cassava director since June 2021. Ex. 72, 2022 Proxy at 18; see also Ex. 94, 2023 Proxy at 23; Ex. 103, 2024 Proxy at 10.

20. Mr. Barry was a Managing Director of Robertson Stephens Investment Management, and a Managing General Partner of Eastbourne Capital Management LLC. Ex. 72, 2022 Proxy at 18; see also Ex. 94, 2023 Proxy at 23; Ex. 103, 2024 Proxy at 10.

21. Mr. Barry is also a director of Sarepta Therapeutics, Inc. *Id.*

22. Pierre Gravier has been a Cassava director since December 2023. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

23. Mr. Gravier has been Chief Financial Officer of PTC Therapeutics, Inc. since July 2023. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

24. Mr. Gravier was a Managing Director in the healthcare group of Perella Weinberg Partners. *Id.*

25. Robert Anderson, Jr. has been a Cassava director since December 2023. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

26. Mr. Anderson previously worked at the Federal Bureau of Investigation, including as the FBI's Executive Assistant Director of the Criminal, Cyber, Response and Services Branch. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

27. Mr. Anderson served as Chief Executive Officer and Chairman of the Board of OakTruss Group, an advisory firm focused on cybersecurity. *Id.*

28. Claude Nicaise, M.D., has been a Cassava director since December 2023. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

29. Dr. Nicaise founded Clinical Regulatory Services, a company providing advice on clinical and regulatory matters to biotechnology companies. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

30. From 1983 to 2023, Dr. Nicaise, served in various positions at Bristol-Myers Squibb, Alexion Pharmaceuticals, and Ovid Therapeutics Inc. *Id*.

31. Dr. Nicaise is also currently a director of Sarepta Therapeutics, Inc., Gain Therapeutics, and Chemomab Therapeutics Ltd. *Id*.

32. Defendant Remi Barbier served as Cassava's Chief Executive Officer from May 1998 to September 2024, and Chair of Cassava's Board of Directors from May 1998 until July 15, 2024. Ex. 29, 2021 Proxy at 15; Ex. 107, Cassava Form 8-K, filed on July 17, 2024 ("July 17, 2024 Form 8-K") at 2; Ex. 109, Sept. 9, 2024 Form 8-K at 2.

33. Mr. Barbier has served as a trustee emeritus of the Carnegie Institute of Washington and Santa Fe Institute and was on the Advisory Board of the University of California Institute for Quantitative Biosciences and BioVentures LLC, a life science incubator at the University of Arkansas for Medical Sciences. *Id*.; *see also* Ex. 72, 2022 Proxy at 18; Ex. 94, 2023 Proxy at 23; Ex. 103, 2024 Proxy at 9.

34. Nadav Friedmann, M.D., Ph.D. served as a Cassava director from September 1998 until his passing in December 2022. Ex. 29, 2021 Proxy at 15; Ex. 89, CASSAVA_000945203; *see also* Ex. 72, 2022 Proxy at 18.

35. Prior to joining Cassava as Chief Medical Officer in 2001, Dr. Friedmann held various positions at Johnson & Johnson, including as Head of Johnson & Johnson's Biotechnology Research Center, was VP, Clinical Research at XOMA Corporation, and President and CEO of Daiichi Pharmaceutical Corporation. *Id*.

5

36.     Defendant Lindsay Burns, Ph.D., has never served as a director of Cassava. *See* Ex. 3, CASSAVA_000535042 at -535057; Ex. 4, CASSAVA_000096151, at -177; *see also* Exs. 13, 29, 72, 94, 103 (2020 – 2024 Proxy Statements); Ex. 28, Cassava's 2020 Form 10-K, filed with the SEC on March 23, 2021 ("2020 Form 10-K"), at 22; Ex. 67, 2021 Form 10-K at 23; Ex. 93, Cassava's 2022 Form 10-K, filed with the SEC on February 28, 2023 ("2022 Form 10-K"), at 23; Ex. 101, Cassava's 2023 Form 10-K, filed with the SEC on February 28, 2024 ("2023 Form 10-K"), at 23; Ex. 115, Cassava's 2024 Form 10-K, filed with the SEC on March 3, 2025 ("2024 Form 10-K"), at 33.

**B.     Executive Officers**

37.     Between 2020 and 2024, there were six individuals who served as executive officers of Cassava: Mr. Barbier, Mr. Barry, Dr. Friedmann, James W. Kupiec, M.D., Eric Schoen, and R. Christopher Cook.   Ex. 13, 2020 Proxy at 15; Ex. 29, 2021 Proxy at 15; Ex. 72, 2022 Proxy at 18; Ex. 94, 2023 Proxy at 23; Ex. 103, 2024 Proxy at 9; Ex. 109, Sept. 9, 2024 Form 8-K.

38.     James W. Kupiec, M.D. served as Chief Medical Officer from December 2022 until May 2025 and as Chief Clinical Development Officer from January 2021 to December 2022. Ex. 29, 2021 Proxy at 15; Ex. 94, 2023 Proxy at 23; Ex. 117, Cassava Form 8-K, filed on April 21, 2025 ("April 21, 2025 Form 8-K") at 2.

39.     Prior to joining the Company, Dr. Kupiec served as VP, Global Clinical Leader for Parkinson's Disease and Clinical Head of Neuroscience Research Unit for Pfizer, Inc., and also held roles at Sanofi and Ciba-Geigy Pharmaceuticals. Ex. 29, 2021 Proxy at 15.

40.     Eric Schoen has served as Cassava's Chief Financial Officer since 2018.  Ex. 103, 2024 Proxy at 9.

41.     Prior to joining Cassava, Mr. Schoen served as Vice President, Senior Vice President, Finance, and Chief Accounting Officer of Aspira Women's Health Inc., and held roles

in the audit and assurance, transaction services and global capital markets practices of PricewaterhouseCoopers. *Id.*

42. R. Christopher Cook joined the Company in October 2022 as General Counsel. Ex. 103, 2024 Proxy at 9.

43. In April 2025, Mr. Cook was appointed Cassava's Chief Operating and Legal Officer. Ex. 117, April 21, 2025 Form 8-K at 2.

44. Prior to joining Cassava, Mr. Cook was Global Head of Litigation and Government Investigations for Alcon, Vice President and Division General Counsel for Walmart Central America, a litigation partner at Jones Day, and an Assistant U.S. Attorney. Ex. 103, 2024 Proxy at 9.

45. Defendant Lindsay Burns, Ph.D., has never served as an executive officer of Cassava. *See* Ex. 3, CASSAVA_000535042 at -535057; Ex. 4, CASSAVA_000096151, at -96177; *see also* Exs. 13, 29, 72, 94, 103 (2020 – 2024 Proxy Statements); Ex. 28, 2020 Form 10-K, at 22; Ex. 67, 2021 Form 10-K at 23; Ex. 93, 2022 Form 10-K, at 23; Ex. 101, 2023 Form 10-K, at 23; Ex. 115, 2024 Form 10-K, at 33.

**C.     Science Team**

46. Between 2020 and 2024, Cassava's science team included Nadav Friedmann, James Kupiec, Lindsay Burns, Michael Marsman, George (Ben) Thornton, Michael Zamloot, Shawn Kucera, Annelies de Kater, Carrie Crowley, Rebecca Carpenter, Antonio Hernandez, Leslie Jones, Laura Ann Rodriguez, Tracy Owen, Stephanie Hayden, Judit Stroe, Emmalee Crow, and Melissa Snyder. Ex. 97, CASSAVA_001454984, at -1455007-1455037; Ex. 3, CASSAVA_000535042 at -535057-535062; Ex. 4, CASSAVA_000096151, at -96172-96200; Ex. 30, CASSAVA_000086872, at -86892-86913; Ex. 28, 2020 Form 10-K, at 22; Ex. 141,

CASSAVA_000534712, at -534724-534732; Ex. 142, CASSAVA_001447291, at 1447305-1447332.

47. At Cassava, Dr. Burns has served as Senior Director of Preclinical Research, Vice President of Neuroscience and Senior Vice President of Neuroscience. Ex. 3, CASSAVA_000535042 at -535057; Ex. 4, CASSAVA_000096151, at -96177; Ex. 97, CASSAVA_001454984 at -1455007.

