**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS, <br><br>          Plaintiffs, <br><br>      v. <br><br> CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS, <br><br><br>          Defendants. | Case No.: 1:24-cv-05948-JLR-OTW <br><br><br> **ORAL ARGUMENT REQUESTED** |

**THE INDIVIDUAL DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants Remi Barbier and*
*Lindsay Burns*

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................4

    I.     Cassava ....................................................................................................................4

          A.     Board of Directors.................................................................................4

          B.     Executive Officers ................................................................................6

          C.     Science Team .........................................................................................6

    II.    Encouraging Results from Simufilam Clinical Trials.......................................7

    III.   FDA Denies Anonymous Citizen Petitions Seeking to Halt Clinical Trials .................9

    IV.   Plaintiffs Adopt the Citizen Petition Allegations and Accuse Cassava of Fraud ........10

    V.    GLP Reviews of Dr. Wang's Non-GLP Laboratory.......................................11

    VI.   Government Investigations of Cassava................................................................12

          A.     DOJ Investigation Does Not Result in Any Charges...................................12

          B.     Settlement of SEC Complaint Alleging Negligent Disclosures ......................12

    VII.  Orrick, Herrington & Sutcliffe LLP Investigation Finds No Evidence That Cassava Engaged in Or Was Aware of Research Misconduct ...................................13

    VIII. CUNY Investigation Finds No Research Misconduct by Dr. Wang ..........................13

    IX.   Dismissal of Criminal Indictment Against Dr. Wang...................................................14

    X.    Cassava's Defamation Action.................................................................................14

    XI.   Plaintiffs File This Lawsuit.......................................................................................15

LEGAL STANDARD........................................................................................................15

ARGUMENT.......................................................................................................................16

    I.     The Individual Defendants Are Entitled To Summary Judgment on Plaintiffs' Claim for Malicious Prosecution of Cassava's Defamation Action ..........................16

          A.     Dr. Burns Did Not Initiate or Prosecute the Defamation Action....................16

          B.     Cassava's Defamation Action Did Not Cause A "Special Injury" ..................19

II.     The Individual Defendants Are Entitled To Summary Judgment on Plaintiffs' Claim That They Conspired With Cassava To Maliciously Prosecute The Defamation Action ................................................................................................19

       A.     Cassava Did Not Need Or Seek Dr. Burns' Agreement To Commence Or Prosecute The Defamation Action ..............................................................20

       B.     Plaintiffs' Claim That Mr. Barbier and Dr. Burns Conspired to Maliciously Prosecute the Defamation Action Is Duplicative of The Malicious Prosecution Claim Against Them ...................................................21

       C.     The Intracorporate Conspiracy Doctrine Bars Plaintiffs' Claim ....................21

       D.     Plaintiffs Are Not Entitled to Punitive Damages .............................................27

CONCLUSION ...................................................................................................................28

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
404 F.3d 566 (2d Cir. 2005)..................................................................................21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................16

*ANS 1 Corp. v. Yosef*,
244 A.D.3d 669 (1st Dep't 2025) ........................................................................16

*Baldini v. Shah*,
2018 WL 11226079 (S.D.N.Y. Aug. 9, 2018)......................................................19

*Brady v. Maryland*,
373 U.S. 83 (1963).................................................................................................14

*Cassava Scis., Inc. v. Bredt*,
2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ......................................................15

*Christians of Cal., Inc. v. Clive Christian N.Y.*,
2015 WL 468833 (S.D.N.Y. Feb. 3, 2015)........................................3, 21, 22, 25

*Gan v. GSUIG Real Est. Member LLC*,
2025 WL 2416950 (E.D.N.Y. Aug. 21, 2025)......................................................21

*Graham v. Peters*,
2013 WL 5924727 (W.D.N.Y. Oct. 31, 2013) .................................................22, 27

*Hewitt v. City of N.Y.*,
2012 WL 4503277 (E.D.N.Y. Sept. 28, 2012) .....................................................17

*Hua Xue v. Jensen*,
2020 WL 6825676 (S.D.N.Y. Nov. 19, 2020)......................................................21

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*,
14 F.Supp.2d 391 (S.D.N.Y. 1998) ......................................................................17

*Kim v. NYC Green Transp. Grp.*,
2025 WL 373465 (E.D.N.Y. Feb. 3, 2025)...........................................................22

*LaFrance v. Bemben*,
2013 WL 132702 (E.D.N.Y. Jan. 10, 2013) .........................................................17

*Langer v. Paysafe Partners LP*,
2020 WL 7684885 (E.D.N.Y. May 22, 2020),
*adopted by* 2020 WL 7041085 (E.D.N.Y. Nov. 30, 2020)..............................20, 25

*Loftus v. Arthur*,
 2007 WL 2376883 (N.Y. Sup. Ct. July 16, 2007) ..................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986)...............................................................................................16

*McCaul v. Ardsley Union Free Sch. Dist.*,
 514 F.App'x.1, 2013 WL 673751 (2d Cir. Feb. 25, 2013) .....................................19

*McKeefry v. Town of Bedford*,
 2019 WL 6498312 (S.D.N.Y. Dec. 2, 2019) .........................................................20

*McKinney v. City of Middletown*,
 49 F.4th 730 (2d Cir. 2022) ...................................................................................16

*Meyer v. Haines*,
 2025 WL 1651154 (N.D.N.Y. June 11, 2025).......................................................21

*Nassau Cnty. Emp. "L" v. City of Nassau*,
 345 F.Supp.2d 293 (E.D.N.Y. 2004) .....................................................................22

*Rhodes v. Tevens*,
 2012 WL 777421 (W.D.N.Y. Mar. 7, 2012)...........................................................25

*Richard v. Leclaire*,
 2017 WL 9511181 (N.D.N.Y. July 10, 2017),
 *adopted by* 2017 WL 4349381 (N.D.N.Y. Sept. 29, 2017) ...................................27

*Sankin v. Abeshouse*,
 545 F.Supp.2d 324 (S.D.N.Y. 2008).......................................................................19

*Sathianathan v. Smith Barney, Inc.*,
 2006 WL 538152 (S.D.N.Y. Feb. 24, 2006)...........................................................21

*Shakimo O. v. Westchester Cnty.*,
 2014 WL 521608 (S.D.N.Y. Feb. 10, 2014)...........................................................27

*Shatkin v. Drescher*,
 2004 WL 5509728 (N.Y. Sup. Ct. Nov. 01, 2004).................................................20

*Trs. of the Nat. Ret. Fund v. Wildwood Corp.*,
 2013 WL 8446003 (S.D.N.Y. Dec. 17, 2013) ........................................................18

**Rules**

Fed. R. Civ. P. 56.........................................................................................................15

Defendants Remi Barbier and Dr. Lindsay Burns ("Individual Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment.

## **<u>INTRODUCTION</u>**

Defendant Cassava Sciences, Inc. is a clinical-stage biotechnology company. In 2017, the FDA accepted Cassava's Investigational New Drug ("IND") application for simufilam, an investigational drug, which allowed Cassava to commence sponsoring small-scale testing of simufilam in people with Alzheimer's disease.

Following encouraging results from Phase 1 and 2 clinical studies on safety and tolerability, Cassava designed a pair of Phase 3 clinical trials to evaluate on a large scale the safety and potential efficacy of simufilam in patients with mid-stage Alzheimer's disease, a condition for which there are no FDA-approved treatments.

In August 2021, Cassava announced that the FDA had granted Special Protocol Assessments to its Phase 3 trial design.

