**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>Plaintiffs,<br><br>v.<br><br>CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,<br><br>Defendants. | Case No. 1:24-cv-05948-JLR-OTW<br><br>ORAL ARGUMENT REQUESTED |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. DAVID A. SANDERS

Dated: September 14, 2026

CLARICK GUERON REISBAUM LLP
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ii

PRELIMINARY STATEMENT 1

BACKGROUND 2

A. Dr. Sanders Is A Biochemist and Recognized Expert In Research Integrity 4

B. Dr. Sanders's Anticipated Expert Testimony 5

1. Dr. Sanders Will Explain Scientific Recordkeeping Standards and Practices to Help the Jury Understand the Significance of Defendants' Departures 5

2. Dr. Sanders Will Explain Research Integrity Standards and Practices to Help the Jury Assess Claims About Defendants' Research 6

3. Dr. Sanders Will Explain that Defendants' Simufilam Research Contains Hallmarks of Data Manipulation or Fabrication 7

4. Dr. Sanders Will Explain Principles of Statistical Analysis to Help the Jury Assess Defendants' Conduct 10

ARGUMENT 10

I. DR. SANDERS IS QUALIFIED TO TESTIFY TO his proffered OPINIONS 11

II. DR. SANDERS RELIABLY APPLIED HIS EXPERTISE TO relevant issues 14

A. Dr. Sanders Makes Appropriate Use of Sources 14

B. Dr. Sanders' Analysis and Comparison of ELISA and Immunoblot Data Is Wholly Appropriate 16

C. The Jury Is Entitled to Hear Dr. Sanders' Proposed Testimony Concerning the Impropriety of Cherry-Picking Data 17

D. Defendants' Attacks on Dr. Sanders' Specific Conclusions Are Wrong and Are No Basis to Exclude His Testimony 18

E. The "Immunoblot Conclusion" Is Not What Defendants Say It Is 22

III. DR. SANDERS DOES NOT USURP THE JURY'S ROLE 24

A. Dr. Sanders Does Not Announce "Legal Conclusions" 24

B. Dr. Sanders Does Not Opine on Mental States 25

C. Dr. Sanders's Opinions Are Properly Temporally Grounded 26

IV. DR. SANDERS WILL NOT CREATE A "COLLATERAL TRIAL" 27

V. THE MOTION PARROTS DEFENDANTS' REBUTTAL EXPERT AND MAKES OBJECTIONS MORE APTLY APPLIED TO DEFENDANTS' OWN EXPERTS 28

CONCLUSION 29

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ....................11

*Am. Home Assur. Co. v. Merck & Co.*,
462 F. Supp. 2d 435 (S.D.N.Y. 2006)....................26

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....................16

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
666 F. Supp. 3d 328 (S.D.N.Y. 2023)....................16

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996)....................11

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................11, 28

*Envy Branding, LLC v. William Gerard Grp., LLC*,
No. 20-cv-03182-JLR, 2024 WL 869156 (S.D.N.Y. Feb. 29, 2024) ....................12

*Gussack Realty Co. v. Xerox Corp.*,
224 F.3d 85 (2d Cir. 2000)....................20

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992)....................25

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995)....................12

*In re Namenda Indirect Purchaser Antitrust Litig.*,
No. 15-cv-6549, 2021 WL 2403727 (S.D.N.Y. June 11, 2021) ....................28

*Nimely v. City of New York*,
414 F.3d 381 (2nd Cir. 2005)....................17

*Oracle Am., Inc. v. Google Inc.*,
No. 10-cv-03561, 2012 WL 4017808 (N.D. Ca. Apr. 10, 2012)....................21

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
No. 17-cv-1388, 2021 WL 673479 (S.D.N.Y. Feb. 22, 2021) ....................26

*Qureshi v. Costco Wholesale Corp.*,
No. 20-cv-4086, 2022 WL 16757952 (E.D.N.Y. Nov. 8, 2022) ....................21

*Restivo v. Hessemann*,
846 F.3d 547 (2d Cir. 2017)....................23

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................16, 17

*Rutledge v. Walgreen Co.*,
182 F.4th 168 (2d Cir. 2026) ....................21

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) ....................16, 25

*Matter of Trusts, Series 2007-C30*,
No. 17-cv-1998, 2020 WL 1304400 (S.D.N.Y. March 19, 2020) ....................26

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991)....................11, 25

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994)....................18, 24

*United States v. Frabizio*,
445 F. Supp. 2d 152 (D. Mass. 2006) ....................23

*United States v. Jacques Dessange, Inc.*,
No. 99-cr-01182, 2000 WL 294849 (S.D.N.Y. Mar. 21, 2000) ....................11, 14, 19

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008)....................16

*United States v. Smith*,
811 F. Supp. 3d 523 (S.D.N.Y. 2025)....................18

*United States v. Wang*
No. 8:24-cr-00211-TDC, Dkt. 132 (D. Md. Oct. 17, 2025)....................13

**Statutes**

New York Civil Rights Law § 70-a ....................26

**Other Authorities**

Fed. R. Evid. 702 .................... *passim*

Fed. R. Evid. 704 ....................24

Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris respectfully submit this memorandum of law in opposition to the motion to exclude the expert testimony of Dr. David A. Sanders by defendant Cassava Sciences, Inc. (Dkts. 227-230) and joined by defendants Remi Barbier and Lindsay Burns (Dkt. 231).

## PRELIMINARY STATEMENT

Defendants knew when they commenced the Defamation Action that no data existed to refute Plaintiffs' claims. They knew real indicia of research misconduct existed. They knew Dr. Burns herself had cherry-picked data and misused outside sample testing services. Dr. Sanders will assist the jury in understanding these facts, and why they matter, including this fundamental truth: that science depends on data and data depends on recordkeeping. He will offer quintessential expert testimony by explaining scientific methods and standards to a lay jury.

To begin with, Dr. Sanders will explain the role of recordkeeping in science. He will describe what responsible labs and scientists do to record and preserve data, and why: including to defend scientific claims against challenges of many kinds. In essence, he will help the jury understand the nature of the evidence that Defendants would have had to use if they had any genuine purpose to prove Plaintiffs' criticisms wrong.

More specifically, Dr. Sanders will explain the two principal biochemical assays (ELISA and immunoblot) that Defendants' scientific claims rested on. That testimony will help the jury understand the nature of the data generated by those assays and hence the nature of the records that would have been required to disprove Plaintiffs' critiques as Defendants claimed to be able to do in the Defamation Action.

Next, Dr. Sanders will provide background on how research integrity issues are investigated in the biomedical sciences. He will explain the meaning of certain indicia of research misconduct associated with simufilam. In particular, he will describe why the pattern of

differences between the original ELISA plate reader data CUNY retrieved from Dr. Wang's lab and the analogous datasets Cassava held out as representing its clinical data are strongly suggestive of deliberate manipulation. He will describe why certain types of anomalies and visual artefacts in images of immunoblot assays are suggestive of impropriety.

Finally, Dr. Sanders will explain certain basic rules governing the statistical analysis of biomedical data, including the importance of pre-specifying any exclusion criteria to prevent results-oriented cherry-picking of data.

