# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:24-cv-05948-JLR-OTW
------------------------------------x
ADRIAN HEILBUT, JESSE BRODKIN, and
ENEA MILIORIS,

Plaintiffs,

DAVID BREDT and GEOFFREY PITT,

Intervenor-Plaintiffs,

-against-

CASSAVA SCIENCES, INC., REMI BARBIER,
and LINDSAY BURNS,
Defendants.
------------------------------------x

VIDEOTAPED DEPOSITION OF
DAVID A. SANDERS
New York, New York
February 23, 2026

Reported By:
ERIC J. FINZ

February 23, 2026
9:32 a.m.

Videotaped Deposition of DAVID A. SANDERS, taken by Defendants, pursuant to Notice, at the offices of Clarick Gueron Reisbaum LLP, 41 Madison Avenue, before ERIC J. FINZ, a Shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S: (All Via Remote)

CLARICK GUERON REISBAUM LLP
Attorneys for Plaintiffs
41 Madison Avenue
New York, New York 10010

BY: *DAVID KUMAGAI, ESQ.
dkumagai@cgr-law.com
ISAAC ZAUR, ESQ.
izaur@cgr-law.com

GIBSON DUNN & CRUTCHER LLP
Attorneys for Defendant Cassava Sciences
1900 Lawrence St.
Denver, Colorado 80202

BY: *SCOTT CAMPBELL, ESQ.
scampbell@gibsondunn.com
*JOHN L. TURQUET BRAVARD, ESQ.
jturquetbravard@gibsondunn.com

BAKER HOSTETLER LLP
Attorneys for Defendants Remi Barbier and Lindsay Burns
45 Rockefeller Plaza
New York, New York 10111
BY: *ZACHARY TAYLOR, ESQ.
ztaylor@bakerlaw.com
ARIC WU, ESQ. (Via Zoom)
awu@bakerlaw.com

ALSO PRESENT:

JESSE BRODKIN (Via Zoom)

DEVERELL WRITE, Videographer

DAVID A. SANDERS

THE VIDEOGRAPHER: We are 09:08:02
going on the record. The time on 09:08:20
the video monitor is 9:08 a.m. on 09:08:22
February 23, 2026. 09:08:25

This is media unit 1 of the 09:08:28
video recorded deposition of 09:08:31
Dr. David A. Sanders, taken by 09:08:36
counsel for the defendant, in the 09:08:38
matter of Adrian Heilbut, et al., 09:08:40
versus Cassava Sciences, 09:08:43
Incorporated, et al. This case is 09:08:44
in the United States District Court 09:08:46
for the Southern District of New 09:08:48
York. 09:08:57

All appearances will be noted 09:08:57
on the stenographic record. 09:08:59

At this time will the reporter 09:09:01
please swear in the witness. 09:09:03

DAVID A. SANDERS, 09:09:03
having been first duly sworn by the 09:09:03
Notary Public (Eric J. Finz), was 09:09:03
examined and testified as follows: 09:09:03

DAVID A. SANDERS
EXAMINATION BY 09:09:12
MR. CAMPBELL: 09:09:12
Q. Good morning, Dr. Sanders. 09:09:13
A. Good morning. 09:09:16
Q. Do you prefer to be called 09:09:17
Dr. Sanders or David? 09:09:19
A. David is fine. 09:09:20
Q. And you've been deposed 09:09:21
before. Right? 09:09:23
A. I have. 09:09:23
Q. Have you ever served as an 09:09:23
expert witness before? 09:09:25
A. I have. 09:09:26
Q. Can you describe for me the 09:09:26
circumstances under which you've served 09:09:29
as an expert witness? 09:09:30
A. There was a case in Texas 09:09:31
about a nurse who was exposed to Ebola 09:09:39
virus. And having expertise in Ebola 09:09:47
virus, I was asked to testify about Ebola 09:09:50
virus, its symptoms, progress of disease, 09:09:54
things like that. 09:09:57
Q. And did you give deposition 09:09:58
testimony in that case? 09:09:59

DAVID A. SANDERS

A. I did not. 09:10:00
Q. Did you testify in court? 09:10:01
A. I did not. 09:10:02
Q. You wrote a report? 09:10:03
A. Yes, I did. 09:10:05
Q. Have you ever testified as an expert before? 09:10:06 09:10:08
A. In a court, no. 09:10:10
Q. You say "in a court" as though you've -- 09:10:12 09:10:14
A. I don't know whether this is testimony or not. So. 09:10:15 09:10:16
Q. This is testimony. I'm asking before today. 09:10:18 09:10:20
A. Before, no. 09:10:21
Q. Have you ever been qualified by a court as an expert before? 09:10:23 09:10:24
A. I have not. 09:10:26
Q. And is Ebola your area of expertise? 09:10:28 09:10:32
A. More broadly, it's about how viruses get into cells. Ebola is one of the viruses that I've worked on. 09:10:33 09:10:35 09:10:38
Q. Is this the second expert 09:10:40

DAVID A. SANDERS

report you've drafted then? 09:10:46
A. Yes. 09:10:47
Q. Did anyone assist you in drafting this report? 09:10:48 09:10:51
A. I was assisted by counsel in terms of editing, organizing, suggested topics to include. 09:10:53 09:10:57 09:11:07
Q. In terms of the substance of the report, setting aside counsel, did anyone assist you with preparing the substance of your opinions in this case? 09:11:09 09:11:12 09:11:15 09:11:16
A. No. 09:11:18
Q. Do you intend to offer any opinions in this case that are not in your report? 09:11:18 09:11:27 09:11:28
A. As of now, no. I will be continuing to inform myself about the cases as we go forward. 09:11:30 09:11:38 09:11:41
Q. What do you mean you'll be continuing to inform yourself about the cases as we go forward? 09:11:43 09:11:45 09:11:50
A. I have -- there are depositions that have been made in this case by other people that I have not yet 09:11:52 09:11:53 09:11:55

DAVID A. SANDERS

read. And I intend to read them. 09:11:57
Q. Which depositions have you not read that you intend to read? 09:12:01 09:12:04
A. There's -- so I've read the ones, the SEC depositions. I have not read the ones that are involved in this trial. 09:12:05 09:12:10 09:12:13 09:12:15
Q. Which SEC depositions have you read? 09:12:18 09:12:20
A. I recall reading Dr. Wang's, and Dr. Burns' depositions. 09:12:22 09:12:27
Q. So you read Dr. Wang and Dr. Burns' depositions taken by the SEC? 09:12:32 09:12:34
A. Yes. 09:12:37
Q. But none of the depositions taken in this case? 09:12:37 09:12:39
A. I did read one from a Laura Rodriguez. I'm sorry, I don't recall whether that was for the SEC or for this case. But I did read that one because that was important, I cited that one in the report. 09:12:40 09:12:44 09:12:47 09:12:51 09:12:52 09:12:54
Q. I'm not trying to make this a memory test. Let me, if you need a copy 09:12:55 09:12:58

DAVID A. SANDERS

of the exhibits to your exhibit -- to your report, if you don't have them, I can give that to you. 09:13:01 09:13:03 09:13:05

MR. KUMAGAI: I believe you have, just for the record, you do have copies of the appendices. To the report. 09:13:07 09:13:08 09:13:10 09:13:17

MR. CAMPBELL: Let's do this. Can we mark this as Exhibit 1 so we have a formal copy of the report. I assume you have a copy? 09:13:17 09:13:18 09:13:20 09:13:23

MR. KUMAGAI: Yeah, thanks. 09:13:25

(Sanders Exhibit 1 for identification, expert report of Dr. David A. Sanders.) 09:13:25 09:13:25 09:14:01

BY MR. CAMPBELL: 09:14:01

Q. That's the official copy for the record. It should be, I assume, since I only have one copy, the same as the copy that you have. So if you've made notes or anything in your own copy, feel free to reference it. But I want to have one for the record. 09:14:01 09:14:03 09:14:06 09:14:08 09:14:10 09:14:12 09:14:14

Does that make sense? 09:14:15

DAVID A. SANDERS
A. Yes. 09:14:16
Q. Do you recognize that draft that I just gave you? 09:14:17 09:14:19
A. Yes. 09:14:20
Q. Does it have your signature at the end? 09:14:20 09:14:22
A. Yes, that is my signature. 09:14:32
Q. I guess the real question I want to ask you is, you say there is additional materials that you want to review. Is there a reason you didn't review them before you drafted your report? 09:14:35 09:14:36 09:14:38 09:14:39 09:14:41 09:14:43
A. They weren't all available to me before I drafted my report. And I don't -- I don't recall, you know -- yeah, I don't -- I've been working on this report for a while. And I just didn't have time to review all of the depositions. They were quite, you know, voluminous. 09:14:45 09:14:48 09:14:58 09:15:05 09:15:08 09:15:13 09:15:17 09:15:20
Q. When you say they weren't available to you. What do you mean? 09:15:22 09:15:24
A. I think some of them have been 09:15:26

DAVID A. SANDERS

gathered. Again, I don't have them in front of me. But I think some of them were gathered after I was writing the bulk of the report. 09:15:29 09:15:32 09:15:34 09:15:37

Q. Were there any materials that you requested for your report that were not provided to you? 09:15:39 09:15:40 09:15:42

A. No. 09:15:43

Q. Are you aware sitting here today of materials that you would like to have had for purposes of writing the report that you did not have? 09:15:48 09:15:50 09:15:52 09:15:54

A. No. 09:15:55

Q. Do you intend to offer evidence in support of any of your opinions in your report, sitting here today, that are not in -- that is not in your report? 09:15:55 09:15:58 09:15:59 09:16:02 09:16:05

A. Not to my knowledge. 09:16:05

Q. You spent the bulk of your career as a professor at Purdue. Is that right? 09:16:07 09:16:14 09:16:18

A. That is correct. 09:16:18

MR. CAMPBELL: Mark this 09:16:29

DAVID A. SANDERS

Exhibit 2, Sanders 2. 09:16:31

(Sanders Exhibit 2 for 09:16:31
identification, Purdue biography of 09:16:31
David Sanders.) 09:16:56

BY MR. CAMPBELL: 09:16:56

Q. Is this a copy of your Purdue 09:16:57
biography? 09:16:59

A. Yes, this is. 09:17:02

Q. And is it accurate, to your 09:17:08
knowledge? 09:17:12

A. Yes. 09:17:12

Q. And under your bio, it 09:17:18
describes challenges in gene therapy 09:17:20
research. 09:17:23

A. Yes. 09:17:24

Q. And then talks about novel 09:17:25
sets of viruses showing promising gene 09:17:28
therapy. Is that right? 09:17:32

A. That is correct. 09:17:33

Q. Is that the experiment in 09:17:33
viruses you were telling me about 09:17:35
earlier? 09:17:37

A. It's an application of the 09:17:38
specialty of viruses. 09:17:40

DAVID A. SANDERS

Q. What is your specialty in viruses, if you could summarize it for me? 09:17:41 09:17:43 09:17:45

A. It's about how enveloped viruses enter cells. 09:17:45 09:17:47

Q. What does that mean? 09:17:51

A. Enveloped or enter or which -- what do you? 09:17:58 09:18:02

Q. When you talk about how enveloped viruses enter cells, what are you talking about? What's an enveloped virus, how does it go about entering cells? 09:18:03 09:18:04 09:18:07 09:18:09 09:18:11

A. Yes. So you can conceptually divide viruses into two types: Those that have their nucleic acid surrounded by a protein, or ones that in addition have a membrane that surrounds them. So that latter class are called enveloped viruses. And in order for them to enter a cell, they have to enter through a process of membrane fusion. Cells have membranes, these viruses have membranes. And they fuse them to become one. 09:18:12 09:18:15 09:18:19 09:18:22 09:18:27 09:18:30 09:18:34 09:18:37 09:18:38 09:18:42 09:18:45

DAVID A. SANDERS

So viruses such as retroviruses, influenza virus, Ebola virus, coronavirus, are enveloped viruses. 09:18:48 09:18:51 09:18:55 09:18:58

So we study the process by which that membrane fusion occurs. And the proteins that are involved in that process. 09:18:59 09:19:01 09:19:03 09:19:05

Q. When you say we study that, who is we? 09:19:06 09:19:08

A. I've had a laboratory, graduate students, postdocs, technicians, undergrads who have worked with me over the course of the years. 09:19:09 09:19:12 09:19:15 09:19:17

Q. And are you currently operating that lab? 09:19:18 09:19:19

A. I am not. 09:19:20

Q. When did you stop operating that lab? 09:19:21 09:19:23

A. With COVID. 09:19:23

Q. That's interesting. I would think that -- 09:19:25 09:19:28

A. I was not working on coronaviruses directly. 09:19:30 09:19:31

DAVID A. SANDERS

Q. Okay. So the lab shut down for COVID? 09:19:32 09:19:37

A. Yes. 09:19:38

Q. But your lab would otherwise potentially be studying coronaviruses? 09:19:38 09:19:42

A. Possibly. We were not -- we were not studying coronaviruses at the time that the lab closed. 09:19:46 09:19:49 09:19:53

Q. So COVID, is that 2021, 2020? 09:19:54

A. 2020. 09:19:59

Q. 2020. 09:20:00

So that lab has been shut down for six years? 09:20:01 09:20:04

A. Yes. 09:20:05

Q. Is it going to restart? 09:20:05

A. I'm not sure. 09:20:07

Q. No current plans to restart it? 09:20:09 09:20:12

A. No current plans. 09:20:12

Q. Why was it shut down? 09:20:13

A. Because laboratories all over the country were shut down during COVID. You couldn't go in. Unless you were working on SARS-CoV-2 related research. 09:20:17 09:20:19 09:20:21 09:20:23

DAVID A. SANDERS

Q. And why did it not restart post-COVID? 09:20:30 09:20:32

A. Because as it happens, the funding for my laboratory went through 2020. And so in order to start new -- in order to start new research I would have had to get a new grant. But I, because of the shutdown, I didn't have any people in the lab to generate the data that I needed for a new grant proposal. 09:20:32 09:20:34 09:20:37 09:20:41 09:20:43 09:20:46 09:20:48 09:20:50

Q. Have you submitted any new grant proposals to restart the lab? 09:20:53 09:20:55

A. No. 09:20:57

Q. Why not? 09:20:58

A. Because I, in order to -- in order to submit a grant proposal, you need to have preliminary results with a lab. And I didn't -- couldn't generate those because I didn't have the money post-COVID to generate. Because of when the grants ended. 09:21:00 09:21:04 09:21:06 09:21:08 09:21:11 09:21:13 09:21:17

Q. So do you do any virus research currently? 09:21:20 09:21:24

A. I do not. 09:21:27

DAVID A. SANDERS

Q. Have you done any in the last six years? 09:21:28 09:21:30

A. I have not. 09:21:30

Q. Up through 2020, was that your primary area of expertise? 09:21:31 09:21:37

A. So I'm a biochemist. We have done work on structural biology. And another project in the lab was on the evolution of the structure and function of a phosphotransferases. 09:21:41 09:21:44 09:21:48 09:21:51 09:21:53

Q. What is that? 09:21:59

A. Phosphate transfer is one of the most common reactions in cells. It is very important for metabolism. And there are enzymes, proteins, that catalyze that reaction. And so we were interested in how they evolved. Proteins, just like organisms, evolve from common ancestors, and we were interested in tracing that process. 09:21:59 09:22:04 09:22:08 09:22:11 09:22:13 09:22:16 09:22:21 09:22:23 09:22:26

Q. And are you still working on that? 09:22:27 09:22:32

A. I am not. 09:22:32

Q. When did you stop working on 09:22:33

that? 09:22:35

A. That would have been a couple of years before 2020. Because the lab was mostly focused on the virus work at the end, before COVID. 09:22:35 09:22:39 09:22:42 09:22:46

Q. So somewhere 2017 or 18? 09:22:49

A. I don't recall exactly. May have been even earlier than that. Around that time. 09:22:54 09:22:55 09:22:58

Q. This is going to be an interesting question because I know you haven't applied for a new job in a long time. 09:22:59 09:23:04 09:23:06 09:23:08

A. Yes. 09:23:08

Q. If you were to give a job talk, what would it be on? 09:23:08 09:23:11

A. Today, it would probably be on research integrity. 09:23:13 09:23:17

MR. CAMPBELL: Mark this as Sanders 3. 09:23:44 09:23:46

(Sanders Exhibit 3 for identification, document headed "Biographical sketch.") 09:23:46 09:23:46 09:23:46

BY MR. CAMPBELL: 09:24:09

DAVID A. SANDERS

Q. And is this a copy of your CV? 09:24:09
A. It is. 09:24:11
Q. And I could tell you this was attached as an appendix to your report. 09:24:12 09:24:15
Is this up to date? 09:24:17
A. Fairly up to date. I believe that there have been some subsequent interviews since this was generated. 09:24:20 09:24:23 09:24:27
Q. What interviews have you conducted subsequent to this? 09:24:31 09:24:33
A. I'm trying to remember. Let's see. 09:24:36 09:24:53
I don't recall. But I feel like there's been some subsequent interviews about either research integrity or the status of -- oh, I know. I know. 09:25:04 09:25:08 09:25:10 09:25:16 09:25:21
There was -- there was a New York Times obituary about which I was interviewed. 09:25:22 09:25:26 09:25:30
Q. A New York Times obituary? 09:25:31
A. Yes. 09:25:33
Q. Whose obituary? 09:25:33
A. Peter Duesberg. 09:25:35

DAVID A. SANDERS

Q. And what were you interviewed about with respect to Peter Duesberg's obituary? 09:25:37 09:25:39 09:25:42

A. So he -- he maintained, I believe until he passed away, that HIV did not cause AIDS. And I knew him personally. I did not share that opinion. I worked on retroviruses. And so they were interviewing me about my interactions with him and what -- yeah, my opinions on that issue. 09:25:44 09:25:47 09:25:50 09:25:54 09:25:56 09:25:59 09:26:03 09:26:09

Q. Other than the obituary in The New York Times, is there any other interviews that you're aware of that you would have put in this CV if you'd had them at the time? 09:26:11 09:26:14 09:26:15 09:26:17 09:26:22

A. I'm trying to think. As you see, I interact with the media often. And sometimes there is an interview which has not yet appeared in an article. So I honestly -- I don't recall -- I don't recall whether that has happened. 09:26:23 09:26:25 09:26:30 09:26:33 09:26:37 09:26:48

Q. Taking a look at your positions on the first page of your CV. 09:26:50 09:26:54

DAVID A. SANDERS

It looks like you were last promoted in 2001 to associate professor. Is that right? 09:26:58 09:27:01 09:27:03
A. That is correct. 09:27:03
Q. Is that a position you still hold? 09:27:04 09:27:05
A. It is. 09:27:05
Q. Have you been considered for a promotion to professor? 09:27:06 09:27:08
A. No. 09:27:10
Q. Do you know why not? 09:27:11
A. I've never requested it. 09:27:15
Q. Same question, do you know why not? 09:27:18 09:27:19
A. I never requested it. 09:27:21
Q. No, no. Do you know why you never requested it? Is there a reason? 09:27:23 09:27:24
A. I was content with what I was doing. 09:27:27 09:27:30
Q. Are you an expert in neurobiology? 09:27:32 09:27:44
A. I am not. 09:27:45
Q. Are you an expert in Alzheimer's disease? 09:27:46 09:27:48

DAVID A. SANDERS

A. I am not. 09:27:50

Q. The next page of your CV lists what are called at the top selected peer reviewed publications. 09:27:51 09:27:56 09:28:00

Do you see that? 09:28:00

A. Yes. 09:28:02

Q. What were these selected based on? 09:28:02 09:28:05

A. What I regarded as important for this particular CV. 09:28:06 09:28:10

Q. What was this particular CV made for? 09:28:16 09:28:18

A. It was made for the purposes of this report. 09:28:19 09:28:21

Q. So are these peer reviewed publications relevant to your report? 09:28:25 09:28:27

A. Yes. They're relevant to my expertise and to the report, yes. 09:28:30 09:28:34

Q. Are there peer reviewed articles in which you played a leading role in your career that are not included on this list? 09:28:35 09:28:38 09:28:41 09:28:43

A. I believe that there are, yes. 09:28:44

Q. What are they? 09:28:49

DAVID A. SANDERS

A. I don't -- I don't recall off the top of my head. But I believe that I haven't -- not all of them are here. I know -- I can see that there are some missing from my graduate work. 09:28:51 09:28:55 09:29:00 09:29:03 09:29:05

I don't recall. I think there is a Microbial paper that's missing from this. Maybe some Virus papers that are missing. 09:29:32 09:29:41 09:29:45 09:29:48

Q. Let me see if I can ask it a different way. 09:29:50 09:29:53

Are there groups of publications organized around, for example, a research topic that you excluded from this list because they were not relevant to this case? 09:29:53 09:29:54 09:29:57 09:29:59 09:30:00

A. I don't believe so. Yes. I focused on what I regarded the most, my most significant publications. And those that are most relevant to the case. 09:30:05 09:30:13 09:30:16 09:30:18

Q. And is this list up to date? 09:30:22

A. Yes. 09:30:27

Q. Did something change in your career trajectory around 2007? And I'll 09:30:33 09:30:35

tell you what's motivating the question. 09:30:43
So it seems like, just based 09:30:45
on this list, you have a fairly regular 09:30:48
record of publication all the way up 09:30:51
through -- basically one to two 09:30:54
publications a year up through No. 18, 09:30:58
which is in 2007. And then there is 09:31:01
nothing on this list for the next six 09:31:04
years. 09:31:06
So I'm just asking, did 09:31:07
something change for you in terms of your 09:31:09
profession or your research in 2007? 09:31:11
A. My wife passed away in 2006. 09:31:14
I became a single parent. And that 09:31:17
definitely affected the way I interacted 09:31:22
with science. 09:31:27
Q. Understood. 09:31:28
Have you ever had a journal 09:31:29
article that you submitted subject to 09:31:40
post-publication review? 09:31:43
A. Yes. 09:31:45
Q. Several? 09:31:45
A. At least two. 09:31:49
Q. And what two were those? 09:31:57

DAVID A. SANDERS

A. One was the Pinter paper here. 09:31:59
Q. No. 6? 09:32:08
A. Yes, No. 6. 09:32:10
Q. 1997. 09:32:14
A. There is another paper, it's not listed here. And that one, let me remember, see if I can remember the name on it. Who the first author was. 09:32:17 09:32:20 09:32:26 09:32:27
It will come to me. 09:32:40
Q. We can come back to it if it's easier. 09:32:42 09:32:44
A. Yeah. 09:32:45
Q. But at least one other one that you can think of? 09:32:45 09:32:46
A. Yes. 09:32:48
Q. That's not on this list? 09:32:48
A. Yes. 09:32:50
Q. And if any more than the two come to mind, will you let me know? 09:32:50 09:32:52
A. Absolutely. 09:32:54
Q. Speaking to the Pinter paper. 09:32:54
A. Yes. 09:32:58
Q. Why was it subject to post-publication review? 09:32:58 09:33:00

DAVID A. SANDERS

A. There was an image that was used in two parts of a figure. But that was okay because it was -- we didn't claim it to be two different images. So. 09:33:01 09:33:06 09:33:15 09:33:19

Q. Okay. And this paper was published in 1997? 09:33:24 09:33:26

A. Yes. 09:33:28

Q. Do you recall when the post-publication review was? 09:33:28 09:33:30

A. It was probably after 2017. I mean, either in 2017 or soon afterwards. 09:33:32 09:33:38

Q. So twenty years later? 09:33:41

A. Yes. 09:33:44

Q. And was that related to some external event in 2017? 09:33:44 09:33:48

A. Yes, it was. 09:33:50

Q. And what was that? 09:33:51

A. That was the publication in The New York Times of an article about a researcher named Carlo Croce, in which I featured. 09:33:52 09:33:54 09:34:00 09:34:07

Q. So your understanding is that this article was subject to post-publication review because of your 09:34:07 09:34:08 09:34:10

DAVID A. SANDERS

involvement in the Croce case? 09:34:11

A. Yes. 09:34:14

Q. And were you involved in dealing with the editors of the Journal of Virology in the post-publication review? 09:34:14 09:34:19 09:34:21 09:34:24

A. So the image was not one that I had generated, it was generated in the lab of my collaborator. I communicated with the author, Dr. Pinter, in whose lab that was communicated. And we discussed it, we discussed it with my institution, how to proceed. And he discussed it with the journal. And we said, you know, there is no error here. I mean, there is not even an error, let alone a problem. 09:34:25 09:34:27 09:34:29 09:34:32 09:34:36 09:34:38 09:34:42 09:34:45 09:34:48 09:34:51

Q. And when you say "he," you mean Mr. Pinter, Dr. Pinter? 09:34:55 09:34:57

A. Dr. Pinter, yes. 09:34:59

Q. Were you personally involved in communications with the journal about the -- 09:35:00 09:35:01 09:35:03

A. In that case, no. 09:35:04

Q. You say "in that case." Were 09:35:06

DAVID A. SANDERS

you involved in the journal -- 09:35:09

A. In the other case that I remember this, I'm trying to recall the graduate student's name, I was involved. 09:35:11 09:35:12 09:35:15

Q. Was the other instance that you're thinking of also in 2017? 09:35:24 09:35:26

A. Yes. 09:35:28

Q. Was it also for an earlier, much earlier drafted paper? 09:35:29 09:35:33

A. It wouldn't have been 1997, it would have been later, while I was at Purdue. 09:35:35 09:35:37 09:35:39

Q. And you say you're trying to think of the graduate student's name. 09:35:42 09:35:44

A. Yes. 09:35:46

Q. Was the primary author a graduate student? 09:35:46 09:35:48

A. Yes. 09:35:48

Q. One working in your lab? 09:35:49

A. Yes. 09:35:50

Q. Do you recall if the paper related to virology? 09:35:51 09:35:52

A. It was virology, yes. 09:35:54

Q. And do you recall what journal 09:35:57

it was? 09:36:01

A. I think it was the journal -- not the Journal of Virology, it was just called Virology. That I recall. 09:36:01 09:36:03 09:36:06

Q. And you engaged in communications with Virology? 09:36:08 09:36:10

A. I did. 09:36:12

Q. And did you submit evidence to Virology in connection with that post-publication review? 09:36:15 09:36:17 09:36:20

A. Yes. 09:36:21

Q. What did you submit? 09:36:22

A. I submitted the images that were -- the original images that were in question. 09:36:24 09:36:30 09:36:33

Q. So this was, again, a question about the images in your papers? 09:36:34 09:36:35

A. Yes. 09:36:37

Q. And where did you get the images that you submitted to Virology? 09:36:37 09:36:42

A. They were in a file that my graduate student had maintained. 09:36:45 09:36:51

Q. Was the student still at Purdue? 09:36:54 09:36:57

DAVID A. SANDERS

A. She was not. 09:36:58

Q. Is she still in the field? 09:36:59

A. Yes. 09:37:01

Q. Is she -- 09:37:02

A. Let me just, if you just give me a second, I'm going to try to recall the name so I can resolve that. 09:37:04 09:37:06 09:37:11

Q. It's okay, we can come back to it. 09:37:40 09:37:42

Do you know what the images were? 09:37:42 09:37:45

A. They were fluorescent microscopy. 09:37:45 09:37:47

Q. And what was the alleged problem with the fluorescent microscopy images? 09:37:49 09:37:51 09:37:56

A. That there were two images that were pretty much the same representing two different experiments. Within a -- within one figure. Within one panel of figures. 09:37:57 09:37:59 09:38:00 09:38:07 09:38:10

Q. And were the images in fact different? 09:38:12 09:38:13

A. No, they were the same. 09:38:14

DAVID A. SANDERS

Q. And they were meant to be the same. 09:38:15 09:38:16

A. They were not meant to be the same. 09:38:17 09:38:18

Q. It was a mistake? 09:38:18

A. It was a mistake. 09:38:20

Q. Did you fix that mistake? 09:38:21

A. I did. 09:38:22

Q. Was the article subject to any of the things that journals can put on them, was it retracted or an expression of concern? 09:38:23 09:38:27 09:38:31 09:38:33

A. No, this was a correction. I don't remember whether it was called correction or corrigendum. 09:38:34 09:38:35 09:38:37

Q. So there was a mistake? 09:38:48

A. Yes. 09:38:49

Q. You submitted a new image. 09:38:50

A. We actually just removed that -- removed that image from the paper. It wasn't necessary. And so we just removed the duplication from the paper. And we describe all this in the correction. 09:38:52 09:38:55 09:38:57 09:39:01 09:39:03 09:39:07

DAVID A. SANDERS

Q. And was there supposed to be another image where the duplicate image was? 09:39:07 09:39:09 09:39:12

MR. KUMAGAI: Object to form. 09:39:13

A. Yes. Yes. 09:39:14

Q. Do you understand my question? 09:39:15

A. Yes. There should have been another image present, yes. 09:39:16 09:39:18

Q. Why didn't you submit that image? 09:39:20 09:39:22

A. I did not have access to that -- to that image. So I did not submit it. 09:39:23 09:39:29 09:39:32

Q. What do you mean you didn't have access to that image? 09:39:32 09:39:34

A. I didn't have access to that image. Looking back at the file of images that we had, I didn't have that image. 09:39:35 09:39:37 09:39:40 09:39:45

Q. Why was that image not in your file? 09:39:46 09:39:48

A. When the article was originally submitted, there was no image at all. We were asked for additional 09:39:50 09:39:52 09:39:54

DAVID A. SANDERS

information. When the -- we were asked for additional information. And we submitted just some additional information. That additional information included that other figure. 09:39:57 09:40:03 09:40:06 09:40:08 09:40:11

I was not aware that this figure was the same as the previous figure. And when we went back, because there had been -- we'd been notified about the fact that it was the same, I did not see a file with that figure in it. 09:40:15 09:40:17 09:40:19 09:40:25 09:40:29 09:40:32 09:40:35

Q. Was that figure lost? 09:40:37

A. I don't know. All I know is I did not see it in the file when I went to review the information. 09:40:40 09:40:43 09:40:45

Q. But that figure existed at some point. Right? 09:40:47 09:40:49

A. I do not know. I do not know. 09:40:50

Q. You know that there was a figure that was specified to be in the place where the duplicated figure was. Right? 09:40:54 09:40:57 09:40:59 09:41:01

A. Yes. 09:41:01

DAVID A. SANDERS

Q. So presumably it existed at some point. Right? 09:41:01 09:41:04
A. I do not know. 09:41:05
Q. Did you investigate that as part of this review? 09:41:07 09:41:09
A. I investigated and I could not find that figure. 09:41:11 09:41:13
Q. Did you ask the primary author? 09:41:13 09:41:15
A. I did. 09:41:16
Q. Was she able to find it? 09:41:16
A. She was not. 09:41:18
Q. Does she know what happened to it? 09:41:19 09:41:20
MR. KUMAGAI: Objection to form. 09:41:22 09:41:22
A. I do not know. 09:41:23
Q. Did you ask her? 09:41:23
A. Yes. 09:41:25
Q. Did she answer you? 09:41:25
A. She also responded that she did not know. 09:41:27 09:41:29
Q. Did you check with the other authors on the article? 09:41:31 09:41:33

DAVID A. SANDERS

A. There was no other authors on the article. 09:41:35 09:41:37
Q. It was just the two of you? 09:41:37
A. That's correct. 09:41:39
Q. So either you or her would have created the original image? 09:41:39 09:41:41
MR. KUMAGAI: Object to form. 09:41:43
A. Well, yes. 09:41:45
Q. But neither one of you have a copy of that image? 09:41:46 09:41:49
A. A copy of which image? 09:41:51
Q. The image that was supposed to go in the paper but did not. 09:41:55 09:41:57
A. I did not have a copy of that image. And I have not been able to find a copy of that image. 09:41:59 09:42:03 09:42:06
Q. But it was relevant to the paper? 09:42:09 09:42:11
A. Very tangentially. 09:42:11
Q. It was meant to be included in the paper? 09:42:15 09:42:17
A. As I said, it wasn't in the original article. You know, it was not an experiment that was important. But in 09:42:18 09:42:19 09:42:21

DAVID A. SANDERS

response to reviewers, that was, you know, that -- it was supposed to be included. 09:42:26 09:42:32 09:42:35

Q. So the reviewers found it relevant to the article? 09:42:35 09:42:37

MR. KUMAGAI: Object to the form. 09:42:38 09:42:39

A. Very possibly, yes. 09:42:40

Q. Is that your understanding, that the reviewers viewed it as relevant to the article? 09:42:43 09:42:45 09:42:47

A. Relevant to the article, yes. 09:42:48

Q. And that image wasn't preserved? 09:42:49 09:42:52

A. I'm sorry? 09:42:52

Q. That image was not preserved? 09:42:53

A. I don't know whether that image existed. I do not know that that image existed. I don't know that that experiment was conducted. I don't -- I have no information about that. 09:42:56 09:43:00 09:43:04 09:43:07 09:43:11

Q. So there was meant to be an image submitted based on an experiment that the reviewers were aware of. 09:43:13 09:43:19 09:43:21

DAVID A. SANDERS

Correct? 09:43:22

A. No. They were not aware of it. They were asking for more, sort of, backup for what we were doing. And so we -- there were some experiments that were potentially relevant. I don't know -- I don't know exactly why this -- there wasn't an image for that experiment. 09:43:23 09:43:24 09:43:28 09:43:32 09:43:35 09:43:40 09:43:49 09:43:52

Q. You're saying you don't even know if the experiment was conducted? 09:43:57 09:43:58

A. I don't know whether that fluorescence microscopy image, whether there ever was a fluorescence microscopy image that represented that particular experiment. 09:44:00 09:44:01 09:44:06 09:44:11 09:44:12

Q. But you have an understanding that an image was intended to be submitted. Is that right? 09:44:12 09:44:14 09:44:16

A. Yes. 09:44:17

Q. And you don't have a copy of that image? 09:44:17 09:44:20

A. No. 09:44:22

Q. And you don't know what 09:44:23

happened to that image? 09:44:25

A. I don't know that there was 09:44:26
such an image. 09:44:27

Q. So how could there be an 09:44:30
intent to submit an image and no actual 09:44:32
image exists? Help me understand. 09:44:36

MR. KUMAGAI: Object to the 09:44:38
form. 09:44:39

A. I believe that the graduate 09:44:39
student made a mistake. 09:44:41

Q. Did she tell you she made a 09:44:44
mistake? 09:44:46

A. I don't recall. I would guess 09:44:47
that's what she said, but I don't recall. 09:44:51

Q. She made a mistake in 09:44:53
describing an experiment that she may 09:44:57
never have conducted? 09:45:00

MR. KUMAGAI: Objection to 09:45:02
form. 09:45:03

A. She may have submitted an 09:45:03
image that when she submitted it she was 09:45:09
mistaken as to what it represented. 09:45:13

Q. Well, clearly she submitted 09:45:20
the wrong image. Right? 09:45:22

DAVID A. SANDERS

A. Clearly, yes. 09:45:24

Q. And it was intended to be some other image. Correct? 09:45:25 09:45:27

MR. KUMAGAI: Objection to form. 09:45:29 09:45:31

A. It was intended to represent a different experiment, yes. 09:45:31 09:45:33

Q. And you're not even sure whether that other experiment was ever conducted? 09:45:34 09:45:36 09:45:37

A. That is correct. 09:45:38

Q. Were you overseeing this graduate student's work at the time? 09:45:39 09:45:46

A. Yes. 09:45:47

Q. So you ultimately were responsible for the work? 09:45:48 09:45:49

A. Yes. 09:45:50

Q. Is there a reason why that publication was not included in your CV? 09:45:55 09:45:58

A. No. As I said, there are other ones that are also not present. 09:46:01 09:46:06

Q. If you learned that any of the data underlying your articles in peer reviewed publications is unreliable, do 09:46:12 09:46:14 09:46:19

DAVID A. SANDERS

you have an obligation to withdraw that article? 09:46:22 09:46:24

A. Withdraw? 09:46:25

MR. KUMAGAI: Objection to form. 09:46:26 09:46:26

A. It depends. No. 09:46:27

Q. What are your obligations? 09:46:30

A. Obligations are to contact all the people concerned, and to determine, to the best of our ability, what is the origin of the problem. And to correct it. If necessary. 09:46:32 09:46:34 09:46:41 09:46:43 09:46:46

Q. And is that what you did with regard to this graduate student? 09:46:49 09:46:50

A. I did. 09:46:52

Q. When in the course of your career did you begin to focus on the ethics of scientific publication? 09:46:58 09:46:59 09:47:02

A. Focus? Probably after 2010, towards the end of 2010. 09:47:05 09:47:14

Q. What was the motivation for that? 09:47:17 09:47:19

A. There was an article, a prominent article in the Journal of 09:47:19 09:47:25

DAVID A. SANDERS

Science that claimed that one could substitute arsenic for phosphorous in, among other things, nucleic acid. 09:47:28 09:47:30 09:47:33

Q. And why did that motivate your focus on ethics of scientific publication? 09:47:38 09:47:40 09:47:42

A. I had worked and was working on the phosphoryl transfer, which is about phosphate. I have expertise in the chemistry of phosphate. And I knew that that was impossible for that substitution to take place. 09:47:43 09:47:45 09:47:51 09:47:54 09:47:56 09:48:00

And I was very concerned that this was a prominent article with a lot of media attention. And I wanted to understand why that occurred. 09:48:02 09:48:04 09:48:07 09:48:10

Q. And so what did you do to understand why that occurred? 09:48:16 09:48:18

A. I wrote to the players. I contacted the media. I took a very in-depth look at the article itself. 09:48:19 09:48:22 09:48:29

Q. I guess what I'm asking is, did you determine that there was something ethically wrong with the paper? 09:48:34 09:48:36 09:48:37

DAVID A. SANDERS

A. Yes, I did. 09:48:39

Q. What did you determine? 09:48:41

A. That the authors knew that their arsenate was contaminated with phosphate. 09:48:42 09:48:48 09:48:51

Q. And how did you determine that? 09:48:52 09:48:53

A. It was in one of the tables in the supplementary materials. 09:48:54 09:48:56

Q. In other words, if you looked at the supplementing materials, you could find the mistake that they'd made? 09:48:58 09:49:00 09:49:02

A. Yes. 09:49:04

Q. And you believe they knowingly made that mistake? 09:49:04 09:49:06

A. Yes. 09:49:07

Q. Was that article withdrawn? 09:49:07

A. It was. I'm laughing because it was -- it took fifteen years to get it retracted. 09:49:10 09:49:17 09:49:20

Q. So it was recently retracted somewhere around 2025? 09:49:22 09:49:24

A. Yes. 09:49:26

Q. Do you have any specialized 09:49:26

DAVID A. SANDERS

training with regard to the ethics of scientific publications? 09:49:34 09:49:37

A. I'm very well read in the history of science, philosophy, ethics. I've been through the courses that we have in responsible conduct of research. I am also often asked to lecture on -- in responsible conduct of research, scientific ethics courses and some. 09:49:39 09:49:54 09:50:03 09:50:07 09:50:14 09:50:23 09:50:24

Q. We'll get to that. I want to start with just the training piece. 09:50:29 09:50:31

So you say you've taken courses in scientific ethics? 09:50:33 09:50:34

A. Yes, that's... 09:50:36

Q. What courses? 09:50:39

A. That's a standard part of a graduate career. You take a course in what's called responsible conduct of research. 09:50:40 09:50:43 09:50:45 09:50:47

Q. So you took a standard graduate course. When you say "standard," most scientists take it as part of their graduate work? 09:50:49 09:50:51 09:50:52 09:50:55

A. That is correct. 09:50:57

DAVID A. SANDERS

Q. Any other courses? 09:50:57
A. No. 09:51:00
Q. Is that just one course or is it a series of courses? 09:51:01 09:51:03
A. It's one course. There are ethical components incorporated in other parts of our training. But it will be as part of a larger course. So we are, for example, presented often with examples of failures in ethical conduct of research. 09:51:05 09:51:11 09:51:13 09:51:15 09:51:20 09:51:24
Q. Outside of the standard course that scientists take as part of their graduate work, have you taken any specialized courses in scientific ethics? 09:51:32 09:51:36 09:51:39 09:51:41
MR. KUMAGAI: Object to the form. 09:51:43 09:51:44
A. No. 09:51:44
Q. Outside of that course, any other formal training in the field? 09:51:45 09:51:47
MR. KUMAGAI: Object to the form. 09:51:49 09:51:51
A. Again, besides the -- what's incorporated in other courses about ethical conduct of research, which is a 09:51:52 09:51:56 09:52:00

DAVID A. SANDERS

frequent topic, outside of that, which is a substantial, I would guess the answer is no. 09:52:05 09:52:10 09:52:13

Q. And I guess what I'm driving at, when you're talking about the incorporation of ethical examples in other courses based on other topics. 09:52:14 09:52:16 09:52:20 09:52:22

A. Yes. 09:52:25

Q. You're still talking about your standard scientific training. Is that right? 09:52:25 09:52:26 09:52:28

A. Yes. 09:52:28

Q. So outside of your standard training as a Ph.D. in the science field. 09:52:28 09:52:31

A. Yes. 09:52:34

Q. Do you have any specialized training in scientific ethics? 09:52:34 09:52:36

MR. KUMAGAI: Objection to form. 09:52:37 09:52:39

A. No. 09:52:39

MR. KUMAGAI: Just make sure you let him finish the question before you answer. 09:52:44 09:52:46 09:52:48

THE WITNESS: Thank you. 09:52:49

DAVID A. SANDERS

Q. Now I'll move on to the other thing you were dealing with. Have you received any awards or citations for your work in scientific ethics? 09:52:50 09:52:52 09:52:53 09:52:56

A. Yes. If I may refer to my -- my rough sketch. The Moses Passer lecture, annual lecture at Cornell University, was because of my work on scientific integrity. I spoke at the 75th anniversary commemoration of the Los Alamos National Laboratory. Spoke there on scientific integrity. And I have given seminars, lectures, around the world on this particular topic. I have also been invited by journals and organizations that represent journals to speak on these topics. 09:52:58 09:53:04 09:53:11 09:53:14 09:53:16 09:53:19 09:53:24 09:53:25 09:53:30 09:53:34 09:53:39 09:53:45 09:53:48

Q. So what's the Moses Passer lecture? 09:53:52 09:53:55

A. It's named after Moses Passer. It's an annual lecture in chemistry at Cornell University. 09:53:56 09:53:59 09:54:03

Q. I guess what I'm asking is, is this a talk, is this a class? What is 09:54:04 09:54:05

it? 09:54:07

A. It is a talk. And also one meets other people who are working in chemistry, you know, to discuss various issues. And we did tend to focus on the scientific integrity issues for those discussions. 09:54:08 09:54:13 09:54:16 09:54:20 09:54:24 09:54:26

Q. So you were invited to give a speech and meet with others at Cornell on the issue? 09:54:27 09:54:30 09:54:32

A. Yes, yes. 09:54:33

Q. And you were invited to give a speech at the Los Alamos National Laboratory? 09:54:33 09:54:36 09:54:39

A. Yes. 09:54:39

Q. And then you say you were invited by journals. Is that right? 09:54:39 09:54:44

A. Yes. 09:54:46

Q. Which journals? 09:54:47

A. So this is Oxford University Press, most recently. The STM, which is listed here, is a group of journalists that all come together for annual, semiannual meetings. I was a keynote 09:54:48 09:54:51 09:54:56 09:55:02 09:55:04

DAVID A. SANDERS

speaker for them in Washington, D.C. I don't have the year. But it's in the last few years. 09:55:07 09:55:13 09:55:15

Q. So the STM was another invited speech? 09:55:17 09:55:20

A. That's correct. 09:55:20

Q. And what about for Oxford University Press, what did you do for them? 09:55:21 09:55:25 09:55:26

A. Gave another keynote address about specifically scientific integrity in research publications. 09:55:27 09:55:29 09:55:33

Q. So you've been invited as a speaker or keynote address giver on at least four occasions. Is that right? 09:55:35 09:55:44 09:55:48

A. Yes. 09:55:50

Q. Can you recall any others? 09:55:50

A. As keynote -- I mean, I have been invited to many universities around the world to speak on these issues. 09:55:51 09:55:54 09:55:58

Q. Which ones? 09:56:01

A. University in Trieste, Toulouse, Lisses. I can't tell you what that stands for, in Paris. I've spoken 09:56:02 09:56:08 09:56:12

DAVID A. SANDERS

at meetings in -- there were a number of meetings in Paris where I've spoken. Oslo, University of Oslo. Zagreb, it's the Ruder Boskovic Institute. University of Liverpool. There are more, but I don't recall them all. 09:56:16 09:56:19 09:56:24 09:56:30 09:56:34 09:56:43

Q. That's a good way to travel around Europe. 09:56:43 09:56:45

A. I have -- there are people who are interested in this research around the world. It is of increasing importance. 09:56:46 09:56:48 09:56:51 09:56:55

Q. And were these all similar, these were invited speeches to faculty or students? 09:56:56 09:56:58 09:57:01

A. Yes. 09:57:01

Q. Anything else? 09:57:02

MR. KUMAGAI: Objection to form. Do you understand? 09:57:07 09:57:07

A. Could you -- anything, what is anything? 09:57:12 09:57:15

Q. Any other invited speeches on the topic of scientific integrity that you can think of. 09:57:15 09:57:17 09:57:20

DAVID A. SANDERS

A. I know I've given at Boston University, Boston College. University of Miami. UC Berkeley. There may be others. 09:57:21 09:57:23 09:57:34 09:57:45

Q. I'm not asking for an exhaustive list. 09:57:45 09:57:47

A. Okay. 09:57:48

Q. I'm just asking as you're sitting here today, I'm trying to understand your career and your experience in scientific integrity. 09:57:49 09:57:50 09:57:52 09:57:53

A. Yes. 09:57:55

Q. And I'm trying to understand your qualifications around that. 09:57:55 09:57:57

A. Yes. 09:57:58

Q. One of the things I'm asking about is your speeches. 09:57:58 09:58:00

A. Yes. 09:58:01

Q. So I'm asking what you can recall about that. 09:58:01 09:58:03

A. Yes. 09:58:03

Q. And then my next question is going to be, have you received, aside from invited speeches, any other awards 09:58:04 09:58:05 09:58:08

DAVID A. SANDERS

or honors related to your work in scientific integrity? 09:58:10 09:58:12

A. No. 09:58:15

Q. In your work on scientific integrity or ethics, do you use any specialized tools? 09:58:22 09:58:24 09:58:28

A. Specialized -- 09:58:29

MR. KUMAGAI: Objection to form. 09:58:33 09:58:34

A. What do you mean by specialized tools? 09:58:35 09:58:36

Q. Sure. 09:58:37

So I know, for example, and I'm not the expert in this area. 09:58:38 09:58:39

A. Yes. 09:58:41

Q. But I know that there are software tools that can detect duplication of images. 09:58:41 09:58:42 09:58:45

A. Yes. 09:58:46

Q. I know there are AI programs that can detect plagiarism. 09:58:47 09:58:49

A. Yes. 09:58:51

Q. I'm asking if you use any specialized tools in your work on 09:58:51 09:58:53

DAVID A. SANDERS

scientific integrity. 09:58:55

A. So I do use plagiarism detection tools. In general, my work relies on visual inspection. Sometimes I will seek confirmation from AI-generated tools. 09:58:57 09:59:00 09:59:04 09:59:07 09:59:17

Q. Let's take those one at a time. What plagiarism detection tools do you use? 09:59:19 09:59:21 09:59:24

A. It tends to be iThenticate. 09:59:24

Q. iThenticate? 09:59:29

A. iThenticate. 09:59:30

Q. And how does iThenticate work? 09:59:33

A. It's a text matching program. They have a database of texts. And they compare an input text to those to see whether there is overlap textually. 09:59:35 09:59:40 09:59:43 09:59:45

Q. You say it tends to be iThenticate. Are there other ones that you use? 09:59:49 09:59:51 09:59:53

A. There is something called Turnitin, which is the same company. So. 09:59:54 09:59:55

Q. That goes back to my graduate days. I remember Turnitin document. 10:00:01 10:00:03

DAVID A. SANDERS

A. Okay. 10:00:06
Q. Other than iThenticate and Turnitin, any others? 10:00:06 10:00:08
A. No. 10:00:10
Q. And then you described a use of AI to confirm your visual inspections. Is that right? 10:00:10 10:00:15 10:00:19
A. Yes. 10:00:19
Q. Describe that process for me. 10:00:20
A. So when I have two images that I think are similar or identical, occasionally, not all the time, but sometimes I will just run it through one of the programs, ProofIT or Image Twin, and see whether it says the same thing or not. 10:00:22 10:00:29 10:00:33 10:00:35 10:00:38 10:00:47 10:00:49
Q. And you say sometimes you will do that. 10:00:50 10:00:52
A. Yes. 10:00:53
Q. What motivates you to do that in certain cases? 10:00:53 10:00:55
A. I can't say. 10:00:57
Q. Sometimes you do, sometimes you don't? 10:00:58 10:01:00

DAVID A. SANDERS

A. It's rare. But sometimes I just think I would like to see what they do with this comparison. 10:01:00 10:01:03 10:01:06
Q. Is AI good at it? 10:01:09
A. Fairly good, yes. 10:01:13
Q. Do you find it typically confirms your view? 10:01:16 10:01:18
A. Yes. 10:01:19
Q. Other than ProofIT or Imagetwin, do you use any others? 10:01:20 10:01:24
A. I do not. 10:01:29
Q. Aside from iThenticate/Turnitin.com for plagiarism and ProofIT and Image Twin for duplication of images, any other specialized tools that you use in your scientific integrity? 10:01:29 10:01:34 10:01:37 10:01:40 10:01:43 10:01:45
A. Specialized. So internet search is not specialized. 10:01:48 10:01:50
Q. I would say no. But how do you use internet searches? 10:01:52 10:01:54
A. Sometimes I'm interested whether -- what is the origin of a particular text. So I'll put it into an 10:01:56 10:02:01 10:02:04

DAVID A. SANDERS

internet search to try to determine whether that phrase has been used previously. 10:02:06 10:02:08 10:02:11

Q. I see. You can take a piece of an academic paper or a student's paper and Google it and see what comes up? 10:02:12 10:02:14 10:02:16

A. I don't use Google as a verb. But yes. 10:02:19 10:02:23

Q. Why don't you use Google as a verb? 10:02:23 10:02:26

A. Because I just -- I think it's more precise to say to conduct a search using the internet. 10:02:27 10:02:29 10:02:31

Q. Okay. So you can take a piece of language from a student's paper or from an academic article, run a search across the internet on some search engine. 10:02:32 10:02:34 10:02:37 10:02:39 10:02:42

A. Yes. 10:02:42

Q. And see what comes up? 10:02:43

A. Correct. 10:02:45

Q. I just want to make sure I close the door on this. 10:02:45 10:02:47

A. Yes. 10:02:49

DAVID A. SANDERS

Q. Setting aside internet searches, any other specialized tools that you use in your scientific integrity work? 10:02:49 10:02:50 10:02:52 10:02:55
A. No. 10:02:55
Q. Any other nonspecialized tools, like internet searches, that you commonly use in your scientific integrity work? 10:02:56 10:02:57 10:02:59 10:03:02
MR. KUMAGAI: Objection to form. 10:03:02 10:03:03
A. No, no. 10:03:03
Q. Did you use any specialized tools for your work in this case? 10:03:11 10:03:13
A. I did not. 10:03:15
Q. Why not? 10:03:19
A. The confidence that I had in my analysis of the data was sufficient that I went on the basis of visual inspection and analysis of the data. 10:03:21 10:03:25 10:03:29 10:03:33
Q. Did you use any AI at all in the drafting of your report? 10:03:37 10:03:45
A. I did not. 10:03:46
Q. Do you belong to any 10:03:47

DAVID A. SANDERS

organizations that are dedicated to scientific integrity or ethics? 10:03:54 10:03:56

A. We are forming a research field named Forensic Scientometrics. Sciento, Metrics. 10:04:01 10:04:04 10:04:21

Q. So hold on. I want to make sure I got an answer to my question then we'll move on to Forensic Scientometrics. 10:04:23 10:04:25 10:04:27

A. Yes. 10:04:31

Q. Do you currently belong to any organizations dedicated to science integrity or ethics? 10:04:31 10:04:34 10:04:37

MR. KUMAGAI: Objection to form. 10:04:39 10:04:40

Q. That are formed. 10:04:41

A. We are forming an organization on the basis of Forensic Scientometrics. 10:04:45 10:04:47

Q. So I'm going to ask you about the formation of that next. 10:04:51 10:04:52

A. Okay. 10:04:54

Q. I just want to make sure I've understood your answer to the prior question. 10:04:54 10:04:56 10:04:57

Which is, do you currently 10:04:58

DAVID A. SANDERS

belong to any formed organizations dedicated to scientific ethics or integrity? 10:04:59 10:05:01 10:05:03

A. No. 10:05:04

Q. What is the nature of this organization that you are forming? 10:05:05 10:05:08

A. People have come together and decided we need to have a formal organization. And so I've been involved in that. The discussions for that. 10:05:11 10:05:15 10:05:17 10:05:20

Q. Who specifically? 10:05:23

A. People involved with journals, people who are involved with research integrity. Those are the -- those are the two groups of people that are coming together. 10:05:25 10:05:30 10:05:36 10:05:44 10:05:48

Q. Are you playing a lead role in putting together that organization? 10:05:48 10:05:51

A. Yes. 10:05:52

Q. Was it your idea? 10:05:53

A. No. 10:05:56

Q. Whose idea was it? 10:05:56

A. If there was one person, I would say it was Leslie McIntosh, who is 10:05:58 10:06:05

DAVID A. SANDERS

I think associated with data science. I think that's the name of the organization. 10:06:08 10:06:10 10:06:11

Q. And did Leslie McIntosh ask you to play a role in putting this organization together? 10:06:11 10:06:14 10:06:16

A. She did. 10:06:17

Q. Have you ever served as a journal editor? 10:06:17 10:06:26

A. No. 10:06:26

Q. Have you ever been invited to serve as a journal editor? 10:06:27 10:06:29

A. Every day. 10:06:30

Q. You don't want to be a journal editor? 10:06:31 10:06:33

A. I do not. 10:06:33

Q. Why not? 10:06:37

A. I don't have any desire to be a journal editor. 10:06:38 10:06:40

Q. Do journal editors play an important role in gatekeeping in scientific integrity? 10:06:42 10:06:44 10:06:46

A. They do. 10:06:47

Q. But you don't want to play 10:06:48

DAVID A. SANDERS

that role? 10:06:52
A. No. 10:06:52
Q. Do you advise journals on 10:06:54
their review process? 10:06:56
A. Yes. 10:06:57
Q. Which ones? 10:06:58
A. Informally, when I am 10:06:59
contacting editors about how they should 10:07:04
be addressing articles. 10:07:09
Q. That's a good distinction. So 10:07:11
let's start. 10:07:14
Do you formally address or do 10:07:14
you formally advise any journals on their 10:07:16
review process? 10:07:19
A. I do not. 10:07:20
Q. But you do tell them what 10:07:20
they're doing wrong in certain cases? 10:07:26
A. Not only what they're doing 10:07:29
wrong, but suggestions for improvements. 10:07:31
Q. And are those unsolicited 10:07:33
suggestions? 10:07:35
A. Mostly. But not exclusively. 10:07:38
Q. Are there occasions where 10:07:43
journals have reached out to you 10:07:44

DAVID A. SANDERS

affirmatively and said, can you advise us on our review process? 10:07:47 10:07:49

A. No. 10:07:51

MR. KUMAGAI: Scott, we've been going for about an hour. I don't want to cut you off. 10:08:00 10:08:01 10:08:03

MR. CAMPBELL: I should be in a good spot to take a break in about five minutes I think. Is that okay for you? 10:08:04 10:08:05 10:08:07 10:08:09

THE WITNESS: Yes. 10:08:10

Q. Have you ever engaged in the post-publication review of an article for a journal? I'm talking about as a reviewer. Have you engaged in that process? 10:08:10 10:08:13 10:08:16 10:08:17 10:08:19

MR. KUMAGAI: Objection to form. 10:08:20 10:08:21

A. Post-publication review for a journal? 10:08:21 10:08:25

Q. Mm-hmm. 10:08:25

A. Could you please explain the question? 10:08:27 10:08:31

Q. Sure. 10:08:32

DAVID A. SANDERS

I'm trying to understand the parameters under which you've advised journals on their process. And I understand that you have offered critiques of articles and as part of that process I understand that you're telling me that you will advise the journals on what they should or shouldn't do with respect to a paper. Is that fair? 10:08:32 10:08:33 10:08:36 10:08:38 10:08:40 10:08:42 10:08:44 10:08:46 10:08:48
A. Yes. 10:08:50
Q. So what I'm trying to do is ask a coherent question to understand that advice. So have you ever been asked by a journal to formally assist them with their post-publication review process? 10:08:50 10:08:52 10:08:55 10:08:58 10:09:01
A. No. 10:09:03
Q. What about peer review, are you involved in the peer review process? 10:09:04 10:09:12
A. Yes. 10:09:14
Q. What was the last article that you peer reviewed? 10:09:14 10:09:18
A. I believe it was about viruses potentially contaminating milk products. 10:09:22 10:09:37
Q. When was that? 10:09:41

DAVID A. SANDERS

A. I don't recall. It was recently. But I don't recall. 10:09:42 10:09:46

Q. Are you regularly engaged in the peer review process as part of your academic work over the last five years? 10:09:47 10:09:50 10:09:52

A. Yes. 10:09:55

Q. And does that relate to specific topics? 10:09:57 10:09:59

A. Yes. 10:10:02

Q. What topics are those? 10:10:03

A. Virus -- virus connected topics. 10:10:05 10:10:11

Q. I want to pivot just slightly away from scientific integrity and ethics and talk about -- oh, yeah, please. 10:10:19 10:10:21 10:10:24

And talk about recordkeeping standards, which is another part of your opinion. Right? 10:10:27 10:10:28 10:10:31

A. Yes. 10:10:31

Q. Have you ever worked directly for an organization that is responsible for setting scientific recordkeeping standards? 10:10:32 10:10:34 10:10:36 10:10:38

A. No. 10:10:40

DAVID A. SANDERS

Q. Do you have any experience enforcing scientific recordkeeping standards? 10:10:43 10:10:45 10:10:48
A. Yes. 10:10:48
Q. And what is that? 10:10:48
A. Both within my laboratory for the students that I teach in laboratory courses. 10:10:50 10:10:54 10:11:01
Q. So you enforce recordkeeping standards in your own lab? 10:11:02 10:11:04
A. Yes. 10:11:05
Q. Outside of your own lab, do you have any experience enforcing recordkeeping standards? 10:11:05 10:11:08 10:11:10
A. Also in the laboratory courses that I teach. So this is not my own lab, these are courses in which students are conducting things -- experiments in a laboratory setting. And I enforce recordkeeping standards there. I have standards that I maintain and that I insist that the -- insist that the students adhere to. 10:11:11 10:11:12 10:11:16 10:11:19 10:11:22 10:11:28 10:11:31 10:11:35 10:11:41
Q. And that's a good distinction. 10:11:42

DAVID A. SANDERS

I guess what I should say is, outside of your own lab where you oversee students in your own courses where you oversee students. 10:11:45 10:11:46 10:11:49 10:11:51

A. Okay. 10:11:52

Q. Do you have any experience enforcing recordkeeping standards? 10:11:53 10:11:55

A. I do not. 10:11:56

Q. Do you have any specialized training in scientific recordkeeping standards outside of what you described as the typical coursework for a scientist? 10:11:57 10:11:59 10:12:01 10:12:03 10:12:05

MR. KUMAGAI: Objection to form. 10:12:05 10:12:06

A. I do not. 10:12:06

Q. Did you understand my question? 10:12:08 10:12:09

A. Yes. 10:12:09

Q. Have you published any peer reviewed articles on recordkeeping standards? 10:12:10 10:12:13 10:12:15

A. I'll say yes. In the sense that I have published peer reviewed 10:12:16 10:12:35

DAVID A. SANDERS

articles which discuss research integrity and the records that are necessary for supporting -- for supporting a research article. 10:12:37 10:12:41 10:12:44 10:12:51

Q. So I want to parse that just a little bit. 10:12:52 10:12:54

A. Yes. 10:12:55

Q. So you have published peer reviewed articles on scientific integrity issues. Correct? 10:12:55 10:12:56 10:12:59

A. Yes. 10:13:00

Q. And sometimes a part of that deals with what records may need to be kept. Is that right? 10:13:01 10:13:02 10:13:04

A. Yes. 10:13:05

Q. Have you published any peer reviewed articles specifically on the topic of recordkeeping standards? 10:13:05 10:13:07 10:13:09

A. I have not. 10:13:10

MR. KUMAGAI: Objection to form. 10:13:11 10:13:12

Q. Do you understand my question? 10:13:12

A. I do, yes. 10:13:13

Q. Do you belong to any 10:13:14

DAVID A. SANDERS

organizations that are involved in creating scientific recordkeeping standards for the industry? 10:13:19 10:13:20 10:13:22

MR. KUMAGAI: Objection to form. 10:13:24 10:13:25

A. I do not. 10:13:26

Q. Do you belong do any organizations that are involved in enforcing recordkeeping standards across the industry? 10:13:28 10:13:33 10:13:35 10:13:37

A. I do not. 10:13:38

Q. Have you ever audited a GLP lab? 10:13:39 10:13:43

A. I have not. 10:13:43

Q. Have you ever audited an academic lab? 10:13:44 10:13:45

A. Please define auditing in this sense. 10:13:48 10:13:51

Q. Sure. 10:13:51

So you're aware, for example, that the FDA conducted an audit of Dr. Wang's lab. Right? 10:13:52 10:13:54 10:13:56

A. Yes. 10:13:57

Q. You're aware that Cassava 10:13:57

DAVID A. SANDERS
conducted an audit of Dr. Wang's lab? 10:13:59
A. Yes. 10:14:01
Q. Have you ever conducted an audit of a lab similar to those? 10:14:01
A. It -- you have to define "similar." 10:14:08
Q. Okay. 10:14:18
A. I have visited labs to try to make sure that they have -- you know, site visits, in order to make sure that they have the capacity to conduct the research that they are proposing. 10:14:19
Q. So let me try to ask a simpler question. 10:14:37
A. Yeah. 10:14:40
Q. Have you ever drafted an audit report for a lab that you audited other than your own? 10:14:40
A. It depends what you mean by "audit." It is not the same -- I have not drafted a report that is the same as the FDA audit, for example. But I have participated in reports about whether a lab is suitable for conducting sets of 10:14:48

DAVID A. SANDERS

experiments through a site visit. 10:15:18

Q. So just describe for me what you're thinking of in your head so I can understand it. What labs have you visited and what did you do? 10:15:20 10:15:22 10:15:23 10:15:25

MR. KUMAGAI: Objection to form. 10:15:26 10:15:27

A. When one -- visit's allowed, for example, to determine for example whether they are a suitable site for a graduate training, you visit labs to make sure that they have the equipment, the infrastructure, in order to allow for proper training, proper experiments and so on. 10:15:28 10:15:34 10:15:35 10:15:41 10:15:45 10:15:49 10:15:53 10:15:56

Q. So in what capacity have you done this? 10:15:56 10:15:59

A. I do this on behalf of national organizations that are trying to decide whether they are going to fund a particular laboratory or laboratory program. 10:15:59 10:16:01 10:16:03 10:16:10 10:16:12

Q. Which national organizations? 10:16:13

A. So this would be the National 10:16:15

DAVID A. SANDERS

Institutes of Health. 10:16:19

Q. Any others? 10:16:20

A. Well, I worked with Howard Hughes Medical Institute, also on a sort of related approach in terms of graduate training. 10:16:22 10:16:31 10:16:34 10:16:38

Q. Other than NIH and Howard Hughes, any others? 10:16:39 10:16:42

A. I don't think so. 10:16:42

MR. CAMPBELL: Now we hit a bold part of my outline. Take a break. 10:16:45 10:16:48 10:16:50

THE WITNESS: I'm sorry? 10:16:51

MR. CAMPBELL: Want to take a break? 10:16:52 10:16:53

THE WITNESS: Yes. 10:16:54

THE VIDEOGRAPHER: The time on the video monitor is 10:16 a.m., we off the record. This end media 1. 10:16:54 10:16:55 10:16:59

(A recess was taken.) 10:17:01

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 10:35 a.m. This start media 2. 10:35:11 10:35:16 10:35:18 10:35:22

DAVID A. SANDERS

BY MR. CAMPBELL: 10:35:23

Q. Welcome back. 10:35:23

Have you ever met any of the plaintiffs in this case? 10:35:25 10:35:26

A. I have not. 10:35:27

Q. Do you know who the plaintiffs are in this case? 10:35:28 10:35:30

A. I know them by name. But I... 10:35:31

Q. How do you know them by name? 10:35:36

A. It's been in materials that have been presented to me. 10:35:37 10:35:40

Q. Never had any conversations with any of them? 10:35:41 10:35:42

A. No. 10:35:43

Q. Were you familiar with who they were before you were engaged for this litigation? 10:35:44 10:35:49 10:35:51

A. You know, I may have heard their names, but I was not really familiar with them at all. 10:35:54 10:35:56 10:35:58

Q. When you say you may have heard their names, in what context? 10:35:59 10:36:00

A. Through social media, I could have heard about the case from Elisabeth 10:36:03 10:36:18

DAVID A. SANDERS

Bik. 10:36:24

Q. Who is Elisabeth Bik? 10:36:27

A. She is a research integrity investigator. 10:36:28 10:36:33

Q. Do you know her personally? 10:36:33

A. I do. 10:36:35

Q. When did you meet Dr. Bik? 10:36:36

A. Well, we probably would have met originally through social media some time ago. Familiar with her work from -- for a decade. And we've met in person on several occasions in the last few years. 10:36:39 10:36:42 10:36:45 10:36:50 10:36:55

Q. And you say you may have been aware of plaintiffs through Elisabeth Bik's social media posts. Is that right? 10:36:57 10:37:01 10:37:04

A. Yes. 10:37:07

Q. Do you recall her making social media posts about the plaintiffs in this case? 10:37:07 10:37:08 10:37:10

A. Not about the plaintiffs. It was about her involvement with Cassava. 10:37:11 10:37:15

Q. And what was her involvement with Cassava? 10:37:20 10:37:22

A. I don't know directly. I just 10:37:23

know that she was involved -- she would 10:37:26
occasionally post -- she would 10:37:30
occasionally post about being attacked by 10:37:33
people associated with Cassava. 10:37:36
Q. You understand that Dr. Bik 10:37:38
was attacked by people associated with 10:37:41
Cassava? 10:37:44
A. Online, yes. 10:37:44
Q. Online attacks? 10:37:45
A. Yes. You know, Twitter, X, 10:37:46
attacks. 10:37:52
Q. Do you know who at Cassava was 10:37:54
involved in Twitter attacks on Elisabeth 10:37:56
Bik? 10:37:59
A. I do not know. This wasn't -- 10:37:59
you know, as I said, I may have 10:38:05
encountered the names of these 10:38:07
individuals during that. Just -- but I 10:38:09
don't -- you know, it wasn't a real 10:38:13
focus. But I do read her tweets. 10:38:16
Q. Do you recall anyone at 10:38:24
Cassava attacking Elisabeth Bik? 10:38:28
A. What I said was people who 10:38:34
were associated with Cassava. I don't 10:38:36

DAVID A. SANDERS

know -- I didn't know who they were, you know, what their relationship to Cassava was. But they were clearly attacking her for something that she had investigated that has some implications for Cassava. 10:38:41 10:38:43 10:38:46 10:38:54 10:38:58

Again, this isn't something that I followed closely. But I'm trying to give you full disclosure that there was -- I had some, you know, un -- vague understanding or I had heard about things associated with Cassava, attacks upon Elisabeth Bik. And it could be that, you know, the -- you know, these individuals -- you know, there were a lot of people named in these tweets, and it could be that their names were there as well. I don't know. Referred to -- not involved in attacks, but referring to. That's all I'm saying. 10:39:01 10:39:03 10:39:05 10:39:07 10:39:15 10:39:19 10:39:22 10:39:26 10:39:31 10:39:32 10:39:35 10:39:36 10:39:39 10:39:42

Because when I learned the names associated with the case, they were not totally unfamiliar to me. But I can't -- I cannot trace when, how, what context I heard the names. 10:39:44 10:39:45 10:39:47 10:39:51 10:39:54

DAVID A. SANDERS

Q. But you were familiar with Cassava based on your following of Elisabeth Bik's social media? 10:39:56 10:39:59 10:40:02

A. That is correct. 10:40:04

Q. And Elisabeth Bik, I take it, was criticizing Cassava's scientific work? 10:40:05 10:40:10 10:40:12

A. What I learned about was about -- what she felt were the attacks upon her from people associated with Cassava. That's what I saw. You know -- yes. 10:40:13 10:40:17 10:40:20 10:40:22 10:40:25

Q. And what is your understanding that it was people associated with Cassava that were attacking her based on? 10:40:26 10:40:30 10:40:31

A. Again, recalling she was saying people associated with Cassava are attacking me. And again, associate, I am not saying it's people who were employed by the company. These are people -- I don't know whether these may be investors. But these are people associated with Cassava are attacking me. That's what I recall the discussion being 10:40:35 10:40:45 10:40:47 10:40:53 10:40:55 10:40:57 10:40:59 10:41:02 10:41:04

about. 10:41:08

Q. So Elisabeth Bik was posting 10:41:08
something to the effect that people 10:41:13
associated with Cassava are attacking me? 10:41:15

A. That's correct. 10:41:17

Q. And that's what you recall 10:41:17
reviewing? 10:41:19

A. Correct. 10:41:19

Q. It might be helpful, when were 10:41:20
you engaged to work on this case? 10:41:24

A. We had discussion -- 10:41:26

MR. KUMAGAI: I just want to 10:41:28
instruct you not to reveal the 10:41:29
substance of any discussions you 10:41:33
had with counsel. But to the 10:41:35
extent you recall approximately or 10:41:36
exactly when you were retained, you 10:41:38
can answer, you can give the time 10:41:40
period. 10:41:43

A. It was in the late summer of 10:41:43
last year. 10:41:48

Q. Summer of 2025? 10:41:50

A. Yes. 10:41:51

Q. So are you familiar with any 10:41:52

DAVID A. SANDERS

of the plaintiffs' scientific training? 10:42:01
A. Plaintiffs, no, I am not. 10:42:04
Q. Do you know Dr. Heilbut's professional experience? 10:42:06 10:42:13
A. I do not. 10:42:15
Q. Do you know if he's run Western blots before? 10:42:15 10:42:18
A. I do not. 10:42:19
Q. Do you know if he's run ELISA experiments before? 10:42:20 10:42:23
A. I do not. 10:42:24
Q. Is ELISA the right word? 10:42:24
A. ELISA is the right pronunciation, yes. 10:42:26 10:42:29
Q. Do you know if he has any training on ELISA machines? 10:42:31 10:42:32
A. I do not. 10:42:35
Q. You view the plaintiffs in this case as whistleblowers? 10:42:35 10:42:38
A. I have not formed an opinion about the plaintiffs in this case. 10:42:40 10:42:41
Q. Sitting here today, you don't have an opinion on that? 10:42:43 10:42:45
A. No. 10:42:46

DAVID A. SANDERS

Q. So taking you back then, when to your recollection did you first hear about Cassava? 10:42:47 10:42:56 10:42:57

A. It would have been through Elisabeth Bik and her tweets about being attacked. 10:43:00 10:43:03 10:43:10

Q. Do you recall around when that was? 10:43:11 10:43:13

A. I do not. 10:43:14

Q. Before you were retained in this case? 10:43:16 10:43:17

A. Yes. 10:43:18

Q. Did you ever have any conversations with Elisabeth Bik about that? 10:43:18 10:43:20 10:43:22

A. It might have been in passing. It was not, you know, a long -- I do not recall any. 10:43:24 10:43:28 10:43:33

Q. Do you recall having any substantive conversations with Elisabeth Bik about her criticisms of Cassava? 10:43:35 10:43:37 10:43:40

A. I do not. 10:43:42

Q. Do you recall having any substantive conversations with Elisabeth 10:43:43 10:43:44

Bik about people attacking her work relating to Cassava? 10:43:47 10:43:50

A. In the context of -- only in the context of that she has been subjected to a number of attacks from people. But not in particular. 10:43:52 10:43:57 10:43:58 10:44:04

Q. You've had conversations with Elisabeth Bik about her being attacked for her work generally? 10:44:07 10:44:10 10:44:11

A. Yes, correct. 10:44:13

Q. But not specific to Cassava? 10:44:14

A. Not that I recall. 10:44:16

Q. When did you first hear of Hoau-Yan Wang? 10:44:18 10:44:22

A. I probably first learned about that through an article in, maybe in Science Magazine. 10:44:24 10:44:37 10:44:42

Q. What do you recall about that article? 10:44:45 10:44:46

A. That there were -- when you say recall, to what do you refer? 10:44:47 10:44:57

Q. Your recollection of the article in Science Magazine where you first heard about Dr. Wang. 10:45:00 10:45:02 10:45:04

DAVID A. SANDERS

A. So I have subsequently re-read it. So I cannot tell you what I recall from the first time I encountered it. 10:45:07 10:45:09 10:45:13

Q. So I recognize that difficulty. It's difficult to say what I knew in 2023 versus what I knew in 2025. 10:45:16 10:45:19 10:45:21

A. Yes. 10:45:24

Q. So let's start here: Were you familiar with scientific criticisms of Dr. Wang before you were engaged in this case? 10:45:24 10:45:26 10:45:29 10:45:32

A. Yes. 10:45:32

Q. Had you reviewed substantive scientific criticisms of Dr. Wang before you were engaged in this case? 10:45:32 10:45:35 10:45:37

A. I did not. 10:45:39

MR. KUMAGAI: Objection to form. 10:45:40 10:45:41

A. I did not. 10:45:41

Q. Did you read the report that was attached to the Science article to your recollection before you were engaged in this case? 10:45:42 10:45:44 10:45:48 10:45:49

MR. KUMAGAI: Object to the 10:45:50

DAVID A. SANDERS

form. 10:45:50

A. I did not. 10:45:51

Q. So you just read the article? 10:45:51

A. Yes. 10:45:53

Q. When did you first review the citizens petition? 10:46:01 10:46:03

A. After I was engaged in the... 10:46:05

Q. When did you first become aware of plaintiffs' allegations of misconduct by Cassava? 10:46:11 10:46:13 10:46:18

A. After I was engaged. 10:46:20

Q. Have you ever reviewed Dr. Bik's analysis of Dr. Wang's work? 10:46:22 10:46:32

A. Not that I recall. 10:46:36

Q. You didn't review it in connection with your work in this case? 10:46:39 10:46:42

A. I have not been in communication with Dr. Bik about this case. 10:46:47 10:46:50 10:46:52

Q. But have you reviewed any of her analysis of Dr. Wang's work as part of your analysis in this case? 10:46:53 10:46:55 10:46:59

A. I did look at what's called PubPeer. And if her analysis had been 10:47:02 10:47:11

DAVID A. SANDERS

included there, I may have come across it. But I don't recall specifically whether it was Dr. Bik's or something else. 10:47:15 10:47:18 10:47:23 10:47:26

Q. So you may have reviewed her analysis, you don't know one way or the other? 10:47:26 10:47:28 10:47:30

A. That is correct. 10:47:30

Q. Are you familiar with Retraction Watch? 10:47:32 10:47:34

A. I am. 10:47:35

Q. What is Retraction Watch? 10:47:35

A. Retraction Watch is a publication which discusses retractions and corrections of scientific literature. 10:47:37 10:47:43 10:47:48

Q. And do you work with them? 10:47:51

A. Yes, I have written articles for Retraction Watch. And they sometimes consult me on images or plagiarism to see whether I concur that there is such an issue. Or sometimes they ask me just to investigate whether there are issues associated with particular articles. 10:47:54 10:47:58 10:48:03 10:48:09 10:48:15 10:48:17 10:48:19

Q. Have you ever been compensated 10:48:21

DAVID A. SANDERS

by Retraction Watch? 10:48:23

A. I have not. 10:48:24

Q. What articles did you write for them? 10:48:25 10:48:31

A. I wrote articles on -- well, if I may consult my -- 10:48:32 10:48:37

Q. You absolutely can. Maybe I'll shortcut it for you. To the extent you've written articles for Retraction Watch, are they listed on your CV for this case? 10:48:41 10:48:43 10:48:46 10:48:48 10:48:50

A. As far as I recall, the answer is yes. 10:48:50 10:48:52

Actually, I guess I truncated it. I've written -- I wrote a series of articles, at least two articles, on the arsenic case that I described, for which I have been an important proponent of retraction. They're not on this list. I think I focused just on most -- on my most recent articles and not all of them. 10:49:27 10:49:30 10:49:33 10:49:36 10:49:39 10:49:43 10:49:45 10:49:48

So I know I wrote those, and those should be considered as articles that I've written for Retraction Watch. 10:49:53 10:49:55 10:49:59

DAVID A. SANDERS

Q. Okay. So there are articles for Retraction Watch related to arsenic that you did not include on this list. 10:50:01 10:50:02 10:50:05

A. That's correct. 10:50:07

Q. Are there any others? 10:50:07

A. There may be. I don't recall -- I know the ones about arsenic. 10:50:09 10:50:14

There was an interview here, but it's listed. 10:50:42 10:50:43

I don't recall any others. 10:50:48

Q. Why didn't you include the articles related to arsenic on the list? 10:50:50 10:50:51

A. I think they were not that recent, and but I could have. 10:50:55 10:50:58

Q. No particular reason? 10:51:04

A. No particular reason. 10:51:05

Q. Do you know if Retraction Watch works with Dr. Bik? 10:51:13 10:51:16

A. Works with? Could you help me understand what you mean by that? 10:51:21 10:51:26

Q. Sure. Maybe we can give an exhibit. Let's mark this as Exhibit 4, I think. Sanders 4. 10:51:28 10:51:32 10:51:35

(Sanders Exhibit 4 for 10:51:35

identification, article headed 10:51:35
"Announcing the Elisabeth Bik 10:51:35
Science Integrity Fund.") 10:52:02
BY MR. CAMPBELL: 10:52:02
Q. So this is a Retraction Watch 10:52:03
article announcing the Elisabeth Bik 10:52:05
Science Integrity Fund. 10:52:08
Do you see that? 10:52:08
A. Yes, I do. 10:52:11
Q. This will allow me to ask more 10:52:12
specific questions. 10:52:12
A. Yes. 10:52:12
Q. It says, "We are thrilled to 10:52:12
be partnering with the foremost 10:52:14
scientific sleuth, Elisabeth Bik." 10:52:17
Do you see that? 10:52:18
A. Yes. 10:52:18
Q. Were you aware that Retraction 10:52:19
Watch partners with Elisabeth Bik? 10:52:22
A. Now that I am reminded about 10:52:23
this fund, yes, that's a partnership, 10:52:26
yes. 10:52:28
Q. So you say reminded about this 10:52:28
fund. You were aware of it? 10:52:32

DAVID A. SANDERS

A. Yes. 10:52:33

Q. And they call her the foremost scientific sleuth. 10:52:34 10:52:37

Do you see that? 10:52:37

A. It says foremost rather than the. But yes. 10:52:40 10:52:42

Q. Absolutely you're correct. With foremost scientific sleuth? 10:52:43 10:52:45

A. Yes, it says that. 10:52:48

Q. There might be other foremost scientific sleuths? 10:52:49 10:52:51

A. It's possible. 10:52:53

Q. Do you know what that means, scientific sleuth? 10:52:53 10:52:55

A. It's a colloquial term for individuals who engage in examining the scientific literature and investigating whether there are violations of scientific norms. 10:52:57 10:53:02 10:53:10 10:53:16 10:53:20

Q. So are you a scientific sleuth? 10:53:21 10:53:25

A. I have been called that. 10:53:25

Q. Are you one of the foremost scientific sleuths? 10:53:26 10:53:30

DAVID A. SANDERS

A. I would not be so bold as to say that. 10:53:32 10:53:34
Q. A foremost scientific sleuth? 10:53:34
A. It's possible. It's possible. 10:53:37
Q. Are the plaintiffs in this case scientific sleuths? 10:53:39 10:53:42
A. I do not know. 10:53:44
Q. Why don't you know? 10:53:45
A. I don't know the plaintiffs. 10:53:48
Q. Have you reviewed their allegations in this case? 10:53:53 10:53:55
A. Yes, I have. 10:53:56
Q. Based on your review of the allegations, would they qualify as scientific sleuths? 10:53:57 10:54:01 10:54:04
A. I didn't make the term. I don't decide who is qualified as that. When we're -- when it's normally employed, it refers to people who are -- have looked into a variety of cases over the course of time. I have no information about the plaintiffs in this case. I only know about this particular case. 10:54:06 10:54:18 10:54:23 10:54:27 10:54:30 10:54:34 10:54:37 10:54:40 10:54:44

DAVID A. SANDERS

Q. You don't know whether they have been involved in scientific integrity investigations of people other than Dr. Wang and Cassava? 10:54:45 10:54:47 10:54:49 10:54:52

A. I do not. I need -- I neither know that they are nor that they're not. 10:54:53 10:54:56

Q. If you look at the third paragraph on here starting "The fund." 10:55:00 10:55:07

Do you see that? 10:55:11

A. Yes. 10:55:11

Q. It says, "the fund launched with the proceeds of Bik's Einstein award will provide financial resources to Bik and other sleuths and collaborators as well as provide funding for training programs, grants, or awards for science integrity advocates." 10:55:12 10:55:18 10:55:24 10:55:26 10:55:29 10:55:30 10:55:34

Do you see that? 10:55:36

A. Yes. 10:55:36

Q. Do you collaborate with Dr. Bik? 10:55:36 10:55:44

MR. KUMAGAI: Objection to form. 10:55:46 10:55:48

A. There have been some articles 10:55:48

that we have worked on together. 10:55:52

Q. Which ones? 10:55:55

A. I do not recall. 10:55:56

Q. When you say there are articles that you have worked on together, are you talking about publishing articles with Dr. Bik? 10:56:04 10:56:06 10:56:07 10:56:09

A. No. 10:56:11

Q. You're talking about criticizing other people's articles with Dr. Bik? 10:56:11 10:56:13 10:56:16

A. Investigating other people's articles with Dr. Bik. 10:56:17 10:56:18

Q. That's a fair clarification.
So you have been involved with Dr. Bik in investigating the basis for other people's scientific work? 10:56:20 10:56:21 10:56:22 10:56:25

A. Yes. 10:56:27

Q. But you don't recall which ones? 10:56:29 10:56:30

A. I do not. 10:56:31

Q. Have you been involved in any of the training programs, grants or awards funded by Bik's Einstein award? 10:56:35 10:56:38 10:56:41

DAVID A. SANDERS

A. I have not. 10:56:44

Q. Talk a little bit about plagiarism. What is plagiarism? 10:56:45 10:56:57

A. If I may refer to my report. 10:57:01

Q. You may always refer to your report at any time you'd like. 10:57:08 10:57:10

A. Plagiarism is the reproduction of other people's work, ideas, concepts, text, without full and proper attribution. 10:58:09 10:58:15 10:58:24 10:58:29

Q. What is full and proper attribution? 10:58:35 10:58:37

A. One must not only, for example, in the case of text, attribute the concepts that are present in that text to, say, previous authors. But also if one is copying the text itself, that also has to be noted through normal processes that involved either quotation marks or indentation. 10:58:39 10:58:43 10:58:48 10:58:52 10:58:55 10:59:00 10:59:05 10:59:08

So it's -- that's why it's full. One can, for example, acknowledge that the source of information is from a particular article. But if one is 10:59:11 10:59:15 10:59:20 10:59:24

DAVID A. SANDERS

absolutely reproducing the text, one needs to acknowledge that as well. It's not enough just to acknowledge the concepts. 10:59:28 10:59:31 10:59:33 10:59:35

Q. Okay. So if you paraphrase someone else's thoughts or text without attributing to them, that's plagiarism. Right? 10:59:38 10:59:43 10:59:45 10:59:48

A. That is correct. 10:59:48

Q. And if you copy actual text without indicating that you're copying actual text, that's plagiarism? 10:59:48 10:59:51 10:59:53

A. That is correct. 10:59:56

Q. And presumably if you copy text with no attribution at all, that's plagiarism? 10:59:56 11:00:00 11:00:03

A. That is correct. 11:00:03

Q. Is plagiarism a form of research misconduct? 11:00:04 11:00:07

A. According to the federal standards, the answer is yes. 11:00:08 11:00:10

Q. What federal standards? 11:00:11

A. So these are -- I know the Office of Research Integrity uses them. 11:00:13 11:00:20

DAVID A. SANDERS

But they are described here. 11:00:25
Right. The Office of Research 11:00:33
Integrity. Other federal agencies, I 11:00:37
know that the National Science Foundation 11:00:38
uses a very similar foundation. NIH uses 11:00:40
this. And I believe it's in federal 11:00:45
statutes that you have this definition of 11:00:48
research misconduct. 11:00:54

Q. And do you know if they use 11:00:55
the same description of plagiarism that 11:00:56
you've just given me? 11:00:59

A. It's very close. It's not 11:01:03
identical. I didn't -- I didn't just 11:01:05
read it. 11:01:09

Q. No, understood. I just mean 11:01:10
conceptually do you understand it to be 11:01:12
the same? 11:01:14

A. Yes, yes. 11:01:14

Q. And is plagiarism the same 11:01:15
whether you're applying it to your 11:01:17
students or your professional colleagues? 11:01:21

MR. KUMAGAI: Objection to 11:01:24
form. 11:01:24

A. Can you -- can you explain to 11:01:25

DAVID A. SANDERS

me what you mean by "the same"? 11:01:33
Q. Is there any difference in the 11:01:37
standard for plagiarism as relates to 11:01:38
research misconduct if you're applying 11:01:40
that standard to your students at Purdue 11:01:43
or your colleagues in your department? 11:01:46
A. So each academic institution 11:01:48
has its own standards that are provided 11:01:53
for, for example, for student work. They 11:01:56
may differ in wording, severity and 11:02:00
consequences. But the general concept of 11:02:06
plagiarism is standard. 11:02:10
Q. And is it the same concept 11:02:16
standard regardless of the context, 11:02:19
whether it's a student paper or an 11:02:21
academic paper or something else? 11:02:23
MR. KUMAGAI: Objection to 11:02:29
form. 11:02:30
A. Could you repeat the question, 11:02:30
please? 11:02:32
Q. What I'm trying to figure out 11:02:32
is, is plagiarism, as you've described it 11:02:33
to me, misconduct in the academic 11:02:37
setting, period, or is it different for 11:02:44

DAVID A. SANDERS

students turning in assignments, 11:02:46
academics publishing papers, experts 11:02:48
publishing reports, or is it just all the 11:02:51
same thing? 11:02:54

MR. KUMAGAI: Objection to 11:02:55
form. 11:02:56

A. So first thing to clarify is 11:02:57
that when we're talking about research 11:03:01
misconduct, we also discuss the 11:03:06
possibility of honest error as something 11:03:11
that is not research misconduct. And 11:03:13
so -- and there's also gradations in how 11:03:15
severe an instance of violation of 11:03:24
scientific norms are and what are the 11:03:29
consequences. 11:03:31

So that's why I'm trying to 11:03:32
clarify here. Because when you talk 11:03:34
about is the definitions the same, the -- 11:03:37
there are nuances in how venial the sin, 11:03:42
as opposed to mortal. So that's what I'm 11:03:55
trying to clarify here, what are you 11:03:58
asking me about. 11:04:00

Q. What does "venial" mean? 11:04:00

A. Venial is a forgivable sin. 11:04:03

DAVID A. SANDERS

As opposed to one that is not. It's a theological term. But. 11:04:07 11:04:11

Q. So let's start with the first piece. So set aside for a moment whether it's a forgivable sin. 11:04:14 11:04:16 11:04:19

A. Yes. 11:04:21

Q. Or a non-forgivable sin. 11:04:21

A. Yes. 11:04:24

Q. Is there a difference based on context of whether the sin of plagiarism has been committed? 11:04:24 11:04:25 11:04:28

A. In general I would say no, there is no difference. 11:04:31 11:04:34

Q. But there may be, depending on what exactly is done and in what context it's done, varying degrees to which you would call it misconduct? 11:04:35 11:04:40 11:04:44 11:04:46

A. Yes, correct. 11:04:48

Q. Or the severity of the misconduct. 11:04:51 11:04:53

A. That's correct. 11:04:54

Q. And who determines how severe the misconduct is? 11:04:58 11:05:01

A. That's normally by the 11:05:02

DAVID A. SANDERS

institution, the committees in charge. 11:05:04
It could be, in case of research 11:05:09
articles, journal editors. 11:05:13

Q. Who decides whether something 11:05:23
constitutes falsification of the 11:05:25
literature? 11:05:26

A. Those same types of 11:05:29
institutions. In addition, of course, we 11:05:31
have granting agencies that have input on 11:05:35
these decisions as well. 11:05:37

Q. So agencies like the NIH? 11:05:42

A. Like the NIH, yes. 11:05:44

Q. You were sued for defamation. 11:05:46
Right? 11:05:54

A. That is correct. 11:05:54

Q. That was about 2017? 11:05:55

A. That is when it was initiated, 11:05:57
was in 2017, correct. 11:06:00

Q. You said that was when it was 11:06:01
initiated. Did it last a long time? 11:06:03

A. It did. 11:06:05

Q. How long did it last? 11:06:06

A. Until 2022. 11:06:07

Q. So five years? 11:06:08

DAVID A. SANDERS

A. Yes. 11:06:09

Q. And you were sued for defamation because you made allegations of scientific misconduct? 11:06:10 11:06:14 11:06:16

A. No, I never actually made any allegations for scientific misconduct. I made allegations for violation of scientific norms. 11:06:17 11:06:21 11:06:23 11:06:25

Q. That's helpful. 11:06:26

What's the difference between allegations of scientific misconduct versus scientific norms? 11:06:27 11:06:29 11:06:31

A. The scope of violation of scientific norms is broader than for misconduct. And misconduct has formal consequences. 11:06:32 11:06:34 11:06:39 11:06:41

Q. So you were alleging that there were violations of general norms, not specific misconduct for which there are punishments? 11:06:45 11:06:47 11:06:50 11:06:52

A. That's correct. 11:06:54

Q. And these allegations were with regard to Dr. Carlo Croce. Is that right? 11:06:55 11:06:58 11:07:03

DAVID A. SANDERS

A. The laboratory of Dr. Carlo Croce. 11:07:03 11:07:05

Q. And why is that -- 11:07:06

A. And the co-authors of the -- the articles of Dr. Croce, rather than Dr. Croce, per se. 11:07:07 11:07:12 11:07:14

Q. And why is that an important distinction? 11:07:16 11:07:18

MR. KUMAGAI: Objection to form. 11:07:21 11:07:22

A. I never maintained that Dr. Croce had created any images, written any texts. I referred solely to the articles that I had in the published literature. 11:07:22 11:07:25 11:07:32 11:07:37 11:07:40

Q. And to clear up Dave's objection, because it is a good objection. Is that an important distinction in your mind, that you were criticizing the lab and not Dr. Croce specifically? 11:07:41 11:07:43 11:07:45 11:07:46 11:07:48 11:07:51

A. I was criticizing the articles that were created by this lab, you know, collaborative labs. I was focused on the 11:07:51 11:07:53 11:07:56

articles. I think that is an important distinction. 11:07:58 11:08:00

Q. And why is that an important distinction? 11:08:01 11:08:02

A. Because that's my focus, is on the scientific literature. 11:08:03 11:08:05

Q. So it's not personal? 11:08:06

A. That's, yes, it's not personal. 11:08:13 11:08:15

Q. And your allegations of violations of scientific norms, you reported those to The New York Times? 11:08:16 11:08:22 11:08:25

A. I did. 11:08:26

Q. Why? 11:08:27

A. I was concerned that the journals were not taking the allegations seriously enough. 11:08:28 11:08:33 11:08:36

Q. And why did you believe that? 11:08:37

A. Because I had identified what I regarded as definite examples of violation of scientific norms, and they were not taking any action. 11:08:41 11:08:45 11:08:49 11:08:52

Q. How do you know they weren't taking any action? 11:08:53 11:08:56

DAVID A. SANDERS

A. That's part of the reporting process. And you can observe whether there are corrections or retractions that occur in the literature. Those are reported. 11:08:57 11:09:01 11:09:03 11:09:07 11:09:10

Q. So you had raised your criticisms of scientific norms to the journals specifically? 11:09:10 11:09:12 11:09:14

A. That is correct. 11:09:15

Q. And they hadn't taken any action? 11:09:15 11:09:17

A. That is correct. 11:09:17

Q. So you reached out to The New York Times? 11:09:17 11:09:21

A. Yes. 11:09:21

Q. And what was your goal in reaching out to The New York Times? 11:09:21 11:09:23

A. To bring the issues about scientific integrity and the fact that journals were not adequately addressing it to the public. 11:09:26 11:09:29 11:09:32 11:09:35

Q. So I think you answered this question for me, but I'll ask. So did you accuse Dr. Croce of committing fraud? 11:09:37 11:09:44 11:09:47

DAVID A. SANDERS

A. I did not. 11:09:51

Q. Do you believe he committed fraud? 11:09:53 11:09:58

A. I have no information. 11:09:58

Q. And I think you testified in that case that you weren't asserting that Dr. Croce himself manipulated any images or plagiarized any text. Correct? 11:10:00 11:10:12 11:10:14 11:10:18

A. That is correct. 11:10:20

Q. Because it could have been somebody else on the team? 11:10:21 11:10:22

A. That's correct. 11:10:23

Q. And you similarly you didn't accuse him personally of any falsification or fabrication. Is that right? 11:10:23 11:10:30 11:10:34 11:10:37

A. That is correct. 11:10:37

Q. Do you know what defamation per se is? 11:10:37 11:10:49

MR. KUMAGAI: To the extent your understanding is based on communications with counsel -- 11:10:51 11:10:54 11:10:57

MR. CAMPBELL: You gave him legal advice on what defamation per 11:11:00 11:11:02

se is? 11:11:05

Q. Setting aside your communications with counsel, do you have an understanding of what defamation per se is? 11:11:07 11:11:08 11:11:09 11:11:11

A. I recall it being explained to me in the context of the previous case. But I could not reproduce that explanation right now. 11:11:11 11:11:13 11:11:16 11:11:19

Q. Okay. And to Dave's point, was it explained to you by your counsel in the previous case? 11:11:20 11:11:22 11:11:23

A. Yes, it was. 11:11:24

Q. And was that the case, the defamation case, that was brought against you? 11:11:25 11:11:27 11:11:29

A. That is correct. 11:11:29

Q. Separate and apart from your communications with counsel, do you have an understanding of whether the court found any of your statements to be defamation per se? 11:11:30 11:11:33 11:11:34 11:11:36 11:11:39

A. The court, no. The case was dismissed at summary judgment. 11:11:41 11:11:48

Q. So your understanding is the 11:11:50
court did not find any of your statements 11:11:51
to be defamation per se? 11:11:54
A. That is my understanding. 11:11:56
Q. Do you recall what journal you 11:11:57
recorded -- well, let me ask you this. 11:12:03
Because I want to be specific. Because 11:12:07
there may have been multiple journals 11:12:08
involved with Dr. Croce's work. Is that 11:12:11
right? 11:12:13
A. Yes. 11:12:13
Q. Do you recall specifically 11:12:14
that you reported allegations of image 11:12:16
duplication to a journal called PNAS? 11:12:19
A. Yes. 11:12:22
Q. How do you say that? 11:12:22
A. PNAS. 11:12:24
Q. PNAS, okay. 11:12:26
And how did that journal 11:12:28
respond to your allegations? 11:12:31
A. They contacted the authors. 11:12:32
The authors submitted a refutation. And 11:12:39
that refutation was shared with me. They 11:12:44
consulted two experts. One of whom said 11:12:48

DAVID A. SANDERS

yes, definitely, there is a problem here. 11:12:52
One of whom said, I'm not so sure. And 11:12:54
then they took no action. 11:12:58

And you're asking -- you've 11:13:00
asked me a question, I've answered it on 11:13:08
the basis of what was their initial 11:13:10
response. 11:13:14

Subsequent to The New York 11:13:17
Times article, they published an 11:13:19
expression of concern for the article. 11:13:21

Q. So that's very helpful. So 11:13:25
let's walk through that one piece at a 11:13:30
time, if you will. 11:13:33

So you submitted allegations 11:13:34
of image duplication to the journal. 11:13:35
They reached out to the authors, who 11:13:38
provided a refutation? 11:13:40

A. Who provided, yes. 11:13:42

Q. Is that what you would expect 11:13:44
a journal to do when they receive 11:13:45
allegations of potential image 11:13:47
duplication? 11:13:49

A. Yes. 11:13:50

Q. And you reviewed that 11:13:50

DAVID A. SANDERS

refutation? 11:13:52

A. Yes. 11:13:53

Q. And the journal also employed multiple experts to evaluate the duplication? 11:13:54 11:13:57 11:14:00

A. Two, as far as I know. 11:14:01

Q. At least two experts? 11:14:03

A. It was communicated to me that it was two. 11:14:05 11:14:08

Q. So two experts that you know of? 11:14:09 11:14:12

A. Yes. 11:14:12

Q. And those experts evaluated whether there was duplication and reached differing conclusions? 11:14:15 11:14:17 11:14:19

A. Yes. 11:14:21

Q. And then the journal decided not to take action? 11:14:22 11:14:26

A. Correct. 11:14:27

Q. So did the journal do a fulsome investigation of the issue? 11:14:28 11:14:30

MR. KUMAGAI: Objection to form. 11:14:32 11:14:33

A. No. 11:14:33

DAVID A. SANDERS

Q. Why not? 11:14:38

A. I don't know why they didn't. 11:14:40

Q. That's a very fair clarification. 11:14:43 11:14:45

My question is, why do you view not seeking a refutation from the authors and employing multiple experts to address the allegations that you've raised as not a sufficient investigation? 11:14:46 11:14:50 11:14:52 11:14:56 11:14:58

A. The refutation by the authors was not scientifically valid. And in terms of the two experts, if one expert finds that there is very strong evidence that there is a problem, and there is -- there needs to be an additional investigation rather than merely relying on someone else who isn't sure. 11:15:01 11:15:10 11:15:15 11:15:22 11:15:27 11:15:33 11:15:35 11:15:37

Q. So I want to break this apart just a little bit so I can understand. 11:15:44 11:15:46

A. Sure. 11:15:48

Q. I'm hearing you think that the journal reached the wrong conclusion. Is that right? 11:15:49 11:15:51 11:15:55

A. Not only did I think that they 11:15:55

DAVID A. SANDERS

reached the wrong conclusion, they eventually reached -- decided they reached the wrong conclusion. 11:15:57 11:15:59 11:16:01

Q. Right. 11:16:03

That's the expression of concern that you say comes later? 11:16:03 11:16:05

A. That's correct. 11:16:06

Q. So I'm going to come back to that. 11:16:06 11:16:08

A. Yes. 11:16:09

Q. But I want to focus for now just on the scope of their investigation that they did. 11:16:09 11:16:12 11:16:16

A. Yes. 11:16:16

Q. So you believe that they reached the wrong conclusion in their initial investigation. Right? 11:16:17 11:16:18 11:16:20

A. Correct. 11:16:21

Q. And is that because they didn't properly evaluate the evidence that they had, or because they needed to seek additional evidence? 11:16:22 11:16:25 11:16:27 11:16:32

A. I do not know what their thinking process involved. 11:16:33 11:16:37

DAVID A. SANDERS

Q. So what I'm trying to get at is, is it your belief that they needed to do more work to investigate, or is it your belief that they did the work to investigate, the refutation was not persuasive, the expert said it was duplication, the other one was noncommittal, and so they should have concluded at that point without further investigation that an expression of concern was warranted? 11:16:39 11:16:41 11:16:46 11:16:48 11:16:52 11:16:54 11:16:56 11:16:58 11:17:00 11:17:02 11:17:05

MR. KUMAGAI: Objection to form. 11:17:06 11:17:07

A. My opinion was that there was sufficient evidence at that time without any countervailing evidence for determining that there was a duplication. 11:17:07 11:17:10 11:17:13 11:17:16

Q. So it's not that more investigation was needed, it's that they didn't draw the right conclusion from the investigation they did? 11:17:18 11:17:20 11:17:23 11:17:25

A. Again, I cannot put myself into their thinking process. It is my opinion that there was sufficient 11:17:26 11:17:28 11:17:33

DAVID A. SANDERS

evidence, and they had additional evidence through the refutation that actually supported the finding that there was a duplication. 11:17:36 11:17:39 11:17:41 11:17:46

Q. Right. 11:17:47

So they had the evidence in front of them? 11:17:47 11:17:49

A. Yes. 11:17:50

Q. Through which they should have been able to draw that conclusion. 11:17:50 11:17:52

A. That is correct. 11:17:53

Q. So it's not that they needed additional evidence, they just drew the wrong conclusion? 11:17:54 11:17:56 11:17:58

A. That is my opinion, yes. 11:17:59

Q. And the journal in fact found that they couldn't conclusively determine whether to issue a correction at the time. Is that right? 11:18:00 11:18:06 11:18:09 11:18:10

A. Can you ask me that again, please? 11:18:12 11:18:16

Q. Yeah. So I'm trying to drive at this issue of the decision that the journal made. 11:18:17 11:18:19 11:18:22

DAVID A. SANDERS

Is it your understanding that they did not at the time issue an expression of concern or some similar corrigendum or retraction of the article because they did not find conclusive evidence of data manipulation or image duplication at the time? 11:18:23 11:18:25 11:18:26 11:18:32 11:18:35 11:18:37 11:18:41

MR. KUMAGAI: Object to the form. 11:18:42 11:18:43

A. I cannot answer that question. I do not know what they were thinking. 11:18:44 11:18:45

Q. Was it frustrating for you that the journal did not agree with you at the time? 11:18:48 11:18:54 11:18:56

A. It was disappointing. 11:18:56

Q. What's the difference? 11:18:58

A. For me, frustration means that there is nothing one can do. Disappointment is, at this time, it's not the outcome, but there may be something that can be done in the future. 11:19:02 11:19:13 11:19:17 11:19:21 11:19:24

Q. So you were disappointed but not frustrated because you could take additional steps? 11:19:27 11:19:29 11:19:31

DAVID A. SANDERS

A. Yes. 11:19:32

Q. Like going to The New York Times? 11:19:32 11:19:34

A. Among other things, yes. 11:19:34

Q. What are the other things? 11:19:35

A. Oh, just communicating with other people about the particular issue at hand. 11:19:36 11:19:38 11:19:42

Q. So you had opportunities to continue to press the issue? 11:19:43 11:19:44

A. Yes. 11:19:46

Q. And you thought the image duplication in PNAS was obvious. Right? 11:19:46 11:19:50

A. Yes. 11:19:56

Q. And you thought the editors who disagreed with that were reckless? 11:19:56 11:19:58

MR. KUMAGAI: Objection to form. 11:20:01 11:20:02

A. Reckless? I felt that they were not fulfilling their obligations. 11:20:02 11:20:12

Q. I'm not pulling this out of thin air. Would you say they had a reckless disregard for the truth? 11:20:16 11:20:18 11:20:21

A. The editors? So that phrase 11:20:23

DAVID A. SANDERS

doesn't apply to the editors. 11:20:46

Q. Who does it apply to? 11:20:49

A. It applied to the authors of this article and their refutation of the image duplication. 11:20:52 11:20:59 11:21:05

Q. Would you describe the defamation lawsuit as a negative experience for you? 11:21:07 11:21:16 11:21:18

A. Yes. 11:21:19

Q. Why? 11:21:19

A. It consumed a substantial amount of time to be involved in a lawsuit. You know. 11:21:23 11:21:31 11:21:33

Q. Any other reasons? 11:21:40

A. The lawsuit, per se? We're talking about the lawsuit. It was a -- yeah, it consumed -- it consumed a lot of time and mental energy. That I could have devoted to other things. 11:21:45 11:21:52 11:21:57 11:22:01 11:22:05

Q. Did it have any lasting implications after the suit was over? 11:22:08 11:22:10

A. We're just talking about the lawsuit itself? I think that there were people who were not favorably disposed 11:22:12 11:22:14 11:22:39

DAVID A. SANDERS

towards me because of my involvement in the lawsuit. And I would hear from them and of them. 11:22:46 11:22:48 11:22:52

Q. Do you have particular people in mind? 11:22:54 11:22:55

A. No. Just recall, you know, I recall that happening. 11:22:58 11:23:06

Q. You recall what happening? 11:23:09

A. You know, people contacting me or saying things to me about the lawsuit. Yes. So they would have learned about the case from the lawsuit, rather than some other activities, for example. And there would sometimes be some negative comments about my -- the fact that I was sued for defamation. 11:23:10 11:23:14 11:23:21 11:23:23 11:23:29 11:23:35 11:23:37 11:23:39

Q. People would make negative comments about the fact that you were sued for defamation? 11:23:42 11:23:45 11:23:47

A. Yes. 11:23:48

Q. Negative comments about you? 11:23:50

A. Yes. 11:23:52

MR. CAMPBELL: This will be Exhibit 5. 11:24:01 11:24:03

DAVID A. SANDERS

(Sanders Exhibit 5 for identification, article entitled "A scientific critic was sued, and won - but did not emerge unscathed. This is his story.") 11:24:03 11:24:03 11:24:03 11:24:03 11:24:30

BY MR. CAMPBELL: 11:24:30

Q. This is a Retraction Watch article entitled "A scientific critic was sued, and won - but did not emerge unscathed. This is his story." 11:24:31 11:24:32 11:24:36 11:24:39

Do you see that? 11:24:41

A. Yes. 11:24:41

Q. Do you recognize this? 11:24:42

A. I do. 11:24:43

Q. And in case there was any doubt, in the first line it says, "Retraction Watch readers may be familiar with the name David Sanders. Sanders, a biologist at Purdue University, has become a scientific sleuth." 11:24:43 11:24:47 11:24:49 11:24:50 11:24:54 11:24:58

A. Yes. 11:25:00

Q. Did you become a scientific sleuth at Retraction Watch? 11:25:01 11:25:04

A. At Retraction Watch I do, yes. 11:25:05

DAVID A. SANDERS

Q. Do you agree with that characterization? 11:25:07 11:25:09

A. As I say, it's a colloquial term. I have been involved in investigating many articles in the scientific literature. You may consider that a form of detective work, detective, sleuth, colloquial term. 11:25:09 11:25:11 11:25:13 11:25:20 11:25:22 11:25:26

Q. You don't have any problem with that term? 11:25:28 11:25:29

A. I do not. 11:25:30

Q. Take a look at the next page. It looks like this is an interview that you did with Retraction Watch. Is that right? 11:25:31 11:25:33 11:25:35 11:25:37

A. Yes, that is correct. 11:25:37

Q. Is this a verbatim interview or more of a summary? 11:25:37 11:25:39

MR. KUMAGAI: Objection to form. 11:25:42 11:25:42

Q. If you know. 11:25:43

A. I do not know. I do not recall. 11:25:43 11:25:45

Q. Okay. It looks like you are 11:25:46

DAVID A. SANDERS
abbreviated here as DS. 11:25:51
Do you see that? 11:25:51
A. Yes. 11:25:53
Q. And I want to look at the second comment above from below that you make. Do you see that? It starts "I am quite grateful." 11:25:53 11:25:57 11:26:00 11:26:03
A. Yes, I see that. 11:26:05
Q. And this is in response to a question, "your university paid your legal costs, but did the experience take other tolls?" 11:26:06 11:26:07 11:26:09 11:26:11
Do you see that? 11:26:13
A. Yes. 11:26:13
Q. You say, "I'm quite grateful to my university for covering the costs. The leadership in my college and department, however, did not recognize my scientific integrity efforts as valuable." 11:26:13 11:26:15 11:26:18 11:26:21 11:26:24 11:26:27
Do you see that? 11:26:27
A. Yes. 11:26:27
Q. Who told you that? 11:26:27
A. Head of my department in 11:26:29

DAVID A. SANDERS

particular. 11:26:32

Q. Who was the head of your department? 11:26:32 11:26:34

A. His name was Steve Konieczny. 11:26:34

Q. And you use the past tense. Is that because he is no longer the leader of the department? 11:26:37 11:26:43 11:26:45

A. That is correct. 11:26:47

Q. And what did he tell you? 11:26:48

A. First I'd like to clarify. That is not about the lawsuit. That's why when I was discussing it before, it wasn't specifically about the lawsuit, it was about my research integrity efforts. Is that distinction clear? 11:26:50 11:26:56 11:26:57 11:27:01 11:27:03 11:27:07

Q. No. But please make it clear for me. 11:27:09 11:27:11

A. His objection, as stated here, was to my scientific integrity efforts, not to the -- my involvement in the lawsuit, per se. 11:27:12 11:27:16 11:27:20 11:27:23

Q. Okay. So that's a helpful clarification. I just want to make sure I understand. 11:27:27 11:27:33 11:27:35

DAVID A. SANDERS

So this article is about your experience in the defamation lawsuit. Right? 11:27:35 11:27:37 11:27:39

MR. KUMAGAI: Object to the form. 11:27:41 11:27:43

A. That's the major focus. But it touches on my research integrity efforts because those were what generated the lawsuit. 11:27:43 11:27:45 11:27:49 11:27:54

Q. Right. 11:27:56

The lawsuit was based on your scientific integrity efforts. 11:27:57 11:28:00

A. That's correct. 11:28:02

Q. And this question, "your university paid your legal costs, but did the experience take other tolls?" 11:28:03 11:28:05 11:28:08

Do you see that? 11:28:10

A. Right. 11:28:11

Q. Do you have any understanding of what the experience relates to, refers to? 11:28:11 11:28:12 11:28:14

A. I interpret it as the experience of being a research integrity person involved with this case, and that 11:28:14 11:28:16 11:28:20

DAVID A. SANDERS

what the work that resulted in the defamation lawsuit, that's part of that experience. 11:28:23 11:28:29 11:28:33

Q. Okay. And so when you say the leadership in my college and department, however, did not recognize my scientific integrity efforts as valuable, you're just referring to their general dislike for your scientific integrity efforts separate and apart from the prior sentence about them covering your litigation costs? 11:28:33 11:28:36 11:28:39 11:28:41 11:28:44 11:28:49 11:28:53 11:28:55 11:28:56

MR. KUMAGAI: Objection to form. 11:28:58 11:28:59

A. That's correct. 11:28:59

Q. Do you understand my question? 11:28:59

A. Yes. 11:29:00

Q. So with all of that in mind, and that clarification, I'll go back to my original question. 11:29:01 11:29:03 11:29:05

Which is, what did the chair of your department tell you about your research integrity efforts at this time? 11:29:06 11:29:07 11:29:09

A. He was concerned about my work 11:29:12

DAVID A. SANDERS

on it. And in particular, there was a junior faculty member in the department who worked in the same field as Dr. Croce. And was expecting to get a letter of recommendation from Dr. Croce. And by my efforts, in my investigation, I was nullifying that -- that letter. 11:29:25 11:29:32 11:29:34 11:29:39 11:29:40 11:29:46 11:29:54

Q. So his communication to you did specifically relate to Dr. Croce? 11:29:59 11:30:05

A. That is correct. 11:30:07

Q. And Dr. Croce is the one who sued you in the defamation suit? 11:30:08 11:30:10

A. That is correct. 11:30:12

Q. Who was the junior faculty member? 11:30:13 11:30:15

A. Her name is Andrea Kasinski. 11:30:15

Q. Do you know if she got the recommendation letter? 11:30:19 11:30:24

A. I need to -- could we go off the record for just a moment? 11:30:27 11:30:35

MR. KUMAGAI: Sure, yeah, let's go off the record for a second. 11:30:37 11:30:39 11:30:40

MR. CAMPBELL: Sure. 11:30:40

DAVID A. SANDERS

THE VIDEOGRAPHER: The time on the video monitor is 11:30 a.m., we off the record. This end media 2. 11:30:43 11:30:44 11:30:47

(A recess was taken.) 11:30:50

THE VIDEOGRAPHER: We are back on the record, the time on the video monitor is 11:50 a.m. This start media 3. 11:50:06 11:50:11 11:50:13 11:50:16

MR. KUMAGAI: We will designate this portion of the testimony concerning questions about the junior faculty member as confidential. 11:50:17 11:50:18 11:50:21 11:50:26 11:50:30

BY MR. CAMPBELL: 11:50:32

Q. I think my question was just, do you know if she got the letter? 11:50:33 11:50:35

A. She did not. 11:50:36

Q. Did you ever speak to her about it? 11:50:37 11:50:38

A. No. 11:50:39

Q. So turning back to the exhibit you have in front of you, Exhibit 5. We were looking at your statements toward the bottom of the second page. Do you 11:50:43 11:50:45 11:50:48 11:50:50

DAVID A. SANDERS

recall that? 11:50:52

A. Yes. 11:50:52

Q. And you say, "Indeed it was conveyed to me that some of my investigatory endeavors, although they were not directed toward articles with authors from my university, were unwelcome." 11:50:52 11:50:58 11:50:59 11:51:02 11:51:04 11:51:08

Do you see that? 11:51:09

A. Yes. 11:51:09

Q. Who conveyed that to you? 11:51:09

A. The head of the department, Steve Kasinski. Steve Konieczny. 11:51:10 11:51:12

Q. Anyone else? 11:51:18

A. So subsequent heads of the department have informed me that my efforts are not considered as research. That's one of my obligations to the university. They're not considered research. And therefore by participating in them, I am not fulfilling the research component of my responsibilities. 11:51:19 11:51:35 11:51:37 11:51:42 11:51:47 11:51:49 11:51:52 11:51:56

Q. Even if you publish on them they're not considered research? 11:52:00 11:52:02

DAVID A. SANDERS

A. Yes. 11:52:04
Q. Do you know why that is? 11:52:04
A. No. 11:52:07
Q. You disagree with that? 11:52:07
A. I do. 11:52:09
Q. You reference here leadership in the college and department. Are you referring to anyone other than Mr. Konieczny, Dr. Konieczny? 11:52:13 11:52:15 11:52:16 11:52:18
A. So the other heads of the department, Janice Evans and Peristera Paschou are current heads, they've all reiterated that this does not constitute research. And in discussions with the deans of the College of Science, our current one is Lucy Flesch, that same message has been conveyed. 11:52:24 11:52:25 11:52:31 11:52:33 11:52:36 11:52:44 11:52:52 11:52:55
Q. Did they convey to you that your efforts were not valuable? 11:52:57 11:52:58
A. So in particular the head of department, Steve Konieczny, did. 11:53:02 11:53:05
Q. And anyone else? 11:53:10
A. It depends whether you consider the fact that it is or is not 11:53:13 11:53:16

DAVID A. SANDERS

research as valuable. 11:53:18

Q. And I'm just using the language you have here. When you say they did not recognize my science integrity efforts as valuable, I'm trying to understand what you mean by that. 11:53:20 11:53:22 11:53:24 11:53:27 11:53:29

A. Right. There -- when one conducts research, one is rewarded in a very -- various forms for conducting that research. There were no such rewards for my conducting this type of research. 11:53:31 11:53:35 11:53:43 11:53:45 11:53:47

Q. Did anyone other than Mr. Konieczny convey to you that your investigator endeavors were unwelcome? 11:53:51 11:53:54 11:53:58

A. No. 11:54:03

Q. So at this point, you'd been working for Purdue for about two decades. Right? 11:54:06 11:54:12 11:54:16

A. Yes. 11:54:16

Q. Were you disappointed with their stance? 11:54:17 11:54:19

A. Yes. 11:54:22

Q. Why? 11:54:25

A. I regard the work that I do as 11:54:27

DAVID A. SANDERS

a form of research. And as a very important form of research. 11:54:32 11:54:36

Q. You say in the last line there was a concomitant withdrawal of resources from my laboratory and me. 11:54:39 11:54:43 11:54:46

Do you see that? 11:54:46

A. Yes. 11:54:48

Q. So Purdue withdrew resources from your lab? 11:54:49 11:54:51

A. I was transferred from a more desirable laboratory situation to a less desirable laboratory situation. 11:54:52 11:54:55 11:55:00

Q. And what does that mean? 11:55:02

A. I was in a building with state-of-the-art facilities, and I was moved to one with less than state-of-the-art facilities for my work. 11:55:04 11:55:05 11:55:08 11:55:09

Q. And did you understand that that was related to your science integrity research? 11:55:13 11:55:14 11:55:18

A. It was at -- it was subsequent to that part of it. I was still conducting research actively on viruses at the time. 11:55:20 11:55:22 11:55:26 11:55:29

DAVID A. SANDERS

Q. Right. 11:55:29
So did you understand that it was related to your science integrity research? 11:55:32 11:55:35 11:55:39
A. It was at the same time that that happened. There was no reason for it to transpire otherwise. 11:55:39 11:55:40 11:55:42
Q. I'm not asking for a tricky question or a fact. 11:55:44 11:55:46
A. Again, under -- there was -- it was not said we are moving you because of your research integrity work. 11:55:47 11:55:51 11:55:54
Q. Let me ask the question in a better way then. 11:55:57 11:55:59
Do you believe that you were transferred to a different lab because of your science integrity research? 11:56:00 11:56:01 11:56:03
A. Yes. 11:56:06
Q. Did you think that was unfair? 11:56:06
A. Yes. 11:56:10
Q. Did it make you angry? 11:56:13
A. No. 11:56:15
Q. Why not? 11:56:15
A. It takes a lot to get me 11:56:17

angry. 11:56:19

Q. Did it inhibit your ability to do further research? 11:56:20 11:56:24

A. It did. 11:56:25

Q. How so? 11:56:26

A. Virology relies on a technique called cell culture. And in order to conduct cell culture experiments, you need to have sterile conditions. It was much more difficult to conduct the experiments in the older facility under sterile conditions than it was in the state-of-the-art facility. 11:56:28 11:56:35 11:56:38 11:56:41 11:56:44 11:56:46 11:56:49 11:56:51

Q. So at the same time they're telling you that your research integrity efforts are not research, not valuable, not welcome, they were inhibiting your ability to do the research that they do consider valuable? 11:56:55 11:56:57 11:57:00 11:57:03 11:57:06 11:57:08

MR. KUMAGAI: Objection to form. 11:57:09 11:57:10

Q. Do you understand my question? 11:57:10

A. Yes. 11:57:11

Q. Go ahead. 11:57:12

DAVID A. SANDERS

A. Yes. 11:57:12

Q. Let's take a look at the third page of this document. The one after that. The third substantive page. Do you see there is a question from Retraction Watch, it says, "What advice would you give to would be sleuths?" 11:57:13 11:57:24 11:57:33 11:57:35 11:57:36 11:57:39

Do you see that? 11:57:43

A. Yes, I see that. 11:57:43

Q. And the first piece of advice that you give is collaborate with other whistleblowers. 11:57:44 11:57:46 11:57:48

Do you see that? 11:57:48

A. I do. 11:57:51

Q. What does that mean? 11:57:51

A. When there are articles that need to be investigated, people have different expertise. And so it's important to collaborate with other people on that, you know, on those articles to make sure that there is a full investigation. 11:57:58 11:58:00 11:58:03 11:58:07 11:58:09 11:58:14 11:58:21

Also when there is more than one participant in an investigation, it's 11:58:22 11:58:26

more difficult to dismiss the investigation on the basis of who's conducting it. 11:58:30 11:58:36 11:58:40

Q. In other words, it's not personal if there is more than one person supporting the allegations? 11:58:43 11:58:46 11:58:48

A. That helps, yes. It need not be personal even if it's just one person. I did not know Dr. Croce, for example, there wasn't any personal element to it. But... 11:58:49 11:58:51 11:58:54 11:58:57 11:58:59

Q. So you think it's important to support other academics who allege research misconduct? 11:59:03 11:59:06 11:59:08

A. Yes. 11:59:10

Q. Down at the bottom there is a bullet in this same response about your advice. Starts with "traditional media." 11:59:10 11:59:19 11:59:22

Do you see that? 11:59:26

A. Yes. 11:59:26

Q. You say, "Traditional media and social media can be effective allies in bringing attention to violations of scientific norms and inducing journals 11:59:26 11:59:29 11:59:31 11:59:33

DAVID A. SANDERS

and institutions to act." 11:59:36

Do you see that? 11:59:38

A. Yes. 11:59:38

Q. What do you mean by that? 11:59:38

A. I'll point out it says, when discussing the matter with the reporter, stick to the facts, provide your evidence, be willing to provide the relevant techniques in science and provide context. So that's an important part of this statement. 11:59:40 11:59:42 11:59:42 11:59:44 11:59:45 11:59:48 11:59:50

So with the Croce case, we'll use that as an example, since we've discussed it. There was limited action taken by the journals until there was the article in The New York Times. And subsequently, the journals started correcting, retracting, issuing editorial expressions of concern. 11:59:51 12:00:00 12:00:03 12:00:09 12:00:14 12:00:18 12:00:23 12:00:29

Many of the articles weren't referenced directly in the article. But because there was a media attention brought to these issues, I believe that journals decided to take them more 12:00:31 12:00:33 12:00:35 12:00:38 12:00:42

seriously. 12:00:45

I will -- yes. 12:00:49

Q. So you're giving an example in the Croce case of how The New York Times article you believe is what ultimately led them to reach the correct conclusion and issue an expression of concern? 12:00:53 12:00:56 12:00:58 12:01:00 12:01:02

MR. KUMAGAI: Objection to form. 12:01:04 12:01:05

A. That's for PNAS. But there were other articles as well. It wasn't just that one article. Where there was action that was previously not taking place. 12:01:05 12:01:07 12:01:09 12:01:11 12:01:13

Q. By other journals? 12:01:14

A. Yes. 12:01:18

Q. And then as you correctly point out, you say, when you're dealing with the media, stick to the facts, provide your evidence, be willing to explain the relevant techniques in science and provide context. Right? 12:01:18 12:01:26 12:01:28 12:01:32 12:01:34 12:01:36

A. That is under -- that is my response to the question of what advice 12:01:38 12:01:40

DAVID A. SANDERS

would you give to would be sleuths. 12:01:42

Q. And why would you give that advice? 12:01:45 12:01:47

A. I think that's the most effective way of having the media, you know, social media, have an impact. 12:01:48 12:01:51 12:01:59

Q. Break it down a little bit. Why is it important to stick to the facts? 12:02:04 12:02:05 12:02:07

A. If there is an ongoing engagement by the media, then you'll be -- you'll be -- in order -- you will want to be able to defend your position. So if you stick to the facts, you'll be able to defend your position more readily. 12:02:11 12:02:15 12:02:20 12:02:23 12:02:27 12:02:30 12:02:34

Q. So what I guess would be the opposite of that? What would not sticking to the facts look like? 12:02:36 12:02:38 12:02:40

A. What not sticking to the facts would mean -- let me think about what you -- let me think about this for a second. 12:02:43 12:02:47 12:02:52 12:02:54

Talking in sort of vague terms 12:03:08

DAVID A. SANDERS

about what's a problem rather than specifying what the problems are. 12:03:10 12:03:17

Q. So making sort of sweeping allegations as opposed to particular fact-driven allegations? 12:03:18 12:03:20 12:03:22

MR. KUMAGAI: Object to the form. 12:03:24 12:03:25

A. Again, I find -- my experience is that that is the effective approach to getting corrections, retractions and so on. That's been most effective for me. So that's the advice that I provide to others, because I find that to be the productive way of engaging. 12:03:25 12:03:27 12:03:34 12:03:37 12:03:41 12:03:42 12:03:46

Q. Sticking to the particular facts instead of making more sweeping broad allegations? 12:03:48 12:03:50 12:03:53

A. That's what I find to be most effective, absolutely. 12:03:55 12:03:57

Q. Why is it important to provide context? 12:04:01 12:04:04

A. So one of the -- one of the issues that we faced over and over again as scientific detectives, has to do with 12:04:10 12:04:15 12:04:20

misinformation that is provided to the public. Such -- I mean, COVID, SARS-CoV-2 was a particular example. And when people would make certain allegations about a drug or about an origin of the virus or some sort of medical procedure, it's not enough to just say you're wrong. You actually have to provide the information that's necessary for people to understand why a particular statement is incorrect. 12:04:28 12:04:32 12:04:37 12:04:46 12:04:47 12:04:52 12:04:56 12:05:01 12:05:05 12:05:09 12:05:13

So that's providing context. It's not just -- it's not -- in my opinion, and that's not how I operate, to just say you're wrong. It is important to be able to say okay, this is what they're saying, and it's not true for the following reason because of the following context. You need -- in order to understand this, you need to also understand these other things as well. 12:05:14 12:05:17 12:05:20 12:05:23 12:05:26 12:05:28 12:05:31 12:05:34 12:05:36 12:05:40

Q. If you look at the next bullet, which I think is on the next page. Your last piece of advice is, 12:05:44 12:05:51 12:05:54

DAVID A. SANDERS

"Join us and do so if you can use using your own name and affiliation." 12:06:01 12:06:03

Do you see that? 12:06:06

A. Yes. 12:06:06

Q. Who is us? 12:06:06

A. Those of us who are trying to maintain the integrity of the scientific literature. 12:06:07 12:06:13 12:06:16

Q. Isn't everyone trying to maintain the integrity of the scientific process? 12:06:18 12:06:24 12:06:26

A. Everyone? There is -- there are a minority of -- but substantial minority, of people who publish who -- for whom that is not a high priority. 12:06:28 12:06:36 12:06:43 12:06:48

I will give you just the example of scientific paper mills. Scientific paper mills are companies that generate completely false papers that one purchases. There are more than a hundred thousand such articles in the literature. 12:06:51 12:06:53 12:06:55 12:06:58 12:07:02 12:07:07

So clearly those companies, and those authors, are not interested in maintaining the integrity of the 12:07:09 12:07:10 12:07:13

DAVID A. SANDERS

scientific literature. 12:07:16

Q. Are there other examples? 12:07:21

A. Oh, there are lots of examples. There are fake journals, there are hijacked journals. There is lots -- this is what the -- this is what the research integrity community focuses on. There are a number of violations of scientific norms that occur. 12:07:23 12:07:24 12:07:26 12:07:29 12:07:31 12:07:35 12:07:38

So it's -- no, it's not everyone. 12:07:40 12:07:44

Q. I don't have a bunch of time and you probably don't either to waste on this, but I'm interested. So scientific paper mills, they generate false papers and sell them to people to publish? 12:07:48 12:07:50 12:07:52 12:07:54 12:07:58

A. Yes. 12:08:00

Q. Like you buy these online? 12:08:00

A. I'm sorry? 12:08:03

Q. Where do you buy these? 12:08:05

A. Yes, you buy them online. 12:08:06

Q. Just a fully ready paper to publish? 12:08:08 12:08:10

A. Yes. 12:08:11

DAVID A. SANDERS

Q. And they are invalid? 12:08:11
A. Yes, completely. 12:08:12
Q. Did you seek to recover your legal fees for your defamation suit from Dr. Croce? 12:08:13 12:08:20 12:08:23
A. We did not. 12:08:25
Q. You did not seek to? 12:08:26
A. No. 12:08:28
Q. Do you know what the Anti-SLAPP law is? 12:08:28 12:08:32
A. Yes. 12:08:32
Q. Do you recall making an Anti-SLAPP claim in your defamation case? 12:08:33 12:08:36
A. What I recall is that we referred to it, but we didn't actually do -- if I recall, there was something about jurisdiction -- 12:08:40 12:08:44 12:08:48 12:08:50
MR. KUMAGAI: Just again, just to, this isn't our communications necessarily. Just be careful not to disclose information that you know solely through conversations with either us as counsel or your lawyers in that case. 12:08:52 12:08:54 12:08:58 12:09:00 12:09:01 12:09:04 12:09:07

THE WITNESS: Absolutely. 12:09:08
A. We did not pursue that. 12:09:09
Q. And to be clear, are you saying you don't know if you sought your legal fees under Anti-SLAPP law or you did not seek? 12:09:13 12:09:15 12:09:17 12:09:20
A. I -- we didn't do a separate action. I recall that there was something about recovery of fees in the summary judgment. But I do not -- I do not recall all the details. 12:09:21 12:09:25 12:09:29 12:09:39 12:09:42
Q. I'll ask an easier question. 12:09:44
Do you recall whether you were able to recover your attorneys' fees? 12:09:46 12:09:47
A. I recall -- no, we were not. 12:09:50
Q. And your university paid your fees. Right? 12:09:52 12:09:56
A. Yes. 12:09:57
Q. Do you think you should have been able to recover your attorneys' fees? 12:09:57 12:10:03 12:10:05
A. Yes. 12:10:05
Q. Were you upset that you were not able to recover your attorneys' fees? 12:10:06 12:10:09

DAVID A. SANDERS

A. Upset, no. Ultimately it was not my decision to be made. 12:10:11 12:10:17

Q. Because the university paid for your fees? 12:10:19 12:10:21

A. That's correct. 12:10:23

Q. Do you generally believe that lawsuits against people who are alleging data manipulation are intended to chill speech? 12:10:23 12:10:40 12:10:41 12:10:45

A. Could you repeat the question, I'm sorry? 12:10:46 12:10:47

Q. Sure.
You're familiar with lawsuits being brought against people who allege data manipulation. Right? 12:10:48 12:10:49 12:10:51 12:10:53

A. Yes. 12:10:54

Q. Including yourself? 12:10:54

A. Yes. 12:10:56

Q. And I'm going to try to come up with a name here. Including against an institution called Data Colada? 12:10:56 12:11:04 12:11:07

A. Yes. 12:11:12

Q. And my question is, you generally believe that these suits 12:11:12 12:11:15

DAVID A. SANDERS

against people who allege data manipulation are intended to chill speech? 12:11:16 12:11:18 12:11:20

A. I can't get into the minds of the people who are initiating these lawsuits. It certainly has that apparent effect of chilling free speech, yes. 12:11:23 12:11:25 12:11:28 12:11:34

Q. Do you recall giving an interview to the Harvard Crimson regarding the Data Colada data manipulation case? 12:11:38 12:11:40 12:11:42 12:11:45

A. I recall doing that. Without seeing it, I couldn't recall the content. 12:11:47 12:11:49

Q. Do you recall telling the Harvard Crimson there is no question that these sorts of lawsuits are designated to kill free speech, to prevent communication between the various parties? 12:11:53 12:11:55 12:11:58 12:12:00 12:12:03 12:12:04

A. Designated, yes. That sounds -- yes, sounds... 12:12:04 12:12:08

Q. So fair to say that you believe that these sorts of defamation lawsuits are designated to kill free 12:12:11 12:12:12 12:12:15

speech? 12:12:17

MR. KUMAGAI: Objection to form. 12:12:17 12:12:18

A. Yes. But -- yes. 12:12:18

Q. And we're talking about defamation lawsuits against allegations -- people who allege data manipulation? 12:12:21 12:12:23 12:12:26 12:12:28

A. That is correct. 12:12:29

Q. What did you do to investigate the allegations in the Data Colada case? 12:12:29 12:12:32

A. I read the news articles about this -- these issues. And that's pretty much what I did to look at that particular case. 12:12:36 12:12:41 12:12:49 12:12:52

Q. Did you do any investigation of the actual allegations of data manipulation? 12:12:52 12:12:54 12:12:57

A. I did. I did. 12:12:58

Q. What did you do to investigate the actual allegations of data manipulation? 12:13:00 12:13:02 12:13:03

A. I looked at the articles involved, and I looked at Data Colada's 12:13:04 12:13:07

blog posts about this. I think it was a four-part post. 12:13:13 12:13:16

Q. And so I guess what I'm trying to differentiate here is, setting aside Data Colada's investigation. 12:13:18 12:13:19 12:13:22

A. Yes. 12:13:24

Q. Did you independently do any investigation of the allegations? 12:13:25 12:13:27

A. I did not. 12:13:29

Q. Did you do anything to assess, yourself personally assess, the validity of the data misconduct allegations? 12:13:29 12:13:36 12:13:39

A. Well, I read the blogs, looked at the article, and came to my conclusions about the validity of the complaints. 12:13:42 12:13:47 12:13:48 12:13:52

Q. So you read their allegations and you agreed with them? 12:13:53 12:13:57

A. Yes. 12:13:59

Q. Did you do anything independently to verify their allegations? 12:13:59 12:14:00 12:14:02

A. Verify? 12:14:03

Q. Sure. Prove true, to 12:14:05

DAVID A. SANDERS

independently on your own assess whether the allegations were valid. 12:14:10 12:14:12

A. I looked at it and saw whether it was consistent with my understanding of data collection and reporting. But it was based upon looking at the allegations. 12:14:15 12:14:22 12:14:25 12:14:31 12:14:35

Q. I mean, did you look at any of the actual evidence itself as opposed to what was written up in a blog, for example? 12:14:37 12:14:39 12:14:41 12:14:44

MR. KUMAGAI: Objection to form. 12:14:44 12:14:45

A. What was written in the blog included references to data. So I looked at those data that were referenced there. 12:14:45 12:14:51 12:14:56

Q. You looked at the reference to the data or was there, like, an appendix with the data itself? 12:15:00 12:15:02 12:15:05

A. I don't recall. It could -- could have been exactly what you said. I do not recall. 12:15:06 12:15:08 12:15:11

Q. Let me ask that question again. 12:15:13 12:15:14

DAVID A. SANDERS
Do you recall looking at any actual underlying data related to the allegations of manipulation? 12:15:14 12:15:16 12:15:20
A. I recall looking at data that, you know -- yes, I do recall looking at data that were related to those allegations, yes. 12:15:25 12:15:27 12:15:30 12:15:32
Q. Do you recall where you got that data? 12:15:32 12:15:34
A. It would have been online. 12:15:35
Q. Do you recall obtaining any data outside of the blog post that you reviewed? 12:15:38 12:15:43 12:15:46
A. As I mentioned, I read a lot of news articles. I was not provided with data, you know, by email or something like that. 12:15:47 12:15:51 12:15:55 12:15:58
Q. Do you recall that Dr. Bik organized a fundraiser for the legal fees of the folks involved in the Data Colada investigation? 12:16:12 12:16:13 12:16:16 12:16:19
A. I recall that there was such an effort. I don't recall that Dr. Bik was involved. But could be. 12:16:21 12:16:23 12:16:29

DAVID A. SANDERS

Q. Let me ask a separate question. 12:16:33 12:16:34

Did you help organize a fundraiser for the litigation fees for the Data Colada team? 12:16:35 12:16:36 12:16:40

A. I did not. 12:16:43

Q. Did you contribute to it? 12:16:44

A. I did not. 12:16:45

Q. Do you view the suit against Data Colada as similar to the suit against you? 12:16:46 12:16:48 12:16:50

A. It was so regarded in the media. 12:16:51 12:16:56

Q. We can go there next. 12:17:00

My first question is just do you view it as similar to the suit against you? 12:17:01 12:17:04 12:17:05

A. I don't have an opinion. 12:17:06

Q. Did you have empathy for the people who were sued? 12:17:07 12:17:08

A. Empathy? I -- because of the parallels brought out, I looked into that case. 12:17:10 12:17:21 12:17:25

Q. Okay. You seem to struggle 12:17:28

with the word "empathy." Was that a bad question? 12:17:33 12:17:35

A. That wasn't what was entering into my consideration. My consideration was there were these parallels that had been brought up between the Croce case and the Data Colada, you know, Geno case. And I thought I should learn about that case. 12:17:36 12:17:39 12:17:41 12:17:43 12:17:45 12:17:52 12:17:54

Q. So you do not have an answer to the question, do you have empathy -- 12:17:57 12:18:00

A. And then I was asked by people to comment. Empathy, there wasn't -- that just wasn't my consideration. 12:18:03 12:18:04 12:18:08

Q. So you didn't consider whether you empathize with the people who were sued? 12:18:12 12:18:14 12:18:17

A. I didn't consider that. 12:18:19

Q. Take a look at your report. So I'm just going to refer to paragraph numbers because I think that's easiest. Is that okay? 12:18:26 12:18:38 12:18:40 12:18:42

A. In the report, yes. 12:18:42

Q. So I'm looking at the first 12:18:44

DAVID A. SANDERS

section B, under scientific recordkeeping, paragraph 15 on page 4. 12:18:47 12:18:52
A. Yes. 12:18:57
Q. Do you see that? 12:18:58
A. Yes. 12:18:59
Q. You say there are several authorities that set recordkeeping standards for scientific laboratories in the United States, including universities, scientific journals, the NIH and the FDA. Is that right? 12:18:59 12:19:01 12:19:02 12:19:04 12:19:06 12:19:09
A. That is correct. 12:19:11
Q. You say -- you use the word "including." Are there other authorities that set recordkeeping standards? 12:19:12 12:19:14 12:19:17
A. Well, there are research institutions that are not associated with universities. There are other scientific organizations that are involved in granting or in regulation that do. So yeah, I would say there's -- this is not an exhaustive list. 12:19:19 12:19:22 12:19:25 12:19:34 12:19:38 12:19:47 12:19:50
Q. Are the recordkeeping standards set by these other research 12:19:52 12:19:54

institutions or scientific organizations not listed here relevant to your report? 12:19:56 12:19:59

MR. KUMAGAI: Objection to form. 12:20:02 12:20:03

A. I cannot answer that question. I haven't read all of them. So I don't know whether they're relevant or not. 12:20:04 12:20:13 12:20:16

I just want to say in general, when I say, like, have -- you asked me have I reviewed something. It means have I read the entire thing, right. Have I read these standards. Have I, you know, read an entire deposition or things like that. 12:20:19 12:20:21 12:20:25 12:20:28 12:20:31 12:20:33 12:20:36

So that's what I mean by "review." It doesn't just mean did I see something from that, right. 12:20:36 12:20:38 12:20:41

So, you know, so I don't -- I cannot -- I cannot say whether some other standard is or is not relevant, because -- unless I have read it in full. 12:20:46 12:20:49 12:20:53 12:20:57

Q. So let me give you a -- give you where I'm going with this. 12:20:59 12:21:02

A. Okay. All right. 12:21:04

DAVID A. SANDERS

Q. So I'm trying to understand the basis for your opinions in the report. 12:21:05 12:21:06 12:21:08
A. Yes. 12:21:08
Q. Right. 12:21:08
And my understanding in reading this section, the first line that you start out with introduces us to authorities that set recordkeeping standards for scientific laboratories in the United States. 12:21:09 12:21:10 12:21:12 12:21:14 12:21:17 12:21:19
A. Yes. 12:21:19
Q. And then you describe universities, scientific journals, the NIH and the FDA. 12:21:20 12:21:21 12:21:24
A. Yes. 12:21:25
Q. And then you go on to list particular regulations from the NIH and the FDA. 12:21:25 12:21:27 12:21:29
A. Yes. 12:21:30
Q. And then you base your opinion on those. 12:21:31 12:21:33
A. Yes. 12:21:33
Q. So when I'm asking the 12:21:33

DAVID A. SANDERS

question, are there any other authorities that are relevant to your opinions in your report, what I'm asking is, are there any other authorities that you are relying on to support your opinion in this case other than the ones that are listed here? 12:21:35 12:21:38 12:21:40 12:21:42 12:21:44 12:21:47 12:21:49

A. I don't recall. I don't recall. 12:21:50 12:21:54

Q. Let me ask it a different way. 12:21:54

If you were relying on any other recordkeeping standards other than the ones listed here, would you have included them in your report? 12:21:56 12:21:58 12:22:02 12:22:05

A. Yes. 12:22:06

Q. And so as I was just describing, in paragraph 23, for example, you cite NIH standards for recordkeeping. Is that right? 12:22:07 12:22:12 12:22:15 12:22:21

A. Yes. 12:22:22

Q. And then in paragraphs 32 to 37, you speak about various FDA regulations and guidelines. Right? 12:22:22 12:22:27 12:22:31

A. Yes. 12:22:33

DAVID A. SANDERS

Q. Have you ever worked for the FDA? 12:22:34 12:22:37

A. I have not. 12:22:37

Q. As part of your work, have you ever conducted any FDA supervised clinical trials? 12:22:39 12:22:41 12:22:44

A. I have not. 12:22:45

Q. Are you expert in FDA policies and procedures? 12:22:46 12:22:49

A. I teach about them in the -- in my courses. So that gives me a certain expertise in them. 12:22:50 12:23:01 12:23:05

Q. So let me ask you this a different way. 12:23:10 12:23:12

If somebody approached you and said we're looking for an expert to testify as to the FDA policies and procedures, would you consider yourself an expert in that? 12:23:14 12:23:15 12:23:17 12:23:19 12:23:21

MR. KUMAGAI: Objection to form. 12:23:22 12:23:22

A. It depends upon the scope, what we -- what we're discussing. If we're talking about drug approval process 12:23:23 12:23:31 12:23:33

DAVID A. SANDERS

or vaccine, then I would have relevant expertise. 12:23:36 12:23:41

Q. So you're expert in the FDA drug approval process? 12:23:42 12:23:45

A. I have relevant expertise in the process of drug approvals and vaccine approval. 12:23:47 12:23:50 12:23:54

Q. Have you been involved directly in having a drug approved by the FDA? 12:23:56 12:24:06 12:24:08

A. I have not. 12:24:08

Q. Have you been involved directly in approving a drug by the FDA? 12:24:09 12:24:10

A. I have not. 12:24:16

Q. But the issue is sometimes relevant in your classes that you teach? 12:24:16 12:24:21

MR. KUMAGAI: Objection to form. 12:24:24 12:24:24

A. Yes. 12:24:25

Q. Do you know whether the FDA did an investigation of Cassava? 12:24:31 12:24:34

A. I know that they conducted an audit of the laboratory of Dr. Wang. I've seen that audit. 12:24:37 12:24:39 12:24:45

DAVID A. SANDERS

The document. The audit document. I didn't see the audit. 12:24:52 12:24:54

Q. You weren't there to witness the actual audit? 12:24:56 12:24:57

A. I wasn't there to witness. 12:24:58

Q. You reviewed the audit report. 12:24:59

A. That's correct, yes. 12:25:01

Q. And that's a Form 483. Right? 12:25:02

A. I haven't memorized the number. 12:25:05 12:25:07

Q. Do you know what a Form 483 is? 12:25:08 12:25:11

A. I haven't -- I don't have memorized the number. If I refer to it in my report, then that's what we are discussing. 12:25:11 12:25:15 12:25:17 12:25:19

Q. Well, hold on. I'm asking a separate question. 12:25:20 12:25:23

So setting aside the report, in the Cassava audit, do you know what a Form 483 is? 12:25:23 12:25:27 12:25:30

A. I recall seeing an FDA form, as well as the information of the audit. If that is the 483 to which you refer, 12:25:34 12:25:36 12:25:39

DAVID A. SANDERS

again, I haven't memorized the number. 12:25:43

Q. I'm asking a separate question. 12:25:45 12:25:47

Set aside the audit you reviewed -- 12:25:47 12:25:49

A. Yes. 12:25:50

Q. -- in this case. Do you know sitting here today what an FDA Form 483 is? 12:25:50 12:25:52 12:25:56

A. By reference of Form 483, no, I do not know what that number refers to. 12:25:58 12:26:03

Q. Do you know what the purpose of a Form 483 is? 12:26:07 12:26:08

A. I do not know the number associated with, you know -- I do not know what that number refers to. 12:26:10 12:26:16 12:26:21

Q. So I take it you don't know whether a Form 483 process is an important FDA process? 12:26:23 12:26:27 12:26:29

MR. KUMAGAI: Objection to form. 12:26:33 12:26:34

A. I anticipate that it is. I just don't know the -- I don't recall the number that we're talking about. 12:26:35 12:26:38 12:26:40

DAVID A. SANDERS

Q. So set aside the number. 12:26:44

A. If -- if I were asked at Purdue do you know about form 123, you know, and is that important, I would not be able to know whether form 123 is important. If you told me what the form did, then I could say oh, yes, I know what that one is. I haven't memorized the numbers. 12:26:47 12:26:51 12:26:54 12:26:56 12:26:58 12:27:00 12:27:03 12:27:05

Q. I want to set aside 123 for a moment, I just want to ask about 483. Okay? 12:27:05 12:27:08 12:27:10

A. Yes. 12:27:10

Q. Do you know sitting here today what a Form 483's purpose is? 12:27:11 12:27:12

A. I do not. 12:27:15

Q. Do you know if the FDA read the citizens petition? 12:27:21 12:27:23

A. I do not recall. 12:27:27

Q. You're aware that plaintiffs in this case submitted a letter to the FDA? 12:27:34 12:27:37 12:27:40

A. What I recall is that the plaintiffs were not the people who 12:27:40 12:27:48

DAVID A. SANDERS

submitted the citizens petition. That's what I recall. 12:27:50 12:27:54

Q. Do you know whether the plaintiffs in this case, who are not the people who submitted the citizens petition, submitted a letter to the FDA? 12:27:57 12:27:58 12:28:00 12:28:02

A. I know that they submitted a letter which I have read. Was it submitted to the FDA? I would have to see the document to be absolutely sure of that. 12:28:05 12:28:07 12:28:15 12:28:18 12:28:22

Q. You don't recall one way or another? 12:28:22 12:28:26

A. To be absolutely sure I would have to see the document itself. 12:28:26 12:28:28

Q. In any case, do you know if the FDA read plaintiffs' letter? 12:28:30 12:28:39

A. I recall a response to the letter. But I cannot right now, without seeing the documents, you know, say who responded, whether it was somebody from the FDA. I cannot answer that. 12:28:40 12:28:43 12:28:47 12:28:53 12:28:55

Q. Do you know the results of the FDA's investigation of Cassava? 12:28:58 12:29:01

DAVID A. SANDERS

MR. KUMAGAI: Objection to form. 12:29:05 12:29:06

A. I know that in the audit, which I believe is referenced here, they found deficiencies in recordkeeping. 12:29:06 12:29:08 12:29:12

That they reported findings, including that the ELISA experiments were not validated, that there was inadequate source records, there wasn't documentation of sample storage and tracking, there wasn't adequate documentation of experimental procedures, there were no source records for Western blot analysis. And there were not -- the audit trails for the plate reader using ELISA experiments were absent. 12:29:40 12:29:43 12:29:46 12:29:49 12:29:51 12:29:53 12:29:57 12:30:00 12:30:04 12:30:06 12:30:09

Q. And are you reading from your report there? 12:30:11 12:30:13

A. I am. 12:30:13

Q. Which paragraph? 12:30:14

A. This is on paragraph 61. 12:30:15

Q. 61. 12:30:20

A. And it mentions here that they issued a Form 483. So I referenced that 12:30:25 12:30:27

at the time. I read the Form 483 report. And that's -- yes. So that's -- I would have read that, yes. 12:30:30 12:30:35 12:30:40

Q. So you read the Form 483? 12:30:41

A. Yes. 12:30:44

Q. As cited in paragraph 60. 12:30:44

A. That's right. 12:30:46

Q. And you summarized it in paragraph 61. Right? 12:30:47 12:30:49

A. I know that Form 83 [sic] was important. I recall an inspection report. There was not complete -- there were two documents that I recall looking at. It says here that I am citing the inspection report and Form 483. So that is what I -- you know, I did check all of my references. So that's what I would have cited. 12:30:50 12:30:56 12:31:01 12:31:04 12:31:07 12:31:15 12:31:18 12:31:21 12:31:23

Q. So my question here is just, you're summarizing your review of the Form 483 in paragraph 61? 12:31:26 12:31:27 12:31:29

A. And the inspection report. I remember there were two documents that I was reviewing. 12:31:32 12:31:34 12:31:36

DAVID A. SANDERS

Q. And reading this, does it refresh your recollection as to the purpose of a Form 483? 12:31:38 12:31:40 12:31:42

A. Without seeing it, I don't think I can give an adequate summary of the stated purposes of a Form 483. 12:31:44 12:32:01 12:32:05

Q. Do you have an understanding of the purposes of a Form 483? 12:32:09 12:32:13

A. As, again, I believe that there were two things that I looked at. So, and for me to have to recall which one was the Form 83, which one was the other document, difficult at this point since I inspected both of them. I -- unless I can, you know, be absolutely sure, if I were presented with the Form 483, that will remind me of, you know, what I -- what I saw when I looked at it originally. 12:32:18 12:32:27 12:32:32 12:32:36 12:32:39 12:32:41 12:32:50 12:32:53 12:32:57 12:33:00 12:33:04

Q. I'm just asking you, do you have an understanding of what the purpose of a Form 483 is? 12:33:06 12:33:08 12:33:10

A. Without looking at it directly, I am loft to try to summarize 12:33:12 12:33:18

DAVID A. SANDERS

what the purpose of a Form 483 is. If I saw it again, I could say, oh, yes. In my own words, this is the way -- you know, this is the way I would regard it. 12:33:23 12:33:26 12:33:30 12:33:33

Q. But sitting here -- 12:33:35

A. I understood it at the time when I was writing the report and reviewing it. But again, Form 483 does not -- just calling it a Form 483 does not immediately bring to mind what were the stated purposes of the document. 12:33:37 12:33:38 12:33:40 12:33:46 12:33:50 12:33:56

Q. Setting aside the stated purposes, just sitting here today, do you have an understanding of what a Form 483 is? 12:33:59 12:34:02 12:34:05 12:34:07

MR. KUMAGAI: Objection; asked and answered. 12:34:07 12:34:09

A. I would anticipate it has something to do with looking at a laboratory and deciding whether it was suitable for being involved in a preclinical or a clinical investigation. 12:34:09 12:34:14 12:34:15 12:34:21 12:34:28

Q. Do you know if the FDA, through its investigation, found research 12:34:32 12:34:44

misconduct by Cassava? 12:34:46
A. I have no information that 12:34:48
says they found research misconduct by 12:34:52
Cassava. 12:34:58
Q. Do you know if the FDA through 12:34:59
its investigation found research 12:35:01
misconduct by Dr. Wang? 12:35:03
A. I do not believe that they 12:35:05
made a finding of research misconduct, 12:35:08
using -- research misconduct. 12:35:11
Q. Looking back at paragraph 37 12:35:18
of your report. You cite to the FDA's 12:35:21
good laboratory practices for nonclinical 12:35:33
laboratory studies. 12:35:35
Do you see that? 12:35:35
A. Yes. 12:35:38
Q. And just to be clear, you've 12:35:39
never conducted an audit of a GLP lab; 12:35:40
right? 12:35:45
A. That is correct. 12:35:45
Q. Do you know if Cassava has any 12:35:48
labs? 12:35:51
A. I have read from 12:35:54
Cassava-provided information that they do 12:35:59

DAVID A. SANDERS

not have their own laboratories. 12:36:00
Q. So is it your understanding that they do not have any laboratories? 12:36:03 12:36:04
A. That is -- that is correct. 12:36:06
Q. Do you know if Dr. Wang's lab was a GLP lab? 12:36:08 12:36:10
A. From things that I have read, the answer is no. 12:36:14 12:36:18
Q. And if the lab was not a GLP lab, would it be subject to the FDA's good laboratory practices for nonclinical laboratory studies? 12:36:20 12:36:24 12:36:27 12:36:29
A. It would not. 12:36:31
Q. I want to turn back to the previous page, paragraphs 31 and 32. 12:36:31 12:36:41
In paragraphs 31 and 32, you cite specific NIH standards for retention of records. 12:36:49 12:36:52 12:36:55
Do you see that? 12:36:55
A. Yes. 12:36:57
Q. And I think you alerted to earlier that you sometimes work with NIH? 12:36:58 12:37:00
A. Yes. I mean, I have never been employed by NIH. I have had 12:37:02 12:37:05

DAVID A. SANDERS

research funds from the NIH. And I have 12:37:09
worked on review panels for the NIH. 12:37:13
Q. Let me see if I can frame this 12:37:16
in an easier way then. 12:37:21
So looking at paragraph 31, 12:37:23
you have a citation to the NIH grants 12:37:28
policy statement Section 8.42. 12:37:33
Do you see that? 12:37:33
A. Yes. 12:37:38
Q. And then in paragraph 2 [sic] 12:37:38
you have an extended quote from 21 CFR 12:37:41
Part 312. 12:37:44
Do you see that? 12:37:45
A. Paragraph 2? 12:37:47
Q. 32. 12:37:48
A. Oh, 32. Yes. 12:37:49
Q. In your work with NIH, have 12:37:51
you ever applied these standards on 12:37:56
behalf of NIH? 12:37:59
A. On behalf of NIH? No. 12:38:00
Q. And you say on behalf of, 12:38:05
that's how you termed it. Have you ever 12:38:10
worked with these standards in 12:38:13
conjunction with NIH? 12:38:14

DAVID A. SANDERS

A. You're going to have to rephrase, please. What do you mean worked with them? 12:38:16 12:38:21 12:38:23

Q. Well, this is what I'm trying to understand. 12:38:24 12:38:26

So you suggested to me that you've done some work in some capacity related to evaluating NIH grants. Is that right? 12:38:26 12:38:28 12:38:31 12:38:34

A. That is correct. 12:38:34

Q. So I'm trying to understand whether that work you did with the NIH in evaluating research grants related specifically to these two citations here. 12:38:34 12:38:36 12:38:40 12:38:43

A. No. 12:38:46

Q. Have you reviewed organizations generally for their compliance with these requirements? 12:38:52 12:38:54 12:38:56

MR. KUMAGAI: Objection to form. 12:38:58 12:38:59

A. No. 12:38:59

Q. I guess what I'm asking is, do you have any experience actually applying these standards on behalf of the NIH? 12:39:03 12:39:05 12:39:07

DAVID A. SANDERS

A. On behalf of, the answer is no. 12:39:11 12:39:15

Q. In conjunction with the NIH. 12:39:15

A. I have contacted the NIH about violations of these recordkeeping standards. 12:39:28 12:39:33 12:39:36

Q. Has the NIH ever asked you affirmatively to apply these standards to a grantee? 12:39:40 12:39:42 12:39:45

A. In the process of reviewing grants for federal agencies, I have also reviewed for NSF, one of the criteria they ask us to do is to make sure that recordkeeping standards are maintained. And that records will be, for example, deposited in suitable databases and also retained. They want us to be able to evaluate the plans for that to take place. 12:39:48 12:40:01 12:40:03 12:40:08 12:40:11 12:40:14 12:40:18 12:40:22 12:40:25 12:40:28

Q. Set aside the NSF for a second because I'm not sure who that is, I'll ask you a different question to figure out who the NSF is. 12:40:29 12:40:32 12:40:34 12:40:35

First I want to focus on the 12:40:37

NIH standards that you cited in your report. 12:40:39 12:40:41
A. Yes. 12:40:42
Q. Has the NIH ever affirmatively asked you to apply those standards to a grant? 12:40:42 12:40:45 12:40:47
MR. KUMAGAI: Objection to form. 12:40:47 12:40:48
A. In evaluating grant proposals, one of the elements of that -- we're frequently asked to evaluate is, you know, are the data going to be maintained, shared, in a proper format. So yeah, our recordkeeping standard is going to be adhered to. That's one of the things that we're tasked with doing. 12:40:48 12:40:51 12:40:56 12:40:58 12:41:02 12:41:05 12:41:09 12:41:11
Q. What grant applications has the NIH tasked you with determining whether they meet these standards? 12:41:13 12:41:15 12:41:19
A. I've worked on biodefense grants, for example. There was a biodefense initiative. That's the one I specifically recall. 12:41:22 12:41:24 12:41:26 12:41:30
Q. So the NIH was giving a grant 12:41:35

DAVID A. SANDERS

through the biodefense initiative? 12:41:38
A. This was a special section on 12:41:42
biodefense under the NIH. And this -- 12:41:46
it's standard for review, grant review 12:41:53
panels to have to comment on 12:41:58
recordkeeping practices of the potential 12:42:01
grantees. 12:42:08
Q. Did you go -- 12:42:09
A. Whether those are in place. 12:42:10
Q. Did you go visit the grantees' 12:42:11
labs to assess? 12:42:15
A. Not in this case, no. 12:42:16
Q. Have you ever on behalf of the 12:42:17
NIH evaluated a grantee's lab? 12:42:19
MR. KUMAGAI: Objection to 12:42:22
form. 12:42:23
A. Yes. 12:42:23
Q. Which lab? 12:42:28
A. These were -- I don't recall. 12:42:29
It was some time ago. It was not about 12:42:38
recordkeeping, it was about are the 12:42:48
facilities adequate for conducting the 12:42:51
research. 12:42:53
Q. Have you ever visited a lab on 12:42:53

DAVID A. SANDERS

behalf of the NIH to evaluate whether -- to evaluate its recordkeeping standards? 12:42:56 12:42:58

A. No. 12:43:00

Q. Do you know if the NIH audited Cassava's compliance with its grants? 12:43:00 12:43:05

A. I do not know. 12:43:10

Q. I want to look at paragraph 38. This is a paragraph where you address CUNY's record retention policies. 12:43:15 12:43:25 12:43:30

Do you see that? 12:43:30

A. I do, yes. 12:43:34

Q. And I presume you looked at CUNY's policies because Dr. Wang worked for CUNY? 12:43:35 12:43:37 12:43:39

A. That is correct. 12:43:40

Q. And CUNY's policy is the records should generally be retained for a period of three years after the research is concluded or otherwise terminated. Is that right? 12:43:40 12:43:44 12:43:46 12:43:48 12:43:50

A. That is correct. 12:43:51

Q. And then in the next paragraph, you cite Cambridge's policy in 39. Is that right? 12:43:51 12:43:54 12:43:58

DAVID A. SANDERS

A. Yes, paragraph 39. 12:44:00

Q. Dr. Wang didn't work at Cambridge; did he? 12:44:02 12:44:05

A. That is correct. 12:44:06

Q. You're not saying that Dr. Wang's lab at CUNY was subject to Cambridge's record retention policies; are you? 12:44:07 12:44:09 12:44:12 12:44:15

A. That is correct. 12:44:15

Q. And then down below at the bottom, paragraph 42, you set your view of how long original data and records should be retained. Is that right? 12:44:15 12:44:19 12:44:24 12:44:26

A. That is correct. 12:44:28

Q. You're not saying that Dr. Wang was subject to your view of how long records should be kept; are you? 12:44:28 12:44:31 12:44:32

MR. KUMAGAI: Objection to form. 12:44:34 12:44:36

A. I am not saying that, yes. 12:44:36

Q. So in terms of determining Dr. Wang's obligations, we would look to paragraph 38 and CUNY's policies. Right? 12:44:38 12:44:44 12:44:46

A. There are formal requirements 12:44:52

DAVID A. SANDERS

and there are requirements which many of us in the field feel exceed that. As I say here, various regulatory requirements are minimum requirements for anyone subject to the regulations. In order to fulfill the purposes of recordkeeping that I have described at the beginning, I believe, paragraph 10. That the primary purpose of good recordkeeping is that the experimenter and present and future members of laboratory can review an experiment and potentially reproduce it. That does not have a time qualification to it. 12:44:57 12:45:01 12:45:06 12:45:10 12:45:13 12:45:16 12:45:18 12:45:27 12:45:32 12:45:34 12:45:36 12:45:38 12:45:41 12:45:45

Again, that is my opinion. But it is widely accepted as the approach to these -- to these issues. 12:45:45 12:45:47 12:45:53

And so there may be legal or internal requirements, that doesn't mean that they are the only requirements that the scientific community sets for itself. 12:45:58 12:46:05 12:46:09 12:46:10

Q. Okay. So for purposes of your opinion, though, you've told me that the relevant standards are set by the NIH, 12:46:22 12:46:25 12:46:27

the FDA, universities and journals. Right? 12:46:29 12:46:32

MR. KUMAGAI: Objection to form. 12:46:32 12:46:33

A. Those are the minimum standards that they set for their formal processes. 12:46:33 12:46:35 12:46:38

Q. Okay. And in terms of the standards that are governing Dr. Wang at CUNY, they would be CUNY's policies. Right? 12:46:39 12:46:41 12:46:44 12:46:47

MR. KUMAGAI: Object to the form. 12:46:47 12:46:48

A. Formal. What formally governs it, not what governs it as a member of the scientific community. 12:46:48 12:46:53 12:46:56

Q. So setting aside all of the requirements that the universities or journals or FDA or NIH have, there is a higher standard for the scientific community in general? 12:47:00 12:47:02 12:47:06 12:47:09 12:47:12

A. That is correct. As described in the report, yes. 12:47:13 12:47:14

MR. KUMAGAI: Scott, I don't 12:47:17

want to cut you off. All the lunch is here, we've been going for about an hour, so whenever you want to break for lunch, we can. Again, I'm not saying it has to be now. 12:47:18 12:47:20 12:47:23 12:47:24 12:47:26

MR. CAMPBELL: That's fine, do you want to take a break? 12:47:32 12:47:33

THE WITNESS: Okay. 12:47:34

THE VIDEOGRAPHER: The time on the video monitor is 12:47 p.m., we off the record. This end media 3. 12:47:35 12:47:36 12:47:42

(A recess was taken.) 12:47:45

DAVID A. SANDERS

A F T E R N O O N S E S S I O N 12:47:45

1:29 p.m. 13:29:49

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 1:29 p.m. This start media 4. 13:29:49 13:29:50 13:29:52 13:29:55

DAVID A. SANDERS, resumed, having been previously duly sworn, was examined and testified further as follows:

CONTINUED EXAMINATION

BY MR. CAMPBELL: 13:29:58

Q. Welcome back. 13:29:58

I want to go back to looking at your report. You have a copy. 13:29:59 13:30:02

A. Yes. 13:30:03

Q. And I want to look starting at paragraph 45 on page 11. 13:30:04 13:30:07

A. Yes. 13:30:12

Q. So this is a section, a subsection C entitled "Recordkeeping standards and practices for immunoblot experience." Is that correct? 13:30:13 13:30:17 13:30:21 13:30:25

A. Yes, that is correct. 13:30:26

DAVID A. SANDERS

Q. And paragraph 45, is a paragraph and then two subsections 1 and 2. Is that right? 13:30:27 13:30:30 13:30:32
A. Yes. 13:30:33
Q. And this paragraph has no citations in it. Right? 13:30:34 13:30:38
A. That is correct. 13:30:40
Q. So these are all your own words and ideas? 13:30:40 13:30:42
A. Yes. 13:30:44
Q. Paragraph 46 has a substantive paragraph at the top and then three subparagraphs. Is that right? 13:30:44 13:30:52 13:30:54
A. Yes. 13:30:55
Q. And there are no citations for this paragraph either. Right? 13:30:56 13:30:58
A. That is correct. 13:31:00
Q. So these are all your own words and ideas? 13:31:00 13:31:02
A. Yes. In the sense that they summarize generally accepted approaches to these issues. 13:31:03 13:31:08 13:31:11
Q. But you're not drawing from any specific literature? 13:31:12 13:31:15

DAVID A. SANDERS

A. I am not. 13:31:16

Q. There is no particular author or group of authors that you would cite for this information? 13:31:17 13:31:20 13:31:23

A. No. 13:31:24

Q. So these are ideas that you've developed? 13:31:27 13:31:29

MR. KUMAGAI: Objection to form. 13:31:31 13:31:32

A. These are ideas that I adhere to in my own work. They are generally accepted standards in the field. You can see variations of these descriptions in the literature. But these are ones that I formulated in the sense that are presented in the report on my own. 13:31:33 13:31:37 13:31:42 13:31:46 13:31:50 13:31:52 13:31:57

Q. So when you say there are variations of these in the literature, what do you mean? 13:31:59 13:32:02 13:32:05

A. I mean there are numerous articles available online where people describe how you should do immunoblots and so on. I did not base mine on any particular one. But I did look at them 13:32:07 13:32:10 13:32:13 13:32:19 13:32:23

DAVID A. SANDERS

just to see if there was something that I missed or something like that that perhaps should be included. But these are -- this is my own formulation. 13:32:28 13:32:30 13:32:33 13:32:35

But, you know, you learn over time, and these are, I think most people in the field, this is sort of a standard approach to how one would conduct immunoblots. 13:32:38 13:32:44 13:32:48 13:32:51 13:32:54

Q. What I'm trying to determine is, is this your own view of how immunoblots should be done? 13:32:55 13:32:56 13:33:03

A. Yes. 13:33:04

Q. And it's not relying on anyone else in the field? 13:33:04 13:33:06

A. It is not. 13:33:07

Q. And you're not citing to any standards for the field in how to do this? 13:33:08 13:33:10 13:33:12

A. That is correct. 13:33:13

Q. This is just the way you think it should be done? 13:33:14 13:33:15

MR. KUMAGAI: Objection to form. 13:33:17 13:33:17

DAVID A. SANDERS

A. Again, these are commonly accepted principles for how immunoblots should be conducted. And I think in virtually every one of these instances, if they were conducted -- if the records were not maintained in the same way or the experiments were not described in the same way, people would find that substandard. 13:33:18 13:33:20 13:33:24 13:33:26 13:33:29 13:33:32 13:33:34 13:33:36 13:33:42

Q. I guess what I'm asking you is, when you say something like if stripping and reprobing is performed, then the order of antibody incubation must be described. 13:33:43 13:33:48 13:33:54 13:33:56 13:33:59

A. Yes. 13:34:01

Q. That's your view? 13:34:01

A. That is my view. It is almost impossible to be able to accurately interpret the results if that is not adhered to. 13:34:03 13:34:05 13:34:08 13:34:10

Q. And you're not relying on some industry standard or some other academic or any literature in reaching that conclusion? 13:34:11 13:34:13 13:34:15 13:34:17

DAVID A. SANDERS

MR. KUMAGAI: Objection to form. 13:34:18 13:34:19

A. No, I'm not relying upon that, no. 13:34:19 13:34:22

Q. Okay. And the same for all of these points in paragraphs 45 to 46, they're just your view? 13:34:22 13:34:24 13:34:27

MR. KUMAGAI: Objection to form. 13:34:29 13:34:30

A. Yes. 13:34:30

Q. So for example, then in paragraph 47, you say data processed by Adobe Photoshop or presented in a PowerPoint slide are never the primary data. 13:34:31 13:34:33 13:34:39 13:34:41 13:34:43

Do you see that? 13:34:43

A. Yes. 13:34:44

Q. That is your view; right? 13:34:44

A. No, that's a statement of fact. Processed data are not the primary data. That's a statement of fact. 13:34:45 13:34:47 13:34:49

Q. Is there a citation for that statement of fact? 13:34:51 13:34:55

A. It doesn't require a citation. 13:34:57

DAVID A. SANDERS

I will tell you that if you looked at many journals, they will state that explicitly. But this is just -- this is just a simple statement of fact. When -- one can't regard data that's been processed by an image processing system as original data. That's just not -- that's a contradiction. 13:35:00 13:35:03 13:35:06 13:35:09 13:35:16 13:35:18 13:35:21 13:35:24

Just the same thing, a PowerPoint slide, you do not get -- an image is never originally created as a PowerPoint slide. You actually -- you always have to import an image into PowerPoint in order for it to be in PowerPoint. 13:35:26 13:35:27 13:35:31 13:35:34 13:35:36 13:35:39 13:35:42

So it cannot be the primary data. 13:35:44 13:35:46

Q. So let me ask you this question then: So the next sentence says, a digital photograph or a membrane or film may be considered as the primary data for storage in a digital format. Right? 13:35:47 13:35:49 13:35:51 13:35:54 13:35:56 13:36:00

A. Correct. 13:36:00

DAVID A. SANDERS

Q. So a digital photo can be primary data? 13:36:01 13:36:03
A. A digital photo can be primary data, right. But Photoshop and PowerPoint are not digital photos. 13:36:04 13:36:07 13:36:10
Q. I'm coming to that. 13:36:13
A. Okay. 13:36:14
Q. If I take that digital photo and I attach it to an email. 13:36:15 13:36:17
A. Yes. 13:36:19
Q. And I send it to the journal. 13:36:19
A. Yes. 13:36:21
Q. That's still primary data? 13:36:21
A. No, not necessarily. 13:36:23
Q. Because I attached it to the email? 13:36:24 13:36:26
A. It depends on the form how you attached it. 13:36:26 13:36:28
Q. In a JPEG? 13:36:30
A. Oh, it's a JPEG. That may be considered primary data, yes. 13:36:32 13:36:34
Q. So if I email a JPEG to the journal. 13:36:36 13:36:39
A. Yes. 13:36:40

DAVID A. SANDERS

Q. Then it can be primary data? 13:36:40
A. Yes. There are caveats, but yes. 13:36:42 13:36:45
Q. What are the caveats? 13:36:45
A. The caveats are that as images get copied, there are potential image corruption, data compression issues that occur. 13:36:46 13:36:51 13:36:54 13:36:57
Q. Okay. So if I take that same image that I emailed to the journal. 13:36:57 13:37:02
A. Yes. 13:37:04
Q. And I put it in a PowerPoint presentation. 13:37:04 13:37:06
A. Yes. 13:37:06
Q. And I send be it to the journal. 13:37:07 13:37:09
A. Yes. 13:37:09
Q. Then it's no longer primary data? 13:37:10 13:37:11
A. That is correct. 13:37:12
Q. Because it's been put in PowerPoint? 13:37:12 13:37:14
A. That's right. 13:37:14
Q. Is it your experience that 13:37:14

journals reject anything sent to them in PowerPoint? 13:37:17 13:37:19

A. It is, again, according to their standards, they are supposed to now, yes. 13:37:19 13:37:25 13:37:27

Q. What standards? 13:37:27

A. The standards that they state, if you look at some of the journal's instructions to authors. 13:37:29 13:37:31 13:37:33

Q. You don't cite any of those journal's instructions here; do you? 13:37:34 13:37:37

A. No. Because again, my statement is about the fact that they are not primary data. Not about what may or may not be submitted to a journal. 13:37:38 13:37:40 13:37:41 13:37:46

Q. Well, I guess what I'm looking for is, would it be wrong for a journal to accept a PowerPoint slide of images as primary data? 13:37:48 13:37:50 13:37:52 13:37:57

A. As primary data, the answer is yes. 13:37:59 13:38:02

Q. Is there -- is that set out anywhere? 13:38:03 13:38:06

A. They may not say -- the 13:38:08

DAVID A. SANDERS

journals may not use the term primary data, or what they do do is some of them say you're not supposed to submit it as a PowerPoint slide. 13:38:12 13:38:14 13:38:18 13:38:21

And if there is a question about what do the primary data look like, it won't be a PowerPoint slide, it will be the original data in the form in which it was collected. A film or sometimes a digital image, depending upon the experiment that we're discussing. 13:38:24 13:38:25 13:38:28 13:38:30 13:38:33 13:38:37 13:38:40

Q. So if a journal asks for your original data. 13:38:42 13:38:49

A. Yes. 13:38:50

Q. And you sent them a PowerPoint slide. 13:38:50 13:38:53

A. Yes. 13:38:54

Q. And they accept that and do their analysis based on it, has the journal violated the industry standards? 13:38:54 13:38:56 13:38:59

A. The current industry standards, yes. 13:39:02 13:39:04

Q. When did the current industry standards come into place? 13:39:05 13:39:06

DAVID A. SANDERS
A. Oh, I don't know, fifteen, twenty years ago. It depends upon the journal. Different journals have different standards. 13:39:07 13:39:10 13:39:13 13:39:16
Q. So that's a different question. That's what I'm driving at. 13:39:16 13:39:18
A. Well, you asked me a time. And there is no -- they don't all, you know, it's not a monopoly. They all have their own different standards. And when they adopt different things depends upon the particular journal and the time. 13:39:19 13:39:21 13:39:26 13:39:31 13:39:33 13:39:35
Q. So the particular journals get to choose what standards they're going to follow? 13:39:38 13:39:40 13:39:43
A. Yes, for this particular issue, yes. 13:39:44 13:39:49
Q. So it wouldn't be a -- there is nothing necessarily wrong with a particular journal deciding to look at data in PowerPoint? 13:39:49 13:39:53 13:39:55 13:39:58
MR. KUMAGAI: Objection to form. 13:39:58 13:39:59
A. So once again, I'm trying to 13:39:59

distinguish between what is published, what the journal uses to publish, and what primary data are. Those are two distinct entities. 13:40:01 13:40:04 13:40:06 13:40:08

A journal, at this point, at some point in the past, may accept for publication images that are not primary data. And they frequently -- they frequently do. But that doesn't mean that it's the primary data. 13:40:10 13:40:13 13:40:15 13:40:18 13:40:20 13:40:22

Q. I see. 13:40:23

So in your view if the JPEG is copied over into a PowerPoint, it's no longer the primary data, period. Right? 13:40:24 13:40:29 13:40:32

A. That's correct. You just copied it from one program to another. 13:40:36 13:40:37

Q. But whether the journal decides to accept that data in that form as sufficient for its purposes -- 13:40:40 13:40:42 13:40:45

A. Yes. 13:40:48

Q. -- is a different question? 13:40:48

A. That is correct. 13:40:49

Q. And it would be okay for a journal to accept data in that form for 13:40:50 13:40:52

its purposes? 13:40:55
A. Okay? What do you mean by "okay"? 13:40:56 13:40:59
Q. So you're the scientific integrity expert. Right? 13:41:00 13:41:04
A. Yes. 13:41:05
Q. So for purposes of determining what's publishable. 13:41:05 13:41:07
A. I would -- and most journals, most credible journals adhere to this standard. They want both a primary image, and then what actually appears in the main text of the article may be, you know, a processed image. But they normally require a -- some primary data. And that frequently will wind up in supplementary material. And then they'll have some processed image included in the main text. 13:41:09 13:41:12 13:41:15 13:41:20 13:41:22 13:41:25 13:41:28 13:41:32 13:41:35 13:41:37 13:41:41
Q. But that's at the discretion of the journal; right? 13:41:42 13:41:45
A. It is at the discretion of the journal, yes. 13:41:46 13:41:49
Q. Are there any FDA requirements 13:41:49

DAVID A. SANDERS

that you're aware of regarding primary data and images? 13:41:51 13:41:54

A. I am not aware that the FDA is -- could you rephrase -- they're not -- are we talking about an FDA journal? What are we talking about, FDA submissions? 13:42:01 13:42:09 13:42:13 13:42:15 13:42:17

Q. No, I'm trying to stay within the bounds of your report. 13:42:18 13:42:21

A. Yeah. 13:42:22

Q. So I'm trying to figure out who the authoritative bodies are who dictate recordkeeping standards. And you listed as the ones that were relevant to your report as the FDA, the NIH, universities and journals. Right? 13:42:23 13:42:24 13:42:27 13:42:31 13:42:33 13:42:37

MR. KUMAGAI: Objection to form. 13:42:40 13:42:42

A. Yes. 13:42:43

Q. And so we were just dealing with journals, and it's at their discretion. So the series of questions that I'm going to ask you now is whether there are separate requirements around 13:42:43 13:42:45 13:42:47 13:42:49 13:42:52

DAVID A. SANDERS

this primary data issue from NIH, FDA, and universities. And so that was my first question is, are there any regulations or rules or particular standards implemented by the FDA as to what constitutes primary data? 13:42:53 13:42:58 13:43:00 13:43:04 13:43:09 13:43:13

A. In paragraph 25, we discuss, I think, the FDA description of raw data. Which I have posited is equivalent to original data. And it says, laboratory worksheets, records, memoranda, notes or exact copies thereof that are the result of original observations and activities of a nonclinical laboratory study and are necessary for the reconstruction and evaluation of the report of that study. In the event that exact transcripts of raw data have been prepared, the exact copy or exact transcript may be substituted for the original source as raw data. 13:43:16 13:43:20 13:43:24 13:43:29 13:43:37 13:43:50 13:43:53 13:43:56 13:44:01 13:44:02 13:44:06 13:44:09 13:44:11 13:44:14 13:44:16

So the criteria here are the original -- the original things or exact copies. What's imported into Adobe 13:44:17 13:44:21 13:44:26

DAVID A. SANDERS

Photoshop or what's imported into 13:44:31
PowerPoint is not an exact copy. 13:44:36
Q. So the next sentence of what 13:44:44
you're reading says, raw data may include 13:44:46
photographs, microfilm or microfiche 13:44:49
copies. Is that right? 13:44:53
A. Yes. 13:44:54
Q. Computer printouts, magnetic 13:44:54
media, included dictated observations and 13:44:57
recorded data from automated instruments. 13:45:01
Is that right? 13:45:03
A. That's correct. 13:45:03
Q. Does this speak to whether you 13:45:04
can put the photo into a PowerPoint? 13:45:06
A. By definition, the answer is 13:45:09
yes, it does. It's not an exact copy. 13:45:13
Q. Because something transferred 13:45:20
in the photo when you put it into 13:45:22
PowerPoint? 13:45:25
A. Yes. 13:45:25
Q. What changed? 13:45:27
A. Well, as I said, there are 13:45:28
data issues when you transfer from one 13:45:31
program to another, what's retained. 13:45:33

DAVID A. SANDERS

There is sometimes metadata present in images and so on. 13:45:37 13:45:43

One, in the case of, for example, of an immunoblot, there is an original film that exists. A photograph of that film is not an exact copy of the film. And certainly a photograph which is transported into PowerPoint is not an exact copy of the film. 13:45:45 13:45:48 13:45:51 13:45:53 13:45:57 13:46:01 13:46:05

Q. So taking a digital photo of a film and storing that as your record of the procedure you conducted is a violation of FDA standards, in your view? 13:46:07 13:46:10 13:46:15 13:46:17

A. It is not original or raw data. 13:46:20 13:46:23

Q. As defined by the FDA? 13:46:23

A. As defined by the FDA. As defined -- yes. 13:46:25 13:46:27

Q. Okay. And you spoke a little bit about changes in the metadata. Why is that significant? 13:46:28 13:46:30 13:46:34

A. In many cases metadata, when something, when the experiment occurred, right. That information's going to be 13:46:35 13:46:40 13:46:42

DAVID A. SANDERS

lost when it's transported into -- when it's transported into PowerPoint. It depends upon what the actual image is and so on. But a lot of -- you know, it tells you what machine is taking the data, when it was taken, the conditions it was taken under. That can be present, for example, in an -- associated with a micro -- a micrograph, things like that. It depends upon how the data were exported and so on. 13:46:44 13:46:47 13:46:52 13:46:54 13:46:57 13:46:59 13:47:01 13:47:04 13:47:07 13:47:13 13:47:16

But some of that information will be lost in the transmission from the -- one image to when it's exported to another program. 13:47:18 13:47:19 13:47:27 13:47:30

Q. Okay. And so if you export data and it changes the metadata that showed that information you were just describing, then it's no longer the raw data? 13:47:30 13:47:33 13:47:38 13:47:39 13:47:42

A. That's correct. 13:47:42

Q. And so in your view it would no longer be the proper source for comparison to determine whether or not 13:47:42 13:47:44 13:47:49

DAVID A. SANDERS

the images are what they say they are? 13:47:51

A. That's right. 13:47:53

MR. KUMAGAI: Objection to form. 13:47:54 13:47:55

A. When -- 13:47:55

THE WITNESS: I'm sorry? 13:47:56

MR. KUMAGAI: I'm just objecting to form. Just give me a second before you answer. 13:47:57 13:47:58 13:48:00

THE WITNESS: That's why I paused, I heard you speak, so I decided not to. 13:48:01 13:48:02 13:48:05

A. Again, it depends upon the nature of the data whether there are going to be metadata present. But there is -- as an image is copied in other programs, there is data loss and data changes that occur. So they cannot be, just by definition, the original raw data. 13:48:06 13:48:08 13:48:09 13:48:11 13:48:15 13:48:18 13:48:21 13:48:23

Q. Okay. So when you change the metadata, it's not the raw data? 13:48:24 13:48:28

A. That's right. As I've stated for recordkeeping, an important part of 13:48:30 13:48:32

DAVID A. SANDERS

recordkeeping is that the date is described, the conditions are described. Those are frequently present in metadata. And they are lost when copying occurs. 13:48:35 13:48:37 13:48:41 13:48:45

So that information, which is an essential part of what the data are, the data include when it was gathered, the conditions when it was gathered. Those are all essential to the data themselves. 13:48:49 13:48:51 13:48:53 13:48:56 13:48:58 13:49:02

I could refer -- I'm pretty sure I describe this in the report. 13:49:05 13:49:07

Well, I refer to NIH standards where this is discussed. 13:49:19 13:49:26

Q. That is helpful. 13:49:32

So now I want to turn back to paragraph 48. 13:49:34 13:49:36

MR. KUMAGAI: Page 12? 13:49:41

MR. CAMPBELL: Yeah. 13:49:42

Q. So here you say, supplying a processed image rather than a direct photograph of an entire membrane or film as an original uncropped blot is a violation of scientific norms and a form 13:49:44 13:49:46 13:49:48 13:49:52 13:49:55

of falsification of the literature. Is that right? 13:49:58 13:50:00

A. Yes, I see that. 13:50:00

Q. And again, there is not a citation for this; right? 13:50:01 13:50:03

A. There is no citation. 13:50:04

Q. So that means it's your own idea. Right? 13:50:06 13:50:08

A. Yes. 13:50:10

Q. You're not referencing literature or particular industry standards for this? 13:50:12 13:50:14 13:50:17

MR. KUMAGAI: Objection to form. 13:50:17 13:50:19

A. I believe it's a function of the English language. But I don't know of where this precisely would be formulated in this sentence. 13:50:19 13:50:27 13:50:30 13:50:33

Q. And all I'm asking here is, if you were attributing -- if you were taking this idea from someone else, from some other source, you would have cited it? 13:50:35 13:50:37 13:50:39 13:50:41 13:50:44

A. That is correct. 13:50:44

DAVID A. SANDERS

Q. So when you say it's a violation of scientific norms in the forms of falsification of the literature, that is your view? 13:50:44 13:50:46 13:50:49 13:50:52

A. That is correct. 13:50:52

Q. And you're not citing some other standard from NIH or FDA or a journal or university for that? 13:50:53 13:50:55 13:50:58

A. I am not. 13:51:00

Q. And here you say, you suggest that a direct photograph of an entire membrane or film could be the original data, are you not? Or is that not what you're saying? 13:51:04 13:51:08 13:51:10 13:51:15 13:51:17

MR. KUMAGAI: Objection to form. 13:51:18 13:51:19

A. That can be. So for example, a direct photograph of an entire membrane, as I mentioned, the -- when we're talking about a staining of membranes, the image can fade with time. And so one wants to create a photograph, perhaps digital photograph, of that membrane as soon as possible because 13:51:19 13:51:21 13:51:23 13:51:27 13:51:29 13:51:33 13:51:40 13:51:42

DAVID A. SANDERS

those membranes can degrade with time. 13:51:44
And so if one wanted to retain 13:51:47
a record, that's the best -- that's the 13:51:50
best option available. But it needs to 13:51:53
be an image of, as it says, the uncropped 13:51:56
blot, right, uncropped. That's, if one 13:52:01
is describing something as an original 13:52:06
uncropped blot, it means the entire film 13:52:08
or membrane or something like that. 13:52:13
That's what uncropped means. 13:52:15
Q. So a digital photograph of an 13:52:18
original film can be the primary data? 13:52:20
A. So this is direct photograph 13:52:28
of an entire membrane or film. So it 13:52:31
can -- it can be original uncropped blot, 13:52:36
okay. It is not really the original 13:52:40
data. But it is, I was really dealing 13:52:44
with the question of what does 13:52:47
"uncropped" mean. And uncropped means 13:52:49
entire. It means uncropped. You cannot 13:52:51
supply a processed image that is missing 13:52:55
a number of the elements that I've 13:52:58
described here as uncropped. I'm 13:53:00
specifically addressing the issue of what 13:53:03

DAVID A. SANDERS

does "uncropped" mean. 13:53:05

Q. Is a photo of a film original data? 13:53:07 13:53:14

A. No. What I'm addressing is the issue uncropped. I'm not saying that if you supply the image then it is original. What I'm addressing is the question of uncropped. And that is that you have to have the entire membrane. 13:53:16 13:53:20 13:53:23 13:53:26 13:53:28 13:53:31

So to call something uncropped, when it is not uncropped, is a violation of scientific norms and a form of falsification of the literature. 13:53:33 13:53:35 13:53:38 13:53:41

Q. Well, in the next paragraph you seem to be describing an important distinction between original images and processed images. Right? 13:53:43 13:53:45 13:53:46 13:53:49

A. Correct, yes. 13:53:51

Q. So if you take a photo of a membrane that is not processed, is that original data? 13:53:52 13:53:55 13:54:01

A. If it is of a membrane and there is no other way to preserve it, the answer would be yes. For a film, the 13:54:04 13:54:07 13:54:10

DAVID A. SANDERS

film are the original data. 13:54:14

There are constraints upon, 13:54:17 you know, recordkeeping, which have to be 13:54:20 acknowledged. And one of them is that 13:54:22 membranes degrade with time. And so in 13:54:26 order to have a record of that, it is 13:54:28 important to generate a film as soon as 13:54:29 possible. 13:54:34

So that's as close as you will 13:54:34 be able to get to original data retained. 13:54:36 Again, the point of the original 13:54:41 uncropped blot, the violation, the 13:54:43 violation is to refer to something that 13:54:48 does not show the entire membrane as 13:54:51 uncropped. 13:54:53

I'm concerned about uncropped 13:54:55 in this paragraph. 13:54:56

Q. I'm looking at the next 13:54:58 paragraph on the distinction between 13:54:59 original and processed images. 13:55:01

A. Sure, yes. So the point of 13:55:04 this is, as it says, to be noted that 13:55:05 whereas membranes can prove to be fragile 13:55:08 over time, the images on films can be 13:55:11

DAVID A. SANDERS

reasonably stable for at least a decade. So therefore they always must be preserved. 13:55:14 13:55:16 13:55:18

Preservation of an image on film, it absolutely needs to be preserved in that form as film. It is not original data -- because we have, we have access to a type of data which can be preserved over time. Which, as I mentioned for membranes, because they are fragile, that cannot. So the best we can do there is to take an image. That's not true for -- that's not true for films. 13:55:18 13:55:21 13:55:24 13:55:26 13:55:29 13:55:32 13:55:34 13:55:37 13:55:39 13:55:42

And the other point is that, I say there is an important distinction between original images and processed images and the originals need to be preserved unaltered. 13:55:43 13:55:48 13:55:49 13:55:52 13:55:54

Q. The original images? 13:55:56

A. Yes. 13:55:57

Q. And the images are the pictures? 13:55:58 13:55:59

A. No. Images includes the film. Film is -- what's on the film is an image 13:56:00 13:56:02

DAVID A. SANDERS

of the experiment. 13:56:05

Q. And so if films are stable for a decade? 13:56:05 13:56:08

A. Yes. 13:56:10

Q. Or at least a decade. Should you take a picture of the film to preserve it in case you need it for more than a decade? 13:56:10 13:56:12 13:56:14 13:56:16

A. Absolutely you should be -- you should be taking a film. And that should be included in your notebook, along with the original film. Absolutely. And it should be dated and labeled along with the original film. Absolutely. 13:56:17 13:56:19 13:56:22 13:56:24 13:56:26 13:56:28 13:56:31

Q. And if you take a picture of the film, and say ten years later there is an investigation of your publication. And you submit that as the original data. Is that falsification of the literature? 13:56:32 13:56:35 13:56:42 13:56:44 13:56:47

A. Again, the issue I'm trying to address is uncropped. That's the falsification issue that I am addressing here. 13:56:49 13:56:51 13:56:55 13:56:58

DAVID A. SANDERS

And if one doesn't -- cannot present something as uncropped when it has been cropped, when it is not showing the entire image. That is the falsification to which I am referring here. 13:56:59 13:57:02 13:57:04 13:57:06 13:57:08 13:57:10

Q. And I'm trying to fully understand your opinion. So I'm asking a separate question. 13:57:11 13:57:12 13:57:14

Which is, if you send an original photo that you took of a film. 13:57:15 13:57:17

A. Yes. 13:57:22

Q. And you send it to a journal as original data. Is that a form of falsification for literature? 13:57:22 13:57:25 13:57:28

A. You should still have the film available to you. And you can say this is what I took at the time. This is what the film looks like now. If you don't do that, it's hard to verify that the image that you took is the correct image. Because I don't know what this -- I mean, if you took an image that showed the full film, showed it as film, and then you can 13:57:29 13:57:31 13:57:35 13:57:37 13:57:39 13:57:46 13:57:48 13:57:50 13:57:53

DAVID A. SANDERS

show with your date and time I'm taking an image of that same film now, and this is what it looks like, there can be a reasonable inference that that earlier photograph represents, to the best ability possible, that original thing. 13:57:57 13:58:00 13:58:03 13:58:05 13:58:10 13:58:12

In the absence of an image of that original film, it's hard to be able to make that adjust -- that assessment that it is in fact representative of the original data. 13:58:14 13:58:17 13:58:20 13:58:24 13:58:26

Q. Is it being hard to make that assessment the same as falsifying the literature? 13:58:26 13:58:28 13:58:31

A. It depends upon the situation. It depends upon the situation. Because when one is using -- if it was just randomly saying I've got this image, that's one thing. But if one is trying to say oh, I've got this image and therefore it proves that this other falsification or fabrication or whatever, has not occurred, then it can be a form of falsification, absolutely. 13:58:32 13:58:35 13:58:37 13:58:40 13:58:45 13:58:48 13:58:51 13:58:55 13:58:57 13:58:59

DAVID A. SANDERS

Q. Do you need to send the original film to the journal? 13:59:01 13:59:12

A. That is not the standard. 13:59:14

Q. You can take a picture of the film and send it? 13:59:18 13:59:20

A. That's correct, you can take a picture of the film. But it has to be of the film, not of some -- again, there is no processing, it's just of the actual film. 13:59:21 13:59:22 13:59:24 13:59:27 13:59:30

Q. So the unprocessed image of the film is -- 13:59:32 13:59:35

A. Complete. I mean, again, the description that I was particularly addressing is, I'll put on my glasses again, I'm sorry, original uncropped blot. If one maintains, in this sort of situation, there is a question about an image, you have been asked to supply an original uncropped blot, if you do not supply an image of the entire uncropped blot and claim that this is the original uncropped blot, that is a falsification of the literature. 13:59:36 13:59:38 13:59:39 13:59:43 13:59:46 13:59:53 13:59:55 13:59:59 14:00:04 14:00:07 14:00:10 14:00:13

DAVID A. SANDERS

Q. Are there indicia on the photo as to whether it's an original uncropped blot? 14:00:14 14:00:18 14:00:21

MR. KUMAGAI: Objection to form. 14:00:21 14:00:22

Q. Do you understand my question? 14:00:22

A. Yes. 14:00:23

Q. Okay. 14:00:24

A. So for example, one has a -- I describe this in the report. Let's see if I can find it readily. I think it's in one of the appendices. 14:00:25 14:00:30 14:00:34 14:00:50

Q. You are looking at your appendix A on immunoblots? 14:01:13 14:01:15

A. Yes, and I'm looking at part C. Immunoblot data must be collected and presented at the highest resolution possible, labeled appropriately, and presented with minimal image manipulation. 14:01:17 14:01:19 14:01:25 14:01:27 14:01:29 14:01:30

I do cite an article from Rosner, this is widely regarded as a standard in the field, in section 32. Is that right? 14:01:31 14:01:34 14:01:38 14:01:40

DAVID A. SANDERS

MR. KUMAGAI: Paragraph 32. 14:01:42

A. Paragraph 32, in section C. 14:01:43
In appendix A. Where it describes the 14:01:45
standard. 14:01:50

So I do cite that. And I am 14:01:50
familiar with those standards. And there 14:01:52
is no doubt that things that are 14:01:56
mentioned in this article are taken into 14:01:59
my thinking, even though I did not, you 14:02:01
know, what I wrote was not necessarily a, 14:02:05
you know, a copy of this or anything like 14:02:08
that. 14:02:10

Here's an example. A lane 14:02:11
containing molecular weight markers must 14:02:15
be included on all gels and the migration 14:02:24
position of those proteins must be 14:02:28
indicated in the image of the immunoblot. 14:02:31
That is part of an uncropped blot. If 14:02:35
it's not present, it's not an uncropped 14:02:38
blot. 14:02:40

Q. I'm interested in where you're 14:02:42
going with this, so I don't want to cut 14:02:43
you off. I do have several questions so 14:02:45
far with what you said. 14:02:48

DAVID A. SANDERS

A. I'll stop right there. 14:02:49

Q. In the first paragraph you cited, you describe -- 14:02:50

MR. KUMAGAI: Sorry, Scott? 14:02:53

MR. CAMPBELL: 31 in the appendix. 14:02:55

Q. You said, immunoblot data must be collected and presented at the highest resolution possible, labeled appropriately and presented with minimal image manipulation. Is that right? 14:02:57

A. Yes. 14:03:08

Q. So some image manipulation is acceptable? 14:03:08

A. Just taking the photograph is a form of image manipulation. It is not the original data. 14:03:12

Q. So what you meant by "presented with minimal image manipulation" is taking the photo? 14:03:18

A. What I mean is presenting a photo that is not further manipulated, yes. 14:03:23

Q. Is that what Rosner and Yamada 14:03:33

DAVID A. SANDERS

say? 14:03:36

A. Oh, yes. 14:03:36

Q. And then down below, you describe, you were talking about this lane containing molecular weight markers. Right? 14:03:38 14:03:42 14:03:45 14:03:48

A. Yes. 14:03:49

Q. And when you take that photo, when you send it in, the journal will be able to tell whether the molecular weight markers are there; right? 14:03:49 14:03:51 14:03:53 14:03:55

A. Yes, they will. 14:03:57

Q. Because that's apparent from the face of the photo? 14:03:58 14:03:59

A. Yes. 14:04:00

Q. So they can then exercise their discretion whether or not to accept that, the image as sufficient for their purposes? 14:04:00 14:04:02 14:04:04 14:04:06

A. That is correct. 14:04:07

Q. Now, working back to the sections on immunoblots analyze experiments at paragraphs 45 all the way through 53. Which is the section on 14:04:07 14:04:16 14:04:22 14:04:24

DAVID A. SANDERS

recordkeeping for ELISA experiments. 14:04:28
Do you see that? 14:04:28
A. Yes. 14:04:33
MR. KUMAGAI: We are back on 14:04:34
page 11 of the report? 14:04:35
MR. CAMPBELL: 11 to 15. 14:04:36
Q. There are no citations for any 14:04:39
of the statements in these sections. 14:04:42
Right? 14:04:43
A. 45 to? 14:04:44
Q. 53. 14:04:48
A. 53. Yes, that is correct. 14:04:49
Q. So these are -- this is all 14:04:53
your original thought and writing? 14:04:55
A. That is correct. 14:04:57
MR. KUMAGAI: Objection. 14:04:58
Q. It's not relying on other 14:04:58
authors in the literature or other 14:05:02
industry standards? 14:05:04
A. No. 14:05:08
Q. No, it's not relying? 14:05:10
A. It is not relying. 14:05:12
Q. I just have a couple of more 14:05:15
questions on Form 483, I think I already 14:05:19

DAVID A. SANDERS
know the answer based on earlier. 14:05:23
But do you know how many Form 14:05:24
483s the FDA issues in a year? 14:05:28
A. I do not. 14:05:30
Q. Do you know if it's more than 14:05:31
a hundred? 14:05:33
A. I do not know. 14:05:33
Q. Do you know if it's thousands? 14:05:34
A. I do not know. 14:05:35
Q. Do you know how many Form 483s 14:05:36
the FDA issues to drug companies? 14:05:39
A. I do not know. 14:05:41
Q. I want to jump then next to 14:05:42
paragraph 100 in your report. And 14:05:51
actually just to tie that out real quick. 14:06:04
Do you know whether the FDA's 14:06:07
issuance of a Form 483 is equivalent to a 14:06:09
charge of research misconduct? 14:06:12
A. My understanding is that it is 14:06:15
not. 14:06:17
Q. Do you know whether it's 14:06:20
equivalent to an allegation of fraud? 14:06:27
A. My understanding is that it is 14:06:28
not. 14:06:31

DAVID A. SANDERS

Q. All right. 14:06:31
Now turning to 100. This is where you're addressing a potential lack of availability of data for journals to evaluate articles. Do you recall that? 14:06:33 14:06:39 14:06:42 14:06:45
A. I'm sorry, could you repeat the question, please? 14:06:48 14:06:50
Q. Yeah. I'm just trying to put you in context in your piece. So this is section E, addressing research integrity concerns. 14:06:51 14:06:53 14:06:55 14:06:59
A. Yes. 14:06:59
Q. And in paragraphs 100 and 101 and 102, you're addressing the potential lack of evidence for journals to conduct their investigations. 14:07:00 14:07:02 14:07:05 14:07:07
A. Yes. 14:07:09
Q. And you opine that certain journals, including the Journal for the Prevention of Alzheimer's Disease and Neurobiology of Aging, were lacking in evidence for their investigations. Is that fair? 14:07:09 14:07:14 14:07:17 14:07:19 14:07:25 14:07:27
A. What I believe what I say here 14:07:29

DAVID A. SANDERS

is that just because a journal has -- I think I wrote it clearly. The language used by JPAD in its conclusion indicates that the investigation was constrained in its fact-finding abilities and it does not amount to a finding that no research misconduct occurred. That's my opinion. 14:07:37 14:07:45 14:07:48 14:07:51 14:07:53 14:07:55 14:07:58

Q. So I want to build on that opinion so I understand the bases for that. 14:08:00 14:08:03 14:08:04

So in paragraph 100, you say, "Lack of readily available evidence to prove or refute research integrity concerns often leads investigator bodies to avoid making formal findings of research misconduct." Right? 14:08:05 14:08:09 14:08:11 14:08:14 14:08:16 14:08:19

A. Yes. 14:08:21

Q. Then you say, "In my view this appears what to have been the case with several of the scientific journals that address research integrity concerns in papers authored by Dr. Wang and Dr. Burns." Right? 14:08:21 14:08:23 14:08:26 14:08:28 14:08:31 14:08:35

A. That's correct. 14:08:35

DAVID A. SANDERS

Q. So you're addressing an inability to make formal findings because of a lack of evidence. Is that right? 14:08:36 14:08:38 14:08:40

A. I'm sorry, could you just repeat that? 14:08:42 14:08:43

Q. Yeah, I'm trying to make sure I understand this by putting it in my own words. And if my own words do not represent the issue correctly I want you to tell me what I'm getting wrong. 14:08:43 14:08:46 14:08:48 14:08:50 14:08:52

What you're describing here is that journals are avoiding making formal findings of research misconduct because they lack evidence. Is that right? 14:08:54 14:08:55 14:08:58 14:09:00

A. That is a big -- in these particular cases, that seems to be what they are -- you know, an important part of what they're saying, yes. 14:09:01 14:09:05 14:09:11 14:09:13

Q. And you say, this opinion is based on my experience with similar investigations and my review of the language used by the journal editors. Right? 14:09:14 14:09:17 14:09:19 14:09:21 14:09:24

A. Correct. 14:09:24

DAVID A. SANDERS

Q. What similar investigations are you referencing? 14:09:25 14:09:27

A. I have looked into hundreds of papers. Discussed articles with -- exchanged, discussed as in through electronic means, with dozens of editors. I have also been involved in a major university investigation. And I have read about other investigations as well. 14:09:28 14:09:36 14:09:41 14:09:44 14:09:49 14:09:55 14:10:00

And it's a simple thing that when there is insufficient evidence to make a decision, many of these institutions will decide that they don't have the evidence to make a particular conclusion. They are not concluding that there was no misconduct. They are concluding they don't have the evidence that there is misconduct. 14:10:04 14:10:10 14:10:13 14:10:17 14:10:19 14:10:22 14:10:27 14:10:30 14:10:32

Those are, in my opinion, not equivalent statements. 14:10:34 14:10:35

Q. And is there anything wrong with the journal making that finding, that they don't have sufficient evidence? 14:10:37 14:10:38 14:10:40

A. Is there anything wrong with 14:10:42

that? 14:10:44

Q. Yeah. 14:10:44

A. I mean, that's what they've -- that's the decision they made. I mean, I may disagree about whether there is sufficient evidence, right. But if there is truly insufficient evidence, then you can come to that conclusion. That's a perfectly valid approach to the problem. 14:10:45 14:10:49 14:10:51 14:10:53 14:10:58 14:11:00 14:11:03

My experience has been that sometimes I believe that there is sufficient evidence for a finding that there has been a violation of scientific norms and I disagree with the conclusions of the journal on that matter. 14:11:05 14:11:09 14:11:11 14:11:14 14:11:17 14:11:20

Q. As in the Croce case, for example? 14:11:22 14:11:26

A. Yes, initially in the Croce case, yes. Because, as it happened, virtually every article that I had an initial issue about in that case, there is now a correction or retraction that's happened. 14:11:26 14:11:29 14:11:32 14:11:35 14:11:37 14:11:41

Q. So looking at paragraph 1 14:11:42

here, you're noting specifically the language, we do not find convincing evidence of manipulation of data or intent to mislead and therefore take no action regarding the published paper. Right? 14:11:46 14:11:48 14:11:52 14:11:54 14:11:58 14:11:59

A. Yes, that's, I think that's a quotation from a document that I read. Yes. 14:12:00 14:12:02 14:12:06

Q. And your focus is on the word, the adjective "convincing evidence." Right? 14:12:06 14:12:10 14:12:12

A. That is correct. 14:12:12

Q. And then in the next paragraph, you reference the Neurobiology of Aging saying, overall the editors did not find compelling evidence of data manipulation intended to misrepresent the results. Right? 14:12:13 14:12:15 14:12:18 14:12:21 14:12:23 14:12:30

A. Yes. 14:12:31

Q. And your focus there is on the word "compelling." Right? 14:12:31 14:12:33

A. Yes. 14:12:35

Q. And in your view, the use of 14:12:35

DAVID A. SANDERS

those adjectives means that they did not have sufficient evidence. Right? 14:12:37 14:12:40

MR. KUMAGAI: Objection to form. 14:12:42 14:12:43

A. So it does say convincing. It doesn't say we find -- or there is no evidence. In the case in paragraph 101, as I state, materials provided to me by counsel also show that during the JPAD investigation, Dr. Aisen consulted a colleague with expertise in Western blots, Dr. Robert Rissman, who stated that there was clear evidence of manipulation and sufficient grounds to retract the article. 14:12:43 14:12:49 14:12:54 14:12:56 14:12:59 14:13:02 14:13:07 14:13:09 14:13:10 14:13:12 14:13:14

So it would appear that during their investigation, one person with expertise saw clear evidence. So the conclusion seems to be that they did not find convincing evidence, not that there was no evidence. Since one of their own consultants found such evidence. So I don't think one can conclude that there is no evidence. It seems to me that the 14:13:15 14:13:17 14:13:22 14:13:26 14:13:29 14:13:31 14:13:35 14:13:38 14:13:40

reasonable interpretation is that "convincing" is an important adjective here. 14:13:43 14:13:46 14:13:48

Q. And the same for "compelling"? 14:13:48

A. So I don't know the additional -- I don't know of the, you know, any additional background, as far as I recall, on this. But once again, not finding an evidence -- not finding evidence that leads to a firm confusion [sic] of research misconduct is not the same as a conclusion that there was no misconduct. 14:13:51 14:13:53 14:13:55 14:13:58 14:14:04 14:14:08 14:14:11 14:14:13 14:14:19

Q. So for example, on your reading, if they were to say -- if they wanted to say there was no evidence, they would just say the editors did not find evidence of data manipulation intended to misrepresent the results as opposed to compelling? 14:14:20 14:14:25 14:14:28 14:14:30 14:14:33 14:14:35 14:14:38

MR. KUMAGAI: Objection to form. 14:14:38 14:14:39

A. You know, again, I don't want to put words in their mouth. But I would 14:14:40 14:14:42

DAVID A. SANDERS

actually prefer any evidence would be the -- would be the wording that I would look for to, you know, if I were just an outside person trying to understand what they're saying. 14:14:45 14:14:48 14:14:51 14:14:56 14:14:58

Q. So if they said do not find any evidence or we find no evidence or something -- 14:14:58 14:15:02 14:15:04

A. Yes. 14:15:05

Q. Do you have any particular expertise that makes you better able to understand these statements by the journal than a layperson? 14:15:07 14:15:16 14:15:19 14:15:22

A. Experience helps. 14:15:28

Q. I mean, I'm trying to figure out if this means something different to you than it does to me, right. When I read the sentence, the editors did not find compelling evidence of data manipulation intended to misrepresent the results, I understand what you mean, the distinction between I found no evidence versus I did not find compelling evidence. 14:15:37 14:15:39 14:15:41 14:15:43 14:15:45 14:15:47 14:15:50 14:15:53 14:15:56 14:15:58

DAVID A. SANDERS

What I'm trying to understand is, is that difference that I can recognize, based on the use of an adjective, the basis for your opinion here, or is it something that you are more of an expert in than just the, as you've said a few times, the English language? 14:15:59 14:16:00 14:16:03 14:16:06 14:16:10 14:16:12 14:16:16 14:16:18

A. So experience with the use of language by editors reinforces what I think is a general approach to, you know, a general interpretation of the English language. But it reinforced that, that that use of language is indicative of the fact that there was evidence, but it wasn't compelling or convincing. 14:16:18 14:16:20 14:16:25 14:16:30 14:16:32 14:16:39 14:16:42 14:16:46

And as I said, we have -- we have data, right. We have data that in the JPAD example, their own -- their own person with expertise saw that evidence. So it would be -- I think it would be strange for the co-editor in chief to say we have no evidence when the person they consulted said that there was evidence. 14:16:49 14:16:53 14:16:56 14:17:04 14:17:09 14:17:17 14:17:23 14:17:25

So. 14:17:28

Q. And your experience leads you to believe that if they had said -- if they had found no evidence, they would say the editors found no evidence? 14:17:28 14:17:30 14:17:35 14:17:36

A. Yes. 14:17:39

Q. Did you review the evidence that JPAD looked at? 14:17:39 14:17:41

A. I am almost certain I did. I'm almost certain I did. There were lots of papers that I looked at. I'm almost certain that I did. 14:17:45 14:17:56 14:18:01 14:18:09

Q. Do you recall sitting here today whether you reviewed the evidence for the JPAD paper? 14:18:11 14:18:13 14:18:15

A. I'm not -- you know, I would like to consult my report to see whether this was one of the articles where some of the things that I did notice for sure occurred. 14:18:23 14:18:27 14:18:30 14:18:32 14:18:37

Q. Let me say this: When we take the next break, do you want to take the time to review your report and see, both for JPAD and the Neurobiology of Aging? 14:18:39 14:18:41 14:18:43 14:18:45

DAVID A. SANDERS

A. Yes. 14:18:48

Q. Just to confirm whether you looked at the materials? 14:18:48 14:18:50

A. It's not -- it's not to whether it would -- if I included it in my report, then I definitely did. If I did not include it in my report, it is highly likely that I did, but I don't necessarily -- I don't have a -- I don't necessarily have an image in my mind of what those data were. 14:18:51 14:18:53 14:18:56 14:18:58 14:19:01 14:19:04 14:19:13 14:19:15

Q. So let me ask you a question. So your report has a list of materials considered. 14:19:17 14:19:19 14:19:22

A. Yes. 14:19:23

Q. Did you put that together? 14:19:24

A. Only in part. Not -- no. I would say no. 14:19:28 14:19:31

Q. Do you know who put it together? 14:19:33 14:19:34

MR. KUMAGAI: To the extent -- you can disclose what you know about, at a high level, the process of that being put together without 14:19:37 14:19:40 14:19:42 14:19:47

DAVID A. SANDERS

disclosing the substance of our communications. 14:19:49 14:19:52

A. It's based on things that I consulted and that were supplied to me by counsel. 14:19:54 14:20:04 14:20:08

Q. Did you understand that that list was to be comprehensive of the materials that you relied on in the report? 14:20:08 14:20:09 14:20:12 14:20:14

A. Yes. 14:20:14

Q. Are the materials that you reviewed and relied on in your report, to your knowledge, that are not included on that list or cited in your report? And to be perfectly fair, I think the list says, and materials cited in my report. 14:20:14 14:20:17 14:20:20 14:20:21 14:20:25 14:20:28

A. Right. I don't know of any that are not there. 14:20:30 14:20:33

Q. So to the extent you reviewed the material that was examined by JPAD or Neurobiology of Aging, you should be able to review your appendices to determine whether you've reviewed it? 14:20:35 14:20:37 14:20:42 14:20:45 14:20:50

A. Yes, that's correct. 14:20:50

DAVID A. SANDERS

Q. Do you know whether JPAD requested any evidence from the authors that was not provided to them? 14:20:56 14:20:58 14:21:02

A. I do not know. 14:21:06

Q. Let me ask you this question: So when discussing the interpretation of a sentence like, we did not find convincing evidence of manipulation of data or intent to mislead, and therefore take no action regarding the published paper, would you defer to the author of that sentence for its meaning? 14:21:22 14:21:24 14:21:27 14:21:29 14:21:32 14:21:35 14:21:37 14:21:39

MR. KUMAGAI: Object to form. 14:21:41

A. So again, what it actually says here is, overall the editors did not find compelling evidence of data manipulation intended to misrepresent the results. 14:21:47 14:21:49 14:21:51 14:21:53 14:21:56

It does not say that there is no evidence of data manipulation, right. It's about the intent. 14:21:58 14:22:02 14:22:06

So I don't know what's in the mind of that person. I think that it's -- if the person meant something 14:22:11 14:22:15 14:22:19

DAVID A. SANDERS

different from what the language suggests, then it was their responsibility to provide the correct language. And that the inclusion of the word "compelling" seems to indicate that there is something beyond -- and that's what it conveys to me as a reader in particular, and I would argue to others as well. 14:22:22 14:22:25 14:22:27 14:22:29 14:22:32 14:22:39 14:22:41 14:22:45 14:22:48

Q. And if there was confusion on the evidence of manipulation of data or intent to mislead, I think it was because we were reading different sentences. 14:22:48 14:22:51 14:22:54 14:22:56

A. I'm sorry. 14:22:58

Q. You're reading the one in 102, I'm reading the one in 101. 14:22:59 14:23:01

A. Okay, I apologize. 14:23:03

Q. So we did not find convincing evidence of manipulation of data or intent to mislead. Are you with me? 14:23:04 14:23:07 14:23:09

A. I see now, yes. 14:23:11

Q. My question is, would you defer to the person who wrote that sentence as to what they meant by it if 14:23:13 14:23:14 14:23:16

they disagreed with your interpretation? 14:23:18

A. I have the sentence as presented to me. And I also have the evidence that's provided by the colleague. Which indicates that there was evidence. 14:23:35 14:23:36 14:23:40 14:23:44 14:23:45

So I would -- I would not want to think that this co-editor in chief would, you know, be saying that there was no evidence when there seem to have been evidence provided to him. I don't want to believe that of that person. 14:23:47 14:23:50 14:23:54 14:24:00 14:24:03 14:24:05

Q. Well, I'm not asking you to believe anything of any person. I'm just asking if either Dr. Aisen or Dr. Rissman wrote this sentence, would you defer to them as to what they meant by it? 14:24:08 14:24:09 14:24:12 14:24:17 14:24:19

A. I don't know. I have a sentence in front of me. That's -- you know, this is what's of record, not intention that I do not -- I cannot, you know, I can't know. 14:24:26 14:24:28 14:24:30 14:24:33 14:24:39

Q. Do you know whether Dr. Aisen changed his mind about whether there was 14:24:40 14:24:43

DAVID A. SANDERS

clear evidence of manipulation? 14:24:46

A. I do not know. 14:24:47

Q. And then next, in paragraph 104, you state that institutional or personal conflicts of interest can impede investigations. Is that right? 14:24:53 14:24:58 14:25:05 14:25:07

A. That's correct. 14:25:09

Q. Are you opining that that is what happened in this case? 14:25:09 14:25:12

MR. KUMAGAI: Object to form. 14:25:14

A. I have been provided with materials by counsel that show that Dr. Aisen, the editor of JPAD, who led the investigation into the JPAD paper, by Dr. Wang and Dr. Burns, had previously served as consultant for Cassava. I would regard that as a potential conflict of interest. 14:25:17 14:25:21 14:25:25 14:25:27 14:25:33 14:25:35 14:25:40 14:25:43

Q. Do you know what consulting work Dr. Aisen did? 14:25:43 14:25:45

A. I do not. 14:25:48

Q. Do you know how much he was paid? 14:25:50 14:25:52

A. I do not recall. 14:25:52

DAVID A. SANDERS

Q. Do you know whether he was paid? 14:25:53 14:25:55

A. I don't recall. 14:25:55

Q. Do you know whether he had even recalled whether he'd done consulting work for Cassava? 14:25:56 14:25:58 14:25:59

A. Well, apparently he's testified to that effect. 14:26:01 14:26:05

Q. Did you review that testimony? 14:26:06

A. I did. 14:26:08

Q. Do you recall whether he actually remembered whether he'd served as a consultant for Cassava? 14:26:10 14:26:14 14:26:16

A. I do not recall the language that he used that led me to this conclusion at this time. 14:26:19 14:26:23 14:26:32

Q. So back to my original question. Are you opining that a conflict of interest prevented Dr. Aisen from doing his job as the editor and the investigator of this article at JPAD? 14:26:33 14:26:35 14:26:37 14:26:43 14:26:47

A. I opine that it is a reasonable hypothesis that a conflict of interest may impede an investigation and 14:26:49 14:26:51 14:26:56

DAVID A. SANDERS

may have been operative in this case. 14:26:59

Q. But you're not opining that 14:27:02
that actually happened? 14:27:05

A. I cannot see into other 14:27:11
people's minds and motivations. I can 14:27:12
just discuss on the basis of my 14:27:17
experience, that these conflicts of 14:27:21
interest frequently result in problematic 14:27:25
situations and decisions that may not 14:27:28
have occurred if there had not been that 14:27:30
conflict of interest. 14:27:33

Q. But you cannot say whether 14:27:35
that conflict of interest or potential 14:27:37
conflict of interest had any impact here? 14:27:39

A. I cannot say that. 14:27:43

MR. KUMAGAI: Scott, it's been 14:27:45
about an hour. 14:27:47

MR. CAMPBELL: One more series 14:27:47
of questions, I'll get to the 14:27:49
bottom of this little bit. 14:27:51

Q. Next paragraph says, 14:27:52
investigations of research misconduct 14:27:54
have also frequently resulted in lawsuits 14:27:56
and other issues for individuals and 14:27:58

DAVID A. SANDERS

institutions involved in research misconduct investigations. 14:27:59 14:28:02

Do you see that? 14:28:02

A. Yes. 14:28:04

Q. And you say, legal costs and risks can provide strong incentives for institutions to avoid finding research misconduct occurred. 14:28:05 14:28:06 14:28:09 14:28:11

Do you see that? 14:28:11

A. That's correct. 14:28:14

Q. Are you opining that a threat of lawsuits prevented institutions from finding that Cassava engaged in research misconduct in this case? 14:28:14 14:28:16 14:28:19 14:28:22

A. I have -- I'm not saying -- ask the question again, I'm sorry. 14:28:27 14:28:34

Q. Are you opining that a threat of lawsuits prevented certain institutions from finding that Cassava engaged in research misconduct in this case? 14:28:37 14:28:39 14:28:42 14:28:44 14:28:47

A. No. 14:28:48

Q. Same question as to Dr. Wang. 14:28:48

A. What I am opining is that this 14:28:52

DAVID A. SANDERS

is a general pattern that I have observed. I cannot enter into the minds of other people. So I cannot say that. Because of experience, it is a reasonable hypothesis that this -- that an investigation was impeded by concerns about lawsuits and realty. I don't know what happened here. 14:29:05 14:29:09 14:29:16 14:29:26 14:29:28 14:29:35 14:29:42 14:29:51

Again, I don't know -- I can't read other people's minds. But my experience is that that is a common phenomenon that institutions take actions such as not finding research misconduct because of potential legal consequences. 14:29:52 14:29:55 14:30:00 14:30:02 14:30:07 14:30:10

Q. But you're not specifically opining here that a threat of lawsuits prevented institutions from finding that Dr. Wang engaged in research misconduct? 14:30:19 14:30:20 14:30:24 14:30:29

A. I do not have any sort of outside knowledge that that is the case. 14:30:32 14:30:34

MR. CAMPBELL: We can take a break now. 14:30:36 14:30:37

THE VIDEOGRAPHER: The time on the video monitor is 2:30 p.m., we 14:30:37 14:30:38

off the record. This end media 4. 14:30:42

(A recess was taken.) 14:30:44

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 2:51 p.m. This start media 5. 14:51:13 14:51:14 14:51:16 14:51:20

BY MR. CAMPBELL: 14:51:21

Q. So I'd like to turn to page 27 of your report. This is section 3, which is entitled "Signs of research misconduct in Simufilam research." 14:51:23 14:51:28 14:51:35 14:51:41

Do you see that? 14:51:44

A. Yes. 14:51:44

Q. So just to be clear, are you opining that Dr. Wang engaged in research misconduct? 14:51:44 14:51:46 14:51:49

A. I am opining that an examination of the data indicates that they were -- again, the information that's provided to me indicates that there were discrepancies in the data that are consistent with a falsification of the data. And that that -- falsification is one of the indications of research 14:51:53 14:51:59 14:52:02 14:52:07 14:52:09 14:52:12 14:52:18 14:52:24

DAVID A. SANDERS

misconduct. 14:52:26

Q. Okay. So you've talked about indications of falsification that are consistent with research misconduct? 14:52:27 14:52:31 14:52:34

A. Yes. 14:52:36

Q. My question is, are you affirmatively opining that Dr. Wang in fact engaged in research misconduct? 14:52:36 14:52:38 14:52:41

A. So the information that I have -- and I will answer your question. The information that I have is that there are unacceptable discrepancies in data between what was generated by a plate reader and what was -- the data generated by the plate reader and what Dr. Wang reported to Cassava. 14:52:44 14:52:48 14:52:50 14:52:53 14:52:59 14:53:05 14:53:17 14:53:22

When we talk about research misconduct, that is a term that's used by the granting, you know, granting organizations. And so to use that term in another context when we're talking about Dr. Wang providing information to a -- to a company, it might be different. But it is a sign of something that would 14:53:26 14:53:29 14:53:35 14:53:40 14:53:46 14:53:49 14:53:58 14:54:03

DAVID A. SANDERS

be regarded as research misconduct using that federal NIH definition. 14:54:05 14:54:09

That is, that we have a discrepancy between the original data that were generated by the plate reader and the data that Dr. Wang reported. If we're talking in a general sense, I would regard that that sort of data manipulation is a form of research misconduct, yes. 14:54:13 14:54:18 14:54:22 14:54:25 14:54:32 14:54:36 14:54:39 14:54:42

Q. Okay. So you are opining that Dr. Wang engaged in research misconduct? 14:54:44 14:54:47

MR. KUMAGAI: Object to form. 14:54:49

A. With the -- with the way I've just explained it, then the answer is yes. 14:54:51 14:54:56 14:54:59

Q. Are you opining that Dr. Wang engaged in fraud? 14:55:00 14:55:02

A. I am opining that he did not supply his original data to Dr. Burns at Cassava. I don't recall having used the term "fraud" in here. I can be reminded if I did. I don't recall that. 14:55:05 14:55:16 14:55:24 14:55:28 14:55:33

I'm mostly focused on an 14:55:39

DAVID A. SANDERS

evaluation of the actual data that I was presented. 14:55:41 14:55:47

Q. So you are not opining that Dr. Wang affirmatively engaged in fraud? 14:55:48 14:55:51

A. Fraud. I am opining that the data that he supplied to Cassava through -- as far as I can tell, through the means of Dr. Burns, is not an accurate representation of the data that the plate reader generated. 14:55:55 14:55:59 14:56:04 14:56:06 14:56:09 14:56:13

You know, fraud has, you know, a particular legal meaning. I don't necessarily know all of the implications of that. 14:56:18 14:56:23 14:56:25 14:56:27

It is wrong, I will say with -- unequivocally, it is absolutely wrong to supply data to anyone, let alone a sponsor of one's research, that are not an accurate reflection of the experiments conducted. 14:56:28 14:56:32 14:56:35 14:56:41 14:56:44 14:56:46

Q. And to be clear, I'm not just talking about section A of the ELISA data, I'm talking about all of section 3, signs of research misconduct in Simufilam 14:56:47 14:56:49 14:56:52 14:56:54

DAVID A. SANDERS

research. 14:56:58

A. I understand. 14:56:59

Q. And is it still, if I understand your answer correctly, you are not opining that Dr. Wang engaged in fraud? 14:57:00 14:57:01 14:57:03 14:57:06

A. In the broadest sense of the term "fraud," what Dr. Wang did could certainly fall under that, yes. 14:57:13 14:57:25 14:57:29

Q. So you are opining that Dr. Wang committed fraud? 14:57:31 14:57:33

MR. KUMAGAI: Objection to form. 14:57:34 14:57:35

A. Depending upon what you mean by "fraud," the answer certainly is yes. 14:57:36 14:57:38

Q. Are you opining that Cassava engaged in research misconduct? 14:57:41 14:57:46

A. I am not. 14:57:51

Q. Are you opining that Cassava engaged in fraud? 14:57:52 14:57:54

A. I am not. 14:57:57

Q. I want to talk about now this ELISA data. So you have an appendix where, appendix B, where you describe 14:58:03 14:58:05 14:58:10

DAVID A. SANDERS

ELISA experiments. Right? 14:58:14

A. Appendix B. I'm looking at appendix B. 14:58:16 14:58:28

Q. And this is your appendix describing ELISA experiments. Right? 14:58:29 14:58:31

A. Yes, correct. 14:58:33

Q. And at the beginning of it you say, over the course of your career you've conducted ELISA experiments. Right? 14:58:34 14:58:35 14:58:37 14:58:40

A. That is correct. 14:58:40

Q. How many ELISA experiments? 14:58:40

A. I have not recorded it, how many I've conducted. But I have conducted he ELISA experiments. 14:58:43 14:58:46 14:58:48

Q. More than a hundred? 14:58:50

A. I don't think so, no. 14:58:53

Q. Do you consider ELISA experiments to be your area of expertise? 14:58:54 14:58:58

A. I have -- I have expertise in ELISAs. I have conducted them. I have taught others how to conduct them. And I teach them nearly every semester that I teach. I describe them in detail. And 14:59:01 14:59:05 14:59:08 14:59:11 14:59:13

DAVID A. SANDERS

we discuss them in our class -- so there are -- there is a generation of students who have come through the university who have learned about ELISAs because of my teaching. 14:59:18 14:59:20 14:59:23 14:59:24 14:59:27
Q. So you teach undergraduate and graduate students how to run ELISA experiments? 14:59:28 14:59:30 14:59:32
A. That's correct. 14:59:33
Q. Now, in appendix B you set out the process for conducting an ELISA experiment. Right? 14:59:34 14:59:38 14:59:41
A. In appendix B, yes. 14:59:42
Q. How long does it take to run an ELISA experiment? 14:59:44 14:59:47
A. Define what you mean by "run an ELISA experiment." 14:59:56 14:59:58
Q. When you go through the steps in section A, step 1, step 2, step 3, step 4, to run an ELISA step, how long does that take? 14:59:59 15:00:01 15:00:05 15:00:07
A. And are you talking about how long it takes -- are you including the plate reader's time and how long it takes 15:00:08 15:00:11 15:00:13

to go through the time? 15:00:16

Q. Yes. 15:00:17

A. Well, it depends how you've optimized the experiment. But it can be relatively quick, under an hour. It can sometimes take longer, depending upon, you know, how many samples, how you are fixing the color, things like that. 15:00:17 15:00:19 15:00:23 15:00:28 15:00:30 15:00:33

Q. Is it possible to do multiple ELISA plate reads in a row? 15:00:36 15:00:40

A. Yes, yes. 15:00:42

Q. And you could do multiple in a day? 15:00:43 15:00:45

A. Oh, yes. 15:00:45

Q. Is that common? 15:00:46

A. Yes. You're talking about -- so ELISA, there are plates with multiple wells. So you're asking me can you do multiple plates, yes, the answer is yes, in a day. 15:00:48 15:00:52 15:00:56 15:00:58 15:01:01

Q. And how long does it take to prep one of these plates before you put it in the reader? 15:01:02 15:01:04 15:01:06

A. To do, you know, just to -- I 15:01:07

mean, it's, again, you can do it in under an hour, longer than an hour. It really depends upon what reagents you're using, which kit you're using, which -- how the development is, how you're fixing it. 15:01:13 15:01:17 15:01:19 15:01:25 15:01:27

Q. Do you usually want to prepare the plate right before you put it in the reader? 15:01:30 15:01:32 15:01:34

A. Yes, generally. 15:01:34

Q. And then taking a look at your section C, you describe other factors to consider. 15:01:39 15:01:42 15:01:46

Do you see that? 15:01:46

A. Yes. 15:01:49

Q. And the first factor that you describe here in 13 is called optimization. Is that right? 15:01:49 15:01:51 15:01:54

A. Yes, correct. 15:01:55

Q. And you say, each step in the assay needs to be optimized. Is that right? 15:01:56 15:01:58 15:02:01

A. Yes. 15:02:01

Q. Does that include optimizing the plate reader? 15:02:01 15:02:04

DAVID A. SANDERS

A. What do you mean by optimize -- picking which plate reader to use? 15:02:06 15:02:10 15:02:12

Q. No. I'm talking about for the actual labware on the plate reader for ELISA, do you need to optimize that before you run the plate? 15:02:12 15:02:14 15:02:18 15:02:20

MR. KUMAGAI: Objection to form. 15:02:22 15:02:23

A. I'm not sure I understand what you mean by "optimize" in this context. 15:02:24 15:02:25

Q. That's a good -- that's a helpful clarification to me. 15:02:28 15:02:30

Do you know what it means to optimize a plate reader for a specific labware? 15:02:31 15:02:33 15:02:37

A. Again, I'm trying to understand what you mean. Do you mean make sure that it's giving standardized results? Is that what "optimized" means for you? Because we're not comparing one reader -- when you say "optimize," that could mean you're comparing one reader with another. And trying to figure out 15:02:37 15:02:39 15:02:42 15:02:44 15:02:47 15:02:50 15:02:54 15:02:56

which one is the best. When you're using the word "optimize," what do you mean by "optimize"? 15:02:59 15:03:02 15:03:03

Q. You know that you can put different plates into an ELISA reader. Right? 15:03:04 15:03:05 15:03:09

A. Different plates from different manufacturers. 15:03:10 15:03:12

Q. Yes. 15:03:15

A. Or different plates -- yeah, okay. 15:03:16 15:03:17

Q. Different plates from different manufacturers. 15:03:18 15:03:19

A. Right. 15:03:20

Q. Do you know whether you need to optimize the reader for the particular plate that you're putting in there? 15:03:20 15:03:21 15:03:23

A. Optimize? Do you mean which software you're using? Is that what you're talking about? 15:03:26 15:03:30 15:03:32

Q. Within the software. 15:03:33

A. Okay, within the software. 15:03:37

Yes, you sometimes have to -- I mean, depending upon, for example, if 15:03:38 15:03:40

you're using a competition assay versus a direct or indirect assay, the readout, the curves are all going to be different. So you have to be using the correct software in order to allow for the correct analysis. 15:03:42 15:03:47 15:03:52 15:03:53 15:03:56 15:03:59

Q. And if you optimize the software. 15:04:01 15:04:06

A. Yes. 15:04:07

Q. For the particular plate reader. 15:04:07 15:04:10

A. Yes. 15:04:11

Q. Is that recorded somewhere on the machine? 15:04:11 15:04:15

A. So if you're doing, for example, using a 4 parameter curve, the variables that go into, there will be like the minimum and the maximum, for each different plate they will have a separate type of sensitivity. So all of that, all of that standard curve, all of that optimization that occurs in producing that, will all be recorded on the machine. And that will be used to 15:04:16 15:04:22 15:04:28 15:04:31 15:04:34 15:04:36 15:04:39 15:04:41 15:04:43 15:04:45

generate the standard curve and then that will be used to analyze the data for producing your eventual concentration calculations. 15:04:47 15:04:50 15:04:56 15:05:00

Q. And is the actual time of optimization of whatever form in the software recorded on the machine in the data? 15:05:01 15:05:02 15:05:05 15:05:08

A. I'm -- I'm sorry, time of optimization, what do you mean time of optimization? 15:05:09 15:05:13 15:05:14

Q. The time at which you conducted the optimization for your experiment that you're running in the ELISA. 15:05:15 15:05:17 15:05:19 15:05:21

A. When you put in a plate and try standards and other things, that -- the metadata will include when that -- when that occurred, yes. I mean, that's one of the outputs. 15:05:23 15:05:28 15:05:32 15:05:35 15:05:38

Q. And when you talk about outputs, you're talking about in the data file associated -- 15:05:40 15:05:42 15:05:44

A. That's right. 15:05:45

DAVID A. SANDERS

Q. Would you say you are intimately familiar with the Multimode Analysis software program that Dr. Wang was using for his ELISA experiments? 15:05:47 15:05:53 15:05:57 15:05:59
A. No. 15:06:01
Q. How familiar are you? 15:06:02
A. After I was engaged, I read the manual. To try to understand, you know, how it worked, what was the output, what you could do with it. So that is, you know, that's the extent of my -- I did not examine one of the machines myself. 15:06:06 15:06:08 15:06:12 15:06:14 15:06:17 15:06:19 15:06:22
Q. Were you familiar before you were engaged with this case with this Multimode Analysis software that Dr. Wang used? 15:06:22 15:06:24 15:06:27 15:06:30
A. That one, no. 15:06:30
Q. Have you ever used that program? 15:06:31 15:06:32
A. No. 15:06:33
Q. Do you typically use a DTX 880 ELISA machine when you do your research? 15:06:33 15:06:39
A. I do not. 15:06:41

DAVID A. SANDERS

Q. I want to go back now to the main part of your report. Paragraph 112. It's on page 27. 15:06:46 15:06:47 15:06:52

Are you with me? 15:07:02

A. Yes, now. 15:07:03

Q. You say, "I also understand that the Multimode Analysis software program used to operate Dr. Wang's plate reader machine autosaves the original result of each plate in the program's database folder which was stored on the computer connected to the plate reader machine at Dr. Wang's laboratory at CUNY." 15:07:04 15:07:06 15:07:08 15:07:10 15:07:13 15:07:16 15:07:19 15:07:21 15:07:24

Do you see that? 15:07:24

A. Yes. 15:07:24

Q. How did you come to understand that the Multimode Analysis software program autosaves the original results of each plate in the program's database folder? 15:07:24 15:07:26 15:07:27 15:07:30 15:07:34

A. This was a fact that I was asked to assume by counsel. 15:07:34 15:07:35

Q. So you don't know whether 15:07:37

DAVID A. SANDERS

that's actually the case? 15:07:39

A. I have not operated this 15:07:41
machine or seen it or obtained output 15:07:44
from the machine. 15:07:48

Q. So you're just assuming it, 15:07:49
you don't know it to be the case? 15:07:53

A. That's correct. 15:07:55

Q. Have you ever used this 15:07:55
software to view results saved in the 15:08:01
database folder before? 15:08:04

A. Have I used the software to 15:08:06
observe the results? 15:08:10

MR. KUMAGAI: Object to form. 15:08:14

A. No. 15:08:16

Q. Did you actually use the 15:08:19
software to view the results in the 15:08:20
database folder produced by CUNY in this 15:08:23
case? 15:08:25

A. I did not use this software. 15:08:26

Q. I think I know the answer to 15:08:32
this question based on what you've told 15:08:35
me so far, but I'm going to ask it 15:08:37
anyway. 15:08:39

So if you were to use the 15:08:40

software to open up the data folder on the computer, do you know what your options are for manipulating that data? 15:08:41 15:08:44 15:08:48

MR. KUMAGAI: Object to form. 15:08:51

A. My options for -- 15:08:56

Q. Maybe "manipulating" is a bad word given your research integrity focus. 15:08:59 15:09:01

Do you know what sorts of things the software can do to evaluate the data? Do you know what is available -- 15:09:04 15:09:06 15:09:07 15:09:09

MR. KUMAGAI: Object to form. 15:09:10

A. Again, through my reading, I saw that it could graph, generate, you know, concentrations potentially. All those. But I -- beyond that, you know, no, I don't -- I don't know everything that it could potentially do. 15:09:11 15:09:13 15:09:17 15:09:23 15:09:27 15:09:29

Q. Do you know if you can change the portion for each well that is measured by the reader, the section of each well? 15:09:31 15:09:33 15:09:35 15:09:37

A. I do not know. 15:09:38

Q. Do you know whether if you 15:09:39

change the particular portion of each well that's measured that can have an effect on the data that comes from the measurement of that well? 15:09:44 15:09:47 15:09:49 15:09:52

A. One would anticipate that it would. 15:09:54 15:09:55

Q. Do you know if you change that parameter and therefore the data, whether that is saved on the -- in the software over the previous read? 15:09:55 15:09:57 15:09:59 15:10:03

MR. KUMAGAI: Object to form. 15:10:06

A. Yes, could you explain what you mean? 15:10:07 15:10:09

Q. Sure. 15:10:10

So if you can change the parameters for where the measurement's taken in each well with the software, after you do the plate read, do you know whether that new parameter-induced data is autosaved over the old data? 15:10:11 15:10:12 15:10:17 15:10:18 15:10:21 15:10:27

MR. KUMAGAI: Object to form. 15:10:29

A. I'm still not quite understanding. I thought you were -- yeah, I don't understand. I thought the 15:10:31 15:10:32 15:10:35

DAVID A. SANDERS

first question was whether it is reading at different places. Now the question is, it's done the read and then it's looking somewhere else in the well? 15:10:38 15:10:41 15:10:44 15:10:47

Q. Do you know if the software's capable of looking elsewhere in the well? 15:10:49 15:10:51

A. I don't know. I do not know. 15:10:53

Q. So I take it you don't know whether you could change where it's reading in the well and overwrite the data? 15:10:58 15:10:59 15:11:01 15:11:04

A. And overwrite the data? I do not know. 15:11:05 15:11:09

THE COURT REPORTER: Can we take a break? 15:11:09 15:11:09

MR. CAMPBELL: Of course. 15:11:15

THE VIDEOGRAPHER: The time on the video monitor is 3:11 p.m., we off the record. 15:11:15 15:11:17 15:11:20

(A recess was taken.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
ADRIAN HEILBUT, JESSE BRODKIN, and
ENEA MILIORIS,

PLAINTIFFS,

DAVID BREDT and GEOFFREY PITT,

INTERVENOR PLAINTIFFS,

-against- Case No.: 1:24-cv-05948-JLR

CASSAVA SCIENCES, INC., REMI BARBIER,
and DR. LINDSAY BURNS,
DEFENDANTS.
---------------------------------------------X
DATE: February 23, 2026
TIME: 4:00 P.M.

VIDEOTAPED REALTIME DEPOSITION of the Expert Witness, DAVID A. SANDERS, taken by the Defendants, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held remotely, at all parties' locations, transcribed by Karyn Chiusano, a Notary Public of the State of New York.

A P P E A R A N C E S:

CLARICK GUERON REISBAUM LLP
Attorneys for the Plaintiffs
ADRIAN HEILBUT, JESSE BRODKIN, and
ENEA MILIORIS
41 Madison Avenue ~ 22nd Floor
New York, New York 10010
BY: DAVID KUMAGAI, ESQ.
dkumagai@cgr-law.com

GIBSON, DUNN & CRUTCHER, LLP
Attorneys for the Defendant
CASSAVA SCIENCES, INC.
1900 Lawrence Street, Suite 3000
Denver, Colorado 80202-2211
BY: SCOTT CAMPBELL, ESQ.
JOHN TURQUET BRAVARD, ESQ.
scampbell@gibsondunn.com
jturquetbravard@gibsondunn.com

BAKER & HOSTETLER LLP
Attorneys for the Defendants
REMI BARBIER and DR. LINDSAY BURNS
45 Rockefeller Plaza
New York, New York 10111
BY: ZACHARY TAYLOR, ESQ.
ztaylor@bakerlaw.com

* * *

ALSO PRESENT:
DEVERELL WRITE, Videographer
ADRIEN HEILBUT
ARIC WU
ISAAC ZAUR
LYNDSY BURNS

* * *

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath with the same effect as if signed before a judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness 30 days after service of the original and one copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial.

* * * *

* DR. DAVID A. SANDERS *

THE VIDEOGRAPHER: We are back on the record.

The time on the video monitor is 4:00 P.M.

D A V I D A. S A N D E R S, called as a witness, having been previously duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY (cont'd)
MR. CAMPBELL:

Q. David, you understand you're still under oath?

A. Yes.

Q. Before we took a break, we were discussing your assumption based on res- -- representations of counsel that the results from each plate were saved in the program's database folder.

Do you recall that?

A. Yes.

Q. And then, we were discussing whether you could use the software to make alterations in the data.

Do you recall that?
A. Yes.
Q. Do you know whether alterations made in the software that affected the data could cause the results saved in the program's database to change?
A. I do not know.
Q. If you were to look, where would you look?
A. Well, I'd combine it with manual, a discussion with customer care, and perhaps working with the machine itself.
Q. Would you be able to tell from the output you were reviewing whether the data had been later updated?
A. Ex- -- by -- so -- I need the whole -- the whole question.
I'm -- I'm not sure I understand.
Q. Sure.
If the data were overwritten at some point later after the original --

* DR. DAVID A. SANDERS *

THE COURT REPORTER: I didn't hear you.

I didn't hear that last part.

Q. If the data were overwritten at some point after the initial auto save on the system, would you expect there to be a record of that in the exported file you were looking at?

A. Well, first, for me to consider the question, I have to know whether there is such an override process. I don't know that.

So, I don't know -- when you talk about "overrides," very frequently, there are records of previous versions of the -- of the data present.

But I -- I simply don't -- I don't know about the overrides, and I don't know about what is retained in that -- in those data that are on this particular machine.

Q. And you didn't review the actual proper bonds; right?

A. I did not.

* DR. DAVID A. SANDERS *

Q. You state in your report, in Paragraph 114, that you:

"Understand that Dr. Wang would export the results from the software to Excel;" is that right?

A. Yes.

Q. Do you know when Dr. Wang would export those results?

A. What does -- a- -- again, give me a little more context --

Q. Sure.

A. -- with the question.

Q. Do you know when, in comparison to when he ran the plates, he would export the results to Excel?

A. I wasn't -- I wasn't there.

I seen data that has time stamps on it and so on, but I don't -- you know, I don't know that. No.

Q. When you runalyze experiments, do you ever export the data to Excel?

A. So, the data can be exported to Excel, depends upon the -- the software.

I have not runalyzed this

for -- for sometime. I'm mostly involved in training people in the lab and training students and so on.

I haven't run them for a while, so I don't know what that's -- exactly means.

Q. When was the last time you ran an ELIZA yourself?

A. Decades.

Q. Decades ago?

A. Yes.

Q. Do you know whether an export to Excel is something the software can do automatically after a plate is read?

A. I -- there are -- I know that there are softwares that do that.

Q. But you don't know whether --

A. I don't know whether -- I'm -- I'm -- I'm not -- I -- I can't say at this time.

Q. You can't say whether you know or not, or you don't know?

A. I don't know.

Q. Okay. So, you don't know

whether Dr. Wang used an automatic export feature on the software?

A. An automatic export?

No.

I -- I don't know.

Q. But you have reviewed Excel exports from the software that Dr. Wang used; right?

A. Yes.

Q. And can you tell when -- from those exports, when they were last modified?

A. One can tell that.

I -- I don't know that I looked -- you know, thought about looking at those data, but one normally can tell, from any Microsoft program, when it was last modified. Yes.

Q. But you didn't look at those in this case?

A. I did not look at those in this case.

Q. So, you compared the ELISA test results that were reported by Dr. Wang to

Cassava with results from the software's database folder on a computer that was connected to Dr. Wang's machine; is that right?

A. That is correct.

Q. And that data from the software's database folder you refer to as "the raw data;" right?

A. Yes; correct.

Q. And that's the data that was in your Appendix E to your report?

A. Yes.

Q. All right. Now, just for clarification:

Did you ever review the actual data in the software database folder?

MR. KUMAGAI: Objection to form.

A. No.

Q. You reviewed an Excel export of that data --

A. That's --

Q. -- correct?

A. Yes. Yes.

* DR. DAVID A. SANDERS *

Q. And you state, in your report, that your -- you understand that CUNY produced the contents of the database folder to Plaintiffs in this case?

A. Yes.

Q. Do you know when that was done?

A. I do not recall.

Q. Do you know if it was done in 2025?

A. I do not recall.

Q. And those results, as you understand it, were exported to Excel for you to look at; is that right?

A. Yes.

Q. Did you create those Excel exports?

A. I did not.

Q. Do you know how they were created?

A. No, I do not.

Q. Do you know when they were created?

A. I do not.

Q. Do you know who created them?

A. I do not.
Q. Do you know the qualifications of the person who created them?
A. I do not.
Q. Do you know their experience with ELISA software?
A. I do not.
Q. What steps did you take to verify that the exports were properly conducted?
A. I -- I was asked to assume that the data that I was presented were an accurate representation of the data that was exported.
Q. So, you took no steps?
A. I took no steps.
Q. The ELISA experiments that are associated with those exports in your Exhibit E, you understand those were performed for experiments that ranged from 2013 to 2021?
A. Yes.
Q. I think you might've answered this question already, but I'm going to ask

* DR. DAVID A. SANDERS *

it, to make sure.

A. Okay.

Q. Did you examine the metadata for the Excel files that you looked at?

A. I did not.

Q. Do you know whether other people at CUNY, besides Dr. Wang and his team, used the same plate reader machine?

A. I do not.

Q. Would it surprise you if other people used the same plate reader machine?

A. No.

It would not surprise me.

Q. Do you know whether the computer attached to the plate meter reader machine was accessible to other people between 2021 and 2025?

A. What do you mean "accessible"?

Q. Whether other people could use it.

A. I wasn't there.

I mean, I don't know.

Q. You opined, as a part of your report, that there was no password

protection on that computer; is that right?
A. That is correct.
Q. And so, other people could access it?
A. A- -- again, yes.
I mean, it's possible other people could access the computer. I don't -- I did not visit the laboratory; I don't know who else might have had access to it.
Q. Is it possible that the data files that you reviewed were changed between 2020 and 2025?
A. I have no outside information about that.
Q. So, it's possible?
A. Yes, it's possible.
Q. I want to look at the data you prepared to understand your process.
MR. CAMPBELL: I'm going to mark two exhibits.
The first I'll mark as Exhibit 6.
I'll give you this copy; right here (handing.)

* DR. DAVID A. SANDERS *

(Whereupon, Sanders Exhibit 6, Set 2-B redo PTOW 181 presented data, was marked for identification as of this date by the Reporter.)

MR. CAMPBELL: And then, I'm going to mark a second, as Exhibit 7 (handing.)

(Whereupon, Sanders Exhibit 7, Set 3 2-B redo PTOW 181 raw data, was marked for identification as of this date by the Reporter.)

Q. Now, the first document that I've handed to you, marked as Exhibit 6, do you see, at the top, it says:

"Set 2-B redo PTOW 181 presented data"?

A. Yes.

Q. Then, it has a Cassava Bates Stamp after that.

Do you see that?

A. Yes.

Q. And then, the second one says:

"Set 3 2-B redo PTOW --

* DR. DAVID A. SANDERS *
THE COURT REPORTER: You have to slow down a little bit.
And say that again, please.
Q. It says:
"Set 3 to be redo PTOW 181 raw data."
Do you see that?
A. Yes.
I do see that.
Q. And you can take a moment to look at these, but do you recognize these as spreadsheets that you used for your comparisons in your report?
A. Yes.
Q. And I know you said you didn't look at the metadata for these documents, but I want to take a -- a look at these.
So, the presented data spreadsheet, this is what you represent as Dr. Wang sent to Cassava; right?
MR. KUMAGAI: Object to the form.
Objection to form.
A. Could you repeat the question,

please?
Q. The presented data spreadsheet, this is what you understand that Dr. Wang sent to Cassava in 2020?
(Witness reviews document.)
A. When I had these data on my -- I -- they were on a screen with a slightly different form and I had them -- you know, I was able to compare different datasets, so...
What -- what's the question again?
THE WITNESS: I'm sorry.
Q. Sure.
I'm just trying to lay a foundation for the questions that are going to come.
So, as part of your analysis in Section 3(a) of your report on --
A. Yes.
Q. -- the ELISA data, you compared is two sets of data; right?
A. Yes.
Q. One that you called the

"presented data," which is what Dr. Wang sent to Cassava in 2020.

A. Yes.

Q. And a second was the raw data which you call the "raw data," that you understood to be an export from the plate reader that was produced by CUNY to the plaintiffs in this case; is that right?

A. Correct.

Q. So, I'm asking you and these are -- I can represent to you that these are the documents that we pulled from your Exhibit E, but I'm asking you if you recognize the document marked as "presented data" as the former and the document marked as "raw data" as the latter in your comparison.

(Witness reviews document.)

A. Yes.

To the best of my ability, yes, that's correct.

Q. Okay. And if you look now at the presented data, so the one on your left.

* DR. DAVID A. SANDERS *

(Witness complies.)

A. Yeah.

Q. Along the left-hand side columns, there are a list of wells in the first column, and then a list of numbers in the second column; right?

A. Yes.

Q. And each of these letter/number combinations, in the left-hand column, that corresponds to a well in the plate that was read; right?

A. Yes.

Q. And the numbers in the second column --

A. May I -- I -- yes.

I'm sorry. Could you repeat what you just asked?

I just want to be sure I'm -- I've answered the question correctly.

Q. Yeah.

So, the letter/number combinations; A-1 and A-2, those correspond to wells on the plate that was read; right?

A. Yes; correct.

* DR. DAVID A. SANDERS *

Q. And then, the numbers next to those, what do those represent?

A. Absorbance readings.

THE COURT REPORTER: I didn't hear you.

THE WITNESS: Absorbance readings.

Q. And what are absorbance readings?

A. So, a -- a light is shined at a particular -- and the -- at a particular wavelengths and there are a -- a detector that detects the light that makes it through.

And as one has material -- the chemical material that absorbs the light and reduces the light that is transmitted, that's what's turned into a -- a number here.

Q. And then, you understand, in this spreadsheet, that after these numbers came out of the machine, Dr. Wang organized them into a plate map.

And you can see the first part

of that in the upper right-hand side; right?
A. Yes.
Q. And then, underneath that plate map, there are a series of calculations; right?
A. You mean the -- where it's -- over here?
On the -- on -- where there -- it says P- -- "grams per mill"?
Q. Yes.
A. Yes. I see that, yes.
Q. And you understand these are calculations that Dr. Wang ran on the data?
A. Yes.
That's my understanding.
Q. Do you know what these calculations are?
A. Can you explain what the question -- what you mean:
"What the calculations are?"
Q. Do you know how the calculations are done?
A. Calculations are generally done

by creating a standard curve and fitting the data that are generated to that standard curve.

Q. And do you know how long --

A. And that --

Q. -- how long it takes to perform those calculations, roughly?

A. I would anticipate that he's using software to generate calculations, but -- so, it shouldn't take very much time.

But I don't know how -- how he does it himself.

Q. Can you understand, reading this -- this spreadsheet, the meaning of the data from just the values in the second column, or do you need the calculations to interpret the data?

A. Repeat the question, and then I'll try again.

Q. Sure.

If you were looking -- if you didn't have the calculations and you were looking to interpret the ELISA data --

* DR. DAVID A. SANDERS *

A. Yes.
Q. -- could you do that based just on the well values, or do you need the calculations to understand the thing?
A. No.
You need the -- you need the calculations, in order to understand the data.
Q. And do you know when Dr. Wang sent this data Ca- -- to Cassava?
A. I do not recall.
I do not know.
Q. Let's look at the front page.
Do you see, on the right-hand side, the metadata for this document?
A. Are you referring to the dates? Yes.
Q. Yes.
A. I see those.
Q. It was created on June 9, 2020 at 9:44 P.M.?
A. Yes.
Q. And the author is listed as: "Wang Family"?

* DR. DAVID A. SANDERS *

A. Yes.

Q. And that it was last modified on June 15th, 2020 at 2:50 P.M.?

A. Yes.

Q. And it was last modified by Lindsay Burns?

A. Yes.

Q. And can you infer from that Cassava, or at least Dr. Burns, had this document by June 15th, 2020?

A. Yes.

Q. And now, the second document that you're calling the "raw data" --

MR. KUMAGAI: Exhibit 7?

MR. CAMPBELL: Yes.

Q. When was that document created?

A. It reads here:

"December 21, 2025."

Q. And who was the author of that document?

A. It says:

"Adrian Heilbut."

Q. And so, do you understand that Adrian Heilbut created this spreadsheet in

2025?

A. Yes.

Q. And in this document, if you look after the tab, we still have data for each well, but there's no calculation in this document, right?

A. Correct.

Q. So, it's your understanding that if you'd done an export at the time that Dr. Wang, in 2020, had just exported the data to expel -- to Excel, this is the form the document would have taken coming out of the plate reader?

A. That is my understanding, yes.

Q. And the basic issue that you identify in your report is that these values in this -- in Dr. Heilbut's export do not match the values in the spreadsheet that was sent to Cassava?

A. So, if I may look at my report.

Q. Yeah.

I was -- I'm looking at Paragraph 116 for that.

A. Yes.

* DR. DAVID A. SANDERS *

So, not only are they different, but in many cases, the differences are round numbers.

In many cases, the most significant digit after the decimal point is different.

THE WITNESS: If I'm reading too fast, please interrupt me.

A. "Whereas the least significant digits are identical.

"In many cases, the values are triplicate groups moved in the same direction relative to their corresponding groups."

Q. So, there are discrepancies in the numbers?

A. Yes.

Q. And now, I want to look at the first page that you --

THE COURT REPORTER: I can't hear you.

Q. I want to look at the first page of this exhibit after the metadata.

So, before you get to the first

blue sheet.
And I think there's an equivalent one in the other exhibit, as well.
Now, do you understand the meaning of the data that's being presented here?
A. I'm looking at all of this.
Mostly, yes.
The answer is yes.
Q. What do you not understand?
A. I am -- I'm interested in the -- I do not understand the optimized -- what that refers to.
Q. Okay. Did you evaluate that as part of your report?
A. I did not.
Q. Okay. So, I want to walk through this step by step, if you will.
So, in, roughly, the third/fourth line down, there's a date column.
Do you see that?
A. Yes.

* DR. DAVID A. SANDERS *

Q. Do you know what that date represents?

A. The -- where it says -- under "new protocol 1; new protocol 1" and the last one?

Q. Yes.

A. Is about a -- I -- my understanding, from what I -- I had looked at is that that's an export date of the data from the software in the machine, something like that.

Q. Okay. So, in the first spreadsheet, Dr. Wang's spreadsheet, the export date is June 9, 2020 at 9:44 A.M.; is that right?

A. Yes.

Q. And in Dr. Heilbut, it's December 21st, 2025 at 3:04 P.M.?

A. That's correct.

Q. And now, looking down at the "date measured" column.

Do you see that?

A. Yes.

Q. What does the "date measured"

mean?

A. I -- I -- I believed that that's the date where the -- the measurement that the -- that is being exported, that that's a record of when that happened.

Q. Okay. And what about the "date evaluated," underneath those?

THE COURT REPORTER: I didn't hear you.

Q. What about the "date evaluated," underneath those?

A. I'm -- to be honest, I'm not sure what the distinction is there.

Q. Okay. But those are the same in both spreadsheets and they both occurred one minute apart on June 9, 2020, right?

A. Correct.

Q. Okay. And I want to look down to the "software" line.

Do you see that?

A. Yes.

Q. In Dr. Wang's spreadsheet, it says:

* DR. DAVID A. SANDERS *
"Multi-mode analysis software."
A. Yes.
Q. And it says:
"Version 34027."
Do you see that?
A. Yes.
Q. And in Dr. Heilbut's spreadsheet, it says:
"Multi version 34025;" right?
A. Yes.
Q. Do you know what those represent?
A. A version of the software.
Q. Do you know if it's the same software?
A. It looks like it's a different version.
Q. Is multi and multi-mode analysis software the same?
A. I didn't -- didn't previously ask that question.
One: I don't know.
Q. Okay. Now, I want to look down to the "lot number."

* DR. DAVID A. SANDERS *

Do you see that?

A. "Lot number."

Yes.

Q. Do you know what the lot number is?

A. That's -- I mean that should be -- no.

I don't -- I -- I -- no.

I don't know.

Q. Okay. The lot numbers, here, are different between Dr. Wang's spreadsheet and Dr. Heilbut's, right?

A. Yes.

Q. And in Dr. Wang's spreadsheet, it's June 9, 2020 at 9:42 P.M., so a minute before the "date measured"?

A. Yes.

Q. And in Dr. Heilbut's spreadsheet, the lot number is August 5, 2021, more than a year after the "date measured," right?

A. Yes.

Q. And then there's also an "optimized date" underneath that, the same

as the "lot number date."

Do you see that?

A. Yes.

Q. So again, the "optimized date" for Dr. Heilbut's data is more than a year after the measurement?

A. Yes.

Q. Do you understand what causes the lot number date to change?

A. I do not.

Q. Do you understand what is referenced by the optimized --

A. I do not.

Q. -- lot in here?

Do you have an understanding of why the data that Dr. Heilbut was presented with was optimized more than a year after it was measured?

A. I do not.

Q. Do you know what effect that optimization would have on the data?

A. I do not.

Q. Do you know if it had an effect on the data?

* DR. DAVID A. SANDERS *

A. I do not.

Q. Did you evaluate that, as part of your report?

A. I did not.

Q. We had a discussion earlier about changes in metadata and how, when there are changes in the metadata, it's no longer the raw --

THE COURT REPORTER: I can't hear you.

Say that again.

MR. CAMPBELL: Yeah.

Q. We had a conversation earlier about raw data and how, when metadata is changed, it is no longer the raw data; is that right?

A. That is -- yes.

That is indicative that it's no longer the raw data; correct.

Q. Given that the date here -- data, here, was optimized in 2021 and the metadata was changed --

A. Yeah.

Q. -- do you still believe that

that this is the raw data from a year earlier, in 2020?

A. The -- I was told to assume that it was the raw data.

I have no independent information.

Q. I'm asking your opinion, looking here at the metadata, and having changed more than a year after the date of measurement.

What your opinion is on whether or not this was the raw data.

A. I was --

MR. KUMAGAI: Object to form.

A. -- I was told to assume that it was the raw data for the purpose of my opinion.

Q. I understand.

A. That's all -- that's really all I can say about it.

I do not claim to have extracted these data or to have -- I just was -- just assumed -- I was asked to assume that it was.

* DR. DAVID A. SANDERS *

And when I did that analysis, it had -- there were particular changes that were -- that were -- that were presented with that -- were in indicative of falsification.

Q. In your experience dealing with metadata from --

THE COURT REPORTER: I didn't hear you.

Q. In your experience dealing with metadata from ELISA outputs, is it common to have a metadata timestamp from a year after the incident -- the data was evaluated?

MR. KUMAGAI: Object to form.

A. When I investigate data, I'm not normally presented with these sorts of data.

Q. Given your definition of raw data that you discussed earlier, is it possible to have a timestamp of 2021 on raw data from 2020?

MR. KUMAGAI: Object to form.

A. The fact that there are

differences means that one would have to understand why those differences arose.

It depend -- again, it -- I would not -- I do not know whether these are raw data or not.

I was asked to compare these data with these data, and what I determined was that there was a -- a pattern of discrepancies and they delve into a particular type of pattern.

That's what my opinion is based on.

That's what I say in the -- in the reports.

Q. When did you reach this opinion?

A. I -- I can answer the question, I just --

THE WITNESS: I need to know whether this is something that is privileged or not.

MR. KUMAGAI: You can disclose the time that you reached --

* DR. DAVID A. SANDERS *

THE COURT REPORTER: I can't hear you.

"You reached your..."

What?

MR. KUMAGAI: You can disclose the time that you reached the opinions.

To the extent that you understand the question.

THE WITNESS: Right.

A. And that --

THE WITNESS: Thank you.

A. On the basis of the data that are present in this document?

Q. Whenever you reached your opinion that's presented in your report.

A. So...

I was presented with an earlier form of the data before this.

So, I was presented with a -- a set of data, a month or so before this, that, I believe, it was Dr. Heilbut had been able to obtain, not from CUNY, but by using some software.

* DR. DAVID A. SANDERS *

I originally --

MR. KUMAGAI: Just -- I just want to make sure that you don't just testify as to anything you -- anything about our substantive discussions. So...

THE WITNESS: That's the -- that's --

MR. KUMAGAI: Can we have two minutes, just to clarify?

THE VIDEOGRAPHER: The time on the video monitor is 4:33 P.M.

We are off the record.

This ends media five.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: We are back on the record.

The time on the video monitor is 4:38 P.M.

This start media 6.

Q. All right. Dr. Sanders, before you took a break to speak with your counsel, we were discussing materials that

* DR. DAVID A. SANDERS *

had been provided to you by Adrian Heilbut before you reviewed these materials.
Is that right?
A. So, before I was provided with the -- this 12- -- 12/21 report, I was provided with materials that I evaluated in the beginning of December that were included in deposition -- I think -- of -- of Dr. Wang.
And they were the -- the -- the the numbers were the same, but -- yeah.
So, that's when I -- that's when I came to that conclusion, was the beginning of December.
Q. And you told me that you understand that Dr. Heilbut obtained those from source -- a source, other than CUNY.
Is that right?
A. No.
That -- that is --
I misspoke.
What I meant to say was that he was not using the -- the soft -- the same software, that he was using own software.

* DR. DAVID A. SANDERS *

So, I -- I didn't mean that the data aren't from -- from CUNY, I -- what I meant was:

It wasn't the same software as the machine that was operating at CUNY.

Q. And do you know what software Dr. Heilbut was using?

A. At which point?

Q. Before December...

A. I do not know.

Q. Did you talk to him about it?

A. I have not sp- -- I -- I have not spoken to him.

Q. Did Dr. Heilbut present the issue of these discrepancies to you?

A. I have never spoken with Dr. Heilbut --

Q. In these materials --

A. -- or communicated with him in any -- in any way.

Q. -- in the materials that you received that you understand were from Dr. Heilbut --

A. Yes.

* DR. DAVID A. SANDERS *

Q. -- before December, did they conain -- contain any analysis comparing the 2020 data to the 2025 data?

MR. KUMAGAI: Object to the form.

You can answer.

A. They presented both sets of -- of data, yes.

And -- yes.

Q. Did they identify the discrepancies for you?

MR. KUMAGAI: Object to the form.

Are you asking about -- who are you saying "they" as?

MR. CAMPBELL: Dr. Heilbut.

Q. The -- the materials that you understood you received from Dr. Heilbut.

A. Yes.

They identified the discrepancies.

Q. Did you include those materials in your "List of Materials Considered" in your report?

A. I do not recall.

Q. Do you know whether you did?

A. I do not recall.

Q. Would you expect them to be listed in your "List of Materials Considered"?

A. Yes.

Q. Because you considered them in forming your opinions in this case?

A. Yes.

Q. Okay. I'm going to give you another couple of sets -- couple of documents.

So, again, the first is going to be presented data.

And I'll mark this as Exhibit 8.

MR. KUMAGAI: Thank you.

(Whereupon, Sanders Exhibit 8, Presented Data, was marked for identification.)

MR. CAMPBELL: And the second will be the -- marked "Raw Data Spreadsheet," which I'll mark as

* DR. DAVID A. SANDERS *

Exhibit 9.

(Whereupon, Sanders Exhibit 9, Raw Data Spreadsheet, was marked for identification.)

MR. KUMAGAI: Do you have an extra copy of those --

MR. CAMPBELL: (Handing.)

Yeah.

MR. KUMAGAI: -- so I can pass these --

MR. CAMPBELL: Yeah.

MR. TAYLOR: Thanks.

MR. CAMPBELL: This is --

MR. KUMAGAI: Same?

This is 9 or 8?

MR. CAMPBELL: That's 9.

Okay.

MR. KUMAGAI: Do you have an extra copy of 8?

Because I gave mine to --

MR. CAMPBELL: Yeah (handing.)

MR. KUMAGAI: Thank you.

MR. CAMPBELL: Yeah.

Q. Do you recognize these as

additional documents that you compared as part of your analysis?

A. Yes.

Q. And the first, Exhibit 8, this is the presented data that Dr. Wang sent to Cassava in 2019; is that right?

A. Yes.

Q. And the second is a spreadsheet created by Adrian Heilbut, in 2025, right?

A. Yes.

Q. I want you to look at the first substantive pages that we discussed setting forth the metadata for the ELISA run.

Do you see that?

A. Yes.

Q. And again, the date of Dr. Wang's data is October 11, 2019?

A. Yes.

Q. You understand that's when the data was exported?

A. Yes.

Q. And Dr. Heilbut's data was exported in 2025?

MR. KUMAGAI: Objection.

* DR. DAVID A. SANDERS *

A. Yes.

Q. And again, if you look down at the software versions, the description of the software is different than the description -- the version is different between the two documents?

A. Yes.

Q. And if you look down at the lot number, the lot numbers are different between the spreadsheets?

A. Yes.

Q. So, again, the lot number for Dr. Wang's data is October 11, 2019 at 14:50.

Is that right?

A. Yeah -- yes.

Q. That's the same time as the "date measured," above?

A. Yes.

Q. And two minutes before the "time of export," above?

A. Yes.

Q. And the lot number for Dr. Heilbut's spreadsheet is October -- is

* DR. DAVID A. SANDERS *

August 5, 2021; is that right?

A. Yes.

Q. More than a year after the "date measured" and "date evaluated"?

A. Yes.

Q. And the same for the optimization dates?

Dr. Wang's is October 11, 2019, three minutes before the "date measured"?

A. Yes.

Q. And Dr. Heilbut's was optimized August 5, 2021, more than a year later.

Is that right?

A. Yes.

Q. And you don't have an understanding of what the time stamps for the lot number and optimization means -- dates mean?

A. I do not.

Q. And you didn't evaluate that, as part of your report?

A. I did not.

Q. You just assumed this was the raw data?

* DR. DAVID A. SANDERS *

A. I was asked to assume that these were the data that were present on the computer and that they had been -- that these were the data that had -- yeah.

That it indicated that they had been exported from the -- from the data reader.

Q. And you just assumed that?

A. I was asked to assume it, yes.

Q. Did you do anything to verify that it was actually the raw data?

A. I did not.

Q. And given your view that changes -- later changes in the metadata -- meaning that the data is no longer original or raw, does that mean that this is not the raw data?

MR. KUMAGAI: Object to form.

A. So, I would -- if I have to -- you know, if -- it -- it means that there are questions as to whether these are the raw data, absolutely.

Q. I'd now like to draw you back to the presented --

* DR. DAVID A. SANDERS *

THE COURT REPORTER: I can't hear you.

MR. CAMPBELL: I'm directing him back to Exhibit 6:

"The presented data for the PTOW 181."

(Witness complies.)

MR. CAMPBELL: I'm going to mark a new exhibit, as Exhibit 10.

(Whereupon, Sanders Exhibit 10, CSF 2-B PTOW Group Zero Versus 28, was marked for identification.)

Q. So, now, do you have Exhibit 6 and Exhibit 10?

A. Yes, I do.

Q. And the title for Exhibit 10 is:

"CSF 2-B PTOW Group Zero Versus 28."

Do you see that?

A. I have:

"Group 1 Zero Versus 28."

Q. That's a good correction:

"Group 1 Zero Versus 28."

* DR. DAVID A. SANDERS *

A. Okay.

Q. Is that right?

A. I just want to make sure it's the same document.

Yes.

Q. And if you look at the "created date" for this spreadsheet, in the metadata on the front, what is that?

A. "Created: 6/9/2020."

Q. At "9:44 A.M."?

A. "9:44 A.M."

Q. And that matches the "created date" on Exhibit 6; is that right?

A. Yes. It does.

Q. And if you look at the "last modified date" for Exhibit 10.

(Witness complies.)

Q. It's approximately 32 minutes later, right?

A. Yes.

Q. So, based on your understanding of that metadata, does that mean that this spreadsheet was last modified 32 minutes after it was created, in June of 2020?

* DR. DAVID A. SANDERS *

A. Yes.

Q. I want you to look at the first substantive pages of both of these spreadsheets, side by side.

(Witness complies.)

Q. Do you see the "date" columns?

A. Yes.

Q. They're exactly the same?

A. Yes.

Q. "Date measured" columns are the same?

A. Yes.

Q. "Date evaluated" are the same?

A. Yes.

Q. "Software versions" and "types" are the same?

A. "Type..."

Is that -- you mean just "software"?

Q. Yeah.

Where it lists the type of software --

A. Okay. Yes.

Q. -- the multi-mode analysis

software.

A. Yes.

Q. And then, if you look down at the "lot numbers."

They're the same?

A. Yes.

Q. To the second?

A. Yes.

Q. And if you look at the "optimized" line, those are the same?

A. Yes.

Q. Okay. And so, the data in both of these spreadsheets was optimized at the same time, on June 9, 2020, right?

MR. KUMAGAI: Objection to form.

A. I'm sorry. Could you repeat the question?

Q. The data in these two run -- ELISA runs was optimized at the same time, on June 9, 2020, right?

MR. KUMAGAI: Objection to form.

A. I do not know what "optimized"

mean -- means.
I've -- I have stated that.
Q. And you don't know what the lot numbers mean, either?
A. No.
Q. But you recognize that there's no difference between these two documents, in terms of the "lot number" and the "date optimized"?
A. Oh, the "date optimized"?
I thought you said -- and that's what I was asking, so -- whether you said "date" -- you said -- I thought you said the:
Data optimized.
The "date optimized"?
I see that the line for "optimized," in terms of the date, is the same. Yes.
Q. And, in fact, all of the metadata for both of these spreadsheets is the same; is that right?
MR. KUMAGAI: Object to form.
A. Yes.

* DR. DAVID A. SANDERS *

Q. Now, turning to the next page.

(Witness complies.)

Q. You have, again, have listings for each well and the output from the ELISA machine.

Do you see that?

A. Yes.

Q. I'd like for you to do the same exercise for these two documents that you did for you report, in comparing the data.

A. Yes.

(Witness complies.)

A. Okay.

Q. Are they the same?

A. The well data is the same, yes.

Q. They're identical?

A. They are identical.

Q. Though the "raw data" values that Dr. Wang exported and saved and last modified 32 minutes after the experiment were run are exactly the same as what was sent to Cassava, right?

MR. KUMAGAI: Object to form.

A. I do not know that these are

the raw data.

I know that the data in this document for the wells is the same as the document for the wells in these data -- in this paper -- in this GTS.

That's what I know.

Q. And unlike the data in Dr. Heilbut's spreadsheet, the metadata for this run is the same as the presented data for -- that Dr. Wang sent to Cassava; correct?

A. That is --

MR. KUMAGAI: Object --

A. -- the --

MR. KUMAGAI: -- to the form.

A. -- the metadata, here, are the same as the metadata on this sheet.

Yes.

Q. And you understand, from the last modified data, that this spreadsheet has not been changed since June 9, 2020, right?

MR. KUMAGAI: Object to form.

A. That would -- that would --

that's my -- that's my interpretation, yes.

Q. Hasn't been changed since 32 minutes after the ELISA analysis was run; right?

A. Yes.

Q. Okay. Based on your expertise and experience, is this a better representation of the raw data than Dr. Heilbut's data, from 2025?

A. I do not know.

Q. Anybody show you this spreadsheet?

A. I don't -- I don't recall it, but I don't -- yeah.

I do not recall it. I don't know.

Q. It is part of the materials that you considered in drafting your report?

A. I don't recall it.

Q. If you'd reviewed this material before, would that affect the conclusions in your report?

A. I was asked to compare the

data, here, with the data, here; and to assume that these were original data.

And these were the ones that were sent to Cassava.

Q. If I asked you to assume that Exhibit 10, the document that was last modified 32 minutes after the run was the raw data and do the same analysis, would you have reached a different conclusion?

A. If I were asked to assume that this was the raw data that came from the machine and it had this same data as the one sent to Cassava?

If you -- if you asked me to assume that, then the answer is that:

These are the same data.

Q. And based on the mid -- the metadata in Dr. Heilbut's spreadsheet, you have reason to question whether that's the raw data, right?

MR. KUMAGAI: Object to form.

A. I have reason to question all -- you know, if -- you know, if you're asking me, as outside, evaluating, I have

* DR. DAVID A. SANDERS *

reason to ask whether any of these represent the raw data.

Q. You have reason to believe, based on the metadata of the documents that were in front of you and that you had evaluated, that Dr. Heilbut's data is not the raw data, given that it has optimization dates a year later, right?

MR. KUMAGAI: Object to form.

A. So, since I don't fully understand what those dates mean, I can't give you a full answer.

I would be -- you know, it is -- it would be an issue to evaluate what those data mean and what is the potential impact on that?

But I was asked to assume that when I made this opinion that these data were the raw data and that these data were the data that were sent to Cassava.

Q. And there's no such metadata discrepancy in Exhibit 10, right?

A. So, there is no -- there is no discrepancy, except for the modification

time for these data.

Q. Which is --

A. And the -- and the -- and there's a different author.

Q. Right.

The "modification time" for this one is 32 minutes after the run, right?

A. Right.

And there's a -- and there's also a different author.

Q. Right: Sabrina.

Do you know who "Sabrina" is?

A. I do not know who Sabrina is.

Q. Okay.

A. And also, there's a -- I mean, there's a different size in the -- in the documents.

Q. Well, you would expect there to be a different size, right?

A. I don't have no expectations.

I'm just saying: You asked me to look at the metadata and I'm noticing the page that you presented is identical,

* DR. DAVID A. SANDERS *

but this page is not identical.

Q. Okay. So, the substantive page readout from the ELISA machine is identical.

MR. KUMAGAI: Object to form.

A. I have -- what I have is what you've presented to me.

You are representing that it is that and then, you've asked me to make assumptions on the basis of that.

I do not know that.

Q. I'm not asking you to assume anything.

Do you know whether this is output from an ELISA machine?

A. This is a -- I mean, this is a piece of paper that you've presented to me; and these are likely to be outputs -- this is the sort of thing that is an output from an ELISA machine.

Q. Okay. And the --

A. What --

Q. -- what appears to you to be outputs from an ELISA --

* DR. DAVID A. SANDERS *

A. Yes.

Q. -- machine is identical to the documents that was sent by Dr. Wang to Cassava in 2020?

A. So, these --

MR. KUMAGAI: Objection to form.

A. -- these -- this page is identical to this page: The -- on -- Exhibit 6 and Exhibit 10.

The -- what's present on the first page is not identical.

Q. And, in fact, Exhibit 6 contains a lot more things than what's in the -- Exhibit 10; is that correct?

A. Correct.

Q. And on -- it includes what you've described as Dr. Wang creating a plate map, right?

A. Yes.

Q. And it includes what you described Dr. Wang cal- -- making various calculations, right?

A. Yes.

* DR. DAVID A. SANDERS *

Q. Okay. And that would change the size of the Excel file, right?

A. Absolutely.

MR. CAMPBELL: And we'll mark another document, as Exhibit 11.

(Whereupon, Sanders Exhibit 11, A beta CSF 5101119-copy, was marked for identification.)

MR. KUMAGAI: I don't have a set.

Q. So, this is the -- a document marked:

"A beta CSF 5101119-copy."

Do you see that?

A. Yes.

Q. And I'd like to compare that with presented data, in Exhibit 8, that you examined that was sent by Dr. Wang to Cassava in 2019.

Do you have that?

A. Exhibit 8?

Q. 8.

A. Thank you.

MR. KUMAGAI: And just for the

record:

Scott, is this a -- is there a Bates Stamp for this document?

MR. CAMPBELL: I think there is.

We printed out this.

This was produced; so I assume there's a Bates Stamp for it.

We can get that for you.

MR. KUMAGAI: Okay.

Q. So, this -- if you look at the "created dates" for these two documents, they're both "October 11, 2019" at "2:52 P.M."

Do you see that?

A. I see that, yes.

Q. And Exhibit 11 was last modified 11 minutes later, at 3:03 P.M., that same day.

Is that right?

A. Yes.

I see that.

Q. Do you understand this spreadsheet hasn't been changed since 11

minutes after the analysis was run?

MR. KUMAGAI: Object to form.

A. What I have is created.

So, I have -- what I have -- yeah: "Created times."

Q. You're looking at the next page.

So, let's go ahead and do that exercise.

A. Yeah.

Q. So, for both of the documents, can you turn to the first substantive page in the ELISA readout?

A. Yes.

Q. The date of the export for both of these is October 11, 2019 at 2:52 P.M.; is that right?

A. Yes.

Q. The "date measured" is two minutes before that, on both?

A. Yeah.

Q. The "date evaluated" is one minute before that, on both?

A. Yes.

* DR. DAVID A. SANDERS *

Q. Again, the "software listing" is the same?

A. Yes.

Q. The "version" is the same?

A. Yes.

Q. The "lot numbers" are the same; is that right?

A. Yes.

Q. Down to the second?

A. Yes.

Q. And the "optimize date and time" are the same, right?

A. Yes.

Q. Any discrepancies between the ELISA readout in these two spreadsheets?

MR. KUMAGAI: I'll object to the form.

A. I do not see any.

Q. Turning to the next page.

(Witness complies.)

Q. I would like you to conduct the same analysis --

THE COURT REPORTER: I can't hear you.

* DR. DAVID A. SANDERS *
I'm sorry.
MR. CAMPBELL: I put a paper right over the screen, when I said that.
Q. I'd like you to conduct the same analysis for these two spreadsheets that you did in your report.
(Witness complies.)
Q. Are they the same?
A. Yeah.
They're the same.
Q. Okay. And so, the spreadsheet that was saved and last modified 11 minutes after it was created has the same data as was sent to Cassava on the same day?
MR. KUMAGAI: Object to form.
A. The -- so, could you repeat the question, please?
Q. Sure.
The data that was saved 11 minutes after it was created, at 3:03 P.M. on October 11, 2019, is the same as the presented data that was sent by Dr. Wang to Cassava?

* DR. DAVID A. SANDERS *

MR. KUMAGAI: Object to form.

A. These -- I'd have to, you know, recall, like, you know, just from looking at the numbers. It doesn't necessarily make me, you know, remember.

But, you know, if you represent that these are the data that were sent to Cassava, I think that's likely.

The data that are present here, you know, for the wells are the same as the data that are present here.

Q. And to be clear: I'm not representing it.

This is from Exhibit E to your report, the presented data.

A. Right.

Q. You're representing was the data --

THE COURT REPORTER: I'm sorry.

Can you repeat the last question?

I couldn't really hear it.

MR. CAMPBELL: Sure.

Q. I'm not representing anything.

* DR. DAVID A. SANDERS *

This is the document, from Exhibit E, that you represented was sent by Dr. Wang to Cassava, right?

MR. KUMAGAI: Object to form.

Are you talking about Exhibit 8?

MR. CAMPBELL: Yes.

Did I say the wrong one?

The presented data spreadsheet: Exhibit 8.

A. The question again?

And then I'll --

Q. This data, you are representing, in your report, was sent by Dr. Wang to Cassava, in 2019?

MR. KUMAGAI: Object to form.

A. I -- the answer is that the data are the same.

I don't recall -- you know, just from looking at a set of numbers which document this is.

But if this -- we can agree, that this is part of my report, we represented it as presented data, then the

answer is yes. Yes.

Q. And the data that was saved out of the ELISA machine 11 minutes after it was created is the same?

MR. KUMAGAI: Object to form.

A. These are -- what's present in this -- this is the same as what's present here.

And based upon the -- based upon this, they're -- I mean this one -- okay.

Based upon this, which doesn't seem to have an author, there's 11 minutes between when it says it's created to when it's been last modified.

Q. Right.

And the 11 minutes is not only after the date it was created, but 11 minutes after the export was created, according to the ELISA metadata, right?

A. Yes. Yes.

Q. Going back to your report.

(Witness complies.)

Q. Paragraph 119, you say:

* DR. DAVID A. SANDERS *

"Based on the facts I have been shown and asked to assume, it appears Dr. Wang repeatedly fabricated data from ELISA experiments conducted from Cassava."

Right?

A. Correct.

Q. What facts were you shown?

A. I was fact -- shown a comparison -- I was shown the data and a comparison of the data that was shared between Dr. Wang and Cassava, I believe through the means of Dr. Burns.

And data that was -- I was asked to assume was generated from -- originally -- that was used from using software to extract the data from the computer that was connected to the plate reader.

And that was -- that was where the -- the data was generated.

Q. And you understand that comparison was done by Dr. Heilbut?

A. Yeah. Yes.

That's what I understand.

* DR. DAVID A. SANDERS *

Q. Okay. And you understand that the exporting of the data was done by Dr. Heilbut?

A. Exporting of the data?

Q. The creation of the Excel spreadsheets you used.

A. Yes.

Q. Were you shown the documents that we just looked at: Exhibit 10 and 11?

MR. KUMAGAI: Just for the record:

Scott --

THE COURT REPORTER: I can't hear you, sir.

MR. KUMAGAI: Just for the record:

Scott, both exhibits, 10 and 11, were produced in this case and have Bates Stamps; is that right?

But the Bates Stamps are not reflected on the documents?

MR. CAMPBELL: That's correct.

A. I do not recall having seen these documents.

* DR. DAVID A. SANDERS *

Q. Were you shown any other contemporaneous records of Phase II ELISA results with metadata indicating they're from the same years?

MR. KUMAGAI: Object to form.

A. You'll have to --

Q. Yeah.

That's a bad question.

What I'm trying to ask is:

Did you see any other documents, that unlike Dr. Heilbut's spreadsheets, which were created in 2015 -- or 2025 -- were created contemporaneously with the ELISA results?

A. I believe I saw the documents that were shared between Dr. Wang, Cassava that were -- you know, they were in the same year as the data were created, to my understanding.

Q. And those were the documents where the metadata and the well plate data match Exhibits 10 and 11, right?

MR. KUMAGAI: Object to form.

A. Those -- yes.

* DR. DAVID A. SANDERS *

Those documents have the -- with the metadata on this page, here, are the same.

Is the same.

Q. Okay.

A. Are the same.

Q. And if you had been shown the documents that I've shown you today, with the metadata that they have, would you have reached the same conclusion:

That Dr. Wang repeatedly fabricated data from ELISA experiments?

A. I would have had -- I would have asked:

What does "lot number" and "optimized" mean?

And whether that has any effect on the interpretation.

Q. And you don't know?

A. I do not know.

Q. Because you don't know what the "lot number" and the "optimized data" from the ELISA output represented?

A. On -- on this thing?

* DR. DAVID A. SANDERS *
No, I do not.
Q. Okay.
MR. CAMPBELL: Let's take a break.
MR. KUMAGAI: Off the record.
THE VIDEOGRAPHER: Yes.
The time on the video monitor is 5:12 P.M.
We are off the record.
(Whereupon, a short recess was taken.)
THE VIDEOGRAPHER: We are back on the record.
The time on the video monitor is 5:24 P.M.
This start -- this start media 7.
Q. Welcome back, David.
So, I next want to look at the section in your report, on Pages 28 to 30, addressing the:
"Phase 2-B biomarker data."
Do you see that?
A. Yes.

* DR. DAVID A. SANDERS *

Q. Okay. And on Page 30, at Paragraphs 126 and 127, these are the conclusions you draw in that section; is that right?

A. Yes.

Q. Okay. And you say:

"Based on the facts disclosed by Cassava, summarized above, in my view, the company, Dr. Burns and Dr. Wang failed to follow sound scientific standards and practices in analyzing and presenting the Phase 2 biomarker data."

Is that right?

A. Yes.

Q. And the facts disclosed by Cassava, that you are discussing, are what are listed in Paragraphs 120 to 125; is that right?

A. That is correct.

Q. Okay. And then, in Paragraph 127, you say that:

"After disclosure of the results from the reanalysis, in September 2020, and subsequent disclosure, in

February 2021, that Dr. Wang's lab, at CUNY, was the academic lab that was involved in the reanalysis. Anyone reasonably familiar with the biomedical sciences would have recognized that there was a legitimate basis to question the integrity of the Phase 2-B biomarker data and simufilam clinical program."

Do you see that?

A. Yes.

Q. Does that mean that Cassava committed fraud?

A. Again, "fraud" is a fraught word.

And it seems, to me, that it -- it seems, to me, that the fact that Dr. Wang's lab, at CUNY, was the academic lab that was involved and that was not provided as information, is not consistent with scientific standards.

Q. And not provided to whom?

A. Not provided to -- I'm trying to remember who it was -- I think there was -- I'm trying to remember now -- it was

not provided in a -- in a press release.

Q. In a public press release?

A. Yes.

Q. Okay. Whose job is it to assess the simufilam clinical program?

A. That's a very broad question.

Q. Whose primary role is to evaluate the clinical program for simufilam?

A. Again, it's a -- probably -- I mean, Cassava, whose conducing the trial, should be evaluating -- evaluating it in a fair and scientifically valid fashion.

Q. And who are they preparing that clinical program for?

MR. KUMAGAI: Object to form.

A. They are presenting -- I mean, to -- ultimately, to the FDA.

But as far as I can tell, there are a -- a company, I think a publicly traded company.

So, they're also presenting a -- data to the public, through press releases.

* DR. DAVID A. SANDERS *

Q. The FDA is the body that decides whether or not the clinical program gets to proceed; right?

A. That is correct.

Q. And the FDA is the one who has to improve the -- approve the parameters around the clinical program; right?

A. That is correct.

Q. Okay. And so, if you want to get into a Phase III clinical trial, you need approval from the FDA, right?

A. Yes.

Q. So, they have to assess --

THE COURT REPORTER: You have to slow down a little bit, sir, because I can't really hear you very well.

I'm sorry.

Q. Okay. So, they have to assess Cassava's clinical program, including Phase II, right?

A. Yes.

Q. Is the FDA reasonably familiar with biomedical sciences?

* DR. DAVID A. SANDERS *
A. Yes.
Q. Are you suggesting that -- well, first of all, do you know whether the FDA was aware that Dr. Wang conducted the reanalysis?
A. I am -- I'm not sure.
Q. Do you know if that data was disclosed on clinicaltrials.com?
A. I remember a reference to that.
I -- and I remember that there were some data that were disclosed and other data that might have -- that should have been disclosed and were not.
I don't recall which is which.
Q. Okay. Do you know what clinicaltrials --
A. Yeah.
Q. -- -.com is?
A. Yeah.
Q. You know that's where clinical trial data is posted?
A. Yes.
Q. And you acknowledge, here, in your report, that, in February of 2021, Dr.

Wang was, in fact, the first author on the phase to be studying manuscripts submitted to research square; is that right?

A. That is correct.

Q. Do you think when the FDA learned about this, they should have shut the clinical program down?

MR. KUMAGAI: Object to form.

A. That is not -- that is not my -- what I'm referring to.

I'm not -- I don't believe I said anywhere, here, about what the FDA should or should not have done.

Q. Would you --

A. I don't think that's present in my opinion.

Q. Well, you said:

"Anyone reasonably familiar with the biomedical sciences would have" recommend -- "would have recognized there was a problem with the integrity of the Phase II data," right?

MR. KUMAGAI: Object to form.

A. What it actually says is that:

* DR. DAVID A. SANDERS *

It would have recognized that there was a legitimate basis to question the integrity of the Phase 2-B biomarker data.

And so, then...

Let me see, from -- clinical program.

Q. That would include the FDA, right?

A. Yes.

Q. Okay. And so, my question is:

Do you think that the FDA should have stopped the simufilam clinical program at that point?

A. My opinion is not about the FDA and it's -- whether it should or should not.

This is something that someone familiar with the bioscience -- biomedical sciences should have taken into account.

Q. Do you know whether they took that into account?

A. I do not know.

Q. Do you know whether they

approved the Phase III trials?

A. I -- my recollection is the answer is "yes."

But I'm not -- I -- I can't visualize, in my mind, which document informed me of that.

Q. But your understanding is yes, the FDA approved the clini- -- the Phase III clinical trials?

A. That, I -- that is what I recall.

Q. With the awareness that Dr. Wang's lab was the academic lab that was involved in the reanalysis?

MR. KUMAGAI: Object to form.

A. I -- as I mentioned before: I don't know that.

Q. Because you don't know whether the FDA was aware?

A. Yes.

Q. And would you expect the FDA to be aware of the data that was published on clinical trials?

A. Yes.

* DR. DAVID A. SANDERS *

Q. And would you expect them to consider that in their evaluation of Phase II(b) before approving Phase III?

A. Yes.

Q. I want to look next at the section Quanterix data, Section C, starting at Paragraph 128.

Do you see that?

A. I do, yes.

Q. And in Paragraph 129, you describe the:

"Plasma testing that Cassava Sciences asked Quanterix to conduct."

Is that right?

A. I don't think I describe it.

I quote from the submission by Cassava to the FDA.

Q. That's a good point.

So, if this entire description from you, on all of Paragraph 129, it's just a quotation of a submission to the FDA by Cassava, right?

A. That is my recollection, yes.

Q. And then, you conclude, based

on that submission, that:

"Anyone familiar with the biomedical sciences would have recognized there was a legitimate basis to question the integrity of the Quanterix data presented by Cassava."

Right?

A. Yes.

Q. And that's based on the submission to the FDA?

A. Yes; correct.

Q. So, the FDA was aware of this information?

A. Yes. They were.

Q. Okay. And they are people reasonably familiar with biomedical sciences, right?

A. Yes.

Q. Okay. Do you think the FDA should have halted the trial at that point?

A. What I say here is that:

"There was a legitimate basis to question the integrity of the Quanterix data presented by Cassava, especially in

light of Dr. Burns" --

(Witness sotto voce.)

A. -- "sending of samples in two halves."

Q. Right.

And so, based on their knowledge, based on Cassava's submission to the FDA, that the data was submitted in two halves, do you think the FDA should have stopped the trials?

A. I believe that this is a failure to follow sound scientific standards.

That's what I am opining on.

Q. And anyone reasonably familiar with the biomedical sciences would recognize that, right?

A. That is correct.

Q. Including the FDA?

A. That is correct.

Q. So, you think the FDA should have questioned the integrity of the clinical trials?

MR. KUMAGAI: Object to form.

* DR. DAVID A. SANDERS *

A. Yes.

Q. So, do you think the FDA should have halted the trials at that point?

A. My opinion is about whether there is a reasonable question to -- of -- of the integrity, not about what the decision-making process of the FDA is.

Q. Do you think the FDA had access to more information about Cassava's clinical trials than you reviewed for this report?

A. Yes.

Q. Okay. And the FDA made the decision to let Cassava proceed with the Phase III clinical trials, right?

A. Yes.

Q. And they're reasonably familiar with the biomedical sciences, right?

A. Yes.

Q. I want to look at your next section, on immunoblot data --

A. Yes.

Q. -- do you see that?

Is there a difference between

immunoblot data and Western blots?
A. No.
Q. So, we can use those interchangeably?
A. Ye.
Q. And again, you have an appendix to your report, Appendix A, describing the Western blotting process; is that right?
A. Yes.
Q. And in the first paragraph of that, you say:
"Over the course of my career, I have conducted dozens of immunoblot experiments, also referred to as 'Western blot experiments,' and presented the results of the same."
Is that correct?
A. That's correct.
Q. And so, by the word "dozens," I take it you have run fewer than 100 Western blots?
A. I am not sure that it's fewer than 100.
Q. Okay.

* DR. DAVID A. SANDERS *

A. It's fewer than 1,000.

Q. Fewer than 1,000?

A. Yes.

Q. Okay. Fewer than 500?

A. I guess it also depends upon what you describe -- what you mean by "experiments."

Q. And when you say you conducted "dozens," what are you referring to?

A. Right.

There, I was actually talking about complete blots.

But each blot represents many experiments. Each lane is its own experiment, so...

Q. Okay. So, if you -- if you add up all of the lanes and all of the blots that you've done, then you may have done hundreds of them?

A. Yes.

I mean, if I'm adding up all of than lanes of all of the blots, I may have actually exceeded 1,000.

Q. Okay. Is that the way you

* DR. DAVID A. SANDERS *

would normally add up --

A. No --

Q. -- the blots?

A. -- I know -- I know -- I -- I -- it's -- this is not a question -- I -- this isn't a question I'm ever asked:

How many immunoblots have you done?

So, I would normally think of it, in terms of the number of blots I have done, rather than the number of lanes, on a -- on the blots.

Q. Okay. Do you consider Western blotting to be your area of expertise?

A. It is an area of expertise, yes.

Q. Okay. And so, you would consider yourself an expert in Western blotting?

A. Yes.

Q. Okay. And I -- I'm sure I asked you this, when we went through it, but do you also consider yourself an expert in ELISA experiments?

* DR. DAVID A. SANDERS *

A. I have expertise in ELISA experiments.

I -- what is -- I -- I think what is important is that I have expertise in the analysis of statistical data, including those from ELISA experiments.

Q. Okay. As opposed to running the ELISA experiments yourself?

A. As a -- I have not -- I have not run as many ELISA experiments as I have run immunoblot blot experiments.

But again, I teach about both of them.

I've taught a generation of students about each one of these techniques.

Q. Okay. When was the last time you ran a Western blot?

A. It -- personally? It would have been decades.

Q. In Paragraph 133, you say:

"You've reviewed allegations against Dr. Wang and Cassava made by plaintiffs and by the authors of the

citizens petition, in 2021."
Do you see that?
A. Yes, I do.
Q. And you say:
"I've also reviewed the reported findings of CUNY's Investigation Committee, as described in the committee's final report, published by Science Magazine in October 2023."
Do you see that?
A. That is correct.
Q. "As well as the retraction notice issued in March 2022 by the scientific journal, Plus One, which retracted five articles by Dr. Wang, including two co-authored by Dr. Burns."
Do you see that?
A. That is correct.
Q. Then, in Paragraph 134, you say:
"In my opinion, these documents describe credible and troubling signs of data falsification or fabrication in Dr. Wang's and Dr. Burns' immunoblot data,

including, among other issues..."

And then, there's a list of them there.

Do you see that?

A. I do.

Q. Okay. So, my question is:

Based on Paragraph 134, are you adopting all of plaintiffs' allegations regarding falsification of Western blots as your own, here?

MR. KUMAGAI: Object to the form.

A. The -- I refer to specific ones in here.

I'm trying to see where that --

Q. That is -- that is exactly the question that I'm going to ask.

So, I'm confused because you have very specific criticisms that are clearly your own --

A. Yes.

Q. -- beginning in Paragraph 136.

A. Yes; correct.

Q. So, I'm just trying to address

* DR. DAVID A. SANDERS *

Paragraph 133 and 134, where you say you've:

"Reviewed various materials and in your opinion, they describe credible and troubling signs of data falsification."

A. Yes.

If you allow me to -- I -- in my recollection, on 149, I refer to a -- what I -- this is my recollection:

On 149, Number 2, I refer to, specifically, an image that was mentioned, I believe, in the slide deck.

Q. Okay. And so, what I -- I understand and we can deal with, separately, the ones after 136 because I clearly understand that those are your opinions.

A. Yes.

Q. I'm just asking how to interpret 134.

Are you saying:

In your opinion, all of the criticisms in the documents, listed in 133, are valid?

* DR. DAVID A. SANDERS *

A. This is the whole list of --

Q. I know --

A. -- of the signs that -- I mean, some of them are, you know, relevant to things directly described by the, you know, in the -- in the documents of others that I was provided and some of which are things that I have seen.

And that many of which were -- examples of which were noted by others over the course of time.

Q. I understand.

And my question is: For purposes of this case --

A. Yes.

Q. -- do you intend to opine that all of the criticisms that were listed in Paragraph 133, in those documents, are valid?

A. So, you're asking me -- 133?

I refer to allegations made by plaintiffs. I have findings by the investigation committee; and I -- there's a retraction notice of -- for Dr. Wang's

articles, which -- which parts of that are you asking me about?

Q. So, I'm asking you about all of them.

So, what I want to know is when we come to speak about your opinions in the report --

A. Yes.

Q. -- and you offer a rebuttal opinion --

A. Yes.

Q. -- I want to know if, in Paragraph 134, you're saying:

"I have reviewed, independently, myself the allegations that plaintiffs made that are made in the citizens petition, that are made in the CUNY report and that were made by Plus One and determined, in my opinion, that those are valid criticisms."

And therefore, I need to go through them with you.

Or are your opinions the ones listed in 136 on?

* DR. DAVID A. SANDERS *

MR. KUMAGAI: Object to the form.

Q. Do you understand my question?

A. I -- mostly.

So, what I say here:

"In my opinion, these documents describe credible and troubling signs of data falsification, the fabrication in Dr. Wang's immunoblot..."

Dah, dah.

That refers to all of Paragraph 133.

It doesn't -- for example, in the reported findings of the investigation committee, there are many findings and -- and then there are many problematic aspects that are mentioned in that.

I am not going to say I agree with that -- in every single case -- there was data falsification and fabrication.

But I will say that looking at the -- the -- all of these documents, the ones made by plaintiffs, the ones made in the citizens petition, the ones that are

* DR. DAVID A. SANDERS *

described in the investigation committee, the retraction, they support a -- a finding that there are troubling signs of data falsification or fabrication.

So, I'm not automatically ascribing to any of this, but they describe credible and troubling signs of data fal- -- falsification.

That's what I'm -- that's what the, you know, opinion says and that's what I mean.

Q. Are there any specific criticisms in any of those reports that you are directly endorsing?

MR. KUMAGAI: Objection.

Q. Your own opinion, they're correct?

MR. KUMAGAI: Object to form.

A. So, I believe that 149-2, if my recollection serves, was described in the allegations against Dr. Wang and Cassava made by plaintiffs.

I have examined the retractions in Plus One and examined the -- the fact

that there seems to be a background duplication, that there were bans imposed, on a consistent background, which is a troubling sign of data falsification or fabrication.

So those -- you know, those I would ascribe to.

There -- I mean, a- -- again, I looked at a number of the things in the -- the final report, which appear to be -- you know, again, it's -- it's -- what the documents describe, they describe troubling signs.

It's not a -- it's not just whether I came to that conclusion, the documents describe troubling signs.

Q. Okay. Other than what's listed in Paragraphs 136 to 151, and the background issues you described in Plus One, are there any other specific criticisms in the items described, in Paragraph 133, that you are directly endorsing?

A. Directly endorsing?

* DR. DAVID A. SANDERS *

Q. Yes.

Adopting the criticisms, as correct, in your opinion, based on your own analysis.

A. I'm sorry. So -- so, you're asking me:

Looking at -- so, we're including what's in 133, as well as all of these other things.

Q. No.

I want to know -- you've told me that in 136 to 151 --

A. Right.

Q. -- that we have your criticisms, right?

A. Yes.

Q. And your -- and -- and at least one of those, 149-2, you understand to be included in one of the materials in 133, right?

A. Yes.

Q. And then, you've also described for me the background issue that was identified by Plus One, which is also an

item discussed in 133, right?

A. Yes.

Q. And I'm asking:

Other than the item in 149-2, the Plus One article, are there any other items in those -- in those sources you listed that you are specifically endorsing and evaluating on your own?

A. So, I'm describing all of the different documents and I -- this is not about -- 134 is not about endorsing or not endorsing, it's about the fact that there are, in these documents, discussions of things that look like credible and troubling signs of data falsification or fabrication.

What I have done, in 135 through -- you know, mostly through 151, is to do my own analysis of things that I can see by visual inspection and using my experience.

There are many -- many people have been involved in looking at the papers of Dr. Wang. There are -- and they made

declarations about different things.

And, you know, I'm -- I have looked at them and said:

"Oh, yes. That looks right."

But I -- I didn't include them, specifically, in this report because, in this report, I was trying to combine my own observations with some observations specifically about this particular image that was presented.

I believe it was from the -- from the clients, the allegations made by the clients; and that's in 149, Number 2.

Q. Okay. And so, the issue for me is:

You're going to get on the stand and you're going to testify in this case.

A. Yes.

Q. So, my question for you is:

Are you going to get up on the stand and pull up the citizens petition and say:

"I looked at this allegation,

* DR. DAVID A. SANDERS *

it's correct, in my view"?

A. For this one?

Certainly, yes.

Q. For 149-2?

A. Yeah.

For 149-2.

Q. Which isn't in this petition, it's in the --

A. Right.

That's what I meant.

I'm sorry.

I apologize.

Q. For anything that is not listed in 136 to 151, which I understand are your opinions?

A. Yes.

Q. Are you going to get up on the stand and offer the opinion that:

Any of the other criticisms, that are levied in the citizens petition, were the plaintiffs documents or any of those things listed in 133 are valid, in your view?

MR. KUMAGAI: Object to form.

* DR. DAVID A. SANDERS *

I'm going to interject:

I think he's getting confused.

Valid?

I think what you're trying to say is:

Is he testifying that he independent -- is he planning to testify that he, independently, looked at each allegation and came to an independent conclusion, as to whether it was -- whether he agreed with the allegations or not?

MR. CAMPBELL: Except I would say "any," instead of "each."

MR. KUMAGAI: Okay.

Q. So, do you intend to offer an opinion, other than what's in 136 to 151, on any specific criticism of Cassava's Western blots? Or Dr. Wang's Western blots?

A. And what was the question?

Do I...

Q. Intend to offer an opinion...

A. "Intend."

* DR. DAVID A. SANDERS *

So, I will respond to what I'm presented.

If I'm asked:

"Compare this with this: Have you seen this before?"

If I have, then I'll say "yes."

And:

"Do you think these are the same?"

I will say: "Yes."

Q. So, let me ask you --

A. It's on -- I -- as a witness, I don't dictate, as far as I recall from what I saw on Perry Mason, I don't dictate what the questions are that I'm asked, I will respond --

Q. Let me ask this a little bit differently:

At the beginning, I asked you if you intended to opine on any issues that were not specifically listed in your report.

Do you remember that?

A. Yes.

* DR. DAVID A. SANDERS *

Q. Do you understand that the purpose of issuing a report in the case, as an expert and in advance of your testimony at trial, is so that I have notice of the issues that you're going to opine on.

A. Absolutely.

Q. Okay. So, my question is:

Based on what you've written in your report, do you intend to specifically opine on any flaws in any immunoblots that were conducted by Dr. Wang, outside of the specific issues that you identified in Paragraphs 136 to 150?

A. The -- my intention is to opine that:

Having looked at all of these -- this large accumulation of data and problematic images, that I have come to the conclusion --

THE WITNESS: I've lost the page.

Q. 32.

A. "That there's credible and troubling signs of data falsification or

fabrication."

That's -- that's what I plan to do.

And it will include -- it -- my opinion is based upon my review of the allegations made by plaintiffs, the citizens petition, the findings of CUNY's Investigation Committee, as described in the final report, as well as the retraction notice that's present in Plus One.

All of those -- all of those elements have informed my opinion.

Q. So, let me ask you this:

Do you intend to go into anymore detail in supporting that conclusion than what you've listed in Paragraphs 133 and 134 in your testimony, at trial?

A. If asked.

But I -- I'm -- I'm not intending to -- I don't know what my intent is about here.

I'm -- I'm going to respond to questions that I'm asked.

* DR. DAVID A. SANDERS *

Q. Okay.

A. I haven't --

Q. You understand you're supposed to set forth your opinions in advance of the report, right?

A. Yes.

Q. Okay. So, when you drafted this report, it includes all of the opinions that you're going to give at trial?

A. Yes.

Q. Was it your intent to capture the full nature of those opinions, in Paragraphs 133 to 134 or do you intend to offer additional testimony, beyond that?

A. So, 134, I describe:

"Duplicated images, a lack of positive controls, as needed, background image similarities, distinct aberrations in bands, shapes and backgrounds, incongruities in the backgrounds of blot panels, unexpected vertical discontinuities in several Western blot panels, suggesting the" -- "suggesting the undisclosed slicing

of blots from different gels, discontinuities in the background intensities of blot panels and discontinuities in background signals, consistent with the cutting and pasting of specific bands."

If the examples that, you know, arise during my testimony, arise from these and they are illustrative of these things, that's what we -- that's what the opinion is about, I'll talk about them.

That's part of my opinion.

Q. Okay. So, which specific images, in the sources identified, in Paragraph 133, in your view, show discontinuities and background signals consistent with the cutting and pasting of specific bands?

THE COURT REPORTER: I can't hear you, sir.

MR. CAMPBELL: Sure.

Q. Which specific Western blot images in the second -- in the citations, in Paragraph 133, show discontinuities in

background signals consistent with the cutting and pasting of specific bands do you intend to opine on at trial?

A. I saw these, when I was looking at the -- the documents.

This is a list of problems that I noticed; and so, that's why they're included.

If -- are you going to ask me:

Which image now?

I can not recall.

Q. Well, I need to ask you which image now because I need to know which ones I'm going to cross examine you on at trial.

This is my only opportunity to depose you and I need to know now.

A. I -- to -- you know, I -- to the --

Q. This is why --

A. To the best of my knowledge, they are present in these -- in the description of these -- the description of -- of these things.

They're present, either, in the

* DR. DAVID A. SANDERS *

allegations made by plaintiffs or by the authors or in the CUNY Investigation Committee or as well as the retraction notice.

I -- I read all of those items.

And when I was reading them, I said:

"Oh, yes. Here's a -- a splicing problem.

"Oh, yes. Here's a background problem."

And that informed -- this is not a list of all of the possible ways to falsify or fabricate immunoblots. These are ones that I specifically observed in this set of documents that I -- that I familiarized myself with.

Q. Which particular images, in those documents, demonstrate the slicing problems?

A. I do not recall.

Q. And you don't set that forth in your report?

MR. KUMAGAI: Object to form.

* DR. DAVID A. SANDERS *

A. In -- I -- am -- no.

Q. There's no way for you and I -- you or I, sitting here today, looking at your report, to know which images in all of these various sources you identified as "problematic"?

A. There's the ones -- they're the ones described in these -- in these doc- -- documents.

Q. And you don't know which ones those are, sitting here today, right?

A. I do not.

Q. And you can't tell from viewing your report, sitting here today, right?

A. Beyond the fact that there are these documents that demonstrate all of these issues that I have included here? No.

I can not tell you which article, you know, off the top of my head, which article has which problematic aspect.

Q. And you can't describe for me which of all of these specific issues you're endorsing as problematic versus not

* DR. DAVID A. SANDERS *

endorsing as problematic?

A. All of these things are problematic.

Q. Okay. So, you agree with all of these criticisms in these papers and adopt them as your own?

MR. KUMAGAI: Object to form.

A. I am -- I have seen examples of all of these different things in the documents that I cite.

Q. Okay. And are you adopting those as part of your opinion in this case as correct?

A. I'm adopting them as indicative of the fact that there are problems; and that the problems are of these kind.

That's -- that's what the opinion says here.

Q. So, you're just saying there were allegations that were made and if true, would be problematic?

A. That's not all I'm saying, but that's an important part of what I'm saying.

* DR. DAVID A. SANDERS *

Q. What else were you saying?

A. I'm saying that there -- when I -- that's -- in -- in this paragraph, what I'm saying is:

In essence, that there are credible and troubling signs of data falsification.

And so, there are allegations of these different things; and they're not only troubling, but they're also credible.

That they are -- the evidence presented about them is consistent with these phenomenon happening.

Q. Are they all credible, in your view?

A. Are they all credible?

It depends -- it depends what -- let's talk about "credible."

I would not, necessarily, have said 100 percent:

"I agree with every single thing."

But that's always true. I'm a very caution person.

* DR. DAVID A. SANDERS *

Q. So, which one --

A. They -- they -- they may still be credible because they could be correct, but I would not necessarily -- looking at the whole -- the whole thing, I would not necessarily say:

"Absolutely 100 percent, you know, these are the things that I would insist are correct."

But, for example, the ones that I included in the reports, I would 100 percent endorse as correct.

Q. Okay. Which do I -- setting aside the ones included in your report, how do I know which of the allegations in these various sources you would endorse as 100 percent credible?

A. I can't tell you that. I can't tell you that answer right now.

Q. Looking at the allegations in 136 through 151, you've identified for me Item 149-2, as one of plaintiffs allegations; is that right?

A. I'm sorry. What number was...

Q. "149-2," I think you said.
A. My recollection is that 149-2 is a -- yes.
Q. Okay. Are -- to your knowledge, are any of the other items, here, identified in the sources you cite, in 133?
A. These papers are mentioned in the -- I -- I -- I can't tell you all of the papers, but a number of papers are mentioned in the CUNY Investigation Committee documents. Yes.
Q. Let me ask you this in a slightly different way:
In terms of the criticisms that you identify in 136 to 151 --
A. Yes.
Q. -- did you independantly identify these or are these things --
THE COURT REPORTER: I couldn't hear you.
I'm sorry.
MR. CAMPBELL: Sorry.
Q. Are these, in 136 through 151,

are these items you independently identified or are they allegations you reviewed by others and agreed with?

A. They mostly began as something to which I was directed by one of these documents.

But then, I went and did further analysis to reassure myself that they were correct; and when I did that, I identified additional problems.

Q. Okay. And the additional problems are what you list in 136 to 151?

A. It will include both -- I mean, it will include both the original problems and the additional problems.

The original problems mentioned in, you know, for example, the CUNY investigations that would have directed me and then, additional problems that I -- I found by examining that.

Q. Okay. And these problems that you found, they are in four different articles, right?

A. I would have to count them up

* DR. DAVID A. SANDERS *

at this time.

Q. I've got the Jay Niro [sic] article from 2009.

A. Yes.

Q. The Niro article from 2005.

A. Yes.

Q. The JPB article from 2010.

A. Yes.

Q. And then, an article in Translationing Neuroscience; is that right? From 2011.

A. Yes.

Q. Do you know whether any of these journals conducted an investigation into these same articles?

A. I believe that -- yes.

That there was.

I -- you know, I don't recall which ones, but I believe that there was because there were -- for example, for Niro 205, there is a -- editorial notes.

Q. Right.

So, let's take that for an example: So, the editorial note for Niro

205, do you recall what that says?

A. Well, according to my report, it referred to "original uncropped blots."

And they were -- they have it at:

"Varying intensities, extensive shared background features that indicate that they're not the original uncropped blots, but rather images of bands superimposed on a common background."

Q. Where is that?

A. This is -- I apologize: 150, Number 2.

Q. This is the 2002 --

A. 2022.

Q. 2022 editorial note?

A. Yes.

Q. Okay. Okay.

A. So, my understanding is that they accepted that these images were original uncropped blots, despite the fact that they had extensive shared background features that indicates that they are not the original uncropped blots, rather.

* DR. DAVID A. SANDERS *

So, that I recall.

Q. And let's take a look at the editorial note.

MR. CAMPBELL: So, this is -- I'll mark this as Exhibit 12.

(Whereupon, Sanders Exhibit 12, February 1, 2022 editorial note, was marked for identification.)

Q. You recognize this as a February 1, 2022 editorial note?

A. Yes, I do.

Q. And did you review this?

A. I did.

Q. And what this says, in the middle of it, is:

After careful examination of these original material, Neuroscience found no evidence of manipulation of the Western blot data or other figures of this publication; is that right?

A. That is correct.

Q. Okay. And unlike the articles that we discussed earlier from J-Pad and from the Journal of Neuroscience, the

editors here explicitly said they found no evidence of manipulation; right?

A. That's correct.

Q. Okay. And so, you would understand that to be different in language than no compelling evidence or no convincing evidence; right?

A. That is correct.

Q. And you understand they found no evidence of manipulation in 2005?

A. That is correct.

Q. Let me ask you this: Going through the materials in your section ascribing signs of research misconduct, right?

A. Yes.

Q. Based on your review of the evidence, can you conclude that Cassava is a total fraud?

A. I don't use that language; and that's not my -- that's not my style to use that language.

I tried to focus on what are the data, right? That's -- is there

manipulation of the data?

Are there image duplications?

It is -- I'm not the deciding person. It's -- there's institutions that make those decisions. It's generals that make those decisions.

I make a recommendation, you know? You should take this seriously and so on, but I don't tend to -- I don't use expressions, that's not my style.

Q. Can you conclude that Cassava is --

THE COURT REPORTER: I didn't hear you.

Q. Can you conclude that Cassava is worse than Theranos?

A. That's not what I'm supposed to be opining about and that's not -- I don't know how that comparison directly would be made.

Q. Can you conclude that Dr. Wang's entire career and all of his key findings are based on scientific fraud and fabrication?

* DR. DAVID A. SANDERS *

A. All?

Q. All of his key findings are based on scientific fraud and fabrication.

A. I have not examined his entire output. I can tell you that there is substantial evidence of image manip- -- manipulation and data manipulation in the documents and articles that I have examined.

Q. Can you conclude that all of the research supporting simufilam is complete made-up garbage?

A. The documents that I have examined bring into question a substantial amount of that research.

I avoid using the words "all" in this context, but I can definitely conclude that there's a substantial basis for concluding that this -- the research conducted is not scientifically sound.

Q. Okay. You -- you say you don't use the word "all."

Why is that?

A. Because I'm not a missent. I

don't know all...

Q. Can you conclude that Dr. Burns and Cassava were complicit in covering up fraud by Dr. Wang?

A. From the documents that have been presented to me, it appears that Cassava was not sufficiently judicious in evaluating the data that they obtained from Dr. Wang.

It was about Dr. Wang, right? You're asking? Yeah.

So, my -- my opinion, based upon the documents that I have, is that they -- that there were warning signs about Dr. Wang's research that they didn't pursue.

Q. And that was warning signs include the material that you submitted to the FDA, right?

A. Well, the materials submitted to the FDA.

Q. Yeah.

For example, the Quanterix data is one of the things that you think is a

warning sign?

A. Sorry. My understanding is that that -- those are not Dr. Wang's data.

Q. I'm just asking you what the red flags were about the problem.

That's a good point you're raising: Quanterix data is separate from Dr. Wang.

So, maybe I should use a better example.

A. The question -- the question was -- I thought was about --

Q. You're --

A. -- are they covering up from Dr. Wang, so...

Q. -- you're correct.

So, what -- let me put it a slightly different way:

Is not being judicious about the data the same as being complicit in covering up fraud, in your view?

A. Well, it can be.

It depends -- it depends.

I -- I -- again, I don't -- I

* DR. DAVID A. SANDERS *
can't see into other people's minds. What I can say is that there were serious flags, serious warnings that it appears were not taken seriously enough.
Q. Can you conclude that Cassava was taking advantage of desperate people to perpetrate a scam?
A. Not my language.
All I can say is that Alzheimer's research is extremely important to a large number of people.
There are many lines of research, there's a very large investment in that line of research by the pharmaceutical industry.
Are people and their -- who have Alzheimer's, but especially are their families, desperate people. I think the answer can be -- can be yes.
Were they judicious enough in evaluating warning signs about research that had implications for Alzheimer's research, I would say no.
Q. My question is: Is not being

judicious enough, in your view, the same as taking advantage of desperate people to perpetrate a scam?

A. I cannot see into their minds, as to their decision-making process.

I believe that there is -- that scientists have a very large duty to do the best that they can for society; and I believe that corporations that are conducting/involved in scientific research also have those very high duties.

If they are not fulfilling those duties -- and especially if they're not fulfilling them knowingly, that is problematic.

But I don't -- I don't look into other people's minds to -- to know what their motivations are.

Q. Can you conclude that anyone at Cassava was a sociopath, defrauding investors and harming elderly, sick patients and their families?

A. As far as I know, I've never met anybody from Cassava, so I do not

have -- I have no opinion on whether they are sociopaths. I simply do not know. I -- and I would not -- that is not a conclusion I would jump to easily.

Q. Based on your review of the evidence, do you have an opinion on whether Cassava was harming elderly, sick people and their families?

A. I believe I answered that.

My -- I -- I do not know their no- -- motivations, I do not know whether, you know, a -- again, there were so- -- many troubling signs in the research that underlies this line of investigation that should have been recognized and should have, you know, could -- should have been taken into greater consideration for whether they should have proceeded.

And there are people who were looking at these trials, who were -- it -- it -- who were hoping that they would succeed, that it was important to them that it would succeed.

And I am concerned that some of

* DR. DAVID A. SANDERS *

those hopes were based upon a lack of due diligence, on behalf of people from Cassava.

Q. And the people that were looking at whether or not Cassava should be allowed to proceed with its Phase III trials --

THE COURT REPORTER: I couldn't hear you.

Q. The people that were looking at whether Cassava could proceed with its Phase III trials and give simufilam to over 1,000 patients, that was the FDA, right?

A. Yes.

Q. Okay. And they allowed the Phase III trials to go forward, right?

A. Yes.

Q. And you conclude, based on your analysis and the evidence you've looked at, that it's all made up, meaning the drug is fake, the research was fake and it's all a --

MR. KUMAGAI: Object to form.

THE COURT REPORTER: And it was

* DR. DAVID A. SANDERS *

all what?

MR. CAMPBELL: A charade.

MR. KUMAGAI: Object to form.

A. As I started with: I do not use "all."

I'm careful about what components I think are problematic and I've presented that, I described it.

You know, I -- I continue to regard this report as an accurate representation of the -- of my opinion and of -- of the facts that are known to -- known to me.

And could you just ask me that one more time, so...

Q. Yeah.

So, you would not conclude, yourself, that it's all made up?

MR. KUMAGAI: Object to form.

A. I -- as I said: I never use -- I never use "all."

I have expressed my -- I have expressed my opinion about some of the underlying information and about whether

there -- yeah.

There's a reliable basis for this drug.

Q. And you wouldn't use the word "all"?

A. I do not use the word "all."

MR. CAMPBELL: Nothing further from me.

MR. KUMAGAI: Okay. Should we take a five-minute break?

(Counsel confer sotto voce.)

THE VIDEOGRAPHER: The time on the video monitor is 6:19 P.M.

We off the record.

This end Media 7.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: We are back on the record.

The time on the video monitor is 6:26 P.M.

This start media 8.

EXAMINATION BY

MR. TAYLOR:

* DR. DAVID A. SANDERS *

Q. Okay. Hi, Dr. Sanders.

All right. So, if you can go back to your report, which I think you have in front of you.

A. Yes.

Q. If you can go to Paragraph 27, which is on Page 7.

(Witness complies.)

A. Yes.

Q. Okay. So, here, you state:

"For immunoblot experiments recorded upon film, the original data are the uncropped images of blots/gels that inclumed -- that include film edges and molecular weight markers."

Do you see that?

A. I do.

Q. When you say:

"Immunoblot experiments recorded upon film," what do you mean?

A. So, when a immunoblot, which is conduct- -- when -- when the proteins have been transferred to a substrate, such as PVDF or -- or nitrocellulose, that is

* DR. DAVID A. SANDERS *

incubated with antibodies and they are antibodies that are labeled with a -- an enzyme that converts one molecule into another.

That, for example, will allow for the omission of light.

When that is exposed to film, the film records that light and the position and the intensity of that light tells you:

What is the molecular weight of the protein?

And how much is there?

So, it is the film that is the record of the experiment.

Q. Okay. And if I -- I remember correctly, you previously testified that film is known or prone to degradation?

That it can degrade over time?

MR. KUMAGAI: Object to form.

A. I -- I -- that is not what I -- I said.

I said that it's stable for at least a decade.

* DR. DAVID A. SANDERS *

Q. Okay. And in the sentence, where you say:

"Uncropped images of blots/gels."

What is an "uncropped image"?

A. So, for example, it mentions one that includes film edges and molecular weight markers.

And those are the original raw data.

And so, that's -- so, it has to include the -- the original includes the -- the whole film to the edge; and also, where the molecular weight markers would be on the gel.

Q. Well, I -- I guess, to back up:

What does it mean to crop an image?

A. What it means is to cut parts of it away.

Q. Okay. And so, an uncropped image is an image that had not been -- had parts of it cut away?

A. That is correct.

Q. Is that correct?

Okay. And is it also true that an uncropped digital image of the film can also be considered to be primary data?

A. So, it is -- that is the form that you would submit to a journal.

The primary data are the ones on the film. Those are the original ones.

What you would -- if you took a -- an image of that, a photograph of that, that would be a representation that you would submit to a -- a journal.

Q. Okay. And if you go to Paragraph 47 of your report.

(Witness complies.)

Q. So, you say, in the second sentence:

"A digital photograph of a membrane or a film may be considered as primary data for storage in a digital format, but the photo must include the entire membrane or film."

Do you see that?

A. That is correct.

* DR. DAVID A. SANDERS *

Q. Okay. So, that's confirming what we just talked about:

That a digital image -- uncropped digital image of the film can be primary data?

A. So, that's for -- so, I start off with that -- for a membrane -- a -- membranes do decay over time.

So, the only way to have a stable image is to make a photograph.

So, that -- that is true.

For the film, again, if you're trying to store it in the digital format, the only way you can do that is by having a -- a photo.

So, that's -- yes. So, that's -- so, for the -- for the membrane, that's the only way you can possibly preserve it, but it's for a -- a film.

It's not a substitute for the film, it may also be considered.

But if you're really trying to be -- if you're trying to reconstruct what happened in the original with -- with the

original data were obtained, you need to retain the film.

And discarding of a film for a immunoblot, especially one that you are going to use for a publication, is not an acceptable procedure.

Q. Okay. But my -- my question is a little bit more limited:

Is an uncropped digital image of -- of a film immunoblot considered a primary data?

MR. KUMAGAI: Object to form.

A. I would -- I would say that journals who -- would consider an uncropped digital image as primary data, though.

Q. Okay. Are you aware of any guidance or authority that would say:

An uncropped digital image of a film immunoblot is not primary data?

A. I -- no.

I mean, I've read and countered and discussed it with people that you need to retain the film. I mean, that's -- that's widely accepted as the correct

approach to that particular issue.

Q. Okay. And when you say, in this sentence:

"Uncropped images of blots/gels that include film edges."

A. Yes.

Q. And what do you mean by:

"That include film edges"?

A. Because it's -- the edges, like the -- the side of the -- the film.

So, it should show you that you're going all the way out to the edge of the film, when you're -- when you're doing it.

And that -- that demonstrates that there are no -- there's nothing in the image that's been eliminated.

Q. Okay. And would such an image have to do include space outside of the film edges or just something that captures the film edges?

A. Just something that captures the film edge, so you know it's the edge.

Q. Okay. If an uncropped,

unprocessed image doesn't include film edges, does that mean it is not original data?

A. Uncropped...

Q. Unprocessed...

A. Unprocessed...

Q. ...image that does not include film edges, does that mean that the image is not original data?

A. That's a very interesting question.

It could qualify as original data, but it would be incomplete original data.

Q. Okay. Let's move on to the second part of your sentence:

"Uncropped images of blots/gels that include..." going forward "...molecular weight markers."

Do you see that?

A. I -- I do not.

Which -- which one are we in?

Q. So, we -- it's in the second part of the sentence.

* DR. DAVID A. SANDERS *

MR. KUMAGAI: I'm sorry?

Q. The original data --

MR. TAYLOR: I'm sorry -- we're in -- I'm sorry. We're back on 27.

MR. KUMAGAI: Oh. Got it now.

THE WITNESS: I...

MR. TAYLOR: Yeah. Yeah.

THE WITNESS: Okay. Going back to 47.

MR. TAYLOR: Yes.

THE WITNESS: Yes.

MR. KUMAGAI: 27, right?

MR. TAYLOR: 27.

THE WITNESS: 27.

27, yes.

Q. So, here, you say:

"The original data are the uncropped images of blots/gels that include film -- film edges" -- that we just discussed -- "and molecular weight markers."

Do you see that?

A. Yes.

* DR. DAVID A. SANDERS *

Q. What is a:
"Molecular weight marker"?

A. So, in an immunoblot, the first step is that one analyzes or SYZ proteins on the basis of their molecular weight.

So, smaller proteins migrate through the gel matrix faster than larger ones. So, you have a sitting effect, where, at the bottom, you have the fastest migrating; and therefore, the smallest proteins and then, at the top, you have larger ones.

And molecular weight marker is a pre-existing set of proteins whose molecular weights are known and they are loaded on the gel along with the experimental sampers -- samples.

And this allows us to determine what is the size of the -- well, what is the size of the proteins in the experimental sample?

So, we can compare the migration of the molecular weight markers with the migration of the proteins in the

sample.

And that gives us a good measure, not a -- not a hundred percent precise measure, but a very good measure of what is the molecular weight of the protein that we're interested in in the sample.

Q. Okay. Are there any scenarios that you're aware where a -- the molecular weight markers would not show up in a digital image of the film?

A. Yes.

So, when we're talking about the molecular weight markers, they will not react with the antibodies, for example.

There are ways to label those molecular weight markers.

So, for example, that they will have a color, so you can see them, you could potentially stain them, you could potentially have them linked to something that would show up on the film.

But in order to show the molecular weight markers, you would indicate on the film by having the blot

next to the film:

Where are those molecular weight markers?

Q. Okay.

A. So, they should be indicated on the film so anybody interested in the experiment later on could see where the molecular weight markers were relative to the -- the proteins on the -- on the gel.

Q. Okay. But just to confirm:

There are scenarios where the molecular weight markers would not show up in a digital image of the film?

A. If you didn't do what you were -- are supposed to do and indicate where the molecular weight markers are.

Q. If an uncropped and unprocessed image does not include molecular weight markers, does that mean it's not original data?

A. It is not fully interpretable original data.

Q. But does it --

A. So --

* DR. DAVID A. SANDERS *

Q. -- mean --

A. -- so --

Q. -- that it's not original data?

A. -- so, in data, I -- it's an interesting -- it's an interesting question.

I could have a band on a -- on a film: Are those data?

They fulfill no scientific criteria of data because I have no idea about the molecular size.

I have no -- again, so input:

So, are they -- they data?

Are they original data?

I guess.

Are they, in any way, meaningful data?

The answer is no.

Are they data that one can compare with a -- the interpretation in a paper?

The answer is no.

That is why we have those standards.

* DR. DAVID A. SANDERS *

Q. And based on your general knowledge between, let's say, 2000 and 2020, was it common practice for published images in journals to include molecular weight markers for immunoblot images?

A. During that time, it became more common.

Q. So, it evolved over the time --

A. It did.

Q. -- the practice of including molecular weight markers?

A. It did.

Q. Okay. So, this definition that you have in paragraph --

A. So, it did --

Q. Go ahead.

A. -- not -- it did not evolve, in terms of recordkeeping.

Q. Understand.

A. Recordkeeping...

The expectations for recordkeeping were that the molecular weights would be indicated on the film and, you know, any image generated from that,

that was -- that was the expectation.

Q. So, if you go back to Paragraph 27.

A. Yes.

Q. So, you write here:

"For immunoblot experiments recorded upon film, the original data are the uncropped images of blots and gels that include film edges and molecular weight markers."

A. Yes.

Q. Are you purporting to define what a ra- -- "original data" means here?

MR. KUMAGAI: Object to form.

Q. Are you -- is this description, in Paragraph 27, are you trying to define the term "original data"?

A. I'm describing what are "original data" for immunoblot experiments recorded upon film.

Q. Okay. And what is this explanation based on?

A. So, it's based upon, as I mentioned: Whether there is any

* DR. DAVID A. SANDERS *

informative element to a -- an image, right?

Where the -- you know, data has -- just as we've talked about some of the other terms, data has -- has -- there's multiple interpretations of what data are.

Scientific data have to allow for an interpretation. You have to provide enough information that can -- one can interpret it.

Merely an image, the -- that does not constitute data. And so, for -- in order for -- in -- in order to have original data that in -- that are interpretable, they need to be uncropped and they need to have -- the film edges need to have the molecular weight markers.

Q. So, is the definition you provide for "original data," in Paragraph 27, your personal definition?

A. This is based upon a widespread acceptance in the scientific community, it is based upon my own experience of what I do in -- in my laboratory and it's also

based upon the many cases in which I've been involved, where people do not adhere to these different standards that I have maintained here; and that leads to problematic situations.

So, that re-emphasizes to me:

These are things that most people do routinely.

And when they're not done, that's when problems arise.

Q. Are you aware of any public guidance from any scientific authority that says that:

"Original data are the uncropped images of blots/gels that include film edges and molecular weight markers"?

A. Am I aware -- I -- am -- under the impression, I couldn't cite it, off the top of my head.

But in my, you know, explorations and dealing with journals, that there are journal rules that maintain that those are -- that those are the rules that you are supposed to obey, when you

submit articles.

Q. Do all journals require that original data include molecular weight markers?

A. They do not.

Q. Are you aware of any governmental authority or regulatory authority that requires molecular weight markers to be included in images to be considered original data?

A. So, if you look at the government sites, they don't tell you what you should do -- you know, what you must do for immunoblots and for them to be considered "original data."

They provide you with recommended procedures and they have a whole -- they're a whole -- all sorts of information about what's proper to do.

Q. Okay.

A. But they don't require it because that -- the government doesn't generally tell people, you know:

"You must conduct your

experiment in the following fashion."

Q. And as you said, also:

Not all journals require it; is that correct?

A. That's correct.

Q. Okay.

MR. TAYLOR: I'm going to introduce Exhibit 13.

(Whereupon, Sanders Exhibit 13, E-mail from Alexander Runko to Orie Shafer Cc'ing Ning Du, Subject: Cell death & differentiation Guide to Authors.pdf, was marked for identification.)

MR. KUMAGAI: You're going to have to mark it --

THE COURT REPORTER: I can't hear you, Mr. Kumagai.

MR. KUMAGAI: I told Jack that he's going to have to mark the exhibit by hand; and that's what he is doing.

MR. TAYLOR: So, before we get into this document, if you look at

the bottom right corner, you'll see the letters and numbers.

It says: "CUNY0025790."

Do you see that?

A. I do.

Q. And if you go back to your report, Paragraph 27, you'll see at the end of your discussion about "original data" a Footnote 7.

Do you see that?

A. Yes.

Q. And then, you go down to Footnote 7 and this is the document that you were citing to; is that correct?

A. Yes.

Q. So, this -- is it fair to say that this is the document that you are relying on for the definition that you provide in Paragraph 27 of your report?

MR. KUMAGAI: Objection to the form.

A. So, these are inclusions that are -- are standard conclusions or I -- this was a good citation that demonstrates

that that is, in fact, the case.

Q. Okay. And if you look at the actual document starting at the top, this is an e-mail chain from a Mr. Alexander Runko to a Mr. Orie Shafer.

Do you see that?

A. Yes.

Q. Okay. And if you go to the first signature block:

"Alexander Runko" is "director, division of investigative oversight at the office of research integrity."

Do you see that?

A. Yes.

Q. Okay. So, this document is a -- is not a public document, is it?

A. No.

Q. This is an -- an e-mail -- private e-mail between the ORI and this Mr. Orie Shafer?

A. Yes.

Q. Okay. This is not a publicly available source or a source of public guidance?

* DR. DAVID A. SANDERS *

A. No.

Q. Okay. If you go to the beginning e-mail -- so, this is at the beginning of the page, the -- the back of the page.

So, you'll see at the bottom, it's -- this is an e-mail from Orie Shafer.

Do you know who Orie Shafer is?

A. No.

Q. Okay. Do you see that his e-mail address ends at "gc.cuny.edu?

A. Can you -- oh. I see it now. Yes.

Q. Okay. So, I'm going to represent to you that Orie Shafer works for the City University of New York.

A. Okay.

Q. And if you look at the -- his e-mail, doctors...

"Dear Drs. Du and Runko,

"Thank you for your continued help and guidance for our ongoing research misconduct investigation for CUNY."

Do you see that?

* DR. DAVID A. SANDERS *

A. Yes.

Q. Okay. And then, if you go to the beginning of the second paragraph, Mr. Shafer -- Dr. Shafer says:

"Throughout our investigation, we have requested uncropped images of the blots used to create figures cited in the various allegations. We have defined these as images containing film edges and molecular weight markers."

Do you see that?

A. Yes.

Q. "The respondent and his lawyers are claiming that this is not a recognized definition of original data and that we are holding Wang to an unreasonable standard that's too strict."

Do you see that?

A. Yes.

Q. He continues:

"One question we have for you is:

"If ORI has posted or published guidance for what is -- it considers to be

original Western blot data."

Do you see that?

A. Yes.

Q. He continues:

"Are there sources we can cite in our final report that would support our contention that uncropped blots that include all film edges are a reasonable definition of 'original blot data.'"

Do you see that?

A. Yes.

Q. Is it fair to say that Dr. Shafer is asking ORI if ORI has any published guidance on what it considers to be original Western blot data?

A. Yes.

MR. KUMAGAI: Object to form.

Q. Is it also fair to say that Dr. Shafer is unaware of any published guidance by ORI as to what constitutes original Western blot data?

MR. KUMAGAI: Object to form.

A. Yes.

Q. Is it also fair to say, based

on the last sentence, that Mr. -- that Dr. Shafer is asking ORI for any sources they can cite to support the contention that uncropped blots include all film edges and are -- as a reasonable definition of "original data"?

MR. KUMAGAI: Object to form.

A. I -- this -- repeat the question.

Q. Yeah.

Is it fair to say that Mr. -- Dr. Shafer is reaching out to ORI for any sources it could cite to support its definition of "original blot data"?

A. Yes.

MR. KUMAGAI: Object to form.

Q. Okay. And if you go to the top e-mail, where Dr. Runko responds.

A. Yes.

Q. So, he says:

"While ORI has not posted or published guidance for what it considers to be original Western blot data, some of the top biomedical journals do have

* DR. DAVID A. SANDERS *
instructions on guidance for authors about how to submit or process their data."
Do you see that?
A. Yes.
Q. So, fair to say that as of that -- at least the date of this e-mail, April 26, 2023 --
A. Yeah.
Q. -- there was no published guidance by ORI on what it considers to constitute original Western blot data?
A. Yes.
MR. KUMAGAI: Object to form.
Q. Okay. And then, if you continue to the bottom, it says -- Dr. Runko says:
"ORI considers that uncropped blots/gels that include film edges and molecular weight markers to be the original data and we apply that standard when assessing image integrity in the oversight of our cases."
MR. KUMAGAI: Object to form.
Q. Do you see that?

* DR. DAVID A. SANDERS *

A. That is correct.

Q. Are you aware of any way that anyone should -- any -- anyone in the public should have known that this is ORIs standard for original raw data?

MR. KUMAGAI: Object to form.

A. I do not know how that -- the public would know that.

Q. Is this the first time that you've seen this definition of original raw data by ORI?

A. By ORI? Yes.

I mean, it was consistent.

I saw it when we referenced it, but I have not learned about this definition before this.

As I mentioned before: NIH and so on doesn't tell people how to conduct experiments.

And so, they -- they have their own internal standards, but I -- NIH does not, in general, publish that -- and ORI, also, is not all of NIH.

That -- that distinction needs

to be made, as well.

Q. Is this the first time you've ever seen any authority for -- convey that this is the definition of "original raw data"?

MR. KUMAGAI: Object to form.

A. As I mentioned: There is guidance from the NIH about what's necessary to be included and we're in immunoblot experiments and when they are submitted.

So, for example, I recall them discussing the fact that splicing is an unacceptable process. That I remember from looking at an NIH site, but that's not the basis of my report and it's not the basis of -- you know, my opinion here, as well.

Q. Un- -- until you received this e-mail from plaintiffs' counsel --

A. Yes.

Q. -- have you seen any published guidance that says:

"Original immunoblot data must include molecular weight markers"?

* DR. DAVID A. SANDERS *

A. I am -- I couldn't tell you exactly where I've seen it because I look at a lot of journal instructions over time.

When I am dealing with issues of research integrity, I see an image, I frequently will look at the journal's rules for that.

This is not the first time that I have seen a man -- a mention that molecular weight markers should be included, when we're talking about immunoblot data.

Q. And so, if you go back to your report, this is only source that your cite for this purported requirement that original immunoblot data include molecular weight markers; isn't that correct?

A. That is correct.

Q. You don't cite any other po- -- any other authorities?

A. Because it wasn't what I consulted and was looking at, you know, when I am doing this report.

Those things would have -- I

* DR. DAVID A. SANDERS *

would have seen these things and formed -- you know, I would -- there are -- I have a number of pages, where I don't cite sources because they were based upon my experience, my reading of sources over the course of many years; discussions with other people, observing when there are violations of scientific norms.

So, when you see that and you think about, you know:

What's the proper way to do it?

How have you been doing it?

That seems to be working and, you know, allows for reproducing the experiment and you see other people not doing that, then you say:

"Okay. This is something that's important, that should be included as an approach to immunoblots."

Q. Okay. So, based on what you've just described, your experience reading journals and working in science, you were unable to find one public source or public guidance that corroborates the

understanding that original immunoblot data must include molecular weight markers?

MR. KUMAGAI: Object to form.

A. I did not -- I did not search for that source.

Q. And as you sit here today, you can't recall any source of such guidance?

A. I can't recall the identity of some source -- of such source, but I can recall seeing such guidance, yes.

Q. Okay.

MR. KUMAGAI: Zach, just to say I think we've got about seven minutes left on the record.

MR. TAYLOR: Okay. Let's go to Paragraph 69 of your report.

(Witness complies.)

Q. So, Paragraph 69 of your report, you state:

"Likewise, according to 'the final repart -- report' of CUNY's Investigation Committee, published by Science Magazine, in October of 2023, Dr. Wang's laboratory engaged in

longstanding and egregious misconduct and" data mismanagement -- "data management" --

MR. TAYLOR: Sorry.

Q. -- "and recordkeeping. It appears likely that no primary data and no research notebooks pertaining to the 31 allegations investigated by the committee exists."

Do you see that?

A. I do.

Q. And if you go to Paragraph 133 in your report.

(Witness complies.)

Q. It's on Page 31.

A. Yes.

Q. You say, in the second sentence:

"I have also reviewed the reported findings of CUNY's Investigation Committee as described in the committee's quote/unquote final report published by the Science Magazine in 2023."

Do you see that?

A. Yes.

* DR. DAVID A. SANDERS *

Q. So, you -- you described the CUNY Investigation Report, in October of 2023, as the final report, in quotation marks.

A. Yes.

Q. Why -- why do you describe it as the final report, in quotation marks?

A. My understanding is that there was going to be -- that there was -- yeah.

Again, I'm trying to remember when exactly I wrote this, but there either was going to be or there was an additional report from CUNY about this -- this matter.

Q. So, you're putting the final -- the term final report, in quotation marks, because you didn't consider it to be the final report?

MR. KUMAGAI: Object to form.

A. You know, I -- it's called the "final report."

I mean, that's the first time -- perhaps if I had capitalized the final report?

I mean, the previous cite, I --

I refer to it as:

"The final report."

It -- I mean, it's just a -- it's just a description of the report.

Q. Are you aware --

A. I --

Q. Okay.

A. And I -- I understand what the distinction being made here is.

Q. Are you aware of how the October 2023 CUNY report became published by Science Magazine?

A. I'm not.

Q. Have you been made aware of the fact that the October, 2023 report only became available to Science Magazine because it was leaked?

A. I believe I have read that, yes.

Q. Okay. Would you agree that if the October, 2023 report was leaked to the media that that may raise questions about the integrity of CUNY's investigative process at the time?

A. I don't know.

I -- I'd have to know -- I'd have to know more about the -- the circumstances.

Q. Okay. Thank you.

And are you aware that on May 30, 2025, CUNY provided the Office of Research Integrity with a letter -- with a quote:

Letter to provide an update and final conclusions on its investigation into allegations of research misconduct against Harry Yong Wang?

A. Yes.

Q. Okay. So, when [sic] you consider CUNY's May 30th, 2025 final conclusions regarding Dr. Wang the final report?

MR. KUMAGAI: Object to form.

A. Again, it's -- the committee's final report -- it's -- it's -- it's an -- it's an interesting -- it's an interesting question.

I -- you know, I haven't -- I

haven't really thought about that, the term "final report" and its significance.

Q. Okay.

MR. TAYLOR: This is the last exhibit.

This is Exhibit 14.

(Whereupon, Sanders Exhibit 14, October 27, 2023 press release from the City University of New York, was marked for identification.)

Q. This is an October 27, 2023 press release from the City University of New York.

Do you see that?

A. Yes.

Q. Have you ever seen this document before?

A. I'm not sure whether I've seen it or whether it was quoted somewhere else -- you know, in part or in full.

But I would not be surprised if I have seen some part of it somewhere in...

Q. Okay.

A. Maybe I -- I -- I don't know

where.

Q. Okay. How would -- instead of me reciting it, if you want to just give it a quick read, it's two paragraphs.

(Witness complies.)

A. Yes.

Q. Okay. If you look in the first paragraph, in the first sentence.

MR. TAYLOR: Actually -- sorry.

Q. With the -- there were the -- the -- and so, in the first sentence, you see that the -- CUNY is revealing that Science Magazine published an article regarding the -- CUNY's investigation into allegations of misconduct?

A. Yes.

Q. Okay. And you see that:

"Consistent with its policy, CUNY will not comment on the accuracy of the investigation referenced in the articles because no final action as to this investigation has been taken."

A. Yes.

Q. And isn't it true that, in your

report, the only CUNY report that you rely on is the October, 2023 report.

Isn't that correct?

MR. KUMAGAI: Object to form.

Q. When you refer to the "final report" in your report you're --

A. That -- that --

Q. -- referring to the October 2020- --

A. Yes.

Q. Okay. And yet, here, on this -- in CUNY's pr- -- pr- -- press release, CUNY, itself, said:

"It can not comment on the accuracy of the investigation at that time."

A. Yes. Yes.

I see that.

Q. Okay. Does that raise any questions, in your mind, as to the credibility or reliability of the final report that you rely on in your report?

A. The final report has a detailed list of allegations that are -- that I

* DR. DAVID A. SANDERS *

looked -- you know, I would look at and see whether they appeared credible.

As to a leaked document or not, that doesn't really concern me.

What concerns me is that I looked at the document, itself, and there was credible description of violations of scientific norms in it.

Q. Correct.

So, putting the leak aside, the fact that CUNY, itself, said that it can not comment on the accuracy of the investigation, doesn't that provide relevant context in determining the credibility or reliability of the report that you reviewed?

A. No.

Q. Why not?

A. They're just -- they're not commenting.

This -- they appear to be more concerned about the leak than they are about actually evaluating misconduct.

Q. So then, let's go to the second

paragraph.

(Witness complies.)

Q. It says:

"CUNY is committed to ensuring that its investigative processes are held to the highest procedural and ethical standards and that the fairness of the proceedings is preserved for all parties.

"To that end, any finding regarding allegations of research misconduct must be reliable and credible because questions regarding the confidentiality and integrity of this investigation have been raised, CUNY will stay the underlying inquiry into the allegations regarding Dr. Wang's research until such time as the university completes a comprehensive investigation of the process."

So, when CUNY, itself, is saying, on October 27, 2023 that:

"Questions have been raised regarding the integrity -- integrity of the investigation."

Is that not important context for you to determine the reliability of the report that you rely on in your expert report?

A. When I read --

MR. KUMAGAI: Object to form.

A. When I read con- -- when I read confidention- -- con- -- "confidentiality integrity," I see that as a reflection of the investigation process.

That's what is being concerned here. This is what is concerned by this statement. It -- there -- yeah.

That's -- that's what they're looking -- that's what they are advising about. They're concerned and they could -- yeah, very rightly concerned about the -- when confidentiality is violated, how that effects the process.

I have no objection to that.

That does not mean that any of the underlying information in the -- what appears as, you know, in the document is incorrect.

Those are not -- that -- that's not the conclusion one -- I would come to.

Q. Okay.

MR. KUMAGAI: And Zach, we're over time, so I'll give you a minute that's all.

MR. TAYLOR: Okay. A minute's fine.

Q. Okay. So, just to -- just to confirm:

The fact that CUNY recognized there were questions regarding not only the confidentiality, but the integrity of the investigative process, it's completely irrelevant to your assessment of the credibility of the earlier, final quote/unquote final report that CUNY had leaked to science?

MR. KUMAGAI: Object to form.

A. The word "integrity" can certainly mean and it seems to mean, in this context, that the nature of the investigation because of the violation of confidentiality is not consistent with the

procedural and ethical standards and, you know, and fairness of the proceedings.

It does not -- there -- I see nothing here that says anything about the -- what the -- the actual content of the investigation.

Q. Okay. And last question:

Is the integrity of an investigative process relative to the credibility or reliability of an investigation's findings?

MR. KUMAGAI: Object to form.

A. Repeat that expression, please.

Q. Yeah.

Is the integrity of an investigative process relative --

MR. TAYLOR: I'm sorry.

Q. -- relevant to assessing whether the findings of an investigation are credible?

A. It depends how you're using the word "integrity."

If we're using "integrity," in terms of truth or falsity, than the answer

is absolutely yes.

If we're using the term "integrity" as into:

Is it intact?

Is it obeying all of the procedures that have been laid out?

Then it doesn't effect the truth or falsity of the allegations that are present.

MR. KUMAGAI: All right, Zach.

MR. TAYLOR: Okay.

MR. KUMAGAI: I just have a couple of questions.

THE COURT REPORTER: You need to put your audio on so I can hear you.

MR. KUMAGAI: Yeah.

Can you hear me now?

THE COURT REPORTER: Yes.

EXAMINATION BY
MR. KAMAGAI:

Q. Okay. Dr. Sanders, you testified earlier today about the deposition transcripts that you reviewed in

connection with your report.
A. Yes.
Q. Do you recall that?
A. Yes.
Q. What did you mean by "review"?
A. When I use the term "review, it means that I've read an entire document.
Q. Did you read portions of deposition transcripts from depositions taken in this case, in connection with your report?
A. I did.
Q. And are those deposition transcripts cited in your report or listed in Appendix D of your report?
A. They are.
Q. Okay. If you turn to Paragraph 45 of your report, on Page 11.
(Witness complies.)
Q. Do you recall Mr. Campbell asking you about the citations, or lack of citations, in the paragraphs in this section:
"Recordkeeping standards and

practices for immunoblot experiments"?

A. I do.

Q. And do you recall Mr. Campbell asking you whether these were just your opinions?

A. I do.

Q. And what did you mean by that?

MR. CAMPBELL: Object to form.

A. I believe I -- it's been a long day -- I believe I stated that these are my opinions, that they're based upon standards in the field, on my experience with -- how we conduct, other people conduct these experiments.

And also, I highlight things that I have seen that are standard ways of doing these experiments, that most people adhere to; and that when they're not adhered to, it causes problematic situations, where you can not see what are the actual original data.

When the -- the images are not labeled appropriately, someone can not make conclusions, as I've said before:

Data must include -- they're only really data if they are interpretable.

Just a mere image is not -- you know, doesn't constitute data. So, it's -- I have laid out -- you know, this is not based upon somebody else's description, but it is based upon a long period of time of conducting these experiments, teaching other people about these experiments and also observing what happens when these recordkeeping protocols are not adhered to.

Q. Okay. And if you turn to Page 4.

(Witness complies.)

Q. Section B is titled:

"General Recordkeeping Standards and Practices."

A. Yes.

Q. Did you see that?

A. Yes.

Q. And in the following paragraphs, you describe general recordkeeping standards and practices; is that right?

* DR. DAVID A. SANDERS *

A. Yes.

Q. And do those general recordkeeping standards and practices apply to immunoblot experiments?

A. Yes. They do.

Q. And do they also apply to ELISA experiments?

A. Yes, I do.

Q. Okay.

MR. KUMAGAI: Subject to any further questions from counsel, I believe we can go off the record.

Thank you very much for your time.

THE VIDEOGRAPHER: Yes.

We are going off the record.

The time on the video monitor is 7:10 P.M.

This concludes today's testimony given by Dr. David Sanders.

The total number of media units used with eight and will be retained by Veritext Legal Solutions.

Thank you.

* DR. DAVID A. SANDERS *
We are off the record.
THE COURT REPORTER: Mr. Taylor, would you like a copy of the transcript?
MR. TAYLOR: Yes, please.
THE COURT REPORTER: Do you need a rough draft?
MR. TAYLOR: Sure.
THE COURT REPORTER: Mr. Campbell, would you like a rough draft of the transcript?
MR. CAMPBELL: Yes, please.
THE COURT REPORTER: Mr. Kumagai, would you like a rough draft of the transcript?
MR. KUMAGAI: Yes, please.
THE COURT REPORTER: Would you like a copy of the transcript, as well?
MR. KUMAGAI: Yes, please.
(Whereupon, at 7:10 P.M., the Examination of this witness was concluded.)

* DR. DAVID A. SANDERS *

° ° ° °

* DR. DAVID A. SANDERS *

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

__________________________

DAVID A. SANDERS

Subscribed and sworn to before me this _____ day of ________________ 20___.

__________________________

NOTARY PUBLIC

* DR. DAVID A. SANDERS *

E X H I B I T S

SANDERS EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | Set 2-B redo PTOW 181 presented data | 269 |
| Exhibit 7 | Set 3 2-B redo PTOW 181 raw data | 269 |
| Exhibit 8 | Presented Data | 296 |
| Exhibit 9 | Raw Data Spreadsheet | 297 |
| Exhibit 10 | CSF 2-B PTOW Group Zero Versus 28 | 302 |
| Exhibit 11 | A beta CSF 5101119-Copy | 315 |
| Exhibit 12 | February 1, 2022 Editorial note | 372 |
| Exhibit 13 | E-mail from Alexander Runko to Orie Shafer Cc'ing Ning Du, Subject: Cell death & differentiation Guide to Authors.pdf | 402 |

* DR. DAVID A. SANDERS *

SANDERS EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | October 27, 2023 press release from the City University of New York | 165 |

(All exhibits, other than 13 and 14, were retained by Counsel.)

* DR. DAVID A. SANDERS *

I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| MR. CAMPBELL | 258 |
| MR. TAYLOR | 383 |
| MR. KAMAGAI | 427 |


INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS PAGE

(None)

QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

* DR. DAVID A. SANDERS *

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF NEW YORK )

I, KARYN CHIUSANO, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of March, 2026.



KARYN CHIUSANO

**&**

**&** 256:9,14 402:13 435:23

**0**

**05948** 255:10

**1**

**1** 273:23 282:5 282:5 302:23 302:25 372:8 372:11 435:18
**1,000** 341:2,3 341:24 381:14
**10** 302:10,11,15 302:17 303:17 310:7 311:23 314:11,16 324:10,18 325:23 435:14
**100** 340:21,24 366:21 367:8 367:13,18
**10010** 256:6
**10111** 256:16
**11** 298:18 299:14 300:9 315:6,7 316:14 316:18,19,25 317:17 319:14 319:21,23 322:4,14,18,19 324:10,19 325:23 428:19 435:16
**114** 261:3
**116** 279:24
**119** 322:25
**12** 293:6 372:6 372:7 435:18
**12/21** 293:6
**120** 328:18
**125** 328:18
**126** 328:3
**127** 328:3,22
**128** 336:8
**129** 336:11,21
**13** 402:9,10 435:20 436:15
**133** 343:22 346:2,24 347:19,21 349:13 351:23 352:9,20 353:2 355:23 359:18 360:15 361:16 361:25 368:8 415:12
**134** 344:20 345:8 346:2,21 348:14 353:12 359:18 360:15 360:17
**135** 353:18
**136** 345:23 346:16 348:25 351:19 352:13 355:15 356:18 358:14 367:22 368:17,25 369:13
**14** 419:7,8 436:6,15
**149** 346:9,11 354:14
**149-2** 350:20 352:19 353:5 355:5,7 367:23 368:2,3
**14:50** 299:15
**150** 358:14 371:13
**151** 351:19 352:13 353:19 355:15 356:18 367:22 368:17 368:25 369:13
**15th** 278:4,11
**165** 436:9
**18034** 438:23
**181** 269:3,10,16 270:6 302:7 435:9,11
**1900** 256:10
**1:24** 255:10
**1st** 438:20

**2**

**2** 269:3,10,16 269:24 273:23 302:12,19 327:23 328:13 329:8 334:4 346:11 354:14 371:14 435:8 435:10,14
**20** 434:19
**2000** 397:3
**2002** 371:15
**2005** 370:6 373:11
**2009** 370:4
**2010** 370:8
**2011** 370:12
**2013** 266:22
**2015** 325:13
**2019** 298:7,18 299:14 300:9 315:20 316:14 317:17 319:23 321:16
**2020** 268:13 271:5 272:3 277:21 278:4 278:11 279:11 282:15 283:18 285:16 288:3 289:23 295:4 303:25 305:15 305:22 308:22 314:5 328:25 397:4 421:10
**2021** 266:22 267:18 285:21 287:22 289:22 300:2,13 329:2

332:25 344:2
**2022** 344:14 371:16,17 372:8,11 435:18
**2023** 344:10 409:8 414:24 415:23 416:4 417:12,16,22 419:9,12 421:3 423:22 436:6
**2025** 265:10 267:18 268:13 278:19 279:2 282:19 295:4 298:10,24 309:10 325:14 418:8,17
**2026** 255:14 438:20
**205** 370:22 371:2
**21** 278:19
**21st** 282:19
**22nd** 256:6
**23** 255:14
**258** 437:5
**26** 409:8
**269** 435:9,11
**27** 384:7 392:6 392:14,15,16 392:17 398:4 398:17 399:21 403:8,20 419:9
419:12 423:22 436:6
**28** 302:12,20,23 302:25 327:21 435:15
**296** 435:12
**297** 435:13
**2:50** 278:4

**3**

**3** 269:10,24 270:6 271:20 435:10
**30** 257:16 327:21 328:2 418:8
**3000** 256:10
**302** 435:15
**30th** 418:17
**31** 415:7,15
**315** 435:17
**32** 303:19,24 307:21 309:3 310:8 312:8 358:23
**34025** 284:10
**34027** 284:5
**372** 435:19
**383** 437:6
**3:03** 316:19 319:22
**3:04** 282:19

**4**

**4** 430:14
**402** 435:25
**41** 256:6
**427** 437:7
**45** 256:16 428:19
**47** 387:15 392:11
**4:00** 255:15 258:5
**4:33** 292:13
**4:38** 292:21

**5**

**5** 285:20 300:2 300:13
**500** 341:5
**5101119** 315:8 315:14 435:16
**5:12** 327:9
**5:24** 327:16

**6**

**6** 268:23 269:2 269:14 292:22 302:5,14 303:14 314:11 314:14 435:8
**6/9/2020** 303:10
**69** 414:17,19
**6:19** 383:14
**6:26** 383:22

**7**

**7** 269:7,9 278:15 327:18 383:16 384:8 403:10,14 435:10
**7:10** 431:19 432:22

**8**

**8** 296:18,20 297:16,20 298:5 315:18 315:22,23 321:7,11 383:23 435:12
**80202-2211** 256:11

**9**

**9** 277:21 282:15 283:18 285:16 297:2,3 297:16,17 305:15,22 308:22 435:13
**9:42** 285:16
**9:44** 277:22 282:15 303:11 303:12

**a**

**a.m.** 282:15 303:11,12
**aberrations** 360:20
**ability** 272:21
**able** 259:15 271:10 291:24
**above** 299:19 299:22 328:9 434:6
**absolutely** 301:23 315:4 358:7 367:8 427:2
**absorbance** 274:4,7,9
**absorbs** 274:17
**academic** 329:3 329:18 335:14
**acceptable** 389:7
**acceptance** 399:23
**accepted** 371:21 389:25
**access** 268:5,8 268:10 339:9
**accessible** 267:17,19
**account** 334:21 334:23
**accumulation** 358:18
**accuracy** 420:20 421:16 422:13
**accurate** 266:14 382:11
**acknowledge** 332:24
**action** 420:22 438:16
**actual** 260:24 264:16 404:4 426:6 429:22
**actually** 301:12 333:25 341:12 341:24 420:10 422:24
**add** 341:17 342:2
**adding** 341:22
**additional** 298:2 360:16 369:11,12,16 369:20 416:13
**address** 345:25 405:12
**addressing** 327:22
**adhere** 400:3 429:19
**adhered** 429:20 430:12
**administer** 257:11
**adopt** 365:7
**adopting** 345:9 352:3 365:12 365:15
**adrian** 255:3 256:5 278:23 278:25 293:2 298:10
**adrien** 256:21
**advance** 358:4 360:5
**advantage** 378:7 379:3
**advising** 424:16
**affect** 309:23
**affected** 259:5
**ago** 262:11
**agree** 321:23 349:19 365:5 366:22 417:21
**agreed** 257:5 257:20 356:12 369:4
**ahead** 317:9 397:17
**alexander** 402:11 404:5 404:11 435:20
**allegation** 354:25 356:10
**allegations** 343:23 345:9 347:22 348:16 350:22 354:13 356:13 359:7 363:2 365:21 366:9 367:16 367:21,24 369:3 406:9 415:8 418:13 420:16 421:25 423:11,17 427:9
**allow** 346:8 385:6 399:8
**allowed** 381:7 381:16
**allows** 393:19 413:15
**alterations** 258:25 259:4
**alzheimer's** 378:11,18,23
**amount** 375:16
**analysis** 271:19 284:2,20 289:2 295:3 298:3 304:25 309:4 310:9 317:2 318:23 319:7 343:6 352:5 353:20 369:9 381:20

**analyzes** 393:5
**analyzing** 328:12
**answer** 281:11 290:18 295:7 310:16 311:13 321:18 322:2 335:4 367:20 378:20 396:19 396:23 426:25
**answered** 266:24 273:20 380:10
**antibodies** 385:2,3 394:15
**anticipate** 276:9
**anybody** 309:12 379:25 395:7
**anymore** 359:16
**apart** 283:18
**apologize** 355:13 371:13
**appear** 351:11 422:22
**appeared** 422:3
**appears** 313:24 323:3 376:7 378:4 415:6 424:24
**appendix** 264:12 340:7,8 428:16
**apply** 409:21 431:4,7
**approach** 390:2 413:20
**appropriately** 429:24
**approval** 331:12
**approve** 331:7
**approved** 335:2,9
**approving** 336:4
**approximately** 303:19
**april** 409:7
**area** 342:15,16
**aric** 256:22
**arose** 290:3
**article** 353:6 364:21,22 370:4,6,8,10 420:14
**articles** 344:16 348:2 369:24 370:16 372:23 375:9 401:2 420:22
**ascribe** 351:8
**ascribing** 350:7 373:15
**aside** 367:15 422:11
**asked** 266:12 273:18 288:24 290:7 301:2,10 309:25 310:6 310:11,15 311:18 312:23 313:10 323:3 323:15 326:15 336:14 342:7 342:23 357:4 357:16,20 359:20,25
**asking** 272:11 272:14 288:8 295:15 306:13 310:25 313:13 346:20 347:21 348:3,4 352:7 353:4 376:12 377:5 407:14 408:3 428:22 429:5
**aspect** 364:22
**aspects** 349:17
**assess** 330:6 331:14,20
**assessing** 409:22 426:19
**assessment** 425:16
**associated** 266:19
**assume** 266:12 288:4,16,25 301:2,10 310:3 310:6,11,16 311:18 313:13 316:8 323:3,15
**assumed** 288:24 300:24 301:9
**assumption** 258:17
**assumptions** 313:11
**attached** 267:16
**attorneys** 256:4 256:9,15
**audio** 427:16
**august** 285:20 300:2,13
**author** 277:24 278:20 312:5 312:12 322:14 333:2
**authored** 344:17
**authorities** 412:21
**authority** 389:18 400:13 401:8,9 411:4
**authorized** 257:11
**authors** 343:25 363:3 409:2

**authors.pdf** 402:14 435:25
**auto** 260:6
**automatic** 263:2,4
**automatically** 262:15 350:6
**available** 404:24 417:17
**avenue** 256:6
**avoid** 375:17
**aware** 332:5 335:20,23 337:13 389:17 394:9 400:12 400:18 401:7 410:3 417:6,11 417:15 418:7
**awareness** 335:13

**b**

**b** 269:3,10,16 269:24 302:12 302:19 327:23 329:8 334:4 336:4 430:16 435:2,8,10,14
**back** 258:2 292:18 301:24 302:5 322:23 327:13,19 383:19 384:4 386:17 392:5 392:10 398:3 403:7 405:5 412:14
**background** 351:2,4,20 352:24 360:19 361:3,5,17 362:2 363:11 371:8,11,23
**backgrounds** 360:21,22
**bad** 325:9
**baker** 256:14
**bakerlaw.com** 256:17
**band** 396:8
**bands** 360:21 361:7,19 362:3 371:10
**bans** 351:3
**barbier** 255:11 256:15
**based** 258:17 277:3 290:12 303:22 309:7 310:18 311:5 322:10,10,13 323:2 328:8 336:25 337:10 338:7,8 345:8 352:4 358:9 359:6 373:18 374:24 375:4 376:13 380:6 381:2,19 397:2 398:23,24 399:22,24 400:2 407:25 413:5,21 429:12 430:7,8
**basic** 279:16
**basis** 291:14 313:11 329:7 334:3 337:5,23 375:19 383:3 393:6 411:17 411:17
**bates** 269:19 316:4,9 324:20 324:21
**began** 369:5
**beginning** 293:8,15 345:23 357:20 405:4,5 406:4
**behalf** 381:3
**believe** 287:25 291:23 311:4 323:12 325:16 333:12 338:12 346:13 350:20 354:12 370:17 370:20 379:7 379:10 380:10 417:19 429:10 429:11 431:13
**believed** 283:3
**best** 272:21 362:21 379:9
**beta** 315:8,14 435:16
**better** 309:8 377:10
**beyond** 360:16 364:16
**biomarker** 327:23 328:13 329:8 334:4
**biomedical** 329:5 331:25 333:20 334:20 337:4,17 338:17 339:19 408:25
**bioscience** 334:20
**bit** 270:3 331:16 357:18 389:9
**block** 404:10
**blood** 438:16
**blot** 340:16 341:14 343:12 343:19 360:22 360:24 361:4 361:23 372:20 394:25 407:2 407:10,16,22 408:15,24 409:12

**blots** 340:2,22 341:13,18,23 342:4,11,13 345:10 356:20 356:21 361:2 371:4,10,22,25 384:14 386:5 390:5 391:18 392:20 398:9 400:16 406:8 407:8 408:5 409:19
**blotting** 340:9 342:15,20
**blue** 281:2
**body** 331:2
**bonds** 260:24
**bottom** 393:10 403:2 405:7 409:16
**bravard** 256:12
**break** 258:16 292:24 327:5 383:11
**bredt** 255:6
**bring** 375:15
**broad** 330:7
**brodkin** 255:3 256:5
**burns** 255:12 256:15,23 278:7,10 323:13 328:10 338:2 344:17 344:25 376:3

**c**

**c** 256:2 336:7 434:2 438:2,2
**ca** 277:11
**cal** 314:23
**calculation** 279:6
**calculations** 275:6,15,19,22 275:24,25 276:8,10,18,24 277:5,8 314:24
**call** 272:6
**called** 258:6 271:25 416:20
**calling** 278:14
**campbell** 256:11 258:12 268:20 269:6 278:16 287:13 295:17 296:23 297:8,12,14,17 297:22,24 302:4,9 315:5 316:5 319:3 320:24 321:8 324:23 327:4 356:14 361:22 368:24 372:5 382:3 383:8 428:21 429:4,9 432:11,13
**capitalized** 437:5 416:23
**capture** 360:13
**captures** 390:21,23
**care** 259:12
**career** 340:13 374:23
**careful** 372:17 382:7
**case** 255:9 263:21,23 265:5 272:9 296:10 324:19 347:15 349:20 354:19 358:3 365:13 404:2 428:11
**cases** 280:3,5 280:12 400:2 409:23
**cassava** 255:11 256:10 264:2 269:19 270:21 271:5 272:3 277:11 278:10 279:20 298:7 307:23 308:11 310:5,14 311:21 314:5 315:20 319:16 319:25 320:9 321:4,16 323:5 323:12 325:17 328:9,17 329:12 330:12 336:13,18,23 337:7,25 339:15 343:24 350:22 373:19 374:12,16 376:4,8 378:6 379:21,25 380:8 381:4,6 381:12
**cassava's** 331:21 338:8 339:10 356:19
**cause** 259:6
**causes** 286:9 429:20
**caution** 366:25
**cc'ing** 402:12 435:22
**cell** 402:12 435:23
**certainly** 355:4 425:22
**certification** 257:8
**certify** 434:4,8 438:9,14
**cgr** 256:7
**chain** 404:5
**change** 259:7 286:10 315:2

**[changed - complies]**


**changed** 268:12 287:16 287:23 288:10 308:22 309:3 316:25
**changes** 287:7 287:8 289:3 301:15,15
**charade** 382:3
**chemical** 274:17
**chiusano** 255:23 438:7 438:23
**circumstances** 418:5
**citation** 403:25
**citations** 361:24 428:22 428:23
**cite** 365:11 368:7 400:19 407:6 408:4,14 412:15,20 413:4 416:25
**cited** 406:8 428:15
**citing** 403:15
**citizens** 344:2 348:18 349:25 354:23 355:21 359:8
**city** 405:17 419:10,13 436:8
**civil** 255:21
**claim** 288:22
**claiming** 406:15
**clarick** 256:4
**clarification** 264:15
**clarify** 292:11
**clear** 320:13
**clearly** 345:21 346:17
**clients** 354:13 354:14
**clini** 335:9
**clinical** 329:9 330:6,9,16 331:3,8,11,21 332:21 333:8 334:7,14 335:10,24 338:24 339:11 339:16
**clinicaltrials** 332:17
**clinicaltrials....** 332:9
**color** 394:19
**colorado** 256:11
**column** 273:6,7 273:10,15 276:18 281:23 282:22
**columns** 273:5 304:7,11
**com** 332:19
**combinations** 273:10,23
**combine** 259:11 354:8
**come** 271:18 348:7 358:19 425:3
**coming** 279:13
**comment** 420:20 421:15 422:13
**commenting** 422:21
**committed** 329:13 423:5
**committee** 344:8 347:24 349:16 350:2 359:9 363:4 368:13 414:23 415:8,21
**committee's** 344:8 415:21 418:21
**common** 289:12 371:11 397:4,8
**communicated** 294:20
**community** 399:23
**company** 328:10 330:21 330:22
**compare** 271:10 290:7 309:25 315:17 357:5 393:23 396:21
**compared** 263:24 271:22 298:2
**comparing** 295:3 307:11
**comparison** 261:14 272:18 323:10,11,23 374:20
**comparisons** 270:14
**compelling** 373:7
**complete** 341:13 375:13
**completely** 425:15
**completes** 423:18
**complicit** 376:4 377:21
**complies** 273:2 302:8 303:18 304:6 307:3,13 318:21 319:9 322:24 384:9

387:16 414:18 415:14 420:6 423:3 428:20 430:15
**components** 382:8
**comprehensive** 423:19
**computer** 264:3 267:16 268:2,8 301:4 323:18
**con** 424:8,9
**conain** 295:3
**concern** 422:5
**concerned** 380:25 422:23 424:12,13,17 424:18
**concerns** 422:6
**conclude** 336:25 373:19 374:12,16,22 375:11,19 376:3 378:6 379:20 381:19 382:18
**concluded** 432:24
**concludes** 431:20
**concluding** 375:20
**conclusion** 293:14 310:10 326:11 351:16 356:11 358:20 359:17 380:5 425:3
**conclusions** 309:23 328:4 403:24 418:12 418:18 429:25
**conducing** 330:12
**conduct** 318:22 319:6 336:14 384:23 401:25 410:19 429:14 429:14
**conducted** 266:11 323:5 332:5 340:14 341:9 358:12 370:15 375:21
**conducting** 379:11 430:9
**confer** 383:12
**confidentiality** 423:14 424:9 424:19 425:14 425:25
**confidention** 424:9
**confirm** 395:11 425:11
**confirming** 388:2
**confused** 345:19 356:3
**connected** 264:4 323:18
**connection** 428:2,11
**consider** 260:10 336:3 342:14,19,24 389:15 416:17 418:17
**consideration** 380:18
**considered** 295:24 296:7,9 309:19 387:5 387:20 388:22 389:11 401:11 401:16
**considers** 406:25 407:15 408:23 409:11 409:18
**consistent** 329:20 351:4 361:6,18 362:2 366:13 410:14 420:19 425:25
**constitute** 399:13 409:12 430:5
**constitutes** 407:21
**consulted** 412:23
**cont'd** 258:11
**contain** 295:3
**containing** 406:10
**contains** 314:15
**contemporan...** 325:3
**contemporan...** 325:14
**content** 426:6
**contention** 407:8 408:4
**contents** 265:4
**context** 261:11 375:18 422:15 424:2 425:23
**continue** 382:10 409:16
**continued** 405:22
**continues** 406:21 407:5
**controls** 360:19
**conversation** 287:14
**converts** 385:4
**convey** 411:4
**convincing** 373:8

**copy** 257:14,17 268:24 297:7 297:20 315:8 315:14 432:4 432:19 435:17
**corner** 403:2
**corporations** 379:10
**correct** 264:6 264:10,24 268:3 272:10 272:22 273:25 279:8 282:20 283:19 287:20 308:12 314:16 314:17 323:7 324:23 328:20 331:5,9 333:5 337:12 338:19 338:21 340:18 340:19 344:12 344:19 345:24 350:18 352:4 355:2 365:14 367:4,10,13 369:10 372:22 373:4,9,12 377:17 386:25 387:2,25 389:25 402:5,6 403:15 410:2 412:18,19 421:4 422:10 434:9
**correction** 302:24
**correctly** 273:20 385:18
**correspond** 273:23
**corresponding** 280:14
**corresponds** 273:11
**corroborates** 413:25
**counsel** 257:6 257:17 258:18 292:25 383:12 411:20 431:12 436:16
**count** 369:25
**countered** 389:22
**county** 438:5
**couple** 296:13 296:13 427:14
**course** 340:13 347:12 413:6
**court** 255:2 257:13 260:2 270:2 274:5 280:21 283:10 287:10 289:9 291:2 302:2 318:24 320:20 324:14 331:15 361:20 368:21 374:14 381:9 381:25 402:18 427:15,20 432:3,7,10,14 432:18
**covering** 376:4 377:15,22
**create** 265:16 406:8
**created** 265:20 265:23,25 266:4 277:21 278:17,25 298:10 303:7 303:10,13,25 316:13 317:4,6 319:15,22 322:5,15,19,20 325:13,14,19
**creating** 276:2 314:19
**creation** 324:6
**credibility** 421:22 422:16 425:17 426:11
**credible** 344:23 346:5 349:8 350:8 353:15 358:24 366:7 366:11,15,17 366:19 367:4 367:18 422:3,8 423:12 426:21
**criteria** 396:11
**criticism** 356:19
**criticisms** 345:20 346:24 347:18 348:21 350:14 351:22 352:3,16 355:20 365:6 368:16
**crop** 386:18
**cross** 362:15
**crutcher** 256:9
**csf** 302:12,19 315:8,14 435:14,16
**cuny** 265:3 267:8 272:8 291:24 293:18 294:3,6 329:3 329:18 348:19 363:3 368:12 369:18 405:24 416:3,14 417:12 418:8 420:13,20 421:2,14 422:12 423:5 423:15,21 425:12,18
**cuny's** 344:7 359:8 414:22 415:20 417:24 418:17 420:15

421:13
**cuny0025790** 403:4
**curve** 276:2,4
**customer** 259:12
**cut** 386:20,24
**cutting** 361:6 361:18 362:3
**cv** 255:10

**d**

**d** 257:2 258:6,6 258:6 428:16 434:2 437:2
**dah** 349:11,11
**data** 258:25 259:5,17,23 260:5,17,21 261:18,22,23 263:17 264:7,9 264:11,17,22 266:13,14 268:11,18 269:3,10,17 270:7,19 271:3 271:7,22,23 272:2,5,6,16,17 272:24 275:15 276:3,17,19,25 277:9,11 278:14 279:5 279:12 281:7 282:11 286:6 286:17,22,25 287:15,16,20 287:22 288:2,5 288:13,17,23 289:14,17,19 289:21,23 290:6,8,8 291:14,20,22 294:3 295:4,4 295:9 296:16 296:21,24 297:4 298:6,18 298:21,23 299:14 300:25 301:3,5,7,12,16 301:18,23 302:6 305:13 305:20 306:16 307:11,16,19 308:2,3,5,8,10 308:21 309:9 309:10 310:2,2 310:3,9,12,13 310:17,21 311:3,7,8,16,19 311:20,20,21 312:2 315:18 319:15,21,24 320:8,10,12,16 320:19 321:10 321:14,19,25 322:3 323:4,10 323:11,14,17 323:21 324:3,5 325:19,22 326:13,23 327:23 328:13 329:8 330:24 332:8,12,13,22 333:23 334:5 335:23 336:7 337:6,25 338:9 339:22 340:2 343:6 344:24 344:25 346:6 349:9,21 350:4 350:8 351:5 353:16 358:18 358:25 366:7 372:20 373:25 374:2 375:8 376:9,24 377:4 377:8,21 384:13 386:11 387:5,8,21 388:6 389:2,12 389:16,20 391:4,10,14,15 392:3,19 395:21,23 396:4,5,9,11,14 396:15,18,20 398:8,14,18,20 399:4,6,7,8,13 399:15,20 400:15 401:4 401:11,16 403:9 406:16 407:2,10,16,22 408:7,15,24 409:3,12,21 410:6,12 411:6 411:24 412:13 412:17 414:2 415:3,3,6 429:22 430:2,3 430:5 435:9,11 435:12,13
**database** 258:20 259:7 264:3,8,17 265:4
**datasets** 271:10
**date** 255:14 269:5,12 281:22 282:2 282:10,15,22 282:25 283:4,8 283:12 285:17 285:21,25 286:2,5,10 287:21 288:10 298:17 299:19 300:5,5,10 303:8,14,17 304:7,11,14 306:9,11,14,17 306:19 317:16 317:20,23 318:12 322:19 409:7

**dates** 277:17 300:8,19 311:9 311:12 316:13
**david** 255:6,19 256:7 258:1,13 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1,19 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1 396:1 397:1 398:1 399:1 400:1 401:1 402:1 403:1 404:1 405:1 406:1 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1 425:1 426:1 427:1 428:1 429:1 430:1 431:1,21 432:1 433:1 434:1,15 435:1 436:1 437:1 438:1
**day** 316:20 319:16 429:11 434:19 438:20
**days** 257:16
**deal** 346:15
**dealing** 289:7 289:11 400:22 412:5
**dear** 405:21
**death** 402:13 435:23
**decade** 385:25
**decades** 262:10 262:11 343:21
**decay** 388:9
**december** 278:19 282:19 293:8,15 294:10 295:2
**decides** 331:3
**deciding** 374:4
**decimal** 280:6
**decision** 339:8 339:15 379:6
**decisions** 374:6 374:7
**deck** 346:13
**declarations** 354:2
**defendant** 256:9
**defendants** 255:13,19 256:15
**define** 398:13 398:17
**defined** 406:9
**definitely** 375:18
**definition** 289:20 397:14

399:19,21 403:19 406:16 407:10 408:6 408:15 410:11 410:17 411:5
**defrauding** 379:21
**degradation** 385:19
**degrade** 385:20
**delve** 290:10
**demonstrate** 363:20 364:17
**demonstrates** 390:16 403:25
**denver** 256:11
**depend** 290:4
**depends** 261:24 341:6 366:18 366:18 377:24 377:24 426:22
**depose** 362:17
**deposition** 255:18 257:8,9 257:14 293:9 427:25 428:10 428:14
**depositions** 428:10
**describe** 336:12,16 341:7 344:23 346:5 349:8 350:7 351:13 351:13,17 360:17 364:23 416:7 430:23
**described** 314:19,23 344:8 347:6 350:2,21 351:20,22 352:23 359:9 364:9 382:9 413:22 415:21 416:2
**describing** 340:8 353:10 398:19
**description** 299:4,6 336:20 362:23,23 398:16 417:5 422:8 430:7 435:7 436:5
**desperate** 378:7,19 379:3
**despite** 371:22
**detail** 359:16
**detailed** 421:24
**detector** 274:13
**detects** 274:14
**determine** 393:19 424:3
**determined** 290:8 348:20
**determining** 422:15
**deverell** 256:21
**dictate** 357:14 357:15
**difference** 306:8 339:25
**differences** 280:4 290:2,3
**different** 271:9 271:10 280:3,7 284:17 285:12 299:5,6,10 310:10 312:5 312:12,18,21 353:11 354:2 361:2 365:10 366:10 368:15 369:23 373:6 377:19 400:4
**differentiation** 402:13 435:24
**differently** 357:19
**digit** 280:6
**digital** 387:4,19 387:21 388:4,5 388:14 389:10 389:16,19 394:11 395:14
**digits** 280:11
**diligence** 381:3
**directed** 369:6 369:19
**directing** 302:4
**direction** 280:14
**directly** 347:6 350:15 351:23 351:25 374:20
**director** 404:11
**discarding** 389:4
**disclose** 290:23 291:6
**disclosed** 328:8 328:16 332:9 332:12,14
**disclosure** 328:23,25
**discontinuities** 360:23 361:3,5 361:17,25
**discrepancies** 280:16 290:10 294:16 295:12 295:22 318:15
**discrepancy** 311:23,25
**discussed** 289:21 298:13 353:2 372:24 389:23 392:22
**discussing** 258:17,23 292:25 328:17 411:14
**discussion** 259:12 287:6

403:9
**discussions** 292:7 353:14 413:7
**distinct** 360:20
**distinction** 283:15 410:25 417:10
**district** 255:2,2
**division** 404:12
**dkumagai** 256:7
**doc** 364:9
**doctors** 405:20
**document** 269:13 271:6 272:15,16,19 277:16 278:11 278:13,17,21 279:4,7,13 291:15 303:5 308:4,5 310:7 315:6,12 316:4 321:2,22 335:6 402:25 403:14 403:18 404:4 404:16,17 419:18 422:4,7 424:24 428:8
**documents** 270:17 272:13 296:14 298:2 299:7 306:8 307:10 311:5 312:19 314:4 316:13 317:12 324:9,22,25 325:12,16,21 326:2,9 344:22 346:24 347:7 347:19 349:7 349:23 351:13 351:17 353:11 353:14 355:22 362:6 363:17 363:20 364:10 364:17 365:11 368:13 369:7 375:9,14 376:6 376:14 437:9 437:10
**doing** 390:14 402:23 412:24 413:13,17 429:18
**dozens** 340:14 340:20 341:10
**dr** 255:12 256:15 258:1 259:1 260:1 261:1,4,8 262:1 263:1,2 263:8,25 264:1 264:4 265:1 266:1 267:1,8 268:1 269:1 270:1,21 271:1 271:4 272:1,2 273:1 274:1,23 275:1,15 276:1 277:1,10 278:1 278:10 279:1 279:11,18 280:1 281:1 282:1,14,18 283:1,24 284:1 284:8 285:1,12 285:13,15,19 286:1,6,17 287:1 288:1 289:1 290:1 291:1,23 292:1 292:23 293:1 293:10,17 294:1,8,15,18 294:24 295:1 295:17,19 296:1 297:1 298:1,6,17,23 299:1,14,25 300:1,9,12 301:1 302:1 303:1 304:1 305:1 306:1 307:1,20 308:1 308:9,11 309:1 309:9 310:1,19 311:1,7 312:1 313:1 314:1,4 314:19,23 315:1,19 316:1 317:1 318:1 319:1,24 320:1 321:1,4,16 322:1 323:1,4 323:12,13,23 324:1,4 325:1 325:12,17 326:1,12 327:1 328:1,10,10 329:1,2,17 330:1 331:1 332:1,5,25 333:1 334:1 335:1,14 336:1 337:1 338:1,2 339:1 340:1 341:1 342:1 343:1,24 344:1 344:16,17,25 344:25 345:1 346:1 347:1,25 348:1 349:1,10 350:1,22 351:1 352:1 353:1,25 354:1 355:1 356:1,20 357:1 358:1,12 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1,23 375:1

**[dr - ends]**


376:1,3,5,10,11 376:16 377:1,4 377:9,16 378:1 379:1 380:1 381:1 382:1 383:1 384:1,2 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1 396:1 397:1 398:1 399:1 400:1 401:1 402:1 403:1 404:1 405:1 406:1,5 407:1,14,20 408:1,3,13,19 409:1,16 410:1 411:1 412:1 413:1 414:1,25 415:1 416:1 417:1 418:1,18 419:1 420:1 421:1 422:1 423:1,17 424:1 425:1 426:1 427:1,23 428:1 429:1 430:1 431:1,21 432:1 433:1 434:1 435:1 436:1 437:1 438:1

**draft** 432:8,12 432:15

**drafted** 360:8

**drafting** 309:19

**draw** 301:24 328:4

**drs** 405:21

**drug** 381:21 383:4

**du** 402:12 405:21 435:22

**due** 381:2

**duly** 258:7 434:5 438:11

**dunn** 256:9

**duplicated** 360:18

**duplication** 351:3

**duplications** 374:3

**duties** 379:12 379:14

**duty** 379:8

**e**

**e** 256:2,2 257:2 257:2 258:6 264:12 266:20 272:14 320:15 321:3 402:11 404:5,19,20 405:4,8,12,20 408:19 409:7 411:20 434:2 435:2,20 437:2 438:2,2

**earlier** 287:6 287:14 288:3 289:21 291:19 372:24 425:17 427:24

**easily** 380:5

**edge** 386:14 390:13,24,24

**edges** 384:15 386:8 390:6,9 390:10,21,22 391:3,9 392:21 398:10 399:17 400:17 406:10 407:9 408:5 409:19

**editorial** 370:22,25 371:17 372:4,8 372:11 435:19

**editors** 373:2

**effect** 257:12 257:15 286:21 286:24 326:18 393:9 427:8

**effects** 424:20

**egregious** 415:2

**eight** 431:23

**either** 306:5 362:25 416:12

**elderly** 379:22 380:8

**element** 399:2

**elements** 359:13

**eliminated** 390:18

**elisa** 263:24 266:7,18 271:22 276:25 289:12 298:14 305:21 307:5 309:4 313:4,16 313:21,25 317:14 318:16 322:4,21 323:5 325:3,15 326:13,24 342:25 343:2,7 343:9,11 431:7

**eliza** 262:9

**else's** 430:7

**emphasizes** 400:7

**endorse** 367:13 367:17

**endorsing** 350:15 351:24 351:25 353:8 353:12,13 364:25 365:2

**ends** 292:15 405:12

**enea** 255:4 256:5
**engaged** 414:25
**ensuring** 423:5
**entire** 336:20 374:23 375:5 387:23 428:8
**enzyme** 385:4
**equivalent** 281:4
**especially** 337:25 378:18 379:14 389:5
**esq** 256:7,11,12 256:17
**essence** 366:6
**ethical** 423:7 426:2
**evaluate** 281:16 287:3 300:21 311:15 330:9
**evaluated** 283:9,13 289:15 293:7 300:5 304:14 311:7 317:23
**evaluating** 310:25 330:13 330:13 353:9 376:9 378:22 422:24
**evaluation** 336:3
**evidence** 366:12 372:19 373:3,7,8,11,19 375:7 380:7 381:20
**evolve** 397:18
**evolved** 397:9
**ex** 259:18
**exactly** 262:6 304:9 307:22 345:17 412:3 416:12
**examination** 258:11 372:17 383:24 427:21 432:23 437:4 438:10,12
**examine** 267:4 362:15
**examined** 258:9 315:19 350:24,25 375:5,10,15
**examining** 369:21
**example** 349:14 367:11 369:18 370:21 370:25 376:24 377:11 385:6 386:7 394:15 394:18 411:13
**examples** 347:11 361:8 365:9
**exceeded** 341:24
**excel** 261:6,16 261:22,24 262:14 263:7 264:21 265:13 265:16 267:5 279:12 315:3 324:6
**except** 257:21 311:25 356:14
**exercise** 307:10 317:10
**exhibit** 266:20 268:23 269:2,7 269:9,14 272:14 278:15 280:24 281:4 296:17,20 297:2,3 298:5 302:5,10,10,11 302:14,15,17 303:14,17 310:7 311:23 314:11,11,14 314:16 315:6,7 315:18,22 316:18 320:15 321:3,7,11 324:10 372:6,7 402:9,10,22 419:6,7,8 435:6,6,8,10,12 435:13,14,16 435:18,20 436:4,4,6
**exhibits** 268:21 324:18 325:23 435:4 436:2,15
**existing** 393:15
**exists** 415:9
**expect** 260:7 296:5 312:20 335:22 336:2
**expectation** 398:2
**expectations** 312:22 397:22
**expel** 279:12
**experience** 266:6 289:7,11 309:8 353:22 399:24 413:5 413:22 429:13
**experiment** 307:21 341:16 385:16 395:8 402:2 413:16
**experimental** 393:18,22
**experiments** 261:21 266:18 266:21 323:5 326:13 340:15 340:16 341:8 341:15 342:25 343:3,7,9,11,12

384:12,20 398:7,20 410:20 411:11 429:2,15,18 430:9,10 431:5 431:8
**expert** 255:18 342:19,24 358:4 424:4
**expertise** 309:7 342:15,16 343:2,5
**explain** 275:20
**explanation** 398:23
**explicitly** 373:2
**explorations** 400:22
**export** 261:5,9 261:15,22 262:13 263:2,4 264:21 272:7 279:10,18 282:10,15 299:22 317:16 322:20
**exported** 260:8 261:23 265:13 266:15 279:11 283:6 298:21 298:24 301:7 307:20
**exporting** 324:3,5
**exports** 263:8 263:12 265:17 266:10,19
**exposed** 385:8
**expressed** 382:23,24
**expression** 426:14
**expressions** 374:11
**extensive** 371:7 371:23
**extent** 291:9
**extra** 297:7,20
**extract** 323:17
**extracted** 288:23
**extremely** 378:11

**f**

**f** 257:2 438:2
**fabricate** 363:15
**fabricated** 323:4 326:13
**fabrication** 344:24 349:9 349:21 350:5 351:6 353:17 359:2 374:25 375:4
**fact** 289:25 306:21 314:14 323:9 329:17 333:2 350:25 353:13 364:16 365:16 371:22 404:2 411:14 417:16 422:12 425:12
**facts** 323:2,8 328:8,16 382:13
**failed** 328:10
**failure** 338:13
**fair** 330:14 403:17 407:13 407:19,25 408:12 409:6
**fairness** 423:8 426:3
**fake** 381:22,22
**fal** 350:8
**falsification** 289:6 344:24 345:10 346:6 349:9,21 350:5 350:9 351:5 353:16 358:25 366:8
**falsify** 363:15
**falsity** 426:25 427:9
**familiar** 329:5 331:24 333:19 334:20 337:3 337:17 338:16 339:18
**familiarized** 363:18
**families** 378:19 379:23 380:9
**family** 277:25
**far** 330:20 357:14 379:24
**fashion** 330:14 402:2
**fast** 280:9
**faster** 393:8
**fastest** 393:10
**fda** 330:19 331:2,6,12,24 332:5 333:6,13 334:9,13,16 335:9,20,22 336:18,22 337:11,13,20 338:9,10,20,22 339:3,8,9,14 376:20,22 381:14
**feature** 263:3
**features** 371:8 371:24
**february** 255:14 329:2 332:25 372:8 372:11 435:18
**federal** 255:20
**fewer** 340:21 340:23 341:2,3

341:5
**field** 429:13
**figures** 372:20 406:8
**file** 260:8 315:3
**files** 267:5 268:12
**filing** 257:7
**film** 384:13,15 384:21 385:8,9 385:15,19 386:8,14 387:4 387:9,20,23 388:5,13,20,22 389:3,4,11,20 389:24 390:6,9 390:11,14,21 390:22,24 391:2,9 392:21 392:21 394:11 394:22,25 395:2,7,14 396:9 397:24 398:8,10,21 399:17 400:17 406:10 407:9 408:5 409:19
**final** 344:9 351:11 359:10 407:7 414:22 415:22 416:4,8 416:15,16,18 416:21,24 417:3 418:12 418:17,18,22 419:3 420:22 421:6,22,24 425:17,18
**find** 413:24
**finding** 350:3 423:10
**findings** 344:7 347:23 349:15 349:16 359:8 374:24 375:3 415:20 426:12 426:20
**fine** 425:9
**first** 260:10 268:22 269:13 273:6 274:25 280:20,23,25 282:13 296:15 298:5,12 304:3 314:13 317:13 332:4 333:2 340:11 393:4 404:10 410:10 411:3 412:9 416:22 420:8,9 420:12 434:5
**fitting** 276:2
**five** 292:15 344:16 383:11
**flags** 377:6 378:3
**flaws** 358:11
**floor** 256:6
**focus** 373:24
**folder** 258:20 264:3,8,17 265:5
**follow** 328:11 338:13
**following** 402:2 430:22
**follows** 258:10
**footnote** 403:10 403:14
**force** 257:15
**foregoing** 434:8
**form** 257:21 264:19 270:23 270:24 271:9 279:13 288:15 289:16,24 291:20 295:6 295:14 301:19 305:17,24 306:24 307:24 308:16,24 310:22 311:10 313:6 314:8 317:3 318:18 319:17 320:2 321:5,17 322:6 325:6,24 330:17 333:9 333:24 335:16 338:25 345:13 349:3 350:19 355:25 363:25 365:8 381:24 382:4,20 385:21 387:6 389:13 398:15 403:22 407:18 407:23 408:8 408:17 409:14 409:24 410:7 411:7 414:4 416:19 418:20 421:5 424:7 425:20 426:13 429:9
**format** 387:22 388:14
**formed** 413:2
**former** 272:16
**forming** 296:10
**forth** 298:14 360:5 363:23 438:11
**forward** 381:17 391:19
**found** 369:21 369:23 372:18 373:2,10
**foundation** 271:17
**four** 369:23
**fourth** 281:22
**fraud** 329:13 329:14 373:20

374:24 375:4 376:5 377:22
**fraught** 329:14
**frequently** 260:15 412:7
**front** 277:14 303:9 311:6 384:5
**fulfill** 396:10
**fulfilling** 379:13,15
**full** 311:13 360:14 419:21
**fully** 311:11 395:22
**further** 257:20 369:9 383:8 431:12 434:8 438:14

**g**

**garbage** 375:13
**gc.cuny.edu** 405:12
**gel** 386:16 393:8,17 395:10
**gels** 361:2 384:14 386:5 390:5 391:18 392:20 398:9 400:16 409:19
**general** 397:2 410:23 430:17 430:23 431:3
**generally** 275:25 401:24
**generals** 374:6
**generate** 276:10
**generated** 276:3 323:15 323:21 397:25
**generation** 343:15
**geoffrey** 255:6
**getting** 356:3
**gibson** 256:9
**gibsondunn.c...** 256:12,13
**give** 261:10 268:24 296:12 311:13 360:10 381:13 420:4 425:6
**given** 287:21 289:20 301:14 311:8 431:21 434:10 438:13
**gives** 394:3
**go** 317:9 348:22 359:15 381:17 384:3,7 387:14 397:17 398:3 403:7,13 404:9 405:3 406:3 408:18 412:14 414:16 415:12 422:25 431:13
**going** 266:25 268:20 269:7 271:17 296:12 296:15 302:9 322:23 345:18 349:19 354:17 354:18,22 355:18 356:2 358:6 359:24 360:10 362:10 362:15 373:13 389:6 390:13 391:19 392:10 402:8,16,21 405:15 416:10 416:13 431:17
**good** 302:24 336:19 377:7 394:3,5 403:25
**government** 401:13,23
**governmental** 401:8
**grams** 275:11
**greater** 380:18
**group** 302:12 302:19,23,25 435:14
**groups** 280:13 280:15
**gts** 308:6
**gueron** 256:4
**guess** 341:6 386:17 396:16
**guidance** 389:18 400:13 404:25 405:23 406:25 407:15 407:21 408:23 409:2,11 411:9 411:23 413:25 414:8,11
**guide** 402:13 435:24

**h**

**h** 435:2
**halted** 337:21 339:4
**halves** 338:5,10
**hand** 273:4,10 275:2 277:15 402:22 438:20
**handed** 269:14
**handing** 268:25 269:8 297:8,22
**happened** 283:7 388:25
**happening** 366:14
**happens** 430:11
**harming** 379:22 380:8

**harry** 418:14
**head** 364:21 400:20
**hear** 260:3,4 274:6 280:22 283:11 287:11 289:10 291:3 302:3 318:25 320:23 324:15 331:17 361:21 368:22 374:15 381:10 402:19 427:16,19
**heilbut** 255:3 256:5,21 278:23,25 282:18 286:17 291:23 293:2 293:17 294:8 294:15,18,24 295:17,19 298:10 323:23 324:4
**heilbut's** 279:18 284:8 285:13,19 286:6 298:23 299:25 300:12 308:9 309:10 310:19 311:7 325:12
**held** 255:21 423:6
**help** 405:23
**hereinbefore** 434:11 438:11
**hereunto** 438:19
**hi** 384:2
**high** 379:12
**highest** 423:7
**highlight** 429:16
**holding** 406:17
**honest** 283:14
**hopes** 381:2
**hoping** 380:22
**hostetler** 256:14
**hundred** 394:4
**hundreds** 341:20

**i**

**idea** 396:11
**identical** 280:11 307:17 307:18 312:25 313:2,5 314:3 314:10,13
**identification** 269:4,11 296:22 297:5 302:13 315:9 372:9 402:15 419:11
**identified** 295:21 352:25 358:13 361:15 364:6 367:22 368:7 369:3,11
**identify** 279:17 295:11 368:17 368:20
**identity** 414:9
**ii** 325:3 331:22 333:23 336:4
**iii** 331:11 335:2 335:10 336:4 339:16 381:7 381:13,17
**illustrative** 361:10
**image** 346:12 354:10 360:20 362:11,14 374:3 375:7 386:6,19,23,23 387:4,11 388:4 388:5,11 389:10,16,19 390:18,19 391:2,8,9 394:11 395:14 395:19 397:25 399:2,12 409:22 412:6 430:4
**images** 358:19 360:18 361:15 361:24 363:19 364:5 371:10 371:21 384:14 386:4 390:5 391:18 392:20 397:5,6 398:9 400:16 401:10 406:7,10 429:23
**immunoblot** 339:22 340:2 340:14 343:12 344:25 349:10 384:12,20,22 389:5,11,20 393:4 397:6 398:7,20 411:11,24 412:13,17 414:2 429:2 431:5
**immunoblots** 342:8 358:11 363:15 401:15 413:20
**impact** 311:17
**implications** 378:23
**important** 343:5 365:24 378:11 380:23 413:19 424:2
**imposed** 351:3

**impression** 400:19
**improve** 331:7
**incident** 289:14
**include** 295:23 334:9 354:6 359:5 369:14 369:15 376:19 384:15 386:13 387:22 390:6,9 390:20 391:2,8 391:19 392:20 395:19 397:5 398:10 400:16 401:4 407:9 408:5 409:19 411:25 412:17 414:3 430:2
**included** 293:9 352:20 362:9 364:18 367:12 367:15 401:10 411:10 412:12 413:19
**includes** 314:18 314:22 360:9 386:8,13
**including** 331:21 338:20 343:7 344:17 345:2 352:9 397:11
**inclumed** 384:15
**inclusions** 403:23
**incomplete** 391:14
**incongruities** 360:22
**incorrect** 424:25
**incubated** 385:2
**independantly** 368:19
**independent** 288:6 356:8,11
**independently** 348:16 356:9 369:2
**indicate** 371:8 394:25 395:16
**indicated** 301:6 395:6 397:24
**indicates** 371:24
**indicating** 325:4
**indicative** 287:19 289:5 365:15
**industry** 378:16
**infer** 278:9
**information** 268:14 288:7 329:20 337:14 339:10 382:25 399:10 401:20 424:23 437:9 437:10
**informative** 399:2
**informed** 335:7 359:13 363:13
**initial** 260:6
**input** 396:13
**inquiry** 423:16
**insist** 367:10
**inspection** 353:21
**institutions** 374:5
**instructions** 409:2 412:4
**intact** 427:5
**integrity** 329:8 333:22 334:4 337:6,24 338:23 339:7 404:13 409:22 412:6 417:24 418:9 423:14 423:24,24 424:10 425:14 425:21 426:9 426:16,23,24 427:4
**intend** 347:17 356:17,24,25 358:10 359:15 360:15 362:4
**intended** 357:21
**intending** 359:22
**intensities** 361:4 371:7
**intensity** 385:10
**intent** 359:22 360:13
**intention** 358:15
**interchangea...** 340:5
**interested** 281:13 394:7 395:7 438:17
**interesting** 391:11 396:6,6 418:23,23
**interject** 356:2
**internal** 410:22
**interpret** 276:19,25 346:21 399:11
**interpretable** 395:22 399:16 430:3
**interpretation** 309:2 326:19 396:21 399:9
**interpretations** 399:7

**interrupt** 280:9
**intervenor** 255:8
**introduce** 402:9
**investigate** 289:17
**investigated** 415:8
**investigation** 344:7 347:24 349:15 350:2 359:9 363:3 368:12 370:15 380:15 405:24 406:6 414:23 415:20 416:3 418:12 420:15 420:21,23 421:16 422:14 423:15,19,25 424:11 425:24 426:7,20
**investigation's** 426:12
**investigations** 369:19
**investigative** 404:12 417:24 423:6 425:15 426:10,17
**investment** 378:14
**investors** 379:22
**involved** 262:2 329:4,19 335:15 353:24 379:11 400:3
**irrelevant** 425:16
**isaac** 256:22
**issue** 279:16 294:16 311:15 352:24 354:15 390:2
**issued** 344:14
**issues** 345:2 351:20 357:21 358:6,13 364:18,24 412:5
**issuing** 358:3
**item** 353:2,5 367:23
**items** 351:22 353:7 363:6 368:6 369:2

**j**

**j** 372:24
**jack** 402:20
**jay** 370:3
**jesse** 255:3 256:5
**jlr** 255:10
**job** 330:5
**john** 256:12
**journal** 344:15 372:25 387:7 387:13 400:23 412:4
**journal's** 412:7
**journals** 370:15 389:15 397:5 400:22 401:3 402:4 408:25 413:23
**jpb** 370:8
**jturquetbravard** 256:13
**judge** 257:13
**judicious** 376:8 377:20 378:21 379:2
**jump** 380:5
**june** 277:21 278:4,11 282:15 283:18 285:16 303:25 305:15,22 308:22

**k**

**kamagai** 427:22 437:7
**karyn** 255:23 438:7,23
**key** 374:23 375:3
**kind** 365:17
**know** 259:4,8 260:11,12,14 260:19,20 261:8,14,20,20 262:6,13,16,18 262:19,22,23 262:24,25 263:6,15,16 265:7,9,19,22 265:25 266:3,6 267:7,15,23 268:10 270:16 271:9 275:18 275:23 276:5 276:13 277:10 277:13 282:2 284:12,15,23 285:5,10 286:21,24 290:5,20 294:7 294:11 296:3 301:21 305:25 306:4 307:25 308:3,7 309:11 309:17 310:24 310:24 311:14 312:14,15 313:12,15 320:3,4,6,7,11 321:20 325:18 326:20,21,22 332:4,8,16,21 334:22,24,25

335:18,19 342:5,5 347:3 347:5,6 348:6 348:13 350:11 351:7,12 352:12 353:19 354:3 359:22 361:8 362:14 362:17,18 364:5,11,21 367:9,16 369:18 370:14 370:19 374:9 374:20 376:2 379:18,24 380:3,11,12,13 380:17 382:10 390:24 397:25 399:4 400:21 401:14,24 405:9 410:8,9 411:18 412:23 413:3,11,15 416:20 418:2,3 418:4,25 419:21,25 422:2 424:24 426:3 430:5,6

**knowingly** 379:15

**knowledge** 338:8 362:21 368:6 397:3

**known** 382:13 382:14 385:19 393:16 410:5

**kumagai** 256:7 264:18 270:22 278:15 288:15 289:16,24 290:23 291:6 292:3,10 295:5 295:13 296:19 297:6,10,15,19 297:23 298:25 301:19 305:16 305:23 306:24 307:24 308:14 308:16,24 310:22 311:10 313:6 314:7 315:10,25 316:11 317:3 318:17 319:17 320:2 321:5,17 322:6 324:11 324:16 325:6 325:24 327:6 330:17 333:9 333:24 335:16 338:25 345:12 349:2 350:16 350:19 355:25 356:16 363:25 365:8 381:24 382:4,20 383:10 385:21 389:13 392:2,7 392:14 398:15 402:16,19,20 403:21 407:18 407:23 408:8 408:17 409:14 409:24 410:7 411:7 414:4,13 416:19 418:20 421:5 424:7 425:5,20 426:13 427:11 427:13,18 431:11 432:15 432:17,21

**l**

**l** 257:2,2 434:2

**lab** 262:3 329:2 329:3,18,18 335:14,14

**label** 394:16

**labeled** 385:3 429:24

**laboratory** 268:9 399:25 414:25

**lack** 360:18 381:2 428:22

**laid** 427:7 430:6

**lane** 341:15

**lanes** 341:18,23 342:12

**language** 373:6 373:21,23 378:9

**large** 358:18 378:12,14 379:8

**larger** 393:8,13

**law.com** 256:7

**lawrence** 256:10

**lawyers** 406:14

**lay** 271:16

**leads** 400:5

**leak** 422:11,23

**leaked** 417:18 417:22 422:4 425:19

**learned** 333:7 410:16

**left** 272:25 273:4,10 414:15

**legal** 431:24

**legitimate** 329:7 334:3 337:5,23

**letter** 273:9,22 418:9,11

**letters** 403:3

**levied** 355:21

**light** 274:11,14 274:17,18 338:2 385:7,9 385:10

**likely** 313:19 320:9 415:6
**likewise** 414:21
**limited** 389:9
**lindsay** 255:12 256:15 278:7
**line** 281:22 283:21 305:11 306:18 378:15 380:15 437:16
**lines** 378:13
**linked** 394:21
**list** 273:5,6 295:24 296:6 345:3 347:2 362:7 363:14 369:13 421:25
**listed** 277:24 296:6 328:18 346:24 347:18 348:25 351:18 353:8 355:14 355:23 357:22 359:17 428:15
**listing** 318:2
**listings** 307:4
**lists** 304:22
**little** 261:11 270:3 331:16 357:18 389:9
**llp** 256:4,9,14
**loaded** 393:17
**locations** 255:22
**long** 276:5,7 429:10 430:8
**longer** 287:9,16 287:20 301:16
**longstanding** 415:2
**look** 259:9,10 263:20,22 265:14 268:18 270:12,17,18 272:23 277:14 279:5,21 280:19,23 283:20 284:24 298:12 299:3,9 303:7,16 304:3 305:4,10 312:24 316:12 327:20 336:6 339:21 353:15 372:3 379:17 401:12 402:25 404:3 405:19 412:3,7 420:8 422:2
**looked** 263:16 267:5 282:9 324:10 351:10 354:4,25 356:10 358:17 381:20 422:2,7
**looking** 260:9 263:16 276:23 276:25 279:23 281:9 282:21 288:9 317:7 320:4 321:21 349:22 352:8 353:24 362:5 364:4 367:5,21 380:21 381:6 381:11 411:16 412:23 424:16
**looks** 284:17 354:5
**lost** 358:21
**lot** 284:25 285:3,5,11,20 286:2,10,15 299:9,10,13,24 300:18 305:5 306:4,9 314:15 318:7 326:16 326:23 412:4
**lyndsy** 256:23

**m**

**machine** 259:13 260:22 264:4 267:9,12 267:17 274:23 282:11 294:6 307:6 310:13 313:4,16,21 314:3 322:4
**made** 259:5 311:19 339:14 343:24 347:22 348:17,17,18 348:19 349:24 349:24 350:23 353:25 354:13 359:7 363:2 365:21 374:21 375:13 381:21 382:19 411:2 417:10,15
**madison** 256:6
**magazine** 344:9 414:24 415:23 417:13 417:17 420:14
**mail** 402:11 404:5,19,20 405:4,8,12,20 408:19 409:7 411:20 435:20
**maintain** 400:23
**maintained** 400:5
**make** 258:24 267:2 292:4 303:4 313:10 320:6 374:6,7 374:8 388:11 429:24
**makes** 274:14
**making** 314:23 339:8 379:6
**man** 412:10

**management** 415:3
**manip** 375:7
**manipulation** 372:19 373:3 373:11 374:2 375:8,8
**manual** 259:12
**manuscripts** 333:3
**map** 274:24 275:6 314:20
**march** 344:14 438:20
**mark** 268:21 268:22 269:7 296:17,25 302:10 315:5 372:6 402:17 402:21
**marked** 269:4 269:11,14 272:15,16 296:21,24 297:4 302:13 315:8,13 372:9 402:14 419:11 437:15
**marker** 393:3 393:14
**markers** 384:16 386:9 386:15 391:20 392:23 393:24 394:10,14,17 394:24 395:4,9 395:13,17,20 397:6,12 398:11 399:18 400:17 401:5 401:10 406:11 409:20 411:25 412:11,18 414:3
**marks** 416:5,8 416:16
**marriage** 438:16
**mason** 357:15
**match** 279:19 325:23
**matches** 303:13
**material** 274:16,17 309:22 372:18 376:19
**materials** 292:25 293:3,7 294:19,22 295:18,23,24 296:6 309:18 346:4 352:20 373:14 376:21
**matrix** 393:8
**matter** 416:14 438:18
**mean** 267:19 267:23 268:7 275:8,21 283:2 285:7 294:2 300:19 301:17 303:23 304:19 306:2,5 311:12 311:16 312:17 313:17 322:11 326:17 329:12 330:12,18 341:7,22 347:4 350:12 351:9 369:14 384:21 386:18 389:22 389:24 390:8 391:3,9 395:20 396:2 410:14 416:22,25 417:4 424:22 425:22,22 428:6 429:8
**meaning** 276:16 281:7 301:16 381:21
**meaningful** 396:18
**means** 262:7 290:2 300:18 301:21 306:2 323:13 386:20 398:14 428:8
**meant** 293:23 294:4 355:11
**measure** 394:4 394:5,5
**measured** 282:22,25 285:17,22 286:19 299:19 300:5,10 304:11 317:20
**measurement** 283:5 286:7 288:11
**media** 292:15 292:22 327:17 383:16,23 417:23 431:22
**membrane** 387:20,23 388:8,18
**membranes** 388:9
**mention** 412:10
**mentioned** 335:17 346:12 349:18 368:9 368:12 369:17 398:25 410:18 411:8
**mentions** 386:7
**mere** 430:4
**merely** 399:12
**met** 379:25
**metadata** 267:4 270:17 277:16 280:24 287:7,8 287:15,23 288:9 289:8,12

289:13 298:14 301:15 303:8 303:23 306:22 308:9,17,18 310:19 311:5 311:22 312:24 322:21 325:4 325:22 326:3 326:10
**meter** 267:16
**microsoft** 263:18
**mid** 310:18
**middle** 372:16
**might've** 266:24
**migrate** 393:7
**migrating** 393:11
**migration** 393:24,25
**milioris** 255:4 256:5
**mill** 275:11
**mind** 335:6 421:21
**minds** 378:2 379:5,18
**mine** 297:21
**minute** 283:18 285:16 317:24 383:11 425:6
**minute's** 425:8
**minutes** 292:11 299:21 300:10 303:19,24 307:21 309:4 310:8 312:8 316:19 317:2 317:21 319:14 319:22 322:4 322:14,18,20 414:14
**misconduct** 373:15 405:24 415:2 418:13 420:16 422:24 423:12
**mismanagem...** 415:3
**missent** 375:25
**misspoke** 293:22
**mode** 284:2,19 304:25
**modification** 311:25 312:7
**modified** 263:13,19 278:3,6 303:17 303:24 307:21 308:21 310:8 316:19 319:14 322:16
**molecular** 384:16 385:12 386:8,15 391:20 392:22 393:3,6,14,16 393:24 394:6,9 394:14,17,24 395:3,9,13,17 395:19 396:12 397:5,12,23 398:10 399:18 400:17 401:4,9 406:11 409:20 411:25 412:11 412:17 414:3
**molecule** 385:4
**moment** 270:11
**monitor** 258:4 292:13,20 327:8,15 383:14,21 431:18
**month** 291:22
**motivations** 379:19 380:12
**move** 391:16
**moved** 280:13
**multi** 284:2,10 284:19,19 304:25
**multiple** 399:7

**n**

**n** 256:2 257:2 258:6 434:2 437:2
**nature** 360:14 425:23
**necessarily** 320:5 366:20 367:5,7
**necessary** 411:10
**need** 259:18 276:18 277:4,7 277:7 290:20 331:12 348:22 362:13,14,17 389:2,23 399:16,17,18 427:15 432:8
**needed** 360:19
**needs** 410:25
**neuroscience** 370:11 372:18 372:25
**never** 294:17 379:24 382:21 382:22
**new** 255:2,24 256:6,6,16,16 258:9 282:5,5 302:10 405:17 419:10,14 436:9 438:4,5 438:8
**nih** 410:18,22 410:24 411:9 411:16

**ning** 402:12 435:22
**niro** 370:3,6,21 370:25
**nitrocellulose** 384:25
**normally** 263:17 289:18 342:2,10
**norms** 413:9 422:9
**notary** 255:23 258:8 434:22 438:7
**note** 370:25 371:17 372:4,8 372:11 435:19
**notebooks** 415:7
**noted** 347:11
**notes** 370:22
**notice** 344:14 347:25 358:5 359:11 363:5
**noticed** 362:8
**noticing** 312:24
**number** 273:9 273:22 274:19 284:25 285:3,5 285:20 286:2 286:10 299:10 299:13,24 300:18 306:9 326:16,23 342:11,12 346:11 351:10 354:14 367:25 368:11 371:14 378:12 413:4 431:22 435:7 436:5
**numbers** 273:6 273:14 274:2 274:22 280:4 280:17 285:11 293:12 299:10 305:5 306:5 318:7 320:5 321:21 403:3

**o**

**o** 257:2 434:2
**oath** 257:12 258:14
**obey** 400:25
**obeying** 427:6
**object** 270:22 288:15 289:16 289:24 295:5 295:13 301:19 306:24 307:24 308:14,24 310:22 311:10 313:6 317:3 318:17 319:17 320:2 321:5,17 322:6 325:6,24 330:17 333:9 333:24 335:16 338:25 345:12 349:2 350:19 355:25 363:25 365:8 381:24 382:4,20 385:21 389:13 398:15 407:18 407:23 408:8 408:17 409:14 409:24 410:7 411:7 414:4 416:19 418:20 421:5 424:7 425:20 426:13 429:9
**objection** 264:18 270:24 298:25 305:16 305:23 314:7 350:16 403:21 424:21
**objections** 257:21
**observations** 354:9,9
**observed** 363:16
**observing** 413:8 430:11
**obtain** 291:24
**obtained** 293:17 376:9 389:2
**occurred** 283:17
**october** 298:18 299:14,25 300:9 316:14 317:17 319:23 344:10 414:24 416:3 417:12 417:16,22 419:9,12 421:3 421:9 423:22 436:6
**offer** 348:10 355:19 356:17 356:24 360:16
**office** 404:13 418:8
**oh** 306:11 354:5 363:9,11 392:7 405:13
**okay** 262:25 267:3 272:23 281:16,19 282:13 283:8 283:16,20 284:24 285:11 296:12 297:18 303:2 304:24 305:13 307:14 309:7 312:16 313:3,22 315:2 316:11 319:13 322:12 324:2 326:6 327:3

328:2,7,21 330:5 331:10 331:20 332:16 334:12 337:16 337:20 339:14 340:25 341:5 341:17,25 342:14,18,22 343:8,18 345:7 346:14 351:18 354:15 356:16 358:8 360:2,8 361:14 365:5 365:12 367:14 368:5 369:12 369:22 371:19 371:19 372:23 373:5 375:22 381:16 383:10 384:2,11 385:17 386:2 386:22 387:3 387:14 388:2 389:8,17 390:3 390:19,25 391:16 392:10 394:8 395:5,11 397:14 398:22 401:21 402:7 404:3,9,16,23 405:3,11,15,18 406:3 408:18 409:15 413:18 413:21 414:12 414:16 417:8 417:21 418:6 418:16 419:4 419:24 420:3,8 420:18 421:12 421:20 425:4,8 425:10 426:8 427:12,23 428:18 430:13 431:10

**omission** 385:7

**ones** 310:4 345:14 346:16 348:24 349:24 349:24,25 362:14 363:16 364:8,9,11 367:11,15 370:20 387:8,9 393:9,13

**ongoing** 405:23

**operating** 294:6

**opine** 347:17 357:21 358:6 358:11,15 362:4

**opined** 267:24

**opining** 338:15 374:19

**opinion** 288:8 288:12,18 290:12,17 291:17 311:19 333:17 334:16 339:5 344:22 346:5,23 348:11,20 349:7 350:11 350:17 352:4 355:19 356:18 356:24 359:6 359:13 361:11 361:13 365:13 365:19 376:13 380:2,7 382:12 382:24 411:18

**opinions** 291:8 296:10 346:18 348:7,24 355:16 360:5 360:10,14 429:6,12

**opportunity** 362:16

**opposed** 343:8

**optimization** 286:22 300:8 300:18 311:9

**optimize** 318:12

**optimized** 281:14 285:25 286:5,13,18 287:22 300:12 305:11,14,21 305:25 306:10 306:11,16,17 306:19 326:17 326:23

**order** 277:8 394:23 399:14 399:14

**organized** 274:23

**ori** 404:20 406:24 407:14 407:14,21 408:3,13,22 409:11,18 410:12,13,23

**orie** 402:11 404:6,21 405:8 405:9,16 435:21

**original** 257:9 257:17 259:24 301:16 310:3 369:15,17 371:4,9,22,25 372:18 384:13 386:10,13 387:9 388:25 389:2 391:3,10 391:13,14 392:3,19 395:20,23 396:4,15 398:8 398:14,18,20 399:15,20 400:15 401:4 401:11,16

403:9 406:16 407:2,10,16,22 408:7,15,24 409:12,20 410:6,11 411:5 411:24 412:17 414:2 429:22
**originally** 292:2 323:16
**oris** 410:5
**outcome** 438:17
**output** 259:16 307:5 313:16 313:20 326:24 375:6
**outputs** 289:12 313:19,25
**outside** 268:14 310:25 358:12 390:20
**override** 260:12
**overrides** 260:15,19
**oversight** 404:12 409:22
**overwritten** 259:23 260:5
**own** 293:25 341:15 345:11 345:21 350:17 352:4 353:9,20 354:8 365:7 399:24 410:22

**p**

**p** 256:2,2 257:2 275:11
**p.m.** 255:15 258:5 277:22 278:4 282:19 285:16 292:13 292:21 316:15 316:19 317:17 319:22 327:9 327:16 383:14 383:22 431:19 432:22
**pad** 372:24
**page** 277:14 280:20,24 307:2 312:25 313:2,3 314:9 314:10,13 317:8,13 318:20 326:3 328:2 358:22 384:8 405:5,6 415:15 428:19 430:13 435:6 436:4 437:4,10 437:16
**pages** 298:13 304:4 327:21 413:4
**panels** 360:23 360:24 361:4
**paper** 308:6 313:18 319:3 396:22
**papers** 353:24 365:6 368:9,11 368:11
**paragraph** 261:3 279:24 322:25 328:21 336:8,11,21 340:11 343:22 344:20 345:8 345:23 346:2 347:19 348:14 349:12 351:23 361:16,25 366:4 384:7 387:15 397:15 398:3,17 399:20 403:8 403:20 406:4 414:17,19 415:12 420:9 423:2 428:18
**paragraphs** 328:3,18 351:19 358:14 359:18 360:15 420:5 428:23 430:23
**parameters** 331:7
**part** 260:4 267:24 271:19 274:25 281:17 287:3 298:3 300:22 309:18 321:24 361:13 365:13,24 391:17,25 419:21,23
**particular** 260:21 274:12 274:12 289:3 290:11 354:10 363:19 390:2
**parties** 255:22 257:7 423:9 438:15
**parts** 348:2 386:20,24
**pass** 297:10
**password** 267:25
**pasting** 361:6 361:18 362:3
**patients** 379:23 381:14
**pattern** 290:9 290:11
**people** 262:3 267:8,12,17,20 268:4,8 337:16 353:23 378:7 378:12,17,19 379:3 380:8,20 381:3,5,11 389:23 400:3,9

401:24 410:19 413:7,16 429:14,18 430:10
**people's** 378:2 379:18
**percent** 366:21 367:8,13,18 394:4
**perform** 276:7
**performed** 266:21
**period** 430:8
**perpetrate** 378:8 379:4
**perry** 357:15
**person** 266:4 366:25 374:5
**personal** 399:21
**personally** 343:20
**pertaining** 415:7
**petition** 344:2 348:18 349:25 354:23 355:8 355:21 359:8
**pharmaceutical** 378:16
**phase** 325:3 327:23 328:13 329:8 331:11 331:22 333:3 333:23 334:4 335:2,9 336:3 336:4 339:16 381:7,13,17
**phenomenon** 366:14
**photo** 387:22 388:16
**photograph** 387:11,19 388:11
**piece** 313:18
**pitt** 255:6
**place** 434:11
**plaintiffs** 255:5 255:8 256:4 265:5 272:9 343:25 345:9 347:23 348:17 349:24 350:23 355:22 359:7 363:2 367:23 411:20
**plan** 359:3
**planning** 356:8
**plasma** 336:13
**plate** 258:19 262:15 267:9 267:12,16 272:7 273:11 273:24 274:24 275:5 279:14 314:20 323:18 325:22
**plates** 261:15
**plaza** 256:16
**please** 270:4 271:2 280:9 319:19 426:14 432:6,13,17,21
**plus** 344:15 348:19 350:25 351:20 352:25 353:6 359:11
**po** 412:20
**point** 259:24 260:6 280:6 294:9 334:15 336:19 337:21 339:4 377:7
**policy** 420:19
**portions** 428:9
**position** 385:10
**positive** 360:19
**possible** 268:7 268:11,16,17 289:22 363:14
**possibly** 388:19
**posted** 332:22 406:24 408:22
**potential** 311:16
**potentially** 394:20,21
**pr** 421:13,13
**practice** 397:4 397:11
**practices** 328:12 429:2 430:18,24 431:4
**pre** 393:15
**precise** 394:5
**prepared** 268:19
**preparing** 330:15
**present** 256:20 260:17 291:15 294:15 301:3 314:12 320:10 320:12 322:7,8 333:16 359:11 362:22,25 427:10
**presented** 266:13 269:3 269:17 270:19 271:3 272:2,15 272:24 281:7 286:17 289:5 289:18 291:17 291:19,21 295:8 296:16 296:21 298:6 301:25 302:6 308:10 312:25 313:8,18 315:18 319:24 320:16 321:10 321:25 337:7

337:25 340:16 354:11 357:3 366:13 376:7 382:9 435:9,12
**presenting** 328:12 330:18 330:23
**preserve** 388:20
**preserved** 423:9
**press** 330:2,3 330:24 419:9 419:13 421:13 436:7
**previous** 260:16 416:25
**previously** 258:7 284:21 385:18
**primary** 330:8 387:5,8,21 388:6 389:12 389:16,20 415:6
**printed** 316:7
**private** 404:20
**privileged** 290:22
**probably** 330:11
**problem** 333:22 363:10 363:12 377:6
**problematic** 349:17 358:19 364:7,22,25 365:2,4,22 379:16 382:8 400:6 429:20
**problems** 362:7 363:21 365:16 365:17 369:11 369:13,15,16 369:17,20,22 400:11
**procedural** 423:7 426:2
**procedure** 255:21 389:7
**procedures** 401:18 427:7
**proceed** 331:4 339:15 381:7 381:12
**proceeded** 380:19
**proceedings** 423:9 426:3
**process** 260:12 268:19 339:8 340:9 379:6 409:3 411:15 417:25 423:20 424:11,20 425:15 426:10 426:17
**processes** 423:6
**produced** 265:4 272:8 316:8 324:19
**program** 263:18 329:9 330:6,9,16 331:3,8,21 333:8 334:8,15
**program's** 258:19 259:7
**prone** 385:19
**proper** 260:24 401:20 413:12
**properly** 266:10
**protection** 268:2
**protein** 385:13 394:6
**proteins** 384:23 393:5,7,12,15 393:21,25 395:10
**protocol** 282:5 282:5
**protocols** 430:12
**provide** 399:9 399:20 401:17 403:20 418:11 422:14
**provided** 293:2 293:5,7 329:19
329:22,23 330:2 347:8 418:8
**ptow** 269:3,10 269:16,24 270:6 302:7,12 302:19 435:8 435:11,14
**public** 255:23 258:8 330:3,24 400:12 404:17 404:24 410:5,9 413:24,24 434:22 438:7
**publication** 372:21 389:6
**publicly** 330:21 404:23
**publish** 410:23
**published** 335:23 344:9 397:4 406:24 407:15,20 408:23 409:10 411:22 414:23 415:22 417:12 420:14
**pull** 354:23
**pulled** 272:13
**purported** 412:16
**purporting** 398:13

**purpose** 288:17 358:3
**purposes** 347:15
**pursuant** 255:20
**pursue** 376:17
**put** 319:3 377:18 427:16
**putting** 416:15 422:11
**pvdf** 384:25

**q**

**qualifications** 266:3
**qualify** 391:13
**quanterix** 336:7,14 337:6 337:24 376:24 377:8
**question** 259:19 260:11 261:13 266:25 270:25 271:12 273:20 275:21 276:20 284:22 290:18 291:10 305:19 310:20 310:23 319:19 320:22 321:12 325:9 329:7 330:7 334:3,12 337:5,24 339:6 342:6,7 345:7 345:18 347:14 349:4 354:21 356:22 358:8 375:15 377:12 377:12 378:25 389:8 391:12 396:7 406:22 408:10 418:24 426:8 437:16
**questioned** 338:23
**questions** 271:17 301:22 357:16 359:25 417:23 421:21 423:13,23 425:13 427:14 431:12 437:15
**quick** 420:5
**quotation** 336:22 416:4,8 416:16
**quote** 336:17 415:22 418:10 425:18
**quoted** 419:20

**r**

**r** 256:2 257:2 258:6 434:2 438:2
**ra** 398:14
**raise** 417:23 421:20
**raised** 423:15 423:23
**raising** 377:8
**ran** 261:15 262:8 275:15 343:19
**ranged** 266:21
**rather** 342:12 371:10,25
**raw** 264:9 269:10 270:6 272:5,6,17 278:14 287:9 287:15,16,20 288:2,5,13,17 289:20,22 290:6 296:24 297:4 300:25 301:12,17,18 301:23 307:19 308:2 309:9 310:9,12,21 311:3,8,20 386:10 410:6 410:11 411:5 435:11,13
**reach** 290:16
**reached** 290:24 291:4,7,16 310:10 326:11
**reaching** 408:13
**react** 394:15
**read** 262:15 273:12,24 363:6 389:22 417:19 420:5 424:6,8,8 428:8,9
**reader** 267:9 267:12,16 272:8 279:14 301:8 323:19
**reading** 276:15 280:8 363:7 413:6,22
**readings** 274:4 274:8,10
**readout** 313:4 317:14 318:16
**reads** 278:18
**really** 288:20 320:23 331:17 388:23 419:2 422:5 430:3
**realtime** 255:17
**reanalysis** 328:24 329:4 332:6 335:15
**reason** 310:20 310:23 311:2,4
**reasonable** 339:6 407:9 408:6
**reasonably** 329:5 331:24

333:19 337:17 338:16 339:18
**reassure** 369:9
**rebuttal** 348:10
**recall** 258:21 259:2 265:8,11 277:12 296:2,4 309:14,16,21 320:4 321:20 324:24 332:15 335:12 357:14 362:12 363:22 370:19 371:2 372:2 411:13 414:8,9,11 428:4,21 429:4
**received** 294:23 295:19 411:19
**recess** 292:16 327:11 383:17
**reciting** 420:4
**recognize** 270:12 272:15 297:25 306:7 338:18 372:10
**recognized** 329:6 333:21 334:2 337:4 380:16 406:15 425:12
**recollection** 335:3 336:24 346:9,10
350:21 368:3
**recommend** 333:21
**recommendat...** 374:8
**recommended** 401:18
**reconstruct** 388:24
**record** 258:3 260:8 283:6 292:14,19 316:2 324:12 324:17 327:6 327:10,14 383:15,20 385:16 414:15 431:13,17 432:2 438:12
**recorded** 384:13,21 398:8,21
**recordkeeping** 397:19,21,23 415:5 428:25 430:12,17,24 431:4
**records** 260:16 325:3 385:9
**red** 377:6
**redo** 269:3,10 269:16,24 270:6 435:8,10
**reduces** 274:18
**refer** 264:8 345:14 346:9 346:11 347:22 417:2 421:6
**reference** 332:10
**referenced** 286:13 410:15 420:21
**referred** 340:15 371:4
**referring** 277:17 333:11 341:10 421:9
**refers** 281:15 349:12
**reflected** 324:22
**reflection** 424:10
**regard** 382:11
**regarding** 345:10 418:18 420:15 423:11 423:13,17,24 425:13
**regulatory** 401:8
**reisbaum** 256:4
**related** 438:15
**relative** 280:14 395:9 426:10 426:17
**release** 330:2,3 419:9,13 421:13 436:7
**releases** 330:25
**relevant** 347:5 422:15 426:19
**reliability** 421:22 422:16 424:3 426:11
**reliable** 383:3 423:12
**rely** 421:2,23 424:4
**relying** 403:19
**remember** 320:6 329:24 329:25 332:10 332:11 357:24 385:17 411:15 416:11
**remi** 255:11 256:15
**remotely** 255:21
**repart** 414:22
**repeat** 270:25 273:17 276:20 305:18 319:18 320:21 408:9 426:14
**repeatedly** 323:4 326:12
**report** 261:2 264:12 265:2

267:25 270:14 271:20 279:17 279:21 281:17 287:4 291:17 293:6 295:25 300:22 307:11 309:20,24 319:8 320:16 321:15,24 322:23 327:21 332:25 339:12 340:8 344:9 348:8,19 351:11 354:7,8 357:23 358:3 358:10 359:10 360:6,9 363:24 364:5,15 367:15 371:3 382:11 384:4 387:15 403:8 403:20 407:7 411:17 412:15 412:24 414:17 414:20,22 415:13,22 416:3,4,8,14,16 416:18,21,24 417:3,5,12,16 417:22 418:19 418:22 419:3 421:2,2,3,7,7 421:23,23,24 422:16 424:4,5 425:18 428:2 428:12,15,16 428:19

**reported** 263:25 344:7 349:15 415:20

**reporter** 260:2 269:5,12 270:2 274:5 280:21 283:10 287:10 289:9 291:2 302:2 318:24 320:20 324:14 331:15 361:20 368:21 374:14 381:9,25 402:18 427:15 427:20 432:3,7 432:10,14,18

**reports** 290:15 350:14 367:12

**represent** 270:20 272:12 274:3 284:13 311:3 320:7 405:16

**representation** 266:14 309:9 382:12 387:12

**representations** 258:18

**represented** 321:3,25 326:24

**representing** 313:9 320:14 320:18,25 321:15

**represents** 282:3 341:14

**reproducing** 413:15

**requested** 406:7 437:9

**require** 401:3 401:22 402:4

**requirement** 412:16

**requires** 401:9

**res** 258:17

**research** 333:4 373:15 375:12 375:16,20 376:16 378:11 378:14,15,22 378:24 379:11 380:14 381:22 404:13 405:23 412:6 415:7 418:9,13 423:11,17

**reserved** 257:22

**respective** 257:6

**respond** 357:2 357:17 359:24

**respondent** 406:14

**responds** 408:19

**results** 258:18 259:6 261:5,9 261:16 263:25 264:2 265:12 325:4,15 328:24 340:17

**retain** 389:3,24

**retained** 260:20 431:23 436:16

**retracted** 344:16

**retraction** 344:13 347:25 350:3 359:10 363:4

**retractions** 350:24

**revealing** 420:13

**review** 260:23 264:16 359:6 372:13 373:18 380:6 428:6,7

**reviewed** 263:7 264:21 268:12 293:3 309:22 339:11 343:23 344:6 346:4 348:15 369:4

415:19 422:17 427:25
**reviewing** 259:16
**reviews** 271:6 272:19
**right** 260:24 261:6 263:9 264:5,9,14 265:14 268:2 268:24 270:21 271:23 272:9 273:7,12,24 275:2,3,7 277:15 279:7 282:16 283:18 284:10 285:13 285:22 287:17 291:11 292:23 293:4,19 298:7 298:10 299:16 300:2,14 303:3 303:14,20 305:15,22 306:23 307:23 308:23 309:5 310:21 311:9 311:23 312:6,9 312:10,13,21 314:20,24 315:3 316:21 317:18 318:8 318:13 319:4 320:17 321:4 322:17,21 323:6 324:20 325:23 328:5 328:14,19 331:4,8,12,22 333:4,23 334:10 336:15 336:23 337:8 337:18 338:6 338:18 339:16 339:19 340:9 341:11 352:14 352:16,21 353:2 354:5 355:10 360:6 364:12,15 367:20,24 369:24 370:11 370:23 372:21 373:3,8,16,25 376:11,20 381:14,17 384:3 392:14 399:3 403:2 427:11 430:25
**rightly** 424:18
**rockefeller** 256:16
**role** 330:8
**rough** 432:8,11 432:15
**roughly** 276:8 281:21
**round** 280:4
**routinely** 400:9
**rules** 255:21 400:23,24 412:7
**rulings** 437:15
**run** 262:5 298:14 305:20 307:22 308:10 309:4 310:8 312:8 317:2 340:21 343:11 343:12
**runalyze** 261:21
**runalyzed** 261:25
**runko** 402:11 404:6,11 405:21 408:19 409:17 435:21
**running** 343:8
**runs** 305:21

**s**

**s** 256:2 257:2,2 258:6,6 435:2
**sabrina** 312:13 312:14,15
**sampers** 393:18
**sample** 393:22 394:2,7
**samples** 338:4 393:18
**sanders** 255:19 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1,2 269:9 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1,23 293:1 294:1 295:1 296:1,20 297:1,3 298:1 299:1 300:1 301:1 302:1,11 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1,7 316:1 317:1 318:1

319:1 320:1
321:1 322:1
323:1 324:1
325:1 326:1
327:1 328:1
329:1 330:1
331:1 332:1
333:1 334:1
335:1 336:1
337:1 338:1
339:1 340:1
341:1 342:1
343:1 344:1
345:1 346:1
347:1 348:1
349:1 350:1
351:1 352:1
353:1 354:1
355:1 356:1
357:1 358:1
359:1 360:1
361:1 362:1
363:1 364:1
365:1 366:1
367:1 368:1
369:1 370:1
371:1 372:1,7
373:1 374:1
375:1 376:1
377:1 378:1
379:1 380:1
381:1 382:1
383:1 384:1,2
385:1 386:1
387:1 388:1
389:1 390:1
391:1 392:1
393:1 394:1
395:1 396:1
397:1 398:1
399:1 400:1
401:1 402:1,10
403:1 404:1
405:1 406:1
407:1 408:1
409:1 410:1
411:1 412:1
413:1 414:1
415:1 416:1
417:1 418:1
419:1,8 420:1
421:1 422:1
423:1 424:1
425:1 426:1
427:1,23 428:1
429:1 430:1
431:1,21 432:1
433:1 434:1,15
435:1,4 436:1
436:2 437:1
438:1
**save** 260:6
**saved** 258:19
259:6 307:20
319:14,21
322:3
**saw** 325:16
357:15 362:5
410:15
**saying** 295:16
312:23 346:22
348:14 365:20
365:23,25
366:2,3,5
423:22
**says** 269:15,23
270:5 275:11
278:22 282:4
283:25 284:4,9
322:15 333:25
350:11 365:19
371:2 372:15
400:14 403:4
406:5 408:21
409:16,17
411:23 423:4
426:5
**scam** 378:8
379:4
**scampbell**
256:12
**scenarios** 394:8
395:12
**science** 344:9
413:23 414:24
415:23 417:13
417:17 420:14
425:19
**sciences** 255:11
256:10 329:6
331:25 333:20
334:21 336:14
337:4,18
338:17 339:19
**scientific**
328:11 329:21
338:13 344:15
374:24 375:4
379:11 396:10
399:8,23
400:13 413:9
422:9
**scientifically**
330:14 375:21
**scientists** 379:8
**scott** 256:11
316:3 324:13
324:18
**screen** 271:8
319:4
**sealing** 257:7
**search** 414:5
**second** 269:7
269:23 272:5
273:7,14
276:17 278:13
296:23 298:9
305:8 318:10
361:24 387:17
391:17,24
406:4 415:17
422:25
**section** 271:20
327:21 328:4
336:7,7 339:22
373:14 428:24

430:16
**see** 269:15,21 270:8,10 274:25 275:13 277:15,20 281:24 282:23 283:22 284:6 285:2 286:3 298:15 302:21 304:7 306:18 307:7 315:15 316:16,17,23 318:19 325:11 327:24 329:10 334:7 336:9 339:24 344:3 344:11,18 345:5,16 353:21 378:2 379:5 384:17 387:24 391:21 392:24 394:19 395:8 403:2,5 403:8,11 404:7 404:14 405:7 405:11,13,25 406:12,19 407:3,11 409:4 409:25 412:6 413:10,16 415:10,24 419:15 420:13 420:18 421:19 422:2 424:10 426:4 429:21 430:20
**seeing** 414:11
**seem** 322:14
**seems** 329:16 329:17 351:2 413:14 425:22
**seen** 261:18 324:24 347:9 357:6 365:9 410:11 411:4 411:22 412:3 412:10 413:2 419:17,19,23 429:17
**sending** 338:4
**sent** 270:21 271:5 272:3 277:11 279:20 298:6 307:23 308:11 310:5 310:14 311:21 314:4 315:19 319:16,24 320:8 321:3,15
**sentence** 386:2 387:18 390:4 391:17,25 408:2 415:18 420:9,12
**separate** 377:8
**separately** 346:16
**september** 328:24
**series** 275:6
**serious** 378:3,4
**seriously** 374:9 378:5
**serves** 350:21
**service** 257:16
**set** 269:3,10,16 269:24 270:6 291:22 315:11 321:21 360:5 363:17,23 393:15 435:8 435:10 438:11 438:20
**sets** 271:23 295:8 296:13
**setting** 298:13 367:14
**seven** 414:14
**several** 360:24
**shafer** 402:12 404:6,21 405:8 405:9,16 406:5 406:5 407:14 407:20 408:3 408:13 435:21
**shapes** 360:21
**shared** 323:11 325:17 371:8 371:23
**sheet** 281:2 308:18
**shined** 274:11
**short** 292:16 327:11 383:17
**show** 309:12 361:16,25 390:12 394:10 394:22,23 395:13
**shown** 323:3,8 323:9,10 324:9 325:2 326:8,9
**shut** 333:7
**sic** 370:3 418:16
**sick** 379:22 380:8
**side** 273:4 275:2 277:16 304:5,5 390:11
**sign** 351:5 377:2
**signals** 361:5 361:17 362:2
**signature** 404:10 438:23
**signed** 257:10 257:12,15
**significance** 419:3
**significant** 280:6,10
**signs** 344:23 346:6 347:4 349:8 350:4,8

351:14,17 353:16 358:25 366:7 373:15 376:15,18 378:22 380:14
**similarities** 360:20
**simply** 260:18 380:3
**simufilam** 329:9 330:6,10 334:14 375:12 381:13
**single** 349:20 366:22
**sir** 324:15 331:16 361:21
**sit** 414:7
**site** 411:16
**sites** 401:13
**sitting** 364:4,12 364:15 393:9
**situations** 400:6 429:21
**size** 312:18,21 315:3 393:20 393:21 396:12
**slicing** 360:25 363:20
**slide** 346:13
**slightly** 271:8 368:15 377:19
**slow** 270:3 331:16
**smaller** 393:7
**smallest** 393:11
**society** 379:9
**sociopath** 379:21
**sociopaths** 380:3
**soft** 293:24
**software** 258:24 259:5 261:5,24 262:14 263:3,8 264:17 266:7 276:10 282:11 283:21 284:2 284:14,16,20 291:25 293:25 293:25 294:5,7 299:4,5 304:16 304:20,23 305:2 318:2 323:17
**software's** 264:2,8
**softwares** 262:17
**solutions** 431:24
**somebody** 430:7
**sorry** 271:14 273:17 305:18 319:2 320:20 331:19 352:6 355:12 367:25 368:23,24 377:3 392:2,4 392:5 415:4 420:10 426:18
**sort** 313:20
**sorts** 289:18 401:19
**sotto** 338:3 383:12
**sound** 328:11 338:13 375:21
**source** 293:18 293:18 404:24 404:24 412:15 413:24 414:6,8 414:10,10
**sources** 353:7 361:15 364:6 367:17 368:7 407:6 408:3,14 413:4,6
**southern** 255:2
**sp** 294:13
**space** 390:20
**speak** 292:24 348:7
**specific** 345:14 345:20 350:13 351:21 356:19 358:13 361:7 361:14,19,23 362:3 364:24
**specifically** 346:12 353:8 354:7,10 357:22 358:10 363:16
**specified** 434:11
**splicing** 363:10 411:14
**spoken** 294:14 294:17
**spreadsheet** 270:20 271:3 274:22 276:16 278:25 279:19 282:14,14 283:24 284:9 285:13,15,20 296:25 297:4 298:9 299:25 303:8,24 308:9 308:21 309:13 310:19 316:25 319:13 321:10 435:13
**spreadsheets** 270:13 283:17 299:11 304:5 305:14 306:22 318:16 319:7 324:7 325:13
**square** 333:4
**ss** 438:4

**stable** 385:24 388:11
**stain** 394:20
**stamp** 269:20 316:4,9
**stamps** 261:19 300:17 324:20 324:21
**stand** 354:18 354:23 355:19
**standard** 276:2 276:4 403:24 406:17 409:21 410:6 429:17
**standards** 328:11 329:21 338:14 396:25 400:4 410:22 423:8 426:2 428:25 429:12 430:18,24 431:4
**start** 292:22 327:17,17 383:23 388:7
**started** 382:5
**starting** 336:7 404:4
**state** 255:24 258:8 261:2 265:2 384:11 414:20 438:4,8
**stated** 306:3 429:11
**statement** 424:14
**states** 255:2
**statistical** 343:6
**stay** 423:16
**step** 281:20,20 393:5
**steps** 266:9,16 266:17
**stipulated** 257:5,20
**stopped** 334:14 338:11
**storage** 387:21
**store** 388:14
**street** 256:10
**strict** 406:18
**students** 262:4 343:16
**studying** 333:3
**style** 373:22 374:11
**subject** 402:12 431:11 435:23
**submission** 336:17,22 337:2,11 338:8
**submit** 387:7 387:13 401:2 409:3
**submitted** 333:3 338:9 376:19,21 411:12
**subpoena** 255:20
**subscribed** 434:18
**subsequent** 328:25
**substantial** 375:7,15,19
**substantive** 292:6 298:13 304:4 313:3 317:13
**substitute** 388:21
**substrate** 384:24
**succeed** 380:23 380:24
**sufficiently** 376:8
**suggesting** 332:3 360:24 360:25
**suite** 256:10
**summarized** 328:9
**superimposed** 371:11
**support** 350:3 407:7 408:4,14
**supporting** 359:16 375:12
**supposed** 360:4 374:18 395:16 400:25
**sure** 259:20,22 261:12 267:2 271:15 273:19 276:22 283:15 292:4 303:4 319:20 320:24 332:7 340:23 342:22 361:22 419:19 432:9
**surprise** 267:11 267:14
**surprised** 419:22
**sworn** 257:10 258:8 434:5,18 438:11
**system** 260:7
**syz** 393:5

**t**

**t** 257:2,2 434:2 435:2 438:2,2
**tab** 279:5
**take** 266:9 270:11,18 276:11 327:4 340:21 370:24 372:3 374:9 383:11
**taken** 255:19 279:13 292:17

327:12 334:21 378:5 380:18 383:18 420:23 428:11
**takes** 276:7
**talk** 260:15 294:12 361:12 366:19
**talked** 388:3 399:5
**talking** 321:6 341:12 394:13 412:12
**taught** 343:15
**taylor** 256:17 297:13 383:25 392:4,9,12,15 402:8,24 414:16 415:4 419:5 420:10 425:8 426:18 427:12 432:4,6 432:9 437:6
**teach** 343:13
**teaching** 430:9
**team** 267:9
**techniques** 343:17
**tell** 259:15 263:11,14,17 330:20 364:14 364:20 367:19 367:20 368:10 375:6 401:13 401:24 410:19 412:2
**tells** 385:11
**tend** 374:10
**term** 398:18 416:16 419:2 427:3 428:7
**terms** 306:9,19 342:11 368:16 397:19 399:6 426:25
**test** 263:24
**testified** 258:9 385:18 427:24
**testify** 292:5 354:18 356:9 434:5
**testifying** 356:7
**testimony** 358:4 359:18 360:16 361:9 431:21 434:6 434:10 438:13
**testing** 336:13
**thank** 291:13 296:19 297:23 315:24 405:22 418:6 431:14 431:25
**thanks** 297:13
**theranos** 374:17
**thing** 277:5 313:20 326:25 366:23 367:6
**things** 314:15 347:6,8 351:10 352:10 353:15 353:20 354:2 355:23 361:10 362:24 365:3 365:10 366:10 367:9 368:20 376:25 400:8 412:25 413:2 429:16
**think** 266:24 281:3 293:9 316:5 320:9 329:24 330:21 333:6,16 334:13 336:16 337:20 338:10 338:22 339:3,9 342:10 343:4 356:3,5 357:9 368:2 376:25 378:19 382:8 384:4 413:11 414:14
**third** 281:22
**thought** 263:16 306:12,14 377:13 419:2
**three** 300:10
**time** 255:15 257:22 258:4 261:18 262:8 262:21 276:12 279:10 290:24 291:7 292:12 292:20 299:18 299:22 300:17 305:15,21 312:2,7 318:13 327:8,15 343:18 347:12 370:2 382:16 383:13,21 385:20 388:9 397:7,9 410:10 411:3 412:4,9 416:23 417:25 421:17 423:18 425:6 430:8 431:15,18 434:10
**times** 317:6
**timestamp** 289:13,22
**title** 302:17
**titled** 430:16
**today** 326:9 364:4,12,15 414:7 427:24
**today's** 431:20
**told** 288:4,16 293:16 352:12 402:20
**took** 258:16 266:16,17 292:24 334:22

387:10
**top** 269:15 364:21 393:12 400:20 404:4 408:18,25
**total** 373:20 431:22
**traded** 330:22
**training** 262:3 262:3
**transcribed** 255:22
**transcript** 432:5,12,16,19 434:9,9
**transcripts** 427:25 428:10 428:15
**transferred** 384:24
**translationing** 370:11
**transmitted** 274:18
**trial** 257:22 330:12 331:11 332:22 337:21 358:5 359:19 360:11 362:4 362:15
**trials** 335:2,10 335:24 338:11 338:24 339:4 339:11,16 380:21 381:8 381:13,17
**tried** 373:24
**triplicate** 280:13
**troubling** 344:23 346:6 349:8 350:4,8 351:5,13,17 353:16 358:25 366:7,11 380:14
**true** 365:22 366:24 387:3 388:12 420:25 434:9 438:12
**truth** 426:25 427:9 434:5
**try** 276:21
**trying** 271:16 325:10 329:23 329:25 345:16 345:25 354:8 356:5 388:14 388:23,24 398:17 416:11
**turn** 317:13 428:18 430:13
**turned** 274:19
**turning** 307:2 318:20
**turquet** 256:12
**two** 268:21 271:23 292:10 299:7,21 305:20 306:8 307:10 316:13 317:20 318:16 319:7 338:4,9 344:17 420:5
**type** 290:11 304:18,22
**types** 304:16

**u**

**u** 257:2
**ultimately** 330:19
**un** 411:19
**unable** 413:24
**unacceptable** 411:15
**unaware** 407:20
**uncropped** 371:4,9,22,25 384:14 386:4,6 386:22 387:4 388:5 389:10 389:15,19 390:5,25 391:5 391:18 392:20 395:18 398:9 399:16 400:16 406:7 407:8 408:5 409:18
**under** 258:14 282:4 400:18
**underlies** 380:15
**underlying** 382:25 423:16 424:23
**underneath** 275:5 283:9,13 285:25
**understand** 258:13 259:21 261:4 265:3,13 266:20 268:19 271:4 274:21 275:14 276:15 277:5,8 278:24 281:6,12,14 286:9,12 288:19 290:3 291:10 293:17 294:23 298:20 308:20 311:12 316:24 323:22 323:25 324:2 346:15,17 347:13 349:4 352:19 355:15 358:2 360:4 373:6,10 397:20 417:9
**understanding** 275:17 279:9 279:15 282:9 286:16 300:17 303:22 325:20

335:8 371:20 377:3 414:2 416:9
**understood** 272:7 295:19
**undisclosed** 360:25
**unexpected** 360:23
**united** 255:2
**units** 431:22
**university** 405:17 419:10 419:13 423:18 436:8
**unprocessed** 391:2,6,7 395:18
**unquote** 415:22 425:18
**unreasonable** 406:17
**unsigned** 257:14
**update** 418:11
**updated** 259:17
**upper** 275:2
**use** 258:24 267:20 340:4 373:21,22 374:10 375:23 377:10 382:6 382:21,22 383:5,7 389:6 428:7
**used** 257:14 263:2,9 267:9 267:12 270:13 323:16 324:7 406:8 431:23
**using** 276:10 291:25 293:24 293:25 294:8 323:16 353:21 375:17 426:22 426:24 427:3

**v**

**v** 258:6
**valid** 330:14 346:25 347:20 348:21 355:23 356:4
**values** 276:17 277:4 279:18 279:19 280:12 307:19
**various** 314:23 346:4 364:6 367:17 406:9
**varying** 371:7
**verify** 266:10 301:11
**veritext** 431:24
**version** 284:5 284:10,14,18 299:6 318:5
**versions** 260:16 299:4 304:16
**versus** 302:12 302:19,23,25 364:25 435:15
**vertical** 360:23
**video** 258:4 292:13,20 327:8,15 383:14,21 431:18
**videographer** 256:21 258:2 292:12,18 327:7,13 383:13,19 431:16
**videotaped** 255:17
**view** 301:14 328:9 355:2,24 361:16 366:16 377:22 379:2
**viewing** 364:14
**violated** 424:19
**violation** 425:24
**violations** 413:8 422:8
**visit** 268:9
**visual** 353:21
**visualize** 335:6
**voce** 338:3 383:12

**w**

**waived** 257:9
**walk** 281:19
**wang** 261:4,8 263:2,8,25 267:8 270:21 271:4 272:2 274:23 275:15 277:10,25 279:11 293:10 298:6 307:20 308:11 314:4 314:19,23 315:19 319:24 321:4,16 323:4 323:12 325:17 326:12 328:10 332:5 333:2 343:24 344:16 350:22 353:25 358:12 376:5 376:10,11 377:9,16 406:17 418:14 418:18
**wang's** 264:4 282:14 283:24 285:12,15 298:18 299:14 300:9 329:2,18 335:14 344:25 347:25 349:10 356:20 374:23

376:16 377:4 414:25 423:17
**want** 268:18 270:18 273:19 280:19,23 281:19 283:20 284:24 292:4 298:12 303:4 304:3 327:20 331:10 336:6 339:21 348:6 348:13 352:12 420:4
**warning** 376:15,18 377:2 378:22
**warnings** 378:4
**wavelengths** 274:13
**way** 294:21 341:25 364:3 368:15 377:19 388:10,15,19 390:13 396:17 410:3 413:12 438:17
**ways** 363:14 394:16 429:17
**we've** 399:5 414:14
**weight** 384:16 385:12 386:9 386:15 391:20 392:22 393:3,6 393:14,24 394:6,10,14,17 394:24 395:4,9 395:13,17,19 397:6,12 398:10 399:18 400:17 401:4,9 406:11 409:20 411:25 412:11 412:18 414:3
**weights** 393:16 397:24
**welcome** 327:19
**wells** 273:5,24 308:4,5 320:11
**went** 342:23 369:8
**western** 340:2 340:9,15,21 342:14,19 343:19 345:10 356:20,20 360:24 361:23 372:19 407:2 407:16,22 408:24 409:12
**whereof** 438:19
**widely** 389:25
**widespread** 399:22
**witness** 255:18 257:10,16,18 258:7 271:6,14 272:19 273:2 274:7 280:8 290:20 291:11 291:13 292:8 302:8 303:18 304:6 307:3,13 318:21 319:9 322:24 338:3 357:13 358:21 384:9 387:16 392:8,10,13,16 414:18 415:14 420:6 423:3 428:20 430:15 432:23 438:10 438:13,19
**word** 329:15 340:20 375:23 383:5,7 425:21 426:23
**words** 375:17
**working** 259:13 413:14 413:23
**works** 405:16
**worse** 374:17
**write** 256:21 398:6
**written** 358:9
**wrong** 321:9
**wrote** 416:12
**wu** 256:22

**x**

**x** 255:3,13 435:2 437:2

**y**

**ye** 340:6
**yeah** 273:3,21 279:22 287:13 287:24 293:12 297:9,12,22,24 299:17 301:5 304:21 309:15 317:6,11,22 319:11 323:24 325:8 332:18 332:20 355:6 376:12,23 382:17 383:2 392:9,9 408:11 409:9 416:10 424:14,18 426:15 427:18
**year** 285:21 286:6,18 288:2 288:10 289:13 300:4,13 311:9 325:19
**years** 325:5 413:7
**yong** 418:14
**york** 255:2,24 256:6,6,16,16 258:9 405:17 419:10,14

436:9 438:4,5 438:8

**z**

**zach** 414:13 425:5 427:11
**zachary** 256:17
**zaur** 256:22
**zero** 302:12,19 302:23,25 435:15
**ztaylor** 256:17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.