# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, AND ENEA MILIORIS, | § | CASE NO. 1:24-CV-05948-JLR-OTW |
| PLAINTIFFS, | § | |
| V. | § | |
| CASSAVA SCIENCES, INC., REMI BARBIER, AND LINDSAY BURNS, | § | |
| DEFENDANTS. | § | |

**HIGHLY CONFIDENTIAL**
ORAL AND VIDEOTAPED DEPOSITION OF
LINDSAY BURNS
NOVEMBER 13, 2025

ORAL AND VIDEOTAPED DEPOSITION OF LINDSAY BURNS, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above styled and numbered cause on Thursday, November 13, 2025, from 9:03 a.m. to 6:03 p.m., before TAMARA CHAPMAN, CSR, RPR-CRR in and for the State of Texas, reported by computerized stenotype machine, at the offices of Baker & Hostetler, LLP, 111 Congress Avenue, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

A P P E A R A N C E S

FOR THE PLAINTIFFS:
David Kumagai
Isaac B. Zaur (via Zoom)
Amanda J. Wong (via Zoom)
CLARICK GUERON REISBAUM LLP
41 Madison Avenue, 23rd Floor
New York, New York 10010
212-633-4310
dkumagai@cgr-law.com
izaur@cgr-law.com
awong@cgr-law.com

FOR THE INDIVIDUAL DEFENDANTS:
Aric Wu
Genevieve York-Erwin
Zachary Rowen Taylor (via Zoom)
BAKER & HOSTETLER, LLP
45 Rockefeller Plaza
New York, New York 10111
212-589-4645
awu@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

FOR CASSAVA SCIENCES:
Michael Scott Campbell
GIBSON DUNN & CRUTCHER LLP
1900 Lawrence Street, Suite 3000
Denver, Colorado 80202
303-298-5723
scampbell@gibsondunn.com

FOR THE WITNESS, LINDSAY BURNS:
William B. Jacobson
JACOBSON LOPEZ PLLC
1015 15th Street NW, Suite 1030
Washington, D.C. 20005
202-810-3225
bjacobson@jacobsonlopez.com

ALSO PRESENT:
Timothy Desadier, Videographer
Adrian Heilbut
Jesse Brodkin
Enea Milioris

I N D E X


| | PAGE |
|---|---|
| APPEARANCES.............................. | 2 |
| LINDSAY BURNS | |
| EXAMINATION | |
| BY MR. KUMAGAI........................... | 9 |
| REPORTER'S CERTIFICATION.................. | 313 |
| CORRECTION PAGE........................... | 315 |
| SIGNATURE PAGE............................ | 316 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 189 | Log of events documented by Dr. Lindsay Burns (CASS-CLASS-01779298 - CASS-CLASS-01779428) | 15 |
| Exhibit 190 | Pain Therapeutics, Inc., A New Drug Candidate and Companion Diagnostic Candidate for Alzheimer's Disease (No Bates - 34 pages) | 130 |
| Exhibit 191 | Article: Aß42-induced tau phosphorylation is a7nAChR-dependent (No Bates - 2 pages) | 132 |
| Exhibit 192 | Email chain originating 04/10/2022 from Iratxe Puebla, Subject "Concerns raised to the attention of COPE regarding retractions in PLOS ONE" (CASSAVA_000741222 - CASSAVA_000741225) | 152 |

E X H I B I T S (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 193 | Email chain originating 04/10/2022 from Iratxe Puebla, Subject "Concerns raised to the attention of COPE regarding retractions in PLOS One" (CASSAVA_000738379 - CASSAVA_000738388) | 155 |
| Exhibit 194 | Email from Lindsay Burns to Kate Watson Moss and Remi Barbier, dated 9/30/2022, Subject "J Pain inquiry" (CASSAVA_000735595) | 158 |
| Exhibit 195 | Email from Lindsay Burns to Lindsay Burns, dated 10/18/2022 (CASSAVA_001022488 - CASSAVA_001022490) | 160 |
| Exhibit 196 | Email from Zhe Pei to Lindsay Burns, Hoau-Yan Wang, and Kate Watson Moss, dated 10/31/2022, Subject "Re: Papers needed" (CASSAVA_000735672 - CASSAVA_000735673) | 161 |
| Exhibit 197 | Chat transcript dated 8/7/2021 between Hoau-Yan Wang and Lindsay Burns (CASSAVA_000217631 - CASSAVA_000217632) | 189 |
| Exhibit 198 | Email from Chuck Davis to Lindsay Burns and Hoau-Yan Wang, dated 8/5/2019, Subject "RE: Data from our first trial in AD patients" (CASSAVA_000059830 - CASSAVA_000059834) | 197 |
| Exhibit 199 | Email from Lindsay Burns to Hoau-Yan Wang, dated 7/13/2020, Subject "Re: P values" (CASSAVA_000059303) | 200 |
| Exhibit 200 | Email from Lindsay Burns to Hoau-Yan Wang, dated 5/14/2020, Subject "stats" (CASSAVA_000922566) | 217 |

E X H I B I T S (continued)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 201 | Summary of Secondary Efficacy Endpoints - Changes In CSF Biomarkers on Day 28 In Comparison to Baseline Visit Within Dose Groups (CASSAVA_000922567 - CASSAVA_000922586) | 217 |
| Exhibit 202 | Email from Lindsay Burns to Hoau-Yan wang, dated 05/14/2020, Subject "Groups" (CASSAVA_001444106) | 223 |
| Exhibit 203 | Copy of spreadsheet (CASSAVA_001444107 - CASSAVA_001444109) | 223 |
| Exhibit 204 | Email from Lindsay Burns to Ben Thornton, dated 7/12/2020, Subject "expecting CSF albumin data today" (CASSAVA_000382849) | 229 |
| Exhibit 205 | Graphs (SEC 0001196 - CASSAVA_001443564) | 233 |
| Exhibit 206 | Clinical Information Request IND 126487, SN0052 (CASSAVA_000835817 - CASSAVA_000835819) | 240 |
| Exhibit 207 | Chat transcript dated 1/12/2021 between Hoau-Yan Wang and Lindsay Burns (CASSAVA_000217567 - CASSAVA_000217568) | 247 |
| Exhibit 208 | Email from Lindsay Burns to Laurie Ryan, dated 12/14/2020, Subject "update" (CASSAVA_000535544 - CASSAVA_000535545) | 248 |

E X H I B I T S (continued)


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 209 | Email from Jim Kupiec to Lindsay Burns, Remi Barbier, Guy Singer, and William J. Foley, dated 4/5/2022, Subject "FW: Cassava PTI-125-07 - 01024 - Discussion of Site Concerns" (CASSAVA_000956262 - CASSAVA_000956265) | 262 |
| Exhibit 210 | Email from Lindsay Burns to Hans Frykman and Dr. Pankaj Kumar, dated 6/23/2021, Subject "Re: SIMOA pTau-181 assay for Cassava samples" (CASSAVA_000724925 - CASSAVA_000724930) | 269 |
| Exhibit 211 | Exhibit: PTau 181 (Mean Concentration pg/m Confirmed AD by total tau/Abeta42 (No Bates - 1 page) | 269 |
| Exhibit 212 | Native spreadsheet (CASSAVA_000854458 - CASSAVA_000854459) | 275 |
| Exhibit 213 | Email from Leslie Jones to Lindsay Burns, Ben Murray, Laura Rodriguez, and Ben Thornton, dated 5/22/2023, Subject "PTI-125-04 - CSF Results from ACU" (CASSAVA_001237668 - CASSAVA_001237931) | 280 |
| Exhibit 214 | Email from Shorena Janelidze to Lindsay Burns, Oskar Hansson, and Carrie Crowley, dated 5/18/2020, Subject "Re: Time to talk?" (CASSAVA_000569709 - CASSAVA_000569710) | 285 |
| Exhibit 215 | Basic Endpoint Protocol (CASSAVA_000569713 - CASSAVA_000569717) | 287 |

## PREVIOUSLY MARKED EXHIBITS



| NO. | PAGE |
|---|---|
| Exhibit 23 | 210 |
| Exhibit 86 | 292 |
| Exhibit 124 | 309 |
| Exhibit 132 | 171 |
| Exhibit 133 | 171 |
| Exhibit 134 | 171 |
| Exhibit 135 | 172 |
| Exhibit 139 | 193 |
| Exhibit 140 | 206 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:03 a.m. on November 13th, 2025. This is Media Unit 1 of the video-recorded deposition of Lindsay Burns, taken by counsel for the plaintiff in the matter of Adrian Heilbut, et al. versus Cassava Sciences, Incorporated, et al., filed in the United States District Court for the Southern District of New York, Case No. 1:24-CV-05948-JLR-OTW.

The location of the deposition is 111 Congress Avenue, Austin, Texas. My name is Timothy Desadier, representing Veritext, and I am the videographer. The court reporter is Tamara Chapman from the firm Veritext.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. KUMAGAI: David Kumagai on behalf of plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris, from the law firm Clarick Gueron Reisbaum.

Also with me on the Zoom is -- are my colleagues, Isaac Zaur and Amanda Wong.

And the individual plaintiffs are

also on the Zoom.

MS. YORK-ERWIN: All of them?

MR. KUMAGAI: Yes.

MR. WU: Aric Wu from Baker Hostetler for the individual defendants. And with me is my colleague, Genevieve York-Erwin.

MR. CAMPBELL: Scott Campbell with Gibson Dunn on behalf of Cassava Sciences, Inc.

MR. JACOBSON: Billy Jacobson, Jacobson Lopez, on behalf of Ms. Burns.

MR. TAYLOR: Zachary Taylor.

MR. WU: Oh, and my colleague Zachary Taylor is on too by Zoom.

LINDSAY BURNS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. KUMAGAI:

Q. All right. Good morning, Dr. Burns. You worked at Cassava for around 23 years.

Is that right?

A. Something like that.

Q. And for purposes of today I'll refer to Cassava as the company when it was called Pain, and when it was called Cassava. Is that okay?

A. Sure.

Q. Can you describe what the company's culture was like during your time there?
A. That's a really vague question. Can you please be more specific?
Q. Do you understand what "company culture" means?
A. Generally, but I don't understand what you want.
Q. What's your --
A. That's a vague question.
Q. -- what's your understanding of "company culture"?
A. That's a vague question. Can you please elaborate on what you want.
Q. Okay. Let's come back to that.
You're familiar with the plaintiffs, Dr. Heilbut, Dr. Brodkin, and Dr. Milioris.
Right?
A. I know who they are.
Q. How would you describe your feelings towards Drs. Heilbut, Brodkin, and Milioris?
A. I don't know them. I know what they've done, so I can't -- I don't really have feelings towards them.
Q. What do you know about what they've done?

A. They were tweeting 24/7 vicious, vitriolic, often sexist, racist comments directed to -- at me personally, Dr. Wang personally, Cassava Sciences, and the drug, many of which were patently false.

Q. Can you give me an example of a tweet that you believe was patently false?

A. There were thousands.

Q. Can you --

A. So...

Q. -- can you think of one example sitting here today?

A. That it was all made up. He said that about 500 times.

Q. Who said that?

A. Adrian.

Q. And what did you understand that to mean?

A. That there was no -- no shred of truth to all of our science, our -- our broad base of scientific research that was published and peer-reviewed and took many years?

Q. And can you give an example of what you understand to be sexist commentary?

A. Yeah. He called me "little Lindsay" repeatedly, "lightweight Lindsay."

Do you want a racist example too?
Q. Sure.
A. "I want you to chop this into 200 micron section chop suey style like Wang did."
That's racist.
Q. And how did those comments make you feel?
A. I wasn't watching them. I was off Twitter. People were sending them to me, and, you know, I was trying to do a job. They were trying to stop our progress.
Q. And are you familiar with Dr. David Bredt and Dr. Geoffrey Pitt?
A. I know that they filed the citizen's petition.
Q. And what do you think of them?
A. I don't know them personally. Dr. Pitt is a cardiologist.
Q. Do you have any opinions at all about what Dr. Bredt or Dr. Pitt said about the company or about you?
A. I'm not sure what they said about me. I don't know that they said anything about me. They -- they were -- in the citizen -- the citizen's petition had many statements that were, on their face, ludicrous.

And as a whole we couldn't take the petition, you know, to be, you know, grounded in any kind of fact.

Q. What do you mean by ludicrous?

A. Some of the allegations were completely misguided.

Q. Can you give me an example?

A. Let me think. Well, clearly they didn't have any -- or much experience in doing high volumes of western blotting because they pointed out what they thought were anomalies. They -- they pointed out details that they thought indicated manipulated blots and anybody who does hundreds or thousands of blots knows that these visual -- what they called anomalies were -- you know, they happen in western blots.

So they clearly didn't have experience with western blotting. They claimed that post-mortem brain tissue harvested five hours after death was dead and that it couldn't be stored in the freezer at minus 70 degrees. That goes counter to any kind of scientific fact, you know, such as the fact that a baby was born to IVF this year that was from an embryo frozen in 1994. That's 30 years.

They claim that enzymes frozen could not

be, you know, active when thawed and used in tissue, and that's just not true at all. I can go on and on.

Q. What sort of experience, if any, do you have with western blots?

A. Very little myself, but obviously it's a technique that Dr. Wang relied on a lot, and I learned a lot in working with him.

Q. Have you ever conducted a single western blot experiment?

A. Yes.

Q. When was that?

A. In the '90s.

Q. Approximately how many have you done in your career?

A. Not many. One -- one project.

Q. So how many experiments?

A. I don't know. Three.

Q. So three western blot experiments in your career?

A. Yeah.

Q. Are you familiar with Dr. Elisabeth Bik?

A. I know who she is.

Q. And what do you think of her?

A. Again, I don't have opinions of her.

Q. Have you ever made any sexist comments about Dr. Bik?
A. No, I've not. Why would I? I'm also female.
Q. You don't think another female can make sexist comments towards another female?
A. Sure they could, but I -- I wouldn't.
(Exhibit 189 was marked.)
Q. I'll mark as Exhibit 189 a document Bates-stamped BURNS_0000650.
Okay, Dr. Burns. Do you recognize Exhibit 189?
A. Give me a second here.
(Pause.)
Q. Is this a journal --
A. I'm still --
Q. -- that you kept --
A. -- reading.
Q. Yeah. We don't have time for you to read the whole thing, Dr. Burns.
So my question is do you recognize this as a journal that you wrote?
A. I wouldn't call it a journal, but, yes, I wrote it.
Q. What would you call it?

A. A log of events while we were being attacked.
Q. And why did you keep this log of events?
A. Just sort of to keep track of -- of, you know, what they were doing and saying. It's a lot to process.
Q. Who is "they"?
A. Your clients, for one.
Q. Who else?
A. The original petitioners, a bunch of anonymous troll twitters.
Q. Anyone else?
A. I don't know.
Q. Did someone tell you to keep this or did you decide to take --
A. No. Sorry.
Q. -- keep this by your own -- on your own?
A. No, no one told me.
Q. It was your own decision to keep this log?
A. It was meant to be private. It was never meant to be shared with anybody.
Q. And so it was intended to be a private log of your thoughts and responses to the comments by our clients and other critics. Is that right?

A. Again, I wouldn't call it that. I would say it was meant to be a log of what was happening.
And obviously some of my thoughts came into, you know, this record of what was happening.
Q. And was it intended to be an honest account of your thoughts and what you believed was happening?
A. I didn't really have any intentions of anything. I was just keeping track.
Q. Okay. Can you turn to the page that ends in 674.
Do you see in the bottom half of the page you've screenshotted some tweets from Dr. Heilbut.
Do you see that?
A. Yeah. Unfortunately, they're too small for me to read, even with my glasses on.
Q. But you see "Adrian H." Do you see that?
A. Yes, I do.
Q. And did you understand that to be Dr. Heilbut?
A. Yes.
Q. And you write: Neither do you, asshat.
Do you see that?
A. I see that, yeah.
Q. And you referred to Dr. Heilbut as an

asshat. Is that right?
A. I did, privately.
Q. Okay.
A. He was referring to me viciously, publicly.
Q. Okay. If you turn to the page ending in 680. Okay. On the top of the page you write -- are you on the page --
A. I am.
Q. -- Dr. Burns?
A. Yep.
Q. You refer to Dr. Elisabeth Bik as a "bitch monkey." Do you see that?
A. I do.
Q. Do you think that was a sexist comment?
A. It was not particularly against her gender, it was against what she was doing with not -- with, again, but, you know, she has about as much western blot experience as I do.
Q. And so that was a comment about western blots?
A. Look, this was a private venting. I was not going out in the world calling Adrian asshat or Elisabeth Bik, "bitch monkey." Okay?
Q. What does "bitch monkey" mean?

A. I don't know. I wrote it in the moment. It was a very traumatic time.
Q. Why monkey?
A. I have no idea. I don't know.
Q. Is that a common term that you use for people in your day-to-day life?
A. No.
MR. WU: Objection; chill out.
MR. KUMAGAI: What's the objection.
MR. WU: She -- you know. Come on.
Q. I'm trying to understand what you meant by "bitch monkey," you don't know?
A. I don't know. As I told you, this was a very traumatic time. I was being attacked and this was a private venting. I was not going out on Twitter saying any nasty things back to your nasty clients.
Q. But you did write that Dr. Bik was a "bitch monkey." Right?
A. Did privately once. Okay?
Q. Just once?
A. Yes.
Q. Okay. Can you turn to Page 681, the next page?
Do you see under the redacted content,

you write: Even greater than delusion, the bitch monkey has emailed me directly along with Hoau.

Do you see that?

A. Okay. I consider this the same time. But if you want to count and get upset about it, go ahead.

Q. Did you -- you were referring to Dr. Bik again as the bitch monkey?

A. Evidently.

Q. Is that right?

MR. WU: She answered the question.

Q. Okay. If you turn to the page ending -- oh, sorry. Actually on that same page, you say: I truly can't believe this wench.

Do you see that?

A. I don't. I can't find it. Would you like me to spend some time to find it?

Q. No. It's -- it's under the redacted. It's in that same paragraph we were just looking at. About three lines from the bottom of that paragraph you write: I truly can't believe this wench?

A. Yes.

Q. Do you see that?

A. Yeah, I see it.

Q. And were you referring to Dr. Bik as a

wench?

A. I was privately to myself. Not to her, not to anybody else.

Q. And is that a sexist comment in your view?

A. I don't have a view on that.

Q. What does "wench" mean to you?

A. I don't know.

Q. You don't know what you wrote here?

A. I used that word because I was very frustrated and I was being attacked. Okay?

Q. You were angry?

A. Yeah, I was.

Q. Okay. If you turn to the page ending 689. The third paragraph you write: My favorite quote in the Wall Street Journal article from the bitch.

And you spelled Bik's name, Dr. Bik's name to look like bitch. Do you see that?

A. I see that, yeah.

Q. And that was you again referring to Dr. Bik again as a bitch?

A. Uh-huh.

Q. Is that right?

A. Sure.

Q. And why -- why were you calling Dr. Bik a bitch at this point in time?
A. Well, she was saying that it was all fraud, but then she was just saying on the other side of her mouth that the drug might work. How is that even possible if the drug is completely fraud and all of the western blots are completely, you know, made up to create an illusion of science that's not there. But then she says: Oh, and the drug might work.
Like, what the hell.
Q. So Dr. Bik questioning the science made her a bitch in your mind?
A. She wasn't questioning the science. She was just attacking because she was paid.
Q. Who was she paid by?
A. She kept her Patreon account anonymous. She was worried that those anonymous donors might not be as private or anonymous as she hoped they would be. So it's hard to know.
Q. How do you know what Dr. Bik hoped about her donors?
A. There was an email that I saw.
Q. From who?
A. I don't remember.

Q. From Dr. Bik?
A. No. From -- from her not to me. But I saw it. Yeah, in all this discovery process.
Q. Who sent it to you?
A. No one sent it to me. I saw it in discovery material.
Q. And that is the basis for your belief that she was paid?
A. We know she was paid.
Q. Paid to criticize the company?
A. Yeah. That's my belief. Okay?
Q. And your basis for that belief is one email that you saw in discovery of this -- in this case --
A. There's all --
Q. -- after you wrote -- after you called her a bitch and a bitch monkey and a wench?
A. There were also people who followed her donations and saw the spike, huge spike in her donations right before she attacked Simufilam and me personally and Dr. Wang even though I was doing the western blots.
Q. Who were the people following her closely?
A. I don't know who they were.

Q. But they conveyed to you that there was a huge spike in donations?
A. They were posting it publicly, yes.
Q. And you were following those posts?
A. Someone was showing them to me.
Q. Who?
A. I don't remember.
Q. Someone at the company?
A. No. I don't remember. I'm sorry, it was five years ago.
Q. If you turn to Page 693. At the top you wrote: Well we are strong, you MFs.
Do you see that?
A. Yeah, I see that.
Q. And what does "MFs" mean?
A. What do you think it means?
Q. I'm not sure. I'm asking you.
A. I think it means motherfuckers.
Q. And who were you calling motherfuckers?
A. All the people attacking.
Q. Including our clients?
A. Yeah.
Q. And what made you think they were motherfuckers?
A. Because there was no actual fact. They

didn't have any actual information that the science was fraud. They were, you know, pretending to be inside whistleblowers and knowledgeable and they were just making stuff up out of thin air and accusing us of making up science.

Q. How do you know -- or what makes you say that they were making stuff up out of thin air?

A. Because they didn't have anything that was not publicly available, yet they were calling themselves whistleblowers.

Q. They were relying on the public information to raise questions about signs of potential data manipulation and questionable science. Right?

A. I wouldn't characterize it that way, no.

Q. What -- how would you characterize it?

A. They were -- they took out their short positions and they were distorting the company.

Q. What do you mean by that?

A. They were trying to make the -- they -- they shorted the company because there was promising data in the eyes of many, many people. And then they attacked that data so that they would make money.

Q. But I'm asking you what you thought about

their specific allegations about the science underlying Simufilam?

A. That's very broad.

MR. WU: Yeah, but what's the question.

Q. What did you think about the specific scientific allegations by our clients and others?

A. Which ones would you like me to go into? Pick one.

Q. Can you think of any of them?

A. No, you pick one. You ask me the question, please.

Q. So sitting here today, you can't think of a single critique that our clients made about the science underlying Simufilam?

A. I went through a few already. Why don't you give me whatever one you'd like me to tear apart?

Q. No, I'm asking you to think about it and tell me what you think about the specific scientific critiques that our clients made?

A. They claimed that the drug doesn't bind its target. And we had done that, you know, two different ways and gotten the same answer. And your client ran into a -- to a lab that he -- and using a

machine that he'd never used, he did a failed experiment and said "a-ha, it doesn't bind."
Q. And you're referring to the claim and that you and Cassava made that Simufilam binds filamin A?
A. Simufilam.
Q. Simufilam binds filamin A. Is that right?
A. Yes.
Q. And what do you mean by there were two tests that you were aware of to show that?
A. We purified -- well, we, Dr. Wang purified filamin A and then showed that -- showed it bound. And then he also used Alzheimer's versus healthy control, post-mortem tissue and showed a difference in binding affinity as I recall.
Q. So both experiments were done by Dr. Wang?
A. Yes.
Q. Aside from experiments by Dr. Wang are you aware of any experiments or tests that demonstrated Simufilam binding to filamin A?
A. Simufilam. Yes, Angélique Bordey at Yale used Simufilam in a mass model of tuberous sclerosis complex epilepsy. This mouse model overexpresses

filamin A just like the human disease. She got the same biologic effect from administering the mice Simufilam as she did with short interfering RNA to suppress expression of filamin A. That shows that the drug is working by binding filamin A.

Q. So your testimony as a scientist is that Dr. Bordey's paper in those experiments reported to find Simufilam binding in filamin A?

A. It -- it showed that the drug was working through filamin A.

Q. Did it show that the drug was binding through filamin A?

A. It's not a direct measure but it's very -- it's a -- it's corroborative science.

Q. So aside from the two tests that you referenced by Dr. Wang, are you aware of any other tests that directly show binding of Simufilam to filamin A?

A. Simufilam.

MR. CAMPBELL: Objection; form.

A. Yes, but they're confidential.

Q. Well, just -- you can answer the question.

MR. WU: You can. It's okay. We'll designate this highly confidential, this section.

A. Well, I don't know the conclusion because I'm not still at the company. But, yes.
Q. So is there tests that are -- that were ongoing when you were terminated or asked to leave in July of 2024?
A. Yeah.
MR. CAMPBELL: Object to form.
Q. Is that right?
A. There was -- there was work done on that, yes.
Q. So those -- no results had come from those tests yet. Right?
MR. CAMPBELL: Object to the form.
A. I don't know because they haven't made them public.
Q. Were those tests started after the defamation action began?
A. I don't remember exactly.
Q. Defamation action began around November of 2022.
A. Yes, I know.
Q. And these tests that you're referring to that were still underway when you left the company in July of 2024, when did those begin, to your knowledge?

A. I'm not sure exactly. Probably after, if that's your question.

Q. Okay. So the only two tests with results that you believe directly show binding of Simufilam to filamin A are the two tests by Dr. Wang that you referenced earlier. Right?

A. I'd have to think about it. Direct binding measurements, I think so.

Q. Okay. Let's go back to your journal. So you referred to our clients and other critics as motherfuckers. Right?

A. Uh-huh.

Q. You have to answer verbally.

A. Yes.

Q. And then you wrote: It has been painful, but you do not know with whom they are dealing. You little army of pathetic immoral bastard fuckheads.

Do you see that?

A. I do.

Q. And you wrote that?

A. I did.

Q. What did you mean when you wrote: You do not know with whom you are dealing?

A. I -- I think it's important to put this whole thing in the context of what I wrote at that

moment. This was a very traumatic time. We were being accused of being -- I was being accused of being Elizabeth Holmes, Theranos, that everything was complete fraud. We were doing our best to bring a novel treatment to Alzheimer's patients and the science was strong and, yet, we were smeared in one of the world's preeminent news publications.

And Rem is very strong, but this is the first time I've ever seen him cry. So, of course, I'm angry. What would you think?

Q. All right.

A. And so what's your question?

Q. I asked you whether you -- what you meant by "you do not know with whom they are dealing"?

A. They were trying to destroy us and we were strong. We are strong people, resilient. They did, you know, everything they could to kill us destroy us, harm us, bring us down so they could make money. And we weren't going down. We -- we were not -- we were not going to be destroyed by this.

Q. You were going to put up a fight?

A. Not put up a fight. We're not -- I just -- we're not going to -- not going to, you know, die. They wanted us to die.

Q. Who wanted you to die?
A. Stop. Okay? You know, this is getting really aggressive. You don't need to do this.
Q. I'm just asking who -- who -- what do you mean by "they wanted us to die"?
A. They wanted to kill the drug, its makers. They were vicious, vituperative, vitriolic, vile. And, you know, they hired a PR company to do a negative campaign against us. It was very well-funded. They were coordinating with hedge funds who were also making money. We were the casualties and they pretended that we were a complete fraud A to Z, which is not at all true. And you know that now.
Q. You testified that you thought our clients wanted you to die.
A. Will you stop?
Q. Is that what -- is that true? Is that what you thought at the time?
A. They wanted to harm us.
Q. How do you know what they wanted?
A. Did you -- were you looking at Twitter 24/7? I wasn't, but they were saying vile, vicious, nasty any -- like, the worst things you can think of, they were saying it publicly.

This was a private venting I never meant to go anywhere else. I was not happy that it somehow got sucked into all this discovery. Okay?

I was not going on Twitter saying nasty things. They were on Twitter saying nasty things about me that I'm a -- a -- you know, it was a scientific charade and a fraud and that I'm Elizabeth Holmes.

Come on. What do you think I'm supposed to do? Just stand there and, like, okay. I was upset.

Q. What about the comparison to Elizabeth Holmes was upsetting?

A. Because she's a fraud and I'm not. Jesus Christ.

Q. What makes you think she's a fraud?

A. A jury found her to be a fraud. She painted a whole rack saying this is a machine. It was, like, not a machine at all. She, like, pretended she had data she didn't have. She raised money from people that -- on -- on stuff that she -- you know, it was her motto, was fake it till you make it. Come on. That was not us. That was not us.

Q. Wasn't SavaDx a blood diagnostic meant to

diagnose Alzheimer's in a similar way to Dr. Holmes' or Elizabeth Holmes' blood diagnostic --

A. Not at all similar.

Q. No?

MR. WU: Object to the form.

Q. How -- how so?

A. She thought she could measure in a tiny drop of blood. The -- the test that worked was a lymphocyte -- lymphocyte-based assay that was not scalable and it was very robust.

Q. It was also a blood diagnostic. Right?

A. It was not a tiny drop of -- of blood. No, it was a -- you know, required larger volumes, isolating lymphocytes, a lengthy process. It was very accurate. Hers was not. She didn't have anything yet. She pretended she had it. We did have data.

Q. You had data showing that SavaDx worked?

A. Yes, its the early version -- its early lymphocyte version worked. Ask Steve Arnold.

Q. Okay. What did you mean by "you little army of pathetic immoral bastard fuckheads"?

A. I already answered. This is a private venting in a very, very traumatic time. I was upset and I was not going to be killed. Okay.

Q. You thought they were trying to kill you?
A. It felt that way.
Q. And you were referring to our clients and other critics of the company as pathetic, immoral, bastard fuckheads. Right?
A. Yeah. It's immoral to -- without, you know, actual knowledge of the whole thing being a fraud scheme to say that it's a whole fraud scheme. Yeah, that's immoral and it's mean and it's not human.
Q. What about what they did made them bastard fuckheads?
A. I already answered. Okay?
Q. The statements, the critiques they made about the company?
A. Yeah, with no basis.
Q. Did you ever personally analyze the bases that they offered for their statements?
A. Could you be more specific?
Q. Did you ever study any of the slide decks that our clients, for example, posted online or the letter to the FDA and assess whether the bases for what they had said about the company were valid or not?
A. I read the letter to the FDA which said

there -- every letter to the FDA said "Theranos 2.0," "Theranos," "Theranos the frontline." That's defamation right there.

Q. Did you assess the analysis that they provided for reaching the conclusions that they did about the company?

A. Yeah, the FDA did, too, and they said you didn't bring any evidence. You asked us to investigate ourselves and we don't do that and they denied the petition. And its four supplements.

Q. That's your understanding of why the FDA denied the citizen's petition?

A. They denied it -- they said it on your -- your petition does not purport to bring any evidence. It instead -- you know, rather it asks us to do our own investigation and that's an abuse of the petition process. And the abuse of petition -- the citizen's petition process is well-documented and they know that was what was going on.

Q. Did the FDA say anything, as far as you know, about the merits of what the citizen petition alleged?

A. They said they took the allegations seriously, but they didn't provide any evidence. They had no evidence. They just said, we think

something's funny here; go investigate. And by the way, stop the trials in the meantime, which hadn't even started.

Q. And did that make you angry?

A. It was ridiculous.

Q. How did it make you feel?

A. I don't know what I felt at the time. You know, it was like it was a big shock. It was very traumatic, as I told you. How many times do you want me to tell you it?

Q. You do remember it being traumatic, but you don't remember exactly how you felt at the time. Is that right?

A. That's correct. Yeah. Trauma does that, doesn't it?

Q. I don't know.

Okay. In that third paragraph of this same page ending 693, you write: These editors are cowards.

Do you see that?

A. I don't.

Q. It's right here.

A. I see it.

Q. Who were you -- who were you calling cowards?

A. I -- I can't remember. I don't know exactly. I don't know specifically.
Q. But was that your view at the time that certain journal editors were cowards?
A. They were being cautious and slow. I think, again, I wrote this in a moment when I was very upset. Remi was very upset and, you know, this was my thought at the time.
Q. What was Remi upset about, as far as you know?
A. Being smeared in the Wall Street Journal and, you know, being painted to look like a fraudster with no evidence.
Q. And that was what had caused him to cry?
A. Yeah.
Q. What do you recall about the conversation around that time with Mr. Barbier?
A. I don't recall anything.
Q. Just that he was crying?
A. As I said, it was a very traumatic experience.
Q. And you mentioned a moment ago that you had been smeared in the Wall Street Journal. What do you mean by that?
A. The whole article was written as if we

were frauds and these, like, wonderful and, you know, previously anonymous whistleblowers had unveiled it and it was not not true.
Q. Do you think the Wall Street Journal was unfair to you and Cassava and Remi?
A. Yes, I do.
Q. Why do you think they presented the article the way that they did?
A. Because the negative PR company got to them and said we want, you know, this sort of spin. I think it was more in the middle than your clients wanted it to be.
Q. What do you mean by "negative PR company"?
A. Well, we know from the "New Yorker" article that the citizen petitioners hired a negative PR company and practiced doing media interviews because it said it right in the article.
Q. What do you mean by "negative PR company"?
A. To do negative PR and, in fact, one of them, you know, Remi confirmed with. I don't know -- I don't remember the name of them.
Q. What do you mean he "confirmed with"?
A. He asked them point-blank and they said,

sorry, got to make a living.
Q. Asked the PR company?
A. Uh-huh.
Q. Why was Remi reaching out to the PR company?
A. I don't know. He didn't -- he doesn't share every detail of his job with me. Didn't.
Q. But he did share the fact that he reached out to the PR company and what they said in response?
A. Yeah, much later.
Q. When?
A. After Cassava Sciences hired that company.
Q. Is it Sitrick?
A. No.
Q. Oh, so Sitrick then hired the negative PR company?
A. No. No. What are you talking about?
Q. I'm struggling to understand what you're talking about.
A. You're inventing.
Q. So what PR company did Cassava hire?
MR. CAMPBELL: Object to form.
A. Somebody other than Sitrick that I'm

talking about later.
Q. For what purposes, as far as you know?
A. I don't know. I wasn't there. You have to ask them.
Q. And that company was the same company that the authors of the citizen's petition had used?
A. No, the -- some like short-seller. I don't know exactly who. He didn't specify. I don't know.
But, yeah, they were -- they were making money and coming and going, first smearing us and then -- yeah, it was interesting.
Q. The PR company?
A. The whole situation.
Q. What whole situation?
A. That first they were smearing and then they were hired by the company they were smeared.
(Discussion off the written record.)
Q. Okay. The paragraph under November 21st on the same page, 693, you're talking about David -- Dr. David Bredt. Do you see that?
A. Yep.
Q. And in the last sentence you called Dr. Bredt "David S. Butthead." Do you see that?
A. I see that. Again, can I remind you this

is my private capturing of the events that were going on. We had just learned that he was posing as an anonymous whistleblower as if he had some inside information, and we wondered who was he?

Q. And what did you mean by "butthead"?

A. Obviously it's a derogatory term because I wasn't happy with what he did.

Q. And what he did was criticize the company, and based on that criticism you thought of him as Dr. Butthead?

A. It wasn't just criticism of the company. He said some flagrantly false things, like "you can't use frozen post-mortem brain tissue," and, you know, other things in the citizen's petition that were just wrong.

Q. And for you, comments like that made him a butthead. Is that right?

A. In the moment of frustration, writing in a private account of things that were happening, I wasn't going out on the street or on Twitter, like your clients were, trying to defame people.

Q. But is that generally what's going on in your mind, you're referring -- thinking about critics as bitch monkeys and pathetic motherfuckers and buttheads?

A. That was one moment. I didn't -- you know, it was, like...
Q. Well, it's been a few moments. I mean, we've looked at a number of these.
A. Okay. It's all private. Right? And was never meant to be in your hands or anybody's hands or shared with anybody. It was my private processing of a very traumatic time.
Q. And is that how you processed it privately, to think of your critics as pathetic, immoral bastards --
A. Otherwise --
Q. -- motherfuckers --
(Simultaneous speaking.)
MR. WU: Objection. Asked and answered --
A. -- buttheads --
MR. WU: -- 15 times now.
Q. Can you answer it?
MR. WU: Stop badgering the witness.
MR. KUMAGAI: I don't think I'm badgering.
A. I think you are.
MR. WU: You're asking the same thing over and over.

Q. I'm asking whether that was -- what was generally how you privately processed the -- what you called a traumatic time?
A. Well, I haven't had multiple episodes of trauma to have a record of how I might privately process all those moments of trauma, so I don't really know.
Q. Okay. If you look at the page ending in 697, there's an entry under December 1st.
The second sentence you write: The biggest is that Hellbutt and Buttskin accessed CUNY emails.
Do you see that?
A. I do. Can I read the rest of the paragraph, please?
Q. No. I just want to ask you who "Hellbutt" was referring to.
MR. WU: No, you can -- if you want to take a moment just to look, it's okay. It's okay.
A. Yeah, I'm going to read the paragraph, please.
Q. Well, I just want to ask you this one question. We don't have time for you to read the whole paragraph. So you can make the record that I

didn't allow you to read the whole paragraph.

I just want to ask you who "Hellbutt" is a reference to?

A. Adrian.

Q. And who is "Buttskin" a reference to?

A. Probably Jesse.

Q. Okay. The last sentence, the second-to-last sentence, you write: It really -- it is really so infuriating that we sit here and keep taking punches. I just don't understand why we have to wait for the investigations to conclude before filing a defamation suit.

Do you see that?

A. I see that.

Q. What was so infuriating?

MR. WU: You can take time to read this.

Q. You can read this paragraph, yes. You may read this paragraph now.

A. (Pause.)

Okay. What's your question?

Q. What was so infuriating to you about sitting here and keeping to take punches?

A. Would you want to sit and keep taking punches day in and day out from someone calling you

a fraud, inhuman, you know, that, like, what you're doing is worthless, and a sham, and a charade?

Would you want -- would you want to sit there and take that for three years, four years? Would you?

Q. I'm asking you.

A. I'm asking you.

Q. You're being deposed, respectfully.

A. I know.

MR. WU: That is her answer. Please move on.

MR. KUMAGAI: It's not an answer. It's a question.

THE WITNESS: It's a rhetorical --

MR. WU: That is an answer.

THE WITNESS: -- it's a rhetorical question as an answer. Okay?

MR. WU: You understand the answer.

MR. KUMAGAI: I actually don't.

Q. So what was so infuriating?

MR. WU: She just answered the question.

MR. KUMAGAI: No, she didn't.

MR. WU: If you don't understand part of her answer --

MR. KUMAGAI: Mr. Wu, I'm going to ask --

MR. WU: -- ask her a question about her answer.

Q. What was so infuriating?

A. Being attacked day in, day out for years by your clients calling me a scam, a fraud, a charade, Elisabeth Holmes, Theranos, when it's all not true. Okay?

Every day, 24/7 on Twitter. Someone was paying them or, you know, incentivizing them to all day long write the most vitriolic, vicious, nasty things about me personally. This is a private processing of their attacks. I was not out attacking your clients. They were attacking me. Okay?

Q. But you were infuriated by that?

A. Of course I was.

Q. And what do you mean by: I just don't understand why we have to wait for the investigations to conclude before filing a defamation suit?

A. Well, I am not, you know, part of any legal team.

MR. CAMPBELL: Objection. If you're

going to make any comments relating to communications with Cassava's legal team, I'd ask you to omit that from your answer, please.

A. I was not. Pretty much any friends that I described the situation to, you know, mentioned, like, wow, that's serious defamation.

And, you know, like anyone on the street thought, you know, we should -- the company should consider that. But what we were doing was taking the allegations seriously, hired an outside law firm to investigate thousands and thousands of documents over months.

MR. CAMPBELL: Hold on. You can't testify as to what the legal team did as part of their investigation.

A. Well, I'm -- well, obviously they did a very thorough extensive investigation, and that was the process that was going on.

Q. How do you know what they did or didn't do?

A. I don't, but obviously they weren't, like, looking at just ten pages.

Q. What makes you say that, if you don't know?

MR. CAMPBELL: Objection. If any of

your understanding is based on communications with the legal team or Cassava's counsel, please exclude that from your answer.

A. I don't know. I wasn't part of that team. I know they interviewed me extensively.

MR. CAMPBELL: Sorry. Objection; move to strike.

Please don't testify to any portion of what the legal team did as their investigation.

Q. When you said "any friends that I described the situation to mentioned, like, wow, that's serious defamation," which friends were you referring to?

A. I don't remember. Just pretty much anybody.

Q. You can't think of a single person?

A. No, I can't.

Q. And what about -- what did you mean by "anyone on the street thought that, you know, we should -- we should consider it defamation"?

A. You know, just generally, you know, it was pretty blatant. It's pretty flagrant what they were doing was defamation to someone on the street. To a lawyer, I don't know. I'm not that -- you know, that's a much more complex matter that I'm not

part of -- was not part of.
Q. And so by this point, December 1st, I believe, 2021, you were infuriated that you were having to sit and keep taking punches. You wanted the company to file a defamation suit.
Is that fair?
A. No. I wanted it to stop. I wanted them to stop attacking every freaking day, day in and day out. I wanted them to stop.
Q. But you connected, I suppose, them stopping with filing a defamation suit here. Right?
A. That's a leap.
Q. Well, what do -- what do you mean by it really is so infuriating that we sit here and keep taking punches. I just don't understand why we have to wait for the investigations to conclude before filing a defamation suit.
Isn't it fair to say that at this point in time you're --
A. You know, I think --
Q. -- wanting to file a defamation suit?
A. No, but -- and I -- you can see that the next -- if you continue to the next page, there's something redacted. I think I was -- and I -- and I can't speak to any privileged information.

Q. Okay. But these are two sentences that you did write. Correct?
A. That are related to the redacted sentences, okay, that I can't speak about.
Q. And your testimony is that you weren't, at the time, fed up with waiting to file a defamation suit?
A. You're making a leap. I wanted it to stop. And I'm not going to talk about any conversations with any lawyers, because I can't.
Q. Setting aside conversations with the lawyers, did you think that one way to make it stop was by filing a defamation suit?
A. People were telling me that.
Q. And you agreed with what they were saying?
A. I wanted it to stop. Whichever way, you know, I'm not the one to decide how to make it stop.
Q. Who was the one to decide?
A. The company. I don't, you know. I was an employee.
Q. Okay. If you turn to the page ending 700. Okay. You're -- this page appears to be describing Dr. Bik again. Do you see that, there's a picture of her at the top?

A. I do.
Q. So you write the sentence saying: Seeing the spring nature award.
Do you see that, the paragraph, the second paragraph?
A. Yeah, can I read it?
Q. You may read that paragraph, yes.
A. (Pause.)
Q. Okay. Are you done?
A. No, I'm not.
Q. It's just the one paragraph I'm asking you to read.
A. I know.
Q. Okay.
A. (Pause.)
Okay.
Q. What was going on there? What are you describing?
A. What specifically are you asking about?
Q. Okay. So you say: I was so freaking angry with tears, fuming, ready to explode. Up ahead on the trail, a mountain biker whom I let safely bike up and over the hill. And safely far from earshot, I had to scream a loud, angry, bloody murder scream.

Do you see that?
A. I do.
Q. What -- why were you letting out a loud, angry, bloody murder scream?
A. Because it had been months of 24/7 attacks. And I was not allowed to defend myself to -- initially I wanted to respond to Elisabeth Bik. But I, you know -- and I -- I can't really reveal any privileged information. But I just had to sit there and take all these punches and being called, you know, a scam, a fraud, a charade, you know, a house of cards, whatever they wanted to call it, day in, day out with the most vicious language possible. And it was hard to take at -- at a certain point.
Q. You were fuming, ready to explode?
A. Yeah, I was.
Q. Okay. The paragraph before that you call Dr. Bik a bitch a couple of times again. Do you see that: Silence from the bitch. Bitch commented.
Do you see that?
A. I'm not looking but, yeah, you told me, so fine.
Q. It was more than just a few instances of calling Dr. Bik a bitch?

A. Okay.
MR. WU: Actually it says "biktch."
MR. KUMAGAI: Okay. B-I-K-T-C-H?
MR. WU: Yeah, just to be clear for the record.
Q. Okay. That was a combination of the Dr. Bik's word and the word bitch. Right?
A. If you see it that way.
Q. How do you see it?
A. Okay.
Q. And then in that same paragraph you refer to Nadav walking in and you exploding at him. Do you see that? The bottom of that same paragraph.
A. Yes.
Q. And that's a reference to Dr. Friedmann. Is that right?
A. Yes.
Q. And why were you exploding at Dr. Friedmann?
A. I exploded at him with all these things. The -- the having to endure this continuous attack day in, day out and being, you know, having my reputation smeared as if they knew I was already -- I was a fraud. There was no evidence of any of this. They were just, like, creating a narrative to

damage to make money.

Q. Okay. And if you go to the page ending 712. There's an entry under December 18th. Do you see that?

A. Yes.

Q. And you say: The shit stirrers are taking a victory lap, high-fiving each other on Twitter about what a multi-level fraud we are and how it is all going to fail (sic) like dominos.

Do you see that?

A. I see it.

Q. Who -- who are the shit stirrers?

A. I'm going to have to read back if you want me to answer specifically. Okay? Do you want me to read this whole page?

Q. That's okay. But you wrote the shitsters. Right?

A. Yeah, so I don't know exactly who I'm talking to right now --

Q. And then --

A. -- about.

Q. -- in the sentence above the redacted content of that paragraph, you write: After the rage and high anxiety stress came the abyss, the tears. How many times can I be kicked, trampled on,

and smeared.

Do you see that?

A. I don't see that. Can I please find it.

Q. It's right here -- under --

A. Yeah.

Q. You see that?

A. I see it.

Q. This is another instance when you were having a rage at the commentary that was being made about the company and about you personally. Is that right?

A. Yeah, all in private. Okay?

Q. Do you consider yourself to have anger management issues?

A. No, Jesus.

Q. You do not?

A. No, this is private, written. I wasn't walking into the company screaming.

Q. Well, you said --

A. I screamed once in a vacuum in the woods where nobody was around. That's -- that's remarkable given everything I withstood for days -- day in, day out for months and months.

Q. You testified earlier and we looked at a passage where you said you exploded at

Dr. Friedmann. Right?
A. I exploded at him with these things. Why are we sitting here taking punches every day. I didn't go, you know, yell at him. Read the sentence.
Q. Okay.
MR. KUMAGAI: Let's take a break.
MR. JACOBSON: Why don't we take a break. It's been an hour.
THE VIDEOGRAPHER: Going off the record. The time is 10:00 o'clock.
(Break.)
THE VIDEOGRAPHER: Back on the record. The time is 10:10.
Q. Okay, Dr. Burns, before the break, we were looking at Exhibit 189. You still have that in front of you. Can you turn to the page ending 715. And I should just say, this goes for both me and you, for the court reporter's benefit, we should try to avoid talking over each other. So I'll try to let you finish your answer before asking a question. If you can try to avoid talking over my questions. Is that okay?
A. Thank you.
MR. CAMPBELL: A little bit slower

would also help the court reporter.
Q. Okay. Are you on Page 715?
A. Yes.
Q. This appears to be a screenshot of a post you made on Facebook. Is that right?
A. Yes.
Q. And you wrote: Sorry shorties. Sorry Adrian Heilbut. Sorry Jesse Brodkin. Sorry Alexander Trevelyan. And sorry Elisabeth Bik. So very sorry David S Bredt. I know you're trying hard with the false accusations and bogus petitions to the FDA. Your days are numbered. This is the second journal to clear us of these ridiculous allegations.
Do you see that?
A. I see it.
Q. What did you mean "by your days are numbered"?
A. Can I first give some context? This was a Facebook post to my friends. I do not know how it got out to Twitter. I did not intend it to be visible to the world. So that's context. I was not tweeting publicly the way they were. Elisabeth Bik is twisting this to say that it's very disturbing. That it's a death threat. It is no such thing. If

you actually look up your -- what was your question again?

Q. How -- what did you mean by "your days are numbered"?

A. It typically means your days in power are -- are coming to an end. She's interpreting this as a death threat.

Q. What do you mean, if you look at that phrase? Where -- where would it give that definition?

A. Why don't you use the internet?

Q. Is that where you found that definition?

A. No, that's how I meant it. Your days in power, controlling the narrative that all of the data is manipulated are coming to an end. Because we then had the first two journals spoke out and said, hey, there's no data manipulation here as they were claiming there to be.

Q. What journal said, hey, there's no data manipulation here?

A. The Journal of Neuroscience, number one, and the journal Neuroscience. They're two separate journals.

Q. Isn't it the case that the Journal of Neuroscience then issued a follow-up expression of

concern and said they would wait to take editorial action until the CUNY investigation concluded?

MR. CAMPBELL: Object to form.

A. That's not my understanding. She did issue an expression of concern to acknowledge that there was supposedly an institutional investigation going on. And she would wait for that investigation but she did not find any evidence of data manipulation herself.

Q. Okay. And so by days of -- your days are numbered, you were telling your friends on Facebook that "the shorties' days were numbered." And by that you meant their days controlling the narrative were soon coming to an end. Is that a fair summary?

A. Approximately.

Q. What about it is not quite right?

A. That their days of trying to damage and convince the world that we were fraud were numbered, you know, not going to continue much longer, I -- I thought.

Q. Do you think it would be reasonable for someone to read this and interpret the phrase "your days are numbered" as a threat against these individuals?

MR. CAMPBELL: Object to the form.

A. No, that wouldn't be reasonable because, number one, that's not how I intended it.

Number two, I never intended it for their eyes. It was -- it was a venting to my Facebook friends. I do not know how it got out onto Twitter.

I was not saying that to their face, "Your days are numbered." I was saying it in my own private venting with my friends.

Q. So is it your view it's not important how it was interpreted by Dr. Bik or others; it's only what you intended that matters?

A. It's what I intended that matters and who I intended to see it. I did not -- I would not have said that to her face or it was not intended for her eyes -- or their eyes.

Q. Why wouldn't you say it to her face?

A. Because I was staying out of the fray.

Q. Because you were -- because you were instructed to stay out of the fray?

MR. CAMPBELL: Object to the form and to the extent that it calls for discussions with legal counsel, please exclude that from your answer.

A. I can't answer.

Q. You can't answer whether or not you were instructed to stay out of the fray or engage with

critics like our clients because of Mr. Campbell's instruction. Is that right?

MR. CAMPBELL: Same objection, same instruction and additional objection to it's compound.

A. I cannot provide any privileged information.

Q. Okay. Let me just correct the compound issue.

So were you instructed not to engage with our clients, Dr. Heilbut, Dr. Brodkin, and Dr. Milioris?

MR. CAMPBELL: Object to form and to the extent that it calls for communications with counsel, please exclude that from your answer.

A. I cannot include any conversations with legal counsel, but I did not want to engage with this -- this -- you know, this -- it was beneath me to engage the way she is engaging, the way your clients were spouting on Twitter.

Q. What do you mean --

A. Like the eye roll.

Q. What do you mean it was beneath you?

A. I had a job to do and I'm not going to spend -- their job was spending all day, every day

on Twitter. That was not my job, nor did I want to.
Q. You were on Facebook, though. Right?
A. A little bit with my Facebook friends, not the entire public world.
Q. And so is it your testimony that you did not have a Twitter account during this time?
A. I was not posting on Twitter.
Q. You did have a Twitter account at this time?
A. I posted three tweets in my life. One was the Austin skyline and the other two were unrelated.
Q. But did you use Twitter to follow what people were saying online about the company or news, generally?
A. No, I had the account ages ago. I never used it.
Q. Is it your testimony that you never logged into your Twitter account to check what people were saying online about you or the company?
MR. CAMPBELL: Object to the form.
A. I was not checking. I can't say that I never logged in, but I -- once they were attacking me, I stayed off. People would send me what they were saying and sometimes I asked them to stop.

Q. And did you stay off Twitter because you were instructed by anyone to stay off Twitter?

MR. CAMPBELL: Object to the form and to the extent it includes any communication with counsel, please exclude that from your answer.

A. I didn't want to. I didn't want -- I -- I didn't want to. I didn't want to -- to see it.

Q. What was the Twitter handle or the name of the account that you had?

A. It is LindsayBBar, but I -- again, I haven't used it.

Q. Have you ever had any other Twitter accounts?

A. No.

Q. Okay. If you turn to the page ending 735. Okay. There's a paragraph that begins "The good news."

Do you see that?

A. I see it. Can I please read it?

Q. So let me just read you a sentence that I want to ask you about.

So "The good news is that we have an army of supporters who have filed, one, counterpetitions to the FDA to ask them to accelerate approval of our drug. Two, a complaint to the medical licensure of

New York about Dr. Pitt. Three, a petition to the DOJ. Four, at least 37 petitions to the SEC and most recently, five, an open letter to the New Yorker about a recent hit piece.

Do you see that?

A. I see it.

Q. And so I just want to ask you that it seems clear you were aware of those actions taken by the so-called army of supporters. Right?

A. I was made aware after the fact by -- of all of these things. And I don't remember them all, but...

Q. And who is the army of supporters you're referring to?

A. I didn't know them. I don't -- I don't know them. People who were fighting back. People who knew that the accusations of fraud were nonsense.

Q. Is this the group that sometimes called themselves the savages or the SAVA army? Are you familiar with those terms?

MR. CAMPBELL: Object to the form.

A. I'm familiar with those terms. Again, I don't think any of these have, you know, specific people in them. It's just a general description of

anyone who stood up and said "nonsense."
Q. Well, isn't it the case that the savages or the SAVA army were the people who were supporting Cassava?
MR. CAMPBELL: Object to the form.
A. I don't know -- they were, in some cases, defending the science because they were knowledgeable scientists.
Again, I -- I wasn't following in detail.
Q. Okay. There's an entry under February 23rd on the same page where you refer to Dr. Bik as "DesBIKable bitch."
Do you see that?
A. I see it.
Q. And you wrote that. Right?
A. I don't remember writing it, but evidently, I wrote it.
Q. Okay.
A. The trauma was ongoing.
Q. And this was around February 23rd, 2022. Does that sound right?
A. I don't know.
Q. Okay. If you go to the page ending 763.
A. What was the page?
Q. 763 or 114 in the log, the numbers.

A. Okay.
Q. Here, about halfway down the page, there's a screenshot from Jesse Brodkin. Do you see that?
A. I'm on the wrong page.
Q. Sorry. It's this one, 114.
A. Okay. Yeah. I can't read it. The -- it's too tiny and blurry.
Q. But can you see that it appears to be Jesse Brodkin, the bolded --
A. I see.
Q. You see that?
And it looks like you refer to Dr. Brodkin as "the biggest dickwad on Twitter."
Do you see that?
A. I see that.
Q. And is that what you thought of Dr. Brodkin at the time?
A. It was a name that I used in the moment of posting this nasty tweet of, of his posting it.
Q. Okay. And you write: I strongly suspect HE manipulated to look manipulated.
Do you see that?
A. I do.
Q. Does that mean in your view you agreed

that the image he posted appeared to be manipulated?

MR. CAMPBELL: Objection; form.

A. What they were doing was extreme contrast and darkness enhance -- enhancements. When people publish western blot images in journals, they sometimes enhance contrast a little bit or darkness to make the image more easily readable by the reader.

And what the accusers were doing were cranking up the dials to 100 percent so that some differences in background appeared more dramatic and then claiming they were Photoshopped when, in fact, they were due to hand-poured gels, all -- all kinds of different things.

Q. And you testified earlier that you're not an expert in western blots; you've done three in your career. Where does your understanding of what constitutes a manipulated blot come from?

A. What constitutes a manipulated blot, well, these weren't it. They were accusing him of Photoshopping in bands like Leen Kawas did of Athira fame and this is not that.

Q. I'm just asking you how you came to learn the different explanations that you provided a moment ago for the blots in question, whether it was

from someone else at Cassava or experts that you consulted.

A. Obviously, some in talking to Dr. Wang and some talking to other western blot experts.

Q. Who?

A. Charles Spruck.

MR. CAMPBELL: I'm going to interpose an objection just to the extent -- and I don't know about what this calls for -- but to the extent any of your knowledge and information comes from communications that were directed by legal counsel or experts hired by legal counsel, please exclude those from your answer.

A. Okay. Well, that conversation or some of those conver- -- I don't know how many times even I -- I only spoke to him maybe once. But others who were not hired by Cassava who had extensive experience in western blotting.

Q. Who?

A. Steve Higgins, Paul Shapiro, a colleague of Steve. I forget her name, a Korean woman. Alec Mian. Another person who was actually -- another one or two people who were eventually hired by the outside firm who was collecting reports of outside experts in western blotting who examined each and

every allegation, many of them overlapping, none of which show -- all of which said there's no evidence of data manipulation here.

So -- but, yes, I spoke to some of them. I spoke to other people as well as Dr. Wang.

Q. Did any of those people ever have possession of the original or raw data from the western blot experiments in question?

A. Yes.

Q. All of them?

A. No.

Q. Who?

A. I can't speak about the outside law firm's hiring of these experts who were hired to investigate all these allegations. And they were provided.

MR. CAMPBELL: Hold on. (Unintelligible) related to the investigation.

Q. Without testifying as to anything about the investigation that Cassava has asserted privilege over, can you tell me who, if anyone, had possession or access to original or raw western blot images from any of the western blots in question?

A. Outside of people who were hired to do that work, I generally had conversations with people

who understood how western blot works and what was standard practice 20 years ago, and what these -- what causes certain anomalies that they claimed was evidence of manipulation, that was not, and those sorts of general conversations.

Q. Did those people you had general conversations with or did you personally ever have access to or review original or raw western blot images from any of the western blots in question?

MR. CAMPBELL: Object to form.

A. I personally, of course, looked at the original western blot images.

Q. Did you go to Dr. Wang's lab and look at them?

A. The original western blot images are considered to be the digital image taken of the film at the time it's developed because that film degrades. So that original high-resolution image is what I looked at and what is defined as an original western blot image.

Q. Dr. Wang sent you those?

A. Yes, of course, because he produced them. Where else would I get them?

Q. And did they have molecular weight markers on them?

A. Oh, thanks for asking that question, because molecular weight markers don't actually show up on these gels because the antibodies are binding them nonspecifically. So if you titrate your antibody perfectly for your gel, they bind where they're supposed to. The proteins that are -- these antibodies are directed against, but they don't bind nonspecifically to the ink that is the western -- the molecular weight marker.

For someone to say that a western blot is only a western blot if the molecular weight markers are shown up is just false. And there's no definition of that being a definition of a western blot by any journal or any institution. It's completely invented.

Q. How do you know the images that you believe were original images from Dr. Wang were, in fact, the original images?

MR. CAMPBELL: Object to form.

A. What else would they be?

Q. Did you do anything to confirm whether what Dr. Wang sent you were, in fact, the original digitized image of the film without any manipulation?

A. I looked at them. And there's a lot of

other research that corroborates the western blot data that is not by western blot to support the science, but if I were somebody who suspected manipulation in a particular image that I thought looked funny, you know, had a funny smile, you know, or a bubble or whatever, that all these techniques can produce, because it's a gel to a film to a membrane to a film, the gel is hand-poured.

There can be, you know, wrinkles in the film, bubbles under the -- the membrane -- bubbles, and then the film. It's x-ray. You know what x-rays look like. It's not a perfect background.

So all these things. But if I wondered, if I really thought, you know, maybe he faked this to make it look a certain way, the first thing I would ask is show me the whole group.

Do you understand that the western blot image in a journal is only representative of an entire group and that the data is actually the densitometric quantitation of each band, that it becomes a number and that number is in a group is submit- -- subjected to statistical analysis, and that's the actual data.

One image is just here's what it looks like. And so that's not the real data. If I

suspected an image was, you know, monkeyed with, I'd say show me the whole group. They better show a similar pattern.

And, yeah, I looked at the whole groups, and -- but all these accusers weren't -- I mean, some of the journals said, yeah, sure, we'd like to see the whole group. And Dr. Wang or -- I -- you know, I was helping him, provided them.

But for an accuser to get hung up on one representative image is -- you know, like, that's not actually how you do an investigation if you really suspected something funny.

Q. Did you personally ever seriously consider whether Dr. Wang had manipulated any particular western blot image?

A. I have known Dr. Wang and worked with him closely for 20 years. I trusted him. I've never known him to be -- have anything but utmost integrity and, you know, worked his butt off, has no motivation to any cheating.

I -- you know, plenty of people in the world have been betrayed, cheated on, whatever. I considered it might be possible. Highly unlikely. So I tried to keep an open mind. And that's why the company hired an outside law firm to do a thorough

investigation with experts that I can't talk about.

MR. CAMPBELL: Stop (unintelligible).

(Reporter admonishment.)

Q. Okay, Dr. Burns. Can you turn to the page ending 780, please.

Okay. You just -- you write: I just feel like kickboxing this woman in the face.

Do you see that?

A. 780?

Q. Yeah.

A. Can I read the whole page, please, because I don't see that?

Q. I'm just asking you first to -- I'm asking --

A. I don't see it. Can I please read it?

Q. It's right above the redacted privilege box. It says: I just feel like kickboxing this woman in the face.

Do you see that?

A. I see it.

Q. Was that a reference to Renee Hoch, the editor of PLOS One?

MR. WU: You can definitely take time to read the entry.

A. I have to read the context before

answering your question.
Q. I'm asking -- sure, you can take a moment to read. If you can't answer the question, let me know.
A. Because I don't know until I read.
(Pause.)
Q. Okay.
A. I need to read the front of the letter.
(Pause.)
Q. And my question is who were you referring to when you wrote: I just feel like kickboxing this woman in the face?
A. This editor.
Q. Dr. Hoch?
A. Uh-huh.
Q. And why?
A. She said she would respond to me within a week and never did. I offered to sit down with them in their office in San Francisco. I gave them a three-day window. They ghosted me. She didn't -- she retracted without following COPE guidelines. COPE guidelines require clear evidence of data manipulation, which they did not have.
That's why I and two others referred the retractions to COPE, the Committee on Publication

Ethics, to say PLOS didn't follow your guidelines. They retracted without having -- don't interrupt me -- without having any evidence, without having clear evidence of data manipulation.

They retracted -- they retracted based on their concerns that the western blots images provided were, quote, unquote, insufficient. They could not explain to me what they meant by insufficient and it clearly did not follow COPE guidelines.

So, yeah, I was frustrated with her. And we know -- we know also that the COPE person who handled this was her manager at PLOS two years earlier. And she's talking about conflicts of interest.

Q. So you thought Dr. Hoch and the journal, PLOS One, had a conflict of interest and that is why they retracted five articles by Dr. Wang, including two that you co-authored?

MR. CAMPBELL: Objection; form.

A. Yes.

Q. What was the conflict of interest?

A. Close ties to Bik, who made up this definition that a western blot has to have molecular weight markers, which is completely false and --

(Brief interruption.)
A. Sorry. I've lost my train of thought now.
MR. WU: Can you re-ask the question?
MR. KUMAGAI: Yeah.
Q. I asked what, in your view, was the conflict of interest that existed at PLOS One?
A. She -- this editor had close ties to Bik, who was attacking the company, and claiming that a western blot is not a western blot when it is a western blot, just inventing her own definition.
And also we learned from The New York Times reporter that Bik claimed she was heavily involved in the retraction process of these five papers, when she was the one who brought the concerns to PLOS. That's a conflict.
Q. What close ties do you mean?
A. There was some overlap in some academic institutions. They're both Dutch. And Hoch went to conferences with her, donated monthly to her Patreon account. So, you know, that's not an, you know, objective relationship.
Q. And so did you think that Dr. Hoch and Dr. Bik were conspiring together against Cassava or Dr. Wang or you personally?

MR. CAMPBELL: Object to form.

A. I didn't think about that question. I was mostly concerned that they retracted without following COPE guidelines or a process for retraction. It was not -- it was completely unwarranted.

Q. And that made you want to get violent with Dr. Hoch?

A. Will you stop. This is, again, a private record of what was happening. I, you know, I said it to myself. I didn't even remember that I said that, you know, past the moment that I wrote it. So I don't know what you're getting on about.

Q. Have you ever had violent fantasies about any of our clients Dr. Heilbut, Dr. Brodkin, or Dr. Milioris?

MR. CAMPBELL: Objection to form.

A. I don't think about them ever. They don't -- they don't warrant my thoughts. And, no.

Q. I mean, they were clearly on your mind throughout this time period. Because you described them in this logbook of events or journal. Right?

A. I answered your question, no. You're badgering me.

Q. Do you consider yourself to be a good

scientist?
A. Yes.
Q. And what is that view based on?
A. Years of training, years of experience, you know, scientific rigor.
Q. What does the term "scientific integrity" mean to you?
A. Doing experiments with, you know, carefully checking, you know, with proper controls, being careful. Keep -- you know, having an open mind of what -- what the -- what the result could be before you do the experiment. Eliminating sources of bias.
Q. Anything else?
A. Yeah, probably.
Q. What do you mean by having an open mind of what the result could be before you do the experiment?
A. You do experiments to answer questions. You have questions because you don't know the answers.
Q. And do you think you acted with scientific integrity during your time at Cassava?
A. Of course, I did.
Q. What makes you say that?

A. What makes you say that I didn't?
Q. I didn't say anything. I'm asking you.
A. Of course, I did. Everything was done with controls. I went to various academic labs who had the expertise to do the work that I wanted done. You know, we didn't have actual labs so I wasn't in the lab doing work myself. I would check the qualifications of the person in the lab who had the expertise of the work that I wanted done. And talked to them, helped design experiments together, reviewed the data. I don't know what else you want me to say.
Q. Do you have an understanding of what it means to confirm or validate a scientific finding?
A. That would mean different things in different situations. It's a very vague question, but, yes.
Q. So in the context of Simufilam research, let's take the -- as an example, the claim that Simufilam binds filamin A. Okay?
A. Simufilam.
Q. Why does the pronunciation matter to you so much?
A. Because the INN told me there's a pronunciation. And it should be followed.

Q. Okay. And how is it -- how do you say it?
A. Simufilam.
Q. Simufilam. Okay.
The scientific claim that Simufilam binds filamin A, what does it mean to you to confirm or validate that claim?
A. Okay. As I said before, Dr. Wang used two different techniques, a direct binding and a displacement binding. They gave the same answer, very close. That's confirmation validation.
Q. To your knowledge, has any other lab aside from Dr. Wang's lab provided confirmation of the claim that Simufilam binds filamin A?
A. Simufilam. As mentioned I can't discuss that work that was ongoing.
Q. That's work that is ongoing and hasn't actually produced any results as far as you know. Right?
MR. CAMPBELL: Object to form.
A. I'm going to not answer that. Because that's not the answer as I see it. I just -- they haven't publicly released any data. I don't know whether it hasn't produced any results yet or not.
Q. Okay. So you're not aware of any lab

aside from Dr. Wang's lab to have confirmed the claim that Simufilam binds filamin A. Correct?

A. Simufilam. As I said, there's other ways to corroborate scientific data. Part of that was done on -- in a different disease, in a different model that is filamin A dependent that was corroborated by SNI -- S -- siRNA knock down of filamin A to get the same results as the drug that shows that the effect of the drug was working through filamin A. And that's pretty supportive. And I don't know of other -- well, also it's our drug. It's not like it's -- it's freely accessible to everybody in the world. And your clients bought bootleg Simufilam. We don't know whether it was actually Simufilam.

So other than the fact that he didn't know what he was doing. He had no help, had no -- you know, it was sort of like a first-time practice experiment that failed with a -- potentially not even the real drug, then show that it didn't bind. It's a joke.

Q. So aside from Dr. Bordey's lab, are you aware of any lab aside from Dr. Wang's lab that has confirmed in your mind the claim that Simufilam binds filamin A?

A. Simufilam. I can't speak about what I was aware of that's not public. By different lab, by a different technique. That's your answer.

Q. You're referring again to the studies that Cassava has potentially conducted on -- is currently potentially conducting?

A. I can't talk about it. It's not public.

Q. It's the same studies you mentioned earlier today. Right?

A. Yes.

MR. WU: Can we -- can we just go off the record for a second. And let me just ask Scott a question because she may be able to testify about it.

MR. KUMAGAI: Okay. Let's go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 10:50.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 11 o'clock.

Q. Dr. Burns, before the break I had asked you about studies that may be ongoing at Cassava. And can you describe what you meant when you said you can't answer, what studies you were referring

to?

A. Okay. This is confidential because it's not been publicized. And it, to my knowledge, has not been finalized. But the company reached out to a lab with expertise in this kind of binding and learned that, first of all, ultra high-affinity bindings like Simufilam for its target were not -- the -- the ITC method was not very appropriate for that binding measurement. And it's my recollection that there was some encouraging data demonstrating Simufilam binding to filamin A using Biacore. It was not finished. But it was, you know, it was not finalized, publishable. But it was evidence by another lab and another technique that Simufilam binds its target. And it's confidential.

Q. And that was your understanding of where things stood when you left the company in July of 2024?

A. It was -- I couldn't remember when it was started. I don't recall the dates. I'm sorry.

Q. What lab conducted that study?

A. A different lab at Yale. And I don't remember the woman's name. It was not Angélique Bordey.

Q. Aside from that study, are you aware of

any other studies either ongoing at Cassava or completed in the past that examined whether Simufilam binds filamin A?

A. Simufilam. I don't know what Cassava is doing right now so -- but that's one, two, three, plus corroborative science, that's four. So, you know, that's -- but do I know number five, six, seven, eight, no.

Q. And by the four, just to be clear, are the two by Dr. Wang, the one by Dr. Bordey, and the one by another individual at Yale. Is that right?

A. Correct.

MR. CAMPBELL: And just for the record, we'll designate the transcript as confidential.

MR. KUMAGAI: Understood. And we reserve our rights to --

MR. CAMPBELL: That's fine.

MR. KUMAGAI: -- challenge as needed.

Q. Okay. What training, if any, Dr. Burns, do you have on scientific recordkeeping?

A. No specific training in recordkeeping.

Q. Were you trained to keep a laboratory notebook of experiments?

A. I don't know what you mean by "trained."

I -- you know, back before people had migrated a lot to electronic records, I was mostly keeping things in paper. It's my understanding it's pretty much a mix today of recordkeeping. Electronic and paper recordkeeping.

Q. And is there a distinction in your mind between a laboratory notebook and a laboratory logbook or do those terms basically mean the same thing to you?

A. I don't know who's using those terms.

Q. I'm asking you if they have different meanings in your mind or not?

A. I don't think I would use the word logbook. I don't know who uses it and what they mean when they use it.

Q. Okay. Are you familiar that in clinical trials the FDA generally requires drug sponsors to pre -- prespecify their primary endpoints for their studies?

A. That's definitely a requirement for Phase 3. And it is typically a require -- expected of earlier-stage studies now. But, you know, much earlier, people would say, what do you mean, it's Phase 2. Why do I have to call things the primary or whatever whenever I'm trying to figure what the

heck my drug does. But definitely for Phase 3 pivotal trials.

Q. And what is your understanding, if any, of the rationale for that requirement?

A. The requirement -- please state the requirement again?

Q. To prespecify primary endpoints?

A. It's just the way the FDA works. So if you have a drug and you want to show that it increases survival time in patients, and then maybe you didn't get that -- hit that primary end point but you saw -- saw that there was a significant reduction in tumor volume, you didn't call the tumor volume, you called the survival time or vice versa. FDA really likes that you hit the one that you set ahead. But sometimes that's hard.

Q. Do you think as a scientist it's generally a good practice to analyze data according to predetermined criteria as opposed to criteria determined after seeing data?

A. Predetermined criteria, I don't even know what you mean by that. Could you please define that for me?

Q. Criteria for what the exclusion criteria should be, what the goal of the study is, how you're

going to analyze the data, those sorts of criteria?
A. You mean the exclusion criteria for patient enrollment?
Q. Just generally?
A. I don't know what you mean generally when you talk about that, that doesn't make sense to me.
Q. So it's too general of a question for you to answer whether or not in your view it's generally a good scientific practice to analyze data according to predetermined criteria?
MR. WU: Object to form.
A. Yeah, that's a really vague question. It depends on circumstance. And I don't -- I don't know what you're talking about.
Q. Are you familiar with the practice of P-hacking?
A. No.
Q. You've never heard that term before?
A. No. I've heard the term. I don't know -- exactly know what it means.
Q. Do you know generally what it means?
A. No. Could you explain it to me?
Q. My understanding is that P-hacking refers to a practice of manipulating data analysis or collection until you get a statistically significant

P-value.
Does that generally sound consistent with what you understand the term to mean?
A. I didn't understand the term. So if you want to say it means that, then it means that to you.
Q. Have you ever in your career manipulated data analysis or collection until you got a statistically significant P-value?
A. No.
MR. CAMPBELL: Object to form.
Q. Never?
A. No.
Q. How did you first meet Dr. Wang?
A. I went to his lab. I reached out to the -- I guess the head of the department at that time to help answer a question about opioid receptor signaling, specifically what was happening to opioid receptors during tolerance and dependence and more specifically what happens to them when opioid agonists are co-administered with ultralow doses of certain opioid antagonists and the phenomenon of enhancing analgesia, reducing tolerance in the dependence. And I wanted to understand what was happening at the -- the receptor level and that lab

was referred to me as an expert in signaling and so I went to that lab.

Q. Approximately when was that?

A. Somewhere around 20- -- 2022.

Q. And who referred you?

A. Ellen Unterwald.

Q. Who was she affiliated with, if you know?

A. I think Temple.

Q. In Arizona?

A. No. In Philadel- -- in Pennsylvania.

Q. Okay. Do you believe Dr. Wang is a good scientist?

A. Yes, I do.

Q. What makes you say that?

A. He takes extra steps for rigor, extra controls, he -- when he has to mix something, he, you know, doesn't just touch it on the vortex for ten seconds. He vortexes for an entire minute to make sure things are fully mixed. He tests his kits and antibodies ahead. He's more careful than most people.

He calibrates his pipettes every week by doing the gravimetric method to make sure that they're working properly. That's not something that everybody does on a weekly basis, but he does -- he

adds protease and phosphatase inhibitors to prevent degradation of proteins that he's interested in measuring. Other people don't bother.

Q. Do you think Dr. Wang is a good recordkeeper of experiments?

A. I -- I -- you know, to the extent that he needs, yeah, I think so. I mean, it's -- it's not -- I don't know on -- by what standard you're asking me that. He's a very rigorous scientist.

Is he the perfect administrator? Probably not. He's too -- his -- his brain is in scientific creativity and -- and rigor of conducting experiments.

Q. Do you think maintaining proper records of experiments is part of being a good scientist?

MR. WU: Object to form.

A. Generally speaking. And I believe he does. He's been able to find all those original western blot images that these journals asked him for, you know, going back over 15 years. That's good recordkeeping, other people who've been asked for them, you know, said, sorry, that was seven years ago; I don't have those.

Q. Did he find the original or raw western blots from the experiments in the 2012 paper in the

Journal of Neuroscience, I believe?
A. Yes, he provided those to the editor.
Q. How many times have you visited Dr. Wang's lab?
A. His lab, once or twice.
Q. So you mentioned the one time, I believe --
A. Oh --
Q. -- in the context of meeting him?
A. -- yeah. So maybe three times.
Q. Approximately when was the second and third time?
A. I don't remember.
Q. Was it before or after the citizen's petition came out?
A. Before.
Q. You have not visited Dr. Wang's lab in the time since the citizen's petition came out. Is that right?
A. I have not personally, no.
Q. Do you believe Dr. Wang has ever done anything wrong in connection with any scientific research?
A. No, I don't. And -- and your word "wrong" is really -- you know, if you're defining a

method that he should have done differently, I -- I don't know what the heck you mean by "wrong." Please define it.

Q. Do you believe Dr. Wang has ever manipulated, fabricated, falsified, or made up any research?

A. No.

Q. And what makes you say that?

A. Because I know him. I trust him. There's other data that corroborates his -- his data and, sorry, but the drug works.

Q. How?

THE WITNESS: Am I allowed to speak about confidential data that's about to be published?

MR. WU: Yes.

A. There were trial design flaws, but the underlying data shows significant drug effects.

And I don't know if I should go into great detail or not because it's confidential and, of course, your creeps are watching.

Q. Who do you mean by "creeps"?

MR. WU: We're going to -- we're going to -- we're going to designate this part of the testimony confidential, or if there's a highly

confidential level, we'll designate it highly confidential.

MR. CAMPBELL: Yeah.

MR. WU: Designate it confidential.

MR. KUMAGAI: We will reserve rights. It's designated confidential.

MR. CAMPBELL: And I'll just say for the record, everybody who's on the --

MR. KUMAGAI: Of course.

MR. CAMPBELL: -- Zoom is agreeing to keep this information within the group who's on Zoom, in addition to your legal staff and the legal staff who's involved.

MR. KUMAGAI: On a provisional basis, until we raise any objections about needing --

MR. CAMPBELL: Sure.

MR. KUMAGAI: -- to use the deposition --

MR. CAMPBELL: Until the court order or otherwise.

Q. Who were you referring to by "creeps" a moment ago?

A. The people who attacked me who are apparently watching.

Q. Dr. Heilbut, Dr. Brodkin, and

Dr. Milioris?
A. Yeah, whatever you want to call them.
Q. That's who you meant by "creeps"?
A. Uh-huh.
Q. You have to answer verbally.
A. Yes.
Q. Can you describe the research that you mentioned a moment ago that is apparently about to be published?
A. Yes. So the public knows that both trials failed and they stopped the second trial within 48 hours of learning that the first trial failed prior to seeing certain subgroups that showed significant effects in the first trial.
And I will say that both trials used a plasma test to confirm disease as opposed to an amyloid PET brain scan, and in the amyloid PET substudy in the second trial that had 160 patients at baseline, there was an error rate of 21 percent. So 21 percent of the patients coming in, at least to that substudy and probably to that whole second trial, were -- didn't have Alzheimer's because amyloid beta deposits approximately 20 years before you actually have symptoms.
So if all these people have supposedly

mild Alzheimer's when they're coming in, yet, they don't have amyloid deposits in their brain 20 percent of the time. That's a problem when you have a drug that's targeting Alzheimer's disease. They have something else.

And I will say that that second trial had -- all the best cites were put on the second trial because it was more complex. It was longer. It had the fancy substudies. It was sites who were potentially interested in publication, more research-focused. It's hard to say the best sites publicly because it doesn't necessarily mean that the cites on the first study were, you know, not good. But they were the lean and mean, less established, no ability to do substudies; sites often with populations who were very different from the ones who were going to the second group of sites.

Q. And so is the research that is about to be published based on the data from the first Phase 3 trial after the percentage of people are excluded because they don't appear to have Alzheimer's?

MR. CAMPBELL: Object to form.

Q. Is that right?

A. You can't exclude them because not everyone had a PET scan. It's just telling you what's the likely error rate in that second study which might even be worse in the first study based on that plasma test. It was just not very accurate.

Q. So what is the paper that is going to be published purport to find? What's the headline?

A. It didn't find, but it -- the data show that in the first study, if you look at all patients, mild and moderate, with the highest half of the plasma test, there's a significant drug effect on slowing cognitive decline.

Q. And you're an author of this paper that is going to be published, I take it?

MR. CAMPBELL: Object to form.

A. I am because I was involved and authorship rules can't exclude me. So yes.

Q. And who else is authored on -- is an author?

A. Well, Jim Kupiec, who designed the trials and a handful of clinical site PIs in the middle.

Q. Is Dr. Wang a coauthor?

A. No, he had nothing to do with our clinical trials.

Q. The Phase 3 trials?

A. Our Phase 3 trials.
Q. Um --
A. And I'm not done.
Q. Okay. Continue.
A. So in the second study, the -- of course, they stopped the trial, so the last time point, 18-month time point, very few patients got there because you already had a dropout rate, and then you told everybody to stop.
So the last reliable time point in aggregate is really month 15. In the predefined mild subgroup, which is about 65 percent of the total population, there's a significant slowing, decline all the way through month 15. Month 18 the effect's gone, crashed, of course, because it's missing half its data in its model. Then it's unreliable.
There's literature saying that if you're missing 40 percent or more of your data you can't rely on that data. Maybe it's hypothesis generating, it's considered exploratory. You can't rely on it.
So basically the last reliable time point is month 15. They -- initially when they opened the envelope and said that it failed, they were looking

at month 18, which, of course, is missing 45 percent of its data. So can't rely on it.

And, you know, thinking that the drug might work in moderate patients with a -- you know, a stretch because nothing works in moderate patients. They're pretty far gone. I had not wanted to go all the way down to the MMSE range that we did, but it was a group decision.

Anyway, so clearly nothing in moderates, but a very clear significant effect even with that 21 percent error rate in there, all the way through month 15. That doesn't tell -- that shows that the drugs is not, you know, a scam, a fraud, made-up science, you know, taking advantage of Alzheimer's patients, stop the trials.

They called for stopping the trials. The company stopped the trials and look what happened. They killed that trial. So that's kind of a tough one. Like, well, it looks great through month 15. I don't know what happened after that.

Q. When is this paper going to be published?

A. We have to hear back from the journal. The second revision was submitted over a week ago. It's probably pretty darn close to being accepted.

Q. So the journal has not yet accepted this

paper?
A. It's very close.
Q. But it has not yet accepted it?
A. Correct.
Q. What journal?
A. It's an Alzheimer's-specific journal. I don't want to say it until it's out.
Q. It's confidential, so please say it.
A. JPAD.
Q. Dr. Aisen's journal?
A. Yeah, the one that's most focused on clinical trials and Alzheimer's disease, Aisen (pronouncing), Aisen (pronouncing).
Q. And have you submitted the paper to any other journals?
A. This paper? Wow, that's an interesting question. Why would you ask that?
Q. Can you answer it, please?
A. We submitted an early version of the paper to Alzheimer's and dementia, and they declined to send it for review.
Q. And any other journals?
A. No.
Q. And what is your understanding of why they declined to send it for review?

A. Well, I think that the editor is a little bit conflicted, even though she's never publicly spoken about Cassava, she has spoken about the -- Lesné -- I don't know what it's called. And, of course, I can't evaluate it because I never looked at it.

But, you know, he was accused of faking data, whether the data was faked or whether the -- it was all about A-Beta*56 and basically the field agreed that while A-Beta*56, which is this strange large oligomer of amyloid-beta, might be very toxic in mice, it doesn't really occur in the human disease.

And this was not translatable, but, of course, you know, the people who were spinning the story was, like, this paper was fraudulent and it encouraged the whole field to chase amyloid, when it's not actually true. Whether it was fraudulent or not, it was this niche.

Anyway, she has spoken saying that his data, some was shockingly blatantly manipulated. I guess she was hired by somebody. But others have spun her statement to apply more broadly to, you know, Cassava's scientific data, which she never did say. But I was concerned initially once I realized

that.

And a few days later she decided, no, I'm not going to send this for review.

Q. And who was responsible for the -- and I'm paraphrasing -- the issue with the 20 percent or so of people who it turns out did not have Alzheimer's who were enrolled in the first Phase 3 study?

MR. WU: Object to form.

A. Well, it's -- the 21 percent error rate was among those 160 patients who did have an amyloid scan, who should have been amyloid positive, who were not. So that's an indication that if that sample of your 1,100 patients had a 21 percent error rate, it doesn't mean the other, you know, 940 patients were going to be fine.

It probably means a similar error rate in them, and it probably means a similar, if not worse error rate, in the first trial that had less-established and research-focused cites.

Q. Who was responsible for screening patients for entry into the Phase 3 trials?

MR. CAMPBELL: Object to form.

A. I think your question is not the right question. I mean, obviously the sites were

following a protocol to collect plasma and send it to the vendor who had this assay that was not sufficiently validated at the time.

I mean, it was -- there was one set of validation data that looked -- you know, I saw it too, but, you know, I was not the one pushing for a plasma test. Obviously it'd be wonderful if it would work, but others were cautioning against --

Q. Is that Neurocode?

A. Yes.

Q. And who determined -- the company determined the enrollment criteria to use for enrollment of the Phase 3 trials. Right?

MR. CAMPBELL: Object to form.

A. There was a list of inclusion and exclusion criteria. But if you're asking about overall responsibility of the clinical trial design, that was the person who was hired to come in and run the Phase 3 trials.

Q. Who was that?

A. Jim Kupiec.

Q. Do you blame him for this issue?

A. I don't blame him. You know, hindsight is 20/20. It's hard. I would have preferred to have gotten a lot of experts in the room to hash

through every detail in question. But it was a flaw.

Q. Okay. Can you describe generally what your annual salary was at Cassava, starting at the beginning? You can give ballpark figures.

A. I think I was hired at 150,000. And I don't -- I didn't keep track of, you know, my raises and promotions.

Q. What was your salary approximately at the time that you left the company?

A. Well, I know that because it had -- I think the whole company got a pretty generous salary raise in January 2024. And at that time mine raised to 490,000. And that was the first time I had had that salary.

Q. And approximately what was the salary before that?

A. I don't know. I didn't keep track.

Q. Just roughly?

A. I don't know. I don't know.

Q. 300,000?

A. Somewhere around there at some point for sure.

Q. And did you receive annual bonuses during your time at Cassava?

A. Once. I think once -- I think just once. It was not a standard thing, no.
Q. Approximately when was that?
A. I don't remember.
Q. Approximately how much?
A. I don't remember. It was 25,000 once, I think. I don't remember.
Q. And you received stock options as well. Right?
A. All employees received stock options up until the point where there were no more stock options to give, which is why the cash incentive bonus plan was put in place, so we could hire new people who expected to receive stock options and there were none to give.
Q. And were you involved in discussions around adopting the cash incentive bonus plan?
A. Absolutely not.
Q. Well, how do you know why it was adopted then?
A. It was explained to me after the fact.
Q. By who?
A. I think Dr. Friedmann.
Q. Around the time it was adopted in 2020?
A. Yeah, because we couldn't hire any

people. We needed to hire a clinical team.
Q. And you understood then that you were a participant in the cash incentive bonus plan.
Right?
A. I don't know that I understood that then.
Q. But you discussed it with Dr. Friedmann around the time that it was adopted. Right?
A. As a way to hire new -- a whole clinical team, yeah.
Q. And you never asked, oh, am I a participant?
A. No, I didn't.
Q. You just assumed that you were?
A. No, I didn't.
Q. You weren't curious?
A. No.
Q. Did you understand that your husband, Mr. Barbier was a participant?
A. At some point I knew that we were, at some point later. I don't remember how.
Q. Did you exercise any of the stock options that you were given?
A. I did. Some.
Q. Approximately how much was the value of the options you exercised?

A. I have no idea.
Q. Approximately when?
A. I had numerous small grants of options. Some expired -- some -- some I exercised. I don't remember. I don't know.
Q. Aside from the salary, bonus, payments, and stock options, did you have any --
A. Singular bonus payment.
Q. Okay. Aside from the salary, the one bonus payment, and the stock options, did you have any other compensation from Cassava during your time as an employee?
A. No.
Q. And during your time as an employee of Cassava, did you have any other sources of income from sources other than Cassava?
A. I don't think so. No.
Q. Investments, real estate?
A. I have a condo that I purchased some years ago that I rent.
Q. Where is that?
A. San Francisco.
Q. Aside from the condo, any other income sources during your time from Cassava that were not from Cassava?

A. Why do you need to know this? It's personal. But, no. What the hell? You're trying to, like -- I don't know what you're doing.

Q. And how much -- you're currently being compensated by Cassava as a consultant. Is that right?

A. No, I'm not.

Q. After you left the company around July of 2024, did you receive any compensation from the company?

A. I did for a bunch of hours on stuff that they asked me to do.

Q. What stuff?

A. Suggesting -- like, research and suggesting additional indications for Simufilam. I don't remember what else. Writing a couple of abstracts for the ADPD meeting.

I don't think there was anything else. I don't remember.

Q. Is the company compensating you for the work you've done on this paper that is under review by JPAD?

A. I -- yes, we're -- well, we're about to be probably about a minimum wage by the time I add up my hundreds of hours spent. I initially said --

I asked for some compensation and they first said, Oh, no, sorry, because Jim already left the company so when he asked you to work on this, you know, it wasn't from us; we're not going to pay you.

And I said, okay, fine.

And then they came around with a -- they came around. So -- but it's, you know, hundreds of hours.

Q. So you are the primary author --

A. No.

Q. -- of this paper?

A. No, I'm not. Jim Kupiec is the first author. I'm the senior -- senior author.

Q. You've spent hundreds of hours on this paper?

A. I have.

Q. How many hours approximately do you think Mr. Kupiec or Dr. Kupiec has spent?

A. Probably hundreds but probably less than me.

They also hired an outside medical writer who didn't even use citation software, you know, could barely get numbers transferred from statistical files to the paper without errors, because there were many errors. I identified errors

coming from Pentera. It was a lot of cleanup.
Q. And when you say they hired, you mean Cassava hired a medical writer?
A. Yeah, because they didn't want to hire me.
Q. What is your understanding of why they didn't want to hire you?
MR. CAMPBELL: Object to form.
A. I don't know.
Q. Did they ever explain to you why they didn't want to hire you?
A. Nobody from the company has ever talked to me. Well, I've had to -- I've had some very brief conversations with the CFO. But, otherwise, no one has explained anything to me ever.
Q. What were your conversations with Mr. Schoen about?
A. Part, like, asking for -- you know, I wanted to speak to somebody who had the dataset, you know, and whether I could have a portion of it to -- to look at it more closely and he pretty much ignored me.
Eventually, I told him that if he -- unless he told me no, I was going to text the person my list of questions because apparently I was not

allowed to talk to her and I would also text him so there's a record of that.

Q. All right. Text the person, you mean the medical writer that was hired?

A. No, we were -- the medical writer was already, you know, working with supposedly all the authors, although most of them were very silent.

Q. Who was -- who were you texting or --

A. The person at the company who has access to the full dataset.

Q. And who was that?

A. Judit Stroe.

Q. Can you spell it?

A. J-U-D-I-T, S-T-R-O-E.

Q. Okay. Can you describe any of your holdings of Cassava stock over the years?

A. Actually, no, I don't know. I have some stock. I've never sold any stock. I don't know how much I have.

Q. Did you become a stockholder before you joined the company?

A. No.

Q. So you first became a stockholder at some point after you joined the company. Is that right?

A. That's correct.

Q. And you held stock the whole time you were at the company?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And you still hold the same -- the stock today. Is that right?
A. I do.
Q. You have no idea approximately how much -- how many shares?
A. I do not.
Q. Do you know Rick Barry?
A. I've never met him, never spoken to him.
Q. Do you have any opinion of Mr. Barry?
A. I said I've never met him, never spoken to him.
Q. That's not my question, though.
Do you have an opinion -- setting aside having not spoken to him or met him, do you have an opinion of him based on --
A. What kind of opinion?
Q. -- what you know about him?
A. About -- I don't know the guy. What -- what do you want me to opine on?
Q. I'm just asking generally if you have any

opinions about Mr. Barry?
A. In relation to what? I don't know him.
Q. In relation to --
A. Never spoken to him.
Q. In relation to his role as CEO of Cassava.
A. Well, he doesn't have any experience running companies. He doesn't have any drug development experience prior to being -- stepping in as CEO.
Otherwise, I know nothing about the guy.
Q. Do you think he's qualified to serve as the CEO of Cassava?
MR. CAMPBELL: Object to form.
A. I don't know him and I'm not a person to judge qualifications for a function that I've never served. That's out of my wheelhouse.
Q. Well, what makes you say he has no experience running companies and -- or any experience in drug development?
A. Because he doesn't.
Q. Can you explain the connection, if any -- well, strike that.
Why did you leave the company in July of 2024?

A. Because -- no one spoke to me, but two board members told Remi that he and I had to take a bullet for the company.

Q. Which board members were those?

A. His long-time mentor, Sandy Robertson, who died three weeks later, probably from the stress, who was in great shape, very active, 93-year-old. Of course, being 93 but, you know, he's perfectly healthy. Suddenly he dies three weeks later.

Q. I'm sorry.

A. Yeah.

Q. Who is the other board member?

A. Bob Gussin.

Q. And your understanding is they told Remi that you and Remi needed to take a bullet for the company. Is that right?

MR. CAMPBELL: Object -- object to form.

A. That's my understanding of what they said.

Q. And your understanding is from Remi?

A. Yes, because nobody ever called me. Nobody ever spoke to me. Nobody told me why. Nobody said we're sorry. Nobody said thank you. To

this day, no one's called me. No one -- no one's explained anything.

Q. And how do you feel about that?

A. Well, it's not -- it's not the way you treat people. It's not the way you treat the inventor of the only asset that the -- the company is still trying to develop.

Q. You being the inventor of Simufilam. Is that what you mean?

A. Coinventor.

Q. And what did you understand that to mean, "take a bullet for the company"?

MR. CAMPBELL: Object to form.

A. That we had to, you know, resign.

Q. For the good of the company?

A. It was an appeasement to the SEC. It was a capitulation to the SEC.

Q. Did you do anything to try to appeal or challenge that decision?

A. I had -- I had no -- no -- no ability to -- no, I had -- what was I supposed to do? If I -- if I didn't agree, they would have given me no severance. They -- you know, my employment contract, you know, was at-will. Like, if they decided they wanted to offer me up to the SEC with

no severance, they would have done that.
Q. What was the severance package that you received?
A. One year of salary.
Q. Any other benefits?
A. No.
Q. Did you have any obligations to the company as part of that severance?
A. Well, no, not of part -- as part of the severance, but I think as long as my -- you know, I had to remain a consultant, but then after, in December, they said they didn't want any consulting services from me. But they couldn't kill the consulting agreement without cause, which there wasn't so...
Q. And aside from the work we've already discussed about the research paper, what have you done professionally since leaving Cassava around July of 2024?
A. I've helped a handful of startups.
Q. What startups are those?
A. I've signed CDAs so I shouldn't mention them.
Q. They can be covered by the protective order as well.

A. I'm trying to remember the name, you know. Sana (phonetic) something and Repeat Therapeutics helped -- I don't remember the name of his company, friend.

Q. What friend is that?

A. Ted Schwartz.

Q. Okay. Anything else?

A. Yeah, another company. What are they called? I can't remember what they're called. I don't remember. Seattle something Neuroscience, something like this. I don't know -- remember.

MR. WU: So we're just designating all that confidential.

MR. KUMAGAI: Okay.

Q. Can you explain the connection, if any, between the research on naloxone that the company did and the subsequent discovery of Simufilam or Simufilam?

A. Simufilam.

Can you rephrase your question?

Q. Can you explain the connection, if any, between the research on naloxone and the subsequent discovery of Simufilam?

A. Well, Dr. Wang identified the high -- ultrahigh affinity binding site of naloxone and

naltrexone as a pentapeptide region on filamin A.

We also knew that ultralow dose naloxone and naltrexone worked beautifully to enhance opioid -- opioid analgesia and reduce tolerance and dependence, meaning the withdrawal symptoms, when administered together. But if you cross a certain threshold of some, you know, ultralow-dose dose, if you got a little too high, then that fell away and that was at a dose even lower than what would be required to hit the opioid receptors. So that led us to believe it would be a different target.

We did see also that naloxone and naltrexone would also bound some other site on filamin A that also -- that was responsible, we believed, for disrupting the effect on opioid analgesia and tolerance and dependence of that even lower dose.

So we wanted a molecule that could activate the opioid receptor and also hit only this ultrahigh affinity binding site on the filamin A but not the rest of the -- any -- any place else in the filamin A protein, which is made of 24 repeats, many of them similar, although the pentapeptide region is unique in that protein.

So we used that pentapeptide as -- to --

a screen to try to find new molecules that would first -- first bind that peptide. If they bound the peptide, then we would do a second assay to see if it actually would turn on the opioid receptor using a functional receptor assay. And that was for obviously an analgesia program.

Q. So does the claim that Simufilam binds filamin A depend in any way on the earlier research claiming that naloxone binds filamin A?

MR. CAMPBELL: Object to form.

A. No, naloxone found us that site on filamin A, it was a separate -- what's your question exactly? I could go on and on. But I don't want to answer something on some tangent that's not your question.

Q. Well, let me try to break it down. Isn't it the case that Simufilam was discovered by testing various compounds in competition with naloxone. Is that right?

A. There was a screening assay of treated naloxone to see its displacement, yes, from that peptide.

Q. And those experiments were Simufilam --

A. Simufilam.

Q. -- were discovered -- those experiments

Simufilam was discovered, assumed based on the prior research on naloxone that naloxone binds to filamin A. Right?

MR. CAMPBELL: Object to the form.

A. That naloxone finds a fragment from filamin A.

Q. The VAKGL peptide. Right?

A. That's correct.

Q. And the research paper where the finding was reported that naloxone binds filamin A, was the 2008 paper in PLOS One. Right?

A. Yes, but that was, you know, separate. I don't know what you're driving at here.

Q. That paper was retracted. Right?

A. Yes, not according to COPE guidelines. Based on, you know, invented stuff that we've already gone over. But in the event to have a definition of what is a western blot, you know, that's completely wrong and not appearing anywhere else.

Q. Aside from the experiments reported in that 2008 retracted paper, what basis if any do you have for the claim that naloxone binds to filamin A?

A. Well, it binds to this fragment because we did it in plates and new binds. And you can

measure that it's tritiated naloxone. You can -- actually, it was FitZine-labeled naloxone not tritium. And you measure it in a machine. It's stuck there. It binds, you know, that's irrefutable.

Q. Those are the tests that were reported in the 2008 PLOS One paper. Right?

MR. CAMPBELL: Object to form.

A. I don't remember all the experiments and details of that paper.

Q. So aside from the tests that you just described and any other tests that may be described in the 2008 PLOS One paper, what other tests or experiments are you aware of to support the claim that naloxone binds filamin A?

A. Well, you know, the ultra low dose naloxone phenomenon has been corroborated by numerous reacher -- researchers. Nobody knew what the target was, but they knew it was at a concentration -- that was not going to hit opioid receptors. They just thought it was magic that like every thousandth time a receptor sees a naloxone, then it might, you know, behave or do some different signaling. And Dr. Wang was the one who showed that it actually binds filamin A. And he used

overlapping peptides to narrow down exactly where on filamin A. Other researchers had already also published that filamin A interacts with the open opioid receptor. Eric Simon --

Q. Okay. But I think my specific question is, is there any other research that shows or claims to show that naloxone binds filamin A?

MR. WU: Objection; form.

MR. CAMPBELL: Object. I don't think you had actually finished your answer to it.

A. I -- I don't know. I don't know. There's a lot of research out there and probably, yes.

Q. But you can't name any sitting here today?

A. Not off the top of my head.

Q. Okay. So Simufilam was --

A. Simufilam.

Q. Simufilam was initially conceived of as a potential painkiller. Is that fair?

A. That's not correct at all. You didn't let me finish the story. Would you like to hear the story?

Q. I'd like to hear how that's not correct.

A. It was never intended to be a painkiller.

It came out of a medicinal chemistry effort that I divided. Once Dr. Wang realized that there was a very large protein linking to the alpha 7 nicotinic acetylcholine receptor when a beta 42 is binding and signaling through that receptor to hyperphosphorylate tau which is a finding he published in 2000 and 2003. He then noticed, hey, there's this huge protein there. I don't know whether it's important. But it's linking up to the receptor. And it's so big, it's one of about five things. So he used antibodies and identified it as filamin A. Wow. So we're over here in this analgesia program, screening for compounds that bind filamin A and also turn on the opioid receptor. We could -- if we could break up that associate, that linkage of filamin a with the alpha 7 receptor, then we could know if that filamin A binding is critical to that toxic signaling. Which, by the way, numerous pharmaceutical companies had tried to disrupt.

So that was a validated pathway for Alzheimer's disease. So we used compounds from -- that were -- we were developing in this med chem expert that was way after the screening that I just described that got us to the scaffolding, the

scaffolds that were the starting point for the medicinal chemistry to test if we could break that up and we found some that did. And therefore he followed that up to see whether the enzyme that hyperphosphorylate tau was still active when the -- the linkage was broken. And it wasn't. And then he measured whether the tau was less phosphorylated in the presence of these compounds. And that was the case too.

So the linkage was critical for this toxic signaling that hyperphosphorylated tau. But in the middle of this process, I directed some of the med chem to continue finding molecules that would turn on the opioid receptor and bind filamin A. But ones that we were sort of interested in following for Alzheimer's disease were, like, the rejects from the opioid part of the -- the med chem. Because we wouldn't want, you know, oh, it binds filamin A, great but it doesn't turn on the opioid receptor. Okay. Great, we want that over here in the Alzheimer's side. So it was parallel track and the patents broadly covered all of these things. Whether they actually turn on the opioid receptor or not. But it's not true that it was originally for pain. That's completely a lie that, again, it was,

just like made up by your people to try to make it sound like bullshit.

Q. Well, was it made up or was it in the patents for Simufilam?

MR. CAMPBELL: Object to form.

A. The patents were -- were claiming broad huge libraries of compounds.

Q. Including --

A. For composition of matter.

Q. -- opioid antagonists?

A. For -- opoid agonists.

Q. Agonists.

A. But some of them were, some of them were not. They were just claiming these molecules.

Q. So the claim that it wasn't made up, it was in the patent?

MR. CAMPBELL: Object to form.

A. Not really.

Q. Okay. Wasn't Simufilam also studied under your supervision as a potential treatment for cancer?

A. It -- there was -- yes, there was work showing plenty of preclinical validation in cancer.

Q. Dr. Wang did that work. Is that right?

A. He did some of it, yeah.

Q. And Dr. Wang's experiments showed that Simufilam --

A. Simufilam.

Q. -- Simufilam reduced the sizes of tumors, cancerous tumors in mice. Right?

A. That's correct.

Q. And then isn't it true that you tried to have an external lab repeat those experiments and validate those findings, and the external lab was unable to do so?

MR. CAMPBELL: Object to form.

A. I remember one failed experiment, the -- by a -- an unknown CRO who did things like leave tissue samples in an ice bucket out over the weekend instead of getting them into the freezer or the fridge or where they were supposed to go. We were not, you know, the -- the tumor cells didn't grow as expected. We weren't sure what they actually implanted as tumors. There were a number of questions. And then there was some effort to try to follow that up. But really our resources were focused on the Alzheimer world.

Q. And did it concern you at all that this outside independent lab was unable to replicate or validate Dr. Wang's research?

A. There were too many things that were off to really understand, but we wondered what, you know, sometimes experiments work only in certain -- certain conditions and you don't know what all those conditions are. And you change a bunch of things and it doesn't work and you don't know which one was important or what was even there that was critical that you may not even have been keeping track of. So cancer -- the cancer field describes their models as tools. Because it is really a sort of a squirrelly field. And so we just thought there's a lot of chasing tails we could do when everything was looking so straightforward on the Alzheimer's front. And it was sort of we didn't -- we did not develop that. But also cancer is a very crowded field.

Q. Did you later propose that Simufilam could potentially be a treatment for COVID-19?

A. The -- the inflammatory -- basically the sepsis-like response that is mediated by multiple inflammatory receptors. Might have been addressed by Simufilam. Not -- not the infection, but the inflammatory organ failure that was killing people. I mean, that was a time when everyone was trying to figure out what they could do to help. And this compound was potently antiinflammatory. And I had

an infectious disease guy who was very excited about it and -- and wanted to help and find sites to test this. And I can't remember his name --

Q. Okay.

A. -- at the moment.

Q. So just -- you did then, yes?

A. Yeah.

THE STENOGRAPHER: Do you mind if we take a break? Whenever you --

MR. KUMAGAI: Just one more, two more questions.

Q. Did you ever question the plausibility of Simufilam being a -- a potential treatment for cancer, potential treatment for COVID-19, and a potential treatment for Alzheimer's?

MR. CAMPBELL: Object to form.

MR. WU: Object to form.

A. No. You want to know why?

Q. Sure.

A. Filamin A binds with over 90 different protein partners. It is intricately involved in so many different signaling pathways in the cell. Some of those goes off, it, you know, filamin -- filamin A. Any disruption or change to filamin A Phosphorylation of Serine 2152, for example, can

cause a whole cascade of cellular disruptions, some cancerous, some Alzheimer's disease, some in, you know, turning on inflammatory receptors persistently to cause chronic inflammation. Those are features of a lot of different disorders. Filamin A is a -- is very involved in -- in tons of cell -- cell signaling pathways. So, no, it's not strange at all.

Q. After the citizen's petition came out and people like our clients criticized the company and its science, did you ever have any doubts about the foundational research claiming that Simufilam binds filamin A?

A. No, because there was too much data supporting it.

MR. KUMAGAI: Okay. We can take a break.

THE VIDEOGRAPHER: Going off the record. The time is 12 o'clock.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 1 o'clock.

(Exhibit 190 was marked.)

Q. Okay. Good afternoon, Dr. Burns. I will mark Exhibit 190, which is a document Bates-stamped

CASSAVA_000329169. And it's a PowerPoint and this is the native version of the document.

Okay. The title of this document is: A New Drug Candidate and Companion Diagnostic Candidate For Alzheimer's Disease.

Dated March 2017. Do you see that?

A. I see it.

Q. Okay. Do you recognize this slide deck, just looking at the first few pages?

A. I can't say that I remember this specifically. You know, there were multiple slide decks here and there.

Q. Okay. And if you look at Slide 4, it refers to PTI 125 on the right side.

Do you see that?

A. Yes.

Q. And that is the same as Simufilam. Right?

A. Simufilam, yes.

Q. Okay. And if -- can you turn to Slide 9, please.

A. Uh-huh.

Q. Can you just read the headline for me, because I can never say that properly.

A. "Aß42-induced tau phosphorylation." It's

alpha 7 nicotinic acetylcholine receptor-dependent.
Q. Okay. And these are -- on this slide there are a series of western blots. Is that right?
A. Yes.
Q. And these are western blots that Dr. Wang conducted?
A. I think so.
Q. Okay. Do you know whether or not any of these western blots that are on this slide were manipulated by Dr. Wang in any way?
A. They were not.
Q. What makes you say that?
A. Because I don't have any reason to believe that they were. As you see, this data was corroborated by another outside lab called -- a researcher called Dineley. It's been corroborated by other labs.
(Exhibit 191 was marked.)
Q. Okay. I'll show you -- I'll mark a document Plaintiffs' Exhibit 191. If you can just keep that slide open as well in Exhibit 190.
And I can represent that Exhibit 191 is a document created by counsel, plaintiffs' counsel, and it is an excerpt of Exhibit 190, Slide 9.
MR. WU: Both sides or is one side of

it the same?
MR. KUMAGAI: Both sides.
MR. WU: Both sides? Okay.
Q. So if you look at the -- this slide, the front with the format picture on the right.
Are you there?
A. Yes.
Q. I can represent that taking the native version of Exhibit 190, if you go into PowerPoint and you format the picture to add a solid fill, this is what appears. The color is blue.
Do you see that?
A. Uh-huh.
Q. Okay. And then the other side is just a blown-up version of Slide 9 with the background color filled, solid fill. Do you see that? Are you with me?
A. This is the blown-up of this?
Q. Yes.
A. Yes.
Q. And this is Slide 9 of Exhibit 190 that has been modified by counsel.
Do you see if -- in the third set of western blots on the left side three boxes?
A. Yes.

Q. How do you explain the different shaped white boxes in the third panel?

MR. CAMPBELL: Object to form.

MR. WU: Objection.

A. What's your point here? So you've manipulated his original blot to find areas that are completely devoid of other, you know, coloration in the background of his blots and made it blue.

So, yes, some of these are white here on the page. I don't know what your point is.

Q. I'm asking about the three different boxes, the three rectangles in the third panel. It appears as though they were copied from different sources or at least are --

A. Well, why would you --

Q. -- different sizes?

MR. CAMPBELL: Objection; form.

MR. WU: Objection.

A. Why do you get that conclusion?

Q. Why isn't it a single band like the rest of the bands?

MR. CAMPBELL: Object to form.

MR. WU: Objection.

A. I don't know what you're talking about. You made this. You made it into three -- three

separate things by inserting, like, blue in this background. Maybe there's -- maybe that's the only part where it seemed to be clearly -- you know, I don't know what your program did or how you got that. It doesn't mean anything to me.

Q. Well, I can represent that all I did -- and your counsel can do this -- and SAVA's counsel can do this -- is open up the native version of Exhibit 190 in PowerPoint, click on the picture and add solid fill to the picture. Okay. That's all that's been done. I can represent that that's all that's been done.

And then it appears as though these three rectangular boxes in this band are from different experiments, doesn't it?

A. Why would you make that conclusion?

MR. CAMPBELL: Object to form.

MR. WU: Objection.

A. You add the solid fill. You added the solid fill and you're saying it's, like, oh, that's from different experiments? How do you reach that conclusion? It's crazy.

Q. That doesn't raise any questions at all in your mind, the fact that the first band is a single box and then the third band is three

different boxes?

MR. WU: Objection; form.

MR. CAMPBELL: Objection to form.

A. Wait a minute. The third band is three different boxes?

Q. The third panel. Excuse me.

A. What -- the third -- what are you even talking about?

Q. This one here, pThr231-tau.

A. Yes. What about it?

Q. Looking at that band, is that what you would call it?

A. Which band?

Q. This band.

A. The first band?

Q. Yeah. No, sorry, the panel.

Does that raise any questions in your mind?

MR. CAMPBELL: Object to form.

A. No. Why would it?

Q. I'm just --

A. I don't know what you're talking about.

Q. -- I'm asking you.

MR. WU: She answered the question. She said no.

MR. KUMAGAI: Okay.
Q. And same question for the -- just to make sure I have the terminology right. Would you call the strip, this is a panel. Right?
A. It's an image of a gel or perhaps two gels spliced together if there are more than eight or however many, you know, lanes in this series because there are only so many lanes that fit on a single gel.
But I don't know what you're talking -- what your point is.
Q. Nothing about the different shaped rectangular white boxes on this slide suggests to you that these images were spliced together from different experiments?
MR. CAMPBELL: Object to form.
A. Back in 2003 people did splice together blots without actually adding an indicator of where they were spliced to make one image, for the simple reason that the gels often didn't have room for more than eight or whatever lanes. So I don't know what your point is.
Q. Just to be clear, in your opinion it wouldn't necessarily be concerning if these were spliced from different experiments?

MR. CAMPBELL: Object to form.
A. From different gels, for the reason that I stated, which is that a single gel doesn't usually have room for 12 lanes. And that was common practice, particularly back then not to even indicate where the two gels that were put together for the single image were joined.
Q. Okay. And so looking at this Exhibit 191, nothing concerns you?
A. No.
Q. Okay. Are you -- strike that.
You are familiar with the defamation lawsuit or defamation action that was filed by Cassava against our clients and a number of other parties. Right?
A. Yes.
Q. How did you become familiar with the defamation action?
A. When it was filed. It was shared with me.
Q. How did you first become aware that the company was contemplating or considering defamation claims?
A. I knew that they had engaged a law firm to consider it.

MR. CAMPBELL: So I'm going to interpose an objection. Just please exclude any communications with counsel either seeking or receiving legal advice from your answer.

MR. KUMAGAI: Can we just go off the record for a few seconds?

THE VIDEOGRAPHER: Going off the record. The time is 1:12.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 1:13.

Q. Okay. Dr. Burns, you said that you knew that the company had engaged a law firm to consider defamation claims. Right?

A. Yes. I'm not sure that I -- I think they were considering various approaches. I --

MR. CAMPBELL: Hold on. If you're talking about the company considering different, various approaches, that's fine. If you're talking about legal considerations or legal advice, please exclude that from your answer.

THE WITNESS: Okay.

A. I didn't know what they were considered. All -- all I knew that they -- that they were engaged to look at the situation.

How about that? Is that okay?
Q. A law firm was --
A. A law firm.
Q. -- engaged?
And how did you come to know that?
A. Probably through Dr. Friedmann.
Q. Okay. And approximately when was -- when was that?
A. I think it was in the spring of 2022.
Q. And we looked at, earlier today, entries from your log or -- or journal where you expressed some frustration about having to sit tight and not understanding why the company was waiting to file defamation claims.
Do you recall looking at that?
A. I didn't -- my log of events did not specifically say that I was waiting for the company to file a defamation action. It was reflecting what my friends were saying to me that I'm sitting here standing taking punches and we're doing nothing to make it stop. We just wanted it to stop. I didn't know how that would happen. There were various ways it could.
And then at some point in the spring, I understood from vague conversations with

Dr. Friedmann that there was a law firm being considered for engagement or whatever.

Q. Before you became aware of the law firm being considered for engagement, you had communications with friends where you discussed potential defamation claims based on the criticism that you had faced. Is that what you meant?

A. Not at all. Not at all. I was discussing what your clients were saying and doing and several of those friends said, wow, that's defamation, period. That's it. There was no discussion of what -- I'm not a lawyer. It's not my -- it's not my wheelhouse. I'm a scientist and I wanted to -- the -- not just criticism, the attacks the baseless -- the lies they invented, you know, vile that was directed specifically at me on -- based on nothing to stop.

Q. And did you at any point view defamation claims as one way to potentially make it stop?

A. It's not in my wheelhouse to -- you know, it was not any kind of -- I don't have the -- the -- it's -- it's not in my skill set to even evaluate or understand what -- how to do that, what -- you know, no. I'm going to push back. No. You're -- you're putting words in my mouth. No.

Q. Were you happy that the company filed the defamation action?

A. I was more relieved that maybe something was going to stop now after putting a -- a -- you know, a line in the sand or however you want to call it. I wasn't happy about any of this situation. It's not -- it's not fun to be attacked for, you know, three years.

Q. What do you mean by you were more relieved that maybe something was going to stop now after putting a line in the sand?

A. Well, basically, your clients were put on notice that, you know, you're potentially engaging in defamation so I would think that if they had a lawyer, their lawyer would say stop going on Twitter 24/7 to spew, like, vitriolic, you know, accusations with no basis in fact.

Q. And so was it your hope at the time the defamation action was filed that people like our clients would stop with the comments that you just described?

MR. WU: Object to form.

A. I wouldn't necessarily link the two. I -- I was trying to do a job. I was trying to do a job. We were trying to enroll clinical trials.

They were doing their best to stop enrollment, to prolong it or to hope that the whole trial stopped, that we'd never get an answer on our drug. I just wanted to get an answer on the drug that I had developed for, you know, 15 years.

Q. What did you -- strike that.

When the defamation action was filed, did you consider any potential benefits of the defamation action?

A. I didn't know how to consider anything. It's not -- it -- I didn't -- you know, I didn't know -- I'm not someone who can evaluate a legal approach. I wasn't involved. I didn't know about it until it was filed. I have no idea. I just thought, okay, somebody's doing something; maybe they'll stop attacking 24/7; maybe I'll be able to actually, you know, enroll patients without them terrified that, you know, they're enrolling in a scam trial, you know.

Imagine that, like, all these patients, like, they didn't -- they, you know -- the -- the one trial site that wanted to sign on that your client emailed said -- you know, to try to discourage them, said, look, I know your science is real, but it -- I'm running a business here; I don't

have time to hand-hold everybody who walks in with the defamatory New York Times article and sit them down and say why I'm not concerned. I'm -- I don't have time for that so I can't do it. And your client made that happen. He should be pleased with himself. I'm sure he was.

But that person forwarded the email to me and there were other examples. They pretended to be fake -- fake patients going into a clinical trial site. That's illegal. That's illegal. That's interfering with clinical trial data and that's a felony.

Q. Who are you talking about when you're referring to the email that you just mentioned?

A. The email that was sent that -- sent to me, Vince Gillen, I think.

Q. Sent you an email -- forwarded to you an email that who had sent him?

A. That Jesse sent him.

Q. Dr. Brodkin?

A. Uh-huh.

Q. And what do you recall about that email?

A. I don't remember. I don't remember. I -- I mean, I had some exchanges with -- with Vince and, you know, he was -- he was honest. Like, he'd

say, look, these guys are -- look what they're doing.

Q. And who was Vince Gilligan (sic)?

A. He's a -- was a trial site coordinator or a director of a site who -- self-described rock star site who said, look, we don't have time to do all this extra hand-holding to say, no, this is a legitimate trial; you should come and enroll because they're trying to, you know, be efficient and -- and -- and enroll -- you know, they had plenty of other trials to deal with who didn't have to deal with this kind of defamation.

Q. And who was -- what site? Where did he work?

A. I don't remember. Somewhere in Pennsylvania. Because obviously we didn't use them.

Q. And what did you mean by defamatory New York Times article?

A. The New York Times hit piece that quoted all the same people, same friends of -- friends of, you know...

Q. Friends of who?

A. Friends of Bredt. It's hard -- it's hard. There were so many I do -- I can't remember what was in which article. It was a well-funded

full-on, you know, PR campaign to discredit the whole science, the drug. And look in the end, the drug actually works.

If they had stopped it, they were calling stop the trials, stop the trials, look what happened when the company actually stopped the second trial. They didn't get that last time point, did they?

Q. When you say there were so many of them, you mean so many hit pieces?

A. Uh-huh.

Q. You have to answer verbally.

A. Hit pieces, yes.

Q. Hit pieces against Cassava, you personally --

A. Everything.

Q. -- Dr. Wang?

A. Uh-huh. Yes.

Q. What other media organizations, in your view, published hit pieces?

A. I don't remember because I try not to, like, you know, engage my brain over it.

Q. The Wall Street Journal was one?

A. Yes.

Q. New York Times was one?

A. Yes.

Q. Was Reuters one?
A. Yes.
Q. Was STAT News one?
A. STAT News attacked even before the petition was filed. I don't remember if they did other stuff.
Q. Was the publication Science another outlet that published hit pieces in your view?
A. Charles Piller for sure.
Q. Any other organizations that you can recall publishing hit pieces in your view?
A. Well, that New Yorker article disguised as a profile of a Jordan Thomas was, you know, really a hit piece on Cassava, all orchestrated by the same PR campaign.
Q. Anyone else?
A. I don't remember.
Q. And how do you explain all of these various separate news organizations or media outlets each independently publishing so-called hit pieces?
MR. CAMPBELL: Object to form.
A. The same people were going to them with the same quotes. David Bredt's close friend, I'm outraged that this is going on. You know, this should never have never been put into patients. His

close friend of him, in his autobiography talks about how -- how -- what a close and fruitful collaboration he's had with David Bredt. He's not an objective source.

Q. Who are you talking about?

A. Roger Nickel.

Q. You're aware that Mr. Barbier referred to him as a brilliant scientist in the company's letter responding to The New York Times article?

A. He has done some good science before, yeah, but he was obviously misguided in his attacking of -- of Simufilam.

Q. Is it your view that Dr. -- Dr. Nickel was out to get you and Cassava?

A. It's my knowledge that David Bredt was reaching out to all of his friends to ask them to support him on his attack of Cassava Sciences.

Q. And in your view, that included Dr. Nickel?

A. Sure. He's a close friend.

Q. Are you aware that Dr. Nickel told The New York Times reporter that, in his view, Cassava was more egregious than Theranos?

A. Yes, he did, and that's defamation.

Q. Did you want to also sue Dr. Nickel?

MR. CAMPBELL: Object to form.
A. I wasn't thinking about legal processes ever here. I'm not a lawyer. Can I make that more clear. I'm a scientist. I want to do my job without having my science being attacked.
Q. So what did you want to happen to Dr. Nickel for, in your view, reaching out to these various --
A. I wanted him to --
Q. -- news -- news outlets?
MR. WU: Objection.
MR. CAMPBELL: Object to form.
A. I wanted him to stop -- to stop, to shut up. Some of the friends of Bredt didn't -- didn't support him. Instead they, you know, went back to the other channel and -- not channels -- told colleagues of Hoau-Yan. Because they knew it was BS. Doesn't want to know --
Q. After the defamation action was filed, what did you want to happen?
MR. CAMPBELL: Objection; form.
MR. WU: Objection.
A. I wanted to do my job in peace.
Q. Did you want the public criticism to stop?

A. I wanted to do my job in peace and get these clinical trials enrolled without having to spend hours and hours hand-holding clinic trial sites who didn't know what to say to their patients. We spent dozens if not hundreds of hours individually Zooming with all these individual clinical trial sites and assuring them and giving them reasons why the science is real and what they can say to patients. There's a lot of time by a lot of company personnel to undo the damage, to mitigate the damage. The damage was done. The trial took a lot longer to enroll than it otherwise would have. That was part of their -- their hope. They hoped that we would never get it enrolled.

Q. Who?

A. The people attacking us. I don't know. You know, and they -- they -- the people who were calling FDA, "stop the trial, stop the trial," they didn't want an answer on this drug. They wanted it to go away quietly.

Q. How much longer in your view did enrollment take?

A. At least a year, a year-plus. And we had originally targeted some earlier date. I forget what date.

Q. And what is your understanding of why enrollment took longer?
A. Because trial sites were slow to sign on, some of them declined, patients were slow to enroll, all of that together, it was time, effort, and money.
Q. To your knowledge, if any, what was the company's purpose for filing the defamation action?
MR. CAMPBELL: Objection.
A. I don't know. I -- I was not involved. I wasn't -- I had no role in the decision processing. And nothing was shared with me. I don't know. Well, you have to ask them.
Q. Who?
A. The legal team who filed it. Why don't you call up Benesch?
Q. Who aside from Benesch would you go to if you wanted to understand why the company filed the defamation action?
A. Benesch would be the one to talk to, perhaps the board. It was a board action. I -- I don't communicate with the board.
Q. Mr. Barbier was on the board. Right?
A. Yeah.
Q. You communicated with him?

A. Not on company matters.

Q. Your testimony is that you've never communicated with Mr. Barbier about company matters?

MR. CAMPBELL: Objection to form.

A. That's not my -- my testimony. Particularly on legal matters, he kept me in the dark intentionally.

Q. So your testimony is you had no involvement in any way in the defamation action?

A. Absolutely. Correct. I had no involvement. I didn't even know for sure it was being filed.

Q. Marked as Exhibit 192 a document marked CASSAVA_000741222.

(Exhibit 192 was marked.)

Q. Exhibit 192 appears to be an email from you, Dr. Burns, dated October 29th 2022 to Kate Watson-Moss at the law firm Benesch. Do you see that?

A. Yes.

Q. And you write: This was PLOS's response to COPE's request for information. Basically the requested process flow is just a list of dates. Lindsay.

Do you see that?

A. Uh-huh.
Q. And why were you sending this email to Benesch?
A. I was told to forward things to them.
MR. CAMPBELL: Hold on. Were you told by counsel to forward things to them?
A. Yeah, I can't discuss this, they basically said -- yeah.
Q. Told by Benesch, by counsel you're referring to Benesch?
A. I'm told I can't respond. It's privileged information.
Q. Okay. But in September of 2022, you were in communication with Benesch, the law firm that filed the defamation action on behalf of Cassava. Right?
A. A one-way flow to anything that might be useful for them.
Q. Useful for what?
MR. CAMPBELL: Objection.
A. I can't say. He just said I can't say.
Q. To your knowledge, did Benesch do any other work for the company aside from the filing of the defamation action?
MR. CAMPBELL: Objection.

A. There were other ways --
MR. CAMPBELL: Hold on.
A. I can't say. I can't say. No, I can't say.
Q. So when you testified a moment ago that you had no involvement in the defamation action in any way, how do you explain this email sending materials to Benesch?
MR. CAMPBELL: Objection.
A. I didn't know what they were going to do with it. And I can't say what they asked me to provide. I was not involved with any -- I didn't have discussions or strategy discussions with them. There was no discussion. It was just anything relevant, send it. Here's the email.
Q. Did you ever -- just "yes" or "no." Did you ever communicate with anyone at Benesch by phone?
A. No.
Q. You did communicate with people at Benesch over email. Right?
A. They -- she didn't reply back. I don't think she -- I don't believe she replied. She received.
Q. You sent materials to Benesch. Right?

A. Uh-huh. I -- I was out of -- outside the loop. I didn't know what they were thinking, doing, considering. I don't know what was happening.

Q. So your testimony is you had no idea why you were asked to send this email to Benesch?

MR. CAMPBELL: Objection; And I just want to make it clear the instruction. You can answer the question of whether or not you sent materials to Benesch. The reasons why you sent materials, if they came, because you were directed by counsel. That is privileged and you can't testify to it.

Q. I think I can just ask whether -- yes or no, whether you know without going into the reason. Okay. Yes or no, do you know why you were sending information to Benesch?

A. They wouldn't have told me that. And I'm not allowed to say instructions, anything.

Q. I'll mark as Exhibit 193 a document Bates-stamped CASSAVA_0007438379?

(Exhibit 193 was marked.)

Q. Okay. Exhibit 193 is another email from you, Dr. Burns, dated September 29th, 2022, to Kate Watson-Moss at the law firm Benesch copying Remi Barbier. Do you see that?

A. Uh-huh.
Q. And you write: Sorry. I just emailed you these attached email threads, but you may also want to see the below email where Matt sends those email strings to Iratxe at -- of COPE with the additional points below suggesting a connection between Bik and Zalm, the editor who did all the retractions. Note also that Renee Hoch, the head ethics editor at PLOS, was an undergrad at Stanford in microbiome biology during the 14-year-long post-doc of Bik in microbiome biology. They surely know each other. Finally, Hoch also did a post-doc at UCSF when Bredt was on faculty there.
Do you see that?
A. Yeah.
Q. And you sent this email to Benesch on September 29th 2022. Right?
A. I did.
Q. And do you know why you sent this email to Benesch?
A. They called --
MR. WU: Hold on. Hold on.
MR. CAMPBELL: You can answer "yes" or "no."
A. No, I really don't without -- I -- I

don't know why. And I can't reveal instructions.
Q. I'm trying to understand if there's actual substance that is being covered by privilege. So do you know why you sent this, yes or no?
A. No, I don't.
Q. You have no recollection as to why you may have sent that?
A. It was explained to me.
MR. CAMPBELL: Hold on. Just your answer, no is fine.
A. My answer is no.
Q. Just -- sorry. Just if you go down the chain, there's an email from Matthew Mac -- Nachtrab on April 2nd 2022. Do you see that?
A. Yes.
Q. Why was Mr. Nachtrab involved in these communications involving PLOS One and COPE?
MR. CAMPBELL: Object to form.
A. Both Matt Nachtrab and Gabriel Olander also appealed to COPE and they decided to respond -- COPE decided to respond together to all three of us.
Q. And what is your relationship with Mr. Nachtrab?
A. I know that he was a supporter of the science and he has an interest in Alzheimer's

disease and therapeutics.
Q. And he was an -- an investor in the company. Right?
A. He was.
Q. And what is your -- how do you know Mr. Olander?
A. I -- I don't really. I understand him to be another supporter which is why he appealed to COPE.
Q. Okay. And you were working with Mr. Nachtrab and Mr. Olander to try and convince COPE to overturn the PLOS One retractions? Is that what was going on?
A. We weren't working together. They were -- there were separate appeals to COPE of these retractions. Five simultaneous retractions. It surely sends a red flag to a lot of supporters.
Q. And so your testimony is that you weren't coordinating with Mr. Nachtrab or Mr. Olander?
A. I was not coordinating.
Q. I mark as Exhibit 194 a document Bates-stamped CASSAVA_000735595.
(Exhibit 194 was marked.)
Q. Okay. And this is an email from you, Dr. Burns, dated September 30th, 2022, to Kate

Watson-Moss, copying Mr. Barbier. Do you see that?
A. I see. Can I please read it?
Q. I'm just asking you that first. And the subject is "J Pain inquiry." Right?
A. Yes.
Q. Okay. You write: Hi, Kate. J Pain assembled a committee to assess allegations of manipulation in a 2008 paper, and our response is including a letter from Spruck. They still had questions or concerns. And so following COPE guidelines, escalated to the institutions, U of Arizona and CUNY. U of Arizona responded that their people did not do the western blots and also noted a federal regulation.
And it continues. And --
A. Citing statute of limitations --
Q. Okay. And then --
A. -- to these inquiries.
Q. Okay. And then you refer to some attachments in the last sentence. Right?
A. Yes.
Q. You sent Benesch a letter from Dr. Spruck, it looks like -- well, strike that.
You sent Benesch a letter from J Pain to the institutions, the University of Arizona response

letter, and a flowchart of COPE guidelines that the J Pain editor sent. Right?
A. Yes.
Q. And why did you send those materials to Benesch in September of 2022?
MR. CAMPBELL: Objection to the extent that the answer would reveal communications with counsel. Please exclude that from your answer.
A. I've answered this type of question already, that I was sending things and I can't disclose any instructions from counsel.
(Exhibit 195 was marked.)
Q. I'll mark as Exhibit 195 a document Bates-stamped CASSAVA_001022488. There you go.
Okay. Do you recognize Exhibit 195, Dr. Burns?
A. No, I don't.
Q. It appears to be an email that you sent to yourself on October 18th, 2022. Do you see that?
A. Yes.
Q. And the attachment here is what appears to be -- well, what is the attachment?
A. This appears to be a tweet by your client that I was saving by emailing to myself so I could pass it, keep a record.

Q. Why were you emailing it to yourself?
A. I guess to keep a record. I don't know. It was, you know, five years ago, three years ago.
Q. What do you mean you were emailing it to yourself so you could pass it?
A. I'm guessing to pass it to Benesch, as I apparently was doing with other things.
Q. Did you help Benesch identify and collect potentially defamatory statements?
MR. CAMPBELL: Objection. If you can answer that somehow without revealing your communications with counsel, I guess you can answer, but please exclude those from your response.
A. No, I did not help them identify what was defamatory or not defamatory. I was just sending things to them.
Q. You sent Benesch statements by our clients. Is that right?
A. I don't know. I don't remember, honestly. It was a one-way -- I don't remember.
Q. Okay. I'll mark as Exhibit 196 a document Bates-stamped CASSAVA_000735672.
(Exhibit 196 was marked.)
Q. Okay. And this appears to be an email from you to Zhe Pei and copying Dr. Wang and copying

Kate Watson-Moss at Benesch. Do you see that?
A. I see.
Q. And it appears to be dated October 31st, 2022, which is a few days before the defamation action was filed. Do you see that?
A. I see the date.
Q. Okay. If you go down to the bottom email of the chain, which begins at the bottom of the first page, you write -- how do you pronounce her name, Zhe Pei?
A. Zhe (pronouncing).
Q. Zhe Pei. Okay. You write: Hi, Zhe. Could you get the PDFs of these papers to us by tomorrow morning. Sorry there are no authors listed. Please reply all so Kate gets them ASAP.
And then you list five bullets of papers. Do you see that?
A. Uh-huh.
Q. You say: Thanks so much, Lindsay.
Do you see that?
A. I see it.
Q. Why were you asking Zhe Pei for these papers?
MR. CAMPBELL: Same objection, same instruction.

A. I have actually no recollection of this email. I didn't -- I didn't -- I have no idea. Obviously I sent this, I don't remember it. They were -- I don't know.

Q. Okay. But you asked Zhe Pei in Dr. Wang's lab for these papers. It appears as though she sent them to you in the next email.

Right?

A. Uh-huh.

Q. And then you said: Thanks so much. Happy Halloween.

A. Uh-huh.

Q. And why -- strike that.

Were you helping Benesch collect papers to cite in the defamation action?

MR. CAMPBELL: Same objection, same instruction.

A. I didn't get specific instructions like that. I don't remember. But -- and I can't reveal any instruction that I may have had that I don't even remember. So that's your answer.

Q. Do you remember whether or not you received instructions to collect papers?

A. I was just told I can't answer any instructions from --

MR. CAMPBELL: You can answer "yes" or "no" whether you recall there being instructions. That's it, though. Just "yes" or "no."
A. I --
MR. WU: Let's be specific. Instructions about what? Can you reread your question?
Q. Do you remember whether or not you received instructions to collect research papers?
A. I honestly don't remember.
Q. Do you remember whether or not you had any communications by phone with Benesch, yes or no?
A. I remember that I did not.
Q. How do you know?
A. I remember one Zoom call and I didn't talk to them. I didn't talk to them by phone.
Q. Okay. So you do remember being on a Zoom call with Benesch. Is that right?
A. One time, very preliminary, you know. I don't remember what they said. If anything, it would have been very high level. And even if I could remember it, I couldn't tell you.
MR. CAMPBELL: Yeah, don't go into the details of any communications from counsel.
Q. I just want to ask the question so the

record is clear.
What do you recall discussing on that Zoom with Benesch?
A. You don't need to point at me like that. I don't remember any substance on the one Zoom call I had. And I'm also instructed not to discuss any communications with counsel.
You now know that I had one call with them ever. Otherwise it's a one-way street of emails, and that's it.
Q. Did you review a draft of the complaint before it was filed in November of 2022?
A. I did not.
Q. Do you know who, if anyone at the company, reviewed drafts of the complaint prior to it being filed in November of 2022?
A. I do not know.
Q. There's a discussion in the complaint about common knowledge within the scientific community. I can represent to that.
A. Okay.
Q. Did you have any input on that section?
A. No, I did not.
Q. You did send research articles to Benesch. Right?

A. Apparently I was asked.
MR. CAMPBELL: Hold on. Don't get into your communications with counsel.
A. I don't know. I don't remember. I -- you know, I didn't come up with that list of five. Somebody who -- you know, if they're counsel -- I don't remember.
Q. Do you know who came up with that list of five?
A. I don't. It wasn't me.
Q. Why were you the one going out to collect?
MR. CAMPBELL: Objection. To the extent it reflects communications with counsel, please exclude that from your answer.
A. I don't know, and I don't remember.
Q. Well, which --
A. I don't remember even sending these, asking Zhe for five publications or whether, you know -- any instructions from counsel inside or outside I obviously can't say, and I don't even remember them happening. So that's the answer to your question. You can stop.
Q. Have you ever reviewed the complaint or any complaint that was filed in the defamation

action?

A. I read through parts of the defamation complaint after it was filed. I did not read the whole thing.

Q. In what context did you review parts of the complaint?

A. I didn't review. I read it after it was filed. But I didn't even read the whole thing.

Q. It was long?

A. Pardon?

Q. It was long?

A. Of course.

Q. What do you remember?

A. You had -- your clients had thousands of defamatory statements.

Q. What, if anything, do you recall from reading part of the complaint?

A. I looked at it once. I moved on. I didn't read the whole thing. I had a job to do. That was their department, not mine.

Q. And why did you look at the complaint?

A. Because it was emailed.

Q. By whom?

A. I don't remember.

Q. Do you know whether Dr. Friedmann

assisted in preparing the complaint?
A. I don't know.
Q. Do you know whether Dr. Wang provided any assistance in preparing the complaint?
A. I'm pretty sure he did not, but if they were communicating him -- with him separately, they might have. I don't think he did.
Q. Okay. After the complaint was filed, do you recall sending the complaint or telling any third parties about the complaint?
A. I do have a -- I have a vague memory of mentioning that the company had filed a defamation case in discussions with clinical trial sites, so they could know that it was serious enough that the company actually decided to file a defamation case. But I don't have other memories.
Q. Do you recall sharing the fact of the defamation action with anyone at NIH?
A. I probably shared it with my contact there -- shared the fact that it was filed with my contact, or contacts, there.
Q. Why?
A. Because they put a grant on hold that was about to be issued based on the allegations, based on no evidence. Just based on allegations, they

just -- they put a hold on it.

Q. And so why send the defamation complaint to them?

A. Because they -- so that they could understand that the company or the company lawyers believed it was serious enough to actually take this action to keep them in the loop because, you know, they held up a large grant on the basis of allegations only. That was more damage to the company.

Q. Do you recall sending the defamation complaint or telling any other third parties about the defamation action?

A. Again, I may have mentioned its existence. I don't remember specifically. It's no reason to, you know, pretend it didn't exist. I don't know what your point is here.

Q. I'm just asking.

MR. WU: When you -- when you get to a good changing point, let's take a break.

MR. KUMAGAI: Okay.

Q. Did you send the defamation complaint or tell -- strike that.

Did you inform Dr. Sahakian and Dr. Robbins about the defamation lawsuit?

A. I may have. I don't remember.
Q. And why would you potentially have told them about the defamation action?
A. Because they were concerned about all these attacks. Barbara was being attacked herself. They wanted -- they wanted their phones and emails to stop, too.
Q. Do you recall informing contacts at Alzforum about the defamation action?
A. I don't specifically recall. It doesn't mean I didn't.
Q. And do you have any sense as to why you would be informing contacts at Alzforum about the defamation action?
A. Alzforum is a -- an online news forum around Alzheimer's disease research who was trying to follow this whole allegation against the company and I -- if I sent it to them, I would have thought it was pertinent information for them in their reporting.
Q. Okay.
A. I don't remember.
MR. KUMAGAI: Okay. Let's take a break.
THE VIDEOGRAPHER: Going off the

record. The time is 1:57.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 2:08.

Q. Back on the record, Dr. Burns. I believe you had testified earlier that you have reviewed some of the letters or slide decks that our clients published online. Is that fair?

A. I wouldn't say that. I -- I may have glanced at some of them. But, no, I tried to stay away from the garbage that they were posting online.

Q. Have you ever been to the website that they created, Cassavafraud.com?

A. No. Why would I go there?

Q. I'm just asking.

A. The answer is no.

Q. Okay. I'll show you a document previously marked as Exhibit 132. And I'll show you a number. We'll go in order. Another document previously marked as 133. You can just set that aside and we'll go -- take that in turn. Another document previously marked as Exhibit 134.

A. Can we do one at a time, please?

Q. Yeah. If you -- it's just to -- put them aside. I'll ask you about them one at a time.

And a document previously marked as 135.
Okay. Let's start with Exhibit 132.
Does Exhibit 132 look familiar, Dr. Burns?
A. I've never seen it before.
Q. If you turn to the last page, you see it's signed "Sincerely, Enea Milioris, Adrian Heilbut, Jesse Brodkin, and Patrick Markey."
Do you see that?
A. I'm not there yet. Hang on.
Yes.
Q. Okay. So I can represent that this is a -- a letter that was included in -- in the defamation action as a document containing allegedly defamatory statements and it was a letter that was sent to the FDA.
A. By your clients.
Q. I believe so.
Okay. If you turn to Page 13, the title is "Selective Analysis of Cognitive Outcomes."
Do you see that?
A. Uh-huh. Yes.
Q. And it says: "Post-hoc analysis of cognitive testing." And the first paragraph refers to what appears to be the Phase 2B study. Right? Or is that what it looks at?

A. I don't know.
Q. Were you responsible --
A. You tell me.
Q. Were you responsible for that cognitive data reported from the Phase 2B study?
A. Dr. Friedmann and I together with a couple other people.
Q. Did the data handling and reporting of cognitive data violate the study protocol and statistical analysis plan for the Phase 2B study?
MR. CAMPBELL: Object to form.
A. The -- any sensitivity analyses by definition are not defined in the statistical analysis plan. So if that's what you're driving at.
Q. I'm just asking whether in your view the data handling and reporting of cognitive data was in any way a violation of the study protocol or a statistical analysis plan.
MR. CAMPBELL: Object to form.
A. No.
Q. Is it true that the sensitivity analysis applied to the cognitive data from the Phase 2B study resulted in the post-hoc elimination of 40 percent of subjects?
A. That's not actually true because actually

there was an error in the statistical analysis plan in not specifically calling out the exclusion of patients who didn't take the drug or who were noncompliant with taking the drug, either by lack of a -- of detectable drug in their plasma or by pill counts and bottles that were returned, you know, with -- full of pills that they should have ingested.

So that's why we do those two things and I was disturbed to see that the SAP did not specifically call that out.

Q. And so is it your testimony that -- well, strike that.

You performed the sensitivity analysis on the cognitive data from the Phase 2B study. Right?

A. On one of the two tests, not both.

Q. Which one?

A. The paired associates learning test. The spatial working memory test had no sensitivity analysis other than removing the patients who didn't take the drug.

Q. And who was responsible for the statistical analysis plan for that component of the cognitive data?

MR. CAMPBELL: Object to form.

A. Dr. Friedmann and Dr. Marsman.

Q. And you believe they made a mistake by omitting the exclusion criteria that you referenced a moment ago?

A. By not -- by not excluding any noncompliant patients from the full analysis set, yes.

Q. And so was it -- strike that.

Before you analyzed any of the data, the cognitive data, was it always your plan to apply the exclusion criteria that you ultimately applied?

A. Can you be more specific in your question? I don't know what you're -- what you mean.

Q. Okay. We'll come back to it.

So just to be clear, you don't believe you've ever seen this document, Exhibit 132, before today?

A. Correct.

Q. Do you recall any discussions with anyone about a letter to the FDA by our clients, Drs. Heilbut, Brodkin, and Milioris?

A. I don't.

Q. Okay. You can set that aside.

Do you have Exhibit 133 in front of you?

Okay. Exhibit 133 is another slide -- is a slide deck. The title is, "Cassava Sciences, A Shambolic Charade," with the date November 3rd, 2021. And Dr. Milioris, Dr. Heilbut, Dr. Brodkin, and Patrick Markey are listed on the first slide.
Do you see that?
A. I'm not looking.
Yes.
Q. To the best of your recollection, have you ever seen this slide deck before?
A. I think I saw the first page and I don't believe I looked at the full slide deck.
Q. And in approximately what context do you believe you saw the first page?
A. They posted it online. I don't know. I don't remember.
Q. Do you recall what your reaction was to seeing it?
A. To not read it.
Q. Why?
A. Because it's -- it's -- they're the shambolic charade.
Q. What do you mean by that?
A. They're -- we've been through this again and again. You know, the science is real. They

said it wasn't real. They said it was all made up. It can't be all made up and the drug actually works.

I wasn't reading this. I had confidence in the full body of -- of scientific data and cognitive data and that, you know, we were developing a worthwhile drug that deserved testing to -- to find out whether it -- it actually helps patients.

Q. Okay. And on Slide 2, it states: The authors of this presentation and the associated letter to FDA holds stock and options positions that may benefit from a decline in Cassava Science's stock price.

Do you see that?

A. Yeah, they're short-sellers.

Q. Okay. Do you recall having any discussions with anyone at any time about this slide deck, Exhibit 133?

A. No, because I didn't read it.

Q. Can you turn to Exhibit 134, please?

The title on the first slide, it says: SavaDx exposed a revolutionary diagnostic for Alzheimer's disease or a scam of scientifically illiterate investors.

Do you see that?

A. I see it.
Q. Have you ever seen this slide deck before?
A. I don't think so. I mean, they were screaming into the wind. I was not listening or reading.
Q. Do you recall any discussions about any slide deck about SavaDx by our clients?
A. Do I recall any discussions amongst themselves? What do you mean?
Q. That was a bad question. Strike that.
Do you recall any discussions about this slide deck, Exhibit 134?
A. Discussions that I had?
Q. Yes.
A. No, I didn't have any discussions about it.
Q. Okay. If you look at Exhibit 135, the first slide has the title "Cassava and the long lab seeing through the blind."
Do you see that?
A. Yes.
Q. Have you ever seen this slide deck before?
A. I remember the title. I -- again, I'm

quite sure I didn't look at it in detail, if I looked at it at all.

Q. And in what context did you see the cover page or the title?

A. Again, they were screaming as loudly they -- as they could from rooftops that, you know, I've come across it at some point. Somebody may have mentioned it to me or shown it to me. I don't remember.

Q. Do you recall what your reaction was to it?

A. Again, not to read it.

Q. And do you recall having any discussions with anyone about this slide deck, Exhibit 135?

A. I did not.

Q. Was Dr. Wang blinded as to the time point of samples when he conducted the analysis for the six month open-label study?

A. His post-hoc blinded him prior to his testing. Obviously the lab had tubes that were labeled with the patient ID and the time point. So the lab itself wasn't blind but when you try to do a blinded experiment, you need someone to help you if you're the one doing the experiment so that you can do it blind. That's kind of standard practice in --

in labs if they want to do that.
Q. And how do you know Dr. Wang himself wasn't unblinded at the time point?
A. Because they told me that's how we -- they did it. Because Zhe sent me the blinding codes. It would have been difficult for him.
Q. Anything else?
A. No.
Q. Do you recall any discussions with anyone at any time about any of the statements our clients made on Twitter or social media?
A. Discussions with anybody? Again, I just tried not to look at it.
Q. But do you recall any particular discussions with anyone about any of the tweets that our clients made?
A. I don't recall any discussions. I recall seeing some of it. Mostly because people would send it to me.
Q. Like who?
A. I don't know.
Q. Can you think of anyone in particular who may have sent you tweets by our clients?
A. No, don't know. Random people.
Q. Investors in Cassava?

A. Probably random supporters. I don't know. At some point, I said don't send me, the lawyers watch it. I don't want to see. Stop.

Q. Did Mr. Nachtrab ever send you any tweets by our clients?

A. I'm trying to remember. Probably not.

Q. What makes you say that?

A. I think he tried to stay above the fray too.

Q. Do you recall seeing a Tweet by Mr. Nachtrab accusing our clients and other short-sellers of committing genocide?

A. I do not.

Q. Would you consider a Tweet like that to be Mr. Nachtrab staying out of the fray?

MR. CAMPBELL: Object to form.

A. Look, I was not watching all this stuff. Okay.

MR. WU: Come on. Jesus Christ.

Q. After -- strike that.

Did you ever consider whether our clients genuinely believed that what they were saying was true?

A. Why would I consider that? It was so flagrantly false. And they were going through such

effort to try to, you know, convince people and distort -- and they're -- they're short-sellers. Like, how are you -- they're conflicted. They're massively conflicted. They are going to make a lot of money if they kill this stock. So why would I take them seriously. Some of it was so outlandish, it was obviously not -- not true.

Q. To anyone who reviewed it?

A. On -- on its face, yeah.

Q. Do you believe that any statements by our clients caused any harm to you personally?

A. The whole campaign was highly traumatizing to me and my family and to my work. I couldn't -- there's work that I wanted to do that I couldn't do that was on hold. Grants that I couldn't get. Papers that I couldn't write. Papers that I couldn't get accepted. Yeah, they -- they absolutely caused harm to me and my career at the time personally.

Q. Do you attribute your departure from Cassava to our clients or other short-sellers in any way?

A. It's all related, yeah.

Q. What do you mean by that?

A. I don't know what I mean by that. The

SEC and the DOJ were promised Theranos. We weren't Theranos. They spent three years trying to find something. They -- FDA right away said there's nothing. Go away. Let them do this trial. And SEC and DOJ just had to find something for their time. And so, you know, they invented something. I'm not going to, you know, that was instigated by this cabal at the beginning. They -- they wanted to find something. If you watch somebody for long enough, you find some little transgression, some -- some -- I don't know, hope to find something that's a good judgment call that they could call, you know, incorrect with hindsight. Or I don't know, they were looking hard.

Q. Approximately when did you become aware of an SEC investigation into you or the company?

A. Shortly after the -- it was clear that the petitioner's ran to three different government agencies at the same time. Because I believe the company had requests for information by -- I don't remember. I -- I don't know. Somehow we knew that SEC and DOJ were asking for information. And the company hired an outside law firm to do a thorough investigation and hand-hold their requests for information. As you have to do. You can't just

open your doors and say come on in, go look. It doesn't work that way. You have to hire a law firm. And that's what the company did.

Q. So approximately around the time of the citizen's petition is when you became aware of the SEC and DOJ asking questions?

A. Approximately, yeah. Like right away at the same time. Obviously happened in a coordinated effort, three -- three agencies at once.

Q. And when you learned about that, were you worried about personal liability or exposure?

A. I didn't know what the hell they were talking about. I mean, it was crazy.

Q. So were you worried?

A. I was stunned. I wasn't worried. You know, what do you mean was I worried? Please ex- -- elaborate what you mean was I worried?

Q. Were you concerned that you would be or were a target of the DOJ or SEC?

A. It was unclear. I -- no, I didn't do anything wrong.

Q. The SEC did eventually charge you with negligence. Right?

A. I settled on negligence because I -- that was the lowest thing they would accept in a

settlement.

Q. And approximately when did you become aware that you were potentially facing liability?

A. I don't -- -- I don't remember. Maybe in the spring of 2024. It wasn't liability, it was like they were inventing things related to me.

Q. Who? The SEC?

A. Yes.

Q. Were you aware -- strike that. Are you aware that the court in the defamation action issued decisions dismissing in part with prejudice and dismissing other claims without prejudice?

A. I was not aware. I recall an amendment. I don't -- it was -- all the details weren't shared with me.

Q. And what do you recall about the amendment?

A. That it existed. I don't know what it was. I don't know. I -- I was trying to do a job and that was not my job.

Q. And how did you become aware of the amendment?

A. I don't remember. I -- you know -- Okay. I can't speak about discussions with counsel so...

Q. Were you made aware through discussions

with counsel, just yes or no?
THE WITNESS: Can I answer that?
MR. CAMPBELL: You can answer "yes" or "no."
A. Yes.
Q. Was that before or after the amendment was filed?
A. I don't remember.
Q. And just to be clear, by amendment, I understand you to be referring to the amended complaint that was filed. Is that right?
A. That was my understanding.
Q. Did you have any involvement in preparing the amended complaint?
A. Not at all.
Q. Did you forward any further information to Benesch or Mr. Cook prior to the filing of the amended complaint?
MR. CAMPBELL: Objection to form.
A. I don't think I can discuss any communications with inside or outside counsel. But I was not communicating with outside counsel -- counsel at that point -- that point at all. Period.
Q. Were you communicating with Mr. Cook at that point, just "yes" or "no"?

A. Somewhat.
Q. About the defamation action?
A. Not really. But I was --
MR. CAMPBELL: Hold on. Just "not really" is enough.
A. That would be, no. But I was working with him.
Q. On what generally, not specifics?
A. I don't -- I don't remember.
Q. It's a little confusing to me what you meant by "not really" in relate -- in response to my question about whether your communications with Mr. Cook were about the defamation action. Can you explain what you meant?
MR. CAMPBELL: My instruction would be if you can answer that question without revealing the substance of your communications with counsel, that's fine. But if you have to reveal the substance, do not answer the question.
A. Okay. Any communications that I had with him, may have been related. But he wasn't telling me why or what. He was asking me questions. I didn't know what he was doing. And I -- as I told you before, I was vaguely aware that there was an amendment at some point.

Q. What was your view as to our client's motives about making statements about you, Cassava, Dr. Wang, Simufilam?

A. Their motives were making money because they're short-sellers and they're also malicious people.

Q. What makes you say they were malicious people?

A. Who sits on Twitter saying vile, nasty, vicious things 24/7 and can still feel like a, you know, a decent person. I don't know anybody who can do that.

Q. In your view, they should have done that privately in a journal or a logbook?

MR. CAMPBELL: Object to form.

Q. Is that right?

A. I didn't -- I didn't have any opinions about that. Okay?

Q. What do you mean?

A. I didn't have any opinions of whether your clients should have been keeping a journal. But they could have stopped, like, saying untrue, vile things about people and a drug that actually should -- may benefit patients. Just to kill it so they can make money.

Q. Did you ever consider whether any of your own financial interests were affecting any of your considerations of our clients' statements?

A. No.

Q. Did you ever consider whether any of your own financial interests were impacting any scientific work that you conducted on Simufilam?

A. How would it?

Q. I'm just asking you whether you considered it.

A. No.

Q. Have you ever considered Dr. Wang's financial motives in any context?

A. What financial motives?

Q. I'm just asking if you've ever considered them?

A. He had no financial motives in this context.

Q. But did you ever consider whether or not he did at any point in time?

A. No.

(Exhibit 197 was marked.)

Q. I'll mark as Exhibit 197 a document Bates-stamped CASSAVA_000217631.

Okay. My first question for you,

Dr. Burns, is whether that is your cell phone number, 512-574-4238?
A. It is.
Q. And so this is a -- well, what is this 197, Exhibit 197?
A. Can I read it?
Q. Yes.
A. (Pause.)
Q. Okay, Dr. Burns. Do you recognize Exhibit 197?
A. I do.
Q. And what is it?
A. It's a text exchange with Hoau-Yan, where he tells me that they bought, with a mortgage, a small house in Delaware away from their Philadelphia small house. And he's conveying that it's scary to sign a mortgage at this age, after I congratulated him. And at that point -- okay.
Q. And then what?
A. And then what? So I told him that -- because I was recently aware also of this cash incentive bonus plan or however it was called. I called it a bonus plan. And that -- to let him know that he was included, and nothing -- you know, all of it depends on the success of the drug.

I just wanted him to know that, you know, we hadn't forgotten about him.

Q. Why?

A. He -- he could have sort of -- you know, he was -- he -- with my help and, you know, discovered this target, he wouldn't have been able to identify this drug target for Alzheimer's disease without the help of our drugs.

But at the same time it would -- you know, he wasn't peeling away and trying to chase it down on CUNY's time and CUNY's dime, partly because he couldn't, but, you know, he was -- he was not compensated by the company for any kind of inventions, he -- and eventually the patents were assigned to Cassava. And it's just my way of saying, you know, we're not forgetting about you. When this drug is approved, you know, we're not going to ignore you.

Q. What do you mean "we're not going to ignore you"?

A. The company was not going to say, oh, yeah, this guy who contributed is not going to get any share somehow of the benefit of any drug approval.

Q. The financial benefit?

A. Right.
Q. And it was sent on August 7th, 2021, or this -- these exchanges?
A. Apparently.
Q. What was the purpose of Cassava's scientific advisory board?
A. Scientific advice.
Q. What advice or feedback do you recall receiving from any member of the SAB?
A. That's a really vague question. Could you please be more specific?
Q. Did you ever consult any member of Cassava's scientific advisory board about any of the allegations by our clients or other short-sellers?
A. I did not consult them about the allegations, no.
Q. What, if anything, do you recall about any feedback you received from anyone on the scientific advisory board about the Phase 2A study?
A. I spoke to Steve Arnold about it. He was excited, but he wanted to -- he wanted ideally to confirm in his lab, partly because he wanted to be involved.
Q. And what is your understanding of why Dr. Arnold wanted to confirm?

A. He wanted to be involved. He's the biomarker guy. He was excited. He wanted to look.
Q. And did that end up happening?
A. It didn't.
Q. Why not?
A. The board said no, and also there wasn't enough CSF left for anything confirmatory anyway.
Q. From the Phase 2A study?
A. Correct.
THE STENOGRAPHER: From the what study?
MR. KUMAGAI: Phase 2A.
Q. Okay. I'll show you a document previously marked as Exhibit 139.
Okay. The top email is from Professor Barbara J. Sahakian to you, Dr. Burns, and it's dated July 5th, 2019. Do you see that?
A. Yes.
Q. And it's cc'g TW Robbins, who is Dr. Robbins. Is that right?
A. Yes.
Q. And Dr. Sahakian and Dr. Robbins were members of the scientific advisory board.
Is that right?
A. At that point.

Q. Okay. I just want to ask you about the email at the bottom of the first page on July 5th from you to Dr. Robbins and Dr. Sahakian.
Do you see that? It says: Dear Trevor and Barbara.
A. Yes. Can I read it, please?
Q. I'm just going to ask you about this first, the second sentence.
MR. WU: But you can read it.
A. I'm sorry. I need to read the whole thing.
MR. WU: You can read it.
Q. Well, we don't really have time. So I'll -- the record can say that I didn't let you read the whole thing.
So I'm going to ask you a question and then if you feel the need to read more for additional context, that's fine, but we don't have time -- I've got limited time with you. We don't have time for you to sit there and read the whole thing.
MR. WU: For the record, this was a six-line email comprised of two sentences that the examiner is not letting the witness read.
MR. KUMAGAI: There's the next -- the

email continues on the next page and there's two more paragraphs.

Q. So I just want to draw your attention to the sentence that says: When we showed the data to Paul Aisen, he thought they were encouraging and exciting, but he flat out did not believe the P-values were possible with 12 patients. We were all at first incredulous. I too don't imagine the statistics will change, but we need to say that a third-party analyzed them.

Do you see that?

A. Yes.

Q. Okay. So Dr. Aisen reviewed the Phase 2A data and told you that he flat out did not believe the P-values were possible with 12 patients.

Is that right?

A. He used softer language. I was exaggerating there.

Q. Why were you exaggerating it?

A. To make a point.

Q. What point?

A. That -- I don't know. I don't know.

Q. Okay. What did you mean by: We were all at first incredulous?

A. We couldn't believe there was such great

effects. And I think once you see the data in this predefined mild subgroup, you see there's a strong difference at four weeks that corroborates the four-week biomarker effect that we saw in the Phase 2A study and Phase 2B.

Q. And what did you mean by: We need to say that a third-party analyzed them?

A. Because I was -- I think if you let me read the thing, I think I was asking her for recommendations on a statistician.

Q. Okay. And did you -- do you recall ever getting a statistician to review the Phase 2A data?

A. I think we did. I don't remember who. And it's pretty straightforward a paired T test is a paired T test, small number of data points. It's exactly the same.

Q. Okay. Dr. Sahakian responds to your email that I just read and says: I do think having someone independent from Dr. Wang run the same analyses is so important.

Do you see that?

A. Yes.

Q. And did Cassava ever have someone independent from Dr. Wang run the same analyses?

MR. CAMPBELL: Object to form.

A. I believe we had somebody else do the statistical analyses, yes.
Q. And who was that?
A. I don't remember. It was a long time ago.
Q. But was that what you understood Dr. Sahakian to be saying, have someone independent run the statistical analysis?
A. Sahakian. I don't know exactly what she meant there. It was a long time ago.
Q. And what is your understanding for why Dr. Sahakian believed it was important to have someone from outside the company?
MR. CAMPBELL: Object to form.
A. Ideally, when you're trying to establish a new scientific finding, that is especially if it's surprising, you do it in one lab, you do it in another lab. If you can change a technique and say every which way we looked at it, we get the same answer, that's -- provides the strongest dataset to, you know, confirm the finding.
(Exhibit 198 was marked.)
Q. I'll mark as Exhibit 198 a document Bates-stamped CASSAVA_000059830.
A. Right.

Q. Okay. The top email in this chain is from Chuck Davis. It's dated August 5th, 2019, addressed to you, Dr. Burns, copying Dr. Wang.
Do you see that?
A. Yes.
Q. Okay. And I just want to start at the bottom of the chain, the first email on the last page from you. It's dated August 1st, 2019. The header is on the second-to-last page.
Do you see that?
A. Yes.
Q. And, first of all, who is Chuck?
A. He's an independent statistician.
Q. Okay. And in that paragraph, in the third line from the bottom, there's a sentence that says: The data are frankly unbelievable. So we need as many stamps on them to verify them as we can, including an independent analysis of the data.
Do you see that?
A. I see it.
Q. And you were describing the Phase 2A data as frankly unbelievable. Is that right?
A. Yes.
Q. Okay. What were the results from Mr. Davis, if any, to the extent he conducted a

statistical analysis?
A. Well, he's a Ph.D. so it's Dr. Davis. And they were the same.
Q. In what respect?
A. The same statistical effect.
Q. And he reran the statistics. Is that right?
A. Yes, he did.
Q. Did he rerun any analysis?
A. He's a statistician.
Q. Is that a "no"?
A. No.
MR. CAMPBELL: Do you have the attachment to this, David?
MR. KUMAGAI: It was, but I don't have it.
Q. Did you ever avoid conducting any tests that might have -- strike that.
Did you ever avoid conducting any tests to validate Dr. Wang's results out of fear that Cassava would then have to disclose divergent results?
MR. CAMPBELL: Object to form.
A. I remember that the board said -- I mean, it was sort of moot because we didn't have enough

CSF for all patients to repeat in Steve Arnold's lab. But the board's concern was if you do it again and the numbers are not exactly the same, the, you know, that can be a problem just because you've already disclosed one number, what if it's like slightly higher, slightly lower. Like, I didn't see any problem with that, but they said no upside; don't do it.

It turns out we didn't have enough CSF to do it anyway. So I said to Steve Arnold, Let's put you on for the next study, the blinded placebo-controlled trial.

Q. Did you ever worry about the possibility that an independent lab might provide results that undermined or contradicted Dr. Wang's results from any of his studies?

A. Why would I? No.

Q. I'm just asking you.

A. The answer is no.

(Exhibit 199 was marked.)

Q. I marked as Exhibit 199 a document Bates-stamped CASSAVA_000059303.

Okay. This appears to be an email from you, Dr. Burns, to Dr. Wang dated July 13th, 2020.

Do you see that?

A. Yes.
Q. Okay. And in the top email, you write to Dr. Wang: It looks okay to me. I can't send you the sheet because it shows min and max for each group. The placebo looks a bit more variable than for the others.
Do you see that?
A. I do. I don't know what I'm talking about.
Q. What is your understanding, if any, of why you wouldn't be able to share with Dr. Wang a sheet that showed min and max for each group?
A. Can you double-check the -- I don't know what he's talking about. Change appears comparable. I don't know what I'm talking about here in this instance.
Q. You don't know what you meant by "I can't send you the sheet because it shows min and max for each group"?
A. I can speculate, but I'm told not to speculate.
Q. Isn't it true that if you share min and max values for a group -- for each group, that could potentially unblind Dr. Wang as to some amount of data?

MR. CAMPBELL: Object to form.
A. If this were the statistics for -- I -- I -- I -- I don't know what is being talked about here. I -- I honestly don't. But statistics sheets often show a minimum and maximum value in addition to a mean. So I don't know exactly what I'm talking about here.
Q. If you send a statistics sheet to a lab that is meant to be blinded with min and max values, that could potentially unblind the lab. Right?
MR. CAMPBELL: Object to form.
A. It could potentially unblind them only if they produced those min and max values themselves.
Q. Or if they had records showing the min and max values. Right?
A. No, that doesn't make sense, no. Only if the min and max values are data points that they produced.
Q. Why?
A. Because then they could -- they would know -- they could go back -- it requires a little work, but it would only unblind them if they produced those min and max values.
Q. I see.
And you write to Dr. Wang here that you

can't send the sheet because of the sheet showing min and max values for each group.

So is it fair to say you were concerned that Dr. Wang had produced those values and so sending it to him could potentially unblind him?

MR. CAMPBELL: Object to form.

A. I don't know. Perhaps.

Q. Can you think of any other reason why you wouldn't send him the sheet with min and max -- max values?

A. No, I can't right here, right now.

Q. You can't think of any reason other than the risk that doing so would potentially unblind him?

A. Not here right now.

Q. Okay. So the first round of biomarker analysis was done by Dr. Oscar Hanson and his team at Lund University in Sweden. Is that right?

A. Dr. Hanson was not in the lab. It was done by some technician or two who had replaced somebody else who was out sick with COVID. This was during the pandemic when the rest of the world was shut down and Oscar was not in the lab. His lab manager was barely overseeing the person whose hands were on the samples who I don't even know who that

was.
Hopefully, that answers your question.
Q. My -- my question was really just he was the one who did the round one analysis, his lab. Right?
A. People in his lab.
Q. Okay.
A. He didn't.
Q. Okay. And why was Lund initially selected to conduct the round one analysis, to your knowledge?
A. So back then, there were very few choices for -- of people -- of labs doing any biomarker work at all. Of course, now, the field has exploded. There are more options.
But I -- he had approached me sometime earlier to ask about SavaDx. I said how do you even know about SavaDx, and he said, well, people talk. But he had a large bank of samples that he was anxious to test in any kind of biomarker test.
He reached out to me. And I said, well, it's not ready yet, let's stay in touch. Then, you know, there weren't -- there was one other name given to me as a possibility for another lab -- first, we tried to use -- what's your question. I'm

just talking.

Q. I think -- I think you've covered it enough. So the data that Lund delivered for the biomarkers that it analyzed for the Phase 2B data, the company concluded was invalid or indeterminate.

Is that right?

A. The -- the changes from baseline were wild, all over the place. And forget about -- you don't know what your drug is going to do. Maybe your drug can cause crazy stuff to happen. But you know that in a placebo, in a slow deteriorating disease there's not going to be a dramatic change in one month.

So when we saw these massive changes in the placebo group in one month we knew that's not reality. That's either sample handling, assay variability. Something is not reliable here.

And beyond that we also saw massive and -- massive changes over one month in one direction on one biomarker and in the other -- opposite direction on another biomarker in the same patient.

So if the patient is getting better, you would see it generally across the biomarkers. You wouldn't say, wow, this one says they're getting a

ton better and the other -- if you look at the other biomarker they're getting massively worse in one month.

And everybody that I showed this data to said assay variability. That's just -- you can't -- if you can't trust your placebo group, the data is no use, no good.

THE STENOGRAPHER: I need to ask for a break.

MR. KUMAGAI: Let's take a break.

THE VIDEOGRAPHER: Going off the record. The time is 2:58.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time is 3:08.

Q. I'll show you a document that was previously marked 140. Exhibit 140 is an email from Dr. Arnold to you, Dr. Burns, on May 16th, 2020.

Do you see that?

A. Yeah.

Q. Okay. And I just want to draw your attention to his paragraph, "Questions and thoughts."

Do you see that?

A. Uh-huh.

Q. The second-to-last line begins: Hoau's data are always surprising. For TNF and IL1B, I would expect greater biotemporal variability over time than any of the others. I don't know how he does it."

Do you see that?

A. Yeah, I see that.

Q. What did you understand Dr. Arnold to mean by "Hoau's data are always surprising"?

A. They're very tight. If you look at the CVs that he has up there, you know, p-tau, which was, according to Oscar Hanson later, supposedly a very stable biomarker, has .38. I guess that's a CV. I'm not sure. But the two biomarkers that Hoau-Yan did were very tight at .02 and .03. He has great experience, great hands. He's been in a lab for decades. The people that -- people or person in Oscar's lab were, you know, student of the month replacing whoever was sick.

And also, we now they don't -- we now know they don't calibrate their parapets more than once a year and that was a month away from when they did this. Hoau-Yan tests his every week.

Q. All right. But is that what you interpreted Dr. Arnold to be -- to mean when he

said, "Hoau's data are always surprising. I don't know how he does it"?

A. Yeah, they're very tight, very careful.

Q. You thought -- you thought Dr. Arnold was being sort of complimentary?

A. He's just always impressed. Look, Dr. Arnold collaborated with Hoau-Yan for 15 years so if he had any worries about him, he would not have been continuing to collaborate him for -- with him for that long.

Q. Did --

A. If you're trying to read into this line in a negative way, you shouldn't be.

Q. Did you ever ask Dr. Arnold whether he had ever had any concerns about Dr. Wang's research?

A. It's hard to recall. I don't -- I don't think I explicitly asked him, but he never communicated anything to make me believe that he had any -- obviously, the fact that he's continued to collaborate with him spoke for itself. He didn't have major concerns.

Q. And do you see the next paragraph, Dr. Arnold writes: It's easy to Monday morning quarterback and I should have thought of this before

but studywise, 28 days is too short to detect any change in a number of these analytes because of the protein half lives.

Do you see that?

A. I see that.

Q. So Dr. Arnold told you that he believed studywise 28 days is too short. Right?

A. He thought about it after the fact but not before the fact. That was perfectly fine before the fact and I didn't find any literature to support what he's saying here. Of course, I looked, but I wanted to know, okay, really? And there was nothing that popped up to support his suggestion of these half lives.

Q. And did you convey that back to Dr. Arnold?

A. I don't remember.

Q. But after he told you that, you went and did some research on your own to see if his statement had a basis in the research. Is that right?

A. If it was backed up by research. And, you know, I think -- I think he was sort of speculating. I'm not going to call him out on saying where do you get this idea. You know,

it's...
Q. Is Dr. Arnold an expert in Alzheimer's disease in your view?
A. He's an Alzheimer's researcher and he's a good scientist. He's a clinician.
Q. You wouldn't call him an expert in Alzheimer's?
A. Sure he is.
Q. Okay. All right. I'll show a document previously marked as Exhibit 23. Okay. And this appears to be --
MR. WU: Wait a minute.
MR. KUMAGAI: Oh, sorry.
Q. This appears to be an email from Dr. Aisen. Did I say that right?
A. Yes.
Q. To you, Dr. Burns, dated May 20th 2020. Do you see that?
A. Yes.
Q. Was Dr. Aisen on the scientific advisory board ever --
A. No --
Q. -- as far as you know?
A. -- never.
Q. So in what capacity or -- strike that.

Why were you communicating with him or consulting him around this time about the Phase 2B data?

A. Because he is an Alzheimer's disease KOL and I wanted his input and he'd been helpful in offering advice at other times.

Q. Okay. Dr. Aisen writes in the top email: Hi, Lindsay, there is no measurable disease progression over 28 days.

Do you see that?

A. Yes.

Q. And what did you understand Dr. Aisen to mean when he told you that?

A. I had just shown him data that showed in placebo massive changes, as I just mentioned earlier, over 28 days. And so he agrees, it doesn't -- it's not going to happen. This data is not believable.

Q. He says: So any change in the placebo arm must be attributed to issues around acquisition and processing of specimens and assay variability.

Do you see that?

A. Yeah.

Q. And is that consistent with what you just said?

A. Yes.
Q. Dr. Aisen -- Aisen in the next paragraph told you that Oscar Hanson's team is excellent. And they utilize all leading assay platforms.
Do you see that?
A. I see that.
Q. And then Dr. Aisen told you: Substantial inter-subject variability is the rule but change in placebo over 28 days is artifactual. Unfortunately 20 subjects per arm may be too small for reliable results.
Do you see that?
A. I see it.
Q. And what did you understand Dr. Aisen to mean with -- in that sentence -- in that paragraph? Excuse me.
A. Well, he's a clinician. He's not really a scientist. But he -- certainly cognitive data is very variable between subjects. So that's when he says that you're going to see lots of variability between subjects, you just have to know that in this field. But then he says "but change in placebo over 28 days is artifactual." Meaning, it's not real change in these patients. It's coming from something else that's an artifact. Do you know what

an -- understand what an artifact is?
Q. Can you explain it?
A. It's some -- something else that's not what you're trying to measure. It's an artifact of the experiment. Like you -- I don't know, if you dropped your coffee in it or God knows what?
Q. And when you say -- so the first sentence, did you really interpret that to be a reference to cognitive data after you had sent him biomarker data and the subject is biomarker data?
A. He's just, he -- you know, again, biomarker data particularly to measure clinical trial -- changes in clinical trials was very new. So what he knows, he's speaking very generally about trials in alzheimer's disease which is typically measuring cognition. So he's just saying in general you have to expect variability. But then he said no way are you going to see changes in the disease process in 28 days. It's just not real. So then he says to sort of end his email, well, maybe you need more than 20 subjects.
Q. And what did you make of that?
A. I don't know. He was just trying to give advice.
Q. Okay. When our clients and other critics

raised concerns about the Phase 2 studies, did you ever think back about any of the feedback you had received from any members of the scientific advisory board?

MR. CAMPBELL: Object to form.

A. Yeah, they said the data are not reliable. They corroborated our suspicion of the data based on wild changes. They said not going to happen over 28 days in placebo patients.

Q. And so your interpretation of what the SAB board members told you was that the Lund data was invalid, they agreed with you in your opinion?

A. Paul, Steve, Steve Arnold, and Jeff Cummings.

Q. Did Dr. Hanson or anyone at Lund ever concede that there were issues with their analysis?

A. I was in pretty constant communication with the lab manager. Oscar was quiet the whole time and not involved. But everything that could go wrong did. The machine broke down, one strip of a -- of a plate didn't work. And they said, oh, okay you're stuck with singlet value -- values. Oh, don't worry about it. Another biomarker had values that were below the limit of quantitation. Which per the manufacturer instructions, means not

reliable. There were some other things, I'm trying to remember them.

Q. But did Lund or Dr. Hanson concede that the data that they provided wasn't valid?

MR. CAMPBELL: Object to form.

A. They were confused. They didn't really want to talk too much. But Oscar said I agree the data are highly variable. I don't know, was there maybe a mix-up in samples. Of course I first wondered that too, but if you were mixing up samples, you wouldn't get changes in opposite directions in the same patient. You'd have like a severe patient paired with a second sample that happened to be from a mild patient. And you'd say, wow, that patient is getting lots better over the time. And -- but it would be seen across the biomarkers. We didn't see that. So it clearly showed it wasn't a mix-up of samples. It was messy data from the assays.

Q. To the best of your knowledge, why was Dr. Wang's lab asked to conduct the redo analysis of the Phase 2B samples?

A. It wasn't a redo analysis. It was a analysis of remaining CSF. We, again, at that time, didn't have a lot of choices. One lab had not

responded to me. We seriously considered Quanterix. Which was kind of our only other option at that point. But we were nervous about the Quanterix platform because they only use their own platform. And the selling point of that platform is not accuracy, it's we can measure the existence of a biomarker in a very small volume. So we were nervous. And we -- we needed to measure accurate changes from baseline that might not get us there.

Q. Around May of 2020, you unblinded yourself as to the Phase 2B CSF data. Right?

A. I didn't unblind myself, but the regulatory person and the CMO decided that we needed to get the unblinding code so we could do -- could investigate all possibilities of error.

Q. And in May of 2020, you shared information with Dr. Wang that could have allowed him to unblind himself as to some number of patients in the Phase 2B study. Right?

MR. CAMPBELL: Object to form.

A. I learned that later. I don't remember sending the file. It was all part of a good-faith effort to try to understand what went wrong and how we got in anomalous data from the Oscar Hanson lab that's supposed to be so great.

Q. Setting intent aside for a moment, do you agree that you did in May of 2020 send Dr. Wang information that he could have used to potentially unblind himself as to some number of subjects. Right?
MR. CAMPBELL: Object to form.
A. I learned that later, yes.
(Exhibits 200 and 201 were marked.)
Q. Okay. I'll mark as Tab 200 document Bates-stamped CASSAVA_000922566.
And I'll mark as Exhibit 201 an attachment to that email, the Bates stamp is CASSAVA_000922657.
And when you testified, Dr. Burns, that you learned that later --
MR. KUMAGAI: Sorry. Can I have that back? One of them back.
Q. When you testified, Dr. Burns, that you learned about that later. How did you learn that?
A. I can't discuss privileged conversations.
Q. Did you learn it from your own counsel?
THE WITNESS: Am I allowed to answer that?
Q. Just "yes" or "no."
MR. CAMPBELL: You can answer "yes"

or "no."

A. Yes.

Q. And was that during the time -- approximately when was that?

A. I don't really remember.

Q. While you were still at Cassava?

A. Yes.

Q. Was it in the context of one of your SEC depositions?

A. I don't think so.

Q. Can you put any approximate time frame around when you discovered that?

A. Spring of 2024.

Q. Okay. Is this exhibit the -- sorry. Exhibit 201 the attachment that contains information sufficient to unblind Dr. Wang as to some number of patients in the Phase 2B study?

MR. CAMPBELL: Object to form.

A. I'm not sure. It might be. I can't tell you for sure.

Q. Why not?

A. I don't know what was attached to this. I can't tell from this. You want me to sit here and swear that this is for sure what was attached to this email? I don't know.

Q. I can represent to you that our understanding, at least based on the way this was produced, is that Exhibit 201 is the document that was attached to Exhibit 200. Is Exhibit 201 the document that contains information sufficient to unblind Dr. Wang as to some number of patients in the Phase 2B study?

MR. CAMPBELL: Object to form.

A. I believe so.

Q. What makes you say that?

A. Because it has two biomarkers that he ran included in this statistics file that was really the statistics of the failed Lund analysis, which is the reason I would have sent it to him.

Q. And it's the min-max values in particular for the two biomarkers that Dr. Wang analyzed in round one. Is that right?

MR. CAMPBELL: Object to form.

A. What's your question?

Q. Is it the min and max values that contain the information sufficient to unblind Dr. Wang --

MR. CAMPBELL: Object to form.

Q. -- as to some number of patients?

MR. CAMPBELL: Same objection.

A. Those could be used.

Q. What else?
A. The median could be used. But nobody was talking about the median. And, again, he would have to do work to do this.
Q. At the time, whether you -- strike that.
Setting aside whether you intended to unblind Dr. Wang, you understood, as a scientist, that sending him min and max values and mean values -- median values for biomarkers that he had previously analyzed could unblind him.
Is that right?
MR. CAMPBELL: Object to form.
A. I did not realize that at the time that we were trying to troubleshoot what the heck went on in Oscar's lab. It didn't cross my mind.
Q. But you did generally have an understanding that sending the min and max -- a document with min and max values would potentially unblind him if he had done an analysis previously?
A. It didn't cross my mind at that time.
MR. CAMPBELL: Hold on. Object to form.
Q. I'm not asking you whether it crossed your mind in connection with sending this email. Okay?

A. Uh-huh.
Q. I'm asking you generally as a scientist if you understood that sending him that type of information could have unblinded him?
MR. WU: Object to form.
MR. CAMPBELL: Object to form.
A. The answer is no.
Q. Well, we looked at an email earlier today when you acknowledged that I can't send you this, Dr. Wang, because it contains min and max values.
A. That came later. This is about the first time I've seen a statistical file like this. I was not in the practice of doing clinical trials with these tables, listings, and figures that I now understand the format of.
This is the first time I saw that. Later, as I thought about it in this other email, I realized, oh, those are actual values in there. I can't send them to him. I had not even remembered that I sent this thing.
Q. But you -- that earlier email that we looked at was from July of 2020. Right?
A. Yeah. This is May.
Q. This was a few months later?
A. Yes. So it had time to sit and digest

this type of file, which I'd never seen before because it was our first blinded study.

Q. And so sometime between May and July you realized that sharing a document with min and max values with Dr. Wang would unblind him?

A. Only for the data that he produced. Remember, the focus here was on Oscar's data. I barely remembered that even his were in there.

And by the way, his actually did show statistical effect between baseline of one of the doses and one of the two biomarkers. And there is no way he was partially unblinded at that point.

And those are the two biomarkers that nobody expected to do anything. Yet they did. And Oscar's was a total mess.

Q. So between May and July 2020 when you realized in your mind that sharing min and max values would unblind Dr. Wang --

A. Could.

Q. -- could unblind Dr. Wang --

A. For some. Yes.

Q. When you discovered -- when you realized that, did you do anything to go back and see if you had inadvertently sent documents to Dr. Wang with that information?

MR. CAMPBELL: Object to form.
A. No, I didn't because I didn't even remember sending this, because it's kind of a useless file that shows nothing. There's no statistical effect of anything.
And I -- the only thing I do remember is Paul Aisen asking for it. And I remember thinking why the heck does he want to see this file that shows no statistical effects? If he asks for it, I'll send it. And evidently I also sent it to Oscar and Hoau-Yan at the same time, which I did not even remember.
Q. So to be clear, you never intended to unblind Dr. Wang as to any samples?
A. No, I didn't. And this was not unblinding him. He had another step of work to do to partially unblind himself.
Q. Why was Dr. Wang asked to conduct analysis for two of the biomarkers in the first round?
A. Because Oscar wasn't interested in testing them.
(Exhibits 202 and 203 were marked.)
Q. I marked as Exhibit 202 a document Bates-stamped CASSAVA_001444106. I'll mark as

Exhibit 203 a document Bates-stamped CASSAVA_001444107, which based on the way it was produced, I understand to be the attachment to Exhibit 202.

A. Yeah.

Q. Okay. So looking at Exhibit 202, is an email from you, Dr. Burns, on May 14th, 2020, to Dr. Wang, with the subject "Groups." In the attachments field it says "groups for Hoau."

Do you see that?

A. I see that.

Q. Okay. And so what is Exhibit 203?

A. What is it?

Q. Yeah.

A. It's the individual data of all of Oscar's biomarkers, stripped of their patient IDs, so that Hoau-Yan could look at the variability in individual patients and between biomarkers, specifically without unblinding himself. And that's why I named the file for Hoau, so I wouldn't accidentally send him a file that had patient IDs divided into groups.

Q. Why were you sending this to Dr. Wang at the time?

A. To help -- we were all trying to

understand is this variability real, can it happen. You know, our three advisors said no way. You know, I wasn't going to just go throw up my hands and -- you know, I wanted to really investigate does this -- can this happen, did he think it's crazy.

And the only way to keep him blinded is to strip out the patient ID numbers and also strip out the values that he produced for the two biomarkers that he ran. And I specifically carefully named it so I wouldn't accidentally attach the wrong file.

Q. And so you understood at this time that Dr. Wang was conducting the redo analysis or whatever you want to call it of the Phase 2B data?

MR. CAMPBELL: Object to form.

A. No. It was not decided, but I was still trying to keep him blind.

Q. When was it decided?

A. I don't remember exactly. Sometime later in June -- probably late June. I don't remember.

Q. Who made that decision?

A. It was a decision between Dr. Freedman, myself, Ben Thornton.

Q. Anyone else?

A. I don't think so. I don't know.

Q. What does the highlighting represent in this Exhibit 203?
A. I think it's left over from a file that I had that, you know, as the biomarkers were coming in from Sweden, you know, the first one came and some of them had, like, massive improvements, and some of them were -- had massive worsening. And then some of them were kind of in the middle.
And so I, you know, was sort of trying to guess what might be placebo, you know, high dose/low dose, and I made a file called "Maybe Groups."
And then he'd send the next biomarker and I'd say the same thing, except guess what? They didn't line up. They weren't the same patients.
So by the end I was -- I didn't know what the heck I had. I couldn't even say which patients I wanted to be in my drug group versus placebos. It was kind of a mess. And I thought, well, maybe there are going to be a couple of biomarkers that are more important and more informative. But I think this highlighting was left over from that file.
Q. So it was highlighting that you had applied to earlier files?
A. Yes.

Q. Okay. You can set that aside.
Do you believe that Dr. Wang did, in fact, conduct the analysis blind?
A. Yes, I do.
Q. Have you -- are you familiar with the SEC charges against Dr. Wang?
A. Yes, I am, generally.
Q. And so --
MR. WU: I'm sorry. Did you say SEC?
MR. KUMAGAI: I mean the SEC, yeah.
Q. So are you familiar with the SEC's allegation that for every biomarker that Dr. Wang tested in round two, generally all patients showed improvements in biomarkers except for those patients who Dr. Wang had identified through his unblinding process as having taken the placebo?
MR. CAMPBELL: Object to form.
A. I think it's my understanding that there were errors in their conclusion there, and that it didn't line up perfectly.
Q. What errors?
A. I don't know. I didn't look at it closely. It was not shown to me.
Q. Where did you get to the understanding that there were errors in that conclusion?

A. I can't reveal privileged conversations.
Q. So it was from counsel. Is that right?
A. Yes.
Q. Before Dr. Wang conducted the analysis for round two of the Phase 2B data, did anyone ever express nervousness or discomfort about having Dr. Wang do it?
A. We were nervous more about going to unknown labs, like Oscar's, who had everything wrong happen. We considered this Quanterix company, thinking a company might be a little more rigorous than an academic shop, but then we were nervous about the Quanterix machine.
We didn't have a lot of other options. MGH was impossible to work with. We tried to use them instead of Oscar until we couldn't, and then went to Oscar. So we didn't have a lot of options.
And besides, we knew he was careful, he had good hands. And we were running out of CSF. We had one shot.
Q. Have you ever heard the term "magic hands"?
A. If you're going to show me an email, show it to me.
Q. Have you ever heard that term before?

A. No.
Q. You don't know -- you're not familiar with what the term "magic hands" means in the scientific context?
A. There's no -- it's not a term that's generally used, no.
(Exhibit 204 was marked.)
Q. I'll mark a document as plain -- as Exhibit 204, Bates-stamped CASSAVA_000382849.
Okay. This appears to be an email from you, Dr. Burns, to Dr. Thornton, dated July 12th, 2020, with the subject: Expecting CSF albumin data today.
Do you see that?
A. Yes.
Q. Okay. In the second paragraph, you write: I spoke to Steve Arnold on Thursday.
And it continues: But he gave me the same nervousness or discomfort about Hoau's magic hands while also acknowledging that things weren't great in Lund. He says that others would like additional data from somewhere else. Hoau thinks we'll get confusing data and Remi tends to agree. But I'd like to pick something that wouldn't undermine our CSF data either way.

Do you see that?
A. I do.
Q. So Dr. Arnold conveyed to you nervousness and discomfort with Dr. Wang's, quote, magic hands, unquote. Is that right?
A. I don't -- I think that was my word. He didn't use the words "magic hands." I, again, am exaggerating to make a point.
You know, Steve didn't stay in the lab, you know, day in and day out for decades. He sees patients. He's barely in the lab. He oversees. He has students rotating in and out and he always loves collaborating with Hoau because he is in the lab and has great hands, but then he says, well, my students don't produce the best -- as -- as tight of data as Hoau's.
So I don't know. I was sort of reading between lines here.
Q. So your testimony is that you remember from five years ago whether or not Dr. Arnold used the specific term "magic hands" or not?
MR. CAMPBELL: Object to form.
A. He didn't use those words. I can tell you that right now. I used those words.
Q. You interpreted what Dr. Arnold said to

you as nervousness or discomfort with Dr. Wang's magic hands. Right?

MR. CAMPBELL: Object to form.

A. Not exactly. But, I mean, obviously anybody would want the same data repeated in a second lab. Steve wanted that to be his lab, but his institution was impossible to work with. And I was interpreting his -- his words. He didn't use those words "magic hands." I did.

Q. You told Dr. Thornton that Dr. Arnold gave you -- conveyed to you nervousness or discomfort about Dr. Wang's magic hands. Right?

MR. CAMPBELL: Object to form.

A. I don't remember exactly how he said it. Hoau's data are always very tight. You know, it would be good if you could get another lab, you know, with more standard messiness, you know, ideally his lab. I was reading between the lines. He did not use those words.

Q. But you did tell Dr. Thornton that Dr. Arnold had nervousness about Hoau's magic hands. Correct?

A. He's very -- you know when people talk about hands in the lab, do you know what that means?

Q. Let's move on.

What did you mean by "I'd like to pick something that wouldn't undermine our CSF data either way"?

A. We're talking about plasma now. Plasma's removed from the brain. Certain KOLs back before there were any plasma assays said I don't even want to talk about your SavaDx assay because it's impossible to tell anything in the brain from plasma. Good-bye.

So we knew we were, like, one step away already. CSF is, you know, more solid if you can get it. Plasma obviously is easier than a spinal tap. So we like -- we wanted to have some supportive data and I think the end of this email says, you know, the Quanterix plasma p-tau assay is coming, but it's not ready yet and then, you know, I'm not sure I want to be the guinea pig on that assay, either, which I eventually did do, as you probably know, when that assay was ready and it did show a statistically significant effect in plasma from the same trial.

Q. You're referring to the Quanterix analysis?

A. Yes.

Q. Okay. Did you ever consider Dr. Arnold's

nervousness or discomfort in connection with considering any statements by our clients or other critics of the company?

A. No. As I said, Steve continued to work with Hoau for years and years. He wasn't that uncomfortable with his hands. He just wished his students would have as good hands as Hoau.

Q. Okay. Let's talk about the cognitive data from the Phase 2B study which you were responsible for. Is that right?

A. Not me alone.

Q. You and who else, again?

A. Dr. Friedmann.

Q. Who was primarily responsible between you and Dr. Friedmann?

A. I reported to Dr. Friedmann. Dr. Friedmann.

Q. Who conducted most of the work on that project?

A. Cambridge Cognition, a company.

Q. I'm going to show you a document Plaintiffs' Exhibit 205, Bates-stamped CASSAVA_001443564.

(Exhibit 205 was marked.)

Q. Do you recognize this document?

A. I don't.
Q. Do you recall being shown this document during one of your depositions at the SEC's offices in Washington?
A. I don't recall.
Q. Did you conduct an ad hoc removal of outliers from the cognitive dataset from the Phase 2B study?
MR. CAMPBELL: Object to form.
A. The word is post-hoc not ad hoc. And there were patients who had no data, one -- one patient that had data that the rater said don't use this data so that's considered missing, and there were five patients who didn't take the drug. So those were removed because we were trying to understand what our drug actually does. Of course, the ones who didn't have data weren't actually removed, but SEC accused me of removing missing data.
The actual post-hoc for this test, which was not done on the other test -- we had two tests. This test had an issue with its baseline being unstable according to one of the developers of the test who I reached out to to understand this data. And, yes, I did a sensitivity analysis -- a post-hoc

sensitivity analysis with cutoffs that were applied to all groups equally to see what I could see.

Q. And as far as you know, is this an accurate representation of what the data looked like before the post-hoc exclusions and after the post-hoc exclusions?

MR. CAMPBELL: Object to form.

A. I -- I understand that the graph on the left is the data that's -- has removed the patients who didn't take the drug and applied the -- the sensitivity analyses baseline cutoffs, yes.

I can't speak to the graph on the right.

Q. And you reviewed the data before deciding the exclusion criteria that you ultimately applied. Right?

A. It's post-hoc, so yes.

Q. You drafted a manuscript about the Phase 2B study results. Right?

A. Yes.

Q. It was never published. Right?

A. No.

Q. Approximately how many journals did you submit it for publication?

A. I sent it to maybe one -- like a nature journal who said, sorry, we're nature for -- I can't

remember -- was it -- I can't remember what it was. And then I sent it to Nature Communications who reviewed it. And then one reviewer had a request for some crazy control experiment so I pulled it and I sent it to -- what's it called -- TRCI who sat on it for three months and didn't send it -- didn't do anything with it. And when I reached out to them to say, hey, can you make sure that these three people are not on your reviewer list, they said, oh, we're about to send it for review. I said, are you kidding me; give it back to me. I sent it back to Nature Communications. We eventually had five reviewers on it because people loved it except for one reviewer was, like, sorry, no way.

Q. So all of the journals that you submitted it to either declined to publish it or you took back the proposal. Is that what you mean?

A. Well, it's not uncommon for, you know, a very top-tier journal to say please send it to a lower journal, when I think the lower journal was Nature Communications as opposed to -- I can't remember what the first one was. And it went through review rounds. And then I sent it back after we did this so we control the experiment that really had no basis for being asked. And they got a

total of five reviewers and then they just couldn't get over the -- the -- the leap with all these allegations by your clients. So I just stopped.

Q. So in your view, our clients are the reason you could never get the Phase 2B manuscript published?

MR. CAMPBELL: Object to form.

A. Yeah.

Q. Okay.

A. Basically said as much. We can't. It's too controversial right now.

Q. Do you recall writing, I really just want it published after receiving a long list of rejections with similar comments boiling down to too good to be true?

A. I don't recall that, no.

Q. Is that a fair summary of what the comments rejecting the manuscript boiled down to?

A. I was exaggerating.

Q. Did you ever consider your inability to publish the Phase 2B data in evaluating whether Dr. Wang's Phase 2B data was reliable?

A. Could you state the question again? I don't understand what you mean.

Q. Okay. Did you ever consider your

inability to publish the Phase 2B manuscript in connection with any evaluation of whether Dr. Wang's Phase 2B analysis was reliable?

A. Well, no one has seen the -- the latest version. Unfortunately, one of these early journals published a pre, you know, in-review version which I did not ask for. I -- their -- their question was misleading. I thought they meant I could share it once it was accepted and here it is out, you know, in an early version, unfinalized version and the world is seeing it and commenting on it. I asked them to take it down. They said, oh, sorry.

But there's a later improved version that showed the correlations in changes from baseline in Hoau's lab and the ridiculous lack of correlations in change from baseline between biomarkers in Oscar's lab, which a reviewer asked for. It also showed the control experiment that this recalcitrant reviewer asked for which was please do a control experiment to show that I think your drug -- that your biomarker effects are artifactual because your drug that's in the CSF with the patients is artificially interfering with the biotin in the assays. They claimed that the drug looked like biotin --

Q. Okay. Dr. Burns --
A. -- which it doesn't.
Can I continue?
Q. No, because it's not really responsive and I --
MR. WU: Wait a second. Are you almost finished with your answer?
THE WITNESS: I'm almost finished.
MR. WU: Okay. Just let her finish.
A. I'm just almost finished.
So we did the experiment. We took ten placebo patients. I had to tell Zhe which ten to get so now I've unblinded her for ten of these placebo patients. She lined up the samples for Dr. Wang to spike in drug or no drug or, you know, vehicle and to measure in one assay that did use biotin because not all of them did. Whether the drug in the -- in the CSF altered the signal in that assay. And it didn't. But it also showed that I could take -- compare those results and I told her pick whichever one has the most volume, baseline or day 28. I don't care which one. So this was a mix of day zero, day 28 of ten random placebo patients. And I could take those and look at the values that he produced 14 months earlier to see how tight they

are. So if he was changing data as people alleged, they wouldn't have matched. They were within 5 or 10 percent. So that was another experiment that showed me he did not cheat.

Q. Did you ever consider your inability to publish the Phase 2B manuscript in connection with assessing whether anything our clients had said was true?

A. Your clients didn't say anything that was true, to my knowledge.

Q. Nothing?

A. I don't think so. Again, I wasn't paying attention.

Q. Right.

MR. KUMAGAI: I'm switching topics. I don't know how long that we've been going for? Do you want to take a five-minute break?

MR. WU: Five-minute break?

THE WITNESS: Sure.

THE VIDEOGRAPHER: Going off the record. The time is 3:55.

(Break.)

THE VIDEOGRAPHER: Back on the record. The time 4:05.

(Exhibit 206 was marked.)

Q. Okay. Dr. Burns, I'll mark as Exhibit 206 a document Bates-stamped CASSAVA_000835817.
Okay. This appears to be a document submitted by Cassava to the FDA in response to a request from the FDA. Do you see that?
A. I --
Q. At the top?
A. Yes, I see.
Q. Have you ever seen this before?
A. I don't think so.
Q. Okay. What was Quanterix's role in connection with the Phase 2B study, if any?
A. We sent them plasma samples to analyze from the Phase 2B study.
Q. And why --
A. In their --
Q. Oh, I'm sorry.
A. In their p-tau 181 assay.
Q. Okay. Why did Cassava send that data to Quanterix to analyze?
A. We sent samples not data to them.
Q. Sorry. And why was Quanterix asked to conduct that work for the company?
A. Because we asked them to analyze these

samples in their newly released p-tau 181 assay because that was an important plasma biomarker. And we thought their assay was validated enough. We didn't have other choices. We sent this plasma.

Q. But if Dr. Wang had already conducted the analysis, what was the point of asking Quanterix to come in and conduct an analysis?

MR. CAMPBELL: Objection; form.

A. No, that's not correct. The -- we sent plasma to Quanterix. They never did any data analysis. They analyzed samples. They stayed blind as they should because they're handling samples.

Q. I'm just trying to understand why Quanterix -- or Cassava did that at all?

A. Why we sent plasma?

Q. Why hire Quanterix to conduct this work?

A. Because we had plasma and we sure as heck weren't going to let Oscar Hanson analyze it.

Q. And what were the results of Quanterix's analysis?

A. There was a significant treatment effect versus placebo in both drug arm -- dose groups.

Q. 15-milligram and 100?

A. Yes.

Q. And who analyzed the data that Quanterix

sent?
A. I don't remember if it was Axiom or Chuck Davis. I obviously -- I possibly looked at it myself in Excel. But I -- I'm -- it was Axiom or Chuck Davis.
Q. What role, if any, did you have in connection with the Quanterix analysis?
A. The samples? What do you mean? I -- I -- I engaged them as a vendor with Dr. Friedmann's agreement.
Q. Were you the point person at Cassava interacting with Quanterix?
A. Yes. And I had interacted with Quanterix earlier about considering testing the remaining CSF samples.
Q. Okay. If you look at the narrative on the first page. It says: Initially Cassava scientist sent plasma samples from approximately half of the study's subjects in the Phase 2B study to Quanterix.
Do you see that?
A. Yes.
Q. Why did Cassava only send half of these study subject samples initially?
A. I think -- I'm trying to remember. I'm

not sure exactly. But I think -- I don't know if it was because Oscar still had our plasma. And we had some plasma at CUNY. I don't remember. Or maybe it was just to see whether the assay looked like it was, you know, performing.

Q. Okay. If you look at that paragraph in the next page, at the top of the next page. It says: Data received from Quanterix for the first half of samples were encouraging enough that Cassava Sciences sent Quanterix the second half of the samples. Do you see that?

A. Yes, I am remembering.

Q. So does that refresh your recollection as to the reason the samples were sent in two-halves?

MR. CAMPBELL: Object to form.

A. No, I don't remember exactly why. I have a vague recollection that they were sent in two shipments.

Q. What is your understanding of the term "encouraging enough" in that sentence?

MR. CAMPBELL: Object to form.

A. It was a really small sample set. But it look like there were some differences.

Q. What does that mean?

A. Well, if you have groups of 20 and you

send 10, 10 is a really tiny sample set. We just wanted -- wanted to see how their -- it was brand-new assay. We wanted to see how it was performing, I believe.

Q. Were you waiting to see if the results from Quanterix for the first half were close enough to Dr. Wang's results to -- before sending the second half?

MR. CAMPBELL: Object to form.

A. Dr. Wang didn't analyze plasma. We just wanted to see whether the -- this assay might show anything interesting in the plasma or not. And obviously costs money too. If it was going to be a highly variable assay and you've already sent all your samples in one place. I was also considering Olink and some other vendors. So it was kind of a test run.

Q. So your testimony is that you weren't trying to -- strike that.

Was -- were you trying to find results from Quanterix that aligned with Dr. Wang's search results?

MR. CAMPBELL: Object to form.

A. I was trying to see how their assay performed in terms of CVs. Whether it was going to

be reasonable to pay for them to look at our samples and whether they could actually show us accurate enough data that we could see anything between the two time points or whether they were just going to say yeah, your patients have plasma p-tau 181 in here.

Q. So the results from the first half -- strike that.

Does "encouraging enough" in the sentence mean showing drug effect?

MR. WU: Objection.

A. Who wrote this document? You would have to ask the author of the document. I didn't write it.

Q. Do you recall sending emails to the NIH or texts to Dr. Wang where you say something to the effect of we're not going to send the second half of samples unless they are close enough to your data, Dr. Wang's data?

A. I don't recall. But I wanted to make a sure the assay was tight and performing.

Q. By "tight and performing," do you mean showing results --

A. CVs. CVs. And remember Dr. Wang never diluted any CSF. This platform uses a standard four

time -- four-fold solution. That's going to introduce some variability into the data, into the measurement. If that four-fold solution is not 100 percent accurate, if it's not 100 percent mixed, you know, that's another variable that'd be nice to avoid. Which the testing neat samples that Hoau-Yan did avoids. So just wonder how -- wondering how this thing was going to perform. And you pay per plate so do one at a time.

(Exhibit 207 was marked.)

Q. Okay. Hand you Document Exhibit 207, a document Bates-stamped CASSAVA_000217567. Okay.

Do you recognize this as a series of texts you exchanged with Dr. Wang on January 12th, 2021?

A. I see it.

Q. What are you referring to in this discussion with Dr. Wang?

A. Let me finish reading it, if I could.

(Pause.)

Okay.

Q. Okay. What were you discussing with Dr. Wang here?

A. I appear to be discussing the Quanterix p-tau data.

Q. What did you mean by plasma p-tau now looks good with reruns and CVs of greater than 15 percent removed. I also removed three outliers who increased by over 100 percent, two in placebo, one in milligrams significant by T test?

A. Kind of speaks for itself, doesn't it?

Q. Is that a reference to the exclusions that you applied to the Quanterix data?

A. I just said there were three outliers removed. And CVs over 15 percent which is huge variability also removed. Even -- actually if they were -- had high CVs, I said please rerun them and they did. And if they were still high, I said I can't use it. It's too variable. So I think there were maybe four like that that were excluded because they just had such high CVs even after repeating.

(Exhibit 208 was marked.)

Q. Okay. I'll mark as Exhibit 208 a document Bates-stamped CASSAVA_000535544. This appears to be an email you sent to Laurie Ryan at NIH dated December 14th, 2020.

Do you see that?

A. Yes. Can I read it?

Q. I just want to -- the first half is about something else, so I just want to point you to the

second paragraph that says "second."
Do you see that?
A. Uh-huh.
Q. It says: Second, I had Quanterix analyze some plasma. I first sent half the samples to test in a triplex assay of Abeta 42 and 40 and total tau. The means look great, but the best P-value versus placebo (N equals 10) was 0.23. Not close enough to justify sending the other half.
Do you see that?
A. Uh-huh.
Q. What did you mean by not close enough to justify sending the other half?
A. Well, it didn't look like there was going to be a treatment effect on -- in this triplex assay, which means it's measuring three things at the same time, which is typically less accurate than an assay that's only focused on one biomarker.
And, you know, looking at the means kind of looks like we'd expect, but the -- you know, of course, the P-values on ten patients. Still, I just thought it's not worth checking this assay. I don't think we're going to see a drug effect on those biomarkers in this plasma, so...
Q. So you were waiting to see if you could

see a drug effect in the first half before deciding to send the second half to Quanterix. Right?

MR. CAMPBELL: Object to form.

A. Look, it's expensive to send plates if an assay looks like it's not going to show anything, you know. I mean, you know, we don't have an affect on that biomarker in that plasma. So why pay to send more samples to not see an effect, even though there's something sort of encouraging.

Q. Were you trying to find the truth or were you trying to find data that showed a drug effect?

MR. CAMPBELL: Object to form.

A. Why would I spend money on a biomarker that looked like it didn't respond to the drug in a -- in a matrix that didn't respond to our drug. It doesn't mean the drug doesn't work. Why bother measuring it if it's not going to -- if it's not going to show anything?

Q. Was that your philosophy?

A. It's no philosophy. I'm just -- we're testing things out. We're testing assays out, we're testing -- you know, it didn't like -- you know, okay, we don't have an effect on Abeta 42, 40 and whatever the third one was in this triplex assay that they have, using specific antibodies. Maybe a

better assay would have shown it. This whole setup didn't look like it was going to show anything informative. Why pay for the second plate to say, yeah, it doesn't show anything.

What's your point? What's your point? What's your point in asking me this?

Q. It appears as though you were only looking for results that showed a drug effect, as opposed to results that might be informative in showing the drug doesn't have an effect.

A. There are all kinds of tissues, all kinds of assays, all kinds of antibodies. All these things play into whether you're going to see a drug effect. You know, what's the big deal? There was a drug effect on p-tau. That's a much more important antibody. A much more important test in plasma.

You saw Paul Aisen's comment about Abeta 42 being notoriously difficult and variable in his earlier email.

Q. Okay. So you waited to see if the first half of samples were encouraging enough in terms of showing a drug effect before deciding to send the second half of samples to Quanterix. Right?

MR. CAMPBELL: Object to form.

A. I tested half the samples in a new assay

to see whether it would be informative. And I decided it was not worth using up the plasma, which, of course, there's also limited plasma, just like there was limited CSF. I wasn't done figuring out what other assays I might want to try.

Q. Okay. If you go to -- back to Exhibit 206 please, the submission to the FDA, in the -- the top paragraph, four lines down, it says: For the second half of samples Quanterix diluted many subject samples eight-fold instead of the standard four-fold, without informing Cassava Sciences. 8X dilution increased the likelihood of high CVs and outlier results.

As a result, Quanterix -- as a result, Quanterix agreed to run, at no extra charge, one extra plate of subject samples with high CVs, anything greater than 11 percent 8X dilutions and a few anomalous results that needed to be repeated.

Do you see that?

A. I see that.

Q. And do you recall that happening?

A. It's accurate.

Q. So you do recall it?

A. Talking about the p-tau assay here, yes.

Q. Okay. Who asked Quanterix to run the one

extra plate of subject samples with high CVs, anything greater than 11 percent 8X dilutions and a few anomalous results?

A. I was the point of contact, but all of this was in discussion with Dr. Friedmann.

Q. Okay.

A. He was never doing anything alone.

Q. Who came up with 11 percent?

A. I think it was driven by how many samples we could fit on a plate that they agreed to do for us at no cost, and just also, you know, I could have said 10 percent, but maybe that, like, bumped -- put in an extra set of samples that -- because, of course, each patient has two samples. You have to run them together in the plate. So that maybe overran the space in a plate. I don't know. I don't remember.

Q. What were the additional anomalous results?

A. I don't remember.

Q. Okay. Were you the one who decided which anomalous results to run on an extra plate?

A. I think it was about three. I don't know -- you know, if things look really, really weird, you might want to run it again.

Q. Okay. The next paragraph says: The final dataset includes all data points with the repeats swapped for the earlier high CV or 8X dilution results. Four subjects' data with Day 0 or Day 28 with CVs greater than 15 percent, i.e., one in placebo, two in 50 milligram and one in 100 milligram were excluded from the final dataset, as were two outliers. The rule for removing outliers --

A. Two outliers.

Q. Sorry. The two outliers.

A. Yeah. I think somewhere else I said three, but I was trying to be equivalent. One would help, one would hurt. And so it was easier to balance that at two.

Q. Okay. And it continues: The rule for removing outliers that was applied was greater than 150 percent change and greater than 2.5PG per ML. This rule allowed removal of one placebo and one in the 100 milligram, both large increases.

Do you see that?

A. Yeah, I see that.

Q. Why 15 percent as the CV cutoff?

A. Because 15 percent is pretty bad and not reliable.

Q. Who came up with that?
A. It's a round number. I don't remember. Probably Dr. Friedmann.
Q. Is that consistent with industry standards?
A. Industry standards either use 15 percent or 20 percent.
Q. In the Orrick white paper that was submitted to the DOJ they say 20 percent as the acceptable industry standard.
A. If you're being extra rigorous, you'd say 15.
Q. You weren't being extra rigorous here?
MR. CAMPBELL: Object to form.
A. I don't know what you're talking about.
Q. How did you come up with the criteria to exclude the two outliers, 150 percent, 2.5PG per ML?
A. I don't remember. I was trying to balance and trying to remove as few as possible and apply the same rule in both cases.
Q. This is another instance where you applied a post-hoc set of exclusion criteria to the data after you had already looked at the data?
MR. CAMPBELL: Object to form.
A. Outliers are usually post-hoc, removed

post-hoc. You get a weird result like -- what Steve Arnold said is, oh, you do bioconfirmational adjusting. He made up some rule that -- some word that he could just randomly throw out things that he didn't like that looked a little weird. I didn't do that. I applied a rule.

You're being really belligerent. Can you please chill out a little bit.

Q. Are the CV cutoffs something that's usually done post-hoc?

A. I don't know. I haven't -- I -- this isn't -- certainly at this time this was not, like, standard business. It's not like everybody was out there measuring biomarkers. These assay -- this assay was brand-new. I had to wait for it.

Q. Okay. So you and/or Dr. Friedmann came up with the exclusion criteria to apply to this Quanterix data. Right?

A. For two outliers, yeah.

Q. And you excluded subjects with CVs greater than 15 percent. Right?

A. Yes.

Q. And you excluded subjects with changes greater than 150 percent and 2.5PG per ML. Right?

A. 150, a round number.

Q. And you determined the exclusion criteria after you had already reviewed the Quanterix data. Right?
A. Look, when I -- one outlier would have helped, one outlier would have hurt. They were both very large increases. It would be more misleading to leave in these large increases to skew the data.
Q. Prior to applying the exclusion criteria, did the Quanterix data show a drug effect?
A. I don't remember.
Q. You massaged the data to get it -- to show a drug effect?
A. Will you stop?
MR. CAMPBELL: Object to form.
MR. WU: Objection.
A. No, I didn't massage the data. I removed outliers using a rule applied to every single value in there.
Q. You engaged in a form of P-hacking with this data. Right?
MR. CAMPBELL: Object to form.
MR. WU: Objection.
A. It is not P-hacking.
Q. Why not?
A. It's removing an outlier. It's standard

practice.
Q. In order to show a drug effect. Is that standard practice?
MR. WU: Objection.
MR. CAMPBELL: Object to form.
A. To best represent the data.
Q. Did you ever consider the post-hoc exclusion criteria that you applied to the Quanterix data in connection with considering whether anything our state clients had said about the company might have some validity to it?
A. No.
Q. Did you ever try to partner with other pharmaceutical companies on Simufilam?
A. We presented the program to a couple other companies.
Q. Who?
A. Lilly and J&J.
Q. And what was the feedback from Lilly?
A. They thought it was very encouraging.
Q. What was encouraging?
A. The data that we had.
Q. And did it go anywhere?
A. They wanted us to do a larger Phase 2 study and we didn't.

Q. Why did they want you to do a larger study?
A. I don't know. De-risk a little more.
Q. And what was the feedback from Johnson & Johnson?
A. That was earlier. They grilled us, sucked as much information out of us as they could. It was two occasions, 2011, 2016, 2017. I count that as one, the later one, even though it was multiple meetings. And they -- yeah.
Q. What came of those discussions?
A. They clearly wanted as much information as they could and then they gave us a couple of reasons that made no sense to us.
Q. Reasons for not partnering?
A. Yeah.
Q. What were those reasons?
A. One was that it was -- what was their word? Our approach was not differentiated enough from what everybody else was doing, which is ludicrous because we were the only people working on targeting filamin A. That was the main reason. The second reason was something about central target engagement, which we had obviously shown in two mouse models. We weren't in the clinic yet, so I

don't know what the heck they meant by that. They just -- we didn't want to talk to them after that.

Q. Okay. And have you -- did you ever have any discussions with a company called Servier Laboratories about a potential partnership?

A. No.

Q. Did you ever consider any of the feedback that you received from Johnson & Johnson or Eli Lilly in connection with assessing whether any statements by our clients might have some truth or validity to them?

A. No, and the comments did not suggest that your clients' statements would have any validity to them.

Q. How did you first become aware of the citizen's petition?

A. I don't remember.

Q. Have you ever reviewed it?

A. Yes.

Q. What was your reaction?

A. Some of the allegations were patently false and ludicrous just on their face. Others, I thought needed to look into a little more clearly. Of course, three days after they filed it, they admitted oh, we're short sellers so that would have

been information that anybody reviewing the citizen petition would want to have at the time that it was actually put out into the world and it was illegally withheld.

Q. Who can you recall discussing the citizen's petition with?

A. That's a vague question. I don't know.

Q. Did you discuss it with Mr. Barbier?

A. A little bit. Dr. Friedmann.

Q. Anyone else?

A. I don't remember.

Q. Did you ever for a moment think that any of the allegations in the citizen's petition might be true?

A. Actually, no. Because half of them were so obviously false, I thought the other half were probably also just a stretch --

Q. Okay.

A. -- by somebody with a ulterior motive.

Q. Okay. We talked about the decision by the scientific journal, PLOS One, to retract five articles by Dr. Wang, including two that you were a co-author on.

A. Yes, which did not follow COPE guidelines.

Q. And did that decision by PLOS One to retract those five articles ever cause you to question in any way whether any of the claims by our clients or other critics of the company might have some truth or validity to them?

A. No, because there was no evidence of any data manipulation. Yet, they -- they retracted. No journal editor ever found any evidence of data manipulation. None.

Q. Do you recall any feedback or reactions from people after news of the PLOS One retractions became public around March of 2022?

A. We were probably, you know, hand-holding clinical sites spending hours and hours again as -- as we were with all the hit pieces. I don't remember.

Q. I'll mark as Exhibit 209 a document Bates-stamped CASSAVA_000956262.

(Exhibit 209 was marked.)

Q. Okay. This appears to be an email from you, Dr. Burns, to Remi Barbier, Guy Singer, and William Foley dated April 5th, 2022.

Do you see that?

A. Is this a privileged communication with -- with counsel on here?

MR. WU: Hold on one second.
MR. KUMAGAI: I don't think so, but --
MR. WU: Hold on one second. Let me just take a look.
THE WITNESS: Hang on.
MR. KUMAGAI: Okay. Let's go off the record.
THE VIDEOGRAPHER: I need both sides to --
MR. KUMAGAI: Can you agree to go off the record?
MR. WU: Go off the record. Yeah.
THE VIDEOGRAPHER: Going off the record. The time is 4:37.
(Break.)
THE VIDEOGRAPHER: Back on the record. The time is 4:46.
Q. All right, Dr. Burns. So this is an email you sent, Exhibit 209, to Mr. Barbier and two lawyers at Orrick, it looks like, on April 5th, 2022.
Do you see that?
A. Yes.
Q. And you write to them: More sites

concerned about PLOS that we have to address.
Do you see that?
A. I see that.
Q. And so is that a reference to sites raising concerns about the retractions that PLOS had issued?
A. This is concerns of sites about these PLOS retractions, yes.
Q. And did you have any discussions with any sites where they mentioned concerns about PLOS?
A. Did I have discussions with sites? I think so. I can't remember specifically which, but this was a record of damage caused by your clients because one site said, sorry, can't do it; we're going to have to, you know, not -- we're going to withdraw our site.
Q. Do you blame our clients for the scientific journal, PLOS One's, decision to retract those five articles?
MR. CAMPBELL: Object to form.
A. They contributed.
Q. Who else contributed?
A. I don't know.
Q. Do you know an individual by the name of Elizabeth McNally or Beth McNally, Dr. Beth McNally?

A. I don't.
Q. Have you ever had any communications with Dr. McNally?
A. I don't know that I did or didn't.
Q. It's possible that you have had communications?
A. It's possible. I don't -- I -- the name's a little familiar. I don't know.
Q. How is it familiar?
A. I don't know.
Q. What -- what, if anything, do you know about Beth McNally?
A. Why don't you just tell me who she is? I don't remember who she is.
Q. I understand that she was the editor-in-chief of the journal The Journal of Clinical Investigation, JCI.
A. Okay.
Q. With that information, does that ring any bells as to any communications you may have had with Dr. McNally?
A. I had no communications with her. She wrote an editorial about your clients pestering journals to retract papers.
Now I remember the name. I --

Q. And what -- I'm sorry, go ahead.
A. I had no communications with her.
Q. Did you have any communications with anyone at The Journal of -- at JCI?
A. Zero.
Q. Do you recall discussions with anyone about the editorial that Dr. McNally wrote?
A. After the fact -- you know, I didn't know that she was doing it until it was published, obviously. I may have sent her editorial to certain people to give context to their concerns about these retractions, et cetera.
Q. Okay. Let's talk about the Phase 2B open-label study. Dr. Wang performed an analysis of biomarkers after six months of treatment as part of that study. Is that right?
A. He did.
Q. And Cassava reported those results to the public. Right?
A. Yes.
Q. After the Phase 2B open-label study concluded, did the final results show a statistically significant effect of Simufilam on cognition?
A. The open-label, I don't -- I don't

remember how -- what are you -- how would that -- this was their -- the decline or lack of decline was compared to historical data and placebos from other trials, but I don't remember any statistics being done on that open-label, you know, change.

I don't know what you -- would want.

Q. So just to be clear. Setting aside the six-month initial phase or whatever you want to call it, after the full Phase 2 open-label study was done, did the final results show a statistically significant effect of Simufilam on any -- on cognition?

MR. CAMPBELL: Object to form.

A. There was no placebo group so how are you going to show a statistically significant effect? Versus what?

Q. So is the answer "no"?

MR. CAMPBELL: Object to form.

A. The answer is you can't -- can't analyze it.

Q. Did the final results of the Phase 2 open-label study show a statistically significant effect of Simufilam on any biomarker of Alzheimer's disease?

A. Their six-month data did and we -- I

don't remember if we even had enough Month 12 and of course we were trying to find other platforms because we didn't want to do any more work with Hoau-Yan because everyone was criticizing him so much. So I don't remember if we ever even got any data at the later time point. There were a small number of samples.

Q. So aside from the six-month data from Dr. Wang, are you aware of any results from the Phase 2 open-label study that showed or purported to show a statistically significant effect of Simufilam on any biomarker?

A. I don't -- I think -- I don't think so.

Q. Okay. Cassava had a number of other independent labs analyze samples from participants in the Phase 2B in open-label studies. Right? Lund, Neurocode, Quanterix, Abilene Christian University?

A. No.

Q. No?

A. Neurocode didn't analyze any Phase 2B samples. Neither did Abilene Christian, as far as I remember. I don't remember. Oh, yeah, we sent some plasma, I think, to Neurocode. I don't remember.

Q. Okay. Around 2021, do you recall asking

Neurocode to analyze samples from participants in the open-label study?

A. I think we're talking about plasma because we didn't have CSF. So I think so, yes.

Q. And why?

A. I don't remember.

(Exhibits 210 and 211 were marked.)

Q. Okay. I'll mark document Exhibit 210, Bates stamp CASSAVA_000724925.

And I'll mark as Exhibit 211 the attachment to Exhibit 2 -- 210 a document Bates-stamped CASSAVA_000724931 and I can represent that this is a PDF version of the Excel.

Okay. In the top email of Exhibit 210, you write: Hi, Hans, I have input the starting MMSE scores into this spreadsheet (that also notes whether samples were shipped as frozen plasma instead of whole blood). There does not seem to be any correlation of milder MMSE with the lower p-tau levels. The only processed variable left to check is the addition of protease and phosphatase inhibitors, diluting by 5 percent and perhaps slightly variable in this dilution.

And it continues.

Do you see that?

A. I see it.
Q. And then in the next paragraph you write: I too am very concerned about the high levels and healthy controls especially as so many were age 20 to 30, tau whether phosphorylated or not only comes from the brains so this high reading can only be nonspecific binding of the antibody (unless there's some other explanation in the assay). Were all your healthy controls elderly?
Do you see that?
A. I do.
Q. Okay. Let's look at the attachment which is Exhibit 211. Okay so these are -- this is data from patients with who were enrolled in the Phase 2 open-label study. Is that right?
A. I think, yes, I think so.
Q. Okay. And if you look at column --
A. But -- yeah, I don't remember this P versus the 13. There were some subjects in this analysis that I'm referring to in this email who were healthy controls. We were -- go ahead, ask your question.
Q. Okay. If you look in Column I, there's X's. Do you see that?
A. Yeah.

Q. Are those X's that you've input into the spreadsheet?
A. I don't know.
Q. Okay. It appears as though the X's indicate values that did not qualify as consistent with Alzheimer's disease. Is that right?
A. Perhaps.
Q. And so is it fair to say that the p-tau 181 data here from Neurocode suggests that about half of these patients did not have p-tau 181 levels consistent with Alzheimer's disease?
A. Okay. What we were doing was testing out the Quanterix p-tau 181 assay which by the way had changed its lot of antibody. And all the researchers who were using this test, were adjusting their -- their cutoffs for what means Alzheimer's. And I can't remember, it went from 2.2 to 1.7 or something like this. So Neurocode did not have their own assay ready yet. And we thought we could start the trial with the Quanterix assay. I wanted to see how good it was at discriminating Alzheimer's versus healthy control. We had a bunch of healthy control samples for other work. And low and behold the Quanterix test said that half the control subjects, many of whom were age 20 to 30 had

Alzheimer's disease. And half the people who we knew -- knew had Alzheimer's disease based on CSF biomarker evaluations were registered as not having Alzheimer's disease in this plasma assay. That was new with a new lot of antibody. And I said we can't -- I might as well just let people walk into this trial rather than use this Quanterix assay. We can't do it.

Q. Dr. Wang had conducted the CSF analyses that you're referring to as the basis for believing --

A. Yes.

Q. -- these patients had Alzheimer's disease. Right?

A. That's correct.

Q. He conducted the tests that were used to screen and enroll patients for the Phase 2 open-label study?

A. Yes.

Q. And so did you find it concerning at all that this Neurocode -- this Neurocode data suggested that about half of the patients that Dr. Wang had screened and enrolled, did not appear to have Alzheimer's disease?

A. You're --

MR. CAMPBELL: Object to form.
A. You're trusting this brand-new plasma assay that with a new lot of antibodies that said that half of the aged 20 to 30 patients actually had Alzheimer's disease? You're going to trust that assay over assays of CSF? No, the -- the conclusion was we can't use this Quanterix p-tau assay. It might have been fine to show changes in the -- the levels of this and certainly with the first lot of antibodies. But right here, right now, what we had, we can't use it for this clinical trial.
Q. Okay. In Column H has the number showing the levels, right, of p-tau 181?
A. I think so.
Q. And these are measurements at baseline 6 months, 12 months. Is that right?
A. Three, six, nine -- it says what they are, I think.
Q. In G, Column G?
A. Yeah.
Q. And the first row has three numbers 1.28, 1.2, 1.42. Do you see that?
A. Uh-huh.
Q. Does it appear to you that the numbers are generally going down or decreasing --

MR. CAMPBELL: Object --
Q. -- in the rows.
MR. CAMPBELL: Object to form.
A. It doesn't appear that to me.
Q. So are these measurements consistent with Dr. Wang's CSF biomarker data?
MR. CAMPBELL: Object to form.
A. I have to look at it really closely if you're asking me to -- to say whether they're generally going down or not. I -- I don't know. It's an assay that clearly is not working if it's telling you that half the patients, half the volunteers who are 20 years old have Alzheimer's. The assay is not working.
Q. Did you consider even for a second that Dr. Wang's CSF analysis might have something wrong with it?
A. No --
MR. WU: Object to form.
A. -- it didn't. Because CSF is more reliable than plasma. And this plasma assay clearly is not working. If we had tested 20 to 30 year olds in Hoau-Yan's lab in the standard ELISA plates with large volumes of undiluted CSF, I guarantee you that none of those 20-year-olds would show up with Abeta

and total tau levels that suggested Alzheimer's disease.

Q. Did you ever consider this data from Neurocode in connection with considering whether any statements by any of our clients might have some truth or validity to them?

A. Not at all. This is speaking about the Quanterix assay which is brand new and unvalidated -- even, as you know, Neurocodes' assay, that they validated and then validated again was 20 percent -- 21 percent wrong.

(Exhibit 212 was marked.)

Q. I'll mark as Exhibit 212 a document Bates-stamped CASSAVA_000854458. And this is a PDF Excel of a document from Neurocode.

Do you recall getting -- receiving another round of data from Neurocode around February of 2022?

A. Vaguely.

Q. Okay. And what do you recall about that data?

MR. CAMPBELL: Just to be clear, Dave, are you representing this was sent to her at some point in time?

Q. Yes, I can represent that this was

attached to an email sent -- sent on February 14th, 2022.

MR. CAMPBELL: From Neurocode to Dr. Burns?

MR. KUMAGAI: It's -- sorry. It's from Dr. Burns to Neurocode. So it's -- the email says: From these 11 open-label subjects, we have a few that were below 30. Some of these CSF confirmed total tau data. Additionally some of those that show decreases in CSF p-tau triplicates using in the trojan ELISAs do not show decreases in plasma.

MR. CAMPBELL: So this --

THE WITNESS: I --

MR. CAMPBELL: -- is a document that you're representing was sent by Dr. Burns to Neurocode.

MR. KUMAGAI: Yes.

A. I don't recall making this. I don't -- I don't know what it is.

Q. Do you recall reviewing additional data from Neurocode?

A. I -- I don't remember.

Q. Do you recall whether any of the ADS (sic) cog scores that you received from any patients was -- suggested that any patients enrolled

in the Phase 2 open-label study had ADS (sic) cog scores below the cutoffs used to screen -- to enroll someone in an Alzheimer's trial?

MR. CAMPBELL: Object to form.

A. At baseline?

Q. Yes?

A. Well, we set our own criteria. And I recall -- I remember that our cutoff was -- I think -- I don't remember whether it was 26 or 20- -- I think it was 26. But we did allow 27 or 28 if they had a confirmation of Alzheimer's disease by a PET -- PET scan by Amyloid PET, said, okay, you can come in. There were, I think, 13 of those patients confirmed by PET who were slightly above our cutoff.

Q. Okay. And if you look in Exhibit 212 Column F, it says: ADS -- ADAS cog total score, Row 5 in Column F has the baseline score of 8.

Do you see that?

A. I don't know if that's base -- yeah, I honestly don't know what that is. I don't know.

Q. Okay. Row 11, Column F has the baseline score as 9.33. Do you see that?

A. Yeah, I don't know what this is.

Q. Okay. Row 20, Column F has the baseline

store as 10.67. Do you see that?
A. Yes. Right. Okay, so our screening criterion was with MMSE. Some of these were -- these were 8S cog.
Q. Okay. And Row 26, Column F the baseline score is 12. Do you see that?
A. Uh-huh.
Q. Are these baseline scores ADS (sic) cog scores consistent with Alzheimer's disease?
MR. CAMPBELL: Object to form.
A. They could be. They're very mild. I think that's why they were highlighted because they were very, very mild.
Q. Did any data that you received from Neurocode at any time ever cause you to question the reliability of Dr. Wang's data?
A. No.
Q. Did any data that you received in Neurocode at any time cause you to question whether any of the allegations by our clients or other critics might have some validity to them?
A. No.
Q. Okay. At some point around 2024, Cassava asked Abilene Christian University, ACU, to test samples from the Phase 2 open-label study too.

Right?
A. They were trying to develop a platform there. It wasn't up and running. It was -- it was very, very -- they were trying to get it validated. There was a lot of -- there were a lot of issues with the assay. The machine, they were trying various different assays. It was on a new machine that they thought might be better than Quanterix.
Q. Okay. Are you familiar with the results of any of the biomarker testing that Cassava asked ACU to conduct?
A. I don't think they ever really had anything validated enough to -- I don't remember, no. It was not me who was handling that.
Q. Do you recall whether any of the ACU data showed that Simufilam had an effect on any biomarker?
A. Simufilam. I don't remember.
Q. Okay. Do you recall whether any of the data from ACU caused you to question the reliability of any data that Dr. Wang had provided you?
A. No.
Q. Did any of the data that ACU provided you or Cassava cause you to reconsider whether any of these statements by our clients had any validity to

them?

A. No.

(Exhibit 213 was marked.)

Q. I show you what I marked as Exhibit 213, which is Bates-stamped CASSAVA_0021 -- sorry. Strike that.

CASSAVA_001237668. Okay. If you look at the second email in this chain of Exhibit 213, there is an email from Leslie Jones at Cassava to you, Dr. Burns, on May 22, 2023. Do you see that?

A. I see it.

Q. Okay. And so Ms. Jones writes: Dear Lindsay, attached please find Cassava NFL result report for PTI-125-04 prepared by ACU. Also attached for our records is a copy of the original raw data (.cysat files) produced by the Ella instrument.

Do you see that?

A. I do.

Q. And then if you look at the page Bates 925, it appears to be an attachment from ACU.

Do you see that?

A. I see this.

Q. Do you recognize this document?

A. I don't.

Q. Do you recall ever reviewing it?
A. I don't because I was not the one, you know, working with this Ella machine and trying to make sure it was validated, whether this was a validation run or what. I don't know what it is.
Q. What are .cydat files?
A. I don't know. Her email says that they were data from the Ella.
Q. And what is an Ella instrument?
A. It's another instrument that Ben Thornton and John Shu and team were using at Abilene Christian to try to get up and running so they could have a validated assay and to be able to run samples.
Q. Is an Ella instrument a machine or a plate reader machine used to conduct ELISA tests?
A. It is an ELISA, I think, and I'm -- and it's -- I don't remember more details, but it's a different machine.
Q. Okay.
A. It doesn't dilute samples, I think.
Q. And so you received a copy of the original raw data produced by the Ella instrument or ELISA instrument from ACU. Is that right?
A. This was really sent to Ben Thornton. I

don't know how closely I looked at this.
Q. Okay. The email is addressed to you, though. Right?
A. I guess so.
Q. Did any of the data from ACU ever cause you to question the reliability of Dr. Wang's data?
A. They were trying to get this machine set up and working. So no.
And as you note here, several of the samples were received thawed, which they had to keep track of because the biomarker is going to be chewed up in the thawed samples perhaps.
MR. CAMPBELL: And, Dave, this is just the first attachment to this email.
MR. KUMAGAI: I think it's just one of them. Yeah, just to clarify for the record, there are a bunch of attachments reflected in the attachments field at the top email from Ms. Rodriguez, and this is just the PDF attachment, I believe.
A. I'm remembering something about sample storage that they were figuring out with some of this too. Some sites didn't have a minus 70 freezer for this open-label study. And so they stored them for long periods of time at minus 20, which turned

out not to be stable for the biomarkers.

Q. And did you ever consider any of the data obtained from ACU in connection with considering whether any statements by our clients might have some truth or validity to them?

A. No. My recollection is that once the sites that didn't actually store -- either ship them immediately on dry ice to a minus 70 freezer or who -- if they didn't have -- if they kept them at minus 20 for any length of time, if those sites were removed, there were some interesting and significant -- I'm not sure significant. I think significant biomarker effects, changes from baseline to six to 12 months.

Q. Did you ever have any concerns that the patients enrolled in the Phase 2 open-label study, based on Dr. Wang's data, did not actually have Alzheimer's?

A. Based on what data you mean? What do you mean? Based on what data?

Q. Did any of the data from Lund, from ACU, from Neurocode cause you any concerns at any time about whether or not Cassava had enrolled non-Alzheimer's patients into the Phase 2 open-label study?

A. Well, the most mild ones that were above MMSE-26 were confirmed by amyloid PET scan. And those are the ones that are going to show the most -- are the most likely to not be Alzheimer's. But I didn't have -- have concerns that there was -- it was -- it was really a safety study, but I -- I didn't have major concerns.
Q. The Phase 2 open-label study you mean was really a safety study?
A. Yes.
Q. Have you ever connected an ELISA test?
A. It's called an ELISA test. I have not. I've seen the instruments.
Q. Whose instruments have you seen?
A. I don't remember.
Q. Have you seen Dr. Wang's ELISA machine?
A. He has a standard plate reader, and I'm pretty sure I saw it on one visit.
Q. Who, if anyone, at Cassava during your time there would you consider to be the most knowledgeable person about ELISA testing?
A. Ben Thornton.
Q. Anyone else?
A. No.
Q. Do you have an idea as to what

constitutes original or raw data from an ELISA test?
A. I know that the plate reader produces a file, which is time-stamped, and that's considered raw data.
Q. So, for example, the cydat files that we saw referenced in the email from Ms. Jones a moment ago, is that an example of what you would consider to be the original raw data from an ELISA test?
A. I think so, assuming that you can read it. That's -- that's from a different instrument. Usually they print out in Excel.
(Exhibit 214 was marked.)
Q. I mark as Exhibit 214 a document Bates-stamped CASSAVA_000569709. Okay. This appears to be an email from Shorena Janelidze.
A. Janelidze (pronouncing).
Q. I'm sorry. Say that again.
A. Janelidze (pronouncing).
Q. Janelidze (pronouncing.) To you, Dr. Burns, dated May 18th, 2020. Do you see that?
A. I see it.
Q. And it's copying Dr. Oscar Hanson Carrie Crowley at Cassava Sciences. Do you see that?
A. Yes.
Q. Okay. In the second email from the top

you write: Hi, Shorena. I'm sure you are working on it, but we do need all the software files today so we can start our QC. I know you are looking at them too. Best, Lindsay.
Do you see that?
A. I am lost where you're reading it.
Q. It's the second email from the top.
A. Oh, yes.
Q. You write: We do need all the software files today so we can start our QC.
Do you see that?
A. Yes.
Q. And then Shorena responds: Hi, Lindsay. I have already sent you the software files for Ab, tau, Ng and YKL-40. These are the files that end with .sda and the software that we have on our VersaMax Microplate Reader is called SoftMax Pro Data Acquisition and Analysis.
Do you see that?
A. I see that.
Q. So why were you asking Lund for the software files from their ELISA machine?
A. As part of the QC process, which Carrie Crowley was -- has a QC background, but we wanted to check all possible sources of error.

Q. And so were those software files what you would consider to be original and raw data from the ELISA tests that Lund conducted?
A. I think so. I don't know.
Q. And so why were you QC'g the data from Lund?
A. Just because you -- you do in any kind of investigation. We also checked our drug supply to make sure it was what it was intended to be.
(Exhibit 215 was marked.)
Q. Okay. I'll mark as Exhibit 215 a document Bates-stamped CASSAVA_000569713. And I can represent that this is one of the attachments to the email at the top of Exhibit 214, which was sent as part of one of the .zip files.
Okay. And do you recognize this document, 215?
A. Vaguely.
Q. And what is it?
A. It's the data file that she sent a run.
Q. Is this what you would consider to be the original raw data from an ELISA test?
A. From her machine, from her plate reader, yeah.
Q. Okay. Did you ever ask Dr. Wang to share

with you any original raw data from any ELISA tests that he had conducted?
A. Our QC person did.
Q. Who?
A. Laura Rodriguez.
Q. When was that?
A. I don't remember exactly.
Q. So you believe that Ms. Rodriguez asked Dr. Wang for the software files from Dr. Wang's ELISA tests?
MR. CAMPBELL: Object to form.
A. She followed an audit trail and confirmed that his Excel data that he was representing as the final data matched the files that came off the plate reader, yes.
Q. Ms. Rodriguez did that?
A. Yes, she did.
Q. How do you know?
A. I think she mentioned it. I'm not allowed to say what counsel may have said to me.
Q. Were any Excel files that Dr. Wang sent you to -- from his -- any of his ELISA tests the original or raw data from his experiments?
MR. CAMPBELL: Object to form.
A. Ask your question again, please.

Q. Let's take a step back. Dr. Wang sent you Excel files from ELISA tests that he claimed to have conducted. Right?

A. Yes, that he conducted.

Q. Have you personally ever checked any of the original software files from any ELISA tests conducted at Dr. Wang's lab to see whether it matched with the results reported in any Excel files?

A. That's the job of the QC person Laura Rodriguez, and she did that, and they matched.

Q. Prior to -- setting aside what Ms. Rodriguez may have done, do you have any basis to conclude that the data in any Excels Dr. Wang sent you from any ELISA tests matched the data in any original software files from any of his ELISA tests?

A. Did I -- did I have any concerns that they didn't match? Is that your question? No, especially once they were confirmed to have matched.

Q. Did you personally ever do anything to check whether the data in any Excel file that Dr. Wang sent you from any ELISA tests matched the data on the original or raw file from the plate reader machine?

MR. WU: Objection; asked and -- literally asked and answered about two questions ago.
A. It wasn't my job.
Q. So no?
A. It wasn't my job. I had other things to do.
Q. So you did not?
A. Laura Rodriguez did it because it was her job.
Q. You personally did not?
A. It was not my job. Do you want me to say it again? It was not my job. It was not my job. It was not my job. I'll go to the chalkboard if you'd like. How many times would you like me to write that?
Q. I think it's clear from you saying, "It was not my job" that it means you did not do it, but I just want to make sure that's clear.
A. No, I didn't do it. It wasn't my job.
Q. Okay.
A. Besides, if I did it, you would say, oh, she's conflicted; why didn't you get the QC person to do it? Well, the QC person did do it.
Q. Why were you the one requesting the data

from Lund and it was left to some QC person for Dr. Wang?

MR. CAMPBELL: Object to form.

A. I was the primary contact with the Lund lab. I let Carrie Crowley do the QC because she had the QC background even though she was also in clinical site management at that point.

Q. And your understanding is that Ms. Rodriguez collected or reviewed some original raw data from Dr. Wang's ELISA testing and was that in connection with the audit that Ms. Rodriguez conducted in 2022?

MR. CAMPBELL: Object to form.

A. I believe so.

Q. So aside from that instance, are you aware of any other instance in which anyone at Cassava collected or checked any raw or original data from any ELISA tests conducted by Dr. Wang?

A. She only needs to do it once. You only did one experiment, so a few -- a few biomarkers for one experiment. So, yeah, she checked that permit --

Q. You're --

A. -- the one that was questioned by your clients.

Q. And you're not aware of any other instance in which someone checked the original or raw data from Dr. Wang's ELISA tests. Right?

A. There was only one other -- I think -- I -- she may have checked also the -- the six-month biomarker because that was done at that time. I don't believe she checked the Phase 2A because that was done much earlier and nobody was talking about that then. I don't know. I'd have to ask Laura.

MR. KUMAGAI: Okay. Let's take a break.

THE VIDEOGRAPHER: Going off the record. The time is 5:28.

(Break.)

THE VIDEOGRAPHER: Back on the record. Time is 5:36.

Q. Okay. So I'll show you a document previously marked as Exhibit 86.

Okay. And this is an article published by The New York Times around April 18th, 2022, with the headline "Scientists question data behind an experimental Alzheimer's drug."

You see that?

A. Yeah.

Q. Do you recall this article coming out?

A. Yes.
Q. And what was your reaction?
A. You know, it was -- it was all, you know, all the same buddies of -- of Bredt and just saying, you know -- just smearing the company.
Q. Okay. And if you go to the second page, halfway down there is a -- I'm sorry, it's one, two, three, four, five paragraphs down. There's a paragraph that says: The New York Times contacted nine prominent experts for comment about the scientific underpinnings of Cassava's trials. All said they did not trust the company's methods, results, or even the premise underlying the drug's supposed effectiveness.
Do you see that?
A. Yeah, they were all the same people that were involved with the petition and were quoted earlier and --
Q. How do you know that?
A. Roger Nickel is the first one quoted. He's best friends with Bredt.
Q. How do you know all nine of these prominent experts were friends of Dr. Bredt?
A. The article is clearly biased. Did you see the response, the letter to the editor that

Cassava sent -- made public? It goes through all of it. All of it. You should perhaps look at that.

Q. Did anything about The New York Times article cause you to consider whether anything our clients had said about the company might have some validity to them?

A. No.

Q. Do you recall hearing concerns from clinical sites about the New York Times article?

A. Of course. It was meant to be damaging and we had to do more damage control. Slow down our trials. People will walk in with this article. Sites dropped out.

Q. What do you mean "It was meant to be damaging"?

A. It was part of the negative PR campaign of all the short-sellers attacking the company of whom -- some of whom were your clients.

Q. Do you think that our clients and other short-sellers control the New York Times?

A. How am I supposed to answer that? They clearly controlled Apoorva Mandavilli.

Q. The New York Times reporter?

A. Yeah. She had a biassed pitch. She didn't listen to -- she spoke to Charles Spruck, but

she -- I don't think she -- she barely even mentioned him. But, you know, he -- he conveyed to her that these allegations about western blot manipulation were completely bogus and he's somebody who does a thousand blots a year and is certainly qualified to speak about that.

And she spoke to a family member of a patient who had been doing very well and she told that family member, oh, it's not about the patients. And that family member said, how can it not be about the patients? You're just trying to attack a company to attack a company and pretend that there's fraud and you're saying it's not about the patients. I don't want to hear how well your father's doing on this drug in the open-label study. I don't care about the patients.

I think it's a biased article.

Q. Do you know whether Dr. Spruck disclosed to the New York Times reporter that he was an investor in Cassava?

A. He probably did.

Q. What makes you say that?

A. He's an honest guy. These guys didn't disclose in their citizen petition that they were short-sellers or your clients when they started, you

know, tearing down, you know, my integrity and the -- and the drug and calling it a trash and -- and scam and fraud and Theranos. Like, they didn't disclose they were short-sellers, did they?

Q. Did you ever present Dr. Spruck as an independent expert to any third parties?

A. He helped respond to some of the journal inquiries as an outside person who was not on the publications and the journal editors appreciated that and his expertise.

Q. Did you ever disclose to any of the journal editors that Dr. Spruck was an investor in Cassava?

MR. CAMPBELL: Object to form.

A. I don't remember.

Q. Do you recall whether Dr. Spruck ever made that disclosure?

A. I don't remember in any -- each case. I don't know.

Q. Do you recall holding Dr. Spruck out to the NIH, scientific journals, including the Journal of -- For the Prevention of Alzheimer's Disease, the Journal of Neuroscience, PLOS One? Do you recall holding Dr. Spruck out to those entities as an independent expert?

MR. CAMPBELL: Object to form.
A. I don't -- what -- how -- how -- please define holding him out as an independent expert.
Q. You told them he was an independent expert.
A. He was not involved with the work. He in some cases may or may not have disclosed that he was also a shareholder. I don't think that's -- changes his assessment of these allegations of western blot anomalies that are so common in his explanations for them. That -- whether or not he had stock in the company really had no bearing on his explanation of common western blot visual anomalies from an expert like him who does a thousand blots a year.
Q. When did you first become aware that Dr. Spruck was an investor in Cassava?
A. I don't remember. I -- he started -- he posted a couple of blog posts immediately anonymously. I didn't know who he was for a little while.
Q. When you -- when you were communicating with the scientific journals and sending them letters from Dr. Spruck, did you know at the time that Dr. Spruck was an investor in Cassava?
MR. CAMPBELL: Object to form.

A. I'm not sure if I knew then or not.
Q. Are you aware that the FDA conducted an inspection of Dr. Wang's lab around September of 2022 and issued a Form 483?
A. Yeah. That was kind of funny.
Q. And were you aware at the time that that happened?
A. I was aware that it happened, yes.
Q. Did anything about the FDA's inspection or Form 483 cause you to question whether any allegations by our clients or any other critics might have some truth to them?
A. No.
Q. And are you aware that in November 2022, the FDA instructed Cassava to remove the Phase 2B CSF data from its investigator's brochure because the FDA was unable to verify the data?
A. I know that they instructed us to remove it from the investigator brochure, but they did go and look at his data files and they did not find -- they found a couple of errors in -- you know, between one and five cells of entire Excel spreadsheets where the value for that sample was averaging two wells instead of three wells. That was the extent of the actual scientific errors that

they found and that result didn't actually change the final numbers at all, so...

Q. But you were aware around the time of the FDA's instruction in November of 2022 that the FDA had made that instruction to remove the data from the investigator's brochure. Is that right?

A. Yes, but it was not based on their audit, which was a GLP audit of an academic lab that was never purported to be GLP. There's no academic lab in the world that would survive an FDA audit and not get a 483.

(Discussion off the written record.)

Q. Dr. Burns in -- you're aware we talked about this already that in 2022, Cassava conducted its own internal audit of Dr. Wang's lab. Right?

A. Yes.

Q. And that was done by Laura Rodriguez and Michael Marsman. Is that right?

A. Yes.

Q. And the audit found that Dr. Wang's lab was temporarily not qualified to conduct any biomarker analyses. Right?

A. Because he's an academic lab. He's not GLP. And they were applying those standards. And we decided we shouldn't use non-GLP labs for any

more clinical work given all the scrutiny.
Q. The audit also found that Dr. Wang's recordkeeping practices were improper or not up to standard. Right?
MR. CAMPBELL: Object to form.
A. They were not up to GLP standards. That's their -- that's benchmark. He's not a GLP lab.
Q. And were you aware of the findings from that audit around the time that the audit happened?
A. Generally Laura did say that some of what the FDA couldn't find, she was able to find.
Q. Okay.
A. She also said that some of the missing calibration records were related to the pandemic. And the fact that these vendors weren't making visits to labs.
Q. And approximately when did Laura tell you that?
A. Shortly after her audit.
Q. Did any of the findings from Cassava's, audit cause you to reconsider any of the criticism facing the company from our clients or other critics?
A. No.

Q. Did you ever consider how Dr. Wang's recordkeeping practices might impact Cassava's ability to respond to allegations of data manipulation?

MR. CAMPBELL: Object to form.

A. No, because he already responded by sending all the original blot images that were requested to journal editors, none of whom found any evidence of data manipulation. I was not concerned.

Q. Are you aware that around October of 2023 media outlet Science published a report or what appeared to be a report from CUNY's investigation of Dr. Wang?

A. It was a -- a report that was not verified by CUNY that appeared to have been written partly by Charles Piller working together with whoever was at CUNY who leaked it to him. So he could pull out plant and pull out quotes that he could use in his salacious hit piece. And also claim that Dr. Wang sent not a single datum based on his definition of what is a western blot. That it must have molecular weight markers. And it must show areas outside all four edges of the block. No institution, no journal nowhere will you find that invented definition that was invented by Bik or I

don't know who.
Q. So --
A. But he used that definition to say, oh, the 1600 blots that he sent, those were not blots. Therefore he sent nothing. And therefore because we didn't have anything to review, we couldn't do our job. All the journal editors were able to do their job and find no evidence of data manipulation. But somehow CUNY couldn't because they weren't sent anything by their own inventive definition.
Q. And so was it your view that Charles Piller somehow influenced the content of the CUNY report that was published by Science?
MR. CAMPBELL: Object to form.
A. That's my belief, yes. Because he also reached out to Dr. Wang with some draft report several months earlier. So he was already -- had hands on a draft three, four months earlier. Tell me he didn't have his fingerprints on it and suggest what to say and invent this label of egregious misconduct which doesn't exist. So he could say the that the recordkeeping was egregious misconduct when, in fact, he had 1600 blot images that he did hand over. And they said he didn't have any. So he's inventing all kinds of recordkeeping

misconduct, if you will, that didn't even exist.
Q. You think Charles Piller somehow controlled or directed the investigation committee at CUNY?
MR. CAMPBELL: Object to form.
A. I believe he was working with them. Clearly they were talking to him if he had a draft report. And if they leaked him the final report, that wasn't even verified by the institution. Clearly he was involved.
Q. And were you aware of the report published by Science around the time it was published?
A. Yeah, it was completely bogus. Claimed that he didn't have any lab -- lab books. He had plenty of lab books. Were they perfect? Probably not. Do most academic researchers have a mix of electronic and paper lab book records, probably. I mean --
Q. Have you -- have you ever reviewed or seen any of Dr. Wang's lab notebooks?
A. No, he sends electronic files to me.
Q. All right. Did anything about the CUNY report published by Science cause you to reconsider whether any of the criticism facing the company from

our clients or any other critics might have some truth or validity to them?

A. Not at all.

Q. To your knowledge, has anyone at Cassava ever tried to influence the process or the outcome of the CUNY investigation?

MR. CAMPBELL: Object to form.

A. No. There -- yeah.

Q. Is it true that you deleted all of your sent emails from before early June of 2020?

A. I was made aware that I did delete my sent file. I was following company policy of deleting trash and sent, and I was trying to comply with that. Earlier the CFO tried to ask that any emails that were older than 30 days be deleted. I said I'd do my best, I can't work that way. But it was a company policy and I was following it.

Q. The CFO asked employees to delete emails that were older than 30 days?

A. Yes.

MR. CAMPBELL: Object to form.

A. Yes, he did. The prior CFO.

Q. Who was that?

A. Pete Brady.

Q. Approximately when was that?

A. I don't remember. It was sort of an ongoing -- on a standing policy. You know, he said he bragged about not having any emails older than 30 days. You really should delete anything, you know, older than a month. I said I can't really work that way. Please clean up your trash. Please clean up your scents. Try to, you know, that was -- there are company policies that -- written that you can see that point to that.

Q. And as far as you know, did people at Cassava follow that policy?

MR. CAMPBELL: Object to form.

A. They tried to.

Q. Did you delete any text messages?

A. I standardly deleted text messages from my phone for the same reason. It could just blow up and take a lot of space. And I didn't have a, you know, massive storage on my phone. It was a standard practice for me.

Q. Did you delete all of your text messages from 2020?

MR. CAMPBELL: Object to form.

A. I don't think so. I don't remember.

Q. Have you ever used the messaging application called Signal?

A. I have.
Q. Have you ever used it to communicate with anyone at Simufilam or Cassava?
A. I had a scientific discussion on Signal with another scientist on Signal.
Q. And --
A. And --
Q. Do you still have those messages or did you delete them?
A. I think I still have them. But actually other people would send me things on Signal which I would then forward by email to counsel as a way of preserving them. Because they were up -- telling me what was going on in this whole battle which I didn't want to pay attention to. And they would set disappearing messages at a day. So I'd get it. I'd send it. Sometimes I'd say stop sending to me. The lawyers are already watching. But that was the extent of my use of the Signal app.
Q. Who was sending you disappearing messages?
MR. CAMPBELL: Object to form.
A. I don't remember. They're not really Signaling me anymore.
Q. What was your understanding of who they

were, investors in Cassava?
A. General supporters who were trying to defend the science.
Q. Did Cassava apply for grants from the NIH to pay for the development of Simufilam and SavaDx?
A. Simufilam, yes.
Q. And Cassava received somewhere in the ballpark of $16 million from the NIH. Is that right?
A. That's correct.
Q. And so was some of that award money from the NIC used to pay your salary?
MR. CAMPBELL: Object to form.
A. A -- a small portion of it, yeah. Because the grants wanted to have -- the very first grant that I sent asked for no salary, just money to do some IND enabling work. It got a great score. And it went through grants management. Grants management said you're not doing any work yourself. And I said, well, we are but I'm just not asking money for it. And they said go change it but you have to do the same amount of work. You have to contribute, you know, 40 percent of the budget has to be your own salaries, something like this. And so I was following rules and asking for salary

support.

Q. The Phase 2A and Phase 2B studies were supported by NIH grants?

A. Yes.

Q. Did you ever have any concerns that any of the data submitted to the NIH might be manipulated or fabricated?

A. No, I did not.

Q. Did you ever have concerns that you might be liable to -- strike that.

Did you ever have any concerns that you might have to pay back any of your salary to the NIH?

A. No.

Q. When was the last time you applied for an NIH grant?

A. Well, we had the large grant and a separate grant that were about to be awarded for September 1 of 2021, both of which were put on hold because of the allegations. And then subsequently never awarded because, you know, the -- everything this whole -- all these attacks persisted. And CUNY was sitting there doing nothing. Then eventually we applied for two more that scored well that should have been funded in the summer of 2024. And they

actually should have been funded in February. And various reasons I don't know why, they were delayed, they were going to hold cycle 1 and cycle 2 and look at them together. Eventually they said that they weren't selected which is strange because they both scored very well.

Q. I'll show you a document previously marked as Exhibit 124. And this is a document entitled: Final report March 15th, 2024, Investigational Research Agreement Between Cassava Sciences, Inc., Lindsay Burns, and APEMM Ralf Jockers. Do you see that?

A. Yes.

Q. Have you ever seen this before?

A. Yes.

Q. And this is a report related to a paper that was published around 2023 in the International Journal of Molecular Sciences. Is that right?

A. It's the report of their piece of the work that was -- went into that publication, yes.

Q. Have you ever looked at the exclusion criteria that Dr. Jockers applied to this dataset that was used for the 2023 paper? It's on Page 9.

Do you see that?

A. No. Where are you -- where are you

looking?

Q. Page 9, ends in 080.

A. I see the page, but where in the page are you talking about excluded criteria.

Q. There's a paragraph that says "inclusion/exclusion criteria."

A. Yes.

Q. Okay. And it -- the last sentence says: Wells displaying donor values outside this range and for which the acceptor/donor ratio values were different from the other replicates, or in case of technical errors on specific wells, were excluded (highlighted in red, and the raw data tables in the appendix).

Do you see that?

A. I see that.

Q. And have you ever looked to see the extent to which data was excluded from the reported results?

A. I did see this report, and I'm not familiar with his -- with this TR-FRET and how often this kind of outside value data points would happen. They're certainly experts in this assay. They developed the assay. They published it. That's why I contacted them to try to test our compound in

their established assay. Their assay was already published before I went to them.

Q. Did you have any discussions -- do you recall having any discussions with Dr. Jockers about the exclusion criteria used for this study?

A. He had already established it in this assay when he published it previously.

Q. Okay.

A. And, by the way, nine of his papers were attacked also, just because he published with us. Probably by your clients.

Q. And did you ever have any concerns about the reliability of research by Dr. Jockers?

A. No, I did not.

Q. Have you ever, at any point in time, had any reason to question whether any statements by our clients might be true?

MR. CAMPBELL: Object to form.

A. No. No.

Q. Have you --

A. No. They're completely unreliable. They're short-sellers. They're sitting on Twitter, saying ridiculous, like, patently false, nasty, vitriolic, malicious stuff. Why would I trust them? Why would I trust them when I've got a body of

scientific data supporting the bio activity of this drug and clinical data now showing that it actually works in Alzheimer's disease patients? Why would I trust these guys?

Q. So you have never considered the possibility that anything our client said might be true?

MR. CAMPBELL: Object to form.

A. Nothing they said had any possibility of being true.

MR. KUMAGAI: Okay. That's all my questions for today, subject to any questions from the other counsel here today.

MR. WU: I have no questions.

MR. KUMAGAI: Thank you very much for your time, Dr. Burns.

THE VIDEOGRAPHER: This concludes today's testimony of Lindsay Burns.

Going off the record. The time is 6:03.

(Deposition concluded at 6:03 p.m.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, AND ENEA MILIORIS, | § | CASE NO. 1:24-CV-05948-JLR-OTW |
| PLAINTIFFS, | § | |
| V. | § | |
| CASSAVA SCIENCES, INC., REMI BARBIER, AND LINDSAY BURNS, | § | |
| DEFENDANTS. | § | |

REPORTER'S CERTIFICATION
DEPOSITION OF LINDSAY BURNS
TAKEN NOVEMBER 13, 2025

I, TAMARA CHAPMAN, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, LINDSAY BURNS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to DAVID KUMAGAI;

That a copy of this certificate was served on all parties and/or the witness shown herein on ___________________________.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

(X) was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 3rd day of December, 2025.

______________________________________

Tamara Chapman, CSR, RPR-CRR
CSR NO. 7248; Expiration Date: 12-31-25
Veritext Legal Solutions
Firm Registration No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
800-336-4000

CHANGES AND SIGNATURE PAGE

WITNESS NAME: LINDSAY BURNS

DATE OF DEPOSITION: NOVEMBER 13, 2025

Changes to spelling of certain names throughout the transcript:

- Change "Oscar Hanson" to "Oskar Hansson"
- Change "Freedman" to "Friedmann"
- Change "Nickel" to "Nicoll"
- Change "Vince Gilligan" to "Vince Gillen"

Specific Changes:

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 11 | 21 | Change "?" to "." | Transcription error |
| 12 | 4 | Change "section" to "sections," | Transcription error |
| 16 | 10 | Change "The original petitioners, a bunch of anonymous troll twitters." to "The original petitioners, and a bunch of anonymous troll twitters." | Correction for clarity |
| 23 | 21 | Change "was doing" to "was not doing" | Transcription error |
| 27 | 24 | Change "mass" to "mouse" | Transcription error |
| 31 | 8 | Change "Rem" to "Remi" | Correction to spelling |
| 34 | 8-10 | Change "The -- the test that worked was a lymphocyte -- lymphocyte-based assay that was not scalable and it was very robust." to "The SavaDx test that worked was a lymphocyte-based assay that was not scalable and it was very robust." | Correction for accuracy |
| 34 | 19 | Change "its the early version" to "its early version" | Correction for accuracy |
| 36 | 2 | Change ""Theranos the frontline"" to "Theranos was the frontline." | Correction for accuracy |
| 41 | 11 | Change "money and coming and going" to "money coming and going" | Correction for accuracy |
| 41 | 17 | Change "the company they were smeared" to "the company they smeared." | Correction for accuracy |
| 55 | 17 | Change "shitsters" to "shit stirrers" | Transcription error |
| 72 | 1-9 | Change "So if you titrate your antibody perfectly for your gel, they bind where they're supposed to. The proteins that are -- these | Correction for clarity |

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| | | antibodies are directed against, but they don't bind nonspecifically to the ink that is the western -- the molecular weight marker.” to “So if you titrate your antibody perfectly for your gel, they bind where they're supposed to – the proteins that these antibodies are directed against. But they don't bind nonspecifically to the ink that is the molecular weight marker.” | |
| 74 | 20 | Change “motivation to any cheating” to “motivation to do any cheating.” | Correction for clarity |
| 83 | 4-10 | Change “Part of that was done on -- in a different disease, in a different model that is filamin A dependent that was corroborated by SNI -- S -- siRNA knock down of filamin A to get the same results as the drug that shows that the effect of the drug was working through filamin A.” to “ Part of that was done in a different disease, in a different model that is filamin A-dependent that was corroborated by siRNA knockdown of filamin A – to get the same results as the drug. That shows that the effect of the drug was working through filamin A.” | Correction for clarity |
| 85 | 4-9 | Change “But the company reached out to a lab with expertise in this kind of binding and learned that, first of all, ultra high-affinity bindings like Simufilam for its target were not -- the -- the ITC method was not very appropriate for that binding measurement. And it's my recollection that there was some encouraging data demonstrating Simufilam binding to filamin A using Biacore.” to “But the company reached out to a lab with expertise in this kind of binding and learned that, first of all, ultra-high-affinity bindings like simufilam for its target were not appropriate -- the ITC method was not very appropriate for that binding measurement. And it's my recollection that there was some encouraging data demonstrating simufilam binding to filamin A using Biacore.” | Correction for clarity |
| 91 | 4 | Change “Somewhere around 20- --2022” to “Somewhere around 2002” | Correction for accuracy |

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 97 | 7 | Change “cites” to “sites” | Correction to spelling |
| 97 | 13 | Change “cites” to “sites” | Correction to spelling |
| 100 | 5 | Change “And, you know, thinking that the drug might work in moderate patients with a -- you know, a stretch” to “And, you know, thinking that the drug might work in moderate patients was a -- you know, a stretch” | Correction for clarity |
| 102 | 4 | Change “Lesne” to “Lesné paper” | Correction for clarity |
| 103 | 20 | Change “cites” to “sites” | Correction to spelling |
| 110 | 5 | Change “okay, fine.” to “okay, fine. You’re on your own.” | Correction for accuracy |
| 118 | 2-3 | Change “Sana (phonetic) something and Repeat Therapeutics helped” to “Sana something and Repeat Therapeutics I helped” | Correction for clarity |
| 118 | 4 | Change “his company, friend” to “his company, a friend” | Correction for accuracy |
| 119 | 13 | Change “naltrexone would also bound” to “naltrexone would also bind” | Correction for clarity |
| 120 | 20-21 | Change “treated naloxone” to “tritiated naloxone” | Correction for accuracy |
| 121 | 5-6 | Change “That naloxone finds a fragment from filamin A.” to “That naloxone binds a fragment from filamin A.” | Correction for accuracy |
| 121 | 17 | Change “in the event to” to “in the event you” | Transcription error |
| 121-122 | 121:21-122:3 | Change “Well, it binds to this fragment because we did it in plates and new binds. And you can measure that it's tritiated naloxone. You can -- actually, it was FitZine-labeled naloxone not tritium.” to “Well, it binds to this fragment because we did it in plates and it binds. And you can measure that -- it's tritiated naloxone. You can -- actually, it was FITC-labeled naloxone not tritium.” | Correction for accuracy |
| 124 | 2 | Change “divided” to “supervised” | Correction for clarity |
| 124 | 4 | Change “a beta 42” to “Abeta42” | Transcription error |
| 124 | 15 | Change “associate” to “association” | Correction for clarity |
| 124 | 16 | Change “filamin a” to “filamin A” | Correction to spelling |
| 124-125 | 124:22-125:3 | Change “So we used compounds from -- that were -- we were developing in this med chem expert that was way after the screening that I just described that got us to the scaffolding, the scaffolds that were the starting point for the medicinal chemistry to test if we could break that up and we found some that did.” to | Correction for accuracy |

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| | | "So we used compounds from -- that we were developing in this med chem effort that was way after the screening that I just described that got us to the scaffolds. The scaffolds were the starting point for the medicinal chemistry compounds we used to test if we could break that up, and we found some that did." | |
| 125 | 5 | Change "hyperphosphorylate" to "hyperphosphorylates" | Transcription error |
| 128 | 20 | Change "inflammatory receptors. Might have" to "inflammatory receptors might have" | Transcription error |
| 128 | 25 | Change "antiinflammatory" to "anti-inflammatory" | Correction to spelling |
| 139 | 23 | Change "considered" to "considering" | Correction for clarity |
| 144 | 15-16 | Change "The email that was sent that--sent to me, Vince Gillen, I think" to "The email that was sent that--sent to me, by Vince Gillen, I think" | Correction for clarity |
| 147 | 23-25 | Change "David Bredt's close friend, I'm outraged that this is going on. You know, this should never have never been put into patients" to "David Bredt's close friend: 'I'm outraged that this is going on.' You know, 'This should never have never been put into patients.'" | Correction for clarity |
| 149 | 4 | Change "want" to "wanted" | Correction for clarity |
| 149 | 18 | Change "Doesn't want to know –" to "He doesn't want to know those names." | Transcription error |
| 151 | 12 | Change "processing" to "process" | Correction for clarity |
| 174 | 6 | Change "pill counts and bottles" to "pill counts in bottles" | Transcription error |
| 178 | 19 | Change "long" to "Wang" | Transcription error |
| 179 | 19 | Change "post-hoc" to "post-doc" | Transcription error |
| 196 | 14 | Change "paired T test" to "paired t-test" | Correction for accuracy |
| 196 | 15 | Change "paired T test" to "paired t-test" | Correction for accuracy |
| 207 | 20 | Change "now" to "know" | Correction for clarity |
| 207 | 21 | Change "parapets" to "pipettes" | Correction for clarity |
| 213 | 6 | Change "what?" to "what." | Transcription error |
| 214 | 22 | Change "singlet" to "singlicate" | Transcription error |
| 216 | 8-9 | Change "And we – we needed to measure accurate changes from baseline that" to "And we, because we needed to measure accurate changes from baseline, that" | Correction for clarity |
| 222 | 10 | Change "statistical" to "a statistical" | Transcription error |

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 236 | 23-25 | Change "And then I sent it back after we did this so we control the experiment that really had no basis for being asked" to "And then I sent it back after we did this control experiment that really had no basis for being asked." | Correction for accuracy |
| 237 | 10 | Change "Basically said" to "They basically said" | Transcription error |
| 238 | 22 | Change "in the CSF with the patients" to "in the CSF of the patients" | Correction for clarity |
| 242 | 23 | Change "15-milligram" to "50 milligram" | Transcription error |
| 243 | 18 | Change "scientist" to "Sciences" | Transcription error |
| 244 | 23 | Change "it look like" to "it looked like" | Transcription error |
| 245 | 2 | Change "it was" to "it was a" | Correction for clarity |
| 245 | 12-13 | Change "And obviously costs money too" to "And it obviously costs money too" | Correction for clarity |
| 246-247 | 246:25-247:1 | Change "four time -- four-fold solution" to "four x -- four-fold dilution" | Transcription error |
| 247 | 3 | Change "four-fold solution" to "four-fold dilution" | Transcription error |
| 247 | 7 | Change "So just wonder" to "So I was just wondering" | Correction for accuracy |
| 248 | 4-5 | Change "one in milligrams significant by T test" to "one in 100 milligrams significant by t-test" | Correction for accuracy |
| 250 | 6 | Change "affect" to "effect" | Transcription error |
| 250 | 23 | Change "Abeta 42, 40" to "A-beta 42, 40" | Correction for accuracy |
| 249 | 20 | Change "looks like we'd expect" to "looks like what we'd expect" | Correction for accuracy |
| 250 | 6 | Change "affect" to "effect" | Correction for spelling |
| 251 | 18 | Change "Abeta 42" to "A-beta 42" | Correction for accuracy |
| 253 | 7 | Change "He" to "I" | Correction for accuracy |
| 256 | 1-5 | Change "You get a weird result like -- what Steve Arnold said is, oh, you do bioconfirmational adjusting. He made up some rule that -- some word that he could just randomly throw out things that he didn't like that looked a little weird." to "You get a weird result like… What Steve Arnold said is, 'Oh, you do bioconformance adjusting.' He made up some rule that -- some word that he could use to justify randomly throwing out things that he didn't like that looked a little weird." | Correction for accuracy |

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 261 | 19 | Change “with a ulterior motive” to “with an ulterior motive” | Correction for clarity |
| 271 | 23 | Change “low” to “lo” | Correction to spelling |
| 273 | 3 | Change “assay that with a new lot of antibodies that said that” to “assay that with a new lot of antibodies said that” | Correction for clarity |
| 276 | 11 | Change “trojan” to “traditional” | Transcription error |
| 276-277 | 276:23-277:3 | Change “Do you recall whether any of the ADS (sic) cog scores that you received from any patients was -- suggested that any patients enrolled in the Phase 2 open-label study had ADS (sic) cog scores below the cutoffs used to screen -- to enroll someone in an Alzheimer's trial?” to “Do you recall whether any of the ADAS-Cog scores that you received from any patients was -- suggested that any patients enrolled in the Phase 2 open-label study had ADAS-Cog scores below the cutoffs used to screen -- to enroll someone in an Alzheimer's trial? | Transcription error |
| 278 | 3-4 | Change “Some of these were -- these were 8S cog” to “Some of these were -- these were ADAS-Cog” | Transcription error |
| 278 | 8 | Change “Are these baseline scores ADS (sic) cog” to “Are these baseline scores ADAS-Cog” | Transcription error |
| 283 | 14 | Change “to six to 12 month” to “to six and to 12 months” | Transcription error |
| 287 | 5 | Change “QC’g” to “QCing” | Transcription error |
| 287 | 20 | Change “that she sent a run” to “that she sent. A run.” | Correction for accuracy |
| 294 | 24 | Change “biassed” to “biased” | Correction to spelling |
| 300 | 7 | Change “That’s their – that’s benchmark” to “That’s their – that’s their benchmark” | Correction for clarity |
| 301 | 18 | Change “so he could pull out plant and pull out quotes” to “so he could pull out – plant and pull out – quotes” | Correction for accuracy |
| 301 | 23 | Change “block” to “blot” | Transcription error |
| 302 | 10 | Change “inventive” to “invented” | Transcription error |
| 305 | 7 | Change “scents” to “sent emails” | Correction for clarity |
| 305 | 24 | Change “Brady” to “Roddy” | Transcription error |
| 307 | 12 | Change “NIC” to “NIH” | Transcription error |
| 310 | 4 | Change “excluded” to “exclusion” | Transcription error |

ADRIAN HEILBUT, et al. -vs-
CASSAVA SCIENCES, INC., et al.
11/13/2025 - LINDSAY BURNS

ACKNOWLEDGEMENT OF DEPONENT

I, LINDSAY BURNS, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ 2 Jan 2026

LINDSAY BURNS Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 1:19 2:10,15 259:4 260:8

**0**

**0** 254:4
**0.23.** 249:8
**000059303** 4:23 200:22
**000059830** 4:20 197:24
**000059834** 4:20
**0000650** 15:10
**0001196** 5:14
**000217567** 5:18 247:12
**000217568** 5:19
**000217631** 4:16 189:24
**000217632** 4:17
**000329169** 131:1
**000382849** 5:13 229:9
**000535544** 5:21 248:19
**000535545** 5:22
**000569709** 6:21 285:14
**000569710** 6:22
**000569713** 6:23 287:12
**000569717** 6:23
**000724925** 6:10 269:9
**000724930** 6:10
**000724931** 269:12
**000735595** 4:8 158:22
**000735672** 4:14 161:22
**000735673** 4:14
**000738379** 4:5
**000738388** 4:6
**000741222** 3:22 152:14
**000741225** 3:23
**0007438379** 155:20
**000835817** 5:16 241:3
**000835819** 5:16
**000854458** 6:14 275:14
**000854459** 6:14
**000922566** 4:25 217:10
**000922567** 5:5
**000922586** 5:6
**000922657** 217:13
**000956262** 6:6 262:18
**000956265** 6:7
**001022488** 4:10 160:14
**001022490** 4:11
**001237668** 6:18 280:7
**001237931** 6:18
**001443564** 5:14 233:23
**001444106** 5:8 223:25
**001444107** 5:9 224:2
**001444109** 5:10
**0021** 280:5
**01024** 6:5
**01779298** 3:13
**01779428** 3:14
**02** 207:15
**03** 207:15
**04/10/2022** 3:20 4:3
**05/14/2020** 5:7
**05948** 1:4 8:9 313:4
**080** 310:2

**1**

**1** 6:13 8:3 130:22 308:19 309:3
**1,100** 103:14
**1.2** 273:22
**1.28** 273:21
**1.42.** 273:22
**1.7** 271:17
**1/12/2021** 5:17
**10** 240:3 245:1 245:1 249:8 253:12
**10.67.** 278:1
**10/18/2022** 4:10
**10/31/2022** 4:13
**100** 68:10 242:23 247:4,4 248:4 254:6,20
**10010** 2:5
**10111** 2:11
**1015** 2:19
**1030** 2:19
**10:00** 57:11
**10:10** 57:14
**10:50** 84:18
**11** 84:21 252:17 253:2,8 276:7 277:22
**11/13/2025** 315:2 316:2
**111** 1:19 8:11
**114** 66:25 67:6
**12** 130:19 138:4 195:7,15 268:1 273:16 278:6 283:14
**12-31-25** 314:22
**12/14/2020** 5:20

**124** 7:4 309:8
**125** 131:14
**125-04** 6:17 280:14
**125-07** 6:5
**126487** 5:15
**12th** 229:11 247:14
**13** 1:13,17 172:18 270:19 277:13 313:13
**130** 3:17
**132** 3:19 7:4 171:18 172:2,3 175:17
**13288** 314:21
**133** 7:5 171:20 175:25 176:1 177:18
**134** 7:5 171:22 177:20 178:13
**135** 7:6 172:1 178:18 179:14
**139** 7:6 193:14
**13th** 8:3 200:24
**14** 156:10 239:25
**140** 7:7 206:17 206:17
**14th** 224:7 248:21 276:1
**15** 3:14 43:18 92:20 99:11,14 99:24 100:12 100:19 143:5 208:7 242:23 248:2,10 254:5 254:23,24 255:6,12 256:21
**150** 254:18 255:17 256:24 256:25
**150,000** 105:6
**152** 3:23
**155** 4:6
**158** 4:8
**15th** 2:19 309:9
**16** 307:8
**160** 4:11 96:18 103:11
**1600** 302:4,23 314:24
**161** 4:14
**16th** 206:18
**171** 7:4,5,5
**172** 7:6
**18** 99:7,14 100:1
**181** 6:9,11 241:19 242:1 246:5 271:9,10 271:13 273:13
**189** 3:12 4:17 15:8,9,12 57:16
**18th** 55:3 160:19 285:20 292:20
**19** 128:17 129:14
**190** 3:14 130:23,25 132:21,24 133:9,21 135:9
**1900** 2:15
**191** 3:17 132:18,20,22 138:9
**192** 3:19 152:13,15,16
**193** 4:2 7:6 155:19,21,22
**194** 4:6 158:21 158:23
**195** 4:9 160:12 160:13,15
**196** 4:11 161:21,23
**197** 4:15,20 189:22,23 190:5,5,10
**198** 4:17 197:22,23
**199** 4:21 200:20,21
**1994** 13:24
**1:12** 139:8
**1:13** 139:11
**1:24** 1:4 8:9 313:4
**1:57** 171:1
**1st** 44:9 50:2 198:8

**2**

**2** 3:4,19 87:24 177:9 214:1 258:24 267:9 267:21 268:10 269:11 270:14 272:17 277:1 278:25 283:16 283:24 284:8 309:3
**2.0** 36:2
**2.2** 271:17
**2.5pg** 254:18 255:17 256:24
**20** 71:2 74:17 91:4 96:23 97:3 103:5 212:10 213:21 244:25 255:7,9 270:4 271:25 273:4 274:13 274:22,25 275:11 277:10 277:25 282:25 283:10 316:15
**20/20** 104:24
**200** 4:23,23 12:3 217:8,9 219:4

**2000** 124:7
**20005** 2:20
**2003** 124:7 137:17
**2008** 121:11,22 122:7,13 159:8
**201** 5:2 217:8 217:11 218:15 219:3,4
**2011** 259:8
**2012** 92:25
**2016** 259:8
**2017** 131:6 259:8
**2019** 193:17 198:2,8
**202** 5:6 223:23 223:24 224:4,6
**202-810-3225** 2:20
**2020** 106:24 200:24 206:18 210:17 216:10 216:16 217:2 221:22 222:16 224:7 229:12 248:21 285:20 304:10 305:21
**2021** 50:3 176:4 192:2 247:15 268:25 308:19
**2022** 29:20 66:20 91:4 140:9 152:17 153:13 155:23 156:17 157:14 158:25 160:5 160:19 162:4 165:12,16 262:12,22 263:22 275:18 276:2 291:12 292:20 298:4 298:14 299:4 299:14
**2023** 280:10 301:10 309:17 309:23
**2024** 29:5,24 85:18 105:13 109:9 114:25 117:19 185:5 218:13 278:23 308:25 309:9
**2025** 1:13,18 8:3 313:13 314:16
**203** 5:9 223:23 224:1,12 226:2
**204** 5:10 229:7 229:9
**205** 5:13 233:22,24
**206** 5:15 7:7 240:25 241:2 252:7
**207** 5:17 247:10,11
**208** 5:19 248:17,18
**209** 6:2 262:17 262:19 263:20
**20th** 210:17
**21** 96:19,20 100:11 103:10 103:14 275:11
**210** 6:7 7:3 269:7,8,11,14
**211** 6:11 269:7 269:10 270:13
**212** 6:13 275:12,13 277:16
**212-589-4645** 2:11
**212-633-4310** 2:5
**213** 6:15 280:3 280:4,8
**214** 6:19 285:12,13 287:14
**215** 6:22 287:10,11,17
**2152** 129:25
**217** 4:25 5:6
**21st** 41:19
**22** 280:10
**223** 5:8,10
**229** 5:13
**23** 7:3 9:19 210:10
**233** 5:14
**23rd** 2:4 66:11 66:20
**24** 119:22
**24/7** 11:1 32:23 47:10 53:5 142:16 143:16 188:10
**240** 5:16
**247** 5:19
**248** 5:22
**25,000** 106:6
**26** 277:9,10 278:5 284:2
**262** 6:7
**269** 6:10,13
**27** 277:10
**275** 6:14
**28** 5:4 209:1,7 211:9,16 212:9 212:23 213:19 214:9 239:22 239:23 254:5 277:10
**280** 6:18
**285** 6:22
**287** 6:23
**292** 7:3
**29th** 152:17 155:23 156:17

**2:08** 171:4
**2:58** 206:12
**2a** 192:19 193:8,12 195:13 196:5 196:12 198:21 292:7 308:2
**2b** 172:24 173:5,10,22 174:15 196:5 205:4 211:2 215:22 216:11 216:19 218:17 219:7 225:14 228:5 233:9 234:8 235:18 237:5,21,22 238:1,3 240:6 241:13,15 243:19 266:13 266:21 268:16 268:21 298:15 308:2
**2nd** 157:14

**3**

**3** 87:21 88:1 97:21 98:25 99:1 103:7,22 104:13,19
**30** 13:24 270:5 271:25 273:4 274:22 276:8 304:15,19 305:3 314:2,5
**300** 314:24
**300,000** 105:21
**3000** 2:15
**303-298-5723** 2:16
**309** 7:4
**30th** 158:25
**313** 3:8
**315** 3:8
**316** 3:9
**31st** 162:3
**34** 3:17
**37** 65:2
**38** 207:13
**3:08** 206:15
**3:55** 240:21
**3rd** 176:3 314:16

**4**

**4** 131:13
**4/5/2022** 6:4
**40** 99:19 173:24 249:6 250:23 286:15 307:23
**41** 2:4
**42** 124:4 249:6 250:23 251:18
**45** 2:10 100:1
**48** 96:12
**483** 298:4,10 299:11
**490,000** 105:14
**4:05** 240:24
**4:37** 263:15
**4:46** 263:18

**5**

**5** 240:2 269:22 277:18
**5/14/2020** 4:24
**5/18/2020** 6:20
**5/22/2023** 6:16
**50** 254:6
**500** 11:14
**512-574-4238** 190:2
**56** 102:9,10
**571** 314:23
**5:28** 292:13
**5:36** 292:16
**5th** 193:17 194:3 198:2 262:22 263:21

**6**

**6** 273:15
**6/23/2021** 6:8
**65** 99:12
**674** 17:11
**680** 18:7
**681** 19:23
**689** 21:15
**693** 24:11 37:18 41:20
**697** 44:9
**6:03** 1:18 312:20,21

**7**

**7** 124:3,16 132:1
**7/12/2020** 5:11
**7/13/2020** 4:22
**70** 13:21 282:23 283:8
**700** 51:23
**712** 55:3
**715** 57:17 58:2
**7248** 314:22
**735** 64:16
**76102** 314:24
**763** 66:23,25
**780** 75:5,9
**7th** 192:2

**8**

**8** 277:18
**8/5/2019** 4:18
**8/7/2021** 4:15
**800-336-4000** 314:25
**80202** 2:16
**86** 7:3 292:18
**8s** 278:4
**8x** 252:12,17 253:2 254:3

**9**

**9** 3:6 131:20 132:24 133:15

133:21 309:23 310:2
**9.33.** 277:23
**9/30/2022** 4:7
**90** 129:20
**90s** 14:13
**925** 280:21
**93** 115:8,8
**940** 103:15
**9:03** 1:18 8:2

**a**

**a.m.** 1:18 8:2
**a7nachr** 3:18
**ab** 286:14
**abeta** 249:6 250:23 251:18 274:25
**abeta42** 6:12
**abilene** 268:17 268:22 278:24 281:11
**ability** 97:15 116:20 301:3
**able** 84:13 92:18 143:16 191:6 201:11 281:13 300:12 302:7
**above** 1:17 55:22 75:16 181:8 277:14 284:1
**absolutely** 106:18 152:10 182:18
**abstracts** 109:17
**abuse** 36:16,17
**abyss** 55:24
**academic** 78:18 81:4 228:12 299:8,9,23 303:17
**accelerate** 64:24
**accept** 184:25
**acceptable** 255:10
**accepted** 100:24,25 101:3 182:17 238:9
**acceptor** 310:10
**access** 70:22 71:8 112:9
**accessed** 44:11
**accessible** 83:12
**accidentally** 224:21 225:10
**account** 17:6 22:17 42:19 63:6,8,16,19 64:9 78:21
**accounts** 64:13
**accuracy** 216:6
**accurate** 34:15 98:5 216:8 235:4 246:2 247:4 249:17 252:22
**accusations** 58:11 65:17 142:16
**accused** 31:2,2 102:7 234:18
**accuser** 74:9
**accusers** 68:9 74:5
**accusing** 25:5 68:20 181:11
**acetylcholine** 124:4 132:1
**acknowledge** 60:5
**acknowledged** 221:9
**acknowledge...** 316:3
**acknowledging** 229:20
**acquisition** 211:20 286:18
**acted** 80:22
**action** 29:17,19 60:2 138:13,18 140:18 142:2 142:19 143:7,9 149:19 151:8 151:19,21 152:9 153:15 153:24 154:6 162:5 163:15 167:1 168:18 169:7,13 170:3 170:9,14 172:13 185:10 187:2,13 314:13,15
**actions** 65:8
**activate** 119:19
**active** 14:1 115:7 125:5
**activity** 312:1
**actual** 24:25 25:1 35:7 73:23 81:6 157:3 221:18 234:20 298:25
**actually** 20:13 46:19 54:2 59:1 69:22 72:2 73:19 74:11 82:18 83:15 96:24 102:18 112:17 120:4 122:2,25 123:10 125:23 127:18 137:18 143:17 146:3,6 163:1 168:15 169:6 173:25

173:25 177:2,7 188:23 222:9 234:16,17 246:2 248:11 261:3,15 273:4 283:7,17 299:1 306:10 309:1 312:2
**acu** 6:17 278:24 279:11 279:15,20,23 280:14,21 281:24 282:5 283:3,21
**ad** 4:19 6:12 234:6,10
**adas** 277:17
**add** 109:24 133:10 135:10 135:19
**added** 135:19
**adding** 137:18
**addition** 95:12 202:5 269:21
**additional** 62:4 109:15 156:6 194:18 229:22 253:18 276:20
**additionally** 276:9
**additions** 316:6
**address** 264:1
**addressed** 128:20 198:3
282:2
**adds** 92:1
**adjusting** 256:3 271:15
**administered** 90:21 119:6
**administering** 28:2
**administrator** 92:10
**admitted** 260:25
**admonishment** 75:3
**adopted** 106:19 106:24 107:7
**adopting** 106:17
**adpd** 109:17
**adrian** 1:3 2:23 8:5,20 11:16 17:17 18:23 45:4 58:8 172:6 313:3 315:1 316:1
**ads** 276:24 277:1,17 278:8
**advantage** 100:14
**advice** 139:4,20 192:7,8 211:6 213:24
**advisors** 225:2
**advisory** 192:6 192:13,19 193:23 210:20 214:3
**affect** 250:6
**affecting** 189:2
**affiliated** 91:7
**affiliations** 8:17
**affinity** 27:16 85:6 118:25 119:20
**afternoon** 130:24
**age** 190:17 270:4 271:25
**aged** 273:4
**agencies** 183:19 184:9
**ages** 63:16
**aggregate** 99:11
**aggressive** 32:3
**ago** 24:10 38:22 63:16 68:25 71:2 92:23 95:22 96:8 100:23 108:20 154:5 161:3,3 175:4 197:5,10 230:20 285:7 290:3
**agonists** 90:21 126:11,12
**agree** 116:22 215:7 217:2 229:23 263:11
**agreed** 51:15 67:25 102:10 214:12 252:15 253:10
**agreeing** 95:10
**agreement** 117:14 243:10 309:10
**agrees** 211:16
**ahead** 20:6 52:22 88:16 91:20 266:1 270:21
**air** 25:4,7
**aisen** 101:12,13 195:5,13 210:15,20 211:7,12 212:2 212:2,7,14 223:7
**aisen's** 101:10 251:17
**al** 8:6,7 315:1,1 316:1,1
**albumin** 5:12 229:12
**alec** 69:21
**alexander** 58:9

**aligned** 245:21
**allegation** 70:1 170:17 227:12
**allegations** 13:5 26:1,7 36:23 48:10 58:14 70:15 159:7 168:24 168:25 169:9 192:14,16 237:3 260:21 261:13 278:20 295:3 297:9 298:11 301:3 308:20
**alleged** 36:22 240:1
**allegedly** 172:13
**allow** 45:1 277:10
**allowed** 53:6 94:13 112:1 155:18 216:17 217:22 254:19 288:20
**alpha** 124:3,16 132:1
**altered** 239:18
**alzforum** 170:9 170:13,15
**alzheimer** 127:22
**alzheimer's** 3:16 27:14 31:5 34:1 96:22 97:1,4 97:23 100:14 101:6,12,20 103:7 124:22 125:16,21 128:13 129:15 130:2 131:5 157:25 170:16 177:23 191:7 210:2,4,7 211:4 213:15 267:23 271:6 271:11,16,21 272:1,2,4,13,24 273:5 274:13 275:1 277:3,11 278:9 283:18 283:24 284:4 292:22 296:22 312:3
**amanda** 2:3 8:24
**amended** 186:10,14,18
**amendment** 185:13,17,22 186:6,9 187:25
**amount** 201:24 307:22
**amyloid** 96:17 96:17,23 97:2 102:11,17 103:11,12 277:12 284:2
**analgesia** 90:23 119:4,16 120:6 124:13
**analyses** 173:12 196:20 196:24 197:2 235:11 272:9 299:22
**analysis** 36:4 73:22 89:24 90:8 172:19,22 173:10,14,18 173:21 174:1 174:14,20,23 175:6 179:17 197:8 198:18 199:1,9 203:17 204:4,10 214:16 215:21 215:23,24 219:13 220:19 223:19 225:13 227:3 228:4 232:23 234:25 235:1 238:3 242:6,7,11,20 243:7 266:14 270:20 274:16 286:18
**analytes** 209:2
**analyze** 35:17 88:18 89:1,9 241:14,21,25 242:18 245:10 249:4 267:19 268:15,21 269:1
**analyzed** 175:9 195:10 196:7 205:4 219:16 220:10 242:11 242:25
**anger** 56:13
**angry** 21:12 31:10 37:4 52:21,24 53:4
**angélique** 27:23 85:23
**annual** 105:4 105:24
**anomalies** 13:11,15 71:3 297:10,13
**anomalous** 216:24 252:18 253:3,18,22
**anonymous** 16:11 22:17,18 22:19 39:2 42:3
**anonymously** 297:19
**answer** 26:24 28:22 30:13

43:19 46:10,12 46:15,17,18,25 47:4 48:3 49:3 55:14 57:21 61:22,23,24 62:15 64:5 69:13 76:3 80:19 82:10,21 82:22 84:3,25 89:8 90:17 96:5 101:18 120:14 123:10 139:4,21 143:3 143:4 146:11 150:19 155:8 156:23 157:10 157:11 160:7,8 161:11,12 163:21,24 164:1 166:15 166:22 171:16 186:2,3 187:16 187:19 197:20 200:19 217:22 217:25 221:7 239:7 267:17 267:19 294:21
**answered** 20:11 34:23 35:13 43:16 46:21 79:23 136:24 160:9 290:2
**answering** 76:1
**answers** 80:21 204:2
**antagonists** 90:22 126:10
**antibodies** 72:3 72:7 91:20 124:11 250:25 251:12 273:3 273:10
**antibody** 72:5 251:16 270:7 271:14 272:5
**antiinflamma...** 128:25
**anxiety** 55:24
**anxious** 204:20
**anybody** 13:13 16:22 21:3 43:7 49:15 180:12 188:11 231:5 261:1
**anybody's** 43:6
**anymore** 306:24
**anyway** 100:9 102:20 193:7 200:10
**apart** 26:18
**apemm** 309:11
**apoorva** 294:22
**app** 306:19
**apparently** 95:24 96:8
111:25 161:7 166:1 192:4
**appeal** 116:18
**appealed** 157:20 158:8
**appeals** 158:15
**appear** 97:22 247:24 272:23 273:24 274:4
**appearances** 3:4 8:16
**appeared** 68:1 68:11 301:12 301:15
**appearing** 121:19
**appears** 51:23 58:4 67:9 133:11 134:13 135:13 152:16 160:18,21,23 161:24 162:3 163:6 172:24 200:23 201:14 210:11,14 229:10 241:4 248:20 251:7 262:20 271:4 280:21 285:15
**appeasement** 116:16
**appended** 316:7
**appendix** 310:14
**application** 305:25
**applied** 173:22 175:11 226:24 235:1,10,14 248:8 254:17 255:22 256:6 257:17 258:8 308:15,24 309:22
**apply** 102:23 175:10 255:20 256:17 307:4
**applying** 257:8 299:24
**appreciated** 296:9
**approach** 143:13 259:19
**approached** 204:16
**approaches** 139:16,19
**appropriate** 85:8
**approval** 64:24 191:24
**approved** 191:17
**approximate** 218:11

**approximately** 14:14 60:15 91:3 93:11 96:23 105:9,16 106:3,5 107:24 108:2 110:17 113:9 140:7 176:13 183:15 184:4,7 185:2 218:4 235:22 243:18 300:18 304:25
**april** 157:14 262:22 263:21 292:20
**areas** 134:6 301:23
**aric** 2:8 9:4
**arizona** 91:9 159:12,12,25
**arm** 211:20 212:10 242:22
**army** 30:17 34:22 64:22 65:9,13,20 66:3
**arnold** 34:20 192:20,25 200:10 206:18 207:8,25 208:4 208:7,14,24 209:6,16 210:2 214:13 229:17 230:3,20,25 231:10,21 256:2
**arnold's** 200:1 232:25
**article** 3:17 21:16 38:25 39:8,16,18 144:2 145:18 145:25 147:12 148:9 292:19 292:25 293:24 294:4,9,12 295:17
**articles** 77:18 165:24 261:22 262:2 264:19
**artifact** 212:25 213:1,4
**artifactual** 212:9,23 238:21
**artificially** 238:23
**asap** 162:15
**aside** 27:20 28:15 51:11 82:13 83:1,22 83:23 85:25 108:6,9,23 113:18 117:16 121:21 122:11 151:17 153:23 171:21,25 175:24 217:1 220:6 227:1 267:7 268:8 289:12 291:15
**asked** 29:4 31:13 36:8 39:25 40:2 43:15 63:25 78:6 84:22 92:19,21 107:10 109:12 110:1,3 154:11 155:5 163:5 166:1 208:18 215:21 223:18 236:25 238:11 238:17,19 241:23,25 252:25 278:24 279:10 288:8 290:1,2 304:18 307:16
**asking** 24:17 25:25 26:19 32:4 43:24 44:1 46:6,7 52:11,19 57:21 68:23 72:1 75:13,14 76:2 81:2 87:11 92:9 104:16 111:18 113:25 134:11 136:23 159:3 162:22 166:19 169:18 171:15 173:15 183:22 184:6 187:22 189:9 189:15 196:9 200:18 220:23 221:2 223:7 242:6 251:6 268:25 274:9 286:21 307:20 307:25
**asks** 36:15 223:9
**assay** 6:9 34:9 104:2 120:3,5 120:20 205:16 206:5 211:21 212:4 232:7,15 232:18,19 239:16,19 241:19 242:1,3 244:4 245:3,11 245:14,24 246:21 249:6 249:16,18,22 250:5,24 251:1 251:25 252:24 256:14,15 270:8 271:13 271:19,20 272:4,7 273:3 273:6,7 274:11 274:14,21 275:8,9 279:6 281:13 310:23

310:24 311:1,1 311:7
**assays** 215:19 232:6 238:24 250:21 251:12 252:5 273:6 279:7
**assembled** 159:7
**asserted** 70:20
**assess** 35:22 36:4 159:7
**assessing** 240:7 260:9
**assessment** 297:9
**asset** 116:6
**asshat** 17:22 18:1,23
**assigned** 191:15
**assistance** 168:4
**assisted** 168:1
**associate** 124:15
**associated** 177:10
**associates** 174:18
**assumed** 107:13 121:1
**assuming** 285:9
**assuring** 150:7
**athira** 68:21
**attach** 225:10
**attached** 156:3 218:22,24 219:4 276:1 280:13,15 314:7
**attachment** 160:21,22 199:14 217:12 218:15 224:3 269:11 270:12 280:21 282:14 282:19
**attachments** 159:20 224:9 282:17,18 287:13
**attack** 54:21 148:17 295:11 295:12
**attacked** 16:2 19:14 21:11 23:20 25:23 47:6 95:23 142:7 147:4 149:5 170:5 311:10
**attacking** 22:15 24:20 47:15,15 50:8 63:23 78:9 143:16 148:12 150:16
294:17
**attacks** 47:14 53:6 141:14 170:5 308:22
**attention** 3:21 4:4 195:3 206:22 240:13 306:15
**attorney** 8:18
**attribute** 182:20
**attributed** 211:20
**audit** 288:12 291:11 299:7,8 299:10,15,20 300:2,10,10,20 300:22
**august** 192:2 198:2,8
**austin** 1:20 8:11 63:11
**author** 98:13 98:19 110:9,13 110:13 246:13 261:23
**authored** 77:19 98:18
**authors** 41:6 112:7 162:14 177:10
**authorship** 98:17
**autobiography** 148:1
**available** 25:9
**avenue** 1:20 2:4 8:11
**averaging** 298:24
**avoid** 57:20,22 199:17,19 247:6
**avoids** 247:7
**award** 52:3 307:11
**awarded** 308:18,21
**aware** 27:11,21 28:16 65:8,10 82:25 83:23 84:2 85:25 122:14 138:21 141:3 148:7,21 183:15 184:5 185:3,9,10,13 185:21,25 187:24 190:21 260:15 268:9 291:16 292:1 297:15 298:2,6 298:8,14 299:3 299:13 300:9 301:10 303:11 304:11
**awong** 2:7

**awu** 2:12
**axiom** 243:2,4
**aß42** 3:17 131:25

**b**

**b** 2:3,18 3:11 4:1 5:1 6:1 54:3
**baby** 13:23
**back** 10:15 19:16 30:9 55:13 57:13 65:16 84:20 87:1 92:20 100:22 130:21 137:17 138:5 139:10 141:24 149:15 154:22 171:3,5 175:15 202:21 204:12 206:14 209:15 214:2 217:17 217:17 222:23 232:5 236:11 236:11,16,23 240:23 252:6 263:17 289:1 292:15 308:12
**backed** 209:22
**background** 68:11 73:12 133:15 134:8 135:2 286:24 291:6
**bad** 178:11 254:24
**badgering** 43:20,22 79:24
**baker** 1:19 2:10 9:4
**bakerlaw.com** 2:12,12,13
**balance** 254:15 255:19
**ballpark** 105:5 307:8
**band** 73:20 134:20 135:14 135:24,25 136:4,11,13,14 136:15
**bands** 68:21 134:21
**bank** 204:19
**barbara** 170:5 193:16 194:5
**barbier** 1:7 4:7 6:3 38:17 107:18 148:7 151:23 152:3 155:25 159:1 261:8 262:21 263:20 313:7
**barely** 110:23 203:24 222:8 230:11 295:1
**barry** 113:12 113:14 114:1
**base** 11:19 277:20
**based** 34:9 42:9 49:1 77:5 80:3 97:20 98:4 113:20 121:1 121:16 141:6 141:17 168:24 168:24,25 214:8 219:2 224:2 272:2 283:17,19,20 299:7 301:20
**baseless** 141:15
**baseline** 5:4 96:19 205:7 216:9 222:10 234:22 235:11 238:14,16 239:21 273:15 277:5,18,22,25 278:5,8 283:13
**bases** 35:17,22
**basic** 6:22
**basically** 87:8 99:23 102:9 128:18 142:12 152:22 153:8 237:10
**basis** 23:7,12 35:16 91:25 95:14 121:22 142:17 169:8 209:20 236:25 272:10 289:13
**bastard** 30:17 34:22 35:5,12
**bastards** 43:11
**bates** 3:17,19 6:13 15:10 130:25 155:20 158:22 160:14 161:22 189:24 197:24 200:22 217:10,12 223:25 224:1 229:9 233:22 241:2 247:12 248:19 262:18 269:9,12 275:14 280:5 280:21 285:14 287:12
**battle** 306:14
**bearing** 297:12
**beautifully** 119:3
**began** 29:17,19
**beginning** 8:17 105:5 183:8
**begins** 64:16 162:8 207:1
**behalf** 8:19 9:8 9:10 153:15
**behave** 122:23

**behold** 271:23
**belief** 23:7,11 23:12 302:15
**believable** 211:18
**believe** 11:7 20:14,21 30:4 50:3 72:17 91:11 92:17 93:1,7,21 94:4 119:11 132:14 154:23 171:5 172:17 175:2 175:16 176:12 176:14 182:10 183:19 195:6 195:14,25 197:1 208:19 219:9 227:2 245:4 282:20 288:8 291:14 292:7 303:6
**believed** 17:6 119:15 169:6 181:22 197:12 209:6
**believing** 272:11
**belligerent** 256:7
**bells** 265:20
**ben** 5:11 6:15 6:16 225:23 281:10,25 284:22
**benchmark** 300:7
**beneath** 62:18 62:23
**benefit** 57:19 177:12 188:24 191:23,25
**benefits** 117:5 143:8
**benesch** 151:16 151:17,20 152:18 153:3,9 153:10,14,22 154:8,17,21,25 155:5,9,16,24 156:16,20 159:22,24 160:5 161:6,8 161:17 162:1 163:14 164:12 164:18 165:3 165:25 186:17
**best** 31:4 97:7 97:11 143:1 176:9 215:20 230:15 249:7 258:6 286:4 293:21 304:16
**beta** 96:23 102:9,10,11 124:4
**beth** 264:25,25 265:12
**betrayed** 74:22
**better** 74:2 205:23 206:1 215:15 251:1 279:8
**beyond** 205:18
**biacore** 85:11
**bias** 80:13
**biased** 293:24 295:17
**biassed** 294:24
**big** 37:8 124:10 251:14
**biggest** 44:11 67:14
**bik** 14:22 15:2 18:12,24 19:18 20:7,25 21:22 22:1,12,21 23:1 51:24 53:8,19,25 58:9,23 61:10 66:12 77:23 78:8,13,24 156:7,11 301:25
**bik's** 21:18,18 54:7
**bike** 52:23
**biker** 52:22
**biktch** 54:2
**billy** 9:9
**bind** 26:22 27:2 72:5,7 83:20 120:2 124:13 125:14
**binding** 27:16 27:22 28:5,8 28:11,17 30:4 30:8 72:3 82:9 82:10 85:5,9 85:11 118:25 119:20 124:4 124:17 270:7
**bindings** 85:7
**binds** 27:4,7 81:20 82:5,14 83:2,25 85:15 86:3 120:7,9 121:2,10,23,24 121:25 122:4 122:15,25 123:7 125:18 129:20 130:12
**bio** 312:1
**bioconfirmati...** 256:2
**biologic** 28:2
**biology** 156:10 156:11
**biomarker** 193:2 196:4 203:16 204:13 204:20 205:20 205:21 206:2 207:13 213:10 213:10,12 214:23 216:7

226:12 227:12 238:21 242:2 249:18 250:7 250:13 267:23 268:12 272:3 274:6 279:10 279:17 282:11 283:13 292:6 299:22
**biomarkers** 5:3 205:4,24 207:14 215:17 219:11,16 220:9 222:11 222:13 223:19 224:16,18 225:9 226:4,19 227:14 238:16 249:24 256:14 266:15 283:1 291:20
**biotemporal** 207:3
**biotin** 238:23 238:25 239:17
**bit** 57:25 63:3 68:6 102:2 201:5 256:8 261:9
**bitch** 18:13,24 18:25 19:12,19 20:1,8 21:17 21:19,22 22:2 22:13 23:17,17 42:24 53:19,20 53:20,25 54:7 66:12
**bjacobson** 2:21
**blame** 104:22 104:23 264:17
**blank** 39:25
**blatant** 49:22
**blatantly** 102:21
**blind** 178:20 179:22,25 225:17 227:3 242:11
**blinded** 179:16 179:19,23 200:11 202:9 222:2 225:6
**blinding** 180:5
**block** 301:23
**blog** 297:18
**blood** 33:25 34:2,8,11,12 269:18
**bloody** 52:24 53:4
**blot** 14:10,19 18:19 68:5,18 68:19 69:4 70:8,22 71:1,8 71:12,15,20 72:10,11,14 73:1,2,17 74:15 77:24 78:10,10,11 92:19 121:18 134:6 295:3 297:9,13 301:7 301:21 302:23
**blots** 13:13,14 13:16 14:5 18:21 22:7 23:22 68:16,25 70:23 71:9 77:6 92:25 132:3,5,9 133:24 134:8 137:18 159:13 295:5 297:14 302:4,4
**blotting** 13:10 13:18 69:18,25
**blow** 305:16
**blown** 133:15 133:18
**blue** 133:11 134:8 135:1
**blurry** 67:8
**board** 115:2,4 115:13 151:21 151:21,22,23 192:6,13,19 193:6,23 199:24 210:21 214:4,11
**board's** 200:2
**bob** 115:14
**body** 177:4 311:25
**bogus** 58:11 295:4 303:14
**boiled** 237:18
**boiling** 237:14
**bolded** 67:10
**bonus** 106:13 106:17 107:3 108:6,8,10 190:22,23
**bonuses** 105:24
**book** 303:18
**books** 303:15 303:16
**bootleg** 83:14
**bordey** 27:23 85:24 86:10
**bordey's** 28:7 83:22
**born** 13:23
**bother** 92:3 250:16
**bottles** 174:6
**bottom** 17:12 20:20 54:13 162:7,8 194:2 198:7,15
**bought** 83:13 190:14
**bound** 27:14 119:13 120:2
**box** 75:17 135:25

**boxes** 133:24 134:2,12 135:14 136:1,5 137:13
**brady** 304:24
**bragged** 305:3
**brain** 13:19 42:13 92:11 96:17 97:2 146:21 232:5,8
**brains** 270:6
**brand** 245:3 256:15 273:2 275:8
**break** 57:7,9,12 57:15 84:19,22 120:16 124:15 125:2 129:9 130:17,20 139:9 169:20 170:24 171:2 206:9,10,13 240:17,18,22 263:16 292:11 292:14
**bredt** 12:11,19 41:21,24 58:10 145:23 148:3 148:15 149:14 156:13 293:4 293:21,23
**bredt's** 147:23
**brief** 78:1 111:14
**brilliant** 148:8
**bring** 31:4,18 36:8,14
**broad** 11:19 26:3 126:6
**broadly** 102:23 125:22
**brochure** 298:16,19 299:6
**brodkin** 1:3 2:23 8:20 10:17,21 58:8 62:11 67:3,10 67:14,18 79:15 95:25 144:20 172:7 175:22 176:4 313:3
**broke** 214:20
**broken** 125:6
**brought** 78:15
**bs** 149:18
**bubble** 73:6
**bubbles** 73:10 73:10
**bucket** 127:14
**buddies** 293:4
**budget** 307:23
**bullet** 115:3,16 116:12
**bullets** 162:16
**bullshit** 126:2
**bumped** 253:12
**bunch** 16:10 109:11 128:5 271:22 282:17
**burns** 1:8,12,16 2:18 3:5,13 4:6 4:9,9,12,16,18 4:21,23 5:6,10 5:18,19 6:3,7 6:15,19 8:4 9:10,14,18 15:10,11,20 18:10 57:15 75:4 84:22 86:20 130:24 139:12 152:17 155:23 158:25 160:16 171:5 172:3 190:1,9 193:16 198:3 200:24 206:18 210:17 217:14 217:18 224:7 229:11 239:1 241:1 262:21 263:19 276:4,6 276:15 280:10 285:20 299:13 309:11 312:16 312:18 313:8 313:12,17 315:2,24 316:2 316:4,12
**business** 143:25 256:13
**butt** 74:19
**butthead** 41:24 42:5,10,17
**buttheads** 42:25 43:17
**buttskin** 44:11 45:5
**bye** 232:9

**c**

**c** 2:1 54:3
**cabal** 183:8
**calibrate** 207:21
**calibrates** 91:22
**calibration** 300:15
**call** 15:23,25 17:1 53:12,18 87:24 88:13 96:2 136:12 137:3 142:5 151:16 164:15 164:18 165:5,8 174:11 183:12 183:12 209:24 210:6 225:14 267:8
**called** 9:23,24 11:24 13:14 23:16 41:23 44:3 53:11 65:9,19 88:14

100:16 102:4 115:23 116:1 118:9,9 132:15 132:16 147:20 156:21 190:22 190:23 226:11 236:5 260:4 284:12 286:17 305:25
**calling** 18:23 22:1 24:19 25:9 37:24 45:25 47:7 53:25 146:4 150:18 174:2 296:2
**calls** 61:21 62:14 69:9
**cambridge** 233:20
**campaign** 32:9 146:1 147:15 182:12 294:16
**campbell** 2:14 9:7,7 28:20 29:7,13 40:24 47:25 48:13,25 49:6 57:25 60:3,25 61:20 62:3,13 63:21 64:3 65:22 66:5 68:2 69:7 70:17 71:10 72:19 75:2 77:20 79:1,17 82:20 86:13,18 90:11 95:3,7 95:10,16,19 97:24 98:15 103:23 104:14 111:8 114:14 115:18 116:13 120:10 121:4 122:8 123:9 126:5,17 127:11 129:16 134:3,17,22 135:17 136:3 136:19 137:16 138:1 139:1,17 147:21 149:1 149:12,21 151:9 152:4 153:5,20,25 154:2,9 155:6 156:23 157:9 157:18 160:6 161:10 162:24 163:16 164:1 164:23 166:2 166:13 173:11 173:19 174:25 181:16 186:3 186:19 187:4 187:15 188:15 196:25 197:14 199:13,23 202:1,11 203:6 214:5 215:5 216:20 217:6 217:25 218:18 219:8,18,22,24 220:12,21 221:6 223:1 225:15 227:17 230:22 231:3 231:13 234:9 235:7 237:7 242:8 244:15 244:21 245:9 245:23 250:3 250:12 251:24 255:14,24 257:14,21 258:5 264:20 267:13,18 273:1 274:1,3 274:7 275:22 276:3,12,14 277:4 278:10 282:13 288:11 288:24 291:3 291:13 296:14 297:1,25 300:5 301:5 302:14 303:5 304:7,21 305:12,22 306:22 307:13 311:18 312:8
**campbell's** 62:1
**cancer** 126:21 126:23 128:9,9 128:15 129:14
**cancerous** 127:5 130:2
**candidate** 3:15 3:16 131:4,5
**capacity** 210:25
**capitulation** 116:17
**capturing** 42:1
**cardiologist** 12:17
**cards** 53:12
**care** 239:22 295:15
**career** 14:15,20 68:17 90:7 182:18
**careful** 80:10 91:20 208:3 228:18
**carefully** 80:9 225:10
**carrie** 6:20 285:22 286:23 291:5
**cascade** 130:1
**case** 1:4 8:9 23:14 59:24 66:2 120:17 125:9 168:13 168:15 296:18

310:11 313:4
**cases** 66:6 255:20 297:7
**cash** 106:12,17 107:3 190:21
**cass** 3:13,14
**cassava** 1:7 2:14 3:22,23 4:5,6,8,10,11 4:14,14,16,17 4:20,20,23,25 5:5,6,8,9,10,13 5:14,16,16,18 5:19,21,22 6:5 6:6,7,9,10,10 6:14,14,18,18 6:21,22,23,23 8:6 9:8,19,23 9:24 11:3 27:4 39:5 40:13,23 66:4 69:1,17 70:20 78:24 80:23 84:5,23 86:1,4 102:3 105:4,25 108:11,15,16 108:24,25 109:5 111:3 112:16 114:6 114:13 117:18 131:1 138:14 146:13 147:14 148:14,17,22 152:14 153:15 155:20 158:22 160:14 161:22 176:2 177:12 178:19 180:25 182:21 188:2 189:24 191:15 196:23 197:24 199:21 200:22 217:10,13 218:6 223:25 224:2 229:9 233:23 241:3,5 241:20 242:14 243:11,17,23 244:9 247:12 248:19 252:11 262:18 266:18 268:14 269:9 269:12 275:14 278:23 279:10 279:24 280:5,7 280:9,13 283:23 284:19 285:14,23 287:12 291:17 294:1 295:20 296:13 297:16 297:24 298:15 299:14 304:4 305:11 306:3 307:1,4,7 309:10 313:7 315:1 316:1
**cassava's** 48:2 49:2 102:24 192:5,13 293:11 300:21 301:2
**cassavafraud....** 171:13
**casualties** 32:12
**cause** 1:17 117:14 130:1,4 205:10 262:2 278:15,19 279:24 282:5 283:22 294:4 298:10 300:22 303:24
**caused** 38:14 182:11,18 264:13 279:20
**causes** 71:3
**cautioning** 104:8
**cautious** 38:5
**cc'g** 193:19
**cdas** 117:22
**cell** 129:22 130:6,6 190:1
**cells** 127:17 298:22
**cellular** 130:1
**central** 259:23
**ceo** 114:5,10,13
**certain** 38:4 53:15 71:3 73:15 90:22 96:13 119:6 128:3,4 232:5 266:10
**certainly** 212:18 256:12 273:9 295:5 310:23
**certificate** 313:23
**certification** 3:8 313:12
**certified** 313:14 314:16
**certify** 313:15 314:1,11
**cetera** 266:12
**cfo** 111:14 304:14,18,22
**cgr** 2:6,6,7
**chain** 3:19 4:2 157:13 162:8 198:1,7 280:8
**chalkboard** 290:14
**challenge** 86:19 116:19
**change** 128:5 129:24 195:9 197:18 201:14 205:12 209:2 211:19 212:8

212:22,24 238:16 254:18 267:5 299:1 307:21 315:4,7 315:10,13,16 315:19
**changed** 271:14
**changes** 5:3 205:7,14,19 211:15 213:13 213:18 214:8 215:11 216:9 238:14 256:23 273:8 283:13 297:8 314:7,8 316:6
**changing** 169:20 240:1
**channel** 149:16
**channels** 149:16
**chapman** 1:18 8:14 313:14 314:22
**characterize** 25:15,16
**charade** 33:7 46:2 47:8 53:11 176:3,22
**charge** 184:22 252:15
**charges** 227:6
**charles** 69:6 147:9 294:25 301:16 302:11 303:2
**chase** 102:17 191:10
**chasing** 128:12
**chat** 4:15 5:17
**cheat** 240:4
**cheated** 74:22
**cheating** 74:20
**check** 63:19 81:7 201:13 269:20 286:25 289:22
**checked** 287:8 289:5 291:17 291:21 292:2,5 292:7
**checking** 63:22 80:9 249:22
**chem** 124:23 125:13,17
**chemistry** 124:1 125:2
**chewed** 282:11
**chief** 265:16
**chill** 19:8 256:8
**choices** 204:12 215:25 242:4
**chop** 12:3,4
**christ** 33:15 181:19
**christian** 268:17,22 278:24 281:12
**chronic** 130:4
**chuck** 4:17 198:2,12 243:2 243:5
**circumstance** 89:13
**citation** 110:22
**cite** 163:15
**cites** 97:7,13 103:20
**citing** 159:16
**citizen** 12:23 36:21 39:16 261:1 295:24
**citizen's** 12:13 12:23 36:12,18 41:6 42:14 93:14,18 130:9 184:5 260:16 261:6,13
**civil** 1:20
**claim** 13:25 27:3 81:19 82:5,7,14 83:2 83:24 120:7 121:23 122:14 126:15 301:20
**claimed** 13:18 26:22 71:3 78:13 238:24 289:2 303:14
**claiming** 59:18 68:12 78:9 120:9 126:6,14 130:12
**claims** 123:6 138:23 139:14 140:14 141:6 141:19 185:12 262:3
**clarick** 2:4 8:21
**clarify** 282:16
**class** 3:13,14
**clean** 305:6,6
**cleanup** 111:1
**clear** 54:4 58:13 65:8 76:22 77:4 86:9 100:10 137:23 149:4 155:7 165:1 175:16 183:17 186:9 223:13 267:7 275:22 290:17,19
**clearly** 13:8,17 77:9 79:20 100:9 135:3 215:17 259:12 260:23 274:11 274:21 293:24 294:22 303:7 303:10
**click** 135:9

**client** 26:25 143:23 144:5 160:23 312:6
**client's** 188:1
**clients** 16:8,25 19:17 24:21 26:7,14,21 30:10 32:16 35:3,21 39:11 42:21 47:7,15 62:1,11,20 79:15 83:13 130:10 138:14 141:9 142:12 142:20 161:18 167:14 171:7 172:16 175:21 178:8 180:10 180:16,23 181:5,11,21 182:11,21 188:21 189:3 192:14 213:25 233:2 237:3,4 240:7,9 258:10 260:10,13 262:4 264:13 264:17 265:23 275:5 278:20 279:25 283:4 291:25 294:5 294:18,19 295:25 298:11 300:23 304:1 311:11,17
**clinic** 150:3 259:25
**clinical** 5:15 87:16 98:21,24 101:12 104:17 107:1,8 142:25 144:9,11 150:2 150:7 168:13 213:12,13 221:13 262:14 265:17 273:11 291:7 294:9 300:1 312:2
**clinician** 210:5 212:17
**close** 77:23 78:8,17 82:11 100:24 101:2 147:23 148:1,2 148:20 245:6 246:18 249:8 249:12
**closely** 23:24 74:17 111:21 227:23 274:8 282:1
**cmo** 216:13
**coauthor** 98:22
**code** 216:14
**codes** 180:6
**coffee** 213:6
**cog** 276:24 277:1,17 278:4 278:8
**cognition** 213:16 233:20 266:24 267:12
**cognitive** 98:12 172:19,23 173:4,9,16,22 174:15,24 175:10 177:5 212:18 213:9 233:8 234:7
**coinventor** 116:10
**collaborate** 208:9,21
**collaborated** 208:7
**collaborating** 230:13
**collaboration** 148:3
**colleague** 9:6 9:12 69:20
**colleagues** 8:24 149:17
**collect** 104:1 161:8 163:14 163:23 164:9 166:12
**collected** 291:9 291:17
**collecting** 69:24
**collection** 89:25 90:8
**color** 133:11,16
**colorado** 2:16
**coloration** 134:7
**column** 270:17 270:23 273:12 273:19 277:17 277:18,22,25 278:5
**combination** 54:6
**come** 10:15 19:10 29:11 33:9,23 68:18 104:18 140:5 145:8 166:5 175:15 179:7 181:19 184:1 242:7 255:16 277:13
**comes** 69:10 270:5
**coming** 41:11 59:6,15 60:14 96:20 97:1 111:1 212:24 226:4 232:16 292:25
**comment** 18:15 18:20 21:4 251:17 293:10

**commentary** 11:23 56:9
**commented** 53:20
**commenting** 238:11
**comments** 11:2 12:6 15:1,6 16:24 42:16 48:1 142:20 237:14,18 260:12
**committee** 76:25 159:7 303:3
**committing** 181:12
**common** 19:5 138:4 165:19 297:10,13
**communicate** 151:22 154:17 154:20 306:2
**communicated** 151:25 152:3 208:19
**communicating** 168:6 186:22 186:24 211:1 297:21
**communication** 64:4 153:14 214:17 262:24
**communicati...** 48:2 49:1 62:14 69:11 139:3 141:5 157:17 160:7 161:12 164:12 164:24 165:7 166:3,14 186:21 187:12 187:17,20 236:2,12,21 265:2,6,20,22 266:2,3
**community** 165:20
**companies** 114:8,19 124:19 258:14 258:16
**companion** 3:15 131:4
**company** 9:23 10:5,11 12:19 23:10 24:8 25:18,21 29:2 29:23 32:8 35:4,15,23 36:6 39:9,14 39:17,20 40:2 40:5,9,14,18,23 41:5,5,13,17 42:9,11 48:8 50:5 51:20 56:10,18 63:14 63:20 74:25 78:9 85:4,17 100:17 104:11 105:10,12 109:8,10,20 110:2 111:12 112:9,21,24 113:2 114:24 115:3,17 116:6 116:12,15 117:8 118:4,8 118:16 130:10 138:22 139:13 139:18 140:13 140:17 142:1 146:6 150:10 151:18 152:1,3 153:23 158:3 165:15 168:12 168:15 169:5,5 169:10 170:17 183:16,20,23 184:3 191:13 191:21 197:13 205:5 228:10 228:11 233:3 233:20 241:24 258:10 260:4 262:4 293:5 294:5,17 295:12,12 297:12 300:23 303:25 304:12 304:17 305:8
**company's** 10:1 148:8 151:8 293:12
**comparable** 201:14
**compare** 239:20
**compared** 267:3
**comparison** 5:4 33:12
**compensated** 109:5 191:13
**compensating** 109:20
**compensation** 108:11 109:9 110:1
**competition** 120:18
**complaint** 64:25 165:11 165:15,18 166:24,25 167:3,6,17,21 168:1,4,8,9,10 169:2,12,22 186:11,14,18
**complete** 31:4 32:13 316:9
**completed** 86:2
**completely** 13:5 22:6,7 72:15 77:25

79:5 121:19 125:25 134:7 295:4 303:14 311:21
**completion** 314:4,10
**complex** 27:25 49:25 97:8
**complimentary** 208:5
**comply** 304:13
**component** 174:23
**composition** 126:9
**compound** 62:5 62:8 128:25 310:25
**compounds** 120:18 124:13 124:22 125:8 126:7
**comprised** 194:23
**computerized** 1:19
**concede** 214:16 215:3
**conceived** 123:19
**concentration** 6:11 122:20
**concern** 60:1,5 127:23 200:2
**concerned** 79:3 102:25 144:3 170:4 184:18 203:3 264:1 270:3 301:9
**concerning** 137:24 272:20
**concerns** 3:20 4:3 6:6 77:6 78:16 138:9 159:10 208:15 208:22 214:1 264:5,7,10 266:11 283:15 283:22 284:5,7 289:18 294:8 308:5,9,11 311:12
**conclude** 45:11 47:21 50:16 289:14
**concluded** 60:2 205:5 266:22 312:21
**concludes** 312:17
**conclusion** 29:1 134:19 135:16 135:22 227:19 227:25 273:6
**conclusions** 36:5
**conditions** 128:4,5
**condo** 108:19 108:23
**conduct** 204:10 215:21 223:18 227:3 234:6 241:24 242:7 242:16 279:11 281:16 299:21
**conducted** 14:9 84:5 85:21 132:6 179:17 189:7 198:25 228:4 233:18 242:5 272:9,16 287:3 288:2 289:3,4,7 291:12,18 298:2 299:14
**conducting** 84:6 92:12 199:17,19 225:13
**conferences** 78:20
**confidence** 177:3
**confidential** 1:11 28:21,25 85:2,15 86:15 94:14,20,25 95:1,2,4,6 101:8 118:13
**confirm** 72:21 81:14 82:6 96:16 192:22 192:25 197:21
**confirmation** 82:11,13 277:11
**confirmatory** 193:7
**confirmed** 6:12 39:22,24 83:1 83:24 276:8 277:14 284:2 288:12 289:20
**conflict** 77:17 77:22 78:7,16
**conflicted** 102:2 182:3,4 290:23
**conflicts** 77:14
**confused** 215:6
**confusing** 187:10 229:23
**congratulated** 190:17
**congress** 1:19 8:11
**connected** 50:10 284:11
**connection** 93:22 114:22 118:15,21 156:6 220:24 233:1 238:2 240:6 241:13 243:7 258:9

260:9 275:4 283:3 291:11
**consider** 20:4 48:9 49:20 56:13 74:14 79:25 138:25 139:13 143:8 143:10 181:14 181:21,24 189:1,5,19 232:25 237:20 237:25 240:5 258:7 260:7 274:15 275:3 283:2 284:20 285:7 287:2,21 294:4 301:1
**considerations** 139:20 189:3
**considered** 71:16 74:23 99:21 139:23 141:2,4 189:10 189:12,15 216:1 228:10 234:13 285:3 312:5
**considering** 138:22 139:16 139:18 155:3 233:2 243:14 245:15 258:9 275:4 283:3
**consistent** 90:2 211:24 255:4 271:5,11 274:5 278:9
**conspiring** 78:24
**constant** 214:17
**constitutes** 68:18,19 285:1
**consult** 192:12 192:15
**consultant** 109:5 117:11
**consulted** 69:2
**consulting** 117:12,14 211:2
**contact** 168:19 168:21 253:4 291:4
**contacted** 293:9 310:25
**contacts** 168:21 170:8,13
**contain** 219:20
**containing** 172:13
**contains** 218:15 219:5 221:10 314:7
**contemplating** 138:22
**content** 19:25 55:23 302:12
**context** 30:25 58:19,22 75:25 81:18 93:9 167:5 176:13 179:3 189:13 189:18 194:18 218:8 229:4 266:11
**continue** 50:23 60:19 99:4 125:13 239:3
**continued** 4:1 5:1 6:1 208:20 233:4
**continues** 159:15 195:1 229:18 254:16 269:24
**continuing** 208:9
**continuous** 54:21
**contract** 116:24
**contradicted** 200:15
**contrast** 68:3,6
**contribute** 307:23
**contributed** 191:22 264:21 264:22
**control** 27:15 236:4,24 238:18,19 271:22,23,24 294:11,20
**controlled** 200:12 294:22 303:3
**controlling** 59:14 60:13
**controls** 80:9 81:4 91:16 270:4,9,21
**controversial** 237:11
**conver** 69:15
**conversation** 38:16 69:14
**conversations** 51:10,11 62:16 70:25 71:5,7 111:14,16 140:25 217:20 228:1
**convey** 209:15
**conveyed** 24:1 230:3 231:11 295:2
**conveying** 190:16
**convince** 60:18 158:11 182:1
**cook** 186:17,24 187:13

**coordinated** 184:8
**coordinating** 32:10 158:19 158:20
**coordinator** 145:4
**cope** 3:21 4:4 76:21,22,25 77:9,12 79:4 121:15 156:5 157:17,20,21 158:9,12,15 159:10 160:1 261:24
**cope's** 152:22
**copied** 134:13
**copy** 5:9 280:15 281:22 313:23
**copying** 155:24 159:1 161:25 161:25 198:3 285:22
**correct** 37:14 51:2 62:8 83:2 86:12 101:4 112:25 121:8 123:21,24 127:6 152:10 175:19 193:9 231:22 242:9 272:15 307:10 316:8
**correction** 3:8
**corrections** 316:6
**correlation** 269:19
**correlations** 238:14,15
**corroborate** 83:4
**corroborated** 83:7 122:17 132:15,16 214:7
**corroborates** 73:1 94:10 196:3
**corroborative** 28:14 86:6
**cost** 253:11
**costs** 245:13
**counsel** 8:5,15 49:2 61:22 62:15,17 64:5 69:11,12 132:23,23 133:22 135:7,7 139:3 153:6,9 155:11 160:8 160:11 161:12 164:24 165:7 166:3,6,14,20 185:24 186:1 186:21,22,23 187:17 217:21 228:2 262:25 288:20 306:12 312:13 314:11
**count** 20:5 259:8
**counter** 13:21
**counterpetiti...** 64:23
**counts** 174:6
**couple** 53:19 109:16 173:7 226:19 258:15 259:13 297:18 298:21
**course** 31:9 47:18 71:11,22 80:24 81:3 94:21 95:9 99:5,15 100:1 102:5,15 115:8 167:12 204:14 209:11 215:9 234:16 249:21 252:3 253:14 260:24 268:2 294:10
**court** 1:1 8:8 8:13 57:19 58:1 95:19 185:10 313:1
**cover** 179:3
**covered** 117:24 125:22 157:3 205:2
**covid** 128:17 129:14 203:21
**cowards** 37:19 37:25 38:4
**cranking** 68:10
**crashed** 99:15
**crazy** 135:22 184:13 205:10 225:5 236:4
**create** 22:8
**created** 132:23 171:13
**creating** 54:25
**creativity** 92:12
**creeps** 94:21,22 95:21 96:3
**criteria** 88:19 88:19,21,24,24 89:1,2,10 104:12,16 175:3,11 235:14 255:16 255:22 256:17 257:1,8 258:8 277:7 309:22 310:4,6 311:5
**criterion** 278:3
**critical** 124:17 125:10 128:7
**criticism** 42:9 42:11 141:6,14 149:24 300:22 303:25

**criticize** 23:10 42:8
**criticized** 130:10
**criticizing** 268:4
**critics** 16:25 30:10 35:4 42:24 43:10 62:1 213:25 233:3 262:4 278:21 298:11 300:24 304:1
**critique** 26:14
**critiques** 26:21 35:14
**cro** 127:13
**cross** 119:6 220:15,20
**crossed** 220:23
**crowded** 128:15
**crowley** 6:20 285:23 286:24 291:5
**crr** 1:18 314:22
**crutcher** 2:15
**cry** 31:9 38:14
**crying** 38:19
**csf** 5:3,12 6:17 193:7 200:1,9 215:24 216:11 228:19 229:12 229:25 232:2 232:11 238:22 239:18 243:14 246:25 252:4 269:4 272:2,9 273:6 274:6,16 274:20,24 276:8,10 298:16
**csr** 1:18 314:22 314:22
**culture** 10:2,5 10:12
**cummings** 214:14
**cuny** 44:11 60:2 159:12 244:3 301:15 301:17 302:9 302:12 303:4 303:23 304:6 308:22
**cuny's** 191:11 191:11 301:12
**curious** 107:15
**currently** 84:6 109:4
**cutoff** 254:23 277:8,15
**cutoffs** 235:1 235:11 256:9 271:16 277:2
**cv** 1:4 8:9 207:14 254:3 254:23 256:9 313:4
**cvs** 207:11 245:25 246:24 246:24 248:2 248:10,12,16 252:13,16 253:1 254:5 256:20
**cycle** 309:3,3
**cydat** 281:6 285:5
**cysat** 280:16

**d**

**d** 3:1 112:14
**d.c.** 2:20
**damage** 55:1 60:17 150:10 150:11,11 169:9 264:13 294:11
**damaging** 294:10,15
**dark** 152:7
**darkness** 68:4 68:6
**darn** 100:24
**data** 4:19 5:12 25:13,22,23 33:20 34:17,18 59:15,17,19 60:8 70:3,7 73:2,19,23,25 76:22 77:4 81:11 82:23 83:4 85:10 88:18,20 89:1 89:9,24 90:8 94:10,10,14,18 97:20 98:8 99:16,19,20 100:2 102:8,8 102:21,24 104:5 130:14 132:14 144:11 173:5,8,9,16,16 173:22 174:15 174:24 175:9 175:10 177:4,5 195:4,14 196:1 196:12,15 198:16,18,21 201:25 202:17 205:3,4 206:4 206:6 207:2,9 208:1 211:3,14 211:17 212:18 213:9,10,10,12 214:6,8,11 215:4,8,19 216:11,24 222:6,7 224:15 225:14 228:5 229:12,22,23 229:25 230:15 231:5,15 232:2 232:14 233:9 234:11,12,13

234:17,19,24 235:4,9,13 237:21,22 240:1 241:20 241:22 242:10 242:25 244:8 246:3,18,19 247:2,25 248:8 250:11 254:2,4 255:23,23 256:18 257:2,7 257:9,11,16,20 258:6,9,22 262:7,8 267:3 267:25 268:6,8 270:13 271:9 272:21 274:6 275:3,17,21 276:9,20 278:14,16,18 279:15,20,21 279:23 280:16 281:8,23 282:5 282:6 283:2,17 283:19,20,21 285:1,4,8 286:18 287:2,5 287:20,22 288:1,13,14,23 289:14,15,22 289:24 290:25 291:10,18 292:3,21 298:16,17,20 299:5 301:3,9 302:8 308:6 310:13,18,22 312:1,2

**dataset** 111:19 112:10 197:20 234:7 254:2,7 309:22

**date** 150:24,25 162:6 176:3 314:5,22 315:24 316:12

**dated** 4:7,9,13 4:15,18,21,24 5:7,11,17,20 6:4,8,16,20 131:6 152:17 155:23 158:25 162:3 193:17 198:2,8 200:24 210:17 229:11 248:21 262:22 285:20

**dates** 85:20 152:23

**datum** 301:20

**dave** 275:23 282:13

**david** 2:2 8:19 12:11 41:20,21 41:24 58:10 147:23 148:3 148:15 199:14 313:22

**davis** 4:17 198:2,25 199:2 243:3,5

**day** 5:4 19:6,6 45:25,25 47:6 47:6,10,12 50:8,8,8 53:13 53:13 54:22,22 56:23,23 57:3 62:25,25 76:20 116:1 230:10 230:10 239:22 239:23,23 254:4,5 306:16 314:16 316:15

**days** 56:22 58:12,17 59:3 59:5,13 60:10 60:10,12,13,17 60:23 61:7 103:2 162:4 209:1,7 211:9 211:16 212:9 212:23 213:19 214:9 260:24 304:15,19 305:4 314:5

**de** 259:3

**dead** 13:20

**deal** 145:11,11 251:14

**dealing** 30:16 30:23 31:14

**dear** 194:4 280:12

**death** 13:20 58:25 59:7

**decades** 207:17 230:10

**december** 44:9 50:2 55:3 117:12 248:21 314:16

**decent** 188:11

**decide** 16:15 51:18,19

**decided** 103:2 116:25 157:20 157:21 168:15 216:13 225:16 225:18 252:2 253:21 299:25

**deciding** 235:13 250:1 251:22

**decision** 16:19 100:8 116:19 151:11 225:21 225:22 261:20 262:1 264:18

**decisions** 185:11

**deck** 131:8 176:2,10,12 177:18 178:2,8 178:13,23 179:14

**decks** 35:20 131:12 171:7
**declare** 316:4
**decline** 98:12 99:14 177:12 267:2,2
**declined** 101:20,25 151:4 236:16
**decreases** 276:10,11
**decreasing** 273:25
**deemed** 316:6
**defamation** 29:17,19 36:3 45:12 47:22 48:6 49:12,20 49:23 50:5,11 50:17,21 51:7 51:13 138:12 138:13,18,22 139:14 140:14 140:18 141:6 141:11,18 142:2,14,19 143:7,9 145:12 148:24 149:19 151:8,19 152:9 153:15,24 154:6 162:4 163:15 166:25 167:2 168:12 168:15,18 169:2,11,13,22 169:25 170:3,9 170:14 172:13 185:10 187:2 187:13
**defamatory** 144:2 145:17 161:9,15,15 167:15 172:14
**defame** 42:21
**defend** 53:6 307:3
**defendants** 1:9 2:8 9:5 313:9
**defending** 66:7
**define** 88:22 94:3 297:3
**defined** 71:19 173:13
**defining** 93:25
**definitely** 75:23 87:20 88:1
**definition** 59:10,12 72:13 72:13 77:24 78:11 121:18 173:13 301:21 301:25 302:3 302:10
**degradation** 92:2
**degrades** 71:18
**degrees** 13:21
**delaware** 190:15
**delayed** 309:2
**delete** 304:11 304:18 305:4 305:14,20 306:9
**deleted** 304:9 304:15 305:15
**deleting** 304:13
**delivered** 205:3 313:21
**delusion** 20:1
**dementia** 101:20
**demonstrated** 27:22
**demonstrating** 85:10
**denied** 36:10 36:12,13
**densitometric** 73:20
**denver** 2:16
**department** 90:16 167:20
**departure** 182:20
**depend** 120:8
**dependence** 90:19,24 119:5 119:16
**dependent** 3:18 83:6 132:1
**depends** 89:13 190:25
**deponent** 314:2 314:3,9 316:3
**deposed** 46:8
**deposition** 1:12 1:16 8:4,10 95:18 312:21 313:12,19,21 314:4,10
**depositions** 218:9 234:3
**deposits** 96:23 97:2
**derogatory** 42:6
**desadier** 2:22 8:12
**desbikable** 66:12
**describe** 10:1 10:20 84:24 96:7 105:3 112:15
**described** 48:5 49:11 79:21 122:12,12 124:25 142:21 145:5
**describes** 128:9
**describing** 51:24 52:18 198:21

**description** 3:12 4:2 5:2 6:2 65:25
**deserved** 177:6
**design** 81:10 94:17 104:17
**designate** 28:25 86:14 94:24 95:1,4
**designated** 95:6
**designating** 118:12
**designed** 98:20
**destroy** 31:15 31:18
**destroyed** 31:20
**detail** 40:7 66:9 94:20 105:1 179:1
**details** 13:12 122:10 164:24 185:14 281:18
**detect** 209:1
**detectable** 174:5
**deteriorating** 205:11
**determined** 88:20 104:11 104:12 257:1
**develop** 116:7 128:14 279:2
**developed** 71:17 143:5 310:24
**developers** 234:23
**developing** 124:23 177:6
**development** 114:9,20 307:5
**devoid** 134:7
**diagnose** 34:1
**diagnostic** 3:15 33:25 34:2,11 131:4 177:22
**dials** 68:10
**dickwad** 67:14
**die** 31:25,25 32:1,5,16
**died** 115:6
**dies** 115:9
**difference** 27:16 196:3
**differences** 68:11 244:23
**different** 26:24 68:14,24 81:15 81:16 82:9 83:5,5 84:2,3 85:22 87:11 97:16 119:11 122:23 129:20 129:22 130:5 134:1,11,13,16 135:14,21 136:1,5 137:12 137:15,25 138:2 139:18 183:18 279:7 281:19 285:10 310:11
**differentiated** 259:19
**differently** 94:1
**difficult** 180:6 251:18
**digest** 221:25
**digital** 71:16
**digitized** 72:23
**dilute** 281:21
**diluted** 246:25 252:9
**diluting** 269:22
**dilution** 252:12 254:4 269:23
**dilutions** 252:17 253:2
**dime** 191:11
**dineley** 132:16
**direct** 28:13 30:7 82:9
**directed** 11:2 69:11 72:7 125:12 141:16 155:10 303:3
**direction** 205:20,21
**directions** 215:12
**directly** 20:2 28:17 30:4
**director** 145:5
**disappearing** 306:16,20
**disclose** 160:11 199:21 295:24 296:4,11
**disclosed** 200:5 295:18 297:7
**disclosure** 296:17
**discomfort** 228:6 229:19 230:4 231:1,12 233:1
**discourage** 143:24
**discovered** 120:17,25 121:1 191:6 218:12 222:22
**discovery** 23:3 23:6,13 33:3 118:17,23
**discredit** 146:1
**discriminating** 271:21
**discuss** 82:15 153:7 165:6 186:20 217:20 261:8
**discussed** 107:6 117:17 141:5

**discussing** 141:9 165:2 247:22,24 261:5
**discussion** 6:5 41:18 141:12 154:14 165:18 247:18 253:5 299:12 306:4
**discussions** 61:21 106:16 154:13,13 168:13 175:20 177:17 178:7,9 178:12,14,16 179:13 180:9 180:12,15,17 185:24,25 259:11 260:4 264:9,11 266:6 311:3,4
**disease** 3:16 28:1 83:5 96:16 97:4 101:12 102:13 124:22 125:16 129:1 130:2 131:5 158:1 170:16 177:23 191:7 205:12 210:3 211:4,8 213:15,18 267:24 271:6 271:11 272:1,2 272:4,14,24 273:5 275:2 277:11 278:9 296:22 312:3
**disguised** 147:12
**dismissing** 185:11,12
**disorders** 130:5
**displacement** 82:10 120:21
**displaying** 310:9
**disrupt** 124:20
**disrupting** 119:15
**disruption** 129:24
**disruptions** 130:1
**distinction** 87:6
**distort** 182:2
**distorting** 25:18
**district** 1:1,1 8:8,8 313:1,1
**disturbed** 174:10
**disturbing** 58:24
**divergent** 199:21
**divided** 124:2 224:22
**dkumagai** 2:6
**doc** 156:11,12
**document** 15:9 130:25 131:2,3 132:20,23 152:13 155:19 158:21 160:13 161:22 171:17 171:19,22 172:1,13 175:17 189:23 193:13 197:23 200:21 206:16 210:9 217:9 219:3,5 220:18 222:4 223:24 224:1 229:8 233:21,25 234:2 241:2,4 246:12,13 247:11,12 248:19 262:17 269:8,11 275:13,15 276:14 280:24 285:13 287:12 287:17 292:17 309:7,8
**documented** 3:12 36:18
**documents** 48:11 222:24
**doing** 13:9 16:5 18:17 23:21 31:4 39:17 46:2 48:9 49:23 68:3,9 80:8 81:7 83:17 86:5 91:23 109:3 140:20 141:9 143:1,15 145:2 155:2 161:7 179:24 187:23 203:13 204:13 221:13 253:7 259:20 266:9 271:12 295:8 295:14 307:19 308:23
**doj** 65:2 183:1 183:5,22 184:6 184:19 255:9
**dominos** 55:9
**donated** 78:20
**donations** 23:19,20 24:2
**donor** 310:9,10
**donors** 22:18 22:22
**doors** 184:1
**dose** 5:4 119:2 119:7,7,9,17 122:16 226:10 226:11 242:22
**doses** 90:21 222:11

**double** 201:13
**doubts** 130:11
**dozens** 150:5
**dr** 3:13 6:8 8:20,20,21 9:18 10:17,17 10:17 11:3 12:11,12,16,19 12:19 14:7,22 15:2,11,20 17:13,20,25 18:10,12 19:18 20:7,25 21:18 21:22 22:1,12 22:21 23:1,21 27:12,18,20 28:7,16 30:5 34:1 41:21,24 42:10 51:24 53:19,25 54:7 54:15,19 57:1 57:15 61:10 62:11,11,12 65:1 66:12 67:14,18 69:3 70:5 71:13,21 72:17,22 74:7 74:14,16 75:4 76:14 77:16,18 78:23,24,25 79:8,15,15,16 82:8,13 83:1 83:22,23 84:22 86:10,10,20 90:14 91:11 92:4 93:4,17 93:21 94:4 95:25,25 96:1 98:22 101:10 106:23 107:6 110:18 118:24 122:24 124:2 126:24 127:1 127:25 130:24 132:5,10 139:12 140:6 141:1 144:20 146:16 148:13 148:13,19,21 148:25 149:7 152:17 155:23 158:25 159:23 160:16 161:25 163:6 167:25 168:3 169:24 169:25 171:5 172:3 173:6 175:1,1 176:4 176:4,4 179:16 180:2 188:3 189:12 190:1,9 192:25 193:16 193:20,22,22 194:3,3 195:13 196:17,19,24 197:7,12 198:3 198:3 199:2,20 200:15,24,24 201:3,11,24 202:25 203:4 203:17,19 206:18,18 207:8,25 208:4 208:7,14,15,24 209:6,16 210:2 210:15,17,20 211:7,12 212:2 212:7,14 214:15 215:3 215:21 216:17 217:2,14,18 218:16 219:6 219:16,21 220:7 221:10 222:5,18,20,24 223:14,18 224:7,8,23 225:13,22 227:2,6,12,15 228:4,7 229:11 229:11 230:3,4 230:20,25 231:1,10,10,12 231:20,21 232:25 233:13 233:15,16,17 237:22 238:2 239:1,15 241:1 242:5 243:9 245:7,10,21 246:16,19,24 247:14,18,23 253:5 255:3 256:16 261:9 261:22 262:21 263:19 264:25 265:3,21 266:7 266:14 268:9 272:9,22 274:6 274:16 276:4,6 276:15 278:16 279:21 280:10 282:6 283:17 284:16 285:20 285:22 287:25 288:9,9,21 289:1,7,14,23 291:2,10,18 292:3 293:23 295:18 296:5 296:12,16,20 296:24 297:16 297:23,24 298:3 299:13 299:15,20 300:2 301:1,13 301:20 302:16 303:21 309:22 311:4,13 312:16
**draft** 165:11 302:16,18 303:7
**drafted** 235:17
**drafts** 165:15

**dramatic** 68:11 205:12
**draw** 195:3 206:21
**driven** 253:9
**driving** 121:13 173:14
**drop** 34:8,12
**dropout** 99:8
**dropped** 213:6 294:13
**drs** 10:21 175:22
**drug** 3:15 11:4 22:5,6,10 26:22 28:5,9 28:11 32:6 64:25 83:8,9 83:12,20 87:17 88:1,9 94:11 94:18 97:4 98:11 100:3 114:8,20 131:4 143:3,4 146:2 146:3 150:19 174:3,4,5,21 177:2,6 188:23 190:25 191:7 191:17,23 205:9,10 226:17 234:14 234:16 235:10 238:20,22,24 239:15,15,18 242:22 246:10 249:23 250:1 250:11,14,15 250:16 251:8 251:10,13,15 251:22 257:9 257:12 258:2 287:8 292:22 295:15 296:2 312:2
**drug's** 293:13
**drugs** 100:13 191:8
**dry** 283:8
**due** 68:13
**duly** 1:17 9:15 313:17
**dunn** 2:15 9:8
**dutch** 78:19

**e**

**e** 2:1,1 3:1,11 4:1 5:1 6:1 112:14 315:3,3 315:3
**earlier** 30:6 56:24 68:15 77:14 84:9 87:22,23 120:8 140:10 150:24 171:6 204:17 211:16 221:8 221:21 226:24 239:25 243:14 251:19 254:3 259:6 292:8 293:18 302:17 302:18 304:14
**early** 34:19,19 101:19 238:5 238:10 304:10
**earshot** 52:24
**easier** 232:12 254:14
**easily** 68:7
**easy** 208:24
**edges** 301:23
**editor** 75:22 76:13 78:8 93:2 102:1 156:7,9 160:2 262:8 265:16 293:25
**editorial** 60:1 265:23 266:7 266:10
**editors** 37:18 38:4 296:9,12 301:8 302:7
**effect** 28:2 83:9 98:12 100:10 119:15 196:4 199:5 222:10 223:5 232:20 242:21 246:10 246:17 249:15 249:23 250:1,8 250:11,23 251:8,10,14,15 251:22 257:9 257:12 258:2 266:23 267:11 267:15,23 268:11 279:16
**effect's** 99:15
**effectiveness** 293:14
**effects** 94:18 96:14 196:1 223:9 238:21 283:13
**efficacy** 5:3
**efficient** 145:9
**effort** 124:1 127:20 151:5 182:1 184:9 216:23
**egregious** 148:23 302:20 302:22
**eight** 86:8 137:6,21 252:10
**either** 86:1 139:3 174:4 205:16 229:25 232:3,18 236:16 255:6 283:7
**elaborate** 10:14 184:17

**elderly** 270:9
**electronic** 87:2 87:4 303:18,22
**eli** 260:8
**eliminating** 80:12
**elimination** 173:23
**elisa** 274:23 281:16,17,24 284:11,12,16 284:21 285:1,8 286:22 287:3 287:22 288:1 288:10,22 289:2,6,15,16 289:23 291:10 291:18 292:3
**elisabeth** 14:22 18:12,24 47:8 53:7 58:9,23
**elisas** 276:11
**elizabeth** 31:3 33:8,12 34:2 264:25
**ella** 280:16 281:3,8,9,15,23
**ellen** 91:6
**email** 3:19 4:2 4:6,9,11,17,21 4:23 5:6,10,19 6:2,7,15,19 22:23 23:13 144:7,14,15,17 144:18,22 152:16 153:2 154:7,15,21 155:5,22 156:3 156:4,5,16,19 157:13 158:24 160:18 161:24 162:7 163:2,7 193:15 194:2 194:23 195:1 196:18 198:1,7 200:23 201:2 206:17 210:14 211:7 213:20 217:12 218:25 220:24 221:8 221:17,21 224:7 228:23 229:10 232:14 248:20 251:19 262:20 263:20 269:14 270:20 276:1,6 280:8 280:9 281:7 282:2,14,18 285:6,15,25 286:7 287:14 306:12
**emailed** 20:2 143:23 156:2 167:22
**emailing** 160:24 161:1,4
**emails** 44:12 165:10 170:6 246:15 304:10 304:15,18 305:3
**embryo** 13:24
**employed** 314:12
**employee** 51:21 108:12,14
**employees** 106:10 304:18
**employment** 116:23
**enabling** 307:17
**encouraged** 102:17
**encouraging** 85:10 195:5 244:9,20 246:9 250:9 251:21 258:20,21
**endpoint** 6:22
**endpoints** 5:3 87:18 88:7
**ends** 17:10 310:2
**endure** 54:21
**enea** 1:3 2:24 8:21 172:6 313:3
**engage** 61:25 62:10,17,19 146:21
**engaged** 138:24 139:13,25 140:4 243:9 257:19
**engagement** 141:2,4 259:24
**engaging** 62:19 142:13
**enhance** 68:4,6 119:3
**enhancements** 68:4
**enhancing** 90:23
**enroll** 142:25 143:17 145:8 145:10 150:12 151:4 272:17 277:2
**enrolled** 103:7 150:2,14 270:14 272:23 276:25 283:16 283:23
**enrolling** 143:18
**enrollment** 89:3 104:12,13 143:1 150:22 151:2
**entire** 63:4 73:19 91:18 298:22

**entities** 296:24
**entitled** 309:9
**entries** 140:10
**entry** 44:9 55:3 66:10 75:24 103:22
**envelope** 99:25
**enzyme** 125:4
**enzymes** 13:25
**epilepsy** 27:25
**episodes** 44:4
**equally** 235:2
**equals** 249:8
**equivalent** 254:13
**eric** 123:4
**errata** 316:7
**error** 96:19 98:3 100:11 103:10,14,17 103:19 174:1 216:15 286:25
**errors** 110:24 110:25,25 227:19,21,25 298:21,25 310:12
**erwin** 2:9 9:2,6
**escalated** 159:11
**especially** 197:16 270:4 289:20
**establish** 197:15
**established** 97:15 103:20 311:1,6
**estate** 108:18
**et** 8:6,7 266:12 315:1,1 316:1 316:1
**ethics** 77:1 156:9
**evaluate** 102:5 141:22 143:12
**evaluating** 237:21
**evaluation** 238:2
**evaluations** 272:3
**event** 121:17
**events** 3:12 16:1,3 42:1 79:22 140:16
**eventually** 69:23 111:23 184:22 191:14 232:18 236:12 308:23 309:4
**everybody** 83:13 91:25 95:8 99:9 144:1 206:4 256:13 259:20
**evidence** 36:8 36:15,24,25 38:13 54:24 60:8 70:2 71:4 76:22 77:3,4 85:13 168:25 262:6,8 301:9 302:8
**evidently** 20:9 66:17 223:10
**ex** 184:16
**exactly** 29:18 30:1 37:12 38:2 41:8 55:18 89:20 120:13 123:1 196:16 197:9 200:3 202:6 225:19 231:4 231:14 244:1 244:16 288:7
**exaggerating** 195:18,19 230:8 237:19
**examination** 3:6 9:16
**examined** 69:25 86:2
**examiner** 194:24
**example** 11:6 11:11,22 12:1 13:7 35:21 81:19 129:25 285:5,7
**examples** 144:8
**excel** 243:4 269:13 275:15 285:11 288:13 288:21 289:2,8 289:22 298:22
**excellent** 212:3
**excels** 289:14
**except** 226:13 227:14 236:13
**excerpt** 132:24
**exchange** 190:13
**exchanged** 247:14
**exchanges** 144:24 192:3
**excited** 129:1 192:21 193:2
**exciting** 195:6
**exclude** 49:2 61:22 62:15 64:5 69:12 98:1,17 139:2 139:21 160:8 161:13 166:15 255:17
**excluded** 97:22 248:15 254:7 256:20,23 310:4,12,18
**excluding** 175:5

**exclusion** 88:24 89:2 104:16 174:2 175:3,11 235:14 255:22 256:17 257:1,8 258:8 309:21 310:6 311:5
**exclusions** 235:5,6 248:7
**excuse** 136:6 212:16
**exercise** 107:21
**exercised** 107:25 108:4
**exhibit** 3:12,14 3:17,19 4:2,6,9 4:11,15,17,21 4:23 5:2,6,9,10 5:13,15,17,19 6:2,7,11,11,13 6:15,19,22 7:3 7:3,4,4,5,5,6,6 7:7 15:8,9,12 57:16 130:23 130:25 132:18 132:20,21,22 132:24 133:9 133:21 135:9 138:9 152:13 152:15,16 155:19,21,22 158:21,23 160:12,13,15 161:21,23 171:18,22 172:2,3 175:17 175:25 176:1 177:18,20 178:13,18 179:14 189:22 189:23 190:5 190:10 193:14 197:22,23 200:20,21 206:17 210:10 217:11 218:14 218:15 219:3,4 219:4 223:24 224:1,4,6,12 226:2 229:7,9 233:22,24 240:25 241:2 247:10,11 248:17,18 252:7 262:17 262:19 263:20 269:8,10,11,14 270:13 275:12 275:13 277:16 280:3,4,8 285:12,13 287:10,11,14 292:18 309:8
**exhibits** 7:1 217:8 223:23 269:7
**exist** 169:16 302:21 303:1
**existed** 78:7 185:18
**existence** 169:15 216:6
**expect** 207:3 213:17 249:20
**expected** 87:21 106:14 127:18 222:14
**expecting** 5:12 229:12
**expensive** 250:4
**experience** 13:9 13:17 14:4 18:19 38:21 69:18 80:4 114:7,9,19,20 207:16
**experiment** 14:10 27:2 80:12,18 83:19 127:12 179:23 179:24 213:5 236:4,24 238:18,20 239:11 240:3 291:20,21
**experimental** 292:22
**experiments** 14:17,19 27:17 27:20,21 28:7 70:8 80:8,19 81:10 86:24 92:5,13,15,25 120:23,25 121:21 122:9 122:14 127:1,8 128:3 135:15 135:21 137:15 137:25 288:23
**expert** 68:16 91:1 124:24 210:2,6 296:6 296:25 297:3,5 297:13
**expertise** 81:5 81:9 85:5 296:10
**experts** 69:1,4 69:12,25 70:14 75:1 104:25 293:10,23 310:23
**expiration** 314:22
**expired** 108:4
**explain** 77:8 89:22 111:10 114:22 118:15 118:21 134:1 147:18 154:7 187:14 213:2
**explained** 106:21 111:15 116:2 157:8

**explanation** 270:8 297:12
**explanations** 68:24 297:10
**explicitly** 208:18
**explode** 52:21 53:16
**exploded** 54:20 56:25 57:2 204:14
**exploding** 54:12,18
**exploratory** 99:21
**exposed** 177:22
**exposure** 184:11
**express** 228:6
**expressed** 140:11
**expression** 28:4 59:25 60:5
**extensive** 48:17 69:17
**extensively** 49:5
**extent** 61:21 62:14 64:4 69:8,9 92:6 160:7 166:14 198:25 298:25 306:19 310:18
**external** 127:8 127:9
**extra** 91:15,15 145:7 252:15 252:16 253:1 253:13,22 255:11,13
**extreme** 68:3
**eye** 62:22
**eyes** 25:22 61:4 61:15,15

**f**

**f** 277:17,18,22 277:25 278:5 314:2
**fabricated** 94:5 308:7
**face** 12:25 61:6 61:14,16 75:7 75:18 76:12 182:9 260:22
**facebook** 58:5 58:20 60:11 61:4 63:2,3
**faced** 141:7
**facing** 185:3 300:23 303:25
**fact** 13:3,22,23 24:25 39:21 40:8 65:10 68:12 72:18,22 83:16 106:21 135:24 142:17 168:17,20 208:20 209:8,9 209:10 227:3 266:8 300:16 302:23
**faculty** 156:13
**fail** 55:9
**failed** 27:1 83:19 96:11,13 99:25 127:12 219:13
**failure** 128:22
**fair** 50:6,18 60:14 123:20 171:8 203:3 237:17 271:8
**faith** 216:22
**fake** 33:22 144:9,9
**faked** 73:14 102:8
**faking** 102:7
**false** 11:5,7 42:12 58:11 72:12 77:25 181:25 260:22 261:16 311:23
**falsified** 94:5
**fame** 68:22
**familiar** 10:16 12:11 14:22 65:21,23 87:16 89:15 138:12 138:17 172:3 227:5,11 229:2 265:8,9 279:9 310:21
**family** 182:13 295:7,9,10
**fancy** 97:9
**fantasies** 79:14
**far** 36:20 38:9 41:2 52:23 82:18 100:6 210:23 235:3 268:22 305:10
**father's** 295:14
**favorite** 21:15
**fda** 35:22,25 36:1,7,11,20 58:12 64:24 87:17 88:8,15 150:18 172:15 175:21 177:11 183:3 241:5,6 252:7 298:2,15 298:17 299:4 299:10 300:12
**fda's** 298:9 299:4
**fear** 199:20
**features** 130:4
**february** 66:11 66:20 275:17 276:1 309:1
**fed** 51:6
**federal** 1:20 159:14

**feedback** 192:8 192:18 214:2 258:19 259:4 260:7 262:10
**feel** 12:6 37:6 75:7,17 76:11 116:3 188:10 194:17
**feelings** 10:20 10:23
**fell** 119:8
**felony** 144:12
**felt** 35:2 37:7 37:12
**female** 15:4,5,6
**field** 102:9,17 128:9,11,15 204:14 212:22 224:9 282:18
**fight** 31:22,23
**fighting** 65:16
**figure** 87:25 128:24
**figures** 105:5 221:14
**figuring** 252:4 282:22
**filamin** 27:5,7 27:13,22 28:1 28:4,5,8,10,12 28:18 30:5 81:20 82:6,14 83:2,6,8,10,25 85:11 86:3 119:1,14,20,22 120:8,9,12 121:3,6,10,23 122:15,25 123:2,3,7 124:12,14,16 124:17 125:15 125:19 129:20 129:23,23,24 130:5,13 259:22
**file** 50:5,21 51:6 140:13,18 168:15 216:22 219:12 221:12 222:1 223:4,8 224:20,21 225:11 226:3 226:11,22 285:3 287:20 289:22,24 304:12
**filed** 8:7 12:13 64:23 138:13 138:19 142:1 142:19 143:7 143:14 147:5 149:19 151:15 151:18 152:12 153:15 162:5 165:12,16 166:25 167:3,8 168:8,12,20 186:7,11 260:24
**files** 110:24 226:24 280:16 281:6 285:5 286:2,10,14,15 286:22 287:1 287:15 288:9 288:14,21 289:2,6,9,16 298:20 303:22
**filing** 45:12 47:21 50:11,17 51:13 151:8 153:23 186:17
**fill** 133:10,16 135:10,19,20
**filled** 133:16
**film** 71:16,17 72:23 73:7,8 73:10,11
**final** 254:2,7 266:22 267:10 267:21 288:14 299:2 303:8 309:9
**finalized** 85:4 85:13
**finally** 156:12
**financial** 189:2 189:6,13,14,17 191:25
**financially** 314:14
**find** 20:16,17 28:8 56:3 60:8 92:18,24 98:7 98:8 120:1 129:2 134:6 177:7 183:2,5 183:8,10,11 209:10 245:20 250:10,11 268:2 272:20 280:13 298:20 300:12,12 301:24 302:8
**finding** 81:14 121:9 124:6 125:13 197:16 197:21
**findings** 127:9 300:9,21
**finds** 121:5
**fine** 53:23 86:18 103:16 110:5 139:19 157:10 187:18 194:18 209:9 273:8
**fingerprints** 302:19
**finish** 57:21 123:22 239:9 247:19
**finished** 85:12 123:10 239:7,8 239:10

**firm** 8:14,21 48:10 69:24 74:25 138:24 139:13 140:2,3 141:1,3 152:18 153:14 155:24 183:23 184:2 314:23
**firm's** 70:14
**first** 4:19 9:15 31:9 41:11,16 58:19 59:16 73:15 75:13 83:18 85:6 90:14 96:12,14 97:13,20 98:4 98:9 103:7,19 105:14 110:1 110:12 112:23 120:2,2 131:9 135:24 136:15 138:21 159:3 162:9 172:23 176:5,11,14 177:21 178:19 189:25 194:2,8 195:8,24 198:7 198:12 203:16 204:25 213:7 215:9 221:11 221:16 222:2 223:19 226:5 236:22 243:17 244:8 245:6 246:7 248:24 249:5 250:1 251:20 260:15 273:9,21 282:14 293:20 297:15 307:15
**fit** 137:8 253:10
**fitzine** 122:2
**five** 13:19 24:10 65:3 77:18 78:14 86:7 124:10 158:16 161:3 162:16 166:5,9 166:19 230:20 234:14 236:12 237:1 240:17 240:18 261:21 262:2 264:19 293:8 298:22
**fiving** 55:7
**flag** 158:17
**flagrant** 49:22
**flagrantly** 42:12 181:25
**flat** 195:6,14
**flaw** 105:2
**flaws** 94:17
**floor** 2:4
**flow** 152:23 153:17
**flowchart** 160:1
**focus** 222:7
**focused** 97:11 101:11 103:20 127:22 249:18
**fold** 247:1,3 252:10,11
**foley** 6:4 262:22
**follow** 59:25 63:13 77:1,9 127:21 170:17 261:24 305:11
**followed** 23:18 81:25 125:4 288:12
**following** 23:23 24:4 66:9 76:21 79:4 104:1 125:16 159:10 304:12 304:17 307:25 313:16
**follows** 9:15
**foregoing** 316:5
**forget** 69:21 150:24 205:8
**forgetting** 191:16
**forgotten** 191:2
**form** 28:20 29:7,13 34:5 40:24 60:3,25 61:20 62:13 63:21 64:3 65:22 66:5 68:2 71:10 72:19 77:20 79:1,17 82:20 89:11 90:11 92:16 97:24 98:15 103:9,23 104:14 111:8 114:14 115:19 116:13 120:10 121:4 122:8 123:8 126:5,17 127:11 129:16 129:17 134:3 134:17,22 135:17 136:2,3 136:19 137:16 138:1 142:22 147:21 149:1 149:12,21 152:4 157:18 173:11,19 174:25 181:16 186:19 188:15 196:25 197:14 199:23 202:1 202:11 203:6 214:5 215:5 216:20 217:6 218:18 219:8 219:18,22 220:12,22 221:5,6 223:1

225:15 227:17 230:22 231:3 231:13 234:9 235:7 237:7 242:8 244:15 244:21 245:9 245:23 250:3 250:12 251:24 255:14,24 257:14,19,21 258:5 264:20 267:13,18 273:1 274:3,7 274:19 277:4 278:10 288:11 288:24 291:3 291:13 296:14 297:1,25 298:4 298:10 300:5 301:5 302:14 303:5 304:7,21 305:12,22 306:22 307:13 311:18 312:8
**format** 133:5 133:10 221:15
**fort** 314:24
**forum** 170:15
**forward** 153:4 153:6 186:16 306:12
**forwarded** 144:7,17
**found** 33:17 59:12 120:11 125:3 262:8 298:21 299:1 299:20 300:2 301:8
**foundational** 130:12
**four** 36:10 46:4 65:2 86:6,9 196:3,4 246:25 247:1,3 248:15 252:8,11 254:4 293:8 301:23 302:18
**fragment** 121:5 121:24
**frame** 218:11
**francisco** 76:19 108:22
**frankly** 198:16 198:22
**fraud** 22:4,6 25:2 31:4 32:13 33:7,14 33:16,17 35:8 35:8 46:1 47:7 53:11 54:24 55:8 60:18 65:17 100:13 295:13 296:3
**frauds** 39:1
**fraudster** 38:13
**fraudulent** 102:16,18
**fray** 61:17,19 61:25 181:8,15
**frcp** 314:1
**freaking** 50:8 52:20
**freedman** 225:22
**freely** 83:12
**freezer** 13:21 127:15 282:23 283:8
**fret** 310:21
**fridge** 127:16
**friedmann** 54:15,19 57:1 106:23 107:6 140:6 141:1 167:25 173:6 175:1 233:13 233:15,16,17 253:5 255:3 256:16 261:9
**friedmann's** 243:9
**friend** 118:4,5 147:23 148:1 148:20
**friends** 48:4 49:10,12 58:20 60:11 61:5,8 63:3 140:19 141:5,10
145:20,20,22 145:23 148:16 149:14 293:21 293:23
**front** 57:17 76:8 128:13 133:5 175:25
**frontline** 36:2
**frozen** 13:24,25 42:13 269:17
**fruitful** 148:2
**frustrated** 21:11 77:11
**frustration** 42:18 140:12
**frykman** 6:8
**fuckheads** 30:17 34:22 35:5,12
**full** 112:10 146:1 174:7 175:6 176:12 177:4 267:9
**fully** 91:19
**fuming** 52:21 53:16
**fun** 142:7
**function** 114:16
**functional** 120:5
**funded** 32:10 145:25 308:25 309:1

**funds** 32:11
**funny** 37:1 73:5,5 74:12 298:5
**further** 186:16 314:1,11,14
**fw** 6:4

**g**

**g** 273:19,19
**gabriel** 157:19
**garbage** 171:11
**gel** 72:5 73:7,8 137:5,9 138:3
**gels** 68:13 72:3 137:6,20 138:2 138:6
**gender** 18:17
**general** 65:25 71:5,6 89:7 213:16 307:2
**generally** 10:7 42:22 44:2 49:21 63:15 70:25 87:17 88:18 89:4,5,8 89:21 90:2 92:17 105:3 113:25 187:8 205:24 213:14 220:16 221:2 227:7,13 229:6 273:25 274:10 300:11
**generating** 99:21
**generous** 105:12
**genevieve** 2:9 9:6
**genocide** 181:12
**genuinely** 181:22
**geoffrey** 12:12
**getting** 32:2 79:13 127:15 196:12 205:23 205:25 206:2 215:15 275:16
**ghosted** 76:20
**gibson** 2:15 9:8
**gibsondunn.c...** 2:17
**gillen** 144:16
**gilligan** 145:3
**give** 11:6,22 13:7 15:13 26:17 58:19 59:9 105:5 106:12,15 213:23 236:11 266:11
**given** 56:22 107:22 116:22 204:24 300:1 313:19 316:9
**giving** 150:7
**glanced** 171:10
**glasses** 17:16
**glp** 299:8,9,24 299:25 300:6,7
**go** 14:2 20:5 26:8 30:9 33:2 37:1 55:2 57:4 66:23 71:13 84:11,15 94:19 100:7 120:13 127:16 133:9 139:5 150:20 151:17 157:12 160:14 162:7 164:23 171:14 171:19,21 183:4 184:1 202:21 214:19 222:23 225:3 252:6 258:23 263:7,11,13 266:1 270:21 290:14 293:6 298:19 307:21
**goal** 88:25
**god** 213:6
**goes** 13:21 57:18 129:23 294:1
**going** 8:2 18:23 19:15 31:19,20 31:22,24,24 33:4 34:25 36:19 41:11 42:2,20,22 44:21 47:1 48:1,18 51:9 52:17 55:9,13 57:10 60:7,19 62:24 69:7 82:21 84:17 89:1 92:20 94:23,24,24 97:17 98:6,14 100:21 103:3 103:16 110:4 111:24 122:20 130:18 139:1,7 141:24 142:4 142:10,15 144:9 147:22 147:24 154:10 155:14 158:13 166:11 170:25 181:25 182:4 183:7 191:18 191:19,21,22 194:7,16 205:9 205:12 206:11 209:24 211:17 212:20 213:18 214:8 225:3 226:19 228:8 228:23 233:21 240:16,20 242:18 245:13 245:25 246:4

246:17 247:1,8 249:14,23 250:5,17,18 251:2,13 263:14 264:15 264:15 267:15 273:5,25 274:10 282:11 284:3 292:12 306:14 309:3 312:19
**good** 8:1 9:18 64:17,22 79:25 88:18 89:9 91:11 92:4,15 92:21 97:14 116:15 130:24 148:10 169:20 183:11 206:7 210:5 216:22 228:19 231:16 232:9 233:7 237:15 248:2 271:21
**gotten** 26:24 104:25
**government** 183:18
**grant** 168:23 169:8 307:16 308:16,17,18
**grants** 108:3 182:15 307:4 307:15,18,18 308:3
**graph** 235:8,12
**graphs** 5:13
**gravimetric** 91:23
**great** 94:20 100:19 115:7 125:19,20 195:25 207:16 207:16 216:25 229:21 230:14 249:7 307:17
**greater** 20:1 207:3 248:2 252:17 253:2 254:5,17,18 256:21,24
**grilled** 259:6
**grounded** 13:2
**group** 65:19 73:16,19,21 74:2,7 95:11 97:17 100:8 201:5,12,19,23 201:23 203:2 205:15 206:6 226:17 267:14
**groups** 5:5,8 74:4 224:8,9 224:22 226:11 235:2 242:22 244:25
**grow** 127:17
**guarantee** 274:24
**gueron** 2:4 8:22
**guess** 90:16 102:22 161:2 161:12 207:13 226:10,13 282:4
**guessing** 161:6
**guidelines** 76:21,22 77:1 77:10 79:4 121:15 159:11 160:1 261:25
**guinea** 232:17
**gussin** 115:14
**guy** 6:3 113:23 114:11 129:1 191:22 193:2 262:21 295:23
**guys** 145:1 295:23 312:4
**gyorkerwin** 2:12

**h**

**h** 3:11 4:1 5:1 6:1 17:17 54:3 273:12 315:3
**ha** 27:2
**hacking** 89:16 89:23 257:19 257:23
**half** 17:12 98:10 99:16 209:3,14 243:19,23 244:9,10 245:6 245:8 246:8,17 248:24 249:5,9 249:13 250:1,2 251:21,23,25 252:9 261:15 261:16 271:10 271:24 272:1 272:22 273:4 274:12,12
**halfway** 67:2 293:7
**halloween** 163:11
**halves** 244:14
**hand** 68:13 73:8 144:1 145:7 150:3 183:24 247:11 262:13 302:24
**handful** 98:21 117:20
**handle** 64:8
**handled** 77:13
**handling** 173:8 173:16 205:16 242:12 279:14
**hands** 43:6,6 203:24 207:16 225:3 228:19

228:22 229:3 229:20 230:4,7 230:14,21 231:2,9,12,21 231:24 233:6,7 302:18
**hang** 172:9 263:6
**hans** 6:8 269:15
**hanson** 203:17 203:19 207:12 214:15 215:3 216:24 242:18 285:22
**hanson's** 212:3
**hansson** 6:20
**happen** 13:15 140:22 144:5 149:6,20 205:10 211:17 214:9 225:1,5 228:10 310:22
**happened** 100:17,20 146:5 184:8 215:14 298:7,8 300:10
**happening** 17:2 17:4,7 42:19 79:10 90:18,25 155:3 166:22 193:3 252:21
**happens** 90:20
**happy** 33:2 42:7 142:1,6 163:11
**hard** 22:20 53:14 58:10 88:16 97:11 104:24 145:23 145:24 183:14 208:17
**harm** 31:18 32:20 182:11 182:18
**harvested** 13:19
**hash** 104:25
**head** 90:16 123:16 156:8
**header** 198:9
**headline** 98:7 131:23 292:21
**healthy** 27:15 115:9 270:4,9 270:21 271:22 271:22
**hear** 100:22 123:22,24 295:14
**heard** 89:18,19 228:21,25
**hearing** 294:8
**heavily** 78:13
**heck** 88:1 94:2 220:14 223:8
226:16 242:17 260:1
**hedge** 32:10
**heilbut** 1:3 2:23 8:6,20 10:17,21 17:13 17:20,25 58:8 62:11 79:15 95:25 172:7 175:22 176:4 313:3 315:1 316:1
**held** 113:1 169:8
**hell** 22:11 109:2 184:12
**hellbutt** 44:11 44:17 45:2
**help** 58:1 83:17 90:17 128:24 129:2 161:8,14 179:23 191:5,8 224:25 254:14
**helped** 81:10 117:20 118:3 257:5 296:7
**helpful** 211:5
**helping** 74:8 163:14
**helps** 177:7
**hereto** 316:8
**hey** 59:17,19 124:7 236:8
**hi** 159:6 162:12 211:8 269:15 286:1,13
**higgins** 69:20
**high** 13:9 55:7 55:24 71:18 85:6 118:24 119:8 164:21 226:10 248:12 248:13,16 252:13,16 253:1 254:3 270:3,6
**higher** 200:6
**highest** 98:10
**highlighted** 278:12 310:13
**highlighting** 226:1,21,23
**highly** 1:11 28:25 74:23 94:25 95:1 182:12 215:8 245:14
**hill** 52:23
**hindsight** 104:23 183:13
**hire** 40:23 106:13,25 107:1,8 111:4 111:7,11 184:2 242:16
**hired** 32:8 39:16 40:13,17

41:17 48:10 69:12,17,23 70:14,24 74:25 102:22 104:18 105:6 110:21 111:2,3 112:4 183:23
**hiring** 70:14
**historical** 267:3
**hit** 65:4 88:11 88:15 119:10 119:19 122:20 145:19 146:9 146:12,13,19 147:8,11,14,20 262:15 301:19
**hoau** 4:12,15 4:18,21,24 5:7 5:17 20:2 149:17 190:13 207:15,23 208:7 223:11 224:9,17,20 229:22 230:13 233:5,7 247:6 268:4 274:23
**hoau's** 207:1,9 208:1 229:19 230:16 231:15 231:21 238:15
**hoc** 172:22 173:23 179:19 234:6,10,10,20 234:25 235:5,6 235:16 255:22 255:25 256:1 256:10 258:7
**hoch** 75:21 76:14 77:16 78:19,23 79:8 156:8,12
**hold** 48:13 70:17 113:6 139:17 144:1 153:5 154:2 156:22,22 157:9 166:2 168:23 169:1 182:15 183:24 187:4 220:21 263:1,4 308:19 309:3
**holding** 145:7 150:3 262:13 296:20,24 297:3
**holdings** 112:16
**holds** 177:11
**holmes** 31:3 33:8,13 34:1,2 47:8
**honest** 17:5 144:25 295:23
**honestly** 161:20 164:10 202:4 277:21
**hope** 142:18 143:2 150:13 183:11
**hoped** 22:19,21 150:13
**hopefully** 204:2
**hostetler** 1:19 2:10 9:4
**hour** 57:9
**hours** 13:19 96:12 109:11 109:25 110:8 110:14,17 150:3,3,5 262:14,14
**house** 53:12 190:15,16
**huge** 23:19 24:2 124:8 126:7 248:10
**huh** 21:23 30:12 40:3 76:15 96:4 113:3 131:22 133:13 144:21 146:10,17 153:1 155:1 156:1 162:18 163:9,12 172:21 206:25 221:1 249:3,11 273:23 278:7
**human** 28:1 35:10 102:12
**hundreds** 13:13 109:25 110:7,14,19 150:5
**hung** 74:9
**hurt** 254:14 257:5
**husband** 107:17
**hyperphosph...** 124:6 125:5
**hyperphosph...** 125:11
**hypothesis** 99:20

**i**

**i.e.** 254:5
**ice** 127:14 283:8
**idea** 19:4 108:1 113:9 143:14 155:4 163:2 209:25 284:25
**ideally** 192:21 197:15 231:18
**identified** 110:25 118:24 124:11 227:15
**identify** 161:8 161:14 191:7
**ids** 224:16,21
**ignore** 191:18 191:20

**ignored** 111:22
**il1b** 207:2
**illegal** 144:10 144:10
**illegally** 261:3
**illiterate** 177:24
**illusion** 22:8
**image** 68:1,7 71:16,18,20 72:23 73:4,18 73:24 74:1,10 74:15 137:5,19 138:7
**images** 68:5 70:23 71:9,12 71:15 72:16,17 72:18 77:6 92:19 137:14 301:7 302:23
**imagine** 143:20 195:8
**immediately** 283:8 297:18
**immoral** 30:17 34:22 35:4,6,9 43:11
**impact** 301:2
**impacting** 189:6
**implanted** 127:19
**important** 30:24 61:9 124:9 128:7 196:20 197:12 226:20 242:2 251:15,16
**impossible** 228:15 231:7 232:8
**impressed** 208:6
**improper** 300:3
**improved** 238:13
**improvements** 226:6 227:14
**inability** 237:20 238:1 240:5
**inadvertently** 222:24
**incentive** 106:12,17 107:3 190:22
**incentivizing** 47:11
**include** 62:16
**included** 148:18 172:12 190:24 219:12
**includes** 64:4 254:2
**including** 8:15 24:21 77:18 126:8 159:9 198:18 261:22 296:21
**inclusion** 104:15 310:6
**income** 108:15 108:23
**incorporated** 8:7
**incorrect** 183:13
**increased** 248:4 252:12
**increases** 88:10 254:20 257:6,7
**incredulous** 195:8,24
**ind** 5:15 307:17
**independent** 127:24 196:19 196:24 197:7 198:13,18 200:14 268:15 296:6,25 297:3 297:4
**independently** 147:20
**indeterminate** 205:5
**indicate** 138:6 271:5
**indicated** 13:12
**indication** 103:13
**indications** 109:15
**indicator** 137:18
**individual** 2:8 8:25 9:5 86:11 150:6 224:15 224:18 264:24
**individually** 150:6
**individuals** 60:24
**induced** 3:17 131:25
**industry** 255:4 255:6,10
**infection** 128:21
**infectious** 129:1
**inflammation** 130:4
**inflammatory** 128:18,20,22 130:3
**influence** 304:5
**influenced** 302:12
**inform** 169:24
**information** 5:15 25:1,12 42:4 50:25 53:9 62:7 69:10 95:11 152:22 153:12 155:16 170:19

183:20,22,25 186:16 216:17 217:3 218:15 219:5,21 221:4 222:25 259:7 259:12 261:1 265:19
**informative** 226:20 251:3,9 252:1
**informing** 170:8,13 252:11
**infuriated** 47:17 50:3
**infuriating** 45:9,15,22 46:20 47:5 50:14
**ingested** 174:8
**inhibitors** 92:1 269:22
**inhuman** 46:1
**initial** 267:8
**initially** 53:7 99:24 102:25 109:25 123:19 204:9 243:17 243:24
**ink** 72:8
**inn** 81:24
**input** 165:22 211:5 269:15 271:1
**inquiries** 159:18 296:8
**inquiry** 4:8 159:4
**inserting** 135:1
**inside** 25:3 42:3 166:20 186:21
**inspection** 298:3,9
**instance** 1:16 56:8 201:16 255:21 291:15 291:16 292:2
**instances** 53:24
**instigated** 183:7
**institution** 72:14 231:7 301:24 303:9
**institutional** 60:6
**institutions** 78:19 159:11 159:25
**instructed** 61:19,25 62:10 64:2 165:6 298:15,18
**instruction** 62:2,4 155:7 162:25 163:17 163:20 187:15 299:4,5
**instructions** 155:18 157:1 160:11 163:18 163:23,25 164:2,6,9 166:20 214:25
**instrument** 280:17 281:9 281:10,15,23 281:24 285:10
**instruments** 284:13,14
**insufficient** 77:7,9
**integrity** 74:19 80:6,23 296:1
**intend** 58:21
**intended** 16:23 17:5 61:2,3,11 61:12,13,14 123:25 220:6 223:13 287:9
**intent** 217:1
**intentionally** 152:7
**intentions** 17:8
**inter** 212:8
**interacted** 243:13
**interacting** 243:12
**interacts** 123:3
**interest** 77:15 77:17,22 78:7 157:25
**interested** 92:2 97:10 125:15 223:21 314:15
**interesting** 41:12 101:16 245:12 283:11
**interests** 189:2 189:6
**interfering** 28:3 144:11 238:23
**internal** 299:15
**international** 309:17
**internet** 59:11
**interpose** 69:7 139:2
**interpret** 60:22 213:8
**interpretation** 214:10
**interpreted** 61:10 207:25 230:25
**interpreting** 59:6 231:8
**interrupt** 77:2
**interruption** 78:1
**interviewed** 49:5
**interviews** 39:18

**intricately** 129:21
**introduce** 247:2
**invalid** 205:5 214:12
**invent** 302:20
**invented** 72:15 121:16 141:15 183:6 301:25 301:25
**inventing** 40:22 78:11 185:6 302:25
**inventions** 191:14
**inventive** 302:10
**inventor** 116:6 116:8
**investigate** 36:9 37:1 48:11 70:15 216:15 225:4
**investigation** 36:16 48:15,17 49:9 60:2,6,7 70:18,20 74:11 75:1 183:16,24 265:17 287:8 301:12 303:3 304:6
**investigational** 309:10
**investigations** 45:11 47:21 50:16
**investigator** 298:19
**investigator's** 298:16 299:6
**investments** 108:18
**investor** 158:2 295:20 296:12 297:16,24
**investors** 177:24 180:25 307:1
**involved** 78:14 95:13 98:16 106:16 129:21 130:6 143:13 151:10 154:12 157:16 192:23 193:1 214:19 293:17 297:6 303:10
**involvement** 152:9,11 154:6 186:13
**involving** 157:17
**iratxe** 3:20 4:3 156:5
**irrefutable** 122:5
**isaac** 2:3 8:24
**isolating** 34:14
**issue** 60:5 62:9 103:5 104:22 234:22
**issued** 59:25 168:24 185:10 264:6 298:4
**issues** 56:14 211:20 214:16 279:5
**it'd** 104:7
**itc** 85:8
**ivf** 13:23
**izaur** 2:6

**j**

**j** 2:3 4:8 6:4 112:14 159:4,6 159:24 160:2 193:16
**j&j** 258:18
**jacobson** 2:18 2:19 9:9,9,10 57:8
**jacobsonlope...** 2:21
**janelidze** 6:19 285:15,16,18 285:19
**january** 105:13 247:14
**jci** 265:17 266:4
**jeff** 214:13
**jesse** 1:3 2:23 8:20 45:6 58:8 67:3,10 144:19 172:7 313:3
**jesus** 33:14 56:15 181:19
**jim** 6:2 98:20 104:21 110:2 110:12
**jlr** 1:4 8:9 313:4
**job** 12:9 40:7 62:24,25 63:1 142:24,25 149:4,23 150:1 167:19 185:19 185:20 289:10 290:4,6,10,12 290:13,13,14 290:18,20 302:7,8
**jockers** 309:12 309:22 311:4 311:13
**john** 281:11
**johnson** 259:4 259:5 260:8,8
**joined** 112:21 112:24 138:7
**joke** 83:21
**jones** 6:15 280:9,12 285:6

**jordan** 147:13
**journal** 15:15 15:22,23 21:16 30:9 38:4,11 38:23 39:4 58:13 59:19,21 59:22,24 72:14 73:18 77:16 79:22 93:1 100:22,25 101:5,6,10 140:11 146:22 188:14,21 235:25 236:19 236:20,20 261:21 262:8 264:18 265:16 265:16 266:4 296:7,9,12,21 296:23 301:8 301:24 302:7 309:18
**journals** 59:16 59:23 68:5 74:6 92:19 101:15,22 235:22 236:15 238:5 265:24 296:21 297:22
**jpad** 101:9 109:22
**judge** 114:16
**judgment** 183:12
**judit** 112:12
**july** 29:5,24 85:17 109:8 114:24 117:19 193:17 194:3 200:24 221:22 222:3,16 229:11
**june** 225:20,20 304:10
**jury** 33:17
**justify** 249:9,13

**k**

**k** 54:3
**kate** 4:7,12 152:17 155:23 158:25 159:6 162:1,15
**kawas** 68:21
**keep** 16:3,4,14 16:17,19 45:9 45:24 50:4,14 74:24 80:10 86:23 95:11 105:7,18 132:21 160:25 161:2 169:7 225:6,17 282:10
**keeping** 17:9 45:23 87:2 128:8 188:21
**kept** 15:17 22:17 152:6 283:9
**kickboxing** 75:7,17 76:11
**kicked** 55:25
**kidding** 236:11
**kill** 31:17 32:6 35:1 117:13 182:5 188:24
**killed** 34:25 100:18
**killing** 128:22
**kind** 13:3,22 85:5 100:18 113:21 141:21 145:12 179:25 191:13 204:20 216:2 223:3 226:8,18 245:16 248:6 249:19 287:7 298:5 310:22
**kinds** 68:13 251:11,11,12 302:25
**kits** 91:19
**knew** 54:23 65:17 107:19 119:2 122:18 122:19 138:24 139:12,24 149:17 183:21 205:15 228:18 232:10 272:2,2 298:1
**knock** 83:7
**know** 10:19,22 10:22,25 12:9 12:13,16,22 13:2,2,15,22 14:1,18,23 16:5,13 17:4 18:18 19:1,4 19:10,12,13 21:8,9 22:8,20 22:21 23:9,25 25:2,6 26:23 29:1,14,21 30:16,23 31:14 31:17,25 32:2 32:8,14,21 33:6,22 34:13 35:7 36:15,19 36:21 37:7,8 37:16 38:1,2,7 38:10,12 39:2 39:10,15,22,23 40:6 41:2,3,8,9 42:14 43:2 44:7 46:1,9 47:11,23 48:5 48:7,8,19,24 49:4,5,19,21,21 49:24,25 50:20 51:18,20 52:13 53:8,11,12 54:22 55:18

| | | | |
|---|---|---|---|
| 57:4 58:10,20 | 114:2,11,15 | 156:12,19 | 209:23,25 |
| 60:19 61:5 | 115:8 116:14 | 157:1,4,24 | 210:23 212:21 |
| 62:18 65:15,16 | 116:23,24 | 158:5 161:2,3 | 212:25 213:5 |
| 65:24 66:6,22 | 117:10 118:2 | 161:19 163:4 | 213:11,23 |
| 69:8,15 72:16 | 118:11 119:7 | 164:14,19 | 215:8 218:22 |
| 73:5,5,9,11,14 | 121:12,13,16 | 165:8,14,17 | 218:25 225:2,2 |
| 74:1,8,10,19,21 | 121:18 122:4 | 166:4,5,6,8,16 | 225:4,25 226:4 |
| 76:4,5 77:12 | 122:16,23 | 166:20 167:25 | 226:5,9,10,15 |
| 77:12 78:21,21 | 123:11,11 | 168:2,3,14 | 227:22 229:2 |
| 79:10,12,13 | 124:8,17 | 169:7,16,17 | 230:9,10,17 |
| 80:5,8,9,10,20 | 125:18 127:17 | 173:1 174:6 | 231:15,17,17 |
| 81:6,11 82:18 | 128:3,4,6 | 175:13 176:15 | 231:23,24 |
| 82:23 83:11,14 | 129:18,23 | 176:25 177:5 | 232:11,15,16 |
| 83:17,18 85:12 | 130:3 131:11 | 179:6 180:2,21 | 232:19 235:3 |
| 86:4,7,7,25 | 132:8 134:7,10 | 180:24 181:2 | 236:18 238:6,9 |
| 87:1,10,14,22 | 134:24 135:3,4 | 182:1,25 183:6 | 239:15 240:16 |
| 88:21 89:5,14 | 136:22 137:7 | 183:7,11,12,13 | 244:1,5 247:5 |
| 89:20,20,21 | 137:10,21 | 183:21 184:12 | 249:19,20 |
| 91:7,17 92:6,8 | 139:23 140:5 | 184:16 185:18 | 250:6,6,22,22 |
| 92:20,22 93:25 | 140:22 141:15 | 185:19,23 | 251:14 253:11 |
| 94:2,9,19 | 141:20,23 | 187:23 188:11 | 253:16,24,24 |
| 97:13 100:3,4 | 142:5,8,13,16 | 188:11 190:23 | 255:15 256:11 |
| 100:13,14,20 | 143:5,10,11,12 | 190:24 191:1,1 | 259:3 260:1 |
| 102:4,7,15,24 | 143:13,17,18 | 191:4,5,10,12 | 261:7 262:13 |
| 103:15 104:5,6 | 143:19,21,23 | 191:16,17 | 264:15,23,24 |
| 104:23 105:7 | 143:24 144:25 | 195:22,22 | 265:4,8,10,11 |
| 105:11,18,20 | 145:9,10,21 | 197:9,21 200:4 | 266:8,8 267:5 |
| 105:20 106:19 | 146:1,21 | 201:8,13,15,17 | 267:6 271:3 |
| 107:5 108:5 | 147:13,24 | 202:3,6,21 | 274:10 275:9 |
| 109:1,3 110:3 | 149:15,18 | 203:7,25 | 276:19 277:20 |
| 110:7,22 111:9 | 150:4,16,17 | 204:18,23 | 277:21,21,24 |
| 111:18,20 | 151:10,13 | 205:9,11 207:4 | 281:3,5,7 |
| 112:6,17,18 | 152:11 154:10 | 207:11,18,21 | 282:1 285:2 |
| 113:12,22,23 | 155:2,3,14,15 | 208:2 209:12 | 286:3 287:4 |

288:18 292:9 293:3,3,5,19,22 295:2,18 296:1 296:1,19 297:19,23 298:18,21 302:1 305:2,4 305:7,10,18 307:23 308:21 309:2
**knowledge** 29:25 35:7 69:10 82:12 85:3 148:15 151:7 153:22 165:19 204:11 215:20 240:10 304:4
**knowledgeable** 25:3 66:8 284:21
**known** 74:16 74:18
**knows** 13:14 96:10 213:6,14
**kol** 211:4
**kols** 232:5
**korean** 69:21
**kumagai** 2:2 3:6 8:19,19 9:3 9:17 19:9 43:21 46:12,19 46:23 47:1 54:3 57:7 78:5 84:15 86:16,19 95:5,9,14,17 118:14 129:10 130:16 133:2 137:1 139:5 169:21 170:23 193:12 194:25 199:15 206:10 210:13 217:16 227:10 240:15 263:2,7,11 276:5,17 282:15 292:10 312:11,15 313:22
**kumar** 6:8
**kupiec** 6:2 98:20 104:21 110:12,18,18

**l**

**lab** 26:25 71:13 81:7,8 82:12 82:13,25 83:1 83:22,23,23 84:2 85:5,14 85:21,22 90:15 90:25 91:2 93:4,5,17 127:8,9,24 132:15 163:6 178:19 179:20 179:22 192:22 197:17,18 200:2,14 202:8 202:10 203:19 203:23,23 204:4,6,24 207:16,18 214:18 215:21 215:25 216:24 220:15 230:9 230:11,13 231:6,6,16,18 231:24 238:15 238:17 274:23 289:7 291:5 298:3 299:8,9 299:15,20,23 300:8 303:15 303:15,16,18 303:21
**label** 179:18 266:14,21,25 267:5,9,22 268:10,16 269:2 270:15 272:18 276:7 277:1 278:25 282:24 283:16 283:24 284:8 295:15 302:20
**labeled** 122:2 179:21
**laboratories** 260:5
**laboratory** 86:23 87:7,7
**labs** 81:4,6 132:17 180:1 204:13 228:9 268:15 299:25 300:17
**lack** 174:4 238:15 267:2
**lanes** 137:7,8 137:21 138:4
**language** 53:13 195:17
**lap** 55:7
**large** 102:11 124:3 169:8 204:19 254:20 257:6,7 274:24 308:17
**larger** 34:13 258:24 259:1
**late** 225:20
**latest** 238:4
**laura** 6:16 288:5 289:10 290:9 292:9 299:17 300:11 300:18
**laurie** 5:20 248:20
**law** 8:21 48:10 70:13 74:25 138:24 139:13 140:2,3 141:1 141:3 152:18 153:14 155:24

183:23 184:2
**law.com** 2:6,6,7
**lawrence** 2:15
**lawsuit** 138:13 169:25
**lawyer** 49:24 141:12 142:15 142:15 149:3
**lawyers** 51:10 51:12 169:5 181:3 263:21 306:18
**leading** 212:4
**leaked** 301:17 303:8
**lean** 97:14
**leap** 50:12 51:8 237:2
**learn** 68:23 217:19,21
**learned** 14:8 42:2 78:12 85:6 184:10 216:21 217:7 217:15,19
**learning** 96:12 174:18
**leave** 29:4 114:24 127:13 257:7
**leaving** 117:18
**led** 119:10
**leen** 68:21
**left** 29:23 85:17 105:10 109:8 110:2 133:24 193:7 226:3,21 235:9 269:20 291:1
**legal** 47:24 48:2,14 49:2,9 61:22 62:17 69:11,12 95:12 95:12 139:4,20 139:20 143:12 149:2 151:15 152:6 314:23
**legitimate** 145:8
**length** 283:10
**lengthy** 34:14
**leslie** 6:15 280:9
**lesné** 102:4
**letter** 35:22,25 36:1 65:3 76:8 148:8 159:9,22 159:24 160:1 172:12,14 175:21 177:11 293:25
**letters** 171:7 297:23
**letting** 53:3 194:24
**level** 55:8 90:25 95:1 164:21
**levels** 269:20 270:3 271:11 273:9,13 275:1
**liability** 184:11 185:3,5
**liable** 308:10
**libraries** 126:7
**licensure** 64:25
**lie** 125:25
**lies** 141:15
**life** 19:6 63:10
**lightweight** 11:25
**likelihood** 252:12
**likely** 98:3 284:4
**likes** 88:15
**lilly** 258:18,19 260:9
**limit** 214:24
**limitations** 159:16
**limited** 194:19 252:3,4
**lindsay** 1:8,12 1:16 2:18 3:5 3:13 4:6,9,9,12 4:16,18,21,23 5:6,10,18,19 6:3,7,15,19 8:4 9:14 11:24,25 152:24 162:19 211:8 280:13
286:4,13 309:11 312:18 313:8,12,17 315:2,24 316:2 316:4,12
**lindsaybbar** 64:10
**line** 142:5,11 194:23 198:15 207:1 208:12 226:14 227:20 315:4,7,10,13 315:16,19
**lined** 239:14
**lines** 20:20 230:18 231:18 252:8
**link** 142:23
**linkage** 124:16 125:6,10
**linking** 124:3,9
**list** 104:15 111:25 152:23 162:16 166:5,8 236:9 237:13
**listed** 162:15 176:5
**listen** 294:25
**listening** 178:5
**listings** 221:14
**literally** 290:2
**literature** 99:18 209:10

**little** 11:24 14:6 30:17 34:21 57:25 63:3 68:6 102:1 119:8 183:10 187:10 202:21 228:11 256:5,8 259:3 260:23 261:9 265:8 297:19
**lives** 209:3,14
**living** 40:1
**llp** 1:19 2:4,10 2:15
**location** 8:10
**log** 3:12 16:1,3 16:20,24 17:2 66:25 140:11 140:16
**logbook** 79:22 87:8,14 188:14
**logged** 63:19 63:23
**long** 47:12 115:5 117:10 156:10 167:9 167:11 178:19 183:9 197:4,10 208:10 237:13 240:16 282:25
**longer** 60:19 97:8 150:12,21 151:2
**look** 18:22 21:19 38:12 44:8,19 59:1,8 67:22 71:13 73:12,15 98:9 100:17 111:21 131:13 133:4 139:25 143:24 145:1,1,6 146:2,5 167:21 172:3 178:18 179:1 180:13 181:17 184:1 193:2 206:1 207:10 208:6 224:17 227:22 239:24 243:16 244:6,23 246:1 249:7,14 250:4 251:2 253:24 257:4 260:23 263:5 270:12 270:17,23 274:8 277:16 280:7,20 294:2 298:20 309:3
**looked** 43:4 56:24 71:11,19 72:25 73:5 74:4 102:5 104:5 140:10 167:18 176:12 179:2 197:19 209:11 221:8 221:22 235:4 238:24 243:3 244:4 250:14 255:23 256:5 282:1 309:21 310:17
**looking** 20:19 32:22 48:22 53:22 57:16 99:25 128:13 131:9 136:11 138:8 140:15 176:7 183:14 224:6 249:19 251:8 286:3 310:1
**looks** 67:13 73:24 100:19 159:23 172:25 201:3,5 248:2 249:20 250:5 263:21
**loop** 155:2 169:7
**lopez** 2:19 9:10
**lost** 78:2 286:6
**lot** 14:7,8 16:5 72:25 87:1 104:25 111:1 123:12 128:12 130:5 150:9,9 150:12 158:17 182:4 215:25 228:14,17 271:14 272:5 273:3,9 279:5 279:5 305:17
**lots** 212:20 215:15
**loud** 52:24 53:3
**loudly** 179:5
**loved** 236:13
**loves** 230:12
**low** 122:16 226:10 271:23
**lower** 119:9,17 200:6 236:20 236:20 269:19
**lowest** 184:25
**ludicrous** 12:25 13:4 259:21 260:22
**lund** 203:18 204:9 205:3 214:11,15 215:3 219:13 229:21 268:17 283:21 286:21 287:3,6 291:1 291:4
**lymphocyte** 34:9,9,20
**lymphocytes** 34:14

**m**

**m** 6:11

**mac** 157:13
**machine** 1:19 27:1 33:18,19 122:3 214:20 228:13 279:6,7 281:3,15,16,19 282:7 284:16 286:22 287:23 289:25
**made** 11:13 15:1 22:8,12 24:23 26:14,21 27:4 29:14 35:11,14 42:16 56:9 58:5 65:10 77:23 79:7 94:5 100:13 119:22 126:1,3,15 134:8,25,25 144:5 175:2 177:1,2 180:11 180:16 185:25 225:21 226:11 256:3 259:14 294:1 296:17 299:5 304:11 316:5
**madison** 2:4
**magic** 122:21 228:21 229:3 229:19 230:4,7 230:21 231:2,9 231:12,21
**main** 259:22
**maintaining** 92:14
**major** 208:22 284:7
**make** 12:6 15:5 25:20,23 31:19 33:23 37:4,6 40:1 44:25 48:1 51:12,18 55:1 68:7 73:15 89:6 91:19,23 126:1 135:16 137:2 137:19 140:21 141:19 149:3 155:7 182:4 188:25 195:20 202:16 208:19 213:22 230:8 236:8 246:20 281:4 287:9 290:19
**makers** 32:6
**makes** 25:6 33:16 48:23 80:25 81:1 91:14 94:8 114:18 132:12 181:7 188:7 219:10 295:22
**making** 25:4,5 25:7 32:11 41:10 51:8 188:2,4 276:18 300:16
**malicious** 188:5,7 311:24
**management** 56:14 291:7 307:18,19
**manager** 77:13 203:24 214:18
**mandavilli** 294:22
**manipulated** 13:12 59:15 67:22,22 68:1 68:18,19 74:14 90:7 94:5 102:21 132:10 134:6 308:7
**manipulating** 89:24
**manipulation** 25:13 59:17,20 60:9 70:3 71:4 72:24 73:4 76:23 77:4 159:8 262:7,9 295:4 301:4,9 302:8
**manufacturer** 214:25
**manuscript** 235:17 237:5 237:18 238:1 240:6
**march** 131:6 262:12 309:9
**mark** 15:9 130:25 132:19 155:19 158:21 160:13 161:21 189:23 197:23 217:9,11 223:25 229:8 241:1 248:18 262:17 269:8 269:10 275:13 285:13 287:11
**marked** 7:1 15:8 130:23 132:18 152:13 152:13,15 155:21 158:23 160:12 161:23 171:18,20,22 172:1 189:22 193:14 197:22 200:20,21 206:17 210:10 217:8 223:23 223:24 229:7 233:24 240:25 247:10 248:17 262:19 269:7 275:12 280:3,4 285:12 287:10 292:18 309:8
**marker** 72:9

**markers** 71:25 72:2,11 77:25 301:22
**markey** 172:7 176:5
**marsman** 175:1 299:18
**mass** 27:24
**massage** 257:16
**massaged** 257:11
**massive** 205:14 205:18,19 211:15 226:6,7 305:18
**massively** 182:4 206:2
**match** 289:19
**matched** 240:2 288:14 289:8 289:11,15,20 289:23
**material** 23:6
**materials** 154:8 154:25 155:9 155:10 160:4
**matrix** 250:15
**matt** 156:4 157:19
**matter** 8:5 49:25 81:22 126:9
**matters** 61:11 61:12 152:1,3 152:6
**matthew** 157:13
**max** 201:4,12 201:18,23 202:9,13,15,17 202:23 203:2,9 203:9 219:15 219:20 220:8 220:17,18 221:10 222:4 222:17
**maximum** 202:5
**mcnally** 264:25 264:25,25 265:3,12,21 266:7
**mean** 6:11 11:17 13:4 18:25 21:7 24:15 25:19 27:10 30:22 32:5 34:21 35:9 38:24 39:13,19,24 42:5 43:3 47:19 49:18 50:13 58:17 59:3,8 62:21 62:23 67:25 74:5 78:17 79:20 80:7,16 81:15 82:6 86:25 87:8,15 87:23 88:22 89:2,5 90:3 92:7 94:2,22 97:12,14 103:15,25 104:4 111:2 112:3 116:9,11 128:23 135:5 142:9 144:24 145:17 146:9 161:4 170:11 175:14 176:23 178:4,10 182:24,25 184:13,16,17 188:19 191:19 195:23 196:6 199:24 202:6 207:9,25 211:13 212:15 220:8 227:10 231:4 232:1 236:17 237:24 243:8 244:24 246:10,22 248:1 249:12 250:6,16 283:19,20 284:8 294:14 303:19
**meaning** 119:5 212:23
**meanings** 87:12
**means** 10:6 24:16,18 59:5 81:14 89:20,21 90:5,5 103:17 103:18 214:25 229:3 231:24 249:7,16,19 271:16 290:18
**meant** 16:21,22 17:2 19:11 31:13 33:1,25 43:6 59:13 60:13 77:8 84:24 96:3 141:7 187:11 187:14 197:10 201:17 202:9 238:8 260:1 294:10,14
**measurable** 211:8
**measure** 28:13 34:7 122:1,3 213:4,12 216:6 216:8 239:16
**measured** 125:7
**measurement** 85:9 247:3

**measurements** 30:8 273:15 274:5
**measuring** 92:3 213:16 249:16 250:17 256:14
**med** 124:23 125:13,17
**media** 8:3 39:17 146:18 147:19 180:11 301:11
**median** 220:2,3 220:9
**mediated** 128:19
**medical** 64:25 110:21 111:3 112:4,5
**medicinal** 124:1 125:2
**meet** 90:14
**meeting** 93:9 109:17
**meetings** 259:10
**member** 115:13 192:9,12 295:7 295:9,10
**members** 115:2 115:4 193:23 214:3,11
**membrane** 73:8,10
**memories** 168:16
**memory** 168:11 174:19
**mention** 117:22
**mentioned** 38:22 48:5 49:11 82:15 84:8 93:6 96:8 144:14 169:14 179:8 211:15 264:10 288:19 295:2
**mentioning** 168:12
**mentor** 115:5
**merits** 36:21
**mess** 222:15 226:18
**messages** 305:14,15,20 306:8,16,21
**messaging** 305:24
**messiness** 231:17
**messy** 215:18
**met** 113:13,15 113:19
**method** 85:8 91:23 94:1
**methods** 293:12
**mfs** 24:12,15
**mgh** 228:15
**mian** 69:22
**mice** 28:2 102:12 127:5
**michael** 2:14 299:18
**microbiome** 156:10,11
**micron** 12:3
**microplate** 286:17
**middle** 39:11 98:21 125:12 226:8
**migrated** 87:1
**mild** 97:1 98:10 99:12 196:2 215:14 278:11 278:13 284:1
**milder** 269:19
**milioris** 1:4 2:24 8:21 10:17,21 62:12 79:16 96:1 172:6 175:22 176:4 313:4
**milligram** 242:23 254:6,7 254:20
**milligrams** 248:5
**million** 307:8
**min** 201:4,12 201:18,22 202:9,13,14,17 202:23 203:2,9 219:15,20 220:8,17,18 221:10 222:4 222:17
**mind** 22:13 42:23 74:24 79:20 80:11,16 83:24 87:6,12 129:8 135:24 136:18 220:15 220:20,24 222:17
**mine** 105:13 167:20
**minimum** 109:24 202:5
**minus** 13:21 282:23,25 283:8,10
**minute** 91:18 136:4 210:12 240:17,18
**misconduct** 302:21,22 303:1
**misguided** 13:6 148:11
**misleading** 238:8 257:6

**missing** 99:16 99:19 100:1 234:13,18 300:14
**mistake** 175:2
**mitigate** 150:10
**mix** 87:4 91:16 215:9,18 239:22 303:17
**mixed** 91:19 247:4
**mixing** 215:10
**ml** 254:18 255:17 256:24
**mmse** 100:7 269:15,19 278:3 284:2
**model** 27:24,25 83:6 99:16
**models** 128:9 259:25
**moderate** 98:10 100:4,5
**moderates** 100:9
**modified** 133:22
**molecular** 71:24 72:2,9 72:11 77:24 301:22 309:18
**molecule** 119:18
**molecules** 120:1 125:13 126:14
**moment** 19:1 31:1 38:6,22 42:18 43:1 44:19 67:19 68:25 76:2 79:12 95:22 96:8 129:5 154:5 175:4 217:1 261:12 285:6
**moments** 43:3 44:6
**monday** 208:24
**money** 25:24 31:19 32:11 33:21 41:11 55:1 151:6 182:5 188:4,25 245:13 250:13 307:11,16,21
**monkey** 18:13 18:24,25 19:3 19:12,19 20:2 20:8 23:17
**monkeyed** 74:1
**monkeys** 42:24
**month** 99:7,11 99:14,14,24 100:1,12,19 179:18 205:13 205:15,19 206:3 207:18 207:22 267:8 267:25 268:1,8 292:5 305:5
**monthly** 78:20
**months** 48:12 53:5 56:23,23 221:24 236:6 239:25 266:15 273:16,16 283:14 302:17 302:18
**moot** 199:25
**morning** 8:1 9:18 162:14 208:24
**mortem** 13:19 27:15 42:13
**mortgage** 190:14,17
**moss** 4:7,12 152:18 155:24 159:1 162:1
**motherfuckers** 24:18,19,24 30:11 42:24 43:13
**motivation** 74:20
**motive** 261:19
**motives** 188:2,4 189:13,14,17
**motto** 33:22
**mountain** 52:22
**mouse** 27:25 259:25
**mouth** 22:5 141:25
**move** 46:11 49:7 231:25
**moved** 167:18
**multi** 55:8
**multiple** 44:4 128:19 131:11 259:10
**murder** 52:25 53:4
**murray** 6:15

**n**

**n** 2:1 3:1 249:8
**nachtrab** 157:13,16,19 157:23 158:11 158:19 181:4 181:11,15
**nadav** 54:12
**naloxone** 118:16,22,25 119:2,12 120:9 120:11,18,21 121:2,2,5,10,23 122:1,2,15,17 122:22 123:7
**naltrexone** 119:1,3,13

**name** 8:11 21:18,19 39:23 64:8 67:19 69:21 85:23 118:1,3 123:14 129:3 162:10 204:23 264:24 265:25
**name's** 265:8
**named** 224:20 225:10
**narrative** 54:25 59:14 60:13 243:16
**narrow** 123:1
**nasty** 19:16,16 32:24 33:4,5 47:12 67:20 188:9 311:23
**native** 6:13 131:2 133:8 135:8
**nature** 52:3 235:24,25 236:2,12,21
**neat** 247:6
**necessarily** 97:12 137:24 142:23
**necessary** 316:7
**need** 32:3 76:8 109:1 165:4 179:23 194:10 194:17 195:9 196:6 198:17 206:8 213:20 263:9 286:2,9
**needed** 4:13 86:19 107:1 115:16 216:8 216:13 252:18 260:23
**needing** 95:15
**needs** 92:7 291:19
**negative** 32:9 39:9,13,17,19 39:21 40:17 208:13 294:16
**negligence** 184:23,24
**neither** 17:22 268:22 314:11
**nervous** 216:3 216:8 228:8,12
**nervousness** 228:6 229:19 230:3 231:1,11 231:21 233:1
**neurocode** 104:9 268:17 268:21,24 269:1 271:9,18 272:21,21 275:4,15,17 276:3,6,16,21 278:15,19 283:22
**neurocodes** 275:9
**neuroscience** 59:21,22,25 93:1 118:10 296:23
**never** 16:21 27:1 33:1 43:6 61:3 63:16,18 63:23 74:17 76:18 89:18 90:12 102:2,5 102:24 107:10 112:18 113:13 113:13,15,15 114:4,16 123:25 131:24 143:3 147:25 147:25 150:14 152:2 172:4 208:18 210:24 222:1 223:13 235:20 237:5 242:10 246:24 253:7 299:9 308:21 312:5
**new** 1:1 2:5,5 2:11,11 3:15 8:8 39:15 65:1 65:3 78:12 106:13 107:8 120:1 121:25 131:4 144:2 145:17,19 146:24 147:12 148:9,22 197:16 213:13 245:3 251:25 256:15 272:5,5 273:2,3 275:8 279:7 292:20 293:9 294:3,9 294:20,23 295:19 313:1
**newly** 242:1
**news** 31:7 63:14 64:17,22 147:3,4,19 149:10,10 170:15 262:11
**nfl** 280:13
**ng** 286:15
**nic** 307:12
**nice** 247:5
**niche** 102:19
**nickel** 148:6,13 148:19,21,25 149:7 293:20
**nicotinic** 124:3 132:1
**nih** 168:18 246:15 248:21 296:21 307:4,8 308:3,6,13,16
**nine** 273:17 293:10,22 311:9

**non** 283:24 299:25
**noncompliant** 174:4 175:6
**nonsense** 65:18 66:1
**nonspecific** 270:7
**nonspecifically** 72:4,8
**notary** 316:13 316:19
**note** 156:8 282:9
**notebook** 86:24 87:7
**notebooks** 303:21
**noted** 159:13 316:7
**notes** 269:16
**notice** 142:13
**noticed** 124:7
**noticing** 8:18
**notoriously** 251:18
**novel** 31:5
**november** 1:13 1:17 8:3 29:19 41:19 165:12 165:16 176:3 298:14 299:4 313:13
**number** 43:4 59:21 61:2,3 73:21,21 86:7 127:19 138:14 171:19 190:2 196:15 200:5 209:2 216:18 217:4 218:16 219:6,23 255:2 256:25 268:7 268:14 273:12
**numbered** 1:17 58:12,18 59:4 60:11,12,18,23 61:7
**numbers** 66:25 110:23 200:3 225:7 273:21 273:24 299:2
**numerous** 108:3 122:18 124:19
**nw** 2:19

**o**

**o** 112:14
**o'clock** 57:11 84:21 130:19 130:22
**object** 29:7,13 34:5 40:24 60:3,25 61:20 62:13 63:21 64:3 65:22 66:5 71:10 72:19 79:1 82:20 89:11 90:11 92:16 97:24 98:15 103:9,23 104:14 111:8 114:14 115:18 115:18 116:13 120:10 121:4 122:8 123:9 126:5,17 127:11 129:16 129:17 134:3 134:22 135:17 136:19 137:16 138:1 142:22 147:21 149:1 149:12 157:18 173:11,19 174:25 181:16 188:15 196:25 197:14 199:23 202:1,11 203:6 214:5 215:5 216:20 217:6 218:18 219:8 219:18,22 220:12,21 221:5,6 223:1 225:15 227:17 230:22 231:3 231:13 234:9 235:7 237:7 244:15,21 245:9,23 250:3 250:12 251:24 255:14,24 257:14,21 258:5 264:20 267:13,18 273:1 274:1,3 274:7,19 277:4 278:10 288:11 288:24 291:3 291:13 296:14 297:1,25 300:5 301:5 302:14 303:5 304:7,21 305:12,22 306:22 307:13 311:18 312:8
**objection** 19:8 19:9 28:20 43:15 47:25 48:25 49:6 62:3,4 68:2 69:8 77:20 79:17 123:8 134:4,17,18,23 135:18 136:2,3 139:2 149:11 149:21,22 151:9 152:4 153:20,25 154:9 155:6 160:6 161:10 162:24 163:16

166:13 186:19 219:24 242:8 246:11 257:15 257:22 258:4 290:1
**objections** 95:15
**objective** 78:22 148:4
**obligations** 117:7
**obtained** 283:3
**obviously** 14:6 17:3 42:6 48:16,21 69:3 103:25 104:7 120:6 145:16 148:11 163:3 166:21 179:20 182:7 184:8 208:20 231:4 232:12 243:3 245:13 259:24 261:16 266:10
**occasions** 259:8
**occur** 102:12
**october** 152:17 160:19 162:3 301:10
**offer** 116:25
**offered** 35:18 76:18
**offering** 211:6
**office** 76:19
**officer** 313:18
**offices** 1:19 234:3
**oh** 9:12 20:13 22:9 40:17 72:1 93:8 107:10 110:2 125:18 135:20 191:21 210:13 214:21,22 221:18 236:9 238:12 241:18 256:2 260:25 268:23 286:8 290:22 295:9 302:3
**okay** 9:24 10:15 15:11 17:10 18:3,6,7 18:24 19:20,23 20:4,12 21:11 21:14 23:11 28:24 30:3,9 32:2 33:3,10 34:21,25 35:13 37:17 41:19 43:5 44:8,19 44:20 45:7,21 46:17 47:9,16 51:1,4,22,23 52:9,14,16,20 53:18 54:1,3,6 54:10 55:2,14 55:16 56:12 57:6,15,23 58:2 60:10 62:8 64:15,16 66:10,18,23 67:1,7,21 69:14 75:4,6 76:7 81:20 82:1,4,8,25 84:15 85:2 86:20 87:16 91:11 99:4 105:3 108:9 110:5 112:15 118:7,14 123:5 123:17 125:20 126:19 129:4 130:16,24 131:3,8,13,20 132:2,8,19 133:3,14 135:10 137:1 138:8,11 139:12,22 140:1,7 143:15 153:13 155:15 155:22 158:10 158:24 159:6 159:17,19 160:15 161:21 161:24 162:7 162:12 163:5 164:17 165:21 168:8 169:21 170:21,23 171:17 172:2 172:11,18 175:15,24 176:1 177:9,16 178:18 181:18 185:23 187:20 188:18 189:25 190:9,18 193:13,15 194:1 195:13 195:23 196:11 196:17 198:1,6 198:14,24 200:23 201:2,3 203:16 204:7,9 206:21 209:12 210:9,10 211:7 213:25 214:22 217:9 218:14 220:25 224:6 224:12 227:1 229:10,16 232:25 233:8 237:9,25 239:1 239:9 241:1,4 241:12,20 243:16 244:6 247:11,12,21 247:22 248:18 250:23 251:20 252:6,25 253:6 253:21 254:1 254:16 256:16

260:3 261:18 261:20 262:20 263:7 265:18 266:13 268:14 268:25 269:8 269:14 270:12 270:13,17,23 271:4,12 273:12 275:20 277:12,16,22 277:25 278:2,5 278:23 279:9 279:19 280:7 280:12 281:20 282:2 285:14 285:25 287:11 287:16,25 290:21 292:10 292:17,19 293:6 300:13 310:8 311:8 312:11
**olander** 157:19 158:6,11,19
**old** 115:8 274:13
**older** 304:15,19 305:3,5
**olds** 274:22,25
**oligomer** 102:11
**olink** 245:16
**omit** 48:3
**omitting** 175:3
**once** 19:20,21 56:20 63:23 69:16 93:5 102:25 106:1,1 106:1,6 124:2 167:18 184:9 196:1 207:22 238:9 283:6 289:20 291:19
**one's** 116:1,1 264:18
**ones** 26:8 97:17 125:15 234:17 284:1,3
**ongoing** 29:4 66:19 82:16,17 84:23 86:1 305:2
**online** 35:21 63:14,20 170:15 171:8 171:11 176:15
**open** 65:3 74:24 80:10,16 123:3 132:21 135:8 179:18 184:1 266:14 266:21,25 267:5,9,22 268:10,16 269:2 270:15 272:18 276:7 277:1 278:25 282:24 283:16 283:24 284:8 295:15
**opened** 99:24
**opine** 113:24
**opinion** 113:14 113:18,20,21 137:23 214:12
**opinions** 12:18 14:25 114:1 188:17,20
**opioid** 90:17,18 90:20,22 119:4 119:4,10,15,19 120:4 122:20 123:4 124:14 125:14,17,19 125:23 126:10
**opoid** 126:11
**opposed** 88:19 96:16 236:21 251:9
**opposite** 205:21 215:11
**option** 216:2
**options** 106:8 106:10,12,14 107:21,25 108:3,7,10 177:11 204:15 228:14,17
**oral** 1:12,16 313:18
**orchestrated** 147:14
**order** 95:19 117:25 171:19 258:2
**organ** 128:22
**organizations** 146:18 147:10 147:19
**original** 16:10 70:7,22 71:8 71:12,15,18,19 72:17,18,22 92:18,24 134:6 280:15 281:23 285:1,8 287:2 287:22 288:1 288:23 289:6 289:16,24 291:9,17 292:2 301:7 313:21
**originally** 125:24 150:24
**originating** 3:19 4:2
**orrick** 255:8 263:21
**oscar** 203:17,23 207:12 212:3 214:18 215:7 216:24 223:10 223:21 228:16 228:17 242:18 244:2 285:22

**oscar's** 207:18 220:15 222:7 222:15 224:16 228:9 238:17
**oskar** 6:20
**otw** 1:4 8:9 313:4
**outcome** 304:5 314:15
**outcomes** 172:19
**outlandish** 182:6
**outlet** 147:8 301:11
**outlets** 147:19 149:10
**outlier** 252:13 257:4,5,25
**outliers** 234:7 248:3,9 254:8 254:9,10,11,17 255:17,25 256:19 257:17
**outraged** 147:24
**outside** 48:10 69:24,24 70:13 70:24 74:25 110:21 127:24 132:15 155:1 166:21 183:23 186:21,22 197:13 296:8 301:23 310:9 310:22
**overall** 104:17
**overexpresses** 27:25
**overlap** 78:18
**overlapping** 70:1 123:1
**overran** 253:16
**overseeing** 203:24
**oversees** 230:11
**overturn** 158:12
**own** 16:17,17 16:19 36:16 61:7 78:11 189:2,6 209:19 216:4 217:21 271:19 277:7 299:15 302:10 307:24

**p**

**p** 2:1,1 4:22 89:16,23 90:1 90:9 195:7,15 207:11 232:15 241:19 242:1 246:5 247:25 248:1 249:7,21 251:15 252:24 257:19,23 269:19 270:18 271:9,10,13 273:7,13 276:10
**p.m.** 1:18 312:21
**package** 117:2
**page** 3:2,8,9,12 4:2 5:2 6:2,13 7:2 17:10,12 18:6,7,8 19:23 19:24 20:12,13 21:14 24:11 37:18 41:20 44:8 50:23 51:22,23 55:2 55:15 57:17 58:2 64:15 66:11,23,24 67:2,5 75:5,11 134:10 162:9 172:5,18 176:11,14 179:4 194:2 195:1 198:8,9 243:17 244:7,7 280:20 293:6 309:23 310:2,3 310:3 314:7 315:4,7,10,13 315:16,19
**pages** 3:17,19 48:22 131:9
**paid** 22:15,16 23:8,9,10
**pain** 3:14 4:8 9:23 125:25 159:4,6,24 160:2
**painful** 30:15
**painkiller** 123:20,25
**painted** 33:18 38:12
**paired** 174:18 196:14,15 215:13
**pandemic** 203:22 300:15
**panel** 134:2,12 136:6,16 137:4
**pankaj** 6:8
**paper** 28:7 87:3 87:4 92:25 98:6,13 100:21 101:1,14,16,20 102:16 109:21 110:11,15,24 117:17 121:9 121:11,14,22 122:7,10,13 159:8 255:8 303:18 309:16 309:23
**papers** 4:13 78:15 162:13 162:16,23

163:6,14,23 164:9 182:16 182:16 265:24 311:9
**paragraph** 20:19,20 21:15 37:17 41:19 44:15,21,25 45:1,18,19 52:4,5,7,11 53:18 54:11,13 55:23 64:16 172:23 198:14 206:22 208:23 212:2,15 229:16 244:6 249:1 252:8 254:1 270:2 293:9 310:5
**paragraphs** 195:2 293:8
**parallel** 125:21
**parapets** 207:21
**paraphrasing** 103:5
**pardon** 167:10
**part** 46:24 47:23 48:14 49:4 50:1,1 83:4 92:15 94:24 111:18 117:8,9,9 125:17 135:3 150:13 167:17 185:11 216:22 266:15 286:23 287:15 294:16
**partially** 222:12 223:17
**participant** 107:3,11,18
**participants** 268:15 269:1
**particular** 73:4 74:15 180:14 180:22 219:15
**particularly** 18:16 138:5 152:6 213:12
**parties** 138:15 168:10 169:12 296:6 313:24 314:12
**partly** 191:11 192:22 301:16
**partner** 258:13
**partnering** 259:15
**partners** 129:21
**partnership** 260:5
**parts** 167:2,5
**party** 195:10 196:7 314:3,9
**pass** 160:25 161:5,6
**passage** 56:25
**past** 79:12 86:2
**patent** 126:16
**patently** 11:4,7 260:21 311:23
**patents** 125:22 126:4,6 191:14
**pathetic** 30:17 34:22 35:4 42:24 43:10
**pathway** 124:21
**pathways** 129:22 130:7
**patient** 89:3 179:21 205:22 205:23 215:12 215:13,14,15 224:16,21 225:7 234:12 253:14 295:8
**patients** 4:19 31:5 88:10 96:18,20 98:10 99:7 100:4,6 100:15 103:11 103:14,16,22 143:17,20 144:9 147:25 150:4,9 151:4 174:3,20 175:6 177:8 188:24 195:7,15 200:1 212:24 214:9 216:18 218:17 219:6,23 224:18 226:14 226:16 227:13 227:14 230:11 234:11,14 235:9 238:22 239:12,14,23 246:5 249:21 270:14 271:10 272:13,17,22 273:4 274:12 276:25,25 277:14 283:16 283:24 295:9 295:11,13,16 312:3
**patreon** 22:17 78:20
**patrick** 172:7 176:5
**pattern** 74:3
**paul** 69:20 195:5 214:13 223:7 251:17
**pause** 15:14 45:20 52:8,15 76:6,9 190:8 247:20
**pay** 110:4 246:1 247:8 250:7 251:3 306:15 307:5 307:12 308:12

**paying** 47:11 240:12
**payment** 108:8 108:10
**payments** 108:6
**pdf** 269:13 275:14 282:19
**pdfs** 162:13
**peace** 149:23 150:1
**peeling** 191:10
**peer** 11:21
**pei** 4:11 161:25 162:10,12,22 163:5
**pennsylvania** 91:10 145:16
**pentapeptide** 119:1,23,25
**pentera** 111:1
**people** 12:8 19:6 23:18,23 24:20 25:22 31:16 33:21 42:21 51:14 63:14,20,24 65:16,16,25 66:3 68:4 69:23 70:5,6 70:24,25 71:6 74:21 87:1,23 91:21 92:3,21 95:23 96:25 97:21 102:15 103:6 106:14 107:1 116:5 126:1 128:22 130:10 137:17 142:19 145:20 147:22 150:16 150:17 154:20 159:13 173:7 180:18,24 182:1 188:6,8 188:23 204:6 204:13,18 207:17,17 231:23 236:8 236:13 240:1 259:21 262:11 266:11 272:1,6 293:16 294:12 305:10 306:11
**peptide** 120:2,3 120:22 121:7
**peptides** 123:1
**percent** 68:10 96:19,20 97:3 99:12,19 100:1 100:11 103:5 103:10,14 173:24 240:3 247:4,4 248:3 248:4,10 252:17 253:2,8 253:12 254:5 254:18,23,24 255:6,7,9,17 256:21,24 269:22 275:11 275:11 307:23
**percentage** 97:21
**perfect** 73:12 92:10 303:16
**perfectly** 72:5 115:9 209:9 227:20
**perform** 247:8
**performed** 174:14 245:25 266:14
**performing** 244:5 245:4 246:21,22
**period** 79:21 141:11 186:23
**periods** 282:25
**permit** 291:22
**persisted** 308:22
**persistently** 130:3
**person** 49:16 69:22 77:12 81:8 104:18 111:24 112:3,9 114:15 144:7 188:11 203:24 207:17 216:13 243:11 284:21 288:3 289:10 290:23,24 291:1 296:8
**personal** 109:2 184:11
**personally** 11:3 11:3 12:16 23:21 35:17 47:13 56:10 71:7,11 74:13 78:25 93:20 146:14 182:11 182:19 289:5 289:21 290:11
**personnel** 150:10
**pertinent** 170:19
**pestering** 265:23
**pet** 96:17,17 98:2 277:12,12 277:12,14 284:2
**pete** 304:24
**petition** 12:14 12:24 13:2 36:10,12,14,17 36:17,18,21 41:6 42:14 65:1 93:15,18 130:9 147:5 184:5 260:16 261:2,6,13

293:17 295:24
**petitioner's** 183:18
**petitioners** 16:10 39:16
**petitions** 58:11 65:2
**pg** 6:11
**ph.d.** 199:2
**pharmaceutical** 124:19 258:14
**phase** 87:21,24 88:1 97:21 98:25 99:1 103:7,22 104:13,19 172:24 173:5 173:10,22 174:15 192:19 193:8,12 195:13 196:5,5 196:12 198:21 205:4 211:2 214:1 215:22 216:11,19 218:17 219:7 225:14 228:5 233:9 234:8 235:18 237:5 237:21,22 238:1,3 240:6 241:13,15 243:19 258:24 266:13,21 267:8,9,21 268:10,16,21 270:14 272:17 277:1 278:25 283:16,24 284:8 292:7 298:15 308:2,2
**phenomenon** 90:22 122:17
**philadel** 91:10
**philadelphia** 190:15
**philosophy** 250:19,20
**phone** 154:18 164:12,16 190:1 305:16 305:18
**phones** 170:6
**phonetic** 118:2
**phosphatase** 92:1 269:21
**phosphorylated** 125:7 270:5
**phosphorylat...** 3:18 129:25 131:25
**photoshopped** 68:12
**photoshopping** 68:21
**phrase** 59:9 60:22
**pick** 26:9,11 229:24 232:1 239:21
**picture** 51:25 133:5,10 135:9 135:10
**piece** 65:4 145:19 147:14 301:19 309:19
**pieces** 146:9,12 146:13,19 147:8,11,20 262:15
**pig** 232:17
**pill** 174:5
**piller** 147:9 301:16 302:12 303:2
**pills** 174:7
**pipettes** 91:22
**pis** 98:21
**pitch** 294:24
**pitt** 12:12,16,19 65:1
**pivotal** 88:2
**place** 106:13 119:21 205:8 245:15
**placebo** 200:12 201:5 205:11 205:15 206:6 211:15,19 212:9,22 214:9 226:10 227:16 239:12,14,23 242:22 248:4 249:8 254:6,19 267:14
**placebos** 226:17 267:3
**plain** 229:8
**plaintiff** 8:5
**plaintiffs** 1:5 1:17 2:2 8:20 8:25 10:16 132:20,23 233:22 313:5
**plan** 106:13,17 107:3 173:10 173:14,18 174:1,23 175:10 190:22 190:23
**plant** 301:18
**plasma** 96:16 98:5,11 104:1 104:7 174:5 232:4,6,9,12,15 232:20 241:14 242:2,4,10,15 242:17 243:18 244:2,3 245:10 245:12 246:5 248:1 249:5,24 250:7 251:16 252:2,3 268:24 269:3,17 272:4 273:2 274:21

274:21 276:11
**plasma's** 232:4
**plate** 214:21 247:9 251:3 252:16 253:1 253:10,15,16 253:22 281:16 284:17 285:2 287:23 288:14 289:24
**plates** 121:25 250:4 274:23
**platform** 216:4 216:4,5 246:25 279:2
**platforms** 212:4 268:2
**plausibility** 129:12
**play** 251:13
**plaza** 2:10
**please** 10:4,13 26:12 44:15,22 46:10 48:3 49:2,8 56:3 61:22 62:15 64:5,19 69:12 75:5,11,15 88:5,22 94:3 101:8,18 131:21 139:2 139:20 159:2 160:8 161:13 162:15 166:15 171:23 177:20 184:16 192:11 194:6 236:19 238:19 248:12 252:7 256:8 280:13 288:25 297:2 305:6,6
**pleased** 144:5
**plenty** 74:21 126:23 145:10 303:16
**pllc** 2:19
**plos** 3:22 4:5 75:22 77:1,13 77:17 78:7,16 121:11 122:7 122:13 156:9 157:17 158:12 261:21 262:1 262:11 264:1,5 264:8,10,18 296:23
**plos's** 152:21
**plus** 86:6 150:23
**point** 22:2 39:25 50:2,18 53:15 88:11 99:6,7,10,23 105:22 106:11 107:19,20 112:24 125:1 134:5,10 137:11,22 140:24 141:18 146:7 165:4 169:17,20 179:7,16,21 180:3 181:2 186:23,23,25 187:25 189:20 190:18 193:25 195:20,21 216:3,5 222:12 230:8 242:6 243:11 248:25 251:5,5,6 253:4 268:6 275:24 278:23 291:7 305:9 311:15
**pointed** 13:10 13:11
**points** 156:6 196:15 202:17 246:4 254:2 310:22
**policies** 305:8
**policy** 304:12 304:17 305:2 305:11
**popped** 209:13
**population** 99:13
**populations** 97:16
**portion** 49:8 111:20 307:14
**posing** 42:2
**positions** 25:18 177:11
**positive** 103:12
**possession** 70:7 70:22
**possibilities** 216:15
**possibility** 200:13 204:24 312:6,9
**possible** 22:6 53:14 74:23 195:7,15 255:19 265:5,7 286:25
**possibly** 243:3
**post** 13:19 27:15 42:13 58:4,20 156:11 156:12 172:22 173:23 179:19 234:10,20,25 235:5,6,16 255:22,25 256:1,10 258:7
**posted** 35:21 63:10 68:1 176:15 297:18
**posting** 24:3 63:7 67:20,20 171:11
**posts** 24:4 297:18

**potential** 25:13 123:20 126:20 129:13,14,15 141:6 143:8 260:5
**potentially** 83:19 84:5,6 97:10 128:17 141:19 142:13 161:9 170:2 185:3 201:24 202:10,12 203:5,13 217:3 220:18
**potently** 128:25
**poured** 68:13 73:8
**power** 59:5,14
**powerpoint** 131:1 133:9 135:9
**pr** 32:8 39:9,13 39:17,19,21 40:2,4,9,17,23 41:13 146:1 147:15 294:16
**practice** 71:2 83:18 88:18 89:9,15,24 138:5 179:25 221:13 258:1,3 305:19
**practiced** 39:17
**practices** 300:3 301:2
**pre** 87:18 238:6
**preclinical** 126:23
**predefined** 99:11 196:2
**predetermined** 88:19,21 89:10
**preeminent** 31:7
**preferred** 104:24
**prejudice** 185:11,12
**preliminary** 164:19
**premise** 293:13
**prepared** 280:14
**preparing** 168:1,4 186:13
**presence** 125:8
**present** 2:22 8:15 296:5
**presentation** 177:10
**presented** 39:7 258:15
**preserving** 306:13
**prespecify** 87:18 88:7
**pretend** 169:16 295:12
**pretended** 32:12 33:20 34:16 144:8
**pretending** 25:2
**pretty** 48:4 49:14,22,22 83:10 87:3 100:6,24 105:12 111:21 168:5 196:14 214:17 254:24 284:18
**prevent** 92:1
**prevention** 296:22
**previously** 7:1 39:2 171:18,20 171:22 172:1 193:14 206:17 210:10 220:10 220:19 292:18 309:7 311:7
**price** 177:13
**primarily** 233:14
**primary** 87:18 87:24 88:7,11 110:9 291:4
**print** 285:11
**prior** 96:13 114:9 121:1 165:15 179:19 186:17 257:8 289:12 304:22
**private** 16:21 16:23 18:22 19:15 22:19 33:1 34:23 42:1,19 43:5,7 47:13 56:12,17 61:8 79:9
**privately** 18:2 19:20 21:2 43:10 44:2,5 188:14
**privilege** 70:21 75:16 157:3
**privileged** 50:25 53:9 62:6 153:12 155:11 217:20 228:1 262:24
**pro** 286:17
**probably** 30:1 45:6 80:15 92:11 96:21 100:24 103:17 103:18 109:24 110:19,19 115:6 123:12 140:6 168:19 181:1,6 225:20 232:19 255:3 261:17 262:13 295:21 303:16

303:18 311:11
**problem** 97:3 200:4,7
**procedure** 1:20
**proceeding** 314:13
**process** 16:6 23:3 34:14 36:17,18 44:6 48:18 78:14 79:4 125:12 152:23 213:19 227:16 286:23 304:5
**processed** 43:9 44:2 269:20
**processes** 149:2
**processing** 43:8 47:14 151:12 211:21
**produce** 73:7 230:15
**produced** 1:16 71:22 82:18,24 202:13,18,23 203:4 219:3 222:6 224:3 225:8 239:25 280:16 281:23
**produces** 285:2
**professionally** 117:18
**professor** 193:15
**profile** 147:13
**program** 120:6 124:13 135:4 258:15
**progress** 12:10
**progression** 211:9
**project** 14:16 233:19
**prolong** 143:2
**prominent** 293:10,23
**promised** 183:1
**promising** 25:21
**promotions** 105:8
**pronounce** 162:9
**pronouncing** 101:13,13 162:11 285:16 285:18,19
**pronunciation** 81:22,25
**proper** 80:9 92:14
**properly** 91:24 131:24
**proposal** 236:17
**propose** 128:16
**protease** 92:1 269:21
**protective** 117:24
**protein** 119:22 119:24 124:3,8 129:21 209:3
**proteins** 72:6 92:2
**protocol** 6:22 104:1 173:9,17
**provide** 36:24 62:6 154:12 200:14
**provided** 36:5 68:24 70:16 74:8 77:7 82:13 93:2 168:3 215:4 279:21,23
**provides** 197:20
**provisional** 95:14
**provisions** 1:20
**ptau** 6:9,11
**pthr231** 136:9
**pti** 6:5,17 131:14 280:14
**public** 25:11 29:15 63:4 84:2,7 96:10 149:24 262:12 266:19 294:1 316:19
**publication** 76:25 97:10 147:7 235:23 309:20
**publications** 31:7 166:19 296:9
**publicized** 85:3
**publicly** 18:5 24:3 25:9 32:25 58:23 82:23 97:12 102:2
**publish** 68:5 236:16 237:21 238:1 240:6
**publishable** 85:13
**published** 11:20 94:15 96:9 97:20 98:7,14 100:21 123:3 124:7 146:19 147:8 171:8 235:20 237:6,13 238:6 266:9 292:19 301:11 302:13 303:12,13,24 309:17 310:24 311:2,7,10
**publishing** 147:11,20

**puebla** 3:20 4:3
**pull** 301:18,18
**pulled** 236:4
**punches** 45:10 45:23,25 50:4 50:15 53:10 57:3 140:20
**purchased** 108:19
**purified** 27:12 27:13
**purport** 36:14 98:7
**purported** 268:10 299:9
**purpose** 151:8 192:5
**purposes** 9:22 41:2
**pursuant** 1:20 314:1
**push** 141:24
**pushing** 104:6
**put** 30:24 31:22 31:23 97:7 106:13 138:6 142:12 147:25 168:23 169:1 171:24 200:10 218:11 253:12 261:3 308:19
**putting** 141:25 142:4,11

**q**

**qc** 286:3,10,23 286:24 288:3 289:10 290:23 290:24 291:1,5 291:6
**qc'g** 287:5
**qualifications** 81:8 114:16
**qualified** 114:12 295:6 299:21
**qualify** 271:5
**quanterix** 216:1,3 228:10 228:13 232:15 232:22 241:21 241:23 242:6 242:10,14,16 242:25 243:7 243:12,13,20 244:8,10 245:6 245:21 247:24 248:8 249:4 250:2 251:23 252:9,14,15,25 256:18 257:2,9 258:8 268:17 271:13,20,24 272:7 273:7 275:8 279:8
**quanterix's** 241:12 242:19
**quantitation** 73:20 214:24
**quarterback** 208:25
**question** 10:3 10:10,13 15:21 20:11 26:5,12 28:23 30:2 31:12 44:24 45:21 46:13,17 46:22 47:3 57:21 59:1 68:25 70:8,23 71:9 72:1 76:1 76:3,10 78:4 79:2,23 81:16 84:13 89:7,12 90:17 101:17 103:24,25 105:1 113:17 118:20 120:12 120:15 123:5 129:12 136:24 137:2 155:8 160:9 164:7,25 166:23 175:13 178:11 187:12 187:16,19 189:25 192:10 194:16 204:2,3 204:25 219:19 237:23 238:7 261:7 262:3 270:22 278:15 278:19 279:20 282:6 288:25 289:19 292:21 298:10 311:16
**questionable** 25:13
**questioned** 291:24
**questioning** 22:12,14
**questions** 25:12 57:22 80:19,20 111:25 127:20 129:11 135:23 136:17 159:10 184:6 187:22 206:22 290:2 312:12,12,14
**quiet** 214:18
**quietly** 150:20
**quite** 60:16 179:1
**quote** 21:16 77:7 230:4
**quoted** 145:19 293:17,20
**quotes** 147:23 301:18

**r**

**r** 2:1 112:14 315:3,3
**racist** 11:2 12:1 12:5

**rack** 33:18
**rage** 55:24 56:9
**raise** 25:12 95:15 105:13 135:23 136:17
**raised** 3:21 4:4 33:20 105:13 214:1
**raises** 105:7
**raising** 264:5
**ralf** 309:11
**ran** 26:25 183:18 219:11 225:9
**random** 180:24 181:1 239:23
**randomly** 256:4
**range** 100:7 310:9
**rate** 96:19 98:3 99:8 100:11 103:10,15,17 103:19
**rater** 234:12
**rather** 36:15 272:7
**ratio** 310:10
**rationale** 88:4
**raw** 70:7,22 71:8 92:24 280:16 281:23 285:1,4,8 287:2,22 288:1 288:23 289:24 291:10,17 292:3 310:13
**ray** 73:11
**rays** 73:12
**reach** 135:21
**reached** 40:8 85:4 90:15 204:21 234:24 236:7 302:16
**reacher** 122:18
**reaching** 36:5 40:4 148:16 149:7
**reaction** 176:17 179:10 260:20 293:2
**reactions** 262:10
**read** 15:19 17:16 35:25 44:14,21,24 45:1,16,18,19 52:6,7,12 55:13,15 57:4 60:22 64:19,20 67:7 75:11,15 75:24,25 76:3 76:5,8 131:23 159:2 167:2,3 167:7,8,19 176:19 177:19 179:12 190:6 194:6,9,10,12 194:15,17,20 194:24 196:9 196:18 208:12 248:23 285:9 316:5
**readable** 68:7
**reader** 68:8 281:16 284:17 285:2 286:17 287:23 288:15 289:25
**reading** 15:18 167:17 177:3 178:6 230:17 231:18 247:19 270:6 286:6
**ready** 52:21 53:16 204:22 232:16,19 271:19
**real** 73:25 83:20 108:18 143:25 150:8 176:25 177:1 212:23 213:19 225:1
**reality** 205:16
**realize** 220:13
**realized** 102:25 124:2 221:18 222:4,17,22
**really** 10:3,23 17:8 32:3 44:7 45:8,9 50:14 53:8 73:14 74:12 88:15 89:12 93:25 99:11 102:12 126:18 127:21 128:2,10 147:14 156:25 158:7 187:3,5 187:11 192:10 194:13 204:3 209:12 212:17 213:8 215:6 218:5 219:12 225:4 236:25 237:12 239:4 244:22 245:1 253:24,24 256:7 274:8 279:12 281:25 284:6,9 297:12 305:4,5 306:23
**reason** 132:13 137:20 138:2 155:14 169:16 203:8,12 219:14 237:5 244:14 259:22 259:23 305:16 311:16 315:6,9 315:12,15,18 315:21
**reasonable** 60:21 61:1 246:1

**reasons** 150:8 155:9 259:14 259:15,17 309:2 314:8
**recalcitrant** 238:18
**recall** 27:16 38:16,18 85:20 140:15 144:22 147:11 164:2 165:2 167:16 168:9,17 169:11 170:8 170:10 175:20 176:17 177:16 178:7,9,12 179:10,13 180:9,14,17,17 181:10 185:13 185:16 192:8 192:17 196:11 208:17 234:2,5 237:12,16 246:15,20 252:21,23 261:5 262:10 266:6 268:25 275:16,20 276:18,20,23 277:8 279:15 279:19 281:1 292:25 294:8 296:16,20,23 311:4
**receipt** 314:6
**receive** 105:24 106:14 109:9
**received** 106:8 106:10 117:3 154:24 163:23 164:9 192:18 214:3 244:8 260:8 276:24 278:14,18 281:22 282:10 307:7
**receiving** 139:4 192:9 237:13 275:16
**recent** 65:4
**recently** 65:3 190:21
**receptor** 90:17 90:25 119:19 120:4,5 122:22 123:4 124:4,5 124:10,14,16 125:14,20,23 132:1
**receptors** 90:19 119:10 122:21 128:20 130:3
**recognize** 15:11,21 131:8 160:15 190:9 233:25 247:13 280:24 287:16
**recollection** 85:9 157:6 163:1 176:9 244:13,17 283:6
**recommendat...** 196:10
**reconsider** 279:24 300:22 303:24
**record** 1:21 8:2 8:17 17:4 41:18 44:5,25 54:5 57:11,14 79:10 84:12,16 84:18,21 86:14 95:8 112:2 130:19,22 139:6,8,11 160:25 161:2 165:1 171:1,4 171:5 194:14 194:22 206:12 206:15 240:21 240:24 263:8 263:12,13,15 263:18 264:13 282:16 292:13 292:16 299:12 312:19 313:19
**recorded** 8:4
**recordkeeper** 92:5
**recordkeeping** 86:21,22 87:4 87:5 92:21 300:3 301:2 302:22,25
**records** 87:2 92:14 202:14 280:15 300:15 303:18
**rectangles** 134:12
**rectangular** 135:14 137:13
**red** 158:17 310:13
**redacted** 19:25 20:18 50:24 51:3 55:22 75:16
**redo** 215:21,23 225:13
**reduce** 119:4
**reduced** 127:4
**reducing** 90:23
**reduction** 88:13
**refer** 9:22 18:12 54:11 66:11 67:13 159:19
**reference** 45:3 45:5 54:15 75:21 213:9 248:7 264:4

**referenced** 28:16 30:6 175:3 285:6
**referred** 17:25 30:10 76:24 91:1,5 148:7
**referring** 18:4 20:7,25 21:21 27:3 29:22 35:3 42:23 44:17 49:13 65:14 76:10 84:4,25 95:21 144:14 153:10 186:10 232:22 247:17 270:20 272:10
**refers** 89:23 131:14 172:23
**reflected** 282:17
**reflecting** 140:18
**reflects** 166:14
**refresh** 244:13
**regarding** 3:21 4:4
**region** 119:1,23
**registered** 272:3
**registration** 314:23
**regulation** 159:14
**regulatory** 216:13
**reisbaum** 2:4 8:22
**rejecting** 237:18
**rejections** 237:14
**rejects** 125:17
**relate** 187:11
**related** 51:3 70:18 182:23 185:6 187:21 300:15 309:16 314:12
**relating** 48:1
**relation** 114:2 114:3,5
**relationship** 78:22 157:22
**released** 82:23 242:1
**relevant** 154:15
**reliability** 278:16 279:20 282:6 311:13
**reliable** 99:10 99:23 205:17 212:10 214:7 215:1 237:22 238:3 254:25 274:21
**relied** 14:7
**relieved** 142:3 142:10
**rely** 99:20,22 100:2
**relying** 25:11
**rem** 31:8
**remain** 117:11
**remaining** 215:24 243:14
**remarkable** 56:22
**remember** 22:25 24:7,9 29:18 37:11,12 38:1 39:23 49:14 65:11 66:16 79:11 85:19,23 93:13 106:4,6,7 107:20 108:5 109:16,19 118:1,3,9,10,11 122:9 127:12 129:3 131:10 144:23,23 145:15,24 146:20 147:5 147:17 161:19 161:20 163:3 163:19,21,22 164:8,10,11,13 164:15,17,20 164:22 165:5 166:4,7,16,18 166:22 167:13 167:24 169:15 170:1,22 176:16 178:25 179:9 181:6 183:21 185:4 185:23 186:8 187:9 196:13 197:4 199:24 209:17 215:2 216:21 218:5 222:7 223:3,6 223:7,12 225:19,20 230:19 231:14 236:1,1,22 243:2,25 244:3 244:16 246:24 253:17,20 255:2,18 257:10 260:17 261:11 262:16 264:12 265:14 265:25 267:1,4 268:1,5,23,23 268:24 269:6 270:18 271:17 276:22 277:8,9 279:13,18 281:18 284:15 288:7 296:15 296:18 297:17 305:1,23 306:23

**remembered** 221:19 222:8
**remembering** 244:12 282:21
**remi** 1:7 4:7 6:3 38:7,9 39:5,22 40:4 115:2,15 115:16,22 155:24 229:23 262:21 313:7
**remind** 41:25
**remotely** 8:16
**removal** 234:6 254:19
**remove** 255:19 298:15,18 299:5
**removed** 232:5 234:15,18 235:9 248:3,3 248:10,11 255:25 257:16 283:11
**removing** 174:20 234:18 254:8,17 257:25
**renee** 75:21 156:8
**rent** 108:20
**repeat** 118:2 127:8 200:1
**repeated** 231:5 252:18
**repeatedly** 11:25
**repeating** 248:16
**repeats** 119:22 254:3
**rephrase** 118:20
**replaced** 203:20
**replacing** 207:19
**replicate** 127:24
**replicates** 310:11
**replied** 154:23
**reply** 154:22 162:15
**report** 280:14 301:11,12,14 302:13,16 303:8,8,11,24 309:9,16,19 310:20
**reported** 1:19 28:7 121:10,21 122:6 173:5 233:16 266:18 289:8 310:18
**reporter** 8:13 58:1 75:3 78:13 148:22 294:23 295:19 313:14
**reporter's** 3:8 57:19 313:12
**reporting** 170:20 173:8 173:16
**reports** 69:24
**represent** 132:22 133:8 135:6,11 165:20 172:11 219:1 226:1 258:6 269:12 275:25 287:13
**representation** 235:4
**representative** 73:18 74:10
**representing** 8:12 275:23 276:15 288:13
**reputation** 54:23
**request** 5:15 152:22 236:3 241:6
**requested** 152:23 301:8 314:3,9
**requesting** 290:25
**requests** 183:20,24
**require** 76:22 87:21
**required** 34:13 119:10 316:13
**requirement** 87:20 88:4,5,6
**requires** 87:17 202:21
**reran** 199:6
**reread** 164:6
**rerun** 199:9 248:12
**reruns** 248:2
**research** 11:20 73:1 81:18 93:23 94:6 96:7 97:11,19 103:20 109:14 117:17 118:16 118:22 120:8 121:2,9 123:6 123:12 127:25 130:12 164:9 165:24 170:16 208:16 209:19 209:20,22 309:10 311:13
**researcher** 132:16 210:4
**researchers** 122:18 123:2 271:15 303:17
**reserve** 86:17 95:5

**resign** 116:14
**resilient** 31:16
**resolution** 71:18
**resources** 127:21
**respect** 199:4
**respectfully** 46:8
**respond** 53:7 76:17 153:11 157:20,21 250:14,15 296:7 301:3
**responded** 159:12 216:1 301:6
**responding** 148:9
**responds** 196:17 286:13
**response** 40:10 128:19 152:21 159:8,25 161:13 187:11 241:5 293:25
**responses** 16:24
**responsibility** 104:17
**responsible** 103:4,21 119:14 173:2,4 174:22 233:10 233:14
**responsive** 239:4
**rest** 44:14 119:21 134:20 203:22
**result** 80:11,17 252:14,14 256:1 280:13 299:1
**resulted** 173:23
**results** 6:17 29:11 30:3 82:18,24 83:8 198:24 199:20 199:22 200:14 200:15 212:11 235:18 239:20 242:19 245:5,7 245:20,22 246:7,23 251:8 251:9 252:13 252:18 253:3 253:19,22 254:4 266:18 266:22 267:10 267:21 268:9 279:9 289:8 293:13 310:19
**retract** 261:21 262:2 264:18 265:24
**retracted** 76:21 77:2,5,5,18 79:3 121:14,22 262:7
**retraction** 78:14 79:5
**retractions** 3:21 4:4 76:25 156:8 158:12 158:16,16 262:11 264:5,8 266:12
**returned** 174:6 314:5,6
**reuters** 147:1
**reveal** 53:9 157:1 160:7 163:19 187:18 228:1
**revealing** 161:11 187:16
**review** 71:8 101:21,25 103:3 109:21 165:11 167:5,7 196:12 236:10 236:23 238:6 302:6
**reviewed** 11:21 81:11 165:15 166:24 171:6 182:8 195:13 235:13 236:3 257:2 260:18 291:9 303:20
**reviewer** 236:3 236:9,14 238:17,19
**reviewers** 236:13 237:1
**reviewing** 261:1 276:20 281:1
**revision** 100:23
**revolutionary** 177:22
**rhetorical** 46:14,16
**rick** 113:12
**ridiculous** 37:5 58:13 238:15 311:23
**right** 9:18,20 10:18 16:25 18:1 19:19 20:10 21:24 23:20 25:14 27:8 29:8,12 30:6,11 31:11 34:11 35:5 36:3 37:13,22 39:18 42:17 43:5 50:11 54:7,16 55:17 55:19 56:4,11 57:1 58:5 60:16 62:2 63:2 65:9 66:15,21 75:16

79:22 82:19 84:9 86:5,11 93:19 97:25 103:24 104:13 106:9 107:4,7 109:6 112:3,24 113:7 115:17 120:19 121:3,7 121:11,14 122:7 126:24 127:5 131:14 131:18 132:3 133:5 137:3,4 138:15 139:14 151:23 153:16 154:21,25 156:17 158:3 159:4,20 160:2 161:18 163:8 164:18 165:25 172:24 174:15 183:3 184:7,23 186:11 188:16 192:1 193:20 193:24 195:16 197:25 198:22 199:7 202:10 202:15 203:11 203:11,15,18 204:5 205:6 207:24 209:7 209:21 210:9 210:15 216:11 216:19 217:5 219:17 220:11 221:22 228:2 230:5,24 231:2 231:12 233:10 235:12,15,18 235:20 237:11 240:14 250:2 251:23 256:18 256:21,24 257:3,20 263:19 266:16 266:19 268:16 270:15 271:6 272:14 273:10 273:10,13,16 278:2 279:1 281:24 282:3 289:3 292:3 299:6,15,18,22 300:4 303:23 307:9 309:18

**rights** 86:17 95:5
**rigor** 80:5 91:15 92:12
**rigorous** 92:9 228:11 255:11 255:13
**ring** 265:19
**risk** 203:13 259:3
**rna** 28:3
**robbins** 169:25 193:19,20,22 194:3
**robertson** 115:5
**robust** 34:10
**rock** 145:5
**rockefeller** 2:10
**rodriguez** 6:16 282:19 288:5,8 288:16 289:11 289:13 290:9 291:9,11 299:17
**roger** 148:6 293:20
**role** 114:5 151:11 241:12 243:6
**roll** 62:22
**rooftops** 179:6
**room** 104:25 137:20 138:4
**rotating** 230:12
**roughly** 105:19
**round** 203:16 204:4,10 219:17 223:20 227:13 228:5 255:2 256:25 275:17
**rounds** 236:23
**row** 273:21 277:18,22,25 278:5
**rowen** 2:9
**rows** 274:2
**rpr** 1:18 314:22
**rule** 212:8 254:8,16,19 255:20 256:3,6 257:17
**rules** 1:20 98:17 307:25
**run** 104:18 196:19,24 197:8 245:17 252:15,25 253:15,22,25 281:5,13 287:20
**running** 114:8 114:19 143:25 228:19 279:3 281:12
**ryan** 5:20 248:20

**s**

**s** 2:1 3:11 4:1 5:1 6:1 41:24 58:10 83:7 112:14 315:3
**sab** 192:9 214:11
**safely** 52:23,23
**safety** 284:6,9
**sahakian** 169:24 193:16

193:22 194:3 196:17 197:7,9 197:12
**salacious** 301:19
**salaries** 307:24
**salary** 105:4,9 105:12,15,16 108:6,9 117:4 307:12,16,25 308:12
**sample** 103:14 205:16 215:13 244:22 245:1 282:21 298:23
**samples** 6:9 127:14 179:17 203:25 204:19 215:9,11,18,22 223:14 239:14 241:14,22 242:1,11,12 243:8,15,18,24 244:9,11,14 245:15 246:1 246:18 247:6 249:5 250:8 251:21,23,25 252:9,10,16 253:1,9,13,14 268:7,15,22 269:1,17 271:23 278:25 281:14,21 282:10,12
**san** 76:19 108:22
**sana** 118:2
**sand** 142:5,11
**sandy** 115:5
**sap** 174:10
**sat** 236:5
**sava** 65:20 66:3
**sava's** 135:7
**savadx** 33:25 34:18 177:22 178:8 204:17 204:18 232:7 307:5
**savages** 65:20 66:2
**saving** 160:24
**saw** 22:23 23:3 23:5,13,19 88:12,12 104:5 176:11,14 196:4 205:14 205:18 221:16 251:17 284:18 285:6
**saying** 16:5 19:16 22:3,4 32:23,25 33:4 33:5,18 51:16 52:2 61:6,7 63:14,20,25 99:18 102:20 135:20 140:19 141:9 181:22 188:9,22 191:16 197:7 209:11,25 213:16 290:17 293:4 295:13 311:23
**says** 22:9 54:2 75:17 172:22 177:21 194:4 195:4 196:18 198:16 205:25 211:19 212:20 212:22 213:20 224:9 229:21 230:14 232:15 243:17 244:8 249:1,4 252:8 254:1 273:17 276:7 277:17 281:7 293:9 310:5,8
**scaffolding** 124:25
**scaffolds** 125:1
**scalable** 34:10
**scam** 47:7 53:11 100:13 143:19 177:23 296:3
**scampbell** 2:17
**scan** 96:17 98:2 103:12 277:12 284:2
**scary** 190:16
**scents** 305:7
**scheme** 35:8,8
**schoen** 111:17
**schwartz** 118:6
**science** 11:19 22:8,12,14 25:1,5,14 26:1 26:15 28:14 31:6 66:7 73:3 86:6 100:14 130:11 143:24 146:2 147:7 148:10 149:5 150:8 157:25 176:25 301:11 302:13 303:12 303:24 307:3
**science's** 177:12
**sciences** 1:7 2:14 8:6 9:8 11:4 40:13 148:17 176:2 244:10 252:12 285:23 309:11 309:18 313:7 315:1 316:1
**scientific** 11:20 13:22 26:7,20 33:7 80:5,6,23 81:14 82:5 83:4 86:21 89:9 92:12

93:22 102:24 165:19 177:4 189:7 192:6,7 192:13,19 193:23 197:16 210:20 214:3 229:4 261:21 264:18 293:11 296:21 297:22 298:25 306:4 312:1
**scientifically** 177:23
**scientist** 28:6 80:1 88:17 91:12 92:9,15 141:13 148:8 149:4 210:5 212:18 220:7 221:2 243:18 306:5
**scientists** 66:8 292:21
**sclerosis** 27:24
**score** 277:17,18 277:23 278:6 307:17
**scored** 308:24 309:6
**scores** 269:16 276:24 277:2 278:8,9
**scott** 2:14 9:7 84:12
**scream** 52:24 52:25 53:4
**screamed** 56:20
**screaming** 56:18 178:5 179:5
**screen** 120:1 272:17 277:2
**screened** 272:23
**screening** 103:21 120:20 124:13,24 278:2
**screenshot** 58:4 67:3
**screenshotted** 17:13
**scrutiny** 300:1
**sda** 286:16
**search** 245:21
**seattle** 118:10
**sec** 5:14 65:2 116:16,17,25 183:1,4,16,22 184:6,19,22 185:7 218:8 227:5,9,10 234:18
**sec's** 227:11 234:3
**second** 15:13 44:10 45:8 52:5 58:13 84:12 93:11 96:11,18,21 97:6,7,17 98:3 99:5 100:23 120:3 146:6 194:8 198:9 207:1 215:13 229:16 231:6 239:6 244:10 245:8 246:17 249:1,1,4 250:2 251:3,23 252:9 259:23 263:1,4 274:15 280:8 285:25 286:7 293:6
**secondary** 5:2
**seconds** 91:18 139:6
**section** 12:4 28:25 165:22
**see** 17:12,14,17 17:17,23,24 18:13 19:25 20:3,15,23,24 21:19,20 24:13 24:14 30:18 37:20,23 41:21 41:24,25 44:13 45:13,14 50:22 51:24 52:4 53:1,19,21 54:8,9,13 55:4 55:10,11 56:2 56:3,6,7 58:15 58:16 61:13 64:7,18,19 65:5,6 66:13 66:14 67:3,9 67:11,12,15,16 67:23 74:7 75:8,12,15,19 75:20 82:22 119:12 120:3 120:21 125:4 131:6,7,15 132:14 133:12 133:16,23 152:18,25 155:25 156:4 156:14 157:14 159:1,2 160:19 162:1,2,5,6,17 162:20,21 172:5,8,20 174:10 176:6 177:14,25 178:1,21 179:3 181:3 193:17 194:4 195:11 196:1,2,21 198:4,10,19,20 200:6,25 201:7 202:24 205:24 206:19,24 207:6,7 208:23 209:4,5,19 210:18 211:10

211:22 212:5,6 212:12,13,20 213:18 215:17 222:23 223:8 224:10,11 229:14 230:1 235:2,2 239:25 241:6,9 243:21 244:4,11 245:2 245:3,5,11,24 246:3 247:16 248:22 249:2 249:10,23,25 250:1,8 251:13 251:20 252:1 252:19,20 254:21,22 262:23 263:23 264:2,3 269:25 270:1,10,24 271:21 273:22 277:19,23 278:1,6 280:10 280:11,18,22 280:23 285:20 285:21,23 286:5,11,19,20 289:7 292:23 293:15,25 305:9 309:12 309:24 310:3 310:15,16,17 310:20

**seeing** 52:2 88:20 96:13 176:18 178:20 180:18 181:10 238:11

**seeking** 139:3

**seem** 269:18

**seemed** 135:3

**seems** 65:8

**seen** 31:9 172:4 175:17 176:10 178:2,23 215:16 221:12 222:1 238:4 241:10 284:13 284:14,16 303:21 309:14

**sees** 122:22 230:10

**selected** 204:10 309:5

**selective** 172:19

**self** 145:5

**seller** 41:7

**sellers** 177:15 181:12 182:2 182:21 188:5 192:14 260:25 294:17,20 295:25 296:4 311:22

**selling** 216:5

**send** 63:24 101:21,25 103:3 104:1 154:15 155:5 160:4 165:24 169:2,22 180:18 181:2,4 201:3,18 202:8 203:1,9 217:2 221:9,19 223:10 224:21 226:12 236:6 236:10,19 241:20 243:23 245:1 246:17 250:2,4,8 251:22 306:11 306:17

**sending** 12:8 153:2 154:7 155:15 160:10 161:15 166:18 168:9 169:11 203:5 216:22 220:8,17,24 221:3 223:3 224:23 245:7 246:15 249:9 249:13 297:22 301:7 306:17 306:20

**sends** 156:4 158:17 303:22

**senior** 110:13 110:13

**sense** 89:6 170:12 202:16 259:14

**sensitivity** 173:12,21 174:14,19 234:25 235:1 235:11

**sent** 23:4,5 71:21 72:22 144:15,15,17 144:18,19 154:25 155:8,9 156:16,19 157:4,7 159:22 159:24 160:2 160:18 161:17 163:3,7 170:18 172:15 180:5 180:23 192:2 213:9 219:14 221:20 222:24 223:10 235:24 236:2,5,11,23 241:14,22 242:4,9,15 243:1,18 244:10,14,17 245:14 248:20 249:5 263:20 266:10 268:23 275:23 276:1,1

276:15 281:25 286:14 287:14 287:20 288:21 289:1,15,23 294:1 301:20 302:4,5,9 304:10,12,13 307:16
**sentence** 41:23 44:10 45:7,8 52:2 55:22 57:5 64:20 159:20 194:8 195:4 198:15 212:15 213:8 244:20 246:9 310:8
**sentences** 51:1 51:4 194:23
**separate** 59:22 120:12 121:12 135:1 147:19 158:15 308:18
**separately** 168:6
**sepsis** 128:19
**september** 153:13 155:23 156:17 158:25 160:5 298:3 308:19
**series** 132:3 137:7 247:13
**serine** 129:25
**serious** 48:6 49:12 168:14 169:6
**seriously** 36:24 48:10 74:13 182:6 216:1
**serve** 114:12
**served** 114:17 313:23
**services** 117:13
**servier** 260:4
**set** 88:15 104:4 133:23 141:22 171:20 175:6 175:24 227:1 244:22 245:1 253:13 255:22 277:7 282:7 306:15
**setting** 51:11 113:18 217:1 220:6 267:7 289:12
**settled** 184:24
**settlement** 185:1
**setup** 251:1
**seven** 86:8 92:22
**several** 141:10 282:9 302:17
**severance** 116:23 117:1,2 117:8,10
**severe** 215:13
**sexist** 11:2,23 15:1,6 18:15 21:4
**sham** 46:2
**shambolic** 176:3,22
**shape** 115:7
**shaped** 134:1 137:12
**shapiro** 69:20
**share** 40:7,8 191:23 201:11 201:22 238:8 287:25
**shared** 16:22 43:7 138:19 151:12 168:19 168:20 185:14 216:16
**shareholder** 297:8
**shares** 113:10
**sharing** 168:17 222:4,17
**sheet** 201:4,12 201:18 202:8 203:1,1,9
**sheets** 202:4
**ship** 283:7
**shipments** 244:18
**shipped** 269:17
**shit** 55:6,12
**shitsters** 55:17
**shock** 37:8
**shockingly** 102:21
**shop** 228:12
**shorena** 6:19 285:15 286:1 286:13
**short** 25:17 28:3 41:7 177:15 181:12 182:2,21 188:5 192:14 209:1,7 260:25 294:17 294:20 295:25 296:4 311:22
**shorted** 25:21
**shorthand** 313:14
**shorties** 58:7 60:12
**shortly** 183:17 300:20
**shot** 228:20
**show** 27:11 28:11,17 30:4 70:2 72:2 73:16 74:2,2 83:20 88:9 98:8 123:7 132:19 171:17 171:18 193:13

202:5 206:16 210:9 222:9 228:23,23 232:20 233:21 238:20 245:11 246:2 250:5,18 251:2,4 257:9 257:12 258:2 266:22 267:10 267:15,22 268:11 273:8 274:25 276:10 276:11 280:4 284:3 292:17 301:23 309:7

**showed** 27:13 27:13,15 28:9 96:13 122:24 127:1 195:4 201:12 206:4 211:14 215:18 227:13 238:14 238:18 239:19 240:4 250:11 251:8 268:10 279:16

**showing** 24:5 34:18 126:23 202:14 203:1 246:10,23 251:10,22 273:12 312:2

**shown** 72:12 179:8 211:14 227:23 234:2 251:1 259:24 313:24

**shows** 28:4 83:9 94:18 100:12 123:6 201:4,18 223:4 223:9

**shred** 11:18

**shu** 281:11

**shut** 149:13 203:23

**sic** 55:9 145:3 276:24 277:1 278:8

**sick** 203:21 207:19

**side** 22:5 125:21 131:14 132:25 133:14 133:24

**sides** 132:25 133:2,3 263:9

**sign** 143:22 151:3 190:17

**signal** 239:18 305:25 306:4,5 306:11,19

**signaling** 90:18 91:1 122:24 124:5,18 125:11 129:22 130:7 306:24

**signature** 3:9 314:2,5,7,21

**signed** 117:22 172:6

**significant** 88:12 89:25 90:9 94:18 96:14 98:11 99:13 100:10 232:20 242:21 248:5 266:23 267:11,15,22 268:11 283:12 283:12,13

**signs** 25:12

**silence** 53:20

**silent** 112:7

**similar** 34:1,3 74:3 103:17,18 119:23 237:14

**simoa** 6:9

**simon** 123:4

**simple** 137:19

**simufilam** 23:20 26:2,15 27:4,6,7,22,23 27:24 28:3,8 28:17,19 30:4 81:18,20,21 82:3,4,5,14,15 83:2,3,14,15,24 84:1 85:7,11 85:14 86:3,4 109:15 116:8 118:17,18,19 118:23 120:7 120:17,23,24 121:1 123:17 123:18,19 126:4,19 127:2 127:3,4 128:16 128:21 129:13 130:12 131:17 131:19 148:12 188:3 189:7 258:14 266:23 267:11,23 268:11 279:16 279:18 306:3 307:5,6

**simultaneous** 43:14 158:16

**sincerely** 172:6

**singer** 6:3 262:21

**single** 14:9 26:14 49:16 134:20 135:25 137:9 138:3,7 257:17 301:20

**singlet** 214:22

**singular** 108:8

**sirna** 83:7

**sit** 45:9,24 46:3 50:4,14 53:10 76:18 140:12 144:2 194:20 218:23 221:25

**site** 6:5 98:21 118:25 119:13 119:20 120:11 143:22 144:10 145:4,5,6,13 264:14,16 291:7
**sites** 97:9,11,15 97:18 103:25 129:2 150:4,7 151:3 168:13 262:14 263:25 264:4,7,10,11 282:23 283:7 283:10 294:9 294:13
**sitrick** 40:15,17 40:25
**sits** 188:9
**sitting** 11:11 26:13 45:23 57:3 123:14 140:19 308:23 311:22
**situation** 41:14 41:15 48:5 49:11 139:25 142:6
**situations** 81:16
**six** 86:7 179:18 194:23 266:15 267:8,25 268:8 273:17 283:14 292:5
**sizes** 127:4 134:16
**skew** 257:7
**skill** 141:22
**skyline** 63:11
**slide** 35:20 131:8,11,13,20 132:2,9,21,24 133:4,15,21 137:13 171:7 176:1,2,5,10,12 177:9,17,21 178:2,8,13,19 178:23 179:14
**slightly** 200:6,6 269:23 277:14
**slow** 38:5 151:3 151:4 205:11 294:11
**slower** 57:25
**slowing** 98:12 99:13
**small** 17:15 108:3 190:15 190:16 196:15 212:10 216:7 244:22 268:6 307:14
**smeared** 31:6 38:11,23 41:17 54:23 56:1
**smearing** 41:11 41:16 293:5
**smile** 73:5
**sn0052** 5:15
**sni** 83:7
**social** 180:11
**softer** 195:17
**softmax** 286:17
**software** 110:22 286:2,9 286:14,16,22 287:1 288:9 289:6,16
**sold** 112:18
**solid** 133:10,16 135:10,19,20 232:11
**solution** 247:1 247:3
**solutions** 314:23
**somebody** 40:25 73:3 102:22 111:19 166:6 179:7 183:9 197:1 203:21 261:19 295:4
**somebody's** 143:15
**something's** 37:1
**somewhat** 187:1
**soon** 60:14
**sorry** 16:16 20:13 24:9 40:1 49:6 58:7 58:7,8,8,9,10 67:6 78:2 85:20 92:22 94:11 110:2 115:11,25 136:16 156:2 157:12 162:14 194:10 210:13 217:16 218:14 227:9 235:25 236:14 238:12 241:18,23 254:11 264:14 266:1 276:5 280:5 285:17 293:7
**sort** 14:4 16:4 39:10 83:18 125:15 128:10 128:14 191:4 199:25 208:5 209:23 213:20 226:9 230:17 250:9 305:1
**sorts** 71:5 89:1
**sound** 66:21 90:2 126:2
**source** 148:4
**sources** 80:12 108:15,16,24 134:14 286:25

**southern** 1:1 8:8 313:1
**space** 253:16 305:17
**spatial** 174:19
**speak** 50:25 51:4 70:13 84:1 94:13 111:19 185:24 235:12 295:6
**speaking** 43:14 92:17 213:14 275:7
**speaks** 248:6
**specific** 10:4 26:1,6,20 35:19 65:24 86:22 101:6 123:5 163:18 164:5 175:12 192:11 230:21 250:25 310:12
**specifically** 38:2 52:19 55:14 90:18,20 131:11 140:17 141:16 169:15 170:10 174:2 174:11 224:19 225:9 264:12
**specifics** 187:8
**specify** 41:8
**specimens** 211:21
**speculate** 201:20,21
**speculating** 209:24
**spell** 112:13
**spelled** 21:18
**spend** 20:17 62:25 150:3 250:13
**spending** 62:25 262:14
**spent** 109:25 110:14,18 150:5 183:2
**spew** 142:16
**spike** 23:19,19 24:2 239:15
**spin** 39:10
**spinal** 232:12
**spinning** 102:15
**splice** 137:17
**spliced** 137:6 137:14,19,25
**spoke** 59:16 69:16 70:4,5 115:1,24 192:20 208:21 229:17 294:25 295:7
**spoken** 102:3,3 102:20 113:13 113:15,19 114:4
**sponsors** 87:17
**spouting** 62:20
**spreadsheet** 5:9 6:13 269:16 271:2
**spreadsheets** 298:23
**spring** 52:3 140:9,24 185:5 218:13
**spruck** 69:6 159:9,23 294:25 295:18 296:5,12,16,20 296:24 297:16 297:23,24
**spun** 102:23
**squirrelly** 128:11
**stable** 207:13 283:1
**staff** 95:12,13
**stage** 87:22
**stamp** 217:12 269:9
**stamped** 15:10 130:25 155:20 158:22 160:14 161:22 189:24 197:24 200:22 217:10 223:25 224:1 229:9 233:22 241:2 247:12 248:19 262:18 269:12 275:14 280:5 285:3,14 287:12
**stamps** 198:17
**stand** 33:10
**standard** 71:2 92:8 106:2 179:25 231:17 246:25 252:11 255:10 256:13 257:25 258:3 274:23 284:17 300:4 305:19
**standardly** 305:15
**standards** 255:5,6 299:24 300:6
**standing** 140:20 305:2
**stanford** 156:9
**star** 145:5
**start** 172:2 198:6 271:20 286:3,10
**started** 29:16 37:3 85:20 295:25 297:17
**starting** 105:4 125:1 269:15
**startups** 117:20 117:21

**stat** 147:3,4
**state** 1:18 8:16 88:5 237:23 258:10 313:15
**stated** 1:20 138:3
**statement** 102:23 209:20
**statements** 12:24 35:14,18 161:9,17 167:15 172:14 180:10 182:10 188:2 189:3 233:2 260:10 260:13 275:5 279:25 283:4 311:16
**states** 1:1 8:7 177:9 313:1
**statistical** 73:22 110:24 173:10,13,18 174:1,23 197:2 197:8 199:1,5 221:12 222:10 223:5,9
**statistically** 89:25 90:9 232:20 266:23 267:10,15,22 268:11
**statistician** 196:10,12 198:13 199:10
**statistics** 195:9 199:6 202:2,4 202:8 219:12 219:13 267:4
**stats** 4:24
**statute** 159:16
**stay** 61:19,25 64:1,2 171:10 181:8 204:22 230:9
**stayed** 63:24 242:11
**staying** 61:17 181:15
**stenographer** 129:8 193:10 206:8
**stenotype** 1:19
**step** 223:16 232:10 289:1
**stepping** 114:9
**steps** 91:15
**steve** 34:20 69:20,21 192:20 200:1 200:10 214:13 214:13 229:17 230:9 231:6 233:4 256:1
**stirrers** 55:6,12
**stock** 106:8,10 106:11,14 107:21 108:7 108:10 112:16 112:18,18 113:1,6 177:11 177:13 182:5 297:11
**stockholder** 112:20,23
**stood** 66:1 85:17
**stop** 12:10 32:2 32:17 37:2 43:20 50:7,8,9 51:9,12,17,18 63:25 75:2 79:9 99:9 100:15 140:21 140:21 141:17 141:19 142:4 142:10,15,20 143:1,16 146:5 146:5 149:13 149:13,25 150:18,18 166:23 170:7 181:3 257:13 306:17
**stopped** 96:11 99:6 100:17 143:2 146:4,6 188:22 237:3
**stopping** 50:11 100:16
**storage** 282:22 305:18
**store** 278:1 283:7
**stored** 13:20 282:24
**story** 102:16 123:22,23
**straightforward** 128:13 196:14
**strange** 102:10 130:7 309:5
**strategy** 154:13
**street** 2:15,19 21:16 38:11,23 39:4 42:20 48:7 49:19,23 146:22 165:9 314:24
**stress** 55:24 115:7
**stretch** 100:5 261:17
**strike** 49:7 114:23 138:11 143:6 159:23 163:13 169:23 174:13 175:8 178:11 181:20 185:9 199:18 210:25 220:5 245:19 246:8 280:6 308:10
**strings** 156:5
**strip** 137:4 214:20 225:7,7

**stripped** 224:16
**stroe** 112:12
**strong** 24:12 31:6,8,16,16 196:2
**strongest** 197:20
**strongly** 67:21
**struggling** 40:20
**stuck** 122:4 214:22
**student** 207:18
**students** 230:12,14 233:7
**studied** 126:19
**studies** 84:4,8 84:23,25 86:1 87:19,22 200:16 214:1 268:16 308:2
**study** 35:20 85:21,25 88:25 97:13 98:3,4,9 99:5 103:8 172:24 173:5,9 173:10,17,23 174:15 179:18 192:19 193:8 193:11 196:5 200:11 216:19 218:17 219:7 222:2 233:9 234:8 235:18 241:13,15 243:19,24 258:25 259:2 266:14,16,21 267:9,22 268:10 269:2 270:15 272:18 277:1 278:25 282:24 283:16 283:25 284:6,8 284:9 295:15 311:5
**study's** 243:19
**studywise** 209:1,7
**stuff** 25:4,7 33:21 109:11 109:13 121:16 147:6 181:17 205:10 311:24
**stunned** 184:15
**style** 12:4
**styled** 1:17
**subgroup** 99:12 196:2
**subgroups** 96:13
**subject** 3:20 4:3,8,13,19,22 4:24 5:7,11,20 6:4,9,17,21 159:4 212:8 213:10 224:8 229:12 243:24 252:10,16 253:1 312:12
**subjected** 73:22
**subjects** 173:24 212:10,19,21 213:21 217:4 243:19 254:4 256:20,23 270:19 271:25 276:7
**submission** 252:7
**submit** 73:22 235:23
**submitted** 100:23 101:14 101:19 236:15 241:5 255:9 308:6
**subscribed** 316:14
**subsequent** 118:17,22
**subsequently** 308:20
**substance** 157:3 165:5 187:17,19
**substantial** 212:7
**substudies** 97:9 97:15
**substudy** 96:18 96:21
**success** 190:25
**sucked** 33:3 259:7
**suddenly** 115:9
**sue** 148:25
**suey** 12:4
**sufficient** 218:16 219:5 219:21
**sufficiently** 104:3
**suggest** 260:12 302:19
**suggested** 272:21 275:1 276:25
**suggesting** 109:14,15 156:6
**suggestion** 209:13
**suggests** 137:13 271:9
**suit** 45:12 47:22 50:5,11 50:17,21 51:7 51:13
**suite** 2:15,19 314:24

**summary** 5:2 60:14 237:17
**summer** 308:25
**supervision** 126:20
**supplements** 36:10
**supply** 287:8
**support** 73:2 122:14 148:17 149:15 209:10 209:13 308:1
**supported** 308:3
**supporter** 157:24 158:8
**supporters** 64:23 65:9,13 158:17 181:1 307:2
**supporting** 66:3 130:15 312:1
**supportive** 83:10 232:14
**suppose** 50:10
**supposed** 33:9 72:6 116:21 127:16 216:25 293:14 294:21
**supposedly** 60:6 96:25 112:6 207:12
**suppress** 28:4
**sure** 9:25 12:2 12:21 15:7 21:25 24:17 30:1 74:6 76:2 91:19,23 95:16 105:23 127:18 129:19 137:3 139:15 144:6 147:9 148:20 152:11 168:5 179:1 207:14 210:8 218:19 218:20,24 232:17 236:8 240:19 242:17 244:1 246:21 281:4 283:12 284:18 286:1 287:9 290:19 298:1
**surely** 156:11 158:17
**surprising** 197:17 207:2,9 208:1
**survival** 88:10 88:14
**survive** 299:10
**suspect** 67:21
**suspected** 73:3 74:1,12
**suspicion** 214:7
**swapped** 254:3
**swear** 218:24
**sweden** 203:18 226:5
**switching** 240:15
**sworn** 1:17 9:15 313:17 316:14
**symptoms** 96:24 119:5

**t**

**t** 3:11 4:1 5:1 6:1 54:3 112:14,14 196:14,15 248:5 315:3,3
**tab** 217:9
**tables** 221:14 310:13
**tails** 128:12
**take** 13:1 16:15 44:19 45:16,23 46:4 53:10,14 57:7,8 60:1 75:23 76:2 81:19 98:14 115:2,16 116:12 129:8 130:16 150:22 169:6,20 170:23 171:21 174:3,21 182:6 206:10 234:14 235:10 238:12 239:20,24 240:17 263:5 289:1 292:10 305:17
**taken** 1:17 8:4 65:8 71:16 227:16 313:13 314:13
**takes** 91:15
**talk** 6:21 51:9 75:1 84:7 89:6 112:1 151:20 164:16,16 204:18 215:7 231:23 232:7 233:8 260:2 266:13
**talked** 81:10 111:12 202:3 261:20 299:13
**talking** 40:19 40:21 41:1,20 55:19 57:20,22 69:3,4 77:14 89:14 134:24 136:8,22 137:10 139:18 139:19 144:13 148:5 184:13 201:8,14,15 202:6 205:1 220:3 232:4

252:24 255:15 269:3 292:8 303:7 310:4
**talks** 148:1
**tamara** 1:18 8:13 313:14 314:22
**tangent** 120:14
**tap** 232:13
**target** 26:23 85:7,15 119:11 122:19 184:19 191:6,7 259:23
**targeted** 150:24
**targeting** 97:4 259:22
**tau** 3:17 6:12 124:6 125:5,7 125:11 131:25 136:9 207:11 232:15 241:19 242:1 246:5 247:25 248:1 249:6 251:15 252:24 269:19 270:5 271:9,10 271:13 273:7 273:13 275:1 276:9,10 286:15
**taylor** 2:9 9:11 9:11,13
**team** 47:24 48:2,14 49:2,5 49:9 107:1,9 151:15 203:17 212:3 281:11
**tear** 26:17
**tearing** 296:1
**tears** 52:21 55:25
**technical** 310:12
**technician** 203:20
**technique** 14:7 84:3 85:14 197:18
**techniques** 73:6 82:9
**ted** 118:6
**tell** 16:14 26:20 37:10 70:21 100:12 164:22 169:23 173:3 218:19,23 230:23 231:20 232:8 239:12 265:13 300:18 302:18
**telling** 51:14 60:11 98:2 168:9 169:12 187:21 274:12 306:13
**tells** 190:14
**temple** 91:8
**temporarily** 299:21
**ten** 48:22 91:18 239:11,12,13 239:23 249:21
**tends** 229:23
**term** 19:5 42:6 80:6 89:18,19 90:3,4 228:21 228:25 229:3,5 230:21 244:19
**terminated** 29:4
**terminology** 137:3
**terms** 65:21,23 87:8,10 245:25 251:21
**terrified** 143:18
**test** 34:8 96:16 98:5,11 104:7 125:2 129:2 174:18,19 196:14,15 204:20,20 234:20,21,22 234:24 245:17 248:5 249:5 251:16 271:15 271:24 278:24 284:11,12
285:1,8 287:22 310:25
**tested** 227:13 251:25 274:22
**testified** 9:15 32:15 56:24 68:15 154:5 171:6 217:14 217:18
**testify** 48:14 49:8 84:13 155:12
**testifying** 70:19
**testimony** 28:6 51:5 63:5,18 94:25 152:2,5 152:8 155:4 158:18 174:12 230:19 245:18 312:18 313:19 316:9
**testing** 120:17 172:23 177:6 179:20 223:22 243:14 247:6 250:21,21,22 271:12 279:10 284:21 291:10
**tests** 27:11,21 28:15,17 29:3 29:12,16,22 30:3,5 91:19 122:6,11,12,13 174:16 199:17

199:19 207:23 234:21 272:16 281:16 287:3 288:1,10,22 289:2,6,15,17 289:23 291:18 292:3
**texas** 1:18,20 8:11 313:15 314:24
**text** 111:24 112:1,3 190:13 305:14,15,20
**texting** 112:8
**texts** 246:16 247:14
**thank** 57:24 115:25 312:15
**thanks** 72:1 162:19 163:10
**that'd** 247:5
**thawed** 14:1 282:10,12
**theranos** 31:3 36:1,2,2 47:8 148:23 183:1,2 296:3
**therapeutics** 3:14 118:3 158:1
**therefor** 314:8
**thin** 25:4,7
**thing** 15:20 30:25 35:7 43:24 58:25 73:15 87:9 106:2 167:4,8 167:19 184:25 194:11,15,21 196:9 221:20 223:6 226:13 247:8
**things** 19:16 32:24 33:5,5 42:12,14,19 47:13 54:20 57:2 65:11 68:14 73:13 81:15 85:17 87:2,24 91:19 124:11 125:22 127:13 128:1,5 135:1 153:4,6 160:10 161:7 161:16 174:9 185:6 188:10 188:23 215:1 229:20 249:16 250:21 251:13 253:24 256:4 290:6 306:11
**think** 11:11 12:15 13:8 14:24 15:5 18:15 24:16,18 24:23 26:6,10 26:13,19,20 30:7,8,24 31:10 32:24 33:9,16 36:25 38:6 39:4,7,11 43:10,21,23 49:16 50:20,24 51:12 60:21 65:24 78:23 79:2,18 80:22 87:13 88:17 91:8 92:4,7,14 102:1 103:24 105:6,12 106:1 106:1,7,23 108:17 109:18 110:17 114:12 117:10 123:5,9 132:7 139:15 140:9 142:14 144:16 154:23 155:13 168:7 176:11 178:4 180:22 181:8 186:20 196:1,8 196:9,13,18 203:8,12 205:2 205:2 208:18 209:23,23 214:2 218:10 225:5,25 226:3 226:21 227:18 230:6 232:14 236:20 238:20 240:12 241:11 243:25 244:1 248:14 249:23 253:9,23 254:12 261:12 263:2 264:12 268:13,13,24 269:3,4 270:16 270:16 273:14 273:18 277:9 277:10,13 278:12 279:12 281:17,21 282:15 283:12 285:9 287:4 288:19 290:17 292:4 294:19 295:1,17 297:8 303:2 305:23 306:10
**thinking** 42:23 100:3 149:2 155:2 223:7 228:11
**thinks** 229:22
**third** 21:15 37:17 93:12 133:23 134:2 134:12 135:25 136:4,6,7 168:10 169:12 195:10 196:7 198:15 250:24 296:6
**thomas** 147:13

**thornton** 5:11 6:16 225:23 229:11 231:10 231:20 281:10 281:25 284:22
**thorough** 48:17 74:25 183:23
**thought** 13:11 13:12 25:25 32:15,19 34:7 35:1 38:8 42:9 48:8 49:19 60:20 67:17 73:4,14 77:16 78:2 122:21 128:11 143:15 170:18 195:5 208:4,4,25 209:8 221:17 226:18 238:8 242:3 249:22 258:20 260:23 261:16 271:19 279:8
**thoughts** 16:24 17:3,6 79:19 206:23
**thousand** 295:5 297:14
**thousands** 11:8 13:13 48:11,11 167:14
**thousandth** 122:22
**threads** 156:3
**threat** 58:25 59:7 60:23
**three** 14:18,19 20:20 46:4 63:10 65:1 68:16 76:20 86:5 93:10 115:6,9 133:24 134:11,12,25 134:25 135:13 135:25 136:4 142:8 157:21 161:3 183:2,18 184:9,9 225:2 236:6,8 248:3 248:9 249:16 253:23 254:13 260:24 273:17 273:21 293:8 298:24 302:18
**threshold** 119:7
**throckmorton** 314:24
**throw** 225:3 256:4
**thursday** 1:17 229:17
**tier** 236:19
**ties** 77:23 78:8 78:17
**tight** 140:12 207:10,15
208:3 230:15 231:15 239:25 246:21,22
**till** 33:22
**time** 6:21 10:2 15:19 19:2,14 20:4,17 22:2 31:1,9 32:19 34:24 37:7,12 38:3,8,17 43:8 44:3,24 45:16 50:19 51:6 57:11,14 63:6 63:9 67:18 71:17 75:23 79:21 80:23 83:18 84:18,21 88:10,14 90:17 93:6,12,18 97:3 99:6,7,10 99:23 104:3 105:10,13,14 105:25 106:24 107:7 108:11 108:14,24 109:24 113:1 115:5 122:22 128:23 130:19 130:22 139:8 139:11 142:18 144:1,4 145:6 146:7 150:9 151:5 164:19 171:1,4,23,25 177:17 179:16 179:21 180:3 180:10 182:19 183:5,19 184:4 184:8 189:20 191:9,11 194:13,19,19 194:20 197:4 197:10 206:12 206:15 207:4 211:2 214:19 215:16,24 218:3,11 220:5 220:13,20 221:12,16,25 223:11 224:24 225:12 240:21 240:24 246:4 247:1,9 249:17 256:12 261:2 263:15,18 268:6 275:24 278:15,19 282:25 283:10 283:22 284:20 285:3 292:6,13 292:16 297:23 298:6 299:3 300:10 303:12 308:15 311:15 312:16,19
**times** 11:14 37:9 43:18 53:19 55:25

69:15 78:13 93:3,10 144:2 145:18,19 146:24 148:9 148:22 211:6 290:15 292:20 293:9 294:3,9 294:20,23 295:19
**timothy** 2:22 8:12
**tiny** 34:7,12 67:8 245:1
**tissue** 13:19 14:1 27:15 42:13 127:14
**tissues** 251:11
**title** 131:3 172:18 176:2 177:21 178:19 178:25 179:4
**titrate** 72:4
**tnf** 207:2
**today** 5:12 9:22 11:12 26:13 84:9 87:4 113:7 123:15 140:10 175:18 221:8 229:13 286:2,10 312:12,13
**today's** 312:18
**together** 78:24 81:10 119:6 137:6,14,17 138:6 151:5 157:21 158:14 173:6 253:15 301:16 309:4
**told** 16:18 19:13 37:9 53:22 81:24 99:9 111:23,24 115:2,15,24 148:21 149:16 153:4,6,9,11 155:17 163:24 170:2 180:4 187:23 190:20 195:14 201:20 209:6,18 211:13 212:3,7 214:11 231:10 239:20 295:8 297:4
**tolerance** 90:19 90:23 119:4,16
**tomorrow** 162:14
**ton** 206:1
**tons** 130:6
**took** 11:21 25:17 36:23 150:11 151:2 236:16 239:11
**tools** 128:10
**top** 18:7 24:11 51:25 123:16 193:15 198:1 201:2 211:7 236:19 241:8 244:7 252:8 269:14 282:18 285:25 286:7 287:14
**topics** 240:15
**total** 6:12 99:13 222:15 237:1 249:6 275:1 276:9 277:17
**touch** 91:17 204:22
**tough** 100:18
**towards** 10:21 10:24 15:6
**toxic** 102:11 124:18 125:11
**tr** 310:21
**track** 16:4 17:9 105:7,18 125:21 128:8 282:11
**trail** 52:22 288:12
**train** 78:2
**trained** 86:23 86:25
**training** 80:4 86:20,22
**trampled** 55:25
**transcript** 4:15 5:17 86:14 313:18 314:6 316:5,9
**transferred** 110:23
**transgression** 183:10
**translatable** 102:14
**trash** 296:2 304:13 305:6
**trauma** 37:14 44:5,6 66:19
**traumatic** 19:2 19:14 31:1 34:24 37:9,11 38:20 43:8 44:3
**traumatizing** 182:13
**trci** 236:5
**treat** 116:5,5
**treated** 120:20
**treatment** 31:5 126:20 128:17 129:13,14,15 242:21 249:15 266:15
**trevelyan** 58:9
**trevor** 194:4
**trial** 4:19 94:17 96:11,12,14,18 96:22 97:6,8 97:21 99:6 100:18 103:19

104:17 143:2 143:19,22 144:9,11 145:4 145:8 146:6 150:3,7,11,18 150:18 151:3 168:13 183:4 200:12 213:13 232:21 271:20 272:7 273:11 277:3
**trials** 37:2 87:17 88:2 96:11,15 98:20 98:24,25 99:1 100:15,16,17 101:12 103:22 104:13,19 142:25 145:11 146:5,5 150:2 213:13,15 221:13 267:4 293:11 294:12
**tried** 74:24 124:19 127:7 171:10 180:13 181:8 204:25 228:15 304:5 304:14 305:13
**triplex** 249:6 249:15 250:24
**triplicates** 276:10
**tritiated** 122:1
**tritium** 122:3
**trojan** 276:11
**troll** 16:11
**troubleshoot** 220:14
**true** 14:2 32:13 32:18 39:3 47:9 102:18 125:24 127:7 173:21,25 181:23 182:7 201:22 237:15 240:8,10 261:14 304:9 311:17 312:7 312:10 313:19 316:8
**truly** 20:14,21
**trust** 94:9 206:6 273:5 293:12 311:24 311:25 312:4
**trusted** 74:17
**trusting** 273:2
**truth** 11:18 250:10 260:10 262:5 275:6 283:5 298:12 304:2
**try** 57:19,20,22 116:18 120:1 120:16 126:1 127:20 143:23 146:20 158:11 179:22 182:1 216:23 252:5 258:13 281:12 305:7 310:25
**trying** 12:9,9 19:11 25:20 31:15 35:1 42:21 58:10 60:17 87:25 109:2 116:7 118:1 128:23 142:24,24,25 145:9 157:2 170:16 181:6 183:2 185:19 191:10 197:15 208:12 213:4 213:23 215:1 220:14 224:25 225:17 226:9 234:15 242:13 243:25 245:19 245:20,24 250:10,11 254:13 255:18 255:19 268:2 279:2,4,6 281:3 282:7 295:11 304:13 307:2
**tuberous** 27:24
**tubes** 179:20
**tumor** 88:13,13 127:17
**tumors** 127:4,5 127:19
**turn** 17:10 18:6 19:23 20:12 21:14 24:11 51:22 57:17 64:15 75:4 120:4 124:14 125:14,19,23 131:20 171:21 172:5,18 177:20
**turned** 282:25
**turning** 130:3
**turns** 103:6 200:9
**tw** 193:19
**tweet** 11:6 67:20 160:23 181:10,14
**tweeting** 11:1 58:23
**tweets** 17:13 63:10 180:15 180:23 181:4
**twice** 93:5
**twisting** 58:24
**twitter** 12:8 19:16 32:22 33:4,5 42:20 47:10 55:8 58:21 61:5

62:20 63:1,6,7 63:8,13,19 64:1,2,8,12 67:14 142:15 180:11 188:9 311:22
**twitters** 16:11
**two** 26:23 27:10 28:15 30:3,5 51:1 59:16,22 61:3 63:11 64:25 69:23 76:24 77:13,19 82:9 86:5,10 115:1 129:10 137:5 138:6 142:23 174:9,16 194:23 195:1 203:20 207:14 219:11,16 222:11,13 223:19 225:8 227:13 228:5 234:21 244:14 244:17 246:4 248:4 253:14 254:6,8,10,11 254:15 255:17 256:19 259:8 259:24 261:22 263:20 290:2 293:7 298:24 308:24
**type** 160:9 221:3 222:1
**typically** 59:5 87:21 213:15 249:17

**u**

**u** 112:14 159:11,12
**ucsf** 156:13
**uh** 21:23 30:12 40:3 76:15 96:4 113:3 131:22 133:13 144:21 146:10 146:17 153:1 155:1 156:1 162:18 163:9 163:12 172:21 206:25 221:1 249:3,11 273:23 278:7
**ulterior** 261:19
**ultimately** 175:11 235:14
**ultra** 85:6 122:16
**ultrahigh** 118:25 119:20
**ultralow** 90:21 119:2,7
**um** 99:2
**unable** 127:10 127:24 298:17
**unbelievable** 198:16,22
**unblind** 201:24 202:10,12,22 203:5,13 216:12,18 217:4 218:16 219:6,21 220:7 220:10,19 222:5,18,20 223:14,17
**unblinded** 180:3 216:10 221:4 222:12 239:13
**unblinding** 216:14 223:16 224:19 227:15
**unclear** 184:20
**uncomfortable** 233:6
**uncommon** 236:18
**under** 19:25 20:18 41:19 44:9 55:3 56:4 66:10 73:10 109:21 126:20
**undergrad** 156:9
**underlying** 26:2,15 94:18 293:13
**undermine** 229:25 232:2
**undermined** 200:15
**underpinnings** 293:11
**understand** 10:5,7 11:17 11:23 17:19 19:11 40:20 45:10 46:18,24 47:20 50:15 73:17 90:3,4 90:24 107:17 116:11 128:2 141:23 151:18 157:2 158:7 169:5 186:10 207:8 211:12 212:14 213:1 216:23 221:15 224:3 225:1 234:16,24 235:8 237:24 242:13 265:15
**understanding** 10:11 36:11 49:1 60:4 68:17 81:13 85:16 87:3 88:3 89:23 101:24 111:6 115:15,20,22 140:13 151:1

186:12 192:24 197:11 201:10 219:2 220:17 227:18,24 244:19 291:8 306:25
**understood** 71:1 86:16 107:2,5 140:25 197:6 220:7 221:3 225:12
**underway** 29:23
**undiluted** 274:24
**undo** 150:10
**unfair** 39:5
**unfinalized** 238:10
**unfortunately** 17:15 212:9 238:5
**unintelligible** 70:18 75:2
**unique** 119:24
**unit** 8:3
**united** 1:1 8:7 313:1
**university** 159:25 203:18 268:18 278:24
**unknown** 127:13 228:9
**unquote** 77:7 230:5
**unrelated** 63:12
**unreliable** 99:17 311:21
**unstable** 234:23
**unterwald** 91:6
**untrue** 188:22
**unvalidated** 275:9
**unveiled** 39:3
**unwarranted** 79:6
**update** 5:21
**upset** 20:5 33:11 34:24 38:7,7,9
**upsetting** 33:13
**upside** 200:7
**use** 19:5 42:13 59:11 63:13 87:13,15 95:17 104:12 110:22 145:16 204:25 206:7 216:4 228:15 230:7 230:23 231:8 231:19 234:12 239:16 248:14 255:6 272:7 273:7,11 299:25 301:19
306:19
**used** 14:1 21:10 27:1,14,24 41:6 63:17 64:11 67:19 82:8 96:15 119:25 122:25 124:11,22 195:17 217:3 219:25 220:2 229:6 230:20 230:24 272:16 277:2 281:16 302:3 305:24 306:2 307:12 309:23 311:5
**useful** 153:18 153:19
**useless** 223:4
**uses** 87:14 246:25
**using** 26:25 85:11 87:10 120:4 250:25 252:2 257:17 271:15 276:10 281:11
**usually** 138:3 255:25 256:10 285:11
**utilize** 212:4
**utmost** 74:18

**v**

**v** 1:6 313:6
**vacuum** 56:20
**vague** 10:3,10 10:13 81:16 89:12 140:25 168:11 192:10 244:17 261:7
**vaguely** 187:24 275:19 287:18
**vakgl** 121:7
**valid** 35:23 215:4
**validate** 81:14 82:7 127:9,25 199:20
**validated** 104:3 124:21 242:3 275:10,10 279:4,13 281:4 281:13
**validation** 82:11 104:5 126:23 281:5
**validity** 258:11 260:11,13 262:5 275:6 278:21 279:25 283:5 294:6 304:2
**value** 90:1,9 107:24 202:5 214:22 249:7

257:17 298:23 310:22
**values** 4:22 195:7,15 201:23 202:9 202:13,15,17 202:23 203:2,4 203:10 214:22 214:23 219:15 219:20 220:8,9 220:9,18 221:10,18 222:5,18 225:8 239:24 249:21 271:5 310:9,10
**variability** 205:17 206:5 207:3 211:21 212:8,20 213:17 224:17 225:1 247:2 248:11
**variable** 201:5 212:19 215:8 245:14 247:5 248:14 251:18 269:20,23
**various** 81:4 120:18 139:16 139:19 140:22 147:19 149:8 279:7 309:2
**vehicle** 239:16
**vendor** 104:2 243:9
**vendors** 245:16 300:16
**venting** 18:22 19:15 33:1 34:24 61:4,8
**verbally** 30:13 96:5 146:11
**verified** 301:15 303:9
**verify** 198:17 298:17
**veritext** 8:12,14 314:23
**versa** 88:14
**versamax** 286:17
**version** 34:19 34:20 101:19 131:2 133:9,15 135:8 238:5,6 238:10,10,13 269:13
**versus** 8:6 27:14 226:17 242:22 249:7 267:16 270:19 271:22
**vice** 88:14
**vicious** 11:1 32:7,23 47:12 53:13 188:10
**viciously** 18:4
**victory** 55:7
**video** 8:4
**videographer** 2:22 8:1,13 57:10,13 84:17 84:20 130:18 130:21 139:7 139:10 170:25 171:3 206:11 206:14 240:20 240:23 263:9 263:14,17 292:12,15 312:17
**videotaped** 1:12,16
**view** 21:5,6 38:3 61:9 67:25 78:6 80:3 89:8 141:18 146:19 147:8,11 148:13,18,22 149:7 150:21 173:15 188:1 188:13 210:3 237:4 302:11
**vile** 32:7,23 141:16 188:9 188:23
**vince** 144:16,24 145:3
**violate** 173:9
**violation** 173:17
**violent** 79:7,14
**visible** 58:22
**visit** 5:4 284:18
**visited** 93:3,17
**visits** 300:17
**visual** 13:14 297:13
**vitriolic** 11:2 32:7 47:12 142:16 311:24
**vituperative** 32:7
**volume** 88:13 88:14 216:7 239:21
**volumes** 13:9 34:13 274:24
**volunteers** 274:13
**vortex** 91:17
**vortexes** 91:18
**vs** 315:1 316:1

**w**

**wage** 109:24
**wait** 45:11 47:20 50:16 60:1,7 136:4 210:12 239:6 256:15

**waited** 251:20
**waiting** 51:6 140:13,17 245:5 249:25
**walk** 272:6 294:12
**walking** 54:12 56:18
**walks** 144:1
**wall** 21:16 38:11,23 39:4 146:22
**wang** 4:12,16 4:18,21,24 5:7 5:18 11:3 12:4 14:7 23:21 27:12,18,20 28:16 30:5 69:3 70:5 71:21 72:17,22 74:7,14,16 77:18 78:25 82:8 86:10 90:14 91:11 92:4 93:21 94:4 98:22 118:24 122:24 124:2 126:24 132:5,10 146:16 161:25 168:3 179:16 180:2 188:3 196:19,24 198:3 200:24 201:3,11,24 202:25 203:4 216:17 217:2 218:16 219:6 219:16,21 220:7 221:10 222:5,18,20,24 223:14,18 224:8,23 225:13 227:2,6 227:12,15 228:4,7 239:15 242:5 245:10 246:16,24 247:14,18,23 261:22 266:14 268:9 272:9,22 279:21 287:25 288:9,21 289:1 289:14,23 291:2,18 301:13,20 302:16
**wang's** 71:13 82:13 83:1,23 93:4,17 127:1 127:25 163:6 189:12 199:20 200:15 208:15 215:21 230:4 231:1,12 237:22 238:2 245:7,21 246:19 274:6 274:16 278:16 282:6 283:17 284:16 288:9 289:7 291:10 292:3 298:3 299:15,20 300:2 301:1 303:21
**want** 10:8,14 12:1,3 20:5 37:10 39:10 44:16,18,23 45:2,24 46:3,3 55:14,14 62:17 63:1 64:6,6,7,7 64:21 65:7 79:7 81:11 88:9 90:5 96:2 101:7 111:4,7 111:11 113:24 117:12 120:13 125:18,20 129:18 142:5 148:25 149:4,6 149:18,20,24 150:19 155:7 156:4 164:25 180:1 181:3 194:1 195:3 198:6 206:21 215:7 218:23 223:8 225:14 231:5 232:6,17 237:12 240:17 248:24,25 252:5 253:25 259:1 260:2 261:2 267:6,8 268:3 290:12 290:19 295:14 306:15
**wanted** 31:25 32:1,5,6,16,20 32:21 39:12 50:4,7,7,9 51:8 51:17 53:7,12 81:5,9 90:24 100:7 111:19 116:25 119:18 129:2 140:21 141:14 143:4 143:22 149:9 149:13,23 150:1,19 151:18 170:6,6 182:14 183:8 191:1 192:21 192:21,22,25 193:1,2 209:12 211:5 225:4 226:17 231:6 232:13 245:2,2 245:3,11 246:20 258:24 259:12 271:20 286:24 307:15
**wanting** 50:21

**warrant** 79:19
**washington** 2:20 234:4
**watch** 181:3 183:9
**watching** 12:7 94:21 95:24 181:17 306:18
**watson** 4:7,12 152:18 155:24 159:1 162:1
**way** 25:15 34:1 35:2 37:2 39:8 51:12,17 54:8 58:23 62:19,19 73:15 88:8 99:14 100:7,11 107:8 116:4,5 120:8 124:18 124:24 132:10 141:19 152:9 153:17 154:7 161:20 165:9 173:17 182:22 184:2 191:15 197:19 208:13 213:18 219:2 222:9,12 224:2 225:2,6 229:25 232:3 236:14 262:3 271:13 304:16 305:6 306:12 311:9
**ways** 26:24 83:3 140:22 154:1
**we've** 43:4 117:16 121:16 176:24 240:16
**website** 171:12
**week** 76:18 91:22 100:23 196:4 207:23
**weekend** 127:14
**weekly** 91:25
**weeks** 115:6,10 196:3
**weight** 71:24 72:2,9,11 77:25 301:22
**weird** 253:25 256:1,5
**wells** 298:24,24 310:9,12
**wench** 20:14,21 21:1,7 23:17
**went** 26:16 78:19 81:4 90:15 91:2 149:15 209:18 216:23 220:14 228:17 236:22 271:17 307:18 309:20 311:2
**western** 13:10 13:15,18 14:5 14:9,19 18:19 18:20 22:7 23:22 68:5,16 69:4,18,25 70:8,22,23 71:1,8,9,12,15 71:20 72:8,10 72:11,13 73:1 73:2,17 74:15 77:6,24 78:10 78:10,11 92:19 92:24 121:18 132:3,5,9 133:24 159:13 295:3 297:9,13 301:21
**wheelhouse** 114:17 141:13 141:20
**whichever** 51:17 239:21
**whistleblower** 42:3
**whistleblowers** 25:3,10 39:2
**white** 134:2,9 137:13 255:8
**who've** 92:21
**wild** 205:8 214:8
**william** 2:18 6:4 262:22
**wind** 178:5
**window** 76:20
**wished** 233:6
**withdraw** 264:16
**withdrawal** 119:5
**withheld** 261:4
**withstood** 56:22
**witness** 1:16 2:18 43:20 46:14,16 94:13 139:22 186:2 194:24 217:22 239:8 240:19 263:6 276:13 313:17,20,24
**woman** 69:21 75:7,18 76:12
**woman's** 85:23
**wonder** 247:7
**wondered** 42:4 73:13 128:2 215:10
**wonderful** 39:1 104:7
**wondering** 247:7
**wong** 2:3 8:24
**woods** 56:20
**word** 21:10 54:7,7 87:13 93:24 230:6 234:10 256:3

259:19
**words** 141:25 230:7,23,24 231:8,9,19
**work** 22:5,10 29:9 70:25 81:5,7,9 82:16 82:17 100:4 104:8 109:21 110:3 117:16 126:22,24 128:3,6 145:14 153:23 182:13 182:14 184:2 189:7 202:22 204:13 214:21 220:4 223:16 228:15 231:7 233:4,18 241:24 242:16 250:16 268:3 271:23 297:6 300:1 304:16 305:5 307:17 307:19,22 309:20
**worked** 9:19 34:8,18,20 74:16,19 119:3
**working** 14:8 28:5,9 83:9 91:24 112:6 158:10,14 174:19 187:6 259:21 274:11 274:14,22 281:3 282:8 286:1 301:16 303:6
**works** 71:1 88:8 94:11 100:5 146:3 177:2 312:3
**world** 18:23 58:22 60:18 63:4 74:22 83:13 127:22 203:22 238:11 261:3 299:10
**world's** 31:7
**worried** 22:18 184:11,14,15 184:16,17
**worries** 208:8
**worry** 200:13 214:23
**worse** 98:4 103:18 206:2
**worsening** 226:7
**worst** 32:24
**worth** 249:22 252:2 314:24
**worthless** 46:2
**worthwhile** 177:6
**wow** 48:6 49:11 101:16 124:12 141:10 205:25 215:15
**wrinkles** 73:9
**write** 17:22 18:7 19:18 20:1,21 21:15 37:18 44:10 45:8 47:12 51:2 52:2 55:23 67:21 75:6 152:21 156:2 159:6 162:9,12 182:16 201:2 202:25 229:17 246:13 263:25 269:15 270:2 286:1,9 290:16
**writer** 110:21 111:3 112:4,5
**writes** 208:24 211:7 280:12
**writing** 42:18 66:16 109:16 237:12
**written** 38:25 41:18 56:17 299:12 301:15 305:8
**wrong** 42:15 67:5 93:22,25 94:2 121:19 184:21 214:20 216:23 225:11 228:9 274:16 275:11
**wrote** 15:22,24 19:1 21:9 23:16 24:12 30:15,20,22,25 38:6 55:16 58:7 66:15,17 76:11 79:12 246:12 265:23 266:7
**wu** 2:8 9:4,4,12 19:8,10 20:11 26:4 28:24 34:5 43:15,18 43:20,24 44:18 45:16 46:10,15 46:18,21,24 47:1,3 54:2,4 75:23 78:4 84:11 89:11 92:16 94:16,23 95:4 103:9 118:12 123:8 129:17 132:25 133:3 134:4,18 134:23 135:18 136:2,24 142:22 149:11 149:22 156:22 164:5 169:19 181:19 194:9 194:12,22 210:12 221:5

227:9 239:6,9 240:18 246:11 257:15,22 258:4 263:1,4 263:13 274:19 290:1 312:14

**x**

**x** 3:1,11 4:1 5:1 6:1 73:11,12 314:9
**x's** 270:24 271:1,4

**y**

**yale** 27:23 85:22 86:11
**yan** 4:12,15,18 4:21,24 5:7,17 149:17 190:13 207:15,23 208:7 223:11 224:17 247:6 268:4
**yan's** 274:23
**yeah** 11:24 14:21 15:19 17:15,24 20:24 21:13,20 23:3 23:11 24:14,22 26:4 29:6 35:6 35:9,16 36:7 37:14 38:15 40:11 41:10,12 44:21 52:6 53:17,22 54:4 55:18 56:5,12 67:7 74:4,6 75:10 77:11 78:5 80:15 89:12 92:7 93:10 95:3 96:2 101:11 106:25 107:9 111:4 115:12 118:8 126:25 129:7 136:16 148:11 151:24 153:7,8 156:15 164:23 171:24 177:15 182:9 182:17,23 184:7 191:22 206:20 207:7 208:3 211:23 214:6 221:23 224:5,14 227:10 237:8 246:5 251:4 254:12,22 256:19 259:10 259:16 263:13 268:23 270:18 270:25 273:20 277:20,24 282:16 287:24 291:21 292:24 293:16 294:24 298:5 303:14 304:8 307:14
**year** 13:23 115:8 117:4 150:23,23 156:10 207:22 274:22,25 295:5 297:14
**years** 9:19 11:21 13:24 24:10 46:4,4 47:6 71:2 74:17 77:13 80:4,4 92:20 92:23 96:23 108:20 112:16 142:8 143:5 161:3,3 183:2 208:7 230:20 233:5,5 274:13
**yell** 57:4
**yep** 18:11 41:22
**ykl** 286:15
**york** 1:1 2:5,5,9 2:11,11 8:9 9:2 9:6 65:1 78:12 144:2 145:18 145:19 146:24 148:9,22 292:20 293:9 294:3,9,20,23 295:19 313:1
**yorker** 39:15 65:4 147:12

**z**

**z** 32:13
**zachary** 2:9 9:11,12
**zalm** 156:7
**zaur** 2:3 8:24
**zero** 239:23 266:5
**zhe** 4:11 161:25 162:10,11,12 162:12,22 163:5 166:19 180:5 239:12
**zip** 287:15
**zoom** 2:3,3,9 8:23 9:1,13 95:10,12 164:15,17 165:3,5
**zooming** 150:6
**ztaylor** 2:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.