# EXHIBIT 17

In more than four decades as a research scientist, Dr. Hoau-Yan Wang ("Dr. Wang") has been motivated by the desire to help people and pursue curiosity-driven research. As previously detailed to this research misconduct investigation committee (the "Committee"), Dr. Wang's academic career includes over 120 ***peer-reviewed*** publications and two R&D collaborations with industry leaders. Developing new drugs that help those suffering from debilitating illnesses, like Alzheimer's Disease, is how Dr. Wang hopes to make a difference and what drives him to undertake a five-hour round-trip ***daily*** commute from his home in Philadelphia to the City University of New York, School of Medicine ("CUNY"). In addition to being a Tenured Medical Professor at CUNY, Dr. Wang balances his research responsibilities with his role in educating the next generation of doctors.

Consistent with Dr. Wang's nearly forty years of ethical behavior, Dr. Wang conducts studies in which he is blinded to the treatment parameters and/or diagnoses of any samples, so that neither Dr. Wang nor others in his lab could manipulate data to any improper end. While all research scientists are fallible human beings capable of making inadvertent errors, Dr. Wang has not been given any benefit of the doubt by the Committee. In fact, Dr. Wang was *never* given the opportunity by the Committee to explain orally his responses to the substance of any of the thirty-one allegations against him and was *only* given the opportunity to respond to ten of the thirty-one in writing prior to issuance of the Committee's draft report on February 10, 2023 (the "Draft Report"). The tone of the Draft Report makes clear that Dr. Wang has been presumed guilty and subjected to a shoddy investigation (the "Investigation") riddled with confirmation bias stemming from that presumption of guilt. For instance, the Committee inadvertently reviewed the *exact same* data in response to Allegations 2 and 14, and somehow found insufficient evidence of misconduct in response to Allegation 2 (an allegation Dr. Wang was asked to address) but sufficient evidence of "*intentional* fabrication" in response to Allegation 14 (an allegation Dr. Wang was **not** asked to address). *Compare* Draft Report at 7-9; *with* Draft Report at 22.

Meanwhile, the last nineteen months have been devastating to Dr. Wang on a personal and professional level. He has been repeatedly and unfairly attacked publicly by people, who, at best, do not understand, or pretend not to understand, the relevant scientific principles behind his research or, at worst, have an admitted financial interest in undermining Dr. Wang's research.

Dr. Wang does not take lightly the points he raises here with the Investigation and the Committee's preliminary findings. Nonetheless, it is impossible to ignore the numerous shortcomings in the methodology, execution, and findings of the Committee's work to date. At best, the Draft Report contains the unfounded personal opinions of the members of the Committee about the sanctity of Dr. Wang's work. The Draft Report is *not* grounded in the proper application of methodologies, standards of proof, or CUNY policies and procedures. It focuses with tunnel vision on Dr. Wang's document organization and retention, while ignoring that CUNY has *no policy* obligating Dr. Wang to maintain *any* records longer than three years (*See* CUNY Document Retention Policy (the "Retention Policy"), at 11), CUNY itself required Dr. Wang's lab to remove records during the COVID-19 pandemic, and CUNY destroyed at least one of Dr. Wang's hard drives inadvertently and took another one for *roughly a year,* depriving Dr. Wang of critical materials he needed to defend himself. Instead, the Committee selectively relies on *one* journal editor (who is not a neuroscientist and has no experience in Western blotting) and the authors of

an obviously financially motivated Citizen Petition filed with the Federal Drug Administration ("FDA"). In so doing, the Committee ignored the opinions of fourteen other journal editors who have evaluated and cleared Dr. Wang's work and five independent experts provided to the Committee at least five months before the Draft Report was issued. The Committee also failed to recognize the financial motivations of the Citizen Petitioners: David Bredt, a neuroscientist with several significant conflicts of interests relevant to the Investigation, and Geoffrey Pitt, a cardiologist who went to medical school with Dr. Bredt (the "Petitioners"), both of whom maintained short positions in Cassava Sciences, Inc. ("Cassava"), Dr. Wang's industry collaborator. Relatedly, it appears that the Committee may have been influenced by four other Cassava short-sellers, Adrian Heilbut, Jesse Brodkin, Patrick Markey, and Enea Milioris (the "Short Sellers"), who have been in contact with CUNY and have pushed unfounded and defamatory conspiracy theories about Dr. Wang and Cassava.[1] Ultimately, this Committee ran with the Petitioners' and Short Sellers allegations with reckless abandon and set in motion a series of events that could devastate Dr. Wang's career and physical, mental, and emotional health.

Also remarkably absent from the Draft Report is any effort to understand the context of Dr. Wang's lab and workload. Dr. Wang teaches a full-time course load, while running a very small lab with limited financial resources, in which he personally conducts many of the experiments (the quantity of which is considerable even for much larger labs, coming to about 1,000 Western blots each year on average) and ultimately prepares manuscripts and figures for publication. He also has a very small staff of two (a postdoctoral research associate and a technical research assistant) who assist him with ministerial tasks, like sample preparation, management, shipping and material ordering, and lab organization. Like most academic labs, Dr. Wang's lab does not have the financial resources for the most cutting-edge technology, which is why his Western blots are done on film, rather than in digital format.

Adding insult to injury, when Dr. Wang ***finally*** had the opportunity to address these allegations before his peers, this Committee ***misled*** Dr. Wang into only responding to ten out of the thirty-one allegations, ***ignored*** objective, third-party expert analysis provided by Dr. Wang, ***blamed*** Dr. Wang for CUNY's destruction of evidence, and ***misapplied*** CUNY's own Research Misconduct Policy (the "Misconduct Policy") in conducting the Investigation.

Dr. Wang has been a model CUNY employee for nearly four decades, and as such, the Committee owes Dr. Wang the common decency of conducting an Investigation that is grounded in fairness, presumes him innocent, and is premised on the objective application of sound methodology and standards of proof.

---

[1] The Petitioners and the Short Sellers are each currently defendants in a defamation lawsuit brought by Cassava related to their maliciously false public statements about Cassava and Dr. Wang. *See Cassava Sciences, Inc. v. David Bredt, Geoffrey Pitt, Quintessential Capital Management, LLC, Adrian Heilbut, Jesse Brodkin, Enea Milioris, and Patrick Market*, No. 22-cv-9409-GHW-OTW (S.D.N.Y.).

## I. DR. WANG'S GENERAL OBJECTIONS TO THE DRAFT REPORT

As previewed in Dr. Wang's March 15, 2023 Letter to CUNY's Office of General Counsel, the Draft Report suffers from five general fatal flaws, all of which are detailed in the following sections. *See* Exhibit 1.[2]

***First***, the Draft Report falsely presumes the Committee directed Dr. Wang to respond to thirty-one allegations and that he chose to respond only to ten of those allegations. However, the Committee ***clearly*** only asked Dr. Wang to address ten specific allegations. *See* Exhibit 2.

***Second***, despite the clear and unequivocal recommendation in the Preliminary Investigation Report dated January 28, 2022 (the "Preliminary Report") that "strongly recommend[s] a broader base of peer input from several independently-chosen experts to distinguish practices that may be innocuous rather than fraudulent" (*see* Preliminary Report, at 11), the Committee apparently chose to ignore (1) five reports from highly respected Western blot experts submitted by Dr. Wang, and (2) conclusions from fourteen highly respected journal editors who found no evidence of misconduct.

***Third,*** there are five fatal procedural flaws with the Draft Report that have the cumulative effect of depriving Dr. Wang of the ability to adequately respond to the Draft Report. Namely: (1) CUNY misplaced evidence and now blames Dr. Wang for its own negligence; (2) CUNY ignored the terms of its own Retention Policy and holds Dr. Wang responsible for the destruction of documents that fell well outside the terms of the Retention Policy; (3) CUNY's lack of resources precluded Dr. Wang from storing his data in the manner that CUNY now claims Dr. Wang should have; (4) the Committee failed to preserve its own evidence related to the Investigation; and (5) the Committee failed to conduct the Investigation in a timely manner.

***Fourth,*** the Committee does not address the fact that the genesis of the allegations against Dr. Wang is a maliciously filed and quickly dismissed FDA Citizen Petition drafted by Bredt and Pitt, two highly conflicted market participants who are engaged in a campaign to destroy the value of Dr. Wang's scientific collaborator, Cassava, so that they can benefit from selling short Cassava's stock. Relatedly, it appears that the Committee may have been influenced by the Short Sellers, who have been in contact with CUNY and have pushed unfounded and defamatory conspiracy theories about Dr. Wang and Cassava.

***Fifth***, the Committee, and the Draft Report, has not identified (because they cannot) any motive for Dr. Wang to falsify data. Dr. Wang's driving principles, over the past four decades of his professional career, have always been his reputation and integrity. There is simply no reason why Dr. Wang would upend those principles when he did not benefit, either financially or professionally, in any way from the alleged submission of falsified data. As the collateral effects of the Investigation clearly demonstrate, Dr. Wang would have had everything to lose and nothing to gain from doing the things the Committee claims he did.

[2] For the Committee's ease, all exhibits referenced in Dr. Wang's response are annexed to the Appendix submitted herein.

