**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>Plaintiffs,<br><br>v.<br><br>CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,<br><br>Defendants. | Case No. 1:24-cv-05948-JLR-OTW<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT BY CASSAVA SCIENCES AND INDIVIDUAL DEFENDANTS BARBIER AND BURNS**

Dated: September 14, 2026


CLARICK GUERON REISBAUM LLP
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii
PRELIMINARY STATEMENT ... 1
STATEMENT OF FACTS ... 4
- A. Filana Therapeutics f/k/a Cassava Sciences f/k/a Pain Therapeutics ... 4
- B. Simufilam Preclinical Research ... 5
- C. Simufilam Phase 2 Results ... 5
- D. Public Scrutiny ... 6
- E. Investor Lawsuits, Government Investigations, Retractions, and Media Scrutiny. 7
- F. FDA Audit and Direction to Remove Phase 2b Data ... 8
- G. Cassava Audit ... 9
- H. Defamation Action ... 10
- I. Defendants Lacked Research Records and Data ... 10
- J. Defendants Knew Plaintiffs and Other Critics Had Raised Valid Concerns ... 12
  - i. Red Flags About Preclinical Research ... 12
  - ii. Red Flags About Phase 2a ... 13
  - iii. Red Flags About Phase 2b ... 14
  - iv. Willful Avoidance ... 15
- K. Actual Motives ... 16
  - i. Silence Critics and Evade Liability ... 16
  - ii. Humiliate and Punish Plaintiffs ... 18
  - iii. Self-Preservation ... 19
  - iv. Self-Enrichment ... 20
- L. Trial Enrollment ... 21

ARGUMENT ... 22
I. GENUINE DISPUTES ABOUT DEFENDANTS' STATE OF MIND PRECLUDE SUMMARY JUDGMENT ON ANTI-SLAPP PUNITIVE DAMAGES ... 23
- A. Defendants Rely on Disputed Evidence and Ignore Countervailing Evidence ... 23
  - i. Defendants' Stated Purpose of Proving Falsity Is Not Credible ... 24
  - ii. Defendants' Stated Purpose of Protecting Trial Enrollment Is Neither Credible Nor Proper ... 27
- B. The Motion Misapprehends the Anti-SLAPP Law ... 29

II. DEFENDANTS ASK THE COURT TO RE-WRITE THE ATTORNEY'S FEES PROVISIONS OF NEW YORK'S ANTI-SLAPP LAW ... 31
- A. The Anti-SLAPP Statute Provides for Attorney's Fees ... 32

B. Defendants Urge an Illogical Distinction ........ 33

C. Cassava's Reliance on the "American Rule" Is Refuted by the Statute ........ 35

D. Cassava Distorts the Litigation Record to Conceal the Absurdity of its Position 36

i. Cassava Falsely Implies It Has Conceded Anti-SLAPP Liability ........ 37

ii. Cassava Uses Inadmissible Evidence to Push Its False Narrative ........ 39

E. Federal Rule 54 Has No Bearing on Cassava's Motion ........ 41

F. Cassava's 'Floodgates' Argument Ignores that Plaintiffs Must Still Establish Anti-SLAPP Liability at Trial ........ 42

III. THERE ARE GENUINE DISPUTES OF FACT CONCERNING PLAINTIFFS' SPECIAL INJURIES ........ 43

IV. DR. BURNS IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE MALICIOUS PROSECUTION CLAIM ........ 46

A. The Motion Ignores Evidence of Dr. Burns's Essential Role ........ 46

B. The Motion Mischaracterizes Dr. Burns's Role and Influence ........ 48

C. The Motion Relies on an Invented Legal Standard ........ 49

V. BARBIER AND BURNS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSPIRACY CLAIM ........ 50

A. The Intracorporate Conspiracy Doctrine Does Not Bar Plaintiffs' Claim ........ 50

i. Dr. Burns Had Independent Personal Motives to Pursue the Case ........ 51

ii. Barbier Had Independent Personal Motives to Pursue the Case ........ 52

B. The Evidence Would Support a Reasonable Jury in Finding that Dr. Burns Conspired with Cassava and Barbier to Prosecute Plaintiffs ........ 54

C. The Conspiracy Claim Is Not Duplicative ........ 55

CONCLUSION ........ 56

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*161 Ludlow Food, LLC v. L.E.S. Dwellers, Inc.*,
No. 153500/2016, 2025 WL 1542338 (N.Y. Sup. Ct. May 29, 2025)..............................33, 43

*315 W. 103 Enters. LLC v. Robbins*,
95 N.Y.S.3d 800 (1st Dep't 2019) ..........................................................................35

*A.G. Ship Maint. Corp. v. Lezak*,
69 N.Y.2d 1 (1986) ...............................................................................................35

*Adelson v. Harris*,
No. 12-cv-6052, 2018 WL 1585676 (S.D.N.Y. Mar. 29, 2018).............................................41

*Alvarez v. City of New York*,
No. 11-cv-05464, No. 11-cv-5464, 2012 WL 6212612 (S.D.N.Y. Dec. 12, 2012)................51

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................22

*Aristocrat Plastic Surgery P.C. v. Silva*,
No. 153200/2021, 2023 WL 6553906 (N.Y. Sup. Ct. Oct. 04, 2023) ...................................33

*Aristocrat Plastic Surgery P.C. v. Silva*,
No. 153200/2021, 2025 WL 26191 (N.Y. Sup. Ct. Jan. 3, 2025)....................................33, 40

*Baldini v. Shah*,
2018 WL 11226079 (S.D.N.Y. Aug. 9, 2018) .........................................................................50

*Bennett v. Towers*,
982 N.Y.S.2d 843 (Sup. Ct. 2014)...........................................................................30

*In Re Cassava Sciences, Inc. Securities Litigation*,
No. 21-cv-00751 (W.D. Tex.)....................................................................................7

*Chi Chao Yuan v. Rivera*,
48 F. Supp. 2d 335 (S.D.N.Y.1999)..........................................................................45

*Chisolm-Mitchell v. Ahmed*,
No. 20-cv-3434, 2021 WL 512460 (E.D.N.Y. Feb. 11, 2021) ..............................................45

*Christians of Cal., Inc. v. Clive Christian N.Y.*,
No. 13-cv-275, 2015 WL 468833 (S.D.N.Y. Feb. 3, 2015) ..................................................53

*In re Dana Corp.*,
574 F.3d 129 (2d Cir. 2009).....................................................................................49

*Davis v. City of New York*,
373 F. Supp. 2d 322 (S.D.N.Y. 2005)....................27

*Duane Reade v. Clark*,
No. 107438/2003, 2 Misc.3d 1007(A), 2004 WL 690191 (N.Y. Sup. Ct. 2004) ....................30

*Dudick v. Gulyas*,
277 A.D.2d 686 (2000) ....................46, 49

*In re Eerie World Entertainment, LLC*,
No. 00-cv-13708, 2006 WL 1288578 (Bankr. S.D.N.Y. Apr. 28, 2006) ....................44

*Egiazaryan v. Zalmayev*,
No. 11-cv-2670, 2013 WL 6486258 (S.D.N.Y. Dec. 11, 2013),
*report and recommendation adopted as modified*,
2014 WL 1244790 (S.D.N.Y. Mar. 19, 2014) ....................30, 31

*Ellis v. La Vecchia*,
567 F. Supp. 2d 601 (S.D.N.Y. 2008)....................31

*Fischl v. Armitage*,
128 F.3d 50 (2d Cir. 1997)....................23

*Gan v. GSUIG Real Est. Member LLC*,
797 F. Supp. 3d 69 (E.D.N.Y. 2025),
*aff'd,* No. 25-cv-2313, 2026 WL 1145891 (2d Cir. Apr. 28, 2026) ....................55

*Gillespie v. Kling*,
192 N.Y.S.3d 78 (1st Dep't 2023) ....................29

*Golan v. Daily News, L.P.*,
No. 151135/2022, 2023 WL 5900247 (N.Y. Sup. Ct. Sep. 11, 2023)....................33, 36

*Goldman v. Abraham Heschel School*,
No. 158209/2021, 2024 WL 1117158 (N.Y. Sup. Ct. Mar. 14, 2024) ....................36

*Gottwald v. Sebert*,
40 N.Y.3d 240 (2023) ....................29

*Graham v. Long Island R.R.*,
230 F.3d 34 (2d Cir. 2000)....................23, 52

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
206 F. Supp. 3d 869 (S.D.N.Y. 2016)....................28

*Hariri v. Amper*,
854 N.Y.S.2d 126 (1st Dep't 2008) ....................35

*Hart v. RCI Hosp. Holdings, Inc.*,
90 F. Supp. 3d 250 (S.D.N.Y. 2015)....................................................................................39

*Heilbut v. Cassava Scis., Inc.*,
778 F. Supp. 3d 551 (S.D.N.Y. 2025)........................................................................... *passim*

*Hewitt v. City of New York*,
544 F. App'x 24 (2d Cir. 2013) ........................................................................................50

*Hua Xue v. Jensen*,
No. 19-cv-1761, 2020 WL 6825676 (S.D.N.Y. Nov. 19, 2020)...........................................55

*Isaly v. Garde*,
No. 160699/2018, 2024 WL 1156850 (N.Y. Sup. Ct. Mar. 18, 2024) ..............................34, 35

*Isaly v. Garde*,
No. 160699/2018, 2024 WL 5466175 (N.Y. Sup. Ct. Oct. 25, 2024) ....................................36

*Isaly v. Garde*,
No. 160699/2018, 2024 WL 5055165 (N.Y. Sup. Ct. Dec. 09, 2024) ...................................36

*Jaffir v. Hirji*,
887 F.3d 111 (2d Cir. 2018).................................................................................................22

*Joglo Realties, Inc. v. Marionovsky*,
No. 20502/2013, 2015 WL 2155725 (N.Y. Sup. Ct. May 8, 2015).................................28, 30

*Johnson v. Ganim*,
342 F.3d 105 (2d Cir. 2003)...........................................................................................23, 27

*LaFrance v. Bemben*,
No. 10-cv-4583, 2013 WL 132702 (E.D.N.Y. Jan. 10, 2013) ................................................50

*Langer v. Paysafe Partners LP*,
No. 19-cv-4388, 2020 WL 7684885 (E.D.N.Y. May 22, 2020) .............................................53

*Loftus v. Arthur*,
No. 05-cv-1682, 16 Misc. 3d 1126(A), 2007 WL 2376883 (N.Y. Sup. Ct. July 16, 2007) ....50

*Manganiello v. City of New York*,
612 F.3d 149 (2d Cir. 2010)...................................................................................................46

*Maskantz v. Hayes*,
39 A.D.3d 211 (1st Dep't 2007) ......................................................................................46, 49

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...............................................................................................................22

*Moorhouse v. Standard*,
124 A.D.3d 1 (1st Dep't 2014) .....46

*Nassau Cnty. Emp. "L" v. Cnty. of Nassau*,
345 F. Supp. 2d 293 (E.D.N.Y. 2004) .....53

*Nelson v. Ardrey*,
231 A.D.3d 179 (2d. Dep't 2024) .....36

*Reeves v. Associated Newspapers, Ltd.*,
218 N.Y.S.3d 19 (1st Dep't 2024) .....29, 36

*Reich v. Lopez*,
38 F. Supp. 3d 436 at 465 (S.D.N.Y. 2014) .....51, 53

*Rent Stabilization Ass'n of N.Y.C., Inc. v. McKee*,
No. 155789/2018, 2025 WL 866045 (N.Y. Sup. Ct. Mar. 18, 2025) .....29, 30

*Rentas v. Ruffin*,
816 F.3d 214 (2d Cir. 2016) .....44

*Rhodes v. Tevens*,
No. 07-cv-471S, 2012 WL 777421 (W.D.N.Y. Mar. 7, 2012) .....53

*Richard v. Leclaire*,
No. 15-cv-00006, 2017 WL 9511181,
*adopted by* 2017 WL 4349381 (N.D.N.Y. Sept. 29, 2017) .....52

*Rosen v. UBS Fin. Servs. Inc.*,
No. 22-cv-03880 (JLR), 2023 WL 6386919 (S.D.N.Y. Sept. 29, 2023) .....22

*Sankin v. Abeshouse*,
545 F. Supp. 2d 324 (S.D.N.Y. 2008) .....50

*Shakimo O. v. Westchester Cnty.*,
No. 12-cv-9468, 2014 WL 521608 (S.D.N.Y. Feb. 10, 2014) .....52

*The New York Times Co. v. Wayfarer Studios LLC*,
No. 162963/2025, 2026 WL 2256440 (N.Y. Sup. Ct. July 27, 2026) .....33

*Thomas v. G2 FMV, LLC*,
48 N.Y.S.3d 358 (1st Dep't 2017) .....43, 46

*Urdaneta v. Kelleher*,
No. 11-cv-0271, 2013 WL 1308709 (W.D.N.Y. Mar. 28, 2013) .....27

*Williston v. Jack Resnick & Sons, Inc.*,
177 A.D.3d 822 (2d Dep't 2019) .....46

*Zagami et al v. Barbier, et al*,
No. 21-cv-00998 (W.D. Tex.) ........ 8

**Statutes**

N.Y. Civ. Rights L. § 70-a(1) ........ *passim*

**Other Authorities**

CPLR 3211(g) ........ 34

Fed. R. Civ. P. 8 ........ 38

Fed. R. Civ. P. 54(d)(2) ........ 41

Fed. R. Civ. P. 56(a) ........ 22

Fed. R. Civ. P. 56(c)(2) ........ 39

Fed. R. Civ. P. 68 ........ 2, 39

Fed. R. Evid. 408 ........ 2, 39

Sponsor's Mem. in Support of L. 2020, ch. 250, Bill Jacket, L. 2020,
ch. 250 (N.Y. 2020) ........ 30, 36

## INDEX OF FILINGS

- **PCC**: Plaintiffs' Consolidated Rule 56.1 Counterstatement of Additional Material Facts, dated September 14, 2026, submitted concurrently herewith
- **PX __**: Plaintiffs' Exhibits attached to the Declaration of David Kumagai, dated September 14, 2026, submitted concurrently herewith
- **Resp-SAVA**: Plaintiffs' Response to Cassava's Rule 56.1 Statement of Undisputed Facts, dated September 14, 2026, submitted concurrently herewith
- **Resp-BB**: Plaintiffs' Response to the Individual Defendants' Rule 56.1 Statement of Undisputed Facts, dated September 14, 2026, submitted concurrently herewith
- **SAVA-Br.**: Defendant Cassava's Memorandum of Law in Support of Its Motion for Summary Judgment, dated August 3, 2026 (Dkt. 234)
- **BB-Br.**: Individual Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, dated August 3, 2026 (Dkt. 243)
- **JSOF**: Joint Statement of Undisputed Facts, dated August 3, 2026 (Dkt. 239)

Plaintiffs respectfully submit this consolidated memorandum of law in opposition to the motions for summary judgment by defendant Cassava Sciences (*see* Dkt. 233-34, 236-37) and individual defendants Remi Barbier and Lindsay Burns (*see* Dkt. 232, 235, 238, 241-44).

