**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>Plaintiffs,<br><br>v.<br><br>CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,<br><br>Defendants. | Case No. 1:24-cv-05948-JLR-OTW<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' RESPONSE TO CASSAVA'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

Dated: September 14, 2026

CLARICK GUERON REISBAUM LLP
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris hereby submit Plaintiffs' Response to Cassava's Rule 56.1 Statement of Undisputed Facts. (*See* Dkt. 237.) Concurrently herewith, Plaintiffs are separately submitting Plaintiffs' Consolidated Rule 56.1 Counterstatement of Additional Material Facts ("**PCC**"), and associated Plaintiffs' Exhibits ("**PX []**").

**PLAINTIFFS' RESPONSE TO CASSAVA'S STATEMENT OF UNDISPUTED FACTS**[1]

1. Simufilam was Cassava's investigational drug candidate for the treatment of Alzheimer's Disease. Joint Statement of Undisputed Facts § 1.

**Plaintiffs' Response**: Undisputed.

2. Cassava conducted Phase 3 clinical trials to determine whether the drug met prespecified endpoints that could support an application for FDA approval. Exhibit 1 (Schoen Dep. Tr.) at 14:3–23, 15:15–24.

**Plaintiffs' Response**: Undisputed that Cassava sponsored Phase 3 clinical trials of simufilam as part of its Alzheimer's disease program. Disputed insofar as the contention implies Cassava's actual, reasonable, or good-faith purpose in sponsoring the trials was to determine whether simufilam could meet prespecified endpoints, considering its knowledge that the critical underlying research had never been corroborated, confirmed, or verified (*see* PCC ¶¶ 314–316, 319–320; *see also* PCC ¶¶ 224, 313, 317–318, 321) and knew that Plaintiffs and other critics had raised legitimate concerns about the integrity of the phase 2 data used to justify phase 3 trials (*see* PCC ¶¶ 232–234; *see also* PCC ¶¶ 323–330, 339–367).

[1] To the extent any response is required to the headings in Cassava's statement, Plaintiffs dispute the headings as unsupported by evidence.

3. Cassava requested Special Protocol Assessments ("SPAs") for proposed Phase 3 protocols on May 6, 2021. After FDA responded on June 18, 2021 that the proposals as presented would not support regulatory submission, Cassava submitted revised requests on July 7, 2021, and FDA responded on August 20, 2021 that the revised SPAs would support regulatory submissions. Exhibit 2 (CASSAVA_000543313) at 3313, 3317; Exhibit 3 (CASSAVA_000543318) at 3318, 3322; Exhibit 4 (CASSAVA_000092905) at 2905, 2907; Exhibit 5 (CASSAVA_000379608) at 9608, 9610; Exhibit 6 (Harvey Report) ¶¶ 55–56.

**Plaintiffs' Response**: Undisputed.

4. The Phase 3 program comprised two double-blind, randomized, placebo-controlled studies in patients with mild-to-moderate Alzheimer's disease: RETHINK-ALZ, designed to enroll approximately 750 patients for 52 weeks, and REFOCUS-ALZ, designed to enroll approximately 1,000 patients for 76 weeks. Exhibit 7 (CASSAVA_000939067) at 9074-9076.

**Plaintiffs' Response**: Undisputed.

5. The approximately 2,000-patient Phase 3 program was a major undertaking for a biotechnology company of Cassava's size. Exhibit 8 (Barry Dep. Tr.) at 199:14–23; Exhibit 1 (Schoen Dep. Tr.) at 10:17–25; Exhibit 7 (CASSAVA_000939067) at 9074-9076; Exhibit 9 (CASSAVA_001308025) at 8035.

**Plaintiffs' Response**: Undisputed.

6. When Cassava decided to commence the Defamation Action, both Phase 3 trials were enrolling patients. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 20:2-12; Exhibit 7 (CASSAVA_000939067) at 9074-9076; Exhibit 11 (CASSAVA_001440911) at 0912.

**Plaintiffs' Response**: Disputed insofar as the cited testimony does not support the contention about the timing of the decision to commence the Defamation Action. Cassava has withheld as privileged the substance of Board discussions concerning the Defamation Action; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Board's conduct concerning the Defamation Action. (*See* PX 8 (Barry Dep. Tr.) at 64:14-66:10 (instructed not to answer questions about the Board's deliberations concerning the Defamation Action); *id.* at 81:14-82:24 (same); PX 16 (Cassava 30(b)(6) Tr.) at 34:05-13 (same), 50:09-14 (same); PX 5 (Barbier Dep. Tr.) at 148:05-11 (same), 149:01-12 (same)). Further, the cited documents do not support the contention and are inadmissible hearsay insofar as they are offered for the truth of their contents.

7. As of September 2022, 538 patients were enrolled in the two Phase 3 trials and 148 clinical sites had been initiated. Sites were recruiting in the United States and Canada, and additional sites were being activated in Australia and South Korea. Exhibit 7 (CASSAVA_000939067) at 9074-9075.

**Plaintiffs' Response**: Undisputed.

8. Cassava expected second-half 2022 operating expenses of approximately $45 million to $50 million, driven in part by Phase 3 enrollment timing. Exhibit 7 (CASSAVA_000939067) at 9079; CASSAVA_001440911 at 0912.

**Plaintiffs' Response**: Undisputed.

9. Cassava completed enrollment in both Phase 3 trials in November 2023, with 804 randomized patients in RETHINK-ALZ and 1,125 randomized patients in REFOCUS-ALZ, for 1,929 randomized patients in total. Exhibit 9 (CASSAVA_001308025) at 8035. By that

time, Cassava had spent at least $110 million running the Phase 3 trials. Exhibit 47 (CASSAVA_001023794) at 3795.

**Plaintiffs' Response**: Undisputed.

10. As of June 7, 2024, RETHINK-ALZ had 486 completers, 156 active patients, and 162 early terminations, while REFOCUS-ALZ had 339 completers, 544 active patients, and 242 early terminations. Exhibit 9 (CASSAVA_001308025) at 8035.

**Plaintiffs' Response**: Undisputed that the cited document reflects those figures. Disputed insofar as the document is inadmissible if offered for the truth of its contents.

11. As of June 2024, FDA had directed Cassava to remain consistent with the previously granted SPAs. Cassava expected Phase 3 efficacy data by December 2024, and planning for a potential new drug application was ongoing. Exhibit 9 (CASSAVA_001308025) at 8035, 8039.

**Plaintiffs' Response**: Disputed insofar as the cited evidence does not support the contention about what the FDA directed.

12. RETHINK-ALZ continued through October 2, 2024, and REFOCUS-ALZ continued through December 30, 2024. See RETHINK-ALZ, ClinicalTrials.gov No. NCT04994483, https://clinicaltrials.gov/study/NCT04994483 (last updated May 25, 2025); REFOCUS-ALZ, ClinicalTrials.gov No. NCT05026177, https://clinicaltrials.gov/study/NCT05026177 (last updated Sept. 22, 2025).

**Plaintiffs' Response**: Undisputed.

13. FDA was aware of allegations concerning simufilam-related data integrity, possessed authority to hold, terminate, or restrict the trials, and communicated nothing to Cassava

indicating that FDA had concluded that the clinical program was based on fabricated data or a fraudulent scientific premise. Exhibit 6 (Harvey Report) ¶ 16; Exhibit 12 (CASSAVA_000696066) at 6068.

**Plaintiffs' Response**: Disputed. *First*, the cited evidence does not support the contentions about the FDA's knowledge or communications.

*Second*, the contentions are contradicted by the FDA's October 27, 2020 letter to Cassava stating that its assertions about the results of simufilam's phase 2a and 2b studies were "untenable" and "highly speculative," and that the unexplained exclusion criteria applied to the phase 2b cognitive data "limits the interpretability of the data" (PX 88 (CASSAVA_000100022) at 023-024); the FDA's findings from its audit of Dr. Wang's lab in September 2022, described in the FDA's Form 483 (PX 144 (CASSAVA_000898032) at 032-033) and Inspection Report (PX 222 (CUNY 001529) at 532), including the finding that there were "inadequate source records to reconstruct" the simufilam phase 2b study; and the FDA's November 1, 2022 communication stating that the phase 2b biomarker data "could not be verified" and should be removed from the investigator's brochure, which the FDA reiterated on November 16, 2022 (PX 172 (CASSAVA 001213617) at 620).

*Third*, the contentions are inconsistent with the fact that in or around December 2025, the FDA ultimately did place the company's subsequent simufilam program on full clinical hold. (PX 254 (2025.12.18 Cassava 8-K); PX 235 (Harvey Dep. Tr.) at 199:19-200:01 ("if FDA had found evidence of fraud or data manipulation, that would have been a reason to put it on clinical hold.").)

14. On August 18, 2021, two petitioners whose identities were not disclosed in the submission and who transmitted the materials anonymously through counsel submitted a Citizen Petition and accompanying report asking FDA to halt two simufilam trials. Exhibit 13 (SITRICK_01485) at 1485–87; Exhibit 12 (CASSAVA_000696066) at 6066.

**Plaintiffs' Response**: Undisputed.

15. On September 1, 2021, they submitted an additional petition asking FDA to halt another simufilam trial. Exhibit 12 (CASSAVA_000696066) at 6066.

**Plaintiffs' Response**: Undisputed.

16. The petitioners were later identified as David Bredt and Geoffrey Pitt, each of whom had taken a short position in Cassava securities before submitting the petitions. Exhibit 14 (Milioris Dep. Tr.) at 326:19–327:9; Exhibit 15 (Heilbut Dep. Tr.) at 83:25–84:3; 84:20–24; Exhibit 16 (Bredt RFA Resp.) No. 1 at 8, No. 2 at 9; Exhibit 17 (Pitt RFA Resp.) No. 1 at 8, No. 2 at 9.

**Plaintiffs' Response**: Undisputed.

17. On February 10, 2022, FDA denied both Citizen Petitions. Exhibit 12 (CASSAVA_000696066) at 6066.

**Plaintiffs' Response**: Disputed insofar as the contention omits material context, including the administrative basis for the denial. That the FDA stated in its February 10, 2022 letter: "[The] Petitions are being denied solely on the grounds that [the Petitioners'] requests are not the appropriate subject of a citizen petition. This response does not represent a decision by the Agency to take or refrain from taking any action relating to the subject matter of [the] Petitions." (Cassava Exhibit 12 (CASSAVA_000696066) at 6068.)

18. Dr. Adrian Heilbut publicly called Cassava a "fraud" and a "complete fraud" and stated that "$SAVA is 100 percent BS." Exhibit 49 (*Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, Ex. A (S.D.N.Y. Mar. 28, 2024)) at 6, 7, 9, 10, 12-14.










He testified that what he meant by this was that Cassava's scientific basis was "substantially made-up and fraudulent" and that no scientific basis for studying simufilam in humans was "true or justified." Exhibit 15 (Heilbut Dep. Tr.) at 8:10–17, 9:11–17, 10:14–24, 11:3–20.

