**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,

Plaintiffs,

v.

CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,

Defendants.

Case No. 1:24-cv-05948-JLR-OTW

ORAL ARGUMENT REQUESTED

# PLAINTIFFS' RESPONSE TO THE INDIVIDUAL DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Dated: September 14, 2026

CLARICK GUERON REISBAUM LLP
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris hereby submit Plaintiffs' Responses to the Individual Defendants' Rule 56.1 Statement of Undisputed Facts. (*See* Dkt. 242.) Concurrently herewith, Plaintiffs are separately submitting Plaintiffs' Consolidated Rule 56.1 Counterstatement of Additional Material Facts ("**PCC**"), and associated Plaintiffs' Exhibits ("**PX []**").

**PLAINTIFFS' RESPONSES TO THE INDIVIDUAL DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**[1]

1. Cassava Sciences, Inc. ("Cassava" or "the Company"), now named Filana Therapeutics, is a clinical-stage biotechnology company. *See* Ex. 67, Cassava 2021 Form 10-K, filed on March 1, 2022 ("2021 Form 10-K") at 4; AC ¶¶ 19, 28.

> **Plaintiffs' Response**: Undisputed, except disputed insofar as it contends the company is currently a "clinical-stage" company; there is no evidence of ongoing clinical trials; and the FDA placed the company's latest proposed trials of simufilam on full clinical hold. (*See* PX 254 (Cassava Sciences Inc, Form 8-K, dated December 18, 2025) at 3 ("on December 15, 2025, the Company received a formal letter from FDA confirming that the proposed clinical trial is on full clinical hold . . .").)

2. Between 2020 and 2024, eleven individuals served as Cassava directors. Ex. 13, Cassava Proxy Statement, filed on March 26, 2020 ("2020 Proxy") at 15; Ex. 29, Cassava Proxy Statement, filed on March 31, 2021 ("2021 Proxy") at 15, 17; Ex. 72, Cassava Proxy Statement, filed on March 24, 2022 ("2022 Proxy") at 18; Esciencex. 94, Cassava Proxy Statement, filed on March 27, 2023 ("2023 Proxy") at 23; Ex. 103, Cassava Proxy Statement, filed on March 26, 2024 ("2024 Proxy") at 9.

[1] To the extent any response is required to the headings in the Individual Defendants' statement, Plaintiffs dispute the headings as unsupported by any evidence.

**Plaintiffs' Response**: Undisputed.

3. Between January 1, 2020 and July 16, 2024, nine of the eleven individuals who served as Cassava directors were independent directors (Robert Z. Gussin, Ph.D., Patrick J. Scannon, M.D., Ph.D., Michael J. O'Donnell, Esq., Saira Ramasastry, Sanford R. Robertson, Richard J. Barry, Pierre Gravier, Robert Anderson, Jr., and Claude Nicaise, M.D.) and two were management directors (Remi Barbier and Nadav Friedmann, M.D., Ph.D.). Ex. 13, 2020 Proxy at 28; Ex. 29, 2021 Proxy at 29; Ex. 72, 2022 Proxy at 19-20; Ex. 94, 2023 Proxy at 24-25; Ex. 103, 2024 Proxy at 11.

**Plaintiffs' Response**: Undisputed insofar as it contends these individuals were not members of management.

4. On July 17, 2024, Richard J. Barry was appointed the Company's principal executive officer and Executive Chairman of the Board. Ex. 109, Cassava Form 8-K and attached press release, filed on Sept. 9, 2024 ("Sept. 9, 2024 Form 8-K") at 4.

**Plaintiffs' Response**: Disputed. The company's July 17, 2024 Form 8-K states that Barry was appointed to these roles on July 15, 2024. (PX 256 (Cassava Sciences Inc, Form 8-K, dated July 17, 2024) at 2.)

5. In September 2024, Mr. Barry was appointed Cassava's Chief Executive Officer. *Id*.

**Plaintiffs' Response:** Undisputed.

6. Robert Z. Gussin, Ph.D. has been a Cassava director since March 2003. Ex. 29, 2021 Proxy at 15; *see also* Ex. 72, 2022 Proxy at 18-19; Ex. 94, 2023 Proxy at 23-24; Ex. 103, 2024 Proxy at 10.

**Plaintiffs' Response:** Undisputed

7. Dr. Gussin worked at Johnson & Johnson for 26 years, including as Chief Scientific Officer and Corporate Vice President, Science and Technology from 1986 through 2000. Ex. 29, 2021 Proxy at 15; *see also* Ex. 72, 2022 Proxy at 18-19; Ex. 94, 2023 Proxy at 23-24; Ex. 103, 2024 Proxy at 10.

**Plaintiffs' Response:** Undisputed

8. Patrick J. Scannon, M.D., Ph.D. has been a Cassava director since December 2007. Ex. 29, 2021 Proxy at 16; *see also* Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24; Ex. 103, 2024 Proxy at 10.

**Plaintiffs' Response**: Undisputed.

9. Dr. Scannon co-founded XOMA Corporation and served as XOMA's Chief Scientific and Medical Officer from 1993 to 2006, and as XOMA's Chief Biotechnology Officer from 2006 to 2016. Ex. 29, 2021 Proxy at 16; *see also* Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24; Ex. 103, 2024 Proxy at 10.

**Plaintiffs' Response**: Undisputed.

10. Michael J. O'Donnell, Esq. has been a Cassava director since June 1998. Ex. 29, 2021 Proxy at 15; Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24; Ex. 103, 2024 Proxy at 10.

**Plaintiffs' Response**: Undisputed.

11. Mr. O'Donnell is a member of the law firm of Orrick Herrington & Sutcliffe, the Company's corporate counsel. Ex. 29, 2021 Proxy at 15; Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24; Ex. 103, 2024 Proxy at 10.

**Plaintiffs' Response**: Undisputed.

12. Mr. O'Donnell serves as corporate counsel to numerous biopharmaceutical and life sciences companies. *Id*.

**Plaintiffs' Response**: Undisputed.

13. Saira Ramasastry was a Cassava director from February 2013 to June 2020. Ex. 13, 2020 Proxy at 15; Ex. 24, Cassava Form 8-K, filed on June 19, 2020.

**Plaintiffs' Response**: Undisputed.

14. Ms. Ramasastry is Managing Partner of Life Sciences Advisory, LLC, a life science company advisory business, and was previously an investment banker with Merrill Lynch & Company, Inc. Ex. 13, 2020 Proxy at 15; Ex. 24, Cassava Form 8-K, filed on June 19, 2020.

**Plaintiffs' Response**: Undisputed.

15. Ms. Ramasastry has also been a director of other public companies, including Sangamo Therapeutics, Inc., VIR Biotechnology, Inc., Innovate Biopharmaceuticals, Inc. and Glenmark Pharmaceuticals Ltd. Ex. 13, 2020 Proxy at 15.

**Plaintiffs' Response**: Undisputed.

16. Sanford R. Robertson was a Cassava director from September 1998 until his passing in August 2024. Ex. 103, 2024 Proxy at 10; Ex. 116, Cassava Proxy Statement, filed on April 14, 2025 ("2025 Proxy") at 33.

**Plaintiffs' Response**: Undisputed.

17. Mr. Robertson was previously the lead director of Salesforce.com. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 33.

**Plaintiffs' Response**: Undisputed.

18. Mr. Robertson founded Francisco Partners, a technology buyout fund, and Robertson, Stephens & Company, a technology investment bank. Ex. 103, 2024 Proxy at 10; *see also* Ex. 29, 2021 Proxy at 16; Ex. 72, 2022 Proxy at 19; Ex. 94, 2023 Proxy at 24.

**Plaintiffs' Response**: Undisputed.

19. Richard J. Barry has been a Cassava director since June 2021. Ex. 72, 2022 Proxy at 18; see also Ex. 94, 2023 Proxy at 23; Ex. 103, 2024 Proxy at 10.

**Plaintiffs' Response**: Undisputed.

20. Mr. Barry was a Managing Director of Robertson Stephens Investment Management, and a Managing General Partner of Eastbourne Capital Management LLC. Ex. 72, 2022 Proxy at 18; see also Ex. 94, 2023 Proxy at 23; Ex. 103, 2024 Proxy at 10.

**Plaintiffs' Response**: Undisputed.

21. Mr. Barry is also a director of Sarepta Therapeutics, Inc. *Id*.

**Plaintiffs' Response**: Undisputed.

22. Pierre Gravier has been a Cassava director since December 2023. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

**Plaintiffs' Response**: Undisputed.

23. Mr. Gravier has been Chief Financial Officer of PTC Therapeutics, Inc. since July 2023. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

**Plaintiffs' Response**: Undisputed.

24. Mr. Gravier was a Managing Director in the healthcare group of Perella Weinberg Partners. *Id*.

**Plaintiffs' Response**: Undisputed.

25. Robert Anderson, Jr. has been a Cassava director since December 2023. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

**Plaintiffs' Response**: Undisputed.

26. Mr. Anderson previously worked at the Federal Bureau of Investigation, including as the FBI's Executive Assistant Director of the Criminal, Cyber, Response and Services Branch. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

**Plaintiffs' Response**: Undisputed.

27. Mr. Anderson served as Chief Executive Officer and Chairman of the Board of OakTruss Group, an advisory firm focused on cybersecurity. *Id*.

**Plaintiffs' Response**: Undisputed.

28. Claude Nicaise, M.D., has been a Cassava director since December 2023. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

**Plaintiffs' Response**: Undisputed.

29. Dr. Nicaise founded Clinical Regulatory Services, a company providing advice on clinical and regulatory matters to biotechnology companies. Ex. 103, 2024 Proxy at 10; Ex. 116, 2025 Proxy at 14.

**Plaintiffs' Response**: Undisputed.

30. From 1983 to 2023, Dr. Nicaise, served in various positions at Bristol-Myers Squibb, Alexion Pharmaceuticals, and Ovid Therapeutics Inc. *Id*.

**Plaintiffs' Response**: Undisputed.

31. Dr. Nicaise is also currently a director of Sarepta Therapeutics, Inc., Gain Therapeutics, and Chemomab Therapeutics Ltd. *Id*.

**Plaintiffs' Response**: Undisputed.

32. Defendant Remi Barbier served as Cassava's Chief Executive Officer from May 1998 to September 2024, and Chair of Cassava's Board of Directors from May 1998 until July 15, 2024. Ex. 29, 2021 Proxy at 15; Ex. 107, Cassava Form 8-K, filed on July 17, 2024 ("July 17, 2024 Form 8-K") at 2; Ex. 109, Sept. 9, 2024 Form 8-K at 2.

**Plaintiffs' Response**: Undisputed, except insofar as Barbier's role as CEO was in name only as of approximately July 5, 2024, when Barbier claims the Board took away his authority. (PX 185 (CASSAVA_001402478) at 2479; PX 256 (July 17, 2024 Form 8-K) at 2.)

33. Mr. Barbier has served as a trustee emeritus of the Carnegie Institute of Washington and Santa Fe Institute and was on the Advisory Board of the University of California Institute for Quantitative Biosciences and BioVentures LLC, a life science incubator at the University of Arkansas for Medical Sciences. *Id.*; *see also* Ex. 72, 2022 Proxy at 18; Ex. 94, 2023 Proxy at 23; Ex. 103, 2024 Proxy at 9.

**Plaintiffs' Response**: Undisputed.

34. Nadav Friedmann, M.D., Ph.D. served as a Cassava director from September 1998 until his passing in December 2022. Ex. 29, 2021 Proxy at 15; Ex. 89, CASSAVA_000945203; *see also* Ex. 72, 2022 Proxy at 18.

**Plaintiffs' Response**: Undisputed.

35. Prior to joining Cassava as Chief Medical Officer in 2001, Dr. Friedmann held various positions at Johnson & Johnson, including as Head of Johnson & Johnson's Biotechnology Research Center, was VP, Clinical Research at XOMA Corporation, and President and CEO of Daiichi Pharmaceutical Corporation. *Id.*

**Plaintiffs' Response**: Undisputed.

36. Defendant Lindsay Burns, Ph.D., has never served as a director of Cassava. *See* Ex. 3, CASSAVA_000535042 at -535057; Ex. 4, CASSAVA_000096151, at -177; *see also* Exs. 13, 29, 72, 94, 103 (2020 – 2024 Proxy Statements); Ex. 28, Cassava's 2020 Form 10-K, filed with the SEC on March 23, 2021 ("2020 Form 10-K"), at 22; Ex. 67, 2021 Form 10-K at 23; Ex. 93, Cassava's 2022 Form 10-K, filed with the SEC on February 28, 2023 ("2022 Form 10-K"), at 23; Ex. 101, Cassava's 2023 Form 10-K, filed with the SEC on February 28, 2024 ("2023 Form 10-K"), at 23; Ex. 115, Cassava's 2024 Form 10-K, filed with the SEC on March 3, 2025 ("2024 Form 10-K"), at 33.

**Plaintiffs' Response**: Undisputed.

37. Between 2020 and 2024, there were six individuals who served as executive officers of Cassava: Mr. Barbier, Mr. Barry, Dr. Friedmann, James W. Kupiec, M.D., Eric Schoen, and R. Christopher Cook. Ex. 13, 2020 Proxy at 15; Ex. 29, 2021 Proxy at 15; Ex. 72, 2022 Proxy at 18; Ex. 94, 2023 Proxy at 23; Ex. 103, 2024 Proxy at 9; Ex. 109, Sept. 9, 2024 Form 8-K.

**Plaintiffs' Response:** Undisputed.

38. James W. Kupiec, M.D. served as Chief Medical Officer from December 2022 until May 2025 and as Chief Clinical Development Officer from January 2021 to December 2022. Ex. 29, 2021 Proxy at 15; Ex. 94, 2023 Proxy at 23; Ex. 117, Cassava Form 8-K, filed on April 21, 2025 ("April 21, 2025 Form 8-K") at 2.

**Plaintiffs' Response**: Undisputed.

39. Prior to joining the Company, Dr. Kupiec served as VP, Global Clinical Leader for Parkinson's Disease and Clinical Head of Neuroscience Research Unit for Pfizer, Inc., and also held roles at Sanofi and Ciba-Geigy Pharmaceuticals. Ex. 29, 2021 Proxy at 15.

**Plaintiffs' Response**: Undisputed.

40. Eric Schoen has served as Cassava's Chief Financial Officer since 2018. Ex. 103, 2024 Proxy at 9.

**Plaintiffs' Response**: Undisputed.

41. Prior to joining Cassava, Mr. Schoen served as Vice President, Senior Vice President, Finance, and Chief Accounting Officer of Aspira Women's Health Inc., and held roles in the audit and assurance, transaction services and global capital markets practices of PricewaterhouseCoopers. *Id.*

**Plaintiffs' Response**: Undisputed.

42. R. Christopher Cook joined the Company in October 2022 as General Counsel. Ex. 103, 2024 Proxy at 9.

**Plaintiffs' Response**: Disputed. While Cassava announced the hiring of the Chief Legal Officer (Chris Cook) on October 27, 2022, Cassava asserted in the context of discovery disputes that Cook had no role in the decision to commence the Defamation Action because he did not start at the company until after the lawsuit was filed on November 2, 2022. (*See, e.g.*, Dkt. 47 at 2 (objecting to proposed deposition of Cook because he "was hired after the Defamation Action commenced").)

43. In April 2025, Mr. Cook was appointed Cassava's Chief Operating and Legal Officer. Ex. 117, April 21, 2025 Form 8-K at 2.

**Plaintiffs' Response**: Undisputed.

44. Prior to joining Cassava, Mr. Cook was Global Head of Litigation and Government Investigations for Alcon, Vice President and Division General Counsel for Walmart

Central America, a litigation partner at Jones Day, and an Assistant U.S. Attorney. Ex. 103, 2024 Proxy at 9.

**Plaintiffs' Response**: Undisputed.

45. Defendant Lindsay Burns, Ph.D., has never served as an executive officer of Cassava. *See* Ex. 3, CASSAVA_000535042 at -535057; Ex. 4, CASSAVA_000096151, at -96177; *see also* Exs. 13, 29, 72, 94, 103 (2020 – 2024 Proxy Statements); Ex. 28, 2020 Form 10-K, at 22; Ex. 67, 2021 Form 10-K at 23; Ex. 93, 2022 Form 10-K, at 23; Ex. 101, 2023 Form 10-K, at 23; Ex. 115, 2024 Form 10-K, at 33.

**Plaintiffs' Response**: Disputed. Dr. Burns wielded influence and authority within the company, and held herself out on behalf of the company in a manner consistent with someone operating as an executive officer (*see* PCC ¶¶ 214–215, 441–442; *see also* PCC ¶¶ 443–444).

46. Between 2020 and 2024, Cassava's science team included Nadav Friedmann, James Kupiec, Lindsay Burns, Michael Marsman, George (Ben) Thornton, Michael Zamloot, Shawn Kucera, Annelies de Kater, Carrie Crowley, Rebecca Carpenter, Antonio Hernandez, Leslie Jones, Laura Ann Rodriguez, Tracy Owen, Stephanie Hayden, Judit Stroe, Emmalee Crow, and Melissa Snyder. Ex. 97, CASSAVA_001454984, at -1455007-1455037; Ex. 3, CASSAVA_000535042 at -535057-535062; Ex. 4, CASSAVA_000096151, at -96172-96200; Ex. 30, CASSAVA_000086872, at -86892-86913; Ex. 28, 2020 Form 10-K, at 22; Ex. 141, CASSAVA_000534712, at -534724-534732; Ex. 142, CASSAVA_001447291, at 1447305-1447332.

**Plaintiffs' Response**: Disputed.

*First*, the term "science team" is vague and not defined; no cited evidence indicates its meaning. As far as Plaintiffs are aware, this submission represents the first use of the term.

