**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,<br><br>Plaintiffs,<br><br>v.<br><br>CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,<br><br>Defendants. | Case No. 1:24-cv-05948-JLR-OTW<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' CONSOLIDATED RULE 56.1 COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS**

Dated: September 14, 2026

CLARICK GUERON REISBAUM LLP
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 56.1, this Court's Individual Rules, and the September 9, 2026 Court order (Dkt. 246), Plaintiffs Adrian Heilbut, Jesse Brodkin, and Enea Milioris hereby submit Plaintiffs' Consolidated Rule 56.1 Counterstatement of Additional Material Facts ("**PCC**"), and associated Plaintiffs' Exhibits ("**PX []**").[1]

## PLAINTIFFS

208. Dr. Heilbut is a scientist. (PX 18 (Heilbut Dep. Tr.) at 118:18-19.)

209. Dr. Brodkin is a scientist. (PX 10 (Brodkin Dep. Tr.) at 236:22-237:2.)

210. Dr. Milioris is a scientist. (PX 20 (Milioris Dep. Tr.) at 4:11-12; 10:22-11:12.)

## DEFENDANTS

211. The FDA rejected Pain Therapeutics' approval applications for its painkiller, Remoxy, four times. (PX 14 (BURNS_00000003) at 23:22-24:2.)

212. After the failure of its painkiller program, the company rebranded as Cassava, in 2019, and pivoted to Alzheimer's disease. (PX 14 (BURNS_00000003) at 23:22-24:23.)

213. Simufilam was developed by Dr. Hoau-Yan Wang at the City University of New York ("CUNY"), in collaboration with Dr. Burns. (PX 141 (CASSAVA_000797948) at 954.)

214. Dr. Wang and Dr. Burns are responsible for all of the preclinical research underlying simufilam as a potential treatment for Alzheimer's disease. (PX 141 (CASSAVA_000797948) at 954.)

215. Dr. Burns joined the company in 2002, married Barbier in 2005, and became the "scientific lead" of the company's Alzheimer's program. (PX141 (CASSAVA_000797948) at

[1] Pursuant to Judge Rochon's Individual Rule III(I)(iii), this Counterstatement begins at paragraph 208 to avoid overlap with the 207 paragraphs in the Individual Defendants' Rule 56.1 Statement (Dkt. 242) or the 126 paragraphs in Cassava's Rule 56.1 Statement (Dkt. 237). Concurrently herewith, Plaintiffs are filing separate responses to Cassava's Rule 56.1 Statement and the Individual Defendants' Rule 56.1 Statement, respectively.

957; PX 5 (Barbier Dep. Tr.) at 22:01-02; PX 204 (CASSAVA_001447291) at 305 (Dr. Burns described herself as "project leader on our Alzheimer's program" and "scientific lead of this program").)

216. From 2019 to 2024, Cassava sponsored clinical trials of an experimental Alzheimer's drug called simufilam. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 12-15.)

217. The Phase 3 clinical trials of simufilam produced "unambiguous" results showing that simufilam had no statistically significant effect on biomarkers of Alzheimer's disease. (PX 249 (Cassava Sciences, Inc., Press Release (Mar. 25, 2025)) ("These results were unambiguous.").)

218. After the failure of its Alzheimer's program, the company rebranded again as Filana Therapeutics, Inc., and pivoted to developing simufilam as a treatment for central nervous system disorders. (PX 234 (Cassava Sciences, Inc. Form 8-K (March 10, 2026)).)

219. The company has raised more than $550 million from investors. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 94-95.)

220. The company has administered experimental drugs to thousands of patients. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 10-15.)

221. The company has never taken a product to market. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 73 ("We have no products approved for commercial sale.").)

222. Barbier and Burns were forced to resign from the company in July 2024 as part of a $40 million settlement with the SEC. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 32-33; PX 200 (CASSAVA_001444640) at 640 (July 18, 2024 email from R. Barry to Board: "no one wanted to remove the founder [Barbier] of a company in this way let alone the

co-inventor [Burns]. . . but the circumstances that came to light over the last month and the information that our investigative committee learned really gave the board no choice but to take action. I shared that the government had developed a remarkably dark view of the company - primarily from various disclosures over the last several years and that dark view caused the SEC in particular to look at everything they uncovered about the company through a highly suspicious lens - and we didn't have the time or the evidence to disprove their allegations.").)

223. Together, Barbier and Burns have collected millions of dollars in compensation from the company. (PX 231 (Cassava Sciences, Inc., DEF 14A (Apr. 3, 2025)) at 38-41 (reporting Barbier's compensation from 2020 to 2024 as $936,120; $1,741,120; $1,114,998; $6,263,038, and $3,685,803).)

**PRECLINICAL RESEARCH**

224. The simufilam clinical trials were based on a series of claimed discoveries by Dr. Wang at CUNY, in collaboration with Dr. Burns: first, they claimed to discover that Alzheimer's patients had altered conformations of the protein filamin-A (FLNA); second, they claimed to discover the small molecule simufilam, capable of binding to these altered conformations of filamin-A; and third, they claimed to discover that simufilam restored altered conformations of filamin-A to their native, healthy shape. (PX 141 (CASSAVA_000797948) at 954-58.)

**PHASE 2 STUDIES**

225. In 2019, Cassava conducted a phase 2a open-label study of simufilam—a 28-day trial involving 13 patients administered simufilam twice daily. (PX 141 (CASSAVA_000797948) at 963.)

226. On September 9, 2019, Cassava announced the phase 2a results, stating that simufilam "significantly reduced biomarkers of Alzheimer's disease pathology." (PX 163 (Cassava Sciences, Inc., Form 8-K (Sept. 9, 2019)).)

227. Between September 2019 and March 2020, Cassava conducted a phase 2b clinical study of simufilam, presented as a randomized, double-blind, placebo-controlled trial. The phase 2b trial was a 28-day study, involving 64 patients split into three groups, with one group receiving placebo, one group receiving 50 mg doses of simufilam, and one group receiving 100 mg doses of simufilam. (PX 141 (CASSAVA_000797948) at 964.)

228. On May 15, 2020, Cassava announced that the study "did not meet its primary endpoint" and the company planned to "re-analyze" the biomarkers from study participants. (PX 119 (Cassava Sciences, Inc., Form 8-K (May 15, 2020)).)

229. On September 14, 2020, Cassava announced that the "re-analysis" showed the study had met its primary endpoints, reporting statistically significant improvement in all biomarkers in treatment groups as compared with the placebo group. (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)).)

230. Cassava also announced positive cognitive data, stating that patients treated with simufilam showed directional improvements in tests of episodic memory and spatial working memory, versus patients on placebo. (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)).)

231. In the months following Cassava's announcement of its phase 2b "results," Cassava raised approximately $260 million from investors to fund Phase 3 trials. (PX 258 (Cassava Sciences, Inc., Form 10-K (FY2021)) (reporting capital raises).)

**PUBLIC SCRUTINY**

232. Beginning in 2021, Plaintiffs and other scientists began raising questions about the integrity of Cassava's scientific research. (PX 288 (Brodkin-Heilbut-Milioris Letter to FDA))

233. In August 2021, Dr. David Bredt, former neuroscience research chief of Johnson & Johnson and Eli Lilly, and Dr. Geoffrey Pitt, a neuroscientist and cardiologist at Weill Cornell Medicine, submitted a 40-page Citizen Petition to the FDA, describing three primary concerns about Cassava's research data: anomalies in Western blot analyses suggestive of systematic data manipulation; preclinical data that exhibited "hallmarks of manipulation"; and questions about the circumstances of the phase 2b biomarker data presented after the "re-analysis" in September 2020. (PX 105 (CASSAVA_000490972) (Aug. 18, 2021 Citizen Petition); *see also* PX 114.)

234. In November 2021, Plaintiffs submitted and posted online a 23-page letter to the FDA and an accompanying slide deck (PX 288 (Brodkin-Heilbut-Milioris Letter to FDA); *see also* PX 292 (Shambolic Charade Deck))—describing four main areas of concern about Cassava's simufilam program: (1) simufilam's proposed mechanism of action was "irrational and not supported by accepted evidence" (*see* PX 288 at 2–4; PX 292 at 13–14); (2) anomalous biomarker values reported by Cassava from Dr. Wang's ELISA tests in the phase 2a and phase 2b studies (*see* PX 288 at 6–12; PX 292 at 21–23); (3) suspicious circumstances surrounding the "re-analysis" of the phase 2b biomarker data (*see* PX 288 at 6–7; PX 292 at 19–20); and (4) apparent manipulations of the phase 2b cognitive data that departed from the pre-approved protocol, including the unexplained post-hoc elimination of 40% of subjects (*see* PX 288 at 13–16; PX 292 at 26–29).

235. Plaintiffs prominently disclosed that they held "stock and options positions that may benefit from a decline in Cassava Sciences' stock price." (PX 292 (Shambolic Charade Deck) at 2.)

236. Over the following weeks and months, Plaintiffs posted additional slide decks, describing further signs of data manipulation or fabrication in the company's research. (PX 291 (SavaDx Exposed Deck); PX 290 (Cassava and the Wang Lab Deck); PX 289 (CTAD Poster).)

**GOVERNMENT INVESTIGATIONS AND RETRACTIONS**

237. On August 25, 2021, [redacted]. (PX 145 (CASSAVA_000905232).)

238. In November 2021, Cassava disclosed that "certain government agencies" had sought "corporate information and documents." (PX 261 (Q3 2021 Form 10-Q) at 34.)

239. Later in November 2021, the Wall Street Journal reported that the SEC was investigating allegations that Cassava had "manipulated research results of its experimental Alzheimer's drug," and Cassava's CEO confirmed that the NIH and CUNY had also initiated inquiries. (PX 264.)

240. In July 2022, Reuters reported that Cassava was under criminal investigation by the DOJ relating to whether Cassava "manipulated research results" for simufilam. (PX 162.)

241. On March 30, 2022, the journal *PLOS One* retracted five articles by Dr. Wang, including two co-authored by Dr. Burns, including a 2008 paper, claiming high affinity binding between Naloxone and filamin-A. (PX 265-269.)

242. In the first half of 2022, three scientific journals retracted seven research papers co-authored by Dr. Wang or Dr. Burns; and four other scientific journals issued expressions of concern or corrections concerning six research papers co-authored by Dr. Wang or Dr. Burns. (PX 270, PX 272-278.)

**DEFAMATION ACTION**

243. In the Defamation Action's First Amended Complaint ("Defamation FAC"), Cassava challenged more than 1,000 allegedly "false and defamatory" statements for conveying

the "overall messages" that "Cassava had manipulated the testing of simufilam, Cassava had manipulated the results associated with simufilam, and Cassava was a fraud." (PX 1 (Defamation FAC) at ¶ 7; PX 2 (Defamation Supplement of Exhibits).)

244. In the Defamation FAC, Cassava asserted that Plaintiffs' statements were false. (PX 1 (Defamation FAC) ¶¶ 121, 141, 144, 151, 154, 157, 162, 169, 175, 190, 198, 206, 211, 216, 223, 228, 232, 240, 247, 253, 259, 267, 274.)

245. In the Defamation FAC, Cassava asserted that it could prove Plaintiffs' statements were "false" based on its research and underlying data. (PX 1 (Defamation FAC) ¶¶ 162-167, 175-178, 190-192, 198-203, 206-209, 211-221, 223-226, 228-230, 232-234, 240-245, 247-251, 253-257, 418-422.)

246. In the Defamation Action's Second Amended Complaint ("Defamation SAC"), Cassava challenged more than 75 allegedly "false and defamatory" statements. (PX 3 (Defamation SAC) ¶ 7.)

247. In the Defamation SAC, Cassava asserted that it could prove Plaintiffs' statements were "false." (PX 3 (Defamation SAC) ¶¶ 645–650.)

248. In the Defamation SAC, Cassava asserted it could prove "falsity" based on its research and underlying data. (PX 3 (Defamation SAC) ¶¶ 520-543.)

249. In the Defamation Action, Cassava asserted that it could prove the research underlying simufilam was not manipulated, fabricated, or doctored. (PX 1 (Defamation FAC) ¶¶ 162, 175, 180, 190, 198, 206, 211, 216, 223, 228, 232, 240, 247, 253, 259, 267, 274 (asserting that "[t]he underlying research and backup for the underlying research demonstrate that the research relied upon by Cassava in connection with developing simufilam was not fabricated, manipulated, or doctored"); PX 3 (Defamation SAC) ¶¶ 520-543.)

250. Since filing the Defamation Action, Cassava has asserted that it does not know and may never know whether Dr. Wang manipulated, falsified, or fabricated simufilam research. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63 ("The Internal Investigation did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants.").

251. Cassava has abandoned many of the research and scientific claims the company pled as proof of falsity in the Defamation Action, including Dr. Wang and Dr. Burns's preclinical research (*see* PX 173 (CASSAVA_001225354) at 367 (removing "References")); the results from the phase 2b clinical study (*see* PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025) at 63 (disclosing that "you should not rely on" the phase 2b results)); and their foundational claim that simufilam binds to altered conformations of filamin A (*see* PX 173 (CASSAVA_001225354) at 356 (revising "Mechanism of Action")).

