# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 1:24-cv-05948-JLR-OTW

---------------------------------------x

ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,

Plaintiffs,

- against -

DAVID BREDT and GEOFFREY PITT,

Intervenors-Plaintiffs,

- against -

CASSAVA SCIENCES, INC., REMI BARBIER, and LINDSAY BURNS,

Defendants.

---------------------------------------x

September 26, 2025
9:04 a.m.

VIDEOTAPED DEPOSITION of DR. ANGELIQUE BORDEY, held at the offices of Gibson Dunn & Crutcher LLP, located at 200 Park Avenue, New York, New York 10166, before Anthony Giarro, a Registered Professional Reporter, a Certified Realtime Reporter and a Notary Public of the State of New York.

A P P E A R A N C E S :

CLARICK GUERON REISBAUM, LLP
Attorneys for Plaintiffs
41 Madison Avenue, 23rd Floor
New York City, New York 10010
(212) 533-4310
BY: DAVE KUMAGAI, ESQ.
dkumagai@cgr-law.com
ISAAC ZAUR, ESQ.
izaur@cgr-law.com

GIBSON DUNN & CRUTCHER, LLP
Attorneys for Defendant Cassava Sciences, Inc.
1900 Lawrence Street, Suite 3000
Denver, Colorado 80202
(303) 298-5700

BY: SCOTT CAMPBELL, ESQ.
scampbell@gibsondunn.com

BAKERHOSTETLER
Attorneys for Defendants Remi Barbier and Lindsay Burns
45 Rockefeller Plaza
New York City, New York 10111
(212) 589-4200
BY: ZACHARY R. TAYLOR, ESQ.
ztaylor@bakerlaw.com

ALSO PRESENT:
RON MARRAZZO, Videographer
CHRIS COOK
ADRIAN HEILBUT
JESSE BRODKIN
(via Zoom)
ENEA MILIORIS
(via Zoom)

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

* * *

THE VIDEOGRAPHER: Good morning. We are now going on the record. The time is approximately 9:04 a.m. It is the 26th of September 2025. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your mobile phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is the video-recorded deposition of Angelique Bordey in the matter of Heilbut, et al., versus Cassava Sciences, Incorporated, et al.

This case is filed in the United States District Court for the Southern District of New York, Case No. 1:24-cv-05948-JLR-OT.

The location of this deposition is Gibson Dunn & Crutcher LLP, located at 200 Park Avenue, New

DR. ANGELIQUE BORDEY

York, New York.

My name is Ron Marrazzo, representing Veritext Legal Solutions, and I'm the videographer. And our court reporter is Anthony Giarro from the firm Veritext Legal Solutions.

I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

All counsel attending will be noted in the written transcript.

We could now swear in the witness and proceed.

D R. A N G E L I Q U E B O R D E Y, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. KUMAGAI:

Q Good morning, Dr. Bordey.

DR. ANGELIQUE BORDEY

MR. KUMAGAI: I just want to state for the record before we begin, I think there was a slight error in the case caption. David Bredt and Geoffrey Pitt are the Intervenor-Plaintiffs. The defendants are Simufilam, Lindsay Burns and Remi Barbier.

Q Dr. Bordey, have you ever been deposed before?

A No.

Q This is your first time?

A Yes.

Q I'll just go over some quick ground rules, so that you understand sort of the rules of the road for today. I'll ask that you please respond to all questions verbally. Is that okay?

A Yes.

Q Try not to talk over me, if you can, and I'll try not to talk over you. So just kind of try to wait a beat before my question is finished and then begin your answer. Is that okay?

A Yes.

Q We'll try to take breaks every hour or so. But if you need a break, just let me know, and we could take a break. I just ask that if there's a question pending, you answer the question, and then we go on break. Is that okay?

A Yes.

Q What did you do, if anything, to prepare for today's deposition?

A We had a meeting yesterday to discuss the deposition.

Q And who attended that meeting?

A Scott and Chris.

Q Anyone else?

A No.

Q And aside from Scott and Chris, have you discussed today's deposition with anyone else?

A No.

Q And just for the record,

DR. ANGELIQUE BORDEY

you're referring to Scott Campbell and Chris Cook; right?

A Yes.

Q Just a yes or no, did you review any documents during that prep?

A Yes.

Q And did any of those documents refresh your recollection or jog your memory as to something you had otherwise forgotten?

A No.

MR. KUMAGAI: I'll mark as Plaintiffs' Exhibit 103, a document that I could represent I downloaded from Linkedin.

(The above-referred-to document was marked as Exhibit 103 for identification, as of this date.)

MR. KUMAGAI: I'll mark another document as Plaintiffs' Exhibit 104.

(The above-referred-to document was marked as Exhibit 104 for identification, as of this date.)

DR. ANGELIQUE BORDEY

Q Dr. Bordey, do you recognize Exhibit 103?

A From where do I recognize it?

Q Do you recognize the substance of the information on Exhibit 103?

A Well, let me read it --

Q Yes.

A -- to make sure.

So it's on my Linkedin profile; is that it?

Q I can represent to you that that's where I downloaded it from. But I just want to basically ask you whether this looks familiar from your Linkedin and whether this is an accurate summary of your professional experience and education.

A Okay. Just making sure. Yes. This is correct.

Q You could set that aside.

Exhibit 104, do you recognize that?

DR. ANGELIQUE BORDEY

A Yes.
Q And what is it?
A This is my CV.
Q You could set that aside.
Can you describe how you came to join Cassava Sciences?
A So back at the beginning of the year, I was contacted by Chris Cook and the CEO, Rick Barry, asking me whether I had any interest in being consultant or an employee of Cassava.
Q And that was around the beginning of 2025?
A Yes. Sometime around the beginning of 2025.
Q And then what happened?
A So I was interviewed by different members of the Cassava team. I enjoyed talking with Rick Barry. And I think it was an opportunity for me to help them move forward in TSC. So I joined.
Q And TSC, just for the record, can you say what that is?

DR. ANGELIQUE BORDEY

A TSC is Tuberculosis Complex. It's orphan disease, genetic disease.

Q And have you met either Mr. Cook or Mr. Barry before they reached out in early 2025?

A You mean met in person?

Q Or had any communications or contact with before then.

A I had communication the year before, I think one phone call.

Q With both Mr. Cook and Mr. Barry?

A Yes.

Q At some point in 2024?

A Yes.

Q And what was the substance or subject matter of that conversation?

A At the time, I was -- I had -- I have several patents at Yale. And I was interested in licensing -- I was looking for people who might be interested in licensing a couple of our patents. And that was the goal of the call.

DR. ANGELIQUE BORDEY

Q Were those patents related to simufilam?

A The one we discussed was related to a different drug.

Q What drug was that?

A It's a new MEK blocker.

Q Can you say that again?

A MEK blocker.

Q What potential uses or indications was that drug for?

A Similar to treat epilepsy and TSC.

Q So you formally joined Cassava as the senior vice president of neuroscience around May of 2025; is that right?

A Yes.

Q And can you describe your role at the company?

A So my role is to help advise on how to move forward with TSC since I've been working on TSC for roughly 15 years. And I know very well, the patient population. So move forward on TSC and

DR. ANGELIQUE BORDEY

trying to -- also trying to work on simufilam.

Q And what studies or projects have you been specifically working on since you joined the company?

A So one of them is to, for example, attend the tuberculosis international meeting, introduce Cassava to some of the investigators. I mean they already knew the TSC Alliance. But we went in person. We had a poster on behalf of Cassava Sciences. And my other role is to really try to understand the function of simufilam and TSC.

Q Who do you report to?

A To Rick Barry, the CEO.

Q And who reports to you?

A Ben Thornton.

Q Anyone else?

A No.

Q What's Ben Thornton's role currently?

A So he has a similar title as VP of technology, I think. And, you

DR. ANGELIQUE BORDEY

know, he has been at Cassava for quite sometime. So he's my go-to guy. If we want to have a CRO, he will be in charge of it. And we discuss science regular basis.

Q And CRO, can you just explain what that means?

A So Corporate Research Organization, I think.

Q I think so too.

And you're still working as a professor at Yale; is that correct?

A Correct.

Q So are you part-time at both or how would you describe sort of the division of your time between those two roles at Cassava and Yale?

A So it's a job and a half because I'm 50 percent at Yale. And basically, I worked twice as much as usual.

Q So you would describe your role at Cassava as a full-time role while also still working at Yale?

DR. ANGELIQUE BORDEY

A I don't have perfect numbers of full-time or, you know. Yale, usually, our dean says don't count numbers, don't count hours because you're expected to work 8 to 8, weekends included.

So it's hard to define how much time I spend on one or the other. I think whatever the work needs to be done, I'll do the work and whatever time it takes.

Q And have you visited Cassava's offices in Texas or are you working remotely?

A I'm remote. I have visited a few times.

Q You're familiar with Dr. Lindsay Burns; right?

A Yes.

Q Can you describe your relationship with Dr. Burns?

A Yale had an MTA, Material Transfer Agreement, with Cassava Sciences. I'm not sure when they change

DR. ANGELIQUE BORDEY

name. More than ten years ago. And that was most of my interaction with Lindsay, was to obtain some of the drug called PTI-125 at the time.

Q And for the purposes of today, I was going to get to this later, can we just refer to PTI-125 and simufilam as one in the same; is that okay?

A Yes.

Q Have you ever met Dr. Burns in person?

A Yes.

Q And what was your impression of her?

A I may have met her more than ten years ago. She came to New Haven. She was very pleasant.

Q What did you think of her as a scientist?

A I think she -- I mean she seems to be clever, intelligent and well-trained. But, you know, that's it. I met her only once.

Q What do you mean by clever?
A I mean clever by intelligent; right? And she was well-trained as a scientist. She had very good questions, insightful questions. That's about it.
Q And have you ever met Mr. Barbier, Remi Barbier?
A No.
Q Have you had any communications with Mr. Barbier?
A I think I was on a phone call with him once. It was not just him. It was one of our Yale director of OCR, Office of Corporate Research, David Lewin, Lindsay and Remi. And they were discussing the patent application.
Q And approximately when was that phone call?
A I don't remember. I think it got to be 2020, roughly.
Q What was your impression of Mr. Barbier?
A I don't think he said much

DR. ANGELIQUE BORDEY

on the call. So I don't know. I just don't know.

Q Have you ever met Dr. Wang?

A No.

Q You're familiar with who Dr. Wang is?

A Yes.

Q What is your understanding of Dr. Wang's role with respect to Cassava and simufilam?

A Well, I think my understanding is that he did some of the pioneering work or regional work on simufilam and contributing to the discovery that some of these analogs were important as a binding partner, binding Filamin.

Q Are you familiar with the criminal charges against Dr. Wang?

A I heard about it. I'm not really familiar about it.

Q And without disclosing anything you know about those charges from counsel, what do you know about

DR. ANGELIQUE BORDEY

those charges, if you could say?

A I just -- so I don't know about legalities. I just know it's -- he has a lawsuit against him and his charge of data manipulation.

Q And you understand that the charges of data manipulation or fabrication concerns some of the research Dr. Wang did related to simufilam?

MR. CAMPBELL: Object to form.

A So I still answer?

Q Yes. You could still answer.

A It is my understanding, yes.

Q Can you describe your compensation from Cassava?

A So my salary, so how much I make?

Q Yes.

A So I have a covered salary of $340,000 a year and stock options.

Q And can you describe those stock options?

DR. ANGELIQUE BORDEY

A I think it is 25,000 stock options per year over the course -- four times $25,000 over four years.

Q And are you familiar with Cassava's cash incentive bonus plan? Are you a participant in that plan?

MR. CAMPBELL: Object to form.

A So again, I'm not really good for legality, things like that. So I did not really read my contract carefully. And I'm not -- because I never had a bonus at Yale. So I know I think it's written. I have a bonus. But I don't remember the details.

Q Do you have any understanding as to whether you would be financially rewarded if simufilam reaches any sort of milestone in terms of approval?

A I don't remember in my contract. I don't think I had that. But I don't remember.

Q You're not sure, sitting

here today, whether or not you will receive a bonus or additional compensation as a result of simufilam reaching a milestone?

A I don't think so. I don't think there was a clause about a bonus regarding that. But I would have to go back to the employment agreement.

Q And prior to becoming an employee of Cassava in May 2025, did you receive any compensation of any kind from the company?

A No.

Q And I take it you're still receiving compensation from Yale; is that right?

A 50 percent, yes.

Q Aside from your compensation from Yale and Cassava, are you receiving compensation from any other sources?

A No.

Q Have you ever been a shareholder in Cassava or Pain stock?

A In the past, yes.

DR. ANGELIQUE BORDEY

Q Just for the purposes of today, I think we can agree Pain became Cassava. So I'll just use Cassava to refer to the company, even when it was technically named Pain; is that okay?

A Yes.

Q So when did you first become a Cassava shareholder?

A In the 2010s. I don't remember the exact date.

Q Approximately how much did you invest in Cassava when you first became an investor?

A Maybe 1,000 shares. I don't know the price of the shares at the time. So not sure.

Q Do you have an estimate or approximation of how much money you had invested when you first invested?

A The shares may have been at like a dollar-something. So maybe $2,000.

Q And why did you invest in Cassava?

DR. ANGELIQUE BORDEY

A Well, I think at the time, so it's a long time ago, Remoxy, I think, was interesting as a drug potential. And that was the primary reason.

Q And since the first investment that you made in the 2010s, have you bought or sold additional Cassava securities since then?

A I mean I bought them. And I sold them and bought them again and sold them again. So I don't remember the timing.

Q Do you recall anything at all about the specific trades that you made after the first purchase?

A No; not specifically, no.

Q Do you recall what caused you to sell Cassava's shares?

A I think like many traders, if the stock goes up, I would sell it and then wait for it to go down and then eventually buy it.

Q Approximately how many trades have you made in Cassava stock?

DR. ANGELIQUE BORDEY

A I have no idea.
Q Can you put any sort of ballpark number on it?
A No. I don't know. I really don't know.
Q More than ten?
A I doubt. But I really don't know.
Q More than five?
A I don't know.
Q Do you know if you've made a profit or incurred a loss as a result of being a Cassava shareholder?
A I made a profit over time, yes.
Q Approximately how much?
A You know, I don't know. I mean we're talking more than ten years ago. So ten years ago, I don't remember.
Q You can't put any ballpark estimate around the profit?
A No, because sometimes it might be $1,000; sometimes it might be $2,000. I don't remember.

DR. ANGELIQUE BORDEY

Q So when was the last time you held Cassava stock?

A I know I held in 2016. And I remember I was in the red in 2016. And as a rule of thumb, I don't sell in the red. And I do not remember the last time I sold it.

Q So are you currently today, a holder of Cassava shares?

A I just --

MR. CAMPBELL: Object to form.

A -- have the stock options from Cassava.

Q I just want to make sure I'm clear.

So between 2016 and 2025, were you a Cassava shareholder?

MR. CAMPBELL: Object to form.

A Not 2025, not 2024. I think I sold years ago. And I don't have share for a long time. I just don't remember exactly the year I sold.

DR. ANGELIQUE BORDEY

Q Are you a shareholder of other pharmaceutical companies?

A Yes.

Q What companies?

A Anavex. I don't remember the name of the company. CGTX. I don't remember the name. I just know the -- I don't look on a daily basis. So I think I have Sarepta. I think that's it for pharmaceutical. I don't want to forgot more.

Q And those are the three companies you're currently a shareholder in?

A Yes.

Q Approximately how much in Anavex, CGTX and Sarepta?

A 1,000 Sarepta, 1,000 roughly of Anavex. That's been a long time. CGTX, maybe 2,000 shares.

Q Do you know what short selling is?

A Yes.

Q Have you ever taken a short

position in a company's stock?
A No.
Q Do you know any of the plaintiffs in this case: Dr. Jesse Brodkin, Dr. Adrian Heilbut, Dr. Enea Milioris, Dr. Geoffrey Pitt or Dr. David Bredt?
A I have met David Bredt a long time ago.
Q What was the context of that meeting?
A I was a postdoc. And he may have been an assistant professor at the time or associate professor. And he came and gave a talk where I was a postdoc.
Q And what was your impression of Dr. Bredt?
A He was a charming person.
Q So aside from Dr. Bredt, have you ever met or had any communications with any of the other plaintiffs?
A Not very good with names. But I don't think so.

DR. ANGELIQUE BORDEY

Q Are you familiar with the statements by our clients and the other plaintiffs in this case that Cassava claimed to be defamatory?

MR. CAMPBELL: Object to form.

A Cassava claimed -- can you explain to me what that mean?

Q I'll take a step back.

You understand that there was an underlying previous lawsuit where Cassava sued our clients, Dr. Pitt, Dr. Bredt and an entity named QCM or Quintessential Capital Management? Do you know that?

MR. CAMPBELL: Object to form. And you could only answer the question if you have an understanding of those, outside of your communications with counsel.

A I did not know before communication with counsel. I had heard about David Bredt because I know him. But that's him.

DR. ANGELIQUE BORDEY

Q Everything you know about the underlying defamation action is knowledge you know from counsel; is that right?

A Yes.

Q If any of the plaintiffs, our clients or David Bredt or Geoffrey Pitt had asked to meet with you about their concerns, that the simufilam science was fabricated or appeared to be manipulated, would you have agreed to meet with them?

MR. CAMPBELL: Object to form.

A No.

Q Are you familiar with a group that calls themselves the SAVA Army or The Savages?

A No. I mean not until our meeting with counsel.

Q Are you familiar with a man named Matthew Nachtrab?

A No.

Q Are you familiar with an

DR. ANGELIQUE BORDEY

individual named Dr. Charles Spruck?

A I think I heard the name. But again, I'm not good with names. But I'm not familiar with that person.

Q Do you have any recollection as to where the context in which you heard the name, Dr. Charles Spruck?

A Not really.

Q When did you first come across simufilam?

A I think it was 2013 when I read the Journal of Neuroscience paper by Dr. Wang.

Q And what is simufilam?

A So this is a small molecule that was described in the publication as a Filamin modulator.

Q And is it a Filamin modulator?

A This is a very good question. This is what we're trying to answer.

Q As of today, the question has not been answered in your view; is

DR. ANGELIQUE BORDEY

that right?

MR. CAMPBELL: Object to form.

A This is -- I would not phrase it that way. I don't think it's the right question. As a scientist, I like to validate someone's finding before making a claim.

Q And to date, you have not yet verified the claim that simufilam is a Filamin modulator; is that right?

MR. CAMPBELL: Object to form.

A So we're working on it.

Q So the answer's yes?

MR. CAMPBELL: Object to form.

A Yes. I've not validated; is that your question? It's a difficult question to answer as a scientist. I think you have hints that it might affect Filamin function. But we're still having to validate that. It is still a Filamin A modulator.

DR. ANGELIQUE BORDEY

Q What does it mean to be a Filamin A modulator?

A It can mean a lot of things. And it can be a very long answer. So you modulate Filamin A by direct binding. That's one way. It could be an indirect binding. You could have a complex where one Molecule A and then Filamin A and then the drug and a still Filamin A modulator. Or you could have a very complex interaction in the cells that somehow lead to a change in the function of Filamin A.

Q And you are currently trying to validate whether Filamin A is modulated by simufilam in any of those ways that you just described?

MR. CAMPBELL: Object to form.

A Correct.

Q And that is because to date, you have not yet validated the claim that simufilam modulates Filamin A; right?

MR. CAMPBELL: Object to

form.

A I think I would not phrase it that way. Like I said, there is hints that somehow, simufilam may function possibly through Filamin A.

Q What are those hints?

A That -- one hint is that if you directly modulate the levels of Filamin A through a genetic manipulation, what is called Short Hairpin RNA, or you give simufilam, you have the same impact on the cells. So it's like an epidemiology study, right.

You have two things that do the same, same thing, ultimately suggest that it might work through Filamin A. But you need additional evidence, fully validated.

Q In order to make the claim that simufilam modulates Filamin A?

MR. CAMPBELL: Object to form.

A To -- yes, correct.

Q You have done some research

using simufilam; right?
A Yes.
Q And are you familiar with the research done by other laboratories and scientists using simufilam?
A To some extent.
Q What do you mean by that?
A So, you know, I don't like to be influenced by someone else work. So I always take someone else work with a grain of salt. And if you want to be fully creative and not being influenced by others, you don't spend too much time on someone work, you know, the details of their work. So we have been trying to do our own work on the side. So I did not delve into reading, extensively, others' papers.
Q But have you read the other published papers on simufilam?
MR. CAMPBELL: Object to form.
A So I glance, as you know, at the Journal of Neuroscience 2013. And at

DR. ANGELIQUE BORDEY

the time, I had zero interest in the experiment being done, I mean zero interest. I was not working on ADs. It's not my thing.

So what was interesting to me, the claim if that it was a Filamin A modulator. So I did not read extensively, that paper in detail. I glance at the original papers prior to the Journal of Neuroscience. And that's kind of about it.

Q So there was the Journal of Neuroscience paper by Dr. Wang, and I believe Dr. Burns is a coauthor, published in 2012; right?

A I don't remember the dates. But there was prior papers, yeah.

Q And you also reviewed, in addition to that Journal of Neuroscience paper, previous papers about simufilam; is that right?

A Yeah. I would not use the word, reviewed. Reviewed implied I was a reviewer. And I was not. I looked at

DR. ANGELIQUE BORDEY

them, yes.

Q So have you read a 2017 paper published in Neurobiology of Aging?

A I actually did not read it. Maybe I should have read it. I did not read it. I glanced at the figures.

Q And approximately when did you do that?

A I mean possibly when it came out. I really don't remember exactly when.

Q Have you read a paper published in 2017 by Dr. Burns and Dr. Wang in neuroimmunology and neuroinflammation?

A Same thing. I don't think I read in-depth. I'm not even sure I looked at the figures for that one.

Q You're aware that a paper with that description exists?

A I'm aware, yes.

Q Have you read a paper published in 2023 by Dr. Ralf Jockers and Dr. Burns in the International Journal of

DR. ANGELIQUE BORDEY

Molecular Sciences?

A What was that one about?

Q I believe they used simufilam as well in that paper.

A I don't think I read that one.

Q What is simufilam's reported mechanism of action in Alzheimer's disease patients?

MR. CAMPBELL: Object to form.

A It's complex for me. And as I said, I've never been fully interested in how it works in Alzheimer's disease. My understanding was that simufilam may interact with Alpha-7 Nicotinic Receptors and I think maybe Toll-Like Receptors binding to Filamin A and disrupt that complex. That's my understanding. I'm not an expert on Alzheimer's disease. So I'm assuming it's one proposed mechanism in Alzheimer's.

Q During your time at Yale, you are a professor of neurology;

correct?
A So I'm in neurosurgery department. So professor of neurosurgery, research side, not clinician. And I have an appointment in cellular and molecular physiology.
Q Fair to say you have much more than a layman's understanding of Alzheimer's?
A Correct.
Q What is your understanding, if any, of the connection, if any, between Filamin A and Alzheimer's?
MR. CAMPBELL: Object to form.
A I think it's a great question. It's a great question for TSC as well. I think -- I think it goes back to this interaction with Alpha-7 Nicotinic Receptors and Toll-Like Receptor 4 which might contribute to neural abnormalities.
Again, I did not read, in-depth, the connection between Alpha-7

DR. ANGELIQUE BORDEY

Nicotinic Receptor and Alzheimer's disease. I know other people have made a connection. I did not read about that. Toll-Like Receptor 4 makes sense because it's presumably inflammation contribution to Alzheimer's disease pathology. But that's where my knowledge stops, really.

Q Do people with Alzheimer's disease have an altered form of Filamin A?

MR. CAMPBELL: Object to form.

A I've never worked on it. So I have not confirmed. I do not know.

Q Have you observed an altered form of Filamin A in any of your studies?

A It's a difficult question to answer because Filamin A's a very complex molecule. It's a huge molecule. And one of the hardest thing in science is to show altered inflammation in a biologic ecosystem. We have not done, yet, experiments that could address that question.

DR. ANGELIQUE BORDEY

Q What do you mean by that?

A That, I cannot address. I do not know if there's an altered form or not. There might be; there might not be. I just do not know.

Q Have you seen any evidence, one way or the other, to lead you to believe there is or is not an altered form of Filamin A in the brains of Alzheimer's patients?

MR. CAMPBELL: Object to form.

A I've never worked on Alzheimer's disease.

Q So no?

A From my work, no.

Q Does simufilam bind Filamin A?

A This is the same question again. I think I would -- this is a great question. And I would really like to know for sure.

Q Sitting here today, you don't know?

DR. ANGELIQUE BORDEY

A Again, binding, so is it a direct binding, indirect binding? I do not know.

Q So you have not observed simufilam binding Filamin A in any of your studies with simufilam; correct?

MR. CAMPBELL: Object to form.

A Like I think I answered before, binding could be indirect. And there is -- and we have not, in my work, shown that there is binding.

Q Are you aware of other people's work that has shown simufilam binding to Filamin A?

A So let me try to recall. There's suggestive work that they could be binding to Filamin A and again, in a broad term, you know, direct or indirect.

Q And what suggestive work are you referring to?

A I think there was -- I mean in Dr. Wang's paper, it's suggestive that it could bind Filamin A.

DR. ANGELIQUE BORDEY

Q What do you mean suggestive?

A I don't think direct binding was shown with the proposed experiments. The experiment was shown that it might interact with Filamin A.

Q Are you aware of any work by anyone that shows or suggests direct binding?

