# EXHIBIT 140

RF Copy

2a|b

# CLINICAL TRIAL AGREEMENT

This Clinical Trial Agreement ("Agreement"), effective as of the 1st day of August, 2018, is entered into by and between Pain Therapeutics, Inc., whose principal business address is 7801 N. Capital of Texas Highway, Suite 260, Austin, TX 78731 ("Sponsor"), and the Research Foundation of CUNY on behalf of The City College of New York (City University of New York), 230 W. 41st St., 7th Fl., New York, NY 10036 ("Institute").

WHEREAS, Sponsor will be conducting a clinical trial and desires Dr. Hoau-Yan Wang ("Researcher") to conduct biomarker screening and testing under this Agreement ("Biomarker Testing") as part of a clinical trial of PTI-125 ("Research Drug") as described in the protocol ("Protocol"), which is incorporated herein by reference as Attachment A.

WHEREAS, Sponsor desires to have such Biomarker Testing conducted by Institute and Researcher in accordance with the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1: DEFINITIONS

1.1 Confidential Information means and includes all technical information, inventions, software, know-how, methods, techniques, patient records, data and other legally protected or proprietary ideas or materials, whether or not patentable or copyrightable, involving Research Drug or the PTI-125DX diagnostic/biomarker that is identified as confidential or proprietary at the time it is delivered or communicated. Any obligation to maintain the confidentiality of Confidential Information will not apply to information that: (a) was known to the receiving party before receipt from the disclosing party as evidenced by the receiving party's written records; (b) is or becomes available to the public through no fault of the receiving party; (c) is received in good faith by the receiving party from a third party and is not subject to an obligation of confidentiality owed by the third party to the disclosing party, or (d) is required to be disclosed by order of governmental authority or a court of competent jurisdiction, provided that the receiving party shall use its best efforts to obtain confidential treatment of such information by the agency or court.

1.2 Intellectual Property means and includes all technical information, inventions, discoveries, software, know-how, methods, techniques, formulae, data, processes and other proprietary

ideas, whether or not patentable or copyrightable, that are conceived, discovered, developed or reduced to practice in the conduct of Biomarker Testing.

**ARTICLE 2: PERFORMANCE**

2.1 Institute and Researcher will perform all the services described herein, or incidental to those described herein, in accordance with the highest standards of pre-clinical Research practice. For clarification, Institute is not engaged in the clinical trial itself; Institute will provide a service (sample analysis) for fee to facilitate Sponsor's conduct of the clinical trial. The Biomarker Testing will be conducted in full compliance with this Agreement and in accordance with the Protocol, any Protocol amendments mutually agreed to by the parties and as reflected via a contract amendment signed by both parties, and all applicable laws and regulations.

2.2 Performance of the Biomarker Testing under this Agreement shall commence within 5 days of receiving samples. Samples may be shipped starting no earlier than August 15, 2018 and are expected to conclude on or before April 30, 2019 In case of delayed performance, this Agreement may, at Sponsor's option, be extended for subsequent one-month periods until the Biomarker Testing is completed. Sponsor shall, in any case, have the option to terminate this Agreement by giving written notice of termination in accordance with Article 7.

The parties acknowledge that the Researcher will utilize Institute's facilities for this Biomarker Testing.

**ARTICLE 3: PAYMENT**

3.1 Sponsor shall make payments to Institute in accordance with the payment schedule set forth in Attachment B. Checks are to be made payable to Research Foundation of CUNY, at the following address:

Research Foundation of CUNY (City University of New York), 230 W. 41st St., 7th Fl., New York, NY 10036

3.2 Sponsor shall reimburse Institute for all direct and indirect costs incurred by Institute in connection with the Biomarker Testing up to $118,975 as detailed in Attachment B. Sponsor will not be liable for any payment in excess of the amount set forth in Attachment B except upon Sponsor's written agreement.

