# EXHIBIT 222

TABLE OF CONTENTS

Summary (SLS, MGK, SC)....1
Administrative Data (SLS)....3
History (SLS)....4
Interstate (I.S.) Commerce (SLS)....4
Jurisdiction (SLS)....4
Individual Responsibility and Persons Interviewed (SLS)....4
Organization (SLS/MGK/SC)....5
Study Administration and Responsibility (SLS)....8
Methodology (MGK, SC)....8
Documentation (MGK, SC)....10
Analysis of Study Samples (MGK, SC)....11
Objectionable Conditions and Management's Response....14
Refusals (SLS)....17
General Discussion with Management....18
Samples Collected....19
Voluntary Corrections....19
Exhibits Collected....19
Attachments....19

**SUMMARY (SLS, MGK, SC)**

This is a pre-announced, comprehensive, high priority, surveillance, PDUFA, Biopharmaceutics Analytical Facility Inspection Assignment. The inspection was conducted as requested by the Center for Drug Evaluation and Research (CDER), Office of Study Integrity and Surveillance (OSIS), under eNSpect Operation ID # 228178, and the assignment memorandum dated 09/06/2022 (**Attachment 3**). The assignment requested to conduct an inspection according to Compliance Program 7348.004, Bioresearch Monitoring: In Vivo Bioavailability/Bioequivalence Studies (Analytical), for Protocol PTl-125-02 “A Phase 2b, Randomized, Double-blind, Placebo-controlled, Multiple Dose, Biomarker and Safety Study of PTl-125 in Mild-to-moderate Alzheimer’s Disease Patients”, sponsored by Cassava Sciences, Inc., 7801 N. Capital of Texas Hwy, Ste. 260, Austin, TX 78731, under [redacted].

There is no inspection history for The City College of New York, School of Medicine or Dr. Hoau-Yan Wang, Analytical Investigator.

The current inspection covered the authority and administration of the conduct of the analytical activities of the study, including sample receiving and storage records, equipment operation and

calibration records, study sample analysis, and methodology. The inspection also included the review of standard operating procedures, temperature monitoring logs, and analytical results.

The study is closed. This site received the first sample for analysis on 8/22/2019, and the last on 5/08/2022.

Upon conclusion of the inspection, we met with Mr. Vincent Boudreau, President of CCNY, Dr. Hoau-Yan Wang, Analytical Investigator, and Dr. Zhe Pei, Research Associate, at the closeout meeting. We issued a Form FDA 483 containing the following eight observations (**Attachment 2**).

These observations pertain to the study conducted to measure Aβ42, total tau, p-tau181, neurogranin, NFL, YKL-40, IL-6, sTREM2, and HMGB1, using ELISA methods, and albumin, and IgG using Western blots in cerebrospinal fluid (CSF) samples from Study PTI-125-02:

1. The ELISA assays used in the study were not validated/verified. Specifically, the site used commercially available ELISA kits without in-house validation/verification of assay parameters, such as accuracy, precision, and sensitivity of the method.
2. The curve fitting model used for ELISA assays was not adequately justified. Specifically, the site fitted the calibration standards data using a linear regression model, but the log-transformed concentration-response relationship for analytes measured using ELISA assays were nonlinear, thus resulting in inaccurate determination of sample concentrations.
3. There were inadequate source records to reconstruct the study. Specifically, the site did not maintain:
    a. Documentation of sample storage and tracking
    b. Documentation of experimental procedures (e.g., record of sample removal/return, preparation of calibration standards, sample aliquoting, processes associated with the conduct of ELISA and Western blot)
    b. Source records for Western blot analysis
    c. Audit trails for the plate reader (Multimode Detector software) used in ELISA assays
4. In ELISA assays for the following analytes and samples, the site excluded one of the three concentration data from triplicate analysis in determining the average sample concentration without justification.
    a. Aβ42 for samples: 03-001-0, 04-009-0, 06-008-0, 10-001-0, and 13-016-0
    b. NFL and YKL-40 for samples: 04-007-28, 06-005-28, 07-008-28, 13-013-28, and 10-004-28
    c. HMGB1 for samples: 04-007-28, 06-005-28, 07-008-28, and 13-013-28
    d. Neurogranin for sample 04-007-28
5. For ELISA assays used in the study, no quality control samples were included during sample analysis to determine run acceptance.
6. The site did not conduct stability assessment to ensure measurements of analytes in study samples were accurate.

7. There was no access control (no user log-in requirement) to the computers connected with the ELISA plate reader and image scanner used in the study.
8. The site did not calibrate major equipment (e.g., Multimode Detector DTX 880 and the -80 °C freezer, ID #045299) during the sample analysis period or could not provide documentation for instrument calibration and maintenance.

No samples were collected. An initial refusal was encountered, but the site eventually granted access for inspection. We informed Mr. Boudreaux and Dr. Wang that the final classification of the inspection would be determined by the Center office within FDA that issued the assignment. A verbal warning was given regarding FDA's available regulatory and administrative actions if found to be in violation of the Food Drug & Cosmetic Act.

**ADMINISTRATIVE DATA (SLS)**

| | |
|---|---|
| Inspected firm: | The City College of New York (CCNY)/CUNY |
| Location: | 160 Convent Ave<br>New York, NY 10031 |
| Phone: | 212-650-7285 |
| FAX: | 212-650-7680 |
| Mailing address: | 160 Convent Ave<br>New York, NY 10031 |
| Email address: | president@ccny.cuny.edu |
| Dates of inspection: | 09/14-16/2022 |
| Days in the facility: | 3 |
| Participants: | **Sheri L Stephenson, Investigator**<br>**Melkamu Getie Kebtie, FDA Center Employee**<br>**Seongeun Cho, FDA Center Employee** |

This inspection was pre-announced on Friday, 09/09/2022 with the office of the Dean of School of Medicine. I (SLS) was promised a return phone call but did not receive one. Upon arrival at the CCNY/CUNY campus on 09/12/2022 at 9:00am, we initially received a refusal to inspect from Mr. Paul F. Occhiogrosso, Executive Counsel to President (of CCNY/CUNY). Additional details can be found in the REFUSALS section of this report.

