**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,

Plaintiffs,

v.

CASSAVA SCIENCES, INC., REMI BARBIER, and DR. LINDSAY BURNS,

Defendants.

Civil Action No. 1:24-cv-05948-JLR-OTW

Oral Argument Requested

**DEFENDANT CASSAVA SCIENCES, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DAVID A. SANDERS**

## TABLE OF CONTENTS

**Page**

I. Sanders Is Not Qualified to Offer the Opinions Plaintiffs Seek ....2

II. Sanders Applied No Reliable Method to the Evidence ....3

A. Sanders's ELISA Opinion Rests on Plaintiffs' Counsel's Assumption, Not Expert Analysis ....3

B. Sanders's Immunoblot Opinion Is Nothing More than Visual Impression and Repetition of Others' Accusations ....6

C. Sanders's Remaining Opinions Recite Documents and General Propositions ....7

III. Sanders Would Usurp the Jury's Role ....8

A. Scientific Vocabulary Does Not Make Legal Conclusions Admissible ....8

B. Sanders Speculates About What Others Knew and Intended ....9

IV. The Testimony Would Replace This Trial with an Irrelevant Trial about Dr. Wang's Research ....10

CONCLUSION ....12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989) .......... 5, 7, 11

*Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328 (S.D.N.Y. 2023) .......... 6

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......... 11

*Envy Branding, LLC v. William Gerard Grp., LLC*, No. 20-cv-03182, 2024 WL 869156 (S.D.N.Y. Feb. 29, 2024) .......... 2

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......... 6

*Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85 (2d Cir. 2000) .......... 4

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) .......... 9

*In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (S.D.N.Y. 2020) .......... 11

*In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570, 2025 WL 2383768 (S.D.N.Y. Aug. 18, 2025) .......... 2, 9, 11

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391 (S.D.N.Y. 1998) .......... 9

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) .......... 2, 9, 11

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017) .......... 3

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) .......... 8

*United States v. Frabizio*, 445 F. Supp. 2d 152 (D. Mass. 2006) .......... 6, 7

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .......... 7

*United States v. Wang*, No. 8:24-cr-00211-TDC, ECF No. 132 (D. Md. Oct. 17, 2025) .......... 3

**Rules**

Fed. R. Civ. P. 26(a)(2)(B)(i) .......... 8

Fed. R. Civ. P. 37(c)(1) .......... 8

Fed. R. Evid. 401 .......... 12

Fed. R. Evid. 403 .......... 11, 12

Fed. R. Evid. 702 .......... 1, 3, 12

Fed. R. Evid. 703 .......... 4, 11, 12

Fed. R. Evid. 704 .......... 9

Cassava's motion provided four independent reasons to exclude Dr. David Sanders. He lacks the expertise his opinions require. He applied no reliable method. His conclusions answer questions reserved for the jury. And his testimony would turn this case into a trial of the work of Dr. Wang, a non-party City University of New York ("CUNY") scientist. ECF 228 ("Mot.") 1–3. Plaintiffs' opposition, ECF 248 ("Opp."), cures none of these defects. Its concessions confirm them:

*First*, Sanders's most serious accusation is that Dr. Wang "repeatedly fabricated" laboratory data. Sanders Rpt. ("Rpt.") ¶ 119. This accusation depends entirely on treating one set of spreadsheets rather than another as the true, original record. Plaintiffs concede that Sanders "assum[ed]" those files contain "the original unaltered data." Opp. 13. Whether they do is the whole question. An expert who assumes the answer has not supplied one.

*Second*, Plaintiffs tout Sanders's experience with misconduct investigations, but concede that he "did not undertake a research integrity investigation for this matter." Opp. 15.

*Third*, Plaintiffs explain that documents and fact witnesses will supply the facts, and Sanders will "contextualize and explain" them, Opp. 3, so the jury will understand why Defendants "could not have had a good faith basis" for the Defamation Action, Opp. 15. That is closing argument from the witness stand.

