**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ADRIAN HEILBUT, JESSE BRODKIN, and ENEA MILIORIS,

Plaintiffs,

v.

CASSAVA SCIENCES, INC., REMI BARBIER, and DR. LINDSAY BURNS,

Defendants.

Case No. 1:24-cv-05948-JLR-OTW

**ORAL ARGUMENT REQUESTED**

# DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS' CONSOLIDATED RULE 56.1 COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1, and this Court's Individual Rules of Practice, Defendants submit the following responses to Plaintiffs' Consolidated Rule 56.1 Counterstatement of Additional Material Facts (ECF 256) (the "PCC"). Citations to "Cassava 56.1" refer to Cassava's Local Rule 56.1 Statement of Undisputed Facts (ECF 237). Citations to "Cassava Exhibit __" refer to the exhibits to the Declaration of M. Scott Campbell (ECF 236). Citations to "Individual Defendants' Exhibit __" refer to the exhibits to the Declaration of Zachary R. Taylor (ECF 235, 238, 241). Citations to "PX __" refer to Plaintiffs' exhibits.

## DEFENDANTS' RESPONSES TO PLAINTIFFS' COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS[1]

208. Dr. Heilbut is a scientist. (PX 18 (Heilbut Dep. Tr.) at 118:18-19.)

**Defendants' Response**: Undisputed.

[1] The PCC contains headings that are argumentative and are not statements of fact. To the extent any response to those headings is required, Defendants dispute them. A response that a document or testimony says what it says is not an admission that its contents are true, material, or admissible.

209. Dr. Brodkin is a scientist. (PX 10 (Brodkin Dep. Tr.) at 236:22-237:2.)

**Defendants' Response**: Undisputed.

210. Dr. Milioris is a scientist. (PX 20 (Milioris Dep. Tr.) at 4:11-12; 10:22-11:12.)

**Defendants' Response**: Undisputed.

211. The FDA rejected Pain Therapeutics' approval applications for its painkiller, Remoxy, four times. (PX 14 (BURNS_00000003) at 23:22-24:2.)

**Defendants' Response**: Undisputed that FDA did not approve Remoxy.

212. After the failure of its painkiller program, the company rebranded as Cassava, in 2019, and pivoted to Alzheimer's disease. (PX 14 (BURNS_00000003) at 23:22-24:23.)

**Defendants' Response**: Undisputed that Pain Therapeutics, Inc. changed its name to Cassava Sciences, Inc. in 2019 and thereafter began work on developing a drug candidate for the treatment of Alzheimer's disease.

213. Simufilam was developed by Dr. Hoau-Yan Wang at the City University of New York ("CUNY"), in collaboration with Dr. Burns. (PX 141 (CASSAVA_000797948) at 954.)

**Defendants' Response**: Undisputed insofar as Dr. Wang tested simufilam and performed tests and analyses at his laboratory in CUNY, and that Dr. Burns co-authored articles regarding simufilam. Dr. Burns did not perform any of the laboratory work for simufilam.

214. Dr. Wang and Dr. Burns are responsible for all of the preclinical research underlying simufilam as a potential treatment for Alzheimer's disease. (PX 141 (CASSAVA_000797948) at 954.)

**Defendants' Response**: Undisputed insofar as Dr. Wang performed the laboratory work for the preclinical research underlying simufilam as a potential treatment for

Alzheimer's disease and that Dr. Burns co-authored articles regarding simufilam as a potential treatment for Alzheimer's disease. Dr. Burns did not perform any of the laboratory work for simufilam.

215. Dr. Burns joined the company in 2002, married Barbier in 2005, and became the "scientific lead" of the company's Alzheimer's program. (PX141 (CASSAVA_000797948) at 957; PX 5 (Barbier Dep. Tr.) at 22:01-02; PX 204 (CASSAVA_001447291) at 305 (Dr. Burns described herself as "project leader on our Alzheimer's program" and "scientific lead of this program").)

**Defendants' Response**: Undisputed.

216. From 2019 to 2024, Cassava sponsored clinical trials of an experimental Alzheimer's drug called simufilam. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 12-15.)

**Defendants' Response**: Undisputed.

217. The Phase 3 clinical trials of simufilam produced "unambiguous" results showing that simufilam had no statistically significant effect on biomarkers of Alzheimer's disease. (PX 249 (Cassava Sciences, Inc., Press Release (Mar. 25, 2025)) ("These results were unambiguous.").)

**Defendants' Response**: Disputed as characterized. Undisputed that Cassava announced that its Phase 3 trials did not meet their prespecified co-primary, secondary, and exploratory biomarker endpoints, and that Mr. Barry described the results as "unambiguous." The release does not state that simufilam had no statistically significant effect on any biomarker of Alzheimer's disease.

218. After the failure of its Alzheimer's program, the company rebranded again as Filana Therapeutics, Inc., and pivoted to developing simufilam as a treatment for central nervous system disorders. (PX 234 (Cassava Sciences, Inc. Form 8-K (March 10, 2026)).)

**Defendants' Response**: Undisputed that Cassava changed its name to Filana Therapeutics, Inc. and has shifted its focus to treatment for central nervous system disorders.

219. The company has raised more than $550 million from investors. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 94-95.)

**Defendants' Response**: Undisputed.

220. The company has administered experimental drugs to thousands of patients. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 10-15.)

**Defendants' Response**: Undisputed. Simufilam was administered thousands of times without a drug-related serious adverse event, and an independent data safety monitoring board recommended that the Phase 3 trials continue. (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 24:23–25:9; Cassava 56.1 ¶ 56.)

221. The company has never taken a product to market. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 73 ("We have no products approved for commercial sale.").)

**Defendants' Response**: Undisputed that Cassava has no products approved for commercial sale.

222. Barbier and Burns were forced to resign from the company in July 2024 as part of a $40 million settlement with the SEC. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 32-33; PX 200 (CASSAVA_001444640) at 640 (July 18, 2024 email from R. Barry to Board: "no one wanted to remove the founder [Barbier] of a company in this way let alone the co-

inventor [Burns]. . . but the circumstances that came to light over the last month and the information that our investigative committee learned really gave the board no choice but to take action. I shared that the government had developed a remarkably dark view of the company - primarily from various disclosures over the last several years and that dark view caused the SEC in particular to look at everything they uncovered about the company through a highly suspicious lens - and we didn't have the time or the evidence to disprove their allegations.").)

**Defendants' Response**: Undisputed insofar as Mr. Barbier and Dr. Burns reached a mutual agreement with Cassava in July 2024 to resign, otherwise disputed.

223. Together, Barbier and Burns have collected millions of dollars in compensation from the company. (PX 231 (Cassava Sciences, Inc., DEF 14A (Apr. 3, 2025)) at 38-41 (reporting Barbier's compensation from 2020 to 2024 as $936,120; $1,741,120; $1,114,998; $6,263,038, and $3,685,803).)

**Defendants' Response**: Undisputed insofar as the cited document describes Mr. Barbier's compensation between 2020 and 2024, but the cited document contains no information about Dr. Burns's compensation.

224. The simufilam clinical trials were based on a series of claimed discoveries by Dr. Wang at CUNY, in collaboration with Dr. Burns: first, they claimed to discover that Alzheimer's patients had altered conformations of the protein filamin-A (FLNA); second, they claimed to discover the small molecule simufilam, capable of binding to these altered conformations of filamin-A; and third, they claimed to discover that simufilam restored altered conformations of filamin-A to their native, healthy shape. (PX 141 (CASSAVA_000797948) at 954-58.)

**Defendants' Response**: Undisputed insofar as Dr. Wang performed the laboratory work for the preclinical research underlying simufilam as a potential treatment for

Alzheimer's disease; Dr. Burns co-authored articles regarding simufilam as a potential treatment for Alzheimer's disease; and certain preclinical research performed by Dr. Wang and certain articles co-authored by Dr. Burns were submitted to FDA in connection with clinical trials. Dr. Burns did not perform any laboratory work for simufilam.

225. In 2019, Cassava conducted a phase 2a open-label study of simufilam—a 28-day trial involving 13 patients administered simufilam twice daily. (PX 141 (CASSAVA_000797948) at 963.)

**Defendants' Response**: Undisputed.

226. On September 9, 2019, Cassava announced the phase 2a results, stating that simufilam "significantly reduced biomarkers of Alzheimer's disease pathology." (PX 163 (Cassava Sciences, Inc., Form 8-K (Sept. 9, 2019)).)

**Defendants' Response**: Undisputed.

227. Between September 2019 and March 2020, Cassava conducted a phase 2b clinical study of simufilam, presented as a randomized, double-blind, placebo-controlled trial. The phase 2b trial was a 28-day study, involving 64 patients split into three groups, with one group receiving placebo, one group receiving 50 mg doses of simufilam, and one group receiving 100 mg doses of simufilam. (PX 141 (CASSAVA_000797948) at 964.)

**Defendants' Response**: Undisputed.

228. On May 15, 2020, Cassava announced that the study "did not meet its primary endpoint" and the company planned to "re-analyze" the biomarkers from study participants. (PX 119 (Cassava Sciences, Inc., Form 8-K (May 15, 2020)).)

**Defendants' Response**: Undisputed.

229. On September 14, 2020, Cassava announced that the "re-analysis" showed the study had met its primary endpoints, reporting statistically significant improvement in all biomarkers in treatment groups as compared with the placebo group. (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)).)

**Defendants' Response**: Undisputed.

230. Cassava also announced positive cognitive data, stating that patients treated with simufilam showed directional improvements in tests of episodic memory and spatial working memory, versus patients on placebo. (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)).)

**Defendants' Response**: Undisputed.

231. In the months following Cassava's announcement of its phase 2b "results," Cassava raised approximately $260 million from investors to fund Phase 3 trials. (PX 258 (Cassava Sciences, Inc., Form 10-K (FY2021)) (reporting capital raises).)

**Defendants' Response**: Undisputed that Cassava's Form 10-K for fiscal year 2021 reports the capital raises described.

232. Beginning in 2021, Plaintiffs and other scientists began raising questions about the integrity of Cassava's scientific research. (PX 288 (Brodkin-Heilbut-Milioris Letter to FDA))

**Defendants' Response**: Disputed as characterized. Beginning in 2021, Plaintiffs publicly accused Cassava of fraud and its executives of criminal conduct. (Cassava 56.1 ¶¶ 18–25.) They also accused Cassava of harming and exploiting patients. For example, Dr. Brodkin posted, "To stop a sociopath from defrauding investors and harming elderly sick people and their families $sava," and "Allowing an obvious fraud like $sava to continue to take advantage of patients, investors and families makes a mockery of our regulatory

framework and markets." Dr. Milioris asked, "How is it legal for $SAVA to spinal tap folks and then just make up their biomarker values?" (PX 3 (Defamation SAC) ¶¶ 207, 212, 217.) Judge Woods held each of those statements actionable and defamatory per se. (Cassava 56.1 ¶¶ 61–63.)

233. In August 2021, Dr. David Bredt, former neuroscience research chief of Johnson & Johnson and Eli Lilly, and Dr. Geoffrey Pitt, a neuroscientist and cardiologist at Weill Cornell Medicine, submitted a 40-page Citizen Petition to the FDA, describing three primary concerns about Cassava's research data: anomalies in Western blot analyses suggestive of systematic data manipulation; preclinical data that exhibited "hallmarks of manipulation"; and questions about the circumstances of the phase 2b biomarker data presented after the "re-analysis" in September 2020. (PX 105 (CASSAVA_000490972) (Aug. 18, 2021 Citizen Petition); see also PX 114.)

**Defendants' Response**: Undisputed that on August 18, 2021, Drs. Bredt and Pitt, through counsel and without disclosing their identities, submitted a Citizen Petition asking FDA to halt simufilam trials; that each had taken a short position in Cassava securities before doing so; and that FDA denied their petitions on February 10, 2022. (Cassava 56.1 ¶¶ 14–17.) Cassava refers to the petition for its contents.

234. In November 2021, Plaintiffs submitted and posted online a 23-page letter to the FDA and an accompanying slide deck (PX 288 (Brodkin-Heilbut-Milioris Letter to FDA); see also PX 292 (Shambolic Charade Deck))—describing four main areas of concern about Cassava's simufilam program: (1) simufilam's proposed mechanism of action was "irrational and not supported by accepted evidence" (see PX 288 at 2–4; PX 292 at 13–14); (2) anomalous biomarker values reported by Cassava from Dr. Wang's ELISA tests in the phase 2a and phase 2b studies (see PX 288 at 6–12; PX 292 at 21–23); (3) suspicious circumstances surrounding the "re-analysis"

of the phase 2b biomarker data (see PX 288 at 6–7; PX 292 at 19–20); and (4) apparent manipulations of the phase 2b cognitive data that departed from the pre-approved protocol, including the unexplained post-hoc elimination of 40% of subjects (see PX 288 at 13– 16; PX 292 at 26–29).

**Defendants' Response**: Undisputed that Plaintiffs submitted and posted the letter and slide deck, which Cassava refers to for their contents. Disputed insofar as the paragraph implies that Plaintiffs' public statements were limited to such contents: Plaintiffs also publicly called Cassava a "fraud" and its executives criminals. (Cassava 56.1 ¶¶ 18–23.)

235. Plaintiffs prominently disclosed that they held "stock and options positions that may benefit from a decline in Cassava Sciences' stock price." (PX 292 (Shambolic Charade Deck) at 2.)

**Defendants' Response**: Undisputed that PX 292 contains the quoted language and that Plaintiffs held short positions or put options in Cassava securities when they publicly accused Cassava of fraud. (Cassava 56.1 ¶ 25.)

236. Over the following weeks and months, Plaintiffs posted additional slide decks, describing further signs of data manipulation or fabrication in the company's research. (PX 291 (SavaDx Exposed Deck); PX 290 (Cassava and the Wang Lab Deck); PX 289 (CTAD Poster).)

**Defendants' Response**: Undisputed that Plaintiffs posted additional slide decks, which Cassava refers to for their contents. Disputed to the extent the paragraph asserts that the decks identified "signs of data manipulation or fabrication."

237. On August 25, 2021, Cassava received a grand jury subpoena from the U.S. Department of Justice. (PX 145 (CASSAVA_000905232).)

**Defendants' Response**: Undisputed.

238. In November 2021, Cassava disclosed that "certain government agencies" had sought "corporate information and documents." (PX 261 (Q3 2021 Form 10-Q) at 34.)

**Defendants' Response**: Undisputed.

239. Later in November 2021, the Wall Street Journal reported that the SEC was investigating allegations that Cassava had "manipulated research results of its experimental Alzheimer's drug," and Cassava's CEO confirmed that the NIH and CUNY had also initiated inquiries. (PX 264.)

**Defendants' Response**: Undisputed that the Wall Street Journal published the report described. Disputed to the extent that Plaintiffs seek to use the article to prove the truth of its contents. Fed. R. Evid. 802.

240. In July 2022, Reuters reported that Cassava was under criminal investigation by the DOJ relating to whether Cassava "manipulated research results" for simufilam. (PX 162.)

**Defendants' Response**: Undisputed that Reuters published the report described. Disputed to the extent that Plaintiffs seek to use the article to prove the truth of its contents. Fed. R. Evid. 802.

241. On March 30, 2022, the journal PLOS One retracted five articles by Dr. Wang, including two co-authored by Dr. Burns, including a 2008 paper, claiming high affinity binding between Naloxone and filamin-A. (PX 265-269.)

**Defendants' Response**: Undisputed that PLOS One retracted the five articles.

242. In the first half of 2022, three scientific journals retracted seven research papers co-authored by Dr. Wang or Dr. Burns; and four other scientific journals issued expressions of concern or corrections concerning six research papers co-authored by Dr. Wang or Dr. Burns. (PX 270, PX 272-278.)

**Defendants' Response**: Undisputed that the cited journals took the described actions. After an inquiry lasting approximately ten or eleven months, the Journal of Prevention of Alzheimer's Disease informed Dr. Burns in August 2022 that it had not found convincing evidence of data manipulation or intent to mislead in the article it reviewed and would take no action. (Cassava 56.1 ¶¶ 58–59.)

243. In the Defamation Action's First Amended Complaint ("Defamation FAC"), Cassava challenged more than 1,000 allegedly "false and defamatory" statements for conveying the "overall messages" that "Cassava had manipulated the testing of simufilam, Cassava had manipulated the results associated with simufilam, and Cassava was a fraud." (PX 1 (Defamation FAC) at ¶ 7; PX 2 (Defamation Supplement of Exhibits).)

**Defendants' Response**: Undisputed that the Defamation FAC challenged more than 1,000 statements. Judge Woods held that Cassava had adequately alleged that a subset of the challenged statements were defamatory *per se*. (Cassava 56.1 ¶¶ 61–63.)

244. In the Defamation FAC, Cassava asserted that Plaintiffs' statements were false. (PX 1 (Defamation FAC) ¶¶ 121, 141, 144, 151, 154, 157, 162, 169, 175, 190, 198, 206, 211, 216, 223, 228, 232, 240, 247, 253, 259, 267, 274.)

**Defendants' Response**: Undisputed that the Defamation FAC alleged that the challenged statements were false.

245. In the Defamation FAC, Cassava asserted that it could prove Plaintiffs' statements were "false" based on its research and underlying data. (PX 1 (Defamation FAC) ¶¶ 162-167, 175-178, 190-192, 198-203, 206-209, 211-221, 223-226, 228-230, 232-234, 240-245, 247-251, 253-257, 418-422.)

**Defendants' Response**: Undisputed that the Defamation FAC alleged facts, including facts concerning Cassava's research and data, in support of its allegations of falsity. Disputed to the extent the paragraph suggests that Cassava's research and underlying data were the only basis that Cassava had to believe, or prove, that Plaintiffs' challenged statements were false.

246. In the Defamation Action's Second Amended Complaint ("Defamation SAC"), Cassava challenged more than 75 allegedly "false and defamatory" statements. (PX 3 (Defamation SAC) ¶ 7.)

**Defendants' Response**: Undisputed that the Defamation SAC asserted claims based on seventy-five separately numbered statements. (Cassava 56.1 ¶ 64.)

247. In the Defamation SAC, Cassava asserted that it could prove Plaintiffs' statements were "false." (PX 3 (Defamation SAC) ¶¶ 645–650.)

**Defendants' Response**: Undisputed that the Defamation SAC alleged that the challenged statements were false.

248. In the Defamation SAC, Cassava asserted it could prove "falsity" based on its research and underlying data. (PX 3 (Defamation SAC) ¶¶ 520-543.)

**Defendants' Response**: Undisputed that the Defamation SAC alleged facts in support of its allegations of falsity. Disputed to the extent the paragraph suggests that Cassava's research and underlying data were the only basis that Cassava had to believe, or prove, that Plaintiffs' challenged statements were false.

249. In the Defamation Action, Cassava asserted that it could prove the research underlying simufilam was not manipulated, fabricated, or doctored. (PX 1 (Defamation FAC) ¶¶ 162, 175, 180, 190, 198, 206, 211, 216, 223, 228, 232, 240, 247, 253, 259, 267, 274 (asserting that

"[t]he underlying research and backup for the underlying research demonstrate that the research relied upon by Cassava in connection with developing simufilam was not fabricated, manipulated, or doctored"); PX 3 (Defamation SAC) ¶¶ 520-543.)

**Defendants' Response**: Disputed as characterized. Undisputed only that the quoted allegation appears in seven of the seventeen paragraphs of the Defamation FAC cited (PX 1 ¶¶ 162, 175, 180, 190, 198, 247, 274) and in two paragraphs of the cited range of the Defamation SAC (PX 3 ¶¶ 522, 531). The quoted language does not appear in the remaining FAC paragraphs cited. (PX 1 ¶¶ 206, 211, 216, 223, 228, 232, 240, 253, 259, 267.) Each complaint pleaded the quoted allegation as one of several independent grounds for the falsity of statements that, as alleged, accused Cassava itself of fraud and illegal conduct. (PX 1 ¶¶ 162–166; PX 3 ¶¶ 520, 530, 540.) Those grounds included that Cassava had not knowingly made any false or misleading statement about simufilam (PX 1 ¶ 165; PX 3 ¶¶ 525, 541); that two Phase 3 trials "approved by FDA" were being conducted at 170 independent clinical sites by an independent contract research organization (PX 3 ¶ 527); that the Journal of Neuroscience had found "[n]o evidence of data manipulation" in a simufilam paper (PX 3 ¶ 535); and that Cassava's management had received no cash payments tied to the stock price and its officers and directors had not sold shares in over a decade (PX 1 ¶ 166; PX 3 ¶¶ 542–543). Cassava's belief, when it commenced the Defamation Action, that the research underlying simufilam had not been manipulated rested on independent grounds. (Cassava 56.1 ¶¶ 49–59.)

250. Since filing the Defamation Action, Cassava has asserted that it does not know and may never know whether Dr. Wang manipulated, falsified, or fabricated simufilam research. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63 ("The Internal Investigation did not

determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants.”).

**Defendants' Response**: Disputed as characterized. The quoted statement from Cassava's March 3, 2025 Form 10-K concerns whether Dr. Wang unblinded himself as to some Phase 2b participants; it does not apply to all research performed by Dr. Wang regarding simufilam. The statement postdates the dismissal of the Defamation Action and does not bear on Cassava's purpose in commencing or continuing it. (Cassava 56.1 ¶ 72.)

251. Cassava has abandoned many of the research and scientific claims the company pled as proof of falsity in the Defamation Action, including Dr. Wang and Dr. Burns's preclinical research (see PX 173 (CASSAVA_001225354) at 367 (removing “References”)); the results from the phase 2b clinical study (see PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025) at 63 (disclosing that “you should not rely on” the phase 2b results)); and their foundational claim that simufilam binds to altered conformations of filamin A (see PX 173 (CASSAVA_001225354) at 356 (revising “Mechanism of Action”)).

**Defendants' Response**: Disputed. PX 173 is a redline of Amendment #3, dated September 18, 2024, to the protocol for Cassava's open-label extension study. (PX 173 (CASSAVA_001225354) at 5354, 5356.) The amendment replaced the protocol's earlier reference list, including three earlier articles by Dr. Wang and Dr. Burns, with a 2023 peer-reviewed article co-authored by Dr. Wang, Dr. Burns, and other researchers, which the revised mechanism-of-action section cites. (*Id.* at 5356, 5367.) The revised section continues to state that simufilam acts “through actions involving filamin A (FLNA),” that it “disrupts the association between Aβ42 and the α7nAChR,” and that Cassava “therefore expect[s] simufilam both to improve cognition and to slow AD progression.” (*Id.* at 5356.)

Cassava's March 3, 2025 Form 10-K advised investors not to rely on two specific data sets, "the CUNY Bioanalysis of CSF biomarkers reported by the Company in connection with the Phase 2b Study" and "the Cognition Disclosures from the Phase 2b Study," in light of the "uncertainties and allegations" it described, including that the Internal Investigation "did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself." (PX 260 at 63.) The same Form 10-K states that "[s]imufilam targets a protein called filamin A (FLNA)," that Cassava's and its collaborators' "published studies have demonstrated that an altered form of FLNA is linked to neuronal dysfunction, neuronal degeneration and neuroinflammation," and that Cassava "believe[s] simufilam disrupts amyloid binding to the α7 nicotinic acetylcholine receptor (α7nAChR), which underlies our drug's primary mechanism of action in Alzheimer's disease." (*Id.* at 6.) To the extent the paragraph relies on the SEC's allegations described in the Form 10-K, *see* Defendants' Response to Paragraph 367.

The paragraph also cites no portion of the Defamation FAC or SAC for its premise that these were claims Cassava "pled as proof of falsity." Further, the protocol amendment and the Form 10-K postdate the voluntary dismissal of the Defamation Action by more than six weeks and seven months, respectively, and do not bear on Cassava's purpose in commencing or continuing it. (Cassava 56.1 ¶ 72.)

252. Cassava owns all simufilam research data. (PX 140 (CASSAVA_000797897 (Clinical Trial Agreement § 4.1)); see also PX 16 (Cassava 30(b)(6) Dep. Tr.) at 282:11-283:4; PX 21 (Rodriguez Dep. Tr.) at 131:16-23; PX 17 (Wang Dep. Tr.) at 29:15-30:10.)

**Defendants' Response**: Undisputed that Cassava owns the data and intellectual property relating to simufilam, other than certain rights retained by Yale. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 282:11–21.)

253. Cassava has always had the right to access or obtain simufilam research data from Dr. Wang at CUNY. Id.

**Defendants' Response**: Undisputed that Cassava owns the data and intellectual property relating to simufilam, other than certain rights retained by Yale. The research at issue was performed in Dr. Wang's laboratory at CUNY under agreements with the Research Foundation of CUNY, and Defendants refer to those agreements as the authority regarding Cassava's right to access or obtain simufilam research data from Dr. Wang at CUNY (PX 180 (CASSAVA_001309142) at 9142.)

254. On September 3, 2021, during a call with investors after the Citizen Petition was published, Barbier said: "One way to settle the discourse around Western blots might be to go back to the original films and images. . . . we don't have the original films or images for the Western blots in question. Those were generated by our science collaborator at CUNY, who is Prof. Wang." (PX 93 (CASSAVA_000310872) at 876.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited document, but Defendants respectfully refer the Court to the document for its full contents and context, including the following statements from Mr. Barbier: "As a reminder, Cassava Sciences does not have its own laboratory facilities. We use other people's labs. For this reason, I have respectfully requested that CUNY inquire thoroughly but expeditiously into the allegations targeting Prof. Wang."

255. On November 16, 2021, Dr. Burns wrote: "without the original images, you can't prove anything." (PX 25 (BURNS_00000650) at 685.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited document, but Defendants respectfully refer the Court to the document for its full contents and context, including that Dr. Wang (and journal editors, among others) evaluated "the original image" in a 2005 research article and others. (PX 25 (BURNS_00000650) at 685.)

256. On September 20, 2022, Cassava represented to the DOJ, in response to document requests and interrogatories: "Cassava outsources research and development to third parties and service providers, and therefore has no original data in its possession." (PX 142 (CASSAVA_000800400) at 415-416.)

**Defendants' Response**: Undisputed that PX 142 contains the quoted statement.

257. When Barbier was asked whether the company has ever had possession of original data from simufilam experiments, he testified: "I had no reason to believe there was original data because we don't have a lab in-house." (PX 5 (Barbier Dep. Tr.) at 253:03-256:01; see also PX 6 (BARBIER_00000183) at 354-55.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited transcript, but Defendants respectfully refer the Court to the full transcript, which makes clear that during the same line of questioning during Mr. Barbier's deposition, when asked whether Cassava ever possessed any original or raw data, he explained that he could not "answer that question" as it was not among his responsibilities as CEO, and that others, including Dr. Friedmann "would have had direct knowledge . . . of whether or not someone,

anyone at Cassava Sciences had original data or raw data that originated from a lab." (PX 5 (Barbier Dep. Tr.) at 253:7, 253:25–254:3.)