48. Prior to joining Cassava, Dr. Burns worked at Elan Pharmaceuticals and Abgenix. Ex. 3, CASSAVA_000535042 at -535057.

49. Dr. Burns received her Ph.D. in behavioral neuroscience from the University of Cambridge and did her post-doctoral work in neurotransplantation at McLean Hospital at Harvard Medical School. Ex. 3, CASSAVA_000535042 at -535057.

50. Dr. Burns was never the lead scientist at Cassava. Ex. 133, Burns Tr. 233:14-17.

51. During her employment at Cassava, Dr. Burns reported to the Chief Medical Officer. Ex. 133, Burns Tr. 233:14-17; Ex. 101, 2023 Form 10-K, at 23.

52. The Chief Medical Officer was responsible for overseeing the clinical development of simufilam. Ex. 30, CASSAVA_000086872 at -86896; Ex. 97, CASSAVA_001454984 at -1455020.

## II. Encouraging Results From Simufilam Clinical Trials

53. In 2017, Cassava began sponsoring clinical trials of simufilam. Ex. 67, 2021 Form 10-K at 4-5, 15; Ex. 93, 2022 Form 10-K, at 15.

54. At the time, published studies had indicated that, in Alzheimer's patients, an altered form of a protein called filamin A ("FLNA") caused neuronal dysfunction, neuronal degeneration and neuroinflammation. Ex. 67, 2021 Form 10-K at 4; *see* Ex. 118, L. Zhang et al., *Filamin A in focus: unravelling the multifaceted roles of filamin A in neurodevelopment and neurological*

*disorders*, Brain 2025:148; 3473–3480 (collecting sources); Ex. 1, Onoprishvili I, Andria M, Kramer H, et al., *Interaction between the µ opioid receptor and filamin A is involved in receptor regulation and trafficking*, Mol Pharmacol. 2003;64:1092–1100; Ex. 2, Feng Y, Walsh C., *The many faces of filamin: A versatile molecular scaffold for cell motility and signalling*, Nat Cell Biol. 2004;6:1034–1038.

55. The Company believed that simufilam's mechanism of action could improve brain health and potentially treat Alzheimer's by reverting altered FLNA back to its native, healthy conformation. Ex. 67, 2021 Form 10-K, at 5.

### A. Phase 1 Study

56. In 2017, the U.S. Food and Drug Administration ("FDA") accepted the Company's Investigational New Drug ("IND") application for simufilam. Ex. 67, 2021 Form 10-K, at 15; Ex. 5, Cassava Form 8-K, filed Aug. 9, 2017 ("Aug. 9, 2017 Form 8-K").

57. Between 2017 and 2018, Cassava sponsored a Phase 1 study of simufilam, a first-in-human volunteer study focused on the primary endpoints of safety, tolerability and pharmacokinetics. Ex. 5, Aug. 9, 2017 Form 8-K.

58. In 2018, the Phase 1 study was completed. *See* ClinicalTrials.gov, A Safety Study of PTI-125 in Healthy Volunteers, NCT03784300, https://clinicaltrials.gov/study/NCT03784300 (last visited Aug. 2, 2026).

59. The Phase 1 study results showed that simufilam was well-tolerated and rapidly absorbed. Ex. 67, 2021 Form 10-K, at 15.

60. The Company believed that the Phase 1 study demonstrated favorable proof-of-principle for the development of simufilam in treating Alzheimer's disease. Ex. 6, Cassava Press Release, dated Oct. 24, 2017; Ex. 8, Cassava 2018 Form 10-K, filed Mar. 29, 2019 ("2018 Form 10-K"), at 8.

### B.   Phase 2a Clinical Study

61.     In 2019, Cassava sponsored a Phase 2a clinical proof-of-concept safety and pharmacokinetic study of simufilam involving thirteen patients, ages 50 to 85, with mild-to-moderate Alzheimer's disease. *See* ClinicalTrials.gov, A PTI-125 for Mild-to-moderate Alzheimer's Disease Patients, NCT03748706, https://clinicaltrials.gov/study/NCT03748706 (last visited Aug. 3, 2026).

62.     An independent analysis by a consulting biostatistician found decreases in eight cerebrospinal fluid ("CSF") biomarkers, when comparing Day 28 to pre-dose baseline. Ex. 67, 2021 Form 10-K at 15-16.

63.     The Company believed the Phase 2a Study results showed clinical evidence of simufilam's mechanism of action and drug-target engagement. Ex. 67, 2021 Form 10-K at 17.

### C.   Phase 2b Clinical Study

64.     In September 2019, Cassava announced the initiation of a Phase 2b study, involving 64 patients with mild-to-moderate Alzheimer's disease. Ex. 14, Cassava Form 8-K and attached press release, filed Mar. 26, 2020 ("Mar. 26, 2020 Form 8-K").

65.     The Phase 2b study was designed to evaluate the safety and tolerability of simufilam. Ex. 14, Mar. 26, 2020 Form 8-K.

66.     The primary endpoint was improvements in levels of CSF biomarkers of disease from baseline to Day 28. *Id*.

67.     The Company initially selected the laboratory of Dr. Oskar Hansson, a professor at Lund University in Sweden, to conduct the CSF biomarker analysis for the Phase 2b study. Ex. 11, CASSAVA_000858421.

68.     During the Lund biomarker analysis, multiple issues arose that caused Cassava and members of its science team to doubt the reliability of Lund's analysis, including:

(a)    The Lund laboratory experienced staffing issues due to the COVID-19 pandemic. Ex. 15, CASSAVA_000857083 ("[o]ne problem is the some of our technical staff is currently on a [sick] leave").

(b)    There were technical errors in the analysis for some of the samples. Ex. 15, CASSAVA_000857083 ("[t]here must have been some fault in this specific strip of wells").

(c)    During the CFS biomarker analysis, the Quanterix Simoa device used to analyze the samples broke down in the middle of a test. Ex. 16, CASSAVA_000856966 ("Unfortunately, Simoa instrument broke down in the beginning of the NfL run. We are not sure if it would be possible to collect the data.").

(d)    Certain CSF samples were refrigerated at the incorrect temperature. Ex. 17, CASSAVA_000857485, at -857485-857486.

(e)    Multiple clerical and technical errors, some of which were only corrected when brought to  attention by Dr. Burns, impacted the output of the biomarker analysis data. Ex. 18, CASSAVA_000391420 ("I made a mistake by running the plate with the wrong calibrator concentrations."); Ex. 19, CASSAVA_000391432 ("Our technician typed 003-014 Day 28 instead of 13-003 Day 28."); Ex. 23, CASSAVA_000418979 ("The pdf file for plate 1 is not correct, it is based on wrong calibrator values.").

(f)    Dr. Hansson agreed that the final data looked "odd" due to the high level of variability. Ex. 21, CASSAVA_000415273 (Dr. Hansson: "I agree that the variation is very high, which is odd as the CVs are low indication good precision of the actual measurements.").

(g)    The Lund data revealed anomalous swings in biomarker measurements, including in placebo groups. Ex. 133, Burns Tr., 205:7-206:7 ("So when we saw these massive

changes in the placebo group in one month we knew that's not reality. That's either sample handling, assay variability. Something is not reliable here.").

(h) The Lund data showed high percentages of "coefficients of variation," which means that multiple values for the same sample returned widely varying results. Ex. 22, CASSAVA_000375558 ("The five QC samples have higher (in some cases double or triple) than expected CVs . . .").

69. Dr. Burns sent Lund's data analysis to Dr. Paul Aisen. Ex. 22, CASSAVA_000375558.

70. Dr. Aisen is the Director of the Alzheimer's Therapeutic Research Institute and has worked in Alzheimer's research for over 35 years. Ex. 120, Aisen Tr. 10:21-11:1, 12:9-11.

71. Dr. Aisen confirmed Dr. Burns' concerns about the Lund CSF biomarker analysis. Ex. 120, Aisen Tr., 47:12-52:23; Ex. 22, CASSAVA_000375558.