But on August 18 and September 1, 2021, an attorney submitted Citizen Petitions ("CPs") on behalf of anonymous clients asking FDA to halt Cassava's clinical trials. The CPs publicly accused Cassava and its scientific collaborator, Dr. Hoau-Yan Wang at the City University of New York ("CUNY"), of scientific fraud and fabricated data, among other things. The media went into a frenzy. In November 2021, the anonymous CP petitioners were revealed to be two individuals with short positions in Cassava stock: David Bredt and Geoffrey Pitt.

In late 2021, Plaintiffs Adrian Heilbut, Enea Milioris, and Jesse Brodkin also began publicly accusing Cassava of fraud. Plaintiffs held short positions in and put options for Cassava stock. Both short positions and put options are investment strategies to profit from a precipitous stock price decline. Between August 18 and December 31, 2021, Cassava's stock price fell nearly 60% from $102.31 to $43.94 per share.

In February 2022, the FDA denied the CPs. And notwithstanding the CP allegations and Plaintiffs' public allegations of fraud, FDA did not halt the Phase 3 clinical trials and never conveyed to Cassava or anyone else that it had concluded the clinical program was based on fabricated data or a fraudulent scientific premise.

In November 2022, Cassava sued the CP petitioners, Plaintiffs, and others for defamation. *See Cassava Scis., Inc. v. Bredt et al*, No. 1:22-cv-09409 (S.D.N.Y.) ("Defamation Action"). In March 2024, Judge Woods dismissed the claims against Plaintiffs without prejudice for failure to plead actual malice, but identified 314 public tweets by Plaintiffs that were defamatory *per se* because they accused Cassava of lying, scientific fraud, or criminal conduct. Cassava filed an amended pleading, before voluntarily dismissing the action on August 2, 2024.

On August 6, 2024, Plaintiffs filed this action asserting an Anti-SLAPP claim against Cassava. In October 2024, Plaintiffs filed an Amended Complaint ("AC") asserting claims against Mr. Barbier, Cassava's former CEO, and Dr. Burns, a former Cassava scientist married to Mr. Barbier, for malicious prosecution and conspiracy.

**Malicious Prosecution Claim**

In Count Two for malicious prosecution, Plaintiffs allege that "[t]he Defamation Action was initiated and continued by Cassava, at the direction of Barbier and Dr. Burns" and that "[t]he Defamation Action caused special injuries to each Plaintiff." AC ¶¶196, 204.

Dr. Burns is entitled to summary judgment because the undisputed material facts show that Dr. Burns, one of 18 scientists who worked at Cassava between 2020 and 2024, did not have the power to, and did not, authorize or direct Cassava's Defamation Action. Instead, it was Cassava's Board of Directors and Litigation Monitoring Committee ("LMC"), with the assistance of counsel, that authorized and directed the Defamation Action. Dr. Burns was never a Cassava director or

executive officer and did not attend any meetings of the Board or LMC regarding the defamation action. There is no evidence that Dr. Burns, a scientist, rather than Cassava's Board, the LMC, or General Counsel, otherwise authorized or directed the Defamation Action.

As explained in Cassava's motion, all Defendants are entitled to summary judgment because Cassava's Defamation Action did not cause "special injury" to Plaintiffs.

## Conspiracy Claim

In Count Three for conspiracy, Plaintiffs allege that Mr. Barbier and Dr. Burns each "agreed" with Cassava to commence and maliciously prosecute the Defamation Action. AC ¶207.

Dr. Burns is entitled to summary judgment because the undisputed material facts show that Cassava did not need or seek her agreement to pursue the Defamation Action. Dr. Burns was never a director or executive officer of the Company, and it was Cassava's Board and LMC, with the assistance of counsel, that authorized and directed the Defamation Action.

Mr. Barbier and Dr. Burns are entitled to summary judgment because conspiracy is not an independent tort and the claim that they conspired to maliciously prosecute the Defamation Action is duplicative of the malicious prosecution claim against them.

Plaintiffs' claim is also barred by the intracorporate conspiracy doctrine—*i.e.,* "the officers, agents, and employees of a single corporate entity, each acting within the scope of [their] employment, are legally incapable of conspiring together." *Christians of Cal., Inc. v. Clive Christian N.Y.*, 2015 WL 468833, *9 (S.D.N.Y. Feb. 3, 2015). The personal-interest exception to the doctrine does not apply because there is no evidence that, in relation to the Defamation Action, Mr. Barbier or Dr. Burns had a purely personal interest "wholly separate and apart from" the interests of Cassava. *Id.* Instead, the evidence shows that each of their interests were aligned with those of Cassava.

**Punitive Damages Demand**

Through their conspiracy claim, Plaintiffs seek to hold Mr. Barbier and Dr. Burns liable for punitive damages on their Anti-SLAPP claim against Cassava. AC ¶207. As explained in Cassava's motion, there is no basis for a punitive damages award because the Defamation Action was not brought for the sole purpose of harassing or intimidating Plaintiffs or otherwise suppressing free speech. Instead, Cassava sought to defend itself against accusations that it was a fraud and that its employees were criminals—statements that were found to be *per se* defamatory.

For all the reasons herein, the Individual Defendants respectfully request that the Court grant summary judgment in their favor.

## FACTUAL BACKGROUND

I.      **Cassava**

Cassava is a clinical-stage biotechnology company. ¶1.[1]

A.      **Board of Directors**

Between 2020 and 2024, eleven individuals served as Cassava directors. ¶2. Until July 16, 2024, nine of these individuals were independent directors, and two were management directors. ¶3. On July 17, 2024, one of the independent directors became a management director when he was appointed the Company's principal executive officer. ¶4.

Three independent directors and one management director had decades of experience with clinical research and trials:

- Robert Gussin, Ph.D., a director since March 2003, worked at Johnson & Johnson for 26 years, including as Chief Scientific Officer and Corporate Vice President, Science and Technology from 1986 to 2000. ¶¶6-7.

- Patrick Scannon, M.D., Ph.D., a director since December 2007, co-founded XOMA and served as its Chief Scientific and Medical Officer from 1993 to 2006, and Chief Biotechnology Officer from 2006 to 2016. ¶¶8-9.

---

[1] Freestanding cites to "¶_" are to paragraphs of the Individual Defendants' Rule 56.1 Statement, and freestanding cites to "Ex._" are to exhibits of the Declaration of Zachary R. Taylor.

- Claude Nicaise, M.D., a director since December 2023, is also a director of Sarepta Therapeutics, Gain Therapeutics, and Chemomab Therapeutics. He founded Clinical Regulatory Services, which provides advice on clinical and regulatory matters. From 1983 to 2023, he served in various positions at Bristol-Myers Squibb, Alexion, and Ovid Therapeutics. ¶¶28-31.

- Nadav Friedmann, M.D., Ph.D. served as a director from September 1998 until his passing in December 2022. Prior to joining Cassava as Chief Medical Officer in 2001, Dr. Friedmann held various positions at Johnson & Johnson, including as Head of the Biotechnology Research Center, was VP, Clinical Research at XOMA, and CEO of Daiichi Pharmaceutical. ¶¶34-35.

The other seven individuals who served as Cassava directors between 2020 and 2024 were

business, finance, law, and law enforcement professionals:

- Mr. Barbier served as CEO from May 1998 until September 2024, and Chair of the Board until July 15, 2024. Mr. Barbier has served as a trustee emeritus of the Carnegie Institute of Washington and Santa Fe Institute, and on the Advisory Board of the University of California Institute for Quantitative Biosciences and BioVentures LLC, a life science incubator. ¶¶32-33.