Defendants aim to foreclose this testimony and deprive the jury of an understanding of good scientific practices. In service of that attempt, their motion to exclude Dr. Sanders's testimony mischaracterizes his report and misapprehends Plaintiffs' trial strategy. Each section of their motion either misconstrues Dr. Sanders's opinions or misstates the law. Defendants also extensively quote (or simply parrot) their own rebuttal experts, underlining that any challenge to Dr. Sanders's proposed testimony is most appropriately made at trial, either through cross-examination or rebuttal testimony. The irony on this front is especially keen given that Defendants' own experts have engaged in the same type of conduct that Defendants criticize in Dr. Sanders—such as relying on data provided by Defendants, summarizing and describing regulations, and opining on the meaning of institutional actions.

It is easy to see why Defendants wish to keep the jury in the dark concerning the norms of laboratory practice and scientific recordkeeping. But there is no basis to exclude any part of Dr. Sanders's proposed testimony.

## BACKGROUND

In the underlying defamation action, Cassava attacked Plaintiffs for publicly critiquing scientific claims Cassava had made about its drug candidate simufilam. Cassava insisted that it could prove both that Plaintiffs' critiques were factually false and that Plaintiffs did not sincerely

believe them to be true. Following the dismissal and abandonment of that defamation action, Plaintiffs filed this action alleging that Defendants' commencement and continuation of the defamation action constituted malicious prosecution and violated New York's anti-SLAPP statute. As relevant to the present motion, Plaintiffs have alleged, and will prove at trial, that Defendants lacked probable cause or any proper purpose for the defamation action because: 1) Defendants knew no scientific evidence existed that could ever have proven Plaintiffs' criticisms to be false; and 2) Defendants were aware of indicia of research misconduct that provided an objectively reasonable basis for Plaintiffs' belief that their critiques were well-founded.

Plaintiffs will prove both the absence of data and the presence of red flags through documents and the testimony of fact witnesses. The absence of data will be shown by, among other things, audits by the FDA and Cassava's own staff, admissions by Cassava to the FDA and DOJ, and statements by Cassava's employees. Defendants' awareness of indicia of misconduct will be shown through warnings by Cassava's own scientific advisors, irregular sample analysis, improper statistical treatment of clinical data, retractions and expressions of concern by peer-reviewed journals, and differences between raw and reported numerical data associated with biochemical assays known as ELISA tests.

Plaintiffs plan to contextualize and explain that factual evidence through expert testimony by Dr. David Sanders, a professor of biological sciences at Purdue University and a widely recognized expert on research integrity and research misconduct. By the present motion, Defendants seek to prevent Dr. Sanders from providing that context and explanation.

### A. <u>Dr. Sanders Is A Biochemist and Recognized Expert In Research Integrity</u>

Dr. David A. Sanders is an Associate Professor of Biological Sciences at Purdue University, where he has served on the faculty since 1995. He holds a B.S. in Molecular Biophysics and Biochemistry from Yale College and a Ph.D. in Biochemistry from the University of California, Berkeley. (Zaur Ex. 1 at 1.)

Dr. Sanders has decades of experience as a laboratory scientist and professor of biological science, including conducting, overseeing, and teaching the two laboratory techniques at issue in this case—immunoblots (Western blots) and ELISAs. (Zaur Ex. 2, App. A ¶ 1, App. B. ¶ 1.) Dr. Sanders has "taught a generation of students about each of these techniques." (Zaur Ex. 3 at 342:14-21, 343:13-17, 236:19-237:09 ("I have conducted them. I have taught others how to conduct them. And I teach them nearly every semester that I teach. I describe them in detail. And we discuss them in our class…").)

Beginning around 2010, Dr. Sanders developed a major research focus on the ethics of scientific publication, deviations from the standards of scientific publication, and the reform of grant and journal-article peer review of scientific research. (Zaur Ex. 2 ¶ 3; Zaur Ex. 3 at 40:20-41:17.) Over the past 15 years, Dr. Sanders has published extensively on these topics, including in *Times Higher Education* and the scientific journal *Oncogene*. (Zaur Ex. 1. at 3-5.) Numerous industry participants and research institutions have invited him to lecture on research integrity. For example, The International Association of Scientific, Technical and Medical Publishers, known as STM, invited Dr. Sanders to provide a lecture titled "Ethics of scientific publication—deficient institutional responses" at the STM Annual Conference in 2023; Cornell University invited Dr. Sanders to provide a lecture titled "Ethics of Scientific Publication" as the honorary Moses Passer Lecturer in 2019; and the 75th Anniversary Commemoration of the Los Alamos

National Laboratory invited Dr. Sanders to provide a lecture titled "Scientific Integrity—Know Your Responsibilities" in 2018. (Zaur Ex. 1 at 1; Zaur Ex. 3 at 46:06-48:17; *see also id.* 47:21-48:24 (describing additional lectures on research integrity issues for Oxford University Press and at universities in Trieste, Toulouse, and Paris).)

Likewise, science journalists frequently solicit Dr. Sanders's views on news stories about research integrity issues, recognizing Dr. Sanders as a scientific "image expert" and "scientific sleuth," known for "ferreting out problems in numerous papers" and "expos[ing] numerous cases of academic fraud." (Zaur Ex. 1 at 5-6 (Retraction Watch (Sept. 2, 2025), Retraction Watch (June 29, 2021), Times Higher Educ. (Apr. 25, 2022).)

### B. <u>Dr. Sanders's Anticipated Expert Testimony</u>

#### 1. Dr. Sanders Will Explain Scientific Recordkeeping Standards and Practices to Help the Jury Understand the Significance of Defendants' Departures

Dr. Sanders will provide the jury with a basic understanding of the role of recordkeeping in contemporary biomedical science. (Zaur Ex. 2 §§ I(A) & I(B).) He will explain why proper recordkeeping is essential in all modern science: it is necessary to replicate, confirm, or verify the results of a scientific experiment. (Zaur Ex. 2 ¶¶ 10-14.) He will testify that basic recordkeeping norms and practices exist across the biomedical sciences. (Zaur Ex. 2 ¶¶ 15-24.)

Dr. Sanders will focus on the two types of biochemical assays—ELISAs and immunoblots (or Western blots)—used in the simufilam research that Plaintiffs criticized and that Defendants claimed they could validate in court. (Zaur Ex. 2 § I(C).) Dr. Sanders will help the jury understand what these laboratory techniques are designed to do, and how they are ordinarily conducted, presented—and, most critically, how they are recorded. (*See* Zaur Ex. 2 ¶¶ 27-28, 45-53, App. A. ¶¶ 1-39, App. B ¶¶ 1-16.)

In this context, Dr. Sanders will testify that Cassava and Dr. Wang's failure to follow these practices—most notably, their failures to maintain laboratory notebooks and original data—undermine the integrity of their research and make it virtually impossible to refute claims that the underlying research was manipulated or fabricated. (Zaur Ex. 2 ¶¶ 54-77.)

This testimony will help the jury understand the degree to which Cassava and Dr. Wang's scientific recordkeeping departed from standard practices, and in so doing, help the jury understand that Defendants lacked a substantial basis or legitimate purpose for the Defamation Action, premised as it was on data and records they knew did not exist.

### 2. Dr. Sanders Will Explain Research Integrity Standards and Practices to Help the Jury Assess Claims About Defendants' Research

Dr. Sanders will provide a background on the basic methodology for investigating concerns about research integrity. (Zaur Ex. 2 § II.)