### A. The Investigation's Shifting Focus Has Materially Prejudiced Dr. Wang and Violated His Due Process Rights.

The Committee has shifted its focus throughout the Investigation, in a way that has made it impossible for Dr. Wang to defend himself and fairly make his positions known. The Preliminary Report focused on ***eight*** allegations. When the Committee began its work on the Draft Report, it requested "a point-by-point response" to ten allegations (the original eight allegations plus two additional – labeled 1-8, 22, and 26 in the Draft Report). *See* Exhibit 2. At no point did the Preliminary Report or the request to Dr. Wang for ten responses mention either that there were thirty-one allegations or that those allegations hailed from correspondence supposedly sent to CUNY by the National Institutes of Health ("NIH").[3]

Dr. Wang provided the requested point-by-point responses to the ten allegations, with relevant supporting data, on September 19, 2022. On September 21, 2022, the Committee requested additional information regarding those ten allegations, and Dr. Wang promptly responded on September 23, 2022. *Never did the Committee ask for responses to the other twenty-one allegations*. In fact, it was during the Committee's interview of Dr. Wang (which lasted only two hours and was limited to his recordkeeping procedures), that the Committee first mentioned thirty-one allegations, after which Dr. Wang expressed shock and told the Committee he was not aware of the existence of thirty-one allegations. The Committee further explained that its Investigation was focused on the ten allegations to which Dr. Wang had previously responded. Thereafter, on October 4, 2022, the Committee provided Dr. Wang with a list of the thirty-one allegations but still *did not* ask him to provide a point-by-point response to the remaining twenty-one allegations. Accordingly, Dr. Wang reasonably concluded that, although there were thirty-one total allegations, the Committee had already resolved (or did not find compelling) twenty-one of those allegations. Yet, the Draft Report now holds Dr. Wang responsible for failing to address twenty-one of the thirty-one allegations. Indeed, the Committee made so-called "findings" of misconduct in ten of the allegations that Dr. Wang was never even asked to address.

Although Dr. Wang had never been asked to respond to the remaining twenty-one allegations, it is abundantly clear that the Committee improperly drew an adverse inference against him based on his purported failure to fully respond. *See, e.g.,* Draft Report at 33 ("Dr. Wang's failure to engage with this committee on [the allegation] is extraordinary and highly irresponsible."). Section 7.2 of the Misconduct Policy requires written notice of any new allegations that were not raised in the Preliminary Report. *See* Misconduct Policy, at Section 7.2 ("The Investigation Committee will give the Respondent written notice of any new Allegations of Research Misconduct not addressed during the Inquiry or in the initial notice of the Investigation ***within a reasonable amount of time*** after a determination to pursue any such new Allegations."). This Committee plainly violated this rule by not providing Dr. Wang with notice of the twenty-one additional allegations until October 4, 2022 and failing to inform him that these allegations were under consideration until the issuance of the Draft Report on February 10, 2023. Moreover,

[3] It is our understanding that Dr. Wang has never been provided a copy of the supposed correspondence from the NIH, but instead has only been given a cut-and-pasted list of allegations in a blank Word document that is in no way associated with the NIH.

Section 7.3 of the Misconduct Policy requires the University to take all "reasonable steps to ensure an impartial and unbiased Investigation." As a result of these failures, Dr. Wang was expected to gather original data from *over a decade* of work, some of which was taken by CUNY and only returned on March 1, 2023 and formulate a substantive response to twenty-one allegations in roughly 45 days. Dr. Wang requested and was denied an additional 90 days to respond.

Dr. Wang has stated from the start of this Investigation that he was prepared and eager to provide a point-by-point response to every single allegation being considered by the Committee. And, yet, at every turn, the Committee has asked Dr. Wang to hit a moving target – changing the allegations at issue from eight to ten to thirty-one – which has materially prejudiced his ability to meaningfully respond and obtain a neutral, unbiased Investigation report. What's more, the Investigation has done an about face on the value of outside expert opinions, calling out their usefulness in the Preliminary Report ("Given concerns raised about potential financial motivations of certain individuals involved in the original allegations, we strongly encourage the investigation include assessments of outside experts to include both scientific expertise and conflicts of interest." Preliminary Report at 11) and then both ignoring the five expert opinions provided by Dr. Wang in the Draft Report and failing to engage a second expert on behalf of CUNY when the first one declined to provide an opinion. *See* Draft Report at 3. ("The [Committee] also requested that CUNY hire an independent consultant to examine all the publications and materials provided by Dr. Wang. However, after working on these allegations for nearly three months, this consultant precipitously withdrew their services, citing legal risks to themselves and their business.").[4] The Committee's approach to the Investigation has materially prejudiced Dr. Wang and violated his constitutional right to Due Process.

CUNY's investigation into the allegations of research misconduct violated Dr. Wang's due process rights because CUNY did not conduct the investigation in a clear and impartial manner. A due process violation requires a showing that an individual "has suffered a deprivation of a constitutionally protected interest" and "that the deprivation was effected without the process that was due." *Esposito v. Metro-North Commuter R. Co.*, 856 F. Supp. 799, 807 (S.D.N.Y. 1994). In making such a determination, a court must balance several factors: "the strength of the individual's interest, the risk of erroneous deprivation, the probable value, if any, of requested additional procedures and the state's interest in providing (or not providing) those procedures." *Id.*

Applying the first factor, Dr. Wang has a strong constitutionally protected property interest in his position as a tenured professor and a liberty interest in his reputation, which could be impugned by the Draft Report. *See e.g.*, *Gilbert v. Homar*, 520 U.S. 924, 927-28 (1997) (holding that "public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process."); *Hamid v. John Jay*

[4] Dr. Wang requested, but CUNY declined to provide, materials related to the CUNY expert, so Dr. Wang has no independent way to corroborate the expert's reasons for declining to give an opinion or evaluate any potential bias. While the Draft Report describes them as concerning legal risk, there could well have been an opinion of the expert's that did not support the Committee's viewpoint. Dr. Wang has a right under Section 8.4 of the Misconduct Policy to see any and all materials, including emails and other correspondence, related to the CUNY expert.

*College of Criminal Justice*, No. 99-cv-8669, 2000 WL 666334 (S.D.N.Y. May 19, 2000) ("Practically speaking, to the extent that the government's stigmatizing conduct effectively precludes plaintiff from participation in professional activities critical for career advancement, his employment has been so terminated . . . . Thus, plaintiff has properly pled a liberty interest."). In fact, recognizing the importance of Dr. Wang's reputation, Section 7.11 of the Misconduct Policy requires CUNY to undertake all reasonable efforts to protect or restore Dr. Wang's reputation, should it determine that Dr. Wang did not commit research misconduct within the meaning set forth in Section 12.17 of the Misconduct Policy.

Applying the second factor, because of the haphazard way in which the document collection process and Investigation have been conducted, CUNY runs the very real risk of depriving Dr. Wang of his due process rights, should it release the Draft Report as written or base any adverse actions against Dr. Wang on it. CUNY has continuously morphed the scope of this Investigation from eight allegations, to ten allegations, to thirty-one allegations of research misconduct, to a full-court press into Dr. Wang's record-keeping processes. The ever-shifting target of the Investigation has rendered it nearly impossible for Dr. Wang to respond completely and clearly to the Draft Report. Ultimately, the Draft Report is built on a house of cards formed from outcome-determinative investigation protocols, opinion-based conclusions that are not grounded in policy or procedure violations, selective reliance on unqualified or biased witnesses, and inconsistent methodological application, among other flaws.

Applying the third factor, Dr. Wang seeks additional procedures that are vital: namely, a fair opportunity to respond to a Preliminary Report that addresses all thirty-one allegations of research misconduct. According to the Draft Report, CUNY first received nine allegations of research misconduct from the NIH on or about September 13, 2021, and then subsequently received an additional twenty-two allegations of research misconduct on or about October 8, 2021. Draft Report at 2. But, the Committee issued its draft Preliminary Report on September 24, 2021, addressing only eight of those thirty-one allegations. *See* Exhibit 3. Dr. Wang responded to the Preliminary Report on December 23, 2021. *See* Exhibit 4. Ultimately, on January 28, 2022, CUNY issued the final Preliminary Report, again related only to eight allegations of research misconduct.[5] *See* Exhibit 5. Astonishingly, the Committee delayed providing Dr. Wang with the complete set of NIH allegations for nearly a full year, before issuing its Draft Report involving all thirty-one allegations on February 10, 2023. *See* Exhibit 6. If CUNY had asked Dr. Wang to respond to all thirty-one allegations in response to the Preliminary Report, the Misconduct Policy afforded Dr. Wang ***sixty days*** to compile his response and then another ***thirty days*** after issuance of the Draft Report to provide a further response. *See* Misconduct Policy, at Sections 6.7; 7.6. Because CUNY skipped over a foundational aspect of the Misconduct Policy and deprived Dr. Wang an opportunity to present his responses to the Committee prior to issuance of the Draft Report, Dr. Wang has only been provided ***<u>forty-five days</u>*** total to respond, which is significantly less than the time allotted for responding to both the Preliminary and Draft Reports. *See* Misconduct Policy, at Section 6.5.

[5] Subsequent to the Preliminary Report, the Committee asked Dr. Wang to respond to Allegation Nos. 22 and 26 for a total of ten allegations that this Committee has asked Dr. Wang to address.

In addition, it is Dr. Wang's understanding that his industry collaborator, Cassava, has asked to review the Draft Report and that CUNY has not responded to Cassava's request. Because Dr. Wang is blinded to much of the information related to his research, it is extremely difficult for Dr. Wang to respond to the Draft Report without consulting Cassava because Cassava maintains information related to results of Dr. Wang's research and the efficacy of Cassava's drug. Dr. Wang requests that Cassava be given the information it seeks and that he be permitted to collaborate with Cassava in preparing his response. Depriving Dr. Wang of that right strips him of his ability to fully respond because he cannot provide information that is solely in Cassava's possession.