## PRELIMINARY STATEMENT

Overwhelming evidence from discovery confirms Plaintiffs' core allegation: Defendants knew they could never prevail in the Defamation Action, because they knew that the scientific evidence they claimed would disprove Plaintiffs' critiques did not exist. Discovery has also shown that Defendants had abundant notice of problems and misconduct in the research underlying simufilam—meaning they knew full well that Plaintiffs' critiques had a meaningful foundation.

Defendants seek to evade the consequences of their malicious litigation on several theories, all incorrect as a matter of law and contradicted by the evidence:

***Anti-SLAPP Punitive Damages.*** Defendants seek to avoid liability for punitive damages under the anti-SLAPP law by proclaiming that they did have proper purposes in bringing the Defamation Action: to obtain a judicial determination that Plaintiffs' statements were false and to "protect" enrollment in Cassava's phase 3 clinical trials. But Defendants cannot erase the evidence of their bad faith with *post-hoc*, self-serving assertions of their own mental state. As a matter of logic, Defendants' knowledge that they could never win the Defamation Action also means they could not have anticipated any judicial determination that would have supported or protected enrollment in their trials. And, as a matter of fact, Defendants' ostensible purpose of protecting enrollment does not stand up. The phase 3 trials were fully enrolled by the time Cassava filed its Second Amended Complaint. And, of the many trial sites that expressed concern about emerging signs of research misconduct related to simufilam, not one said anything about any statement by any Plaintiff. There is ample evidence to support a reasonable jury

concluding that Defendants did not, as they now contend, sue Plaintiffs to prove them wrong or protect clinical trial enrollment, but rather to silence critics and conceal the truth. (*Infra* § I.)

***Anti-SLAPP Legal Fees.*** Defendants cannot evade liability for Plaintiffs' legal fees incurred pursuing this anti-SLAPP action. The plain language of the anti-SLAPP statute allows victims of SLAPP suits "to recover damages, including costs and attorney's fees." N.Y. Civ. Rights Law § 70-a(1). Every court to consider the issue has awarded anti-SLAPP fees to prevailing anti-SLAPP plaintiffs. Cassava's suggestion that this case should be different because they made an offer of judgment under Rule 68 is nonsensical and indeed improper as a matter of FRE 408 and the plain language of both Rule 68 and their own offer—all of which preclude the use of that offer as evidence. It also makes no sense as a practical matter: Defendants have never conceded that the Defamation Action lacked a substantial basis, meaning they have never admitted any liability whatsoever. To the contrary, they have contested that question vigorously throughout this litigation and apparently intend to do so at trial. Hence, Plaintiffs' fees (including those incurred in responding to Defendants' meritless summary judgment and *Daubert* submissions) are recoverable as anti-SLAPP damages, caused by Defendants' ongoing intransigence and aggressive litigation conduct. (*Infra* § II.)

***Malicious Prosecution, Special Damages.*** Each Plaintiff has adduced evidence of special damages sufficient to sustain the malicious prosecution claim. Dr. Milioris lost a signed three-year employment contract. Dr. Heilbut's incipient consulting business failed, including the loss of a specific identified client who feared being drawn into Cassava's litigation. And, Dr. Brodkin, the primary caregiver for a son with special needs, suffered concrete harm to his family finances and household far exceeding the ordinary burdens of defending a lawsuit. Defendants'

attempts to minimize these injuries turn on disputed facts and credibility determinations reserved for the jury. (*Infra* § III.)

***Malicious Prosecution by Dr. Burns.*** The motion casts Dr. Burns as a bystander to the Defamation Action, and an inconsequential employee ("one of 12 members" of a larger "science team"). In truth, she was the driving force behind the lawsuit's preparation and prosecution, exchanged over 190 emails about the Defamation Action (many with outside litigation counsel and withheld as privileged), and was involved even in the manner in which Cassava served Plaintiffs. On November 23, 2022, Dr. Burns texted a supporter that she "would love to serve" Dr. Heilbut "at his poster" presentation at the Clinical Trials on Alzheimer's Disease conference; on December 2, 2022, Cassava's process server did exactly that. As a major driver of the Defamation Action, including its malicious character, Dr. Burns cannot escape liability now with self-serving assertions and revisionist history. (*Infra* § IV.)

***Conspiracy.*** Nor can Dr. Burns or Barbier escape liability by re-litigating the applicability of the personal-interest exception. The personal interests the Court held sufficient at the pleading stage have been fully substantiated in discovery. Dr. Burns and Barbier were each animated by interests distinct to them: protecting their jobs and reputations and in avoiding liability. The lawsuit's dismissal two weeks after they were forced to resign confirms it. (*Infra* § V.)

For years, Defendants deflected inquiries about their good faith concerning the science underlying simufilam by pointing out that they did not possess any of the underlying data. Indeed, they actively obstructed investigations by government and research institutions by (among other things) emphasizing that no original records existed that could definitively show data manipulation or fabrication. When investigators discovered this was true and gave up in

disgust or issued inconclusive findings, Defendants trumpeted such outcomes as "exonerations." But, in prosecuting the Defamation Action, Defendants turned the tables on themselves: they claimed, stridently and repeatedly, that they could prove Plaintiffs' statements to be false—and claimed they would do so on the basis of the very data they knew full well did not exist. This was a cynical lie, designed not to win the Defamation Action but to impose crushing fear and expense on Plaintiffs to punish them for speaking out and to dissuade others from doing so. And, it supported their broader strategy of blaming all criticism on "short sellers" to dissuade further investigation. Now, they are hoist on their own petard: the absence of original data, and their admitted knowledge of that absence, will show definitively that there was no possible proper basis for the Defamation Action.

In sum, Defendants pursued a lawsuit seeking more than $2 billion from individuals of modest means, knowing all the while they could never prove the falsity on which that lawsuit depended. They now ask this Court to credit their own account of their motives and disregard the evidence to the contrary. That is not the function of summary judgment. The motion should be denied in its entirety.

## STATEMENT OF FACTS

### A. Filana Therapeutics f/k/a Cassava Sciences f/k/a Pain Therapeutics

In 1998, Remi Barbier founded Cassava under the name Pain Therapeutics to develop opioid painkillers. (Resp-BB ¶ 32.) Dr. Lindsay Burns joined the company in 2002, married Barbier in 2005, and became the "scientific lead" of the company's Alzheimer's program. (PCC ¶ 215.) After the FDA rejected the company's approval applications for its opioid formulation "Remoxy" for the fourth time (*id.* ¶ 211), the company rebranded as Cassava and pivoted to Alzheimer's disease (*id.* ¶ 212). From 2019 to 2024, Cassava sponsored clinical trials of an experimental Alzheimer's drug called simufilam. (*Id.* ¶ 216.) After the "unambiguous" failure

of its Alzheimer's program in 2024 (*id.* ¶ 217), the company rebranded again as Filana Therapeutics, and pivoted to developing simufilam as a treatment for epilepsy (*id.* ¶ 218). In December 2025, the FDA placed the company's simufilam program on "full clinical hold." (*Id.* ¶ 432.)

Since its founding in 1998, the company has raised more than $550 million from investors, administered experimental drugs to thousands of patients, and never taken a product to market. (*Id.* ¶¶ 219-221.) Barbier and Burns, who were forced to resign from the company in July 2024, as part of a $40 million settlement with the SEC (*id.* ¶ 222), have themselves collected millions in compensation (*id.* ¶ 223).

**B. <u>Simufilam Preclinical Research</u>**

The simufilam clinical trials were based on a series of ostensible discoveries by Dr. Hoau-Yan Wang at the City University of New York ("CUNY"), in collaboration with Dr. Burns: *first*, they claimed to discover that Alzheimer's patients had altered conformations of a protein called filamin-A (FLNA); *second*, they claimed to discover a molecule, simufilam, capable of binding to filamin-A in its supposed altered conformation; and *third*, they claimed to discover that simufilam restored filamin-A from that altered conformation to its native, healthy shape. (*Id.* ¶ 224; *see also* ¶¶ 213-214.) No other scientist has ever produced evidence of any one of those three propositions—before or since. (*Id.* ¶¶ 314-316.)

**C. <u>Simufilam Phase 2 Results</u>**

In 2019, Cassava conducted a phase 2a open-label study of simufilam—a 28-day trial involving 13 patients administered simufilam twice daily. (*Id.* ¶ 225.) On September 9, 2019, Cassava announced the phase 2a results, stating that simufilam "significantly reduced biomarkers for Alzheimer's disease pathology," and that "[r]esults will need to be replicated in larger studies

to prove it's a definitive advance in the field." (*Id.* ¶ 226.) Dr. Wang conducted all the biomarker assays for this trial. (PX 218 at 769; *see also* PCC ¶¶ 323-331.)

Between September 2019 and March 2020, Cassava conducted a phase 2b clinical study of simufilam, presented as a randomized, double-blind, placebo-controlled trial. The phase 2b trial was a 28-day study, involving 64 patients split into three groups, with one group receiving placebo, one group receiving 50 mg doses of simufilam, and one group receiving 100 mg doses of simufilam. (PCC ¶ 227.) The stated objectives were "to evaluate safety, tolerability and drug effects" on biomarkers, with "[t]he primary endpoint [being] improvement in biomarkers" from baseline to Day 28, and a secondary endpoint of change in cognition. (*Id.* ¶ 227.)

On May 15, 2020, Cassava announced that the study "did not meet its primary endpoint" and the company planned to "re-analyze" the biomarkers from study participants. (*Id.* ¶ 228.) On September 14, 2020, Cassava announced that the "re-analysis" showed the study had met its primary endpoint, reporting statistically significant improvement in all biomarkers in treatment groups as compared with the placebo group. (*Id.* ¶ 229.) Cassava also announced positive cognitive data, stating that patients treated with simufilam showed directional improvements in memory tests, versus patients on placebo. (*Id.* ¶ 230.)

In the months following Cassava's announcement of its phase 2b "results," Cassava raised approximately $260 million from investors to fund Phase 3 trials. (*Id.* ¶ 231.)

**D. <u>Public Scrutiny</u>**

Beginning in 2021, scientists began raising public questions about the integrity of Cassava's scientific research. (*Id.* ¶¶ 232-236; *see also* ¶¶ 208-210.)

In August 2021, Dr. David Bredt, former neuroscience research chief of Johnson & Johnson and Eli Lilly, and Dr. Geoffrey Pitt, a neuroscientist and cardiologist at Weill Cornell Medicine, submitted a 40-page Citizen Petition to the FDA, describing three primary concerns

about Cassava's research data. (*Id.* ¶ 233.) *First*, they described Western blot analyses in papers by Dr. Wang and Dr. Burns that contain "anomalies [] suggestive of systematic data manipulation" (*id.*); *second*, they explained that the company's claims about simufilam's effects were based on preclinical data that exhibited "hallmarks of manipulation" (*id.*); and *third*, they raised questions about the circumstances of the phase 2b biomarker data presented after the "reanalysis" in September 2020 (*id.*).

On November 2, 2021, Plaintiffs published a 23-page letter to the FDA and an accompanying slide deck, describing four main areas of concern about Cassava's simufilam program. (*Id.* ¶ 234.) *First*, Plaintiffs explained that simufilam's proposed mechanism of action was "irrational and not supported by accepted evidence," noting no other lab had replicated the foundational claims about simufilam binding to, and restoring, altered conformations of filamin-A (*id.*); *second*, Plaintiffs raised concerns about anomalous biomarker values reported by Cassava from Dr. Wang's ELISA tests in the phase 2a and phase 2b studies (*id.*); *third*, Plaintiffs raised questions about suspicious circumstances surrounding the "re-analysis" of the phase 2b biomarker data (*id.*); and *fourth*, Plaintiffs described apparent manipulations of the phase 2b cognitive data that departed from the pre-approved protocol—including the unexplained *post-hoc* elimination of 40% of subjects (*id.*). Plaintiffs prominently disclosed that they held "stock and options positions that may benefit from a decline in Cassava Sciences' stock price." (*Id.* ¶ 235.)

Over the following weeks and months, Plaintiffs posted additional slide decks, describing further signs of data manipulation or fabrication in the company's research. (*Id.* ¶ 236.)

**E. <u>Investor Lawsuits, Government Investigations, Retractions, and Media Scrutiny</u>**

Beginning in August 2021, several investors filed securities fraud class actions against Cassava, Barbier, and others related to the development of simufilam. *See In Re Cassava*

*Sciences, Inc. Securities Litigation*, No. 21-cv-00751 (W.D. Tex.). Shareholder derivative actions followed. *See Zagami et al v. Barbier, et al*, No. 21-cv-00998 (W.D. Tex.).

On August 25, 2021, [redacted] (PCC ¶ 237.) In November 2021, Cassava disclosed that "certain government agencies" had sought "corporate information and documents." (*Id.* ¶ 238.) Later that month, the Wall Street Journal reported that the SEC was investigating allegations that Cassava had "manipulated research results of its experimental Alzheimer's drug," and Barbier confirmed that the NIH and CUNY had also initiated inquiries. (*Id.* ¶ 239.) In July 2022, Reuters reported that Cassava was under criminal investigation by the DOJ relating to whether Cassava "manipulated research results" for simufilam. (*Id.* ¶ 240.)

Scientific journals launched research integrity investigations into Dr. Wang's and Dr. Burns's publications. In the first half of 2022, three scientific journals retracted seven research papers co-authored by Dr. Wang or Dr. Burns (*id.* ¶ 242); and four other scientific journals issued expressions of concern or corrections concerning six research papers co-authored by Dr. Wang or Dr. Burns (*id.*). Most notably, in March 2022, the journal *PLOS One* retracted five articles by Dr. Wang, including two co-authored by Dr. Burns. (*Id.* ¶ 241.)

On April 19, 2022, The New York Times published an article titled "Scientists Question Data Behind an Alzheimer's Drug," reporting: "The Times contacted nine prominent experts for comment about the scientific underpinnings of Cassava's trials. All said they did not trust the company's methods, results or even the premise underlying the drug's supposed effectiveness." (*Id.* ¶ 370.)

**F. <u>FDA Audit and Direction to Remove Phase 2b Data</u>**

On September 16, 2022, the FDA audited Dr. Wang's lab at CUNY. (*Id.* ¶¶ 260-264.) The FDA found that the experiments used in the phase 2b study "were not validated/verified" and that

there were "inadequate source records to reconstruct the study." According to the FDA, the lab lacked sample storage documentation, records of experimental procedures, source records for Western-blot analyses, and audit trails for the plate reader software. (*Id.* ¶ 261.)

On November 1, 2022, one day before the Defamation Action, the FDA directed Cassava to remove the phase 2b biomarker data from its Investigator's Brochure because the data "could not be verified." (*Id.* ¶¶ 265-268.) The FDA further explained that the "retention" of the unverified phase 2b data would be "misleading." (*Id.* ¶ 266.)