**Plaintiffs' Response**: Undisputed, except insofar as the contentions paraphrase the cited documents and testimony, which speak for themselves, and insofar as the contention omits the context in which the statements were made and that Dr. Heilbut disclosed the bases for his statements, clearly conveyed to reasonable readers that the statements were opinions, and disclosed that he held a short position.

19. Dr. Heilbut stated that there was "no ethical or regulatory justification for further clinical trials," that "the biology was MADE UP," that "it is all fabricated nonsense," and that "Wang and $SAVA . . . are LIARS, and it is ALL MADE UP." Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 2, 3, 10.




**Plaintiffs' Response**: Undisputed.

20. Dr. Jesse Brodkin publicly stated, "I will NEVER cover Sava. Simufilam is a frauuud!"; stated that Cassava either "has been lying to us for months about having the blots" or "submitted fake evidence to the Journal of Neuroscience"; and later stated that Cassava was

"committing securities fraud by lying about [its] 'science.'" Exhibit 18 (Brodkin Dep. Tr.) at 139:2–140:7, 140:18–142:12, 212:6–24; Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 1, 8.




**Plaintiffs' Response**: Undisputed, except insofar as the contentions paraphrase the cited documents and testimony, which speak for themselves, and insofar as the contention omits the context in which the statements were made and that Dr. Brodkin disclosed the bases for his statements, clearly conveyed to reasonable

readers that the statements were opinions, and disclosed that he held a short position.

21. Dr. Brodkin also stated that allowing "an obvious fraud like $SAVA" to continue taking advantage of patients, investors, and families made a mockery of the regulatory framework, followed by "50:50 Remi ends up behind bars." Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 4.




Dr. Brodkin confirmed that this statement accused Cassava of intentional fraud and accused Barbier of criminal acts. Exhibit 18 (Brodkin Dep. Tr.) at 190:12–191:23, 237:3–238:9.

**Plaintiffs' Response**: Undisputed except insofar as the contentions paraphrase the cited documents and testimony, which speak for themselves.

22. Dr. Enea Milioris publicly compared Cassava to "Flintstones Theranos" and asked, "How is it legal for $SAVA to spinal tap folks and then just make up their biomarker values?" Exhibit 14 Milioris Dep. Tr.) at 218:1–22, 223:9–224:18; Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 4, 5.

**Enea Milioris**
@DRnotaDR

A Western Blot-based blood diagnostic with unprecedented accuracy is the Flintstones' Theranos $SAVA

> **Jesse Brodkin** @jesse_brodkin · Nov 29, 2021
> 💊📰Breaking $sava Fraud News📰💊:
> We FOIA'd some emails from Cassava's collaborator Dr. Xu to SAB member and Western Blot magic-man Dr. Wang. By a stroke of luck we happened to catch the behind-the-scenes exchange of the raw data behind the $sava AD diagnostic SavaDx...1/3

**From:** Qiang Xu <qxx07a@acu.edu>
**Sent time:** 01/24/2021 10:48:30 PM
**To:** Ben Thornton <gthornton@cassavasciences.com>; Ben Thornton <gbt20a@acu.edu>; Hoau-Yan wang <[redacted]@gmail.com>; Hoau-yan Wang
**Subject:** [EXTERNAL] 20210124 results
**Attachments:** 20210124 Western blot results.xlsx

Hi Ben and Hoau,

Hope you are well! Attached is today's results and analysis.

Blessings,

John

--
Qiang (John) Xu, Ph.D.
Professor
Department of Biology
Abilene Christian University
ACU Box 27868
Abilene, Texas 79699-7868

3:07 PM · Nov 29, 2021




**Plaintiffs' Response**: Undisputed, except insofar as the contentions paraphrase the cited documents and testimony, which speak for themselves, and insofar as the contention omits the context in which the statements were made and that Dr. Milioris disclosed the bases for his statements, clearly conveyed to reasonable readers that the statements were opinions, and disclosed that he held a short position.

23. In another exchange, beneath "Sue me for libel," Dr. Milioris wrote, "SAVA data are made up," followed by a trademark notation. He testified that the notation was a joking reference to the accusation being "almost our trademark" and that "our" included himself and Dr. Heilbut. Exhibit 14 (Milioris Dep. Tr.) 236:23–237:21; Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A) at 18.

**Plaintiffs' Response**: Undisputed, except insofar as the contentions paraphrase the cited documents and testimony, which speak for themselves.

24. When Dr. Milioris published the statement about made-up biomarker values, he did not believe he had evidence that anyone at Cassava had fabricated those values and later could not identify any such evidence. Exhibit 14 (Milioris Dep. Tr.) at 219:18–223:1.

**Plaintiffs' Response**: Disputed insofar as the contention seeks to paraphrase and mischaracterizes three pages of testimony, which speaks for itself, and which show the questioning was aimed at distinguishing Dr. Wang and Cassava.

25. Dr. Heilbut took a short position in Cassava securities the same month he began tweeting about Cassava; Dr. Brodkin bought put options before the group's first publication about Cassava; and Dr. Milioris took a short position before contacting any regulatory authority. Exhibit 15 (Heilbut Dep. Tr.) at 301:2–21, 303:4–20, 306:3–10; Exhibit 18 (Brodkin Dep. Tr.) at 292:14–23; Exhibit 14 (Milioris Dep. Tr.) at 337:2–20, 338:6–13, 338:20-339:8.

**Plaintiffs' Response**: Undisputed.

26. In a November 8, 2021 communication, Dr. Heilbut wrote that he was "no doubt guilty" of calling Cassava a fraud, advised Dr. Brodkin to distinguish "scientific fraud" from accusing someone of a crime, and advised against calling Cassava a fraud. Dr. Brodkin responded that "corrective action" had been taken and testified that he likely deleted a tweet. Exhibit 18 (Brodkin Dep. Tr.) at 150:5–18, 151:5–24; Exhibit 50 (PLAINTIFFS0207417) at 2.

**Plaintiffs' Response**: Undisputed.

27. After the Defamation Action was filed, Dr. Heilbut urged the group to focus on "the data, science, [and] papers" and avoid opinions about people, the company, or their motives or character; at that time, he was not certain of any particular individual's motive or intent. Exhibit 15 (Heilbut Dep. Tr.) at 323:8–25, 324:13–25, 325:10–18; Exhibit 51 (PLAINTIFFS0229623) at 3.

**Plaintiffs' Response**: Undisputed.

28. Cassava received reports that some clinical sites had agreed to participate and then withdrew, that some physicians had patients who would have enrolled but for online statements

describing Cassava as a fraud, and that unidentified individuals had contacted clinical sites and questioned how the sites could work with a company described as a fraud. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 20:13–21:20. Barry testified that "[a]cademic centers, in particular, worry about their reputation. And those are the ones that we lost, and it was because of this." Exhibit 8 (Barry Dep. Tr.) at 202:13-15.

**Plaintiffs' Response**: Disputed. *First*, the cited evidence does not support the contentions. The cited testimony from Cassava's 30(b)(6) witness ignores his subsequent admission that the company had no evidence connecting whoever was purportedly calling clinical trial sites to statements by Plaintiffs (Cassava Exhibit 10 at 23:11-14). And, the cited testimony from Barry is in reference to a document (marked in his deposition as exhibit 92), in which a clinical trial site—UCSF—told Cassava that it was withdrawing from the phase 3 trials because of a New York Times article and Cassava's "unacceptable" response to the article:

> "The Times article raised significant and comprehensive concerns about the integrity of the data supporting use of simufilam - the scope of which we were not aware.
>
> "Further, we found your use of our site's participation in the trial in an attempt to counter Dr. Nicoll's legitimate concerns to be completely unacceptable.
>
> "Due to the these concerns and others, our site will no longer be participating in your trial. We have halted all screening and enrollment activity, and we are moving to terminate our contract."

(PX 203 (CASSAVA_001444921) at 921.)

*Second*, despite asserting in the Defamation Action that Plaintiffs caused nine clinical trial sites to withdraw or decline to participate in the phase 3 trials (Defamation FAC ¶ 430)—the company's corporate representative could not name a single one and was not aware of any specific patient or site that ever

attributed their decision not to participate to anything Plaintiffs said or did. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

*Third*, there is no evidence showing a single patient or trial site attributing a decision not to participate in the trials to anything Plaintiffs said or did—and the company's 30(b)(6) witness was unaware of any such evidence. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

*Fourth*, the contemporaneous evidence shows that clinical trial sites told Cassava they were withdrawing or declining to participate in the trials for other reasons, including reporting by the New York Times (*see* PX 203 (CASSAVA_001444921), PX 158 (CASSAVA_000995649), PX 182 (CASSAVA_001320378)); the NIH's investigation (*see* PX 184 (CASSAVA_001335110)); and retractions of simufilam research by the journal *PLOS One* (*see* PX 151 (CASSAVA_000956262) ("More sites concerned about PLOS that we have to address")).

*Fifth*, after the New York Times published an article in April 18, 2022 (PX 293), Dr. Burns led an effort to contact sites, summarizing the conversations in an Excel spreadsheet that Dr. Burns labeled "FUD response to Sites"; even in Dr. Burns's accounts of these conversations, there is no record of any site mentioning Plaintiffs or Plaintiffs' statements. (PX 161 (CASSAVA_001008843) at 843, 845 (tracking chart).)

29. On April 4, 2022, the Executive Director of the Lehigh Center for Clinical Research informed Premier Research and Cassava that, after internal discussions concerning public developments the site regarded as increasingly troubling, the site had decided to withdraw

from protocol PTI-125-07. Exhibit 19 (CASSAVA_001133797) at 6263; Exhibit 20 (Burns Dep. Tr.) at 262:10–264:16.

**Plaintiffs' Response**: Disputed. The contention that the clinical site Lehigh attributed its decision to withdraw to unspecified "public developments" mischaracterizes the cited evidence and factual record. The cited evidence shows Dr. Burns describing a conversation with Lehigh's Executive Director in which he reported being troubled by questions he could not answer concerning retractions of Dr. Burns's and Dr. Wang's research by the scientific journal *PLOS One*. (Cassava Exhibit 19 (CASSAVA_001133797) at 3797.) *PLOS One* issued retraction notices for five papers co-authored by Dr. Wang and/or Dr. Burns on March 30, 2022. (PCC ¶ 241; PX 265 to 269.) After receiving Lehigh's email on April 4, 2022, Dr. Burns forwarded it to outside counsel and wrote: "More sites concerned about PLOS that we have to address." (PX 151 (CASSAVA_000956262) at 262.)

30. Cassava's Board of Directors made the decision to commence the Defamation Action after receiving advice from outside counsel at Benesch and Orrick, and Cassava's Chief Legal Officer. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 17:23–18:11; Exhibit 21 (Cassava July 24 Interrog. Resp.) No. 1 at 4-5.

**Plaintiffs' Response**: Disputed. *First*, when asked about who at the company decided to retain the law firm Benesch to represent the company in the Defamation Action, Rick Barry, current CEO and then-Board member, testified: "Remi was always the decision maker, so we were advising." (PX 8 (Barry Dep. Tr.) at 195:12-16.) Barry further testified that he could not recall whether there

was ever a vote of the Board to authorize the Defamation Action. (PX 8 (Barry Dep. Tr.) at 71:11-71:22.)