*Second*, the cited evidence indicates that several of these individuals had roles that did not involve scientific research or analysis of simufilam research, including Michael Marsman (regulatory affairs), Michael Zamloot (technical operations), Shawn Kucera (drug manufacturing), Carrie Crowley (compliance), Leslie Jones (clinical operations), Laura Ann Rodriguez (compliance), Tracy Owen (project management), Stephanie Hayden (project management), and Judit Stroe (compliance), Emmalee Crow (compliance).

*Third*, the cited evidence shows that Dr. Burns was the "project director" and "principal investigator" on each study, and shows that Dr. Hoau-Yan Wang was described as "co-lead scientist on discovery & development of simufilam and SavaDx." (*See* BB Ex. 28 at 22).

47. At Cassava, Dr. Burns has served as Senior Director of Preclinical Research, Vice President of Neuroscience and Senior Vice President of Neuroscience. Ex. 3, CASSAVA_000535042 at -535057; Ex. 4, CASSAVA_000096151, at -96177; Ex. 97, CASSAVA_001454984 at -1455007.

**Plaintiffs' Response**: Undisputed except disputed insofar as it implies Dr. Burns's actual role was consistent with her titles (*see* PCC ¶¶ 214–215, 441–442; *see also* PCC ¶¶ 443–444).

48. Prior to joining Cassava, Dr. Burns worked at Elan Pharmaceuticals and Abgenix. Ex. 3, CASSAVA_000535042 at -535057.

**Plaintiffs' Response**: Undisputed.

49. Dr. Burns received her Ph.D. in behavioral neuroscience from the University of Cambridge and did her post-doctoral work in neurotransplantation at McLean Hospital at Harvard Medical School. Ex. 3, CASSAVA_000535042 at -535057.

**Plaintiffs' Response**: Undisputed.

50. Dr. Burns was never the lead scientist at Cassava. Ex. 133, Burns Tr. 233:14-17.

**Plaintiffs' Response**: Disputed. On March 30, 2024, Dr. Burns described her role at Cassava as follows to the NIH:

> "I have been the ***project leader on our Alzheimer's program*** since my academic collaborator, Dr. Hoau-Yan Wang, and I identified filamin A (FLNA) as a novel therapeutic target . . . I monitored the proof-of-concept research, lead selection and efficacy experiments for simufilam and oversaw IND-enabling studies, chronic toxicity studies, and first-in-human and first-in-patient clinical trials. I have written six papers on simufilam . . . . In preparation for the first-in-human clinical trial in normal volunteers, I wrote the Investigator's Brochure and, with the help of my clinical and regulatory colleagues, wrote the clinical protocol and the Informed Consent. I completed Module 2 of the IND . . . . I am motivated and capable of continuing as ***scientific lead of this program***, with help from a growing team of clinical, regulatory and CMC personnel."

(BB Ex. 142 at 7305 (emphasis added).)

Dr. Burns is identified as the "project director" and "principal investigator" on each simufilam study. (BB Ex. 3 at 5044; BB Ex. 30 at 6874; BB Ex. Ex. 97 at 4985; BB Ex. 141 at 4713; BB Ex. 142 at 7292.)

51. During her employment at Cassava, Dr. Burns reported to the Chief Medical Officer. Ex. 133, Burns Tr. 233:14-17; Ex. 101, 2023 Form 10-K, at 23.

**Plaintiffs' Response**: Disputed insofar as the contention implies Dr. Burns reported only to the Chief Medical Officer, based on evidence showing Dr. Burns and Barbier, the CEO, regularly reported to each other. (PCC ¶¶ 443–444.)

52. The Chief Medical Officer was responsible for overseeing the clinical development of simufilam. Ex. 30, CASSAVA_000086872 at -86896; Ex. 97, CASSAVA_001454984 at -1455020.

**Plaintiffs' Response**: Disputed. Dr. Burns described herself as the "project leader" and "scientific lead" on the development of simufilam. (BB Ex. 142 at 7305).

53. In 2017, Cassava began sponsoring clinical trials of simufilam. Ex. 67, 2021 Form 10-K at 4-5, 15; Ex. 93, 2022 Form 10-K, at 15.

**Plaintiffs' Response**: Undisputed.

54. At the time, published studies had indicated that, in Alzheimer's patients, an altered form of a protein called filamin A ("FLNA") caused neuronal dysfunction, neuronal degeneration and neuroinflammation. Ex. 67, 2021 Form 10-K at 4; *see* Ex. 118, L. Zhang et al., *Filamin A in focus: unravelling the multifaceted roles of filamin A in neurodevelopment and neurological disorders*, Brain 2025:148; 3473–3480 (collecting sources); Ex. 1, Onoprishvili I, Andria M, Kramer H, et al., *Interaction between the μ opioid receptor and filamin A is involved in receptor regulation and trafficking*, Mol Pharmacol. 2003;64:1092–1100; Ex. 2, Feng Y, Walsh C., *The many faces of filamin: A versatile molecular scaffold for cell motility and signalling*, Nat Cell Biol. 2004;6:1034–1038.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention. *First*, the cited Exhibit 118 is a paper published in 2025 and cannot show what "studies had indicated" in 2017. The reference to unspecified "collected sources" is ambiguous, but only four of the sources cited in 3473-3480 of Exhibit 118 even purport to concern Alzheimer's disease: (1) the paper cited in footnote 72 (*see* PX 282), which was published in 2023 and does not report finding an altered form of FLNA; (2) the paper

cited in footnote 83 (*see* PX 283), which was co-authored by Dr. Wang and Dr. Burns and relied on other contested research by Dr. Wang and Dr. Burns subject to an Expression of Concern (*see* PX 277), for the claim that Alzheimer's disease is associated with an altered form of FLNA; (3) the paper cited in footnote 84, which was co-authored by Dr. Wang and Dr. Burns and used unwarranted post-hoc exclusion criteria to omit approximately 40% of the data (*see* PX 157 (CASSAVA_000994072) at 086 ("values were excluded from the analysis (highlighted in red)"), 086-094 (showing approximately 40% of data as excluded)); and (4) the paper cited in footnote 85 (*see* PX 137), which does not report finding an altered form of FLNA.

*Second*, the cited Exhibit 1 and Exhibit 2 do not purport to study Alzheimer's disease and do not report finding an altered form of FLNA.

55. The Company believed that simufilam's mechanism of action could improve brain health and potentially treat Alzheimer's by reverting altered FLNA back to its native, healthy conformation. Ex. 67, 2021 Form 10-K, at 5.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention about what Cassava, Barbier, or Dr. Burns genuinely believed, only what the company asserted to investors. Plaintiffs dispute any assertions by Defendants that they held an actual, reasonable, or good-faith belief in simufilam's mechanism of action or therapeutic potential, based on the evidence that Defendants knew about and sought to silence legitimate concerns about the integrity of the research underlying simufilam's purported mechanism of action and therapeutic potential (*see* PCC ¶¶ 313–322, 323–367; *see also* PCC ¶¶ 369–373) and evidence of their personal interests in prolonging the clinical trials (*see* PCC ¶¶ 446–451, 483–494)

56. In 2017, the U.S. Food and Drug Administration ("FDA") accepted the Company's Investigational New Drug ("IND") application for simufilam. Ex. 67, 2021 Form 10-K, at 15; Ex. 5, Cassava Form 8-K, filed Aug. 9, 2017 ("Aug. 9, 2017 Form 8-K").

**Plaintiffs' Response**: Undisputed.

57. Between 2017 and 2018, Cassava sponsored a Phase 1 study of simufilam, a first-in-human volunteer study focused on the primary endpoints of safety, tolerability and pharmacokinetics. Ex. 5, Aug. 9, 2017 Form 8-K.

**Plaintiffs' Response**: Undisputed.

58. In 2018, the Phase 1 study was completed. *See* ClinicalTrials.gov, A Safety Study of PTI-125 in Healthy Volunteers, NCT03784300, https://clinicaltrials.gov/study/NCT03784300 (last visited Aug. 2, 2026).

**Plaintiffs' Response**: Undisputed.

59. The Phase 1 study results showed that simufilam was well-tolerated and rapidly absorbed. Ex. 67, 2021 Form 10-K, at 15.

**Plaintiffs' Response**: Undisputed.

60. The Company believed that the Phase 1 study demonstrated favorable proof-of-principle for the development of simufilam in treating Alzheimer's disease. Ex. 6, Cassava Press Release, dated Oct. 24, 2017; Ex. 8, Cassava 2018 Form 10-K, filed Mar. 29, 2019 ("2018 Form 10-K"), at 8.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention about what Cassava, Barbier, or Dr. Burns genuinely believed, only what the company asserted to investors and the public. Plaintiffs dispute any assertions by Defendants that they held an actual, reasonable, or good-faith belief in simufilam's

mechanism of action or therapeutic potential, based on the evidence that Defendants knew about and sought to silence legitimate concerns about the integrity of the research underlying simufilam's purported mechanism of action and therapeutic potential (*see* PCC ¶¶ 313–322, 323–367; *see also* PCC ¶¶ 369–373) and evidence of their personal interests in prolonging the clinical trials (*see* PCC ¶¶ 446–451, 483–494)

Plaintiffs further dispute that the Phase I study, focused solely on clinical safety, could reasonably be interpreted as establishing a "favorable proof-of-principle for the development of PTI-125 in Alzheimer's disease." The cited Exhibit 8 states that the Phase I study claimed to show only the "absence of dose-limiting effects in healthy adults." (BB Ex. 8 at 8.)

61. In 2019, Cassava sponsored a Phase 2a clinical proof-of-concept safety and pharmacokinetic study of simufilam involving thirteen patients, ages 50 to 85, with mild-to-moderate Alzheimer's disease. *See* ClinicalTrials.gov, A PTI-125 for Mild-to-moderate Alzheimer's Disease Patients, NCT03748706, https://clinicaltrials.gov/study/NCT03748706 (last visited Aug. 3, 2026).

**Plaintiffs' Response:** Undisputed that Cassava sponsored a Phase 2a clinical study of simufilam. Disputed that the thirteen patients in the study had mild-to-moderate Alzheimer's disease, on the basis that the screening data generated by Dr. Wang to confirm Alzheimer's disease appears to have been fabricated. (PX 238 (Sanders Report) § III.A.)

62. An independent analysis by a consulting biostatistician found decreases in eight cerebrospinal fluid ("CSF") biomarkers, when comparing Day 28 to pre-dose baseline. Ex. 67, 2021 Form 10-K at 15-16.

**Plaintiffs' Response:** Disputed. It was not an "independent analysis." The biomarker measurement data were generated by Dr. Wang, Cassava's long-time collaborator and consultant; Dr. Wang, through Cassava, provided his unverified biomarker measurements to a statistician to analyze. (PX 84 (CASSAVA_000059830) at 834 ("The data were all analyzed by my academic collaborator who ran the ELISAs.").) Providing a third-party statistician with data generated and analyzed by Dr. Wang is not an "independent analysis." There is no evidence that the statistician obtained raw, unaltered data. Plaintiffs dispute that raw data from the plate-reader machine, unmediated by Dr. Wang, would show "decreases" in biomarkers if independently analyzed by the same consulting statistician. (PX 238 (Sanders Report) § III.A.)

63. The Company believed the Phase 2a Study results showed clinical evidence of simufilam's mechanism of action and drug-target engagement. Ex. 67, 2021 Form 10-K at 17.

**Plaintiffs' Response:** Disputed. The cited evidence does not support the contention about what Cassava, Barbier, or Dr. Burns genuinely believed, only what the company asserted to investors and the public. Plaintiffs dispute any assertions by Defendants that they held an actual, reasonable, or good-faith belief in simufilam's mechanism of action or drug-target engagement, based on the evidence that Defendants knew about and sought to silence legitimate concerns about the integrity of the research underlying simufilam's purported mechanism of action (*see* PCC ¶¶ 313–322, 323–367; *see also* PCC ¶¶ 369–373) and evidence of their personal interests in prolonging the clinical trials (*see* PCC ¶¶ 446–451, 483–494)

The contention is disputed by (i) Dr. Burns's own disbelief: "The data are frankly unbelievable so we need as many stamps on them to verify them as we can." (PX 84

(CASSAVA_000059830) at 9834); and (ii) the fact the phase 2a study was not placebo-controlled and purported to examine safety, not efficacy (PX 7 (BARBIER_00000001) at 62:02 [redacted].)

64. In September 2019, Cassava announced the initiation of a Phase 2b study, involving 64 patients with mild-to-moderate Alzheimer's disease. Ex. 14, Cassava Form 8-K and attached press release, filed Mar. 26, 2020 ("Mar. 26, 2020 Form 8-K").

**Plaintiffs' Response**: Undisputed that Cassava announced the initiation of the Phase 2b study. Disputed that all of the 64 patients in the study had mild-to-moderate Alzheimer's disease, on the basis that the screening data generated by Dr. Wang to confirm Alzheimer's disease appears to have been fabricated (PX 238 (Sanders Report) § III.A), and Dr. Burns received data from other labs that indicated some number of patients enrolled by Dr. Wang had cognition scores inconsistent with an Alzheimer's diagnosis (*see* PCC ¶ 373).

65. The Phase 2b study was designed to evaluate the safety and tolerability of simufilam. Ex. 14, Mar. 26, 2020 Form 8-K.

**Plaintiffs' Response**: Undisputed except insofar as the contention omits the full description provided in the cited document, which states that the study was "designed to evaluate the safety and tolerability of PTI-125, and its effects on biomarkers of disease."

66. The primary endpoint was improvements in levels of CSF biomarkers of disease from baseline to Day 28. *Id.*

**Plaintiffs' Response:** Undisputed that the company and Dr. Burns viewed the primary endpoint of every study as "improvements" in biomarkers or cognition; disputed

insofar the actual primary endpoint should have been "changes" (positive or negative) in biomarkers.

67. The Company initially selected the laboratory of Dr. Oskar Hansson, a professor at Lund University in Sweden, to conduct the CSF biomarker analysis for the Phase 2b study. Ex. 11, CASSAVA_000858421.

**Plaintiffs' Response:** Disputed. The cited evidence does not support the contention, particularly the "initially selected" characterization. The cited document (BB Ex. 11) appears to be a contract with Lund dated February 10, 2020. The Phase 2b Clinical Research Protocol PTI-125-02, dated June 28, 2019, states that samples would be analyzed by Dr. Wang at CUNY, and it does not make any reference to Dr. Hansson or Lund. (PX 85 (CASSAVA_000060946) at 968 ("The samples collected at screening and on Study Day 28 will be shipped […] to Dr. Hoau-Yan Wang, CUNY School of Medicine [. . .] to be tested in biomarker assays.")

68. During the Lund biomarker analysis, multiple issues arose that caused Cassava and members of its science team to doubt the reliability of Lund's analysis, including:

**Plaintiffs' Response**: Disputed. The cited evidence does not indicate any "doubts" about Lund or its process by anyone at Cassava until after Dr. Burns unblinded herself and saw the negative results. (PX 143 (CASSAVA_000857156) at 156 ("We have broken the blind and unfortunately the data are so variable that nothing makes sense.).)

(a) The Lund laboratory experienced staffing issues due to the COVID-19 pandemic. Ex. 15, CASSAVA_000857083 ("[o]ne problem is the some of our technical staff is currently on a [sick] leave").

**Plaintiffs' Response**: Disputed. The quote from the cited evidence was a response from someone at Lund to Dr. Burns's questions about the timing of when results would be ready, not about substantive issues.

(b) There were technical errors in the analysis for some of the samples. Ex. 15, CASSAVA_000857083 ("[t]here must have been some fault in this specific strip of wells").

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention and omits the remainder of the statement from Lund in which they conclude the data is safe to use: "There must have been some fault in this specific strip of wells, since the rest of the plate worked well. I think it is save(sic) to use the data given that CVs in the t-tau assay are very low."

(c) During the CFS biomarker analysis, the Quanterix Simoa device used to analyze the samples broke down in the middle of a test. Ex. 16, CASSAVA_000856966 ("Unfortunately, Simoa instrument broke down in the beginning of the NfL run. We are not sure if it would be possible to collect the data.").

**Plaintiffs' Response**: Undisputed that the Quanterix Simoa device experienced a momentary crash during one of several tests. Disputed insofar as the contention suggests this invalidated all of Lund's data, considering the technician from Quanterix explained later on the same day: "The curve shape, and the values look really good and I've attached the data here…. I believe your sample values should be reliable." (PX 107 (CASSAVA_000541901) at 903)

(d) Certain CSF samples were refrigerated at the incorrect temperature. Ex. 17, CASSAVA_000857485, at -857485-857486.

**Plaintiffs' Response**: Disputed. This is the same purported issue as subparagraph (c), and was caused by the momentary crash of the Quanterix device. The cited evidence does not support the contention that any samples were stored at "incorrect" temperatures. Rather, the evidence reflects that certain samples were stored at a temperature different from the "suggested" temperature. The technicians involved indicated that this issue did not affect the reliability of the data. (PX 107 (CASSAVA_000541901) at 903 ("I believe your sample values should be reliable.").)

(e) Multiple clerical and technical errors, some of which were only corrected when brought to attention by Dr. Burns, impacted the output of the biomarker analysis data. Ex. 18, CASSAVA_000391420 ("I made a mistake by running the plate with the wrong calibrator concentrations."); Ex. 19, CASSAVA_000391432 ("Our technician typed 003-014 Day 28 instead of 13-003 Day 28."); Ex. 23, CASSAVA_000418979 ("The pdf file for plate 1 is not correct, it is based on wrong calibrator values.").

**Plaintiffs' Response**: Disputed insofar as the contention is that these "technical" or "clerical" errors affected the data, considering the evidence that the supposed errors were corrected and admittedly only clerical errors. Lund corrected the cited "mistakes" (PX 165 (CASSAVA_001012396) ("Please see the attached file of your recalculated data!").) The quoted passage from BB Ex. 23 is misleading and omits the passage explaining that it was a labeling mistake not an issue with the data: "The pdf file for plate 1 is not correct, it is based on wrong calibrator values. The correct data was in the '2020-04-22

LB_NFL_plate1_pl_RunData QTRX Recalc_PL.xlsx' files that I sent on April 27th."