**RESEARCH RECORDS AND DATA**

252. Cassava owns all simufilam research data. (PX 140 (CASSAVA_000797897 (Clinical Trial Agreement § 4.1)); *see also* PX 16 (Cassava 30(b)(6) Dep. Tr.) at 282:11-283:4; PX 21 (Rodriguez Dep. Tr.) at 131:16-23; PX 17 (Wang Dep. Tr.) at 29:15-30:10.)

253. Cassava has always had the right to access or obtain simufilam research data from Dr. Wang at CUNY. *Id.*

254. On September 3, 2021, during a call with investors after the Citizen Petition was published, Barbier said: "One way to settle the discourse around Western blots might be to go back to the original films and images. . . . we don't have the original films or images for the Western blots in question. Those were generated by our science collaborator at CUNY, who is Prof. Wang." (PX 93 (CASSAVA_000310872) at 876.)

255. On November 16, 2021, Dr. Burns wrote: "without the original images, you can't prove anything." (PX 25 (BURNS_00000650) at 685.)

256. On September 20, 2022, Cassava [redacted] (PX 142 (CASSAVA_000800400) at 415-416.)

257. When Barbier was asked whether the company has ever had possession of original data from simufilam experiments, he testified: "I had no reason to believe there was original data because we don't have a lab in-house." (PX 5 (Barbier Dep. Tr.) at 253:03-256:01; *see also* PX 6 (BARBIER_00000183) at 354-55.)

258. Barbier testified that he never asked anyone at the company whether or not the company possessed any raw or original data from any simufilam research. (PX 5 (Barbier Dep. Tr.) at 255:23-256:01.)

259. When asked whether Cassava had possession of original or raw data from Dr. Wang's simufilam experiments, Cassava's corporate representative testified: "I'm fairly certain the answer is no. I don't know why we will have the originals, but I can't say we don't." (PX 16 (Cassava 30(b)(6) Dep Tr.) at 205:23-208:02.)

**FDA AUDIT**

260. On September 14-16, 2022, the FDA conducted an audit of Dr. Wang's lab at CUNY. (PX 222 (CUNY 001529) ("FDA Inspection Report"); PX 144 (CASSAVA_000898032) ("Form 483").

261. The FDA reported the following findings from its September 2022 audit of Dr. Wang's lab at CUNY:

> The ELISA experiments used in the study were not validated/verified. Specifically, the site used commercially available ELISA kits without in-house validation/verification of assay parameters, such as accuracy, precision, and sensitivity of the method.
>
> There were inadequate source records to reconstruct the study. Specifically, the site did not maintain;
>
> > a. Documentation of sample storage and tracking;
> >
> > b. Documentation of experimental procedures (e.g., records of sample removal/return, preparation of calibration standards, sample aliquoting, and processes associated with the conduct of ELISA and Western blot);
> >
> > c. Source records for Western-blot analysis; and
> >
> > d. Audit trails for the plate reader (Multimode Detector software) used in ELISA experiments.

(PX 222 (CUNY 001529) at 530; PX 144 (CASSAVA_ 000898032) at 032.)

262. When Cassava filed the Defamation Action, Defendants knew that the FDA had audited Dr. Wang's lab at CUNY in September 2022. (PX 144 (CASSAVA_000898032); PX 222 (CUNY 001529); PX 191 (CASSAVA_001418364) (Oct. 3, 2022 email from Orrick to Barbier attaching CUNY's draft response to Form 483.)

263. When Cassava filed the Defamation Action, Defendants knew of the FDA's findings from its audit of Dr. Wang's lab at CUNY in September 2022. (*Id.*)

264. When Cassava filed the Defamation Action, Defendants knew that the FDA had determined that Dr. Wang had "inadequate source records to reconstruct" the results from the phase 2b study of simufilam. (*Id.*)

265. On November 1, 2022, the FDA directed Cassava to remove the phase 2b data from its investigator's brochure because the data "could not be verified." (PX 172 (CASSAVA_001213617) at 620 (the "objective of that inspection was to confirm the reliability

of [the phase 2b biomarker] data . . . . The Agency staff who conducted that audit concluded that the reliability of [the data] could not be verified. . . . Based on the conclusions of the above audit, you must now delete all data for the cerebrospinal fluid analytes [] from the Investigator's Brochure.").

266. On November 16, 2022, the FDA sent a follow-up email to Cassava concerning its audit and instruction to remove the phase 2b biomarker data: "As already stated in our email to you, dated November 1, 2022, those data could not be verified during the recent FDA audit of the aforementioned CCNY /CUNY laboratory. Their retention in the Investigator's Brochure would thus be potentially misleading." (PX 172 (CASSAVA_001213617) at 617.)

267. When Cassava filed the Defamation Action, Defendants knew the FDA had directed Cassava to remove the phase 2b biomarker data from its investigator's brochure because the data "could not be verified." (PX 12 (Burns Dep. Tr.) at 298:02-299:11; PX 5 (Barbier Dep. Tr.) at 245:04-25; PX 170 (CASSAVA_001134756) (forwarding FDA email with "high" priority tag to chief medical officer, Nadav Friedmanm, on November 1, 2022); PX 16 (Cassava 30(b)(6) Tr.) at 176:15-178:24.)

268. When Cassava sent the revised Investigator's Brochure to clinical trial sites, removing Dr. Wang's phase 2b biomarker data, the company did not mention the FDA's direction to remove the data in its "summary of changes and rationale." (PX 172 (CASSAVA_001211317) at 326-328, 344 (redline of changes required by FDA); PX 171 (CASSAVA_001211317) at 359 ("Summary of Changes and Rationale" without disclosing rationale of FDA direction).)

269. According to the FDA's Establishment Inspection Report, the FDA conducted the September 2022 audit of Dr. Wang's lab at CUNY "according to Compliance Program 7348.004." (PX 222 (CUNY 001529) at 529.)

270. Neither the FDA Inspection Report nor the FDA Form 483 state that the FDA applied GLP standards when it audited Dr. Wang's lab at CUNY in 2022. (PX 222 (CUNY 001529); PX 144 (CASSAVA_ 000898032).)

**CASSAVA AUDIT**

271. On September 21-22, 2022, Cassava's Senior Director of Clinical Quality Systems, Laura Rodriguez, and SVP of Regulatory Affairs, Michael Marsman, conducted an on-site audit of Dr. Wang's lab at CUNY. (PX 139 (CASSAVA_000796682).)

272. Cassava's September 2022 audit of Dr. Wang's lab at CUNY concluded that the lab "lack[ed] standard operating procedures, proper good documentation practices, and laboratory practices (i.e., equipment calibration and sample management) that are deemed critical for conducting any type of analysis to support a clinical trial"; and that the lab was "unacceptable" and "not qualified to provide biomarker analysis and research services for any future Cassava studies." (PX 139 (CASSAVA_000796682) at -688.)

273. Cassava's audit report acknowledged that Dr. Wang's lab was not subject to GLP requirements but was expected to perform work "according to sound scientific principles, many of which are also cGLP requirements." (PX 139 (CASSAVA_000796682) at 684.)

274. Dr. Wang's lab at CUNY was never reinstated as an approved lab for Cassava's research after the September 2022 audit. (PX 21 (Rodriguez Dep. Tr.) at 85:05-13, 237:13-20.)

275. Cassava's auditors stated: "The biggest concern [] was also the lack of proper documentation practices." (PX 139 (CASSAVA_000796682) at 686.)

276. Cassava's auditors identified the following "Critical" deficiencies:

> "[1] The laboratory did not have any formal SOPs in place. The four SOPs provided were not well written, did not contain an approval signature, and were not in a formal template.
>
> "[2] Lack of experiment logbooks/notebooks for all study/research work being performed.
>
> "[3] Lack of study record organization which makes it difficult to recreate what was used during sample analysis (i.e., reagents, ELISA and Western Blot kit lots, pipets, BOC freezer, and balances). All documents provided were either on network drive, in a binder, or loose in a folder.
>
> "[4] The -80°C freezer had not been qualified/validated prior to sample storage of study samples.
>
> "[5] Essential equipment such as the FilterMax F5 (ELISA) and -80°C freezer monitor had not been calibrated in several years."

(PX 139 (CASSAVA_000796682) at 690.)

277. Cassava's auditors defined a "Critical" deficiency as: "Observed conditions, practices, or processes that adversely affect the rights, safety, or well-being of the subjects and/or the quality and integrity of data. Critical findings could be a combination of major deficiencies which indicate a serious systemic failure. Critical deficiencies require immediate action." (PX 139 (CASSAVA_000796682) at 685.)

278. Cassava's auditors identified the following "Major" deficiencies:

> "[1] The ELISA computer being utilized was not the original computer as the previous one had been stolen. Due to this, there was no password protection to the system and/or the FilterMax F5 software.
>
> "[2] There was no formal process for sample inventory, tracking, and chain of custody for PTI-125-02 samples. All three studies had their samples grouped into one inventory spreadsheet. Sample manifest forms were also bound together in one binder.

(PX 139 (CASSAVA_000796682) at 690.)

279. Cassava's auditors defined a "Major Deficiency" as: "Observed conditions, practices or processes that might adversely affect the rights, safety, or well-being of the subjects

and/or the quality and integrity of data. Major observations are serious deficiencies and are direct violations of cGLP principles." (PX 139 (CASSAVA_000796682) at 685.)

280. Cassava's auditor, Laura Rodriguez, testified that "[t]here were no logbooks to indicate what was being performed, how [Dr. Wang] did … the experiments that he worked on"; "it was true for everything Dr. Wang did at that lab . . . . All research. He didn't have a logbook." (PX 21 (Rodriguez Dep. Tr.) at 214:12-215:06.)

281. Cassava's auditor, Laura Rodriguez, testified that Dr. Wang had discarded all original films from Western blot experiments. (PX 21 (Rodriguez Dep. Tr.) at 176:09-20 ("All Western blot experiments, whether it was ours or anybody else's, all were gone.")

282. When Cassava filed the Defamation Action, Defendants knew that Cassava's Senior Director of Clinical Quality Systems, Laura Rodriguez, and SVP of Regulatory Affairs, Michael Marsman, had audited Dr. Wang's lab at CUNY in September 2022. (PX 21 (Rodriguez Dep. Tr.) at 83:20-24 ("Remi knew I was going. . . And Lindsay knew I was going."); PX 12 (Burns Dep. Tr.) at 300:09-25; PX 133 (CASSAVA_000738939) at 8939 ("We need to wait until Laura completes her audit before you start this work. Stay tuned.").

283. When Cassava filed the Defamation Action, Defendants knew the findings from Cassava's audit of Dr. Wang's lab at CUNY in September 2022. (PX 12 (Burns Dep. Tr.) at 299:13-300:25; PX 5 (Barbier Dep. Tr.) at 246:02-247:13; PX 16 (Cassava 30(b)(6) Dep. Tr.) at 183:25-184:12 (testifying that the conclusion that Dr. Wang's lab was unacceptable and unqualified "certainly would have been a relevant piece of information"); PX 21 (Rodriguez Dep. Tr.) at 238:03-240:11 (testifying that Barbier told her to copy outside counsel at Orrick and Dr. Wang's counsel when sending the "corrective actions" from the audit).

**CUNY INVESTIGATION**

284. On October 12, 2023, *Science* published a "final report" of the CUNY investigation committee from its investigation of Dr. Wang. (PX 279; PX 232 (RFCUNY000743))

285. The 50-page report published by *Science* on October 12, 2023 is titled "CITY UNIVERSITY OF NEW YORK FINAL INVESTIGATION REPORT OF Associate Professor Hoau-Yan Wang, Ph.D." (*Id.*)

286. The "Final Investigation Report" published by *Science* on October 12, 2023, was the Investigation Committee's final report from its investigation of Dr. Wang. (PX 223 (CUNY 001573) at 574 (confirming the version published by *Science* was the "Final Report" and the Committee's work concluded in May 2023.)

287. The CUNY Investigation Committee's Final Report found "long-standing and egregious misconduct in data management and record keeping" and that "[i]t appears likely that no primary data and no research notebooks pertaining to the 31 allegations [investigated by the committee] exist." (PX 232 (RFCUNY000743) at 743)

288. The CUNY Investigation Committee's Final Report stated:

> "In no instance did Dr. Wang provide any material that could be reasonably recognized as original, uncropped blots (images that included clear film/blot edges and molecular weight markers). In his response to our investigation, Dr. Wang has protested that our definition of original blot data is unreasonably strict. However, our definition is shared by ORI, for whom this report is written. The third-party analysis of Dr. Wang's work by Dr. Spruck was also based on images that are clearly not original data. It also became clear from our interviews with Dr. Wang and, Dr. Zhe Pei, a post-doctoral Research Associate in the Wang lab, that the lab did not employ notebooks to record the details of the preparation or execution of the western blot Experiments performed in the lab."

(PX 232 (RFCUNY000743) at 746)

289. The CUNY Investigation Committee found that, due to Dr. Wang's lack of experimental logbooks or notebooks, "even if unedited images of films or film scans exist, it does not appear to be possible to determine how data were acquired or which original western blots were used to create the figures cited in each of the 31 allegations." (PX 232 (RFCUNY000743) at 746)

290. The CUNY Investigation Committee's Final Report stated: "Though it was our intention to examine all primary data upon which the western blots identified in the specific allegations were based, we were unable to acquire any such material." (PX 232 (RFCUNY000743) at 746.)