A I think I did not read the 2017, and I did not read, in-depth, the 2023. So I don't know if they had done experiments to show that. So I refer mostly to the Journal of Neuroscience paper, that I looked more carefully at the figures. So I don't know for the other papers.

Q And so you're not aware, sitting here today, of any work by anyone that shows direct binding of simufilam to Filamin A; is that right?

MR. CAMPBELL: Object to form.

A If I were to read the papers, maybe I can give you an answer

DR. ANGELIQUE BORDEY

yes or no. But as is, I did not read the papers. So I do not know.

Q So sitting here today, you are not aware of any work by anyone that shows direct binding of simufilam to Filamin A; correct?

MR. CAMPBELL: Same objection.

A So there is suggestive binding to Filamin A. These original papers that -- I mean the way the experiment was done, suggestive of direct binding. It's hard to put a word, direct, because you could bind a complex where you have Filamin A in another molecule and in my mind, to the binding partner and not just directly Filamin A, but it will somehow interfere with Filamin A function.

So could you call that direct binding? I'm not sure if it's a binding to a complex or the binding partner in the complex. So I don't know. And that's where we're suggestive in the

DR. ANGELIQUE BORDEY

experiments.

Q Okay. That's helpful. Thank you.

So just to recap, sitting here today, you're aware of one paper, the 2012 Journal of Neuroscience paper, that was suggestive of simufilam binding Filamin A; right?

A I like to say suggestive of simufilam to modulate Filamin A function. It's again very hard to show direct binding. So it might bind; it might not bind. I just really do not know.

Q And aside from that one paper, the 2012 Journal of Neuroscience paper, you are not aware of any other papers or experiments that show simufilam modulating Filamin A?

MR. CAMPBELL: Object to form.

Q Is that right?

A I mean I'm assuming the other papers did, based on the title, I think. But I did not read the papers.

DR. ANGELIQUE BORDEY

But I'm assuming they did. I couldn't remember exactly the papers. But you alluded to it before. What did you say? Filamin A binds an altered confirmation of Filamin A?

So I'm assuming these papers alluded to some of the binding to Filamin A, direct or indirect, modulation of Filamin A.

Q And you're referring to the other papers by Dr. Wang or Dr. Burns?

A That's right.

Q Aside from the papers or work by Dr. Wang or Dr. Burns, are you aware of any other research that suggests or demonstrates simufilam modulating Filamin A?

MR. CAMPBELL: Object to form.

A I think there was an abstract from an Italian group a long time ago, suggesting -- and I like to use the word, suggesting -- that simufilam could modulate the phosphorylation of

Filamin A.

Q And how does phosphorylation of Filamin A relate to the claim that simufilam binds Filamin A?

A It could relate in many different ways. So how does phosphorylation happen? Inside cells, you have kinase. The kinase will go and phosphorylate Filamin A. To phosphorylate Filamin A, the kinase has to come very close in nanometer, very, very close to Filamin A.

So you could see that either the simufilam could prevent the kinase to come close without being in interaction with Filamin A, or simufilam could bind between the kinase and Filamin A. Ultimately, phosphorylating Filamin A will alter Filamin A's function. So many different ways, very hard to show one way or another.

Q So very hard to show, one way or the other, that phosphorylation is connected to binding? Is that what you

mean?

A Well, the question was about simufilam. So very hard to show where simufilam binds. Does it bind to the kinase? Does it bind between the kinase and Filamin A? Does it bind to Filamin A to prevent the phosphorylation? Very hard to show that, very hard to tease apart.

Q Does simufilam revert altered forms of Filamin A back to its native form?

A So I think I would have to -- you know, what is its native form?

Q Are you asking me?

A Yes.

Q Well, I don't know. So my question is for you, as the expert or the scientist, whether you know or believe that simufilam reverts altered forms of Filamin A back to its native form.

MR. CAMPBELL: Object to form.

A In which context?

DR. ANGELIQUE BORDEY

Q In any context.

A Well, I have no idea in any context. A drug is -- you know, every confirmation of a protein is context-dependent. So protein in Filamin A is a giant protein, really big. It can fold in many different ways. If it's phosphorylated, it might fold and phosphorylate a different way, forms a dimer, might twist a little bit. The cells migrate. They'll twist. So it's really context-dependent. So I don't know in any context.

Q Sitting here today, are you aware of any context in which simufilam reverts an altered form of Filamin A back to its native form?

MR. CAMPBELL: Object to form.

A I can only refer to the title you mention original in one of the papers from Lindsay Burns, that publication that says simufilam altered or revert, whatever the title was, an

DR. ANGELIQUE BORDEY

altered conformation of Filamin A. So that was mentioned in a title.

Q And aside from the title of that paper, are you aware of any other contexts in which simufilam reverts an altered form of Filamin A back to its native form?

MR. CAMPBELL: Object to form.

A I mean it's too broad of a question again --right?-- because I'm sure someone has shown that Filamin A has different conformation in different state. Whether -- I mean so it would be good to have the question more specific. Can you rephrase the question?

Q Well, we're specifically talking about simufilam.

A Okay.

Q So are you aware of any context, aside from the reference you made to the title of Dr. Burns's paper, where simufilam reverted altered forms of Filamin A back to its native form?

MR. CAMPBELL: Object to form.

A So it's in Dr. Burns's paper. I do not remember if it was in the January science paper as a claim. I don't remember the wording of the paper. Maybe they did mention it. I really do not remember. I'm assuming they mentioned it in other papers. She mentioned it to me by e-mail. Did the Italian mention it? I do not remember that.

Q And you've referred a couple of times to the Italian abstract?

A It was an abstract, yeah.

Q The Milan Institute or Something, does that sound familiar?

A Maybe, yeah.

Q Sitting here today, do you have confidence in the integrity of the simufilam research conducted by Dr. Wang or Dr. Burns?

MR. CAMPBELL: Object to form.

DR. ANGELIQUE BORDEY

A So integrity, what do you mean by integrity?

Q Are you familiar with the term or concept of research integrity?

A Yes. It's a very broad term.

Q What is your understanding of that term?

A So it could mean that -- so it's a broad term definition. So you could -- integrity means that to the best of your knowledge, you publish data that you believe are correct -- right? -- that you did the right statistics, you discussed with others, you validated the data, you repeated it enough time to be confident with the result of your data.

Q So based on that definition, do you have confidence in the integrity of the simufilam research conducted by Dr. Wang or Dr. Burns?

MR. CAMPBELL: Object to form.

A So based on the definition,

DR. ANGELIQUE BORDEY

I think -- I don't know Dr. Wang. I never met him. But I'm assuming he tried to follow that path.

Q And so do you have confidence?

A I don't know him. I mean -- I don't know him. So every scientist in general try to be -- you know, have high integrity on the data. But I don't know the guy.

Q So you can't answer, one way or the other, whether you, sitting here today, have confidence in the integrity of the simufilam research conducted by Dr. Wang or Dr. Burns?

MR. CAMPBELL: Object to form.

A Based on my definition -- so for me as a scientist, I assume people have high integrity when they do, you know, their work. And I assume he has -- I assume the guy has high integrity, and Lindsay has high integrity. What I don't know is how experiments have performed

DR. ANGELIQUE BORDEY

ultimately. I don't know in anybody's lab.

Q So you do or do not have confidence in the integrity of the simufilam research conducted by Dr. Burns or Dr. Wang?

MR. CAMPBELL: Object to form.

A Like I said, I cannot answer that question.

Q Do you know whether any articles or studies about simufilam contain fabricated, manipulated or doctored information?

A I do not know if they contained fabricated data. What I know is that people claim they have fabricated data.

Q Do you have any opinion, one way or the other?

A I have no idea if he fabricated data, no, I don't know.

Q Either prior to becoming the SVP of neuroscience at Cassava or since

DR. ANGELIQUE BORDEY

you joined the company, have you done anything to look into or investigate whether any of Dr. Wang's or Dr. Burns's data was fabricated, manipulated or doctored?

MR. CAMPBELL: Object to form.

A So I remember -- was it 2020 when the citizen petition came out? I don't remember if it's 2020 or 2021.

Q I think it was 2021.

A Okay. 2021. Well, it was surprising. And it was just like -- I mean it was surprising. I had not in-depth again look at these papers. I did not really go back to his papers. And I glanced at the citizen petition. I did not spend much time on it because it has no relationship to my work, ultimately.

Q Even now as the SVP of neuroscience at Cassava, working with simufilam, you don't think the inventors of simufilam, the people who authored the

DR. ANGELIQUE BORDEY

preclinical research, you don't think their research or the integrity of their research is relevant to your current work?

MR. CAMPBELL: Object to form.

A The outcome of the research does not impact my work.

Q So you are not relying on any of Dr. Burns's or Dr. Wang's research with simufilam in your ongoing studies of simufilam?

A Correct.

Q And just to be clear, you have not looked into any of the allegations of data manipulation or fabrication against Dr. Wang or Dr. Burns; is that right?

A Well, I think it's the same question as before. I've glanced at the citizen petition. So in that sense, you can call it, I have looked at the allegation, I'm assuming. But I'm a visual person. So I will look at the

DR. ANGELIQUE BORDEY

figures. And I did not spend time reading, really, the text in-depth.

Q So you have not done anything to assess whether the allegations against Dr. Wang or Dr. Burns or Cassava of data manipulation or fabrication are true or not?

A How would I do that?

Q How would you do that?

A I'm not sure. You may have to repeat the experiments which we did not do.

Q So have you verified or replicated the results from any particular experiments that Dr. Wang or Dr. Burns conducted with simufilam?

A So it's hard to answer because I have not read all their papers. So I don't know all of the type of experiments they did. I can only say the one in the Journal of Neuroscience, we did not reproduce these experiments.

Q Have you reviewed the data from any of simufilam's clinical studies?

DR. ANGELIQUE BORDEY

A Since I joined Cassava, I have been exposed to some of the Phase 3 clinical data. And I think we had a couple of meetings about it. I do not spend a lot of time looking at it.

Q What was your -- sorry.

A We have enough work on TSC. So AD is for me in the past. It's not my data.

Q What was your impression of the Phase 3 simufilam data?

A It's a gigantic study with a lot of patients and a lot of graphs, maybe hundreds of graphs. So it's an overwhelming amount of data. That's my impression.

Q Positive or negative?

A You know, I did not really assess that. So it's just overwhelming amount of data. I did not even read the November, whenever it came out, press release about the data. It's just -- it's not my work. It's a Phase 3. I don't know the -- I did not know all the

DR. ANGELIQUE BORDEY

details of the Phase 3. It's years of work. I do not know.

Q And what about the Phase 2A or Phase 2B studies of simufilam? Have you reviewed any of the data or the publications related to those studies?

A I did not review. But I think it was mentioned in citizen petition. I think some of the Phase 2 were mentioned there. I don't remember the details.

Q And aside from coming across the Phase 2 studies in the context of the citizen petition, have you reviewed or looked at any of the Phase 2 data or papers in any other context?

A Not that I recall, no.

MR. KUMAGAI: I think we've been going for about an hour, if you want to take a break.

MR. CAMPBELL: Before we go off the record, I want to designate the transcript confidential starting at 9:12 a.m. when we started the

DR. ANGELIQUE BORDEY

discussion of the patients.

THE VIDEOGRAPHER: The time is 10:10 a.m. We're going off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: The time is approximately 10:30 a.m. We are back on the record.

Q Dr. Bordey, in or around February of 2020, you published a paper on simufilam in Science Translational Medicine; is that right?

A Yes.

Q Can you describe, at a high level, the findings reported in that paper as they relate to simufilam?

A So in that paper, we used a mouse model of focal onset seizures. And these mice had spontaneous seizures. And we found that simufilam treatment in these mice decrease the frequency of seizure activity.

Q Anything else in terms of kind of the main findings that you would

DR. ANGELIQUE BORDEY

include in a summary?

A Simufilam also reduced the soma size of these cells which is enlarged in that disease condition.

Q Did your 2020 paper confirm any of the claims that Dr. Burns, Dr. Wang or Cassava had made about simufilam?

MR. CAMPBELL: Object to form.

A I mean I cannot answer that question. We did not try to confirm some of these claim.

Q So you did not try to confirm any of the claims that Dr. Burns, Dr. Wang or Cassava had made about simufilam, and therefore, fair to say your 2020 paper did not confirm any of those claims?

MR. CAMPBELL: Object to form.

A No. That's not correct. We did not try to confirm. So you can't say we did not confirm which is did not try.

DR. ANGELIQUE BORDEY

I would say -- that's it, yeah. We did not do the appropriate experiment to even address these questions.

Q Which questions?

A What you told me, confirming Wang's and Burns's and Cassava's data.

Q Just to be clear, so none of the studies reported in your 2020 paper sought out to confirm any of the claims that Dr. Burns, Dr. Wang or Cassava had made about simufilam?

A So we did not perform any experiments to try to confirm the data. And it's a different disease state. So it's comparing apple and oranges.

Q Your 2020 paper using simufilam was not about Alzheimer's disease; is that right?

A Correct.

Q And in your 2020 paper, you did not aim to confirm simufilam's mechanism of action; is that right?

A Well, it depends which mechanism of action you're referring to.

DR. ANGELIQUE BORDEY

Q Did your 2020 paper aim to confirm any mechanism of action for simufilam?
A So our 2020 paper published that simufilam decreased or partially restore the size of these mutant neuron. This is a mechanism of action, how you might decrease seizure activity.
Q Did your 2020 paper aim to confirm simufilam's mechanism of action in Alzheimer's disease patients?
A We did not aim to confirm the previous data in Alzheimer's disease.
Q The answer's no?
MR. CAMPBELL: Object to form.
A We did not try to confirm simufilam's mechanism of action in AD. Our paper was not about Alzheimer's disease.
Q Just to be clear, when you say AD, you're referring to Alzheimer's disease?
A Alzheimer's disease, yes.

DR. ANGELIQUE BORDEY

Q Did your 2020 paper aim to confirm that simufilam targets Filamin A?

A We did not perform experiment to confirm that claim.

Q Did your 2020 paper aim to confirm that simufilam binds Filamin A?

A We did not perform experiments to confirm that claim either.

Q Did your 2020 paper aim to confirm that simufilam binds at the specific site on Filamin A known as IgFLNA24?

A We did not perform any experiments to confirm these claims.

Q Did your 2020 paper aim to confirm that simufilam binds an altered form of Filamin A?

A We did not perform experiments to confirm these claim.

Q Did your 2020 paper aim to confirm that simufilam reverts an altered form of Filamin A back to its native healthy form?

A We performed no experiment

DR. ANGELIQUE BORDEY

to confirm this claim.

Q Sitting here today, are you personally aware of any specific studies by your lab or any other lab that demonstrates simufilam binding to Filamin A?

A We are performing a series of experiment to try to understand whether simufilam somehow interact with Filamin A.

Q Those experiments are ongoing; right?

A Correct.

Q And have those experiments produced any preliminary results or any results?

A Still undergoing.

Q Have those experiments produced any evidence, demonstrating that simufilam binds to Filamin A?

A Once they're finished, hopefully, we will know. But they're undergoing.

Q As of today, you're not

DR. ANGELIQUE BORDEY

aware of any studies by your lab or any other lab that demonstrates simufilam binding to Filamin A; is that right?

MR. CAMPBELL: Object to form.

A I think it's all about defined binding. Like we discussed before, you can bind directly and indirectly. So if I refer to the Italian group, it suggests these experiments by -- that group suggested that somehow, simufilam may modulate Filamin A function. I don't know if that group is doing more experiment. I don't know if my colleagues are doing experiments. So I don't know.

Q We talked a little bit before about TSC. And you've described it a little bit so far.

But can you just give sort of a short-term summary of what it is?

A So TSC, Tuberculosis Complex, is a genetic disease. So the kids are born with a mutant TSC1 or TSC2

DR. ANGELIQUE BORDEY

gene. Half of the gene is mutant. And during embryonic life in utero, they have additional mutation that occur in the brain. These mutation lead to malformation of the cortex, one part of the brain. And these malformation lead to seizures.

Q And what is simufilam's mechanism of action, if any, in TSC patients?

A So, you know, it's still undergoing work. The 2020 paper suggests the way simufilam may help to reduce seizure activity is by reducing these abnormal cell overgrowth.

Q And so what is your basis for believing, assuming you do believe, that simufilam could treat TSC?

A What is the basis? The fact that in two preclinical mouse models, simufilam treatment reduce seizure activity.

Q And are you referring to the two preclinical mouse models in your 2020

paper?

A My 2020 paper published one mouse model, that model disease called Focal Cortical Dysplasia Type 2, which has the same pathology as TSC.

Q What is the other preclinical mouse model that you referenced a moment ago?

A It is TSC1, conditional knockout transgenic mice. A short piece of data is in our investor deck online.

Q And that is the deck that was published around -- when was that published?

A August or September, maybe September. I'm not too sure.

Q Of last year?

A Of this month.

Q Of this month. Okay.

Aside from those two mouse model studies, do you have any other research that you're basing your belief, that simufilam could treat TSC on?

A Those thing are the leading

DR. ANGELIQUE BORDEY

piece of data that support clinical trial, showing a drug's efficacy on seizure activity.

Q And I think we've probably covered this.

But just to be clear, are you relying in any way on research by Dr. Wang or Dr. Burns as you develop the simufilam TSC program?

A We do not.

Q And why not?

A I rely on my work.

Q They are the inventors of simufilam; right?

A They did not work on TSC.

Q And sorry. You said they did not work on TSC.

Are the allegations of research misconduct against Dr. Wang or Dr. Burns a factor in any way in you not relying on their work for the TSC program?

A It's a complicated question. I mean that has nothing -- I think that

question is not relevant. The work is not about TSC. So it has no bearing on our work on TSC.

Q Work with simufilam as it relates to one disease state has no bearing on work with simufilam as it relates to a different disease state?

MR. CAMPBELL: Object to form.

A Depends on the disease.

Q What about the work by the Italian group that you referenced? Are you relying on their work with simufilam in any way for the TSC program?

A I don't remember which system they were studying, so no.

Q So just to be clear, I think I understand you to be saying you're effectively only relying on the work that you have done or you have overseen with simufilam for purposes of the TSC program; is that a fair summary?

A So I rely on my work. I rely on people who validated some of our

DR. ANGELIQUE BORDEY

work, independent. So the TSC1 mouse model was not my work. It was work by the TSC Alliance that had their own CROs and validated my lab's finding.

Q And how did it validate your lab's finding?

A They had similar data on seizure activity.

Q And which findings did it, in your view, validate?

A That simufilam was able to prevent these kind of worsening in seizure activity in young mice.

MR. KUMAGAI: Mark as Plaintiffs' Exhibit 15, a document Bates Stamped CASSAVA_000498960.

(The above-referred-to document was marked as Exhibit 105 for identification, as of this date.)

Q Dr. Bordey, take as long as you like to review Exhibit 105.

Do you recognize this e-mail?

A No. I need to read it.

DR. ANGELIQUE BORDEY

Q And just to be clear, I want to direct your attention to the bottom e-mail, the paragraph that begins "Dear, Dr. Schoenhard and Dr. Burns."

A Okay. I just don't remember that broadcastshareholder.com. I think, yes, I recognize that e-mail. I just do not remember with Peter Roddy.

Q And just to be clear, it appears as though after the e-mail was sent to this shareholder e-mail contact, it was forwarded within Cassava. So I'm just asking you about the first e-mail that begins, "Dear, Dr. Schoenhard and Dr. Burns."

Is that your first outreach to Cassava?

A It looks like it. It's 2013, 12 years ago. I don't remember word for word. But it looks like it.

Q It appears you reference a paper.

And is that the 2012 paper published in the Journal of Neuroscience

DR. ANGELIQUE BORDEY

that you mentioned earlier today?

A I assume it is.

Q And what happened, if you recall, after you submitted this e-mail to Dr. Schoenhard and Dr. Burns?

A I don't remember the details. But somehow, I got in touch with Lindsay Burns.

Q And what do you recall, if anything, about your subsequent communications with Dr. Burns?

A I mean a positive outcome since we received the drug. We first had to have an MTA. And then we received the drug.

Q And after you spoke with Dr. Burns, Cassava sent you a supply of simufilam?

A Correct.

Q And then what did you do?

A 2013, I mean it took us some time slowly to test simufilam in our system.

MR. KUMAGAI: I'll mark as

DR. ANGELIQUE BORDEY

Plaintiffs' Exhibit 106, a document Bates Stamped BORDEY68.

(The above-referred-to document was marked as Exhibit 106 for identification, as of this date.)

Q Do you recognize Exhibit 106, Dr. Bordey?

A Yes. I think vaguely. It's a long time ago. I've applied to at least five grants a year in the past 12 years. So many don't get funded. So I remove them from my memory because it is painful.

Q I hear you.

A So I vaguely remember that one.

Q So this, just to be clear, is one grant that you applied for around 2013 that was not funded; is that right?

A Funded, yes.

Q If you look at the top under Principal Investigators, it lists your name and Dr. Burns. Do you see that?

A Yes.

DR. ANGELIQUE BORDEY

Q Do you recall what the purpose of this proposal was?

A I have to read it. So do you want me to read it? Because I don't remember.

Q No. That's fine.

Do you recall that it was a proposal to study simufilam?

A I have to read it.

Q But if you look at the project title, it says "PTI-125" which is simufilam; right?

A But I have to read it to see what I propose exactly to do. I really do not remember.

Q That's fine. I don't want you to read the whole thing right now, given its length.

If you turn to the page ending in 85, there's an abstract. Do you see that?

A Yeah.

Q And the first sentence says, "The goal of this proposal is to test the

DR. ANGELIQUE BORDEY

efficacy of PT-125, a novel compound that binds Filamin A at preventing brain malformations and associated seizures in a mouse model of tuberous sclerosis complex."

You see that?

A Yes.

Q Does that refresh your recollection as to the sort of general purpose of this proposal from 2013?

A To some extent. I still have to read the experiment to see what we propose.

Q Is it fair to say that at this point in time, you had conducted prior studies that found elevated levels of Filamin A in brains of mice with TSC?

A I would have to validate. But I would think yes.

Q And in what tissues or cell types have you found Filamin A to be most highly expressed?

A So I can only answer partially, that question, because I did

DR. ANGELIQUE BORDEY

not look in many different cell types. In the 2014 paper, we had used conditional TSC1 knockout mice. And we had done a small screen in both the olfactory bulb and later, the cortex. And that screen suggested that there was increased Filamin A in this brain region that contain TSC1 null neurons.

Q So your proposal here, it looks like or at least part of it based on the abstract was to test whether simufilam could knock down Filamin A to normal levels in brains of mice with TSC; is that fair?

A No. I have to read.

Q Yes.

A Do you want me to read the abstract?

Q Yeah, if you don't mind.

A Okay. Okay. Can you say your question again?

Q Sure.

Is it fair to say that part of the proposal here was to test whether

simufilam could knock down Filamin A to normal levels in parts of the brain of mice with TSC?

A So based on the abstract, that was not the goal.

Q What was the goal based on the abstract?

A The goal was to -- let me see -- test whether simufilam would prevent or rescue some of these brain abnormality in a mouse model of TSC and potentially seizure activity.

Q In any of your other studies, have you set out to test whether simufilam could knock down Filamin A to normal levels?

A We performed -- we use a technique called Western Blot. And we looked at the level of Filamin A upon simufilam treatment. And we did not see a change.

Q Can you explain what you mean by that?

A We found that simufilam

treatment did not change the levels of Filamin A.

Q When was that?

A I think it's published in the -- we have these experiments. I think it's published in the 2020 paper. These papers have a lot of experiments. They're pretty heavy.

Q I've noticed.

About two-thirds of the way down, there's a sentence that says, "Pain Therapeutics has developed PTI-125, the first FLNA binding compound that readily crosses the blood brain barrier."

Do you see that sentence?

A Yes.

Q And what does that mean?

A Lindsay Burns, Cassava Sciences owns PTI-125. The drug processes the red brain barrier. So it goes into the brain. And their data suggested that Filamin A binds -- no, I'm sorry. Simufilam binds Filamin A.

Q And according to this, it

DR. ANGELIQUE BORDEY

was the first of its kind.

What does that mean?

A As far as I knew at the time, so from Cassava Sciences in 2013 doing a Google search, and I had -- that's the only company that I had found who had a drug that might bind Filamin A or modulate Filamin A function. That's what it means. Whether there was other companies at the time, I do not know.

Q And in the time since you did that Google search, have you become aware of other compounds that have been reported to bind Filamin A?

A Yes.

Q Which compounds are those?

A It's called kartogenin.

Q Have you done any work with that compound?

A Yes. We performed in vitro work, meaning cells in culture, to show whether it would reduce these cell overgrowth, and it did.

Q And are you pursuing further

DR. ANGELIQUE BORDEY

work with that compound?

A Not at the present time.

Q Why not?

A It did not pass the blood brain barrier.

Q So sitting here today, is simufilam the only compound that you're aware of that has been reported to bind Filamin A and readily cross the blood brain barrier?

MR. CAMPBELL: Object to form.

A I think Cassava's patents suggests there might be analogs of simufilam that might bind Filamin A and maybe pass -- crosses the blood brain barrier. But I don't know if they have tested -- whether they crossed the blood brain barrier.

Q And so when you first came across simufilam, the fact that in your view was the first view compound of its kind that binds Filamin A and crosses the blood brain barrier, did that make you

DR. ANGELIQUE BORDEY

skeptical of the science or the data?

MR. CAMPBELL: Object to form.

A Why would that make me skeptical? We're the first one showing simufilam -- we were the first one showing Filamin A increased in TSC. It's not because it's the first time. You have to be -- so you are skeptical about data. But it does not mean the data is wrong; right? So it's why you request the drug, and you try it.