**ARTICLE 4: RECORDS AND REPORTS AND CONFIDENTIAL INFORMATION**

4.1 All data generated in the Biomarker Testing, including all information required in the Protocol, records, reports, and other work product generated by or on behalf of Researcher in the course of performance of the Biomarker Testing ("Data") shall be the sole and exclusive property of Sponsor. The Institute and Researcher may use such Data for their own non-commercial research, publication (subject to article 6) and education purposes in accordance with this Agreement, but will not disclose or transfer any such Data collected under the



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

Protocol to any third party, without the prior written permission of Sponsor. All Data collected under the Protocol shall be delivered to Sponsor by Investigator in a timely manner throughout the performance of this Biomarker Testing, as provided in the Protocol, and in no event later than ten (10) working days after the date of termination of this Agreement or on which Sponsor otherwise requests delivery of the Data. Sponsor shall have the right to review, publish, disclose and use, any Data developed during the course of this Biomarker Testing as Sponsor, in its sole discretion, deems appropriate, including, without limitation, in submission to FDA and other regulatory authorities.

4.2 Institute and Researcher shall not disclose to any other party or use for any purpose other than performance of Biomarker Testing, Sponsor's Confidential Information.

**ARTICLE 5: INTELLECTUAL PROPERTY**

5.1 Title to any Intellectual Property generated in the Biomarker Testing by Institute or Researcher, including but not limited to Intellectual Property relating to PTI-125DX, or variants thereof, whether or not contemplated by the written description or Protocol of Biomarker Testing ("Biomarker Use"), shall vest exclusively in Sponsor. Title to any Intellectual Property developed solely by Sponsor shall vest exclusively in Sponsor. Intellectual Property developed jointly by Institute and Researcher and Sponsor in the performance of Biomarker Testing shall be owned by the Sponsor.

The parties intend and consider the services and intellectual property provided by Institute and Researcher under this Agreement to be works made for hire for Sponsor. If for any reason the services are not considered works made for hire under applicable law, Institute and Researcher hereby sells, assigns and transfers to Sponsor and its successors and assigns all rights, title and interest, including goodwill, in and to the intellectual property, including registrations and applications, in all services, and all works based upon, derived from or incorporating all or part of services, and all rights corresponding to the forgoing throughout the world.

5.2 Institute shall promptly report to Sponsor in writing any Intellectual Property developed in the performance of Biomarker Testing.

Researcher and all other study personnel are bound or shall have agreed: (a) to comply with the terms of this Agreement; and (b) not to enter into agreements with third parties which would impair their ability to perform Biomarker Testing.

5.3 Nothing in this Agreement shall be interpreted as giving Institute any rights under any intellectual property rights now, or hereafter, owned by Sponsor. Nothing in this Agreement shall be interpreted as giving Sponsor any rights under any intellectual property rights now, or hereafter, owned by Institute.

**ARTICLE 6: PUBLICATION**

6. It is understood and mutually agreed upon that the study design and Biomarker Testing proposed herein are a collaborative effort by Sponsor and Institute and, if appropriate, that



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

both parties will share in Publication authorship commensurate with intellectual contribution. Institute and Researcher shall be free to publish, present or use any results arising out of the performance of this Agreement ("Publication") for their own instructional, research or publication objectives, provided that such Publication does not disclose any Confidential Information. At least forty-five (45) days prior to submission for publication, presentation or use, Institute and Researcher shall submit to Sponsor for review and comment any proposed oral, written, or electronic Publication, which period may be extended for an additional thirty (30) days if requested in writing by Sponsor in the event that Sponsor provides reasonable need for such extension. Expedited reviews for abstracts or poster presentations may be arranged if mutually agreeable to Sponsor, Institute and Researcher. In the event that any proposed Publication contains Confidential Information of Sponsor, at the request of Sponsor, such information shall be removed. Upon notice to Institute that Sponsor reasonably believes that one or more patent applications relating to an Invention (as defined in Article 1.2 hereof) should be filed prior to any Publication, then such Publication will be delayed until such patent application(s) have been filed, provided that Institute and Researcher and Sponsor shall cooperate in expeditiously filing any such patent application(s).