We were eventually granted access to the inspection site and initiated the inspection on 09/14/2022 at 11:00am. We presented our credentials and issued a Form FDA 482 to Anthony M. Liss, PhD, Provost and Senior Vice President Academic Affairs, dated 09/14/2022 (**Attachment 1**).

Sections of this report are identified by authors initials: SLS, MGK, and SC.

**HISTORY (SLS)**
The City College of New York (CCNY) is one of 25 campuses under the umbrella of City University of New York (CUNY). It is the location of the CUNY School of Medicine, with an administration address of 160 Convent Ave, New York, NY 10031. Dr. Wang is employed by CCNY School of Medicine, Department of Physiology, Pharmacology, and Neuroscience, in the Center for Discovery and Innovation located at 85 St. Nicolas Terrace, New York, NY 10031. He stated his hours of work are typically 7:30 am to 5:00 pm or later, depending on his planned activities.

This is the first inspection of CCNY and Dr. Wang. [redacted]

Post-inspectional correspondence should be addressed to:
The City College of New York/CUNY
Vincent Boudreau, President
160 Convent Ave, Room 300
New York, NY 10031
president@ccny.cuny.edu

**INTERSTATE (I.S.) COMMERCE (SLS)**
Dr. Wang is an Analytical Investigator at CCNY and as such is not involved in the distribution or marketing of regulated products. He received clinical trial samples from clinical sites throughout the United States and Canada, and from the sponsor, Cassava.

**JURISDICTION (SLS)**
Dr. Wang was the Analytical Investigator for FDA-regulated human clinical trials involving investigational products for Protocol PTI-125-02 "A Phase 2b, Randomized, Double-blind, Placebo-controlled, Multiple Dose, Biomarker and Safety Study of PTI-125 in Mild-to-moderate Alzheimer's Disease Patients", sponsored by Cassava Sciences, Inc., 7801 N. Capital of Texas Hwy, Ste. 260, Austin, TX 78731, under [redacted].

**INDIVIDUAL RESPONSIBILITY AND PERSONS INTERVIEWED (SLS)**
**Hoau-yan Wang, PhD, Analytical Investigator**: Dr. Wang was the sole Analytical Investigator for the study protocol PTI-125-02 and was responsible for conducting analysis on whole blood and cerebrospinal fluid samples. Dr. Wang stated he has been employed with CCNY for 21 years and has been conducting analytical research over 30 years. His CV was collected as **Exhibit 1**. Dr. Wang stated this and a related Phase 2a study were the only FDA-regulated studies for which he has conducted analysis. Dr. Wang answered questions and provided documents as requested during the inspection. He reports to Gonzalo Torres, Chair for Department of Molecular Cellular & Biomedical Sciences, CUNY School of Medicine, Harris Hall, Room H-205H.

**Zhe (Jenny) Pei, PhD, Research Associate**: Dr. Pei assisted Dr. Wang during the conduct of the study by handling samples. She was responsible for receiving, storing, and preparing samples for Dr. Wang. She answered some questions related to the conduct of the study and provided some documents as requested during the inspection. Dr. Pei reports to Dr. Wang.

**Kuo-Chieh Lee, Research Technician**: Mr. Lee was contacted on the final inspection day by Dr. Cho and Dr. Getie Kebtie to obtain copies of the ELISA Kit user manuals. He did not have any further participation in the inspection, and he left the site before he could be interviewed about his roles and responsibilities.

**Anthony M. Liss, PhD, Provost & Senior Vice President Academic Affairs, CCNY**: Dr. Liss stated he was the most responsible person available at the beginning of this inspection since the president was not available. He accepted the Form FDA 482 on behalf of the college. During a brief introductory meeting, Dr. Liss stated he oversees academic affairs for all academic programs and all of the deans report to him with one exception. The Dean of the School of Medicine reports directly to the president, Mr. Boudreau. Dr. Liss had no involvement in the study. He reports to the president, Mr. Boudreau.

**Vincent Boudreau, President, CCNY**: Mr. Boudreau was not present or available during this inspection until the close out meeting. He accepted the Form FDA 483 as the most responsible person at the college. He communicated directly with Dr. Wang during the closeout meeting as they agreed and understood the observations and planned to respond in writing within 15 business days.

**ORGANIZATION (SLS/MGK/SC)**
The most responsible person at the inspection site was the president of CCNY, Vincent Boudreau; however, he was not available during this inspection. The second most responsible person, and the person to whom the Form FDA 482 was issued, was Anthony M. Liss, PhD, Provost and Senior Vice President Academic Affairs. He did not participate in the inspection after accepting the FDA 482.

I obtained a copy of the college's organizational chart from the website, ccny.cuny.edu (**Attachment 4**). A copy of the contract between the college and the sponsor was provided by Dr. Wang (**Exhibit 3**). No third parties were responsible for any aspect of the analytical activities.

On 09/14/2022, Dr. Wang accompanied the team during the inspection of his laboratory. We observed five freezers in the 3rd floor hallway outside Dr. Wang's lab. Dr. Wang and Dr. Pei both stated at separate times that the -80 freezer "PHCBI Twinguard", Equipment ID #045299, was purchased specifically for this study 3 years ago and was the only one of the five freezers utilized for the study. Dr. Wang stated there were no calibration records available for any of the freezers and there were no calibration stickers visible on the freezers. The freezer has a digital screen on front of

the door with temperature display and includes time, date, alarm status, and door status (closed). Regarding temperature monitoring, Dr. Wang stated that the temperature of the freezer #045299 was being tracked on a daily basis by manually recording the temperature displayed on the front panel of the freezer onto a spreadsheet. We asked how he would be sure if the temperature displayed on the front panel is accurate since it has not been calibrated and he said he had occasionally verified the temperature using another thermometer put into the freezer. Dr. Wang stated the freezer is set to activate an auditory alarm at -74. He stated there is always someone onsite, such as faculty and staff or maintenance personnel. If the freezer alarm is activated, the person who hears the alarm will contact Dr. Wang as his phone number is posted on the freezer. Per Dr. Wang, "everyone" is responsible for monitoring for alarms. He stated all equipment is connected to a generator in the event of a power failure. Dr. Wang refers to this freezer as "Panasonic." Investigator Stephenson reviewed temperature logs from April 2022 and found no temperature excursions. No temperature logs were available prior to April 2022.