Plaintiffs' answer to every defect is cross-examination. Opp. 2, 13, 29. But Rule 702 makes these threshold questions for the Court, not weight questions for the jury. And cross-examination would exacerbate the harm, forcing Cassava to litigate whether Dr. Wang's research was sound rather than what Cassava knew when it sued Plaintiffs for defamation.

Sanders's opinions should be excluded.

## I. Sanders Is Not Qualified to Offer the Opinions Plaintiffs Seek

Plaintiffs argue that Cassava is "inventing rigid qualification requirements" and that the Court should consider "the totality of the witness's background." Opp. 11–12 (quoting *Envy Branding, LLC v. William Gerard Grp., LLC*, No. 20-cv-03182, 2024 WL 869156, at *8 (S.D.N.Y. Feb. 29, 2024)). Cassava asks only that the expertise match the opinion. That is the rule. *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005). A totality test asks the same question. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570, 2025 WL 2383768, at *11–12 (S.D.N.Y. Aug. 18, 2025) (terrorism researcher qualified on al Qaeda's history, not on defendants' finances, which he studied only "on the side").

Plaintiffs stress that Sanders has taught two laboratory techniques at issue, ELISAs and immunoblots, and has reviewed "hundreds of papers" for misconduct. Opp. 12–13. And they admit he is no expert on "Alzheimer's disease," "clinical trial design," "FDA regulation," or "electronic assay data provenance." Opp. 12. But these are the very areas of expertise Sanders's opinions require.

Sanders's ELISA opinion does not depend on knowing how to run an ELISA. It depends on whether spreadsheets generated from a laboratory database years after the experiments were conducted accurately preserve what the instrument measured at the time of the experiment. That is "electronic assay data provenance." Plaintiffs respond that Sanders needs no expertise in the instrument or its software because he is "assuming" the data are original. Opp. 13. A witness cannot cure a lack of qualification by assuming away the question that requires it. Ignorance of the relevant subject matter renders an expert unqualified. *See Nimely*, 414 F.3d at 399 n.13.

Likewise, Sanders's Phase 2b and Quanterix opinions judge the handling of clinical-trial data, yet Sanders is not an expert in neurobiology or Alzheimer's disease and has never conducted an FDA-supervised clinical trial. Sanders Dep. Tr. ("Tr.") 21:21–22:2, 151:5–8. For statistics,

Plaintiffs identify only his biochemistry degree and general research career. Opp. 13. Again, Sanders is simply not an expert in the relevant fields.

Nor does teaching experience close the gap for the immunoblot opinion. Sanders last ran an immunoblot "decades" ago, and producing an immunoblot is different from detecting manipulation in a small, compressed picture printed in a journal. Tr. 343:18–21. The court in Dr. Wang's criminal case drew that line: it allowed a scientist to testify from experience about "using Western blot images," but it barred the expert from opining "whether two images are the same." *United States v. Wang*, No. 8:24-cr-00211-TDC, ECF No. 132, at 2 (D. Md. Oct. 17, 2025). Plaintiffs cite the first half of that ruling, Opp. 13 n.3, and ignore the second, which precisely describes Sanders's proffered immunoblot opinion.

## II. Sanders Applied No Reliable Method to the Evidence

An expert must apply a reliable method to sufficient facts. Fed. R. Evid. 702(b)–(d). Plaintiffs' own authority holds experience-based experts to that standard. *Restivo v. Hessemann*, 846 F.3d 547, 575–76 (2d Cir. 2017); *see* Opp. 23 n.5.

### A. Sanders's ELISA Opinion Rests on Plaintiffs' Counsel's Assumption, Not Expert Analysis

An ELISA measures a protein in samples placed in wells on a plate; an instrument called a plate reader records a number for each well, and software stores the numbers, which can be exported to a spreadsheet. Mot. 5 n.1.

Sanders compared two sets of spreadsheets: the data Dr. Wang reported to Cassava (the "presented data"), and a second set Plaintiffs call the "raw data," which they contend reflects a database CUNY copied from Dr. Wang's laboratory computer in 2021. Opp. 7. Because the numbers differ, Sanders concluded that Dr. Wang "appears" to have "repeatedly fabricated" the presented data. Rpt. ¶ 119. But that assertion about Dr. Wang's actions is not proper expert opinion.