258. Barbier testified that he never asked anyone at the company whether or not the company possessed any raw or original data from any simufilam research. (PX 5 (Barbier Dep. Tr.) at 255:23-256:01.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited transcript, but Defendants respectfully refer the Court to the full transcript, which includes Mr. Barbier's testimony that he "always [knew] Dr. Wang to be a very ethical person," and "never had any reasons to doubt his ethics." (PX 5 (Barbier Dep. Tr.) at 256:20–22.)

259. When asked whether Cassava had possession of original or raw data from Dr. Wang's simufilam experiments, Cassava's corporate representative testified: "I'm fairly certain the answer is no. I don't know why we will have the originals, but I can't say we don't." (PX 16 (Cassava 30(b)(6) Dep Tr.) at 205:23-208:02.)

**Defendants' Response**: Undisputed that Cassava's Rule 30(b)(6) designee so testified. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 207:12–19.)

260. On September 14-16, 2022, the FDA conducted an audit of Dr. Wang's lab at CUNY. (PX 222 (CUNY 001529) ("FDA Inspection Report"); PX 144 (CASSAVA_ 000898032) ("Form 483").

**Defendants' Response**: Undisputed.

261. The FDA reported the following findings from its September 2022 audit of Dr. Wang's lab at CUNY:

> The ELISA experiments used in the study were not validated/verified. Specifically, the site used commercially available ELISA kits without in-house validation/verification of assay parameters, such as accuracy, precision, and sensitivity of the method. There were inadequate source records to reconstruct the study. Specifically, the site did not maintain;
>
> a. Documentation of sample storage and tracking;
>
> b. Documentation of experimental procedures (e.g., records of sample removal/return, preparation of calibration standards, sample aliquoting, and processes associated with the conduct of ELISA and Western blot);
>
> c. Source records for Western-blot analysis; and
>
> d. Audit trails for the plate reader (Multimode Detector software) used in ELISA experiments.

(PX 222 (CUNY 001529) at 530; PX 144 (CASSAVA_ 000898032) at 032.)

**Defendants' Response**: Undisputed that the Form 483 issued at the close of the inspection lists these among eight "inspectional observations," which by the form's own terms "do not represent a final Agency determination regarding [the laboratory's] compliance." (PX 144 (CASSAVA_000898032) at 8032–33.) Disputed that the records described did not exist. Cassava's auditor, Laura Rodriguez, testified that some of the Form 483 observations "were not accurate" because "the information was there," and that during her own audit she located the audit trail on the ELISA software and the audit trail for the freezer in which study samples were stored. (PX 21 (Rodriguez Dep. Tr.) at 169:9–21.) The freezer audit trail showed that the study samples were kept at minus 70 to 80 degrees Celsius "the entire time they were stored," and the plate reader used for the ELISA assays maintained an audit trail that would have indicated any alteration of data. (Id. at 221:17–22, 225:4–11.) Ms. Rodriguez also used the laboratory's sample inventory spreadsheet and sample manifest forms to verify that the Phase 2b samples were in place and that their

receipt was documented. (Id. at 226:5–227:7 [confirm cited pages are in PX 21; if not, add to supplemental excerpt].)

262. When Cassava filed the Defamation Action, Defendants knew that the FDA had audited Dr. Wang's lab at CUNY in September 2022. (PX 144 (CASSAVA_000898032); PX 222 (CUNY 001529); PX 191 (CASSAVA_001418364) (Oct. 3, 2022 email from Orrick to Barbier attaching CUNY's draft response to Form 483.)

**Defendants' Response**: Undisputed that, before the Defamation Action was filed, Cassava was aware that FDA had inspected Dr. Wang's laboratory in September 2022.

263. When Cassava filed the Defamation Action, Defendants knew of the FDA's findings from its audit of Dr. Wang's lab at CUNY in September 2022. (Id.)

**Defendants' Response**: Undisputed that, before the Defamation Action was filed, Cassava was aware of the inspectional observations listed in the Form 483, which states that the observations "do not represent a final Agency determination." (PX 144 (CASSAVA_000898032) at 8032.)

264. When Cassava filed the Defamation Action, Defendants knew that the FDA had determined that Dr. Wang had "inadequate source records to reconstruct" the results from the phase 2b study of simufilam. (Id.)

**Defendants' Response**: Disputed as characterized. The Form 483 lists, as an inspectional observation that does "not represent a final Agency determination," that "[t]here were inadequate source records to reconstruct the study." (PX 144 (CASSAVA_000898032) at 8032.)

265. On November 1, 2022, the FDA directed Cassava to remove the phase 2b data from its investigator's brochure because the data "could not be verified." (PX 172

(CASSAVA_001213617) at 620 (the "objective of that inspection was to confirm the reliability of [the phase 2b biomarker] data . . . . The Agency staff who conducted that audit concluded that the reliability of [the data] could not be verified. . . . Based on the conclusions of the above audit, you must now delete all data for the cerebrospinal fluid analytes [] from the Investigator's Brochure.").

> **Defendants' Response**: Undisputed that on November 1, 2022, FDA informed Cassava that the staff who conducted the September 2022 inspection had "concluded that the reliability of cerebrospinal fluid sample data in Figure 2" of the Investigator's Brochure "could not be verified," and directed Cassava to delete those data from the Investigator's Brochure. (PX 172 (CASSAVA_001213617) at 3620.) FDA did not state that any data had been fabricated or manipulated. (*Id.*) Cassava responded by proposing that retained samples from the study be analyzed "by a different laboratory to provide independent confirmation of the CUNY data." (*Id.* at 3619–20.)

266. On November 16, 2022, the FDA sent a follow-up email to Cassava concerning its audit and instruction to remove the phase 2b biomarker data: "As already stated in our email to you, dated November 1, 2022, those data could not be verified during the recent FDA audit of the aforementioned CCNY /CUNY laboratory. Their retention in the Investigator's Brochure would thus be potentially misleading." (PX 172 (CASSAVA_001213617) at 617.)

> **Defendants' Response**: Undisputed. FDA's November 16, 2022 email responded to Cassava's request that the data be retained pending independent analysis of the retained samples by a different laboratory. (PX 172 (CASSAVA_001213617) at 3618–20.)

267. When Cassava filed the Defamation Action, Defendants knew the FDA had directed Cassava to remove the phase 2b biomarker data from its investigator's brochure because the data "could not be verified." (PX 12 (Burns Dep. Tr.) at 298:02-299:11; PX 5 (Barbier Dep.

Tr.) at 245:04-25; PX 170 (CASSAVA_001134756) (forwarding FDA email with "high" priority tag to chief medical officer, Nadav Friedmann, on November 1, 2022); PX 16 (Cassava 30(b)(6) Tr.) at 176:15-178:24.)

**Defendants' Response**: Undisputed.

268. When Cassava sent the revised Investigator's Brochure to clinical trial sites, removing Dr. Wang's phase 2b biomarker data, the company did not mention the FDA's direction to remove the data in its "summary of changes and rationale." (PX 172 (CASSAVA_001211317) at 326-328, 344 (redline of changes required by FDA); PX 171 (CASSAVA_001211317) at 359 ("Summary of Changes and Rationale" without disclosing rationale of FDA direction).)

**Defendants' Response**: Disputed. Neither cited exhibit reflects that the revised Investigator's Brochure reflected in PX 171, or its "Summary of Changes and Rationale," was sent to clinical trial sites.

269. According to the FDA's Establishment Inspection Report, the FDA conducted the September 2022 audit of Dr. Wang's lab at CUNY "according to Compliance Program 7348.004." (PX 222 (CUNY 001529) at 529.)

**Defendants' Response**: Undisputed that the Establishment Inspection Report contains the quoted language.

270. Neither the FDA Inspection Report nor the FDA Form 483 state that the FDA applied GLP standards when it audited Dr. Wang's lab at CUNY in 2022. (PX 222 (CUNY 001529); PX 144 (CASSAVA_ 000898032).)

**Defendants' Response**: Undisputed that neither document refers to GLP standards.

271. On September 21-22, 2022, Cassava's Senior Director of Clinical Quality Systems, Laura Rodriguez, and SVP of Regulatory Affairs, Michael Marsman, conducted an on-site audit of Dr. Wang's lab at CUNY. (PX 139 (CASSAVA_000796682).)

**Defendants' Response**: Undisputed.

272. Cassava's September 2022 audit of Dr. Wang's lab at CUNY concluded that the lab "lack[ed] standard operating procedures, proper good documentation practices, and laboratory practices (i.e., equipment calibration and sample management) that are deemed critical for conducting any type of analysis to support a clinical trial"; and that the lab was "unacceptable" and "not qualified to provide biomarker analysis and research services for any future Cassava studies." (PX 139 (CASSAVA_000796682) at -688.)

**Defendants' Response**: Undisputed that the cited audit report contains the quoted language.

273. Cassava's audit report acknowledged that Dr. Wang's lab was not subject to GLP requirements but was expected to perform work "according to sound scientific principles, many of which are also cGLP requirements." (PX 139 (CASSAVA_000796682) at 684.)

**Defendants' Response**: Undisputed that the cited audit report contains the quoted language.

274. Dr. Wang's lab at CUNY was never reinstated as an approved lab for Cassava's research after the September 2022 audit. (PX 21 (Rodriguez Dep. Tr.) at 85:05-13, 237:13-20.)

**Defendants' Response**: Undisputed.

275. Cassava's auditors stated: "The biggest concern [] was also the lack of proper documentation practices." (PX 139 (CASSAVA_000796682) at 686.)

**Defendants' Response**: Undisputed that the cited audit report contains the quoted language.

276. Cassava's auditors identified the following "Critical" deficiencies:

> "[1] The laboratory did not have any formal SOPs in place. The four SOPs provided were not well written, did not contain an approval signature, and were not in a formal template.
>
> "[2] Lack of experiment logbooks/notebooks for all study/research work being performed.
>
> "[3] Lack of study record organization which makes it difficult to recreate what was used during sample analysis (i.e., reagents, ELISA and Western Blot kit lots, pipets, BOC freezer, and balances). All documents provided were either on network drive, in a binder, or loose in a folder.
>
> "[4] The -80°C freezer had not been qualified/validated prior to sample storage of study samples.
>
> "[5] Essential equipment such as the FilterMax F5 (ELISA) and -80°C freezer monitor had not been calibrated in several years."

(PX 139 (CASSAVA_000796682) at 690.)

**Defendants' Response**: Undisputed that the cited audit report's attachment lists five "Critical" observations, except that the observation concerning equipment calibration states that the equipment had not been calibrated in several years "due to Covid." (PX 139 (CASSAVA_000796682) at 6690.)

277. Cassava's auditors defined a "Critical" deficiency as: "Observed conditions, practices, or processes that adversely affect the rights, safety, or well-being of the subjects and/or the quality and integrity of data. Critical findings could be a combination of major deficiencies which indicate a serious systemic failure. Critical deficiencies require immediate action." (PX 139 (CASSAVA_000796682) at 685.)

**Defendants' Response**: Undisputed that the cited audit report contains the quoted language.

278. Cassava's auditors identified the following "Major" deficiencies:

> "[1] The ELISA computer being utilized was not the original computer as the previous one had been stolen. Due to this, there was no password protection to the system and/or the FilterMax F5 software.
>
> "[2] There was no formal process for sample inventory, tracking, and chain of custody for PTI-125-02 samples. All three studies had their samples grouped into one inventory spreadsheet. Sample manifest forms were also bound together in one binder.

(PX 139 (CASSAVA_000796682) at 690.)

**Defendants' Response**: Disputed as characterized. The audit report's attachment identifies two "Major" observations: the absence of a formal sample inventory, tracking, and chain-of-custody process for PTI-125-02 samples, and the laboratory's congested condition and expired reagents, as to which the report notes that documentation "demonstrated expired reagents were not used." (PX 139 (CASSAVA_000796682) at 6690.) The quoted statement regarding the ELISA computer appears in the body of the report, which also states that the auditor located the audit trail for the PTI-125-02 sample analysis. (*Id.* at 6688.)

279. Cassava's auditors defined a "Major Deficiency" as: "Observed conditions, practices or processes that might adversely affect the rights, safety, or well-being of the subjects and/or the quality and integrity of data. Major observations are serious deficiencies and are direct violations of cGLP principles." (PX 139 (CASSAVA_000796682) at 685.)

**Defendants' Response**: Undisputed that the cited audit report contains the quoted language.

280. Cassava's auditor, Laura Rodriguez, testified that "[t]here were no logbooks to indicate what was being performed, how [Dr. Wang] did … the experiments that he worked on";

"it was true for everything Dr. Wang did at that lab . . . . All research. He didn't have a logbook." (PX 21 (Rodriguez Dep. Tr.) at 214:12-215:06.)

**Defendants' Response**: Undisputed that Ms. Rodriguez gave the quoted testimony. Disputed to the extent Plaintiffs are implying that Ms. Rodriguez could not identify the same information elsewhere. Ms. Rodriguez testified that "many university research labs do not maintain logbooks," and that, although the laboratory's study documentation was scattered, "after much search, we could piece everything together to show things were in place; they just were not organized." (PX 21 (Rodriguez Dep. Tr.) at 72:24–73:5, 205:4–206:3, 235:13–15.)

281. Cassava's auditor, Laura Rodriguez, testified that Dr. Wang had discarded all original films from Western blot experiments. (PX 21 (Rodriguez Dep. Tr.) at 176:09-20 ("All Western blot experiments, whether it was ours or anybody else's, all were gone.")

**Defendants' Response**: Undisputed that Ms. Rodriguez testified that Dr. Wang told her during her September 2022 audit that he had discarded the original X-ray films from his Western blot experiments, which he attributed in part to a direction from the university to discard materials during COVID, and that she did not observe any films. (PX 21 (Rodriguez Dep. Tr.) at 175:8–176:20.) Disputed to the extent Plaintiffs are implying that no data therefore existed for those experiments. Ms. Rodriguez testified that, as she understood it, Western blot films are not ordinarily retained because they degrade over time; that a digital image is taken "to preserve what the original film looked like"; and that she "would have considered the photographs the data" and the films "part of the experiment apparatus." (*Id.* at 75:16–76:15, 177:23–178:5.)

282. When Cassava filed the Defamation Action, Defendants knew that Cassava's Senior Director of Clinical Quality Systems, Laura Rodriguez, and SVP of Regulatory Affairs, Michael Marsman, had audited Dr. Wang's lab at CUNY in September 2022. (PX 21 (Rodriguez Dep. Tr.) at 83:20-24 ("Remi knew I was going. . . And Lindsay knew I was going."); PX 12 (Burns Dep. Tr.) at 300:09-25; PX 133 (CASSAVA_000738939) at 8939 ("We need to wait until Laura completes her audit before you start this work. Stay tuned.").

> **Defendants' Response**: Undisputed that Ms. Rodriguez and Dr. Marsman, who conducted the audit, knew of it, and that Ms. Rodriguez testified that Ms. Jones, Mr. Barbier, Dr. Marsman, and Dr. Burns knew she was going to conduct it. (PX 21 (Rodriguez Dep. Tr.) at 83:20–24.) Mr. Barbier testified that he became aware of the audit after the fact. (PX 5 (Barbier Dep. Tr.) at 246:2–12.) Disputed to the extent the paragraph implies that Cassava's Board as a whole was aware of the audit before the Defamation Action was filed: Mr. Barry, then a member of the Board, testified that he did not learn that Cassava had audited Dr. Wang's laboratory until June 2024. (PX 8 (Barry Dep. Tr.) at 94:7–25.) The cited email reflects that, in May 2022, Dr. Burns told only Dr. Wang and Dr. Zhe Pei of his laboratory that they would "need to wait until Laura completes her audit before you start this work." (PX 133 (CASSAVA_000738939) at 8939.)

283. When Cassava filed the Defamation Action, Defendants knew the findings from Cassava's audit of Dr. Wang's lab at CUNY in September 2022. (PX 12 (Burns Dep. Tr.) at 299:13-300:25; PX 5 (Barbier Dep. Tr.) at 246:02-247:13; PX 16 (Cassava 30(b)(6) Dep. Tr.) at 183:25-184:12 (testifying that the conclusion that Dr. Wang's lab was unacceptable and unqualified "certainly would have been a relevant piece of information"); PX 21 (Rodriguez Dep.

Tr.) at 238:03-240:11 (testifying that Barbier told her to copy outside counsel at Orrick and Dr. Wang's counsel when sending the "corrective actions" from the audit).

**Defendants' Response**: Disputed. The record does not show that the decision-makers who commenced the Defamation Action knew the findings of Cassava's September 2022 audit when they did so. Mr. Barry, then a member of Cassava's Board, testified that he did not learn that Cassava had audited Dr. Wang's laboratory until June 2024. (PX 8 (Barry Dep. Tr.) at 94:7–25.) Cassava's Rule 30(b)(6) designee did not recall any discussions of the audit's findings or whether they were brought to the Board's attention. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 181:12–25.) Ms. Rodriguez testified that she discussed the contents of the audit only with Dr. Marsman, and that she told the clinical-operations project managers only that the laboratory was temporarily disqualified as a vendor. (PX 21 (Rodriguez Dep. Tr.) at 82:11–83:4, 242:8–13.) Undisputed only that Ms. Rodriguez and Dr. Marsman, who conducted the audit, knew of their observations, and that on September 28, 2022, Ms. Rodriguez emailed Dr. Wang and Dr. Pei the corrective actions she requested. (PX 139 (CASSAVA_000796682) at 6698–99.) The written audit report quoted in the preceding paragraphs was not drafted until October 2023 and was signed on October 18, 2023. (Id. at 6683, 6700; PX 21 at 103:14–16.)

284. On October 12, 2023, Science published a "final report" of the CUNY investigation committee from its investigation of Dr. Wang. (PX 279; PX 232 (RFCUNY000743))

**Defendants' Response**: Undisputed that on October 12, 2023, Science published a copy of what it referred to as a "final report." Disputed to the extent Plaintiffs are implying that the report reflected CUNY's final determination regarding the issues it addresses. After Science published the document, CUNY stated on October 27, 2023, that

"no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) *See* Defendants' Response to Paragraph 286.

285. The 50-page report published by Science on October 12, 2023 is titled "CITY UNIVERSITY OF NEW YORK FINAL INVESTIGATION REPORT OF Associate Professor Hoau-Yan Wang, Ph.D." (Id.)

**Defendants' Response**: Undisputed that the document bears that title.

286. The "Final Investigation Report" published by Science on October 12, 2023, was the Investigation Committee's final report from its investigation of Dr. Wang. (PX 223 (CUNY 001573) at 574 (confirming the version published by Science was the "Final Report" and the Committee's work concluded in May 2023.)

**Defendants' Response**: Undisputed that CUNY's May 30, 2025 letter states that Science's story "was accompanied by the publication of a copy of the Final Investigation Report and Final Report Addendum dated May 26, 2023 (the 'Final Report') issued by the Research Misconduct Investigation committee," and that "the Committee's work concluded in May 2023." (PX 223 (CUNY 001573) at 1574.) Disputed to the extent the paragraph asserts that CUNY confirmed or verified the version Science published, which the letter does not state, or that the May 2023 report was the Committee's final word on every allegation: as to one allegation, the same letter states that "the Committee concluded its investigation in July 2023" and refers to "the conclusions reached by the Committee in its July 2023 Report." (*Id.* at 1583.) When Science published the document, CUNY stated that "no final action as to this investigation has been taken." (PX 153

(CASSAVA_000980995) at 0995.) CUNY's final determination, issued May 30, 2025, was that the Committee "did not find that Dr. Wang's actions constituted acts of intentional, knowing, or reckless falsification and/or fabrication," and that "research misconduct did not occur" as to each allegation. (PX 223 at 1574, 1576–88.)

287. The CUNY Investigation Committee's Final Report found "long-standing and egregious misconduct in data management and record keeping" and that "[i]t appears likely that no primary data and no research notebooks pertaining to the 31 allegations [investigated by the committee] exist." (PX 232 (RFCUNY000743) at 743)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent Plaintiffs use PX 232 to prove the truth of the matters asserted in it. Fed. R. Evid. 802. Disputed to the extent the paragraph presents the quoted statements as CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

288. The CUNY Investigation Committee's Final Report stated:

> "In no instance did Dr. Wang provide any material that could be reasonably recognized as original, uncropped blots (images that included clear film/blot edges and molecular weight markers). In his response to our investigation, Dr. Wang has protested that our definition of original blot data is unreasonably strict. However, our definition is shared by ORI, for whom this report is written. The third-party analysis of Dr. Wang's work by Dr. Spruck was also based on images that are clearly not original data. It also became clear from our interviews with Dr. Wang and, Dr. Zhe Pei, a post-doctoral Research Associate in the Wang lab, that the lab did not employ notebooks to record the details of the preparation or execution of the western blot Experiments performed in the lab."

(PX 232 (RFCUNY000743) at 746)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent Plaintiffs use PX 232 to prove the truth of the matters asserted in it. Fed. R. Evid. 802. Disputed to the extent the paragraph presents the quoted statements as CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

289. The CUNY Investigation Committee found that, due to Dr. Wang's lack of experimental logbooks or notebooks, "even if unedited images of films or film scans exist, it does not appear to be possible to determine how data were acquired or which original western blots were used to create the figures cited in each of the 31 allegations." (PX 232 (RFCUNY000743) at 746)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent Plaintiffs use PX 232 to prove the truth of the matters asserted in it.

Fed. R. Evid. 802. Disputed to the extent the paragraph presents the quoted statements as CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

290. The CUNY Investigation Committee's Final Report stated: "Though it was our intention to examine all primary data upon which the western blots identified in the specific allegations were based, we were unable to acquire any such material." (PX 232 (RFCUNY000743) at 746.)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent Plaintiffs use PX 232 to prove the truth of the matters asserted in it. Fed. R. Evid. 802. Disputed to the extent the paragraph presents the quoted statements as CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

291. The CUNY Investigation Committee's Final Report stated: "Dr. Wang has failed to provide data that can be verified as unmanipulated, uncropped, underlying primary western blot data, as defined by ORI. It is not clear to this committee why some editors have accepted such

material as original underlying blots from Wang in response to inquiries regarding misconduct allegations." (PX 232 (RFCUNY000743) at 747.)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent Plaintiffs use PX 232 to prove the truth of the matters asserted in it. Fed. R. Evid. 802. Disputed to the extent the paragraph presents the quoted statements as CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

292. The CUNY Investigation Committee's Final Report stated:

> "Though we acknowledge that a significant number of the publications concern data published over a decade ago, Dr. Wang has been unable to provide original data or records even for his most recent publications. He is therefore responsible for the inability of this committee to make an objective assessment for even a single allegation. Notwithstanding the specific data retention policies of CUNY and the NIH, Dr. Wang's failure to store original data and maintain research records is reckless and clearly not in keeping with the standard practices in the field. It is our conclusion that this amounts to significant research misconduct."

(PX 232 (RFCUNY000743) at 749.)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent Plaintiffs use PX 232 to prove the truth of the matters asserted in it. Fed. R. Evid. 802. Disputed to the extent the paragraph presents the quoted statements as CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to

this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

293. The CUNY Investigation Committee's Final Report faulted Dr. Burns as the co-author of several research papers. (PX 232 (RFCUNY000743) at 773 ("Dr. Lindsay H. Burns also bears some measure of responsibility."); id. at 779, 781, 786, 787, 789.)

**Defendants' Response**: Disputed as characterized. Undisputed that PX 232, the investigation committee's report, which was anonymously leaked to *Science* in 2023, contains the quoted language. (PX 232 (RFCUNY000743) at 773.) Dr. Burns was not a respondent in the investigation, which concerned allegations of research misconduct against Dr. Wang. (PX 223 (CUNY 001573) at 1573.) In May 2025, CUNY sent the Office of Research Integrity for the Department of Health and Human Services its "final conclusions on its investigation into allegations of research misconduct against" Dr. Wang, stating that, "for each of the allegations of research misconduct, the University has determined that research misconduct did not occur," and did not attribute any fault to Dr. Burns. (PX 223 (CUNY 001573) at 1573–74; *see* Individual Defendants' Exhibit 119.)

294. The CUNY Investigation Committee's Final Report stated: "The committee requested that CUNY hire an independent image consultant to examine all the publications and materials provided by Dr. Wang. However, after working on these allegations for nearly three months, this consultant precipitously withdrew their services, citing legal risks to themselves and their business." (PX 232 (RFCUNY000743) at 745.)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent Plaintiffs use PX 232 to prove the truth of the matters asserted in it. Fed. R. Evid. 802. Disputed to the extent the paragraph presents the quoted statements as CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

295. The CUNY Investigation Committee's Final Report contains the following conclusion:

> Already frustrated by the respondent's inability to provide even a single datum or notebook in response to any allegation, the committee decided that it would be most conservative to conclude that the respondent's failure to provide data or records prevented us from making an objective assessment in any case. But to be clear, the committee concludes that Dr. Wang's inability or unwillingness to provide primary research materials to this investigation represents egregious misconduct. This failure, the troubling research practices described in our report, and the clear indications of misconduct in his response to PLoS editorial concerns, is highly suggestive of longstanding and deliberate scientific misconduct by Dr. Wang. However, absent access to primary research materials, it is not possible to make definitive assessments for the 31 specific allegations. This is a source of deep frustration to the committee, which spent the better part of a year actively attempting to provide an objective investigation into these serious charges against Dr. Wang.

(PX 232 (RFCUNY000743) at 792 (emphasis in original).)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent Plaintiffs use PX 232 to prove the truth of the matters asserted in it. Fed. R. Evid. 802. Disputed to the extent the paragraph presents the quoted statements as

CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

296. After Science published the CUNY Investigation Committee's Final Report, on October 12, 2023, Cassava demanded CUNY investigate the committee's investigation. (PX 174 at 502 (CASSAVA_001229498) (Oct. 18, 2023 letter from Cassava to CUNY: "Cassava demands that CUNY reject the flawed findings of this leaked committee report.").)

**Defendants' Response**: Undisputed that on October 18, 2023, Cassava's General Counsel sent CUNY a letter containing the quoted sentence. (PX 174 (CASSAVA_001229495) at 9502.) The letter asked CUNY to conduct "a meticulous, transparent, and fair investigation conducted in accordance with due process," and to investigate the leak, and it noted that the report "makes no finding of data manipulation or other research misconduct as defined by law." (*Id.* at 9499, 9502.) CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 223 (CUNY 001573) at 1574, 1576–88.)

297. On October 27, 2023, CUNY announced that it would "stay the underlying inquiry into the allegations regarding Dr. Wang's research until such time as the University completes a comprehensive investigation of the process." (PX 153 (CASSAVA_000980995) at 996.)

**Defendants' Response**: Undisputed. The same statement said that "no final action as to this investigation has been taken" and that "any finding regarding allegations of

research misconduct must be reliable and credible." (PX 153 (CASSAVA_000980995) at 0995–96.)

298. On October 27, 2023, Rick Barry sent an email responding to news of CUNY's investigation of the Committee's investigation by congratulating Cassava's Chief Legal Officer: "Awesome! Well done Chris Cook!" (PX 153 (CASSAVA_000980995) at 995.)