72. Dr. Aisen did not receive any compensation from Cassava for his review of the Lund data. Ex. 120, Aisen Tr. at 13:19-14:3.

73. On May 15, 2020, Cassava announced that the initial Phase 2b CSF biomarker data would have to be re-analyzed. Ex. 20, Cassava Form 8-K, filed May 15, 2020, at 5; Ex. 28, 2020 Form 10-K, at 12 ("Overall, we believe data from the initial bioanalysis can be interpreted as anomalous and highly improbable. With its validity in question, the initial bioanalysis serves no useful purpose.").

74. The Company contacted Dr. Hoau-Yan Wang, professor at the City University of New York, to perform an analysis of the remaining patient CSF samples from the Phase 2b trial. Ex. 133, Burns Tr. at 215:20-24.

75.     Dr. Burns testified that Dr. Wang's laboratory was chosen because Cassava "didn't have a lot of choices" for laboratories that were capable of doing the CSF biomarker analysis and available. Ex. 133, Burns Tr. at 215:23-216:9.

76.     In addition to the CSF biomarker analysis for the primary endpoint of the Phase 2b study, an analysis of cognitive changes was conducted by Cambridge Cognition. Ex. 10, CASSAVA_001045729.

77.     The cognitive study tests were exploratory and not meant to support conclusions about efficacy. Ex. 106, Cassava Form 8-K, filed July 1, 2024 ("July 1, 2024 Form 8-K"), at 3 ("The Phase 2b Study's CANTAB tests were not powered for statistical significance . . . .").

78.     On September 14, 2020, Cassava announced the final results of the Phase 2b study. Ex. 25, Cassava Form 8-K and attached press release and presentation, filed on September 14, 2020 ("Sept. 14, 2020 Form 8-K"), at 5.

79.     In a September 14, 2020 press release, Cassava reported that the drug was safe and well-tolerated in the study and that simufilam improved biomarkers in patients with Alzheimer's disease compared to a placebo group. Ex. 25, Sept. 14, 2020 Form 8-K, at 7.

80.     The September 14, 2020 press release also reported that simufilam appeared to benefit cognition. *Id.*

81.     The presentation deck for Cassava's conference call that day noted that, for the cognitive analyses, "[p]atients who did not take drug (no blood levels) were removed" and, for one of the two tests, "[e]ffect sizes vs. placebo were calculated … after removing the most and least impaired subjects across all groups by baseline score." Ex. 25, Sept. 14, 2020 Form 8-K, at 37-38.

82.     Approximately 40% of the 64 Phase 2b study participants were excluded from the cognitive analyses. Ex. 106, July 1, 2024 Form 8-K, at 3.

83.     The excluded participants consisted of participants with very few errors (ceiling effects), participants whose performance on the cognitive evaluation indicated that they may not have understood the task, participants reported not to have understood the instructions, participants in the non-placebo group who appeared not to have taken simufilam, participants who were not compliant with the medication regimen, and patients with no baseline test. Ex. 106, July 1, 2024 Form 8-K at 3; Ex. 133, Burns Tr. 173:21-174:8.

**D.      Phase 2 Open-Label Study**

84.     In 2020, Cassava sponsored an open-label study (no blinded group) to evaluate the long-term safety and tolerability of simufilam, and to assess exploratory efficacy endpoints. Ex. 93, 2022 Form 10-K at 6.

85.     The efficacy outcomes were analyzed by Pentara Corporation, an independent biostatistical consulting firm. Ex. 93, 2022 Form 10-K at 7; Ex. 90, CASSAVA_000391870, at -391874.

86.     In January 2023, Cassava announced positive top-line results for the Phase 2 open-label study. Ex. 93, 2022 Form 10-K at 6-8.

**E.      Phase 3 Clinical Trials**

87.     On May 6, 2021, Cassava requested Special Protocol Assessments ("SPAs") for proposed Phase 3 protocols. Ex. 136, Expert Report of Dr. Brian Harvey ("Harvey Rpt."), at Fig. 3.

88.     After FDA responded on June 18, 2021 that the proposals as presented would not support regulatory submissions, Cassava submitted revised requests on July 7, 2021, and FDA responded on August 20, 2021 that the revised SPAs would support regulatory submissions. *Id*.

89. In 2021, the Company announced the initiation of two Phase 3 clinical trials: RETHINK-ALZ and REFOCUS-ALZ. Ex. 55, Cassava Form 10-Q, filed on Nov. 15, 2021 ("Q3 2021 Form 10-Q"), at 25.

90. RETHINK-ALZ was designed to evaluate the safety and efficacy of oral simufilam 100 mg in enhancing cognition and slowing cognitive and functional decline over 52 weeks. Ex. 55, Q3 2021 Form 10-Q, at 26.

91. The secondary objectives of RETHINK-ALZ included the assessment of simufilam's effect on neuropsychiatric symptoms and caregiver burden. *Id*.

92. The Company planned to enroll approximately 750 patients in the U.S. and Canada, and eventually overseas. *Id*.

93. REFOCUS-ALZ, was designed to evaluate the safety and efficacy of oral simufilam 100 mg and 50 mg over 76 weeks. Ex. 115, 2024 Form 10-K, at 7.

94. The Company planned to enroll approximately 1,000 patients in the U.S. and Canada and, eventually, overseas. Ex. 55, Q3 2021 Form 10-Q, at 26.

### III. FDA Denies Anonymous Citizen Petitions Seeking To Halt Clinical Trials

95. On August 18, 2021, Jordan A. Thomas, a lawyer affiliated with Labaton Sucharow LLP, submitted a Citizen Petition to the FDA on behalf of anonymous clients, asking the FDA to halt Cassava's Phase 2 Open Label and Phase 3 RETHINK-ALZ clinical trials. Ex. 33, CASSAVA_000490972 (Aug. 18, 2021 Citizen Petition), at 3.

96. On August 30, September 9, November 17, and December 8, 2021, Mr. Thomas filed supplements to the Citizen Petition. Ex. 37, CASSAVA_001442046 (Aug. 30, 2021 Supp. to Citizen Petition); Ex. 41, CASSAVA_000491151 (Sept. 9, 2021 Second Supp. to Citizen Petition); Ex. 58, CASSAVA_000696037 (Nov. 17, 2021 Third Supp. to Citizen Petition); Ex. 59, CASSAVA_000714451 (Dec. 8, 2021 Fourth Supp. to Citizen Petition).

97. On September 1, 2021, Mr. Thomas submitted another Citizen Petition asking the FDA to halt the ongoing Phase 3 REFOCUS-ALZ trial. Ex. 39, (Sept. 1, 2021 Citizen Petition).

98. The Citizen Petitions made three principal allegations: (1) the Western blot analyses published in journal articles used to support simufilam's connection to Alzheimer's disease suggest that the data was manipulated; (2) Cassava's scientific claims are "impossible" and that they are based on "scientifically undoable" experiments; and (3) Cassava's presentation of Phase 2b clinical biomarker data shows "signs of data anomalies or manipulation." *See generally* Exs. 33, 37, 41, 58, 59.

99. Mr. Thomas' November 17, 2021 submission alleged that Western Blot images that had been supplied to certain academic journals to address the Citizen Petition allegations of Western Blot image manipulation were not "original" images. Ex. 58, CASSAVA_000696037 (Third Supp. to Citizen Petition) at -696055.

100. The Western Blot images at issue were generated by Dr. Wang. Ex. 133, Burns Tr. 14:4-21; Ex. 40, CASSAVA_000008476, at 5; Ex. 123, Brodkin Tr. 176:11-20.

101. Neither Dr. Burns nor anyone else at Cassava generated the Western blot images. Ex. 133, Burns Tr. 14:4-21.

102. Dr. Wang maintained that the Western Blot images provided to the academic journals were the original images. Ex. 70, CASSAVA_000719933, at -719935 (Dr. Wang: "I was still able to locate most of the original files and provide them to PLOS One"); Ex. 96, CASSAVA_001331679 (Dr. Wang: "As Dr. Burns has indicated, all the representative blots provided were full blots. I was [unaware] of the requirement to show any areas outside the blots. In addition, I am not aware of the requirements of showing molecular weight markers in the

16

gel since a well-titrated antibodies will NOT detect any molecular markers unless the concentrations of antibodies are too high or molecular weight markers were over-loaded.").