- Michael O'Donnell, a director since June 1998, is a member of Orrick Herrington & Sutcliffe LLP, Cassava's corporate counsel. Mr. O'Donnell serves as corporate counsel to numerous biopharmaceutical companies. ¶¶10-12.

- Saira Ramasastry, a director from 2013 to June 2020, is Managing Partner of Life Sciences Advisory and was previously a Merrill Lynch investment banker. She was also a director of Sangamo Therapeutics, VIR Biotechnology, Innovate Biopharmaceuticals, and Glenmark Pharmaceuticals. ¶¶13-15.

- Sanford Robertson, a director from September 1998 until his passing in August 2024, was previously the lead director of Salesforce.com. He founded Francisco Partners, a technology buyout fund, and Robertson, Stephens & Company, a technology investment bank. ¶¶16-18.

- Richard Barry, a director since June 2021, was a Managing Director of Robertson Stephens Investment Management, and a Managing General Partner of Eastbourne Capital. He is also a director of Sarepta Therapeutics. ¶¶19-21.

- Pierre Gravier, a director since December 2023, has been CFO of PTC Therapeutics since July 2023. From 2013 to July 2023, he was a Managing Director in the healthcare group of Perella Weinberg Partners. ¶¶22-24.

- Robert Anderson, Jr., a director since December 2023, was the FBI's Executive Assistant Director of the Criminal, Cyber, Response and Services Branch. He also served as CEO and Chair of the Board of OakTruss Group. ¶¶25-27.

**B.    Executive Officers**

Between 2020 and 2024, there were six individuals who served as executive officers. ¶37. In addition to Mr. Barbier, who served as CEO, ¶32, Mr. Barry, who served as principal executive officer and then CEO after Mr. Barbier's departure, and Dr. Friedmann, who served as Chief Medical Officer until December 2022, ¶¶4-5, 35, the executive officers were:

- James W. Kupiec, M.D., Chief Medical Officer from December 2022 until May 2025. Prior to joining Cassava as Chief Clinical Development Officer in January 2021, Dr. Kupiec served as VP, Global Clinical Leader for Parkinson's Disease and Clinical Head of Neuroscience Research Unit for Pfizer and held leadership roles at Sanofi and Ciba-Geigy Pharmaceuticals. ¶¶38-39.

- Eric Schoen has served as CFO since 2018. Prior to joining Cassava, Mr. Schoen was Vice President, Senior Vice President, Finance, and Chief Accounting Officer of Aspira Women's Health and in the audit and assurance, transaction services and global capital markets practices of PwC. ¶¶40-41.

- R. Christopher Cook joined Cassava in October 2022 as General Counsel. In April 2025, he was appointed Chief Operating and Legal Officer. Mr. Cook was previously Global Head of Litigation and Government Investigations for Alcon, Vice President and division General Counsel for Walmart Central America, a Jones Day litigation partner, and an Assistant U.S. Attorney. ¶¶42-44.

**C.    Science Team**

Between 2020 and 2024, there were 18 individuals who served on Cassava's science team, including Dr. Burns, who was Senior Vice President of Neuroscience at the time. ¶46. She was previously Cassava's Senior Director of Preclinical Research and Vice President of Neuroscience. ¶47. Prior to Cassava, Dr. Burns worked at Elan Pharmaceuticals and Abgenix. ¶48. Dr. Burns received her Ph.D. in behavioral neuroscience from the University of Cambridge, and did her post-doctoral work in neurotransplantation at McLean Hospital at Harvard Medical School. ¶49. Throughout her career at Cassava, Dr. Burns reported to the Chief Medical Officer. ¶¶50-51.

## II. Encouraging Results from Simufilam Clinical Trials

In 2017, Cassava began sponsoring clinical trials of simufilam. ¶53. At the time, published studies had indicated that, in Alzheimer's patients, an altered form of a protein called filamin A ("FLNA") caused neuronal dysfunction, neuronal degeneration and neuroinflammation. ¶54. The Company believed simufilam could improve brain health and potentially treat Alzheimer's by reverting altered FLNA back to its native, healthy conformation. ¶55.

**Phase 1 Study:** In 2017, the FDA accepted Cassava's IND application for simufilam. ¶56. Between 2017 and 2018, Cassava sponsored a Phase 1 study focused on the primary endpoints of safety, tolerability and pharmacokinetics. ¶57. In 2018, the Phase 1 study was completed and showed that simufilam was well-tolerated and rapidly absorbed. ¶¶58-59. The Company believed the Phase 1 study demonstrated favorable proof-of-principle for the development of simufilam in treating Alzheimer's. ¶60.

**Phase 2a Study:** In 2019, Cassava sponsored a Phase 2a clinical proof-of-concept safety and pharmacokinetic study involving thirteen patients, ages 50 to 85, with mild-to-moderate Alzheimer's. ¶61. An independent analysis by a consulting biostatistician found decreases in eight cerebrospinal fluid ("CSF") biomarkers, when comparing Day 28 to pre-dose baseline. ¶62. The Company believed these results showed clinical evidence of simufilam's mechanism of action and drug-target engagement. ¶63.

**Phase 2b Study:** In September 2019, Cassava announced the initiation of a Phase 2b study, involving 64 patients with mild-to-moderate Alzheimer's. ¶64. The study was designed to evaluate safety and tolerability, and the primary endpoint was improvements in levels of CSF biomarkers of disease from baseline to Day 28. ¶¶65-66.

The Company initially selected a Lund University laboratory in Sweden to conduct the biomarker analysis. ¶67. But multiple issues arose at the Lund laboratory that caused Cassava and

its science team to doubt the reliability of Lund's work, including: staffing issues, technical and clerical errors, a breakdown of the machine used to analyze patient samples, improper handling of patient samples, and data that showed unusually high variability, internal inconsistency, and inexplicable swings in biomarker measurements. ¶¶68(a)-(h).

Dr. Burns sent Lund's data analysis to Dr. Paul Aisen, Director of the Alzheimer's Therapeutic Research Institute and a prominent Alzheimer's researcher for over 35 years. ¶¶69-70. Dr. Aisen confirmed Cassava's concerns about the Lund analysis. ¶71.

Because Cassava "didn't have a lot of choices" for laboratories that were capable of the biomarker analysis and available, ¶75, the Company asked Dr. Wang at CUNY to perform an analysis of the remaining patient CSF samples. ¶74.

In addition to the CSF biomarker analysis for the primary endpoint, an exploratory analysis of cognitive changes was conducted by a company called Cambridge Cognition. ¶76. The cognitive study was not designed to support any conclusions about efficacy. ¶77.

In a September 14, 2020 press release, Cassava announced the final results of the Phase 2b study. ¶78. Cassava reported that the drug was safe and well-tolerated in the study and that simufilam improved biomarkers in Alzheimer's patients compared to a placebo group. ¶¶79-80. Cassava also reported that the drug appeared to benefit cognition. *Id.* The presentation deck for Cassava's conference call that day noted that, for the cognitive analyses, "[p]atients who did not take drug (no blood levels) were removed" and, for one of the two tests, "[e]ffect sizes vs. placebo were calculated … after removing the most and least impaired subjects." Ex. 25, at 37-38. Because a number of participants failed to take simufilam during the cognitive study, failed to comply with required medication regimen, or did not have any baseline test, approximately 40% of the 64 cognitive study participants were excluded from the cognitive analyses. ¶¶81-83.