He will explain that, as a general matter, the most reliable method for investigating research integrity concerns is to compare (a) primary records (*e.g.*, original data and experimental logbooks) from an experiment or study, with (b) the reported results. (Zaur Ex. 2 ¶¶ 97-98, 107-110.) Dr. Sanders will also explain that the absence of such records can be both a major obstacle to any investigation of research misconduct *and* a major signal of possible misconduct. (Zaur Ex. 2 ¶¶ 99, 103-106.) This testimony will be especially helpful to the jury in light of Defendants' repeated (false) assertions in the Defamation Action that research misconduct investigations with inconclusive results arising from the absence of original records "exonerated" them. *See* Zaur Ex. 4 at 140:18-141:22 (claiming journal notices were "exonerations"); Zaur Ex. 5 (listing "Journal Exonerations" among "factual bases" for Defamation Action)); Zaur Ex. 6 ¶¶ 300-01; Zaur Ex. 7 ¶¶ 544, 564-65; *see also* Zaur Ex. 8

RFCUNY000743 (CUNY Investigation Report noting constraints "due to the failure of Dr. Wang to provide underlying, original data or research records").

### 3. Dr. Sanders Will Explain that Defendants' Simufilam Research Contains Hallmarks of Data Manipulation or Fabrication

In his Report, Dr. Sanders analyzed several discrete issues related to Defendants' simufilam research. (Zaur Ex. 2 § III)

#### a. ELISA Data

Dr. Sanders analyzed ELISA data generated by Dr. Wang's lab in testing for biomarkers associated with Alzheimer's disease for signs of data manipulation, using the widely recognized method of comparing original data with presented data. (Zaur Ex. 2 ¶¶ 111-119; Zaur Exs. 28-35; *see also* Zaur Ex. 2 ¶¶ 97-98.)

Specifically, for eight different simufilam experiments, Dr. Sanders compared (1) the original data that CUNY had collected from the database folder on Dr. Wang's computer in 2021 (where the ELISA software program autosaved raw data) ("CUNY Data"); with (2) corresponding data presented by Defendants. Dr. Sanders identified discrepancies that followed highly suspicious patterns, including round-number differences, changes to the most significant digit in the absence of changes to less-significant digits, and same-direction movement within triplicate groups. (Zaur Ex. 2 ¶¶ 111-119.) Dr. Sanders provided an Appendix with the eight datasets and comparison charts that illustrate these patterns of discrepancies. (*See* Zaur Exs. 28-35.) For example, the comparison chart below, from a simufilam experiment on phase 2a study samples, shows an example dataset reported by Dr. Wang, with the red digits representing figures in the presented data that differ from figures in the CUNY Data.

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 0.1976 | 0.1974 | 0.0358 | 0.9012 | 0.8645 | 0.8524 | 0.9141 | 0.9381 | 0.9631 | 0.8962 | 0.9569 | 0.9256 |
| B | 0.1416 | 0.1502 | 0.0406 | 0.9339 | 0.9216 | 0.9382 | 0.9209 | 0.9312 | 0.9222 | 0.9612 | 0.9933 | 0.9235 |
| C | 0.1959 | 0.2048 | 0.8566 | 0.9803 | 0.9788 | 0.8836 | 0.9092 | 0.9305 | 0.8284 | 0.8300 | 0.8312 | 0.8277 |
| D | 0.2771 | 0.2765 | 0.9294 | 0.9743 | 0.9389 | 0.9586 | 0.9548 | 0.9224 | 0.9870 | 0.0465 | 0.0452 | 0.0828 |
| E | 0.4541 | 0.4358 | 0.8666 | 0.9067 | 0.9863 | 0.8681 | 1.2814 | 1.2465 | 1.3090 | 1.3690 | 1.1861 | 1.4407 |
| F | 0.8326 | 0.8732 | 0.9285 | 0.9507 | 0.9127 | 0.9534 | 1.0332 | 1.1386 | 1.3920 | 1.2026 | 1.0107 | 1.1369 |
| G | 1.3438 | 1.2980 | 0.9354 | 0.8840 | 0.9171 | 0.8674 | 0.9108 | 0.9465 | 0.9652 | 0.8664 | 0.8727 | 0.8255 |
| H | 2.1125 | 2.2306 | 0.9289 | 0.9990 | 0.9843 | 0.9935 | 0.9980 | 0.9697 | 0.9821 | 0.9129 | 0.9113 | 0.9712 |

(Zaur Ex. 28, Set 1 - Data comparison.)

These same patterns appeared in each of the eight datasets. As a result, Dr. Sanders concluded that—assuming the datasets he examined do reflect original data as CUNY has informed the Defendants—Dr. Wang appears to have repeatedly fabricated data from ELISA experiments conducted for Cassava. (Zaur Ex. 2 ¶ 119.) Because (as separate factual evidence will show) Cassava had ready access to this original data, this testimony by Dr. Sanders will bear directly on whether Defendants had a substantial or good-faith basis to assert in the Defamation Action that "Cassava did not fabricate data or rely on fabricated data" and that the "underlying research and backup" would prove it. (*See* Zaur Ex. 6 ¶¶ 162-65, 211-13; Zaur Ex. 7 ¶¶ 522-24, 530-32.)

**b. Reanalysis of Phase 2b Biomarker Data**

Apart from the deliberate alteration of raw ELISA data, Dr. Sanders will draw on his experience and training to testify that Defendants failed to follow ordinary scientific standards and practices in analyzing and presenting biomarker data from the phase 2b study of simufilam. (Zaur Ex. 2 § III.B.) He will explain why the circumstances surrounding Defendants' "reanalysis" of the data—including that Dr. Wang himself conducted the reanalysis—raised legitimate questions about the integrity of the simufilam clinical program. (Zaur Ex. 2 ¶¶ 120-27.) Dr. Sanders applies his expertise to the facts surrounding Cassava's Phase 2b study (as

disclosed by Cassava). This testimony will help the jury understand Defendants' departures from scientific norms and thus to evaluate their purposes and bases—which included these phase 2b "results"—for suing Plaintiffs. (*See* Zaur Ex. 6 ¶¶ 228-42, 350-52; Zaur Ex. 7 ¶¶ 534, 537.)

**c. Misuse of Quanterix**

Dr. Sanders also will testify that there was a legitimate basis to question the propriety of Cassava's reliance on bioassays of phase 2 data by testing vendor Quanterix. (Zaur Ex. 2 § III.C) Specifically, he will explain the impropriety of sending plasma samples in two batches and reviewing the first half before sending the second—i.e. reviewing preliminary results before deciding whether to complete testing. (Zaur Ex. 2 ¶¶ 128-131.) This testimony will help the jury understand and assess Defendants' false assertions in this case and the Defamation Action that the Quanterix data "corroborated" Dr. Wang's research findings and justified their continued reliance on Dr. Wang. (*See* Zaur Ex. 6 ¶¶ 65, 537; *see also* Zaur Ex. 9 CASSAVA_000016365 at -368 (submission to FDA asserting that Quanterix data "corroborate treatment effects" from Dr. Wang); Zaur Ex. 10 (Burns Dep Tr.) at 242:19-22 (testifying that Quanterix data showed "a significant treatment effect versus placebo").)