Applying the final factor, CUNY has no interest in not providing Dr. Wang with the referenced procedures because CUNY is charged with conducting an Investigation that is impartial and comports with its Misconduct Policy. Simply, CUNY has no interest in not affording Dr. Wang procedures mandated by notions of fairness that will ensure the validity of the Investigation.

For these reasons, the Committee's approach to the Investigation has materially prejudiced Dr. Wang and violated his constitutional right to Due Process.

### B. The Draft Report Is Biased And Ignores The Findings Of Highly Respected Experts In Western Blotting.

Despite the clear and unequivocal conclusion in the Preliminary Report that "strongly recommend[s] a broader base of peer input from several independently-chosen experts to distinguish practices that may be innocuous rather than fraudulent," (*see* Preliminary Report, at 11), the Committee ignored reports from several highly-respected Western blotting experts submitted by Dr. Wang and downplayed or ignored conclusions from highly-respected scientific journals that found no evidence of misconduct. In fact, the Committee failed to obtain input from a single outside expert, and instead relied heavily on feedback from Dr. Maria Zalm at PLoS ONE[6], who ironically appears to be the only senior editor of the relevant journals without a specialized expertise in neuroscience or Western blotting.[7] As detailed in Dr. Spruck's Expert Report dated April 10, 2023 ("the Spruck Report"), the Editors at PLOS ONE, as well as the Committee, on several occasions have failed to recognize obvious, unique band characteristics, which to any expert in the field of Western blotting would clearly demonstrate that they had not been fabricated. *See* Spruck Report Exhibit 7 at 12. For example, accusations of fabricated and/or falsified Western blot data can be caused by a number of legitimate factors such as insufficient blocking or washing of the membrane resulting in non-specific antibody binding or background differences in the underlying film, as stated in Dr. Coleen M. Atkins' report dated April 5, 2023 ("the Atkins Report"). *See* Atkins Report Exhibit 8 at 14. As Dr. Atkins repeatedly finds therein, the Committee did not have a sufficient basis to rule out legitimate, alternative explanations when making its

[6] Remarkably, PLOS ONE apparently has a very short memory because earlier this month, Dr. Alexandra Kavushansky, an academic editor at PLOS ONE, asked Dr. Wang to peer review an article set for publication.

[7] Based on her experience posted on LinkedIn, Dr. Zalm is not an expert in neuron biology. Her research experience consists of a four-year Ph.D. program (Oct. 2013 – Sep. 2017) focusing on "Structural and Functional Analysis of ZraP in Salmonella Typhimurium," a bacterial protein. Dr. Zalm stopped doing research after her PhD and became an editor.

findings. *Id*. Even more troubling, it appears the Committee further rested its conclusions on analysis provided to them in June 2022 by the Short Sellers[8] – who have never had access to any of Dr. Wang's underlying data and have apparent financial conflicts-of-interest.

By contrast, Dr. Wang provided the Committee with reports from several highly respected scientists in the field of Western blotting. On March 18, 2022, Dr. Wang submitted:

(1) a report from Professor Venkat Venkataraman, a molecular biologist/biochemist and academic researcher with more than 20 years of experience in Western blotting and image processing. Professor Venkataraman found "no evidence of willful manipulation or fraud in the published data." *See* Exhibit 9. Professor Venkataraman also represented that he was available to provide CUNY with specific input on the allegations; and

(2) several reports from Dr. Charles Spruck, another molecular biologist with over 25 years of experience in Western blotting and whose lab routinely runs 500-1,000 Western blots annually. Dr. Spruck concluded there is "no evidence of data manipulation of scientific misconduct with any of the WB data in question." *See* Exhibit 10.

Then, on April 21, 2022, Dr. Wang provided CUNY with additional reports from Drs. Spruck and Venkataraman, and new reports from:

(3) Professor Robert H. "Hal" Scofield, M.D., a clinician-scientist who has written extensively about the Western blot technique and contributed to and edited one of the most influential books on Western blotting, "Western Blotting: Methods and Protocols" (Kurien BT, Scofield RH, eds., Western Blotting. Humana Press: New York, 2015). Dr. Scofield "found no evidence of misconduct by Dr. Wang;"

(4) Peter Radtke, Ph.D., a trained biochemist and molecular biologist with over 40 years of experience in academic and industrial organizations and who has conducted hundreds of Western blots. Dr. Radtke concluded "there is absolutely no evidence of fraudulent manipulation of any of the WBs in question;" and

(5) Coleen Atkins, PhD., a neuroscientist with over 25 years of experience in Western blotting and has published her Western blot findings in over 30 scientific publications. Dr. Atkins found "no evidence of data manipulation or research misconduct by Dr. Wang."

As discussed in their reports, Drs. Scofield and Radtke are leading authorities on Western blots and have authored several publications and articles on the subject. Both separately concluded there is no evidence that Dr. Wang engaged in misconduct. *See* Exhibits 11.

Moreover, numerous outside sources made relevant findings that suggest Dr. Wang had not engaged in misconduct, none of which the Committee appears to have considered.

[8] The Committee fails to acknowledge or understand that Adrian Heilbut has not published an academic article since 2012, has never been a first-author in any research publication, and has a direct financial motive in Cassava's failure as a short-seller of Cassava's stock.

Further, numerous journals with extensive experience in Western blotting (a) did not find evidence of misconduct, (b) published errata that did not alter or impact Dr. Wang's underlying conclusions, or (c) declined to even conduct an inquiry. *The Committee neglected to contact any of these journals*, and *only* interviewed Dr. Maria Zalm of PLOS ONE, who is an editor at one of the only journals that decided to retract a publication. As the Committee knows, journals are ranked by Impact Factor,[9] which measures their audience reach and credibility in the scientific community. PLoS ONE's Impact Factor is 3.752, i.e., the lowest-rated of the relevant journals, save four.

The following chart provides a list of 14 journals that either found no evidence of misconduct by Dr. Wang or decided not to take action in the face of the Short Sellers' allegations. Ten of these journals have an Impact Factor that is higher than PLOS ONE's.

| Allegation(s) | Journal | Impact Factor (2021-2022) | Result and Editor(s) |
|---|---|---|---|
| 20, 22 | Journal of Neuroscience | 6.709 | (1) Case closed. No action required.<br>(2) Case closed: "Thank you for forwarding the images of the uncropped Western blots for this article. I have reviewed them carefully and agree that there is no evidence of data manipulation. I consider these issues to be addressed."<br>*Two others were resolved with no inquiry<br><br>Editor-in-Chief: Dr. Marina Picciotto of Yale, Charles B. G. Murphy Professor of Psychiatry and Professor in the Child Study Center, of Neuroscience and of Pharmacology; Director Division of Molecular Psychiatry, Psychiatry; Deputy Chair for Basic Science Research, Dept. of Psychiatry; Deputy Director, Kavli Institute for Neuroscience; Co-Director, Neuroscience Research Training Program, Yale Department of Psychiatry (https://medicine.yale.edu/profile/marina-picciotto/) (https://en.wikipedia.org/wiki/Marina_Picciotto) |
| 26, 29 | Neuroscience | 3.708 | (1) Case closed: "Neuroscience found no evidence of manipulation of the Western blot data or other figures of this publication."<br>(2) Case closed with corrigendum published |

[9] "The impact factor (IF) or journal impact factor (JIF) of an academic journal is a scientometric index calculated by Clarivate that reflects the yearly mean number of citations of articles published in the last two years in a given journal, as indexed by Clarivate's Web of Science." https://en.wikipedia.org/wiki/Impact_factor. By way of contrast, PLOS ONE has an impact factor of 3.240.

| Allegation(s) | Journal | Impact Factor (2021-2022) | Result and Editor(s) |
|---|---|---|---|
| | | | Editor: Prof. Juan Lerma (PhD) of Instituto de Neurociencias CSIC-UMH – The Instituto de Neurociencias de Alicante in Spain (https://www.eni-net.org/members/professor-juan-lerma/; https://en.wikipedia.org/wiki/Juan_Lerma_G%C3%B3mez) |
| 10, 11 | Nature Medicine | 87.241 | No action required<br><br>Editor-in-Chief: Dr. Magdalena Skipper, first woman editor-in-chief of Nature in its 150-year history. Nature is a British weekly scientific journal founded and based in London, England. It is considered one of the most prestigious scientific journals in the scientific community.<br><br>(https://en.wikipedia.org/wiki/Magdalena_Skipper) |
| 1, 12 | Molecular Psychiatry | 13.437 | Case closed: "After consideration of the information and images supplied, we are not planning to take editorial action at this time."<br><br>Editor: Dr. James Sleigh, Senior Research Fellow at the University College London, Institute of Neurology (https://iris.ucl.ac.uk/iris/browse/profile?upi=JSLEI96). |
| 3, 4, 15, 23, 24, 31 | Neurobiology of Aging | 5.133 | Feb. 12, 2022: Expression of Concern published; conclusion that number/nature of errors raised legitimate concerns, but no evidence of deliberate data manipulation.<br>*One other issue was closed without inquiry<br><br>Editor-in-Chief: Dr. David Joseph Madden, Professor of Medical Psychology in the Department of Psychiatry and Behavioral Sciences, Duke University (https://psychiatry.duke.edu/profile/david-joseph-madden) |
| 7, 25 | Journal for the Prevention of Alzheimer's Disease | 4.160 | No action required<br><br>Editors-In-Chief: Prof. Bruno Vellas (MD, PhD), Chair of Toulouse Gérontopôle and the Chief of Department of Internal Medicine and Geriatrics in Toulouse University hospital |