### G. Cassava Audit

On September 21-22, 2022, Cassava conducted its own on-site audit of Dr. Wang's lab. (*Id.* ¶¶ 271-283.) The audit concluded that the lab "lack[ed] standard operating procedures, proper good documentation practices, and laboratory practices (*i.e.*, equipment calibration and sample management) that are deemed critical for conducting any type of analysis to support a clinical trial"; and that the lab was "unacceptable" and "not qualified to provide biomarker analysis and research services." (*Id.* ¶ 272.)

Cassava's auditors identified five "Critical" deficiencies—defined in their Audit Report as deficiencies compromising safety or research integrity (*see id.* ¶ 277)—including: (1) "no formal SOPs"; (2) "lack of experiment logbooks or notebooks for all study and research work"; (3) "lack of study record organization"; (4) "unqualified sample storage equipment"; and (5) "essential equipment that had not been calibrated in several years." (*Id.* ¶ 276.)

As Cassava auditor Laura Rodriguez testified: "There were no logbooks to indicate what was being performed, how [Dr. Wang] did … the experiments that he worked on"; "it was true for everything Dr. Wang did at that lab . . . . All research. He didn't have a logbook." (*Id.* ¶ 280.) Rodriguez further testified that Dr. Wang had discarded all original films from "[a]ll Western blot experiments, whether it was ours or anybody else's, all were gone." (*Id.* ¶ 281.)

### H. Defamation Action

On November 2, 2022, Cassava filed the Defamation Action, naming Plaintiffs, the authors of the Citizen Petition, and another prominent critic of the company. (JSOF ¶ 6.) Cassava blamed Plaintiffs and the other defendants for a "$2 billion" decline in the company's market value (PCC ¶¶ 396, 522-527) and, in an accompanying press release, described Plaintiffs as "shameful" people, who "placed personal enrichment over science, over the health of patients, and over the truth" without "any real or valid concerns with Cassava, its foundational science, or its tests." (*Id.* ¶ 396.) Cassava challenged more than 1,000 allegedly "false and defamatory" statements and asserted that "[t]he underlying research and backup for the underlying research demonstrate that the research relied upon by Cassava in connection with developing simufilam was not fabricated, manipulated, or doctored." (*Id.* ¶¶ 243, 249; *see also* ¶¶ 244-245, 247-248.)

Since that time, Cassava has abandoned many of the research and scientific claims the company called Plaintiffs "shameful" for questioning, including Dr. Wang's and Dr. Burns's preclinical research (*id.* ¶ 251), the results from the phase 2b study (*id.*), and the foundational claim that simufilam binds to filamin A (*id.*). Cassava has admitted that it could "not determine, and may never be able to determine with any reasonable degree of certainty," whether Dr. Wang engaged in research misconduct. (*Id.* ¶ 250.) And the new CEO, Rick Barry, has admitted that the company "didn't have [] the evidence" to disprove the SEC's allegations. (*Id.* ¶ 222.)

### I. Defendants Lacked Research Records and Data

Prior to filing suit, Defendants recognized that original data would be needed to answer questions that had been raised about the propriety of research underlying simufilam—and that the company did not have it. For example, on September 3, 2021, Barbier told investors: "One way to settle the discourse around Western blots might be to go back to the original films and images. . . . we don't have the original films or images for the Western blots in question." (*Id.* ¶

254.) On November 16, 2021, Dr. Burns wrote: "without the original images, you can't prove anything." (*Id.* ¶ 255.)

Defendants never obtained the data or records they knew would have been needed to address the issues—even though Cassava sponsored and owned all simufilam research data and always had the contractual right to access it from Dr. Wang at CUNY. (*Id.* ¶¶ 252-253.) [redacted] (*Id.* ¶ 256.) As Barbier explained: "I had no reason to believe there was original data because we don't have a lab in-house." *(Id.* ¶ 257; *see also* ¶ 258 (Barbier never asked whether Cassava possessed raw data); ¶ 259 (Cassava's corporate representative was fairly certain the company had no original data).)

Despite pointing to Dr. Wang as the source of their data (*id.* ¶¶ 254, 256), Defendants have known since at least September 2022 that he had none (*id.* ¶¶ 262-264, 282-283). Defendants knew about the FDA's audit findings in September 2022, and Cassava's audit findings that same month (*id.*). And, the CUNY Investigation Committee's findings, disclosed in October 2023, reaffirmed that "the lab did not employ notebooks" and lacked original data. (*Id.* ¶ 288, ¶ 292 ("Dr. Wang has been unable to provide original data or records even for his most recent publications."); *see also* ¶¶ 305 ("Dr. Wang consistently reported that he did not maintain original research data in hard copy files, electronic images, or lab notebooks"), ¶ 306 (Dr. Wang's "lack of preservation of research records represents a significant departure from accepted practices of the scientific community.")

For his part, Dr. Wang has offered inconsistent explanations for why original data and records were unavailable. In August 2021, he texted Dr. Burns: "I tried to find the original files .

. . but I can't. These were all in a hard drive that was fried." (*Id.* ¶ 311.) Dr. Wang later testified that the FBI had seized thumb drives with experimental data. (*Id.* ¶ 312.) According to the CUNY Investigation Committee, Dr. Wang claimed he threw away research records during a COVID-related lab cleanup CUNY had directed him to conduct, but CUNY officials could not confirm this and no other faculty members reported being asked to discard research materials. (*Id.* ¶ 307.) Cassava's own audit report noted that the ELISA computer being used was "not the original computer as the previous one had been stolen." (*Id.* ¶ 308.) According to the FDA, Dr. Wang told them in September 2022 that the DOJ had taken the original USB drives containing his ELISA data. (*Id.* ¶ 309.) Yet, according to Cassava auditor Laura Rodriguez's February 2026 affidavit, in September 2022, Dr. Wang gave her "a removable flash drive" containing some ELISA data "that he stated he kept locked in his desk." (*Id.* ¶ 310.)

## J. <u>Defendants Knew Plaintiffs and Other Critics Had Raised Valid Concerns</u>

### i. Red Flags About Preclinical Research

Defendants have always known that no independent laboratory has confirmed or verified Dr. Wang's claims that an altered conformation of filamin-A exists in Alzheimer's patients, that simufilam binds to filamin-A, or that simufilam restores supposedly misfolded filamin-A to its supposed original shape. (*Id.* ¶¶ 313-316.)

Defendants have also known about other laboratories that tried and failed to replicate Dr. Wang's core findings. (*Id.* ¶ 319.) And they have long known their science was viewed, at best, skeptically within the industry; multiple pharmaceutical companies Cassava tried to partner with on simufilam declined due to express disbelief in the company's unverified data and scientific claims. (*Id.* ¶ 320; *see also* ¶¶ 369-371.)

As Rick Barry admitted to the Board in July 2024: "we seemed to have an unfortunate habit of running one test and accepting it as gospel." (*Id.* ¶ 318.) He expressed alarm that the

company had never "validate[d] our basic science" by running "tests [] to prove our assertion about the method of action," called it a "critical matter that needed attention," and noted "the crazy part of it is these tests are not expensive - approximately $300k for the whole package." (*Id.* ¶ 318; *see also* ¶ 317 ("Most companies are suspicious of academic data that is just from one lab.").)

Defendants have repeatedly—and falsely—pointed to ostensibly "corroborating" studies as evidence of their good faith. The 2020 Yale study they invoke "had nothing to do with Alzheimer's disease," nor did it even purport to confirm the existence of altered filamin-A, or simufilam binding to filamin-A. (*Id.* ¶ 495.) Dr. Burns was a co-author who edited the manuscript to add language about simufilam's mechanism of action (*id.* ¶ 496), and the study's lead author, Dr. Bordey, was a Cassava investor at the time (*id.* ¶ 497) and ultimately became Dr. Burns's successor at the company (*id.* ¶ 497; *see also* Resp-SAVA ¶ 52.) The handful of other studies Defendants have claimed as "independent" and "corroborating" cannot reasonably be viewed as either; they post-date the Defamation Action (Quebec studies, Sichuan study, Milan study), did not even use simufilam (Nagoya study, Quebec studies), studied other diseases (Sichuan study), were co-authored by Dr. Burns or Dr. Wang (Cochin study, Milan study), funded by Cassava (Milan study), unpublished (Milan study), or are themselves proven unreliable (Cochin study). (PCC ¶¶ 498-500; *see also* Resp-BB ¶ 182.)

**ii. Red Flags About Phase 2a**

In May 2019, Dr. Burns identified "strange" discrepancies in Dr. Wang's phase 2a biomarker data. (PCC ¶ 323.) Around the same time, Barbier wrote to the Board: "One of the key themes we're hearing is that 'no one will believe us.'" (*Id.* ¶ 324.) Dr. Burns described the data as "so striking" that Cassava would need to "replicat[e] them in a second lab." (*Id.* ¶ 325.) She described the results as "frankly unbelievable" and noted that Dr. Wang's "wildly significant

p values for such a small study" were "raising eyebrows." (*Id.* ¶¶ 326-329.) Dr. Paul Aisen, a former paid consultant for Cassava and editor-in-chief of the journal that published the phase 2a results, told Dr. Burns that he "flat-out did not believe the p values were possible." (*Id.* ¶ 327.) Dr. Barbara Sahakian and other members of Cassava's scientific advisory board urged Cassava to have an independent scientist validate Dr. Wang's findings. (*Id.* ¶ 328.) In the end, however, [redacted] (*Id.* ¶ 330.)

**iii. Red Flags About Phase 2b**

The phase 2b biomarker data was never reliable. (*Id.* ¶¶ 339-367.) On May 14, 2020, Dr. Burns sent Dr. Wang information sufficient to unblind himself to roughly a third of the patients in the Phase 2b study. (*Id.* ¶ 347.)[1] Dr. Burns subsequently deleted all emails in her "sent" folder prior to June 2020. (*Id.* ¶ 349.) For every biomarker tested by Dr. Wang, [redacted] (*Id.* ¶ 353.)

Nor was the phase 2b cognitive data ever sound. Dr. Burns, unblinded, received cognitive data showing no improvements; Dr. Burns then excluded 40% of the patient population from the results by creating and applying exclusion criteria in violation of the Statistical Analysis Plan. (*Id.* ¶¶ 356-358.)

Plaintiffs raised these concerns in their FDA letter. (*Id.* ¶ 234.) Cassava called these claims defamatory—but eventually disclaimed the phase 2b results in 2025, telling investors "you should not rely on the CUNY Bioanalysis of CSF biomarkers reported by the Company in connection with the Phase 2b Study or the Cognition Disclosures from the Phase 2b Study." (*Id.* ¶ 367; *see also* ¶¶ 359-360.) Even at the time, members of Cassava's scientific advisory board

[1] Dr. Burns knew from prior experience that sending Dr. Wang information with "min and max" values for each group would break the blind. (PCC ¶ 348.)

expressed alarm to Defendants about the integrity of the phase 2b data. (*Id.* ¶¶ 361-362; *see also* ¶ 321.) For example, Dr. Steven Arnold told Dr. Burns: "[Dr. Wang's] data are always surprising" and "I don't know how he does it." (*Id.* ¶ 361.) And Dr. Arnold expressed "discomfort" about Dr. Wang's "magic hands" and told Dr. Burns that "others would like additional data from somewhere else." (*Id.* ¶ 362.) Reacting to requests from Dr. Arnold and others for third-party confirmation of Dr. Wang's phase 2b data, Dr. Burns wrote: "Hoau thinks we'll get confusing data and Remi tends to agree, but I'd like to pick something that wouldn't undermine our CSF data either way." (*Id.* ¶ 363; *see also* ¶ 318 ("Remi was worried about the optics of such a result.")

On October 27, 2020, the FDA rejected Cassava's request for "Breakthrough Therapy" designation, in a letter describing the company's characterizations of its phase 2a and 2b studies as "untenable" and its inference that the drug would treat Alzheimer's as "highly speculative." (*Id.* ¶ 368.)

Similarly, multiple scientific journals rejected Dr. Burns's efforts to publish a manuscript on the phase 2b results, with peer reviewers conveying that the data was "hard to believe"; "too good to be true"; and the claimed behavior of biomarkers "a result I have never seen in any setting in 30 years of running clinical trials." (*Id.* ¶¶ 365-366.)

**iv. Willful Avoidance**

Within "minutes" of receiving the Citizen Petition, Barbier dismissed it as "complete non-sense." (*Id.* ¶ 381.)[2] Within days, the company consulted with a PR firm about a defamation suit. (*Id.* ¶ 382.) Dr. Wang testified that nobody at Cassava ever asked him any

[2] Renowned scientist Dr. Hans Wigzell had the opposite reaction to the Citizen Petition, writing to Rick Barry that the simufilam research data appeared to be "faked" or "falsified" and that Barry should resign from the Board. (PCC ¶ 369.)

questions about the integrity of his data or asked him if he had ever fabricated or manipulated data. (*Id.* ¶ 374.)

Most glaringly, Cassava claims to have never obtained or examined the original plate reader data files from Dr. Wang. (*Id.* ¶ 375.) Despite being Dr. Wang's primary contact and collaborator (*id.* ¶ 441 ("I only communicated with [] Lindsay"), Dr. Burns testified that she never checked whether data in any Excel file provided by Dr. Wang matched the raw outputs from his machine because it was "not my job" (*id.* ¶ 376). Yet, Dr. Burns did exactly that in other instances where other labs reported data inconsistent with Dr. Wang's. (*Id.* ¶¶ 377-378.)

At minimum, Cassava and Dr. Burns willfully avoided examining the raw plate reader data. An expert comparison of (i) the raw data, collected by CUNY in 2021 directly from the plate-reader machine in Dr. Wang's lab, with (ii) the data presented by Dr. Wang and Cassava, shows highly suspicious patterns—including changes to the most significant digit in the absence of changes to less-significant digits, and same-direction movement within triplicate groups. (*Id.* ¶ 379 (Sanders Expert Report § III.A).) As Plaintiffs' expert, Dr. David Sanders, will testify, "it appears Dr. Wang repeatedly fabricated data from ELISA experiments conducted for Cassava." (*Id.*)

**K. <u>Actual Motives</u>**

**i. Silence Critics and Evade Liability**

The Defamation Action was the centerpiece of Defendants' "offensive strategy" to silence critics and distract investigators. (*Id.* ¶¶ 395-421.)

Cassava publicized the Defamation Action with a press release stating: "We are still investigating whether additional individuals or entities should be brought into this case or have separate claims brought against them." (*Id.* ¶ 396.) Barbier and Dr. Burns disseminated the Defamation Action to investigators, news outlets, and the NIH. (*Id.* ¶¶ 397-403.) Between May

2022 and January 2023, Cassava's defamation counsel at Benesch sent at least seven letters or emails threatening defamation claims—to The New York Times (¶ 406), Science (¶ 407), Reuters (¶ 408), Mother Jones (¶ 409), Nature (¶ 410), and STAT News (¶ 411)—each dismissing criticism of the company as financially motivated, and in several cases referring specifically to the Defamation Action.