*Second*, the cited Interrogatory Response states: "Cassava's Board of Directors and Cassava's CEO, Remi Barbier, were the primary individuals involved in the decision to file the Defamation Action." (Cassava Ex. 21 at 4-5.)

*Third*, while Cassava announced the hiring of the Chief Legal Officer (Chris Cook) on October 27, 2022, Cassava asserted in the context of discovery disputes that Cook had no role in the decision to commence the Defamation Action because he did not start at the company until after the lawsuit was filed on November 2, 2022. (*See, e.g.*, Dkt. 47 at 2 (objecting to proposed deposition of Cook because he "was hired after the Defamation Action commenced").)

*Fourth*, the contention ignores the integral role that Dr. Burns played in pursuing, encouraging, and directing the prosecution of Plaintiffs and other critics through the Defamation Action. (PCC ¶¶ 452–477; *see also* PCC ¶¶ 441–451.)

31. The Board, then-Chief Executive Officer, Chief Legal Officer, and outside counsel were also the primary participants or advisers in decisions to continue the Defamation Action. Exhibit 21 (Cassava July 24 Interrog. Resp.) Nos. 1–2 at 4–5.

**Plaintiffs' Response**: Disputed on the same bases as Paragraph 30, *supra*, except insofar as the third basis (concerning Cook) does not apply to this contention.

32. Cassava's Chief Financial Officer attended every Board meeting and was present for the Board's deliberations. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 19:1–11.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention that Schoen attended "every Board meeting." Schoen later corrected

this testimony to state that he did not attend special meetings of the Board and that he may have missed one or two regular board meetings but could not recall. (PX 24 (Schoen Dep. Tr.) at 32:05-35:05.)

33. The Board acted in response to statements asserting that Cassava was a fraud and that simufilam was unsafe, and to efforts Cassava understood as seeking to shut down its trials. The business considerations included litigation expense and concern that public accusations of fraud were impeding recruitment. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 19:12–20:20; Exhibit 7 (CASSAVA_000939067) at 9079; Exhibit 11 (CASSAVA_001440911) at 0912.

**Plaintiffs' Response**: Disputed. *First*, the cited evidence does not support the contentions. Cassava's 30(b)(6) witness testified: "the important piece of this is we were enrolling two large Phase 3 clinical trials, and the defamatory, false statements of the defendants were, either directly or indirectly -- impossible to tell -- inhibiting our ability to recruit." (Cassava Exhibit 10 at 20:07-20:20.)

*Second*, Cassava has withheld as privileged the substance of Board discussions concerning the Defamation Action; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Board's conduct or "considerations" concerning the Defamation Action. (*See* PX 8 (Barry Dep. Tr.) at 64:14-66:10 (instructed not to answer questions about the Board's deliberations concerning the Defamation Action); *id.* at 81:14-82:24 (same); PX 16 (Cassava 30(b)(6) Tr.) at 34:05-13 (same), 50:09-14 (same); PX 5 (Barbier Dep. Tr.) at 148:05-11 (same), 149:01-12 (same).) The cited documents lack detail and/or are redacted, and are inadmissible hearsay insofar as they are offered for the truth of their contents.

*Third*, the contention that the decision to commence the Defamation Action was a Board decision is disputed by contradictory evidence that Barbier was "always the decision maker" (PX 8 (Barry Tr.) at 195:15-16), and Dr. Burns was integral to the decision (*see* PCC ¶¶ 452–477; *see also* PCC ¶¶ 441–451). *See also supra* Paragraphs 20-31.

*Fourth*, there is no evidence that Plaintiffs asserted that simufilam was "unsafe" (*see* PX 24 (Schoen Dep. Tr.) at 128:18-132:01 (admitting that statements did not assert that simufilam was unsafe), nor evidence that Defendants pursued the Defamation Action to prove any statements about "safety" were false.

34. Cassava's identified purposes for filing the Defamation Action were to respond to accusations it regarded as false and to protect its ability to recruit for and conduct the Phase 3 trials. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 23:20–24:13.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention. Contrary evidence shows Defendants knew they could never prove falsity or prevail in the Defamation Action (*see* PCC ¶¶ 250–251, 367; *see also* PCC ¶¶ 243–249, 252–259, 260–306); Defendants knew Plaintiffs' statements raised legitimate concerns about the integrity of their research (*see* PCC ¶¶ 232–236, 313–322; *see also* PCC ¶¶ 323–367, 369–373); and there is no evidence showing Plaintiffs' statements negatively affected trial enrollment but ample evidence showing other reasons for trial sites and patients declining to participate (*see* PCC ¶¶ 422–428).

35. Schoen testified on behalf of Cassava that the company welcomes "scientific debate [and] criticism of the company" but could not abide "defam[ing] the company with statements that are known to be untrue," accusations of "fraud," and suggestions that its drug was "unsafe." Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 253:24-254:6; *id.* at 24:2-8. Schoen further testified that Plaintiffs' statements were "impacting the company's ability to recruit and run a Phase 3 trial -- and the whole reason you do that is to find out if a drug works." *Id.* at 24:10-12.

**Plaintiffs' Response**: Disputed. *First*, the contentions mischaracterize Cassava's 30(b)(6) testimony. The cited testimony on page 253 and 254 concerns Cassava's decision to publicize the Defamation Action through a press release. (PX 177 (CASSAVA_001278817).) The cited testimony on page 24 referred to ostensible statements that simufilam was unsafe, but Plaintiffs did not assert that simufilam was unsafe. (*See* PX 24 (Schoen Dep. Tr. 128:18-132:01) (admitting that statements did not assert that simufilam was unsafe).)

*Second*, the testimony that Cassava welcomes debate and criticism is not credible and is contradicted by evidence showing the Defendants did not welcome debate or criticism (PCC ¶¶ 384–395; *see also* PCC ¶¶ 446–451 (showing Defendants' anger at criticism)).

36. Cassava believed statements on cassavafraud.com were false or misleading and damaging the company. Exhibit 8 (Barry Dep. Tr.) at 67:1–24.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention as it merely reflects Barry's conclusory assertion and a passing reference to the website. Contrary evidence shows Defendants knew they could never prove falsity or prevail in the Defamation Action (*see* PCC ¶¶ 250–251, 367; *see also* PCC ¶¶ 243–249,

252–306); Defendants knew Plaintiffs' statements raised legitimate concerns about the integrity of their research (*see* PCC ¶¶ 232–236, 313–322; *see also* PCC ¶¶ 323–367, 369–373); and there is no evidence showing Plaintiffs' statements were negatively affecting trial enrollment but ample evidence showing other reasons for trial sites and patients declining to participate (*see* PCC ¶¶ 422–428).

37. Cassava's ad hoc Litigation Monitoring Committee met seven times between September 1, 2021 and November 1, 2022, with attorneys from Orrick or Benesch attending by invitation. At meetings on October 29 and November 1, 2022, counsel made reports and the Committee reached a consensus to proceed as discussed. Exhibit 22 (CASSAVA_000545144); Exhibit 23 (CASSAVA_000799544); Exhibit 24 (CASSAVA_000395575); Exhibit 25 (CASSAVA_001435249); Exhibit 26 (CASSAVA_001435250); Exhibit 27 (CASSAVA_001434669); Exhibit 28 (CASSAVA_001440099); Exhibit 8 (Barry Dep. Tr.) at 125:6-126:23.

**Plaintiffs' Response**: Undisputed that the Committee was formed, but disputed insofar as Cassava has withheld the substance of discussions involving the Litigation Monitoring Committee; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Litigation Monitoring Committee. (*See* PX 8 (Barry Dep. Tr.) at 60:18-62:13 (instructed not to answer questions regarding substance of litigation committee discussions and deliberations); *id.* at 122:24-123:17 (instructed not to answer whether litigation committee discussed FDA audit, findings, or correspondence); PX 5 (Barbier Dep. Tr.) at 197:7-19 (instructed not to answer regarding substance of discussions at litigation committee meeting).) Further disputed as inadmissible insofar as the evidence of

the Litigation Monitoring Committee's existence or purported consultations are offered for the purpose of drawing inferences of good faith.

Further, the cited testimony shows that Barry did not recognize and was unable to testify to the cited meeting minutes.

38. Before filing, the Litigation Monitoring Committee of Cassava's Board of Directors discussed its belief that Plaintiffs were defaming Cassava, harming Phase 3 recruitment, and unfairly damaging the company's reputation. Exhibit 8 (Barry Dep. Tr.) at 62:25–63:23.

**Plaintiffs' Response**: Disputed. The contentions mischaracterize the cited testimony, in which Barry subsequently clarified that he could not recall if the referenced discussions were "individual discussions or committee meetings." (PX 8 (Barry Dep. Tr.) at 62:25-68:05).) Cassava has withheld the substance of discussions involving the Litigation Monitoring Committee; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Litigation Monitoring Committee. (*See* PX 8 (Barry Dep. Tr.) at 60:18-62:13 (instructed not to answer questions regarding substance of litigation committee discussions and deliberations); *id.* at 122:24-123:17 (instructed not to answer whether litigation committee discussed FDA audit, findings, or correspondence); PX 5 (Barbier Dep. Tr.) at 197:7-19 (instructed not to answer regarding substance of discussions at litigation committee meeting).) Further disputed as inadmissible insofar as the evidence of the Litigation Monitoring Committee's existence or purported consultations are offered for the purpose of drawing inferences of good faith.

39. Richard Barry shared that belief, but initially preferred to avoid confronting short sellers and focus on executing Cassava's business plan; he supported litigation only after concluding that

the conduct was affecting Phase 3 recruitment. Exhibit 8 (Barry Dep. Tr.) at 57:15–21, 62:25-63:23, 199:14–200:8.

**Plaintiffs' Response**: Disputed. The contention is unclear as to what belief Barry purportedly shared, and mischaracterizes the cited testimony. Further, Barry also testified that the lawsuit was counsel's idea (PX 8 (Barry Dep. Tr.) at 93:22), despite initially reacting to the report from the defamation defendant QCM by writing "looks like I may have a defamation case" (PX 8 (Barry Dep. Tr.) at 197:05-99:04). Further, there is no evidence that Plaintiffs' statements were affecting Phase 3 recruitment (*supra* Paragraph 28).

40. During executive sessions on March 4 and September 16, 2022, the independent directors discussed investigations and allegations concerning Cassava and recorded that they had received no facts indicating wrongdoing by, or causing them to doubt the integrity or actions of, Cassava's management or employees. Exhibit 29 (CASSAVA_001435035) at 5038; Exhibit 11 (CASSAVA_001440911) at 0913.

**Plaintiffs' Response:** Disputed. Cassava has withheld as privileged and/or work product the substance of the Orrick investigation; thus, Plaintiffs have been precluded from assessing or testing the truth of contentions about the Orrick investigation. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 69:10-15 (refusing to answer what findings from the Orrick investigation, if any, the company relied on as a basis for the Defamation Action); 152:05-18 (refusing to testify as to any experts Orrick relied on as part of investigation); 154:07-156:09 (Cassava counsel explanation of scope of privilege/work product assertions concerning Orrick

investigation).) Further disputed as inadmissible insofar as the outside counsel investigations are offered for the purpose of drawing inferences of good faith.