(f) Dr. Hansson agreed that the final data looked "odd" due to the high level of variability. Ex. 21, CASSAVA_000415273 (Dr. Hansson: "I agree that the variation is very high, which is odd as the CVs are low indication good precision of the actual measurements.").

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention as Dr. Hansson's remark was about one set of biomarker data out of the seven biomarkers that Lund ran. The "odd" variation is consistent with "a third of the patients" not having Alzheimer's disease at all. (PX 100 (CASSAVA_000391440) at 141.) [redacted] (PX 15 (CASSAVA_001442693) at 732-733.)

(g) The Lund data revealed anomalous swings in biomarker measurements, including in placebo groups. Ex. 133, Burns Tr., 205:7-206:7 ("So when we saw these massive changes in the placebo group in one month we knew that's not reality. That's either sample handling, assay variability. Something is not reliable here.").

**Plaintiffs' Response**: Disputed. For the placebo group, there was no statistically significant change or "massive changes in the placebo group," in any of the seven biomarkers that Lund ran. No biomarker change showed a statistically significant treatment effect of simufilam versus placebo. (PX 217 (Aisen_0001390).)

(h) The Lund data showed high percentages of "coefficients of variation," which means that multiple values for the same sample returned widely varying results. Ex. 22, CASSAVA_000375558 ("The five QC samples have higher (in some cases double or triple) than expected CVs . . .").

**Plaintiffs' Response**: Disputed. Variability of the four core Alzheimer's biomarkers were well within the accepted 10% range and, according to the Lund technician who performed the assays, correlations between biomarkers was "in the expected range . . . so I would say the assays worked well." (PX 207 (CASSAVA_000857583) at 583)

69. Dr. Burns sent Lund's data analysis to Dr. Paul Aisen. Ex. 22, CASSAVA_000375558.

**Plaintiffs' Response**: Disputed. The contention mischaracterizes the cited evidence, as the "data analysis" Dr. Burns sent to Dr. Aisen was Dr. Burns's reorganization of the data into groups of subjects with high and low values.

70. Dr. Aisen is the Director of the Alzheimer's Therapeutic Research Institute and has worked in Alzheimer's research for over 35 years. Ex. 120, Aisen Tr. 10:21-11:1, 12:9-11.

**Plaintiffs' Response**: Undisputed.

71. Dr. Aisen confirmed Dr. Burns' concerns about the Lund CSF biomarker analysis. Ex. 120, Aisen Tr., 47:12-52:23; Ex. 22, CASSAVA_000375558.

**Plaintiffs' Response**: Disputed. Dr. Aisen never "confirmed" Dr. Burns's concerns and the cited evidence does not support the contention. Dr. Aisen told Dr. Burns over email at the time and testified in his deposition: "we would not expect any measurable disease progression over 28 days. This is a disease that progresses over many

years." (BB Ex. 120 (Aisen Tr.) at 51:15-24); BB Ex. 22 at 5558 ("There is no measurable disease progression over 28 days.").) Dr. Aisen also told Dr. Burns: "Oskar Hansson's team is excellent, and they utilize all leading assay platforms" and "change in placebo over 28 days is artifactual. Unfortunately, 20 subjects per arm may be too small for reliable results." (BB Ex. 22 at 5558.) Rather than confirming Dr. Burns's attempts to discredit the Lund data, Dr. Aisen expressed concerns about the study design and Dr. Burns's efforts to draw meaningful conclusions about the drug's efficacy on Alzheimer's biomarkers from a 28-day study with groups of only 20 study subjects. (*Id.*) Similarly, Dr. Steven Arnold, a member of Cassava's scientific advisory board, told Dr. Burns on May 16, 2020 the same thing: "study-wise, 28 days is too short" and at the same time, cautioned Dr. Burns about relying on Dr. Wang, writing "Hoau's data are always surprising [. . . ] I don't know how he does it." (PX 75 (CASSAVA_000018239) at 239.)

72. Dr. Aisen did not receive any compensation from Cassava for his review of the Lund data. Ex. 120, Aisen Tr. at 13:19-14:3.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention; Dr. Aisen testified that he was a "paid consultant" for Cassava when it was called Pain Therapeutics and that he "believe[d]" his subsequent work with Cassava was "informal, unpaid, but I can't be certain of that." (BB Ex. 120 (Aisen Tr.) at 13:19-14:03.)

73. On May 15, 2020, Cassava announced that the initial Phase 2b CSF biomarker data would have to be re-analyzed. Ex. 20, Cassava Form 8-K, filed May 15, 2020, at 5; Ex. 28, 2020 Form 10-K, at 12 ("Overall, we believe data from the initial bioanalysis can be interpreted

as anomalous and highly improbable. With its validity in question, the initial bioanalysis serves no useful purpose.").

**Plaintiffs' Response**: Undisputed that Cassava purported to express the belief that the data was anomalous and would have to be re-analyzed. Disputed insofar as the contention implies the stated reasons were true, reasonable, or sincere. There is no evidence that Lund or Dr. Hanssen ever agreed with the claim that these data were anomalous, unreliable, or that the data's validity was in question.

74. The Company contacted Dr. Hoau-Yan Wang, professor at the City University of New York, to perform an analysis of the remaining patient CSF samples from the Phase 2b trial. Ex. 133, Burns Tr. at 215:20-24.

**Plaintiffs' Response**: Disputed. The contention implies Dr. Wang was not already working with Cassava on the phase 2b study; in fact, Dr. Wang had already analyzed the same patient samples from the Phase 2b trial for two other biomarkers; Dr. Burns did not ask Dr. Wang to "re-analyze" the samples for the biomarkers originally tested by Lund, until after Dr. Burns reviewed was unblinded and reviewed the data. (*See* PX 217 (Aisen_0001390) (columns AK and AO "bioanalysis by HY").)

75. Dr. Burns testified that Dr. Wang's laboratory was chosen because Cassava "didn't have a lot of choices" for laboratories that were capable of doing the CSF biomarker analysis and available. Ex. 133, Burns Tr. at 215:23-216:9.

**Plaintiffs' Response**: Undisputed that Dr. Burns offered this explanation at her deposition. Disputed insofar as Dr. Burns is not credible; and there is no contemporaneous evidence to support this explanation, nor evidence that Dr. Burns or Cassava contacted other laboratories to conduct the "re-analysis."

76. In addition to the CSF biomarker analysis for the primary endpoint of the Phase 2b study, an analysis of cognitive changes was conducted by Cambridge Cognition. Ex. 10, CASSAVA_001045729.

**Plaintiffs' Response**: Disputed. Dr. Burns directed the so-called "sensitivity analysis" that the company presented concerning purported cognitive changes. (PX 92 (CASSAVA_000255421)).

77. The cognitive study tests were exploratory and not meant to support conclusions about efficacy. Ex. 106, Cassava Form 8-K, filed July 1, 2024 ("July 1, 2024 Form 8-K"), at 3 ("The Phase 2b Study's CANTAB tests were not powered for statistical significance . . . .").

**Plaintiffs' Response**: Disputed insofar as it is contradicted by what Cassava claimed at the time. The contention cites a July 2024 disclosure. But when Cassava publicly announced the results of the phase 2b "redo," on September 14, 2020, the company claimed in its press release that the results supported conclusions about efficacy: "Alzheimer's Patients in Drug Groups Showed Improved Cognition Compared to Placebo Group (Effect Size 46-17%)." (BB Ex. 25 at 4.)

78. On September 14, 2020, Cassava announced the final results of the Phase 2b study. Ex. 25, Cassava Form 8-K and attached press release and presentation, filed on September 14, 2020 ("Sept. 14, 2020 Form 8-K"), at 5.

**Plaintiffs' Response**: Undisputed.

79. In a September 14, 2020 press release, Cassava reported that the drug was safe and well-tolerated in the study and that simufilam improved biomarkers in patients with Alzheimer's disease compared to a placebo group. Ex. 25, Sept. 14, 2020 Form 8-K, at 7.

**Plaintiffs' Response**: Undisputed, except disputed insofar as it omits other significant details about the press release, including that it did not identify Dr. Wang's lab at CUNY as the lab that conducted the re-analysis (describing it as "an academic lab"); and that it falsely asserted the re-analysis was conducted "under blinded conditions to eliminate any possibility of bias." (BB Ex. 25 at 7.)

80. The September 14, 2020 press release also reported that simufilam appeared to benefit cognition. *Id.*

**Plaintiffs' Response**: Disputed insofar as it understates the claims in the press release, which contained the following bolded sub-heading: "Alzheimer's Patients in Drug Groups Showed Improved Cognition Compared to Placebo Group (Effect Size 46-17%)." (BB Ex. 25 at 4.)

81. The presentation deck for Cassava's conference call that day noted that, for the cognitive analyses, "[p]atients who did not take drug (no blood levels) were removed" and, for one of the two tests, "[e]ffect sizes vs. placebo were calculated … after removing the most and least impaired subjects across all groups by baseline score." Ex. 25, Sept. 14, 2020 Form 8-K, at 37-38.

**Plaintiffs' Response**: Undisputed, except insofar as the contention implies the presentation deck was not misleading. For example, it did not disclose that these post-hoc maneuvers were not prespecified in the Statistical Analysis Plan. (*See* PX 285.) Nor did it disclose that these post-hoc maneuvers led to the removal of approximately 40% of the phase 2b study participants.

82. Approximately 40% of the 64 Phase 2b study participants were excluded from the cognitive analyses. Ex. 106, July 1, 2024 Form 8-K, at 3.

**Plaintiffs' Response**: Undisputed, except insofar as the passive phrasing omits the fact that Dr. Burns was the one who excluded the approximately 40% of study participants. (PCC ¶¶ 354-360.)

83. The excluded participants consisted of participants with very few errors (ceiling effects), participants whose performance on the cognitive evaluation indicated that they may not have understood the task, participants reported not to have understood the instructions, participants in the non-placebo group who appeared not to have taken simufilam, participants who were not compliant with the medication regimen, and patients with no baseline test. Ex. 106, July 1, 2024 Form 8-K at 3; Ex. 133, Burns Tr. 173:21-174:8.

**Plaintiffs' Response**: Disputed insofar as it mischaracterizes the specific exclusions described in the cited July 1, 2024 disclosure (BB Ex. 106 at 4) and insofar as it implies these exclusion criteria were reasonable or prespecified in the Statistical Analysis Plan. (*See* PX 285 at 18 ("Results will be summarized for subjects by treatment group. The summary and statistical analysis will be conducted using FAS population.")

84. In 2020, Cassava sponsored an open-label study (no blinded group) to evaluate the long-term safety and tolerability of simufilam, and to assess exploratory efficacy endpoints. Ex. 93, 2022 Form 10-K at 6.

**Plaintiffs' Response**: Disputed insofar as Cassava has offered shifting descriptions of the open-label study and its "efficacy endpoints." In June 2020, the company stated: "In March 2020, we initiated an open-label, multi-center, extension study of PTI-125 in the U.S. to monitor long-term safety and tolerability of PTI-125 at 100 mg twice-daily over 12 months in approximately 100 patients with mild-to-moderate

Alzheimer's. The open-label extension study is designed to satisfy core regulatory requirements around enlarging the clinical safety database, per ICH guidelines." (PX 111 (CASSAVA_000669999) at 017.)

85. The efficacy outcomes were analyzed by Pentara Corporation, an independent biostatistical consulting firm. Ex. 93, 2022 Form 10-K at 7; Ex. 90, CASSAVA_000391870, at -391874.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention. BB Ex. 90 at 873 states: "Statistical analysis on changes in CSF biomarkers was conducted internally." The cited documents are the company's own disclosures referring to Pentara as the firm that conducted the statistical analysis of certain cognitive data. Further disputed insofar as Dr. Wang was responsible for screening patients for the open-label trial.

86. In January 2023, Cassava announced positive top-line results for the Phase 2 open-label study. Ex. 93, 2022 Form 10-K at 6-8.

**Plaintiffs' Response**: Undisputed that Cassava presented the results as "positive." Disputed that the actual results suggest any positive efficacy of simufilam given the evidence that it was designed solely as a safety study, was open-label, and had no placebo group. Cassava explicitly disclaimed the headline "positive" results, stating: "The open-label design and size of this study may introduce clinical or statistical bias or may generate results that may not fully distinguish between drug effects and random variation." (BB Ex. 93 at 8.)

87. On May 6, 2021, Cassava requested Special Protocol Assessments ("SPAs") for proposed Phase 3 protocols. Ex. 136, Expert Report of Dr. Brian Harvey ("Harvey Rpt."), at Fig. 3.

**Plaintiffs' Response**: Undisputed.

88. After FDA responded on June 18, 2021 that the proposals as presented would not support regulatory submissions, Cassava submitted revised requests on July 7, 2021, and FDA responded on August 20, 2021 that the revised SPAs would support regulatory submissions. *Id*.

**Plaintiffs' Response**: Undisputed.

89. In 2021, the Company announced the initiation of two Phase 3 clinical trials: RETHINK-ALZ and REFOCUS-ALZ. Ex. 55, Cassava Form 10-Q, filed on Nov. 15, 2021 ("Q3 2021 Form 10-Q"), at 25.

**Plaintiffs' Response**: Undisputed.

90. RETHINK-ALZ was designed to evaluate the safety and efficacy of oral simufilam 100 mg in enhancing cognition and slowing cognitive and functional decline over 52 weeks. Ex. 55, Q3 2021 Form 10-Q, at 26.

**Plaintiffs' Response**: Undisputed, except insofar as "designed" implies any of the Defendants had an actual, reasonable, or good-faith belief that these objectives were plausible (*see* PCC ¶¶ 313–322, 339–367; *see also* PCC ¶¶ 369–373).

91. The secondary objectives of RETHINK-ALZ included the assessment of simufilam's effect on neuropsychiatric symptoms and caregiver burden. *Id*.

**Plaintiffs' Response**: Undisputed.

92. The Company planned to enroll approximately 750 patients in the U.S. and Canada, and eventually overseas. *Id*.

**Plaintiffs' Response**: Undisputed.

93. REFOCUS-ALZ, was designed to evaluate the safety and efficacy of oral simufilam 100 mg and 50 mg over 76 weeks. Ex. 115, 2024 Form 10-K, at 7.

**Plaintiffs' Response**: Undisputed, except insofar as "designed" implies any of the Defendants had an actual, reasonable, or good-faith belief that these objectives were plausible (*see* PCC ¶¶ 313–322, 339–367; *see also* PCC ¶¶ 369–373).

94. The Company planned to enroll approximately 1,000 patients in the U.S. and Canada and, eventually, overseas. Ex. 55, Q3 2021 Form 10-Q, at 26.

**Plaintiffs' Response**: Undisputed.

95. On August 18, 2021, Jordan A. Thomas, a lawyer affiliated with Labaton Sucharow LLP, submitted a Citizen Petition to the FDA on behalf of anonymous clients, asking the FDA to halt Cassava's Phase 2 Open Label and Phase 3 RETHINK-ALZ clinical trials. Ex. 33, CASSAVA_000490972 (Aug. 18, 2021 Citizen Petition), at 3.

**Plaintiffs' Response**: Undisputed.

96. On August 30, September 9, November 17, and December 8, 2021, Mr. Thomas filed supplements to the Citizen Petition. Ex. 37, CASSAVA_001442046 (Aug. 30, 2021 Supp. to Citizen Petition); Ex. 41, CASSAVA_000491151 (Sept. 9, 2021 Second Supp. to Citizen Petition); Ex. 58, CASSAVA_000696037 (Nov. 17, 2021 Third Supp. to Citizen Petition); Ex. 59, CASSAVA_000714451 (Dec. 8, 2021 Fourth Supp. to Citizen Petition).

**Plaintiffs' Response**: Undisputed.

97. On September 1, 2021, Mr. Thomas submitted another Citizen Petition asking the FDA to halt the ongoing Phase 3 REFOCUS-ALZ trial. Ex. 39, (Sept. 1, 2021 Citizen Petition).

**Plaintiffs' Response**: Undisputed.

98. The Citizen Petitions made three principal allegations: (1) the Western blot analyses published in journal articles used to support simufilam's connection to Alzheimer's disease suggest that the data was manipulated; (2) Cassava's scientific claims are "impossible" and that they are based on "scientifically undoable" experiments; and (3) Cassava's presentation of Phase 2b clinical biomarker data shows "signs of data anomalies or manipulation." *See generally* Exs. 33, 37, 41, 58, 59.

**Plaintiffs' Response**: Undisputed.

99. Mr. Thomas' November 17, 2021 submission alleged that Western Blot images that had been supplied to certain academic journals to address the Citizen Petition allegations of Western Blot image manipulation were not "original" images. Ex. 58, CASSAVA_000696037 (Third Supp. to Citizen Petition) at -696055.

**Plaintiffs' Response**: Undisputed.

100. The Western Blot images at issue were generated by Dr. Wang. Ex. 133, Burns Tr. 14:4-21; Ex. 40, CASSAVA_000008476, at 5; Ex. 123, Brodkin Tr. 176:11-20.

**Plaintiffs' Response**: Undisputed.

101. Neither Dr. Burns nor anyone else at Cassava generated the Western blot images. Ex. 133, Burns Tr. 14:4-21.

**Plaintiffs' Response**: Undisputed.

102. Dr. Wang maintained that the Western Blot images provided to the academic journals were the original images. Ex. 70, CASSAVA_000719933, at -719935 (Dr. Wang: "I was still able to locate most of the original files and provide them to PLOS One"); Ex. 96, CASSAVA_001331679 (Dr. Wang: "As Dr. Burns has indicated, all the representative blots provided were full blots. I was [unaware] of the requirement to show any areas outside the

blots. In addition, I am not aware of the requirements of showing molecular weight markers in the gel since a well-titrated antibodies will NOT detect any molecular markers unless the concentrations of antibodies are too high or molecular weight markers were over-loaded.”).