291. The CUNY Investigation Committee's Final Report stated: "Dr. Wang has failed to provide data that can be verified as unmanipulated, uncropped, underlying primary western blot data, as defined by ORI. It is not clear to this committee why some editors have accepted such material as original underlying blots from Wang in response to inquiries regarding misconduct allegations." (PX 232 (RFCUNY000743) at 747.)

292. The CUNY Investigation Committee's Final Report stated:

> "Though we acknowledge that a significant number of the publications concern data published over a decade ago, Dr. Wang has been unable to provide original data or records even for his most recent publications. He is therefore responsible for the inability of this committee to make an objective assessment for even a single allegation. Notwithstanding the specific data retention policies of CUNY and the NIH, Dr. Wang's failure to store original data and maintain research records is reckless and clearly not in keeping with the standard practices in the field. It is our conclusion that this amounts to significant research misconduct."

(PX 232 (RFCUNY000743) at 749.)

293. The CUNY Investigation Committee's Final Report faulted Dr. Burns as the co-author of several research papers. (PX 232 (RFCUNY000743) at 773 ("Dr. Lindsay H. Burns also bears some measure of responsibility."); *id.* at 779, 781, 786, 787, 789.)

294. The CUNY Investigation Committee's Final Report stated: "The committee requested that CUNY hire an independent image consultant to examine all the publications and materials provided by Dr. Wang. However, after working on these allegations for nearly three months, this consultant precipitously withdrew their services, citing legal risks to themselves and their business." (PX 232 (RFCUNY000743) at 745.)

295. The CUNY Investigation Committee's Final Report contains the following conclusion:

> Already frustrated by the respondent's inability to provide even a single datum or notebook in response to any allegation, the committee decided that it would be most conservative to conclude that the respondent's failure to provide data or records prevented us from making an objective assessment in any case. ***But to be clear, the committee concludes that Dr. Wang's inability or unwillingness to provide primary research materials to this investigation represents egregious misconduct.*** This failure, the troubling research practices described in our report, and the clear indications of misconduct in his response to PLoS editorial concerns, is highly suggestive of longstanding and deliberate scientific misconduct by Dr. Wang. However, absent access to primary research materials, it is not possible to make definitive assessments for the 31 specific allegations. This is a source of deep frustration to the committee, which spent the better part of a year actively attempting to provide an objective investigation into these serious charges against Dr. Wang.

(PX 232 (RFCUNY000743) at 792 (emphasis in original).)

296. After *Science* published the CUNY Investigation Committee's Final Report, on October 12, 2023, Cassava demanded CUNY investigate the committee's investigation. (PX 174 at 502 (CASSAVA_001229498) (Oct. 18, 2023 letter from Cassava to CUNY: "Cassava demands that CUNY reject the flawed findings of this leaked committee report.").)

297. On October 27, 2023, CUNY announced that it would "stay the underlying inquiry into the allegations regarding Dr. Wang's research until such time as the University completes a comprehensive investigation of the process." (PX 153 (CASSAVA_000980995) at 996.)

298. On October 27, 2023, Rick Barry sent an email responding to news of CUNY's investigation of the Committee's investigation by congratulating Cassava's Chief Legal Officer: "Awesome! Well done Chris Cook!" (PX 153 (CASSAVA_000980995) at 995.)

299. On May 30, 2025, CUNY submitted a letter to the Office of Research Integrity, to provide "an update and final conclusions on its investigation into allegations of research misconduct against [Dr. Wang]." (PX 223 (CUNY 001573) at 573.)

300. In its May 30, 2025 letter to ORI, CUNY stated that it retained an outside law firm, Foley Hoag LLP, "to conduct an internal investigation into whether there was an unauthorized disclosure of draft and final reports related to the Research Misconduct Investigation, and to evaluate the applicable policies, processes, and procedures used during that investigation." (PX 223 (CUNY 001573) at 573.)

301. In CUNY's May 30, 2025 letter to ORI, CUNY wrote: "In addition, an important update to communicate is that Dr. Wang has announced his retirement from the University effective July 2025. As a result, he will no longer conduct research at CUNY." (PX 223 (CUNY 001573) at 573.)

302. CUNY's May 30, 2025 letter to ORI states: "The University has further concluded that the disclosure did not compromise the integrity of the Committee's investigation or the content of its Final Report. Because of this, the University believes that although there were issues with the findings of the Committee, which are described below, the investigation of

Dr. Wang was undertaken in good faith, and the University bases its final conclusions on the Committee's findings." (PX 223 (CUNY 001573) at 574.)

303. The "issues with the findings of the Committee" identified in CUNY's May 30, 2025 letter to ORI, concern the "evidence standard" applied by the Committee. (PX 223 (CUNY 001573) at 576 ("The Committee seemed to believe that definitive evidentiary proof of fabrication or falsification was required for a finding of research misconduct. This requirement may have surpassed what is required by a preponderance of the evidence standard"); *id.* ("while the Committee may have applied a heightened standard of evidence, the Committee's work concluded in May 2023, and the University does not believe that it should disturb or reevaluate those findings, as it was undertaken in good faith and was not compromised by any unauthorized disclosures. Therefore, for each of the following allegations of research misconduct, the University has determined that research misconduct did not occur based on the conclusions reached by the Committee in its Final Report .).)

304. CUNY's May 30, 2025 letter to ORI adopts the factual findings set forth in the CUNY Investigation Committee's Final Report. (PX 223 (CUNY 001573) at 576.)

305. CUNY's May 30, 2025 letter to ORI confirmed that Dr. Wang did not maintain original research data. (PX 223 (CUNY 001573) at 575 ("Dr. Wang consistently reported that he did not maintain original research data in hard copy files, electronic images, or lab notebooks.").)

306. CUNY's May 30, 2025 letter to ORI repeatedly confirms and adopts the Investigation Committee's findings that Dr. Wang's "lack of preservation of research records represents a significant departure from accepted practices of the scientific community." (PX 223 (CUNY 001573) at 576-588.)

**INCONSISTENT EXPLANATIONS FOR LACK OF DATA OR RECORDS**

307. According to the CUNY Investigation Committee's Final Report: "[Dr. Wang] stated that a significant number of boxes containing research records were thrown away in response to a request from [CUNY] to clean the lab during the COVID-19 pandemic. Officials at [CUNY] were not able to confirm this. Furthermore, as CUNY faculty, none of the committee members were directed to throw away research material during the pandemic and are not aware of other colleagues who were asked to do so. In our experience, labs were asked to decontaminate but not discard belongings." (PX 232 (RFCUNY000743) at 746-747.)

308. According to Cassava's Audit Report, "the ELISA computer being utilized was not the original computer as the previous one had been stolen." (PX 139 (CASSAVA 000796682) at 688.)

309. According to the FDA Establishment Inspection Report, when the FDA asked for original data from Dr. Wang's ELISA experiments, "Dr. Wang stated the Department of Justice (DOJ) took the original USB drive containing the original Excel files containing data from the plate reader as well as a second USB he made as a back-up copy." (PX 222 (CUNY 001529) at 535).)

310. According to Laura Rodriguez's February 2026 affidavit, in September 2022: "Dr. Wang provided me with a removable flash drive" containing ELISA data "that he stated he kept locked in his desk." (PX 239 (Dkt. 299-4, Aff.) at ¶ 6.)

311. On August 25, 2021, Dr. Wang texted Dr. Burns: "I tried to find the original files for the J neurosci, but I can't. These were all in a hard drive that was fried. I don't know what to do now." (PX 121 (CASSAVA_000727933) at 952.)

312. Dr. Wang testified that a laptop he was using as his work computer was "fried" around 2013 or 2014; and that in 2021, the FBI seized thumb drives with experimental data. (PX 17 (Wang Dep. Tr.) at 47:09-51:02; 77:24-78:05.)

**RED FLAGS ABOUT SCIENTIFIC CLAIMS**

313. Cassava held simufilam out as a "novel agent with a novel mechanism of action for treating Alzheimer's disease." (PX 80 (CASSAVA_000053857) ("We understand that there should be healthy skepticism around a novel agent with a novel mechanism of action for treating Alzheimer's disease").)

314. No independent laboratory has ever confirmed or verified the claim that an altered conformation of filamin-A exists in Alzheimer's patients. (PX 173 (CASSAVA_001225354) at 356 (revising "Mechanism of Action"); PX 288 (Brodkin-Heilbut-Milioris Letter to FDA) at 2; PX 200 (CASSAVA_001444640) at 643-644 (recognizing the company had never "validate[d]" its "basic science"; and "seemed to have an unfortunate habit of running one test and accepting it as gospel")

315. No independent laboratory has ever confirmed or verified the claim that simufilam binds to filamin-A. (*Id.*; *see also* PX 12 (Burns Dep. Tr.) at 82:04-83:24.)

316. No independent laboratory has ever confirmed or verified the claim that simufilam restores altered conformations of filamin-A to its native shape. (*Id.*)

317. On January 23, 2019, Dr. Burns wrote to Dr. Angelique Bordey: "Most companies are suspicious of academic data that is just from one lab." (PX 79 (CASSAVA_000044890) at 890.)

318. On July 18, 2024, Rick Barry sent an email to the Board, stating, in part:

> "Another important decision needed to be made about doing an analysis or plasma biomarkers and CSF left over from our Phase 2 trial. Recall that

> plasma samples were taken routinely from all patients in the P2 and some patients even had CSF samples taken (yikes!). After the company reported the revised analysis of our P2b biomarkers by Dr. Wang, we never disclosed any biomarker data from the P2 and investors have clearly noticed - it is one of the legs of the short sellers' stool. The reason it wasn't announced is the analysis was never performed. Worse, in our Statistical Analysis Plan submitted to FDA in advance of our P2, we essentially promised the agency to produce that data. Our quandary now is that the samples are 4-5 years old and their stability is questionable. There is some literature that states that samples like these could have stability for 5-15 years, but that is unknown. It is possible that running the analysis now could produce a sub-optimum result and apparently ***Remi was worried about the optics of such a result***. But, again, we told the FDA we would do it and now there is real question about whether any of our biomarker data from Dr. Wang should be believed. . . .
>
> "The other critical matter than needed attention was what work our scientific team could do ***to validate our basic science*** - specifically, what tests can we run to prove our assertion about the method of action. ***In the past we have had one-off tests*** from 3 labs that provided some validation to our claims, but ***we seemed to have an unfortunate habit of running one test and accepting it as gospel***. We are telling investors that we will be scientifically rigorous and the best way to do that is to produce data that validate our claims. The scientific team made a great presentation to me this afternoon of several tests that could be performed by validated outside labs that, if successful, could really enhance our reputation. ***The crazy part of it is that these tests are not expensive*** - approximately $300k for the whole package. I told them to get started today and, of course, we will make our findings public. I do not intend to inform investors that we are doing this work. They will be badgering us incessantly if we do. I'd rather surprise them when we know and fully understand our findings."

(PX 200 (CASSAVA_001444640) at 643-644 (emphasis added).)

319. Other laboratories have tried and failed to replicate Dr. Wang's reported findings concerning simufilam's purported mechanism of action. (PX 94 (CASSAVA_000328575) (May 9, 2018 email from Dr. Burns: "we were so stumped as to why it failed in the xenograft experiment at TD2, and it seemed tricky to ask for money to repeat xenograft studies with no real hypothesis"); PX 103 (CASSAVA_000438273) (June 12, 2018 email from Remi Barbier to

Board: "On the other hand, our blood test for Alzheimer's is puzzling. We recently analyzed about 300 blinded, human plasma samples. The study bombed. Results indicate we detected absolutely nothing correctly. Here's the puzzling part: in the previous two blinded studies we detected nearly 100% of plasma samples correctly. So, we went from 100% accuracy to 0% accuracy."); PX 95 (CASSAVA_000331603) at -604 ("Results from new, highly pedigreed samples (amyloid imaging or CSF biomarkers) obtained from the Australian Imaging Biomarkers and Lifestyle Flagship Study of Ageing (AIBL) and the University of Pennsylvania Memory Center (UPMC) have failed to reproduce the original findings."); PX 178 (CASSAVA_001279825) (July 22, 2024 email from Yale researcher: "I ran the experiment twice and saw absolutely no binding").)

320. Cassava had attempted to partner on the development of simufilam with multiple other scientists and companies, who expressed skepticism about Cassava's research data and claims about simufilam's mechanism of action. (PX 112 (CASSAVA_000675922) (comments from Servier: "much work on real MOA of drug and its more general pharmacology need to be addressed"); PX 117 (CASSAVA_000702946) at 947 (comments from Eli Lilly: "the Lilly team is not yet comfortable in the mechanism" and "we would prefer a 3rd party such as Covance, Kai Blennow, Les Shaw to run bio samples for future studies or rerun the current samples. This would add greater confidence to the biomarker findings and ensure adequate arm-distance objectivity for outside suitors."); PX 96 (CASSAVA_000343648) (comments from J&J: "to be candid, there is some skepticism about the "reasons to believe" in the molecule"); PX 156 (CASSAVA_000988088) ("last year Pablo's science team had two feet in the camp of 'the-data-is-too-good-to-be-true'"); PX 113 (CASSAVA_000676024) at 024 ("the evidence that

[simufilam] is exerting its effects through binding to filamin A is not compelling . . . I am very skeptical that this is what is happening")

321. Cassava avoided conducting experiments that risked "undermining" the company's scientific claims. (PX 99 (CASSAVA_000382849) (July 12, 2020 email from Dr. Burns): "[Dr. Steve Arnold] says that others would like additional data from somewhere else. Hoau thinks we'll get confusing data and Remi tends to agree, but I'd like to pick something that wouldn't undermine our CSF data either way.")