Q Look at the reviewer critiques, starting on the second page, 69.

A 69, you said?

Q Yes.

This appears to be feedback that reviewers of these proposals provide to the NIH; is that right?

A Yes.

Q If you look at the next page, the first critique, there's a No. 3 that says "Innovation."

DR. ANGELIQUE BORDEY
A Yeah.
Q And under weaknesses, do you see that?
A Yes.
Q It says, "The approach has many unknowns, unknown mechanism of PTI-125, unknown relevance of Filamin A to TSC, unknown relevance of outcome measures to therapeutic potential."
Do you see that?
A Yes.
Q Did you agree with that critique at the time?
A Partially. I would have to -- so I said partially. The paper was not published in 2013. But I would have to look at the data that are presented.
Q And which paper are you referring to? The 2014 paper?
A The 2014 paper.
So the unknown relevance of Filamin A to TSC, I don't remember the data presented.
Q But your view is that the

DR. ANGELIQUE BORDEY

2014 paper that you published kind of made known the relevance of Filamin A to TSC; is that right?

A Possibility of being a therapeutic target. I think the question here -- the comment is vague, out of context. Unknown relevance of Filamin A to TSC, in which context? If you say, does it decrease in the context of decreasing epilepsy? We presume we did not have any data; right? So what did the reviewer mean? I don't know.

Unknown relevance of outcome measures to therapeutic potential, we presumably did not have the data yet. That's why we had the grants.

Unknown of PTI in TSC, I'm assuming, yeah, we did not have a mechanism yet. Again, I don't remember the data presented.

Q And the approach weaknesses, the second bullet, do you see that? It says, "The proposed experiments are phenomenological and not mechanistic,

DR. ANGELIQUE BORDEY

i.e., these are essentially black box experiments. Consequently, if the effects of the compound are not as expected, there is no way to know. This is because the target was not appropriately engaged or whether PTI-125 is not an appropriate therapy for TSC."

Do you see that?

A Yeah.

Q And have you done any mechanistic experiments with simufilam?

A So again, I don't know here, what they're asking. What we publish in 2014 and 2020 is one mechanism; right? Mechanism has two meanings. One of the mechanism is how does -- how can you risk prevent seizure activity? And you might be doing that by shrinking back cell size which restore to some extent, their connectivity. And I don't know if it refers to that. But we have done that.

Mechanism can be at the molecular level. How does it do it at the molecular level? I do not know. So

DR. ANGELIQUE BORDEY

I'm not clear without reading the grant what it refers to mechanism.

Q And so have you done any molecular-level mechanistic studies of simufilam at any time?

A So we have -- we have -- we have taken an unbiased approach, an open-minded approach. And it's still work undergoing where we have, for example, treated cells with simufilam, collected the cells, grounded them up and look both at the pathways and proteins that have changed inside the cells. So high-level approach.

Q And what have you found?

A Many things.

Q Can you describe?

A Many proteins have changed, suggesting that simufilam, it's in a TSC condition in the cells that has no TSC2. So TSC2 knockout cells. I don't know in Alzheimer's disease are normal cells. It was improving mitochondrial function.

Q And have you seen any

DR. ANGELIQUE BORDEY

evidence from those studies of simufilam binding to Filamin A?

A These experiments would not address that question.

Q Are you aware of any experiments done by anyone that are mechanistic and looked at simufilam on a molecular level?

A I mean can we go back to my previous answer? Because I think I address that one already. So maybe the Italian groups are working on it. I do not know them. We are trying to understand the mechanism of action of simufilam in the context of TSC.

Q If you look at Reviewer 2, which begins on page 71, you see Critique 2 about halfway down the page.

A To go through these things is very painful for a scientist.

Q I'm sorry.

A This is our life. Last year, I wrote eight freakin grants, one funded, very painful.

DR. ANGELIQUE BORDEY

Q I'm sorry to make you relive it.

Could you look at the page -- so we're looking at Reviewer Critique 2 now. And if you go to the page ending in 72, which is the next page under Innovation Weaknesses, there's three bullets. Do you see that?

A Oh, yeah, yeah.

Q And there's a question in the second bullet that says, "Does the PI expect that this overexpressed Filamin A is in a pathological confirmation?"

Do you see that?

A Yes.

Q And what is your understanding of what that question is asking?

A I think it's actually the same question you asked before. And we never resubmitted the grants. We never answered the question because I do not know.

Q Has it ever been your

DR. ANGELIQUE BORDEY

expectation, based on any of the work that you've done, that Filamin A is in a pathological confirmation or abnormal shape in people with TSC?

MR. CAMPBELL: Object to form.

A I would not be able to answer that question. I have not done the experiments to address it.

Q Meaning you've never formed a view, one way or the other, as to whether Filamin A in TSC patients has an altered shape?

A I don't have -- I mean see if I formed a view, what does that mean, if I have an opinion; is that your question?

Q Yes.

Have you ever had an opinion, one way or the other, as to whether Filamin A in TSC patients exists in an altered shape?

A I have no idea. I cannot -- I don't have an opinion.

DR. ANGELIQUE BORDEY
Q Have you ever had an opinion on that question?
A An opinion on the question?
Q I think it's clear you have no opinion, one way or the other, whether Filamin A in TSC patients has an altered shape; right?
A I do not know if it has an altered shape.
Q Setting aside this document, Exhibit 106, just talking generally about your work with simufilam in the TSC context, one of the aims or ideas of simufilam's potential is that it might knock down or inhibit Filamin A; is that right?
A I don't think so. I don't think we propose that it might knock down Filamin A.
Q But you have found that Filamin A is overexpressed in TSC?
A Correct.
Q And one of the hypotheses or aims of simufilam in the TSC context is

DR. ANGELIQUE BORDEY

that it might inhibit or reduce the overexpressed levels of Filamin A; is that fair?

A I don't remember if we propose that it would reduce Filamin A level. I don't think so. There are many ways to inhibit a protein function, many ways.

Q And Filamin A is found in cells all across the body, throughout the body; right?

A I think so; you know, every cell type, I don't know. But it's widespread.

Q You found or you reported in the 2020 paper that inhibiting Filamin A was one way, potential way to treat TSC; right?

A A potential way, yes.

Q So what effect would you expect inhibiting Filamin A in all cells or other parts of the body have on a person?

A Have what?

DR. ANGELIQUE BORDEY

Q How would you expect a drug that inhibits Filamin A, if it were to inhibit Filamin A everywhere it exists in the body, what sort of side effects or effects would you think might happen?

MR. CAMPBELL: Object to form.

A We did not expect too much because Filamin B can compensate for the loss of Filamin A.

Q And so was it your view or expectation that overexpressed Filamin A in TSC was limited to the brain and not other parts of the body?

A I don't know. I did not explore that in other parts of the body.

MR. KUMAGAI: I'll mark as Exhibit 107, a document Bates Stamped CASSAVA_000498856.

(The above-referred-to document was marked as Exhibit 107 for identification, as of this date.)

Q This appears to be, starting at the bottom of the e-mail chain, the

DR. ANGELIQUE BORDEY

page ending in 859, beginning with an e-mail from Dr. Burns to you, Dr. Bordey, on October 30th, 2014. Do you see that?

A Yes.

Q And then it continues through December 3rd, if you look at the bottom e-mail on the first page, the exchange between you and Dr. Burns, and then is forwarded on to others at Cassava. Do you see that?

A Okay, yeah.

Q And Dr. Wang.

Looking at the October 2014 e-mail at the bottom, the first e-mail, the subject line is Impact Score. Do you see that?

A I'm sorry. October 14, the last page; right?

Q October 30, sorry, 2014, at the bottom.

A Okay. That one.

Q Dr. Burns writes to you. Do you see that? And she's referring to an Impact Score for an SBIR.

DR. ANGELIQUE BORDEY

A Yeah.

Q Do you recall what this exchange was about?

A I don't remember. I have to read it. You want me to go through it?

Q Well, I'd like to start with your e-mail on 858, December 2nd, 2014 at 6:48 p.m.

A 858, December 2nd?

Q Yes. You write, "Hi, Lindsay."

Do you see that?

A Yes.

Q And you write, "We have good news but may also need more drug. We are happy to report that decreasing FLNA levels using shRNA during cortical development prevents neuronal misplacement and cell hypertrophy. And we have tested several PTI-125 concentrations: 120, 12.5, 30 and 60 milligrams per kilogram from Embryonic Day 15 to Postnatal Day 7."

You see that?

DR. ANGELIQUE BORDEY

A Yeah.

Q What are you referring to there?

A You're reading is as good as mine, that we tested the drug. We injected it from embryonic use at Day 15 to postnatal. I'll have to keep reading to make sure what we did.

Q Sure.

A Okay. All right.

Q There's a sentence that says, "PTI -- so simufilam -- at 12.5 and 120 did nothing. Presumably decreasing Filamin A activity using 120 milligrams per kilogram of PTI is too much. 30 milligrams per kilogram did not work too well but a little, but 60 milligrams per kilogram seems to work well."

You see that?

A Yeah.

Q What is that referring to?

A So my assumption is as good as yours because I do not remember the details of these experiments. I'm

DR. ANGELIQUE BORDEY

assuming we were looking at cell size, cell hypertrophy and that 60-milligram shrinks cell size. I think this data have never been published. That's why I don't remember them in details.

Q Are you familiar with the sort of dose response curve?

A Yes.

Q And was the dose response curve in these tests using simufilam surprising to you?

MR. CAMPBELL: Object to form.

A Surprising in which way?

Q In any way.

A 60-milligram worked well. Seems like it's a bell-shaped curve which some drugs have.

Q Most drugs have sort of a S-shaped curve; isn't that right?

A Some drugs have, not all.

Q Is an S-shaped curve or a bell-shaped curve more common?

A S, not bell-shaped. Some

DR. ANGELIQUE BORDEY

drugs, if you give too little or too much, will have negative impact. S means if you did too much, you have a negative impact. You have any kind of scenario with drugs. If you give a drug at way too high levels, you have off-target effects. If you don't give enough, it might not work. It'll have a different target. I think it's very hard to generalize.

Q So you can't recall, one way or the other, ever being surprised or finding the dose responses surprising in any way?

A Not so much, no.

Q If you continue up the chain -- and you could read the e-mails in between -- but I want to direct your attention to the e-mail you sent on December 3rd at 10 a.m. which starts at the bottom of the page ending in 856 and continues on to the next page.

A Okay.

Q So this is an e-mail from

DR. ANGELIQUE BORDEY

you to Dr. Burns; right?

A Sure. It's a model.

Q And you write, "Using this protocol, only the 60-milligram per kilogram shows a nice effect."

Do you see that?

A Yes.

Q And then further down the e-mail, you write, "We have tested for seizures, but only the 120-milligram per kilogram concentration given from E15 to six weeks of age. We will test the 60-milligram per kilogram concentration using the following injection protocols, followed by EEG at six to eight weeks."

And it continues.

You see that?

A Yes.

Q What is that referring to?

A Can you be more specific?

Q Are you referring to tests of simufilam at concentrations of 120-milligram per kilogram and 60-milligram per kilogram that you

DR. ANGELIQUE BORDEY

conducted around this time?
A So I don't remember these -- what we have done at that time for these experiments. But it seems we tried the 120-milligram per kilogram, again from embryonic to six weeks of age. I do not recall the results. And I guess we were going to test the 60-milligram per kilogram in six to eight weeks. I do not know if we did it.
Q And you write, "We can explain the poor effect of 120 mg per kg."
You see that?
A Okay, yeah.
Q Is that --
A Yeah. I just don't know if I refer to the morphology or the seizures.
Q Well, it says, "We have tested for seizures but only the 120-milligram per kilogram."
A Yeah. But the last sentence suggests morphology abnormalities. So

DR. ANGELIQUE BORDEY

I'm not sure. In 2014, it is a long time ago.

Q But based on this e-mail with Dr. Burns, as of December 2014, you had run tests to determine whether simufilam "prevents neuronal misplacement in cell hypertrophy"; right?

A Using one treatment paradigm which we never published.

Q What e-mail are you referring to?

A That it was done from Embryonic Day 15 to whatever age is --

Q Postnatal Day 7?

A 7.

Q That's page 858, the e-mail from December 2nd, 2014 at 6:48 p.m?

A Yes.

Q So using that injection protocol, you also used simufilam concentrations of 12.5, 30, 60 and 120 milligrams per kilogram; right?

A Yes, based on what I wrote.

Q You found that 12.5 did

DR. ANGELIQUE BORDEY

nothing; right?
A Yes.
Q You found 30 did not work too well; right?
A Yes.
Q And 60 seems to work well; right?
A That's what is written, yes.
Q And 120 did nothing; right?
A That's right.
Q And so in your 2020 paper, you found that doses of 12 milligrams per kilogram of simufilam had the best results; is that right?
A So on seizure, we only tried 12.5. So I cannot compare to the others.
Q Was it 12 or 12.5 in the 2020 paper? I think it was 12.
A 12 -- I don't remember actually. 12 or 12.5, but yeah. But we did not compare on the other dosage for seizures.
Q So how do you explain finding the 12.5 did nothing in 2014 with

your findings in the 2020 paper where you said doses of 12 work the best?

A Different protocol, different age.

Q Anything else?

A That's the major change. You treat embryonic. Day 15 is an extremely mature brain still. And for the 2020, our earliest treatment was Postnatal Day 8.

Q Do you have an understanding as to why simufilam would do nothing using the protocol that starts at E15 but shows some positive effects if you started at P8?

MR. CAMPBELL: Object to form.

A I don't have an understanding or an explanation. I only have a hypothesis.

Q And what is that?

A So Embryonic Day 15, I do not know if Filamin A's increased in the TSC conditions. It is increased at

Postnatal Day 8. Embryonic Day 15, these cells are not even abnormal yet because we actually create Embryonic Day 15. We inject the plasmids. These cells are normal. So it's a completely different condition.

Q And so why did you then begin your studies by using this protocol? What hypothesis was that based on?

A I think it was presumably based on using the shRNA. The shRNA is expressed on Embryonic Day 15. And that's why we did that -- I mean it's going back 11 years -- right? -- or the rationale because then we switched. But that would be my guess, is that we first followed the protocol we did with shRNA.

MR. KUMAGAI: I think we've been going about an hour. I'm happy to break. But I'm also happy to keep going.

THE WITNESS: I don't need a break. We can keep going.

MR. CAMPBELL: Do you want to push through another half-hour through lunch?

MR. KUMAGAI: Sure.

Q Who is Dr. David Calderwood?

A He's one of my colleagues at Yale.

Q And what does he do at Yale?

A He runs his lab in the department of pharmacology. Now he's professor of pharmacology.

Q Fair to say he's an expert in his field?

A I guess so, yes.

Q Did you hesitate for a reason or are there doubts about that?

A Well, it depends how you define experts.

Q Would you --

A So, you know, if you're a leading entity in your field, recognized among the top scientists in your field, I actually do not know Dr. Calderwood's ranking. But I think he's a pretty good

DR. ANGELIQUE BORDEY

pharmacologist.

Q And when did you first meet him? Can you describe sort of your relationship with him?

A I mean the first time, I've been at Yale for 25 years. So the first time I met him could be at a seminar. I just do not remember.

Q And over the years, how often have you interacted with him, spoke to him?

A We had a grant together. We applied for a grant together; you know, I don't remember if it's 2016, 2018. But we applied for a grant together quite some time ago.

Q And what was the subject of the grant?

A There was a big grant. One of the goals of the grant was to look at binding partners of Filamin A in TSC condition, identify these binding partner and then seeing whether they were decreased or overexpressed in TSC and see

whether restoring the expression could also reduce seizure activity.

Q And that was a grant that was granted or funded?

A Yes.

Q And why did you partner with Dr. Calderwood in that study? What was sort of your area of expertise and his area on that partnership?

A My expertise is on TSC, the disease condition, the pathology, the fact we found that Filamin A was increased. David Calderwood had published on Filamin A and binding partners of Filamin A.

Q And was there kind of a division in terms of who was working on what in that grant or was it collaborative kind of for every piece of it?

A I'm more of an in vivo scientist. So we had a lot of the in vivo experiment in charge. And he was more in charge of looking at the binding

DR. ANGELIQUE BORDEY

partners.

Q Aside from that work with Dr. Calderwood on that grant, have you had any other professional or personal relationships with him over the years?

A Not personal; never went to his house. We have another grant together.

Q What's the subject of that grant?

A The same thing. And it's a smaller grant.

Q And have either or both of those grants completed or are they still ongoing?

A That original grant was -- so it was a five-year grant, terminated -- oh, my God. I can't remember if it was 2023, 2024, something like that. And the new grant was funded this year. Surprisingly, we got it.

Q And in either of those grants, did you study simufilam?

A The sub aim was to look at

DR. ANGELIQUE BORDEY

simufilam.

Q In both?

A I think the original grant as well.

MR. KUMAGAI: I'll mark as Exhibit 108, a document Bates Stamped CASSAVA_000725328.

(The above-referred-to document was marked as Exhibit 108 for identification, as of this date.)

Q This appears to be, at least looking at the top, an e-mail from you to Dr. Burns, dated January 5th, 2015. Do you see that?

A Yes.

Q And if you go to the bottom of the chain, the last page, the second-to-last page, ending in 331, there's an e-mail from you to Dr. Burns on December 16th, 2014. Do you see that?

A Yes.

Q And you write to Dr. Burns, "Thinking in terms of publication, we will need to show that PTI somehow

interacts or modulates Filamin A function. What would help is to know whether, One, you know where PTI binds on Filamin A. Then we could overexpress a Filamin A plasmid about the binding domain and test PTI in vivo. Two, how did you identify the femtomolar affinity? Three, can you give us the PTI structure?"

Do you see that?

A Yes.

Q Dr. Burns responds to your question in the next e-mail. Do you see that?

A Yes.

Q And then it appears you forward your questions and Dr. Burns's responses on to David Calderwood. Do you see that?

A I'm sorry. From David, yes.

Q And Dr. Calderwood responds a couple of days later on December 19th, 2014. Do you see that?

A Yeah.

DR. ANGELIQUE BORDEY

Q Do you recall having this exchange with Dr. Calderwood?

A No. I have to read it.

Q Do you recall why, just generally, you were sending questions or information to Dr. Calderwood about simufilam?

A At some point, we wrote a grant together. So, you know, I wanted to have his opinion on PTI-125.

Q And do you recall, generally, what his opinion was, either at this time in December 2014 or at any time, what his opinions have been on simufilam?

A Well, I have to read his answer, I guess.

Q But setting aside, we'll go through the e-mail.

But do you have a recollection, independent of this document, of the feedback or opinions that David Calderwood has expressed about simufilam?

MR. CAMPBELL: Object to form.

A I think David is an extremely skeptical scientist. And he will only trust someone's data if he reproduces it. So any study publish, David will trust it if he reproduces it. And it's particularly true for Filamin A where in his own hands, he want to reproduce it. So in my opinion, he will presumably say I'm not sure.

Q And when you say he's very skeptical for that reason, how is that different from the way you described the studies that you are relying on which are only your studies?

MR. CAMPBELL: Object to form.

A So my study -- so he's not skeptical about his studies. So what do you mean skeptical about my study?

Q No. I thought you had earlier described you yourself are only relying on the experiments or studies

DR. ANGELIQUE BORDEY

that you have done with simufilam, not anyone else's; right?

A Because I cannot talk for someone else studies -- right? -- how they did it.

Q Just a moment ago, you described Dr. Calderwood as being a very skeptical scientist, and the reason you gave was that he only trusts or relies on his own studies; right?

A Yes.

Q Isn't that the same position that you're taking?

A So are you saying that I'm saying the same thing?

Q I'm just trying to understand if your description of his skepticism is based on anything different than your approach or skepticism to other people's work.

A I think in general, we -- if we know the investigator, and we know how the experiments are done, and we know they double check their lab members'

DR. ANGELIQUE BORDEY

work, we will be trustful, more trustful of the result. But we tend to, you know -- every scientist is trained to be skeptical. And often -- and we train our students to be skeptical.

And to trust something 100 percent when someone else has validated it, it does not mean the work is wrong. And David is the same. I think a trust might work. And it's why we had a grant together. And I trust his work because I know how he runs his lab.

Q I don't think you actually answered the original question which was, independent of this exchange, do you recall Dr. Calderwood's feedback or opinions expressed about simufilam?

A Not in-depth. I have to read it.

Q What do you recall generally?

A David will presumably say I have to read the papers. So I don't remember his original first answers.

DR. ANGELIQUE BORDEY

Q Over time, like when's the last time you spoke to Dr. Calderwood about simufilam?

A When we wrote the grant. And last year when we did the experiments together, we have a shared postdoc.

Q In the context of that grant writing or work, has he expressed views about simufilam to you?

MR. CAMPBELL: Object to form.

A I mean I think since we have a grant to look whether simufilam somehow modulate Filamin A function, that would be fair to say, that David has the hypothesis that simufilam modulates Filamin A function.

Q But has he ever said that to you?

A It's in the grant. We work together.

Q But has he ever said to you that he believes simufilam might modulate Filamin A?

DR. ANGELIQUE BORDEY

A We don't use the word, believe. We raise hypothesis that it might actually modulate Filamin A's function, like we would not say we demonstrate. We suggest. The data suggests. So we will know once we have accomplished the experiments.

Q Did he ever suggest or ask or imply that the grant that you're working on together should not include simufilam studies?

A I don't recall. I think the first version of the grant, not this one, R21. The R01, we reduced Filamin A experiment to the minimum because NIH grant usually a more mechanistic, not drug-specific. It's a threonate-based, genetic tools-based. This kind of R01 usually not based on finding the mechanism of a drug.

Q And sitting here today, what is your impression of Dr. Calderwood's views on simufilam?

MR. CAMPBELL: Object to

form.

A I have to read what -- I don't recall what he said at the time.

Q No. Sorry. I'm not asking you about this 2014 e-mail right now.

I'm asking you, sitting here today, based on your work with David Calderwood over the years, what is your understanding of Dr. Calderwood's views of simufilam.

A Dr. Calderwood, David Calderwood's view and mine are the same, that we don't know whether simufilam -- and we don't know how simufilam modulate Filamin A. We have a hypothesis that it might. And we will test it.

Q Let's look at the e-mail now.

So page 329, Dr. Calderwood responds to you on December 19th, 2014. Do you see that?

A Yeah.

Q And in the second paragraph, he writes, "All in all, I think the

DR. ANGELIQUE BORDEY

evidence, that simufilam is exerting its effects through binding to Filamin A, is not compelling. It remains possible that this is what is happening, but there's just so little evidence. I am very skeptical that this is what is happening. And if it is, I am doubtful that it is happening in the way they think, i.e., through interactions with the pentapeptide in IgFLNA24."

Do you see that?

A Yeah.

Q So Dr. Calderwood, fair to say, was very skeptical of the scientific claims that Dr. Wang and Cassava had made about simufilam's purported mechanism of action in Alzheimer's disease; right?

MR. CAMPBELL: Objection to form.

A No. That's not what he wrote.

Q What is your understanding of what he wrote?

A His writing is focused on

DR. ANGELIQUE BORDEY

the exact mechanism of exact ways simufilam may bind Filamin A. He has nothing to do with AD.

Q But you're familiar with Cassava's claim that simufilam's mechanism of action in Alzheimer's patients is that it binds Filamin A at the binding site, IgFLNA24; right?

MR. CAMPBELL: Object to form.

A I'm not actually sure that's their claim, to be honest. My understanding from that January science paper -- and I did not look in-depth at the others -- is that it disrupt an interaction with the Alpha-7 Nicotinic Receptor in Filamin A or Toll-Like Receptor in Filamin A.

And that's the connection to Alzheimer's disease. I don't find there's any evidence of binding to Ig24. I don't think they have -- I don't know if they have shown a connection to Alzheimer's disease. But I did not read

DR. ANGELIQUE BORDEY

all the publication. And it's not referring to Alzheimer's disease.

Q But he's expressing skepticism that simufilam is binding to Filamin A; right?

MR. CAMPBELL: Object to form.

A He thinks that the data are not compelling. The skepticism is that exactly -- my understanding is that that's the exact -- so what he says. It's happening in the way they think. So he does not mean that it might not bind to Filamin A. It might still bind to Filamin A but maybe not the way they think.

Q Well, he said it's possible that simufilam is binding to Filamin A, but there's just so little evidence; right?

MR. CAMPBELL: Object to form.

A It's what is written.

Q And he writes that he is

DR. ANGELIQUE BORDEY

very skeptical that simufilam A is binding at the binding site on Filamin A IgFLNA24; right?

MR. CAMPBELL: Object to form.

A The way they think through interaction with the pentapeptide in Ig24.

So if I read his sentence the way you did as well, he is not certain. He is skeptical that the interaction is through that pentapeptide.

Q That's the binding site on Filamin A that Cassava had claimed simufilam binds to; right?

MR. CAMPBELL: Object to form.

A Presumably one of the binding sites.

Q What other binding sites are you aware of?

A It does not mean if you find one that there are no others. So it's, you know, one of them, possibly.

DR. ANGELIQUE BORDEY

Q It's the one that Cassava claims simufilam bound to; right?

MR. CAMPBELL: Object to form.

A The papers -- I think -- one of the first paper is very complex. And I think this is conclusion, I think, of the publication. For me, it's a complex paper to read, but yeah.

Q Dr. Calderwood continues in the next paragraph to describe one of the Plus One papers from Dr. Burns. Do you see that?

A Yes. That's the complex paper.