**ARTICLE 7: TERMINATION**

7.1 In addition to termination upon the conclusion of Biomarker Testing as provided in Article 2, either party may terminate this Agreement effective upon written notice to the other party, if the other party breaches any of the terms or conditions of this Agreement and fails to cure such breach within thirty (30) days after receiving written notice thereof. In the event of an incurable breach, the non-breaching party may terminate this Agreement effective immediately upon written notice to the breaching party.

7.2 In addition, either party may terminate this Agreement for any reason upon thirty (30) days prior written notice to the other party. In such event, Institute and Researcher shall immediately take proper steps to terminate activities in a cost-effective manner.

7.3 In the event of termination of this Agreement prior to its stated term whether for breach or for any other reason whatsoever, Institute shall be entitled to either a) be reimbursed for or b) retain from the payments made by Sponsor prior to termination, Institute's reasonable costs of concluding the work in progress Allowable costs include, without limitation, all costs or non-cancelable commitments incurred up to and including the date of termination. In the event of termination, Institute and Researcher shall submit a final report of all costs incurred and all funds received under this Agreement within thirty (30) days after the effective termination date. The report shall be accompanied by a check in the amount of any excess of funds advanced over costs and allowable commitments incurred.

7.4 Termination of this Agreement shall not affect the rights and obligations of the parties accrued prior to the date of termination. The provisions of Article 5, entitled Intellectual Property, Article 6, entitled Publication, Article 8, entitled Disclaimer of Warranties, Indemnification and Article 11 entitled Miscellaneous, shall survive such termination. Section 4.1 shall survive termination for a period of five (5) years.



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

**ARTICLE 8: REPRESENTATIONS AND WARRANTIES, INDEMNIFICATION**

8.1 Institute and Researcher represent and warrant that:

(i) they have the legal authority and right to enter into this Agreement;

(ii) they have no obligations to any other party which is in conflict with their obligations under this Agreement;

(iii) they will conduct the Biomarker Testing in accordance with the Protocol in full compliance with all applicable laws and regulations;

(iv) The Biomarker Testing will be conducted solely at Institute's facilities;

(v) All representations made, directly or indirectly, by Institute and Researcher to Sponsor related to Institute and Researcher qualifications, ability and competence to perform the Services or as set forth in any document or as a part of any other understanding by PTI in relation thereto, are true and correct to the best of Institute and Researcher knowledge at the time of Company's execution of this Agreement;

(vi) they acknowledge that (i) Sponsor's Confidential Information may represent material, non-public information of the Sponsor, (ii) federal securities laws prohibit anyone who is in possession of material, non-public information of PTI from purchasing or selling Sponsor's securities on the basis of material, non-public information of Sponsor and (iii) neither it, its affiliates nor its representatives in possession of material, non-public information of PTI shall purchase or sell securities of Sponsor on the basis of material, non-public information of PTI during the Agreement Term and for one (1) year thereafter;

8.2 Sponsor represents and warrants that: (i) Sponsor has the legal authority and right to enter into this Agreement; and (ii) Sponsor has no obligation to any other party which is in conflict with Sponsor's obligation under this Agreement.

8.3 Sponsor agrees to indemnify Institute and Researcher from any and all liability, loss, or damage they might suffer as a result of claims, demands, costs or judgment against them arising out of or relating to a breach by Sponsor of any of its representations, warranties or obligations under this Agreement except to the extent that the Institute's or Researcher's actions or omissions contributed to the liability, loss or damage. Sponsor shall indemnify Institute and Researcher from any and all liability, loss, or damage they might suffer as a result of claims, demands, costs or judgments against them arising out of or relating to any harm attributable to use of the Research Drug.