In addition to the new -80 freezer, there are 2 older -80 freezers: ID 30266, which has a read out on the side of the unit, which is not visible due to the proximity of the freezer next to it. Dr. Pei stated she uses her phone to take a photo of the readout to record temperature for that freezer; and ID 019028, which has a digital temperature read out on the front lower panel. Another freezer, ID 3200-6, has a label on the front door that reads "Store at -20" however there was no temperature reading on the unit to verify temperature. The last freezer, ID 3200-4, had unknown temperature. All five freezers were kept locked with a key or padlock which was kept in Dr. Wang's lab. Per Dr. Pei, she only uses the newest freezer because she "doesn't trust the older ones." Dr. Pei pointed out the 4°C walk-in cooler utilized by all lab faculty and staff with a temperature recording chart mounted to the outside wall left of the door. Dr. Pei provided a list of the samples received from the clinical sites and the sponsor (**Exhibit 2**).

**Sample Receipt and Handling**

We entered Dr. Wang's lab and he explained that half of the lab was his (1 ½ benches plus the back wall), but no area was locked and secure; anyone had access. Per Dr. Wang, Dr. Pei removed the samples from the freezer into a tub of dry ice, then carried the samples into the lab. After placing the samples on the bench, they were transferred into a rectangular plastic container with wet ice, to fully defrost. Dr. Wang stated Dr. Pei would open the caps on each well in preparation for assay. Dr. Wang stated the ELISA kits used during the study were stored per label at 4°C in the walk-in cooler. Dr. Wang stated he used his iPhone as a stopwatch for monitoring prescribed times included in the ELISA kit instruction manual.

The ELISA plate reader is a DTX880 Multimode Detector (Beckman Coulter). Dr. Wang stated he had no calibration records and the sticker on machine indicated the last calibration occurred in 2019 (**FDA 483 Observation #8**).

During the facility inspection on 9/14/22, we asked Dr. Wang to demonstrate the plate reading and image scanning procedures used for the ELISA and Western blot analysis, respectively, for analysis

of the CSF samples from study PTl-125-02. While Dr. Wang was demonstrating the procedures, we noticed that he accessed both computers connected to the plate reader and the image scanner without any log-in requirements (**FDA 483 Observation #7**). We asked him whether any username and password combinations were required to access the computers. Dr. Wang stated that he did not put any log-in requirement in place to access the operating system of these computers nor instrument software installed in the computer. We expressed our concern to Dr. Wang that, due to lack of access control to the computers, data security may not have been ensured. We also stated that the user log-in information is important in identifying the user who acquired the data and reconstructing the study. As stated in the "DOCUMENTATION" section, due to lack of records of experimental procedures, there is no alternative means of tracking users. Dr. Wang stated that data from the plate reader and image scanner were directly saved on to USB drives and no data were stored in the computers used to operate the plate reader and image scanner.

At our request for demonstration of experimental procedures, Dr. Wang placed a previously discarded tray in the plate reader and commenced the reading. After optimization, Dr. Wang centered well images then the machine read the wells and populated the response values on to the plate map. Upon clicking a menu on the software, data were then automatically exported into an Excel spreadsheet. Dr. Wang stated he saved the Excel files onto a USB drive. Dr. Wang stated that the Excel data are not saved in the computer connected the plate reader due to limited memory and the potential to be deleted by someone else accessing the equipment. Dr. Wang also explained that the data populated in the plate map within the software were saved neither in the computer nor in the USB drive. We asked him why these data are not saved, and he stated that he doesn't know if the plate reader software has the option to do so. We noted that the software has what appeared to be a save function next to the selection for Excel export. At our request, Dr. Wang attempted to test that option but didn't proceed further when a warning message asking to confirm an overwrite popped up. We asked Dr. Wang to contact the vendor of the software or check the instruction manual to see if such an option is available. During the inspection, Dr. Wang did not report back to us whether he attempted to contact the Vendor. Dr. Wang stated the Department of Justice (DOJ) took the original USB drive containing the original Excel files containing data from the plate reader as well as a second USB he made as a back-up copy. Dr. Wang also stated the computer is not dedicated for use only with the plate reader. It is used by other people in the lab, but he said he would not always know. There is no sign-in sheet or request form to use the computer. Per the audit log on computer, the plate reader software was set to not request password on 11/21/2007.

The Western blot process was explained by Dr. Wang. Resulting X-ray films were scanned to electronic images then originals discarded per Dr. Wang (**FDA 483 Observation #3c**). He stated it was too difficult to retain source films. The films were scanned using an Epson scanner with the film placed under a white sheet of paper and scanned to a computer next to the scanner. Dr. Wang stated he adjusted the contrast and darkness before saving the images to a USB drive. Dr. Wang stated the adjustments were only for visual purposes and were not saved as the original, but we observed that any adjustments he made to the image was how the image was saved. He stated he then used Adobe Photoshop to create image files. Dr. Wang stated he no longer has Photoshop

software because DOJ took his computer. Dr. Wang used Image J program to measure the bands on western blot images.

We asked Dr. Wang to provide an index of SOPs and copies of SOPs associated with the conduct of the ELISA and Western blot analysis for CSF samples from study PTI-125-02. The site did not provide an index of SOPs but provided copies of the SOP for determination of albumin in CSF and plasma and the SOP for determination of IgG in CSF and plasma (**Exhibit 4**). Dr. Wang stated that he uses the instructions in the ELISA kit manual (**Exhibit 7**) for the rest of the analytes and his lab doesn't have any other SOPs.

## STUDY ADMINISTRATION AND RESPONSIBILITY (SLS)

We did not collect a list of studies from Dr. Wang as he stated the Cassava studies (PTI-125-02 [Phase 2b] and PTI-125-03 [Phase 2a]) were the only FDA-regulated studies he had conducted.