*The premise.* Plaintiffs call Cassava's challenge to the source of the "raw data" a "non sequitur": they will lay that foundation "through CUNY itself," and an expert may rely on data "she did not personally collect." Opp. 20–21 (quoting *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d Cir. 2000)). The objection is not about *who* collected the data, but instead *what the data represent*. Sanders's opinion improperly purports to resolve this disputed evidentiary question of whether the data are, in fact, the "raw data." If two versions of a document differ, noticing the differences does not reveal which is the original or who changed what. Sanders admits that he "took no steps" to find out. Tr. 266:9–17. He "was told to assume that it was the raw data" and had "no independent information" confirming it. *Id.* at 288:4–7.

CUNY cannot fill that gap. By Plaintiffs' own account, CUNY copied the database in 2021 and produced it in October 2025; in December 2025, a Plaintiff, Heilbut, bought the software, loaded the production into it, and generated the spreadsheets Sanders used. Opp. 21; Mot. 19. At most, CUNY can say what was on the computer in 2021. It cannot say what the instrument measured when the experiments were run, some as early as 2013. Tr. 266:18–23. The software lets users re-analyze saved results and save over the originals. Scofield Rpt. ¶¶ 47–50. And the computer was "not the original computer" and had "no password protection," as Sanders's own report recites. Rpt. ¶ 66. Authenticating a source does not validate its numbers, and experts would not reasonably rely on unvalidated spreadsheets an adverse party created during litigation. Fed. R. Evid. 703; Mot. 20.

*The metadata.* The spreadsheets Sanders treated as original carry dates and instrument settings that differ from Dr. Wang's contemporaneous files. Mot. 19–20. Plaintiffs call these differences "inconsequential," a "trivial matter" of export settings. Opp. 22. That is counsel's post-

hoc explanation, not a witness's. Sanders could not explain these fields when asked and agreed that a change in metadata "is indicative that it's no longer the raw data." Tr. 284:12–287:20.

*Cassava's audit.* Before Cassava sued, its Director of Clinical Quality Systems audited Dr. Wang's laboratory. She compared Dr. Wang's ELISA files with the plate reader's own audit trail, a log the machine keeps of each run, and the data matched. Rodriguez Aff. ¶¶ 5–16. Sanders agreed that the values in those files are "identical" to those reported to Cassava, and he could not say which files better represent the original measurements: "I do not know." Tr. 307:9–18, 309:7–11, 319:6–12. Plaintiffs respond that Dr. Wang handed the auditor those files on a flash drive and that they cover only two of eight datasets. Opp. 22. But where the instrument's own records permitted a check, the check confirmed the presented data. For the other six datasets, Sanders has only the spreadsheets he was told to assume were original.

*The patterns.* Plaintiffs argue that Sanders does "considerably more" than compare numbers, because the differences follow suspicious patterns. Opp. 7, 17. The patterns are the comparison. Sanders's entire ELISA analysis occupies five paragraphs. Rpt. ¶¶ 115–119. He reports that the two sets of numbers differ and lists three features of the differences: in "many cases" they are round numbers, the first digit after the decimal point changes while the remaining digits match, and values within triplicate groups move in the same direction. *Id.* ¶ 117. Anyone who lays the two spreadsheets side by side can see each of those "patterns." *See* Opp. 7–8 (reproducing comparison chart). Sanders does not explain why the patterns are "suspicious," does not test whether they could arise from reprocessing the data, and, critically, does not explain why the patterns indicate deliberate alteration rather than another cause. Sanders's only reason for blaming Dr. Wang is that he "cannot think of any legitimate explanation." Rpt. ¶ 118. Again, professed ignorance is no substitute for expertise, and Sanders offers nothing the jury lacks. *See*

*Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (testimony on "lay matters which a jury is capable of understanding and deciding without the expert's help" is not expert testimony); *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 378–80 (S.D.N.Y. 2023) (excluding expert who "merely look[ed] at the two models" without applying a "specialized method").