**Defendants' Response**: Undisputed that PX 153 contains the quoted response.

299. On May 30, 2025, CUNY submitted a letter to the Office of Research Integrity, to provide "an update and final conclusions on its investigation into allegations of research misconduct against [Dr. Wang]." (PX 223 (CUNY 001573) at 573.)

**Defendants' Response**: Undisputed. The letter's final conclusion is that "research misconduct did not occur," and that "[b]ecause the Research Misconduct Investigation has not resulted in a finding of research misconduct, no administrative actions against Dr. Wang are completed, pending, or planned." (PX 223 (CUNY 001573) at 1574, 1588–89.)

300. In its May 30, 2025 letter to ORI, CUNY stated that it retained an outside law firm, Foley Hoag LLP, "to conduct an internal investigation into whether there was an unauthorized disclosure of draft and final reports related to the Research Misconduct Investigation, and to evaluate the applicable policies, processes, and procedures used during that investigation." (PX 223 (CUNY 001573) at 573.)

**Defendants' Response**: Undisputed.

301. In CUNY's May 30, 2025 letter to ORI, CUNY wrote: "In addition, an important update to communicate is that Dr. Wang has announced his retirement from the University effective July 2025. As a result, he will no longer conduct research at CUNY." (PX 223 (CUNY 001573) at 573.)

**Defendants' Response**: Undisputed.

302. CUNY's May 30, 2025 letter to ORI states: "The University has further concluded that the disclosure did not compromise the integrity of the Committee's investigation or the content of its Final Report. Because of this, the University believes that although there were issues with the findings of the Committee, which are described below, the investigation of Dr. Wang was undertaken in good faith, and the University bases its final conclusions on the Committee's findings." (PX 223 (CUNY 001573) at 574.)

**Defendants' Response**: Undisputed.

303. The "issues with the findings of the Committee" identified in CUNY's May 30, 2025 letter to ORI, concern the "evidence standard" applied by the Committee. (PX 223 (CUNY 001573) at 576 ("The Committee seemed to believe that definitive evidentiary proof of fabrication or falsification was required for a finding of research misconduct. This requirement may have surpassed what is required by a preponderance of the evidence standard"); id. ("while the Committee may have applied a heightened standard of evidence, the Committee's work concluded in May 2023, and the University does not believe that it should disturb or reevaluate those findings, as it was undertaken in good faith and was not compromised by any unauthorized disclosures. Therefore, for each of the following allegations of research misconduct, the University has determined that research misconduct did not occur based on the conclusions reached by the Committee in its Final Report .).)

**Defendants' Response**: Undisputed that the letter identifies, as an issue with the Committee's findings, that the Committee "may have applied a heightened evidentiary standard," and that the University nonetheless declined to "disturb or reevaluate those findings" and "determined that research misconduct did not occur." (PX 223 (CUNY

001573) at 1574, 1576.) Disputed to the extent the paragraph implies that the evidentiary standard was the only respect in which CUNY disagreed with the Committee: the letter also states that, "[w]hile the Committee speculated that they did not have access to all image files that were present in Dr. Wang's lab, the investigation found no evidence to support this." (*Id*. at 1575.)

304. CUNY's May 30, 2025 letter to ORI adopts the factual findings set forth in the CUNY Investigation Committee's Final Report. (PX 223 (CUNY 001573) at 576.)

**Defendants' Response**: Disputed as characterized. The letter states that the University "bases its final conclusions on the Committee's findings" and "accepted the Committee's findings," while identifying "issues with the findings of the Committee" and stating that the investigation "found no evidence to support" the Committee's speculation that it lacked access to image files from Dr. Wang's laboratory. (PX 223 (CUNY 001573) at 1574–75, 1588–89.) The letter does not state that CUNY adopted every statement in the Final Report, and as to one allegation it relies on "the conclusions reached by the Committee in its July 2023 Report." (Id. at 1583.) The findings CUNY accepted include that "the Committee did not find that Dr. Wang's actions constitute acts of intentional, knowing, or reckless falsification and/or fabrication," and the University accordingly "determined that research misconduct did not occur." (*Id.* at 1576, 1588–89.) *See* Defendants' Responses to Paragraphs 286 and 303.

305. CUNY's May 30, 2025 letter to ORI confirmed that Dr. Wang did not maintain original research data. (PX 223 (CUNY 001573) at 575 ("Dr. Wang consistently reported that he did not maintain original research data in hard copy files, electronic images, or lab notebooks.").)

**Defendants' Response**: Disputed as characterized. The letter does not state that CUNY confirmed or verified Dr. Wang's account. It reports that "Dr. Wang consistently reported that he did not maintain original research data in hard copy files, electronic images, or lab notebooks," in explaining that CUNY's investigation "found no evidence" to support the Committee's speculation that it lacked access to image files from Dr. Wang's laboratory. (PX 223 (CUNY 001573) at 1575.)

306. CUNY's May 30, 2025 letter to ORI repeatedly confirms and adopts the Investigation Committee's findings that Dr. Wang's "lack of preservation of research records represents a significant departure from accepted practices of the scientific community." (PX 223 (CUNY 001573) at 576-588.)

**Defendants' Response**: Undisputed that the letter repeats that finding, which it attributes to the Committee, as to each allegation. In each instance, the letter also states that "the Committee did not find that Dr. Wang's actions constitute acts of intentional, knowing, or reckless falsification and/or fabrication" and that "the University has determined that research misconduct did not occur." (PX 223 (CUNY 001573) at 1576–88.)

307. According to the CUNY Investigation Committee's Final Report: "[Dr. Wang] stated that a significant number of boxes containing research records were thrown away in response to a request from [CUNY] to clean the lab during the COVID-19 pandemic. Officials at [CUNY] were not able to confirm this. Furthermore, as CUNY faculty, none of the committee members were directed to throw away research material during the pandemic and are not aware of other colleagues who were asked to do so. In our experience, labs were asked to decontaminate but not discard belongings." (PX 232 (RFCUNY000743) at 746-747.)

**Defendants' Response**: Undisputed that PX 232 contains the quoted language. Disputed to the extent the paragraph presents the quoted statements as CUNY's final determination or as the Committee's final word on every allegation. After Science published PX 232, CUNY stated on October 27, 2023, that "no final action as to this investigation has been taken," and CUNY's final determination, issued May 30, 2025, was that "research misconduct did not occur" as to each allegation. (PX 153 (CASSAVA_000980995) at 0995; PX 223 (CUNY 001573) at 1574, 1576–88.) See Defendants' Response to Paragraph 286.

308. According to Cassava's Audit Report, "the ELISA computer being utilized was not the original computer as the previous one had been stolen." (PX 139 (CASSAVA 000796682) at 688.)

**Defendants' Response**: Undisputed that the cited audit report contains the quoted statement.

309. According to the FDA Establishment Inspection Report, when the FDA asked for original data from Dr. Wang's ELISA experiments, "Dr. Wang stated the Department of Justice (DOJ) took the original USB drive containing the original Excel files containing data from the plate reader as well as a second USB he made as a back-up copy." (PX 222 (CUNY 001529) at 535).)

**Defendants' Response**: Undisputed that PX 222 records the quoted statement by Dr. Wang. Disputed to the extent the paragraph implies that the Establishment Inspection Report is a complete or reliable account of the information available at Dr. Wang's laboratory. Ms. Rodriguez, who audited the laboratory days after FDA's inspection, testified that FDA "didn't really dig enough or really explain, I think, to Dr. Wang or Dr.

Zhe what it was they were looking for, because the information was there"; that she located items FDA did not, including the audit trail for the ELISA software; that the laboratory staff told her during and after the inspection that they did not understand what FDA was asking; and that, based on its date, the report was written before CUNY's responses to the Form 483 were reviewed. (PX 21 (Rodriguez Dep. Tr.) at 166:17–167:14, 169:9–170:2, 173:9–174:2.) Cassava did not have the Establishment Inspection Report when it commenced the Defamation Action: FDA declined to share additional information about the inspection with Cassava, and Ms. Rodriguez first saw the report at the end of 2023 or beginning of 2024, when Dr. Wang sent it to her. (PX 172 (CASSAVA_001213617) at 3617–18; PX 21 at 172:19–24.)

310. According to Laura Rodriguez's February 2026 affidavit, in September 2022: "Dr. Wang provided me with a removable flash drive" containing ELISA data "that he stated he kept locked in his desk." (PX 239 (Dkt. 299-4, Aff.) at ¶ 6.)

**Defendants' Response**: Undisputed.

311. On August 25, 2021, Dr. Wang texted Dr. Burns: "I tried to find the original files for the J neurosci, but I can't. These were all in a hard drive that was fried. I don't know what to do now." (PX 121 (CASSAVA_000727933) at 952.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited document. Disputed to the extent Plaintiffs imply that the Journal did not receive the data it requested. Dr. Burns testified that Dr. Wang "responded by sending all the original blot images that were requested to journal editors, none of whom found any evidence of data manipulation." (PX 12 (Burns Dep. Tr.) at 301:1–9.) And Dr. Brodkin testified that

the editor of the Journal of Neuroscience had said the journal "got raw data from Cassava." (PX 10 (Brodkin Dep. Tr.) at 147:19–25, 202:17–20.)

312. Dr. Wang testified that a laptop he was using as his work computer was "fried" around 2013 or 2014; and that in 2021, the FBI seized thumb drives with experimental data. (PX 17 (Wang Dep. Tr.) at 47:09-51:02; 77:24-78:05.)

**Defendants' Response**: Undisputed that Dr. Wang testified that a laptop he used as his work computer was destroyed "[s]omewhere between 2012, 2013, '14 maybe," although he did not "recall exactly when," and that the FBI took "quite a few thumb drives" around 2021. (PX 17 (Wang Dep. Tr.) at 47:9–49:2.) In the same testimony, Dr. Wang stated, "I always have a backup," testified that files from the laptop were backed up on thumb drives, and said he was not sure whether the seized drives held the "entirety" of those backups. (Id. at 48:14–49:7.)

313. Cassava held simufilam out as a "novel agent with a novel mechanism of action for treating Alzheimer's disease." (PX 80 (CASSAVA_000053857) ("We understand that there should be healthy skepticism around a novel agent with a novel mechanism of action for treating Alzheimer's disease").)

**Defendants' Response**: Undisputed.

314. No independent laboratory has ever confirmed or verified the claim that an altered conformation of filamin-A exists in Alzheimer's patients. (PX 173 (CASSAVA_001225354) at 356 (revising "Mechanism of Action"); PX 288 (Brodkin-Heilbut-Milioris Letter to FDA) at 2; PX 200 (CASSAVA_001444640) at 643-644 (recognizing the company had never "validate[d]" its "basic science"; and "seemed to have an unfortunate habit of running one test and accepting it as gospel")

**Defendants' Response**: Disputed. Cassava relied on research by outside researchers reporting similar biological activity, including a 2020 Yale study and a May 2022 Nagoya University study, and on biomarker results from Quanterix. (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 12:6–23, 44:25–45:7, 47:13–49:21; Cassava 56.1 ¶¶ 51–54.) Plaintiffs' citation to their own letter to FDA is not evidence of the fact asserted. Mr. Barry's July 2024 email, which postdates the commencement of the Defamation Action by more than twenty months, describes "one-off tests from 3 labs that provided some validation to our claims." (PX 200 (CASSAVA_001444640) at 4643–44.) PX 173 is a redline of Amendment #3, dated September 18, 2024, to the protocol for Cassava's open-label extension study. (PX 173 (CASSAVA_001225354) at 5354, 5356.) The amendment replaced the protocol's earlier reference list, including three earlier articles by Dr. Wang and Dr. Burns, with a 2023 peer-reviewed article co-authored by Dr. Wang, Dr. Burns, and other researchers, which the revised mechanism-of-action section cites. (*Id.* at 5356, 5367.) The revised section continues to state that simufilam acts "through actions involving filamin A (FLNA)," that it "disrupts the association between Aβ42 and the α7nAChR," and that Cassava "therefore expect[s] simufilam both to improve cognition and to slow AD progression." (*Id.* at 5356.)

315. No independent laboratory has ever confirmed or verified the claim that simufilam binds to filamin-A. (Id.; see also PX 12 (Burns Dep. Tr.) at 82:04-83:24.)

**Defendants' Response**: Disputed. (*See* Defendants' Response to Paragraph 314.) Plaintiffs' citation to their own letter to FDA is not evidence of the fact asserted.

316. No independent laboratory has ever confirmed or verified the claim that simufilam restores altered conformations of filamin-A to its native shape. (Id.)

**Defendants' Response**: Disputed. (*See* Defendants' Response to Paragraph 314.) Plaintiffs' citation to their own letter to FDA is not evidence of the fact asserted.

317. On January 23, 2019, Dr. Burns wrote to Dr. Angelique Bordey: "Most companies are suspicious of academic data that is just from one lab." (PX 79 (CASSAVA_000044890) at 890.)

**Defendants' Response**: Undisputed.

318. On July 18, 2024, Rick Barry sent an email to the Board, stating, in part:

> "Another important decision needed to be made about doing an analysis or plasma biomarkers and CSF left over from our Phase 2 trial. Recall that plasma samples were taken routinely from all patients in the P2 and some patients even had CSF samples taken (yikes!). After the company reported the revised analysis of our P2b biomarkers by Dr. Wang, we never disclosed any biomarker data from the P2 and investors have clearly noticed - it is one of the legs of the short sellers' stool. The reason it wasn't announced is the analysis was never performed. Worse, in our Statistical Analysis Plan submitted to FDA in advance of our P2, we essentially promised the agency to produce that data. Our quandary now is that the samples are 4-5 years old and their stability is questionable. There is some literature that states that samples like these could have stability for 5-15 years, but that is unknown. It is possible that running the analysis now could produce a sub-optimum result and apparently Remi was worried about the optics of such a result. But, again, we told the FDA we would do it and now there is real question about whether any of our biomarker data from Dr. Wang should be believed. . . . "The other critical matter than needed attention was what work our scientific team could do to validate our basic science - specifically, what tests can we run to prove our assertion about the method of action. In the past we have had one-off tests from 3 labs that provided some validation to our claims, but we seemed to have an unfortunate habit of running one test and accepting it as gospel. We are telling investors that we will be scientifically rigorous and the best way to do that is to produce data that validate our claims. The scientific team made a great presentation to me this afternoon of several tests that could be performed by validated outside labs that, if successful, could really enhance our reputation. The crazy part of it is that these tests are not expensive - approximately $300k for the whole package. I told them to get started today and, of course, we will make our findings public. I do not intend to inform investors that we are doing this work. They will be badgering us incessantly if we do. I'd rather surprise them when we know and fully understand our findings."

(PX 200 (CASSAVA_001444640) at 643-644 (emphasis added).)

**Defendants' Response**: Undisputed that PX 200 contains the quoted language. Cassava refers to the email for its complete contents, which describe Mr. Barry's decisions to analyze the retained Phase 2 samples, to notify FDA in advance, to announce the results "whether the results are good or bad," and to commission outside validation tests and "make our findings public." (PX 200 (CASSAVA_001444640) at 4643–44.)

319. Other laboratories have tried and failed to replicate Dr. Wang's reported findings concerning simufilam's purported mechanism of action. (PX 94 (CASSAVA_000328575) (May 9, 2018 email from Dr. Burns: "we were so stumped as to why it failed in the xenograft experiment at TD2, and it seemed tricky to ask for money to repeat xenograft studies with no real hypothesis"); PX 103 (CASSAVA_000438273) (June 12, 2018 email from Remi Barbier to Board: "On the other hand, our blood test for Alzheimer's is puzzling. We recently analyzed about 300 blinded, human plasma samples. The study bombed. Results indicate we detected absolutely nothing correctly. Here's the puzzling part: in the previous two blinded studies we detected nearly 100% of plasma samples correctly. So, we went from 100% accuracy to 0% accuracy."); PX 95 (CASSAVA_000331603) at -604 ("Results from new, highly pedigreed samples (amyloid imaging or CSF biomarkers) obtained from the Australian Imaging Biomarkers and Lifestyle Flagship Study of Ageing (AIBL) and the University of Pennsylvania Memory Center (UPMC) have failed to reproduce the original findings."); PX 178 (CASSAVA_001279825) (July 22, 2024 email from Yale researcher: "I ran the experiment twice and saw absolutely no binding").)

**Defendants' Response**: Disputed. None of the cited documents shows that another laboratory tried and failed to replicate Dr. Wang's reported findings concerning simufilam's mechanism of action. PX 94 is a May 2018 email concerning Cassava's PTI-910 cancer program; it refers to a xenograft experiment "at TD2" and to in vitro anti-proliferative work in cancer cells, notes that the filamin A alteration in cancer cells is "slightly different," and does not address simufilam's mechanism of action in Alzheimer's disease. (PX 94 (CASSAVA_000328575) at 8575–76.) PX 103 and PX 95 concern Cassava's blood-based diagnostic test, not simufilam's mechanism of action, and neither reflects testing by another laboratory. PX 103 states that "[w]e recently analyzed" the

samples and that "we may have used a bum antibody in this last study." (PX 103 (CASSAVA_000438273) at 8273.) PX 95 refers to samples "obtained from" AIBL and the University of Pennsylvania, reports that archived samples continued to "test true," and identifies "definite differences in the reactivity and specificity of the older and new lot" of the antibody used in the assay. (PX 95 (CASSAVA_000331603) at 1604–07.) PX 178 reflects surface plasmon resonance testing that Cassava arranged in July 2024 using drug and synthetic peptide samples prepared and shipped by Cassava and its collaborator; the quoted email reports "no binding for neither of the drugs to any of the peptides," and Cassava's scientist responded that he wished to discuss "a possible issue with the peptide." (PX 178 (CASSAVA_001279825) at 9825–33.)

320. Cassava had attempted to partner on the development of simufilam with multiple other scientists and companies, who expressed skepticism about Cassava's research data and claims about simufilam's mechanism of action. (PX 112 (CASSAVA_000675922) (comments from Servier: "much work on real MOA of drug and its more general pharmacology need to be addressed"); PX 117 (CASSAVA_000702946) at 947 (comments from Eli Lilly: "the Lilly team is not yet comfortable in the mechanism" and "we would prefer a 3rd party such as Covance, Kai Blennow, Les Shaw to run bio samples for future studies or rerun the current samples. This would add greater confidence to the biomarker findings and ensure adequate arm-distance objectivity for outside suitors."); PX 96 (CASSAVA_000343648) (comments from J&J: "to be candid, there is some skepticism about the "reasons to believe" in the molecule"); PX 156 (CASSAVA_000988088) ("last year Pablo's science team had two feet in the camp of 'the-data-is-too-good-to-be-true'"); PX 113 (CASSAVA_000676024) at 024 ("the evidence that

[simufilam] is exerting its effects through binding to filamin A is not compelling . . . I am very skeptical that this is what is happening”)

**Defendants’ Response**: Disputed as characterized. Undisputed that the cited documents contain the quoted language. The cited documents reflect scientific due diligence and commentary concerning simufilam’s mechanism of action; none states that Cassava’s data were fabricated or manipulated, and the paragraph omits language in the same documents. PX 112 is an undated set of questions from Servier, with Cassava’s responses, that begins by describing the program as a “[v]ery interesting concept.” (PX 112 (CASSAVA_000675922) at 5922.) In PX 117, Eli Lilly wrote that “[o]verall the biomarker changes were very encouraging,” recommended a further Phase 2 study as “the best opportunity to derisk the program,” and wished Cassava “the best in finding a partner and advancing this program.” (PX 117 (CASSAVA_000702946) at 2946–47.) PX 96 is a February 2017 email in which a Johnson & Johnson representative listed, “[a]s a primer to our discussion,” questions about the scientific rationale for the program and invited Cassava’s “thoughts.” (PX 96 (CASSAVA_000343648) at 3648–49.) PX 156 is Mr. Barbier’s October 2020 report to a director that a meeting with Royalty Pharma “went well” and that its science team’s skepticism had diminished: “This year it’s only one foot.” (PX 156 (CASSAVA_000988088) at 8088.) PX 113 is a December 2014 email from a Yale professor to a Yale colleague, Dr. Bordey, not a communication from a prospective development partner; the quoted passage omits his statement that “it remains possible that this is what is happening,” and he added that “it is intriguing that it produces effects in your model which you know to be filamin sensitive.” (PX 113 (CASSAVA_000676024) at 6024–25.)

321. Cassava avoided conducting experiments that risked "undermining" the company's scientific claims. (PX 99 (CASSAVA_000382849) (July 12, 2020 email from Dr. Burns): "[Dr. Steve Arnold] says that others would like additional data from somewhere else. Hoau thinks we'll get confusing data and Remi tends to agree, but I'd like to pick something that wouldn't undermine our CSF data either way.")

**Defendants' Response**: Disputed. The cited email does not show that Cassava avoided any experiment. In it, Dr. Burns proposed obtaining additional data from an outside source, identifying outside laboratories including Olink and Quanterix, and suggesting Quanterix "for something we can track in plasma." (PX 99 (CASSAVA_000382849) at 2849.) Cassava thereafter obtained plasma p-tau181 data from the Phase 2b study measured by Quanterix Corporation, which Cassava described as "an independent commercial laboratory." (PX 171 (CASSAVA_001211317) at 1326, 1359.) In November 2022, Cassava also proposed to FDA that retained Phase 2b samples be analyzed "by a different laboratory to provide independent confirmation of the CUNY data." (PX 172 (CASSAVA_001213617) at 3619–20.)

322. Dr. Burns was aware of inconsistencies in Dr. Wang's biomarker data, including large differences in baseline values between studies. (PX 120 (CASSAVA_000727886) ("For total tau, the baseline values for Phase 2b for were 104 - 106 pg/mL, but for the OLE, they were 163 for those 25.") RED FLAGS ABOUT PHASE 2a "RESULTS"

**Defendants' Response**: Undisputed insofar as PX 120 contains the quoted language attributed to it, but Defendants respectfully refer the Court to PX 120 for its full contents and context. Rather than reflecting that Dr. Burns was aware of inconsistencies in the final Phase 2b biomarker data, PX 120 reflects that Dr. Burns inquired whether different

vendors or assays were used with respect to the Phase 2b and "latest 25 at 6 months" analyses, and whether that could account for certain changes in baseline data.

323. On May 21, 2019, Dr. Burns identified "strange" discrepancies in the Phase 2a biomarker data reported by Dr. Wang. (PX 81 (CASSAVA_000053951) at 952) ("I noticed that the total tau/Abeta ratios in the recent data are not the same as in the initial biomarker runs."; "But it is so strange that you get one value the first run and another for the same sample the second run.")

**Defendants' Response**: Undisputed insofar as PX 81 contains the quoted language attributed to it, but Defendants respectfully refer the Court to PX 81 for its full contents and context, including that Dr. Burns asked Dr. Wang for his input on why "recent data" were not the "same as in the initial biomarker runs," and Dr. Wang responded that he would look into the "good questions" raised by Dr. Burns.

324. On May 24, 2019, Remi Barbier wrote to the Board about the phase 2a study results from Dr. Wang: "One of the key themes we're hearing is that 'no one will believe us.' Quite possibly true, but the data stands on its own." (PX 72 (CASSAVA_000004863) at 863.)

**Defendants' Response**: Undisputed insofar as PX 72 contains the quoted language attributed to it, but Defendants respectfully refer the Court to PX 72 for its full contents and context, including that Mr. Barbier also conveyed that the Phase 2a study "showed robust improvements in a standard battery of AD biomarkers" and a "robust drug effect across all patients," "mak[ing] the data twice as exciting."

325. On June 13, 2019, Dr. Burns wrote that the Phase 2a biomarker results were "so striking" that Cassava would "be replicating them in a second lab." (PX 197 (CASSAVA_001443943) at 943.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited document.

326. On July 3, 2019, Dr. Burns wrote that Dr. Wang's "wildly significant p values for such a small study" was "raising eyebrows." (PX 82 (CASSAVA_000055933) at 935.)

**Defendants' Response**: Undisputed insofar as PX 82 contains the quoted language attributed to it, but Defendants respectfully refer the Court to PX 82 for its full contents and context, including that Dr. Burns stated she was contacting Professor Barbara Sahakian to discuss obtaining third-party validation of Dr. Wang's analysis.

327. On July 5, 2019, Dr. Burns wrote about Dr. Paul Aisen's reaction to the phase 2a data: "he flat-out did not believe the p values were possible with 12 patients. We were all at first incredulous." (PX 82 (CASSAVA_000055933) at 933.)

**Defendants' Response**: Undisputed insofar as PX 82 contains the quoted language attributed to it, but Defendants respectfully refer the Court to PX 82 for its full contents and context, including that Dr. Burns was contacting Professor Barbara Sahakian to discuss obtaining third-party validation of Dr. Wang's analysis.

328. In July 2019, Dr. Barbara Sahakian told Dr. Burns that they needed to have an independent scientist validate Dr. Wang's reported findings from the phase 2a study. (PX 82 (CASSAVA_000055933) at 933 ("I do think having someone independent from Dr Wang run the same analyses is so important [...] And as you and your Board point out, the other scientist who runs the analyses should not be based in your Company."); id. at 934 ("there were some questions raised by Jeff [Cummings] and others about the methodology"; "it would be useful to get an independent verification of the data obtained by Hoau-Yan.")

**Defendants' Response**: Undisputed insofar as PX 82 contains the quoted language attributed to it, but Defendants respectfully refer the Court to PX 82 for its full contents and context.

329. On August 1, 2019, Dr. Burns described the data from the phase 2a study as "frankly unbelievable." (PX 84 (CASSAVA_000059830) at 834.)

**Defendants' Response**: Undisputed insofar as PX 84 contains the quoted language attributed to it, but Defendants respectfully refer the Court to PX 84 for its full contents and context, including that the statement was made by Dr. Burns in an email to Chuck Davis, a third-party statistician, seeking his analysis of Dr. Wang's data.

330. Dr. Burns testified that the Board ultimately decided not to have an independent lab validate Dr. Wang's phase 2a results. (PX 13 (BURNS_00000503) at 517:16-21 (Q. "You note, 'We will be replicating them in a second lab with our backup CSF samples.' Did that occur?" A. "It did not." Q. "Okay, and [] why not?" A. "The board decided not to.")

**Defendants' Response**: Undisputed insofar as PX 13 contains the quoted language attributed to it, but Defendants respectfully refer the Court to PX 13 for its full contents and context, including that Dr. Burns also testified that the Board decided to use a "second lab to do the next study rather than repeating these same samples, which were already depleted." (PX 13 (BURNS_00000503) at 518:1–4.)

331. Dr. Burns and Dr. Wang submitted an article on the Phase 2a study to the Journal for the Prevention of Alzheimer's Research on October 31, 2019; and it was accepted for publication six days later on November 6, 2019. (PX 218 (Aisen_0001761) at 761; PX 4 (Aisen Dep. Tr.) at 67:17-68:09.)

**Defendants' Response**: Undisputed.

332. Dr. Paul Aisen was the editor-in-chief of JPAD and a former paid consultant for Cassava. (PX 4 (Aisen Dep. Tr.) at 13:19-14:03, 70:05-12.)