103. Dr. Hal Scofield is a clinician scientist at the University of Oklahoma Health Sciences Center and the Oklahoma Medical Research Foundation. Ex. 137, Expert Report of Dr. Hal Scofield ("Scofield Rpt."), at 1.

104. Dr. Scofield is also the Research Integrity Officer at the Oklahoma City U.S. Department of Veterans Affairs Medical Center, where he conducts and participates in research misconduct investigations. Ex. 137, Scofield Rpt., at 2.

105. Dr. Scofield has authored multiple papers related to Western blotting and is an editor of a textbook entitled "Western Blotting" (Kurien BT, Scofield RH, eds., Humana Press: New York, 2015). Ex. 137, Scofield Rpt., at 1.

106. In 2022, Dr. Scofield submitted a letter to CUNY concerning the Western blot images discussed in the Citizen Petitions. Ex. 73, CASSAVA_001418716; Ex. 137, Scofield Rpt.

107. Dr. Scofield's letter to CUNY stated: "[T]he allegations in the Citizen Petition appear to be the result of a fundamental lack of understanding of Western blotting, particularly regarding the ways that visual artifacts appear in the final images. Additionally, the petitioners clearly do not understand the ways in which Western blots are prepared for publication. I have found no evidence of misconduct by Dr. Wang." Ex. 73, CASSAVA_001418716 at -1418722; Ex. 137, Scofield Rpt.

108. Dr. Burns had no reason to doubt that the Western Blot images provided to the academic journals were the original images and saw no evidence that the images were manipulated. Ex. 47, CASSAVA_000015887 ("There is no manipulation in these images. I'm confident any

reasonable person with knowledge, experience & expertise in Western blots will reach this same conclusion."); Ex. 133, Burns Tr. 70:6-73:12; 72:10-15.

109. On August 25, 2021, Cassava issued a press release denying the allegations in the Citizen Petition. Ex. 35, CASSAVA_000094847 ("Cassava Sciences Responds to Allegations").

110. On November 17, 2021, the anonymous clients behind the Citizen Petitions were revealed to be Dr. David Bredt and Dr. Geoffrey Pitt, who had each taken short positions in Cassava stock. Ex. 58, CASSAVA_000696037, at -696038-696039; Ex. 63, CASSAVA_000541050; Ex. 75, CASSAVA_000899854.

111. On February 10, 2022, the FDA denied the Citizen Petitions. Ex. 65, CASSAVA_000696066.

112. FDA did not halt the Phase 3 clinical trials and never conveyed to Cassava or anyone else that it had concluded the clinical program was based on fabricated data or a fraudulent scientific premise. Ex. 136, Harvey Rpt. ¶ 16.

113. Dr. Brian Harvey is a physician and biochemist who served at the FDA for eleven years. Ex. 136, Harvey Rpt. ¶¶ 1-2.

114. Dr. Harvey testified that, based on his experience, the FDA would have conducted an in-depth analysis of the Citizen Petition allegations. Ex. 138, Harvey Tr. 177:23-178:7 (the FDA denial "wasn't just petition denied, outside the scope of citizen's petition[,]" "[i]t actually went into other subjects. So it shows that there was . . . in-depth review and thoughtful analysis of what was going on[.]"); *id.* 183:2-184:4.

115. Dr. Harvey further testified that if the Citizen Petition allegations "were true to the extreme extent of what was made," "FDA would have reacted, would have acted, [] quickly, [] to put things on clinical hold." Ex. 138, Harvey Tr. 181:10-22; *id.* 182:7-11 ("So FDA review

division had a lot of information. . . . [I]f there have been red flags, those would have come up. If the [Citizen Petition] had, you know, any element of truth to it, FDA would have reacted.").

116.    Dr. Harvey explained that Patrizia Cavazzoni, the Director of the FDA's Center for Drug Evaluation and Research, who reviewed the Citizen Petition and ultimately signed off on the denial, *see* Ex. 65, CASSAVA_000696066 at -696068, is "very . . . experienced . . . and if those allegations had been true, she wouldn't have sat back and, and hid behind a technicality of it being outside the scope. She would have come down with an iron hand if any of those – you know, if those sweeping allegations had been true, but that's because I know her, I worked with her." Ex. 138, Harvey Tr. 184:15-22.

**IV.     Plaintiffs Adopt the Citizen Petition Allegations and Accuse Cassava of Fraud**

117.    In late 2021, Plaintiffs began publicly accusing Cassava of fraud. Cassava Sciences (SAVA): A Shambolic Charade, Home Page, www.cassavafraud.com (last visited Jul. 27, 2026); Ex. 50, CASSAVA_001441984; Ex. 48, CASSAVA_000992410; Ex. 85, Chart of Social Media Statements; Ex. 53, PLAINTIFFS0078087 ("it is all complete, made-up garbage."); Ex. 51, PLAINTIFFS0056669, at -56670 ("Simufilam is a frauuud!"); Ex. 66, PLAINTIFFS0035073, at -35074 ("$SAVA remains a complete scientific fraud").

118.    Plaintiffs coordinated with one another on their public accusations against Cassava. Ex. 123, Brodkin Tr. 51:2-53:25; Ex. 122, Milioris Tr. 254:6-257:11.

119.    Plaintiffs also coordinated the timing and substance of their public accusations against Cassava with other individuals and investment firms with short interests in Cassava stock. Ex. 45, PLAINTIFFS0042127; Ex. 128, Heilbut Tr. 373:14-21, 374:6-15; Ex. 123, Brodkin Tr. 104:3-105:3; 119:2-120:3; 127:8-130:23; 373:21-375:1; *see also* Ex. 123, Brodkin Tr. 45:9-46:10; 355:16-362:5; 373:21-375.2.

120. At the time Plaintiffs publicly accused Cassava of fraud, they had short positions in or put options for Cassava stock. Ex. 128, Heilbut Tr. 301:2-17, 303:4-20, 306:3-10 (short position); Ex. 122, Milioris Tr. 337:12-20, 338:6-13, 339:1-8 (short position); Brodkin Dep. Tr. 292:14-23 (put options).

121. Plaintiffs' goal in making public accusations of fraud against Cassava was to drive Cassava's stock price down. Ex. 44, PLAINTIFFS0171136, at -171138 ("I like the challenge of destroying 2B in fraudulent market cap"); Ex. 43, PLAINTIFFS0159091, at -159093; Ex. 54, PLAINTIFFS0028478, at -28479 ("We've got them on the ropes and we're ready for your to help deliver the killing blows [strong arm emoji]."); Ex. 49, PLAINTIFFS0170476, at -170481 ("I have been working up a rather deep dive deconstructing every aspect of the sava story and plan on submitting to several regulatory oversight bodies at after close. I believe (and the other share this belief) that this will have some (maybe significant) effect on stock price. I have personally increased my put position by about 50% in short term expiry near the money strikes."); Ex. 128, Heilbut Tr. 376:6-11 (testifying that Plaintiffs hoped the release of their website in conjunction with the QCM report would have an impact on the stock price); Ex. 123, Brodkin Tr. 81:6-16 (testifying that he expected the stock to "drop down to zero immediately" following the publication of the allegations in November 2021); *id.* 98:14-19 (testifying that he and QCM shared the goal of driving down Cassava's stock price); *id.* 104:3-105:3 (testifying that Plaintiffs had an agreement with QCM to coordinate the release of their reports in an effort to drive the stock price down).

## V. Impact of Public Allegations Against Cassava on Clinical Sites and Recruitment

122. In the wake of the public accusations of fraud against Cassava, the Company received reports that some clinical sites participating in the Phase 3 clinical trials had withdrawn, that some physicians had patients who would have enrolled but for online statements describing Cassava as a fraud, and that unidentified individuals had contacted clinical sites and questioned

how the sites could work with a company described as a fraud. Exhibit 125, Cassava 30(b)(6) Tr. 20:13–21:20. Barry testified that "[a]cademic centers, in particular, worry about their reputation. And those are the ones that we lost, and it was because of this." Exhibit 124, Barry Tr. 202:13-15.