**Phase 2 Open-Label Study:** In 2020, Cassava sponsored an open-label study (no blinded group) to evaluate long-term safety and tolerability, and to assess exploratory efficacy endpoints. The efficacy outcomes were analyzed by an independent biostatistical consulting firm. In January 2023, Cassava announced positive top-line results for the Phase 2 open-label study. ¶¶84-86.

**Phase 3 Clinical Trials.** In 2021, Cassava announced the initiation of two Phase 3 clinical trials. RETHINK-ALZ was designed to evaluate the safety and efficacy of simufilam in enhancing cognition and slowing cognitive and functional decline over 52 weeks. Its secondary objectives included the assessment of simufilam's effect on neuropsychiatric symptoms and caregiver burden. The planned enrollment for RETHINK-ALZ was approximately 750 patients. REFOCUS-ALZ was designed to evaluate the safety and efficacy of simufilam over 76 weeks. The planned enrollment for REFOCUS-ALZ was approximately 1,000 patients. ¶¶87-94.

### III. FDA Denies Anonymous Citizen Petitions Seeking to Halt Clinical Trials

On August 18, 2021, Jordan Thomas, a lawyer with Labaton Sucharow LLP, submitted a CP on behalf of anonymous clients asking FDA to halt Cassava's Phase 2 Open Label and Phase 3 RETHINK-ALZ trials. Ex. 33, at 3; ¶95. On August 30, September 9, November 17, and December 8, 2021, Mr. Thomas filed supplements to the CP. ¶96. On September 1, 2021, Mr. Thomas submitted another CP asking FDA to halt the Phase 3 REFOCUS-ALZ trial. ¶97.

The CPs made three principal allegations: (i) Western blot analyses published in journal articles were "manipulated"; (2) Cassava's scientific claims were "impossible" and based on "scientifically undoable" experiments; and (3) Phase 2b biomarker data showed "signs of data anomalies or manipulation." ¶98. The November 17, 2021 submission alleged that Western Blot images supplied to certain academic journals to address the CP allegations were not "original" images. ¶99.

9

The Western Blot images at issue were generated by Dr. Wang, who maintained that the images were the original images. ¶¶100-102. Dr. Hal Scofield, a Western Blot expert, examined the images and found no evidence that they were manipulated. ¶¶103-107.

On November 17, 2021, the *Wall Street Journal* revealed the anonymous CP petitioners to be Bredt and Pitt, each of whom had taken short positions in Cassava stock. ¶110.

On February 10, 2022, the FDA denied the CPs. ¶111.

**IV.  Plaintiffs Adopt the Citizen Petition Allegations and Accuse Cassava of Fraud**

In late 2021, Plaintiffs adopted the CP allegations and began publicly accusing Cassava of fraud. ¶117; Ex. 53 ("it is all complete, made-up garbage."); Ex. 51, at -56670 ("Simufilam is a frauuud!"); Ex. 66, at -35074 ("$SAVA remains a complete scientific fraud").

Plaintiffs held short positions in and put options for Cassava stock. ¶120. Plaintiffs coordinated with one another, and with others holding short positions, on their public accusations against Cassava. ¶¶118-119. In private, Plaintiffs were clear that their goal was to drive Cassava's stock price down to profit from their short positions, ¶121:

- "I have been working up a rather deep dive deconstructing every aspect of the sava story and plan on submitting to several regulatory oversight bodies at after close. I believe (and the other share this belief) that this will have some (maybe significant) effect on stock price. I have personally increased my put position by about 50% in short term expiry near the money strikes." Ex. 49, at -170481.

- "We've got them on the ropes and we're ready for you to help deliver the killing blows [strong arm emoji]." Ex. 54, at -28479.

*See also* Ex. 123, 81:6-16 (Brodkin expected stock to "drop down to zero immediately" following November 2021 allegations but "much to [his] dismay, that didn't happen"); *id.* 104:3-105:3 (Plaintiffs coordinated with QCM, an investment firm that issued a short report on the same day Plaintiffs launched CassavaFraud.com, to drive stock price down); Ex. 128, 376:6-11 (same).

## V. GLP Reviews of Dr. Wang's Non-GLP Laboratory

Cassava did not have its own laboratory. ¶124. It contracted with third parties to perform laboratory work for studies of simufilam, including Dr. Wang's laboratory at CUNY. ¶125.

Academic laboratories like Dr. Wang's laboratory are generally not subject to, and do not purport to adhere to, Good Laboratory Practice ("GLP") standards. ¶¶126-127. The contract between CUNY and Cassava expressly stated that Dr. Wang's work was not subject to GLP requirements. ¶128.

In September 2022, the FDA conducted an inspection of Dr. Wang's laboratory. ¶129. Although Dr. Wang's laboratory did not purport to adhere to GLP standards, the FDA applied GLP standards. ¶130. The FDA's inspection report identified certain correctable deficiencies as of September 12, 2022, but did not "represent a final agency determination regarding compliance." Ex. 79. The FDA inspection did not find evidence that Dr. Wang engaged in any research misconduct. ¶132.

In September 2022, Cassava employees Laura Rodriguez and Michael Marsman decided to perform an on-site audit of Dr. Wang's laboratory "because of the fact that the FDA had just been there as well." ¶135.

Although Dr. Wang's laboratory was not subject to GLP requirements, Ms. Rodriguez and Dr. Marsman applied GLP standards. ¶136. Their audit report stated that, due to the noncompliance with GLP standards, as of September 22, 2022, Dr. Wang's laboratory, was "temporarily not qualified to provide biomarker analysis and research services for any future Cassava studies." ¶137. Their audit did not find evidence that Dr. Wang engaged in any research misconduct. ¶138.

At the time of their audit, Ms. Rodriguez and Dr. Marsman did not realize that Dr. Wang's laboratory was not subject to GLP standards. ¶139; Ex. 121, 213:3-6 ("I gave them a critical

finding because I, at the time, was still wanting to hold them to a GLP standard, realizing later that they were not being held to that standard.").

Mr. Barbier and Dr. Burns were not aware of the Cassava audit results until after the audit concluded, and did not believe that either the FDA inspection or Cassava audit, which applied GLP standards to a non-GLP laboratory, rendered the Company's reported clinical study results unreliable. ¶¶140-143.

## VI. Government Investigations of Cassava

In November 2021, Cassava disclosed that it had received requests for information from government agencies. ¶144.  In July 2024, Cassava disclosed that it was engaging with the DOJ and SEC in connection with investigations into the Company and two senior employees. ¶145.

### A. DOJ Investigation Does Not Result in Any Charges

In September 2024, Cassava disclosed that it did not anticipate the DOJ bringing charges against the Company. ¶146. The DOJ has not brought any charges against the Company or its employees. ¶147.

### B. Settlement of SEC Complaint Alleging Negligent Disclosures

On September 26, 2024, the SEC filed a complaint alleging negligence-based disclosure violations of Sections 17(a)(2) and (3) of the Securities Act of 1933 relating to the Phase 2b study results reported in September 2020. ¶148. Although Cassava disclosed that "[p]atients who did not take drug (no blood levels) were removed" from the exploratory cognitive analyses and that the analysis for one of the two tests calculated effect sizes "after removing the most and least impaired subjects," ¶81, the SEC faulted Cassava for "negligently fail[ing] to fully disclose" the removal of 40% of the study participants from the cognitive analyses. Ex. 110 ¶5. The SEC also alleged Cassava's disclosures were deficient because "Dr. Burns negligently provided information sufficient to allow Dr. Wang to partially unblind himself" in the CSF biomarker analysis. *Id.* ¶2.

Cassava, Mr. Barbier, and Dr. Burns settled the SEC action without admitting or denying the SEC's allegations. ¶151.