**d. Immunoblot (Western Blot) Research**

Drawing on his experience in research integrity investigations, Dr. Sanders will testify that published immunoblot figures from papers co-authored by Dr. Wang and Dr. Burns contain widely recognized hallmarks of research misconduct, including repeated signs of duplicated images used to represent supposedly different experiments. (Zaur Ex. 2 § III.D) This testimony, and Dr. Sanders's independent identification of additional signs of improper manipulation, will help the jury assess Defendants' bases for the Defamation Action, including their assertions that short sellers are the only people who see signs of misconduct in Dr. Wang's (and Dr. Burns's) immunoblot research. (*See, e.g.,* Zaur Ex. 6 ¶¶ 235-38; Zaur Ex. 7 ¶¶ 531-35.)

#### 4. Dr. Sanders Will Explain Principles of Statistical Analysis to Help the Jury Assess Defendants' Conduct

Finally, Dr. Sanders will explain certain basic practices and standards for the statistical analysis of biomedical research data, including general expectations that analysis methods be prespecified, that exclusion criteria be set in advance, and that exclusion criteria be uniformly applied to a dataset. (Zaur Ex. 2 § IV.) The validity of this testimony is undisputed (*see* Zaur Ex. 11 at 203:6–204:3) and it will help the jury understand and evaluate factual evidence showing Dr. Burns's *post-hoc* creation and non-uniform application of exclusion criteria to the phase 2b cognitive data (which led to SEC charges against Cassava and Dr. Burns)[1] and Quanterix data.[2] This is relevant because Defendants asserted in the Defamation Action that Plaintiffs' critiques about the phase 2b cognitive data (and specifically about the apparent statistical manipulation of this data) were defamatory (*see* Zaur Ex. 6 ¶¶ 222-226), and Defendants likewise contend that Quanterix "corroborated" their claims (*supra* § B.3.c).

## ARGUMENT

Defendants raise no legitimate challenge to any aspect of Dr. Sanders' proposed expert testimony. Under Federal Rule of Evidence 702:

> A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's

[1] *See* Zaur Ex. 12 CASSAVA_001443564 ([redacted]); Zaur Ex. 13 CASSAVA_000041919 (Dr. Burns description of exclusion criteria over email); Zaur Ex. 14 Cassava 10-K, Mar. 3, 2025 at 63 (disclosing that phase 2b data should not be relied on)

[2] *See* Zaur Ex. 15 CASSAVA_000835817 at -818 (describing Quanterix analysis); Zaur Ex. 16 CASSAVA_000535544 (describing initial negative results from Quanterix).

> opinion reflects a reliable application of the principles and methods to the facts of the case.

"The Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (internal quotations omitted). Within that context, District Courts have "broad discretion in the matter of the admission or exclusion of expert evidence." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)). *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Courts routinely allow experts to testify about standards of accepted practice in an industry, and to provide frameworks that help juries understand complex concepts and obscure terms. *See, e.g., United States v. Jacques Dessange, Inc.*, No. 99-cr-01182, 2000 WL 294849, at *2 (S.D.N.Y. Mar. 21, 2000) ("testimony regarding ordinary practices in an industry is appropriate if it helps a jury evaluate a defendant's conduct against 'the standards of accepted practice.'"); *see also United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) (same).

## I. <u>DR. SANDERS IS QUALIFIED TO TESTIFY TO HIS PROFFERED OPINIONS</u>

Defendants attack Dr. Sanders's qualifications by distorting the topics of his proposed testimony, inventing rigid qualification requirements, and asserting that Dr. Sanders does not meet those invented requirements. (Mot. at 7-11.) This approach fails. An expert witness can be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Any of the five forms" is sufficient and a court considers "the totality of the witness's

background." *Envy Branding, LLC v. William Gerard Grp., LLC*, No. 20-cv-03182-JLR, 2024 WL 869156, at *8 (S.D.N.Y. Feb. 29, 2024). Dr. Sanders easily clears this standard.

Contrary to Defendants' contentions, Plaintiffs are not offering Dr. Sanders as an expert on "Alzheimer's disease," "clinical trial design," "FDA regulation," or "electronic assay data provenance." (Mot. at 8.) Nor are Plaintiffs seeking to have Dr. Sanders define legally "binding" recordkeeping obligations (if such a legal opinion were even a proper basis for expert opinion). (*Id*.) There is little left of Defendants' effort to disqualify Dr. Sanders, and the remainder is groundless.

Dr. Sanders is highly qualified to provide his proffered opinions on recordkeeping standards and practices, and Defendants' departures from these norms. (*Supra* Background § A and § B.1; Zaur Ex. 2 § I.) Defendants mischaracterize these opinions as focused on "FDA and NIH requirements" and contend they require particular experience, such as past employment with the FDA or NIH. (Mot. at 11.) But Dr. Sanders's report merely describes FDA and NIH rules and guidelines (along with those from academic institutions), to illustrate the general acceptance of the norms he will explain.

Likewise, Dr. Sanders is amply qualified to offer his opinions on research integrity and misconduct investigations, including that the most reliable method to address research integrity concerns is to compare primary records (*e.g.*, original data and experimental logbooks) with reported results. (*Supra* Background § 1 and § 2.B; *see also* Zaur Ex. 3 at 213:04-07 (testifying about experience investigating "hundreds of papers" for potential research misconduct and corresponding with "dozens of editors" about research integrity concerns); *id.* at 99:24-100:06, 104:15-24, 130:15-131:02.) *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("practical experience" satisfies Rule 702). Again, Defendants attack Dr. Sanders's

qualifications for these opinions by inventing formal requirements, such as experience serving as a "research integrity officer" (Mot. at 10)—a role Defendants' rebuttal expert once held, though his experience was limited to passive consultations on only two complaints. (Zaur Ex. 11 at 21:18-23, 22:02-04, 25:16-19.) These challenges go to the weight of testimony, not its admissibility.

Dr. Sanders is also qualified to offer his opinions on signs of research misconduct in Defendants' simufilam research. (*Supra* Background § A and § B.3; *see also* Zaur Ex. 2 § III.) He has approximately 30 years of experience conducting, supervising, and teaching ELISA and immunoblot experiments. (Zaur Ex. 2 ¶ 3, App. A ¶ 1, App. B ¶ 1.) He teaches these techniques "nearly every semester." (Zaur Ex. 3 236:19-237:10).[3] Again, Defendants misrepresent Dr. Sanders's opinions and seek to impose overly rigid qualification criteria—such as experience with a specific plate reader machine or its software—to disqualify Dr. Sanders. (Mot. at 9.) But Dr. Sanders is not offering opinions that require expertise on a specific plate reader model or software. Rather, he is assuming that the ELISA data collected and produced by CUNY from Dr. Wang's computer is in fact the original unaltered data, which Plaintiffs will establish separately at trial. (*Infra* at pp. 21-22.)

Finally, Dr. Sanders is qualified to offer his opinions on basic principles of statistical analysis of biomedical research data. (*Supra* Background § A and § B.4; Zaur Ex. 2 § IV.) He has a Ph.D. in biochemistry and decades of experience designing, conducting, and analyzing biomedical experiments.