| Allegation(s) | Journal | Impact Factor (2021-2022) | Result and Editor(s) |
|---|---|---|---|
| | | | (https://www.actcinfo.org/people/bruno-vellas-md/);<br><br>Prof. Paul Aisen (MD), Professor of Neurology in the Keck School of Medicine of the University of Southern California; Director, Alzheimer's Therapeutic Research Institute (https://keck.usc.edu/faculty-search/paul-aisen/);<br><br>Dr. Jacques Touchon (MD, PhD), Centre Hospitalier Universitaire de Montpellier \| CHU Montpellier · Département de neurologie (https://fr.linkedin.com/in/jacques-touchon-16831351/en) |
| 5 | Physiology & Behavior | 3.742 | Cleared, corrigendum published<br><br>Editor: Prof. Thomas A. Lutz<br><br>Full Professor for Veterinary Physiology and Deputy director of the Institute of Veterinary Physiology in the University of Zurich (https://www.vetphys.uzh.ch/en/missionstatement/staff/management/lutz.html). |
| 6 | Molecular Neurodegeneration | 18.879 | Retracted on Feb. 4, 2022, *then retraction was withdrawn* on Feb. 16, 2022<br><br>Editor-In-Chief: Guojun Bu, Neuroscientist at the Mayo Clinic in Jacksonville, Florida, and a professor of neuroscience at the Mayo Clinic College of Medicine and Science. |
| 9 | Cassava poster | 16.655 | Quantification was done on a different study. An erratum with the missing point added was issued, but no findings of misconduct were made.<br><br>Abstracts for oral presentations and posters presented in the meetings are published in Alzheimer's & Dementia.<br><br>Editor-in-Chief: Donna M. Wilcock, PhD, Assistant Dean for Biomedicine Robert P. and Mildred A. Moores Endowed Chair in Alzheimer's Disease at the University of Kentucky (https://medicine.uky.edu/users/dmwi228). |

| Allegation(s) | Journal | Impact Factor (2021-2022) | Result and Editor(s) |
|---|---|---|---|
| 16, 17, 28 | Journal of Biological Chemistry | 5.486 | No inquiry |
| 21 | Biological Psychology | 3.111 | No inquiry |
| 13 | Translational Neuroscience | 1.32 | No inquiry |
| 2, 14 | Journal of Clinical Investigations | 19.456 | No inquiry |
| 1, 12 | Molecular Psychiatry | 13.437 | No inquiry |

The Draft Report ignores *all* of the foregoing experts and journals. In fact, contrary to the Preliminary Report's clear recommendation for "broad input from several independently-chosen experts," the Committee failed to obtain input from *any* independent industry expert. The Committee states it consulted with one image expert who left "precipitously" after three months of work. But, the Committee has refused to disclose the name of this expert or communications with this expert, in violation of CUNY policies.

Rather than contact the foregoing experts submitted by Dr. Wang – at least one of which offered to speak with CUNY (Dr. Spruck) – or find an expert of its own based on the recommendations outlined in the Preliminary Report, the Committee instead heavily rests its conclusions on interviews with Dr. Maria Zalm of PLoS ONE, who does not appear to have any relevant expertise. Dr. Zalm only has four years of PhD research experience, which is considered entry-level in the life sciences field. Moreover, the journals that found no evidence of impropriety – such as Journal of Neuroscience, Neurobiology of Aging, and Molecular Psychology – are more highly regarded in neurobiology than PLoS ONE. Yet, the Committee simply chose to ignore, downplay, or second-guess the findings of these respected journals without attempting to speak to them, which runs contrary to the goal of all investigations to be objectively truth-seeking.

At base, the Committee's evident focus on finding evidence of wrongdoing does not follow the requirement set forth in Section 7.3 of the Misconduct Policy to take "reasonable steps to ensure an impartial and unbiased Investigation," nor does it align with Section 7.4's requirement of "diligent efforts to ensure that the Investigation is thorough and sufficiently documented and that it includes an examination of all Research Records and Evidence." "Evidence" is defined in Section 12.4 as "any document, tangible item, or testimony . . . that tends to prove or disprove the existence of an alleged fact." As outlined above, it is abundantly clear that the Committee did not review, much less consider, "all evidence" that would "prove **or disprove**" the allegations, but instead ignored the views of five experts in the field and numerous well-respected journals.

### C. Procedural Flaws

There are five fatal procedural flaws with the Draft Report that have the cumulative effect of depriving Dr. Wang of the ability to adequately respond to the Draft Report. Namely: (1) CUNY spoliated evidence and now blames Dr. Wang for its own spoliation; (2) CUNY ignored the terms of its own Retention Policy and holds Dr. Wang responsible for the destruction of documents that fell well outside the required retention period under that Policy; (3) CUNY's lack of resources precluded Dr. Wang from storing his data in the manner that CUNY now claims Dr. Wang should have; (4) the Committee failed to preserve its own evidence related to the Investigation; and (5) the Committee failed to conduct the Investigation in a timely manner.

#### 1. CUNY Lost Evidence And Now Blames Dr. Wang.

As Dr. Wang has explained on several occasions, the City College of New York ("CCNY")[10] sequestered one of Dr. Wang's hard drives and his laptop in August or September 2021 – which contained a significant amount of research data – then evidently broke the hard drive and lost his laptop for a substantial period, only returning the laptop on March 1, 2023. In addition, sometime in late 2020 or early 2021, one of Dr. Wang's computers used to store the raw images had a hardware issue, and all the data on the hard drive was lost. The Committee has clearly held Dr. Wang's inability to produce original data, lab notes, and other documents against him. *See* Draft Report at 1 ("Finally, our investigation has revealed long-standing and egregious misconduct in data management and record keeping by Dr. Wang."). Yet, the Draft Report fails to consider that Dr. Wang's inability to produce additional records was at least partially *due to CCNY's actions* and outside of his control. The Committee laudably pointed out CCNY's slipshod investigation tactics in a scathing critique at the end of its Draft Report, but then has disregarded these troubling facts when holding Dr. Wang accountable for CCNY's failures. *See* Draft Report at 43.

#### 2. CUNY's Document Retention Policy Permitted Dr. Wang to Purge Records After Three Years.

Similarly, the Committee's repeated assertion that Dr. Wang's recordkeeping is "egregious" and "clearly not in keeping with accepted standards in the field" is contrary to the Retention Policy. The Retention Policy has a retention timeframe of only 3-years for research records:

> <u>Faculty and faculty-student research records . . .</u>
>
> b. Other records, including but not limited to records *summarizing and publicizing research*, and research files which are not the personal property of the researchers, regardless of whether

[10] CCNY is a public research institution that operates within the CUNY network of schools. Therefore, to the extent that CCNY took actions, as opposed to CUNY, we have made that distinction in this response.

> the research is sponsored by government agencies or other sponsors or is unfunded.
>
> **RETENTION: 3 years after research concluded or otherwise terminated.**

*See* Retention Policy, at 11 (emphasis added). The NIH applies a similar 3-year document retention policy to its own grant-making records.[11]

The thirty-one NIH allegations concern journals spanning over a decade: 2003 (Allegations 16 and 28), 2005 (Allegation 29), 2006 (Allegations 10, 11, and 17), 2008 (Allegations 18 and 30), 2009 (Allegation 19 and 20), 2010 (Allegation 21), 2011 (Allegation 13), 2012 (Allegations 2, 22, and 14), 2015 (Allegation 1), 2016 (Allegations 8 and 27), 2017 (Allegations 4, 23, 24, and 31), 2019 (Allegations 3 and 15), 2020 (Allegations 7, 9, 12, and 25), and 2021 (Allegations 5, 6, and 26).

Thus, the overwhelming majority of the thirty-one allegations relate to research Dr. Wang conducted far outside of the scope of the Retention Policy. By the time Dr. Wang was put on notice of the investigation against him on August 18, 2021, he was only obligated to maintain records dating back to late 2018. Yet, the Draft Report astonishingly finds that the lack of records for *all* of the thirty-one allegations is a factor suggesting that Dr. Wang engaged in misconduct. For instance, the Committee states: "Dr. Wang's failure to store original data and maintain research records is egregious and is clearly not in keeping with accepted standards in the field" in response to Allegations 1, 2, 4, 8, 13, 16, 17, 18, 19, 20, 21, 22, 23, 24, 28, 29, and 31 – even though *all seventeen of those allegations* involve data that is outside of CUNY's three-year retention period and some involve data that is two-decades old. Notably, the Committee does not define or cite the "accepted standards" for record retention that it purports Dr. Wang has not satisfied, suggesting that the "accepted standards" the Committee references are merely personal opinion. Simply put, Dr. Wang's inability to produce data dating back decades is not a basis from which to impute misconduct, and the Committee's "findings" do not meet Section 12.17 of the Misconduct Policy, which clearly defines 'Research Misconduct' as "[f]abrication, falsification, or plagiarism in proposing or performing research, reviewing research, or in reporting research results. Research Misconduct does not include honest error or differences of opinion.").