In March 2023, Cassava privately threatened CUNY with ruinous indemnification claims if it should find that Dr. Wang engaged in research misconduct, writing that such a finding "would, under the relevant contracts, require CUNY to 'indemnify and hold [Cassava] harmless from any and all liability, loss, or damage.'" (*Id.* ¶ 405.)

Defendants' campaign was, for a time, successful. A forensic image analyst hired by the CUNY Investigation Committee resigned due to "legal threats." (*Id.* ¶ 294.) After *Science* published the CUNY Investigation Committee's Final Report, Cassava immediately demanded that CUNY "reject the flawed findings" (*id.* ¶ 296), which included that "Dr. Wang's failure to store original data and maintain research records is reckless and clearly not in keeping with the standard practices in the field" and that Dr. Burns, as a co-author, "bears some measure of responsibility" (*id.* ¶¶ 292-293; *see also* ¶¶ 287-291, 295). CUNY promptly announced it would "stay the underlying inquiry" and complete "a comprehensive investigation of the process," and then-director Barry responded to the news by congratulating Cassava's Chief Legal Officer: "Awesome! Well done Chris Cook!" (*Id.* ¶¶ 297-298.)

After the investigation of the investigation concluded, the University announced Dr. Wang's resignation, adopted all of the Committee's factual findings, and determined the Committee had applied an overly heightened evidentiary standard in refraining from ultimately concluding that Dr. Wang engaged in research misconduct. (*Id.* ¶¶ 299-306.) Nevertheless, the

University elected not to revisit the ultimate conclusion under the lower standard. (*Id.* ¶ 303.) In the end, Defendants' indemnification threat worked (*id.* ¶ 405)—turning investigatory findings of "long-standing and egregious misconduct in data management and record keeping," "highly suggestive of longstanding and deliberate scientific misconduct" (*id.* ¶ 287, 295)—into a final (fear-based) conclusion by the University that "research misconduct did not occur." (*Id.* ¶ 303.)

Likewise, Defendants sought to prevent scientific journals from investigating research integrity concerns by claiming the issues arose solely from "financially motivated" short sellers, enlisted Dr. Charles Spruck to defend the research, and held Dr. Spruck out as "independent" and "unaffiliated"—notwithstanding their knowledge that he was a longtime Cassava investor. (*Id.* ¶¶ 333-338, 418.)

Defendants also coordinated with an "army of supporters" to amplify the company's talking points and attack Plaintiffs and other critics. (*Id.* ¶ 416 ("we have an army of supporters who have filed 1) counter petitions to the FDA to ask them to accelerate approval of our drug, 2) a complaint to the medical licensure of NY about Dr. Pitt, 3) a petition to the DOJ, 4) at least 37 petitions to the SEC, and most recently, 5) an open letter to the New Yorker about a recent hit piece."); *see also* ¶¶ 412-421.) After *PLOS One* retracted five of Dr. Wang's and Dr. Burns's articles—Dr. Burns deployed the SAVA Army to contest the journal's findings. (*Id.* ¶¶ 418-419.)

**ii. Humiliate and Punish Plaintiffs**

The Defamation Action also expressed Defendants' extreme ill-will toward Plaintiffs and other critics. Dr. Burns described Plaintiffs as "pathetic immoral bastard fuckheads" (*id.* ¶ 384), referred to Dr. Heilbut as "Hellbut" and "asshat" (*id.* ¶ 385), called Dr. Brodkin "Buttskin" (*id.* ¶ 386), and was "infuriated" at not filing the lawsuit sooner (*id.* ¶ 394). Rick Barry referred to Plaintiffs as "jihadists" (*id.* ¶ 390), testified that he and then board member Sanford Robertson

were "furious" at Plaintiffs (*id.* ¶¶ 391-392), and admitted that Cassava selected the law firm Benesch because the firm shared this "outrage" (*id.* ¶ 393).

This animosity was manifest throughout the litigation. For example, on November 23, 2022, Dr. Burns texted a supporter that she "would love to serve" Dr. Heilbut "at his poster" presentation at the CTAD conference (*id.* ¶ 474); on December 2, 2022, Cassava's process server did exactly that (*id.* ¶ 475).

**iii. Self-Preservation**

Public scrutiny—including SEC and DOJ investigations—posed particular risks to Barbier and Burns, in view of Barbier's role as CEO and Dr. Burns's role as the leader of the simufilam program, Dr. Wang's main contact, and the person responsible both for excluding 40% of patients from the phase 2b cognitive data, and sending Dr. Wang unblinding information. (*Id.* ¶¶ 347, 357, 442, 444.) According to Dr. Burns, she believed her "entire academic research career" was at stake when "Wall St investors and their collaborators started to relentlessly attack my reputation and scientific integrity." (*Id.* ¶ 446.) She described the scrutiny as "traumatic" for both her and Barbier. (*Id.* ¶¶ 447-448.)

Dr. Burns closely monitored online criticism by Plaintiffs and other critics. (*Id.* ¶ 445.) Through the "SAVA Army" or "Discord Detectives," Dr. Burns gathered personal information about critics (*id.* ¶ 417 ("The Discord Detectives came up with some interesting details . . . We now know that Brodkin is working for Summit Point Capital"))—and collected online statements "for legal." (*Id.* ¶¶ 412-421.) She fed members of the SAVA Army information and encouraged them to advance the company's offensive strategy. (*Id.* ¶¶ 413-419.) She was in particularly close contact with investor Anthony Daher (*see id.* ¶¶ 419-421), one of the company's most aggressive allies, who parroted Dr. Burns's language and attacks on critics. (*Id.* ¶ 420 (Daher encouraged SAVA Army members to attack prominent research integrity expert Dr. Elizabeth

Bik: "Please retweet share and comment fuck that bitch. She attacks one of us we will give her hell."); ¶ 379 (Dr. Burns described Dr. Bik as a "bitch monkey"; "despicable Biktch"; and wrote that she wanted to "kickbox this woman in the face").)

Prior to the lawsuit, Dr. Burns threatened Plaintiffs online (*id.* ¶ 450 ("Sorry shorties. Sorry Adrian Heilbut. Sorry Jesse Brodkin. . . . Your days are numbered.")) and grew increasingly agitated about filing suit (*id.* ¶ 452). Barbier echoed Dr. Burns's impatience after a "maddening" story in The New York Times, writing that "a few of us have had it"; it was time to launch an "offensive strategy" to "hit back, hit hard." (*Id.* ¶ 395.)

After the company retained Benesch, Dr. Burns became a key source of information for the defamation pleading, including Plaintiffs' statements. (*Id.* ¶¶ 453-473.) Cassava's privilege log shows more than 190 emails involving Dr. Burns that Cassava described as related to the "Defamation Action" and withheld as privileged. (*Id.* ¶¶ 453-454.) And the handful of exchanges between Dr. Burns and Benesch that were not withheld confirm that she was integral to the prosecution and its maliciousness. (*Id.* ¶¶ 456-477.) Once the suit was filed, Dr. Burns disseminated it to her contacts. (*Id.* ¶ 402 ("FYI, we filed a defamation lawsuit against the A-holes (short and distort perpetrators) in early Nov. Things should be turning around soon."); ¶¶ 397-403.) She even sought to edit Wikipedia pages to mention the case (*id.* ¶ 404).

**iv. Self-Enrichment**

On August 26, 2020, in the midst of the company's "reanalysis" of the phase 2b study, Cassava's Board approved a Cash Incentive Bonus Plan tied to the company's stock price, not the success of its clinical trials or approval of simufilam. (*Id.* ¶¶ 483-485.) Participants became eligible for bonuses upon the company's market capitalization reaching certain valuation "milestones." (*Id.* ¶ 484.) Under the original Plan, Barbier was entitled to one third of the aggregate bonus pool for each milestone. (*Id.* ¶ 486.) Dr. Burns and Dr. Wang were also

participants. (*Id.* ¶ 488 (text from Burns to Wang: "there is a bonus plan and you are on it - obviously."))

Actual payment of bonuses was deferred until (1) the company completed a merger, or (2) the compensation committee determined the company had sufficient cash to meet projected needs for the subsequent 24 months. (*Id.* ¶ 489.) Between 2020 and 2021, the company achieved additional milestones making Barbier's entitlement more than $78 million. (*Id.* ¶¶ 490-491.) Had the Plan not been amended in connection with derivative action settlements in 2023 and 2025, Barbier would have collected those funds if the company was sold or the compensation committee determined it had sufficient cash to release the funds. (*Id.* ¶¶ 492-494.)

The atypical nature of the original Plan—with eligibility tied to stock price rather than drug approval—gave Barbier and Burns added incentive to silence public criticism and boost the company's stock price. (*Id.* ¶¶ 483-494.)

### L. <u>Trial Enrollment</u>

There is no evidence of any trial site or patient mentioning Plaintiffs or Plaintiffs' statements as a reason for declining to participate in the simufilam clinical trials. (*Id.* ¶¶ 422-423.) Indeed, Cassava's corporate representative admitted the company never had evidence connecting Plaintiffs to any decision by any patient or trial site to drop out of (or decline to participate in) the phase 3 trials. (*Id.* ¶ 427.) Rather, contemporaneous evidence shows sites withdrew because of a New York Times article and Cassava's "unacceptable" response (*id.* ¶ 424 ("The Times article raised significant and comprehensive concerns . . . we found your use of our site's participation in the trial in an attempt to counter Dr. Nicoll's legitimate concerns to be completely unacceptable"); the retractions of Dr. Wang's and Dr. Burns's research by *PLOS One* (*id.* ¶ 425 ("More sites concerned about PLOS that we have to address.")); and government investigations (*id.* ¶ 428; *see also* ¶ 426). Nor is there evidence that Defendants were genuinely

concerned about the pace of recruitment at the time. By contrast, in August 2022—three months before filing suit—Dr. Spruck reported that Dr. Burns said trial enrollment was "well ahead of schedule." (PCC ¶ 428 ("Talked to Lindsay and Tony . . . They were very happy with the pace of recruitment. . .").)

On November 6, 2023, Cassava announced that its phase 3 trials were fully enrolled. (*Id.* ¶ 429.) Nearly five months later, on April 29, 2024, Cassava filed a second amended complaint (*id.* ¶ 246). And Cassava did not abandon suit until August 2, 2024, two weeks after the SEC settlement forced Barbier and Burns to resign. (*Id.* ¶¶ 478-482.)

## ARGUMENT

A summary judgment movant must show there is "no genuine dispute as to any material fact" such that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Rosen v. UBS Fin. Servs. Inc.*, No. 22-cv-03880 (JLR), 2023 WL 6386919, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

To defeat a motion for summary judgment, the nonmovant need only advance more than "a scintilla of evidence," *Liberty Lobby*, 477 U.S. at 252—and demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Courts must construe the evidence "in the light most favorable" to the nonmovant, "drawing all reasonable inferences and resolving all ambiguities in [its] favor." *Jaffir v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). "[C]redibility assessments, choices between

conflicting versions of the events, and the weighing of evidence are matters for the jury not [] for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).

## I. GENUINE DISPUTES ABOUT DEFENDANTS' STATE OF MIND PRECLUDE SUMMARY JUDGMENT ON ANTI-SLAPP PUNITIVE DAMAGES

To recover punitive damages under the anti-SLAPP statute, Plaintiffs must first establish liability under Section 70-a(1) by demonstrating that the Defamation Action lacked a "substantial basis in fact and law"; and then make "an additional demonstration that the action [] was commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." N.Y. Civ. Rights Law § 70-a(1)(c). Defendants' assertion that "undisputed evidence" precludes a reasonable jury from finding that their sole purpose was improper under Section 70-a(1)(c) (SAVA-Br. at 19-23) ignores the summary judgment standard by asking the court to credit their own testimony and ignore all evidence to the contrary. This is wrong. *See Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) ("[s]ummary judgment is sparingly used where intent and state of mind are at issue"); *Johnson v. Ganim*, 342 F.3d 105, 115 (2d Cir. 2003) (vacating summary judgment due to contested facts on defendant's "motivation or intent").

### A. Defendants Rely on Disputed Evidence and Ignore Countervailing Evidence

According to Defendants, "evidence shows that Cassava had 'many logical and highly plausible reasons' to pursue the Defamation Action—'including, most obviously, obtaining a judicial ruling regarding the falseness of the challenged statements.'" (SAVA-Br. at 20.) Defendants further describe their purpose as "to discredit defamatory statements that were impeding enrollment in its Phase 3 clinical trials." (*Id.*.) Neither is credible.

#### i. Defendants' Stated Purpose of Proving Falsity Is Not Credible

Both publicly and in their pleadings, Defendants recognized the need for original data and primary research records to refute the allegations of research misconduct by Plaintiffs and other critics. (PCC ¶¶ 249, 254-255.) And, Defendants always have known that they did not have the data or records they needed to prove falsity. (*Id.* ¶¶ 256-257.) Despite gesturing to Dr. Wang, Defendants knew before filing suit that his records and data were either non-existent or unverifiable. Indeed, during just the six-week period before Defendants sued, the FDA told Defendants that Dr. Wang lacked "source records" or documentation to "reconstruct" the phase 2b study, the FDA directed Defendants to remove Dr. Wang's data from their investigator's brochure because it "could not be verified," and Cassava's own auditors disqualified Dr. Wang's lab and found that Dr. Wang had "no logbooks" for any research "to indicate what was being performed," nor any original films from his Western blot experiments. (*Id.* ¶¶ 261, 265, 272, 280-281.)

Dr. Wang's lack of records or data was confirmed during the Defamation Action by the CUNY Investigation Committee in October 2023 (*id.* ¶¶ 284-296) and more recently by CUNY's report to ORI in May 2025 (*id.* ¶ 305), by Cassava's own admission that it could "not determine, and may never be able to determine" whether Dr. Wang engaged in research misconduct (*id.* ¶ 250), and by Barry's assertion that the company paid $40 million to the SEC in 2024 because it "didn't have [] the evidence" to refute their allegations (*id.* ¶ 222).

In addition to knowing that they could never prove Plaintiffs wrong, Defendants also knew Plaintiffs' statements raised legitimate concerns about the integrity of their research. Defendants knew they had "an unfortunate habit of running one test and accepting it as gospel," knew they had never "validate[d]" their "basic science" (*id.* ¶ 318), knew other labs had tried and failed to replicate Dr. Wang's experiments (*id.* ¶ 319), knew that more established companies

were deeply skeptical of their scientific claims (*id.* ¶ 320), and knew that leading experts "did not trust the company's methods, results or even the premise underlying the drug's supposed effectiveness" (*id.* ¶ 370).

Nor is it credible for Defendants to rely on their own unreliable clinical data as evidence of their good-faith in the Defamation Action. Defendants received contemporaneous warnings from their own scientific advisory board that the Phase 2a results were not credible. (*Id.* ¶¶ 323-329.) Even Dr. Burns identified "strange" discrepancies in the "frankly unbelievable" and "wildly significant" data, while others "flat-out did not believe" the data was possible. (*Id.*) Although everyone, at the time, seemed to agree that independent validation was essential—[redacted] (*Id.* ¶¶ 323-330.)