41. Before the filing decision, Cassava consulted at least three law firms, no decision to sue had been made before those consultations, and the Board made the ultimate decision after discussion, reasoning, and debate. Exhibit 30 (Barbier Dep. Tr.) at 124:8–17, 125:8–15.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention. Cassava has also withheld as privileged the substance of consultations with the purported "three law firms"; and thus, Plaintiffs have not been able to assess or test the truth of the contention about those purported consultations, such as whether two of the firms told Cassava *not* to file defamation claims because they lacked merit and could never succeed. (*See, e.g.,* PX 5 (Barbier Dep. Tr.) at 121:22–122:8 (refusing to answer questions about law firms' diligence), 123:18–124:1 (instructed not to answer whether the other two law firms recommended filing a defamation action) 130:1–131:16 (same); PX 16 (Cassava 30(b)(6) Tr.) at 36:17–38:06 (same).

Further, Cassava has withheld as privileged the substance of Board discussions concerning the Defamation Action; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Board's purported "discussion, reasoning, and debate" concerning the Defamation Action. (*See* PX 8 (Barry Dep. Tr.) at 64:14-66:10 (instructed not to answer questions about the Board's deliberations concerning the Defamation Action); *id.* at 81:14-82:24 (same); PX 16 (Cassava 30(b)(6) Tr.) at 34:05-13 (same), 50:09-14 (same); PX 5 (Barbier Dep. Tr.) at 148:05-11 (same), 149:01-12 (same).) Further disputed as

inadmissible insofar as the fact of these purported consultations are offered for the purpose of drawing inferences of good faith.

42. The Board considered the resources, time, effort, and staffing the litigation would require, whether Cassava had a sufficient legal basis and ability to prevail, and ultimately reached a unanimous filing decision. Exhibit 30 (Barbier Dep. Tr.) at 128:1–12, 129:2–21.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention. Cassava has withheld as privileged the substance of Board discussions concerning the Defamation Action; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Board's purported "considerations" concerning the Defamation Action. (*See* PX 8 (Barry Dep. Tr.) at 64:14-66:10 (instructed not to answer questions about the Board's deliberations concerning the Defamation Action); *id.* at 81:14-82:24 (same); PX 16 (Cassava 30(b)(6) Tr.) at 34:05-13 (same), 50:09-14 (same); PX 5 (Barbier Dep. Tr.) at 148:05-11 (same), 149:01-12 (same).)

Further, the contention that the decision to commence the Defamation Action was a Board decision is disputed by contradictory evidence that Barbier was "always the decision maker" (PX 8 (Barry Tr.) at 195:12-16), and at least inconsistent with Barry's testimony that the subsequent decision to dismiss the lawsuit was his decision not a Board decision (*id.* at 85:21 ("it was my decision").)

43. Dr. Burns did not participate in the Board's filing-decision process, understood the filing to be a Board action, and identified no role for herself in that decision; Cassava's corporate designee, who attended all relevant Board meetings, likewise was unaware of any such role.

Exhibit 20 (Burns Dep. Tr.) at 151:7–22, 152:8–12; Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 18:12–18.

**Plaintiffs' Response**: Disputed. The compound contention is improper. Dr. Burns's testimony is not credible and refuted by extensive evidence of her active encouragement and involvement in all aspects of the Defamation Action (*see* PCC ¶¶ 452–477; *see also* PCC ¶¶ 441–451), including apparently directing the manner in which Dr. Heilbut was served with the pleading—publicly at the Clinical Trials of Alzheimer's conference. On November 23, 2022, Dr. Burns texted a friend that she "would love to serve" Dr. Heilbut "at his poster" presentation at the CTAD conference. (PX 32 (BURNS_00000841) at 841.) On December 2, 2022, a process server served the Defamation Action pleadings on Dr. Heilbut at his poster presentation at the CTAD conference. (PX 73; PX 210 (PLAINTIFFS0180166).)

Schoen corrected his testimony about attending all Board meetings to clarify that he did not attend special meetings and may not have attended all regular Board meetings (*supra* Paragraph 32).

Further, Cassava has withheld as privileged the substance of Board discussions concerning the Defamation Action; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Board's conduct concerning the Defamation Action. (*See* PX 8 (Barry Dep. Tr.) at 64:14-66:10 (instructed not to answer questions about the Board's deliberations concerning the Defamation Action); *id.* at 81:14-82:24 (same); PX 16 (Cassava 30(b)(6) Tr.) at

34:05-13 (same), 50:09-14 (same); PX 5 (Barbier Dep. Tr.) at 148:05-11 (same), 149:01-12 (same).)

44. The witnesses in this case who addressed Cassava's filing decision identified the action's purposes as obtaining redress for statements Cassava believed were false, protecting Cassava's clinical operations and Phase 3 enrollment, and prevailing in the action; none identified harassment, intimidation, punishment, or suppression of protected speech as a purpose. Cassava's corporate designee expressly denied that the Defamation Action or its public announcement was intended to silence critics. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 23:20–24:13, 253:15–254:6, 258:18–259:16; Exhibit 8 (Barry Dep. Tr.) at 62:25–63:23, 67:1–24, 199:14–200:8; Exhibit 30 (Barbier Dep. Tr.) at 155:1–158:21.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention and the self-serving testimony is not credible, considering Defendants knew they could never prove falsity (*see* PCC ¶¶ 250–251, 367; *see also* PCC ¶¶ 243–249, 252–306), knew the statements were well-founded and raised legitimate concerns (*see* PCC ¶¶ 232–236, 313–322; *see also* PCC ¶¶ 323–367, 369–373), Defendants publicly threatened other critics when it publicized the Defamation Action (*see, e.g.,* PX 177 (CASSAVA_001278817) at 819 ("We are still investigating whether additional individuals or entities should be brought into this case or have separate claims brought against them"), and the Defamation Action was the centerpiece of a multi-pronged "offensive strategy" to silence criticism and evade liability (*see* PCC ¶¶ 396–411; *see also* PCC ¶¶ 384–395, 412–421, 451).

45. In a non-privileged discussion before the Defamation Action was filed, at least three members of the Litigation Monitoring Committee confirmed that the action was a means of

addressing harm to Cassava's reputation and its ability to recruit participants for its Phase 3 trial. Barry testified:

> Q: [D]id any members of the litigation committee discuss the purpose or purposes of the defamation lawsuit outside the presence of counsel before it was filed?
>
> A: [T]he company was being defamed by your clients, and it was hurting our ability to recruit a phase 3 trial, and severely damaging the reputation of the company unfairly . . . . It's unfair to express your scientific opinion of something as fact when, in fact, it's not fact; it's opinion. Exhibit 8 (Barry Dep. Tr.) at 62:25-63:20.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention that "three members" of the Litigation Monitoring Committee "confirmed" the contention's stated purposes; the testimony is the current CEO's self-serving account of a purported conversation or conversations of which he could not recall further details. (PX 8 (Barry Dep. Tr.) at 64:04-06.) Cassava has withheld the substance of discussions involving the Litigation Monitoring Committee; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Litigation Monitoring Committee. (*See* PX 8 (Barry Dep. Tr.) at 60:18-62:13 (instructed not to answer questions regarding substance of litigation committee discussions and deliberations); *id.* at 122:24-123:17 (instructed not to answer whether litigation committee discussed FDA audit, findings, or correspondence); PX 5 (Barbier Dep. Tr.) at 197:7-19 (instructed not to answer regarding substance of discussions at litigation committee meeting).)

The testimony is not credible insofar as there is no evidence Plaintiffs' statements caused any patient or trial site to decline to participate in the trials, whereas evidence shows patients and trial sites declined for other reasons (*supra* Paragraph 28).

46. Barry further testified that the purpose of the Defamation Action was to defend Cassava's reputation and the clinical safety of its drug candidate, stating:

> [Plaintiffs] took out a website on the internet, cassavafraud.com [that] had a number of statements on there that were false and misleading. They were certainly defamatory. We couldn't take it down. . . . Every time I Googled Cassava what came up first was cassavafraud.com. We don't think that we were frauds. The record will show that we weren't. We had to do something. The company was being really damaged by the defamatory statements by your clients. That's why we filed the suit.

Exhibit 8 (Barry Dep. Tr.) at 67:7-21. Barry believed Plaintiffs' statements would continue if Cassava did not file the Defamation Action. *Id.* at 67:22-24.

**Plaintiffs' Response**: Undisputed insofar as Barry implicitly agreed in the cited testimony that the goal was to silence Plaintiffs. Otherwise disputed insofar as the testimony is not supported by any contemporaneous evidence. Plaintiffs contest that the purported purposes mentioned by Barry reflect Defendants' actual purpose, based on evidence showing their sole purpose was to silence and intimidate critics (*see* PCC ¶¶ 384–395, 396–411; *see also* PCC ¶¶ 412–421, 446–451) and that their stated purposes of proving falsity and protecting enrollment are not credible (*see* PCC ¶¶ 250–251, 367, 422–428; *see also* PCC ¶¶ 243–249, 252–306)

47. Barbier similarly testified that the purpose of filing the Defamation Action was to "let the sun in" or "let the truth be told" about Cassava. Exhibit 30 (Barbier Dep. Tr.) at 157:3-4; 157:18-158:2.

**Plaintiffs' Response**: Disputed. The contention that Barbier's testimony was "similar" is disputed, given that Barbier did not testify that the purpose of the lawsuit was to protect Phase 3 trial enrollment or recruitment. Further disputed insofar as Barbier's testimony is not credible and he deferred to Benesch when

asked about the decision to file the Defamation Action and whether he believed Plaintiffs' statements were false. (PX 5 (Barbier Tr.) at 178:11-19 ("What I believe is that the attorneys who filed the defamation action believed there was legal grounds for -- to claim defamation as defined in the law."), 125:16-20 ("It wasn't for me [to] recommend. It was for the attorneys who specialize in this area of law to say thumbs up or thumbs down."), 127:16-20 (Q. "What facts did the company base its decision on?" A. "The fact that we got -- we felt we got very good legal advice from people with -- from legal experts in this specific, narrow field of the law.").)

Plaintiffs contest the actual purpose was "to let the sun in" or "let the truth be told," based on evidence showing Defendants' sole purpose was to silence critics and evade liability (*see* PCC ¶¶ 384–395, 396–411; *see also* PCC ¶¶ 412–421, 446–451) and their now-stated purposes of proving falsity, "letting the sun in," or protecting enrollment are not credible (*see* PCC ¶¶ 250–251, 367, 422–428; *see also* PCC ¶¶ 243–249, 252–306).

48. Cassava's corporate representative rejected the idea that its purpose in filing the Defamation Action or issuing concurrent press releases about the case was to send a message to critics. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 253:20-24.

**Plaintiffs' Response**: Undisputed that Cassava's 30(b)(6) witness provided the cited testimony. The testimony is not credible and is contradicted by the express language in the press release: "We are still investigating whether additional individuals or entities should be brought into this case or have separate claims brought against them." (PX 177 (CASSAVA_001278817) at 8819.)