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention that Dr. Wang maintained all Western blot images provided were originals, as it refers to specific instances and he does not even claim to have found all originals. (PX 121 (CASSAVA_000727933) at 952 (“I tried to find the original files for the J neurosci, but I can't. These were all in a hard drive that was fried. I don't know what to do now.”) Further disputed insofar as the cited evidence shows Dr. Burns was the one who transmitted the images to journals after attempting to collect them from Dr. Wang and they purported to disagree with scientific journal editors about what constituted “original” images. Further disputed insofar as it is contradicted by the FDA audit (PX 222 (CUNY 001529) at 530 (Dr. Wang lacked “source records for Western-blot analysis”); Cassava audit (PX 21 (Rodriguez Dep. Tr.) at 176:09-20 (“All Western blot experiments, whether it was ours or anybody else's, all were gone”); CUNY Investigation Committee's Final Report (PX 232 (RFCUNY000743) at 0746 (“In no instance did Dr. Wang provide any material that could be reasonably recognized as original, uncropped blots”); and the University's May 2025 letter to ORI (PX 223 (CUNY 001573) at 575 (“Dr. Wang consistently reported that he did not maintain original research data in hard copy files, electronic images, or lab notebooks.”).)

103. Dr. Hal Scofield is a clinician scientist at the University of Oklahoma Health Sciences Center and the Oklahoma Medical Research Foundation. Ex. 137, Expert Report of Dr. Hal Scofield (“Scofield Rpt.”), at 1

**Plaintiffs' Response**: Undisputed.

104. Dr. Scofield is also the Research Integrity Officer at the Oklahoma City U.S. Department of Veterans Affairs Medical Center, where he conducts and participates in research misconduct investigations. Ex. 137, Scofield Rpt., at 2.

**Plaintiffs' Response**: Undisputed.

105. Dr. Scofield has authored multiple papers related to Western blotting and is an editor of a textbook entitled "Western Blotting" (Kurien BT, Scofield RH, eds., Humana Press: New York, 2015). Ex. 137, Scofield Rpt., at 1.

**Plaintiffs' Response**: Undisputed.

106. In 2022, Dr. Scofield submitted a letter to CUNY concerning the Western blot images discussed in the Citizen Petitions. Ex. 73, CASSAVA_001418716; Ex. 137, Scofield Rpt.

**Plaintiffs' Response**: Undisputed, except insofar as it implies Dr. Scofield addressed all of the images discussed in the Citizen Petition.

107. Dr. Scofield's letter to CUNY stated: "[T]he allegations in the Citizen Petition appear to be the result of a fundamental lack of understanding of Western blotting, particularly regarding the ways that visual artifacts appear in the final images. Additionally, the petitioners clearly do not understand the ways in which Western blots are prepared for publication. I have found no evidence of misconduct by Dr. Wang." Ex. 73, CASSAVA_001418716 at -1418722; Ex. 137, Scofield Rpt.

**Plaintiffs' Response**: Undisputed that Dr. Scofield's letter contained the quoted text. Disputed insofar as the contention implies it was a reasonable or reliable conclusion, given Dr. Scofield's testimony that "Dr. Wang didn't have the original blots, he had photographs of them" (PX 23 (Scofield Tr.) at 192:11-12); "there were some problems in

how he kept scientific records" (PX 23 (Scofield Tr.) at 37:23-24); "the main problem has been a failure to sometimes be able to produce original data" (PX 23 (Scofield Tr.) at 38:8-10); "I have looked at blots provided to me by counsel" (PX 23 (Scofield Tr.) at 40:10); "through counsel I received photos of -- of the full blots of those experiments" (PX 23 (Scofield Tr.) at 184:4-5).

108. Dr. Burns had no reason to doubt that the Western Blot images provided to the academic journals were the original images and saw no evidence that the images were manipulated. Ex. 47, CASSAVA_000015887 ("There is no manipulation in these images. I'm confident any reasonable person with knowledge, experience & expertise in Western blots will reach this same conclusion."); Ex. 133, Burns Tr. 70:6-73:12; 72:10-15.

**Plaintiffs' Response**: Disputed. Dr. Burns had ample reason to doubt that the Western Blot images she provided were original and unmanipulated, including the fact that Dr. Wang had confessed to Dr. Burns that he did not have original files. PX 90 (CASSAVA_000217591) (Aug 31 2021 Text Messages: "Hoau-Yan Wang: Ok. I tried to find the original files for the j neurosci but I can't (these were all in a hard drive that was fried). I don't know what to do now. Dr. Burns: Call you soon."). Dr. Burns also had possession of PowerPoint files containing other western blot images provided by Dr. Wang constructed as a collage of individual fragments, which also should have raised serious concerns about Dr. Wang's western blot images. (PX 97 (CASSAVA_000374078) at -4086.)

109. On August 25, 2021, Cassava issued a press release denying the allegations in the Citizen Petition. Ex. 35, CASSAVA_000094847 ("Cassava Sciences Responds to Allegations").

**Plaintiffs' Response**: Undisputed.

110. On November 17, 2021, the anonymous clients behind the Citizen Petitions were revealed to be Dr. David Bredt and Dr. Geoffrey Pitt, who had each taken short positions in Cassava stock. Ex. 58, CASSAVA_000696037, at -696038-696039; Ex. 63, CASSAVA_000541050; Ex. 75, CASSAVA_000899854.

**Plaintiffs' Response**: Undisputed.

111. On February 10, 2022, the FDA denied the Citizen Petitions. Ex. 65, CASSAVA_000696066.

**Plaintiffs' Response**: Undisputed; however, note that the FDA stated in its February 10, 2022 letter: "[The] Petitions are being denied solely on the grounds that [the Petitioners'] requests are not the appropriate subject of a citizen petition. This response does not represent a decision by the Agency to take or refrain from taking any action relating to the subject matter of [the] Petitions." (BB Ex. 65 at 6068.)

112. FDA did not halt the Phase 3 clinical trials and never conveyed to Cassava or anyone else that it had concluded the clinical program was based on fabricated data or a fraudulent scientific premise. Ex. 136, Harvey Rpt. ¶ 16.

**Plaintiffs' Response**: Disputed. *First*, the cited evidence does not support the contentions about the FDA's knowledge or communications.

*Second*, the contentions are contradicted by the FDA's October 27, 2020 letter to Cassava stating that the company's assertions about the results of simufilam clinical studies were "untenable" (PX 88 (CASSAVA_000100022) at 023); the FDA's findings from its audit of Dr. Wang's lab in September 2022, described in the FDA's Form 483 (PX 144 (CASSAVA_000898032) at 032-033) and Inspection Report (PX 222 (CUNY 001529) at 532), including the finding that there were "inadequate source records to

reconstruct" the simufilam phase 2b study; and the FDA's November 1, 2022 communication stating that the phase 2b biomarker data "could not be verified" and should be removed from the investigator's brochure, which the FDA reiterated on November 16, 2022 (PX 172 (CASSAVA_001213617) at 3620).

*Third*, the contentions are contradicted by the fact the FDA placed the simufilam program on full clinical hold on December 15, 2025. (PX 254 (2025.12.18 Cassava 8-K) at 3.)

113. Dr. Brian Harvey is a physician and biochemist who served at the FDA for eleven years. Ex. 136, Harvey Rpt. ¶¶ 1-2.

**Plaintiffs' Response**: Undisputed.

114. Dr. Harvey testified that, based on his experience, the FDA would have conducted an in-depth analysis of the Citizen Petition allegations. Ex. 138, Harvey Tr. 177:23-178:7 (the FDA denial "wasn't just petition denied, outside the scope of citizen's petition[,]" "[i]t actually went into other subjects. So it shows that there was . . . in-depth review and thoughtful analysis of what was going on[.]"); *id.* 183:2-184:4.

**Plaintiffs' Response**: Disputed. Mischaracterizes Dr. Harvey's testimony and opinions. The cited testimony reflects Dr. Harvey's speculation about what the FDA did to assess the allegations in the Citizen Petition; the opinion is not credible and is based entirely on the FDA's February 10, 2022 letter, which directly contradicts Dr. Harvey's assertions by stating that it will not "initiate an investigation." (BB Ex. 65 at 6067 ("We are denying your Petitions to the extent that they request, through the citizen petition process, that FDA initiate an investigation.").) Dr. Harvey's opinion is based on the letter's phrase "FDA has carefully considered your petition"; he further testified: "it lists

all the different supplements, and [] it was my impression, as I was reading the letter, that they had investigated things internally." (BB Ex. 138 at 178:12-13, 183:02-10.) Dr. Harvey testified that he had never experienced another situation where the FDA denied a citizen petition on the same grounds, further undermining the credibility of his interpretation of the FDA's letter. (BB Ex. 138 at 186:24-187:03.)

115. Dr. Harvey further testified that if the Citizen Petition allegations "were true to the extreme extent of what was made," "FDA would have reacted, would have acted, [] quickly, [] to put things on clinical hold." Ex. 138, Harvey Tr. 181:10-22; *id.* 182:7-11 ("So FDA review division had a lot of information. . . . [I]f there have been red flags, those would have come up. If the [Citizen Petition] had, you know, any element of truth to it, FDA would have reacted.").

**Plaintiffs' Response**: Disputed insofar as the contention is that Dr. Harvey's testimony is credible or uncontested. (*See supra* Paragraph 115.)

116. Dr. Harvey explained that Patrizia Cavazzoni, the Director of the FDA's Center for Drug Evaluation and Research, who reviewed the Citizen Petition and ultimately signed off on the denial, *see* Ex. 65, CASSAVA_000696066 at -696068, is "very . . . experienced . . . and if those allegations had been true, she wouldn't have sat back and, and hid behind a technicality of it being outside the scope. She would have come down with an iron hand if any of those – you know, if those sweeping allegations had been true, but that's because I know her, I worked with her." Ex. 138, Harvey Tr. 184:15-22.

**Plaintiffs' Response**: Undisputed that Dr. Harvey provided the cited testimony. Disputed insofar as the contention is that Dr. Harvey's testimony is credible or uncontested. (*See supra* Paragraph 115.)

117. In late 2021, Plaintiffs began publicly accusing Cassava of fraud. Cassava Sciences (SAVA): A Shambolic Charade, Home Page, www.cassavafraud.com (last visited Jul. 27, 2026); Ex. 50, CASSAVA_001441984; Ex. 48, CASSAVA_000992410; Ex. 85, Chart of Social Media Statements; Ex. 53, PLAINTIFFS0078087 ("it is all complete, made-up garbage."); Ex. 51, PLAINTIFFS0056669, at -56670 ("Simufilam is a frauuud!"); Ex. 66, PLAINTIFFS0035073, at -35074 ("$SAVA remains a complete scientific fraud").

> **Plaintiffs' Response**: Undisputed that Plaintiffs made the cited statements. Disputed insofar as the contention omits the context in which the allegations were made. The cited evidence shows that Plaintiffs provided the factual bases for their opinions and clearly conveyed to reasonable readers that the allegations were opinions based on signs of data manipulation and fabrication in simufilam research; and it shows that Plaintiffs prominently disclosed their short positions. (*See, e.g.,* BB Ex. 50 at 985 ("DISCLOSURE The authors of this presentation and the associated letter to FDA hold stock and options positions that may benefit from a decline in Cassava Sciences' stock price.").)

118. Plaintiffs coordinated with one another on their public accusations against Cassava. Ex. 123, Brodkin Tr. 51:2-53:25; Ex. 122, Milioris Tr. 254:6-257:11.

> **Plaintiffs' Response**: Undisputed.

119. Plaintiffs also coordinated the timing and substance of their public accusations against Cassava with other individuals and investment firms with short interests in Cassava stock. Ex. 45, PLAINTIFFS0042127; Ex. 128, Heilbut Tr. 373:14-21, 374:6-15; Ex. 123, Brodkin Tr. 104:3-105:3; 119:2-120:3; 127:8-130:23; 373:21-375:1; *see also* Ex. 123, Brodkin Tr. 45:9-46:10; 355:16-362:5; 373:21-375.2.

**Plaintiffs' Response**: Undisputed that Plaintiffs coordinated release date with QCM; otherwise disputed.

120. At the time Plaintiffs publicly accused Cassava of fraud, they had short positions in or put options for Cassava stock. Ex. 128, Heilbut Tr. 301:2-17, 303:4-20, 306:3-10 (short position); Ex. 122, Milioris Tr. 337:12-20, 338:6-13, 339:1-8 (short position); Brodkin Dep. Tr. 292:14-23 (put options).

**Plaintiffs' Response**: Undisputed, except disputed insofar as it omits the context of Plaintiffs' allegations and suggests Plaintiffs simply called Cassava a "fraud" without explaining the bases for its opinions (*see supra* Paragraph 118.)

121. Plaintiffs' goal in making public accusations of fraud against Cassava was to drive Cassava's stock price down. Ex. 44, PLAINTIFFS0171136, at -171138 ("I like the challenge of destroying 2B in fraudulent market cap"); Ex. 43, PLAINTIFFS0159091, at -159093; Ex. 54, PLAINTIFFS0028478, at -28479 ("We've got them on the ropes and we're ready for your to help deliver the killing blows [strong arm emoji]."); Ex. 49, PLAINTIFFS0170476, at -170481 ("I have been working up a rather deep dive deconstructing every aspect of the sava story and plan on submitting to several regulatory oversight bodies at after close. I believe (and the other share this belief) that this will have some (maybe significant) effect on stock price. I have personally increased my put position by about 50% in short term expiry near the money strikes."); Ex. 128, Heilbut Tr. 376:6-11 (testifying that Plaintiffs hoped the release of their website in conjunction with the QCM report would have an impact on the stock price); Ex. 123, Brodkin Tr. 81:6-16 (testifying that he expected the stock to "drop down to zero immediately" following the publication of the allegations in November 2021); *id.* 98:14-19 (testifying that he and QCM shared the goal of driving down Cassava's stock price); *id.* 104:3-

105:3 (testifying that Plaintiffs had an agreement with QCM to coordinate the release of their reports in an effort to drive the stock price down).

**Plaintiffs' Response:** Disputed insofar as the contention is that profit was Plaintiffs' only goal. Plaintiffs have articulated other goals both in their testimony and in their statements in the record. (*See, e.g.*, PX 209 (PLAINTIFFS0099749) (Letter from Dr. Heilbut to CUNY Trustees) ("As I have previously disclosed, I am an independent analyst and investor, and had (and currently have) short positions in Cassava Sciences. At this point, however, my major motivation and interest in this case is to ensure that the truth is exposed and the scientific record is corrected without undue delay, that the gaslighting, coverup, and obfuscation ends, that the integrity of the system for new drug clinical testing and evaluation gets repaired, that CUNY handles its own risks and improves, and that justice gets done.").)

122. In the wake of the public accusations of fraud against Cassava, the Company received reports that some clinical sites participating in the Phase 3 clinical trials had withdrawn, that some physicians had patients who would have enrolled but for online statements describing Cassava as a fraud, and that unidentified individuals had contacted clinical sites and questioned how the sites could work with a company described as a fraud. Exhibit 125, Cassava 30(b)(6) Tr. 20:13–21:20. Barry testified that "[a]cademic centers, in particular, worry about their reputation. And those are the ones that we lost, and it was because of this." Exhibit 124, Barry Tr. 202:13-15.

**Plaintiffs' Response**: Disputed. *First*, the cited evidence does not support the contentions. The cited testimony from Cassava's 30(b)(6) witness ignores his subsequent admission that the company had no evidence connecting whoever was purportedly calling

clinical trial sites to statements by Plaintiffs (BB Ex. 125 at 23:11-14). And, the cited testimony from Barry is in reference to a document (marked in his deposition as exhibit 92), in which a clinical trial site—UCSF—told Cassava that it was withdrawing from the phase 3 trials because of a New York Times article and Cassava's "unacceptable" response to the article:

> "The Times article raised significant and comprehensive concerns about the integrity of the data supporting use of simufilam - the scope of which we were not aware.
>
> Further, we found your use of our site's participation in the trial in an attempt to counter Dr. Nicoll's legitimate concerns to be completely unacceptable.
>
> Due to the these concerns and others, our site will no longer be participating in your trial. We have halted all screening and enrollment activity, and we are moving to terminate our contract."

(PX 203 (CASSAVA_001444921) at 921.)

*Second*, despite asserting in the Defamation Action that Plaintiffs caused nine clinical trial sites to withdraw or decline to participate in the phase 3 trials (Defamation FAC ¶ 430)—the company's corporate representative could not name a single one and was not aware of any specific patient or site that ever attributed their decision not to participate to anything Plaintiffs said or did. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

*Third*, there is no evidence showing a single patient or trial site attributing a decision not to participate in the trials to anything Plaintiffs said or did—and the company's 30(b)(6) witness was unaware of any such evidence. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

*Fourth*, the contemporaneous evidence shows that clinical trial sites told Cassava they were withdrawing or declining to participate in the trials for other reasons, including

reporting by the New York Times (*see* PX 203 (CASSAVA_001444921), PX 158 (CASSAVA_000995649), PX 182 (CASSAVA_001320378)); the NIH's investigation (*see* PX 184 (CASSAVA_001335110)); and retractions of simufilam research by the journal *PLOS One* (*see* PX 151 (CASSAVA_000956262) ("More sites concerned about PLOS that we have to address")).