322. Dr. Burns was aware of inconsistencies in Dr. Wang's biomarker data, including large differences in baseline values between studies. (PX 120 (CASSAVA_000727886) ("For total tau, the baseline values for Phase 2b for were 104 - 106 pg/mL, but for the OLE, they were 163 for those 25.")

**RED FLAGS ABOUT PHASE 2a "RESULTS"**

323. On May 21, 2019, Dr. Burns identified "strange" discrepancies in the Phase 2a biomarker data reported by Dr. Wang. (PX 81 (CASSAVA_000053951) at 952) ("I noticed that the total tau/Abeta ratios in the recent data are not the same as in the initial biomarker runs."; "But it is so strange that you get one value the first run and another for the same sample the second run.")

324. On May 24, 2019, Remi Barbier wrote to the Board about the phase 2a study results from Dr. Wang: "One of the key themes we're hearing is that 'no one will believe us.' Quite possibly true, but the data stands on its own." (PX 72 (CASSAVA_000004863) at 863.)

325. On June 13, 2019, Dr. Burns wrote that the Phase 2a biomarker results were "so striking" that Cassava would "be replicating them in a second lab." (PX 197 (CASSAVA_001443943) at 943.)

326. On July 3, 2019, Dr. Burns wrote that Dr. Wang's "wildly significant p values for such a small study" was "raising eyebrows." (PX 82 (CASSAVA_000055933) at 935.)

327. On July 5, 2019, Dr. Burns wrote about Dr. Paul Aisen's reaction to the phase 2a data: "he flat-out did not believe the p values were possible with 12 patients. We were all at first incredulous." (PX 82 (CASSAVA_000055933) at 933.)

328. In July 2019, Dr. Barbara Sahakian told Dr. Burns that they needed to have an independent scientist validate Dr. Wang's reported findings from the phase 2a study. (PX 82 (CASSAVA_000055933) at 933 ("I do think having someone independent from Dr Wang run the same analyses is so important [...] And as you and your Board point out, the other scientist who runs the analyses should not be based in your Company."); *id.* at 934 ("there were some questions raised by Jeff [Cummings] and others about the methodology"; "it would be useful to get an independent verification of the data obtained by Hoau-Yan.")

329. On August 1, 2019, Dr. Burns described the data from the phase 2a study as "frankly unbelievable." (PX 84 (CASSAVA_000059830) at 834.)

330. Dr. Burns testified that [redacted] (PX 13 (BURNS_00000503) at 517:16-21 [redacted]

331. Dr. Burns and Dr. Wang submitted an article on the Phase 2a study to the *Journal for the Prevention of Alzheimer's Research* on October 31, 2019; and it was accepted for publication six days later on November 6, 2019. (PX 218 (Aisen_0001761) at 761; PX 4 (Aisen Dep. Tr.) at 67:17-68:09.)

332. Dr. Paul Aisen was the editor-in-chief of *JPAD* and a former paid consultant for Cassava. (PX 4 (Aisen Dep. Tr.) at 13:19-14:03, 70:05-12.)

333. On September 27, 2021, Matthew Schrag, a professor of neurology at Vanderbilt university submitted a research integrity concern about the phase 2a simufilam paper. (PX 215 (Aisen_0000661) at 661.)

334. Dr. Burns responded to the investigation by writing a letter stating: "The professional Wall St investors who made these allegations are 100% motivated by financial profit. No journal can be expected to adjudicate allegations that are strictly motivated by a financial profit." (PX 214 (Aisen_0000653) at 655.)

335. Dr. Aisen led *JPAD*'s investigation of the research integrity concerns about the phase 2a simufilam paper. (PX 4 (Aisen Dep. Tr.) at 13:19-14:03, 70:05-12.)

336. In response to the research integrity concerns about the phase 2a study, Dr. Burns submitted a letter to *JPAD* from Dr. Charles Spruck, describing him as an "independent" and "unaffiliated" expert; Dr. Burns did not disclose to Dr. Aisen or JPAD that Dr. Spruck was a Cassava investor. (PX 104 (CASSAVA_000461586) (Dr. Burns email: "An immunoblot expert offered to provide his perspective on this matter. Attached please find his letter. He is independent, unaffiliated with, and not compensated by us or anyone we know for this analysis."); PX 4 (Aisen Dep. Tr.) at 98:02-12; PX 12 (Burns Dep. Tr.) at 296:05-298:01; PX 176 (CASSAVA_001257502) at 507 (Cassava letter to Ernst & Young acknowledging Spruck was an "investor in Cassava").

337. Dr. Burns described communications with Dr. Spruck by email and phone in her diary beginning in October 2021. (PX 25 (BURNS_00000650) at 662, 696, 699, 712, 713, 725, 726, 728, 743, 744, 758-59.)

338. In reaching JPAD's conclusion of its research integrity investigation, Dr. Aisen relied on an analysis by Dr. Charles Spruck; his understanding from Dr. Burns that Dr. Spruck was "totally independent of the authors and Cassava"; and his understanding from Dr. Burns that the research integrity concerns were "financially motivated." (PX 216 (Aisen_0000748) at 748; PX 4 (Aisen Dep. Tr.) at 102:10-21; 103:23-104:22 (two of the three sources JPAD consulted determined there was "evidence to suggest the possibility of cutting and splicing" and the other source was Dr. Spruck), 151:20-152:24 (there was "conflicting evidence on the issue of splicing gels").

**<u>RED FLAGS ABOUT PHASE 2b "RESULTS"</u>**

339. Cassava described the phase 2b study as a double-blinded clinical trial, meaning neither the patient nor the tester is aware which patient received which treatment. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63 (describing "Phase 2b Study" as "randomized, double-blind, placebo-controlled"); PX 111 (CASSAVA_000669999) at 015 (Board presentation: "Our academic collaborator at CUNY will conduct this bioanalysis under blinded conditions.").)

340. The Phase 2b Clinical Research Protocol, dated June 28, 2019, designated Dr. Wang at CUNY—not Lund University—to analyze the biomarker samples: "The samples collected at screening and on Study Day 28 will be shipped . . . to Dr. Hoau-Yan Wang, CUNY School of Medicine . . . to be tested in biomarker assays." (PX 85 (CASSAVA_000060946) at 0968.)

341. In May 2020, Dr. Oskar Hansson's laboratory at Lund University in Sweden delivered its analysis of biomarker measurements from participants in the phase 2b study. (PX 146 (CASSAVA_000922566); PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

342. None of the tests performed by Lund University showed an effect of the drug treatment groups compared with the placebo group. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

343. The data from Lund University did not show a drug effect consistent with Dr. Wang's Phase 2a results. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

344. Dr. Aisen told Dr. Burns that "Oskar Hansson's team is excellent, and they utilize all leading assay platforms" and that "change in placebo over 28 days is artifactual. Unfortunately, 20 subjects per arm may be too small for reliable results." (PX 98 (CASSAVA_000375558).) Dr. Aisen further stated: "There is no measurable disease progression over 28 days." (*Id.*)

345. [redacted] (PX 15 (CASSAVA_001442693) at 2730-2733.)

346. On May 14, 2020, Dr. Burns sent Dr. Wang a document with "min, max, and change from baseline data" and asked Dr. Wang to evaluate Lund's data. (PX 146 (CASSAVA_000922566); PX 260 (Cassava Sciences, Inc., Form 10-K, dated March 3, 2025) at p. 63;)

347. The information Dr. Burns provided to Dr. Wang on May 14, 2020, contained information sufficient for Dr. Wang to unblind himself to roughly a third of the patients in the Phase 2b study: eight patients in the placebo group; seven patients in the 50 mg simufilam group; and eight patients in the 100 mg simufilam group. (PX 146 (CASSAVA_000922566); PX 260 (Cassava Sciences, Inc., Form 10-K, dated March 3, 2025) at p. 63)

348. Dr. Burns knew from prior experience that sending Dr. Wang information with "min and max" values for each group would be sufficient to allow Dr. Wang to unblind himself. (PX 83 (CASSAVA_000059303) ("I can't send you the sheet because it shows min and max for each group.").)

349. Dr. Burns deleted all of the emails in her "sent" folder from before early June of 2020—one month after sending Dr. Wang the unblinding information. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 285:6-14; PX 12 (Burns Dep. Tr.) at 304:18-306:19.)

350. On or before June 12, 2020, Cassava's Board of Directors was aware that Dr. Wang's lab at CUNY was conducting a "reanalysis" of the phase 2b data analyzed by Lund University. (PX 111 (CASSAVA_000669999) at 015 ("Our academic collaborator at CUNY will conduct this bioanalysis under blinded conditions.")

351. On September 14, 2020, Cassava publicized Dr. Wang's results which showed statistically significant improvement in all biomarkers in the treatment groups as compared with the placebo group. (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)).)

352. Cassava's September 14, 2020 press release stated: "Bioanalyses were conducted under blinded conditions to eliminate any possibility of bias. An academic lab generated final results." (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)); PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63 (disclosing that "certain statistical information . . . could have been used to unblind him as to some number of Phase 2b Study participants").)

353. For every biomarker tested by Dr. Wang, [redacted] (PX 199 (CASSAVA_001444134).)

354. The Phase 2b trial included cognition testing in addition to biomarker analysis. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

355. Cassava's Statistical Analysis Plan ("SAP") and Trial Protocol stated that the company would report statistics for *all subjects tested* as part of its cognitive testing. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

356. Dr. Burns received cognitive data in May 2020 that showed no improvement in episodic memory in the simufilam treatment arms compared with the placebo group. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

357. After receiving these results, Dr. Burns, who was unblinded, removed patients with missing data and patients who did not take the drug and then engaged in what Dr. Burns described as a "sensitivity analysis" whereby Dr. Burns removed the highest performing patients and lowest performing patients by baseline score cutoffs until the results appeared to show separation between the placebo group and the simufilam treatment groups. (PX 196 (CASSAVA_001443564); PX 78 (CASSAVA_000041919) (Dr. Burns description of exclusion criteria over email); PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63)

358. Dr. Burns ultimately removed 40% of the patient population from the "results" that the company presented publicly. (PX 196 (CASSAVA_001443564); PX 78 (CASSAVA_000041919) (Dr. Burns description of exclusion criteria over email); PX 260 (Cassava 10-K, Mar. 3, 2025) at 63.)

359. When Cassava presented the "cognitive data," the company claimed "Alzheimer's patients treated with [simufilam] showed directional improvements in validated tests of episodic memory and spatial working memory, versus patients on placebo (Effect Sizes 46-17%)." (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)).)

360. Cassava did not disclose that Dr. Burns had excluded 40% of the patient population from the presented results. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

361. After reviewing Dr. Wang's biomarker data from the phase 2b study, Dr. Steven Arnold wrote to Dr. Burns: "[Dr. Wang's] data are always surprising"; and "I don't know how he does it." (PX 75 (CASSAVA_000018239) at 239.)

362. Dr. Steven Arnold expressed "discomfort" about Dr. Wang's "magic hands" to Dr. Burns, and that "others would like additional data from somewhere else." (PX 99 (CASSAVA_000382849) at 849.)

363. In reaction to requests from Dr. Steven Arnold and others for third-party confirmation of Dr. Wang's phase 2b data, Dr. Burns wrote: "Hoau thinks we'll get confusing data and Remi tends to agree, but I'd like to pick something that wouldn't undermine our CSF data either way." (PX 99 (CASSAVA_000382849) at 849.)

364. Dr. Steven Arnold wrote to Dr. Burns: "the challenge will be to convince reviewers/investors that the 'too good to be true' biological and clinical results in 98% of subjects in a 28 day study are real enough to fund a big 2b for replication and longer duration." (PX 76 (CASSAVA_000025770) at 770.)

365. Multiple scientific journals rejected Dr. Burns's submission of the phase 2b study manuscript for publication, with scientific reviewers conveying disbelief in the data. (PX 80 (CASSAVA_000053857) at 857 ("It is hard to believe that these changes in such a short period of time are due to disease modification."); PX 87 (CASSAVA_000090277) at 277 (rejecting publication due to "poor clinical trial reporting i.e. the incomplete reporting, the disconnect between the pre-specified outcomes and the outcomes reported []; the undisclosed conflict in that

the external validation experiments were performed in the lab of a co-inventor"); PX 74 (CASSAVA_000011956) at 958 (rejecting publication because "statistical analysis plan was not followed, the analysis of memory outcomes and reaction times used only standardized effect sizes and is not satisfactory or appropriate" and "[c]ognitive outcomes are misrepresented"); PX 86 (CASSAVA_000086301) (reviewer describing claimed biomarker result as "a result I have never seen in any setting in 30 years of running clinical trials and evaluating clinical trial data" and one "[t]hat seems biologically unlikely").