Q What is your understanding of what Dr. Calderwood is saying in this paragraph? And you could take a moment to read it because I know it's a few sentences.

A Yeah. I mean I don't remember the Plus One paper in details. I always found it a very complex paper to read. And David, as he says, it's not

DR. ANGELIQUE BORDEY

his area of expertise either.

Q So what is your understanding of his concern, if it's fair to call it a concern, expressed in that paragraph?

MR. CAMPBELL: Object to form.

A Yeah. I'm still reading it. Again, this is a complex e-mail. Going through halfway, David thinks unlikely but not impossible.

Q Unlikely, but not impossible what?

A That -- in the follow-up paper, they reviewed that these site on Filamin A binds to the mu opioid receptor and that it can also bind to Filamin A itself again, which actually is not clear, that binds many thing. I think it's referring to the pentapeptide. But it's not really clear. It's a long e-mail, but out of context. It's discussing two papers and then a third paper.

DR. ANGELIQUE BORDEY

And again -- I forgot, actually. This mechanism of action, it's not my work. AD, Alzheimer's disease, is not what I study. It's really not clear.

Q Are you done with the e-mail?

A I'm a slow reader. I'm sorry.

Q It's okay.

A Okay. I'm good. I'm done.

Q So what is your impression of Dr. Calderwood's opinion at this point in time?

A That he is a good scientist. He says I'm not sure. Possible. We need to test further.

Q And in the conclusion sentence, he writes, "In conclusion, whether simufilam really binds Filamin protein, and if so how binding at this surface site on IgFLNA24 impacts so many Filamin interactions is really not clear."

Do you see that?

DR. ANGELIQUE BORDEY

A Yes.

Q And then further down, he writes, "Anyway, I remain very skeptical that this is working through Filamin, but it is intriguing that it produces effects in your model."

Do you see that?

A Yes.

Q And then he describes -- at the end, he has some questions for you.

"Do we know if simufilam alters Filamin expression levels in your model? If not, could mu opioid receptor or nAchR readily be implicated in the response?"

And then he continues.

Do you see that?

A Yes.

Q And then you forwarded David's comments to Dr. Burns; right?

A Yeah.

Q And what was your understanding of Dr. Burns's or anyone else's, Cassava's reaction to

DR. ANGELIQUE BORDEY

Dr. Calderwood's skepticism?

MR. CAMPBELL: Object to form.

A Well, I have to read her answer. I do not remember. So I forwarded. Sorry. Where is her answer?

Q Let's start at the next e-mail from you to Dr. Burns on January 2nd.

You write, "Lindsay, here are David's comments. He is quite direct. So do not feel offended."

Do you see that?

A Yes.

Q And why did you say that to Dr. Burns?

A Because as many scientists, David is skeptical. And it suggests the data need to be reproduced or tested in another way.

Q And why did you think Dr. Burns might be offended?

A Because he's skeptical of the data. So, you know, some people

DR. ANGELIQUE BORDEY

don't take it well, you know. If you tell them I'm not sure, we need to do it again, some people get upset. I did not know Lindsay Burns very well.

Q And Dr. Burns responds.

"Just finding this now and gave it a quick read."

Do you see that sentence in that paragraph?

A Yes.

Q And she says, "We are used to skepticism."

Do you see that?

A We're used to skepticism, yes.

Q Do you have any understanding of what, if anything, Dr. Burns or anyone at Cassava did to address or alleviate the skepticism expressed by Dr. Calderwood?

MR. CAMPBELL: Object to form.

A I have no idea what was going on at Cassava, so no.

DR. ANGELIQUE BORDEY

Q Do you know if anyone replicated the experiments that produced the data that Dr. Calderwood was skeptical about?

MR. CAMPBELL: Object to form.

A You mean anyone in the world?

Q Are you aware of anyone having done that?

A This is a lot of experiments that it's referring to. I think only -- I mean I'm not sure. I think the Italian group may have done some. I don't remember the abstracting details, whether they used the pentapeptide or not. I do not remember that. And whether other people did it, I do not know.

Q Aside from perhaps the Italian group, sitting here today, can you think of anyone else who has replicated any of the experiments that Dr. Calderwood was referencing in this e-mail?

DR. ANGELIQUE BORDEY

A I mean it's a little hard to answer the question because I have not looked for anybody doing it. So I don't know.

Q I think you're answering it.

I'm asking you, are you aware of, sitting here today, any such experiments?

A I mean we are trying to understand some Filamin function. So we are doing it with David.

Q Dr. Calderwood, are you referring to the grant that you're working with him on?

A Yes. So the experiments are not exactly the same. We don't work in Alzheimer's disease. It's in TSC condition. But we're looking to see whether some Filamin somehow interact with Filamin A, one way or another.

Q And those studies are still ongoing? You haven't produced any results yet; right?

A Yes. I wish to have result.

DR. ANGELIQUE BORDEY

We're working on it.

Q When those results come in, are you going to publish or disclose publicly those results, whether they're good, bad or indifferent?

MR. CAMPBELL: Object to form.

A I mean for us, usually, we will -- so if you look at the grant or the abstract, which is publicly available, a lot of the core of the grant is to look at binding partner of Filamin A in TSC condition. The hypothesis is that they change. They may change; they may not change.

And luckily now, journals accept that they are either negative or positive. So, yes, we will publish it because it's important for any scientist who want to work on Filamin A.

Q Aside from this exchange here where Dr. Calderwood's comments were forwarded to Dr. Burns, are you aware of any other instances where Dr. Calderwood

DR. ANGELIQUE BORDEY

interacted with anyone at Cassava about simufilam?

A I cannot doubt that he interacted. But I do not know.

MR. KUMAGAI: Let's take a break.

THE VIDEOGRAPHER: The time is 12:06. We are going off the record.

(A lunch recess was taken.)

THE VIDEOGRAPHER: The time is approximately 1:04 p.m. We are back on the record.

Q Good afternoon, Dr. Bordey.

MR. KUMAGAI: I'll mark an exhibit, Plaintiffs' Exhibit 109, a document Bates Stamped CASSAVA_000044890.

(The above-referred-to document was marked as Exhibit 109 for identification, as of this date.)

Q The top e-mail appears to be an e-mail from you, dated January 23rd, 2019, to Dr. Lindsay Burns. Do you see

that?

A Yes.

Q If you go to the bottom of the thread, the very first e-mail on January 23rd, 2019 with the subject, Sex Differences, from Dr. Burns, do you see that?

A You mean at the end?

Q Well, it's technically the start of the chain, but yes.

A Yeah. I see, yeah.

Q And it appears Dr. Burns is suggesting that you test for potential differences between male and female mice; is that fair?

A Yes.

Q And then there's sort of a back-and-forth throughout January 23rd between you and Dr. Burns. And I just want to direct your attention to the e-mail on page 891 from you to Dr. Burns on January 23rd at 2:11 p.m. Do you see that e-mail?

A Yes.

DR. ANGELIQUE BORDEY

Q And you write, "I can ask David Calderwood, my collaborator on the FLNA grant. David is a hardcore cell biologist. And he is not convinced by the binding data. But we will cite data related to simufilam and FLNA."

Do you see that?

A Yes.

Q What was that referring to?

A Let me read the e-mail string, I guess. I'm not too sure what I was referring to. It's not convinced because -- okay. I'm assuming -- I'm referring to a question I have. You still don't know if PTI-125 is binding and altered confirmation or not? No, no. That's from Lindsay, yeah, Lindsay to me, yeah. That was a question to me.

And I said David is not convinced by the binding that we discuss earlier today where he was skeptical about the data and need to be reproduced.

Q And at this point in 2019, Dr. Calderwood, based on the e-mail of

DR. ANGELIQUE BORDEY

Dr. Burns here, was still skeptical of the binding data from simufilam; is that right?

A So I don't remember the time of the other e-mail or the year of the other e-mail. We have not done any experiments I think yet to confirm in our hands or explore in our hands, binding between Filamin A and simufilam. So if we don't have in our hand, experiments, David will remain skeptical.

Q And that's still true today; right? You or Dr. Calderwood still don't have any data in your hands, demonstrating simufilam binding Filamin A; right?

MR. CAMPBELL: Object to form.

A We are still working on these experiments. And again, we're not -- binding is a very broad term, I think. We're looking whether Filamins somehow interact with Filamin A function.

Q If you continue reading the

DR. ANGELIQUE BORDEY

rest of the chain, after your response when you tell Dr. Burns about Dr. Calderwood's not being convinced by the binding data, Dr. Burns responds, "Ooph, what binding data?"

Do you see that?

A Yeah. That's why it was not clear in my previous e-mail. That's why it's a little hard to know what it actually meant at the time.

Q There's a couple of more e-mails between you and Dr. Burns.

And then Dr. Burns in the last e-mail on January 23rd, 2019 at 3:46 p.m. writes to you, "And by the way, companies have to go through GLP labs and the data QC'd. Most companies are suspicious of academic data that is just from one lab."

Do you see that?

A Yes.

Q And then you respond, "I know, and they should be."

Do you see that?

DR. ANGELIQUE BORDEY

A Yes.

Q So you were telling Dr. Burns in January 2019, you agreed that companies should be suspicious of academic data that is from just one lab; is that right?

A I think what I would -- I would not use the word, suspicious. I would use the word, skeptical, like David and I are. We're skeptical from data from only one lab. We don't know how the data were acquired. If we do not know the lab, usually, we like to have data reproduced.

Q And Dr. Burns here, though, does say, "Most companies are suspicious of academic data that is from just one lab."

And in response to that, you respond, "I know, and they should be"; right?

A Yes. And I implied that they should be skeptical like we are skeptical. I mean I don't know what

DR. ANGELIQUE BORDEY

company did at the time.

Q We talked a bit earlier today about Dr. Wang's lab at CUNY; right?

A Yes.

Q And that was an academic lab; right?

A Yes.

Q And you're aware that Dr. Wang's lab was responsible for all of Cassava's preclinical data on simufilam; right?

MR. CAMPBELL: Object to form.

A Well, I don't know if it was all of them. I mean company of their own data. So I don't know that. I did not know that.

Q But assuming Cassava's preclinical data on simufilam was from Dr. Wang's lab, it was your view that Cassava should be skeptical or suspicious of relying on that data; right?

MR. CAMPBELL: Object to

DR. ANGELIQUE BORDEY

form.

A They should be skeptical. And I don't think they relied only on his data. I think they worked with other groups, one in France, and it's possible Lindsay was on this abstract from this Italian. I don't remember 100 percent. So they contracted other labs.

Q What does it mean to get data QC'd?

A Quality control. So now having been in a company, you do have someone in a company that will make sure their CRO, Corporate Research Organization, our labs have the appropriate procedure in place to perform experiments.

Q And so was the data that you published on simufilam QC'd?

A They never came to my lab to double check everything.

Q So no?

A Well, the reason is because the raw data published, everything is

DR. ANGELIQUE BORDEY

published online. Everybody can access the data, reproduce statistical analysis. Everything is published online.

Q And that is your understanding of the reason why your data was not QC'd in the paper you published on simufilam?

A And simufilam did not -- Cassava did not own my data. I did not do work for Cassava.

Q Do you know whether any of the simufilam data that Dr. Wang or Dr. Burns have published was QC'd?

A I do not know.

Q You could set that aside.

MR. KUMAGAI: I'll mark Plaintiffs' Exhibit 110, a document Bates Stamped BORDEY171.

(The above-referred-to document was marked as Exhibit 110 for identification, as of this date.)

Q Exhibit 110 appears to be an e-mail exchange between yourself, Dr. Burns, copying David Lewin and Longbo

DR. ANGELIQUE BORDEY

Zhang with an attachment, beginning on the page 172. Do you see that?

A Yes.

Q What's going on in this e-mail exchange between you and Dr. Burns?

A All right. Let me see, read it.

Q It appears as though you sent Dr. Burns a draft of the manuscript that you eventually published in 2020. And then Dr. Burns responded by providing some proposed edits and comments; is that fair?

A What she says, I need to go through the initial comments, yes.

Q And David Lewin and Longbo Zhang, why are they included in this exchange?

A Longbo is the first author of the manuscript. So I was keeping him informed. He's also on the patent application. So he was informed.

David Lewin was an associate

DR. ANGELIQUE BORDEY

director at -- OCR is the Office of Corporate Research that was handling all our patents. So since I propose a timeline for patent application and submission, these guys needed to know.

Q And Longbo, was he sort of junior to you, like did he work for you in your lab or how would you describe the relationship with him?

A Yes. He was one of my trainees.

Q And am I saying his last name right? How do you say it?

A I think you're fine.

Q So Dr. Burns provided comments to the draft of the paper that you eventually published in 2020 in Translational Medicine; is that right?

A Yes.

Q And the attached document has some edits from Dr. Burns. If you just kind of flip through, you could see the redline. Do you see that?

A It's black and white.

DR. ANGELIQUE BORDEY

Q Not red line. But you could see track changes and some comments. Do you see that?

A Yeah.

Q LB1 comment on page ending in 175.

A Yes.

Q And is that Dr. Burns?

A LB presumably, yes.

Q If you go to the page 175, are you there?

A Yeah. Where there was the comment; right?

Q Yes.

The first paragraph reads with Dr. Burns's edits, "To investigate the therapeutic potential of modulating FLNA activity, we tested whether a small molecule targeting FLNA would reduce seizure activity. PTI-125 binds and restores an altered confirmation of FLNA and is currently in clinical trials for Alzheimer's disease. Whether the confirmation of FLNA is altered and TSC

DR. ANGELIQUE BORDEY

is unknown, although its function and/or confirmation may be altered simply by its overexpression, PTI-125 binds altered and native FLNA with femtomolar and picomolar affinity, respectively."

Do you see that?

A Yes.

Q And so you had, it looks like, initially described simufilam as a small molecule modulator of FLNA, and then Dr. Burns revised the language to this language we just read; is that right?

A Yes.

Q And Dr. Burns added the language, stating that simufilam binds and restores an altered confirmation of FLNA; right?

A In Alzheimer's disease.

Q Right?

A With the addition that it's in Alzheimer's disease, yes.

Q And Dr. Burns also added the sentence, "Whether the confirmation of

DR. ANGELIQUE BORDEY

FLNA is altered and TSC is unknown, although its function and/or confirmation may be altered simply by its overexpression"; right?

A This is what is written, yes.

Q Those are Dr. Burns's edits; right?

A Yes.

Q It looks like Dr. Burns revised the next sentence to state that simufilam binds altered and native FLNA with femtomolar and picomolar affinity, respectively. Do you see that?

A Yes.

Q Is that true?

MR. CAMPBELL: Object to form.

A I would have to go back to her paper, No. 19 --right?-- to see what she claimed in that paper. And she does not imply in TSC. It is in 19, whatever condition was used in that paper.

Q If you look at the

DR. ANGELIQUE BORDEY

references on page 181, Footnote 19 appears to be a reference to Dr. Wang's 2017 paper in Neurobiology Agent. Do you see that?

A Yes.

Q Have you reviewed that paper?

A No. Like I said earlier, I never really read these paper in-depth. But Neurobiology of Agent, I assume it's Alzheimer's disease.

Q So you haven't done anything to try and confirm the claim that simufilam binds altered and native FLNA with femtomolar and picomolar affinity, respectively; right?

MR. CAMPBELL: Object to form.

A So we're working right now trying to have experiments to understand whether simufilam somehow interact with Filamin A which include examining whether it binds to Filamin A.

Q But at this time in 2019 and

DR. ANGELIQUE BORDEY

up to the point when you published the final version of this paper in 2020, you had not conducted any studies to verify the claim that simufilam binds Filamin A; right?

A I had not verified -- I had not performed experiment to verify this in Alzheimer's disease, in Alzheimer's. With David Cassava, we had a grant together to see whether simufilam could somehow interact with Filamin A in TSC condition.

Q And in the context of that grant and those experiments, did you verify or confirm whether simufilam interacts with Filamin A?

A We're still working on these experiments.

Q As of today, you have not?

A As of today, yes. We're still working on these experiments. It's not a trivial question to address.

Q You could set that aside.

MR. KUMAGAI: I'll mark as

DR. ANGELIQUE BORDEY

Plaintiffs' Exhibit 111, a document Bates Stamped CASSAVA_001045560.

(The above-referred-to document was marked as Exhibit 111 for identification, as of this date.)

Q The top e-mail in Exhibit 111 appears to be an e-mail from you to Dr. Burns, dated March 20th, 2019. Do you see that?
A Yes.
Q And the subject line is Decision on Pre-Submission Inquiry NMED-PI96389. Do you see that?
A Yes.
Q What's going on in this exchange here?
A Go back to the beginning.
Q It appears as though you had submitted the manuscript that ultimately became the 2020 paper to this journal, Nature Medicine, and they declined to publish it; is that right?
A They declined to review it.
Q What's the difference?

A It's a two-step journal where you send it to the editors. And the editor will go through it pretty quickly and decide whether they want to review it or not because they may have 1,000 submission, and they publish 10 papers. So they don't review all the papers that are submitted.
Q And in the third paragraph of the e-mail on March 15th, 2019 from Brett Benedetti on the page 561, do you see that?
A Yeah.
Q The third paragraph, Dr. Benedetti writes, "In this case, while we appreciate the potential of targeting Filamin A with simufilam to lower seizures, it seems from materials provided that this compound has only been tested in one rodent model. The cover letter mentions a potential co-treatment strategy with rapamycin, but it wasn't clear if the study has demonstrated a synergistic effect of simufilam and rap.

DR. ANGELIQUE BORDEY

As you have seen over the last year, Nature Medicine has begun."

And it continues.

Do you see that?

A Yup.

Q So is it fair to say that Nature declined to review it because they wanted to see simufilam in combination with rapamycin?

MR. CAMPBELL: Object to form.

A This is not the only reason.

Q Is it fair to say that was one of the reasons?

A Presumably one of the reason. But to me, the major reason is not that.

Q What's the major reason?

A So our work was pre-clinical. We used mostly essentially mice. And they wanted human data. I think it seems to be one of the major reasons.

Q And have you in the time

DR. ANGELIQUE BORDEY

since this e-mail done any studies of simufilam in combination with rapamycin?

A No, we did not.

Q And why not?

A If someone comes and give me $200,000 to do it, we would have really happily done it. But we have many more resources in our lab. And we have to make strategy decision, what we pursue. At the time, it was not a primary question.

Q Isn't the way simufilam would be used in a clinic as a treatment in combination with rapamycin?

MR. CAMPBELL: Object to form.

A I would say some of the patient will have rapamycin, and some will not.

Q And are you currently conducting tests or planning to conduct tests of simufilam in combination with rapamycin?

A Not at the present time.

Q And by present time, you mean today, sitting here today?

A Not now. We have never done it, yeah.

Q Are you planning to test simufilam in combination with rapamycin in any rodent model before trying to administer simufilam to children?

A I think the question is more like, why would we do this? If there was a synergistic effect, I think we would find out when we give it to patients.

In a mouse model, it's difficult because rapamycin is like a sledgehammer. And out of the lot of the doses that is used, there's not much left to rescue. The mice respond very well. Rapamycin has better the blood brain barrier of mice than human. Human passes a very low level. So it's not as informative to do it in mice.

MR. KUMAGAI: I'll mark as Exhibit 112, a document Bates Stamped BORDEY207.

DR. ANGELIQUE BORDEY

(The above-referred-to document was marked as Exhibit 112 for identification, as of this date.)

Q The subject line at the top e-mail refers to a draft license agreement. You see that?

A Yes.

Q And I just want to direct your attention to the e-mail from you to David Lewin on April 5th, 2019.

You write, "Gezzz. That guy is such a pain. His company has done so poorly over the years. And I even don't believe that they will make it work for the Alzheimer's treatment. Wrong patient population. They don't hire the experts presumably to not pay them while Remi salary is 1 million."

You see that?

A Yeah.

Q And you're referring to Remi Barbier as the guy who is such a pain; right?

A Yes.

DR. ANGELIQUE BORDEY

Q And you're referring to Cassava when you refer to the company that's done so poorly, and you don't believe will make it work for Alzheimer's; right?

MR. CAMPBELL: Object to form.

A So this e-mail is referring to Cassava, indeed.

Q What did you mean by that guy is such a pain with respect to Mr. Barbier?

A So let me give you some context here, though you might know. I think this e-mail chains was after David Lewin interacted with Remi. I was BCC'd on the e-mails. And I actually never looked at them because I hate these kind of things.

And unfortunately at the time, Remi Barbier did not license our patent. And I have to say, my reaction was twofold, really sad and angry. It was a lot of work. And we were under the

DR. ANGELIQUE BORDEY

impression they would.

So that e-mail is me being angry. That's as far as it goes. And it's a reaction to the lack of licensing the patent because I believed that it would have been great to give it to patent in TSC. And they need a new treatment.

Q And what gave you the impression that the company or Mr. Barbier were going to license the patent?

A We had beautiful interaction with Lindsay Burns. And Lindsay knew and I completely agreed that the patent belongs to Yale from the beginning. And I cannot speak for Cassava. I was not in the company. So I don't know what happened intimately, why they ultimately did not license.

Q But your understanding that the company would license was based on your interactions with Dr. Burns; is that fair?

A I mean Yale has a long-standing practice of working with companies. And if they provide an MTA, usually a company shows interest, and it's very common that if the company has the financial mean, they will license the patent, have an exclusivity and exclusive license of the patent.

Q And what was your understanding of why they decided not to license the patent?

A I actually did not know at the time. I did not know.

Q What did you mean when you wrote, "His company has done so poorly over the years," referring to Cassava?

A I think Remoxy, presumably, that they failed in 2019, I was likely referring to Remoxy or Remoxy. I don't remember how we say it.

Q And at this time, were you a shareholder of Cassava?

A 2019, likely not. But I'm not sure. Likely not.

DR. ANGELIQUE BORDEY

Q What did you mean when you wrote, "I even don't believe that they will make it work for Alzheimer's treatment"?

A I was frustrated and angry. So that's me venting.

Q And you were presumably referring to simufilam as an Alzheimer's treatment?

A Yes.

Q What made you say that? Why didn't you believe that Cassava would make Cassava work as an Alzheimer's treatment?

MR. CAMPBELL: Object to form.

A Because every company failed before that.

Q And what did you mean by wrong patient population?

A You know, I'm not an Alzheimer's disease expert. But like epilepsy, when you're going after many epilepsy patient, there are many cause

DR. ANGELIQUE BORDEY

that lead to epilepsy.

Presumably, my opinion, although I don't have any evidence, but my thinking, there are many cause that leads to Alzheimer's disease. So it's a mixed patient population. So the drug may work; may not work. I don't know.

Q And what did you mean when you wrote, "They don't hire the experts presumably to not pay them well, Remi salary is 1 million"?

A Yeah. So it presumably says it all, that actually -- obviously did not know who worked at Cassava Sciences. But I was angry, and I was just venting. I was just -- it was a disappointment.

Q Has your opinion of Mr. Barbier changed since you wrote this e-mail in April 2019?

A I mean that e-mail is again to take with a grain of salt. It's someone who is angry after disappointing news. I have never met Remi Barbier. I don't know the guy.

DR. ANGELIQUE BORDEY

Q Has anything happened to change your opinion that he was such a pain?

A I mean I don't know the guy. So I cannot comment whether he was actually a real pain for his company or not.

MR. KUMAGAI: I'll mark as Exhibit 113, a document Bates Stamped CASSAVA_000024221.

(The above-referred-to document was marked as Exhibit 113 for identification, as of this date.)

Q Exhibit 113 appears to be an e-mail from you to Dr. Burns, dated October 16th, 2019.

And you write, "Lindsay, this is our latest draft in the rebuttal. We will submit next week."

Do you see that?

A Yeah.

Q And then the attachment beginning on the page 270 is titled Answers to the Reviewers. Do you see

DR. ANGELIQUE BORDEY

that?

A Yes.

Q And what is this attachment?

A So I'm assuming it's for Science Translational Medicine. We submitted the paper. It was ultimately reviewed. It is very common practice to have reviewer comments getting back at you. And you have to address the comments.

Q And I want to draw your attention to a few of the comments.

If you go to the page ending 272 at the bottom of that page, there's a paragraph that begins "G5."

Do you see that?

A Yes.

Q And it runs on to the next page. Do you see that paragraph?

A Yes.

Q And the reviewer writes, "There are no evidences they are demonstrating that PTI-125 modifies the structure of normal Filamin A or the

DR. ANGELIQUE BORDEY

interactions of Filamin A with its normal partners."

Do you see that?

A Yes.

Q What do you understand that to mean?

A Let me see. So it's still the reviewer's comment; right? Yeah.

Q Dr. Bordey, do you have an understanding of what that meant?

A Yes. I'm just finishing reading my answers to them. Yeah. I think my understanding in the way I answered the reviewer's comment is that the reviewer was confused. And he thought we propose that simufilam worked by interacting with a Beta and Alpha-7 nicotinic receptors. And I think this is not what we implied in the discussion.

So my answer acknowledge that we do not know the mechanism. And it could be Filamin A independent. And we modified our discussion.

Q You don't know the mechanism

DR. ANGELIQUE BORDEY

of simufilam, is what you're referring to; is that right?

A Yes. In TSC, we do not know the molecular mechanism, right.

Q And in your response, the third sentence, you write, "What we know is that PTI-125 binds native FLNA, as well as FLNA and Alzheimer's disease," citing Footnote 12."

Do you see that?

A Yes.

Q And did you know that to be true at the time or was that just based on Dr. Wang's reported research?

MR. CAMPBELL: Object to form.