8.4 Institute and Researcher agree to indemnify and hold Sponsor harmless from any and all liability, loss, or damage it might suffer as a result of claims, demands, costs or judgment which are or alleged to be arising solely out of:

Negligent acts and omissions on the part of Institute or Researcher; or

A breach of its representations, warranties or obligations under this Agreement;

8.5 Each party's agreement to indemnify and hold the other harmless is conditioned on the indemnified party:



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

Providing written notice to the indemnifying party of any claim, demand or action arising out of the Indemnified activities within thirty (30) days after the indemnified party has knowledge of such claim, demand or action;

Permitting the indemnifying party to assume full responsibility to investigate, prepare for and defend against any such claim or demand;

Assisting the indemnifying party, at the indemnifying party's reasonable expense, in the investigation of preparation for and defense of any such claim or demand;

Not compromising or settling such claim or demand without the indemnifying party's written consent.

**ARTICLE 9: NOTICES**

9.1 Notices under this Agreement shall be in writing and sent only by prepaid, recognized public courier and addressed as follows:

If to Institute:

Research Foundation of CUNY
230 W. 41st St., 7th Fl.
New York, NY 10036
Telephone: 212-417-8363
Email: Legalaffairs@rfcuny.org

If to Sponsor:

Pain Therapeutics, Inc.
Attention President and CEO
7801 N. Capital of Texas Highway, Suite 260
Austin, TX 78731
USA
512-501-1900

**ARTICLE 10: PUBLICITY**

10.1 Neither party will issue a press release or make any other public statement that references this Agreement or identify the other in any promotional advertising or other promotional materials to be disseminated to the public or use the name of any faculty member, employee, or student or any trademark, service mark, trade name, or symbol of the other without the other's prior written consent, except to the extent required by law or federal agencies.



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

**ARTICLE 11: MISCELLANEOUS**

11.1 This Agreement shall in all respects be governed by and construed in accordance with the laws in force in the State of New York.

11.2 Neither party may assign this Agreement without the prior written consent of the other party.

11.3 If any provision of this Agreement becomes or is declared illegal, invalid, or unenforceable, such provision will be divisible from this Agreement and will be deemed to be deleted from this Agreement. If such deletion substantially alters the basis of this Agreement the parties will negotiate in good faith to amend the provisions of this Agreement to give effect to the original intent of the parties.

11.4 Institute and Sponsor are independent contractors and neither is an agent, joint venturer, or partner of the other.

11.5 In the event of any inconsistencies between the terms of this Agreement and the documents referenced or incorporated herein, the terms of this Agreement will prevail.

11.6 This Agreement represents the entire agreement and understanding between the parties with respect to its subject matter and supersedes any prior and/or contemporaneous discussions, representations, or agreements, whether written or oral, of the parties regarding this subject matter.

11.7 Amendments or changes to this Agreement must be in writing and signed by duly authorized representatives of the parties.

11.8 Sponsor and its designated representatives shall have the right, upon reasonable notice, to audit all applicable records of Institute for the purpose of determining Institute's compliance with the obligations set forth in this Section. This right to audit shall extend throughout the Agreement Term and for one (1) year after the (i) expiration or termination of this Agreement or (ii) resolution of any dispute between Sponsor and Institute hereunder

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed in duplicate as of the dates entered below.

**INSTITUTE:**

Name: [signature] cc     Date: 9/19/18

JERRY STEELE
OPERATING OFFICER

Research Foundation of the City University of New York



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

**SPONSOR:**

| Name: *Remi Barbier* | Date: 09/19/2018 |
| --- | --- |

Remi Barbier
President & CEO
Pain Therapeutics, Inc.