## METHODOLOGY (MGK, SC)

| Applicable study number | Analyte(s) | Matrix | Sponsor/applicant | Application number |
|---|---|---|---|---|
| PTI-125-02 | Aβ42, total tau, p-tau181, neurogranin, NFL, YKL-40, IL-6, sTREM2, HMGB1, albumin, and IgG | Cerebrospinal fluid (CSF) | Cassava Sciences, Inc. | [redacted] |

### Method validation

No method validation report was submitted to FDA pertaining to the bioanalytical study to measure the above-mentioned analytes in CSF samples from Study PTI-125-02 associated with [redacted]. We asked Dr. Wang if he has a method validation report and he answered no. As stated below, Dr. Wang also mentioned that his lab did not conduct any method validation/verification experiments in relation to the bioanalytical study for analysis of CSF samples from Study PTI-125-02.

### *Precision and Accuracy Assessments*

All analytes in the CSF samples from the study PTI-125-02 were analyzed by ELISA, except for albumin and IgG, which were analyzed by Western blot. For ELISA, each analyte was analyzed by a commercially sourced ELISA kit for corresponding analyte. The following table shows the name of analytes the site analyzed for study PTI-125-02, the manufacturer of ELISA kits, catalogue numbers, and the type of ELISA assay.

| Analyte | Kit Manufacturer | Catalog # | Type |
|---|---|---|---|
| Total tau | Invitrogen Thermo | KHB0041 | Sandwich |

| | | | |
|---|---|---|---|
| pT181-tau | Invitrogen Thermo | KHO0631 | Sandwich |
| Aβ42 | Invitrogen Thermo | KHB3441 | Sandwich |
| Neurofilament light chain | Lifespan | LS-F6701 | Sandwich |
| Neurogranin | Lifespan | LS-F6894 | Indirect |
| YKL-40 | Lifespan | LS-F1020 | Sandwich |
| IL-6 | Lifespan | LS-F9982 | Sandwich |
| TREM-2 | Invitrogen Thermo | EH464RB | Sandwich |
| HMGB1 | Biomatik | EKF57253 | Sandwich |

During the facility inspection, Dr. Wang was asked to show us an example of ELISA kits used in the study. He brought out an unopened box of the commercially sourced ELISA kit from a cold chamber (~4 °C) that was kept in a vinyl bag. On one of the sides of the ELISA kit box, there was a label attached to it indicating a storage condition/temperature. Dr. Wang stated that each box contains two ELISA plates and assay reagents needed for assay.

Dr. Wang explained that the assays were performed as specified in the instruction sheet that came with each ELISA kit. We asked Dr. Wang if he had performed any validation or verification of the ELISA kits prior to initiating the study sample analyses, such as accuracy, precision, sensitivity, etc. He responded he had not and stated that he himself had run all ELISA assays for the study PTl-125-02 and that he followed the exact procedures as specified by the kit manufacturers (**FDA 483 Observation #1**).

We reviewed ELISA instruction sheets that were previously provided to OSIS for the RRA planned to be conducted in May 2022 but cancelled due to insufficient documentation submitted. During the facility inspection on 9/14/2022, Dr. Wang demonstrated the experimental steps that he performed during the sample analysis for study PTl-125-02. On 9/16/22, we confirmed the catalogue numbers of ELISA kits for each analyte used in the study and requested the copy of the ELISA assay manuals (**Exhibit 7**).

***Dilution Integrity***

During the study sample analysis, the site used a half volume of CSF samples in ELISA assays for four out of nine analytes (HMGB-1, IL-6, sTREM-2, and YKL40) and a full volume of CSF for the rest of analytes. To account for the different volumes used in the study, the site applied a dilution factor of 2 to those four analytes. Therefore, once analyte concentrations were calculated based on regression of calibration standards, values were multiplied by two to obtain the final concentration. The site did not conduct dilution integrity experiments. We asked Dr. Wang how he determined which samples need to be diluted and at what dilution factor and he responded that he had some prior knowledge on the concentrations of each analyte from the Phase 2a study and that the main driver for using a smaller volume when possible was to ensure sufficient volume of samples was available to analyze all analytes because of the scarcity of the samples.

***Long Term Matrix Stability***

Dr. Wang stated that his lab did not conduct any stability tests (**FDA 483 Observation #6**). He stated that during the study, he asked Ms. Lindsey Burns at Cassava whether they had stability data. However, he stated that he did not receive any response from Cassava about the stability nor anything specific about the conditions of the study samples. He also stated that he does not know the storage conditions of the study samples prior to arriving at his lab. He explained that for the study PTl-125-02, whole blood samples were shipped with ice packs and CSF samples were shipped in dry ice. When we asked for the process of receiving/verifying samples at his lab, he stated that Dr. Pei would contact the sponsor if there had been any visual issues upon receipt. However, Dr. Pei indicated there were no such occasions for this study. We asked Dr. Wang whether he has a copy of correspondence with Cassava requesting the stability data and he said it was a phone call.

***Benchtop Matrix Stability***

The site did not conduct benchtop stability assessment (**FDA 483 Observation #6**). Dr. Wang stated that the assays were performed as specified in the instruction sheet that came with ELISA kits. Those instructions do not indicate whether stability assessments were performed to cover sample handling during the bench top experimental procedures.

***Freeze-Thaw Stability***

The site did not evaluate freeze/thaw stability (**FDA 483 Observation #6**). Dr. Wang stated that for most samples, they received samples in a volume that is just enough to run the ELISA assays and they discarded any remaining residual samples, if any. For whole blood samples, they were shipped along with ice pack and once they added aliquots of protease inhibitor and phosphatase inhibitor solutions (Roche Applied Science) to the samples, they were stored at -80 °C until the assay. For CSF, samples arrived in a frozen status packaged in dry ice. Dr. Wang stated that Dr. Pei thawed samples to add a protease inhibitor and a protein inhibitor, aliquoted the samples into 5-6 tubes, and stored them at -80 °C until they were thawed on the day of assay. Dr. Pei explained that because of the limited sample volumes, she chose to aliquot the samples to 5-6 tubes to reduce loss of samples due to assay-specific aliquoting while minimizing the number of freeze-thaw cycles for each tube.