*The comparison is a party's.* Sanders did not generate anything. Tr. 264:16–265:8. Heilbut created the spreadsheets. Opp. 21. Sanders testified that the materials he received from Heilbut "presented both sets" of data, and "[t]hey identified the discrepancies." Tr. 295:2–22. He never spoke with Heilbut and does not know what software Heilbut used. *Id.* at 294:7–21. Thus, a party to this case created the data, ran the comparison, and flagged the discrepancies; Sanders then agreed, and concluded that Cassava's research was "fabricated" by Dr. Wang. Rpt. ¶ 119. That is inadmissible *ipse dixit* presented as expert opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (excluding testimony "connected to existing data only by the *ipse dixit* of the expert").

### B. Sanders's Immunoblot Opinion Is Nothing More than Visual Impression and Repetition of Others' Accusations

An immunoblot, or Western blot, is an image of protein bands. Mot. 5 n.2. Published versions are small and compressed, and are routinely cropped, contrast-adjusted, and assembled from more than one gel. Scofield Rpt. ¶¶ 112–114. Sanders looked at published figures "with the naked eye" and reported that certain bands look "remarkably similar," share "dots" or "jutting" features, or appear "horizontally stretched." Rpt. ¶¶ 135–151. He applied no forensic methods and no technical skills whatsoever in forming these opinions.

Plaintiffs argue (without citation) that these are "widely recognized hallmarks of research misconduct" that jurors could not appreciate without an expert, and that *Frabizio* excluded only opinions of unjustified certainty. Opp. 9, 17, 23 n.5. But if jurors cannot judge what a feature

means, the expert must supply a reliable way to judge it. Sanders supplies none: no protocol, no criteria for when two bands "match," no software, no error rate, and no way to distinguish improper reuse from ordinary image preparation. Rpt. ¶ 147; Mot. 21–22. And the certainty problem Plaintiffs describe remains present: he calls improper reuse nearly inescapable and honest error implausible. Rpt. ¶¶ 142, 147; *see United States v. Frabizio*, 445 F. Supp. 2d 152, 165–70 (D. Mass. 2006).

Much of Sanders's opinion is not even his own. Paragraph 133 simply collects others' accusations, including Plaintiffs' own presentation titled "Cassava Sciences: A Shambolic Charade." Rpt. ¶ 133 & nn.57–58. Paragraph 134 labels those accusations "credible and troubling." Of others' work, Sanders testified: "Oh, yes. That looks right." Tr. 353:10–354:5. Plaintiffs describe *Mejia* as excluding an expert who "merely recounted hearsay evidence without expert analysis." Opp. 16. That describes Sanders's testimony exactly. *United States v. Mejia*, 545 F.3d 179, 197–98 (2d Cir. 2008).

Plaintiffs now say Sanders will testify only that "concerning indicia are present," not that images were "actually falsified." Opp. 23. A softer label does not supply a missing reliable method.

### C. Sanders's Remaining Opinions Recite Documents and General Propositions

*Recordkeeping*. Plaintiffs say Sanders will describe "basic and universal scientific norms," and that tying them to specific rules would be a "technical quibble." Opp. 14, 19. Cassava does not dispute that scientists should keep records, and jurors need no expert to tell them so. *Andrews*, 882 F.2d at 708. The disputed opinion is that gaps in *these* records made Plaintiffs' accusations "virtually impossible to refute." Opp. 6. That requires identifying which records were missing for which experiments and why the remaining evidence could not conceivably answer the accusations. Sanders does none of this. He acknowledges that "different requirements may apply" in different

contexts, Rpt. ¶ 16, but never says which applied here, and even concedes that the federal laboratory rules he cites would not apply to Dr. Wang's laboratory as he understood it. Tr. 161:10–162:14.