**Defendants' Response**: Undisputed that Dr. Aisen testified that he is "an editor in chief" of JPAD, and that he believed he "was a paid consultant briefly for Pain," Cassava's predecessor, "years ago," although he did not "really remember the details." (PX 4 (Aisen Dep. Tr.) at 12:18–22, 13:19–23.) Dr. Aisen further testified that he believed his later interactions with Dr. Burns were "informal" and unpaid." (Id. at 13:23–14:3.)

333. On September 27, 2021, Matthew Schrag, a professor of neurology at Vanderbilt university submitted a research integrity concern about the phase 2a simufilam paper. (PX 215 (Aisen_0000661) at 661.)

**Defendants' Response**: Undisputed that on September 27, 2021, Dr. Schrag emailed JPAD's editors identifying "a prominent rectangular change in the background surrounding a band in one of the western blots" in the Phase 2a paper, and stating that he had "no investments related to any securities associated with this material." (PX 215 (Aisen_0000661) at 661; PX 4 (Aisen Dep. Tr.) at 72:10–73:2.) Dr. Aisen, who forwarded the email to a colleague the next day, testified that when he looked at the published figure he "did not see any reason for concern," and he asked whether the issue was "simply an artifact of over-enlarging a digital image." (PX 4 at 70:24–71:3, 74:4–17.) Dr. Aisen also testified that he now believes Dr. Schrag "was being disingenuous in saying he had no financial interest since I believe he is being paid by a group of short sellers." (Id. at 75:12–15.)

334. Dr. Burns responded to the investigation by writing a letter stating: "The professional Wall St investors who made these allegations are 100% motivated by financial profit.

No journal can be expected to adjudicate allegations that are strictly motivated by a financial profit." (PX 214 (Aisen_0000653) at 655.)

**Defendants' Response**: Undisputed.

335. Dr. Aisen led JPAD's investigation of the research integrity concerns about the phase 2a simufilam paper. (PX 4 (Aisen Dep. Tr.) at 13:19-14:03, 70:05-12.)

**Defendants' Response**: Undisputed. (PX 4 (Aisen Dep. Tr.) at 70:5–12.) After an inquiry of approximately ten or eleven months that Dr. Aisen described as thorough, JPAD's editors concluded that they had not found convincing evidence of data manipulation or intent to mislead and would take no action. (Cassava Exhibit 34 (CASSAVA_000739110); PX 4 (Aisen Dep. Tr.) at 156:1–3, 157:13–24, 158:21–159:5, 194:7–195:15; Cassava 56.1 ¶ 58.)

336. In response to the research integrity concerns about the phase 2a study, Dr. Burns submitted a letter to JPAD from Dr. Charles Spruck, describing him as an "independent" and "unaffiliated" expert; Dr. Burns did not disclose to Dr. Aisen or JPAD that Dr. Spruck was a Cassava investor. (PX 104 (CASSAVA_000461586) (Dr. Burns email: "An immunoblot expert offered to provide his perspective on this matter. Attached please find his letter. He is independent, unaffiliated with, and not compensated by us or anyone we know for this analysis."); PX 4 (Aisen Dep. Tr.) at 98:02-12; PX 12 (Burns Dep. Tr.) at 296:05-298:01; PX 176 (CASSAVA_001257502) at 507 (Cassava letter to Ernst & Young acknowledging Spruck was an "investor in Cassava").

**Defendants' Response**: Undisputed insofar as Dr. Burns submitted to *JPAD* a letter from Dr. Spruck, but Defendants respectfully refer the Court to the full transcript of Dr. Burns's deposition, in which she testified that Dr. Spruck "was not involved with the work" and that his status as a Cassava shareholder "really had no bearing on his explanation

of common western blot visual anomalies from an expert like him who does a thousand blots a year." (PX 12 (Burns Dep. Tr.) at 297:6–14.)

337. Dr. Burns described communications with Dr. Spruck by email and phone in her diary beginning in October 2021. (PX 25 (BURNS_00000650) at 662, 696, 699, 712, 713, 725, 726, 728, 743, 744, 758-59.)

**Defendants' Response**: Undisputed.

338. In reaching JPAD's conclusion of its research integrity investigation, Dr. Aisen relied on an analysis by Dr. Charles Spruck; his understanding from Dr. Burns that Dr. Spruck was "totally independent of the authors and Cassava"; and his understanding from Dr. Burns that the research integrity concerns were "financially motivated." (PX 216 (Aisen_0000748) at 748; PX 4 (Aisen Dep. Tr.) at 102:10-21; 103:23-104:22 (two of the three sources JPAD consulted determined there was "evidence to suggest the possibility of cutting and splicing" and the other source was Dr. Spruck), 151:20-152:24 (there was "conflicting evidence on the issue of splicing gels"). RED FLAGS ABOUT PHASE 2b "RESULTS"

**Defendants' Response**: Disputed. Dr. Aisen testified that JPAD's decision not to take editorial action "was based on our conclusion that there was not convincing evidence of manipulation of data," and he rejected the suggestion that the critics' financial motives were a factor in that decision. (PX 4 (Aisen Dep. Tr.) at 155:23–156:3, 156:17–24, 157:13–18.) Dr. Aisen testified that he based his statement that Dr. Spruck's involvement was "totally independent of the authors and Cassava" on what Dr. Spruck told him by telephone. (Id. at 143:11–23; PX 216 (Aisen_0000748) at 748.) Dr. Aisen further testified that Dr. Rissman's concern was that "there was no proof of the integrity of the data," which is "not the same as saying there is convincing evidence of data manipulation," and that the

software analysis identified "potentially artifactual issues with the figures" and did not conclude that the paper should be retracted. (PX 4 (Aisen Dep. Tr.) at 159:14–24.) He testified that JPAD "did not have any evidence of an intent to mislead," that he "did not find convincing evidence that the data was manipulated," and that the editors "were aware of what we considered to be a reasonable explanation for the appearance of the figures." (Id. at 152:4–10, 160:2–12.)

339. Cassava described the phase 2b study as a double-blinded clinical trial, meaning neither the patient nor the tester is aware which patient received which treatment. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63 (describing "Phase 2b Study" as "randomized, double-blind, placebo-controlled"); PX 111 (CASSAVA_000669999) at 015 (Board presentation: "Our academic collaborator at CUNY will conduct this bioanalysis under blinded conditions.").)

**Defendants' Response**: Undisputed that Cassava described the Phase 2b study as "randomized, double-blind, placebo-controlled," and that June 2020 Board materials stated that "[o]ur academic collaborator at CUNY will conduct this bioanalysis under blinded conditions." (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63; PX 111 (CASSAVA_000669999) at 670012, 670015.)

340. The Phase 2b Clinical Research Protocol, dated June 28, 2019, designated Dr. Wang at CUNY—not Lund University—to analyze the biomarker samples: "The samples collected at screening and on Study Day 28 will be shipped . . . to Dr. Hoau-Yan Wang, CUNY School of Medicine . . . to be tested in biomarker assays." (PX 85 (CASSAVA_000060946) at 0968.)

**Defendants' Response**: Undisputed that the June 28, 2019 Phase 2b protocol provided for CSF samples collected at screening and on Study Day 28 to be shipped to Dr. Wang at CUNY "to be tested in biomarker assays." (PX 85 (CASSAVA_000060946) at 0968.)

341. In May 2020, Dr. Oskar Hansson's laboratory at Lund University in Sweden delivered its analysis of biomarker measurements from participants in the phase 2b study. (PX 146 (CASSAVA_000922566); PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

**Defendants' Response**: Undisputed.

342. None of the tests performed by Lund University showed an effect of the drug treatment groups compared with the placebo group. (PX 260 (Cassava Sciences, Inc., Form 10- K (Mar. 3, 2025)) at 63.)

**Defendants' Response**: Undisputed.

343. The data from Lund University did not show a drug effect consistent with Dr. Wang's Phase 2a results. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

**Defendants' Response**: Undisputed.

344. Dr. Aisen told Dr. Burns that "Oskar Hansson's team is excellent, and they utilize all leading assay platforms" and that "change in placebo over 28 days is artifactual. Unfortunately, 20 subjects per arm may be too small for reliable results." (PX 98 (CASSAVA_000375558).) Dr. Aisen further stated: "There is no measurable disease progression over 28 days." (Id.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited document, but Defendants respectfully refer the Court to the document for its full contents and context, including that Dr. Burns asked: "[A]re the extreme changes we are seeing in placebo over 28 days possible?" and Dr. Aisen's response: "[A]ny change in the

placebo arm must be attributed to issues around acquisition and processing of specimens and assay variability." (PX 98 (CASSAVA_000375558) at 5558–59.)

345. Dr. Jeffrey Cummings testified that variability in one of the biomarkers from the placebo group "might suggest there is an unusually large number of non-Alzheimer's patients." (PX 15 (CASSAVA_001442693) at 2730-2733.)

**Defendants' Response**: Cassava objects to PX 15, a transcript of Dr. Cummings's testimony in an SEC investigative proceeding in which Cassava did not participate, to prove the truth of the quoted statement. Fed. R. Evid. 802, 804(b)(1). Subject to that objection, undisputed that Dr. Cummings testified, in discussing variability in the Lund University data set, that "this variability in the placebo group might suggest there's an unusually large number of non-Alzheimer's patients." (PX 15 (CASSAVA_001442693) at 77:13–78:1.) The statement is expressly tentative, and Dr. Cummings testified that he "would want to know more about what's creating the variability." (Id. at 86:8–11.)

346. On May 14, 2020, Dr. Burns sent Dr. Wang a document with "min, max, and change from baseline data" and asked Dr. Wang to evaluate Lund's data. (PX 146 (CASSAVA_000922566); PX 260 (Cassava Sciences, Inc., Form 10-K, dated March 3, 2025) at p. 63;)

**Defendants' Response**: Disputed as characterized. The quoted language appears in the cited document, but Defendants respectfully refer the Court to the document for its full contents, which make clear that the document does not show that Dr. Burns "asked Dr. Wang to evaluate Lund's data."

347. The information Dr. Burns provided to Dr. Wang on May 14, 2020, contained information sufficient for Dr. Wang to unblind himself to roughly a third of the patients in the

Phase 2b study: eight patients in the placebo group; seven patients in the 50 mg simufilam group; and eight patients in the 100 mg simufilam group. (PX 146 (CASSAVA_000922566); PX 260 (Cassava Sciences, Inc., Form 10-K, dated March 3, 2025) at p. 63)

> **Defendants' Response**: Undisputed insofar as PX 260 stated that "certain statistical information contained in an attachment to an email sent . . . to Dr. Wang . . . could have been used to unblind him as to some number of Phase 2b Study participants," but Defendants respectfully refer the Court to the document for its full contents, including that it stated an investigation committee "did not determine . . . whether Dr. Wang unblinded himself." (PX 260 at 63.) Moreover, Dr. Burns testified that the attachment "was not unblinding him" because "[h]e had another step of work to do to partially unblind himself," and that she believes Dr. Wang conducted the analysis blind; Dr. Wang testified that, although he "could have" used the information, he "did not use it to do anything." (PX 12 (Burns Dep. Tr.) at 223:13–17, 227:1–4; PX 17 (Wang Dep. Tr.) at 232:11–233:5.)

348. Dr. Burns knew from prior experience that sending Dr. Wang information with "min and max" values for each group would be sufficient to allow Dr. Wang to unblind himself. (PX 83 (CASSAVA_000059303) ("I can't send you the sheet because it shows min and max for each group.").)

> **Defendants' Response**: Disputed, PX 83, an email dated July 13, 2020, postdates the May 14, 2020 email attachment referred to in paragraph 348, and does not state that "min and max" values would be sufficient to allow Dr. Wang to unblind himself.

349. Dr. Burns deleted all of the emails in her "sent" folder from before early June of 2020—one month after sending Dr. Wang the unblinding information. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 285:6-14; PX 12 (Burns Dep. Tr.) at 304:18-306:19.)

**Defendants' Response**: Disputed, the cited transcripts do not support the contention. Dr. Burns testified she "did delete [her] sent file" generally "following company policy of deleting trash and sent [emails]" that were "older than 30 days." (PX 12 (Burns Dep. Tr.) at 304:11–17.) Cassava's 30(b)(6) witness testified that he "[did not] know" whether "Dr. Burns had deleted all of her sent email from before early June of 2020." (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 285:6–11.)

350. On or before June 12, 2020, Cassava's Board of Directors was aware that Dr. Wang's lab at CUNY was conducting a "reanalysis" of the phase 2b data analyzed by Lund University. (PX 111 (CASSAVA_000669999) at 015 ("Our academic collaborator at CUNY will conduct this bioanalysis under blinded conditions.")

**Defendants' Response**: Undisputed that the June 12, 2020 Board materials described a plan to re-analyze retained CSF samples using "sandwich ELISA, the same technique used to analyze biomarkers in our Phase 2a study," and stated that "[o]ur academic collaborator at CUNY will conduct this bioanalysis under blinded conditions, provided, however, that our remaining stock of CSF samples are not degraded." (PX 111 (CASSAVA_000669999) at 670015.) Disputed to the extent the paragraph asserts that CUNY was then conducting a reanalysis of Lund's data; the materials describe a planned analysis of "backup clinical samples." (Id.) At its May 15, 2020 meeting, the Board had authorized management "to analyze the remaining CSF biomarkers from study participants, if such analysis is technically and logistically possible." (Id. at 670011.)

351. On September 14, 2020, Cassava publicized Dr. Wang's results which showed statistically significant improvement in all biomarkers in the treatment groups as compared with the placebo group. (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)).)

**Defendants' Response**: Undisputed that on September 14, 2020, Cassava announced the final results of the Phase 2b study, generated by Dr. Wang's laboratory at CUNY, reporting that patients in the drug groups showed statistically significant improvements in biomarkers of disease compared to the placebo group and that simufilam "improved an entire panel of validated biomarkers of Alzheimer's disease." (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)), Ex. 99.2 at 1, 4; PX 260 at 63.) The same release disclosed that "an initial bioanalysis by a different lab showed highly anomalous data" and that, "[w]ith its validity in question, the initial bioanalysis serves no useful purpose." (PX 262, Ex. 99.2 at 4.)

352. Cassava's September 14, 2020 press release stated: "Bioanalyses were conducted under blinded conditions to eliminate any possibility of bias. An academic lab generated final results." (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)); PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63 (disclosing that "certain statistical information . . . could have been used to unblind him as to some number of Phase 2b Study participants").)

**Defendants' Response**: Undisputed that Cassava's September 14, 2020 press release contains the quoted statements, and that Cassava's March 3, 2025 Form 10-K disclosed the Internal Investigation's determination that certain statistical information sent to Dr. Wang "could have been used to unblind him as to some number of Phase 2b Study participants." (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)), Ex. 99.2 at 4; PX 260 at 63.) The same Form 10-K states that the Internal Investigation "did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants." (PX 260 at 63.)

353. For every biomarker tested by Dr. Wang, nearly all patients showed improvements in biomarkers, except the patients on placebo for whom Dr. Wang had received unblinding information. (PX 199 (CASSAVA_001444134).)

**Defendants' Response**: Disputed. Cassava objects to the paragraph as an unsupported characterization of the document. PX 199 is a printout of a spreadsheet listing sample numbers and assay plate layouts; it contains no biomarker measurements and does not show that any patient "showed improvements in biomarkers." (PX 199 (CASSAVA_001444134).) Cassava's March 3, 2025 Form 10-K states that certain statistical information sent to Dr. Wang "could have been used to unblind him as to some number of Phase 2b Study participants," and that the Internal Investigation "did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants." (PX 260 at 63.)

354. The Phase 2b trial included cognition testing in addition to biomarker analysis. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

**Defendants' Response**: Undisputed.

355. Cassava's Statistical Analysis Plan ("SAP") and Trial Protocol stated that the company would report statistics for all subjects tested as part of its cognitive testing. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

**Defendants' Response**: Disputed. The cited Form 10-K does not state that the Phase 2b statistical analysis plan or protocol provided that Cassava would report statistics for all subjects. The cited page reports only that the SEC's complaint "alleged, among other things, that disclosures relating to the Phase 2b Study's cognition results . . . , which

reported results from a post hoc sensitivity analysis, were inadequate and misleading." (PX 260 at 63.) The SEC's allegations are not evidence of the facts alleged, and Cassava objects to their use to prove the truth of the matters asserted. The allegations were resolved by a settlement in which Cassava neither admitted nor denied them. Fed. R. Evid. 408; *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

356. Dr. Burns received cognitive data in May 2020 that showed no improvement in episodic memory in the simufilam treatment arms compared with the placebo group. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

**Defendants' Response**: Disputed, insofar as PX 260 does not make any reference to any cognitive data Dr. Burns received in May 2020, or what it showed. Defendants respectfully refer the Court to Cassava's September 14, 2020 disclosures for their full contents and context, including Cassava's disclosure that results for the cognitive analyses were calculated after exclusion of "[p]atients who did not take drug (no blood levels)" and, for one of the two tests, "[e]ffect sizes vs. placebo were calculated . . . after removing the most and least impaired subjects." (Individual Defendants' Exhibit 25 at 37–38.)

357. After receiving these results, Dr. Burns, who was unblinded, removed patients with missing data and patients who did not take the drug and then engaged in what Dr. Burns described as a "sensitivity analysis" whereby Dr. Burns removed the highest performing patients and lowest performing patients by baseline score cutoffs until the results appeared to show separation between the placebo group and the simufilam treatment groups. (PX 196 (CASSAVA_001443564); PX 78 (CASSAVA_000041919) (Dr. Burns description of exclusion criteria over email); PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63)

**Defendants' Response**: Undisputed insofar as Dr. Burns undertook a sensitivity analysis, but the cited documents do not reflect that "Dr. Burns removed the highest performing patients and lowest performing patients by baseline score cutoffs until the results appeared to show separation between the placebo group and the simufilam treatment groups." The exclusion criteria resulted in the removal of: "the most and least impaired subjects" based on baseline score, "treatment arm study participants who did not appear to have taken simufilam," "patients who were ≥25% noncompliant with the study's treatment regimen," "patients with no baseline test," and "patients who, according to study investigators, did not understand the test instructions." (Individual Defendants' Exhibit 106 at 3; PX 78 (CASSAVA_000041919).)

358. Dr. Burns ultimately removed 40% of the patient population from the "results" that the company presented publicly. (PX 196 (CASSAVA_001443564); PX 78 (CASSAVA_000041919) (Dr. Burns description of exclusion criteria over email); PX 260 (Cassava 10-K, Mar. 3, 2025) at 63.)

**Defendants' Response**: Undisputed insofar as approximately 40% of the 64 Phase 2b study participants were excluded from the cognitive analyses results reported by Cassava, but Defendants respectfully refer the Court to Cassava's September 14, 2020 disclosures for their full contents and context, including Cassava's disclosure that, for the cognitive analyses, "[p]atients who did not take drug (no blood levels) were removed" and, for one of the two tests, "[e]ffect sizes vs. placebo were calculated . . . after removing the most and least impaired subjects." (Individual Defendants' Exhibit 25 at 37–38.)

359. When Cassava presented the "cognitive data," the company claimed "Alzheimer's patients treated with [simufilam] showed directional improvements in validated tests of episodic

memory and spatial working memory, versus patients on placebo (Effect Sizes 46-17%).” (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)).)

**Defendants’ Response**: Undisputed that Cassava’s September 14, 2020 press release contains the quoted statement. (PX 262 (Cassava Sciences, Inc., Form 8-K (Sept. 14, 2020)), Ex. 99.2 at 2.) The investor presentation that Cassava filed with the same Form 8-K disclosed how the cognition effect sizes were calculated, stating that they were calculated “after removing the most and least impaired subjects across all groups by baseline score” for one test and that “[p]atients who did not take drug (no blood levels) were removed” for the other. (PX 262, Ex. 99.1 at slides 28–29.)

360. Cassava did not disclose that Dr. Burns had excluded 40% of the patient population from the presented results. (PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

**Defendants’ Response**: Disputed as to the cited evidence and as characterized. The cited page of Cassava’s Form 10-K does not state that Dr. Burns excluded 40% of the patient population or that Cassava failed to disclose any exclusion; it reports the SEC’s allegation that the Phase 2b cognition disclosures, “which reported results from a post hoc sensitivity analysis, were inadequate and misleading.” (PX 260 at 63.) The September 14, 2020 investor presentation that Cassava filed with the SEC disclosed that the cognition effect sizes were calculated “after removing the most and least impaired subjects across all groups by baseline score” and that “[p]atients who did not take drug (no blood levels) were removed.” (PX 262, Ex. 99.1 at slides 28–29.) Cassava settled the SEC’s claims, which alleged negligence-based disclosure violations, without admitting or denying the allegations, and it objects to the use of those allegations or of the settlement to prove the

truth of the allegations. (PX 260 at 31.) Fed. R. Evid. 408; *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

361. After reviewing Dr. Wang's biomarker data from the phase 2b study, Dr. Steven Arnold wrote to Dr. Burns: "[Dr. Wang's] data are always surprising"; and "I don't know how he does it." (PX 75 (CASSAVA_000018239) at 239.)

**Defendants' Response**: Undisputed that PX 75 contains the quoted statements by Dr. Arnold.

362. Dr. Steven Arnold expressed "discomfort" about Dr. Wang's "magic hands" to Dr. Burns, and that "others would like additional data from somewhere else." (PX 99 (CASSAVA_000382849) at 849.)

**Defendants' Response**: Disputed as characterized. The cited document contains the quoted language, but Defendants respectfully refer the Court to the document for its full contents and context, including that Dr. Arnold did not use the phrase "magic hands."

363. In reaction to requests from Dr. Steven Arnold and others for third-party confirmation of Dr. Wang's phase 2b data, Dr. Burns wrote: "Hoau thinks we'll get confusing data and Remi tends to agree, but I'd like to pick something that wouldn't undermine our CSF data either way." (PX 99 (CASSAVA_000382849) at 849.)

**Defendants' Response**: Undisputed insofar as the quoted sentence appears in the cited document, but Defendants respectfully refer the Court to the document for its full contents and context, which reflects that Dr. Burns proposed obtaining additional data from outside laboratories, identifying Inoviv, Olink, and Quanterix. (PX 99 (CASSAVA_000382849) at 2849.)

364. Dr. Steven Arnold wrote to Dr. Burns: “the challenge will be to convince reviewers/investors that the ‘too good to be true’ biological and clinical results in 98% of subjects in a 28 day study are real enough to fund a big 2b for replication and longer duration.” (PX 76 (CASSAVA_000025770) at 770.)

**Defendants’ Response**: Undisputed insofar as the quoted language appears in the cited document, but Defendants respectfully refer the Court to the document for its full contents and context, including that Dr. Arnold also stated “the data are the data” and presented an “absolutely exciting story,” and that Dr. Arnold would “love to hear plans for the next study and help if I can.”

365. Multiple scientific journals rejected Dr. Burns’s submission of the phase 2b study manuscript for publication, with scientific reviewers conveying disbelief in the data. (PX 80 (CASSAVA_000053857) at 857 (“It is hard to believe that these changes in such a short period of time are due to disease modification.”); PX 87 (CASSAVA_000090277) at 277 (rejecting publication due to “poor clinical trial reporting i.e. the incomplete reporting, the disconnect between the pre-specified outcomes and the outcomes reported []; the undisclosed conflict in that the external validation experiments were performed in the lab of a co-inventor”); PX 74 (CASSAVA_000011956) at 958 (rejecting publication because “statistical analysis plan was not followed, the analysis of memory outcomes and reaction times used only standardized effect sizes and is not satisfactory or appropriate” and “[c]ognitive outcomes are misrepresented”); PX 86 (CASSAVA_000086301) (reviewer describing claimed biomarker result as “a result I have never seen in any setting in 30 years of running clinical trials and evaluating clinical trial data” and one “[t]hat seems biologically unlikely”).

**Defendants' Response**: Undisputed insofar as certain scientific journals did not accept Cassava's Phase 2b manuscript for publication and stated their reasons for not doing so.

366. Dr. Burns summarized the comments of reviewers who had rejected her manuscript from the phase 2b study as conveying the message: "the positive data are hard to believe or too good to be true." (PX 89 (CASSAVA_000142174) at 174.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited document, but Defendants respectfully refer the Court to the document for its full contents and context, including that Dr. Burns stated that "[w]e believe the results suggest we have a ground-breaking treatment."

367. In its 2024 annual report, Cassava disclosed to investors that they should not rely on the phase 2b data:

> "The Internal Investigation determined that certain statistical information contained in an attachment to an email sent by a former senior employee of Cassava to Dr. Wang before the CUNY Bioanalysis of CSF biomarkers was conducted could have been used to unblind him as to some number of Phase 2b Study participants. Unblinded information, if accessed in connection with bioanalysis, could be improperly utilized to manipulate underlying samples or data to skew reported results. The Internal Investigation did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself as to some number of Phase 2b Study participants. Nevertheless, the fact that Dr. Wang possessed information that could have been used to so unblind himself, together with the allegations in the DOJ indictment, undermine the blinded study design and create substantial uncertainty about the validity of the CUNY Bioanalysis of CSF biomarkers. In addition, another objective of the Phase 2b Study was to measure changes in cognitive outcome measures using the Cambridge Neuropsychological Test Automated Battery, or CANTAB, over the 28-day study period. In connection with our settlement with the SEC, the SEC's complaint alleged, among other things, that disclosures relating to the Phase 2b Study's cognition results (the Cognition Disclosures), which reported results from a post hoc sensitivity analysis, were inadequate and misleading. Accordingly, in light of the foregoing uncertainties and allegations, you should not rely on the CUNY Bioanalysis of CSF biomarkers reported by the Company in connection with the Phase 2b Study or the Cognition Disclosures from the Phase 2b Study."

(PX 260 (Cassava Sciences, Inc., Form 10-K (Mar. 3, 2025)) at 63.)

**Defendants' Response**: Undisputed that Cassava's March 3, 2025 Form 10-K contains the quoted disclosure, which is limited to "the CUNY Bioanalysis of CSF biomarkers" and "the Cognition Disclosures" from the Phase 2b study. (PX 260 at 63.) The disclosure postdates the dismissal of the Defamation Action by more than seven months, and it states that the Internal Investigation "did not determine, and may never be able to determine with any reasonable degree of certainty, whether Dr. Wang unblinded himself." (Id.) Cassava settled the SEC's claims, which alleged negligence-based disclosure violations, without admitting or denying the allegations, and it objects to the use of those

allegations or of the settlement to prove the truth of the allegations. (Id. at 31.) Fed. R. Evid. 408; *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

368. On October 27, 2020, the FDA rejected Cassava's request for "Breakthrough Therapy" designation, in a letter describing the company's characterizations of its phase 2a and 2b studies as "untenable" and its inference that the drug would treat Alzheimer's as "highly speculative." (PX 88 (CASSAVA_000100022) at 022-023.)