123. On April 4, 2022, the Executive Director of the Lehigh Center for Clinical Research informed Premier Research and Cassava that, after internal discussions concerning public developments the site regarded as increasingly troubling, the site had decided to withdraw from protocol PTI-125-07. Exhibit 143, CASSAVA_001133797 at -1133799; Exhibit 133, Burns Tr. 262:10–264:16.

## VI. GLP Reviews of Dr. Wang's Non-GLP Laboratory

124. Cassava does not have its own laboratory. Ex. 40, CASSAVA_000490972, at 5 ("Cassava Sciences does not have its own laboratory facilities. We use other people's labs.").

125. Cassava contracted with third parties to perform laboratory work for studies of simufilam, including Dr. Wang's laboratory at CUNY. *Id*.

126. Dr. Wang's laboratory at CUNY was an academic laboratory. Ex. 133, Burns Tr. 299:7-11; 299:23-300:1.

127. Academic laboratories like Dr. Wang's laboratory are generally not subject to, and do not purport to adhere to, Good Laboratory Practice ("GLP") standards. Ex. 133, Burns Tr. 299:7-11; Ex. 121, Rodriguez Tr. 67:19-22, 153:20-23, 203:24-205:1.

128. A September 2018 contract between CUNY and Cassava expressly stated that Dr. Wang's work was not subject to GLP requirements. Ex. 7, CASSAVA_000001320, at 9.

129. In September 2022, the FDA conducted an inspection of Dr. Wang's laboratory at CUNY. Ex. 79, CASSAVA_000898032.

130. The FDA applied GLP standards in its inspection of Dr. Wang's laboratory. Ex. 140, (FDA GLP Questions and Answers); Ex. 133, Burns Tr. 299:7-11.

131. The FDA's inspection report identified certain deficiencies in Dr. Wang's laboratory as of September 12, 2022, but did not "represent a final agency determination regarding compliance." Ex. 79, CASSAVA_000898032.

132. The FDA inspection did not find evidence that Dr. Wang engaged in any research misconduct. *See* Ex. 79, CASSAVA_000898032.

133. Mr. Barbier did not believe that the FDA's inspection of Dr. Wang's laboratory using GLP standards rendered the Company's reported clinical study results unreliable. Ex. 132, Barbier Tr. 242:20-245:25.

134. Dr. Burns did not believe that the FDA's inspection of Dr. Wang's laboratory using GLP standards rendered the Company's reported clinical study results unreliable. Ex. 133, Burns Tr. 298:9-299:11.

135. In September 2022, Cassava employees Laura Rodriguez and Michael Marsman decided to perform an on-site audit of Dr. Wang's laboratory "because of the fact that the FDA had just been there as well." Ex. 121, Rodriguez Tr. 164:6-9.

136. Ms. Rodriguez and Dr. Marsman applied GLP standards in their audit of Dr. Wang's laboratory and found deficiencies as to those standards. Ex. 99, CASSAVA_000796682, at 5; Ex. 133, Burns Tr. 299:13-300:8.

137. Their audit report stated that, due to the noncompliance with GLP standards, as of September 22, 2022, Dr. Wang's laboratory, was "temporarily not qualified to provide biomarker analysis and research services for any future Cassava studies." Ex. 99, CASSAVA_000796682, at 5.

138. Ms. Rodriguez's and Dr. Marsman's audit did not find evidence that Dr. Wang engaged in any research misconduct. *See* Ex. 99, CASSAVA_000796682.

139. At the time of their audit, Ms. Rodriguez and Dr. Marsman did not realize that Dr. Wang's laboratory was not subject to GLP standards. Ex. 121, Rodriguez Tr. 213:3-6 (referring to the Cassava Audit Report, "I gave them a critical finding because I, at the time, was still wanting to hold them to a GLP standard, realizing later that they were not being held to that standard."); *id*. 213:10-14 (testifying that she had been "under the impression" that Dr. Wang's lab was to be subject to GLP standards but that she "was wrong.").

140. Mr. Barbier was not aware of the results of the audit conducted by Ms. Rodriguez and Dr. Marsman until after the audit had concluded. Ex. 132, Barbier Tr. 246:9-12.

141. Mr. Barbier did not believe that the audit conducted by Ms. Rodriguez and Dr. Marsman using GLP standards rendered the Company's reported clinical study results unreliable. Ex. 132, Barbier Tr. 250:4-8 (testifying that Dr. Wang's lab failed the GLP audit "as any academic lab would.").

142. Dr. Burns was not aware of the results of the audit conducted by Ms. Rodriguez and Dr. Marsman until after the audit had concluded. Ex. 133, Burns Tr. 300:9-20.

143. Dr. Burns did not believe that the audit conducted by Ms. Rodriguez and Dr. Marsman using GLP standards rendered the Company's reported clinical study results unreliable. Ex. 133, Burns Tr. 300:6-8 (explaining that the Cassava Audit concluded that Dr. Wang's laboratory was "not up to GLP standards" and that "[h]e's not a GLP lab"); *id*. 300:21-25 ("Q. Did any of the findings from Cassava's audit cause you to reconsider any of the criticism facing the company from our clients or other critics? A. No.").

## VII.    Government Investigations of Cassava

144. On November 15, 2021, Cassava disclosed that it had received requests for information from government agencies. Ex. 55, Q3 2021 Form 10-Q at 34.

145. On July 1, 2024, Cassava disclosed that it was engaging with the Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") in connection with investigations into the Company and two senior employees. Ex. 106, July 1, 2024 Form 8-K.

### A. DOJ Investigation Does Not Result in Any Charges

146. On September 26, 2024, Cassava disclosed that it did not anticipate that the DOJ would bring charges against or seek a resolution with the Company. Ex. 114, Cassava Form 8-K, filed on Sept. 26, 2024, at 5.

147. The DOJ has not brought any charges against the Company or its employees.

### B. Settlement of SEC Complaint Alleging Negligent Disclosures

148. On September 26, 2024, the SEC filed a complaint, alleging negligence-based disclosure violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 relating to the Phase 2b study results reported in September 2020. Ex. 110, SEC Compl. at 25-27.

149. Although Cassava disclosed that for the cognitive analyses, "[p]atients who did not take drug (no blood levels) were removed" and that the analysis of one of those two tests calculated effect sizes "after removing the most and least impaired subjects," Ex. 25, Sept. 14, 2020 Form 8-K, at 37-38, the SEC faulted Cassava for "negligently fail[ing] to fully disclose" the removal of 40% of the study participants from the cognitive analyses. Ex. 110, SEC Compl. at ¶ 5.

150. The SEC also alleged that Cassava's disclosures were deficient because "Dr. Burns negligently provided information sufficient to allow Dr. Wang to partially unblind himself" in the CSF biomarker analysis. Ex. 110, SEC Compl. at ¶ 2.

151. On September 26, 2024, Cassava, Mr. Barbier, and Dr. Burns settled the SEC action without admitting or denying the allegations. Ex. 111, Cassava Consent to Final Judgment ¶ 2; Ex. 112, Barbier Consent to Final Judgment ¶ 2; Ex. 113, Burns Consent to Final Judgment ¶ 2.

24

## VIII. Orrick, Herrington & Sutcliffe LLP Investigation Finds No Evidence That Cassava Engaged in or Was Aware of Research Misconduct

152. In late 2021, Orrick, Herrington & Sutcliffe LLP commenced an investigation of the allegations of research misconduct. Ex. 125, Cassava 30(b)(6) Tr. 72:5-11; Ex. 132, Barbier Tr. 165:20-22; Ex. 102, Cassava Form 8-K, filed Feb. 28, 2024 ("Feb. 28, 2024 Form 8-K"), at 7.

153. Orrick reported to a committee of Cassava independent directors, which in turn reported to Cassava's Board of Directors. Ex. 125, Cassava 30(b)(6) Tr. 68:9-13 ("The board also formed a special—I'm going to call it investigation committee—I'm not sure exactly what the formal title was—comprised of independent directors to get information from the law firm about the results of their investigation."); *id.* 70:6-7.