## VII. Orrick, Herrington & Sutcliffe LLP Investigation Finds No Evidence That Cassava Engaged in Or Was Aware of Research Misconduct

In late 2021, Orrick, Herrington & Sutcliffe LLP commenced an investigation of the allegations of research misconduct. ¶152. Orrick reported to a committee of Cassava's independent directors, which in turn reported to the Board. ¶153.

In February 2024, Cassava disclosed Orrick's investigation "ha[d] found no evidence to substantiate allegations that the Company or its employees engaged in or were aware of research misconduct." ¶154. In March 2025, Cassava disclosed the investigation determined "that certain statistical information contained in an attachment to an email sent by a former senior employee of Cassava to Dr. Wang before the CUNY Bioanalysis of CSF biomarkers was conducted could have been used to unblind him as to some number of Phase 2b Study participants," but "did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants." ¶155. Dr. Burns did not believe that she sent Dr. Wang unblinding information and did not have any reason to believe that Dr. Wang had partially unblinded himself. ¶156; *see also* Ex. 133, 216:16-25; 223:13-17. Dr. Wang testified that he did not unblind himself to any study participants and that he could not have used the email attachment at issue for unblinding. ¶157; Ex. 134, 232:11-233:5; *id.* 233:16-234:10; 240:7-8.

## VIII. CUNY Investigation Finds No Research Misconduct by Dr. Wang

On August 27, 2021, CUNY commenced an investigation. ¶158. In 2022 and 2023, Plaintiff Heilbut contacted CUNY's investigation committee to urge them to pursue the investigation with greater speed and publicity and to seek information about the investigation.

¶¶159-160. In October 2023, a preliminary report on CUNY's investigation was leaked to *Science* magazine. ¶161.

On May 30, 2025, CUNY issued a final report to the Office of Research Integrity ("ORI") of the Department of Health and Human Services stating that "research misconduct did not occur" and that "the Committee did not find that Dr. Wang's actions constitute acts of intentional, knowing, or reckless falsification and/or fabrication." ¶¶162-163.

## IX.      Dismissal of Criminal Indictment Against Dr. Wang

In June 2024, Dr. Wang was indicted for alleged false statements to the National Institutes of Health ("NIH") in connection with data submitted as part of grant applications. ¶164. Dr. Wang filed a motion to dismiss, arguing in part that the Government had withheld the final CUNY report in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). ¶165.

On October 17, 2025, the court found that the final CUNY report was exculpatory and ordered the Government to submit for *in camera* review all communications with the NIH and the ORI, and to review all of the materials in its possession for additional *Brady* material. ¶166.

On October 22, 2025, prior to the deadline for turning over its communications with NIH and ORI, the Government moved to dismiss the indictment against Dr. Wang. ¶167. In the motion hearing, the court remarked: "Dr. Wang was put through this whole process up to this point, and there was never even a real attempt to try to prove this at trial." The court called the process "regrettable and unfortunate" and "not a good example of how things should be done." ¶¶168-169.

On October 23, 2025, the indictment against Dr. Wang was dismissed. ¶170.

## X.      Cassava's Defamation Action

In August 2021, Cassava director Sanford Robertson raised the possibility of a defamation action against short sellers accusing Cassava of fraud. ¶171. On August 31, 2021, Cassava's Board formed the LMC to evaluate a possible defamation action and present its recommendations to the

Board. ¶172. The members of the LMC were Messrs. Robertson, O'Donnell, Barry, and Barbier. ¶174. The LMC's first meeting was held on September 1, 2021. ¶175. The LMC consulted with Orrick and Benesch Friedlander Coplan & Aronoff LLP. ¶176.

On November 2, 2022, more than a year after it commenced deliberations over whether to pursue a defamation action, Cassava, through Benesch, filed a complaint against Bredt, Pitt, Heilbut, Brodkin, Milioris, and others. ¶182.

Prior to the filing of the Defamation Action, the LMC met at least seven times. ¶183. Dr. Burns was not a member of the LMC or the Board, and did not attend any LMC meetings, or any Board meetings related to the Defamation Action. ¶¶177-178, 194-195.

In a March 2024 decision, Judge Woods found that 314 of the public statements by Plaintiffs Heilbut, Brodkin, and Milioris were defamatory *per se*, but that Cassava failed to plead actual malice. ¶191; *Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, *22, 29 (S.D.N.Y. Mar. 28, 2024).

On April 29, 2024, Cassava filed an amended pleading. ¶192.

On August 2, 2024, Cassava filed a stipulation of voluntary dismissal that was so-ordered on August 5. ¶193.

## XI.     Plaintiffs File This Lawsuit

On August 6, 2024, Plaintiffs filed the Complaint in this action asserting an Anti-SLAPP claim against Cassava.

On October 24, 2024, Plaintiffs filed their Amended Complaint asserting claims against Mr. Barbier and Dr. Burns for malicious prosecution and conspiracy. ECF 9 ¶¶195-214.

## LEGAL STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A defendant

need only "point[] to a lack of evidence … on an essential element of the nonmovant's claim." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). Plaintiff then "must come forward with evidence that would be sufficient to support a jury verdict in its favor." *Id.* This requires more than "a scintilla of evidence" or unsupported allegations—Plaintiff must produce "significant probative evidence" supporting its claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 252 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

**I.     The Individual Defendants Are Entitled To Summary Judgment on Plaintiffs' Claim for Malicious Prosecution of Cassava's Defamation Action**

"The elements of the tort of malicious prosecution of a civil action are (1) prosecution of a civil action against the plaintiff, (2) by or at the instance of the defendant, (3) without probable cause, (4) with malice, (5) which terminated in favor of plaintiff, and (6) causing special injury." *ANS 1 Corp. v. Yosef*, 244 A.D.3d 669, 671 (1st Dep't 2025).

The Individual Defendants are entitled to summary judgment because (i) Cassava did not pursue the Defamation Action "by or at the instance of" Dr. Burns; and (ii) the Defamation Action did not cause a "special injury" to Plaintiffs.

**A.     Dr. Burns Did Not Initiate or Prosecute the Defamation Action**

In alleging that Cassava pursued the Defamation Action at Dr. Burns' direction, AC ¶196, Plaintiffs overlook Cassava's corporate governance structure. Between 2020 and 2024, there were eleven individuals who served as directors and six individuals who served as executive officers. ¶¶2, 37. Dr. Burns was never a director or executive officer.  ¶¶36, 45.  Nor was she Cassava's

"lead scientist," as Plaintiffs' counsel represented to the Court. Ex. 139, 13:21-22. Instead, she was part of a larger science team and reported to Cassava's Chief Medical Officer. ¶¶46, 50-51.

Shortly after the CP filing in August 2021, Cassava's Board formed a committee, the LMC, comprised of four directors, to evaluate whether to file a defamation action, with the assistance of outside counsel at Orrick and Benesch. ¶¶172, 174, 176. After deliberating for more than a year, including in seven meetings, the LMC recommended that Cassava file suit. ¶¶182-183. Following the LMC's recommendation, the Board authorized the Defamation Action filed in November 2022. ¶182. After Cassava's new General Counsel arrived in October 2022, he also attended LMC meetings. ¶¶42, 184.

Dr. Burns was not a member of the LMC, and did not attend any meetings of the LMC, or any Board meetings regarding the Defamation Action. ¶¶177-178, 194-195.