---

[3] Defendants rely on *United States v. Wang* (Mot. at 11-12), but there, the court *permitted* the Government's expert to offer opinions "grounded in his experience as a research scientist using Western blot images." No. 8:24-cr-00211-TDC, Dkt. 132, at 2 (D. Md. Oct. 17, 2025).

## II. DR. SANDERS RELIABLY APPLIED HIS EXPERTISE TO RELEVANT ISSUES

Apart from their attack on his credentials, Defendants seek to smear Dr. Sanders's approach on a variety of essentially rhetorical grounds and to exclude his specific opinions on scientific recordkeeping (Zaur Ex. 2 § I), research integrity (*id.* § II), the phase 2b study (*id.* § III.B), Quanterix data (*id.* § III.C), and immunoblot research (*id.* § III.D). At times they attack Dr. Sanders by (falsely) suggesting that he offers no opinion of his own at all; at other times they recite the shibboleth that his conclusions are "*ipse dixit*" rather than the product of identifiable methodology. (Mot. 12-14.) Both criticisms ignore the actual substance of his report and proposed testimony.

### A. Dr. Sanders Makes Appropriate Use of Sources

Defendants launch a scattershot attack on Dr. Sanders' use of sources, suggesting that he merely "recites documents the jury can read for itself." This is actually several wrong arguments huddling under a single rhetorical umbrella.

*First*, Defendants attempt to neutralize Dr. Sanders' recordkeeping-related opinions by attacking his citation to a range of research integrity guidelines promulgated by academic and regulatory entities. In that connection, Defendants claim that Dr. Sanders merely "assembles" those sources "without method." (Mot. at 12-13.) This misses the point. Dr. Sanders will testify to certain basic and universal scientific norms—such as maintaining records of experiments. His references to a broad range of written research integrity guidelines and policies support and illustrate his point: that across institutions, certain key norms are consistent. *See, e.g., Dessange*, 2000 WL 294849, at *2 ("testimony regarding ordinary practices in an industry is appropriate if it helps a jury evaluate a defendant's conduct against the standards of accepted practice.") (internal quotations omitted).

*Second,* Defendants claim Dr. Sanders's opinions on research integrity (Zaur Ex. 2 § 2) "merely" provides "a narrative of other people's accusations" without a "method for assessing the significance of these allegations." (Mot. at 13.) This again misrepresents both his opinions and their proposed use at trial. Dr. Sanders did not undertake a research integrity investigation for this matter and will not offer any definitive opinion that Dr. Wang actually perpetrated research misconduct. Rather, he will draw on his own scholarship and experience with research integrity investigations to testify that reasonable members of the scientific community would recognize numerous indicia of potential research misconduct and would understand on the basis of those red flags that Plaintiff's critiques—true or not—at least rested on a reasonable foundation. (Zaur Ex. 2 ¶¶ 100-106; Zaur Ex. 3 210:14-212:25.) This will help the jury understand why Defendants could not have had a good faith basis to aver that Plaintiffs' criticisms were knowingly false.

*Third*, Defendants complain that some of the red flags Dr. Sanders identifies are found in Defendants' own disclosures. But the fact that Cassava itself (eventually) revealed or admitted these facts only underlines Defendants' clear awareness of indicia that would have alerted any scientist reasonably familiar with clinical research to concerns about the data's integrity, including: (1) the initial announcement in May 2020 that the Phase 2b study failed to meet its primary endpoint and plan to "re-analyze" the data; (2) the "re-analysis" was conducted by Dr. Wang's laboratory at CUNY, yet Cassava described it to the public only as an "outside" "academic lab"; (3) the company's announcement in Sept. 2020 that the "reanalysis" showed the phase 2b study had succeeded; and (4) the subsequent disclosure that Dr. Burns had sent Dr. Wang statistical information in May 2020 that "could have been used to unblind him as to some number of Phase 2b Study participants"—leading Cassava to tell investors "you should not rely

on" the data. (Zaur Ex. 2 ¶¶ 120-127.) That many of these facts are reflected in Cassava's own public disclosures bolsters, rather than undermines, the force of Dr. Sanders' proposed testimony.

None of the cases Defendants cite in this section is even remotely apposite. (Mot. 12-14.) *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540-41, 551 (S.D.N.Y. 2004) (excluding opinions "so vague as to be unhelpful"); *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) (excluding expert who merely recounted hearsay evidence without expert analysis); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) (excluding causation expert who failed to abide by own methodology in measuring and assessing chemical exposure). This is no surprise, given the absence of substance to the attacks themselves.

### B. Dr. Sanders' Analysis and Comparison of ELISA and Immunoblot Data Is Wholly Appropriate

Defendants attempt to suppress Dr. Sanders' proposed testimony concerning evident manipulation of ELISA data by claiming that his "ELISA work consists of placing two spreadsheets side by side and observing that numbers in one differ from numbers in the other." (Mot. 15.) This is wrong both legally and factually.

To begin with, even if Dr. Sanders did no more than testify that two sets of data were different from each other, courts routinely admit such testimony. *See, e.g., Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 374–75 (S.D.N.Y. 2023) (admitting testimony where expert's analysis "consisted of using Microsoft Excel to sort and deduplicate spreadsheets" to "compare if they were identical or not"); *see also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (expert testimony admissible "where it synthesizes or summarizes data in a manner that streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.") (internal quotations omitted).

And, here, Dr. Sanders will do considerably more. First, based on his experience performing and teaching ELISAs, he will explain that the data in question represent purported outputs from an instrument known as a plate reader, organized according to a structure known as a "plate map," and will explain in general terms what numbers represent (the "optical density" of a set of test and control samples after treatment with a series of biological and chemical agents). (*See* Zaur Ex. 2 ¶ 114(2), App. B ¶¶ 1-16.) The comparisons attached to Dr. Sanders' report as Appendix E help to illustrate that the dataset comparisons are not mere "lay observations." (*See* Zaur Exs. 28-35.)

Moreover, as described above, Dr. Sanders will explain not only that the figures in the two sets of data are different, but also that they differ in specific ways that are highly suggestive of deliberate manipulation—for example because the changes almost all involve the most significant digits and move in the same direction within triplicate groups. (*Supra* p. 2.)

Likewise, Dr. Sanders's proposed testimony concerning Dr. Wang's immunoblot assay images (Zaur Ex. 2 § III.D) reflect his application of specialized knowledge and experience conducting similar analyses of published research. Dr. Sanders identifies dots, jutting elements, horizontal stretching, shared backgrounds, and other features whose significance a jury could not appreciate without expert assistance. (*Id.*)

Neither of Defendants' cases is on point. (Mot. at 16.) *See Nimely v. City of New York*, 414 F.3d 381, 397 (2nd Cir. 2005) (excluding testimony about another witness's credibility); *Rezulin*, 309 F. Supp. 2d 551 (excluding historical account with "gloss" supporting plaintiff).

### C. **<u>The Jury Is Entitled to Hear Dr. Sanders' Proposed Testimony Concerning the Impropriety of Cherry-Picking Data</u>**

Aiming to keep the jury from understanding Dr. Burns' egregious cherry-picking of phase 2b cognitive data, Defendants ask the Court to preclude Dr. Sanders's opinions on

statistical analysis in Section IV as well as the "definitional portions of Sections I and II" because they constitute "general propositions." (Mot. at 16.)