Further, the Committee has undertaken no effort to understand when Dr. Wang completed his research so as to analyze the application of the Retention Policy with any semblance of accuracy. For example, for Allegations 3 and 15, which relate to 2019 submissions to *Neurobiology of Aging*, Dr. Wang completed his research in 2017, meaning that CUNY's Retention Policy permitted Dr. Wang to purge those records in 2020, well before Dr. Wang learned of the allegations against him. Of the thirty-one allegations, only seven (Allegations 5, 6, 7, 9, 12, 25, and 26) could arguably fall with CUNY's document-retention period. Yet, the Draft Report

[11] Section 8.4.2 (available at: https://grants.nih.gov/grants/policy/nihgps/html5/section_8/8.4.2_record_retention_and_access.htm) (commencing the three-year document retention policy from the date of the Request For Funding).

ignores this distinction and holds Dr. Wang's record-keeping against him for each and every finding. This again violates Dr. Wang's Due Process rights to a fair and impartial Investigation.

### 3. Dr. Wang Lacked an SDMS Data Management System Because of CUNY Resources.

The Committee has ignored, or failed to acknowledge, Dr. Wang's explanations for his inability to produce some of the original data, which were emailed to the Committee on September 23, 2022. *See* Exhibit 12. As recently as March 27, 2023, the Committee acknowledged that it has not conducted the investigation CUNY charged it to perform. *See* Exhibit 13 (asking that Dr. Wang provide certain materials so that the Committee "may conduct the investigation that CUNY has charged us to perform."). As Dr. Wang explained, there are generally two ways to catalog such a large set of raw image files:

(1) Using a scientific data management system (SDMS). A SDMS is a centralized document management system which collects, catalogs, and stores data generated by and in a scientific lab and allows for the storage of raw images securely on the cloud with backups. Unfortunately, Dr. Wang's lab does not have access to such a system given his limited resources and its public university budget.

(2) Manually cataloging documents, which is the method Dr. Wang's lab utilizes. This method requires keeping detailed records of every raw image in a searchable way. Given the massive amount of data produced by Dr. Wang's lab, he simply does not have the resources (employees or students) to catalog and save records dating back two decades. Thus, it would be impractical, if not impossible, to locate the original Western blot films for many of the thirty-one allegations.

Further, due to lack of access to an SDMS, Dr. Wang had to store original Western blot films on the hard drives of local computers. Sometime in late 2020 or early 2021, one of Dr. Wang's computers used to store the raw images had a hardware issue, and all the data on the hard drive was lost. CCNY also took one of his hard drives and accidentally broke it during the course of this investigation and took one of his laptops and lost it for nearly twelve months.

As Dr. Spruck details, "[the Committee] should realize that prior to digital images most researchers would expose western blots to 1-3 films per blot to generate various exposures (light to dark). Over the course of a single year, a lab that runs 500 western blots would generate ~ 1500 films (enough to fill [] 10 large data binders). Multiply that by 20 years of research and storing original film data becomes untenable. As scanning films was transitioning to digital imaging of blots, most researchers were under the impression that it was sufficient to simply store the scanned western blot images linked to publications on their computers. Many labs discarded the original films because they simply took up too much space. Also, films can become lighter and brittle over time, making them essentially worthless for data storage." *See* Spruck Report at 2.

The Draft Report fails to take into account any of the foregoing explanations. It is ironic the Committee cites its lack of resources at a public university as an excuse for failing to conduct a timely Investigation (Draft Report, at 43), and yet it ignores that those very same constraints

have hamstrung Dr. Wang's ability to keep and store massive sets of data over the course of two decades.

### 4. The Committee Failed To Keep And Provide The Underlying Evidence.

The Committee failed to maintain "written records" underlying its Investigation as required by the Misconduct Policy.[12] Section 7.4 of the Misconduct Policy requires "diligent efforts to ensure that the Investigation is thorough and sufficiently documented and that it includes an examination of all Research Records and Evidence relevant to reaching a decision on the merits of the Allegations." "Evidence" is defined as "any document, tangible item, or testimony offered or obtained during a Research Misconduct Proceeding that tends to prove or disprove the existence of an alleged fact," which includes "***written records of each interview***." *See* Misconduct Policy, at Sections 12.4; 7.5 (emphasis added). The Committee is required to provide a copy of "the Evidence on which the draft Investigation report is based." Section 7.6.

Based on the Draft Report, the Committee relied on the following evidence, none of which was initially disclosed to Dr. Wang:

a. interviews with "several administrators at the CUNY School of Medicine and CCNY," including President Boudreau (Draft Report at 1, 5);

b. interviews with "a senior editor representing the ethics team for the Public Library of Science (PLoS)," who is presumably Dr. Maria Zalm (Draft Report at 1, 5). It appears the Committee interviewed Maria Zalm on October 6, 2022 at 2:20pm EST, yet the Committee failed to disclose its notes and records of this meeting;

c. multiple letters between CCNY and the Director of the Division of Investigative Oversight at the Office of Research Integrity (Draft Report at 2);

d. documents and communications with the independent expert who "precipitously withdrew their services" after consulting with the Committee for nearly three months (Draft Report at 3);

e. the "timeline of actions taken by CCNY and CUNY to secure research materials" created by the Committee (Draft Report at 3);

f. 647 image files provided by President Boudreau to the Committee (Draft Report at 5);[13] and

g. data sequestered from Dr. Wang's computers (Draft Report at 43).[14]

[12] Considering that the Draft Report's collateral consequences expand ***well beyond*** this Investigation, it is likely that this Draft Report, and possibly the testimony of this Committee, will become evidence in the multiple pending and future legal proceedings.
[13] CUNY only returned these materials to Dr. Wang on March 1, 2023.
[14] CUNY only returned these materials to Dr. Wang on March 1, 2023.

Dr. Wang requested the foregoing records on February 21, 2023. *See* Exhibit 14. In response, the Committee provided some additional records, but it claimed that it does not have, and has never created, the following records:

a. Interview Records with CUNY and CCNY administrators: Although the Committee specifically cites "interviews" with CUNY and CCNY administrators in the first page of the Draft Report, the Committee confirmed it never created a record of those interviews, stating "[President Boudreau's] department Chairs and/or Deans provided no relevant aspects of the Investigation. There are no interview transcripts to provide." *See* Exhibit 14 ***This is a plain violation of Section 7.5 of the Misconduct Policy***.

b. Records of its Interview with Dr. Maria Zalm on October 6, 2022: The Committee conducted an interview with Dr. Maria Zalm on October 6, 2022. The Draft Report specifically describes this meeting as an "interview." Draft Report at 5. Yet, the Committee confirmed there is "[n]o interview transcript to provide with Dr. Maria Zalm. She discussed the Editorial retraction of Dr. Wang's publications." *Id.* The Committee further noted: "Dr. Zalm was not used as an expert or consultant. The meeting with Dr. Zalm was to discuss how Dr. Wang responded to the editorial concerns regarding western blot data in their publications. Several publications were editorially retracted by PLoS ONE for which Dr. Zalm is Senior Editor." *See* Exhibit 13. ***This is a plain violation of Section 7.5 of the Misconduct Policy***

c. Documents and Communications with unnamed expert: Although the Committee states it corresponded with an expert for nearly three months, it has refused to disclose the name of the expert, the communications with the expert, and the reasons for his/her withdrawal, stating, "There are no deliverable as the expert withdraw from assignment. There were no other experts." *See* Exhibit 14. ***This is a plain violation of Section 7.5 of the Misconduct Policy***.

Dr. Wang's response is severely handicapped by the Committee's failure to keep and disclose written records of its communications/interviews with Dr. Maria Zalm, the undisclosed expert, and school administrators, all of which it was required to create and maintain pursuant to Sections 12.4 and 7.5 of the Misconduct Policy.[15] Again, this failure to follow the Misconduct Policy violates Dr. Wang's constitutional right to Due Process.

### 5. The Committee Did Not Conduct A Timely Investigation.

The Misconduct Policy requires a timely and thorough investigation. *See* Misconduct Policy, at Section 6.7 ("All efforts should be made to complete the Inquiry as expeditiously as possible, and within 60 calendar days of its initiation, unless circumstances clearly warrant a longer period."). Any investigation must begin within 30 calendar days after the President's referral to

[15] It is notable that the Committee repeatedly and uncompromisingly confronted Dr. Wang in the Draft Report over his purported failures to keep and maintain physical records from well-over a decade ago (when CUNY's policies do not require such retention). Yet, the Committee itself has utterly failed to maintain records of its own Investigation.

the Vice Provost for Research. *See* Misconduct Policy, at Section 7.2. Despite the Misconduct Policy's clear directive, it appears the Committee may not have begun to investigate until October 2022, which is when it requested the underlying records. *See* Exhibit 15 ("The chair of the committee is requesting the Sequestration of Research Records by the committee. We have yet to get access to any files from CUNY OGC."). In addition, the Committee must give a respondent written notice of any new Allegations within a "reasonable amount of time." *Id.* The Committee first issued its Preliminary Report on September 24, 2021, related to eight allegations of research misconduct. *See* Exhibit 15. Dr. Wang responded to those eight allegations on December 23, 2021. *See* Exhibit 3. Consistent with Section 6.7 of the Misconduct Policy, Dr. Wang should have been afforded 60 calendar days from the date of the final Preliminary Report, which should have addressed all thirty-one allegations, to respond to those thirty-one allegations. *See* Misconduct Policy, at Section 6.7. At no point has CUNY or the Committee issued a Preliminary Report related to the twenty-three remaining allegations of research misconduct, glossing over a fundamental step in its own procedures. *Id*. Regardless, CUNY took ***thirteen months*** to issue the Draft Report, which included twenty-three new allegations of research misconduct. Yet, the Committee expects Dr. Wang to fully respond to the Draft Report (and its twenty-three new allegations of research misconduct) in forty-five days.