The Phase 2b study was also riddled with red flags from the outset. While it took the company four years to finally disclaim the phase 2b results, in March 2025 (*id.* ¶ 367), the facts underlying that overdue disclosure were not new. After all, Dr. Burns was the one who, in May 2020, sent Dr. Wang information to break the blind (and then apparently deleted that email), and it was Dr. Burns who, after she was unblinded, removed 40% of patients from the cognitive dataset to present the "results" as showing "directional improvements" (*id.* ¶¶ 347-358) in a maneuver the FDA criticized as early as 2020 (*id.* ¶ 368). And again, Cassava's own advisory board members were expressing real-time concerns to Cassava: "Hoau's data are always surprising . . . I don't know how he does it." (*Id.* ¶ 361.)

By the time Plaintiffs and other critics began publicly raising alarms, Defendants were practiced in the art of evasion. Barbier dismissed the 40-page Citizen Petition as "complete nonsense" mere minutes after receiving it (and thus obviously without reading it), and from the beginning, Defendants treated it as a PR problem to silence, not a scientific one to investigate.

(*Id.* ¶ 381.) Remarkably, Dr. Wang testified that nobody at Cassava ever questioned him about the integrity of his data. (*Id.* ¶ 374.) A glaring oversight—considering that the plate-reader files CUNY preserved have now shown that Dr. Wang "appears to have repeatedly fabricated data from ELISA experiments conducted for Cassava." (*Id.* ¶ 379.) And, despite rigorously inspecting analogous raw output files from similar machines from other labs that provided data Cassava (and particularly Dr. Burns) did not like (*e.g.*, Lund)—Defendants claim they never obtained let alone examined the original plate-reader files from Dr. Wang in their 20-year collaboration. (*Id.* ¶¶ 375, 377-378.) Despite being the program "leader," Dr. Burns insisted it was not her job. (*Id.* ¶ 376.)

The Defamation Action was the centerpiece of a broader strategy to silence critics and evade liability. (*Id.* ¶¶ 396-421.) Defendants publicized the lawsuit with a direct threat to other critics and would-be critics. (*Id.* ¶ 396.) During the same period, Cassava threatened at least seven media outlets with defamation claims (*id.* ¶¶ 406-411), privately threatened CUNY with dire indemnification claims if it found Dr. Wang had engaged in research misconduct (*id.* ¶ 405)—pressure that caused a forensic image analyst to resign because of "legal threats" (*id.* ¶ 294) and the University to contort its conclusions (*id.* ¶¶ 299-306). Defendants enlisted an "army of supporters" to file counter-petitions and attack critics (*id.* ¶¶ 412-421). And, despite pushing the narrative that all criticism should be dismissed as financially motivated, Defendants held out Dr. Spruck to investigators as an "independent" expert vouching for Dr. Wang, deliberately concealing his conflicts of interest. (*Id.* ¶¶ 333-338.)

Through this multipronged campaign, Defendants' personal animosity for Plaintiffs was manifest (*see id.* ¶¶ 384-395), as they repeated the same bad-faith message to investigators: the research integrity concerns should be dismissed because they originate with short sellers.

(*Id.* ¶¶ 334-338, 406-411.) The Defamation Action gave weight to this narrative. And the fact it was not dropped until two weeks after the company, Barbier, and Burns settled with the SEC confirms its true purpose: silencing critics to ward off investigators and evade liability. Only when that strategy ultimately failed with the SEC was the defamation case abandoned. (*Id.* ¶¶ 478-482.)

On this record, a reasonable jury would be entitled to find that Defendants never genuinely believed they could prove falsity, and thus never had a proper purpose. *See Johnson*, 342 F.3d at 115-17 (2d Cir. 2003) (vacating summary judgment due to contested facts concerning defendant's "motivation or intent"); *see also Davis v. City of New York*, 373 F. Supp. 2d 322, 335-36 (S.D.N.Y. 2005) (denying summary judgment on malicious prosecution claim where inaccuracies in court documents signed by defendants created "genuine issue [] as to defendants' states of mind and credibility"); *Urdaneta v. Kelleher*, No. 11-cv-0271, 2013 WL 1308709, at *5 (W.D.N.Y. Mar. 28, 2013) (finding "reasonable jury could conclude Defendants' actions were taken with the sole purpose to humiliate" plaintiff).

**ii. Defendants' Stated Purpose of Protecting Trial Enrollment Is Neither Credible Nor Proper**

As a matter of logic, Cassava's second stated goal of "discrediting" criticisms cannot be proper under these circumstances: because Defendants knew they could never prove the falsity of the statements they did not like and thereby win the lawsuit. And, in any event, the supposed purpose of protecting enrollment of the Phase 3 clinical trials is based entirely on after-the-fact deposition testimony inconsistent with contemporaneous evidence. (SAVA-Br. at 20-21; *see* PCC ¶¶ 433-439.) Defendants concede there is no evidence to support this stated purpose—nothing that shows any trial site or patient dropping out of the clinical trials because of Plaintiffs (or even mentioning Plaintiffs as a factor for declining to participate). (PCC ¶¶ 422-423, 427.)

Rather, the contemporaneous evidence shows sites withdrawing because of a New York Times article and Cassava's "unacceptable" response to it (PCC ¶¶ 424, 426), retractions of Dr. Wang's and Dr. Burns's research by *PLOS One* (*id.* ¶ 425), and government investigations (*id.* ¶ 428). Nor is there evidence that Defendants were genuinely concerned about the pace of recruitment when they sued. (*See id.* ¶ 428.)

While the two Cassava witnesses still employed by the company (Barry and Schoen) asserted repeatedly that protecting Phase 3 enrollment was the lawsuit's purpose—Barbier, the CEO at the time, who Barry said was "always the decisionmaker," never mentioned protecting enrollment. (*Id.* ¶¶ 433-439.) The only genuine throughline in Defendants' depositions was an unwillingness to take accountability for the lawsuit—pointing to outside counsel and deceased board members (Barbier and Barry), pointing to Barbier (Barry), "absolutely" denying any involvement "in any way" (Burns), and disclaiming personal involvement (Schoen). (*Id.* ¶¶ 433-439.)

Finally, even if the company's talking points articulated by Barry and Schoen were credible (and they are not), they cannot explain Defendants' purposes for "continuing" the Defamation Action for an additional nine months after the phase 3 trials were fully enrolled in November 2023. (*Id.* ¶¶ 429, 478-482.) Defendants' *post-hoc* assertions of a legitimate purpose cannot defeat Plaintiffs' well-supported claim for punitive damages. *See Joglo Realties, Inc. v. Marionovsky*, No. 20502/2013, 2015 WL 2155725, at *9 (N.Y. Sup. Ct. May 8, 2015) (granting punitive damages where, "when given the opportunity," plaintiffs "failed to demonstrate . . . any purpose other than to intimidate, harass and punish defendant"); *see also Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 912 (S.D.N.Y. 2016) (finding "sole purpose of

inflicting intentional harm" based on allegations that defendant "sought, in a fit of pique, to exact revenge by running the plaintiffs out of business.")

**B. <u>The Motion Misapprehends the Anti-SLAPP Law</u>**

*First,* Defendants ignore the "commenced or continued" standard in Section 70-a(1)(c). Defendants assert only that the lawsuit was "commenced" with a proper purpose but neglect to assert that it was continued with a proper purpose. (SAVA-Br. at 22-23 (arguing that "no reasonable jury could find *that Cassava commenced* the Defamation Action for the 'sole purpose' of . . ." and that "[t]here is no evidence *that Cassava brought* the lawsuit . . .".) (emphasis added). Plaintiffs may recover punitive damages upon a demonstration of a solely improper purpose at any time during the litigation from November 2, 2022 through August 2, 2024. *See Gottwald v. Sebert*, 40 N.Y.3d 240, 259 (2023) (liability for anti-SLAPP damages began accruing mid-suit when the action was "continued" after the anti-SLAPP amendments' effective date); *Reeves v. Associated Newspapers, Ltd.*, 218 N.Y.S.3d 19, 26 (1st Dep't 2024) (same). By defending their supposed "purpose" only as of the November 2, 2022 commencement date, Defendants fail to take on the entirety of the punitive damages claim.

*Second,* Defendants are wrong to assert that a "clear and convincing" evidence standard applies to claims for punitive damages under Section 70-a(1)(c). (SAVA-Br. at 22-23 (citing *Rent Stabilization Ass'n of N.Y.C., Inc. v. McKee,* 2025 WL 866045 (N.Y. Sup. Ct. Mar. 18, 2025); *Gillespie v. Kling*, 192 N.Y.S.3d 78, 80 (1st Dep't 2023).) The *Gillespie* decision does not address anti-SLAPP punitive damages; rather, it references the "clear and convincing" standard applicable to defamation claims involving issues of public interest pursuant to Section 76-a. *Gillespie*, 192 N.Y.S.3d 78, 80 (citing N.Y. Civ. Rights Law § 76-a). In *McKee*, the court appears to misread *Gillespie*'s articulation of the evidence standard for defamation claims as applying to anti-SLAPP claims, as well, but there is no support in the *Gillespie* decision (or

otherwise) for this reading. *McKee*, 228 N.Y.S.3d at 4. Rather, the Legislature's express inclusion of the "clear and convincing" standard for defamation claims (Section 76-a), but not anti-SLAPP claims (Section 70-a) demonstrates that New York's default "preponderance of evidence" standard applies here. Cases granting punitive damages to anti-SLAPP claimants confirm the point: they do not refer to any heightened standard of proof. *See Joglo Realties*, 2015 WL 2155725, at *9 (granting punitive damages on summary judgment); *Duane Reade v. Clark*, No. 107438/2003, 2 Misc.3d 1007(A), 2004 WL 690191 at * 10 (N.Y. Sup. Ct. 2004) (granting punitive damages where the motion and pleading alone "established no purpose other than intimidation, harassment and punishment").

*Third*, Defendants rely on two pre-amendment cases that "strictly construed" the anti-SLAPP statute. (SAVA-Br. at 20 (citing *Bennett v. Towers*, 982 N.Y.S.2d 843, 850 (Sup. Ct. 2014); and *Egiazaryan v. Zalmayev,* No. 11-cv-2670, 2013 WL 6486258, at *12 (S.D.N.Y. Dec. 11, 2013), *report and recommendation adopted as modified*, 2014 WL 1244790 (S.D.N.Y. Mar. 19, 2014).) These cases are no longer good law in light of the Legislature's stated goal of overcoming such "narrow interpretation by courts" that "strictly limited" the pre-amendment statute. *See* Sponsor's Mem. in Support of L. 2020, ch. 250, Bill Jacket, L. 2020, ch. 250, at 4-5 (N.Y. 2020). In any event, the cases are factually inapposite. The *Bennett* court dismissed the punitive damages claim where the record showed "plaintiffs' motivation [] was at least partially, and likely mainly, economic gain." *Bennett*, 982 N.Y.S.2d 850. Even if such evidence could be dispositive in other contexts, it certainly is not here, where Defendants have not even asserted an "economic" rationale for the Defamation Action, and any attempt to do so would collapse under the evidence showing the only true purpose was to silence criticism and evade liability. And, in *Egiazaryan*, the Magistrate Judge rejected the anti-SLAPP claimant's attempt to show an

improper purpose based entirely on a legal treatise and inferences of bad faith drawn from the plaintiff's decisions not to sue another party or respond publicly to the alleged defamatory statements, *see Egiazaryan*, 2013 WL 6486258, at *12; the Court, however, elected to dismiss the punitive damages claim because the claimant had failed to establish threshold liability under Section 70-a(1)(a), *see* 2014 WL 1244790, at *7 (S.D.N.Y. Mar. 19, 2014). Even if these pre-amendment cases were still valid, the evidence here is far stronger.

***

Notably, Defendants do not dispute the recoverability of punitive damages on the malicious prosecution cause of action. *See Ellis v. La Vecchia*, 567 F. Supp. 2d 601, 610 (S.D.N.Y. 2008) ("Because an element of the malicious prosecution claim is actual malice on the part of the defendant, the finding of liability for malicious prosecution supports an award of punitive damages."). Hence, even if the Court should grant summary judgment as to the third prong of the anti-SLAPP claim, punitive damages would still be available if Plaintiffs prevail on the malicious prosecution claim.

## II. DEFENDANTS ASK THE COURT TO RE-WRITE THE ATTORNEY'S FEES PROVISIONS OF NEW YORK'S ANTI-SLAPP LAW

The plain language of the anti-SLAPP law makes attorney's fees for prosecuting an anti-SLAPP action recoverable as damages to an anti-SLAPP plaintiff. *See* N.Y. Civil Rights Law Section 70-a(1). Defendants do not appear to contest that general proposition.[3] Indeed, Defendants' position with respect to fees is not entirely clear. At best, they seem to suggest that fees associated with an anti-SLAPP proceeding are available only insofar as they are necessary to recover fees expended in the defense of the underlying action—and are unavailable for any

[3] *See* Dkt. 212 at 3: "Plaintiffs may seek fees incurred establishing any recoverable § 70-a(1)(a) fee award." Cassava's motion neither repeats nor recants this admission.

effort to recover punitive and other compensatory damages. But that is not what the statute says, and in any case, it has no application to this litigation, where Defendants have refused to concede liability on any of the three "prongs" of Section 70-a(1). Defendants' renewed attempt to neuter the anti-SLAPP law should be denied.

### A. **The Anti-SLAPP Statute Provides for Attorney's Fees**

In service of its remedial purpose to deter abusive litigation concerning matters of public interest, New York's anti-SLAPP statute provides for attorney's fees to a prevailing plaintiff. The law provides that a SLAPP defendant:

> "may maintain an action, claim, cross claim or counterclaim to recover damages, **including costs and attorney's fees**, from any person who commenced or continued such action; provided that:
>
> > (a) costs and attorney's fees shall be recovered upon a demonstration [] that the action [] was commenced or continued without a substantial basis in fact and law [];
> >
> > (b) other compensatory damages may only be recovered upon an additional demonstration that the action [] was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights; and
> >
> > (c) punitive damages may only be recovered upon an additional demonstration that the action [] was commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights.

N.Y. Civil Rights Law Section 70-a(1) (emphasis added). By allowing a SLAPP victim who proceeds under the statute "to recover damages, including costs and attorney's fees," the statutory text plainly makes fees associated with such a proceeding part of the damages available to a successful plaintiff.