49. When the Defamation Action was filed, Cassava possessed preclinical research, Phase 2 clinical results, a multi-site open-label study, and peer-reviewed publications that it regarded as evidence against accusations of fabrication or manipulation. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 9:11–10:19.

**Plaintiffs' Response**: Disputed. This compound contention is improper. It is not supported by the cited testimony, which does not establish what Cassava possessed at the time. Plaintiffs dispute the contention that Cassava "possessed" the cited research or results, considering Defendants' admissions that it never had the underlying data or research records (*see* PCC ¶¶ 252–259; *see also* PCC ¶¶ 280–281).

Further disputed that Cassava had an actual, reasonable, or good-faith belief that the cited materials were "evidence against accusations of fabrication or manipulation," considering Defendants knew (i) there were legitimate concerns about the integrity of the preclinical research conducted entirely by Dr. Wang and Dr. Burns, and the company had never "validate[]" its "basic science [] to prove" its "assertion about the method of action" of simufilam (*see* PX 200 (CASSAVA_001444640) at 643-644; *see also* PCC ¶¶ 313–322; *see also* PCC ¶¶ 232–236, 319–321); (ii) the Phase 2 "clinical results" focused on safety, not efficacy, and that there were signs of manipulation in the reported efficacy results (*see* PCC ¶¶ 339–367; *see also* PCC ¶¶ 323–330); and (iii) that several "peer-reviewed publications" had either been retracted or subjected to expressions of concern (*see* PCC ¶¶ 241–242); and (iv) there were no peer-reviewed publications that even purported to confirm or replicate Dr. Wang's or Dr. Burns's findings

concerning simufilam's purported mechanism of action in Alzheimer's disease (*see* PCC ¶¶ 314–316, 495–500).

50. Cassava had worked with Dr. Wang for more than a decade, and Cassava personnel had reviewed his work. Cassava regarded that experience as part of its basis for not accepting accusations that his work was fraudulent. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 44:8–18.

**Plaintiffs' Response**: The compound contention is improper. Undisputed that Cassava had worked with Dr. Wang for more than a decade at the time the Defamation Action was filed. Disputed insofar as the contention implies Cassava's experience with Dr. Wang was an actual, reasonable, or good-faith "basis for not accepting accusations that his work was fraudulent," considering that Cassava had never succeeded in developing a drug based on Dr. Wang's work, Cassava was aware of concerns about the integrity of Dr. Wang's work from the company's own scientific advisory board (*see* PCC ¶¶ 320, 361–364; *see also* PCC ¶¶ 317–318, 344–345), the FDA (*see* PCC ¶¶ 260–270, 368; *see also* PCC ¶¶ 265–267), and Cassava's own audit (*see* PCC ¶¶ 271–283); and *none* of Dr. Wang's purported findings concerning simufilam has ever been validated, replicated, or confirmed by any other scientist (*see* PCC ¶¶ 314–316, 319–320).

Further disputed that Cassava personnel "had reviewed his work" insofar as Dr. Wang testified that nobody questioned him about the integrity of his research (PX 17 (Wang Dep. Tr.) at 38:24-40:10 (Q. "Did anyone at Cassava ever ask you if you had fabricated any data?" A. "No." Q. "Did anyone at Cassava ever ask you if you had manipulated any data?" A. "No. And no, I don't." … Q. "Has anyone at Cassava ever questioned you about the integrity of your research?" A.

"No.").) Further disputed insofar as Cassava claims not to have checked whether raw data outputs from his platereader machine matched his reported data (*see* PCC ¶¶ 374–378).

51. Cassava regarded research by outside researchers reporting similar biological activity as support for the integrity of Dr. Wang's work. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 44:25-45:7.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention. The cited testimony stated: "to the extent his work was showing [] the mechanism of action -- the drug effect of simufilam and we have third-party outside researchers also showing or confirming [] that same kind of activity, that's also evidence that – it's not evidence that the Western blots weren't manipulated, but it shows that his work was – had integrity to it." (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 44:25-45:07.) The contention and cited testimony do not identify which "outside researchers" and is thus improperly vague and unsupported. Plaintiffs dispute that Cassava had an actual, reasonable, or good-faith belief that any "outside researchers" had made findings that supported the integrity of Dr. Wang's work (*see* PCC ¶¶ 495–500), considering no outside lab had ever replicated or validated any of his experiments underlying simufilam's purported mechanism of action in Alzheimer's disease (*see* PCC ¶¶ 314–316, 319–320.)

52. A 2020 Yale study reported increased FLNA expression in identified human tissue and mouse models and reported that PTI-125 treatment reduced seizure frequency in those mouse models. Yale-affiliated researchers performed and analyzed most experiments, and the

seizure analyses were blinded. Exhibit 31 (Bordey Ex. 116) at 1, 3, 7, 11–12; Exhibit 32 (Bordey Ex. 117) at 1; Exhibit 33 (Bordey Dep. Tr.) at 185:16–187:19.

**Plaintiffs' Response**: Disputed. *First*, Dr. Bordey, the primary author, testified that the study had nothing to do with Alzheimer's disease, the experiments did not seek to confirm the existence of altered FLNA, and the study did not confirm or seek to confirm simufilam binding to FLNA. (PX 9 (Bordey Tr.) at 62:18-64:24 ("We did not try to confirm simufilam's mechanism of action in AD. Our paper was not about Alzheimer's disease."); *see also id.* at 61:08-20 ("we did not perform any experiments to try to confirm the data [from Dr. Wang and Dr. Burns]. And it's a different disease state. So it's comparing apple and oranges."). Dr. Burns was a co-author and edited the draft manuscript to add language making the study sound "corroborating" when in fact it was not. (PX 9 (Bordey Tr.) at 140:11-144:24; PX 219 (BORDEY-0000000171) at 175 (redline showing inserts by Dr. Burns). And, Dr. Bordey was an investor in Cassava at the time. (PX 9 (Bordey Tr.) at 216:14-217:21; PX 77 (CASSAVA_000027886)).

*Second*, the seizure analyses were not blinded. Dr. Bordey chose which days to analyze after she was unblinded. (PX 9 (Bordey Tr.) at 301:09-302:07 (Q: "And so prior to beginning the study, was it always the plan to compare the first five days to the last five days" A: " No. You adjust your analysis based on the seizure pattern in your vehicle treated mice"). Similarly, the analysis of which subjects and which days of those subjects to exclude from analysis was not blind, including the removal of (i) 2 days of all placebo subjects' data (*see* PX 220 (CASS_BORDEY_00000177) (page 7: column 3, row 2 to column 4, row 6); (ii)

all days of 2 simufilam subjects' data (one died of seizures) (*see* PX 221 (CASS_BORDEY_00001880) (pages 10-13, rows 4-5); (iii) 2 days of another simufilam subject's data that showed high seizures (*see* PX 220 (CASS_BORDEY_000001880) (page 12: column 8, row 9; and column 9, row 9)); and (iv) 11 days of another simufilam subject's data (*id.* (page 7: column 6, row 12 to column 10, row 12; and page 9: column 1, row 12 to column 6, row 12)). In the paper itself, the only exclusion mentioned was (iii), above, and the stated reason was that the equipment malfunctioned despite data existing (*see* SAVA-Ex. 31 at 9). All other exclusions were undisclosed.

53. A May 2022 Nagoya University study also provided evidence supporting a role for FLNA in tau pathology. Cassava understood the study to report that increased FLNA enhanced tau phosphorylation and insolubility and that reducing FLNA corrected aberrant tau levels in cells cultured from patients with progressive supranuclear palsy. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 12:6–23.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention about what the study showed. The paper does not purport to confirm or corroborate any claims about simufilam. It did not use simufilam, and it merely cites papers by Dr. Wang and Dr. Burns, without purporting to confirm, replicate, or corroborate any of their findings. (PX 137 (CASSAVA_000785987).)

54. Cassava also relied on biomarker results from Quanterix that it understood to be consistent with Dr. Wang's findings. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 47:13–49:21.

**Plaintiffs' Response**: Disputed. The presented results were not from Quanterix. On August 27, 2021, Quanterix released a public statement in response to Cassava presenting a subset of the data they generated, stating: "Quanterix or its employees did not interpret the test results or prepare the data charts presented by Cassava at the Alzheimer's Association International Conference (AAIC) in July 2021 or otherwise." (PX 281 (2021.08.27 Quanterix Statement). But for the *post-hoc* and arbitrary removal and/or reanalysis of 17 sample values by Dr. Burns, the Quanterix data shows no effect of simufilam on plasma p-Tau. (*See* PX 229 (Quanterix_Cassava_Heilbut_Litig_0000139); PX 230 (Quanterix_Cassava_Heilbut_Litig_0000141).)

Also, Quanterix found no effect of simufilam on Abeta42, Abeta40 and total Tau. (PX 106 (CASSAVA_000535544) at 544 ("I had Quanterix analyze some plasma. I first sent HALF the samples to test in a triplex assay of Abeta42 and 40 and total tau. The means look great, but the best p value vs. placebo (n=10) was 0.23. Not close enough to justify sending the other half.").) When asked about this approach, Dr. Burns testified: "why pay to send more samples to not see an effect" and "[w]hy bother measuring it if it's not going to -- if it's not going to show anything?" (PX 12 (Burns Dep. Tr.) at 249:25-252:05).

55. Cassava's corporate designee described the multi-site open-label study as having been conducted at approximately sixteen sites and as producing promising evidence of simufilam's potential. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 10:5–19.

**Plaintiffs' Response**: Undisputed that Cassava's 30(b)(6) witness provided the cited testimony, except disputed insofar as the contention mischaracterizes the

testimony, which was: "We have a Phase 2b open label study that was done at -- I believe it was 16 independent sites, give or take, that also showed ***not efficacy for the drug***, but promising evidence of its -- you know, of its potential." (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 10:5-19 (emphasis added).)

56. Simufilam had been administered thousands of times without a drug-related serious adverse event, and an independent data-safety monitoring board had recommended that the Phase 3 trials continue. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 24:23–25:9.

**Plaintiffs' Response**: Disputed insofar as the testimony does not support the contentions.

57. At the time the Defamation Action was filed, Cassava considered the supporting evidence "real and credible." Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 45:16-47:7.

**Plaintiffs' Response**: Disputed. The contention is ambiguous and vague insofar as it does not identify specific "supporting evidence." Plaintiffs dispute that Cassava genuinely believed that "supporting evidence" existed, considering the company knew that it had no data or research records (*see* PCC ¶¶ 252–259; *see also* PCC ¶¶ 280–281), knew of legitimate problems with its preclinical and clinical research (*see* PCC ¶¶ 313–367), and knew the "basic science" had never been validated (PX 200 (CASSAVA_001444640) at 643-644). Further disputed insofar as the company had never audited or inspected Dr. Wang's lab, until the company's September 2022 audit (PX 21 (Rodriguez Tr.) at 66:24-67:1, 108:9-13), which found the lab had no records and was unqualified (*see* PCC ¶¶ 271–283).