*Fifth*, after the New York Times published an article in April 18, 2022 (PX 293), Dr. Burns led an effort to contact sites, summarizing the conversations in an Excel spreadsheet that Dr. Burns labeled "FUD response to Sites"; even in Dr. Burns's accounts of these conversations, there is no record of any site mentioning Plaintiffs or Plaintiffs' statements. (PX 161 (CASSAVA_001008843) at 843, 845 (tracking chart).)

123. On April 4, 2022, the Executive Director of the Lehigh Center for Clinical Research informed Premier Research and Cassava that, after internal discussions concerning public developments the site regarded as increasingly troubling, the site had decided to withdraw from protocol PTI-125-07. Exhibit 143, CASSAVA_001133797 at -1133799; Exhibit 133, Burns Tr. 262:10–264:16.

**Plaintiffs' Response**: Disputed. The contention that the clinical site Lehigh attributed its decision to withdraw to unspecified "public developments" mischaracterizes the cited evidence and factual record. The cited evidence shows Dr. Burns describing a conversation with Lehigh's Executive Director in which the director reported being troubled by questions he could not answer concerning retractions of Dr. Burns's and Dr. Wang's research by the scientific journal *PLOS One*. (BB Ex. 143 (CASSAVA_001133797) at 797.) *PLOS One* issued retraction notices for five papers co-authored by Dr. Wang and/or Dr. Burns on March 30, 2022. (PCC ¶ 241; PX 265 to 269.)

After receiving Lehigh's email on April 4, 2022, Dr. Burns forwarded it to outside counsel and wrote: "More sites concerned about PLOS that we have to address." (PX 151 (CASSAVA_000956262) at 262.)

124. Cassava does not have its own laboratory. Ex. 40, CASSAVA_000490972, at 5 ("Cassava Sciences does not have its own laboratory facilities. We use other people's labs.").

**Plaintiffs' Response**: Undisputed.

125. Cassava contracted with third parties to perform laboratory work for studies of simufilam, including Dr. Wang's laboratory at CUNY. *Id*.

**Plaintiffs' Response**: Undisputed.

126. Dr. Wang's laboratory at CUNY was an academic laboratory. Ex. 133, Burns Tr. 299:7-11; 299:23-300:1.

**Plaintiffs' Response**: Undisputed.

127. Academic laboratories like Dr. Wang's laboratory are generally not subject to, and do not purport to adhere to, Good Laboratory Practice ("GLP") standards. Ex. 133, Burns Tr. 299:7-11; Ex. 121, Rodriguez Tr. 67:19-22, 153:20-23, 203:24-205:1.

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention. Neither Dr. Burns nor Rodriguez are sufficiently qualified or disinterested to support the contention about general regulatory practices.

128. A September 2018 contract between CUNY and Cassava expressly stated that Dr. Wang's work was not subject to GLP requirements. Ex. 7, CASSAVA_000001320, at 9.

**Plaintiffs' Response**: Disputed insofar as the contention omits the relevant language from the contract, which requires work to be performed according to sound scientific principles and CUNY's standard operating procedures: "It is understood that

this work is not subject to GLP requirements, but will be performed according to sound scientific principles, in compliance with CUNY School of Medicine standard operating procedures, and with review by Dr. Wang and supervisory technica1staff." (BB Ex. 7 at 9.)

129. In September 2022, the FDA conducted an inspection of Dr. Wang's laboratory at CUNY. Ex. 79, CASSAVA_000898032.

**Plaintiffs' Response**: Undisputed.

130. The FDA applied GLP standards in its inspection of Dr. Wang's laboratory. Ex. 140, (FDA GLP Questions and Answers); Ex. 133, Burns Tr. 299:7-11.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention. The FDA's inspection report expressly states that the audit was conducted "according to Compliance Program 7348.004" (PX 222 (CUNY 001529) at 1529), which is the FDA's monitoring program for "In Vivo Bioavailability/Bioequivalence Studies." By contrast, the FDA's monitoring program for "Good Laboratory Practice" standards is classified as "Compliance Program 7348.808" (*compare* PX 286, *with* PX 287).

Regardless of the regulatory standards applied by the FDA, Dr. Wang's recordkeeping failures, including the lack of any laboratory notebook, were serious departures from basic scientific norms. (PX 238 (Sanders Report) § I; *see also* PX 232 (RFCUNY000743) at 749 ("Dr. Wang's failure to store original data and maintain research records is reckless and clearly not in keeping with the standard practices in the field"); PX 223 (CUNY 001573) at 576-588 (Dr. Wang's "lack of preservation of research records represents a significant departure from accepted practices of the scientific community.").)

131. The FDA's inspection report identified certain deficiencies in Dr. Wang's laboratory as of September 12, 2022, but did not "represent a final agency determination regarding compliance." Ex. 79, CASSAVA_000898032.

**Plaintiffs' Response**: Disputed insofar as the contention omits the material fact that, as a result of the FDA's audit, on November 1, 2022, the FDA directed Cassava to remove the phase 2b biomarker data because the data could not be verified. (PX 170 (CASSAVA_001134756) ("Based on the conclusions of the above audit, you must now delete all data for the cerebrospinal fluid analytes described in Figure 2 from the Investigator's Brochure for this IND.") The characterization of the FDA inspection is contested, and the cited testimony is neither credible nor reasonable, considering (i) the "GLP" characterization is wrong and irrelevant to the factual findings (*supra* Paragraph 131); (ii) the FDA told Cassava on November 1, 2022, that the "objective of that inspection was to confirm the reliability of [the phase 2b biomarker] data . . . . The Agency staff who conducted that audit concluded that the reliability of [the data] could not be verified. . . . Based on the conclusions of the above audit, you must now delete all data for the cerebrospinal fluid analytes [] from the Investigator's Brochure" (PX 172 (CASSAVA_001213617) at 3620); and (iii) the FDA reiterated the same message on November 16, 2022: "As already stated in our email to you, dated November 1, 2022, those data could not be verified during the recent FDA audit of the aforementioned CCNY /CUNY laboratory. Their retention in the Investigator's Brochure would thus be potentially misleading." (PX 172 (CASSAVA_001213617) at 618.)

132. The FDA inspection did not find evidence that Dr. Wang engaged in any research misconduct. *See* Ex. 79, CASSAVA_000898032.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention. The FDA found "inadequate source records to reconstruct the study" conducted by Dr. Wang (*see* PCC ¶¶ 260–264) and then instructed Cassava not to rely on the data because it could not be verified (*supra* Paragraph 132).

133. Mr. Barbier did not believe that the FDA's inspection of Dr. Wang's laboratory using GLP standards rendered the Company's reported clinical study results unreliable. Ex. 132, Barbier Tr. 242:20-245:25.

**Plaintiffs' Response**: Disputed. The characterization of the FDA inspection is contested, the cited testimony is neither credible nor reasonable, and the circumstantial evidence weighs heavily against Dr. Burns's self-serving testimony as to her own belief, considering (i) the "GLP" characterization is wrong and irrelevant to the factual findings (*supra* Paragraph 131); (ii) the FDA told Cassava on November 1, 2022, that the "objective of that inspection was to confirm the reliability of [the phase 2b biomarker] data . . . . The Agency staff who conducted that audit concluded that the reliability of [the data] could not be verified. . . . Based on the conclusions of the above audit, you must now delete all data for the cerebrospinal fluid analytes [] from the Investigator's Brochure" (PX 172 (CASSAVA_001213617) at 620); and (iii) the FDA reiterated the same message on November 16, 2022: "As already stated in our email to you, dated November 1, 2022, those data could not be verified during the recent FDA audit of the aforementioned CCNY /CUNY laboratory. Their retention in the Investigator's Brochure would thus be potentially misleading." (PX 172 (CASSAVA_001213617) at 618.)

134. Dr. Burns did not believe that the FDA's inspection of Dr. Wang's laboratory using GLP standards rendered the Company's reported clinical study results unreliable. Ex. 133, Burns Tr. 298:9-299:11.

**Plaintiffs' Response**: Disputed. The characterization of the FDA inspection is contested, and the cited testimony is neither credible nor reasonable, and the circumstantial evidence weighs heavily against Dr. Burns's self-serving testimony as to her own belief, considering (i) the "GLP" characterization is wrong and irrelevant to the factual findings (*supra* Paragraph 131); (ii) the FDA told Cassava on November 1, 2022, that the "objective of that inspection was to confirm the reliability of [the phase 2b biomarker] data . . . . The Agency staff who conducted that audit concluded that the reliability of [the data] could not be verified. . . . Based on the conclusions of the above audit, you must now delete all data for the cerebrospinal fluid analytes [] from the Investigator's Brochure" (PX 172 (CASSAVA_001213617) at 620); and (iii) the FDA reiterated the same message on November 16, 2022: "As already stated in our email to you, dated November 1, 2022, those data could not be verified during the recent FDA audit of the aforementioned CCNY /CUNY laboratory. Their retention in the Investigator's Brochure would thus be potentially misleading." (PX 172 (CASSAVA_001213617) at 618.)

135. In September 2022, Cassava employees Laura Rodriguez and Michael Marsman decided to perform an on-site audit of Dr. Wang's laboratory "because of the fact that the FDA had just been there as well." Ex. 121, Rodriguez Tr. 164:6-9.

**Plaintiffs' Response**: Undisputed that the Cassava audit was undertaken because of the FDA audit, but disputed insofar as the contention implies the decision to conduct

the audit was made solely by Laura Rodriguez and Michael Marsmann. The audit commenced in April 2022; and there is evidence suggesting others, including Barbier, Dr. Burns, and outside counsel, were involved in decisions concerning the audit and its timing. For example, on May 10, 2022, Dr. Burns wrote to Dr. Wang: "We need to wait until Laura completes her audit before you start this work. Stay tuned." (PX 133 (CASSAVA_000738939) at 8939; *see also* PX 21 (Rodriguez Dep. Tr.) at 83:20-24) ("Remi knew I was going. . . And Lindsay knew I was going."); PX 21 (Rodriguez Dep. Tr.) at 238:03-240:11 (testifying that Barbier told her to copy outside counsel at Orrick and Dr. Wang's counsel when sending the "corrective actions" from the audit).

136. Ms. Rodriguez and Dr. Marsman applied GLP standards in their audit of Dr. Wang's laboratory and found deficiencies as to those standards. Ex. 99, CASSAVA_000796682, at 5; Ex. 133, Burns Tr. 299:13-300:8.

**Plaintiffs' Response**: Disputed. These explanations do not make sense (*see supra* Paragraph 131) and the standards do not change the factual findings, which included: "There were no logbooks to indicate what was being performed, how he did the -- he didn't have logbooks to show his -- the experiments that he worked on . . . It was true for everything Dr. Wang did at that lab. . .. All research. He didn't have a logbook." (PX 21 (Rodriguez Dep. Tr.) at 214:12-215:06.)

137. Their audit report stated that, due to the noncompliance with GLP standards, as of September 22, 2022, Dr. Wang's laboratory, was "temporarily not qualified to provide biomarker analysis and research services for any future Cassava studies." Ex. 99, CASSAVA_000796682, at 5.

**Plaintiffs' Response**: Disputed insofar as the contention mischaracterizes the audit findings as based solely on GLP compliance. The audit report states "[t]hough the contract with CCNY stated the work was not subject to cGLP requirements it was expected that the facility would perform the contracted work according to sound scientific principles, many of which are also cGLP requirements." (PX 139 (CASSAVA_000796682) at 684.)

138. Ms. Rodriguez's and Dr. Marsman's audit did not find evidence that Dr. Wang engaged in any research misconduct. *See* Ex. 99, CASSAVA_000796682.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention. The audit found five "Critical" deficiencies, defined in the Audit Report as: "Observed conditions, practices, or processes that adversely affect the rights, safety, or well-being of the subjects and/or the quality and integrity of data. . . . Critical deficiencies require immediate action." (PX 139 (CASSAVA_000796682) at 685.) The audit found the lab "lack[ed] standard operating procedures, proper good documentation practices, and laboratory practices (i.e., equipment calibration and sample management) that are deemed critical for conducting any type of analysis to support a clinical trial"; and that the lab was "unacceptable" and "not qualified to provide biomarker analysis and research services for any future Cassava studies." (PX 139 (CASSAVA_000796682) at -688.)

139. At the time of their audit, Ms. Rodriguez and Dr. Marsman did not realize that Dr. Wang's laboratory was not subject to GLP standards. Ex. 121, Rodriguez Tr. 213:3-6 (referring to the Cassava Audit Report, "I gave them a critical finding because I, at the time, was still wanting to hold them to a GLP standard, realizing later that they were not being held to that

standard."); *id*. 213:10-14 (testifying that she had been "under the impression" that Dr. Wang's lab was to be subject to GLP standards but that she "was wrong.").

**Plaintiffs' Response**: Disputed. The cited testimony is not credible and does not support the contentions, which are contradicted by the audit report itself, which acknowledges the lab was not subject to GLP standards but still expected to comply with "sound scientific principles" (PX 139 (CASSAVA_000796682) at 684); and contradicted by the fact that Dr. Wang's lab was never reinstated as an approved lab (PX 21 (Rodriguez Dep. Tr.) at 85:05-13, 237:13-20.)

140. Mr. Barbier was not aware of the results of the audit conducted by Ms. Rodriguez and Dr. Marsman until after the audit had concluded. Ex. 132, Barbier Tr. 246:9-12.

**Plaintiffs' Response**: Disputed insofar as the contention is that the audit did not "conclude" until the final report was formally signed by Rodriguez in October 2023, more than one year after the audit actually concluded. The cited testimony does not support the contention and is not credible insofar as Barbier suggests he did not know it was happening at the time. Rodriguez testified "Remi knew I was going. . . And Lindsay knew I was going." (PX 21 (Rodriguez Dep. Tr.) at 83:20-24).)

141. Mr. Barbier did not believe that the audit conducted by Ms. Rodriguez and Dr. Marsman using GLP standards rendered the Company's reported clinical study results unreliable. Ex. 132, Barbier Tr. 250:4-8 (testifying that Dr. Wang's lab failed the GLP audit "as any academic lab would.").

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention and is not credible, particularly because it says nothing about the factual findings of the audit, such as the finding that Dr. Wang had no lab notebooks or proper

records. (PX 21 (Rodriguez Dep. Tr.) at 214:16-25 ("There were no logbooks to indicate what was being performed, how he did the -- he didn't have logbooks to show his -- the experiments that he worked on . . . It was true for everything Dr. Wang did at that lab. . .. All research. He didn't have a logbook.")

142. Dr. Burns was not aware of the results of the audit conducted by Ms. Rodriguez and Dr. Marsman until after the audit had concluded. Ex. 133, Burns Tr. 300:9-20.

**Plaintiffs' Response**: Disputed insofar as the contention is that the audit did not "conclude" until the report was formally signed by Rodriguez in October 2023, more than one year after the audit was actually concluded.

143. Dr. Burns did not believe that the audit conducted by Ms. Rodriguez and Dr. Marsman using GLP standards rendered the Company's reported clinical study results unreliable. Ex. 133, Burns Tr. 300:6-8 (explaining that the Cassava Audit concluded that Dr. Wang's laboratory was "not up to GLP standards" and that "[h]e's not a GLP lab"); *id*. 300:21-25 ("Q. Did any of the findings from Cassava's audit cause you to reconsider any of the criticism facing the company from our clients or other critics? A. No.").

**Plaintiffs' Response**: Disputed. The cited testimony does not support the contention and is not credible, particularly because it says nothing about the factual findings of the audit, such as the finding that Dr. Wang had no lab notebooks or proper records. (PX 21 (Rodriguez Dep. Tr.) at 214:16-25 ("There were no logbooks to indicate what was being performed, how he did the -- he didn't have logbooks to show his -- the experiments that he worked on . . . It was true for everything Dr. Wang did at that lab. . .. All research. He didn't have a logbook.")

144. On November 15, 2021, Cassava disclosed that it had received requests for information from government agencies. Ex. 55, Q3 2021 Form 10-Q at 34.

**Plaintiffs' Response**: Undisputed.

145. On July 1, 2024, Cassava disclosed that it was engaging with the Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") in connection with investigations into the Company and two senior employees. Ex. 106, July 1, 2024 Form 8-K.

**Plaintiffs' Response**: Undisputed.

146. On September 26, 2024, Cassava disclosed that it did not anticipate that the DOJ would bring charges against or seek a resolution with the Company. Ex. 114, Cassava Form 8-K, filed on Sept. 26, 2024, at 5.

**Plaintiffs' Response**: Undisputed.

147. The DOJ has not brought any charges against the Company or its employees.

**Plaintiffs' Response**: Undisputed.

148. On September 26, 2024, the SEC filed a complaint, alleging negligence-based disclosure violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 relating to the Phase 2b study results reported in September 2020. Ex. 110, SEC Compl. at 25-27.

**Plaintiffs' Response**: Undisputed.

149. Although Cassava disclosed that for the cognitive analyses, "[p]atients who did not take drug (no blood levels) were removed" and that the analysis of one of those two tests calculated effect sizes "after removing the most and least impaired subjects," Ex. 25, Sept. 14, 2020 Form 8-K, at 37-38, the SEC faulted Cassava for "negligently fail[ing] to fully disclose" the removal of 40% of the study participants from the cognitive analyses. Ex. 110, SEC Compl. at ¶ 5.

**Plaintiffs' Response**: Undisputed that the quoted language appears in the SEC complaint, but disputed insofar as the contention omits material context, including the failure to disclose that the removals were done by Dr. Burns *after* she had reviewed the data, and the removals did not comply with the Statistical Analysis Plan. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

150. The SEC also alleged that Cassava's disclosures were deficient because "Dr. Burns negligently provided information sufficient to allow Dr. Wang to partially unblind himself" in the CSF biomarker analysis. Ex. 110, SEC Compl. at ¶ 2.