366. Dr. Burns summarized the comments of reviewers who had rejected her manuscript from the phase 2b study as conveying the message: "the positive data are hard to believe or too good to be true." (PX 89 (CASSAVA_000142174) at 174.)

367. In its 2024 annual report, Cassava disclosed to investors that they should not rely on the phase 2b data:

> "The Internal Investigation determined that certain statistical information contained in an attachment to an email sent by a former senior employee of Cassava to Dr. Wang before the CUNY Bioanalysis of CSF biomarkers was conducted could have been used to unblind him as to some number of Phase 2b Study participants. Unblinded information, if accessed in connection with bioanalysis, could be improperly utilized to manipulate underlying samples or data to skew reported results.
>
> The Internal Investigation did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants. Nevertheless, the fact that Dr. Wang possessed information that could have been used to so unblind himself, together with the allegations in the DOJ indictment, undermine the blinded study design and create substantial uncertainty about the validity of the CUNY Bioanalysis of CSF biomarkers.
>
> In addition, another objective of the Phase 2b Study was to measure changes in cognitive outcome measures using the Cambridge Neuropsychological Test Automated Battery, or CANTAB, over the 28-day study period. In connection with our settlement with the SEC, the SEC's complaint alleged, among other

> things, that disclosures relating to the Phase 2b Study's cognition results (the Cognition Disclosures), which reported results from a post hoc sensitivity analysis, were inadequate and misleading.
>
> Accordingly, in light of the foregoing uncertainties and allegations, you should not rely on the CUNY Bioanalysis of CSF biomarkers reported by the Company in connection with the Phase 2b Study or the Cognition Disclosures from the Phase 2b Study."

(PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

**ADDITIONAL RED FLAGS**

368. On October 27, 2020, the FDA rejected Cassava's request for "Breakthrough Therapy" designation, in a letter describing the company's characterizations of its phase 2a and 2b studies as "untenable" and its inference that the drug would treat Alzheimer's as "highly speculative." (PX 88 (CASSAVA_000100022) at 022-023.)

369. On August 30, 2021, Hans Wigzell wrote to Rick Barry that the simufilam research data appeared to be "faked" or "falsified" (PX 201 (CASSAVA_001444730)).

370. On April 19, 2022, the New York Times published an article titled "Scientists Question Data Behind an Alzheimer's Drug," reporting that "The Times contacted nine prominent experts for comment about the scientific underpinnings of Cassava's trials" and "[a]ll said they did not trust the company's methods, results or even the premise underlying the drug's supposed effectiveness." (PX 293.)

371. On June 22, 2022, Cassava obtained through a FOIA request emails exchanged between the New York Times and neurologist Dr. Roger Nicoll, in which Dr. Nicoll told the New York Times that Cassava was "more egregious than Theranos." (PX 205 (CASSAVA_001494801) at 801, 804.)

372. Dr. Wang conducted the tests that were used to screen and enroll patients for the phase 2 open-label study of simufilam. (PX 12 (Burns Dep. Tr.) at 272:09-19.)

373. Dr. Burns was aware of data from Neurocode in 2021 and 2022, and from Abilene Christian University in 2023, which showed some number of patients, who were screened by Dr. Wang for enrollment in the phase 2 open label study and phase 2 cognitive maintenance study, had cognition scores that were inconsistent with an Alzheimer's disease diagnosis. (PX 12 (Burns Dep. Tr.) at 269:15-284:10.)

**WILLFUL AVOIDANCE**

374. Dr. Wang testified that nobody at Cassava ever questioned him about the integrity of his data or asked him if he had ever fabricated or manipulated data. (PX 17 (Wang Dep. Tr.) at 289:10-290:5 (Q. "Did anyone at Cassava ever ask you if you had fabricated any data?" A. "No." Q. "Did anyone at Cassava ever ask you if you had manipulated any data?" A. "No. And no, I don't." Q. "Has anyone at Cassava ever questioned you about the integrity of your research?" A. "No.").)

375. Cassava did not request the original plate reader data files from Dr. Wang. (PX 17 (Wang Dep. Tr.) at 77:24-25 ("Q. Did anyone at Cassava ever ask for something other than the Excel files that you sent them with the data – A. No. Q. – from your ELISA tests? A. No.")

376. Dr. Burns testified that she never checked whether the data in any Excel file provided by Dr. Wang matched the original or raw data from the ELISA plate-reader machine because it was "not my job." (PX 12 (Burns Dep. Tr.) at 289:21-290:16 ("It was not my job. Do you want me to say it again? It was not my job. It was not my job. It was not my job. I'll go to the chalkboard if you'd like. How many times would you like me to write that?").)

377. On May 18, 2020, Dr. Burns requested "all the software files" from ELISA experiments conducted by Dr. Oskar Hansson's lab at Lund University "to start our QC." (PX 109 (CASSAVA_000569709) at 709.)

378. On May 22, 2023, Dr. Burns obtained the raw software files from ELISA experiments conducted by Abilene Christian University. (PX 175 (CASSAVA_001237668) at 668 ("Dear Lindsay, Attached please find Cassava NFL Result Report for PTI-125-04 prepared by ACU. Also attached for our records is a copy of the original raw data (.cydat files).").)

379. The raw plate reader data, collected by CUNY in 2021 directly from the plate-reader machine in Dr. Wang's lab, when compared with the data presented by Dr. Wang and Cassava, shows highly suspicious patterns—including round-number differences, changes to the most significant digit in the absence of changes to less-significant digits, and same-direction movement within triplicate groups. (PX 238 (Sanders Expert Report) at ¶¶ 115-117; PX 240 to 247 (comparisons from Appendix E of Sanders Expert Report); PX 22 (Sanders Dep. Tr.) at 280:02-18, 375:05-08.)

380. Dr. Burns testified that she never considered the "possibility" that Plaintiffs' statements might be true. (PX 12 (Burns Dep. Tr.) at 311:15-22 ("Q. Have you ever, at any point in time, had any reason to question whether any statements by our clients might be true? A. No. No. [] They're completely unreliable. They're short-sellers. . . ."), 312:05-10 ("Q. So you have never considered the possibility that anything our client said might be true? A. Nothing they said had any possibility of being true.").) Dr. Burns also testified that she never reconsidered whether anything they said might be true in light of subsequent events. (PX 12 (Burns Dep. Tr.) at 294:3-7 (New York Times article quoting nine experts critical of Cassava did not cause her to consider whether anything Plaintiffs had said might have "some validity"); 298:9-13 (same re FDA audit of Dr. Wang); 300:21-25 (same re Cassava audit of Dr. Wang); 303:23-304:3 (same re CUNY Investigation Committee Final Report).)

381. Within "minutes" of receiving the Citizen Petition, Barbier dismissed the allegations as "complete non-sense." (PX 136 (CASSAVA_000771233).)

382. Within days of receiving the Citizen Petition, the company consulted with the PR firm Sitrick and Co. about a defamation suit. (PX 233 (SITRICK_03393) (Aug 25, 2021 email from Mike Sitrick: "Here is the report about which they are considering a defamation suit").

383. The outside counsel investigations by Orrick and Gibson were not completed until after Cassava filed the Defamation Action. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 72:1-14; *id.* at 208:17-19.)

**DEFENDANTS' ANIMOSITY FOR PLAINTIFFS**

384. Dr. Burns described Plaintiffs as "pathetic immoral bastard fuckheads." (PX 25 (BURNS_00000650) at 692.)

385. Dr. Burns referred to Dr. Heilbut as "Hellbut" and "asshat." (PX 25 (BURNS_00000650) at 697, 703, 710, 743; PX 12 (Burns Dep. Tr.) at 17:22–18:02, 44:01–04.)

386. Dr. Burns referred to Dr. Brodkin as "Buttskin." (PX 25 (BURNS_00000650) at 0697, 0765; PX 12 (Burns Dep. Tr.) at 44:05–06.)

387. Dr. Burns referred to Dr. Elizabeth Bik as "bitch monkey," "DesBikable bitch," "wench" and "biktch". (PX 25 (BURNS_00000650) at 679, 696, 680, 735; PX 12 (Burns Dep. Tr.) at 17:12–20:11, 53:01–05, 65:11–17.)

388. Dr. Burns wrote in her diary in reference to Dr. Elizabeth Bik: "I just feel like kickboxing this woman in the face." (PX 25 (BURNS_00000650) at 780; PX 12 (Burns Dep. Tr.) at 75:06-76:10.)

389. Cassava's corporate representative, Eric Schoen, testified that Dr. Burns was "outraged" by Plaintiffs' criticism. (PX 24 (Schoen Dep. Tr.) at 62:06-63:25.)

390. Barry referred to Plaintiffs as "jihadists." (PX 202 (CASSAVA_001444768))

391. Barry testified that he was "furious" at Plaintiffs. (PX 8 (Barry Dep. Tr.) at 196:2-6.)

392. Barry testified: "It's a good thing [then-board member Sanford Robertson is] not alive today. He was more outraged than I am. He was furious. He was -- he was really upset." (PX 8 (Barry Dep. Tr.) at 196:2-6.)

393. Barry testified that the company selected the law firm Benesch to represent the company in the Defamation Action because they shared the company's "outrage" at Plaintiffs. (PX 8 (Barry Dep. Tr.) at 194:15-195:20.)

394. On December 1, 2021, Dr. Burns wrote: "It is really so infuriating that we sit here and keep taking punches." (PX 25(BURNS_00000650) at 0697.)

395. On April 18, 2022, in response to a New York Times article, Barbier wrote: "This is maddening. I get there are legal complexities around launching an offensive strategy, but a few of us have had it with being told to sit still while being punched us in the face. These cowardly attacks on innovation won't stop until they put us out of business or until we hit back, hit hard." (PX 224 (Francisco_0000322) at 0322).

**DEFENDANTS PUBLICIZED THE DEFAMATION ACTION**

396. On November 3, 2022, Cassava issued a press release to publicize the Defamation Action, which stated:

> "Defendants placed personal enrichment over science, over the health of patients, and over the truth . . . Defendants saw an opportunity to manipulate a stock price and financially benefit from their 'short positions' by defaming a company developing a drug for people with Alzheimer's disease . . . . Defendants' conduct is beyond shameful. It is unlawful. . . . Defendants did not have any real or valid concerns with Cassava, its foundational science, or its tests. Defendants engaged in their saturation campaign to profit based on a decline in Cassava's stock price. . . . We are still investigating whether

> additional individuals or entities should be brought into this case or have separate claims brought against them."

(PX 177 ((CASSAVA_001278817)) at 8819.)

397. On November 7, 2022, Dr. Burns sent an email to Lucia Huntington at Alzforum, copying Gabrielle Strobel, stating: "see our press release of last week stating that Cassava has filed a defamation lawsuit." (PX 129 (CASSAVA_000736199) at 6199.)

398. On November 7, 2022, Dr. Burns emailed Kenneth Santora and Laurie Ryan at NIH a copy of Cassava's press release stating that it had filed a defamation lawsuit. (PX 160 (CASSAVA_001008694) at -694.)

399. On November 9, 2022, Remi Barbier emailed Claudia Williams of Tortoise Media, referring Ms. Williams to the Defamation Action and requesting that Tortoise not republish "false" allegations about Cassava. (PX 150 (CASSAVA_000945615) at -615.)

400. On November 10, 2022, Dr. Burns sent an email to Trevor Robbins and Barbara Sahakian stating: "see our press release of last week stating that we have filed a defamation lawsuit." (PX 166 (CASSAVA_001014559) at -559.)

401. On November 16, 2022, Dr. Burns emailed Carine Giry and others at the *Journal of Prevention of Alzheimer's Disease* requesting disclosure language stating that Plaintiffs' statements had prompted Cassava to file a defamation lawsuit accusing them of disseminating false information about simufilam to profit from short selling. (PX 101 (CASSAVA_000391883) at -884.)

402. On November 20, 2022, Dr. Burns sent a message to Lauren Greenfield stating: "FYI, we filed a defamation lawsuit against the A-holes ('short and distort' perpetrators) in early Nov. Things should be turning around soon." (PX 71 (BURNS_00002120) at 120.)

403. On December 24, 2022, Dr. Burns sent an email to Deborah Copaken attaching the defamation complaint and stating that Copaken could scan it for anything helpful. (PX 181 (CASSAVA_001318054) at 054.)

404. Dr. Burns attempted to edit Wikipedia pages of the company and Dr. David Bredt to mention the Defamation Action. (PX 36 (BURNS_00000867) at 867; PX 183 (CASSAVA_001329982) at 982.)

**ADDITIONAL LEGAL THREATS**

405. On March 8, 2023, Cassava, through counsel, sent a letter to CUNY, which stated: "To the extent that CUNY finds that misconduct actually occurred in this instance, that decision would, under the relevant contracts, require CUNY to 'indemnify and hold [Cassava] harmless from any and all liability, loss, or damage it might suffer as a result of claims, demands, costs, or judgment[s]' in the securities class action suit and all other matters related to Dr. Wang's research." (PX 180 (CASSAVA_001309142) at 145.)

406. On May 5, 2022, Cassava's counsel sent a letter to The New York Times, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 154 (CASSAVA_000986192) at 202.)