A Since the reference is from Dr. Wang and Burns, I'm referring to their paper of Alzheimer's disease.

Q So did you know, one way or the other, at the time whether or not PTI-125 binds native Filamin A, as well as Filamin A Alzheimer's disease?

MR. CAMPBELL: Object to

DR. ANGELIQUE BORDEY

form.

A Myself, I did not do the experiment. But when you write a paper, you cite Peer Reviewed publication. The Peer Reviewed publication suggests that simufilam binds Filamin A in Alzheimer's disease. So we made reference to the publication.

Q And that's the 2017 paper by Dr. Wang and Dr. Burns published in Neurobiology of Aging that we had talked about earlier today; right?

A That's right.

Q And you testified earlier that you have not reviewed that paper; is that right?

A I did not look at it in-depth. But you can read the -- you can read the title of the paper.

Q Did you review more than the title of the paper?

A I don't think I reviewed that paper in-depth in 2017. I guess I presumably glanced at it. But I did not

DR. ANGELIQUE BORDEY

look in-depth; you know, you cite a paper, and people like you and others will read it. And it's a Peer Reviewed publication. And this is what you do in a discussion.

Q And when you're publishing or authoring articles, is it common for you not to review, in-depth, the articles that you cite in your footnotes?

MR. CAMPBELL: Object to form.

A For that particular paper, it has no bearing on our paper. It has no implication on Alzheimer's disease, compared to TSC.

Q So Dr. Wang and Dr. Burns's 2017 paper has no bearing on your 2020 paper published concerning simufilam?

A So the finding in that paper was not used or useful for the design of our study published in 2020.

Q So why cite it at all?

A It's a discussion. So you discuss possible mechanism of action.

DR. ANGELIQUE BORDEY

And like we state, we do not know in TSC. And like we agreed with the reviewer. It could be Filamin A-dependent or it may be Filamin A independent. But you provide reference for people who read the papers so they have -- if they want to, they go and read it.

Q And is that still true today, your agreement with the reviewer, that simufilam may reduce seizure through an FLNA independent mechanism?

A So I agree that simufilam may reduce seizure through Filamin A-dependent or independent mechanism. We're working on the mechanism.

Q And that's your opinion today?

A Yes.

Q In your response, you write, "We also added in the discussions that based on data in Alzheimer's disease, one possible mode of PTI-125 actions is by binding to Filamin A that may have an abnormal confirmation and

DR. ANGELIQUE BORDEY

thus abnormal binding partners. However, this suggested mechanism would need to be validated. And the binding partners would need to be identified."

And I think I know the answer. But I just want to be clear.

Sitting here today, have you validated the mechanism or identified the binding partners of simufilam?

MR. CAMPBELL: Object to form.

A In TSC, we're working on it, in TSC condition.

Q So as of today, not yet, but you're working on it?

A Not yet, but we're working on it.

Q What about in the Alzheimer's disease context?

A We never worked on Alzheimer's disease context.

MR. KUMAGAI: I'll mark as Plaintiffs' Exhibit 114, a document Bates Stamped CASSAVA_00023050.

DR. ANGELIQUE BORDEY

(The above-referred-to document was marked as Exhibit 114 for identification, as of this date.)

Q This is an exchange between you and Dr. Burns and some others in November of 2019 into December of 2019. Do you see that?

A Yes.

Q And it appears as though the first e-mail at the bottom of the chain is a note to you, saying that the Science Translational Medicine has agreed to publish your paper; is that right?

A I'm sorry. The next page; right? Yes.

Q And then I want to direct your attention to the e-mail on the page ending 050, the first page from you to Dr. Burns on December 2nd at 8:10 a.m. Do you see that?

A Yes.

Q You write, "Lindsay, we did a complete dose response curve based on the publication and chose 12 milligrams

DR. ANGELIQUE BORDEY

per kilogram based on the ultimate data. We did consider your recommendation, but we could not go with it without a dose response curve. It's not in the paper because too much simufilam, starting at 60, made everything worse, at least for one age paradigm. 30 milligrams per kilogram was not better or slightly worse than 12 milligrams per kilogram. In our case, too much or too little Filamin A is bad, as we've already shown in our original paper."

You see that?

A Yes.

Q What were you referring to there?

A You mean referring in terms of actual experiments?

Q Yes.

What did you mean by we did a complete dose response curve?

A Prior to performing the seizure experiments, we injected mice with different concentration of

DR. ANGELIQUE BORDEY

simufilam, different doses. And our readout was cell size to see what's the -- what could be the best dose to reduce cell size.

In the paper we published, we compared and published 6-milligram versus 12-milligram per kilogram. And 12 was better. And we had done additional experiments comparing 12, 30, 60, 120. And 12 seems to be better. We have not done 20, for example. Just wanted to make sure, you know, was the right dose or close to the right dose to give.

Q And so why omit the data from the simufilam experiments with 30, 60 and 120 milligrams per kilogram from the paper?

MR. CAMPBELL: Object to form.

A I think at the time, we -- we had done preliminary experiments that were actually published in -- that were included in grants application. But we did more extensive measurement at 6 and

12 for publication. The effect at 12 was pretty good. So there was no reason to include additional doses.

Q And what was your understanding for why higher doses than 12 produced worse effects or no effects?

A We don't have all of the data to answer the question. But it is not uncommon for a drug to have a bell-shaped curve where you have an optimal concentration to get the right effect.

Q Have you determined what dose of simufilam you planned to propose for any clinical trials in the TSC program?

A So this is a Cassava question. I mean if you look at our PowerPoint on the investor, the investor slide on our Web site, we have tried three concentration: 5, 10 and 20. 20 was better than 10, yeah. 20 was better than 10. And we perform PK studies to see what is the actual concentration in

DR. ANGELIQUE BORDEY

mice to know exposure and how that might translate in human.

Q And was 10 better than 5?

A 10 was better than 5.

Q So in the latest studies, it's not a bell shape; is that right?

A It might be because we did not try 30, 60 and 120.

Q And why didn't you try 30, 60 and 120 or higher doses than 120?

A Because these experiments are -- if we could with an infinite amount of money, we would do. These experiments are extremely time consuming and costly. EEG recordings are extremely technically tedious and difficult, require a lot of analysis and a lot of mice. This is not cell experiment.

Q In that same e-mail further up the chain, your e-mail to Lindsay, you write, "By the way, we have no mechanism of action."

Do you see that?

A Yes.

DR. ANGELIQUE BORDEY

Q You had not determined at that point what simufilam's mechanism of action was in TSC; is that right?

A So as we discussed before, there are two types of mechanism of action. We know one type, that it restores cell size and network connectivity. And that's likely to decrease hyperexcitability of the network. This is a mechanism of action. It's usually called with a little O. And the molecular mechanism of action, we're working on it.

Q So in this paragraph here, are you referring to which mechanism of action?

A The molecular mechanism of action.

MR. KUMAGAI: Let's take a five-minute break.

THE VIDEOGRAPHER: The time is 2:01 p.m. We are going off the record.

(A short recess was taken.)

DR. ANGELIQUE BORDEY

THE VIDEOGRAPHER: The time is approximately 2:14 p.m. We are back on the record.

MR. KUMAGAI: I'll mark as Plaintiffs' Exhibit 115, a document with the title, Cover Page, and the project title, Filamin A in TSC.

(The above-referred-to document was marked as Exhibit 115 for identification, as of this date.)

Q Exhibit 115 is a document with the first page, shows the project title, Filamin A in TSC. And under the program director principal investigator information, it lists your name, Dr. Bordey. Do you see that?

A Yes.

Q Do you recognize what this document is?

A Yes.

Q And what is it?

A It's a progress report, annual progress report for your RO1 grant from NIH.

DR. ANGELIQUE BORDEY

Q So RPPR stands for Research Progress-Something report?

A Yeah. Something like that.

Q These are annual documents that you submit to the government to provide an update on the status of your research; right?

A Correct.

Q Was Dr. Calderwood involved in this grant?

A Yes. He should have been, yes. Let me see. Yes.

Q And this is one of the two grants that we've talked about today where you were -- one of your aims or part of the grant looking at simufilam; right?

A Correct.

Q If you turn to page 4 and look at Aim 3, Aim 3 is titled Investigate How Increased Filamin A Levels Leads to Dysmorphogenesis and Stalled Migration. Do you see that?

A Yes.

DR. ANGELIQUE BORDEY

Q Can you describe what that means?

A So David Calderwood was -- I think as mentioned before, we were interested to find out whether the binding partners of Filamin A would change in disease condition in TSC.

Q And what was the purpose of looking at that?

A One potential mechanism of action of how changes in Filamin A level could contribute to dysmorphogenesis and installed migration.

Q In the second paragraph under Aim 3, you write, "To investigate potential mechanisms by which PTI-125 acts on Filamin A, we purified recombinant, his tagged IgFLNA24 from bacteria."

And it continues.

Do you see that?

A Yeah.

Q And it describes IgFLNA24 as the putative PTI-125 binding site; right?

DR. ANGELIQUE BORDEY

A This contain -- yes.

Q And it describes what appears to be a study to conduct that investigation; right?

A Yes.

Q And then it says, "To date, we have been unable to verify direct simufilam binding to IgFLNA24."

Do you see that?

A Yes.

Q "This suggests that the binding site may be elsewhere in the Filamin A protein or that drug binding is not associated with alterations in the melting temperature of the well-folded IgFLNA24 domain."

Do you see that?

A Yes.

Q So what does that mean?

A So I'm not an expert in DSF, Differential Scanning Fluorimetry. So basically, I think it is taking -- it's a test tube experiment where you put that tiny chunk of Filamin A protein. And you

DR. ANGELIQUE BORDEY

apply simufilam. And you just look whether that would change the melting temperature of that protein. And that could change -- a drug binding could affect that but not -- it's not a guarantee.

Q And so this was an experiment that you and Dr. Calderwood did --

A That David did, yeah. I did not do.

Q Let me start again.

This is an experiment that Dr. Calderwood conducted in an attempt to verify direct simufilam binding to IgFLNA24; right?

A Using these type of experiment, there's one way to look for potential direct binding. But as he writes, it's inconclusive.

Q Right.

So Dr. Calderwood attempted to verify direct simufilam binding to IgFLNA24; right?

DR. ANGELIQUE BORDEY

A Yes.

Q And he was unable to verify that binding claim; right?

A I disagree with that last statement. I don't think -- based on that experiment, you cannot claim it does not bind.

Q Well, let me just rephrase.

Dr. Calderwood conducted experiments in an effort to verify simufilam direct binding to IgFLNA24; right?

A Yes.

Q And the results of those experiments did not verify direct simufilam binding to IgFLNA24?

A I disagree again with the last statement. You cannot say it does not bind. It's just inconclusive. It's inconclusive. It might bind. It just does not change the melting temperature.

Q Dr. Calderwood was unable to verify direct simufilam binding to IgFLNA24; right?

DR. ANGELIQUE BORDEY

MR. CAMPBELL: Object to form.

A I think again, it's misleading because I think I would add, using these type of measurement that looks at alteration in the melting temperature of the Filamin A protein, he found using these experiment, there was no binding. But there could be binding -- there could still be binding. It just does not change the melting temperature.

Q So the study did not demonstrate no binding, but it also did not demonstrate binding; right?

A So the study's inconclusive.

Q And who wrote this paragraph?

A David.

Q And he wrote, "To date, we have been unable to verify direct simufilam binding to IgFLNA24."

You see that?

A That's right, using DSF.

DR. ANGELIQUE BORDEY

Q And the goal of that DSF experiment was to verify direct simufilam binding to IgFLNA24; right?

A Yes. Using the specific experiment, that may or may not work because the drug may not change the melting point of the protein. That's why it is difficult to show binding or no binding.

Q And Dr. Calderwood tried to show binding using this particular method and was unable to do so; right?

A Well, again, it goes back to -- we did not show using these method, simufilam did not change. Actually, the point should be, simufilam does not change the melting point of Filamin A. Maybe binds, maybe it does not bind would have been the right conclusion.

Q Dr. Calderwood wrote, "To date, we have been unable to verify direct binding"?

A Just after the sentence using DSF and the melting point, yes,

using that method specifically.

Q Right.

So he set out to try to verify whether simufilam binds to IgFLNA24, and using that experiment was unable to do so; right?

MR. CAMPBELL: Object to form.

A No. Again, it's the same sentence. And we could add that sentence where clearly, we did not show a change in the melting temperature of the well-folded IgFLNA24 domain. We will explore these option in the coming years. So it might still bind. We do not know if it binds or does not bind using other methods.

Q And Dr. Calderwood had used this method to try to figure out whether it binds, and he was unable to prove that it binds; right?

A It showed that it does not change the melting point of the protein. We do not know if it binds based on these

experiments. It was inconclusive.

Q And the goal of the experiment was to find out that it binds?

A If we had a change in the melting point, we could have say it might bind. It's still not a definitive show.

Q And he couldn't even get to that point of saying it might bind because of this experiment?

A Yeah. It might bind. We still can say it might bind. It's not because it does not change the melting point, that it does not bind. So it might still bind. We do not know. It's inconclusive.

Q You tried to find conclusive evidence but have been unable to do so; right?

A The goal of science is the pursuit of the truth and to do multiple experiment to draw a conclusion. Here, it's inconclusive.

Q And Dr. Calderwood, who's the expert in this area, chose to conduct

this particular experiment in order to try to verify direct binding of simufilam to IgFLNA24; right?

A As a preliminary experiment, he wanted to see whether the drug would change the melting point which could suggest it binds.

Q And he was unable to find that suggestion of binding through this experiment; right?

A Again, the drug might still bind. It does not mean it does not bind.

Q That's not my question, though.

He tried to find out whether or not simufilam binds to Filamin A by conducting this particular DSF experiment; right? Yes?

A If the drug binds Ig24 in a well-folded form in a test tube experiment, not in a disease condition, not in AD, not in TSC.

Q And he was unable to demonstrate through this experiment that

DR. ANGELIQUE BORDEY

simufilam binds to Filamin A?

MR. CAMPBELL: Object to form.

Q Right?

A I would not use the word, demonstrate, no. It's a strong word. I think these experiments suggest that we need to try maybe folded Filamin A and do it again to see if it changed the melting temperature. So it's inconclusive. We cannot draw a conclusion from these experiment. And it's why you will explore other options.

Q Right. I'm not asking for conclusions. I'm asking for just the factual sequence here.

Dr. Calderwood chose to conduct this particular experiment in an effort to verify direct PTI-125 binding to IgFLNA24, and he was unable to do so from that experiment; right?

MR. CAMPBELL: Object to form.

A He was unable to show that

DR. ANGELIQUE BORDEY

the drug changed the melting point it has. So again, the drug might bind. It's why I cannot conclude that. It's not that -- it's hard to say it did not happen when you can't see it, but it might still happen. So in that sense, our experiments was fully inconclusive.

Q And Dr. Calderwood conducted this experiment in order to see if he could examine or observe simufilam binding to IgFLNA24; right?

A Yes.

Q And he was unable to make that observation; right?

A He cannot only draw a conclusion if you have a positive response. If you have a positive response, it suggests it might bind. The other way -- in my opinion, we just don't know.

Q He did not observe the positive response; right?

A We did not observe a positive change in the melting point of

DR. ANGELIQUE BORDEY

Filamin A.

Q But had you --

A But we cannot conclude on binding, in my opinion; right?

Q The paragraph references exploring other options to verify direct simufilam binding in the coming year; right?

A Yes.

Q And how did those options go?

A I don't remember what David did. The goal was to -- the goal of the grant was really to find the binding partners. So I'm not sure he did more on this type of experiments because it's inconclusive. That technique is like if you get a positive response, it gives you a specific direction. You get a negative response, you go a different direction and explore other domains or binding partners or a bigger chunk of the protein.

I don't know if he did these

DR. ANGELIQUE BORDEY

experiments. I don't remember reporting them, the next year of our report. So you may have the report. I just don't remember. I cannot even remember that one, to be honest.

Q If Dr. Calderwood had conducted further experiments and succeeded in verifying direct binding of simufilam to Filamin A, would he have told you?

A I assume he would have told me. It's why I don't know if we reported it in 2020 report. I'm not sure.

Q And he never told you of any successful experiments?

A No. We focused on the -- for us, I wanted to focus on the binding partners. So I think presumably, it's what he did after that.

Q The binding partners of what?

A Filamin A.

Q And what did you find in terms of the Filamin A binding partners?

DR. ANGELIQUE BORDEY

A We're still working on it in the disease condition. These experiments are not technically trivial. So we're still working on it.

Q In your 2020 paper, there's no mention of experiments or tests to investigate whether simufilam directly binds to IgFLNA24, is there?

A I don't think so.

Q And why didn't you include these experiments in the paper that you published?

A Because this was not the point of the paper.

Q What was the point of the paper?

A To show that knocking down Filamin A or using some FLNA decreased seizure activity.

Q And it wasn't relevant in your view to include experiments that attempted to verify simufilam's purported mechanism of action?

A We had some mechanism of

DR. ANGELIQUE BORDEY

action which explain Filamin level, by restoring network connectivity might decrease seizure activity which was important. It's already a big paper. It was not a mechanistic paper.

MR. KUMAGAI: I'll mark Plaintiffs' Exhibit 116.

(The above-referred-to document was marked as Exhibit 116 for identification, as of this date.)

Q Dr. Bordey, do you recognize Exhibit 116?

A Yes.

Q And what is it?

A This is our 2020 publication in Science Translational Medicine.

Q And this is the publication or the paper that we've been referring throughout the course of the day at various points as the 2020 paper; is that fair?

A That's correct.

MR. KUMAGAI: I'll mark as Exhibit 117, a document titled

DR. ANGELIQUE BORDEY

Supplementary Materials for Filamin A Inhibition Reduces Seizure Activity in a Mouse Model of Focal Cortical Malformations.

(The above-referred-to document was marked as Exhibit 117 for identification, as of this date.)

Q Dr. Bordey, do you recognize Exhibit 117?

A Yes.

Q And what is that?

A This is the supplemental material for the Science Translational Medicine paper 2020.

Q So Exhibit 117 is the supplemental materials for Exhibit 116; right?

A Yes.

Q Let's just start with the title: Filamin A Inhibition Reduces Seizure Activity in a Mouse Model of Focal Cortical Malformations.

What does Filamin A inhibition mean?

DR. ANGELIQUE BORDEY

A So we use a title that was -- so inhibition implied we were reducing Filamin A's function in that disease condition.

Q And that's what you meant by the title, Filamin A Inhibition?

A That's what the editor chose as a title.

Q And did you agree with or disagree with that title?

A I agreed with the editor.

Q So yes?

A Yes.

Q At some points in the paper and also in your patent, you described simufilam as a Filamin A modulator. Does that sound familiar?

A Yes.

Q So what does that mean?

A It is a used term because it's an extremely vague term. It means -- could be anything. Aspirin is a modulator of your headache. So it can be somehow -- simufilam may act on Filamin A

DR. ANGELIQUE BORDEY

function, directly or indirectly, in many way possible.

Q And is that why you chose the word, modulator? Because it was such a vague and broad term?

MR. CAMPBELL: Object to form.

A We did chose that word because as we discussed, we do not have the molecular mechanism of action of simufilam in TSC. And it had been proposed to modulate Filamin A function.

Q Proposed by whom?

A By the papers we discussed with Lindsay Burns and Dr. Wang.

Q And have you ever examined or confirmed the molecular mechanism of action of simufilam in Alzheimer's disease?

A We did not examine the mechanism of action. We never worked on it in Alzheimer's disease.

Q Just looking at the authors, it looks like there's eight listed

DR. ANGELIQUE BORDEY

authors. Do you see that?

A Yes.

Q And you've mentioned Longbo already.

Can you just briefly describe who each of the other coauthors are and your relationship with them?

A So Tianxiang Huang was a graduate student from China. Shannon, I don't remember her last name. Shannon was an undergraduate student. Lena Nguyen was a postdoc associate. Lawrence Hsieh was a postdoctoral associate. Xuan Gong was a graduate student from China. Well, Lindsay Burns and myself, yeah.

Q So with the exception of Dr. Burns, the other authors of this paper were sort of junior scientists or aspiring scientists; is that fair?

A They were my lab members, yes.

Q So they worked for you; right?

A Yes.

DR. ANGELIQUE BORDEY

Q In the second paragraph, you refer to prior studies where you reported increased levels of Filamin A in multiple sources associated with TSC; is that right?

A Yes.

Q And in your prior papers, you reported that increased Filamin A was independent of mTOR activity; is that right?

A Yes.

Q Can you explain what that means briefly?

A At least in the TSC condition or -- how you say that? In a condition where you have hyperactive mTOR due to either the loss of TSC1 or the overexpression of REB, we had an increase in Filamin A. And if we blocked mTOR activity, that had no change on Filamin A expression.

Q And was that a source of disagreement or difference of opinion if you could recall between your views of

DR. ANGELIQUE BORDEY

simufilam's potential mechanism of action and Dr. Burns's or Dr. Wang's view of simufilam's mechanism of action in Alzheimer's?

MR. CAMPBELL: Object to form.

A This is completely unrelated.

Q You don't recall having any sort of back-and-forth or disagreements with Dr. Burns or Dr. Wang about whether or not Filamin A was independent of mTOR activity, increased Filamin A?

A I mean Lindsay had mentioned that -- and I can't remember exactly -- either simufilam or Filamin A interact with P10 which is upstream the mTOR pathway. But in our case, it was definitely not a disagreement. It's a discussion.

In our case, because TSC1 or TSC2 is gone or Rheb is overactive, P10 has no more function on the mTOR signaling in our condition. And it's why

I always say very carefully at the beginning, in a hyperactive mTOR condition, Filamin A is not -- levels and in a REB and TSC1 knockdown condition, Filamin A increase was independent of mTOR. It's also context-dependent.

Q Let's look at where you start to describe the results of the experiments. So there's a red heading on page 1 that says "Results" and then various bold subheadings. Do you see that?

A I'm sorry. Where?

Q On page 1, there's a heading that says "Results" at the front.

A Yes. Sorry.

Q And then if you go to page 3, looks like the first section where you describe results from simufilam studies is on the right column of page 3, the sentence, "Long-term treatment with a small molecule or modulator of Filamin A PTI-125 before seizure onset partially prevents neuronal dysmorphogenesis and

DR. ANGELIQUE BORDEY

reduces seizure activity."

You see that?

A Yes.

Q And then in the first sentence, you describe simufilam as a small FLNA binding molecule. Do you see that?

A Yes.

Q And that description was not based on any studies that you had conducted; right? That was based on prior research reported by Dr. Wang or Dr. Burns?

A Correct.

Q None of the experiments or studies reported in this paper aimed to confirm that simufilam is or is not, in fact, a Filamin A binding molecule; right?

A Correct.

Q And Dr. Calderwood had attempted to verify direct binding of simufilam by conducting that experiment that you reported to the NIH in 2019;

right?

A Yes.

Q But he was unable to conclusively verify the binding claim; is that right?

MR. CAMPBELL: Object to form.

A The experiment was inconclusive. So we don't know if there is binding or no binding based on that experiment.

Q And that was an experiment that sought to verify that there was binding; right?

A If that experiment had been positive, it could have suggested that there is binding. A negative outcome is inconclusive.

Q And it was a negative outcome?

A So they're data inconclusive.

Q In the second sentence, you write, "PTI-125 was derived from an

DR. ANGELIQUE BORDEY

iterative in silico, in vitro screening process against a known pentapeptide region of Filamin A that was identified in an earlier study."

You cite Footnote 21.

Do you see that?

A Yes.

Q And then in the next sentence, you write, "PTI-125 has been reported to bind native Filamin A, as well as aberrant Filamin A in Alzheimer's disease with picomolar and femtomolar affinity, respectively."

You cite Footnote 22.

Do you see that?

A Yes.

Q And that's the sentence that Dr. Burns revised the draft of that we looked at earlier today; right?

MR. CAMPBELL: Object to form.

A Yes.

Q And none of the experiments or studies in this paper aimed to verify

or confirm the claim that simufilam binds native Filamin A with picomolar affinity or the claim that simufilam binds aberrant Filamin A with femtomolar affinity; right?

MR. CAMPBELL: Object to form.

A We did not perform any experiments to confirm these binding.

Q Picomolar and femtomolar affinity binding claims, are those also part of your ongoing studies with simufilam?

A You know, you don't start an experiment by saying, oh, it's going to be picomolar, femtomolar. You just do the experiment and see what you get.

Q Are you currently seeking to measure the affinity, if any, of simufilam's potential binding?

A I think we will -- we have ongoing experiment that might provide some affinity data.

Q And no results have come

DR. ANGELIQUE BORDEY

from that study yet?

A No.

Q In you turn to page 12 of your paper in the references -- and I think we covered this to some extent already today, so I'll try to do it quick -- you cite Footnotes 21, 22 and 23. Do you see that?

A Yes.

Q And those are papers by Dr. Burns and Dr. Wang; right?

A Correct.

Q And none of your experiments or studies in this 2020 paper sought to replicate any of the same experiments reported in any of those three papers; right?

A Correct.

Q And as far as you know, none of your experiments or studies in this 2020 paper sought to replicate any prior experiments with simufilam that anyone else had conducted at any time; is that right?

DR. ANGELIQUE BORDEY

A Well, I cannot answer that. I don't know what other people had done.

Q Well, that's why I'm asking. So as far as you're aware. So let me just rephrase.

So recognizing that you don't know what everyone has done --

A As far as I knew, nobody had tested simufilam on seizure activity in TSC.