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

## ATTACHMENTS:

### Attachment A – Protocol

Study Title: Biomarker Screening and Testing for Clinical trial PTI-125-02

1. **Executive Summary**
PTI-125DX (PTI's proprietary diagnostic/biomarker assay) will be used in both plasma-based and lymphocyte-based versions for this work. The plasma-based version will be used to screen patient blood samples meeting all other screening criteria. A final screening criterion for patients with positive PTI-125DX will be the $A\beta_{42}$/tau index from a baseline CSF draw. Patient lymphocyte samples from enrolling patients will then be tested in the lymphocyte-based PTI-125DX assay as a baseline measure. Both versions of PTI-125DX will also be tested on Day 7 blood samples and end of study blood samples. All enrolling subjects will also have CSF samples from baseline and end of study tested in the YKL40 neuroinflammation assay and for $A\beta_{42}$, tau and P-tau. There will be 36 subjects enrolled in the study.

2. **Quality Statement**

   It is understood that this work is not subject to GLP requirements, but will be performed according to sound scientific principles, in compliance with CUNY School of Medicine standard operating procedures, and with review by Dr. Wang and supervisory technical staff.

3. **Timing**

   The project can be started in August/September 2018.

4. **Summary of Costs and Payment Schedule**

   A summary of costs and payment schedule is listed in Attachment B.

   Statistical analyses work will be performed at:

   Department of Pharmacology, Physiology and Neuroscience
   SOM CDI 3370
   85 St Nicholas Terrace
   New York, NY 10031



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

All accounting activities will be processed at:

Research Foundation of CUNY
230 W. 41st St., 7th Fl.
New York, NY 10036



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

ATTACHMENTS:

**Attachment B – Payment and Budget**

Payment: Up to $118,975 (including overhead).

Payment Schedule: Invoiced as incurred or as needed.

**Detailed Budget:**

**Salary & fringe benefit:**

| | | | |
|---|---|---|---|
| Hoau-Yan Wang, Ph.D. | PI | (0.77 month, 7%) | **$13,055**<br>**$ 8,646 + $ 4,409** |

He will design and execute the assays using blood samples obtained from test subjects. He will oversee the data collection and analysis.

| | | |
|---|---|---|
| Kuo-Chieh Lee, M.S. | Research Assistant (3.75 month, 37.5%) | **$ 25, 752**<br>**$ 18,750 + $ 7,002** |

He will assist PI in running Western blotting. He will characterize all the antibodies used in the experiments.

**$ 38,807**
**$ 27,396 + $ 11,411**

Fringe Benefits are calculated with the following rates:

- Faculty Academic Effort 51%
- Research Assistant 37.34%

**Primary and secondary antibodies and protein A/G beads**

Primary antibodies for immunoprecipitation and Western blotting
Secondary antibodies for Western blotting
Protein A/G beads for immunoprecipitation **$ 20,980**

**Drugs, detergents and Chemicals**

Agonists/antagonists for biological reagents
Detergents, protease and protein phosphatase inhibitors

**$ 4,785**



CONFIDENTIAL AND COMMERCIALLY SENSITIVE

| | |
|---|---|
| **Electrophoresis and Western blotting supplies, ECL reagents, Film**<br>Buffers, membranes for Western blotting<br>Chemiluminescent (ECL) reagents for Western blotting detection<br>Films for Western blotting visualization | **$ 8,410** |
| **General supplies (pipette tips, test tubes, gloves, freezer boxes)** | **$ 1,448** |
| **Multi-mode plate reader service contract (prorated)** | **$ 1,350** |
| **Direct cost** | **$ 75,780** |
| **Indirect cost (57%)** | **$ 43,195** |

Indirect costs are calculated based on our Facilities and Administrative Rate Agreement (57%) dated 03/16/2017. The modified total direct cost (MTDC) base is defined as the total direct costs excluding capital expenditures, the portion of each subaward in excess of $25,000, participant costs, student tuition remission and student support cost (ex. stipends, fellowships, scholarships).

| | |
|---|---|
| **Total** | **$ 118,975** |