***Reference Standard Expiration and Storage***

The reference standards for each analyte used in the ELISA assay were received as a component of the ELISA kit box. As described earlier, Dr. Wang stated that the kit boxes are stored in a cold chamber (~4 °C) upon receipt until used, as specified in the kit instructions. The site provided copies of invoices/purchase orders for the ELISA kits. The boxes were discarded after the experiment and the site did not maintain records of expiration dates of the reference standards; therefore, we could not verify whether the reference standards were used prior to their expiration dates.

**DOCUMENTATION (MGK, SC)**

The site did not maintain documentation throughout the study conduct that was sufficient to verify and reconstruct critical activities. That includes minimal or no documentation in regard to study conduct, such as sample storage and tracking, preparation of calibration standards, sample aliquoting, processes associated with the conduct of ELISA and Western blot, Western blot x-ray

films, audit trails of the Multimode Detector software used for plate reading (**FDA 483 Observation #3**).

**ANALYSIS OF STUDY SAMPLES (MGK, SC)**

***Sample Receipt and Tracking for audited studies***

Samples were received by Dr. Pei and logged into an excel spreadsheet at the time of receipt. Dr. Pei stated she did not check temperatures upon receipt, and she did not keep any sample storage or tracking documentation (**FDA 483 Observation #3a**). Dr. Pei stated that she would store the samples in the freezer, or given ample time and supplies, she would prepare the samples and create aliquots on the same day of receipt, then move the aliquots into the -80 freezer.

***Sample Processing***

The site did not have any documents related to sample processing to review (**FDA 483 Observation #3b**). Dr. Wang stated that he followed the instructions provided by the manufacturers of the ELISA kits they purchased for the study. He stated Dr. Pei laid out study samples to be analyzed for the day and he processed the samples per the instructions, but that he did not record any steps related to the analysis such as addition of study samples, duration of antibody incubations, addition of detection agents, plate shaking, addition of stopping reagents, etc.

***Calibration Curves and Regression Model***

While reviewing calibration curves for ELISA assays of analytes previously submitted to OSIS for RRA, we noted that the site used a linear regression model to fit the log-transformed concentration-response data. During the inspection, we confirmed that the site used a linear regression model for all analytes analyzed by ELISA. However, the plotted log-transformed concentration-response relationship for all analytes appeared non-linear (**FDA 483 Observation #2**). During the inspection, we asked Dr. Wang to provide a justification for selection of the linear regression model used to fit the calibration curves data and whether he explored other curve fitting models that best fit the data. He responded that he used GraphPad in Prism version 5 to fit the calibration standards data and the only curve fitting model available in the software that he was aware of was linear regression. We indicated that the log-transformed concentration-response plots for the audited study appear non-linear and the currently used linear regression model may result in inaccurate determination of sample concentrations. Dr. Pei acknowledged it. We then asked Dr. Wang if he would consider exploring other curve fitting models that would better fit the data and recalculate the sample concentrations for all analytes using the new calibration curves. Dr. Wang expressed his willingness to explore other curve fitting models but stated that he needed to contact the sponsor (Cassava) for their statistical group to evaluate/perform statistics. However, up until the time we closed the inspection on 9/16/2022, he did not provide any data to that effect.

***Quality Controls (QC)/Run Acceptance***

We reviewed ELISA results and identified that the assay plates did not include quality control samples to assess run performance/determine acceptance and rejection of the runs (**FDA 483 Observation #5**). As described in an earlier section of this report, Dr. Wang stated that he simply followed the instructions for the ELISA kits provided by the manufacturer. He said he believed the calibration standards included in each ELISA assay plate would be a potential indicator if the assays performed as expected. We explained to him the roles and utility of quality control samples during bioanalysis, which are independent from those for calibration standards, and he said he understood.

***Data acquisition and processing***

As described elsewhere, data acquired from reading ELISA plates is first populated in a plate map in the plate reader software (Multimode Detector Software) and automatically exported into an Excel spreadsheet. The data populated in the plate map within the software were not saved. Instead, the exported Excel spreadsheets were saved. Additional data processing, such as log transformation, calculating a mean, calculating a percent difference between the baseline and post-treatment, etc., were made on the Excel spreadsheet. While reviewing the spreadsheets (**Exhibit 8**), we noticed that during the calculation of HMGB-1 concentrations, Dr. Wang excluded the concentration from well D.5 for Group 5, sample 13-016-0, in calculating the mean value for the sample. Dr. Wang explained that he flagged the concentration of well D.5 because the triplicate values for this sample were 178.203 (well D.4), 1095.5798 (well D.5), and 183.055 (well D.6), and he considered the value from well D.5 (1095.5798) as an outlier. We asked, although this example appears to be an outlier, did Dr. Wang have any preset criteria in determining which data points would be identified as outliers to be excluded when he conducts studies. He responded that he generally considers an outlier when its value is greater than 20 -30 % different from the other values. However, he did not give us a specific percentage number and also mentioned that he had determined it based on his judgement. Dr. Wang mentioned that although he excluded outliers from treatment effect calculations, he sent all acquired data in Excel to Cassava. We explained that he should define criteria for outlier determination before initiating studies.