*Phase 2b and Quanterix.* Plaintiffs argue that Cassava's own public disclosures "bolster[]" the Phase 2b opinion. Opp. 15–16. Sanders confirmed those disclosures are the sole basis for his opinion, Tr. 328:2–20, which the jury can read for itself. He adds only his say-so that there was a "legitimate basis to question" the data. Rpt. ¶ 127. As for Sanders's Quanterix opinion, Plaintiffs contend that Dr. Burns reviewed results from a first batch of samples before deciding whether to send the rest, giving her "advance, un-blinded information." Opp. 19–20. This theory appears for the first time in counsel's brief; Sanders did nothing to analyze it. Fed. R. Civ. P. 26(a)(2)(B)(i), 37(c)(1) (undisclosed opinions are barred).

*Statistics.* Plaintiffs say the jury is "entitled to hear what proper statistical analysis looks like" because "separate fact evidence" will show that Dr. Burns created exclusion criteria after the fact. Opp. 18. But Sanders is not a statistics expert, analyzes no dataset, and makes no calculation. Rpt. ¶¶ 154–157. He recites a principle that researchers should set their rules before seeing results and should apply them evenly. Jurors can grasp that concept without expert assistance. It is not among the "obscure terms and concepts" experts may explain. *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

## III. Sanders Would Usurp the Jury's Role

### A. Scientific Vocabulary Does Not Make Legal Conclusions Admissible

Plaintiffs must prove that Cassava sued without a substantial basis and for an improper purpose. Mot. 4. They say Sanders will help show both "without telling the jury there was no such basis or purpose." Opp. 24–25. Yet Plaintiffs also promise testimony that their accusations, "true

or not," "at least rested on a reasonable foundation," so the jury will understand why Defendants "could not have had a good faith basis" to allege knowing falsity. Opp. 15. Because Cassava's defamation claims alleged knowing or reckless falsehoods, Mot. 4, that is the jury's ultimate question, answered in scientific vocabulary. So is the opinion that missing records made the accusations "virtually impossible to refute," Rpt. ¶¶ 76–77, because whether Cassava could refute Plaintiffs' statements, at least according to Plaintiffs, *is the substantial-basis question*. Plaintiffs invoke Rule 704, Opp. 24, but it does not permit an expert to tell the jury what result to reach. *See Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir. 1992). This court has previously rejected such expert testimony on litigation reasonableness in a malicious-prosecution action because "[w]hether a party acted with objective reasonableness is a quintessential common law jury question." *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391, 403–04 (S.D.N.Y. 1998).

**B. Sanders Speculates About What Others Knew and Intended**

Several journals reviewed Dr. Wang's papers and made no formal misconduct findings. Sanders opines that this was because evidence was missing, not because there was no misconduct, and he reads the editors' words "convincing" and "compelling" as signs of limited investigations. Rpt. ¶¶ 100–105. Plaintiffs call this "context" that rebuts Cassava's description of the notices as exonerations. Opp. 6, 25. But Sanders admitted he does "not know what their thinking process involved." Tr. 107:24–25. While Plaintiffs may argue from the notices themselves, they may not have an expert supply the editors' unstated reasons. *See Terrorist Attacks*, 2025 WL 2383768, at *15; *Nimely*, 414 F.3d at 398. And if Cassava's "apparent failure" to review data is an observation from external evidence, Opp. 25, the jury can draw that inference itself.

## IV. The Testimony Would Replace This Trial with an Irrelevant Trial about Dr. Wang's Research

Plaintiffs say they need not prove research misconduct by Dr. Wang and have "no intention of doing so," yet add that "the proof of it now is readily at hand." Opp. 27. They further argue that Cassava made Dr. Wang's research central to the Defamation Action and "cannot have it both ways." Opp. 27–28. To be clear, Cassava does not seek to exclude evidence of what research it relied on or what it believed in pursuing the Defamation Action. Documents and fact witnesses can prove those facts. Cassava does, however, challenge an expert's 2026 verdict on a non-party's research, offered as proof of what Cassava knew years earlier.

The question at trial is what Cassava knew when it filed and pursued the Defamation Action between November 2022 and August 2024. Mot. 4. Information Cassava did not have "could not have played a role" in its decisions. ECF 206 at 3–4. Fatally, Sanders never addresses what Cassava knew, or when.