**Defendants' Response**: Undisputed that on October 27, 2020, FDA denied Cassava's request for Breakthrough Therapy designation, stating that "the preliminary clinical evidence you have submitted does not indicate that the drug may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints." (PX 88 (CASSAVA_000100022) at 0022.) Disputed as to the characterization of the letter. FDA described as "untenable" the "assertions that you made in support of this Breakthrough Therapy designation request," and the first reason it gave was that the clinical data "do not include any direct comparisons of the effects of PTI-125 with those of drugs that are currently approved." (Id. at 0023.) FDA described as "highly speculative" the inference that the biomarker effects indicate "a 'disease-modifying' effect," not an inference that the drug would treat Alzheimer's disease. (Id.) The letter invited Cassava to "submit a new request if you obtain new clinical evidence." (Id. at 0024.) FDA later agreed, through Special Protocol Assessments issued in August 2021, that the Phase 3 protocols would support regulatory submissions, and it permitted the Phase 3 trials to proceed. (Cassava 56.1 ¶¶ 3, 11, 13.)

369. On August 30, 2021, Hans Wigzell wrote to Rick Barry that the simufilam research data appeared to be "faked" or "falsified" (PX 201 (CASSAVA_001444730)).

**Defendants' Response**: Undisputed that PX 201 contains an August 30, 2021 email from Dr. Wigzell to Mr. Barry using the quoted words. Cassava objects to the use of the email to prove the truth of its contents. Fed. R. Evid. 802. Mr. Barry testified that he "took it seriously"; that he regarded it as "one viewpoint" from someone he respected and therefore sought other views ("I need to get others. So I got others."); and that he would have resigned had he concluded "that this company was really a fraud," but that he "wasn't satisfied" that Dr. Wigzell was right. (PX 8 (Barry Dep. Tr.) at 208:18–210:21, 212:2–7.)

370. On April 19, 2022, the New York Times published an article titled "Scientists Question Data Behind an Alzheimer's Drug," reporting that "The Times contacted nine prominent experts for comment about the scientific underpinnings of Cassava's trials" and "[a]ll said they did not trust the company's methods, results or even the premise underlying the drug's supposed effectiveness." (PX 293.)

**Defendants' Response**: Undisputed that The New York Times published the article, which Cassava refers to for its contents, and that the article contains the quoted language; the article was published on April 18, 2022, under the title "Scientists Question Data Behind an Experimental Alzheimer's Drug." (PX 154 (CASSAVA_000986192) at 6192–93; PX 205 (CASSAVA_001494801) at 4802.) Cassava objects to the use of the article to prove the truth of its contents. Fed. R. Evid. 802. On May 5, 2022, Cassava's counsel asked The Times to correct statements Cassava regarded as inaccurate and to disclose its sources' conflicts of interest, noting that seven of the nine experts quoted had previously criticized Cassava publicly. (PX 154 at 6192–93, 6202.)

371. On June 22, 2022, Cassava obtained through a FOIA request emails exchanged between the New York Times and neurologist Dr. Roger Nicoll, in which Dr. Nicoll told the New

York Times that Cassava was "more egregious than Theranos." (PX 205 (CASSAVA_001494801) at 801, 804.)

**Defendants' Response**: Undisputed that PX 205 contains an April 9, 2022 email in which Dr. Nicoll, a non-party, wrote to a New York Times reporter that "[f]or me this saga is more egregious than Theranos," and that Cassava had obtained the email by June 17, 2022. (PX 205 (CASSAVA_001494801) at 4801, 4804.) Cassava objects to the use of the statement to prove the truth of the matter asserted. Fed. R. Evid. 802. Cassava's counsel had advised The Times on May 5, 2022 that Dr. Nicoll and Dr. David Bredt are close research collaborators, a relationship the article did not disclose. (PX 154 (CASSAVA_000986192) at 6194.)

372. Dr. Wang conducted the tests that were used to screen and enroll patients for the phase 2 open-label study of simufilam. (PX 12 (Burns Dep. Tr.) at 272:09-19.)

**Defendants' Response**: Undisputed.

373. Dr. Burns was aware of data from Neurocode in 2021 and 2022, and from Abilene Christian University in 2023, which showed some number of patients, who were screened by Dr. Wang for enrollment in the phase 2 open label study and phase 2 cognitive maintenance study, had cognition scores that were inconsistent with an Alzheimer's disease diagnosis. (PX 12 (Burns Dep. Tr.) at 269:15-284:10.)

**Defendants' Response**: Undisputed insofar as the cited testimony reflects Dr. Burns's awareness of data from Neurocode and Abilene Christian University ("ACU"), but Defendants respectfully refer the Court to the transcript of Dr. Burns's testimony for its full contents and context, including Dr. Burns's explanation that certain patients were intended to be "healthy controls," that the Neurocode and ACU data were based on novel

assays not as reliable as CSF assays, and that the samples sent to ACU had been incorrectly stored. (PX 12 (Burns Dep. Tr.) at 270:19–21 ("There were some subjects in this analysis that I'm referring to in this email who were healthy controls."); *id.* at 271:18–272:5 ("So Neurocode did not have their own assay ready yet. And we thought we could start the trial with the Quanterix assay. I wanted to see how good it was at discriminating Alzheimer's versus healthy control. We had a bunch of healthy control samples for other work. And low and behold the Quanterix test said that half the control subjects, many of whom were age 20 to 30 had Alzheimer's disease. And half the people who we knew -- knew had Alzheimer's disease based on CSF biomarker evaluations were registered as not having Alzheimer's disease in this plasma assay. That was new with a new lot of antibody."); *id.* at 273:2–7 ("You're trusting this brand-new plasma assay that with a new lot of antibodies that said that half of the aged 20 to 30 patients actually had Alzheimer's disease? You're going to trust that assay over assays of CSF? No, the -- the conclusion was we can't use this Quanterix p-tau assay."); *id.* at 274:11–14 ("It's an assay that clearly is not working if it's telling you that half the patients, half the volunteers who are 20 years old have Alzheimer's. The assay is not working."); *id.* at 275:7–11 ("This is speaking about the Quanterix assay which is brand new and unvalidated -- even, as you know, Neurocodes' assay, that they validated and then validated again was 20 percent -- 21 percent wrong."); *id.* at 283:2–14 ("Q. And did you ever consider any of the data obtained from ACU in connection with considering whether any statements by our clients might have some truth or validity to them? A. No. My recollection is that once the sites that didn't actually store -- either ship them immediately on dry ice to a minus 70 freezer or who -- if they didn't have -- if they kept them at minus 20 for any length of time, if those sites were removed,

there were some interesting and significant – I'm not sure significant. I think significant biomarker effects, changes from baseline to six to 12 months.").)

374. Dr. Wang testified that nobody at Cassava ever questioned him about the integrity of his data or asked him if he had ever fabricated or manipulated data. (PX 17 (Wang Dep. Tr.) at 289:10-290:5 (Q. "Did anyone at Cassava ever ask you if you had fabricated any data?" A. "No." Q. "Did anyone at Cassava ever ask you if you had manipulated any data?" A. "No. And no, I don't." Q. "Has anyone at Cassava ever questioned you about the integrity of your research?" A. "No.").)

**Defendants' Response**: Undisputed that Dr. Wang testified as described.

375. Cassava did not request the original plate reader data files from Dr. Wang. (PX 17 (Wang Dep. Tr.) at 77:24-25 ("Q. Did anyone at Cassava ever ask for something other than the Excel files that you sent them with the data – A. No. Q. – from your ELISA tests? A. No.")

**Defendants' Response**: Undisputed that Dr. Wang testified as described. (PX 17 (Wang Dep. Tr.) at 77:24–78:5.) Dr. Wang also testified that the plate reader's output was an Excel file, that he would "always send the reading as it come off on the computer," and that "[t]hey [Cassava] have raw data. I send them the Excel file coming out from the computer." (*Id.* at 74:17–19, 75:12–16, 77:9–16.)

376. Dr. Burns testified that she never checked whether the data in any Excel file provided by Dr. Wang matched the original or raw data from the ELISA plate-reader machine because it was "not my job." (PX 12 (Burns Dep. Tr.) at 289:21-290:16 ("It was not my job. Do you want me to say it again? It was not my job. It was not my job. It was not my job. I'll go to the chalkboard if you'd like. How many times would you like me to write that?").)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited transcript, but Defendants respectfully refer the Court to transcript for its full contents and context, including that Dr. Burns testified that Laura Rodriguez confirmed that the Excel file data matched the original or raw data from the ELISA plate-reader machine because "it was her job." (PX 12 (Burns Dep. Tr.) at 290:9–10.)

377. On May 18, 2020, Dr. Burns requested "all the software files" from ELISA experiments conducted by Dr. Oskar Hansson's lab at Lund University "to start our QC." (PX 109 (CASSAVA_000569709) at 709.)

**Defendants' Response**: Undisputed.

378. On May 22, 2023, Dr. Burns obtained the raw software files from ELISA experiments conducted by Abilene Christian University. (PX 175 (CASSAVA_001237668) at 668 ("Dear Lindsay, Attached please find Cassava NFL Result Report for PTI-125-04 prepared by ACU. Also attached for our records is a copy of the original raw data (.cydat files).").)

**Defendants' Response**: Undisputed.

379. The raw plate reader data, collected by CUNY in 2021 directly from the plate-reader machine in Dr. Wang's lab, when compared with the data presented by Dr. Wang and Cassava, shows highly suspicious patterns—including round-number differences, changes to the most significant digit in the absence of changes to less-significant digits, and same-direction movement within triplicate groups. (PX 238 (Sanders Expert Report) at ¶¶ 115-117; PX 240 to 247 (comparisons from Appendix E of Sanders Expert Report); PX 22 (Sanders Dep. Tr.) at 280:02-18, 375:05-08.)

**Defendants' Response**: Disputed for the reason's described in Cassava's pending motion to exclude the testimony of Dr. David Sanders. (ECF 227.)

380. Dr. Burns testified that she never considered the "possibility" that Plaintiffs' statements might be true. (PX 12 (Burns Dep. Tr.) at 311:15-22 ("Q. Have you ever, at any point in time, had any reason to question whether any statements by our clients might be true? A. No. No. [] They're completely unreliable. They're short-sellers. . . ."), 312:05-10 ("Q. So you have never considered the possibility that anything our client said might be true? A. Nothing they said had any possibility of being true.").) Dr. Burns also testified that she never reconsidered whether anything they said might be true in light of subsequent events. (PX 12 (Burns Dep. Tr.) at 294:3-7 (New York Times article quoting nine experts critical of Cassava did not cause her to consider whether anything Plaintiffs had said might have "some validity"); 298:9-13 (same re FDA audit of Dr. Wang); 300:21-25 (same re Cassava audit of Dr. Wang); 303:23-304:3 (same re CUNY Investigation Committee Final Report).)

**Defendants' Response**: Undisputed.

381. Within "minutes" of receiving the Citizen Petition, Barbier dismissed the allegations as "complete non-sense." (PX 136 (CASSAVA_000771233).)

**Defendants' Response**: Undisputed that PX 136, an August 24, 2021 internal email from Mr. Barbier to Cassava employees, contains the quoted words.

382. Within days of receiving the Citizen Petition, the company consulted with the PR firm Sitrick and Co. about a defamation suit. (PX 233 (SITRICK_03393) (Aug 25, 2021 email from Mike Sitrick: "Here is the report about which they are considering a defamation suit").

**Defendants' Response**: Undisputed that PX 233 is an August 25, 2021 email from Mike Sitrick, a public-relations consultant, to Dan Webb, which attached a "Statement of Concern" about simufilam, stated "[h]ere is the report about which they are considering a defamation suit," and asked whether "this is something you can do." (PX 233

(SITRICK_03393) at 3393–94.) The email does not reflect any decision by Cassava. Cassava did not commence the Defamation Action until November 2, 2022, after the Board's Litigation Monitoring Committee met seven times, Cassava consulted at least three law firms, and the Board deliberated. (Cassava 56.1 ¶¶ 37, 41–42, 60.)

383. The outside counsel investigations by Orrick and Gibson were not completed until after Cassava filed the Defamation Action. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 72:1-14; id. at 208:17-19.)

**Defendants' Response**: Undisputed that Cassava's Rule 30(b)(6) designee testified that an investigation overseen by a committee of independent directors, with outside counsel, began shortly after the Citizen Petition in 2021 and concluded in the 2024 time period. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 71:16–72:14.) He further testified that an initial investigation concluded before the SEC settlement and that the work continued after the SEC provided information in mid-2024 that the company "had not seen or didn't have any privy to." (Id. at 73:5–14.) The paragraph's second citation concerns CUNY's investigation, not Cassava's. (Id. at 208:8–19.)

384. Dr. Burns described Plaintiffs as "pathetic immoral bastard fuckheads." (PX 25 (BURNS_00000650) at 692.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited document, a private journal, but Defendants respectfully refer the Court to the document for its full contents and context, which makes clear that Dr. Burns's statement was not specific to Plaintiffs.

385. Dr. Burns referred to Dr. Heilbut as "Hellbut" and "asshat." (PX 25 (BURNS_00000650) at 697, 703, 710, 743; PX 12 (Burns Dep. Tr.) at 17:22–18:02, 44:01–04.)

**Defendants' Response**: Undisputed, insofar as the quoted language appears in the cited document, a private journal.

386. Dr. Burns referred to Dr. Brodkin as "Buttskin." (PX 25 (BURNS_00000650) at 0697, 0765; PX 12 (Burns Dep. Tr.) at 44:05–06.)

**Defendants' Response**: Undisputed, insofar as the quoted language appears in the cited document, a private journal.

387. Dr. Burns referred to Dr. Elizabeth Bik as "bitch monkey," "DesBikable bitch," "wench" and "biktch". (PX 25 (BURNS_00000650) at 679, 696, 680, 735; PX 12 (Burns Dep. Tr.) at 17:12–20:11, 53:01–05, 65:11–17.)

**Defendants' Response**: Undisputed, insofar as the quoted language appears in the cited document, a private journal.

388. Dr. Burns wrote in her diary in reference to Dr. Elizabeth Bik: "I just feel like kickboxing this woman in the face." (PX 25 (BURNS_00000650) at 780; PX 12 (Burns Dep. Tr.) at 75:06-76:10.)

**Defendants' Response**: Undisputed, insofar as the quoted language appears in the cited document, a private journal.

389. Cassava's corporate representative, Eric Schoen, testified that Dr. Burns was "outraged" by Plaintiffs' criticism. (PX 24 (Schoen Dep. Tr.) at 62:06-63:25.)

**Defendants' Response**: Disputed. The cited testimony does not state that Dr. Burns was "outraged," and Mr. Schoen gave it in his individual capacity, not as Cassava's corporate representative. Mr. Schoen testified that he never discussed the Defamation Action with Dr. Burns, that his impression of her reaction came from "anecdotes," and that she was "generally displeased with the comments being made online" because "she was

being attacked online. Sometimes personally. I don't know if it was by defendants." (PX 24 (Schoen Dep. Tr.) at 62:13–63:21.)

390. Barry referred to Plaintiffs as "jihadists." (PX 202 (CASSAVA_001444768))

**Defendants' Response**: Undisputed that, in a November 4, 2021 email to Dr. Hans Wigzell, Mr. Barry used the quoted word. Disputed that the email refers to Plaintiffs: it does not mention them, and it refers to the authors of "[a] new short report" and to "the 'activist' shorts" who were then accusing Dr. Wang of fraud. (PX 202 (CASSAVA_001444768) at 4768.)

391. Barry testified that he was "furious" at Plaintiffs. (PX 8 (Barry Dep. Tr.) at 196:2-6.)

**Defendants' Response**: Disputed. The cited testimony does not state that Mr. Barry was "furious." Asked whether Mr. Robertson "also share[d] your outrage at the defendants in the defamation action," Mr. Barry testified that Mr. Robertson "was more outraged than I am. He was furious." (PX 8 (Barry Dep. Tr.) at 196:2–6.) The outrage Mr. Barry had just described was "at the fact that people were trying to deprive Alzheimer's patients of the medicine that appeared to have a chance of working." (*Id.* at 194:14–25.)

392. Barry testified: "It's a good thing [then-board member Sanford Robertson is] not alive today. He was more outraged than I am. He was furious. He was -- he was really upset." (PX 8 (Barry Dep. Tr.) at 196:2-6.)

**Defendants' Response**: Cassava objects to the quoted testimony as speculation about the state of mind of Mr. Robertson, who is deceased; Mr. Barry lacks personal knowledge of Mr. Robertson's mental state. Fed. R. Evid. 602, 701. Subject to and without waiving that objection, undisputed that Mr. Barry gave the quoted testimony in response

to the question whether Mr. Robertson "also share[d] your outrage at the defendants in the defamation action." (PX 8 (Barry Dep. Tr.) at 196:2–6.) The outrage Mr. Barry had just described was "at the fact that people were trying to deprive Alzheimer's patients of the medicine that appeared to have a chance of working." (*Id.* at 194:14–25.)

393. Barry testified that the company selected the law firm Benesch to represent the company in the Defamation Action because they shared the company's "outrage" at Plaintiffs. (PX 8 (Barry Dep. Tr.) at 194:15-195:20.)

**Defendants' Response**: Disputed. Mr. Barry did not testify that the company selected Benesch because it shared an "outrage" at Plaintiffs. He testified that Mr. Connolly of Benesch "was outraged at the fact that people were trying to deprive Alzheimer's patients of the medicine that appeared to have a chance of working"; that this "influenced me," but "I can't speak for Sandy or Remi"; that "Remi was always the decision-maker, so we were advising"; and that he believed Mr. Connolly "understood the issue" and that "what he had planned could be most helpful to us." (PX 8 (Barry Dep. Tr.) at 194:14–195:20.) Cassava announced that Mr. Connolly "has litigated some of the largest defamation claims in the country." (PX 177 (CASSAVA_001278817) at 8819.) Counsel instructed the witness not to disclose what Mr. Connolly told him, and the testimony at 195:1–11 was given subject to the parties' agreement that it would not constitute a waiver. (PX 8 (Barry Dep. Tr.) at 194:1–9, 195:1–11.)

394. On December 1, 2021, Dr. Burns wrote: "It is really so infuriating that we sit here and keep taking punches." (PX 25(BURNS_00000650) at 0697.)

**Defendants' Response**: Undisputed.

395. On April 18, 2022, in response to a New York Times article, Barbier wrote: "This is maddening. I get there are legal complexities around launching an offensive strategy, but a few of us have had it with being told to sit still while being punched us in the face. These cowardly attacks on innovation won't stop until they put us out of business or until we hit back, hit hard." (PX 224 (Francisco_0000322) at 0322).

**Defendants' Response**: Undisputed.

396. On November 3, 2022, Cassava issued a press release to publicize the Defamation Action, which stated:

> "Defendants placed personal enrichment over science, over the health of patients, and over the truth . . . Defendants saw an opportunity to manipulate a stock price and financially benefit from their 'short positions' by defaming a company developing a drug for people with Alzheimer's disease . . . . Defendants' conduct is beyond shameful. It is unlawful. . . . Defendants did not have any real or valid concerns with Cassava, its foundational science, or its tests. Defendants engaged in their saturation campaign to profit based on a decline in Cassava's stock price. . . . We are still investigating whether additional individuals or entities should be brought into this case or have separate claims brought against them."

(PX 177 ((CASSAVA_001278817)) at 8819.)

**Defendants' Response**: Undisputed that on November 3, 2022, Cassava issued a press release announcing the Defamation Action and that the press release contains the quoted language. The press release attributes the first quoted passages to the complaint, introducing them with "The lawsuit alleges" and "According to the complaint," and attributes the final sentence to Cassava's outside counsel. (PX 177 (CASSAVA_001278817) at 8818–19.) The press release described the lawsuit as "another step in Cassava Sciences' vigorous defense of itself and its stakeholders," and listed Cassava's earlier announcements, including that a Journal of Neuroscience review showed no evidence of data manipulation and that FDA had denied the Citizen Petition. (Id. at

8819.) Cassava's Rule 30(b)(6) designee testified that the press release was intended "to get the word out to patients and sites that . . . the things being said by the defamers are not true," and that "it wasn't meant to quiet critics." (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 253:15–254:6; Cassava 56.1 ¶¶ 44, 48.)

397. On November 7, 2022, Dr. Burns sent an email to Lucia Huntington at Alzforum, copying Gabrielle Strobel, stating: "see our press release of last week stating that Cassava has filed a defamation lawsuit." (PX 129 (CASSAVA_000736199) at 6199.)

**Defendants' Response**: Undisputed.

398. On November 7, 2022, Dr. Burns emailed Kenneth Santora and Laurie Ryan at NIH a copy of Cassava's press release stating that it had filed a defamation lawsuit. (PX 160 (CASSAVA_001008694) at -694.)

**Defendants' Response**: Undisputed.

399. On November 9, 2022, Remi Barbier emailed Claudia Williams of Tortoise Media, referring Ms. Williams to the Defamation Action and requesting that Tortoise not republish "false" allegations about Cassava. (PX 150 (CASSAVA_000945615) at -615.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited document, but Defendants respectfully direct the Court to the document for its full contents and context, including that Mr. Barbier stated: "In light of this outstanding legal complaint, we specifically request that your media company not enable the 'short & distort' campaign in any manner whatsoever, to include republishing false allegations made against the Company, its personnel, advisors or research."

400. On November 10, 2022, Dr. Burns sent an email to Trevor Robbins and Barbara Sahakian stating: "see our press release of last week stating that we have filed a defamation lawsuit." (PX 166 (CASSAVA_001014559) at -559.)

**Defendants' Response**: Undisputed.

401. On November 16, 2022, Dr. Burns emailed Carine Giry and others at the Journal of Prevention of Alzheimer's Disease requesting disclosure language stating that Plaintiffs' statements had prompted Cassava to file a defamation lawsuit accusing them of disseminating false information about simufilam to profit from short selling. (PX 101 (CASSAVA_000391883) at -884.)

**Defendants' Response**: Undisputed.

402. On November 20, 2022, Dr. Burns sent a message to Lauren Greenfield stating: "FYI, we filed a defamation lawsuit against the A-holes ('short and distort' perpetrators) in early Nov. Things should be turning around soon." (PX 71 (BURNS_00002120) at 120.)

**Defendants' Response**: Undisputed

403. On December 24, 2022, Dr. Burns sent an email to Deborah Copaken attaching the defamation complaint and stating that Copaken could scan it for anything helpful. (PX 181 (CASSAVA_001318054) at 054.)

**Defendants' Response**: Undisputed.

404. Dr. Burns attempted to edit Wikipedia pages of the company and Dr. David Bredt to mention the Defamation Action. (PX 36 (BURNS_00000867) at 867; PX 183 (CASSAVA_001329982) at 982.)

**Defendants' Response**: Undisputed insofar as the cited documents reflect that Dr. Burns attempted to edit Wikipedia pages, but Defendants respectfully refer the Court to the

documents for their full contents and context, including that Dr. Burns stated that her edits were "taken down because [the short sellers] don't want anyone to know, for example, that all three simufilam publication[s] have been cleared of false allegations of data misconduct." (PX 183 (CASSAVA_001329982) at 9982.)

405. On March 8, 2023, Cassava, through counsel, sent a letter to CUNY, which stated: "To the extent that CUNY finds that misconduct actually occurred in this instance, that decision would, under the relevant contracts, require CUNY to 'indemnify and hold [Cassava] harmless from any and all liability, loss, or damage it might suffer as a result of claims, demands, costs, or judgment[s]' in the securities class action suit and all other matters related to Dr. Wang's research." (PX 180 (CASSAVA_001309142) at 145.)

**Defendants' Response**: Undisputed that on March 8, 2023, Cassava's outside counsel sent a letter to CUNY and the Research Foundation of CUNY that contains the quoted language, which appears at CASSAVA_001309144, not 145. (PX 180 (CASSAVA_001309142) at 9144.) Cassava refers to the letter for its complete contents. The letter asked CUNY, consistent with its research-misconduct policies, to provide Cassava as research sponsor with the allegations under consideration and an opportunity to be heard; stated that Cassava "currently has no reason to question Dr. Wang's integrity or the quality of his work"; urged that the investigation be conducted "meticulously, transparently, fairly," with each allegation "evaluated by a trained expert in the relevant scientific field who has no conflicts of interest"; and proposed "a constructive dialogue rather than resorting to the further exchange of written correspondence." (Id. at 9142–44.)

406. On May 5, 2022, Cassava's counsel sent a letter to The New York Times, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 154 (CASSAVA_000986192) at 202.)

> **Defendants' Response**: Disputed as characterized. On May 5, 2022, Cassava's outside counsel sent a letter, marked "not for publication," to the general counsel of The New York Times concerning an April 18, 2022 article. (PX 154 (CASSAVA_000986192) at 6192.) The letter did not threaten defamation claims. It identified statements in the article that Cassava regarded as inaccurate and explained why, asked The Times to disclose its sources' conflicts of interest and to answer questions about its reporting, requested a correction, and offered to meet "to further discuss these issues and the promise of simufilam"; it did not state that Cassava would bring any claim. (Id. at 6192, 6199–6202.) Nor did the letter dismiss criticism of the company as financially motivated. Beyond identifying its sources' undisclosed affiliations, including with competing drug developers, the letter addressed the substance of the article, explaining, among other things, that the five retracted papers the article cited had nothing to do with Alzheimer's disease and that Cassava was not "new to Alzheimer's research." (Id. at 6193–95, 6199–6200.) The letter states that Cassava "expressly supports the exercise of free speech and dissenting opinion," and it reports that, after the article, "one clinical testing site has withdrawn from simufilam's Phase 3 study program, making it more challenging to locate participants for the study." (Id. at 6192, 6201.)

407. On July 26, 2022, Cassava's counsel sent a letter to the Editor-in-Chief of Science, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 155 (CASSAVA_000986398) at 405.)

**Defendants' Response**: Disputed as characterized. On July 26, 2022, Cassava's outside counsel sent a letter, marked "not for publication," to the Editor-in-Chief of Science concerning a July 21, 2022 article. (PX 155 (CASSAVA_000986398) at 6398.) The letter did not threaten defamation claims. It identified four statements in the article that Cassava regarded as false, explained in detail why each was inaccurate, requested a correction, and, in closing, reserved Cassava's rights, including the right to bring an action for defamation. (Id. at 6398–6402, 6405.) Nor did the letter dismiss criticism of the company as financially motivated. It responded to the article on the merits, explaining, among other things, that no Cassava scientist contributed to the 2012 paper the article called "the most influential Cassava-related paper," and that only three peer-reviewed publications, plus one review, concern simufilam, not the "34 published papers by Cassava-linked scientists" the article described. (Id. at 6399–6402.) Its request that Science disclose the conflicts of interest of certain sources accompanied those substantive responses; it did not replace them. (Id. at 6398.) The letter also states that Cassava "expressly supports the exercise of free speech and dissenting opinion." (Id.)

408. On July 26, 2022, Cassava's counsel emailed Reuters reporter Marisa Taylor, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 206 (CASSAVA_001495215) at 218.)