154. In February 2024, the Company disclosed that Orrick's investigation "ha[d] found no evidence to substantiate allegations that the Company or its employees engaged in or were aware of research misconduct." Ex. 102, Feb. 28, 2024 Form 8-K, at 7.

155. On March 3, 2025, the Company disclosed Orrick's investigation determined "that certain statistical information contained in an attachment to an email sent by a former senior employee of Cassava to Dr. Wang before the CUNY Bioanalysis of CSF biomarkers was conducted could have been used to unblind him as to some number of Phase 2b Study participants," but "did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants." Ex. 115, 2024 Form 10-K, at 63.

156. Dr. Burns did not believe that she sent Dr. Wang unblinding information and did not have any reason to believe that Dr. Wang had partially unblinded himself. Ex. 133, Burns Tr. 216:16-25 ("I don't remember sending the file. It was all part of a good-faith effort to try to understand what went wrong and how we got in anomalous data from the Oscar Hanson lab . . .

."); *id*. 223:13-17 ("Q. So to be clear, you never intended to unblind Dr. Wang as to any samples? A. No, I didn't. And this was not unblinding him. He had another step of work to do to partially unblind himself.").

157.    Dr. Wang testified that he did not unblind himself to any study participants and that he could not have used the email attachment at issue for unblinding. Ex. 134, Wang Tr. 76:12-17; 96:8-15; 167:12-17; 168:3-10; 197:17-24; 232:11-233:5; 233:16-234:10 ("Without the grouping data, I cannot plot this one, I cannot plot these scatter plot. If I don't know the grouping, how do I know which one is the, what they said is correct or not. I don't know."); *id.* 240:7-8 (referring to the Phase 2b study groups, "Up to this day, I still don't know which one is which.").

## IX.    CUNY Investigation Finds No Research Misconduct By Dr. Wang

158.    On August 27, 2021, CUNY commenced an investigation of the allegations of research misconduct by Dr. Wang. Ex. 36, CASSAVA_000018236.

159.    In 2022 and 2023, Plaintiff Adrian Heilbut contacted CUNY's investigation committee on multiple occasions to urge them to pursue the investigation of Dr. Wang with greater speed and publicity and to seek information concerning the ongoing investigation. *See* Ex. 71, PLAINTIFFS0067485, at -67488-67489; *id*. at -67485; Ex. 91, PLAINTIFFS0181301; Ex. 128, Heilbut Tr. 396:5-11.

160.    In February 2022, Mr. Heilbut exchanged Twitter messages with Dr. Orie Shafer, head of CUNY's investigation committee, regarding the ongoing investigation into Dr. Wang. Ex. 128, Heilbut Tr. 397:7-399:17.

161.    In October 2023, a preliminary report on CUNY's investigation was leaked to *Science* magazine. Ex. 98, CASSAVA_001332122.

162.    On May 30, 2025, CUNY issued a final report to the Office of Research Integrity ("ORI") of the Department of Health and Human Services ("Final CUNY Report"). Ex. 119, Final

CUNY Report, as filed in *U.S. v. Wang*, No. 8:24-cr-00211 (D. Md. Oct. 14, 2025), ECF 118-2 ("Final CUNY Report").

163. The Final CUNY Report stated that "research misconduct did not occur" and that "the Committee did not find that Dr. Wang's actions constitute acts of intentional, knowing, or reckless falsification and/or fabrication." Ex. 119, Final CUNY Report, at 4.

**X.     Dismissal of Criminal Indictment Against Dr. Wang**

164. On June 27, 2024, Dr. Wang was indicted on charges of fraud, wire fraud, and making false statements to the National Institutes of Health ("NIH") in connection with data submitted to the NIH as part of grant applications related to simufilam. Ex. 105, Dr. Wang Indictment; AC ¶ 77.

165. Dr. Wang filed a motion to dismiss the indictment for prosecutorial misconduct on October 14, 2025, arguing in part that the Government had withheld exculpatory evidence, specifically the Final CUNY Report, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Ex. 127, Dr. Wang Mot. to Dismiss.

166. On October 17, 2025, the court found that the Final CUNY Report was exculpatory and ordered the Government to submit for *in camera* review all communications with the NIH and the ORI, and to review all of the materials in its possession for additional *Brady* material. Ex. 129, Oct. 17, 2025 Order, at 2-3.

167. On October 22, 2025, prior to the deadline for turning over its communications with NIH and ORI, the Government moved to dismiss the indictment against Dr. Wang. Ex. 130, Gov't. Mot. to Dismiss.

168. In the hearing on the Government's motion to dismiss the indictment, the court remarked that "Dr. Wang was put through this whole process up to this point, and there was never even a real attempt to try to prove this at trial." Ex. 131, Oct. 23, 2025 *U.S. v. Wang* Tr., 17:10-13.

169.   The court called the process "regrettable and unfortunate" and remarked that "this is not a good example of how things should be done." *Id*. at 17:14-19.

170.   On October 23, 2025, the criminal indictment against Dr. Wang was dismissed with prejudice. *Id*., 14:22-24; 20:2-3.

## XI.   Cassava's Defamation Action

171.   In August 2021, Cassava Director Sanford Robertson raised the possibility of a defamation action against the short sellers accusing the Company of fraud. Ex. 132, Barbier Tr. 112:8-113:20.

172.   On August 31, 2021, Cassava's Board of Directors formed an *ad hoc* Litigation Monitoring Committee to evaluate whether to pursue a defamation action and present its recommendations to the Board. Ex. 42, CASSAVA_000395785, at 13; Ex. 124, Barry Tr. 56:15-57:10; Ex. 132, Barbier Tr., 120:19-21.

173.   The Board of Directors had the ultimate authority over whether to pursue a defamation action. Ex. 125, Cassava 30(b)(6) Tr., 18:10-11 ("The decision [to commence the defamation action] was made by the board. That's who. . . can authorize a . . . legal action."); Ex. 132, Barbier Tr., 147:1.

174.   The members of the Litigation Monitoring Committee were Michael O'Donnell, Sanford Robertson, Richard Barry, and Remi Barbier. Ex. 42, CASSAVA_000395785, at 13; Ex. 38, CASSAVA_000545144; Ex. 56, CASSAVA_000799544; Ex. 62, CASSAVA_000395575; Ex. 64, CASSAVA_001435249; Ex. 69, CASSAVA_001435250; Ex. 80, CASSAVA_001434669; Ex. 81 CASSAVA_001440099.

175.   The Litigation Monitoring Committee's first meeting was held on September 1, 2021. Ex. 38, CASSAVA_000545144.

176. In evaluating whether to pursue a defamation action, the Litigation Monitoring Committee consulted with Orrick and Benesch Friedlander Coplan & Aronoff LLP. Ex. 125, Cassava 30(b)(6) Tr. 36:10-16; 68:17-69:9; Ex. 38, CASSAVA_000545144; Ex. 64, CASSAVA_001435249, Ex. 81, CASSAVA_001440099.

177. Dr. Burns was not a member of the Litigation Monitoring Committee. *See* Exs. 38, 56, 62, 64, 69, 80, 81 (Minutes of the Litig. Monitoring Comm.).

178. Dr. Burns did not attend any Litigation Monitoring Committee meetings. *See* Exs. 38, 56, 62, 64, 69, 80, 81 (Minutes of the Litig. Monitoring Comm.).