From time to time, Dr. Burns was asked to provide and did provide certain materials, including some of Plaintiffs' Twitter posts, to Benesch. ¶¶197. *See LaFrance v. Bemben,* 2013 WL 132702, at *6 (E.D.N.Y. Jan. 10, 2013) (explaining that "[t]he mere fact that [defendant] provided [] information" cannot establish defendant initiated the action);[2] *Hewitt v. City of N.Y.,* 2012 WL 4503277, *7 (E.D.N.Y. Sept. 28, 2012) ("One who does no more than disclose … all material information within his knowledge" or who acts in a "supporting role … in the investigation" is "not deemed to be the initiator of the proceeding"), *aff'd,* 544 F.App'x 24 (2d Cir. 2013).

But Dr. Burns did not participate in any LMC or Board deliberations regarding the Defamation Action. ¶¶177-178, 194-195; Ex. 125, 17:23-18:18 (Cassava "not aware" of any role

---

[2] Although *LaFrance* involved an underlying criminal proceeding, "the same elements of malicious prosecution must be shown where the initial proceeding was civil." *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F.Supp.2d 391, 392 (S.D.N.Y. 1998).

by Dr. Burns in decision to file lawsuit); Ex. 124, 54:12-20, 62:25-63:8, 93:19-22 (LMC did not include Dr. Burns in any discussion of the defamation action); Ex. 132, 182:5-183:4 (because Dr. Burns was not a director, "she would have no input on – on the whole decision-making on the go/no-go, decision-making path").

Nor did Dr. Burns draft any section of any complaints in the Defamation Action or review any drafts prior to filing. ¶198. And she did not pay any legal bills for, or otherwise fund, the Defamation Action. ¶196.

Plaintiffs concede Dr. Burns "did not have the formal authority to cause Cassava to prosecute the Defamation Action," ECF 217, at 5, but claim she nonetheless caused Cassava to pursue the Defamation Action because, on December 1, 2021, she wrote in her private journal: "I just don't understand why we have to wait for the investigations to conclude before filing a defamation suit." *Id.*

Dr. Burns' comment in her private journal—nearly a year before the filing of the Defamation Action—underscores that Cassava did not act at Dr. Burns' direction. Instead of moving forward with a defamation action in December 2021, Cassava's Board and LMC, with the assistance of counsel, deliberated for more than a year after the first LMC meeting in September 2021 and did not file suit until November 2022. Moreover, that Dr. Burns did not understand why Cassava had "to wait" to file suit shows that she was *not* "engaged in Cassava's litigation strategy," much less *"the driving force behind"* the Defamation Action. ECF 217, at 5.

Dr. Burns simply did not have the power to authorize or direct Cassava to pursue the Defamation Action. ¶194. Nor can she be deemed to have authorized or directed the Defamation Action based on her spousal relationship with Mr. Barbier. *See Trs. of the Nat. Ret. Fund v. Wildwood Corp.*, 2013 WL 8446003, *6 (S.D.N.Y. Dec. 17, 2013) (rejecting argument that

husband's "knowledge of the lawsuit" should be imputed to wife). In addition to generally not discussing Company matters with Dr. Burns in their private life, Mr. Barbier "kept [Dr. Burns] in the dark intentionally" with respect to "legal matters," including with respect to the Defamation Action. ¶¶200-201.

Because there is no evidence that Dr. Burns, a scientist, rather than Cassava's Board, the LMC, or General Counsel, authorized or directed the Defamation Action, summary judgment should be granted in Dr. Burns' favor. *See Baldini v. Shah*, 2018 WL 11226079, *5 (S.D.N.Y. Aug. 9, 2018) ("That Bellevue did not initiate the proceedings against Demirtas defeats Plaintiffs' malicious prosecution claim."); *Sankin v. Abeshouse*, 545 F.Supp.2d 324, 327 (S.D.N.Y. 2008) (dismissing claim where "Plaintiff has not shown that the [action] was initiated by" defendants and was instead "initiated by [the company]."); *Loftus v. Arthur*, 2007 WL 2376883, *3-4 (N.Y. Sup. Ct. July 16, 2007) (granting summary judgment to defendant who "was not a party to," and had not "initiated or prosecuted," the underlying action).

## B.     Cassava's Defamation Action Did Not Cause A "Special Injury"

All Defendants, including Mr. Barbier and Dr. Burns, are entitled to summary judgment because Cassava's Defamation Action did not cause "special injury" to Plaintiffs. *See McCaul v. Ardsley Union Free Sch. Dist.*, 514 F.App'x.1, 2013 WL 673751, *5 (2d Cir. Feb. 25, 2013).

To avoid duplicative briefing, Mr. Barbier and Dr. Burns join in, and incorporate by reference, the arguments and undisputed material facts cited in Cassava's motion.

## II.     The Individual Defendants Are Entitled To Summary Judgment on Plaintiffs' Claim That They Conspired With Cassava To Maliciously Prosecute The Defamation Action

To prevail on a conspiracy theory, a plaintiff must establish "an underlying tort, as well as the following elements: '(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan

or purpose; and (4) resulting damage or injury.'" *Langer v. Paysafe Partners LP*, 2020 WL 7684885, *9, *adopted by* 2020 WL 7041085 (E.D.N.Y. Nov. 30, 2020).

As discussed below, the Individual Defendants are entitled to summary judgment because (i) Cassava did not need or seek Dr. Burns' agreement to pursue the Defamation Action; (ii) conspiracy is not an independent tort and the claim that Mr. Barbier and Dr. Burns conspired to maliciously prosecute the Defamation Action is duplicative of the malicious prosecution claim against them; and (iii) the intracorporate conspiracy doctrine bars Plaintiffs' claim.

### A. Cassava Did Not Need Or Seek Dr. Burns' Agreement To Commence Or Prosecute The Defamation Action

Plaintiffs allege Dr. Burns "agreed to commence and continue the Defamation Action," AC ¶207, but Cassava did not need or seek her agreement.

Dr. Burns was not a director or executive officer and did not have the power to authorize or direct the Defamation Action. ¶¶36, 45, 194. Instead, it was Cassava's Board and LMC, with the assistance of outside counsel (and after he joined, Cassava's General Counsel), that authorized and directed the Defamation Action. ¶¶173, 176, 184. There is no evidence that the Defamation Action was prosecuted at the direction of Dr. Burns, rather than Cassava's Board, the LMC, or General Counsel. That Dr. Burns was asked from time to time to provide certain materials to Benesch does not change the analysis. *See supra* at pp. 17-18; *McKeefry v. Town of Bedford*, 2019 WL 6498312, *11 n.18 (S.D.N.Y. Dec. 2, 2019) ("providing information … does not suggest conspiracy unless private party improperly influenced or controlled" the decisionmaker); *Shatkin v. Drescher*, 2004 WL 5509728 (N.Y. Sup. Ct. Nov. 1, 2004) (granting summary judgment; defendant could not "be liable for conspiracy to commit … malicious prosecution" because defendant "was not the plaintiff and did not initiate or continue" the underlying action).

Any attempt by Plaintiffs to hold Dr. Burns liable based on her spousal relationship with Mr. Barbier would be contrary to the facts and the law. On the facts, there is no evidence that the Board, the LMC, or Cassava's General Counsel acted at her direction because she is Mr. Barbier's spouse. *See supra* at pp. 18-19. On the law, a defendant's mere status as a spouse is insufficient to establish the defendant's "agreement" to an alleged conspiracy. *See Meyer v. Haines*, 2025 WL 1651154, *6 (N.D.N.Y. June 11, 2025) (rejecting contention that, "as a natural extension of their marriage," defendants conspired and had a "standing agreement, either explicit or implicit").