This is contrary to the law. Courts routinely admit expert testimony that provides the jury with a framework for understanding complex evidence, particularly in cases like this one involving "obscure terms and concepts." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994); *see also United States v. Smith*, 811 F. Supp. 3d 523, 542 (S.D.N.Y. 2025) (denying motion to exclude opinions on general definitions and concepts, noting that "depending on the direction the defense takes at trial, such testimony has the capacity to assist the jury in grasping technical concepts").

Here, Plaintiffs will show—through separate fact evidence—that Dr. Burns applied improper post-hoc "exclusion criteria" to cognitive data, removing data points selectively to create a positive effect of simufilam on cognition where none existed. (This cherry-picking features prominently in the SEC's complaint.) Additionally, Plaintiffs will show that Dr. Burns applied similar post hoc and arbitrary reanalysis and exclusion criteria to biomarker data generated by Quanterix, without which the data would not have shown an effect of simufilam. The jury is entitled to hear what proper statistical analysis looks like, to help them understand the impropriety of Dr. Burns' conduct. *See Smith*, 811 F. Supp. 3d 542.

### D. <u>Defendants' Attacks on Dr. Sanders' Specific Conclusions Are Wrong and Are No Basis to Exclude His Testimony</u>

Defendants rehash their baseless methodological criticisms in attacking the specific opinions they most fear. Each of these attacks is wrong.

#### 1. The "Recordkeeping Conclusions" Are Well Founded

Defendants, obviously mindful of the problem that none of the data they claimed to rely on even existed, try again to prevent testimony on that topic by erecting an obvious straw man:

that Dr. Sanders does not rest his conclusion on any single set of institutional guidelines. (Mot. 17.)

As already explained, this misses the point. Dr. Sanders is not going to testify that Dr. Wang violated some technical quibble in a particular institution's published research guidelines for a particular year. Rather, he will explain that the wholesale failure to maintain data or logbooks controverts the most fundamental precept of modern science. This is also the reason that Dr. Sanders does not purport to opine (as Defendants would apparently prefer) as to which particular FDA rule or authority governed each particular simufilam experiment or dataset: Plaintiffs are not seeking to enforce FDA regulations in this action, and Dr. Sanders is not proposed as an expert in FDA regulations. Rather, his testimony will describe basic norms of scientific research and publication, which in turn will help the jury understand and evaluate Defendants' attempts to dismiss all criticism of their recordkeeping practices by claiming they were not subject to particular recordkeeping regulations. *See, e.g., Dessange*, 2000 WL 294849, at *2.

### 2. Cassava Misstates Dr. Sanders' Criticism of Dr. Burns' Use of Quanterix

Defendants mischaracterize Dr. Sanders's opinion on the Quanterix data (Zaur Ex. 2 § III.C) as resting solely on "the bare fact of batched testing." (Mot. at 14; *see also* Mot. at 18 (claiming that "the sole basis for his opinion is that plasma samples were tested in two batches").) But that is not correct. The problem Dr. Sanders identified is not that Quanterix ran tests in batches. The problem is that Dr. Burns sent a subset of plasma samples from a given experiment to the lab and waited until *after* reviewing those results to decide whether to send the rest such that complete reports would be generated. (Zaur Ex. 2 ¶¶ 128-131; *see also* Zaur Ex. 10 250:2-9 (explaining that she decided not to "send plates if an assay looks like it's not going to

show anything" and "why pay to send more samples to not see an effect…").) In so doing, as Dr. Sanders will explain, she effectively gave herself advance, un-blinded information about whether the tests would show results she could present as positive before she decided to provide Quanterix with the complete group of samples.

### 3. "The ELISA Conclusion" is Well Founded

Cassava's expert admitted that alterations in plate reader data—if they occurred—would be improper. (Zaur Ex. 11 149:7-150:25.) He also admitted that the data "must have been changed" between the two datasets. (*Id*. 68:6-19.) Indeed, at his deposition, he abandoned the opinion offered in his report that the two sets of data might have arisen from separate sets of experiments, including because of the presence of many identical data points "down to a thousandth place." (*Id.* 91:17-92:11 (acknowledging that while the opinion stated in his report was that the data may have come from separate experiments, "then when you look at the – you have the optical density datas [sic] match in multiple wells, that – that would seem to be – it would seem that's not right").). Cassava does not appear to contest any of this.

Rather, Cassava spends four pages of its brief attacking Dr. Sanders's reliance on the assumption counsel asked him to make: that the CUNY datasets reflect raw ELISA data retrieved by CUNY from the computer in Dr. Wang's laboratory in 2021 and produced in this litigation. (Mot. at 18-21.) This whole line of attack is a *non sequitur*, because Plaintiffs do not intend to offer Dr. Sanders' testimony to establish the provenance of the CUNY data.

In truth, Plaintiffs do not believe there is any genuine dispute as to the authenticity of the CUNY datasets. However, to the extent required, they will lay the foundation for their admission at trial through CUNY itself—certainly not through Dr. Sanders. This is entirely standard—there is no requirement that an expert qualified to assess a body of data also be in a position to say where that data came from. *See Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94–95 (2d Cir.

2000) ("[A]n expert may rely on data that she did not personally collect."); *Qureshi v. Costco Wholesale Corp.,* No. 20-cv-4086, 2022 WL 16757952, at *2 (E.D.N.Y. Nov. 8, 2022) (expert's reliance on "assumptions and inferences based on facts provided by others" did not render testimony inadmissible; challenges to underlying facts were matters for cross-examination); *Oracle Am., Inc. v. Google Inc.,* No. 10-cv-03561, 2012 WL 4017808, *4 (N.D. Ca. Apr. 10, 2012) (denying motion to exclude where expert did not independently verify data and party planned to lay foundation at trial).[4] Defendants' own rebuttal expert did the same in his "expert" analysis of Dr. Wang's immunoblots. (Zaur Ex. 11 40:9–12 ("…I have looked at blots provided to me by counsel. . . [.]")

***

Though not truly germane to the present motion—because it will form no part of Dr. Sanders' own testimony—Plaintiffs submit that proving the provenance of the data in question will be straightforward: Following the publication of the Citizen's Petition in August 2021, CUNY sequestered the data from Dr. Wang's computer (*see* Zaur Ex. 17 CUNY 004265 at 277) and retained a copy of the data; on October 9, 2025, CUNY produced the data to Plaintiffs in response to their request for "*[t]he contents of the database folder on Dr. Wang's plate-reader computer [] collected and imaged by CUNY*" (Zaur Ex. 18); in December 2025, Plaintiffs purchased a version of the software program used by Dr. Wang, loaded the CUNY production into the software program, and exported the datasets to Microsoft Excel (following the same process Dr. Wang purportedly used to export data from his ELISA experiments).

---

[4] Defendants' reliance on *Rutledge* is misplaced. There, the court excluded an expert's opinion that relied on an obvious error in its interpretation of an underlying study. *Rutledge v. Walgreen Co.*, 182 F.4th 168, 201 (2d Cir. 2026).

Defendants are free to contest this provenance if they think the facts will support such a challenge, but their efforts on that front to date suggest they will be tilting at windmills. A few examples illustrate the point.