Despite this, the Investigation has taken an unnecessary and unjustifiable amount of time, worsening the impact on Dr. Wang's physical and mental health. Dr. Wang received the Preliminary Report on October 2, 2021 and was asked to make comments, which he submitted on December 23, 2021. CUNY thereafter issued the Preliminary Report on January 28, 2022, which included the President's referral of the matter to the Vice Provost for Research.

Even though Section 7.2 requires the Investigation to begin within 30 days of the referral to the Vice Provost for Research, the Committee apparently did not begin investigating for eight months. *See* Draft Report at 43. Further, the Draft Report makes painstakingly clear that CUNY's administration delayed the investigation:

> The committee would like to express its frustration at several aspects of CUNY's handling of this investigation. It was exceedingly difficult for the committee to get a clear picture of the actions taken by CCNY in support of their initial inquiry into the alleged misconduct. It took months of interviews with CCNY leadership to get a rudimentary idea of what materials, if any, were sequestered by CCNY.[16] Upon learning that CUNY and CCNY had sequestered data from at least one of Dr. Wang's computers, the committee

[16] Dr. Wang requested all documents and communications with CCNY leadership supporting the Committee's assertion it conducted "months of interviews" with CCNY leadership (*see* Exhibit 14), but in response, the Committee admitted it actually had not conducted substantive interviews with CCNY leadership, *see* Exhibit 14 (requesting documents and communications of interviews with "several administrators at the CUNY School of Medicine and CCNY," and the Committee responded, the "department Chairs and/or Deans provided no relevant aspects of the Investigation. There are no interview transcripts to provide.").

> immediately requested access to these files. However, CUNY was wholly unresponsive, for the better part of six months, to these requests. Only after interviewing the President of CCNY, were we granted permission to examine all the image files copied from Dr. Wang's computer. However, the committee waited weeks before they were given access to *only three files* from Wang's computer. It was only upon multiple additional requests that a significant number of image files were made available to us. Based on how this was handled by CCNY and CUNY central administration, we are not confident that we have been given access to the majority of image files stored on Wang lab computers. **We suspect that significant insight could be provided by a systematic examination of such files. We encourage CCNY and CUNY to be more supportive and responsive to future research misconduct committees**.

Draft Report at 43 (emphasis added). In no uncertain terms, the Committee highlights CUNY's failure to conduct a timely investigation and consider potentially exculpatory evidence, which is a clear violation of the Misconduct Policy. *See* Misconduct Policy, at Section 6.7

Moreover, the Committee failed to provide notice of the thirty-one NIH allegations within a reasonable period of time. The Draft Report suggests multiple letters exist between CCNY and the Director of the Division of Investigative Oversight at the Office of Research Integrity ("ORI") dating back to September 2021 that discuss the thirty-one new allegations:

> On September 13, 2021, Dr. Tony Liss, Provost and Senior Vice President for Academic Affairs at the City College of New York (CCNY), received a letter from Dr. Alexander Runko, the Director of the Division of Investigative Oversight at the Office of Research Integrity (ORI), informing Dr. Liss that ORI had received allegations of research misconduct from the National Institutes of Health (NIH) against Dr. Hoau-Yan Wang, Associate Medical Professor, City College of New York (CCNY). The letter from ORI outlined nine specific allegations pertaining to work reported in eight publications, a poster presented at a conference, and an NIH grant proposal. **Following the reception of this letter, ORI notified CCNY of additional allegations made against Dr. Wang, bringing the total number of allegations to thirty-one.**

Draft Report at 2 (emphasis added). Dr. Wang requested records of these communications to confirm the date the Committee obtained the full set of thirty-one NIH allegations. *See* Exhibit 15. In response, the Committee stated, "As per what is stated in the Draft Investigation report <u>there is only one letter</u> dated September 13, 2021 to Tony Liss at CCNY." *Id.*

Thus, CUNY presumably received the thirty-one NIH allegations on September 13, 2021, yet failed to send those allegations to Dr. Wang for *over a year*, or on October 4, 2022. And, even

then, the Committee never asked for a point-by-point response to twenty-one of those thirty-one NIH allegations. Section 7.2 of the Misconduct Policy requires providing the respondent notice of any new allegations "within a reasonable amount of time." There is simply no excuse for CUNY's extraordinary delay in sending all thirty-one NIH allegations to Dr. Wang when it presumably had them in its possession for over a year and apparently, based on the language of the Draft Report, wanted Dr. Wang to respond to them despite never asking him to do so. The Committee's failure has materially prejudiced Dr. Wang, who is left scrambling to locate data from *over a decade* to address the twenty-one new allegations within 59 days.[17] It took the Committee seventeen months to accomplish a response to thirty-one allegations, and yet the Committee asks Dr. Wang to respond to twenty-one allegations in 59 days. Again, the Committee's violation of the Misconduct Policy violates Dr. Wang's Due Process rights.

### D. CUNY Must Consider The Source Of The Citizen Petition

In the Draft Report, the Committee fails to address the fact that the allegations of research misconduct against Dr. Wang stem from an August 2021 FDA Citizen Petition filed by two highly-motivated market participants, Drs. David Bredt and Geoffrey Pitt ("Petitioners"), who launched a disinformation campaign aimed at destroying the value of Dr. Wang's long-time scientific collaborator, Cassava, and fails to do so in clear violation of the Misconduct Policy. *See* Misconduct Policy, at Sections 7.3; 7.4.

The allegations against Dr. Wang largely originated in an FDA Citizen Petition filed on August 23, 2021, which was anonymously authored and published by the Petitioners. The Citizen Petition is a public "short seller" report that is full of misstatements and disinformation and is plainly designed to negatively impact the price of Cassava's stock. Over the course of several months, the Petitioners submitted three supplemental filings to the original Citizen Petition, each of which also included factually inaccurate information and fabricated claims against both Dr. Wang and Cassava.

Bredt and Pitt both held short positions in Cassava, a fact they chose not to disclose until eight days after they anonymously filed the Citizen Petition. Despite not disclosing this obvious financial conflict of interest, the Petitioners claimed that the original Citizen Petition included all information "known to the [Petitioners] which are unfavorable to the petition." Of course, this was not true: there can be no question that a financial conflict of interest qualifies as information "unfavorable" to the petition.

#### 1. Bredt's Other Conflicts of Interest

In addition to failing to disclose his substantial financial interest in attacking Cassava and Dr. Wang, Bredt has other conflicts of interest of which the Committee should be aware. For example, five months before filing the Citizen Petition, Bredt became an Executive Partner at MPM Capital, a leading biotechnology investment firm that invests in early-stage therapeutics

[17] The period was initially 30 days. Dr. Wang asked for a 90-day extension, but the Committee agreed to a wholly inadequate 29-day extension.

companies. MPM has invested in numerous competitors to Cassava that are also developing drugs targeting protein misfolding diseases, including Alzheimer's disease. While the Citizen Petition baselessly attacked Dr. Wang's research as being highly improbable, Bredt was actively investing in companies with products that do largely the same thing as Cassava's product candidate. Unsurprisingly, Bredt failed to disclose his employment relationship with MPM Capital and the multiple financial interests he had in Cassava's competitors when the Citizen Petition was filed.

Additionally, Bredt failed to disclose that his patent application unambiguously competes with Dr. Wang's research. Indeed, Dr. Wang is an inventor of the patent for simufilam, Cassava's drug candidate, which targets a protein linked to the Alpha 7 nicotonic acetylcholine receptor. Bredt is the author on three very similar pending patent applications targeting the Alpha 9 / Alpha 10 nicotinic acetylcholine receptor.

### 2. The Twitter Short Sellers

Emboldened by the Petitioners' disinformation campaign, the Short Sellers masquerading as internet neuroscientists, began a campaign of their own, publishing unfounded claims of research misconduct against Dr. Wang to discredit Cassava's drug candidate and tank the company's stock price. In addition to publishing false and misleading allegations against Dr. Wang on a website dedicated to destroying Cassava, the Short Sellers obsessively use Twitter to defame Dr. Wang and harass anyone who questions their views. For example, two of the Short Sellers have repeatedly harassed the editors of the relevant scientific journals to demand they "admit" that the data included in those articles is fraudulent. They have also spent significant energy contacting CUNY in support of their defamatory conspiracy theories concerning Dr. Wang and Cassava.

The Short Sellers all admittedly have an undeniable financial interest in discrediting Dr. Wang's research and Cassava. Moreover, none of the Short Sellers are neuroscientists and each is completely unqualified to evaluate Dr. Wang's Western blot data. Indeed, we have found no evidence that any of the Short Sellers have any substantial experience with the technique.

The Committee's failure to examine and consider the origins of the thirty-one allegations and the significant conflicts of interest that exist, as well as its decision to rely only on the opinions of Dr. Zalm and self-interested Short Sellers, while ignoring the experts proffered by Dr. Wang and the other journal editors who cleared him of misconduct, clearly violates the Misconduct Policy. *See* Misconduct Policy, at Section 7.3 ("The University will take reasonable steps to ensure an impartial and unbiased Investigation [free of] financial conflicts of interest"); Section 7.4 ("The Investigation Committee will use diligent efforts to ensure that the Investigation … includes an examination of all … Evidence," including "any document, tangible item, or testimony offered or obtained during [the investigation] that tends to prove or disprove the existence of an alleged fact.").