Every court to consider the issue has agreed that fees incurred in a successful anti-SLAPP proceeding—*i.e.*, any of the statute's expressly enumerated vehicles to recover damages—are

recoverable as damages under Section 70-a(1). *See The New York Times Co. v. Wayfarer Studios LLC*, No. 162963/2025, 2026 WL 2256440, at *5 (N.Y. Sup. Ct. July 27, 2026) (awarding anti-SLAPP damages, inclusive of attorney's fees incurred in prior defamation action and attorney's fees incurred in anti-SLAPP action as "compensable damages on anti-SLAPP claims"); *161 Ludlow Food, LLC v. L.E.S. Dwellers, Inc.*, No. 153500/2016, 2025 WL 1542338, at *2 (N.Y. Sup. Ct. May 29, 2025) ("the work performed [] in order to win [] counterclaim for fees … should be recoverable"); *Aristocrat Plastic Surgery P.C. v. Silva*, No. 153200/2021, 2025 WL 26191, at *5 (N.Y. Sup. Ct. Jan. 3, 2025) (the "contention that attorneys' fees should be fixed at the time [the] causes of action were dismissed is not persuasive"); *Golan v. Daily News, L.P.*, No. 151135/2022, 2023 WL 5900247, at *2 (N.Y. Sup. Ct. Sep. 11, 2023) ("It therefore cannot be disputed that Defendants are entitled to fees and costs for the appellate proceedings here.").

At least one court has held that all fees incurred by an anti-SLAPP movant on a motion for anti-SLAPP damages were recoverable under Section 70-a(1)(a), even where the court denied the movant's requests for additional compensatory damages and punitive damages under Sections 70-a(1)(b) and (c). *See Aristocrat Plastic Surgery P.C. v. Silva*, No. 153200/2021, 2023 WL 6553906, at *2 (N.Y. Sup. Ct. Oct. 04, 2023). And this is appropriate for the obvious reason: To exclude fees for pursuit of compensatory and punitive damages from the "fees" component of damages under the anti-SLAPP law would effectively defang the deterrent purpose of the regime by discouraging SLAPP victims from ever seeking that relief.

### B. <u>Defendants Urge an Illogical Distinction</u>

In essence, Defendants now acknowledge the numerous cases awarding fees to anti-SLAPP plaintiffs but imply that such fees are available only for the purpose of establishing

liability under Section 70-a(1)(a).[4] This doctrine—for which Defendants cite no precedent of any kind—makes no sense.

*First*, the statute does not say this. Indeed, it says quite the opposite: that a victim of a SLAPP suit "may maintain an action, claim, cross claim or counterclaim to recover damages, **including costs and attorney's fees**, from any person who commenced or continued such action." N.Y. Civ. Rights L. 70-a(1) (emphasis added).

*Second*, the distinction Defendants propose is unworkable in many if not most cases. This is because the facts showing a lack of substantial basis (*i.e.*, to prevail under sub-section 70-a(1)(a)) will often—as here—overlap materially if not entirely with the facts necessary to show an improper purpose (*i.e.*, to prevail under sub-sections (b) and (c)). The present case is an excellent example: the total absence of scientific data to support Defendants' claims about simufilam is a central fact showing *both* that Defendants could never have prevailed on the Defamation Action *and* that they knew this to be true and hence had no conceivable proper purpose.

Cassava cites only one anti-SLAPP case in ostensible support of its position. (SAVA-Br. at 14-15 (citing *Isaly v. Garde*, No. 160699/2018, 2024 WL 1156850, at *7-8 (N.Y. Sup. Ct. Mar. 18, 2024).) But *Isaly* does not help them. There, the court merely noted the uncontroversial fact that each of the three "damages claims available to deter SLAPPs require progressively higher levels of intent and motive" and noted that CPLR 3211(g) provides an

[4] At certain points, Cassava seems to suggest that fees are available only in connection with a "summary determination (such as under New York's motion to dismiss or motion for summary judgment provisions specifically addressing anti-SLAPP motions)." (SAVA-Br. 14.) This flies in the face of the plain language of Section 70-a(1), which clearly contemplates fees associated with an anti-SLAPP "action, claim, cross claim or counterclaim." It also would create forum-shopping and *Erie* problems, inasmuch as the mechanisms for "summary determination" to which they refer are not available in federal court.

expedited mechanism in state court to obtain dismissal and attorney's fees, whereas the other prongs "are more conducive to pleadings and litigation." *Isaly*, 2024 WL 1156850, at *7-8. Nothing in *Isaly* suggests that there is or should be any difference in the recoverability of attorney's fees for prosecuting an anti-SLAPP claim to recover one form of anti-SLAPP damages, but not other forms of damages.

### C. <u>Cassava's Reliance on the "American Rule" Is Refuted by the Statute</u>

*First*, Cassava overstates the "American Rule" to argue that it bars Plaintiffs' claim for fees incurred in this action. (SAVA-Br. at 15.) As the Court of Appeals acknowledged in *Lezak*, the "American Rule" is a "general rule" that treats costs and fees as "incidents of litigation" unavailable to prevailing parties "unless an award is authorized by agreement between the parties or by statute or court rule." *A.G. Ship Maint. Corp. v. Lezak,* 69 N.Y.2d 1, 5 (1986). Here, Plaintiffs' requested damages are "authorized" "by statute." The anti-SLAPP law explicitly authorizes an "action [] to recover damages, including costs and attorney's fees." (N.Y. Civ. Rights L. § 70-a(1).)

*Second*, Cassava cites two anti-SLAPP cases, decided prior to the 2020 amendments for the general proposition that fee-shifting provisions are in "derogation of the common law" and must be "strictly construed." (SAVA-Br. at 15 (citing *315 W. 103 Enters. LLC v. Robbins*, 95 N.Y.S.3d 800, 800 (1st Dep't 2019); *Hariri v. Amper*, 854 N.Y.S.2d 126, 130 (1st Dep't 2008).) These decisions say nothing about the scope of anti-SLAPP damages. *See Robbins*, 95 N.Y.S.3d at 800 (holding that attorney's fees could not be recovered "by motion to dismiss"); *Hariri*, 854 N.Y.S.2d at 130 (finding plaintiff was not "public applicant or permittee" eligible for relief "in view of narrow construction which must be afforded [§ 70-a and § 76-a]"). Even if they were on point, they are no longer good law. (*Supra* pp. 30-31.) In explicitly refuting Cassava's approach, the Legislature sought to solve the problem that "the principal remedy" of the anti-

SLAPP regime was "almost never actually imposed" because courts had "failed to use their discretionary power to award costs and attorney's fees to a defendant found to have been victimized by a frivolous lawsuit intended only to chill free speech." Sponsor's Mem. in Support of L. 2020, ch. 250, Bill Jacket, L. 2020, ch. 250, at 4-5 (N.Y. 2020); *see Reeves v. Associated Newspapers*, Ltd., 218 N.Y.S.3d 19, 31 (1st Dep't 2024) (describing legislative history); *Nelson v. Ardrey*, 231 A.D.3d 179 (2d. Dep't 2024) (describing "intent of the Legislature to redefine New York's anti-SLAPP statute as broadly as possible"); *see also Isaly v. Garde*, No. 160699/2018, 2024 WL 5466175, at *9 (N.Y. Sup. Ct. Oct. 25, 2024) ("[t]o order less than full recoupment as sought on this record would be directly contrary to the letter and intent of the defamation reforms that underpin this proceeding"), adopted by *Isaly v. Garde*, No. 160699/2018, 2024 WL 5055165, at *1 (N.Y. Sup. Ct. Dec. 09, 2024); *Golan v. Daily News,* 2023 WL 5900247, at *2 (awarding fees incurred on appeal and those incurred on fee motion, in light of the 2020 amendments' purpose); *Goldman v. Abraham Heschel School*, No. 158209/2021, 2024 WL 1117158, at *6 (N.Y. Sup. Ct. Mar. 14, 2024) (awarding fees as consistent with "intent of Legislature").

### D. <u>Cassava Distorts the Litigation Record to Conceal the Absurdity of its Position</u>

Cassava's motion to pre-emptively deny fees rests on the false premise that this action concerns only punitive damages and compensatory damages—ignoring the threshold substantial basis showing required by Section 70-a(1)(a). In part, this represents Cassava's (ironic) effort to smear Plaintiffs as greedy and excessively litigious. But it also reflects an effort to conceal the fact that Defendants have forced Plaintiffs to litigate, in this action, the absence of any substantial basis for the Defamation Action.

### i. Cassava Falsely Implies It Has Conceded Anti-SLAPP Liability

As this Court recognized, to prevail on their anti-SLAPP claim, Plaintiffs must prove "that the "Defamation Action 'involve[ed] public petition and participation' and 'was commenced or continued without a substantial basis in fact and law.'" *Heilbut v. Cassava Scis., Inc.*, 778 F. Supp. 3d 551, 569–70 (S.D.N.Y. 2025) (quoting N.Y. Civ. Rights Law § 70-a(1)(a)). Cassava entirely ignores the principal "substantial basis" demonstration required to establish liability under Section 70-a(1)(a). From there, Cassava pushes the false narrative that Plaintiffs' only contested claims are for "other compensatory damages" and "punitive damages" under Sections 70-a(1)(b) and (c). This is simply wrong. Cassava has never conceded liability on any part of the anti-SLAPP claim and never admitted the Defamation Action ever lacked a substantial basis. In fact, Cassava and the other Defendants have contested this claim vigorously and continue to do so today.

For instance, Defendants argued in their motions to dismiss that the Defamation Action had a substantial basis in fact and law;[5] they relied on Judge Woods's decision as evidence of the action's substantial basis because the Court granted leave to replead—describing it as a "provisional ruling in Cassava's favor"[6] finding "315 of [Plaintiffs'] statements [] defamatory."[7] Even after this Court rejected many of these arguments at the pleading stage, *see* 778 F. Supp. 3d at 571—Defendants continued to assert that the Defamation Action had a substantial basis

[5] *See* Dkt. 44 at 11-13 ("Plaintiffs cannot show that Cassava lacked a substantial basis in law to allege Dot.com Plaintiffs defamed it"; and "Plaintiffs cannot show that Cassava lacked a substantial basis in fact to allege Dot.com Plaintiffs defamed it"); Dkt. 46 at 11-15.

[6] Dkt. 47 at 2; *see also* Feb. 6, 2025 Tr. at 07:19-21 ("There were many provisional holdings in our favor")

[7] Dkt. 44 at 3, 12 ("Cassava could not have lacked a substantial basis in law for its claims when the district court agreed that Dot.com Plaintiffs' statements—at least at the motion to dismiss stage—were actionable and defamatory.")

throughout discovery.[8] They do so again in their present motions.[9] And, as is clear from their operative pleadings in this case—Defendants plan to contest liability under the "substantial basis" standard at trial. (*See* PCC ¶¶ 528-30.)[10]

As a result of Defendants' position, Plaintiffs have placed significant focus in this action on developing evidence for trial that will establish the Defamation Action lacked a substantial basis. Otherwise, they will recover nothing. While Plaintiffs are confident they will succeed on their anti-SLAPP claim, it is no simple task (and certainly no "blank check"). To do so, Plaintiffs must confront Defendants' abusive pleadings in that action, where they began by filing a 190-page complaint that attached more than 100 exhibits spanning "more than 1,600 pages."

After that complaint was dismissed (including on the basis that it violated FRCP 8), Defendants filed an even more abusive 237-page complaint that attached nearly 200 exhibits, including all of the same research, plus additional studies and supposedly supportive (though ultimately baseless) evidence. (*See* Defamation Dkt. 138.) Defendants refused even to consent to Plaintiffs' request for an extension of time and page limitations for their motion to dismiss that

[8] Dkt. 81 at 3 ("Cassava must be given an opportunity to defend and establish the basis for the defamation suit."); Dkt. 186 at 3 ("Barbier and Burns are entitled to develop evidentiary support for their defenses in this action, including evidence showing that the defamatory statements were false and made with malice, which supports both the existence of probable cause and their good faith").

[9] SAVA-Br. 22 ("Moreover, as found by the court in the Defamation Action, more than 300 of Plaintiffs' statements constituted defamation *per se*"); BB-Br. 15.

[10] *See, e.g.*, Dkt. 91, Cassava Answer ¶ 15 ("Cassava denies all liability for the claims alleged in the First Amended Complaint and denies that the Plaintiffs are entitled to any relief whatsoever"); Tenth Aff. Def. ("Plaintiffs' claims are barred because the statements alleged by Cassava as the basis for the Defamation Action were false, defamatory statements, including statements constituting defamation *per se*, and thus do not constitute protected speech."); *see also* Dkt. 107, Burns Answer, Fifth Aff. Def. (same); Dkt. 118, Barbier Answer, Fifth Aff. Def. (same).

pleading (*id.* Dkt. 127), only to voluntarily dismissed the action on the day their opposition was due (*id.* Dkt. 140), thus evading a ruling on that pleading.

Defendants' portrayal of this case—as an extended "chase" for a "bonanza" or "windfall"—ignores their own misguided litigation strategy: contest everything, concede nothing. Their decisions to bring vast but baseless claims and to deny any liability whatsoever, even now, despite a mountain of evidence and rulings against them, are the reason for the "years of affirmative litigation" they now lament.

**ii. Cassava Uses Inadmissible Evidence to Push Its False Narrative**

Flouting the express terms of their Rule 68 Offer, Defendants submit it as purported support for their "blank check" narrative. This is improper and easily refuted.

*First,* it is inadmissible. Rule 56(c)(2) requires that motions for summary judgment be made on the basis of evidence that would be admissible at trial. Rule 68(b) itself categorically bars evidence of an unaccepted offer "except in a proceeding to determine costs." Indeed, the text of Defendants' own Offer does the same, providing that, "any evidence of this Offer will be inadmissible, except in a proceeding to determine costs." (SAVA Ex. 48.) Needless to say, this motion is not a proceeding to determine costs. Federal Rule of Evidence 408 also bars settlement offers from being used to prove or disprove the validity or amount of a disputed claim, which is precisely what Defendants seek to do here—wielding it under the guise of a policy argument, as purported evidence of Plaintiffs' motivations, to obtain a judgment that would reduce the value of Plaintiffs' claims. *See Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 283 (S.D.N.Y. 2015) (finding such offers "clearly inadmissible"). Hence, Defendants' attempt to wield their unaccepted Rule 68 offer as a sword to pre-emptively avoid the full scope of damages authorized by statute is improper.

Even it were admissible, the Offer still would not support the narrative Cassava is pushing. It was made on May 6, 2025, after this Court denied Defendants' motion to stay discovery (Dkt. 56) and motion to dismiss (Dkt. 82), and five months into fact discovery (Dkt. 42). Moreover, it was not limited to Plaintiffs' claim for attorney's fees, but rather, sought a complete release of all asserted and potential claims. (SAVA-Ex. 48 (offering "to fully and finally resolve all claims").)