Further, the cited testimony asserts: "[c]laims that simufilam does not bind filamin A were disproven by researchers at Yale and the University of Milan in 2020 and 2023." (PX 16 (Cassava 30(b)(6) Tr.) at 45:24-45:02.) Neither study "disproved" that claim (*supra* Paragraph 52); and the Milan study post-dated the Defamation Action; thus, it could not have been considered "at the time the Defamation Action was filed" as the contention asserts. (*See* PCC ¶¶ 495–500).

58. On August 15, 2022, less than three months before filing, Dr. Paul Aisen informed Dr. Burns on behalf of the Journal of Prevention of Alzheimer's Disease's Editors-in-Chief that the journal had completed its review of the identified article, did not find convincing evidence of data manipulation or intent to mislead, and would take no action regarding the paper. The inquiry had lasted approximately ten or eleven months; Dr. Aisen described it as thorough; and the editors accepted that recommendation by consensus. Exhibit 34 (CASSAVA_000739110); Exhibit 35 (Aisen Dep. Tr.) at 156:1–3, 157:13–24, 158:21–159:5, 194:7–195:15.

**Plaintiffs' Response**: Disputed. Dr. Aisen, a former paid consultant of Cassava, who led the investigation, testified that there was conflicting evidence of manipulation (the publisher's expert and another independent expert found such evidence), but that the Journal ultimately based its conclusion on an analysis by Cassava investor Dr. Charles Spruck; Dr. Aisen's understanding from Dr. Burns that Dr. Spruck was "totally independent of the authors and Cassava"; and Dr. Aisen's understanding from Dr. Burns that the research integrity concerns were "financially motivated." (PX 216 (Aisen_0000748) at 748; PX 4 (Aisen Dep. Tr.) at 102:10-21; 103:23-104:22 (two of the three sources JPAD consulted

determined there was "evidence to suggest the possibility of cutting and splicing" and the other source was Dr. Spruck), 151:20-152:24 (there was "conflicting evidence on the issue of splicing gels").) (*See also* PCC ¶¶ 331-338).

59. Dr. Aisen further testified that he did not find convincing evidence that the data in the identified paper had been manipulated and that the editors were aware of what they regarded as a reasonable explanation for the appearance of the figures at issue. Exhibit 35 (Aisen Dep. Tr.) at 160:2–12.

**Plaintiffs' Response**: Disputed. Mischaracterizes the testimony and omits the material context described in the response to Paragraph 58 *supra*.

60. Cassava commenced the Defamation Action on November 2, 2022. ECF 9 ¶ 46.

**Plaintiffs' Response**: Undisputed.

61. On March 28, 2024, Judge Gregory H. Woods dismissed the claims against all defendants without prejudice. The Court held that a subset of challenged tweets had been adequately alleged to be defamatory *per se*. *Bredt*, 2024 WL 1347362, at *1, *21–*22, *29.

**Plaintiffs' Response**: Undisputed.

62. Exhibit A to the March 28 Order contains 328 numbered tweet entries—the "Defamatory Tweets"—that were defamatory per se because they accused Cassava of lying, scientific fraud, or criminal conduct, or asserted that Cassava's technology lacked scientific support. *Bredt*, 2024 WL 1347362, at *21–*22, n.42; Exhibit 49 (*Bredt*, 2024 WL 1347362, Ex. A).

**Plaintiffs' Response**: Undisputed except insofar as it paraphrases and mischaracterizes the Court's decision, which speaks for itself.

63. The March 28 Order also held that two statements concerning blinding in the Open Label Study were actionable, but that Cassava had not adequately pleaded actual malice, and

permitted Cassava to amend its claims concerning the challenged tweets and those two statements. *Bredt*, 2024 WL 1347362, at *17–*18, *28–*29.

**Plaintiffs' Response**: Undisputed except insofar as it paraphrases and mischaracterizes the Court's decision, which speaks for itself.

64. On April 29, 2024, Cassava filed a Second Amended Complaint against Drs. Heilbut, Brodkin, Milioris, and Patrick Markey, asserting four individual defamation counts and a conspiracy count based on seventy-five separately numbered statements. *Cassava Scis., Inc. v. Bredt*, No. 1:22-cv-9409-GHW, ECF 120 ¶¶ 137–519, 667–732 (S.D.N.Y. Apr. 29, 2024).

**Plaintiffs' Response**: Undisputed.

65. Cassava's identified purpose did not change during the litigation, and Cassava understood the Second Amended Complaint to be an effort to address pleading deficiencies identified by the Court. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 29:2–9, 88:17–89:2; Exhibit 21 (Cassava July 24 Interrog. Resp.) No. 2 at 5; *Bredt*, 2024 WL 1347362, at *29.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention, and Plaintiffs dispute Cassava's contention about its "identified purpose" (*see* PCC ¶¶ 384–395, 396–411; *see also* PCC ¶¶ 446–451). The contention that "Cassava understood the Second Amended Complaint" as an "effort to address pleading deficiencies" is further disputed by the pleading itself, which merely repackaged and rearranged the same allegations of "actual malice" the court had already found insufficient. (*See* Defamation Dkt. 138 (Plaintiffs Memo. of Law re MTD SAC) at 22-35.)

66. On June 28, 2024, Plaintiffs moved to dismiss the Second Amended Complaint. ECF 9 ¶ 76.

**Plaintiffs' Response**: Undisputed.

67. By the time Cassava dismissed the Defamation Action, Cassava regarded the risk that public statements would impede continued enrollment in the Phase 3 trials as substantially diminished. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 29:19–30:8; Exhibit 9 (CASSAVA_001308025) at 8035.

**Plaintiffs' Response**: Disputed insofar as the cited evidence does not support the contention, and the contention does not make sense given the trials had completed enrollment in November 2023. (*See* PCC ¶¶ 429). Further disputed insofar as the evidence indicates the abandonment of the lawsuit was due to the SEC settlement and forced resignations of Barbier and Dr. Burns two weeks prior to the dismissal (*see* PCC ¶¶ 478–482).

68. Remi Barbier resigned as Cassava's Chief Executive Officer in July 2024. Exhibit 8 (Barry Dep. Tr.) at 41:20–42:9.

**Plaintiffs' Response**: Undisputed except insofar as it implies the resignation was voluntary or unrelated to the SEC settlement and related factual findings (*see* PCC ¶¶ 478–482).

69. Barry became Cassava's Executive Chairman and principal executive officer in July 2024. He became Chief Executive Officer in September 2024, after Cassava had dismissed the Defamation Action. Exhibit 8 (Barry Dep. Tr.) at 41:20–24, 46:11–20; ECF 9 ¶ 80.

**Plaintiffs' Response**: Undisputed, except insofar as the contention implies there was any actual or functional difference between Barry's role of "principal executive" and "Chief Executive Officer," which is not supported by evidence.

70. After becoming Executive Chairman and principal executive officer, Barry reviewed Cassava's operations and the status of the Phase 3 program, concluded that the trials would

be completed and produce readouts concerning simufilam, and recommended dismissal. Exhibit 8 (Barry Dep. Tr.) at 85:17–86:23, 88:16–25.

**Plaintiffs' Response**: Disputed. Barry testified that the trials were already "fully enrolled" when he became principal executive, and that his decision to dismiss was driven primarily by the desire to redirect legal spending to "endeavors that would create shareholder value." (PX 8 (Barry Dep. Tr.) at 85:21–86:23, 88:1-4.) Further, Barry testified that the decision to dismiss was his decision, not merely a "recommendation." (PX 8 (Barry Dep. Tr.) at 85:21 ("it was my decision").) The contention omits that the Phase 3 trials had been fully enrolled since November 2023—five months before Cassava filed its Second Amended Complaint in April 2024—undermining the credibility of the purported rationale. Further, the contention omits that the voluntary dismissal was filed on the same day Cassava's opposition to Plaintiffs' motion to dismiss was due (*see* Defamation Dkt. 140), five weeks after Dr. Wang's criminal indictment by the DOJ was filed on or around June 27, 2024 (*see* Indictment, *United States v. Wang*, No. 24-cr-00211-TDC (D. Md.)), and two weeks after Burns and Barbier were forced to resign in connection with the SEC settlement (*see* PCC ¶¶ 478–482).

71. The Board decided to dismiss, based in part on the change in corporate leadership, the completed Phase 3 enrollment, the reduced perceived threat to recruitment, and the desire to allocate corporate resources to drug development and clinical studies. Exhibit 10 (Schoen 30(b)(6) Dep. Tr.) at 29:19–31:24, 90:4–23; Exhibit 21 (Cassava July 24 Interrog. Resp.) No. 3 at 5–6.

**Plaintiffs' Response**: Disputed. The contention is not supported by the cited evidence, except insofar as it acknowledges the significance of the "change in corporate leadership" to the decision to abandon the lawsuit (*see supra* Paragraph 70, including Rick Barry's testimony that the decision to dismiss "was my decision" (PX 8 (Barry Dep. Tr.) at 85:21)).

72. On August 2, 2024, rather than file an opposition to the pending motion to dismiss, Cassava voluntarily dismissed the Defamation Action. *Cassava Scis., Inc. v. Bredt*, No. 1:22-cv-9409-GHW, ECF 141 (S.D.N.Y. Aug, 2 2024).

**Plaintiffs' Response**: Undisputed.

73. RETHINK-ALZ and REFOCUS-ALZ continued after dismissal through October 2 and December 30, 2024, respectively. *See* RETHINK-ALZ, ClinicalTrials.gov No. NCT04994483, https://clinicaltrials.gov/study/NCT04994483 (last updated May 25, 2025); REFOCUS-ALZ, ClinicalTrials.gov No. NCT05026177, https://clinicaltrials.gov/study/NCT05026177 (last updated Sept. 22, 2025).

**Plaintiffs' Response**: Undisputed.

74. The First Amended Complaint in this action was filed on October 24, 2024, after Cassava's August 2, 2024 voluntary dismissal of the Defamation Action. ECF 9 ¶ 1; *id.* ¶ 80.

**Plaintiffs' Response**: Undisputed.

75. On December 2, 2024, David Bredt and Geoffrey Pitt moved to intervene as plaintiffs; the Court granted their unopposed motion on December 9, 2024; and they filed a Complaint in Intervention on December 12, 2024. ECF 30, 39–40.

**Plaintiffs' Response**: Undisputed.

76. In separate paragraphs of their prayer for relief, Plaintiffs request attorney's fees and costs incurred in the Defamation Action and attorney's fees and costs incurred in prosecuting this action; they separately request additional compensatory, actual, special, and punitive damages. ECF 9, Prayer for Relief ¶¶ A–E.

**Plaintiffs' Response**: Undisputed.

77. Each Plaintiff verified a damages response that separately itemized as damages his one-third share of approximately $440,000 in attorney's fees and costs incurred in the Defamation Action and his one-third share of approximately $330,000 in attorney's fees and costs incurred to date in prosecuting this action. Exhibit 36 (Brodkin May 12 Interrog. Resp.) No. 9 at 8–10; Exhibit 37 (Heilbut May 12 Interrog. Resp.) No. 9 at 8–10; Exhibit 38 (Milioris May 12 Interrog. Resp.) No. 9 at 8–10.