**Plaintiffs' Response**: Undisputed that the quoted language appears in the SEC complaint, but disputed insofar as the contention implies this was merely an allegation; Cassava and Dr. Burns have admitted that Dr. Burns provided Dr. Wang with information sufficient to unblind Dr. Wang as to a third of the phase 2b study participants. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

151. On September 26, 2024, Cassava, Mr. Barbier, and Dr. Burns settled the SEC action without admitting or denying the allegations. Ex. 111, Cassava Consent to Final Judgment ¶ 2; Ex. 112, Barbier Consent to Final Judgment ¶ 2; Ex. 113, Burns Consent to Final Judgment ¶ 2.

**Plaintiffs' Response**: Undisputed that the SEC settlement did not itself require admissions of the allegations in the SEC complaint, but disputed insofar as Cassava, Barbier, and Dr. Burns have admitted to many of the factual allegations in the SEC complaint, including that Dr. Burns provided Dr. Wang information sufficient to unblind him and that Dr. Burns applied post-hoc exclusion criteria in violation of the study

protocol that excluded 40% of the patients from the reported results. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

152. In late 2021, Orrick, Herrington & Sutcliffe LLP commenced an investigation of the allegations of research misconduct. Ex. 125, Cassava 30(b)(6) Tr. 72:5-11; Ex. 132, Barbier Tr. 165:20-22; Ex. 102, Cassava Form 8-K, filed Feb. 28, 2024 ("Feb. 28, 2024 Form 8-K"), at 7.

**Plaintiffs' Response**: Disputed. Defendants have withheld as privileged and/or work product the substance of the investigation; thus, Plaintiffs have been precluded from assessing or testing the truth of contentions about the Orrick investigation. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 69:10-15 (refusing to answer what findings from the Orrick investigation, if any, the company relied on as a basis for the Defamation Action); 152:05-18 (refusing to testify as to any experts Orrick relied on as part of investigation); 154:07-156:09 (Cassava counsel explanation of scope of privilege/work product assertions concerning Orrick investigation).)

153. Orrick reported to a committee of Cassava independent directors, which in turn reported to Cassava's Board of Directors. Ex. 125, Cassava 30(b)(6) Tr. 68:9-13 ("The board also formed a special—I'm going to call it investigation committee—I'm not sure exactly what the formal title was—comprised of independent directors to get information from the law firm about the results of their investigation."); *id.* 70:6-7.

**Plaintiffs' Response**: Undisputed that Cassava formed a committee of non-management directors that included the company's long-time counsel. Disputed as to the activities of that committee because Defendants have withheld as privileged and/or work product the substance of the investigation; thus, Plaintiffs have been precluded from

assessing or testing the truth of contentions about the Orrick investigation. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 69:10-15 (refusing to answer what findings from the Orrick investigation, if any, the company relied on as a basis for the Defamation Action); 152:05-18 (refusing to testify as to any experts Orrick relied on as part of investigation); 154:07-156:09 (Cassava counsel explanation of scope of privilege/work product assertions concerning Orrick investigation).)

154. In February 2024, the Company disclosed that Orrick's investigation "ha[d] found no evidence to substantiate allegations that the Company or its employees engaged in or were aware of research misconduct." Ex. 102, Feb. 28, 2024 Form 8-K, at 7.

**Plaintiffs' Response**: Undisputed that the Company made the quoted disclosure. Disputed as to the truth of the disclosure because Defendants have withheld as privileged and/or work product the substance of the investigation; thus, Plaintiffs have been precluded from assessing or testing the truth of contentions about the Orrick investigation. (PX16 (Cassava 30(b)(6) Dep. Tr.) at 69:10-15 (refusing to answer what findings from the Orrick investigation, if any, the company relied on as a basis for the Defamation Action); 152:05-18 (refusing to testify as to any experts Orrick relied on as part of investigation); 154:07-156:09 (Cassava counsel explanation of scope of privilege/work product assertions concerning Orrick investigation).)

155. On March 3, 2025, the Company disclosed Orrick's investigation determined "that certain statistical information contained in an attachment to an email sent by a former senior employee of Cassava to Dr. Wang before the CUNY Bioanalysis of CSF biomarkers was conducted could have been used to unblind him as to some number of Phase 2b Study participants," but "did not determine, and may never be able to determine with any reasonable

degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants." Ex. 115, 2024 Form 10-K, at 63.

**Plaintiffs' Response:** Undisputed that the Company made the quoted disclosures and undisputed that in May 2020, Dr. Burns sent Dr. Wang information sufficient to unblind him as to approximately a third of the phase 2b study participants. Disputed as to the truth of the disclosure insofar as Defendants have withheld as privileged and/or work product the substance of the investigation; thus, Plaintiffs have been precluded from assessing or testing the truth of contentions about the Orrick investigation. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 69:10-15 (refusing to answer what findings from the Orrick investigation, if any, the company relied on as a basis for the Defamation Action); 152:05-18 (refusing to testify as to any experts Orrick relied on as part of investigation); 154:07-156:09 (Cassava counsel explanation of scope of privilege/work product assertions concerning Orrick investigation).)

156. Dr. Burns did not believe that she sent Dr. Wang unblinding information and did not have any reason to believe that Dr. Wang had partially unblinded himself. Ex. 133, Burns Tr. 216:16-25 ("I don't remember sending the file. It was all part of a good-faith effort to try to understand what went wrong and how we got in anomalous data from the Oscar Hanson lab . . . ."); *id*. 223:13-17 ("Q. So to be clear, you never intended to unblind Dr. Wang as to any samples? A. No, I didn't. And this was not unblinding him. He had another step of work to do to partially unblind himself.").

**Plaintiffs' Response**: Disputed. The contention is based entirely on self-serving and discredited testimony, including because (i) the data from Dr. Hanssen's lab was not "anomalous" or unreliable, it simply showed the drug had no effect (*supra* Paragraphs

68–71); (ii) Dr. Burns deleted all of the emails in her "sent" folder from before early June of 2020 (PX 16 (Cassava 30(b)(6) Dep.) at 285:6-14; PX 12 (Burns Dep Tr.) at 304:18-306:19); and (iii) Dr. Burns had previously recognized that sending "min and max" values would break the blind (PX 83 (CASSAVA_000059303) ("I can't send you the sheet because it shows min and max for each group.").).

157. Dr. Wang testified that he did not unblind himself to any study participants and that he could not have used the email attachment at issue for unblinding. Ex. 134, Wang Tr. 76:12-17; 96:8-15; 167:12-17; 168:3-10; 197:17-24; 232:11-233:5; 233:16-234:10 ("Without the grouping data, I cannot plot this one, I cannot plot these scatter plot. If I don't know the grouping, how do I know which one is the, what they said is correct or not. I don't know."); *id.* 240:7-8 (referring to the Phase 2b study groups, "Up to this day, I still don't know which one is which.").

**Plaintiffs' Response**: Undisputed that Dr. Wang provided the quoted testimony. Disputed insofar as the testimony is not credible and is contradicted by contemporaneous emails showing [redacted]. (PX 146 (CASSAVA_000922566); PX 147 (CASSAVA_000922567); PX 198 (CASSAVA_001444107).)

Further disputed by the fact that [redacted] (PX 199 (CASSAVA_001444134).)

158. On August 27, 2021, CUNY commenced an investigation of the allegations of research misconduct by Dr. Wang. Ex. 36, CASSAVA_000018236.

**Plaintiffs' Response**: Disputed insofar as the contention mischaracterizes the cited August 28, 2021 email, which states: "An Inquiry will be conducted to determine whether an Investigation of the Allegation is necessitated." (BB Ex. 36 at 8236.)

159. In 2022 and 2023, Plaintiff Adrian Heilbut contacted CUNY's investigation committee on multiple occasions to urge them to pursue the investigation of Dr. Wang with greater speed and publicity and to seek information concerning the ongoing investigation. *See* Ex. 71, PLAINTIFFS0067485, at -67488-67489; *id*. at -67485; Ex. 91, PLAINTIFFS0181301; Ex. 128, Heilbut Tr. 396:5-11.

**Plaintiffs' Response**: Undisputed.

160. In February 2022, Mr. Heilbut exchanged Twitter messages with Dr. Orie Shafer, head of CUNY's investigation committee, regarding the ongoing investigation into Dr. Wang. Ex. 128, Heilbut Tr. 397:7-399:17.

**Plaintiffs' Response**: Undisputed that Dr. Heilbut exchanged Twitter messages with Dr. Shafer in February 2022.

161. In October 2023, a preliminary report on CUNY's investigation was leaked to *Science* magazine. Ex. 98, CASSAVA_001332122.

**Plaintiffs' Response**: Disputed insofar as the contention is that the report was "preliminary." The report is titled: "CITY UNIVERSITY OF NEW YORK FINAL INVESTIGATION REPORT OF Associate Professor Hoau-Yan Wang, Ph.D" (BB Ex. 98 at 124); and CUNY subsequently confirmed that it was the final report of the investigation committee (*see* PX 223 (CUNY 001573) at 574.)

162. On May 30, 2025, CUNY issued a final report to the Office of Research Integrity ("ORI") of the Department of Health and Human Services ("Final CUNY Report"). Ex. 119,

Final CUNY Report, as filed in *U.S. v. Wang*, No. 8:24-cr-00211 (D. Md. Oct. 14, 2025), ECF 118-2 ("Final CUNY Report").

**Plaintiffs' Response**: Undisputed.

163. The Final CUNY Report stated that "research misconduct did not occur" and that "the Committee did not find that Dr. Wang's actions constitute acts of intentional, knowing, or reckless falsification and/or fabrication." Ex. 119, Final CUNY Report, at 4.

**Plaintiffs' Response**: Undisputed that the report contained the quoted language. Disputed insofar as the contention omits key context and findings reported in the March 30, 2025 letter, including (i) the "important update [] that Dr. Wang has announced his retirement from the University effective July 2025" and that "he will no longer conduct research at CUNY" (BB Ex. 119 at 025); (ii) the finding that "Dr. Wang consistently reported that he did not maintain original research data in hard copy files, electronic images, or lab notebooks" (*id.* at 027) and (iii) the findings that Dr. Wang's "lack of preservation of research records represents a significant departure from accepted practices of the scientific community" (*id. passim*).

Further disputed insofar as it omits context that explains the reasoning of the CUNY letter to ORI (*i.e.*, its finding that the committee applied an improperly heightened evidentiary standard in declining to reach a conclusion of research misconduct, yet deciding not to revisit the conclusion under the lower evidentiary standard): Cassava had threatened CUNY in March 2023, that if CUNY made a finding of research misconduct, the company would seek indemnification from CUNY for all liabilities and expenses incurred as a result, including those incurred in ongoing securities litigation. (PX 180 (CASSAVA_001309142) at 144 ("To the extent that CUNY finds that misconduct

actually occurred in this instance, that decision would, under the relevant contracts, require CUNY to 'indemnify and hold [Cassava] harmless from any and all liability, loss, or damage it might suffer as a result of claims, demands, costs, or judgment[s]' in the securities class action suit and all other matters related to Dr. Wang's research").)

164. On June 27, 2024, Dr. Wang was indicted on charges of fraud, wire fraud, and making false statements to the National Institutes of Health ("NIH") in connection with data submitted to the NIH as part of grant applications related to simufilam. Ex. 105, Dr. Wang Indictment; AC ¶ 77.

**Plaintiffs' Response**: Undisputed.

165. Dr. Wang filed a motion to dismiss the indictment for prosecutorial misconduct on October 14, 2025, arguing in part that the Government had withheld exculpatory evidence, specifically the Final CUNY Report, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Ex. 127, Dr. Wang Mot. to Dismiss.

**Plaintiffs' Response**: Undisputed.

166. On October 17, 2025, the court found that the Final CUNY Report was exculpatory and ordered the Government to submit for *in camera* review all communications with the NIH and the ORI, and to review all of the materials in its possession for additional *Brady* material. Ex. 129, Oct. 17, 2025 Order, at 2-3.

**Plaintiffs' Response**: Disputed insofar as the contention paraphrases the order, which stated, in relevant part, that the letter was "exculpatory material pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963)"—*i.e.*, material information withheld by the government and favorable to the defendant, not "exculpatory" in the lay sense, which the Final CUNY

Report is not, considering it adopts the factual findings of the Investigation Committee's Final Report.

167. On October 22, 2025, prior to the deadline for turning over its communications with NIH and ORI, the Government moved to dismiss the indictment against Dr. Wang. Ex. 130, Gov't. Mot. to Dismiss.

**Plaintiffs' Response**: Disputed insofar as the cited evidence does not support the contention; the order appears to set production deadlines of October 17 and 20, 2025 (BB Ex. 129 at 2-3).

168. In the hearing on the Government's motion to dismiss the indictment, the court remarked that "Dr. Wang was put through this whole process up to this point, and there was never even a real attempt to try to prove this at trial." Ex. 131, Oct. 23, 2025 *U.S. v. Wang* Tr., 17:10-13.

**Plaintiffs' Response**: Undisputed.

169. The court called the process "regrettable and unfortunate" and remarked that "this is not a good example of how things should be done." *Id*. at 17:14-19.

**Plaintiffs' Response**: Undisputed.

170. On October 23, 2025, the criminal indictment against Dr. Wang was dismissed with prejudice. *Id*., 14:22-24; 20:2-3.

**Plaintiffs' Response**: Undisputed.

171. In August 2021, Cassava Director Sanford Robertson raised the possibility of a defamation action against the short sellers accusing the Company of fraud. Ex. 132, Barbier Tr. 112:8-113:20.

**Plaintiffs' Response**: Undisputed that Barbier mentioned Mr. Robertson "suggesting that we look into" a defamation action, but disputed insofar as Barbier could not recall dates or details. (BB Ex. 132 (Barbier Dep. Tr.) at 114:11-14 ("I don't remember precise dates or even who said what to whom. I know it was floated among board members, perhaps individually, perhaps at a board meeting. I -- I just don't remember.").) Barry claimed it was counsel's idea. (PX 8 (Barry Tr.) at 93:19-22 (Q. "Whose idea was it to file the defamation lawsuit?" A. "It was counsel.") Further disputed as inadmissible hearsay insofar as offered for its truth.

172. On August 31, 2021, Cassava's Board of Directors formed an *ad hoc* Litigation Monitoring Committee to evaluate whether to pursue a defamation action and present its recommendations to the Board. Ex. 42, CASSAVA_000395785, at 13; Ex. 124, Barry Tr. 56:15-57:10; Ex. 132, Barbier Tr., 120:19-21.

**Plaintiffs' Response**: Undisputed that a committee was formed but disputed as to its true purpose because Cassava has withheld as privileged the substance of Board discussions concerning the Defamation Action; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Board's conduct concerning the Defamation Action. (*See* PX 8 (Barry Dep. Tr.) at 64:14-66:10 (instructed not to answer questions about the Board's deliberations concerning the Defamation Action); *id.* at 81:14-82:24 (same); PX 16 (Cassava 30(b)(6) Tr.) at 34:05-13 (same), 50:09-14 (same); PX 5 (Barbier Dep. Tr.) at 148:05-11 (same), 149:01-12 (same).)

173. The Board of Directors had the ultimate authority over whether to pursue a defamation action. Ex. 125, Cassava 30(b)(6) Tr., 18:10-11 ("The decision [to commence the

defamation action] was made by the board. That's who. . . can authorize a . . . legal action."); Ex. 132, Barbier Tr., 147:1.

**Plaintiffs' Response**: Disputed. Rick Barry, who was an independent Board member and purported member of the litigation committee at the time, testified: "Remi was always the decision maker, so we were advising." (PX 8 (Barry Dep. Tr.) at 195:12-16.) Barry further testified that he could not recall whether there was ever a vote of the Board to authorize the Defamation Action. (PX 8 (Barry Dep. Tr.) at 71:11-22.) Further disputed insofar as the contention is inconsistent with Barry's testimony that the subsequent decision to dismiss the Defamation Action was his decision, not a Board decision. (PX 8 (Barry Dep. Tr.) at 85:21 ("it was my decision").)

174. The members of the Litigation Monitoring Committee were Michael O'Donnell, Sanford Robertson, Richard Barry, and Remi Barbier. Ex. 42, CASSAVA_000395785, at 13; Ex. 38, CASSAVA_000545144; Ex. 56, CASSAVA_000799544; Ex. 62, CASSAVA_000395575; Ex. 64, CASSAVA_001435249; Ex. 69, CASSAVA_001435250; Ex. 80, CASSAVA_001434669; Ex. 81 CASSAVA_001440099.

**Plaintiffs' Response**: Undisputed.

175. The Litigation Monitoring Committee's first meeting was held on September 1, 2021. Ex. 38, CASSAVA_000545144.

**Plaintiffs' Response**: Undisputed.

176. In evaluating whether to pursue a defamation action, the Litigation Monitoring Committee consulted with Orrick and Benesch Friedlander Coplan & Aronoff LLP. Ex. 125, Cassava 30(b)(6) Tr. 36:10-16; 68:17-69:9; Ex. 38, CASSAVA_000545144; Ex. 64, CASSAVA_001435249, Ex. 81, CASSAVA_001440099.

**Plaintiffs' Response**: Disputed. Cassava has withheld the substance of discussions involving the Litigation Monitoring Committee; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Litigation Monitoring Committee's evaluations or consultations. (*See* PX 8 (Barry Dep. Tr.) at 60:18-62:13 (instructed not to answer questions regarding substance of litigation committee discussions and deliberations); *id.* at 122:24-123:17 (instructed not to answer whether litigation committee discussed FDA audit, findings, or correspondence); PX 5 (Barbier Dep. Tr.) at 197:7-19 (instructed not to answer regarding substance of discussions at litigation committee meeting).) Further disputed as inadmissible insofar as the evidence of the Litigation Monitoring Committee's existence or purported consultations are offered for the purpose of drawing inferences of good faith.

177. Dr. Burns was not a member of the Litigation Monitoring Committee. *See* Exs. 38, 56, 62, 64, 69, 80, 81 (Minutes of the Litig. Monitoring Comm.).