407. On July 26, 2022, Cassava's counsel sent a letter to the Editor-in-Chief of *Science*, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 155 (CASSAVA_000986398) at 405.)

408. On July 26, 2022, Cassava's counsel emailed Reuters reporter Marisa Taylor, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 206 (CASSAVA_001495215) at 218.)

409. On August 12, 2022, Cassava's counsel emailed Mother Jones reporter Jackie Mogensen, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 186 (CASSAVA_001415124) at 127.)

410. In December 2022, Cassava's counsel sent several emails to Holly Else of *Nature*, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 128 (CASSAVA_000736161) at 167.)

411. On January 24, 2023, Cassava's counsel sent STAT News a letter, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 152 (CASSAVA_000963333) at 341.)

**COORDINATION WITH "SAVA ARMY"**

412. On January 4, 2022, Matthrew Nachtrab wrote to Dr. Burns and Eric Schoen: "you guys asked for us to let you know if we see blatant lies. Attached are very blatant likes [sic] by Jesse Brodkin. He is a known short." (PX 124 (CASSAVA_000733886) at 887.)

413. On January 4, 2022, Dr. Burns thanked Matthew Nachtrab for his work on a DOJ petition against Plaintiffs and other critics and said he was "doing a lot of great work for the cause." (PX 124 (CASSAVA_000733886) at -886.)

414. On January 20, 2022, Anthony Daher wrote to Dr. Burns, at her personal email address and her Cassava email address, and Eric Schoen: "Here are some more that might interest you and your layers [sic]"; and Dr. Burns forwarded the email to Orrick. (PX 123 (CASSAVA_000731713) at 713.)

415. On February 18, 2022, Anthony Daher emailed Dr. Burns a list of volunteers wanting to help with SAVA-related activities. (PX 159 (CASSAVA_001001300) at -300.)

416. On February 21, 2022, Dr. Burns wrote: "we have an army of supporters who have filed 1) counter petitions to the FDA to ask them to accelerate approval of our drug, 2) a

complaint to the medical licensure of NY about Dr. Pitt, 3) a petition to the DOJ, 4) at least 37 petitions to the SEC, and most recently, 5) an open letter to the New Yorker about a recent hit piece." (PX 122 (CASSAVA_000728606).)

417. In March 2022, Dr. Burns wrote in her journal: "The Discord Detectives came up with some interesting details ... We now know that Brodkin is working for Summit Point Capital, because they are the ones who FOIA'd the 1B, and Brodkin is the one posting and smearing it on Twitter." (PX 25 (BURNS_00000650) at 745-746.)

418. On April 15, 2022, Dr. Burns emailed COPE and *PLOS One* personnel, copying Gabriel Olander and Matthew Nachtrab, and attached materials supporting their complaints about *PLOS One*'s retractions of Dr. Wang's and Dr. Burns's research. (PX 132 (CASSAVA_000738731) at -731.)

419. A member of the SAVA Army Discord chat group, Mark Johnson, testified that one of the members "AD3" (Anthony Daher) was "claiming to post things" for Dr. Burns "fairly often." (PX 19 (Johnson Dep. Tr.) at 53:03-20.)

420. On September 9, 2022, Anthony Daher posted a link to Dr. Elizabeth Bik's Twitter profile in the SAVA Army Discord thread and wrote: "Please retweet share and comment fuck that bitch. She attacks one of us we will give her hell." (PX 225 (Johnson_0016922) at 926; PX 280.)

421. Between January 2022 and July 2023, Dr. Burns and Anthony Daher exchanged at least 40 text threads and multiple emails about Plaintiffs, the Defamation Action, online criticism, and other topics. (PX 69 (BURNS_00001338) (Daher emails Burns and Schoen information about Dr. Heilbut); PX 159 (CASSAVA_001001300) (SAVA Army volunteer list with names and addresses); PX 70 (BURNS_00001366) (sharing social media posts); PX 26

(BURNS_00000795-96) (sharing Dr. Heilbut tweet "For legal"); PX 27 (BURNS_00000797-800) (questioning timing of Defamation Action); PX 28 (BURNS_00000801) (commenting on response to Defamation Action); PX 29 (BURNS_00000802-03) (describing Dr. Heilbut as "A-holebutt" and discussing Plaintiffs' poster at CTAD conference); PX 30 (BURNS_00000812–16) (discussing sharing Defamation Action complaint); PX 31 (BURNS_00000828–31) (discussing social media criticism and SAVA Army activity); PX 33 (BURNS_00000843) (describing Dr. Heilbut as "A-Holebutt"); PX 34 (BURNS_00000847) (discussing biomarkers and PR strategy); PX 35 (BURNS_00000858-60) (Burns responds to Brodkin tweet: "He is so screwed in our lawsuit"); PX 37 (BURNS_00000868) (discussing stock price); PX 38 (BURNS_00000907) (sharing "deleted tweet from AH", with screenshot of Dr. Heilbut post); PX 39 (BURNS_00000922-23) (discussing critics); PX 40 (BURNS_00000932–33) (Dr. Burns shares information acknowledged as "Not public info"); PX 41 (BURNS_00000941-45) (discussing "not public info"); PX 42 (BURNS_00000947-48) (discussing Dr. Bik); PX 43 (BURNS_00000955) (discussing lawsuit and plaintiffs); PX 44 (BURNS_00000971) (forwarding tweet); PX 45 (BURNS_00000976) (forwarding tweets "For legal"); PX 46 (BURNS_00000986) (forwarding tweet); PX 47 (BURNS_00001000) (Daher and Burns tracking tweets); PX 48 (BURNS_00001006-07) (personal exchange); PX 49 (BURNS_00001009) (forwarding tweet); PX 50 (BURNS_00001013) (screenshots for potential use in litigation); PX 51 (BURNS_00001017) (describing Heilbut as "aholebutt" and sharing "for lawyers"); PX 52 (BURNS_00001027) (Daher shares Discord document); PX 53 (BURNS_00001040) (Daher forwards material "for LEGAL"); PX 54 (BURNS_00001041) (sharing news coverage); PX 55 (BURNS_00001043-44) (discussing data); PX 56 (BURNS_00001048) (sharing Dr. Brodkin tweet); PX 57 (BURNS_00001049) (Burns and Daher discuss identity of anonymous critic);

PX 58 (BURNS_00001052) (discussing efforts to identify Dr. Heilbut at CTAD event and discussing "defamation case"); PX 59 (BURNS_00001057) (Burns writes "Someone should have grabbed A-holebutt" referring to Dr. Heilbut); PX 60 (BURNS_00001062) (Daher forwards material "For legal"); PX 61 (BURNS_00001069) (discussing stock drop and market manipulation); PX 62 (BURNS_00001109) (Daher asks about biomarker samples); PX 63 (BURNS_00001110) (discussing Twitter activity); PX 64 (BURNS_00001133-35) (discussing SEC investigation); PX 65 (BURNS_00001151) (Daher shares article); PX 66 (BURNS_00001155).

**PHASE 3 ENROLLMENT**

422. There is no evidence of any trial site mentioning Plaintiffs or Plaintiffs' statements as a reason for declining to participate in, or withdrawing from, the simufilam clinical trials. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

423. There is no evidence of any patient mentioning Plaintiffs or Plaintiffs' statements as a reason for declining to participate in, or withdrawing from, the simufilam clinical trials. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

424. UCSF conveyed to Cassava that it was withdrawing from the Phase 3 trials because of a New York Times article and Cassava's "unacceptable" response to the article. (PX 203 (CASSAVA_001444921) ( "The Times article raised significant and comprehensive concerns about the integrity of the data supporting use of simufilam - the scope of which we were not aware. Further, we found your use of our site's participation in the trial in an attempt to counter Dr. Nicoll's legitimate concerns to be completely unacceptable. Due to the these concerns and others, our site will no longer be participating in your trial. We have halted all screening and enrollment activity, and we are moving to terminate our contract.")

425. After Lehigh Center withdrew from the Phase 3 trial, Dr. Burns forwarded the Lehigh email to outside counsel and wrote: "More sites concerned about PLOS that we have to address." (PX 151 (CASSAVA_000956262) at 262; *see also* PX 169.)

426. After the New York Times article was published on April 18, 2022, Dr. Burns led an effort to contact trial sites and summarized conversations with trial sites in an Excel spreadsheet that Dr. Burns labeled "FUD response to Sites." (PX 161 (CASSAVA_001008843) at 843, 845 (tracking chart).)

427. Cassava's 30(b)(6) corporate representative admitted the company had no evidence connecting whoever was purportedly calling clinical trial sites to Plaintiffs. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 23:11-14.)

428. On August 5, 2022, Dr. Charles Spruck texted Matthew Nachtrab:

> "Talked to Lindsay and Tony (involved in clinical trials for the company) for 2 hours over dinner. . . . She said a lot is riding on the CUNY. If they find misconduct, then DOJ will likely follow up. She also said that DOJ investigation scared away a couple of trial sites to that were set to start treating patients but these were Stanford and Duke, which want to protect their reputations. Other sites have been very supportive and recruitment is well ahead of schedule. . . . They were very happy with the pace of recruitment. . ."

(PX 226 (Nachtrab03000) at 3001)

429. On November 6, 2023, Cassava announced that its phase 3 clinical trials were fully enrolled. (PX 250 (Nov. 6, 2023 Cassava Press Release))

**PHASE 3 FAILURE & CLINICAL HOLD**

430. On November 25, 2024, Cassava announced the failure of its first Phase 3 clinical trial and the termination of its second Phase 3 trial. (PX 249 (2024.11.25 Press Release, Cassava Sciences Topline Phase 3 Data Did Not Meet Co-Primary Endpoints).)

431. On March 25, 2025, the company's CEO Rick Barry said: "We are disappointed that the results of REFOCUS-ALZ and RETHINK-ALZ showed no treatment benefit for patients with mild-to-moderate Alzheimer's disease. These results were unambiguous." (PX 248 (2025.03.25 Press Release, Cassava Sciences Reports Topline Phase 3 REFOCUS-ALZ Data).)

432. On December 18, 2025, Cassava announced that the FDA had placed the company's simufilam program on full clinical hold. (PX 254 (2025.12.18 Cassava 8-K, FDA Clinical Hold).)

**DECISION TO SUE**

433. Rick Barry testified: "Remi was always the decision maker, so we were advising." (PX 8 (Barry Dep. Tr.) at 195:12-16.)

434. Rick Barry testified that it was counsel's idea to file the Defamation Action. (PX 8 (Barry Tr.) at 93:19-22 (Q. "Whose idea was it to file the defamation lawsuit?" A. "It was counsel.")

435. Barbier testified that deceased former Board member Sanford Robertson "suggested that we look into" a defamation lawsuit. (PX 5 (Barbier Tr.) at 111:20-25.)

436. When asked whether he recommended to the Board that the company file the defamation action, Barbier testified: "It wasn't for me [to] recommend. It was for the attorneys who specialize in this area of law to say thumbs up or thumbs down." (PX 5 (Barbier) at 125:16-20; *id.* 127:16-20 (Q. "What facts did the company base its decision on?" A. "The fact that we

got -- we felt we got very good legal advice from people with -- from legal experts in this specific, narrow field of the law.”).)

437. When asked whether he believed Plaintiffs’ statements were false, Barbier testified: “What I believe is that the attorneys who filed the defamation action believed there was legal grounds for -- to claim defamation as defined in the law.” (PX 5 (Barbier Tr.) at 178:11-19.)

438. Burns testified that she “absolutely” had no involvement “in any way” in the Defamation Action. (PX 12 (Burns Dep. Tr.) at 152:08-12 (Q. “So your testimony is you had no involvement in any way in the defamation action?” A. “Absolutely. Correct. I had no involvement”).)

439. Eric Schoen testified that he was not part of the team that made the decision to file the Defamation Action. (PX 24 (Schoen Dep. Tr.) at 60:18-21 (Q. “When you say you were part of the team, do you mean you were part of the team that made the decision to commence the defamation action?” A. “No.”).)

440. Rick Barry could not recall whether there was ever a vote of the Board to authorize the Defamation Action. (PX 8 (Barry Dep. Tr.) at 71:11-71:22.)

**BARBIER AND BURNS**

441. Dr. Burns was the company’s primary contact with Dr. Wang. (PX 17 (Wang Dep. Tr.) at 51:03-06 (“I only communicated with [] Lindsay, Dr. Burns”); PX 91 (CASSAVA_000217631).)

442. On March 30, 2024, Dr. Burns described her role at Cassava as follows to the NIH: “I have been the project leader on our Alzheimer’s program since my academic collaborator, Dr. Hoau-Yan Wang, and I identified filamin A (FLNA) as a novel therapeutic target . . . I monitored the proof-of-concept research, lead selection and efficacy experiments for

simufilam and oversaw IND-enabling studies, chronic toxicity studies, and first-in-human and first-in-patient clinical trials." She further stated she was "motivated and capable of continuing as scientific lead of this program." (PX 204 (CASSAVA_ 001447291) at 305.)

443. Dr. Burns and Barbier regularly discussed company affairs, including company strategy for responding to critics and legal matters. (PX 25 (BURNS_00000650) at 652, 661, 684 ("Remi tells me . . ."), 720 ("I got home and Remi hands me his cell phone . . ."), 686 ("Remi tried to call me to tell me the DOJ wanted all emails with JNS editor").