Q And so as far as you know, none of your studies or experiments in this paper sought to replicate any other studies of simufilam; right?

A It's sort of a vague answer. I can just tell you what we did and that nobody -- as far as I know, nobody had tried to use simufilam in TSC.

Q On page 8 of the paper, Exhibit 116, there's a paragraph on the left side that begins, "We acknowledge several limitations to our study."

Do you see that?

A Yes.

DR. ANGELIQUE BORDEY

Q And this second limitation states, "Second, we did not test a higher concentration of simufilam that may be more efficient of reducing seizure frequency."

Do you see that?

A Yes.

Q Is that true?

A Correct. We did not try a higher concentration on seizure activity.

Q Well, in the December 2014 e-mail we looked at earlier today, you told Dr. Burns that you had tested for seizures using a 120-milligram per kilogram concentration; right?

A It was not on seizures. It was -- if I recall -- I mean -- I see that e-mail. I forgot about that one. I do not remember the data for that one. It was an embryonic treatment, yeah. It was an embryonic treatment. So we did not try postnatal treatment.

Q But that's not what the sentence says; right? It just says, "We

DR. ANGELIQUE BORDEY

did not test a higher concentration of simufilam that may be more efficient of reducing seizure frequency"?

A I think it's in the context of that paper and the work. We did not try higher concentration in that context.

Q But you had tested higher concentrations of simufilam in reducing seizure frequency but in different contexts?

A In completely different contexts which is not viable for patient.

Q How was that context completely different?

A You do not usually give a drug to a pregnant woman.

Q And so that's why you didn't mention the fact that you had actually tested higher concentrations of simufilam?

MR. CAMPBELL: Object to form.

A Not in this context. So that sentence makes a reference to that

DR. ANGELIQUE BORDEY

paper in these condition.

Q Where does it say that?

A Because it's the paper. The whole paper is about these postnatal treatment. I would have had to say, but we did a number of embryonic treatment. And this is -- the paper is not about embryonic treatment. It's about postnatal treatment.

Q We looked at an e-mail earlier where you told Dr. Burns in December 2019 that you had conducted a complete dose response curve with simufilam, and it was not in the paper because too much simufilam, starting at 60, made everything worse. Do you recall looking at that e-mail?

A That's why we did not include them in the paper. Like we discuss before, I did not include in the paper because the 12 worked really well.

Q If you look at --

A And we did not try on seizure.

DR. ANGELIQUE BORDEY

Q If you look at Exhibit 114, do you still have that in front of you?

A Yes.

Q You write, "We did a complete dose response curve."

You see that sentence?

A Yes.

Q And then you say, "It's not in the paper because too much simufilam starting at 60 made everything worse."

So is your testimony that that's not actually the reason it's not in the paper?

MR. CAMPBELL: Object to form.

A Well, for me, when I wrote the paper, there was no reason to give -- to mention 60. It's like, you know, you take one Tylenol pill, it'll be fine. You take 20, you might die. So 60's a fairly high dose. 12 worked really well. So there was no reason. I think what would we have achieved by giving more when looking at the data?

Q Well, you also wrote that 30 mg/kg was not better or slightly worse than 12 mg; right?

A Yup.

Q And you didn't include the results from the 30 mg/kg concentration, the 60 or the 120; right?

A Well, we never tried on seizures. We just did not. We only tried on cell size.

Q But you reported other cell?

A We report the 6 and 12 to make sure the 6 was not better.

You know, the lower, the better. And we obtained a complete set of data with the 6. 6 are pretty heavy, enough cells to feel confident to report the data. And we did not pursue more with the 60 or 120 or 30.

Q So is the reason you didn't include the complete dose response curve, the reason you gave Dr. Burns in December 2019, it made everything worse or is there some other reason?

DR. ANGELIQUE BORDEY

MR. CAMPBELL: Object to form.

A So it made everything worse, at least one age paradigm -- right? -- on the one reported condition, cell size. When we tried the 12, on seizure was a very good rescue. There was no reason to do a higher concentration which would presumably not be able to apply to patients.

Q Why did you conduct the tests anyway in the first place?

A Well, just to make sure the 12-milligram that was suggested was a decent dosage.

Q If the complete dose response curve had not made everything worse, would you have included the results from those experiments in the 2020 paper?

A I don't think so. I had a very good rescue at 12. So unless the 30 -- I mean I don't have -- I never did the data. We did not do the experiments.

DR. ANGELIQUE BORDEY

If 30 completely rescued, we might have included it. 12 gives you a lot of leeway where you can decrease or increase the dosage. So in terms of seizure, it was a very good outcome.

Q And what was your understanding at the time of why doses above 12 made everything worse?

A I don't think above 12. I think starting at 60 started -- it's not -- actually, it's an overstatement. It's not everything worse. We looked at one thing. So it just did not change the cell size. There was not a rescue. And often again, drugs have bell-shaped curve. When you start taking too much through unknown mechanism, you might make things worse.

Q Next, staying on the same page with the acknowledgment of limitations, you write, "Third, we do not know the exact mode of simufilam's action to reduce seizure activity."

Do you see that?

DR. ANGELIQUE BORDEY

A Yes.

Q The next sentence says, "On the basis of mechanistic data in Alzheimer's disease most models and postmortem human tissue -- citing Footnotes 22 and 23 -- it is possible that Filamin A may have an altered confirmation in the present study and thus different binding partners, specific to TSC and FCD2."

You continue, "Simufilam would then prevent the abnormal binding partners of Filamin A, resulting in reduced TSC and FCD2 pathology. This speculative mechanism and the possible abnormal binding partners would need to be investigated in future studies. It is also possible that simufilam reduces seizures through a Filamin A independent mechanism, perhaps by altering the excitability of the entire network, including that of abnormal neurons, resulting in a reduction of the overall epileptogenicity of the cortex."

You see that?

A Yes.

Q So your 2020 paper explicitly recognized the possibility that simufilam's mechanism of action was independent of Filamin A; right?

MR. CAMPBELL: Object to form.

A No.

Q No?

A No. It's speculative; right? It could be through Filamin A, or it could be independent of Filamin A or both. I don't know.

Q I think we're saying the same thing.

I was asking, it seems to me that the paper is explicitly recognizing the possibility that simufilam has an effect that's independent of Filamin A or dependent on Filamin A?

MR. CAMPBELL: Object to form.

A It is, indeed, a hypothesis

DR. ANGELIQUE BORDEY

that simufilam may have a dual mode of action.

Q And I'm just looking at the sentence that begins, "It is also possible that simufilam reduces seizures through an FLNA independent mechanism" and continues.

You see that?

A Yes.

Q And so there, the 2020 paper is recognizing the possibility that simufilam, its mechanism of action, is independent of FLNA; right?

A So when you do not have a mechanism -- a molecule mechanism of action of a drug, you're better off. So it could be through Filamin A or independent of Filamin A or both. So it's a pure speculation and hypothesis.

Q And the paper was explicit about that?

A That we could have several mode of actions, yes.

Q Including one that was

DR. ANGELIQUE BORDEY

independent of FLNA?

A Like many drugs, no drugs are specific. So it is possible.

Q Page 9 on the left column in the conclusion paragraph, do you see that?

A Yes.

Q Near the bottom, there's a sentence that states, "A more thorough study of dosing and duration of treatment might identify a regimen to enhance simufilam's efficacy in treating seizures."

You see that?

A Yes.

Q And what did you mean by a more thorough study?

A Let me see. What did it mean at the time? So I don't remember all the details. But, you know, we tried different conditions, different length of treatment. And I think what you can see, based on the data in Figure 5, is that it takes time for the drug to have effect.

DR. ANGELIQUE BORDEY

So it would be really nice to know if we waited longer, would we have a better effect? So you can do a lot of experiments. If we wash out the drug, does the effect persist? So, you know, you can play with it. These experiments are extremely difficult, technical, very time consuming and costly. So we cannot do all the conditions.

Q In the acknowledgments section on page 12, you see that?

A Yes.

Q You thanked Dr. Calderwood for helpful comments on the manuscript. You see that?

A Yes.

Q What comments did Dr. Calderwood provide?

A He read the manuscripts. I don't remember his comments.

Q Why wasn't Dr. Calderwood a coauthor on the paper?

A Because he did not

contribute to any experiments.

Q Sorry.
Say that again.

A He did not contribute to any of the experiments.

Q He was a coinvestigator on the underlying grant for these experiments, wasn't he?

A A lot of these experiments were started before the grant. But he never performed any of these experiments.

Q Was there ever a time when Dr. Calderwood was going to be included as a coauthor on this paper?

MR. CAMPBELL: Object to form.

A I don't think so. I don't recall. I don't think so.

Q Do you recall any communication where Dr. Calderwood asked not to be included as an author on the paper?

A Why would he ask not to be included?

DR. ANGELIQUE BORDEY

Q I'm asking you if you recall.

A No. I'm not included in David Calderwood's paper, although we have a grant together.

Q And then near the bottom of that paragraph, there's a sentence that says, "AB has equity in Cassava Sciences that provided PTI-125."

Do you see that?

A Yes.

Q And is that you?

A Yes.

Q As of when this paper was published, you were a shareholder of Cassava; right?

A I guess so. I don't remember when I sold them.

Q And you testified earlier today that you had initially bought Cassava stock around 2016; is that right?

A Some before; some at 2016, yes.

Q And so were you a

DR. ANGELIQUE BORDEY

shareholder of Cassava when you conducted the studies in the paper and when it was published in February 2020?

A I don't remember if I had them in 2020.

Q Well, this was published February 2020. It says you have equity in Cassava; right?

A Yes. I just don't know if I still had it. By the time it's published, I don't know. I don't remember when I sold them. So it might be. My COI form would know. I just do not remember. I think Cassava's stock was so down.

And with citizen petition, I think it crashed or something. So if I had stocks, I don't sound the red. So I was stuck with them.

MR. KUMAGAI: I'll mark as Exhibit 118, a document Bates Stamped CASSAVA_000027886.

(The above-referred-to document was marked as Exhibit 118

DR. ANGELIQUE BORDEY

for identification, as of this date.)

Q Exhibit 118 appears to be an e-mail there you, Dr. Bordey, to Dr. Burns, copying someone at Yale by the name of Kelly Fusco. Do you see that?

A Yeah.

Q And you write, "Lindsay, again, here's a letter about having some stocks in your company. Best, Angelique."

You see that?

A Yes.

Q And then the attachment on the page ending 887 is a letter from you dated March 17th, 2020. Do you see that?

A Yes.

Q And here, you disclose that you are, in fact, a shareholder of Cassava as of at least March 2020; right?

A Okay. All right.

Q And does this refresh your recollection at all as to the timeline in which you were a holder of Cassava stock?

A It does not help me to know

when I sold it. I don't remember.

Q You said you don't sell when it's in the red.

A That's right.

Q So does that help? Is there a time, later in time?

A I think -- I mean -- no, because I don't remember when it went back up. And I don't remember what price I bought them at. So, you know, I had the information somewhere. I just don't recall.

Q And as a shareholder of Cassava and as a general investor, you knew that positive news about simufilam had the potential to boost Cassava's stock price; right?

MR. CAMPBELL: Object to form.

A Yes.

Q And you also knew negative news about simufilam had the potential to cause the stock price to drop; is that right?

DR. ANGELIQUE BORDEY

A Presumably, unless it was already at the bottom.

Q So publishing a study with positive findings about simufilam had the potential to boost Cassava's stock; right?

A Possibly.

Q So publishing this 2020 paper was in your financial interests as a shareholder of Cassava; right?

MR. CAMPBELL: Object to form.

A I don't know if I would phrase it that way because I did not think about it. So I presumably bought the share when they were high. And I doubt my little study on TSC, that Cassava has no ownership, would make a huge difference on the price of the shares.

Q Would you describe the studies on simufilam in your paper as positive or negative?

MR. CAMPBELL: Object to

DR. ANGELIQUE BORDEY

form.

A It is positive for my lab and for the TSC population. Cassava had no ownership of the patent. So they were nothing at that time.

Q Right.

But the publication of a study that purported to make positive findings about Cassava's only drug, simufilam, had the potential to boost Cassava's stock price; right?

MR. CAMPBELL: Object to form.

A Maybe if it's visible.

Q This paper was visible; right?

A To my community in TSC, yes. If you look at citation, it's not that highly cited. So with respect to Cassava, I don't think it was that visible. I don't know if the price went up. Someone else might know. But I don't know.

Q But would you agree that as

a Cassava shareholder, it was in your financial interests to publish a study that had positive news about the company's only drug, simufilam?

MR. CAMPBELL: Object to form.

A I'm not sure it was my financial interest. I had so few shares that it's not like I would have made a lot of money on it. So my interest was against -- for the TSC community to offer a new treatment option. And the Cassava saga was really related to Alzheimer's disease. It's a multi-billion dollar moneymaker, not TSC.

Q Is it your view then that this paper had nothing to do with their Alzheimer's project?

MR. CAMPBELL: Object to form.

A The paper was not related to their Alzheimer's project.

Q Did your stock holdings in Cassava influence any decisions you made

DR. ANGELIQUE BORDEY

about what to include or omit from the 2020 paper?

A No.

Q And how do you know that?

A Because I did not think about stocks. It was not in my thought. I was holding them for a long time to not sell them. It was not the goal. That did not influence any experimental design, no. It was not in my thoughts.

Q Was your equity in Cassava a factor in your decision to omit the complete dose response curve of simufilam that showed doses over 60 made everything worse?

A Definitely not.

Q How do you know that?

A Many drugs have a negative effect at high dose. It's very common. So definitely not. The neurologists know that very well. They start at low dose and slowly increase until they have a negative impact. So makes no difference. No drug is -- has no side effect if you

go to high dose.

Q Was your equity in Cassava a factor in deciding not to include in your 2020 paper, the inconclusive results of Dr. Calderwood's efforts to verify simufilam binding to Filamin A?

A Not at all.

Q And how do you know that?

A Because we do not care. It has no bearing on the data in this paper.

Q And in the last sentence of the acknowledgments, it says, "All data associated with this study are present in the paper or the supplementary materials."

Do you see that?

A Yes.

Q Is that true?

A So all of the Excel sheet that we've used to do the analysis are in supplementary material. The raw data, which had terabytes of data, cannot be included in a publication.

Q What about the data from the

DR. ANGELIQUE BORDEY

complete dose response curve you had conducted and showed doses over 60 made everything worse?

A Well, we're asking the questions not presented in the paper.

Q That's not associated with the study in the paper?

A No. It's not discussed at all. Why would you present it? It's not mentioned at all.

Q Isn't it the case that you did test simufilam at higher doses than just 12 milligrams per kilogram prior to this paper's publication?

MR. CAMPBELL: Object to form.

A So we tested on one perimeter of cell size.

Q You didn't conduct any tests of simufilam at higher doses or concentrations in 12 on seizure activity?

A As you reminded me, we tried the 120 using embryonic treatment.

Q And what about doses at

DR. ANGELIQUE BORDEY

60 milligrams per kilogram?

A I mean I have to go back to the e-mail. I don't remember.

Q Sitting here today, you're not sure whether or not you conducted tests using simufilam concentrations of 60 milligrams per kilogram to examine the effect on seizures?

A This paradigm in Embryonic Day 15 was a long time ago. And I do not remember if we did it. I do not remember if we did the 120 embryonic because you can't use it in patients. You just can't use it.

Q But you did conduct those studies.

Why?

MR. CAMPBELL: Object to form.

A I think I would guess my postdoc originally tried it, embryonic treatment, again as I mentioned before, to mimic the effect of the shRNA with Filamin A, to knock down Filamin A, which

DR. ANGELIQUE BORDEY

is a very different type of experiments.
And I think it's why we did that
originally, and we decided to do that.

MR. KUMAGAI: Let's take a break.

THE VIDEOGRAPHER: The time is 3:24 p.m. We are going off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: The time is 3:46 p.m. We are back on the record.

MR. KUMAGAI: I'll mark Plaintiffs' Exhibit 119.

(The above-referred-to document was marked as Exhibit 119 for identification, as of this date.)

Q Dr. Bordey, do you recognize
Exhibit 119?

A Let me see. What is it? I
think it is PubPeer.

Q And it appears to be
comments posted on PubPeer on your 2020
paper that we looked at before the break,

DR. ANGELIQUE BORDEY

and you responded to the comments. Do you see that?

A Yes.

Q I want to draw your attention to the Comment No. 5 at the top of the second page.

It begins, "Several of the reported statistics."

Do you see that?

A Yes.

Q And the commenter appears to be taking issue with the way in which you ran statistics that were presented in the 2020 paper. Is that your understanding?

A Yes.

Q And what is your understanding of the comment?

A I thought it was a good comment. And before doing our stats, we had discussed with different statistician. And reported the way we do stats is fine. But I think, if I recall, we took the comment seriously. We ran the stats different way than we

DR. ANGELIQUE BORDEY

suggested. And we had the same results.

Q And so if I'm understanding the comment correctly, each measurement in the statistical analysis is required to be independent from the other measurements, and in this case, in the 2020 paper, you had taken samples or measurements from the same subject which meant that those two measurements are measurements from the same subject were not independent. Is that generally what's going on here?

MR. CAMPBELL: Object to form.

A Not exactly. In simpler term, we had four mice, N equal 4 per condition. And I think it was either cell size or the dendrites. Let's say cell size. We look at cell size of the cells. And there were 46 cells measured across four mice. And we did the stats on the cells. A lot of people do that. It's a common practice in statistics.

And what he suggests is we

DR. ANGELIQUE BORDEY

should have met an average per mouse and have four data point and compare using N equal 4. And ultimately, we did that, had the same results, and the data available online.

Q Do you agree with the comment that by calculating stats using the number of observations as the N rather than the number of subjects as the N, you're more likely to detect statistically significant results that may not be warranted?

A I think it depends on your sample size in terms of N measured. It depends on your effect size. In our case, it made no difference.

Q Are you saying you published the recalculated statistics somewhere?

A We did not publish the recalculated statistics because the data available, and people can do it.

Q But isn't that one of your responses, and in reply, the same commenter says it's actually not possible

DR. ANGELIQUE BORDEY

to do that using the data that's available because of the way it's organized or labeled?

A No, no. It's possible to do that. The data publicly available is in an Excel sheet. And they can just run the statistics.

Q If you look at Comment No. 7, so on the last page, on the second last page, there's a paragraph that says, "Thank you for sharing the raw data."

Do you see that?

A I see. Oh. I see. Did not generally stratify by sample in the Excel sheet. Yeah. I guess we forgot about that. We did not stratify by sample size. I think one way -- I did not tell him to usually get at -- is that roughly, we have the same number of cells per sample size.

Q And you wrote, "Thank you for the additional clarification. I just checked, indeed, and did not generally stratify by examples in the Excel sheet.

DR. ANGELIQUE BORDEY

I will discuss with my lab members."

Did you discuss with your lab members?

A Yes. And I did not add comments. But the data there, I should have responded, same number, the data available in the sense that same number of cells were measure per mice. So you can just divide 46 by 4 and get it.

Q And so have you continued to present statistics in the same manner in other papers that you've published since this was brought to your attention or have you calculated statistics differently?

A Well, presumably, I've done both. Because it's still valid statistics, I was suggested to use by statisticians.

Q And which statisticians specifically suggested to you that you run the stats in the manner you did for the 2020 paper?

A We have usually meetings

with Yale statisticians.

Q And so your testimony is that Yale statisticians told you to run the statistics in the manner that you did for the 2020 paper, using the number of cells as the N instead of the mice, number of mice?

MR. CAMPBELL: Object to form.

A In this case, the statisticians say it was okay.

Q And what was the name of the statistician?

A I don't remember. I don't remember the name of the statistician. We have presented data in a very similar way in a lot of our papers. And a lot of our colleagues have done that. The point is very well-taken here.

And I agreed with that reviewer. And we do run -- I think we still run both statistics. So as a question how to run the statistics. And we usually talk to people who know better

about statistics.

Q Is it your view that two measurements taken from one subject are independent measurements?

A It depends on the context because you could do different time points. Then they would be considered independent. But it depends on the context.

Q And in the context of this particular paper, were the multiple measurements taken from individual subjects, independent measurements?

A I would have to ask statistician for the exact terminology to be honest with you. They are from -- they're not from independent mice. They're not from different mice.

So I'm assuming it's fair to say they are not independent measurements. But we would have to double check with statistician.

MR. KUMAGAI: I'll mark Exhibit 120.

DR. ANGELIQUE BORDEY

(The above-referred-to document was marked as Exhibit 120 for identification, as of this date.)

Q Dr. Bordey, do you recognize Exhibit 120?

A Yes, I do.

Q And what is it?

A That's the cover page for one of my NIH grant, R61.

Q And so it says "Final RPPR" on the top.

Do you see that?

A Yes. So this is the final report for the R61 which is a two-year phase of the grant.

Q And it says "date submitted, May 18th, 2022."

Do you see that?

A May 18th --

Q Sorry. On the right, the third row, right column.

A Oh, okay, yes.

Q And the project title is Treating Seizures in TSC and FCD, and

DR. ANGELIQUE BORDEY

you're listed as the program director/principal investigator. Do you see that?

A Yes.

Q And so this is one of the grants that we discussed earlier today.

And as part of that grant, you conducted some studies using simufilam; right?

A The goal -- yes.

Q Can you turn to page 6?

A Actually, during 2019 -- yes. It was the end of the experiment, yes. It was a complex grant.

Q On page 6, about halfway down in black text, there's a subheading that says "Milestone 3: PK experiments for PTI-125 in mice."

Do you see that?

A Yes.

Q And criteria for Success 3 says, "In order to progress to the R33 phase, the brain plasma ratio must be at least 1 to 10, and the half-life needs to

DR. ANGELIQUE BORDEY

be at least two hours."

Do you see that?

A Yes.

Q And then for achievements for Milestone 3, you write, "We have analyzed the blood brain permeability with Scripps Institute core facility. The drug was given at 10 milligrams per kilogram via oral gavage. The plasma and blood concentrations were measured at one and three hours, post injection. To perform more in vivo tests, we need to synthesize more drug. These data provide a standard for the analogs."

Do you see that?

A Yes.

Q And so just taking a step back, what is a drug's half-life?

A So which drug are you talking here? NED-59163?

Q I'm just asking kind of generally what it means.

A So how long half of the drug will remain in the body.

DR. ANGELIQUE BORDEY

Q And why is that a measurement that scientists look at?

MR. CAMPBELL: Object to form.

A It's one of the measurements. It's not all of the measurements. But if you have drug, and you give it, and it's gone in ten minutes, that drug presumably would not have any efficacy. So it needs to stay, you know, a couple of hours inside the body.

Q The chart below, what is NED-59163?

A It was a synthesized simufilam.

Q What does that mean?

A It means that by that time, I cannot use Cassava's simufilam. I did not have an MTA anymore. So I had it synthesized by a chemist.

Q Recreated, basically; is that what that means?

A Yeah.

DR. ANGELIQUE BORDEY

Q What is this table showing?

A So the Scripps Institute injected the drug through a reg average at 10-milligram per kilogram and collected. So the plasma at one hours or at two hours.

And at the same time, these mice collected the brain of these mice and looked at the amount of simufilam in the plasma and in the brain to give you an idea of how much the drug is getting into the brain.

Q And so one hour after injection, the average amount of simufilam in the plasma was 4.74; is that right?

A Yes.

Q And three hours after injection, the average amount of simufilam in the plasma was 0.21; is that right?

A Yes.

Q So what does that mean for simufilam's half-life?

DR. ANGELIQUE BORDEY

A It's not -- I would not call it simufilam. I mean we tried to synthesize it. But we did not have -- so simufilam from Cassava Sciences is a salt, has two HCL. And that one was a freebase. And it's going to behave very different.

Here with these experiments, these experiment did not look at really half-life. We did other experiments for that. That experiment was really designed to tell you how much simufilam like goes into the brain. And it tells us you 40 percent of the drug at one hour is in the brain.

Q And doesn't that translate to like a half-life of about 30 minutes?

MR. CAMPBELL: Object to form.

A No, it does not. To really monitor half-life, you have to take a many different time points: Ten minutes, 30 minutes, one hour, two hour, three hours, six hours. You cannot extrapolate

DR. ANGELIQUE BORDEY

on only two time points. That experiment was specifically designed to look at how much is going into the brain. A lot of it goes into the brain, basically.

Q And it was an experiment done in the context of a milestone where success was measured as identifying a half-life of at least two hours; right? You wrote that?

A Which I don't show you the data here. I show you the data for brain plasma ratio is more than one to ten. So much more than 10 percent goes into the brain. 43 percent goes into the brain.

Q And what have you found in attempting to determine simufilam's half-life?

A I think you -- we did it with Scripps, with that particular drug. And we -- Scripps collected plasma at different time points. And I don't remember if the half-life was three or four hours.

Q And have you published those

DR. ANGELIQUE BORDEY

studies or results?

A No. For me, it was just informative.

Q And so where, if any, did those findings exist from those experiments to examine simufilam's half-life?

A I'm sorry?

Q Where have you presented that data, if anywhere?

A Nowhere else.

Q Did you achieve Milestone 3?

A We achieved Milestone 3.

Q Why didn't you present that data here in this paper in the final progress report?

A Which paper? There's no paper related to this. That was to the NIH, yeah.

Q I'm just looking at the criteria for Success 3, is demonstrating a half-life of at least two hours. And then under achievements, it doesn't seem to say anything related to half-life or

whether that particular milestone was met.

A Well, at that time, it was not done, and then we did it. We had to make more drugs, and we did it. If you have looked at the grant and all the communication related to these grant, the goal ultimately was to generate analogs of simufilam.