Dr. Wang calculated mean values of each sample analyzed in triplicates and then based on the mean values of the day 0 and day 28 samples, he calculated % difference of the analyte level at day 0 vs 28 days after treatment. While reviewing the Excel spreadsheet that contained the calculations, we identified the formula to calculate averages of certain samples for ELISA analysis used two values only instead of all three values, although those excluded values were not believed to be outliers (**FDA 483 Observation #4**). We showed the examples of those incidents from the Aβ42 spreadsheet to Dr. Wang. Dr. Wang reviewed the spreadsheets and acknowledged they were indeed errors, not intended outliers for exclusion. He explained that it is likely that he had made a mistake in creating a formula for group 1 and then used the same formula for calculation for the rest of groups by cutting and pasting the formula, causing the same mistake applied to all five groups. We asked him to verify the accuracy of calculation for analytes analyzed by ELISA with the priority on Aβ42, total tau, p-tau181, NFL, and YKL-40. After approximately 3 hours, Dr. Wang stated that he completed reviewing the data for these analytes and did not find any additional similar errors on the spreadsheets. However, our independent review of the same spreadsheets identified several additional samples affected by similar errors in calculating mean concentrations of NFL and YKL-

40. In addition, we also identified similar error in the other analytes. We showed all erroneous calculations we found from review of the spreadsheets of all the nine analytes to Dr. Wang and he agreed with our findings. The affected samples included the following: Aβ42 for samples 03-001-0, 04-009-0, 06-008-0, 10-001-0, and 13-016-0; NFL and YKL-40 for samples 04-007-28, 06-005-28, 07-008-28, 13-013-28, and 10-004-28; HMGB1 for samples 04-007-28, 06-005-28, 07-008-28, and 13-013-28; and Neurogranin for sample 04-007-28 (**Exhibit 8**).

On 9/15/22, Dr. Wang stated that he corrected all calculation errors and submitted the updated data to Cassava via email. In addition, he provided the corrected spreadsheets (**Exhibit 5**) as well as a copy of email correspondence sent to Cassava (**Exhibit 6**) to us. He also stated that he would pay more attention in reviewing data in future.

***Repeat Analysis***

No samples were subject to repeat analysis. Dr. Wang stated that in most cases, the volumes of samples they received were just enough to run an ELISA assay one time (in triplicate). Any remaining samples were discarded.

***Incurred Sample Reanalysis (ISR)***

Incurred Sample analysis were not performed.

***Method Performance***

The site did not include QC samples in the ELISA plates analyzed as previously described, thus the performance of the method during sample analysis could not be evaluated.

***Audit Trails***

We asked Dr. Wang if he could provide a copy of audit trails for the instrument software (Multimode Detector software) used in the ELISA assay. He responded that he was not aware of the existence of any audit trails (**FDA 483 Observation #3d**). During the facility inspection, we asked him to go through each step of ELISA assay he performed for the study and also to show us the step when ELISA plates were ready to be read on a plate reader. He used a test plate to demonstrate the operation of the plate reader. However, he could not describe how to find audit trails on the computer connected to the plate reader. We were earlier provided with the plate reader instrument manual and upon review, were able to locate a section where it described how to view audit trails. Subsequently, Dr. Wang followed the procedure specified in the manual. However, following the instruction, all that were displayed on the audit trail dialogue box were approximately 10 – 20 line items dated as 2007, which Dr. Wang suspected were events associated with the date/year of the purchase of the instrument. We waited about 15 minutes to see if it would show more recent events, but no additional information was displayed in the dialogue box.

***Western blot analysis***

The site performed western blot analyses to quantify the level of albumin and IgG in CSF and plasma samples after the drug treatment. Dr. Wang explained that he used the same dilution/volume for plasma and CSF samples for western blot. He stated that he prepared gels in-house and each gel

contained 10 lanes for sample loading. Once separated on a gel, proteins are transferred to a membrane and each membrane is subject to western blot to detect IgG, albumin and GAPDH. Dr. Wang stated that GAPDH was used to visually monitor consistency of sample loading in each lane, but it was not used to normalize the densitometry values of albumin and IgG. We asked whether membranes were incubated with three primary antibodies sequentially. Dr. Wang stated that he did sequential incubations with primary antibodies against IgG and albumin. He said molecular weights for albumin and GAPDH are apart enough to be able to do a simultaneous incubation with both antibodies, but he said he could not recall if it was done simultaneously or in sequence. Due to lack of records, we could not verify how the incubation was done.

Following the blotting, he said he used x-ray films to detect the signals. He said he exposed membranes to x-ray film for seconds to minutes, depending on the amount of the protein, and once obtaining adequate level of signals, he scanned the film using Epson scanner. He demonstrated the steps of scanning and saving the image. During his demonstration to us, upon completing the scan of a film, Epson scanner opened a dialogue box, in which a user was able to adjust brightness/contrast of the image. Dr. Wang explained this adjustment process was done prior to saving the original image and we discussed with Dr. Wang about a potential issue of this step and not being able to retrieve original images as a source record (**FDA 483 Observation #3c**). Images were subsequently saved in Adobe Photoshop and Dr. Wang stated that once images were saved, he discarded the source X-ray film because it is cumbersome to maintain them. Densities of each band in the saved image file was quantified by NIH freeware ImageJ (which is now called Fiji). Dr. Wang performed this quantitation by drawing a square box around the band and using "measure" option under Analyze menu. He used "mean" output in calculating group differences. When we asked how he recorded those values during the study, he stated that he manually recorded (transferred) the density values displayed on the computer screen into the Excel spreadsheet.

## OBJECTIONABLE CONDITIONS AND MANAGEMENT'S RESPONSE

**Observations listed on form FDA 483 are included in bold text below.**

**These observations pertain to the study conducted to measure Aβ42, total tau, p-tau181, neurogranin, NFL, YKL-40, IL-6, sTREM2, and HMGB1, using ELISA methods and albumin, and IgG using Western blots in CSF samples from Study PTI-125-02:**

**1. The ELISA assays used in the study were not validated/verified. Specifically, the site used commercially available ELISA kits without in-house validation/verification of assay parameters, such as accuracy, precision, and sensitivity of the method.**

Supporting Evidence and Relevance: According to Dr. Wang, the site did not perform any validation or verification experiments for the ELISA assays. Validation or verification of the ELISA assays is necessary to ensure the assays used to measure Aβ42, total tau, p-tau181, neurogranin, NFL, YKL-40, IL-6, sTREM2, and HMGB1 in the CSF samples from the audited study are accurate, sensitive, and with appropriate precision.

Discussion with Management: Dr. Wang stated that he performed the assays per the instruction sheet that came with each of the ELISA kits and did not provide any justification why validation or verification of the assays was not performed.