Plaintiffs offer three responses. Opp. 26. *First*, the statute reaches a suit a party "commences or continues." True, but the suit ended in August 2024, before the October 2025 database production, the December 2025 spreadsheets, and Sanders's 2026 image review. *Second*, "most of the evidence" predates the suit, including audits in September 2022. But *Sanders's* fabrication opinion rests on files created in December *2025*. *Cassava* was contemporaneously aware of a *2022* audit that matched Dr. Wang's files to the instrument's own records. *Supra* Part II.A. *Third*, Cassava "always had a right to access" the data. But Sanders's report never says what those records would have shown, nor when or whether Cassava learned of the discrepancies Sanders later purports to have identified. The report's imagined observer—"[a]nyone reasonably familiar with the biomedical sciences," Rpt. ¶¶ 127, 153—is Sanders himself reviewing in 2026 materials Cassava never had. Such testimony has no bearing on this case.

Plaintiffs otherwise do not engage the Rule 403 balancing, Mot. 7, 25–26, which plays a "uniquely important role" for experts because jurors give their testimony special weight. *Nimely*, 414 F.3d at 397. The harms here are concrete. *First*, jurors who hear a professor say "fabricated" are likely to treat that as proof the lawsuit was baseless, skipping the question of what Cassava knew. *Second*, Plaintiffs invite Cassava to "contest this provenance" at trial, Opp. 22, which would require a trial within the trial on the database, the software, dozens of images, and journal practices. Leaving the accusations unanswered preserves their expert backing; answering them produces the misconduct trial Plaintiffs disclaim. *Third*, jurors cannot unhear conclusions drawn from 2025 files when judging Cassava's 2022 beliefs, and no instruction can perform the separation Sanders never did. *See Andrews*, 882 F.2d at 708. *Fourth*, hearsay accusations Sanders repeats from others would reach the jury with an expert's authority and no means of testing them. Fed. R. Evid. 703.

Cross-examination tests "shaky but admissible evidence," but does not supplant admissibility. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). Courts cannot "relegate issues of reliability to cross-examination." *Terrorist Attacks*, 2025 WL 2383768, at *2. Nor must the Court pick a winner in a "battle of experts." Opp. 28. Plaintiffs say the motion repeats Cassava's rebuttal expert and that some objections fit Cassava's own experts. Opp. 28–29. But the defects here come from Sanders's own admissions and Plaintiffs' own brief: he assumed the key premise, conducted no investigation, and applied no method. Cassava cites its rebuttal expert only for explanations Sanders never considered, and a rebuttal expert need not build a competing model to expose flaws in another's work. *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020).

## CONCLUSION

The Court should exclude Sanders's report and testimony in their entirety under Rules 401, 403, 702, and 703.

Dated: October 5, 2026

Respectfully submitted,

/s/ *Monica K. Loseman*
Monica K. Loseman (NY Bar No. 6100671)
Mylan L. Denerstein (NY Bar No. 2620730)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
MLoseman@gibsondunn.com
MDenerstein@gibsondunn.com

M. Scott Campbell (admitted pro hac vice)
John Turquet Bravard (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
Telephone: 303.298.5700
SCampbell@gibsondunn.com
JTurquetBravard@gibsondunn.com

*Attorneys for Defendant Cassava Sciences, Inc.*

**CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATION**

Pursuant to Rule 3.C of the Individual Rules of Practice in Civil Cases of the Honorable Jennifer L. Rochon, I hereby certify that the foregoing reply memorandum of law complies with the applicable word-count limitation. Exclusive of the caption, the table of contents, the table of authorities, the signature block, and this certificate, and inclusive of footnotes, the memorandum contains 3,500 words, as counted by the word-processing system used to prepare it, and therefore does not exceed the 3,500-word limit for reply memoranda. The memorandum is double-spaced and set in 12-point Times New Roman type, including footnotes.

/s/ *Monica K. Loseman*
Monica K. Loseman