**Defendants' Response**: Disputed as characterized. On July 26, 2022, after a Reuters reporter sent Cassava five written "[d]eadline questions" about a forthcoming report, Cassava's outside counsel emailed the reporter responses to those questions. (PX 206 (CASSAVA_001495215) at 5215–18.) The email did not threaten defamation claims. It answered each of the reporter's questions, invited further questions, and stated that

Cassava "will have no choice but to pursue legal action should Reuters publish anything false about it," a statement expressly conditioned on the publication of false statements. (Id. at 5215–16.) Nor did the email dismiss criticism of the company as financially motivated. It responded to the substance of the accusations, stating that no government agency had informed Cassava of any findings of wrongdoing, that FDA had rejected the Citizen Petition, and that neutral third-party experts in Western blot techniques who reviewed the challenged data had found the accusations unfounded, and it enclosed Cassava's detailed written responses to the data-manipulation allegations. (Id. at 5215.) Its observation that short sellers had reportedly profited from the decline in Cassava's stock accompanied those substantive responses; it did not replace them. (Id. at 5216.)

409. On August 12, 2022, Cassava's counsel emailed Mother Jones reporter Jackie Mogensen, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 186 (CASSAVA_001415124) at 127.)

**Defendants' Response**: Disputed as characterized. On August 12, 2022, after a Mother Jones reporter asked Cassava to comment on a forthcoming piece about a Science article, Cassava's outside counsel emailed the reporter responses to her three questions. (PX 186 (CASSAVA_001415124) at 5124–27.) The email did not threaten defamation claims. It identified what Cassava regarded as factual errors in the Science article, enclosed Cassava's letters to Science explaining them in detail, noted the legal principle that republishing false and defamatory statements carries the same liability as the original publication, and stated that Cassava "will have no choice but to pursue legal action should Mother Jones publish anything false about it," a statement expressly conditioned on the publication of false statements. (Id. at 5125.) Nor did the email dismiss criticism of the

company as financially motivated. It answered each of the reporter's questions on the merits, reiterated Cassava's denial of the misconduct allegations, and directed the reporter to Cassava's published Phase 2b and open-label study data and to the status of its ongoing Phase 3 program. (Id.) Its reference to the Citizen Petition's having been filed by "admitted short sellers" accompanied those substantive responses; it did not replace them. (Id.)

410. In December 2022, Cassava's counsel sent several emails to Holly Else of Nature, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 128 (CASSAVA_000736161) at 167.)

**Defendants' Response**: Disputed as characterized. In December 2022, in response to eleven written questions from a Nature reporter seeking Cassava's comment for a forthcoming article, and to her follow-up questions, Cassava's outside counsel sent the reporter three emails. (PX 128 (CASSAVA_000736161) at 6161–71.) The emails did not threaten defamation claims. They answered the reporter's questions in detail and stated that Cassava "will have no choice but to pursue legal action should Nature publish false and defamatory statements about it," a statement expressly conditioned on the publication of false and defamatory statements. (Id. at 6163, 6168.) Nor did the emails dismiss criticism of the company as financially motivated. They responded to the substance of the reporter's questions, including by addressing the status of journal reviews of the challenged papers, quoting the cautionary language in Cassava's disclosures about its open-label data, and identifying independent research published in 2022 linking filamin A to tau pathology. (Id. at 6161–63, 6167–68.) Their references to the financial interests of short sellers accompanied those substantive responses; they did not replace them. (Id. at 6167–68.)

411. On January 24, 2023, Cassava's counsel sent STAT News a letter, threatening defamation claims and dismissing criticism of the company as financially motivated. (PX 152 (CASSAVA_000963333) at 341.)

**Defendants' Response**: Disputed as characterized. On January 24, 2023, Cassava's outside counsel sent a letter to STAT's editors demanding the retraction and correction of an article published that evening, which the letter stated mischaracterized the results of a Phase 2 open-label study Cassava had announced that day. (PX 152 (CASSAVA_000963333) at 3333–35.) The letter did not threaten defamation claims. It explained why Cassava regarded the article's headline and analysis as inaccurate, pointing to the study data and the conclusions of the outside biostatistician Cassava had retained, offered to "work with [STAT] to correct the defamatory falsehoods contained therein," and invited further questions; it did not state that Cassava would bring any claim. (Id. at 3333–35.) Nor did the letter dismiss criticism of the company as financially motivated; it says nothing about the financial interests or motives of any critic. (Id.)

412. On January 4, 2022, Matthrew Nachtrab wrote to Dr. Burns and Eric Schoen: "you guys asked for us to let you know if we see blatant lies. Attached are very blatant likes [sic] by Jesse Brodkin. He is a known short." (PX 124 (CASSAVA_000733886) at 887.)

**Defendants' Response**: Undisputed.

413. On January 4, 2022, Dr. Burns thanked Matthew Nachtrab for his work on a DOJ petition against Plaintiffs and other critics and said he was "doing a lot of great work for the cause." (PX 124 (CASSAVA_000733886) at -886.)

**Defendants' Response**: Undisputed.

414. On January 20, 2022, Anthony Daher wrote to Dr. Burns, at her personal email address and her Cassava email address, and Eric Schoen: “Here are some more that might interest you and your layers [sic]”; and Dr. Burns forwarded the email to Orrick. (PX 123 (CASSAVA_000731713) at 713.)

**Defendants’ Response**: Undisputed.

415. On February 18, 2022, Anthony Daher emailed Dr. Burns a list of volunteers wanting to help with SAVA-related activities. (PX 159 (CASSAVA_001001300) at -300.)

**Defendants’ Response**: Undisputed.

416. On February 21, 2022, Dr. Burns wrote: “we have an army of supporters who have filed 1) counter petitions to the FDA to ask them to accelerate approval of our drug, 2) a complaint to the medical licensure of NY about Dr. Pitt, 3) a petition to the DOJ, 4) at least 37 petitions to the SEC, and most recently, 5) an open letter to the New Yorker about a recent hit piece.” (PX 122 (CASSAVA_000728606).)

**Defendants’ Response**: Undisputed insofar as the quoted language appears in the cited document, but Defendants respectfully refer the Court to the document for its full contents and context, including that Dr. Burns stated: “[O]ur Phase 3 clinical trials are ongoing. There has certainly been damage to the speed of start-up by scaring both investigators and patients, but it’s hard to quantify.”

417. In March 2022, Dr. Burns wrote in her journal: “The Discord Detectives came up with some interesting details ... We now know that Brodkin is working for Summit Point Capital, because they are the ones who FOIA’d the 1B, and Brodkin is the one posting and smearing it on Twitter.” (PX 25 (BURNS_00000650) at 745-746.)

**Defendants’ Response**: Undisputed.

418. On April 15, 2022, Dr. Burns emailed COPE and PLOS One personnel, copying Gabriel Olander and Matthew Nachtrab, and attached materials supporting their complaints about PLOS One's retractions of Dr. Wang's and Dr. Burns's research. (PX 132 (CASSAVA_000738731) at -731.)

**Defendants' Response**: Undisputed.

419. A member of the SAVA Army Discord chat group, Mark Johnson, testified that one of the members "AD3" (Anthony Daher) was "claiming to post things" for Dr. Burns "fairly often." (PX 19 (Johnson Dep. Tr.) at 53:03-20.)

**Defendants' Response**: Undisputed.

420. On September 9, 2022, Anthony Daher posted a link to Dr. Elizabeth Bik's Twitter profile in the SAVA Army Discord thread and wrote: "Please retweet share and comment fuck that bitch. She attacks one of us we will give her hell." (PX 225 (Johnson_0016922) at 926; PX 280.)

**Defendants' Response**: Undisputed that PX 225 contains the quoted message, which was posted under the username "AD3," which Plaintiffs attribute to Anthony Daher, a non-party, and which concerns another non-party, Dr. Elisabeth Bik. (PX 225 (Johnson_0016922) at 6926.) The message links to a post by the account "@ad3endalz," not to Dr. Bik's profile. (Id.) PX 280 is a separate post on X by the account "@AD3ENDALZ" replying to Dr. Bik; it does not contain the quoted language. (PX 280 at 1.)

421. Between January 2022 and July 2023, Dr. Burns and Anthony Daher exchanged at least 40 text threads and multiple emails about Plaintiffs, the Defamation Action, online criticism, and other topics. (PX 69 (BURNS_00001338) (Daher emails Burns and Schoen information about

Dr. Heilbut); PX 159 (CASSAVA_001001300) (SAVA Army volunteer list with names and addresses); PX 70 (BURNS_00001366) (sharing social media posts); PX 26 (BURNS_00000795-96) (sharing Dr. Heilbut tweet "For legal"); PX 27 (BURNS_00000797- 800) (questioning timing of Defamation Action); PX 28 (BURNS_00000801) (commenting on response to Defamation Action); PX 29 (BURNS_00000802-03) (describing Dr. Heilbut as "A-holebutt" and discussing Plaintiffs' poster at CTAD conference); PX 30 (BURNS_00000812–16) (discussing sharing Defamation Action complaint); PX 31 (BURNS_00000828–31) (discussing social media criticism and SAVA Army activity); PX 33 (BURNS_00000843) (describing Dr. Heilbut as "A-Holebutt"); PX 34 (BURNS_00000847) (discussing biomarkers and PR strategy); PX 35 (BURNS_00000858-60) (Burns responds to Brodkin tweet: "He is so screwed in our lawsuit"); PX 37 (BURNS_00000868) (discussing stock price); PX 38 (BURNS_00000907) (sharing "deleted tweet from AH", with screenshot of Dr. Heilbut post); PX 39 (BURNS_00000922-23) (discussing critics); PX 40 (BURNS_00000932–33) (Dr. Burns shares information acknowledged as "Not public info"); PX 41 (BURNS_00000941-45) (discussing "not public info"); PX 42 (BURNS_00000947-48) (discussing Dr. Bik); PX 43 (BURNS_00000955) (discussing lawsuit and plaintiffs); PX 44 (BURNS_00000971) (forwarding tweet); PX 45 (BURNS_00000976) (forwarding tweets "For legal"); PX 46 (BURNS_00000986) (forwarding tweet); PX 47 (BURNS_00001000) (Daher and Burns tracking tweets); PX 48 (BURNS_00001006-07) (personal exchange); PX 49 (BURNS_00001009) (forwarding tweet); PX 50 (BURNS_00001013) (screenshots for potential use in litigation); PX 51 (BURNS_00001017) (describing Heilbut as "aholebutt" and sharing "for lawyers"); PX 52 (BURNS_00001027) (Daher shares Discord document); PX 53 (BURNS_00001040) (Daher forwards material "for LEGAL"); PX 54 (BURNS_00001041) (sharing news coverage); PX 55 (BURNS_00001043-44) (discussing data);

PX 56 (BURNS_00001048) (sharing Dr. Brodkin tweet); PX 57 (BURNS_00001049) (Burns and Daher discuss identity of anonymous critic); PX 58 (BURNS_00001052) (discussing efforts to identify Dr. Heilbut at CTAD event and discussing "defamation case"); PX 59 (BURNS_00001057) (Burns writes "Someone should have grabbed A-holebutt" referring to Dr. Heilbut); PX 60 (BURNS_00001062) (Daher forwards material "For legal"); PX 61 (BURNS_00001069) (discussing stock drop and market manipulation); PX 62 (BURNS_00001109) (Daher asks about biomarker samples); PX 63 (BURNS_00001110) (discussing Twitter activity); PX 64 (BURNS_00001133-35) (discussing SEC investigation); PX 65 (BURNS_00001151) (Daher shares article); PX 66 (BURNS_00001155).

**Defendants' Response**: Undisputed insofar as the cited texts and emails concern one or more of Plaintiffs, the Defamation Action, online criticism, or other topics; they did not all concern Plaintiffs.

422. There is no evidence of any trial site mentioning Plaintiffs or Plaintiffs' statements as a reason for declining to participate in, or withdrawing from, the simufilam clinical trials. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

**Defendants' Response**: Disputed. The cited testimony establishes only that Cassava's Rule 30(b)(6) designee could not name a specific patient or site that had said "explicitly" that it would not participate in the Phase 3 trials because of Plaintiffs' statements. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14–21.) It does not establish that no such evidence exists. Cassava received reports that clinical sites that had agreed to participate "walked away," that physicians had patients "who would be in the trial but for . . . the things they read online about the company being a fraud," and that individuals contacting sites repeated the same accusation that "[t]he company is a fraud." (PX 16

(Schoen 30(b)(6) Dep. Tr.) at 20:5–21:5, 22:12–23:10; Cassava 56.1 ¶ 28.) Mr. Barry testified that, when the Defamation Action was filed, Cassava "had clinical sites that were dropping out because of the defamatory statements made by [Plaintiffs]." (PX 8 (Barry Dep. Tr.) at 88:17–24.) He further testified that Plaintiffs "took out a website on the internet, cassavafraud.com," and that "[e]very time I Googled Cassava what came up first was cassavafraud.com." (Id. at 67:7–21.)

423. There is no evidence of any patient mentioning Plaintiffs or Plaintiffs' statements as a reason for declining to participate in, or withdrawing from, the simufilam clinical trials. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14-282:10.)

**Defendants' Response**: Disputed for the reasons stated in response to Paragraph 422. The cited testimony establishes only that Cassava's designee could not name a specific patient who had "explicitly" attributed a decision to Plaintiffs' statements. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 281:14–21.) Immediately before that testimony, the designee testified that Cassava had "participants who drop out . . . and tell their doctor . . . I've heard these . . . rumors that . . . your science is false." (Id. at 281:5–10.) Physicians also reported to Cassava that they had patients who would have enrolled but for what they read online about the company being a fraud. (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 20:13–18; Cassava 56.1 ¶ 28.) Cassava's designee further testified that, with a website called cassavafraud.com and social-media posts calling the company a fraud, Cassava experienced slow recruitment, sites withdrawing, and "patients leaving [its] study." (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 85:2–22.) Mr. Barry testified that "there was so much damage done in the Alzheimer's community by their statements, I don't know that we ever would have fully recruited the trial." (PX 8 (Barry Dep. Tr.) at 68:2–5.)

424. UCSF conveyed to Cassava that it was withdrawing from the Phase 3 trials because of a New York Times article and Cassava's "unacceptable" response to the article. (PX 203 (CASSAVA_001444921) ("The Times article raised significant and comprehensive concerns about the integrity of the data supporting use of simufilam - the scope of which we were not aware. Further, we found your use of our site's participation in the trial in an attempt to counter Dr. Nicoll's legitimate concerns to be completely unacceptable. Due to the these concerns and others, our site will no longer be participating in your trial. We have halted all screening and enrollment activity, and we are moving to terminate our contract.")

**Defendants' Response**: Undisputed that PX 203 contains the quoted language, which appears in an April 27, 2022 email from a UCSF investigator stating that the site would no longer participate "[d]ue to the these concerns and others." (PX 203 (CASSAVA_001444921) at 4921.) The UCSF email responded to an email sent earlier that day by Cassava's Chief Clinical Development Officer offering to discuss any concerns and to provide updates on the pending investigations. (Id. at 4921_0002.) Cassava refers to the document for its complete contents and disputes the paragraph to the extent it implies that UCSF's stated reasons reflect the reasons of any other site or patient.

425. After Lehigh Center withdrew from the Phase 3 trial, Dr. Burns forwarded the Lehigh email to outside counsel and wrote: "More sites concerned about PLOS that we have to address." (PX 151 (CASSAVA_000956262) at 262; see also PX 169.)

**Defendants' Response**: Undisputed.

426. After the New York Times article was published on April 18, 2022, Dr. Burns led an effort to contact trial sites and summarized conversations with trial sites in an Excel spreadsheet

that Dr. Burns labeled "FUD response to Sites." (PX 161 (CASSAVA_001008843) at 843, 845 (tracking chart).)

**Defendants' Response**: Undisputed.

427. Cassava's 30(b)(6) corporate representative admitted the company had no evidence connecting whoever was purportedly calling clinical trial sites to Plaintiffs. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 23:11-14.)

**Defendants' Response**: Undisputed that, when asked whether Cassava had "any evidence connecting whoever was calling the sites to the statements by [Plaintiffs]," Cassava's Rule 30(b)(6) designee answered "No," explaining that "we don't know who . . . was doing that." (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 23:11–19.) Disputed to the extent the paragraph implies that Cassava lacked a basis for understanding that the callers were repeating Plaintiffs' accusations: the same witness testified that the callers told sites that "[t]he company is a fraud," the accusation Plaintiffs had repeatedly published, and that Plaintiffs' statements were "a likely source." (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 20:23–21:5, 22:12–23:10.)

428. On August 5, 2022, Dr. Charles Spruck texted Matthew Nachtrab:

> "Talked to Lindsay and Tony (involved in clinical trials for the company) for 2 hours over dinner. . . . She said a lot is riding on the CUNY. If they find misconduct, then DOJ will likely follow up. She also said that DOJ investigation scared away a couple of trial sites to that were set to start treating patients but these were Stanford and Duke, which want to protect their reputations. Other sites have been very supportive and recruitment is well ahead of schedule. . . . They were very happy with the pace of recruitment. . ."

(PX 226 (Nachtrab03000) at 3001)

**Defendants' Response**: Undisputed that PX 226 contains the quoted text messages, which a non-party, Dr. Charles Spruck, sent to another non-party on August 5.

(PX 226 (Nachtrab03000) at 3001.) Cassava objects to the use of PX 226 for the truth of Dr. Spruck's account of what others told him; the messages are inadmissible hearsay. Fed. R. Evid. 801(c), 802, 805. Disputed insofar as the paragraph implies that public accusations of fraud were not threatening Cassava's clinical sites or recruitment. (*See* Defendants' Response to Paragraph 422; Cassava 56.1 ¶ 28.)

429. On November 6, 2023, Cassava announced that its phase 3 clinical trials were fully enrolled. (PX 250 (Nov. 6, 2023 Cassava Press Release))

**Defendants' Response**: Undisputed that on November 6, 2023, Cassava announced that it had completed enrollment in its Phase 3 trials. The trials continued thereafter: as of June 7, 2024, 700 patients remained active in the two trials, which continued through October 2, 2024 and December 30, 2024, respectively. (Cassava Exhibit 9 (CASSAVA_001308025) at 8035; Cassava 56.1 ¶¶ 10, 12.)

430. On November 25, 2024, Cassava announced the failure of its first Phase 3 clinical trial and the termination of its second Phase 3 trial. (PX 249 (2024.11.25 Press Release, Cassava Sciences Topline Phase 3 Data Did Not Meet Co-Primary Endpoints).)

**Defendants' Response**: Undisputed that on November 25, 2024, Cassava announced that topline results from its first Phase 3 trial did not meet the co-primary endpoints and that it would discontinue its second Phase 3 trial.

431. On March 25, 2025, the company's CEO Rick Barry said: "We are disappointed that the results of REFOCUS-ALZ and RETHINK-ALZ showed no treatment benefit for patients with mild-to-moderate Alzheimer's disease. These results were unambiguous." (PX 248 (2025.03.25 Press Release, Cassava Sciences Reports Topline Phase 3 REFOCUS-ALZ Data).)

**Defendants' Response**: Undisputed that Cassava's March 25, 2025 press release contains the quoted statement.

432. On December 18, 2025, Cassava announced that the FDA had placed the company's simufilam program on full clinical hold. (PX 254 (2025.12.18 Cassava 8-K, FDA Clinical Hold).)

**Defendants' Response**: Disputed as characterized. The cited Form 8-K reports that FDA confirmed that a proposed proof-of-concept clinical trial of simufilam in tuberous sclerosis complex-related epilepsy was on full clinical hold "subject to the Company providing FDA with additional information, including additional pre-clinical data, and modifying the protocol design." (PX 254 (Dec. 18, 2025 Cassava Form 8-K) at 3.) It does not report a clinical hold on Cassava's Alzheimer's program. Moreover, on September 22, 2026, Cassava announced that FDA "lifted the clinical hold on the Company's investigational new drug (IND) application, enabling Filana to initiate a planned Phase 2a proof-of-concept study in patients aged 12 to 15 with TSC-related epilepsy."[2]

433. Rick Barry testified: "Remi was always the decision maker, so we were advising." (PX 8 (Barry Dep. Tr.) at 195:12-16.)

**Defendants' Response**: Undisputed that Mr. Barry gave the quoted testimony. Disputed that the testimony concerned the decision to commence the Defamation Action. Mr. Barry was answering the question whether he, Mr. Robertson, and Mr. Barbier were "the decision-makers about who would represent Cassava in that case." (PX 8 (Barry Dep. Tr.) at 195:1–16.) The decision to commence the Defamation Action was made by

[2] Press Release, Filana Therapeutics, Inc., *Filana Therapeutics Announces FDA Lift of Clinical Hold on Simufilam, Enabling Phase 2a Study in TSC-Related Epilepsy* (Sept. 22, 2026), https://www.filanatx.com/news-releases/news-release-details/filana-therapeutics-announces-fda-lift-clinical-hold-simufilam.

Cassava's Board, and it was unanimous. (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 17:23–18:11; Cassava Exhibit 21 (Cassava July 24 Interrog. Resp.) No. 1 at 4–5; PX 5 (Barbier Dep. Tr.) at 129:2–7; Cassava 56.1 ¶¶ 30, 42.)

434. Rick Barry testified that it was counsel's idea to file the Defamation Action. (PX 8 (Barry Tr.) at 93:19-22 (Q. "Whose idea was it to file the defamation lawsuit?" A. "It was counsel.")

**Defendants' Response**: Undisputed that the quoted words appear in the transcript, in an answer given while Cassava's counsel was interposing a privilege objection; counsel then instructed Mr. Barry not to answer. (PX 8 (Barry Dep. Tr.) at 93:19–24.) Cassava objects to the use of this testimony, or of Cassava's assertion of privilege, to support any inference about the content of privileged communications. The decision to commence the Defamation Action was made by Cassava's Board, informed by outside counsel. (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 17:23–18:11; *see* Defendants' Response to Paragraph 433.)

435. Barbier testified that deceased former Board member Sanford Robertson "suggested that we look into" a defamation lawsuit. (PX 5 (Barbier Tr.) at 111:20-25.)

**Defendants' Response**: Undisputed.

436. When asked whether he recommended to the Board that the company file the defamation action, Barbier testified: "It wasn't for me [to] recommend. It was for the attorneys who specialize in this area of law to say thumbs up or thumbs down." (PX 5 (Barbier) at 125:16-20; id. 127:16-20 (Q. "What facts did the company base its decision on?" A. "The fact that we got -- we felt we got very good legal advice from people with -- from legal experts in this specific, narrow field of the law.").)

**Defendants' Response**: Undisputed that Mr. Barbier gave the quoted testimony. Asked what, aside from advice of counsel, the Board's decision to file the Defamation Action was based on, Mr. Barbier testified that it was also based on "the harm to the company that the short sellers were doing and continued to do for a long time, both with the citizens' petition, calling our clinical sites, doing their best to . . . make the stock price decline, calling principal investigators, you know, trying to enroll in our . . . patients." (PX 5 (Barbier Dep. Tr.) at 269:22–270:6.)

437. When asked whether he believed Plaintiffs' statements were false, Barbier testified: "What I believe is that the attorneys who filed the defamation action believed there was legal grounds for -- to claim defamation as defined in the law." (PX 5 (Barbier Tr.) at 178:11-19.)

**Defendants' Response**: Undisputed insofar as the quoted language appears in the cited transcript, but Defendants respectfully refer the Court to the transcript for its full contents and context, including Mr. Barbier's testimony that: "The company had been hit by a series of allegations that were false"; that "the board believed it had a basis to both file and win a case"; "it was a battle of truth versus non-truths"; "There are just so many allegations that were just so obviously false that we needed to tell our side of the story. And we did as best we could. And part of that arsenal was engaging with attorneys to tell our side of the story"; "the allegations were false." (PX 5 (Barbier Dep. Tr.) at 144:8, 150:12–18, 153:18, 155:6–10.)

438. Burns testified that she "absolutely" had no involvement "in any way" in the Defamation Action. (PX 12 (Burns Dep. Tr.) at 152:08-12 (Q. "So your testimony is you had no involvement in any way in the defamation action?" A. "Absolutely. Correct. I had no involvement").)

**Defendants' Response**: Undisputed.

439. Eric Schoen testified that he was not part of the team that made the decision to file the Defamation Action. (PX 24 (Schoen Dep. Tr.) at 60:18-21 (Q. "When you say you were part of the team, do you mean you were part of the team that made the decision to commence the defamation action?" A. "No.").)

**Defendants' Response**: Undisputed that Mr. Schoen, testifying in his individual capacity, so testified; he explained that he was part of "the management team" and "broadly aware of all significant actions that the company takes." (PX 24 (Schoen Dep. Tr.) at 60:18–23.) Mr. Schoen attended every Board meeting, and he testified as Cassava's Rule 30(b)(6) designee concerning the decision to commence the Defamation Action. (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 17:23–18:18, 19:1–11; Cassava 56.1 ¶ 32.)

440. Rick Barry could not recall whether there was ever a vote of the Board to authorize the Defamation Action. (PX 8 (Barry Dep. Tr.) at 71:11-71:22.)

**Defendants' Response**: Undisputed that Mr. Barry testified that he did not recall a Board vote; he also testified that a vote was "likely," that "I'm not saying it didn't happen," and that "I would have voted in favor. I'll make that clear." (PX 8 (Barry Dep. Tr.) at 71:11–22.) The Board's decision to commence the Defamation Action was unanimous. (PX 5 (Barbier Dep. Tr.) at 129:2–7; Cassava 56.1 ¶ 42.)

441. Dr. Burns was the company's primary contact with Dr. Wang. (PX 17 (Wang Dep. Tr.) at 51:03-06 ("I only communicated with [] Lindsay, Dr. Burns"); PX 91 (CASSAVA_000217631).)

**Defendants' Response**: Undisputed.

442. On March 30, 2024, Dr. Burns described her role at Cassava as follows to the NIH: "I have been the project leader on our Alzheimer's program since my academic collaborator, Dr. Hoau-Yan Wang, and I identified filamin A (FLNA) as a novel therapeutic target . . . I monitored the proof-of-concept research, lead selection and efficacy experiments for simufilam and oversaw IND-enabling studies, chronic toxicity studies, and first-in-human and first-in-patient clinical trials." She further stated she was "motivated and capable of continuing as scientific lead of this program." (PX 204 (CASSAVA_ 001447291) at 305.)

**Defendants' Response**: Undisputed.

443. Dr. Burns and Barbier regularly discussed company affairs, including company strategy for responding to critics and legal matters. (PX 25 (BURNS_00000650) at 652, 661, 684 ("Remi tells me . . ."), 720 ("I got home and Remi hands me his cell phone . . ."), 686 ("Remi tried to call me to tell me the DOJ wanted all emails with JNS editor").

**Defendants' Response**: Disputed. The cited document contains the quoted language, but it does not support Plaintiffs' claimed fact. Defendants respectfully refer the Court to the document for its full contents and context, which reflect only a handful of instances in which Mr. Barbier and Dr. Burns discussed newspaper articles and a single instance in which Mr. Barbier, Cassava's CEO, requested that Dr. Burns, a Cassava employee, provide certain information in response to a DOJ request. The cited documents do not reflect that Mr. Barbier and Dr. Burns "regularly discussed . . . legal matters." Moreover, Dr. Burns testified that, "[p]articularly on legal matters, [Mr. Barbier] kept me in the dark intentionally." (PX 12 (Burns Dep. Tr.) at 152:5–7.)