179. At the time Cassava was considering whether to pursue a defamation action, Cassava's directors and executive officers believed the clinical results from the Phase 1, 2a, 2b, and 2 open-label studies showed simufilam's potential for the treatment of Alzheimer's. Ex. 27, CASSAVA_000241256 (Jan. 20, 2021 email from Dr. Friedman: "Things at our company are pretty exciting as our biomarker data looks great."); Ex. 31, CASSAVA_000012770 (June 17, 2021 email from Dr. Scannon; "I have been thinking a lot about the considerable clinical activity/benefits of sim[u]filam."); Ex. 26, CASSAVA_000988927 ("Sandy [Robertson] has told me about the exciting success SAVA had with its Phase 2 trials with your Alzheimer's research."); Ex. 60, CASSAVA_001307524 (Dec. 20, 2021 email from Mr. Barry: "In an open label P2 trial, the drug produced results that had not been seen before with other AD drugs in a clinical trial"); Ex. 124, Barry Tr. 30:5-10 ("I can remember looking at the phase 2 of the responders . . . [a]nd looking at, you know, what was the baseline versus the current and how the patients were doing. And that was persuasive to me."); *id*. 46:11-13 ("Q. How did you personally decide to become the principal executive of Cassava in July of 2024? A. I believe in the drug."); *id*. at 48:22-25; Ex. 46, CASSAVA_000948046 (Oct. 28, 2021 Email from Dr. Gussin: "We now have solid clinical

evidence that Simufilam has positive activity in Alzheimer's patients. In fact, early results even exceeded our expectations!"); Ex. 74, CASSAVA_000719406; Ex. 9, CASSAVA_000004863 (May 24, 2019 email from Mr. Barbier: "I have great news regarding our program in Alzheimer's disease (AD): we just generated spectacular data."; "we believe[] NO DRUG has ever improved these AD biomarkers by so much in patients."); *see also* Ex. 32, CASSAVA_000009154; Ex. 52, CASSAVA_000015793.

180. At the time Cassava was considering whether to pursue a defamation action, Cassava's science team believed the clinical results from the Phase 1, 2a, 2b, and 2 open-label studies showed simufilam's potential for the treatment of Alzheimer's. Ex. 27, CASSAVA_000241256 (Jan. 20, 2021 email from N. Friedman; "Things at our company are pretty exciting as our biomarker data looks great."); Ex. 74, CASSAVA_000719406, at -719406-719407 (Apr. 5, 2022 Email from J. Kupiec, denying the allegations and noting "[d]espite this background noise, the clinical phase 3 studies continue to aggressively recruit."); Ex. 57, BURNS_00000650, at -651 (Dr. Burns: "I feel fulfilled, also knowing that this drug candidate has great potential to help millions of families affected by Alzheimer's disease. This is the dream of any neuroscientist, to have a chance to make an impact. . . . While much of the innovation credit goes to my collaborator, I take pride in the persistence and focus and just getting here. Simufilam has improved both biomarkers and cognition in phase two trials, and the just started phase three will tell all."); *see also id*. at -718; Ex. 133, Burns Tr., 98:8-12; 311:25-312:3.

181. At the time Cassava was considering whether to pursue a defamation action, the Company believed that research performed at third party institutions corroborated simufilam's mechanism of action to revert altered FLNA back to its native, healthy conformation. Ex. 12, February 2020 Yale Study; Ex. 76, May 2022 Nagoya University Study; Exs. 86 & 88, November

2022 Quebec Studies; Ex. 92, February 2023 Sichuan University Study; Ex. 95, May 2023 University of Milan Study; Ex. 124, Barry Tr. 98:25-99:2; 236:20-23 (Plaintiffs' allegations "dismiss[] the work from the Cochin Institute" as well as "the work from Professor Bordey at Yale."; referring to the Milan Study and recalling "this was a validating study. These guys contacted Cassava, asked for the drug, wanted to do this experiment and was successful."); Ex. 125, Cassava 30(b)(6) Tr. 11:7-14 (describing the Yale Study as "establish[ing] the bioactivity of the drug as well as its effect on diseases"); *id.* 12:6-23 (similar regarding the Nagoya University Study); *id*. 51:5-8; Ex. 100, CASSAVA_001031140 (Oct. 29, 2023 Email from Dr. Kupiec: "The results [of a study by the Cochin Institute in Paris] confirm simufilam's primary mechanism of action").

182.    On November 2, 2022, Cassava, through Benesch, filed the complaint in *Cassava Sciences v. Bredt et al.*, No. 1:22-cv-09409 (S.D.N.Y.) (the "Defamation Action"), asserting claims for defamation and conspiracy to defame against David Bredt and Geoffrey Pitt (the two individuals behind the Citizen Petitions), Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris, and others.  Ex. 82, Original Defamation Compl. at 170-182; Ex. 83, Cassava Form 8-K, filed on Nov. 3, 2022, at 5; Ex. 124, Barry Tr. 192:9-15.

183.    Prior to the filing of the Defamation Action on November 2, 2022, the Litigation Monitoring Committee met at least seven times. *See* Exs. 38, 56, 62, 64, 69, 80, 81 (Minutes of the Litig. Monitoring Comm.).

184.    At a November 1, 2022 Litigation Monitoring Committee meeting, Mr. Barbier stated that "Chris Cook had joined the Corporation as its new General Counsel and would be joining future Litigation Committee meetings." Ex. 81, CASSAVA_001440099; Ex. 132, Barbier Tr. 139:12-13.

185.     The Board authorized the defamation action to address what it believed to be false allegations against the Company, protect the ongoing Phase 3 clinical trials, and prevent further damage to the Company. Ex. 125, Cassava 30(b)(6) Tr. 20:5-20 (testifying that the "defamatory" and "false" statements were "inhibiting our ability to recruit" for the phase 3 clinical trials and that this was a motivating factor in commencing the defamation action); *id*. 29:21-25 ("[T]he origination of the suit was, Hey, we've got people defaming us and calling us liars and calling us frauds that are impacting our trial sites and our ability to recruit for the – for this study."); Ex. 124, Barry Tr. 154:25-155:4 ("I was concerned because it was having an effect on the company's business and enrolling in the trial. And I was concerned because the company's reputation was being unfairly destroyed by statements that were defamatory."); *id*. 67:19-21 ("We had to do something. The company was being really damaged by the defamatory statements by your clients. That's why we filed suit.").

186.     The Company believed that numerous statements made by the defendants in the Defamation Action, including statements by Adrian Heilbut, Jesse Brodkin, and Enea Milioris, were defamatory. Ex. 125, Cassava 30(b)(6) Tr. 23:20-24:8 ([Y]ou cross a line. . .  when you go and you maliciously defame the company with statements that are known to be untrue by the company"); *id.* 29:21-45, 242:21-243:13; Ex. 124, Barry Tr. 63:6-23 (testifying that he "believed [] then and believe[s] [] now" that "the company was being defamed by your clients" and that the impact of the allegations on Cassava's reputation and its ability to recruit for the phase 3 trials was "unfair to patients. It was unfair to the company. It was unfair to employees."); *id*. 154:23-155:4, 156:15-17.

187.     The Company believed that the defamatory statements by the defendants in the Defamation Action were financially motivated. Ex. 125, Cassava 30(b)(6) Tr. 26:7-16 (describing

Plaintiffs as defaming the Company "for financial benefit" because they were "known short sellers of the company's stock"); *id*. 131:23-132:2; 235:21-236:17; 238:15-18; Ex. 124, Barry Tr. 98:5-99:12; 241:19-242:7.

188. The Company believed that the defamatory statements by the defendants in the Defamation Action were negatively impacting the Company's ability to complete its then-ongoing clinical trials of simufilam. Ex. 125, Cassava 30(b)(6) Tr. 20:5-20 (testifying that the "defamatory" and "false" statements were "inhibiting our ability to recruit" for the phase 3 clinical trials and that this was a motivating factor in commencing the defamation action); *id.* 29:21-25; 33:22-34:4 (testifying that filing the defamation action was "necessary" to stop the defamation defendants from "inhibiting the fair and full enrollment of the trials"); *id.* 35:15-16; Ex. 124, Barry Tr. 63:6-20 (testifying that he, Robertson, and Barbier identified the impact of the allegations on Cassava's ability to recruit participants for the phase 3 clinical trials as one of the purposes of commencing the defamation action).