**B.** **Plaintiffs' Claim That Mr. Barbier and Dr. Burns Conspired to Maliciously Prosecute the Defamation Action Is Duplicative of The Malicious Prosecution Claim Against Them**

Both Mr. Barbier and Dr. Burns are entitled to summary judgment on Plaintiffs' claim that they conspired to "commit" the malicious prosecution of the Defamation Action, AC ¶207, because it is duplicative of the malicious prosecution claim against them.

"[C]ivil conspiracy is not an independent tort." *Gan v. GSUIG Real Est. Member LLC*, 2025 WL 2416950, *110 (E.D.N.Y. Aug. 21, 2025); *accord Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 591 (2d Cir. 2005).

Where, as here, a tort claim, such as Plaintiffs' malicious prosecution claim, is asserted against defendants, such as Mr. Barbier and Dr. Burns, who are also alleged to have conspired in the tort, courts have repeatedly rejected a conspiracy theory as duplicative. *See Gan*, 2025 WL 2416950, *111; *Hua Xue v. Jensen*, 2020 WL 6825676, *12 (S.D.N.Y. Nov. 19, 2020).

**C.** **The Intracorporate Conspiracy Doctrine Bars Plaintiffs' Claim**

The intracorporate conspiracy doctrine bars Plaintiffs' conspiracy claim in its entirety.

"Under the intracorporate conspiracy doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of [their] employment, are legally incapable of conspiring together." *Christians*, 2015 WL 468833, *9; *Sathianathan v. Smith Barney, Inc.*,

2006 WL 538152, *23 (S.D.N.Y. Feb. 24, 2006) ("[U]nder the intracorporate conspiracy doctrine, '[w]here individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand.'"). "To constitute a civil conspiracy, each of the defendants must have had an independent, personal conspiratorial purpose, wholly separate and apart from the entity.'" *Christians*, 2015 WL 468833, *9; *accord Kim v. NYC Green Transp. Grp.*, 2025 WL 373465, *6 (E.D.N.Y. Feb. 3, 2025); *Graham v. Peters*, 2013 WL 5924727, *5 (W.D.N.Y. Oct. 31, 2013) (personal-interest exception applies only where "defendants acted in pursuit of some purely personal interests apart from the interests of the [entity]").

There is no evidence that Mr. Barbier or Dr. Burns had "purely personal interests" that were "wholly separate and apart from" Cassava's interests. Instead, the undisputed material facts show that their interests were aligned with Cassava's interests.

### 1. **Mr. Barbier**

As CEO, Chair of the Board, and a director on the LMC, ¶¶32, 174, Mr. Barbier acted within the scope of his employment in participating in deliberations and decisions regarding the Defamation Action. *Nassau Cnty. Emp. "L" v. City of Nassau*, 345 F.Supp.2d 293, 305 (E.D.N.Y. 2004) ("Despite an [allegedly] improper motive, since conducting an investigation … was within the scope of [defendant's] official duties, the [intracorporate conspiracy] doctrine bars plaintiff's conspiracy claim.").

At the time Cassava was considering whether to pursue a defamation action, Cassava's directors, executive officers, and scientists believed the clinical results from the Phase 1 and 2 studies showed simufilam's potential for the treatment of Alzheimer's, and that research performed at third party institutions corroborated simufilam's mechanism of action to revert altered FLNA back to its native, healthy conformation. ¶¶179-181.

There is no evidence that anyone at Cassava believed Plaintiffs' allegations that Cassava was a fraud. Instead, the Company denied the allegations, ¶¶109, 185-187, and Mr. Barbier and Cassava's other directors authorized the Defamation Action to "let the sun in" and "bring some truth to all the allegations that were being charged against the [C]ompany," Ex. 132, 150:8-151:25, in an effort to protect the ongoing Phase 3 clinical trials and prevent further damage to the Company. Ex. 132, at 269:22-270:13 (explaining that Board's reasons for filing the defamation action included addressing "the harm to the company that the short sellers were doing and continued to do" by "calling principal investigators … trying to enroll ... patients" and "damag[ing] … the company's reputation"; "they were clearly out to destroy the stock price, make money, go home, and perhaps do it again somewhere"); ¶¶122-123, 188.

Mr. Barbier was concerned about the impact of what he believed to be false allegations on Cassava, its employees, and the ongoing clinical trials. Ex. 34, (8/24/21: "[T]hese [CP] allegations are complete non-sense," but driving stock price down because "investors are selling first, asking questions later"); Ex. 68, (3/4/22: "[S]ince August 2021, … [a] small team of short sellers have been targeting Cassava Sciences with sham Citizen Petitions, false allegations, false rumors published on social media, etc. The bad actors who engage in this behavior have one goal: to seek a decline in our stock."); Ex. 77, (6/20/22 email reflecting concern about the impact on "directors, managers, employees, advisors and clinicians – who are going through blood, sweat & tears to test a new drug treatment for patients with Alzheimer's"); ¶¶122-123, 189.

As reflected in the testimony of Cassava's 30(b)(6) designee, Mr. Barbier's concerns were aligned with those of the Company:

- Q. And so what was Cassava's ultimate purpose for commencing the defamation action? A. Well, we had a group of defendants who was maliciously defaming the company…. So that was the -- the reason is – is those statements impacting the company's ability to recruit and run a Phase 3 trial." Ex. 125, 23:20-24:13;

23

*id.* 29:21-25 ("the origination of the suit was, Hey, we've got people defaming us and calling us liars and calling us frauds that are impacting our trial sites and our ability to recruit for the – for this study.").

- "The defamation case was filed against your clients because of the outright – things that we knew to be untrue: That the company is a fraud …. This is, you know, the impact of the defendants was damaging our ability to recruit subjects and complete our clinical studies timely and objectively. So someone who's doing that is an opponent to the Company…. [I]t goes past the line, if you will, if you're impacting somebody's business with false statements." *Id.* 242:21-243:13.

The testimony of Mr. Barry, a director on the LMC, also underscores that Mr. Barbier's concerns were aligned with those of Cassava:

- "The substance [of Mr. Barry's discussions with Messrs. Barbier and Robertson] was that the company was being defamed by [Plaintiffs], and it was hurting our ability to recruit a phase 3 trial, and severely damaging the reputation of the company unfairly. And we couldn't manage. It was unfair to patients. It was unfair to the company. It was unfair to employees." Ex. 124, 63:6-20; 67:19-21.

- "I was concerned about what [Plaintiffs] were planting in the media, but I was concerned because it was having an effect on the company's business or enrolling in the trial. And I was concerned because the company's reputation was being unfairly destroyed by statements that were defamatory and untrue." *Id.* 154:23-155:4; *id.* 156:15-17 ("We wanted to stop false, misleading, untruthful information that happened to be defamatory towards the company.").

Plaintiffs put the cart before horse when they speculate that Mr. Barbier was motivated to "conceal [his] awareness of and involvement in research misconduct," "limit[] his personal exposure to civil and criminal liability," ECF 82, at 36; AC ¶210, and "protect[] [Dr. Burns'] professional and scientific reputation," ECF 217, at 6; AC ¶210. No investigation or audit—by Orrick, the Government, CUNY, or Cassava—has found evidence of any knowing or deliberate research misconduct. ¶¶132, 138, 147, 148, 154-155. Moreover, Mr. Barbier is not a scientist and had no personal role in the clinical studies of simufilam. ¶32; Ex. 132, 7:21-23. Instead, he relied on the experts, including Cassava's science team and the Cassava directors who were medical

professionals with decades of experience in clinical research and trials. Ex. 132, 12:24-13; 18:10-14; 20:12-25.