*First*, Defendants extensively parrot their own rebuttal expert Dr. Hal Scofield's claims to have identified differences in the metadata between the two datasets. (Mot. at 18-20.) However, Dr. Scofield's deposition testimony made clear that he has little idea how any metadata is generated or what it means. (*See* Zaur Ex. 11 74:3–8, 78:2–19, 84:6–15.) Moreover, he appears to have been unaware that the inconsequential differences in metadata that he pointed to are a function of the settings used when exporting data—it is a trivial matter to export reports of the CUNY data that match Cassava's datasets by adjusting the settings within the plate reader software's export function.

*Second*, Defendants insist that Cassava's internal auditor Laura Rodriguez verified that the original plate-reader data matched the data Cassava had presented publicly. (Mot. at 20-21.) That is false. Ms. Rodriguez's affidavit states that Dr. Wang gave her what she called the "original" data on a flash drive; she did not collect it from the computer attached to the plate reader. (Zaur Ex. 19 ¶ 6 ("Dr. Wang provided me with a removable flash drive that he stated he kept locked in his desk.").) And, as Defendants' rebuttal expert Dr. Scofield acknowledged, that flash drive contains files corresponding to only two of the eight datasets that Dr. Sanders opined on. (Zaur Ex. 11 129:9-130:2.) Defendants' current claim that they collected and verified this data is especially remarkable given that they told the public, the FDA, [redacted] that they did not have any original data. (*See* Zaur Ex. 11 169:24–170:17 (acknowledging inconsistency); Zaur Ex. 27 CASSAVA_000800400 [redacted].)

### E. The "Immunoblot Conclusion" Is Not What Defendants Say It Is

Defendants contend that Dr. Sanders merely "vouch[ed] for accusations that others have made" about Defendants' immunoblot data (Mot. at 14) and that "Dr. Sanders's conclusion that published images were manipulated applies neither expert judgment nor specialized knowledge" (Mot. at 21-22). Both characterizations of Dr. Sanders' testimony are simply wrong.

Dr. Sanders conducted a visual analysis of published immunoblot images across multiple articles co-authored by Dr. Wang (and Dr. Burns), as he has done in many other contexts. (Zaur Ex. 2¶¶ 135-153.) He also reviewed similar analyses, including in the Citizen's Petition, *PlosOne*, and CUNY's investigation report. Based on his review, independent analysis, and experience conducting similar analyses, Dr. Sanders concluded that there were "credible and troubling signs of data falsification or fabrication in Dr. Wang's (and Dr. Burns's) immunoblot data," listing the signs. (Zaur Ex. 2 ¶¶ 133-134.) These included the appearance of duplicate images as results of supposedly separate experiments and various visual artifacts and anomalies.[5]

Notably, Dr. Sanders did not conclude, and will not testify, that Dr. Wang and Dr. Burns *actually falsified immunoblot images*. Rather, he will testify that concerning indicia are present and that it is impossible to prove or disprove the hypothesis of deliberate image manipulation absent the original blots and research records.[6]

[5] Defendants' reliance on *Frabizio* is misplaced. *United States v. Frabizio*, 445 F. Supp. 2d 152, 154, 169 (D. Mass. 2006) (excluding opinion asserted with "level of certainty unjustified by" expert's method or experience); *see also Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017) (methods grounded in experience are permissible).

[6] Zaur Ex. 8 RFCUNY000743 (CUNY Investigation Report noting constraints "due to the failure of Dr. Wang to provide underlying, original data or research records")

## III. DR. SANDERS DOES NOT USURP THE JURY'S ROLE

### A. Dr. Sanders Does Not Announce "Legal Conclusions"

Defendants accuse Dr. Sanders of announcing legal conclusions "restated in scientific vocabulary" (Mot. at 3) and seek to bar him on that basis from testifying that, as a matter of scientific practice, "accusations against Cassava were 'virtually impossible' to refute and that there was a 'legitimate basis to question' Cassava's research.'"" (Mot. at 2; *see id*. at 23 (challenging Zaur Ex. 2 ¶¶ 72-77 (recordkeeping), ¶ 127 (phase 2b), ¶ 131 (Quanterix), ¶ 153 (immunoblots).)

It is true that Dr. Sanders' testimony is likely to be damaging to Defendants. But that does not mean that his proposed testimony would usurp the jury's role as finder of fact or offer any legal conclusion. Dr. Sanders reviewed Defendants' recordkeeping practices and concluded that—as a matter of scientific practice—the absence of primary records left no viable way to confirm the integrity of their research (*see* Zaur Ex. 2 § 1). Likewise, Dr. Sanders reviewed Defendants' own disclosures and published research, identified departures from scientific norms and hallmarks of research misconduct that, in his opinion, raised legitimate questions about the research's integrity (*see* Zaur Ex. 2 §§ III.B-D).

These opinions will help Plaintiffs show that Defendants lacked a substantial basis or proper purpose for the Defamation Action—without telling the jury there was no such basis or purpose. *See Duncan*, 42 F.3d at 101 (expert testimony on money laundering and falsity were admissible "factual conclusions"); *see also* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue"); Adv. Comm. Note on Fed. R. Evid. 704 ("[T]he question, 'Did T have the capacity to make a will?' would be excluded [because the answer would merely tell the jury what result to reach], while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of

his bounty and to formulate a rational scheme of distribution?' would be allowed."). Indeed, Dr. Sanders will not testify at all about the defamation claims.

Again, Defendants rely on inapposite cases. In *Bilzerian*, 926 F.2d at 1294-95, the court excluded a former SEC director's testimony about whether "hypotheticals" that closely tracked the indictment would violate the securities laws—essentially testifying as an expert that certain conduct was unlawful; *see also Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (excluding expert testimony in excessive force case that use of force was "totally improper" and not "warranted under the circumstances.")

### B. Dr. Sanders Does Not Opine on Mental States

Defendants claim that Dr. Sanders opines on the mental states of scientific journal editors (Zaur Ex. 2 ¶¶ 100-102, 104-105) and Cassava (*id.* ¶¶ 72-77). (Mot. at 23-24.) This is wrong.

*First*, Dr. Sanders does not opine on the journal editors' mental states. Rather, Dr. Sanders draws on his experience with research integrity investigations conducted by scientific journals and research institutions to provide context about the constraints and factors affecting research misconduct investigations, which will help the jury interpret the notices and evaluate Defendants' claims of "exoneration." *See, e.g.*, *Scott*, 315 F.R.D. at 45 (expert may "offer commentary on documents in evidence" to provide context based on specialized knowledge and experience).

*Second*, Defendants also suggest that Dr. Sanders's recordkeeping conclusions are improper opinions on Cassava's mental state. (Mot. at 24.) Dr. Sanders's use of the phrase "apparent failure" (in describing whether Defendants reviewed original ELISA data) is the opposite of an opinion on an interior mental state: it reflects an observation about what seems to have happened based on external evidence. (Zaur Ex. 2 ¶ 77.) Likewise, Dr. Sanders does not opine on what Cassava "personnel should have understood" (Mot. at 24), but rather, on what

people "reasonably familiar with the biomedical sciences would recognize." (Zaur Ex. 2 ¶¶ 72-77.) Opinions about common understandings and expectations in the scientific community are admissible. *See Pac. Life Ins. Co. v. Bank of New York Mellon*, No. 17-cv-1388, 2021 WL 673479, at *2, *11 (S.D.N.Y. Feb. 22, 2021) (allowing expert testimony on "market expectations" and "industry understandings and expectations"); *Am. Home Assur. Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 449 (S.D.N.Y. 2006) (allowing transit insurance expert to testify about what "he understands to be the standard practices and customs of his business" and "standard expectations"); *see also Matter of Trusts, Series 2007-C30*, No. 17-cv-1998, 2020 WL 1304400, at *52 (S.D.N.Y. March 19, 2020) (cases precluding state of mind testimony irrelevant to testimony about typical industry understandings).