The Committee's reliance on such misinformation could also subject CUNY to an investigation into its own practices. As of late, the U.S. Department of Justice has stepped up investigation and enforcement efforts to combat short selling of stocks, manipulative trading, and inappropriate market influence. It has issued investigative subpoenas to dozens of hedge funds and

research firms. *See US Prosecutors Explore Racketeering Charges in Short-Seller Probe*, REUTERS (Feb. 20, 2022). As reported by the Wall Street Journal, "[f]ederal prosecutors are investigating whether short sellers conspired to drive down stock prices by sharing damaging research reports ahead of time and engaging in illegal trading tactics." *See* Liz Hoffman and Justin Baer, *Justice Department Targets 'Spoofing' and 'Scalping' in Short Seller Investigation*, WALL STREET JOURNAL, (Feb. 16, 2022). CUNY perpetuated similar behavior here by engaging and apparently relying on the demonstrably false conclusions pressed by the Short Sellers—all of whom possess inextricable financial interests. Thus, the release of the Draft Report, which appears to rely on the misinformed views of these individuals instead of independent experts who reached conclusions in support of Dr. Wang, may expose CUNY to federal investigation into the role CUNY played in encouraging the Short Sellers' behavior.

### E. Dr. Wang Had No Motive to Falsify Data.

In stark contrast to the Short Sellers' clear and admitted financial interests, Dr. Wang has absolutely no motive to submit falsified data. Dr. Wang has built his 40-year professional career around his reputation and integrity, which have never been questioned until now. While Dr. Wang was paid a de minimis stipend of approximately $10,000 for his work for Cassava, Dr. Wang has not otherwise financially profited in any way from his work for Cassava. While Cassava's stock prices soared, Dr. Wang did not make a single penny. In fact, Dr. Wang has ***never*** held a position in Cassava's stock, as opposed to the Short Sellers who collectively made hundreds of millions of dollars at the expense of Dr. Wang's reputation. The Committee has not even made an attempt to explain why a hard-working scientist like Dr. Wang, who commutes from Philadelphia to New York daily, and carries a full teaching load while running a research lab, would risk his life's work for a $10,000 contract with Cassava. Simply put, Dr. Wang is a hard-working scientist who has no motive to lie and whose integrity is being impugned by financially-motivated market manipulators.

## II. DR. WANG'S SPECIFIC RESPONSES TO THE DRAFT REPORT

The Draft Report is littered with conclusory statements, assumptions, biases, and contradictions, and generally demonstrates a complete disregard for the Misconduct Policy. Below is a breakdown of these issues, all of which are fatal to any findings of research misconduct under Section 12.17 of the Misconduct Policy, and indeed, likely support legal claims against CUNY should the Committee proceed to publish the Draft Report as it currently stands.

### A. CUNY's standard for research misconduct has not been satisfied.

The Committee concluded that Dr. Wang committed "knowing" research misconduct by a "preponderance of the evidence" with respect to fourteen allegations (Allegations 4, 6, 8, 11, 14, 18-22, 25, 27, 29, and 30). Draft Report at 43. Aside from the fact that the Committee never asked Dr. Wang to respond to ten of those fourteen allegations (Allegations 11, 14, 18-21, 25, 27, 29, and 30), the Committee's findings unequivocally fail to satisfy the research misconduct standard set forth in Sections 12.5, 12.6, 12.13, and 12.17 of the Misconduct Policy.

Research misconduct is "fabrication, falsification, or plagiarism." Section 12.17. "Research Misconduct" is defined:

> **Fabrication, Falsification, or Plagiarism** in proposing or performing research, reviewing research, or in reporting research results. **Research Misconduct does not include honest error or differences of opinion**. A finding of Research Misconduct made under this Policy requires that: (a) there be a **significant departure from accepted practices** of the relevant research community; (b) the misconduct be committed **intentionally, knowingly, or recklessly**; and (c) the Allegation be proven by a **Preponderance of the Evidence**.

Section 12.17 (emphasis added). "Fabrication" is defined as "making up data or results and recording or reporting them." Section 12.5. "Falsification" is defined as "manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." Section 12.6. Nowhere in this standard does it say that a failure to keep records equates to a finding of research misconduct.

To make a finding of misconduct, there must be a "significant departure from accepted practices" of the "relevant research community." Section 12.17. The departure cannot merely be a "difference of opinion." *Id.* The departure must be committed "intentionally, knowingly, or recklessly." *Id.* And the departure must be proven by a preponderance of the evidence. *Id.* Preponderance of evidence means "proof by information that, compared with that opposing it, leads to the conclusion that the fact at issue is more probably true than not." Section 12.14.

Intentional, knowing, and reckless conduct is not mere negligence. Negligence, intentional, knowing, and reckless are precise legal terms that have specific legal definitions. Negligence occurs when somebody fails to "exercise the degree of care that a reasonably prudent person would have used under similar circumstances." *Schipani v. McLeod*, 541 F.3d 158, 162 (2d Cir. 2008) (citing *McLean v. Triboro Coach Corp.*, 302 N.Y. 49, 51 (1950)). In comparison, intentional, knowing, and reckless conduct are significantly higher standards to prove. New York law defines reckless conduct as acts that indicate disregard of the consequence of the person's action or inaction or acts suggesting a reckless indifference to the rights of others. *See* N.Y. Pattern Jury Instr.--Civil 2:10A; *see also Gallagher v. Ruzzine*, 147 A.D.3d 1456, 1459–60, 46 N.Y.S.3d 323, 328 (2017) ("[T]o constitute gross negligence,[18] a party's conduct must smack of intentional wrongdoing or evince [ ] a reckless indifference to the rights of others. Stated differently, a party is grossly negligent when it fails to exercise even slight care ... or slight diligence."); *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000) ("Intentional misconduct is easily identified since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount."); *Rolf v. Blyth*, *Eastman Dillon & Co., Inc.*, 570 F.2d 38, 45 (2d Cir. 1978) ("Use of the word "knowing" implies conduct which is somewhat less directed and focused than "intentional" activity which commonly is characterized by a specific mental state whose animus is to bring about a particular result.").

As explained below, the Committee falls far short of satisfying the high threshold for establishing intentional, knowing, or reckless conduct. Indeed, the Committee makes clear

throughout the Draft Report that it generally does not have sufficient evidence, because it has not been given access to all pertinent information, to make conclusions of misconduct, much less make findings of "significant departures" from accepted standards. *See* Draft Report at 43 ("Based on how this was handled by CCNY and CUNY central administration, we are not confident that we have been given access to the majority of image files stored on Wang lab computers. We suspect that significant insight could be provided by a systematic examination of such fil es.").

### B. The Committee Fails To Cite Standards From The "Relevant Research Community."

The Committee is required to base its findings on standards from the "relevant research community." *See* Misconduct Policy, at Section 12.17. But, the Committee has not provided the curriculum vitae of its members to establish their expertise in the field of Western blotting or their membership in the "relevant research community." The Committee also ignored findings of highly regarded experts and scientific journals specialized in the "relevant research community" (*supra* pp. 7-11), and instead turned to Dr. Maria Zalm for input, even though Dr. Zalm appears to be the only editor without a background in the "relevant research community" of neurobiology and Western blotting. *Id.*

To illustrate the Committee's failure to obtain input from the "relevant research community," the Committee has requested images of "uncropped blots from the densitometer scans . . . includ[ing] the edges of the developed films and the molecular weight markers." *See* Exhibit 15. The Committee reiterates 18 times in the Draft Report that it *requires* Dr. Wang to produce original Western blots with "clear edges" and "molecular weight markers." Draft Report at 4, 5, 6, 8, 17, 20, 24, 31, 33, 36, 42. In fact, the Committee even recommends that journals adopt its view that Dr. Wang must produce uncropped blots with "clear edges" and "molecular weight markers." *See, e.g., id.* at 36 ("We recommend that the editors of *The Journal of Prevention of Alzheimer's Disease* request uncropped images of the original blots that include blot edges and molecular weight markers.). But, the Committee's definition of "uncropped" is <u>contrary to industry standards</u> and <u>significantly more restrictive</u>. As Dr. Spruck details in his report, "[i]t is repeatedly stated in the CUNY Draft Investigation Report that Dr. Wang failed to provide original uncropped and unmanipulated blots with clear film/blot edges and molecular (MW) markers. In my analysis below, I show in many cases that when the original scans provided by Dr. Wang are darkened that film and/or blot edges are evident and there is no evidence of manipulation. ***I believe you are holding Dr. Wang to a standard that is likely outside the requirements of nearly every Institute and journal regarding how long western blot data should be stored***." *See* Spruck's Report at 1-2 (emphasis added). By way of example, a September 2022 paper published in PLoS Biology, the journal for which Dr. Zalm works and on which the Committee relies, hails:

> While several groups have studied the prevalence of image manipulation or provided recommendations for improving western blotting, data on the prevalence of common publication practices are scarce. We systematically examined 551 articles published in the top 25% of journals in neurosciences (n = 151) and cell biology (n = 400) that contained western blot images, focusing on practices that

> may omit important information. **Our data show that most published western blots are cropped and blot source data are not made available to readers in the supplement. Publishing blots with visible molecular weight markers is rare, and many blots additionally lack molecular weight labels. Western blot methods sections often lack information on the amount of protein loaded on the gel, blocking steps, and antibody labeling protocol. Important antibody identifiers like company or supplier, catalog number, or RRID were omitted frequently for primary antibodies and regularly for secondary antibodies.**

C. Kroon, et al., Blind spots on western blots: Assessment of common problems in western blot figures and methods reporting with recommendations to improve them, PLoS Biol. 2022 Sep 12 (available at: https://pubmed.ncbi.nlm.nih.gov/36095010/) (emphasis added).