Had Defendants offered to resolve Plaintiffs' damages claim for attorney's fees only *and* admitted to liability under the "substantial basis" standard; and then, having rejected the offer, had Plaintiffs continued to pursue claims for additional compensatory damages and punitive damages while also claiming entitlement to all attorney's fees incurred doing so, there might at least be internal coherence to Defendants' rhetoric. Alternatively, Defendants could have conceded that the Defamation Action lacked a substantial basis in their Answers—before the parties spent many months and resources in discovery. Instead, Defendants admitted nothing, demanded a total release in exchange for substantially less than what Plaintiffs believe their claims are worth; and, after Plaintiffs rejected the offer, continued to pursue an all-out defensive strategy that left Plaintiffs no choice but to litigate all aspects of their claims to secure any damages award at all. On these facts and in this posture, Cassava's motion cannot succeed. *See Aristocrat Plastic Surgery P.C. v. Silva*, No. 153200/2021, 2025 WL 26191, at *5 (N.Y. Sup. Ct. Jan. 03, 2025) (awarding fees incurred on appeal because "it would not be until after the successful appeal that the Defendants' entitlement to an attorneys fees award would be secured.").

### E. <u>Federal Rule 54 Has No Bearing on Cassava's Motion</u>

Citing no case law, Cassava contends that "Plaintiffs' request that the jury calculate and award attorney's fees as damages" is "inconsistent with Federal Rules of Civil Procedure governing attorney's fee awards." (SAVA-Br. at 15-17.) The argument is meritless.

*First*, it is irrelevant to Cassava's motion; it says nothing about the scope of permissible damages under the anti-SLAPP statute. The court need not address it now.

*Second*, the argument is wrong. Rule 54(d)(2)(A) provides "a claim for attorney's fees and related nontaxable expenses must be made by motion *unless the substantive law requires those fees to be proved at trial as an element of damages*." Fed. R. Civ. P. 54(d)(2)(A) (emphasis added). And the Advisory Committee Notes explain that Rule 54(d)(2) "does not … apply to fees recoverable as an element of damages, as when sought under the terms of a contract; such damages typically are to be claimed in a pleading and may involve issues to be resolved by a jury." Here, anti-SLAPP statute expressly classifies "costs and attorney's fees" as an element of damages. (§ 70-a(1) (authorizing "an action [] to recover damages, including costs and attorney's fees".) Thus, Rule 54(d)(2) is inapplicable. In a case involving Nevada's anti-SLAPP statute, Judge Oetken rejected precisely this argument as "meritless"—holding "[w]here, as here, a statute expressly provides an award of 'reasonable costs and attorney's fees,' the right to recover and the amount to be awarded are governed by the underlying statute." *Adelson v. Harris*, No. 12-cv-6052, 2018 WL 1585676, at *5 (S.D.N.Y. Mar. 29, 2018).

As this Court previously held, "New York's anti-SLAPP regime [] provides for a substantive cause of action, 'codified at section 70-a,' that allows SLAPP defendants to 'bring an affirmative anti-SLAPP suit' for damages." *Heilbut*, 778 F. Supp. 3d at 567. In this regard, New York's anti-SLAPP statute is fundamentally distinct from statutes or contracts with prevailing party fee-shifting provisions, collateral to the merits of the case.

All this being said, as a matter of trial-planning, Plaintiffs accept that certain practical difficulties may arise in trying the amount of fees for prosecuting this anti-SLAPP matter—such as the fact that fees will continue to accrue even during trial. Plaintiffs therefore would not object to a post-trial determination by the Court as to the amount of fees; albeit Plaintiffs submit that this would effectively mean a short bench trial as to that fee amount since the fees in question are plainly damages under the law.

### F. Cassava's 'Floodgates' Argument Ignores that Plaintiffs Must Still Establish Anti-SLAPP Liability at Trial

Cassava's "floodgates" argument once again ignores its own decision not to concede that the Defamation lacked a substantial basis in fact and law. (SAVA-Br. at 17-19.) It posits a scenario, totally different from this one, where (1) a defendant in state court prevails under one of the CPLR's summary adjudication procedures and obtains a ruling on liability under Section 70-a(1)(a)—*i.e.*, that the plaintiff's claim lacked a substantial basis in fact or law; and (2) the defendant then files "a new, separate, and future action for compensatory and punitive damages under subsections 70-a(1)(b) and (c)" with a "blank check" because the prior summary adjudication guaranteed their right to recover fees in the separate action even if they lose. It is doubtful such a case would ever arise—this one is certainly not of that nature.

*First*, Cassava filed its claims in federal court, so the CPLR's summary adjudication mechanisms were unavailable to Plaintiffs, and they had no choice but to vindicate their substantive rights and establish liability through this plenary action. *Second*, unlike the hypothesized anti-SLAPP victims, Plaintiffs have prosecuted this action without *any* guaranteed damages recovery and, due to Defendants' decision to contest every aspect of Plaintiffs' claims, have had to proceed through discovery and prepare a case for trial where liability has yet to be established and remains fully contested. Also, and to be clear, Plaintiffs have paid their counsel

in this matter on an ongoing basis; this is not a contingency arrangement where Plaintiffs are proceeding risk-free. Rather, they have committed substantial financial resources of their own (and their families') to achieve a just result.

Here, Plaintiffs' fees incurred in this action are necessary to establish anti-SLAPP liability and their entitlement to any damages at all; therefore, if Plaintiffs succeed in establishing liability at trial, then Section 70-a(1)(a) requires such fees be awarded as damages, regardless of whether the jury awards additional relief under Sections 70-a(1)(b) or (c). *See 161 Ludlow Food*, 2025 WL 1542338, at *2.

## III. <u>THERE ARE GENUINE DISPUTES OF FACT CONCERNING PLAINTIFFS' SPECIAL INJURIES</u>

Defendants seek dismissal of the malicious prosecution cause of action, claiming that "undisputed evidence" "establishes that the Defamation Action did not cause any Plaintiff any special injury." (SAVA-Br. at 23-29.) This is wrong. A "special injury" is "some concrete harm that is considerably more cumbersome than the physical, psychological or financial demands of defending a lawsuit." *Heilbut*, 778 F. Supp. 3d at 574. In denying Defendants' motion to dismiss, the Court recognized that special injury is "'analyze[d] . . . on a case-by-case basis" and held that Plaintiffs satisfied the "special injury" element by alleging that the Defamation Action "marred, in [a] specific and meaningful way, [their] financial opportunities." *Id.* Discovery has substantiated each Plaintiff's special injuries.

**Dr. Milioris.** Dr. Milioris produced a signed 3-year employment contract with a Greek drug manufacturer and testified that the employer rescinded it upon learning of the Defamation Action. (PCC ¶¶ 501-508.) *See Thomas v. G2 FMV, LLC*, 48 N.Y.S.3d 358, 358 (1st Dep't 2017) ("special injury" where "plaintiff had a consulting arrangement [] and was terminated as a direct result of the allegations in the complaint"). Defendants concede, as they must, that this

injury constitutes a "special injury." (SAVA-Br. at 27-29.) Nevertheless, they attempt to introduce factual doubt as to whether ElmiPharm actually (or properly) repudiated the contract, insinuating that Dr. Milioris should have sued ElmiPharm to enforce it. They also suggest that ElmiPharm may not have actually believed the factual allegations in the Defamation Action—which, of course, is beside the point. The loss of this opportunity is plainly sufficient to bring the question of special injury to the jury. *See Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016) (plaintiff "entitled to rely on his own testimony to establish his malicious prosecution claim").

**Dr. Heilbut.** Defendants contend that Dr. Heilbut's special injuries rely on "general allegations" of "lost earnings" insufficient to establish special damages. (SAVA-Br. at 25-27.) This misrepresents the record. Dr. Heilbut testified that an investment fund named Perceptive had curtailed and then stopped consulting with him after the Defamation Action was filed, and that his primary contact there specifically told him that Perceptive was "concerned about doing the calls with me … because of the defamation case." (PCC ¶¶ 513-515; *see also* ¶¶ 509-512 (describing prior work for Guidepoint as consultant).) Dr. Heilbut also testified that the Defamation Action caused his startup equity research consulting business Logphase to fail, including because the Defamation Action and Defendants' related intimidation campaign chilled his ability to freely communicate new research and opinions, and prevented him from marketing his expertise. (PCC ¶¶ 516-518 ("I was scared"), ("[T]he reason for my being scared was … my fear of how those statements could be used" against him by Cassava in the Defamation Action).) This is sufficient. *In re Eerie World Entertainment, LLC*, No. 00-cv-13708, 2006 WL 1288578 (Bankr. S.D.N.Y. Apr. 28, 2006) (finding special injury based on clients that refused to do business when they found out about pending litigation).

**Dr. Brodkin**. Finally, Defendants contend there is "no evidence in the record that Cassava caused Brodkin special injury." (SAVA-Br. at 24-25.) Wrong again. While Dr. Brodkin works primarily as a caregiver for an adult son with special needs and therefore cannot as readily prove loss of business income, both he and his wife testified that the Defamation Action wreaked havoc on their marriage and on their family finances. (*See* PCC ¶¶ 519-520 (J. Brodkin ("So she was quite furious with me for getting into this situation and thought that I had placed our family's financial future in serious jeopardy and that I was, I guess, an unfit father in that respect. And we had a lot of fights about that.") ("And she changed her financial situation so that I didn't have access to her money that she got through her income.") ("And she sought legal Counsel from a bankruptcy lawyer and family lawyer and lots of fights and yelling and slamming of doors, that kind of stuff.")); *id.* ¶¶ 521-522 (additional J. Brodkin testimony); *id.* ¶¶ 523-525 (L. Brodkin ("Cassava wanted to take everything from us and our family. And I was terrified. ... I was terrified and we argued about it."), ("I feel like we were continuing to argue, fight, talk about divorce, talk about — we had — it was an ongoing issue."); *id.* ¶ 526 ("I was nearing — I was hoping to retire in the near future. I was starting to plan for that. I have been working really hard for that for many years. When this lawsuit happened, I had to stop planning for retirement. I don't know when I could stop working now.") ("I hope our marriage will survive. . . . time will tell, but it is scary."); *see also id.* ¶¶ 524-527 (additional L. Brodkin testimony). This constitutes a unique and concrete harm, far exceeding the ordinary harms of defending a lawsuit. *See Chi Chao Yuan v. Rivera*, 48 F.Supp.2d 335, 349 (S.D.N.Y.1999) (severe impact on familial relationship constitutes special injury); *Chisolm-Mitchell v. Ahmed*, No. 20-cv-3434, 2021 WL 512460, at *4 (E.D.N.Y. Feb. 11, 2021) (impact on ability to provide for children constitutes special injury).

## IV. <u>DR. BURNS IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE MALICIOUS PROSECUTION CLAIM</u>

Under New York law, individuals may be liable for malicious prosecution where the underlying action was prosecuted "by or at [their] instance." *Heilbut*, 778 F. Supp. 3d at 571-72 (collected cases). This standard requires "something 'more than merely report[ing] [an offense] and cooperat[ing] in its prosecution," *Moorhouse v. Standard*, 124 A.D.3d 1, 7 (1st Dep't 2014)—such as, providing "advice and encouragement" to authorities, "importuning the authorities to act," *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010), providing knowingly false information to authorities, *Williston v. Jack Resnick & Sons, Inc.*, 177 A.D.3d 822 (2d Dep't 2019), or otherwise "participat[ing] in the commission of the tort," *Thomas v. G2 FMV, LLC*, 48 N.Y.S.3d 358, 701 (1st Dep't 2017).

Here, Dr. Burns did far more than provide information and cooperation—she "vigorously" sought to prosecute claims against Plaintiffs, "took an active role" in the prosecution of Plaintiffs, and was responsible for manipulated research that the company relied on in the Defamation Action (*see* PCC ¶¶ 347-358, 453-475). This is more than sufficient. *See Dudick v. Gulyas*, 277 A.D.2d 686, 687 (2000) (denying summary judgment based on evidence that defendant authored material that formed foundation for complaint in underlying action); *Maskantz v. Hayes*, 39 A.D.3d 211, 214 (1st Dep't 2007) (upholding jury verdict against private individual who "vigorously" sought criminal prosecution of former business partner).

### A. <u>The Motion Ignores Evidence of Dr. Burns's Essential Role</u>

The motion seeks to portray Dr. Burns as a bystander to the Defamation Action. This cannot pass muster.

The motion concedes that "[f]rom time to time, Dr. Burns was asked to provide and did provide certain materials, including some of Plaintiffs' Twitter posts, to Benesch." (BB-Br. 17.)

In truth, Dr. Burns was far more involved than this concession suggests, actively encouraging and participating in the prosecution of Plaintiffs. From the beginning, Dr. Burns viewed the critiques by Plaintiffs and others as a personal threat to her scientific credibility and livelihood. (*Id.* ¶ 446.) Dr. Burns closely monitored statements by critics on Twitter and other platforms (*id.* ¶ 445), and she developed intense animosity toward Plaintiffs and other critics (*id.* ¶¶ 384-395). In December 2021, she publicly threatened Plaintiffs on Facebook. (*Id.* ¶ 450.)

Before and after Cassava filed the Defamation Action, Dr. Burns was in frequent communication with Benesch about the lawsuit (*id.* ¶¶ 453-473); she collected Plaintiffs' tweets from members of the "SAVA Army" "for legal" and passed them to Benesch (*id.* ¶¶ 412-421). She also appears to have been Benesch's primary source of information and research concerning simufilam (*id.* ¶¶ 453-473). Dr. Burns not only knew of reasons to believe the information and research relied on in the Defamation Action was unreliable (*id.* ¶¶ 319-338), she was personally responsible for the research integrity concerns at issue, including the manipulated phase 2b cognitive data that the company relied on in the Defamation Action (*id.* ¶¶ 347-358).

There is even evidence indicating that Dr. Burns directed Benesch to serve Dr. Heilbut at his poster presentation at the Alzheimer's conference, CTAD. (*Id.* ¶¶ 474-475.) Dr. Burns's publicization and celebration of the Defamation Action after it was filed is yet more evidence of her close involvement in its prosecution. (*Id.* ¶¶ 402.) Likewise, her role amplifying attacks on Plaintiffs in other forums and through her close coordination with the SAVA Army, shows she was central to the company's targeting of Plaintiffs and other critics. (*Id.* ¶¶ 412-421, 404.)

On this record, a reasonable jury could certainly find that the Defamation Action was filed "at the instance" of Dr. Burns.

### B. The Motion Mischaracterizes Dr. Burns's Role and Influence

The motion mischaracterizes Dr. Burns as merely one member of "a larger science team" who was focused solely on the "science" and "kept in the dark" on legal matters. (BB-Br. at 16.) In truth, Dr. Burns wielded outsized influence within the company, and she was both privy to—and routinely engaged in—company affairs far beyond her job description. (PCC ¶¶ 442-455.)

Dr. Burns described herself to the NIH as the "project leader on our Alzheimer's program"—the company's only program at the time—and "scientific lead of this program," explaining that she oversaw IND-enabling studies and clinical trials and wrote the Investigator's Brochure. (*Id.* ¶ 442.) She was a co-inventor of the company's only product, simufilam, and named on its patents. (*Id.* ¶ 224, 481-482.) Dr. Burns was the company's primary contact with Dr. Wang, its principal scientific collaborator; and she served as Barbier's intermediary to communicate with Dr. Wang. (*Id.* ¶¶ 440-444.)