**Plaintiffs' Response**: Undisputed.

78. Each Plaintiff's verified response stated that legal fees, costs, and other compensatory damages were likely to exceed $2 million and proposed punitive damages of four to ten times compensatory damages—$8 million to $20 million—for claimed total damages of at least $10 million to $22 million. Exhibit 36 (Brodkin May 12 Interrog. Resp.) No. 9 at 8–10; Exhibit 37 (Heilbut May 12 Interrog. Resp.) No. 9 at 8–10; Exhibit 38 (Milioris May 12 Interrog. Resp.) No. 9 at 8–10.

**Plaintiffs' Response**: Undisputed.

79. None of the three damages responses provided an hour total or a breakdown between attorney's fees and costs for the Defamation Action. Exhibit 36 (Brodkin May 12 Interrog. Resp.) Nos. 7–9 at 8–10; Exhibit 37 (Heilbut May 12 Interrog. Resp.) Nos. 7–9 at 8–10; Exhibit 38 (Milioris May 12 Interrog. Resp.) Nos. 7–9 at 8–10.

**Plaintiffs' Response**: Undisputed as to the cited responses to interrogatories. Disputed insofar as the contention suggests such information was otherwise withheld from discovery.

80. In a May 28, 2025 court-ordered submission, Plaintiffs reported net trading losses on Cassava securities through November 2, 2022 of $72,079.02 for Dr. Heilbut, $278,985.00 for Dr. Brodkin, and $899,443.70 for Dr. Milioris, together with the periods during which each held net-short positions. Exhibit 39 (Milioris Ex. 1) at 1.

**Plaintiffs' Response**: Undisputed.

81. In March 2022, before the Defamation Action was filed, Dr. Brodkin wrote, "I need Sava to sue me so I can get into discovery," and believed a lawsuit would give him access to Cassava's internal communications and data at no cost to him. Exhibit 18 (Brodkin Dep. Tr.) at 240:2–24; Exhibit 40 (PLAINTIFFS0151099) at 1099.

**Plaintiffs' Response**: Undisputed.

82. Immediately after the Defamation Action was filed, Dr. Brodkin publicly repeated "Please name me" six times and stated that he would be disappointed if he were not served. Exhibit 52 (Brodkin Ex. 33) at 1.




He testified that he wanted to be named so that he could obtain discovery, believed at the time that there was no financial downside and that the litigation would be resolved rapidly,

and did not want dismissal because he wanted discovery. Exhibit 18 (Brodkin Dep. Tr.) at 249:14–251:23.

**Plaintiffs' Response**: Undisputed that Dr. Brodkin provided the cited testimony but disputed insofar as it paraphrases and mischaracterizes the cited evidence and ignores evidence from Dr. Brodkin and his wife, Lise Brodkin, about the Defamation Action's impact on their lives (*see* PCC ¶¶ 519–527).

83. Dr. Brodkin also asked his co-defendants privately at the time about the "Chances we get rich off counterclaim anti-SLAPP mega class action suit?," described the litigation as "our big break," and wrote that Plaintiffs should explore opportunities to "recoup [their] investment and time." Exhibit 18 (Brodkin Dep. Tr.) at 252:14–256:7; Exhibit 53 (PLAINTIFFS0175058) at 6, 7; Exhibit 54 (PLAINTIFFS0230146) at 18.

**Plaintiffs' Response**: Undisputed.

84. Immediately after filing, Dr. Milioris wrote, "If I can countersue for 10M then I'm in," later wrote, "I want discovery all the way!," and stated that the group had "very good chances which ever [sic] way this goes." Exhibit 41 (PLAINTIFFS0193748) at 3759, 3764; Exhibit 42 (PLAINTIFFS0233202) at 3203; Exhibit 14 (Milioris Dep. Tr.) at 239:1–248:22.

**Plaintiffs' Response**: Undisputed.

85. Cassava served offers of judgment on Bredt, Pitt, Heilbut, Brodkin, and Milioris before completion of discovery in this case, which included an offer of $1.5 million to Brodkin, Heilbut, and Milioris. Cassava estimated that this amount would comfortably cover all damages available under N.Y. Civil Rights Law § 70-a(1)(a) for fees incurred in defending the Defamation Action. Campbell Decl. ¶ 3; Exhibit 48 (Offer of Judgment).

**Plaintiffs' Response**: Disputed pursuant to FRCP 56(c)(2). Offer of judgment is not capable of being presented in a form that would be admissible under FRE 408 and FRCP 68(b).

86. Bredt and Pitt later resolved their claims against Cassava, Barbier, and Burns, and on October 2, 2025, the Court entered a stipulated dismissal of their claims with prejudice; final judgment was entered on October 6, 2025, with each party bearing its own costs. ECF 172–73.

**Plaintiffs' Response**: Disputed pursuant to FRCP 56(c)(2). Non-parties' decision to settle is not capable of being presented in a form that would be admissible under FRE 401 or 408.

87. Heilbut, Brodkin, and Milioris did not accept Cassava's offers and continued litigating. Campbell Decl. ¶ 4.

**Plaintiffs' Response**: Disputed pursuant to FRCP 56(c)(2). Offer of judgment is not capable of being presented in a form that would be admissible under FRE 408 and FRCP 68(b).

88. Plaintiffs' economist Michael Soudry prepared one economic-loss report for Dr. Heilbut and one for Dr. Milioris. Exhibit 43 (Soudry Dep. Tr.) at 9:9-11:13; Exhibit 44 (Soudry Heilbut Report) at 1; Exhibit 45 (Soudry Milioris Report) at 1.

**Plaintiffs' Response**: Undisputed.

89. Mr. Soudry did not prepare an economic-loss report for Dr. Brodkin. Exhibit 43 (Soudry Dep. Tr.) at 9:9-11:13.

**Plaintiffs' Response**: Undisputed.

90. The factual information underlying both Soudry analyses was assumed to be true, and Soudry did not independently verify the facts supplied through pleadings, records, depositions, Plaintiff interviews, and counsel. Exhibit 44 (Soudry Heilbut Report) at 1; Exhibit 45 (Soudry Milioris Report) at 1; Exhibit 43 (Soudry Dep. Tr.) at 24:10–25:16, 36:5–38:7.

**Plaintiffs' Response**: Undisputed as to factual information specific to Plaintiffs. Disputed insofar as it ignores Soudry's reliance on his expertise and experience, as reflected in the reports and his testimony.

91. Soudry calculated $166,598 in alleged lost earnings for Dr. Heilbut and $404,679 in alleged lost earnings for Dr. Milioris. Exhibit 44 (Soudry Heilbut Report) at 3; Exhibit 45 (Soudry Milioris Report) at 2.

**Plaintiffs' Response**: Undisputed.

92. Plaintiffs served no expert report quantifying or offering an expert damages opinion concerning any Plaintiff's alleged emotional-distress, reputational, or other non-economic damages. Exhibit 43 (Soudry Dep. Tr.) at 9:9–11:17; Campbell Decl. ¶ 5.

**Plaintiffs' Response**: Undisputed.

93. Dr. Brodkin claimed tens of thousands of dollars in lost behavior-spectrometer sales, hundreds of thousands or millions of dollars in lost future earnings, at least $1 million in emotional-distress damages, and unspecified additional compensatory and reputational damages, but his verified response identified no particular lost customer, sale, analyst position, application, offer, or contract. Exhibit 36 (Brodkin May 12 Interrog. Resp.) No. 9 at 8–10.

**Plaintiffs' Response**: Undisputed.

94. Dr. Brodkin testified that he received approximately $30,000 from behavior-spectrometer sales in 2021, approximately $13,000 recognized in 2022 that was mostly attributable to a prior-year sale, no box-sale income in 2023, and no box sales in 2024; in 2025, he received an order for four boxes. Exhibit 18 (Brodkin Dep. Tr.) at 25:15–30:17.

**Plaintiffs' Response**: Undisputed.

95. Dr. Brodkin could not identify what behavior-spectrometer sales would have occurred absent the Defamation Action, stating "Yeah, I don't know. That's kind of hard for me to answer. It's . . . I can't answer what might have happened." In fact, Dr. Brodkin admitted that no customer ever told him that the action caused a decision not to purchase. Exhibit 18 (Brodkin Dep. Tr.) at 264:17–265:23.

**Plaintiffs' Response**: Undisputed.

96. Dr. Brodkin did not know who posted the negative online reviews he associated with his claimed lost sales and had no reason to believe the reviewers were employed by or directed by Cassava. Exhibit 18 (Brodkin Dep. Tr.) at 266:13–268:6.

**Plaintiffs' Response**: Undisputed.

97. No fund contacted Dr. Brodkin about a biotech-analyst position, he never applied for one, and no one offered him hundreds of thousands or millions of dollars to work as a biotech analyst. Exhibit 18 (Brodkin Dep. Tr.) at 268:15–271:5.

**Plaintiffs' Response**: Undisputed.

98. Dr. Brodkin's claimed emotional distress principally concerned conflict with his wife over perceived financial and legal risks, and he could not separately identify his additional compensatory and reputational damages. Exhibit 18 (Brodkin Dep. Tr.) at 271:6–272:23, 276:8–277:15.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention that Dr. Brodkin was unable to identify additional compensatory and reputational damages.

99. Dr. Heilbut claimed $8,500 in lost consulting calls, tens of thousands of dollars in future consulting calls, hundreds of thousands or millions of dollars from an equity-research and consulting business and future biotechnology-investment employment, at least $1 million in emotional-distress damages, and unspecified additional compensatory and reputational damages, but his verified response identified no particular canceled call, written refusal, future engagement, application, offer, or employment contract. Exhibit 37 (Heilbut May 12 Interrog. Resp.) No. 9 at 8–10.

**Plaintiffs' Response**: Undisputed.

100. Dr. Heilbut claims $8,500 in lost earnings from paid consulting calls that he contends would have occurred between November 2022 and October 2024. Exhibit 15 (Heilbut Dep. Tr.) at 138:11–22.

**Plaintiffs' Response**: Undisputed.

101. Dr. Heilbut's paid consulting calls were arranged through Guidepoint. He identified Perceptive and Eminence as the relevant clients, estimated that he participated in approximately twelve to fifteen Perceptive calls beginning in fall 2021 and continuing through 2022, followed by one or two calls in early 2023, and participated in two Eminence calls in fall 2021. Exhibit 15 (Heilbut Dep. Tr.) at 138:18–141:15.

**Plaintiffs' Response**: Undisputed.

102. Nearly every Perceptive or Eminence call discussed Cassava as a primary or secondary topic. Dr. Heilbut charged $350 per hour and estimated that he earned approximately $15,000

to $20,000 from equity-research calls and reports from late 2021 through early 2023. Exhibit 15 (Heilbut Dep. Tr.) at 142:10–143:8, 145:5–146:18.