**Plaintiffs' Response**: Undisputed.

178. Dr. Burns did not attend any Litigation Monitoring Committee meetings. *See* Exs. 38, 56, 62, 64, 69, 80, 81 (Minutes of the Litig. Monitoring Comm.).

**Plaintiffs' Response**: Undisputed.

179. At the time Cassava was considering whether to pursue a defamation action, Cassava's directors and executive officers believed the clinical results from the Phase 1, 2a, 2b, and 2 open-label studies showed simufilam's potential for the treatment of Alzheimer's. Ex. 27, CASSAVA_000241256 (Jan. 20, 2021 email from Dr. Friedman: "Things at our company are pretty exciting as our biomarker data looks great."); Ex. 31, CASSAVA_000012770 (June 17, 2021 email from Dr. Scannon; "I have been thinking a lot about the considerable clinical

activity/benefits of sim[u]filam."); Ex. 26, CASSAVA_000988927 ("Sandy [Robertson] has told me about the exciting success SAVA had with its Phase 2 trials with your Alzheimer's research."); Ex. 60, CASSAVA_001307524 (Dec. 20, 2021 email from Mr. Barry: "In an open label P2 trial, the drug produced results that had not been seen before with other AD drugs in a clinical trial"); Ex. 124, Barry Tr. 30:5-10 ("I can remember looking at the phase 2 of the responders . . . [a]nd looking at, you know, what was the baseline versus the current and how the patients were doing. And that was persuasive to me."); *id*. 46:11-13 ("Q. How did you personally decide to become the principal executive of Cassava in July of 2024? A. I believe in the drug."); *id*. at 48:22-25; Ex. 46, CASSAVA_000948046 (Oct. 28, 2021 Email from Dr. Gussin: "We now have solid clinical evidence that Simufilam has positive activity in Alzheimer's patients. In fact, early results even exceeded our expectations!"); Ex. 74, CASSAVA_000719406; Ex. 9, CASSAVA_000004863 (May 24, 2019 email from Mr. Barbier: "I have great news regarding our program in Alzheimer's disease (AD): we just generated spectacular data."; "we believe[] NO DRUG has ever improved these AD biomarkers by so much in patients."); *see also* Ex. 32, CASSAVA_000009154; Ex. 52, CASSAVA_000015793.

**Plaintiffs' Response:** Disputed. This compound contention is improper. The cited evidence does not support the contention about what Cassava, Barbier, or other directors or officers genuinely believed. Plaintiffs dispute the assertion that Defendants held an actual, reasonable, or good-faith belief that "the clinical results from the Phase 1, 2a, 2b, and 2 open-label studies showed simufilam's potential for the treatment of Alzheimer's." The contention is contradicted by evidence showing Cassava knew the Phase 1 and Phase 2 trials were primarily or entirely focused on the drug's safety, not its efficacy. (*See* PX 7 (BARBIER_00000001) [redacted]

[redacted] PX 14 (BURNS_00000003) [redacted] PX 258 (Cassava 10-K (FY 2021)) at 5-6 ("Much of the value of our ongoing open-label study is to gain data to support simufilam's long-term safety profile in patients"; and "The study is intended to monitor the long-term safety and tolerability of simufilam 100 mg twice daily for 12 or more months.")

Further disputed by evidence showing Defendants knew the only study that purported to be placebo-controlled and blinded, the phase 2b study, was not reliable (*see* PCC ¶¶ 339–367); Defendants knew there were legitimate reasons to question Dr. Wang's research (*see* PCC ¶¶ 260–306, 313–322); and no independent lab had confirmed, validated, or even corroborated any of their foundational scientific claims about simufilam (*see* PCC ¶¶ 314–316, 319–320; *see also* PCC ¶¶ 495–500).

The contention relies on cherrypicked instances where individuals express positive and momentary sentiments, ignoring other evidence (*see* PX 110 (CASSAVA_000607957) at 957-959 (Jan 12, 2019 Scanlon email to Board: "I am not an expert in AD or its pathology"; "We will actually not know until well controlled studies in AD patients have demonstrated significant clinical benefit").

Further disputed to the extent the cited evidence post-dates the Defamation Action and does not concern Defendants' purported beliefs at the time. (*See* PX 8 (Barry Tr.) at 46:11-13.)

180. At the time Cassava was considering whether to pursue a defamation action, Cassava's science team believed the clinical results from the Phase 1, 2a, 2b, and 2 open-label studies showed simufilam's potential for the treatment of Alzheimer's. Ex. 27, CASSAVA_000241256 (Jan. 20, 2021 email from N. Friedman; "Things at our company are pretty exciting as our biomarker data looks great."); Ex. 74, CASSAVA_000719406, at -719406-719407 (Apr. 5, 2022 Email from J. Kupiec, denying the allegations and noting "[d]espite this background noise, the clinical phase 3 studies continue to aggressively recruit."); Ex. 57, BURNS_00000650, at -651 (Dr. Burns: "I feel fulfilled, also knowing that this drug candidate has great potential to help millions of families affected by Alzheimer's disease. This is the dream of any neuroscientist, to have a chance to make an impact. . . . While much of the innovation credit goes to my collaborator, I take pride in the persistence and focus and just getting here. Simufilam has improved both biomarkers and cognition in phase two trials, and the just started phase three will tell all."); *see also id*. at -718; Ex. 133, Burns Tr., 98:8-12; 311:25-312:3.

**Plaintiffs' Response**: Disputed. This compound contention is improper. The cited evidence does not support the contention about what Cassava, Barbier, or Dr. Burns genuinely believed. Plaintiffs dispute the assertion that Defendants held an actual, reasonable, or good-faith belief that "the clinical results from the Phase 1, 2a, 2b, and 2 open-label studies showed simufilam's potential for the treatment of Alzheimer's." (*See supra* Paragraph 180.)

181. At the time Cassava was considering whether to pursue a defamation action, the Company believed that research performed at third party institutions corroborated simufilam's mechanism of action to revert altered FLNA back to its native, healthy conformation. Ex. 12, February 2020 Yale Study; Ex. 76, May 2022 Nagoya University Study; Exs. 86 & 88, November 2022 Quebec Studies; Ex. 92, February 2023 Sichuan University Study; Ex. 95, May 2023 University of Milan Study; Ex. 124, Barry Tr. 98:25-99:2; 236:20-23 (Plaintiffs' allegations "dismiss[] the work from the Cochin Institute" as well as "the work from Professor Bordey at Yale."; referring to the Milan Study and recalling "this was a validating study. These guys contacted Cassava, asked for the drug, wanted to do this experiment and was successful."); Ex. 125, Cassava 30(b)(6) Tr. 11:7-14 (describing the Yale Study as "establish[ing] the bioactivity of the drug as well as its effect on diseases"); *id.* 12:6-23 (similar regarding the Nagoya University Study); *id*. 51:5-8; Ex. 100, CASSAVA_001031140 (Oct. 29, 2023 Email from Dr. Kupiec: "The results [of a study by the Cochin Institute in Paris] confirm simufilam's primary mechanism of action").

**Plaintiffs' Response**: Disputed. This compound contention is improper. The cited evidence does not support the contention about what Cassava, Barbier, or Dr. Burns genuinely believed. Plaintiffs dispute the assertion that Defendants held an actual, reasonable, or good-faith belief that "research performed at third party institutions corroborated simufilam's mechanism of action to revert altered FLNA back to its native, healthy conformation." The contention refers to the "time Cassava was considering whether to pursue a defamation action" but only two of the cited "corroborating" studies predate the November 2, 2022 Defamation Action (the Yale study and Nagoya study).

Further, the contention is not credible because none of the cited studies even purport to corroborate simufilam's supposed mechanism of action.

Yale study (Feb. 2020) (BB Ex. 12): Dr. Bordey, the primary author, testified that the study had nothing to do with Alzheimer's disease, the experiments did not seek to confirm the existence of altered FLNA, and the study did not confirm or seek to confirm simufilam binding to FLNA. (PX 9 (Bordey Tr.) at 62:18-21 ("We did not try to confirm simufilam's mechanism of action in AD. Our paper was not about Alzheimer's disease."); *see also id.* at 61:13-16 ("we did not perform any experiments to try to confirm the data [from Dr. Wang and Dr. Burns]. And it's a different disease state. So it's comparing apple and oranges."). Dr. Burns was a co-author and edited the draft manuscript to add language making the study sound "corroborating" when in fact it was not. (PX 9 (Bordey Tr.) at 140:11-144:24; PX 219 (BORDEY-0000000171).) Dr. Bordey was an investor in Cassava at the time. (PX 9 (Bordey Tr.) at 216:14-217:21; PX 77 (CASSAVA_000027886).)

Nagoya study (May 2022) (BB Ex. 76): The paper does not purport to confirm or corroborate any claims about simufilam. It did not use simufilam, and it merely cites papers by Dr. Wang and Dr. Burns, without purporting to confirm, replicate, or corroborate any of their findings.

Quebec studies (Nov. 2022) (BB Exs. 86, 88): The papers do not purport to confirm or corroborate any claims about simufilam. They did not use simufilam, or purport to confirm, replicate, or corroborate any findings by Dr. Wang or Dr. Burns.

Sichuan study (Feb. 2023) (BB. Ex. 92): This study is about pituitary tumors (not Alzheimer's disease) and phosphorylation (not conformation).

Milan study (May 2023) (BB Ex. 95): Dr. Burns is a co-author and Cassava paid for the study. It is an unpublished abstract, does not purport to confirm, replicate, or corroborate any of Dr. Wang's or Dr. Burns's claims that simufilam binds to altered conformations of FLNA or restores misshapen FLNA to its native shape; rather, it observed possible effects on FLNA phosphorylation (unrelated to conformation).

Cochin study (Sept. 2023): Dr. Burns and Dr. Wang are co-authors. The paper used unwarranted post-hoc exclusion criteria to omit approximately 40% of the data (*see* PX 157 (CASSAVA_000994072) at 086 ("values were excluded from the analysis (highlighted in red)"), 086-094 (showing approximately 40% of data as excluded)).

182. On November 2, 2022, Cassava, through Benesch, filed the complaint in *Cassava Sciences v. Bredt et al.*, No. 1:22-cv-09409 (S.D.N.Y.) (the "Defamation Action"), asserting claims for defamation and conspiracy to defame against David Bredt and Geoffrey Pitt (the two individuals behind the Citizen Petitions), Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris, and others. Ex. 82, Original Defamation Compl. at 170-182; Ex. 83, Cassava Form 8-K, filed on Nov. 3, 2022, at 5; Ex. 124, Barry Tr. 192:9-15.

**Plaintiffs' Response**: Undisputed.

183. Prior to the filing of the Defamation Action on November 2, 2022, the Litigation Monitoring Committee met at least seven times. *See* Exs. 38, 56, 62, 64, 69, 80, 81 (Minutes of the Litig. Monitoring Comm.).

**Plaintiffs' Response**: Undisputed, except disputed as inadmissible insofar as the fact of the meetings are offered for the purpose of drawing inferences of good faith.

184. At a November 1, 2022 Litigation Monitoring Committee meeting, Mr. Barbier stated that "Chris Cook had joined the Corporation as its new General Counsel and would be

joining future Litigation Committee meetings." Ex. 81, CASSAVA_001440099; Ex. 132, Barbier Tr. 139:12-13.

> **Plaintiffs' Response**: Undisputed that the cited minutes purport to show that such a statement was made, but disputed insofar as Cassava has withheld the substance of discussions involving the Litigation Monitoring Committee; and thus, Plaintiffs have not been able to assess or test the truth of contentions about the Litigation Monitoring Committee. (*See* PX 9 (Barry Dep. Tr.) at 60:18-62:13 (instructed not to answer questions regarding substance of litigation committee discussions and deliberations); *id.* at 122:24-123:17 (instructed not to answer whether litigation committee discussed FDA audit, findings, or correspondence); PX 5 (Barbier Dep. Tr.) at 197:7-19 (instructed not to answer regarding substance of discussions at litigation committee meeting).)

185. The Board authorized the defamation action to address what it believed to be false allegations against the Company, protect the ongoing Phase 3 clinical trials, and prevent further damage to the Company. Ex. 125, Cassava 30(b)(6) Tr. 20:5-20 (testifying that the "defamatory" and "false" statements were "inhibiting our ability to recruit" for the phase 3 clinical trials and that this was a motivating factor in commencing the defamation action); *id*. 29:21-25 ("[T]he origination of the suit was, Hey, we've got people defaming us and calling us liars and calling us frauds that are impacting our trial sites and our ability to recruit for the – for this study."); Ex. 124, Barry Tr. 154:25-155:4 ("I was concerned because it was having an effect on the company's business and enrolling in the trial. And I was concerned because the company's reputation was being unfairly destroyed by statements that were defamatory."); *id*. 67:19-21 ("We had to do something. The company was being really damaged by the defamatory statements by your clients. That's why we filed suit.").

**Plaintiffs' Response**: Disputed. This compound contention is improper. The cited evidence does not support the contention about what the Board or Defendants believed. The contention that the Board authorized or made the decision is contested (*supra* Paragraph 174.) Further, Plaintiffs dispute the assertion that Defendants held an actual, reasonable, or good-faith belief that the Defamation Action would "address what [they] believed to be false allegations against the Company, protect the ongoing Phase 3 clinical trials, and prevent further damage to the Company." The evidence shows Defendants knew they could never win the Defamation Action (*see* PCC ¶¶ 250–251, 367; *see also* PCC ¶¶ 243–249, 252–306), knew Plaintiffs' statements raised legitimate concerns about their research (*see* PCC ¶¶ 232–236, 313–322; *see also* PCC ¶¶ 323–367, 369–373, and the stated purpose of protecting trial enrolment is not credible or supported by evidence (*see* PCC ¶¶ 422–428).

186. The Company believed that numerous statements made by the defendants in the Defamation Action, including statements by Adrian Heilbut, Jesse Brodkin, and Enea Milioris, were defamatory. Ex. 125, Cassava 30(b)(6) Tr. 23:20-24:8 ([Y]ou cross a line. . . when you go and you maliciously defame the company with statements that are known to be untrue by the company"); *id.* 29:21-45, 242:21-243:13; Ex. 124, Barry Tr. 63:6-23 (testifying that he "believed [] then and believe[s] [] now" that "the company was being defamed by your clients" and that the impact of the allegations on Cassava's reputation and its ability to recruit for the phase 3 trials was "unfair to patients. It was unfair to the company. It was unfair to employees."); *id*. 154:23-155:4, 156:15-17.

**Plaintiffs' Response**: Disputed. This compound contention is improper. The cited evidence does not support the contention about what the Company believed and

does not even reference specific statements. Plaintiffs dispute the assertion that Defendants held an actual, reasonable, or good-faith belief that the statements made by Adrian Heilbut, Jesse Brodkin, and Enea Milioris were defamatory. The evidence shows Defendants knew they could never prove defamation (*see* PCC ¶¶ 250–251, 367; *see also* PCC ¶¶ 243–249, 252–306) and knew Plaintiffs' statements raised legitimate concerns about their research (*see* PCC ¶¶ 232–236, 313–322; *see also* PCC ¶¶ 323–367, 369–373).

187. The Company believed that the defamatory statements by the defendants in the Defamation Action were financially motivated. Ex. 125, Cassava 30(b)(6) Tr. 26:7-16 (describing Plaintiffs as defaming the Company "for financial benefit" because they were "known short sellers of the company's stock"); *id*. 131:23-132:2; 235:21-236:17; 238:15-18; Ex. 124, Barry Tr. 98:5-99:12; 241:19-242:7.

**Plaintiffs' Response**: Disputed. The cited testimony is not credible. Plaintiffs dispute the assertion that the Company held an actual, reasonable, or good-faith belief that the statements were financially motivated. The evidence shows the Company used the Plaintiffs' purported financial motives as an excuse to distract from the substance of the allegations (*see* PCC ¶¶ 334, 396, 451; *see also* PCC ¶¶ 405–411) and knew that the Plaintiffs' statements raised legitimate concerns about the Company's research (*see* PCC ¶¶ 232–236, 313–322; *see also* PCC ¶¶ 323–367).

188. The Company believed that the defamatory statements by the defendants in the Defamation Action were negatively impacting the Company's ability to complete its then-ongoing clinical trials of simufilam. Ex. 125, Cassava 30(b)(6) Tr. 20:5-20 (testifying that the "defamatory" and "false" statements were "inhibiting our ability to recruit" for the phase 3

clinical trials and that this was a motivating factor in commencing the defamation action); *id.* 29:21-25; 33:22-34:4 (testifying that filing the defamation action was "necessary" to stop the defamation defendants from "inhibiting the fair and full enrollment of the trials"); *id.* 35:15-16; Ex. 124, Barry Tr. 63:6-20 (testifying that he, Robertson, and Barbier identified the impact of the allegations on Cassava's ability to recruit participants for the phase 3 clinical trials as one of the purposes of commencing the defamation action).

**Plaintiffs' Response**: Disputed. *First*, the cited testimony does not support the contention about "completing" the trials, as the testimony describes purported concerns about recruitment and enrollment. The cited testimony from Cassava's 30(b)(6) witness ignores his subsequent admission that the company had no evidence connecting whoever was purportedly calling clinical trial sites to statements by Plaintiffs (BB Ex. 125 (Schoen 30(b)(6) Dep. Tr.) at 23:11-14). The cited testimony from Barry is in reference to a document (marked in his deposition as exhibit 92), in which a clinical trial site—UCSF—told Cassava that it was withdrawing from the phase 3 trials because of a New York Times article and Cassava's "unacceptable" response to the article:

> "The Times article raised significant and comprehensive concerns about the integrity of the data supporting use of simufilam - the scope of which we were not aware.
>
> Further, we found your use of our site's participation in the trial in an attempt to counter Dr. Nicoll's legitimate concerns to be completely unacceptable.
>
> Due to the these concerns and others, our site will no longer be participating in your trial. We have halted all screening and enrollment activity, and we are moving to terminate our contract."