444. Barbier communicated with Dr. Wang through Dr. Burns. (PX 121 (CASSAVA_000727933) at 949 (Dr. Burns text to Dr. Wang: "Remi says we will call you when you are ready. No emails please").)

445. Dr. Burns monitored statements by Plaintiffs and other critics. (PX 25 (BURNS_00000650) at 676-680; PX 167 (CASSAVA_001022488); PX 67 (BURNS_00001308); PX 68 (BURNS_00001309); PX 168 (CASSAVA_001025059).)

446. Dr. Burns felt personally attacked by Plaintiffs and other critics and believed her career was on the line. (PX 25 (BURNS_00000650) at 706 ("my entire academic research career was suddenly subjected to intense public scrutiny when Wall St investors and their collaborators started to relentlessly attack my reputation and scientific integrity, often with outlandish claims of data manipulation").)

447. Dr. Burns testified that "being painted to look like a fraudster" had caused Barbier to cry. (PX 12 (Burns Dep. Tr.) at 38:09-21.)

448. Dr. Burns described the public scrutiny as "traumatic" for both her and Barbier. (PX 12 (Burns Dep. Tr.) at 38:20-21.)

449. According to Dr. Burns, Dr. Burns and Barbier felt that the company's critics were "trying to kill us." (PX 12 (Burns Dep. Tr.) at 31:15-19.)

450. Dr. Burns publicly threatened Plaintiffs by name, writing on Facebook in December 2021: "Sorry shorties. Sorry Adrian Heilbut. Sorry Jesse Brodkin. . . . Your days are numbered." (PX 208 (PLAINTIFFS0055826); PX 25 (BURNS_00000650) at 715.)

451. Barbier and Dr. Burns were responsible for developing and implementing the company's strategy to blame criticism and negative media coverage on short sellers. (PX 93 (CASSAVA_000310872) at 873-874; PX 183 (CASSAVA_001329982) at 982; PX 118 (CASSAVA_000719419) at 421 (responding to scientific journal investigation by blaming "short-seller hedge funds"); PX 174 ("Per Dr. Burns' instructions yesterday, the attached letter has been supplied [] to share with the site [responding to CUNY Investigation Report].")

**DR. BURNS AND DEFAMATION ACTION**

452. On December 1, 2021, Dr. Burns wrote: "I just don't understand why we have to wait for the investigations to conclude before filing a defamation suit [redacted for privilege]." (PX 25 (BURNS_00000650) at -697)

453. Cassava's privilege log shows more than 190 emails involving Dr. Burns that Cassava described as related to the "Defamation Action" and withheld as privileged. (PX 228 (Priv Log Excerpt: Burns-Defamation).)

454. Cassava's privilege log also shows more than 25 emails from Benesch to Dr. Burns. (PX 227 (Priv Log Excerpt: Burns-Benesch).)

455. Barbier and Dr. Burns were the only Cassava employees on some emails with outside counsel. (PX 205 (CASSAVA_001494801); PX 149 (CASSAVA_000942580).)

456. On September 28, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded a 2019 rejection from Nature Medicine for a

manuscript on PTI-125 CSF biomarker results, including peer reviewer comments raising concerns about sample size, study design, and lack of placebo control. (PX 188 (CASSAVA_001415178) at 178.)

457. On September 28, 2022, Dr. Burns exchanged an email with Kate Watson Moss at Benesch without any other Cassava employees, forwarding the JPAD manuscript-acceptance email and related submission correspondence. (PX 102 (CASSAVA_000391909) at 909.)

458. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded COPE correspondence regarding the *PLOS One* retractions of Dr. Wang's and Dr. Burns's papers, including Dr. Burns's challenges to *PLOS One*'s retraction process and her demand to see the underlying evidence. (PX 189 (CASSAVA_001415243) at 243.)

459. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded further COPE correspondence regarding the *PLOS One* retractions, including Cassava investor and "SAVA Army" member Matthew Nachtrab's objections to the retractions. (PX 190 (CASSAVA_001415279) at 279.)

460. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, forwarding *PLOS One* correspondence regarding its retractions and noting that *PLOS One* had promised a response only after Dr. Burns had emailed its CEO. (PX 125 (CASSAVA_000735587) at 587.)

461. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, forwarding PLOS's response to COPE and raising confidentiality concerns about including non-authors in the correspondence. (PX 134 (CASSAVA_000741208) at 208.)

462. On September 29, 2022, Dr. Burns emailed Kate Watson Moss, copying Remi Barbier, forwarding COPE and *PLOS One* correspondence and identifying alleged connections between Elisabeth Bik and *PLOS* editors. (PX 131 (CASSAVA_000738379) at 379.)

463. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded an email chain regarding the retraction of a Dr. Wang paper by the *Journal of Alzheimer's Research and Therapy*, in which Dr. Burns demanded the journal identify its "independent expert," disclose conflicts of interest, and explain the basis for the retraction. (PX 192 (CASSAVA_001422638) at 638.)

464. On September 29, 2022, Dr. Burns exchanged an email with Benesch that forwarded an email from Matthew Nachtrab reporting he had filed a complaint against Dr. Geoffry Pitt with the New York State Department of Health Office of Professional Medical Conduct, alleging Pitt and other short sellers were attempting to prevent Alzheimer's patients from accessing a viable treatment for financial gain. (PX 194 (CASSAVA_001423033) at 033.)

465. On September 30, 2022, Dr. Burns sent an email to Kate Watson Moss, copying Remi Barbier, regarding an inquiry by the scientific journal J Pain; and the company's response to allegations, including a letter from Dr. Spruck. (PX 126 (CASSAVA_000735595) at 595.)

466. On October 26, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded an email chain regarding Nuvance Health's compliance department requiring documentation from authoritative sources before proceeding with the simufilam clinical trial, and included Dr. Burns's talking points defending Cassava's science. (PX 187 (CASSAVA_001415173) at 173.)

467. On October 26, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded an email chain in which Duke University withdrew from the simufilam Phase 3 clinical trial. (PX 195 (CASSAVA_001423121) at 121.)

468. On October 29, 2022, Dr. Burns emailed Kate Watson Moss at Benesch stating that *PLOS One*'s response to COPE was "basically the requested process flow is just a list of dates." (PX 135 (CASSAVA_000741222) at 222.)

469. On October 31, 2022, Dr. Burns asked Zhe Pei, Dr. Wang's post-doc student, to send several research papers for Benesch to use in the Defamation Action. (PX 127 (CASSAVA_000735672) at 672-673.)

470. On November 10, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Dr. Wang, Chris Cook, and Remi Barbier, that forwarded an email from Paul Aisen regarding a CTAD conference poster abstract authored by Plaintiffs, which reported a failure to replicate binding of simufilam to its purported molecular target. (PX 108 (CASSAVA_000542140) at 140; PX 108 (CASSAVA_000542140) at 141.)

471. On November 18, 2022, Dr. Burns sent an email to Dr. Aisen, blind copying Kate Watson Moss at Benesch, about Plaintiffs' CTAD conference poster; and Cassava's letter to the editor in response. (PX 164 (CASSAVA_001011091) at 091.)

472. On November 19, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch that forwarded her email exchange with Dr. Aisen regarding Plaintiffs' CTAD conference poster. (PX 193 (CASSAVA_001422868) at 868.)

473. On November 22, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, flagging Elisabeth Bik's criticism of journal editors and Dr. Brodkin's retweet of it. (PX 179 (CASSAVA_001303342) at 342.)

474. On November 23, 2022, Dr. Burns texted a friend that she "would love to serve" Dr. Heilbut "at his poster" presentation at the CTAD conference. (PX 32 (BURNS_00000841) at 841)

475. On December 2, 2022, a process server served the Defamation Action pleadings on Dr. Heilbut at his poster presentation at the CTAD conference. (PX 73 (Defamation Dkt. 68); PX 210 (PLAINTIFFS0180166).)

476. On January 9, 2023, Dr. Burns sent an email to Dr. Wang, copying Remi Barbier and Kate Watson Moss, that forwarded a rejection from the journal Aging and Disease for a manuscript on Simufilam, noting that 25 invited experts had declined to review it, and stating "I cannot take it." (PX 130 (CASSAVA_000736588) at 588.)

477. On January 26, 2023, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier and Chris Cook, that forwarded information regarding Dr. Heilbut's Twitter posts. (PX 148 (CASSAVA_000942361) at 361.)

**BARBIER AND BURNS DEPARTURES**

478. In July 2024, the Board forced Barbier and Dr. Burns to resign from the company as part of the company's settlement of an SEC investigation and complaint against Cassava, Barbier, and Burns. (PX 200 (CASSAVA_001444640) at 640; PX 185 (CASSAVA_001402478).)

479. On July 15, 2024, Barbier resigned from the company, effective as of September 13, 2024. (PX 256 (Cassava Sciences, Inc., Form 8-K (July 17, 2024)).)

480. On July 15, 2024, the Board appointed Richard Barry to serve as the company's principal executive officer. (PX 256 (Cassava Sciences, Inc., Form 8-K (July 17, 2024)).)

481. On July 16, 2024, Dr. Burns and Cassava "agreed that Dr. Burns will step down from her employment, effective immediately." (PX 256 (Cassava Sciences, Inc., Form 8-K (July 17, 2024)).)

482. On July 18, 2024, Rick Barry sent an email to the Board, stating:

> "I explained that no one wanted to remove the founder of a company in this way let alone the co-inventor of such a promising drug - but the circumstances that came to light over the last month and the information that our investigative committee learned really gave the board no choice but to take action. I shared that the government had developed a remarkably dark view of the company - primarily from various disclosures over the last several years and that dark view caused the SEC in particular to look at everything they uncovered about the company through a highly suspicious lens - and we didn't have the time or the evidence to disprove their allegations."

(PX 200 (CASSAVA_001444640) at 640.)

**<u>2020 BONUS PLAN</u>**

483. Cassava's Board approved the 2020 Cash Incentive Bonus Plan on August 26, 2020, in the midst of the company's "reanalysis" of the phase 2b study. (PX 115 (CASSAVA_000700979) at -979 (2020 Cash Incentive Bonus Plan, effective Aug. 26, 2020); PX 257 (Cassava Sciences, Inc., Form 10-K (FY2020)) at 73.)

484. Plan participants would be awarded bonuses upon the achievement of "Target Valuation Milestones," with aggregate payments for all participants ranging from $10 million at a market capitalization of $200 million to $50 million at $5 billion. (PX 115 (CASSAVA_000700979) at 991 (Schedule 1, Target Valuation Milestones and Aggregate Bonus Payments).)

485. Bonus Payments were not conditional on the success of the company's clinical trials or approval of simufilam; eligibility was tied solely to the company's stock price. (PX 115 (CASSAVA_000700979) at -982 (Section 4.1, Achievement of a Target Valuation Milestone

tied to Market Price or Merger Transaction, not clinical outcomes); PX 16 (Cassava (30(b)(6)) Dep. Tr.) at 136:5-137:4 (acknowledging "the actual language in the plan was not based on the drug getting approved").)

486. Barbier, as Chairman, President, and CEO, was entitled by formula to no less than 33.3% of each aggregate bonus—a non-discretionary entitlement—while approximately 59% of each aggregate award was subject to the discretionary judgment of the Compensation Committee for allocation among other participants. (PX 115 (CASSAVA_000700979) at 982 (Section 4.1); PX 257 (Cassava Sciences, Inc., Form 10-K (FY2020)) at 91.)

487. Dr. Burns was a participant in the bonus plan. (PX 115 (CASSAVA_000700979) at 992.)

488. On August 7, 2021, Dr. Burns texted Dr. Wang: "there is a bonus plan and you are on it – obviously." (PX 91 (CASSAVA_000217631) at 632.)

489. Actual payment of bonuses was deferred until (1) the company completed a merger or acquisition transaction ("Merger Transaction"), in which case all earned bonuses would be paid, or (2) the Compensation Committee determined the company had sufficient cash remaining—after pro forma payment of all bonuses—to meet the company's projected cash needs for the subsequent 24 months. (PX 115 (CASSAVA_000700979) at 982 to 984 (Sections 4.1, 4.6, 5.1); PX 257 (Cassava Sciences, Inc., Form 10-K (FY2020)) at 73.)

490. Cassava achieved 12 milestones in total. The first was achieved on October 13, 2020, when the company's market capitalization exceeded $200 million for 20 consecutive trading days. Eleven additional milestones were achieved during 2021. No milestones were achieved in 2022, 2023, or 2024. (PX 116 (CASSAVA_000702208) (First Milestone Memo,

Oct. 16, 2020); PX 258 (Cassava Sciences, Inc., Form 10-K (FY2021)) at 82; PX 259 (Cassava Sciences, Inc., Form 10-K (FY2023)) at 88.)

491. Barbier's non-discretionary entitlement from the first milestone was $3.33 million; and the 11 milestones achieved in 2021 triggered a further non-discretionary potential obligation to Barbier of $74.9 million. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 110.)