Q And did you succeed in generating analogs?

A We generated 25 analogs. We characterized two in vitro. And that's what we did, yeah.

Q Are the numbers in this table under Milestone 3 consistent with your subsequent findings of a half-life between three and four hours?

A I have to go back to our data which -- which I should remember. But right now -- so Cassava redid with the real simufilam, the HCL salt version, a strict PK analysis. And I just can't remember the exact number.

DR. ANGELIQUE BORDEY

What I remember is that Cassava had done, to some extent, a different way to measure blood brain -- brain penetration using CSF. And for them, it was a 50 percent entry into the CSF. So for that, that was the same.

The half-life, I know the peak is like 30 minutes. And the half-life is mild strain-dependent. That's why I have a hard time remembering.

So it could be quite close to three or four. I just can't remember exactly. Those were CD1 mice, a specific type of mice. No, no. Those were B67 mice. And we did in CD1 mice, a different strain of mice. We all behaved different. Male and female behaved different. That's why I'm just blocking on the number. But it's around three or four.

Q And is this finding in this table where the average plasma was 4.74 after one hour and then down to 0.21

after three hours consistent with a half-life of three or four hours?

A You cannot conclude anything from these data for PK. You just can't. This is not designed for it. You need to -- you just can't.

Q Well, the milestone is called Milestone 3 PK experiments for PTI mice.

A That's right. And I don't report it. I'm reporting the plasma and blood concentration here which is the plasma ratio to the brain is beautiful. It's just beautiful. It's amazing.

MR. KUMAGAI: I'll mark as Exhibit 121, a document Bates Stamped BORDEY996.

(The above-referred-to document was marked as Exhibit 121 for identification, as of this date.)

Q Exhibit 121 appears to be an e-mail from you, Dr. Bordey, dated August 24th, 2021, to David Lewin and Longbo Zhang. Do you see that?

DR. ANGELIQUE BORDEY

A Yes.

Q And you write, "Dave, Cassava is going down in flames. There's a document that was submitted to the FDA, requested that they stop their clinical trials. One of the documents attached here shows that the papers have a lot of fake data, an incredible amount of blots that were duplicated. The document also suggests that the data showing binding of PTI-125 to Filamin A is likely fake. In my opinion, it may not directly bind. But simufilam may need Filamin A to act. We need to test that. Crazy. We don't want to have anything to do with Cassava."

Do you see that?

A Yes.

Q And the attachment appears to be the citizens petition. Do you see that?

A Yes.

Q Do you still believe that this citizens petition shows that the

papers have a lot of fake data and an incredible amount of blots that were duplicated?

MR. CAMPBELL: Object to form.

A So that description of this e-mail is me telling Dave, look what people are saying about Cassava. And I did scroll through the petition. And I did not really look at the -- if it's the Phase 2 data. And some of the, it's just -- for me -- so I glanced at it. And to be honest, I did not care. I just did not care. It has no bearing on my experiment. I did not know Dr. Wang. I did not care.

So I look quickly. And I'm looking at it quickly now. And some data might be duplicated. Whether they are fabricated, I just have no idea. I just don't know. I just don't know.

Q When you say you don't care, what do you mean by that, and why if you didn't care, did you share it with David

DR. ANGELIQUE BORDEY

Lewin and Longbo Zhang and say we don't want to have anything to do with Cassava?

MR. CAMPBELL: Object to form.

A Well, at the time -- when was it? -- 2021, we had actually no connection whatsoever with Cassava. And they were doing AD. So, yeah, we did not want to do anything with Cassava.

Q And at this time, were you still a Cassava shareholder?

A You tell me. I don't remember when I sold it. Maybe, maybe not.

Q Have you seen any evidence that demonstrates, one way or the other, whether the papers have a lot of fake data or not?

MR. CAMPBELL: Object to form.

A I would not be qualified or knowledgeable to know if they're fake data. I don't know.

Q Do you have an opinion, one

DR. ANGELIQUE BORDEY

way or the other, whether or not Dr. Wang's or Dr. Burns's papers have an incredible amount of blots that were duplicated?

A I don't know of an incredible amount. I would have to look at them carefully. And these kind of thing like here, thin white hollow surrounding each band, is from someone who never did a Western Blot because that happens. If you overexpose, you will have a white hollow.

So I don't know. I would have to overlay them on Photoshop to make sure they completely overlay. And I'm hoping these people did that. I don't know.

Q By these people, you're talking about the authors?

A The citizens, yeah. If I look at it, we have a lot of blots. We do a lot of Western. And some of them look darn similar. So I do not know Dr. Wang weighing, whatever we say. I

DR. ANGELIQUE BORDEY

don't know. All bends are unique, all bend blending into background.

Q In the e-mail, you also wrote that the citizens petition suggests that the data showing binding of PTI-125 to Filamin A is likely fake. You see that?

A Yes.

Q Do you believe that?

MR. CAMPBELL: Object to form.

A I do not have an opinion. I do not know. That's what the document suggest and suggested. I have no way to know whether Dr. Wang falsified the data. I just don't know.

Q Have you spoken to anyone at Cassava about whether or not Dr. Wang falsified data?

A No.

Q How would you determine whether or not Dr. Wang falsified data?

MR. CAMPBELL: Object to form.

DR. ANGELIQUE BORDEY

A I guess you do what they did. You go to his lab. It's difficult because I think it was presumably many years after he published the data.

So I don't know. You have to keep data for -- what is it? -- five or seven years? The numbers has changed over the years. Original was five years. I think now it's seven years. And blots don't survive forever. Our blots don't survive. Minute you take the picture, the blot will -- it does not last.

So I think in my opinion, it's very difficult to go back to Western Blot because unless it was on film, they might not exist. And it's why we publish the entire blot for us in our 2020 papers because the blot will not survive. I mean it's mostly blots; right?

Q And so if there is no original record or data available from the Western Blot experiments, is there any way to demonstrate or prove that the Western Blots were not manipulated?

DR. ANGELIQUE BORDEY

MR. CAMPBELL: Object to the form of the question.

A I mean I think it's -- I mean it is difficult. I think -- I mean they did what was required to do in that citizen petition where you go, and you take the figures, and you enhance it in a software like Photoshop to see if something pops up. Hollow will happen in Western Blot. It just happens. Duplication is easier to confirm. And you say that got messed up. And I don't want to use the word fake or fake the data. It's because errors happen. These papers are big and maybe put a placeholder and forgot to change it. So I do not know what happened.

Q But you did use the term, fake data, in your e-mail to Dave?

A It's correct. I just exactly reported to Dave what the petition wrote. As you could see, one of the documents shows that the paper of a lot of fake data. It's what the document

DR. ANGELIQUE BORDEY

claim to show; right? I mean it's...

Q So the document is fake, SAVA is going down in flames?

MR. CAMPBELL: Object to form.

A When you have a citizen petition like that, it's not going to be good for a company; right? I mean I'm assuming; right? And I don't think it was good for the company. But at that time, I did not focus on Cassava carefully because we had no connection to Cassava. They did not license our patent which we were -- you know, it was really heartbreaking. It was difficult.

And I was just trying to find another way to bring that treatment to patients. And so it's unfortunate for them. I don't know what Dr. Wang did. I just don't know.

Q And so your initial reaction to the citizen petition was to write to your colleague at Yale, David Lewin, and say, crazy, we don't want to have

DR. ANGELIQUE BORDEY

anything to do with Cassava; right?

A Correct.

Q And what changed between you sending this e-mail in 2021 and you joining the company as its SVP of neuroscience?

MR. CAMPBELL: Object to form.

A That's right. Four years has passed or have passed. Cassava, unfortunately for them, failed Phase 3, unfortunately for the patients. There was a change of CEO. The TSC Alliance who knew the new CEO reached out to Cassava Sciences to see whether they would be interested in pursuing TSC.

Q And prior to joining Cassava, to work on the simufilam TSC program, your testimony is you didn't ask any questions or do any investigation into whether the research from the inventor of simufilam was fabricated or falsified or manipulated?

MR. CAMPBELL: Object to

DR. ANGELIQUE BORDEY

form.

A Correct. I did not try to investigate further, Dr. Wang, myself.

Q Was there anything that gave you comfort or confidence in the research underlying simufilam that overcame these initial reactions to the citizens petition?

MR. CAMPBELL: Object to form.

A These reaction were huge surprise. What is going on here? But again, for us, the data acquired by Dr. Wang have no bearing on my work. It doesn't matter if he's correct or not correct. It doesn't matter.

Q Just to be clear, in your view, the simufilam Alzheimer's research has no bearing on your work whatsoever with simufilam?

MR. CAMPBELL: Object to form.

A Whatsoever with simufilam? So the data acquired by Dr. Wang in

DR. ANGELIQUE BORDEY

Alzheimer's disease have no impact on our work in TSC.

MR. KUMAGAI: I'll mark as Exhibit 122, a document entitled A Novel Filamin A Binding Molecule May Significantly Enhance SST2, Antitumoral Actions in GH-Secreting PitNET Cells.

(The above-referred-to document was marked as Exhibit 122 for identification, as of this date.)

Q Dr. Bordey, do you recognize Exhibit 122?

A Yes. This is -- yes.

Q And what is it?

A I think this is the abstract from the Italian group that we discussed earlier.

Q And you see the underlying author is Erika Peverelli, and Dr. Burns is also listed as a coauthor. Do you see that?

A Yes.

Q Have you reviewed this

DR. ANGELIQUE BORDEY

abstract or presentation before?

A I've -- I had read the abstract, yes.

Q And this is an abstract and presentation as opposed to a published paper.

What's the difference between the two?

A It is not Peer Reviewed. So they had posted a presentation at a meeting. It is not Peer Reviewed.

Q And the study appears to concern pituitary cancer; is that right?

A I only looked at one piece of data. So I have to check. Pituitary tumors, I guess yes.

Q As far as you can tell, it has nothing to do with Alzheimer's disease; is that right?

A Yes.

Q And as far as you know, does this study or abstract confirm or demonstrate simufilam binding to Filamin A?

DR. ANGELIQUE BORDEY

MR. CAMPBELL: Object to form.

A I think we discussed earlier -- I have to re-read it. I do not remember. It's always complicated to draw a straight conclusion from this. I think -- so somehow, it suggests -- it could suggest many things.

One thing, it suggests that simufilam could actually alter the kinase that phosphorylated Filamin A because it reduced Filamin A phosphorylation, or it could show simufilam binds to Filamin A.

So it's now at a place where it cannot be phosphorylated, or it prevents the binding between the kinase and Filamin A.

So I think it would be -- so it's inconclusive in terms of direct binding or indirect binding. I would like to -- I have to read one more sentence. I just don't know how they did it without seeing the abstract, seeing the poster. This suggests there's a

DR. ANGELIQUE BORDEY

complex between Filamin A and SSD2 which is a receptor. But it's not clear. We don't have the poster to know whether simufilam did anything to that complex. I just don't know.

Q Does the abstract demonstrate or confirm that simufilam reverses altered confirmations of Filamin A back to their native shape?

MR. CAMPBELL: Object to form.

A With this -- you know, based on what -- I don't think these data addressed -- what is written in the abstract, there's no way to know whether that -- that's happening. I don't know.

Q Does the finding, that simufilam reduced Filamin A phosphorylation, say anything about the effect on Filamin A's shape?

A Not necessarily. So it could but might not do it. It's a really hard thing to show.

Q Okay. You could set that

aside.

MR. KUMAGAI: Let's just take a five-minute break.

THE VIDEOGRAPHER: The time is 4:36 p.m. We are going off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: The time is approximately 4:47 p.m. We are back on the record.

MR. KUMAGAI: I'll mark Exhibit 123.

(The above-referred-to document was marked as Exhibit 123 for identification, as of this date.)

Q Do you recognize Exhibit 123, Dr. Bordey?

A Yes.

Q And what is it?

A It's a publication by Dr. Wang and Lindsay Burns in the International Journal of Molecular Sciences.

Q And have you read this paper

DR. ANGELIQUE BORDEY

before?

A I did not read the paper. I have to confess.

Q Are you familiar, generally, at a high level with its purported findings?

A No. I would have to read at least the abstract.

Q Are you familiar with the Cochin Institute for Dr. Ralf Jockers?

A I know the Cochin Institute in France. I don't know Ralf Jockers.

Q If you look on the left-hand corner, it appears, though, this was published on September 11th, 2023. Do you see that?

A Yes.

Q About halfway down in the abstract, it says, "Here, we aim to clarify simufilam's mechanism."

Do you see that?

A Are you halfway through the abstract? Yes. I see that.

Q And then it continues to

DR. ANGELIQUE BORDEY

describe the experiment and findings. Do you see that?

A Yes.

Q Have you relied on this paper or its findings in any of your work with simufilam?

A No.

MR. KUMAGAI: I'll mark as Exhibit 124, a document Bates Stamped CASSAVA_000994072.

(The above-referred-to document was marked as Exhibit 124 for identification, as of this date.)

Q Have you ever seen this document before, Dr. Bordey?

A I did not read the document. It is on the Cassava Web site. But I did not read the document.

Q And this appears to be -- well, it's titled Final Report, dated March 15th, 2024, Investigational Research Agreement between Cassava Sciences, Inc. (Lindsay Burns) and L'Association de Pr vention et d' tudes

DR. ANGELIQUE BORDEY

des Maladies Mol culaires(APEMM).

Do you see that?

A Yes.

Q This appears to be a final report related to the paper that was published in International Journal of Molecular Sciences which was Exhibit 123; is that right?

A Well, I guess they are after; right? Yes. That's one of the study was published.

Q And if you turn to page 9, there's a paragraph that says "inclusion/exclusion criteria."

Do you see that?

A Yes.

Q And it describes what appear to be the inclusion/exclusion criteria used for this study. Do you see that?

A Yes.

Q The last sentence says, "Bells displaying donor values outside this range and for which the acceptor donor ratio values were

DR. ANGELIQUE BORDEY

different from the other replicates or in case of technical errors on specific wells were excluded highlighted in red in the raw data tables in the appendix."

You see that?

A Yes.

Q And so it appears to be saying that the red data in the appendix were excluded from the reported findings of this study; is that fair?

A Well, let me read it again because I've never done FRET experiments. Donor values outside these range, I don't know which range they're talking about when donor values were within 10 percent range of the mean value. The accepted donor values ratio were different from the other replicates; you know, I don't know what they did. I just don't know. I would have to read it in details.

Q But you do see that the last parenthetical refers to highlighted data in red in the appendix which was the data that was excluded?

DR. ANGELIQUE BORDEY

A I can see what they wrote about that. I have no way to know whether they should exclude them or not.

Q If you turn to page 15, which is the appendix --

A Okay.

Q -- you see the tables on pages 15 through to 23 in the appendix reflect the data from these experiments, and the excluded data is in red. Do you see that?

A Yes.

Q Would it surprise you or concern you to learn that approximately 35 percent of the data was excluded from the published results of these experiments?

MR. CAMPBELL: Object to form.

A I have to read it. I don't know. I don't know exactly what they did. I'm not too sure. I understand the inclusion/exclusion criteria. I mean they're very transparent about it. But I

DR. ANGELIQUE BORDEY

would have to understand it.

Q Have you ever excluded between 30 and 40 percent of your data from reported published findings?

MR. CAMPBELL: Object to form.

A So if the mice die halfway, and we have only two days out of ten, well, we cannot report this data. We don't have enough data points. In TSC, we lose 10 to 20 percent of the mice, die of seizure at different time point. We cannot include them. I don't know.

Q Would it raise questions in your mind if a study excluded 40 percent of the data?

MR. CAMPBELL: Object to form.

A I mean they would have to have a good reason to exclude these data. Technical errors, the machine did not work. We did an experiment the other day. Halfway, the machine start working and cranks out data. But we know

DR. ANGELIQUE BORDEY

halfway, the experiment stopped working. So can't report the data. So I do not know what they did here, why they again removed the data. It could be a valid; it could be very valid.

Q Based on your reading the exclusion-inclusion criteria, do you have an understanding of what they meant by technical errors in the context of these studies?

A No. I mean they are FRET experiment. I don't know which one is the donor. I don't know the acceptor. Technical errors could be the machine. I don't know which machine they use. So I don't know.

Q And in the published paper that we looked at, Exhibit 123, there's no mention of outliers or any exclusion criteria.

Does that make sense to you?

MR. CAMPBELL: Object to form. Are you representing that there's no representation in the

DR. ANGELIQUE BORDEY

paper?

MR. KUMAGAI: I can represent to you, sure.

A And I would have to read the paper because I don't know what this 35 percent refer to. There's a lot of data here. Is that Figure 5, is that Figure 4?

Q If you were --

A Figure 6?

Q -- drafting a paper for publication, and you relied on certain inclusion or exclusion criteria for your data, would you typically include a reference to the criteria and the excluded data in your paper?

MR. CAMPBELL: Object to form.

A I think if -- so it's a difficult question because I don't know the standard in FRET to know what is acceptable or not acceptable. And scientists may have a specific say, oh, this 10 percent, whatever, changes, not

acceptable. FRET is extremely sensitive and finicky.

So I do not know what is acceptable for FRET. For us, it depends on the experiment. If it's seizures and the mice died, and I do a heat map, and I show it, but I don't include the data because it don't have enough data point, I might say, well, this mice is not included because when it is -- it really depends on the experiment. So some might be trivial for someone. I don't know FRET's criteria.

So it's very hard for me to judge for us if it's a different type of experiment. If all the cells should die, well, you don't include them. But you don't write they're not included because they're dead. So it's again context-dependent. So everything will be different. So it's very hard for me to relate to the exclusion/inclusion criteria.

Q You could set that aside.

DR. ANGELIQUE BORDEY

So at various points today, you've mentioned ongoing or proposed studies to verify or look into simufilam's mechanism of action or interaction with Filamin A; is that right?

A Yes.

MR. KUMAGAI: I'll mark as Exhibit 125, a document Bates Stamped CASSAVA_001494351.

(The above-referred-to document was marked as Exhibit 125 for identification, as of this date.)

Q Do you recognize this document, Dr. Bordey?

A I mean I've never seen it before. So I guess I don't recognize it, no.

Q And the title is MOA of Simufilam/Filamin A Scientific Study Plan. You see that?

A Yeah.

Q MOA being Mechanism Of Action; right?

DR. ANGELIQUE BORDEY

A Yes.

Q If you look at the second page, there's a table at the left. The company says Scantox.

Do you see that?

A Yes.

Q Are you aware of these studies?

A I know of the Scantox.

Q Both Study 1 and Study 2?

A Study 2, yes.

Q So what is the purpose of Scantox Study 1?

A I think the goal -- I mean it's not detailed. I think the goal was to test whether simufilam in a cell line that had been challenged with A-beta, the toxic form of A-beta, whether simufilam had neuroprotective effect, cell viability, as well as measurement of Tau and Tau phosphorylation. And that was one study.

And the other study was to -- and I'm assuming it's simufilam.

It does not say it specifically here; right? But it says it here.

Q Mechanism of action in that column.

A Yes. Whether it affects the level of cytokines, again -- actually in different cells. In iPSC, derive microglia from healthy patients, Alzheimer's disease patient. They were stimulated by a beta.

Q Have you had any involvement in either of these two studies?

A No.

Q Do you know what the status or findings of these studies are?

A I think they were completed.

Q And have the results of these studies been released?

A They're released internally at Cassava.

Q But not publicly?

A No.

Q And what is your understanding of the findings from Study

DR. ANGELIQUE BORDEY

1?

A I don't remember all of the data. They tested simufilam in a metabolite. And I think there was -- I just can't remember the actual data because again, it's AD. And it's not TSC. I think one of the drugs or both of the drug had a beneficial effect, reduced release of cytokines. I do not remember on Tau.

Q And what about the second study?

A So second study, I think that was the same. One of the drug or both reduce the level of cytokines. I'm not sure it's all of the cytokines. I have to go back to the data, but at least one of the cytokines. And I don't remember for Tau.

Q And the next page there, it describes two studies by a company, Charles River. Do you see that?

A Oh. I'm sorry. That's what I was talking of.

DR. ANGELIQUE BORDEY

Q Okay.

A I was talking about Cytokine Study Design 2.

Q You weren't talking about Scantox?

A Both of them. My recollection is that both of the drug had an effect on the levels of some of the cytokines. I do not remember for Tau.

Q So just to be clear, the Scantox studies on the page ending in 352 and the Charles River studies on page 353 have been completed?

A I think so.

Q And is there any plan to release results of those studies, as far as you know?

MR. CAMPBELL: Object to form.

A I don't know.

Q If you turn to the page ending in Bates 357, you're familiar with this study by APEMM in France?

A What is CLR?

DR. ANGELIQUE BORDEY

Q Sorry. I think --

A I'm looking at the wrong one.

Q You should be looking at the page ending in 357.

A Oh. I'm so sorry. I missed. Is that the one we discussed that is published?

Q I'm not sure.

A I'm not sure, actually.

Q The paper we did look at by Dr. Jockers, Dr. Wang, Dr. Burns involved APEMM. This appears to be, at least to my eyes, a different study. But I don't know.

A I'm not aware of it. I just don't know. I don't know. I'm not aware of it.

Q Are you aware of any ongoing work between Cassava and APEMM related to simufilam?

A I am not aware of it.

Q The next page, 358, the company is Yale University. Do you see

that?

A Yes.

Q You're familiar with these four study designs?

A So let me see because those were written behind my time at Cassava. So I have not seen those. I was not aware of that specific written very well-design.

Q So what is the status of the first Yale study?

A So Study Design 1 is undergoing.

Q How many findings or results been released or discussed?

A The study undergoing. Actually, Study Design 1 is not done yet. Study Design 2 and 3 are undergoing.

Q And sorry. What's the difference? Study Design 1 has not started yet?

A Yeah. I'm just reading it for the first time. Immobilization of target Filamin A peptides, unless they

did it before my time. I'm not aware of it right now. But I'm aware of Study Design 2 and 3.

Q And what's happening with those two studies?

A It's undergoing. It's with the Yale core. So it's a little slow.

Q Who is overseeing those studies?

A Myself and Dr. Thornton.

Q At Cassava?

A Yes.

Q And you're using your lab at Yale?

A No. We use a core facility at Yale.

Q Have any results, preliminary results been --

A We have only visibility data.

Q And what does that data show?

A It shows nothing, basically. So on the bio courtship. So that's an

equipment. Basically, what happen with these experiments is that you have nickel, and you have to attach a fragment of Filamin A to the nickel. And then you can pass a drug to -- pass a drug. And you know if the drug kind of binds by shining light. And depending, the light refracts. So if the drug binds, the refraction will be different.

And what we have done right now is just trying different ways to attach Filamin A to that platform of the fragments and different fragments. And we have been -- not we, but the Yale core has been successful in attaching Filamin A. So I think -- and several fragments. The next step is to pass simufilam.

Q So that next step is intended to actually potentially verify whether simufilam binds to Filamin A?

A It'll take a lot of time because even if you have a binding, you have to do a lot of negative controls. It just takes us time because this is not

DR. ANGELIQUE BORDEY

our machine. We depend on the core facility.

Q And when are those Studies 2 and 3 expected to be complete?

A Hopefully at least -- you know, hopefully -- what are we? -- September, October. The negative controls can take a little bit of time because you have to generate other protein as negative controls. So, you know, if we're lucky, end of October. But they started, you know, some time ago. It just takes time.

Q What about Yale Study Design 4? Are you familiar with that study?

A I was not familiar with that. And I don't think it's undergoing.

Q What makes you say that?

A Because I have not heard anything about it.

Q So the only studies at Yale that you're aware of involving simufilam are Study Design 2 and 3; is that right?

A So study involving

DR. ANGELIQUE BORDEY

simufilam, we have other studies involving simufilam.

Q Can you describe those studies, please?

A So as I mentioned earlier, we did, in collaboration with the TSC Alliance, experiment where we tested simufilam on epilepsy in these mice with a reduction or prevention of these worsening of seizures. The CRO psychogenic did the experiments, collect the brain and ship them back to us.

And we have done through Yale core again, transcriptome mean analysis, looking at gene expression and how they change with simufilam treatment, only a few mice. And I'm eagerly waiting for the analysis. I don't have the result.

Q And among those experiments or studies ongoing at Yale, which, if any, are intended to examine whether or not simufilam binds to Filamin A?

A Biocore.

DR. ANGELIQUE BORDEY

Q Just Study Design 2 and 3?

A Yes.

Q Are you familiar with an individual named Ewa Folta-Stogniew?

A I don't think so.

Q E-W-A, F-O-L-T-A, S-T-O-N-G-N-I-E-W.

A Yes. It's me being dyslexic. Yes.

Q And how do you know her?

A Well, Yale has two core facility for the biocore. And Dr. Thornton before joined Cassava was working with Ewa on the biocore.

Q Study Design 1?

A Well, I don't know what he did with Ewa. So for sure, Design 2. But actually, I don't know what he did prior to me coming to Yale -- coming to Cassava.

Q And is she still involved in any of these experiments or studies?

A No. We're working with other core facility.

DR. ANGELIQUE BORDEY

MR. KUMAGAI: I'll mark as Exhibit 126, a document Bates Stamped CASSAVA_001279825.

(The above-referred-to document was marked as Exhibit 126 for identification, as of this date.)

Q This is an e-mail exchange between Dr. Thornton and Dr. Folta-Stogniew.

Do you see that?

A Yes.

Q I don't believe you're copied here.

So I take it you've never seen this before?

A Indeed. I did not see that before. I had done a lot more than I thought.