**2. The curve fitting model used for ELISA assays was not adequately justified. Specifically, the site fitted the calibration standards data using a linear regression model, but the log-transformed concentration-response relationship for analytes measured using ELISA assays were nonlinear, thus resulting in inaccurate determination of sample concentrations.**

Supporting Evidence and Relevance: Our review of the calibration curves used in the ELISA assays revealed that the site fitted log-transformed concentration-response data to a linear regression model when the relationship between the concentration and response data was clearly non-linear. Examples include linear regressions that the site generated, for Aβ42, total tau, and p-tau181 (**Exhibits 9-11**). Dr. Wang told us that the site did not evaluate other curve fitting models to determine which model fits the data best.

Discussion with Management: Dr. Wang stated that he used the only available curve fitting model in the software that he used (GraphPad in Prism version 5), which was linear regression, and that he did not know of the existence of other models in the software. We discussed with Dr. Wang that because the concentration-response plots for the audited study appear non-linear, the currently used linear regression model would result in inaccurate determination of sample concentrations. As stated elsewhere in the EIR, although he was receptive of our comment to explore other curve fitting models and re-calculate the concentration data using the best curve fit, Dr. Wang did not provide any new data up until the time we closed the inspection on 9/16/2022.

**3. There were inadequate source records to reconstruct the study. Specifically, the site did not maintain:**

**a. Documentation of sample storage and tracking**

**b. Documentation of experimental procedures (e.g., record of sample removal/return, preparation of calibration standards, sample aliquoting, processes associated with the conduct of ELISA and Western blot)**

**c. Source records for Western blot analysis**

**d. Audit trails for the plate reader (Multimode Detector software) used in ELISA assays**

Supporting Evidence and Relevance: In conversations we had with Dr. Wang throughout the inspection it was revealed that the site did not maintain sufficient documentation throughout the study conduct that allows for verification and reconstruction of critical activities.

Discussion with Management: Dr. Wang acknowledged this observation and stated that he wasn't aware of the need to document these activities.

**4. In ELISA assays for the following analytes and samples, the site excluded one of the three concentration data from triplicate analysis in determining the average sample concentration without justification.**

**a. Aβ42 for samples: 03-001-0, 04-009-0, 06-008-0, 10-001-0, and 13-016-0**
**b. NFL and YKL-40 for samples: 04-007-28, 06-005-28, 07-008-28, 13-013-28, and 10-004-28**
**c. HMGB1 for samples: 04-007-28, 06-005-28, 07-008-28, and 13-013-28**
**d. Neurogranin for sample 04-007-28**

Supporting evidence: During review of the spreadsheets where calculated concentration data are provided, we noted that, for some of the analytes, one of the three concentrations (i.e., triplicates) was excluded from calculation in determining the average sample concentration. Additional details and supporting evidence are provided under "Data acquisition and processing" above.

Discussion with management: Dr. Wang acknowledged this finding and explained that those excluded values were not meant to be excluded, but rather due to a mistake in creating an Excel formula for group 1, which was then carried over to other groups by cutting and pasting the erroneous formula, causing the same mistake repeated in all five groups. Dr. Wang stated that he corrected all the calculation errors and submitted the updated data to Cassava via email.

**5. For ELISA assays used in the study, no quality control samples were included during sample analysis to determine run acceptance.**

Supporting Evidence and Relevance: Dr. Wang acknowledged that QC samples were not included in the assay plates to determine run/plate acceptance.

Discussion with Management: We explained to Dr. Wang the importance of QC samples in bioanalysis, and he stated that he understood the need for including them in the future.

**6. The site did not conduct stability assessment to ensure measurements of analytes in study samples were accurate.**

Supporting Evidence and Relevance: The site could not provide any documentation of stability assessments. Dr Wang stated that his lab did not conduct any stability tests. He stated that he asked Cassava whether stability tests were performed, but Cassava did not provide him information to his inquiry.

Discussion with Management: During the inspection, we asked Dr. Wang if his lab has conducted any stability assessment to support the sample shipment, storage, and handling conditions for the CSF samples in the audited study. He answered no. During the closeout meeting, he acknowledged the observation.

**7. There was no access control (no user log-in requirement) to the computers connected with the ELISA plate reader and image scanner used in the study.**

Supporting Evidence and Relevance: During our inspection of the facility, we witnessed that computers connected to the plate reader and the image scanner do not require password to log-in. Dr. Wang stated that there is no log-in requirement in place to access the operating system of these

computers. We expressed our concern to Dr. Wang that, due to lack of access control to the computers, data security may not have been ensured. In addition, we mentioned that lack of log-in information would prevent us from verifying a user who acquired the data, which is important information to reconstruct the study.

Discussion with Management: Dr. Wang stated that data from the plate reader and image scanner were directly saved into USB drives and no data were stored in the computers. During the closeout meeting, Dr. Wang acknowledged this observation.

**8. The site did not calibrate major equipment (e.g., Multimode Detector DTX 880 and the -80 °C freezer, ID #045299) during the sample analysis period or could not provide documentation for instrument calibration and maintenance.**

Supporting Evidence and Relevance: During our inspection of Dr. Wang's laboratory on 09/14/2022, he stated, while we were examining the freezers, that none of the freezers had been calibrated and there were no calibration records. While the inspection team observed Dr. Wang's demonstration of the operation of the DTX 880 plate reader, we noted the calibration sticker on the machine showed a date of "2019," the year of the last calibration. Dr. Wang stated that the DTX 880 had not been calibrated since then and he stated he did not have any calibration records.

Discussion with Management: Dr. Wang stated he wasn't aware of the requirements for calibration, and he will ensure that calibrations are attained and maintained going forward.

**REFUSALS (SLS)**

The inspection team was scheduled to arrive on 09/12/2022 at 9:00 AM at the inspection site of Dr. Wang's office and laboratory, located at the CUNY Center for Discovery and Innovation, 85 St. Nicolas Terrace, New York, NY 10031. I (SLS) arrived at the site first, at approximately 8:55 AM and approached the east entrance of the building where a guard desk with gate-controlled access included instructions for providing COVID vaccination status or negative COVID test documentation. I identified myself to the security guard, showed my credentials, and explained I was there to conduct an inspection and that I did not have a COVID vaccination ID card or a recent negative test result. Two additional security guards arrived onsite and escorted me in an official vehicle to the campus administration building located at 160 Convent Avenue, Room 200, New York, NY 10031, to meet with the school's "legal office."

I was first greeted in Room 200 by Sakine Franke, Assistant to Executive Counsel, and Kay Kelly, Assistant to Executive Counsel. I presented my credentials to Ms. Franke and she asked me to identify the subject of our investigation. When I informed her I could not divulge details until I was given the opportunity to issue a Notice of Inspection (Form FDA 482), she asked, "Is this related to Dr. Wang?" I responded in the affirmative. She then informed me that she was aware of the issues related to Dr. Wang and her office had conducted their own investigation and collected documentation from Dr. Wang's office. She also stated that she was aware of a "DOJ" (Department of Justice) investigation. She did not elaborate about the DOJ investigation. She left the room and contacted Mr. Paul F.

Occhiogrosso, Executive Counsel to the President, by phone privately, then informed me he would be arriving to the office in approximately 15 minutes.

In the meantime, Ms. Franke escorted me to a conference room adjacent to Room 200, where I awaited the arrival of Mr. Occhiogrosso, and my colleagues, Dr. Cho and Dr. Getie Kebtie. Within approximately 10 minutes, my FDA colleagues arrived, and approximately 20 minutes later Mr. Occhiogrosso arrived. I presented my credentials to Mr. Occhiogrosso.

Mr. Occhiogrosso asked how he could help us. I explained the purpose of our inspection and a general explanation of the scope. I stated that I was the lead investigator, and my colleagues were Subject Matter Experts (SMEs) with the Center for Drug Evaluation and Research. Mr. Occhiogrosso asked what documentation of authority we had and if we were in possession of court-issued subpoena or warrant. I stated we were not, but my intention was to issue an official Form FDA 482, Notice of Inspection, which explained the authority granted to us by section 704 of the FD&C Act, and that he was free to look over a blank copy if he wished. Mr. Occhiogrosso made no attempt to review the 482.

Dr. Cho then proceeded to explain to Mr. Occhiogrosso that our purpose for inspection was to verify data of a specific study submitted to FDA under an IND submission. Mr. Occhiogrosso asked whether we need to have access to the study documents and Dr. Cho responded in the affirmative. Mr. Occhiogrosso then asked whether we would be taking any documents for the study and Dr. Cho responded that we would not be taking any source records but may request staff to make a copy of certain records as needed.

Mr. Occhiogrosso then excused himself from the room and stated he would return in a few minutes. Approximately three to four minutes later, he returned with two security guards, stated that he would not consent to our inspection without a warrant or subpoena, then instructed the guards to escort us out of building. The inspection team left the building and proceeded to depart the CUNY campus.

ORA BIMO management was notified of the initial refusal, and after two days of discussions with CUNY and Cassava representatives, as well as communications with relevant CDER and ORA staff, on the evening of 9/13/22, the inspection team was granted access to the site to commence the inspection on 09/14/22.

## GENERAL DISCUSSION WITH MANAGEMENT

On 9/16/22, we held a closeout meeting with Mr. Vincent Boudreau, President of CCNY, Dr. Hoau-Yan Wang (via video conference), Analytical Investigator, and Dr. Zhe Pei, Research Associate, to present the Form FDA 483 as detailed in the OBJECTIONABLE CONDITIONS AND MANAGEMENT'S RESPONSE section of this report. There were no discussion items verbally discussed with the firm during the closeout.

We informed Mr. Boudreau that if he chose to respond in writing, he should do so within 15 calendar days. I also informed him the final classification of the inspection would be determined by the Center within FDA that issued the assignment and that the observations made may be determined, upon further review by the Agency, to be violations of the FD&C Act and that administrative actions, injunction, fines, and prosecution are options available to FDA. Mr. Boudreau stated he understood, and he would coordinate with Dr. Wang to submit a written response within 15 days.

**SAMPLES COLLECTED**
No samples collected.

**VOLUNTARY CORRECTIONS**
No voluntary corrections were necessary as this was the initial inspection.

**EXHIBITS COLLECTED**

| | |
|---|---|
| 1(SLS) | CV Dr. Wang, 34 pages |
| 2(SLS) | List of samples received, 9 pages |
| 3(SLS) | Clinical Trial Agreement, 12 pages |
| 4(SLS) | SOPs used during study, 6 pages |
| 5(SLS) | Corrected spreadsheets, 1 page |
| 6(SLS) | Email with corrected spreadsheets to Cassava, 2 pages |
| 7(SLS) | ELISA Kits User Manuals (all), 114 pages |
| 8(SLS) | Original analyte spreadsheets, 1 page |
| 9(SLS) | Calibration Curve PT181, 1 page |
| 10(SLS) | Calibration Curve AB42, 1 page |
| 11(SLS) | Calibration Curve Total Tau, 1 page |

**ATTACHMENTS**

| | |
|---|---|
| 1(SLS) | Form FDA 482, Notice of Inspection, issued to Anthony M. Liss, PhD, Provost & Sr. VP Academic Affairs, 09/14/2022, 3 pages |
| 2(SLS) | Form FDA 483, Inspectional Observations, issued to Vincent Boudreau, President, 09/16/2022, 2 pages |
| 3(SLS) | Assignment Memo, 7 pages |
| 4(SLS) | CCNY Organizational Chart, 1 page |

Sheri L. Stephenson
Digitally signed by Sheri L. Stephenson
Date: 2022.09.29 10:50:21 -04'00'

Melkamu Getie Kebtie -S
Digitally signed by Melkamu Getie Kebtie -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People, 0.9.2342.19200300.100.1.1=0013219608, cn=Melkamu Getie Kebtie -S
Date: 2022.09.29 12:54:24 -04'00'

Seongeun Cho -S
Digitally signed by Seongeun Cho -S
Date: 2022.09.29 16:59:03 -04'00'