444. Barbier communicated with Dr. Wang through Dr. Burns. (PX 121 (CASSAVA_000727933) at 949 (Dr. Burns text to Dr. Wang: "Remi says we will call you when you are ready. No emails please").)

**Defendants' Response**: Undisputed insofar as the cited document contains a single text from Dr. Burns to Dr. Wang stating that "Remi says we will call you when you are ready," but Defendants respectfully the Court to the document for its full contents and context, which show no other instances in which Mr. Barbier sought to communicate with Dr. Wang or in which Dr. Burns conveyed that Mr. Barbier sought to communication with Dr. Wang.

445. Dr. Burns monitored statements by Plaintiffs and other critics. (PX 25 (BURNS_00000650) at 676-680; PX 167 (CASSAVA_001022488); PX 67 (BURNS_00001308); PX 68 (BURNS_00001309); PX 168 (CASSAVA_001025059).)

**Defendants' Response**: Undisputed.

446. Dr. Burns felt personally attacked by Plaintiffs and other critics and believed her career was on the line. (PX 25 (BURNS_00000650) at 706 ("my entire academic research career was suddenly subjected to intense public scrutiny when Wall St investors and their collaborators started to relentlessly attack my reputation and scientific integrity, often with outlandish claims of data manipulation").)

**Defendants' Response**: Undisputed insofar as the cited document contains the quoted language attributed to it in the parenthetical, but Defendants respectfully refer the Court to the document for its full contents and context, including that the document does not reflect that Dr. Burns "believed her career was on the line."

447. Dr. Burns testified that "being painted to look like a fraudster" had caused Barbier to cry. (PX 12 (Burns Dep. Tr.) at 38:09-21.)

**Defendants' Response**: Undisputed.

448. Dr. Burns described the public scrutiny as "traumatic" for both her and Barbier. (PX 12 (Burns Dep. Tr.) at 38:20-21.)

**Defendants' Response**: Undisputed.

449. According to Dr. Burns, Dr. Burns and Barbier felt that the company's critics were "trying to kill us." (PX 12 (Burns Dep. Tr.) at 31:15-19.)

**Defendants' Response**: Undisputed.

450. Dr. Burns publicly threatened Plaintiffs by name, writing on Facebook in December 2021: "Sorry shorties. Sorry Adrian Heilbut. Sorry Jesse Brodkin. . . . Your days are numbered." (PX 208 (PLAINTIFFS0055826); PX 25 (BURNS_00000650) at 715.)

**Defendants' Response**: Disputed. The quoted language appears in the cited documents, but it was not a threat. Defendants respectfully refer the Court to the documents for their full contents and context, which make clear that Dr. Burns's statement that "Your days are numbered" related to Plaintiffs' efforts to publicly attack Cassava, and do not reflect any personal threat directed toward Plaintiffs.

451. Barbier and Dr. Burns were responsible for developing and implementing the company's strategy to blame criticism and negative media coverage on short sellers. (PX 93 (CASSAVA_000310872) at 873-874; PX 183 (CASSAVA_001329982) at 982; PX 118 (CASSAVA_000719419) at 421 (responding to scientific journal investigation by blaming "short-seller hedge funds"); PX 174 ("Per Dr. Burns' instructions yesterday, the attached letter has been supplied [] to share with the site [responding to CUNY Investigation Report].")

**Defendants' Response**: Disputed insofar as the cited documents do not demonstrate that Cassava had any formal "strategy to blame criticism and negative media coverage on short sellers" or that Mr. Barbier or Dr. Burns were "responsible" for any such strategy.

452. On December 1, 2021, Dr. Burns wrote: "I just don't understand why we have to wait for the investigations to conclude before filing a defamation suit [redacted for privilege]." (PX 25 (BURNS_00000650) at -697)

**Defendants' Response**: Undisputed.

453. Cassava's privilege log shows more than 190 emails involving Dr. Burns that Cassava described as related to the "Defamation Action" and withheld as privileged. (PX 228 (Priv Log Excerpt: Burns-Defamation).)

**Defendants' Response**: Undisputed.

454. Cassava's privilege log also shows more than 25 emails from Benesch to Dr. Burns. (PX 227 (Priv Log Excerpt: Burns-Benesch).)

**Defendants' Response**: Undisputed.

455. Barbier and Dr. Burns were the only Cassava employees on some emails with outside counsel. (PX 205 (CASSAVA_001494801); PX 149 (CASSAVA_000942580).)

**Defendants' Response**: Undisputed.

456. On September 28, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded a 2019 rejection from Nature Medicine for a manuscript on PTI-125 CSF biomarker results, including peer reviewer comments raising concerns about sample size, study design, and lack of placebo control. (PX 188 (CASSAVA_001415178) at 178.)

**Defendants' Response**: Undisputed.

457. On September 28, 2022, Dr. Burns exchanged an email with Kate Watson Moss at Benesch without any other Cassava employees, forwarding the JPAD manuscript-acceptance email and related submission correspondence. (PX 102 (CASSAVA_000391909) at 909.)

**Defendants' Response**: Undisputed.

458. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded COPE correspondence regarding the PLOS One retractions of Dr. Wang's and Dr. Burns's papers, including Dr. Burns's challenges to PLOS One's retraction process and her demand to see the underlying evidence. (PX 189 (CASSAVA_001415243) at 243.)

**Defendants' Response**: Undisputed.

459. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded further COPE correspondence regarding the PLOS One retractions, including Cassava investor and "SAVA Army" member Matthew Nachtrab's objections to the retractions. (PX 190 (CASSAVA_001415279) at 279.)

**Defendants' Response**: Undisputed.

460. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, forwarding PLOS One correspondence regarding its retractions and noting that PLOS One had promised a response only after Dr. Burns had emailed its CEO. (PX 125 (CASSAVA_000735587) at 587.)

**Defendants' Response**: Undisputed.

461. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, forwarding PLOS's response to COPE and raising confidentiality concerns about including non-authors in the correspondence. (PX 134 (CASSAVA_000741208) at 208.)

**Defendants' Response**: Undisputed

462. On September 29, 2022, Dr. Burns emailed Kate Watson Moss, copying Remi Barbier, forwarding COPE and PLOS One correspondence and identifying alleged connections between Elisabeth Bik and PLOS editors. (PX 131 (CASSAVA_000738379) at 379.)

**Defendants' Response**: Undisputed.

463. On September 29, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded an email chain regarding the retraction of a Dr. Wang paper by the Journal of Alzheimer's Research and Therapy, in which Dr. Burns demanded the journal identify its "independent expert," disclose conflicts of interest, and explain the basis for the retraction. (PX 192 (CASSAVA_001422638) at 638.)

**Defendants' Response**: Undisputed.

464. On September 29, 2022, Dr. Burns exchanged an email with Benesch that forwarded an email from Matthew Nachtrab reporting he had filed a complaint against Dr. Geoffry Pitt with the New York State Department of Health Office of Professional Medical Conduct, alleging Pitt and other short sellers were attempting to prevent Alzheimer's patients from accessing a viable treatment for financial gain. (PX 194 (CASSAVA_001423033) at 033.)

**Defendants' Response**: Undisputed.

465. On September 30, 2022, Dr. Burns sent an email to Kate Watson Moss, copying Remi Barbier, regarding an inquiry by the scientific journal J Pain; and the company's response to allegations, including a letter from Dr. Spruck. (PX 126 (CASSAVA_000735595) at 595.)

**Defendants' Response**: Undisputed.

466. On October 26, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded an email chain regarding Nuvance Health's compliance department requiring documentation from authoritative sources before proceeding with the

simufilam clinical trial, and included Dr. Burns's talking points defending Cassava's science. (PX 187 (CASSAVA_001415173) at 173.)

**Defendants' Response**: Undisputed.

467. On October 26, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, that forwarded an email chain in which Duke University withdrew from the simufilam Phase 3 clinical trial. (PX 195 (CASSAVA_001423121) at 121.)

**Defendants' Response**: Undisputed.

468. On October 29, 2022, Dr. Burns emailed Kate Watson Moss at Benesch stating that PLOS One's response to COPE was "basically the requested process flow is just a list of dates." (PX 135 (CASSAVA_000741222) at 222.)

**Defendants' Response**: Undisputed.

469. On October 31, 2022, Dr. Burns asked Zhe Pei, Dr. Wang's post-doc student, to send several research papers for Benesch to use in the Defamation Action. (PX 127 (CASSAVA_000735672) at 672-673.)

**Defendants' Response**: Undisputed insofar as Dr. Burns requested that Zhe Pei forward 5 research papers, but Defendants respectfully refer the Court to the document for its full contents and context, which does not refer to the Defamation Action or refer to any "use" of the research papers in the Defamation Action.

470. On November 10, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Dr. Wang, Chris Cook, and Remi Barbier, that forwarded an email from Paul Aisen regarding a CTAD conference poster abstract authored by Plaintiffs, which reported a failure to replicate binding of simufilam to its purported molecular target. (PX 108 (CASSAVA_000542140) at 140; PX 108 (CASSAVA_000542140) at 141.)

**Defendants' Response**: Undisputed insofar as the cited document reflects that Dr. Burns forwarded an email from Paul Aisen that attached a CTAD conference poster, but Defendants respectfully refer the Court to the document for its full contents and context, including that the document does not refer to any "failure to replicate binding of simufilam to its purported molecular target."

471. On November 18, 2022, Dr. Burns sent an email to Dr. Aisen, blind copying Kate Watson Moss at Benesch, about Plaintiffs' CTAD conference poster; and Cassava's letter to the editor in response. (PX 164 (CASSAVA_001011091) at 091.)

**Defendants' Response**: Undisputed.

472. On November 19, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch that forwarded her email exchange with Dr. Aisen regarding Plaintiffs' CTAD conference poster. (PX 193 (CASSAVA_001422868) at 868.)

**Defendants' Response**: Undisputed.

473. On November 22, 2022, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier, flagging Elisabeth Bik's criticism of journal editors and Dr. Brodkin's retweet of it. (PX 179 (CASSAVA_001303342) at 342.)

**Defendants' Response**: Undisputed.

474. On November 23, 2022, Dr. Burns texted a friend that she "would love to serve" Dr. Heilbut "at his poster" presentation at the CTAD conference. (PX 32 (BURNS_00000841) at 841)

**Defendants' Response**: Undisputed.

475. On December 2, 2022, a process server served the Defamation Action pleadings on Dr. Heilbut at his poster presentation at the CTAD conference. (PX 73 (Defamation Dkt. 68); PX 210 (PLAINTIFFS0180166).)

**Defendants' Response**: Undisputed.

476. On January 9, 2023, Dr. Burns sent an email to Dr. Wang, copying Remi Barbier and Kate Watson Moss, that forwarded a rejection from the journal Aging and Disease for a manuscript on Simufilam, noting that 25 invited experts had declined to review it, and stating "I cannot take it." (PX 130 (CASSAVA_000736588) at 588.)

**Defendants' Response**: Undisputed.

477. On January 26, 2023, Dr. Burns sent an email to Kate Watson Moss at Benesch, copying Remi Barbier and Chris Cook, that forwarded information regarding Dr. Heilbut's Twitter posts. (PX 148 (CASSAVA_000942361) at 361.)

**Defendants' Response**: Undisputed.

478. In July 2024, the Board forced Barbier and Dr. Burns to resign from the company as part of the company's settlement of an SEC investigation and complaint against Cassava, Barbier, and Burns. (PX 200 (CASSAVA_001444640) at 640; PX 185 (CASSAVA_001402478).)

**Defendants' Response**: Disputed. Mr. Barbier resigned by letter dated July 15, 2024, and on July 16, 2024, Cassava and Dr. Burns agreed that she would step down from her employment, on terms set forth in a consulting agreement. (PX 185 (CASSAVA_001402478) at 2478–79; PX 256 (Cassava Sciences, Inc., Form 8-K (July 17, 2024)), Items 5.02, 8.01.) Cassava's Form 8-K reported that Mr. Barbier's resignation from the Board "is not a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices." (PX 256, Item 5.02.) Plaintiffs cite no

evidence that either departure was "part of" a settlement with the SEC. Neither cited document refers to any settlement, and the court did not enter judgment on Cassava's settlement with the SEC until October 18, 2024. (PX 185 at 2478–79; PX 200 (CASSAVA_001444640) at 4640; PX 260 at 31.)

479. On July 15, 2024, Barbier resigned from the company, effective as of September 13, 2024. (PX 256 (Cassava Sciences, Inc., Form 8-K (July 17, 2024)).)

**Defendants' Response**: Undisputed.

480. On July 15, 2024, the Board appointed Richard Barry to serve as the company's principal executive officer. (PX 256 (Cassava Sciences, Inc., Form 8-K (July 17, 2024)).)

**Defendants' Response**: Undisputed.

481. On July 16, 2024, Dr. Burns and Cassava "agreed that Dr. Burns will step down from her employment, effective immediately." (PX 256 (Cassava Sciences, Inc., Form 8-K (July 17, 2024)).)

**Defendants' Response**: Undisputed.

482. On July 18, 2024, Rick Barry sent an email to the Board, stating:

> "I explained that no one wanted to remove the founder of a company in this way let alone the co-inventor of such a promising drug - but the circumstances that came to light over the last month and the information that our investigative committee learned really gave the board no choice but to take action. I shared that the government had developed a remarkably dark view of the company - primarily from various disclosures over the last several years and that dark view caused the SEC in particular to look at everything they uncovered about the company through a highly suspicious lens - and we didn't have the time or the evidence to disprove their allegations."

(PX 200 (CASSAVA_001444640) at 640.)

**Defendants' Response**: Undisputed that PX 200 contains the quoted language, which appears in a July 18, 2024 email from Mr. Barry to the Board describing remarks he

made to employees about the company's leadership change. (PX 200 (CASSAVA_001444640) at 4640.)

483. Cassava's Board approved the 2020 Cash Incentive Bonus Plan on August 26, 2020, in the midst of the company's "reanalysis" of the phase 2b study. (PX 115 (CASSAVA_000700979) at -979 (2020 Cash Incentive Bonus Plan, effective Aug. 26, 2020); PX 257 (Cassava Sciences, Inc., Form 10-K (FY2020)) at 73.)

**Defendants' Response**: Undisputed that the Board approved the Plan, effective August 26, 2020.

484. Plan participants would be awarded bonuses upon the achievement of "Target Valuation Milestones," with aggregate payments for all participants ranging from $10 million at a market capitalization of $200 million to $50 million at $5 billion. (PX 115 (CASSAVA_000700979) at 991 (Schedule 1, Target Valuation Milestones and Aggregate Bonus Payments).)

**Defendants' Response**: Undisputed.

485. Bonus Payments were not conditional on the success of the company's clinical trials or approval of simufilam; eligibility was tied solely to the company's stock price. (PX 115 (CASSAVA_000700979) at -982 (Section 4.1, Achievement of a Target Valuation Milestone tied to Market Price or Merger Transaction, not clinical outcomes); PX 16 (Cassava (30(b)(6)) Dep. Tr.) at 136:5-137:4 (acknowledging "the actual language in the plan was not based on the drug getting approved").)

**Defendants' Response**: Undisputed that under Section 4.1 of the Plan, achievement of a Target Valuation Milestone turned on the company's market capitalization or the consideration received in a Merger Transaction, rather than on a

clinical or regulatory outcome. (PX 115 (CASSAVA_000700979) at 0982.) Disputed that eligibility was tied "solely" to the company's stock price, because a milestone could also be achieved through a Merger Transaction. (Id.) The quoted words come from a question put to Cassava's Rule 30(b)(6) designee, who agreed with the question but added that any award "had to be awarded by the compensation committee of the board of directors and had to hit actual triggers for payouts." (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 137:5–14.) He also testified that the amounts awarded were "a hypothetical bonus amount that was never paid" and that "the intent was this is a success-based plan." (Id. at 136:1–4, 136:21–23.)

486. Barbier, as Chairman, President, and CEO, was entitled by formula to no less than 33.3% of each aggregate bonus—a non-discretionary entitlement—while approximately 59% of each aggregate award was subject to the discretionary judgment of the Compensation Committee for allocation among other participants. (PX 115 (CASSAVA_000700979) at 982 (Section 4.1); PX 257 (Cassava Sciences, Inc., Form 10-K (FY2020)) at 91.)

**Defendants' Response**: Disputed as characterized. Defendants respectfully refer the Court to the cited documents for their full contents and context, including that (i) Section 4.1 of the Plan provides that the Chairman, President and CEO would receive no less than 33.3% of any Aggregate Bonus Payment, but that no Bonus Payment was payable unless and until further conditions were met (PX 115 (CASSAVA_000700979) at 0982, 0984–85); and (ii) no Bonus Payment was ever authorized or made under the Plan, to Mr. Barbier or any other participant (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88).

487. Dr. Burns was a participant in the bonus plan. (PX 115 (CASSAVA_000700979) at 992.)

**Defendants' Response**: Undisputed.

488. On August 7, 2021, Dr. Burns texted Dr. Wang: "there is a bonus plan and you are on it – obviously." (PX 91 (CASSAVA_000217631) at 632.)

**Defendants' Response**: Undisputed.

489. Actual payment of bonuses was deferred until (1) the company completed a merger or acquisition transaction ("Merger Transaction"), in which case all earned bonuses would be paid, or (2) the Compensation Committee determined the company had sufficient cash remaining—after pro forma payment of all bonuses—to meet the company's projected cash needs for the subsequent 24 months. (PX 115 (CASSAVA_000700979) at 982 to 984 (Sections 4.1, 4.6, 5.1); PX 257 (Cassava Sciences, Inc., Form 10-K (FY2020)) at 73.)

**Defendants' Response**: Undisputed that, other than in connection with a Merger Transaction, Section 4.6 of the Plan required the company to defer payment of any Bonus Payment until it had "Remaining Sufficient Cash," as the Plan defines that term, and that Section 5.1 governs the timing of payment following a Merger Transaction. (PX 115 (CASSAVA_000700979) at 0984–85.) No payment was ever authorized or made under the Plan. (PX 16 (Cassava 30(b)(6) Dep. Tr.) at 136:1–3; PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88.)

490. Cassava achieved 12 milestones in total. The first was achieved on October 13, 2020, when the company's market capitalization exceeded $200 million for 20 consecutive trading days. Eleven additional milestones were achieved during 2021. No milestones were achieved in 2022, 2023, or 2024. (PX 116 (CASSAVA_000702208) (First Milestone Memo, Oct. 16, 2020);

PX 258 (Cassava Sciences, Inc., Form 10-K (FY2021)) at 82; PX 259 (Cassava Sciences, Inc., Form 10-K (FY2023)) at 88.)

**Defendants' Response**: Undisputed that Cassava's SEC filings so report. (PX 257 (Cassava Sciences, Inc., Form 10-K (FY2020)) at 91; PX 258 (Cassava Sciences, Inc., Form 10-K (FY2021)) at 102; PX 259 (Cassava Sciences, Inc., Form 10-K (FY2023)) at 87; PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88.) As the paragraph acknowledges, no milestone was achieved in 2022, the year Cassava commenced the Defamation Action, or thereafter. The same filings report that no payment was ever authorized or made under the Plan. (PX 259 at 87; PX 260 at 88.)

491. Barbier's non-discretionary entitlement from the first milestone was $3.33 million; and the 11 milestones achieved in 2021 triggered a further non-discretionary potential obligation to Barbier of $74.9 million. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 110.)

**Defendants' Response**: Disputed as characterized. Section 4.1 of the Plan provides that the Chairman, President and CEO would receive no less than 33.3% of any Aggregate Bonus Payment, but no Bonus Payment was payable unless and until further conditions were met. (PX 115 (CASSAVA_000700979) at 0982, 0984–85.) No payment was ever authorized or made under the Plan, to Mr. Barbier or any other participant. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88.)

492. The Plan was subsequently amended three times. First, effective March 16, 2023, the Board amended the Plan to remove all independent directors as participants; the directors' share of potential benefits was completely forfeited to the company and not reallocated to any other participant. This amendment followed a shareholder derivative action filed on August 19, 2022 in the Delaware Court of Chancery, alleging that the individual defendants breached their

fiduciary duties by approving the Plan. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88, 133.)

**Defendants' Response**: Undisputed that Cassava's Form 10-K so reports. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88, 113.) The same filing reports that the independent directors consented to their removal and "have not received, and as a result of such amendment will never receive, any payments under the CIB Plan." (Id. at 88.) The allegations of the derivative complaint are not evidence of the facts alleged.

493. Second, on May 28, 2024, the parties to the derivative action entered into a Stipulation and Agreement of Settlement, which required the company to, among other things, create a compensation disclosure committee, retain a compensation consultant, and change the manner in which Barbier was eligible for payment under the Plan. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88, 133.)

**Defendants' Response**: Undisputed that on May 28, 2024, the parties to the derivative action entered into a Stipulation and Agreement of Settlement, Compromise, and Release, which the Delaware Court of Chancery approved on January 24, 2025, and that the Final Order and Judgment requires Cassava to further amend the Plan as provided in the Stipulation. (PX 260 (Cassava Sciences, Inc., Form 10-K (FY2024)) at 88, 113.) Disputed that the cited Form 10-K describes the specific terms the paragraph recites; it does not. (Id.)

494. Third, on March 6, 2025, the Board amended and restated the Plan to give effect to the amendments required by a derivative action settlement: upon a Merger Transaction, the Chairman/President/CEO would no longer be entitled to any payments based on market capitalization milestones, but would instead receive a bonus based solely on the merger

consideration; and outside of a Merger Transaction, no bonus payments would be made to the Chairman/President/CEO unless and until the FDA approved simufilam. (PX 263 (Cassava Sciences, Inc., Form 10-Q (Q2 2025)) at 17.)

**Defendants' Response**: Undisputed that, as Cassava's Form 10-Q reports, the Plan was amended on March 6, 2025, as required by the final judgment approving the derivative settlement, and that under the amendment the Chairman, President and CEO is not entitled to payments based on market capitalization upon a Merger Transaction but instead to a bonus based on the Merger Transaction only. (PX 263 (Cassava Sciences, Inc., Form 10-Q (Q2 2025)) at 14 [Plaintiffs cite 17; confirm pagination].) Disputed as to the cited evidence insofar as the paragraph asserts that the amendment conditioned any payment on FDA approval of simufilam; the cited Form 10-Q says nothing of the kind. (Id.)

495. Dr. Angelique Bordey testified that the 2020 Yale study "had nothing to do with Alzheimer's disease," that the experiments "did not seek to confirm the existence of altered FLNA," and that the study "did not confirm or seek to confirm simufilam binding to FLNA." (PX 9 (Bordey Dep. Tr.) at 62:18-64:24 ("We did not try to confirm simufilam's mechanism of action in AD. Our paper was not about Alzheimer's disease."), 61:08-20.)

**Defendants' Response**: Disputed as quoted. Apart from the parenthetical, the cited testimony does not contain the phrases the paragraph places in quotation marks. (PX 9 (Bordey Dep. Tr.) at 61:8–20, 62:18–64:24.) Dr. Bordey testified that the 2020 study did not include experiments designed to test the claims made about simufilam in Alzheimer's disease, and she rejected the characterization that the study failed to confirm them: "We did not try to confirm. So you can't say we did not confirm which is did not try." (Id. at 60:12–61:4.) She also testified that reducing Filamin A genetically and administering

simufilam "have the same impact on the cells," which would "ultimately suggest that it might work through Filamin A," although additional evidence would be needed to validate that hypothesis. (Id. at 33:8–19.) The Yale study reported increased FLNA expression in identified human tissue and mouse models and that PTI-125 treatment reduced seizure frequency; Yale-affiliated researchers performed and analyzed most experiments, and the seizure analyses were blinded. (Cassava Exhibit 31 at 1, 3, 7, 11–12; Cassava Exhibit 32 (Bordey Ex. 117); PX 9 (Bordey Dep. Tr.) at 185:16–187:19; Cassava 56.1 ¶ 52.) Cassava regarded the study as outside research reporting similar biological activity. (Cassava 56.1 ¶ 51.)

496. Dr. Burns was a co-author of the Yale study and edited the draft manuscript to add language about simufilam's mechanism of action. (PX 9 (Bordey Dep. Tr.) at 140:11- 144:24; PX 219 (BORDEY-0000000171).)

**Defendants' Response**: Undisputed.

497. Dr. Bordey was an investor in Cassava at the time the 2020 Yale study was published. (PX 9 (Bordey Dep. Tr.) at 216:14-217:21; PX 77 (CASSAVA_000027886).)

**Defendants' Response**: Undisputed. Dr. Bordey testified that she first invested in Cassava in the 2010s, purchasing approximately 1,000 shares for about $2,000. (PX 9 (Bordey Dep. Tr.) at 22:8–23.)

498. The Nagoya University study, published in May 2022, did not use simufilam and did not purport to confirm or corroborate any findings by Dr. Wang or Dr. Burns. (PX 137 (CASSAVA_000785987).)

**Defendants' Response**: Undisputed that the Nagoya study did not use simufilam. Disputed to the extent the paragraph implies that the study had no bearing on Cassava's

scientific hypothesis. The study reported that increased FLNA promoted tau phosphorylation and aggregation in progressive supranuclear palsy, a tauopathy, and that reducing FLNA corrected aberrant tau levels. It cited Dr. Burns's and Dr. Wang's published work for the propositions that altered FLNA induces tau hyperphosphorylation and that a small molecule with high affinity for altered FLNA can inhibit that pathway, and it described its findings as suggesting "the potential for FLNA-targeted strategies in PSP." (PX 137 (CASSAVA_000785987) at 5987, 5996.) Cassava understood the study as further support for a role for FLNA in tau pathology. (PX 16 (Schoen 30(b)(6) Dep. Tr.) at 12:6–23; Cassava 56.1 ¶ 53.)

499. The Milan study, an unpublished abstract from May 2023, co-authored by Dr. Burns, and paid for by Cassava, did not purport to confirm or corroborate any of Dr. Wang's or Dr. Burns's findings. (PX 138 (CASSAVA_000786068).)

**Defendants' Response**: Undisputed that Dr. Burns is listed as a co-author of the abstract, which reported research conducted at the University of Milan using simufilam that Cassava provided under a Material Transfer Agreement. (PX 138 (CASSAVA_000786068) at 6068, 6073.) Disputed that the abstract was "unpublished": it was published in Endocrine Abstracts in connection with the May 2023 European Congress of Endocrinology. (Id. at 6068.) Disputed that the cited document shows that Cassava "paid for" the study; it states only that simufilam was provided under a Material Transfer Agreement, and the abstract's senior author, Dr. Erika Peverelli, declared no potential conflict of interest. (Id. at 6072–73.) Disputed to the extent the paragraph implies that the abstract has no bearing on simufilam's reported mechanism: it reported that simufilam

reduced FLNA phosphorylation and enhanced and prolonged FLNA's interaction with a partner protein in human pituitary tumor cells. (Id. at 6068–69.)

500. The Cochin study, published in September 2023, co-authored by Dr. Burns and Dr. Wang, relied on post-hoc exclusion criteria to omit approximately 40% of the data. (PX 157 (CASSAVA_000994072) at 086 ("values were excluded from the analysis (highlighted in red)"), 086-094 (showing approximately 40% of data as excluded)).

**Defendants' Response**: Undisputed that the study's published article, issued in September 2023, lists Dr. Burns and Dr. Wang among its co-authors. Disputed as characterized. PX 157 is the final report, dated March 15, 2024, of a TR-FRET binding study conducted between July and September 2023 at Institut Cochin. (PX 157 (CASSAVA_000994072) at 4072, 4077.) The report's methodology section sets out the inclusion and exclusion criteria applied to individual replicate wells: wells were considered valid when donor values fell within 10% of the plate mean, and wells outside that range whose acceptor/donor ratios diverged from the other replicates, or wells affected by technical errors, were excluded. (Id. at 4080.) The cited Appendix pages apply those criteria within each experiment; they do not state that the criteria were adopted after the data were collected, and they do not quantify the share of data excluded. (Id. at 4086–94.) Plaintiffs cite no testimony supporting either characterization.

501. Before the Defamation Action was filed, Dr. Milioris executed a written employment agreement with a Greek pharmaceutical company called ElmiPharm. (PX 211 (PLAINTIFFS0234937) at 937.)

**Defendants' Response**: Undisputed that Dr. Milioris testified that he executed an employment agreement with ElmiPharm in early October 2022, and that PX 211 is a

certified translation of a fixed-term employment contract dated October 11, 2022. (PX 20 (Milioris Dep. Tr.) at 37:19–38:1; PX 211 (PLAINTIFFS0234937) at 4937–38.)

502. The ElmiPharm employment agreement contemplated three years' employment. (PX 211 (PLAINTIFFS0234937) at 937.)

**Defendants' Response**: Undisputed that PX 211 provides for a fixed term of three years commencing January 9, 2023, which could be terminated before its expiration only "for substantive cause." (PX 211 (PLAINTIFFS0234937) at 4937.) Dr. Milioris never began working for ElmiPharm. (PX 20 (Milioris Dep. Tr.) at 262:5–14; Cassava 56.1 ¶ 117.)

503. The ElmiPharm employment agreement provided for a base salary of 96,000 Euros. (PX 211 (PLAINTIFFS0234937) at 937.)

**Defendants' Response**: Undisputed that PX 211 provides for monthly compensation of €8,000, or €96,000 per year. (PX 211 (PLAINTIFFS0234937) at 4937; PX 20 (Milioris Dep. Tr.) at 260:13–18.)

504. The ElmiPharm employment agreement provided for a target bonus of 40% of his base salary. (PX 211 (PLAINTIFFS0234937) at 937.)

**Defendants' Response**: Undisputed that PX 211 refers to "a performance bonus equivalent to 40% of annual earnings." (PX 211 (PLAINTIFFS0234937) at 4937.) Disputed insofar as the paragraph implies that any bonus was assured: Dr. Milioris testified that the bonus was not guaranteed, that it "could be up to 40 percent, not strictly 40 percent," and that it would depend on unspecified conditions such as "meeting sales objectives." (PX 20 (Milioris Dep. Tr.) at 260:19–261:20; Cassava 56.1 ¶ 124.)

505. Dr. Milioris disclosed the commencement of the defamation action to ElmiPharm. (PX 20 (Milioris Dep.) at 41:11-24.)

**Defendants' Response**: Undisputed that Dr. Milioris testified that, in the second week of November 2022, he initiated an in-person meeting with ElmiPharm to disclose the Defamation Action and "asked them to consider whether that would be an issue for them." (PX 20 (Milioris Dep. Tr.) at 40:7–13, 41:11–24, 42:12–17; Cassava 56.1 ¶ 117.)

506. After Dr. Milioris disclosed the commencement of the defamation action to ElmiPharm, the company declined to move forward with his employment. (PX 20 (Milioris Dep.) at 38:14-19 ("Q. And you mentioned that offer was rescinded; is that right? A. Yes. Q. After the contract was executed? A. Yes."); see also id. 38:20-43:19.)

**Defendants' Response**: Undisputed that Dr. Milioris never began working for ElmiPharm and that he described ElmiPharm's decision as a rescission. (PX 20 (Milioris Dep. Tr.) at 38:14–19, 262:5–14.) Disputed insofar as the paragraph presents ElmiPharm's reasons as established fact. The only evidence Plaintiffs offer of those reasons is Dr. Milioris's own account of what ElmiPharm's representatives told him; Plaintiffs offer no testimony, document, or declaration from ElmiPharm, and their damages expert relied solely on Dr. Milioris's account. (Cassava Exhibit 43 (Soudry Dep. Tr.) at 128:3–129:16; Cassava 56.1 ¶¶ 117–121.) Cassava objects to that account to the extent it is offered for the truth of ElmiPharm's actions or reasons for those actions as inadmissible hearsay. Fed. R. Evid. 802. By Dr. Milioris's own account, after he initiated a meeting to disclose the suit and asked ElmiPharm "to consider whether that would be an issue for them," ElmiPharm "proposed that we postpone the engagement indefinitely until the case had resolved" and "suggested that we call it off until the case resolves and then we can potentially revisit."

(PX 20 (Milioris Dep. Tr.) at 41:11–42:17, 43:1–4, 43:17–19.) He did not seek legal advice, did not believe at the time that the contract had been wrongfully rescinded, and "couldn't fault an employer for . . . taking a caution stance." (Id. at 89:5–90:9, 265:11–13.) He reports that when he later contacted ElmiPharm, there was no role available; he does not know why, and he did not ask. (Id. at 43:20–44:14.)

507. Proposed expert witness Michael Soudry calculated cumulative lost earnings associated with the lost ElmiPharm position as €351,124 (approximately $404,697) over three years. (PX 237 (M. Soudry Expert Report, Milioris).)

**Defendants' Response**: Undisputed that Mr. Soudry's report calculates €351,124 in claimed lost earnings, which it converts to $404,679, not $404,697. (PX 237 (Soudry Milioris Report) at 2; Cassava Exhibit 45 (Soudry Milioris Report) at 2.) Disputed that the calculation reflects any loss caused by the Defamation Action. Mr. Soudry assumed the truth of the facts supplied to him, including that ElmiPharm rescinded the offer because of the Defamation Action, which he accepted from Dr. Milioris without independent verification or any corroborating communication. (PX 237 at 1–2; Cassava Exhibit 43 (Soudry Dep. Tr.) at 128:3–129:16.) Again, Plaintiffs have offered no admissible evidence that ElmiPharm rescinded any offer or that it did so because of the Defamation Action. He also assumed that Dr. Milioris would have received the full 40 percent bonus in each year, although Dr. Milioris testified that the bonus was not guaranteed, and, beyond deducting Dr. Milioris's reported earnings, he did not analyze job-search efforts, alternative employment, or termination risk. (PX 237 at 2; Cassava Exhibit 43 (Soudry Dep. Tr.) at 131:4–132:6; Cassava Exhibit 46 (Bubna Report) ¶ 13(6)–(8), ¶¶ 53–59; Cassava 56.1 ¶¶ 118, 122–123.)

508. Dr. Milioris required psychiatric care as a result of the stress caused by the Defamation Action. (PX 212 (PLAINTIFFS0235978) (medical opinion); PX 213 (PLAINTIFFS0235981) (prescription).)

**Defendants' Response**: Disputed. Cassava objects to PX 212 and PX 213 as inadmissible hearsay. Fed. R. Evid. 802. PX 212 is a translated "medical opinion" dated February 17, 2025, prepared at Dr. Milioris's request "for any legitimate legal use," and Plaintiffs served no expert report offering any opinion concerning any Plaintiff's alleged emotional distress. (PX 212 (PLAINTIFFS0235978) at 5978; Cassava 56.1 ¶ 92.) PX 213 is a prescription issued the same day, more than six months after the Defamation Action was dismissed. (PX 213 (PLAINTIFFS0235981) at 5981.) PX 212 itself reports that Dr. Milioris's symptoms remitted beginning in April 2024, that his medications were gradually discontinued, and that he was functioning normally "without active psychopathology." (PX 212 at 5978.) Dr. Milioris testified that by late 2022 he was experiencing stress in "loads of other aspects of [his] life," including stock trading, and PX 212 attributes his symptoms to "psychologically stressful situations (legal dispute)" without identifying the Defamation Action. (PX 20 (Milioris Dep. Tr.) at 55:1–19, 59:15–60:13; PX 212 at 5978; Cassava 56.1 ¶ 126.)

509. Dr. Heilbut earned approximately fifteen to twenty thousand dollars through paid consulting calls with hedge funds Perceptive and Eminence between 2021 and 2022. (PX 18 (Heilbut Dep.) at 142:10-143:8; 145:5-146:18; see also PX 236 (M. Soudry Expert Report, Heilbut) at 2.)

**Defendants' Response**: Undisputed that Dr. Heilbut estimated that he earned "on the order of $15- to $20,000" from equity-research calls and reports between late 2021 and

early 2023. (PX 18 (Heilbut Dep. Tr.) at 145:8–146:15.) By year, he estimated "a few thousand dollars in late 2021," "on the order of $8- to $10,000 in 2022," and "a couple of thousand dollars in 2023." (Id. at 146:2–13.) Nearly every call concerned Cassava as a primary or secondary topic. (Id. at 142:10–143:8; Cassava 56.1 ¶ 102.)

510. These consulting calls were conducted through a service called Guidepoint. (PX 18 (Heilbut Dep.) at 138:18-139:10.)

**Defendants' Response**: Undisputed.

511. Dr. Heilbut's hourly rate for these consulting calls was $350. (PX 18 (Heilbut Dep.) at 145:5-7.)

**Defendants' Response**: Undisputed that Dr. Heilbut so testified.

512. Dr. Heilbut conducted over a dozen calls with Perceptive during this period. (PX 18 (Heilbut Dep.) at 140:2-19.)

**Defendants' Response**: Undisputed that Dr. Heilbut testified that he had "on the order of 12 to 15" calls with Perceptive, roughly a dozen of them between the fall of 2021 and the end of 2022, at a rate of about once or twice a month, and one or two in early 2023. (PX 18 (Heilbut Dep. Tr.) at 139:21–140:19.)

513. After the filing of the Defamation Action, a representative of Perceptive named Hossein Ekrami told Dr. Heilbut that Perceptive had concerns about continuing to consult with him, because of the pendency of the Defamation Action. (PX 18 (Heilbut Dep.) at 148:19-153:4.)

**Defendants' Response**: Undisputed that Dr. Heilbut testified that a Perceptive employee, Hossein Ekrami, told him that Perceptive was concerned about doing calls with him "officially through GuidePoint" because of the Defamation Action and "the regulatory risk to them." (PX 18 (Heilbut Dep. Tr.) at 148:19–149:9.) Disputed insofar as the

paragraph implies that Dr. Heilbut knows Perceptive's reasons. Dr. Heilbut testified that the concern was "expressed pretty vaguely," that he does not "know what their internal debate about that was," and that his account of Perceptive's reasons reflects his "suspicion." (Id. at 151:15–153:4.) Cassava objects to Dr. Heilbut's account of Mr. Ekrami's statements to the extent it is offered to prove Perceptive's reasons. To the extent Dr. Heilbut offers testimony to prove the Hossein Ekramai's statement are true, they are inadmissible hearsay. Fed. R. Evid. 802.

514. After the filing of the Defamation Action, Perceptive ceased consulting with Dr. Heilbut, apart from occasional unpaid calls outside of the GuidePoint platform. (PX 18 (Heilbut Dep.) at 153:5-158:3.)

**Defendants' Response**: Undisputed that Dr. Heilbut testified that Perceptive stopped scheduling paid calls with him through GuidePoint and thereafter spoke with him informally, without payment, on a handful of occasions. (PX 18 (Heilbut Dep. Tr.) at 155:4–156:22.) Disputed insofar as the paragraph implies that Perceptive ended its relationship with Dr. Heilbut or lost interest in speaking with him: he testified that Perceptive personnel "were still interested in speaking with" him and were reluctant to run calls "through the GuidePoint platform." (Id.) And in any case, if offered for their truth, Dr. Heilbut's testimony as what Perceptive personnel told him is inadmissible hearsay. Fed. R. Evid. 802. He also agreed that companies are not as interested in Cassava stock as they were in 2021 and 2022. (Id. at 154:6–12.)

515. Eminence did not consult with Dr. Heilbut on a paid basis after the commencement of the Defamation Action. (PX 18 (Heilbut Dep.) at 140:20-142:6.)

**Defendants' Response**: Undisputed that Dr. Heilbut so testified. Dr. Heilbut's only paid calls with Eminence were two calls in the fall of 2021, more than a year before the Defamation Action was filed, and he testified that no one at Eminence told him that its calls stopped because of the Defamation Action. (PX 18 (Heilbut Dep. Tr.) at 140:20–141:15, 149:20–23; Cassava 56.1 ¶¶ 101, 104.)

516. In February 2021, prior to the filing of the Defamation Action, Dr. Heilbut launched an equity research consulting firm called Logphase. (PX 18 (Heilbut Dep.) at 191:13- 19.)

**Defendants' Response**: Undisputed that Dr. Heilbut testified that he created the website logphase.com and published research in February or March 2021, and that he formed an LLC in the spring of 2022. (PX 18 (Heilbut Dep. Tr.) at 191:13–192:4.) The venture generated "only several thousand dollars" in revenue in 2021, consisting of the same consulting-call income described above and other miscellaneous work. (Id. at 192:5–24; Cassava 56.1 ¶ 112.)

517. Dr. Heilbut testified that the Defamation Action stalled his efforts to make Logphase a success and to grow its business. (PX 18 (Heilbut Dep.) at 191:13-192:04; see also 159:21-182:18.)

**Defendants' Response**: Undisputed that Dr. Heilbut so testified. Disputed that any evidence other than Dr. Heilbut's own testimony supports that assertion. Plaintiffs' damages expert did not attempt to value Logphase or project its earnings, testifying that there were "too many variables" to do so (Cassava Exhibit 43 (Soudry Dep. Tr.) at 56:10–20; Cassava 56.1 ¶ 109.) Dr. Heilbut attributed his claimed inability to grow the business to "the enormous distraction in time and like just anxiety caused by this whole thing" and

to concerns about his reputation. (PX 18 (Heilbut Dep. Tr.) at 164:18–24; Cassava 56.1 ¶ 113.)

518. Dr. Heilbut also experienced significant emotional distress and mental health issues arising from the Defamation Action. (PX 18 (Heilbut Dep.) at 209:14-210:17 (Defamation Action caused "a lot of anxiety and distraction…because…it represented an existential threat to, you know, like my financial state my career and everything"); 215:8-19 (sought care of psychiatrist); 219:8-12 ("my own personal like perception is that I've been miserable and depressed because of the stress and financial costs from the defamation action").)

**Defendants' Response**: Defendants' Response: Disputed. The only evidence cited is Dr. Heilbut's own testimony, and that testimony does not establish "significant emotional distress" or "mental health issues arising from the Defamation Action." Dr. Heilbut described the claimed distress as "primarily anxiety" and distraction from "having to be focused on the case." (PX 18 (Heilbut Dep. Tr.) at 209:23–210:12.) He testified that any depression was "not severe enough to be something that required more intervention," that he felt "more functional not taking medication for that," and that his belief that he has been "miserable and depressed" because of the Defamation Action reflects his "own personal like perception." (Id. at 218:20–219:12.) The psychiatrist he identified is one he has seen intermittently since about 2018, principally for renewals of a prescription for ADHD medication, and he was prescribed medication for depression in approximately 2019, years before the Defamation Action. (Id. at 215:11–216:21, 217:17–218:11.) He does not believe the frequency of his visits increased after the Defamation Action was filed, and he received no new diagnosis and no new prescription for depression after the filing. (PX 18 (Heilbut Dep. Tr.) at 217:4–218:15; Cassava 56.1 ¶ 114.) Plaintiffs cite no medical

record, treating-physician testimony, or expert opinion attributing any condition to the Defamation Action.

519. The Defamation Action caused extreme conflict between Dr. Brodkin and his wife Dr. Lisa Brodkin, including accusations by Dr. Lisa Brodkin that he was an unfit father. (PX 10 (J. Brodkin Dep.) at 271:22–272:4 ("So she was quite furious with me for getting into this situation and thought that I had placed our family's financial future in serious jeopardy and that I was, I guess, an unfit father in that respect. And we had a lot of fights about that.").)

**Defendants' Response**: Disputed. The cited testimony is Dr. Brodkin's description of the category of damages identified in his verified interrogatory response as "[d]amages for emotional distress including the disruption of personal and family relationships." (PX 10 (Brodkin Dep. Tr.) at 271:6–17; Cassava Exhibit 36 (Brodkin May 12 Interrog. Resp.) No. 9 at 8–10; Cassava 56.1 ¶ 98.) The record shows that conflict between Dr. Brodkin and Dr. Lisa Brodkin over his public statements about Cassava predated the Defamation Action. Before the action was filed, Dr. Lisa Brodkin was "very afraid" that he would be sued because his tweets were "obnoxious and occasionally inflammatory," and she asked him to stop tweeting "[c]onstantly," which he "[n]ever" did. (PX 11 (L. Brodkin Dep. Tr.) at 51:24–52:4, 55:4–56:11.) Asked why she believed he had put the family "in harm's way," she answered: "Tweets. Obnoxious tweets." (Id. at 90:13–18.) She also testified that a tweet Dr. Brodkin posted after the Defamation Action was filed, asking to be named as a defendant, was "reckless" and "irresponsible" and is "something that we still fight about to this day." (Id. at 65:17–67:17.) Dr. Brodkin and Dr. Lisa Brodkin remain married. (PX 10 (Brodkin Dep. Tr.) at 271:18–19.)

520. The Defamation Action led Dr. Lisa Brodkin to separate her personal finances from Dr. Brodkin and to seek legal counsel to advise concerning a potential bankruptcy or divorce. (PX 10 (J. Brodkin Dep.) at 272:5–8 ("And she changed her financial situation so that I didn't have access to her money that she got through her income."); 272:9–12 ("And she sought legal Counsel from a bankruptcy lawyer and family lawyer and lots of fights and yelling and slamming of doors, that kind of stuff.").)

**Defendants' Response**: Undisputed that Dr. Brodkin so testified. *See* Defendants' Response to Paragraph 519.

521. The Defamation Action led to significant disruption of the marital relationship between Dr. Brodkin and Dr. Lisa Brodkin. (PX 10 (J. Brodkin Dep.) at 272:18–23 ("Her position was that I don't understand how the legal system works and that even if you're completely innocent, it can cost you hundreds of thousands of dollars. And even if you're right, you may not win and everybody loses."); 272:24–273:4 ("And she was particularly freaked out about the kind of $2 billion number that was floated on the defamation suit. And she saw that as kind of an existential threat. So she was really mad at me."); 273:13–16 ("Yes, the disruption of the relationship. We had a lot of fights and didn't get along for a very long time, which was emotionally draining.").)

**Defendants' Response**: Disputed for the reasons stated in response to Paragraph 519.

522. The Defamation Action was frightening for Dr. Brodkin and led to an ongoing fear of bankruptcy. (PX 10 (J. Brodkin Dep.) at 274:8–13 ("My opponent, the person who was trying to inflict damage on me had, basically, an unlimited budget, had an army of trolls willing to help

them out and that was sort of scarey for quite a long time."); 262:7–9 ("No, but there was a lot of costs. And there was an overhanging threat of bankruptcy.").)

> **Defendants' Response**: Disputed. Dr. Brodkin's contemporaneous messages belie the asserted fear: within days after the Defamation Action was filed, he wrote, "Nay, this is our big break," and in February 2023 he wrote, "Scary but I am not scared." (PX 11 (L. Brodkin Dep. Tr.) at 67:21–70:8, 84:10–12.)

523. The Defamation Action led Dr. Lisa Brodkin to become furious with Dr. Brodkin and to fear that the family would lose its financial security. (PX 10 (L. Brodkin Dep.) at 90:4–12 ("So when he did get sued, I was furious on him. I felt that he put our family in harm's way and angry. I was fearful and I thought we were going to lose everything. I ultimately — my anger was with Cassava for doing this, suing us for two billion dollars. They were really the source of my anger, but I took it all out on Jesse rightfully or wrongfully."); 88:22–89:12 ("We were sued for two billion dollars. Like I don't have — Jesse and I do not have two billion. We have a very modest income family. We are being sued by a billion-dollar company. That is terrifying and someone suing you for two billion dollars, to me, that person wants you to wipe you off the map and they want to take everything from you. That is how it felt for me. Cassava wanted to take everything from us and our family. And I was terrified. ... I was terrified and we argued about it."); 88:9–11 ("I feel like we were continuing to argue, fight, talk about divorce, talk about — we had — it was an ongoing issue."); 88:12–19 ("I think maybe what he is referring to is 'Don't talk about it,' is we probably — we could not talk about the case without it erupting into a horrible fight. So we maybe tried — we tried to maybe to keep the peace, we tried not to talk about it but so, but it was not like — we were still having terrible disagreements.").)

**Defendants' Response**: Undisputed that Dr. Lisa Brodkin so testified; the cited testimony appears in PX 11, not PX 10. Dr. Lisa Brodkin testified that, before the Defamation Action was filed, she was afraid Dr. Brodkin would be sued because his tweets were "obnoxious and occasionally inflammatory," and, asked why she believed he had put the family "in harm's way," answered: "Tweets. Obnoxious tweets." (PX 11 (L. Brodkin Dep. Tr.) at 55:4–56:11, 90:13–15.) Disputed insofar as the paragraph implies that Dr. Brodkin suffered emotional distress as a result of the Defamation Action. *See* Defendants' Response to Paragraph 519.

524. The Defamation Action caused Dr. Lisa Brodkin to fear that the family would lose the money they had saved in trust for their son with special needs. (PX 11 (L. Brodkin Dep.) at 92:7–12 ("Then this lawsuit came and I thought they were going to take away that money and I was distraught and I am still suffering that pain that I felt of having my son's money being taken away. It was literally terrifying to me.").)

**Defendants' Response**: Undisputed that Dr. Lisa Brodkin so testified. Disputed insofar as the paragraph implies that Dr. Brodkin suffered emotional distress as a result of the Defamation Action. *See* Defendants' Response to Paragraph 519.

525. Dr. Lisa Brodkin's decision to terminate Dr. Brodkin's access to her income led to tension between them. (PX 11 (L. Brodkin Dep.) at 92:19–93:1 ("I opened up another account solely in my name for my earnings to go into that account. That created horrible tension amongst Jesse and I. Jesse and I, the way that we handle our finances now has been altered. The pain for this has been a hardship.").)

**Defendants' Response**: Undisputed that Dr. Lisa Brodkin so testified. Disputed insofar as the paragraph implies that Dr. Brodkin suffered emotional distress as a result of the Defamation Action. *See* Defendants' Response to Paragraph 519.

526. The Defamation Action caused Dr. Lisa Brodkin to put plans for her own retirement on hold indefinitely. (PX 11 (L. Brodkin Dep.) at 93:2–8 ("I was nearing — I was hoping to retire in the near future. I was starting to plan for that. I have been working really hard for that for many years. When this lawsuit happened, I had to stop planning for retirement. I don't know when I could stop working now.").)

**Defendants' Response**: Undisputed that Dr. Lisa Brodkin so testified. Disputed insofar as the paragraph implies that Dr. Brodkin suffered emotional distress as a result of the Defamation Action. *See* Defendants' Response to Paragraph 519.

527. The Defamation Action led Dr. Lisa Brodkin to be uncertain whether her marriage will survive. (PX 11 (L. Brodkin Dep.) at 93:12–15 ("I hope our marriage will survive. I love Jesse but I know we can resolve my resentment, but time will tell, but it is scary."); 86:16– 87:3 ("I mean we fought endlessly passed, beyond the first two months. Perhaps there was some reprieve knowing that some of our legal bills might be covered, but it's not like we were not doing well by any means. . . . Um, our finances. . . . Um, that we were going to be declaring bankruptcy.").)

**Defendants' Response**: Disputed for the reasons stated in response to Paragraph 519. Dr. Lisa Brodkin attributed the risk to the family to Dr. Brodkin's "obnoxious tweets," which she had asked him not to post, and testified that his post asking to be named in the Defamation Action is "something that we still fight about to this day." (PX 11 (L. Brodkin Dep. Tr.) at 65:17–67:17, 90:13–18.) Dr. Brodkin and Dr. Lisa Brodkin have been married for 25 years and remain married. (Id. at 8:8–10; PX 10 (Brodkin Dep. Tr.) at 271:18–19.)

528. Cassava has maintained throughout this lawsuit that the Defamation Action had a substantial basis in fact and law. (PX 251 (Dkt. 91, Cassava Answer) at ¶ 15 ("Cassava denies all liability for the claims alleged in the First Amended Complaint and denies that the Plaintiffs are entitled to any relief whatsoever"); id, Tenth Aff. Def. ("Plaintiffs' claims are barred because the statements alleged by Cassava as the basis for the Defamation Action were false, defamatory statements, including statements constituting defamation per se, and thus do not constitute protected speech.")

**Defendants' Response**: Undisputed.

529. Barbier has maintained throughout this lawsuit that the Defamation Action had a substantial basis in fact and law. (PX 253 (Dkt. 118, Barbier Answer), Fifth Aff. Def. ("Plaintiffs' claims are barred because the statements alleged as the basis for the Defamation Action were false, defamatory statements, including statements constituting defamation per se, and thus do not constitute protected speech.")

**Defendants' Response**: Undisputed.

530. Dr. Burns has maintained throughout this lawsuit that the Defamation Action had a substantial basis in fact and law. (PX 252 (Dkt. 107 (Burns Answer)), Fifth Aff. Def. ("Plaintiffs' claims are barred because the statements alleged as the basis for the Defamation Action were false, defamatory statements, including statements constituting defamation per se, and thus do not constitute protected speech."). Dated: September 14, 2026

**Defendants' Response**: Undisputed.

Dated: October 5, 2026

Respectfully submitted,

/s/ *Monica K. Loseman*
Monica K. Loseman (NY Bar No. 6100671)
Mylan L. Denerstein (NY Bar No. 2620730)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
MLoseman@gibsondunn.com
MDenerstein@gibsondunn.com

M. Scott Campbell (admitted pro hac vice)
John Turquet Bravard (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
Telephone: 303.298.5700
SCampbell@gibsondunn.com
JTurquetBravard@gibsondunn.com

*Attorneys for Defendant Cassava Sciences, Inc.*

/s/ *Douglas W. Greene*
Douglas W. Greene
Aric H. Wu
Zachary R. Taylor
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200
dgreene@bakerlaw.com
awu@bakerlaw.com
ztaylor@bakerlaw.com

*Attorneys for Defendants Remi Barbier and Lindsay Burns*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on October 5, 2026, a true and correct copy of the foregoing document was served electronically on counsel through the ECF filing system.

*/s/ Monica K. Loseman*
Monica K. Loseman