189. Mr. Barbier believed that numerous statements by the defendants in the Defamation Action, including statements by Adrian Heilbut, Jesse Brodkin, and Enea Milioris, were false and/or unfounded, financially motivated, and had negatively impacted the Company. Ex. 132, Barbier Tr. 269:22-270:13 (testifying that the decision to file the defamation action was based on the harm being done to the Company); *id*., 150:8-151:25; Ex. 77, CASSAVA_001494801 (describing the impact arising out of Plaintiffs' allegations on the Company and Cassava's "directors, managers, employees, advisors and clinicians – who are going through blood, sweat & tears to test a new drug treatment for patients with Alzheimer's"); Ex. 68, CASSAVA_000836090 ("[S]ince August 2021, … [a] small team of short sellers have been targeting Cassava Sciences with sham Citizen Petitions, false allegations, false rumors published on social media, etc. The bad

33

actors who engage in this behavior have one goal: to seek a decline in our stock."); Ex. 34, CASSAVA_000490971 ("Needless to say, these allegations are complete non-sense. The 'evidence' cited in their document is laughable."); Ex. 40, CASSAVA_000008476 ("Let me be very clear: I think these allegations are false."); Ex. 61, CASSAVA_000836171; Ex. 78, CASSAVA_000391537; Ex. 35, CASSAVA_000094847.

190. On November 4, 2022, Cassava filed its First Amended Complaint in the Defamation Action. Ex. 84, First Am. Defamation Compl.

191. In its March 28, 2024 decision on the defendants' motion to dismiss the First Amended Complaint, the court found that 314 of the public statements by Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris were defamatory *per se*, but that Cassava failed to plead actual malice with respect to those statements. *See Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, at \*22, 29 (S.D.N.Y. Mar. 28, 2024).

192. On April 29, 2024, Cassava filed a Second Amended Complaint in the Defamation Action. Ex. 104, Second Am. Defamation Compl.

193. On August 2, 2024, Cassava filed a stipulation of voluntary dismissal, which was so-ordered on August 5, 2024. Ex. 108, So-Ordered Stipulation.

194. Dr. Burns did not have the power to authorize or direct Cassava's prosecution of the Defamation Action and did not authorize or direct Cassava's initiation or prosecution of the Defamation Action. Ex. 125, Cassava 30(b)(6) Tr. 17:23-18:18 (decision to file lawsuit made by "board of directors … as informed by outside counsel"; "not aware" of any role by Dr. Burns in decision to file lawsuit); *id.* 86:3-25 (Company and its counsel were responsible for continuing the defamation action after the dismissal of the first amended complaint); Ex. 124, Barry Tr. 54:12-20, 62:25-63:8, 93:19-22 (board's litigation committee did not include Dr. Burns in any discussion

of the defamation action); *id.* 195:12-16 ("Remi was always the decision maker, so we were advising."); Ex. 126, Schoen Tr. 55:6-17; Ex. 132, Barbier Tr. 120:19-21 (defamation action was "board decision, driven by the litigation committee"); *id.* 182:23-183:4 (because Dr. Burns was not a director, "she would have no input on – on the whole decision-making on the go/no-go, decision-making path"); Ex. 133, Burns Tr. 143:10-14, 152:8-12 (testifying that she had no involvement in the defamation action and was not certain it would be filed).

195.    Dr. Burns did not participate in any Litigation Monitoring Committee or Board deliberations regarding the Defamation Action.  Ex. 132, Barbier Tr. 120:19-21; 182:23-183:4; Ex. 133, Burns Tr. 143:10-14, 152:8-12; *see also* Exs. 38, 56, 62, 64, 69, 80, 81 (Minutes of the Litig. Monitoring Comm.).

196.    Dr. Burns did not pay any legal bills for, or otherwise fund, the Defamation Action.

197.    From time to time, Dr. Burns was asked to provide and did provide certain materials to outside litigation counsel at Benesch. *See e.g.*, Ex. 87, CASSAVA_001303342.

198.    Dr. Burns did not draft any section of any complaint in the Defamation Action, nor did she review any drafts prior to filing. Ex. 133, Burns Tr. 165:11-13 ("Q. Did you review a draft of the complaint before it was filed in November of 2022? A. I did not."); *id.* 165:22-23 ("Q. Did you have any input on that section [of the Defamation Complaint concerning knowledge within the scientific community] A. No, I did not."); *id.* 138:17-20; Ex. 125, Cassava 30(b)(6) Tr. 17:23-18:18; Ex. 124, Barry Tr. 54:12-20, 62:25-63:8, 93:19-22, 195:12-16 Ex. 126, Schoen Tr. 55:6-17; Ex. 132, Barbier Tr. 120:9-21, 182:5-183:4.

199.    Mr. Barbier and Dr. Burns are married.

200.    Mr. Barbier and Dr. Burns generally did not discuss Company matters. Ex. 133, Burns Tr. 151:25-152:12, 152:6-7.

201.   Mr. Barbier intentionally did not discuss Company legal matters with Dr. Burns. Ex. 133, Burns Tr. 151:25-152:12; *id.* 152:6-7 ("Particularly on legal matters, [Mr. Barbier] kept me in the dark intentionally"); Ex. 132, Barbier Tr. 182:21-183:10.

202.   When the Defamation Action was filed, Dr. Burns hoped it would help preserve clinical trial sites and trial enrollment, which had been adversely impacted by the accusations from Plaintiffs and others. Ex. 133, Burns Tr., 142:18-143:5 ("Q. [W]as it your hope at the time the defamation action was filed that people like our clients would stop with the comments you just described? A. . . . I was trying to do a job. We were trying to enroll clinical trials. They were doing their best to stop enrollment, to prolong it or to hope that the whole trial stopped, that we'd never get an answer on our drug. I just wanted to get an answer on the drug. . . ."); *id.* 143:14-19 ("I just thought, okay, somebody's doing something; maybe they'll stop attacking 24/7; maybe I'll be able to actually, you know, enroll patients without them terrified that, you know, they're enrolling in a scam trial. . . .").

203.   Dr. Burns believed that numerous statements by the defendants in the Defamation Action, including statements by Adrian Heilbut, Jesse Brodkin, and Enea Milioris, were false and/or unfounded, financially motivated, and had negatively impacted the Company. Ex. 133, Burns Tr., 150:1-25; *id.* 142:12-17 ("[Y]our clients were put on notice that, you know, you're potentially engaging in defamation so I would think that if they had a lawyer, their lawyer would say stop going on Twitter 24/7 to spew, like vitriolic, you know, accusations with no basis in fact."); *id.* 142:25-143:3 ("We were trying to enroll clinical trials. They were doing their best to stop enrollment, to prolong it or to hope that the whole trial stopped, that we'd never get an answer on our drug."); 12:23-25 ("[T]he citizen's petition had many statements that were, on their face, ludicrous."); *id.* 24:25-25:5; 130:9-15; 143:14-25; 181:21-182:7; Ex. 57, BURNS_00000650, at -

651 ("the damage and unfairness to our hard work and to the Alzheimer's disease community in general leaves me questioning humanity"); *id.* at -693 ("[David Bredt] must just be so pissed that Hoau[-Yan Wang] figured it out [the mechanism behind simufilam], and we actually have a drug, and it is in Phase 3."); *id*. at -728, -749.

## XII. Plaintiffs File This Lawsuit

204. On August 6, 2024, Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris filed the original Complaint in this action asserting an Anti-SLAPP claim against Cassava. ECF 1.

205. The Complaint alleged that they suffered damages "caused by Cassava's filing and prosecution of a meritless lawsuit against them for the sole purpose of harassing, intimidating, punishing, and maliciously inhibiting public participation in scientific and popular discourse related to" simufilam. ECF 1, ¶1.

206. On October 24, 2024, Plaintiffs filed the Amended Complaint, which added Mr. Barbier and Dr. Burns as defendants, and added claims for malicious prosecution and conspiracy against all defendants. ECF 9.

207. Neither Mr. Barbier nor Dr. Burns were parties to Cassava's Defamation Action. *See* Ex. 82, Original Defamation Compl.; Ex. 84, First Am. Defamation Compl.; Ex. 104, Second Am. Defamation Compl.

Dated: August 3, 2026
   New York, New York

                 Respectfully submitted,

                 BAKER & HOSTETLER LLP

                 By:  */s/ Zachary R. Taylor*
                    Douglas W. Greene (*pro hac vice*)
                    Aric H. Wu
                    Zachary R. Taylor

                 45 Rockefeller Plaza

New York, NY 10111
Telephone: 212.589.4200
dgreene@bakerlaw.com
awu@bakerlaw.com
ztaylor@bakerlaw.com

*Attorneys for Defendants Remi Barbier and Lindsay Burns*