Without any evidence, Plaintiffs speculate that Mr. Barbier was motivated to prosecute the Defamation Action to "keep[] his job" or because his "compensation [was] tied to Cassava's elevated stock price." AC ¶210; ECF 217, at 6. The alleged desire to keep one's job is not a personal-interest exception to the intracorporate conspiracy doctrine. *See Rhodes v. Tevens*, 2012 WL 777421 (W.D.N.Y. Mar. 7, 2012) (allegation that defendants sought to "further each of their careers" not sufficient to establish that "[d]efendants were motivated by independent personal interests"), *aff'd*, 519 F.App'x 703 (2d Cir. 2013). Nor is the alleged prospect of stock-based compensation because it is an alleged financial interest tied to the financial success of the Company. *See Christians*, 2015 WL 468833, *9 (finding that personal interests exception did not apply because "[w]hatever benefits [defendant] would have from the [transaction] would have accrued to him through financial benefits to his business"); *Langer*, 2020 WL 7684885, *10 (rejecting application of personal-interest exception where CEO's embezzlement and termination was concealed from a company's business partner to induce further payments to the company).

In sum, the personal-interest exception to the intracorporate conspiracy doctrine does not apply because Mr. Barbier was acting within the scope of his employment as CEO, director, and member of the LMC, and his concerns and hopes in relation to the Defamation Action were aligned with, and not "wholly separate and apart from," the Company.

### 2. **Dr. Burns**

Even assuming *arguendo* that Cassava needed and sought Dr. Burns' agreement to pursue the Defamation Action when the evidence clearly shows it did not, there is no evidence that Dr. Burns had "purely personal interests" that were "wholly separate and apart from" Cassava's interests. Instead, the evidence shows that her interests were aligned with Cassava's interests.

In alignment with the Company, Dr. Burns hoped that the Defamation Action would help preserve clinical trial sites and trial enrollment, which had been adversely impacted by the accusations from Plaintiffs and others:

- Q. [W]as it your hope at the time the defamation action was filed that people like our clients would stop with the comments you just described? A…. I was trying to do a job. We were trying to enroll clinical trials. They were doing their best to stop enrollment, to prolong it or to hope that the whole trial stopped, that we'd never get an answer on our drug…" Ex. 133, 142:18-143:4; *see also id.* 143:14; ¶202-203.

*Compare with* Ex. 125, 20:8-12 (Cassava 30(b)(6): "[W]e were enrolling two large Phase 3 clinical trials, and the defamatory, false statements … were … inhibiting our ability to recruit … So it was impacting our business[.]"); Ex. 124, 154:25-155:4 (Mr. Barry: "I was concerned because it was having an effect on the company's business and enrolling in the trial. And I was concerned because the company's reputation was being unfairly destroyed by statements that were defamatory…").

Plaintiffs again put the cart before horse when they speculate that Dr. Burns was motivated to "conceal [her] awareness of and involvement in research misconduct," ECF 82 at 36; AC ¶210, in light of being the "co-author of key articles" regarding simufilam, ECF 217, at 6. No investigation or audit—by Orrick, the Government, CUNY, or Cassava—has found evidence of any knowing or deliberate research misconduct. ¶¶132, 138, 147, 148, 154-155. And, as reflected in her private journal, Dr. Burns was unwavering in her belief in the science behind simufilam and the clinical trial results:

- "I feel fulfilled, also knowing that this drug candidate has great potential to help millions of families affected by Alzheimer's disease. … Simufilam has improved both biomarkers and cognition in phase two trials, and the started phase three will tell all." Ex 57, at -651.

- "[A] nightmare has intruded. Cassava Sciences, its shareholders, my collaborator and I have been hit with continued unprecedented attacks by short-sellers, including filing of an anonymous Citizen's Petition with the FDA to stop our phase three trials. Baseless, the petition is a publicity stunt that provided enormous profit via 'short and distort.'" Ex. 57, at -651.

- "[T]he damage and unfairness to our hard work and to the Alzheimer's disease community in general leaves me questioning humanity[.]"Ex. 57, at -651; *id.* at -749 (describing the "negative campaign against Cassava" as "an attempt to stop or slow two large Phase 3 clinical trials of our promising drug candidate for Alzheimer's"); *id.* ("Short-seller hedge funds (who profit from causing a decline in the stock price) have been manipulating the stock price to great gain. Twitter 'scientists' have been promoting a false and damaging narrative that the program is 'all made up' and even that some experiments 'didn't happen.' We know certain of these negative voices on Twitter have ties to hedge funds.").

Dr. Burns' alleged animus towards, or alleged desire to "punish" Plaintiffs, is insufficient to establish the personal-interest exception. ECF 217, at 6; *see Shakimo O. v. Westchester Cnty.*, 2014 WL 521608, *14 (S.D.N.Y. Feb. 10, 2014) ("personal animus … does not support application of the personal interests exception."); *Richard v. Leclaire*, 2017 WL 9511181, *17, *adopted by* 2017 WL 4349381 (N.D.N.Y. Sept. 29, 2017) (plaintiff "must show more than simply alleging that the defendants were motivated by personal bias against the plaintiff"); *Graham*, 2013 WL 5924727, *1, 5 (dismissing, under intracorporate conspiracy doctrine, claim that defendants conspired to retaliate against plaintiff).

In sum, even assuming *arguendo* that Cassava needed and sought Dr. Burns' agreement to pursue the Defamation Action when the evidence clearly shows it did not, Dr. Burns is entitled to summary judgment under the intracorporate conspiracy doctrine because her interests were aligned with, and not "wholly separate and apart from," the Company.

### D.       Plaintiffs Are Not Entitled to Punitive Damages

Through their conspiracy claim, Plaintiffs seek to hold Mr. Barbier and Dr. Burns liable for punitive damages on their Anti-SLAPP claim against Cassava.  AC ¶207. There is no basis for a punitive damages award because the evidence shows that Cassava's Defamation Action was not brought for the sole purpose of harassing or intimidating Plaintiffs. Instead, Cassava sought to defend itself against accusations that it was a fraud and that its employees were criminals—statements that were found to be *per se* defamatory.

To avoid duplicative briefing, Mr. Barbier and Dr. Burns join in, and incorporate by reference, the arguments and undisputed material facts cited in Cassava's motion.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Mr. Barbier and Dr. Burns respectfully request that the Court enter summary judgment in their favor.

Dated: August 3, 2026  
      New York, New York

Respectfully submitted,

BAKER & HOSTETLER LLP

By:    */s/ Zachary R. Taylor*  
      Douglas W. Greene (*pro hac vice*)  
      Aric H. Wu  
      Zachary R. Taylor

45 Rockefeller Plaza  
New York, NY 10111  
Telephone: 212.589.4200  
dgreene@bakerlaw.com  
awu@bakerlaw.com  
ztaylor@bakerlaw.com

*Attorneys for Defendants Remi Barbier and Lindsay Burns*

# CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(C)

Pursuant to the Court's Individual Practice Rule 3(C) and Local Civil Rule 7.1(c), I hereby certify that on August 3, 2026, I electronically filed the foregoing Individual Defendants' Memorandum of Law in Support of their Motion for Summary Judgment. As measured by the word processing system used to prepare it, the memorandum has a word count of 8,636 and complies with Rule 7.1(c) of the Local Rules of the United States District Court for the Southern District of New York.

BAKER & HOSTETLER LLP

By:     */s/ Zachary R. Taylor*
         Zachary R. Taylor