### C. <u>Dr. Sanders's Opinions Are Properly Temporally Grounded</u>

After claiming (falsely) that Dr. Sanders opined on Cassava's mental state, Defendants then criticize Dr. Sanders for "never pars[ing] what Cassava knew on November 2, 2022, when it filed the Defamation Action, or in April 2024, when it filed the Second Amended Complaint." (Mot. at 24-25.) This is not a valid objection.

The argument also misrepresents the anti-SLAPP law and the facts Dr. Sanders relies on. *First,* the anti-SLAPP statute imposes liability where a party "commences or continues" a SLAPP action (*see* New York Civil Rights Law § 70-a(1)); thus, what Defendants knew at any point before or during the Defamation Action is directly relevant. *Second*, most of the evidence Dr. Sanders relies on pre-dates the Defamation Action, including most notably, the FDA's audit and Cassava's audit of Dr. Wang's lab in September 2022. *Third*, the ELISA data on which Dr. Sanders opines are from experiments that predate the Defamation Action (*see supra* pp. 20-21); Cassava itself owned the data and always had a right to access it; and its failure to validate the data is plainly relevant.

## IV. <u>DR. SANDERS WILL NOT CREATE A "COLLATERAL TRIAL"</u>

As Defendants concede, Plaintiffs do not need to prove that Dr. Wang engaged in research misconduct to prevail. (Mot. at 25-26.) And Plaintiffs have no intention of doing so (though the proof of it now is readily at hand). Rather, Plaintiffs plan to—and need only—show that Defendants were either aware of or willfully blind to serious red flags in Dr. Wang's research practices and reported results. This will underline the fact that Defendants' defamation claims (based on Dr. Wang's research) lacked a substantial basis, and that Defendants knew the claims were baseless but sued nevertheless—not to prove Plaintiffs wrong but to shut them up.

There is a powerful irony in Defendants' attempt to suggest that Dr. Wang's conduct is irrelevant to this case. After all, it was Defendants who infused the defamation action with Dr. Wang's research, insisting over and over again that his research and the supposed "backup" for it would prove Plaintiffs' critiques false. In fact, Defendants mentioned Dr. Wang more than 130 times in their First and Second Amended Complaints, attached dozens of his research papers as exhibits to both, and claimed that the research and "underlying data" that Dr. Wang generated for Cassava would "prove" that Defendants' statements were false and defamatory. (*See, e.g.*, Zaur Ex. 6 ¶¶ 162, 175-78, 198, 211, 332; Zaur Ex. 7 ¶¶ 531, 599-604.) Cassava also has paid all of Dr. Wang's legal fees and maintained a joint-defense agreement with him since 2021,[7] which they continued to invoke in this litigation. (*See* Zaur Ex. 21 at 259:18-21, 263:12-14, 264:01-06, 266:14–19.)

Dr. Wang co-invented simufilam with Dr. Burns. He conducted all of the preclinical research underlying simufilam and most of the clinical research prior to phase 3. He and Dr.

[7] *See* Zaur Ex. 23 Decl. of William J. Foley, (Jan. 31, 2025); Zaur Ex. 24 Decl. of Jennifer Beidel (Jan. 31, 2025).

Burns attempted to publish that research together—unsuccessfully—for many months. Defendants cannot escape the reality that their purported bases for the Defamation Action rest largely on Dr. Wang. (*See* Dkt. 185 (granting contested motion for deposition given Dr. Wang's relevance "as the first author on many, if not all, of the scientific papers underpinning Cassava's studies of simufilam").) Defendants cannot have it both ways—maintaining to this very day that the Defamation Action had a substantial basis in fact and law (and probable cause)—while seeking to bar evidence bearing directly on the bases they pled.

## V. THE MOTION PARROTS DEFENDANTS' REBUTTAL EXPERT AND MAKES OBJECTIONS MORE APTLY APPLIED TO DEFENDANTS' OWN EXPERTS

Contrary to the Court's guidance at the pre-motion conference, Defendants arguments attacking Sections III.A and III.D of Dr. Sanders's report largely invoke the opinions of Defendants' rebuttal expert, Dr. Scofield. (*Compare* Zaur Ex. 22 ¶¶ 44-45, 64-98, *with* Mot. at 18-20 (duplicating Dr. Scofield's ELISA opinions); *compare* Zaur Ex. 22 ¶¶ 112–114, *with* Mot. at 20-21 (duplicating Dr. Scofield's immunoblot opinions).) *See* Zaur Ex. 25 at 06:02-05 ("Once you involve your expert or otherwise, in looking at it, certainly if there are a battle of experts, I'm not going to exclude one of them, so you should think about that as you are going through."); *see also In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15-cv-6549, 2021 WL 2403727, at *13 (S.D.N.Y. June 11, 2021) ("disagreements between experts rarely if ever justify *Daubert* exclusions (although they are too often the basis for *Daubert* motions)").

Moreover, many of Defendants' objections apply more aptly to their own experts' proposed testimony, including the objections that (i) Dr. Sanders is unqualified (*compare* Mot. at 8-11, *with* Zaur Ex. 11 32:19-22, 34:03-10 (not an expert in Alzheimer's disease or scientific ethics), *id.* 25:20-26:01 (never been involved in research misconduct investigation concerning ELISA data); (ii) Dr. Sanders "recites documents the jury can read for itself" (*compare* Mot. at

12-14, *with* Zaur Ex. 26 ¶¶ 43-72 (assembling regulations, correspondence, and other documents to narrate Defendants' history with the FDA); (iii) Dr. Sanders "states general propositions he applies to nothing" (*compare* Mot. at 15-16, *with* Zaur Ex. 26 ¶¶ 23-42 (stating general FDA regulatory principles without application or analysis); and (iv) Dr. Sanders "opines on the motives and mental states of others" (*compare* Mot. at 22-23, *with* Zaur Ex. 22 ¶¶ 112-114 (opining on the "likely" explanations of journal editors), *and with* Zaur Ex. 26 ¶¶ 23-42, 53-72 (opining on what the "FDA believed," "determined," and "would have" done).

These challenges are more appropriately raised on cross-examination.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to exclude Dr. Sanders.

Dated: September 14, 2026
New York, New York

CLARICK GUERON REISBAUM LLP

By: */s/Isaac B. Zaur*
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*

**CERTIFICATION OF COMPLIANCE**

Pursuant to Rule 3.C of the Individual Rules of Practice in Civil Cases of the Honorable Jennifer L. Rochon, I certify that the foregoing memorandum of law, including footnotes and excluding the caption, table of contents, table of authorities, signature block, and this certification, contains 8,663 words according to the word-processing system used to prepare it.

Dated: September 14, 2026
New York, New York

CLARICK GUERON REISBAUM LLP

By: */s/Isaac B. Zaur*

Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*