Further, several highly prestigious journals accept a definition of "uncropped" that differs from the Committee's view – see the following examples, none of which include "the edges of the developed film" or "molecular weight markers":

**1. Nature Cell Biology (Impact factor: 28.21)**




Source: https://www.researchgate.net/figure/Uncropped-Western-Blot-images-Uncropped-images-of-all-Western-blots-are-shown-as-well-as_fig17_324757105

2. **Nature Neuroscience (Impact factor: 24.88)**




Source: https://www.researchgate.net/figure/Extended-data-from-Fig-3-Uncropped-Western-Blot-images-A-C-Uncropped-Western-Blot_fig19_334473647

3. **Nature Genetics (Impact factor: 41.38)**




Source: https://www.researchgate.net/figure/Uncropped-full-length-pictures-of-western-blotting-membranes-Uncropped-full-length_fig9_322506968

4. **<u>Nature Cell Biology</u> (Impact factor: 28.21)**




Source: https://www.researchgate.net/figure/Uncropped-images-from-Western-blots-Uncropped-images-for-Fig1a-j-Uncropped-images-for_fig14_324113121

The foregoing journals accept "uncropped" blots even if they do not show edges or molecular weight markers. These are prestigious journals with high impact factors, yet they would fall short of the Committee's standard.

To meaningfully respond to the Committee, Dr. Wang asked the Committee to provide citations to the underlying standards it seemingly references. *See* Exhibit 14. In response, the Committee simply relied on the Draft Report. *See* Exhibit 14 (email from A. Winter-Potter dated Feb 21, 2023).

Interestingly, the only reference in the Committee's source material to "molecular weight markers" is in allegations it received from the financially-motivated Short Sellers. *See* Exhibit 16 (highlighting "absence of molecular weight markers (or lanes where they might have been present on the original gel) and other expected control experiments missing"). The need for "molecular weight markers" does not appear anywhere else in the Committee's record, nor was this issue raised in the Preliminary Report. If the Short Sellers are indeed the source of the Committee's belief that it needs "uncropped blots with clean edges and molecular weight markers," that would, of course, blatantly violate the Misconduct Policy's requirement for a diligent, thorough, and unbiased investigation free from financial conflicts of interest (Sections 7.3, 10.5), as these admittedly financially-motivated individuals, were never provided access to original data, and do not appear to have a specialized expertise in Western blotting.

The Draft Report fails to set forth any objective standards that Dr. Wang violated, but instead apparently reflects the personal opinions of the Committee members. This approach not only violates the Misconduct Policy but also Dr. Wang's Constitutional right to Due Process.

## III. CUNY'S INVESTIGATION AND FINDINGS MUST BE KEPT CONFIDENTIAL DUE TO PENDING AND PROSPECTIVE LEGAL PROCEEDINGS.

***First***, New York's Freedom of Information Law ("FOIL") requires confidentiality of all documents and communications subject to pending and prospective legal proceedings. Public Officers Law § 87(2)(e)(i); *Jewish Press, Inc. v. Kingsborough Cmty. Coll*., 201 A.D.3d 547, 548 (2022). Section 87(e)(i) applies to all records compiled for law enforcement purposes, civil investigations, and agency investigations. *Id.*; *see also Matter of Scaccia v. New York State Div. of State Police*, 138 A.D.2d 50, 53 (3d Dept. 1988). The law enforcement exemption extends not only to current but prospective and potential legal action. *Madeiros v. New York State Educ. Dep't*, 30 N.Y.3d 67, 78 (2017). As you know, the investigation of Cassava and Dr. Wang has been the subject of a broad range of criminal and regulatory proceedings, including by the Department of Justice, Securities and Exchange Commission, and U.S. Food and Drug Administration. And, as outlined herein, releasing the Draft Report, as written, will likely subject CUNY to significant legal risk. The Investigation fits squarely within the FOIL exception outlined in Section 87(e)(i), and CUNY should take appropriate measures to safeguard and prevent the release of any documents, communications, and records connected to the Investigation.

***Second***, the Family Educational Rights and Privacy Act ("FERPA") prohibits CUNY from disclosing educational records that reveal, or in combination with other information may reveal, the identity of an individual student. 20 USC § 1232g; 34 CFR § 99.3; *Huseman v. New York City Department of Educ*., No. 151019/16, 2016 WL 3029581, at *3 (N.Y. Sup. Ct. May 25, 2016). FERPA strictly prohibits disclosure of both direct and indirect personally identifiable information. *Jewish Press, Inc. v. Kingsborough Cmty*. Coll., 201 A.D.3d 547, 549 (2022). Consequences for violating FERPA include loss of federal funding. 20 U.S.C. § 1232g(b)(2); *Huseman v. New York City Department of Educ.*, No. 151019/16, 2016 WL 3029581, at *3 (N.Y. Sup. Ct. May 25, 2016). In the present matter, Dr. Wang's lab records connected to the research underlying the relevant journal articles are replete with student data, particularly the data of his postdoctoral research associates. Public Officers Law § 87(2)(a) prohibits from disclosure any material exempt under federal statute, including FERPA. As such, CUNY should avoid disclosing any information that may tend to reveal, directly or indirectly, the identity of its students, which includes an extensive amount of the documents and communications underlying this Investigation.

***Third,*** the Misconduct Policy requires strict confidentiality of ***all*** documents related to the Investigation. *See, e.g.*, Misconduct Policy, at Section 5 ("In order to protect the privacy and professional reputations of those involved, all Research Misconduct Proceedings will be conducted in a fashion designed to maintain confidentiality. . . . All individuals having knowledge of the identity of the Respondents and the Complainants and access to information in any reports or drafts thereof prepared in connection with a Research Misconduct Proceeding must keep such knowledge and information confidential.").

Accordingly, the Committee must take appropriate steps to safeguard from disclosure, inadvertent or otherwise, *all* documents and communications connected to this Investigation, including the Draft Investigation Report.

## IV. THE DRAFT REPORT IS DEFAMATORY AND CAUSES DR. WANG EMOTIONAL DISTRESS.

If issued as written, the Draft Report will defame Dr. Wang and violate certain of his other rights under New York law.

*First,* if this Draft Report were published with the defects Dr. Wang has identified above, a court is likely to find that it is defamatory. *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) (finding defamatory a letter that falsely disparaged the plaintiff professionally).

*Second,* CUNY's handling of this Investigation has caused Dr. Wang actionable emotional distress. Coming to such a severe conclusion on an allegation to which Dr. Wang never had an opportunity to respond can only be called outrageous. *See, e.g., Nolan v. Cnty. of Erie*, No. 1:19-CV-01245, 2020 WL 1969329, at *12 (W.D.N.Y. Apr. 24, 2020) (holding that plaintiff's intentional infliction of emotional distress claim against former employer could proceed); *Sullivan v. Bd. of Educ. of Eastchester Union Free Sch. Dist.*, 517 N.Y.S.2d 197, 199 (N.Y. App. Div. 1987) (holding high school principal adequately pled intentional infliction of emotional distress claim against Board of Education where he alleged the Board "used the threat of bringing falsified charges against him to coerce him into resigning from his tenured position").

CUNY has failed to appreciate the impact that releasing the Draft Report will have not only or Dr. Wang's professional future but also on his personal life and mental health. Dr. Wang has been a research scientist for 40 years, contributed to 120 peer-reviewed articles, and been in involved in numerous industry research and development collaborations during that time. Throughout his four-decade career, Dr. Wang has established a stellar reputation for exhibiting ethical behavior, thereby earning a pristine reputation among colleagues, collaborators, and scientists. He commutes five hours round trip every day to New York City from his home in Philadelphia. He is deeply passionate about his work in Alzheimer's research and believes that the research he is working on has the potential to help patients like his parents, who suffer from dementia. This Investigation has already caused Dr. Wang tremendous stress, both in digesting the accusations against him and in spending time and resources trying to respond to the thirty-one allegations and clear his name.

When he is not teaching or in his lab, Dr. Wang is spending every waking moment of his life addressing this Investigation. The entire experience has been very isolating for Dr. Wang, as he feels he is being singled out by CUNY. The consistent disregard of CUNY's own policies and other fatal flaws in this Investigation discussed above have also caused Dr. Wang tremendous stress as he feels that he is not getting a fair opportunity to defend himself. For example, he was interviewed only once by the Committee, for a period of approximately two hours. In that time, the Committee asked him *only* about his document-retention and record-keeping policies. They seemed not to care one iota about how he conducted his research or the specifics of the thirty-one allegations against him. In other words, no one at CUNY has ever asked Dr. Wang to verbally explain his side of the story.

*Third*, by failing to provide Dr. Wang with a Mandarin interpreter during the investigation, CUNY has discriminated against him on the basis of race and national origin. *See* Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*.; N.Y. Exec. Law § 290, *et seq.*; N.Y.C. Admin. Code, § 8-101 *et seq*. As CUNY knows, English is not Dr. Wang's primary language. Yet, CUNY refused to provide Dr. Wang with a foreign language interpreter during his interview by the Committee, prohibited his counsel from assisting him in understanding the questions, and at every step bombarded him with complex questioning to which he was unable to adequately and effectively respond. Because of CUNY's discriminatory practice, Dr. Wang had no effective opportunity to engage with the Committee orally, articulate a defense of the research at issue, or explain in his own words that his conduct was consistent with scientific standards.