Dr. Burns and Barbier regularly discussed company affairs beyond her job description, including company strategy for responding to allegations by Plaintiffs and other legal matters. (*Id.* ¶¶ 443-444.) She was not only privy to the company's media strategy, she assumed the role of chief defender and proponent of the company's narrative that all criticism and scrutiny should be attributed to "financially motivated" short sellers—repeating this attack line to scientific journals, scientific advisors, and government officials at every opportunity. (*Id.* ¶¶ 334-338, 406-411.)

The motion suggests Plaintiffs' claim rests entirely on imputing Barbier's knowledge to Dr. Burns based on their marriage. (BB-Br. at 18.) And it cites testimony by Burns and Barbier that he "generally" did "not discuss[] Company matters with Dr. Burns in their private life" and kept "kept [Dr. Burns] in the dark intentionally" with respect to "legal matters." But other

evidence shows the opposite—that they regularly discussed company matters in private, including legal matters, and that Barbier copied Burns (and no other employees) on correspondence with Benesch. (PCC ¶¶ 443-455.) Nor, indeed, should Dr. Burns's own testimony on this front be credited at all, considering her blatantly false assertion that she "absolutely. . . had no involvement" of any kind in the Defamation Action. (*Id.* ¶ 438.) *See In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009) ("Circumstantial evidence may permit a factfinder to infer that a witness had knowledge of a particular fact despite his testimonial denial of knowledge.").

The claim does not depend on Dr. Burns's 21-year marriage to Barbier. Rather, it is based on contemporaneous evidence showing Dr. Burns's zealous pursuit of Plaintiffs and active role in the Defamation Action. (PCC ¶¶ 384-395, 445-475.)

### C. <u>The Motion Relies on an Invented Legal Standard</u>

The motion misstates the legal standard as requiring proof that Dr. Burns "authorized or directed" the Defamation Action. (BB-Br. at 17-18.) The motion deploys that invented standard to imply that attendance at Board meetings or some monetary contribution to the lawsuit are necessary to hold an individual liable for malicious prosecution. This makes no sense, particularly in light of the case law recognizing the validity of claims in the criminal or administrative context against individuals other than the prosecuting body. *See, e.g.*, *Maskantz v. Hayes*, 39 A.D.3d 211, 214 (1st Dep't 2007) (affirming claim against private individual who lacked authority or power to "direct" prosecution); *see also Dudick v. Gulyas*, 277 A.D.2d 686, 687 (2000) (affirming claim against private individual who lacked authority or power to "direct" medical licensing body's prosecution).

Moreover, the motion relies on two cases where the court dismissed claims under the "by or at the instance" standard because the underlying action was filed by the malicious prosecution

plaintiff herself or himself. *See Baldini v. Shah*, 2018 WL 11226079, *5 (S.D.N.Y. Aug. 9, 2018) (plaintiff had commenced the underlying proceeding herself, seeking release from involuntary psychiatric commitment); *Loftus v. Arthur*, No. 05-cv-1682, 16 Misc. 3d 1126(A), 2007 WL 2376883, *3-4 (N.Y. Sup. Ct. July 16, 2007) (underlying action was "brought by the [malicious prosecution] plaintiffs, not by the defendants"). The motion's other cases are equally inapposite. *See Hewitt v. City of New York*, 544 F. App'x 24, 26 (2d Cir. 2013) (finding no evidence to support inference that individual defendants misled prosecution to target plaintiff); *LaFrance v. Bemben*, No. 10–cv–4583, 2013 WL 132702, at *6 (E.D.N.Y. Jan. 10, 2013) (dismissing claim where police officer-defendants "had no role whatsoever in the decision to prosecute Plaintiff" and "did not encourage the prosecution of [Plaintiff] in any manner"); *Sankin v. Abeshouse*, 545 F.Supp.2d 324, 327 (S.D.N.Y. 2008) (dismissing claim against individuals where alleged involvement in underlying action based entirely on job titles as principal and general counsel). Neither the facts nor the law support Dr. Burns's effort to avoid liability for maliciously prosecuting Plaintiffs.

## V. BARBIER AND BURNS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSPIRACY CLAIM

### A. The Intracorporate Conspiracy Doctrine Does Not Bar Plaintiffs' Claim

Dr. Burns and Barbier seek dismissal of the conspiracy claim by invoking the general bar on liability for conspiracy within a corporation. As the Court already recognized, the personal-interest exception allows claims where "the individual defendants were motivated by an independent personal stake in achieving the corporation's objective rather than merely carrying out the corporation's managerial policy." *Heilbut*, 778 F. Supp. 3d at 577 (quotations omitted). Specifically, the Court found Plaintiffs had sufficiently alleged that "Dr. Burns and Barbier had independent personal interests in commencing and continuing the Defamation Action to conceal

their awareness of and involvement in the alleged research misconduct underlying simufilam in order to avoid legal, reputational, and financial exposure." *Id.*; *see also Reich v. Lopez*, 38 F. Supp. 3d 436 at 465 (S.D.N.Y. 2014) (applying personal-interest exception where defendants stood to profit significantly from covering up illegal corporate scheme); *Alvarez v. City of New York*, No. 11-cv-05464, No. 11-cv-5464, 2012 WL 6212612, at *3 (S.D.N.Y. Dec. 12, 2012) (sustaining claim where individuals "allegedly maintained the pretense of serving the [entity] while in fact pursuing their own ends to avoid liability."). Again, discovery has substantiated these allegations.

#### i. Dr. Burns Had Independent Personal Motives to Pursue the Case

Dr. Burns believed that her "entire academic research career" was at stake and viewed Plaintiffs' and other critics' statements as an "attack" on "my reputation and scientific integrity." (*Id.* ¶ 446.) Dr. Burns was a co-author of many of the papers under investigation by CUNY and scientific journals. (*See Id.* ¶ 293 (CUNY Committee finding Dr. Burns, as co-author, "bears some measure of responsibility" for various research integrity problems).) And, Dr. Burns had herself manipulated simufilam research and also shared information sufficient to unblind Dr. Wang, as the company eventually admitted in disclosures in 2024 and 2025, based on emails Dr. Burns sent to Dr. Wang in 2020 (and then deleted). (*Id.* ¶¶ 347-358.) Dr. Burns stood to gain personally from the Defamation Action, as it was central to her efforts to scapegoat short sellers for all criticism of the unreliable simufilam research she had overseen with Dr. Wang. (*See, e.g., id.* ¶¶ 338, 458, 462.) In communications with scientific journal editors, government officials, and media looking into research integrity concerns, Dr. Burns repeatedly pushed the narrative that the concerns could be ignored as "financially motivated," and implored investigators not to take action. (*Id.* ¶¶ 334-338, 406-411.) She did all of this while personally under investigation

by the SEC, and as part of an ultimately futile bid to save her job, reputation, and to protect her husband's lucrative position and compensation as CEO and Chairman. (*See id.* ¶¶ 481-482.)

Ignoring this evidence, the motion asserts that "no investigation or audit" has "found evidence of any knowing or deliberate research misconduct." (BB-Br. at 26.) In reality, Dr. Burns's and Barbier's forced resignation as a result of the SEC investigation and settlement—followed by the company's abandonment of the Defamation Action—strongly support an inference that their personal interests were driving the prosecution. (PCC ¶¶ 478-482; *see also* ¶¶ 241, 242, 293, 367, 486, 487.)

Finally, the motion seeks to reduce Plaintiffs' claim to one based solely on Dr. Burns's personal animus for Plaintiffs, but that is only one aspect of the claim here. As such, the motion's reliance on cases involving claims grounded on animus alone is misplaced. *See Shakimo O. v. Westchester Cnty.*, No. 12-cv-9468, 2014 WL 521608, *14 (S.D.N.Y. Feb. 10, 2014) ("personal animus … does not support application of the personal interests exception."); *Richard v. Leclaire*, No. 15-cv-00006, 2017 WL 9511181, *17, adopted by 2017 WL 4349381 (N.D.N.Y. Sept. 29, 2017) (requiring "more than simply alleging [] personal bias"); *Graham*, 2013 WL 5924727, *1, 5 (motive to retaliate insufficient on its own).

**ii. Barbier Had Independent Personal Motives to Pursue the Case**

Barbier also had personal interests for pursuing the Defamation Action independent from the company's interests, including his interests in keeping his extraordinarily lucrative position, avoiding legal liability, and protecting both his and his wife's reputations. (PCC ¶¶ 438-449, 483-494.)

Dr. Burns testified that both she and Barbier felt that the company's critics were "trying to kill us." (*Id.* ¶ 449.) The Defamation Action was a vehicle for Barbier to protect his own interests—his job, his compensation, and his exposure to personal legal liability for his role

promoting and fundraising based on unverified research that he knew to lack integrity. (*Id.* ¶¶ 222–223, 254, 256–257, 318, 447–448; *see also* ¶¶ 319–320, 395, 451.) Moreover, Barbier's financial interests in suppressing public criticism far exceeded the ordinary interests of a corporate officer due to the company's adoption in 2020 of an atypical bonus plan tied to the company's stock price rather than the company's financial performance or the approval of simufilam. (*Id.* ¶¶ 483-491.) Under the plan, Barbier was personally eligible to receive nearly $80 million. (*Id.* ¶ 491.) *See Reich*, 38 F. Supp. 3d at 465. And Barbier's eventual forced resignation as a result of the SEC investigation, two weeks before the company's new leadership abandoned the Defamation Action, is compelling evidence that his personal motives were integral to the prosecution. (PCC ¶¶ 449, 478-482.)

Finally, the motion recycles the same rejected argument advanced on the motion to dismiss (*see* Dkt. 44 at 20-21, Dkt. 65 at 10-11)—asserting that "Barbier acted within the scope of his employment in participating in deliberations and decisions regarding the Defamation Action." (BB-Br. at 22-25.) However, the motion entirely ignores the evidence of Barbier's pursuit of personal interests independent of the company. As such, the motion's cases are inapposite. *See Langer v. Paysafe Partners LP*, No. 19-cv-4388, 2020 WL 7684885, at *10 (E.D.N.Y. May 22, 2020) (individuals' alleged reason for participating in scheme was "to confer a benefit upon [entity]" and thus not personal); *Christians of Cal., Inc. v. Clive Christian N.Y.*, No. 13-cv-275, 2015 WL 468833, *9 (S.D.N.Y. Feb. 3, 2015) (dismissing claim where alleged co-conspirators were four affiliated entities and one individual, absent evidence "the only defendant who [was] a living person" had distinct personal motive); *Nassau Cnty. Emp. "L" v. Cnty. of Nassau*, 345 F. Supp. 2d 293, 305 (E.D.N.Y. 2004) (dismissing claim where there was "no allegation" individual defendant pursued own "interests"); *Rhodes v. Tevens*, No. 07-cv-

471S, 2012 WL 777421 (W.D.N.Y. Mar. 7, 2012) (vague allegations of career-furthering motives insufficient).

### B. <u>The Evidence Would Support a Reasonable Jury in Finding that Dr. Burns Conspired with Cassava and Barbier to Prosecute Plaintiffs</u>

The motion challenges the conspiracy claim against Dr. Burns, arguing that Cassava "did not need or seek her agreement" to commence or continue the Defamation Action. (BB-Br. at 20-21.) This argument rests on the same cherrypicked evidence and discredited testimony as the motion's argument to dismiss the malicious prosecution claim against Dr. Burns and fails for the same reasons. (*Supra* § IV.) The motion also ignores this Court's prior finding that "the existence of an agreement connecting Dr. Burns and Barbier to Cassava's initiation of the Defamation Action" could be shown by evidence that "Defendants were all aware of or contributed to the purported research misconduct underlying Cassava's claims regarding simufilam"; and "Dr. Burns and Barbier publicly amplified Cassava's allegations from the Defamation Action regarding Plaintiffs' motives and integrity." *Heilbut*, 778 F. Supp. 3d at 578 (citing *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03-cv-3120, 2005 WL 1902780, at *18 (S.D.N.Y. Aug. 9, 2005); and *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 414 (S.D.N.Y. 2015).) Discovery has substantiated this claim with evidence of Dr. Burns's participation in the research misconduct underlying Cassava's claims (*see* PCC ¶¶ 347-358); her amplification (if not origination) of Cassava's attacks on Plaintiffs' motives and integrity (*see id.* ¶¶ 384-395, 451); her zealous encouragement of the company's prosecution of Plaintiffs (*see id.* ¶¶ 453-473); and her active involvement in the litigation, including the particular manner in which the company served Dr. Heilbut (*see id.* ¶¶ 474-475).

### C. <u>The Conspiracy Claim Is Not Duplicative</u>

*First*, the motion ignores that the conspiracy claim also ties Burns and Barbier to the anti-SLAPP claim asserted against Cassava. (*See* FAC ¶¶ 206-214.) Thus, the conspiracy claim is not merely duplicative of the malicious prosecution claim asserted against them.

*Second*, the motion fails to support its assertion that "courts have repeatedly rejected" these types of conspiracy claims as duplicative. The cited decisions do not, as the motion suggests, hold that conspiracy claims must be dismissed as duplicative of underlying tort claims—rather, they dismiss conspiracy claims where (i) the underlying tort claim has been dismissed; or (ii) the conspiracy claims are duplicative of aiding and abetting claims. *See Gan v. GSUIG Real Est. Member LLC*, 797 F. Supp. 3d 69, 111 (E.D.N.Y. 2025) (dismissing claims for conspiracy to breach fiduciary duty and to breach a contract as duplicative of claims for aiding and abetting breach of fiduciary duty and tortious interference with contract), *aff'd,* No. 25-cv-2313, 2026 WL 1145891 (2d Cir. Apr. 28, 2026); *Hua Xue v. Jensen*, No. 19-cv-1761 (VSB), 2020 WL 6825676, at *12 (S.D.N.Y. Nov. 19, 2020) (dismissing conspiracy claim as "derivative" and "duplicative" of dismissed fraud claim) (citing *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, No. 99-cv-9623, 2007 WL 1040809, at *26 (S.D.N.Y. Apr. 4, 2007), a*ff'd sub nom. Briarpatch Ltd. LP v. Phoenix Pictures, Inc.*, 312 F. App'x 433 (2d Cir. 2009) (dismissing conspiracy claim as duplicative of aiding and abetting claim)).

Barbier and Dr. Burns are not entitled to dismissal of the conspiracy claim.

## CONCLUSION

Plaintiffs respectfully request that the Court deny the motions for summary judgment.

Dated: September 14, 2026
New York, New York

CLARICK GUERON REISBAUM LLP

By: */s/ Isaac B. Zaur*

Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*

## CERTIFICATION OF COMPLIANCE

Pursuant to this Court's Order (Dkt. 246), undersigned counsel for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris, hereby certifies that the number of words in the foregoing memorandum of law, excluding footnotes and excluding the caption, table of contents, table of authorities, signature block, and this certification, contains 17,252 words according to the word-processing system used to prepare it.

Dated: September 14, 2026
New York, New York


CLARICK GUERON REISBAUM LLP

By: */s/ Isaac B. Zaur*
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*