**Plaintiffs' Response**: Undisputed.

103. The claimed $8,500 in lost Guidepoint consulting calls is an extrapolation of what Dr. Heilbut believes he would have earned if calls had continued at the same rate. Exhibit 15 (Heilbut Dep. Tr.) at 138:11–22, 139:7–25, 142:10–143:8, 148:3–18.

**Plaintiffs' Response**: Undisputed.

104. Dr. Heilbut testified that his causation theory concerning Perceptive was based on a statement from one contact expressing concern about official Guidepoint calls because of the Defamation Action; no one at Eminence told him that calls stopped because of the action. Exhibit 15 (Heilbut Dep. Tr.) at 148:19–149:23.

**Plaintiffs' Response**: Disputed insofar as the statement suggests that only one contact had concern about continuing official Guidepoint calls; cited testimony shows that the Perceptive contact was expressing concern on the part of the team.

105. Dr. Heilbut's employer, Kallyope, terminated Dr. Heilbut in February 2021, approximately twenty months before the Defamation Action, because the company was dissatisfied with the amount or nature of his work and he was not getting along with his immediate supervisor. Exhibit 15 (Heilbut Dep. Tr.) at 194:16–196:19.

**Plaintiffs' Response**: Undisputed.

106. Dr. Heilbut's annual Kallyope salary was approximately $130,000, and his income was roughly $50,000 to $70,000 in each of 2021, 2022, and 2023. In 2024, while the Defamation Action remained pending, he sought a "steady job" to increase his income in light of his legal expenses, and Alivia Analytics hired him full time at an annual salary of approximately

$160,000 to $165,000. Exhibit 15 (Heilbut Dep. Tr.) at 193:7-194:25, 198:3–199:9, 200:11–203:17.

**Plaintiffs' Response**: Undisputed.

107. Dr. Heilbut voluntarily resigned from Alivia in April 2025 after approximately one year because he was not enjoying the job, did not believe he was learning enough, considered it a poor fit, and wanted to seek a different and better position. He was unemployed again at the time of his deposition. Exhibit 15 (Heilbut Dep. Tr.) at 201:15–202:6.

**Plaintiffs' Response**: Disputed. Cited testimony does not support the contention that Dr. Heilbut was unemployed at the time of his deposition. Testimony at pages 193-194 of his deposition indicate that he was employed as an adjunct faculty member at Columbia University.

108. Dr. Heilbut identified no employer that declined to hire him because of the Defamation Action, no particular job application he submitted, and no specific employment rejection attributable to the action. Exhibit 37 (Heilbut May 12 Interrog. Resp.) No. 9 at 8–10.

**Plaintiffs' Response**: Undisputed.

109. Soudry used Dr. Heilbut's average 2018–2020 Kallyope earnings of $133,279 per year as the benchmark for alleged losses from January 2023 through April 2024. According to Soudry, too many variables prevented a conventional projection of the consulting business, so Soudry measured an assumed lost opportunity by reference to those prior wage earnings. Exhibit 44 (Soudry Heilbut Report) at 2–3; Exhibit 43 (Soudry Dep. Tr.) at 55:17–57:12, 81:3–21.

**Plaintiffs' Response**: Undisputed.

110. Soudry was not specifically aware of any job-search efforts by Dr. Heilbut between November 2022 and April 2024 and did not analyze business planning, market conditions, investment, competition, relevant experience, entrepreneurial risk, or labor-market supply and demand in projecting consulting or alternative wage earnings. Exhibit 43 (Soudry Dep. Tr.) at 83:25–86:16; Exhibit 46 (Bubna Report) ¶ 13(4)–(5), ¶¶ 39–44.

**Plaintiffs' Response**: Undisputed.

111. Dr. Heilbut's claim for hundreds of thousands or millions of dollars in future earnings rests on typical investment-management compensation and hypothetical profit-sharing or "balance sheet" arrangements, although he has never been employed as an investment manager or equity analyst and has never earned that level of compensation in either role. Exhibit 15 (Heilbut Dep. Tr.) at 180:2–183:3.

**Plaintiffs' Response**: Undisputed.

112. The only balance-sheet arrangement Dr. Heilbut entered was a 2024 arrangement concerning Cassava with Hindenburg; the position was not profitable and he received no payment. He entered no other balance-sheet arrangement, and his equity-research venture generated only several thousand dollars in 2021, which includes earnings from consulting calls through Guidepoint. Exhibit 15 (Heilbut Dep. Tr.) at 183:4–188:11, 191:13–192:24, 195:7–10.

**Plaintiffs' Response**: Undisputed.

113. Dr. Heilbut claims he was unable to grow his career as a consultant and equity research analyst "because of the enormous distraction in time and like just anxiety caused by this whole thing and because . . . it sort of affected my reputation, I think." Exhibit 15 (Heilbut

Dep. Tr.) at 164:18-24. He further claimed that he was "distracted" and "more risk averse." *Id.* at 182:5-9.

**Plaintiffs' Response**: Undisputed.

114. Dr. Heilbut had seen the same psychiatrist intermittently since approximately 2018; the frequency of visits did not increase after the Defamation Action was filed, and he received no new diagnosis or depression prescription after filing. Exhibit 15 (Heilbut Dep. Tr.) at 217:4–218:15.

**Plaintiffs' Response**: Undisputed.

115. Dr. Milioris's last full-time work engagement ended in early 2020, more than two years before the Defamation Action. Afterward, he traded for his own account and attempted to establish Alphavia Advisors, which never advised a client. When Cassava filed the Defamation Action, he was not employed in a full-time salaried position and had begun a discrete consulting project for Pharmathen that continued until spring 2023. Exhibit 14 (Milioris Dep. Tr.) at 17:18–24:7, 29:2–30:12, 33:1–15.

**Plaintiffs' Response**: Undisputed.

116. Dr. Milioris signed a fixed-term employment contract dated October 11, 2022 with Elmipharm Mon Ike—referred to at his deposition as "InnoPharm"—for a full-time sales-director position with a stated three-year term and a January 2023 start date. Exhibit 14 (Milioris Dep. Tr.) at 37:19–38:19, 262:8–14; Exhibit 45 (Soudry Milioris Report) at 1–2.

**Plaintiffs' Response**: Undisputed.

117. Dr. Milioris never began working for Elmipharm. He testified that he initiated a November 2022 meeting to disclose the Defamation Action and ask whether it presented an

issue, and Elmipharm representatives proposed postponing the engagement indefinitely until the action resolved. Exhibit 14 (Milioris Dep. Tr.) at 41:11–43:19, 262:5–14, 265:18–22.

**Plaintiffs' Response**: Disputed to the extent the paragraph contends that Elipharm representative gave Dr. Milioris any option to go ahead with the position. (PX 20 (Milioris Dep.) at 43:5-19.)

118. The causal account that Elmipharm withdrew the position because of the Defamation Action rests on Dr. Milioris's description of that in-person meeting. Soudry conducted no independent verification and reviewed no corroborating communication from Elmipharm. Exhibit 14 (Milioris Dep. Tr.) at 38:20–43:19; Exhibit 43 (Soudry Dep. Tr.) at 128:3–129:16.

**Plaintiffs' Response**: Undisputed that Soudry conducted no independent verification of the reason Elmipharm withdrew the position.

119. In September 2023, Dr. Milioris moved to Paros, a Greek island where he frequently spent his summer vacations. Exhibit 14 (Milioris Dep. Tr.) at 60:17-61:21. If Dr. Milioris had not been in Paros, he "most likely would [have been] in a position to either look for employment in Athens or potentially back in London where the opportunities would have been even better." *Id.* at 272:13-17.

**Plaintiffs' Response**: Undisputed.

120. When Dr. Milioris contacted Elmipharm after the Defamation Action was dismissed and learned that no role was available, he did not ask what had happened to the original role or why no position was available. Exhibit 14 (Milioris Dep. Tr.) at 43:20–44:14.

**Plaintiffs' Response**: Undisputed.

121. Dr. Milioris described his employment with Elmipharm as a "near certainty" because "employment laws in Greece generally favor the employee," making it "rather rare and

difficult to . . . get fired without . . . good cause." Nevertheless, Dr. Milioris did not seek legal advice concerning the contract and, at the time, did not feel that its rescission was wrongful because he believed Elmipharm was entitled to take a cautious position. Exhibit 14 (Milioris Dep. Tr.) at 88:23–90:9, 261:21-262:4, 265:11–13.

**Plaintiffs' Response**: Disputed. Cited testimony relates to Dr. Milioris' belief that continued employment would be a "near certainty" once employment began.

122. Soudry assumed that Dr. Milioris would receive €134,400 for each of three years, including the full 40 percent annual bonus, and calculated a cumulative net loss of €351,124, converted to $404,679. Exhibit 45 (Soudry Milioris Report) at 2; Exhibit 43 (Soudry Dep. Tr.) at 131:4–132:6, 133:22–135:7.

**Plaintiffs' Response**: Undisputed.

123. Soudry treated €12,000 in 2023 earnings and €20,038 in 2024 earnings as mitigation, assumed the same €20,038 amount for 2025, and did not analyze the asserted cancellation, alternative employment, job-search efforts, labor-market conditions, termination risk, or voluntary reductions in work. Exhibit 45 (Soudry Milioris Report) at 2; Exhibit 46 (Bubna Report) ¶ 13(6)–(8), ¶¶ 53–59.

**Plaintiffs' Response**: Undisputed.

124. According to Dr. Milioris, the three years of employment was not guaranteed, it was up to Elmipharm to decide whether he would begin working despite the signed contract, and the contemplated bonus was up to 40 percent rather than guaranteed. Exhibit 14 (Milioris Dep. Tr.) at 260:13–262:21.

**Plaintiffs' Response**: Disputed insofar as Cassava interprets the absence of a written guarantee of continued employment outside the context of Greek

employment law and social and commercial practice, which Dr. Milioris describes at the cited testimony.

125. At the time of his deposition, Dr. Milioris was not seeking employment because he was caring for his wife and child and participating in this litigation, and his claimed future opportunities included positions he could not identify that might have existed in Athens or London. Exhibit 14 (Milioris Dep. Tr.) at 266:21–267:5, 270:9–24, 271:15272:7.

**Plaintiffs' Response**: Undisputed.

126. By late 2022, Dr. Milioris was experiencing stress in multiple aspects of his life, including stock trading, and his later improvement followed multiple interventions, including moving, exercise, medication, and stepping back from social media. Exhibit 14 (Milioris Dep. Tr.) at 55:1–19, 59:15–60:13, 62:6–11, 63:4–17, 88:5–20.

**Plaintiffs' Response**: Disputed insofar as Cassava contends that this is a substantially complete list of interventions that contributed to improvement in Dr. Milioris' mental health. As Dr. Milioris testified at pages 63-70, those interventions also included treatment by a psychiatrist and psychologist. (*See* PCC ¶ 508; PX 212 (PLAINTIFFS0235978) (medical opinion); PX 213 (PLAINTIFFS0235981) (prescription).)

Dated: September 14, 2026
New York, New York

CLARICK GUERON REISBAUM LLP

By: */s/ Isaac B. Zaur*
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310

izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut,
Dr. Jesse Brodkin, and Dr. Enea Milioris*