(PX 203 (CASSAVA_001444921).)

*Second*, despite asserting in the Defamation Action that Plaintiffs caused nine clinical trial sites to withdraw or decline to participate in the phase 3 trials (Defamation

FAC ¶ 430)—the company's corporate representative could not name a single one and was not aware of any specific patient or site that ever attributed their decision not to participate to anything Plaintiffs said or did. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

*Third*, there is no contemporaneous or documentary evidence in the record showing a single patient or trial site attributing a decision not to participate in the trials to anything Plaintiffs said or did—and the company's 30(b)(6) witness was unaware of any such evidence. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

*Fourth*, the contemporaneous evidence shows that clinical trial sites told Cassava they were withdrawing or declining to participate in the trials for other reasons, including reporting by the New York Times (*see* PX 203 (CASSAVA_001444921), PX 158 (CASSAVA_000995649), PX 182 (CASSAVA_001320378)); the NIH's investigation (*see* PX 184 (CASSAVA_001335110)); and retractions of simufilam research by the journal *PLOS One* (*see* PX 151 (CASSAVA_000956262) ("More sites concerned about PLOS that we have to address").

*Fifth*, after the New York Times published an article in April 18, 2022 (PX 293), Dr. Burns led an effort to contact sites, summarizing the conversations in an Excel spreadsheet that Dr. Burns labeled "FUD response to Sites"; even in Dr. Burns's accounts of these conversations, there is no record of any site mentioning Plaintiffs or Plaintiffs' statements. (PX 161 (CASSAVA_001008843) at 843, 845 (tracking chart).)

189. Mr. Barbier believed that numerous statements by the defendants in the Defamation Action, including statements by Adrian Heilbut, Jesse Brodkin, and Enea Milioris, were false and/or unfounded, financially motivated, and had negatively impacted the Company.

Ex. 132, Barbier Tr. 269:22-270:13 (testifying that the decision to file the defamation action was based on the harm being done to the Company); *id*., 150:8-151:25; Ex. 77, CASSAVA_001494801 (describing the impact arising out of Plaintiffs' allegations on the Company and Cassava's "directors, managers, employees, advisors and clinicians – who are going through blood, sweat & tears to test a new drug treatment for patients with Alzheimer's"); Ex. 68, CASSAVA_000836090 ("[S]ince August 2021, … [a] small team of short sellers have been targeting Cassava Sciences with sham Citizen Petitions, false allegations, false rumors published on social media, etc. The bad actors who engage in this behavior have one goal: to seek a decline in our stock."); Ex. 34, CASSAVA_000490971 ("Needless to say, these allegations are complete non-sense. The 'evidence' cited in their document is laughable."); Ex. 40, CASSAVA_000008476 ("Let me be very clear: I think these allegations are false."); Ex. 61, CASSAVA_000836171; Ex. 78, CASSAVA_000391537; Ex. 35, CASSAVA_000094847.

**Plaintiffs' Response:** Disputed. The cited evidence does not support the contention and does not identify any specific statements by Plaintiffs. Barbier testified that he did not recall ever reviewing Plaintiffs' statements or discussing them with anyone. (PX 5 (Barbier Dep. Tr.) at 171:09-10 ("I may have seen one or two somewhere along the line. I -- I don't remember"); 174:14-15 ("If I read it, I -- I don't remember it. I certainly don't remember discussing it with anyone"); 178:09 ("If I did, I -- I just don't remember").) When asked whether he believed Plaintiffs' statements were false, Barbier refused to take a position and instead testified: "What I believe is that the attorneys who filed the defamation action believed there was legal grounds for -- to claim defamation as defined in the law." (PX 5 (Barbier Dep. Tr.) at 178:17-19.) Plaintiffs dispute the assertion that Barbier held an actual, reasonable, or good-faith belief that any statement

made by Adrian Heilbut, Jesse Brodkin, and Enea Milioris was false or unfounded. Barbier knew the statements were well-founded and raised legitimate concerns (*see* PCC ¶¶ 232–236, 313–322; *see also* PCC ¶¶ 323–367). Barbier used the financial interests of Plaintiffs and other critics as a strategy to distract from the substance of the allegations and blame all criticism on "short sellers" despite knowing many other scientists had raised similar concerns (*see* PCC ¶¶ 334, 396, 451; *see also* PCC ¶¶ 405–411). Barbier was personally interested in silencing critics to avoid liability, protect his job, protect his wife's scientific reputation, and maximize his bonus (*see* PCC ¶¶ 446–451, 483–494).

190. On November 4, 2022, Cassava filed its First Amended Complaint in the Defamation Action. Ex. 84, First Am. Defamation Compl.

**Plaintiffs' Response**: Undisputed

191. In its March 28, 2024 decision on the defendants' motion to dismiss the First Amended Complaint, the court found that 314 of the public statements by Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris were defamatory *per se*, but that Cassava failed to plead actual malice with respect to those statements. *See Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, at *22, 29 (S.D.N.Y. Mar. 28, 2024).

**Plaintiffs' Response**: Disputed. The contention mischaracterizes the Court's decision, which found that the first amended complaint failed to state any claim for defamation (as to any statements) because the pleading failed to allege actual malice; the pleading violated Rule 8(a); and certain statements had a plausible defamatory meaning, viewed under the Rule 12(b)(6) standard in the light most favorable to Cassava, but the pleading lacked sufficient context to properly assess whether they had a defamatory meaning such that it would not be futile to allow an amended pleading. 2024 WL

1347362, at *22 ("Plaintiff has nonetheless failed to state a claim for defamation against any of these defendants because it has failed to adequately plead actual malice"), *id.* at *29 ("The Court concludes that any amendment of Plaintiff's claims regarding the FDA Letters, QCM Report, and Dot Com Slide Decks would be futile. The Court has already had the opportunity to examine those challenged statements in their full contexts . . . However, the Court cannot conclude that amendment of the Complaint to replead Plaintiff's claims with respect to the challenged tweets would be futile. Plaintiff challenged hundreds of tweets but provided few individualized allegations regarding the context of each tweet."), *id.* at *27 ("To the extent that Plaintiff attached dozens of studies to the Complaint with the expectation that the Court would compare the methodologies used by Dr. Burns, Dr. Wang, and Plaintiff to the methodologies used by other scientists and determine whether the latter conflicted with Defendants' critiques—particularly when the Complaint does not direct the Court to any specific sections of the articles—the Court agrees with Judge Wang's conclusion that Plaintiff's pleadings violate Fed. R. Civ. P. Rule 8(a).

192. On April 29, 2024, Cassava filed a Second Amended Complaint in the Defamation Action. Ex. 104, Second Am. Defamation Compl.

**Plaintiffs' Response**: Undisputed.

193. On August 2, 2024, Cassava filed a stipulation of voluntary dismissal, which was so-ordered on August 5, 2024. Ex. 108, So-Ordered Stipulation.

**Plaintiffs' Response**: Undisputed except to clarify that Cassava's stipulation sought dismissal without prejudice and the case was not closed until August 14, 2024.

194. Dr. Burns did not have the power to authorize or direct Cassava's prosecution of the Defamation Action and did not authorize or direct Cassava's initiation or prosecution of the Defamation Action. Ex. 125, Cassava 30(b)(6) Tr. 17:23-18:18 (decision to file lawsuit made by "board of directors … as informed by outside counsel"; "not aware" of any role by Dr. Burns in decision to file lawsuit); *id.* 86:3-25 (Company and its counsel were responsible for continuing the defamation action after the dismissal of the first amended complaint); Ex. 124, Barry Tr. 54:12-20, 62:25-63:8, 93:19-22 (board's litigation committee did not include Dr. Burns in any discussion of the defamation action); *id.* 195:12-16 ("Remi was always the decision maker, so we were advising."); Ex. 126, Schoen Tr. 55:6-17; Ex. 132, Barbier Tr. 120:19-21 (defamation action was "board decision, driven by the litigation committee"); *id.* 182:23-183:4 (because Dr. Burns was not a director, "she would have no input on – on the whole decision-making on the go/no-go, decision-making path"); Ex. 133, Burns Tr. 143:10-14, 152:8-12 (testifying that she had no involvement in the defamation action and was not certain it would be filed).

> **Plaintiffs' Response**: Disputed. The evidence shows Dr. Burns wielded outsized influence at Cassava far beyond her job title (*see* PCC ¶¶ 214–215, 441–442; *see also* PCC ¶¶ 443–444), was actively engaged in the Defamation Action (*see* PCC ¶¶ 452–477), and even directed the manner in which the pleading was served on Dr. Heilbut (*see* PX 32 (BURNS_00000841) at 841; *see also* PCC ¶¶ 474–475).

195. Dr. Burns did not participate in any Litigation Monitoring Committee or Board deliberations regarding the Defamation Action. Ex. 132, Barbier Tr. 120:19-21; 182:23-183:4; Ex. 133, Burns Tr. 143:10-14, 152:8-12; *see also* Exs. 38, 56, 62, 64, 69, 80, 81 (Minutes of the Litig. Monitoring Comm.).

**Plaintiffs' Response**: Undisputed insofar as Dr. Burns is not identified as an attendee on the meeting minutes, but disputed insofar as Cassava has withheld the substance of discussions involving the Litigation Monitoring Committee and Board; and thus, Plaintiffs have not been able to assess or test the truth of contentions regarding their "deliberations." (*See* PX 8 (Barry Dep. Tr.) at 60:18-62:13 (instructed not to answer questions regarding substance of litigation committee discussions and deliberations); *id.* at 122:24-123:17 (instructed not to answer whether litigation committee discussed FDA audit, findings, or correspondence); PX 5 (Barbier Dep. Tr.) at 197:7-19 (instructed not to answer regarding substance of discussions at litigation committee meeting).)

196. Dr. Burns did not pay any legal bills for, or otherwise fund, the Defamation Action.

**Plaintiffs' Response**: Disputed. No evidence is offered to support the contention.

197. From time to time, Dr. Burns was asked to provide and did provide certain materials to outside litigation counsel at Benesch. *See e.g.*, Ex. 87, CASSAVA_001303342.

**Plaintiffs' Response**: Undisputed, except insofar as "from time to time" understates the extent of Dr. Burns's involvement (*see* PCC ¶¶ 452–477).

198. Dr. Burns did not draft any section of any complaint in the Defamation Action, nor did she review any drafts prior to filing. Ex. 133, Burns Tr. 165:11-13 ("Q. Did you review a draft of the complaint before it was filed in November of 2022? A. I did not."); *id*. 165:22-23 ("Q. Did you have any input on that section [of the Defamation Complaint concerning knowledge within the scientific community] A. No, I did not."); *id.* 138:17-20; Ex. 125, Cassava

30(b)(6) Tr. 17:23-18:18; Ex. 124, Barry Tr. 54:12-20, 62:25-63:8, 93:19-22, 195:12-16 Ex. 126, Schoen Tr. 55:6-17; Ex. 132, Barbier Tr. 120:9-21, 182:5-183:4.

**Plaintiffs' Response**: Undisputed that Dr. Burns provided the cited testimony, but disputed insofar as the testimony is not credible and inconsistent with the evidence showing that Dr. Burns was heavily involved in the preparation and prosecution of the Defamation Action (*see* PCC ¶¶ 452–477).

199. Mr. Barbier and Dr. Burns are married.

**Plaintiffs' Response**: Undisputed.

200. Mr. Barbier and Dr. Burns generally did not discuss Company matters. Ex. 133, Burns Tr. 151:25-152:12, 152:6-7.

**Plaintiffs' Response**: Disputed. The testimony is not credible and is refuted by evidence showing the opposite, including Dr. Burns's private journal (*see* PX 25 (BURNS_00000650) at 652, 661, 684 ("Remi tells me . . ."), 720 ("I get home and Remi hands me his cell phone . . ."); PX 25 (BURNS_00000650) at 686 ("Remi tried to call me to tell me the DOJ wanted all emails with the JNS editor").) (*See also* PCC ¶¶ 443–444).

201. Mr. Barbier intentionally did not discuss Company legal matters with Dr. Burns. Ex. 133, Burns Tr. 151:25-152:12; *id.* 152:6-7 ("Particularly on legal matters, [Mr. Barbier] kept me in the dark intentionally"); Ex. 132, Barbier Tr. 182:21-183:10.

**Plaintiffs' Response**: Disputed. The testimony is not credible and is refuted by evidence showing the opposite (*see* PX 121 (CASSAVA_000727933) at 949 (Dr. Burns text to Dr. Wang: "Remi says we will call you when you are ready. No emails please").) (*See also* PCC ¶¶ 443–444.)

202. When the Defamation Action was filed, Dr. Burns hoped it would help preserve clinical trial sites and trial enrollment, which had been adversely impacted by the accusations from Plaintiffs and others. Ex. 133, Burns Tr., 142:18-143:5 ("Q. [W]as it your hope at the time the defamation action was filed that people like our clients would stop with the comments you just described? A. . . . I was trying to do a job. We were trying to enroll clinical trials. They were doing their best to stop enrollment, to prolong it or to hope that the whole trial stopped, that we'd never get an answer on our drug. I just wanted to get an answer on the drug. . . ."); *id*. 143:14-19 ("I just thought, okay, somebody's doing something; maybe they'll stop attacking 24/7; maybe I'll be able to actually, you know, enroll patients without them terrified that, you know, they're enrolling in a scam trial. . . .").

**Plaintiffs' Response**: Disputed. The testimony is not credible, there is no contemporaneous evidence to support the contention, and there is considerable evidence contradicting the contention. (*See supra* Paragraphs 123, 189.)

203. Dr. Burns believed that numerous statements by the defendants in the Defamation Action, including statements by Adrian Heilbut, Jesse Brodkin, and Enea Milioris, were false and/or unfounded, financially motivated, and had negatively impacted the Company. Ex. 133, Burns Tr., 150:1-25; *id.* 142:12-17 ("[Y]our clients were put on notice that, you know, you're potentially engaging in defamation so I would think that if they had a lawyer, their lawyer would say stop going on Twitter 24/7 to spew, like vitriolic, you know, accusations with no basis in fact."); *id.* 142:25-143:3 ("We were trying to enroll clinical trials. They were doing their best to stop enrollment, to prolong it or to hope that the whole trial stopped, that we'd never get an answer on our drug."); 12:23-25 ("[T]he citizen's petition had many statements that were, on their face, ludicrous."); *id.* 24:25-25:5; 130:9-15; 143:14-25; 181:21-182:7; Ex. 57,

BURNS_00000650, at -651 ("the damage and unfairness to our hard work and to the Alzheimer's disease community in general leaves me questioning humanity"); *id.* at -693 ("[David Bredt] must just be so pissed that Hoau[-Yan Wang] figured it out [the mechanism behind simufilam], and we actually have a drug, and it is in Phase 3."); *id*. at -728, -749.

**Plaintiffs' Response**: Disputed. The cited evidence does not support the contention and does not identify any specific statements by Plaintiffs. Plaintiffs dispute the assertion that Dr. Burns held an actual, reasonable, or good-faith belief that any statement made by Adrian Heilbut, Jesse Brodkin, and Enea Milioris was false or unfounded. Dr. Burns knew the statements were well-founded and raised legitimate concerns (*see* PCC ¶¶ 232–236, 313–322; *see also* PCC ¶¶ 323–367, 369–373). Dr. Burns knew, for example, that Plaintiffs' criticism about the *post-hoc* exclusion of 40% of participants from the phase 2b cognitive data was valid because she was the one who excluded the data (PCC ¶¶ 356–360), and Dr. Burns knew the phase 2b biomarker data was unreliable because she was the one who sent Dr. Wang information sufficient to unblind him (PCC ¶¶ 346–348), and then deleted all of her emails sent prior to June 2020 (PCC ¶ 349).

Dr. Burns used the financial interests of Plaintiffs and other critics as a strategy to distract from the substance of the allegations and blame all criticism on "short sellers" despite knowing many other scientists had raised similar concerns (*see* PCC ¶¶ 334, 396, 451; *see also* PCC ¶¶ 405–411). Dr. Burns held Dr. Charles Spruck out to investigators from scientific journals, CUNY, and government officials as an "independent expert," despite knowing he was financially interested and a longtime Cassava shareholder (*see* PCC ¶¶ 336–338). Dr. Burns was personally interested in silencing critics to avoid

liability, protect her job and reputation, protect her husband, and maximize his bonus (*see* PCC ¶¶ 446–451, 483–494).

204. On August 6, 2024, Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris filed the original Complaint in this action asserting an Anti-SLAPP claim against Cassava. ECF 1.

**Plaintiffs' Response**: Undisputed.

205. The Complaint alleged that they suffered damages "caused by Cassava's filing and prosecution of a meritless lawsuit against them for the sole purpose of harassing, intimidating, punishing, and maliciously inhibiting public participation in scientific and popular discourse related to" simufilam. ECF 1, ¶1.

**Plaintiffs' Response**: Undisputed.

206. On October 24, 2024, Plaintiffs filed the Amended Complaint, which added Mr. Barbier and Dr. Burns as defendants, and added claims for malicious prosecution and conspiracy against all defendants. ECF 9.

**Plaintiffs' Response**: Undisputed.

207. Neither Mr. Barbier nor Dr. Burns were parties to Cassava's Defamation Action. *See* Ex. 82, Original Defamation Compl.; Ex. 84, First Am. Defamation Compl.; Ex. 104, Second Am. Defamation Compl.

**Plaintiffs' Response**: Undisputed.

Dated: September 14, 2026
New York, New York

CLARICK GUERON REISBAUM LLP

By: */s/ Isaac B. Zaur*
Isaac B. Zaur
David Kumagai

41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*