492. The Plan was subsequently amended three times. First, effective March 16, 2023, the Board amended the Plan to remove all independent directors as participants; the directors' share of potential benefits was completely forfeited to the company and not reallocated to any other participant. This amendment followed a shareholder derivative action filed on August 19, 2022 in the Delaware Court of Chancery, alleging that the individual defendants breached their fiduciary duties by approving the Plan. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88, 133.)

493. Second, on May 28, 2024, the parties to the derivative action entered into a Stipulation and Agreement of Settlement, which required the company to, among other things, create a compensation disclosure committee, retain a compensation consultant, and change the manner in which Barbier was eligible for payment under the Plan. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88, 133.)

494. Third, on March 6, 2025, the Board amended and restated the Plan to give effect to the amendments required by a derivative action settlement: upon a Merger Transaction, the Chairman/President/CEO would no longer be entitled to any payments based on market capitalization milestones, but would instead receive a bonus based solely on the merger consideration; and outside of a Merger Transaction, no bonus payments would be made to the

Chairman/President/CEO unless and until the FDA approved simufilam. (PX 263 (Cassava Sciences, Inc., Form 10-Q (Q2 2025)) at 17.)

**“CORROBORATING” RESEARCH**

495. Dr. Angelique Bordey testified that the 2020 Yale study “had nothing to do with Alzheimer’s disease,” that the experiments “did not seek to confirm the existence of altered FLNA,” and that the study “did not confirm or seek to confirm simufilam binding to FLNA.” (PX 9 (Bordey Dep. Tr.) at 62:18-64:24 (“We did not try to confirm simufilam’s mechanism of action in AD. Our paper was not about Alzheimer’s disease.”), 61:08-20.)

496. Dr. Burns was a co-author of the Yale study and edited the draft manuscript to add language about simufilam’s mechanism of action. (PX 9 (Bordey Dep. Tr.) at 140:11-144:24; PX 219 (BORDEY-0000000171).)

497. Dr. Bordey was an investor in Cassava at the time the 2020 Yale study was published. (PX 9 (Bordey Dep. Tr.) at 216:14-217:21; PX 77 (CASSAVA_000027886).)

498. The Nagoya University study, published in May 2022, did not use simufilam and did not purport to confirm or corroborate any findings by Dr. Wang or Dr. Burns. (PX 137 (CASSAVA_000785987).)

499. The Milan study, an unpublished abstract from May 2023, co-authored by Dr. Burns, and paid for by Cassava, did not purport to confirm or corroborate any of Dr. Wang’s or Dr. Burns’s findings. (PX 138 (CASSAVA_000786068).)

500. The Cochin study, published in September 2023, co-authored by Dr. Burns and Dr. Wang, relied on post-hoc exclusion criteria to omit approximately 40% of the data. (PX 157 (CASSAVA_000994072) at 086 (“values were excluded from the analysis (highlighted in red)”), 086-094 (showing approximately 40% of data as excluded)).

**MILIORIS**

501. Before the Defamation Action was filed, Dr. Milioris executed a written employment agreement with a Greek pharmaceutical company called ElmiPharm. (PX 211 (PLAINTIFFS0234937) at 937.)

502. The ElmiPharm employment agreement contemplated three years' employment. (PX 211 (PLAINTIFFS0234937) at 937.)

503. The ElmiPharm employment agreement provided for a base salary of 96,000 Euros. (PX 211 (PLAINTIFFS0234937) at 937.)

504. The ElmiPharm employment agreement provided for a target bonus of 40% of his base salary. (PX 211 (PLAINTIFFS0234937) at 937.)

505. Dr. Milioris disclosed the commencement of the defamation action to ElmiPharm. (PX 20 (Milioris Dep.) at 41:11-24.)

506. After Dr. Milioris disclosed the commencement of the defamation action to ElmiPharm, the company declined to move forward with his employment. (PX 20 (Milioris Dep.) at 38:14-19 ("Q. And you mentioned that offer was rescinded; is that right? A. Yes. Q. After the contract was executed? A. Yes."); *see also id.* 38:20-43:19.)

507. Proposed expert witness Michael Soudry calculated cumulative lost earnings associated with the lost ElmiPharm position as €351,124 (approximately $404,697) over three years. (PX 237 (M. Soudry Expert Report, Milioris).)

508. Dr. Milioris required psychiatric care as a result of the stress caused by the Defamation Action. (PX 212 (PLAINTIFFS0235978) (medical opinion); PX 213 (PLAINTIFFS0235981) (prescription).)

**HEILBUT**

509. Dr. Heilbut earned approximately fifteen to twenty thousand dollars through paid consulting calls with hedge funds Perceptive and Eminence between 2021 and 2022. (PX 18 (Heilbut Dep.) at 142:10-143:8; 145:5-146:18; *see also* PX 236 (M. Soudry Expert Report, Heilbut) at 2.)

510. These consulting calls were conducted through a service called Guidepoint. (PX 18 (Heilbut Dep.) at 138:18-139:10.)

511. Dr. Heilbut's hourly rate for these consulting calls was $350. (PX 18 (Heilbut Dep.) at 145:5-7.)

512. Dr. Heilbut conducted over a dozen calls with Perceptive during this period. (PX 18 (Heilbut Dep.) at 140:2-19.)

513. After the filing of the Defamation Action, a representative of Perceptive named Hossein Ekrami told Dr. Heilbut that Perceptive had concerns about continuing to consult with him, because of the pendency of the Defamation Action. (PX 18 (Heilbut Dep.) at 148:19-153:4.)

514. After the filing of the Defamation Action, Perceptive ceased consulting with Dr. Heilbut, apart from occasional unpaid calls outside of the GuidePoint platform. (PX 18 (Heilbut Dep.) at 153:5-158:3.)

515. Eminence did not consult with Dr. Heilbut on a paid basis after the commencement of the Defamation Action. (PX 18 (Heilbut Dep.) at 140:20-142:6.)

516. In February 2021, prior to the filing of the Defamation Action, Dr. Heilbut launched an equity research consulting firm called Logphase. (PX 18 (Heilbut Dep.) at 191:13-19.)

517. Dr. Heilbut testified that the Defamation Action stalled his efforts to make Logphase a success and to grow its business. (PX 18 (Heilbut Dep.) at 191:13-192:04; *see also* 159:21-182:18.)

518. Dr. Heilbut also experienced significant emotional distress and mental health issues arising from the Defamation Action. (PX 18 (Heilbut Dep.) at 209:14-210:17 (Defamation Action caused "a lot of anxiety and distraction…because…it represented an existential threat to, you know, like my financial state my career and everything"); 215:8-19 (sought care of psychiatrist); 219:8-12 ("my own personal like perception is that I've been miserable and depressed because of the stress and financial costs from the defamation action").)

**BRODKIN**

519. The Defamation Action caused extreme conflict between Dr. Brodkin and his wife Dr. Lisa Brodkin, including accusations by Dr. Lisa Brodkin that he was an unfit father. (PX 10 (J. Brodkin Dep.) at 271:22–272:4 ("So she was quite furious with me for getting into this situation and thought that I had placed our family's financial future in serious jeopardy and that I was, I guess, an unfit father in that respect. And we had a lot of fights about that.").)

520. The Defamation Action led Dr. Lisa Brodkin to separate her personal finances from Dr. Brodkin and to seek legal counsel to advise concerning a potential bankruptcy or divorce. (PX 10 (J. Brodkin Dep.) at 272:5–8 ("And she changed her financial situation so that I didn't have access to her money that she got through her income."); 272:9–12 ("And she sought legal Counsel from a bankruptcy lawyer and family lawyer and lots of fights and yelling and slamming of doors, that kind of stuff.").)

521. The Defamation Action led to significant disruption of the marital relationship between Dr. Brodkin and Dr. Lisa Brodkin. (PX 10 (J. Brodkin Dep.) at 272:18–23 ("Her position was that I don't understand how the legal system works and that even if you're

completely innocent, it can cost you hundreds of thousands of dollars. And even if you're right, you may not win and everybody loses."); 272:24–273:4 ("And she was particularly freaked out about the kind of $2 billion number that was floated on the defamation suit. And she saw that as kind of an existential threat. So she was really mad at me."); 273:13–16 ("Yes, the disruption of the relationship. We had a lot of fights and didn't get along for a very long time, which was emotionally draining.").)

522. The Defamation Action was frightening for Dr. Brodkin and led to an ongoing fear of bankruptcy. (PX 10 (J. Brodkin Dep.) at 274:8–13 ("My opponent, the person who was trying to inflict damage on me had, basically, an unlimited budget, had an army of trolls willing to help them out and that was sort of scarey for quite a long time."); 262:7–9 ("No, but there was a lot of costs. And there was an overhanging threat of bankruptcy.").)

523. The Defamation Action led Dr. Lisa Brodkin to become furious with Dr. Brodkin and to fear that the family would lose its financial security. (PX 10 (L. Brodkin Dep.) at 90:4–12 ("So when he did get sued, I was furious on him. I felt that he put our family in harm's way and angry. I was fearful and I thought we were going to lose everything. I ultimately — my anger was with Cassava for doing this, suing us for two billion dollars. They were really the source of my anger, but I took it all out on Jesse rightfully or wrongfully."); 88:22–89:12 ("We were sued for two billion dollars. Like I don't have — Jesse and I do not have two billion. We have a very modest income family. We are being sued by a billion-dollar company. That is terrifying and someone suing you for two billion dollars, to me, that person wants you to wipe you off the map and they want to take everything from you. That is how it felt for me. Cassava wanted to take everything from us and our family. And I was terrified. ... I was terrified and we argued about it."); 88:9–11 ("I feel like we were continuing to argue, fight, talk about divorce, talk about —

we had — it was an ongoing issue."); 88:12–19 ("I think maybe what he is referring to is 'Don't talk about it,' is we probably — we could not talk about the case without it erupting into a horrible fight. So we maybe tried — we tried to maybe to keep the peace, we tried not to talk about it but so, but it was not like — we were still having terrible disagreements.").)

524. The Defamation Action caused Dr. Lisa Brodkin to fear that the family would lose the money they had saved in trust for their son with special needs. (PX 11 (L. Brodkin Dep.) at 92:7–12 ("Then this lawsuit came and I thought they were going to take away that money and I was distraught and I am still suffering that pain that I felt of having my son's money being taken away. It was literally terrifying to me.").)

525. Dr. Lisa Brodkin's decision to terminate Dr. Brodkin's access to her income led to tension between them. (PX 11 (L. Brodkin Dep.) at 92:19–93:1 ("I opened up another account solely in my name for my earnings to go into that account. That created horrible tension amongst Jesse and I. Jesse and I, the way that we handle our finances now has been altered. The pain for this has been a hardship.").)

526. The Defamation Action caused Dr. Lisa Brodkin to put plans for her own retirement on hold indefinitely. (PX 11 (L. Brodkin Dep.) at 93:2–8 ("I was nearing — I was hoping to retire in the near future. I was starting to plan for that. I have been working really hard for that for many years. When this lawsuit happened, I had to stop planning for retirement. I don't know when I could stop working now.").)

527. The Defamation Action led Dr. Lisa Brodkin to be uncertain whether her marriage will survive. (PX 11 (L. Brodkin Dep.) at 93:12–15 ("I hope our marriage will survive. I love Jesse but I know we can resolve my resentment, but time will tell, but it is scary."); 86:16–87:3 ("I mean we fought endlessly passed, beyond the first two months. Perhaps there was some

reprieve knowing that some of our legal bills might be covered, but it's not like we were not doing well by any means. . . . Um, our finances. . . . Um, that we were going to be declaring bankruptcy.").)

**LITIGATION POSITIONS**

528. Cassava has maintained throughout this lawsuit that the Defamation Action had a substantial basis in fact and law. (PX 251 (Dkt. 91, Cassava Answer) at ¶ 15 ("Cassava denies all liability for the claims alleged in the First Amended Complaint and denies that the Plaintiffs are entitled to any relief whatsoever"); *id,* Tenth Aff. Def. ("Plaintiffs' claims are barred because the statements alleged by Cassava as the basis for the Defamation Action were false, defamatory statements, including statements constituting defamation per se, and thus do not constitute protected speech.")

529. Barbier has maintained throughout this lawsuit that the Defamation Action had a substantial basis in fact and law. (PX 253 (Dkt. 118, Barbier Answer), Fifth Aff. Def. ("Plaintiffs' claims are barred because the statements alleged as the basis for the Defamation Action were false, defamatory statements, including statements constituting defamation per se, and thus do not constitute protected speech.")

530. Dr. Burns has maintained throughout this lawsuit that the Defamation Action had a substantial basis in fact and law. (PX 252 (Dkt. 107 (Burns Answer)), Fifth Aff. Def. ("Plaintiffs' claims are barred because the statements alleged as the basis for the Defamation Action were false, defamatory statements, including statements constituting defamation per se, and thus do not constitute protected speech.").

Dated: September 14, 2026
New York, New York

CLARICK GUERON REISBAUM LLP

By: */s/ Isaac B. Zaur*
Isaac B. Zaur
David Kumagai
41 Madison Avenue, 23rd Floor
New York, NY 10010
212-633-4310
izaur@cgr-law.com
dkumagai@cgr-law.com

*Attorneys for Plaintiffs Dr. Adrian Heilbut, Dr. Jesse Brodkin, and Dr. Enea Milioris*