Q If you turn to the page ending 825, it's the first page, there's an e-mail from Ewa on July 22nd, 2024 to Dr. Thornton with the subject, Draft Sample Preps. You see that? It runs on to the next page.

DR. ANGELIQUE BORDEY

A I'm sorry. Okay. Got it.

Q And Ewa writes, "Hello. I ran the experiment twice and saw absolutely no binding for neither of the drugs to any of the peptides. I will write up the report tomorrow and send it to you more likely tomorrow."

Do you see that?

A Yes.

Q And it appears from this e-mail that Ewa attempted to demonstrate simufilam binding and was planning to write a report.

Have you seen any report from Ewa on the experiments that she ran with simufilam?

MR. CAMPBELL: Object to the form of the question.

A I saw some of the late reports she did this year, 2025, when I joined in May. And then she was supposed to retire. So I've never seen those reports. Ewa was a bit flakey. So I'm assuming they have the report. I have

DR. ANGELIQUE BORDEY

just not seen the report.

Q You have seen a report that Ewa drafted from her simufilam experiments?

A I've seen a report back in May where she was trying to put the fragments because here, it's the peptides on the chip. And as far as I am concerned, I think she had issues to attach the fragment on the chip. And it was a little frustrating. And then she went on vacation and was supposed to retire and did not retire ultimately.

Q She is not retired, as far as you know?

A No. Actually, I don't know for sure.

Q And so have you seen or do you have any understanding of what Ewa found from her experiments where she attempted to find simufilam binding to Filamin A?

A I would have to go back to Ewa's report because it was just very new

for me when I joined Cassava. And I did not contribute to any of the experiments. I did nothing.

Q And were any of the experiments successful in terms of generating positive results?

MR. CAMPBELL: Object to form.

A I just don't know because I think she was still trying to -- my understanding is that she was trying to attach the fragment to the chip. And I'm not sure it was successful.

Q As far as you know, Ewa was unable to verify binding?

A I don't know. I just don't know what she did. I mean from 2024 all the way to 2025, I have no idea what she did.

Q And I believe you testified a minute ago that she was a bit flakey.

What do you mean by that?

A That she would send the report late. I had worked with her a

DR. ANGELIQUE BORDEY

long time ago. And she would tell you, I'll send the report. And then you wait two weeks to receive the report. And she would run experiment in the middle of the night.

So she was not very good at keeping -- I mean maybe she was better with Ben. I don't know. But in the past, she was not very good at keeping in touch.

Q And when was your prior experience with Ewa?

A A long time ago when we worked on either kartogenin or one of the analogs.

Q And how much work did you do with her?

A Not much. I'm not even sure we ended up fully working with her. But I don't remember.

Q If you turn to the next page ending 359, there's another table, the company Medicilon.

MR. CAMPBELL: You're

DR. ANGELIQUE BORDEY
switching back to the previous
exhibit?
MR. KUMAGAI: Yes.
Exhibit 125, Bates 359.
A Yes.
Q Are you familiar with any of
these studies?
A So not these studies
specifically. I'm familiar with
Medicilon.
Q Do you know if Medicilon has
completed any studies with simufilam?
A I don't know. I don't know
about these studies.
Q Do you know if any of these
studies are currently ongoing?
A I don't know about those.
But we do have undergoing studies with
Medicilon where they are generating
additional Filamin A fragments, not
peptides, and binding partners. And they
will ultimately try these biocore chip
experiments.
Q So as far as you know,

DR. ANGELIQUE BORDEY

Medicilon is planning at some future date to begin working on these four studies listed on this page?

A I have no idea for these four studies. It's not what I described. It's different studies. I mean I do not know.

Q And those studies have not yet begun?

A Well, one is in progress. So presumably began.

Q No. I'm sorry. I'm talking about the studies that you had just described.

A We started.

Q You have started?

A Yeah.

Q And the next page, Bates ending 360, there is a company named Abilene Christian University, ACU. You see that?

A Yes.

Q Are you familiar with any of these four studies?

DR. ANGELIQUE BORDEY

A I think -- so I'm not specifically familiar with them. But I heard about the -- so I don't know if they have been -- if they have been done. And I have not seen any results. But I know Dr. Thornton mentioning the FITC simufilam.

But I do not know if they actually tried it on Filamin A protein. Actually, I don't even know how they would do it. So, you know, I don't know. Some may have been done. But I actually don't know, yeah.

Q Aside from the studies in this document and the studies you've already mentioned today, are you aware of any other ongoing studies of simufilam that Cassava is currently conducting?

MR. CAMPBELL: Object to form.

A Yes. We are trying to do a crystallography experiment to see whether simufilam binds Filamin A.

Q And what's the status of

DR. ANGELIQUE BORDEY

those experiments?

A They are still -- well, the crystallographist, it's not me doing -- someone who does crystallography has only recently been successful at synthesizing large amount of Filamin A fragment, as well as a binding partner. And I'm not too sure how long it's going to take him to grow crystals, and it takes time to grow crystal. So I just don't know.

Q And who is the person conducting that experiment?

A This is the director of the core at -- I don't remember the title -- protein lab. I mean UNC is the core facility.

Q University of North Carolina?

A Yes.

Q What is your role with respect to those experiments?

A We just ask him to do the experiments.

Q Have you worked with him

before?
A I've worked with him before.
Q In what context?
A I wanted to see whether kartogenin would bind Filamin A. And he did crystallography. And it was a negative result.
Q Aside from that experiment, are you aware of any other experiments that Cassava is currently conducting with simufilam?
A Beside those in my lab were the R21 experiment with David Calderwood. And we -- like I mentioned before, we had done proteomic analysis, sprinkle simufilam on cells and see what happen at the protein level. We'll have the data from the RNA sequencing, the TSC1 mice being treated with simufilam.
We are doing -- actually, I forgot one. We are doing proteomic analysis of these brains, some of these brains that have been treated with simufilam. So really, a global approach.

DR. ANGELIQUE BORDEY

And for that one, I think it's the last one. Ben had initiated doing what is called solvent shift. That's kind of these experiments about these melting curve that David did. So solvent shift still a complex for me. So try to explain, you know, we are -- everybody well understanding that some drug, when they bind to a protein, it cannot change the charge around that protein. And if it changes the charge and you have different solvent, that protein may drop in a different solvent. It's like it precipitates. And we did this experiments where the company, Proteome, in TSC to knock out cells. And they treated the cells and did solvent shift.

Q And those studies have been completed?

A These studies are completed in these condition. We have to do a different condition. These were done not in cells but in the ground-up tissue from

DR. ANGELIQUE BORDEY

the cells. And we want to do them in cells.

Q And what are the results of those initial studies?

A So simufilam -- I have to say this technique a bit complex, has changed -- actually, we're doing the analysis of the experiments. The analysis is done. But we're grinding through the data. And we have to go one by one.

And there was a small shift in Filamin A of -- it changed one fraction, basically, which, to me, may or may not mean binding. I'm careful. And I want to see a bigger shift. And it's a little bit of a difficult experiment because many drugs will do nothing because it won't change the unique composition of a drug.

So it's not going to drop. That's why you have to do many different types of experiments. And it's what we're doing. So I'm not sure it's a

DR. ANGELIQUE BORDEY

biological significance to have a drop of one fraction. I just do not know.

Q And aside from that study and the others that you've described, any other studies that you're aware of, the company conducting with simufilam?

A I don't know in the past.

Q Currently?

A Right now, I think -- you know, I think this is it. I'm hoping I'm not forgetting one. But I think this is it.

Q And as far as you know, is it the company's plan to disclose the results or findings from all of these studies, regardless of the results: Good, bad, indifferent?

A Yes. We will be eager to publish.

Q Even if the conclusion is there's no binding?

A Yes, because in these experiments, we will identify maybe -- we will identify the function of simufilam.

DR. ANGELIQUE BORDEY

So it does not matter for my experiments if it's through Filamin A or not Filamin A.

Q You mentioned one of the studies at Yale that as far as you know has been complete; right?

A You mean the Ewa study?

Q Yes.

A I would not -- I don't know what was completed with Ewa because the study's undergoing with the other core facility. So I really don't know what was the conclusion of these experiments.

Q You could set that document aside.

We talked about this a little bit already today.

But what is the current status of the simufilam TSC program in terms of moving towards clinical trials?

A The company has worked on a proof of design, clinical trial design as completed, a lot of toxicity studies and is preparing to -- is preparing a 90.

DR. ANGELIQUE BORDEY

Q When does the company expect to submit the IND for approval?

A Hopefully in October.

Q And are you personally involved in preparing the IND?

A I was only involved with writing my section on my data, on the mouse data.

Q And who at the company is in charge of the program?

A So it's a team effort. We have a consultant and analyst, de Kater. Let me look at that person. That person, analyst, de Kater, is in charge. Mike Marsman, who is the SVP of regulatory affairs, is in charge, the new clinical people involved in giving opinion on the proof of concept in the IND. And a lot of us will read for typos.

Q Have you had any meetings with the FDA thus far, pre-IND meetings?

A I think there was a pre-IND meeting with the FDA. I think it was just before my time. But I'm not too

DR. ANGELIQUE BORDEY

sure when to let them know about the TSC program. And I have the FDA letter. And I think it was positive. I think it was only one meeting.

Q And you haven't intended or you're not aware of other meetings with the FDA?

A This should be -- I think we were discussing whether we should have another meeting. I don't know if it's on the book to discuss. I'm not regulatory affairs. I go to some of these meeting at the company, but not all of them. So I don't want to say something wrong. But I think they're discussing another meeting.

Q And as far as you know, there's been one pre-IND meeting with the FDA?

A Yeah, one, at least one.

MR. KUMAGAI: I'll mark Exhibit 127.

(The above-referred-to document was marked as Exhibit 127

DR. ANGELIQUE BORDEY

for identification, as of this date.)

Q The title of Exhibit 127 is Form 8-K. Do you see that?

A Yes.

Q And if you look at the third page, it's signed by Eric J. Schoen on September 8th, 2025.

Do you see that?

A Yes.

Q And then there is a presentation that begins on the next page.

A Yes.

Q Industrial Overview, September 2025. Do you see that?

A Yes.

Q Have you seen this presentation before?

A Yes.

Q And were you involved in drafting it?

A Yes.

Q And what was your role?

A Primarily to look -- I mean

DR. ANGELIQUE BORDEY

provide the science slides or work on the science slide.

Q And which slides would be the science slides?

A So let me just go. Slide 8 -- is that 8? Yes. Slide 8; slide 7 for the wording on the effect of simufilam; Slide 9, to advise which indication to go after. I did not do -- so Slide 12. Slide 13 that we have discussed TSC; Slide 16, 17, 18, 19, 20. There's a lot of slides: 21, 22. And that's it. I don't know the appendix now. You know, when there is like 20 -- this is really small, 26, you know, anything that relates to my work. I will look at the wording.

Q Starting with Slide 7, you reference your involvement in the wording of simufilam's effect; right?

A Yes.

Q And simufilam is described here as a potential Filamin A modulator. Do you see that?

DR. ANGELIQUE BORDEY

A Yes.

Q Is that your language?

A This is Cassava's language, yes.

Q Did you help draft that description?

A Yes.

Q And potential because it's not proven yet in your mind whether simufilam functions through Filamin A or not?

MR. CAMPBELL: Object to form.

A I mean rephrase the sentence. I don't have evidence from my lab that it modulates Filamin A function.

Q And what lab conducted the experiments that are described in the subsequent slides?

A My lab conducted some of these experiments.

Q And what was the role of the company called PsychoGenics, if any?

A PsychoGenics is part of the

DR. ANGELIQUE BORDEY

preclinical consortium of the TSC Alliance where they have TSC mouse model. And they have tested a lot of compounds for the TSC Alliance.

Q And what role, if any, did PsychoGenics or PsychoGenics's mouse model have in these studies depicted in these slides?

A So in that particular -- I mean is -- so Statement 1 is from other people's lab.

Q What slide are you looking at? Sorry.

A Slide 8. Is that still 8, you're on?

Q I'm just asking generally about the slide deck and these studies, what role PsychoGenics had.

A PsychoGenics run the experiment for Slide 22.

Q And Slide 22 appears to measure seizure activity between the first five days and the last five days of treatment; is that right?

DR. ANGELIQUE BORDEY

A Not of treatment, but of recordings, EEG recording.

Q And how long were the mice recorded for?

A In this case, 20 days.

Q And how did you or PsychoGenics decide to present the data by comparing the first five days to the last five days?

A So usually, what you do, you draw a heat map. And when you see -- the first thing as a rule of thumb in science is that if you can see an effect visually, you presumably have an effect.

So you draw the heat map. And what you see in the vehicle treated mice, a lot of the mice have an increase in seizure activity over time. And you see that the five milligram per kilogram treated mice still have an increase in seizure activity. And it's not as pronounced in the 10 and 20-milligram.

So what we did is that, you know, it's not a lot of days recorded.

DR. ANGELIQUE BORDEY

But we looked at the first five days that -- the first five days seem very stable in terms of seizure activity. And you can really see that in most of the mice, the seizures increased -- at least the five milligram per kilogram starts to be very pronounced the last five days of seizure activity. So that's why we compared the first five and the last five.

Q What did the results show from the entire recordings in the full period if you compare the entire duration of the recordings?

A It's not a valid measurement because it's not a stable. Seizure increases over time. And because we know that simufilam takes time to act, you have to wait a little bit longer. We showed that before. So you have to wait that the drug had enough time to restore network activity. It's not like blocking an ion channel.

Q Did you look at the first

DR. ANGELIQUE BORDEY

three days and the last three days?

A Yes.

Q And what were the results?

A Similar.

Q And what about the first four days and the last four days?

A I'm not sure I did it.

Q And so prior to beginning the study, was it always the plan to compare the first five days to the last five days?

A No. You adjust your analysis based on the seizure pattern in your vehicle treated mice. If its mice had no increase in seizure activity -- actually, we might still do the same. Actually, I had done that in my paper. I should rephrase what I did. I had done that in my paper, comparing the first five days to the last five days as well in one of the experiments. In another experiments, because I had not recorded for long period of time, I only compared at the end.

DR. ANGELIQUE BORDEY

Q It just seems somewhat arbitrary to me how you chose five days at the beginning to compare to five days at the end.

A It's the opinion. My opinion is different.

Q In the press release announcing the results, it stated that not all parameters measured reach statistical significance.

What did that refer to?

A So, for example, because we lose so many mice in the control, we just don't have enough mice. If you compare the last five days, for example, of the vehicle to the last five days of the 5-milligram, 10 and 20-milligram were very stringent statistics. You do not see a difference.

Q Did any of the doses produce a statistically significant effect on survival?

A No.

Q Did any of the doses produce

DR. ANGELIQUE BORDEY

a statistically significant effect on the number of seizures?

A So like I just said, depends how you measure. If you just compare these last five days across the four, you don't see a statistical significance with strong statistics.

Let's say we only had done the vehicle in the 20-milligram, it would have been statistically significance. But we added two to be more stringent. And it makes a statistic a lot harder to reach the statistical significance.

Q Did any dose produce a statistically significant effect on the length of seizures?

A On the length of seizures? So it's a little hard to describe. So if we quantify the lengths of seizures, you can see also that -- I mean it prevents the worsening.

And if you compare I think either the five or -- actually, I think we may have even compared -- yeah, the

DR. ANGELIQUE BORDEY

five days. I have to go back. And if you do -- I don't know if you're familiar with statistics, the data not normally distributed. You do a Kruskal-Wallis analysis. Your Kruskal-Wallis analysis is significant.

However, when you do post hoc analysis because there are two few mice and a lot of variability in these mice, you don't have significance across group.

Q What was the effect of the positive control of rapamycin in this experiment?

A Rapamycin tested on four mice ablated seizures and decreased the mouse size by half -- not by half, actually. In this case, I think it was a little less. Rapamycin is a very strong drug.

THE VIDEOGRAPHER: The time is 5:50 p.m. We're going off the record.

(A short recess was taken.)

DR. ANGELIQUE BORDEY

THE VIDEOGRAPHER: The time is 5:56 p.m. We are back on the record.

Q Dr. Bordey, are you familiar with the procedure of stripping and reprobing Western Blots?

A Yes.

Q Is that a method you've used in your laboratory before?

A Yes.

Q And just at a very high level, what are the sort of steps involved in that process?

A As an example, you would run a gel for, let's say, a protein, a phosphorylated protein, phosphorylated S6. So you want to run the total, not just the phosphorylated, which is exactly the same size. And it needs to be on the same gel. So you strip your gel. You validate with a secondary antibody that it's gone. And then you probe again for the total protein, for example.

MR. KUMAGAI: I'll mark

DR. ANGELIQUE BORDEY

Exhibit 128.

(The above-referred-to document was marked as Exhibit 128 for identification, as of this date.)

Q You recognize this as a paper you published in 2014?

A Yes.

Q If you look at page 80, Figure 2D --

A Yes.

Q -- is this an example showing Western Blots that were stripped and reprobed in order to quantify phosphorylation?

A I'm not sure for all of them -- so, for example, protein sometimes have different sizes. So you do not need to strip. You just cut your membrane. And you can run it, or you can probe for the different antibodies.

So where you would definitely strip and reprobe is like for first four Filamin A and the total Filamin A because they exactly the same

size. First 4s6 kinase 1 and s6 kinase, the Filamin B, as well as you would do first 4s6 kinase, strip and reprobe for s6 kinase, same thing for first 4s6 and strip and reprobe for s6. So it depends on the size of the protein.

And I do not -- and you can tell that we did quantify first. We also run at the end, a total protein. So you know how much was in each well. And we quantify here for the total protein for Filamin B.

MR. KUMAGAI: I'll mark Exhibit 129.

(The above-referred-to document was marked as Exhibit 129 for identification, as of this date.)

Q Do you recognize Exhibit 129?

A I mean that's one of the Wang and Burns paper that I did not read carefully.

Q Well, this appears to be the 2012 paper in the Journal of

DR. ANGELIQUE BORDEY

Neuroscience; right?
A Oh. I'm so sorry. So I got confused with the neurology of disease because they have another one; right?
Q I think so.
A Sorry.
Q This is the paper that first, you encountered when you ran your Google search in 2013 and reached out to Cassava?
A That's right, yes.
Q If you look at Figure 6 on the page ending 9779 --
A Okay.
Q -- these appear to be Western Blots; right?
A Yes.
Q And what, if anything, do you observe about the phospho Tau bands in Figure 6 compared to each other and compared to the Tau bands?
MR. CAMPBELL: Object to form.
A I'm sorry. So Tau -- the

DR. ANGELIQUE BORDEY

Tau band. Where is the Tau band?

Q No. I don't think there's Tau, sorry, just compared to each other.

A So the blots to each other?

Q Yes.

MR. CAMPBELL: Object to form.

A At first site, what am I supposed to look for?

Q Is there anything unusual about the shapes, orientations, vertical positions, horizontal spacing that you could observe?

MR. CAMPBELL: Object to form.

A I would have to make them a little bigger. At first sight, the size of blots, I don't see anything specific.

Q Looking at these, sitting here today, nothing jumps out at you as unusual or unexpected?

MR. CAMPBELL: Object to form.

A I guess I'm missing

something. But I'm trying to compare them. I don't think so.

Q You could set that aside.

Have you ever been accused of research misconduct?

A No.

Q If you were accused of fabricating or manipulating Western Blots in one of your research papers, what would you do to refute that allegation?

MR. CAMPBELL: Object to form.

A At first, I would cry for making a mistake. So if I had found that somehow we made a mistake on Western Blot; is that what you're saying?

Q If someone accused you of duplicating or manipulating one of the Western Blots in your papers, how would you go about first assessing whether the allegation was true or not?

MR. CAMPBELL: Object to form.

A Well, I would not have to go

DR. ANGELIQUE BORDEY

and assess the allegation. Yale University would do it.

Q What is your understanding of how they would do that?

A I mean I'm not too sure of the exact procedure that they do. But they would have presumably put a committee together that look at the claim and look at my papers.

Q And what sort of data or records would you need to provide in order to respond to an allegation that you manipulated or fabricated Western Blot data?

MR. CAMPBELL: Object to form.

A I mean it never happened to me. So I'm not too sure what would be required.

Q If you didn't have any original records or raw data from those experiments, how would you demonstrate to an investigator that the Western Blots were not manipulated?

MR. CAMPBELL: Object to form.

A Well, I think ultimately, those are the data. And I'm not sure how you prove fraud. I just don't know.

Q You could set that paper aside.

I'm asking you how you would go about demonstrating to an investigator that the Western Blots that you presented in a paper of yours, let's use the 2020 paper as an example, how you would go about demonstrating that the Western Blots were not manipulated.

MR. CAMPBELL: Object to form.

A We publish the blots. They are published.

Q The original records?

A Yes.

Q And what does that mean?

A A picture of the original record is published because these journal required them. And we happily publish

DR. ANGELIQUE BORDEY

the records.

Q Including with the molecular weight markers?

MR. CAMPBELL: Object to form.

A You cannot always include the molecular weight markers, depending how it is done. Now we can. And we include them because the way it is run does not always include the molecular markers, I think.

Q Do you keep logbooks, laboratory notebooks of all the experiments that you run in your lab?

A We keep notebooks, yes.

Q Do you keep either the original films or photographs of the original Western Blots that you run in your lab?

MR. CAMPBELL: Object to form.

A We have kept most of the original film. And now since it's digital, we keep the image.

DR. ANGELIQUE BORDEY

Q And how old are the films that you have in your lab?

MR. CAMPBELL: Object to form.

A Past ten years, usually often we don't keep. So that's about it.

Q After five, six, seven years, do the films degrade?

MR. CAMPBELL: Object to form.

A I think some film -- I mean, I think, in general, these old-fashion film will remain stable. But degrades is -- the new method that we do degrades in 24 hours. So you really have to take the picture.

Q Has Cassava conducted an audit of your lab, as far as you know?

A Not a formal audit, no.

Q Have they conducted an informal audit?

A We have discussed recordkeeping and best practice.

Q And did they find any

non-compliance or concerns with your recordkeeping practices?

A Since it was -- just discussion, no.

MR. KUMAGAI: Could we take two minutes if we have any minutes left? Go off the record.

MR. CAMPBELL: I think you've got about two.

THE VIDEOGRAPHER: The time is 6:09 p.m. We are going off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: The time is approximately 6:10 p.m. We are back on the record.

Q Dr. Bordey, do you know if obtaining a clinical indication of simufilam to treat TSC would result in any bonus payments to any current or former Cassava personnel?

A Can you rephrase that a little bit? I'm sorry.

Q Do you know if obtaining a

DR. ANGELIQUE BORDEY

clinical indication or approval for simufilam to treat TSC would result in a bonus payment to any current or former Cassava personnel?

A I don't know.

Q Do you know if the company has plans, alternative plans or fallback plans if the TSC program fails?

A Not that I know of.

(Continued on the following page.)

MR. KUMAGAI: Dr. Bordey, thank you very, very much for your time. Those are all my questions, subject to any questions others may have.

MR. CAMPBELL: No questions on behalf of Cassava or Mr. Schoen.

THE VIDEOGRAPHER: The time is 6:12 p.m. This concludes today's testimony. We are off the record.

(Time noted: 6:12 p.m.)

______________________

DR. ANGELIQUE BORDEY

Subscribed and sworn to
before me on this _______day
of _______________________, 2025.

__________________________________

NOTARY PUBLIC

I N D E X

E X A M I N A T I O N

EXAMINATION

Mr. Kumagai 5

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 103 | Linkedin profile | 8 |
| Exhibit 104 | CV | 9 |
| Exhibit 105 | E-mail | 70 |
| Exhibit 106 | Summary statement | 73 |
| Exhibit 107 | E-mails | 91 |
| Exhibit 108 | E-mails | 107 |
| Exhibit 109 | E-mails | 129 |
| Exhibit 110 | E-mails | 137 |
| Exhibit 111 | E-mails | 145 |
| Exhibit 112 | E-mails | 150 |
| Exhibit 113 | E-mail | 156 |
| Exhibit 114 | E-mails | 164 |
| Exhibit 115 | Cover page | 170 |
| Exhibit 116 | Article | 186 |

INDEX (Cont.)


| | | |
|---|---|---|
| Exhibit 117 | Paper | 187 |
| Exhibit 118 | E-mail | 215 |
| Exhibit 119 | Article | 224 |
| Exhibit 120 | Grant | 232 |
| Exhibit 121 | E-mail | 242 |
| Exhibit 122 | Article | 253 |
| Exhibit 123 | Article | 257 |
| Exhibit 124 | Report | 259 |
| Exhibit 125 | Study plan | 267 |
| Exhibit 126 | E-mails | 279 |
| Exhibit 127 | Form 8-K | 295 |
| Exhibit 128 | Paper | 306 |
| Exhibit 129 | Paper | 307 |

C E R T I F I C A T I O N

I, ANTHONY GIARRO, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, DR. ANGELIQUE BORDEY, was duly sworn on the date indicated, and that the foregoing, to the best of my ability, is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

<%5259,Signature%>

____________________

ANTHONY GIARRO

ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC
1-800-727-6396

330 Old Country Road 7 Times Square
Mineola, New York 11501 New York, New York 10036

NAME OF CASE: Heilbut, et al. versus Cassava, et al.

DATE OF DEPOSITION: September 26, 2025

NAME OF DEPONENT: Dr. Angelique Bordey

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |
| ____ | ______ | ________________ | _____________ |

______________________
DR. ANGELIQUE BORDEY

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ___________, 20__.

___________________ ___________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES: